## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| **LAMONTE MCINTYRE &** | ) | |
| **ROSE LEE MCINTYRE,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | |
| | ) | |
| **UNIFIED GOVERNMENT OF** | ) | Case No. 2:18-cv-02545-KHV-KGG |
| **WYANDOTTE COUNTY AND** | ) | |
| **KANSAS CITY, KANSAS;** | ) | |
| **DETECTIVE ROGER GOLUBSKI;** | ) | |
| **DAPHNE R. HALDERMAN, AS** | ) | |
| **SPECIAL ADMINISTRATOR OF THE** | ) | |
| **ESTATE OF DETECTIVE JAMES** | ) | |
| **MICHAEL KRSTOLICH, DECEASED;** | ) | |
| **DETECTIVE DENNIS WARE;** | ) | |
| **OFFICER JAMES L. BROWN;** | ) | |
| **DAPHNE R. HALDERMAN, AS** | ) | |
| **SPECIAL ADMINISTRATOR OF THE** | ) | |
| **ESTATE OF LIEUTENANT DENNIS** | ) | |
| **OTTO BARBER, DECEASED;** | ) | |
| **DETECTIVE CLYDE BLOOD;** | ) | |
| **DETECTIVE W.K. SMITH; DAPHNE** | ) | |
| **R. HALDERMAN, AS SPECIAL** | ) | |
| **ADMINISTRATOR OF THE ESTATE** | ) | |
| **OF LIEUTENANT STEVE CULP,** | ) | |
| **DECEASED, all in their individual** | ) | |
| **capacities,** | ) | |
| | ) | |
| **Defendants.** | | |

## SECOND AMENDED COMPLAINT AND JURY DEMAND

The Plaintiffs Lamonte McIntyre and Rose Lee McIntyre, by and through their attorneys,

Neufeld Scheck & Brustin, LLP, Lathrop Gage LLP, and Morgan Pilate, LLC, allege:

## INTRODUCTION

1.      For decades, the Kansas City Police Department (KCKPD) permitted Detective

Roger Golubski to terrorize an entire community—by using his badge to extort sexual favors

from poor black women and by coercing and manipulating those women into providing

fabricated evidence to close his cases. With the full knowledge of KCKPD supervisors, including

his former partner, current KCKPD police chief Terry Zeigler, Golubski forced his victims to

submit to sexual acts, through physical force or with threats of arrest or harm to them or their

loved ones. He also manipulated his victims by promising favors, like clearing arrest warrants, or

by providing illegal drugs to those who were addicted. Golubski's practice was to gain leverage

over vulnerable women and force them to provide fabricated information that he would use to

close cases without any proper investigation. Throughout the community, and among the women

he manipulated, Golubski had a reputation for being corrupt and for "putting cases on people."

2.      Plaintiffs Lamonte McIntyre and Rose Lee McIntyre were two of Golubski's

many victims. Golubski and the other Defendants caused Lamonte to be convicted of an

execution-style double-murder he did not commit and spend 23 years in prison before the

District Attorney labeled the case a "manifest injustice" and dropped all charges.

3.      The McIntyres' nightmare began several years before the 1994 double homicide,

when Golubski forced Rose McIntyre to submit to a sexual act by threatening to arrest both her

and her then-boyfriend. Rose, a working single mother raising five children, had never been

arrested and unwillingly endured his assault out of fear. But Golubski wanted more—a long-term

sexual arrangement. He harassed her for weeks, calling her two or three times a day. Rose was

afraid to confront him and say "no," so she got rid of him by moving and changing her phone

number.

2

4.      In retaliation for Rose rejecting his sexual advances—among other improper motives—Golubski subjected Rose to a more extreme form of torment. With the help of the other Defendants, he framed her son Lamonte, then 17 years old, for a double murder.

5.      In April 1994, a drug enforcer known as "Monster" murdered two men in a parked car on a residential street in Kansas City, Kansas. (One of Monster's drug bosses has since admitted under oath that Monster was the killer, and that account has been corroborated by others.) Instead of investigating the crime, which would have easily turned up evidence of Monster's involvement, Golubski and other Defendants fabricated false evidence implicating innocent Lamonte. Defendants made no effort to look for the murder weapon, the getaway car, or any other evidence that would point to the real killer. Instead, Defendants arrested Lamonte a mere six hours after the crime on the basis of one coerced, demonstrably false identification.

6.      Shortly after the shooting, Golubski and a partner, Defendant James Krstolich, used coercion or suggestion to pressure a witness who lived down the street to identify Lamonte McIntyre in a photographic lineup. The witness, Ruby Mitchell, knew Golubski and feared him. On the way to the police station, Golubski made threatening sexual comments. Ruby Mitchell succumbed to the detectives' pressure and gave a brief taped statement falsely identifying McIntyre's photo from an unduly suggestive array. Golubski and Krstolich also fed Mitchell Lamonte McIntyre's name and pressured her to misrepresent that she knew McIntyre and that his name had originated with her. Based solely on this false identification, Lamonte was arrested six hours after the homicides. Years later, the witness admitted that Lamonte McIntyre did not resemble the real killer.

7.      The day after the shooting, Golubski and another detective, Defendant Dennis Ware, used coercion and improper suggestion to manipulate a second eyewitness, Niko Quinn, to

falsely identify Lamonte. She initially refused to lie for the detectives. Approximately a week or two later, Golubski isolated Niko Quinn in his police car behind a high school and used improper coercion or suggestion to get her to identify Lamonte from a photograph. Golubski wrote no report on this identification and did not document this irregular meeting in any way. When the witness later tried to truthfully retract her false identification—because Lamonte looked nothing like the true perpetrator—Golubski and the prosecutor threatened her. Terrified and feeling she had no choice, Quinn succumbed to Defendants' demands and falsely identified Lamonte as the shooter at trial.

8.      From the moment of her son's arrest six hours after the shooting, Rose's life descended into horror. She knew her son had been with his aunt and cousins at the time of the shooting. She begged detectives to conduct a "ballistics" or gunshot residue test on her son, but they refused. She invited them to search her home, but they did not. Instead, one of Golubski's supervisors, Dennis Barber, lied and reported that Rose had attempted to provide a false alibi for her son and made other statements that tended to incriminate him. Rose made none of the statements attributed to her, but Defendants sent Lamonte to prison using what they falsely claimed were her words.

9.      Although even a cursory investigation would have quickly exonerated Lamonte, Defendants either deliberately failed to investigate or deliberately buried the obvious evidence pointing to Monster, the true killer, and his bosses in a notorious neighborhood drug ring.

10.      For example, a third eyewitness, Stacy Quinn, instantly recognized Monster as the shooter, but there is no record of any interview with her, even though another witness (her mother) told police she knew who the suspect was.  Golubski's police report stated simply that she was "not available" even though he had a longstanding sexual relationship with her and saw

her several times a week. Either Golubski and the other Defendants simply failed to ask Stacy who she had seen, or, more likely, she told them, and they buried it.

11.     Defendants also failed to take many other basic investigative steps. Despite an abundance of physical evidence, Defendants either knowingly failed to conduct even the most basic forensic testing—including comparing Lamonte's fingerprints to those lifted off the outside of the victims' car or testing his clothing for gunpowder—or they buried the exculpatory results of such testing. Defendants did not seize Lamonte's shoes or clothing, a remarkable failure in a close-range shooting that blasted broken glass and blood everywhere. Detectives made no effort to look for a getaway car or the shooter's accomplice, and they did not seek a search warrant for Lamonte's home or any other place. Instead, they arrested him after obtaining less than 20 minutes of taped witness interviews.

12.     With no physical evidence tying him to the crime, Lamonte was convicted by the false and fabricated testimony of the two unreliable, coerced eyewitnesses. There was no evidence of motive and no evidence that Lamonte even knew the two victims.

13.     A year and a half after Lamonte's trial, Niko Quinn stated in an affidavit what she had told many others—that she lied under police pressure. She retracted her false identification and truthfully attested that Lamonte looked nothing like the real killer. Stacy Quinn, who had seen the shooting and immediately recognized Monster as the perpetrator, also came forward to exonerate Lamonte, and testified in a post-trial hearing. On the basis of misrepresentations by the defendant officers, the Court denied relief.

14.     Lamonte and Rose continued to fight his convictions and ultimately won an evidentiary hearing on the basis of new evidence of innocence, including affidavits from two of Monster's drug associates implicating him in the murders.

15.     On the basis of evidence presented at that hearing, the District Attorney declared Lamonte's conviction a "manifest injustice." He asked the judge to grant a new trial, then immediately moved to dismiss the case. Lamonte was freed on October 13, 2017, after spending 23 years in prison for a crime he had no knowledge of and nothing to do with.

16.     Lamonte and Rose now sue Defendants for the unconstitutional misconduct that caused Lamonte's arrest and conviction and the harm they both suffered as a consequence.

## JURISDICTION AND VENUE

17.     This action is brought under 42 U.S.C. § 1983 and state law to redress the deprivation under color of law of Lamonte and Rose McIntyre's rights as secured by the United States Constitution.

18.     This Court has jurisdiction of this action under 28 U.S.C. §§ 1331 and 1367.

19.     Venue is proper under 28 U.S.C. § 1391(b) and (c). On information and belief, all parties reside in the District of Kansas, and the events giving rise to the claims asserted herein all occurred within this district.

## THE PARTIES

20.     Plaintiff **Lamonte McIntyre** is a 42-year-old resident of Kansas City, Kansas.

21.     Plaintiff **Rose Lee McIntyre** is a 64-year-old resident of Kansas City, Kansas.

22.     Defendant **Unified Government of Wyandotte County and Kansas City, Kansas,** is the successor of the municipality, the City of Kansas City, Kansas. The Unified Government was created by and established under the law of the State of Kansas in 1997. It is authorized to sue or be sued in its own name. Its headquarters is located at 701 N. 7th Street, Kansas City, Kansas. The City of Kansas City, Kansas, is a subdivision of the Unified Government and is located within Wyandotte County.

