## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

LAMONTE MCINTYRE, et al.,    )
    )
    Plaintiffs,    )
    )
v.    )    **Case No. 2:18-cv-02545-KHV-KGG**
    )
UNIFIED GOVERNMENT OF    )
WYANDOTTE COUNTY AND    )
KANSAS CITY, KS, et al.,    )
    )
    Defendants.    )
    )

### Plaintiffs' Opening Brief in Response to Unified Government's, Defendant Officers', and Golubski's Motions to Dismiss

### NATURE OF THE MATTER BEFORE THE COURT

In 1994, 17-year-old Lamonte McIntyre was convicted by false and fabricated evidence of a crime he did not commit—a grisly double murder carried out by a drug enforcer known as "Monster." McIntyre's conviction was not an accident but rather the result of intentional misconduct by the individual Defendants, officers of the Kansas City, Kansas Police Department (KCKPD). That misconduct included fabricating two false identifications of McIntyre from witnesses through coercion, manipulation, suggestion, and other improper means, fabricating false inculpatory statements and falsely attributing them to McIntyre and his mother, and burying obviously important exculpatory evidence. No legitimate evidence ever implicated McIntyre, and Defendants' fabrications caused him to be wrongfully incarcerated for more than 23 years. In 2017, he was finally exonerated after new evidence of his innocence and of the officers' misconduct emerged, including sworn statements from the men who hired Monster to commit the murders and who stated that McIntyre was completely innocent.

Defendants' misconduct was the predictable result of the KCKPD's egregious failure to supervise and discipline obvious corruption. For decades, the KCKPD tolerated or encouraged Golubski and other officers' blatant abuse of authority to exploit women in Kansas City, Kansas, for sex and false evidence, which KCKPD officers routinely used to close cases. Golubski in particular was known for extorting sex and "information" through threats of arrest, promises of leniency, or offers of money or drugs. Such information was often false, and, indeed, the falsity of it sometimes served the officers' corrupt ends. KCKPD Supervisors supported or turned a blind eye to Golubski's misconduct because they knew he could use his network of "informants"—victims of his abuse—to close tough cases by providing false evidence. After Plaintiff Rose McIntyre refused Golubski's sexual advances, he and the other Defendant KCKPD officers used Golubski's well-established pattern of witness coercion to frame her son Lamonte for the double murder he did not commit. Plaintiffs now sue under 42 U.S.C. § 1983 for the decades of damages caused by McIntyre's wrongful conviction and the deliberate interference with both Plaintiffs' right to familial association.

The law is clear that the extraordinary misconduct alleged here is actionable under § 1983 and not protected by qualified immunity. *See, e.g.*, *Pierce v. Gilchrist*, 359 F.3d 1279, 1293, 1298 (10th Cir. 2004). But Defendants' motions to dismiss attempt to evade this well-settled law, casting a smokescreen of inapplicable legal arguments to distract from the central issues in this case. For example, Defendants completely attempt to conflate Plaintiffs' primary § 1983 fair trial claims—for fabrication of evidence and suppression of exculpatory evidence—with their § 1983 malicious prosecution claim. But Plaintiffs' Complaint shows liability on all three well-established theories of liability, any one of which is enough to proceed to discovery. Defendants repeatedly advance the same timeliness arguments, ignoring settled Supreme Court law holding that claims "attacking the

fact or length of confinement" do not accrue until a wrongful prosecution has concluded. *Heck v. Humphrey*, 512 U.S. 477, 482 (1994) (internal quotations and citations omitted). And ignoring scores of allegations, and the inferences to which Plaintiffs are entitled, Defendants rely on immunity arguments that have been rejected by both federal and state courts. Defendants' motions are meritless and should be denied.

## FACTS

Starting in the late 1970s and continuing for decades, Defendant Roger Golubski was a dirty cop who used his badge to coerce both sex and fabricated witness statements from vulnerable black women, including black women who worked as prostitutes. ¶¶ 1, 33.[1] Golubski would use the threat of arrest—or offers of leniency, like dismissing tickets or fixing warrants— to compel these women to perform sexual favors and to lie for him. ¶ 34. KCKPD officers and supervisors knew about and endorsed Golubski's behavior. ¶¶ 35, 37, 39, 40, 108–110. In particular, it was widely known among KCKPD officers and supervisors that when Golubski went out on calls, he would arrest black prostitutes and force them to give him sex—often in the station house itself. ¶¶ 35, 115. KCKPD officers and supervisors also knew that Golubski would coerce the women they called his "girls" to give false and unreliable evidence that he would use to close cases. ¶¶ 37, 108, 111–114, 120. Supervisors and detectives in the KCKPD were told that if they had a difficult case, they could come to Golubski for information because he could coerce his network of informants to say anything—through the threat of arrest, promises of leniency, gifts of money or drugs, or all three. ¶¶ 111, 113, 120. Rather than being disciplined for abusing his authority, Golubski was rewarded, advancing to the rank of captain before his

