## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

LAMONTE MCINTYRE and            )
ROSE LEE MCINTYRE,              )
                               )
                 Plaintiffs,    )          CIVIL ACTION
                               )
v.                              )          No. 18-2545-KHV
                               )
UNIFIED GOVERNMENT              )
OF WYANDOTTE COUNTY AND         )
KANSAS CITY, KANSAS, et al.,    )
                               )
                 Defendants.    )
_____)

## MEMORANDUM AND ORDER

On September 20, 2019, Lamonte McIntyre and Rose Lee McIntyre sued the Unified Government of Wyandotte County and Kansas City, Kansas ("Unified Government"), Roger Golubski, Dennis Ware, James Brown, Clyde Blood, W.K. Smith and Daphne Halderman (as special administrator of the estates of James Michael Krstolich, Dennis Otto Barber and Steve Culp, who are deceased).[1]  Second Amended Complaint And Jury Demand (Doc. #74).  Plaintiffs allege that defendants arrested, prosecuted and imprisoned Lamonte for a crime that he did not commit, and they bring various claims under 42 U.S.C § 1983 and state law.  This matter is before the Court on Unified Government's Motion To Dismiss For Failure To State A Claim (Doc. #78), Defendant Officers' Motion To Dismiss (Doc. #86) and Defendant Golubski's Motion To Dismiss Plaintiffs' Second Amended Complaint (Doc. #103), all filed October 18, 2019.  For reasons stated below, the Court sustains each motion in part.

---

[1]      Plaintiffs sued in their individual capacities Roger Golubski, Daphne Halderman (as special administrator of the estates of James Michael Krstolich, Dennis Otto Barber and Steve Culp, who are deceased), Dennis Ware, James Brown, Clyde Blood and W.K. Smith.

**Factual Background**

The second amended complaint alleges as follows:

## I.      Golubski's History Of Misconduct

Since the early 1980s, Roger Golubski used his power as a police officer to exploit sex from vulnerable black women in the north end of Kansas City, Kansas.  To do so, he threatened arrest and prosecution, fixed tickets, made warrants disappear and paid money and drugs.  He would often fixate on particular women, harassing them continually for months or even years.  These predilections and abuses were well known among other officers and supervisors within the Kansas City, Kansas Police Department ("KCKPD").  They knew – and even joked about – Golubski's practice of arresting black prostitutes, forcing them to have sex (often at the precinct house itself) and then releasing them without pressing charges.

In addition to sex, Golubski used these women as informants to help him clear cases. Known by other KCKPD officers as "Golubski's girls," the women would provide critical evidence which resulted in convictions in many of Golubski's investigations – evidence which the officers knew was unreliable because it was the product of coercive relationships.  Golubski also worked closely with drug kingpins in Kansas City, Kansas.  In exchange for money or drugs, Golubski fixed investigations, including framing innocent people for crimes that the drug gangs had committed.  Despite this being common knowledge, the KCKPD never reprimanded him.  In fact, before he retired, the KCKPD promoted Golubski to captain.  Although many kept quiet out of fear of retaliation, since his retirement several current and former KCKPD officers have blown the whistle on Golubski's conduct – at least two have given sworn statements which describe the sexual exploitation and the permissive supervision that allowed it to continue.

Rose McIntyre was one of Golubski's victims.  In the late 1980s, Rose was sitting in a car

with her former boyfriend when Golubski pulled up and demanded that she accompany him to his unmarked squad car. There, he threatened to cause trouble for Rose and her boyfriend if she did not allow him to perform oral sex. Rose – a mother of five children who had never been arrested – surrendered to the threat and went to the police station the next night, where other officers took her directly to Golubski's office. There, he renewed his threat. During the ensuing sexual assault, another officer opened Golubski's door, saw what was happening and left without saying anything. For weeks after the assault, Golubski harassed Rose – calling her two or three times a day and telling her that he wanted a long-term relationship and that he promised to pay for sex. Rose repeatedly rejected his advances, but Golubski's harassment did not stop. As a result, Rose had to move to a new home and change her phone number. At the time, she believed that this marked the end of Golubski's terrorizing.

## II.     The Murders Of Doniel Quinn And Donald Ewing

Neil Edgar Jr. – better known as "Monster" – worked for a Kansas City drug kingpin. On April 15, 1994, Monster murdered Doniel Quinn and Donald Ewing with a shotgun as they sat in a parked car. The double murder was part of a planned hit – Monster would receive $500 to murder Quinn, who was suspected of stealing drugs from a stash house. After the murders, Monster escaped in a car driven by Marlon Williams, who also worked for the kingpin. Although Monster's role in the murders was widely known in the community – two leaders of the drug gang have since sworn under oath that he killed Quinn for money – neither Monster nor Williams were ever prosecuted. Monster is currently serving 33 years for an unrelated murder and other drug offenses. In 2014, Williams was shot to death while leaving a court appearance.

Lamonte McIntyre is Rose's son, and was 17 years old when the Quinn and Ewing murders occurred. He did not have any knowledge about or involvement in the murders. When they

transpired, Lamonte was with his family, a fact which five family members have since confirmed under oath.

## III.   The Investigation

Defendants did not conduct their investigations of the Quinn and Ewing murders to bring the guilty parties to justice.  Whether to retaliate against Rose for spurning sexual advances, to protect Monster's drug bosses from prosecution or to quickly close a double homicide, defendants framed Lamonte for crimes that he did not commit.  To do so, defendants fabricated evidence, withheld exculpatory evidence and deliberately chose not to take basic investigative steps which would have exonerated Lamonte.

### A.   False Identification By Ruby Mitchell

Golubski had sexual relationships with two of the eyewitnesses to the murders – Ruby Mitchell and Stacy Quinn.  Knowing that Golubski had had sexual relationships with Mitchell, Stacy Quinn and other women in the community, officer Steve Culp specifically chose Golubski to investigate the double murder.  Based on Golubski's open and notorious practice of soliciting false evidence from these women, Culp understood that Golubski would use any means necessary – including misconduct – to solve the case.  Culp closely monitored the investigation and approved each investigative step, including the deliberate fabrication of evidence.

Mitchell observed the shootings from her front door, but could not identify the killer.  She did, however, provide officer James Michael Krstolich a description of the killer, which did not resemble Lamonte.  Later, Golubski drove Mitchell to the police station for further questioning.  During the car ride, Golubski made sexually suggestive comments and veiled threats to gain her cooperation, with the implication that he would charge her with solicitation if she did not comply.

Shortly after this interaction, Golubski and Krstolich used coercion and suggestion to force

Mitchell to falsely identify Lamonte in a photo array.  The array only had five photos, three of which were Lamonte and two of his close relatives.  Golubski and Krstolich later fabricated a false story to explain why they used the name and photo of Lamonte – who had no connection to the murders – and how Mitchell – who did not know Lamonte – was able to identify him by first and last name.  According to Golubski and Krstolich, Mitchell stated at the station that she had recognized the shooter as a man named Lamonte.  They therefore showed her five photos of men named Lamonte, and she identified McIntyre by his full name.  This story is false for several reasons.  Not only was McIntyre the only "Lamonte" among the five photos, Mitchell could not have identified McIntyre – a complete stranger – by his first and last name.  Indeed, Mitchell could not have identified anyone by his first and last name because she did not recognize the shooter.  Contrary to this fabricated story, Mitchell knew to identify Lamonte because Golubski and Krstolich fed her the information.  Golubski and Krstolich later falsely represented to the prosecution in written and oral reports that the identification had originated with Mitchell.  They did not disclose to prosecution, Lamonte or his defense counsel that the identification was the product of suggestion and coercion.

Lieutenant Dennis Barber – the supervisor of Golubski and Krstolich – reviewed and approved their written reports despite having reason to know that the identification was unreliable and the product of misconduct.  Barber later reported that he was directly responsible for obtaining Lamonte's name and photograph and that he had heard from numerous sources that Lamonte was the killer.  This was a lie to bolster the false identification – Barber had no sources implicating Lamonte.

### B.      False Identification By Niko Quinn

Later, Golubski and detective Dennis Ware visited eyewitness Niko Quinn, and attempted

to use coercion and suggestion to elicit a second false identification.  To do so, they used the same suggestive array that they had showed Mitchell.  When Niko could not identify the shooter, Ware pointed to Lamonte and revealed his name, indicating that she should choose him.  Niko refused, however, to make the false identification.  Golubski and Ware then falsified details of this identification procedure in written and oral reports to the prosecution, and failed to disclose any of the suggestive or coercive techniques to Lamonte or his defense counsel.  Culp fully reviewed and approved the false reports.

Approximately a week later, Golubski met Niko Quinn alone behind a high school track, and used a combination of threats and financial promises to coerce her into identifying Lamonte.  When she complied, Golubski helped her move to a new home.  Golubski later falsely represented to the prosecution that Niko had identified Lamonte without coercion or suggestion, and he never disclosed that he helped Quinn find a new apartment in exchange for the identification.

Niko finally saw Lamonte for the first time in person at a pretrial hearing.  At that time, she realized that he could not have been the shooter because he was much taller and had different facial features.  She immediately tried to correct her false identification, telling prosecutor Terra Morehead that her identification was inaccurate.  Based on Golubski's assurance that Niko Quinn had previously identified Lamonte freely and without coercion, Morehead did not believe that the retraction was credible.  At some point before trial, Golubski and other unknown officers contacted Niko through a relative and threatened to take her children away and put her in jail.  Knowing that Golubski would make good on his threats, Niko testified against Lamonte at trial.  In 1996, and again in 2014, Niko gave sworn recantations of her testimony, declared that Lamonte was not the shooter and described the coercive and suggestive identification procedures that Golubski and Ware conducted.

## C.   Deliberate Investigative Omissions

From beginning to end, the investigation of the Doniel Quinn and Ewing murders lasted no more than six hours.  The only evidence that the officers collected against Lamonte were the fabricated identifications by Ruby Mitchell and Niko Quinn.

Officer W.K. Smith interviewed Niko Quinn and Josephine Quinn at the scene of the murders.  Niko told Smith that she could identify the shooter, and Josephine told him that her oldest daughter – Stacy Quinn – could also make a positive identification (Stacy later testified that she immediately recognized the killer as Monster).  Despite this information, Smith either deliberately failed to question Stacy to avoid developing evidence that would have directed the investigation away from Lamonte, or did question her and failed to document her exculpatory statements.  With respect to Niko, Smith only conducted a four-minute taped interview.  During this interview, Smith intentionally failed to elicit or follow up on any of the information that would have directed the investigation away from Lamonte, such as Niko's indication that men from a nearby drug house had recently beaten up Doniel Quinn – evidence which would have revealed a gang-related motive for the murders.  Smith never followed up with Niko and Stacy, despite the fact that Culp turned the investigation over to him and Golubski.

Like Smith, Clyde Blood was one of the first officers to the scene, and failed to take basic investigate steps that would have exonerated Lamonte.  After speaking with Krstolich, Blood failed to properly collect or document physical evidence on the victims, and failed to search the area where Ruby Mitchell saw the shooter drop something.  Culp and Blood then went to the hospital, where Blood failed to document statements from family members that again indicated a motive for Doniel Quinn's murder.

The day after the shooting, Golubski returned to the scene and reported that he did not

interview Stacy Quinn (who lived across the street) because she was "not available." Either he did interview Stacy (she was one of Golubski's regular victims whom he regularly harassed for sex and information) and buried her exonerating statements, or he deliberately declined to interview her to avoid developing evidence that would have shown that Lamonte was not the culprit.

## IV.    Lamonte Arrested

Hours after the first eyewitness (Ruby Mitchell) adopted the initial false identification, but before police had developed any other evidence inculpating Lamonte, Barber and Golubski tracked him down and arrested him.  Officer James Brown then drove Lamonte back to the police station. Brown later falsely reported that Lamonte had given a false alibi during the car ride, claiming that Lamonte said that he had been working at a restaurant when the shooting occurred.  Lamonte never made this statement – he consistently told police that he was at his aunt's house with family at the time of the shooting.

After the arrest, Barber and Golubski prepared police reports which falsely claimed that Rose had made statements implicating her son in the murders.  Specifically, they falsely reported that Rose had asked whether a person who killed someone could be arrested for murder, and that this inculpated Lamonte because no one had yet told Rose that they were investigating a homicide. Moreover, they reported that she had given Lamonte a bogus alibi by falsely asserting that he had been working at a restaurant during the shootings.  Rose never made any of these statements. Barber and Golubski forwarded their false police reports to prosecutors, but did not reveal that they had falsified the statements.

## V.    Lamonte's Conviction And Exoneration

On September 29, 1994, a jury convicted Lamonte of murdering Doniel Quinn and Donald Ewing. The conviction rested entirely on evidence that defendants had fabricated: the two false

eyewitness identifications from Ruby Mitchell and Niko Quinn and false inculpatory statements that defendants attributed to Lamonte and Rose. On January 6, 1995, Lamonte was sentenced to two consecutive life sentences.

In 1996, just over a year after Lamonte's sentencing, Niko and Stacy Quinn both came forward with affidavits attesting to Lamonte's innocence and stating that he looked nothing like the true perpetrator. Niko fully recanted her false trial testimony, and Stacy also testified unequivocally at a hearing that the killer was not Lamonte McIntyre.

Over the next two decades, Lamonte and Rose fought but failed to prove Lamonte's innocence through direct appeals, habeas petitions and post-conviction motions. Ultimately, the drug kingpin who employed Monster and Williams and a drug associate both swore in affidavits that Monster and Williams had killed Quinn and Ewing in retaliation for Quinn's suspected drug theft. Based on this and other new evidence, Lamonte moved again to vacate his conviction. On the second day of a scheduled six-day hearing, the Wyandotte County District Attorney concluded that Lamonte's conviction was "manifest injustice" and moved to dismiss the indictment, stating that new evidence "regarding the identification of Mr. McIntyre" could have "certainly" added reasonable doubt to Lamonte's trial. <u>Transcript Of Evidentiary Hearing</u> (Doc. #107-1) at 7. On October 13, 2017, the District Court of Wyandotte County, Kansas vacated Lamonte's conviction, and the prosecution dismissed the charges. Beginning at the age of 17, Lamonte had spent 23 years in prison for crimes that he did not commit.

On September 20, 2019, Lamonte and Rose filed their second amended complaint, which asserts the following claims:

<u>Count 1</u>: Under Section 1983, Lamonte asserts Fourth and Fourteenth Amendment malicious prosecution claims against Golubski, Krstolich, Ware, Brown, Barber, Culp, Smith and Blood;

Count 2: Under Section 1983, Lamonte asserts Fourth and Fourteenth Amendment evidence fabrication and Brady violations against Golubski, Krstolich, Ware, Brown, Barber and Smith;

Count 3: Under Section 1983, Lamonte and Rose assert First and Fourteenth Amendment familial association claims against Golubski;

Count 4: Under Section 1983, Lamonte asserts Fourth and Fourteenth Amendment failure to intervene claims against Krstolich, Ware, Barber, Culp, Smith, Blood and Brown;

Count 5: Under Section 1983, Lamonte asserts First, Fourth, Fifth and Fourteenth Amendment conspiracy claims against Golubski, Krstolich, Ware, Barber, Culp, Smith, Blood and Brown;

Count 6: Under Section 1983, Lamonte asserts Fourth and Fourteenth Amendment supervisory liability claims against Barber and Culp;

Count 7: Under Section 1983, Lamonte and Rose assert Monell claims against Unified Government;

Count 8: Under state law, Lamonte asserts malicious prosecution claims against Golubski, Krstolich, Ware, Brown, Barber, Culp, Smith and Blood;

Count 9: Under state law, Lamonte asserts respondeat superior liability against Unified Government for the state-level malicious prosecution claims.

