**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS**

LAMONTE MCINTYRE &,
ROSE LEE MCINTYRE,

Plaintiffs,

v.        Case No. 2:18-cv-02545-KHV-KGG

UNIFIED GOVERNMENT OF WYANDOTTE
COUNTY AND KANSAS CITY, KS, et al.,

Defendants.

---

**PRETRIAL ORDER**

A pretrial conference was conducted in this case on March 10, 2022, by U.S. Magistrate Judge Kenneth G. Gale via teleconference.  The plaintiffs, LaMonte McIntyre and Rose Lee McIntyre, appeared through counsel, Michael Abrams, Cheryl Pilate, Alana McMullin, Emma Freudenberger, Sona R. Shah, and Grace Paras. The defendants, Unified Government of Wyandotte County and Kansas City, KS, appeared through counsel, David R. Cooper and Charles E. Branson.  The defendant, Roger Golubski, appeared through Counsel, Morgan L. Roach, and Christopher M. Napolitano.  The defendants, Estate of Detective James Michael Krstolich, Detective Dennis Ware, Officer James L. Brown, The Estate of Lieutenant Dennis Otto Barber, Detective W.K. Smith, and The Estate of Lieutenant Steve Culp, appeared through counsel, Tracy M. Hayes and Elizabeth Evers Guerra.

This pretrial order supersedes all pleadings and controls the subsequent course of this case. It will not be modified except by consent of the parties and the court's approval, or by order of the court to prevent manifest injustice.  Fed. R. Civ. P. 16(d) & (e); D. Kan. Rule 16.2(b).

**1)  PRELIMINARY MATTERS.**

  **a)  Subject-Matter Jurisdiction.**  Subject-matter jurisdiction is invoked under 28 U.S.C. 1331 and is not disputed.

  **b)  Personal Jurisdiction.**  The court's personal jurisdiction over the parties is not disputed.

c) **Venue.** Venue in this court is not disputed.

d) **Governing Law.** Subject to the court's determination of the law that applies to the case, the parties believe and agree that the substantive issues in this case are governed by the following law:

> Federal law for claims under 42 U.S.C. §1983, and Kansas law for state law claims.

2) **STIPULATIONS.**

a) **The following facts are stipulated:**

1. At the time of Lamonte McIntyre's arrest and conviction, Roger Golubski, James Michael Krstolich, Dennis Ware, James. L. Brown, W.K. Smith, Dennis Otto Barber and Steve Culp were employed as police officers and/or detectives for the Kansas City, Kansas Police Department.

2. At the time of Lamonte McIntyre's arrest and conviction, Defendant Culp was a supervisor of homicide detectives at the Kansas City, Kansas Police Department.

3. Roger Golubski became a detective in February 1986, was promoted to the rank of captain in August 2002, and retired from the KCKPD effective April 1, 2010.

4. Terry Ziegler was the KCKPD Chief of Police from December 2014 to September 2019.

5. On April 15, 1994, Doniel Quinn and Donald Ewing were shot while they sat in the front seat of a parked car on Hutchings Street, in Kansas City, Kansas by a lone assailant who fired a shotgun at least 4 times.

6. Doniel Quinn died of a shotgun wound to the head.

7. Donald Ewing was transported to Bethany Medical Center, where he died of multiple gunshot wounds from a shotgun.

8. Defendant Steve Culp was the Lieutenant supervising the homicide and crimes against persons unit in 1994 at the time of the Ewing/Quinn homicides.

9. During the Ewing/Quinn homicide investigation, Defendant Dennis Barber was a Lieutenant in the Response Unit.

10. Lamonte McIntyre was taken into police custody at approximately 8:00 p.m. on the day the crime occurred.

11. Det. Krstolich's report says Ruby Mitchell stated "she thought she recognized the party by the name of 'Lamonte.'"

12. After Lamonte McIntyre was taken into police custody, Defendant James L. Brown drove him to the detective bureau.

13. A report by Det. Golubski stated Josephine Quinn told Det. W.K. Smith "there was another daughter by the name of Stacy who stated she knew who the suspect was but on this particular date of the photo lineup, Stacy was not available. Josephine was cooperative and stated that she would make ever [sic] effort to contact her daughter and have her get in contact with us."

14. Stacy Quinn did not testify during the jury trial in 94 CR 1213.

15. Lamonte McIntyre was convicted of the murders of Doniel Quinn and Donald Ewing on September 29, 1994, and was imprisoned 23 years, 5 months, and 28 days.

16. On January 6, 1995, Lamonte was sentenced to two consecutive life sentences.

17. Lamonte McIntyre filed a motion to vacate his conviction for the double homicide. On October 13, 2017, the Wyandotte County District Attorney dismissed the charges after the District Court of Wyandotte County, Kansas had vacated Lamonte's convictions.

18. Rose McIntyre is the mother of Lamonte McIntyre and was present at the time Lamonte McIntyre was taken into police custody on April 15, 1994.

19. Plaintiffs submitted a notice to Unified Government of Wyandotte County and Kansas City, Kansas of its intent to file a claim under KSA § 12-105b with the Unified Government clerk, and no response was made within 120 days.

20. On February 24, 2020, Lamonte McIntyre received a Certificate of Innocence.

21. Plaintiffs Lamonte and Rose McIntyre brought this action on October 11, 2018.

22. On September 20, 2019, Lamonte and Rose McIntyre filed their Second Amended Complaint in this action.

23. Without prejudicing the right to contend the detention, arrest, charge, and conviction of Lamonte McIntyre were supported by probable cause, counsel for defendants will not argue to the jury that Lamonte McIntyre was definitively the shooter.

24. With permission from the Court, the initials of alleged victims of sexual assault are used herein but the names of are known to the parties.

b)       **The parties have stipulated to the foundation (but not the admissibility) of the following exhibits for purposes of summary judgment and trial:**

1.    Court file in State v. Lamonte McIntyre, Case No. 94CR1213 (BATES FPSS 45449-46124)

2.    McIntyre Waiver Hearing Transcript, Case No. 94JV489 (78 pages beginning Bates No. LMKSDC_0003705)

3.    Partial transcript of jury trial, Volume I, Case No. 94CR1213 (215 pages beginning BATES No. LMKSDC_0003796)

4.    Partial transcript of jury trial, Volume II, Case No. 94CR1213 (170 pages beginning BATES No. LMKSDC_0004011)

5.    Partial transcript of jury trial, Volume III, Case No. 94CR1213 (133 pages, LMKSDC_0004181)

6.    38 color photos included in State's Exhibits, including notice of alibi, Case No. 94CR1213 (38 pages beginning LMKSDC_0004328)

7.    Photo Array (Deposition Exhibit 21, State's Exhibits 28-32, BATES Nos. LMKSDC_ 0004352 - LMKSDC_0004360)

8.    Police File # 04154006081 (Deposition Exhibit 5, 110 pages, beginning BATES No. LMKSDC_0003391)

9.    Composite sketch (Deposition Exhibit 6, States Exhibit 21-A, BATES No. LMKSDC_0004345)

10.   Recording of Keva Garcia statement (FPSS 46181)

11.   Recording of John Quinn statement (FPSS 46182)

12.   Recording of Lt. Barber (FPSS 46183)

13.   Recording of M'Sherie Johnson statement (BATES No. FPSS 46184)

14.   Recording of statements by Niko Quinn and Josephine Quinn (BATES No. FPSS 46185)

15.   Recording of Ruby Mitchell statement (BATES No. FPSS 46186)

16.   Recording of Ruby Mitchell statement (BATES No. FPSS 46187)

17.   Audio recording of statements of Yolanda Johnson and Natasha Haygood (FPSS 46188)

18.   Homicide Listings 1985 to 2000 (BATES Nos. FPSS 51834-FPSS 51944)

19. Memoranda of Understanding between the Unified Government and Fraternal Order of Police, 1990-2002 (BATES Nos. FPSS 51260-FPSS 51833)

20. KCKPD General Orders (BATES Nos. FPSS 97248-FPSS 97283; FPSS 108138 - FPSS 109991)

21. General Order 93-4 (Deposition Exhibit 49)

22. General Order 91-9 (Deposition Exhibit 51)

23. KCKPD Code of Ethics Effective 5-1-1993 (Deposition Exhibit 48)

24. Lamonte McIntyre's Certificate of Innocence (Doc. 187-2)

## 3)   FACTUAL CONTENTIONS.

### a)   Contentions of Plaintiff(s).

<u>Golubski's Control Over the KCK Community:</u> Since the late 1970s, Roger Golubski has used the power of his badge to create an atmosphere of fear and terror that would allow him to control and coerce the most vulnerable members of the Kansas City, Kansas community – primarily black women who were impoverished or addicted to drugs, and black men who were vulnerable to police threats, thefts and beatings.

With the knowledge and approval of his colleagues and supervisors up the chain of command at the Kansas City, Kansas Police Department ("KCKPD"), Golubski threatened, coerced and sexually assaulted black women, feeding them drugs and forcing them to act as "informants," both for his cases and to keep secure his network of illegal activity. Golubski preyed on the most vulnerable – homeless and drug-addicted women, those who were working as prostitutes, those who had an outstanding warrant, and sometimes, those who simply had the misfortune to be walking down the street alone when he encountered them and lured them into his police vehicle.

Golubski also brazenly relied on his police authority to detain and arrest, employing that power to obtain compliance with his abusive, illicit and illegal demands – whether for sex, payoffs, or the provision of false "information" that could be used to "solve" a case or at least muddy the investigation sufficiently that the actual perpetrator – usually a major drug dealer allied with Golubski – would never be caught. Golubski used his badge to protect the guilty, frame the innocence, and serve his personal agenda, whether it was carrying out a vendetta or protecting the drug dealers who paid him.

Golubski was well known in the KCKPD for his "vast network" of informants, who were almost entirely female. But Golubski never documented those informants or shared their names. If they were referenced at all in reports, they were simply called "sources," or "unknown sources." Golubski's colleagues knew that he would meet alone with these vulnerable women – in his car, in housing projects, and in his office, often at night. Supervisors up the chain of command knowingly permitted Golubski to violate the rights of citizens with impunity. No supervisor acted to prevent Golubski's improper acts through appropriate discipline or supervision, even though supervisors at the KCKPD were expected to keep abreast of their supervisees' work with

informants. No training deterred Golubski from his constant and egregious violations of residents' constitutional rights.

Golubski's use and coercion of informants, and his use of physical threats and abuse toward both men and women created an atmosphere of fear and terror throughout the black community. Both men and women knew they had to comply with Golubski's demands – whether for sex or information or payoffs – or they risked threats of harm or removal of their children, abuse, assault, or arrest. Golubski's use of his vast "informant network" created fear and distrust, and any "witness" in any case being investigated by Golubski knew they risked abuse, threats or retaliation if they did not comply with what Golubski wanted them to do. This understanding existed throughout the community and affected countless criminal investigations and cases, causing some witnesses to fear coming forward and others to provide the false accounts that Golubski needed to "clear" the case or to protect the actual perpetrator, usually a criminal ally.

Throughout the KCKPD, Golubski's vast network of "informants" were relied upon because of their alleged ability to "solve" cases but were only used as Golubski saw fit. In fact, strings of seemingly related homicides remained unsolved during Golubski's tenure, because he was protecting some of his drug confederates or was concealing his own extensive contacts with a female homicide victim. KCKPD officers and supervisors knew Golubski repeatedly produced "evidence" that in fact was the product of coercive relationships or bribes and was unreliable, and either were willfully blind to his investigative misconduct and corruption, or actively condoned or encouraged it. In fact, Golubski's supervisors, were well aware of his undocumented informant network and his improper practices, nonetheless allowed Golubski free rein with his improper and unconstitutional methods of "investigation." The goal was to "clear" cases, whether that meant framing an innocent person (such as Lamonte McIntyre) or protecting a drug dealer by determining an investigation could not be solved and quickly moving on, often before even basic interviews had been conducted. Golubski was never held to account for the misuse of his badge, and the complaints that residents tried to make were quickly dismissed or not sustained. Golubski's power and reputation in the community continued to grow, and in the black community, he was widely regarded as above the law and untouchable. Indeed, residents feared making a complaint about his wrongdoing as they risked their own safety in doing so. Golubski additionally used his position as a detective to troll case files for the names of black women or to prowl the streets for vulnerable victims. His role as a detective provided not only enormous power, but also the "cover" to target and corner vulnerable women in the course (or under the guise) of conducting an investigation, and could always justify his conduct by stating that the woman was an "informant." Even when woman did provide "information," that information was not reliable or would only be relevant to Golubski's illicit role of protecting drug dealers.

Over the years, Golubski's power as a police officer allowed him to victimize countless women – threatening them or their loved ones with arrest, or worse, if they did not comply. If a woman complied, he would agree to fix tickets; make warrants disappear; and would pay her with money and/or drugs. Golubski's abuse and exploitation of black women served multiple purposes – he was able to sexually assault women behind the shield of his badge, was able to claim them as "informants" for his network and rely on secret, unknown "sources" to fix or clear cases, and was able to rely on exploited black women to serve his personal agenda of monitoring the activities of drug dealers, whether an ally or a foe. This exploitation of women allowed him to stoke the climate of fear in the community and induce compliance with his demands.

The women that Golubski assaulted and exploited were among the most vulnerable in the community. Golubski would often fixate on particular women, and stalk or harass them for months or even years. After Golubski assaulted a woman, he would make clear to her that she was not to tell anyone or complain to anyone at the Department. Golubski would let the woman know that any attempt to complain could cost a woman her life or the life of a loved one.

Among the many women Golubski victimized, assaulted, harassed, or attempted to do so were: Rose McIntyre, S.Q., E.A., D.L., C.S.R., D.D. K.K., G.B., T.B., N.H., K.D. O.W., S.K., D.W., E.G., P.W., L.S., R.R., S.B.E., M.D., R.M., R.C., N.F., R.E.T., M.A., L.M., C.K., P.H., E.M., L.G. aka K.E., T.W., P.J.C., T.H., D.E., R.C., L.M., O.W., V.H., B.R., N.F., S.H., M.H. Y.J., P.H., T.R., R.S., D.M., J.H., T.M., T.T., D.H., E.M., A.B., A.W, G.G., K.P., M.W., S.H., C.J., A.C., B.F., S.C.,, K.F., M.S., E.W., C.W., D.B., L.M., T.D., M.S., J.,H., B.W., and S.M..

Golubski also abused, threatened, and terrorized black male residents in Kansas City, KS. Men knew that Golubski, at any time he chose, could threaten, beat, shake down or terrorize any Black male he encountered. Along with other officers, he took men to isolated areas where he would strip them of all their belongings and threaten their lives. He was known to falsely arrest men, kick in their houses without a warrant, manufacture allegations against them and falsely accuse the innocent to protect guilty drug dealers with whom he was allied. Among the many men he victimized were Lamonte McIntyre, Carl Cofield, Kerry Keith, Chris Lindsey, Wayne Germany, Marvin Brantley, Ray Hickman, Ernest King, Larry Rucker Greg Wilson, and Dion Martin. To avoid harassment, humiliation, beatings and theft, men would agree to pay Golubski and his confederates in order to stay safe.

Golubski also repeatedly used investigations to target and harass black residents and extort information from them, under threat of arrest if they did not cooperate. He conscripted individuals into roles as "informants," both to provide information (often false) in criminal cases and to monitor persons for Golubski's personal benefit. He would also regularly investigate cases involving women he had a sexual, informant, or other coercive, intimate relationship without disclosing the relationship to the prosecution or defense, in order to shield them from discovery or arrest for his own benefit or to further exploit them. These exploitations and abuses were well known throughout the KCKPD, including among other officers, supervisors, and commanders. Some of the illicit, coercive sexual acts occurred at police headquarters or in police vehicles which officers repeatedly witnessed.

Golubski was also widely known to have fathered children with prostitutes and other drug-addicted women in the KCK community. He failed to support them and/or consistently prevented a declaration of paternity so he could conceal his connection to these children, conceal his sexual relationships with women he repeatedly used as informants and/or witnesses, and hide his connections to criminal activity. Even if Golubski attempted to conceal his sexual extortion and exploitation of women, it was unsuccessful as his fathering of multiple children by these women was widely known throughout the KCKPD and in the community.

Golubski's sexual exploitation of poor women, his fathering of their children, and his alliance with powerful drug dealers created conflicts of interest in his cases. Despite Golubski's knowledge that these conflicts existed, he never disclosed them to prosecutors or the defense– allowing him to

conduct a search in a homicide case at the home of a biological daughter and to conduct investigations into the homicides of women whom he had long exploited for sexual activity.

The above misconduct was known to KCKPD officers and supervisors, including but not limited to Michael Kobe, Michael York, Gary Wohlforth, Rick Armstrong, Terry Zeigler, Ronald Miller, Tim Maskil, Ruby Ellington, Burnett Ambler, Defendant James Krstolich, Defendant Dennis Ware, Defendant James Brown, Defendant Dennis Barber, Clyde Blood, Defendant W.K. Smith, and Defendant Steve Culp, and was systematically suppressed and/or deliberately disregarded by the KCKPD. Further, Golubski worked as an intermediary between KCKPD officers looking for sex and the prostitutes who were under his influence. Golubski's sexual coercion and exploitation of vulnerable Black women, his repeated misrepresentations that women he had relationships with were objective witnesses or informants volunteering information that Golubski instead had fabricated, and his harassment and humiliation of Black males gave him the reputation of being corrupt, all-powerful, widely feared, and "untouchable."

Golubski was also known in the Department for working closely with powerful drug dealers in Kansas City, Kansas, including Cecil Brooks, a leader of the Brooks/Robinson drug gang. In exchange for money or drugs, Golubski protected gang members – misdirecting or sabotaging investigations, failing to take necessary steps or gather evidence, and/or framing innocent people for crimes that the drug gangs had committed. Golubski worked to protect gang members like Neil Edgar Jr., Wendell Anderson, Cecil Brooks, Joe Robinson, William Roark, Antonio and Marcus Quinn, and Ezekiel Payne from prosecution or arrest, as they were valuable sources of payoffs and drugs, and by giving them advance warning if a raid was coming and deflecting cases away from investigations of Brooks gang members. Golubski also stole drugs and money from lower-level drug dealers and would provide those drugs to vulnerable or drug-addicted women in exchange for sex or information to operate his network of informants. Despite Golubski's climate of fear and terror in the community being common knowledge, the KCKPD never disciplined him and in fact promoted Golubski to Captain before he retired in 2010. Although many officers kept quiet, including out of fear, some complained to their superiors about Golubski's conduct, but no disciplinary action was ever taken. Likewise, several community members attempted to complain to the Internal Affairs Unit but were either turned away or told without basis that their complaints had no merit. Now, several KCKPD officers and other witnesses have given sworn statements or testimony describing his misconduct, his abuse of Black residents, and his sexual exploitation of women, which, when coupled with the Department's permissive supervision and/or tacit endorsement of Golubski's tactics, allowed such abuses to continue.

Plaintiff Rose McIntyre was one of Golubski's victims in the late 1980s. Rose was sitting in a car with her former boyfriend, Greg Hill, when Golubski pulled up from behind and demanded that she accompany him to his unmarked squad car. There, Golubski threatened to cause trouble for Rose, a single mother of five, and arrest her boyfriend if she did not come see him at the precinct the next night. Rose feared Golubski and, under threat of arrest, she went to the police station the next night as Golubski told her she must. There, an officer buzzed her in and she went to Golubski's office. Golubski again threatened to arrest Rose and her then-boyfriend unless she allowed him to perform oral sex. During the ensuing sexual assault, a KCKPD officer opened Golubski's office door, saw the sexual assault, and left without saying anything. Rose later tried to file a complaint with Internal Affairs, but they refused to take her complaint, telling her that "our officers don't do

things like that." Golubski continued to harass Rose for months, and as a result, Rose had to move to a new home and change her phone number.

The Murders of Doniel Quinn and Donald Ewing: On April 15, 1994, Doniel Quinn and Donald Ewing were murdered at close range with a shotgun by a single assailant as they sat in a parked car. After the murders, the shooter escaped in a getaway car driven by an accomplice. Evidence shows that Neil Edgar, Jr., an enforcer known as "Monster" committed the murders for money, because Quinn was suspected of stealing drugs from a drug spot operated by the Brooks-Robinson gang. Evidence also shows that after the murders, Monster escaped in a dark blue Oldsmobile driven by fellow gang member Marlon Williams.

