# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| **LAMONTE MCINTYRE, et al.,** ) | |
| ) | |
| **Plaintiffs,** ) | |
| ) | **Case No. 2:18-cv-02545-KHV-KGG** |
| **vs.** ) | |
| ) | |
| **UNIFIED GOVERNMENT OF WYANDOTTE** ) | |
| **COUNTY AND KANSAS CITY, KANSAS,** ) | |
| **et al.,** ) | |
| ) | |
| **Defendants.** ) | |

## DEFENDANT OFFICERS' MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

COMES NOW Defendants Estates of James Michael Krstolich, Dennis Otto Barber, and Lieutenant Steven Culp; Dennis Ware, James L. Brown, and W.K. Smith (hereinafter "Defendant Officers") and hereby submits their Memorandum in Support of their Motion for Summary Judgment.

## I.   STATEMENT OF THE NATURE OF THE MATTER

Plaintiff Lamonte McIntyre has brought this action against the Defendant Officers and others alleging Section 1983 and a state tort claim for the alleged wrongful arrest and conviction of Plaintiff in 1994. Plaintiff Rose McIntyre, Lamonte McIntyre's mother, has not alleged any claims against the Defendant Officers.[1] *See* Plaintiffs' Second Amended Complaint and Jury Demand, Doc. 74.

For the reasons set forth below, the Defendant Officers are entitled to judgment as a matter of law on all the claims asserted by Plaintiff.

---

[1] As Rose McIntyre has not alleged any claims against these defendants, any reference to "Plaintiff" in the Defendant Officers' pleadings is referring to Lamonte McIntyre. In the event the Defendant Officers intend to reference Rose McIntyre, she will be identified as "Plaintiff Rose McIntyre".

## II.   STATEMENT OF UNCONTROVERTED MATERIAL FACTS[2]

**Ewing/Quinn Homicide and Investigation**

1.      At around 2:00 p.m. on April 15, 1994, Doniel Quinn and Donald Ewing were shot while they sat in the front seat of a parked car on Hutchings Street, in Kansas City, Kansas by a lone assailant who fired a shotgun at least 4 times.  Doc. 562, Pretrial Order, Factual Stipulation ¶ 5; Exhibit 1, Ewing/Quinn Homicide File (Deposition Exhibit 5), P0002.

2.      Numerous Kansas City, Kansas Police Department ("KCKPD") personnel responded to the scene, including Officer L. Vallejo, Officer J. Orendac, Officer G. Wansley, Officer J. Myers, Officer Ambler, Officer Clair, Officer Howard, Officer Stubler, Officer Keith, Officer Bagsby, Officer Steel, Sgt. Singleton, Sgt. Keith, Detective Golubski, Detective Krstolich, Sgt. Blood, Detective Shomin, Detective Maskill, Detective W.K. Smith, Detective Nelson, Lt. Culp, ADA Grosko, Captain Twitchell, Lt. Harrington, and ID Unit Officers.  Exhibit 1, P0006, 0020, 0021, 0051.

3.      It is indicated in the homicide file that at 2:14 p.m., Officer J.D. Myers reported to 3032 Hutchings where he saw the victims.  He roped off the crime scene with Officer Ambler. Exhibit 1, P0018.

4.      It is indicated in the homicide file that at 2:15 p.m., Officer Ambler was dispatched to 3031 Hutchings and reported that he observed no brass in the street around the victims' car. Officer Wansley was assigned to rope off the immediate area.  Officer J. Bagsby was given control of an eyewitness.   Officer Myers was given control of another black female witness.   EMS transported the victims.  Exhibit 1, P0020.

5.      It is indicated in the homicide file that Officer Ambler, Officer Keith, Officer

---

[2] Abbreviated "SOF" throughout the pleading.

Wansley and Officer Myers conducted a canvas of a vacant lot on the west side of Hutchings. Exhibit 1, P0020.

6.     It is indicated in the homicide file that Officer Wansley assisted Sgt. Keith in searching a vacant burnt building on the northwest corner of Hiawatha.  Exhibit 1, P0020.

7.     It is indicated in the homicide file that Officer Wansley canvassed the area, identified Ruby Mitchell of 3020 Hutchings and she related that she heard someone arguing out in front of her residence.  When she looked out the front door, she noticed a black male wearing all black, carrying a shotgun.  The black male approached the driver's side of the vehicle and fired the shotgun into the driver's window at the driver.  The black male then went around to the front passenger side and shot into the passenger in the vehicle.  The suspect then ran west across a vacant lot toward Hiawatha.  Exhibit 1, P0020.

8.     It is indicated in the homicide file that Officer Wansley met with Alvin Finley of 3029 Hiawatha, who said he was in bed and did not hear any shots fired.  Exhibit 1, P0014.

9.     It is indicated in the homicide file that Officer Wansley met with Breon Shelton who said she heard several shots fired.  She also noticed a dark blue Chevy Caprice classic parked on the west side of Hiawatha across from her residence near the open vacant lot.  She saw two black males seated in the vehicle.  A canvass of the remaining area was met with negative results. Exhibit 1, P0014.

10.     It is indicated in the homicide file that at 2:20 p.m., ID Officers Clair and Howard as well as Lt. Harrington reported to the homicide scene where they took photos of the scene, collected physical evidence and processed the victim's vehicle.  Officer Howard ran a video and collected evidence while Officer Clair took still photos and dusted the vehicle for latent prints. Exhibit 1, P0017/26.

11.     It is indicated in the homicide file that Officer Clair collected physical evidence from the victims' vehicle, including clothing, plastic wadding, a crack pipe, glass, cash, blood and liquor bottles.  From the crime scene, he collected four spent shell casings and additional glass and blood samples.  Exhibit 1, P0040-0041.

12.     It is indicated in the homicide file that at 2:30 p.m., Sgt. Blood and Det. Maskill reported to the crime scene.  Det. Smith, Golubski and Krstolich were all on scene interviewing witnesses.  Lt. Culp directed Sgt. Blood and Det. Maskill to Bethany Medical Center to see what information could be obtained regarding the victim.  Exhibit 1, P0053-6.

13.     Detective Golubski prepared a full body diagram of Donald Ewing and diagram of the crime scene. Exhibit 1, P0048-49.

14.     On April 16, 1994, autopsies of Doniel Quinn and Donald Ewing were performed. Photographs were taken and physical evidence was collected.  Exhibit 1, P0056-8, P0025; P0047.

15.     In an investigative addendum dated April 16, 1994, Detective Golubski reported Ruby Mitchell identified the suspect as someone with the first name "Lamonte" and Detective Maskill had also obtained information that the suspect's name was "Lamonte". Exhibit 1, P0062-0064.

16.     In an investigative addendum dated April 16, 1994, Detective Golubski reported he went to the area of 1515 Wood to attempt to locate a suspect vehicle.  At this location there was a vehicle that was described as being driven often by Lamonte and James McIntyre.  Photos were taken and later shown to people in a neighborhood canvas.  Exhibit 1, P0065-66.

17.     On April 16, 1994, Detective Golubski reported he spoke to Josephine Quinn who indicated she did not get a good look at the suspect and could not identify anyone from the photo lineup.   Josephine Quinn stated that her daughter Stacy Quinn knew the suspect but was not

4

available that day to view the lineup.  Josephine said she would make every effort to have Stacy Quinn get in contact with police.  Exhibit 1, P0065-66.

18.     It is indicated in the homicide file that on April 16, 1994, Detective Golubski and Detective Ware went to 2743 Cleveland and left a business card to speak with John Quinn.  Exhibit 1, P0065-66.

19.     It is indicated in the homicide file that on April 16, 1994, Detective Golubski and Detective Ware recanvassed the 3000 block of Hiawatha.  They made contact with witness Breon Shelton and her mother.  She said that although the photos of the vehicle taken at 1515 Wood are the same color as the suspect vehicle, she did not think they were the same vehicle.  Breon was shown the five-person line up but could not identify anyone.  She saw one suspect exit the vehicle to do the shooting and the other suspect remain in the vehicle.  Exhibit 1, P0065-66.

20.     It is indicated in the homicide file that on April 19, 1994, Det. Golubski took a statement from John Quinn who stated neither victim told him they had a problem.  Although John's son Doniel never told him about a problem, John said he sensed something wasn't right weeks and weeks ago due to the way he was acting and individuals he associated with.  Exhibit 1, P0072-77.

21.     It is indicated in the homicide file that on April 20, 1994, Detective Golubski took statements from Yolanda Johnson, Natasha Haygood, and M'Sherie Johnson regarding Lamonte McIntyre's whereabouts on the day of the shooting, including what he was wearing.  Detective Golubski also inquired regarding their knowledge about Lamonte McIntyre's involvement with drug use / sales and vehicles with which he may be associated.  Exhibit 1, P0078-102.

22.     It is indicated in the homicide file that on September 21, 1994, Det. Golubski took a statement from Keva Garcia, Ruby Mitchell's niece, regarding the "Lamonte" she was talking

to.  Keva Garcia reviewed a picture of Lamonte McIntyre and said that they looked alike but were not the same.    Exhibit 1, P0105-109.

23.      Det. Golubski prepared the Prosecutive Summary.  Exhibit 1, P0005.

24.      Stacy Quinn is listed as a witness in the Prosecutive Summary as a witness "who can testify to observing the crime and to possibly being able to identify the suspect".  Exhibit 1, P0003.

25.      Detective Golubski was identified as the lead detective on the case at trial.  Exhibit 2, Trial Transcript, LMKSDC_0004098.

**Interview of Niko Quinn and Josephine Quinn by Defendant Smith**

26.      At the scene, Niko Quinn's and Josephine Quinn's recorded witness statements were taken by Detective W.K. Smith.  Exhibit 1, P0006.

27.      In her recorded statement to Detective Smith, Niko Quinn described a suspect dressed in black – black shirt, black hat, black pants and black tennis shoes.  Exhibit 1, P00027-30.

28.       In her recorded statement to Detective Smith, Niko Quinn stated she did not recognize the shooter, he was carrying a shotgun with a long barrel, and he shot three times and returned from the way he came.  Exhibit 1, P00027-30.

29.      In her recorded statement to Detective Smith, Niko Quinn denied any knowledge of either of the victims having difficulties with anyone.  Exhibit 1, P00027-30.

30.      In her recorded statement to Detective Smith, Niko Quinn denied she had ever seen the suspect before but that would be able to recognize the person if she saw him again.  Exhibit 1, P00027-30.

31.      At her deposition, Niko Quinn testified she did not recall speaking to Detective

Smith prior to the recording starting.  Exhibit 3, Deposition of Niko Quinn, 131:15-18.

32.   At her deposition, Niko Quinn admitted to not telling Detective Smith the truth in her statement.  Exhibit 4, Deposition of Niko Quinn, 72:9-15.

33.   At her deposition, Niko Quinn admitted intentionally withholding information regarding her cousin's trouble with drug dealers.  Exhibit 5, Deposition of Niko Quinn, 51:11-52:1; 72:9-15.

34.   At her deposition Niko Quinn testified that her family and boyfriend told her not to speak to the police.  Exhibit 6, Deposition of Niko Quinn, 72:9-15; 67:10-17; 131:1-6.

35.   At her deposition, Niko Quinn testified that the voice of Freda Quinn can be heard saying "is this over, I'm trying to get to the hospital".  Exhibit 7, Deposition of Niko Quinn, 130:15-25.

36.   At her deposition, Niko Quinn testified that she was wanting to get the interview over with so she could go to the hospital.  Exhibit 8, Deposition of Niko Quinn, 138:21-25.

37.   In her recorded statement to Detective Smith, Josephine Quinn stated she heard three or four shots but could not identify a suspect.  Exhibit 1, P0036-39.

38.   In her recorded statement to Detective Smith, Josephine Quinn said that Doniel Quinn was a loafer but she did not know whether he was involved in drug trafficking or what he was involved in.  Exhibit 1, P0036-39.

39.   In her recorded statement to Detective Smith, Josephine Quinn did not state that Stacy Quinn had witnessed the shooting.  Exhibit 1, P0036-39.

40.   Detective Smith did not testify at the preliminary hearing or trial.  Exhibit 9, witness lists from trial and preliminary hearing.

41.   Defendant Smith testified he does not recall interviewing Niko Quinn or Josephine

Quinn.  Exhibit 10, Deposition of Detective Smith, 96:3-9.

42.     Defendant Smith did not write a report as part of the investigation.  *See* Exhibit 1.

**Ruby Mitchell Interactions with Defendant Krstolich**

43.     Ruby Mitchell's witness statement and a composite sketch were taken by Detective James Krstolich.  Exhibit 1, P0050.

44.     It is indicated in the homicide file that at 2:55 p.m., Detetive Krstolich took Ruby Mitchell's initial statement wherein Ms. Mitchell described a suspect dressed in all black with a short shotgun who shot four or five times.  His hair was not real short, it was slicked back.  As to height, she said "About, I don't know, 5'6", I don't know."  Ruby said the suspect was thin and brown skinned.  She would recognize him again if she saw him.  The suspect was wearing a black t-shirt with white writing and black khakis.  Exhibit 1, P0031-0035.

45.     It is indicated in the homicide file that at 5:58 p.m., Ruby Mitchell made a positive identification of Lamonte McIntyre.  Exhibit 1, P0031-0035.

46.     Detective Krstolich's investigative addendum reports that Ruby Mitchell had to get her kids from school before she could report to the bureau to try to conduct a composite sketch of the suspect.  The composite results made Ruby Mitchell believe that she recognized the suspect as a guy named "Lamonte".  Exhibit 1, P0051-52.

47.     In her statement, Ruby Mitchell states that said recognized the suspect as Lamonte, a guy who used to try and talk to her niece.  Exhibit 1, P0051-52.

48.     It is indicated in the homicide file that Ruby Mitchell identified a photograph of Lamonte McIntyre from a photo lineup.  Exhibit 1, P0052.

