# EXHIBIT C
# TO DECLARATION OF SONA R. SHAH
# IN SUPPORT OF PLAINTIFFS' MOTION TO
# EXCLUDE TESTIMONY OF
# ROBERT BLAKE McCONNELL

# PARK DIETZ & ASSOCIATES, INC.

Forensic Experts

**Robert Blake McConnell, M.A., SFPC, (FBI, ret.)**

1414 Mt. Isle Harbor Drive
Charlotte, NC 28214
Ph. 703-357-7789
E-mail: blakemcmail@gmail.com

**Administrative Offices**

2906 Lafayette
Newport Beach, CA  92663
Tel:  949-723-2211
Fax:  949-723-2212
Email: expert@parkdietzassociates.com
Website: www.parkdietzassociates.com

- **Forensic Psychiatry**
- **Forensic Psychology**
- **Forensic Pathology**
- **Forensic Neurology**
- **Forensic Social Work**
- **Child Welfare**
- **Criminology**
- **Security**

**IN THE MATTER OF:** Lamonte McIntyre & Rose Lee McIntyre, Plaintiffs, v. Unified Government of Wyandotte County and Kansas City, Kansas, et.al., Defendants, Case No. 2:18-cv-02545-KHV-KGG

**PREPARED FOR:**  Counsel for Defendant Roger Golubski Ensz & Jester, P.C., 1100 Main Street, Suite 2121, Kansas City, Missouri 64105.

## PURPOSE OF ANALYSIS

Rose McIntyre alleges she was sexually assaulted in the late 1980s by Roger Golubski, then a detective with the Kansas City, Kansas Police Department (KCKPD). Rose McIntyre says Roger Golubski wanted to continue a sexual relationship with her after the assault, but she avoided him. Rose McIntyre's son, Lamonte McIntyre, was convicted of murder in 1994. Jim McCloskey of Centurion Ministries subsequently conducted an investigation leading to the exoneration of Lamonte McIntyre in 2017. Rose McIntyre says, in approximately 2006, Jim McCloskey told her Roger Golubski was the lead detective in the investigation resulting in Lamonte McIntyre's 1994 murder conviction. Up to that point, Rose McIntyre says she had no idea Roger Golubski ever worked on Lamonte McIntyre's case. Upon learning this information, Rose McIntyre concluded that Roger Golubski framed her son for murder because she did not continue a sexual relationship with him in the late 1980s.

My analysis concerns the reliability of Rose Lee McIntyre's allegations against Roger Golubski.

**EXHIBIT**

154

I am conducting this analysis for Counsel for Defendant Roger Golubski. While I am compensated by Park Dietz & Associates (PD&A), PD&A is charging $450 per hour for the study and preparation of this report, and for any subsequent deposition or trial testimony.

**DOCUMENTS REVIEWED:**

- Transcription of videotaped deposition of James McCloskey/Centurion Ministries, October 13, 2021
- Transcription of videotaped deposition of Rose Lee McIntyre, June 17, 2021, Volume I and the following exhibits to that deposition:
  - Exhibit 55: Report of George Woods, Jr., M.D., May 27, 2021
  - Exhibit 56: Affidavit of Rose Lee McIntyre, December 5, 2014
  - Exhibit 57: Partial transcript of Lamonte McIntyre Waiver Hearing, June 28, 1994
  - Exhibit 58: Affidavit of Caroline Adams, July 31, 2014
  - Three investigative reports of Caroline Adams
    - LMKSDC_0004657 Contact with Josephine Quinn on 1/3/1995
    - LMKSDC_0004658 Contact with Niko Quinn on 2/5/1995
    - LMKSDC_0004659 Contact with Ruby Mitchell on 2/20/1995
  - Exhibit 59: Partial Transcript Jury Trial, Kansas v. McIntyre, September 28 and 29, 1994 (testimony of Yolanda Johnson)
  - Exhibit 60: Printout of Kansas City Department of Corrections search results of Gregory Hill
  - Exhibits 61 and 62, LMKSDC_0026206–26245 Cover and pages of two spiral notebooks containing notes of Rose Lee McIntyre
- LMKSDC_000452–453 Affidavit of Greg Hill, dated 9/28/2011 by affiant and notary with additional stamped date of 8/27/2015 by notary.
- GOLUBSKI000294-296 Newspaper article "Miscarriage of Justice"
- GOLUBSKI000297-298 Newspaper article "Miscarriage of Justice",
- LMKSDC_0009632–937 University of Kansas Health System, After Visit Summary for Rosie L. McIntyre on June 18, 2019
- LMKSDC_0026945–25962 Social Security Administration Rec'ds regarding to Rosie L. McIntyre
- LMKSDC_009537–9631 Records from Wyandot Center for Community Behavioral Health concerning Rosie McIntyre
- LMKSDC_0026183–26189 Letter from Rose McIntyre to Reverend Rice
- LMKSDC_0026190–26193 Letter from Rose McIntyre to Reverend Rice
- LMKSDC_0026194–26196 Letter from Rose McIntyre to Montel

**EXPERT QUALIFICATIONS:**

I am currently a Criminal Behavior Analyst providing contract services to Park Dietz & Associates (PD&A). I was a Special Agent of the Federal Bureau of Investigation (FBI), retiring after 21 years of service in 2011. From 1990 to 2001, I investigated a variety of federal criminal violations, mostly in the white collar and violent crime programs. In 2001, I became a certified FBI Polygraph Examiner, continuing to conduct criminal investigations while also administering polygraph examinations in criminal and personnel security investigations for the Houston Division of the FBI. In 2006, I left the Houston Division after being selected as a Supervisory Special Agent (SSA) to the FBI Security Division, Polygraph Unit. In 2008, I left the Security Division after being selected to the FBI's Behavioral Analysis Unit (BAU), Quantico, Virginia. Agents in the BAU, referred to as *criminal profilers*, provide expert advice to federal, state, and local law enforcement agencies in bizarre, unusual, and repetitive investigations of violent crime. While there, I provided expert advice in numerous investigations. I received an individual certificate of achievement award from the FBI Director before retiring in 2011.

