**EXHIBIT D**
**TO DECLARATION OF SONA R. SHAH**
**IN SUPPORT OF PLAINTIFFS' MOTION TO**
**EXCLUDE TESTIMONY OF**
**ROBERT BLAKE McCONNELL**

Page 1

```
 1           IN THE UNITED STATES DISTRICT COURT
                FOR THE DISTRICT OF KANSAS
 2
 3     LAMONTE McINTYRE, et al.,)
                                 )
 4                  Plaintiffs, )
                                 )
 5     vs.                       ) 2:18-cv-02545-KHV-KGG
                                 )
 6     UNIFIED GOVERNMENT OF     )
       WYANDOTTE COUNTY AND      )
 7     KANSAS CITY, KANSAS,      )
       et al.,                   )
 8                               )
                    Defendants. )
 9
10
11
12                  DEPOSITION OF ROBERT BLAKE
13     McCONNELL, a Witness, taken on behalf of the
14     Plaintiffs, before Alison A. Tracy, Missouri CCR
15     No. 554, Kansas CSR No. 1525, pursuant to Notice,
16     on the 18th day of January, 2022, via Zoom.
17
18
19
20
21
22
23
24
25
```

Page 6

1  (The deposition commenced at 9:30 a.m.)
2         ROBERT BLAKE McCONNELL,
3  the Witness, being first duly sworn, testified
4  under oath as follows:
5             EXAMINATION
6  BY MS. SHAH:
7     Q.  Hi, Mr. McConnell.  My name in Sona
8  Shah, I'm one of the attorneys for plaintiffs.  I
9  will be asking you some questions today.  Before
10 we get started I just wanted to go over some
11 ground rules pretty quickly.  Of course the court
12 reporter is here, she is taking down everything
13 you say.  We need a written record of all of your
14 questions and answers, so please be sure to give
15 verbal answers and don't just shake your head yes
16 or no in response to my questions.
17        We can take a break at any time that you
18 feel you need a break as long as a question is
19 not pending at the time.  So, please just let me
20 know any time you would like to take a couple of
21 minutes.
22        Finally, your attorneys may object to
23 some of the questions that I ask you, but you
24 should still go ahead and answer those questions
25 unless you are advised by your attorney not to

Page 7

1  answer them.  Does all of that make sense?
2     A.  Yes.
3     Q.  Can you please state your name for the
4  record?
5     A.  Robert Blake McConnell.
6     Q.  And your home address?
7     A.  1414 Mt. Isle Harbor Drive, Charlotte,
8  North Carolina.
9     Q.  Your business address?
10    A.  The same.
11    Q.  Mr. McConnell, are you a psychologist?
12    A.  I am not.
13    Q.  Do you conduct clinical examinations of
14 people?
15    A.  I do not.
16    Q.  Do you consider yourself qualified to
17 diagnose mental health issues?
18    A.  No.
19    Q.  Are you a member of the American
20 Psychological Association?
21    A.  No.
22    Q.  Where are you currently employed,  Mr.
23 McConnell?
24    A.  I'm an independent contractor and I
25 provide services to Park Dietz & Associates.

Page 8

1  Also I'm a polygraph examiner sometimes and I do
2  polygraph examinations for the federal
3  government.
4     Q.  Is there any place else that as an
5  independent contractor you are currently
6  providing services?
7     A.  As an independent contractor -- well,
8  Park Dietz has another company called Threat
9  Assessment Group.  I tentatively had planned to
10 work for them and still might, but I haven't
11 actually provided them with any services.  And
12 then additionally I'm an adjunct faculty
13 instructor at George Washington University.
14    Q.  What are you teaching at George
15 Washington University?
16    A.  The name of the course, it is misnamed,
17 but it is called interviewing and interrogation.
18 Which the discipline in law enforcement used to
19 be call interview and interrogation.  For some
20 reason they have it backwards.  But I asked them
21 to change that to investigative interviewing, but
22 they haven't done that yet.
23    Q.  Have you taught any other classes at
24 George Washington University?
25    A.  No, just that one.

Page 9

1     Q.  Mr. McConnell, do you work with victims
2  of sexual assault?
3     A.  I do not.
4     Q.  Have you worked with victims of sexual
5  assault in the past?
6     A.  I have.
7     Q.  In what capacity?
8     A.  An investigator.
9     Q.  Can you tell me a little bit more about
10 your experience as an investigator working with
11 victims of sexual assault.  Can you provide some
12 more context for me?
13    A.  Sure.  So as an FBI agent one of the
14 places where that might come up and has come up
15 is allegations of sexual assault by prison
16 guards, and that would actually be a civil rights
17 investigation.
18    Q.  What was your role in investigating
19 those claims?
20    A.  My role was, as an investigator was we
21 in the FBI we are the investigative arm of the
22 Department of Justice so any investigations we do
23 are for the Department of Justice.  And in that
24 capacity I was responding to a complaint from
25 multiple victims that they had been sexually

3 (Pages 6 - 9)

Page 14

1  wouldn't come in and talk. I know I had at least
2  one or two of those.
3     Q.  Can you explain what you mean by that?
4     A.  Well, we had an initial complaint, it
5  may have been from the victim or somebody else,
6  maybe from somebody they told, so it seems like I
7  had a couple of cases where we were told by
8  somebody that this person was assaulted. An
9  official case wasn't opened but the complaint
10 came in, we were investigating the complaint. We
11 had to run all of our complaints through the
12 Department of Justice before we could open the
13 case. But, I know I had a couple where I tried
14 to reach out to the victims and they just said
15 they didn't want to get involved in it, they
16 didn't want to go further with the complaint.
17 Or, they may have just said I was just telling
18 that person that I was assaulted. I don't know
19 that that happened. It could have been something
20 like that, that they told somebody they were
21 assaulted but it really didn't happen, they were
22 telling that for some other reason.
23    Q.  This is what they conveyed to you,
24 right? You have no way of knowing as a fact
25 whether the assault ever occurred or not?

Page 15

1     A.  Right. I don't have a recollection of
2  exactly why they didn't want to come in and be
3  interviewed.
4     Q.  Okay. So, in connection with your
5  previous work with victims of sexual assault,
6  when you interviewed victims what were you trying
7  to find out during those interviews? What were
8  your goals in the interviews?
9     A.  Well, just to, first of all, get an idea
10 of exactly happened during those interviews;
11 their account, you could say, so their account of
12 what happened. And then whether I felt like the
13 account that they were giving me was truthful or
14 not, which is with any interview that you do.
15    Q.  What factors did you use to assess
16 whether the account they were giving you was
17 truthful or not?
18    A.  Well, back at that time I would have
19 been -- all of my training would have been by the
20 FBI on indicators of truthfulness and deception
21 and these types of things. And back then what we
22 were taught was indicators of truthfulness and
23 deception by verbal and non-verbal indicators of
24 deception. And I felt the number 1 thing you are
25 looking for is, is what they are saying plausible

Page 16

1  and does it match the evidence in the case.
2     Q.  Do you recall what indicators of
3  deception would have been? Could you give me
4  some examples?
5     A.  I can give you an example of one in that
6  particular case, because all three of those ended
7  up being false allegations. When we reviewed the
8  security footage with one of the victims, the
9  security footage did not match up with what that
10 victim was telling me. So, actually that victim
11 was out of jail at the time. One of the victims
12 was still in jail. For some reason I was having
13 a hard time getting back in touch with the victim
14 whose story didn't match up.
15        So I went back to the jail and
16 interviewed another victim there and I told her
17 that there seems to be some problems with the
18 testimony. And she admitted that they had
19 collectively made this up, that these were false
20 allegations, and that one of the other victims it
21 was her idea to make the allegations against the
22 guard.
23    Q.  What was the goal of them making those
24 allegations?
25    A.  I cannot recall right now why they made

