**EXHIBIT D
TO DECLARATION OF SONA R. SHAH
IN SUPPORT OF PLAINTIFFS' MOTION TO
LIMIT TESTIMONY OF TARIK KHATIB**

Page 1

```
 1         IN THE UNITED STATES DISTRICT COURT
              FOR THE DISTRICT OF KANSAS
 2
 3   LAMONTE McINTYRE, et al.,)
                              )
 4              Plaintiffs,   )
                              )
 5   vs.                      ) 2:18-cv-02545-KHV-KGG
                              )
 6   UNIFIED GOVERNMENT OF    )
     WYANDOTTE COUNTY AND     )
 7   KANSAS CITY, KANSAS,     )
     et al.,                  )
 8                            )
                Defendants.   )
 9
10
11
12              DEPOSITION OF TARIK KHATIB, a
13   Witness, taken on behalf of the Plaintiffs,
14   before Alison A. Tracy, Missouri CCR No. 554,
15   Kansas CSR No. 1525, pursuant to Notice, on the
16   14th day of December, 2021, at Lathrop GPM LLP,
17   2345 Grand, Suite 2200, Kansas City, Missouri.
18
19
20
21
22
23
24
25
```

Page 46

1 developments in that investigation, for a whole
2 host of reasons, correct?
3    MR. COOPER: Object to form.
4    MS. EVERS GUERRA: Join.
5    MR. ROACH: Join.
6  A. For the Lawrence Police Department and
7 the way it worked in our department, I would say
8 yes. For other departments it just depends on
9 the structure. I can't just make a general
10 statement about all police departments.
11  Q. (By Ms. Freudenberger) Certainly in the
12 Lawrence Police Department that was important,
13 right?
14  A. Yes.
15  Q. By the way, have you ever worked in any
16 police department other than the Lawrence Police
17 Department?
18  A. No.
19  Q. So you don't know how it works in other
20 police departments, just Lawrence Police
21 Department; fair to say?
22  A. I mean, I have a general understanding
23 -- I interact with a lot with different police
24 departments so I have a general understanding of
25 how other departments work and I have worked with

Page 47

1 many detectives and sergeants and captains and
2 chiefs over the years, so through that
3 interaction I have learned how some departments
4 work and some don't. So, I think specifically
5 Lawrence, you know, KCK by reading materials, I
6 made some inferences there. But in terms of
7 specifics of other departments, besides
8 generalities, probably not.
9  Q. You said you have some familiarity with
10 the KCK by reading materials. What materials?
11  A. The materials I was given to read as
12 part of my expert opinion formulation.
13  Q. What is listed in your report?
14  A. Yes.
15  Q. Okay. Anything else you are referring
16 to when you say that?
17  A. No.
18  Q. Anything else that informs your
19 understanding of the way the supervision
20 structure in homicides at the KCK Police
21 Department works?
22  A. Not anything in addition to what I have
23 reviewed, no.
24  Q. Okay. All of which is listed in your
25 report, correct?

Page 48

1  A. Yes.
2  Q. Okay. Just to be crystal clear. You
3 have never worked in the KCK Police Department,
4 obviously, correct?
5  A. That's correct.
6  Q. Now, we were talking about the homicide
7 you recall supervising as a sergeant, the double
8 homicide of the elderly couple, and you mentioned
9 that your duties and responsibilities in the
10 course of supervising, your supervision in that
11 homicide included reviewing reports, keeping the
12 chain of command informed about developments in
13 the case, and making assignments. Anything else
14 you did in the course of supervising that
15 investigation?
16  A. I'm sure there was more, but as I sit
17 here right now I can't recall.
18  Q. Okay. As you sit here right now can you
19 recall any other homicide cases you supervised as
20 a sergeant assigned to the drug enforcement unit
21 between approximately 2002 and 2007?
22  A. To be fair, I just can't recall any
23 others besides the one I just mentioned.
24  Q. Okay. You think there may have been one
25 more but you can't recall as you sit here today,

Page 49

1 correct?
2  A. Yes.
3  Q. After 2007 what was your next
4 assignment?
5  A. I got assigned as the detective sergeant
6 within the detective bureau.
7  Q. How long did you hold that position?
8  A. At least a couple years.
9  Q. We will come back to what you did there.
10 But where did you go next?
11  A. I was promoted to captain after that.
12 At some point there was a change between
13 lieutenant/captain became the same, so when I say
14 lieutenant and captain I'm using those
15 interchangeably. We called it lieutenant then,
16 we call it captain now. I was promoted to
17 captain -- well no. I need to refer to my CV if
18 I could real quick.
19  Q. Sure.
20  A. I was to promoted to captain and
21 assigned to the midnight shift.
22  Q. And that was patrol?
23  A. Yes.
24  Q. What year was that?
25  A. 2008.

