## UNITED STATES DISTRICT COURT
## DISTRICT OF KANSAS

LAMONTE MCINTYRE and )
ROSE LEE MCINTYRE, )
 )
                Plaintiffs, )
 )
        v. )        Case No. 2:18-CV-02545-KHV-KGG
 )
UNIFIED    GOVERNMENT    OF )
WYANDOTTE COUNTY, *et al.*, )
 )
                Defendants. )

## DEFENDANT ROGER GOLUBSKI'S
## MEMORANDUM IN SUPPORT OF HIS MOTION FOR SUMMARY JUDGMENT

COMES NOW Defendant Roger Golubski, by and through counsel, and submits his Memorandum in Support of his Motion for Summary Judgment which is being filed contemporaneously herewith.

### I.   NATURE OF THE MATTER BEFORE THE COURT

Plaintiffs Lamonte and Rose McIntyre brought this action alleging federal and state claims against Defendant Unified Government of Wyandotte County and Kansas City, Kansas, and individual defendants arising from the 1994 arrest, conviction, and subsequent twenty-three-year incarceration of Plaintiff in connection with a double homicide shooting. Defendant Roger Golubski is one of the individual defendants, all of whom are current or former employees of the Kansas City, Kansas Police Department.

The record will demonstrate that, despite the scandalous allegations against Golubski, the McIntyre's have no admissible evidence that could lead a reasonable jury to conclude Golubski framed Lamonte, fabricated evidence, coerced evidence, otherwise knew that the two positive identifications by Niko Quinn and Ruby Mitchell were incorrect, or that any actions Golubski took

violated clearly established law. Importantly, Ruby Mitchell has never recanted her identification of Lamonte McIntyre and to the extent Niko Quinn lied at trial, she did so only because she was threatened by the prosecutor, not Golubski. For these and other reasons explained below, Golubski is entitled to summary judgment on all counts.

TABLE OF CONTENTS

Table of Contents .................................................................................................. iii

Table of Authorities ............................................................................................... v

Exhibit List ........................................................................................................... ix

I.      Nature of the Matter Before the Court ............................................................1

II.     Statement of Uncontroverted Material Facts ................................................... 2

III.    Questions Presented ...................................................................................... 20

IV.     Argument and Authorities ..............................................................................23

        A.      Summary Judgment Standard ...............................................................23

        B.      Impact of Fifth Amendment Invocation on Summary Judgment ..........23

        C.      Qualified Immunity Standards.............................................................. 24

        D.      Count II: Lamonte's Fourteenth Amendment Fabrication Claims..................... 24

                1.      Golubski did not fabricate evidence, and regardless, in 1994 there was no
                        clearly established law establishing Golubski's conduct constituted
                        fabrication. ......................................................................................... 24

        E.      COUNT II: Defendant Golubski is entitled to qualified immunity as to Lamonte's
                claim that he committed Brady violations because Golubski did not fail to disclose
                any Brady material, let alone clearly established Brady material. ..........................27

                1.      In 1994, it was not clearly established that a police officer, as opposed to the
                        prosecutor, had an affirmative duty to disclose Brady material............... 28

                2.      The law does not require an officer to disclose his own misconduct
                        unrelated to the subject investigation and, if it does, such law was not clearly
                        established in 1994. .................................................................. 29

                3.      The law does not require an officer to disclose his own misconduct related
                        to the subject investigation and, if it did, the clearly established law only
                        required the disclosure of existing evidence. ............................................ 29

                4.      Much of Lamonte's alleged Brady material cannot be determined as such
                        because the evidence is too uncertain to permit a court to determine
                        whether it would have been material to Lamonte's guilt or innocence in
                        1994. ....................................................................................... 30

                5.      It was not clearly established in 1994 inadmissible evidence was subject to
                        disclosure in 1994 ...................................................................... 30

                6.      Niko Quinn's Meeting with Golubski behind Wyandotte High School was
                        not helpful to Lamonte, as determined by the Kansas Supreme Court. ....31

F.      Counts I & VIII: Lamonte's Malicious Prosecution Claims Fail Because sufficient cause existed, or at least a reasonable official would have believed probable cause existed, to arrest, detain, and prosecute Lamonte. .................................................31

      1.     Golubski had probable cause, or at least arguable probable cause. ............32

      2.     All of this probable cause evidence should be included in the analysis......36

G.      COUNTS I, II, III, V, & VIII: Lamonte McIntyre cannot demonstrate that Golubski caused his alleged constitutional deprivations. ......................................................39

      1.     Golubski was but one of many investigators and officers involved in Lamonte's investigation. He was not the cause of Lamonte's arrest, detention, or prosecution. ........................................................................39

      2.     Ruby Mitchell and Niko Quinn's in-court identifications were months after any alleged police wrongdoing, breaking the chain of causation. ...............41

H.      COUNT I: The Fourth Amendment Provides No "Malicious Prosecution" Claim. .............................................................................................................................45

I.      COUNT I:  Lamonte's § 1983 Fourteenth Amendment Claims are barred because there exists an adequate remedy at state law. ........................................................45

J.      COUNT V: Conspiracy ....................................................................................... 46

K.      COUNT III: Familial Association ....................................................................... 48

      1.     Both Plaintiffs ..................................................................................... 48

      2.     Lamonte's Familial Association Claim ...................................................... 51

V.      Conclusion .........................................................................................................53

TABLE OF AUTHORITIES

CASES

*Apodaca v. Rio Arriba Cty. Sheriff's Dep't*, 905 F.2d 1445 (10th Cir. 1990) ..............................49, 50

*BancInsure, Inc. v. McCaffree*, 3 F. Supp. 3d 904 (D. Kan. 2014) ....................................................23

*Baxter v. Palmigiano*, 425 U.S. 308, 96 S. Ct. 1551, 47 L. Ed. 2d 810 (1976) .................................23

*Becker v. Kroll*, 494 F.3d 904 (10th Cir. 2007) ......................................................................... 31, 32

*Bledsoe v. Board of County Commissioners of County of Jefferson*, 501 F. Supp. 3d. 1059 (D. Kan., Nov. 18, 2020) ...................................................................................................................... 46

*Brandt v. City of Westminster*, 300 F. Supp. 3d 1259 (D. Colo. 2018) ...........................................35

*Brigham City, Utah v. Stuart*, 547 U.S. 398 (2006).........................................................................34

*Bryson v. City of Edmond*, 905 F.2d 1386 (10th Cir. 1990)......................................................49, 50

*Burton v. Richmond*, 370 F.3d 723 (8th Cir. 2004) ....................................................................... 29

*Butera v. District of Columbia,* 235 F.3d 637 (D.C. Cir. 2001).................................................... 50

*Clanton v. Cooper*, 129 F.3d 1147 (10th Cir. 1997) .............................................................. 36, 37, 38

*Collaizzi v. Walker*, 812 F.2d 304 (7th Cir. 1987)......................................................................... 49

*Crowe v. Cty. of San Diego*, 303 F. Supp. 2d 1050 (S.D. Cal. 2004) ..............................................36

*Crowe v. Cty. of San Diego*, 593 F.3d 841 (9th Cir. 2010) ..............................................................36

*Crowe v. Cty. of San Diego*, 608 F.3d 406 (9th Cir. 2010)..............................................................36

*Crowe v. Cty. of San Diego*, No. 99CV0241 R (RBB), 2005 WL 8156613 (S.D. Cal. Apr. 11, 2005) ............................................................................................................................................36

*Cruz v. City of Albuquerque*, No. CIV 17-676 JAP/SCY, 2019 WL 1085160 (D.N.M. Mar. 6, 2019) ....................................................................................................................................... 32, 33

*Darwin v. Connecticut*, 391 U.S. 346 (1968)................................................................................. 42

*DeLoach v. Bevers*, 922 F.2d 618 (10th Cir. 1990) .........................................................................41

*Doe ex rel. Rudy-Glanzer v. Glanzer*, 232 F.3d 1258 (9th Cir. 2000) ...............................................23

*Fraiser v. Evans*, 992 F.3d 1003 (10th Cir. 2021)............................................................................. 46

*Franz v. Lytle*, 791 F. Supp. 827 (D. Kan. 1992)............................................................................... 48

*Gadd v. Campbell*, 712 F. App'x 796 (10th Cir. 2017) ..................................................................... 24

*Good v. Board of County Com'rs of Shawnee County*, 209 F. Supp. 2d 1124 (D. Kan. 2002)46,   47, 48

*Grider v. City of Auburn, Ala.*, 618 F.3d 1240 (11th Cir. 2010)....................................................... 46

*Griffin v. Strong*, 983 F.2d 1540 (10th Cir. 1993) .......................................................... 36, 49, 50, 51

*Halley v. Huckaby*, 902 F.3d 1136 (10th Cir. 2018)............................................................. 48, 49, 51

*Hart v. Mannina*, 798 F.3d 578 (7th Cir. 2015) .................................................................................32

*Harte v. Board of Commissioners of County of Johnson, Kansas*, 864 F.3d 1154 (10th Cir. 2017) .....33

*Hedger v. Kramer*, 726 F. App'x 677 (10th Cir. 2018) ..................................................................... 50

*Hedger v. Kramer*, No. CIV-13-0654-HE, 2014 WL 1645792 (W.D. Okla. Apr. 24, 2014) ........... 50

*Hill v. New Orleans City*, 643 F. App'x 332 (5th Cir. 2016) ............................................................ 49

*Hill v. New Orleans City*, No. CIV.A. 13-2463, 2015 WL 222185 (E.D. La. Jan. 13, 2015) ........... 49

*Hunter v. Bryant*, 502 U.S. 224, 112 S.Ct. 534, 116 L.Ed.2d 589 (1991)..........................................32

*Illinois v. Gates*, 462 U.S. 213 (1983) ..............................................................................................35

*J.B. v. Washington County*, 127 F.3d 919 (10th Cir.1997)............................................................... 50

*Jean v. Collins*, 221 F.3d 656 (4th Cir. 2000)................................................................................... 28

*JL ex rel. Thompson v. N.M. Dep't of Health*, 165 F. Supp. 3d 996 (D. N.M. 2015) .......................51

*Kaley v. United States*, 571 U.S. 320, 134 S. Ct. 1090, 188 L. Ed. 2d 46 (2014) .............................34

*Karr v. Smith*, 774 F.2d 1029 (10th Cir. 1985) .................................................................................32

*Kennedy v. Peele*, 552 F. App'x 787 (10th Cir. 2014) ......................................................................25

*Kyles v. Whitley*, 514 U.S. 419 (1995) ............................................... 28

*LaSalle Bank Lake View v. Seguban*, 54 F.3d 387 (7th Cir. 1995) ................................. 23

*Lassiter v. Alabama A&M University*, 28 F.3d 1146 (11th Cir. 1994) ........................... 49

*Legenzoff v. Steckel*, 564 F. App'x 136 (6th Cir. 2014) ....................................... 32, 33, 39

*Leon v. Wainwright*, 734 F.2d 770 (11th Cir. 1984) ......................................... 42

*Lester v. Roberts*, 986 F.3d 599 (6th Cir. 2021) .......................................... 32, 35

*Lyons v. Oklahoma*, 322 U.S. 596 (1944) ................................................ 42

*Manual v. City of Joliet, Ill.*, 137 S.Ct. 911 (2017) .................................... 45, 51

*Margheim v. Buljko*, 855 F.3d 1077 (10th Cir. 2017) ...................................... 45

*Martinez v. Carr*, 479 F.3d 1292 (10th Cir. 2007) ......................................... 24

*McCurdy v. Dodd*, 352 F.3d 820 (3rd Cir. 2003) .......................................... 50

*Mullenix v. Luna*, 577 U.S. 7, 136 S. Ct. 305, 193 L. Ed. 2d 255 (2015) ........................ 33

*Myers v. Koopman*, 738 F.3d 1190 (10th Cir. 2013) ......................................... 46

*Oliver v. Woods*, 209 F.3d 1179 (10th Cir. 2000) ......................................... 35

*Perry v. Durborow*, 892 F.3d 1116 (10th Cir. 2018) .................................... 24, 49

*Pierce v. Gilchrist*, 359 F.3d 1279 (10th Cir. 2004) ..................................... 25, 29

*Przybysz v. City of Toledo*, 302 F. Supp. 3d 915 (N.D. Ohio 2017) ............................ 50, 51

*Reasonover v. St. Louis County*, 447 F.3d 569 (8th Cir. 2006) ................................ 49

*Reed v. City of Chicago*, 77 F.3d 1049 (7th Cir. 1996) ...................................... 40

*Rivera v. Guevara*, 319 F. Supp. 3d 1004 (N.D. Ill. 2018) .................................. 23

*Sanchez v. Hartley*, 810 F.3d 750 (10th Cir. 2016) ........................................ 39

*Saunders-El v. Rohde*, 778 F.3d 556 (7th Cir. 2015) ....................................... 29

*Serrano v. Guevara*, 315 F. Supp. 3d 1026 (N.D. Ill. 2018) .................................. 30, 39

*Sharp v. Rohling*, 793 F.3d 1216 (10th Cir. 2015) .............................................................38

*Simuro ex rel. K.S. v. Shedd*, 176 F. Supp. 3d 358 (D. Vt. 2016) .....................................51

*Six v. Henry*, 42 F.3d 582 (10th Cir. 1994) ...................................................................... 46

*Smith v. Secretary of New Mexico Dept. of Corrections*, 50 F.3d 801 (10th Cir. 1995)...................... 28

*Snell v. Tunnell*, 920 F.2d 673 (10th Cir. 1990) ............................................................... 46

*Snow v. Sirmons*, 474 F.3d 693 (10th Cir. 2007)..............................................................25, 30, 42

*State v. McIntyre*, 259 Kan. 488, 912 P.2d 156 (Kan. 1996) ............................................31

*Stenocipher v. Valles*, 759 F.3d 1134 (10th Cir. 2014) .....................................................33

*Stewart v. City of Prairie Village, Kansas*, 904 F. Supp. 2d 1143 (D. Kan. 2012) ............................51

*Sykes v. Anderson*, 625 F.3d 294 (6th Cir. 2010) .............................................................39

*Taylor v. Meachum*, 82 F.3d 1556 (10th Cir. 1996).............................................................41

*Thomas v. Kaven*, 765 F.3d 1183 (10th Cir. 2014) ............................................................51

*Tiscareno v. Anderson*, 639 F.3d 1016 (10th Cir. 2011) ................................................... 29

*Trujillo v. Board of County Com'rs of Santa Fe County*, 768 F.2d 1186 (10th Cir. 1985)48, 49, 50, 51

*Truman v. Orem City*, 1 F.4th 1227 (10th Cir. 2021) .................................................25, 27

*U.S. v. Anderson*, 31 F. Supp. 2d 933 (D. Kan. 1998) ..................................................... 30

*U.S. v. Gonzalez*, 164 F.3d 1285 (10th Cir. 1999) ............................................................36

*U.S. v. Lopez*, 437 F.3d 1059 (10th Cir. 2006)............................................................41, 42

*U.S. v. McCullah*, 76 F.3d 1087 (10th Cir. 1996).............................................................36

*U.S. v. Michael Lynn Cash*, 733 F.3d 1264 (10th Cir. 2013)............................................36

*U.S. v. Perdue*, 8 F.3d 1455 (10th Cir. 1993)............................................................41, 42

