

# Police Department
## RECORDS AND TECHNOLOGY UNIT



Ronald Miller
Chief of Police

Lieutenant Michael Webb
Unit Commander

## Request For Information Form

Date of Request:_____ Request taken by:_____

Requested by: BOBIN                    D.A. office
Date of Incident:_____ Type of incident:_____
Location of Incident:_____
Location Reported:_____
Victim Name:_____D.O.B_____
Victim Address:_____
Suspect/Arrestee (If Applicable):_____
D.O.B.:_____ Remarks:_____
_____
_____

#0415400 6081    FAX- 573-2949
L2-                              573 2999
MCINTYRE

Contact Information
Name:_____Phone #:_____
Address:_____
City/State:_____ Zip:_____

1994

**EXHIBIT**
**1**
**RG SUMMARY JUDGMENT**

*"In partnership with the community"*

•701 North 7ᵗʰ •Kansas City, Kansas 66101 •Phone (913) 573-5000

Golubski
EXHIBIT ___5___
DATE 1-19-20 RPTR AT
The Cooper Group

KANSAS CITY KANSAS POLICE DEPARTMENT

\*\* PROSECUTIVE SUMMARY \*\*

April 16, 1994

OFFENSE : Double Homicide
DATE/TIME/LOCATION OF OFFENSE: 4-15-94, 1400 Hours, 3032 Hutchings

FILE #: 04154006081

DISTRICT COURT #:                    CITY COURT #:

---

### SUSPECT/ARRESTEE INFORMATION

WHERE HELD ?: Juvenile Detention Center

PERSON ARRESTED : Lamonte McIntyre, B/M, ▓▓▓▓ 1929 N. 6th, KCK, 342-4147 (Juvenile)

---

### VICTIM INFORMATION

VICTIM'S NAME/ADDRESS/PHONE #: #1) Daniel Quinn, ▓▓▓▓▓▓▓▓▓▓▓▓▓
#2) Donald E. Ewing, ▓▓▓▓▓▓▓▓ 3038 N. 20th, KCK, 621-6903

OWNER'S NAME/ADDRESS/PHONE # :

---

### ARRESTING OFFICERS

OFFICER NAME/SERIAL #: J. Brown #1627

---

SIGNED, WRITTEN STATEMENT ?: No                    ORAL ADMISSION OF CRIME ? : No

NAME OF PERSON WHO HEARD THE ADMISSION : N/A

---

### SYNOPSIS OF CRIME

On 4-15-94 both victims were in an 80's model blue Cadillac, bearing Kansas ITL176, facing north bound on Hutchings, slightly north of 3032 Hutchings.  As the two victims were seated in their vehicle, the suspect approached from an east to westerly direction, and had in his possession a shot gun.  Both victims were fired upon by the assailant, both were hit numerous times.  Mr. Quinn expired on the scene.  Mr. Ewing was transported to Bethany, underwent surgery, and later expired at the hospital.

---

PROSECUTION SUMMARY
FILE # 04154005081
PAGE 2

### WITNESS(S) INFORMATION AND SYNOPSIS OF TESTIMONY

1. Niko Quinn, 3018 Hutchings, KCK, 321-6262 — Who can testify to seeing the assailant approach the victims, to seeing him with a shot gun, to hearing approximately three shots, and to seeing the suspects path of direction when he left. Also, to seeing the condition of the victims after the crime.

2. Ruby Mitchell, 3020 Hutchings, KCK, 342-8422 — Can testify to the crime, seeing the suspect approach the victims who were seated in the vehicle, to hearing approximately four or five shots, to seeing the suspect then leave the scene, to later viewing a photo line up in the Bureau, and to positively identifying the suspect, Lamonte McIntyre.

3. Josephine Quinn, 3032 Hutchings, KCK, 321-6262 — Who can testify to hearing between 3 and 4 shots, seeing the suspect approach the victims, to seeing the victims condition after the weapon was discharged at them, seeing the suspect leave the scene. She can also testify to viewing a photo line up and to not being able to identify any suspects from the photo line up.

4. John Quinn, 2743 Cleveland — Who can testify to breaking the windows of the victims vehicle, observing the condition of the vehicle, and to hearing the shots.

5. Stacy Quinn, 3032 Hutchings — Who can testify to observing the crime and to possibly being able to identify the suspect.

6. Lt. Barber, KCKPD — Who can testify to the unsolicited statement of Rose McIntyre, that her son was with her all day long, and to her remarks about would a subject be incarcerated if he was only mentioned as a suspect in a murder, also to the unsolicited remarks of the suspect, who stated he had been with his brother all day long.

7. Officer Orendac — Who can testify to the offense report of Mr. Quinn.

8. Officer Vallejo — Can testify to the offense report of Mr. Ewing and recovering the subjects personal clothing items from Bethany.

9. Officer Wansley — Testify to the initial interview with Ms. Mitchell. Can testify to interviewing a Ms. Shelton who stated she saw a suspect vehicle on the proceeding block.

10. Officer Ambler — Who can testify to the tow in report.

11. Detective Maskil & Sgt. Blood — Who can testify to the initial investigation and crime scene.

12. Detective W.K. Smith — Who can testify to the statement of Niko and Josephine Quinn.

13. Detective Krstolich — Who can testify to doing an identi-kit from Ms. Mitchell. Also to being present when she made the positive i.d. of the suspect. Also to the advice of rights to Lamonte McIntyre, his waiver of rights, and spontaneous consent to an oral interview and not a taped interview.

PAGE                    2

PROSECUTION SUMMARY
FILE # 04154006081
PAGE 3

### WITNESS INFORMATION (CONT'D)

14. **Lt. Barber** – Who can testify to the unsolicited remarks of Rose McIntyre and the suspect Lamonte McIntyre.

15. **Officer J. Brown** – Who can testify to the arrest and also to hearing the advice of rights and remarks given by Mr. Lamonte McIntyre while in the Bureau.

16. **Detective Shomin** – Who can testify to the autopsy of Doniel Quinn.

17. **Officer Joe Stubler** – Who can testify to video taping both autopsy's and recovery of pertinent evidence.

18. **Officer Bill Howard, Frank Claire, and Lt. Stan Harrington, I.D. Unit** – Who can testify to processing the crime scene on Hutchings.

19. **Detective Golubski** – Who can testify to the photo line up, to the identification by Ms. Mitchell of Lamonte McIntyre, to the advice of rights to Lamonte McIntyre, to statements he gave informally while in the Bureau after being advised of his rights. Also to attending the autopsy of Donald Ewing.

---

### EVIDENCE

PHYSICAL :  #1) One black, brown, green, and tan hat; recovered rear seat just right of center. ( victim's vehicle)
#2) Broken liquor bottle and paper sack; just west of left rear tire.
#3) Broken glass sample.
#4) Plastic wadding; left front floor board (victim's vehicle)
#5) One plastic wadding; center of front floor board.
#6) Two plastic wadding; recovered from front seat left side.
#7) One pair of eyeglasses; left front floor mat (victim's vehicle)
#8) One crack pipe, cigarette lighter; left side of right front seat.
#9) One gray plastic part of wadding; between windshield and door post just above dash of victim's vehicle.
#10) One plastic wadding; right front floor board of victim's vehicle.
#11) Known sample from driver's side front door glass.
#12) One $10 dollar bill and one $1 dollar bill; floor board under left front seat.
#13) Unknown type cloth; left front door inside by door glass.
#14) Blood sample; right front floor between seat and door.
#15) Bottom of liquor bottle on ground under driver's door.
#16) Glass sample; drivers side rear door window.
Physical evidence recovered from crime scene.

PAGE          3

PROSECUTION SUMMARY
FILE # 04154006081
PAGE 4

## EVIDENCE (CONT'D)

OTHER     : From the Donald Ewing autopsy:   One hair sample from the head of the victim,
one blood sample from the body of the victim - two tubes, one blood sample recovered from
the body of the victim - two swabs, one sample of shot gun shot and wadding recovered from
the victim's left upper shoulder, one sample of shot gun shot recovered from the victim's
middle back of the inside, one large shot gun shot recovered from the victim's right arm,
one large shot gun shot recovered from the victims parachordal sack.   The above property
recovered by Dr. Mitchell at the post of Mr. Ewing at Bethany Hospital.

Autopsy Daniel Quinn:   One hair sample recovered from the victim's head, two
tubes of blood sample from the victim's body, two swabs of blood sample from the victim's
body, one shot gun shot and wadding sample recovered from the victim's head, one blue
cigarette lighter recovered from the clothing of the victim, one red and white shirt with
blood on it recovered from the victim's property, one pull over white shirt with blood on
it recovered from the victim's property, one pair of yellow pants with blood on them
recovered from the victim's property, one pair of black shoes recovered from the victim's
property, one pair of white underpants with blood on them recovered from the victim's
property, two pairs of white socks recovered from the victim's property.   The above
evidence is recovered by Dr. Anderson, given to Officer Stubler at the request of Detective
Shomin; the post K.U..

One pair of brown L.A. Gear shoes size 11, one pair of black sweat pants
drenched in blood, one pair of red/white boxer shorts, one white sock, one pair of grey
sweatshorts drenched in blood, one brown leather jacket drenched in blood, four quarters,
one pink lighter, one white ink pen, one white shirt drenched in blood.   The property
recovered from Mr. Ewing, Bethany Hospital, by registered nurse Sandy Robinson; given to
Officer Vallejo.

DISPOSITION OF EVIDENCE : Police I.D. Unit

## PROPERTY

APPROXIMATE VALUATION OF PROPERTY STOLEN : N/A

## ADMINISTRATIVE

NAME OF INVESTIGATOR(S) WORKING THE CASE : Detectives Blood, Maskil, W.K. Smith, Krstolich,
Golubski

NAME OF PERSON WHO PREPARED SUMMARY REPORT : Detective Golubski

SUPERVISOR SIGNATURE :

424

PAGE                4

KANSAS CITY, KANSAS POLICE DEPARTMENT

PROSECUTIVE INDEX

April 18, 1994

VOLUME # One                                    FILE # 04154006081

| INDEX NUMBER & DESCRIPTION | DATE | PAGES | OFFICER |
|---|---|---|---|
| 1. Offense Report (Donald Ewing) | 4-15-94 | 2 | L. Vallejo #1637 |
| 2. Offense Report (Doniel Quinn) | 4-15-94 | 1 | J. Orendac #1642 |
| 3. Investigative | 4-15-94 | 1 | J. Orendac #1642 |
| 4. Investigative | 4-15-94 | 2 | G. Wansley #1581 |
| 5. Investigative | 4-15-94 | 1 | L. Vallejo #1637 |
| 6. Field Investigation Report | 4-15-94 | 1 | Clair/Howard |
| 7. Investigative | 4-15-94 | 1 | J. Myers #1553 |
| 8. Tow-In | 4-15-94 | 1 | Ambler #1310 |
| 9. Investigative | 4-15-94 | 2 | Ambler #1310 |
| 10. Property Report | 4-15-94 | 1 | L. Vallejo #1637 |
| 11. Juvenile Report | 4-15-94 | 1 | J. Brown #1627 |
| 12. Field Investigation Report | 4-15-94 | 1 | J. Stubler #1390 |
| 13. Field Investigation Report | 4-15-94 | 1 | Clair/Howard |
| 14. Witness Statement (Niko Quinn) | 4-15-94 | 3 | Detective W.K. Smith |
| 15. Witness Statement (Ruby Mitchell) | 4-15-94 | 5 | Detective Krstolich |
| 16. Witness Statement (Josephine Quinn) | 4-15-94 | 4 | Detective W.K. Smith |

PROSECUTION INDEX
FILE # 04154006081
PAGE 2

| | | | |
|---|---|---|---|
| 17. Property Report | 4-15-94 | 1 | F. Clair |
| 18. Advice of Rights (Lamonte McIntyre) | 4-15-94 | 1 | Golubski/Krstolich |
| 19. Witness Statement (Dennis Barber) | 4-15-94 | 4 | Detective Golubski |
| 20. Property Report | 4-15-94 | 1 | |
| 21. Full body diagram of Donald Ewing | | 1 | Detective Golubski |
| 22. Diagram of crime scene | | 1 | Detective Golubski |
| 23. Composite of suspect | 4-15-94 | 2 | Detective Krstolich |
| 24. Investigative Addendum | 4-15-94 | 2 | Detective Krstolich |
| 25. Investigative Addendum | 4-15-94 | 4 | Sgt. Blood |
| 26. Field Investigation Report | 4-16-94 | 1 | J. Stubler #1390 |
| 27. Property Report | 4-16-94 | 1 | J. Stubler #1390 |
| 28. Property Report | 4-16-94 | 1 | J. Stubler #1390 |
| 29. Investigative Addendum | 4-16-94 | 2 | Detective Shomin |
| 30. Investigative Addendum | 4-16-94 | 3 | Detective Golubski |
| 31. Investigative Addendum | 4-16-94 | 2 | Detective Golubski |
| 32. Clearance | 4-16-94 | 1 | Detective Golubski |

END OF REPORT

424

PAGE2

Kansas City, Ks Police Department   **OFFENSE REPORT**   1. PAGE 1 OF 3

KB106020D  KCKPD #44193

| 2. Date of Occurrence From: MM | DD | YY | HH | MM | To: | MM | DD | YY | HH MM | 3. Complaint Number |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |

| 4. When Reported: MM | DD | YY | HH | MM | 5. Where Reported: (Street, City, State, Zip) | | 6. District |
| 04 | 15 | | 15 | 24 | | | |

7. Location of Offense: (Street, City, State, Zip)

8. Received

| 9. Vict.# | 10. Victim Name: | | 11. Type of Victim | ☐ G-Government | ☐ U-Unknown |
| | | | ☑ I-Individual | ☐ B-Business | ☐ S-Society |
| 12. Victim Address: (Street,City,State,Zip) | | ☐ F-Financial Institute ☐ R-Religious Organization ☐ O-Other | | | |

| 13. DOB: MM | DD | YY | 14. Age | 15. Sex | 16. Race | 17. Eth. | 18. Hgt. | 19. Wgt. | 20. Hair | 21. Eye | 25. Employment/School |
| | | | | M | | | | | BLK | BRN | |

| 22. Victim of Offense Number (Circle) | 23. Home Phone # | 24. Business Phone # | 26. Employment/School Address |
| 1  2  3  4  5  6  7  8  9  10 | | | |

| 27. Victim Relationship to Suspect (Indicate all suspects) | 28. Injury Type | 29. ☑ R-Resident | 30. Circum. Agg.Aslt./Battery/ |
| 1  2  3  4  5  6  7  8  9  10 | | ☐ N-Non/Resident | Homicide: |

| 31. Victim Taken To: | 32. Transported By: | 33. Physician | 34. Date/Time Pronounced | 36. Medical | ☑ Y-Yes | 36. Coroner ☐ Y-Yes |
| | | | | Attention ☐ N-No | | Notified ☐ N-No |

| 37. Offense (Statute/Ordinance) | 38. Offense Title: | 40. ☐ A-Attempt | 37b. Offense (Statute/Ordinance) | 38c. Offense Title: | 40b. ☐ A-Attempt |
| | | ☑ C-Complete | | | ☐ C-Complete |

| 41. ☐ Aid/Abett ☐ Conspiracy ☐ Solicitation | 45. Entry: | 50. Type of Force/Weapon: | 41b. ☐ Aid/Abett ☐ Conspiracy ☐ Solicitation | 45b. Entry: | 50b. Type of Force/Weapon: |
| Prem.Code | # of Prem | Hate/Bias | | ☐ 11-Firearm | ☐ Auto | Prem.Code | # of Prem | Hate/Bias | ☐ F-Force | ☐ 11-Firearm | ☐ Auto |
| 42. | 43. | 44. | ☐ F-Force | ☐ 12-Handgun | ☐ Auto | 42b. | 43b. | 44b. | ☐ N-NoFor. | ☐ 12-Handgun | ☐ Auto |
| | | | | ☐ 13-Rifle | ☐ Auto | | | | | ☐ 13-Rifle | ☐ Auto |
| 46. Type of Criminal Activity: | 48. Campus Crime: | ☑ 14-Shotgun | ☐ Auto | 46b. Type of Criminal Activity: | 48b. Campus Crime: | ☐ 14-Shotgun | ☐ Auto |
| ☐ | ☐ KCAVTS ☐ KCCC | ☐ 15-Other Firearm | | ☐ B-Buying/Receiving | ☐ KCAVTS ☐ KCCC | ☐ 15-Other Firearm | |
| ☐ B-Buying/Receiving | ☐ HRBLKT ☐ KU | | | ☐ C-Cult/Manuf/Publish | ☐ HRBLKT ☐ KU | | |
| ☐ C-Cult/Manuf/Publish | 49. Type of Theft: | ☐ 20-Knife/Cutting Instru | | ☐ D-Distrib/Selling | 49b. Type of Theft: | ☐ 20-Knife/Cutting Instru | |
| ☐ D-Distrib/Selling | ☐ A-M/V Parts/Acces | ☐ 30-Blunt Object | | ☐ E-Exploiting Children | ☐ A-M/V Parts/Acces | ☐ 30-Blunt Object | |
| ☐ E-Exploiting Children | ☐ B-From Building | ☐ 35-Motor Vehicle | | ☐ O-Oper/Promote/Assist | ☐ B-From Building | ☐ 35-Motor Vehicle | |
| ☐ O-Oper/Promote/Assist | ☐ E-Embezzlement | ☐ 40-Personal Weapon | | ☐ P-Possess/Concealing | ☐ E-Embezzlement | ☐ 40-Personal Weapon | |
| ☐ P-Possess/Concealing | ☐ F-Theft from M/V | ☐ 50-Poison | | ☐ T-Transp/Trans/Import | ☐ F-Theft from M/V | ☐ 50-Poison | |
| ☐ T-Transp/Trans/Import | ☐ L-Shoplifting | ☐ 60-Explosive | | ☐ U-Using/Consuming | ☐ L-Shoplifting | ☐ 60-Explosive | |
| 47. Suspected of Using: | ☐ M-Coin Machine | ☐ 65-Fire/Incendiary/Device | | 47b. Suspected of Using: | ☐ M-Coin Machine | ☐ 65-Fire/Incendiary/Device | |
| ☐ A-Alcohol | ☐ O-All Other | ☐ 70-Drug/Narc/Sleep Pills | | ☐ A-Alcohol | ☐ O-All Other | ☐ 70-Drug/Narc/Sleep Pills | |
| ☐ C-Computer Eq. | ☐ P-Pocket-Picking | ☐ 85-Asphyxiation | | ☐ C-Computer Eq. | ☐ P-Pocket-Picking | ☐ 85-Asphyxiation | |
| ☐ D-Drugs/Narcotics | ☐ S-Purse-Snatching | ☐ 90-Other | | ☐ D-Drugs/Narcotics | ☐ S-Purse-Snatching | ☐ 90-Other | |
| ☐ N-Not Applicable | ☐ T-Poss/Stol.Prop. | ☐ 95-Unknown | | ☐ N-Not Applicable | ☐ T-Poss/Stol.Prop. | ☐ 95-Unknown | |
| | ☐ V-Motor Vehicle | | | | ☐ V-Motor Vehicle | | |

| 51. Vehicle Information: | ☐ S-Stolen | ☐ E-Embezzled | ☐ R-Recovered | ☐ T-Suspect | ☐ O-Other |
| 52. Year | 53. Make | 54. Model | 55. Style | 56. Color | 57. VIN | 58. License # | 59. Co. | 60. State | 61. Year |

| 62. Additional Descriptive: | | 63. Location: |

| 64. Keys ☐ Y-Yes | 65. Car ☐ Y-Yes | 66. Value | 67. Insurance/Finance Company |
| Left > ☐ N-No | Locked > ☐ N-No | | |

| 68. Person Interviewed | DOB | Race/Sex | Address | Telephone# | ☐ W ☐ R ☐ K ☐ N |
| # | | | | | ☐ W ☐ R ☐ K ☐ N |
| # | | | | | ☐ W ☐ R ☐ K ☐ N |
| # | | | | | ☐ W ☐ R ☐ K ☐ N |

| 69.Type | 70.Property/Drug | 71.Property Description/Model | 72.Serial # | 73.Quantity | 74.Fraction | 75.Measure | 76.Value | 77.Recov Date | Type Prop; Loss Codes |
| | | | | | | | | | 1.None |
| | | | | | | | | | 2.Burned |
| | | | | | | | | | 3.Counterfeit/Forgery |
| | | | | | | | | | 4.Destroyed/Dam/Vand |
| | | | | | | | | | 5.Recovered |
| | | | | | | | | | 6.Seized |
| | | | | | | | | | 7.Stolen |
| | | | | | | | | | 8.Unknown |

| 78. Supervisory Review By: | Serial # | 79. Reporting Officer | Serial # |
| | | | |

Exh. 01

P0008

LMKSDC_0003398

PAGE __ OF __

COMPLAINT # _____

| 80. Instrument Used: | 81. Point of Entry: | 82. Point of Exit: | 83. Premise Neighborhood: | 84. Safe Entered: |
|---|---|---|---|---|
| ☐ 1-Key | ☐ 1-Front | ☐ 1-Front | ☐ B-Urban/Business/Commercial | ☐ 1-Yes  ☐ 6-Exploded |
| ☐ 2-Pry Tool  ☐ 7-Vise Grips | ☐ 2-Rear | ☐ 2-Rear | ☐ R-Rural/Farm/Agriculture | ☐ 2-No  ☐ 7-Combination |
| ☐ 3-Saw Drill  ☐ 8-Physical Force | ☐ 3-Side | ☐ 3-Side | ☐ S-Suburban/Residence | ☐ 3-Attempted  ☒ 9-Not Applicable |
| ☐ 4-Hammer  ☐ 9-Thrown Object | ☐ 4-Roof | ☐ 4-Roof | ☐ U-Uninhabited | ☐ 4-Removed |
| ☐ 5-Bolt Cutter  ☐ 10-Other | ☒ 9-Not Applicable | ☒ 9-Not Applicable | ☒ N-Not Applicable | ☐ 5-Peeled |
| ☐ 6-Chopping Tool  ☒ 11-Not Applic. | | | | |

85. Evidence: ☐ 1-Hair ☐ 2-Weapons/Tools ☐ 3-Photos ☐ 4-Rape Kit ☐ 5-Latent Prints ☐ 6-Stains ☐ 7-Semen   86. Incident Activity: ☐ D-DV with Children ☐ B-Gang Activity
☐ 8-Drugs ☐ 9-DNA ☐ 10-Other Prints ☐ 11-Blood ☐ 12-Documents ☐ 13-Alcohol ☐ O-None ☒ 99-Other   ☐ D-Domestic Vio. ☐ J-Car Jacking ☐ S-Drive by Shooting

| 87. Susp/Arr # | 88. Suspect/Arrestee Name: | 89. Alias: | 90. Telephone# |
|---|---|---|---|
| 91. Address: (Street, City, State, Zip) | | 92 Frequents: | 93. Social Security # |

| DOB | MM | DD | YY | 95.Age | 96.Sex | 97.Race | 98.Eth | 99.Hgt | 100.Wgt | 101.Hair | 102.Eye | 103. Employment/School | 104. ☐ R-Resident |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 94. | | | | | | | | | | | | | ☐ N-Non/Res. |

| 87b. Susp/Arr # | 88b. Suspect/Arrestee Name: | 89b. Alias: | 90b. Telephone# |
|---|---|---|---|
| 91b. Address:(Street,City,State,Zip) | | 92b. Frequents: | 93b. Social Security # |

| DOB | MM | DD | YY | 95b.Age | 96b.Sex | 97b.Race | 98b.Eth | 99b.Hgt | 100b.Wgt | 101b.Hair | 102b.Eye | 103b. Employment/School | 104b. ☐ R-Resident |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 94b. | | | | | | | | | | | | | ☐ N-Non/Res. |

| 105. R/L Handed | 106. Hair Length: | 107. Glasses: | 108. Complexion: | 109. Speech: | 110. Skin Tone: |
|---|---|---|---|---|---|
| Suspect/Arrestee# | Suspect/Arrestee# | Suspect/Arrestee# | Suspect/Arrestee# | Suspect/Arrestee# | Suspect/Arrestee# |
| ☐ | ☐ ☐ S-Short | ☐ ☐ H-Half-Framed | ☐ ☐ A-Acne | ☐ | ☐ ☐ ALB-Albino |
| ☐ ☐ A-Ambidex | ☐ ☐ B-Bald/Balding | ☐ ☐ P-Plastic Framed | ☐ ☐ D-Dark | ☐ ☐ A-Apologetic | ☐ ☐ BLK-Black |
| ☐ ☐ R-Right Hand | ☐ ☐ L-Long | ☐ ☐ S-Sunglasses | ☐ ☐ F-Freckled | ☐ ☐ C-Accent | ☐ ☐ DBR-Dark Brown |
| ☐ ☐ L-Left Hand | ☐ ☐ M-Medium | ☐ ☐ W-Wire Rimmed | ☐ ☐ L-Light | ☐ ☐ D-Deep/Rasping | ☐ ☐ DRK-Dark |
| | | | ☐ ☐ M-Medium | ☐ ☐ E-Effeminate | ☐ ☐ FAR-Fair |
| | | | ☐ ☐ R-Ruddy | ☐ ☐ H-High | ☐ ☐ LGT-Light |

| 111. Eye Appearance: | 112. Hair Style: | 113. Facial Hair: | 114. Teeth: | | 110 cont. |
|---|---|---|---|---|---|
| Suspect/Arrestee# | Suspect/Arrestee# | Suspect/Arrestee# | Suspect/Arrestee# | ☐ ☐ L-Lisp | ☐ ☐ MBR-Med Brown |
| ☐ | ☐ | ☐ | | ☐ ☐ P-Profane/Abusive | ☐ ☐ MED-Medium |
| ☐ ☐ A-Afflicted Eye | ☐ ☐ A-Afro | ☐ ☐ B-Beard | ☐ ☐ B-Broken | ☐ ☐ S-Soft/Polite | ☐ ☐ OLV-Olive |
| ☐ ☐ B-Blinks | ☐ ☐ B-Braided | ☐ ☐ G-Goatee | ☐ ☐ C-Decayed/Dirty | ☐ ☐ T-Stutter | ☐ ☐ RUD-Ruddy |
| ☐ ☐ C-Crossed | ☐ ☐ C-Curly/Wavy | ☐ ☐ M-Mustache | ☐ ☐ D-Designed(gold) | | ☐ ☐ SAL-Sallow |
| ☐ ☐ M-Missing | ☐ ☐ S-Straight | ☐ ☐ S-Sideburns | ☐ ☐ G-Gold/Silver | | ☐ ☐ YEL-Yellow |
| ☐ ☐ P-Pop/Bulging | ☐ ☐ U-Unkept/Shaggy | ☐ ☐ U-Unusual | ☐ ☐ M-Missing/Gap | | |
| ☐ ☐ S-Squint | ☐ ☐ W-Wig | | ☐ ☐ P-Protruding | | |

| 115. Tatoos: | Other | 116. Scar/Marks: | Other: |
|---|---|---|---|
| Suspect # | Suspect# __ : _____ | Suspect # | Suspect # __ : _____ |
| 1 | | | |
| ☐ ☐ B-Body | ☐ ☐ N-Name/Initial | ☐ ☐ A-Arm  ☐ ☐ N-Neck | |
| ☐ ☐ E-Extremity | ☐ ☐ P-Picture  Suspect# __ : | ☐ ☐ H-Hand  ☐ ☐ U-Unk. Body  Suspect# __ : | |
| ☐ ☐ F- Face | ☐ ☐ U-Unknown | ☐ ☐ F-Head/Face | |

| 117. Clearance status: | ☐ A- Arrest | 118. Excep. Clear. Date: | ☐ A- Death of Offender | ☐ C- Extradition Denied | ☐ E- Juvenile - No Custody |
|---|---|---|---|---|---|
| ☐ S-Summons Advised ☐ N-No Prosecution | | MM  DD  YY | ☐ B- Prosecution Denied | ☐ D- Victim Refuses to Testify | ☐ N- Not Applicable |
| Citation # | | | | | |