6

23.     Defendant **Roger Golubski** was, at all times relevant to this complaint, a duly appointed and active detective of the KCKPD acting within the scope of his employment and under color of law pursuant to statutes, ordinances, regulations, policies, customs, and usage of the City of Kansas City, Kansas, and its successor the Unified Government of Wyandotte County and Kansas City, Kansas as well as the State of Kansas. Upon information and belief, he is entitled to indemnification under statute and by contract. He is sued in his individual capacity.

24.     Defendant **Daphne R. Halderman** is the special administrator of the **Estate of James Michael Krstolich**, who was, at all times relevant to this complaint, a duly appointed and active detective of the KCKPD acting within the scope of his employment and under color of law pursuant to statutes, ordinances, regulations, policies, customs, and usage of the City of Kansas City, Kansas, and its successor, the Unified Government of Wyandotte County and Kansas City, Kansas, as well as the State of Kansas. Upon information and belief, he is entitled to indemnification under statute and by contract. He is sued in his individual capacity.

25.     Defendant **Dennis Ware** was, at all times relevant to this complaint, a duly appointed and active detective of the KCKPD acting within the scope of his employment and under color of law pursuant to statutes, ordinances, regulations, policies, customs, and usage of the City of Kansas City, Kansas, and its successor, the Unified Government of Wyandotte County and Kansas City, Kansas, as well as the State of Kansas. Upon information and belief, he is entitled to indemnification under statute and by contract. He is sued in his individual capacity.

26.     Defendant **James L. Brown** was, at all times relevant to this complaint, a duly appointed and active officer of the KCKPD acting within the scope of his employment and under color of law pursuant to statutes, ordinances, regulations, policies, customs, and usage of the City of Kansas City, Kansas, and its successor, the Unified Government of Wyandotte County and

Kansas City, Kansas, as well as the State of Kansas. Upon information and belief, he is entitled to indemnification under statute and by contract. He is sued in his individual capacity.

27.     Defendant **Daphne R. Halderman** is the special administrator of the **Estate of Dennis Otto Barber**, who was, at all times relevant to this complaint, a duly appointed and active lieutenant of the KCKPD acting within the scope of his employment and under color of law pursuant to statutes, ordinances, regulations, policies, customs, and usage of the City of Kansas City, Kansas, and its successor, the Unified Government of Wyandotte County and Kansas City, Kansas, as well as the State of Kansas. Upon information and belief, he is entitled to indemnification under statute and by contract. He is sued in his individual capacity.

28.     Defendant **Clyde Blood** was, at all times relevant to this complaint, a duly appointed and active detective of the KCKPD acting within the scope of his employment and under color of law pursuant to statutes, ordinances, regulations, policies, customs, and usage of the City of Kansas City, Kansas, and its successor the Unified Government of Wyandotte County and Kansas City, Kansas as well as the State of Kansas. Upon information and belief, he is entitled to indemnification under statute and by contract. He is sued in his individual capacity.

29.     Defendant **W.K. Smith** was, at all times relevant to this complaint, a duly appointed and active detective of the KCKPD acting within the scope of his employment and under color of law pursuant to statutes, ordinances, regulations, policies, customs, and usage of the City of Kansas City, Kansas, and its successor the Unified Government of Wyandotte County and Kansas City, Kansas as well as the State of Kansas. Upon information and belief, he is entitled to indemnification under statute and by contract. He is sued in his individual capacity.

30.     Defendant **Daphne R. Halderman** is the special administrator of the **Estate of Steve Culp** who was, at all times relevant to this complaint, a duly appointed and active

lieutenant of the KCKPD acting within the scope of his employment and under color of law pursuant to statutes, ordinances, regulations, policies, customs, and usage of the City of Kansas City, Kansas, and its successor the Unified Government of Wyandotte County and Kansas City, Kansas as well as the State of Kansas. Upon information and belief, he is entitled to indemnification under statute and by contract. He is sued in his individual capacity.

31.     Defendants **John Doe Officers 1–10** were, at all times relevant to this complaint, duly appointed and active officers of the KCKPD acting within the scope of their employment and under color of law pursuant to statutes, ordinances, regulations, policies, customs, and usage of the City of Kansas City, Kansas, and its successor the Unified Government of Wyandotte County and Kansas City, Kansas as well as the State of Kansas. Upon information and belief, they are entitled to indemnification under statute and by contract. They are sued in their individual capacities.

32.     Defendants **Roger Roe Supervisors 1–10** were, at all times relevant to this complaint, duly appointed and active supervising officers of the KCKPD acting within the scope of their employment and under color of law pursuant to statutes, ordinances, regulations, policies, customs, and usage of the City of Kansas City, Kansas, and its successor the Unified Government of Wyandotte County and Kansas City, Kansas as well as the State of Kansas. Upon information and belief, they are entitled to indemnification under statute and by contract. They are sued in their individual capacities.

## FACTS

**With the full knowledge of the KCKPD, Roger Golubski spent decades terrorizing the black community and coercing sexual acts from vulnerable black women.**

33.     For decades, Defendant Roger Golubski was a dirty cop who used the power of his badge to exploit vulnerable black women, including black women who worked as prostitutes.

9

Beginning as early as the 1980s and continuing for more than two decades, he haunted Quindaro Boulevard and the housing projects in the north end of Kansas City, Kansas, looking for sex.

34.     Golubski arrested, or threatened to arrest, these women, sometimes without cause, and used the threat of prosecution to obtain sexual favors. In other instances, he would use his position in the KCKPD to fix tickets and make warrants disappear in exchange for sex. Though he would sometimes pay his victims with drugs or money, his preferred currency was compulsion.

35.     Golubski's predilections and abuses were well-known among KCKPD officers and supervisors. The squad room openly joked about his mistreatment of black women and the many offspring he was rumored to have fathered by them. It was widely known among KCKPD officers and supervisors that when Golubski went out on calls, he would arrest black prostitutes, force them to give him sex—often at the precinct house itself—and release them without ever pressing charges.

36.     Golubski would often fixate on particular women, harassing them continually for months or even years. Once he gained leverage over a woman, he would demand that she carry out other acts for him.

37.     In particular, once Golubski had established his dominance, he used many of his victims as informants to help him clear cases. KCKPD officers and supervisors came to expect that the women they called Golubski's "girls" would provide critical evidence leading to convictions in many of Golubski's investigations. These officers and supervisors knew that the information coming from Golubski's informants was unreliable because it was the product of his coercive relationships.

38.     Golubski worked closely with Kansas City, Kansas, drug kingpins to protect their interests. In exchange for money or drugs (which he would use to buy sex), Golubski fixed investigations, including by making cases and witnesses disappear and framing innocent people for crimes committed by the drug gangs. Golubski's relationship with the drug underworld was also widely known in the KCKPD.

39.     Golubski never sought to conceal his misconduct from KCKPD officers and supervisors. Although Golubski's corruption was common knowledge at the KCKPD, he was never reprimanded and was instead promoted, becoming a captain before his retirement. The few KCKPD officers who were disgusted by his misconduct kept quiet to avoid retaliation—Golubski had powerful friends in the department, including the current chief, his former partner Terry Zeigler.

40.     Since Golubski's retirement, however, several current and former KCKPD officers have blown the whistle on his misconduct. At least two KCKPD officers have given sworn statements describing Golubski's exploitation of vulnerable black women and the permissive or collusive supervision at the KCKPD that allowed him to get away with it.

41.     Plaintiff Rose McIntyre was one of Golubski's victims. One night in the late 1980s, Rose was sitting in a car with her former boyfriend when Golubski pulled up from behind and demanded that she accompany him to his unmarked squad car. There, Golubski threatened to cause trouble for Rose and her boyfriend if she did not allow him to perform oral sex. Rose, a single mother to five children, had never been arrested before and understandably feared Golubski's badge. Following Golubski's instructions, she went to the police station the next night, where officers on duty brought her directly to Golubski's office. Golubski again threatened Rose with arrest unless she allowed him to perform oral sex.

42.     During the ensuing sexual assault, a KCKPD officer opened Golubski's office door, saw what was happening, and left without saying anything. Although Golubski assaulted Rose in a station full of police officers, nobody intervened.

43.     After Golubski assaulted Rose, he harassed her for weeks, calling her two or three times a day. He told her that he wanted a long-term relationship and promised to pay her for sex.

44.     Rose repeatedly rejected Golubski's advances, but his harassment did not stop. She was forced to move to a new home and change her telephone number to avoid him.

45.     By moving, Rose thought that she had permanently escaped Golubski and prevented him from ever harming her or her family again. She was wrong. Several years later, Golubski orchestrated the wrongful conviction of her son Lamonte.

## A drug enforcer known as Monster, not Lamonte McIntyre, murdered Doniel Quinn and Donald Ewing.

46.     On April 15, 1994, Neil Edgar Jr., better known as "Monster," murdered Doniel Quinn and Donald Ewing with a shotgun as they sat in a parked car. Monster was a "thundercat," a loyal foot soldier for a Kansas City, Kansas, drug kingpin who killed for money and prestige. The double murder was a planned hit—Monster had been offered $500 to murder Quinn, who was suspected of stealing drugs from a stash house. After the murders, Monster escaped in a dark blue Oldsmobile driven by fellow thundercat Marlon Williams.

47.     Monster's role as the triggerman was widely known among the community. At least one eyewitness knew Monster as the murderer, and two leaders of the drug gang have since sworn under oath that Monster killed Doniel Quinn for money. Yet neither Monster nor Marlon Williams were ever prosecuted for the murders and continued their lives of crime. Monster is currently incarcerated on sentences totaling 33 years for murder and drug offenses; Williams, the accomplice, was shot to death leaving a court appearance in 2014.