---

[1] All paragraph citations Plaintiffs' briefs in response to Defendants' motions to dismiss refer to Plaintiffs' Second Amended Complaint, D.E. 74.

retirement. ¶¶ 39, 111–113, 132, 133. Supervisors and commanders knowingly permitted Golubski's misconduct because, among other reasons, they knew that he could be counted on to close cases—using false witness statements if necessary. ¶¶ 108, 109, 113, 114, 120, 121.

Golubski's misconduct was so open and notorious that KCKPD officers joked about children Golubski was reputed to have fathered with black prostitutes. ¶ 118. Golubski also served as an intermediary between KCKPD officers looking for sex and the prostitutes under his influence—often forcing prostitutes to have sex with other officers, a practice known as "trickin' and tradin'." ¶ 117. Like Golubski, other KCKPD officers would have sex with prostitutes openly in their official vehicles in full view of civilians and other police officers. ¶¶ 117, 120. Golubski also kept close and illicit associations with high-ranking drug dealers, including those who ordered the murder of Doniel Quinn, and Golubski intervened to help them avoid sanctions for their crimes. ¶¶ 123–125. Golubski would ensure that those drug dealers would avoid criminal sanctions by protecting them from arrest and warning them about investigations and planned raids. ¶ 123. In exchange, Golubski received money and drugs that he used to operate his network of coerced female informants. ¶ 124.

Golubski's misconduct repeatedly came to the attention of the KCKPD and was known by the highest levels of the department. ¶¶ 110, 115, 119, 120, 135–138. Officers, detectives, and supervisors repeatedly walked in on Golubski while he was having sex with informants, and detectives in the Internal Affairs Bureau learned that Golubski had sex with informants while on duty—but no action was ever taken against him. ¶¶ 115, 135, 138. Fellow officers, including a former police chief, have attested under oath that they knew Golubski had sex with prostitutes who were also his informants and that their evidence was therefore unreliable. ¶¶ 119, 120, 136, 137. One retired officer stated in an affidavit that Golubski "used his prostitutes as his

4

informants. Once he had leverage or control over them, he could use them to obtain information for his cases from them, whether that information was true or not." ¶ 120. A retired KCKPD captain, who once supervised Golubski, attempted to report Golubski up the chain of command, but was frustrated because supervisors never took allegations against Golubski seriously. ¶ 137. Golubski's misconduct was so notorious that the Kansas State Legislature passed a bill making it a crime for police officers to have sex with informants; it later became law. ¶ 122.

**Plaintiff Rose McIntyre becomes one of Golubski's many victims.**

One night in the late 1980s, Golubski accosted Plaintiff Rose McIntyre while she was sitting in a car with her former boyfriend and demanded that she accompany him to his unmarked squad car. ¶ 41. There, Golubski threatened to cause trouble for Rose and her boyfriend if she did not allow him to perform oral sex on her. *Id.* Rose, a single mother of five, had never been arrested before and understandably feared Golubski's authority. *Id.* Following his instructions, she went to the police station the next night, where officers on duty let her in Golubski's office, and Golubski sexually assaulted her. ¶¶ 41, 42. During the assault, a KCKPD officer opened Golubski's office door, saw what was happening, and left without saying anything. ¶ 42. Like the other officers present in the station that night, he did not intervene. *Id*. After assaulting Rose, Golubski harassed her for weeks, calling daily, begging for a long-term relationship, and offering to pay for sex. ¶ 43. Rose rejected Golubski's advances, but his harassment did not stop. ¶ 44. She was forced to move to a new home and to change her telephone number to avoid him. *Id.* Rose thought she had permanently escaped Golubski, but she was wrong. ¶ 45.