## Legal Standards

In ruling on a motion to dismiss under Fed. R. Civ. P. 12(b)(6), the Court assumes as true all well-pleaded factual allegations and determines whether they plausibly give rise to an entitlement of relief. Ashcroft v. Iqbal, 556 U.S. 662, 679 (2009). To survive a motion to dismiss, a complaint must contain sufficient factual matter to state a claim which is plausible – and not merely conceivable – on its face. Id. at 679-80; Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007). To determine whether a complaint states a plausible claim for relief, the Court draws on its judicial experience and common sense. Iqbal, 556 U.S. at 679. Plaintiffs make a facially plausible claim when they plead factual content from which the Court can reasonably infer that defendants are liable for the misconduct alleged. Id. at 678. However, plaintiffs must show more

than a sheer possibility that defendants have acted unlawfully – it is not enough to plead facts that are "merely consistent with" defendants' liability.  Id. (quoting Twombly, 550 U.S. at 557).  Where the well-pleaded facts do not permit the Court to infer more than the mere possibility of misconduct, the complaint has alleged – but has not "shown" – that the pleader is entitled to relief.  Id. at 679.  The degree of specificity necessary to establish plausibility and fair notice depends on context; what constitutes fair notice under Fed. R. Civ. P. 8(a)(2) depends on the type of case.  Robbins v. Okla., 519 F.3d 1242, 1248 (10th Cir. 2008).

The Court need not accept as true those allegations which state only legal conclusions.  See Iqbal, 556 U.S. at 678; Hall v. Bellmon, 935 F.2d 1106, 1110 (10th Cir. 1991).  Rather, plaintiffs bear the burden of framing their complaint with enough factual matter to suggest that they are entitled to relief; it is not enough to make threadbare recitals of a cause of action accompanied by conclusory statements.  Twombly, 550 U.S. at 556.  A pleading that offers labels and conclusions, a formulaic recitation of the elements of a cause of action or naked assertions devoid of further factual enhancement will not stand.  Iqbal, 556 U.S. at 678.

Although the statute of limitations is an affirmative defense, the Court may appropriately resolve a statute of limitations question on a Rule 12(b) motion "when the dates given in the complaint make clear that the right sued upon has been extinguished."  Aldrich v. McCulloch Props., Inc., 627 F.2d 1036, 1041 n.4 (10th Cir. 1980).

## Analysis

Pursuant to Rule 12(b)(6), Fed. R. Civ. P., defendants argue that the Court should dismiss plaintiffs' second amended complaint because plaintiffs do not state claims upon which relief can be granted.  Unified Government and Golubski filed independent motions, while Ware, Brown, Blood, Smith and the estates of Krstolich, Barber and Culp ("Officers") filed a collective motion.

## I.     Golubski

Golubski seeks dismissal of Counts 1, 2, 3, 5 and 8, arguing that each fails to state a claim upon which relief can be granted.   As explained below, the Court partially sustains Golubski's motion.  To the extent that Count 5 is based on First and Fourteenth Amendments rights to access courts and executive clemency, the Court sustains Golubski's motion.   The Court overrules Golubski's motion on all other issues.

### A.     Counts 1 and 2

Golubski seeks dismissal of Counts 1 and 2 because they fail to state claims upon which relief can be granted.  Under Count 1, Lamonte asserts claims for malicious prosecution under the Fourth and Fourteenth Amendments, alleging that Golubski fabricated inculpatory evidence and intentionally withheld and misrepresented exculpatory facts that would have vitiated probable cause to believe that he committed the murders.  Based largely on the same allegations, Count 2 asserts Fourth and Fourteenth Amendments claims for evidence fabrication and the withholding of exculpatory evidence in violation of Brady v. Maryland, 373 U.S. 83 (1963).[2]

Golubski argues that (1) the Court should dismiss Count 2 because it duplicates Count 1, (2) the Fourth Amendment claims under Counts 1 and 2 are time-barred, (3) the Fourteenth Amendment claims under Counts 1 and 2 fail because Kansas provides adequate state law remedies, (4) the malicious prosecution claims under Count 1 fail because Lamonte's criminal proceedings did not terminate favorably and (5) he is entitled to qualified immunity because Counts 1 and 2 do not allege viable constitutional violations.

---

[2]      In Brady, the Supreme Court held that "suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment."  373 U.S. at 87.

### 1.    Duplicity Of Claims

Golubski asserts that the Court should dismiss Count 2 because it is essentially the same as Count 1.  Specifically, Golubski argues that a malicious prosecution claim (Count 1) subsumes evidence fabrication and Brady claims (Count 2).

Golubski does not cite a single case in which a court found that malicious prosecution, evidence fabrication and Brady claims are duplicative, and he ignores the great weight of authority which holds to the contrary.  McDonough v. Smith, 139 S. Ct. 2149, 2156 n.3 (2019) (addressing evidence fabrication claim and "distinct" malicious prosecution claim); Lowery v. Cty. of Riley, 522 F.3d 1086, 1093 (10th Cir. 2008) (same); Beck v. City of Muskogee Police Dep't, 195 F.3d 553, 560 (10th Cir. 1999) (recognizing both malicious prosecution and Brady claims); Bledsoe v. Jefferson Cty., Kansas, 275 F. Supp. 3d 1240, 1263 (D. Kan. 2017), aff'd in part, dismissed in part sub nom. Bledsoe v. Vanderbilt, 934 F.3d 1112 (10th Cir. 2019) (separately analyzing malicious prosecution, evidence fabrication and Brady claims); Truman v. City of Orem, 362 F. Supp. 3d 1121, 1128 (D. Utah 2019), objections overruled sub nom. Truman v. Orem City, No. 17-775-TS, 2019 WL 1923389 (D. Utah Apr. 30, 2019) (evidence fabrication and Brady claims are distinct and subject to different tests); Mills v. Barnard, 869 F.3d 473, 480-86 (6th Cir. 2017) (plaintiff could bring separate claims for malicious prosecution, fabrication of evidence and Brady violations); Poventud v. City of New York, 750 F.3d 121, 137 (2d Cir. 2014) (malicious prosecution and Brady claims "entirely distinct").  Consistent with this authority, the Court finds that Lamonte's claims under Counts 1 and 2 are not duplicative.  The Court therefore overrules Golubski's motion on this issue.

### 2.    Statute Of Limitations

Golubski asserts that Lamonte's Fourth Amendment claims under Counts 1 and 2 are time-

barred. Like he did when he argued that Count 2 duplicates Count 1, Golubski conflates the two Counts. Accordingly, he conducts his statute of limitations analysis under the false assumption that the claims under Counts 1 and 2 are the same. As a result, Golubski's analysis never specifies which particular claims – the malicious prosecution, evidence fabrication or Brady claims – he is attacking at any given point. As best the Court can ascertain, Golubski limits his challenge to Lamonte's Fourth Amendment claims for malicious prosecution under Count 1.[3] Specifically, Golubski argues that this claim is actually for false imprisonment, which is time-barred because it began to accrue in 1994 when Lamonte was arrested and convicted.

For purposes of a Section 1983 claim, the Court borrows the statute of limitations from the personal injury laws of the state in which the claim arose. McCarty v. Gilchrist, 646 F.3d 1281, 1289 (10th Cir. 2011). Accordingly, for Section 1983 claims arising in Kansas, the Court applies a two-year statute of limitations. See K.S.A. § 60–513(a)(4); Clark v. Blue Valley Unified Sch. Dist. No. 229, No. 12-CV-2538, 2013 WL 3867532, at *4 (D. Kan. July 25, 2013). To determine when the claim begins to accrue, the Court applies federal law. McCarty, 646 F.3d at 1289. Under federal law, the type of claim dictates when it begins to accrue. See Myers v. Koopman, 738 F.3d 1190, 1194 (10th Cir. 2013), as amended on denial of reh'g (Jan. 8, 2014) (false imprisonment and malicious prosecution claims do not accrue at same time). While a false imprisonment claim begins to accrue when the false imprisonment ends, a malicious prosecution claim does not accrue

---

[3]     Golubski dedicates his brief to explaining the differences between malicious prosecution and false imprisonment, and arguing that Lamonte's claims actually fall under the latter. Golubski does not mention the evidence fabrication or Brady claims. Accordingly, he effectively does not challenge Count 2 under the statute of limitations.

Moreover, Golubski focuses exclusively on the malicious prosecution claim under the Fourth Amendment, and ignores the one under the Fourteenth Amendment. Defendant Golubski's First Memorandum In Support Of His Motion To Dismiss Plaintiffs' Second Amended Complaint (Doc. #105) filed October 18, 2019 (only seeking dismissal of Fourth Amendment claims).

until the criminal proceedings terminate in plaintiff's favor.  Myers v. Koopman, 738 F.3d 1190, 1194 (10th Cir. 2013), as amended on denial of reh'g (Jan. 8, 2014).

Here, Golubski asserts that Lamonte's claim is not for malicious prosecution, but is instead for false imprisonment.[4]  To determine whether a claim is for malicious prosecution or false imprisonment, the Tenth Circuit looks to whether the alleged detention occurred before or after the institution of legal process.  Id.  If plaintiff's detention occurred before he received legal process, he can assert a claim for false imprisonment.  See Wallace v. Kato, 549 U.S. 384, 389 (2007) (false imprisonment claim where defendants did not have warrant for plaintiff's arrest).  In other words, plaintiff has a viable false imprisonment claim if he alleges that his detention occurred *without legal process*.  Id.  By contrast, if plaintiff's alleged detention occurred *with legal process*, he can assert a claim for malicious prosecution.  Wilkins v. DeReyes, 528 F.3d 790, 795 (10th Cir. 2008) (malicious prosecution claim where defendants arrested plaintiff with arrest warrant obtained with fabricated evidence and coercive interrogation techniques).  That is, plaintiff has a viable malicious prosecution claim where he alleges that his detention occurred "after the institution of legal process," but that the legal process itself was wrongful.  Myers, 738 F.3d at 1195 (malicious prosecution claim where plaintiff challenged probable cause determination for arrest warrant).  These claims, however, are not mutually exclusive.  A plaintiff who has a false imprisonment claim because he was initially detained without legal process (without a warrant) can also properly assert a malicious prosecution claim by challenging the subsequent legal process that led to further pre-trial detention.  Sanchez, 810 F.3d at 757 (viable malicious prosecution claim

---

[4]       Although ambiguous, Golubski apparently argues that Lamonte's Fourth Amendment claim under Count 1 cannot be for malicious prosecution because such a claim can only fall under the Fourteenth Amendment – not the Fourth Amendment.  The Tenth Circuit has expressly rejected this argument. See Sanchez v. Hartley, 810 F.3d 750, 755 (10th Cir. 2016).

based on post-warrantless arrest determinations of probable cause).  In other words, defendant is not immune from a malicious prosecution claim merely because he arrested plaintiff without a warrant.  Id. (plaintiff's initial warrantless arrest immaterial to validity of malicious prosecution claim).

Here, Lamonte asserts a Fourth Amendment claim for malicious prosecution under Count 1.  He alleges that after his warrantless arrest, defendants fabricated inculpatory evidence and intentionally withheld and misrepresented exculpatory facts that would have vitiated probable cause to believe that he committed the murders.  As a result, Lamonte was wrongfully detained for several months between the post-arrest probable cause determinations and his trial.  Under federal law, this malicious prosecution claim did not begin to accrue until October 13, 2017, when the District Court of Wyandotte County, Kansas vacated his conviction and the District Attorney dismissed the charges.  See Myers, 738 F.3d at 1194 (malicious prosecution claim does not begin to accrue until criminal proceedings terminate in plaintiff's favor).  Lamonte filed his initial complaint on October 11, 2018, well within the two-year limitations period.[5]

---

[5]        Golubski ends his statute of limitations challenge by arguing that because Lamonte was ultimately tried and convicted, he no longer has a Fourth Amendment claim for malicious prosecution.  In support, he cites a single sentence from a footnote in a recent Supreme Court decision which states that once a trial occurs, the Fourth Amendment "drops out" and plaintiff's claim now falls under the Fourteenth Amendment.  Manuel v. City of Joliet, Ill., 137 S. Ct. 911, 920 n.8 (2017).  Not only is it unclear how this argument relates to the Golubski's statute of limitations challenge, it is wrong.  Nowhere does the Supreme Court suggest – let alone hold – that plaintiff loses his claim under the Fourth Amendment for pretrial liberty deprivation simply because he was later convicted and suffered further liberty deprivations.  The trial only marks the temporal boundary between Fourth and Fourteenth Amendment claims.  Id. (plaintiff challenging sufficiency of evidence to support conviction and ensuing incarceration does so under Due Process Clause of Fourteenth Amendment).  Golubski cites no authority – or logic – for the proposition that the existence of the latter somehow eliminates the former.

### 3.    Adequate State Law Remedies (Fourteenth Amendment Claims)

Golubski asserts that the Court should dismiss Lamonte's Fourteenth Amendment claims under Counts 1 and 2 because Kansas tort law provides an adequate remedy for his injuries.

The Fourteenth Amendment protects individuals against deprivations of liberty without due process of law.  U.S. Const. amend. XIV, § 1.  If the state could not have anticipated a state actor's unauthorized conduct before the deprivation occurred, then an adequate post-deprivation remedy – such as a state tort claim – will satisfy due process requirements.  Myers v. Koopman, 738 F.3d 1190, 1193 (10th Cir. 2013), as amended on denial of reh'g (Jan. 8, 2014).  In other words, a state does not violate plaintiff's procedural due process rights under the Fourteenth Amendment so long as it provides an adequate remedy for the deprivation.  See Parratt v. Taylor, 451 U.S. 527, 543-44 (1981); see also Myers, 738 F.3d at 1193.  For ease of reference, the Court refers to this principle as the Parratt doctrine.

Here, Golubski asserts that because Kansas tort law provides an adequate remedy, the Parratt doctrine bars Lamonte's claims for malicious prosecution (Count 1) and his claims for evidence fabrication and Brady violations (Count 2).

### i.    Malicious Prosecution (Count 1)

Golubski first asserts that Lamonte cannot bring his Fourteenth Amendment malicious prosecution claims (Count 1) because Kansas law recognizes a tort action for malicious prosecution, which would sufficiently remedy Lamonte's injuries.

While the Tenth Circuit has applied the Parratt doctrine to bar Fourteenth Amendment claims that are based on brief, unwarranted pretrial detentions, it has never addressed whether Parratt extends to Fourteenth Amendment claims that are based on wrongful convictions resulting from actions – such as the withholding and fabrication of evidence – that fundamentally undermine

the trial process itself.  See Myers, 738 F.3d at 1193 (plaintiff only detained for pretrial hearings

until charges dropped); see also Becker v. Kroll, 494 F.3d 904, 922-25 (10th Cir. 2007) (dismissed

criminal case and administrative hearing decided in plaintiff's favor).  Indeed, neither of the Tenth

Circuit cases that Golubski cites involved a criminal trial at all, let alone a trial that was tainted by

false evidence and which led to an innocent person spending over 20 years in prison.  In other

words, the Tenth Circuit has never applied the Parratt doctrine to bar claims that are even remotely

similar to those in this case.  In fact, the Court is unaware of any court that has done so.  See

Armstrong v. Daily, 786 F.3d 529, 541 (7th Cir. 2015) ("No court has accepted the defendants'

argument that the Parratt analysis applies when the plaintiff is alleging that wrongful conduct

[including destruction of exculpatory evidence] corrupted fair fact-finding in the criminal justice

system.  We will not be the first.").