Lamonte McIntyre is Rose's son, and was 17 years old when the Quinn and Ewing murders occurred. Lamonte McIntyre is innocent of these crimes, had no connection to the victims, or to the Brooks-Robinson drug gang who controlled the street where the shooting occurred, and had no knowledge about or involvement in the murders. When the double homicide occurred, Lamonte was with his family, which five family members confirmed under oath. Golubski arrived at the crime scene soon after the shooting. Either to protect the Brooks-Robinson drug gang, to frame Rose's son, Lamonte, in retaliation for her spurning his demands for a sexual relationship, to close the case quickly, because one eyewitness Ruby Mitchell believed the man she saw resembled a different man named Lamonte, or a combination of the above, Golubski fixated on Lamonte McIntyre.

Because of his close and illicit ties with Cecil Brooks, Golubski moved quickly to protect Cecil and his gang from being implicated in the double homicide.  By arriving at the scene and then leading the investigation, Golubski was able to immediately shift suspicion to a teenager whom he knew was innocent but whose mother had refused Golubski's sexual demands.  Golubski could protect his criminal ally – Brooks – while also retaliating against the woman who had spurned him.

One of the eyewitnesses, Ruby Mitchell, thought the suspect looked like a "Lamonte" who had dated her niece. Instead of investigating to determine which "Lamonte" had dated Ruby's niece, he and Krstolich used suggestion, coercion, or other improper means to get Ruby Mitchell to identify Lamonte *McIntyre,* a man she didn't know and had never met. They then fed her his first and last name which she recited in a taped statement, five hours after the shooting, falsely stating that he had dated her niece to bolster her purported identification.

Golubski knew or should have known Lamonte did not commit the double homicide, but he framed him by deliberately not pursuing any evidence that would point toward the actual perpetrators while using suggestion, manipulation, coercion, and/or other improper tactics to fabricate purported identifications of Lamonte McIntyre from two eyewitnesses. When Lamonte was arrested six hours after the shooting, on April 15, 1994, no probable cause existed for his arrest, as the police had nothing more than 19 ½ minutes of taped interviews and, further, because the sole identification of him, by Ruby Mitchell, had been obtained by the police through manipulation, coercion and improperly providing information to the witness. Police had no physical evidence connecting Lamonte to the crimes, no evidence of motive and no evidence that Lamonte even knew the victims.. Police also made no effort to identify the alleged accomplice, the getaway vehicle or to search for the weapon. Instead, at the time of Lamonte's arrest, they relied solely on the identification of a single witness whose facially dubious account was procured through

manipulation and coercion.   Further, as explained in detail below, Defendants fabricated inculpatory evidence and intentionally withheld and misrepresented exculpatory facts that they knew would have vitiated probable cause against McIntyre and they knew would have impeached witnesses for the prosecution at trial. In targeting Lamonte, Golubski worked closely with the other Defendants who participated in the frame-up, all of whom worked under the supervision of Lieutenant Culp, who was responsible for monitoring their work on the Ewing/Quinn investigation.

Defendants told the prosecutor they had reliable "street sources" they did not have, they fabricated evidence and coerced and manipulated witnesses, withheld exculpatory evidence, and deliberately avoided taking basic and obvious investigative steps which would have undermined their case and/or proved Lamonte's innocence. Their actions were intentional, deliberate and constituted a reckless deviation from widely accepted investigative standards.

<u>Defendants' Improper Investigation:</u> There is evidence that Golubski was intimately acquainted with two of the eyewitnesses to the murders – Ruby Mitchell, whom Golubski visited numerous times when she lived in another neighborhood and Stacy Quinn, whom Golubski had sexually exploited for years. Homicide detectives, Blood and Maskil, were originally assigned to the case. However, based on Golubski's open and notorious practice of soliciting false evidence via his relationships with individuals in KCK, including sexual and/or sexually predatory relationships with women, and knowing Golubski would use any means necessary to solve the double homicide, Steve Culp re-assigned Golubski, a non-homicide detective, to the investigation along with Defendant W.K. Smith. As the trained homicide detective on the team, it was W.K. Smith's obligation pursuant to KCKPD policy to lead the investigation; every documented investigative step after two audio recorded interviews at the crime scene appears to have been performed by Golubski alone or in concert with another detective. Culp was responsible for monitoring the investigation and approving each investigative step, which he did – including the fabrication and coercion of evidence, the withholding of exculpatory evidence, the failure to documents investigative steps or misconduct, the improper photo showings and unreliable identifications, and the failure to collect, gather, or analyze physical evidence. It was Culp's responsibility to ensure all investigative leads were followed, yet several obvious glaring investigative failures occurred apparently without any intervention by Culp. Moreover, Culp reported in the press that the crimes were drug related, yet detectives failed to follow-up in any way on that theory of motive or investigate how a teenager with no apparent connection to the drug gangs that controlled that territory came to commit an execution-style homicide in broad daylight.

Ruby Mitchell saw the shootings. She initially provided police with a general description of the shooter as a black male in black clothes. Less than an hour later, she gave Krstolich the shooter's height, build, skin tone, hairstyle, and clothing, but could not describe his face. During her initial taped statement, Mitchell never mentioned recognizing the killer or knowing his name. With no other officer in the vehicle, Golubski drove Mitchell to the police station for further questioning. During the car ride, Golubski interviewed Mitchell and made sexually suggestive comments and thinly veiled threats to her, touching Mitchell's upper thigh, with the implication that he would charge her with solicitation if she did not cooperate. After this incident, Mitchell told police at the station that she thought she recognized the shooter as the "Lamont" who dated her niece, Keva Garcia. Despite her apparent identification of the shooter, police did not contact Ms. Garcia to identify the "Lamont" she knew. Instead, Mitchell was later asked to complete a composite sketch

of the shooter at the Police Department, and the sketch did not match her initial description. Then, Defendants Golubski and Krstolich put together an improper photo showing, which included only five individuals, three of whom were McIntyre family members, Lamonte, his brother and a cousin. No reason has ever been given for the inclusion of three family members (two of which were apparently "suspects") in the array of photographs, and Defendants have given multiple, conflicting explanations for how Lamonte McIntyre's photo came to be shown to eyewitnesses as a suspect. Instead of obtaining photos from the I.D. Unit, as was the usual practice, detectives used Polaroid photos from a 1992 juvenile case, including a photo of Lamonte McIntyre that bore little resemblance to how he appeared in April 1994. Krstolich would have had easy access to a photo of Lamonte McIntyre taken two months earlier after an arrest, but instead opted to use the outdated photo.  Krstolich's police report falsely claimed Ruby Mitchell was shown photos of "different Lamontes," but Lamonte McIntyre was the only "Lamonte" shown to Ruby Mitchell. In her second taped interview, hours after the first, and although Mitchell had never heard of Lamonte McIntyre prior to her identification, Ruby Mitchell purportedly identified Lamonte McIntyre – by first and last name – from the improper photo array, and indicated she recognized him because he was the individual who used to date her niece. Because Ruby Mitchell had never met or heard of Lamonte McIntyre, the only reasonable inference is that Golubski and Krstolich fed her the name in order to misrepresent that she knew McIntyre and that his name had originated with her. This was done to bolster her false and improper identification and to make the identification appear reliable. Mitchell has since admitted that Lamonte McIntyre did not resemble the real killer. Defendant Culp, Golubski and Krstolich's supervisor, reviewed and approved these fabricated written reports despite the clearly unreliable identification and the obvious misconduct, as shown by discrepancies between the police reports and the obvious use of an improper photo showing. Further, Defendant Barber later attempted to explain how the name Lamonte McIntyre entered the investigation by falsely reporting that he was directly responsible for obtaining Lamonte's name and photograph and that he had heard from numerous sources—within mere hours of the shooting—that Lamonte was the killer. There were no such sources and no evidence to support this assertion.

Niko Quinn and Josephine Quinn were interviewed by Defendant W.K. Smith at the scene. Niko Quinn said she could identify the shooter, and, according to a subsequent report by Detective Golubski, Josephine Quinn told police that her other daughter, Stacy Quinn, had seen the shooting and knew who the shooter was. Either Golubski fabricated that Josephine had so reported on the assumption that he could manipulate Stacy Quinn into identifying his suspect, or W.K. Smith intentionally failed to document this obviously important information.  Smith failed to ask Niko Quinn or Josephine Quinn for a description of the shooter. The taped interview of Niko omitted other important details, including that Niko told police about men associated with a nearby drug house who had recently beaten Doniel. Further, Smith either deliberately failed to question Stacy Quinn or failed to document her exculpatory statements. Golubski's sexual exploitation of Stacy Quinn – also known as "Buckwheat" – was well-known in the community and was longstanding at the time of the murders. Despite their relationship Golubski reported that when he returned to the scene the next day (along with Ware)  that Stacy Quinn was "not available." Even though Golubski had a longstanding relationship with Stacy, saw her regularly, and knew she lived directly across the street from the scene (and thus could have been readily located and interviewed at any time), Golubski either interviewed Stacy and suppressed her exculpatory statements, or deliberately failed to interview her – at any point in time, and misrepresented that he was unable to locate her. Stacy Quinn testified in Lamonte McIntyre's April 1996 post- trial hearing that the shooter was not Lamonte and in an affidavit stated that she recognized "Monster" as the shooter.

Also in 1996, Niko Quinn stated in an affidavit that she lied under police and prosecutor pressure, recanted her false identification of Lamonte McIntyre at trial and attested that Lamonte looked nothing like the killer.

Six hours after Ruby Mitchell's false identification, Barber and Golubski arrested Lamonte McIntyre, based solely on that purported identification. After Lamonte's arrest, Barber and Golubski fabricated prepared police reports which falsely claimed that Rose McIntyre had asked whether a person who killed someone could be arrested for murder, and that this inculpated Lamonte because no one had yet told Rose that they were investigating a homicide. Moreover, they reported that she had given Lamonte a false alibi by asserting that he had been working at a restaurant during the shootings. Rose never made any of these statements. Barber and Golubski forwarded their false police reports to prosecutors, but did not reveal that they had falsified the statements. Additionally, after his arrest, Defendant James Brown drove Lamonte back to the police station. Brown then falsely reported to Detectives Golubski and Krstolich that Lamonte had given a different alibi during the car ride than he later told to police. No report of this statement was documented by Brown because it did not occur.

The day after the homicides, Defendants Golubski and Ware visited Niko Quinn at her home and showed her the same improper stack of five photographs that Ruby Mitchell was shown. Defendants Ware and Golubski both used improper tactics, including direct suggestions to get Niko Quinn to select the Polaroid of Lamonte McIntyre. In fact, during the photo identification procedure, Ware pointed to Lamonte McIntyre's photo, indicating that Niko should choose his photo. Despite this improper suggestion, Niko did not make a positive identification. The detectives buried their improper tactics and falsely reported that Ms. Quinn's demeanor indicated that she had recognized Lamonte McIntyre as the perpetrator but refused to identify him. Lieutenant Culp fully reviewed and approved the false reports.

A few weeks later, Niko Quinn met Golubski – with no other officers present – behind the Wyandotte High School track. There, Niko Quinn told Golubski that she knew who committed the double homicide, explaining that Aaron Robinson, Monster, and their associates had beaten Doniel Quinn before the murders, and that they and Cecil Brooks had something to do with his homicide. Golubski told Niko that she shouldn't be talking about Cecil Brooks and threatened that she would be harmed if she did. Golubski then handed to Niko the same photo of Lamonte McIntyre that Niko could not identify previously, falsely telling Niko that police had his clothes and the gun and knew for a fact that he committed the murders. Golubski then promised Niko he would help her relocate, which he did and failed to disclose or report.

Golubski deliberately failed to report that this meeting ever occurred, let alone that Niko Quinn was threatened and promised favors. After the meeting was revealed, Golubski misreported to the prosecutor and then testified that Niko Quinn had made an unequivocal, positive identification during that encounter. Despite the fact that the purported identifications from Ruby Mitchell and Niko Quinn were the only direct evidence inculpating Lamonte McIntyre in the crimes, Golubski never documented this alleged unequivocal positive identification, and failed to report it to the prosecutor prior to the preliminary hearing or raise it when questioned about his identification procedure with Niko Quinn at that hearing---because the alleged positive identification never occurred.

Further, when Niko Quinn finally saw Lamonte McIntyre for the first time in person at a pretrial hearing, she realized that he could not have been the shooter. He was much taller and had different facial features. She immediately tried to correct her false identification by telling the prosecutor Terra Morehead that her identification was inaccurate, but the prosecutor believed the retraction was not credible based on Golubski's misrepresentation that Quinn previously had identified McIntyre freely and without coercion. Additionally, before trial, Golubski and other unknown officers contacted Niko through a relative and threatened to take her children away and put her in jail, the same threat Terra Morehead made to Niko Quinn when she told Morehead that McIntyre was not the shooter. Knowing that the prosecutor and police would make good on their threats, Niko testified against Lamonte at trial. Since 1996, Niko has recanted her false testimony on multiple occasions, including in two sworn statements and in a taped statement to the District Attorney's office, stating that McIntyre was not the shooter, and describing the coercive and suggestive identification procedures used by Golubski and Ware.

Another family member, Doniel's father, John Quinn, was also in the area when the assailant fired the shotgun.  John said he did not see the shooting, but told Golubski that he was familiar with some of his son's dangerous associates, whom he described as being capable of inflicting "instant death."  Despite this statement, Golubski did not show John Quinn the photos shown to Ruby and Niko, nor did he show him any other photographs.

At the scene of the shooting, Defendants failed to take basic investigate steps that would have exonerated Lamonte. Specifically, Defendants failed to properly collect or document physical evidence on the victims, and also failed to search the area where Ruby Mitchell saw the shooter drop something. At the direction of Culp, Clyde Blood and Tim Maskil then went to the hospitals, where Blood failed to document statements from the victim's family members that indicated a motive for Doniel Quinn's murder. No shotgun shells were analyzed for prints or biological material, nor were they tested or run for ballistics to match a homicide weapon. Also, the latent prints obtained from the outside of the victims' vehicle were never analyzed and, despite muddy conditions, no footprints were lifted from the scene. Also, despite blood and glass on the ground of the crime scene, Lamonte McIntyre's clothing and shoes were not collected as evidence nor were they tested for gunshot residue, despite the fact that witnesses said Lamonte had been wearing the same clothes for three days and that the close-range shooting had occurred less than six hours before his arrest. Defendants also made no effort to look for the murder weapon or the getaway car or the driver.

Throughout the Ewing/Quinn investigation, Golubski and the other Defendants suppressed and failed to document or disclose Golubski's longtime sexual relationship with eyewitness Stacy Quinn, and that his claim Stacy was "not available" for an interview was false; the suggestive and coercive means used to secure Niko Quinn's pre-trial identification of Lamonte McIntyre; Niko Quinn's report that Doniel had been in a recent dispute with men associated with a drug house and had been beaten by those men; the fact that Golubski sexually coerced and threatened Ruby Mitchell prior to her second taped statement to police where she identified Lamonte McIntyre as the shooter; that Defendants Krstolich and Golubski manipulated Ruby Mitchell and fed her the name "Lamonte McIntyre"; the fact that Ruby Mitchell initially reported that the shooter had French braids; Golubski's close relationship with drug dealers who operated in the neighborhood, including Aaron Robinson; the fact that police knew of drug and gang activity in the area and that the crime was likely connected to neighborhood drug dealers; and the fact that police had a very

recent photo of Lamonte McIntyre that established that Lamonte looked nothing like the outdated photo shown to Ruby Mitchell or Niko Quinn.

Culp should have addressed the failure to properly collect or analyze the physical evidence in this double homicide. In addition to the failures at the scene, no officer applied for a search warrant or sought consent to search any residence, including Lamonte McIntyre's home, even though Rose McIntyre invited police to search her home at the time of Lamonte's arrest. Also, no effort was made to identify the getaway car or the driver. No motive was ever identified, and there was no evidence that showed Lamonte even knew the two victims. Additionally, despite numerous consistent statements by several family members as to Lamonte McIntyre's alibi at the time of the shooting, officers failed to gather evidence regarding the cab company Lamonte called at the time of the homicides.

Defendant Culp was the supervisor of the Ewing/Quinn homicide investigation, but failed to ensure that all eyewitnesses – like Stacy Quinn – were interviewed, failed to ensure there was an investigation into the getaway driver, failed to investigate evidence of drug-related motivations for the murders, failed to look into the obvious red flags raised by the witness accounts and myriad investigatory failures, and failed to investigate whether any connection or relationship existed between Lamonte McIntyre and the victims. Further, officers waited five months after Lamonte's arrest to interview Ruby Mitchell's niece and failed to interview the "Lamont" that had dated her niece – the individual whom Ruby Mitchell believed looked like the shooter during the homicides. Inconsistencies on the face of the police reports and large gaps in the investigation put supervisors, including Culp, on notice that further investigation was required and that misconduct had occurred, including with respect to Lamonte McIntyre's introduction into the photo arrays, the origination of the last name "McIntyre" in Ruby Mitchell's second statement, the alibi statement that Defendant Brown said Lamonte McIntyre volunteered despite the consistent alibi witness accounts as well as the failure of Brown to document that statement, the failure to interview an eyewitness who could identify the shooter, and the failure to gather or test relevant physical evidence.

On September 29, 1994, a jury convicted Lamonte McIntyre of murdering Doniel Quinn and Donald Ewing based entirely on the evidence fabricated by Defendants: the two false eyewitness identifications and the false inculpatory statements attributed to Lamonte and Rose McIntyre, and without the suppressed exculpatory evidence, including evidence of misconduct during this investigation and Golubski's sexual relationships with witnesses in this case and others. On January 6, 1995, Lamonte was sentenced to two consecutive life sentences. Defendants' fabrications and suppression of exculpatory evidence caused Lamonte's conviction and 23-year incarceration of Lamonte McIntyre for crimes he did not commit. In 2017, the District Attorney declared Lamonte's conviction a "manifest injustice" at his evidentiary hearing and asked the judge to grant a new trial. After a new trial was granted, the District Attorney dismissed all charges. Lamonte was freed on October 13, 2017. On February 24, 2020 the Shawnee County District Court issued Lamonte McIntyre a Certificate of Innocence, and found that "[t]he Claimant [Lamonte McIntyre] did not commit the crimes for which he was convicted and sentenced." Plaintiffs' claims, including Rose McIntyre's, accrued after Lamonte's conviction was vacated on October 13, 2017, and Plaintiffs timely filed this action within the applicable two-year statute of limitations, on October 11, 2018.

At the time of Lamonte McIntyre's arrest, Defendants Golubski, Ware, Krstolich, Smith, Culp, Brown, and Barber were KCKPD officers, supervisors, and employees and acted within the scope of their employment when they investigated the Ewing/Quinn homicides. The Unified Government of Wyandotte County and Kansas City, Kansas is responsible for the policies, customs, and practices of the KCKPD.

The Unified Government, by and through its final policymaker and supervisor Culp, acted with recklessness and/or deliberate indifference to the rights of citizens by failing to provide adequate training, supervision, and discipline of defendant officers, thereby causing the individual defendant officers to deprive McIntyre of his clearly established constitutional rights. Defendant Culp, who supervised the Ewing/Quinn homicide investigation, is liable for his actions as a supervisor.

Inadequate Supervision and Unconstitutional Misconduct, Including Abuse of Authority: As a matter of practice and custom, the Unified Government, defendant Culp and other KCKPD supervisors acquiesced or encouraged Golubski and the other officers' blatant abuse of authority to protect certain notorious drug dealers from arrest, (by pursuing and wrongfully arresting other individuals for crimes they did not commit or by fixing cases) the exploitation of women in KCK for sex and the use of these women to obtain false evidence through manipulation, pressure, or sexual assaults. KCKPD officers routinely used such false and tainted evidence to target innocent suspects and/or close cases. KCKPD supervisors and commanders supported or turned a blind eye to Golubski's misconduct because they knew he could use his network of "informants" (victims of his abuse and exploitation) to say anything – through the threat of arrest, promises of leniency, gifts of money or drugs, or all three – to close cases. They also knew that when "leads" were needed, Golubski's network of informants could be used, regardless of whether their "information" was reliable.