49.     At her deposition, Ruby Mitchell testified she pointed to the picture that she thought was the shooter.  Exhibit 11, Deposition of Ruby Mitchell, 60:1-7.

50.     At her deposition, Ruby Mitchell denied anyone telling her the name "Lamonte McIntyre."  Exhibit 12, Deposition of Ruby Mitchell, 78:6-14.

51.     At her deposition, Ruby Mitchell denied anyone turning a picture over and showing her the name "Lamonte McIntyre."  Exhibit 13, Deposition of Ruby Mitchell, 79:2-13.

52.     At her deposition, Ruby Mitchell denied giving any false testimony at the trial. Exhibit 14, Deposition of Ruby Mitchell, 92:2-8.

53.     At her deposition, Ruby Mitchell testified she did not believe she made a mistake in her identification of Lamonte McIntyre.  Exhibit 15, Deposition of Ruby Mitchell, 100:20-24.

54.     At her deposition, Ruby Mitchell testified the officers did not pressure her to pick a particular picture or suggest she pick a particular picture.  Exhibit 16, Deposition of Ruby Mitchell, 112:21-113:1.

**Defendant Barber Involvement with Investigation**

55.     Lt. Barber did not prepare a written report and instead gave a recorded witness statement to Detective Golubski.  Exhibit 1, P0043-46.

56.     At 8:35 p.m., Detective Golubski took Lt. Dennis Barber's statement.  Exhibit 1, P0043-46.

57.     Lt. Barber stated he spoke with Lamonte McIntyre's grandmother, Maxine Crowder, and his mother, Rose McIntyre and told them that they were investigating Lamonte for a felony crime.  Exhibit 1, P0043-46.

58.     Lt. Barber stated that unsolicited, Ms. McIntyre asked if someone had told her she had killed somebody, would that person be taken down and charged with murder.  Exhibit 1, P0043-46.

59.     Lt. Barber stated that when Ms. McIntyre asked what time the serious felony crime

occurred and Lt. Barber responded with "2:00 p.m.", Ms. McIntyre indicated that it couldn't have been Lamonte because he was at FiFis from 11:00 a.m. to 2:45 p.m.  Exhibit 1, P0043-46.

60.     Lt. Barber stated he directed Officer Brown to do a stop and pat down frisk and handcuff Lamonte for questioning.  Exhibit 1, P0043-46.

61.     Lt. Barber stated that he asked Lamonte about whether he had any problems with any groups, he said he had not, and during that day had been with his brother James, neither of which had been in a fight or jumped or had an altercation with any individuals.  Exhibit 1, P0043-46.

62.     Lt. Barber stated that they had received information that the suspect blue vehicle matched the description of a vehicle Lamonte McIntyre has been seen to operate. Exhibit 1, P0043-46.

63.     Lt. Barber stated that Officer Viera received information from an informant in the Juniper Gardens area that Lamonte is known to frequent that he was seen riding in a 1998 white Oldsmobile with blue tinted windows in the area of 2nd street.  Exhibit 1, P0043-46.

**Defendant Brown Interactions with Lamonte McIntyre**

64.     It is indicated in the homicide file that Officer James Brown was instructed to assist Lt. Barber in locating a juvenile suspect.  Officer Brown made contact with Lamonte McIntyre and his mother Rose McIntyre at FiFi's.  Officer Brown transported Lamonte McIntyre to the detective bureau.  Exhibit 1, P0024.

65.     Officer Brown's transport report did not include information regarding any conversations with Lamonte McIntyre during the transport.  Exhibit 1, P0023-24.

66.     It is indicated in the homicide file that at 8:04 p.m., Detective Golubski interviewed Lamonte McIntyre who stated he was at his auntie's house with his auntie, cousin and cousin's

girlfriend in the vicinity of 16th and Wood all day long and that some dude came by and told them that Little Quinn's brother had been shot.  Exhibit 1, P0052.

67.     Defendant Brown testified at his deposition that he does not recall transporting Lamonte McIntyre.  Exhibit 17, Deposition of James Brown, 210:12-16.

**Defendant Ware Involvement with Investigation**

68.     It is indicated in the homicide file that on April 16, 1994, Detective Golubski, accompanied by Detective Dennis Ware, went to 3018 Hutchings to speak with eye-witness Niko Quinn.  Exhibit 1, P0065-66.

69.     Detective Dennis Ware did not write a report related to this interaction.  See Exhibit 1.

70.     Detective Dennis Ware testified at his deposition he only went with Detective Golubski as back up.  Exhibit 18, Deposition of Dennis Ware, 168:1-13.

71.     Detective Dennis Ware testified at his deposition he did not know anything about the case.  Exhibit 19, Deposition of Dennis Ware, 166:20-25.

72.     Detective Dennis Ware testified at his deposition he does not recall meeting with Niko Quinn.  Exhibit 20, Deposition of Dennis Ware, 167:8-15.

73.     The photo lineup used with Niko Quinn on April 16, 1994 was the same shown to Ruby Mitchell on April 15, 1994. Exhibit 21, Trial Transcript, LMKSDC0004129.

74.     Detective Dennis Ware did not compile the pictures used for the photo lineup with Niko Quinn.  Exhibit 22, Deposition of Dennis Ware, 166:20-166:25.

75.     Detective Golubski included in his report that Niko Quinn was still visibly traumatized by what happened as both victims were cousins of hers. Exhibit 1, P0065.

76.     Niko Quinn testified at her deposition in this matter that she was under the influence

of drugs at the time of her meeting with Detective Golubski and Ware on April 16, 1994.  Exhibit 23, Deposition of Niko Quinn, 81:17-22.

77.     Detective Golubski included in his report that Niko Quinn viewed a photo lineup of five individuals and repeatedly and for a prolonged period of time viewed photo three, Lamonte McIntyre's photograph, and began shaking, becoming teary eyed and hesitant to make statements. Exhibit 1, P0065.

78.     Detective Golubski reported that Niko Quinn indicated that she could not positively identify the shooter from the photographs.  Exhibit 1, P0065.

79.     Niko Quinn testified at her deposition that she was able to rule out some of the individuals in the photo lineup for various reasons.  Exhibit 24, Deposition of Niko Quinn, 83:3-16.

80.     Niko Quinn testified at her deposition that one of the officers, but she was not sure which one, made comments like "what was the name that Ruby had said the guy's name was?" and Niko Quinn Responded "Lamont."  Exhibit 25, Deposition of Niko Quinn, 84:16-25; 134:24-135:9.

81.     Niko Quinn testified that she told the officers that she did not know who it was and they left.  Exhibit 26, Deposition of Niko Quinn, 85:11-18.

82.     Niko Quinn testified that she could not say that anything that was done was inappropriate or improper from the meeting with Detective Golubski and Detective Ware on April 16, 1994.  Exhibit 27, Deposition of Niko Quinn, 85:20-23.

83.     Niko Quinn testified that it was Terra Morehead who threatened to take her kids away if she did not testify.  Exhibit 28, Deposition of Niko Quinn, 104:12-105:14; 108:20-109:1.

84.     Defendant Ware did not testify at the preliminary hearing or trial.  Exhibit 29,

Deposition of Dennis Ware, 154:17-20.

**Criminal Proceedings**

85.    On June 28, 1994, a waiver and preliminary hearing were held before the Honorable Matthew G. Podrebarac in Wyandotte County District Court. The witnesses who testified at this hearing were Ruby Mitchell, Niko Quinn, Roger Golubski, Rose McIntyre and Denise Armstrong. Exhibit 30, Preliminary Hearing Transcript, FPSS043624, FPSS043626, FPSS043675.

86.    Ruby Mitchell identified Lamonte McIntyre as the shooter and maintained this identification throughout cross-examination.   Exhibit 31, Preliminary Hearing Transcript, FPSS043634.

87.    During her testimony, Ruby Mitchell denied that a detective told her who to pick out of the lineup, stating "No.  He didn't tell me to pick nothing."  Exhibit 32, Preliminary Hearing Transcript, FPSS043643.

88.    Niko Quinn identified Lamonte McIntyre as the shooter and maintained this identification throughout cross-examination.   Exhibit 33, Preliminary Hearing Transcript, FPSS043651.

89.    Rose McIntyre testified that she gave a statement as to the whereabouts of Lamonte McIntyre.  Exhibit 34, Preliminary Hearing Transcript, FPSS043671.

90.    Rose McIntyre testified she told police Lamonte was at work based on her belief they were talking about the day before the shooting.  Exhibit 35, Preliminary Hearing Transcript, LMKSDC_0003752.

91.    Rose McIntyre testified when she realized the shooting occurred the day Lamonte McIntyre was taken into custody, she told officers that he was at his aunt's house. Exhibit 36, Preliminary Hearing Transcript, LMKSDC_0003753.

92.    Judge Podrebarac waived Lamonte McIntyre to adult status and found probable cause existed to bind Lamonte McIntyre over as charged.   Exhibit 37, Preliminary Hearing Transcript, FPSS043699-700.

93.    Lamonte McIntyre's criminal jury trial occurred the week of September 26, 1994. Exhibit 38, Trial Transcript, FPSS043703.

94.    Niko Quinn identified Lamonte McIntyre as the shooter and maintained this identification throughout cross-examination.  Exhibit 39, Trial Transcript, FPSS43864

95.    Niko Quinn denied that Detective Golubski suggested in any way who she should identify when he and another detective showed her photos the day after the murder.  Exhibit 40, Trial Transcript, FPSS043861.

96.    Niko Quinn testified she held on to one photo the entire time but did not identify anyone.  Exhibit 41, Trial Transcript, FPSS043862.

97.    Ruby Mitchell identified Lamonte McIntyre as the shooter and maintained this identification throughout cross-examination.  Exhibit 42, Trial Transcript, FPSS043895-6; FPSS043929.

98.    Detective Krstolich testified that he had been employed with the KCKPD for almost twenty years and a detective for ten years.  Exhibit 43, Trial Transcript FPSS044002.

99.    Detective Krstolich testified that he made contact with Ruby Mitchell shortly after the shooting at her residence and Ms. Mitchell thought she could recognize the suspect if she saw him again so Detective Krstolich asked her to come with him to the KCKPD to build a composite picture of the suspect.  Exhibit 44, Trial Transcript, FPSS044004.

100.    Detective Krsotlich testified that after the composite was made, Ms. Mitchell said she thought she knew who the party was.  She almost called out his name when she saw him before

the shooting and gave the name "Lamonte".  Exhibit 45, Trial Transcript, FPSS044005.

101.    Detective Krstolich testified that he handed Ms. Mitchell the stack of five photos and did not suggest at all who she should pick out.  Ms. Mitchell selected Lamonte McIntyre's photograph.  Exhibit 46, Trial Transcript, FPSS044009-10.

102.    Detective Golubski testified to a second meeting with Niko Quinn where she identified Lamonte McIntrye as the shooter.  Exhibit 47, Trial Transcript, LMKSDC_0004130-0004132.

103.    Detective Golubski testified there was a not a report regarding this meeting.  Exhibit 48, Trial Transcript, LMKSDC_0004134.

104.    Lt. Dennis Barber testified that he has been employed with the KCKPD for 24 years.  Exhibit 49, Trial Transcript FPSS044079.

105.    Lt. Barber testified that he was responsible for obtaining the name "Lamonte McIntyre" during the investigation and that he had obtained the name from numerous sources. Exhibit 50, Trial Transcript, FPSS044080.

106.    Lt. Barber testified that he made contact with Ms. McIntyre after he was dispatched to Fi Fi's on a specific request to go there and speak with Lamonte's mother.  Exhibit 51, Trial Transcript, FPSS044083.

107.    Lt. Barber testified that upon arrival, Lamonte's grandmother Maxine Crowder introduced Lt. Barber to Lamonte's mother, Ms. McIntyre, and Lt. Barber told her that there had been allegations that Lamonte was involved in a felony crime.  Exhibit 52, Trial Transcript, FPSS044084.

108.    Lt. Barber testified that Ms. McIntyre was uncertain as to what a felony crime meant, so Lt. Barber explained that it was a serious crime punishable by more than one year in jail

such as a shooting, stabbing or robbery.  Exhibit 53, Trial Transcript, FPSS044084.

109.     Lt. Barber testified that he did not indicate that it was a double homicide and while he was explaining what a felony crime was, Ms. McIntyre said words to the effect that if she had killed somebody, would he take her down and charge her?  Exhibit 54, Trial Transcript, FPSS044085-87.

110.     Lt. Barber testified that then Ms. McIntyre said that it could not have been Lamonte because he had been a Fi Fi's all day.  Exhibit 55, Trial Transcript, FPSS044087.

111.     Officer James Brown testified that he started with the KCKPD in September 1991. Exhibit 56, Trial Transcript, FPSS044093.

112.     Officer Brown testified that he made contact with Ms. McIntyre who indicated she wanted to meet with Lt. Barber, so he called Lt. Barber to FiFi's.  Exhibit 57, Trial Transcript, FPSS044094.

113.     Officer Brown testified that at around 8:40 p.m., Officer Brown per Lt. Barber's instruction patted Lamonte McIntyre down and placed him in the patrol car to transport to the bureau.  Exhibit 58, Trial Transcript, FPSS044094-5.

114.     Officer Brown testified that during the transport, Lamonte McIntyre asked what was going on, and Officer Brown said detectives wanted to talk to him about an incident. Exhibit 59, Trial Transcript, FPSS044094-5

115.     Officer Brown testified that Lamonte McIntyre made the unsolicited statement that that he didn't know what he could have done because he was at Fi Fi's all day helping his mother out in the kitchen doing some work.  Exhibit 60, Trial Transcript, FPSS044094-96.

116.     Officer Brown testified that he was present at the bureau when Detective Golubski and Detective Krstolich were speaking with Lamonte McIntyre, and heard him say he was in the

area of 15th and Wood all day.  Exhibit 61, Trial Transcript, FPSS044096.