In 2011, I became a contract polygraph examiner and analyst for the U.S. Department of State, Diplomatic Security Branch, working exclusively at embassies and consulates in high threat posts in Afghanistan and Iraq. In 2015, I became a contract polygraph examiner and analyst for the National Geospatial Intelligence Agency, Security Installation, and continue this employment on a part-time basis. I became an adjunct faculty instructor in the Forensic Psychology Master's Degree program at George Washington University, Washington, D.C., in 2015 and I am currently teaching a course in forensic interviewing in the Fall and Spring semesters. This course includes lectures and assignments on criminal profiling, a component of forensic interview preparation and planning as well as in-interview behavioral assessment. I have been a Criminal Behavior Analyst for PD&A since 2018.

I have a B.S. in Public Administration from the University of Tennessee Martin, a certificate of graduate studies in Psychophysiological Detection of Deception from the National Center of Credibility Assessment (U.S. Department of Defense), and an M.A. in Forensic Psychology, Argosy University, Washington, District of Columbia. I hold a Security Fundamentals Professional Certification (SFPC) from The Center for Development of Security Excellence (CDSE).

My Curriculum Vitae (CV) is attached as an exhibit to this report and made a part hereof.

**SUMMARY OF RELEVANT CASE FACTS:**

James McCloskey of Centurion Ministries was essentially an investigator, seeking evidence and information to prove Lamonte McIntyre was wrongly convicted of a double homicide in 1994, but also that of an advocate for Lamonte McIntyre, coordinating efforts to present evidence and information to the Wyandotte County District Attorney's Office that might lead to Lamonte McIntyre's exoneration. During an October 13, 2021, deposition of James McCloskey he described the process Centurion Ministries went through when cases were received, indicating they were first vetted, then an investigation would take place if warranted (pp. 10-25). James McCloskey described his efforts to obtain evidence and information showing Lamonte McIntyre was wrongfully convicted of murder in 1994 after Centurion Ministries determined that his case had merit.

In his October 13, 2021, deposition, James McCloskey interest in the case in the summer of 2008 and upon reviewing what Centurion Ministries had gathered to date, authored over a 20-page memorandum describing the case and why he believed Lamonte McIntyre was innocent based on Centurion's initial review. From there, Centurion Ministries and Mr. McCloskey "committed" to the case and Mr. McCloskey began personally investigating the matter making around nineteen visits to Kansas City. (Mr. McCloskey Tr. 31–33). This included several meetings with Lamonte McIntyre's mother, Rose McIntyre. According to James McCloskey, he and Rose McIntyre eventually became friends. (Mr. McCloskey Tr. 33–34)

In a June 17, 2021, deposition of Rose McIntyre, she confirms telling James McCloskey she was sexually assaulted in the late 1980s by Roger Golubski, who was a detective with the Kansas City, Kansas, Police Department (KCKPD) at the time (p. 148). Her account of the encounter is detailed in an affidavit dated December 5, 2014. In the affidavit, Rose McIntyre alleges Roger Golubski sexually assaulted her in the KCKPD building. Rose McIntyre also alleges Roger Golubski attempted to continue a sexual relationship with her after the assault, but she was able to avoid contact with him.

In her June 17, 2021, deposition, Rose McIntyre testified she was unaware Roger Golubski was involved in the 1994 murder investigation of her son until approximately twelve years after her son's conviction (Rose McIntyre Tr. 148). Rose McIntyre testified she became aware and believed

that Roger Golubski was the involved her son's case when talking to Jim McCloskey (Rose McIntyre Tr. 149). This is apparently when Rose McIntyre concluded Roger Golubski framed her son for murder.

In her deposition, Rose McIntyre testified she is alleging Roger Golubski "framed her son for murder" because she did not have a sexual relationship with him (Rose McIntyre Tr. 150). She also testified the only reason she did not come forward during her son's murder trial was her lack of knowledge that Roger Golubski was involved in the murder investigation (Rose McIntyre Tr. 152).

## FALSE INFORMATION IN INVESTIGATIVE INTERVIEWS

Interviewing solves more criminal cases than any other investigative technique. False information is the biggest threat to the reliability of information obtained during interviews. False information is common in interviews of guilty suspects who attempt to deceive their interviewers and avoid detection. Less common are false confessions from innocent suspects and false allegations by people claiming to be victims and witnesses of crimes. While all three forms of false information are problematic in criminal investigations, false confessions and false allegations are generally more difficult to detect.

The problems with false information obtained during investigative interviews is not limited to criminal investigations. False information has also been cited as being problematic in clinical interviews. And it would be unreasonable to assume any type of investigation is completely immune from obtaining false information during interviews whether criminal or civil in nature, especially when measures are not in place to prevent or discourage false information from interviewees.

A significant amount of research has been dedicated to the prevention and identification of deception, false confessions, and false allegations in investigative interviews. Most of this research has focused on law enforcement interviews, but the results can be applied to investigations of many non-criminal matters as well.