Page 17

1  those up.
2     Q.  So in that case they filed some sort of
3  formal complaint against the guard?
4     A.  They did.
5     Q.  And you had some objective evidence that
6  exposed a flaw in their claims, correct?
7     A.  Correct.
8     Q.  Mr. McConnell, how would you describe
9  your areas of expertise?
10    A.  In this particular case? My areas of
11 expertise are in interviewing and interrogation.
12 A lot of that is ways, based on my, not only my
13 past experience in interviewing and
14 interrogation, but extensive training that I have
15 received in interview and interrogation, of which
16 they are now calling investigative interviewing
17 because of the connotations, the term
18 interrogation, and changes in the way things are
19 done.
20        But, in 2001, I believe, or maybe 2002,
21 I was asked by the Houston division of the FBI,
22 where I was at the time, if I would be available
23 to conduct interview and interrogation training,
24 which is not unusual for polygraph examiners,
25 because we get a lot of that training not only in

| | |
|---|---|
| Page 18<br>1  polygraph school but as part of our continuing<br>2  education. The federal polygraph school, they<br>3  are very good at the interview and interrogation<br>4  training.<br>5    Q. And those interviews and your interview<br>6  and interrogation experience is all in the law<br>7  enforcement context, is that correct?<br>8    A. That's correct.<br>9    Q. Are you an expert on false confessions?<br>10  When I use the term false confessions, I'm<br>11  including false allegations for gain in that<br>12  term, if that makes sense.<br>13    A. Yes. Yes. Because in my, not only my<br>14  extensive training I have had in that but my<br>15  experience in that and also the research that I<br>16  have conducted in that area. When I say<br>17  research, what I mean is looking at research that<br>18  has been conducted in those areas not only for<br>19  the training that I did previous to working at<br>20  George Washington, but since then.<br>21    Q. Your expertise in false confessions is<br>22  in the context of custodial interrogations,<br>23  correct, custodial interrogations, correct?<br>24    A. I would say law enforcement<br>25  investigative interviewing. They are not all | Page 20<br>1  involving multiple assaults. So not all of the<br>2  victims were deceased, but some were.<br>3    So in that aspect, reviewing those cases<br>4  and conducting an analysis on the investigation<br>5  itself, there were some sexual assaults involved<br>6  in those cases.<br>7    Q. And those sexual assaults involved false<br>8  confessions?<br>9    A. In those cases --<br>10    MR. ROACH: I'm going to object to<br>11  form. Do you mean false allegations?<br>12    MS. SHAH: As I clarified at the<br>13  beginning, I'm using false confessions to include<br>14  the idea of false allegations for gain, and I<br>15  think Mr. McConnell and I have an understanding<br>16  on that. But if you need me to I guess ask each<br>17  question twice, I can do that, if you prefer.<br>18    MR. ROACH: I personally thought it<br>19  was unclear. So my objection is to form. You<br>20  can answer if you understand.<br>21    A. So, the question -- can you repeat that?<br>22    Q. (By Ms. Shah) Mr. McConnell can we<br>23  agree that when I use the term false confessions,<br>24  I'm including encompassed by that term is false<br>25  allegation for gain. |
| Page 19<br>1  custodial.<br>2    Q. That's fair.<br>3    A. The reason I'm saying that, there is a<br>4  distinction between custodial, non-custodial, for<br>5  the purposes of Miranda warnings. So these are<br>6  done in non-custodial settings.<br>7    Q. That's an important distinction, I do<br>8  understand. You were previously discussing some<br>9  firsthand experience with false confessions from<br>10  sexual assault victims. Do you have any other<br>11  experiences specific to false confessions by<br>12  sexual assault victims?<br>13    A. Well, not directly. But just to<br>14  elaborate that a little bit. When I was in the<br>15  FBI, my last three years I was in the behavioral<br>16  analysis unit, and that unit there is three,<br>17  there was three units at the time; one was crimes<br>18  against children, one was crimes against adults.<br>19  So I was sitting in the crimes against children<br>20  section but also worked some of the cases crimes<br>21  against adults. So while I wasn't out actually<br>22  interviewing these people, I was reviewing local<br>23  law enforcement cases involving sexual assault.<br>24  Unfortunately a lot of those had resulted in<br>25  death of the victim. But they were usually cases | Page 21<br>1    A. They can be, yes.<br>2    Q. Okay. If you need to make a distinction<br>3  in your answer, I'm happy to accommodate that and<br>4  understand that.<br>5    So, in your experience with the BAU that<br>6  you are describing with sexual assault victims,<br>7  do any of those cases, to your recollection,<br>8  involve false confessions or false allegations<br>9  for gain?<br>10    A. Not that I recall.<br>11    Q. Have you, yourself, ever conducted<br>12  research on false confessions or false<br>13  allegations for gain?<br>14    A. No.<br>15    Q. I see you have never published any<br>16  articles on that topic, correct?<br>17    A. I have not.<br>18    Q. Have you lectured on that topic?<br>19    A. I have in the context that in my courses<br>20  when I was teaching law enforcement officers and<br>21  in my current courses at George Washington<br>22  University I have always included a section on<br>23  false confessions, and sometimes those involved<br>24  false allegations.<br>25    Q. I think you said this in your answer, |

Veritext Legal Solutions
www.veritext.com                                    888-391-3376

Page 22

1  but I just want to make sure that I understand.
2  Those lectures are all in the law enforcement
3  context, correct?
4     A.  Yes.  I'm sorry, can I correct that?
5     Q.  Of course.
6     A.  When I was teaching law enforcement
7  officers, yes, it was all in the law enforcement
8  context.  However, I probably shouldn't say that
9  about George Washington University.  I have been
10 there for about five years now.  That's forensic
11 psychology, so, not all of those people are
12 involved in law enforcement.  Some of those
13 people are involved in clinical, some in
14 correctional settings, some in law enforcement.
15    Q.  Fair point.  Mr. McConnell, would you
16 consider yourself an expert in false memories?
17    A.  An expert in false memories?  No.
18    Q.  Do you have any firsthand experience
19 with false memories in the context of law
20 enforcement interrogations?
21    A.  I do.
22    Q.  Can you describe that for me?
23    A.  Yes.  On at least one occasion that I
24 can remember now I conducted a polygraph of an
25 individual who was cognitively impaired; and to

Page 23

1  what extent, I don't know.  Just that was my
2  impression and I think the impression of other
3  people, too.  He was a suspect in a child
4  abduction case.  My polygraph result was
5  inconclusive probably because just his
6  physiology, he had been away for a long time.  So
7  after the test, based on not only the test
8  results but based on evidence in the case, it
9  certainly looked like he was involved in this
10 abduction, so I interviewed him on that.
11        And he ended up telling me in sort of a
12 third-party context that he had abducted this
13 child, had just done some horrible things to her,
14 disposed of her body, and actually took me to
15 where he was saying the body was disposed of.
16 There was no body there.  He changed his story
17 and said it was at another location.  We went to
18 that location, there was no body there.
19        And so I took him back to the office,
20 and while I was there they found the girl to be
21 alive.  So, I would say that was based on a false
22 memory.
23    Q.  Can you recall any other firsthand
24 experiences with false memories in the context of
25 law enforcement interrogations?