Page 62

1 assumed responsibility for major investigations
2 including multiple homicides and shooting cases.
3   A.  That's correct.
4   Q.  Everything else described on your CV
5 here is administrative in nature, would you
6 agree?
7   A.  Yes, it looks like it.
8   Q.  So let's talk about directly managing
9 and assuming responsibility for major
10 investigations including homicides.  Tell me what
11 that means.
12   A.  Just means that the cases that Rose to
13 the level of detectives would be involved in I
14 would be responsible for supervising those.
15   Q.  The supervision work in Lawrence,
16 specifically when it came to homicides, what were
17 your duties and responsibilities as a supervisor
18 on a homicide case in that position?
19   A.  So, I think in my opinion I described it
20 as two common ways that homicides are supervised
21 is one in which the supervisor plays the role of
22 the lead in terms of he or she is not going out
23 actually doing the investigation but he or she is
24 assigning things, reading reports, reassigning,
25 putting out new leads based upon what is in the

Page 63

1 reports, etc.  The second one is when you have a
2 lead detective and the supervisor makes a
3 resource assignment.  For the Lawrence Police
4 Department it was the former one.
5   Q.  Let's take a look at your section of
6 your opinions.  This is something I'm going to
7 ask about.  This is on page 11.
8       MS. EVERS GUERRA:  Did you say page
9 11?
10   Q.  (By Ms. Freudenberger)  Are you
11 referring to the first paragraph on page 11 of
12 your report under Case Management and
13 Supervision, is that correct?
14   A.  Yes, that's correct.
15   Q.  Then you describe two different
16 supervisory structures?
17   A.  Yes.
18   Q.  And where are you getting those
19 supervisory structures?  When were you instructed
20 or taught about the multiple supervisory
21 structures police departments use?
22   A.  Just from my general experience as a
23 police officer, leader, and Chief of 25 years in
24 law enforcement.
25   Q.  Okay.  Is that written down anywhere?

Page 64

1   Are the supervisory structures -- I'm not being
2 glib.  I just want to understand the bases for
3 your opinion.  Are the supervisory structures you
4 are referring to in this paragraph written down
5 anywhere, to your knowledge?
6   A.  No.
7   Q.  So when you talk about the supervisory
8 structures, you are talking about understanding
9 gleaned from your own experience, correct?
10   A.  My experience and seeing how other
11 departments also do it over the years.
12   Q.  Okay.  And how does that experience come
13 about?  When you say seeing how other departments
14 do it, in what context have you had occasion to
15 see how other departments structures supervision
16 of homicide cases?
17   A.  There are several times when we worked
18 with other departments on cases, because major
19 cases, including homicides, generally go across
20 sometimes organizational boundaries.  We may have
21 a suspect that we are looking for in Topeka and
22 we will work with detectives there.  They may
23 have somebody they are looking for in Lawrence
24 and or Wichita, whatever.  So there is
25 opportunity to work with and interact with

Page 65

1 detectives and detective supervisors across
2 agencies.  You tend to figure out kind of how
3 they are structured that way.
4   Q.  So what other agencies specifically have
5 you worked with?
6   A.  Topeka was one that I worked with in
7 terms of on a homicide.  I know we sent officers
8 down to Wichita.  I want to say maybe Olathe.
9 But there has been more, I just can't, as I sit
10 here, remember them.
11   Q.  Take a minute and think about it.  This
12 is important.  I want to make sure I understand
13 all of the bases for your opinion.  So what other
14 departments, other than the three in Kansas you
15 have just given me, have you become familiar,
16 what other department's supervisory structures
17 for homicides have you become familiar with aside
18 from Topeka, Wichita and Olathe?
19   A.  Topeka, Wichita, Olathe.  I mean, KCK
20 just from reading the materials.
21   Q.  When you say KCK, you mean based on the
22 materials you reviewed in this case, correct?
23   A.  Yes.
24   Q.  All of which are listed in your report,
25 right?