*United States v. Astello*, 241 F.3d 965 (8th Cir. 2001)......................................................36

*United States v. Hensley*, 469 U.S. 221, 105 S.Ct. 675, 83 L.Ed.2d 604 (1985)...............................35

*United States v. Lee Vang Lor*, 706 F.3d 1252 (10th Cir. 2013) ....................................................... 29

*White v. Pauly*, 137 S. Ct. 548 196 L. Ed. 2d 463 (2017) .................................................................. 24

*Wilkins v. DeReyes*, 528 F.3d 790 (10th Cir. 2008) ............................................................. 32, 41, 42

*Wilson v. Layne*, 526 U.S. 603 (1999) ............................................................................................ 29

**STATUTES**

K.S.A. § 60-447 ................................................................................................................................ 31

**RULES**

Fed. R. Civ. P. 56(c) ........................................................................................................................ 23

**EXHIBIT LIST**

| No. | Document Description |
|---|---|
| 1 | KCKPD Investigative File, (the "Case File") |
| 2 | Deposition of Niko Quinn |
| 3 | Niko Quinn Witness Statement |
| 4 | Transcript of Niko Quinn DA Interview |
| 5 | Transcript of June 28, 1994 Preliminary Hearing |
| 6 | Trial Transcript of Lamonte's Murder Trial |
| 7 | Deposition of James McCloskey |
| 8 | Affidavit of Ruby Mitchell |
| 9 | Deposition of Ruby Mitchell |
| 10 | 2014 Affidavit of Niko Quinn |
| 11 | Ruby Mitchel Audio Recording Clip 1 "Looked Like Lamonte" |
| 12 | Affidavit of James McCloskey |
| 13 | Excerpt of McCloskey's Testimony at Exoneration Hearing |
| 14 | Deposition of Bernard Crawford |
| 15 | Deposition of Joe Robinson |
| 16 | 1996 Transcript Re Motion for New Trial |
| 17 | Affidavit of Freda Quinn |
| 18 | Deposition of Freda Quinn |
| 19 | 1996 Niko Quinn Affidavit |
| 20 | Documents from 1992 Armed Robbery |
| 21 | Mark Songer Report |
| 22 | Ruby Michell Audio Recording Clip 2 "Easily Identified Lamonte" |
| 23 | Ruby Mitchell Audio Recording Clip 3: "No Lamonte Drain Photo" |
| 24 | Arrest Report |
| 25 | Juvenile Complaint |

| 26 | Detention and Bond Order |
| 27 | April 19 and 21 Prosecutorial Supplement |
| 28 | Deposition of Terra Morehead. |
| 29 | Deposition of Lamonte McIntyre |
| 30 | DA Lamonte McIntyre Prior |
| 31 | Jermaine McIntyre |
| 32 | February 27 Arrest |

## II.    STATEMENT OF UNCONTROVERTED MATERIAL FACTS

The following facts are uncontroverted for purposes of summary judgment only, and for no other purpose.

### The Parties & Nature of Claim

1.    Plaintiff Lamonte McIntyre (Lamonte)[1] was convicted in September of 1994 for the April 15, 1994, murders of Doniel Quinn and Donald Ewing.  Lamonte McIntyre spent twenty-three years in prison for the murders before being exonerated. (Doc. 562: Pre-Trial Order, Factual Stipulations ¶ 15)

2.    Roger Golubski (Golubski) is a former Detective for the Kansas City Kansas Police Department.  Roger Golubski was one of the detectives that investigated the April 15, 1994 murders. (Doc. 562: Pre-Trial Order, Factual Stipulations ¶ 2; Exhibit 1: Case File, LMKSDC0003392-3395)

3.    Rose McIntyre (Rose) is Lamonte's mother.  Rose alleges Golubski sexually assaulted her many years before the April 15, 1994, murders of which Lamonte was convicted. (Doc. 562: Pre-Trial Order, Plaintiff's Legal Claims, p. 43–44)

4.    Lamonte and Rose McIntyre's lawsuit generally alleges Lamonte was framed by Detective Golubski and others in the Kansas City Kansas Police Department. The lawsuit alleges that Detective Golubski's motive for framing Lamonte McIntyre was Rose declined his sexual advances. (Doc. 562: Pre-Trial Order, Plaintiff's Legal Claims, p. 43–44)

### Eyewitness Niko Quinn & her boyfriend Chris Jones aka "C-Love" aka "The Grim Reaper"

5.    Niko Quinn was the close cousin of one of the decedents, Doniel Quinn, and witnessed the murders on April 15, 1994. (Exhibit 1: Case File at  LMKSDC0003393, 3417–3419;

---

[1] For purposes of clarity, since both Plaintiffs share a last name, we will refer to Plaintiff Lamonte McIntyre as "Lamonte" and Rose McIntyre as "Rose."

Exhibit 2: Deposition of Niko Quinn, tr. 20:15–21)

6.      Niko Quinn lived at 3018 Hutchings, which was only a few doors down from where the shooting occurred. Niko Quinn had "few" drug houses at the time of the murders. (Exhibit 2: Deposition of Niko Quinn tr. 73:4–9, 30:4–33:14)

7.      Niko Quinn lived with her kids and boyfriend Chris Jones, aka "C-Love" aka "The Grim Reaper." Like Niko Quinn, Chris Jones was also a drug dealer and was feared in the neighborhood. (Exhibit 3: Statement of Niko Quinn, LMKSDC0003417–3419, Exhibit2: Deposition of Niko Quinn, tr. 29:9–30:10, 14:17–24, 47:4–19)

8.      In April of 1994, Niko Quinn only dated and hung around big-time drug dealers. That was her "motto." (Exhibit 4: Transcript of Niko Quinn's DA Interview, tr. 35:5–36:6)

9.      The big-time drug dealer she was dating on April 15, 1994, was Christopher Jones, also known as "C-Love" and the "Grim Reaper." (Exhibit 2: Deposition of Niko Quinn, tr. 14:17–2447:1–19, 27:14–29:4)

10.      While there were other violent and big-time drug dealers in the Kansas City, Kansas area drug trade, even those other drug dealers feared C-Love, including Cecil Brooks.  (Exhibit 2: Deposition of Niko Quinn, tr. 47:1–19)

11.      C-Love utilized the Edgar Family—led by Neil "Ace" Edgar, Sr.—for his supplier of drugs, specifically Ace's daughter, Monita. (Exhibit 2: Deposition of Niko Quinn, tr. 34:19–35:19, 52:24–53:6)

12.      At one point, Niko Quinn accused Chris Jones of the murders. She was told the same by people in her family. (Exhibit 2: Deposition of Niko Quinn, tr. 116:9–23)

**Eyewitness Ruby Mitchell**

13.     At the time of the April 15, 1994 murders, Ruby Mitchell lived across the street from where the murders took place (3020 Hutchings) and witnessed the shooting. (Exhibit 1: Case File, Ruby Mitchell Statement at LMKSDC0003421–3425)

14.     Ruby Mitchell identified Lamonte as the shooter in the April 15, 1994, murders twice in open Court. (Exhibit 5: Preliminary Hearing Transcript, tr. 9:5–14; Exhibit 6: Trial Transcript, tr. 174:26–175:11, 208:2–8)

15.     To date, Ruby Mitchell has not recanted her identification of Lamonte McIntyre as the shooter. In Ruby Mitchell's 2011 affidavit, which was procured by Lamonte McIntyre's investigator James McCloskey, she did not recant, but rather asked for forgiveness, "if I made a mistake in the identification of Lamonte McIntyre. (Exhibit 7: Deposition of James McCloskey, tr. 46:9–18, 120:17–22; Exhibit 8: Ruby Mitchell Affidavit, ¶ 13)

16.     Ruby Mitchell did not know or ever recall seeing Detective Golubski prior to April 15, 1994. Ruby Mitchell never saw or spoke with Detective Golubski again after April 15, 1994. (Exhibit 9: Deposition of Ruby Mitchell, tr. 124:15–125:8)

17.     Police, including Roger Golubski, did not suggest, intimidate, or otherwise influence Ruby Mitchell into identifying Lamonte McIntyre as Doniel Quinn and Donald Ewing's murders but she was told that if she saw anyone, she noticed to point them out, and that is what she did. She picked out who she thought was the guy that come down the hill to kill Doniel and Donald. (Exhibit 9: Deposition of Ruby Mitchell, tr. 59:14-21, 112:24–113:1); Exhibit 6: Trial Transcript tr. 174:23–175:11, 179:2–7, 195:16–196:15; 205:2–8; Exhibit 5: Preliminary Hearing, tr. 18:21–23; Exhibit 11: Ruby Mitchell Interview Recording (Looked like Lamonte)

**Lamonte McIntyre's Investigator**

18.     James McCloskey was Lamonte's primary investigator for many years. Mr. McCloskey took it upon himself to try to exonerate Lamonte and, in the process, conducted numerous interviews and obtained numerous witness affidavits. (Exhibit 7: Deposition of James McCloskey, tr. 10:4–15, 91:19–92:14)

19.     McCloskey, believing the truth "evolves" over time, did not record most of his interviews with most witnesses. (Exhibit 7: Deposition of James McCloskey, tr. 45:1–5)

20.     McCloskey made approximately 19 trips to Kansas to interview over a hundred people. (Exhibit 12: Affidavit of James McCloskey, ¶ 11; Exhibit 13: Exoneration Hearing Transcript, 103:19–104:2; Exhibit 7: Deposition of James McCloskey tr 72:12–17)

21.     McCloskey, who is not an ordained minister or priest, wore a priest collar when he would interview witnesses. (Exhibit 7: Deposition of James McCloskey, tr. 127:9–128:6)

22.     One of the first things McCloskey did was find and interview Ruby Mitchell, he recorded that interaction. (Exhibit 13: 2017 Exoneration Hearing, tr. 104:3–23; Exhibit 7: Deposition of James McCloskey tr. 43:13–44:13 )

23.     At least two witnesses in this case have accused McCloskey of coercive, intimidating, suggestive, and/or harassing tactics. (Exhibit 14: Deposition of Bernard Crawford, tr. 21:4–24:21, Exhibit 15: Deposition of Joe Robinson, tr. 111:12–117:7)

**Murder Victim Doniel Quinn**

24.     One of the victims in the April 15, 1994 slaying was Doniel Quinn, who was a close cousin of Niko Quinn. Doniel Quinn had a drug addiction and, according to Lamonte's lead investigator, was a known drug addict and scandalous—he would steal to feed his addiction, including from his family. (Exhibit 2: Deposition of Niko Quinn tr. 33:25–34:3; Exhibit 7: Deposition of James McCloskey, tr. 101:4–17)

25.     Doniel Quinn also worked for another drug dealer who was close in proximity to one of Niko Quinn's drug houses. (Exhibit 4: Transcript of Niko Quinn's Meeting with District Attorney, tr. 1:23–2:15, Exhibit 2: Deposition of Niko Quinn, tr. 11:18–12:15, 142:14–17)

26.     Doniel Quinn worked in the drug trade as a doorman for a drug house that was not run by Niko Quinn or Chris Jones aka "C-Love" but would occasionally bring customers to one of Niko's houses to sell drugs. (Exhibit 2: Deposition of Niko Quinn, tr. 142:14–17)

**Doniel's Purported Debt for Stealing Drugs**

27.     Niko Quinn, Doniel's cousin, testified that a week or so before Doniel's murder, he had been beaten up by Aaron Robinson, Monster, and five others for being believed to have stolen drugs from one of their drug houses. (Exhibit 2: Deposition of Niko Quinn tr. 40:21–46:13)

28.     According to Niko, she sent her sister and her then-boyfriend, C-Love, to try to pay the debt—$4,000, which Niko had and was ready and willing to pay—but the offer was not accepted. (Exhibit 2: Deposition of Niko Quinn tr. 40:21–46:13)

29.     The night before Doniel was murdered, Aaron Robinson, Cecil Brooks, and Neil Edgar, Jr. (aka "Monster") stopped Doniel while he was walking with Niko and several others in between Niko's drug houses. Niko alleges C-Love pulled Doniel out of the car. (Exhibit 2: Deposition of Niko Quinn tr. 50:7–51:18; Exhibit 4: Transcript of District Attorney Interview, tr. 1:16–5:10)

**The April 15, 1994 Murders and Subsequent Investigatory Efforts**

30.     On April 15, 1994, around 2:00 p.m., a man walked down the hill from Hiawatha Street to a blue vehicle parked on Hutchings Street in Kansas City, Kansas, and fired numerous shotgun blasts into the car killing its occupants—Doniel Quinn and Donald Ewing. (Doc. 562: Pre-Trial Order, Factual Stipulations ¶ 5)

31.     The time police arrived at the scene, Stacy Quinn—Niko's sister who also witnessed the shooting—had left. She was not there. (Exhibit 16: Hearing on Motion for New Trial, tr. 28: 10–22)

32.     Stacy Quinn testified in a 1996 hearing that she left the area immediately after the shooting because she was hurting and mad. (Exhibit 16: Hearing on Motion for New Trial, tr. 28: 10–22)

33.     Stacy Quinn "stayed out" and did not go back home for a long time after the murders, instead, she was doing drugs to cope, around four times a day. (Exhibit 16: Hearing on Motion for New Trial, tr. 33:5–11)

34.     On April 4, 1996, at the hearing for New Trial, Stacy Quinn testified that she did not speak with police because she was messed up and on drugs at the time.  (Exhibit 16:  Hearing on Motion for New Trial, tr. 18:17–22)

**Niko Quinn's On-Scene Statement**

35.     Approximately forty-six minutes after the shooting, Niko Quinn gave a recorded statement to Detective W.K. Smith.  In her statement, Niko Quinn said she saw the shooting but didn't recognize the shooter. (Exhibit 1: Case File at LMKSDC003417-3419)

36.     Niko Quinn began to give her statement to officer W.K. Smith at the scene of the crime but her family and her boyfriend, Chris Jones, told her to stop talking. (Exhibit 2: Deposition of Niko Quinn, tr. 72:9–14; 67:10–17; 131:1–6)

37.     Before she was told to stop talking to police, Detective Smith asked her if Doniel had any trouble with anyone. Niko said "no," which Niko now admits was a lie. (Exhibit 3: Niko Quinn Witness Statement; Exhibit 2: Deposition of Niko Quinn, tr. 51:11–52:1; 72:9–14.)