119. Synopsis:
_____
_____
_____
_____
_____

| ADDENDUM | KANSAS CITY KANSAS POLICE DEPARTMENT | 1. Complaint # |
|---|---|---|
| ☐ Investigative  ☒ Continuation  ☐ Misc. Offense  ☐ Tow-In  ☐ Release | | 045400608/ |

| 2. Victim's Name (Last, First, Middle) or Firm Name if Business | 3. Victim's Address (House No.-Street Name-Zip Code) | | 4. Telephone |
|---|---|---|---|
| CUYAR, DONALD E | 3038 N. 20TH | 66104 | 621-6903 |

| 5. Classification of Offense | 6. Location of Offense | | 7. Dist. of Occur. | 8. Date/Time |
|---|---|---|---|---|
| CONTINUATION | 3020 HUTCHINGS | 66104 | 113 | 0445 94  1410 |

9. Narrative:

SIMON ROBINSON. THE ABOVE LISTED ITEMS WERE TRANSPORTED TO CENTRAL PATROL DIVISION
WHERE THEY WERE LOGGED IN AS EVIDENCE. #320

| 10. Owner/Driver | | 11. Address | | 12. Telephone |
|---|---|---|---|---|
| 13. Year | 14. Make/Model | 15. Style | 16. VIN # | |
| 17. License  State | County and Number | Year | 18. Color | Top  Bottom |
| 19. Time Tow Truck Requested ___ Hrs.  Time Tow Truck Arrived ___ Hrs. | | 20. Towed From:  Towed By: | 21. Private Tow  Yes  No | Request of: |
| 22. Stolen  Yes  No | 23. Condition of Vehicle: | Driveable  Yes  No  Stripped (list missing parts in Block # 9)  Yes  No | VIN Altered  Yes  No | Wrecked  Yes  No |

24. Reason towed or Officer's comments (list valuables in Block # 9):

| 25. Owner notified by: | Date/Time |
|---|---|
| 26. Released to: | 27. Address | 28. Released by: | Date/Time |

| 29. Reporting Officer(s) | 30. Supervisor Approval | 31. District of Report |
|---|---|---|
| L. M. VALLEJO  (1637) | AGT Gamela  1585 | 116 |

KB1060200 · KCKPD #44(93)

**Kansas City, Ks Police Department**   **OFFENSE REPORT**   1. PAGE 1 OF 2

| 2. Date or Occurrence From: MM DD YY HH MM | To: | MM DD YY HH MM | 3. Complaint Number |
| | | 01 15 1994 00 | 04 15 00 |

| 4. When Reported: MM DD YY HH MM | 5. Where Reported: (Street, City, State, Zip) | 6. District |
| 04 15 1994 00 | 39 AND RAIN BOW 66102 | 773 |

7. Location of Offense: (Street, City, State, Zip)   3912 Hutchings   66102   8. Received

| 9. Vict.# 2 | 10. Victim Name: Quinn Dow | 11. Type of Victim: ☐G-Government ☐U-Unknown ☒I-Individual ☐B-Business ☐F-Financial Institute ☐R-Religious Organization ☐O-Other |

12. Victim Address: (Street, City, State, Zip)

| 13. DOB: MM DD YY | 14. Age 23 | 15. Sex M | 16. Race B | 17. Eth N | 18. Hgt | 19. Wgt | 20. Hair BLK | 21. Eye BRN | 26. Employment/School |

| 22. Victim of Offense Number (Circle)   ① 2 3 4 5 6 7 8 9 10 | 23. Home Phone # | 24. Business Phone # | 25. Employment/School Address |

| 27. Victim Relationship to Suspect (Indicate all suspects)   IRV 2 3 4 5 6 7 8 9 10 | 28. Injury Type   1 2 3 4 5 | 29. ☒R-Resident ☐N-Non/Resident | 30. Circum. Agg.Aslt./Battery/ Homicide: 101 |

| 31. Victim Taken To: KU MED | 32. Transported By: KARE 42 | 33. Physician RODRIGUEZ | 34. Date/Time Pronounced 04 15 94 1455 | 35. Medical ☒Y-Yes ☐N-No  Attention | 36. Coroner ☐Y-Yes  Notified ☒N-No |

| 37. Offense Status (Statute/Ordinance) | 39. Offense Title: Homicide | 40. ☐A-Attempt ☒C-Complete | 37b. Offense (Statute/Ordinance) | 39b. Offense Title: | 40b. ☐A-Attempt ☐C-Complete |

| 41. ☐Aid/Abett ☐Conspiracy ☐Solicitation | 45. Entry: | 60. Type of Force/Weapon: | 41b. ☐Aid/Abett ☐Conspiracy ☐Solicitation | 46b. Entry: | 50b. Type of Force/Weapon: |
| Prem.Code 42 42 #of Prem 43 44 Hate/Bias ☐ ☐F-Force | | ☐11-Firearm ☐Auto ☐12-Handgun ☐Auto ☐13-Rifle ☐Auto ☒14-Shotgun ☐Auto ☐11-F-Other Firearm | Prem.Code 42b #of Prem 43b Hate/Bias ☐F-Force 44b ☐N-NoFor. | | ☐11-Firearm ☐Auto ☐12-Handgun ☐Auto ☐13-Rifle ☐Auto ☐14-Shotgun ☐Auto ☐15-Other Firearm |
| 46. Type of Criminal Activity: | 48. Campus Crime: ☐KCAVTS ☐KCCC ☐HRBLKT ☐KU | 49. Type of Theft: | 46b. Type of Criminal Activity: | 48b. Campus Crime: ☐KCAVTS ☐KCCC ☐HRBLKT ☐KU | 49b. Type of Theft: |
| ☐ ☐B-Buying/Receiving ☐C-Cult/Manuf/Publish ☐D-Distrib/Selling ☐E-Exploiting Children ☐O-Oper/Promote/Assist ☐P-Possess/Concealing ☐T-Transp/Trans/Import | | Cutting Instru ant Object -Motor Vehicle ☐A-M/V Parts/Ar ☐B-From Bus ☐E-Emb ☐F-Theft from M/V ☐L-Shoplifting ☐M-Coin Machine ☐O-All Other ☐P-Pocket-Picking ☐S-Purse-Snatching ☐T-Poss/Stol.Prop. ☐V-Motor Vehicle | ☐40-Personal Weapon ☐50-Poison ☐60-Explosive ☐65-Fire/Incendiary/Device ☐70-Drug/Narc/Sleep Pills ☐85-Asphyxiation ☐90-Other ☐95-Unknown | ☐B-Buying/Receiving ☐C-Cult/Manuf/Publish ☐D-Distrib/Selling ☐E-Exploiting Children ☐O-Oper/Promote/Assist ☐P-Possess/Concealing ☐T-Transp/Trans/Import ☐U-Using/Consuming | | ☐A-M/V Parts/Acces ☐B-From Building ☐E-Embezzlement ☐F-Theft from M/V ☐L-Shoplifting ☐M-Coin Machine ☐O-All Other ☐P-Pocket-Picking ☐S-Purse-Snatching ☐T-Poss/Stol.Prop. ☐V-Motor Vehicle |
| 47. Suspected of Using: ☐A-Alcohol ☐C-Computer Eq. ☒D-Drugs/Narcotics ☐N-Not Applicable | | | 47b. Suspected of Using: ☐A-Alcohol ☐C-Computer Eq. ☐D-Drugs/Narcotics ☐N-Not Applicable | | ☐40-Personal Weapon ☐50-Poison ☐60-Explosive ☐65-Fire/Incendiary/Device ☐70-Drug/Narc/Sleep Pills ☐85-Asphyxiation ☐90-Other ☐95-Unknown |

| 51. Vehicle Information: | ☐S-Stolen | ☐E-Emblezzied | ☐R-Recovered | ☐T-Suspect | ☐O-Other |
| 52. Year | 53. Make | 54. Model | 55. Style | 56. Color | 57. VIN | 58. License # | 59. Co. | 60. State | 61. Year |

62. Additional Descriptive:   63. Location:

| 64. Keys ☐Y-Yes ☐N-No | 65. Car ☐Y-Yes ☐N-No Locked | 66. Value | 67. Insurance/Finance Company |
| Left > | | | |

| 68. Person Interviewed | DOB | Race/Sex | Address | Telephone# | ☐W ☐R ☐O ☐K ☐N |
| | | | | | ☐W ☐R ☐O ☐K ☐N |
| | | | | | ☐W ☐R ☐O ☐K ☐N |

| 69. Type | 70. Property/Drug | 71. Property Description/Model | 72. Serial # | 73. Quantity | 74. Fraction | 76. Measure | 76. Value | 77. Recov Data | Type Prop: Loss Codes |
| | | | | | | | | | 1.None |
| | | | | | | | | | 2.Burned |
| | | | | | | | | | 3.Counterfeit/Forgery |
| | | | | | | | | | 4.Destroyed/Dam/Vand |
| | | | | | | | | | 5.Recovered |
| | | | | | | | | | 6.Seized |
| | | | | | | | | | 7.Stolen |
| | | | | | | | | | 8.Unknown |

| 78. Supervisory Review By: | Serial # | 79. Reporting Officer | Serial # |
| ARG Reimler | 1575 | J.E. Orenday | 1642 |

PAGE 2 OF 2                    COMPLAINT # 041540060

| 80. Instrument Used: | 81. Point of Entry: | 82. Point of Exit: | 83. Premise Neighborhood: | 84. Safe Entered: |
|---|---|---|---|---|
| ☐ 1-Key | ☐ 1-Front | ☐ 1-Front | ☐ B-Urban/Business/Commercial | ☐ 1-Yes ☐ 6-Exploded |
| ☐ 2-Pry Tool ☐ 7-Vise Grips | ☐ 2-Rear | ☐ 2-Rear | ☐ R-Rural/Farm/Agriculture | ☐ 2-No ☐ 7-Combination |
| ☐ 3-Saw Drill ☐ 8-Physical Force | ☐ 3-Side | ☐ 3-Side | ☒ S-Suburban/Residence | ☐ 3-Attempted ☒ 9-Not Applicable |
| ☐ 4-Hammer ☐ 9-Thrown Object | ☐ 4-Roof | ☐ 4-Roof | ☐ U-Uninhabited | ☐ 4-Removed |
| ☐ 5-Bolt Cutter ☐ 10-Other | ☒ 9-Not Applicable | ☒ 9-Not Applicable | ☐ N-Not Applicable | ☐ 5-Peeled |
| ☐ 6-Chopping Tool ☐ 11-Not Applic. | | | | |

85. Evidence: ☐ 1-Hair ☐ 2-Weapons/Tools ☐ 3-Photos ☐ 4-Rape Kit ☐ 5-Latent Prints ☐ 6-Stains ☐ 7-Semen   86. Incident Activity: ☐ C-CV with Children ☐ B-Gang Activity
☐ 8-Drugs ☐ 9-DNA ☐ 10-Other Prints ☐ 11-Blood ☐ 12-Documents ☐ 13-Alcohol ☒ 90-None ☐ 99-Other  ☐ D-Domestic Vio. ☐ J-Car Jacking ☐ S-Drive by Shooting

119. Synopsis: THE VICTIM WAS SHOT A NUMBER OF TIMES BY AN UNKNOWN SUSPECT WITH A SHOTGUN. THE VICTIM WAS PRONOUNCED DEAD AT 1455 HRS AND WAS TRANSPORTED TO KU MED BY KARE UNIT 42.

Exh. 01                    P0012

| ADDENDUM | | KANSAS CITY KANSAS POLICE DEPARTMENT | 1. Complaint # |
|---|---|---|---|
| ☑Investigative ☐ Continuation ☐Misc. Offense ☐Tow-in ☐Release | | | 04/15/00 0081 |

| 2. Victim's Name (Last, First, Middle) or Firm Name if Business | 3. Victim's Address (House No.-Street Name-Zip Code) | 4. Telephone |
|---|---|---|
| QUIAN DON | | |

| 5. Classification of Offense | 6. Location of Offense | 7. Dist.of Occur. | 8. Date/Time |
|---|---|---|---|
| HOMICIDE / INVEST | 3032 HUTCHINRS | 113 | 04-15-04 1400 |

**9. Narrative:**

ON 04/15/04 AT 1532 HOURS I RESPONDED TO KU MED CENTER
OF A HOMICIDE. ON ARRIVAL I MET WITH DET BLOOD (1172) AND
DET MASKIL (1139). THEY TOLD ME THAT DON QUIAN WAS
THE VICTIM OF A HOMICIDE AT 3032 HUTCHINRS, AND THAT
HE ALSO USED THE NAME OF DON SUBLETT-QUIAN.
I SPKE TO CPL. CORTEZ WATERS (1050) OF THE KU POLICE. HE
SAID THAT AN UNKNOWN BLACK MALE HAD ASKED HIM TO CALL A
CINDERELLA QUINN AT 321-5916 IF ANY NEW DEVELOPMENTS AROSE.
THE VICTIM WAS PRONOUNCED BY DR. RODRIGUEZ AT 1455 HOURS
AT KU MED. HE WAS TAKEN TO KU BY KARE 42.

| 10. Owner/Driver | | 11. Address | | 12. Telephone |
|---|---|---|---|---|
| 13. Year | 14. Make/Model | 15. Style | 16. VIN # | |
| 17. License State | County and Number | | 18. Color | Top Bottom |

| 19. Time Tow Truck Requested Hrs. Time Tow Truck Arrived Hrs. | 20. Towed From: Towed By: | 21. Private Tow | Yes No | Request of: |
|---|---|---|---|---|
| 22. Stolen Yes No | 23. Condition of Vehicle: | Driveable Yes No | Stripped (list missing parts in Block # 9) Yes No | VIN Altered Yes No | Wrecked Yes No |

24. Reason towed or Officer's comments (list valuables in Block # 9):

| | 25. Owner notified by: | Date/Time |
|---|---|---|
| 26. Released to: | 27. Address | 28. Released by: | Date/Time |

| 29. Reporting Officer(s) | 30. Supervisor Approval | 31. District of Report |
|---|---|---|
| J.E. OREDA 1092 | ASPT Sunda 545 | 113 |

P0013
LMKSDC_0003403

| ADDENDUM | KANSAS CITY KANSAS POLICE DEPARTMENT | 1. Complaint # |
| --- | --- | --- |
| ☒Investigative ☐ Continuation ☐Misc. Offense ☐Tow-in ☐Release | | 04154006081 |
| 2. Victim's Name (Last, First, Middle) or Firm Name If Business | 3. Victim's Address (House No.-Street Name-Zip Code) | 4. Telephone |

| 5. Classification of Offense | 6. Location of Offense | 7. Dist. of Occur. | 8. Date/Time |
| --- | --- | --- | --- |
| INVESTIGATIVE | 3020 HUTCHINGS | 113 | 04-15-94 1400-1414 |

**9. Narrative:**

ON 04-15-94 AT 1416 HOURS, REPORTING OFFICER AND OFFICER AMBLER (UNIT# 112)
WERE DISPATCHED TO 3020 HUTCHINGS ON A REPORTED SHOOTING.

UPON ARRIVAL, OFFICER FOUND TWO BLACK MALE, WHO HAD BEEN SHOT, IN THE
FRONT SEAT OF A LIGHT BLUE CADI, 4 DOOR.

WHILE OFFICER AMBLER WAS ATTEMPTING TO OBTAINED INFORMATION OF
THE TWO VICTIMS. REPORTING OFFICER SECURED THE CRIME SCENE WITH CRIME
TAPE. AFTER SECURING THE CRIME SCENE, REPORTING OFFICER BEGAN CANVASSING
THE AREA.

WHILE CANVASSING THE AREA, A RUBY MITCHELL, BLACK FEMALE, DOB 11-26-66, SS# 571-68-
9288, OF 3020 HUTCHINGS, RELATED THAT SHE HEARD SOMEONE ARGUING OUT IN FRONT
OF HER RESIDENCE. WHEN SHE LOOKED OUT HER FRONT DOOR, SHE NOTICED A BLACK MALE
WEARING ALL BLACK, CARRYING A SHOTGUN. THE BLACK MALE APPROACHED THE DRIVER'S
SIDE OF THE ABOVE LISTED VEHICLE AND FIRED THE SHOTGUN INTO THE DRIVER'S WINDOW AT
THE DRIVER OF THE VEHICLE. THE BLACK MALE THEN WENT AROUND TO THE FRONT PASSENGER
SIDE OF THE VEHICLE AND SHOT INTO THE VEHICLE, SHOOTING THE PASSENGER (FRONT SEAT) IN
THE VEHICLE. THE BLACK MALE (SUSPECT) THEN RAN WEST ACROSS A VACANT LOT TOWARD
HIAWATHA. REPORTING OFFICER THEN ASSISTED A/SGT KEITH SEARCH A VACANT BURNT
BUILDING ON THE NORTH WEST CORNER OF HIAWATHA (HIAWATHA + BROWN).

WHILE CANVASSING THE AREA OF HIAWATHA + BROWN, REPORTING OFFICER MET WITH
A ALVIN FINLEY, BLACK MALE, DOB 11-25-62, OF 3029 HIAWATHA. WHEN ASKED IF HE HEARD
ANY SHOTS FIRED IN THE AREA. MR FINLEY STATED HE WAS IN BED AND DIDN'T HEAR ANY
SHOTS FIRED. MR FINLEY WAS DRESSED ONLY IN HIS UNDER PANTS WHEN HE ANSWERED
HIS FRONT DOOR. REPORTING OFFICER THEN WENT TO 3025 HIAWATHA. AT 3025 HIAWATHA

| 10. Owner/Driver | | 11. Address | | 12. Telephone |
| --- | --- | --- | --- | --- |
| 13. Year | 14. Make/Model | 15. Style | 16. VIN # | |
| 17. License State | County and Number | 18. Color Year | Top Bottom | |
| 19. Time Tow Truck Requested ___ Hrs. Time Tow Truck Arrived ___ Hrs. | 20. Towed From: Towed By: | | 21. Private Tow  Yes ☐ No ☐ | Request of: |
| 22. Stolen Yes ☐ No ☐ | 23. Condition of Vehicle: | Drivable Yes ☐ No ☐ | Stripped (list missing parts in Block # 9) Yes ☐ No ☐ | VIN Altered Yes ☐ No ☐   Wrecked Yes ☐ No ☐ |
| 24. Reason towed or Officer's comments (list valuables in Block # 9): | | | | |

| | | 25. Owner notified by: | Date/Time |
| --- | --- | --- | --- |
| 26. Released to: | 27. Address | 28. Released by: | Date/Time |

| 29. Reporting Officer(s) | | 30. Supervisor Approval: | | 31. District of Report |
| --- | --- | --- | --- | --- |
| GARY D. WANGLEY | 1581 | A/SGT Sample 1545 | | 113 |

P0014
LMKSDC_0003404

**ADDENDUM**

☐ Investigative   ☒ Continuation
☐ Misc. Offense   ☐ Tow-In   ☐ Release

**KANSAS CITY KANSAS POLICE DEPARTMENT**

| 1. Complaint # | |
|---|---|
| 0415400 6081 | |

| 2. Victim's Name (Last, First, Middle) or Firm Name if Business | 3. Victim's Address (House No.-Street Name-Zip Code) | 4. Telephone |
|---|---|---|
| | | |

| 5. Classification of Offense | 6. Location of Offense | 7. Dist. of Occur. | 8. Date/Time |
|---|---|---|---|
| INVESTIGATIVE | 3020 HUTCHINGS | 113 | 04-15-94 1400-1414 |

9. Narrative:

REPORTING OFFICER MET A BREON SHENTON, BLACK FEMALE, DOB 07-22-74, OF 3025 HIAWATHA, RELATED THAT SHE HAD HEARD SEVERAL SHOTS FIRED.  SHE ALSO NOTICED A DARK BLUE CHEV CAPRICE CLASSIC PARKED ON THE WEST SIDE OF HIAWATHA ACROSS FROM HER RESIDENCE NEAR THE OPEN VACANT LOT.  MRS SHENTON RELATED SHE SAW TWO BLACK MALES SEATING IN THE VEHICLE.  A CANVASS OF THE REMAINING AREA OF HIAWATHA & BROWN MET WITH NEGATIVE RESULTS.

| 10. Owner/Driver | 11. Address | 12. Telephone |
|---|---|---|
| | | |

| 13. Year | 14. Make/Model | 15. Style | 16. VIN # |
|---|---|---|---|
| | | | |

| 17. License | | | 18. Color | Top | |
|---|---|---|---|---|---|
| State | | | | Bottom | |
| County and Number | | Year | | | |

| 19. Time Tow Truck Requested | Hrs. | 20. | Towed From: | 21. | Private Tow | Yes No | Request of: |
|---|---|---|---|---|---|---|---|
| Time Tow Truck Arrived | Hrs. | | Towed By: | | | | |

| 22. Stolen | Yes No | 23. Condition of Vehicle: | Driveable | Yes No | Stripped (list missing parts in Block # 9) | Yes No | VIN Altered | Yes No | Wrecked | Yes No |
|---|---|---|---|---|---|---|---|---|---|---|

24. Reason towed or Officer's comments (list valuables in Block # 9):

| 25. Owner notified by: | Date/Time |
|---|---|
| | |

| 26. Released to: | 27. Address | 28. Released by: | Date/Time |
|---|---|---|---|

| 29. Reporting Officer(s) | 30. Supervisor Approval | 31. District of Report |
|---|---|---|
| GARY D. WANSLEY     1531 | [signature] 1545 | 113 |

P0015
LMKSDC_0003405

**ADDENDUM**
☑ Investigative ☐ Continuation
☐ Misc. Offense ☑ Tow-In ☐ Release

**KANSAS CITY KANSAS POLICE DEPARTMENT**

| 1. Complaint # |
| 04154000081 |

2. Victim's Name (Last, First, Middle) or Firm Name if Business | 3. Victim's Address (House No.-Street Name-Zip Code) | 4. Telephone

EWING DONALD E | 3038 No. 20TH   KCK   66104 | 621-6908

5. Classification of Offense | 6. Location of Offense | 7. Dist. of Occur. | 8. Date/Time

INVESTIGATIVE | 3080 HUTCHING'S   66104 | 113 | 04-15-94 1410

9. Narrative:

ON 04-15-94 AT 1826 HOURS, I WAS DISPATCHED TO 51 NO 121 BETHANY MEDICAL CENTER ON A

SHOOTING VICTIM FROM 3080 HUTCHINGS.

UPON ARRIVAL I MADE CONTACT WITH KANSAS CITY KANSAS FIRE DEPARTMENT PARAMEDIC RANDY SMITH.