48.     Seventeen-year-old Lamonte McIntyre had no knowledge of or involvement in the Quinn and Ewing murders. Unlike Monster, Lamonte was not a paid killer or drug ring enforcer. Lamonte spent the afternoon of the murders as he often did—enjoying the company of his extended family. Five of Lamonte's family members have attested under oath to his whereabouts that day, and family members of the two victims have believed in his innocence throughout the case.

49.     Despite his clear innocence, Defendants caused Lamonte to spend the next 23 years of his life incarcerated for Monster's brutal crimes. Whether to retaliate against Rose McIntyre for spurning his advances, to protect Monster's drug bosses from prosecution, to quickly close a double homicide, or all three, Golubski, his co-investigators, and his supervisors framed Lamonte McIntyre for the crimes.

**Defendants fabricated two false identifications of Lamonte McIntyre.**

50.     Defendant Culp assigned Golubski to investigate the double homicide knowing that Golubski had relationships with female witnesses in the community, including, upon information and belief, witnesses Ruby Mitchell and Stacy Quinn. Based on Golubski's open and notorious sexual relationships with his informants and his long and widely acknowledged history of using sexual domination to cause vulnerable black women to give false evidence, Culp understood that Golubski would use any means necessary, including misconduct, to solve the double homicide. Culp closely monitored the investigation and approved each investigative step—including Defendants' deliberate evidence fabrications.

51.     Ruby Mitchell, a partial eyewitness to the murders, had previously been forced to provide sexual services to Golubski. He had regularly visited her home when she earlier lived in another neighborhood.

52.     Mitchell witnessed the shootings from inside her front door, which was screened. She saw a man walk down a dirt-covered hill in a vacant lot, at an angle across the street, stroll up to the car, and fire his shotgun four or five times. But she was too far away to see his face.

53.     During her first police interview, she described the shooter as a black male in black clothes. Less than an hour later, she gave Defendant Krstolich the killer's height, build, skin tone, hairstyle, and clothing, but could not describe his face, just stating that all she could see was that it was "brown skinned."  Despite extended questioning, she never mentioned recognizing the killer or knowing his name in her initial taped statement.

54.     Lamonte McIntyre looked nothing like the initial description Mitchell gave of the perpetrator. Mitchell described the perpetrator as 5'6"; Lamonte McIntyre was 5'11". And Mitchell described the perpetrator as having "slicked back" French braids, whereas Lamonte McIntyre wore his hair extremely short, cut close to his scalp. Consistent with Mitchell's initial description, true perpetrator Monster was considerably shorter and slighter than McIntyre and wore his hair in slicked back French braids at the time.

55.     Defendants failed to document the distinctive braided hairstyle Mitchell described and later used coercion or suggestion to get her to change her description to "short on the sides and long on top"—the hairstyle McIntyre wore in the photo Mitchell later identified.

56.     Later, Golubski drove Mitchell to the police headquarters for further questioning. While they were alone in his car, Golubski made sexually suggestive comments and veiled threats to gain her cooperation, with the implication that he was setting her up for a solicitation charge if she did not comply.

57.     Shortly after this interaction, Golubski and Krstolich used coercion and suggestion to force Mitchell to falsely identify Lamonte McIntyre as the shooter while showing her a photo

14

array at the precinct. For example, in addition to the coercion implicit in Golubski's threats, the photo array was unduly suggestive. It consisted of only five photographs (instead of the required six), and included photographs of McIntyre and two of his close relatives.

58.     There is no record, documentation, or explanation in any police report as to why Lamonte McIntyre's name or photo was brought into the Ewing-Quinn investigation.

59.     Furthermore, the photo of McIntyre that Mitchell identified was over a year old. In the intervening year, McIntyre's face had matured such that his features differed significantly from his appearance in the photo.

60.     Golubski and Krstolich fabricated a false story to account for why McIntyre had been included in the photo array despite bearing no resemblance to Mitchell's description or any other reason to suspect him, and, second, how Mitchell had identified him by name when she had no connection to or knowledge of Lamonte McIntyre.

61.     According to Golubski and Krstolich, Mitchell stated at the station that she had recognized the shooter as a man named Lamonte—her niece's former boyfriend. They claim that they then showed her five photographs of men named "Lamonte," and she identified Lamonte McIntyre (who had never dated her niece) by his full name.

62.     But this story is demonstrably false. Krstolich and Golubski did not show Mitchell five photographs of men named Lamonte. In fact, Lamonte McIntyre was the only Lamonte among the five photographs they did show, and two of the other photographs were of a brother and a first cousin.

63.     Furthermore, Mitchell identified a photograph of Lamonte McIntyre's face using his first and last name—even though she had not seen the shooter's face and her niece had dated a man named Lamonte *Drain*, who looked nothing like McIntyre. And she did not mention recognizing the

15

shooter during her first police interview. While Mitchell has testified that she forgot this consequential fact, neither she nor Golubski and Krstolich have been able to consistently say *how* or *when* she suddenly recalled recognizing the shooter.

64.     Mitchell's misidentification could not have been an innocent mistake because Lamonte McIntyre looked nothing like the true perpetrator *or* Lamonte Drain. And Mitchell could not have known the name of Lamonte McIntyre, a stranger, unless Golubski and Krstolich had fed it to her. Mitchell's false identification is simply a product of egregious misconduct by Golubski and Krstolich.

65.     Golubski and Krstolich falsely represented in written and oral reports to the prosecution that the identification of McIntyre had originated with Mitchell and failed to disclose to the prosecution, or McIntyre and his defense attorney, the suggestive or coercive circumstances used to obtain the false identification. Lieutenant Dennis Barber, their supervisor, reviewed and approved Golubski and Krstolich's written reports despite reason to know that Mitchell's identification was unreliable and a product of police misconduct.

66.     Barber subsequently reported that he was directly responsible for obtaining Lamonte McIntyre's name and photograph and that he had heard from numerous sources that Lamonte was the perpetrator, a fact that he never previously documented. In fact, Barber had no sources implicating McIntyre and lied to bolster Mitchell's false identification.

67.     The next day, Golubski and Detective Dennis Ware visited eyewitness Niko Quinn, a first cousin of victim Doniel Quinn, and attempted to use coercion and suggestion to elicit a second false identification. Golubski and Ware showed Quinn the same improperly suggestive array they had shown Mitchell. When she could not identify the shooter, Ware pointed to Lamonte McIntyre's photo and showed her his name, indicating that she should choose him, but Quinn still

would not make the false identification. Golubski and Ware falsified details of this identification procedure in written and oral reports to the prosecution and failed to disclose the suggestive and coercive nature of the procedure to McIntyre and his defense counsel. The supervisor of the investigation, Lieutenant Steve Culp, and upon information and belief, Barber, fully reviewed and approved Golubski and Ware's false report.

68.     About a week or so later, Golubski met Niko Quinn alone behind the Wyandotte High School track and used a combination of threats and promises of financial help to coerce Quinn into falsely identifying McIntyre. When she complied, Golubski helped her move to new housing. Either Golubski did not record this interview in a written police report, contrary to KCKPD customs and accepted police practices, or he did make such a report and failed to disclose it. Golubski falsely represented to the prosecution that Quinn had identified McIntyre without coercion or suggestion.

69.     Golubski never disclosed to prosecutors, McIntyre, or his defense counsel that he helped Quinn find a new apartment in exchange for falsely identifying McIntyre.

70.     When Niko Quinn finally saw Lamonte McIntyre for the first time in person at a pretrial hearing, she realized that he could not have been the shooter. He was much taller and had different facial features. She immediately tried to correct her false identification. She personally told prosecutor Terra Morehead that her identification was inaccurate, but the prosecutor believed the retraction was not credible based on Golubski's misrepresentation that Quinn previously had identified McIntyre freely and without coercion.

71.     At some point before trial, Golubski and other unknown officers contacted Niko Quinn through a relative and threatened to take her children away and put her in jail. Knowing that Golubski could and would use his badge to make good on his threats, Quinn testified against McIntyre at trial.

17

72.     In 1996, and again in 2014, Niko Quinn gave sworn recantations of her testimony, declared that McIntyre was not the shooter, and described the coercive and suggestive identification procedures conducted by Golubski and Ware.

**Barber and Golubski fabricated statements they attributed to Rose McIntyre.**

73.     Hours after the first eyewitness, Ruby Mitchell, adopted the initial false identification, but before police had developed any other evidence inculpating Lamonte McIntyre, Barber and Golubski tracked him down and arrested him.

74.     After the arrest, Barber and Golubski prepared police reports falsely claiming that Rose McIntyre had made statements implicating her son in the murders. Barber and Golubski falsely reported that Rose had asked whether a person who killed somebody could be arrested for murder. Barber and Golubski claimed that this statement inculpated Lamonte because nobody had yet told Rose that they were investigating a homicide. The statement, however, was completely fabricated; Rose never said any such thing.

75.     Barber and Golubski also falsely reported that Rose McIntyre had given her son a bogus alibi by falsely claiming that he had been working at a restaurant at the time of the shootings.

76.     Barber and Golubski forwarded their false police report in oral and written form to prosecutors. They did not reveal to prosecutors or to Lamonte McIntyre and his defense counsel that they had falsified the statements attributed to Rose McIntyre.

**Officer James L. Brown fabricated a false statement attributed to Lamonte McIntyre.**

77.     After Lamonte McIntyre was arrested, Defendant James L. Brown drove him back to the police station for booking.

78.     Brown later misreported that Lamonte had given a false alibi during the car ride—
Brown falsely claimed that Lamonte said he had been working at a restaurant when the shooting
happened.

79.     Lamonte never made that statement and consistently told police the truth—that he
was at his aunt's house with his extended family at the time of the shooting. Brown either failed to
accurately document Lamonte's statement in a police report, as required by the KCKPD and
accepted police practices, or he did document the statement and failed to turn it over to the
prosecution.