**A drug enforcer known as Monster, not Lamonte McIntyre,**
**murdered Doniel Quinn and Donald Ewing.**

On April 15, 1994, Neil Edgar Jr., better known as "Monster," murdered Doniel Quinn and Donald Ewing with a shotgun in a planned drug hit. ¶ 46. Monster had been promised $500 cash to murder Quinn, who was suspected of stealing drugs from a drug house. *Id.* After the murders, Monster escaped in a dark blue Oldsmobile driven by an accomplice, Marlon Williams. *Id.* At least one eyewitness recognized Monster as the shooter, and his identity was well known to the community. ¶ 47. Two leaders of the drug ring have since sworn under oath that Monster killed Quinn for money, but neither Monster nor his accomplice were ever prosecuted for the crime. ¶¶ 47, 105. Monster is currently incarcerated in Missouri on sentences totaling 33 years for another murder and drug offenses, and his accomplice was shot to death leaving a court appearance in 2014. ¶ 47.

Seventeen-year-old Lamonte McIntyre had no knowledge of or involvement in the murders. ¶ 48. No physical or forensic evidence ever implicated him, and he was convicted solely on the basis of false and fabricated eyewitness testimony. ¶ 12. Unlike Monster, he was not a paid killer or a drug ring enforcer. ¶ 48. McIntyre spent the afternoon of the murders as he often did—enjoying the company of his extended family, five of whom have sworn to his whereabouts that day. *Id.* But, despite his clear innocence, Golubski and the other Defendants caused McIntyre to spend the next 23 years of his life incarcerated for the double murder. ¶ 49. Whether to retaliate against Rose for spurning his advances, to protect Monster's drug bosses, to quickly close a double homicide, or all three, Golubski, his co-investigators, and supervisors framed McIntyre for the murders. *Id.*

### Golubski, Krstolich, and Barber fabricated Ruby Mitchell's
### false identification of Lamonte.

Partial eyewitness Ruby Mitchell had a longstanding coercive sexual relationship with Golubski and had repeatedly provided him with sexual services. ¶ 51. She saw the double murder from an angle across the street, through her screened front door, and was too far away to see the shooter's face. ¶ 52. In her initial police report, she described the shooter generically as a black male in black clothes but did not indicate that she recognized him in any way. ¶ 53. Less than an hour later, she described to Defendant Krstolich the shooter's height, build, skin tone, hairstyle, and clothing, but could not describe his face. *Id.* Again, she did not indicate that she recognized the shooter or knew his name. *Id.* She initially described the shooter as 5'6", with slicked back French braids, a description matching Monster, but not McIntyre. ¶ 54. McIntyre was much taller, at 5'11", and wore his hair close to his scalp. *Id.* Krstolich failed to document that Mitchell initially described the shooter as having a distinctive braided hairstyle, a fact that would have exculpated McIntyre. ¶ 55.

Golubski and Krstolich later used coercion and suggestion to force Mitchell to dramatically change her description of the shooter and to falsely identify Lamonte McIntyre. ¶ 55, 57. While driving Mitchell to the police station, Golubski made sexually suggestive comments and veiled threats, which implied to Mitchell that he would charge her with solicitation if she did not tell him what he wanted to hear. ¶ 56. Golubski and Krstolich then used coercion and suggestion to cause her to falsely identify Lamonte McIntyre from a five-person photo array that also included two of McIntyre's close relatives. ¶ 57.

Lacking a legitimate explanation for how McIntyre's photograph was included in the photo array—despite looking nothing like Mitchell's description of the shooter—Golubski and Krstolich fabricated false evidence to support their decision to include him in the photo array.

¶¶ 58, 60. They claimed that Mitchell told them that she had recognized the shooter as a man named Lamonte—her niece's former boyfriend—and that they showed her five photographs of men named Lamonte, including McIntyre. ¶ 61. They then claimed that Mitchell identified McIntyre (who had never dated her niece) using his first and last name. ¶ 61. But this story is demonstrably false. ¶ 62. The photo array did not include five men named Lamonte—McIntyre was the only Lamonte among the photos—and Mitchell could never have identified McIntyre using his first and last name because she had never met him and did not know who he was. ¶ 63, 64.

Mitchell's misidentification of Lamonte McIntyre could not have been an innocent mistake. He looked nothing like the true perpetrator *or* Lamonte *Drain*, the man who had dated Mitchell's niece. ¶¶ 63, 64. And Mitchell would not have known the full name of McIntyre, a stranger, unless Golubski and Krstolich had provided it to her. ¶ 64.

Defendant Dennis Barber, Golubski and Krstolich's superior, subsequently reported that he had heard from numerous (unnamed) sources that McIntyre was the shooter, but this was another fabrication. ¶ 66. He did not in fact have any sources implicating McIntyre in the murders and was simply lying to support Mitchell's false identification. *Id.* Hours after Mitchell falsely identified McIntyre, but before police had developed any other evidence inculpating him, Barber and Golubski tracked him down and arrested him. ¶ 73.