        Moreover, the Circuits that have directly addressed this issue have found Parratt

inapplicable to claims like Lamonte's.  Id. (Parratt does not bar malicious prosecution claims from

plaintiff who wrongfully spent over 20 years in prison after defendants destroyed exculpatory

evidence); Avery v. City of Milwaukee, 847 F.3d 433, 441 (7th Cir. 2017) (Parratt does not apply

to claims that plaintiff was wrongfully convicted of crime in trial tainted by falsified evidence,

known perjury or deliberate destruction of exculpatory evidence);  Castellano v. Fragozo, 352 F.3d

939, 942 (5th Cir. 2003) ("state's manufacturing of evidence and knowing use of that evidence

along with perjured testimony to obtain a wrongful conviction deprives a defendant of his long

recognized right to a fair trial secured by the Due Process Clause, a deprivation of a right not

reached by the Parratt doctrine.").  As these Circuits have explained, when plaintiff alleges that he

was wrongfully convicted in a trial tainted by falsified or destroyed evidence, his malicious

prosecution claim "is grounded in the due process guarantee of fundamental fairness in criminal

prosecutions." Armstrong, 786 F.3d at 540.  And Parratt "doesn't apply in this context." Avery, 847 F.3d at 441.  Accordingly, the "availability of a state-law remedy for malicious prosecution doesn't defeat a federal due-process claim against an officer who fabricates evidence that is later used to obtain a wrongful conviction." Avery, 847 F.3d at 441.

Here, the Parratt doctrine does not bar Lamonte's Fourteenth Amendment claims for malicious prosecution (Count 1).  Lamonte alleges that Golubski – along with the other defendants – violated his due process right to a fair trial.  Specifically, he alleges that Golubski fabricated evidence and intentionally withheld and misrepresented exculpatory evidence, which led to his conviction.  As a result, Lamonte spent 23 years in prison for crimes that he did not commit.  These allegations fit squarely within the category of claims "that are beyond the reach of Parratt." Armstrong, 786 F.3d at 540.  Accordingly, the Court overrules Golubski's motion on this issue.

### ii.   Evidence Fabrication And Brady Violations (Count 2)

Golubski asserts that the Parratt doctrine also bars Lamonte's Fourteenth Amendment evidence fabrication and Brady claims under Count 2.  In support, Golubski relies on the argument that the Court just rejected – that a *malicious prosecution* claim under Kansas tort law provides an adequate remedy for Lamonte's injuries.  According to Golubski, the malicious prosecution, evidence fabrication and Brady claims are similar enough for a single malicious prosecution tort to cover all three.  In other words, because Parratt bars the malicious prosecution claim, it must also bar the evidence fabrication and Brady claims.

This argument collapses under the Court's analysis above.  Contrary to Golubski's assertion, the Parratt doctrine does not bar Lamonte's malicious prosecution claim.  Accordingly, even if the evidence fabrication and Brady claims were sufficiently analogous to the malicious

prosecution claim,[6] their similarity is irrelevant if the malicious prosecution claim remains viable. Accordingly, the Court overrules Golubski's motion on this issue.

### 4.      Favorable Termination Of Criminal Proceeding

Golubski asserts that the Court should dismiss the claims under Counts 1 and 2 because Lamonte has not alleged that his criminal proceeding terminated favorably.[7]

To state a claim for malicious prosecution, plaintiff must show, among other things, that the original action terminated in his favor.[8] Montoya v. Vigil, 898 F.3d 1056, 1066 (10th Cir. 2018). To carry his burden, plaintiff must allege facts which, if true, would allow a reasonable jury to find the proceedings terminated "for reasons indicative of innocence." Id. When criminal proceedings terminate in a way other than acquittal due to innocence – which is the most obvious way plaintiff can satisfy the requirement – the Court looks to "the stated reasons for the dismissal as well as to the circumstances surrounding it in an attempt to determine whether the dismissal indicates the accused's innocence." Id. In other words, the Court asks whether the termination "touch[ed] the merits" of plaintiff's case. Id. (citations omitted); see Wilkins, 528 F.3d at 803

---

[6]      To show that malicious prosecution, evidence fabrication and Brady claims are effectively the same, Golubski repeats the arguments that he made while asserting that Count 2 duplicates Count 1. As explained above, he ignores the great weight of authority which holds that these are three distinct claims that involve different elements. Even if they were sufficiently similar, Golubski does not cite a single case in which a court found that because Parratt bars a malicious prosecution claim, it also bars all similar claims.

[7]      Golubski again conflates Counts 1 and 2, working under the assumption that Count 2 also asserts a malicious prosecution claim. As explained above, this is incorrect: Count 2 asserts evidence fabrication and Brady claims. Even if "favorable termination" was an element of these distinct claims, Lamonte has satisfied that element here, as explained below. Accordingly, the Court overrules Golubski's motion as to both Counts 1 and 2.

[8]      In addition, plaintiff must show (1) defendant caused plaintiff's continued confinement or prosecution; (2) no probable cause supported the original arrest, continued confinement or prosecution; (3) defendant acted with malice and (5) plaintiff sustained damages. Montoya, 898 F.3d at 1066. Golubski does not challenge Lamonte's claims under these elements.

(favorable determination where termination was result of prosecutor's judgment that case could not be proven beyond reasonable doubt).  Accordingly, termination generally does not satisfy this standard when the prosecution abandons proceedings "pursuant to an agreement of compromise" or "out of mercy requested or accepted by the accused."  Montoya, 898 F.3d at 1066 (citations omitted).

Here, Golubski argues that Lamonte's malicious prosecution claim fails because the circumstances surrounding the termination of Lamonte's criminal proceedings leave unresolved the question of guilt or innocence.  Specifically, he offers the statements that the prosecutor made after he dismissed Lamonte's case.[9]  The prosecutor stated that the question "is merely whether the unanimous verdict in 1994 might have been different if the information presented to my office was available for consideration during their deliberation."  Tr. Of Evid. Hr'g (Doc. #107-1) filed October 18, 2019 at 7.  He went on to say that the new evidence "is of a nature that I believe that had it been presented to the jury in the 1994 trial . . ., it may certainly have caused those jurors to have reasonable doubt as to Mr. McIntyre's guilt."  Id.  Because of this information, the prosecutor requested that "the court find that manifest injustice exists."  Id.

Golubski's contention that the circumstances surrounding the dismissal of Lamonte's charges did not "indicate[ ] [his] innocence" or "touch the merits" of his case is frivolous.  See Montoya, 898 F.3d at 1066.  Lamonte alleges that the prosecution dismissed his indictment based on significant new evidence which showed that he was innocent.  This included affidavits in which two Kansas City drug bosses testified that Monster – not Lamonte – committed the murders.

---

[9]      To decide a Rule 12(b)(6) motion, the Court may consider facts that are subject to judicial notice without converting the motion to dismiss into a motion for summary judgment.  Tal v. Hogan, 453 F.3d 1244, 1264 n.24 (10th Cir. 2006).  This allows the Court to take judicial notice of facts which are matters of public record.  Id.

Accordingly, when the prosecutor dismissed the charges and called Lamonte's conviction a "manifest injustice," he did not do so pursuant to a "compromise" or an "act of mercy," but instead because new evidence tended to show that Lamonte had spent 23 years in prison for a crime that he did not commit.  See id.  Golubski's nearly exclusive reliance on these post-dismissal statements from the prosecutor is puzzling, as the statements actually cut against his argument.  To pick just one, the prosecutor expressly stated that the new evidence "regard[s] the identification of Mr. McIntyre" as the perpetrator of the two murders, and could have "certainly" added reasonable doubt to Lamonte's trial.  Tr. Of Evid. Hr'g (Doc. #107-1) at 7; see Wilkins, 528 F.3d at 803.  The circumstances surrounding the dismissal of Lamonte's charges would allow a reasonable jury to find that the proceedings terminated "for reasons indicative of innocence."  Montoya, 898 F.3d at 1066.  The Court therefore overrules Golubski's motion on this issue.

### 5.    Qualified Immunity

Golubski asserts that the Court should dismiss Counts 1 and 2 because he is entitled to qualified immunity for these claims.

Qualified immunity protects government officials from liability for civil damages if their conduct "does not violate clearly established statutory or constitutional rights" about which a reasonable person would have known.  N.E.L. v. Douglas Cty., Colorado, 740 F. App'x 920, 928 (10th Cir. 2018), reh'g denied (July 17, 2018), cert. denied sub nom. N.E.L. v. Douglas Cty., Colo., 139 S. Ct. 1320, 203 L. Ed. 2d 564 (2019).  Accordingly, to overcome a government official's qualified immunity, plaintiff must demonstrate that (1) the official violated a statutory or constitutional right and (2) the law clearly establishes that right.  Id.

Here, Golubski asserts that Lamonte has not satisfied the first element by alleging that Golubski violated a statutory or constitutional right.  In support, Golubski directs the Court to his

prior arguments that Lamonte's constitutional claims under Counts 1 and 2 must fail.  Specifically, he argues that the constitutional claims under Counts 1 and 2 fail because (1) his malicious prosecution claim is actually a false imprisonment claim, which is untimely, (2) Count 2 duplicates Count 1, (3) Lamonte's criminal proceedings did not terminate favorably and (4) Kansas provides adequate tort remedies.  The Court has rejected each of these arguments and found that Lamonte plausibly alleges constitutional violations.  The Court therefore overrules Golubski's motion on this issue.

**B.    Count 3**

Golubski seeks dismissal of Count 3 because it fails to state a claim upon which relief can be granted.   Under Count 3, Lamonte and Rose assert familial interference claims against Golubski, alleging that after Rose rejected his sexual advances, Golubski retaliated against her by orchestrating the wrongful conviction of her son, Lamonte.  Golubski asserts that the Court should dismiss the familial interference claims because (1) he is entitled to qualified immunity and (2) they are time-barred.

**1.    Qualified Immunity**

Golubski asserts that he is entitled to qualified immunity on plaintiffs' familial interference claims.  As the Court explained above, to overcome a government official's qualified immunity, plaintiffs must demonstrate that (1) the official violated a statutory or constitutional right and (2) the law clearly establishes that right.  Id.

Here, Golubski challenges plaintiffs' claims under the second prong, arguing that the right to familial association – in the context of the particular allegations in this case – was not clearly established in 1994 when his alleged conduct occurred.  Specifically, although the right to familial association was clearly established in 1985, see Trujillo v. Bd. of Cty. Comm'rs of Santa Fe Cty.,

768 F.2d 1186, 1190 (10th Cir. 1985), he argues that it was not clearly established in the context of wrongful prosecutions.  In other words, Golubski argues that he is entitled to qualified immunity because by 1994 the Tenth Circuit had not clearly established that his alleged actions – falsifying evidence to wrongfully convict a son because a mother rejected the officer's sexual advances – violated their constitutional rights.

A constitutional right is clearly established when it is "sufficiently clear that every reasonable official would have understood that what he is doing violates that right."  Estate of Ceballos v. Husk, 919 F.3d 1204, 1215 (10th Cir. 2019) (citations omitted).  Although the Supreme Court has warned against defining a clearly established right "at a high level of generality" and that the law must be "particularized to the facts of the case," this does not mean that a right is only clearly established if a case exists that is factually identical.  Id. (citations omitted).  In other words, the "clearly established" prong does not require plaintiffs to show that "the very act in question previously was held unlawful."  Weigel v. Broad, 544 F.3d 1143, 1153 (10th Cir. 2008) (citations omitted).  This makes good sense: if a right is only clearly established if a case exists with identical facts, qualified immunity would apply whenever a different fact pattern arises.  Under this standard, officials would always be entitled to qualified immunity so long as their actions – no matter how outrageous or harmful – are sufficiently novel.  The Tenth Circuit has accounted for this potential of rewarding particularly egregious conduct, explaining that the "more obviously egregious the conduct in light of prevailing constitutional principles, the less specificity is required from prior case law to clearly establish the violation."  Stetzel v. Holubek, 661 F. App'x 920, 922 (10th Cir. 2016); see Duran v. Sirgedas, 240 F. App'x 104, 127 (7th Cir. 2007), vacated in part on reh'g (July 17, 2007) (citations omitted) ("[i]t would create perverse incentives indeed if a

qualified immunity defense could succeed against those types of claims that have not previously arisen because the behavior alleged is so egregious that no like case is on the books.").

In 1994, the right to familial association was sufficiently clear that every reasonable official would have understood that what Golubski was doing violates that right.  By 1985, the Tenth Circuit had made clear that intentionally and unlawfully interfering with familial relations is unconstitutional.  See Trujillo, 768 F.2d at 1190.  According to plaintiffs' allegations, which the Court accepts as true for purposes of the motion to dismiss, Golubski sexually assaulted Rose and continually harassed her, pressuring her for a long-term relationship and offering to pay for sex. Rose repeatedly rejected his advances, changed her phone number and moved to a new home to hide from Golubski.  To punish Rose for her rejections, Golubski took away her son by framing him for murder – coercing identifications, fabricating police reports and suppressing exculpatory evidence.  Golubski's plot succeeded: Lamonte was wrongfully convicted and spent 23 years in prison.  As a result, Rose suffered extreme emotional and psychological devastation.

Golubski is correct that in 1994, no Tenth Circuit court had held that an officer violates the clearly established right to familial association by framing a son for murder in retaliation for the mother's rejection of sexual advances.  But every reasonable officer would have understood that this egregious conduct violates that right.  The Court overrules Golubski's motion on this issue.

### 2.    Statute Of Limitations

Golubski asserts that the statute of limitations bars Lamonte's familial association claims under Count 4.

As noted, for purposes of a Section 1983 claim, the Court borrows the statute of limitations from the personal injury laws of the state in which the claim arose.  McCarty, 646 at 1289. Accordingly, for Section 1983 claims arising in Kansas, the Court applies a two-year statute of

limitations.  See K.S.A. § 60–513(a)(4); Clark, 2013 WL 3867532, at *4.  To determine when the claim begins to accrue, the Court applies federal law.  McCarty, 646 F.3d at 1289.  Because the injury under a Section 1983 claim is a violation of a constitutional right, it begins to accrue when plaintiff "knows or should know that his [ ] constitutional rights have been violated."  Beck, 195 F.3d at 557.  When the Section 1983 claim necessarily challenges the validity of a conviction or sentence, the Heck doctrine delays the accrual date "until the conviction or sentence has been invalidated."  Id.; Heck v. Humphrey, 512 U.S. 477, 487 (1994).