Supervisors and commanders expended little or no effort to determine whether the real perpetrator of a crime was arrested. However, they regularly aided Golubski by making sure he could clear warrants and make cases against his informants disappear in exchange for sexual favors and information. Golubski's exploitation of vulnerable black women in KCK as an investigatory tactic and for his sexual or monetary benefit was so open and notorious that the Kansas State legislature's House Judiciary Committee passed a bill criminalizing it and that KCKPD officers joked about children Golubski was reputed to have fathered with black prostitutes. Golubski also served as an intermediary between KCKPD officers looking for sex and the prostitutes under his influence, and would connect his colleagues with women in the "Bottoms," an area well known for drugs and prostitution. The frequent and open misconduct reflected a complete failure to adequately supervise and discipline officers, including Golubski. Golubski would not have committed such brazen sexual misconduct, if he thought there would be personal or professional consequences resulting from his behavior. Indeed, rather than being disciplined for abusing his authority and for his misconduct, Golubski was repeatedly rewarded, advancing to the head of major crimes and eventually the rank of captain.

After Rose McIntyre spurned Golubski's continued sexual advances, Golubski and the other defendant officers used Golubski's well-established pattern of witness coercion to frame Rose's son Lamonte for the double murder he did not commit. Golubski knew that the Brooks-Robinson drug gang was exceptionally violent and controlled the drug-ridden neighborhood where the crime occurred and knew that the Brooks-Robinson gang was responsible for the double homicide. But

Golubski had a close and illicit association with Cecil Brooks, as he did with other high-ranking drug dealers, and he intervened in the investigation to protect the gang members from charges. Golubski deliberately ignored obvious leads and steered the investigation away from the neighborhood's violent drug dealers and instead targeted Lamonte McIntyre, who did not even know the victims.  Golubski also made sure that the exculpatory account of Stacy Quinn, whom he had sexually exploited for years, was never included in the case file.  Also, at trial, Defendants claimed they obtained information from "reliable sources," but no such information was ever provided or documented.

Golubski's misconduct repeatedly came to the attention of the KCKPD and was known by the highest levels of the Department. Officers, detectives, and supervisors repeatedly walked in on Golubski while he was having sex with women or saw him go behind closed doors with women in his office. Command staff, including chiefs during Golubski's tenure, were aware of his conduct. Additionally, detectives in the Internal Affairs Bureau learned that Golubski had sex with informants while on duty—but no action was ever taken against him nor any investigation initiated. Fellow officers have attested under oath that they knew Golubski had sex with prostitutes who were also his informants and that their evidence was therefore unreliable, that Golubski used his prostitutes as his informants and obtained information for his cases from them whether that information was true or not, and that Golubski was reported up the chain of command, but supervisors and commanders never took allegations against Golubski seriously nor did they regard the allegations as problematic. The KCKPD administration spoke with Golubski about his improper use of Black sex workers as informants, and knew his use of informants did not comport with KCKPD policy or was otherwise improper.

Golubski's misconduct and his reliance on his informant network was not only permitted but was welcomed and even endorsed, allowing Golubski and the other defendants to close cases, use unreliable statements, fabricate inculpatory evidence, and suppress exculpatory evidence, when it was clear that their investigations were grossly inadequate and/or flawed.

<u>Unconstitutional and Inadequate Supervision of the Ewing-Quinn Investigation:</u> The KCKPD had a custom, pattern and practice of failing to adequately supervise and discipline problem officers, including Roger Golubski. Defendant Culp – the supervisor in charge of the 1994 Ewing/Quinn homicide investigation – failed to adequately supervise or discipline Defendants in this case, as mandated by KCKPD's own policies, procedures, and customs. At all relevant times, Defendant Culp ignored KCKPD policies in place for reviewing investigative reports authored by his supervisees, and these supervisory failures were tolerated up the chain of command.

Despite KCKPD policies to the contrary, KCKPD supervisors such as Defendant Culp had a custom and practice of failing to: (1) review investigative reports in any meaningful way, (2) intervene in deficient investigations, and/or (3) report officer misconduct. Indeed, Defendant Culp either failed to review the Lamonte McIntyre investigative reports or ignored the obvious deficiencies and misconduct altogether. KCKPD supervisors like Defendant Culp had the obligation to ensure detectives followed KCKPD rules in the course of their investigations. If, in fulfilling this obligation, Defendant Culp learned that KCKPD officers were violating KCKPD rules or policies, he was obligated to take the investigative steps not performed by his supervisees and to report these violations, which Culp failed to do.

Specifically, in the Ewing/Quinn investigation, Culp failed to: (1) ensure all eyewitnesses were interviewed, including Stacy Quinn, (2) ensure that eyewitnesses were properly interviewed and not subjected to improper suggestion or manipulation, (3) ensure there was an investigation into the getaway driver, (4) investigate evidence of a drug-related motivation for the double homicide, (5) investigate the nature of the relationship or connection, if any, between Lamonte McIntyre and the victims, (6) interview Ruby Mitchell's niece for five months and Lamont Drain at all, (7) investigate how the last name "McIntyre" originated in this case, (8) gather relevant physical evidence that could have either connected the real shooter to the crime or exculpated Lamonte McIntyre, (9) analyze Lamonte McIntyre's clothing, hands, and face, for gunshot residue, (10) order a search warrant of Lamonte McIntyre's home, (11) investigate statements made by alibi witnesses and to collect evidence to determine the validity of Lamonte McIntyre's alibi, (12) ensure photo lineups were conducted properly, (13) properly use a composite sketch photo, (14) use live lineups instead of photo identification procedures when a suspect was in custody, (15) assign a homicide detective to the double homicide as the lead investigator, (16) properly supervise officers' interactions with informants, (17) turn over exculpatory and inculpatory evidence to the prosecution, (18) investigate the obvious contradictions and investigatory failures of Defendants that were obvious on the face of the reports, and (19) follow up when Defendant Smith did not ask Niko Quinn for a description of the shooter when he first interviewed her.

Unconstitutional Customs, Policies and Practices in Other Homicide Investigations: The KCKPD had a custom, policy, and practice of improper and unreliable investigative practices, including: (1) using misleading and improperly suggestive photo lineups; (2) obtaining identifications through manipulative and coercive means; (3) feeding information to eyewitnesses or indicating whom they should identify; (4) manipulating, coercing or threatening witnesses into making false or fabricated statements; (5) failing to document or disclose exculpatory evidence; (6) failing to document witness statements and instead relying solely on an officer's claims about what the witness said; (7) failing to search for, gather or analyze critical physical evidence; (8) failing to adequately document crime scenes; (9) failing to adequately document evidence gathering or steps in an investigation; (10) failing to document the use of informants, their reliability, or the information provided by informants; (11) deliberately failing to follow obvious leads or use legitimate and accepted investigative practices; (12) supervisors failing to assess the adequacy of investigations or to direct subordinates to correct or fill in gaps; and/or (13) failing to protect against conflicts of interest in the conduct of investigation.

These widespread customs, patterns and practices are evident from the multiple, repeated violations not only in the Ewing/Quinn investigation, which resulted in Lamonte McIntyre's wrongful conviction, but also in several other KCKPD investigations that are characterized by the use of inadequate and improper investigative practices, resulting in charges or convictions where it is apparent the prosecution's case rested on extremely weak, contradictory, fabricated or flawed evidence. These cases are also tainted by the use of manipulated or coerced witnesses, the use of secret incentives, or the existence of conflicts of interest based on Golubski's connection to the victims, suspects or witnesses.

The following cases resulted in charges against those who were innocent or likely innocent and who were charged on the basis of flawed, defective and tainted evidence: (1) the investigation into the homicide of Rodney Brody, which resulted in a wrongful case, later dismissed, against Gentry Bolton; (2) the investigation into the homicide of Reginald Allen, which resulted in a wrongful

charge, later dismissed,  against DeShannon Daniels; (3) the wrongful conviction of Nicole Williams for involuntary manslaughter in the homicide of Beatrice Russell while the true perpetrator was not pursued; (4) the wrongful conviction of Brian Betts and Celester McKinney for the murder of Greg Miller; (5) the wrongful conviction of Ahmon Mann for the murder of Robert Diaz; and (6) the wrongful conviction of Donnell Dobbs for the murder of Myurel Josenberger. All of these cases involve the use of inadequate, flawed, manipulative, coercive or improper investigative practices or fabricated/tainted evidence that resulted, or likely resulted, in the charging or conviction of an innocent person or persons.

The KCKPD's longstanding pattern, practice and custom of failing to adequately supervise investigations or failing to conduct constitutionally adequate investigations is also reflected in its failure to examine whether any connections existed among the numerous murders of vulnerable, impoverished – and mostly Black – women.   From at least 1983 through 2008, the KCKPD was aware that multiple women were murdered in KCK in strikingly brutal and similar ways, which were characterized by the following: (1) the women were often homeless or drug addicted or worked as prostitutes; (2) the majority of the women were Black; (3) nearly all of the women were murdered in a "hands on" and brutal manner, frequently by strangulation, asphyxiation, blunt force trauma and/or stabbing; (4) the women were dumped in remote or isolated locations or abandoned buildings; (5) the women were all partially or fully nude, almost always with the pants pulled off or shirts pulled down, resulting in the exposure of breasts or genitals or both; and (6) the victims' clothing items were scattered nearby.

Despite the fact that Roger Golubski knew most, if not all, of them, none of the homicide files reflect that he provided his knowledge of these women, including that he exploited them for sex – nor was he asked to do so.  In fact, with some cases, such as the Rose Calvin homicide, Golubski played a lead role in the investigation, despite his connection to the deceased and his clear conflict of interest.

Despite the abundance of potential physical evidence that could be analyzed, most of the above-mentioned homicide cases received inadequate forensic attention, with either limited evidence collected or limited efforts to identify possible assailants with whom any DNA or other forensic results could be compared.  In one case, the homicide of Christina King, the KCKPD received a DNA match with a potential suspect, but did no follow up investigation.  In other cases, the limited or inadequate collection of physical evidence reduced the probative value of that evidence.

In many of these cases, witness interviews were short and superficial or did not include the persons most likely to have useful information. Obvious leads were not pursued, and, in at least one case, no investigation was done at all.  In October 1997, the body of Diane Edwards was discovered amid dense foliage next to the river. Defendants W.K. Smith and Roger Golubski both responded to the scene, and Smith attended the autopsy.  But no further investigative activity ever occurred.

Some of the investigations into these homicides appear to have received little or no attention from KCKPD supervisors.  Notably, the signature line for the reviewing supervisor was left blank in several cases, including in the investigations into the homicides of Theresa Davis, Eliza Michie and Trina Harris.

The murders of these women, who were killed in exceptionally violent ways and who were left with their genitals or breasts exposed, prompted little attention in the KCKPD, despite the fact that the women were well acquainted with certain police officers and, in particular, were well acquainted with Roger Golubski because they had been coerced for sex or information or both. No one examined any possible connections among the homicides or whether they were linked with the drug gangs with whom Golubski had close relationships. The women who were murdered include: (1) Dorothy Cooper in 1983; (2) Theresa Davis in 1992; (3) Rosemary Baker-Powers in 1995; (4) Sandra Wilson in 1995; (5) Rose Calvin in 1996; (6) Pearl Barnes in 1996; (7) Sandra Glover in 1997; (8) Beatrice Russell in 1997; (9) Diane Edwards in 1997; (10) Kelly Fant [no body recovered]; (11) Monique Allen in 1998; (12) Rhonda Tribue in 1998; (13) Christina King in 1998; (14) Anita Webb in 2000; (15) Vickie Hollinshed in 2000; (16) Kia Vang in 2001; (17) Barbara Finch in 2006; (18) Trina Harris in 2006; and (19) Pearlina Henderson in 2008. Because Golubski was known to have relationships with many of these women – either a sexually exploitive relationship, or an informant relationship or both – his involvement in these cases, as a detective or supervisor, constituted a conflict of interest.  In all cases, the investigations were handled by Golubski or his fellow detectives, including W.K. Smith or Dennis Ware, or by Golubski's subordinates when he was promoted to a supervisory role.

Golubski's supervisors knew of his improper relationships with and sexual exploitation of women in the community, but they acquiesced in failing to adequately investigate these murders because of the victims' status as impoverished Black women.  Racist attitudes in the KCKPD were not uncommon; KCK residents who had encounters with particular detectives or officers, either in the street or in the KCKPD office, were sometimes addressed using the "N" word.

When Stacy Quinn, the eyewitness in the McIntyre case whose account was never documented, was herself murdered in 2000, Golubski and his then-partner Terry Zeigler (who later became Chief of Police) led the investigation into her shooting death even though Golubski had been exploiting Stacy for sex and information for more than 10 years.  Although Golubski's relationship with Stacy was widely known throughout the community, Golubski feigned ignorance of her at the crime scene and was the one who "investigated" who "Buckwheat" was (Buckwheat was Stacy's nickname). Golubski subsequently submitted a false report, where he again pretended not to know Stacy's identity, raising questions about the integrity of the entire investigation as well as why Golubski was assigned to Stacy's case to begin with. Ware signed Golubski's report as the supervisor. Golubski's only formal discipline by KCKPD was for submitting a false report in 1978, in connection with an in-custody death of an arrestee.

Like Golubski's relationships with female homicide victims, Golubski's close relationships with certain drug dealers, including Cecil Brooks, raises questions about the investigative integrity of multiple homicide investigations. In the McIntyre case, Golubski's lead role in the investigation allowed him and other individuals to protect Cecil Brooks and the Brooks-Robinson drug ring from investigation. It was widely known that Golubski and Brooks had a close relationship. Similarly, it was widely known that Golubski was involved in and profited from the drug trade, in large part because of his connection with Brooks.

In addition to protecting Brooks and his gang in the Ewing/Quinn investigation, Golubski and other KCKPD officers protected the drug gang in other cases, including: (1) the 2000 stabbing murder of Vickie Hollinshed Dew where Brooks' brother Joe Robinson, was the identified

perpetrator, but was never prosecuted; (2) the 1997 strangulation/blunt trauma murder of Beatrice Russell where Brooks' "enforcer," Wendell Anderson was the identified perpetrator but avoided a criminal charge after Golubski's intervention; (3) the 2000 murder of Tommy Benson where Wendell Anderson was again the identified perpetrator but avoided criminal charge.

Golubski and the other defendants also protected other drug dealers from criminal charges, including Antonio and Marcus Quinn, with whom Golubski had an illicit business connection. The Quinn brother operated a very visible and widely known drug business and committed many violent crimes, yet avoided criminal repercussions. Golubski also had a relationship with other gang members, including William ("Still Bill") Roark and his gang, and, because of that, multiple gang-related murders were inadequately investigated and/or not prosecuted (the homicides of Ben Grant, Corey Welch, Adrian Caldwell, Aderyl Caldwell and Delvin Matthews).  As part of his protection of Roark's gang, Golubski exposed one of his own informants, leading to her being pursued by armed assailants and then fleeing town.

Although the KCKPD had a Code of Ethics, it was neither heeded nor applied.  From the earliest years of Golubski's career at the KCKPD, he was involved in misconduct and criminal activities. As early as the 1980s, Golubski lured women into his vehicle and sexually assaulted them. He submitted false reports – like the one he was disciplined for in 1978 – and, in at least one case (the 1989 death of Kenneth Khan), he helped cover up what was likely a homicide by classifying it as a suicide and ignoring or covering up facts that suggested the victim was killed.

As early as the 1980s, Golubski was exploiting vulnerable women for sex and calling them "informants"; taking KCK residents to isolated areas, threatening them and taking their belongings or drugs; and aiding his criminal confederates by using his position as a detective to conceal their criminal activity or protect them from legal repercussions.

The KCKPD also failed to discipline problem officers by refusing to take or investigate complaints of officer misconduct by citizens including Rose McIntyre, Davilyn Dobbs, Trellia Jackson, Melvin White, Ray Hickman, Dion Martin, Shanaya Kane (through her aunt), Tina Peterson, or their family members, when they reported officer misconduct. These individuals were turned away and their complaints were never documented or investigated.

The KCKPD was also aware of, but refused to investigate, reports or complaints of Golubski's misconduct made by officers and supervisors, including Tim Hausback and Michael Kobe, and civilians Sarah Bigelow and Ethel Abbott. In addition to the misconduct of Roger Golubski and the Defendant Officers in this case, the KCKPD knew of – but ignored – the need for training, discipline, and/or policies in place prohibiting the extensive investigative and sexual misconduct mentioned above, especially in light of other similar misconduct reported to the KCKPD relating to William Saunders, Shawn Buck, and Robert Lane, as well as Vince Davenport, Steven Haulmark, and John Cosgrove.  Although officers were sometimes disciplined, serious discipline was rare, and generally did not hinder the officer's career.  Both John Cosgrove and Steven Haulmark, who had lengthy Internal Affairs records, rose to the highest levels of the KCKPD.

The Defendant Unified Government was responsible for the policies, practices and customs of the KCKPD, as outlined above. Through its final policymakers, the UG and the KCKPD had in force and effect the customs and practices described above of unconstitutional misconduct in serious

felony investigations, including the use of coerced, unreliable or fabricated witness statements, the coercion of witnesses, the failure to adequately collect and/or analyze physical evidence, the use of coerced and unreliable informants, the failure to follow obvious leads, the use of suggestive and improper identification procedures, the withholding of exculpatory and impeachment evidence, the failure to adequately supervise and discipline officers, and the failure to conduct meaningful investigations into complaints of misconduct. Despite repeated opportunities to do so during the Quinn-Ewing investigation and for years beforehand and following, final policymakers for the UG failed to adequately supervise, train and discipline officers for failing to use proper and legal investigative techniques. The egregious acts of Golubski and the other officers were endorsed or deliberately ignored by the KCKPD and the Unified Government as multiple officers, supervisors and policymakers knew about the misconduct and turned a blind eye and did nothing.

Defendants' misconduct in Lamonte McIntyre's case was the predictable result of the KCKPD's culture of corruption and the KCKPD's longstanding failure to supervise, discipline, or conduct adequate investigations, free of constitutional violations. The KCKPD's failures of supervision, discipline and training, and its longstanding custom and practice of using improper investigative tactics and practices was the moving force behind Lamonte McIntyre's wrongful conviction and his 23 years, 5 months, and 28 days of incarceration.

<u>Lamonte McIntyre and Rose McIntyre suffered damages:</u> Lamonte McIntyre was arrested, prosecuted, and convicted of a double homicide he had nothing to do with. As a result, he was wrongfully incarcerated for twenty-three years.

First, Lamonte McIntyre has missed out on the benefit of the life experiences gained in one's late teens, twenties, and thirties. Since he was released from prison, he has had to attempt to make a life for himself without the benefit of the life experiences and resources that normally equip adults for that task. Lamonte McIntyre's incarceration deprived him of basic physical freedom. Restrictions on this basic freedom included limiting Lamonte McIntyre's diet, sleep, personal contact, education opportunities, vocational opportunities, athletic opportunities, personal fulfillment, sexual activity, reading, television, movies, travel, enjoyment, and expression. He also missed the opportunity to have basic life experiences, including spending holidays, births, funerals, and other life events with loved ones; falling in love; marrying; and living life autonomously. Particularly painful for Lamonte was his inability to attend his grandfather's funeral in 2003.

Lamonte McIntyre's incarceration also caused him detrimental health effects, by causing him of physical pain and suffering, psychological damages, severe mental anguish, permanent loss of natural psychological development, and emotional distress. Lamonte has been diagnosed with complex Post-Traumatic Stress Disorder. As a result of depression and anxiety, Lamonte has problems sleeping. He experiences nightmares. During the day, he is also hypervigilant and anxious. Due to his wrongful incarceration, Lamonte is unable to trust, which isolates him from his mother, siblings, and wife. He suffers emotional distress from witnessing his wrongful conviction's detrimental effects on his mother's life.

Lamonte McIntyre's incarceration also caused him to lose family relationships, property, income, and career opportunities. For example, because it was difficult for Lamonte to witness his siblings' growth while he was trapped behind bars, his relationships with them weakened. Lamonte McIntyre also had enormous legal expenses to put towards his defense and post-conviction efforts.

His wrongful incarceration also caused him humiliation, indignity, and embarrassment. The tragedy of Lamonte McIntyre's case has caused it to be quite public. As a private person, Lamonte McIntyre suffered from the public attention he got as the result of his wrongful conviction.

When Lamonte was released from incarceration he had trouble adapting to a technological and online world. For example, he attempted to attend community college on a scholarship, but when the school switched to a web platform, he stopped attending class, as he was incarcerated in 1994, and had only experienced assignments putting pen to paper. Lamonte McIntyre is still overwhelmed by technology despite his attempts to assimilate.