117.    Officer Brown testified this is when he remembered that Lamonte McIntyre told him that he was at Fi Fi's all day on 5th and Richmond so he wrote the detective a note telling him what Lamonte McIntyre had said in the car that he had been at Fi Fi's with his mother all day. Exhibit 62, Trial Transcript, FPSS044096-97.

118.    Lamonte McIntyre testified that he spent the night of April 14, 1994 at 1510 Walker at Peggy Crowder's house.  On the morning of the 15th, he got up, left with his mother to have her do something at the house, came back early, went to the store, stayed there, watched a couple of movies, and started using the phone between 1:20-1:30 p.m.  Exhibit 63, Trial Transcript FPSS044181-82.

119.    Lamonte McIntyre testified that he stayed at Yolanda's house after calling a cab a second time around 1:45 – 1:50 p.m. until his mother took him to FiFi's between 4:30 and 5 p.m. Exhibit 64, Trial Transcript, FPSS044183-84.

120.    Lamonte McIntyre testified that he did not tell the police officer he had been at FiFi's all that day.  Exhibit 65, Trial Transcript, FPSS044186

121.    Lamonte McIntyre was convicted by the jury for the murders of Doniel Quinn and Donald Ewing.  Doc. 562, Pretrial Order, Stipulation of Fact ¶ 15.

122.    On March 29, 1996, Lamonte McIntyre's counsel Lindsey Erickson filed a Motion for New Trial based on Newly Discovered Evidence.  Exhibit 66, Motion for New Trial, FPSS044313-6.

123.    In the Motion for New Trial, Ms. Erickson alleged that she spoke with Niko Quinn who recanted her previous statements that McIntyre was the shooter on April 15, 1994 and that Niko stated that she committed perjury on the witness stand because she wanted the entire thing

to be over with and because she wanted someone, anyone, to be convicted for killing her cousins. If called to testify, Niko would state that after viewing four photos of McIntyre, there is no doubt in her mind that McIntyre is not the shooter.  Exhibit 67, Motion for New Trial, FPSS044313-6.

124.    In the Motion for New Trial, Ms. Erickson alleged that she spoke with Stacy Quinn, a newly discovered witness, who informed Ms. Erickson that the wrong person was convicted for the double homicide.  Exhibit 68, Motion for New Trial, FPSS044313-6.

125.    In the Motion for New Trial, Ms. Erickson alleged that Stacy said that she got a good look at the shooter and, after looking at four photographs of McIntyre, there is no doubt in Stacy's mind that he was not the shooter.  Exhibit 69, Motion for New Trial, FPSS044313-6.

126.    On April 4, 1996, at the hearing for New Trial, Stacy Quinn testified that she did not speak with police because she was messed up and on drugs at the time.  Exhibit 70, Hearing on Motion for New Trial, FPSS044338.

127.    Stacy Quinn testified that she left the area immediately after the shooting because she was hurting and mad.  Exhibit 71, Hearing on Motion for New Trial, FPSS044348.

## III.    **FACTUAL BACKGROUND**

On April 15, 1994, around 2 p.m., Doniel Quinn and Donald Ewing were shot while they sat in the front seat of a parked car on Hutchings Street, in Kansas City, Kansas by a lone assailant who fired a shotgun at least 4 times. SOF ¶1.  Numerous Kansas City, Kansas Police Department ("KCKPD") personnel responded to the scene, including Officer L. Vallejo, Officer J. Orendac, Officer G. Wansley, Officer J. Myers, Officer Ambler, Officer Clair, Officer Howard, Officer Stubler, Officer Keith, Officer Bagsby, Officer Steel, Sgt. Singleton, Sgt. Keith, Detective Golubski, Detective Krstolich, Sgt. Blood, Detective Shomin, Detective Maskill, Detective W.K. Smith, Detective Nelson, Lt. Culp, ADA Grosko, Captain Twitchell, Lt. Harrington, and ID Unit

Officers.  SOF ¶2.  The officers who initially responded roped off the crime scene, started canvassing the area, including a vacant lot through which the suspect fled, and spoke to witnesses. SOF ¶¶3-9.  The ID unit arrived and began taking photos and collecting evidence. SOF ¶¶10-11.

At the scene, Detective Smith obtained recorded statements from Niko Quinn and Josephine Quinn.  SOF ¶26.  In her recorded statement to Detective Smith, Niko Quinn described a suspect dressed in black.  SOF ¶27.  Niko Quinn indicated that she did not recognize the shooter, he was carrying a shotgun with a long barrel, and he shot three times and returned from the way he came. SOF ¶28.  Niko Quinn also denied any knowledge of either of the victims having difficulties with anyone.  SOF ¶29.

However, in Niko Quinn's deposition for this matter, she admitted that she was not honest with Detective Smith in her statement.  SOF ¶32.  Niko Quinn admitted to intentionally withholding information regarding her cousin's troubles with drug dealers. SOF ¶33. Niko Quinn also testified that she did not recall speaking to Detective Smith prior to the recording starting.  SOF ¶31. However, Niko Quinn does remember that her family and boyfriend told her not to speak to the police.  In fact, her aunt's voice can be heard in the recorded statement saying "is this over, I'm trying to get to the hospital".  SOF ¶35.

As to Josephine Quinn, in her recorded statement to Detective Smith at the scene, she stated she heard three or four shots but could not identify a suspect.  SOF ¶37.  She also stated that one of the victims was a loafer but she did not know whether he was involved in drug trafficking or what he was involved in.  SOF ¶38.

Detective Smith had no further involvement with the investigation, did not write a report, and did not testify at either the preliminary hearing or trial of this matter. SOF ¶¶40, 42.

The other key witness, Ruby Mitchell, was questioned by officers and later met with Detective

Krstolich to do a composite drawing and review photographs.  SOF ¶¶43-46.  During this process, Ruby Mitchell indicated that she believed the suspect's first name was "Lamonte".  SOF ¶46.  She later picked Lamonte McIntyre from a photo lineup.  SOF ¶48.  Other KCKPD personnel also reported having information that the suspect's name was "Lamonte."  SOF ¶15.

Ruby Mitchell has never wavered in her identification of Lamonte McIntyre as the shooter.  At her deposition in this matter, Ruby Mitchell testified that she pointed to the picture of who she thought was the shooter, which was the photograph of Lamonte McIntyre.  SOF ¶49.  Ruby Mitchell denied that she was coerced or that any suggestions were made to her as to which picture to pick or the name of the shooter.  SOF ¶¶50-54.  Ruby Mitchell denied providing any false testimony at trial.  SOF ¶52.

Based on the identification of Lamonte McIntyre by Ruby Mitchell, the KCKPD began looking for him.  Lt. Barber participated in finding Lamonte McIntyre.  SOF ¶57.  Lt. Barber did not write a report, but he did give a statement to Detective Golubksi and testified at the criminal trial.  SOF ¶¶55, 104.

In the recorded statement on April 15, 1994, Lt. Barber stated that he spoke with Lamonte McIntyre's grandmother, Maxine Crowder, and his mother, Rose McIntyre and told them that they were investigating Lamonte for a felony crime.  SOF ¶57.  Lt. Barber stated that unsolicited, Ms. McIntyre asked if someone had told her she had killed somebody, would that person be taken down and charged with murder.  SOF ¶58.  Lt. Barber stated that when Ms. McIntyre asked what time the serious felony crime occurred and Lt. Barber responded with "2:00 p.m.", Ms. McIntyre indicated that it couldn't have been Lamonte because he was at FiFis from 11:00 a.m. to 2:45 p.m.  SOF ¶59.  Lt. Barber also stated that he and another officer had heard from informants regarding Lamonte McIntyre's possible involvement.  SOF ¶¶62-63.  Lt. Barber provided nearly identical

testimony at the criminal trial.  SOF ¶¶104-110.

During the preliminary hearing, Rose McIntyre admitted to originally telling the officers that Lamonte McIntyre was at FiFis at the time of the shooting because she thought they were talking about the day before.  SOF ¶¶89-90.  Although Ms. McIntyre testified that she later notified the officers of this mistake, she did not indicate that she specifically told Lt. Barber this information.  SOF ¶91.

Officer Brown transported Lamonte McIntyre to the detective bureau for questioning.  SOF ¶64.  Officer Brown's report does not include any information regarding any statements made by Lamonte McIntyre during the transport.  SOF ¶65.  However, during his testimony at trial, Officer Brown stated that during his transport, Lamonte McIntyre made the unsolicited statement that that he didn't know what he could have done because he was at FiFi's all day helping his mother out in the kitchen doing some work.  SOF ¶¶114-115.  Officer Brown explained in his trial testimony that he was present at the bureau when Detective Golubski and Detective Krstolich were speaking with Lamonte McIntyre, and heard him say that he was in the area of 15th and Wood all day.  Remembering what Lamonte McIntyre had said in his vehicle about being at FiFi's, Defendant Brown passed a note to the detectives with this information.  SOF ¶¶116-117.

On April 16, 1994, the day after the homicides, Detective Golubski, accompanied by Detective Ware as backup, followed up with a number of witnesses and canvassed relevant areas.  SOF ¶¶18-19.  During Detective Golubski's interview of Josephine Quinn on April 16, 1994, she indicated that her daughter Stacy Quinn could identify the shooter.  SOF ¶17.  Stacy Quinn would later testify that she immediately left the area after the shootings.  SOF ¶127.  Stacy Quinn was identified as a possible witness in the homicide file. SOF ¶24.

One of the witnesses that Detective Golubski met with on April 16, 1994 was Niko Quinn.

SOF ¶68.  Detective Ware did not write a report, and testified during his deposition that he was likely only with Detective Golubski as backup and he would not have had any knowledge of the case.  SOF ¶¶69, 70.  During this interview, Niko Quinn was shown the same photo lineup as Ruby Mitchell.  SOF ¶73.  Detective Golubski included in his report that Niko Quinn did not positively identify anyone from this meeting.  SOF ¶78.

At her deposition in this matter, Niko Quinn testified that was under the influence of drugs at the time of her meeting with Detective Golubski and Detective Ware on April 16, 1994.  SOF ¶76. Niko Quinn testified she was able to rule out some of the individuals in the photo lineup for various reasons.  SOF ¶79.  It is Niko Quinn's recollection that one of the officers, but she was not sure which one, made comments like "what was the name that Ruby had said the guy's name was?" SOF ¶80.  Niko Quinn testified that she told the officers that she did not know who it was and they left.  SOF ¶81.  Niko Quinn testified that she could not say that anything that was done was inappropriate or improper from the meeting with Detective Golubski and Detective Ware on April 16, 1994.  SOF ¶82.

Although there was a second meeting between Niko Quinn and Detective Golubski where she picked Lamonte McIntyre's picture from the photograph lineup, Detective Ware was not present for this meeting and there was no report written.  SOF ¶¶102-103.  Further, Niko Quinn testified in her deposition that it was the prosecutor Terra Morehead who threatened to take her kids away if she did not testify, not any of the officers.  SOF ¶83.  Detective Ware had no further involvement in the investigation, did not write a report, and did not testify at the preliminary hearing or trial.

On April 19, 1994, Detective Golubski met with John Quinn who indicated that one of the victims had gotten involved with the wrong kind of people.  SOF ¶20.  On April 20, 1994, Detective Golubski interviewed Lamonte McIntyre's alibi witnesses.  SOF ¶21.  On September

21, 1994, Detective Golubski interviewed Keva Garcia, Ruby Mitchell's niece, regarding the "Lamonte" she was talking to based on Ruby Mitchell's prior statements. SOF ¶22.

Detective Golubski was identified as the lead detective on the case at trial and prepared the Prosecutive Summary. SOF ¶¶23, 25. On June 28, 1994, a waiver and preliminary hearing were held. SOF ¶85. During the preliminary hearing, both Ruby Mitchell and Niko Quinn identified Lamonte McIntyre as the shooter.  SOF ¶¶86, 88. During her testimony, Ruby Mitchell denied that a detective told her who to pick out of the lineup. SOF ¶87. After the testimony, Lamonte McIntyre was waived to adult status and probable cause was found to bind him over as charged.  SOF ¶92.

Lamonte McIntyre's criminal jury trial occurred the week of September 26, 1994.  SOF ¶93. Again, both Niko Quinn and Ruby McIntyre identified Lamonte McIntyre as the shooter at trial. SOF ¶¶94, 97.  At trial, Niko Quinn denied that Detective Golubski suggested in any way who she should identify when he and another detective showed her photos the day after the murder. SOF ¶95. It would only be years later that Niko Quinn would allege that she did so because she was threatened by the prosecutor.  SOF ¶83.  Although in 1996 Niko Quinn admitted to committing perjury, she testified at that time that it was because she just wanted someone to be found guilty. SOF ¶123.  Lamonte McIntyre testified at trial, denied any involvement in the shooting, and denied telling Defendant Brown he had been at FiFis the day of the shoot.  SOF ¶¶ 118-120.  A jury convicted Lamonte McIntyre of the murders of Doniel Quinn and Donald Ewing.  SOF ¶121.

On March 29, 1996, Lamonte McIntyre's counsel Lindsey Erickson filed a Motion for New Trial based on Newly Discovered Evidence, including Niko Quinn recanting her prior identification of Lamonte McIntyre and Stacy Quinn having been located and identifying the shooter as someone other than Lamonte McIntyre.  SOF ¶¶122-127.  This Motion failed.