### Deception

The most reliable method of detecting deceptive statements from interviewees is to determine if the information conflicts with other facts, statements, and evidence known to be true. Investigators can also look for verbal indicators of deception, which are less reliable, or non-verbal indicators of deception, the least reliable of all.

## False Confessions

There are three types of false confessions. A *coerced* false confession happens when an innocent person tells an interviewer "what they want to hear" to escape the pressure to confess. An *internalized* false confession happens when a person is convinced they have committed a crime when, in fact, they have not. A *voluntary* false confession happens when an innocent person volunteers that they have committed a crime, typically for attention or fame.

## False Allegations

There are two types of false allegations. False allegations for *gain* involve gaining sympathy or compensation, eliminating competition, covering up a crime, or exacting revenge on another. The most studied form of false allegations for gain involves sexual assaults. *False memories* occur when someone is convinced they were the victim of a crime when, in fact, they were not. The most studied form of false memories also involves sexual assaults.

## Investigative Interview Methods

To guard against false, inaccurate, or otherwise unreliable information, most law enforcement investigators receive extensive training in proper interview techniques. Research on the reliability of information obtained during investigative interviews and techniques to obtain the highest quality of "psychological evidence" possible has been integrated into the training materials for law enforcement.[1] This type of training exists not only in law enforcement academies, but within the continuing education materials for law enforcement officers. Investigators understand their interview skills are critical in preventing false, inaccurate, or misleading information.

The use of different question types, such as open-ended questions, direct questions, suggestive questions, and option-posing questions, is one of the most researched areas of investigative interviewing.[2] Many law enforcement training manuals prescribe the "funnel approach" when conducting victim, witnesses, and suspect interviews. Using this approach, investigators begin with open-ended questions to elicit information in narrative form without interrupting the interviewee. Clarifying questions are then used to elicit information not addressed by an interviewee in their initial

---

[1] Huang, Ching-Yu, and Bul. R. "Applying Hierarchy of Expert Performance (HEP) to investigative interview evaluation."
[2] Huang, Ching-Yu, and Bul. R. "Applying Hierarchy of Expert Performance (HEP) to investigative interview evaluation."

account. Direct questions can then be asked to clarify further details. When asking follow-up questions, investigators must be very careful not to introduce or suggest new information, such as case facts, theories, likelihoods, or rumors that can be adopted by an interviewee on a conscious or sub-conscious level.

The *cognitive approach* to investigative interviewing was introduced in the early 1990s to maximize the amount of information provided by victims and witnesses without compromising accuracy and reliability.[3] This approach, taught internationally to sexual assault investigators, has been extensively researched and improved on since its introduction.[4] The cognitive interview uses a variety of science-based techniques to enhance free recall while avoiding the use of suggestable question types.

Regardless of how credible an interviewee may appear, or whether the interviewee is considered a victim, witness, or suspect, law enforcement investigators are trained to scrutinize and test the accuracy of all information provided during investigative interviews. Even experienced investigators understand they are not immune to making errors when judging the reliability of an interviewee's statements. Truth default theory suggests we all tend to believe what others are saying since most verbal communication is not deceptive.[5] By believing others, we will be correct more often than not. While, blanket belief makes communication more efficient, our truth default makes us susceptible to deception and accepting incorrect information from others, even when it appears unreliable. Law enforcement investigators are trained to keep their truth bias "in-check".

**EVALUATION OF RELEVANT INFORMATION**

Applying what is known about false information obtained during investigative interviews, Rose McIntyre should have been treated as a high risk of providing false information during the wrongful conviction investigation of Lamonte McIntyre.

Research strongly suggests that some people are at a higher risk of providing false information during investigative questioning than others due to dispositional and situational risk factors.[6] Dispositional risk factors

---

[3] Fisher, R.P., Geiselman, R.E., "Memory enhancing techniques for investigative interviewing: The cognitive interview." Springfield, IL: Charles C. Thomas (1992).

[4] Rachel Zajac, N.J., Ali, M.M. and Powell, M. "Investigative interviews with adult sexual assault complaints." In: *Evidence-based investigative interviewing*. New York:Routledge (2019): 177-192.

[5] Levine, Timothy R. "Truth-default theory (TDT) a theory of human deception and deception detection." *Journal of Language and Social Psychology* 33, no. 4 (2014): 378-392.

[6] Kassin, Saul M., et.al., "Police-induced confessions: Risk factors and recommendations."

concern the mental state and cognitive abilities of a person being interviewed. Situational risk factors concern the physical and conditional environment in which interviews are conducted. A combination of dispositional and situational risk factors is typically involved when false information, admissions, and confessions are provided.

## Dispositional Risk Factors

During much of the investigation into the wrongful conviction of Lamont McIntyre, Rose McIntyre was suffering from various forms of depression and anxiety. Some of the relevant information from Rose McIntyre's mental health records are described below.

In a letter to Rose L. McIntyre from the Social Security Administration, Office of Hearings and Appeals dated July 19, 1997, in an attachment tiled DECISION by William E. Zleit, on p. 6 (LMKSDC_0026951), Zleit writes:

> Claimant reported precipitating and aggravating factors consisting of being nervous, tense, forgetful, anxious and short of breath and having thoughts of suicide, difficulty concentrating and decreased energy level.

In a second attachment to the letter titled "OHA Psychiatric Review Technique Form", pages 11 and 12 (LMKSD_002956 and LMKSD_ 002957), boxes are checked indicating that Rose McIntyre has, among other symptoms, "Difficulty thinking or concentrating", "Hallucinations, delusions, or paranoid thinking", and "Recurrent and intrusive recollections of a traumatic experience, which are a source of marked stress".