Page 24

1     A.  I had conducted a similar case, a child
2  abduction matter.  It ended up the same way.  But
3  I didn't conduct the interview, all of the
4  interview.  I conducted part of the interview and
5  felt like the person was just, he was slightly
6  cognitively impaired, probably because of drug
7  use, not that he was on drugs at the time but he
8  had used drugs over a long period of time, and a
9  lot of that involves huffing, which you know what
10 that is, it is where you are breathing in aerosol
11 fumes and it has a terrible effect on your brain.
12        So I had interviewed him for a period of
13 time.  It felt like that he was -- I thought he
14 was being honest with me, or that he was just so
15 cognitively impaired, he wasn't sure.  But he
16 never admitted to it verbally.  He would shake
17 his head saying that he did this.  And then
18 someone else came in and interviewed him while I
19 was there, I mean I was sitting there, and he
20 admitted to abducting the child and killing her
21 and disposing of her body in a certain way in a
22 bayou in Houston.
23        They went and searched the bayou and
24 there was no body there.  His confession wasn't
25 believed because of a lot of things.  And I can't

Page 25

1  remember exactly what happened after that.  But I
2  know just not too long after that they did find
3  the girl's body and they know now who did that.
4  So, obviously that was a false confession or
5  false memory.
6        I'm drawing a distinction there, because
7  these people tended to believe, without a lot of
8  coercion, that they actually had been involved in
9  something like that.  I think it is because of
10 their cognitive impairments.
11    Q.  Can you recall any other experiences
12 with false memories in the context of law
13 enforcement investigations?
14    A.  Not mine personally.  But as I teach law
15 enforcement officers they tell me, I have heard a
16 lot of stories about similar things.
17    Q.  So your firsthand experience with false
18 memories is limited to those two child abduction
19 interviews involving cognitively impaired
20 individuals that were later determined to be
21 false, correct?
22        MR. ROACH:  Object to form.
23    A.  Yes, ma'am.
24    Q.  (By Ms. Shah)  It wasn't great.  I can
25 try again.  Mr. McConnell, your firsthand

| | |
|---|---|
| Page 26<br>1  experience with false memories is limited to<br>2  those two interviews in child abduction cases<br>3  that you just discussed in which a cognitively<br>4  impaired individual provided evidence to you that<br>5  you later determined to be false, correct?<br>6         MR. ROACH: Object to form. You<br>7  can answer.<br>8     A.  Yes. As far as my direct involvement<br>9  with that. Otherwise it would be in the<br>10 prevention information, it is a result of false<br>11 memories.<br>12    Q.  (By Ms. Shah) I'm sorry, you cut out<br>13 for a second. It would be in the what of<br>14 information?<br>15    A.  Prevention of information from people<br>16 that may involve false memories.<br>17    Q.  Can you explain what you mean by that?<br>18    A.  Sure. In interviewing and interrogation<br>19 or investigative interviewing you have to guard<br>20 against things like false memories, you have to<br>21 guard against things like false confessions,<br>22 unreliable information. So as far as being an<br>23 expert in the area, I would say my expertise is<br>24 in how to avoid those things while conducting<br>25 interviews. | Page 28<br>1     Q.  I appreciate that distinction. Do you<br>2  lecture on the subject of false memories?<br>3     A.  Yes.<br>4     Q.  Can you give me some more background on<br>5  those lectures?<br>6     A.  Yes. So that would be, as far as<br>7  teaching at George Washington University, I touch<br>8  on those. The reason I touch on those is because<br>9  those students, as a prerequisite to my course,<br>10 have taken courses that involve false eyewitness<br>11 testimony, false memories. So I have to review<br>12 that when we are talking about methods that<br>13 prevent those things. But those students should<br>14 already have a good understanding of how false<br>15 memories happen from a theoretical standpoint.<br>16        So I gave them the case I just explained<br>17 to you where the young man explained this whole<br>18 episode where he killed this girl and disposed of<br>19 her body. I use that as an example in this class<br>20 because it was very unexpected, I did not put a<br>21 lot of pressure on this person. And also I have<br>22 got some videos where that has happened with<br>23 other people. So in that context I have lectured<br>24 on that to explain that this can happen and what<br>25 we need to do to prevent those things from |
| Page 27<br>1     Q.  Do you have any firsthand experience<br>2  with false memories in sexual assault victims?<br>3     A.  No personal where somebody has told me<br>4  of a false memory that has been proven.<br>5     Q.  Have you ever conducted your own<br>6  research on false memories?<br>7     A.  No.<br>8     Q.  So you have never published any studies<br>9  or articles related to false memories, correct?<br>10    A.  Just to be clear, I have published one<br>11 article on interviewing, interview and<br>12 interrogation and how to prevent unreliable -- I<br>13 can't remember in that particular article if I<br>14 mentioned false memories specifically. I may<br>15 have. I'm just not sure right now. But just to<br>16 be specific about that, again it is prevention of<br>17 causing people to have false memories or the<br>18 prevention of obtaining information that is<br>19 unreliable.<br>20        I want to distinguish between being an<br>21 expert in false memories as far as prevention,<br>22 and an expert in false memories in doing research<br>23 on that and actually sitting down with people who<br>24 have been through those things. If that makes<br>25 sense. | Page 29<br>1  happening, or recognize when something like that<br>2  does happen.<br>3     Q.  So it sounds like your focus is more on<br>4  the prevention of false memories rather than<br>5  assessing false memories, is that correct?<br>6     A.  Correct.<br>7     Q.  Just a couple of background questions,<br>8  Mr. McConnell. Have you ever been arrested?<br>9     A.  Yes.<br>10    Q.  Can you provide some background?<br>11    A.  When I was 18 years old I got arrested<br>12 on New Year's Eve. A friend of mine got in a<br>13 fight at a bar and we were kicked out and we were<br>14 leaving and the police pulled me over. Now,<br>15 according to the FBI they could never find a<br>16 record of that. But I was arrested.<br>17    Q.  And what was the reason that you were<br>18 arrested?<br>19    A.  Well, I was charged with DUI. But I<br>20 don't know what -- the guy I was with, I'm not<br>21 sure what happened to him.<br>22    Q.  So were you officially charged with a<br>23 DUI?<br>24    A.  I was. But for some reason nobody can<br>25 find a record of that, from what I understand. |

| Page 38 | Page 40 |
|---|---|
| 1  what time period those cases occurred in?<br>2    A.  No.  Just all of the other testimony I<br>3  would have given in the court proceedings would<br>4  have been as an investigator in the FBI, an<br>5  agent.<br>6    Q.  As an FBI employee?<br>7    A.  Correct.<br>8    Q.  And have you ever been retained as an<br>9  expert on false confessions or false allegations<br>10  for gain before this case?<br>11    A.  No.<br>12    Q.  Have you ever been retained as an expert<br>13  on false memories before this case?<br>14    A.  No.<br>15    Q.  Have you ever previously served as a<br>16  fact witness or a non-expert witness in any cases<br>17  aside from your work with the FBI?<br>18    A.  Testified?<br>19    Q.  Yes, we can start with that.<br>20    A.  No.<br>21    Q.  Have you been deposed as a fact witness<br>22  or non-expert witness in any case?<br>23    A.  No.<br>24    Q.  Have you ever given testimony as an<br>25  expert witness assessing the reliability of | 1  time you have provided an expert opinion<br>2  assessing circumstances or events that occurred<br>3  where there was no law enforcement investigation,<br>4  correct?<br>5        MR. ROACH:  Object to form.  You<br>6  can answer.<br>7    A.  An official, yes, in an official<br>8  capacity it would be limited to that, yes.<br>9    Q.  (By Ms. Shah)  Thank you.  When were you<br>10  first contacted to be an expert witness in this<br>11  case?<br>12    A.  So, as an expert witness, I believe that<br>13  would have been, for this particular matter, in<br>14  November.<br>15    Q.  November of 2021?<br>16    A.  Correct.<br>17    Q.  I would like to introduce your report as<br>18  an exhibit.  I think we are doing that by screen<br>19  share since we are all remote, and I think Ariel<br>20  is going to help me with that.  Ariel, are you<br>21  able to share the report?  My understanding is<br>22  that we are up to -- Exhibit 154 was either the<br>23  last exhibit marked or what we are starting with<br>24  today.<br>25        MS. MANNING:  We will be starting |