Page 66

1   A.  That's correct.
2   Q.  Okay.  Go on.
3   A.  There was a Florida case where we sent
4  detectives down there and had to interact and
5  find somebody.  I can't remember what town that
6  was.
7   Q.  In the course of sending a detective,
8  what you did is you sent one of your detectives
9  down to Florida to find somebody, either a
10 witness or a fugitive or suspect or something
11 like that?
12  A.  We contacted their supervision down
13 there and asked for assistance and then we would
14 send detectives down to find a suspect to
15 interview them and bring them back.
16  Q.  So did you become familiar with that
17 department in Florida's supervision structure for
18 homicide investigations through that contact you
19 just described, or would you take that one off
20 the list?
21  A.  Well, to be fair, probably I will take
22 that one off the list.
23  Q.  Any others?
24  A.  Not that I can think of.
25  Q.  Okay.  So back to your own experience

Page 67

1  between 2006 and 2008 as a supervising sergeant.
2  How many homicides did you supervise as a
3  sergeant during those two years?
4   A.  It was probably in the neighborhood of
5  10 to 12 homicides.
6   Q.  On each of those 10 to 12 homicides
7  there were detectives below you investigating
8  those homicides, correct?
9   A.  Yes.
10  Q.  And you were managing those detectives,
11 supervising those detectives, correct?
12  A.  Yes.
13  Q.  Have you ever investigated a homicide
14 yourself as a detective?
15  A.  I was never a detective.
16  Q.  Okay.
17  A.  When I was in the drug enforcement unit
18 I was a, quote, investigator.  When I was on the
19 street, I was an investigator and I investigated,
20 I participated in homicide investigations during
21 those times.
22  Q.  But in Lawrence, homicides are
23 investigated by detectives as a general matter,
24 correct?
25          MR. COOPER:  Object to form.

Page 68

1  Misstates his prior testimony.  Go ahead.
2          MS. EVERS GUERRA:  Join.
3          MR. ROACH:  Join.
4   A.  We have a team.
5   Q.  (By Ms. Freudenberger)  Okay.  So I
6  understand.  The reason I'm asking, some police
7  departments have investigators and investigators
8  perform all functions including homicide
9  investigations.  And then some police departments
10 have investigators and then they have detectives
11 and detectives investigate homicides.  So my
12 question for you is, did the Lawrence Police
13 Department during your tenure have detectives who
14 investigated major crimes, including homicides,
15 or was all of the investigation in the department
16 done by investigators?
17         MR. COOPER:  Object to form.
18         MS. EVERS GUERRA:  Join.
19         MR. ROACH:  Join.
20  A.  I'm trying to understand your question.
21 We had detectives who had the rank of detective,
22 so it is a promotion and they would investigate
23 whatever was assigned to them, including
24 homicides.  Then we had assignments, so sometimes
25 a police officer, patrol officer would get a

Page 69

1  temporary assignment, they would be assigned to
2  the drug enforcement unit, for example, so I took
3  on the role as an investigator, did all of those
4  things a detective would do but I didn't have the
5  rank.  There are other times people would go into
6  investigative division and they would be juvenile
7  investigators, they would do all of the
8  investigation of juvenile crimes, sexual assaults
9  against juveniles but they didn't have the rank
10 of detective; they were doing investigations.  So
11 that's why I'm confused with your question.
12 Whether you are a detective or whether you are an
13 officer or on a special assignment you may be
14 involved in a homicide investigation just like a
15 detective would be.
16  Q.  (By Ms. Freudenberger)  Okay.  But there
17 were detectives who had been promoted to the rank
18 of detective who investigated homicides, correct?
19         MR. COOPER:  Object to form.  Asked
20 and answered.
21         MS. EVERS GUERRA:  Join.
22  A.  Yes, sure.
23  Q.  (By Ms. Freudenberger)  Okay.  And then
24 sometimes other investigators would be pulled in
25 to perform investigative tasks in homicide