38.     The culture at that time, at least in Niko Quinn's eyes, was not to cooperate with the police. (Exhibit 2: Deposition of Niko Quinn, tr. 72:9–18)

39.     Niko Quinn also told Detective Smith, and later testified twice in Court that she had never seen the shooter before that day. (Exhibit 3: Niko Quinn Statement, LMKSDC0003417–3419, Exhibit 6: Trial Transcript, tr. 143:9–16)

40.     Niko Quinn's closest aunt, Freda Quinn, came to the scene of the shooting minutes after it happened. (Exhibit 2: Deposition of Niko Quinn, tr. 20:1–8, Exhibit 17: Affidavit of Freda Quinn, ¶ 5)

41.     Niko told her Aunt Freda Quinn that she (Niko) had seen the shooter, knew him from school, and knew who he was. (Exhibit 17: Affidavit of Freda Quinn, ¶ 9; Exhibit 18: Deposition of Freda Quinn, tr. 38:16–39:2)

42.     The evening of the shooting, a news report on television stated that someone had been arrested for the double murder and a picture was flashed on the television screen. Niko Quinn said something to the effect of "they got the wrong guy." (Exhibit 17: Affidavit of Freda Quinn, ¶ 8; Exhibit 18: Deposition of Freda Quinn, tr. 40:18–24)

43.     The evening Lamonte was arrested (April 15, 1994), Tiffany Daniel told Niko Quinn that "Monster" committed the murders. (Exhibit 4: Transcript of Niko Quinn Interview with District Attorney, tr. 43:13–22)

44.     Niko Quinn admitted in a 1996 affidavit that she knew Lamonte McIntyre even though she testified in court that she had never seen Lamonte McIntyre before the shooting. (Exhibit 19: 1996 Niko Quinn Affidavit, ¶ 11; Exhibit 2: Deposition of Niko Quinn, tr. 87:23–88:3)

45.     Niko told the District Attorney in 2017 that she knew Neil Edgar, Jr. from her childhood, and saw him the night before trying to lure Doniel into his vehicle. (Exhibit 2: Deposition of Niko Quinn, tr. 1:23–5:6; Exhibit 2: Deposition of Niko Quinn, tr. 71:24–72:8)

46.     Niko Quinn told James McCloskey that Monster went to Robert and John Quinn's house with a shotgun with the message "keep your mouth shut." Robert and John Quinn communicated this to Niko Quinn.  (Exhibit 7: Deposition of James McCloskey, tr. 61:7–12)

**Ruby Mitchell Says the Shooter Looked Like a "Lamonte"**

47.     Detective Krstolich interviewed Ruby Mitchell and, when she indicated she would recognize the shooter if she saw him again, he asked her to go with him to the police station to prepare a composite sketch. (Exhibit 1: Case File at LMKSDC003441–3442; Exhibit 6: Trial Transcript, tr. 277:5–22)

48.     The officers allowed Ruby Mitchell the flexibility to go to the station later so she could tend to her children. (Exhibit 1: Case File at LMKSDC0003422)

49.     Krstolich worked with Ruby Mitchell to prepare a composite. After which, Ruby told Detective Krstolich of the name "Lamonte." (Exhibit 1: Case File at LMKSDC003441–3442)

50.     After Ruby Mitchell told Krstolich of the name "Lamonte" she agreed to look at photographs to try to identify a suspect.  (Exhibit 6: Trial Transcript, tr. 170:17–20; 280:10–18)

51.     Around 6:00 p.m. on April 15, 1994, Ruby Mitchel, an eyewitness to the shooting who called police, chose Lamonte McIntyre out of a stack of polaroid photographs, identifying him as the shooter. (Exhibit 1: Case File at LMKSDC0003421-3425, 3441–3441)

**Detectives Barber and Maskill developed the suspect's name, Lamonte McIntyre**

52.     Detectives Dennis Barber and Tim Maskill worked with their sources to see if they could develop any leads and "numerous sources" and "street talk" informed them of the name

"Lamonte McIntyre" as the shooter. (Exhibit 1: Case File at LMSKDC003433–3436 at 3434, LMKSDC003453; Exhibit 6: Trial Transcript, tr. 301:9–18, 306:15–25)

53.    Dennis Barber was directly responsible for obtaining the name Lamonte McIntyre. (Exhibit 6: Trial Transcript tr. 353:7–10)

54.    Detectives worked to put a photo array together that included a photograph of Lamonte McIntyre. (Exhibit1: Case File at LMKSDC003453)

55.    The photograph of Lamonte McIntyre and two others were taken from a file relating to a prior arrest involving an armed robbery in which Robert Goddell was the investigating detective.  Lamonte McIntyre eventually pleaded guilty to involvement in an armed robbery.  The back of the photos bears the initials of Robert Goddell—RG. (Exhibit 20: Documents from Armed Robbery Arrest; Exhibit 21: Mark Songer Report)

**Ruby Mitchell Identifies Lamonte's Photo**

56.    All three photographs taken by Robert Goddell were used in the set of photos shown to Ruby Mitchell. The other two photos shown to Ruby Mitchell came from Detective Golubski's collection of photos of individuals he had interacted with on the job. (Exhibit 21: Mark Songer Report)

57.    When shown several photos, Ruby Mitchell easily picked Lamonte McIntyre as the assailant. (Exhibit 22: Audio Recording of Ruby Mitchell  Regarding Quick Identification)

58.    The police, on April 15, 1994, did not show Ruby Mitchell a photograph of the Lamonte her niece dated, Lamonte Drain aka Anthony Lewis. (Exhibit 23: Audio Recording of Ruby Mitchell Interview Regarding Not Seeing Lamonte Drain photo).

**Lamonte's arrest and inconsistent alibi statements**

59.     After Ruby Mitchell identifies Lamonte McIntyre as the shooter, the police department's efforts turn to finding and arresting Lamonte. This effort was spearheaded by Lt. Dennis Barber. (Exhibit 6: Trial Transcript, tr. 353:23–25)

60.     Officer Wansley had learned from Breon Shelton that the getaway car was a blue Chevrolet Caprice Classic. (Exhibit 6: Trial Transcript, tr. 240:11–15; 248:6–11)

61.     Police also had information that Lamonte McIntyre drove or rode around in such a car. (Exhibit 1: Case File at LMKSDC0003435)

62.     Another officer, Officer Viera, knew Lamonte to have a hangout at Juniper Gardens. (Exhibit 1: Case File at LMKSDC0003435 )

63.     Lt. Barber provided a statement to Detective Golubski that when he spoke with Lamonte McIntyre's mother, Rose McIntyre, prior to his arrest she had asked whether police would automatically take someone down and charge them with murder if someone told him that she had killed somebody. Lt. Barber also reported that she stated that Lamonte had been with her at FiFi's from 11:00 in the morning until 2:45 in the afternoon. (Exhibit 1: Case File at LMKSDC0003433–3436)

64.     Before being taken to the police station, Lamonte stated he had been with his brother, James, during the day. (Exhibit 1: Case File, Barber Statement at LMKSDC0003435)

65.     Around 8:40 p.m. on April 15, 1994, Lamonte McIntyre was arrested by Lt. Barber and Officer James Brown. (Exhibit 24: Arrest Report)

66.     On the way to the police station, Lamonte told Officer James Brown that he had been his mom at work. (Exhibit 6: Trial Transcript, tr. 370:13–371:5)

67.     During Lamonte's interview at police headquarters, he stated that he was at his auntie's house at 15th and Wood all day. (Exhibit 1: Case File at LMKSDC0003453-54)

**Niko Lingers on Lamonte's Photo the Day After the Shooting**

68.     The day after the murders, April 16, 1994, Golubski and Detective Ware went back to Niko Quinn's house to show Niko the photographs that were shown to Ruby Mitchell. (Exhibit 1: Case File at LMKSDC0003455–3456)

69.     On April 16, 1994, Niko Quinn was impaired on drugs (PCP) and alcohol at the time of her meeting with Detective Golubski and Detective Dennis Ware. (Exhibit 2: Deposition of Niko Quinn, tr. 81:3–22]

70.     On April 16, 1994, Niko did *not* positively identify any of the photographs as the shooter, but lingered on one, Lamonte McIntyre's. (Exhibit 1: Case File at LMKSDC0003455–3456; Exhibit 6: Trial Transcript, 141:10–25)

71.     At the time she was shown the photo array on April 16, 1994, she knew Lamonte's photo from seeing it on the news the night before. (Exhibit 2: Deposition of Niko Quinn, tr. 87:23–88:3)

72.     Niko did not think Golubski did anything improper during his meeting with Niko Quinn on April 16, 1994. (Exhibit 2: Deposition of Niko Quinn, tr. 85:20-23; Exhibit 6: Trial Transcript, tr. 140:22–141:3 )

73.     Detective Golubski documented in his report that Niko did not positively identify Lamonte, but that "it is very obvious that Niko Quinn knows exactly who the shooter is, but being highly traumatized at this time is reluctant to provide that information." (Exhibit 1: Case File, at LMKSDC0003455–3456)

74.     In fact, Stacy Quinn's mom, Josephine Quinn, stated to Detective Krstolich that Stacy "knew who the suspect was" which Golubski documented in his report to the prosecutors. (Exhibit 1: Case File at LMKSDC0003456)

12

75.     Golubski documented in his April 16, 1994, investigative addendum that Breon Shelton and Josephine Quinn were *not* able to identify Lamonte's photo as the shooter. (Exhibit 1: Case File at LMKSDC0003456)

76.     Golubski documents in his file to the prosecutors that Breon Shelton stated the car outside Lamonte's house was *not* the getaway car. (Exhibit 1: Case File at LMKSDC0003456)

**Lamonte's Prosecution Begins**

77.     On April 16, 1994, Roger Golubski submitted the prosecution summary to the Wyandotte County District Attorney's office.  (Exhibit 1: Case File at 3392–3395)

78.     On April 18, 1994, Juvenile Prosecutor Vickie Myers filed two First Degree Murder Charges against Lamonte McIntyre in Juvenile Court. (Exhibit 25: Juvenile Complaint)

79.     On April 19, 1994, a hearing was held before the Juvenile Court, and Lamonte McIntyre was ordered to be detained or post a $250,000 surety bond. (Exhibit 26: Detention and Bond Order)

80.     Also on April 19 and April 21, 1994, Detective Golubski provided supplements to the prosecutor's summary to the Wyandotte District Attorney's office containing additional witness statements and skull diagrams of the victims. (Exhibit 27: Prosecutorial Supplements)

**Niko Quinn Calls Detective Golubski to Tell Him she Can Identify the Shooter**

81.     A week or so after the murders, Niko Quinn called Roger Golubski, who had left a card with her the day after the homicide, and told Golubski she wanted to meet *because she could identify the person who shot her cousin*.  (Exhibit 2: Deposition of Niko Quinn, tr. 91:15–92:1, 149:2–15; Exhibit 6: Trial Transcript, tr. 145:24–146:2))

82.     Niko Quinn was driven to the meeting by her boyfriend, Chris Jones. (Exhibit 2: Deposition of Niko Quinn, tr. 99:22–93:1)

83.     During that meeting, Niko Quinn identified Lamonte McIntyre as the shooter. (Exhibit 2: Deposition of Niko Quinn, tr. 99:22–94:23)

84.     During the meeting, Niko told Golubski that she thought others, including Aaron Robinson and Cecil Brooks were involved in her cousins' deaths, in response Golubski cautioned her to be careful regarding Cecil Brooks because he had murdered his prior girlfriend and police were not able to prosecute him for it.  But, Niko Quinn did not care about Golubski's statement. (Exhibit 2: Deposition of Niko Quinn, tr. 99:22–94:23)

85.     While Golubski did not document this information in a report, he did tell prosecutor Morehead sometime after the preliminary hearing but before trial. (Exhibit 28: Deposition of Terra Morehead, tr. 131:3–9).

86.     Despite Golubski not informing the prosecution of the meeting behind Wyandotte High School prior to the June 28, 1994, preliminary hearing, Niko Quinn was called as a witness and identified Lamonte McIntyre in open court as the killer. (Exhibit 5: Preliminary Hearing Transcript, tr. 26:1–9)

87.     Niko now states she acquiesced to picking Lamonte as the shooter because Golubski told her police had the clothes, the gun, Lamonte in custody, and police knew he was the shooter. (Exhibit 2: Deposition of Niko Quinn, tr. 94:8–14)

88.     While Golubski may have told "told [Niko] to go down to the housing authority" and "somehow [] talked to someone in the housing authority and got [Niko] moved into [a] place that was available at the time" Golubski provided Niko no other assistance, including no financial assistance. (Exhibit 2: Deposition of Niko Quinn, tr. 98:9–99:4)

89.     April 15, 1994, was the one and only day Ruby Mitchell interacted with Roger Golubski.  (Exhibit 9: Deposition of Ruby Mitchell, tr. 124:15–125:8)

90.     Niko Quinn did not talk to any police, including Roger Golubski from the time she met with him behind Wyandotte High School through Lamonte's trial. (Exhibit 2: Deposition of Niko Quinn, tr. 166:21–25).

**Detective Golubski's Additional Evidence Gathering Including Disclosing Exculpatory Evidence**

91.     On April 19, 1994, Detective Golubski interviewed John Quinn, the father of decedent Doniel Quinn.  John Quinn told Detective Golubski that he did not see who committed the murders. Golubski submitted this additional statement to the prosecutor in a supplemental report. (Exhibit 27:  Prosecution Supplements, Statement of John Quinn, WCDA0001825–1829)

92.     On April 20, 1994, Detective Golubski took statements from Yolanda Johnson, Natasha Haygood, and M'Sherie Johnson regarding Lamonte McIntyre's whereabouts on the day of the shooting, including what he was wearing.  Detective Golubski also inquired regarding their knowledge about Lamonte McIntyre's involvement with drug use/sales and vehicles with which he may be associated.  (Exhibit 27: Prosecution Supplements)

93.     On September 21, 1994, Det. Golubski took a statement from Keva Garcia, Ruby Mitchell's niece, regarding the "Lamonte" she was talking to.  Keva Garcia reviewed a picture of Lamonte McIntyre and said that they looked alike but were not the same. (Exhibit 1:  Case File Statement of Keva Garcia at LMKSDC0003496–3498)

94.     Golubski noted in his file that there "remains the possibility that John Quinn and Stacy Quinn can identify" the shooter, but that Stacy Quinn was unavailable when he went to speak with her. (Exhibit 1: Case File at LMKSDC0003456)

**The June 28, 1994, Juvenile Waiver/Probable Cause Hearing**

95.     On June 28, 1994, a juvenile waiver hearing/preliminary hearing was held in juvenile court.  The prosecutor was A.J. Stecklein. (Exhibit 5: Transcript of Preliminary Hearing)

96.     On June 28, 1994, Ruby Mitchell identified Lamonte McIntyre in open court as the killer.  (Exhibit 5: Preliminary Hearing Transcript, tr. 9:5–14)

97.     After Lamonte McIntyre was "waived" into adult court, Terra Morehead took over the prosecution of Lamonte McIntyre. (Exhibit 28: Deposition of Terra Morehead, tr. 101:21–103:5)

**Niko Quinn Alleges the Prosecutor threatened to Take Away her Children Prior to Trial**

98.     Sometime after the preliminary hearing, in the summer of 1994, Niko broke off her relationship with C-Love and moved to an apartment on Cleveland Street. (Exhibit 2: Deposition of Niko Quinn, tr. 100:12–101:4)

99.     Terra Morehead visited Niko's residence, leaving a card and a message: contact me or I will have you arrested and take your children away. (Exhibit 2: Deposition of Niko Quinn, tr. 101:5–103:12)

100.    After receiving a threat Niko Quinn consulted with an attorney and then met with Terra Morehead. (Exhibit 2: Deposition of Niko Quinn, tr. 101:5–103:12)

101.    During her meeting with Terra Morehead, she told Ms. Morehead that she was not sure Lamonte McIntyre was the killer.  (Exhibit 2: Deposition of Niko Quinn, tr. 103:25–105:25, 107:23–109:10)

102.    In response, Ms. Morehead showed her photos of her dead cousins, and asked her, "don't you want somebody to be held accountable for this?" "don't you want something done?" and "don't you want somebody convicted?" at which time Niko began to cry and, "told her she didn't think it was Lamonte." Ms. Morehead showed her more graphic pictures and again said, "don't you want someone to be held accountable?" Niko relented and identified Lamonte

McIntyre at trial as the shooter. (Exhibit 2: Deposition of Niko Quinn, tr. 103:25–105:25, 107:23–109:10)

**Lamonte's Criminal Jury Trial**

103.     On September 26-29, 1994, Lamonte's jury trial was held and Lamonte McIntyre was convicted. (Exhibit 6: Trial Transcript)

104.     Terra Morehead's investigators in the District Attorney's office would have been talked with trying to follow up with locating and serving witnesses. (Exhibit 28: Deposition of Terra Morehead, tr. 261:12-24)

105.     In December 1992, Lamonte McIntyre along with his brother James McIntyre and cousin Terrance Terrell, pleaded guilty to charges relating to an armed robbery. (Exhibit 29: Deposition of Lamonte McIntyre, tr. 117:8–118:1)

106.     At the time she identified Lamonte McIntyre as the shooter, she knew it was not the "Lamonte" that dated her niece, but that it looked like that person. (Exhibit 6: Trial Transcript, tr. 127:10–14, 195:16–196:15; Exhibit 11: Ruby Mitchell Interview Clip 1).