SMITH ADVISED ON 04-15-94 AT ABOUT 1410 HOURS THEY RESPONDED IN KARE UNIT #44 TO THE AREA OF

3080 HUTCHINGS. UPON ARRIVAL PARAMEDICS MATT LANE AND SMITH DISCOVERED THAT THE VICTIM, EWING

DWALD E, B/M 10-20-59 AND ANOTHER PARTY HAD BEEN SHOT INSIDE OF A VEHICLE. SMITH ADVISED THAT UNKNOWN

PERSON(S) USING UNKNOWN TYPE FIRE ARM HAD SHOT THE VICTIM CAUSING SEVERE LACERATIONS TO THE BACK, CHEST AND

SIDE AREA.

THE VICTIM WAS TRANSPORTED TO BETHANY MEDICAL CENTER WHERE HE WAS EXAMINED AND TREATED BY DR. BAYLESS.

I RECOVERED THE VICTIMS CLOTHING AND TRANSPORTED THEM TO CENTRAL PATROL HEADQUARTERS WHERE

THEY WERE LOGGED IN AS PROPERTY.

A SGT SAUNDERS WAS NOTIFIED OF THE INCIDENT

| 10. Owner/Driver | 11. Address | 12. Telephone |
| 13. Year | 14. Make/Model | 15. Style | 16. VIN # | |
| 17. License State | County and Number | Year | 18. Color | Top / Bottom |
| 19. Time Tow Truck Requested ___ Hrs. / Time Tow Truck Arrived ___ Hrs. | 20. Towed From: / Towed By: | 21. Private Tow Yes/No | Request of |
| 22. Stolen Yes/No | 23. Condition of Vehicle: Drivable Yes/No | Stripped (list missing parts in Block # 9) Yes/No | VIN Altered Yes/No | Wrecked Yes/No |
| 24. Reason towed or Officer's comments (list valuables in Block # 9): |

| 25. Owner notified by: | Date/Time |
| 26. Released to: | 27. Address | 28. Released by: | Date/Time |
| 29. Reporting Officer(s) | 30. Supervisor Approval | 31. District of Report |
| L.M. VALLEJO   1637 | Sgt Saunders 1745 | 116 |

FIELD INVESTIGATION REPORT
IDENTIFICATION UNIT
KANSAS CITY KANSAS POLICE DEPARTMENT

| CALL OUT:      COMPLETED: | OFFENSE: | COMPLAINT NUMBER: | DATE: |
|---|---|---|---|
| 1420  HRS.  1630 HRS. | HOMICIDE ( CTS) | 04154006081 | 4-15-94 |

| LOCATION: | SCENE/REPORTING OFFICER: | SUSPECT(S): |
|---|---|---|
| 3037 HUTCHINGS | B. AMBLER | |

DETAILS OF INVESTIGATION:

| | | FILM:        TOTAL | FOR I.D. USE |
|---|---|---|---|
| WERE PHOTOGRAPHS TAKEN  . . . YES [XX]  NO [ ] | | B&W ROLLS | FILM:        NUMBERS |
| LATENT PRINTS TAKEN . . . . . YES [ ]  NO [XX] | | COLOR    XXXX | B&W |
| FOOT PRINTS TAKEN . . . . . . YES [ ]  NO [XX] | | POLAROID SHOTS | COLOR |
| PHYSICAL EVIDENCE COLLECTED . YES [XX]  NO [ ] | | LATENTS: | POLAROID SHOTS |
| ADDITIONAL INFO ON BACK . . . YES [ ]  NO [XX] | | NUMBER TAKEN | LATENTS: |
| AUTOMOBILE PROCESSED. . . . . YES [XX]  NO [ ] | | EVIDENCE: | WORKABLE |
| LATENTS. . . . . . YES [XX]  NO [ ] | | # OF ITEMS TAGGED | NOT WORKABLE |

DETAILS OF REPORT: On 4-15-94 at 1420 Hrs. Officer Howard proceeded to the homicide scene. He was joined at approx. 1445 Hrs. by Lt. Harrington and Officer Clair. On the scene Officer Howard ran a video and collected evidence and Officer Clair took still photos and dusted the vehicle for latent prints. Lt. Harrington assisted both officers. The vehicle processed was a lt. blue cad. 4-dr. bearing ITL-176 (94) issue. The vehicle is registered to O.D. EWING of 2208 N. 26 st. K.C.K. A blood trail extended from in front of 3016 Hutchings to in front of 3037 Hutchings. Hutchings street is 26'3" wide. 3037 Hutchings is a vacant lot at this time.

| INVESTIGATING OFFICER(S): #1314      # 1225 F. CLAIR /  W. HOWARD | IDENTIFICATION COMMANDER: | DATE: 4/18/94 |
|---|---|---|

P0017
LMKSDC_0003407

| ADDENDUM | KANSAS CITY KANSAS POLICE DEPARTMENT | 1. Complaint # |
|---|---|---|
| ☒ Investigative ☐ Continuation ☐ Misc. Offense ☐ Tow-in ☐ Release | | 04/15002081 |

| 2. Victim's Name (Last, First, Middle) or Firm Name If Business | 3. Victim's Address (House No.-Street Name-Zip Code) | 4. Telephone |
|---|---|---|

| 5. Classification of Offense | 6. Location of Offense | 7. Dist. of Occur. | 8. Date/Time |
|---|---|---|---|
| INVESTIGATIVE | 3032 HUTCHINGS | 113 | 4-15-94 1507 HRS |

**9. Narrative:**

ON 04-15-94 AT 1414 HRS THE REPORTING OFFICER RESPONDED TO THE LOCATION OF 3032 HUTCHINGS ON A SHOOTING THAT JUST TOOK PLACE. UPON ARRIVAL THE REPORTING OFFICER SAW TWO BLACK MALES LYING DOWN IN THE SEAT OF A LIGHT BLUE CADILLAC WITH WOUND'S TO THE HEAD. THE REPORTING OFFICER ROPE OFF THE CRIME SCENE FOR OFFICER AMBLER WHO WAS THE PRIMARY OFFICER CALL TO THE SCENE OF THE INCIDENT. THE REPORTING OFFICER PROTECTED THE CRIME SCENE UNTIL OFFICER KEITH RELIEFED ME OF MY DUTIES.

| 10. Owner/Driver | 11. Address | 12. Telephone |
|---|---|---|

| 13. Year | 14. Make/Model | 15. Style | 16. VIN # |
|---|---|---|---|

| 17. License State | County and Number | Year | 18. Color | Top Bottom |
|---|---|---|---|---|

| 19. Time Tow Truck Requested | Hrs. | 20. Towed From: | | 21. Private Tow | Yes / No | Request of: |
|---|---|---|---|---|---|---|
| Time Tow Truck Arrived | Hrs. | Towed By: | | | | |
| 22. Stolen | Yes / No | 23. Condition of Vehicle: | Driveable Yes / No | Stripped (list missing parts in Block # 9) Yes / No | VIN Altered Yes / No | Wrecked Yes / No |

24. Reason towed or Officer's comments (list valuables in Block # 9):

| | | 25. Owner notified by: | Date/Time |
|---|---|---|---|

| 26. Released to: | 27. Address | 28. Released by: | Date/Time |
|---|---|---|---|

| 29. Reporting Officer(s) | 30. Supervisor Approval | 31. District of Report |
|---|---|---|
| J. D. Myers #1553 | | 745 |

P0018
LMKSDC_0003408

ADDENDUM
☐ Continuation

KANSAS CITY KANSAS POLICE DEPARTMENT

House No. Street Name-Zip Code

1. Complaint #
0415400 608l

4. Telephone

Date/Time

KANSAS CITY, KANSAS
DEPARTMENT OF POLICE

**CHECKED** APR 27 1994

COMP# 04154 006081

CHECK ONE ONLY:

☒ VEHICLE RELEASE
DRIVE OUT

☐ PROPERTY RELEASE

☐ VEHICLE RELEASE
TOW AWAY ONLY

THE: _Munice_         ON: _4-20-94_
Name of Tow Company            Date of Release

RELEASED TO: _Bessie Hawthorne_  _3025 N. 21st_  _621-1397_
(Name)                    (Address)          (Telephone#)

*VEHICLE TOW AWAY MUST BE IN ACCORDANCE WITH CITY ORDINANCE 36-294. (Ex: Tow truck, tow bar on trailer).

VEHICLE: _87_  _Cadi_  _Dev_  _Blu_  _ITL176_ Ks  _0595_
(Year)  (Make)  (Model)  (Color)  (License)  (Vin)

PERSONAL PROPERTY _____
(Description)                per Lt. Culp

DATE TOWED: _4-15-94_    RELEASED BY: _Frances L Wake_
                                      (signature)

RELEASED TO: _Bessie Hawthorne_  RELEASED ON: TITLE / REG. / OTHER "LIST"
(Signature)

Hold FOR INVESTIGATIVE UNIT

12. Telephone

11. Address  2208 N. 26

| 10. Owner/Driver | 15. Style | 16. VIN # | | | Top | Blue |
|---|---|---|---|---|---|---|
| O.D. EWING | Hd | 1G6CD 518XH 420595 | | | Bottom | Blue |
| 13. Year 1987 14. Make/Model | 18. Color | | | | Private Tow | Yes No ☒ | Request of: KcKPD |
| CADiLLAC-Sedan deville | ITL-I76 | Year 94 | | | | | Wrecked Yes No ☒ |
| 17.License K5 County and Number | 19. Towed From: 3031 Hutchings | | | VIN Altered | Yes No ☒ | |
| State Time Tow Truck Requested 1512 Hrs. | 20. Towed By: MUNICE | Yes ☒ | Stripped (list missing parts in Block # 9) | Yes No ☒ | | |
| 19. Time Tow Truck Arrived 1535 Hrs. | Driveable | Yes No | | | | |

22. Stolen Yes No ☒  23. Condition of Vehicle:

24. Reason towed or Officer's comments (list valuables in Block # 9):
Vehicle involved in Aggravated Battery at 3032 Hutchings
Tow authorized by Sgt Singleton. Tow Ordinance 36-151

25. Owner notified by:                    Date/Time

28. Released by:                          Date/Time

26. Released to:    27. Address    30. Supervisor Approval: _Aber Buender 15215_  31. District of Report 112

29. Reporting Officer(s)    _Ombler # 1310_

P0019
LMKSDC_00034

ADDENDUM
☒ Investigative   ☐ Continuation
☐ Misc. Offense ☐ Tow-in ☐ Release

**KANSAS CITY KANSAS POLICE DEPARTMENT**

1. Complaint #  04454 00 6081

2. Victim's Name (Last, First, Middle) or Firm Name if Business 3. Victim's Address (House No.-Street Name-Zip Code)   4. Telephone

5. Classification of Offense   6. Location of Offense   7. Dist. of Occur. 8. Date/Time
AGG. BATTERY   3031 Hutchings   113   04154-1421

9. Narrative:

Reporting OFFICER responded to SCENE of Aggravated Battery at 3031 Hutchings. A Blue 87 Cadillac 4d was parked on the west side of Hutchings with Two B/m subject in the front seat both displaying Numerous GUN shot wounds. Reporting OFFICER observed NO BRASS in The STREET around The VICTIMS CAR. Reporting OFFICER imediately Took control OF CRIME SCENE. OFFICER WANZLEY WAS assigned To Rope OFF imediate area with CRIME SCENE TAPE, OFFICER J. BAGSBY WAS GIVEN control OF A EYE WITNESS, OFFICER J.D. MEYERS WAS GIVEN control OF ANOTHER B/F witness. The KARE unit Responded and Transported victim #1 To K.U. MED. CENTER and The second Kare unit responded and took #2 Victim To BE Thany E.R.
Sgt Singleton and A/sgt Keith arrived and Entered crime scene and were Briefed at 1431. Reporting OFFICER HAD A/sgt Keith take himself, Wanslay, and OFFICER J.D. Myers To do a Vacant Lot canvas in Two vacant Lots on the West side of Hutchings.
Det Maskill and blood CRIME scene investigators arrived and entered the CRIME scene at 1437 hours.
The I.D unit arrived and I.D. OFFICER Bill Howard was Briefed by reporting OFFICER and he entered The CRIME SCENE at 1443 hrs. CAPT. newson entered The CRIME scene at 1449 hrs. Capt Twitchell entered The CRIME scene at 1500, GROSKO P.A. OFFICE 1449

10. Owner/Driver   11. Address   12. Telephone

13. Year   14. Make/Model   15. Style   16. VIN #

17. License
State   County and Number   Year   18. Color   Top
   Bottom

19. Time Tow Truck Requested   Hrs. 20. Towed From:   21. Private Tow   Yes   Request of:
    Time Tow Truck Arrived   Hrs.   Towed By:   No

22. Stolen   Yes   23. Condition of   Driveable   Yes   Stripped (list missing parts in Block # 9)   Yes   VIN Altered   Yes   Wrecked   Yes
    No   Vehicle:   No   No   No   No

24. Reason towed or Officer's comments (list valuables in Block # 9):

25. Owner notified by:   Date/Time

26. Released to:   27. Address   28. Released by:   Date/Time

29. Reporting Officer(s)   30. Supervisor Approval   31. District of Report
Ashley #1310   A/SGT Knowles 1545   11R

**ADDENDUM**

☑ Investigative   ☐ Continuation
☐ Misc. Offense ☐ Tow-In ☐ Release

**KANSAS CITY KANSAS POLICE DEPARTMENT**

1. Complaint # 04/054 006081
4. Telephone

2. Victim's Name (Last, First, Middle) or Firm Name II Business   3. Victim's Address (House No.-Street Name-Zip Code)

5. Classification of Offense

INVESTIGATIVE

6. Location of Offense

3031 Hutchings

7. Dist. of Occur. 113   8. Date/Time 04/15 1800

9. Narrative

clair From I.d. at 1500. LT. culp from Investigative
unit at 1501, Det Golubski at 1503, Lt. Harrington
at 1504  P.O. OFFICER Kevin Steel at 1508
Muncie was ordered for tow at 1512 arrived at
at 1545.
Det. R. Nelson entered crime scene at 1521
Det W.K. Smith at 1524.
Dr. HANCOCK arrived on the Scene and entered
crime scene at 1530.
THE LICENCE TAG on the Victim car was ITL-176 KS 94
which registered To AN O.D. EWING at 2208 N. 26.
By now it was determined That one OF The subject's in
The car was Donald Ewing.
CRIME SCENE UNIT was on The Scene collecting evidence
unit 1645 when the Vechicle was towed by Muncie Tow
With a police Hold. Reporting officer responded To CPP
where Tow in Report and Investigative was completed.

10. Owner/Driver   11. Address   12. Telephone

13. Year   14. Make/Model   15. Style   16. VIN #

17. License
State   County and Number   Year   18. Color   Top / Bottom

19. Time Tow Truck Requested ___ Hrs. / Time Tow Truck Arrived ___ Hrs.   20. Towed From: / Towed By:   21. Private Tow  Yes ☐ No ☐   Request of:

22. Stolen  Yes ☐ No ☐   23. Condition of Vehicle: Driveable Yes ☐ No ☐   Stripped (list missing parts in Block # 9) Yes ☐ No ☐   VIN Altered Yes ☐ No ☐   Wrecked Yes ☐ No ☐

24. Reason towed or Officer's comments (list valuables in Block # 9):

25. Owner notified by:   Date/Time

26. Released to:   27. Address   28. Released by:   Date/Time

29. Reporting Officer(s)   Mahler   1310   30. Supervisor Approval   ABOT Summer   15=15   31. District of Report   112

KANSAS CITY, KANSAS
POLICE DEPARTMENT

# PROPERTY REPORT

0415400608 1
COMPLAINT NUMBER

| RECOVERED BY OFFICER 1. M. VALLEJO | SERIAL NO. 1637 | ARRESTEE | ADULT JUVENILE | STATUS | EVIDENCE SAFEKEEPING FOUND PROP. | STOLEN | YES NO X UNKNOWN |
| LOCATION 51 No 12 | | ADDRESS | | | RECEIVED BY (Property Officer) H. SMITHEY 1167 | | |
| DATE 04-15-94 | TIME 1646 | ARRESTEE | ADULT JUVENILE | DATE 4-19-94 | | TIME 1173 | |
| RECOVERED FROM RN SANDY ROBINSON | | ADDRESS | | RECEIVED FROM | | | |
| ADDRESS 51 No 12TH | | CHARGE(S) | | | | | |
| TELEPHONE 281-8909 | OWNER FINDER VICTIM OTHER X | | | | | | |

| QUANTITY | COMPLETE DETAILED DESCRIPTION OF PROPERTY (Brand, Make, Model, Type, Color, Caliber, Marks, Serial Number, etc.) | VALUE |
|---|---|---|
| 1 | PAIR BROWN LA GEAR SHOES, SIZE 11 | UNK |
| 1 | PAIR BLACK SWEAT PANTS (BLOOD SOAKED) | UNK |
| 1 | PAIR RED WHITE BOXER SHORTS | UNK |
| 1 | PAIR GRAY SWEAT SHORTS (BLOOD SOAKED) | UNK |
| 1 | WHITE SOCK | UNK |
| 1 | BROWN LEATHER JACKET (BLOOD SOAKED) | UNK |
| 4 | (.25 ¢) QUARTERS | 1.00 |
| 1 | PINK LIGHTER | UNK |
| 1 | WHITE INK PEN | UNK |
| 1 | WHITE SHIRT (BLOOD SOAKED) | UNK. |
| ASSORTED | SHOTGUN POWERS FROM CLOTHING | .50 |

NARRATIVE

ON 04-15-94 AT 151_ HOURS I WAS DISPATCHED TO BETHANY MEDICAL CENTER, #51 No 12TH ON A SHOOTING. UPON ARRIVAL I MADE CONTACT WITH HOSPITAL PERSONNEL, AND RECOVERED THE VICTIMS ABOVE LISTED CLOTHING. ON 04-15-94 AT ABOUT 1410 HOURS, THE VICTIM, FLOWE, DONALD E. B/M 10-20-59 SUFFERED FROM MULTIPLE GUNSHOT WOUNDS TO CHEST AND BACK AREA. I RECOVERED THE ABOVE LISTED ITEMS FROM FROM EMERGENCY ROOM PERSONNEL RN SANDY ROBINSON. THE CLOTHES WERE TRANSPORTED TO CENTRAL PATROL DIVISION WHERE THEY WERE LOCKED IN AS EVIDENCE.

PROPERTY INVENTORY NUMBER

ROOM 4 / Shelf #17 / Row #3

**71401**

| PROPERTY OWNER | PROPERTY RELEASED TO | PROPERTY RELEASED BY |
|---|---|---|
| NAME | SIGNATURE | SIGNATURE |
| ADDRESS | ADDRESS | DATE TIME |

| REPORTED BY L. M. VALLEJO | SERIAL NO. 1637 | DATE 04-15-94 | TIME 1609 | REVIEWED BY _Gumbes_ | SERIAL NO. |

P0022
LMKSDC_0003412

**KANSAS CITY, KANSAS POLICE DEPARTMENT**

## ARREST REPORT

1. COMPLAINT NO. 0415400608

2. ☐ ADULT   ☒ JUVENILE   ☐ DOMESTIC VIOLENCE   ☐ CHILD IN NEED OF CARE

| 3. Report Date: MM DD YY | 4. Incident Date: MM DD YY | 5. Location: (City,State,Zip) | | 6. District |
|---|---|---|---|---|
| Time: 2040   9 15 17th | 04 15 17th | St RICHMOND 66101 | | 112 |

| 7. Arrest/CINC Transaction Number (Booking #) | 8. Type of Arrest: | 9. Drug Activity Indicators (Max 3) |
|---|---|---|

8. Type of Arrest:
☐ O-On View ☐ S-Summoned
☐ X-Other ☐ T- Warrant

9. Drug Activity Indicators (Max 3)
☐ D-Dist/Selling   ☐ T-Trans/Transmit/Import   ☐ P-Possess/Concealing
☐ C-Cultivating/Manufac   ☐ B-Buying/Receiving   ☐ O-Oper/Promote/Assist
☐ E-Exploiting Children   ☐ U-Using/Consuming

10. Disposition of Arrest:
☐ 1-Handled In Dept ☒ 2-Referred to Court
Disp. of Juvenile: ☐ 3-SRS   ☐ 7-Contact Only
☐ 4-Non-SRS   ☐ 6-Other LEA   ☐ 5-Other

11. Campus Crime:
☐ KCKCC   ☐ KCAVTS   ☐ HRBLKT

12. Clearance Indicator:
☐ M-Multiple Incident   ☒ C-Single Incident

13. Victim to Suspect Relationship

| 14. Arr # 1 of 1 | 15. Arrestee / CINC Name: (Last,First,Middle) MCINTYRE LAMONTE | 16. Alias(es)/Monikers: | 17. Telephone# Res/Bus 342-4147 |
|---|---|---|---|

| 18. Address: (City,State,Zip) 1929 N 6" 66101 | 19. ☒ R-Resident ☐ N-Non-Resident | 20. Drivers License # | State | 21. Social Security # |
|---|---|---|---|---|

| | T / CO a KS | 24.Age 17 | 25.Sex M | 26.Race B | 27.Eth N | 28.Hgt 5'11 | 29.Wgt 142 | 30.Hair BLK | 31.Eye BRN | 32. Employment/Occupation |
|---|---|---|---|---|---|---|---|---|---|---|

| 33. R/L Handed | 34. Hair Length | 36. Hair Style: | 36. Facial Hair: | 37. Complexion: | 38.Eye Appearance: | 39. Glasses: | 40. Wore: |
|---|---|---|---|---|---|---|---|
| ☐ A-Ambidex | ☒ S-Short | ☒ A-Afro | ☐ B-Beard | ☐ M-Medium | ☐ A-Afflicted Eye | ☐ H-Half-Framed | ☒ C-Coat/Jacket |
| ☒ R-Right Hand | ☐ B-Bald/Balding | ☐ W-Wig | ☐ S-Sideburns | ☒ D-Dark | ☐ M-Missing | ☐ P-Plastic Framed | ☐ G-Gloves |
| ☐ L-Left Hand | ☐ L-Long | ☐ S-Straight | ☐ G-Goatee | ☐ F-Freckled | ☐ B-Blinks | ☐ S-Sunglasses | ☒ H-Hat/Cap |
| | ☐ M-Medium | ☐ B-Braided | ☐ M-Mustache | ☐ L-Light | ☐ S-Squint | ☐ W-Wire Rimmed | ☐ M-Mask/Ski/Stocking |
| | | ☐ C-Curly/Wavy | ☐ U-Unusual | ☐ R-Ruddy | ☐ C-Crossed | | ☐ S-Sportswear |
| | | ☐ U-Unkept/Shag | | ☐ A-Acne | ☐ P-Pop/Bulging | | |

| 41. Skin Tone: | 42. Teeth: | 43. Speech: | 44. General Appearance: | 46. Arrestee Armed With: | 46. Arrestee Behavior: |
|---|---|---|---|---|---|
| ☐ ALB-Albino | ☐ B-Broken | ☐ A-Apologetic | ☒ D-Dirty/Ragged | ☐ 01-Unarmed | ☐ D-Drunk |
| ☐ MED-Medium | ☐ M-Missing/Gaps | ☐ L-Lisp | ☐ J-Jewelry(unusual) | ☐ 11-Firearm _____ | ☐ K-Drinking |
| ☒ BLK-Black | ☐ D-Decayed/Dirty | ☐ C-Accent | ☐ M-Modish/usual | ☐ 12-Handgun _____ | ☐ I-Injured |
| ☐ MBR-Medium Brown | ☐ P-Protruding | ☐ P-Profane/Abusive | ☐ N-Neat/Well Dressed | ☐ 13-Rifle _____ | ☐ R-Resisted |
| ☐ DRK-Dark | ☐ G-Gold/Silver | ☐ D-Deep/Rasping | ☐ U-Uniform | ☐ 14-Shotgun _____ | ☐ |
| ☐ OLV-Olive | ☒ V-Very White | ☐ S-Soft/Polite | | ☐ 15-Other Firearm _____ | ☐ B-Bizarre |
| ☐ DBR-Dark Brown | ☐ D-Designed (gold) | ☐ E-Effeminate | | ☐ 16-Lethal Cutting Instru _____ | ☐ L-Loud |
| ☐ RUD-Ruddy | | ☐ T-Guttural | | ☐ 17-Club/Black Jack/Knocks _____ | ☐ S-Suicidal Remarks |
| ☐ FAR-Fair | | ☐ H-High | | | ☐ U-Rude/Combative/Belligerent |
| ☐ SAL-Sallow | | | | IF Weapon is Automatic mark "A" | |
| ☐ LGT-Light | | | | In blank.   Max of 2 | |
| ☐ YEL-Yellow | | | | | |

| 47. Tattoos: | | 48. Scars: | |
|---|---|---|---|
| ☐ B-Body | ☐ N-Name/Initial | ☐ A-Arm | ☐ N-Neck |
| ☐ E-Extremity | ☐ P-Picture | ☐ H-Hand | ☐ U-Unk.Body |
| ☐ F-Face | ☐ U-Unknown | ☐ H-Head/Face | |