**Defendants failed to conduct any meaningful investigation of the homicides.**

80.     The entire investigation of the Quinn and Ewing homicides lasted no more than six
hours and involved no bona fide police work. The only evidence Defendants collected against
Lamonte McIntyre was the fabricated identifications made by Mitchell and Quinn. Defendants
obtained no forensic evidence implicating McIntyre—despite an abundance of physical evidence at
the scene—and either failed to interview key eyewitnesses or buried those interviews.

81.     The repeated and egregious violations of accepted investigatory practices in this case
were shocking in their breadth and depth. Real police work would have led to the real killer and
exonerated McIntyre.

82.     Defendants documented that Stacy Quinn, Niko Quinn's sister, and the witness
nearest to the crime, had seen the shooting and, as stated by her mother, could identify the shooter.
Yet, the police file includes no record of an interview with her, and she was not called at trial.

83.     Defendant Smith was one of the first officers on the scene of the double homicide
and did initial interviews with Josephine Quinn and Niko Quinn. Josephine was an aunt of victim
Doniel Quinn, and Niko was Doniel's first cousin.  Niko Quinn told Smith at the scene that she

could identify the shooter, and Josephine told Smith that her other daughter, Stacy Quinn, could also make a positive identification. As Stacy later attested, she immediately recognized the shooter.

84.     On information and belief, Niko Quinn described the shooter in detail to police, including his face, build, and clothing, and the description did not match Lamonte McIntyre.

85.     Nevertheless, Smith conducted a taped interview with her that lasted only four minutes.  Instead of asking Niko about details of the shooter's appearance, such as height or build, he asked her only how the shooter was dressed.   The taped interview also omitted other important details, including that Niko Quinn told police about men associated with a nearby drug house who had recently beaten Doniel. Smith also intentionally did not document Josephine Quinn's statement to him that Stacy could identify the perpetrator.

86.     In the taped interview of Niko, Smith intentionally failed to elicit or follow up on any of the information that would have led away from Lamonte McIntyre and toward the real perpetrator, including developing facts pertaining to the actual shooter's appearance.  The neighborhood where the crime occurred was infested with drug houses, yet Smith never investigated any drug-related lead, despite the fact that Niko told police that men from a nearby drug house had recently beaten up Doniel.

87.     Regarding Stacy Quinn, either Smith deliberately failed to question her to avoid developing evidence that exonerated McIntyre, or he did question Quinn and failed to document her exculpatory statements.  Although Stacy left the scene sometime during the first hour or two following the shooting, she lived directly across the street from the scene and could have been readily located and interviewed at any time in the days following the double homicide.  Smith, like Golubski, was responsible for follow-up interviews.  In fact, the police file explicitly states that

following the initial police response, Culp turned the case over to Detectives Golubski and Smith for any further investigation.

88.    Defendant Blood was also one of the first detectives on the scene of the double homicide He spoke with responding officers and also spoke with Krstolich, who checked in with him when he arrived a short time later.  Along with Detective Maskil, Blood directed or participated in the initial investigative activities, including a brief search for physical evidence.  Despite noting the presence of blood, tissue, and shotgun wads in the victims' car, Blood failed to take steps to have all of the physical evidence properly documented or collected. He also took no steps to document the shooter's specific route down the grassy hill or to direct a proper search for physical evidence in that area, a glaring omission as Ruby Mitchell told police that she saw the shooter drop something on the hill and attempt to pick it up.    Proper collection of the physical evidence in the area would have helped prove the actual shooter's guilt and exonerated McIntyre.

89.    Upon assignment by Lieutenant Culp, Defendant Blood, along with Detective Maskil, then went to both hospitals (Bethany and the University of Kansas Medical Center) to contact family members of the two victims.  Blood interviewed Quinn family members at the hospital, including one who had gone to the scene right after the shooting and had information about the men who had attacked Doniel. Upon information and belief, Blood failed to properly document statements suggesting a motive for Doniel Quinn's murder.

90.    The day after the shooting, Golubski returned to the scene and misreported that he did not interview Stacy Quinn because she was "not available."  Golubski's apparent failure to interview Stacy Quinn defies belief: she was one of his regular victims, a prostitute he terrorized for sex and information. If he *had* interviewed Stacy, she would have named the true perpetrator— Monster, whom she had immediately recognized.

91.    Either Golubski *did* interview Stacy Quinn and buried her statements exculpating McIntyre, or he deliberately avoided asking this key witness any questions that would lead to the true perpetrator.

92.    Defendants also failed to gather or retain forensic evidence. Despite arresting Lamonte McIntyre mere hours after he purportedly murdered two people with a shotgun, Golubski and the other Defendants did not search his home or any other location for the murder weapon. In fact, Golubski and the other Defendants *never* obtained a search warrant for Lamonte's home. Despite the fact that witnesses told police Lamonte had been wearing the same clothes for days, his clothes and shoes were never collected or tested for gunpowder residue or other physical evidence such as glass shards or blood.

93.    Although the KCKPD lifted latent fingerprints from the victims' car, there is no record of Defendants ever comparing those fingerprints to Lamonte's. Either the KCKPD did make that comparison, and suppressed the results when they excluded Lamonte, or they failed to even try—contrary to common sense, KCKPD regulations, and accepted police practices.

94.    Similarly, the KCKPD recovered four shotgun shells but made no apparent effort to lift fingerprints or biological material from them.

95.    Defendants also made no legitimate effort to corroborate Lamonte's alibi. Although Lamonte named at least four witnesses who could attest to his whereabouts during the shooting, the Defendants did not conduct any legitimate investigation into the validity of his alibi. Instead, they made up false statements to make the alibi appear unreliable.

96.    Defendants also made no effort to investigate the accomplice who drove the shooter's getaway vehicle. Nothing in the police file suggests questioning of any witness regarding the accomplice nor any effort to track down his vehicle.

22

97.     The only reason Defendants failed to investigate the accomplice was to avoid undermining their case against McIntyre. The shooter's accomplice could not have implicated McIntyre because McIntyre was not the shooter.

98.     And Niko Quinn—the witness Golubski coerced into making the second false identification of McIntyre after first refusing to identify him—told police that neighborhood drug dealers had recently beaten the murder victim Doniel Quinn, her cousin, just days before the murder and had a motive to harm him, as they thought he had stolen a large amount of crack cocaine from a nearby drug house.

99.     Nevertheless, Defendants failed to investigate the potential involvement of drug gangs in the neighborhood, despite finding a crack pipe in the vehicle the victims were shot in.

**Defendants suppressed and failed to disclose exculpatory evidence.**

100.     Golubski and the other Defendants suppressed and failed to document or disclose the following exculpatory evidence to the prosecutor or the defense: Golubski's sexual relationships with informants and repeated use of improper and illegal investigatory practices; Golubski's longtime sexual relationship with eyewitness Stacy Quinn, and the related fact that the claim in his report that she was "not available" for an interview was false; the suggestive and coercive means used to secure Niko Quinn's pre-trial identification of Lamonte McIntyre; Niko Quinn's report that Doniel had been in a recent dispute with men associated with a drug house and had been beaten by those men; the fact that Defendants Kristolich and Golubski manipulated Ruby Mitchell and fed her the name "Lamonte McIntyre"; the fact that Ruby Mitchell initially reported that the shooter had French braids; Golubski's close relationship with drug dealers who operated in the neighborhood, including Aaron Robinson; the fact that police had a very recent photo of Lamonte McIntyre that established that Lamonte looked nothing like the outdated photo shown to Ruby Mitchell or Niko

Quinn; and a contemporaneous photo of Lamonte Drain which would have shown he and Lamonte McIntyre did not resemble each other.

### Lamonte McIntyre was convicted based on the evidence fabricated and coerced by Defendants; his conviction was vacated more than 23 years later.

101.    On September 29, 1994, the jury convicted Lamonte McIntyre of murdering Doniel Quinn and Donald Ewing based entirely on the evidence fabricated by Defendants: the two false eyewitness identifications and the false inculpatory statements attributed to Lamonte and Rose McIntyre, and without the suppressed exculpatory evidence. On January 6, 1995, Lamonte was sentenced to two consecutive life sentences. Defendants' fabrications and suppression of exculpatory evidence caused Lamonte's conviction.

102.    Lamonte and Rose McIntyre fought continually over the next two decades to prove his innocence through direct appeals, habeas petitions, and post-conviction motions.

103.    In 1996, just over a year after Lamonte's sentencing, Niko and Stacy Quinn both came forward with affidavits attesting to Lamonte's innocence and stating that he looked nothing like the true perpetrator. Niko fully recanted her false trial testimony, and Stacy also testified unequivocally at a hearing that the killer was not Lamonte McIntyre.

104.    But the evidence of Lamonte's innocence was ignored, and the true perpetrators, Monster and his accomplice Williams, were free to continue their lives of crime.

105.    Decades later, Monster and Williams's former employers, drug kingpin Cecil Brooks and drug associate Joe Robinson, swore in affidavits that Monster and Williams had killed Quinn and Ewing in retaliation for Doniel Quinn's suspected drug theft.

106.    Based on this and other new evidence, McIntyre moved again to vacate his conviction. By the second day of a scheduled six-day hearing, the Wyandotte County District Attorney concluded that McIntyre's conviction was a manifest injustice and moved to dismiss the

24

indictment. On October 13, 2017, the District Court of Wyandotte County, Kansas vacated

Lamonte's conviction, and the charges were dismissed.

**The City of Kansas City, Kansas, caused Lamonte McIntyre's wrongful conviction.**

107.    The constitutional violations that caused Lamonte McIntyre's wrongful

conviction were not anomalous or isolated acts of misconduct; they resulted directly from the

KCKPD's customs, policies, patterns or practices.