**Golubski and Ware fabricated Niko Quinn's false identification of McIntyre.**

The day after McIntyre's arrest, Golubski and Ware attempted to use coercion and suggestion to cause eyewitness Niko Quinn to falsely identify McIntyre. ¶ 67. Golubski and Ware showed Quinn the same improperly suggestive photo array Mitchell had seen. *Id.* When she could not identify the shooter, Ware pointed her to McIntyre's photo and showed her his

name, indicating that she should choose him, but Quinn still would not make the false identification. *Id.* Golubski and Ware falsified details of this identification procedure in written and oral reports to the prosecution and failed to disclose the suggestive and coercive nature of the procedure. *Id.* Defendant Steven Culp knowingly reviewed and approved the false report. *Id.*

Later, Golubski met Quinn alone behind a high school track and used a combination of threats and promises of financial help to coerce Quinn into falsely identifying McIntyre. ¶ 68. When she complied, Golubski helped her move to new housing. *Id.* Golubski failed to document this interview, including his threats and promises, and falsely represented to the prosecution that Quinn had identified McIntyre without coercion or suggestion. *Id.* Golubski did not disclose to prosecutors or McIntyre that he helped Quinn find a new apartment in exchange for her false identification. ¶ 69.

When Quinn finally saw McIntyre for the first time in person at a pretrial hearing, she realized that he could not have been the shooter because he was much taller and had different facial features. ¶ 70. She immediately told the prosecutor that her identification was wrong, but, based on Golubski's misrepresentation that Quinn had previously identified McIntyre without suggestion, the prosecutor rejected Quinn's retraction. *Id.* At some point before trial, Golubski and other unknown officers contacted Niko Quinn through a relative and threatened to take her children away and put her in jail. ¶ 71. Knowing that Golubski could and would use his badge to make good on his threats, Quinn testified against McIntyre at trial. *Id.* In 1996, and again in 2014, Niko Quinn gave sworn recantations of her testimony, declared that McIntyre was not the shooter, and described the coercive and suggestive identification procedures conducted by Golubski and Ware. ¶ 72.

**Barber and Golubski fabricated statements they attributed to Rose McIntyre.**

After McIntyre's arrest, Barber and Golubski prepared police reports falsely claiming that Rose McIntyre had made statements inculpating Lamonte. ¶ 74. Barber and Golubski falsely reported that Rose had asked whether a person who killed somebody could be arrested for murder. *Id.* Barber and Golubski claimed that this statement inculpated Lamonte because nobody had yet told Rose that they were investigating a homicide. *Id.* The statement, however, was completely fabricated; Rose never said any such thing. *Id.* Barber and Golubski also falsely reported that Rose McIntyre had given her son a false alibi by falsely claiming that he had been working at a restaurant at the time of the shootings—another statement she never made. ¶ 75. Barber and Golubski reported these fabricated statements attributed to Rose in oral and written reports to prosecutors and did not reveal to prosecutors or McIntyre's defense that they had falsified the statements. ¶ 76.

**Officer James L. Brown fabricated a false statement attributed to Lamonte McIntyre.**

Defendant James Brown misreported that Lamonte McIntyre gave a false alibi immediately after his arrest. ¶ 78. Brown falsely claimed that McIntyre said he had been working at a restaurant when the shooting happened. *Id.* But McIntyre never made that statement; he told Brown the truth—that he had been at his aunt's house with his family at the time of the shooting. ¶ 79. Brown failed to document and report McIntyre's consistent alibi. *Id.*

**Lieutenant Culp assigned Golubski to investigate the double homicide knowing that he would use his exploitative relationships with "informants" to close the case.**

Aware of Golubski's long history of misconduct and knowing that Golubski had sexual relationships with his informants—including Ruby Mitchell and Stacy Quinn—Defendant Culp, the lieutenant in charge of the investigation, assigned him to investigate the double homicide. ¶ 50. Culp understood that Golubski would use any means necessary, including procuring false

statements from coerced witnesses, to close the case. *Id.* Culp closely supervised the case, including knowingly approving false and fabricated police reports. ¶¶ 50, 67.

**Defendant Smith fails to document an exculpatory interview with Niko Quinn.**

Defendant Smith, one of the first officers on the scene of the double murder, did initial interviews with Niko Quinn in which she described the shooter in detail, including his face, build, and clothing. ¶¶ 83–84. Because she was describing Monster, the true perpetrator, the description did not match McIntyre. ¶ 84. Smith failed to document this exculpatory description, and, in a brief taped interview, asked Quinn only how the shooter was dressed. ¶ 85. Defendant Smith also intentionally failed to question Stacy Quinn despite learning that she saw the shooter and knew who he was. ¶¶ 83, 87.