Here, Golubski argues that Heck does not apply to plaintiffs' familial association claims because such claims do not require a showing of an overturned conviction.[10]  Although case law appears largely undeveloped on whether Heck applies to familial association claims, the Court finds Golubski's argument unpersuasive.  Under the plain text of the rule, the Heck doctrine applies when the claim "necessarily impl[ies] the invalidity" of plaintiff's conviction.  Beck, 195 F.3d at 557.  And as the Tenth Circuit has explained, whether a claim does so depends on its substance.  Id.  Here, plaintiffs allege that Golubski deliberately interfered with their familial relationship by committing the constitutional violations which Lamonte alleges under Counts 1 and 2.  Under those counts, Lamonte alleges that Golubski violated his Fourth and Fourteenth Amendment rights by fabricating and withholding evidence, which caused Lamonte to be prosecuted and convicted for crimes that he did not commit.  Accordingly, to succeed on their familial association claims, both Lamonte and Rose will have to show that Golubski intentionally and unlawfully interfered with their relationship by causing Lamonte's wrongful prosecution and imprisonment.  This

---

[10]      Golubski also argues that plaintiffs' familial association claims are presumed to have to accrued in 1994 because they arise out of Lamonte's arrest.  Even if such a presumption applied to arrests, this argument ignores the fact that plaintiffs' claims arise out of Lamonte's wrongful prosecution and conviction.

necessarily implies the invalidity of Lamonte's conviction.  Accordingly, <u>Heck</u> delays the accrual date for plaintiffs' claims until Lamonte's conviction was invalidated, which was October 13, 2017 – well within the two-year statute of limitations.  The Court therefore overrules Golubski's motion on this issue.

C.      **Count 5**

Golubski argues that Count 5 also fails to state a claim upon which relief can be granted.  Under Count 5, Lamonte asserts conspiracy, alleging that that Golubski – along with other defendants – acted in concert to deprive him of rights under (1) the Fourth, Fifth and Fourteenth Amendments to be free from unreasonable searches and seizures, malicious prosecution, coercion, deprivation of liberty without due process of law and to a fair trial and (2) First and Fourteenth Amendments to access courts and executive clemency.

To succeed on a conspiracy claim under Section 1983, plaintiff must allege (1) specific facts showing an agreement and concerted action among defendants and (2) an actual deprivation of a constitutional right.  <u>Maier v. Kansas</u>, No. 16-3219-SAC, 2017 WL 552629, at *3 (D. Kan. Feb. 10, 2017).  Here, Golubski asserts that the Court should dismiss Count 5 because (1) it does not allege a constitutional violation and (2) he is entitled to qualified immunity.

1.      **Constitutional Violation**

Golubski seeks dismissal of Counts 5 because Lamonte has not alleged a viable constitutional violation.

Golubski asserts that the first set of rights under Count 5 refer to the claims under Counts 1 and 2 (Fourth, Fifth and Fourteenth Amendment rights to be free from unreasonable searches and seizures, malicious prosecution, coercion, deprivation of liberty without due process of law and to a fair trial).  Because Lamonte does not assert otherwise, the Court assumes that this is the case.

Golubski argues that these allegations fail to show viable constitutional violations for the same reasons that Counts 1 and 2 fail to do so.[11]  In other words, Golubski directs the Court to the arguments that it has already rejected.  Absent further argument, the Court therefore finds that this first group of claims under Count 5 alleges viable constitutional violations.

Golubski correctly points out, however, that new constitutional claims – First and Fourteenth Amendment rights of access to courts and executive clemency – appear for the first time in Count 5.  The second amended complaint does not contain separate causes of action for these claims, and in response to Golubski's motion, Lamonte does not direct the Court to any allegations that would support such claims.  In fact, Lamonte's response is silent on this issue.  Accordingly, even if allegations regarding access to courts and executive clemency could support constitutional claims, Lamonte apparently does not assert them.  Therefore, absent argument to the contrary, to the extent that Count 5 is based on allegations regarding First and Fourteenth Amendments rights to access courts and executive clemency, the Court sustains Golubski's motion.  As explained above, however, Count 5 survives based on other viable constitutional violations.

### 2.      Qualified Immunity

Golubski asserts that the Court should dismiss Counts 5 because he is entitled to qualified immunity for these claims.  Specifically, he argues that Lamonte has not alleged a viable constitutional violation, and again directs the Court to arguments that it has already rejected.  Accordingly, the Court overrules Golubski's motion on this issue.

---

[11]      Specifically, (1) Lamonte's malicious prosecution claim is actually a false imprisonment claim, which is untimely, (2) Count 2 duplicates Count 1, (3) Lamonte's criminal proceedings did not terminate favorably and (4) Kansas provides adequate tort remedies.

**D.    Count 8**

Golubski seeks dismissal of Count 8 on the ground that Lamonte has not alleged that his criminal proceedings terminated in his favor.  Under Count 8, Lamonte asserts claims for malicious prosecution under Kansas law.

To succeed on a claim for malicious prosecution under Kansas law, plaintiff must show that (1) defendant initiated, continued or procured criminal procedures against him, (2) defendant did so without probable cause, (3) defendant acted with malice (4) the proceeding terminated in plaintiff's favor and (5) plaintiff sustained damages.  Mohr v. Margolis, Ainsworth & Kinlaw Consulting, Inc., 434 F. Supp. 2d 1051, 1057 (D. Kan. 2006).  Here, Golubski argues that Lamonte has not satisfied the fourth element by showing that his criminal proceedings terminated in his favor.

The parties have different ideas about what the "favorable termination" element means under Kansas law.  Golubski apparently assumes that Kansas law merely incorporates the federal standard – he does not cite any authority under Kansas law, and instead repeats the same federal law that he used to unsuccessfully challenge Lamonte's Fourteenth Amendment claims.  By contrast, Lamonte asserts that Kansas applies a less demanding "favorable termination" standard which he can satisfy by showing "the withdrawal of the proceedings by the person bringing them" or "dismissal of the proceedings because of his failure to prosecute them."  See Nelson v. Miller, 227 Kan. 271, 280 (1980).  In other words, unlike federal law, Kansas law does not require that dismissal touch the merits of his case or indicate innocence.

Although Kansas courts have not explicitly defined "favorable termination" in the criminal context, they have cast serious doubt on the definition that Lamonte suggests.  Lamonte acquired his less stringent rule from a case that involved a defendant who wrongfully brought a *civil* action

against a plaintiff.  See id.  The Court of Appeals of Kansas has suggested, however, that the "favorable termination" standard for a *criminal* case is different, explaining that the "dismissal of a criminal prosecution arguably presents a different mix of legal and policy issues." Ball v. Credit Bureau Servs., Inc., 353 P.3d 469 (Kan. Ct. App. 2015).  Accordingly, the Court of Appeals of Kansas doubted that the less stringent standard for civil proceedings would apply to wrongful criminal prosecutions.  In doing so, it pointed to the Restatement (Second) of Torts § 660 (1976), which provides that to satisfy the "favorable termination" standard in the criminal context, plaintiff must show that the dismissal "is such as to indicate the innocence of the accused." Id. (Kansas courts regularly turn to Restatement (Second) of Torts as "authoritative source for general principles reflecting well-reasoned policy").

Accordingly, although Kansas does not merely incorporate federal malicious prosecution law as Golubski suggests, it does appear that Kansas courts have adopted a similar rule under which the dismissal of plaintiff's case must indicate his innocence.  As explained above, Lamonte has satisfied this more stringent standard.  Lamonte alleges that the prosecution dismissed his indictment as "manifest injustice" after significant new evidence showed that he was innocent.  Upon dismissing Lamonte's charges, the prosecutor expressly stated that the new evidence "regard[s] the identification of Mr. McIntyre" as the perpetrator of the two murders, and could have "certainly" added reasonable doubt to Lamonte's trial.  Tr. Of Evid. Hr'g (Doc. #107-1) at 7.  These allegations are sufficient to show that the dismissal indicated Lamonte's innocence.  Accordingly, the Court overrules Golubski's motion on this issue.

## II.    Officers

The Officers seek dismissal of Count 1, 2, 4, 5, 6 and 8 because each fails to state a claim upon which relief can be granted.  As explained below, the Court sustains the Officers' motion

with respect to Count 5 to the extent that it is based on First and Fourteenth Amendment rights to access courts and executive clemency.  The Court also dismisses Brown, Smith and Blood from Counts 4 and 5.  The Court overrules the Officers' motion on all other issues.

### A.    Counts 1 and 2

The Officers assert that Counts 1 and 2 fail to state claims upon which relief can be granted. Count 1 asserts Fourth and Fourteenth Amendment malicious prosecution claims against all Officers, while Count 2 asserts Fourth and Fourteenth Amendment claims for evidence fabrication and Brady violations against all Officers except Culp and Blood.

The Officers argue that (1) the Fourth Amendment claims under Counts 1 and 2 are time-barred, (2) the Fourteenth Amendment claims under Counts 1 and 2 fail because Kansas provides adequate state law remedies, (3) the allegations under Count 1 fail to satisfy several of the elements of a malicious prosecution claim, (4) the Court should dismiss Count 2 because it duplicates Count 1 and (5) they are entitled to qualified immunity because Counts 1 and 2 do not allege viable constitutional violations.

### 1.    Statute of Limitations

The Officers seek dismissal of Lamonte's Fourth Amendment malicious prosecution claims under Count 1 because they are time-barred.[12]  In support, the Officers adopt the same argument that the Court has already rejected with respect to Golubski – that Lamonte's claim is not for malicious prosecution, but is instead for false imprisonment, which began to accrue in 1994

---

[12]      Like Golubski, the Officers apparently conflate the claims under Counts 1 and 2. Although they seek dismissal of both Counts pursuant to the statute of limitations, they focus exclusively on the differences between malicious prosecution and false imprisonment claims – never mentioning the distinct claims for evidence fabrication and Brady violations under Count 2. Accordingly, as best the Court can ascertain, the Officers only argue that Lamonte's malicious prosecution claims under Count 1 are time-barred.

when he was arrested and convicted.  As explained above, this argument is meritless – Lamonte asserts a Fourth Amendment malicious prosecution claim under Count 1.  Under federal law, this claim did not accrue until October 13, 2017, when the District Court of Wyandotte County, Kansas vacated his conviction and the District Attorney dismissed the charges.  See Myers, 738 F.3d at 1194 (malicious prosecution claim does not begin to accrue until criminal proceedings terminate in plaintiff's favor).  Because Lamonte filed his initial complaint on October 11, 2018, his malicious prosecution claims are not time-barred.  Accordingly, the Court overrules the Officers' motion on this issue.

### 2.   Adequate State Law Remedies

The Officers seek dismissal of Lamonte's Fourteenth Amendment claims under Counts 1 and 2 because Kansas law provides an adequate remedy for his injuries.  In other words, the Officers employ the argument that the Court already rejected – that the Parratt doctrine bars Lamonte's Fourteenth Amendment claims under Counts 1 and 2.[13]  As explained above, the availability of state-law remedies does not bar Lamonte's claims. When a plaintiff alleges that he was wrongfully convicted in a trial tainted by falsified or destroyed evidence, his claim "is grounded in the due process guarantee of fundamental fairness in criminal prosecutions." Armstrong, 786 F.3d at 540.  The Parratt doctrine does not apply in this context.  Accordingly, the Court overrules the Officers' motion on this issue.

---

[13]     Also like Golubski, the Officers make no effort to distinguish between the claim under Count 1 for malicious prosecution and the claims under Count 2 for evidence fabrication and Brady violations.  The Officers merely offer the tort for malicious prosecution under Kansas law, and argue that it is sufficient to cover all of Lamonte's claims under Counts 1 and 2.  As explained above, even if this were true, the Parratt doctrine still does not bar Lamonte's claims under either count.

### 3.      Count 1

The Officers seek dismissal of Lamonte's Fourth and Fourteenth Amendment malicious prosecution claims under Count 1.  To succeed on a malicious prosecution claim, plaintiff must show that (1) defendants caused plaintiff's continued confinement or prosecution, (2) the original action terminated in favor of plaintiff, (3) no probable cause supported the original arrest, continued confinement or prosecution, (4) defendants acted with malice and (5) plaintiff sustained damages.  Montoya, 898 F.3d at 1066.

Here, the Officers assert that Lamonte's allegations fail to state a claim for malicious prosecution against all or some of the Officers because (1) they had probable cause for Lamonte's arrest, continued confinement and prosecution, (2) they did not act with malice and (3) they did not cause Lamonte's arrest, continued confinement or prosecution.[14]

### i.      Probable Cause

The Officers assert that Lamonte's malicious prosecution claims fail against Brown, Barber, Culp, Smith and Blood[15] because probable cause supported Lamonte's arrest, confinement and prosecution.

Probable cause exists if "the facts and circumstances are sufficient to warrant a person of reasonable caution to believe" that an individual committed a crime.  McCarty, 646 F.3d at 1286; Wilkins, 528 F.3d at 801.  If evidence is falsified or withheld, "the probable cause determination is made by considering whether, excluding the falsified inculpatory evidence or including the withheld exculpatory evidence, probable cause existed to prosecute."  McCarty, 646 F.3d at 1286.

---

[14]      The Officers also assert that Lamonte's allegations do not show that his criminal proceedings terminated favorably.  The Court has already rejected this argument.

[15]      The Officers do not challenge the probable cause element with respect to Krstolich or Ware.

In other words, the Court asks whether – considering the exculpatory evidence and ignoring the falsified evidence – a person of reasonable caution would believe that the individual committed a crime.[16]  See Wilkins, 528 F.3d at 801.

Here, Lamonte sufficiently alleges that probable cause did not support his continued confinement or prosecution.  Lamonte alleges that the only evidence that he committed the murders was the fabricated identifications from Mitchell and Niko Quinn, fabricated statements from Rose which inculpated him and fabricated false alibis that the Officers attributed to him.  In other words, the only evidence that supported probable cause was falsified.  Setting aside this evidence, probable cause for Lamonte's continued confinement or prosecution did not exist.  Sanchez v.

---

[16]     The Officers propose that the Court apply a variation of the probable cause standard under which the Court determines whether defendants had "arguable probable cause" for the arrest, which means that defendants' conclusions "rest[ed] on an objectively reasonable, even if mistaken, belief that probable cause exist[ed]."  Stonecipher v. Valles, 759 F.3d 1134, 1141 (10th Cir. 2014) (citations omitted).  Applying this standard, the Officers argue that Brown, Barber, Culp, Smith and Blood had objectively reasonable belief that probable existed to support Lamonte's arrest and confinement because they had no way of knowing that the identifications by Niko Quinn and Mitchell were false.

The Officers' analysis is fundamentally flawed for a variety of reasons.  First, even assuming that this standard applies, their application omits key allegations that Brown and Barber both participated in the fabrication of evidence.  Accordingly, they could not reasonably believe that probable cause existed.  Second, the "arguable probable cause" standard does not apply here.  This standard is a different way to articulate the clearly-established prong of the qualified immunity analysis in the context of warrantless arrests.  A.M. v. Holmes, 830 F.3d 1123, 1139 (10th Cir. 2016) (citations omitted) (as practical matter, court implements clearly-established law standard by asking whether arguable probable cause existed for warrantless arrest).  And it is not clear that the Officers are attempting to invoke the clearly-established prong.  Consistent with other parts of their motion, they do not explain that the particular right at issue was not clearly established at the time of Lamonte's arrest.  Even so, the Tenth Circuit has explained that this standard applies when a warrantless arrest is at issue.  Id. (citations omitted).  As explained above, Lamonte is asserting a malicious prosecution claim which, by definition, is based on the institution of legal process – not his warrantless arrest.  The legal process that Lamonte challenges is the post-arrest probable cause determination which led to his continued wrongful confinement and prosecution.  Because his warrantless arrest is not at issue, the "arguable probable cause" standard does not apply.  The proper question is whether, excluding fabricated evidence and including exculpatory evidence, probable cause existed for Lamonte's continued confinement.