In addition to all that Lamonte McIntyre was deprived of due to his incarceration, he was also held in prison for twenty-three years, where he was exposed to stark and horrific conditions. He was held amongst individuals convicted of violent felonies and thus lived with the constant threat of violence while incarcerated.

Rose McIntyre suffered devastating and ongoing injuries as well. Defendant Officers' framing of Lamonte McIntyre caused Rose and her family grave and irreparable harm. As a result of her son's wrongful incarceration, Ms. McIntyre suffered extreme and emotional physical devastation, becoming, at times incapacitated and unable to properly care for her other children. She suffered intense depression and anxiety and had severe psychological damage. These consequences led to Rose McIntyre's physical pain and suffering, severe mental anguish, and emotional distress. Rose McIntyre has suffered mental breakdowns and had suicidal thoughts following her son's wrongful incarceration. Following her first mental breakdown, she was in and out of psychological treatment for 17 years in Kansas. She feels tremendous guilt for having drove Lamonte McIntyre to the police station in the hopes of clearing any confusion over his involvement. She experiences frequent flashbacks for taking her son to the police station.

Rose McIntyre has been diagnosed with complex Post-Traumatic Stress Disorder and major depressive disorder. During Lamonte McIntyre's wrongful incarceration, Rose McIntyre was unable to sleep, obsessing over how to prove her son's innocence. She would stay awake until 3 or 4 o'clock in the morning—a pattern that continues today. She also suffers from panic attacks, debilitating anxiety, a tendency to isolate and withdraw, and the inability to trust. These symptoms will continue.

The wrongful incarceration of her son also included humiliation, indignities, and embarrassment. She also paid legal expenses for her son's defense and post-conviction efforts. Rose McIntyre also suffered the loss of property, income, and career opportunities. And her family relationships suffered. Lamonte McIntyre's incarceration has caused a tension among his siblings, who once shared a tight-knit bond. This tension causes Rose McIntyre panic attacks.

Rose McIntyre's damages go beyond the normal pain and suffering experienced by a loved one whose family member is incarcerated, or even wrongfully incarcerated. Once she learned of Golubski's role in investigating her son's case she carried the guilt and stress of having placed her son in the crossfires of his retaliation, having refused Golubski's sexual advances years earlier.

**b)**     **Contentions of Defendant Unified Government.**

On April 15, 1994, Doniel Quinn and Donald Ewing were shot and killed while sitting in a car in the 3000 block of Hutchings Street in Kansas City, Kansas. Eyewitnesses Niko Quinn and Ruby Mitchell saw the shooting and saw the shooter. Ruby Mitchell identified Lamonte McIntyre as the shooter on April 15, 1994, Lamonte McIntyre was thereafter arrested on April 15, 1994. Niko Quinn later identified Lamonte McIntyre as the shooter.

Lamonte McIntyre was charged in Wyandotte County District Court with two counts of first degree murder on April 18, 1994, Case No. 94JV489. A waiver hearing and preliminary hearing was held on June 28, 1994 in Case No. 94JV489 during which Ruby Mitchell and Niko Quinn made in-court identifications of Lamonte McIntyre as the person they saw shoot Doniel Quinn and Donald Ewing. At the conclusion of the waiver/preliminary hearing, the Wyandotte County District Court waived Lamonte McIntyre to be tried as an adult and found probable cause existed to believe Lamonte McIntyre committed the offense of first degree murder. An information was then filed on June 28, 1994 charging Lamonte McIntyre with two counts of first degree murder, Case No. 94CR1213.

A jury trial was conducted in Case No. 94CR1213 from September 26 to 29, 1994 after which a jury convicted Lamonte McIntyre on two counts of first degree murder.

The arrest, detention, charge, and conviction of Lamonte McIntyre were supported by probable cause.

The conviction and imprisonment of Lamonte McIntyre were caused by (1) the eyewitness testimony of Ruby Mitchell and Niko Quinn identifying Lamont McIntyre as the shooter and (2) the testimony of Peggy Crowder, Felicia Williams, Yolanda Johnson, M'Sheria Johnson, and Lamonte McIntyre with respect to an alibi defense which did not account for the whereabouts of Lamonte McIntyre at the time of the shooting.

The arrest, detention, charge, and conviction of Lamonte McIntyre were not caused by any wrongful act or omission employee of the Unified Government acting with the scope of employment.

The Unified Government did not have a policy, practice, or custom:

i)     of unconstitutional misconduct in serious felony investigations, the encouragement and use of coerced and unreliable witness statements officers and/or detectives from vulnerable witnesses through the threat of arrest, physical violence, sexual domination, payment in drugs or money, or other consequences (*Second Amended Complaint, Doc. 74, ¶ 189*);

ii)     of deliberately and/or systematically withholding exculpatory and impeachment evidence from the prosecution and criminal defendants (*Second Amended Complaint, Doc. 74, ¶ 190*);

iii)     of failing to adequately supervise, discipline and train officers investigating serious felonies (*Second Amended Complaint, Doc. 74, ¶ 191*);

iv)     of failing to supervisor or discipline officers for misconduct committed during the course of serious felony investigations (*Second Amended Complaint, Doc. 74, ¶ 192*);

v)      of failing to adequately supervise, discipline, and train officers in the proper and lawful use investigative tactics; of not physically, psychologically, and sexually abusing female informants, coercing informants to provide false evidence, illegally protecting individuals involved in the illegal drug trade, failing to turn over exculpatory evidence to the prosecution and criminal defendants, or wrongfully pursuing, prosecuting, or convicting innocent individuals to close cases (*Second Amended Complaint, Doc. 74, ¶ 193*)

No policymaker for the Unified Government had knowledge or notice of misconduct by Roger Golubski, James Michael Krstolich, Dennis Ware, James L. Brown, Dennis Otto Barber, Clyde Blood, W.K. Smith, and/or Steve Culp, or other officers and/or detectives that deprived persons, including Lamonte McIntyre, of their constitutional rights. No policymaker for the Unified Government had knowledge or notice of that Rober Golubski encouraged and/or used coerced and unreliable witness statements from vulnerable witnesses through the threat of arrest, physical violence, sexual domination, payment in drugs or money, or other consequences. (*Second Amended Complaint, Doc. 74, ¶ 194*).

The Unified Government did not have a policy, practice, or custom of allowing Roger Golubski to openly assault, harass and coerce women investigating crimes and/or collecting evidence.

With respect to the *Monell* claims under § 1983, the policymaker for the Unified Government was the Chief of Police.

The Unified Government and its policymaker(s) were not deliberately indifferent to the constitutional rights of criminal defendants or their family members. The arrest, detention, charge, and conviction of Lamonte McIntyre were not caused by deliberate indifference to the constitutional rights of criminal suspects and/or defendants generally or of Lamonte McIntyre or Rose McIntyre specifically.

The Unified Government is not vicariously liable for the wrongful acts or omissions of Roger Golubski, James Michael Krstolich, Dennis Ware, James L. Brown, Dennis Otto Barber, Clyde Blood, W.K. Smith, and/or Steve Culp, or other officers and/or detectives alleged in the Second Amended Complaint or in Plaintiffs' contentions above because such acts, if proven, were not within the scope of employment with the Unified Government or the KCKPD as a matter of law.

The Unified Government is not vicariously liable for Rose McIntyre's claim for interference with familial association, if proven.

Detective Golubski's conduct directed at Rose McIntyre, if any, was not caused by any custom, practice or policy of the Unified Government.

Detective Golubski's conduct directed at Rose McIntyre, if any, was not within the scope of Golubski's employment as a matter of law.

Lamonte McIntyre's Fourth Amendment claims accrued in 1994 and are barred by the two-year statute of limitations and the statute of repose. K.S.A. 60-513.

Rose McIntyre's familial association claim accrued in 1994 and is barred by the two-year statute of limitations and statute of repose. K.S.A. 60-513.

Lamonte McIntyre's Claims under the Due Process Clause of the Fourteenth Amendment are precluded because Kansas provides an adequate remedy via a common law cause of action for malicious prosecution.

Plaintiffs' claims are barred or limited by the extent to which any notice of claim failed to substantially comply with K.S.A. 12-105b.

Plaintiffs' claims are barred by the doctrine of sovereign immunity and the provisions of the Kansas Tort Claims Act, K.S.A. 75-6101, *et seq*. The claims are likewise barred by the exceptions set forth in K.S.A. 75-6104(c), (d), (e), (i), and (n). Plaintiffs' claims are based upon the manner in which the law was enforced as to Lamonte McIntyre, or not enforced as to "Monster" or others, which is barred by K.S.A. 75-6104(c). Plaintiffs' claims are based upon the manner in which the policies were enforced or the lack of such policies which is barred by K.S.A. 75-6104(d). Plaintiffs' claims are based upon the discretionary decisions and manner in which the Ewing/Quinn homicides were investigated and the discretionary decisions and manner in which detectives and police officers were supervised which are barred by K.S.A. 75-6104(e). Plaintiffs' claims are based upon conduct by individuals who are entitled to absolute and/or qualified immunity, and discretionary function immunity to which the Unified Government is entitled to adoptive immunity under K.S.A. 75-6104(i). Plaintiffs' claims are based upon the manner in which police protection was provided which is barred by K.S.A. 75-6104(n).

Plaintiffs' damages are limited by K.S.A. 75-6105, K.S.A. 60-1903, and K.S.A. 60-19a02. Claims under Kansas law for prejudgment interest, compensatory damages in excess of $500,000. Punitive damages as to the Unified Government are precluded by statute and the doctrine of sovereign immunity.

Plaintiffs' damages are limited or offset by Lamonte McIntyre's monetary recovery under K.S.A. 60-5004.

### c)   Contentions of Defendant Roger Golubski.

Roger Golubski was hired by the KCKPD in 1975.  He worked in patrol and then became a detective in February 1986.  He was promoted to the rank of captain in August 2002 and retired from the KCKPD effective April 1, 2010.  Roger Golubski did not frame Lamonte McIntyre for the murder of Doniel Quinn and Donald Ewing—for any reason—and took appropriate investigative steps during the investigation and prosecution of their murders as described below. Further, Roger Golubski did not sexually assault Rose McIntyre or engage in any of the corruption or misconduct, sexual or otherwise, alleged by Plaintiffs.

### I.   The Brutal Murders of Doniel Quinn and Donald Ewing & Ensuing Investigation

In the early afternoon of April 15, 1994, a person carrying a shotgun walked up to a vehicle parked on Hutchings Street in Kansas City, Kansas's "North End"—a neighborhood riddled with addiction and drug dealers preying upon those with drug addictions. Inside the vehicle sat Doniel Quinn and Donald Ewing; both victims of addiction themselves and, in the moments that followed, tragically became victims of murder as the shotgun-wielding person approached the vehicle in broad daylight, said a few words, and fired multiple shotgun blasts into their vehicle.

### A.   Doniel Quinn was in trouble with drug dealers.

According to eyewitness Niko Quinn, a week or so before the April 15, 1994 murders her cousin, Doniel Quinn, had been beaten up by Aaron Robinson's drug crew on suspicion that he had stolen drugs from him. At the time, Doniel Quinn worked for Aaron Robinson as a doorman at his drug houses. Niko Quinn was also a big-time drug dealer, along with her boyfriend, Chris Jones (aka "C-Love"). Niko Quinn and Chris Jones had multiple drug houses and Doniel Quinn also worked for them, bringing drug-addicted patrons to purchase drugs from them.

Niko Quinn testified that after Doniel Quinn's beating, there was a bounty on his head of $4,000 that she could easily pay, and was willing to do so. As a result, Niko Quinn allegedly sent her boyfriend, Chris Jones (aka "C-Love") to try to pay off the debt, unsuccessfully.

The night before Doniel Quinn's murder, Niko alleges she and her crew were walking up and down Quindaro between her drug houses when Aaron Robinson, Marlon Williams, and Neil Edgar, Jr. (aka "Monster") stopped and tried to lure Doniel Quinn to get into their vehicle. As Niko Quinn's story goes, Niko Quinn's boyfriend, Chris Jones, saved his life by dragging him out of the vehicle—staying his execution by one day.

That night, Niko Quinn says she had a nightmare that Doniel Quinn was murdered. Niko Quinn testified that the next morning, as Chris Jones was leaving to go to his mom's house to take a shower, she asked him to leave his gun at the house because she suspected trouble. Ten minutes later, Doniel Quinn was murdered.

### B.   The Investigation Begins

Many Kansas City, Kansas Police Department (KCKPD) personnel arrived at the scene or otherwise assisted in the response and investigation into the murders.[1] And, when they arrived, they began processing the scene. While on the scene, Roger Golubski was responsible for marshaling the cataloging of the scene, including diagraming, while others interviewed witnesses who were in the area.

Those interviewing witnesses tried to talk to the many people in the area at the time of the murders. But, as is true of many neighborhoods riddled with predatory and violent drug dealers,

---

[1] They included Officer Gary D. Wansley, Officer L.M. Vallejo, Officer F. Clair, Officer Stan Harrington, Officer William (Bill). Howard, Officer J.D. Meyers, Officer Keith, Officer Burdette Ambler, Officer #1310, Officer J. Brown, Officer J. Stubler,  Lt. Dennis Barber, Detective W.K. Smith, Detective James Krstolich, Detective Roger Golubski, Detective Blood, Detective Maskil, Detective Shoman, and Captain Steve Culp.  Over a dozen people participated in the investigation.

most who witnessed the murders were unwilling to speak to police, or provided knowingly false information.  Despite this, the KCKPD was able to obtain the statements of several witnesses who either saw the murders, or were nearby, including Ruby Mitchell, Niko Quinn, Josephine Quinn, John Quinn, and Breon Shelton.

### C.      Niko Quinn Misleads Police from the Beginning

Niko Quinn was one of the first interviewed and gave her statement on the scene. Despite Niko Quinn's alleged knowledge of Doniel Quinn's involvement in the drug world—and her alleged belief he had a bounty out on his head—when Det. W.K. Smith asked her whether Doniel was in trouble with anybody, she lied and stated she no. She was also pressured by her family and boyfriend, Chris Jones (who had returned to the scene shortly after the murder), not to speak with police.  However, while she was at the scene but after she spoke to Det. W.K. Smith, she told her aunt that she did in fact recognize the shooter from school.  She later told that same aunt, when Lamonte McIntyre's photo was on television later that evening, that police had the wrong suspect in custody.  She told none of this to the police.

### D.      Ruby Mitchell Thinks She Can Identify The Shooter

Ruby Mitchell also saw the murderer.  Prior to the murders, she was in her home and heard a ruckus outside, so she headed toward her front door to see what was going on.  Then, while there, she witnessed the shooter walk down the hill from Hiawatha Street and then fatally shoot Doniel Quinn and Donald Ewing.  Ms. Mitchell was the person who called the police and, when they arrived, Detective James Krstolich interviewed her.

While at the crime scene, Ms. Mitchell indicated that she thought she could identify the shooter if she saw him again.  She thought the shooter looked like a man her niece had been seeing named Lamonte, but she did not know his last name at the time.  As a result, Detective Krstolich—who was trained in preparing composite sketches—asked that Ms. Mitchell go to the police station to try to create a composite sketch based on what she had seen.  Her arrival was delayed because she had to pick up her children.

### E.      Dennis Barber and Tim Maskill, not Roger Golubski, Identify Lamonte McIntyre as the Shooter

Given the heinousness of the crime, and the boldness with which it was committed, many of the KCKPD's resources were utilized in trying to quickly catch the killer.  Other officers and detectives, including Lt. Dennis Barber and Det. Tim Maskill, were working with their networks to try to identify a suspect.  According to Lt. Barber, he learned from numerous sources that Lamonte McIntyre was the perpetrator.  Meanwhile, Det. Maskill's sources provided the same name—Lamonte McIntyre.  Another officer involved in the investigation, James Brown, had previously been involved in a drug-related arrest of Lamonte McIntyre just six weeks earlier on February 27, 1994.  Lamonte had been arrested for possession of crack cocaine which he was selling for his cousin Donald Johnson (DJ)—a reputed drug dealer associated with Cecil Brooks and Aaron Robinson.  DJ tried to obstruct the arrest and physically assaulted Officer Brown. Lamonte's mother, Rose McIntyre, was also arrested during that incident for assaulting a different officer.

The KCKPD then sought out a photograph of Lamonte McIntyre to put in a lineup to show to Ruby Mitchell.  It was common KCKPD practice at the time for detectives to have their own collection of photographs of individuals they encountered so that they could use them in situations such as this to help identify witnesses, victims, and perpetrators.  Detective Golubski sought out juvenile prosecutor, Vicki Meyer, to determine if she had any records on Lamonte McIntyre.  It was common practice for Ms. Meyer to assist with locating a photograph or other needed information.  It was also customary practice at the time for detectives to ask other detectives if any of them had photographs of potential suspects for identification.  In this case, fellow detective Robert Godell had a photograph of a Lamonte McIntyre from one of Lamonte's three previous arrests.

### F.    Robert Godell Previously Arrested and Took a Photo of Lamonte McIntyre in an Armed Robbery Case

Robert "Bobby" Godell was the detective in a December 1992 robbery in which Terence Terrell, James McIntyre, and Lamonte McIntyre ordered a pizza to a different address and, when the pizza delivery person arrived, James and Terrence held him at gunpoint and stole the pizza.  All three of them consumed the pizza.  All three were represented by attorney Michael Redmond.  And all three pled guilty.

During that case, Detective Godell took polaroids of Terence Terrell, James McIntyre, and Lamonte McIntyre.  On the back of each, Godell wrote the name of the person depicted, their date of birth, and placed his initials—"RG"—in the corner.  All three of these photographs were used in the photo array shown to Ruby Mitchell.  The other two photographs appear to have been taken from Roger Golubski's collection of photographs to fill out the array.

### G.    Ruby Mitchell Identifies Lamonte McIntyre to Detective Krstolich

After reviewing the photographs with Detective Krstolich, Ruby Mitchell identified Lamonte McIntyre as Doniel Quinn and Donald Ewing's killer around 6:00 p.m.  She would later identify Mr. McIntyre in open court as the shooter both at his preliminary hearing on June 28, 1994, and at his trial in September 1994.  In fact, during the trial, she explained that the photograph she picked was *not* the same person who dated her niece, but that they looked alike.  She also testified that when she made the identification no one suggested or hinted to her who she should choose.  To this day, Ruby Mitchell maintains that nothing the police did impacted her identification of Lamonte McIntyre as the shooter.  And Ruby Mitchell had never met or interacted with Roger Golubski prior to April 15, 1994, and has not interacted with him since.

### H.    Police begin Searching for Lamonte McIntyre

Based on Ruby Mitchell's identification of Lamonte McIntrye, the police began a canvass to find Lamonte McIntyre.  This effort was spearheaded by Lt. Dennis Barber.  Police had learned from Breon Shelton—a person living on Hiawatha near where the shooter fled—that the shooter got into a blue vehicle and sped away.  Lt. Dennis Barber learned, through his network, that Lamonte McIntyre was known to be seen driving a vehicle matching that description—further probable cause to believe Lamonte McIntyre was involved.

Another officer, Officer Jose Viera, also obtained information through an informant that Lamonte McIntyre was known to be seen in an Oldsmobile 98 and to hang out at Juniper Gardens—a housing project believed to be controlled by a notorious drug kingpin, Cecil Brooks.

## I.   Lamonte is Arrested At His Mother's Work, FiFi's Restaurant

Lamonte had indicated in the prior robbery arrest that he lived with his grandmother, so Dennis Barber contacted Lamonte McIntyre's grandmother.  She was very helpful and reached out to Lamonte's mother.  Detectives learned that Rose McIntyre was at work at FiFi's, so they went to FiFi's.

Multiple officers and detectives were there, including Dennis Barber, James Brown, and Roger Golubski.  Dennis Barber was the detective to speak with Rose McIntyre, and she was very inquisitive about what was going on.  She wanted to know whether a person would automatically be arrested if the charge was murder.  Suspiciously, no one with the KCKPD informed her of the nature of the investigation at that point.  Rose McIntyre further volunteered that Lamonte could not have been at the crime scene because was working at FiFi's until 2:35 p.m.  For his part, while at FiFi's, Lamonte McIntyre volunteered he had been at FiFi's all day.