Lamonte McIntyre remained incarcerated until 2017 and filed this instant lawsuit against the

23

Defendant Officers for the following:

> Count 1:     Under Section 1983, Lamonte asserts Fourth and Fourteenth Amendment malicious prosecution claims against Golubski, Krstolich, Ware, Brown, Barber, Culp, and Smith;

> Count 2:     Under Section 1983, Lamonte asserts Fourth and Fourteenth Amendment evidence fabrication and *Brady* violations against Golubski, Krstolich, Ware, Brown, Barber, and Smith;

> Count 4:     Under Section 1983, Lamonte asserts Fourth and Fourteenth Amendment ffailure to intervene claims against Krstolich, Ware, Barber, and Culp;

> Count 5:     Under Section 1983, Lamonte asserts Fourth, Fifth and Fourteenth Amendment conspiracy claims against Golubski, Krstolich, Ware, Barber and Culp;

> Count 6:     Under Section 1983, Lamonte asserts Fourth and Fourteenth Amendment supervisory liability claims against Culp;

> Count 8:     Under state law, Lamonte asserts malicious prosecution claims against Golubski, Krstolich, Ware, Brown, Barber, Culp, and Smith;

The Defendant Officers deny all the claims and seek summary judgment on all Counts.

## IV.   <u>STATEMENT OF QUESTIONS PRESENTED</u>

A.     Should Plaintiff's claims under the Fourth Amendment in Counts I, II, IV, V, and VI be dismissed based on the statute of limitations?

B.     Should Plaintiff's claims under the Fourteenth Amendment in Counts I, II, IV, V, and VI be dismissed as the claims are barred because there are adequate state tort remedies?

C.     Are Defendants Krstolich, Ware, Brown, Barber, Culp and Smith entitled to judgment as a matter of law as to Count I as Plaintiff cannot prove all elements of malicious prosecution?

D.     Are Defendants Krstolich, Ware, Brown, Barber, Culp and Smith entitled to qualified immunity as to the claims asserted by Plaintiff in Count I?

E.     Are Defendants Krstolich, Ware, Brown, Barber, and Smith entitled to judgment as

a matter of law as to Count II as Plaintiff cannot prove all elements of deprivation of liberty without due process of law and denial of fair trial?

      F.     Are Defendants Krstolich, Ware, Brown, Barber, and Smith entitled to qualified immunity as to the claims asserted by Plaintiff in Count II?

      G.     Are Plaintiff's claims in Counts IV, V and VI barred by the statute of limitations?

      H.     Are Defendants Krstolich, Ware, Barber, and Culp entitled to judgment as a matter of law as to Count IV as Plaintiff cannot prove all elements of failure to intervene; or in the alternative, entitled to qualified immunity?

      I.     Are Defendants Krstolich, Ware, Barber, and Culp entitled to judgment as a matter of law as to Count V as Plaintiff cannot prove all elements of conspiracy; or in the alternative, entitled to qualified immunity?

      J.     Is Defendant Culp entitled to judgment as a matter of law as to Count VI as Plaintiff cannot prove all elements of supervisory liability; or in the alternative, entitled to qualified immunity?

      K.     Are Defendants Krstolich, Ware, Brown, Barber, Culp, and Smith entitled to judgment as a matter of law as Plaintiff cannot prove all elements of malicious prosecution under Kansas tort law?

      L.     Are Defendants Krstolich, Ware, Brown, Barber, Culp, and Smith entitled to judgment as a matter of law as Plaintiff's claims are barred by provisions of the Kansas Tort Claims Act, K.S.A. 75-6104?

## V.     ARGUMENTS AND AUTHORITIES

### A.     Standards for Summary Judgment

The primary purpose of summary judgment is to isolate and dispose of factually unsupported claims. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986). A conclusory allegation that is not supported by evidence will not be sufficient to establish that a genuine dispute of material fact exists. *BancInsure, Inc. v. McCaffree*, 3 F.Supp.3d 904, 906 (D. Kan. 2014); FRCP 56 (c). Under Rule 56, the moving party initially bears the burden of making a prima facie showing of the absence of a genuine issue of material fact and an entitlement to judgment as a matter of law, which can be satisfied by pointing to an absence of evidence on an essential element. *See Adler v. Wal–Mart Stores, Inc.,* 144 F.3d 664, 670-671 (10th Cir.1998) (citation omitted).

### B.     The Fourth Amendment claim in Counts I, II, IV, V, and VI should be dismissed based on the statute of limitations

In Counts I, II, IV, V, and VI, Plaintiff has asserted claims against the Defendant Officers under both the Fourteenth and Fourth Amendment. An "initial seizure is governed by the Fourth Amendment, but at some point after arrest, and certainly by the time of trial, constitutional analysis shifts to the Due Process Clause.'" *Mondragon v. Thompson,* 519 F.3d 1078 (10th Cir. 2008) (quotation omitted). Where an initial seizure occurs prior to the institution of legal process, the Fourth Amendment claim arising from the initial seizure is properly pled as one for false arrest. *See Id.; Myers v. Koopman*, 738 F.3d 1190 (10th Cir. 2014); *Margheim v. Buljko*, 855 F.3d 1077 (10th Cir. 2017). "The period of time between an unlawful arrest and the institution of legal process forms one constitutional claim, arising under the Fourth Amendment." *Id.* "That claim accrues when the plaintiff is released or legal process is instituted justifying that imprisonment." *Id.* "The period of time between the institution of that process and its favorable termination — through acquittal, habeas corpus, voluntary dismissal, etc. — forms a second claim,

arising under the Due Process Clause." *Id.* "That claim accrues, at the earliest, when favorable termination occurs." *Id.*

Although the **Fourth** Amendment claims of Counts I, II, IV, V, and VI are styled otherwise, they actually present claims for false imprisonment. *See id.* This characterization is important because Plaintiff has previously conceded his Fourth Amendment claim for false imprisonment is time-barred [Doc. 43, pp 30]. In *Manuel v. City of Joliet*, 137 S.Ct. 911 (2017), the Supreme Court decided the initiation of pretrial process did not bar a Fourth Amendment claim but clarified that "[b]y contrast . . . **once a trial has occurred**, the Fourth Amendment drops out: A person challenging the sufficiency of the evidence to support both a conviction and any ensuing incarceration does so under the Due Process Clause of the **Fourteenth** Amendment." *Id.* at 920 n.8 (emphasis added). Thus, the holding in *Heck v. Humphrey*, 512 U.S. 477 (1994), has no application to the Fourth Amendment claims.

As K.S.A. 60-513 provides the applicable statute of limitations for Section 1983 claims in Kansas, Plaintiff's **Fourth** Amendment claims expired in 1996; or, in the alternative, under the statute of repose in K.S.A. 60-513(b), in 2004. *Oyler v. Finney*, 870 F.Supp. 1018, 1023 (D. Kan. 1994). Therefore, the 4th Amendment claims are time barred and Defendant Officers are entitled to judgment as a matter of law on the 4th Amendment claims in Counts I, II, IV, V, and VI.

**C.** **The Fourteenth Amendment claims in Counts I, II, IV, V, and VI should be dismissed as the claims are barred because there are adequate state tort remedies**

Plaintiff's claims against the Defendant Officers under the Fourteenth Amendment in Counts I, II, IV, V, and VI fail as a matter of law because claims under Section 1983 alleging violation of the Fourteenth Amendment are precluded if there is an adequate state law remedy. "The Fourteenth Amendment protects individuals against deprivations of liberty without due process of law." *Myers*, 738 F.3d at 1193. "The existence of the state remedy flattens the Fourteenth

Amendment peg on which [Plaintiff] now tries to hang [his] § 1983 malicious-prosecution claim." *Id*. Here, the state of Kansas has a tort of malicious prosecution, which bars Plaintiff's claims under the Fourteenth Amendment.  Although Plaintiff has attempted to allege different claims under these various counts, Plaintiff relies on the same facts and legal arguments for all the counts.

In *Parratt v. Taylor*, 451 U.S. 527 (1981), the Supreme Court expressly stated that "[a]lthough the state remedies may not provide the respondent with all the relief which may have been available if he could have proceeded under §1983, that does not mean that the state remedies are not adequate to satisfy the requirements of due process." *Id*. at 543-544 .  Citing this same language, *Archuleta v. Colorado Dept'd of Institutions*, 936 F.2d 483 (10th Cir. 1991)  recognized that "[t]he fact that plaintiff could obtain more relief under Sec. 1983 does not mean that the remedy for the temporary deprivation of her property was constitutionally inadequate" and held that the plaintiff's state law remedies were adequate to satisfy due process .  *Id*. at 491-492.[3]  The Tenth Circuit's analysis in *Becker v. Kroll* is dispositive.  494 F.3d 904, 921 (10th Cir. 2007). The *Becker* decision noted that no pre-deprivation process could have anticipated the malfeasance of investigators so as to protect the plaintiff "from an abusive investigation, and we decline to supply procedural requirements in addition to already-established criminal procedure under the Constitution and state law." *Id*.

Here, based on the admissible evidence obtained through discovery and depositions, there is an adequate state law remedy for Plaintiff's claims against the Defendant Officers:  Ruby Mitchell has denied any "coercion or suggestion" on behalf of Defendant Krstolich; Niko Quinn has denied that Defendant Ware did anything improper or influenced her; Rose McIntyre has admitted she told Defendant Barber that Lamonte McIntyre was at FiFis, and she was just mistaken regarding the date at the time of telling him; Defendant Brown testified under oath regarding statements

---

[3] *See also Julian v. Hanna*, 732 F.3d 842, 848 (7th Cir. 2013).

made by Lamonte McIntyre and is entitled to immunity; there is no evidence that Defendant Culp improperly supervised the Defendant Officers in this matter; and there is no evidence that Defendant Smith failed to question Niko Quinn regarding prior statements made. SOF ¶¶50-54, 82, 89-91, 115, 31. Therefore, based on the admissible evidence in this matter, there is an adequate state tort remedy for the claims asserted and the Defendant Officers are entitled to judgment as a matter of law on all of Plaintiff's Fourteenth Amendment claims in Counts I, II, IV, V, and VI.

### D. Defendant Officers are entitled to judgment as a matter of law for Count I as Plaintiff cannot prove all necessary elements

"To prevail on a § 1983 malicious-prosecution claim, a plaintiff must show: (1) the defendant caused the plaintiff's confinement or prosecution; (2) the original action terminated in the plaintiff's favor; (3) there was no probable cause to confine or prosecute the plaintiff; (4) malice; and (5) damages." *Cordova v. City of Albuquerque*, 816 F.3d 645, 650 (10th Cir. 2016).

"Probable cause exists if the facts and circumstances are sufficient to warrant a person of reasonable caution to believe a crime has been committed." *McCarty v. Gilchrist*, 646 F.3d 1281, 1286 (10th Cir. 2011). When reviewing "whether an officer had probable cause for an arrest," courts "examine the events leading up to the arrest, and then decide whether these historical facts, viewed from the standpoint of an objectively reasonable police officer, amount to probable cause." *District of Columbia v. Wesby*, 138 S.Ct. 577, 586 (2018) (quotation omitted). Probable cause "is not a high bar." *Kaley v. United States*, 571 U.S. 320, 338 (2014). Probable cause requires only the "kind of fair probability on which reasonable and prudent people, not legal technicians, act." *Florida v. Harris*, 568 U.S. 237, 244 (2013) (quotation omitted). "The test for probable cause is not reducible to precise definition or quantification." *Id*. at 243 (quotation omitted). "Finely tuned standards such as proof beyond a reasonable doubt or by a preponderance of the evidence ... have no place in the [probable cause] decision." *Illinois v. Gates*, 462 U.S. 213, 235 (1983).

To state a viable claim, Plaintiff must show that, at the time, the Defendant Officers lacked even arguable probable cause. *Stonecipher v. Valles*, 759 F.3d 1134, 1141 (10th Cir. 2014). "Probable cause existed if at the moment the arrest was made the facts and circumstances within their knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent man in believing" the subject committed a crime. *Hunter v. Bryant*, 502 U.S. 224, 228 (1991) (quotation omitted).  A law enforcement officer does not violate the Constitution merely by arresting an individual who happens to be innocent. *Romero v. Fay*, 45 F.3d 1472, 1480 (10th Cir. 1995). "The Constitution does not guarantee that only the guilty will be arrested." *Baker v. McCollan*, 443 U.S. 137, 145 (1979).

Here, the probable cause to arrest Lamonte McIntyre was his identification by Ruby Mitchell. To this day, Ms. Mitchell stands by her identification of Lamonte McIntyre as the shooter.  SOF ¶¶49, 52, 53.  Ms. Mitchell has denied any coercion or suggestion in the selecting of the photograph of Lamonte McIntyre shortly after the shooting.  SOF ¶¶49-54.  Therefore, there was probable cause to arrest Lamonte McIntyre for the Ewing/Quinn Homicides.

Malice is also a fundamental element of malicious prosecution.  *See Cordova*, 816 F.3d at 650. Malice requires proof that a defendant acted with actual evil-mindedness, a specific intent to injure or deprive another of a federal right, without just cause or excuse. *See generally* Restatement (Second) of Torts, § 668 (1977); *Jackson v. Kan. Cnty. Ass'n Multiline Pool*, No. 03-4181, 2006 WL 963838, at *18 (D. Kan. Apr. 6, 2006).  Although malice can be inferred from a lack of probable cause or reckless disregard for truth, something more than negligence, inattention, or general second-guessing is required. *Stonecipher*, 759 F.3d at 1142.  **Each individual defendant** must have acted with the culpable state of mind.  *Stonecipher*, 759 F.3d at 1142 n.3.

Plaintiff has failed to present any admissible evidence each Defendant Officers acted with

malice.  Ruby Mitchell has denied that she was coerced or manipulated into identifying Plaintiff in the photo lineup. SOF ¶¶49-54. Niko Quinn has denied that anything done by Defendant Ware was improper and did not identify Lamonte McIntyre at the time of her interactions with Defendant Ware. SOF ¶82. Defendant Brown did not craft a false police report and only testified at trial regarding what Lamonte McIntyre had told him. SOF ¶¶65, 114-117. Rose McIntyre has admitted that she initially told Defendant Barber that Lamonte McIntyre was with her at FiFis. SOF ¶¶89-91. There is no admissible evidence that Defendant Smith failed to obtain full statement from Niko Quinn or that he refused to interview Stacy Quinn. SOF ¶31, 127.   There is no admissible evidence that Defendant Culp was aware of the alleged misconduct by Defendant Golubski.[4]  Therefore, Plaintiff cannot prove malice on the part of each of the Defendant Officers.