In records from Wyandot Center for Community Behavioral Health, in a document titled Wyandot Center Psychiatric Evaluation dated 4/13/2010 (LMKSDC_0009572), by the heading "Significant history since last visit", among other language, it says, "She is finding her contact with the Innocence Project to be stressful, however, and she has an occasional panic attack." In another document titled Wyandot Center Psychiatric Evaluation dated 1/6/2012 (LMKSDC_0009576), by the heading "Significant history since last visit", among other language it says, "Reports stressor: son was arrested for a murder he said he did not commit. Reports the Innocence Project has been involved. Reports this has been a chronic stressor."

According to the report of George Woods, Jr., M.D., dated May 27, 2021, regarding his neuropsychiatric examination of Lamonte McIntyre and his mother, Rose McIntyre, Woods says on page 10, "Rosie meets the clinical criteria for complex post-traumatic stress disorder, as well as the major

depressive disorder, severe, recurring, for which she has been treated for many years. On page 11 Woods explains, "The dissociation Rosie experiences, which is a breakdown in self-organization that has lasted for years, is consistent with her diagnosis of complex post-traumatic stress disorder, as well as major depressive disorder."

Research suggests that Rose McIntyre's mental health symptoms, when combined with suggestive questioning/language and information contamination (providing information the Rose McIntyre did not otherwise know), could put her at a higher risk for providing an internalized false confession or adopting a false memory.

**Situational Risk Factors**

During Jim McCloskey's investigation to collect evidence and information to prove Lamont McIntyre was wrongfully convicted, he had many meetings with Rose McIntyre. In his October 13, 2021, deposition, Jim McCloskey agreed he had numerous conversations with Rose McIntyre about Roger Golubski before Rose McIntyre mentioned the alleged sexual assault for the first time. When asked if he mentioned Roger Golubski "allegedly frequenting prostitutes, things of that nature" (p. 89, 90), before Rose McIntyre mentioned the sexual assault, Jim McCloskey responded, "I don't have a clear recollection of that, but I would think that I would tell her what people told me about his behavior in the community over the years, yes" (p.90).  This appears to be a reference to his sharing with Rose McIntyre witness accounts claiming sexual misconduct by Roger Golubski.

By revealing this information to Rosie McIntyre, Jim McCloskey was suggesting to her that Roger Golubski was widely considered to be a sexually deviant and someone who is not suitable to be a law enforcement officer. This information could have led Rose McIntyre to realize such accusations would be important to her son's release while also suggesting that a false allegation of sexual assault against Roger Golubski would be believable. This information could also lead or suggest to Ms. McIntyre that it would not be wrong, but potentially even warranted, because, by providing information of Mr. Golbuski's alleged wrongful conduct, she is led to believe that she is justified.  Research on false confessions suggests this type of minimization can increase the risk of a coerced false confession, especially in combination with other dispositional risk factors such as cognitive impairment and suggestibility.[7]

---

[7] Kassin, Saul M. "The social psychology of false confessions." *Social Issues and Policy Review* 9, no. 1 (2015): 25-51.

Jim McCloskey was also asked about his response when Rose McIntyre first told him that Roger Golubski had allegedly raped her. He said it was "hard to hear" (p. 126). Jim McCloskey was then asked, "You assumed it was true from the get-go?" He answered, "Absolutely" (127). From this statement, it does not appear Jim McCloskey challenged or otherwise scrutinized the allegation made by Rose McIntyre, despite there being reason to do so. This may be explained by confirmation bias as Mr. McCloskey testified, he believed in Lamonte McIntyre's innocence prior to beginning his own investigation when he wrote his 20-plus-page memorandum in January 2009. Experimental research on false confessions supports a theory that confirmation bias leads investigators to look for behavioral cues from interviewees that confirm their beliefs and disregard those that do not.[8] This resulted in false assumptions that negatively influence interview outcomes.

Additionally, Mr. McCloskey's deposition testimony further reveals his own confirmation bias when he testified he would only prepare a summary of a witness interview if information provided was "helpful to the cause or significant." (Mr. McCloskey Tr. 25) Confirmation bias is another concerning situational risk factor present in this case.

As her friend, it is understandable Jim McCloskey would not want to delve into such a sensitive topic with Rose McIntyre, but as an investigator, he should have considered the possibility that the information was inaccurate due to Rose McIntyre's desire to see her son exonerated and that fact that he, himself, may have created a situation where a false allegation could arise. This put Rose McIntyre at a higher risk for telling Jim McCloskey "what he wanted to hear", a rationale that can lead to a false confession.[9]

## OPINIONS

The following opinions were made after an evaluation of the relevant information provided to me at the time of this report and are based on my education, training, and experience in the area of investigative interviewing. I have attempted to support my conclusions with selected peer-reviewed research in the relevant areas.

---

[8] Narchet, Fadia M., Christian A. Meissner, and Melissa B. Russano. "Modeling the influence of investigator bias on the elicitation of true and false confessions." *Law and human behavior* 35, no. 6 (2011): 452-465.
[9] Ibid.

False allegation in the form of sexual assaults are not uncommon. In an analysis of raw data from the FBI Uniform Crime Report (UCR) from 2006 through 2010, researchers found 5% of all rape cases were determined by law enforcement to involve false and baseless allegations, a rate higher than all other UCR crimes.[10] A body of research indicates a majority of false allegations of rape were made for some form of gain, primarily emotional.[11]

## Risk of *coerced false confession (false allegation for gain)*

A combination of dispositional and situational risk factors increased Rose McIntyre's risk of providing a   coerced false confession during interviews associated with the wrongful conviction investigation of Lamonte McIntyre. In this investigation, a *false allegation for gain* could also be categorized as a coerced false confession since both would involve reasoning associated with "telling an interviewer what they wanted to hear".