| Page 39 | Page 41 |
|---|---|
| 1  statements provided, outside of a law enforcement<br>2  context?<br>3    A.  Sorry, can you repeat that?<br>4    Q.  Let me modify my question a little bit.<br>5  Aside from the Everett case that we just<br>6  discussed, have you ever given an expert witness<br>7  opinion assessing the reliability of statements<br>8  that were given outside of a law enforcement<br>9  context?<br>10        MR. ROACH:  Object to form.  You<br>11  can answer.<br>12    A.  I may have given my opinion about that,<br>13  but I wasn't specifically retained for that or<br>14  asked for that opinion.<br>15    Q.  (By Ms. Shah)  When I say opinion, I<br>16  mean like an official written report or<br>17  testimony.<br>18    A.  No, not for that specifically.<br>19    Q.  The Everett case is the only case where<br>20  you have provided an expert opinion regarding<br>21  statements that were given outside of a law<br>22  enforcement context, correct?<br>23    A.  Well, statements?<br>24    Q.  That's a fair question.  Let me try to<br>25  modify my question.  The Everett case is the only | 1  with that today, 154.<br>2        MS. SHAH:  Thank you, Ariel.<br>3    Q.  (By Ms. Shah)  I'm not sure if<br>4  Mr. McConnell is able to page down in this report<br>5  or not.  Can you go to page 10 of the report,<br>6  Ariel.<br>7        Mr. McConnell, if at any time you want<br>8  to see different pages of this report, please<br>9  just let us know and we will navigate to the area<br>10  you would like to see.  Can you scroll down,<br>11  Ariel.<br>12        Mr. McConnell, your opinions in this<br>13  case begin here at the bottom of page 10 and then<br>14  continue through the end of the report on page<br>15  14, correct?<br>16    A.  I believe that's correct.<br>17    Q.  There are no other opinions that you are<br>18  offering or plan to offer in this case, correct?<br>19    A.  Correct.<br>20    Q.  Can you explain the process that you<br>21  used to develop your opinion?<br>22    A.  So, I reviewed the depositions in this<br>23  case and all of the information.  And speaking<br>24  earlier about criminal investigative analysis,<br>25  this process that we use in the behavioral |

Page 50

1  A. Any documents? I don't recall reviewing
2  any documents.
3  Q. What was the process for making edits to
4  the report? Who did that?
5      MR. ROACH: I'm going to object,
6  ask the witness not to answer.
7  Q. (By Ms. Shah) Mr. McConnell, did you
8  make edits to the report after the initial draft
9  was done?
10  A. Yes.
11  Q. About how many rounds of edits do you
12  recall?
13  A. I'm sorry. Let me back up. The initial
14  draft, did I make edits to it. I believe I did
15  make edits to it. Are you talking about the copy
16  that you have now?
17  Q. Yes.
18  A. No, there has been no -- I guess the
19  draft, I'm thinking that it is kind of a work in
20  progress or living document. There was a draft
21  that I did and then there was some changes made
22  to it, some minor changes, and then kind of a
23  final version that is probably what you have now,
24  if that makes sense.
25  Q. And some of those changes were made by

Page 51

1  you, correct?
2  A. Yes.
3  Q. We have been going for a little bit over
4  an hour. Do you want to take a brief break or
5  would you like to keep going?
6  A. I can keep going.
7  Q. Okay. Mr. McConnell, you have never
8  actually met Rose McIntyre in person, correct?
9  A. Correct.
10  Q. You have never spoken to her on the
11  phone?
12  A. No.
13  Q. You have never had any conversations
14  with her?
15  A. No.
16  Q. So nothing in your report is based on
17  firsthand knowledge of Rose McIntyre, correct?
18  A. Correct.
19  Q. And did you ever ask to meet with her?
20  A. No.
21  Q. What about Jim McCloskey, did you ever
22  meet with him in person?
23  A. No.
24  Q. You have never talked with him on the
25  phone, right?

Page 52

1  A. No.
2  Q. You have never had any conversations
3  with him of any sort?
4  A. No.
5  Q. And you have never asked to meet with
6  him, correct?
7  A. I didn't understand what you just said.
8  Q. I'm sorry. You have never asked to meet
9  with Jim McCloskey, correct?
10  A. No.
11  Q. So nothing in your report is based on
12  firsthand knowledge of Jim McCloskey, correct?
13  A. Correct.
14  Q. You understand and you have included in
15  your report that Rose McIntyre and Jim McCloskey
16  had a close friendship, right?
17  A. I'm sorry, but would you say that again?
18  Q. Sure. You understand and you include in
19  your report that Rose McIntyre and Jim McCloskey
20  had a close friendship, right?
21  A. Right.
22  Q. Reading your opinion, it is based on the
23  premise that the first time Rose McIntyre learned
24  of Roger Golubski's reputation of sexual
25  misconduct in the Kansas City, Kansas community

Page 53

1  was through Jim McCloskey, correct?
2      MR. ROACH: Object to form. You
3  can answer if you understand.
4  A. Can you ask that question again? I'm
5  sorry.
6  Q. (By Ms. Shah) Sure. Your expert
7  opinion is based on the premise that Rose
8  McIntyre learned of Roger Golubski's reputation
9  of sexual misconduct in the Kansas City, Kansas
10  community through Jim McCloskey, correct?
11      MR. COOPER: Object to form.
12  A. Partially.
13  Q. (By Ms. Shah) Can you explain what you
14  mean by that?
15  A. Well, it is my understanding that an
16  individual named Gregg Hill had explained this to
17  her also and I think Rose had indicated that she
18  had heard about his reputation from other people
19  in the community.
20  Q. So, you understand that Rose McIntyre
21  had heard about Roger Golubski's reputation and
22  allegations of sexual misconduct prior to
23  speaking with Jim McCloskey about it?
24  A. That's my understanding, yes.
25  Q. Your opinion is based on the premise

14 (Pages 50 - 53)

Page 54

1  that the first time Rose McIntyre disclosed Roger
2  Golubski's sexual assault against her occurred
3  during her conversations with Jim McCloskey,
4  correct?
5      MR. ROACH: Object to form. You
6  can answer.
7      A. I hate to keep asking this. I want to
8  make sure I understand this question because --
9  can you ask that again?
10     Q. (By Ms. Shah) Sure. The conclusions in
11 your opinion are based on the premise that Rose
12 McIntyre disclosed Roger Golubski's sexual
13 assault against her for the first time to anyone
14 during her conversations with Jim McCloskey, is
15 that right?
16     MR. ROACH: Same objection.
17     A. I believe she mentioned that she had
18 mentioned it to an attorney prior to mentioning
19 it to him.
20     Q. (By Ms. Shah) Is that attorney -- go
21 ahead.
22     A. I think she mentioned that in a
23 deposition.
24     Q. Is that attorney Michael Redmon, do you
25 recall?