18 (Pages 66 - 69)

| Page 70 | Page 72 |
|---|---|
| 1  investigations as well, correct?<br>2     A.   That's correct.<br>3     Q.   Okay.  And you were never a detective<br>4  assigned to investigate a homicide during your<br>5  career, correct?<br>6     A.   I did not -- I never held the rank of<br>7  detective in my career, that's correct.<br>8     Q.   So the answer to my question is yes,<br>9  correct?<br>10           MR. COOPER:  Object to form.<br>11           MS. EVERS GUERRA:  Object to form.<br>12           MR. COOPER:  He answered the<br>13  question.<br>14           MR. ROACH:  Join.<br>15     A.   As a detective supervisor I considered<br>16  myself somebody that was investigating homicides,<br>17  but I wasn't a detective before that, if that's<br>18  your question.<br>19     Q.   (By Ms. Freudenberger) Okay.  And you<br>20  as a detective supervisor, do you hold the rank,<br>21  was your rank detective-supervisor, or were you a<br>22  supervisor of detectives?<br>23     A.   I was a supervisor -- detective sergeant<br>24  was my title.<br>25     Q.   Detective sergeant was your title.  And | 1  department, going to training, being a Chief,<br>2  getting briefings about homicide cases, making<br>3  suggestions, understanding how they are being<br>4  investigated, having consultations with my<br>5  commanders and district attorneys offices about<br>6  cases.  There is a lot more that goes into my<br>7  background and experience besides just my<br>8  physical assignment during those times.  There is<br>9  the whole breadth of my experience and some of<br>10  the training I have gone to and some of the other<br>11  duties that cross over.<br>12     Q.   All right.  So, we talked about your<br>13  direct experience and we will get to the duties<br>14  that cross over.  Why don't we do that now.  The<br>15  duties that cross over would include being<br>16  briefed by your commander on ongoing homicides<br>17  when you were Chief of Police, is that correct?<br>18     A.   Yes, and our Chief, Chief of Police,<br>19  that's correct.<br>20     Q.   Okay.  And what kind of communications<br>21  with district attorneys would you have about<br>22  homicides in your department once you were<br>23  promoted out of the investigations division?<br>24     A.   Mostly just our resource and timing<br>25  issues, feedback on potentially -- not directly |
| **Page 71** | **Page 73** |
| 1  you supervised detectives as a detective sergeant<br>2  in the investigations unit, correct?<br>3     A.   That's correct.<br>4     Q.   And you told me you worked on 10 to 12<br>5  homicide cases in that capacity?<br>6     A.   Yes.<br>7     Q.   Is there a list of those cases<br>8  somewhere?<br>9     A.   I don't have one.<br>10     Q.   Is there a way, I'm not suggesting that<br>11  I'm doubting you, I'm wondering if there is a way<br>12  to verify that number of homicides, if the<br>13  department might keep track of that information,<br>14  that you know of?<br>15     A.   Not that I know of.<br>16     Q.   Okay.  Have we now covered the sum total<br>17  of your qualifications in this case that come<br>18  from the component of your own experience on<br>19  homicide cases?<br>20     A.   I don't know that you have covered it<br>21  all.<br>22     Q.   Tell me what I have missed.<br>23     A.   So, there is the component of me being<br>24  an active participant in homicide cases and then<br>25  there is the component of me being on the police | 1  from the DA, but additional things that we need<br>2  to maybe investigate or look at.<br>3     Q.   What else?<br>4     A.   Are you talking about in relation --<br>5     Q.   I'm looking for the sum total of your<br>6  experience that contributes to your<br>7  qualifications that forms the basis for your<br>8  qualifications to offer expert opinions in a<br>9  homicide case, outside of the realm of your<br>10  direct experience which we have already talked<br>11  about.<br>12     A.   The training, the briefings, feedback I<br>13  have given, interaction with other departments.<br>14     Q.   We talked about that, right?<br>15     A.   Yes.<br>16     Q.   Can we talk about training?  Or is there<br>17  anything more to add to that list?<br>18     A.   Not as I recall right this minute.<br>19     Q.   Let's talk about your training in<br>20  homicides.  Before we do, you would agree that<br>21  although homicides may have investigative<br>22  features in common with other investigations,<br>23  there is a whole body of training that is<br>24  specific to investigating homicides?<br>25     A.   I would agree that there is a lot of |