107.     In fact, she remembers almost calling out the name Lamonte at the time of the shootings. (Exhibit 9: Deposition of Ruby Mitchell, tr. 18:9–18, 124:4–14; Exhibit 5: Preliminary Hearing tr. 13:6-22)

108.     On September 26, 1994, Ruby Mitchell again identified Lamonte McIntyre in open court as the killer. (Exhibit 6: Trial Transcript, tr. 174:26–175:11, 208:2–8)

109.     When Ruby Mitchell testified during the criminal proceedings, she thought she was identifying the person who did the shooting. (Exhibit 9: Deposition of Ruby Mitchell, tr. 127:10–14)

110.     Niko Quinn testified that Ruby *did* yell out "Lamonte." (Exhibit 2: Deposition of Niko Quinn, tr. 62:3–15).

111.     On June 28, 1994, Ruby Mitchell identified Lamonte McIntyre in open court as the killer. (Exhibit 5: Preliminary Hearing Transcript, tr. 9:5–14)

112.     On September 26, 1994, Ruby Mitchell again identified Lamonte McIntyre in open court as the killer. (Exhibit 6: Trial Transcript, tr. 174:26–175:11, 208:2–8)

113.     When Ruby Mitchell testified during the criminal proceedings, she thought she was identifying the person who did the shooting. (Exhibit 9: Deposition of Ruby Mitchell, tr. 127:10–14)

114.     To date, Ruby Mitchell has not recanted her identification of Lamonte McIntyre as the shooter. In Ruby Mitchell's 2011 affidavit, which was procured by Lamonte McIntyre's investigator James McCloskey, she did not recant but rather asked for forgiveness, "if I made a mistake in the identification of Lamonte McIntyre. (Exhibit 7:  Deposition of James McCloskey, tr. 46:9–18, 120:17–22; Exhibit 8: Ruby Mitchell Affidavit, ¶ 13)

115.     On September 26, 1994, Niko again identified Lamonte McIntyre as the killer in open court at Lamonte's jury trial. (Exhibit 10: 2014 Affidavit of Niko Quinn, ¶ 21)

116.     Later, in her 1996 affidavit, Niko explained why she knowingly lied and identified Lamonte McIntyre as the shooter, stating that she "wanted the whole thing to over with" and "did not care who was convicted" but rather "wanted someone, anyone, to pay for their deaths." (Exhibit 19: 1996 Niko Quinn Affidavit, ¶ 6)

117.     In her November 2021 deposition, Niko Quinn testified that Terra Morehead, not Roger Golubski, threatened to have her kids taken away. (Exhibit 6: Trial Transcript tr. 143:1–16)

118.    Lamonte's "alibi" witnesses provided inconsistent statements as to his whereabouts on the date of the murders.  (Exhibit 29: Deposition of Lamonte McIntyre, tr. 167:8–168:11; Exhibit 1: Case File, Alibi Witness Statements at LMKSDC0003468–3492)

119.    Niko admits she perjured herself at Lamonte's criminal trial. (Exhibit 2: Deposition of Niko Quinn, tr. 157:1–16)

120.    Niko testified at trial that Golubski did not suggest that she should identify any of the photos shown to her. (Exhibit 6: Trial Transcript, tr. 140:22–141:9)

121.    Niko explained in her 1996 affidavit that the reason she identified Lamonte was that she wanted the whole thing to be over with, and she did not care who was convicted. Both victims sitting in the blue car were her cousins. She wanted someone, anyone, to pay for their deaths (Exhibit 19: 1996 Niko Quinn Affidavit, ¶ 5–6).

122.    Niko, in her 1996 affidavit, said she told Golubski during their meeting behind Wyandotte High School that she feared men stalking her with guns. (Exhibit 19: 1996 Niko Quinn Affidavit, ¶ 10)

123.    Niko's 2014 affidavit states that when she met with Golubski at a neutral site, she believed "Lamonte in some ways looked somewhat similar to the shooter" and that she "allowed" Defendant Golubski to "push" her into identifying him. (Exhibit 10: 2014 Niko Quinn Affidavit, ¶ 20)

**Lamonte Dealt Drugs for his cousin, Donald Johnson, an associate of Cecil Brooks/Aaron Robinson**

124.    According to Lamonte he sold drugs, crack cocaine, as often as he could for his cousin, Donald Johnson, Jr. (DJ) (Exhibit 29: Deposition of Lamonte McIntyre, tr. 123:2–124:17)

125.    On February 27, 1994, Lamonte McIntyre was arrested on possession of crack cocaine, and the trial was pending at the time he was charged with murdering Doniel Quinn and

Donald Ewing. (Exhibit 29: Deposition of Lamonte McIntyre, tr. 119:18–120:23, Exhibit 30: DA Criminal History)

126.     According to Lamonte's brother, DJ was a big-time drug dealer in Kansas City, Kansas. (Exhibit 31: Deposition of Jermaine McIntyre, tr. 26: 1–25)

127.     DJ knew and hung out with Aaron Robinson. (Exhibit 29: Deposition of Lamonte McIntyre, tr. 100:14–101:10)

128.     Six weeks before the murders on February 27, 1994, Lamonte, DJ, and Lamonte's mother, Rose McIntyre were arrested at Yolanda Johnson's house. Lamonte was charged with possession of crack cocaine (which he intended to sell), and DJ and Rose were arrested for assaulting police officers, including Defendant James Brown. (Exhibit 29: Deposition of Lamonte McIntyre, tr. 119:18–120:23, Exhibit 32: February 27, 1994, Arrest Records)

## III.   QUESTIONS PRESENTED

1.     Whether Golubski is entitled to qualified immunity on Lamonte's Fabrication Claims in Count II because he did not fabricate evidence, and regardless, whether in 1994 the law did not clearly establish his conduct, even if true, constituted fabrication?

2.     Whether Golubski is entitled to qualified immunity on Lamonte's Brady Claims in Count II because in 1994 the law did not clearly establish that a police officer, as opposed to the prosecutor, had an affirmative duty to disclose Brady material?

3.     Whether Golubski is entitled to qualified immunity on Lamonte's Brady Claims in Count II because the law does not require an officer to disclose his own misconduct *unrelated* to the subject investigation and, even if it does, such law was not clearly established in 1994?

4.     Whether Golubski is entitled to qualified immunity on Lamonte's Brady Claims in Count II because the law does not require an officer to disclose his own misconduct *related* to the

subject investigation and, if it does, the clearly established law only required the disclosure of existing evidence?

5.     Whether Golubski is entitled to qualified immunity on Lamonte's Brady Claims in Count II because much of Lamonte's alleged Brady material is too vague to permit Golubski, or the Court, whether it would have been material to Lamonte's guilt or innocence in 1994?

6.     Whether Golubski is entitled to qualified immunity on Lamonte's Brady Claims in Count II because the law did not clearly establish, in 1994, that evidence inadmissible under the Kansas law could be "material" to Lamonte's guilt or innocence and thereby requiring disclosure under *Brady?*

**7.**     Whether Golubski is entitled to qualified immunity on Lamonte's Brady Claims regarding Niko Quinn's identification behind Wyandotte High School in Count II because the Supreme Court determined that information did not require disclosure under Brady and, as a result, his obligations under the circumstances were not clearly established?

**8.**     Whether Golubski is entitled to summary judgment on Lamonte's Malicious Prosecution Claims because probable cause existed, or at least a reasonable officer in Golubski's position would have believed reasonable probable cause existed to arrest, detain, and/or prosecute Lamonte and, thereby, entitling Golubski to qualified immunity as the federal Malicious Prosecution Claim?

9.     Whether Golubski is entitled to summary judgment on Lamonte's Malicious Prosecution Claims because Golubski only relied on inculpatory information provided to him by witnesses and other officers, passed on the information he obtained to the prosecutor, did not know if any of it was false or inaccurate, and did not pressure the prosecutor to bring charges?

10.     Whether Golubski is entitled to summary judgment on all claims, and qualified immunity on all federal claims because the chain of causation, if any, between Golubski's alleged wrongdoing and Lamonte's conviction was broken by Ruby Mitchell and Niko Quinn's in-court identifications months later, and especially Niko Quinn's recantation to Terra Morehead; and the law in 1994 was not clearly established that Golubski's conduct, in light of the above, caused a deprivation given the prosecutor's wrongful conduct resulted in Niko Quinn's? identification and testimony to Terra Morehead but perjured herself at Lamonte's trial due to the threats made by the prosecutor, and the law does not and did not clearly establish in 1994. And whether the law in 1994 would have put Golubski on notice that any causation between his alleged actions and Niko Quinn's identification would remain unbroken in light of the above, specifically the prosecutor's subsequent alleged threats?

11.     Whether Golubski is entitled to qualified immunity on Lamonte's § 1983 Fourteenth Amendment Claims because Kansas law provides an adequate remedy?

12.     Whether Golubski is entitled to summary judgment on Lamonte's § 1983 Conspiracy Claims?

13.     Whether Golubski is entitled to qualified immunity on Plaintiffs' § 1983 Familial Association Claims under the First Amendment because no such right, let alone a clearly established right, exists under the First Amendment.

14.     Whether Golubski is entitled to qualified immunity on Plaintiffs' § 1983 Familial Association Claims because the law did not clearly establish if such claims existed, in 1994, in the context of a wrongful prosecution/detainment, in the context of forced separation of a child from a parent of any kind,  a mother and a seventeen-year-old son who was mature and competent

enough to rebut the presumed age of majority and be prosecuted as an adult, or that such a violation would extend beyond the minor reaching the age of majority.

15.     Whether Golubski is entitled to qualified immunity on Lamonte's § 1983 Familial Association for Lamonte's detainment and because the law did not clearly establish Lamonte had such a right given the Fourth Amendment provides an explicit textual source of constitutional protection, and because the law does not clearly establish a familial association right from the child to parent or that such a right could be based on transferred intent.

## IV.   ARGUMENT AND AUTHORITIES

### A.     Summary Judgment Standard

"Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *BancInsure, Inc. v. McCaffree*, 3 F. Supp. 3d 904, 906 (D. Kan. 2014); Fed. R. Civ. P. 56(c).

### B.     Impact of Fifth Amendment Invocation on Summary Judgment

The Fifth Amendment alone cannot form the basis for denying summary judgment as doing so would "penalize the employment of the privilege." *Rivera v. Guevara*, 319 F. Supp. 3d 1004, 1039 (N.D. Ill. 2018). Rather, the resisting party cannot "rely exclusively on the moving party's invocation of the Fifth Amendment Privilege." *Id.* at 1039–40. Adverse inferences, if made, can only be drawn if other evidence exists of the fact to which the party refuses to answer. *See, e.g.*, *Baxter v. Palmigiano*, 425 U.S. 308, 317–18, 96 S. Ct. 1551, 1558, 47 L. Ed. 2d 810 (1976); *LaSalle Bank Lake View v. Seguban*, 54 F.3d 387, 391 (7th Cir. 1995); *Doe ex rel. Rudy-Glanzer v. Glanzer*, 232 F.3d 1258, 1264 (9th Cir. 2000).

### C.     Qualified Immunity Standards

Golubski asserts he is entitled to qualified immunity on all of Plaintiffs' § 1983 claims. Plaintiffs bear the *heavy* burden of establishing a federal violation, and that it was clearly established in 1994. *Martinez v. Carr*, 479 F.3d 1292, 1294–95 (10th Cir. 2007).  When determining if a right was clearly established, the Court "must not define the relevant constitutional right at a high level of generality." *Perry v. Durborow*, 892 F.3d 1116, 1123 (10th Cir. 2018) (cleaned up). Rather, the McIntyres must direct the Court to a Supreme Court or published Tenth Circuit decision on point; or demonstrate that the "clearly established weight of authority from other courts has found the law to be as the plaintiff maintains" so as to place the question "beyond debate." *Id*. at 1123–24; *White v. Pauly*, 137 S. Ct. 548, 551, 196 L. Ed. 2d 463 (2017). A precedent is sufficiently particularized and relevant if it addresses the critical facts alleged in the case at bar. *Gadd v. Campbell*, 712 F. App'x 796, *801 (10th Cir. 2017) (unpublished). "[B]efore the district court [can] determine the law was clearly established, it [has] to identify a case where an official acting under similar circumstances … was held to have violated" the right alleged. *Perry v. Durborow*, 892 F.3d at 1124 (10th Cir. 2018). A district court errs when it "(fails) to tether its clearly-established analysis to the particularized facts of any case decided before" the date of the alleged constitutional violation. *Id*. (cleaned up).

### D.     Count II: Lamonte's Fourteenth Amendment Fabrication Claims

> #### 1.     *Golubski did not fabricate evidence, and regardless, in 1994 there was no clearly established law establishing Golubski's conduct constituted fabrication.*

Lamonte's fabrication claim involves "the two false eyewitness identifications [by Ruby Mitchell and Niko Quinn] and the allegedly false inculpatory statements attributed to Lamonte and Rose McIntyre...." (PTO at 14). Among other things, Lamonte's claim requires him to prove that

Golubski knowingly fabricated evidence. *Truman v. Orem City*, 1 F.4th 1227, 1236 (10th Cir. 2021). "Although there is some disagreement over what degree of intent the officer must have" to be determined to have fabricated evidence, "he necessarily must possess knowledge of the evidence's falsity." *Id.* (cleaned up).

In *Truman*, the Tenth Circuit determined a prosecutor fabricated evidence because he had *independent* knowledge of the evidence and provided knowingly false evidence to lead a witness to a desired conclusion. *Id.* At 1240. In *Pierce v. Gilchrist*, 359 F.3d 1279 (10th Cir. 2004), the Tenth Circuit determined a forensic chemist fabricated evidence by knowingly falsifying inculpatory evidence when the tests had returned exculpatory results. *Id.* at 1293. Finally, *Kennedy v. Peele*, 552 F. App'x 787, 793 (10th Cir. 2014) (unpublished), demonstrates that relying on questionable evidence, rather than knowledge of falsity or falsifying evidence, falls short of fabrication.