Codes: CO = KCK City Ordinance   SS = Kansas State Statute   CW = KCK City Warrant   SW = Kansas State Warrant   OC = O/S City Warrant   OS = O/S State Warrant

| 49.Code | 50.Statute/Ordinance Number | 51.Title of Offense / Warrant # | 52. Citation Number | 53. Case Number | 54. Court Date |
|---|---|---|---|---|---|
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |

| 55. Arrestee's Status: | ☐ P-Parole | ☐ G-Probation | ☐ B-On Bond | ☐ R-Own Recognizance | ☐ Not Applicable |
|---|---|---|---|---|---|

| 56. Complainant(s) Name STATE OF KANSAS | Address 710 N 0" | Telephone # 573-2865 |
|---|---|---|
| 56b. Complainant(s) Name | Address | Telephone # |

KCKPD #49(83)

**57. Offender**
- [X] 1 = Felony
- [ ] 2 = Misdemeanor
- [ ] 3 = Liquor/CMB Violation

**58. CINC**
- [ ] 5 = Runaway
- [ ] 6 = Truant
- [ ] 7 = Abuse/Neglect
- [ ] 8 = Status
- [ ] 9 = Felony/Misdemeanor < 10 years

**59. Other**
- [ ] 10 = Fish & Game
- [ ] 11 = Traffic
- [ ] 12 = Other PickUp Order/Warrant
- [ ] 16 = Out-of-State Jurisdiction
- [ ] 19 = Runaway-Court Placement
- [ ] 68 = City/County Ordinance
- [ ] 77 = Gang Related
- [X] 99 = Other

**60. TAKEN:** [ ] J = Fingerprints   [ ] P = Palm Prints   [ ] X = Photograph(s)

**61. Contact Disposition of Juvenile:**
- [ ] N = No Further Action
- [ ] S = Self/Parent/Guardian
- [ ] F = Foster Care
- [ ] A = Attendant Care
- [ ] W = Contact Only
- [ ] E = Emergency Shelter
- [X] J = Juvenile Detention/Jail
- [ ] X = Another Jurisdiction
- [ ] O = Other
- [ ] Z = No Contact

**62. Type Restraint Within Facility**
- [ ] N = None
- [ ] S = Non-Secure Custody
- [X] H = Handcuffed and Supervised
- [ ] R = Handcuffed to Object
- [ ] I = Locked in Room
- [ ] C = Locked in Cell
- [ ] O = Other

**63. Referred to Prosecution**
- [ ] Y-Yes [ ] N-No [ ] U-Unknown

**64. Duration of Juvenile Restraint**
(Indicate Date & Time )
Begin ___4-15-94___ | 2000
End ___4-15-94___ | 2105

| 65. Offense by Statute Number | Description | 4. Offense by Statute Number | Description |
|---|---|---|---|
| 2. 21-3401 | MURDER 1st DEGREE | 5. | |
| 3. 21-3401 | MURDER 1st DEGREE | 6. | |

| 66. Parent/Guardian Name | Address (City, State, Zip) | Telephone # |
|---|---|---|
| ROSE MCINTYRE | 1929 N L 66101 | 342-4147 |
| Parent/Guardian Employer Name | Address (City, State, Zip) | Telephone # |
| F1 Fis FINE FOOD | 5t RICHMOND | |
| 66b. Parent/Guardian Name | Address (City, State, Zip) | Telephone # |
| | | |
| Parent/Guardian Employer Name | Address (City, State, Zip) | Telephone # |
| | | |

**RELEASE OF JUVENILE INFORMATION**

| 67. Juvenile Released To (Person/Facility) | Address (City, State, Zip) | Relationship |
|---|---|---|
| JUVENILE DETENTION CENTER | 710 N OT | DETENTION |

| 68. [Signature] of Person Accepting Custody | Day | Date | Time | Telephone Number |
|---|---|---|---|---|
| | FRIDAY | 4-15-94 | 2110 | 573-5106 |

| 69. Signature of Supervisor Authorizing Transfer | Serial # | 70. Signature of Detective | Serial # |
|---|---|---|---|
| [signature] 1266 | | | |

**71. NARRATIVE**

ON 04-15-94 I WAS INSTRUCTED TO ASSIST LT BARBER TO LOCATE A SUSPECT FOR A J-) EARLIER TODAY. AT AROUND 2000 HOURS JUVENILES MOTHER APPROACHED MYSELF AND LT BARBER AT 5t AND RICHMOND, ABOVE JUVENILE WAS WITH HIS MOTHER IN HER VEHICLE.

JUVENILE WAS TRANSPORTED TO THE DETECTIVE BUREAU FOR STATEMENTS, AND ID FOR PRINTING.

JUVENILE WAS TRANSPORTED AND BOOKED INTO COUNTY JAIL WITHOUT INCIDENT.

| 72. Reporting Officer | Serial Number | 74. Arrested By Officer: | Serial Number |
|---|---|---|---|
| J B BROWN | 1627 | J BROWN | 1627 |
| 73. Supervisory Review | Serial Number | 74b. Arrested By Officer: | Serial Number |
| [signature] | 1266 | | |

P0024
LMKSDC_0003414

FIELD INVESTIGATION REPORT
IDENTIFICATION UNIT
KANSAS CITY KANSAS POLICE DEPARTMENT

| CALL OUT: | COMPLETED: | OFFENSE: | COMPLAINT NUMBER: | | DATE: |
|---|---|---|---|---|---|
| 2200 | 0100 | Post | 04154006081 | | 04-16-94 |

| LOCATION: | SCENE/REPORTING OFFICER: | SUSPECT(S): |
|---|---|---|
| Bethany Morgue | Det. Golubski | |

DETAILS OF INVESTIGATION:

| | | FILM: | TOTAL | FOR I.D. USE |
|---|---|---|---|---|
| WERE PHOTOGRAPHS TAKEN . . . YES [xx] NO [ ] tape A-332 | | B&W ROLLS | | FILM:  NUMBERS |
| LATENT PRINTS TAKEN . . . . . YES [xx] NO [ ] | | COLOR | | B&W |
| FOOT PRINTS TAKEN . . . . . . YES [ ] NO [xx] | | POLAROID SHOTS | | COLOR |
| PHYSICAL EVIDENCE COLLECTED . YES [xx] NO [ ] | | LATENTS: | | POLAROID SHOTS |
| ADDITIONAL INFO ON BACK . . . YES [ ] NO [xx] | | NUMBER TAKEN | | LATENTS: |
| AUTOMOBILE PROCESSED. . . . . YES [ ] NO [xx] | | EVIDENCE: | | WORKABLE |
| LATENTS. . . . . . YES [ ] NO [xx] | | # OF ITEMS TAGGED | | NOT WORKABLE |

DETAILS OF REPORT:  On 04-16-94 at 2200 hours the I/O was requested to
attend the autopsy of Donald Ewing (Homicide victim) at the Bethany
Hospital Morgue.  Present during the autopsy was Det. Golubski and it
was done by Dr. Mitchell.  The I/O photographed the post with the 8mm
camera and the Mamiya 645 camera (tape A-332).  The I/O also collected
the physical evidence listed on the property report from Dr. Mitchell
who
~~who~~ removed it from the victim.

| INVESTIGATING OFFICER(S): | IDENTIFICATION COMMANDER: | DATE: |
|---|---|---|
| J. Stubler 1390 | Ǫ·SH | 4/18/94 |

P0025
LMKSDC_0003415

FIELD INVESTIGATION REPORT
IDENTIFICATION UNIT
KANSAS CITY KANSAS POLICE DEPARTMENT

| CALL OUT: COMPLETED: | OFFENSE: | COMPLAINT NUMBER: | DATE: |
|---|---|---|---|
| 1420 HRS. 1630 HRS. | HOMICIDE ( CTS) | 04154006081 | 4-15-94 |

| LOCATION: | SCENE/REPORTING OFFICER: | SUSPECT(S): |
|---|---|---|
| 3037 HUTCHINGS | B. AMBLER | |

DETAILS OF INVESTIGATION:

WERE PHOTOGRAPHS TAKEN . . . YES [XX] NO [ ]

LATENT PRINTS TAKEN . . . . . YES [ ] NO [XX]

FOOT PRINTS TAKEN . . . . . . YES [ ] NO [XX]

PHYSICAL EVIDENCE COLLECTED . YES [XX] NO [ ]

ADDITIONAL INFO ON BACK . . . YES [ ] NO [XX]

AUTOMOBILE PROCESSED. . . . . YES [XX] NO [ ]

LATENTS. . . . . . . YES [XX] NO [ ]

| FILM: | TOTAL |
|---|---|
| B&W ROLLS | _____ |
| COLOR | XXXX |
| POLAROID SHOTS | _____ |
| LATENTS: NUMBER TAKEN | _____ |
| EVIDENCE: # OF ITEMS TAGGED | _____ |

FOR I.D. USE

| FILM: | NUMBERS |
|---|---|
| B&W | _____ |
| COLOR | _____ |
| POLAROID SHOTS | _____ |
| LATENTS: WORKABLE | _____ |
| NOT WORKABLE | _____ |

DETAILS OF REPORT: On 4-15-94 at 1420 Hrs. Officer Howard proceeded to the homicide scene. He was joined at approx. 1445 Hrs. by Lt. Harrington and Officer Clair. On the scene Officer Howard ran a video and collected evidence and Officer Clair took still photos and dusted the vehicle for latent prints. Lt. Harrington assisted both officers. The vehicle processed was a lt. blue cad. 4-dr. bearing ITL-176 (94) issue. The vehicle is registered to O.D. EWING of 2208 N. 26 st. K.C.K. A blood trail extended from in front of 3016 Hutchings to in front of 3037 Hutchings. Hutchings street is 26'3" wide. 3037 Hutchings is a vacant lot at this time.

| INVESTIGATING OFFICER(S): #1314     # 1225 P. CLAIR / W. HOWARD | IDENTIFICATION COMMANDER: | DATE: 4/18/94 |
|---|---|---|

Exh. 01

KANSAS CITY KANSAS POLICE DEPARTMENT                    FILE # 04154006081
BUREAU OF INVESTIGATIONS
DATE: 4-15-94
TIME: 1446 hours
Taken at 3016 Hutchings, K.C.K.

## WITNESS STATEMENT

I, **Niko Quinn**, make the following statement to Det. W.K. Smith, whom I know to be Detective
with the Police Department of Kansas City, Kansas, concerning a matter I understand is the subject
of an official investigation.

Q:   What is your full name?

A:   Niko Latoya Quinn.

Q:   When and where were you born?

A:   Kansas City, Kansas, ▮▮▮▮

Q:   Where do you live and what is your telephone number?

A:   3018 Hutchings, I don't have a phone but the number I can be reached is 321-6262.

Q:   With whom do you live?

A:   Myself and my children.

Q:   Where are you employed and how long have you worked there?

A:   I don't work.

Q:   Niko, focusing your attention on 4-15-94 did you have an occasion to witness a shooting that
     occurred there?

A:   Yes.

Q:   Would you tell me the facts pertaining to this incident.

A:   I seen a man come running from between the houses and ran up to a blue car and shot the
     windows. There was three (3) shots.

Q:   Now, which house did he run from between?

A:   A yellow house on the next block.

Q:   On the next block?

(4)

WITNESS STATEMENT OF NIKO QUINN
FILE #04154006081
PAGE #2

A:   Uh-huh.

Q:   And that block would be what?

A:   Hiawatha up there.

Q:   Hiawatha, and so how was he dressed?

A:   He had on black.  A black shirt, black hat, black pants and black tennis shoes.

Q:   Did he have a mask or anything on?

A:   No.

Q:   Did you recognize this individual?

A:   No.

Q:   And what type of gun or weapon did he have?

A:   A shotgun.

Q:   Did it have a long barrel on it?

A:   Yes.

Q:   It wasn't altered in any way, the barrel?

A:   No.

Q:   And after he shot three (3) times what did he do?

A:   He walked off.

Q:   Which way did he walk, did he walk back the way he came?

A:   Yes.

Q:   So technically speaking he came from the east, is that correct?

A:   Yes.

Q:   And he went back to the east, in other words he was coming from Hiawatha, it would be east and then he went back on Hiawatha in an easterly direction, is that correct?

A:   Yes.

Q:   Were there any words exchanged between him and the people that were in the Cadillac?

P0028
LMKSDC_0003418

WITNESS STATEMENT OF NIKO QUINN
FILE #04154006081
PAGE #3

A:   Not that I know of.

Q:   Did you know the people that were in the Cadillac?

A:   One was my cousin.

Q:   What was his name?

A:   Doniel Quinn.

Q:   Doniel?

A:   Yes.

Q:   How are you spelling that?

A:   D-o-n-i-e-l.

Q:   What was the others name?

A:   I don't know.

Q:   Am I finished?

A:   No.

Q:   Do you know whether or not the people in the Cadillac, your cousin included, were having any difficulties with anyone?

A:   No, I don't.

Q:   And after he shot three (3) times into the vehicle I assume, did he mutter anything?

A:   No, none that I seen.

Q:   Did he walk back in an easterly direction towards Hiawatha or did he run?

A:   He ran.

Q:   And you never saw this person before?

A:   No.

Q:   If you saw this person again would you be able to recognize him?

A:   Yes.

P0029
LMKSDC_0003419

WITNESS STATEMENT OF NIKO QUINN
FILE #04154006081
PAGE #4

END OF STATEMENT

I HAVE READ THE ABOVE STATEMENT CONSISTING OF (3) THREE PAGES AND
SIGN IT AS BEING TRUE AND CORRECT TO THE BEST OF MY KNOWLEDGE

WITNESS:_____SIGNED:_____

_____DATE & TIME:_____

342

P0030
LMKSDC_0003420

KANSAS CITY KANSAS POLICE DEPARTMENT  FILE # 04154006081
BUREAU OF INVESTIGATIONS
DATE: 4-15-94
TIME: 1455 HOURS

## WITNESS STATEMENT

I, **RUBY MITCHELL**, make the following statement to Det. Krstolich, whom I know to be Detective with the Police Department of Kansas City, Kansas, concerning a matter I understand is the subject of an official investigation.

Q:   What is your full name?

A:   Ruby Ann Mitchell.

Q:   Can you spell your last name please.

A:   M-i-t-c-h-e-l-l.

Q:   When and where were you born?

A:   Kansas City, Kansas, Bethany Hospital, ████.

Q:   Where do you live and what is your telephone number?

A:   3020 Hutchings, 342-8422.

Q:   With whom do you live?

A:   With my three (3) boys.

Q:   Where are you employed and how long have you worked there?

A:   I'm not employed.

Q:   Ms. Mitchell, were you an eye-witness to the shooting that occurred in front of your house today?

A:   Yes.

Q:   What's the first thing you recollect of the shooting, did you see the party who did the shooting approach the car?

A:   Yes.

Q:   Where did he come from?

15

WITNESS STATEMENT OF RUBY MITCHELL
FILE #04154006081
PAGE #2

A:    He came from the hill across the street from my house.

Q:    There is some fresh dirt, did he walk across that?

A:    Yes.

Q:    And what did he do?

A:    He came down the hill and then he stopped about halfway and picked up something. I guess he dropped a shell or something, I don't know.  Then he pumped the gun and then he came to the car and he said something to the dudes and then he just started shooting.

Q:    How long was the shotgun?

A:    It was one of them short ones.

Q:    Was it short?

A:    Yep.

Q:    And you say he pumped it?

A:    Yeah, it had a brown handle right here at the bottom of it and he did like this, cocked it back like this and then started shooting.

Q:    How many times did he fire?

A:    About four (4) or five (5) times.

Q:    Did he act like he knew the guys in the car?

A:    Yep.

Q:    Did you hear what they said?

A:    Nope.

Q:    Where were you standing when you saw all of this?

A:    In my front door.

Q:    Just looking out the door?

A:    Yep.

Q:    How was the man dressed?

A:    In all black.

WITNESS STATEMENT OF RUBY MITCHELL
FILE #04154006081
PAGE #3

Q:   You said it was all black, what type of hair did he have?

A:   He had...it wasn't real short, it was like slicked back, going back like this. It wasn't slicked down, it was like an afro but it was going back like this.

Q:   How tall was he?

A:   About, I don't know, 5'6", I don't know.

Q:   Was he heavy or thin?

A:   No, he was thin.

Q:   Did you see his face?

A:   Well, he's brown skinned, that's all I could tell, I didn't know no scars or nothing like that.

Q:   Would you recognize him again if you saw him?

A:   Yep.

Q:   What type of shirt did he have on?

A:   He had like a black t-shirt with white writing in the front.

Q:   How about his pants, or were they pants, were they short pants?

A:   They were pants, black khaki's.

Q:   How about his shoes, did you notice his shoes?

A:   Nope.

Q:   How long was it before he walked up to the car before he started shooting?

A:   I can't say how long, because I had just went to the door and I just seen him walking down.

Q:   Did he walk directly up to the car and start shooting?

A:   Yep. He walked to the car. He said a couple words and then he started shooting.

Q:   There was no conversation?

A:   Nope.

Q:   After the shooting what did he do?

A:   He took off and ran back up the hill the way he came down.

Q:   Did you see him go all the way up the hill?

P0033
LMKSDC_0003423

WITNESS STATEMENT OF RUBY MITCHELL
FILE #04154006081
PAGE #4

A:  No.

Q:  Why not?

A:  Because I came back in my room and called the police.

Q:  But you could recognize him again if you saw him?

A:  Yep.

Q:  The time is now 1758 hours. We are at headquarters. I am with Ms. Ruby Mitchell whose statement is above. She has made a positive identification of the party. She thought she knew him and know she knows she is positive that she did see the shooter and she knew who he was. Ms. Mitchell, did you tell me after we took your statement that you almost called out a name when you saw the man run down the hill?

A:  Yes.

Q:  What name did you almost call out?

A:  Lamont.

Q:  Why did you almost yell Lamont?

A:  Because he used to try to talk to my niece and I knew him.

Q:  When you got to headquarters did we show you a series of five (5) pictures?

A:  Yes.

Q:  Were you able to pick out the shooter of the picture?

A:  Yes.

Q:  Is there a number on that picture?

A:  Yes.

Q:  What is the number?

A:  Number three (3).

Q:  Are you absolutely sure this is the party who did the shooting?

A:  Yes.

Q:  Who is this party?

A:  Lamont.

P0034
LMKSDC_0003424

WITNESS STATEMENT OF RUBY MITCHELL
FILE #04154006081
PAGE #5

Q:   Do you know his last name?

A:   Yes.

Q:   What is it?

A:   McIntyre.

Q:   How do you know this party?

A:   Because he used to talk to my niece.

Q:   How long have you known him?

A:   For a couple months.

Q:   Once again, you are absolutely sure this is the party?

A:   Yes.

Q:   Beyond any reasonable doubt?

A:   Nope.

Q:   That's him?

A:   Yep.

Q:   Is there anything else you want to add to this statement?

A:   Nope.

END OF STATEMENT

I HAVE READ THE ABOVE STATEMENT CONSISTING OF (5) FIVE PAGES AND
SIGN IT AS BEING TRUE AND CORRECT TO THE BEST OF MY KNOWLEDGE

WITNESS:_____SIGNED:_____

_____DATE & TIME:_____

342

P0035
LMKSDC_0003425

**KANSAS CITY KANSAS POLICE DEPARTMENT**
**BUREAU OF INVESTIGATIONS**
**DATE:** 4-15-94
**TIME:** 1456 HOURS
TAKEN IN FRONT OF 3016 HUTCHINGS, K.C.K.

FILE # 04154006081

## WITNESS STATEMENT

I, JOSEPHINE QUINN, make the following statement to Det. W.K. Smith, whom I know to be Detective with the Police Department of Kansas City, Kansas, concerning a matter I understand is the subject of an official investigation.

Q:  What is your full name?

A:  Josephine Quinn.

Q:  When and where were you born?

A:  I was born ▨▨▨▨, high noon in Humphrey County, Mississippi.

Q:  Where do you live and what is your telephone number?

A:  Right now I'm residing at 3032 Hutchings, Kansas City, Kansas, 66104, 321-6262.

Q:  With whom do you live?

A:  With my grandson and his mother comes in and out.

Q:  Where are you employed and how long have you worked there?

A:  Right now I'm working at Kansas City Kansas Newspaper part-time, Telemarketing, and I just started on Monday.

Q:  Is there yet another telephone number that I might reach you at in case of an emergency?

A:  Well, I usually be at my parents house and that's 321-5316.

Q:  Josephine, directing your attention to 4-15-94 did you have an occasion to witness or hear a shooting that occurred in the 3000 block of Hutchings?

A:  Yes, and this is to my best remembrance of what happened. I had just came back from my grandmothers house. I had got some clothes that she had got from a relative for my grandchildren.

Q:  Approximately what time was this?

A:  Well, I didn't really look at no clock, but I figured it was after 12:00 o'clock. It might of been 1:00. I don't know.



P0036
LMKSDC_0003426

WITNESS STATEMENT OF JOSEPHINE QUINN
FILE #04154006081
PAGE #2

Q:   Continue.

A:   Okay, at that time I came home and I was upset because my brother had gave me a washer,
     I mean, not a washer, but a dryer and I was waiting for him to move it into the house and
     he got in a situation where he needed money and he sold it. So when I seen him I had went
     in the house and first I asked my daughter did she...I came down to my daughter where she
     was and asked her did she need any clothes for the children. She said that she would look
     at them and told me to put them out on the porch. No, she told me to bring them inside the
     house and I told her I wasn't bringing them inside the house. She had to look at them outside
     on the porch. So when she got to saying...hesitating about wanting the clothes because she
     gets like that I decided to go up to my house, pull the truck up to where I'm staying, pull it
     in the driveway and take the clothes out so we could separate the clothes on the porch and
     at that time I seen...I went in the house and I was talking to my daughter. I put my purse in
     there and I was talking to my daughter about my cigarettes coming up missing. I was talking
     to her about some more problems. She said she didn't want to hear it. At that time she was
     trying to get her some fresh clothes so she could leave again. I was talking to her about her
     room. She said I was upsetting her so I came back out of the house and I seen my brother
     and I came down and I was fussing with him about giving me something and then taking it
     back.

Q:   How old is your brother?

A:   He's twenty-seven (27).

Q:   What's his name?

A:   His name is Robert.

Q:   Continue.

A:   Okay, when I got through doing that then I went back. I told him not to say nothing else to
     me. I didn't want to see him coming up to my house, I said, because you're like your other
     brothers. You want to give things and you want to take it back. I told him, as far as what
     money I owe him I figured I didn't owe him nothing for what he put me through so I went
     back up to my truck to start un-loading again and I went in the house and said something to
     my daughter and I came back out to the truck. I told her I was sick and tired of people them
     doing this for years to me. Then I came back and she said she didn't want to hear it so I
     came back outside and I was...started back towards the truck and that's when I heard the
     shots.

Q:   How many shots did you hear?

A:   About three (3) or four (4) because I figure one (1), I guess he was trying to get penetration,
     then it pumped again and I turned around and looked and he fired two (2) more shots and then
     I turned around to try to get a look at him and I couldn't but he had turned at that time and
     had ran and my daughter came out screaming that that's Don. I said, "No, Don's not in
     there." She said, "Oh yes he is. He's been riding around with that guy all day." She said,
     "That's little Don, that's little Don." I said, "No, it couldn't be little Don." So she ran over
     and she looked and she got to screaming, "It's Don, it's Don." They told me to go...heard
     a lot of screaming and hollering and they told me to call 911. I went in and called 911 and

P0037
LMKSDC_0003427

WITNESS STATEMENT OF JOSEPHINE QUINN
FILE #04154006081
PAGE #3

I was telling them to get here, get here quick, because he was still breathing, but I hadn't looked at him because my daughter said he was still alive so when I got through communicating with them I came outside and I came around and I looked and his whole side of his head was gone. His eyes was dead and he was breathing hard and he went to take his last breath and I said what prayer I was taught in church to say over him and he took his last breath and he was dead.

Q: Exactly where was he in relation to positions in the vehicle?

A: He was on the passenger side.

Q: The guy that was on the drivers side, did you know him?

A: No, I didn't know him and I couldn't see him anyway because he was between the arm rest with sunglasses on and I didn't want to touch him because he was still breathing.

Q: So they were both in the front seat, is that correct?

A: Yes.

Q: Did you know who owned the Cadillac?

A: No, I don't.

Q: And you say that Don had been riding around with this individual in the Cadillac all morning?

A: That's what I was told. See, I try to stay...I know I'm in a mess, in a hell hole, in a fix, I try to read books, occupy my mind and try to work with my grandchildren because I done tried. Don was one that I tried to talk to when his mother wasn't around. I tried to talk him when his father wasn't around. I tried to show him the way but he got with other people that made me, just like my daughters and them got with other people, and made me thing...I mean made them think that I was the enemy so what I learned, what I did, what I said they couldn't see it because they was busy listening to other people around them so I couldn't get and penetrate the crowd of people that was around them. Don could of easily been a man if people wouldn't of trapped him.

Q: Tell me what type of activity was he involved in?

A: Well, he was just a loafer, I guess. For the simply reason because he tried to hold jobs but there was always circumstances where he needed help. He couldn't budget his money. He put his money to foolishness and not for as survival as far as something essential like a place to stay, for a future or money or anything trying to put money aside. He was trapped.

Q: Was he involved in any illegal traffic?

A: Drug traffic?

Q: Yes.

P0038
LMKSDC_0003428

WITNESS STATEMENT OF JOSEPHINE QUINN
FILE #04154006081
PAGE #4

A:  That I wouldn't know.

Q:  What about the individual that was driving the car, you didn't know of him, this is the first
    time you saw him today?

A:  No.

Q:  I'm sorry.