*KCKPD's Custom, Policy, and Practice of Permitting Officers to Abuse Their Positions*
*to Coerce, Manipulate, Pressure, and Sexually Assault Poor Black Women and, In Turn,*
*to Obtain from Them False and Unreliable Evidence to Assist in Cases*

108.    In 1994, before, and for many years after, the City had a custom and practice of

encouraging or knowingly permitting certain favored officers, including Roger Golubski and

other Defendants, to operate outside of the Department's formal, though oft-ignored, policies and

procedures by engaging in unreliable, improper, and illegal investigative methods. These

officers, including Roger Golubski, exploited and terrorized the inner-city KCK community,

typically referred to as the "north end." In particular, they regularly engaged in improper and

illegal acts to obtain unreliable and often falsified evidence for the purpose of closing cases and

intentionally protected certain notorious drug dealers from arrest by wrongfully arresting other

residents of the community for the dealers' crimes.

109.    Using threats and illegal inducements, Golubski developed a large and

undocumented network of poor, typically drug-addicted black women whom he used as his

"informants." Many of the women were homeless or worked as prostitutes. Golubski used his

position as an officer with the KCKPD to extort sexual acts from them, through use of force,

threats, or improper incentives. For some women, Golubski promised favors connected with his

position with the KCKPD in return for sex: for example, clearing a warrant, getting rid of a

municipal charge, or asking the District Attorney to "go easy" on a family member facing charges. With others, Golubski was more forceful, obtaining sex through physical force or threats to arrest the woman or a member of her family if she did not engage in sexual acts.

110.    The Department's supervisors and commanders not only knowingly permitted Golubski and other officers' misconduct, they endorsed and rewarded it. Supervisors allowed Golubski and other favored officers to use whatever methods they chose to close cases and expended little or no effort to try to determine if the real perpetrator of a crime was arrested.

111.    Supervisors and detectives throughout the KCKPD knew that if they had a difficult case, they could come to Golubski for information because he could coerce his network of informants to say anything. Although Golubski jealously guarded the identities of many of his informants, supervisors and other detectives knew that Golubski had sexual relationships with these women and controlled them with the threat of arrest or other consequences.

112.    Supervisors and detectives throughout the KCKPD also knew that Golubski would abuse his authority to clear warrants and make cases against his informants disappear in exchange for sexual favors and information. Golubski regularly received assistance up and down the chain of command in order to provide those benefits.

113.    To operate his informant network, Golubski used resources from the street, including drugs and money that he regularly stole from lower-level drug dealers and provided to women in exchange for sex and information. Golubski's practice of providing drugs and money to addicted women was well-known to his supervisors. It was also well known in the Department that Golubski rode around in his police vehicle with these women and obtained sexual services while on duty. Supervisors and commanders knowingly permitted these practices because Golubski could be counted on to close cases.

114.   Because the bulk of Golubski's information came from informants who had been coerced or bribed, supervisors and other detectives at the KCKPD knew that it was unreliable. But supervisors and other detectives nonetheless used the information to clear tough cases.

115.   Golubski's misconduct was open and notorious, and he regularly had sex with informants in his KCKPD office and vehicle. Officers, detectives, and supervisors repeatedly walked in on Golubski while he was having sex with informants. Although detectives in the Internal Affairs Bureau learned that Golubski had sex with informants in his office while on duty, they never opened an investigation.

116.   Golubski regularly picked up his informants, including women working as prostitutes, in his official police vehicle. He openly drove those women around KCK, where he was seen by community members and countless officers of the KCKPD, and he openly had sex with informants in his police vehicle.

117.   Golubski worked as an intermediary between KCKPD officers looking for sex and the prostitutes who were under his influence. Like Golubski, his fellow officers would sometimes pay for sex but would also obtain it through compulsion. Golubski's fellow officers followed his lead by openly having sex with prostitutes in their official police vehicles. KCK prostitutes referred to their relationship with Golubski and his fellow officers as "trickin' and tradin'."

118.   At shift changes, officers joked about children that Golubski was reputed to have fathered with prostitutes. When one of Golubski's alleged daughters was arrested, the arresting officer had a courtesy call placed to Golubski to notify him.

119.   Indeed, the custom, policy, pattern, or practice of the KCKPD of allowing Golubski and other officers to exploit vulnerable black women in the community as an

27

investigatory tactic was so widespread, open, and notorious that many people, including KCKPD

detectives, officers, and supervisors—including a former police chief—have attested under oath

that they knew about this misconduct. Indeed, given its open and notorious nature, anyone

familiar with the KCKPD was aware of the issue.

120.    For example, retired officer Ruby Ellington stated in an affidavit: "Golubski made

no secret of his activities. In fact, it was well known in the Department and the community that

he would get sexual favors from prostitutes in his police vehicle while he was on duty" . . .

"Golubski also used his prostitutes as his informants. Once he had leverage or control over them,

he could use them to obtain information for his cases from them, whether that information was

true or not."

121.    Along with Ruby Mitchell, Stacy Quinn, and Rose McIntyre, others who have

been victimized by Golubski are now coming forward with their accounts:

- Golubski met E.A. in the early 1990s while he was investigating a murder at her work place. He became obsessed with her, falsely accused her of being involved with the murder (as a pretense to talk to her), and repeatedly called her at home, once pretending to be a rapist. He stalked her continually until she agreed to marry him if he took care of her financially. She divorced him after learning about his sexual involvement with witnesses. Following the divorce, he stalked her for 10 years. When he later assaulted her in her car, in defiance of an order of protection, the KCKPD refused to discipline him.

- Golubski had a regular relationship with D.L. and used her for sex and information. She knew, as most other women in KCK knew, that when Golubski came around the "Bottoms" in KCK, they either had to provide sexual services to Golubski or get arrested.

- C.R., a prostitute in the early 1990s, tried for a long time to avoid Golubski, but ended up having sex with him on several occasions. Golubski provided protection from arrest in return for frequent sexual favors. In an affidavit, she stated: "I did what I had to do to stay out of jail….I provided him with sexual favors in his vehicle."

- T.B. was the friend of a murder victim whom Golubski attempted to coerce into giving information related to the crime. T.B. knew nothing about the murder, but

28

Golubski interrogated her anyway, frightening her with sexual advances. He later stalked her at home and work.

- Golubski stopped N.H. under the guise that she looked like an aggravated battery suspect. He began paying her for sex and information on a regular basis. Golubski introduced N.H. to other KCKPD officers, who also paid her for sex. When an officer raped her at gunpoint after an arrest, she complained to the KCKPD, but to her knowledge, the officer was never disciplined.

- K.D., who used to sell drugs, encountered Golubski in the course of her dealing in the late 1990s. Although Golubski typically shook down street-level dealers and took their inventory, he sometimes purchased drugs. K.D. once sold crack cocaine to Golubski through an intermediary, and then saw him enter the back room of a house to have sex with the woman who received the drugs. Sometime later, Golubski approached K.D. for sex, telling her that he had "pull" and could get rid of any tickets for her.

122.    The KCKPD's custom, policy, pattern or practice of exploiting vulnerable black women in the community as an investigatory tactic was so widespread, open, and notorious that the Kansas State Legislature's House Judiciary Committee passed a bill criminalizing it. *See* https://www.kansas.com/news/politics-government/article210902319.html. (The bill was later signed into law.)

123.    Golubski and other favored officers also developed close and illicit associations with high-level drug dealers, including Cecil Brooks and Aaron Robinson. These dealers not only sold drugs but protected their turf and business interests through violent acts, including assault, kidnapping, and beatings. Although these acts were well known and sometimes reported to police, the high-level dealers consistently avoided criminal sanctions, because Golubski and other favored officers protected them from arrest and warned them of investigations and planned raids.

124.    Golubski was known to be especially close to Cecil Brooks, and they were often seen speaking together, either in Golubski's car or in a secluded area. Although Cecil Brooks was known throughout the community as an open and notorious dealer of crack cocaine

throughout the 1990s and early 2000s, he largely escaped any criminal consequences. The "protection" provided to Brooks allowed him and other high-level drug dealers to operate large, lucrative drug enterprises and engage in violent acts to protect their interests without criminal consequences. Golubski, in turn, benefitted from his relationship with Brooks and other high-level dealers because they supplied money and drugs Golubski used to operate his network of female informants.

125.    Ellington, a retired officer who served in the vice unit, attested that although she and other officers repeatedly tried to bring charges against Brooks, he was "always clean" when they stopped him, indicating that favored officers in the Department were warning Brooks about investigations.

<em>KCKPD's Custom Pattern and Practice of Improper and Unreliable Investigative<br>Practices, Including Failing to Document or Disclose Exculpatory Evidence</em>

126.    KCKPD also had a custom and practice of permitting Golubski and other favored officers to engage in a wide variety of improper and unreliable investigative practices, including, but not limited to (i) using misleading and improperly suggestive photo lineups; (ii) obtaining identifications through manipulative and coercive means; (iii) feeding information to eyewitness or indicating whom they should identify; (iv) manipulating or coercing witnesses into making false or fabricated statements; (v) failing to document or disclose exculpatory evidence; (vi) failing to document witness statements and instead relying solely on an officer's claims about what the witness said; (vii) failing to gather or analyze critical physical evidence; and (viii) deliberately failing to follow obvious leads or use legitimate and accepted investigative practices. These widespread customs, patterns and practices are evident from the multiple, repeated violations in this case and others.

30

127.    In particular, Golubski repeatedly failed to disclose to the prosecution or defense that he had sexual contact with witnesses, or that the information he obtained from his "informants" was obtained through coercion via the practices described in paragraphs 101 through 114 above.

128.    For example, in 1997, Golubski fabricated a witness statement to pin the unsolved murder of a convenience store customer on Gentry Bolton, who had committed a similar, unrelated murder days earlier. On information and belief, Golubski coerced Irene Bradley to name Bolton as the customer's killer by holding her in custody and refusing to let her leave until she made the false identification. Months later, an eyewitness told Golubski that Bolton was not the shooter, but Golubski suppressed the exculpatory statement from the prosecution and Bolton's defense attorney. It came out only after the trial court ordered production of complete copies of the police file based on obvious Brady violations.