**Defendants deliberately failed to conduct any meaningful investigation of the homicides.**

The entire investigation of the Quinn and Ewing homicides lasted no more than six hours and involved no bona fide police work. ¶ 80. The fabricated identifications made by Mitchell and Quinn were the only evidence Defendants collected against Lamonte McIntyre. *Id.* Defendant Blood obtained no forensic evidence implicating McIntyre—despite an abundance of physical evidence at the scene—and either failed to interview key eyewitnesses or buried those interviews. ¶¶ 80, 88. Golubski also apparently failed to interview Stacy Quinn, Niko's sister and the witness nearest to the crime, despite knowing her as a prostitute whom he regularly terrorized for sex and information. ¶¶ 82, 90. In the alternative, Golubski *did* interview Stacy Quinn, she named the true perpetrator (whom she recognized immediately), and Golubski buried the information. ¶ 90. The KCKPD also apparently failed to compare Lamonte McIntyre's fingerprints to latent fingerprints found on the victims' car or to lift fingerprints or biological material from shotgun shells found at the scene. ¶¶ 93, 94. Nor did Defendants search any location for the murder weapon or make any

effort to identify the shooter's accomplice who drove the getaway vehicle. ¶¶ 92, 96. Remarkably, they sought not a single search warrant, nor did they even collect McIntyre's clothing. ¶ 92. Defendants also failed to investigate the potential involvement of drug gangs despite statements from Niko Quinn that victim Doniel Quinn, her cousin, had recently been beaten by neighborhood drug dealers for stealing from them. ¶ 98. Defendants intentionally failed to take those basic investigatory steps to avoid generating evidence exculpating McIntyre and to cover up their own misconduct. ¶¶ 80, 81, 84, 93, 97.

**Lamonte McIntyre was wrongfully convicted based on false and fabricated evidence; his conviction was vacated more than 23 years later.**

On September 29, 1994, the jury convicted Lamonte McIntyre of murdering Doniel Quinn and Donald Ewing based entirely on the evidence fabricated by Defendants: the two false eyewitness identifications and the false inculpatory statements attributed to Lamonte and Rose McIntyre, and without the suppressed exculpatory evidence. ¶ 101. There was no physical evidence, no motive evidence, and no evidence even suggesting that Lamonte knew the two victims. He was sentenced to two consecutive life sentences. *Id.* Lamonte and Rose McIntyre fought continually over the next two decades to prove his innocence through direct appeals, habeas petitions, and post-conviction motions. ¶ 102. Decades later, Monster's former employers, two highly placed Kansas City drug bosses, swore in affidavits that Monster and his accomplice had killed Quinn and Ewing in retaliation for Quinn's suspected drug theft. ¶ 105. Based on this and other new evidence, the Wyandotte County District Attorney declared McIntyre's conviction a "manifest injustice" and moved to vacate his conviction and dismiss the indictment. ¶¶ 2, 106. On October 13, 2017, the

state court vacated McIntyre's conviction and dismissed the charges. ¶ 106. McIntyre had been

wrongly incarcerated for more than 23 years. ¶ 2.

## QUESTIONS PRESENTED

- Whether Plaintiffs stated a § 1983 fabrication claim by alleging that Defendants Golubski, Krstolich, and Ware deliberately fabricated false eyewitness testimony and that Defendants Barber and Brown deliberately fabricated false witness statements.

- Whether Plaintiffs stated a § 1983 *Brady* claim by alleging that Defendants Golubski, Krstolich, and Ware deliberately suppressed evidence impeaching the only two eyewitnesses to implicate McIntyre in the double murder, that Defendant Smith suppressed key impeachment concerning eyewitness Niko Quinn, and that Barber and Blood suppressed the true contents of their conversations with Rose and Lamonte McIntyre.

- Whether the prosecution's dismissal of McIntyre's indictment based on evidence of his innocence satisfies the favorable termination element of malicious prosecution under § 1983 and Kansas state law.

- Whether Defendants are entitled to qualified immunity for deliberately prosecuting McIntyre with false, fabricated evidence and suppressing exculpatory evidence, when binding case law, including *Pierce*, 359 F.3d 1279, states otherwise.

- Whether Defendants had "arguable probable cause" to prosecute McIntyre when the only evidence against him was false and fabricated.