Hartley, 65 F. Supp. 3d 1111, 1124 (D. Colo. 2014), aff'd in part, appeal dismissed in part, 810

F.3d 750 (10th Cir. 2016) (without falsified evidence, no probable cause for plaintiff's continued

confinement or prosecution); Wilkins, 528 F.3d at 801 (same).  Accordingly, the Court overrules

the Officers' motion on this issue.

**ii.      Malice**

The Officers assert that Lamonte's malicious prosecutions claims must fail because he does

not allege that each of them acted with malice.  This argument is frivolous.

For purposes of a malicious prosecution claim, Lamonte sufficiently alleges that Krstolich,

Ware, Brown, Barber and Culp acted with malice.  Lamonte's allegations with respect to each of

these defendants are as follows:

> Krstolich:  coerced, manipulated and otherwise pressured Ruby Mitchell to identify
> Lamonte in a lineup; falsely represented in written and oral reports to the
> prosecution that Lamonte's identification originated with Mitchell; and failed to
> disclose the coercion to Lamonte or his counsel;
>
> Ware: participated in a coercive identification procedure with Niko Quinn, who
> later identified Lamonte as the murderer; fabricated a report that falsified details of
> the identification procedure; and failed to disclose the nature of the identification
> to Lamonte or his counsel;
>
> Brown: crafted a false police report by fabricating false alibis that Lamonte that did
> not give;
>
> Barber: prepared police reports which falsely claimed that Rose made statements
> implicating Lamonte in the murders and provided false alibis for him; later
> forwarded this fabricated information to prosecutors, but did not reveal to Lamonte
> or his counsel that he had falsified the statements attributed to Rose; and
>
> Culp: specifically choosing Golubski to investigate the murders because he knew
> about Golubski's sexual relationships with various witnesses – including Ruby
> Mitchell and Stacy Quinn – and knew that Golubski would use those relationships
> to obtain false identifications and other fabricated evidence, just as he done in the
> past;

The common thread running through these allegations is that each Officer specifically targeted

-35-

Lamonte for prosecution and conviction, and shaped his investigations accordingly – whether by falsifying evidence or selecting particular Officers to do so.  These allegations are sufficient to allege that each Officer acted with malice for purposes of a malicious prosecution claim.

The same is true for Smith and Blood.  With respect to Smith, Lamonte alleges that despite Niko Quinn telling him that she immediately recognized the murderer and providing a detailed description – which looked nothing like Lamonte – Smith interviewed her for only four minutes. Smith also knew that Stacy Quinn could similarly provide a positive identification, but he refused to interview her.   According to Lamonte's allegations – which the Court must accept as true at this stage – Smith intentionally failed to take basic investigative steps that would have exonerated Lamonte because he was actively avoiding information that would have pointed any direction other than Lamonte.

Lamonte makes similar allegations with respect to Blood, asserting that Blood failed to document key physical evidence at the scene and key information from Doniel Quinn's family that would have shown that someone other than Lamonte was responsible for the murders.  Thus, contrary to the Officers' assertion, these allegations amount to much more than mere negligence. That is, Lamonte is not simply alleging that these Officers made investigative mistakes or conducted an inadequate investigation.  He is alleging that they deliberately chose not to take certain basic investigative steps because they were intentionally dodging evidence that would have exonerated Lamonte.  In other words, Smith and Blood were only searching for evidence that incriminated Lamonte.  These allegations plausibly show malice for purposes of a malicious prosecution claim.  The Court therefore overrules the Officers' motion on this issue.

### iii.   Causation

The Officers assert that Lamonte's malicious prosecutions claims must fail because his

allegations do not show that Brown, Barber, Culp, Smith and Blood caused Lamonte's confinement or prosecution.[17]

Under Section 1983, a government actor is liable if he "set in motion a series of events that [he] knew or reasonably should have known would cause others to deprive [plaintiff] of [his] constitutional rights." Martinez v. Carson, 697 F.3d 1252, 1255 (10th Cir. 2012) (citations omitted). In other words, defendant is liable for the harm that his conduct proximately causes. Id. Accordingly, an officer can be liable for the violation of plaintiff's constitutional rights if the violation "would not have occurred but for [defendant's] conduct and if there were no unforeseeable intervening acts superseding [defendant's] liability." Id. (citations omitted). The fact that people other than defendant "may have concurrently caused the harm does not change the outcome as to [defendant]." Id. (citations omitted). Causation "is generally a question of fact for the jury." Schneider v. City of Grand Junction Police Dep't, 717 F.3d 760, 778 (10th Cir. 2013).

Here, Lamonte's allegations against Brown, Barber, Culp, Smith and Blood – which the Court detailed above – are sufficient to plausibly show that they proximately caused deprivations of his liberty. The Court therefore overrules the Officers' motion on this issue.

### 4.     Count 2

The Officers seek dismissal of Lamonte's Fourth and Fourteenth Amendment claims under Count 2 for evidence fabrication and Brady violations. In doing so, the Officers raise arguments that the Court has already addressed: (1) the Court should dismiss Count 2 because it duplicates Count 1 and (2) the Court should dismiss the Fourteenth Amendment claims because Kansas tort law provides an adequate remedy for Lamonte's injuries.[18] Because the Court has already rejected

---

[17]     The Officers do not challenge causation with respect to Krstolich or Ware.

[18]     In passing, the Officers also argue that their alleged conduct only shows negligence,

these arguments, the Court overrules the Officers' motion on this issue.

### 5.        Qualified Immunity (Counts 1 and 2)

The Officers assert that they are entitled to qualified immunity for Lamonte's claims under Counts 1 and 2.

As explained above, qualified immunity protects government officials from liability for civil damages if their conduct "does not violate clearly established statutory or constitutional rights" about which a reasonable person would have known.  N.E.L., 740 F. App'x at 928. Accordingly, to overcome a government official's qualified immunity, plaintiff must demonstrate that (1) the official violated a statutory or constitutional right and (2) the law clearly establishes that right.  Id.

As the Tenth Circuit has explained, the Twombly standard for motions to dismiss "may have a greater bite" in the context of a Section 1983 claim against individual government actors because "they typically include complex claims against multiple defendants."  Kansas Penn Gaming, LLC v. Collins, 656 F.3d 1210, 1215 (10th Cir. 2011) (citations omitted).  Under these circumstances, it is "particularly important . . . that the complaint make clear exactly *who* is alleged to have done *what* to *whom*, to provide each individual with fair notice as to the basis of the claims against him or her, as distinguished from collective allegations against the state."  Id. (citations omitted) (emphasis in original).

---

which does not violate the Constitution. This argument is meritless – Lamonte's allegations go well beyond mere negligence.

Here, the Officers assert that Lamonte's allegations do not show that each individual Officer[19] violated his clearly-established constitutional rights.[20]  The Officers do not expressly identify, however, which element prevents Lamonte's allegations from overcoming their qualified immunity defense.  As best the Court can ascertain, the Officers focus exclusively on the first element, arguing that none of the Officers violated Lamonte's constitutional rights.[21]

Complicating their challenge even further, the Officers continue to conflate the distinct constitutional claims under Counts 1 and 2.  For each individual Officer, they fail to identify which claim, constitutional right or Count they are challenging.  They simply paraphrase Lamonte's allegations (under both counts), and then conclude that the allegations are insufficient to show a constitutional violation.  In fact, nowhere in the Officer-specific sections do they mention the Fourth or Fourteenth Amendments – the constitutional provisions that Lamonte alleges they violated – nor do they mention malicious prosecution, fabrication of evidence or Brady abuses.  Because the question central to the Officers' claim of qualified immunity is whether Lamonte has alleged a constitutional violation, it appears crucial to at least identify the particular constitutional violation that Lamonte alleges.  For example, Ware is a defendant under Counts 1 and 2.  Accordingly, as to Ware, Lamonte asserts Fourth and Fourteenth Amendment claims for malicious prosecution, evidence fabrication and Brady violations, which are different claims that consist of

---

[19]    The Officers do not argue that Krstolich is entitled to qualified immunity.

[20]    The Officers also assert that regardless of which Officer allegedly committed the violations, Counts 1 and 2 do not establish viable constitutional violations for a variety of reasons.  As the Court explained above, these arguments are meritless – Lamonte has asserted viable constitutional violations under Counts 1 and 2.

[21]    Beyond reciting the black letter law in their introductory paragraphs, the Officers do not mention the "clearly established" prong in their analysis.  In other words, they never argue that even if an Officer's conduct amounted to a constitutional violation, that violation was not clearly established when it occurred.

different elements.[22]   The Officers, however, fail to even mention any of these claims, let alone identify their elements and explain which ones that Lamonte's allegations do not satisfy.

Where the Officers' specific challenges are apparent, the Court addresses them.  Where the challenges are not apparent, the Court does not.  It is not the Court's responsibility to comb through the Officers' motion and guess which claims they find insufficient and for what reasons.

### i.      Ware

Against Ware, Lamonte asserts Fourth and Fourteenth Amendment claims for malicious prosecution, evidence fabrication and Brady violations.  Specifically, Lamonte alleges that Ware (1) participated in a coercive identification procedure with Niko Quinn, who later identified Lamonte as the murderer, (2) fabricated a report that falsified details of the identification procedure and (3) failed to disclose the nature of the identification to Lamonte or his counsel.

The Officers argue that the first allegation – that Ware coerced Niko Quinn into identifying Lamonte – does not state a constitutional violation because Ware's conduct did not cause Lamonte's deprivations of liberty.[23]   The Officers point out that despite Ware's coercion, Quinn

---

[22]      To succeed on a claim for malicious prosecution, plaintiff must show that (1) defendant caused plaintiff's continued confinement or prosecution, (2) the original action terminated in favor of plaintiff, (3) no probable cause supported the original arrest, continued confinement or prosecution, (4) defendant acted with malice and (5) plaintiff sustained damages.  Montoya, 898 F.3d at 1066.

To succeed on a Brady claim, plaintiff must show (1) the evidence at issue is favorable to him either because it is exculpatory, or because it is impeaching, (2) the state suppressed that evidence, either willfully or inadvertently and (3) he was prejudiced.  Powell v. Miller, 104 F. Supp. 3d 1298, 1309 (W.D. Okla. 2015).

To succeed on a claim for evidence fabrication, plaintiff must prove that defendant falsified evidence knowingly or with reckless disregard for the truth.  Bledsoe, 275 F. Supp. 3d at 1254.

[23]      The Officers do not mention the latter two allegations: report fabrication and disclosure of the coercion.  Accordingly, the Court assumes that the Officers do not challenge the sufficiency of those allegations.

did not actually identify Lamonte during this encounter – she did so later in the presence of only Golubski.  In other words, the crux of the Officers' argument is that because Niko Quinn's false identification did not occur in Ware's presence immediately after his coercion, he did not violate Lamonte's constitutional rights.

Tenth Circuit law does not support the narrow causational rule that the Officers propose.  As explained above, a government actor is liable under Section 1983 if he "set in motion a series of events that [he] knew or reasonably should have known would cause others to deprive [plaintiff] of [his] constitutional rights."  Martinez, 697 F.3d at 1255 (citations omitted).  In other words, defendant is liable for the harm that his conduct proximately causes.  Id.  Accordingly, an officer can be liable for the violation of plaintiff's constitutional rights if the violation "would not have occurred but for [defendant's] conduct and if there were no unforeseeable intervening acts superseding [defendant's] liability."  Id. (citations omitted).  The fact that people other than defendant "may have concurrently caused the harm does not change the outcome as to [defendant]."  Id. (citations omitted).  Causation "is generally a question of fact for the jury." Schneider, 717 F.3d at 778.

For purposes of the motion to dismiss, Lamonte sufficiently alleges that Ware's coercive conduct caused the violation of his constitutional rights.  Lamonte alleges that while questioning Niko Quinn with Golubski, Ware pointed to Lamonte's photograph, told her Lamonte's name and instructed her to select Lamonte as the culprit.  Although Quinn initially declined to make the false identification, she did so later in the presence of Golubski.  These allegations plausibly show that Ware's coercive tactics – along with falsifying the interrogation report and failing to disclose this information – caused the violation of Lamonte's rights.  That Ware was not physically present

when Quinn eventually made the identification does not compel a different conclusion. The Court therefore overrules the Officers' motion on this issue.

### ii.    Brown

Against Brown, Lamonte asserts Fourth and Fourteenth Amendment claims for malicious prosecution, evidence fabrication and <u>Brady</u> violations. Specifically, Lamonte alleges that Brown crafted a false police report by fabricating inculpatory statements that Lamonte that did not make. The Officers contend that these allegations "are at most claims of negligence," and do not rise to a level of a constitutional deprivation.

This argument is frivolous. Lamonte alleges that following his arrest, Brown drove him to the police station for booking, and later reported that during that car ride, Lamonte gave a false alibi that he had been working at a restaurant when the shooting occurred. Lamonte alleges that he never made that statement and had consistently told the police the truth – that he was at his aunt's house with his extended family during the shooting. In other words, Brown fabricated a false alibi, which contributed to Lamonte's continued confinement and ultimate wrongful conviction. These allegations sufficiently show that Brown violated Lamonte's constitutional rights. <u>Bledsoe</u>, 275 F. Supp. 3d at 1254 (fabricating evidence is clearly-established constitutional violation). The Court therefore overrules the Officers' motion on this issue.

### iii.    Barber

Against Barber, Lamonte asserts Fourth and Fourteenth Amendment claims for malicious prosecution, evidence fabrication and <u>Brady</u> violations. Specifically, Lamonte alleges that Barber fabricated various reports with false alibis and other inculpatory information. The Officers contend that these allegations only show that Barber signed off on the reports as a supervisor, which does not show the level of personal participation required for a constitutional violation.

This argument is also frivolous.  Lamonte alleges that after his arrest, Barber prepared police reports which falsely claimed that Rose made statements implicating Lamonte in the murders and provided false alibis for him.  Barber later forwarded this fabricated information to prosecutors, but did not reveal to Lamonte or his counsel that he had falsified the statements attributed to Rose.  These allegations plausibly show that Barber violated Lamonte's constitutional rights.  See id.  The Court therefore overrules the Officers' motion on this issue.

### iv.      Culp

Against Culp, Lamonte asserts Fourth and Fourteenth Amendment claims for malicious prosecution.  Specifically, Lamonte alleges that Culp caused the violation of his constitutional rights by specifically choosing Golubski to investigate the murders because he knew about Golubski's sexual relationships with various witnesses – including Ruby Mitchell and Stacy Quinn – and knew that Golubski would use those relationships to obtain false identifications and other fabricated evidence, just as he had done in the past.  The Officers argue that these allegations do not show the level of personal involvement by Culp necessary to impose liability under Section 1983.  In other words, the Officers argue that Culp's liability is based solely on his supervisory role, which is insufficient under Section 1983.

Under Section 1983, defendant cannot be liable under a theory of respondeat superior.  Plaintiff must instead show that "an affirmative link exists between the constitutional deprivation and either [ ] defendant's personal participation, his exercise of control or direction, or his failure to supervise."  Sandifer v. Green, 126 F. App'x 908, 909 (10th Cir. 2005) (citations omitted).