## J.   Lamonte Is Questioned.

Officer James Brown drove Lamonte to the police station.  Once at the police station, Detective Golubski read Lamonte his Miranda rights.  During the interview with Detective Golubski, James Brown heard Lamonte state that he had been hanging out at 15th and Wood all day—which contradicted his and his mother's prior statement to Lt. Barber and Officer Brown that he had been at FiFi's all day with Rose McIntyre. Also, during Lamonte's questioning, he provided names of witnesses who he believed could attest to his whereabouts at the time of the murders.

## II.   Golubski's Additional Investigatory Steps Uncover Both Inculpatory and Exculpatory Evidence—And He Openly Documented the Exculpatory Information

Golubski's efforts to investigate the murders of Doniel Quinn and Donald Ewing did not stop on the day of the murder.  In the days, weeks, and months that followed, Roger Golubski and others undertook additional investigatory efforts, some of which yielded exculpatory evidence that Roger Golubski documented in the investigative file for all to see.

### A.   The Day After

#### 1.   *Roger Golubski and Detective Ware re-interview Niko Quinn.*

The day after the murders, on April 16, 1994, Detectives Roger Golubski and Detective Dennis Ware went back out to the crime scene to continue the investigation.  Specifically, they wanted to show Niko Quinn the same group of photos from which Ruby Mitchell identified Lamonte McIntyre.  When Detectives Ware and Golubski arrived, they spoke with Niko Quinn on her porch and showed her the same five photos shown to Ruby Mitchell.  Niko Quinn lingered on

one of the photographs—Lamonte McIntyre's.  But she did not identify Lamonte McIntyre at that time.  According to Niko Quinn, Roger Golubski did not do anything inappropriate during that interaction.  Importantly, Golubski documented that Ms. Quinn viewed the photos and did *not* identify the shooter.

**2.**     *Golubski searches for the getaway car*

Also on the day after the murders, because another officer's informants had given information that Lamonte McIntyre was known to drive around in a blue vehicle, and because a witness provided information that the killer sped away in a blue vehicle, Roger Golubski went to the house Lamonte was at the day of the murders and took photographs of a vehicle there that matched the description of both the vehicle that Lamonte was known to ride around in, and matched the color of the alleged getaway vehicle.  Roger Golubski then took the photos of that vehicle to the witness who saw the murderer get in a vehicle and speed away.  That witness informed Detective Golubski that the photographs of the vehicle depicted outside of Lamonte's house were not of the same vehicle in which the murderer sped away.  During his meeting with this witness, Golubski also showed the witness the photographs shown to Ruby Mitchell, and the witness could not make a positive identification.  Roger Golubski documented all of this exculpatory information in the investigatory file.

**B.     Golubski Interviews Lamonte Mcintyre's Purported Alibi Witnesses**

After Lamonte's arrest, Lamonte provided several alibi witnesses.  Roger Golubski interviewed these witnesses not knowing whether the information they would provide would conflict with or support the charges of murder.  As it turned out, and according to Lamonte himself, his alibi witnesses were terrible for his case, including when they testified at trial.  For all Golubski knew, however, those same witnesses could have provided an iron-clad alibi and the prosecution of Lamonte would have never happened.  There are no allegations that Roger Golubski did anything improper with respect to the alibi witnesses.

**C.     Golubski Attempted to Interview Others Who Witnessed the Murder—Including Stacy Quinn**

Roger Golubski also interviewed John Quinn—father of Doniel Quinn.  John Quinn was in the area of the murders and potentially saw or knew the identity of the shooter.  Roger Golubski did not know whether John Quinn would corroborate or contradict Ruby Mitchell's positive identification of Lamonte McIntyre when he interviewed John Quinn.  Nevertheless, Roger Golubski interviewed him and placed the resulting information in the investigative file.

Roger Golubksi also documented in the file that there was another witness, Stacy Quinn, whose mother, Josephine Quinn, thought knew who committed the murder.  While Stacy Quinn was not present at the scene after the murders, or when Roger Golubski returned the following day, he did not conceal this information but instead highlighted Stacy Quinn's possible importance in the investigatory file, even though she could single-handedly upend the investigation/prosecution *if* she identified anyone other than Lamonte McIntyre as the shooter.

D.   **Roger Golubski Also Interviewed Ruby Mitchell's Niece—Keva Garcia.**

After the murders, Roger Golubski interviewed Keva Garcia about her relationship with a "Lamonte," which is what caused Ruby Mitchell to call out his name at the time of the murders. However, not even Keva Garcia knew the last name of the Lamonte she had dated. Keva Garcia told Roger Golubski, in a recorded statement, that the Lamonte she had been dating—Lamonte Drain—came by her house the night of the shooting and Ruby Mitchell told him that she informed police the shooter looked like him—not that she identified him.

III.   **Niko Quinn, out of Self-Interest, Lied to Roger Golubski, the Prosecutor, the Judge, and the Jury to Convict Lamonte Mcintyre.**

A week or so after Detectives Ware and Golubski spoke to Niko Quinn on her front porch, Niko Quinn called Detective Golubski. She told him she was scared and asked him to meet her behind Wyandotte High School.   Niko Quinn did not go to that meeting alone.   Her boyfriend, Chris Jones, drove her to the meeting—the same boyfriend who had stopped her from talking to police on the day of the murders.   And, during the meeting, Chris Jones stood outside Roger Golubski's car to monitor what Niko and Detective Golubski spoke about.

During that meeting, Niko Quinn told Roger Golubski that people were lurking around her house with guns, and that she was scared for her safety.   She explained that it could not have been Lamonte's family because she had been in a relationship with his brother, James McIntyre. She then identified Lamonte McIntyre as her cousin Doniel Quinn's killer.

A.   **Niko Quinn Was Not Coerced, She Knowingly Lied to Detective Golubski, the Prosecutors, the Judge, and the Jury.**

Niko Quinn, contrary to her numerous inconsistent statements since her sworn trial testimony in 1994, was not coerced by Roger Golubski into identifying Lamonte McIntyre. Rather, Niko Quinn lied to Roger Golubski to protect her own interests and those of her boyfriend, Chris Jones.

Niko Quinn, like the people she *now* accuses of killing her cousins, was a drug dealer who operated numerous drug houses, including the one at which Doniel Quinn spent the night before his death obtaining drugs.  And Niko Quinn's boyfriend, Chris Jones, was also a notorious drug dealer who partnered with and who went by the street names "C-Love" and the "Grim Reaper." According to Niko, even the drug kingpins she now accuses of killing her cousins feared C-Love. And, look no farther than the tattoo on Niko's chest to understand her devotion to C-Love.

After Doniel Quinn and Donald Ewing were murdered, people told Niko Quinn that they saw the murderer come out of her house. C-Love told Niko Quinn ten minutes before the murders, he was leaving to go take a shower at his mom's house in Kansas City, Missouri; yet he showed back up shortly after the murders.

Niko Quinn suspected C-Love was behind her cousin's murder.  She even confronted C-Love and accused him of the murders.  But, thereafter, Niko called Detective Golubski, asked for

a meeting, was driven to that meeting by C-Love, who monitored what they were saying from the outside the car, and identified Lamonte McIntyre as the shooter.

Then, when James McCloskey and other investigators on behalf of Lamonte McIntyre started asking her questions decades later, she initially tried to dodge their attempts to contact her. C-Love did not want her talking to them. She finally acquiesced to speaking with them and, to deflect blame away from her then-again boyfriend, C-Love, told Lamonte's investigators that C-Love had saved Doniel Quinn from being murdered the night before by Aaron Robinson's Drug gang for stealing drugs, and, in retaliation for the murder of Doniel, shot up the drug house of a rival drug dealer, Aaron Robinson. Notably, however, immediately following the murders, when Niko Quinn was interviewed on the scene by Detective W.K. Smith she was asked directly if she knew of any trouble Doniel was having with anyone and she said no.

Many years later—but not to the police in 1994, or at Lamonte McIntyre's first hearing for freedom in 1996, or in her first affidavit—she identified Neil Edgar, Jr. (aka "Monster") as the shooter to James McCloskey. But, Neil Edgar, Jr. is the brother of Monita Edgar, one of C-Love's drug suppliers.

So, either out of fear for her life, protection of her drug enterprise, or out of devotion to her boyfriend, Niko Quinn called Roger Golubski—who she had no contact with prior to this investigation—and told him she wanted to see the photos again. And, being chaperoned by C-Love/the Grim Reaper, she went to Wyandotte High School and identified Lamonte McIntyre as the murderer.

## IV.   The prosecution of Lamonte McIntyre

### A.   Preliminary Hearing/Juvenile Waiver Hearing

The preliminary hearing was held on June 28, 1994. Because the case was, at that time, still in juvenile court, the juvenile prosecutor, Assistant District Attorney A.J. Stecklein, was the prosecutor assigned to the case. However, the adult prosecutor, Assistant District Attorney Terra Morehead, attended the preliminary hearing to observe the witnesses.

AJ Stecklein or other investigators/prosecutors with the district attorney's office met with the witnesses prior to them testifying at the preliminary hearing, including Niko Quinn. They did this, in part, to determine if Niko Quinn was able to identify Lamonte McIntyre as the shooter. Because, at that point, the prosecution was unaware of the inculpatory evidence Roger Golubski had obtained from Niko Quinn behind Wyandotte High School—instead, the police file reflected only that Niko had lingered on Lamonte McIntyre's photograph without identifying him as the shooter, which had occurred the morning after the murders. At the preparation meeting, Niko Quinn confirmed to the prosecutors that Lamonte McIntyre was the shooter and that she would identify him in court. Roger Golubski did not participate in this meeting.

Both Ruby Mitchell and Niko Quinn identified Lamonte McIntyre as the shooter at that June 28, 1994 hearing. Notably, Rose McIntyre was present at the preliminary hearing where Ruby Mitchell and Niko Quinn identified Lamonte McIntyre as the shooter, and where Roger Golubski testified as to his role in the investigation.

As a result of the hearing, the Court determined probable cause existed to proceed with the murder charges against Lamonte McIntyre, and that he should be tried as an adult. From there, Assistant District Attorney Terra Morehead assumed responsibility for the prosecution.

## B.      Trial: Niko Quinn No Longer Wants to Testify

In preparation for trial, Terra Morehead met, or tried to meet, with all the witnesses that would testify at trial. However, Niko, who had previously testified at the preliminary hearing, was not cooperating. Since the preliminary hearing had occurred, Niko Quinn had broken up with her boyfriend and drug dealer, C-Love/Grim Reaper, and moved from her drug house on Hutchings.

Because Niko Quinn was an eyewitness, Terra Morehead and her investigators within the District Attorney's Office went to look for Niko Quinn. Niko Quinn alleges that Terra Morehead and/or her investigators threatened to take her kids away if she did not testify consistently with her testimony at the pre-trial hearing. Ultimately, Niko Quinn again identified Lamonte McIntyre in open court during his jury trial, resulting in his conviction. Roger Golubski was not involved in any of this.

## V.     Lamonte McIntyre's Post-Conviction Relief Efforts

## A.      Direct Appeal

Lamonte McIntyre appealed his conviction. Rose McIntyre attended oral argument before the Kansas Supreme Court in Topeka, Kansas. Ultimately, the Kansas Supreme Court upheld Lamonte McIntyre's conviction finding that Roger Golubski's meeting with Niko Quinn behind Wyandotte High School—which Lamonte McIntyre argued had not been properly disclosed—was inculpatory, not exculpatory evidence. Roger Golubski's name appeared nineteen times in the Kansas Supreme Court's opinion stemming from the oral argument at which Rose McIntyre was present.

## B.      Lamonte McIntyre's First K.S.A. 60-1507 Hearing

Two years after Lamonte's conviction, Stacy Quinn was located by Lamonte's post-conviction attorneys. His attorneys were able to obtain a hearing before the Court at which Stacy Quinn testified. The Court dismissed the request for post-conviction relief. Notably, however, Stacy Quinn made no allegations of police misconduct or any purported relationship with Roger Golubski. She said her absence was due to the trauma of the murders and her drug addiction.

## C.      Centurion Ministries and Lamonte's Exoneration

James McCloskey (McCloskey), a non-ordained minister, founded Centurion Ministries— an organization devoted to freeing the wrongfully convicted. When a convicted person requests help, Centurion Ministries vets the case, first gathering as much documentation about the investigation and conviction as possible and then, if Centurion believes it is a situation of actual factual innocence, takes the case and begins its on-the-ground investigation to try to get the convicted person freed.

In Lamonte McIntyre's case, Centurion Ministries began its initial vetting process in or around 2003 and finally took the case in or around 2008. After Centurion finally took the case, James McCloskey became the primary investigator and hired attorney Cheryl Pilate and other investigators to assist. From the time Centurion took Lamonte's case until he was freed, McCloskey made at least nineteen trips to Kansas City.

### 1.     McCloskey's investigation process is not beyond reproach

McCloskey, in successfully obtaining Lamonte McIntyre's exoneration, accused the KCKPD of improperly suggestive, coercive tactics. But McCloskey himself employed these same tactics in obtaining Lamonte's exoneration, and in accusing Roger Golubski. McCloskey, unlike the police, did not audio record most of his meetings with witnesses because, as McCloskey testified, the truth "evolves" over time and comes out in "bits and pieces."

McCloskey made at least nineteen trips to Kansas City and interviewed an unknown number of people—but over a hundred. Of those more than a hundred, he obtained affidavits from less than half. In procuring their cooperation, he wore a priest collar despite not being an ordained clergyman. And, when a witness would not voluntarily corroborate his "truth"—that Neil Edgar, Jr. was the murderer or that Roger Golubski was the "dirtiest cop" he ever encountered—he would yell at them, curse at them, harass them at their place of work, or make them feel that they would be outed to law enforcement or to their community as a "snitch" to compel their compliance.

Even more concerning, McCloskey contaminated Rose McIntyre's memory and beliefs over years of meeting with her and telling her scores of alleged wrongful acts of which McCloskey thought Roger Golubski was guilty. During McCloskey's investigation, every time he came to Kansas City—at least nineteen times—he would meet with Rose McIntyre and tell her all of the horrible things McCloskey believed about Roger Golubski. These meetings were extremely stressful to Rose McIntyre, who was dealing with diagnosed anxiety and depression. And Rose McIntyre knew that unless there was new evidence, her son's attempt to be exonerated would be unsuccessful.

### VI.     Decades Later, Rose McIntyre Accuses Roger Golubski of Sexual Assault

Rose McIntyre alleges that sometime in the mid to late 1980s she was pulled over while with her boyfriend—who was at the time a drug dealer—and was asked to come to the police station the following day. She alleges that, fearing arrest, she went to the station the next day where Roger Golubski performed oral sex on her and desired an ongoing relationship.

Rose McIntyre alleges that Roger Golubski then called her every day and came to her house for a period of a few months in an effort to continue the alleged sexual interactions. She alleges it got to the point where she had to change her phone number and move so that Detective Golubski could not find her. According to her testimony, she moved all of one block. Since then, she has never had any interaction with Roger Golubski.

She now alleges that Roger Golubski was somehow able to wield essentially the entire KCKPD organization, in a matter of hours, to steer the investigation—involving a dozen or more officers and supervisors—in Lamonte McIntyre's direction to retaliate against her for not having

a continued relationship with her; seven years or more earlier. And he was supposedly able to coordinate this complicated, multi-person scheme despite being a loner at work, being a private person, being not especially well-liked by other detectives, and, by all accounts, not being a team-player.

Importantly, this is not Rose McIntyre's first theory. Initially, when Lamonte McIntyre was arrested, she thought the arrest was retaliatory for a purported civil suit she filed for excessive force against the KCKPD stemming from her arrest for assaulting a police officer when she tried to obstruct the arrest of Lamonte for possession of crack cocaine, just six weeks before the April 15, 1994 murders. She held this belief for years, even telling the Kansas City Call which reported on her belief in July 1997.

Fast forward to the present day, and Rose McIntyre now states she formed the belief that her son's arrest was retaliation by Golubski after she realized that he was one of the detectives working on Doniel Quinn and Donald Ewing's murders. She alleges she did not previously know Roger Golubski was involved and, if she had, she would have raised this allegation and formed her belief immediately. And, she would have told those who could have used the information, such as Lamonte's attorneys, to Lamonte's benefit. But Rose McIntyre has known all along because:

- Roger Golubski was present at FiFi's when Rose McIntyre surrendered Lamonte McIntyre to the police in 1994.

- Rose McIntyre, Roger Golubski, and the other witnesses were sworn in together at the juvenile wavier/preliminary hearing on June 28, 1994, and both testified at that hearing.

- Rose McIntyre was close with some of Lamonte's alibi witnesses. Specifically, Yolanda Johnson. Rose and Yolanda met with Gary Long, Lamonte McIntyre's criminal attorney, in advance of Lamonte's trial to go over Yolanda's testimony, which would have included the statement she gave to Roger Golubski.

- Roger Golubski testified at Lamonte's criminal trial and Rose McIntyre sat in the hallway the entire time where she could see the witnesses, such as Roger Golubski, enter the courtroom.

- After Lamonte's conviction, Rose McIntyre hired an investigator, Carolyn Adams to investigate the investigation. In January 1994, Carolyn Adam's investigation documented that Roger Golubski was one of the detectives.

- Rose McIntyre did her own street investigation into the murders and the investigation.

- According to Rose McIntyre, Niko Quinn told Rose in or around 1995, that Roger Golubski was involved in Lamonte's murder investigation.

- In the winter/spring of 1996, Rose McIntyre traveled to Topeka to be at the oral argument for Lamonte's appeal to the Kansas Supreme Court. Roger

Golubksi's name appears 19 times in the Supreme Court's opinion and would have been mentioned in the oral argument.

- In July 1997, the Kansas City Call ran an article on Lamonte's conviction. Rose pushed for its publication and read it. It mentioned Roger Golubski.

- Rose McIntyre testified she told attorney Michael Redmond of her purported assault by Roger Golubski sometime between her arrest in February 1994 and April 15, 1994. But, according to Michael Redmond, the first time he heard of the accusation of misconduct by Roger Golubski against Rose McIntyre was a few years ago, from Rose McIntyre's current attorney, Cheryl Pilate. Michael Redmond also met with Rose McIntyre in or around September 2000 when she sought his help to get her son out of prison. Mr. Redmond wrote two letters to assist Ms. McIntyre and neither of them even referenced Roger Golubski.

- In the early 2000s, Rose McIntyre's other son, Jermaine, was selling marijuana and was pulled over by Roger Golubski. After Golubski approached, Jermaine fled. After that incident, Rose McIntyre told Jermaine that Roger Golubski was one of the detectives on his brother's case.

Yet only after years of meeting with James McCloskey, during which he informed Rose McIntyre of rumors of bad sexual acts Roger Golubski was accused of engaging in, did she make an accusation against Roger Golubski. Indeed, McCloskey himself says he had no doubt that Rose McIntyre knew Roger Golubski was involved in Lamonte's investigation.

## VII.    Contingency issues

Roger Golubski does not believe that any "evidence" or argument of his alleged bad character should be legally relevant or admissible in this matter. However, if the Court should disagree in a later ruling and Plaintiffs are allowed to present what they believe to be evidence of bad character, then Roger Golubski will contend that he was a good cop and detective, that he cared about the community he served, particularly the African American community, and that he sought to hold dirty cops accountable, specifically Duane Hooks.

## VIII.    Conclusion

The arrest, detention, charge, and conviction of Lamonte McIntyre were supported by probable cause. The arrest, detention, charge, and conviction of Lamonte McIntyre were not caused by any wrongful act or omission of Roger Golubski. Golubski did not act with any malice during the Ewing/Quinn homicide investigation. Roger Golubski followed acceptable police practices in the investigation of the Ewing/Quinn homicides.

The conviction and imprisonment of Lamonte McIntyre were supported by, among other things, (1) the eyewitness testimony of Ruby Mitchell and Niko Quinn identifying Lamont McIntyre as the shooter and (2) the testimony of Peggy Crowder, Felicia Williams, Yolanda Johnson, M'Sheria Johnson, and Lamonte McIntyre with respect to an inconsistent alibi defense that did not account for the whereabouts of Lamonte McIntyre at the time of the shooting.

Roger Golubski did not sexually assault Rose McIntyre or engage in any of the corruption or misconduct, sexual or otherwise, alleged by Plaintiffs. Roger Golubski did not work with or conspire with other officers to frame Lamonte McIntyre. Roger Golubski did not suppress any information regarding the Ewing/Quinn homicides.