As to causation, "[a] plaintiff must allege factual causation—i.e. 'but for' causation—in order to state a claim under § 1983." *Lippoldt v. Cole*, 468 F.3d 1204, 1219 (10th Cir. 2006). "In civil rights cases, a superseding cause, as we traditionally understand it in tort law, relieves a defendant of liability." *Trask v. Franco*, 446 F.3d 1036, 1046 (10th Cir. 2006).  Plaintiff has failed to present any admissible evidence that the Defendant Officers caused Plaintiff's confinement or prosecution. As noted above regarding malice, the admissible evidence in this matter does not demonstrate that any action on behalf of the individually named defendants caused Plaintiff's incarceration.  Each defendant had minimal involvement in this matter.  At the trial of this matter, both Ruby Mitchell and Niko Quinn identified Lamonte McIntyre as the shooter.  SOF ¶¶94, 97.  To this day, Ruby Mitchell stands by her identification.  SOF ¶¶49, 52-53.  Niko Quinn has testified that it was threats of the *prosecutor*, not the individual defendants, that caused her to falsely identify Lamonte McIntyre as the shooter.  SOF ¶83.  Further, as noted by the Kansas Court of Appeals, there was

---

[4] See Doc. 190, pp. 35-36 regarding the basis of the finding of sufficient allegations by Plaintiff related to malice on behalf of the Defendant Officers.

conflicting alibi testimony on behalf of Plaintiff's family members.  *State v. McIntyre*, 259 Kan. 488, 489–92 (1996).  These superseding actions, which did not involve the Defendant Officers, caused Lamonte McIntyre's conviction, not the actions of the Defendant Officers.  Therefore, the Defendant Officers entitled to judgment as a matter of law on Count I.

E.      **Defendant Officers  are entitled to qualified immunity as to Count I**

"The defense of qualified immunity shields government officials performing discretionary functions from individual liability unless their conduct violates clearly established statutory or constitutional rights of which a reasonable person would have known."  *Jackson,* No. 03-4181-JAR, 2005 WL 756773, at *4 (internal citation omitted).  "The doctrine of qualified immunity serves the goals of protecting public officials who are required to exercise their discretion and the related public interest in encouraging the vigorous exercise of official authority."  *Smith v. Barber*, 195 F.Supp. 2d 1264, 1272–73 (D. Kan. 2002).  (internal citation and quotation omitted).  "The Tenth Circuit has developed a framework for analyzing claims of qualified immunity: once a defendant pleads qualified immunity, the plaintiff bears the burden of (1) coming forward with sufficient facts to show that the defendant's actions violated a federal constitutional or statutory right and (2) demonstrating that the right violated was clearly established at the time of the conduct at issue.  In order to carry this burden, the plaintiff must do more than identify in the abstract a clearly established right and allege that the defendant has violated it.  Rather, the plaintiff must articulate the clearly established constitutional right and the defendant's conduct which violated the right with specificity."  *Jackson*, No. 03-4181-JAR, 2005 WL 756773, at *5 (internal citation and quotation omitted).  The right also must be clearly established at the time the officer took the challenged action. *Ziglar v. Abbasi*, 137 S.Ct. 1843, 1866 (2017).  In short, "only the plainly incompetent or those who knowingly violate the law" do not qualify for qualified immunity. *Id*. at 1867.  Qualified immunity gives "breathing room to make reasonable but mistaken judgments."

32

*Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011).  Officers can have reasonable, but mistaken beliefs and still be entitled to qualified immunity.  *See Stonecipher*, 759 F.3d at 1141.  Based on the admissible evidence in this matter, all of the Defendant Officers are entitled to qualified immunity for the claims asserted in Count I.

**Defendant Krstolich (deceased):**   Defendant Krstolich's only involvement in the investigation of the Ewing/Quinn homicides was with Ruby Mitchell.  Ruby Mitchell has testified that she was not coerced by the officers and the officers did not suggest to her which picture she should pick.  In fact, to this day, Ruby Mitchell stands by her identification of Lamonte McIntyre as the shooter.  SOF ¶¶49, 52-53.  "Plaintiff must do more than identify in the abstract a clearly established right and allege that the defendant has violated it.  Rather, the plaintiff must articulate the clearly established constitutional right **and the defendant's conduct which violated the right** with specificity and demonstrate a substantial correspondence between the conduct in question and prior law establishing that the defendant's actions were clearly prohibited."  *Lemons v. Lewis*, 963 F.Supp. 1038, 1046–49 (D. Kan. 1997) (internal quotation/citation omitted; emphasis added). As detailed above, based on Ruby Mitchell's testimony, Plaintiff cannot identify any conduct on behalf of Defendant Krstolich that violated his constitutional rights.  "A defendant is entitled to qualified immunity if a reasonable officer could have believed that probable cause existed to arrest or detain the plaintiff."  *Stonecipher*, 759 F.3d at 1141.  Here, Defendant Krstolich acted reasonably regarding the identification of Lamonte McIntyre by Ruby Mitchell as there is no evidence that she was coerced or unduly influenced by the officers.  As it relates to the claims by Plaintiff that Defendant Krstolich conducted an improper photograph lineup, the Supreme Court has held that whether a defendant's due process rights are violated by the admission at trial of an unduly suggestive lineup depends upon the totality of the circumstances surrounding

the lineup. *Stovall v. Denno*, 388 U.S. 293 (1967).   Further, the Constitution does not set a particular standard of quality for police photo arrays and lineups.  *See Alexander v. City of S. Bend*, 433 F.3d 550, 555 (7th Cir. 2006). Here, Ruby Mitchell has testified that Defendant Krstolich did not influence her picking of Lamonte McIntyre from the photograph lineup.  Further, there is no evidence that Defendant Krstolich compiled the photographs for the lineup.  Therefore, Defendant Krstolich is entitled to qualified immunity.

**Defendant Ware**:    Defendant Ware's only involvement in the investigation of the Ewing/Quinn homicides was when he accompanied Defendant Golubski to interview witnesses the day after the homicides.  SOF ¶68.  Defendant Ware only went with Defendant Golubski as backup and would not have actively participated in interviewing of witnesses as he was not assigned to the investigation of the Ewing/Quinn homicides.  SOF ¶¶70-71.  The only witness at issue in this matter that Defendant Ware was present for was Niko Quinn.  Defendant Ware did not write a report of this interaction because he was there only as an additional officer, primarily for the safety of Defendant Golubski.  SOF ¶69-71.  Niko Quinn has testified that she did not feel anything improper occurred during her interactions with officers the day after the shooting.  SOF ¶82.  Niko Quinn testified she was handing the photographs, and she immediately was able to rule out some of the individuals for various reasons.  SOF ¶79.  She testified that she was unable to identify the shooter and told the officers this.  SOF ¶81.  One of the officers then held up the photograph of Lamonte McIntyre and told her to "remember what Ruby [Mitchell] said."  SOF ¶80.  However, Niko Quinn cannot identify which officer did this.  SOF ¶80.  Regardless, Niko Quinn stood by her statement that she could not identify the shooter.   SOF ¶81.  After Defendant Ware went with Defendant Golubski on April 16, 1994 to meet with witnesses, he had no further involvement with the Ewing/Quinn homicides.  He did not write a report.  SOF ¶69.  He did not

testify at trial.  SOF ¶84.  He would not have been aware that Defendant Golubksi later met with Niko Quinn and she identified Lamonte McIntyre as the shooter during this second interaction. SOF ¶103.  Plaintiff's only claim against Defendant Ware is regarding the improper identification of Lamonte McIntyre by a witness.  The Constitution does not set a particular standard of quality for police photo arrays and lineups.  *Alexander*, 433 F.3d at 555.  Plaintiff cannot prove that Defendant Ware did anything coercive or suggestive regarding the photo lineup with Niko Quinn on April 16, 1994, as Niko Quinn herself cannot recall which officer actually did the talking.  SOF ¶80.  *See Lemon*, 963 F.Supp. at 1046-1049 (Plaintiff must articulate what conduct of defendant violated the right).  Further, "a suggestive pre-indictment identification procedure does not, in itself, intrude upon a constitutionally protected interest." *Manson v. Brathwaite,* 432 U.S. 98, 113 n.13 (1977).  Instead, the Supreme Court has held that whether Plaintiff's due process rights are violated **by the admission at trial** of an unduly suggestive lineup depends upon a totality of the circumstances of the lineup.  *Stovall,* 388 U.S. 293.  Defendant Ware did not create the photo lineup shown to Niko Quinn, which was the same shown to Ruby Mitchell.  SOF ¶¶73-74.  Again, Niko Quinn did not identify Lamonte McIntyre during the meeting when Defendant Ware was present. SOF ¶81.  The fact that she could not identify Lamonte McIntyre was included in Defendant Golubski's report **and** testified to at trial by Defendant Golubski and Niko Quinn.  SOF ¶¶78, 96, 102.  Plaintiff has not produced any evidence that anything done by Defendant Ware himself caused Niko Quinn to identify Lamonte McIntyre as the shooter.  Niko Quinn did not identify Lamonte McIntyre during this interaction, and it was Niko Quinn's testimony that only threats by the *prosecutor*  lead her to identify Lamonte McIntyre at trial.  SOF ¶83.  Therefore, Defendant Ware is entitled to qualified immunity.

**Defendant Brown:**  Defendant Brown's only involvement with the Ewing/Quinn homicides

was that he was the patrol officer who transported Lamonte McIntyre from Fifi's Restaurant to be questioned.  SOF ¶64.  Defendant Brown's report only provided the details of the transport and did not include any statements made by Lamonte McIntyre.  SOF ¶65.  During the questioning of Lamonte McIntyre, Defendant Brown was present and heard Lamonte McIntyre state that he had been with family members at the time of the homicides.  SOF ¶¶114-117.  Defendant Brown testified he passed a note to Defendant Golubski alerting him that Lamonte McIntyre had previously indicated to him during the transport that he had been at Fifis.  SOF ¶117.  Other than the note passed to Defendant Golubski, which Defendant Golubski did not include in the file or make note of, this exchange is not documented.  SOF ¶65.  Lamonte McIntyre testified at trial that he did not make these statements to Defendant Brown.  SOF ¶120. Given the only time Defendant Brown provided the information related to the statements by Lamonte McIntyre was during his testimony at trial, he is immune from liability.  The United States Supreme Court has previously held that all witnesses, including police officers, are immune from civil liability under Section 1983 based on testimony.  *Briscoe v. LaHue*, 460 U.S. 325, 328 (1983).  Therefore, Defendant Brown is entitled to absolute immunity.

**Defendant Barber (deceased):**  Defendant Barber's only involvement in this matter relates to interactions with Rose McIntyre on April 15, 1994, and his testimony related to informants providing him the name of Lamonte McIntyre.[5]  Defendant Barber did not provide a written report in this matter, and instead gave a statement to Defendant Golubski.  SOF ¶55.  In the statement, and in his trial testimony, Defendant Barber indicated that Rose McIntyre had indicated that Lamonte McIntyre was with her at Fifis on the day of the shooting.  SOF ¶¶59, 110.  Rose McIntyre

---

[5] Plaintiff had initially alleged claims of supervision against Defendant Barber and for signing off on various reports. However, Plaintiff has withdrawn these claims and are now only proceeding forward related to Defendant Barber's actions as detailed above. *See* Pretrial Order, Doc. 562.

has testified that she did in fact provide these statements, but that was because she was mistaken on the day of the incident.  She later corrected the statement, but did not indicate that she in fact informed *Defendant Barber* of this error.  SOF ¶¶89-91.  Defendant Barber also provided a statement and testified that Rose McIntyre questioned him regarding what would happen if someone had committed a murder, prior to ever being told anyone was investigating a homicide. SOF ¶¶58, 108-109.  To date, Defendant Officers' counsel has not been able to question Rose McIntyre regarding this statement.  Therefore, any alleged evidence by Plaintiff that this statement is false is inadmissible.  *See Virgin Mobile USA, L.P. v. Keen*, 447 F.Supp.3d 1071, 1082 (D. Kan. 2020).[6]  Finally, Defendant Barber provided testimony that he had heard the name "Lamonte McIntyre" from informants.  SOF ¶105.  Plaintiff has not provided any evidence that this was a false statement.  Further, Defendant Barber is immune from liability based on trial testimony.  *See Briscoe*, 460 U.S. 325.  Based on the admissible evidence in this matter, Plaintiff has not produced any evidence that Defendant Barber violated Plaintiff's constitutional rights.  Therefore, Defendant Barber is entitled to qualified immunity.

**Defendant Culp (deceased):**  The only claims being asserted against Defendant Culp in this matter is his assigning the Ewing/Quinn homicides to Defendant Golubski for improper purposes and reviewing/approving the reports of the individually named defendants.  To the extent the Court dismisses all the constitutional claims against the individually named defendants, the claims against Defendant Culp should likewise be dismissed.  Plaintiff has provided no admissible evidence that Defendant Culp was aware of the allegations of misconduct against Golubski. Further, there is no constitutional right to a full investigation.  Instead, "the failure to investigate a

---

[6] "Summary judgment evidence need not be submitted in a form that would be admissible at trial. But the content or substance of the evidence must be admissible.  Under Fed. R. Civ. P. 56(c)(2), a party may object on this basis—that the material cannot be presented in a form that would be admissible in evidence."

matter fully, to exhaust every possible lead, interview all potential witnesses, and accumulate overwhelming corroborative evidence rarely suggests a knowing or reckless disregard for the truth. To the contrary, it is generally considered to be token negligence at most." *Stonecipher*, 759 F.3d at 1142 (citation and quotation omitted). Ruby Mitchell has stood by her identification of Lamonte McIntyre as the shooter. SOF ¶¶49, 52-53. Niko Quinn has testified that nothing improper occurred during her interaction with Defendants Golubksi and Ware. SOF ¶82. There was no report written and therefore no report that could be reviewed, of the second interaction between Defendant Golubksi and Niko Quinn. SOF ¶103. Numerous officers responded to the scene of the homicides, interviewed witnesses, and collected evidence. SOF ¶¶2-13. Defendant Golubksi conducted follow-up interviews, including interviews of alibi witnesses, and per his reports, attempted to locate Stacy Quinn. SOF ¶¶15-22. Plaintiff has not provided any evidence that Defendant Culp knew or should have known that anything improper was being done. Therefore, Defendant Culp is entitled to qualified immunity.