Researchers have attributed coerced false confessions to situations where interviewees have provided false or inaccurate information during investigative questioning simply to avoid interrogative pressure or to please investigators.[12] This typically occurs in lengthy or repetitive interviews when suggestive questioning techniques are used.[13] Most people adopt a resistant coping strategy during interrogative questioning and do not readily acquiesce when presented with leading, assumptive, or otherwise suggestive question forms[14]. This strategy involves a degree of focus and motivation to resist "going along" with interviewers and providing false information. The focus and motivation to resist may be lacking in depressed individuals, especially when long-term consequences are not considered. Without the drive and ability to resist suggestive questioning, a person with depression or anxiety may give in to an interviewer who is pressuring them to answer questions, whether this pressure is being applied intentionally or unintentionally. This can result in a pattern of compliant responding where an interviewee provides answers that agree with an interviewer's

---

[10] De Zutter, A. W. E. A., Robert Horselenberg, and Peter J. Van Koppen. "The prevalence of false allegations of rape in the United States from 2006-2010." *Journal of Forensic Psychology* 2, no. 2 (2017): 1-5.

[11] De Zutter, André W.E.A., Robert Horselenberg, and Peter J. Van Koppen. "Motives for filing a false allegation of rape." *Archives of sexual behavior* 47, no. 2 (2018): 457-464.

[12] Kassin, Saul M. "False confessions: Causes, consequences, and implications for reform." *Current Directions in Psychological Science* 17, no. 4 (2008): 249-253.

[13] Kassin, Saul M., Steven A. Drizin, Thomas Grisso, Gisli H. Gudjonsson, Richard A. Leo, and Allison D. Redlich. "Police-induced confessions: Risk factors and recommendations." Law and human behavior 34, no. 1 (2010): 3-38.

[14] Gudjonsson, Gisli H., and Noel K. Clark. "Suggestibility in police interrogation: A social psychological model." *Social Behaviour* (1986).

suggestions without actually accepting them.[15] Research in this area supports theories that people experiencing negative affective states, when subjected to pressure during investigative interviews, are prone to suggestible responding.[16]

In Rose McIntyre's case, she met with Mr. McCloskey numerous times—each time he would visit Kansas City—and Mr. McCloskey would update her about the investigation, including Roger Golubski's alleged sexual misconduct. These meetings were numerous and occurred over an extended period of time. Further, as Mr. McCloskey stated, he developed a close personal friendship with Rose McIntyre, which would indicate she had liked Mr. McCloskey and had a desire to help him and provide helpful information to him, in addition to her personal motivations to help her son. This, in conjunction with the fact that Rose McIntyre's medical records indicate her interactions with the "Innocence Project" was a chronic stressor, and her strong sense of guilt for her son's conviction (Dr. Woods' report, p. 8), would make her ability, or even desire, to resist suggestive questioning and information contamination more difficult. As a result, Ms. McIntyre was at and increased and significant risk of *coerced false confession* in the form of in the form of a false allegation for gain for reasons.

## Risk of an *internalized false confession* (*false memory*)

A combination of dispositional and situational risk factors increased Rose McIntyre's risk of an internalized false confession during interviews associated with the wrongful conviction investigation of Lamonte McIntyre. In this investigation, a *false memory* could also be categorized as an internalized false confession since both would be the product of suggestible language and information contamination from an interviewer. A false allegation of sexual assault for gain could also be categorized as a coerced false confession because both would involve the mindset of "telling an investigator what they want to hear".

Research on the reliability of victim and witness testimony indicates some people are more prone to accepting misinformation as reality, creating

---

[15] Gudjonsson, Gisli H. "Psychological vulnerabilities during police interviews. Why are they important?" *Legal and criminological Psychology* 15, no. 2 (2010): 161-175.
[16] Wolfradt, Uwe, and Thomas Meyer. "Interrogative suggestibility, anxiety and dissociation among anxious patients and normal controls." *Personality and Individual Differences* 25, no. 3 (1998): 425-432.; McGroarty, Allan, and Heather Thomson. "Negative emotional states, life adversity, and interrogative suggestibility." *Legal and criminological psychology* 18, no. 2 (2013): 287-299.

the potential of an *internalized* false confession.[17] This is when someone truly believes they were involved in a crime when, in fact, they were not. *Memory distrust* plays an important role in the acceptance of misinformation. Memory distrust occurs when people lose confidence in their ability to accurately remember things. *State* memory distrust occurs after a situational cognitive failure and may be brief. *Trait* memory distrust is the result of repeated cognitive failures and is more pervasive.

People scoring high on personality characteristics such as empathy, self-monitoring, and dissociation, have been found to have a greater susceptibility to misinformation.[18] This dispositional risk factor, in combination with the situational risk factor of suggestive questioning can lead to false memories. Elizabeth Loftus, a renowned expert on false memories, explains:

> Misinformation can cause people to falsely believe that they saw details that were only suggested to them. Misinformation can even lead people to have very rich false memories. Once embraced, people can express these false memories with confidence and detail.

False memory has been identified in the research as one of several pathways to false allegations of sexual assault.[19]

Again, Rose McIntyre had numerous interactions with Mr. McCloskey where he contaminated her memory by sharing information about Roger Golubski's alleged sexual misconduct.  This, along with Mr. McCloskey's close personal friendship with Rose McIntyre, her mental state of depression and anxiety and chronic stress when dealing with Centurion Ministries, and her guilt for her son's conviction, created increased and significant risk of *internalized false confession* in the form of a false allegation for gain.