Page 55

1      A. That sounds familiar.
2      Q. If Rose disclosed her allegations of
3  sexual assault against Roger Golubski prior to
4  Lamonte McIntyre's arrest, do you believe there
5  still is the likelihood of a false allegation for
6  gain?
7      MR. ROACH: Object to form. You
8  can answer if you can.
9      A. I don't know if it was before or after
10 the arrest. I just can't remember what she said
11 about it. But obviously, yes, if it can be shown
12 that she had disclosed this to someone else, yes.
13 Obviously that would be -- that could change my
14 opinion.
15     Q. (By Ms. Shah) So your opinion regarding
16 her susceptibility to providing a false
17 allegation for gain or having a false memory,
18 your analysis is reliant on when that allegation
19 of assault is disclosed for the first time,
20 correct?
21     MR. ROACH: Object to form. You
22 can answer.
23     MR. COOPER: Join.
24     A. I wouldn't say it is reliant on that.
25 What I would say is that if it can be shown that

Page 56

1  she had mentioned this previously to other
2  people, it might change the way I look at that.
3      Q. (By Ms. Shah) You don't address that in
4  your report, correct?
5      A. That if we can show there was previous
6  communications about this with other people? No,
7  that's not addressed in my report.
8      Q. Right. So, you are aware from reading
9  Rose McIntyre's transcript that she stated in her
10 deposition she had disclosed her allegations of
11 sexual assault to at least one other person
12 before Jim McCloskey. But that fact is not
13 addressed in your report at all, correct?
14     A. Well, yes.
15     MR. ROACH: Object to form. You
16 can continue answering.
17     A. I did not mention she told or said in a
18 deposition that she mentioned it to this other
19 attorney, if that's what you are asking.
20     Q. (By Ms. Shah) Why not?
21     A. Because what would be important in that
22 situation is, from what I remember, she wasn't
23 sure about the time period, and whether that
24 information could be corroborated somehow. I'm
25 just saying that based on the fact that if it is

Page 57

1  some kind of a false allegation, it is not
2  unusual for people who provide false confessions
3  to, there is research on this, to provide
4  corroborating information or provide supporting
5  information that cannot be corroborated. It is
6  referred to as verifiable facts. If that makes
7  sense.
8      In other words, if you interview someone
9  and they are providing you with verifiable facts,
10 for example if you are interviewing someone and
11 they say yes, I wasn't here on that particular
12 day, you can check my bank account or you can
13 check my credit card receipts, you can check with
14 this person, or you can look at security cameras
15 and these types of things, those are indicators
16 of truthfulness or verifiable facts. Where what
17 you see in cases of people who are providing
18 false information are non-verifiable facts, are
19 providing information that is either vague or for
20 some reason cannot be verified. So the
21 verifiability of any information that somebody
22 gives you like that is obviously important. I
23 mean, just because of my training and experience
24 that's the way I look at information like that.
25     Q. So, in this case we are dealing with

Page 66

1  investigations. False information has also been
2  cited as being problematic in clinical
3  interviews."
4      Who has cited it as being problematic?
5  There is no footnote on this sentence.
6      A.   So, probably if you go to, I don't want
7  to mess this thing up, I myself is all digital
8  because I couldn't get over to the office today,
9  but I'm going to try to pull that up.
10     Q.   I'm sorry, what are you trying to pull
11 up?
12     A.   It is my understanding that you have
13 been provided with the articles that I provided.
14     Q.   Sure. Do you recall which of those
15 articles cited this as being problematic outside
16 of criminal investigations?
17     A.   I do. I'm pretty sure it is in a
18 particular article. It is just generally known
19 in that world of investigative interviewing. But
20 I can show you.
21     Q.   We don't need to do that just yet.
22 Thank you. I know previously when we were
23 talking about clinical interviews that deal with
24 false information, you mentioned a doctor/patient
25 context for those types of clinical interviews,

Page 67

1  is that right?
2      A.   Yes.
3      Q.   You also mentioned insurance agency
4  interviews, correct?
5      A.   Correct.
6      Q.   Are there any other clinical types of
7  interviews that you can think of that would deal
8  with false information?
9      A.   Clinical?
10     Q.   Yes. You wrote here, "False information
11 has always been cited as being problematic in
12 clinical interviews." What types of clinical
13 interviews are those?
14     A.   It could be with psychiatrists,
15 psychologists, it could be internal medicine
16 doctors. Or, as I mentioned before, some of the
17 original research on deception started with
18 nurses who were interviewing patients to
19 determine if they had any suicidal thoughts. The
20 research in those areas has been incorporated
21 into interview and interrogation methods or
22 investigative interview methods used by law
23 enforcement, for victims, witnesses and suspects.
24     Q.   So, as we have discussed, you are aware
25 that Rose McIntyre and Jim McCloskey had a close

Page 68

1  personal friendship. Is there any evidence cited
2  in your report supporting the conclusion that
3  false information is an issue when people are
4  talking socially outside of an official interview
5  context?
6      A.   I was looking at this his role as an
7  investigator in this case. They were also
8  friends. And investigator can become friends
9  with someone they are investigating. But just as
10 his role as an investigator, I have made friends
11 from criminal investigations, where I have gone
12 out and interviewed people and then later became
13 their friends. It is rare, but it has happened a
14 couple of times.
15     Q.   Jim McCloskey as an investigator was
16 hired by Rose McIntyre, correct?
17         MR. ROACH:  Object to form. You
18 can answer if you can.
19     A.   I don't know that.
20     Q.   (By Ms. Shah)  And their friendship
21 developed during the course of the investigation,
22 according to both of their testimony, correct?
23     A.   Correct.
24     Q.   Do you know of any studies that analyze
25 a statement made in the context of a friendship

Page 69

1  as a false admission for gain?
2      A.   I'm not aware of any peer-reviewed
3  research in that area. Just because of the
4  interest in that, is probably less than law
5  enforcement clinical interviews in these types of
6  things, from the research perspective. Obviously
7  we don't want people lying to us. But as far as
8  areas where research will be targeted and
9  peer-reviewed and argued and these types of
10 things, I believe it would have more to do with
11 some area where interviewing is critical. It
12 would be more concentrated in those areas. But I
13 don't know. I haven't specifically looked for
14 research on friendly discussions between friends.
15     Q.   Ariel, can you scroll down to where it
16 is the bottom of page 5 a little bit more. Thank
17 you. At the bottom of page 5 under Deception,
18 you say, "The most reliable method of detecting
19 deceptive statements from interviewees is to
20 determine if the information conflicts with other
21 facts, statements, and evidence known to be
22 true." That kind of conflict doesn't exist here,
23 does it?
24         MR. ROACH:  Object to form. You
25 can answer if you can.

Veritext Legal Solutions
www.veritext.com                                                    888-391-3376

Page 70

1  A. Does not exist. Well, based on what I
2  have seen and what -- I'm trying to think of the
3  context of that question. It is kind of broad.
4  As far as what she said happened with her, the
5  allegation, whether it is true or false, there is
6  other statements and evidence known to be true,
7  facts. I would say that there is none of that
8  that can disprove her statement. If that's what
9  you are asking.
10  Q. So, that means that what you are saying
11  is the most reliable method of detecting a
12  deceptive statement is not a method that can be
13  used here, correct?
14  A. Correct, that's correct. That I'm aware
15  of, that I have seen.
16  Q. And Ariel, can we go to the top of page
17  6, please.
18      MR. ROACH: Sona, we are coming up
19  on two hours shortly. It doesn't have to be this
20  second, but if you find a breaking point, that
21  would be great.
22      MS. SHAH: This is a fine time to
23  take a break. Does 15 minutes work for
24  everybody, or would you like longer?
25      THE WITNESS: That's fine with me.

Page 71

1      MR. ROACH: Come back at 11:30
2  Central.
3      (Short recess was taken.)
4  Q. (By Ms. Shah) If we can go back to the
5  screen share please, to the top of page 6.
6  Mr. McConnell, do you see at the top of page 6
7  you say there are three types of the false
8  confessions, and you detail that those are the
9  coerced false confession, the internalized false
10  confession, and the voluntary false confession.
11  What's the authority for that statement?
12  A. So, there is some argument over the
13  different types of confessions. But the article
14  that first introduced these three types of false
15  confessions -- I don't want to say it is the
16  first article, but one article that is important
17  is an article by Saul Kassin, I think it is
18  referenced in here somewhere, and others, a host
19  of authors, and it explained -- the article was
20  about coerced false confessions. In that article
21  is where they started introducing this I guess
22  dichotomy or categorization of false confessions.
23  So that is one area. But some people have
24  subcategories of these. That's where that came
25  from.