|  |  |
|---|---|
| Page 102<br>1  misconduct, right?<br>2         MS. EVERS GUERRA:  Object to form.<br>3     A.  Yes, that's my understanding.<br>4     Q.  (By Ms. Freudenberger) Okay.  So you<br>5  are not offering an opinion in this case about at<br>6  what point they may have had to report something<br>7  to Internal Affairs, because they all reported<br>8  they do not, correct?<br>9     A.  But there is allegations that they did<br>10 know something.  So outside of their, defendants<br>11 statements, there is other information that I<br>12 reviewed that said everybody in the department<br>13 knew.  So the jump is, well then, did these<br>14 people know?  So for me to examine that I had to<br>15 look at those things.<br>16    Q.  Right.  But I'm talking about the<br>17 opinions you are offering.  So it sounds like<br>18 what you are saying is all of the individual<br>19 defendants say no, we never heard anything like<br>20 this.  But then there is other evidence that in<br>21 fact everybody knew about these allegations, they<br>22 were widely discussed in the department, etc.  In<br>23 other words, you have seen evidence in the record<br>24 that contradicts the individual defendants'<br>25 denials, correct? | Page 104<br>1  opinion you are offering in this case.  In this<br>2  case you understand the individuals defendants<br>3  are all saying we never heard anything like this.<br>4  And then there are other sources, there are other<br>5  people who have given sworn affidavits saying no,<br>6  everybody knew about this.  You aren't, as an<br>7  expert, in a position to testify to who knew<br>8  what, correct?<br>9     A.  I'm in a position to testify based upon<br>10 my review of the material and my experience as a<br>11 knowledgeable, having been around IA<br>12 investigations and complaints, that I didn't find<br>13 any evidence that these particular officers knew<br>14 about these allegations.<br>15    Q.  If you credited -- let's take an<br>16 example.  Clyde Blood and Tim Maskill were<br>17 partners for years working homicides, right?<br>18    A.  Yes, I seem to recall that, yes.<br>19    Q.  And you saw Blood's testimony that they<br>20 shared an office, right?<br>21    A.  Okay, yes.<br>22    Q.  And that they talked about outside<br>23 interests, I think woodworking was one of them,<br>24 although I may be misremembering.  Right?<br>25    A.  I mean, to the extent that I'm not |
| Page 103<br>1         MR. COOPER:  Object to form.  That<br>2  calls for a legal conclusion as well.<br>3         MR. ROACH:  Join.<br>4     A.  There is affidavits where people make<br>5  statements that everybody knew.  But there wasn't<br>6  any --<br>7     Q.  (By Ms. Freudenberger) Right.  There<br>8  are affidavits where people make statements that<br>9  everybody knew, and then on the other hand the<br>10 individual defendants say we didn't know anything<br>11 at all.  That's a fair general characterization<br>12 of the record on this issue, correct?<br>13        MR. COOPER:  Object to form.<br>14        MS. EVERS GUERRA:  Join.<br>15        MR. ROACH:  Join.<br>16    A.  Yes, that's a general characterization,<br>17 correct.<br>18    Q.  (By Ms. Freudenberger) Okay.  And those<br>19 two things are completely contradictory, correct?<br>20        MS. EVERS GUERRA:  Object to form.<br>21        MR. COOPER:  Object to form.<br>22        MR. ROACH:  Join.<br>23    A.  Not necessarily.<br>24    Q.  (By Ms. Freudenberger) Well, let's put<br>25 it this way.  I'm just trying to get at the | Page 105<br>1  reading what you are saying, I would agree with<br>2  you.<br>3     Q.  Okay.  And Tim Maskill's affidavit<br>4  indicates that everybody in the department knew<br>5  about some of these corruption allegations<br>6  against Detective Golubski, correct?<br>7         MR. ROACH:  Object to form.<br>8         MR. COOPER:  Object to form.<br>9         MS. EVERS GUERRA:  Join.<br>10    A.  He mentioned the people in the<br>11 department know but he doesn't mention who he<br>12 told or that he challenged Blood about it or any<br>13 of that, just the generalized statement that<br>14 everybody knew.<br>15    Q.  (By Ms. Freudenberger) I understand.<br>16 But you are not in a position to testify as to<br>17 whether Clyde Blood's denials of ever hearing<br>18 anything about Golubski engaging in this type of<br>19 misconduct are credible, that's not something<br>20 that you are doing in this case, correct?<br>21    A.  I'm not saying whether Clyde is credible<br>22 or not.  I'm just simply saying based upon what I<br>23 reviewed, I didn't find anything that<br>24 specifically said that Clyde Blood knew about the<br>25 allegations. |