Here, the McIntyres cannot establish that Golubski fabricated Mitchell's identification of Lamonte. There is no evidence that Golubski knew who committed the murders, or that Mitchell's identification of Lamonte was incorrect. SOF, 15. Neither Roger Golubski nor any other officer did anything improper to obtain her identification of Lamonte. SOF, 17; *Snow v. Sirmons*, 474 F.3d 693, 715 (10th Cir. 2007) (Finding on a petition for habeas relief, a state court had determined the witnesses' testimony was not coerced because "at trial and during direct appeal she attested otherwise."). And, in Mitchell's 2011 affidavit—drafted by plaintiffs' counsel—she asks for forgiveness only "*if* [she] made a *mistake* in the identification of Lamonte McIntyre or the person who did this double homicide," which are not the words of someone who knowing falsely identified Lamonte as the shooter. SOF, 15. (emphasis added). Since even today, Mitchell's identification is at worst inaccurate, rather than knowingly false, it cannot, as a matter of law, be fabricated.

Similarly, Golubski did not know Niko Quinn lied to him. Niko admits *she* perjured herself

at Lamonte's trial. SOF, 119. There is no evidence Golubski had independent knowledge of the shooter or knew Niko's lingering on Lamonte's photograph and later identification of Lamonte was false. SOF, 70, 72-73, 120. In fact, Niko testified that Golubski did nothing improper during the meeting on April 16, 1994. SOF, 72. And, despite telling her aunt the night of the shooting that police had the wrong suspect, SOF, 42, and having told Terra Morehead before trial that she did not believe Lamonte was the shooter, SOF, 101-102, Niko makes no allegation that she told this information to Golubski. SOF, 90. Instead, she lingered on Lamonte's photograph but did not identify him as the shooter. SOF, 70. Golubski documented Niko's non-identification, which illustrates Golubski's lack of knowledge of falsity. SOF, 73. Why document a non-identification if attempting to force her to identify Lamonte? And, from Golubski's perspective, this interaction with Niko would have been the end of the story. But *she called* Golubski a week or so later, said *she wanted* to identify the killer, and arranged a meeting with Golubski *on her own terms*. SOF, 81–82. During the meeting, Niko identified Lamonte as the shooter. SOF, 83. These facts do not suggest coercion.

Moreover, Niko's prior statements do *not* suggest fabrication by police. She testified at trial that Golubski did not suggest that she needed to identify anyone. SOF, 120. She explained in her 1996 affidavit that the reason she identified Lamonte was because, "the [prosecutor] questioned me and threatened to take my children away from me if I did not talk. *I wanted the whole thing to be over with, and I did not care who was convicted.* Both victims sitting in the blue car were my cousins. *I wanted someone, anyone, to pay for their deaths*." SOF, 121-122 (emphasis added). And, in her 1996 version, she told Golubski during their meeting behind Wyandotte High School that she feared men stalking her with guns. *Id*. In response, Golubski simply told her that whoever was scaring her was not Lamonte because he was in custody. *Id*. While Niko's 1996 affidavit conflates

"police" with the "prosecutor," her 2021 deposition testimony makes clear it was Terra Morehead who threatened to take her kids away. SOF, 117. Further, in a 2014 affidavit, Niko said that when she met with Golubski at the neutral site, she believed "Lamonte in some ways looked somewhat similar to the shooter" and that she "allowed" Defendant Golubski to "pressure" and "push" her into identifying him. SOF, 123. Nothing in Niko's statements indicates Golubski knew the information she provided was false.

Therefore, neither did Golubski fabricate the above statements. Nor does Lamonte have any evidence that he fabricated inculpatory statements attributed to Lamonte and Rose McIntyre; for this reason and the reasons set out in the Defendant Officers' brief, he cannot prove fabrication of Lamonte and Rose's statements. Finally, although the general principle—that an accused has a right to not have fabricated evidence introduced against him at trial—was well established, Golubski cannot locate a pre-1994 case that would have alerted him that his conduct here constituted fabrication. *Truman v. Orem City*, 1 F.4th 1227, 1236 (10th Cir. 2021) (Finding anything less than knowingly using false evidence cannot, as a matter of law, be fabrication).

### E. COUNT II: Defendant Golubski is entitled to qualified immunity as to Lamonte's claim that he committed Brady violations because Golubski did not fail to disclose any Brady material, let alone clearly established Brady material.

According to Lamonte, his *Brady* claims involve Golubski's failure to disclose (1) his alleged sexual exploitation of poor women, his alleged fathering of their children, and his alleged alliance with powerful drug dealers created conflicts of interest in his cases that allowed him participate in two other cases where he had an alleged conflict, (2) that he allegedly promised, and, in fact, helped Niko relocate, (3) his alleged sexual relationship with eyewitness Stacy Quinn and the alleged fact that Golubski's claim that Stacy was unavailable for an interview was false, (4) the alleged suggestive and coercive means used to secure Niko's pre-trial identification, (5) Niko's

alleged report that Doniel had been in a recent dispute with men associated with a drug house and had been beaten by those men, (6) that he allegedly had sexually coerced and threatened Ruby prior to her second taped statement to police where she identified Lamonte as the shooter, (7) that he and Defendant Krstolich allegedly manipulated Ruby and fed her the name "Lamonte McIntyre," (8) that Ruby allegedly initially reported that the shooter had French braids, (9) his alleged close relationship with drug dealers who operated in the neighborhood, including Aaron Robinson, (10) that police knew of drug and gang activity in the area and that the crime was likely connected to neighborhood drug dealers, and (11) that police had a very recent photo of Lamonte that allegedly established that Lamonte looked nothing like the outdated photo shown to Ruby and Niko.  (PTO at 7, 12, 13-14)

>    1.    *In 1994, it was not clearly established that a police officer, as opposed to the prosecutor, had an affirmative duty to disclose Brady material.*

In 1994, the law did not clearly establish that anyone other than the prosecutor had an affirmative duty, including a police investigator, to turn over exculpatory evidence under *Brady*. Thus, Golubski is entitled to qualified immunity as to all *Brady* claims and any claims incorporating alleged *Brady* violations.  *See Kyles v. Whitley*, 514 U.S. 419, 437 (1995) (holding, for the first time, a prosecutor has an obligation to seek out *Brady* information but without requiring police officers to affirmatively disclose such information); *Smith v. Secretary of New Mexico Dept. of Corrections*, 50 F.3d 801, 825 (10th Cir. 1995); *Jean v. Collins*, 221 F.3d 656, 659-660 (4th Cir. 2000) (concurring opinion stating the various circuits "have left unclear the exact nature of any duty that the law imposes on police with regard to exculpatory evidence," without identifying a Tenth Circuit case requiring affirmative disclosure by police officers) ("to speak of the duty binding police officers as a *Brady* duty is simply incorrect" because "it would be inappropriate to charge police with answering [whether evidence is exculpatory, impeachment, or material] for their job of gathering

evidence is quite different from the prosecution's task of evaluating it"); *Tiscareno v. Anderson*, 639 F.3d 1016, 1023 n.3 (10th Cir. 2011) (noting divergent opinions and recognizing that *some* sister circuits had acknowledged such a duty upon police officers (largely post 1994), while others have not) (and suggesting Tenth Circuit law became clear in *Pierce v. Gilchrist*, 359 F.3d 1279 (10th Cir. 2004)).  With this much confusion, how can Golubski, as a police officer, be expected to recognize in 1994 that he had such a duty?  *Burton v. Richmond*, 370 F.3d 723, 730 (8th Cir. 2004) (circuit split suggests lack of clearly established); *Wilson v. Layne*, 526 U.S. 603, 618 (1999) ("If judges thus disagree on a constitutional question, it is unfair to subject police to money damages for picking the losing side of the controversy").

> **2.     *The law does not require an officer to disclose his own misconduct <u>unrelated</u> to the subject investigation and, if it does, such law was not clearly established in 1994.***

Lamonte also assumes that Golubski's affirmative duty under *Brady*, if any, included an obligation to report his own alleged professional and personal misconduct <u>unrelated</u> to the McIntyre investigation, including alleged *Brady* violation numbers (1) and (9). But he is wrong.  *See United States v. Lee Vang Lor*, 706 F.3d 1252, 1260 (10th Cir. 2013) ("Nor would [the officer] have thought he had a duty to disclose the information at the time since it was part of an unrelated … investigation."). As a result, there can be no violation of a federal right, let alone of a clearly established right in 1994, under *Brady* based upon these allegations.

> **3.     *The law does not require an officer to disclose his own misconduct <u>related</u> to the subject investigation and, if it did, the clearly established law only required the disclosure of existing evidence.***

Lamonte also contends that Golubski was required to self-report undocumented information related to the McIntyre investigation. But Lamonte is wrong.  *Saunders-El v. Rohde*, 778 F.3d 556, 562 (7th Cir. 2015) (*Brady* cannot "serve as the basis of a cause of action against

police officers for failing to disclose the circumstances surrounding a coerced confession to a prosecutor … (or) keeping quiet about their wrongdoing, not for failing to disclose any existing piece of *evidence"*); *Serrano v. Guevara*, 315 F. Supp. 3d 1026, 1041 (N.D. Ill. 2018) (same) (involving witness statement); *Snow v. Sirmons*, 474 F.3d 693, 715 (10th Cir. 2007) ("the only potentially relevant *Brady* material the state could have turned over in terms of Campbell's testimony at the time of trial was handwritten police notes regarding Campbell's arrest and initial police interview" and not referring to the possibility of the officers disclosing their wrongdoing) (involving witness statement).  Yet again, how can Golubski be held responsible in 1994 for failure to disclose undocumented actions when the Tenth Circuit in 2007 suggested such information was not subject to *Brady*?  Therefore, *Brady* allegations numbers (2)–(8), (10)–(11) are not violations, much less of clearly established law.

>    **4.    *Much of Lamonte's alleged Brady material cannot be determined as such because the evidence is too uncertain to permit a court to determine whether it would have been material to Lamonte's guilt or innocence in 1994.***

When allegations of would-have-been evidence are too general for a Court to determine whether they would have been material to the accused's guilt or innocence, there can be no *Brady* violation.  *Serrano v. Guevara*, 315 F. Supp. 3d 1026, 1041–42 (N.D. Ill. 2018).  Here, many of Lamonte's purported *Brady* violations are far too general and speculative, or entirely unsupported by the record, to be able to determine materiality, including alleged *Brady* violations (1), (2), (3), (9), (10), and (11).  Therefore, these claims should be dismissed for lack of violation and no clearly established law in 1994.

>    **5.    *It was not clearly established in 1994 inadmissible evidence was subject to disclosure in 1994***

In 1994, it was unclear whether *Brady* material included inadmissible evidence.  *U.S. v. Anderson*, 31 F. Supp. 2d 933, 940 n.1 (D. Kan. 1998) (discussing "conflict of authority" and

predicting the Tenth Circuit's position because prior law had not made it clear). Here, Kansas rules of evidence state that "specific instances of conduct other than evidence of conviction of a crime which tends to prove [a] trait … shall be inadmissible." K.S.A. § 60-447. As a result, evidence of specific instances of Golubski's alleged misconduct, unrelated to Lamonte's investigation, would have been inadmissible at Lamonte's trial. Therefore, Golubski is entitled to qualified immunity for those alleged violations.

### 6. *Niko Quinn's Meeting with Golubski behind Wyandotte High School was not helpful to Lamonte, as determined by the Kansas Supreme Court.*

Based upon the Kansas Supreme Court's determination that Niko Quinn's second identification need not be disclosed, a reasonable officer, in 1994—prior to that decision—would not know he had to disclose such information (even though he did in this case). SOF, 85. *State v. McIntyre*, 259 Kan. 488, 496, 912 P.2d 156, 163 (Kan. 1996). As a result, there was no constitutional violation, let alone a violation of clearly established law relating to Golubski's meeting with Niko Quinn behind Wyandotte High School, and it cannot form the basis of a *Brady* claim.

### F. Counts I & VIII: Lamonte's Malicious Prosecution Claims Fail Because sufficient cause existed, or at least a reasonable official would have believed probable cause existed, to arrest, detain, and prosecute Lamonte.

The Tenth Circuit noted as recently as 2007, § 1983-based malicious prosecution claims present "murky waters." *Becker v. Kroll*, 494 F.3d 904, 913 (10th Cir. 2007). Such a claim, if it exists[4], alleges a violation of the Fourth Amendment right to be free from the unreasonable seizure of one's liberty. *Id.* at 914[5]. At bottom, the claim is that a person's liberty was unreasonably seized—that is, without probable cause. *Id.* Circuits courts that acknowledge a Fourth Amendment malicious prosecution claim, use the common law elements of a malicious prosecution claim as a starting point under § 1983. However, "the core inquiry under any § 1983 claim" is whether there

31

was an unreasonable seizure of liberty—a detention without probable cause. *Id.*

Malicious prosecution requires Lamonte to demonstrate a genuine issue of fact, among other things, that (1) Golubski caused Lamonte's arrest, continued confinement, or prosecution (the seizure)[6]; and (2) that no probable cause supported the original arrest, continued confinement, or prosecution. *Wilkins v. DeReyes*, 528 F.3d 790, 799 (10th Cir. 2008). And, in the qualified immunity context, whether probable cause existed is a question of law for the Court to resolve. *Cruz v. City of Albuquerque*, No. CIV 17-676 JAP/SCY, 2019 WL 1085160, at *7 (D.N.M. Mar. 6, 2019) (citing *Hunter v. Bryant*, 502 U.S. 224, 227-28, 112 S.Ct. 534, 116 L.Ed.2d 589 (1991).

### 1.   *Golubski had probable cause, or at least arguable probable cause.*

"[T]he presence of probable cause for a prosecution or pretrial detention dooms any Fourth Amendment claim." *Lester v. Roberts*, 986 F.3d 599, 609 (6th Cir. 2021). Lamonte's admission that Golubski could have obtained a search warrant for Lamonte's residences is akin to an admission that probable cause existed to believe Lamonte was the shooter. Otherwise, there would have been no reasonable basis to believe instrumentalities of the crime would be found at his residence. But even absent Lamonte's fatal admission, there can be no genuine dispute that probable cause, at least arguable probable cause, existed.

Probable cause exists where the police officer is aware of facts and circumstances sufficient to warrant a prudent man in believing that the petitioner had committed … an offense." *Karr v. Smith*, 774 F.2d 1029, 1031 (10th Cir. 1985). "Probable cause can be based on a single identification from a credible witness." *Hart v. Mannina*, 798 F.3d 578, 587 (7th Cir. 2015). *Legenzoff v. Steckel*, 564 F. App'x 136, 142 (6th Cir. 2014). As a result, for probable cause *not* to exist, Lamonte must present admissible evidence that could lead a reasonable jury to conclude that *both* Ruby Mitchell and Niko Quinn's identifications were fabricated or coerced. He cannot meet this burden.