A:  This is...let me tell you this, I don't, I'm saying, no, I do not know him. See, you don't
    understand I'm isolated from a lot of people. I have friends that I grew up with I see every
    now and then. I go out to see them or they call me on the phone to keep in touch to see if
    I'm alright, but as far as getting out there being in the groove of things or being in the
    mainstream of what's going on out there in the circular world, I don't do that. I don't
    know...to get information I either read the newspaper or either my daughters and them tell
    me.

Q:  So in other words you didn't know what he was involved in?

A:  No.

Q:  Is there anything further that you would like to add to your statement?

A:  I believe the police department can do better.


                        END OF STATEMENT

I HAVE READ THE ABOVE STATEMENT CONSISTING OF (4) FOUR PAGES AND
SIGN IT AS BEING TRUE AND CORRECT TO THE BEST OF MY KNOWLEDGE

WITNESS:_____SIGNED:_____

_____DATE & TIME:_____

342

P0039
LMKSDC_0003429

KANSAS CITY, KANSAS
POLICE DEPARTMENT

# PROPERTY REPORT

04154006081
COMPLAINT NUMBER

| RECOVERED BY OFFICER | SERIAL NO. | ARRESTEE | | ADULT | STATUS | EVIDENCE SAFEKEEPING FOUND PROP | X | STOLEN | YES NO | |
|---|---|---|---|---|---|---|---|---|---|---|
| B. HOWARD | 1225 | | | JUVENILE | | | | | UNKNOWN | |
| LOCATION | | ADDRESS | | | RECEIVED BY (Property Officer) | | | | | |
| 3037 HUTCHINGS | | | | | H. SMITH EY. 1168 | | | | | |
| DATE | TIME | ARRESTEE | | ADULT | DATE | | TIME | | | |
| 4-15-94 | 1500 HRS. | | | JUVENILE | 4-18-94 | | 1135 | | | |
| RECOVERED FROM | | ADDRESS | | | RECEIVED FROM | | | | | |
| CRIME SCENE | | | | | ED. UNIT | | | | | |
| ADDRESS | | CHARGE(S) | | | | | | | | |
| 3037 HUTCHINGS | | HOMICIDE | | | | | | | | |
| TELEPHONE | | OWNER | FINDER | | | | | | | |
| | | VICTIM | OTHER | | | | | | | |

| # PROPERTY | COMPLETE DETAILED DESCRIPTION OF PROPERTY (Brand, Make, Model, Type, Color, Caliber, Marks, Serial Number, etc.) | VALUE |
|---|---|---|
| #1 | BLACK, BROWN, GREEN AND TAN HAT ---REAR SEAT JUST RIGHT OF CENTER. | |
| #2 | BROKEN LIQUOR BOTTLE IN PAPER SACK---JUST WEST OF LEFT REAR CURB | |
| #3 | BROKEN GLASS SAMPLE--- 3'9" south of meter on curb & street. | |
| #4 | PLASTIC WADDING--- LEFT FRONT FLOOR BOARD OF VICTIMS VEHICLE | |
| #5 | 1 PLASTIC WADDING --- CENTER OF FRONT FLOOR BOARD. | |
| #6 | 2 PLASTIC WADDINGS --- RECOVERED FROM FRONT SEAT LEFT SIDE | |
| #7 | 1 PAIR EYE GLASSES--- LEFT FRONT FLOORMAT OF VICTIMS VEHICLE | |
| #8 | 1 CRACK PIPE & CIG. LIGHTER---LEFT SIDE OF RIGHT FRONT SEAT | |
| #9 | 1 GRAY PLASTIC PART OF WADDING--- BETWEEN WINDSHIELD & DOOR POST | JUST |
| | ABOVE DASH OF VICTIMS VEHICLE | |
| #10 | 1 PLASTIC WADDING---RIGHT FRONT FLOOR BOARD   "    "     " | |
| #11 | KNOWN SAMPLE FROM DRIVERS SIDE FRONT DOOR GLASS | |
| #12 | 1 - $10 DOLLAR BILL & 1- $1 DOLLAR BILL --- FLOOR BOARD UNDER LEFT | |
| | FRONT SEAT. | |
| #13 | UNKNOWN TYPE CLOTH--- LEFT REAR DOOR INSIDE BY DOOR GLASS | |
| #14 | BLOOD SAMPLE---RIGHT FRONT FLOOR BETWEEN SEAT & DOOR | |
| #15 | BOTTOM OF LIQUOR BOTTLE---ON GROUND UNDER DRIVERS DOOR | |
| #16 | GLASS SAMPLE---DRIVERS SIDE REAR DOOR WINDOW | |

NARRATIVE
Above evidence collected from homicide scene. Vehicle processed was a 1987
Cad. 4-dr light blue bearing WY ITL-176 (94).

PROPERTY INVENTORY NUMBER
**71401**

ROOM 4/ Shelf #17 / Row #3

| PROPERTY OWNER | PROPERTY RELEASED TO | PROPERTY RELEASED BY |
|---|---|---|
| NAME | SIGNATURE | SIGNATURE |
| ADDRESS | ADDRESS | DATE | TIME |

| REPORTED BY | SERIAL NO. | DATE | TIME | REVIEWED BY | SERIAL NO. |
|---|---|---|---|---|---|
| P. CLAIR | 1314 | 4-16-94 | 0005 | | |

KANSAS CITY, KANSAS
POLICE DEPARTMENT

# PROPERTY REPORT

04154006081

COMPLAINT NUMBER

| RECOVERED BY OFFICER | SERIAL NO. | ARRESTEE | | EVIDENCE | |
|---|---|---|---|---|---|
| B. HOWARD | 1225 | | ADULT / JUVENILE | STATUS: SAFEKEEPING / FOUND PROP | STOLEN |

LOCATION: 3037 HUTCHINGS

RECEIVED BY (Property Officer): B. SMITHEY 1225

| DATE | TIME |
|---|---|
| 4-15-94 | 1500 HRS. |

ARRESTEE | ADULT / JUVENILE

DATE: 4-15-94   TIME: 1525

RECOVERED FROM: CRIME SCENE

ADDRESS

RECEIVED FROM: JOHNSON

ADDRESS: 3037 HUTCHINGS

CHARGE(S): HOMICIDE

TELEPHONE | OWNER | FINDER | VICTIM | OTHER

| QUANTITY | COMPLETE DETAILED DESCRIPTION OF PROPERTY (Brand, Make, Model, Type, Color, Caliber, Marks, Serial Number, etc.) | VALUE |
|---|---|---|
| #17 | 1 12 GA. FEDERAL SHELL CASING---1'9" SOUTH OF WATER METER AND 1'5" EAST OF EAST CURB. | |
| #18 | 1 12 GA. FEDERAL SPENT SHELL CASING---7" EAST AND 2" SOUTH OF WATER METER COVER, EAST OF EAST CURB. | |
| #19 | 1 12 GA. WINCHESTER SPENT SHELL CASING--- 1" SOUTH OF WATER METER COVER AND 7" WEST OF EAST CURB. | |
| #20 | 1 12 GA. FEDERAL SPENT SHELL CASING--- 2" SOUTH OF WATER METER AND 2'8" EAST OF EAST CURB. | |
| #21 | GLASS SAMPLE FROM RIGHT FRONT DOOR WINDOW | |
| #22 | BLOOD SAMPLE---FROM LEFT FRONT SEAT OF VICTIMS VEHICLE. | |
| #23 | BROKEN GLASS FROM A BOTTLE---FROM DRIVERS SIDE REAR FLOORBOARD. | |

NARRATIVE: ABOVE EVIDENCE COLLECTED FROM HOMICIDE SCENE

PROPERTY INVENTORY NUMBER: **71401**

ROOM#4/ Shelf #17/ Row#3

| PROPERTY OWNER | PROPERTY RELEASED TO | PROPERTY RELEASED BY |
|---|---|---|
| NAME | SIGNATURE | SIGNATURE |
| ADDRESS | ADDRESS | DATE | TIME |

| REPORTED BY | SERIAL NO. | DATE | TIME | REVIEWED BY | | SERIAL NO. |
|---|---|---|---|---|---|---|
| P. CLAIR | #1314 | 0905-94 | 0088 HRS. | | | |

PRO 1/86

P0041
LMKSDC_0003431

FILE NUMBER: _0415400608l_

## INTERROGATION:   ADVICE OF RIGHTS

### YOUR RIGHTS

Place _ΠΟ1 Π.Π ( Π/32)_
Date _4·15·94_
Time _2.0.04_

· Before we ask you any questions, you must understand your rights.

· You have the right to remain silent.

, Anything you say can be used against you in court.

You have the right to talk to a lawyer for advice before we ask you any questions and
· to have him with you during questioning.

, If you cannot afford a lawyer, one will be appointed for you before any questioning if
you wish.

If you decide to answer questions now without a lawyer present, you will still have
the right to stop answering at any time.  You also have the right to stop answering
at any time until you talk to a lawyer.

### WAIVER OF RIGHTS

I have read this statement of my rights and I understand what my rights are.  I am
willing to make a statement and answer questions.  I do not want a lawyer at this
time.  I understand and know what I am doing.  No promises or threats have been
made to me and no pressure or coercion of any kind has been used against me.

Signed _Refused_
(Chamont McIntyre)

Witness: _Dtl Gng. R Whlul_

Witness: _____

Time: _20.15L_

19

P0042
LMKSDC_0003432

KANSAS CITY KANSAS POLICE DEPARTMENT                    FILE # 04154006081
BUREAU OF INVESTIGATIONS
DATE: 4-15-94
TIME: 2035 HRS.


## WITNESS STATEMENT


I, DENNIS O. BARBER, make the following statement to DET. ROGER GOLUBSKI, #1376, whom I know to be Detective with the Police Department of Kansas City, Kansas, concerning a matter I understand is the subject of an official investigation.


Q:   What is your full name?

A:   Dennis O. Barber.

Q:   When and where were you born?

A:   Kansas City, Missouri,

Q:   Where do you live and what is your telephone number?

A:

Q:   With whom do you live?

A:

Q:   Where are you employed and how long have you worked there?

A:   Kansas City, Kansas Police Department, about 23-1/2 years.

Q:   And at what capacity are you so employed?

A:   I'm a lieutenant in charge of the Response Unit.

Q:   On April 15, 1994, what unit were you assigned to?

A:   Response Unit.

Q:   Now as part of your duties, did you go out on this particular date and assist in a homicide investigation, which took you to the area of 5th and Parallel?

A:   I did.

Q:   And did you have a conversation with a lady there, Ms. McIntyre?

A:   I did.



WITNESS STATEMENT OF DENNIS O. BARBER
FILE #04154006081
PAGE #2

Q:   And briefly, could you tell us the content of that conversation, please.

A:   Prior to proceeding there I went with several units of the agency to 2908 Parkwood. At that point in time I spoke directly with an elderly lady by the name of Maxine Crowder. She is the grandmother of a listed suspect in a homicide which transpired this date. One, Lamont McIntyre. I solicited her assistance. She guaranteed she would. Approximately an hour later, after looking for the individual throughout the streets, I received a radio transmission indicating that Lamont's mother, Ms. McIntyre, was requesting my presence at 5th and Richmond. I was in the immediate proximity. It didn't take me long to get there. Upon arrival, in front of FiFi's Restaurant there, in the parking lot at 5th and Richmond, I once again met the grandmother, Ms. Crowder and the mother, Ms. McIntyre. At that point in time they made an inquiry as to what had transpired. I indicated that there had been some street talk, wherein Lamont McIntyre had been named as a suspect in a felony crime. She indicated well that's why she brought Lamont down to get things straightened out because he'd indicated he hadn't been in any problem. At that time I noticed, in a gray mini-van, possibly a Plymouth make, which was backed in in the parking lot, the suspect in question, Lamont, who was seated in the van. I indicated and motioned for him to approach and he did so. I conversed briefly with him and at that time, directed Officer Jim Brown to go ahead and do a stop and pat down frisk. And the subject was subsequently handcuffed and placed in district car #112. I then conversed in a conversation with Ms. McIntyre again. She was not familiar with what a felony crime was. I indicated to her that it was anything punishable by more than a year in prison. Examples of such may be a shooting, a stabbing or an armed robbery. Totally unsolicited, she indicated to me that if someone had told me that she had killed somebody, would I take them down and charge them with murder. Prior to this, the word "homicide" or "murder" had never been murmured from my mouth. I indicated that certainly we would have to investigate such an allegation. I further explained that I wasn't convicting him, that I wasn't a judge, and I wasn't a district attorney, but a district attorney would have to be contacted to overview the file and see if there was sufficient evidence to detain Lamont or to request a warrant or filing of charges regarding same. This conversation convened at approximately 1950 hours with Ms. McIntyre. She made an inquiry of me as to what time this serious problem had occurred and I indicated around 2:00. Her response was "Well that couldn't have been Lamont that was involved because he works part-time at FiFi's and he was here from 11:00 this morning until 2:45 this afternoon. I indicated "Well, that's why I needed to talk to the young man, that there's two sides to every story" and that I appreciated her assistance in bringing him down, and the grandmother's assistance in contacting her. That my main intent was to go ahead and give Lamont an opportunity to tell his version regarding the allegations and that I was doing in so in hopes to off-set any possible retaliatory action from any other family members of the victims involved.

Q:   And these remarks by her were totally unsolicited as far as where he was during the day and the consequences of a homicide investigation. Is that correct?

A:   That's correct.

Q:   Also, while you were having this initial conversation with her, at any time did she indicate to you where Lamont was or motion for him to come to you?

A:   As I had indicated, shortly after the conversation had convened, she said "Well Lamont told me he hasn't been any problem and that's why I brought him down here". And at that point in time, I looked over and saw him in this van that was backed in against the building. And

P0044

LMKSDC_0003434

WITNESS STATEMENT OF DENNIS O. BARBER
FILE #04154006081
PAGE #3

she did call his name as I motioned for him by a hand signal to approach me and he did so.

Q:   When Lamont approached you, did he ever make any statements solicited or otherwise as to anything at all as to where he had been or anything concerning this investigation?

A:   Yes.  He had his hands in his pocket and naturally that caused a concern.  So I had him remove same and asked him if he at this time was in possession of any weapons and he said "No, go ahead and check me".  That's when I directed Officer Brown to conduct a stop/frisk. I asked him if he had had any problems with any individuals that could have been running in groups or with any individuals which were known to be down with any sets or anything of that nature.  And he said no, that he hadn't, that during the day he had been with his brother, James, and neither of which had been in any fight or been jumped on or had any altercation with any individuals.

Q:   So once again, he indicated that he had been with his brother throughout the day?

A:   Yes.

Q:   Was there also some information on the scene that he had just exited a blue type of vehicle?

A:   There was information early on that a blue vehicle that's he's known to ride in or matched the description which he's been seen to operate, was a block over from the homicide scene. Additionally, Officer Viera, which I had assistance to, received information from an informant in Juniper Gardens area, where Lamont is also known to frequent.  This information was that he was seen riding in an Oldsmobile 98, white in color, with blue tinted windows in the area of 2nd Street.

Q:   During these remarks, was the grandmother also present?

A:   She was.

Q:   And did she interject any remarks at all?

A:   The grandmother was quite helpful.  She just was naturally concerned and slightly upset and said "I know this has to be of serious nature or there wouldn't be all these officers here". And at such point in time when the mother was becoming less cooperative, then grandma told her "Now look, you know, they've got a job to do and if Lamont's not involved in anything, in any event, we just need to go ahead and find out what's going on".  And I assured her that upon reaching the Bureau, given an opportunity, I would contact her as far as what the disposition of Lamont was going to be tonight.

Q:   But she never interjected where Lamont had been throughout the day?

A:   Now when I conversed with her at 2908 Parkwood and down at 5th and Richmond, she indicated she hadn't seen Lamont all day and that all she ever saw him do was walk.  She never knew him to operate a vehicle and had never come to her house in a car.

Q:   Is there anything else that you can think of you'd like to add to this statement?

A:   No, I think that covers it.

WITNESS STATEMENT OF DENNIS O. BARBER
FILE #04154006081
PAGE #4

END OF STATEMENT
TIME: 2045 HOURS

I HAVE READ THE ABOVE STATEMENT CONSISTING OF FOUR (4) PAGES AND
SIGN IT AS BEING TRUE AND CORRECT TO THE BEST OF MY KNOWLEDGE.

SIGNED:_____WITNESSED:_____

DATE & TIME:_____

321

KANSAS CITY, KANSAS
POLICE DEPARTMENT

# PROPERTY REPORT

04154006081

COMPLAINT NUMBER

| RECOVERED BY OFFICER | SERIAL NO. | ARRESTEE | | | | |
|---|---|---|---|---|---|---|
| J. Stubler | 1390 | | ADULT | STATUS | EVIDENCE XX | STOLEN |
| LOCATION KU Morgue | | ADDRESS | JUVENILE | | SAFEKEEPING FOUND PROP. | YES NO XX |
| DATE 04-16-94 | TIME 0900 | ARRESTEE | ADULT | RECEIVED BY Property Officer | | |
| RECOVERED FROM Doniel Quinn | | ADDRESS | JUVENILE | DATE | | TIME |
| ADDRESS Homicide Victim | | CHARGE(S) | | RECEIVED FROM | | |
| TELEPHONE | OWNER FINDER VICTIM OTHER XX | | | | | |

| QUANTITY | COMPLETE-DETAILED DESCRIPTION OF PROPERTY (Brand, Make, Model, Type, Color, Caliber, Marks, Serial Number, etc.) | VALUE |
|---|---|---|
| 1 | Hair Sample recovered form the victim's head | |
| 1 | Blood Sample (2 tubes) recovered from the victim's body | |
| 1 | Blood Sample recovered from the victim's body (2 swabs) | |
| 1 | Shotgun Shot (small) & Wadding Sample recovered from the victim's head | |
| 1 | Blue cigarette Lighter recovered from the clothing of the victim | |
| 1 | Red & White Shirt with blood on it recovered from the victim's property | |
| 1 | Pullover Shirt (white) with blood on it recovered from the victim's property | |
| 1pr | Yellow Pants with blood on them recovered from the victim's property | |
| 1pr | Black Shoes recovered from the victim's property | |
| 1pr | White underpants with blood on them recovered from the victim's property | |
| 2pr | White Socks recovered from the victim's property | |
| | | |
| | Note: The victim's property was sent to the Morgue from the Emergency room.  It is unknown who removed it from the victim. | |

NARRATIVE

The above physical evidence was recovered by Dr. Anderson and given to the R/O at the request of Det. Shomin.

X-ROOM 4/Shelf #17/Row #3

Refig. #2

PROPERTY INVENTORY NUMBER

**71401**

| PROPERTY OWNER | PROPERTY RELEASED TO | PROPERTY RELEASED BY |
|---|---|---|
| NAME | SIGNATURE | SIGNATURE |
| ADDRESS | ADDRESS | DATE TIME |
| REPORTED BY J. Stubler | SERIAL NO. 1390 | DATE 04-16-94 TIME 1600 | REVIEWED BY | SERIAL NO. |

P0047
LMKSDC_0003437



Full body, male, anterior and posterior views (ventral and dorsal).

Name _Donald Ewing_  Autopsy No. _0415406081_

Age _34_  Race _Black_  Sex _male_  Date _10 / 20 / 1959_

Cat. No. 44-1-006-00





# City of Kansas City, Kansas

### DEPARTMENT OF POLICE

COMPLAINT# 04154006081      VICTIM: Quinn Don,MBN,23yrs/Ewing Donald,MBN,10-20-59

DATE: 04-15-94      TIME: 1430      LOCATION: 3020 Hutchings

SUSPECT#1 Black Male,15-20yrs,Slender,Short hair on sides-longer on top,5'7",
Black T-shirt with white lettering,black kackipants

KIT#1  C7,F12,L19,N21,H134,E65

WEAPON: #1 Shotgun

VEHICLE:

M.O.:  Suspect walked up to passenger side of
vehicle,said a few words, shot both victims
with weapon, left on foot.



CONTACT: Det. R. Golubski #1376

KIT OPERATOR: Det. J.M. Krstolich #1383

23

KANSAS CITY KANSAS POLICE DEPARTMENT

** INVESTIGATIVE ADDENDUM / CLEARANCE **

April 15, 1994

FILE # 04154006081

OFFENSE        : Double Homicide
REPORT TYPE    : Investigative Addendum
INVESTIGATOR   : Det. J. Krstolich, #1383
UNIT           : C. A. Persons
# OF ARREST    : 1
CLEARED BY     : Cleared by Arrest
STATUS         : Active
# OF PAGES     : 2
SUPERVISOR SIGNATURE

---

VICTIM'S NAME : #1-QUINN, DON,                    Unknown Address
               #2-EWING, DONALD E.,               3038 N. 20th St., KCK

---

SUSPECT(S): McINTYRE, LAMONTE, B/M, DOB        1929 N. 6th St., KCK, 342-4147

---

### NARRATIVE

On 4-15-94, reporting detective was ordered to respond to the 3000 block of Hutchings on a possible double homicide by the Crimes Against Persons Commander, Lt. Steven Culp. Reporting detective did as ordered, responded in vehicle #219 to the scene and proceeded up where I met with Detectives Blood and Maskil. Asked if anything was needed. At this time they said "No, stand by", that anything was needed, they would advise.

At that time reporting detective was shown a black female who identified herself as Ms. Ruby Mitchell. She stated that she lived in the area and that she was standing at the door and witnessed the entire crime. Reporting detective interviewed Ms. Mitchell and took her inside her residence and took a complete taped statement. She stated that she was standing at her front door and she saw a black male party run down the hill towards a blue Cadillac, which was the homicide vehicle. On the way down the party seemed to drop something. He stooped, bent to the ground and picked something up. She saw a shotgun in his hand. He walked to the passenger's side of the vehicle that was sitting Hutchings, facing northbound. She stated that he said something to the passenger. It was nothing more than an few words and then fired the shotgun four (4) times into the vehicle. When asked what type of shotgun it was, she though it was a pump shotgun, relating that he had to manipulate something before each round was fired into the vehicle. Ms. Mitchell stated then that the party ran back up the hill. She left the door and telephoned the police. Ms. Mitchell stated the party was about 5'6" to 5'7", 15 to 20 YOA, a dark black male, having short hair on the sides and

24.

INVESTIGATIVE ADDENDUM
FILE #04154006081
PAGE #2

long hair on top, wearing a black t-shirt with white lettering and black khaki pants. Reporting detective asked if she could ID the party and she stated "Yes". Ms. Mitchell had to retrieve her children from the school and brought them home. At this time reporting detective requested Ms. Mitchell to come to the KCK Police Department Detective Bureau and try to do a composite of the face she saw. Ms. Mitchell did make a composite of E65, H134, N21, C19, F12, C7. She stated that this looked like the face of the party the best she could remember. And it was also brought to light that she thought she recognized the party by the name of "Lamonte". At this time, reporting detective did have her look through the mug books and pictures of different Lamontes were shown to her in a picture interview of five (5) separate black individuals. The picture of Lamonte McIntyre was placed in position number three (3). Ms. Mitchell did pick this party out as the party she saw shoot the individuals in the Cadillac outside of her residence.

Reporting detectives then took Ms. Mitchell back to her residence and proceeded to 13th and Quindaro where other units of the KCK Police Department were met for an all-out canvass of the area in an attempt to locate Lamonte McIntyre. Mr. McIntyre was located at his mother's place of employment, FiFi's Restaurant, located at 5th and Parallel. He was brought into the KCK Police Department for an interview. Mr. McIntyre read his rights, understood his rights, read the Waiver and understood the Waiver, but stated that he would talk to reporting detectives, but would sign nothing. This was heard by Officer J.E. Brown, Detective Golubski and Detective Krstolich.

During the interview, Mr. McIntyre stated he was at his auntie's house in the vicinity of 16th and Wood all day long and that some dude came by and told them that Little Quinn's brother had been shot and that he was there with his auntie, his cousin, and his cousin's girlfriend. Later int the day his brother, James, did come by. Mr. McIntyre was taken to the KCK Identification Unit and was booked on the charge of Double Homicide. He was taken to the Wyandotte County Jail and booked on the charges.

END OF INVESTIGATIVE

321

Supvr. Initial

P0052
LMKSDC_0003442

KA. S CITY KANSAS POLICE DEPARTMEN.

** INVESTIGATIVE ADDENDUM / CLEARANCE **

APRIL 15, 1994

FILE # 04154006081

OFFENSE          : HOMICIDE
REPORT TYPE      : INVESTIGATIVE
INVESTIGATOR     : SGT. BLOOD
UNIT             : HOMICIDE
# OF ARREST      :
CLEARED BY       :
STATUS           : ACTIVE
# OF PAGES       :
SUPERVISOR SIGNATURE :

VICTIM'S NAME : #1 - QUINN, DON, B2/M, APPROXIMATELY 23 YEARS OF AGE, DATE OF BIRTH AND
                ADDRESS AT THIS TIME ARE UNKNOWN

SUSPECT(S):

## NARRATIVE

On 4-15-94 the reporting officers were advised of a double shooting with one
subject deceased at 3032 Hutchings.

Reporting officer and Det. Maskil proceeded to that location.  Upon our
arrival at 1430 hours we made contact with Off. Burdette Ambler of the Kansas
City, Kansas Police Dept.  Off. Ambler indicated that both subjects had been shot
apparently with shotguns by two (2) black male suspect who had fled the scene.
Both victims were removed from the scene by KARE.  One subject was transported to
Bethany Medical Center and the other one to K.U. Medical Center.