129.    After the district attorney dropped the prosecution of Bolton, Golubski used physical and psychological coercion to force Kevin Martin to confess to the murder, grabbing him by the throat and telling him that he could not leave police custody until he confessed.

130.    The constitutional violations that caused Lamonte McIntyre's wrongful conviction resulted directly from the KCKPD's custom, pattern, and practice of failing to disclose exculpatory evidence, including the failure to disclose the nature of Golubski's relationships with his "informants" and witnesses and the fact that the information provided by those "informants" and witnesses was false and unreliable.

*KCKPD's Custom, Pattern and Practice of Failing to Adequately Supervise and Discipline Problem Officers, Including Roger Golubski*

131.    The constitutional violations that caused Lamonte McIntyre's wrongful conviction also resulted directly from the KCKPD's failure to provide adequate supervision,

31

discipline and training to deter its officers from: (i) physically, mentally and sexually exploiting women in the community and forcing them to become informants; and (ii) using these women to obtain unreliable and falsified "information," including false identifications and statements that could be used to close cases. Defendant KCKPD also failed to provide adequate supervision, discipline, and training to its officers to ensure that officers, including supervisors, met their obligations to report and discipline misconduct by fellow officers.

132.    Golubski's misconduct and illegal acts were widely known at every level of the department. Although Golubski's misconduct was open and notorious, he suffered no significant discipline or repercussions. Instead, he was rewarded with increased responsibility and promotions. When Golubski retired in 2010, he held the rank of Captain.

133.    Throughout his career with the KCKPD, supervisors up the chain of command knowingly permitted Golubski to violate the constitutional rights of citizens with impunity. With little or no check on his conduct, Golubski used the power of his badge to satisfy personal vendettas, protect favored individuals including high-level drug dealers, and frame innocent people for the crimes of others. No supervisor acted to prevent this through appropriate discipline or supervision, and there was no training provided to deter Golubski from his constant and egregious violations of residents' constitutional rights, or to require other officers to report his misconduct.

134.    Because Golubski had operated so openly and for so long without any apparent repercussions, the community viewed him as both enormously powerful and able to commit crimes against them without repercussion. Golubski reinforced the community's belief in his unlimited authority with regular actions of humiliation and exploitation, including:

- Entering at will residents' homes in the low-income projects and threatening to arrest the female resident's boyfriend if she did not have sex with Golubski or

provide information. Sometimes, even the woman's compliance was not enough to deter Golubski from arresting the boyfriend.

- Following black men around the community, harassing and threatening them, and stealing their money and drugs to use with his drug-addicted informants.

- Picking up black women in his police car and openly driving around with them in the community, exposing them as informants and as victims of his sexual assaults.

- Engaging in acts of humiliation, including an incident recalled by affiant Gregory Wilson, who described how Golubski once conducted a search of a man's groin by forcing him to drop his pants and lift his testicles in front of a crowd of 20 or 30 people.

- Leading other officers to the "Bottoms" to pick up prostitutes, and hunting for the younger women, those in their 20s and even younger, who were known to be Golubski's favorites and knew they had to comply with the officers' demands for sex or be arrested.

- Acting out of personal animus and targeting particular individuals for retribution, including members of the McIntyre family. After Rose McIntyre rejected Golubski's continued efforts to extort sexual favors, 17-year-old Lamonte was arrested a few years later based on a photo lineup that was stacked with three members of the McIntyre family. A few years later, Golubski threatened yet another member of the McIntyre family, confronting Lamonte's younger brother Jermaine McIntyre on the street and yelling: "You're one of those McIntyres," and "I'm gonna get your fat ass."

135. Golubski's abuses were almost universally known in the north end, yet residents were often afraid to make complaints, fearing harassment, retribution or being falsely arrested.

Residents who *did* complain found that their complaints went nowhere. For example:

- Rose McIntyre went to the KCKPD Internal Affairs office to complain about Golubski forcing her to submit to a sexual act but was refused the opportunity to file a complaint. The IA investigator told her "our officers don't do things like that." Rose was upset by the officer's statement, as she knew it was false and also knew that at least one witness had seen her with Golubski—another officer who, not knowing what was happening in Golubski's office, had opened the door and seen Golubski with her. The officer did not intervene; he simply backed out and shut the door.

- In the 2000s, another woman was with Golubski in his office when a detective unknowingly opened the closed door and found Golubski with his fly unzipped and his groin not far from the woman's face. Police commanders learned of the incident, but did nothing.

- A detective received a phone call from one of his informants, who told him in an upset tone that he had just seen Golubski up on the north end, buying sexual services from prostitutes.

- Officers often witnessed Golubski leaving decrepit motels and low-income housing projects, where he was known to obtain sexual services from "informants" and other exploited women.

- On one notable occasion, Golubski was spotted in the north end, off duty, under suspicious circumstances. When a nearby patrol officer, acting under orders from his supervisor, pursued him, Golubski fled in his vehicle.

136.     Knowledge of Golubski's misconduct was pervasive throughout the Department. He made little effort to hide his illicit sexual activity, and his fellow officers even joked about him having babies with women in the community. Low-level officers and even supervisors feared complaining about him and believed their complaints would do no good.

137.     For example, Michael Kobe, a retired captain with the KCKPD, reported Golubski's misconduct to his then-supervisor, Major Gary Wohlforth, but the Department did nothing to address the issue. Kobe, who was also Golubski's supervisor at one point, failed to document his concerns in writing, believing based on experience that complaints about Golubski's misconduct would not be taken seriously by those up the chain of command.

138.     Despite the complaints referred to above and the open and notorious nature of Golubski's misconduct, Golubski's Internal Affairs record is minimal. The few complaints that were logged were deemed unsubstantiated, most often because the complainant was deemed "not credible." None of the many officers who witnessed or otherwise became aware of Golubski's sexual activities and his exploitation of drug-addicted and unreliable informants submitted an internal complaint to IA, and there is no record that any supervisor or commander attempted to deter Golubski's sexual exploitation and misconduct. In fact, despite knowledge that his informants were not only sexually exploited but also (in some cases) drug-addicted and

unreliable, Golubski was put in charge of increasingly serious cases, rising to be head of the "major cases."

139.    Throughout Golubski's tenure at the KCKPD, the Department failed to implement adequate policies, training, procedures, and guidelines to: (1) deter sexual activity between officers and witnesses or informants; (2) ensure the physical and emotional safety of informants and protect them from exploitation; and (3) protect the integrity, legitimacy and accuracy of investigations, prosecutions, and convictions. The lack of adequate and appropriate supervision for officers and detectives and the failure to discipline and train officers and detectives to report the misconduct of their colleagues demonstrates a deliberate indifference toward the known risks that individuals would be accused and convicted of crimes that they did not do.

140.    The KCKPD has failed to adequately discipline and train officers, detectives, and supervisors concerning the issue of sexual exploitation, the extreme risks associated with sexual activity between police and informants/witnesses, and immense and foreseeable risk of obtaining false and fabricated evidence as a result of such activity. This failure to discipline and train constitutes deliberate indifference to a substantially certain risk that the constitutional rights of citizens would be violated and that wrongful convictions would almost certainly occur.

141.    The KCKPD, through its encouragement, ratification, and/or approval of the aforementioned policies, customs and/or practices, in spite of their known and obvious inadequacies and dangers, has been deliberately indifferent to the constitutional rights of Lamonte McIntyre and other individuals in the community.

142.    The KCKPD has failed to adequately supervise, discipline and train detectives and officers concerning sexual misconduct with informants and using fabricated and coerced

evidence against innocent individuals. This failure to train constitutes deliberate indifference to a substantially certain risk that wrongful convictions would occur.

143.     The multiple red flags in this investigation, including without limitation the failure to conduct basic investigatory steps, the absence of proper documentation of investigatory steps, the absence of inculpatory information other than dubious eyewitness accounts from two vulnerable women from KCK, the failure to gather or analyze physical evidence, the failure to develop any evidence of motive, and Golubski's prior sexual assault of Rose McIntyre, either did, or should have alerted superiors that this case was part of the pattern of misconduct described in paragraphs 101 through 118 above, that the entire investigation was unreliable, and that the arrest and prosecution of Lamonte McIntyre for these crimes was wrongful.

144.     KCKPD, through its continued encouragement, ratification, and/or approval of the aforementioned policies, customs, and/or practices, in spite of their known and obvious inadequacies and dangers, has been deliberately indifferent to Lamonte McIntyre, and other wrongfully accused individuals' constitutional rights.

## DAMAGES

145.     Lamonte McIntyre spent more than 23 years incarcerated for a crime he did not commit. He must now attempt to make a life for himself without the benefit of those life experiences and resources that normally equip adults for that task.

146.     As a direct result of Defendants' intentional, bad faith, willful, wanton, reckless, and/or deliberately indifferent acts and omissions, McIntyre sustained injuries and damages, which continue to date and will continue into the future, including: loss of freedom for more than 23 years; physical pain and suffering; severe mental anguish; emotional distress; loss of family relationships; severe psychological damage; loss of property; legal expenses; loss of income and

36

career opportunities; humiliation, indignities, and embarrassment; degradation; permanent loss of natural psychological development; and restrictions on all forms of personal freedom including but not limited to diet, sleep, personal contact, educational opportunity, vocational opportunity, athletic opportunity, personal fulfillment, sexual activity, family relations, reading, television, movies, travel, enjoyment, and expression, for which he is entitled to monetary relief.

147.    Additionally, the emotional pain and suffering caused by losing those years has been substantial. During his incarceration, McIntyre was stripped of the various pleasures of basic human experience, from the simplest to the most important, which all free people enjoy as a matter of right. McIntyre missed out on the ability to share holidays, births, funerals, and other life events with loved ones, the opportunity to fall in love, to marry, and the fundamental freedom to live one's life as an autonomous human being.