- Whether Plaintiffs pleaded notice to KCKPD decisionmakers of Golubski's open and notorious, decades-long pattern or practice of manipulating vulnerable black women to give fabricated witness statements.

- Whether Plaintiffs pleaded the personal involvement of supervisor Defendant Barber, who directly fabricated evidence against McIntyre and approved the other Defendants' misconduct, and Defendant Culp, who assigned Golubski to the investigation because he could close the case with false evidence from his network of "informants."

- Whether Golubski has qualified immunity for Plaintiffs' familial association claim when, under clear Tenth Circuit case law, no reasonable officer would have believed it permissible to punish Rose McIntyre's resistance to sexual pressure by wrongfully arresting, prosecuting, and convicting her son of a double murder he did not commit.

## LEGAL STANDARD

A Rule 12(b)(6) motion must be denied if the complaint "pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Bistline v. Parker*, 918 F.3d 849, 863 (10th Cir. 2019) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). At this stage, the Court must accept "a plaintiff's well-pleaded factual allegations as true and determine whether the plaintiff has provided enough facts to state a claim to relief that is plausible on its face." *George v. Urban Settlement Servs.*, 833 F.3d 1242, 1247 (10th Cir. 2016) (internal quotation marks and citation omitted). In determining the plausibility of a claim, the Court must "look to the elements of the particular cause of action, keeping in mind that the Rule 12(b)(6) standard doesn't require a plaintiff to set forth a prima facie case for each element." *Id.* (internal quotation marks and citation omitted). Claims, like many of Defendants' challenges here, that involve "state of mind…are often unsuitable for a Rule 12(b)(6) motion to dismiss." *Juarez v. Utah Dep't of Health-Family Dental Plan*, No. 2:05CV0053 PGC, 2006 WL 2037574, at *1 (D. Utah July 18, 2006); *see also Kocsis v. Sedgwick Cty.*, No. 14-2167, 2015 WL 3776507, at *4–5 (D. Kan. 2015) (holding state of mind may be established through "inference from circumstantial evidence" and arguments concerning state of mind "are better suited at the motion for summary judgment stage").

In addition to the allegations in the complaint, the Court may also take judicial notice of court filings and decisions, but "the documents may only be considered to show their contents, not to prove the truth of matters asserted therein." *Tal v. Hogan*, 453 F.3d 1244, 1264 n.24 (internal quotation marks and citation omitted); *see also Winzler v. Toyota Motor Sales U.S.A., Inc.*, 681 F.3d 1208, 1213 (10th Cir. 2012) (holding the contents of publicly available documents "traditionally qualify for judicial notice, even when the truthfulness of the documents on file is another matter").

Taking judicial notice of publicly filed documents does not require the Court to convert a Rule 12(b)(6) motion into a Rule 56 motion for summary judgment, and doing so is not appropriate here, where no discovery has yet taken place. *See Tal*, 453 F.3d at 1264 n.24; *Sims v. Unified Gov't of Wyandotte Cty.*, 120 F. Supp. 2d 938, 943–44 (D. Kan. 2000) (declining to convert a Rule 12 motion into one for summary judgment because discovery had not "progressed to any tangible degree").

Date:  December 20, 2019                    Respectfully submitted,

                                            LATHROP GAGE LLP


By:   /s/ *Michael J. Abrams*_____
            Michael J. Abrams #15407
            William G. Beck #77974
            Alexander T. Brown (admitted *pro hac vice*)
            Alana M. McMullin (admitted *pro hac vice*)
            2345 Grand Boulevard, Suite 2200
            Kansas City, MO 64108
            (816) 292-2000
            (816) 292-2001 Facsimile
            mabrams@lathropgage.com

            Cheryl A. Pilate #14601
            Lindsay Runnels #78822
            Morgan Pilate, LLC
            926 Cherry Street
            Kansas City, MO 64106
            Telephone: (816) 471-6694
            Facsimile: (816) 472-3516
            cpilate@morganpilate.com

            Barry Scheck (admitted *pro hac vice*)
            Emma Freudenberger (admitted *pro hac vice*)
            Rick Sawyer (admitted *pro hac vice*)
            Amelia Green (admitted *pro hac vice*)
            Neufeld Scheck & Brustin, LLP
            99 Hudson Street, Eighth Floor
            New York, NY 10013
            Telephone: (212) 965-9081
            Facsimile: (212) 965-9084
            emma@nsbcivilrights.com

            *Attorneys for Plaintiffs*