For purposes of the motion to dismiss, Lamonte's allegations are sufficient to show personal actions and participation from Culp which caused the violation of Lamonte's constitutional rights.  Lamonte alleges that based on Golubski's open and notorious sexual

relationships with his informants – including those relevant to the murders at issue – and his history of "using sexual domination to cause vulnerable black women to give false evidence," Culp specifically chose Golubski to investigate the murders.  Golubski then proceeded to do exactly what Culp had intended – fabricate evidence to arrest, prosecute and convict Lamonte.  The Court overrules the Officers' motion on this issue.

### v.    Smith And Blood

Against Smith, Lamonte asserts Fourth and Fourteenth Amendment claims for malicious prosecution, evidence fabrication and Brady violations.  Against Blood, Lamonte asserts Fourth and Fourteenth Amendment claims for malicious prosecution.  As the Court explained above, Lamonte specifically alleges that both of these Officers deliberately chose not to take basic investigative steps in order to avoid evidence that would have exonerated Lamonte.

The Officers contend that these allegations amount to mere negligence, which does not violate the Constitution.  Not only is it unclear which particular claim the Officers are challenging,[24] they mischaracterize Lamonte's allegations with respect to Smith and Blood.  Lamonte is not simply alleging that these Officers were negligent.  That is, he is not alleging that they made investigative mistakes or that the investigation was conducted inadequately.  He is alleging that they deliberately chose not to take certain basic investigative steps because they were intentionally dodging evidence that would have exonerated him.  In other words, Smith and Blood

---

[24]    Consistent with challenges regarding the other Officers, they never identify which particular claim they are challenging at any given point.  Here, for example, the Officers do not specify which claim (malicious prosecution, evidence fabrication or Brady violations), which constitutional right (Fourth or Fourteenth Amendment), or even which count (Count 1 or 2) they are challenging.  As the Court explained above, each of these claims involves different elements.  It is not the Court's responsibility to fish through the Officers' motion and guess which claims – and which elements within those claims – they find insufficient and for what reasons.  Accordingly, the Court does not conduct a separate analysis for each claim.

were only searching for evidence that incriminated Lamonte.  These allegations plausibly show that they violated Lamonte's constitutional rights.  The Court therefore overrules the Officers' motion on this issue.

## B.      Count 4

The Officers assert that Count 4 fails to state a claim upon which relief can be granted.  Under Count 4, Lamonte asserts Fourth and Fourteenth Amendment failure to intervene claims against the Officers.  Specifically, Lamonte alleges that the Officers had opportunities to intervene to prevent his liberty deprivations, but failed to do so.  The Officers assert that Lamonte's allegations under Count 4 are insufficient because (1) they do not to state a claim for failure to intervene and (2) the statute of limitations bars them.[25]

### 1.      Failure To State A Claim

The Officers assert that Lamonte's allegations under Count 4 do not state a claim for failure to intervene.

All law enforcement officials "have an affirmative duty to intervene to protect the constitutional rights of citizens from infringement by other law enforcement officers in their presence."  Bledsoe, 275 F. Supp. 3d at 1264 (citations omitted).  An officer who has a realistic opportunity to intervene but fails to do so is liable "for the preventable harm caused by the actions of the other officers where that officer observes or has reason to know" that the others committed a constitutional violation.  Jones v. Norton, 809 F.3d 564, 576 (10th Cir. 2015); Vondrak v. City of Las Cruces, 535 F.3d 1198, 1210 (10th Cir. 2008) (citations omitted).

---

[25]      The Offices also argue that Counts 1 and 2 do not state viable constitutional violations, and therefore they cannot form the basis for Lamonte's failure to intervene claim.  The Court has already found that Counts 1 and 2 state viable constitutional violations.

Here, the Officers assert that Lamonte has failed to allege specific conduct that would support a failure to intervene claim against each Officer.  With respect to Brown, Smith and Blood, the Court agrees.  Lamonte alleges that Brown fabricated a false alibi that Lamonte purportedly provided during the ride to the police station.  The second amended complaint appears devoid of any allegation that Brown knew or had reason to know about the constitutional violations by other officials.  In response to the motion to dismiss, Lamonte does not direct the Court to any such allegations – he addresses every Officer except Brown.  The Court therefore finds that Lamonte's allegations do not state a failure to intervene claim against Brown.

The same is true with respect to Smith and Blood.  Lamonte alleges that both of these Officers failed to adequately investigate the murders, but never alleges that they knew or had reason to know about misconduct by other officials.  His response to the motion to dismiss does not direct the Court to any such allegations, but instead repeats these same allegations and concludes that they plausibly show that both Smith and Blood "understood that McIntyre was innocent but took no steps to prevent other officer[s] from violating his constitutional rights by causing his wrongful conviction."  Plaintiffs' Response to Defendant Officers' Memorandum In Support Of Issue 7 (Doc. #147) filed December 20, 2019.  Glaringly absent from that explanation is any assertion – or most importantly any direction to allegations in the second amended complaint – that Smith or Blood actually knew or had reason to know of constitutional violations by other officials.  Accordingly, the Court dismisses the failure to intervene claims against Brown, Smith and Blood.

With respect to Krstolich, Ware, Barber and Culp, however, the Court overrules the Officers' motion because Lamonte's allegations plausibly show that each knew or had reason to

know about constitutional violations by other officials, but declined to intervene.  Specifically, Lamonte alleges the following:

> Krstolich: present during coercive interrogations and failed to take any steps to prevent the resulting false evidence from causing Lamonte's prosecution.

> Ware: present during coercive interrogations and failed to take any steps to prevent the resulting false evidence from causing Lamonte's prosecution.

> Barber: reviewed and approved the written reports from Golubski and Krstolich despite having reason to know that Mitchell's identification was the product of coercion or other misconduct.

> Culp: specifically selected Golubski to investigate the murders knowing that he would fabricate evidence and engage in other misconduct, and later reviewed and approved the false report from Golubski.

For purposes of the motion to dismiss, these allegations are sufficient to state a claim for failure to intervene.[26]  The Court therefore overrules the Officers' motion with respect to Krstolich, Ware, Barber and Culp.

### 2.      Statute Of Limitations

The Officers assert that the statute of limitations bars Lamonte's failure to intervene claims under Count 4.

As noted, for purposes of a Section 1983 claim, the Court borrows the statute of limitations from the personal injury laws of the state in which the claim arose.   McCarty, 646 at 1289.

---

[26]      In two short sentences, the Officers also argue that they cannot be liable for failing to intervene because Lamonte's allegations do not explain what steps the Officers could have taken to stop the constitutional violations, or whether those steps would have realistically prevented the violation of Lamonte's constitutional rights.  In other words, the Officers are asking the Court to dismiss Lamonte's claims because he did not, for example, expressly explain in his second amended complaint what Krstolich – who allegedly partnered with Golubksi to coerce false identifications – could have done to expose those constitutional violations.  This is not a serious argument, nor is it true.  Lamonte alleges several times that the Officers could have at least revealed the violations to prosecutors or Lamonte's lawyers.  See Second Amended Complaint (Doc. #74) ¶ 100.

Accordingly, for Section 1983 claims arising in Kansas, the Court applies a two-year statute of limitations.  See K.S.A. § 60–513(a)(4); Clark, 2013 WL 3867532, at *4.  To determine when the claim begins to accrue, the Court applies federal law.  McCarty, 646 F.3d at 1289.  Because the injury under a Section 1983 claim is a violation of a constitutional right, it begins to accrue when plaintiff "knows or should know that his [ ] constitutional rights have been violated."  Beck, 195 F.3d at 557.  When the Section 1983 claim necessarily challenges the validity of a conviction or sentence, the Heck doctrine delays the accrual date "until the conviction or sentence has been invalidated."  Id.; Heck, 512 U.S. at 487.

Here, the Officers argue that Heck does not apply because a failure to intervene claim does not require a showing of an overturned conviction.  Although case law appears largely undeveloped on whether Heck applies to failure to intervene claims, the Court finds the Officers' argument unpersuasive.  See Patrick v. City of Chicago, 213 F. Supp. 3d 1033, 1053 (N.D. Ill. 2016) (Heck doctrine applies to failure to intervene claim).  Under the plain text of the rule, the Heck doctrine applies when the claim "necessarily impl[ies] the invalidity" of plaintiff's conviction.  Beck, 195 F.3d at 557.  And as the Tenth Circuit has explained, whether a claim does so depends on its substance.  Id.

Here, Lamonte's failure to intervene claim alleges that the Officers failed to stop the constitutional violations which he asserts under Counts 1 and 2.  Under those counts, Lamonte alleges that the Officers and Golubski violated his Fourth and Fourteenth Amendment rights when they fabricated and withheld evidence, which caused Lamonte to be prosecuted and convicted for crimes that he did not commit.  Accordingly, to succeed on his failure to intervene claim, Lamonte will have to show that he was wrongfully prosecuted and convicted.  This necessarily implies the invalidity of his conviction.  See Patrick, 213 F. Supp. at 1053.  Accordingly, Heck delays the

accrual date for Lamonte's failure to intervene claim until his conviction was invalidated, which was October 13, 2017 – well within the two-year statute of limitations.  The Court therefore overrules the Officers' motion on this issue.

### 3.  Qualified Immunity

The Officers assert that they are entitled to qualified immunity for Lamonte's failure to intervene claims because the allegations do not show that each individual Officer violated his constitutional rights.  Although unclear, the Officers apparently argue that if an Officer did not himself commit the particular underlying constitutional violation, he cannot be liable for failing to stop other officials from committing that violation.

Even if it were accurate, the Officers' argument is moot.  As the Court explained above, Lamonte asserts viable constitutional claims under Counts 1 and 2 against Krstolich, Ware, Barber and Culp – the Officers that remain under the failure to intervene claims.   The Court therefore overrules the Officers' motion on this issue.[27]

### C.      Count 5

The Officers seek dismissal of Count 5 because it fails to state a claim upon which relief can be granted.  Under Count 5, Lamonte asserts a conspiracy claim under Section 1983, alleging that that the Officers – along with Golubski – acted in concert to deprive him of his rights under the Fourth, Fifth and Fourteenth Amendments to be free from unreasonable searches and seizures, malicious prosecution, coercion, deprivation of liberty without due process of law and to a fair

---

[27]      The Officers continue to trumpet the baseless argument that they cannot be liable for failing to intervene because Lamonte's allegations do not explain what steps each Officer could have taken to stop the constitutional violations.

trial.[28]   As the Court explained above, these allegations apparently refer to Lamonte's constitutional claims under Counts 1 and 2.

To succeed on a conspiracy claim under Section 1983, plaintiff must allege (1) specific facts showing an agreement and concerted action among defendants and (2) an actual deprivation of a constitutional right.  Maier, 2017 WL 552629, at *3.  Here, the Officers assert that the Court should dismiss Count 5 because (1) Lamonte's allegations do not show an agreement and concerted action, (2) the statute of limitations bars the conspiracy claim and (3) they are entitled to qualified immunity.[29]

### 1.    Agreement And Concerted Action

The Officers assert that Count 5 must fail because his allegations do not show an agreement and concerted action among defendants to deprive Lamonte of his constitutional rights.

To succeed on a Section 1983 claim for conspiracy, plaintiffs must allege "specific facts showing an agreement and concerted action among defendants" to deprive him of his constitutional rights – conclusory allegations are not enough.  Dornon v. Jurgens, No. 14-4065-RDR, 2015 WL 2449578, at *4 (D. Kan. May 22, 2015), aff'd, 636 F. App'x 457 (10th Cir. 2016).  This requires plaintiff to allege facts that manifest a "specific goal to violate [plaintiff's] constitutional rights by engaging in a particular course of action."  Bledsoe, 275 F. Supp. at 1252.  Because direct evidence

---

[28]     Count 5 also alleges that the Officers and Golubski acted in concert to deprive him of his rights under the First and Fourteenth Amendments to access courts and executive clemency. As the Court explained above, Lamonte does not direct the Court to any allegations that would support such claims.  Accordingly, the Court dismisses Count 5 to the extent that it is based on allegations regarding First and Fourteenth Amendments rights to access courts and executive clemency.

[29]     The Officers also argue that Count 5 must fail because his allegations do not establish any constitutional violations, and therefore cannot satisfy the second prong of a conspiracy claim.  The Court has already found, however, that Counts 1 and 2 state viable constitutional violations.

of an agreement to join a conspiracy is rare, the Court can infer assent "from acts furthering the conspiracy's purpose."  Id.  The Court decides whether plaintiff has alleged sufficient facts to support a conspiracy claim on a case-by-case basis.  Id.

Here, Lamonte has sufficiently alleged a conspiracy claim against Krstolich, Ware, Barber and Culp.  With respect to Krstolich and Ware, Lamonte alleges that they intentionally worked in concert to coerce witnesses into wrongfully identifying him as the murderer.  In other words, Krstolich and Ware worked with Golubski to fabricate eyewitness testimony that falsely implicated Lamonte, and then failed to document and disclose material exculpatory evidence to prosecutors, including the fact that the identifications were false.  These specific facts plausibly show an agreement and concerted actions by Krstolich and Ware to deprive Lamonte of his constitutional rights.

Lamonte also asserts a viable conspiracy claim against Barber.  He alleges that Barber prepared police reports which falsely claimed that Rose made statements implicating Lamonte in the murders and provided false alibis for him.  Barber later forwarded this fabricated information to prosecutors, but did not reveal to Lamonte or his counsel that he had falsified the statements attributed to Rose.  Moreover, Barber reviewed and approved written reports from Golubski and Krstolich despite knowing or having reason to know that the information in the reports was the product of coercion or other misconduct.  To cover up this misconduct and bolster the falsified identification, Barber later reported that he had heard from numerous sources that Lamonte was the perpetrator, which was a lie.  These specific allegations plausibly show that Barber intentionally worked with other officials – including Golubski and Krstolich – to deprive Lamonte of his constitutional rights.

The same is true with respect to Culp.  Lamonte alleges that Culp specifically chose Golubski to investigate the murders because he knew about Golubski's sexual relationships with various witnesses – including Ruby Mitchell and Stacy Quinn – and knew that Golubski would use those relationships to obtain false identifications and other fabricated evidence, just as he had done in the past.  Golubski then proceeded to do exactly what Culp had intended – fabricate evidence to arrest, prosecute and convict Lamonte.  These specific allegations are sufficient to plausibly show an agreement and concerted actions to deprive Lamonte of his constitutional rights.

Lamonte does not, however, assert viable conspiracy claims against Brown, Smith and Blood.   Against these Officers, Lamonte alleges the following:

> Brown: drove Lamonte to the police station for booking, and later reported that during that car ride, Lamonte gave a false alibi that he had been working at a restaurant when the shooting occurred.

> Smith: deliberately or recklessly failed to investigate and document key evidence that would have exonerated Lamonte; despite Niko Quinn telling Smith that she immediately recognized the murderer, and providing a detailed description of him, Smith interviewed her for only four minutes; and failed to question Stacy Quinn despite Niko telling him that she could also provide a positive identification.