Roger Golubksi did not fabricate evidence, coerce witnesses, manipulate witnesses, withhold exculpatory evidence, or deliberately avoid taking basic and obvious investigative steps. Roger Golubski did not use or having any knowledge regarding the use of an improper photo lineup based on 1994 standards. Roger Golubski followed proper police procedure based on 1994 standards.

Roger Golubski did not falsify police reports or intentionally fail to document information. Roger Golubski did not fabricate or coerce any statements or informants. Roger Golubski did not use improper tactics, including direction, suggestion or coercion, for witnesses to identify Lamonte McIntyre. Roger Golubski did not fail to document exculpatory information.

Roger Golubski did not act with recklessness or deliberate indifference in the investigation of the Ewing/Quinn homicides. Roger Golubski did not ignore the KCKPD policies and procedures. Roger Golubksi did not protect drug dealers from criminal charges, in this case or otherwise.

### d)   Contentions of Other Defendant Officers.

On April 15, 1994, Doniel Quinn and Donald Ewing were shot and killed while sitting in a car in the 3000 block of Hutchings Street in Kansas City, Kansas. Eyewitnesses Niko Quinn and Ruby Mitchell saw the shooting and saw the shooter. Ruby Mitchell identified Lamonte McIntyre as the shooter on April 15, 1994. Lamonte McIntyre was thereafter arrested on April 15, 1994. Niko Quinn later identified Lamonte McIntyre as the shooter.

Lamonte McIntyre was charged in Wyandotte County District Court with two counts of first-degree murder on April 18, 1994, Case No. 94JV489. A waiver hearing and preliminary hearing were held on June 28, 1994 in Case No. 94JV489 during which Ruby Mitchell and Niko Quinn made in-court identifications of Lamonte McIntyre as the person they saw shoot Doniel Quinn and Donald Ewing. At the conclusion of the waiver/preliminary hearing, the Wyandotte County District Court waived Lamonte McIntyre to be tried as an adult and found probable cause existed to believe Lamonte McIntyre committed the offense of first-degree murder. An Information was then filed on June 28, 1994 charging Lamonte McIntyre with two counts of first-degree murder, Case No. 94CR1213.

A jury trial was conducted in Case No. 94CR1213 from September 26 to 29, 1994 after which a jury of twelve unanimously convicted Lamonte McIntyre on two counts of first-degree murder beyond a reasonable doubt The Ewing/Quinn homicides were two of numerous homicides that occurred in the early portion of 1994 in Kansas City, Kansas, which had seen an increase in violence and homicides.

As to the claims of Plaintiff Lamonte McIntyre, Defendants Daphne R. Halderman, as Special Administrator of the Estate of Detective James Michael Krstolich, deceased; Detective Dennis Ware; Officer James L. Brown; Daphne R. Halderman, as Special Administrator of the

Estate of Lieutenant Dennis Otto Barber, deceased; Detective W.K. Smith, and Daphne R. Halderman, as Special Administrator of the Estate of Lieutenant Steve Culp (hereinafter "Defendant Officers") contend that they conducted their limited, individual roles in the 1994 double homicide investigation in good faith, that they acted reasonably, with good cause and without malice. Defendant Golubski was the lead detective on the investigation of the Ewing/Quinn homicides. Defendant Officers deny that the acted in concert with Defendant Golubksi for any improper purpose in the arrest and conviction of Lamonte McIntyre. Defendant Officers deny that they had any knowledge of the claims being asserted against Defendant Golubski, failed to intervene in any unconstitutional actions of Defendant Golubski, or conspired to obtain the arrest and conviction of Lamonte McIntyre. Defendant Culp denies any inadequate supervision. Defendant Officers were all working within the course and scope of their employment during the investigation of the Ewing/Quinn homicides.

Defendant Krstolich's limited involvement in the investigation of the Ewing/Quinn homicides involved the interviewing of Ruby Mitchell on April 15, 1994. Ruby Mitchell has testified that her interactions with Defendant Krstolich were not coercive or suggestive. Ruby Mitchell has denied that Defendant Krstolich provided her the name of "Lamonte McIntyre". Defendant Krstolich did not fabricate or withhold any evidence as it relates to the investigation of the Ewing/Quinn homicides. Defendant Krstolich denies using any suggestion, coercion or other improper means to get Ruby Mitchell to identify Lamonte McIntyre. Defendant Krstolich denies providing Ruby Mitchell with the name "Lamnote McIntyre". Defendant Krstolich was also present during the questioning of Lamonte McIntyre on April 15, 1994. Defendant Krstolich testified at the trial. Defendant Krstolich had no further involvement with the investigation after April 15, 1994.

Defendant Ware's limited involvement in the investigation of the Ewing/Quinn homicides was to accompany Defendant Golubski as an additional officer while he interviewed witnesses on April 16, 1994. The only witness interview at issue in this matter is Niko Quinn. Defendant Ware has denied using or observing any coercion or suggestion while with Defendant Golubski on April 16, 1994. Niko Quinn has testified that she did not feel coerced to identify a suspect and denied that there was improper suggestion during the interactions with the officers on April 16, 1994. Niko Quinn testified she did not believe anything improper occurred during this interaction. Niko Quinn cannot recall which officer did what during the interaction on April 16, 1994. Defendant Ware did not fabricate or withhold any evidence as it relates to the investigation of the Ewing/Quinn homicides. Defendant Ware had no further involvement with the investigation after accompanying Defendant Golubski on April 16, 1994. Defendant Ware did not complete any reports and did not testify at the preliminary hearing or at trial.

Defendant Brown's limited involvement in this matter was to transport Lamonte McIntyre from Fifis Restaurant to the police department for questioning. Defendant Brown testified at trial that during this transport, Lamonte McIntyre indicated that he has been at Fifis all day. Defendant Brown notified Defendant Golubski of this information by passing him a note after hearing Lamonte McIntyre tell the interrogating officers that he had been at a family member's home. Defendant Brown only prepared a transport report in this matter and did not provide a narrative report. Defendant Brown testified at trial, as did Lamonte McIntyre, when he denied making this statement to Defendant Brown. Defendant Brown had no further involvement in the Ewing/Quinn homicides.

Defendant Barber's limited involvement in this matter is that he participated in attempting to locate Lamonte McIntyre for questioning after he was identified as the shooter by Ruby Mitchell. Defendant Barber was present when Rose McIntyre met with officers at Fifis Restaurant with Lamonte McIntyre. Defendant Barber gave a recorded statement to Defendant Golubski regarding statements made by Rose McIntyre at that time. Rose McIntyre has admitted that she initially told officers that Lamonte McIntyre was at Fifis. Defendant Barber, along with other officers, provided information that they had sources that were saying that Lamonte McIntyre was responsible for the Ewing/Quinn homicides. Defendant Barber did not complete a written report, but instead gave a recorded statement. Defendant Baber also testified at trial. Defendant Barber had no further involvement in the Ewing/Quinn homicides.

Defendant Smith's limited involvement in this matter included the interviewing of Niko Quinn and Josephine Quinn on April 15, 1994, shortly after they witnessed the shooting of Ewing and Quinn. It is alleged that Defendant Smith did not adequately question Niko Quinn and failed to elicit statements from her that she stated to him prior to being recorded. Niko Quinn has testified that she does not recall what, if anything, she said to Detective Smith prior to the recorded statement. Further, Niko Quinn has confirmed that the voice of her aunt, Freda Quinn, can be heard in the recording encouraging her not to speak to the police and to hurry up. Niko Quinn has testified that she recalls her family discouraging her from speaking to the police and to finish quickly so they could go to the hospital. Defendant Smith prepared a written report of these interviews and provided the recordings of the interviews. To the extent that Plaintiff alleges that Defendant Smith purposefully failed to report Stacy Quinn's knowledge of events, this is false based on their own allegations that it is noted in Defendant Golubski's notes that he was informed of Stacy Quinn as a witness and his attempts to locate her. Defendant Smith did not testify at trial and had no further involvement in the Ewing/Quinn homicides after April 15, 1994.

Defendant Culp was the supervising lieutenant over the Ewing/Quinn homicides. Defendant Culp was not deliberately indifferent to Lamonte McIntyre's constitutional rights. The Plaintiff has not provided any evidence that Defendant Culp had any personal knowledge regarding Defendant Golubski's misconduct. Defendant Culp denies failing to adequately supervise and discipline officers he supervised.

The arrest, detention, charge, and conviction of Lamonte McIntyre were supported by probable cause. The arrest, detention, charge, and conviction of Lamonte McIntyre were not caused by any wrongful act or omission of the Defendant Officers. The Defendant Officers did not act with any malice during the Ewing/Quinn homicide investigation.

The Defendant Officers followed acceptable police practices for their individual roles in the investigation of the Ewing/Quinn homicides. The Defendant Officers followed acceptable police practices in their interviewing of witnesses, documenting their actions, the use of photos and/or photo lineups, and their interactions with witnesses in this matter. The Defendant Officers deny the fabrication of any evidence and deny withholding any exculpatory, or inculpatory, evidence.

The conviction and imprisonment of Lamonte McIntyre were supported by (1) the eyewitness testimony of Ruby Mitchell and Niko Quinn identifying Lamont McIntyre as the shooter and (2) the testimony of Peggy Crowder, Felicia Williams, Yolanda Johnson, M'Sheria

Johnson, and Lamonte McIntyre with respect to an inconsistent alibi defense that did not account for the whereabouts of Lamonte McIntyre at the time of the shooting.

The Defendant Officers deny any knowledge of the allegations regarding Defendant Golubski's misconduct and the Plaintiffs have produced no evidence that the Defendant Officers had knowledge of the alleged misconduct. The Defendant Officers deny working with or conspiring with Defendant Golubski to frame Lamonte McIntyre. The Defendant Officers deny they had any information or suppressed any information regarding Defendant Golubski's alleged sexual relationship with witnesses involved in the Ewing/Quinn homicides.

The Defendant Officers deny fabricating evidence, coercing witnesses, manipulating witnesses, withholding exculpatory evidence, and deliberately avoiding taking basic and obvious investigative steps. The Defendant Officers deny using or having any knowledge regarding the use of an improper photo lineup based on 1994 standards. Defendants deny they failed to follow proper police procedure based on 1994 standards. Defendant Officers fulfilled their duties based on each of their limited roles in the Ewing/Quinn homicides.

The Defendant Officers deny falsifying police reports or intentionally failing to document information. The Defendant Officers deny fabricating statements of Plaintiffs and informants. The Defendant Officers deny using improper tactics, including direction, suggestion or coercion, for witnesses to identify Lamonte McIntyre. The Defendant Officers deny they had any knowledge of the alleged suggestive and coercive identifications of Lamonte McIntyre by Niko Quinn and Ruby Mitchell .

The Defendant Officers deny failing to document information provided to them through the course of the investigation. The Defendant Officers deny any knowledge of misconduct and failure to investigate during the investigation of the Ewing/Quinn homicides.

The Defendant Officers deny acting with recklessness or deliberate indifference in the investigation of the Ewing/Quinn homicides. The Defendant Officers deny ignoring the KCKPD polices and procedures. The Defendant Officers deny protecting drug dealers from criminal charges.

The Defendant Officers further incorporate by reference the Factual Contentions of Defendant Golubski.

4)      LEGAL CLAIMS AND DEFENSES.

   a)      **Legal Claims of Plaintiff(s).**

Plaintiffs Lamonte McIntyre and Rose McIntyre assert that they are entitled to recover upon the following theories:

Count 1: Under Section 1983, Lamonte asserts Fourth and Fourteenth Amendment malicious prosecution claims against Golubski, Krstolich, Ware, Brown, Barber, Culp, and Smith;

<u>Count 2:</u>  Under Section 1983, Lamonte asserts Fourth and Fourteenth Amendment evidence fabrication and *Brady* violations against Golubski, Krstolich, Ware, Brown, Barber, and Smith;

<u>Count 3:</u> Under Section 1983, Lamonte and Rose assert First and Fourteenth Amendment familial association claims against Golubski;

<u>Count 4:</u> Under Section 1983, Lamonte asserts Fourth and Fourteenth Amendment failure to intervene claims against Krstolich, Ware, Barber, and Culp;

<u>Count 5:</u> Under Section 1983, Lamonte asserts Fourth, Fifth and Fourteenth Amendment conspiracy claims against Golubski, Krstolich, Ware, Barber and Culp;

<u>Count 6:</u>  Under Section 1983, Lamonte asserts Fourth and Fourteenth Amendment supervisory liability claims against Culp;

<u>Count 7:</u> Under Section 1983, Lamonte and Rose assert *Monell* claims against the Unified Government;

<u>Count 8:</u> Under state law, Lamonte asserts malicious prosecution claims against Golubski, Krstolich, Ware, Brown, Barber, Culp, and Smith;

<u>Count 9:</u> Under state law, Lamonte asserts *respondeat superior* liability against the Unified Government for the state-level malicious prosecution claim.

Additionally, the defenses alleged by the Defendants to the above Counts are not supported by the facts or evidence, are not viable or applicable here, or have already been ruled upon by the Court. *See* the Court's Memorandum and Order filed March 3, 2020 (Doc. 190). To the extent not already addressed by the Court's Order or the factual contentions or legal claims of made by Plaintiffs herein, Plaintiffs assert that: (1) there is no adequate post-deprivation state law remedy, including the common law cause of action for malicious prosecution, that could fully compensate Plaintiff for his more than 23 years of wrongful incarceration; (2) the Defendants are not entitled to immunity under federal or state law for the extraordinary misconduct alleged herein including the intentional and malicious prosecution of Lamonte McIntyre, the deliberate targeting of Lamonte McIntyre to deprive Rose McIntyre of his company, the fabrication of inculpatory evidence, the suppression of exculpatory evidence, the coercion of witnesses, and the intentional or reckless failure to intervene to prevent the above misconduct; (3) the Defendants are not entitled to protection from liability under the Kansas Tort Claims Act, K.S.A. 75-6101, *et seq*, nor from the exceptions set forth in K.S.A. § 6104 (c, d, e, i, n), as the Officers' conduct alleged herein was not resultant from the enforcement of a law, from the failure or adoption of a policy protecting persons' health or safety, or from the failure to provide police or fire protection, and because the Officers' conduct was deliberate and not a discretionary function, and (4) the applicable two-year statute of limitations does not bar Plaintiffs' action or claims, nor does any statute of repose, as Plaintiffs timely filed their claims on October 11, 2018, less than two years after such claims accrued in October 2017.

Subject to the court's determination of the law that applies to this case, in order to prevail on this theory of recovery, plaintiff has the burden of proving the following essential elements, and which Plaintiffs will prove using the factual contentions alleged within this Order:

Count 1 – 42 U.S.C. 1983 – Malicious Prosecution.

1. Defendants Golubski, Krstolich, Ware, Brown, Barber, Culp, and Smith violated Lamonte McIntyre's Fourth and Fourteenth Amendment rights by causing Lamonte McIntyre's continued confinement or prosecution for the Ewing and Quinn murders;
2. No probable cause supported McIntyre's confinement or prosecution;
3. Defendants acted with malice;
4. Lamonte McIntyre's criminal action terminated in his favor; and
5. Lamonte McIntyre sustained damages.

Defendants Golubski, Krstolich, Ware, Brown, Barber, Culp, and Smith knew that probable cause did not exist to prosecute Lamonte McIntyre for the murders of Quinn and Ewing, yet still intentionally caused McIntyre to be arrested, charged, and prosecuted for these murders. Individually and in concert, they fabricated inculpatory evidence and intentionally withheld and misrepresented exculpatory facts that they knew would have vitiated probable cause against Lamonte McIntyre. This fabricated, withheld, and misrepresented evidence would also have impeached witnesses for the prosecution at trial, in particular the two eyewitnesses these Defendants coerced or otherwise fabricated into identifying Lamonte McIntyre. These actions by Defendants were the direct and proximate cause of the injuries Lamonte McIntyre suffered while wrongfully incarcerated for twenty-three years. Defendants' actions in fabricating, withholding, and misrepresenting evidence were performed under color of state law.

As a result of the malicious prosecution, Lamonte McIntyre was wrongfully convicted and incarcerated for twenty-three years, and also suffered the other grievous damages laid out in Plaintiffs' Factual Contentions, above, and in the Damages section, below.

Count 2 – 42 U.S.C. 1983 – Fabrication of Evidence.

1. Defendants Golubski, Krstolich, Ware, Brown, Barber, and Smith violated Lamonte McIntyre's Fourth and Fourteenth Amendment rights by knowingly fabricating evidence,
2. The fabricated evidence was used against Lamonte McIntyre,
3. The use of the fabricated evidence caused Lamonte McIntyre's deprivation of liberty.

Defendants Golubski, Krstolich, Ware, Brown, Barber, and Smith, acting individually and in concert, and within the scope of their employment and under the color of state law, fabricated false evidence against Lamonte McIntyre. They did this deliberately, by coercing witnesses to make false statements implicating Lamonte McIntyre. They also used suggestion to achieve these false witness statements.

As a result of this fabrication of evidence, Lamonte McIntyre was wrongfully convicted and incarcerated for twenty-three years, and also suffered the other grievous damages laid out in Plaintiffs' Factual Contentions, above.

Count 2 – 42 U.S.C. 1983 –*Brady* Violations.

1.  Defendants Golubski, Krstolich, Ware, Brown, Barber, and Smith violated Lamonte McIntyre's Fourth and Fourteenth Amendment rights by deliberately failing to turn over evidence;
2.  The evidence at issue is favorable to Lamonte McIntyre;
3.  The evidence was material to the defense; and
4.  Lamonte McIntyre was prejudiced, or the suppression affected the outcome at trial.

The Defendants, acting in the scope of their employment and under color of state law, concealed the misconduct leading to the creation of the false statements, as stated above under Count 2 – Fabrication of Evidence. Prior to trial, these Defendants withheld material from both the prosecution and defense, including exculpatory evidence from Lamonte McIntyre, including exculpatory statements made by the eyewitnesses prior to their coerced and false statements. Had Defendants documented and disclosed these exculpatory statements and other inculpatory evidence—including evidence of the Defendants' misconduct—it would have tended to prove Lamonte McIntyre's innocence, cast doubt on the entire investigation and prosecution, and impeached critical trial testimony by eyewitnesses. Ultimately, these actions by Defendants undermined confidence in Lamonte McIntyre's guilty verdict and deprived him of a fair trial.

As a result of this withholding of evidence, Lamonte McIntyre was wrongfully convicted and incarcerated for twenty-three years, and also suffered the other grievous damages laid out in Plaintiffs' Factual Contentions, above and the Damages Section, below.

Count 3– 42 U.S.C. 1983 – Familial Association.

1.  Defendant Golubski violated Lamonte and Rose McIntyre's First and Fourteenth Amendment rights by intentionally interfering with the familial relationship of Lamonte McIntyre and Rose McIntyre;
2.  Golubski had knowledge that his statements or conduct would adversely affect that relationship; and
3.  Golubski's actions caused Rose McIntyre and Lamonte McIntyre's relationship to suffer.

Rose McIntyre is Lamonte McIntyre's mother. She was present at the time of his arrest, which occurred when Lamonte was only seventeen years old. Rose and Lamonte enjoyed a very close relationship, and also relied on each other. Golubski used the Quinn/Ewing investigation as a mechanism to retaliate against Rose for refusing his continued sexual advances. Golubski specifically targeted Lamonte to deprive Rose the company of her son.

Golubski's unlawful and intentional actions caused Lamonte to spend twenty-three years in prison and Rose to be effectively denied a relationship with her son during those years.

In addition, Rose McIntyre and her counsel followed all rules of civil procedure in the taking of Ms. McIntyre's deposition. Indeed, the Defendants have repeatedly admitted that "inability to complete Ms. McIntyre's deposition is not Defendants' fault. It is not Plaintiffs' fault. It is the result of Plaintiff's illness," (Doc. 535). In addition, Ms. McIntyre's counsel has consistently informed Defendants that if Plaintiff is medically able to be deposed before trial, she will be made available to complete her deposition. The noncompletion of Ms. McIntyre's deposition by the discovery deadline in this action is not grounds for dismissal of Count 3 nor for the striking of her prior statements or sworn testimony. This is especially true here as Defendants intend to take the depositions of several other witnesses after the discovery deadline by agreement of the parties, and because Ms. McIntyre's previous statements as well as other evidence relating to Count 3 have been provided to Defendants which consistently and adequately informed Defendants of the factual basis for this claim.

Count 4 – 42 U.S.C. 1983 – Failure to Intervene.