**Defendant Smith:**   Defendant Smith's only involvement in the investigation of the Ewing/Quinn homicides was with interviewing witnesses at the scene immediately following the homicides. SOF ¶26. At issue is Defendant Smith's interview of Niko Quinn and Josephine Quinn. Plaintiff has alleged that Defendant Smith did not obtain a full statement from Niko Quinn regarding everything she observed and had reported to him prior to recording her statement and that Defendant Smith did not obtain the name "Stacy Quinn" from Josephine Quinn during the recorded statement. As it relates to Niko Quinn, Niko Quinn has testified that she does not recall what, if anything, she said to Defendant Smith prior to his recording her statement. SOF ¶31. Further, Niko Quinn has admitted that she did not inform Defendant Smith of everything she knew because she was being told by others at the scene, primarily her family members, not to speak to

the officer and to hurry up so they could get to the hospital.  SOF ¶¶32-36.  Niko Quinn has also admitted to being dishonest when giving her statement.  SOF ¶32.  Therefore, there is no admissible evidence that Defendant Smith failed to obtain a full statement from Niko Quinn.  As to the references to Stacy Quinn, although Josephine Quinn does not include her name in the recorded statement with Defendant Smith, Defendant Golubski obtained this information the next day from Josephine Quinn.  SOF ¶17.  Therefore, even if Josephine Quinn did actually give Defendant Smith Stacy Quinn's name on April 15, 1994, which there is no admissible evidence that indicates this did in fact occur, there would be no prejudice to the Plaintiff related to this information as Stacy Quinn's name appeared within the file the next day, and she is listed as a witness "who can testify to observing the crime and to possibly being able to identify the suspect" in the Prosecution Summary to the case.  SOF ¶24.  Further, Stacy Quinn testified at a later date that she immediately left the area after the shootings and did not speak to the police that day because she was messed up and on drugs.  SOF ¶¶126-127.  There is no constitutional right to a full investigation.  Instead, "the failure to investigate a matter fully, to exhaust every possible lead, interview all potential witnesses, and accumulate overwhelming corroborative evidence rarely suggests a knowing or reckless disregard for the truth. To the contrary, it is generally considered to be token negligence at most." *Stonecipher*, 759 F.3d at 1142 (citation/quotation omitted). "Where a government official's act causing injury to life, liberty, or property is merely negligent, no procedure for compensation is constitutionally required. *Daniels v. Williams*, 474 U.S. 327, 333(1986)(citation/quotation omitted). Thus, Defendant Smith is entitled to qualified immunity.

**F.  Defendants Krstolich, Ware, Brown, Barber, Smith are entitled to judgment as a matter of law as to Count II as Plaintiff cannot prove all elements for Count II**

As an initial matter, Plaintiff does not offer the Court any precedent from the Tenth Circuit establishing that the claims asserted in Count II for fabrication and *Brady* allegations constitute

independent claims rather than being part of his malicious prosecution claim. The Court's decision in *Lowery v. County of Riley* does not address the matter. 522 F.3d 1086 (10th Cir. 2008). Similarly, *Morgan v. Gertz* is not helpful. 66 F.3d 1307 (10th Cir. 1999). These cases stop well short of endorsing independent causes of action. In *Wilkins*, the Court utilized evidence of fabrication in addressing the elements of malicious prosecution. 528 F.3d 790, 799-804; 793 (10th Cir. 2008). Similarly, in *Mondragon v. Thompson*, the plaintiff sued after being imprisoned pursuant to a forged arrest warrant based upon fabricated allegations and the Court analyzed the case for malicious prosecution. 519 F.3d 1078, 1082-1084, n. 7 (10th Cir. 2008). In *Pierce v. Gilchrist*, the 10th Circuit explained that similar to the allegations in this case, claims related to fabrication of evidence is a cause of action for malicious prosecution. 359 F.3d 1279, 1284-1285 (10th Cir. 2004). Therefore, Plaintiff's Count II does not give rise to independent cause of action.[7]

In the alternative, Plaintiff has failed to produce evidence to support a fabrication or *Brady* violation against each of the named Defendant Officers in Count II. To succeed on a *Brady* claim, plaintiff must prove (1) the evidence at issue is favorable to him either because it is exculpatory, or because it is impeaching, (2) the state suppressed that evidence, either willfully or inadvertently and (3) he was prejudiced. *Powell v. Miller*, 104 F. Supp. 3d 1298, 1309 (W.D. Okla. 2015). To succeed on a claim for evidence fabrication, plaintiff must prove that defendant falsified evidence knowingly or with reckless disregard for the truth. *Bledsoe v. Jefferson County, Kansas*, 275 F.Supp.3d 1240, 1254 (D. Kan. 2017). First, as to the claims of fabrication of evidence, Plaintiff has not provided any evidence that defendants fabricated any evidence.

Ruby Mitchell has testified that Defendant Krstolich did not provide her with the name "Lamonte McIntyre" and that there was no coercion or suggestion by Defendant Krstolich during

---

[7] *See also Jocks v. Tavernier*, 316 F.3d 128, 138 (2nd Cir. 2003) (malicious prosecution claim improperly dismissed because there was evidence of fabrication).

her interactions.   SOF ¶50-54.   Defendant Ware's only involvement in this matter was to accompany Defendant Golubski to meetings with witnesses the day after the homicides.  SOF ¶68. The only interaction at issue in this matter is the meeting with Niko Quinn.  During that interaction, Niko Quinn did not identify the shooter.  SOF ¶78.  Niko Quinn has testified that nothing improper occurred during this interaction.  SOF ¶82.  Further, Defendant Ware wrote no report related to this interaction.  Only Defendant Golubski did, in which he indicated that Niko Quinn did not identify the shooter.  SOF ¶78.  Defendant Brown only testified regarding the statements by Lamonte McIntyre at trial so he is immune from liability in this matter.  *Briscoe*, 460 U.S. 325. The claims against Defendant Barber center on his statements that Rose McIntyre indicated to him that Lamonte McIntyre had been at FiFis, that Rose McIntyre asked questions related to a homicide when no one had told her that they were investigating a homicide, and Defendant Barber indicating that he received the name "Lamonte McIntyre" from informants.  SOF ¶¶104-110.  Rose McIntyre admitted in her testimony at the preliminary hearing that she initially told Defendant Barber that Lamonte McIntyre was at FiFis because she was mistaken regarding the date of the crimes at issue. SOF ¶¶89-91.  Although Ms. McIntyre indicates she eventually clarified this statement, she does not indicate that she told *Defendant Barber* this information.  SOF ¶91. Therefore, there was no falsification of evidence on this point.  As to the testimony provided by Defendant Barber that he heard Lamonte McIntyre's name from informants, Plaintiff has not provided any evidence that Defendant Barber did not receive information from informants and Defendant Barber is immune from liability based on trial testimony regarding this statement.  *See Briscoe*, 460 U.S. 325. Finally, as it relates to statements by Rose McIntyre regarding homicide, because Defendant Officers have not been permitted to question Ms. McIntyre on this issue to date, this evidence should be excluded from consideration for the purposes of this motion as her affidavit includes

inadmissible hearsay.  *See Virgin Mobile*, 447 F. Supp. 3d at 1082.  As for Defendant Smith, it is unclear from Plaintiff's allegations regarding what evidence Defendant Smith is to have fabricated. Plaintiff's claims against Defendant Smith all center on the statement he obtained from Niko Quinn and Josephine Quinn.  Both Niko Quinn and Josephine Quinn's statements were **recorded** and Defendant Smith did not write a report.  SOF ¶¶26, 42.  Niko Quinn has testified she does not recall any discussions prior to the recording.  SOF ¶31.  Therefore, there is no evidence of fabricated evidence.

As to the *Brady* violations, Plaintiff has not provided any evidence that Defendants Krstolich, Ware, Brown, Barber or Smith withheld exculpatory evidence.  As noted above, Ruby Mitchell has testified that Defendant Krstolich did not provide her with the name "Lamonte McIntyre" and that there was no coercion or suggestion by Defendant Krstolich during her interactions.  SOF ¶¶50-54.  Defendant Ware's only involvement in this matter was to accompany Defendant Golubski to meetings with witnesses the day after the homicides.  SOF ¶68.  The only interaction at issue in this matter is the meeting with Niko Quinn.  During that interaction, Niko Quinn did not identify the shooter.  SOF ¶78.  Niko Quinn has testified that nothing improper occurred during this interaction.  SOF ¶82.  Further, Defendant Ware wrote no report related to this interaction. Only Defendant Golubski did, in which he indicated that Niko Quinn did not identify the shooter. SOF ¶78.  Therefore, no exculpatory evidence was withheld from this interaction --- it was disclosed that Ms. Quinn did not identify the shooter by Defendant Golubksi.  As for Defendant Brown, it is unclear from Plaintiff's allegations regarding what exculpatory evidence Defendant Brown allegedly withheld.  In fact, in the Pretrial Order, Doc. 562, Plaintiff's claims regarding *Brady* violations relates to statements made by eyewitnesses, which Defendant Brown was not involved in.  The claims against Defendant Barber center on his statements that Rose McIntyre

indicated to him that Lamonte McIntyre had been at FiFis, that Rose McIntyre asked questions related to a homicide when no one had told her that they were investigating a homicide, and Defendant Barber indicating that he received the name "Lamonte McIntyre" from informants. SOF ¶105. Rose McIntyre admitted in her testimony at the preliminary hearing that she initially told Defendant Barber that Lamonte McIntyre was at FiFis because she was mistaken regarding the date of the at issue crimes. SOF ¶¶89-91. Although Ms. McIntyre indicates she eventually clarified this statement, she does not indicate that she told *Defendant Barber* this information. SOF ¶91. As to the testimony provided by Defendant Barber that he heard Lamonte McIntyre's name from informants, Plaintiff has not provided any evidence that Defendant Barber did not receive information from informants. Further, Defendant Barber is immune from liability based on trial testimony. *See Briscoe*, 460 U.S. 325. Finally, as it relates to statements by Rose McIntyre regarding homicide, because Defendant Officers have not been permitted to question Ms. McIntyre on this issue to date, this evidence should be excluded from consideration for the purposes of this motion as her affidavit includes inadmissible hearsay. *See Virgin Mobile*, 447 F. Supp. 3d at 1082. Therefore, it is unclear what exculpatory evidence Defendant Barber is alleged to have withheld. As for Defendant Smith, Niko Quinn has testified she does not recall what, if anything, she told Defendant Smith prior to him recording the statement. SOF ¶31. Therefore, Plaintiff cannot produce any evidence of Defendant Smith withholding explicatory evidence. As to the claim that Defendant Smith attempted to hide that he was told Stacy Quinn may have more information, Plaintiff does not have any evidence that this in fact occurred. Stacy Quinn testified she left the area immediately after the shooting. SOF ¶127. Further, her name became known the day after the homicides on April 16, 1994. SOF ¶17. Therefore, there is no evidence of Defendant Smith withholding exculpatory evidence. Therefore, Defendants Krstolich, Ware, Brown, Barber, and

Smith are entitled to judgment as a matter of law.

**G.      Defendants Krstolich, Ware, Brown, Barber, and Smith are entitled to qualified immunity as to the claims asserted by Plaintiff in Count II**

Defendants Krstolich, Ware, Brown, Barber and Smith incorporate by reference the arguments and authorities related to qualified immunity for Count I.  Plaintiff's claims in Count II against Defendants Krstolich, Ware, Brown, Barber and Smith are based on the same allegations in Count I.  Therefore, for the same reasons as stated above for Count I, which is incorporated by reference herein, Defendants Krstolich, Ware, Brown, Barber, and Smith are entitled to qualified immunity.

**H.      Defendant Officers are entitled to judgment as a matter of law on Counts IV, V, and VI as the claims are barred by the statute of limitations**

K.S.A. 60-513 provides the applicable statute of limitations (two years) for Section 1983 claims in Kansas.  As a result, Plaintiff's claims pursuant to 42 U.S.C. § 1983 in Counts IV, V, and VI are time barred based on the two-year statute of limitations.  *Oyler*, 870 F. Supp. at 1023. Based on the claims alleged, all of the facts "giving rise to the cause of action" would have first caused "substantial injury" when Plaintiff was convicted in 1994.  *See* K.S.A. 60-513(b). Therefore, the statute of limitations expired in 1996.  Even under the statute of repose in K.S.A. 60-513(b), Plaintiff's claims would have been barred in 2004.

Further, to the extent that Plaintiff attempts to argue that he was not aware of issues with his conviction, as early as March 1996, Plaintiff filed a Motion for New Trial based on newly discovered evidence, which included claims of Niko Quinn falsifying her testimony and that Stacy Quinn had seen someone other than McIntyre commit the homicides.  SOF ¶¶122-127.