## CONCLUSION

During Jim McCloskey's investigation concerning the wrongful conviction of Lamont McIntyre, he had many meetings with Lamonte McIntyre's mother, Rose McIntyre.  During these meetings, he testified he conveyed the information he was hearing about Roger Golubski, including alleged sexual misconduct. It was not until "probably 2010, when [Mr.

---

[17] Gudjonsson, Gisli Hannes, Jon Fridrik Sigurdsson, Arndis Soffia Sigurdardottir, Haraldur Steinthorsson, and Valgerdur Maria Sigurdardottir. "The role of memory distrust in cases of internalised false confession." *Applied Cognitive Psychology* 28, no. 3 (2014): 336-348.
[18] Loftus, Elizabeth F. "Planting misinformation in the human mind: A 30-year investigation of the malleability of memory." *Learning & memory* 12, no. 4 (2005): 361-366.
[19] O'Donohue, William T. "Understanding False Allegations of Sexual Assault." In *Handbook of Sexual Assault and Sexual Assault Prevention*, pp. 537-549. Springer, Cham, 2019.

McCloskey had] been working on the case and visiting with [Rose McIntyre] each trip where she and Golubski – [they] talked about Mr. Golubski" did Rose McIntyre convey the encounter that allegedly occurred approximately 22 years earlier.

As a result of certain dispositional and situational risk factors associated with providing false information in investigative interviews, including contamination and potential suggesting questioning, Rose McIntyre's mental state, with her interactions with the "Innocence Project" being a chronic stressor, along with her desire to help her son and alleviate feelings of guilt, I can say with a reasonable degree of certainty that Rose McIntyre was susceptible to providing a coerced false confession to Jim McCloskey or adopting a false memory as a result of their discussions.

My opinions in this matter are preliminary and based on the information that was available to me when this report was generated. For example, it is my understanding that a second deposition of Rose McIntyre has been planned. Her future testimony may or may not provide additional insight concerning her allegations against Roger Golubski.

Robert Blake McConnell

## APPENDIX B

## CURRICULUM VITAE

## Blake McConnell, MA, FBI (Ret.), SFPC

**SUMMARY**

Blake McConnell retired from the Federal Bureau of Investigation (FBI) in 2011 as a Supervisory Special Agent at the National Center for the Analysis of Violent Crime (NCAVC), Behavioral Analysis Unit (BAU). During his FBI career, Mr. McConnell established himself as an expert in criminal behavior analysis, investigative interviewing, polygraph, and criminal investigation. Since retiring from the FBI, Mr. McConnell has worked as a consultant in criminal behavior analysis, as a contract polygraph examiner for the U.S. Government, and as a graduate level instructor in investigative interviewing techniques.

**CURRENT POSITIONS**

2019: Consultant in Criminal Behavior Analysis, Park Dietz & Associates, Newport Beach, CA and Washington, D.C.

2019: Analyst, Threat Assessment Group, Inc., Newport Beach, California (Violence prevention consulting firm)

2015: Adjunct Faculty Instructor, George Washington University, Forensic Psychology Master's Program

2011: Contract Polygraph Examiner, U.S. Government

**PREVIOUS POSITIONS**

2008 – 2011: Supervisory Special Agent, FBI, NCVAC, BAU, Quantico, VA. The BAU assists federal, state, and local law enforcement agencies in solving bizarre, unusual, or repetitive violent crimes. While there, Mr. McConnell analyzed case files and provided expert advice to help solve these investigations. He also conducted research and provided training to law enforcement officers in special investigative interviewing techniques.

2008: Acting Unit Chief, FBI Polygraph Unit, Headquarters. Mr. McConnell managed the FBI's Polygraph Program for a six-month period. While in this position, Mr. McConnell testified as the government's expert witness in a

rare Daubert hearing on the admissibility of polygraph results in federal court.

2006 – 2008: Supervisory Special Agent, FBI Polygraph Unit, Headquarters. Mr. McConnell managed various aspects of the FBI's polygraph program, to include polygraph examiner oversight and training. He also assisted in writing and implementing polygraph policy and procedures. While in this position, Mr. McConnell was called upon by FBI upper management to develop investigative interview guides and provide training to FBI security personnel after deficiencies were identified in that program.

2001 – 2006: Special Agent Polygraph Examiner, FBI Houston Field Office. Mr. McConnell conducted hundreds of polygraph examinations in criminal investigations and personnel security matters. He also provided training to federal, state, and local law enforcement personnel in investigative interviewing techniques.

1990 – 2001: Special Agent, FBI, Houston Field Office. Mr. McConnell conducted hundreds of investigations in violent crime, white collar crime, and civil rights cases. He also assisted state and local law enforcement agencies in criminal investigations with a federal nexus, such as kidnappings and fugitive investigations.

**EDUCATION**

2005: M.A. Forensic Psychology, Argosy University, Washington, D.C. (This is a joint degree with the Department of Defense National Cerner for Credibility Assessment)

2001: Certificate of Graduate Studies, National Center of Credibility Assessment, Ft, Jackson, SC

1984: B.S. Public Administration, University of Tennessee at Martin

**CURRENT CERTIFICATIONS**

Certified Polygraph Examiner, National Geospatial Intelligence Agency (NGA) since 3/24/2014

Security Fundamentals Professional Certification (SFPC) by The Center for Development of Security Excellence (CDSE) on 7/24/2020

**ADDITIONAL TRAINING**

2021 Federal Interagency Polygraph Seminar (40 hours of instruction satisfying continuing education requirements of all federal polygraph examiners), via videoconference.