Page 72

1  Q. Okay. Any reason you didn't cite that
2  authority here?
3  A. No. But I can point you to that.
4  Q. Can we go to page 8, please. In this
5  section regarding dispositional risk factors,
6  which we discussed very briefly before, you rely
7  upon a Social Security Administration letter,
8  records from the Wyandotte Center for Community
9  Behavioral Health, and the report of George
10  Woods, correct?
11  A. Correct.
12  Q. And you are accepting the statements in
13  those documents as true, right?
14  A. Correct.
15  Q. And you haven't done any independent
16  examination of Rose McIntyre or drawn your own
17  conclusions regarding her mental health, correct?
18  A. Correct.
19  Q. You have never met her, so that would be
20  impossible, right?
21  A. Correct.
22  Q. Can we go to page 9, please. In the
23  first full paragraph we are looking at here that
24  begins, "Research suggests," you say that,
25  "Research suggests that Rose McIntyre's mental

Page 73

1  health symptoms could put her at a higher risk
2  for providing an internalized false confession or
3  adopting a false memory." That statement isn't
4  definitive. You say it could put her at a higher
5  risk, right?
6  A. That's right.
7  Q. So, how much higher is the risk? Can
8  you quantify it?
9  A. Well, no, there is no -- so, in a world
10  of risk analyses for this, there has been an
11  assessment tool developed by Gudjonsson that
12  suggestibility is an assessment tool. But as far
13  as the risk levels, nobody has, that I'm aware
14  of, other than that suggestibility, there is one
15  for children, there is one for adults, but other
16  than that particular assessment tool, nobody has
17  really come up with, for investigators, in other
18  words for an investigator to sit down and decide
19  when this person is at a low, moderate or high
20  risk, nobody has developed that, that I'm aware
21  of.
22  Q. Okay. So there is no way to quantify
23  how much higher the risk is that she provided --
24  there is no way to quantify -- strike that.
25  There is no way to quantify how much higher Rose

Page 74

1  McIntyre's risk is for providing an internalized
2  false confession for adopting a false memory, in
3  your opinion, correct?
4       MR. ROACH: Object to form. Go
5  ahead.
6    A. That's correct. There is no assessment
7  tool that I would rely on to do that or that I'm
8  authorized to use.
9    Q. (By Ms. Shah) And you say it could put
10 her at a higher risk. Does that mean it does not
11 necessarily put her at a higher risk?
12   A. Yes. I'm sorry, it could put her at a
13 higher risk, so yes, she could not be at a high
14 risk or internalize false confession, but there
15 is no -- the only information that is out there
16 is that there are certain conditions,
17 dispositional risk factors that put people at a
18 higher risk. So there is no formula or
19 assessment tool to say where in that higher risk
20 somebody is, I will put it that way.
21   Q. There is no way to quantify it without
22 speculating, correct?
23      MR. ROACH: Object to form.
24   A. I would not say she is at a low risk.
25   Q. (By Ms. Shah) Can we go to page 9 of

Page 75

1  the report please. Or are we already on page 9?
2  Can we go to page 10, please.
3       Mr. McConnell, in the top paragraph on
4  this page you suggest that Jim McCloskey may have
5  suffered from confirmation bias, correct? You
6  can take your time as far as reading this
7  paragraph.
8    A. Correct.
9    Q. And you say that, "Experimental research
10 on false confessions supports a theory that
11 confirmation bias leads investigators to look for
12 behavioral cues from interviewees that confirm
13 their beliefs and disregard those that do not."
14   A. Correct.
15   Q. What behavioral cues do you believe Jim
16 McCloskey recognized with Rose McIntyre?
17      MR. ROACH: Object to form. Go
18 ahead.
19   A. Well, I don't know specifically what
20 those would be. I'm just indicating that
21 confirmation bias creates that situation.
22   Q. (By Ms. Shah) You don't know of any
23 behavioral cues that specifically led to
24 confirmation bias for Jim McCloskey?
25      MR. ROACH: Object to form. Go

Page 76

1  ahead.
2    A. No.
3    Q. (By Ms. Shah) You don't know of any
4  behavioral cues that he ignored in connection
5  with any confirmation bias either, correct?
6       MR. ROACH: Same objection. Go
7  ahead.
8    A. I don't.
9    Q. (By Ms. Shah) And there really is no
10 way for you to know that, right?
11      MR. ROACH: Same objection. Go
12 ahead.
13   A. Without any of those being recorded.
14 That's how you would look for those.
15   Q. (By Ms. Shah) So, what leads you to
16 conclude that Jim McCloskey may have suffered
17 from confirmation bias then?
18   A. Well, confirmation bias simply indicates
19 that he had, in looking at this case, and we all
20 have, investigators all have confirmation bias
21 going in to investigations; it is just that you
22 need to make sure you keep those things in check.
23 And I'm not saying that he ignored his
24 confirmation bias or looked for alternative
25 explanations for everything, because that's how

Page 77

1  you overcome that. I'm just saying that based on
2  my experience and what I know about interviewing,
3  that that is something that needs to be done.
4  And it certainly could have existed in this area.
5  Again, I'm not saying that he saw these
6  behavioral cues. I'm just saying this is an
7  important aspect of interviewing that should be
8  considered here.
9    Q. Let's go to page 11 of the report,
10 please. At the top of the page you say, "False
11 allegations in the form of sexual assaults are
12 not uncommon." And you talk about a study of
13 data from 2006 where researchers found 5 percent
14 of rape cases involved false allegations. When
15 you say false allegations in the form of sexual
16 assaults are not uncommon, what does not uncommon
17 mean to you?
18   A. That they don't happen.
19   Q. You are just saying that false
20 allegations of rape sometimes happen, correct?
21   A. Correct.
22   Q. If the numbers you say are accurate,
23 that 5 percent of rape cases involve false
24 allegations, that means the vast majority of rape
25 allegations do not involve false allegations,

20 (Pages 74 - 77)

Page 90

1  some people refer to as being re-traumatized or
2  secondary traumatization of the sexual assault.
3  So there may be different reasons why they might
4  not come to law enforcement or some official
5  versus people close to them.
6        But as far as law enforcement goes, a
7  lot of times that's just they don't want to get
8  involved in the case or they may be afraid of
9  this person.
10     Q.  And in Rose McIntyre's deposition
11  transcript, which you reviewed, she says that she
12  didn't say anything about the assault for some
13  time because she was ashamed, correct?
14     A.  That's correct, yes.
15        MR. ROACH:  Object to form.  Go
16  ahead.
17     Q.  (By Ms. Shah)  And in Jim McCloskey's
18  deposition transcript, which you also reviewed,
19  he testified that he concluded that Rose did not
20  -- Rose McIntyre did not disclose the alleged
21  sexual assault to him earlier and waited until
22  they had known each other for awhile, because she
23  was embarrassed, correct?
24        MR. ROACH:  Object to form.  Go
25  ahead.