| Page 126 | Page 128 |
|---|---|
| 1  MS. EVERS GUERRA: Object to form.<br>2  MR. ROACH: Join.<br>3  MR. COOPER: Join.<br>4  A. I mean, he has got experience it seems<br>5 like in the area and you have hired him as an<br>6 expert so I assume you believe he is qualified to<br>7 offer expert opinion in this case.<br>8  Q. (By Ms. Freudenberger) I'm not asking<br>9 about my belief. I'm actually asking you<br>10 objectively. Would you agree objectively that<br>11 Russ Fischer has exceptional qualifications when<br>12 it comes to police procedures around homicide<br>13 investigations?<br>14  MS. EVERS GUERRA: Object to form.<br>15  MR. COOPER: Object to form.<br>16  MR. ROACH: Join.<br>17  A. Yes, I think based on his resumé he has<br>18 qualifications to be an expert witness.<br>19  Q. (By Ms. Freudenberger) It is a<br>20 different question. Would you agree that Russ<br>21 Fischer is exceptionally qualified to opine to<br>22 the investigative issues concerning homicide<br>23 cases?<br>24  MS. EVERS GUERRA: Object to form.<br>25 Asked and answered. | 1  Q. Okay. Would you agree that Russ Fischer<br>2 has much more extensive experience with homicide<br>3 investigations than you do?<br>4  MS. EVERS GUERRA: Object to form.<br>5  MR. ROACH: Join.<br>6  A. I mean, remind me how many<br>7 investigations. I'm not recalling what his<br>8 experience is. I know it was listed. But if it<br>9 went into detail in his deposition, I'm not<br>10 recalling that right now.<br>11  Q. (By Ms. Freudenberger) All right. Fair<br>12 enough. Have you ever been an instructor for the<br>13 IACP?<br>14  A. No.<br>15  Q. Have you ever been a hired as an<br>16 instructor on any topic related to homicide<br>17 investigations by any national organization?<br>18  A. No.<br>19  Q. Ever done any work for the U.S.<br>20 Government?<br>21  A. No, no, I have not.<br>22  Q. Okay. Have you ever taught at the<br>23 undergraduate level?<br>24  A. Not in the university setting, no.<br>25  Q. And since you retired from the Lawrence |

| Page 127 | Page 129 |
|---|---|
| 1  MR. COOPER: Asked and answered.<br>2  A. If you want to be specific, based upon<br>3 his opinion, no.<br>4  Q. (By Ms. Freudenberger) Okay. Why? Did<br>5 you hear me, sir? I asked why.<br>6  A. You froze their for a second.<br>7  Q. I asked why.<br>8  A. I think you were asking me a lot of<br>9 questions earlier about making credibility<br>10 statements and how that would not be maybe<br>11 appropriate, but I see his reports full of<br>12 assumptions, speculation, credibility<br>13 determinations, a lot of those things that you<br>14 were asking me about. So just throughout our<br>15 action, if you look at asking the same questions<br>16 of him as an expert that you just asked me, I<br>17 think he would have a hard time answering the<br>18 questions you asked me as well. So in terms of<br>19 I'm not saying what his qualifications are, what<br>20 his background is, but just the way he put his<br>21 opinions together would suggest a lot more of<br>22 treading into that, making a credibility<br>23 determination of folks.<br>24  Q. And you reviewed his deposition, right?<br>25  A. Yes. It has been a little while. | 1 Police Department, what kind of work have you<br>2 been doing?<br>3  A. I'm currently Law Enforcement Leadership<br>4 Academy Program Director at the Public Management<br>5 Center at KU.<br>6  Q. And we talked about this is the first<br>7 civil case in which you have been retained as an<br>8 expert. But you have been retained as an expert<br>9 in criminal cases, correct?<br>10  A. Yes, when I have testified before deemed<br>11 an expert by the court on certain topics.<br>12  Q. My question is a little different. You<br>13 have testified over the course of your career in<br>14 criminal cases, obviously?<br>15  A. Yes.<br>16  Q. Okay. And have you been hired as an<br>17 expert consultant to testify in criminal cases?<br>18  A. No. Maybe I misunderstood that question<br>19 when you first asked it. No, I have not.<br>20  Q. Okay. So this is the first case in<br>21 which you have been hired as an expert consultant<br>22 on a policing issue; fair to say?<br>23  A. That's correct.<br>24  Q. Do you know how Mr. Sturdivan got your<br>25 name? |