Importantly, when the defense of qualified immunity is asserted against a § 1983 malicious prosecution claim, the issue is not whether probable cause existed, but whether arguable probable cause existed. *Cruz v. City of Albuquerque*, No. CIV 17-676 JAP/SCY, 2019 WL 1085160, at *8 (D.N.M. Mar. 6, 2019) (citing *Harte v. Board of Commissioners of County of Johnson, Kansas*, 864 F.3d 1154, 1178 (10th Cir. 2017) ("[F]or purposes of qualified immunity, the deputies needed merely to show arguable probable cause to satisfy the Fourth Amendment's reasonableness requirement."))[7]. "Arguable probable cause is another way of saying that the officer's conclusions rest on an objectively reasonable, even if mistaken, belief that probable cause exists." *Stenocipher v. Valles*, 759 F.3d 1134, 1141 (10th Cir. 2014). Accordingly, Golubski is entitled to qualified immunity if "a reasonable officer could have believed that probable cause existed to arrest or detain" Lamonte. *Id.* (internal citations omitted). And, "where… it is sometimes difficult for an officer to determine how the relevant legal doctrine . . . will apply to the factual situation that the officer confronts," Courts must take "a rigorous approach to requiring prior relevant or controlling precedent that involves factually analogous situations holding similar conduct to be unconstitutional before an officer's claim to qualified immunity can be denied." *Mullenix v. Luna*, 577 U.S. 7, 12, 136 S. Ct. 305, 308, 193 L. Ed. 2d 255 (2015) (alteration, internal quotation marks omitted). Importantly, while Courts must remove fabricated or coerced evidence[8] from the probable cause analysis, if it is a close call as to whether a piece of evidence was coerced, the defendant officer gets the benefit of that evidence as arguable probable cause. *Id.* at 19.

Against this backdrop, Golubski did not violate Lamonte's Fourth Amendment rights. But should the Court find a violation *today*, the Court must still consider whether the law, under the facts presented to Golubski, clearly established probable cause did not exist. *Legenzoff v. Steckel*, 564 F. App'x 136, 141 (6th Cir. 2014) ("[T]he right at issue is whether it was clearly established

that the circumstances with which the officers were confronted did not constitute probable cause.") (cleaned up). Importantly, under the Fourth Amendment, Golubski's alleged motivation is immaterial, as the Fourth Amendment presents an objective test. *Brigham City, Utah v. Stuart*, 547 U.S. 398, 404–05 (2006) (finding the subjective motivation of an officer in a Fourth Amendment case to be "irrelevant.").

Probable cause "is not a high bar." *Kaley v. United States*, 571 U.S. 320, 338, 134 S. Ct. 1090, 1103, 188 L. Ed. 2d 46 (2014). Here, that bar was met by the following evidence, which Lamonte cannot genuinely dispute:

(1) Ruby Mitchell's providing the first name "Lamonte" as someone looking like the shooter; SOF, 49, (2) Det. Barber and Det. Maskill informed Golubski and others that numerous sources stated Lamonte McIntyre was involved; SOF, 52-53, (3) Breon Shelton's description of the getaway vehicle matching intel that Lamonte McIntyre uses such a similar vehicle; SOF, 61, (4) Lamonte's past criminal history including involvement in armed robbery and crack cocaine possession; SOF, 55, 105, 125, 128, (5) Information from Off. Viera that Lamonte hung out in Juniper Gardens; SOF, 62, (6) Rose McIntyre's unsolicited question about what would happened if someone was accused of murder; SOF, 63, (7) Rose McIntyre's unsolicited statement that Lamonte was with her at her job from 11:00 a.m. to 2:45 p.m.; SOF, 63, (8) Lamonte's own statement that he was with his brother the whole day; SOF, 64 (9) Lamonte's later statement that he was at his mom's job during the crime; SOF 66, (10) Another of Lamonte's later statements that he was with his aunt during the crime; SOF, 67, (11) Niko Quinn's lingering on Lamonte's photo the day after the shooting; SOF, 68-70, (12) Lamonte's "alibi" witnesses providing inconsistent statements as to Lamonte's whereabouts; SOF, 118, (13) Niko Quinn's first identification of Lamonte as the shooter; SOF, 83, (14) Ruby Mitchell's in-court identification of

Lamonte at the preliminary hearing and at trial; SOF, 111-112, 114, and (15) Niko Quinn's in court identifications of Lamonte at the preliminary hearing and at trial.  SOF, 39.

Lamonte cannot genuinely dispute these facts, or that Golubski reasonably believed these facts to be true.  And, while a single eyewitness—either Mitchell or Niko—provides probable cause, there was ample other information obtained by other officers that rose to the level of arguable probable cause, if not actual probable cause.  Lamonte cannot dispute that Golubski was permitted to reasonably rely on such information in taking any action he took against Lamonte.

Golubski was and is permitted to rely on other officers' information.  Courts recognize that "[i]nformants' tips doubtless come in many shapes and sizes from many different types of persons,' ranging from the professional 'informant' to the 'honest citizen.'" *Lester v. Robert*s, 986 F.3d 599, 609 (6th Cir. 2021) (quoting *Illinois v. Gates*, 462 U.S. 213, 232-34 (1983)).  And, Courts have determined that "a statement from a witness known to police is generally sufficient to establish probable cause without further corroboration because the legal consequences of lying to law enforcement tend to ensure reliability." *Id.* (cleaned up).  Further, it is well-settled that "effective law enforcement cannot be conducted unless police officers can act on directions and information transmitted by one officer to another and officers cannot be expected to cross-examine their fellow officers about the foundation for the transmitted information." *Brandt v. City of Westminster*, 300 F. Supp. 3d 1259, 1273 (D. Colo. 2018) (quoting *United States v. Hensley*, 469 U.S. 221, 231, 105 S.Ct. 675, 83 L.Ed.2d 604 (1985)).  Thus, under this "fellow officer" rule, Golubski was "entitled to rely upon information relayed to" him by Detective Barber or Tim Maskill to "justify an investigative detention or probable cause to arrest." *Id.* (quoting *Oliver v. Woods*, 209 F.3d 1179, 1190 (10th Cir. 2000)).

Because Lamonte cannot genuinely dispute probable cause existed, Golubski is entitled to

summary judgment on Lamonte's malicious prosecution claims under § 1983 and state law.

### 2.    *All of this probable cause evidence should be included in the analysis*

As shown above, neither Mitchell nor Niko's statements were fabricated.  And a witness

statement is coerced only if "the government's conduct caused the witness' will to be overborne

and his capacity for self-determination critically impaired." *U.S. v. Gonzalez*, 164 F.3d 1285, 1289

(10th Cir. 1999) (cleaned up). Thus, courts analyze whether a witness statement is coerced under

the same standards as a coerced confession. *Id.* (quoting from and applying standards in a coerced

confession case—*U.S. v. McCullah*, 76 F.3d 1087 (10th Cir. 1996)); *U.S. v. Michael Lynn Cash*, 733

F.3d 1264, 1280 (10th Cir. 2013).

"Police interrogation tactics are designed to elicit a response, and the fact that the tactics

produced the intended result…does not make [a] confession involuntary." *United States v. Astello*,

241 F.3d 965, 968 (8th Cir. 2001).  It has long been clear that police can engage in at least some

deceptive and coercive behavior during an interrogation without running afoul of the Fourteenth

Amendment.  *Crowe v. Cty. of San Diego*, 303 F. Supp. 2d 1050, 1095 (S.D. Cal. 2004), on

reconsideration in part, No. 99CV0241 R (RBB), 2005 WL 8156613 (S.D. Cal. Apr. 11, 2005), and

aff'd in part, rev'd in part and remanded, 593 F.3d 841 (9th Cir. 2010), opinion amended and

superseded on denial of reh'g, 608 F.3d 406 (9th Cir. 2010), and aff'd in part, rev'd in part and

remanded, 608 F.3d 406 (9th Cir. 2010).

In *Griffin v. Strong*, 983 F.2d 1540 (10th Cir. 1993), the Court ruled that a suspect who

confessed after threats of physical violence and being told he could be reunited with his daughter

was subjected to coercion. Similarly, in *Clanton v. Cooper*, 129 F.3d 1147, 1158 (10th Cir. 1997), the

Court determined that promise that the suspect would get off lightly was coercive because "courts

are much less likely to tolerate misrepresentations of law."  *Id.* (cleaned up). The Court reasoned

that while the "lies themselves are not unconstitutional … adding lies [with] the apparent promises [of leniency] would make it more likely that the confession would be considered involuntary." *Id*. at 1159.

Applying these standards reveals that Mitchell's identification was *not* coerced. She witnessed the murders and voluntarily called the police. SOF, 47-49. Krstolich took her statement on scene and asked if she could assist with identifying the shooter. SOF, 47-49. Mitchell stated she would recognize him again if she saw him and agreed to go to the police station to prepare a composite sketch. *Id*. The officers allowed her time to leave and take care of her children. SOF, 48. Once at the station, Mitchell volunteered the name "Lamonte" and agreed to look at photographs. SOF, 49–51. And, based upon the same analysis contained in the fabrication section above, there is no evidence suggesting Golubski or others improperly impacted Mitchell's identification. SOF, 17. Among other things, she picked Lamonte readily, and later twice identified him in open court. SOF, 57, 96, 108, 111-112. She has never recanted, but only wondered if she made a "mistake." SOF, 114. As such, there is no reason to believe "the government's conduct caused [her] will to be overborne and [her] capacity for self-determination critically impaired."

As it relates to alleged coercion of Niko, the same analysis explained above as to why her identification was not fabricated largely applies here. Among other things, Niko admits Golubski did nothing wrong during the April 16 meeting and admits that she did not care about Golubski's alleged statements about Cecil Brooks. SOF, 72, 84. And Golubski was content to document that Niko did *not* positively identify Lamonte. SOF, 73. And, later, *she chose* to call Golubski and ask for a private meeting so she could identify the shooter. SOF, 81. She now suggests she acquiesced to the fact that Lamonte did it because Golubski told her the police had the clothes, the gun, Lamonte in custody, and that they knew he was the shooter. SOF, 87. But, it "is well-settled that a

confession is not considered coerced merely because the police misrepresented to a suspect the strength of the evidence against him." *Clanton v. Cooper*, 129 F.3d 1147, 1158 (10th Cir. 1997). As the Tenth Circuit has acknowledged, courts have found confessions to be voluntary even if "they were prompted by such misrepresentations as that the murder victim was still alive, that nonexistent witnesses have been found, that the murder weapon had been uncovered, that defendant's prints were found at the crime scene, and that an accomplice had confessed and implicated the defendant." *Id*. As this demonstrates, Golubski's alleged misrepresentations that police had more evidence than they did, do not render Niko's statement coerced.

Lamonte also suggests Golubski coerced Niko by promising and assisting Niko with relocating. Regarding the extent of assistance, she admits Golubski did not assist financially but rather "told [her] to go down to the Housing Authority" and "*somehow they* talked to *someone* in the Housing Authority and got me moved into this place that was available at the time." SOF, 88. Setting aside—for now—all the unknowns these alleged facts present, this does not establish coercion. *Sharp v. Rohling*, 793 F.3d 1216, 1234 (10th Cir. 2015) (promise of finding shelter "might not [ordinarily] appear coercive" but relevant insofar as it "added weight" to a promise of leniency). In sum, because Mitchell and Niko's statements were not fabricated or coerced, they remain part of the probable cause analysis. And because the totality of the evidence amounted to probable cause, Lamonte's federal and state malicious prosecution claim should be dismissed.

Although the general principle—that an accused has a right to not be detained without probable cause—was well established, Golubski cannot locate a pre-1994 case that would have alerted him that his conduct was fabrication/coercion (meaning that he could believe in good faith the two witness statements are not excluded from the analysis and establish probable cause), that he could not rely upon information from other officers, and/or that the amount of evidence did not

establish probable cause.  As a result, Golubski's actions did not violate the law, let alone clearly established law and Golubski was permitted to reasonably rely on Niko and Mitchell's identifications.

### G.   COUNTS I, II, III, V, & VIII: Lamonte McIntyre cannot demonstrate that Golubski caused his alleged constitutional deprivations.

Because all Lamonte's claims require him to demonstrate that Golubski's actions resulted in his constitutional deprivation—fabrication, *Brady* violations, familial association, or malicious prosecution—all causation arguments are being addressed in one section.

### 1.   *Golubski was but one of many investigators and officers involved in Lamonte's investigation. He was not the cause of Lamonte's arrest, detention, or prosecution.*

To establish that Golubski caused the arrest, detention, or prosecution for purposes of his malicious prosecution claim, Lamonte must come forward with evidence that Golubski knowingly used false information or recklessly disregarded the truth to institute legal process. *Sanchez v. Hartley*, 810 F.3d 750, 758 (10th Cir. 2016). "[A]n officer will not be deemed to have commenced a criminal proceeding against a person when the claim is predicated on the mere fact that the officer turned over to the prosecution the officer's truthful materials." *Legenzoff v. Steckel*, 564 F. App'x 136, 146 (6th Cir. 2014) (citing *Sykes v. Anderson*, 625 F.3d 294, at 314 (6th Cir. 2010)). It follows then that Lamonte must demonstrate with admissible evidence that Golubski knew, or recklessly disregarded the truth, in the information he provided to the prosecutor's office—i.e. the investigative file—or otherwise pressured the prosecutor to pursue charges. *Serrano v. Guevara*, 315 F. Supp. 3d 1026, 1043 (N.D. Ill. 2018)("Officers may wrongfully arrest someone, but "the chain of causation is broken by an indictment, absent an allegation of pressure or influence exerted by the police officers, or knowing misstatements made by the officers to the prosecutor.") (quoting

*Reed v. City of Chicago*, 77 F.3d 1049, 1053 (7th Cir. 1996)). Lamonte cannot meet this burden for the same reasons that Lamonte cannot meet his burden to demonstrate that Golubski fabricated or coerced any evidence as explained above.

Further, the information Golubski included in the reports deprives a reasonable jury of the ability to even draw the inference that Golubski knew the information in the investigative file was false or that he recklessly disregarded the truth. To the contrary, Golubski's own reports contain information that is not in dispute in this case, and which would have been helpful to Lamonte's defense attorney(s) at trial.

For example, Golubski's report indicated that Niko Quinn *did not* identify Lamonte McIntyre when shown the polaroid's the day after the killings. SOF 73. His report indicated there was another eyewitness, Stacy Quinn, who knew who the suspect was but was unavailable at the time.  SOF, 74, 94. Notably, Stacy Quinn's own testimony from a later hearing corroborated that she left the area after the shooting and stayed away SOF, 31–34.  Golubski's report also made clear that Breon Shelton, who had seen the shooter enter a getaway vehicle after the shooting, could *not* identify Lamonte as the shooter from the same lineup shown to Ruby and Niko. SOF, 75. And Josephine Quinn was also unable to identify Lamonte as the shooter. *Id.* Golubski's report also made clear that the car that sat in front of the location Lamonte was known to live in did *not* match the description of the car Breon Shelton saw leaving the crime scene. SOF, 76.

Golubski also interviewed Lamonte's "alibi" witnesses, as well as John Quinn, who was initially identified as a potential witness to the shooting and the father of Doniel Quinn, *with no idea what they would say*, and submitted these statements to the prosecutor in a supplement report. SOF, 91, 94. Later Golubski interviewed Keva Garcia—Ruby Mitchell's niece who dated the "Lamonte"—who confirmed that Mitchell said the shooter *looked like* Keva's old boyfriend,

Lamonte, not that it was *that* Lamonte. SOF, 93.

Lamonte does not, or cannot, genuinely dispute the above information is true and that Golubski provided it to the prosecution. And, at the very least, Lamonte has no evidence to cause a reasonable jury to believe that Golubski knew or should have known it was not true, just as with the statements and identifications provided by Ruby Mitchell and Niko Quinn discussed above.