On the scene reporting officers observed a blue Cadillac, four (4) door,
Sedan, with Wyandotte County license ITL-176.  The vehicle was parked northbound
on Hutchings opposite of 3032 Hutchings.  The drivers door and left rear passenger
door windows were broken out and in the drivers side front seat the reporting
officers observed what appeared to be shotgun wads, plastic wads, and pellet
damage to the upper portion of the drivers front seat.  The right front passenger
door window was also broken out and on that door was a large substantial of blood
and tissue, apparently from the victim, who was a passenger on that side of the
car.  Det. Maskil, in searching the area, immediately north of the victims

35

P0053
LMKSDC_0003443

INVESTIGATIVE
FILE #04154006081
PAGE #2

vehicle, found four (4) spent shotgun shell casings, appeared to be .12 gauge. They were pointed out to I.D. Officer, Bill Howard, who was processing the scene and Off. Howard indicated that he would photograph them in place and collect them as evidence.

Officers on the scene, Det. W.K. Smith and Roger Golubski, and Det. James Krstolich, were in the process of interviewing witnesses at that time. Reporting officer and Det. Maskil were advised by Lt. Culp to proceed to Bethany Medical Center to see what information we could obtain regarding the victim at that location.

Upon our arrival at Bethany Medical Center at 1444 hours we went to the Emergency Room and Emergency Room Personnel at that time were working on a black male subject who had suffered gunshot wounds. Reporting officers weren't able to interview the subject or get a close look at him.

Det. Maskil and Sgt. Blood examined the victims clothing in an attempt to locate any identification. There was none in his clothing at that point. Emergency Room Personnel further advised reporting officers that there was additional clothing underneath the victim at the time they were working on him but they were unable to remove that clothing at that time. There is possibly identification in the victims clothing, but we were not able to gain access to it.

Trooper, Larry Roland, of the Kansas Highway Patrol, was on the scene at the Emergency Room and was able to get a look at the victims face and identified him as Donald Ewing. He said he knew the subject through previous contacts.

Reporting officer then made contact with KARE Technician, Randy Smith. He indicated that the victim had suffered two (2) gunshot wounds to the back. One (10 on each side of the shoulder blade areas. He indicated they appeared to be shotgun wounds but he couldn't be positive at this time. He also indicated that there were bullet wounds to the right arm. There appeared to be two (2) wounds, they could be shotgun or possibly bullet wounds. Again, he wasn't sure. There was also what appeared to be an entry wound. KARE Technician said he couldn't tell for sure if they were bullet wounds or possible wounds caused by fragmented glass that came from the door of the vehicle in which the victim was sitting at the time the KARE Technicians attempted to treat him.

At this time the identification of Donald Ewing is tentative based on information from Kansas State Trooper, Larry Roland.

Reporting officers ran a license registration check on the vehicle. It came back to a 1987 Cadillac registered to a Donald Ewing of 2208 N. 26th. That being license number Wyandotte ITL-176.

On running the address of 2208 N. 26th, Det. Maskil was able to obtain a date

Supvr. Initial                                                                                    PAGE    2

INVESTIGATIVE
FILE #04154006081
PAGE #3

of birth on Donald Ewing of 10-20-59. He also has a Police Department jacket #31204, that being with the Kansas City, Kansas Police Identification Unit.

While at the Bethany Medical Center, reporting officer and Det. Maskil were alerted by a nurse that she had a telephone call from a relative of Donald Ewing. Det. Maskil handled that call and talked to a young lady by the name of Sharon Bennett, who indicated that she was a relative of Donald Ewing.

Det. Maskil was unable to obtain any useful information from Mrs. Bennett. She was in fact asking questions if or not Donald Ewing had been positively identified.  She stated that she would have family members enroute to Bethany Medical Center to make contact with police officers at that location.

From Bethany Medical Center the reporting officer and Det. Maskil proceeded to K.U. Medical Center.  Upon our arrival at K.U. Medical Center at 1535 hours the reporting officers made contact with KARE Technician, Steve Gallager, of the Kansas City, Kansas Fire Dept.  Mr. Gallager advised reporting officers that the subject that they had recovered and brought to K.U. was recovered from the passenger side of the motor vehicle. He indicated that Doctor Jeter of the K.U. Emergency Room Staff pronounced that victim dead at 1455 hours.

Reporting officers were able to make contact with a relative at that location, a Mr. Andrew Quinn, who is a black male, DOB: 4-29-59, 2718 Lathrop, K.C.K., 621-3631.  Mr. Quinn advised that he is a cousin of the victim and he identified the victim as Don Quinn and said he was approximately twenty-three (23) years of age.  Mr. Andrew Quinn advised reporting officer that he did not know the date of birth or the address or telephone number of the victim, Don Quinn.  He advised reporting officer to make contact with a Mrs. Cinderella Quinn, 321-5316. She apparently is the grandmother of the victim, Don Quinn, and she can offer some information as to Don's date of birth and address.

Reporting officers then entered the Emergency Room where the victim was being held and with the assistance of Dr. Rodriguez of the Emergency Room Staff, observed injuries to the victims face. There was an extreme destruction of the victims face and skull and indications of a very close range gunshot wound and all indications from Dr. Rodriguez were that those gunshot wounds were caused by most likely a shotgun.

Again, there was no personnel property in the possession of this victim that would relate to a positive identification as to date of birth or address. The only information we have at this time is that received from Andrew Quinn, his cousin. Mr. Quinn advised reporting officers that he was at the scene at the time the victim was removed from the blue Cadillac and he is positive that he is his cousin, Don Quinn.

At approximately 1635 hours Det. Maskil made contact with Mrs. Cinderella Quinn, the grandmother of victim, Don Quinn. Mrs. Quinn was unable to offer any

Supvr. Initial                                                              PAGE        3

INVESTIGATIVE
FILE #04154006081
PAGE #4

information as to Don's address or date of birth.  She indicated that none of the family was available at this time and she had no idea where they were at but she would have them make contact with either Det. Maskil or Sgt. Blood for additional information.

At the present time reporting officers have been unable to obtain a date or birth or address information regarding the victim, Don Quinn.

There is nothing additional to add to this report at this time.

At the orders of Lt. Culp the case has been turned to Det.'s W.K. Smith and Roger Golubski for further investigation.

END OF INVESTIGATIVE

342

Super. Initial

PAGE      4

FIELD INVESTIGATION REPORT
IDENTIFICATION UNIT
KANSAS CITY KANSAS POLICE DEPARTMENT

| CALL OUT: 0800 | COMPLETED: 1300 | OFFENSE: Post | COMPLAINT NUMBER: 04154006081 | DATE: 04-16-94 |
|---|---|---|---|---|
| LOCATION: KU Morgue | | SCENE/REPORTING OFFICER: Det. Shomin | SUSPECT(S): | |

DETAILS OF INVESTIGATION:

WERE PHOTOGRAPHS TAKEN . . . YES [xx] NO [ ]
A-332

LATENT PRINTS TAKEN . . . . . YES [xx] NO [ ]

FOOT PRINTS TAKEN . . . . . . YES [ ] NO [xx]

PHYSICAL EVIDENCE COLLECTED . YES [xx] NO [ ]

ADDITIONAL INFO ON BACK . . . YES [ ] NO [xx]

AUTOMOBILE PROCESSED. . . . . YES [ ] NO [xx]

LATENTS. . . . . . YES [ ] NO [xx]

FILM:          TOTAL
B&W ROLLS  _____
COLOR      _____
POLAROID
SHOTS      _____

LATENTS:
NUMBER
TAKEN

EVIDENCE:
# OF ITEMS
TAGGED

FOR I.D. USE

FILM:          NUMBERS
B&W        _____
COLOR      _____
POLAROID
SHOTS      _____

LATENTS:
WORKABLE   _____
NOT
WORKABLE   _____

DETAILS OF REPORT:   On 04-16-94 at 1300 hours the I/O was dispatched to the K.U. Morgue for the autopsy of Doniel Quinn at the request of Det. Shomin.  Upon the I/O's arrival he was met by Det. Shomin and Dr. Mitchell and they advised the I/O the details of the offense.  The I/O photographed the autopsy with the 8mm VCR camera and with the Mamiya 645 camera.  The I/O then recovered the physical evidence listed on the property report from Dr. Mitchell who removed it from the victim.

| INVESTIGATING OFFICER(S): J. Stubler 1390 | IDENTIFICATION COMMANDER: | DATE: 4/18/94 |
|---|---|---|

Exh. 01

P0057
LMKSDC_0003447

KANSAS CITY, KANSAS
POLICE DEPARTMENT

# PROPERTY REPORT

04154006081

COMPLAINT NUMBER

| RECOVERED BY OFFICER | SERIAL NO. | ARRESTEE | ADULT | STATUS | EVIDENCE | STOLEN | YES |
|---|---|---|---|---|---|---|---|
| J. Stubler | 1390 | | JUVENILE | | SAFEKEEPING | | NO |
| LOCATION | | ADDRESS | | RECEIVED BY (Property Officer) | FOUND PROP. | | UNKNOWN |
| KU Morgue | | | | | | | |
| DATE | TIME | ARRESTEE | ADULT | DATE | | | |
| 04-16-94 | 0900 | | JUVENILE | | | | |
| RECOVERED FROM | | ADDRESS | | RECEIVED FROM | | | |
| Doniel Quinn | | | | | | | |
| ADDRESS | | CHARGE(S) | | | | | |
| Homicide Victim | | | | | | | |
| TELEPHONE | OWNER | FINDER | | | | | |
| | VICTIM | OTHER X | | | | | |

| QUANTITY | COMPLETE DETAILED DESCRIPTION OF PROPERTY (Brand, Make, Model, Type, Color, Caliber, Marks, Serial Number, etc.) | VALUE |
|---|---|---|
| 1 | Hair Sample recovered form the victim's head | |
| 1 | Blood Sample (2 tubes) recovered from the victim's body | |
| 1 | Blood Sample recovered from the victim's body (2 swabs) | |
| 1 | Shotgun Shot (small) & Wadding Sample recovered from the victim's head | |
| 1 | Blue cigarette Lighter recovered from the clothing of the victim | |
| 1 | Red & White Shirt with blood on it recovered from the victim's property | |
| 1 | Pullover Shirt (white) with blood on it recovered from the victim's property | |
| 1pr | Yellow Pants with blood on them recovered from the victim's property | |
| 1pr | Black Shoes recovered from the victim's property | |
| 1pr | White underpants with blood on them recovered from the victim's property | |
| 2pr | White Socks recovered from the victim's property | |
| | | |
| | Note: The victim's property was sent to the Morgue from the Emergency room. It is unknown who removed it from the victim. | |

| NARRATIVE |
|---|
| The above physical evidence was recovered by Dr. Anderson and given to the R/O at the request of Det. Shomin. |

X-ROOM 4/shelf #17/Row #3

Re fig: #2

PROPERTY INVENTORY NUMBER

71401

| | PROPERTY OWNER | | PROPERTY RELEASED TO | | PROPERTY RELEASED BY |
|---|---|---|---|---|---|
| NAME | | SIGNATURE | | SIGNATURE | |
| ADDRESS | | ADDRESS | | DATE | TIME |
| REPORTED BY | SERIAL NO. | DATE | REVIEWED BY | | SERIAL NO. |
| J. Stubler | 1390 | 04-16-94 1600 | | | |

P0058
LMKSDC_0003448

KANSAS CITY, KANSAS
POLICE DEPARTMENT

# PROPERTY REPORT

04154006081
COMPLAINT NUMBER

| RECOVERED BY OFFICER | SERIAL NO. | ARRESTEE | ADULT | STATUS | EVIDENCE | | STOLEN | YES |
|---|---|---|---|---|---|---|---|---|
| J. Stubler | 1390 | | JUVENILE | | SAFEKEEPING | | | NO |
| LOCATION | | ADDRESS | | | FOUND PROP. | | | UNKNOWN |
| Bethany Morgue | | | | RECEIVED BY PROPERTY CLERK | | | | |
| DATE 04-18-94 | TIME 2300 | ARRESTEE | ADULT | DATE 4-18-94 | | TIME 0125 | | |
| RECOVERED FROM | | | JUVENILE | | | | | |
| Donald Ewing | | ADDRESS | | RECEIVED FROM | | | | |
| ADDRESS | | | | DUI | | | | |
| Homicide Victim | | CHARGE(S) | | | | | | |
| TELEPHONE | | OWNER | FINDER | | | | | |
| | | VICTIM | OTHER | | | | | |

| QUANTITY | COMPLETE DETAILED DESCRIPTION OF PROPERTY (Brand, Make, Model, Type, Color, Caliber, Marks, Serial Number, etc.) | VALUE |
|---|---|---|
| 1 | Hair Sample recovered from the Head of the victim | |
| 1 | Blood Sample recovered from the body of the victim (2 tubes) | |
| 1 | Blood Sample recovered from the body of the victim (2 swabs) | |
| 1 | Sample of Shotgun Shot (small) and wadding recovered from the victim's Left Upper Shoulder | |
| 1 | Sample of Shotgun Shot (small) recovered from the victim's middle back on the inside | |
| 1 | Large Shotgun Shot recovered from the victim's right Arm | |
| 1 | Large Shotgun Shot recovered from the victim's Pericardial Sack | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

NARRATIVE            The above physical evidence was recovered from the body
of Donald Ewing (Homicide victim) by Dr. Mitchell at the request of Det.
Gobulskii  Dr. Mitchell then gave it to the R/O as the evidence of the case.

PROPERTY INVENTORY NUMBER

Ref. Fig. #2

**71401**

| PROPERTY OWNER | PROPERTY RELEASED TO | PROPERTY RELEASED BY |
|---|---|---|
| NAME | SIGNATURE | SIGNATURE |
| ADDRESS | ADDRESS | DATE / TIME |

| REPORTED BY | SERIAL NO. | DATE | TIME | REVIEWED BY | SERIAL NO. |
|---|---|---|---|---|---|
| J. Stubler | 1390 | 04-16-94 | 0800 | | |

KANSAS CITY KANSAS POLICE DEPARTMENT

** INVESTIGATIVE ADDENDUM / CLEARANCE **

April 16, 1994

FILE # 04154006081

| | |
|---|---|
| OFFENSE | : Double Homicide |
| REPORT TYPE | : Investigative Addendum |
| INVESTIGATOR | : Det. M. Shomin, #1301 |
| UNIT | : C. A. Persons/Homicide |
| # OF ARREST | : 1 |
| CLEARED BY | : Cleared by Arrest |
| STATUS | : Active |
| # OF PAGES | : 1 |
| SUPERVISOR SIGNATURE | : |

VICTIM'S NAME : #1-QUINN, DONIEL, B/ , Address & Telephone Unknown
#2-EWING, DONALD E., B/M 038 N. 20th St., KCK

SUSPECT(S): McINTYRE, LAMONTE, B/M, 15 YOA, 1929 N. 6th St., KCK, 342-4147

## NARRATIVE

On 4-16-94 at approximately 0830 hours, this reporting detective proceeded to the K.U. Medical Center Morgue for the purpose of attending the post mortem on the above-listed victim, Doniel Quinn. Also in attendance besides this reporting detective was Identification Officer Joseph Stubler, Staff Pathologist Dr. Anderson, Resident Pathologist Dr. Balarezo and Mortician Robert Waters.

Upon arrival at the morgue the victim was already lying on a gurney, wrapped in numerous sheets. Upon removal of the sheets by mortician Robert Waters, the victim was then placed on the examination table. Upon preliminary examination, the victim sustained numerous shotgun blasts to the head and the face, resulting in massive damage to the point that the victim was not recognizable. The right eye was not visible, as it was the area where the blast had hit, as well as several other blasts to the head. Upon x-rays being ordered by Dr. Anderson, it was apparent the victim had sustained numerous blasts to the right side of the face with numerous shotgun pellets being visible in x-ray film on the left side of the victim's head. Also, the victim sustained a shotgun blast to the right hand, which was a through and through wound, entering on the back of the area approximately above the ring finger and exiting at the palm level at the thumb. It was at this point the examination proceeded by Pathologist, advising that it was apparent that the victim had sustained massive head injury, resulting in brain damage, resulting in the victim's death. The procedure was photographed and vide-taped by Identification Officer Stubler, as well as, specimens of blood, urine and vitrious fluid taken for purposes of toxology for traces of alcohol and drugs at a later date and time. The Pathologist advised that the cause of death to the above-listed victim was numerous gunshot wounds

P0060
LMKSDC_0003450

INVESTIGATIVE ADDEND.
FILE #04154006081
PAGE #2

to the head, resulting in massive damage, resulting in his death.

END OF INVESTIGATIVE

321

Supvr. Initial

PAGE   2

P0061
LMKSDC_0003451

KANSA. .ITY KANSAS POLICE DEPART. .NT

## ** INVESTIGATIVE ADDENDUM / CLEARANCE **

April 16, 1994

FILE # 04154006081

OFFENSE          : Double Homicide
REPORT TYPE      : Investigative Addendum
INVESTIGATOR     : Det. R. Golubksi, #1376
UNIT             : C. A. Persons
# OF ARREST      : 1
CLEARED BY       : Cleared by Arrest
STATUS           : Active
# OF PAGES       : 3
SUPERVISOR SIGNATURE :

VICTIM'S NAME : #1-EWING, DONALD E., B/M,            , 3038 N. 20th St., KCK, 621-6903
                #2-QUINN, DONIEL, B/M, DO            known Address

SUSPECT(S): McINTYRE, LAMONTE, B/M, DOB          29 N. 6th St., KCK, 342-4147

### NARRATIVE

On 4-15-94 at approximately 1400 hours, an individual walked through a vacant lot toward a parked light blue Cadillac bearing Kansas "ITL 176", parking northbound on Hutchings, directly across the street from 3032 Hutchings. The suspect approached the vehicle, he had a shotgun in his possession, he approached the passenger's side of the car, discharged approximately three (3) to four (4) rounds directly into the vehicle, striking both occupants and causing the passenger, Mr. Quinn, to immediately expire. Mr. Ewing managed to survive temporarily, was transported to Bethany and underwent surgery and later expired at the hospital.

Detective Golubski arrived at the scene, the victim had been removed at this point. Present on the scene was the ID Unit, in addition to Detectives W.K. Smith and Krstolich. Detective W.K. Smith there interviewed two (2) witnesses, a Josephine Quinn of 3032 Hutchings and a Niko Quinn of 3018 Hutchings. Ms. Quinn stated that she heard three to four shots and her daughter went to the vehicle. She later went to the vehicle and noticed that the passenger, who is known to them, had been expired, suffering severe massive head injury.

Also, Detective Smith, in interviewing a Niko Quinn, Ms. Quinn indicated to him that she also heard approximately three shots and saw and could possibly identify the suspect.

Detective Krstolich located a witness by the name of Ruby Mitchell. He took a statement from

INVESTIGATIVE ADDEND. . .(
FILE #04154006081
PAGE #2

Ms. Mitchell. Ms. Mitchell reiterated basically the same narrative. The suspect walking through
the vacant lot, directly up to the vehicle and discharging several rounds and then going back through
the same means. Ms. Mitchell was brought into the Bureau. Detective Krstolich did an initial
composite drawing. Ms. Mitchell stated that she knew the suspect because she used to date his
cousin. She came up with a first name of "Lamonte". Detective Maskil also ascertained some
information that the suspect's name was "Lamonte". With the assistance of Victoria Meyers of the
District Attorney's Office, a picture was produced of a Lamonte McIntyre. A photo line-up was
comprised and was shown to Ms. Mitchell and Ms. Mitchell immediately identified the photo of
Lamonte McIntyre as being the perpetrator.

Also on the scene, it was mentioned that a John Quinn was on the scene and that he, thinking
that the victims were still alive, took a bottle and broke out the driver side windows in an attempt
to remove the victims, since somehow maybe the door was jammed in some manner. Mr. John
Quinn was not present on the scene while we were there.

Officers Bill Howard, Frank Clair and Lt. Stan Harrington conducted the evidence collection.
Underneath the drivers side of the car was one $10 bill and a one $1 bill. Also, there was some
plastic substance. There was also an unknown plastic item in the drivers side window of the car.
On the passenger's side of the car was one crack pipe and a lighter. The car was processed,
photographed and printed on the scene by the ID Unit.

Apparently the vehicle was initially next to a telephone pole facing northbound on Hutchings.
Slightly north of the residence of 3032 Hutchings, but on the east side of the street. After the shots
were fired, the car rolled back approximately 36.4 feet to it's termination point. The front wheels
were approximately 1.6 feet from the curb. The back wheels were approximately 1.7 feet to the
curb. The width of the street was 25 feet.

Having made a positive ID of the suspect, through Ms. Mitchell's assistance, Detectives
Golubski and Krstolich, with the assistance of Lt. Barber and uniform personnel, initially went to
2908 Parkwood, the last listed address of Lamonte McIntyre. Therein, Lt. Barber spoke with the
grandmother. She stated she would try to make contact with Rose McIntyre, the suspect's mother.
She stated that Rose McIntyre worked at FiFi's, a restaurant at approximately 5th and Parallel.
Officers then converged and did a parallel canvass of the area. Lt. Barber was requested to respond
to the restaurant to speak to the mother and grandmother. While there he stated that he was engaged
in a conversation with Ms. Rose McIntyre, who made unsolicited remarks about if a person was
mentioned as a suspect in a homicide, would they automatically be booked into the jail. Lt. Barber
stated that these were unsolicited remarks by the mother. Also, she stated to him that her son,
Lamonte, had worked from 11:00 to 2:45 with her at the restaurant.

After speaking to the mother, Lt. Barber observed the suspect in a van next to the restaurant.
The mother requested that he come out, at which point, Lt. Barber also stated that Lamonte
McIntyre made remarks that he had been with his brother all day long.

Lamonte McIntyre was taken into custody without incident. He was brought into the Bureau.
In the Bureau he was advised of his rights by Detective Golubski. This was witnessed by Detective
Krstolich and Officer Brown. Lamont stated that he would refuse to sign anything, but that he
would talk to us. This, once again I stressed this, after he was advised of his rights. He proceeded
to give us his date of birth of 7-28-76. He stated he lived at 1929 N. 6th St., KCK, 342-4147. He

Supvr. Initial _____                                                        PAGE   2

P0063
LMKSDC_0003453

INVESTIGATIVE ADDEND.
FILE #04154006081
PAGE #3

stated that throughout the day he had been with an aunt, Yolanda Johnson, at 1515 Wood, 321-3567. At this address he was with a cousin, Montray Johnson and his girlfriend, Tasha. He stated that at no time did he leave until his brother arrived at about 4:00. Then he still did not leave until he was contacted by his grandmother and mother and then was taken to the area of 5th and Parallel by his mother. He stated that while at the address of 1515 Wood, that neither Montray or Tasha left either. That later in the afternoon Tasha stated she heard several ambulances and knew (this was Lamonte's statement in his interview) that they were going toward the shooting involving Chris Quinn's brother. He also stated some unknown "dude" walked by and informed Tasha and Montray that Chris Quinn's brother had just been shot. Lamonte stated that he did not know the guy. He did not speak to him personally. After this Lamonte refused to give a formal statement. He was then taken and booked into the Juvenile Detention Center.

Later, the autopsy which was suppose to begin at 2100 hours, did not commence until almost 2230 hours. The pathologist stating that the official cause of death was multiple gunshot wounds to the victim. Any of which would have been fatal. Officer Stubler from the ID Unit was present and video-taped the autopsy. At that point, Detective Golubski returned to the Bureau and the investigation is still on-going at this time. At this point, this is the information up to this point.

END OF INVESTIGATIVE

321

Supvr. Initial

PAGE   3

P0064
LMKSDC_0003454

KA    S CITY KANSAS POLICE DEPARTMEN

** INVESTIGATIVE ADDENDUM / CLEARANCE **

April 16, 1994

FILE # 04154006081

OFFENSE          : Double Homicide
REPORT TYPE      : Investigative Addendum
INVESTIGATOR     : Detective Golubski
UNIT             : Crimes Against Persons
# OF ARREST      : One
CLEARED BY       : Arrest
STATUS           : Active
# OF PAGES       : 2
SUPERVISOR SIGNATURE :

VICTIM'S NAME : #1) Donald E. Ewing,          , 3038 N. 20th, KCK, 621-6903
               #2) Daniel Quinn, B/M          known address

SUSPECT(S): Lamonte McIntyre, B/M,      929 N. 6th, KCK, 342-4147

## NARRATIVE

On 4-16-94 Detective Golubski went to the area of 1515 Wood, in an attempt to
locate a suspect vehicle.    At this location there was a vehicle that was
described as being driven very often by Lamonte and James McIntyre.   The vehicle
that was described was located directly across from this residence, bearing Kansas
GIG007.  Numerous photos of the car were taken and were later shown to people in
the neighborhood canvas and to other witnesses.

From this location, Detective Golubski responded with Detective Dennis Ware to
3018 Hutchings, at this location we spoke to a Niko Quinn. Ms. Quinn was still
visibly traumatized by what had happened, in as both victims were cousins of hers.
She viewed a photo line up of five individuals, she repeatedly and for a prolonged
period of time, viewed photo number three, began shaking, became teary eyed, and
was very hesitant in making any statements.   I then asked her numerous times if
she was fearful of picking the individual, if she in fact thought there was some
type of difference in any of the photos; she would not let go of photo number
three.    After four or five minutes of this, I then took the pictures from her,
asked her very directly if this was the individual; she put her head down and
stated that she thought that this was the individual but was not sure at this time
positively.  But thought this might be him.  The subject Niko then appeared to be
even more traumatized and shaken and excused herself and we concluded that

31.