148.    Because of the foregoing, McIntyre has suffered tremendous damage, including but not limited to physical harm, mental suffering, and loss of a normal life, all proximately caused by Defendants' misconduct. These damages continue to date and will continue into the future.

149.    Rose McIntyre has similarly suffered devastating and ongoing injuries.

150.    Detective Golubski's framing of her son caused grave and irreparable harm to Ms. McIntyre and her family. As a result of her son's years of wrongful incarceration, Ms. McIntyre suffered extreme emotional and psychological devastation, becoming, at times, incapacitated and unable to properly care for her other children as well as experiencing intense depression and anxiety.

151.    As a direct result of Defendants' intentional, bad faith, willful, wanton, reckless, and/or deliberately indifferent acts and omissions, Ms. McIntyre sustained injuries and damages,

37

which continue to date and will continue into the future, including: loss of her son for more than

23 years; physical pain and suffering; severe mental anguish; emotional distress; loss of family

relationships; severe psychological damage; loss of property; legal expenses; loss of income and

career opportunities; humiliation, indignities, and embarrassment.

152.    Because of the foregoing, Ms. McIntyre has suffered tremendous damage,

including but not limited to physical harm, mental suffering, and loss of a normal life, all

proximately caused by Defendants' misconduct.

## CLAIMS FOR RELIEF

## FEDERAL CAUSES OF ACTION

## COUNT I

### 42 U.S.C. § 1983 Malicious Prosecution in Violation of the Fourth and Fourteenth Amendments

*Against Defendants Golubski, Krstolich, Ware, Brown, Barber, Culp, Smith, and Blood*

153.    Plaintiff hereby incorporates by reference all of the foregoing paragraphs.

154.    Defendants, acting individually and in concert, with malice and knowing that

probable cause did not exist to prosecute Lamonte McIntyre for the murders of Quinn and Ewing

intentionally caused McIntyre to be arrested, charged, and prosecuted for those crimes, thereby

violating his clearly established right, under the Fourth and Fourteenth Amendments to the U.S.

Constitution, to be free of prosecution absent probable cause.

155.    Specifically, as described in detail above, Defendants, acting individually and in

concert, fabricated inculpatory evidence and intentionally withheld and misrepresented

exculpatory facts that they knew would have vitiated probable cause against McIntyre and they

knew would have impeached witnesses for the prosecution at trial, including but not limited to

the fact that Defendants coerced or otherwise fabricated two false eyewitness identifications. These actions caused McIntyre's continued confinement and prosecution.

156.     McIntyre is completely innocent of the murders of Quinn and Ewing, and his arrest was not based on probable cause.

157.     The case finally terminated in McIntyre's favor on October 13, 2017, when his conviction was vacated and the charges dismissed.

158.     McIntyre suffered damages arising from his 23 years of wrongful incarceration.

159.     Defendants performed the above-described acts under color of state law, intentionally, with reckless disregard for the truth, and with deliberate indifference to McIntyre's clearly established constitutional rights. No reasonable officer in 1994 would have believed this conduct was lawful.

160.     The acts and omissions by Defendants described in the preceding paragraphs were the direct and proximate cause of McIntyre's injuries because these Defendants knew, or should have known, that their conduct would result in the wrongful arrest, prosecution, conviction, and incarceration of McIntyre.

## COUNT II

**42 U.S.C. § 1983 Deprivation of Liberty without Due Process of Law and Denial of Fair Trial by Fabricating Evidence, Withholding Material Exculpatory and Impeachment Evidence, and Deliberately Failing to Conduct a Constitutionally Adequate Investigation in Violation of the Fourth and Fourteenth Amendments**

*Against Defendants Golubski, Krstolich, Ware, Brown, Barber, and Smith*

161.     Plaintiff hereby incorporates by reference all of the foregoing paragraphs.

162.     Defendants, acting individually and in concert, and within the scope of their employment with the KCKPD, deprived McIntyre of his clearly established constitutional right to due process of law and to a fair trial.

39

163.    Defendants deprived McIntyre on his right to a fair trial by deliberately fabricating false inculpatory evidence and using coercion and/or undue suggestion to obtain false inculpatory witness statements. Defendants then concealed the misconduct that had produced those statements, including but not limited to coercive and suggestive tactics used in witness interviews.

164.    These Defendants deprived McIntyre of his right to a fair trial by withholding material exculpatory and impeachment evidence from prosecutors and defense, including without limitation, exculpatory statements of alleged witnesses prior to their coerced, false statements.

165.    Had Defendants' fabrications and material, exculpatory and impeachment evidence known to them been documented and/or disclosed, they would have tended to prove McIntyre's innocence, cast doubt on the entire police investigation and prosecution, and impeached critical trial testimony. The exculpatory and impeachment evidence withheld by Defendants undermines confidence in the verdict against McIntyre, and the concealment of this evidence deprived McIntyre of a fair criminal trial.

166.    Defendants performed the above-described acts under color of state law, intentionally, with reckless disregard for the truth, and with deliberate indifference to McIntyre's clearly established constitutional rights. No reasonable officer in 1994 would believe this conduct was lawful.

167.    The acts and omissions of Defendants, as described in the preceding paragraphs, were the direct and proximate cause of McIntyre's injuries. These Defendants knew, or should have known, that their conduct would result in McIntyre's wrongful arrest, prosecution, conviction, and incarceration.

## COUNT III

### 42 U.S.C. § 1983 First and Fourteenth Amendment Claim for
### Interference with Family Relationships

*Against Defendant Golubski*

168.    Plaintiffs hereby incorporate by reference all of the foregoing paragraphs and further allege as follows:

169.    Rose Lee McIntyre is the mother of Lamonte McIntyre and was present at the time of his arrest. The individual Defendants knew that Rose was then-17-year-old Lamonte's mother. Rose and Lamonte enjoyed a particularly close relationship and relied on each other for mutual support.

170.    Golubski deliberately targeted Lamonte McIntyre specifically to deprive Rose McIntyre of the company of her son. Golubski wished to retaliate against Rose for refusing his sexual advances.

171.    By wrongfully arresting her son and causing his wrongful incarceration by fabricating inculpatory evidence and suppressing exculpatory evidence, knowing or having reason to know that Lamonte had nothing to do with the crime, Golubski intentionally deprived Rose of her right of familial association with her son. As a result of Golubski's unlawful and intentional actions, Lamonte spent 23 years in prison and his mother was effectively denied a relationship with her son during those years.

172.    Golubski, through his misconduct, deliberately violated Lamonte and Rose Lee McIntyre's clearly established First and Fourteenth Amendment rights to be free from unwarranted government interference with their familial relationships without due process of law. By deliberately targeting Lamonte to retaliate against Rose, Golubski used the power of the

state to drive them apart. No reasonable law enforcement officer in 1994 would have believed that Golubski's actions were lawful.

## COUNT IV

### 42 U.S.C. § 1983 Failure to Intervene

*Against Defendants Krstolich, Ware, Brown, Barber, Smith, Blood, and Culp*

173.     Plaintiff hereby incorporates by reference all of the foregoing paragraphs.

174.     By their conduct and under color of state law, Defendants, acting within the scope of their employment, had opportunities to intervene on behalf of McIntyre to prevent his malicious prosecution and deprivation of liberty without due process of law, but with deliberate indifference, declined to do so.

175.     These Defendants' failures to intervene violated McIntyre's clearly established constitutional right not to be deprived of liberty without due process of law as guaranteed by the Fourth and Fourteenth Amendments. No reasonable police at the times relevant to this complaint would have believed that failing to intervene to prevent these Defendants from fabricating inculpatory evidence or causing McIntyre to be arrested and prosecuted without probable cause, were lawful.

176.     These Defendants' acts and omissions, as described in the preceding paragraphs, were the direct and proximate cause of McIntyre's injuries. Defendants knew, or should have known, that their conduct would result in McIntyre's wrongful arrest, prosecution, conviction, and incarceration.

## COUNT V

**42 U.S.C. § 1983 Civil Rights Conspiracy**

*Against Defendants Golubski, Krstolich, Ware, Brown, Barber, Smith, Blood, and Culp*

177.    Plaintiff hereby incorporates by reference all the foregoing paragraphs.

178.    Defendants Golubski, Krstolich, Ware, Brown,  Barber, Smith,  Blood and Culp, acting within the scope of their employment and under color of state law, agreed among themselves and with others, including the coerced witnesses, to act in concert in order to deprive McIntyre of his clearly established Fourth, Fifth, and Fourteenth Amendment rights to be free from unreasonable searches and seizures, malicious prosecution, coercion, deprivation of liberty without due process of law, and to a fair trial, as well as depriving him of his First and Fourteenth Amendment rights of access to courts and executive clemency.

179.    In furtherance of the conspiracy, each defendant engaged in and facilitated numerous overt acts, including, without limitation, the following:

a.  Defendants Golubski and Krstolich worked in concert with Mitchell to compel fabricated eyewitness testimony falsely implicating McIntyre in the murder of Quinn and Ewing and failed to document and disclose material exculpatory evidence to prosecutors, including, without limitation, the fact that Mitchell's account was false and that the details of her account originated with investigators, not Mitchell;

b.  Defendants Golubski and Ware worked in concert with Niko Quinn to compel fabricated eyewitness testimony falsely implicating McIntyre in the murder of Quinn and Ewing and failed to document and disclose material exculpatory evidence to prosecutors, including, without limitation, the fact that Niko Quinn's

account was false and that the details of her account originated with

investigators, not Niko Quinn;

180.    As a direct and proximate result of Defendants' actions, McIntyre was wrongfully

convicted and imprisoned for more than 23 years and suffered the other grievous damages and

injuries set forth above.

## COUNT VI

### 42 U.S.C. § 1983 Supervisory Liability Claim

*Against Defendants Barber and Culp*

181.    Plaintiff hereby incorporates by reference all of the foregoing paragraphs.

182.    Defendants Golubski, Krstolich, Ware, Brown, Smith and Blood acted with

impunity in an environment in which they were not adequately supervised, disciplined, or trained

by Defendants Barber, Culp or Roger Roe supervisors in this case and as a matter of practice.