> Blood: deliberately or recklessly failed to investigate and document key evidence that would have exonerated Lamonte; and failed to take steps to properly document or collect physical evidence, which would have showed that he was not responsible for the murders

None of these allegations include specific facts that show any agreements or concerted actions to deprive Lamonte of his constitutional rights.  See Dornon, 2015 WL 2449578, at *4. Indeed, as the Court explained above, the second amended complaint is devoid of any allegations that these Officers even knew about others violating Lamonte's rights, let alone agreed to work with them in doing so.  Beyond listing them in the heading, the conspiracy cause of action does not mention Brown, Smith or Blood.  Lamonte's response to the motion to dismiss suffers from the same defect – he does not direct the Court to any allegations regarding these particular

individuals, and instead refers to all seven Officers collectively.  Tenth Circuit law is clear that to assert a viable conspiracy claim against an individual, a plaintiff must allege "specific facts showing an agreement and concerted action" by that individual – conclusory allegations are not enough.  Lamonte cannot satisfy that standard by simply lumping a defendant in with six others and concluding – without further explanation – that they all acted in concert.  The Court therefore dismisses the conspiracy claims against Brown, Smith and Blood.

### 2.     Statute Of Limitations

The Officers assert that the statute of limitations bars Lamonte's conspiracy claims under Count 5.

As noted, for purposes of a Section 1983 claim, the Court borrows the statute of limitations from the personal injury laws of the state in which the claim arose.  McCarty, 646 at 1289.  Accordingly, for Section 1983 claims arising in Kansas, the Court applies a two-year statute of limitations.  See K.S.A. § 60–513(a)(4); Clark, 2013 WL 3867532, at *4.  To determine when the claim begins to accrue, the Court applies federal law.  McCarty, 646 F.3d at 1289.  Because the injury under a Section 1983 claim is a violation of a constitutional right, it begins to accrue when plaintiff "knows or should know that his [ ] constitutional rights have been violated."  Beck, 195 F.3d at 557.  When the Section 1983 claim necessarily challenges the validity of a conviction or sentence, the Heck doctrine delays the accrual date "until the conviction or sentence has been invalidated."  Id.; Heck, 512 U.S. at 487.

Here, the Officers argue that Heck does not apply because a conspiracy claim does not require a showing of an overturned conviction.  Like with failure to intervene claims, Tenth Circuit case law is largely undeveloped on whether Heck applies to conspiracy claims.  As the Court

explained above, however, <u>Heck</u> applies to Lamonte's failure intervene claims because they necessarily imply the invalidity of his conviction.

The same logic applies to Lamonte's conspiracy claims.  Under these claims, he alleges that the Officers conspired to violate his rights under the Fourth and Fourteenth Amendments – the constitutional violations under Counts 1 and 2.  Under those counts, Lamonte alleges that the Officers and Golubski violated his Fourth and Fourteenth Amendment rights when they fabricated and withheld evidence, which caused Lamonte to be prosecuted and convicted for crimes that he did not commit.  Accordingly, to succeed on his conspiracy claim, Lamonte will have to show that he was wrongfully prosecuted and convicted.  This necessarily implies the invalidity of his conviction.  <u>See</u> <u>Hines v. Oklahoma</u>, No. 07-197-R, 2007 WL 3046458, at *1 (W.D. Okla. Oct. 17, 2007) (malicious prosecution and conspiracy to convict necessarily imply invalidity of plaintiff's convictions for purpose of <u>Heck</u>); <u>Bradford v. Scherschligt</u>, 803 F.3d 382, 388 (9th Cir. 2015) (citing <u>Walker v. Jastremski</u>, 159 F.3d 117, 119 (2d Cir. 1998) (claim based on officers' conspiracy to fabricate evidence accrued when charges dismissed)); <u>Coley v. Ventura Cty.</u>, No. 18-10385-PAJ, 2019 WL 7905740, at *4 (C.D. Cal. Sept. 24, 2019) (<u>Heck</u> delays accrual date for conspiracy claim).  Accordingly, <u>Heck</u> delays the accrual date for Lamonte's conspiracy claim until his conviction was invalidated, which was October 13, 2017 – well within the two-year statute of limitations.  The Court therefore overrules the Officers' motion on this issue.

### 3. Qualified Immunity

The Officers assert that they are entitled to qualified immunity on Lamonte's conspiracy claims.  Specifically, they argue that Lamonte's allegations do not show that each individual Officer violated his constitutional rights.  In other words, the Officers apparently make the same argument that they made with respect to the failure to intervene claims – that if an Officer did not

himself commit the particular underlying constitutional violation, he cannot be liable for conspiring with other Officers to do so.

This argument is also moot. As the Court explained above, Lamonte asserts viable constitutional claims under Counts 1 and 2 against Krstolich, Ware, Barber and Culp – the Officers that remain under the conspiracy claims. The Court therefore overrules the Officers' motion on this issue.

### D.      Count 6

The Officers seek dismissal of Count 6 because it fails to state a claim upon which relief can be granted. Under Count 6, Lamonte asserts Fourth and Fourteenth Amendment supervisory liability claims against Barber and Culp. Specifically, he alleges that Barber and Culp acted with gross negligence, recklessness and/or deliberate indifference to the constitutional rights of citizens by failing to provide adequate training, supervision and discipline to the other Officers, which caused these Officers to violate Lamonte's constitutional rights.

The Officers assert that Lamonte's allegations fail to state a claim upon which relief can be granted because (1) they do not show that Culp or Barber were personally involved in violating Lamonte's rights, (2) the statute of limitations bars the supervisor liability claims and (3) Culp and Barber are entitled to qualified immunity.

### 1.      Failure To State A Claim

The Officers assert that Lamonte's allegations do not show that Culp and Barber had the level of personal involvement necessary to establish supervisor liability. [30]

---

[30]      The Offices also argue that Barber and Culp cannot be liable for supervisory liability because Lamonte's allegations do not show that their subordinates – the other Officers – violated his constitutional rights. The Court has already found that Lamonte asserts viable constitutional claims against the Officers under Counts 1 and 2.

Because vicarious liability does not apply to claims under Section 1983, plaintiffs must show that each defendant violated his constitutional rights through his own individual actions. Durkee v. Minor, 841 F.3d 872, 877 (10th Cir. 2016). Accordingly, Section 1983 does not involve any "special rules" for supervisor liability – the test for a supervisor "is the same as the test for everyone else." Id. That is, a supervisor is only liable if plaintiff can show (1) personal involvement, (2) causation and (3) a culpable state of mind. Burke v. Regalado, 935 F.3d 960, 997 (10th Cir. 2019). To satisfy the personal involvement requirement, plaintiffs must show an "affirmative link" between the constitutional deprivation and "either the supervisor's personal participation, his exercise of control or discretion, or his failure to supervise." Estate of Hammers v. Douglas Cty., Kansas Bd. of Commissioners, 303 F. Supp. 3d 1134, 1150 (D. Kan. 2018) (citations omitted). Plaintiffs can do so by showing that the supervisor adopted a plan or policy which demonstrated his authorization or approval of misconduct. Stewart v. City of Prairie Vill., Kan., 904 F. Supp. 2d 1143, 1159 (D. Kan. 2012).

Here, the Officers assert that Lamonte's allegations do not show the requisite personal involvement by Culp and Barber, and therefore Lamonte is effectively attempting to hold them vicariously liable for the actions of other officials.[31]

This argument is unpersuasive. Lamonte alleges that in addition to fabricating false alibis and creating false police reports which implicated him in the murders, Barber personally helped Golubski and Krstolich to violate Lamonte's constitutional rights. Specifically, Barber reviewed and approved written reports from Golubski and Krstolich despite knowing or having reason to

---

[31]     In one sentence, the Officers also assert that Lamonte's allegations do not satisfy the causation and state of mind requirements for supervisor liability – they do not cite any authority or even explain why they find the allegations insufficient. Absent further explanation or argument, the Court cannot address these contentions.

know that the information in the reports was false and the product of police misconduct.  To cover

up this misconduct and bolster the falsified identification in order to prosecute Lamonte, Barber

later reported that he had heard from numerous sources that Lamonte was the perpetrator, which

was a lie.  These allegations plausibly establish the level of personal involvement necessary to

establish supervisor liability.

The same is true with respect to Culp.  Lamonte alleges that Culp specifically chose

Golubski to investigate the murders because he knew about Golubski's sexual relationships with

various witnesses – including Ruby Mitchell and Stacy Quinn – and knew that Golubski would

use those relationships to obtain false identifications and other fabricated evidence, just as he had

done in the past.  Golubski then proceeded to do exactly what Culp had intended – fabricate

evidence to arrest, prosecute and convict Lamonte.  In other words, Culp directly facilitated

Golubski in violating Lamonte's rights.  Therefore, contrary to the Officers' assertion, Lamonte is

not simply attempting to hold Culp vicariously liable as Golubski's supervisor, but is instead

bringing his claim based on Culp's personal and deliberate involvement in the violation of his

rights.  For purposes of the motion to dismiss, these allegations are sufficient to state a claim for

supervisor liability.  The Court therefore overrules the Officers' motion on this issue.

## 2.     Statute Of Limitations

The Officers assert that the statute of limitations bars Lamonte's supervisor liability claims

under Count 6.

As explained above, the Court borrows the statute of limitations from the personal injury

laws of the state in which the claim arose.  McCarty, 646 at 1289.  Accordingly, for Section 1983

claims arising in Kansas, the Court applies a two-year statute of limitations.  See K.S.A. § 60–

513(a)(4); Clark, 2013 WL 3867532, at *4.  To determine when the claim begins to accrue, the

Court applies federal law.  McCarty, 646 F.3d at 1289.  Because the injury under a Section 1983 claim is a violation of a constitutional right, it begins to accrue when plaintiff "knows or should know that his [ ] constitutional rights have been violated."  Beck, 195 F.3d at 557.  When the Section 1983 claim necessarily challenges the validity of a conviction or sentence, the Heck doctrine delays the accrual date "until the conviction or sentence has been invalidated."  Id.; Heck, 512 U.S. at 487.

Here, the Officers argue that Heck does not apply because a supervisor liability claim does not require a showing of an overturned conviction.  Like with the failure to intervene and conspiracy claims, courts within the Tenth Circuit have infrequently addressed whether Heck applies to supervisor liability claims.  Where courts have addressed the issue, however, they have held in the affirmative.  See McCarty, 646 F.3d at 1289 (Heck applies to supervisor liability claims).  Lamonte's supervisor liability claims call for the same conclusion here.  As the Court has explained, Heck applies to claims that necessarily imply the invalidity of convictions.  Under Lamonte's supervisor liability claims, he alleges that Culp and Barber acted with gross negligence, recklessness and/or deliberate indifference by failing to provide adequate training, supervision and discipline to the other Officers, which caused these Officers to violate Lamonte's constitutional rights – the constitutional violations under Counts 1 and 2.  Under those Counts, Lamonte alleges that the Officers and Golubski violated his Fourth and Fourteenth Amendment rights when they fabricated and withheld evidence, which caused Lamonte to be prosecuted and convicted for crimes that he did not commit.  Accordingly, to succeed on his supervisor liability claim, Lamonte will have to show that he was wrongfully prosecuted and convicted.  This necessarily implies the invalidity of his conviction.  Id.; Coley, 2019 WL 7905740, at *4.  Accordingly, Heck delays the accrual date for Lamonte's supervisory liability claim until his conviction was invalidated, which

was October 13, 2017 – well within the two-year statute of limitations.  The Court therefore overrules the Officers' motion on this issue.

### 3.     Qualified Immunity

The Officers assert that Culp and Barber are entitled to qualified immunity on Lamonte's supervisor liability claims.  Specifically, they argue that his allegations do not show that Culp or Barber violated his constitutional rights.

Because the Court found that Lamonte asserts viable supervisor liability claims against Culp and Barber, the Court overrules the Officers' motion on this issue.

### E.     Count 8

The Officers seek dismissal of Count 8 – Lamonte's malicious prosecution claim under Kansas law – because it fails to state a claim upon which relief can be granted.

To succeed on a claim for malicious prosecution under Kansas law, plaintiff must show that (1) defendant initiated, continued or procured criminal procedures against him, (2) defendant did so without probable cause, (3) defendant acted with malice, (4) the proceeding terminated in plaintiff's favor and (5) plaintiff sustained damages.  Mohr, 434 F. Supp. 2d at 1057.

Here, the Officers argue that Lamonte's allegations do not state a claim for malicious prosecution under Kansas law because (1) they had probable cause for Lamonte's arrest, continued confinement and prosecution, (2) they did not act with malice and (3) they are entitled to discretionary function immunity.[32]

---

[32]     The Officers also assert that Lamonte's allegations do not satisfy the "favorable termination" element under Kansas law.  The Court has already found that they do.

### 1.   Probable Cause

Citing only federal law, the Officers assert that the Kansas malicious prosecution claims fail against Brown, Barber, Culp, Smith and Blood[33] because "arguable probable cause" supported Lamonte's arrest, confinement and prosecution.[34]

Under Kansas law, probable cause exists where there are "reasonable grounds for suspicion, supported by circumstances sufficiently strong in themselves to warrant a cautious or prudent person in the belief that the party committed the act of which he or she is complaining." Lindenman v. Umscheid, 255 Kan. 610, 624 (1994).

Here, Lamonte's allegations are sufficient to show that probable cause did not support his continued confinement or prosecution.  Lamonte alleges that the only evidence that he committed the murders was the fabricated identifications from Mitchell and Niko Quinn, fabricated statements from Rose which inculpated him and fabricated false alibis that the Officers attributed to him.  In other words, the only evidence supporting probable cause was falsified.  These allegations

---

[33]      The Officers do not challenge the probable cause element with respect to Krstolich or Ware.

[34]      As the Court explained above, the Officers propose that the Court apply the "arguable probable cause" standard.  Applying this standard, the Officers argue that Brown, Barber, Culp, Smith and Blood each had an objectively reasonable belief that probable existed to support Lamonte's arrest and confinement because they had no way of knowing that the identifications by Niko Quinn and Mitchell were false.

This second attempt to invoke the "arguable probable cause" standard is even more fundamentally flawed than the first.  In addition to the reasons the Court explained above (Brown and Barber both allegedly fabricated evidence and this standard only applies to warrantless arrests), "arguable probable cause" is a standard under *federal* law, which does not apply to Lamonte's malicious prosecution claim under state law.  Moreover, no equivalent standard exists under Kansas law.

plausibly show that reasonable grounds did not exist to suspect that Lamonte was responsible for the murders. The Court therefore overrules the Officers' motion on this issue.

### 2. Malice

The Officers assert that Lamonte's allegations do not show that they acted with malice. To satisfy the malice requirement, plaintiff can show that "the prior action was instituted for any improper or wrongful motive," meaning that the proceeding "is intentionally instituted with any other motive than to bring a party to justice." Nelson v. Miller, 227 Kan. 271, 278 (1980).

Here, the Officers conclude in a single sentence that Lamonte's allegations are insufficient because "there has been no allegation of malice on part of the Defendant Officers." This argument is again frivolous. With respect to Krstolich, Ware, Brown, Barber and Culp, the second amended complaint repeatedly alleges that these individuals deliberately targeted Lamonte for prosecution despite knowing or having reason to know that he was not responsible for the murders. They then fabricated and withheld evidence to ensure that Lamonte was wrongfully prosecuted and convicted. In other words, these allegations show that Krstolich, Ware, Brown, Barber and Culp were not seeking justice. Id.