1. Defendant Golubski violated Lamonte McIntyre's Fourth and Fourteenth Amendment rights by fabricating evidence, suppressing *Brady* material or maliciously prosecuting Lamonte McIntyre for the murders of Ewing and Quinn;
2. Defendants Krstolich, Ware, Barber and Culp were aware of or had reason to know of Defendant Golubski's constitutional violations;
3. Defendants Krstolich, Ware, Barber and Culp had a reasonable opportunity to intervene;
4. Defendants Krstolich, Ware, Barber and Culp failed to intervene;
5. As a result, Lamonte McIntyre sustained damages.

Defendants Krstolich, Ware, Barber, and Culp were presented with opportunities within the scope of their employment and acting under color of state law, to intervene on behalf of Lamonte McIntyre to prevent his malicious prosecution and deprivation of liberty. Yet, with deliberate indifference, they declined to do so. Any reasonable police officer at the time of the Quinn/Ewing investigation would have known that intervention was necessary to protect against the constitutional violations Lamonte would suffer, including fabrication of evidence, suppression of *Brady* evidence, and the arrest of Lamonte without probable cause, and the malicious prosecution of him. These Defendants, experienced officers, knew or should have known, that their conduct would result in McIntyre's wrongful arrest, prosecution, conviction, and incarceration – which did in fact result.

Count 5 – 42 U.S.C. 1983 –Conspiracy.

1. Defendants Golubski, Krstolich, Ware, Barber, and Culp formed a tacit or express agreement to violate Lamonte McIntyre's Fourth, Fifth or Fourteenth Amendment rights;
2. Defendants Golubski, Krstolich, Ware, Barber, and Culp acted in concert

to deprive Lamonte McIntyre of these constitutional rights; and

3. Lamonte McIntyre was actually deprived of his constitutional right to be free from unreasonable searches and seizures, malicious prosecution, coercion, deprivation of liberty without due process and/or to a fair trial.

Defendants Golubski, Krstolich, Ware, Barber, and Culp, acting within the scope of their employment and under the color of state law, agreed amongst themselves and with others, including the coerced witnesses, to act in concert to deprive Lamonte McIntyre of his Fourth, Fifth, and Fourteenth Amendment rights. This conspiracy resulted in the unreasonable search and seizure, malicious prosecution, coercion, and deprivation of liberty without due process of law of Lamonte McIntyre, alongside his right to a fair trial.

Additionally, Defendants Golubski and Krstolich worked in concert with Mitchell to compel fabricated eyewitness testimony falsely implicating McIntyre as murdering Quinn and Ewing. In concert, they also failed to document and disclose material exculpatory evidence to the prosecutors, including the fact that Mitchell's account was false and that the details of her account—especially in naming Lamonte McIntyre as the shooter— originated with KCKPD officers and not Mitchell herself.

Golubski also conspired with Ware. Together, they worked in concert to compel Niko Quinn's testimony falsely implicating McIntyre as murdering Quinn and Ewing. They also conspired to fail to document and disclose material evidence to prosecutors, including the fact that Niko Quinn's account was false and that the details of her account originated with KCKPD officers and not Niko Quinn herself.

As a result of these conspiracies, Lamonte McIntyre was wrongfully convicted and incarcerated for twenty-three years, and also suffered the other grievous damages laid out in Plaintiffs' Factual Contentions, above and the Damages Section, below.

Count 6 – 42 U.S.C. 1983 –Supervisory Liability.

1. Defendant Culp was personally involved in a violation of Lamonte McIntyre's Fourth and Fourteenth Amendment rights by any of the following:
    a. Directing Defendants Golubski, Ware, Krstolich, and Smith to suppress *Brady* evidence, fabricate evidence, or maliciously prosecute Lamonte McIntyre for the Ewing and Quinn murders; or
    b. Having actual knowledge of Defendants' violations of Lamonte McIntyre's constitutional right to be free from unreasonable searches and seizures, malicious prosecution, coercion, deprivation of liberty without due process and to a fair trial and acquiescing in that violation; or
    c. Establishing and maintaining a policy, practice or custom, with deliberate indifference to the consequences, which directly caused the violation of Lamonte McIntyre's constitutional rights.
2. Defendant Culp's actions set in motion a series of events that Culp knew or reasonably should have known would cause others to deprive McIntyre

of his constitutional rights.

3. Defendant Culp knew a constitutional violation would occur or was deliberately indifferent to the risk that a constitutional violation would occur.

By failing to adequately supervise, discipline, or train Defendants Golubski, Krstolich, Ware, Brown, and Smith, Culp created an environment in which these Defendants acted with impunity. Culp's failure to adequately supervise, discipline, or train these Defendants was a result of his gross negligence, recklessness, and/or deliberate indifference to the constitutional rights of citizens, such as Lamonte McIntyre. Culp's actions resulted in the deprivation of Lamonte McIntyre's clearly established rights, including his right to be free from false imprisonment, malicious prosecution, and deprivation of liberty without due process of law, and his right to a fair trial. If the Unified Government of Wyandotte County, the KCKPD, and Defendant Culp had not provided such grossly inadequate discipline, supervision, and training of Defendants Golubski, Krstolich, Ware, Brown, and Smith, they would not have fabricated inculpatory evidence, failed to disclose exculpatory evidence, and intentionally and maliciously caused Lamonte McIntyre to be arrested and prosecuted without probable cause.

Defendant Culp was directly involved in the investigation of Lamonte McIntyre, and he directly supervised the investigative acts taken by the Defendant Officers. Culp supervised the Defendant Officers under the color of state law. Culp's grossly negligent, reckless, and/or deliberately indifferent conduct violated his clearly established duties as supervisor, especially as he had actual or constructive notice of Defendant Officers' misconduct.

As a direct and proximate cause of Culp's grossly negligent, reckless, and/or deliberately indifferent supervision, Lamonte McIntyre was wrongfully incarcerated for twenty-three years, and also suffered the other grievous damages laid out in Plaintiffs' Factual Contentions, above and the Damages Section, below.

Count 7 — 42 U.S.C. 1983 – *Monell*

1. The Fourth, Fifth, or Fourteenth Amendment rights of Lamonte McIntyre were violated by Unified Government employees including Defendants;

2. Such violations resulted from the Unified Government's official policy or custom, including any of the following:
   a. A policy statement or decision that is officially made by the Unified Government's policy-making official
   b. A custom that is a widespread, well-settled practice that constitutes a standard operating procedure of the Unified Government; or
   c. Inadequate training, supervision, or failure to adopt a needed policy, and the Unified Government's failure to adequately train, supervise or adopt a needed policy amounted to deliberate indifference to the fact that inaction would obviously result in the violation of Lamonte's constitutional rights;

3. Such policy, custom, or inadequacy was the moving force behind the violation of Lamonte McIntyre's constitutional rights.

The Unified Government was responsible for the policies, practices, and customs of the KCKPD. The Unified Government is the successor entity to the City of Kansas City, Kansas, which employed all of the Defendant Officers in 1994. The Unified Government, by and through its final policymakers, had in force and effect—both during the investigation of the Quinn and Ewing murders, as well as for years before and after—a policy, practice, or custom of unconstitutional misconduct in serious felony investigations. In particular, the Unified Government had a policy, practice, or custom encouraging the use of coerced and unreliable witness statements taken by Golubski and other favored KCKPD officers. The Unified Government's policy, practice, or custom of encouraging such witness statements often included taking statements from vulnerable witnesses by threatening arrest, using physical violence, imposing sexual domination, paying them in drugs or money, among other incentives and consequences.

The Unified Government, by and through its final policymakers, had in force and effect— both during the investigation of the Quinn and Ewing murders, as well as for years before and after—a policy, practice, or custom of withholding *Brady* evidence from both the prosecution and defense. KCKPD officers would specifically fail to turn over evidence that would undermine the reliability of witnesses who had given false, coerced testimony under the threat of arrest, physical violence, sexual domination, payment in drug money, or other consequences. These officers systematically failed to turn over evidence that investigating officers, including Golubski, maintained relationships of sexual domination of witnesses in serious felony investigations.

The Unified Government, by and through its final policymakers, had in force and effect— both during the investigation of the Quinn and Ewing murders, as well as for years before and after—a policy, practice, or custom of failing to supervise, discipline, and train officers investigating serious felonies.

The Unified Government had actual or constructive notice of KCKPD officers' misconduct, but repeatedly failed to make any meaningful investigation into claims that officers used misconduct to close cases. The Unified Government also had actual or constructive notice that the widespread failures to supervise or discipline KCKPD officers for misconduct performed in the course of serious felony investigations enabled officers to engage in misconduct without repercussion. By continually adhering to these unconstitutional municipal polices, practices, and customs, the Unified Government acted with deliberate indifference to the constitutional rights of defendants.

The Unified Government had repeated opportunities before, during, and after the investigation of the Quinn and Ewing homicides to adequately supervise, discipline, and train officers for failing to use proper and legal investigative tactics by not physically, psychologically, and sexually abusing female informants, coercing those informants to provide false evidence, illegally protecting individuals involved in the illegal trade of drugs, failing to turn over exculpatory evidence, failing to document interactions with and evidence allegedly provided by informants, and wrongfully pursuing, prosecuting, or convicting innocent individuals. And yet they failed to do so.

In particular, the Unified Government turned a blind eye to the egregious acts of Golubski and others. Multiple KCKPD officers knew of this misconduct but turned a blind eye. Final policymakers for the Unified Government knew that failing to act would be substantially certain to result in constitutional violations including, but not limited to, the use of false, fabricated or coerced testimony, and perjury, false eyewitness reports, fabricated evidence, false identifications, wrongful arrests, malicious prosecutions, and wrongful convictions.

The above unconstitutional municipal policies were the moving force behind Lamonte McIntyre's wrongful twenty-three-year incarceration, and the other grievous injuries and damages as set forth above and below.

Count 8 – K.S.A. 75-6103 –Malicious Prosecution

1. Defendants Golubski, Krstolich, Ware, Brown, Barber, Culp, and Smith, initiated, continued, or procured criminal procedures against Lamonte McIntyre for the murders of Ewing and Quinn;
2. No probable cause supported McIntyre's confinement or prosecution;
3. Defendants acted with malice;
4. The proceeding terminated in Lamonte McIntyre's favor; and
5. Lamonte McIntyre sustained damages.

Defendants Golubski, Krstolich, Ware, Brown, Barber, Culp, and Smith, acting within the scope of their employment, initiated or continued proceedings against Lamonte McIntyre without probable cause and with malice when they intentionally and knowingly deliberately misrepresented the truth and withheld exculpatory facts from prosecutors that vitiated probable cause. These facts included that the incriminating witness statements were fabricated and the product of coercion, and that Defendant Officers fed these witnesses nonpublic and false details they did not know—and could not have known, because Lamonte McIntyre is innocent.

Following Lamonte McIntyre's wrongful arrest, prosecution, conviction, and incarceration, the criminal proceedings against him ultimately terminated in his favor. On October 13, 2017, the District Attorney moved for a new trial then immediately moved to dismiss charges. Lamonte McIntyre was then released from prison. As a direct of this malicious prosecution, Lamonte McIntyre spent twenty-three years in jail and sustained other grievous injuries as detailed above and below.

The Defendant Officers are not entitled to protection from liability under the Kansas Tort Claims Act, K.S.A. 75-6101, *et seq*, nor from the exceptions set forth in K.S.A. § 6104 (c, d, e, i, n), as the Officers' conduct alleged herein was not resultant from the enforcement of a law, from the failure or adoption of a policy protecting persons' health or safety, or from the failure to provide police or fire protection, and because the Officers' conduct was deliberate and not a discretionary function.

Count 9 – K.S.A. 75-6103 –Respondeat Superior

1. At all times relevant to this action, Defendants were employees of the

2.     Unified Government of Wyandotte County and/or its predecessor, the City of Kansas City, Kansas; and

2.     Defendant Unified Government of Wyandotte County and Kansas City, Kansas, is liable as principal for all intentional torts committed by its agents; and

3.     Defendants acted within the scope of their employment in committing the misconduct described in Count 8;

The Defendant Officers were employed by the Unified Government, or its predecessor, the City of Kansas City, Kansas, at all relevant times. The officers acted within the scope of their employment in committing all the misconduct alleged above. In fact, the Defendant Officers undertook their tortious conduct while carrying out routine investigative functions. The Defendants' tortious conduct was reasonably expected by, and in fact foreseen by, Defendant Unified Government.

The Defendant Unified Government is not entitled to protection from liability under the Kansas Tort Claims Act, K.S.A. 75-6101, *et seq*, nor from the exceptions set forth in K.S.A. § 6104 (c, d, e, i, n), as the Officers' conduct alleged herein was not resultant from the enforcement of a law, from the failure or adoption of a policy protecting persons' health or safety, or from the failure to provide police or fire protection, and because the Officers' conduct was deliberate and not a discretionary function. The Unified Government is liable as principal for all intentional torts committed by its agents—the Defendant officers.

### b)     Defenses of Defendant Unified Government.

The Unified Government denies all claims by plaintiffs Lamonte McIntyre and Rose McIntyre as to liability and damages.

The arrest, detention, charge, and conviction of Lamonte McIntyre were supported by probable cause.

With respect to the *Monell* claims under § 1983, the policymaker for the Unified Government was the Chief of Police.

The Unified Government is not vicariously liable for the wrongful acts or omissions of Roger Golubski, James Michael Krstolich, Dennis Ware, James L. Brown, Dennis Otto Barber, Clyde Blood, W.K. Smith, and/or Steve Culp, or other officers and/or detectives alleged in the Second Amended Complaint or in Plaintiffs' contentions above because such acts, if proven, were not within the scope of employment with the Unified Government or the KCKPD as a matter of law.

The Unified Government is not vicariously liable for Rose McIntyre's claim for interference with familial association, if proven.

Detective Golubski's conduct directed at Rose McIntyre, if any, was not caused by any custom, practice or policy of the Unified Government.

Detective Golubski's conduct directed at Rose McIntyre, if any, was not within the scope of Golubski's employment as a matter of law.

Lamonte McIntyre's Fourth Amendment claims accrued in 1994 and are barred by the two-year statute of limitations and the statute of repose. K.S.A. 60-513.

Rose McIntyre's familial association claim accrued in 1994 and is barred by the two-year statute of limitations and statute of repose. K.S.A. 60-513.

Lamonte McIntyre's Claims under the Due Process Clause of the Fourteenth Amendment are precluded because Kansas provides an adequate remedy via a common law cause of action for malicious prosecution.

Plaintiffs' claims are barred by the doctrine of sovereign immunity and the provisions of the Kansas Tort Claims Act, K.S.A. 75-6101, *et seq*. The claims are likewise barred by the exceptions set forth in K.S.A. 75-6104(c), (d), (e), (i), and (n). Plaintiffs' claims are based upon the manner in which the law was enforced as to Lamonte McIntyre, or not enforced as to "Monster" or others, which is barred by K.S.A. 75-6104(c). Plaintiffs' claims are based upon the manner in which the policies were enforced or the lack of such policies which is barred by K.S.A. 75-6104(d). Plaintiffs' claims are based upon the discretionary decisions and manner in which the Ewing/Quinn homicides were investigated and the discretionary decisions and manner in which detectives and police officers were supervised which are barred by K.S.A. 75-6104(e). Plaintiffs' claims are based upon conduct by individuals who are entitled to absolute and/or qualified immunity, and discretionary function immunity to which the Unified Government is entitled to adoptive immunity under K.S.A. 75-6104(i). Plaintiffs' claims are based upon the manner in which police protection was provided which is barred by K.S.A. 75-6104(n).

Plaintiffs' damages are limited by K.S.A. 75-6105, K.S.A. 60-1903, and K.S.A. 60-19a02. Claims under Kansas law for prejudgment interest, compensatory damages in excess of $500,000. Punitive damages as to the Unified Government are precluded by statute and the doctrine of sovereign immunity.

Plaintiffs' damages are limited or offset by Lamonte McIntyre's monetary recovery under K.S.A. 60-5004.

### c)   Defenses of Defendant Roger Golubski.

Defendant Golubski disputes all claims by Plaintiffs Lamonte McIntyre and Rose McIntyre as to liability and damages.

The arrest, detention, charge, and conviction of Lamonte McIntyre were supported by probable cause.

Defendant Golubski was acting within the scope of his employment during the investigation, arrest, detention, charge, and conviction of Lamonte McIntyre.

Defendant Golubski disputes the allegations of misconduct asserted by Plaintiffs and asserts he did not act in concert with any other officer to deprive Lamonte McIntyre of his constitutional rights.

Lamonte McIntyre's Fourth Amendment claims accrued in 1994 and are barred by the two-year statute of limitations and the statute of repose. K.S.A. 60-513.

Lamonte McIntyre's Claims under the Due Process Clause of the Fourteenth Amendment are precluded because Kansas provides an adequate remedy via a common law cause of action for malicious prosecution..

Plaintiffs' claims are barred by the provisions of the Kansas Tort Claims Act, K.S.A. 75-6101, *et seq*., including K.S.A. 75-6104(c), (d), (e), (i), and (n).  Plaintiff's claims revolve around Defendant Golubski's role in the investigation of the Ewing/Quinn homicides.  Accordingly, these immunities under the KTCA apply.  Defendant Golubski was acting within the course and scope of his employment.  *See* K.S.A. 75-6104.  In the investigation, he was enforcing state criminal laws.  *See* K.S.A. 75-6104(c).  Plaintiff's claims are based on alleged failures to adhere to KCKPD policy.  *See* K.S.A. 75-6104(d).  Defendant Golubski was exercising a discretionary function by performing his duties in the Ewing/Quinn investigation.  *See* K.S.A. 75-6104(e).  He is entitled to absolute immunity related to his trial testimony.  *See* K.S.A. 75-6104(i).  Finally, Plaintiff's claims challenge Defendant Golubski's method of providing police protection.  *See* K.S.A. 75-6104(n).

Plaintiffs' damages are limited by K.S.A. 75-6105, K.S.A. 60-1903, and K.S.A. 60-19a02.  Claims under Kansas law for prejudgment interest, compensatory damages in excess of $500,000.

Plaintiffs' damages are limited or offset by Lamonte McIntyre's monetary recovery under K.S.A. 60-5004.

Plaintiff's claims for punitive damages against Defendant Golubski violate the United States Constitution and the Constitution of the State of Kansas.

Further, as it relates to each of the Counts alleged by the Plaintiff Lamonte McIntyre to Defendant Golubski, the following defenses are raised:

<u>Count 1:</u> Under Section 1983, Lamonte asserts Fourth and Fourteenth Amendment malicious prosecution claims against Golubski, Krstolich, Ware, Brown, Barber, Culp, and Smith;

- Based on the facts disclosed through discovery and submissible evidence, Plaintiff has failed to state a claim upon which relief can be granted;
- Plaintiff's Fourth Amendment claims are barred by the statute of limitations;
- Plaintiff's Fourteenth Amendment claims are barred because there are adequate state tort remedies;
- Defendant Golubski is entitled to qualified immunity for the claims alleged in Count 1;
- 
- There was probable cause for the arrest and confinement of Plaintiff;

- Defendant Golubski is entitled to absolute immunity for testimony provided at the preliminary hearing and/or trial;

Count 2: Under Section 1983, Lamonte asserts Fourth and Fourteenth Amendment evidence fabrication and *Brady* violations against Golubski, Krstolich, Ware, Brown, Barber, and Smith;

- Based on the facts disclosed through discovery and submissible evidence, Plaintiff has failed to state a claim upon which relief can be granted;
- Plaintiff's Fourth Amendment claims are barred by the statute of limitations;
- Plaintiff's Fourteenth Amendment claims are barred because there are adequate state tort remedies;
- Count 2 should be dismissed because it is duplicative of Count 1;
- Defendant Golubski is entitled to qualified immunity for the claims alleged in Count 2;
- There was probable cause for the arrest and confinement of Plaintiff;
- Defendant Golubski is entitled to absolute immunity for testimony provided at the preliminary hearing and/or trial;

Count 3: Under Section 1983, Lamonte and Rose assert First and Fourteenth Amendment familial association claims against Defendant Golubski;

- Based on the facts disclosed through discovery and submissible evidence, Plaintiffs have failed to state a claim upon which relief can be granted;
- Count 3 is barred by the statute of limitations and statute of repose. K.S.A. 60-513.;
- Count 3 is barred because there are adequate state tort remedies;
- Count 3 should be dismissed if Count 1 and/or Count 2 are dismissed;
- Defendant Golubski is entitled to qualified immunity for the claims alleged in Count 3;
- Golubski
- There was probable cause for the arrest and confinement of Plaintiff Lamonte McIntyre;
- Defendant Golubski is entitled to absolute immunity for testimony provided at the preliminary hearing and/or trial;
- Count 3 should be dismissed, pursuant to Fed. R. Civ. P. 41(b) and Fed. R. Civ. P. 37(b)(2)(v),  due to Rose McIntyre's failure to follow the rules of civil procedure and this court's orders because she unilaterally terminated her deposition with five hours of court-ordered time remaining, she cancelled a scheduled date to complete her deposition, she refused to complete her deposition by the discovery deadline, and she appears unwilling to be deposed prior to trial.  Furthermore, during Rose McIntyre's partial deposition, her counsel repeatedly interfered with the questioning through coaching, speaking objections, clarifications, and other improper tactics.