"Since the injury in a § 1983 case is the violation of a constitutional right, such claims accrue when the plaintiff knows or should know that his or her constitutional rights have been violated." *Smith v. City of Enid*, 149 F.3d 1151, 1154 (10th Cir. 1998) (quotation omitted).  The last sentence of K.S.A. 60-513(b), provides that "if the fact of injury is not reasonably ascertainable until

sometime after the initial act, then the period of limitation shall not commence until the fact of injury becomes reasonably ascertainable to the injured party, *but in no event shall an action be commenced more than 10 years beyond the time of the act giving rise to the cause of action.*" [emphasis added].  When read together, the statute of limitations and the statute of repose "express the public policy of Kansas concerning when claims for personal injury can be brought in court." *O'Neill v. Dunham*, 41 Kan.App.2d 540, 543 (2009).  The two laws set clear limits on claims – the statute of limitations eliminates stale claims, and the statute of repose provides immunity. *Id.*  The Supreme Court of Kansas declares that the statute of repose "operates as a general grant of immunity against claims arising more than 10 years after the defendant's actions and abolishes a cause of action even if it has not yet accrued." *Id.* (citation omitted).

It is anticipated that Plaintiff will attempt to argue the holding in *Heck v. Humphrey*, should apply to his claims in Counts IV, V, and VI.  However, the ability to bring a claim for failure to intervene (Count IV), conspiracy (Count V)[8] and supervisory liability (Count VI) does not require a showing of an overturned conviction and all the actions at issue in these claims occurred in 1994.  Therefore, Counts IV, V and VI should be dismissed because Plaintiff's claims are barred by the statute of limitations.

I.   **Defendants Krstolich, Ware, Barber, and Culp are entitled to judgment as a matter of law as to Count IV and are entitled to qualified immunity**

To state a claim for failure to intervene, Plaintiff must show a defendant was present at the scene, failed to take reasonable steps to protect the plaintiff from an obvious violation, and had a realistic opportunity to prevent the harm. *See Mascorro v. Billings*, 656 F.3d 1198, 1204 n.5 (10th Cir. 2011*); see also Fogarty v. Gallegos*, 523 F.3d 1147, 1162 (10th Cir. 2008).  Any attempt by

---

[8] As to Count V, at most, only Plaintiff's claim for conspiracy related to malicious prosecution would survive under *Heck*.  As it relates to the other alleged conspiracies --- unreasonable searches and seizures, coercion, deprivation of liberty without due process of law, and fair trial --- all of the alleged actions of the Defendant Officers that could be used to attempt to state a such claims occurred in 1994.

Plaintiff to argue that he is not required to plead who participated versus who was "merely looking on" fails. *See DiPippo v. County of Putnam,* 17-CV-7948 (NSR), 2019 WL 1004152, at *15 (S.D.N.Y. Feb. 28, 2019).[9] Here, as it relates to each of the defendants named in Count IV, Plaintiff has failed to provide evidence that these defendants failed to intervene in this matter.

Further, based on the admissible facts in this matter, Defendants Krstolich, Ware, Barber, and Culp are entitled to qualified immunity as there was no constitutional violation. *See Jackson*, No. 03-4181-JAR, 2005 WL 756773, at *5. In short, "only the plainly incompetent or those who knowingly violate the law" do not qualify for qualified immunity. *Id.* at 1867. Qualified immunity gives "breathing room to make reasonable but mistaken judgments." *Ashcroft*, 563 U.S. at 743. Officers can have reasonable, but mistaken beliefs and still be entitled to qualified immunity. *See Stonecipher*, 759 F.3d at 1141.

As to Defendant Krstolich, Plaintiff alleges that he failed to intervene in the coercion of Ruby Mitchell. However, Ruby Mitchell has testified that she was not subjected to coercion, suggestion, or provided the name "Lamonte McIntyre". SOF ¶¶49-54. Therefore, there is no evidence to support a claim for failure to intervene.

As to Defendant Ware, his only involvement in this matter was to accompany Defendant Golubski to meetings with witnesses the day after the homicides. SOF ¶68. During the interaction with Niko Quinn she not identify the shooter. SOF ¶78. Niko Quinn has testified that nothing improper occurred during this interaction. SOF ¶82. Therefore, there is no evidence that Defendant Ware failed to intervene. Further, Niko Quinn has testified she does not know which officer did what during the interaction. SOF ¶80. Therefore, Plaintiff's claim fails because he

---

[9] Holding "Plaintiff's argument that his failure to intervene claim is sufficiently pleaded against each individual Defendant because he alleged that Stephens, Castaldo, and Quick were 'each present during multiple coercive interrogations' but that he does not know 'which officer applied the coercion and which (if any) merely looked on' cannot overcome the lack of detail that is required as far as who took which impermissible action against whom at which time."

cannot show who participated versus who was "merely looking on".  *See DiPippo,* 17-CV-7948 (NSR), 2019 WL 1004152, at *15.

As to Defendant Barber, it is unclear from Plaintiff's allegations in the Pretrial Order in what way Defendant Barber failed to intervene.[10]  As previously noted, Defendant Barber's involvement centers on his statements that Rose McIntyre indicated to him that Lamonte McIntyre had been at FiFis, that Rose McIntyre asked questions related to a homicide when no one had told her that they were investigating a homicide, and Defendant Barber indicating that he received the name "Lamonte McIntyre" from informants.  SOF ¶¶55-63; 104-110.  Therefore, it is unclear what actions Defendant Barber should have intervened in.

Plaintiff has provided no admissible evidence that Defendant Culp was aware of the allegations of misconduct against Golubski.  Ruby Mitchell has stood by her identification of Lamonte McIntyre as the shooter.  SOF ¶¶49, 52-53.  Niko Quinn has testified that nothing improper occurred during her interaction with Defendants Golubksi and Ware.  SOF ¶82.  There was no report written and therefore no report that could have been reviewed regarding the second interaction between Defendant Golubksi and Niko Quinn.  SOF ¶103.  Numerous officers responded to the scene of the homicides, interviewed witnesses, and collected evidence.  SOF ¶¶2-13.  Defendant Golubksi conducted follow-up interviews, including alibi witnesses, and per his reports, attempted to locate Stacy Quinn.  SOF ¶¶15-22.  Therefore, there is no evidence to support a claim for failure to intervene.

Further, based on the admissible evidence in this matter, Defendants Krstolich, Ware, Barber and Culp are entitled to qualified immunity. As Plaintiff relies on the same allegations found in

---

[10] Plaintiff had originally alleged that Defendant Barber had signed a number of the individuals defendants' reports. However, as seen in the police file for this matter, Defendant Barber did not sign off on any reports other than Defendant Brown's arrest report.  *See* Exhibit 1.

Count I and Count II for the claim of failure to intervene in Count IV, the defendants' arguments related to qualified immunity for Counts I and II are incorporated by reference herein as it relates to Count IV.

Therefore, Defendants Krstolich, Ware, Barber and Culp are entitled to judgment as a matter.

### J.      Defendants Krstolich, Ware, Barber, and Culp are entitled to judgment as a matter of law as to Count V and are entitled to qualified immunity

In Count V, Plaintiff Lamonte McIntyre has asserted a claim for conspiracy pursuant to Section 1983 against Defendants Krstolich, Ware, Barber and Culp.  In order to succeed on a claim of conspiracy under Section 1983, Plaintiff must be able to prove  "(1) specific facts showing an agreement and concerted action among defendants and (2) an actual deprivation of a constitutional right." *Maier v. Kansas*, No. 16-3219-SAC, 2017 WL 552629, at *3 (D. Kan. Feb. 10, 2017). Plaintiff must prove facts that manifest a "specific goal to violate [plaintiff's] constitutional rights by engaging in a particular course of action." *Bledsoe*, 275 F.Supp.3d at 1254.  Here, Plaintiff has alleged a conspiracy based on the claims found under Counts I and II.  Doc. 562, pp. 44-45.

Plaintiff has not produced any evidence that supports an agreement or a concerted action between the Defendant Officers or their motive for the actions.  *See Cruz v. City of Merriam*, Kan., 21 F. Supp. 3d 1177, 1183–84 (D. Kan. 2014).[11] Further, as argued above in relationship to Count I and Count II, which is incorporated by reference, Plaintiff has not proven an actual deprivation of a constitutional right based on the actions of Defendants Krstolich, Ware, Barber and Culp.

In the Pretrial Order (Doc. 562, p. 45), Plaintiff only alleges two circumstances related to defendants acting in concert:

(1) Defendants Golubski and Krstolich worked in concert with Mitchell to compel fabricated eyewitness testimony falsely implicating McIntyre as murdering Quinn and Ewing[.]

(2) Golubski also conspired with Ware. Together, they worked in concert to compel Niko Quinn's

---

[11] Plaintiff's conspiracy claim dismissed for failing to "address how the supposed conspiracy acted or provide any plausible motive for its actions."

testimony falsely implicating McIntyre as murdering Quinn and Ewing[.]

As has been stated numerous times above, Ruby Mitchell denies she was coerced or that her identification of Lamonte McIntyre as the shooter was fabricated.   SOF ¶¶49-54.   In addition, Defendant Ware was not present when Niko Quinn identified Lamonte McIntyre as the shooter. SOF ¶¶102-103.  In fact, the report of the only interaction with Niko Quinn where Defendant Ware was present states she did *not* identify anyone as the shooter.  SOF ¶78.  Therefore, based on Plaintiff's only specific allegations of conspiracy, the claims fail and Defendants are entitled to judgment as a matter of law.

Further, based on the admissible facts in this matter, Defendants Krstolich, Ware, Barber, and Culp are entitled to qualified immunity as there was no constitutional violation.  As Plaintiff relies on the same allegations found in Count I and Count II for the claim of conspiracy in Count V, the defendants' arguments related to qualified immunity for Counts I and II are incorporated by reference herein as it relates to Count V.

 Therefore, Defendants are entitled to judgment as a matter of law.

### K.     Defendant Culp is entitled to judgment as a matter of law as to Count VI as and he is entitled to qualified immunity

A defendant cannot be held liable in a civil rights action based solely upon his or her supervisory capacity.  *Sandifer v. Green*, 126 Fed.Appx. 908, 909 (10th Cir. 2005).  "Instead, a plaintiff must show that an affirmative link exists between the constitutional deprivation and either the defendant's personal participation, his exercise of control or direction, or his failure to supervise."  *Id.*  (citation omitted).  When a plaintiff sues an official pursuant to Section 1983 for conduct "arising from his or her superintendent responsibilities," Plaintiff "must plausibly plead and eventually prove not only that the official's subordinates violated the Constitution, but that the official by virtue of his own conduct and state of mind did so as well."  *Dodds v. Richardson*, 614

F.3d 1185, 1197–98 (10th Cir. 2010). This requires more than "a supervisor's mere knowledge of his subordinate's" conduct. *See Iqbal,* 556 U.S. at 677. *Iqbal* explained that "[b]ecause vicarious liability is inapplicable to. . .§ 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Id.* at 676.

As an initial matter, Plaintiff's claim for supervisory liability fails as Plaintiff cannot show Defendant Culp's subordinates violated the Constitution. To the extent the Court enters judgment in favor of the individually named defendants for constitutional violations, Plaintiff's claims against Defendant Culp under Count VI should likewise be dismissed.

In the alternative, "[t]he factors necessary to establish a supervisor's § 1983 violation depend upon the constitutional provision at issue, including the state of mind required to establish a violation of that provision." *Webb v. Thompson*, 643 Fed. Appx. 718, 724 (10th Cir. 2016) (citation and quotation omitted). A supervisor's state of mind is a "critical bridge between the conduct of the subordinate and his own behavior." *Serna v. Colorado Dept. of Corrections*, 455 F.3d 1146, 1151 (10th Cir. 2006).

Plaintiff has provided no admissible evidence that Defendant Culp was aware of the allegations of misconduct against Golubski or that Defendant Culp had actual knowledge of any constitutional violations by any of the individually named defendants. Defendant Culp is deceased and Plaintiff's contentions regarding his conduct, knowledge, and state of mind are inadmissible speculation. Therefore, Plaintiff cannot show a "culpable state of mind" on behalf of Defendant Culp.

Further, as it relates to the different steps of the investigation that Defendant Culp allegedly failed to supervise, Ruby Mitchell has stood by her identification of Lamonte McIntyre as the shooter. SOF ¶49, 52-53. Niko Quinn has testified that nothing improper occurred during her interaction with Defendants Golubksi and Ware. SOF ¶82. There was no report written and

therefore no report that could have been reviewed regarding the second interaction between Defendant Golubksi and Niko Quinn.  SOF ¶103.  Numerous officers responded to the scene of the homicides, interviewed witnesses, and collected evidence.  SOF ¶¶2-13.  Defendant Golubksi conducted follow-up interviews, including of alibi witnesses, and per his reports, attempted to locate Stacy Quinn.  SOF ¶¶15-22.   Further, there is no constitutional right to a full investigation. Instead, "the failure to investigate a matter fully, to exhaust every possible lead, interview all potential witnesses, and accumulate overwhelming corroborative evidence rarely suggests a knowing or reckless disregard for the truth. To the contrary, it is generally considered to be token negligence at most." *Stonecipher*, 759 F.3d at 1142 (citation and quotation omitted).

Plaintiff has also alleged that Defendant Culp failed to adequately train the individually named defendants.  However, Plaintiff has not produced any evidence that the defendants did not receive adequate training or that Defendant Culp was responsible for training the individual defendants.

Further, based on the admissible evidence in this matter, Defendant Culp is entitled to qualified immunity.  As Plaintiff relies on the same allegations found in Count I and Count II for the claim of supervisory liability in Count VI, Defendant Culp's arguments related to qualified immunity for Counts I and II are incorporated by reference herein as it relates to Count VI.

Therefore, Defendant Culp is entitled to judgment as a matter of law.