2019 Federal Interagency Polygraph Seminar, Chantilly, VA

2018 Federal Interagency Polygraph Seminar, Springfield, VA

2016 Federal Interagency Polygraph Seminar, Arlington, VA

2014 Federal Interagency Polygraph Seminar, Springfield, VA

2011 Counterterrorism Driving Course, Department of State

2011 Iraq Familiarization, Department of State, Foreign Service Institute, Arlington, VA

2011 Afghanistan Familiarization, Department of State, Foreign Service Institute, Arlington, VA

2010 Turn to Political Violence, Dr. Marc Sageman

2010 International Homicide Investigators Association (IHA) Annual Training Symposium, Sparks, NV

2010 NCAVC Phase I Certification Training – FBI NCAVC, Stafford, VA, 10 weeks

- Basic Psychology of Offenders (SSA Dr. Tia Hoffer)

- NCAVC overview

- Violent Crime Apprehension Program overview (SSA Michael Harrington)

- Biology & Genetics of Violence (Dr. Jay Phelan)

- Personality Disorders Relating to Criminal Behavior (Dr. Phil Erdberg)

- Neurobiology of Violence (Dr. Debra Niehoff)

- Research Principles (NCAVC RC Yvonne Muirhead)

- Psychopathy (Dr. Adelle Forth)

- FBI Laboratory Overview of Services (Various presenters)

- Abnormal Psychology (Dr. Greg Saathoff)

- Threat & Risk Assessment (Dr. Reid Meloy)

- Suicidology (Dr. David Jobes)

- Critical Incident Response Group Capabilities (Various presenters)

- Geographic Profiling (ATF SSA Rhonda Trahern)

- Criminal Investigative Analysis Concepts (SSA Susan Kossler)

- Deception/Statement Analysis (SSA Andre Simons)

- Statement Analysis Case Study (ATF SSA Ron Tunkel)

- General Assessment Questionnaire (SSA Dr. Tia Hoffer)

- Behavioral Aspects of Interviewing (SSA Bob Drew)

- Polygraph (Polygraph Unit UC Bob Hilland)

- Basic Homicide Investigation / Best Practices (Tim Keel)

- Major Case Management (SSA Susan Kossler)

- Crime Scene Assessment/Homicide Case Studies (SSA Jim McNamara)

- Intimate Partner Violence/Homicide Case Study (SSA Kim Quesinberry)

- Roger Allen Homicide Case Study (Tim Keel)

- Robert Armstrong Homicide Case Study (SSA Bob Drew)

- Serial Sexual Assault Investigation (SSA Armin Showalter)

- Texas Serial Rape Case Study (SSA Bob Drew)

- 911 Calls & Statement Analysis (SSA Sue Adams)

- False Allegation Research & Case Studies (SSA Jim McNamara)

- NY Serial Rape Case Study (SSA Jim McNamara)

- Decomposition/Taphonomy (SSA Bob Morton)

- Equivocal Death Investigation/Case Study (SSA Dan Bermingham)

- No Body Homicide/Case Studies (SSA Jim McNamara)

- Sexually Motivated Murder (SSA Bob Morton)

- Serial Murder (UC Mark Hilts)

- Kansas City Serial Murder Case Study (SSA Armin Showalter)

- Hong Kong & London Serial Murder Case Studies (SSA Jim McNamara)

- Serial Murder Case Studies (SSA Bob Morton)

- Advanced Concepts in Criminal Psychology (Dr. Louis Schlesinger)
- Radicalization & Jihad (Dr. Patrick Sookhdeo)
- Interview & Interrogation (SSA Tom Neer, ret.)
- Counter Terrorism (Dr. Bruce Hoffman)
- Radicalization (Dr. John Horgan)
- Islamic Law / Terrorism (Steve Coughlin)
- Explosives (SSA Kirk Yeager)
- Risk Assessment (Dr. Phil Resnick)
- Arson Bombings (ATF SSA Ron Tunkel)
- Targeted Violence (Dr. Randy Borum)
- Child Abduction Research Projects (SSA Jim Beasley)
- Child Injuries (Dr. Tracey Corey,MD)
- NDURE
- Child Abduction Case Studies (Wayne Koka)
- Interviewing Child Sex Offenders (Dr. Michael Bourke)
- Maternal Filicide (Joy Shelton)
- Child Abduction Exercise (SSA William Donaldson)
- Child Abduction Response Plan & Case Examples (SSA William Donaldson)
- Child Sex Offenders (Dr. Peter Collins)
- Cellular Telephone Tracking
- NCAVC/BAU/CAC History (SSA Ken Lanning, ret.)
- Sexual Exploitation of Children (SSA Jennifer Eakin)
- False Allegation in Child Abductions (SSA William Donaldson)

2009 Kinesic Interview & Interrogation, Phase I & II, Stan Walters, Indianapolis, IN

2009 Crimes Against Children Conference; Dallas, TX

2009 Behavioral Analysis Program Seminar; FBI BAP, Stafford, VA

- Get Anyone To Do Anything (Dr. David Lieberman)

- False Memory (Dr. Elizabeth Loftus)

- Non-verbal Communications (Dr. David Givens)