Page 91

1     A.  I believe that's what he said.
2  Something along those lines.
3     Q.  (By Ms. Shah)  But you don't address
4  that possibility in your report that Rose didn't
5  disclose her sexual assault due to shame or
6  embarrassment, right?
7     A.  I did not.
8     Q.  Why not?
9     A.  Well, one thing I just mentioned, when
10  you weigh the -- I think this has been discussed
11  in the deposition, when you weigh -- I just
12  mentioned, sometimes people don't want to report
13  a sexual allegation to law enforcement because
14  they don't want to get involved in the
15  investigation, those types of things.  Then it
16  may be that they don't want to report that to
17  some friend because they are embarrassed.  So
18  there is different reasons that lead to what we
19  refer to as pathways of a false allegation.
20        But, in this particular situation, Rose
21  McIntyre's reasons for coming forward early with
22  these allegations would have been, seems like
23  they would be very strong and outweigh any
24  embarrassment, because those allegations -- they
25  would have done something to help her son get out

Page 92

1  of his situation.
2     Q.  Rose testified that she didn't know that
3  Roger Golubski was involved in Lamonte McIntyre's
4  arrest and prosecution until much later when Jim
5  McCloskey told her, right?
6        MR. ROACH:  Object to form.  Go
7  ahead.
8     A.  That's correct.  But I don't know what
9  the time period was.  But Jim McCloskey indicated
10  that he had talked about Roger Golubski several
11  times before she mentioned this.
12     Q.  (By Ms. Shah)  So you don't believe that
13  the reason Rose McIntyre didn't say anything
14  sooner is because she was embarrassed?
15     A.  If the allegations are true, what I'm
16  saying is I just believe that the consequences
17  for telling someone like Jim McCloskey about it
18  ==she should have been -- I think the==
19  ==embarrassment, it seems like that would outweigh==
20  ==the embarrassment, the fact that it could get her==
21  ==son out of jail.  I'm just saying the potential==
22  is yes, yes, she could have been embarrassed
23  about it, but it certainly seems like the fact
24  that she could get her son out of jail would
25  overcome that embarrassment.

Page 93

1     Q.  Can we go to page 14 of the report,
2  please.  In this first full paragraph on the page
3  you say, "As a result of certain dispositional
4  and situational risk factors associated with
5  providing false information in investigative
6  interviews, including contamination and potential
7  suggesting questioning, Rose McIntyre's mental
8  state, with her interactions with the Innocence
9  Project being a chronic stressor, along with her
10  desire to help her son and alleviate feelings of
11  guilt, I can say with a reasonable degree of
12  certainty that Rose McIntyre was susceptible to
13  providing a coerced false confession to Jim
14  McCloskey or adopting a false memory as a result
15  of their discussions."  And that is your
16  conclusion in this case, correct?
17     A.  Correct.
18     Q.  So, your opinion here is applying
19  dispositional and situational risk factors for a
20  false confession in a law enforcement or clinical
21  context to a situation involving individuals
22  speaking to each other as friends, correct?
23        MR. ROACH:  Object to the form.  Go
24  ahead if you can.
25     A.  Primarily, as well in his role as an

Page 102

1  interview, right?
2      A.  That's correct.
3      Q.  But you can't -- we discussed earlier
4  you can't quantify the susceptibility?
5          MR. ROACH:  Object to form.
6      A.  That's correct.  There is no scale that
7  I'm aware of other than the Gudjonsson scales.
8      Q.  (By Ms. Shah)  Would you say it is more
9  likely than not that she would provide a coerced
10 false confession or adopt a false memory?
11     A.  No, I wouldn't say that.  I would just
12 say that she is -- more likely than not she is
13 susceptible to that.
14         MS. SHAH:  I probably need about 20
15 minutes to a half hour break.  I don't know if
16 this is a good time to break for lunch or if you
17 guys would just like to do a 20 minute break.
18         MR. ROACH:  How much time
19 afterwards do you have?
20         MS. SHAH:  I won't have very long
21 at all.  Probably just 15 minutes or so.  But I
22 don't know if anyone else has any questions.
23         MR. ROACH:  I vote for 20, but I'm
24 open to hearing from other people.
25         MS. HAYES:  20 is probably

Page 103

1  sufficient, unless anybody has strong feelings
2  otherwise.
3          MR. COOPER:  I agree with that.
4          MS. SHAH:  How about 45 past the
5  hour.  Does that work for everyone?
6          MR. ROACH:  Yes.
7          (Short recess was taken.)
8      Q.  (By Ms. Shah)  Mr. McConnell, have you
9  ever been asked to give an expert opinion
10 regarding false admissions for gain or false
11 memories, outside of the law enforcement context?
12     A.  I have not.
13     Q.  Are you aware of any expert being
14 permitted to give an opinion regarding
15 susceptibility to false admissions for gain or
16 false memories, outside the context of law
17 enforcement?
18         MR. ROACH:  Object to the form.  Go
19 ahead.
20     A.  Can you repeat that?
21     Q.  (By Ms. Shah)  Are you aware of any
22 expert being permitted to give an opinion
23 regarding susceptibility to false admissions for
24 gain or false memories, outside the law
25 enforcement context?

Page 104

1          MR. ROACH:  Same objection.  Go
2  ahead.
3      A.  I'm just not familiar with that.
4      Q.  (By Ms. Shah)  Okay.  Mr. McConnell, do
5  you believe that you are qualified to give an
6  opinion regarding false confessions or false
7  admissions for gain or false memories, outside of
8  a law enforcement context?
9      A.  I do.
10         MR. ROACH:  Object to the form.
11     Q.  (By Ms. Shah)  Just give me one moment.
12 Mr. McConnell, to go back to something we
13 discussed before.  In Rose McIntyre's transcript,
14 in Rose McIntyre's deposition she testified that
15 she told at least one other person about the
16 alleged sexual assault by Roger Golubski,
17 correct?
18         MR. ROACH:  Object to the form.  Go
19 ahead.
20     A.  At least one other, yes.
21     Q.  (By Ms. Shah)  And if that disclosure by
22 Rose McIntyre regarding the alleged sexual
23 assault by Roger Golubski took place before
24 Lamonte McIntyre's conviction, the situational
25 and dispositional risk factors that you discuss

Page 105

1  in your report would not have been applicable to
2  her disclosure, correct?
3          MR. ROACH:  Object to the form.  Go
4  ahead if you can.
5      A.  I wouldn't say they wouldn't be
6  applicable, but it would have a dramatic impact
7  on that, if that information is reliable.
8      Q.  (By Ms. Shah)  What do you mean when you
9  say dramatic impact?
10     A.  Well, if she had before this, before her
11 son was -- I would have to say before he was
12 arrested or charged with this, if she had made
13 those same allegations and it is not just
14 something that she said he did but there is
15 actual evidence of that, then certainly that
16 would at least change my opinion about this.  I'm
17 just completely unaware of anything like that.  I
18 would have to look at it again.  I mean,
19 basically.  Because the reasons that I'm -- the
20 situational risk factors I talked about, those
21 would be affected by that, the way I look at
22 those risk factors.
23     Q.  Right.  And if those risk factors were
24 not applicable due to the change in
25 circumstances, her susceptibility to false