33 (Pages 126 - 129)

Page 258

1 Defendant Ware's testimony on that point?
2    A.   I don't dispute he said that.
3    Q.   No, I'm asking, do you dispute his
4 testimony?  Do you dispute the accuracy of that
5 testimony?
6    A.   I think his testimony also included that
7 from a practical point of view he was never asked
8 to follow up from Lieutenant Culp or asked
9 questions about.  I think some of the defendants,
10 I pointed this out in my opinion, some of the
11 officers agree in theory that as a supervisor
12 this is an expectation, but then they couldn't
13 give specific examples of any time they were
14 actually asked questions.  The detectives had
15 wide berth to do whatever they needed to do and
16 the lieutenant was mostly just for resources.  So
17 I think the answer is bigger than just what Ware
18 said.
19    Q.   What I'm asking you about is actually
20 not what happened in practice.  I'm asking about
21 Culp's obligation.  I'm using the word
22 obligation, because that was what Defendant Ware
23 testified to at his deposition.  He testified
24 that Lieutenant Culp had an obligation to ensure
25 that the detectives investigating crimes under

Page 259

1 his command were taking all reasonable steps to
2 follow the cases they were charged with
3 investigating.  Do you dispute that testimony?
4        MR. COOPER:  Object to form.
5    Q.   (By Ms. Freudenberger)  Not that it was
6 said, but something --
7    A.   I don't dispute that he said that.  But
8 I think from a practical point of view that's not
9 what occurred.
10    Q.   I understand.  I agree with you.  Do you
11 dispute that Lieutenant Culp had an obligation to
12 ensure that the detectives investigating crimes
13 under his command were taking all reasonable
14 steps they were charged with to investigate it?
15    A.   It depends on what the investigative
16 structure was.  If you recall, when I was
17 describing the two different, where one person
18 like a supervisor is managing things and the
19 detectives are eyes and ears, versus hey, I
20 assign this to a detective and then I expect you
21 to do all of those things you just mentioned,
22 make sure everything is done and have an
23 obligation to do all of those other things.
24    Q.   So one possibility is Ware, who actually
25 held this position, had it wrong, and in fact a

Page 260

1 different supervisory structure was being
2 utilized as you describe in your report, right?
3        MS. EVERS GUERRA:  Object to form.
4        MR. COOPER:  Join.
5    A.   As you pointed out he was an acting
6 supervisor on certain things so he may not have
7 had the same understanding of what Culp might
8 have had.
9    Q.   (By Ms. Freudenberger)  And another
10 possibility is that Lieutenant Culp did have the
11 obligation that Defendant Ware describes, he just
12 didn't do it in this case, correct?
13    A.   I mean, you have to put it in the
14 context of what's going on at the time.  It is
15 incredibly busy, tons of homicides occurring.  So
16 if he didn't do it, and he didn't do it on
17 purpose, then I think maybe that's a failure in
18 his obligation.  But if he is so busy and he has
19 already handed this off to another detective to
20 now do those other things and he has basically
21 transferred that obligation to the folks he
22 assigned the case to, then I don't know that that
23 would be a true statement all the time.
24    Q.   And how do you transfer the obligation
25 for supervising a homicide investigation to the

Page 261

1 people who are investigating it?
2    A.   You assign the lead detective.  And the
3 testimony is that once lead detectives are
4 assigned, they make all of the decisions in terms
5 of that case, they decide whether they
6 investigate past the arrest or not, whether
7 additional follow-up is done, all of that.  There
8 is deposition testimony that states how
9 detectives worked cases in Kansas City, Kansas in
10 1994.
11    Q.   Is it your testimony it would have been
12 consistent with Detective -- Lieutenant Culp's --
13 he was a lieutenant at this time, Culp?
14    A.   I believe so, yes.
15    Q.   Is it your testimony that it would have
16 been consistent with Lieutenant -- Lieutenant
17 Culp would have met his obligations in this
18 double homicide case by simply saying to Golubski
19 you know what, I'm busy, I'm going to transfer my
20 responsibilities to supervise you in this double
21 homicide investigation to you, to supervise
22 yourself?
23        MS. EVERS GUERRA:  Object to form.
24    A.   Given what I understand from the record,
25 it appears that's how the detective division was