Further, the fact that Golubski did not omit the above potentially exculpatory information demonstrates that Golubski was not recklessly disregarding the truth, or even the possibility of Lamonte's innocence. While recklessness can be inferred from the omission of critical facts that would cut against probable cause, *DeLoach v. Bevers*, 922 F.2d 618, 622 (10th Cir. 1990), the inclusion of all of this information demonstrates that Golubski did not knowingly use false information and was not recklessly disregarding the potential for Lamonte's innocence. Rather, he was truthfully reporting what he learned to the prosecutor.

### 2. *Ruby Mitchell and Niko Quinn's in-court identifications were months after any alleged police wrongdoing, breaking the chain of causation.*

Finally, even if there was any police wrongdoing, Lamonte cannot dispute that Mitchell's and Niko's in-court identifications were "sufficiently attenuated" from any police wrongdoing to break the chain of causation. *Wilkins v. DeReyes*, 528 F.3d 790, 802 (10th Cir. 2008) (citing *Taylor v. Meachum*, 82 F.3d 1556, 1561 (10th Cir. 1996) (preliminary hearing can break chain of causation); *U.S. v. Lopez*, 437 F.3d 1059, 1066 (10th Cir. 2006) ("The government must show intervening circumstances which indicate that the second confession was insulated from the effect of all that went before. The later confession will be admissible while the first confession will not only if such a distinction is justified by a sufficiently isolating break in the stream of events"); *U.S. v. Perdue*, 8 F.3d 1455, 1467 (10th Cir. 1993) (considering "whether the coercion surrounding the first statement had been sufficiently dissipated so as to make the second statement voluntary") (cleaned

up); *Snow v. Sirmons*, 474 F.3d 693, 715 (10th Cir. 2007) (Finding on a petition for habeas relief, a state court had determined the witnesses' testimony was not coerced because "at trial and during direct appeal she attested otherwise.").

In *Wilkins*, the Tenth Circuit doubted that a time gap of only a couple of days between an allegedly coerced statement and a second statement could afford sufficient attenuation between the two. *Wilkins v. DeReyes*, 528 F.3d 790, 802 (10th Cir. 2008). Yet in *Lopez*, the Tenth Circuit implied that a time gap of "almost twelve hours" including "a night's sleep and a meal" could be sufficient attenuation. *U.S. v. Lopez*, 437 F.3d 1059, 1066 (10th Cir. 2006). However, the Court considered other factors such as that the same police officer participated in both confessions, that the suspect was unable to communicate with an attorney or his family, and that a promise of leniency (which largely created the coercion) had not been withdrawn and determined the second statement was involuntary. *Id.* at 1066–67 (citing *Lyons v. Oklahoma*, 322 U.S. 596 (1944), and *Leon v. Wainwright*, 734 F.2d 770, 773 (11th Cir. 1984), for the proposition the second statement will be, or at least can be, uncoerced, where the coercer did not participate in it, and *Darwin v. Connecticut*, 391 U.S. 346, 349 (1968), for the proposition that second confession not voluntary if the suspect is "held incommunicado" in between the two statements). In *Perdue*, the Tenth Circuit noted that "the tense and coercive atmosphere" of the first statement "pervaded" the second, which occurred only minutes later and featured the presence of the coercing officer along with upward of twenty law enforcement officials. *U.S. v. Perdue*, 8 F.3d 1455, 1468 (10th Cir. 1993).

Here, Ruby's first identification of Lamonte as the shooter occurred on April 15, 1994, and she later identified Lamonte in court on June 28, 1994, and again on September 26, 1994. SOF, 14, 96, 108. Notably, April 15, 1994, was the one and only day Mitchell interacted with Golubski.  SOF, 89.  Thus, Lamonte can point to no evidence that Golubski played any role in these subsequent

events, or even had any contact with Mitchell at all. Mitchell was neither in custody nor held incommunicado. Consequently, the chain of causation was broken on June 28, 1994 (over two months later), or at the latest on September 26, 1994 (over five months later), based upon Mitchell's testimony in court, which occurred long after her initial identification and in a completely different environment, free of any indication of police influence. Thus, Lamonte's claims for damages should be limited from April 15, 1994, to June 28, 1994, or at the latest, to September 26, 1994.

Relating to Niko's first identification of Lamonte, it occurred a week or so after the shootings during the private meeting *she* requested and arranged with Golubski;  at a location *she was comfortable with*.  SOF*, 81*. During that meeting, after Golubski allegedly warned her not to get Cecil Brooks involved because he was dangerous, Niko responded "I don't care." SOF, 84.  This alone demonstrates Golubski's statements about Cecil did not cause her identification of Lamonte. Further, Niko later met with the prosecutor's office and identified Lamonte as the shooter in court on June 28, 1994.  SOF, 86, 95.

Lamonte has not uncovered any evidence suggesting that Golubski played any role in these subsequent events or had any contact with Niko at all after her requested meeting and before trial. SOF, 90. Niko was neither in custody nor was held incommunicado. And there was no "bright-line" coercion to withdraw as there would have been with a promise of leniency. Consequently, the chain of causation was broken on June 28, 1994 (over two months later) based upon Niko's testimony in court at the preliminary hearing, which occurred long after her initial identification and in a completely different environment, free of any indication of police influence. Thus, while Lamonte cannot sustain his claims, at the very least his claim for damages should be limited to April 15, 1994, to June 28, 1994.

And it is very clear Golubski did not cause Niko's trial testimony. Sometime after her testimony in the preliminary hearing on June 28, 1994, but before trial in September, prosecutor Terra Morehead visited Niko's residence, leaving a card and a message: contact me or I will have you arrested and take your children away. SOF, 99. Niko consulted with an attorney who encouraged her to contact Ms. Morehead and, as a result, Niko met with Ms. Morehead. SOF, 100.  During the meeting, Niko told Ms. Morehead that she was "not sure" if Lamonte was the killer. SOF, 101.  Ms. Morehead showed her graphic pictures of the victims—her cousins—and peppered her with questions implying Niko's need for obtaining justice such as:

- "don't you want somebody to be held accountable for this?,"
- "don't you want something done?," and
- "don't you want somebody convicted?"

SOF, 102. Niko started crying and "told her [she] didn't think it was Lamonte." *Id.* Ms. Morehead showed more graphic photos, and said "don't [you] want somebody to be held accountable?" *Id.* Niko relented and subsequently identified Lamonte at trial, and her reasons for doing so, as she testified to in her 1996 affidavit, line up with her description of Ms. Morehead's influence. *Id.* In her 1996 affidavit, Niko explained that "the [prosecutor][9] questioned me and threatened to take my children away from me if I did not talk.  *I wanted the whole thing to be over with, and I did not care who was convicted.*  Both victims sitting in the blue car were my cousins. *I wanted someone, anyone, to pay for their deaths.*" SOF, 116 (emphasis added).

As such, the impact on Niko of any police wrongdoing dissipated prior to her trial testimony. Indeed, the above facts show that she felt free enough from police influence to break off communication with the prosecutor's office, and to explicitly tell Terra Morehead that she wished to alter her position. Clearly, then, by this point in time, at the latest, Niko reestablished a "capacity for self-determination," assuming it was ever "critically impaired" in the first place.

Because Lamonte has not uncovered any evidence suggesting Golubski played any role in these pre-trial events or had any contact with Niko at all during that critical time, the chain of causation was broken at the latest on September 26, 1994 (five months later) based upon Niko's trial testimony that was not coerced by Golubski or any other police officer but rather prosecutor Terra Morehead. Indeed, when the prosecutor participates in the alleged misconduct, liability for malicious prosecution lies with the prosecutor, not the police officers investigating the crime. *Serrano v. Guevara*, 315 F. Supp. 3d 1026, 1043 (N.D. Ill. 2018).

## H.  COUNT I: The Fourth Amendment Provides No "Malicious Prosecution" Claim.

After *Manual v. City of Joliet, Ill.*, 137 S.Ct. 911, 923-24 (2017), there is reason to believe the Supreme Court questions the existence of a Fourth Amendment Malicious Prosecution claim. Given the United States Supreme Court's admitted silence as of 2017 on whether the Fourth Amendment provides a malicious prosecution claim, as well as the Tenth Circuit's acknowledgement of that silence along with its own 2017 admission that the Tenth Circuit has found such a right "at least prior to trial," the right that Lamonte now asserts cannot be said to have been clearly established—that is, beyond debate—in 1994 at the time of his conviction. *Margheim v. Buljko*, 855 F.3d 1077, 1085 (10th Cir. 2017). Thus, it would not be reasonable for an officer in Golubski's position in 1994, even taking Lamonte's allegations as true, to know that he would have violated Lamonte's Fourth Amendment rights. Accordingly, Golubski is entitled to qualified immunity because the right Lamonte asserts, if it now exists, was not clearly established in 1994.

## I.  COUNT I:  Lamonte's § 1983 Fourteenth Amendment Claims are barred because there exists an adequate remedy at state law.

Because Kansas provides an adequate state remedy, all Lamonte's Fourteenth

Amendment claims, including his malicious prosecution claim, fail. *Myers v. Koopman*, 738 F.3d 1190, 1193 (10th Cir. 2013); *Bledsoe v. Board of County Commissioners of County of Jefferson*, 501 F. Supp. 3d. 1059, 1104 (D. Kan., Nov. 18, 2020) ("Applying the *Myers* holding to the facts alleged here, plaintiff[] . . . can't rely on Fourteenth Amendment *procedural* due process because Kansas law provides a malicious prosecution tort claim that satisfies procedural due process requirements.")[10].

### J.      COUNT V: Conspiracy

Because Lamonte hasn't prove an actual deprivation, Lamonte's conspiracy claim fails. *Snell v. Tunnell*, 920 F.2d 673, 702 (10th Cir. 1990); *Grider v. City of Auburn, Ala.*, 618 F.3d 1240, 1260 (11th Cir. 2010). To prove a conspiracy, Lamonte must demonstrate Golubski and another formed an unlawful agreement to violate Lamonte's rights. *Fraiser v. Evans*, 992 F.3d 1003, 1024-25 (10th Cir. 2021). But "proof that defendants engaged in parallel actions does not necessarily indicate an agreement to act in concert." *Id.* (cleaned up). And, "proof that defendants … conspired to engage in … lawful investigative activities . . . would be inadequate." *Id.* (cleaned up). "There must be sufficient evidence of a conspiracy to prevent a jury from 'enga[ing] in sheer speculation and conjecture." *Good v. Board of County Com'rs of Shawnee County*, 209 F. Supp. 2d 1124, 1129 (D. Kan. 2002) (quoting *Six v. Henry*, 42 F.3d 582, 585 (10th Cir. 1994)). Rather, Lamonte must "specifically present facts 'tending to show agreement and concerted action.'" *Id.* (quoting *Hunt v. Bennett*, 17 F.3d 1263, 1268 (10th Cir. 1994)).

Here, all acts were ordinary acts of law enforcement officers doing their jobs including: (1) Barber learning the name Lamonte McIntyre from sources; SOF, 52-53, (2)  Lamonte was known to be seen in a blue car matching the description of the getaway vehicle; SOF, 60, 61, (3) Officer Viera passing on the information Lamonte is known to hang around Juniper Gardens; SOF, 62, (4)

Krstolich preparing a composite sketch with Mitchell; SOF, 47-49, (5) Detectives finding photographs of Lamonte McIntyre from previous police interactions; SOF, 55, 105, (6) showing the same lineup Mitchell was shown to other witnesses; SOF, 75, 68, (7) noting in police reports that there was another eyewitness, Stacy Quinn; SOF, 94, 74, (8) interviewing Lamonte's alibi witnesses; SOF, 118, (9) interviewing Keva Garcia; SOF, 93, among other things.

Aside from rank speculation, Lamonte has *no evidence* that these actions were taken pursuant to an agreement to deprive Lamonte of a federally protected right. At best, Lamonte's evidence demonstrates that many officers assisted each other in investigating the heinous murders. But, permitting a conspiracy claim against police officers to survive summary judgment simply because all the police officers worked on a criminal investigation would automatically impose conspirator liability on everyone involved in an investigation.

In *Good*, the District Court determined that the plaintiff—a former deputy alleging a nurse and a prosecutor conspired to maliciously prosecute him for perjury—failed to bring forth sufficient evidence of an unlawful conspiracy. *Good v. Board of County Com'rs of Shawnee County*, 209 F. Supp. 2d 1124 (D. Kan. 2002). The plaintiff's case was premised on the theory that Nurse Gordy and the prosecutor, Hamilton, conspired together to create "bogus notes" that could be used against Good. *Id*. at 1129. The plaintiff's evidence consisted of (1) plaintiff's own affidavit indicating he did not meet with Gordy on the date of the notes and had never met Gordy; (2) Gordy was unable to correctly describe the plaintiff's appearance; (3) evidence that some notes that contained incorrect information; (4) evidence regarding the appearance of notes in the medical record; (5) a meeting between Gordy and Hamilton to discuss testimony; and (6) evidence that Hamilton was aware of information in the notes prior to receiving the ability to examine the notes. *Id*. The Court noted that while evidence of a conspiracy "may be difficult to procure, [the Court]

also understand[s] that the plaintiff has the burden to produce sufficient evidence of a conspiracy." *Id*. But under this evidence, "a jury would be forced to engage in sheer speculation and conjecture." *Id*. The same is true in this case.

Permitting Lamonte's conspiracy claim to proceed without any actual evidence that the police officers and detectives involved had a shared objective specifically to violate Lamonte's rights, as opposed to do their jobs and investigate the crime, would turn every criminal investigation into a conspiracy to deprive the accused or suspected of federally protected rights. For these, and the reasons given by the Defendant Officers, the conspiracy claim should be dismissed.

### K.   COUNT III: Familial Association

#### 1.   *Both Plaintiffs*

Golubski is entitled to summary judgment as to Count III based on qualified immunity. First, Plaintiffs' First Amendment claims should be dismissed because the First Amendment is inapplicable. *Halley v. Huckaby*, 902 F.3d 1136, 1155 (10th Cir. 2018) ("familial association claims are grounded in the shocks-the-conscience approach to substantive due process claims challenging executive action").

The Tenth Circuit first recognized a general constitutional right to familial association in 1985. *See Trujillo v. Board of County Com'rs of Santa Fe County*, 768 F.2d 1186 (10th Cir. 1985); But "general recognition of the right to … is not sufficient, in itself, to amount to a "clearly established law…" *Franz v. Lytle*, 791 F. Supp. 827, 833 (D. Kan. 1992). Indeed, the "murky" right to familial association as the type of right which requires "closely corresponding factual and legal precedent" to be clearly established. *Id*. (citations omitted). As a 1992 decision, the *Franz* analysis helps us guard against using hindsight. "We must be wary of ... imagining that public officials have the training and experience in extracting legal rules from case law that appellate judges

48

have." *Collaizzi v. Walker*, 812 F.2d 304, 308 (7th Cir. 1987). "Public officials are not obligated to be creative or imaginative in drawing analogies from previously decided cases." *Lassiter v. Alabama A&M University*, 28 F.3d 1146, 1150 (11th Cir. 1994) (en banc). Put another way, how can a Kansas police officer in 1994 be expected to understand that *Trujillo*, standing alone, created clearly established rights "with obvious clarity" when a federal judge—in his own judicial district—had just said the opposite? *See Halley v. Huckaby*, 902 F.3d 1136, 1157 (10th Cir. 2018) (general statements of law can provide fair warning, but only if they apply with obvious clarity to the specific conduct in question).