INVESTIGATIVE ADDENDUM
FILE # 04154006081
PAGE 2

interview and the photo session with her.

Previous to this we had spoken to her mother, Josephine Quinn, at 3032 Hutchings. Josephine stated she did not get a good look at the individual. She also viewed the five photos and cannot identify anyone. She stated it was her brother, John Quinn, who resides at 2743 Cleveland, that was the individual that broke the windows. She stated she had been in a verbal confrontation with him prior to the shooting and that her brother had driven around the block at the time of the shooting, heard the shots, and returned, and it was he that had broken the windows out of the victim's Cadillac.

Detective Ware and Golubski went to 2743 Cleveland, left a business card for Mr. Quinn to call us. This is the third card we left with relatives for him to contact us and he has not done such. Also, Josephine stated as per Detective W.K. Smith's statement with her that was not identified by Detective Smith through that statement by Josephine, that there was another daughter by the name of Stacy who stated she knew who the suspect was but on this particular date of the photo line up, Stacy was not available. Josephine was cooperative and stated that she would make ever effort to contact her daughter and have her get in contact with us.

Finally Detective Ware and Golubski recanvassed the 3000 block of Hiawatha. In the Officer's report there was a Breon Shelton of 3025 Hiawatha, who stated she observed the suspect vehicle. In speaking to Breon's mother, she stated we had just missed her and she was at a Beauty Salon at 18th and Washington. We proceeded to this location, located her in the beauty shop. Breon was extremely cooperative. She viewed the photos of the car taken at 1515 Wood, she stated that this was the wrong vehicle. She stated it was definitely a blue Chevy Caprice Classic, 4-door, with dark tinted windows, with Kansas tags. She said the photo of the car that we were showing her was the same color as the suspect vehicle. She also stated that the car that she saw was plain and did not have Daytons and had not been seen by herself in the area previous to this. Also one other note of interest is that Breon also viewed the photos of the five individuals, and she stated that she cannot identify the suspects that got into the car. She also reiterated that it was the one suspect that remained in the car, the other suspect did the shooting and appeared to have a shot gun with him, and got into the car, and they sped off from the scene. She cannot once again identify any of the photos.

At this time there still remains the possibility that John Quinn and Stacy Quinn can identify the perpetrators photo. Also, it is very obvious that Niko Quinn knows exactly who the shooter is, but being highly traumatized at this time is reluctant to provide that information. At this point the investigation is continuing, there is one subject in custody. One other note is to a previous investigative, the Pathologist name for the autopsy of Donald Ewing that I attended was Eric Mitchell.

                    END OF REPORT/424

Supvr. Initial

                                          PAGE    2

KA...S CITY KANSAS POLICE DEPARTMEN.

** INVESTIGATIVE ADDENDUM / CLEARANCE **

April 16, 1994

FILE # 04154006081

```
OFFENSE       : Double Homicide
REPORT TYPE   : Clearance
INVESTIGATOR  : Detective Golubski
UNIT          : Crimes Against Persons
# OF ARREST   : One
CLEARED BY    : Arrest
STATUS        : Active
# OF PAGES    : 1
SUPERVISOR SIGNATURE :
```

VICTIM'S NAME : #1) Donald E. Ewin        , 3038 N. 20th, KCK, 621-6903
             #2) Daniel Quinn,        nknown address

SUSPECT(S): Lamonte McIntyre, B/M,      1929 N. 6th, KCK, 342-4147

### NARRATIVE

This case is cleared with the arrest of,

LAMONTE MCINTYRE, B/M,      .

with all facts and details pertaining to this file being sent to the District
Attorney's Office, Juvenile Court, for review and final disposition.

END OF REPORT

424

*32*

P0067
LMKSDC_0003457

KANSAS CITY, KANSAS POLICE DEPARTMENT
BUREAU OF INVESTIGATIONS

ADDITIONAL INFORMATION
PROSECUTION REPORT

SUSPECTS:  McIntyre, Lamonte

FILE NO:  **Homicide File #04154006081**

DATE PAPERS SENT TO DISTRICT ATTORNEY:  **April 19, 1994**

1.  Full head diagram
    (Daniel Quinn)       1 page    4-16-94    Detective Shomin

2.  Full body diagram
    (Daniel Quinn)       1 page    4-16-94    Detective Shomin

END OF REPORT

424



Head, surface and skeletal anatomy, anterior and posterior views.

1 of 2

Name Daniel Quinn                    Autopsy No. 0415400 6081

Age 21     Race Black    Sex Male      Date 4/16/94
    10-12-72

MASSIVE
FACIAL
TRAUMA
FROM
Shotgun
BLASTS

Cat. No. 44-1-014-00



Full body, male, anterior and posterior views (ventral and dorsal).

2603

Name Daniel Quinn                           Autopsy No. 0415 4006081

Age 21   Race Black   Sex Male            Date 04/16/94
10-12-72

Shotgun
Blast
thru Then          Entry

Ent

Cat. No. 44-1-006-00

KANSAS CITY, KANSAS POLICE DEPARTMENT
BUREAU OF INVESTIGATIONS

ADDITIONAL INFORMATION
PROSECUTION REPORT

SUSPECTS:        McIntyre, Lamonte

FILE NO:        Homicide - File # 04154006081

DATE PAPERS SENT TO DISTRICT ATTORNEY:        April 21, 1994

| | | | | |
|---|---|---|---|---|
| 1. | Witness Statement (John Quinn) | 4-19-94 | 6 pages | Detective Golubski |
| 2. | Witness Statement (Yolanda Johnson) | 4-20-94 | 8 pages | Detective Golubski |
| 3. | Juvenile Witness Statement | 4-20-94 | 10 pages | Detective Golubski |
| 4. | Witness Statement (M'Sherie Johnson) | 4-20-94 | 7 pages | Detective Golubski |

END OF REPORT

424

P0071
LMKSDC_0003461

KANSAS CITY KANSAS POLICE DEPARTMENT                           FILE # 04154006081
BUREAU OF INVESTIGATIONS
DATE: 4-19-94
TIME: 1407 Hours


## WITNESS STATEMENT

I, **John Quinn**, make the following statement to **Detective Golubski**, whom I know to
be Detective with the Police Department of Kansas City, Kansas, concerning a
matter I understand is the subject of an official investigation.


Q:   What is your full name?

A:   John Quinn.

Q:   When and where were you born?

A:   I was born here in Kansas, ▮▮▮ ▮.

Q:   Where do you live and what is your telephone number?

A:   I live at 2714 Cleveland, the telephone number is 321-5316.

Q:   With whom do you live?

A:   Well I stay with my mom.

Q:   Where are you employed and how long have you worked there?

A:   I'm self employed.

Q:   What relationship is Donald Ewing and Doniel Quinn to you?

A:   Donald my cousin, Doniel Quinn is my son.

Q:   And calling your attention to this past Friday, at about 2:30 or 3 in the
     afternoon, did you have an occasion to be there in the 3000 block of
     Hutchings?

A:   Yes I was.

Q:   Is Josephine your sister?

A:   Yes.

Q:   Were you, your other brother Robert, over there talking to her?



WITNESS STATEMENT OF JOHN QUINN
FILE # 04154006081
PAGE 2

A: Yeah, right.

Q: And was there a little disagreement between Robert and Josephine?

A: Well they was just arguing, it really wasn't about nothing. That's what they do you know all the time, off and on, thing of it was it distracted me and I should of seen what happened.

Q: Now you saw your son and your cousin in a vehicle, right?

A: Yes, but wasn't aware of it. I mean then yeah at the time, that before it happened, yeah I was aware they was there.

Q: What kind of car were they in?

A: About a 92 or 93 Fleetwood, powder blue.

Q: And whose car was that, do you know?

A: Well Donny Ewing's as far as I know.

Q: Now were you sitting in the car about this time about three houses down from them?

A: Yes, about three houses down, right behind them, directly....

Q: Now during the time you were there did either of them indicate to you that there was a problem?

A: No they didn't.

Q: Did your son tell you why he was there?

A: I never talked to him. He sit in the car and really I never was aware it was him until we passed him ____.

Q: So he never had a conversation?

A: Nor or Donny.

Q: Were they there before you got there?

A: Yeah, they was sitting there when we pulled up.

Q: But did he ever get out and talk to anybody else, either of them?

A: No.

Q: They look like they were waiting for somebody?

P0073
LMKSDC_0003463

WITNESS STATEMENT OF JOHN QUINN
FILE # 04154006081
PAGE 3

**A:** Not, no because you know i'm usually...

**Q:** Either of them have a pager on?

**A:** No.

**Q:** Would it seem to be out of place for them to be waiting there or sitting there?

**A:** No, because he usually comes through and you know when I usually see them, you know he might be sitting somewhere you know just talking.

**Q:** Had you talked to your son at all that day?

**A:** No.

**Q:** Now so your in a vehicle three houses down behind your son, correct?

**A:** Right.

**Q:** And what kind of car were you in?

**A:** I was in a Ford Tempo, about 73 -74, dark blue.

**Q:** Now it was you, your brother, and another man in this car right and you pull down the street?

**A:** We drove right around them.

**Q:** You barely made the corner when what did you hear?

**A:** A gun shot.

**Q:** How many?

**A:** One was enough for me to react, because I knew my son was sitting there.

**Q:** But how many shots did you hear?

**A:** Six all together.

**Q:** After you heard the shots what happened?

**A:** After I heard the first shot I was trying to get the driver to react, he never reacted until after six shots were shot off.

**Q:** Then what occurred?

WITNESS STATEMENT OF JOHN QUINN
FILE # 04154006081
PAGE 4

A:  We went back finally, passed the vehicle they was in, because I visioned my
    niece standing in her yard right where we just, the location where we just
    had pulled off from.  Not aware that they was in the car and something had
    happened like that.  So she told me, I jumped out, finally got out of the
    car, and walked to the car.  I couldn't get in so I had reached down and
    picked up a wine bottle, and knocked the window out.

Q:  Now why is it that you couldn't get in the car?

A:  Power locks.  Then I broke the first window and wasn't aware of where the
    hand lock was or the automatic lock button, and then after that I just broke
    the back window out.

Q:  Now on the passenger or driver's side?

A:  On the driver's side, I never went to the passenger side.

Q:  Then what happened?

A:  Well I just seen my son and them in there.

Q:  Now did anyone get in that car?

A:  No. Nobody got in it.

Q:  So no one got in the car or took anything out?

A:  No, I was the first one that was there.  I was the first one that knocked
    the window out, then I didn't even get in the car.

Q:  And then someone called the police and the police arrived?

A:  Right.

Q:  And you had left before the police got there right?

A:  Ah.. let me see.  No, I was there when the police got there.  I left during
    the time they got there and started taping it off.  They had taped it off
    and requested everybody to get back and get out of the tape vicinity.

Q:  Mr. Quinn did your son indicate that he was having a problem with anybody,
    that anybody wanted to do him or Donald Ewing any harm?

A:  No, but I sensed that something wasn't right weeks and weeks ago.

Q:  And why is that?

A:  Because the way he was acting and the individuals he associated with.

Q:  Was he ever specific with you that there was a problem with anybody?

P0075
LMKSDC_0003465

WITNESS STATEMENT OF JOHN QUINN
FILE # 04154D06081
PAGE 5

A:  No, he didn't act like it was no problem. My thing was the individuals that
    he was associated with was the wrong type of individuals for him to be
    around.

Q:  And without trying to be malicious or slandering your sons character, what
    type of people was he hanging around with?

A:  The worst kind.

Q:  And which is in your opinion what?

A:  A cobra snake with any kind of bite would be instant death.

Q:  So are you talking about drug dealers?

A:  Well _____ yeah, I don't know what the do, but I knew something was about
    the individuals that had.....

Q:  Do you know any of these individuals by names that he was dealing with?

A:  No I don't, because they youngsters.

Q:  When you say youngsters, how young is young?

A:  Well I would say about his age.

Q:  Which is?

A:  21.

Q:  And your positive no one else got in that car?

A:  Until no one before the police _____.

Q:  And your the one that broke out the windows?

A:  That's right.  I never got in it.

Q:  Is there anything else you can think of Mr. Quinn you'd like to add to this
    statement?

A:  No.

END OF STATEMENT

P0076
LMKSDC_0003466

WRITTEN STATEMENT OF JOHN QUINN
FILE # 0012-000000
PAGE 6

I HAVE READ THE ABOVE STATEMENT CONSISTING OF ( 6) PAGES AND SIGN IT AS BEING
TRUE AND CORRECT TO THE BEST OF MY KNOWLEDGE.

WITNESS:_____     SIGNED:_____

_____

DATE & TIME:_____

424

P0077
LMKSDC_0003467

KANSAS CITY KANSAS POLICE DEPARTMENT      **FILE #** 04154006081
BUREAU OF INVESTIGATIONS
DATE: 4-20-94
TIME: 0950 HRS.

## WITNESS STATEMENT

I, **YOLANDA JOHNSON**, make the following statement to DET. ROGER GOLUBSKI, #1376, whom I know to be Detective with the Police Department of Kansas City, Kansas, concerning a matter I understand is the subject of an official investigation.

Q: What is your full name?

A: Yolanda Elaine Johnson.

Q: When and where were you born?

A: Kansas City, Kansas.

Q: Where do you live and what is your telephone number?

A: 1515 Wood, 321-3567.

Q: With whom do you live?

A: Myself, Rashita Johnson, M'Sherie Johnson, Montray Johnson.

Q: Where are you employed and how long have you worked there?

A: I'm not employed at the time.

Q: What relationship is Lamonte McIntyre to you?

A: He's my nephew.

Q: So you and his mother are sisters?

A: Well, I'm married to his uncle.

Q: Who is?

A: Donald Johnson.

Q: Calling your attention to April 14, 1994, a Friday, 15th, I'm sorry, I'd like for you to tell me who was at your house prior to 2:15 that day?

A: It was Lamonte McIntyre, Rashita Johnson.

WITNESS STATEMENT OF YOLANDA JOHNSON
FILE #04154006031
PAGE #2

Q:   No, before 2:15.

A:   Oh, before 2:15, okay it was Sherie Johnson, Montray Johnson, Rashita Johnson, Tasha Haygood.

Q:   And what time did Lamonte McIntyre get to your house?

A:   2:15.

Q:   And that's in the afternoon?

A:   Yes.

Q:   And when he arrived at your house, what was he wearing?

A:   He was wearing a black faded out shirt, a blue "Michigan" hat and bronze colored pants, gold colored pants.

Q:   Did he tell you where he had been prior to this?

A:   He was over to his auntie's house.

Q:   And her name and address?

A:   Peggy Williams, 1510 Walker.

Q:   Now had you seen him over there before he came to your house?

A:   No, I hadn't seen him over there before he came to my house.

Q:   So you base this on the fact that he had told you he had been there, right?

A:   He come from over there.  He's over there all the time, yes.

Q:   Well you didn't see him over there that day though, right?

A:   No I didn't see him over there.

Q:   Now how did he get to your house?

A:   He walked.  It's just a hop, skip and jump.

Q:   Now when he got to your house at 2:15, he had told you he had been at Ms. Williams' house, right?

A:   Yes.

Q:   And did he ask to, what did he ask to do when he got to your house?

A:   Could he use the phone.

P0079
LMKSDC_0003469

WITNESS STATEMENT OF YOLANDA JOHNSON
FILE #04154006081
PAGE #3

Q:   Do you know he called?

A:   United Cab.

Q:   And do you know for what purpose?

A:   For his cousin, Michael.

Q:   And do you know Michael's last name?

A:   No I don't.

Q:   Was Michael with him?

A:   No he wasn't.  He was by himself.

Q:   How come Michael didn't use the phone himself and Lamonte was using it?

A:   Well cause Michael _____ .

Q:   And you never saw Michael?

A:   No.

Q:   So then after he used the phone the first time, what did Lamonte do?

A:   The first time he went and go back over there and came back to use the phone again to call the cab again, United Cab.

Q:   When he called the cab the second time did he cancel the cab?

A:   No.

Q:   Why would he call them so quickly?

A:   Well I don't know, you know.  He just asked could he use the phone again the second time and that was it.  And after that he stayed at the house the whole time until his . . .

Q:   You're saying after approximately 2:20 in the afternoon that he never left your house again until when his mother came?

A:   Right.

Q:   Now after he was at your house, did he ever leave the house?

A:   No he didn't.

Q:   Ever go out in the front yard?

A:   No.

WITNESS STATEMENT OF YOLANDA JOHNSON
FILE #04154006081
PAGE #4

Q: Matter of fact, any of the other kids that were at the house, did they go outside when Lamonte was there?

A: Montray went out to smoke a cigarette.

Q: And when he was outside, do you know if he had conversation with anybody?

A: No he didn't.

Q: Anytime that afternoon, prior to say 5:00 or 6:00 PM, did anyone tell you that there had been a double shooting up on Hutchings?

A: Before 5:00 and 6:00?

Q: Anytime that afternoon?

A: Well, somebody had, they had mentioned it, you know, but uh, when his mother came over, you know. She said that he needed to go down and talk to someone. And he just went on.

Q: So when Rose came over, we're talking about Rose, correct?

A: Rose, uh huh (yes).

Q: When she came over, she said that Lamonte needed to talk to the police about a shooting?

A: She just said Lamonte needed to talk to the police, you know.

Q: So there was no conversation about why the police wanted to talk to him, or in fact, there was no mention of a double homicide, is that correct?

A: Not that I can think of, yeah. I don't remember.

Q: Did you see Lamonte with a gun that day?

A: Huh uh, no.

Q: Have you ever seen him with a gun?

A: I've never seen him with a gun.

Q: Do you know if he associates with any gang members?

A: No he doesn't.

Q: Is he in a gang?

A: No he's not.

Q: Do you know if he sells drugs?

P0081

LMKSDC_0003471

WITNESS STATEMENT OF YOLANDA JOHNSON
FILE #04154006081
PAGE #5

A:  He doesn't.

Q:  Wasn't there in fact, several people that were arrested at your house not long ago for selling drugs?

A:  For selling drugs, like who?

Q:  Well, was there anyone at your house that were arrested . . .

A:  I was at church at the time, so I'm just trying to . . .

Q:  Well are you aware of any people being at your house for selling drugs here?

A:  No.

Q:  So if anybody by the name of Tony Gordon or Felicia came in and stated they was at your house on that date, that would be incorrect then?

A:  Say that again.

Q:  If any of these people I just mentioned came in and told me they were at your house on the 15th of April, that would be incorrect?

A:  They wasn't in my house, huh uh.

Q:  Well you just told me there was no one outside?

A:  Montray was out there smoking a cigarette.

Q:  Right. And other than him, you didn't see anyone, right?

A:  That's it.

Q:  Okay. Now James is Lamonte's brother, right?

A:  Uh huh, yes.

Q:  Did you see him that day, that afternoon?

A:  I'm trying to think. Yes, I think he had come over to the house.

Q:  Are you positive of that?

A:  I'm trying to think now. Yes he did come over to the house.

Q:  What time was that?

A:  I don't know what time it was. It was right after he got off from work.

Q:  Was Lamonte still there?

P0082
LMKSDC_0003472

WITNESS STATEMENT OF YOLANDA JOHNSON
FILE #04154006081
PAGE #6

A:   Whatever time, I can't remember the time that his mother came over to come get him to take him down there, whatever that time was, that's the time he was there and after that he left.

Q:   So he hadn't been there long at all before his mother got there?

A:   Like I say, from there to 2:15, from the time his mother . . .

Q:   No, I'm talking about James.

A:   Oh, James, he come right after work.

Q:   Which is what time?

A:   4:00.

Q:   Okay.  Did he come in a vehicle?

A:   I don't know.

Q:   So you don't know how he got there?

A:   James?

Q:   Yeah.

A:   No.

Q:   Does he have a car?

A:   Not that I know of.

Q:   Where does he work at?

A:   He works down here at the Re-hab place on 17th Street, 17th and, right behind that school. I guess it's Grant.

Q:   Which is only a couple blocks from where the double homicide took place then, right?

A:   Yeah, I guess so.

Q:   Have you ever seen Lamonte or anyone else at your house, talking about younger kids here, that would drive a blue vehicle?

A:   Huh uh (no).

Q:   I'm sorry, what's your answer?

A:   No, I've never seen anybody with a blue vehicle.

Q:   Do you know a young man by the last name of "Holmes"?

WITNESS STATEMENT OF YOLANDA JOHNSON
FILE #04154006081
PAGE #7

A:  Who is that?  I don't know him.

Q:  Has a first name of B-E-H-Y-J-R-U-M-S?

A:  Huh uh, I don't know him.

Q:  Try to talk up for me.

A:  No.

Q:  So you've never seen this individual at your house?

A:  No.

Q:  You've never seen a blue vehicle with a brown/beige top in front of your house?

A:  A blue vehicle?

Q:  Has daytons on it.  It has a sun-roof?

A:  Not in front of my house.

Q:  So Lamonte gets off work at 4:00?

A:  James.

Q:  I'm sorry, James.

A:  Uh huh (yes), it's about, yeah 4:00.

Q:  So if he doesn't have car, he would have had to walk from 17th and Quindaro to 15th and Wood, which would take about how long to walk, do you think?

A:  From 17th to 15th and Wood, I don't know.  I couldn't tell you.

Q:  How about at least a half hour?

A:  I don't know.  I know a lot of times, I take this back, I know a lot of times he'll call his mother to come pick him up, okay, so . . .

Q:  What type of car does she have?

A:  She has a blue van.

Q:  A van?

A:  Uh huh, yes.

Q:  Do you know if Lamonte had ever mentioned the names Donald Ewing or Doniel Quinn?

P0084
LMKSDC_0003474

WITNESS STATEMENT OF YOLANDA JOHNSON
FILE #04154006081
PAGE #8

A:   No he hasn't.

Q:   Can you say if he knows these people though?

A:   I don't think he knows the people.

Q:   But you don't have any personal knowledge if he does or doesn't then, right?

A:   Huh uh (no).

Q:   Ms. Johnson, is there anything else that you can think of you'd like to add to this statement?

A:   Lamonte didn't do it.  He's innocent.

TIME OF STATEMENT
TIME: 1005 HOURS

I HAVE READ THE ABOVE STATEMENT CONSISTING OF EIGHT (8) PAGES AND
SIGN IT AS BEING TRUE AND CORRECT TO THE BEST OF MY KNOWLEDGE.

SIGNED:_____WITNESSED:_____


DATE & TIME:_____


321

KANSAS CITY KANSAS POLICE DEPARTMENT
BUREAU OF INVESTIGATIONS
DATE: 4-20-94
TIME: 1030 HRS.

FILE # 04154006081

### JUVENILE WITNESS STATEMENT

I, **NATASHA HAYGOOD**, make the following statement to DET. ROGER GOLUBSKI, #1376, whom I know to be Detective with the Police Department of Kansas City, Kansas, concerning a matter I understand is the subject of an official investigation.

Q:    What is your full name?

A:    Natasha DeLynn Haygood.

Q:    That's H-A-Y-G-O-O-D?

A:    Yes.

Q:    When and where were you born?

A:    Des Moines, Iowa, ▓▓▓▓

Q:    Where do you live and what is your telephone number in Des Moines?

A:    724 26th St., 277-4801, area code is 515.

Q:    And that is in Des Moines?

A:    Yes.

Q:    Who are you staying with down here right now?

A:    Yolanda Johnson.

Q:    At?

A:    1515 Wood.

Q:    With whom do you live?

A:

Q:    Where do you go to school and what grade are you in there?

A:    I'm in the 9th grade. I go to school at DeMack.

P0086
LMKSDC_0003476

JUV. WITNESS STATEMENT OF NATASHA HAYGOOD
FILE #04154006081
PAGE #2

Q:  Where are you employed and how long have you worked there?

A:  I'm not employed.

Q:  What relationship is Montray Johnson to you?

A:  My boyfriend.

Q:  How long have you been in Kansas City, Kansas?

A:  Two weeks.

Q:  And during that time you've been with Ms. Johnson at 1515 Wood?

A:  Yes.

Q:  Do you know Lamonte McIntyre?

A:  Yes I do.

Q:  What relationship is he to Montray?

A:  Cousins.

Q:  Drawing your attention to April 15, 1994, a Friday, were you at Ms. Johnson's house that day?

A:  Yes.

Q:  Did you ever leave?

A:  No.

Q:  Who else was at the house that morning?

A:  M'Sherie Johnson, Rashita Johnson, Yolanda Johnson and Montray Johnson.

Q:  What time did Lamonte get to the house?

A:  I'd say about 2:00, 2:15.

Q:  Where did he come from, do you know?

A:  His uncle's.

Q:  Whose his uncle?

A:  I don't, I don't know his name.

Q:  How do you know he came from his uncle's house?

JUV. WITNESS STATEMENT OF NATASHA HAYGOOD
FILE #04154006081
PAGE #3

A:   Cause he had been spent the night over there.

Q:   How do you know that?

A:   How do I know this?

Q:   Yeah.

A:   Cause he did stay all night over there.

Q:   Well how do you know that, were you there at his uncle's house to see him?