183.    Defendants Barber and Culp acted with gross negligence, recklessness, and/or

deliberate indifference to the constitutional rights of citizens by failing to provide adequate

training, supervision, and discipline of the Defendant Officers, and thereby caused the individual

Defendant Officers to deprive McIntyre of his clearly established constitutional rights, including

his rights to be free from false imprisonment, malicious prosecution, and deprivation of liberty

without due process of law, and his right to a fair trial.

184.    Had Defendants Unified Government of Wyandotte, KCKPD, Barber, and Culp

not provided grossly inadequate discipline, supervision and training of the Defendant Officers,

they would not have fabricated inculpatory evidence, failed to disclose exculpatory evidence, and

intentionally and maliciously caused McIntyre to be arrested and prosecuted without probable

cause. Defendants Barber and Culp were directly involved in the investigation of McIntyre and

directly supervised the specific investigative acts taken by the KCKPD officer defendants in this case.

185.    The grossly negligent, reckless, and/or deliberately indifferent conduct of Defendants Barber and Culp supervisors, all under color of state law violated their duty, which had been clearly established by 1994, to supervise Defendant officer, and no reasonable police supervisor by 1994 would have believed that grossly negligent, reckless, and/or deliberately indifferent supervision in the face of actual or constructive notice of misconduct by their subordinate officers was lawful.

186.    As a direct and proximate result of Defendants' actions, Lamonte McIntyre was wrongly convicted and imprisoned for 23 years and suffered the other grievous and continuing damages and injuries set forth above.

## COUNT VII

### 42 U.S.C. § 1983 *Monell* Claim

**Unconstitutional Customs, Policies, and Practices of Defendant Unified Government of Wyandotte County and Kansas City, Kansas**

*Against Defendant Unified Government of Wyandotte County*

187.    Plaintiff hereby incorporates by reference all of the foregoing paragraphs.

188.    Defendant Unified Government was at all times relevant to this Complaint responsible for the polices, practices, and customs of the KCKPD. The Unified Government is the successor entity to the City of Kansas City, Kansas, which employed all of the individual Defendants in 1994.

189.    Defendant Unified Government, by and through its final policymakers, had in force and effect during the investigation of the Quinn-Ewing murders and for years before and after, a policy, practice, or custom of unconstitutional misconduct in serious felony

45

investigations, including, in particular, the encouragement and use of coerced and unreliable witness statements taken by Defendant Golubski and other favored KCKPD officers and Defendants here from vulnerable witnesses through the threat of arrest, physical violence, sexual domination, payment in drugs or money, or other consequences.

190.    Defendant Unified Government, by and through its final policymakers had in force and effect during the investigation of the Quinn-Ewing murders and for years beforehand a policy, practice, or custom of deliberately withholding exculpatory and impeachment evidence from the prosecution and criminal defendants like Lamonte McIntyre in violation of constitutional rights established by *Brady v. Maryland*, 373 U.S. 83 (1963) and *Giglio v. United States*, 405 U.S. 150 (1972). Specifically, KCKPD officials systematically failed to turn over evidence that would undermine the reliability of witnesses who had given false, coerced testimony under the threat of arrest, physical violence, sexual domination, payment in drugs or money, or other consequences,  and KCKPD officials systematically failed to turn over evidence that investigating officers, including but not limited to Golubski, maintained relationships of sexual domination of witnesses in serious felony investigations.

191.    Defendant Unified Government by and through its final policymakers, had in force and effect during the Quinn-Ewing investigation and for years beforehand, a policy, practice, or custom of failing to adequately supervise, discipline and train officers investigating serious felonies.

192.    Final policymakers for the Unified Government had actual or constructive notice of, but repeatedly failed to make any meaningful investigation into charges that KCKPD officers used the misconduct described above to close cases. Final policymakers for the Unified Government also had actual or constructive notice that widespread failures to supervise or

46

discipline officers for misconduct committed during the course of serious felony investigations enabled officers to engage in misconduct without repercussion. The continued adherence to these unconstitutional municipal customs, practices and/or policies amounted to deliberate indifference to the constitutional rights of criminal defendants like Lamonte McIntyre.

193.    Despite repeated opportunities to do so during the Quinn-Ewing investigation and for years beforehand, final policymakers for the Unified Government failed to adequately supervise, discipline, and train officers for failing to use proper and legal investigative tactics by not physically, psychologically, and sexually abusing female informants, coercing those informants to provide false evidence, illegally protecting individuals involved in the illegal drug trade, failing to turn over exculpatory evidence to the prosecution and criminal defendants, and wrongfully pursuing, prosecuting, or convicting innocent individuals to close cases.

194.    The egregious acts of Golubski and other officers were deliberately ignored by KCKPD and the Unified Government as multiple officers and policymakers knew about the misconduct but either encouraged it or turned a blind eye. Final policymakers for the Unified Government knew that failing to act would be substantially certain to result in constitutional violations including, but not limited to the use of false, fabricated or coerced testimony and perjury, false eyewitness reports, fabricated evidence, false identifications, wrongful arrests, malicious prosecutions, and wrongful convictions.

195.    Such unconstitutional municipal customs, practices and/or policies were the moving force behind McIntyre's arrest, prosecution, and 23 years of wrongful incarceration, as well as all the other grievous injuries and damages set forth above.

## STATE LAW CLAIMS

## COUNT VIII

### Malicious Prosecution under Kansas state law

*Against Defendants Golubski, Krstolich, Ware, Brown, Barber, Culp, Smith, and Blood*

196.     Plaintiffs hereby incorporate by reference all of the foregoing paragraphs.

197.     Defendants initiated or continued proceedings against McIntyre without probable cause and with malice. Specifically, they intentionally and knowingly deliberately misrepresented the truth and withheld exculpatory facts from prosecutors that vitiated probable cause, including but not limited to the facts that the incriminating witness statements were fabricated and the product of coercion, and that Defendants fed witnesses nonpublic and false details they did not know and could not have known, because McIntyre is innocent.

198.     The proceedings ultimately terminated in McIntyre's favor on October 13, 2017, when the District Attorney moved for a new trial, then immediately moved to dismiss charges, and McIntyre was then released from prison after more than 23 years of wrongful incarceration.

199.     Defendants committed these acts within the scope of their employment.

200.     As a direct and proximate result of this malicious prosecution, McIntyre sustained the injuries set forth above.

201.     Plaintiffs gave notice to Unified Government of Wyandotte County and Kansas City, Kansas by timely filing a notice of claim under KSA § 12-105b with the Unified Government clerk, and more than 120 days have elapsed without a response.

## COUNT IX

**Respondeat Superior Liability**

*Against Defendant Unified Government of Wyandotte County*

202.     Plaintiffs hereby incorporate by reference all of the foregoing paragraphs.

203.     Defendants were at all times material to this complaint employees of the Unified

Government of Wyandotte County and/or its predecessor, the City of Kansas City, Kansas and

acted within the scope of their employment in committing the misconduct described above.

204.     Defendants' tortious conduct was undertaken while carrying out routine

investigative functions. The conduct was reasonably expected by, and in fact foreseen by,

Defendants' employer.

205.     Defendant Unified Government of Wyandotte County and Kansas City, Kansas, is

liable as principal for all intentional torts committed by its agents.

206.     Plaintiffs gave notice to the Unified Government of Wyandotte County and

Kansas City, Kansas by timely filing a notice of claim under KSA § 12-105b with the Unified

Government clerk, and more than 120 days have elapsed without a response.

## DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38, Plaintiffs hereby demand trial to a jury

on all issues so triable in this action.

## DESIGNATION OF PLACE OF TRIAL

Pursuant to D. Kan. Rule 40.2, Plaintiff requests Kansas City, Kansas as the place of trial.

**WHEREFORE**, Plaintiffs Lamonte and Rose McIntyre pray as follows:

A.  That the Court award compensatory damages to Plaintiffs and against all Defendants,

jointly and severally, in an amount to be determined at trial;

B.  That the Court award punitive damages to Plaintiffs, and against all individual

    Defendants in their individual capacity, in an amount to be determined at trial, that will

    deter such conduct by Defendants in the future;

C.  For a trial by jury;

D.  For pre-judgment and post-judgment interest and recovery of Plaintiffs' costs, including

    reasonable attorney's fees pursuant to 42 U.S.C. § 1988 for all 42 U.S.C. §1983 claims;

    and

E.  For any and all other relief to which Plaintiffs may be entitled.

Date:  September 20, 2019               Respectfully submitted,

                                           */s/ Michael J. Abrams*
                                           William G. Beck #77974
                                         Michael J. Abrams #15407
                                         Alexander T. Brown (admitted *pro hac vice*)
                                         LATHROP GAGE LLP
                                         2345 Grand Boulevard, Suite 2200
                                         Kansas City, MO 64108
                                         Telephone: (816) 292-2000
                                         Facsimile (816) 292-2001
                                         mabrams@lathropgage.com
                                         abrown@lathropgage.com

                                         Cheryl A. Pilate #14601
                                       Morgan Pilate, LLC
                                         926 Cherry Street
                                         Kansas City, MO 64106
                                         Telephone: (816) 471-6694
                                         Facsimile: (816) 472-3516
                                         cpilate@morganpilate.com

Barry Scheck (admitted *pro hac vice*)
Emma Freudenberger (admitted *pro hac vice*)
Richard Sawyer (admitted *pro hac vice*)
Amelia Green (admitted *pro hac vice*)
Neufeld Scheck & Brustin, LLP
99 Hudson Street, Eighth Floor
New York, NY 10013
Telephone: (212) 965-9081
Facsimile: (212) 965-9084
emma@nsbcivilrights.com

Attorneys for Plaintiffs

51