The allegations also plausibly allege that Smith and Blood acted with malice. As explained above, Lamonte is not simply alleging that they made investigative mistakes or conducted an inadequate investigation. According to Lamonte's allegations – which the Court must accept as true for purpose of the motion to dismiss – Smith and Blood deliberately chose not to take certain basic investigative steps because they were intentionally dodging evidence that would have exonerated Lamonte. In other words, Smith and Blood did not seek to "bring a party to justice," but instead sought only to inculpate Lamonte. These allegations plausibly show malice for

purposes of a malicious prosecution claim.  The Court therefore overrules the Officers' motion on this issue.

### 3.     Discretionary Function Immunity

The Officers assert that they are entitled to discretionary function immunity for the malicious prosecution claims because their investigative decisions were discretionary.

Under Kansas law, a government employee acting within the scope of his employment is not liable for damages resulting from "any claim based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of [the] employee, whether or not the discretion is abused and regardless of the level of discretion involved." K.S.A. § 75-6104(e).  As the Supreme Court of Kansas recently explained, whether a function or duty is discretionary is "highly contextual," and Kansas courts "look foremost to the nature and quality of the discretion exercised."  Williams v. C-U-Out Bail Bonds, LLC, 450 P.3d 330, 344 (Kan. 2019) (citations omitted).  Although the use of judgment is relevant to determining whether a function is discretionary, the "mere application of any judgment is not the hallmark of the exception." Id.  In other words, a function is not discretionary for purposes of immunity merely because it requires an employee to use judgment.  Id. (officers' choice to cut investigation short was not "of the nature and quality which the legislature intended to put beyond judicial review").  Moreover, immunity does not apply to "willful or wanton acts by governmental employees." Lindenman, 255 Kan. at 639 (government has no power or grant of immunity under statute "to maliciously prosecute a citizen of the state"); Agustonelli v. Springer, No. 03-2025-GTV, 2003 WL 21105081, at *3 (D. Kan. May 12, 2003) (police officer who commits intentional tort not entitled to immunity).

Here, the Officers' are not entitled to immunity under K.S.A. § 75-6104(e).  As the Court has explained, Lamonte alleges that each Officer took deliberate actions – whether fabricating

evidence, withholding evidence or evading exculpatory evidence – to ensure that he was wrongfully prosecuted and convicted. The fact that the Officers exercised judgment in violating Lamonte's constitutional rights does not entitle them to immunity under Kansas law. The Court therefore overrules their motion on this issue.

## III.    Unified Government

Unified Government seeks dismissal of Counts 7 and 9, arguing that each fails to state a claim upon which relief can be granted. As explained below, the Court sustains Unified Government's motion to the extent that it would be liable under Count 7 for its employees' conspiracy violations regarding the First and Fourteenth Amendment rights to access courts and executive clemency (Count 5), and to the extent that it would be liable under Count 9 for punitive damages and prejudgment interest. The Court overrules Unified Government's motion on all other issues.

### A.    Count 7 (Monell Claim)

Unified Government asserts that the Court should dismiss Count 7 because plaintiffs' allegations fail to state a claim upon which relief can be granted. Under Count 7, Lamonte and Rose assert that under Monell, Unified Government is liable for the constitutional violations by Golubski and the Officers. Specifically, plaintiffs allege that for years, Unified Government had a policy, practice or custom of unconstitutional misconduct in felony investigations – it used and encouraged coerced and unreliable witness statements that KCKPD officers obtained through the threat of arrest, physical violence, sexual domination and payment in drugs or money.

Generally, a municipality is not liable under Section 1983 for the actions of its employees. Waller v. City & Cty. of Denver, 932 F.3d 1277, 1283 (10th Cir. 2019). Under Monell, however, a municipality can be liable "for acts for which the municipality itself is actually responsible," or

acts which the municipality has officially sanctioned or ordered.  C.F.B. v. Hayden, No. 16-2645-CM, 2019 WL 1299679, at *4 (D. Kan. Mar. 21, 2019).  To establish Monell liability, plaintiffs must show, (1) a constitutional violation by a municipal employee, (2) the existence of a municipal custom or policy and (3) a direct causal link between the custom or policy and the violation alleged.  Id.

Here, Unified Government asserts that plaintiffs' allegations are insufficient to state a claim for Monell liability because (1) plaintiffs do not have viable constitutional claims against its employees and (2) it did not have a custom or policy for some of the alleged constitutional violations.

### 1.    Constitutional Violations By Employees

Unified Government asserts that it cannot be liable under Monell because plaintiffs do not have viable constitutional claims against its employees.[35]  Specifically, it argues that (1) Counts 1 and 2 are time-barred, (2) the allegations under Counts 1 and 2 are insufficient to establish Fourteenth Amendment claims[36] and (3) the familial interference claim under Count 3 fails to state a claim.

---

[35]    As the Court explained above, Count 5 (conspiracy) does not sufficiently allege claims regarding First and Fourteenth Amendments rights to access courts and executive clemency.  To the extent that Unified Government would be liable under Monell for these constitutional violations, the Court sustains Unified Government's motion to dismiss.

[36]    Unified Government also argues that Count 4 (failure to intervene), Count 5 (conspiracy) and Count 6 (supervisor liability) do not assert claims that are distinct from those under Counts 1 and 2 (malicious prosecution, evidence fabrication and Brady violations), and therefore they do not assert independent causes for relief.  According to Unified Government, these are not independent claims, but are instead methods of proving "causation" for purposes of the constitutional violations under Counts 1 and 2.  The crux of their argument is that the claims under Counts 4, 5 and 6 are not viable because each requires an underlying constitutional violation, which plaintiffs have not shown under Counts 1 and 2.  First, the argument is wrong – the case that Unified Government cites for the proposition that these claims fall under the "causation" element explicitly holds to the contrary.  Fogarty v. Gallegos, 523 F.3d 1147, 1162 (10th Cir. 2008) (Tenth Circuit has recognized two distinct ways plaintiff can satisfy "personal involvement" requirement

### i.      Statute Of Limitations (Counts 1 and 2)

Unified Government asserts that Lamonte's malicious prosecution claims under Count 1 are time-barred.[37]  In support, it adopts the same argument that the Court has already rejected – that Lamonte's claim is not for malicious prosecution, but instead for false imprisonment, which began to accrue in 1994 when he was arrested and convicted.  As explained above, this argument is meritless – Lamonte asserts a Fourth Amendment malicious prosecution claim under Count 1. Under federal law, this claim did not begin to accrue until October 13, 2017, when the District Court of Wyandotte County, Kansas vacated his conviction and the District Attorney dismissed the charges.  See Myers, 738 F.3d at 1194 (malicious prosecution claim does not begin to accrue until criminal proceedings terminate in plaintiff's favor).  Because Lamonte filed his initial complaint on October 11, 2018, his malicious prosecution claim is not time-barred.  Accordingly, the Court overrules Unified Government's motion on this issue.

### ii.      Fourteenth Amendment Claims (Counts 1 and 2)

Unified Government asserts that the allegations under Counts 1 and 2 are insufficient to establish Fourteenth Amendment claims.  Specifically, it argues that (1) the Fourteenth Amendment claims are barred because Kansas law provides an adequate remedy for Lamonte's injuries and (2) Lamonte's allegations do not satisfy the "favorable termination" element of a Fourteenth Amendment malicious prosecution claim.  The Court has already rejected both of these arguments, and therefore overrules United Government's motion on this issue.

---

– failure to intervene and supervisor liability).  Even so, the argument is moot because plaintiffs have alleged viable constitutional violations under Counts 1 and 2, which the Court explained above.

[37]      Like the other defendants, Unified Government apparently assumes that Count 2 also asserts malicious prosecution claims, which it does not.

### iii.     Count 3

Unified Government asserts that Count 3 fails to state a claim upon which relief can be granted.  Under Count 3, plaintiffs assert familial interference claims against Golubski, alleging that after Rose rejected his continual sexual advances, Golubski retaliated against her by orchestrating the wrongful conviction of her son, Lamonte.  Unified Government asserts that these claims are time-barred.

The Court previously rejected this argument.  In doing so, it explained that <u>Heck</u> delays the accrual date of plaintiffs' familial association claims because they necessarily imply the invalidity of Lamonte's conviction.  In other words, to succeed on their familial association claims, both Lamonte and Rose will have to show that Golubski intentionally and unlawfully interfered with their relationship by causing Lamonte's wrongful prosecution and imprisonment.  This necessarily implies the invalidity of Lamonte's conviction.  Accordingly, <u>Heck</u> delays the accrual date for plaintiffs' claims until Lamonte's conviction was invalidated, which was October 13, 2017 – well within the two-year statute of limitations.  The Court therefore overrules Unified Government's motion on this issue.

### 2.     Custom Or Policy

Unified Government asserts that it is not liable for the familial association claims against Golubski because his alleged animus towards Rose was not the result of an official custom or policy.

This argument is unpersuasive.  Among other ways, plaintiffs can satisfy the custom or policy prong by showing (a) an informal custom amounting to a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a custom or usage with the force of law or (b) the failure to adequately train or supervise

employees, so long as that failure results from deliberate indifference to the injuries that may be caused.  Waller, 932 F.3d at 1283.  With respect to the second option, plaintiffs satisfy the deliberate indifference standard by showing that the municipality has "actual or constructive notice that its action or failure is substantially certain to result in a constitutional violation, and it consciously and deliberately chooses to disregard the risk of harm."  Olsen v. Layton Hills Mall, 312 F.3d 1304, 1318 (10th Cir. 2002).

Here, plaintiffs' allegations plausibly show that Unified Government had a pattern and practice of allowing Golubski to openly assault, harass and coerce women like Rose while investigating and collecting evidence.  These allegations are sufficient to show that Unified Government had actual or constructive notice of the conduct that Golubski employed against Rose and Lamonte, and deliberately chose to disregard the substantial risk of constitutional violations. Plaintiffs have therefore satisfied the custom or policy element of their Monell claims for purposes of the motion to dismiss.

### B.    Count 9

Unified Government asserts that (1) it is not liable under Count 9 and (2) Kansas law bars some of Lamonte's damages claims.

#### 1.    Liability

Unified Government asserts that it is not liable under Count 9.  Under Count 9, Lamonte and Rose assert that under Kansas law, Unified Government is liable for the state-level malicious prosecution claims against its employees.  Under Kansas law, "each governmental entity shall be liable for damages caused by the negligent or wrongful act or omission of any of its employees while acting within the scope of their employment under circumstances where the governmental entity, if a private person, would be liable under the laws of this state."  K.S.A. § 75-6103(a).

Unified Government argues that it is not liable under K.S.A. § 75-6103(a) because Lamonte's allegations fail to state a claim for malicious prosecution under Kansas law (Count 8). Specifically, it asserts that Lamonte's allegations do not satisfy the "favorable termination" element. The Court has already found to the contrary, and therefore overrules Unified Government's motion on this issue.

### 2.  Damages

Unified Government also seeks to cap or dismiss several of plaintiffs' damages claims under Count 9: (1) prejudgment interest, (2) compensatory damages in excess of $500,000 and (3) punitive damages.[38]

With respect to punitive damages and prejudgment interest, the Court agrees. Under K.S.A. § 75-6105(c), government entities are "not liable for punitive or exemplary damages or for interest prior to judgment" for claims arising under state law. Plaintiffs do not address this issue in response to the motion to dismiss. Absent argument to the contrary, the Court dismisses the damages claims against Unified Government under Count 9 to the extent that it would be liable for punitive damages or prejudgment interest.

For purposes of the motion to dismiss, the Court declines to resolve Unified Government's challenge with respect to compensatory damages. Unified Government argues that Kansas law caps the amount of damages for state tort claims at $500,000. K.S.A. 75-6105(a). As plaintiffs point out, however, the Kansas Supreme Court recently struck down as unconstitutional a $300,000 cap on noneconomic damages under a different state statute which governed personal injury claims. Hilburn v. Enerpipe Ltd., 309 Kan. 1127, 1147 (2019). The Kansas Supreme Court explained that under Section 5 of the Kansas Constitution Bill of Rights, the right to a jury is

---

[38]   These challenges to not apply to the damages claims under Count 7.

"inviolate," and the $300,000 cap on damages violated that right by "substituting juries' factual determinations of actual damages with an across-the-board legislative determination of the maximum conceivable amount of actual damages." Id. Given this reasoning, it is unclear whether the $500,000 cap under K.S.A. 75-6105(a) would also be unconstitutional. The Kansas Supreme Court did not explicitly extend their holding to *all* state statutory caps, and Kansas courts have not addressed whether it does.

The Court declines to answer this question on the motion to dismiss – it would only need to do so if and when a jury might award Lamonte more than $500,000 for his claims under Count 9. The Court therefore overrules Unified Government's motion on this issue.

**IT IS THEREFORE ORDERED** that Unified Government's Motion To Dismiss For Failure To State A Claim (Doc. #78) filed October 18, 2019 is **SUSTAINED in part and OVERRULED in part**. The Court sustains Unified Government's motion to the extent that it would be liable under Count 7 for its employees' conspiracy violations regarding the First and Fourteenth Amendment rights to access courts and executive clemency (Count 5), and to the extent that it would be liable under Count 9 for punitive damages and prejudgment interest. The Court overrules Unified Government's motion on all other issues.

**IT IS FURTHER ORDERED** that Defendant Officers' Motion To Dismiss (Doc. #86) filed October 18, 2019 is **SUSTAINED in part and OVERRULED in part**. The Court sustains the Officers' motion with respect to Count 5 to the extent that it is based on First and Fourteenth Amendment rights to access courts and executive clemency. The Court also dismisses Brown, Smith and Blood from Counts 4 and 5. The Court overrules the Officers' motion on all other issues.

**IT IS FURTHER ORDERED** that Defendant Golubski's Motion To Dismiss Plaintiffs'

Second Amended Complaint (Doc. #103) filed October 18, 2019 is **SUSTAINED in part and OVERRULED in part**.  The Court sustains Golubski's motion with respect to Count 5 to the extent that it is based on First and Fourteenth Amendment rights to access courts and executive clemency.  The Court overrules Golubski's motion on all other issues.

Accordingly, the following claims remain:

Count 1: Under Section 1983, Lamonte asserts Fourth and Fourteenth Amendment malicious prosecution claims against Golubski, Krstolich, Ware, Brown, Barber, Culp, Smith and Blood;

Count 2: Under Section 1983, Lamonte asserts Fourth and Fourteenth Amendment evidence fabrication and Brady violations against Golubski, Krstolich, Ware, Brown, Barber and Smith;

Count 3: Under Section 1983, Lamonte and Rose assert First and Fourteenth Amendment familial association claims against Golubski;

Count 4: Under Section 1983, Lamonte asserts Fourth and Fourteenth Amendment failure to intervene claims against Krstolich, Ware, Barber and Culp;

Count 5: Under Section 1983, Lamonte asserts Fourth, Fifth and Fourteenth Amendment conspiracy claims against Golubski, Krstolich, Ware, Barber and Culp;

Count 6: Under Section 1983, Lamonte asserts Fourth and Fourteenth Amendment supervisory liability claims against Barber and Culp;

Count 7: Under Section 1983, Lamonte and Rose assert Monell claims against Unified Government;

Count 8: Under state law, Lamonte asserts malicious prosecution claims against Golubski, Krstolich, Ware, Brown, Barber, Culp, Smith and Blood;

Count 9: Under state law, Lamonte asserts respondeat superior liability against Unified Government for the state-level malicious prosecution claim.

Dated this 3rd day of March, 2020 at Kansas City, Kansas.

s/ Kathryn H. Vratil
KATHRYN H. VRATIL
United States District Judge