Count 5: Under Section 1983, Lamonte asserts Fourth, Fifth and Fourteenth Amendment conspiracy claims against Golubski, Krstolich, Ware, Barber and Culp;

- Based on the facts disclosed through discovery and submissible evidence, Plaintiff has failed to state a claim upon which relief can be granted;

- Plaintiff's Fourth and Fifth Amendment claims are barred by the statute of limitations;
- Plaintiff's Fourteenth Amendment claims are barred because there are adequate state tort remedies;
- Count 5 should be dismissed if Count 1 and/or Count 2 are dismissed;
- Defendant Golubski is entitled to qualified immunity for the claims alleged in Count 5;
- There was probable cause for the arrest and confinement of Plaintiff;
- Defendant Golubski is entitled to absolute immunity for testimony provided at the preliminary hearing and/or trial;

Count 8: Under state law, Lamonte asserts malicious prosecution claims against Golubski, Krstolich, Ware, Brown, Barber, Culp, and Smith;

- Based on the facts disclosed through discovery and submissible evidence, Plaintiff has failed to state a claim upon which relief can be granted;
- Plaintiff has failed to show Defendant Golubski acted with malice;
- There was probable cause for the arrest and confinement of Plaintiff;
- Defendant Golubski is entitled to absolute immunity for testimony provided at the preliminary hearing and/or trial;
- Defendant Golubski is entitled to discretionary function immunity;
- Plaintiffs' claims are barred by the provisions of the Kansas Tort Claims Act, K.S.A. 75-6101, *et seq*., including K.S.A. 75-6104(c), (d), (e), (i), and (n), as provided in more detail above.

### d)    Defenses of Other Individual Defendants.

The Defendant Officers deny all claims by Plaintiffs Lamonte McIntyre and Rose McIntyre as to liability and damages.

The arrest, detention, charge, and conviction of Lamonte McIntyre was supported by probable cause.

The Defendant Officers were acting within the scope of their employment during the investigation, arrest, detention, charge, and conviction of Lamonte McIntyre.

Lamonte McIntyre's Fourth Amendment claims accrued in 1994 and are barred by the two-year statute of limitations and the statute of repose. K.S.A. 60-513.

Lamonte McIntyre's Claims under the Due Process Clause of the Fourteenth Amendment are precluded because Kansas provides an adequate remedy via a common law cause of action for malicious prosecution.

Plaintiffs' claims are barred by the provisions of the Kansas Tort Claims Act, K.S.A. 75-6101, *et seq*., including K.S.A. 75-6104(c), (d), (e), (i), and (n).  Plaintiff's claims revolve around Defendant Officers' roles in the investigation of the Ewing/Quinn homicides.  Accordingly, these immunities under the KTCA apply.  Defendant Officers were acting within the course and scope

of their employment. *See* K.S.A. 75-6104. In the investigation, they were enforcing state criminal laws. *See* K.S.A. 75-6104(c). Plaintiff's claims are based on alleged failures to adhere to KCKPD policy. *See* K.S.A. 75-6104(d). Defendant Officers were exercising a discretionary function by performing their duties in the Ewing/Quinn investigation. *See* K.S.A. 75-6104(e). They are entitled to absolute immunity related to their trial testimony. *See* K.S.A. 75-6104(i). Finally, Plaintiff's claims challenge Defendant Officers' methods of providing police protection. *See* K.S.A. 75-6104(n).

Plaintiffs' damages are limited by K.S.A. 75-6105, K.S.A. 60-1903, and K.S.A. 60-19a02. Claims under Kansas law for prejudgment interest, compensatory damages in excess of $500,000.

Plaintiffs' damages are limited or offset by Lamonte McIntyre's monetary recovery under K.S.A. 60-5004.

Plaintiff's claims for punitive damages against the Defendant Officers violate the United States Constitution and the Constitution of the State of Kansas.

Further, as it relates to each of the Counts alleged by the Plaintiff Lamonte McIntyre to each Defendant Officer, the following defenses are raised:

Count 1: Under Section 1983, Lamonte asserts Fourth and Fourteenth Amendment malicious prosecution claims against Golubski, Krstolich, Ware, Brown, Barber, Culp, and Smith;

- Defendants Krstolich, Ware, Brown, Barber, Culp and Smith state that based on the facts disclosed through discovery and submissible evidence, Plaintiff has failed to state a claim upon which relief can be granted as to Defendants Krstolich, Ware, Brown, Barber, Culp and Smith;
- Plaintiff's Fourth Amendment claims are barred by the statute of limitations;
- Plaintiff's Fourteenth Amendment claims are barred because there are adequate state tort remedies;
- Defendants Krstolich, Ware, Brown, Barber, Culp and Smith are entitled to qualified immunity for the claims alleged in Count 1;
- Defendants Krstolich, Ware, Brown, Barber, Culp and Smith had probable cause for the arrest and confinement of Plaintiff;
- Defendants Krstolich, Brown, and Barber are entitled to absolute immunity for testimony provided at the preliminary hearing and/or trial;

Count 2: Under Section 1983, Lamonte asserts Fourth and Fourteenth Amendment evidence fabrication and *Brady* violations against Golubski, Krstolich, Ware, Brown, Barber, and Smith;

- Defendants Krstolich, Ware, Brown, Barber, and Smith state that based on the facts disclosed through discovery and submissible evidence, Plaintiff has failed to state a claim upon which relief can be granted as to Defendants Krstolich, Ware, Brown, Barber, and Smith;
- Plaintiff's Fourth Amendment claims are barred by the statute of limitations;

- Plaintiff's Fourteenth Amendment claims are barred because there are adequate state tort remedies;
- Count 2 should be dismissed because it is duplicative of Count 1;
- Defendants Krstolich, Ware, Brown, Barber, and Smith are entitled to qualified immunity for the claims alleged in Count 2;
- Defendants Krstolich, Ware, Brown, Barber, and Smith had probable cause for the arrest and confinement of Plaintiff;
- Defendants Krstolich, Brown, and Barber are entitled to absolute immunity for testimony provided at the preliminary hearing and/or trial;

Count 4: Under Section 1983, Lamonte asserts Fourth and Fourteenth Amendment failure to intervene claims against Krstolich, Ware, Barber, and Culp.

- Defendants Krstolich, Ware, Barber, and Culp state that based on the facts disclosed through discovery and submissible evidence, Plaintiff has failed to state a claim upon which relief can be granted as to Defendants Krstolich, Ware, Barber, and Culp;
- Plaintiff's Fourth Amendment claims are barred by the statute of limitations;
- Plaintiff's Fourteenth Amendment claims are barred because there are adequate state tort remedies;
- Count 4 should be dismissed if Count 1 and/or Count 2 are dismissed;
- Defendants Krstolich, Ware, Barber, and Culp are entitled to qualified immunity for the claims alleged in Count 4;
- Defendants Krstolich, Ware, Barber, and Culp had probable cause for the arrest and confinement of Plaintiff;
- Defendants Krstolich and Barber are entitled to absolute immunity for testimony provided at the preliminary hearing and/or trial;

Count 5: Under Section 1983, Lamonte asserts Fourth, Fifth and Fourteenth Amendment conspiracy claims against Golubski, Krstolich, Ware, Barber and Culp;

- Defendants Krstolich, Ware, Barber, and Culp state that based on the facts disclosed through discovery and submissible evidence, Plaintiff has failed to state a claim upon which relief can be granted as to Defendants Krstolich, Ware, Barber, and Culp;
- Plaintiff's Fourth and Fifth Amendment claims are barred by the statute of limitations;
- Plaintiff's Fourteenth Amendment claims are barred because there are adequate state tort remedies;
- Count 5 should be dismissed if Count 1 and/or Count 2 are dismissed;
- Defendants Krstolich, Ware, Barber, and Culp are entitled to qualified immunity for the claims alleged in Count 5;
- Defendants Krstolich, Ware, Barber, and Culp had probable cause for the arrest and confinement of Plaintiff;
- Defendants Krstolich and Barber are entitled to absolute immunity for testimony provided at the preliminary hearing and/or trial;

Count 6: Under Section 1983, Lamonte asserts Fourth and Fourteenth Amendment supervisory liability claims against Culp;

- Defendant Culp states that based on the facts disclosed through discovery and submissible evidence, Plaintiff has failed to state a claim upon which relief can be granted as to Defendant Culp;
- Plaintiff's Fourth and Fifth Amendment claims are barred by the statute of limitations;
- Plaintiff's Fourteenth Amendment claims are barred because there are adequate state tort remedies;
- Count 6 should be dismissed if Count 1 and/or Count 2 are dismissed;
- Defendant Culp is entitled to qualified immunity for the claims alleged in Count 6;
- Defendant Culp had probable cause for the arrest and confinement of Plaintiff;

Count 8: Under state law, Lamonte asserts malicious prosecution claims against Golubski, Krstolich, Ware, Brown, Barber, Culp, and Smith;

- Defendants Krstolich, Ware, Brown, Barber, Culp, and Smith state that based on the facts disclosed through discovery and submissible evidence, Plaintiff has failed to state a claim upon which relief can be granted as to Defendants Krstolich, Ware, Brown, Barber, Culp, and Smith;
- Defendants Krstolich, Ware, Brown, Barber, Culp, and Smith had probable cause for the arrest and confinement of Plaintiff;
- Defendants Krstolich, Barber, and Brown are entitled to absolute immunity for testimony provided at the preliminary hearing and/or trial;
- Defendants Krstolich, Ware, Brown, Barber, Culp, and Smith are entitled to discretionary function immunity;
- Plaintiffs' claims are barred by the provisions of the Kansas Tort Claims Act, K.S.A. 75-6101, *et seq.*, including K.S.A. 75-6104(c), (d), (e), (i), and (n), as provided in more detail above;

## 5)    DAMAGES AND NON-MONETARY RELIEF REQUESTED.

Lamonte McIntyre has suffered considerable economic and emotional damages as a result of Defendants' conduct, and will be seeking $1,586,858 for past and future loss of income and earning capacity as further explained in Plaintiffs' expert reports of Kurt Kruger and Kristine Skahan, and which encompasses Lamonte's pre-incarceration and post-incarceration expected market earning capacity as a barber and/or with a bachelor degree, and $72,000,000 for his 23 years wrongfully incarcerated and for his continuing pain and suffering. In regard to pain and suffering, Lamonte McIntyre has missed out on the benefit of the life experiences gained in one's late teens, twenties, and thirties. Since he was released from prison, he has had to attempt to make a life for himself without the benefit of life experiences, guidance and resources that normally equip adults for that task. Lamonte McIntyre's incarceration deprived him of basic physical freedom. Restrictions on

this basic freedom included limiting Lamonte McIntyre's diet, sleep, personal contact, education opportunities, vocational opportunities, athletic opportunities, personal fulfillment, sexual activity, reading, television, movies, travel, enjoyment, and expression. He also missed the opportunity to have basic life experiences, including spending holidays, births, funerals, and other life events with loved ones; falling in love; marrying; and living life autonomously. Particularly painful for Lamonte was his inability to attend his grandfather's funeral in 2003.

Lamonte McIntyre's incarceration also caused him detrimental health effects, by causing him of physical pain and suffering, psychological damages, severe mental anguish, permanent loss of natural psychological development, and emotional distress. Lamonte has been diagnosed with complex Post-Traumatic Stress Disorder. As a result of depression and anxiety, Lamonte has problems sleeping. He experiences nightmares. During the day, he is also hypervigilant and anxious. Due to his wrongful incarceration, Lamonte is unable to trust, which isolates him from his mother, siblings, and wife. He also suffers emotional distress from witnessing his wrongful conviction's detrimental effects on his mother's life.

Lamonte McIntyre's incarceration also caused him to lose family relationships, property, income, and career opportunities. For example, because it was difficult for Lamonte to witness his siblings' growth while he was trapped behind bars, his relationships with them weakened. Lamonte McIntyre also had enormous legal expenses to put towards his defense and post-conviction efforts. His wrongful incarceration also caused him humiliation, indignity, embarrassment and extreme mental distress. The tragedy of Lamonte McIntyre's case has caused it to be quite public. As a private person, Lamonte McIntyre suffered from the public attention he got as the result of his wrongful conviction.

When Lamonte was released from incarceration he had trouble adapting to a technological and online world. For example, he attempted to attend community college on a scholarship, but when the school switched to a web platform, he stopped attending class, as he was incarcerated in 1994, and had only experienced assignments by putting pen to paper. Lamonte McIntyre is still overwhelmed by technology despite his attempts to assimilate.

In addition to all that Lamonte McIntyre was deprived of due to his incarceration, he was also held in prison for twenty-three years, where he was exposed to stark and horrific conditions. He was held amongst individuals convicted of violent felonies and thus lived with the constant threat of violence while incarcerated. Rose McIntyre has also suffered considerable economic and emotional damages as a result of the framing of her son, who was targeted by Roger Golubski, who then used his fellow officers and the KCKPD to frame Lamonte McIntyre. Rose McIntyre will be seeking $10,000,000 for compensatory damages for the devastating and ongoing injuries she suffered as a result. The framing of Lamonte McIntyre caused Rose and her family grave and irreparable harm. As a result of her son's wrongful incarceration, Ms. McIntyre suffered extreme and emotional physical devastation, becoming, at times incapacitated and unable to properly care for her other children. She suffered intense depression and anxiety and had severe psychological damage. These consequences led to Rose McIntyre's physical pain and suffering, severe mental anguish, and emotional distress. Rose McIntyre has suffered mental breakdowns and had suicidal thoughts following her son's wrongful incarceration. Following her first

mental breakdown, she was in and out of psychological treatment for 17 years in Kansas. She feels tremendous guilt for having driven her son to the police station in the hope of responding to police questions. She also experiences frequent flashbacks for taking her son to the station.

Rose McIntyre has been diagnosed with complex Post-Traumatic Stress Disorder and major depressive disorder. During Lamonte McIntyre's wrongful incarceration, Rose McIntyre was unable to sleep, obsessing over how to prove her son's innocence. She would stay awake until 3 or 4 o'clock in the morning—a pattern that continues today. She also suffers from panic attacks, debilitating anxiety, a tendency to isolate and withdraw, and the inability to trust. These symptoms will continue.

The wrongful incarceration of her son also caused humiliation, indignities, and embarrassment. She also paid legal expenses for her son's defense and post-conviction efforts. Rose McIntyre also suffered the loss of property, income, and career opportunities. And her family relationships suffered. Lamonte McIntyre's incarceration has caused a tension among his siblings, who once shared a tight-knit bond. This tension causes Rose McIntyre panic attacks.

Rose McIntyre's damages go beyond the normal pain and suffering experienced by a loved one whose family member is incarcerated, or even wrongfully incarcerated. Once she learned of Golubski's central role in investigating her son's case, she carried the guilt and stress of having placed her son in the crossfire of his retaliation, having refused Golubski's sexual advances years earlier.

Both Plaintiffs are also entitled to punitive damages up to $20,000,000. as Defendants engaged in unconstitutional misconduct, practices, and customs with malice or reckless indifference to Lamonte McIntyre's and Rose McIntyre's constitutionally protected rights, including their intentional and malicious prosecution of Lamonte McIntyre, the deliberate targeting of Lamonte McIntyre to deprive Rose McIntyre of his company, their fabrication of inculpatory evidence, their suppression of exculpatory evidence, their coercion of witnesses, and their intentional or reckless failure to intervene to prevent the above misconduct, all of which are further explained in detail above.

Plaintiffs are also entitled to attorneys' fees.

## 6)   AMENDMENTS TO PLEADINGS.

All claims asserted in the Second Amended Complaint, Doc. 74, against defendant Clyde Blood are dismissed from this action. The supervisory liability claim against Defendant Dennis Barber, Count VI in the Second Amended Complaint, is dismissed.

## 7)   DISCOVERY.

Under the scheduling order and any amendments, all discovery was to have been completed by January 31, 2022. Discovery is incomplete, in that the deposition of Plaintiff Rose McIntyre is incomplete due to medical complications previously disclosed to the Court, the depositions of the following may be taken after the discovery deadline by agreement of the parties, none of which

will be the basis for requesting extension of the April 1, 2022 dispositive motion deadline or the related briefing deadlines for dispositive motions:

(1) Rose McIntyre
(2) Bernard Crawford
(3) Yolanda Johnson
(4) M'Sherie Johnson
(5) Richelle Miller
(6) Phillip Miller
(7) Detra Butler Wilson.

Unopposed discovery may continue after the deadline for completion of discovery so long as it does not delay the briefing of or ruling on dispositive motions or other pretrial preparations. Although discovery may be conducted beyond the deadline for completion of discovery _if_ all parties are in agreement to do so, under these circumstances the court will <u>not</u> be available to resolve any disputes that arise during the course of such extended discovery.

All above referenced depositions and trial depositions are to be completed by September 2, 2022.

**8)    MOTIONS.**

      **a)    Pending Motions.**

           None.

      **b)    Additional Pretrial Motions.**

      After the pretrial conference, the parties intend to file the following motions:

Motions for Summary Judgement
Motions to exclude testimony of expert witnesses
Motion to Dismiss Count 3
Motions to Separate/Bifurcate. Defendants contend the trial should be bifurcated as to separate the claims of misconduct against defendant Golubski from the claims against the remaining defendants.
Motion to determine the place of trial. Defendants contend trial of this matter should be held in Wichita, outside of the Kansas City media market.
Motions in Limine
Motions related to Defendant Golubski's Fifth Amendment invocations
Motions related to Defendant Golusbki's health and attendance at trial
Motions related to the Defendant Officers attendance at trial

The dispositive-motion deadline, as established in the scheduling order and any amendments, is **April 1, 2022**. The deadline for motion to separate/bifurcate and to determine the place of trial is **April 15, 2022**.

The parties should follow the summary-judgment guidelines available on the court's website:

http://ksd.uscourts.gov/wp-content/uploads/2015/10/Summary-Judgment-Guidelines.pdf

Consistent with the scheduling order filed earlier in this case, the arguments and authorities section of briefs or memoranda must not exceed 30 pages, absent an order of the court.

### c)    Motions Regarding Expert Testimony.

All motions to exclude testimony of expert witnesses pursuant to Fed. R. Evid. 702-705, *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), *Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999), or similar case law, must be filed no later than **April 1, 2022**.

### 9)    ALTERNATIVE DISPUTE RESOLUTION (ADR).

Mediation is ordered. Absent further order of the court, mediation must be held no later than August 30, 2022. An ADR report must be filed by defense counsel within 14 days of any scheduled ADR process, using the form located on the court's website:

*http://ksd.uscourts.gov/wp-content/uploads/2015/10/adrreportrev20141.pdf*

### 10)    TRIAL.

The trial docket setting, as established in the scheduling order and any amendments, is **November 7, 2022 at 9:00 a.m., in Kansas City, Kansas.**  This case will be tried by jury.  Trial is expected to take approximately 4 weeks. The court will attempt to decide any timely filed dispositive motions approximately 60 days before trial.  If no dispositive motions are timely filed, or if the case remains at issue after timely dispositive motions have been decided, then the trial judge may enter an order or convene another pretrial conference to set deadlines for filing final witness and exhibit disclosures, exchanging and marking trial exhibits, designating deposition testimony for presentation at trial, motions in limine, proposed instructions in jury trials, and proposed findings of fact and conclusions of law in bench trials.

IT IS SO ORDERED.

Dated March 17, 2022, at Wichita, Kansas.

/s KENNETH G. GALE
Kenneth G. Gale
U. S. Magistrate Judge