**L.     Defendant Officers are entitled to judgment as a matter of law as Plaintiff cannot prove all elements of malicious prosecution under Kansas tort law**

The elements required to establish a malicious prosecution claim under Kansas state law are "(1) that defendant initiated, continued, or procured the proceeding of which complaint is made; (2) that defendant in doing so acted without probable cause; (3) that defendant must have acted with malice; (4) that the proceedings terminated in favor of plaintiff; and (5) that plaintiff sustained damages." *Lindenman v. Umscheid*, 255 Kan. 610, 624 (1994).  In order for Plaintiff to prevail on

a claim for malicious prosecution, he "must prove both malice and lack of probable cause, and unless both are proved, the plaintiff's claim must fail." *Thompson v. General Finance Co.*, 205 Kan. 76, 91 (1970).

Under Kansas law, probable cause exists where there are "reasonable grounds for suspicion, supported by circumstances sufficiently strong in themselves to warrant a cautious or prudent person in the belief that the party committed the act of which he or she is complaining." *Lindenman*, 255 Kan. at 624. For malice, Plaintiff must show that the "action was instituted for any improper or wrongful motive. When a proceeding is intentionally instituted with any other motive than to bring a party to justice, it is in law a malicious prosecution. A criminal prosecution is properly brought only to punish crime and to bring criminals to justice." *Nelson v. Miller*, 227 Kan. 271, 278 (1980).

As argued above and is incorporated by reference herein, there was probable cause in this matter as Ruby Mitchell identified Lamonte McIntyre as the shooter and has testified that she was not coerced or received any suggestion in selecting his photograph. SOF ¶¶49-54. Further, as argued above and incorporated by reference herein, Plaintiff has not alleged any facts that show that the Defendant Officers acted with malice towards Plaintiff.[12] Therefore, Defendant Officers are entitled to judgment as a matter of law on Count VIII.

### M. Defendant Officers are entitled to judgment as a matter of law as Plaintiff's claims are barred by provisions of the Kansas Tort Claims Act, K.S.A. 75-6104

Plaintiff's claims revolve around Defendant Officers' roles an investigation therefore the immunities under the KTCA apply as the Defendant Officers were acting within the course and scope of their employment. *See* K.S.A. 75-6104(a), (c), (d), (e), (i), and (n).

---

[12] See Doc. 190, pp. 35-36 regarding the basis of the finding of sufficient allegations by Plaintiff related to malice on behalf of the Defendant Officers.

Defendant Officers were exercising a discretionary function by performing their duties in the Ewing/Quinn investigation.  *See* K.S.A. 75-6104(e).  "To determine whether the function or duty is discretionary, Kansas courts look foremost to the nature and quality of the discretion exercised." *Soto v. City of Bonner Springs*, 291 Kan. 73, 79 (2010) (citation omitted).  Kansas courts have found the manner of conducting an investigation is a discretionary function.  *See Id.*[13]  "Police must be allowed the discretion to investigate, based on the situation that confronts an experienced officer."  *Schreiner*, 55 Kan.App.2d at 58.  "In other words, discretionary function immunity protects government employees even if they make an incorrect choice in applying their discretion." *Id.* at 62.  "[P]olice officers should be vested with the necessary discretionary authority to act in a manner which they deem appropriate without the threat of potentially large tort judgments against the city, if not against the officers personally." *Id.* at 63 (citation/quotation omitted).  "Regardless of whether the police officers exercised prudent judgment or abused their discretion and regardless of the level of discretion involved, their investigation of the events and their resulting decision . . . falls within the discretionary function exception to the KTCA." *Williams,* 54 Kan.App.2d at 616. The discretionary function exception applies in the absence of a "clearly defined mandatory duty or guideline" that governs the challenged conduct. *Patterson v. Cowley County, Kansas*, 307 Kan. 616, 638 (2018). There is no statute, regulation or guideline that dictates what a law enforcement officer *must* do when investigating a double homicide. "Discretionary function immunity under the KTCA comes into play when a government actor makes a choice among discretionary options in addressing a given set of circumstances." *Henderson v. Montgomery County Board of Commissioners*, 57 Kan.App.2d 818, 835 (2020). The conduct of the Defendant Officers "reflect[s] a course of conduct grounded in legitimate options requiring an exercise of reasonable judgment

---

[13] *See also Burney v. Kansas Dept. of SRS*, 23 Kan.App.2d 394, 931 P.2d 26 (1997), *Schreiner v. Hodge*, 55 Kan. App. 2d 50, 407 P.3d 264 (2017); *Williams v. C-U-Out Bail Bonds, LLC*, 54 Kan. App. 2d 600, 402 P.3d 558 (2017).

to select one option over the others," meaning discretionary function immunity applies. *Id.* (citation omitted).  A reasonable suspicion or probable cause determination by a law enforcement officer is a discretionary function to which discretionary function immunity applies. *See, e.g.*, *Schreiner v. Hodge*, __ Kan. __, 504 P.3d 410, 427 (Feb. 18, 2022).[14] The inquiry is not on whether the officers *correctly* determined" probable cause, but on "whether the underlying act was discretionary in nature requirement had been met." *Id.*  "Officers are entitled to discretionary function immunity, even though their reasonable suspicion determination ultimately proved to be mistaken when subjected to after-the-fact scrutiny."  *Id.* at 417.  The Kansas Supreme Court has recently held that "[w]e have consistently found the investigatory methods and procedures employed by governmental employees to be matters requiring the exercise of judgment and discretion."  *Id.* at 424.  As to each of the Defendant Officers, as detailed above and incorporated by reference, their interactions with the various witnesses fall within their discretionary function of investigating the Ewing/Quinn homicides.[15]

In addition, to the extent any of Plaintiff's claims are based on the testimony given by Defendants Krstolich, Brown or Barber[16] in this matter, they are entitled to absolute immunity related to their trial testimony.  *See Briscoe*, 460 U.S. 325; K.S.A. 75-6104(i).

Plaintiff's claims against the Defendant Officers all relate to their investigation of the

---

[14] "The determination of whether reasonable suspicion exists is an inherently discretionary act because it requires officers to evaluate the totality of the circumstances and make a judgment in light of their experience and training. And, generally, the types of decisions officers make over the course of an investigation, including whether reasonable suspicion exists to detain a person, are sufficiently grounded in policy to fall within the discretionary function immunity provision of K.S.A. 75-6104(e)." *Schreiner v. Hodge*, 504 P.3d 410, 416 Syl. 6 (Kan. 2022).

[15] Briefly stated, Ruby Mitchell has denied that she was coerced or manipulated into identifying Lamonte McIntyre in the photo lineup.  SOF ¶¶49-54.  Niko Quinn has denied that anything done by Defendant Ware was improper and did not identify Lamonte McIntyre at the time of her interactions with Defendant Ware.  SOF ¶82.  Defendant Brown did not craft a false police report and only testified at trial regarding what Lamonte McIntyre had told him.  SOF ¶¶65, 114-117.  Rose McIntyre has admitted that she initially told Defendant Barber that Lamonte McIntyre was with her at FiFis.  SOF ¶¶89-91.  There is no admissible evidence that Defendant Smith failed to obtain full statement from Niko Quinn or that he refused to interview Stacy Quinn.  SOF ¶31, 127.  There is no admissible evidence that Defendant Culp was aware of the alleged misconduct by Defendant Golubski.

[16] Defendants Ware, Culp and Smith did not testify at the preliminary hearing or the trial of this matter.

Ewing/Quinn homicides and the enforcement of state criminal laws. *See* K.S.A. 75-6104(c). Plaintiff's claims are based on alleged failures by the Defendant Officers failing to adhere to KCKPD policy. *See* K.S.A. 75-6104(d). The KCKPD policies do not create an independent duty of care nor was the KCKPD required to adopt or enforce different policies. These claims are precluded by K.S.A. 75-6104(c) and (d). *See Jarboe v. Bd. of Cnty. Comm' rs of Sedgwick Cnty.*, 262 Kan. 615, 628 (1997); *Kennedy v. Kan. Dept. of Soc. & Rehab. Servs.*, 26 Kan.App.2d 98, 101-02 (1999).

In addition, all of Plaintiff's claims against the Defendant officers are regarding the method in which they, police officers, provided police protection. *See* K.S.A. 75-6104(n); *Gragg v. Wichita State Univ.*, 261 Kan. 1037, 1060 (1997) and *Beck v. Kansas Adult Auth.*, 241 Kan. 13, 24 (1987).[17] "[T]he provision of training and supervision as well as the adoption of policies and procedures are covered by the police protection exception." *Allen v. Bd. of Comm'rs of Cty. of Wyandotte*, 773 F. Supp. 1442, 1456 (D. Kan. 1991). The Kansas Supreme Court cited the *Allen* decision with approval in *Gragg*. 261 Kan. at 1061.

The Kansas Supreme Court in *Keiswetter*, held by the police and fire exception in K.S.A. 75-6104(n) barred a claim for damages arising from an injury could have been avoided through closer supervision or if more or different personnel had been hired. *Keiswetter v. State*, 304 Kan. 362, 372–73 (2016). Plaintiff's claims that his prosecution and conviction could have been avoided through different training, supervision or hiring decisions, especially as it relates to Defendant Culp, are barred.

Therefore, Plaintiff's state tort claim of malicious prosecution in Count VIII is barred by the provisions of the Kansas Tort Claims Act, K.S.A. 75-6104(c), (d), (e), (i), and (n).

---

[17] "The determination of how to provide police protection is immunized. The Medical Center is not liable because of the methods it adopted for police protection."

## VI.      ADOPTION OF DEFENDANTS' ARGUMENTS

In the interest of judicial economy, and pursuant to FRCP 10(c), the Defendant Officers adopt and incorporate by reference Unified Government of Wyandotte County and Kansas City, Kansas, and Golubski's Memorandums in Support of their Motions for Summary Judgment.

## VII.      CONCLUSION

WHEREFORE, based on the above and foregoing, the Defendant Officers move for an Order from this Court pursuant to Rule 56 of Federal Rules of Civil Procedure granting judgment as a matter of law on all claims against the Defendant Officers, and for such other relief this Court finds just and equitable.

Respectfully submitted,

/s/      *Tracy M. Hayes*

Sean M. Sturdivan          KS #21286
Tracy M. Hayes             KS #23119
Elizabeth A. Evers Guerra KS #22580
SANDERS WARREN & RUSSELL LLP
Compass Corporate Centre
11225 College Boulevard, Suite 450
Overland Park, KS  66210
Phone:  913-234-6100
Fax:  913-234-6199
s.sturdivan@swrllp.com
e.eversguerra@swrllp.com
t.hayes@swrllp.com
*Attorneys for The Estate of Detective James  Michael Krstolich, Detective Dennis Ware, Officer James L. Brown, The Estate of Lieutenant Dennis Otto Barber, Detective W.K. Smith, and The Estate of Lieutenant Steve Culp*

## CERTIFICATE OF SERVICE

I HEREBY certify that on this 1st day of April, 2022, the foregoing was filed with the Clerk of the Court using the CM/ECF system which will send notice of electronic filing to all counsel of record.

Michael J. Abrams
William G. Beck
Alexander T. Brown *(Pro Hac Vice)*
Alana M. McMullin *(Pro Hac Vice)*
LATHROP GPM LLP
2345 Grand Boulevard, Suite 2200
Kansas City, MO  64108
Phone: 816-292-2000
Fax: 816-292-2001
michael.abrams@lathropgpm.com
william.beck@lathropgpm.com
alexander.brown@lathropgpm.com
alana.mcmullin@lathropgpm.com

and

Cheryl Pilate
Lindsey Runnels
MORGAN PILATE LLC
926 Cherry Street
Kansas City, MO  64106
Phone: 816-471-6694
Fax: 816-472-3516
cpilate@morganpilate.com
lrunnels@morganpilate.com
***Attorneys for Plaintiffs***

and

Barry Scheck
Emma Freudenberger
Grace Ann Paras
NEUFELD SCHECK & BRUSTIN, LLP
99 Hudson Street, Eighth Floor
New York, NY  10013
Phone: 212-965-9081
Fax: 212-965-9084
barry@nsbcivilrights.com
emma@nsbcivilrights.com
grace@nsbcivilrights.com

David R. Cooper
Charles E. Branson
FISHER, PATTERSON, SAYLER & SMITH, LLP
3550 S.W. 5th Street
Topeka, KS  66606
Phone: 785-232-7761
Fax: 785-286-6609
dcooper@fisherpatterson.com
cbranson@fpsslaw.com
***Attorneys for Unified Government of
Wyandotte County and Kansas City, Kansas***

Henry E. Couchman Jr.
Edward James Bain
UNIFIED GOVERNMENT OF WYANDOTTE
COUNTY/KANSAS CITY, KANSAS
Legal Department
701 N. 7th Street, Suite 961
Kansas City, KS  66101
Phone: 913-573-5060
Fax: 913-573-5243
hcouchman@wycokck.org
ebain@wycokck.org
***Attorneys for Unified Government of
Wyandotte County and Kansas City, Kansas***

Sean P. McCauley
Morgan L. Roach
Jeffrey S. Kratofil
MCCAULEY & ROACH, LLC
527 W. 39th Street, Suite 200
Kansas City, MO  64111
Phone: 816-523-1700
Fax: 816-523-1708
sean@mccauleyroach.com
morgan@mccauleyroach.com
jeff@mccauleyroach.com

and

***Pro Hac Vice* for Plaintiffs**

Daphne R. Halderman
MCCAUSLAND BARRETT & BARTALOS
P.C.
8695 College Blvd., Suite 200
Overland Park, Kansas 66210
Phone: 816-523-3000
Fax: 816-523-1588
Email: dhalderman@mbblawfirmkc.com
***Special Administrator for Defendants***
***Krstolich, Barber, and Culp, deceased***

Matthew J. Gist
Christopher M. Napolitano
ENSZ & JESTER, P.C.
1100 Main Street, Suite 2121
Kansas City, MO 64105
Phone: 816-474-8010
Fax: 816-471-7910
Emails: mgist@enszjester.com
            cnapolitano@enszjester.com
***Attorneys for Detective Roger Golubski***

*/s/      Tracy M. Hayes*
                    **ATTORNEY**