2009 Seminar in Homicide Investigations; Harvard Associates of Police Science,

Baltimore, MD

2008 FBI Chief Security Officer's Conference, Orlando, FL

2008 FBI Polygraph Examiners Annual Conference, San Francisco, CA

2008 FBI Chief Security Officer's Conference, St. Louis, MO

2008 NCAVC, ViCAP, Highway Serial Killings Initiative National Seminar, Los

Angeles, CA

2007 Counterintelligence Screening Elicitation Course, DoD PI, Ft. Jackson, SC

2007 FBI Polygraph Examiners Annual Conference, Quantico, VA

2006 FBI Chief Security Officers Conference, Orlando, FL

2006 Interview Strategies Through Statement Analysis, FBI Training Division, FBI Academy, Quantico, VA

2006 FBI Polygraph Examiners Annual Conference, San Antonio, TX

2005 FBI Polygraph Examiners Annual Conference, Las Vegas, NV

2004 Advanced Instructor Certification Course, FBI Training Division, Quantico, VA

2003 Instructor Development Course, FBI Training Division, Houston, TX

2003  Behavioral Assessment and Elicitation, CIA, FBI Academy, Quantico, VA

2003 FBI Polygraph Examiners Annual Conference, Jacksonville, FL

2002 FBI Polygraph Examiners Annual Conference, San Antonio, TX

2001 The Reid Technique of Interview/Interrogation, San Antonio, TX

2001 Advanced Course on The Reid Technique of Interview/Interrogation, San Antonio, TX

2001 FBI Polygraph Examiners Annual Conference, Ft. Lauderdale, FL

2000 Mortgage Fraud In-Service, FBI Academy, Quantico, VA

2000 Fraud Training Seminar, Int'l Assn. of Financial Crimes Investigators, Houston, TX

1999 Crimes Against Children Conference, Dallas, TX

**INVESTIGATIVE INTERVIEWING TRAINING PROVIDED** (Topics include case analysis, behavioral analysis, detecting deception, elicitation of truthful information)

2016 Special Issues - Virginia Polygraph Association, Annual Conference, Virginia Beach, VA

2011 Basic Course – New Agents, FBI, Richmond, VA

2011 Special Issues - FBI, Innocent Images National Initiative, Linthicum, MD

2011 Special Issues - NCAVC Regional Seminar, Hershey, PA

2010 Special Issues - NCAVC Regional Seminar, Albuquerque, NM

2010 Special Issues - NCAVC Regional Seminar, San Antonio, TX

2010 Special Issues - Montana Violent Crime Investigators Association, Annual Conference, Missoula, MT

2009 Special Issues - NCAVC Regional Seminar, Houston, TX

2009 Special Issues - NCAVC Regional Seminar, Los Angeles, CA

2009 Special Issues - U.S. Attorney's Project Safe Childhood Seminar, Richmond, VA

2009 Special Issues - Annual Forensic Seminar, Foley, AL

2009 Basic Course - FBI, Springfield, MO

2009 Psychopathic Offenders - Child Abduction Response Seminar, San Diego, CA

2008 Special Issues - FBI, National Center for the Analysis of Violent Crimes (NCAVC) Highway Serial Killer Initiative Seminar, Los Angeles, CA

2008 Using the New Security Interview Guide - FBI Chief Security Officers Conference, St. Louis, MO

2007  Basic Course - Texas Department of Criminal Justice, Office of Inspector General

2006  Basic Course - Texas Department of Criminal Justice, Office of Inspector General

2006  Basic Course - Pasadena Police Department, Pasadena, TX

2006  Basic Course - Texas Department of Criminal Justice, Office of inspector General

2004  Basic Course - U.S. Coast Guard, Galveston, TX

2004  Basic Course - Texas Department of Criminal Justice, Office of Inspector General

2004  Basic Course - FBI New Agents, Houston, TX

2005  Basic Course - Texas Department of Criminal Justice, Office of Inspector General

2005  Basic Course - Federal Air Marshals, Houston, TX

2005  Special Issues - Protecting Texas Children's Conference

2003  Basic Course - FBI New Agents, Houston, TX

2003  Basic Course - Colombia National Police, Bogota, Colombia

**POLYGRAPH PRESENTATIONS GIVEN**

2018  Research Findings, Evidence Recognition Sensor – Federal Interagency Polygraph Seminar, Springfield, VA

2018  Research Findings, Evidence Recognition Sensor - American Polygraph Association, Annual Conference, Austin, TX

2010  The Concealed Information Test – International Homicide Investigators Association, Annual Conference, Sparks, NV

2011  Research Findings: Polygraph in Child Abduction Investigations, FBI Child Abduction Rapid Deployment Team Annual Conference

2009  The Directed Lie Polygraph Technique - FBI Polygraph Examiners Conference, San Francisco, CA

2008  Polygraph in Personnel Security Investigations - FBI Chief Security Officers, Conference, Orlando, FL

2007 Polygraph in Personnel Security Investigations - FBI Chief Security
      Officers, Conference, Orlando, FL

**PUBLICATIONS**

2018 Interview and Interrogation in Serious Crime Investigations, by Blake
      McConnell, Published in The Handbook of Behavioral Criminology,
      Springer

2018 The Evidence Recognition Sensor, by Timothy Weber and Blake
      McConnell, Published in Polygraph & Forensic Credibility Assessment: A
      Journal of Science and Field Practice

2014 The Concealed Information Test: An Alternative to the Traditional
      Polygraph, by Blake McConnell and Timothy Weber, Published in the
      FBI Law Enforcement Bulletin

APPENDIX C

Prior Testimony

- Superior Court of Fulton County, Georgia: *Tosha Everett, as surviving parent, next of kin and administratrix of the estate of Jaylin Everett, Plaintiff v. Jefferson Family Development, LP, LDG, Jefferson Family Development, LLC and Gateway Management Company, LLC, Defendants*

- *City of Monroe Louisiana v. Corporal Reginald Brown* (Disciplinary Hearing)