| Page 110 | Page 112 |
|---|---|
| 1  conclusion -- your conclusion must be dependent<br>2  on Rose being mistaken about disclosing that, or<br>3  lying about whether she disclosed that, correct?<br>4      MR. ROACH: Same objection.<br>5      A. I'm just saying that, just like the<br>6  potential of a false allegation, that would be<br>7  questionable too. I'm not saying that she was<br>8  mistaken about that. I mean, it is just unknown<br>9  information. It needs to be looked at further<br>10 and proven or disproven.<br>11     Q. (By Ms. Shah) Would you agree -- I'm<br>12 sorry, go ahead.<br>13     A. I can't remember now if he is available<br>14 or people tried to talk to him about that or not.<br>15     Q. But you agree that if things happened as<br>16 Rose McIntyre testified and she did tell somebody<br>17 about the sexual assault years and years earlier,<br>18 you would have to dramatically reevaluate your<br>19 report, correct?<br>20     MR. ROACH: Objection.<br>21     A. When you say years earlier, you are<br>22 talking about the conviction?<br>23     Q. (By Ms. Shah) Correct.<br>24     A. Yes. Or I guess before the charge,<br>25 after the accusations, yes, that would change | 1  question? Go ahead. Can you repeat it?<br>2      MS. SHAH: Alison, can you read it<br>3  back?<br>4      (The previous question was read back.).<br>5      MR. ROACH: Same objection.<br>6      A. No, I wouldn't say that.<br>7      Q. (By Ms. Shah) Have you accounted in<br>8  your opinion for the idea that -- strike that.<br>9      Does your opinion acknowledge anywhere<br>10 that Rose McIntyre could have disclosed the<br>11 alleged sexual assault by Roger Golubski to<br>12 anyone before Jim McCloskey?<br>13     A. No, that was not in my -- did you say my<br>14 report, or my assessment?<br>15     Q. Both.<br>16     A. I mean, the possibility that she could<br>17 have said that to someone earlier did play into<br>18 it, where obviously I'm looking at this, and<br>19 that's one of the things that you would be<br>20 looking for in any case like this, is there a<br>21 time when she had no reason to, may have had some<br>22 other reason to have disclosed this or possibly<br>23 made a false allegation. It may have had an<br>24 effect in that respect. But as far as -- I"m<br>25 sorry, what was your original question? I'm |

| Page 111 | Page 113 |
|---|---|
| 1  my -- that would have an impact on it, sure.<br>2      Q. Did you consider at all, when forming<br>3  your opinion, those things that we talked about a<br>4  few minutes ago, that there are affidavits<br>5  regarding Roger Golubski's alleged misconduct in<br>6  the Kansas City, Kansas community with black<br>7  women, that Roger Golubski took the Fifth<br>8  Amendment when questioned about these incidents,<br>9  is any of that considered in your report?<br>10     MR. ROACH: Object to the form.<br>11     Q. (By Ms. Shah) Considered in connection<br>12 with forming your opinions, I should say.<br>13     MR. ROACH: Same objection.<br>14     A. I wasn't aware that he took the Fifth.<br>15 I wasn't aware of these affidavits you are<br>16 talking about. So that was not included in my<br>17 opinion when forming my opinion.<br>18     Q. (By Ms. Shah) So your opinion is based<br>19 on -- strike that. The analysis included in your<br>20 opinion is based on the assumption that Rose<br>21 McIntyre disclosed the alleged sexual assault by<br>22 Roger Golubski for the first time to Jim<br>23 McCloskey, correct?<br>24     MR. ROACH: Object to the form.<br>25     A. It is not -- can you repeat that | 1  getting tired.<br>2      MS. SHAH: No problem. Me too.<br>3  Alison, can you read it back, please?<br>4      (The following question was read back:<br>5      Q. Does your opinion acknowledge<br>6  anywhere that Rose McIntyre could have disclosed<br>7  the alleged sexual assault by Roger Golubski to<br>8  anyone before Jim McCloskey?)<br>9      A. Does it acknowledge, no, it does not<br>10 acknowledge that, that she could have done that.<br>11     Q. (By Ms. Shah) In order to reach your<br>12 opinion you disregarded Rose McIntyre's testimony<br>13 that she had told at least one other person<br>14 before Lamonte McIntyre was convicted, correct?<br>15     MR. ROACH: Object to form.<br>16     A. No, I didn't disregard it. But<br>17 certainly if that could be proven, then it would<br>18 have an impact, especially if it was before he<br>19 was charged.<br>20     Q. (By Ms. Shah) The basis for your<br>21 opinion that -- strike that. Your opinion<br>22 doesn't address Rose's prior -- Rose McIntyre's<br>23 testimony that she had disclosed the sexual<br>24 assault previously, because you didn't feel it<br>25 met -- you didn't feel it was reliable enough to |

Page 114

1  warrant changing your opinion, correct?
2          MR. ROACH:  Object to the form.  Go
3  ahead.
4       A.  Change it, yes, that's correct.
5       Q.  (By Ms. Shah)  Your assessment of Rose
6  McIntyre's ability to give false allegations for
7  gain or false memories is based in part on the
8  fact that Jim McCloskey's references to Roger
9  Golubski's reputation in the community suggested
10  this idea to her, correct?
11      A.  Correct.
12      Q.  So you don't address in your report Rose
13  McIntyre's testimony that she had been aware of
14  Roger Golubski's reputation prior to knowing Jim
15  McCloskey, correct?
16      A.  I did not reference that, no, I don't
17  believe I did.
18      Q.  And is that because you didn't find her
19  testimony to be sufficiently reliable to warrant
20  being addressed?
21          MR. ROACH:  Object to the form.
22      A.  Well, I mean, he told her about these
23  things.  If she heard it from other people, too,
24  it is just more of that.  I don't think it would
25  change anything, if she heard it from him and

Page 115

1  other people as well.
2          MS. SHAH:  I don't really have
3  anything more.  But I did want to put on the
4  record that plaintiffs' counsel would like to
5  request that Mr. McConnell produce any syllabi
6  from the classes that he teaches at George
7  Washington University, and we can send you a
8  written request in the near future, but just
9  wanted to get that on the record as well.  I have
10  nothing further for this witness.  I'm not sure
11  if there are any questions from anyone else.
12          MS. HAYES:  This is Tracy Hayes.
13  No questions on behalf of my clients.
14          MR. COOPER:  David Cooper, no
15  questions.
16          MS. SHAH:  Mr. McConnell, thank you
17  so much for your time today.  We really
18  appreciate it.
19          THE WITNESS:  Thank you.
20      (The deposition concluded at 1:09 p.m.)
21          MR. ROACH:  Alison, he will review
22  and sign.
23
24
25

Page 116

1              C E R T I F I C A T E
2          I, Alison A. Tracy, a Certified
3  Court Reporter in the State of Kansas, do hereby
4  certify:
5          That prior to being examined the
6  witness was by me duly sworn;
7          That said deposition was taken down
8  by me in shorthand at the time and place
9  hereinbefore stated and was thereafter reduced to
10  writing under my direction;
11         That I am not a relative or employee
12  or attorney or counsel of any of the parties, or
13  a relative or employee of such attorney or
14  counsel, or financially interested in the action.
15         WITNESS my hand this 24th day of
16  January, 2022.
17
18
19              *Alison A. Tracy*
20              Alison A. Tracy, CSR 1525
21
22
23
24
25

Page 117

1  1  Morgan Roach
2  2  morgan@mccauleyroach.com
3  3              Jamuary 31, 2022
4  4  RE:   Mcintyre, Lamonte Et Al v. Unified Government Of Wyandotte
       County And Kansas City, Kansas, Et Al.
5  5   1/18/2022, Robert Blake McConnell (#5025019)
6  6    The above-referenced transcript is available for
7  7  review.
8  8    Within the applicable timeframe, the witness should
9  9  read the testimony to verify its accuracy. If there are
10 10 any changes, the witness should note those with the
11 11 reason, on the attached Errata Sheet.
12 12   The witness should sign the Acknowledgment of
13 13 Deponent and Errata and return to the deposing attorney.
14 14 Copies should be sent to all counsel, and to Veritext at
15 15 erratas-cs@veritext.com
16 16
17 17 Return completed errata within 30 days rom
18 18 receipt of testimony.
19 19  If the witness fails to do so within the time
20 20 allotted, the transcript may be used as if signed.
21 21
22 22        Yours,
23 23        Veritext Legal Solutions
24 24
25 25