Page 262

1 run and that's what the expectation was. So, he
2 met his obligation according to how things were
3 structured and how investigations were taken care
4 of in that timeframe.
5    Q. (By Ms. Freudenberger) What is the
6 basis for that testimony you just gave here?
7 Where does it say that's how the detective
8 division was run, that Lieutenant Culp authorized
9 the detectives to supervise themselves on
10 homicide investigations?
11         MR. COOPER: Object to form.
12 Misstates the testimony.
13         MR. ROACH: Join.
14    A. I don't know that I said supervise
15 themselves. I said supervise the investigation,
16 make investigative decisions about what happens
17 next. I don't think I said supervise himself. I
18 mean Ware, Blood and I believe Maskill all talked
19 about that.
20    Q. (By Ms. Freudenberger) Did you consider
21 KCK PD General Order 93.4 on the supervisor's
22 responsibility for seeing that work is performed
23 in accordance with management's expectations, in
24 formulating your expert opinions in this case?
25    A. I don't remember specifically whether I

Page 263

1 looked at that or not.
2    Q. You will agree the way you just told me
3 about the way that you inferred that the
4 department operated based when it came to
5 supervision in homicide cases based on the
6 deposition testimony is directly contrary to
7 Defendant Ware's statement at his deposition that
8 Lieutenant Culp had an obligation to ensure that
9 the detectives investigating crimes under his
10 command were taking all reasonable steps to
11 follow through on their case, correct?
12         MS. EVERS GUERRA: Object to form.
13         MR. COOPER: Join.
14    A. I don't think it was contradictory. I
15 think Ware also stated -- he believes that's the
16 obligation, but also understood that it didn't
17 happen that way sometimes. So, it is not solely
18 a contradiction. It is generally what we think
19 our obligation is and from a practical standpoint
20 of what it actually ends up being while we are
21 working cases.
22    Q. (By Ms. Freudenberger) So sometimes the
23 way it works is that detectives have obligations
24 on paper, but in practice they don't follow those
25 obligations, is that your testimony?

Page 264

1         MS. EVERS GUERRA: Object to form.
2    A. No, that's not what I stated.
3    Q. (By Ms. Freudenberger) Would you agree
4 that Defendant Ware is in a better position than
5 you are to know what the obligations of the
6 lieutenant in charge of the crimes against
7 persons bureau were in the mid nineties in the
8 Kansas City, Kansas Police Department?
9         MS. EVERS GUERRA: Object to form.
10    A. Not necessarily.
11    Q. (By Ms. Freudenberger) No? Okay. What
12 qualifies you to know what the obligations,
13 Lieutenant Culp's obligations were at the time?
14    A. I have had access to all of the other
15 information in the case and Ware hasn't.
16    Q. Like what?
17    A. In terms of the other people's
18 deposition testimony, affidavit information, a
19 lot of -- I think Ware, he was asked about his
20 involvement in a vacuum. He does not necessarily
21 have the bigger picture of everything else going
22 on because his recollection was not there.
23    Q. I see. So what qualifies you to better
24 understand the obligations is the amount of --
25 the complete record that you have been able to

Page 265

1 review in this case, which he has not, correct?
2    A. That's correct.
3    Q. You would agree that if Defendant Smith
4 was told that Stacy Quinn knew who the
5 perpetrator was and intentionally omitted that
6 from his interview, that would be a violation of
7 minimally accepted police practices, right?
8    A. I think if somebody intentionally omits
9 something, that would be a cause for concern,
10 yes.
11    Q. By the way, you wrote on page 8 of our
12 report, "When an arrest is made early due to the
13 circumstances as in this case, it places
14 additional importance on the post-arrest
15 investigation to continue to gather information."
16 Do you stand by that statement?
17    A. What page are you on?
18    Q. Page 8.
19    A. 'M sorry, what line?
20         MS. EVERS GUERRA: Can you repeat,
21 Emma?
22    Q. (By Ms. Freudenberger) Sure. The last
23 two sentences of the paragraph
24 under Responsibilities for Investigation.
25    A. Okay. What was your question about?