In *Reasonover v. St. Louis County*, 447 F.3d 569 (8th Cir. 2006), the Court accepted the general proposition that a right to familial association existed, but found the law was not clearly established as to wrongful incarceration explaining that "… any right to familial association was not sufficiently clear such that defendants reasonably could have understood they were violating it." *Id.* at 585. So, *Reasonover* makes clear a police officer in 2006 would be on notice that the right to familial association could be violated by wrongfully incarcerating a family member. *See also Hill v. New Orleans City*, No. CIV.A. 13-2463, 2015 WL 222185, at *18 (E.D. La. Jan. 13, 2015), dismissed in part, remanded in part, 643 F. App'x 332 (5th Cir. 2016) (granting qualified immunity in wrongful arrest case because it "is insufficient to rely upon the broadly framed recognition of a right to family autonomy…"). Especially considering that by 1994, the Tenth Circuit had *never found* a violation of the right to familial association in *any* context. *Trujillo v. Board of County Com'rs of Santa Fe County*, 768 F.2d 1186, 1190 (10th Cir. 1985); *Bryson v. City of Edmond*, 905 F.2d 1386, 1393–94 (10th Cir. 1990); *Apodaca v. Rio Arriba Cty. Sheriff's Dep't*, 905 F.2d 1445, 1448 (10th Cir. 1990); *Griffin v. Strong*, 983 F.2d 1544, 1549 (10th Cir. 1993); *Perry v. Durborow*, 892 F.3d 1116, 1124 (10th Cir. 2018) ("[B]efore the district court [can] determine the law was clearly established,

it [has] to identify a case where an official acting under similar circumstances … was held to have violated").

Moreover, the Tenth Circuit had not made it clear that a "forced separation" of child from parent—of *any* kind and by *any* governmental action—implicates the right of familial association. *Hedger v. Kramer*, No. CIV-13-0654-HE, 2014 WL 1645792, at *5 (W.D. Okla. Apr. 24, 2014), aff'd, 726 F. App'x 677 (10th Cir. 2018) (pointing to *J.B. v. Washington County*, 127 F.3d 919, 925 (10th Cir.1997) as the first case to do so). It was also unclear, in the wrongful detention context, whether a mother had a right to familial association with a seventeen-year-old son who was mature and competent enough to rebut the presumed age of majority and be prosecuted as an adult, because the Tenth Circuit has never squarely addressed the question of whether age mattered. *Trujillo v. Board of County Com'rs of Santa Fe County*, 768 F.2d 1186, 1190 (10th Cir. 1985); *Bryson v. City of Edmond*, 905 F.2d 1386, 1393–94 (10th Cir. 1990); *Apodaca v. Rio Arriba Cty. Sheriff's Dep't*, 905 F.2d 1445, 1448 (10th Cir. 1990); *Griffin v. Strong*, 983 F.2d 1544, 1549 (10th Cir. 1993) (disposing of claims based on lack of intent to interfere, without analyzing the importance of age). However, other courts have determined that the right to familial association does not apply between parents and *adult* children, and that the age of adulthood is not determined by age alone. *McCurdy v. Dodd*, 352 F.3d 820, 830 (3rd Cir. 2003). If federal appellate judges can view the right to familial association this way in 2003, Golubski could not have known in 1994 that a mother has a clearly established familial association right with her son who was mature and competent enough to rebut the presumed age of majority for purposes of prosecution. *See also Butera v. District of Columbia,* 235 F.3d 637, 654 (D.C. Cir. 2001); *Przybysz v. City of Toledo*, 302 F. Supp. 3d 915, 926 n.6 (N.D. Ohio 2017). And even if Lamonte is treated as a minor for purposes of familial association, it would not have been clear to Golubski that this violation would continue

beyond Lamonte's eighteenth birthday. *Id.* Thus, in 1994, it was not "beyond debate" that a wrongful arrest/detention of a son who was prosecuted as an adult implicated the right to familial association of the son and his mother. *Halley v. Huckaby*, 902 F.3d 1136, 1144 (10th Cir. 2018).

Finally, plaintiffs must show Golubski either unduly burdened or effected an unwarranted intrusion into their relationship. *Thomas v. Kaven*, 765 F.3d 1183, 1196 (10th Cir. 2014). As shown above, however, there was probable cause for Lamonte's arrest so he cannot meet this standard.   For all these reasons, Count III should be dismissed in its entirety.

### 2.    *Lamonte's Familial Association Claim*

Golubski has qualified immunity on Lamonte's familiar association claim for three additional reasons. First, Lamonte did not have a clearly established right in 1994 to familial association with Rose. *JL ex rel. Thompson v. N.M. Dep't of Health*, 165 F. Supp. 3d 996, 1030-1031 (D. N.M. 2015) (explaining that a child's familial association rights with a parent were still unestablished by Supreme Court or Tenth Circuit case law up to and including *Griffin* in 1993).  But even if he did, his claim should be dismissed because the Fourth Amendment provides an explicit textual source of constitutional protection for his detainment. *Manuel v. City of Joliet*, 137 S. Ct. 911, 918 (2017); *Simuro ex rel. K.S. v. Shedd*, 176 F. Supp. 3d 358, 384 (D. Vt. 2016).

Finally, a claim for deprivation of familial association requires "an intent to interfere with a particular relationship protected by the freedom of intimate association." *Trujillo v. Board of County Com'rs of Santa Fe County*, 768 F.2d 1186, 1190 (10th Cir. 1985). The defendant must have acted "with knowledge that the … conduct will adversely affect that relationship." *Griffin v. Strong*, 983 F.2d 1544, 1548 (10th Cir. 1993). And, importantly, "the intent must be directed at the *plaintiff's* rights—the intent cannot be transferred from another person, even another family member." *Stewart v. City of Prairie Village, Kansas*, 904 F. Supp. 2d 1143, 1163 (D. Kan. 2012).

Here, Lamonte has not amassed any evidence suggesting that Golubski was attempting to interfere with *his* and not Rose's right to familial association. Nor would any such violation be clearly established law since it was not apparent in 1994 that intent could be transferred from one family member to another. For these three additional reasons, Golubski is entitled to qualified immunity as to Lamonte's claim in Count III.

## V.    CONCLUSION

Golubski respectfully requests that this Court issue an order determining Defendant Golubski is:

1.       entitled to qualified immunity on Lamonte's Fabrication Claims in Count II because he did not fabricate evidence and because in 1994 the law did not clearly establish his conduct, even if true, constituted fabrication;

2.       entitled to qualified immunity on Lamonte's Brady Claims in Count II because in 1994 the law did not clearly establish that a police officer, as opposed to the prosecutor, had an affirmative duty to disclose Brady material;

3.       entitled to qualified immunity on Lamonte's Brady Claims in Count II because the law does not require an officer to disclose his own misconduct *unrelated* to the subject investigation and, even if it does, such law was not clearly established in 1994;

4.       entitled to qualified immunity on Lamonte's Brady Claims in Count II because the law does not require an officer to disclose his own misconduct *related* to the subject investigation and the clearly established law only required the disclosure of existing evidence;

5.       entitled to qualified immunity on Lamonte's Brady Claims in Count II because much of Lamonte's alleged Brady material is to vague to permit Golubski, or the Court, whether it would have been material to Lamonte's guilt or innocence in 1994;

6.       entitled to qualified immunity on Lamonte's Brady Claims in Count II because the law did not clearly establish, in 1994, that evidence inadmissible under the Kansas law could be "material" to Lamonte's guilt or innocence and thereby requiring disclosure under *Brady;*

53

7.      entitled to qualified immunity on Lamonte's Brady Claims regarding Niko Quinn's identification behind Wyandotte High School in Count II because the Supreme Court determined that information did not require disclosure under Brady and, as a result, his obligations under the circumstances were not clearly established;

8.      entitled to summary judgment on Lamonte's Malicious Prosecution Claims because probable cause existed, or at least a reasonable officer in Golubski's position would have believed reasonable probable cause existed to arrest, detain, and/or prosecute Lamonte and, thereby, entitling Golubski to qualified immunity as the federal Malicious Prosecution Claim;

9.      entitled to summary judgment on Lamonte's Malicious Prosecution Claims because Golubski only relied on inculpatory information provided to him by witnesses and other officers, passed on the information he obtained to the prosecutor, did not know it any of it was false or inaccurate, and did not pressure the prosecutor to bring charges;

10.     entitled to summary judgment on all claims, and qualified immunity on all federal claims because the chain of causation, if any, between Golubski's alleged wrongdoing and Lamonte's conviction was broken by Ruby Mitchell and Niko Quinn's in-court identifications months later, and especially Niko Quinn's recantation to Terra Morehead; and the law in 1994 was not clearly established that Golubski's conduct, in light of the above, caused a deprivation given the prosecutor's wrongful conduct resulted in Niko Quinn's? identification and testimony to Terra Morehead but perjured herself at Lamonte's trial due to the threats made by the prosecutor, and the law does not and did not clearly establish in 1994.  And whether the law in 1994 would have put Golubski on notice that any causation between his alleged actions and Niko Quinn's identification

would remain unbroken in light of the above, specifically the prosecutor's subsequent alleged threats;

11.     entitled to qualified immunity on Lamonte's § 1983 Fourteenth Amendment Claims because Kansas law provides an adequate remedy;

12.     entitled to summary judgment on Lamonte's § 1983 Conspiracy Claims;

13.     entitled to qualified immunity on Plaintiffs' § 1983 Familial Association Claims under the First Amendment because no such right, let a lone a clearly established right, exists under the Fist Amendment;

14.     entitled to qualified immunity on Plaintiffs' § 1983 Familial Association Claims because the law did not clearly establish if such claims existed, in 1994, in the context of a wrongful prosecution/detainment, in the context of a forced separation of a child from a parent of any kind, a mother and a seventeen-year-old son who was mature and competent enough to rebut the presumed age of majority and be prosecuted as an adult, or that such a violation would extend beyond the minor reaching the age of majority.  Further, if the Court determines such a right does exist but does not extend past the age of majority, enter an order dismissing any claims accruing after Lamonte's eighteenth birthday.

15      entitled to qualified immunity on Lamonte's § 1983 Familial Association for Lamonte's detainment and because the law did not clearly establish Lamonte had such a right given the Fourth Amendment provides an explicit textual source of constitutional protection, and because the law does not clearly establish a familial association right from child to parent or that such a right could be based on transferred intent; and

16.     for other relief this Court deems just and proper.

Respectfully submitted,

**ENSZ & JESTER, P.C.**

/s/ Matthew J. Gist

MATTHEW J. GIST            KS #20829
CHRISTOPHER M. NAPOLITANO KS #25499
1100 Main Street, Suite 2121
Kansas City, Missouri  64105
Telephone:  816-474-8010
Facsimile:   816-471-7910
E-mails:     mgist@enszjester.com
             cnapolitano@enszjester.com

**and**

MORGAN L. ROACH           KS #23060
SEAN P. McCAULEY          KS #20174
NICHOLAS S. RUBLE         KS #25636
JEFFREY S. KRATOFIL       KS #23983
MCCAULEY & ROACH, LLC
527 W. 39th Street, Suite 200
Kansas City, Missouri  64111
Telephone:  816-523-1700
Facsimile:   816-523-1708
E-mails:     morgan@mccauleyroach.com
             sean@mccauleyroach.com
             nick@mccauleyroach.com
             jeff@mccauleyroach.com
**ATTORNEYS FOR DEFENDANT
DETECTIVE ROGER GOLUBSKI**

## CERTIFICATE OF SERVICE

I hereby certify that, on April 1, 2022, the above and foregoing was electronically filed with the Clerk of the Court to be served by operation of the Court's electronic filing system upon all counsel of record.

MICHAEL J. ABRAMS      KS #15407
WILLIAM G. BECK        KS #77974
ALEXANDER T. BROWN   KS #78891
ALANA M. McMULLIN    KS #78948
LATHROP GPM LLP
2345 Grand Boulevard, Suite 2200
Kansas City, Missouri  64108
Telephone:  816-292-2000
Facsimile:   816-292-2001
E-mail(s):   michael.abrams@lathropgmp.com
            william.beck@lathropgpm.com
            alexander.brown@lathropgpm.com
            alana.mcmullin@lathropgpm.com

**and**

CHERYL A. PILATE      KS #14601
LINDSAY RUNNELS    KS #78822
MORGAN PILATE, LLC
926 Cherry Street
Kansas City, Missouri  64106
Telephone:  816-471-6694
Facsimile:   816-472-3516
E-mail(s):   cpilate@morganpilate.com
            lrunnels@morganpilate.com

**and**

BARRY SCHECK        *Pro Hac Vice*
EMMA FREUDENBERGER  *Pro Hac Vice*
AMELIA GREEN        *Pro Hac Vice*
SONA R. SHAH        *Pro Hac Vice*
NEUFELD SCHECK & BRUSTIN, LLP
99 Hudson Street, 8th Floor
New York, New York  10013
Telephone:  212-965-9081
Facsimile:   212-965-9084
E-mail(s):   barry@nsbcivilrights.com
            emma@nsbcivilrights.com
            amelia@nsbcivilrights.com

sona@nsbcivilrights.com
**ATTORNEYS FOR PLAINTIFFS**
DAVID R. COOPER            KS #16690
CHARLES E. BRANSON         KS #17376
FISHER, PATTERSON, SAYLER & SMITH, LLP
3550 SW 5th Street
Topeka, Kansas  66606
Telephone:  785-232-7761
Facsimile:   785-286-6609
E-mail(s):    dcooper@fpsslaw.com
              cbranson@fpsslaw.com
**and**

HENRY E. COUCHMAN, JR.     KS #12842
EDWARD JAMES BAIN          KS #26442
UNIFIED   GOVERNMENT   OF   WYANDOTTE
COUNTY
KANSAS CITY, KANSAS LEGAL DEPARTMENT
701 North 7th Street, Suite 961
Kansas City, Kansas 66101
Telephone:  913-573-5060
Facsimile:   913-573-5243
E-mail(s):    hcouchman@wycokck.org
              jbain@wycokck.org
**ATTORNEYS    FOR    DEFENDANT
UNIFIED    GOVERNMENT    OF
WYANDOTTE COUNTY AND KANSAS
CITY, KANSAS**


SEAN M. STURDIVAN          KS #21286
ELIZABETH A. EVERS         KS #22580
TRACY M. HAYES             KS #23119
SANDERS WARREN RUSSELL LLP
11225 College Boulevard, Suite 450
Overland Park, Kansas  66210
Telephone:  913-234-6100
Facsimile:   913-234-6199
E-mail(s):    s.sturdivan@swrllp.com
              e.evers@swrllp.com
              t.hayes@swrllp.com
**ATTORNEYS  FOR  THE  ESTATE  OF
DETECTIVE     JAMES     MICHAEL
KRSTOLICH,    DETECTIVE    DENNIS**

58

**WARE, OFFICER JAMES L. BROWN, THE ESTATE OF LIEUTENANT DENNIS OTTO BARBER, DETECTIVE CYLDE BLOOD, DETECTIVE WK SMITH, AND THE ESTATE OF LIEUTENANT STEVE CULP**

/s/ Matthew J. Gist

**ATTORNEYS FOR DEFENDANT DETECTIVE ROGER GOLUBSKI**