A:   No I wasn't.

Q:   So how do you know that?

A:   Cause he had went around there.

Q:   So you saw him over there?

A:   No, I did not see him over there.

Q:   Well how do you know he spent the night there

A:   Because he spent the night with the girl that lives there.

Q:   And I'm asking you how do you know that? Did you see him there?

A:   No.

Q:   Okay, so you can't say for a fact you know he spent the night there, right?

A:   No.

Q:   Did he tell you he spent the night there?

A:   Yes.

Q:   So you base this information on what Lamonte McIntyre told you then?

A:   Yes.

Q:   So you weren't at the uncle's house, you didn't spend the night there and you weren't there that morning to see him there, correct?

A:   Correct.

Q:   So about 2:15 he came over to Ms. Johnson's house, and what did he say or do when he came over?

P0088
LMKSDC_0003478

JUV. WITNESS STATEMENT OF NATASHA HAYGOOD
FILE #04154006081
PAGE #4

A:   He came to call a cab.

Q:   For who?

A:   His uncle.

Q:   You don't know his uncle's name?

A:   No I don't.

Q:   How come his uncle didn't come over and use the phone?

A:   I don't know.

Q:   And you don't know his uncle's name?

A:   No I don't.

Q:   You're sure it was uncle or did he ask to use if for a friend by the name of Michael?

A:   I don't know.  I know that he came over there and called a cab.

Q:   Do you know which cab company?

A:   No I don't.

Q:   After he called the cab, what did he do?

A:   Went over back to his uncle's.

Q:   How long did he stay there?

A:   For about 10 minutes.

Q:   And he came back by himself?

A:   Yes.

Q:   What did he do when he came back?

A:   Called another cab.

Q:   Do you know why he called a cab when he just called a cab?

A:   No I don't.

Q:   After he called a cab again, what did he do?

A:   Came back over to Ms. Johnson's.

P0089
LMKSDC_0003479

JUV. WITNESS STATEMENT OF NATASHA HAYGOOD
FILE #04154006081
PAGE #5

Q: Did he ever leave after that?

A: No he didn't.

Q: So he stayed there the whole time?

A: Yes he did.

Q: Do you remember how he was dressed?

A: Yes I do.

Q: How was that?

A: He had on a blue, yellow and white Michigan hat, a black faded t-shirt with some brown rusted color jeans.

Q: Why is it that you can remember how he was dressed a week ago so well?

A: Because he had it on for so long. Cause Montray's little sister had been talking about him not changing his clothes.

Q: Now before going on tape, you told me that in fact Lamonte did leave with his brother, after his brother got there. So did he leave with his brother or did he stay?

A: Yeah, that was after his brother had got off work.

Q: And his brother is who?

A: James McIntyre.

Q: What time did James get to the house, approximately?

A: 3:30.

Q: How did he get to the Johnson residence?

A: Got dropped off.

Q: Do you know why he came to the Johnson residence?

A: No, but he comes there every day.

Q: Can you tell me the person that dropped him off and the type of vehicle he got dropped off in?

A: No I don't.

Q: Now also before going on tape, you told me that Lamonte was at the house during the morning. Is this incorrect now?

P0090
LMKSDC_0003480

JUV. WITNESS STATEMENT OF NATASHA HAYGOOD
FILE #04154006081
PAGE #6

A: That I told you what?

Q: That Lamonte was at the house there in the morning.

A: Yeah, he was there early that morning.

Q: So he just dropped in and left?

A: He had been around the corner, yeah.

Q: So now you're saying that he was in the house before 2:15?

A: He was in the house before 2:15? You mean had he came over there earlier?

Q: Yeah.

A: Yeah.

Q: How long did he stay?

A: About 10, 15 minutes. Matter of fact I think we bummed a cigarette off of him.

Q: But you don't know what time that was he came over?

A: No.

Q: He came over with someone else?

A: No, he was by himself.

Q: When James got there, him and Lamonte left and went somewhere for a brief of period of time?

A: Around to his uncle's yes.

Q: Did you see him go in his uncle's house, either of them?

A: No I didn't. I seen him going . . .

Q: Did they tell you they were going to his uncle's house?

A: Yes they did.

Q: So they walked, all you know is they walked toward the direction of their uncle's house?

A: Yeah.

Q: No one picked them up?

A: No.

JUV. WITNESS STATEMENT OF NATASHA HAYGOOD
FILE #04154006081
PAGE #7

**Q:** Now after James got there, some unknown subject walked down the street and had a conversation with who?

**A:** Montray and James.

**Q:** Who all was out there at the time of this conversation?

**A:** Me, Montray, James and Lamonte.

**Q:** What did this person say?

**A:** He asked them did they hear about the shooting. And I don't know what else he said.

**Q:** Did he say which shooting?

**A:** No he didn't.

**Q:** And you don't know this person's name?

**A:** Huh uh (no).

**Q:** And did it appear that Montray knew him real well?

**A:** Yeah.

**Q:** Okay, Montray is your boyfriend and you know most of his friends?

**A:** Yeah.

**Q:** But you didn't know this person?

**A:** No.

**Q:** And he just walked down the street and asked about a shooting?

**A:** Yeah.

**Q:** And you didn't find that strange?

**A:** No.

**Q:** Did you hear some shots that afternoon?

**A:** No I didn't.

**Q:** After that, Lamonte didn't leave at all until his mother came and picked him up?

**A:** Right.

**Q:** Have you ever seen Lamonte with a gun?

P0092
LMKSDC_0003482

JUV. WITNESS STATEMENT OF NATASHA HAYGOOD
FILE #04154006081
PAGE #8

A:  No.

Q:  Ever seen James with a gun?

A:  No.

Q:  Do you know if they associate with any gang members?

A:  No.

Q:  You don't know or . . .

A:  I doubt it, no.

Q:  And you ever seen them with anyone that sells narcotics?

A:  No.

Q:  You ever hear them mention the name Donald Ewing or Doniel Quinn?

A:  No.

Q:  Did Lamonte state he's having a problem with anyone recently?

A:  No.

Q:  Did he ever change clothes when he's was at Ms. Johnson's house?

A:  No.

Q:  Did he have the same clothes on when he came over in the morning as he did in the afternoon?

A:  Yes. He still gots the same clothes on.

Q:  Now the girl that you said he was seeing as his aunt or uncle's house, what's her name?

A:  I don't know. It's his uncle's wife's daughter.

Q:  So what you're telling me is he's having a relationship with a relative?

A:  Yeah, they're not blood. That's what she makes it seem like anyway.

Q:  Did anyone else come or go to the house that day, do you recall?

A:  No.

Q:  Have you ever seen anyone at that house in a blue Chevy?

A:  No.

P0093
LMKSDC_0003483

JUV. WITNESS STATEMENT OF NATASHA HAYGOOD
FILE #04154006081
PAGE #9

**Q:** Do you know an individual with the name of B-E-H-Y-J-R-U-M-S Holmes?

**A:** No. I don't know him. I have seen him.

**Q:** Okay, have you seen him at Ms. Johnson's house before?

**A:** No.

**Q:** You haven't?

**A:** No.

**Q:** Were you at Ms. Johnson's house on April the 16th, Saturday?

**A:** Yes.

**Q:** And you did not see Mr. Holmes over there that day?

**A:** No. He wasn't over at Ms. Johnson's.

**Q:** Do you know what type of car this man drives?

**A:** No I don't.

**Q:** You've never seen him a blue vehicle?

**A:** No.

**Q:** Where have you seen him at then?

**A:** I've seen him, I've seen that car over in front of Ms. Johnson's.

**Q:** What car?

**A:** That car, that blue car.

**Q:** So now in fact there was a blue car in front of Ms. Johnson's house, right?

**A:** Yeah.

**Q:** You just said you didn't see a blue car there.

**A:** You said a blue "Chevy".

**Q:** What kind of car is it then?

**A:** I don't know. It's blue and I know it's got some roadsters on it, some rims.

**Q:** And do you know who he's there to see or who he's friends with?

P0094
LMKSDC_0003484

JUV, WITNESS STATEMENT OF NATASHA HAYGOOD
FILE #04154006081
PAGE #10

A:  No I don't.

Q:  Is there anything else you can think of you'd like to add to this statement?

A:  No.

Q:  One other question Miss Haygood, if a person by the name of Tony Gordon or Felicia came in and say there were at the house that day, would that be a lie?

A:  No.

Q:  It wouldn't be a lie?

A:  No.

Q:  Well when were they at the house then?

A:  See they don't, they wasn't at the house, they live across the street. They was across the street. They know that Lamonte was there at the time that this shooting happened, they know that.

Q:  How do they know that?

A:  Because they seen him over there.

Q:  They came over and talked to him?

A:  No they didn't come over there and talk to him but they . . . .

Q:  Are these relatives or friends?

A:  Yeah, they friends.

Q:  Is there anything else you can think of you'd like to add to this statement?

A:  No.


### END OF STATEMENT


I HAVE READ THE ABOVE STATEMENT CONSISTING OF TEN (10) PAGES AND
SIGN IT AS BEING TRUE AND CORRECT TO THE BEST OF MY KNOWLEDGE.

SIGNED:_____WITNESSED:_____

DATE & TIME:_____
321

P0095
LMKSDC_0003485

**KANSAS CITY KANSAS POLICE DEPARTMENT**
**BUREAU OF INVESTIGATIONS**
**DATE:** 4-20-94
**TIME:** 1050 HRS.

FILE # 04154006081

## WITNESS STATEMENT

I, M'SHERIE JOHNSON, make the following statement to DET. ROGER GOLUBSKI, #1376, whom I know to be Detective with the Police Department of Kansas City, Kansas, concerning a matter I understand is the subject of an official investigation.

Q:  What is your full name?

A:  M'Sherie Moore Johnson.

Q:  When and where were you born?

A:  Born in Kansas City, Kansas, ▮▮▮▮

Q:  Spell your first name, please.

A:  M-'S-H-E-R-I-E.

Q:  Where do you live and what is your telephone number?

A:  I live at 1515 Wood and my phone number is 321-3567.

Q:  With whom do you live?

A:  My mother.

Q:  Where are you employed and how long have you worked there?

A:  I don't work.

Q:  And what relationship is Lamonte McIntyre to you?

A:  He's my first cousin.

Q:  Drawing your attention to April 15, 1994, on Friday, I'd like for you to tell me who was at your mother's house that morning?

A:  Myself, my mother, my sister Rashita, my brother's girlfriend Tasha and my brother.

Q:  And your brother's name?

A:  Monte.

( 4 )

WITNESS STATEMENT OF M'SHERIE MOORE JOHNSON
FILE #04154006081
PAGE #2

**Q:** And did Lamonte ever come over to your mother's house that morning?

**A:** Not that morning.

**Q:** When was the first time you saw Lamonte that day?

**A:** About 12:00.

**Q:** Where at?

**A:** Over on the next block. He was at this lady name Peggy's house.

**Q:** What was he doing?

**A:** Watching TV.

**Q:** With whom?

**A:** This girl named Felicia.

**Q:** And you don't know Felicia's last name?

**A:** No.

**Q:** That suppose to be his girlfriend?

**A:** Not that I know of.

**Q:** And you stayed there how long?

**A:** About three minutes.

**Q:** When was the next time you saw Lamonte?

**A:** He came over to the house about 2:00 or 2:10 to use the telephone.

**Q:** And what was he using the phone for?

**A:** He was calling a cab for somebody at Peggy's house.

**Q:** You don't know who?

**A:** No.

**Q:** Did he tell you it was for his uncle or his cousin?

**A:** He said some dude named Mike. Some dude he was calling a cab for named Mike.

**Q:** Do you know who Mike is?

P0097
LMKSDC_0003487

WITNESS STATEMENT OF M'SHERIE MOORE JOHNSON
FILE #04154006081
PAGE #3

A:   No, I don't know Mike.

Q:   And Lamonte was by himself?

A:   Yes.

Q:   So he used the phone, left and came back about 20 minutes later and used the phone again?

A:   He came back about five minutes later and used the phone again.

Q:   Called the cab again?

A:   Yeah, called another cab.

Q:   And did he leave after that?

A:   He went over there, he went back over there and told them that the cab was coming again.
     After he went back over there he came back and he stayed.

Q:   Did he ever leave then?

A:   No.

Q:   Now at this time it's 2:30 in the afternoon when he's over there, whose at the house,
     everyone that was there that morning?

A:   Yes.

Q:   Anybody else?

A:   James. James was over there about, around that time.

Q:   When you state James, who is James?

A:   James is Lamonte's brother.

Q:   James McIntyre?

A:   Yes.

Q:   So James is at the house about 2:30?

A:   Yes.

Q:   But normally he doesn't get off until about 3:00 or 3:30?

A:   Yes.

Q:   So he was there early that day?

WITNESS STATEMENT OF M'SHERIE MOORE JOHNSON
FILE #04154006081
PAGE #4

A:   Yes.

Q:   And do you know how he got to your mother's house?

A:   No, cause I was inside.

Q:   How was James dressed that day?

A:   I can't remember what James had on.

Q:   What did you have on?

A:   I can't remember. I don't know. What did I have on Friday. I don't know. I think some red shorts.

Q:   What did Lamonte have on?

A:   Same thing. He had some goldish/bronze, I think it was bronze colored jeans. Had a blue, white and yellow hat on. It was a "Michigan" hat. And he had black and gray shoes on and a black shirt.

Q:   Was there any writings on that shirt?

A:   I don't remember, I don't think so. Cause he been having them clothes for like three days.

Q:   So you can remember what Lamonte had on but you can't remember what you had on?

A:   No, cause I change clothes every day. He don't even change clothes. He had them clothes on three days.

Q:   Were you outside when someone supposedly spoke to your brother about a shooting?

A:   No.

Q:   Do you in fact, did someone have a conversation with Montray about a shooting up on Quindaro?

A:   Not that I know of.

Q:   So no one came in and said "Oh, someone has just been shot up on Quindaro"?

A:   Nope. How we found, found out is, I guess the police had been looking for Lamonte over to, over there where my grandmother live at. And she called us to see if Lamonte was over there. And he was over there and he talked to her on the phone. And then it looked like about five minutes later his mother came and they came down here.

Q:   Well during his conversation, was it mentioned about homicide or a shooting?

A:   No, he didn't know why. No, they didn't say what they were looking for him for or why they were looking for him. Cause he didn't even know why they was looking for him. He

P0099
LMKSDC_0003489

WITNESS STATEMENT OF M'SHERIE MOORE JOHNSON
FILE #04154006081
PAGE #5

just, his mother and him just said "Let's go down here and see why the police looking for us".

Q: To the best of your knowledge, did Lamonte or James ever leave at all after 2:30?

A: No.

Q: And they were inside the house, they weren't even outside, is that right?

A: They was, our door usually stay open, so he was on the porch.

Q: But you never saw him leave?

A: No.

Q: Nor James either, right?

A: No.

Q: Did you ever see LaTasha or your brother leave?

A: No.

Q: You never saw anyone walk up and talk to your brother then?

A: Huh uh (no).

Q: And if someone would've mentioned that there had just been a shooting with somebody they knew, probably they would have told everyone in the house, right?

A: If they knew, yeah.

Q: Did you ever see Lamonte with a gun that day?

A: No.

Q: Ever seen him with a gun?

A: No.

Q: Ever seen James with a gun?

A: No.

Q: Do you know if Lamonte associates with any gang members?

A: No, Lamonte just, he normally stays to himself.

Q: You never seen him associate with anybody you've known to be a gang member?

WITNESS STATEMENT OF M'SHERIE MOORE JOHNSON
FILE #04154006081
PAGE #6

A:   No.

Q:   Ever seen him associate with anybody that's dealt in drugs?

A:   No.

Q:   Have you known him to deal in any drugs?

A:   No.

Q:   Do you know about a drug arrest that was at your mother's house not long ago?

A:   Yes.

Q:   Who got arrested?

A:   Lamonte had got arrested.

Q:   Who?

A:   Lamonte, yeah Lamonte.

Q:   Montray did?

A:   Montray got arrested?  I think that, they arrested him for like . . .

Q:   How about D.J.?

A:   Yeah, he got arrested too.

Q:   For drugs?

A:   No.

Q:   So Lamonte's the only one that got arrested for drugs?

A:   Yes.

Q:   Have you ever heard of him or James mention the name Donald Ewing or Doniel Quinn?

A:   No.

Q:   Do you know either of these two?

A:   No.

Q:   Do you know why Lamonte would have been singled out and arrested for drugs and no one else would have?

A:   Nope.

WITNESS STATEMENT OF M'SHERIE MOORE JOHNSON
FILE #04154006081
PAGE #7

Q:   Do you know if Lamonte sells drugs?

A:   Nope.

Q:   You don't know?

A:   Nope.

Q:   So if he does, you don't know it?

A:   He don't sell them that I know of.

Q:   But you're not with him all the time, right?

A:   (No verbal response).

Q:   Correct?

A:   No, I ain't with him all the time. But I ain't never seen him with no drugs.

Q:   Has there ever been anyone with a blue vehicle that's been to your mother's house that are friends of James of Lamonte?

A:   No.

Q:   Do either of them have a car?

A:   No.

Q:   Do you know anyone that drives a blue vehicle with tinted windows that are friends of your brothers or your cousins there?

A:   No.

Q:   Anything else you can think of Ms. Johnson you'd like to add to this statement?

A:   No.

END OF STATEMENT
TIME: 1104 HOURS

I HAVE READ THE ABOVE STATEMENT CONSISTING OF SEVEN (7) PAGES AND
SIGN IT AS BEING TRUE AND CORRECT TO THE BEST OF MY KNOWLEDGE.

SIGNED:_____WITNESSED:_____

DATE & TIME:_____                      321

CITY OF KANSAS CITY KANSAS

DEPARTMENT OF POLICE

ORIGINAL REPORTS FOR PROSECUTION

DATE: 08-08-94

COMPLAINT: 04154006081

SUSPECT NAME: MCINTYRE, Lamonte

ORIGINAL MIRANDA WAIVER OF : (refused McIntosh,Lamont)

ORIGINAL LINE-UP OF :

ORIGINAL STATEMENT OF :

ORIGINAL WITNESS STATEMENT OF: QUINN, Niko (4)
                                MITCHELL, Ruby (5)
                                QUINN, Josephine (4)
                                BARBER, Dennis O. (4)
                                QUINN, John (6)
                                JOHNSON, Yolanda (8)
                                HAYGOOD, Natasha (10)
                                JOHNSON, M'Sherie (7)

RECEIVED BY_____
                (NAME)

P0103
LMKSDC_0003493

CITY OF KANSAS CITY KANSAS

DEPARTMENT OF POLICE

ORIGINAL REPORTS FOR PROSECUTION
ADDITIONAL INFROMATION

DATE:10-12-94

COMPLAINT: 04154006081

SUSPECT NAME:MCINTYRE, Lamonte
(JUVENILE)

ORIGINAL MIRANDA WAIVER OF :


ORIGINAL LINE-UP OF :


ORIGINAL STATEMENT OF :


ORIGINAL WITNESS STATEMENT OF:GARCIA, Keva Lashelle(juvenile) 4


RECEIVED BY_____
(NAME)

KANSAS CITY, KANSAS POLICE DEPARTMENT
BUREAU OF INVESTIGATIONS

## ADDITIONAL INFORMATION
### PROSECUTION REPORT


SUSPECTS:        McIntyre, Lamonte (Juvenile)


FILE NO:        Homicide - File # 04154006081

DATE PAPERS SENT TO DISTRICT ATTORNEY:    September 22, 1994

1.  Witness Statement
    (Keva Garcia)            9-21-94   4 pages   Det. Golubski


### END OF REPORT

424

LMKSDC_0003495

KANSAS CITY KANSAS POLICE DEPARTMENT                    FILE # 04154006081
BUREAU OF INVESTIGATIONS
DATE: 9-21-94
TIME: 1105 Hours
LOCATION: Wyandotte High School


### JUVENILE WITNESS STATEMENT

I, **Keva Lashelle Garcia**, make the following statement to **Detective Golubski**, whom I know to be Detective with the Police Department of Kansas City, Kansas, concerning a matter I understand is the subject of an official investigation.


Q:   What is your full name?

A:   Keva Lashelle Garcia.

Q:   When and where were you born?

A:   I was born in KCKS, ▮▮▮▮▮▮▮▮▮

Q:   Where do you live and what is your telephone number?

A:   I live on 1412 N. 23rd, I don't have a phone.

Q:   With whom do you live?

A:   My mother, Pernella Ann Garcia.

Q:   Where do you go to school and what grade are you in there?

A:   I go to Wyandotte High School and i'm in the 10th grade.

Q:   What relationship are you to Ruby Mitchell?

A:   It's my auntie.

Q:   Now back in April of this year, were you seeing or talking to an individual with the first name of Lamont?

A:   Yes.

Q:   And what does this individual look like or did he look like then?

A:   Ah.. he was kind of tall, dark, he wore braids in his hair, his hair was real long, had big lips, ah.. big nose, ___ eyes.

Q:   And how long had you talked to or been with this person?

JUVENILE WITNESS OF KEVA GARCIA
FILE # 04154006081
PAGE 2

A:  I talked to him for about like 2 or 3 weeks.

Q:  And where did you meet him or know him from?

A:  From basketball practice, I met him at a basketball court ah.. on Hiawatha, I
    guess that's the street.

Q:  Did he live there in the neighborhood?

A:  Somewhere around there, I guess.

Q:  Did you two ever go out or call each other?

A:  No.

Q:  Now you said that you don't know his last name?

A:  No.

Q:  But you think one of his relatives last name may be?

A:  Wright.

Q:  And you thought they might live in the area of 11th and Quindaro?

A:  He used to, 11th and Quindaro.

Q:  Now since April, have you seen him anymore?

A:  No.

Q:  Do you ever know where he went to school or anything about his family?

A:  No.

Q:  You heard about the homicide that had happened, correct?

A:  Yes.

Q:  Now after that homicide happened did you speak to Lamont?

A:  That night it happened.

Q:  Explain that to me please?

A:  Ah.. he came to my aunties house which is like right across the street from
    where it happened and he ah.. he asked her did she tell the police that he
    did it and she said she told the police it looked like, she told the police
    she saw somebody that looked like him that shot the people but she didn't
    know if it was him or not.   And he's like okay.  He was fine about it and

Exh. 01

P0107
LMKSDC_0003497

JUVENILE WITNESS OF KEVA GARCIA
FILE # 04154006081
PAGE 3

    (cont'd) he just left.

Q: In fact what else did he say?

A: That's it.  He said he didn't do it and then he was like, well I wasn't there, he said he was in Missouri or somewhere with his cousin and she was like well I just told him it was somebody that looked like him and he was like well I wasn't in Kansas.  And she was like okay and he left.

Q: Now I showed you a photograph here of an individual, the photograph i'm showing you does that look like in someway, if anyways, the person that you knew as Lamont?

A: He looked like him a little bit, but that's not him.

Q: And what's similarities are there?

A: The face feature.

Q: Be more specific?

A: The lips, and the nose, and the eyes, all those.

Q: What about the complexion?

A: Lamont is darker then him, a little darker then him.

Q: So now how are they different?

A: He got a longer neck and his ears are big.

Q: Now and how old is the Lamont you knew?

A: About 18.

Q: And you haven't had any contact with him since?

A: April.

Q: And now the picture i'm showing you now, have you ever met or had any contact with him?

A: No, never seen him before.

Q: So from a distance if someone should see this picture i'm showing you now, you think that they?

A: Might mistake him as Lamont.

P0108
LMKSDC_0003498

JUVENILE WITNESS OF KEVA GARCIA
FILE # 04154006081
PAGE 4

Q:   But there is a definite difference in your mind between this picture and the
     Lamont you knew?

A:   Yes.

Q:   Is there anything else you can think of you'd like to add to this statement?

A:   No.

Q:   Lamont you knew did he have a car?

A:   No.


END OF STATEMENT


I HAVE READ THE ABOVE STATEMENT CONSISTING OF ( 4) PAGES AND SIGN IT AS BEING
TRUE AND CORRECT TO THE BEST OF MY KNOWLEDGE.

WITNESS:_____ SIGNED:_____


          _____

               DATE & TIME:_____


424

KANSAS CITY, KANSAS
DEPARTMENT OF POLICE

CHECKED APR 2 7 1994

COMP# 04154 006081

CHECK ONE ONLY:

VEHICLE RELEASE
DRIVE OUT

☐ PROPERTY RELEASE

☐ VEHICLE RELEASE
TOW AWAY ONLY

THE: _Munier_ ON: _4-20-94_
(Name) of Tow Company          Date of Release:

RELEASED TO: _Bessie Hawthorne_ _3025 N. 21ᵗ_ _621-1397_
(Name)                     (Address)              (Telephone#)

*VEHICLE TOW AWAY MUST BE IN ACCORDANCE WITH CITY ORDINANCE 36-294. (Ex: Tow truck, tow bar on trailer):

VEHICLE: _87_ _Cadi_ _Dev_ _Blu_ _ITL176_ _0595_
(Year)   (Make)  (Model)  (Color)  (License)  (Vin)

PERSONAL PROPERTY _____
(Description)

DATE TOWED: _4-15-94_          RELEASED BY: _Frances L Wake_
per Lt. Culp
(signature)

RELEASED TO: _Bessie Hawthorne_  RELEASED ON: TITLE / REG. / OTHER "LIST"
(Signature)