Page 1

1              UNITED STATES DISTRICT COURT
2                   DISTRICT OF KANSAS
3              CASE NO. 2:18-CV-02545-KHV-KGG
4
5
6  LAMONTE MCINTYRE and
   ROSA LEE MCINTYRE,
7
8                   Plaintiffs,
9
          vs.
10
11 UNIFIED GOVERNMENT OF
   WYANDOTTE COUNTY, et al.,
12
                    Defendants.
13
   -------------------------------
14
15              DEPOSITION OF JAMES McCLOSKEY
                 WEDNESDAY, OCTOBER 13, 2021
16
17              Deposition of JAMES McCLOSKEY in the
18 above-mentioned matter before Jomanna DeRosa, a
19 Certified Court Reporter (License No.30XI00188500),
20 and Notary Public of the State of New Jersey, taken
21 via Zoom at 192 Fisher Place, Princeton, New Jersey
22 08540 on Wednesday, October 13, 2021 commencing at
23 9:25 a.m.
24
25

**EXHIBIT**
**7**
**RG SUMMARY JUDGMENT**

Page 2

1   A P P E A R A N C E S (via Zoom)

2   ENSZ & JESTER, PC

3   BY:   MATTHEW GIST, ESQ.

4            And

5         CHRISTOPHER NAPOLITANO, ESQ.

6   1100 Main Street/Suite 2121

7   Kansas City, Missouri 64105

8

9   CENTURION - NEW JERSEY

10  BY:  PAUL CASTELEIRO, ESQ.

11  1000 Herrontown Road/2nd Floor

12  Princeton, New Jersey 08540

13

14  FISHER, PATTERSON, SAYLER & SMITH, LLP

15  BY:   CHARLES E. BRANSON, ESQ.

16            And

17        DAVID COOPER, ESQ.

18  3550 SW 5th Street

19  Topeka, Kansas 66606

20

21  MORGAN PILATE, LLC

22  BY:  CHERYL PILATE, ESQ.

23  926 Cherry Street

24  Kansas City, Missouri 64106

25

Page 3

1   APPEARANCES (cont.)

2   LATHROP GPM, LLP

3   BY:   MICHAEL J. ABRAMS, ESQ.

4   2345 Grand Boulevard/Suite 2200

5   Kansas City, Missouri 64108

6

7   McCAULEY & ROACH

8   BY:   MORGAN ROACH, ESQ.

9   527 West 39th Street/Suite 200

10  Kansas City, Missouri 64111

11

12  NEUFELD, SCHECK & BRUSTIN, LLP

13  BY:   SONA SHAH, ESQ.

14  99 Hudson Street/8th Floor

15  New York, New York 10013

16

17  SANDERS, WARREN, RUSSELL & SCHEER, LLP

18  BY:   TRACY HAYES, ESQ.

19  11225 College Boulevard/Suite 450

20  Overland Park, Kansas 66210

21

22  ALSO PRESENT:

23  Lamonte McIntyre

24  Katherine Sittenauer

25  Matthew MacMurchy - videographer

Page 4

```
 1              I N D E X

 2   WITNESS          EXAMINATION BY              PAGE

 3   Mr. McCloskey    Mr. Gist                    6,123

 4                    Ms. Hayes                   103,128

 5                    Mr. Cooper                  115

 6

 7              E X H I B I T S

 8   NUMBER           DESCRIPTION                 PAGE

 9   111              Carolyn Adams' Affidavit    36

10   112              McCloskey trial testimony   50

11   113              Niko Quinn's Affidavit      74

12   114              Letter                      82

13   115              Mr. McCloskey's Affidavit   90

14   116              Ms. Martin's Affidavit      95

15   117              A Document                  124

16

17

18   (All exhibits were retained by Counsel.)

19

20

21

22

23

24

25
```

Page 5

1            THE VIDEOGRAPHER:  Good morning.  We are

2    going on the video record at 9:25 a.m. on October

3    13th, 2021.

4            This is media unit one of the video

5    recorded deposition of James McCloskey and Centurion

6    Ministries taken in the matter of McIntyre versus

7    Unified Government of Wyandotte, et al. filed in the

8    U.S. District Court for the District of Kansas,

9    indication No. 2:18-CV-02545-KHV-KGG.

10            This deposition is being held virtually

11    by video Zoom conferencing.  My name is Matt

12    MacMurchy from the firm Veritext and I'm the

13    videographer.  The court reporter is Jomanna DeRosa

14    from the firm Veritext.  I'm not authorized to

15    administer an oath.  I'm not related to any party in

16    this action, nor am I financially interested in the

17    outcome.  Counsel will now state their appearances

18    and affiliations for the record.

19            MR. GIST:  Matthew Gist on behalf of

20    defendant, Roger Golubski.

21            MR. ABRAMS:  Michael Abrams, Cheryl

22    Pilate, Sona Shah on behalf of the plaintiffs.

23            MR. CASTELEIRO:  Paul Casteleiro on

24    behalf of James McCloskey and Centurion Ministries.

25            MR. COOPER:  David Copper and Charles

Page 6

1    Branson on behalf of the Unified Government.  Also

2    attending is Katherine Sittenauer, a law clerk in my

3    office.

4                    MS. HAYES:  Tracy Hayes on behalf of the

5    remaining individually named defendants.

6                    MR. ROACH:  Morgan Roach on behalf of

7    defendant, Golubski.

8                    MR. GIST:  And also present on behalf of

9    Roger Golubski is Chris Napolitano.

10                   THE VIDEOGRAPHER:  Will the court

11   reporter please swear in the witness?

12

13                   JAMES McCLOSKEY, residing at 192 Fisher

14   Place, Princeton, New Jersey 08540, having first been

15   duly sworn by the Notary, then testified as follows:

16

17   DIRECT EXAMINATION

18   BY MR. GIST:

19        Q.    Good morning, Mr. McCloskey.  My name is

20   Matt Gist.  Can you hear me okay?

21        A.    Yes, sir.  Good morning.

22                   MS. HAYES:  We've got a really bad echo

23   right now because of I'm guessing a mic on the

24   computer of the attorney in the room.

25                   MR. CASTELEIRO:  Okay, maybe somebody

Page 7

1   can help me turn it off.

2

3   BY MR. GIST:

4        Q.    Okay, are we ready to resume?

5        A.    Yes.

6        Q.    I hear you fine, but if at any time you

7   don't hear me, just let me know and we'll try to get

8   it fixed.

9              Okay?

10       A.    Yes, sir.

11       Q.    Is this your first Zoom deposition?

12       A.    First Zoom deposition, yes, sir.

13       Q.    Sometimes these problems happen.  Well,

14   as I introduced myself to the record, I'm one of the

15   attorneys representing Roger Golubski in a civil case

16   filed by Lamonte and Rose McIntyre.  I'm here to take

17   your deposition today asking questions about

18   Centurion Ministries and more specific questions

19   about Centurion Ministries and your work on Lamonte

20   McIntyre's criminal case, his exoneration.

21             Do you understand that?

22       A.    I do understand that, yes.

23       Q.    During the course of this deposition, if

24   there's any question that I ask that you're uncertain

25   of, just let me know, please, and I can either have

1    it read back to you or I can try and rephrase it.

2          A.     I will do that.

3          Q.     What is your current relationship to

4    Centurion Ministries?

5          A.     My current relationship is I retired

6    five years ago from the day-to-day management.  I

7    still remain on the board of directors of Centurion

8    and I have one case that I've been working on for a

9    number of years that I'm still working on.

10         Q.     And for this deposition today, I'll

11   refer to Centurion Ministries as Centurion.  Is that

12   okay?

13         A.     That's fine, yes.

14         Q.     So are you no longer the executive

15   director?

16         A.     I am no longer the executive director.

17         Q.     And would that have ceased approximately

18   five years ago at your semiretirement?

19         A.     Yes, in 2015.

20         Q.     Thank you.  What is -- who is the

21   current executive director?

22         A.     Corey, C-O-R-E-Y, Waldron,

23   W-A-L-D-R-O-N.  She is the executive director.

24         Q.     Thank you.  When was Centurion formed?

25         A.     Centurion was formed in 1983.

1      Q.      And did you form it?

2      A.      I did.

3      Q.      Currently, how many employees are there

4    at Centurion?

5      A.      My understanding is that as we speak

6    today, there are 12 paid employees.

7      Q.      During the time period that you would

8    have been working on Lamonte McIntyre's case, would

9    there have been close to that number or would it have

10   been less?

11     A.      Yeah, let's see.  I think it would have

12   been less.  Let's see, when I finished work on

13   Lamonte's case, there were probably eight or nine

14   paid employees.

15     Q.      What type of legal entity is Centurion?

16     A.      It's a nonprofit, 501 (c)(3)

17   organization.

18     Q.      And during the time period that you were

19   the executive director, did you answer to the board?

20     A.      Yes.

21     Q.      And how large is the board?

22     A.      Now?

23     Q.      No, during the time period of Lamonte

24   McIntyre's case that you were working on.

25     A.      There are 14 members of the board now.

1    At that point, there were probably nine or ten.

2         Q.      Okay.

3         A.      As an estimate.

4         Q.      But as the executive director, did you

5    run the day-to-day operations of Centurion?

6         A.      I did.

7         Q.      Can you give me an example or examples

8    of things you would have to bring to the board?

9         A.      Well, we would bring to the board the

10   state a rundown or a briefing of the current cases

11   that we were working on, what was happening within

12   those cases, we would present to the board all

13   financial information at that time, and any other

14   issues that may arise that we felt deserved the

15   board's attention.

16        Q.      Specific to whether or not Centurion

17   would take on a particular case, did that have to be

18   approved by the board or did you have that power?

19        A.      We had that power.

20        Q.      And what source or sources of money

21   would Centurion derive its operating budget from?

22        A.      We get our money from several sources.

23   The -- the primary one is individual benefactors

24   wherever they may be, across the country and

25   elsewhere, some foundation money, some church money,

1   some bequest money, and they're the main source.

2        Q.     Would any money -- would Centurion

3   derive any monies from the persons that they

4   represented?

5        A.     No, that was never arranged or asked for

6   by us.  However, if they were exonerated and they

7   received a certain amount of money in compensation

8   from the state for their wrongful prosecution or a

9   civil suit, if they chose to, they might give us --

10  might make a donation to Centurion.

11       Q.     Was there any type of written agreements

12  dictating what you just outlined where there would be

13  a written agreement wherein an exonerated person

14  would agree ahead of time to provide money to

15  Centurion if they were able to be exonerated?

16       A.     No, there was never, never any written

17  agreement at all with anyone.

18       Q.     Did Centurion at any point in time have

19  any agreements with law firms wherein the law firm

20  agrees to provide a certain amount of money to

21  Centurion depending on the outcome of a case?

22       A.     No, sir, no.

23       Q.     What is the role of Kate, and I

24  apologize if I'm going to mispronounce her name,

25  German.

Page 12

1       A.      Yes.

2       Q.      What is her role at Centurion?

3       A.      At this time?

4       Q.      Yes.

5       A.      She really oversees the development,

6  Centurion's development, of prospective cases that is

7  petitioners trying to -- attempting to petition us

8  for help for us to take on their case.  She' -- it's

9  difficult to describe her role because she has her

10  fingers in a lot of our pies because she's been with

11  me since 1987, and she's very familiar with the

12  details of the organization and, you know, she was

13  executive director and she stepped aside from that of

14  her own volition and we brought Corey Waldron on, so

15  she does a lot of different things.

16       Q.      Is it accurate to say that she would

17  have been involved in some capacity with Lamonte

18  McIntyre's case?

19       A.      Only in the very beginning as the staff

20  and the volunteers were developing the case.  At that

21  time, it was a prospective case, but once the case

22  began, once I entered the picture and began work on

23  the case and committed Centurion to it, she was not

24  involved.

25       Q.      If you don't know the exact number, best

1   approximation if you can, but how many cases has

2   Centurion formally agreed to take?

3          A.     Altogether throughout our history?

4          Q.     Yes.

5          A.     102.

6          Q.     I do want to go through your vetting

7   process, but just so I understand, 102 cases is how

8   many cases you agreed to take on and did your own

9   investigation.  It's not the total number of cases

10  that you would have looked through the records and

11  made a determination on.  Correct?

12         A.     That's correct, the 102 represents the

13  number of cases that we agreed to work on their

14  behalf.

15         Q.     Of those 102 cases, did any of them not

16  involve police corruption allegations?

17         A.     Geez, let me just say this:  Most of

18  them did.  I can't say they all did, but a great

19  majority of them have.  Excuse me, when I say that,

20  that's police and/or prosecutorial misconduct.

21         Q.     Thank you for the distinction.  I

22  believe from your testimony earlier in this case that

23  you get actually I believe thousands of applications

24  or thousands of letters a year asking for Centurion

25  to take a look at their case.  Is that correct?

1      A.      That's correct.  Since 1992, we get

2   anywhere from 1,000 to 13 or 1,400 new requests each

3   year asking for our assistance.

4      Q.      And just as a way of background,

5   obviously, I read the testimony that you provided in

6   the Wyandotte County District Court back on October

7   12th, 2017, so I have, you know, some information as

8   to how Centurion goes through it's process, but

9   specific to that I wanted to ask you, did you --

10   prior to your deposition today, did you review your

11   testimony in the October 12th, 2017 hearing?

12      A.      Yes, I did.

13      Q.      And you reviewed it shortly in time

14   prior to this deposition to help refresh your memory?

15      A.      I reviewed it last weekend.

16      Q.      Thank you.  I do want to go through

17   Centurion's vetting process.  So what I assume if

18   you're getting 13 or 1,400 cases a year, obviously,

19   you're only taking a very small percentage of them,

20   and what I'd like to get a better understanding of

21   though is how do you determine how much of a look you

22   give a particular case.  What I mean by that is I'm

23   going to presume some of these cases you probably

24   don't spend a lot of time on, but then there might be

25   others that you spend quite amount of time on and

Page 15

1    then ultimately decline to take it.  Is that correct?

2         A.      That's a fair characterization.  Yes.

3         Q.      So just kind of take me through the

4    vetting process when the letter comes in.  How does

5    Centurion process the initial --

6         A.      Yes, when the letter comes in, we have

7    an intake person.  She reads every letter that comes

8    in, and at that point -- now I've been divorced from

9    this process for five years.

10        Q.      And I apologize to interrupt you.

11   Because of what you said is the reason I'm

12   interrupting.  I didn't mean to be rude, but I am

13   focused more on Lamonte McIntyre's time period.  So I

14   understand from your testimony that I believe he

15   wrote a letter I think in 2003, so I'm more

16   interested in the time period of 2003 through, say,

17   2009, which is when I believe Centurion formally

18   accepted the case.  I'll focus the vetting process on

19   that time period, if that helps.

20        A.      That is helpful.  Do you want me to

21   speak specifically about the vetting process of

22   Lamonte McIntyre or just in general?

23        Q.      I will get to Lamonte specifically, but

24   I would like for you in general because I'm trying to

25   get an idea of -- well, in general, I'd like to know

Page 16

1   about the process in general.

2        A.    The letter comes in, it goes to an

3   intake person, staff person, she reads the letter,

4   and then we'll send some kind of what she considers

5   to be an appropriate response, and there is a form

6   sent to the inmate asking the inmate to complete the

7   form with some historical information about the case,

8   and then once a correspondence starts to develop

9   between the inmate and Centurion, the intake person

10   receives that letter, the response to the first

11   letter, and the correspondence begins to flow, then

12   the intake person at some point during the

13   correspondence with the inmate will turn it over to

14   prospective case developers, staff members.  They

15   will begin -- at that point, they will take over the

16   development or vetting of the case.  As they're doing

17   that, it -- at some point, the main staff person who

18   is vetting the case, who is responsible for vetting

19   the case, asks a volunteer to work with -- assigns

20   that case to a volunteer and the volunteer in

21   consultation with a staff member and other members of

22   management really go deeper into the correspondence

23   and begin to ask for the historical written record of

24   the case.  That can take -- obtaining that record can

25   take several years or it could take less.  It just

1  depends on the case.  Eventually, during that process

2  as the historical record -- I'm talking about trial

3  transcripts, preliminary hearing, police reports,

4  legal briefs, et cetera.  We -- the staff begins to

5  assess the case for its potential.  Staff meetings

6  are held to discuss that case as well as others that

7  have risen to that level within the development

8  process, and then once the record collection has been

9  obtained to the best of our ability, and that might

10  include, you know, public records request to the

11  authorities, the staff members have discussed it and

12  others, it begins to rise to the top and then the

13  volunteer who has been in charge of developing the

14  case really working with a staff member, he or she

15  will write a written report summarizing the case,

16  case summaries are presented and are the basis for

17  further discussion, and then eventually it's brought

18  to my attention.  The more serious the case, the more

19  interesting, the one richer in potential.  It's what

20  I'm able to -- we're always working on a number of

21  cases at any given time.  Then I will be asked by the

22  staff to take a look at what has developed.

23       Q.    The process you just described can take

24  several years before you would become actually aware

25  of any of the specifics of the case.  Is that

1    correct?

2         A.    Well, you know, basically, yes, however,

3    if the case looks particularly interesting and for

4    whatever reasons seems to really stick out, then I'm

5    consulted at various levels, but not in depth.  We

6    have staff meetings, I've read the case summary

7    report, I've spoken with the volunteer and, you know,

8    we have a full staff meeting, and the case, as

9    developed to that point, is discussed with me.  That

10   comes in a relatively later point in its development.

11        Q.    In the process that you described up to

12   the point of when a case -- Centurion agrees to take

13   a case, how much back and forth of correspondence

14   would there be with the prospective client inmate?

15        A.    Yeah, that's a continuing correspondence

16   that the more we learn about the case, the more

17   records we receive and review, the more questions

18   might pop up, and there's a continuing exchange of

19   correspondence between the inmate and the Centurion

20   people.

21        Q.    Specifically with respect to Lamonte

22   McIntyre, would there have been back and forth

23   communication between Centurion and him from 2003 to

24   the end of 2008 prior to Centurion agreeing to take

25   his case?

Page 19

1        A.      Yes, sir.

2        Q.      And would those records be kept or

3    maintained by Centurion?

4        A.      Yes.  Yes.

5        Q.      At what point does Centurion -- let me

6    ask it this way:  Does Centurion hire attorneys

7    before or after it decides to take on a case?

8        A.      For the most part, after we decide to

9    commit to a case.

10       Q.      And earlier you mentioned volunteers.  I

11   think I know what a volunteer is, but just to

12   clarify, this is not a Centurion employee.  This is

13   just someone donating their time to review case

14   files, records, things of that nature?

15       A.      That's correct.  Right now, we have 20

16   volunteers, and that level has stayed consistent in

17   the last, I don't know, five to ten years.  For the

18   most part, they're retired people, residents of the

19   Princeton area, and they come from various walks of

20   life.

21       Q.      When Centurion makes a decision to take

22   on a case, do you have any type of either engagement

23   letter or contract with the client?

24       A.      I don't know what happens now.  I'm not

25   familiar with that, but when I was the executive

1   director, no, we did not have a contract.  It was a

2   letter to the inmate declaring our commitment and

3   work on that person's behalf.

4           Q.     Mr. McCloskey, you described a letter.

5   I'll characterize it as an engagement letter.  If

6   you're not comfortable with that term, correct me.

7   But my question is whether such a letter would have

8   gone to Lamonte McIntyre when Centurion decided to

9   take on his case?

10          A.     Yes, it did.

11          Q.     And would Centurion maintain a copy of

12  that letter?

13          A.     Yes.

14          Q.     I should have asked this earlier.  Just

15  to clarify, Centurion is not a law firm.  Correct?

16          A.     That's correct.

17          Q.     You don't have in-house legal counsel

18  that actually investigates or works on the cases you

19  take on.  Is that correct?

20          A.     Well, we have -- we brought Paul

21  Casteleiro joined Centurion as a full-time paid legal

22  director at the end of 2014 and has remained,

23  obviously, in that capacity ever since.  He gets, as

24  far as I know, and again, I've been retired from the

25  day-to-day, but Paul gets involved in assisting the

Page 21

1    staff and assessing prospective cases since that

2    time.

3         Q.    Okay, thank you.  With respect to --

4    once Centurion agrees to take on a case, is it

5    accurate that Centurion decides what actions, who

6    they're going to talk to, what type of investigations

7    they're going to do on their own independent of the

8    client.  Is that correct?

9              MR. ABRAMS:  Objection to form.

10

11   BY MR. GIST:

12        Q.    Mr. McCloskey, did you understand the

13   question?

14        A.    Would you repeat it, please?

15             MR. ABRAMS:  Matt, so we don't stumble

16   on each other, if I object and you say, "Do you

17   understand the question," or, "Will you answer the

18   question," will you just confirm that the objection

19   proceeding stands?

20             MR. GIST:  Yes.

21

22   BY MR. GIST:

23        Q.    Mr. McCloskey, my question was:  Does

24   Centurion decide on its own what it's going to do in

25   its investigation independent of client approval?

Page 22

```
 1              MR. ABRAMS:  Object as to form.
 2    Overbroad.
 3
 4    BY MR. GIST:
 5         Q.    Mr. McCloskey, can you answer the
 6    question?
 7         A.    Yeah, I'll try.  In the -- first of all,
 8    as we develop our investigation strategy and go about
 9    doing its work, the inmate is consulted and kept
10    informed as to what we plan to do and his or her
11    ideas are requested, so they kind of -- we consult
12    with them, and once we begin our investigation, we --
13    pretty early on in our investigation in Lamonte's
14    case was a common example, we retain attorneys to
15    work with us and then together we develop and execute
16    an investigative plan.
17         Q.    For example, you wouldn't have to run
18    by -- specific to Lamonte McIntyre, you wouldn't have
19    to run by Lamonte McIntyre, you know, the dates
20    you're coming to Kansas City to interview certain
21    witnesses.  Is that correct?
22         A.    Yeah, I do not need, nor do we need
23    their permission to do what we do.  We just go about
24    doing what we do, and they're fully informed.
25         Q.    Is that outlined in the engagement
```

Page 23

1    letter?

2          A.      I don't think so.   The engagement letter

3    is pretty sparse.

4                MR. CASTELEIRO:  I think, just for

5    clarification, calling a letter to the client

6    informing them that we're taking their case is not --

7    I think the use of the term "engagement letter" is

8    really inaccurate.  It would just be -- and Mr.

9    McCloskey indicated to you that we tell the client

10   that we're taking the case.  It's not an engagement

11   letter.

12               THE WITNESS:  A better word is it's a

13   commitment letter.  We let them know that we're

14   committing to do in all of our effort to free and

15   exonerate them, that they are now officially a

16   Centurion Ministries beneficiary, if you will.

17

18   BY MR. GIST:

19         Q.      You've kind of touched on this already

20   when you described the vetting process, but what I'd

21   like to go over is the type of records that Centurion

22   would keep during the course of a case that it takes

23   on.  Can you describe that for me, the type of

24   records that Centurion would generate during its

25   investigation?

1      A.      Yes, once the investigation and

2   commitment has begun or even before that?

3      Q.      Let's go once it begun because I think

4   you may not have touched on everything, but I thought

5   you did a pretty thorough job of describing the

6   vetting process.  I'm focusing on what records would

7   be kept after that letter goes out saying that we're

8   going to take your case.

9      A.      Well, working in close concert with the

10  attorney, who we've retained on behalf of the inmate,

11  the main records, I guess, would be when I go out, in

12  Lamonte's case and others, investigative reports of

13  who I interviewed and a summary of that interview is

14  provided to the attorney, and in some instances, the

15  attorney is with me as we interview various witnesses

16  in the case.  They're the main record, so to speak.

17  We also might further our effort during the

18  investigation to obtain a more complete record of the

19  police records, again, through the freedom of

20  information act and other means to build up the

21  discovery material, you know, to add to the discovery

22  material we've already received prior.

23      Q.      Specific to witness interviews when you

24  go out into the field, when you or anyone with

25  Centurion and go out into the field and interview a

1   witness, can you describe what records are kept, if

2   any, from that specific interview?

3        A.     I'd like to speak -- what we do is we

4   interview a witness, and then at some point

5   subsequent to the interview, we will write up a

6   summary of that interview.  Not all the time.  It

7   depends.  If there's not much gained, I might make a

8   note that so and so was interviewed as a list, but if

9   there is some information that the interviewee

10  provided which we think will be helpful to the cause

11  or significant, I'll write up a summary of that.

12       Q.     While the interview is taking place,

13  would you ever take handwritten notes on a notepad

14  and then use that to type up your summary later?

15       A.     Yes.

16       Q.     Okay.

17       A.     Yes, I do.  I take notes, if not during

18  the interview, subsequent to the interview when it's

19  relatively fresh in my poorest mind.

20       Q.     Are the records disposed of after the

21  summaries are typed up?

22       A.     By and large, yes, they're of no use.

23       Q.     And I believe from at your testimony at

24  the hearing, you would normally not keep audio

25  recordings or do audio recordings I should say, not

1   keep, but take audio recordings of witness

2   interviews?

3          A.      That's correct.

4          Q.      With some exceptions, I assume?

5          A.      Yes, there's an exception here and

6   there, but a very rare instance will I record the

7   interview as it's taking place.

8          Q.      For example, specific to Lamonte

9   McIntyre, if I were to come to your office,

10  Centurion's office, and say, you know, show me the

11  Lamonte McIntyre file, would it be like a bunch of

12  boxes, is it stored digitally, is it a combination?

13         A.      Well, because -- it's not stored

14  digitally.  I'm kind of a dinosaur in that regard.

15  It's paper -- it's files kept in boxes; paper files

16  kept in boxes.

17         Q.      And would you maintain those files for a

18  certain amount of years or were they destroyed at any

19  point?

20         A.      No, they're maintained for an

21  indeterminate period of time, a long time.

22         Q.      In this particular matter, Lamonte

23  McIntyre's case, I understand that you brought on

24  Cheryl Pilate with the law firm of Morgan Pilate

25  after the decision was made to take on the case.  Is

 1    that correct?

 2         A.     Yes, that's correct.

 3         Q.     And had you worked with Morgan Pilate on

 4    any cases prior to Lamonte McIntyre's?

 5         A.     This is the third case that Cheryl and I

 6    teamed up and worked together on behalf of Ellen

 7    Riesonover, a St. Louis conviction.  She was

 8    exonerated and freed in 1999.  And once that was

 9    completed, we took on the Daryl Burton case, another

10    St. Louis homicide, and worked on his case together

11    until he was freed in August of 2008.

12         Q.     To your knowledge, did either of those

13    two cases go into civil litigation after the

14    exoneration?

15         A.     They both did.

16         Q.     Were you called upon to provide any

17    testimony in either of those two cases?

18         A.     I have a deposition in the Daryl Burton

19    case.

20         Q.     And then in the civil litigation, the

21    law firm of, I don't know if I'm going to pronounce

22    all of these names right, Neufeld Scheck & Brustin,

23    LLP, referred to as NSI, is involved in the civil

24    litigation of this case, had you ever retained them

25    before with respect to any of Centurion's cases?

```
 1               MR. ABRAMS:  Just to be clear, Matt,
 2     it's NSB, not NSI.  NSI may be a show.
 3               MR. GIST:  I wrote it down wrong.
 4               MR. ABRAMS:  That's okay.
 5
 6     BY MR. GIST:
 7          Q.    Mr. McCloskey, had you ever retained the
 8     services of NSB, Neufeld Scheck & Brustin, for any of
 9     the cases that Centurion has taken on?
10          A.    No, Centurion has not.  Once the case
11     has been resolved and the person has been exonerated,
12     in a variety of different ways, the lawyers are
13     obtained and they go to work and initiate civil suits
14     or try and get compensation through the state laws.
15     We're not involved in that process as a primary
16     retainer.
17          Q.    Same question for another law firm,
18     Lathrop & Gage.  I guess now they're just called
19     Lathrop.  But has Centurion ever engaged the services
20     of Lathrop?
21          A.    I don't remember Lathrop.  I don't
22     remember engaging them for any purpose, no.
23          Q.    Of the 102, I think you said 102 cases
24     that you've taken on, and I'm not looking for a
25     specific number, but have a large or decent of those
```

Page 29

1    come from the Midwest around the Kansas City area,

2    State of Missouri, and that general geographic

3    region?

4         A.    We have had about in the Midwest area,

5    which is primarily Missouri and Kansas, as far as

6    we're concerned, there have been about I believe six

7    cases or so.

8         Q.    So you've used other law firms, other

9    than Morgan Pilate, in this general geographic area.

10   Is that correct?

11        A.    Yes.

12        Q.    I'm going to shift away from kind of the

13   general Centurion process questions and I'll move

14   more specifically into Lamonte McIntyre's case.  I

15   believe you testified that you received a letter from

16   Lamonte McIntyre in 2003.  Does that sound correct?

17        A.    It does.

18        Q.    And the vetting period would have

19   continued from approximately that time period up

20   through the fall of 2008?

21        A.    That's correct.

22        Q.    At the hearing that you testified at,

23   you said you gave a serious look at Lamonte

24   McIntyre's case in the fall of 2008 after being

25   "surprised" by your staff that the case was "bubbling

Page 30

1    up to the top and looking pretty good."  Do you

2    recall that testimony?

3         A.    If that's what I testified.  I don't

4    recall that specific testimony, but if that's on the

5    record, then that's what I said.

6         Q.    And on that, because I'm going through a

7    fair amount of your testimony because I don't want to

8    play any tricks or anything, if you have any -- if

9    you want to look at the testimony, we have the trial

10   pad and its software and we can do that, so just let

11   me know.

12        A.    Sure.

13        Q.    Okay.  But in a general sense, was

14   there -- do you recall being a little bit surprised

15   that the Lamonte McIntyre was going to be a case that

16   was going to get serious consideration?

17        A.    Well, I was -- I was aware of the

18   Lamonte McIntyre case, but I didn't give it my

19   undivided attention.  When I finally cleared the

20   decks when Cheryl and I freed Daryl Burton in the

21   summer of 2008, that's when I became interested in

22   the case based on the staff's and the volunteer who

23   did this work strong recommendation that I take a

24   good look at this because, in their view, it looked

25   like a really good case of actual innocence, so

1   that's when I came in in a serious way.

2        Q.    In January of 2009, you wrote a 21 or

3   22-page memorandum describing the case and why you

4   believed Lamonte McIntyre was innocent.  Is that

5   correct?

6        A.    That's correct, yes.

7        Q.    And was that memo presented to the board

8   of directors for approval?

9        A.    No, it was no necessary.  We had full

10  operational responsibility and authority.

11       Q.    But the letter, the memo, excuse me,

12  would have predated the letter to Lamonte McIntyre

13  informing him of acceptance of his case?

14       A.    I'm not sure if it predated the

15  commitment letter or not.  I forget what the date of

16  that commitment letter was.  It may have been late

17  2008 or it may have been early 2009.

18       Q.    Fair enough.  I'm not asking you to do

19  that right now, but you could consult your file and

20  clarify that.  Correct?

21       A.    Yes, I can.

22       Q.    Just one more question on the memo.  I

23  understand you didn't go to the board.  Is it just

24  drafted -- did you draft the memo to submit it to any

25  person or persons in particular for any reason?

1        A.      Yes, the main reason I drafted that

2    memo, as I have done in other cases, is I wanted to

3    present it to Cheryl Pilate.  Cheryl and I worked

4    long and hard together on the other two prior cases,

5    and I was hoping she would be able to agree to take

6    on Lamonte McIntyre's case.  One of the primary

7    reasons I wrote that memo is here is the cases as we

8    see it.  It's a 20-page summary of the case, its

9    legal history, its factual basis as far as we know,

10   and why we believe he's innocent.  Read this and see

11   if you're interested in working with us.  So I sent

12   it to her.

13        Q.      And in that memorandum that you're

14   testifying about, is there anything in there about

15   wrongdoings of Roger Golubski doing things criminal

16   in nature?

17        A.      I don't think so.

18        Q.      We'll get to your investigation here in

19   a moment, but I just want to ask a few questions

20   about Rose McIntyre.  Rose McIntyre is also a

21   plaintiff in this case.  I don't know if you were

22   aware of that, but she is a plaintiff in this case,

23   and I need to ask you some questions about Ms.

24   McIntyre.  At any point in time, was she ever a

25   client of Centurion?

Page 33

1        A.      No, her son was, obviously, but she

2    herself was not.

3        Q.      So would there be any written

4    correspondence between Centurion and Rose McIntyre?

5        A.      There may be.  I don't have a clear

6    recollection of if there were or not, so I'm not sure

7    of that.  I don't think so, but I'm not sure.

8        Q.      And again, it would be something -- your

9    file material would reveal if there was written

10   correspondence to and from Ms. McIntyre?

11       A.      It should reflect that, yes.

12       Q.      And did you personally meet with Rose

13   McIntyre?

14       A.      I very definitely did.

15       Q.      And do you know on how many occasions?

16       A.      Every time I went to Kansas City,

17   Kansas, I met with Rosy.

18       Q.      And would that be approximately 19

19   times.  Does that sound correct?

20       A.      Yes, sir.

21       Q.      And when you would meet with Rose

22   McIntyre, would it just be you and Ms. McIntyre or

23   would other people be there?

24       A.      It was primarily Rosy and me.  Sometimes

25   Cheryl would join us, sometimes her deceased older

1    son, James, would join us, but mostly -- Rosy became

2    a good friend of mine as well as we were working to

3    free her son.

4         Q.    When you were having these meetings with

5    Rose McIntyre, they would be in person face-to-face.

6    Correct?

7         A.    Correct, yes, sir.

8         Q.    Would there be phone calls

9    intermittently in between your trips as well?

10        A.    Yes, I'm sure there were.

11        Q.    And would you have kept summaries of

12   your meetings with Rose McIntyre?

13        A.    No, no.  I don't think so -- well, if I

14   did, I don't remember as such, because she didn't

15   really have any -- she had some important

16   information, but that wasn't until a little later in

17   the investigation.  By and large, no, but sometimes

18   yes.

19        Q.    Would you show Rose McIntyre any

20   documents or records, documentation of any kind

21   pertaining to the case?

22        A.    No, it was verbal summaries of what was

23   going on and what we were learning.

24        Q.    You would update her though as to

25   information you were learning during the course of

1   the investigation?

2          A.      I would, yes.

3          Q.      Did you recall if Rose McIntyre was able

4   to provide you -- Centurion and/or you with any

5   documents that she complied in her efforts to try and

6   exonerate her son prior to Centurion getting

7   involved?

8          A.      If she did, I don't remember that, but

9   she would describe to me and to our staff as we were

10  developing this case as a prospective case what she

11  was learning or what she had learned in the past or

12  what she had done in the past to help free her son.

13         Q.      Do you recall her providing you or

14  anyone with Centurion a newspaper article from a

15  local paper called the Call?

16         A.      I believe we received that.

17         Q.      Okay.  Do you recall her telling you

18  about an investigator she hired by the name of

19  Carolyn Adams?

20         A.      I do, yes.

21         Q.      And you yourself, you got a chance to

22  meet with Carolyn Adams.  Isn't that correct?

23         A.      I did.

24         Q.      I understand that she has since passed?

25         A.      I did not know that.  I'm sorry to hear

1    that.

2         Q.     That's my understanding.  I'm pretty

3    certain she passed.  I don't know exactly when, but

4    that is my understanding.

5              Carolyn Adams though did provide an

6    affidavit in this case.  I believe it was in 2014.

7    Do you recall her affidavit?

8         A.     I know that she gave one.  I didn't

9    remember the date, and I don't remember what was in

10   that affidavit.  I think Cheryl was the one who took

11   that affidavit, who prepared that affidavit, based on

12   her interview with her.  I believe that was Cheryl's

13   work.

14        Q.     Do you recall whether Rose McIntyre gave

15   you any documentation that Carolyn Adams would have

16   gave her previously?

17        A.     Right, in the back of my mind, yes, but

18   I can't be specific as to what that was.

19        Q.     Okay.

20             MR. GIST:  I'm going to pull up the

21   Carolyn Adams affidavit and show that to you.

22

23             (Whereupon, Exhibit 111 is marked for

24   identification.)

25

1   BY MR. GIST:

2        Q.     So Exhibit 111.  Can you see that okay,

3   Mr. McCloskey?

4        A.     Yes, I can.  Thank you.

5        Q.     Okay.  In total, it's a four-page

6   affidavit with an Exhibits A, B, and C attached to

7   it.  By no means do I want to hurry you through it,

8   but the paragraphs I'm most interested in of the

9   affidavit is paragraph 6.

10       A.     Yes, I see that.  Yes.

11       Q.     Does that help refresh your memory?

12       A.     Yes, it does.  Thank you.  I reviewed

13  with them reports that I read about my interviews,

14  yes.  She either gave those reports to me or to me

15  and Cheryl or to Cheryl alone.  I forget which, but

16  yes, we had them.

17       Q.     And I'll focus on paragraph 7, which

18  unfortunately starts on one page and goes to the

19  other.  So let's go ahead and read paragraph 7

20  together.

21       A.     I've read that.

22       Q.     And it states in there or makes a

23  reference to documents that she, meaning Carolyn

24  Adams, had provided to Rosy McIntyre.  Do you see

25  that?

1      A.      Yes.

2      Q.      And does that one way or the other

3   refresh your memory at all as to whether Rosy

4   McIntyre had any documents from Carolyn Adams that

5   she would have provided to Centurion?

6      A.      I don't have a clear or specific

7   recollection of that, but it certainly could have

8   been the case.

9      Q.      The affidavit, this affidavit, is dated

10   July 31st of 2014 -- I'm going to withdraw that

11   question.

12          It says in the affidavit that she talked

13   to Centurion recently, so I'm going to assume --

14   well, let me ask you that, sorry.  Do you remember

15   when you first spoke to Carolyn Adams?

16      A.      I had trouble contacting her.  I think

17   in the earlier stages of the investigation, I think

18   she had some personal issues that she had to deal

19   with, and for the longest of time, I was unable to

20   make contact with her and meet with her.  Eventually,

21   I did, and I think I met with her by myself the first

22   time and then I brought Cheryl into it, a.  Cheryl

23   and I together would have interviewed her, and Cheryl

24   would have, I think, I'm not certain, but I think

25   more than likely prepared this affidavit with

1    Carolyn.

2         Q.    So there's a document, and think this is

3    stated in the paragraph that we read, paragraph 6

4    earlier, but there are three exhibits to this

5    affidavit, one of which is Exhibit B, and I'm going

6    to pull that up on the screen.  And like I said, this

7    is Exhibit B to the affidavit, and it appears to be a

8    summary of Ms. Adams's interview with Doniel Quinn

9    back on January 5th of 1995.

10        A.    Okay, yes.

11        Q.    Does this document look familiar to you?

12        A.    I believe we would have received this.

13        Q.    Can you say whether you received this

14   from Carolyn Adams or whether you received it from

15   Rose McIntyre or possibly both?

16        A.    I believe we would have received it from

17   Rosy and then it may have even come in during the

18   case development.

19        Q.    Would your file reflect when it came in

20   if it did come in during case development?

21        A.    I can't be sure.  It could, but I just

22   can't be sure if it would.

23        Q.    And if you would, please, the first

24   sentence on the second paragraph, there's a reference

25   to Detective Golubski.  Do you see that?

1        A.      Yes.

2        Q.      Rose McIntyre testified in the civil

3    case that she didn't know that Detective Golubski was

4    involved in her son's criminal case until many, many

5    years later.  Is that consistent with what she would

6    have told you?

7                MR. ABRAMS:  Objection.  Calls for work

8    product.

9                MR. CASTELEIRO:  I second that

10   objection.

11

12   BY MR. GIST:

13       Q.      Are you going to answer the question,

14   Mr. McCloskey?

15       A.      I prefer --

16               MR. CASTELEIRO:  He's not going to

17   answer.  I'm directing him not to answer.

18

19   BY MR. GIST:

20       Q.      Are you taking your counsel's advice?

21       A.      I am taking my counsel's advice, yes,

22   sir.

23               MR. GIST:  I'm done with this exhibit,

24   so I'm going to take it down.

25

Page 41

1    BY MR. GIST:

2         Q.    I have a couple of more questions about

3    Rose McIntyre and then it may be a good time for a

4    short break.  Rose McIntyre did give a pretty

5    detailed affidavit in this case.  Do you recall that?

6         A.    Yes.

7         Q.    Would you have drafted that affidavit?

8         A.    I think Cheryl and I together drafted

9    that with Rosy.

10         Q.    In a general sense, when you draft an

11   affidavit, you try to include the most important

12   facts that are most pertinent to the case.  Correct?

13              MR. ABRAMS:  Objection to the form.

14              MR. GIST:  You can answer, if you

15   understand.

16

17   BY MR. GIST:

18         Q.    I'm just asking, in the affidavits that

19   you draft, you put the important stuff in there?

20         A.    We try to, yes.

21         Q.    And you maybe didn't draft Rose

22   McIntyre's affidavit by yourself, but you certainly

23   had input on it?

24         A.    That's correct.

25         Q.    And by the time the affidavit was

Page 42

1  completed, you would have had well over a dozen

2  meetings with Rose McIntyre on top of phone calls.

3  Correct?

4       A.    Yes.  If you can, what's the date of

5  that affidavit, please?

6       Q.    I will get that for you.  Let me pull it

7  up.  This was previously marked Deposition Exhibit

8  56, and we're going to scroll down to the bottom.  So

9  the end of 2014.

10      A.    Okay, thank you.

11      Q.    Prior to December 5th of 2014, you would

12  have had numerous meetings with Rose McIntyre by that

13  point in time.  Correct?

14      A.    Yes.

15      Q.    For now at least, I'm done with Rose

16  McIntyre questions.  We might come back to it and I

17  want to shift into Lamonte's case.

18            THE VIDEOGRAPHER:  The time is 10:22.

19  We're going off the video record.

20

21            (Whereupon, a brief recess was taken off

22  the record.)

23

24            THE VIDEOGRAPHER:  It is 10:41.  We're

25  on the video record.

Page 43

1

2    BY MR. GIST:

3        Q.    Mr. McCloskey, we're back after a short

4    break.  Are you ready to resume?

5        A.    Yes, I am.

6        Q.    You testified at the October 2017

7    hearing that the case against Lamonte McIntyre was

8    built on two eyewitnesses, specifically Ruby Mitchell

9    and Niko Quinn.  Correct?

10       A.    Yes.

11       Q.    And nothing has changed your opinion?

12       A.    No, nothing has changed my opinion.

13       Q.    When you first came to Kansas City,

14   Kansas to start your field investigation, the first

15   thing you did was visit the scene of the shooting.

16   Is that correct?

17       A.    Yes, it is.

18       Q.    You went there to try and get an idea of

19   specifically what Ruby Mitchell and Niko Quinn would

20   have seen back on April 15th of 1994?

21       A.    Yes, from their vantage points of where

22   they were when the shooting took, yes.

23       Q.    And it became apparent to you even from

24   your first visit that Ruby Mitchell's view of the

25   shooting was, I don't know, less than ideal?

1          A.      I would say highly problematic.

2          Q.      And correct me if I'm wrong, but the

3    next thing you did was locate and have an interview

4    with Ruby Mitchell?

5          A.      That's correct.

6          Q.      So in discovery in this case, we

7    received a recording, an audio recording, of an

8    interview with Ruby Mitchell and you're on there and

9    Dan Clark.  Does that sound right that you recorded

10   your first interview with Ruby Mitchell with Dan

11   Clark present?

12         A.      I completely forgot about that, but yes,

13   we did.

14         Q.      And then in discovery, I asked some

15   questions -- in written discovery, I asked a question

16   as to -- because you can't tell from the audio the

17   date, so I asked in discovery when that interview

18   would have taken place, and the answer by plaintiffs

19   was April 1st, 2009.  Does that -- do you have any

20   reason to dispute that it wouldn't be on or about

21   that date?

22         A.      That sounds accurate to me.

23         Q.      Now, I think we covered this earlier,

24   but normally you do not record witness interviews?

25         A.      That's correct, yes.

Page 45

1          Q.     And you testified that the reason or one
2    of the reasons you don't record them is because the
3    truth comes out in bits and pieces and evolves over
4    time?
5          A.     Yes.
6          Q.     And with respect to affidavits, you wait
7    until the interviews are complete, and when you
8    finally get what you believe to be as much of the
9    truth as you're going to secure from the witness, you
10   prepare the affidavit and go over it with that
11   witness?
12         A.     Yes.
13         Q.     And backing up now to that first
14   interview with Ruby Mitchell.
15         A.     Yes.
16         Q.     She didn't recant in any way in that
17   interview.  Correct?
18               MR. ABRAMS:  Work product.
19               MR. GIST:  Again, this is an audio
20   recording that was produced by plaintiffs.
21               MR. ABRAMS:  Maybe I misunderstood the
22   question, Matt.  Were you asking about what's in the
23   tape?
24               MR. GIST:  I'm asking if he agrees with
25   me that yes, that it's clear on the tape and she

Page 46

1   recant.  She says thought it was Lamonte McIntyre.

2              MR. ABRAMS:  I didn't hear that, I'm

3   sorry.  I thought you were talking about something

4   different.

5              MR. GIST:  I'll rephrase my question so

6   we have a clean record.

7

8   BY MR. GIST:

9       Q.    Mr. Mccloskey, is it accurate that in

10  the April 1st, 2009 interview with Ruby Mitchell that

11  Dan Clark was a part and that you recorded that Ruby

12  Mitchell did not recant that Lamonte McIntyre was --

13  that she believed Lamonte McIntyre was the shooter?

14             MR. ABRAMS:  Objection.  I'll just say

15  that the tape speaks for itself.

16             MR. GIST:  You can answer.

17             THE WITNESS:  Yes.  There certainly

18  wasn't a clear recantation, that's correct.

19

20  BY MR. GIST:

21      Q.    Did you work on Ruby Mitchell's

22  affidavit?

23      A.    I did.

24      Q.    How many times did you meet with Ruby

25  Mitchell?

1      A.     I met with Ruby probably three -- three

2  times when we actually had a sit down with her.

3  Other than that first meeting, which again, I

4  completely forgot about that Dan was with me on that,

5  Cheryl and I usually met with Ruby together on

6  several occasions leading up to that affidavit.

7      Q.     And do you know how many occasions that

8  would have been?  Would it have been more than three

9  or do you just not know?

10     A.     I'm guessing three or so.

11     Q.     And would your file materials perhaps

12 reflect if they were more than that?

13     A.     Yes, they would.

14     Q.     And we can pull up the affidavit, if

15 need be.  I don't mind doing that.  At no point in

16 time did Ruby Mitchell flat out say, "I got it

17 wrong"; did she?

18          MR. ABRAMS:  Objection.  Work product.

19          THE WITNESS:  Well, she did tell Cheryl

20 and me that there's a real possibility she made a

21 mistake when we showed her the photos of Lamonte that

22 she identified with short hair when she always has

23 insisted that the shooter wore french braids.  That

24 unsettled her dramatically.

25

Page 48

1  BY MR. GIST:

2      Q.    Following up on that, I mean, you

3  testified about that where you pointed out to her

4  trial testimony to her and she started to cry.  Do

5  recall that?

6      A.    I don't recall testifying to that, but I

7  recall that meeting with her when she did, yes.

8      Q.    So let me back up just a little bit.

9  The affidavits, I mean, you want everything in those

10 affidavits to be true and accurate.  Correct?

11     A.    Yes.

12     Q.    How do you handle a situation if a

13 witness is telling you something that based on other

14 information you gather in the investigation you know

15 or at least have serious reason to believe is false,

16 how do you handle that situation?

17          MR. ABRAMS:  Objection.  Overbroad.

18 Objection to form.

19          THE WITNESS:  Well, you know, every

20 situation is different.  If we're trying, sometimes

21 we would -- I would gently confront the witness with

22 a particular statement I knew was false.  Other

23 times, if I thought it would really be a disturbance

24 or upset the interviewee at the time, I might let it

25 ride without pointing out to him or her why I thought

Page 49

1   it was not accurate what they were saying.  It just

2   varies how I handle that.

3

4   BY MR. GIST:

5       Q.      I apologize, I may have just asked this,

6   but I want to clarify.  Were you present during the

7   final walkthrough, if you will, with Ruby Mitchell

8   going over her affidavit and her signing it?

9       A.      Yes, I was.

10      Q.      So I'll direct your attention to your

11  testimony at the October 17th -- excuse me, October

12  12th, 2017 hearing.  I'll put up on the screen page

13  175.  Sorry, it will take a second for me to get it

14  up on the screen.  This is some questions and answers

15  from a hearing.  You're being questioned I believe by

16  Jennifer Tatum.  If you would you please, because

17  this is going to go to page 176, but would you read

18  to yourself starting at line 8 and tell me when

19  you're ready to go to the next page.

20      A.      I've read the question.

21          MR. CASTELEIRO:  You have to scroll.

22  You have to scroll it.

23

24  BY MR. GIST:

25      Q.      What I'm asking is, Mr. McCloskey:

Page 50

1    Could you please read page 175 starting at line 8 to

2    the end of the page and let me know and then I will

3    turn to the next page.

4            A.      So you want me to read to the end of the

5    page, okay.

6            Q.      Yeah.

7            A.      Hold on.  Yes, go ahead.

8            Q.      And the next page, if you would, just

9    read to line 19 -- excuse me, line 22, I apologize.

10           A.      So basically the whole page?

11           Q.      Yeah, and then I'll be done.

12           A.      Okay.  Okay, I've read it.

13           Q.      And do you remember the meeting with

14   Ruby Mitchell that you're describing in that

15   testimony?

16           A.      I do.

17           Q.      And for the record, by the way, this is

18   your trial testimony.  It's been marked as Exhibit

19   112.

20

21                   (Whereupon, Exhibit 112 is marked for

22   identification.)

23

24   BY MR. GIST:

25           Q.      My question is:  Am I correct that in

1   that testimony, you're summarizing a meeting that you

2   had with Ruby Mitchell, your third meeting, where you

3   confront her with the fact that her trial testimony

4   she said she never saw the shooter's hair and yet

5   she's insistent that the shooter had french braids

6   and she breaks down crying and realizes she may have

7   just messed up and wrongfully identified Lamonte

8   McIntyre as the shooter.  Is that correct?

9        A.    That's correct.

10       Q.    Yet in Ruby Mitchell's affidavit, the

11   french braid stuff is in there.  I mean, you don't

12   take that out of the affidavit.  Why is that?

13       A.    In line with that, she asked -- she

14   asked me not to include the fact that she cried and

15   offered an apology to the family and she may have

16   made a mistake.  That's not the part she didn't want

17   in there.

18       Q.    Sure, but she's acknowledging that she's

19   wrong about the french braids.  Correct?

20       A.    I would have to reread that.  She is

21   maintaining that the shooter had french braids.  She

22   always told us that, and when she saw Lamonte's

23   photo, she realized that he did not have french

24   braids at the time of the shooting.

25       Q.    I can pull the testimony back up for

Page 52

1    you.  You yourself had the trial transcript and

2    you're showing Ruby Mitchell that at trial she said

3    multiple times that she didn't see the shooter's hair

4    and wasn't paying attention to the shooter's hair?

5         A.    Right, yes.

6              MR. ABRAMS:  I object to the question as

7    it's posed.  Objection to form.

8

9    BY MR. GIST:

10        Q.    And the reason you're showing her her

11   trial testimony, you're trying to pin down to her

12   that she has this french braid description as just

13   simply not accurate because however many, you know, a

14   decade and and a half earlier, she testified that she

15   didn't see the shooter's hair and she she breaks down

16   crying?

17        A.    Yes, that's correct.

18        Q.    So isn't it inconsistent that her

19   affidavit insists that the shooter had french braids,

20   but she then acknowledges to you after looking at her

21   trial testimony that she never saw the shooters hair?

22             MR. ABRAMS:  Object as to form.

23             THE WITNESS:  Again, I guess I will try

24   to be clear with my testimony today that all that is

25   true.  That occurred during the interview, which is

Page 53

1   what this testimony reflects, but again, she was

2   unwilling to have us include in the affidavit.  My

3   recollection is that, you know, she made a mistake

4   and she helped send an innocent man to prison.  She

5   wouldn't go clearly that far.

6

7   BY MR. GIST:

8        Q.    Wouldn't it be better to take out the

9   paragraph in her affidavit about the shooter having

10  french braids because you knew it to be false?

11              MR. ABRAMS:  Object to form.

12              THE WITNESS:  I thought it was very

13  important to include that discrepancy in her

14  testimony versus what he has continuously said, which

15  is that the shooter wore french braids, and she also

16  told us that she told the police that.  No, I thought

17  it was important to include that.

18

19  BY MR. GIST:

20       Q.    At this meeting when you showed her the

21  trial testimony where she repeatedly testified that

22  she didn't see the shooter's hair, she does break

23  down crying.  Correct?

24       A.    Yes, she broke down crying after she saw

25  the photos of Lamonte taken at the time or near the

1   scene of the crime.

2        Q.    So you're meeting with Ruby Mitchell for

3   the third time.  You know by that point in time,

4   she's insisting that the shooter had french braids?

5        A.    Yes.

6        Q.    And you show her trial testimony where

7   she repeatedly says that she didn't know what kind of

8   hair the shooter had.  You show her a picture of

9   Lamonte McIntyre and she breaks down crying.

10  Correct?

11       A.    Yes, that's correct.

12       Q.    What was the purpose of showing her the

13  trial testimony where she said she didn't know what

14  kind of hair the shooter had?  Why are you showing

15  her that?

16            MR. ABRAMS:  Objection.  Work product.

17

18  BY MR. GIST:

19       Q.    You specifically testified about a very

20  specific event in the court hearing.  Obviously,

21  there was a waiver.

22            MR. ABRAMS:  The question was why, for

23  the record.

24

25  BY MR. GIST:

1        Q.      Can you answer the question?

2        A.       I pointed this out to her during that

3   interview about the french braids versus the short

4   hair of Lamonte hoping that would inspire her to

5   admit for the record in the affidavit that her

6   identification was completely wrong and which would

7   resulted in a clear recantation of her testimony.

8        Q.      Mr. McCloskey, I understand showing her

9   the photo of Lamonte where his hair doesn't have

10   french braids, and I get that, but what I don't

11   understand is why are you showing Ruby Mitchell her

12   trial testimony when she's saying, "I don't even know

13   what kind of hair the shooter had because I wasn't

14   looking at his hair, I was looking at his face"?

15                MR. ABRAMS:  Object as to form.

16

17   BY MR. GIST:

18        Q.      What's the purpose of that?

19        A.       I thought the purpose was pretty clear.

20   I was trying to demonstrate to her that her trial

21   testimony was inaccurate based on what she has been

22   telling us during the course of our interviews with

23   her.

24        Q.      Okay.

25        A.       I don't know how else to explain it.

1      Q.      Well, we can agree that her trial

2  testimony is I don't know what hair he had, and when

3  you're talking to her, she's adamant that he had

4  french braids?

5      A.      That's correct.

6      Q.      So again, earlier I asked you about your

7  testimony that the case against Lamonte McIntyre was

8  built on two eyewitnesses, Ruby Mitchell and the

9  other being Niko Quinn, and that's where I'd like to

10  move on t now.

11             MR. ABRAMS:  Matt, are you sharing

12  something?  We don't see -- we see a blank.  I just

13  want to make sure you're not sharing something.

14             MR. GIST:  No, we're going to be

15  potentially showing parts of his testimony, if need

16  be.

17             MR. ABRAMS:  Okay, just making sure.

18

19  BY MR. GIST:

20      Q.      So it wasn't clear to me from your

21  previous testimony when you first talked to Niko

22  Quinn.  Do you recollect if it was before or after

23  you agreed to take the case -- that Centurion agreed

24  to take Lamonte McIntyre's case?

25      A.      Yes, I do have a clear recollection of

1  that, and I first spoke with Niko Quinn in either

2  April or June of 2009.  I think it was June of 2009.

3        Q.    How were you able to get in contact with

4  her?

5        A.    I visited with one of her sisters, Layla

6  Gatlin I think her name was.  I'm not sure of her

7  last name.  And she told us that we should visit with

8  Niko, which I wanted to do anyhow.  I asked her to

9  call Niko and ask Niko to call me, and she did that.

10 She and her sister did that, and within 30 minutes, I

11 received a call from Niko Quinn.

12       Q.    And when you met with Niko Quinn for the

13 first time, do you recall where that took place?

14       A.    Would you repeat that question, please?

15       Q.    Do you recall where the first meeting

16 with Niko Quinn took place?

17       A.    The first conversations at that time

18 that I just described and how I got contact with her

19 I believe were by telephone.  There were two

20 conversations, rather lengthy by telephone; not a

21 meeting that first time.

22       Q.    Thank you.  And in total, how many times

23 had you had an in-person meeting with Niko Quinn?

24       A.    Oh, boy, I would say two or three over

25 time.

1      Q.     And you described I think one or two

2   phone calls early on.  Do you know how many phone

3   calls you would have had with Niko Quinn?

4      A.     Those two phone calls occurred -- the

5   first day when she called me in response to her

6   sister's request, we spoke on the phone, and then the

7   next day and I asked her, "Could I follow up with you

8   to have a further conversation," and she agreed and

9   it was during that conversation the next day that was

10  rather lengthy that we had -- we talked about what

11  she knew about the case and what had happened.

12     Q.     And that was by phone as well.  Right?

13     A.     That was by phone at that time, yes.

14     Q.     Okay, and I think you testified that

15  there would have been two or three in-person meetings

16  at some point thereafter?

17     A.     Yes.

18     Q.     Do you recall if there was lengthy phone

19  calls after the ones you just described?

20     A.     I don't recollect that.  I don't think

21  so, but I'm not sure.

22     Q.     So Niko Quinn is the person who told you

23  about Neil Edgar Jr., otherwise known as Monster,

24  because you never heard about Monster prior to

25  talking to Niko Quinn?

Page 59

1        A.      That's correct, yes.

2        Q.      And she told you Monster did the

3   shooting?

4        A.      Yes.

5        Q.      Niko Quinn did not -- was not the person

6   who told you about Cecil Brooks.  You learned that

7   elsewhere from Saundra Newsom's recording of John

8   Quinn?

9        A.      That's correct, yes.

10       Q.      And Niko Quinn told you that Monster,

11  whose real name is Neil Edgar Jr., was one of three

12  men that beat up her cousin, Doniel Quinn, a week

13  before he was murdered?

14       A.      Either a week before or a day or two

15  before.

16       Q.      And Niko Quinn told you that he was

17  beaten at a nearby drug house operated by Aaron

18  Robinson?

19       A.      Yes.

20       Q.      Niko Quinn told you that Neil Edgar Jr.,

21  otherwise known as Monster, was one of the three

22  leaders of the drug spot that Doniel Quinn was beaten

23  up at?

24       A.      I wouldn't characterize it as a leader.

25  He was their enforcer.

Page 60

```
 1        Q.     Okay.  I'm going to pull up your
 2   testimony, page 134, and again, this is Exhibit 112.
 3   You can take your time to read, but it's lines 11
 4   through 13.
 5        A.     Okay, I read it.
 6        Q.     And in this testimony, you referred to
 7   Monster as one of the three leaders of Aaron's drug
 8   spot.  Correct?
 9        A.     Yes, I guess, yes.
10        Q.     And I understand.  I fully understand
11   that Monster was the muscle and the enforcer and Niko
12   Quinn told you that.  Correct?
13        A.     Yes.  This testimony of mine about the
14   three leaders, it was a mischaracterization -- as I
15   look at it now, it was a mischaracterization of
16   Monster's leadership role in that drug house, but
17   anyway, it's there.
18        Q.     But sometimes the enforcer -- you dug
19   really deep into the Kansas City drug scene.
20   Correct?
21        A.     Yes.
22        Q.     And an enforcer is a pretty important
23   role for a drug kingpin?
24        A.     Yes, however, the enforcer does what
25   he's told in this instance, and he was a 15-year old
```

 1    kid at the time and he basically followed the orders

 2    of Aaron Robinson and Cecil Brooks.

 3         Q.    But you can't be a successful drug

 4    dealer in Kansas City, Kansas without a killer?

 5         A.    But that doesn't mean that the killer or

 6    the enforcer is a leader.

 7         Q.    Fair enough.  I'll move on from that.

 8              Niko Quinn also told you that Monster

 9    took a shotgun over to her uncle Robert Quinn's house

10    with John Quinn present to relay the message "keep

11    your mouth shut"?

12         A.    That's correct, yes.

13         Q.    And that happened -- Niko Quinn told you

14    that that occurred the evening of the shooting.

15    Correct?

16         A.    I don't remember that now as you ask me

17    that question, but it very well could have been, but

18    I don't remember saying that.

19         Q.    Or shortly after the shootings.  Is that

20    fair?

21         A.    Again, I'm not clear on the timing of

22    that now as I sit here, but it could have been.  I

23    don't know.

24         Q.    It's my understanding that Robert Quinn

25    is no longer alive.  Did you ever have an opportunity

1   to talk to him?

2        A.     I tried and he made himself scarce.  He

3   was not willing to talk to me.  He didn't tell me

4   that directly, but he was just scared.

5        Q.     And just so we're clear, I'm talking

6   about Robert, not John.

7        A.     Yes, I'm talking about Robert as well.

8   Yes, sir.

9        Q.     And you didn't get a chance to talk to

10  John Quinn either.  Correct?

11       A.     I did not.

12       Q.     Is it your understanding that Robert

13  Quinn is passed as well?

14       A.     Yes, my understanding is that he's dead.

15  He was killed.

16       Q.     On January 24th of 2017, Niko Quinn met

17  with the Wyandotte County district attorney's office.

18  My understanding is that Cheryl Pilate was present,

19  Jennifer Tatum, assistant district attorney, was

20  present, and there were some others.  My question is:

21  Were you present for that meeting?

22       A.     I was not, no.

23       Q.     An audio was kept of that meeting and

24  produced in discovery, which I've had a chance to

25  review.  Have you ever listened to that tape?

Page 63

1        A.      I have not.

2        Q.      Have you ever read a transcript of it or

3   anything like that?

4        A.      No, sir.

5        Q.      Do you have any knowledge or

6   understanding as to what she said at this meeting?

7        A.      No, I don't.

8        Q.      So I'm going to tell you some things she

9   said at this meeting and ask whether you had ever

10   heard that before.  She admitted to being a drug

11   dealer, Niko Quinn that is.  Did Niko Quinn ever

12   state that to you?

13            MR. ABRAMS:  Objection as to work

14   product.

15

16   BY MR. GIST:

17        Q.      Can you answer?

18        A.      Not with such clarity.

19        Q.      She said that she had a drug house and

20   described it being in close vicinity to Aaron

21   Robinson's drug house.  Have you ever heard that

22   before?

23            MR. ABRAMS:  Same objection.

24            THE WITNESS:  I have not heard that.

25

Page 64

1    BY MR. GIST:

2        Q.    She described her boyfriend whose name

3    was Chris Jones with a street name of C-Love saw

4    Aaron Robinson and Monster the night before the

5    killings on Quintero Boulevard.  Did Niko Quinn tell

6    you that?

7                MR. ABRAMS:  Same objection.

8                THE WITNESS:  No, I don't belive she

9    did, although I'm very familiar with C-Love.

10

11   BY MR. GIST:

12       Q.    How are you familiar with C-Love?

13       A.    Because first of all, I met with C-Love.

14   I met his mother, and Niko told me that he was living

15   with her on Hutchinson Street when the crime

16   occurred.

17       Q.    C-Love was living with Niko at the time

18   of the murder?

19       A.    Yes.

20       Q.    Was he present at the time of the

21   murder?

22       A.    I don't think he was.  I think she told

23   me that he had left the house and was not there when

24   this shooting took place.

25       Q.    Did you get contact information for

Page 65

1   C-Love?

2        A.      Yes.  Yes.

3        Q.      C-Love never gave an affidavit to you.

4   Is that true?

5        A.      That is true.

6        Q.      When was the last time you talked to

7   C-Love?

8                MR. ABRAMS:  Objection.  Work product.

9                MR. CASTELEIRO:  I object on a work

10  product basis, and I'm directing him not to answer

11  about C-Love.

12               MR. GIST:  Just so I understand, it's

13  work product the last time he talked to him?

14               MR. CASTELEIRO:  The work product is the

15  fact that you're asking him the content of

16  conversations that he had with C-Love.

17               MR. GIST:  I'm only asking when is the

18  last time he talked to him.  I'm not asking about the

19  content.

20               MR. CASTELEIRO:  Okay, you can answer

21  that.

22               THE WITNESS:  All right, the last time I

23  met with C-Love I would say -- I don't have a clear

24  date in mind, but it was probably around 2011 or so.

25

Page 66

1   BY MR. GIST:

2          Q.      Thank you.

3                  THE VIDEOGRAPHER:   The time is 11:13.

4   Going off the video record.   This concludes media

5   unit one.

6

7                  (Whereupon, a brief recess was taken off

8   the record.)

9

10                 THE VIDEOGRAPHER:   The time is 11:24.

11  We're on the video record.   This begins media unit

12  two.

13

14  BY MR. GIST:

15         Q.      Mr. McCloskey, we're back after a short

16  break.   I have some follow-up questions about Chris

17  Jones who went by the street name of C-Love.   You

18  stated you were well acquainted with him.   How many

19  times total did you either meet your speak with him?

20         A.      By "well acquainted," I certainly knew

21  who he was.   That's what I meant by that, not

22  personally well acquainted.   Repeat your question,

23  I'm sorry, please.

24         Q.      In total, how many times did you either

25  speak with or meet with C-Love?

1          A.      One time.

2          Q.      And who was present at that time, who

3    else was there?

4          A.      I met him in Wichita, Kansas by

5    appointment and the owner of the house we met in as

6    well as one of his associates whose name I forget.

7          Q.      Was Cheryl Pilate present?

8          A.      She was not.

9          Q.      Was Niko Quinn present?

10         A.      No, just the three people I mentioned

11   were there.

12         Q.      And what about phone conversations, did

13   you have phone conversations with them?

14         A.      No.

15         Q.      And do you recall how long the meeting

16   lasted?

17         A.      It was probably 30 minutes or so.

18         Q.      And would have done a witness summary of

19   this meeting?

20         A.      Yes, I think I did.

21         Q.      You mentioned earlier that you talked to

22   C-Love's mother?

23         A.      That was -- she was present at that

24   meeting.  It was agreed that we would meet at the

25   other gentleman's mother's house in Wichita -- I'm

1    sorry, yes, I also at another time meet with C-Love's

2    mother in Kansas City, Missouri.

3         Q.     And what was her name?

4         A.     I forget.

5         Q.     And do you know if it was the same last

6    name as Jones or a different last name?

7         A.     I'm sorry, I don't remember.

8         Q.     And would that be in your witness

9    summaries?

10        A.     I would think so.

11        Q.     Did you understand that Chris Jones,

12   otherwise known as C-Love, was living in Wichita,

13   Kansas at the time that you met with him?

14        A.     No, his homie he was, and he wanted to

15   meet in his friend's mother's home in Wichita for

16   whatever reasons.  I don't know.

17        Q.     Do you know where he was living -- do

18   you know where Chris Jones was living at that time?

19        A.     I do not.

20        Q.     Do you know where he's living now?

21        A.     I do not.

22        Q.     You understand that he was in the

23   business of dealing drugs?

24        A.     Yes.

25        Q.     Back in 1994, did you know that Cecil

1   Brooks was actually his supplier?

2          A.     I do not know that.

3          Q.     Earlier I was telling you some things

4   that Niko Quinn told the district attorney's office

5   back on January 4th, 2017.  I'm going to jump back to

6   that.  Okay?

7          A.     Yes.

8          Q.     She told the district attorney that she

9   saw Aaron Robinson and Monster trying to get Doniel

10  Quinn to get into their car the evening before the

11  shooting.  Did Niko Quinn ever tell you that?

12         A.     She did not.

13         Q.     She said that C-Love actually went over

14  and pulled him and got him away from the car the

15  evening before the shooting.  Had you ever heard that

16  before?

17         A.     I did not.

18         Q.     She told the district attorney's office

19  that the morning or the day of the shooting, I don't

20  know if it was morning or early afternoon, that she

21  told C-Love to leave his gun over because she was

22  concerned something bad might happen.  Did she ever

23  tell you that?

24         A.     That C-Love was to leave his gun where?

25         Q.     At Niko Quinn's house.

Page 70

1       A.      No, I don't recall her saying that to

2   me.

3       Q.      Did Niko Quinn indicate that she was

4   surprised that Doniel Quinn was murdered?

5       A.      I don't think she was surprised at all

6   because of the beating he took at the hands of Aaron

7   Robinson et al.

8       Q.      Niko Quinn told the district attorney

9   that she had C-Love actually go to Aaron Robinson

10  before the murders, after the beating, but before the

11  murders, and see if there could be a certain amount

12  of money paid to either save Doniel Quinn or just

13  keep him from further harm.  Did Niko Quinn ever tell

14  you that?

15      A.      No, she did not.

16      Q.      Sitting here today, can you tell me

17  where C-Love, Chris Jones, resides?

18      A.      I have no idea.

19      Q.      But you do have a phone number somewhere

20  on file?

21      A.      For C-Love?

22      Q.      Yes.

23      A.      No, I had his mother's phone number, but

24  not his.

25      Q.      All right.  Niko Quinn told you that she

1   told the prosecutor, Terra Morehead, that Lamonte

2   McIntyre was the shooter -- was not the shooter --

3   let me start over because I messed that up.

4            Niko Quinn told you that she told

5   Wyandotte prosecutor, Terra Morehead, that Lamonte

6   McIntyre was not the shooter after the preliminary

7   hearing, but before the jury trial.  Is that correct?

8        A.    That's correct, yes.

9        Q.    Among the file material you reviewed in

10  this case, one of them was the preliminary hearing.

11  Correct?

12       A.    Yes.

13       Q.    And Niko Quinn does identify Lamonte

14  McIntyre as the shooter at that hearing, at the

15  preliminary hearing.  Correct?

16       A.    Yes.

17       Q.    Did Niko Quinn ever tell you why she

18  perjured herself at that hearing, the preliminary

19  hearing?

20       A.    She just felt -- she just felt pressure

21  by Golubski to do so.

22       Q.    Did Niko Quinn tell you about -- strike

23  that.

24            At any point in time, did you ever

25  question whether Niko Quinn was telling you the truth

1    about the reason she committed perjury?

2          A.    Well, you often -- you always take that

3    into consideration, but what she told me made a world

4    of sense based on my knowledge and the facts and

5    circumstances of this case and my work in this area.

6          Q.    Does it make sense that Niko Quinn would

7    have perjured herself and said that Lamonte McIntyre

8    was the shooter because she was afraid that Monster

9    might kill her if she didn't do otherwise?

10         A.    That was a possibility in her mind.  She

11   had a lot of pressures operating on her.

12         Q.    What about the code of -- you

13   interviewed what, 100 or so people in the Kansas

14   City, Kansas area in connection with this case.

15   Correct?

16         A.    Altogether, approximately that amount, I

17   would say, yes.

18         Q.    Did witnesses talk about the code of

19   silence, you know, you don't talk to the cops, you

20   don't snitch, things like that?

21         A.    I knew about that, but yes.

22         Q.    And did you ever consider that Niko

23   Quinn being involved with drugs herself was simply

24   not in the position to be able to snitch on a

25   neighboring drug dealer?

1        A.      A neighboring drug dealer?

2        Q.      On Aaron Robinson?

3        A.      Yes, on Aaron Robinson.  No, I don't

4    think that really ever entered my mind in assessing

5    her credibility.

6        Q.      Did Niko Quinn tell you that Stacey

7    Quinn had left before the police could get there

8    after the shooting?

9        A.      No, that wasn't my source of that

10   information.  Josephine told Golubski that the

11   afternoon of the crime.

12       Q.      Thank you.  Did you review Niko Quinn's

13   recorded statement to the police that was

14   approximately 44 minutes after the shooting?

15       A.      44 minutes?  I think it was four

16   minutes.

17       Q.      No, I think what you're referring to is

18   the length of the recording.  I'm asking -- by "44

19   minutes," I was saying 44 minutes after the shooting

20   is when the recording began or was taken.  Is that

21   consistent --

22       A.      You know, it's not clear in my mind

23   right now whether I had that transcript or whether I

24   just had the police report summarizing what she told

25   that investigator the afternoon of the crime.

Page 74

1        Q.      Do you know if at any point in time

2   you've seen Niko Quinn's statement to the police, the

3   transcription of the statement she gave to the

4   police?

5        A.      You know, I may have, but that's not

6   ringing a bell to me for some reason.

7        Q.      I'm going to pull that up.

8

9               (Whereupon, Exhibit 113 is marked for

10  identification.)

11

12              MR. GIST:  I'll put up Niko Quinn's

13  transcribed statement to police.

14

15  BY MR. GIST:

16       Q.      So in front of you is Exhibit 114.  This

17  is a transcription of Niko Quinn's statement.  If you

18  look up in the top left corner, I guess I was wrong.

19  It says the time the statement was taken, 14:46.

20       A.      Yes.

21       Q.      I said 44, I think.  It's 46 minutes.

22       A.      That's okay.  That's the date, 4/15, but

23  it took place at 46 hours.  Go head, I'm sorry.

24       Q.      Do you know if you've seen this before?

25       A.      You know, I think I have.  Can you go to

1    the next page?

2         Q.     Yes.

3         A.     Yeah, I have seen this, I'm sorry, yes.

4         Q.     I understand.  There's a lot of

5    documents.  I just wanted to ask you about a

6    particular question and answer she gave.  It will be

7    on the third page.  Okay, there's a question a little

8    past halfway down.  It starts "do you know whether."

9    Do you see that?

10        A.     Yes, I do.

11        Q.     Niko Quinn was asked the question:

12               "Do you know whether or not the people

13   in the Cadillac, your cousin included, were having

14   any difficulties with anyone?"

15               ANSWER:  "No, I don't."

16        A.     Yes.

17        Q.     And based on what Niko Quinn told you,

18   that was not true?

19        A.     That's not true, yes.

20        Q.     Did she ever tell you why she lied to

21   police?

22        A.     I don't think I ever pointed that out to

23   her.

24        Q.     Now, it is in her affidavit that she

25   told the police about -- let me start over.

1          Niko Quinn's affidavit, I think I may
2    have already asked you this, the 2014 affidavit, did
3    you assist in drafting that?
4          A.    What was the date of that, please?
5          Q.    2014, June 30th.
6          A.    I don't recall whether I did or didn't
7    or whether Cheryl worked that up with Niko.  I think
8    it was the latter, but I'm not entirely certain.
9          Q.    Did Niko Quinn ever tell you that she at
10   some other point in time did tell the police about
11   her cousin, Doniel Quinn, getting beat up the week
12   before the shooting?
13         A.    Yes, she told me that, yes.
14         Q.    Did she say when or who she said that
15   to?
16         A.    She said that she said that to Detective
17   Golubski.  At some point early in the -- early in the
18   aftermath of the crime at some point, I'm not exactly
19   sure when, she told me that she did tell Mr. Golubski
20   that.
21         Q.    Did Niko Quinn tell you that Cecil
22   Brooks operated Aaron Robinson's drug house?
23         A.    She was aware of that, yes, that he was
24   in partnership with his first cousin, Aaron Robinson.
25   It was commonly known.

Page 77

1      Q.      And you met with -- you interviewed a

2   Joe Robinson as well.  Correct?

3      A.      Yes.

4      Q.      And do you know how many times you met

5   with Joe Robinson?

6      A.      I met with Joe I think twice leading up

7   to the affidavit.

8      Q.      Okay, did you draft his affidavit?

9      A.      I did.

10             MR. GIST:  Okay, I'll pull that up and

11   mark that as Exhibit 114 -- I'm sorry, this is

12   previously marked as Exhibit 94, my apologies.

13

14   BY MR. GIST:

15      Q.      So do you recognize this affidavit as

16   the affidavit that you drafted for Joe Robinson?

17      A.      Yes.

18      Q.      And I just wanted to ask you about

19   paragraph 6.  Can you read that out loud please?

20      A.      "Aaron ran his own operation independent

21   of Cecil.  He was the boss and ran his own crew.

22   Aaron was a big player back in the 1990s respected by

23   all who knew him well."

24      Q.      Wouldn't that say that Cecil Brooks did

25   not run Aaron Robinson's drug house?

1       A.      It's more complicated than that.  Cecil

2  Brooks was the drug lord of that community, and he

3  did trade up Aaron Robinson and he had a lot of

4  confidence in Aaron, but they would consult on

5  different problems that would come up.

6       Q.      Didn't you understand that Cecil Brooks

7  was really just the supplier?

8       A.      No, I understood that Cecil Brooks

9  really ran the drug business -- he was a drug lord in

10  that part of Kansas City, Kansas.  He wasn't just a

11  supplier.

12       Q.      Well, the affidavit that you took from

13  Joe Robinson, based on things that Joe Robinson told

14  you.  Correct?

15       A.      Yes.

16       Q.      He was the boss and ran his own crew?

17       A.      Are you talking about Aaron now?

18       Q.      No, I'm reading paragraph 6 -- well,

19  yeah, Joe Robinson in his affidavit is saying that

20  he, meaning Aaron, Aaron Robinson was the boss and

21  ran his own crew, ran his own operation independent

22  of Cecil?

23       A.      Again, it's a little more complicated

24  than that and nuanced.  As an example, I think in

25  Cecil's draft of the affidavit, Cecil was there the

```
 1   night before the two men were killed and Cecil and

 2   Aaron and Monster were consulting with each other

 3   about what to do about the stolen drugs, so that

 4   would indicate to me that Cecil, you know, he was a

 5   CEO.  Any problems, he might help them out and decide

 6   what to do.

 7        Q.    If you look at paragraph 5 of the

 8   affidavit.

 9        A.    Right.

10        Q.    Second to the last sentence, can you

11   read that out loud please?

12        A.    "If Aaron did not need Cecil or really

13   anyone to tell him how to run his business.  He had

14   the ability to figure things out and run a successful

15   drug business."

16              Yes, that's what Joe told me, but again,

17   basically that might be true that Aaron had operating

18   authority, but that's not to say that he did not

19   consult with the man, Cecil Brooks, on things, which

20   I just pointed out.

21        Q.    But Cecil never told you that he ran the

22   drug house on 21st and Quintero with Aaron Robinson?

23        A.    No, he never put it with that clarity,

24   that definitive clarity, but if Cecil had nothing to

25   do with Aaron's running of a drug house, why would
```

Page 80

```
 1   Cecil be consulting with Aaron about just to do with
 2   these two guys that were killed the night before they
 3   were killed.
 4         Q.    Because they're friends?
 5         A.    I think it goes beyond that.
 6         Q.    So did you understand -- I may have
 7   asked this, but did you have any information that
 8   Cecil was also the supplier for C-Love?
 9         A.    I did not know that.
10         Q.    When Niko told you about Monster taking
11   the shotgun over to Robert Quinn's house with John
12   Quinn present with the message "keep your mouth
13   shut," did she explain to you how she became aware of
14   that information?
15         A.    Not specifically, but I would think one
16   of the relatives, Robert, would have told her that.
17   I don't know.  No, she did not say.
18         Q.    Okay.  Frieda Quinn, do you recall
19   Frieda Quinn?
20         A.    Yes.
21         Q.    Did you have occasion to meet with
22   Frieda Quinn?
23         A.    I never met with Frieda by myself, but
24   Cheryl and I would visit with her on occasion.
25         Q.    And she provided I think actually two
```

Page 81

1    affidavits in this case.  Would you have had any

2    assistance in the preparing of those affidavits?

3         A.     Yes, I would think I had a secondary

4    participation in that.  Cheryl had developed a good

5    relationship with Frieda and I would say was the

6    primary developer of those affidavits with Frieda.

7         Q.     Sitting here today, do you know the

8    whereabouts of Frieda Quinn?

9         A.     I'm sorry?

10        Q.     Do you know where Frieda Quinn is

11   located?

12        A.     I do not, no.

13        Q.     Do you recall Frieda Quinn telling you

14   and Cheryl that Niko told Frieda in the immediate

15   aftermath of the shooting that she recognized the

16   shooter from school?

17        A.     Yes, I do remember Frieda saying that.

18        Q.     Do you recall Frieda telling you and

19   Cheryl Pilate that the evening of the shooting, a

20   news report came out on the TV showing a mugshot of

21   Lamonte McIntyre which prompted Niko saying that they

22   got the wrong guy?

23        A.     Yes, I do recall her saying that.

24        Q.     And did you find Frieda to be credible?

25        A.     I found Frieda to be very credible, yes.

1          Q.      On or about February 11th of 2010, you

2     and Cheryl Pilate and Dan Clark met with Jerry

3     Gorman, the Wyandotte County district attorney.  Do

4     you recall that?

5          A.      I don't remember Dan being with us, but

6     I certainly do remember that meeting.

7          Q.      And the purpose of the meeting was to

8     discuss obviously the Lamonte McIntyre case and why

9     you guys believed him to be innocent?

10         A.      Yes, that's right, yes.

11         Q.      And at that meeting, would you have laid

12    out the reasons you believe Lamonte McIntyre to be

13    innocent?

14         A.      Cheryl took the lead in that regard.

15         Q.      Okay.  There was a letter that I believe

16    you authored.  I'll pull it up here.  I think that

17    will be Exhibit 114.

18

19                 (Whereupon, Exhibit 114 is marked for

20    identification.)

21

22    BY MR. GIST:

23         Q.      I apologize for the sticky note.

24    It's -- we got this from the Wyandotte County

25    district attorney's office, and that's just the way

Page 83

1  it is, so, I apologize for that, but this is a letter

2  that was written to Mr. Gorman that I believe you

3  authored.  Scroll down to the third page --

4          A.     May I point something out?

5          Q.     Yes.

6          A.      I thought you indicated that this

7  meeting took place in 2011, but this letter is from

8  2010.

9          Q.      Thank you for pointing that out.  So if

10  I said that, I'm obviously incorrect.  I stand

11  corrected.  I probably did say that.  Because it was

12  February 11th, I may have said 2011.  So let me start

13  over.

14          A.     Yeah.

15          Q.      You would have met, you and per the

16  letter, Dan Clark, Cheryl Pilate met with Jerome

17  Gorman on or about February 11th, 2010?

18          A.     Yes.

19          Q.      Do you recall that meeting, sitting here

20  today?

21          A.      Yes, I recall being in his office that

22  day, yes.

23          Q.      And the purpose of the meeting was to

24  explain why Lamonte McIntyre you guys believed was

25  innocent?

Page 84

1          A.      That's correct, yes.

2          Q.      I apologize again for the sticky note,

3     but I would like for you to do your best to just read

4     the letter and tell me when you're ready to go to the

5     second page.

6          A.      I'm going to start with No. 1 at the

7     bottom right because of the sticky.

8          Q.      Yeah.

9          A.      Okay.  I'm ready for the next page.  Do

10    you want me to read the whole thing to myself?

11         Q.      Well, I have questions about it.  It's

12    really up to you.  I don't want to be unfair.

13         A.      Well, why don't we go ahead with your

14    questions and you might refer me to a particular

15    paragraph that would help.

16         Q.      It's a broader question than that.

17    Would this letter accurately summarize the points you

18    were making at the meeting with Jerry Gorman as to

19    why you believe Lamonte McIntyre was innocent?

20         A.      Yes, absolutely, yes.

21         Q.      And we can agree that there's nothing in

22    here about Roger Golubski coercing Niko Quinn.

23    There's nothing in here about Roger Golubski raping

24    Rose Quinn.  There's really nothing in here about

25    Roger Golubski committing any misconduct.  Would you

Page 85

1    agree with that?

2         A.    Yes, it's not in here.

3         Q.    He is mentioned one time, but it's in

4    context of his statement he took from John Quinn.

5    That I don't believe is mentioned.

6         A.    That's right.

7         Q.    Would it be accurate to say that at the

8    time you met with prosecutor Gorman, that you would

9    have wanted to layout the best facts you guys had in

10   support of Lamonte McIntyre's innocence?

11        A.    Yes, that would be accurate, except I

12   would add, if I may, that we thought we had enough

13   facts without going into Golubski's misconduct in the

14   community over the years because the prosecutor and

15   the police had a relationship and we didn't think by

16   detailing Golubski's misdeeds that would aid our

17   cause in convincing Mr. Gorman, the district

18   attorney, that there was a miscarrying of justice.

19        Q.    And even an alleged rape of Lamonte's

20   mom?

21        A.    I don't think we knew that at the time.

22   I think Rosy told me that at a later point.

23        Q.    Sometime after 2010?

24        A.    After February of 2010.

25        Q.    Thank you.  Can you describe for me the

Page 86

1    context and how she brought that to your attention?

2         A.    Yes.  Can I take one very quick break?

3         Q.    Yes.

4              THE VIDEOGRAPHER:  Time is 11:52.  Going

5    off the video record.

6

7              (Whereupon, a brief recess was taken off

8    the record.)

9

10             THE VIDEOGRAPHER:  The time is 11:55.

11   We are on the video record.

12

13   BY MR. GIST:

14        Q.    Mr. McCloskey, we're back from a short

15   break.  I think you were -- do you recall the

16   question?

17        A.    Would you please repeat it?

18             MR. GIST:  I'm just going to have it

19   read back, if that's okay.  Can we have it read back?

20             THE VIDEOGRAPHER:  The time is 11:55.

21   Going off the video record.

22

23             (Whereupon, a brief recess was taken off

24   the record.)

25

```
 1                THE VIDEOGRAPHER:  The time is 12:03.
 2   We are on the video record.
 3
 4                (Whereupon, the requested portion of the
 5   record was read by the reporter.)
 6
 7                THE WITNESS:  Which rape are we talking
 8   about?
 9
10   BY MR. GIST:
11        Q.    Rose McIntyre telling you that --
12        A.    Yes, I'm sorry, repeat it one more time.
13   I now know the subject we're dealing with.  Go ahead,
14   one more time, please.
15        Q.    Can you describe the context in which --
16   I'm just going to re-ask the question.
17        A.    Yeah.
18        Q.    Can you describe the context in which
19   Rose McIntyre told you that she was raped by Roger
20   Golubski?
21        A.    Yes, I can.  Rosy and I had developed a
22   very close friendship with each other.  It got to the
23   point where she had been hurt so much in the past by
24   this whole loss of her son and nothing worked out for
25   her prior to our arrival on the scene, but anyway, we
```

Page 88

1    developed a rapport and a real trusting relationship

2    over the first -- maybe later in 2010 into 2011.  It

3    was probably in 2010 when I'd been working on the

4    case and visiting with her each trip where she and

5    Golubski was a -- we talked about Mr. Golubski on a

6    number of occasions in our conversations.  So she

7    said, "Jim, there's something I need to tell you and

8    I'm really embarrassed by this, but you and Cheryl

9    need to know this," and I said, "What is that, Rosy,"

10   and then in the privacy of her apartment, she relayed

11   what is in the affidavit, the whole Golubski

12   encounter that night back in 1988 with her boyfriend

13   and what happened the next day in Golubski's office.

14   That was it.

15        Q.    Did you ever ask her why she didn't

16   bring this up previously, specifically back in 1994

17   because it may have helped Lamonte not get convicted?

18        A.    First of all, she just felt like woman

19   victims do.  She felt ashamed, humiliated,

20   embarrassed, and she didn't want her son to know this

21   until she decided that she's got to tell this to

22   somebody.  This is just weighing heavily on her mind,

23   and so for whatever reasons, and I'd like to think it

24   was because of the relationship we developed, she

25   felt she could trust me and confide in me that

Page 89

1    information.

2         Q.    Did she ever tell you that she regretted

3    not bringing this up back in 1994 because it might

4    have kept her son out of prison?

5         A.    She never said that specifically, but,

6    you know, it's something that she wanted to do, but

7    she didn't know who to go to with this information

8    with this tragic encounter with Detective Golubski --

9    no, there was no place to go, in her own mind.

10        Q.    But she never explained why she didn't

11   tell Lamonte McIntyre's criminal defense attorney.

12   Correct?

13        A.    Yes, and my same answer applies to any

14   contact she had with regard to her son's case.

15        Q.    Prior to her coming forward and telling

16   you this about what you just described, this rape,

17   you had numerous discussions with her about Roger

18   Golubski.  Correct?

19        A.    Yes, Detective Golubski was a central

20   character in this case, so his name would come up

21   often with her, yes, that's true.  It wasn't a

22   singular focus, but yes, his name would come up,

23   sure.

24        Q.    Prior to her coming forward about this

25   alleged rape back in the '80s, were you telling her

1    some of the things you were getting about Roger

2    Golubski, specifically him allegedly frequenting

3    prostitutes, things of that nature?

4         A.    I don't have a clear recollection of

5    that, but I would think that I would tell her what

6    people told me about his behavior in the community

7    over the years, yes.

8         Q.    So you gave an affidavit that I'm going

9    to pull up here on the screen.  Do you recall

10   providing an affidavit in this case, in Lamonte's

11   case?

12        A.    Yeah.  What was the date of that?

13        Q.    I'm going to pull it up.  June 27, 2016.

14        A.    Yes.

15

16             (Whereupon, Exhibit 115 is marked for

17   identification.)

18

19   BY MR. GIST:

20        Q.    Do you recall his affidavit?

21        A.    Yes.

22        Q.    Would you have drafted this?

23        A.    Cheryl drafted it.

24        Q.    But you would have reviewed it and made

25   sure it was accurate before signing it.  Correct?

```
                                                    Page 91
1          A.     Yes.

2          Q.     I'd like to direct your attention to

3     paragraph 12, which is going to be on the third page,

4     so I'll move to the third page.

5                 MR. ABRAMS:  Do you have it on the

6     screen now?

7                 MR. GIST:  Yes, is it not showing?

8                 MR. ABRAMS:  I'm not seeing it, but

9     maybe it's me.

10                THE WITNESS:  I'm not seeing it either.

11

12    BY MR. GIST:

13         Q.     How about now, do you see it now?

14         A.     Yes.

15         Q.     Sorry.  So this is page 3 of your

16    affidavit.  I'd like to ask you some questions about

17    paragraph 12.

18         A.     Yes.

19         Q.     You say some affidavits were more

20    difficult to obtain, and some were -- were easy --

21    were easier.  Which ones were the difficult ones?

22                MR. ABRAMS:  Object as to work product.

23                THE WITNESS:  Probably, like I say here,

24    there were 40-some odd affidavits.  Which ones were

25    the difficult ones.  A lot of them were.  As part of
```

Page 92

1   the investigation, we developed -- we would visit

2   with different people, but without asking them to

3   execute an affidavit until we thought maybe they

4   might feel more comfortable with us and proceed to

5   that request, and while we were doing that, a number

6   of them were very reluctant to do that.  Everyone

7   expressed fear.  Not everyone, but most of them

8   expressed fear of Detective Golubski in retribution

9   by him and others the KCK Police Department, and they

10  finally allowed their own consciences to enable them

11  to give the affidavit.  I can't cite you chapter and

12  verse because that was a fairly common reluctance

13  that we were encountering for a lot of these

14  affidavits.

15          I guess as an example, Mr. Golubski's

16  wife, Ethel, she she was not happy to, you know,

17  offer an affidavit, but she agreed to it because she

18  recognized -- she knew what her former husband was up

19  to in the community, and she finally agreed to do it.

20  It was just -- you know, I guess "difficult" is a

21  subjective word, but it wasn't easy.

22      Q.    In fact, this one of the most

23  challenging investigations that you ever worked on.

24  Correct?

25      A.    Yes, it was, but a number of them are

1   very challenging, but this stands among the more

2   difficult ones, I could say.

3        Q.    And I may not encapsulate all the

4   reasons it made it difficult, but some of them were

5   the fear of the witnesses that you described, the

6   poverty situation of many of the witnesses, the fact

7   that they're moving often, living chaotic lives.

8   Would you agree with all of that?

9        A.    The basic reason was the community of

10  folks that we were dealing with and meeting with and

11  learning about their experiences, they were totally

12  alienated, distrustful, and fearful of the Kansas

13  City, Kansas Police Department, and some of them were

14  law-abiding citizens who knew about KCK police

15  behavior, others were criminals who had direct

16  experience with them, and the last thing they wanted

17  to do was to anger the police for fear of some kind

18  of retribution by them, and I -- the number of the

19  cases that I've worked on, I would say that I've

20  never seen such constant fear in a very broad section

21  of the community that I did in this case.  That's why

22  this stands out among a number of others.

23        Q.    I do want to ask a few questions about

24  Cecil Brooks.  You got his name during your

25  investigation and you went down and met with him down

Page 94

1    in a prison somewhere in Mississippi.  Is that

2    correct?

3         A.    Yes.

4         Q.    And you met with him for about three

5    hours or so at the prison?

6         A.    Yes.

7         Q.    And he was -- at the beginning, he was a

8    little reluctant, but then he opened up and gave you

9    a lot of information.  Is that correct?

10        A.    That's correct, yes.

11        Q.    And based on that information, you

12   drafted an affidavit for him.  Is that correct?

13        A.    I did.

14        Q.    And I understand that you sent the

15   affidavit to him, but you didn't get it back, but at

16   some point in time, he ends up sign the affidavit you

17   admitted him with some changes.  Is that correct?

18        A.    Yes.

19        Q.    So let me ask you this:  At any point in

20   time, did Cecil Brooks ever tell you that Roger

21   Golubski worked for him?

22        A.    He never told me that, no.

23             MR. GIST:  I'm getting close to the end.

24   I will be passing this witness.

25

Page 95

 1   BY MR. GIST:

 2       Q.     But I do want to go over one more

 3   affidavit with you.  This would be Kendra Dean

 4   Martin.  Do you remember Kendra Dean Martin?

 5       A.     I do.

 6       Q.     And did you meet with her as well?

 7       A.     Yes.

 8       Q.     And I believe she gave two affidavits in

 9   the case.  Would you have had any role in drafting

10   those?

11       A.     I know I did the first one.  I don't

12   know about the second one.  I may have, but I don't

13   remember.

14               MR. GIST:  I'm going to pull up her

15   first affidavit.

16

17               (Whereupon, Exhibit 116 is marked for

18   identification.)

19

20   BY MR. GIST:

21       Q.     You would have interviewed Kendra Dean

22   Martin on how many occasions?

23       A.     Leading up to this affidavit, maybe two

24   times.

25       Q.     And the affidavit would be based on the

Page 96

1    information that she provided to you?

2         A.    That's correct, yes.

3         Q.    And you understood that Kendra Dean

4    Martin herself was involved in the drug trade?

5         A.    I do, yes.  I did.

6         Q.    And in fact, and I'm just looking at the

7    bottom of paragraph 5, Cecil Brooks was one of her

8    suppliers.  Is that correct?

9         A.    I had forgotten that particular aspect,

10   but that's what it says, so yes, that's true.

11        Q.    Do you recall of any other drug dealers

12   that you talked to that Cecil Brooks was the

13   supplier -- where Cecil Brooks was the supplier?

14        A.    Not offhand.  Off the top of my head,

15   not right now.

16        Q.    Okay.  I'd like to ask you a little bit

17   about paragraph 6, excuse me.  Can you go ahead and

18   read that to yourself?

19        A.    Yes.  I've read it.

20        Q.    In this paragraph, Kendra Dean Martin

21   describes herself as an entrusted associate of all

22   these drug dealers.  Do you see that?

23        A.    Yes.

24        Q.    Who are -- what drug dealers was she

25   referring to?

1      A.     I don't think we got into the details of

2   who they were.  She was speaking generally about her

3   work and association in that world.  So I don't

4   believe I drilled too much deeper than that in terms

5   of identifying these drug dealers or who they were.

6   I was more interested in focusing with her on what

7   she knew that could assist us in getting to the truth

8   of the matter.

9      Q.     I understand.  But she does describe in

10  paragraph 6 how basically drug dealers will get

11  together and discuss overall business?

12     A.     Yeah.

13     Q.     Would you agree?

14     A.     Yeah, what I do recollect is that she --

15  I don't specifically recall the specifics of that

16  conversation, but she was even at this late date when

17  she had completely transformed her life and was a

18  hard working mother, she wasn't about to snitch on

19  people that she had dealt business with years before.

20  That was a different world she participated in.  She

21  was long gone from that world and -- but she was just

22  kind of describing her activity at that time during

23  those years.

24     Q.     Right, and what she described to you was

25  that drug dealers would work together to some extent,

1    different drug dealers would work together in order

2    to run successful operations, so specifically just

3    trying to stay away from the police and jail time?

4          A.    Well, yes, she talked about how they

5    would associate with each other and do business with

6    each other, yeah.

7          Q.    All right, so did she ever specifically

8    include Chris Jones in this group?

9          A.    No, not Chris Jones, no, I don't

10   recollect her talking about Chris Jones.

11         Q.    In paragraph 7 of the affidavit, she

12   discusses different drug dealers conversing in order

13   to avoid arrests.  Fair?

14         A.    Yes, I'm reading it right now.

15         Q.    Sure.

16         A.    Yes, I see this, yes.  What was your

17   question?  I'm sorry.

18         Q.    Let me ask you this:  Knowing that Chris

19   Harris was a drug dealer -- excuse me, Chris Jones.

20   Knowing that Chris Jones was a drug dealer, did you

21   ever form the opinion that he was against having this

22   girlfriend, live-in girlfriend, rat out another drug

23   dealer because that could actually affect his

24   operations?

25         A.    No, in other words, Chris Jones being

1   afraid if Niko Quinn ratted someone out it would

2   affect his business, is that what you're saying?

3        Q.     Yes.

4        A.     Niko had a very turbulent relationship

5   with Mr. Love and she was, on occasion -- she was

6   afraid of him, fearful of him.  He was a violent man,

7   so she had to be careful with how she dealt with him

8   until finally she would break off with him, he'd come

9   back, she'd break off, he'd come back.  It was a very

10  difficult challenge for her to keep him at bay, and

11  finally she was able to do that, but it wasn't easy

12  and, you know, there's just all levels of fear in

13  that community and he was one of them with her.

14       Q.     So Niko Quinn told you that she was

15  afraid of Chris Jones?

16       A.     Yes, she talked about how turbulent the

17  relationship was with him and he was difficult to

18  separate from him.

19       Q.     Did she tell you that Chris Jones knew

20  Aaron Robinson?

21       A.     She said that he certainly knew who

22  Robinson was and he knew -- he knew C-Love and what

23  was going on at the Robinson drug house up on 21st

24  and Quintero.  So yes, she talked about that, but I

25  never heard from her, I don't believe, that C-Love

Page 100

1    considered Aaron Robinson to be a drug rival.  I

2    don't know.  I don't remember that.

3         Q.    Not a rival, but just a competitor.  I

4    mean, if they're both selling drugs, can you see how

5    Chris Jones wouldn't want Aaron Robinson to go down

6    because if he goes down, he's going to take -- it's

7    going to affect Chris?

8         A.    The thing I remember about that is when

9    this crime occurred, and this is Niko telling me this

10   and relating this to me, they were very aware of the

11   problems that Doniel Quinn had with Aaron Robinson

12   and that drug house, namely stealing drugs, and they

13   you knew that trouble was brewing between Doniel

14   Quinn and the Aaron Robinson drug spot.  What Niko

15   didn't tell me was that when C-Love came back to the

16   house later that afternoon and discovered that the

17   double homicide had occurred on that block, he was

18   really very angry at Aaron Robinson because they

19   suspected that Robinson was behind this.  At some

20   point during the next week, Niko told me that C-Love

21   and somebody else, I forget who was with him, they

22   went by the drug spot of Aaron Robinson and shot it

23   up late at night, in the middle of the night.

24   That's -- that was the extent of whatever she had to

25   tell me about C-Love and his response to what

1   happened to Doniel Quinn who was a beloved first

2   cousin of his live-in girlfriend, Niko Quinn.  He

3   felt --

4        Q.    Did Niko Quinn ever tell you how C-Love

5   felt about Doniel Quinn?

6        A.    Well, Doniel Quinn, as they say in that

7   world, was "scandalous."  In other words, he would

8   steel anything he could get his hands on from loved

9   ones, from the mother of his children, from anybody

10  to sell for cash to buy drugs.  He was a classic drug

11  addict.  On the other hand, he was also, when he

12  wasn't high on drugs, he was a very charming,

13  gregarious, personable, beloved figure by many

14  different people who knew him in different

15  capacities.  So there was mixed feeling about Doniel

16  Quinn.  They didn't trust him, but they loved him,

17  those that were close to him and knew him.

18        Q.    Did she ever tell you though that Chris

19  Jones, because of his drug problems, that Doniel

20  Quinn was a liability and was bad for the business

21  operations?

22        A.    No, no.  She made -- Niko made it very

23  clear and I came to believe through the earlier

24  stages of this investigation that C-Love had nothing

25  to do with this.

Page 102

1    Q.    Did Niko Quinn ever tell you that Chris

2    Harris -- that Chris Jones told her to keep quiet and

3    not talk to police?

4    A.    I don't remember her saying that

5    specifically, but C-Love did not want Niko talking to

6    us.  That I know.

7    Q.    Do you know about the two guys coming to

8    Niko Quinn's house at night with guns and that caused

9    her to contact Roger Golubski.  Correct?

10    A.    Yes, that's what she said.

11    Q.    That's what she told you at least?

12    A.    That's what she told us, yes.

13    Q.    Would that have been after C-Love and

14    whoever shot up Aaron Robinson's drug house?

15    A.    It was a very short time after the

16    double homicide occurred.

17    MR. GIST:  I'm going to go ahead and

18    pass the witness, and I may have some more questions

19    at the end.  I don't know, but Mr. McCloskey, thank

20    you for your time and everything.

21    THE WITNESS:  Thank you.  Appreciate it.

22    THE VIDEOGRAPHER:  The time is 12:31.

23    Going off the video record.

24

25    (Whereupon, a brief recess was taken off

Page 103

1    the record.)

2

3              THE VIDEOGRAPHER:  The time is 12:32.

4    We are on the video record.

5

6    CROSS-EXAMINATION

7    BY MS. HAYES:

8         Q.    Sir, my name is Tracy Hayes.  I

9    represent a number of the individually named

10   defendants in this lawsuit.  I have just a couple of

11   follow-up questions for you.

12              I'm going to name my individual

13   defendants, and I just want to know what, if any,

14   information you had heard regarding any of them

15   during your investigation.  My first client that I

16   represent is Dennis Ware.  Do you recall any

17   information that you obtained regarding Dennis Ware?

18        A.    Dennis Ware, let's see.

19              MR. ABRAMS:  I object to the extent that

20   it calls for work product.

21              THE WITNESS:  I know I never spoke with

22   him.  I think, but I could be wrong, the record will

23   correct me if I am that he did come to the crime

24   scene and was one of the interviewers, but right now,

25   I can't be sure of that.

Page 104

1

2    BY MS. HAYES:

3        Q.     That's fine.  Anything else you recall

4    about Dennis Ware?

5                MR. ABRAMS:  Same objection.

6                THE WITNESS:  I'm thinking.  Not

7    offhand.  I'm sorry.

8                MS. HAYES:  That's okay, sir.

9

10   BY MS. HAYES:

11       Q.     The next client I represent is WK Smith

12   or William Smith.  Do you recall anything about

13   William Smith during your investigation?

14               MR. ABRAMS:  Same objection.

15               THE WITNESS:  I do recall that he did

16   interview.  He did go to the crime scene.  I don't

17   remember why I remember him, but he did go to the

18   crime scene, and I believe he interviewed Niko or

19   Ruby that Friday afternoon.

20

21   BY MR. ABRAMS:

22       Q.     And do you recall having any concerns

23   about those interviews that he conducted?

24       A.     Yes, I do.  They were extremely short

25   and not at all thorough.  I was shocked at the

1    falsity of information and the time he spent with

2    these eyewitnesses to the crime or the eyewitness of

3    the crime.

4         Q.    Do you recall, did you ever speak to

5    Mr. Smith?

6         A.    I don't think I did.

7         Q.    Anything else that you recall regarding

8    Mr. Smith?

9         A.    Not offhand.

10        Q.    My next client is Clyde Blood.  Any

11   recollection of speaking to Mr. Blood?

12             MR. ABRAMS:  Same objection.

13             THE WITNESS:  Mr. Blood, if I recall --

14   Investigator Blood, he was -- I think he was one of

15   the evidence collectors forensic persons who

16   collected the evidence at the crime scene, including

17   the four spent shotgun shells.  I think that was his

18   main purpose at the crime scene.

19

20   BY MS. HAYES:

21        Q.    Anything else that you recall about

22   Mr. Blood?

23        A.    Well, I don't know whether -- I'm not

24   sure if Mr. Blood was responsible for performing any

25   tests on the evidence that he collected, but if he

1    was, he didn't do anything with that evidence.

2         Q.    And when you say he didn't do anything

3    with that evidence, in what regard are you referring

4    to?

5         A.    What I mean by that is that as far as we

6    know, nobody, including Investigator Blood, did any

7    testing on the physical evidence, including a

8    fingerprint that was lifted at the crime scene that

9    would further their investigation.

10        Q.    And for clarification sake just so we're

11   on the same page, Mr. Blood was not what we would

12   call a CSI or anything like that.  Is that your

13   recollection that he was with the forensic unit --

14   Mr. Blood was a homicide detective?

15        A.    He was a homicide detective, you're

16   saying?

17        Q.    Yes.

18        A.    I don't have a clear recollection, so I

19   can't add to that.

20        Q.    And to the best of your recollection,

21   you never spoke to him.  Correct?

22        A.    I never did, no.  Let me amend that

23   please.  I forget I had heard that a retired KCK

24   police officer, whose name I can't remember, was

25   close with Officer Blood and I did go to him asking

Page 107

1    him if he would introduce me and asked Mr. Blood to

2    speak with me, and that never worked out.  It led

3    nowhere, so I never did end up speaking with him.

4         Q.    Do you recall that officer's name?

5         A.    No, I don't, I'm sorry.

6         Q.    James Brown is my next client.  Do you

7    recall any information from your investigation

8    regarding Mr. Brown?

9              MR. ABRAMS:  Same objection.

10             THE WITNESS:  I do not.

11

12   BY MS. HAYES:

13        Q.    Do you recall ever speaking to

14   Mr. Brown?

15        A.    I did not.

16        Q.    And my next client is James Krstolich.

17        A.    Yes.

18        Q.    Do you remember anything from your

19   investigation regarding James Krstolich?

20        A.    I do.

21   BY MS. HAYES:

22        Q.    And what do you recall about James

23   Krstolich?

24             MR. ABRAMS:  Same objection.

25             THE WITNESS:  I visited him at his home

Page 108

1   one afternoon.  I would guess it was sometime in

2   2010, and he was working in his garage.  He was a big

3   man, as you know, and he invited me into the kitchen

4   for a little conversation and we talked about -- he

5   remembered the case, but claimed not to remember much

6   about it, and I don't recall the details of what he

7   told me that afternoon, but it certainly didn't help

8   my investigation.

9

10  BY MS. HAYES:

11        Q.     Are you aware that Mr. Krstolich is

12  deceased?

13        A.     I am aware of that, yes, ma'am.

14        Q.     Did you do a memo or any type of summary

15  of that interview?

16        A.     I did.

17        Q.     And is that something that has been

18  produced in this matter?

19        A.     I don't recall.

20        Q.     Do you recall whether that interview was

21  recorded?

22        A.     It was not.

23        Q.     Do you recall, did Mr. Krstolich provide

24  you an affidavit?

25        A.     He did not.

Page 109

1      Q.     Anything else that you recall regarding

2    Mr. Krstolich?

3              MR. ABRAMS:  Same objection.

4              THE WITNESS:  Well, I know that he

5    was -- that he and Detective Golubski were two of the

6    men who interviewed Ruby Mitchell down at the police

7    department and obtained her identification that

8    evening.

9

10   BY MS. HAYES:

11     Q.     And were there any concerns regarding

12   Mr. Krstolich that evening taking it apart from

13   Mr. Golubski?

14     A.     Well, my recollection is he was the one

15   that prepared the composite, so to speak.  It wasn't

16   a composite, but he prepared that and I believe --

17   its been a long time since I read the police report.

18   I think it was Mr. Krstolich who wrote up the

19   interview of Ruby Mitchell.  I could be wrong.  It

20   was either him or Golubski where Ruby said that the

21   Lamonte that she saw do the shooting was the one who

22   dated her niece and that somehow she -- she

23   identified the photo of Lamonte and knew his name at

24   that time, Lamonte McIntyre, so I always questioned

25   when she did not know Lamonte McIntyre, she did not

1    know his name and testified to that at the trial that

2    she didn't know who it was.  I always wondered how

3    she came to supposedly know his name during that

4    interview.

5          Q.    And did Ms. Mitchell tell you where that

6    name came from during that interview?

7          A.    I'm thinking.  She couldn't account for

8    it is my recollection, but she did tell us that she

9    did not know his name.

10         Q.    Thank you, sir.  Anything else that you

11   recall regarding Mr. Krstolich?

12         A.    No, just one thing I visited.  I found

13   out that Detective Golubski was working at a

14   Walgreen's as security.  So I went to interview him

15   again and he told me that his good friend,

16   Mr. Krstolich, had died.

17         Q.    So Golubski is the one that told you

18   Krstolich had passed?

19         A.    Yes.

20         Q.    Anything else regarding Ms. Krstolich?

21         A.    No, there's not.

22         Q.    My next client is Dennis barber.  Did

23   you ever speak to Mr. Barber or obtain any

24   information regarding Mr. Barber during your

25   investigation?

Page 111

1           MR. ABRAMS:  Objection as to work

2    product.

3           THE WITNESS:  I never spoke with him,

4    but if I'm not mistaken, he was one of the arresting

5    officers of Lamonte later that day, and I believe he

6    testified that Rose McIntyre told him and the

7    arresting officers that her son had a good alibi

8    working at that restaurant when Rosy claims she never

9    told him such a thing.

10

11   BY MS. HAYES:

12      Q.     Did Rosy ever tell you what she did say

13   to the officers that day?

14      A.     Well, she told me that her mother,

15   Ms. Kraughter, the police went to Ms. Kraughter's

16   office initially looking for Lamonte, and

17   Ms. Kraughter telephoned Rosy and let the police know

18   that they were looking for Lamonte, and Rosy, in

19   turn, was able to locate and talk with Lamonte over

20   at his relatives house that day when the shooting

21   took place, and so she went over and picked Lamonte

22   up to take him to the police and was told, I think by

23   Lieutenant Barber, that they just wanted to speak

24   about something, and I think it was Lieutenant Barber

25   who told the jury that Rosy asked without knowing why

Page 112

1   the police wanted to talk to her son, she wanted to

2   know if somebody could be convicted of a murder.  It

3   didn't make sense.  Their point was how would Rosy

4   know that they were investigating her son for a

5   murder if Lamonte hadn't told her that.  Those are my

6   recollections of Lieutenant Barber.

7        Q.     Sir, my question was a little bit

8   different.  Did Rosy ever tell you anything that she

9   did say to the officers at the time of the arrest?

10       A.     Well, if I remember correctly, what she

11  told me was that she was at a complete loss as to why

12  the police wanted to speak with her son, Lamonte.  So

13  she took him down there -- the arresting officers

14  took them down there.  They were vague on why they

15  wanted to talk to them.  They told her to come down

16  to the jail and pick him up in 15 minutes and take

17  him home, which of course never happened.

18       Q.     So to the best of your recollection, you

19  don't recall Rosy ever tell telling you what specific

20  conversation occurred at that time, other than

21  assuring that the officers just wanted to talk to him

22  and that he could return home later?

23       A.     Right now, I don't have -- I'm sure she

24  told me some other things, but I don't have any

25  recollection of what they were at this point in time.

Page 113

1     Q.     And you said that was all you recall

2   regarding Mr. Barber?

3     A.     As far as I can remember at this point,

4   yes.

5     Q.     And my last client is Mr. Steven Colt.

6   Do you recall any information from your investigation

7   regarding Mr. Colt or ever speaking to him?

8             MR. ABRAMS:  Objection.  Calls for work

9   product.

10             THE WITNESS:  I never spoke with him,

11   but my understanding was that he was the lieutenant

12   in charge of this investigation and appointed

13   Golubski to head it up.  That's all I remember about

14   him.  I never spoke with him.

15

16   BY MS. HAYES:

17     Q.     No other information on Lieutenant Colt,

18   other than the assignment of Golubski?

19             MR. ABRAMS:  Same objection.

20             THE WITNESS:  No other information about

21   him.

22             MS. HAYES:  Thank you, sir.

23

24   BY MS. HAYES:

25     Q.     But in Exhibit 112, the transcript from

Page 114

1   your testimony, there was reference to after you had

2   reviewed all the hearing information, discovery,

3   police reports, in your own words, et cetera, you

4   wrote about a 21, 22-page memo of the case describing

5   the history and why you felt Lamonte was innocent.

6   Is that memo still in Centurion's possession?

7        A.    Yes, it is.

8        Q.    And has a copy of that memo been

9   provided to us in response to the subpoena to date?

10       A.    I have no idea.

11             MR. ABRAMS:  The question was:  Have you

12   received the document?

13             MS. HAYES:  Yes, sir.

14             THE WITNESS:  Yes, I don't know if it's

15   been provided.  I don't know if it's been provided or

16   not.

17

18   BY MS. HAYES:

19       Q.    But that memo still exists.  It's not

20   something that would have been destroyed or lost or

21   anything since the passage of time?

22       A.    Yes, ma'am.

23             MS. HAYES:  I have no further questions

24   at this time.

25             MR. ABRAMS:  I think the defendants bat

Page 115

1  first.

2

3  CROSS-EXAMINATION

4  BY MR. COOPER:

5      Q.    This is David Cooper for the Unified

6  Government.

7            Preliminarily, Mr. McCloskey, did you in

8  your individual capacity or in your capacity as the

9  designee for Centurion Ministries bring any documents

10 pursuant to the subpoenas and notices duces tecum for

11 this case?

12     A.    No, I did not.

13     Q.    Looking at Exhibit 115, which is your

14 affidavit from June of 2016, in paragraph 9, your

15 affidavit begins:

16            "We learned, for instance, that the

17 prosecutor withheld critical exculpatory hard

18 evidence."

19            What evidence do you contend was

20 withheld or please identify all evidence you contend

21 was withheld by the prosecutor?

22     A.    First of all, I don't see that affidavit

23 on the screen.

24     Q.    I'm not sharing it.  I just read it to

25 you.

Page 116

1           MR. ABRAMS:  Can you share it?

2           MR. COOPER:  I probably could, but I

3    don't intend to.  The question is:  What exculpatory

4    evidence does this witness either in his 30(b)(6)

5    capacity or individual capacity claims was withheld?

6           THE WITNESS:  So a couple of things.

7    One would be that the Josephine Quinn, the aunt of

8    Doniel, gave an affidavit and also told relatives

9    that when she was called down to the courthouse to

10   testify at the trial of Lamonte and she saw Lamonte,

11   she told Terra Morehead, the prosecutor, "That's not

12   the man.  You got the wrong man."  He did not fit the

13   physical characteristics that she recalled the

14   shooter having, and Terra told her, "It's in the

15   jury's hands.  We won't be using you for testimony,

16   and go home."  So it seems to me that Ms. Morehead

17   should have divulged that or disclosed that

18   conversations she had with Josephine to the

19   defendant.

20           And secondly.  What was also withheld is

21   that Niko had told Terra Morehead before the trial

22   that they have the wrong man and that she told

23   Golubski that, and that was not disclosed.  Those

24   were two things that come to my mind.

25

Page 117

1    BY MR. COOPER:

2         Q.    Is your answer complete, sir?

3         A.    Let me think.  Oh, also what was not

4    disclosed was that Niko had told us that she told

5    Golubski about the assault on Doniel Quinn by the

6    Aaron Robinson people shortly before the murder.  We

7    think that should have been disclosed.  And I'm sure

8    there are others, but they're just not coming to my

9    mind right away.

10        Q.    Paragraph 12 of your affidavit, Exhibit

11   115, you state:

12              "Over a period of five years, we

13   obtained over 40 affidavits in support of Lamonte

14   McIntyre's case and identified the more than 40

15   affidavits procured by Centurion Ministries," and

16   yourself.

17              MR. ABRAMS:  Objection.  Work product.

18

19   BY MR. COOPER:

20        Q.    Identify the persons, the over 40

21   persons from whom you obtained affidavits?

22              MR. ABRAMS:  Same objection.

23              THE WITNESS:  I mean, I can't identify

24   all 40.  They're a matter of record.

25

Page 118

1    BY MR. COOPER:

2         Q.    Well, where is the record that

3    identifies the 40 persons -- in excess of 40 persons

4    from whom affidavits were procured?

5              MR. ABRAMS:  Same objection.

6              THE WITNESS:  I would guess that they

7    are exhibits to the original filing back in 2016.

8

9    BY MR. COOPER:

10        Q.    I can tell you that there are not more

11   than 40 affidavits.

12        A.    Can you tell me how many there are?

13        Q.    20 odd.

14        A.    When I said 40, I thought we had taken

15   40.  I don't remember if I counted every single

16   one -- was that during my hearing testimony, sir?

17        Q.    No, that's in your affidavit.

18        A.    Yeah.  Well, those other 20 affidavits

19   that were not filed with the filing, they are --

20   they're a matter of record somewhere.

21             MR. COOPER:  Withdraw and let me ask it

22   more clearly.

23

24   BY MR. COOPER:

25        Q.    Does Centurion Ministries have copies of

Page 119

1   the in excess of 40 affidavits procured during the

2   investigation?

3              MR. ABRAMS:  I'll object that it

4   misstates the evidence, this whole line of

5   questioning, but go ahead.  You can answer.

6              THE WITNESS:  Yes, I would imagine that

7   we do have them somewhere in the many boxes of our

8   files.

9

10  BY MR. COOPER:

11       Q.    You testified earlier today, Mr.

12  McCloskey, that Ruby Mitchell always told us that the

13  shooter had french braids?

14       A.    Yes.

15       Q.    Who are all the persons included in the

16  pronoun "us"?

17       A.    Those persons include Cheryl Pilate and

18  myself and maybe Dan Clark.

19       Q.    I want to ask you a little bit more

20  detail,

21  Mr. McCloskey.  You mentioned earlier in your

22  testimony today that you had no recollection of the

23  2009 recorded conversation involving yourself,

24  Mr. Clark, and Ms. Mitchell?

25              MR. CASTELEIRO:  I object to the

Page 120

1    phrasing.  He didn't say he had no recollection of

2    the conversation.  He had no recollection that it was

3    recorded.

4                    THE WITNESS:  Yeah.

5                    MR. COOPER:  That actually leads to one

6    of my questions.

7

8    BY MR. COOPER:

9         Q.     Is that accurate what your counsel just

10   stated is that you didn't have a recollection of it

11   being recorded or that you didn't recall meeting with

12   Mr. Clark --

13        A.     No, I recall meeting with Ruby Mitchell.

14   I don't recall that Dan Clark was with me, nor that

15   it was a recorded conversation.  I don't remember it

16   being recorded.

17        Q.     And you mentioned the number of

18   occasions that you met with Ms. Mitchell before first

19   procuring an affidavit from her.  About how many

20   times did you meet with Ms. Mitchell?

21        A.     I said I think around three comes to my

22   mind.

23        Q.     That may clarify my confusion, but what

24   I wanted to clear up is, was it three meetings you

25   recall and the one that included Mr. Clark was a

Page 121

1    fourth or the one that included Mr. Clark is one of

2    the three?

3         A.    I can't remember one with Mr. Clark

4    would have been one of the three, but I do remember

5    the day and it was early on in the investigation that

6    I thought I, but apparently Dan was with me, that

7    Ruby agreed to meet with us, so that would have been

8    probably the fourth; three or four.  I can't be exact

9    on that.

10        Q.    Did you create a summary of the

11   information you obtained from Ms. Mitchell after each

12   meeting with her?

13        A.    My recollection is that I did do that.

14        Q.    So is it correct to say that the

15   Centurion records would include a summary of each

16   occasion that you met with and conversed with

17   Ms. Mitchell?

18        A.    More than likely.

19        Q.    As a 30(b)(6) witness then, how many

20   times did you create summaries of interviews with

21   Ms. Mitchell?

22        A.    Well, I would do so after each

23   investigative trek.

24        Q.    And you're unable to state at this time

25   whether there was three or four occasions?

Page 122

```
 1         A.     To be precise with precision, no.
 2         Q.     To your recollection, Mr. McCloskey, did
 3    any witness, other than Ruby Mitchell, describe the
 4    hairstyle of the shooter of a person having french
 5    braids?
 6         A.     I'm thinking.
 7         Q.     Did anyone, other than Ms. Mitchell,
 8    describe the shooter as a person having french
 9    braids?
10         A.     I said I'm thinking on that.
11         Q.     I thought you said say again.
12         A.     I'm sorry.  I didn't articulate that
13    clearly.  I think she was the only one that told us
14    that.  Well, there were only supposedly two
15    eyewitnesss.  Niko did not tell us that, I don't
16    believe, because I think she had the shooter wearing
17    a hat.  So I think Ruby was the only one that told us
18    that.
19              MR. COOPER:  I believe those are all the
20    questions I have at this time, Mr. McCloskey.  Thank
21    you.
22              MR. ABRAMS:  I don't have any questions
23    for the witness.
24              THE VIDEOGRAPHER:  Going off the video
25    record at 1:02.
```

Page 123

1

2              (Whereupon, a brief recess was taken off

3      the record.)

4

5              THE VIDEOGRAPHER:  The time is 1:10.

6      We're on the video record.  This begins media unit

7      three.

8

9      REDIRECT EXAMINATION

10     BY MR. GIST:

11         Q.     I just have a few follow-up questions.

12         A.     Can I have one question?  My screen

13     shows the name Ensz & Jester.

14         Q.     That's the name of my law firm, yes.

15         A.     And what is your name, sir?

16         Q.     Matt Gist.

17         A.     Thank you.

18         Q.     Okay, so earlier I asked you a lot of

19     questions about Chris Jones, C-Love, and I just want

20     to show you a photograph I have and you tell me if

21     this is him or not.  Okay?

22         A.     Yes.  That's him, yes.

23         Q.     Thank you.  We've had a hard time

24     finding him as well.

25             MR. GIST:  This will be marked as

Page 124

1    Exhibit 117.

2

3              (Whereupon, Exhibit 117 is marked for

4    identification.)

5

6    BY MR. GIST:

7         Q.    I believe you testified that you did

8    talked with Niko Quinn's sister, Layla Quinn.  I know

9    she has a different last name now.

10        A.    Yes.

11        Q.    Did Layla Quinn ever provide you an

12   affidavit?

13        A.    She did not.

14        Q.    Did Layla Quinn tell you that she

15   witnessed the shooting?

16             MR. ABRAMS:  I want to interpose an

17   objection to the extent it calls for work product.

18             THE WITNESS:  My recollection -- I

19   remember the name was with me when we did interview

20   lay will an and what I'm trying to remember was she

21   visiting Niko on Hudson Street when this crime

22   occurred and I don't have a clear recollection -- I

23   don't think she was but that's a possibility, maybe

24   even a remote one.  Anyway -- what was your question

25   again about her?  Did she provide an affidavit?  No.

Page 125

1

2    BY MR. GIST:

3        Q.    Did she witness the actual shooting?

4        A.    I don't believe she did.  I don't think

5    she was there.  I'm not certain of that.  It's a

6    little murky in my mind.

7        Q.    When you were getting the affidavit of

8    Joe Robinson, do you recall if a notary public would

9    have come with you to have the affidavit notarized?

10       A.    Yes, a notary public did come with me at

11   the time of the execution of the affidavit, yes.

12       Q.    With respect to Rose McIntyre, did you

13   feel in the interactions with her in discussing this

14   case that they were stressful to her?

15       A.    Very much so.  She almost -- she came

16   close to having two nervous breakdowns before our

17   entry into the case.

18       Q.    Did you explain to Rose McIntyre at any

19   point in time that you needed to obtain new evidence

20   in order to have Lamonte McIntyre freed?

21            MR. CASTELEIRO:  Objection.  Work

22   product.

23            THE WITNESS:  I just kept it more

24   general than specific that, you know, we're going to

25   investigate this case from top to bottom and see if

Page 126

1   we can come up with enough evidence to demonstrate

2   that he didn't do this he had no involvement in this.

3   She knew that.  That wasn't any big secret.

4

5   BY MR. GIST:

6        Q.     Did you have any knowledge or

7   understanding as to Rosy McIntyre's overall IQ?

8        A.     She seemed to be pretty sharp to me.

9   Very aware.  She was depressed a lot over the course

10  of the years.  Prior to Lamonte's exoneration, her

11  oldest son, James, was in a terrible tragic

12  automobile accident and was hospitalized for half a

13  year.  She had to bear that burden.  Economically,

14  things were not easy for her.  She was raising a

15  young niece.  She had a lot on her plate, but yes, I

16  would say Rosy is an intelligent woman, absolutely.

17       Q.     When she told you about this alleged

18  rape by Roger Golubski back in the '80s, what was

19  your response?

20       A.     I was -- to hear it firsthand and the

21  way that it occurred and even the fact that during

22  the course of this encounter between him and her in

23  his office, a door opened and she saw another police

24  officer looking in, I was stuck.  It was hard to

25  hear.  Hard to hear.

Page 127

1      Q.      You assumed it to be true from the

2   get-go?

3      A.      Absolutely.

4      Q.      Was there any doubt -- was there any

5   ambiguity or doubt in your mind that she knew Roger

6   Golubski was the detective investigating her son's

7   case?

8      A.      No, there was no doubt in my mind.

9      Q.      Last question.  I just read some article

10  in the Washington Post.  The reason I'm asking, did

11  you wear a priest collar for any of your field

12  interviews in this case?

13     A.      On occasion, I would.  In the early part

14  of the investigation I would do that, yep.  Perfectly

15  legitimate as a Presbyterian Master Divinity graduate

16  student.

17     Q.      But what was the purpose of wearing it?

18     A.      I consider this work and still do to be

19  my ministry, so that was a symbol of the work that we

20  do as an individual.

21     Q.      But the goal of wearing that or the

22  motivation is that you believe it would help you with

23  the witnesses?

24     A.      Sometimes, yes.  Other times, no, the

25  only time I've had a gun pointed at me, I was wearing

Page 128

```
 1    the collar.  People can have different reactions to
 2    that.  To have a "religious person" show up at your
 3    door could be very off putting to the resident, but
 4    the main reason was this was my symbol of doing this
 5    work and my calling to do the work.
 6         Q.    And you're not ordained?
 7         A.    I am not ordained, no, sir.
 8              MR. GIST:  Thank you.  I don't have any
 9    further questions for this deposition.  I don't know
10    if any of the other attorneys do.
11              MS. HAYES:  I just have a couple of
12    follow-up.
13
14    RECROSS-EXAMINATION
15    BY MS. HAYES:
16         Q.    So I have a full understanding, how are
17    the documents for this file, to the best of your
18    knowledge organized, are they all in paper?
19         A.    They're all in paper, yes ma'am.
20         Q.    Are they organized by affidavits or
21    dates or topics, how is the organization of the file?
22         A.    Well, over the years they've become, as
23    far as -- I haven't seen the files in years since the
24    exoneration but they just become -- when I last saw
25    them they were haphazard kind of disorganized, but
```

Page 129

1   you know not totally disorganized, but, you know, but

2   not as well organized as they should be after all

3   these years.

4          Q.    So you could probably find it in the

5   file but it would be harder for me to locate it?

6          A.    I think it would be harder for you to

7   locate it than me.

8          Q.    And is that file kept at Centurion

9   Ministries?

10         A.    Yes, ma'am.

11               MS. HAYES:  I have no further questions.

12               MR. COOPER:  I have no further

13   questions.

14               MR. ABRAMS:  No questions from me.

15               MR. GIST:  I don't have any further

16   questions.  This may be more for Paul.  Is it

17   Centurion's position that no records are going to be

18   produced pursuant to the subpoena?

19               MR. CASTELEIRO:  We have a conference in

20   this case, a phone conference with Chris, and I think

21   I wrote in my letter I would produce records that

22   were court filings, and everything else, we are

23   asserting the privilege, but anything filed in court

24   we would produce, and we could talk about some of the

25   other things that have developed in terms of Mr.

Page 130

1    McCloskey's testimony.  Much, if not all of it, is

2    either attorney-client or work product.

3              MR. NAPOLITANO:  My understanding was

4    plaintiffs's counsel was going to produce a privilege

5    log, which is clear from today's testimony that not

6    every document from today's testimony made it to that

7    privilege log, but it does look like we're going to

8    need to move forward with that subpoena, so we need

9    to know on the record if you're planning on complying

10   with the subpoena or if we need to file an action to

11   enforce it.

12             MR. CASTELEIRO:  We will comply in the

13   fashion that I indicated to you, and the problem is

14   the file is in seven or eight boxes or six boxes.  I

15   forget what the number is.  It's tons of paper, and

16   trying to organize it in some fashion that you could

17   create a privilege log has been a difficult task.  We

18   don't have a staff to kind of just do that function,

19   and so in time, I'll be able to put together the

20   privilege log and get to you what I said I would get

21   to you.

22             MR. NAPOLITANIO:  I originally was

23   August 31st, and you may not know the discovery

24   closes in this case in about a month and a half or

25   two.

Page 131

1           MR. CASTELEIRO:  I don't know that, to
2    be quite honest.
3           MR. NAPOLITANO:  When can we expect your
4    document production.
5           MS. HAYES:  Or the privilege log?
6           MR. CASTELEIRO:  I don't know.  I'll
7    have to get back to you on that.
8           MS. HAYES:  I request that the records
9    please be sure to keep the records and do not destroy
10   them.  I understand that you are asserting a
11   privilege for not producing them and that's an issue
12   that obviously that we'll obviously take up with a
13   judge, but I suggest that no documents be destroyed.
14          MR. NAPOLITANO:  Paul, for simplicity,
15   would Centurion consent to the district of Kansas?
16          MR. CASTELEIRO:  I don't know.  If we
17   get to that point, we'll discuss those issues.  Okay?
18          MR. NAPOLITANO:  Okay.
19          MR. CASTELEIRO:  We'd like to put on the
20   record, Chris, we had a conversation in which we
21   discussed the parameters of this deposition and at
22   the time we offered -- at that time and I think we
23   complied with it that you could ask Mr. McCloskey
24   anything you wanted in terms off the evidentiary
25   hearing testimony and what was submitted in court,

Page 132

1    and we kind of never really got a rejection to that

2    or an acceptance of that, and I mean, that's the end

3    of it as far as where we went in terms of discussing

4    it to resolve it.

5              MR. NAPOLITANO:  We did have that meet

6    and confer.

7              MR. CASTELEIRO:  Right.

8              MR. NAPOLITANO:  We wanted to have this

9    deposition to determine Mr. McCloskey's waived any of

10   those privileges, which I believe he did we'll move

11   forward based on that.

12             MR. CASTELEIRO:  Okay.

13             MS. HAYES:  With that in mind we need to

14   keep this deposition open regarding the production of

15   those documents through subpoena.

16             MR. CASTELEIRO:  We'll come to that

17   bridge when we get there, cross it.  Okay?

18             THE VIDEOGRAPHER:  We are off the record

19   at 1:25.  This concludes today's testimony given by

20   James McCloskey.

21

22             (Whereupon, the deposition was concluded

23   at 1:25 p.m.)

24

25

Page 133

1                       CERTIFICATE

2

3

4           I, JOMANNA DEROSA, a Certified Court

5    Reporter and Notary Public of the State of New

6    Jersey, do hereby certify that the foregoing is a

7    true and accurate transcript of the testimony as

8    taken stenographically and digitally at the time,

9    place and on the date hereinbefore set forth, to the

10   best of my ability.

11

12

13        I DO FURTHER CERTIFY that I am neither a

14   relative nor employee nor attorney nor counsel of any

15   of the parties to this action, and that I am neither

16   a relative nor employee of such attorney or counsel,

17   and that I am not financially interested in the

18   action.

19

20

21

22                JOMANNA DEROSA, C.C.R.

                  License No. 30XI00188500

23                Notary Public of the

                  State of New Jersey

24

25

[& - 82]

| & | | |
| --- | --- | --- |
| **&**   2:2,14 3:7,12,17 27:22 28:8,18 123:13 | | |

| 0 | | |
| --- | --- | --- |
| **02545**   1:3 5:9 | | |
| **08540**   1:22 2:12 6:14 | | |

| 1 | | |
| --- | --- | --- |
| **1**  84:6 | | |
| **1,000**  14:2 | | |
| **1,400**  14:2,18 | | |
| **100**  72:13 | | |
| **1000**  2:11 | | |
| **10013**   3:15 | | |
| **102**   13:5,7,12,15 28:23,23 | | |
| **103,128**   4:4 | | |
| **10:22**   42:18 | | |
| **10:41**   42:24 | | |
| **11**  60:3 | | |
| **1100**  2:6 | | |
| **111**   4:9 36:23 37:2 | | |
| **112**   4:10 50:19,21 60:2 113:25 | | |
| **11225**   3:19 | | |
| **113**   4:11 74:9 | | |
| **114**   4:12 74:16 77:11 82:17,19 | | |
| **115**   4:5,13 90:16 115:13 117:11 | | |
| **116**   4:14 95:17 | | |
| **117**   4:15 124:1,3 | | |
| **11:13**   66:3 | | |
| **11:24**   66:10 | | |
| **11:52**   86:4 | | |
| **11:55**   86:10,20 | | |
| **11th**   82:1 83:12,17 | | |
| **12**   9:6 91:3,17 117:10 | | |

**124**   4:15
**12:03**   87:1
**12:31**   102:22
**12:32**   103:3
**12th**   14:7,11 49:12
**13**   1:15,22 14:2,18 60:4
**134**   60:2
**13th**   5:3
**14**   9:25
**14:46**   74:19
**15**   60:25 112:16
**15th**   43:20
**175**   49:13 50:1
**176**   49:17
**17th**   49:11
**19**   33:18 50:9
**192**   1:21 6:13
**1983**   8:25
**1987**   12:11
**1988**   88:12
**1990s**   77:22
**1992**   14:1
**1994**   43:20 68:25 88:16 89:3
**1995**   39:9
**1999**   27:8
**1:02**   122:25
**1:10**   123:5
**1:25**   132:19,23
**1st**   44:19 46:10

| 2 | | |
| --- | --- | --- |
| **20**   19:15 32:8 118:13,18 | | |
| **200**   3:9 | | |
| **2003**   15:15,16 18:23 29:16 | | |
| **2008**   18:24 27:11 29:20,24 30:21 31:17 | | |

**2009**   15:17 31:2,17 44:19 46:10 57:2 57:2 119:23
**2010**   82:1 83:8,17 85:23,24 88:2,3 108:2
**2011**   65:24 83:7,12 88:2
**2014**   20:22 36:6 38:10 42:9,11 76:2,5
**2015**   8:19
**2016**   90:13 115:14 118:7
**2017**   14:7,11 43:6 49:12 62:16 69:5
**2021**   1:15,22 5:3
**21**   31:2 114:4
**2121**   2:6
**21st**   79:22 99:23
**22**   31:3 50:9 114:4
**2200**   3:4
**2345**   3:4
**24th**   62:16
**27**   90:13
**2:18**   1:3 5:9
**2nd**   2:11

| 3 | | |
| --- | --- | --- |
| **3**   9:16 91:15 | | |
| **30**   57:10 67:17 116:4 121:19 | | |
| **30th**   76:5 | | |
| **30xi00188500** 133:22 | | |
| **31st**   38:10 130:23 | | |
| **3550**   2:18 | | |
| **36**   4:9 | | |
| **39th**   3:9 | | |

| 4 | | |
| --- | --- | --- |
| **4/15**   74:22 | | |
| **40**   91:24 117:13,14 117:20,24 118:3,3 118:11,14,15 119:1 | | |
| **44**   73:14,15,18,19 74:21 | | |
| **450**   3:19 | | |
| **46**   74:21,23 | | |
| **4656**   133:21 | | |
| **4th**   69:5 | | |

| 5 | | |
| --- | --- | --- |
| **5**   79:7 96:7 | | |
| **50**   4:10 | | |
| **501**   9:16 | | |
| **527**   3:9 | | |
| **56**   42:8 | | |
| **5th**   2:18 39:9 42:11 | | |

| 6 | | |
| --- | --- | --- |
| **6**   37:9 39:3 77:19 78:18 96:17 97:10 116:4 121:19 | | |
| **6,123**   4:3 | | |
| **64105**   2:7 | | |
| **64106**   2:24 | | |
| **64108**   3:5 | | |
| **64111**   3:10 | | |
| **66210**   3:20 | | |
| **66606**   2:19 | | |

| 7 | | |
| --- | --- | --- |
| **7**   37:17,19 98:11 | | |
| **74**   4:11 | | |

| 8 | | |
| --- | --- | --- |
| **8**   49:18 50:1 | | |
| **80s**   89:25 126:18 | | |
| **82**   4:12 | | |

**8th**   3:14

**9**

**9**   115:14
**90**   4:13
**926**   2:23
**94**   77:12
**95**   4:14
**99**   3:14
**9:25**   1:23 5:2

**a**

**a.m.**   1:23 5:2
**aaron**   59:17 61:2
   63:20 64:4 69:9
   70:6,9 73:2,3
   76:22,24 77:20,22
   77:25 78:3,4,17,20
   78:20 79:2,12,17
   79:22 80:1 99:20
   100:1,5,11,14,18
   100:22 102:14
   117:6
**aaron's**   60:7 79:25
**abiding**   93:14
**ability**   17:9 79:14
   133:10
**able**   11:15 17:20
   32:5 35:3 57:3
   72:24 99:11
   111:19 130:19
**abrams**   3:3 5:21
   5:21 21:9,15 22:1
   28:1,4 40:7 41:13
   45:18,21 46:2,14
   47:18 48:17 52:6
   52:22 53:11 54:16
   54:22 55:15 56:11
   56:17 63:13,23
   64:7 65:8 91:5,8
   91:22 103:19
   104:5,14,21

105:12 107:9,24
109:3 111:1 113:8
113:19 114:11,25
116:1 117:17,22
118:5 119:3
122:22 124:16
129:14
**absolutely**   84:20
   126:16 127:3
**acceptance**   31:13
   132:2
**accepted**   15:18
**accident**   126:12
**account**   110:7
**accurate**   12:16
   21:5 44:22 46:9
   48:10 49:1 52:13
   85:7,11 90:25
   120:9 133:7
**accurately**   84:17
**acknowledges**
   52:20
**acknowledging**
   51:18
**acquainted**   66:18
   66:20,22
**act**   24:20
**action**   5:16 130:10
   133:15,18
**actions**   21:5
**activity**   97:22
**actual**   30:25 125:3
**adamant**   56:3
**adams**   4:9 35:19
   35:22 36:5,15,21
   37:24 38:4,15
   39:14
**adams's**   39:8
**add**   24:21 85:12
   106:19

**addict**   101:11
**administer**   5:15
**admit**   55:5
**admitted**   63:10
   94:17
**advice**   40:20,21
**affect**   98:23 99:2
   100:7
**affidavit**   4:9,11,13
   4:14 36:6,7,10,11
   36:11,21 37:6,9
   38:9,9,12,25 39:5
   39:7 41:5,7,11,22
   41:25 42:5 45:10
   46:22 47:6,14
   49:8 51:10,12
   52:19 53:2,9 55:5
   65:3 75:24 76:1,2
   77:7,8,15,16 78:12
   78:19,25 79:8
   88:11 90:8,10,20
   91:16 92:3,11,17
   94:12,15,16 95:3
   95:15,23,25 98:11
   108:24 115:14,15
   115:22 116:8
   117:10 118:17
   120:19 124:12,25
   125:7,9,11
**affidavits**   41:18
   45:6 48:9,10 81:1
   81:2,6 91:19,24
   92:14 95:8 117:13
   117:15,21 118:4
   118:11,18 119:1
   128:20
**affiliations**   5:18
**afraid**   72:8 99:1,6
   99:15
**aftermath**   76:18
   81:15

**afternoon**   69:20
   73:11,25 100:16
   104:19 108:1,7
**ago**   8:6,18
**agree**   11:14 32:5
   56:1 84:21 85:1
   93:8 97:13
**agreed**   13:2,8,13
   56:23,23 58:8
   67:24 92:17,19
   121:7
**agreeing**   18:24
**agreement**   11:13
   11:17
**agreements**   11:11
   11:19
**agrees**   11:20 18:12
   21:4 45:24
**ahead**   11:14 37:19
   50:7 84:13 87:13
   96:17 102:17
   119:5
**aid**   85:16
**al**   1:11 5:7 70:7
**alibi**   111:7
**alienated**   93:12
**alive**   61:25
**allegations**   13:16
**alleged**   85:19
   89:25 126:17
**allegedly**   90:2
**allowed**   92:10
**altogether**   13:3
   72:16
**ambiguity**   127:5
**amend**   106:22
**amount**   11:7,20
   14:25 26:18 30:7
   70:11 72:16
**anger**   93:17

[angry - beginning]                                                                Page 3

**angry** 100:18
**answer** 9:19 21:17
  22:5 40:13,17,17
  41:14 44:18 46:16
  55:1 63:17 65:10
  65:20 75:6,15
  89:13 117:2 119:5
**answers** 49:14
**anybody** 101:9
**anyway** 60:17
  87:25 124:24
**apart** 109:12
**apartment** 88:10
**apologies** 77:12
**apologize** 11:24
  15:10 49:5 50:9
  82:23 83:1 84:2
**apology** 51:15
**apparent** 43:23
**apparently** 121:6
**appearances** 3:1
  5:17
**appears** 39:7
**applications** 13:23
**applies** 89:13
**appointed** 113:12
**appointment** 67:5
**appreciate** 102:21
**appropriate** 16:5
**approval** 21:25
  31:8
**approved** 10:18
**approximately**
  8:17 29:19 33:18
  72:16 73:14
**approximation**
  13:1
**april** 43:20 44:19
  46:10 57:2
**area** 19:19 29:1,4
  29:9 72:5,14

**arranged** 11:5
**arrest** 112:9
**arresting** 111:4,7
  112:13
**arrests** 98:13
**arrival** 87:25
**article** 35:14 127:9
**articulate** 122:12
**ashamed** 88:19
**aside** 12:13
**asked** 11:5 17:21
  20:14 44:14,15,17
  49:5 51:13,14
  56:6 57:8 58:7
  75:11 76:2 80:7
  107:1 111:25
  123:18
**asking** 7:17 13:24
  14:3 16:6 31:18
  41:18 45:22,24
  49:25 65:15,17,18
  73:18 92:2 106:25
  127:10
**asks** 16:19
**aspect** 96:9
**assault** 117:5
**asserting** 129:23
  131:10
**assess** 17:5
**assessing** 21:1
  73:4
**assignment** 113:18
**assigns** 16:19
**assist** 76:3 97:7
**assistance** 14:3
  81:2
**assistant** 62:19
**assisting** 20:25
**associate** 96:21
  98:5

**associates** 67:6
**association** 97:3
**assume** 14:17 26:4
  38:13
**assumed** 127:1
**assuring** 112:21
**attached** 37:6
**attempting** 12:7
**attending** 6:2
**attention** 10:15
  17:18 30:19 49:10
  52:4 86:1 91:2
**attorney** 6:24
  24:10,14,15 62:19
  69:8 70:8 82:3
  85:18 89:11 130:2
  133:14,16
**attorney's** 62:17
  69:4,18 82:25
**attorneys** 7:15
  19:6 22:14 128:10
**audio** 25:24,25
  26:1 44:7,16
  45:19 62:23
**august** 27:11
  130:23
**aunt** 116:7
**authored** 82:16
  83:3
**authorities** 17:11
**authority** 31:10
  79:18
**authorized** 5:14
**automobile** 126:12
**avoid** 98:13
**aware** 17:24 30:17
  32:22 76:23 80:13
  100:10 108:11,13
  126:9

**b**

**b** 4:7 37:6 39:5,7
  116:4 121:19
**back** 8:1 14:6
  18:13,22 36:17
  39:9 42:16 43:3
  43:20 48:8 51:25
  66:15 68:25 69:5
  69:5 77:22 86:14
  86:19,19 88:12,16
  89:3,25 94:15
  99:9,9 100:15
  118:7 126:18
  131:7
**background** 14:4
**backing** 45:13
**bad** 6:22 69:22
  101:20
**barber** 110:22,23
  110:24 111:23,24
  112:6 113:2
**based** 30:22 36:11
  48:13 55:21 72:4
  75:17 78:13 94:11
  95:25 132:11
**basic** 93:9
**basically** 18:2
  50:10 61:1 79:17
  97:10
**basis** 17:16 32:9
  65:10
**bat** 114:25
**bay** 99:10
**bear** 126:13
**beat** 59:12 76:11
**beaten** 59:17,22
**beating** 70:6,10
**began** 12:22,22
  73:20
**beginning** 12:19
  94:7

**begins**  16:11 17:4
  17:12 66:11
  115:15 123:6
**begun**  24:2,3
**behalf**  5:19,22,24
  6:1,4,6,8 13:14
  20:3 24:10 27:6
**behavior**  90:6
  93:15
**believe**  13:22,23
  15:14,17 25:23
  29:6,15 32:10
  35:16 36:6,12
  39:12,16 45:8
  48:15 49:15 57:19
  82:12,15 83:2
  84:19 85:5 95:8
  97:4 99:25 101:23
  104:18 109:16
  111:5 122:16,19
  124:7 125:4
  127:22 132:10
**believed**  31:4
  46:13 82:9 83:24
**belive**  64:8
**bell**  74:6
**beloved**  101:1,13
**benefactors**  10:23
**beneficiary**  23:16
**bequest**  11:1
**best**  12:25 17:9
  84:3 85:9 106:20
  112:18 128:17
  133:10
**better**  14:20 23:12
  53:8
**beyond**  80:5
**big**  77:22 108:2
  126:3
**bit**  30:14 48:8
  96:16 112:7

  119:19
**bits**  45:3
**blank**  56:12
**block**  100:17
**blood**  105:10,11
  105:13,14,22,24
  106:6,11,14,25
  107:1
**board**  8:7 9:19,21
  9:25 10:8,9,12,18
  31:7,23
**board's**  10:15
**boss**  77:21 78:16
  78:20
**bottom**  42:8 84:7
  96:7 125:25
**boulevard**  3:4,19
  64:5
**boxes**  26:12,15,16
  119:7 130:14,14
**boy**  57:24
**boyfriend**  64:2
  88:12
**braid**  51:11 52:12
**braids**  47:23 51:5
  51:19,21,24 52:19
  53:10,15 54:4
  55:3,10 56:4
  119:13 122:5,9
**branson**  2:15 6:1
**break**  41:4 43:4
  53:22 66:16 86:2
  86:15 99:8,9
**breakdowns**
  125:16
**breaks**  51:6 52:15
  54:9
**brewing**  100:13
**bridge**  132:17
**brief**  42:21 66:7
  86:7,23 102:25

  123:2
**briefing**  10:10
**briefs**  17:4
**bring**  10:8,9 88:16
  115:9
**bringing**  89:3
**broad**  93:20
**broader**  84:16
**broke**  53:24
**brooks**  59:6 61:2
  69:1 76:22 77:24
  78:2,6,8 79:19
  93:24 94:20 96:7
  96:12,13
**brought**  12:14
  17:17 20:20 26:23
  38:22 86:1
**brown**  107:6,8,14
**brustin**  3:12 27:22
  28:8
**bubbling**  29:25
**budget**  10:21
**build**  24:20
**built**  43:8 56:8
**bunch**  26:11
**burden**  126:13
**burton**  27:9,18
  30:20
**business**  68:23
  78:9 79:13,15
  97:11,19 98:5
  99:2 101:20
**buy**  101:10

**c**

**c**  2:1 8:22 9:16
  37:6 64:3,9,12,13
  64:17 65:1,3,7,11
  65:16,23 66:17,25
  67:22 68:1,12
  69:13,21,24 70:9
  70:17,21 80:8

  99:22,25 100:15
  100:20,25 101:4
  101:24 102:5,13
  123:19
**c.c.r.**  133:22
**cadillac**  75:13
**call**  35:15 57:9,9
  57:11 106:12
**called**  27:16 28:18
  35:15 58:5 116:9
**calling**  23:5 128:5
**calls**  34:8 40:7
  42:2 58:2,3,4,19
  103:20 113:8
  124:17
**capacities**  101:15
**capacity**  12:17
  20:23 115:8,8
  116:5,5
**car**  69:10,14
**careful**  99:7
**carolyn**  4:9 35:19
  35:22 36:5,15,21
  37:23 38:4,15
  39:1,14
**case**  1:3 7:15,20
  8:8 9:8,13,24
  10:17 11:21 12:8
  12:18,20,21,21,23
  13:22,25 14:22
  15:18 16:7,14,16
  16:18,19,20,24
  17:1,5,6,14,15,16
  17:18,25 18:3,6,8
  18:12,13,16,25
  19:7,9,13,22 20:9
  21:4 22:14 23:6
  23:10,22 24:8,12
  24:16 26:23,25
  27:5,9,10,19,24
  28:10 29:14,24,25

30:15,18,22,25
31:3,13 32:6,8,21
32:22 34:21 35:10
35:10 36:6 38:8
39:18,20 40:3,4
41:5,12 42:17
43:7 44:6 56:7,23
56:24 58:11 71:10
72:5,14 81:1 82:8
88:4 89:14,20
90:10,11 93:21
95:9 108:5 114:4
115:11 117:14
125:14,17,25
127:7,12 129:20
130:24
**cases** 10:10,12
12:6 13:1,7,8,9,13
13:15 14:18,23
17:21 20:18 21:1
27:4,13,17,25 28:9
28:23 29:7 32:2,4
32:7 93:19
**cash** 101:10
**casteleiro** 2:10
5:23,23 6:25
20:21 23:4 40:9
40:16 49:21 65:9
65:14,20 119:25
125:21 129:19
130:12 131:1,6,16
131:19 132:7,12
132:16
**cause** 25:10 85:17
**caused** 102:8
**ceased** 8:17
**cecil** 59:6 61:2
68:25 76:21 77:21
77:24 78:1,6,8,22
78:25 79:1,4,12,19
79:21,24 80:1,8

93:24 94:20 96:7
96:12,13
**cecil's** 78:25
**central** 89:19
**centurion** 2:9 5:5
5:24 7:18,19 8:4,7
8:11,11,24,25 9:4
9:15 10:5,16,21
11:2,10,15,18,21
12:2,23 13:2,24
14:8 15:5,17 16:9
18:12,19,23,24
19:3,5,6,12,21
20:8,11,15,21 21:4
21:5,24 23:16,21
23:24 24:25 28:9
28:10,19 29:13
32:25 33:4 35:4,6
35:14 38:5,13
56:23 115:9
117:15 118:25
121:15 129:8
131:15
**centurion's** 12:6
14:17 26:10 27:25
114:6 129:17
**ceo** 79:5
**certain** 11:7,20
22:20 26:18 36:3
38:24 70:11 76:8
125:5
**certainly** 38:7
41:22 46:17 66:20
82:6 99:21 108:7
**certificate** 133:1
**certified** 1:19
133:4
**certify** 133:6,13
**cetera** 17:4 114:3
**challenge** 99:10

**challenging** 92:23
93:1
**chance** 35:21 62:9
62:24
**changed** 43:11,12
**changes** 94:17
**chaotic** 93:7
**chapter** 92:11
**character** 89:20
**characteristics**
116:13
**characterization**
15:2
**characterize** 20:5
59:24
**charge** 17:13
113:12
**charles** 2:15 5:25
**charming** 101:12
**cherry** 2:23
**cheryl** 2:22 5:21
26:24 27:5 30:20
32:3,3 33:25
36:10 37:15,15
38:22,22,23 41:8
47:5,19 62:18
67:7 76:7 80:24
81:4,14,19 82:2,14
83:16 88:8 90:23
119:17
**cheryl's** 36:12
**children** 101:9
**chose** 11:9
**chris** 6:9 64:3
66:16 68:11,18
70:17 98:8,9,10,18
98:19,20,25 99:15
99:19 100:5,7
101:18 102:1,2
123:19 129:20
131:20

**christopher** 2:5
**church** 10:25
**circumstances**
72:5
**cite** 92:11
**citizens** 93:14
**city** 2:7,24 3:5,10
22:20 29:1 33:16
43:13 60:19 61:4
68:2 72:14 78:10
93:13
**civil** 7:15 11:9
27:13,20,23 28:13
40:2
**claimed** 108:5
**claims** 111:8 116:5
**clarification** 23:5
106:10
**clarify** 19:12
20:15 31:20 49:6
120:23
**clarity** 63:18
79:23,24
**clark** 44:9,11
46:11 82:2 83:16
119:18,24 120:12
120:14,25 121:1,3
**classic** 101:10
**clean** 46:6
**clear** 28:1 33:5
38:6 45:25 46:18
52:24 55:7,19
56:20,25 61:21
62:5 65:23 73:22
90:4 101:23
106:18 120:24
124:22 130:5
**cleared** 30:19
**clearly** 53:5
118:22 122:13

**clerk** 6:2
**client** 18:14 19:23
  21:8,25 23:5,9
  32:25 103:15
  104:11 105:10
  107:6,16 110:22
  113:5 130:2
**close** 9:9 24:9
  63:20 87:22 94:23
  101:17 106:25
  125:16
**closes** 130:24
**clyde** 105:10
**code** 72:12,18
**coercing** 84:22
**collar** 127:11
  128:1
**collected** 105:16
  105:25
**collection** 17:8
**collectors** 105:15
**college** 3:19
**colt** 113:5,7,17
**combination**
  26:12
**come** 19:19 26:9
  29:1 39:17,20
  42:16 78:5 89:20
  89:22 99:8,9
  103:23 112:15
  116:24 125:9,10
  126:1 132:16
**comes** 15:4,6,7
  16:2 18:10 45:3
  120:21
**comfortable** 20:6
  92:4
**coming** 22:20
  89:15,24 102:7
  117:8

**commencing** 1:22
**commit** 19:9
**commitment** 20:2
  23:13 24:2 31:15
  31:16
**committed** 12:23
  72:1
**committing** 23:14
  84:25
**common** 22:14
  92:12
**commonly** 76:25
**communication**
  18:23
**community** 78:2
  85:14 90:6 92:19
  93:9,21 99:13
**compensation**
  11:7 28:14
**competitor** 100:3
**complete** 16:6
  24:18 45:7 112:11
  117:2
**completed** 27:9
  42:1
**completely** 44:12
  47:4 55:6 97:17
**complicated** 78:1
  78:23
**complied** 35:5
  131:23
**comply** 130:12
**complying** 130:9
**composite** 109:15
  109:16
**computer** 6:24
**concerned** 29:6
  69:22
**concerns** 104:22
  109:11

**concert** 24:9
**concluded** 132:22
**concludes** 66:4
  132:19
**conducted** 104:23
**confer** 132:6
**conference** 129:19
  129:20
**conferencing** 5:11
**confide** 88:25
**confidence** 78:4
**confirm** 21:18
**confront** 48:21
  51:3
**confusion** 120:23
**connection** 72:14
**consciences** 92:10
**consent** 131:15
**consider** 72:22
  127:18
**consideration**
  30:16 72:3
**considered** 100:1
**considers** 16:4
**consistent** 19:16
  40:5 73:21
**constant** 93:20
**consult** 22:11
  31:19 78:4 79:19
**consultation** 16:21
**consulted** 18:5
  22:9
**consulting** 79:2
  80:1
**cont** 3:1
**contact** 38:20 57:3
  57:18 64:25 89:14
  102:9
**contacting** 38:16
**contend** 115:19,20

**content** 65:15,19
**context** 85:4 86:1
  87:15,18
**continued** 29:19
**continuing** 18:15
  18:18
**continuously**
  53:14
**contract** 19:23
  20:1
**conversation** 58:8
  58:9 97:16 108:4
  112:20 119:23
  120:2,15 131:20
**conversations**
  57:17,20 65:16
  67:12,13 88:6
  116:18
**conversed** 121:16
**conversing** 98:12
**convicted** 88:17
  112:2
**conviction** 27:7
**convincing** 85:17
**cooper** 2:17 4:5
  5:25 115:4,5
  116:2 117:1,19
  118:1,9,21,24
  119:10 120:5,8
  122:19 129:12
**copies** 118:25
**copper** 5:25
**cops** 72:19
**copy** 20:11 114:8
**corey** 8:22 12:14
**corner** 74:18
**correct** 13:11,12
  13:25 14:1 15:1
  18:1 19:15 20:6
  20:15,16,19 21:8
  22:21 26:3 27:1,2

[correct - described]

29:10,16,21 31:5,6
31:20 33:19 34:6
34:7 35:22 41:12
41:24 42:3,13
43:9,16 44:2,5,25
45:17 46:18 48:10
50:25 51:8,9,19
52:17 53:23 54:10
54:11 56:5 59:1,9
60:8,12,20 61:12
61:15 62:10 71:7
71:8,11,15 72:15
77:2 78:14 84:1
89:12,18 90:25
92:24 94:2,9,10,12
94:17 96:2,8
102:9 103:23
106:21 121:14
**corrected** 83:11
**correctly** 112:10
**correspondence**
16:8,11,13,22
18:13,15,19 33:4
33:10
**corruption** 13:16
**counsel** 4:18 5:17
20:17 120:9 130:4
133:14,16
**counsel's** 40:20,21
**counted** 118:15
**country** 10:24
**county** 1:11 14:6
62:17 82:3,24
**couple** 41:2
103:10 116:6
128:11
**course** 7:23 23:22
34:25 55:22
112:17 126:9,22
**court** 1:1,19 5:8
5:13 6:10 14:6

54:20 129:22,23
131:25 133:4
**courthouse** 116:9
**cousin** 59:12 75:13
76:11,24 101:2
**covered** 44:23
**create** 121:10,20
130:17
**credibility** 73:5
**credible** 81:24,25
**crew** 77:21 78:16
78:21
**cried** 51:14
**crime** 54:1 64:15
73:11,25 76:18
100:9 103:23
104:16,18 105:2,3
105:16,18 106:8
124:21
**criminal** 7:20
32:15 40:4 89:11
**criminals** 93:15
**critical** 115:17
**cross** 103:6 115:3
132:17
**cry** 48:4
**crying** 51:6 52:16
53:23,24 54:9
**csi** 106:12
**current** 8:3,5,21
10:10
**currently** 9:3
**cv** 1:3 5:9

**d**

**d** 4:1 8:23
**dan** 44:9,10 46:11
47:4 82:2,5 83:16
119:18 120:14
121:6
**daryl** 27:9,18
30:20

**date** 31:15 36:9
42:4 44:17,21
65:24 74:22 76:4
90:12 97:16 114:9
133:9
**dated** 38:9 109:22
**dates** 22:19 128:21
**david** 2:17 5:25
115:5
**day** 8:6,6 10:5,5
20:25,25 58:5,7,9
59:14 69:19 83:22
88:13 111:5,13,20
121:5
**dead** 62:14
**deal** 38:18
**dealer** 61:4 63:11
72:25 73:1 98:19
98:20,23
**dealers** 96:11,22
96:24 97:5,10,25
98:1,12
**dealing** 68:23
87:13 93:10
**dealt** 97:19 99:7
**dean** 95:3,4,21
96:3,20
**decade** 52:14
**deceased** 33:25
108:12
**december** 42:11
**decent** 28:25
**decide** 19:8 21:24
79:5
**decided** 20:8
88:21
**decides** 19:7 21:5
**decision** 19:21
26:25
**decks** 30:20

**declaring** 20:2
**decline** 15:1
**deep** 60:19
**deeper** 16:22 97:4
**defendant** 5:20
6:7 116:19
**defendants** 1:12
6:5 103:10,13
114:25
**defense** 89:11
**definitely** 33:14
**definitive** 79:24
**demonstrate**
55:20 126:1
**dennis** 103:16,17
103:18 104:4
110:22
**department** 92:9
93:13 109:7
**depending** 11:21
**depends** 17:1 25:7
**deposition** 1:15,17
5:5,10 7:11,12,17
7:23 8:10 14:10
14:14 27:18 42:7
128:9 131:21
132:9,14,22
**depressed** 126:9
**depth** 18:5
**derive** 10:21 11:3
**derosa** 1:18 5:13
133:4,22
**describe** 12:9
23:23 25:1 35:9
85:25 87:15,18
97:9 122:3,8
**described** 17:23
18:11 20:4 23:20
57:18 58:1,19
63:20 64:2 89:16
93:5 97:24

**describes**  96:21
**describing**  24:5
  31:3 50:14 97:22
  114:4
**description**  4:8
  52:12
**deserved**  10:14
**designee**  115:9
**destroy**  131:9
**destroyed**  26:18
  114:20 131:13
**detail**  119:20
**detailed**  41:5
**detailing**  85:16
**details**  12:12 97:1
  108:6
**detective**  39:25
  40:3 76:16 89:8
  89:19 92:8 106:14
  106:15 109:5
  110:13 127:6
**determination**
  13:11
**determine**  14:21
  132:9
**develop**  16:8 22:8
  22:15
**developed**  17:22
  18:9 81:4 87:21
  88:1,24 92:1
  129:25
**developer**  81:6
**developers**  16:14
**developing**  12:20
  17:13 35:10
**development**  12:5
  12:6 16:16 17:7
  18:10 39:18,20
**dictating**  11:12
**died**  110:16

**different**  12:15
  28:12 46:4 48:20
  68:6 78:5 92:2
  97:20 98:1,12
  101:14,14 112:8
  124:9 128:1
**difficult**  12:9
  91:20,21,25 92:20
  93:2,4 99:10,17
  130:17
**difficulties**  75:14
**digitally**  26:12,14
  133:8
**dinosaur**  26:14
**direct**  6:17 49:10
  91:2 93:15
**directing**  40:17
  65:10
**directly**  62:4
**director**  8:15,16
  8:21,23 9:19 10:4
  12:13 20:1,22
**directors**  8:7 31:8
**disclosed**  116:17
  116:23 117:4,7
**discovered**  100:16
**discovery**  24:21
  24:21 44:6,14,15
  44:17 62:24 114:2
  130:23
**discrepancy**  53:13
**discuss**  17:6 82:8
  97:11 131:17
**discussed**  17:11
  18:9 131:21
**discusses**  98:12
**discussing**  125:13
  132:3
**discussion**  17:17
**discussions**  89:17

**disorganized**
  128:25 129:1
**disposed**  25:20
**dispute**  44:20
**distinction**  13:21
**district**  1:1,2 5:8,8
  14:6 62:17,19
  69:4,8,18 70:8
  82:3,25 85:17
  131:15
**distrustful**  93:12
**disturbance**  48:23
**divinity**  127:15
**divorced**  15:8
**divulged**  116:17
**document**  4:15
  39:2,11 114:12
  130:6 131:4
**documentation**
  34:20 36:15
**documents**  34:20
  35:5 37:23 38:4
  75:5 115:9 128:17
  131:13 132:15
**doing**  16:16 22:9
  22:24 32:15 47:15
  92:5 128:4
**donating**  19:13
**donation**  11:10
**doniel**  39:8 59:12
  59:22 69:9 70:4
  70:12 76:11
  100:11,13 101:1,5
  101:6,15,19 116:8
  117:5
**door**  126:23 128:3
**double**  100:17
  102:16
**doubt**  127:4,5,8
**dozen**  42:1

**draft**  31:24 41:10
  41:19,21 77:8
  78:25
**drafted**  31:24 32:1
  41:7,8 77:16
  90:22,23 94:12
**drafting**  76:3 95:9
**dramatically**
  47:24
**drilled**  97:4
**drug**  59:17,22
  60:7,16,19,23 61:3
  63:10,19,21 72:25
  73:1 76:22 77:25
  78:2,9,9 79:15,22
  79:25 96:4,11,22
  96:24 97:5,10,25
  98:1,12,19,20,22
  99:23 100:1,12,14
  100:22 101:10,19
  102:14
**drugs**  68:23 72:23
  79:3 100:4,12
  101:10,12
**duces**  115:10
**dug**  60:18
**duly**  6:15

**e**

**e**  2:1,1,15 4:1,7
  8:22
**earlier**  13:22
  19:10 20:14 38:17
  39:4 44:23 52:14
  56:6 67:21 69:3
  101:23 119:11,21
  123:18
**early**  22:13 31:17
  58:2 69:20 76:17
  76:17 121:5
  127:13

easier 91:21
easy 91:20 92:21
99:11 126:14
echo 6:22
economically
126:13
edgar 58:23 59:11
59:20
effort 23:14 24:17
efforts 35:5
eight 9:13 130:14
either 7:25 19:22
27:12,17 37:14
57:1 59:14 62:10
66:19,24 70:12
91:10 109:20
116:4 130:2
ellen 27:6
embarrassed 88:8
88:20
employee 19:12
133:14,16
employees 9:3,6
9:14
enable 92:10
encapsulate 93:3
encounter 88:12
89:8 126:22
encountering
92:13
ends 94:16
enforce 130:11
enforcer 59:25
60:11,18,22,24
61:6
engaged 28:19
engagement 19:22
20:5 22:25 23:2,7
23:10
engaging 28:22

ensz 2:2 123:13
entered 12:22 73:4
entirely 76:8
entity 9:15
entrusted 96:21
entry 125:17
esq 2:3,5,10,15,17
2:22 3:3,8,13,18
estimate 10:3
et 1:11 5:7 17:4
70:7 114:3
ethel 92:16
evening 61:14
69:10,15 81:19
109:8,12
event 54:20
eventually 17:1,17
38:20
evidence 105:15
105:16,25 106:1,3
106:7 115:18,19
115:20 116:4
119:4 125:19
126:1
evidentiary
131:24
evolves 45:3
exact 12:25 121:8
exactly 36:3 76:18
examination 4:2
6:17 103:6 115:3
123:9 128:14
example 10:7
22:14,17 26:8
78:24 92:15
examples 10:7
exception 26:5
exceptions 26:4
excess 118:3 119:1
exchange 18:18

exculpatory
115:17 116:3
excuse 13:19
31:11 49:11 50:9
96:17 98:19
execute 22:15 92:3
execution 125:11
executive 8:14,16
8:21,23 9:19 10:4
12:13 19:25
exhibit 36:23 37:2
39:5,7 40:23 42:7
50:18,21 60:2
74:9,16 77:11,12
82:17,19 90:16
95:17 113:25
115:13 117:10
124:1,3
exhibits 4:18 37:6
39:4 118:7
exists 114:19
exonerate 23:15
35:6
exonerated 11:6
11:13,15 27:8
28:11
exoneration 7:20
27:14 126:10
128:24
expect 131:3
experience 93:16
experiences 93:11
explain 55:25
80:13 83:24
125:18
explained 89:10
expressed 92:7,8
extent 97:25
100:24 103:19
124:17

extremely 104:24
eyewitness 105:2
eyewitnesses 43:8
56:8 105:2
eyewitnesss
122:15

f

face 34:5,5 55:14
fact 51:3,14 65:15
92:22 93:6 96:6
126:21
facts 41:12 72:4
85:9,13
factual 32:9
fair 15:2 30:7
31:18 61:7,20
98:13
fairly 92:12
fall 29:20,24
false 48:15,22
53:10
falsity 105:1
familiar 12:11
19:25 39:11 64:9
64:12
family 51:15
far 20:24 29:5
32:9 53:5 106:5
113:3 128:23
132:3
fashion 130:13,16
fear 92:7,8 93:5,17
93:20 99:12
fearful 93:12 99:6
february 82:1
83:12,17 85:24
feel 92:4 125:13
feeling 101:15
felt 10:14 71:20,20
88:18,19,25 101:3
101:5 114:5

**field**  24:24,25
  43:14 127:11
**figure**  79:14
  101:13
**file**  26:11 31:19
  33:9 39:19 47:11
  70:21 71:9 128:17
  128:21 129:5,8
  130:10,14
**filed**  5:7 7:16
  118:19 129:23
**files**  19:14 26:15
  26:15,17 119:8
  128:23
**filing**  118:7,19
**filings**  129:22
**final**  49:7
**finally**  30:19 45:8
  92:10,19 99:8,11
**financial**  10:13
**financially**  5:16
  133:17
**find**  81:24 129:4
**finding**  123:24
**fine**  7:6 8:13 104:3
**fingerprint**  106:8
**fingers**  12:10
**finished**  9:12
**firm**  5:12,14 11:19
  20:15 26:24 27:21
  28:17 123:14
**firms**  11:19 29:8
**first**  6:14 7:11,12
  16:10 22:7 38:15
  38:21 39:23 43:13
  43:14,24 44:10
  45:13 47:3 56:21
  57:1,13,15,17,21
  58:5 64:13 76:24
  88:2,18 95:11,15
  101:1 103:15

115:1,22 120:18
**firsthand**  126:20
**fisher**  1:21 2:14
  6:13
**fit**  116:12
**five**  8:6,18 15:9
  19:17 117:12
**fixed**  7:8
**flat**  47:16
**floor**  2:11 3:14
**flow**  16:11
**focus**  15:18 37:17
  89:22
**focused**  15:13
**focusing**  24:6 97:6
**folks**  93:10
**follow**  58:7 66:16
  103:11 123:11
  128:12
**followed**  61:1
**following**  48:2
**follows**  6:15
**foregoing**  133:6
**forensic**  105:15
  106:13
**forget**  31:15 37:15
  67:6 68:4 100:21
  106:23 130:15
**forgot**  44:12 47:4
**forgotten**  96:9
**form**  9:1 16:5,7
  21:9 22:1 41:13
  48:18 52:7,22
  53:11 55:15 98:21
**formally**  13:2
  15:17
**formed**  8:24,25
**former**  92:18
**forth**  18:13,22
  133:9

**forward**  89:15,24
  130:8 132:11
**found**  81:25
  110:12
**foundation**  10:25
**four**  37:5 73:15
  105:17 121:8,25
**fourth**  121:1,8
**free**  23:14 34:3
  35:12
**freed**  27:8,11
  30:20 125:20
**freedom**  24:19
**french**  47:23 51:5
  51:11,19,21,23
  52:12,19 53:10,15
  54:4 55:3,10 56:4
  119:13 122:4,8
**frequenting**  90:2
**fresh**  25:19
**friday**  104:19
**frieda**  80:18,19,22
  80:23 81:5,6,8,10
  81:13,14,17,18,24
  81:25
**friend**  34:2 110:15
**friend's**  68:15
**friends**  80:4
**friendship**  87:22
**front**  74:16
**full**  18:8 20:21
  31:9 128:16
**fully**  22:24 60:10
**function**  130:18
**further**  17:17
  24:17 58:8 70:13
  106:9 114:23
  128:9 129:11,12
  129:15 133:13

**g**

**gage**  28:18
**gained**  25:7
**garage**  108:2
**gather**  48:14
**gatlin**  57:6
**geez**  13:17
**general**  15:22,24
  15:25 16:1 29:2,9
  29:13 30:13 41:10
  125:24
**generally**  97:2
**generate**  23:24
**gentleman's**  67:25
**gently**  48:21
**geographic**  29:2,9
**german**  11:25
**getting**  14:18 35:6
  76:11 90:1 94:23
  97:7 125:7
**girlfriend**  98:22
  98:22 101:2
**gist**  2:3 4:3 5:19
  5:19 6:8,18,20 7:3
  21:11,20,22 22:4
  23:18 28:3,6
  36:20 37:1 40:12
  40:19,23 41:1,14
  41:17 43:2 45:19
  45:24 46:5,8,16,20
  48:1 49:4,24
  50:24 52:9 53:7
  53:19 54:18,25
  55:17 56:14,19
  63:16 64:1,11
  65:12,17 66:1,14
  74:12,15 77:10,14
  82:22 86:13,18
  87:10 90:19 91:7
  91:12 94:23 95:1
  95:14,20 102:17

123:10,16,25
124:6 125:2 126:5
128:8 129:15
**give** 10:7 11:9
14:22 30:18 41:4
92:11
**given** 17:21
132:19
**go** 13:6 14:16
16:22 22:8,23
23:21 24:3,11,24
24:25 27:13 28:13
31:23 37:19 45:10
49:17,19 50:7
53:5 70:9 74:23
74:25 84:4,13
87:13 89:7,9 95:2
96:17 100:5
102:17 104:16,17
106:25 116:16
119:5 127:2
**goal** 127:21
**goes** 14:8 16:2
24:7 37:18 80:5
100:6
**going** 5:2 11:24
14:23 21:6,7,24
24:8 27:21 29:12
30:6,15,16 34:23
36:20 38:10,13
39:5 40:13,16,24
42:8,19 45:9 49:8
49:17 56:14 60:1
63:8 66:4 69:5
74:7 84:6 85:13
86:4,18,21 87:16
90:8,13 91:3
95:14 99:23 100:6
100:7 102:17,23
103:12 122:24
125:24 129:17

130:4,7
**golubski** 5:20 6:7
6:9 7:15 32:15
39:25 40:3 71:21
73:10 76:17,19
84:22,23,25 87:20
88:5,5,11 89:8,18
89:19 90:2 92:8
94:21 102:9 109:5
109:13,20 110:13
110:17 113:13,18
116:23 117:5
126:18 127:6
**golubski's** 85:13
85:16 88:13 92:15
**good** 5:1 6:19,21
30:1,24,25 34:2
41:3 81:4 110:15
111:7
**gorman** 82:3 83:2
83:17 84:18 85:8
85:17
**government** 1:11
5:7 6:1 115:6
**gpm** 3:2
**graduate** 127:15
**grand** 3:4
**great** 13:18
**gregarious** 101:13
**group** 98:8
**guess** 24:11 28:18
52:23 60:9 74:18
92:15,20 108:1
118:6
**guessing** 6:23
47:10
**gun** 69:21,24
127:25
**guns** 102:8
**guy** 81:22

**guys** 80:2 82:9
83:24 85:9 102:7

**h**

**h** 4:7
**hair** 47:22 51:4
52:3,4,15,21 53:22
54:8,14 55:4,9,13
55:14 56:2
**hairstyle** 122:4
**half** 52:14 126:12
130:24
**halfway** 75:8
**hand** 101:11
**handle** 48:12,16
49:2
**hands** 70:6 101:8
116:15
**handwritten**
25:13
**haphazard** 128:25
**happen** 7:13 69:22
**happened** 58:11
61:13 88:13 101:1
112:17
**happening** 10:11
**happens** 19:24
**happy** 92:16
**hard** 32:4 97:18
115:17 123:23
126:24,25
**harder** 129:5,6
**harm** 70:13
**harris** 98:19 102:2
**hat** 122:17
**hayes** 3:18 4:4 6:4
6:4,22 103:7,8
104:2,8,10 105:20
107:12,21 108:10
109:10 111:11
113:16,22,24
114:13,18,23

128:11,15 129:11
131:5,8 132:13
**head** 74:23 96:14
113:13
**hear** 6:20 7:6,7
35:25 46:2 126:20
126:25,25
**heard** 58:24 63:10
63:21,24 69:15
99:25 103:14
106:23
**hearing** 14:11
17:3 25:24 29:22
43:7 49:12,15
54:20 71:7,10,14
71:15,18,19 114:2
118:16 131:25
**heavily** 88:22
**held** 5:10 17:6
**help** 7:1 12:8
14:14 35:12 37:11
79:5 84:15 108:7
127:22
**helped** 53:4 88:17
**helpful** 15:20
25:10
**helps** 15:19
**hereinbefore**
133:9
**herrontown** 2:11
**high** 101:12
**highly** 44:1
**hire** 19:6
**hired** 35:18
**historical** 16:7,23
17:2
**history** 13:3 32:9
114:5
**hold** 50:7
**home** 68:15
107:25 112:17,22

116:16
homicide   27:10
   100:17 102:16
   106:14,15
homie   68:14
honest   131:2
hoping   32:5 55:4
hospitalized
   126:12
hours   74:23 94:5
house   20:17 59:17
   60:16 61:9 63:19
   63:21 64:23 67:5
   67:25 69:25 76:22
   77:25 79:22,25
   80:11 99:23
   100:12,16 102:8
   102:14 111:20
hudson   3:14
   124:21
humiliated   88:19
hurry   37:7
hurt   87:23
husband   92:18
hutchinson   64:15

i

idea   15:25 43:18
   70:18 114:10
ideal   43:25
ideas   22:11
identification
   36:24 50:22 55:6
   74:10 82:20 90:17
   95:18 109:7 124:4
identified   47:22
   51:7 109:23
   117:14
identifies   118:3
identify   71:13
   115:20 117:20,23

identifying   97:5
imagine   119:6
immediate   81:14
important   34:15
   41:11,19 53:13,17
   60:22
inaccurate   23:8
   55:21
include   17:10
   41:11 51:14 53:2
   53:13,17 98:8
   119:17 121:15
included   75:13
   119:15 120:25
   121:1
including   105:16
   106:6,7
inconsistent   52:18
incorrect   83:10
independent   21:7
   21:25 77:20 78:21
indeterminate
   26:21
indicate   70:3 79:4
indicated   23:9
   83:6 130:13
indication   5:9
individual   10:23
   103:12 115:8
   116:5 127:20
individually   6:5
   103:9
information   10:13
   14:7 16:7 24:20
   25:9 34:16,25
   48:14 64:25 73:10
   80:7,14 89:1,7
   94:9,11 96:1
   103:14,17 105:1
   107:7 110:24
   113:6,17,20 114:2

121:11
informed   22:10,24
informing   23:6
   31:13
initial   15:5
initially   111:16
initiate   28:13
inmate   16:6,6,9,13
   18:14,19 20:2
   22:9 24:10
innocence   30:25
   85:10
innocent   31:4
   32:10 53:4 82:9
   82:13 83:25 84:19
   114:5
input   41:23
insisted   47:23
insistent   51:5
insisting   54:4
insists   52:19
inspire   55:4
instance   26:6
   60:25 115:16
instances   24:14
intake   15:7 16:3,9
   16:12
intelligent   126:16
intend   116:3
interactions
   125:13
interested   5:16
   15:16 30:21 32:11
   37:8 97:6 133:17
interesting   17:19
   18:3
intermittently
   34:9
interpose   124:16
interrupt   15:10

interrupting   15:12
interview   22:20
   24:13,15,25 25:2,4
   25:5,6,12,18,18
   26:7 36:12 39:8
   44:3,8,10,17 45:14
   45:17 46:10 52:25
   55:3 104:16
   108:15,20 109:19
   110:4,6,14 124:19
interviewed   24:13
   25:8 38:23 72:13
   77:1 95:21 104:18
   109:6
interviewee   25:9
   48:24
interviewers
   103:24
interviews   24:23
   26:2 37:13 44:24
   45:7 55:22 104:23
   121:20 127:12
introduce   107:1
introduced   7:14
investigate   125:25
investigates   20:18
investigating
   112:4 127:6
investigation   13:9
   21:25 22:8,12,13
   23:25 24:1,18
   32:18 34:17 35:1
   38:17 43:14 48:14
   92:1 93:25 101:24
   103:15 104:13
   106:9 107:7,19
   108:8 110:25
   113:6,12 119:2
   121:5 127:14
investigations
   21:6 92:23

**investigative** 22:16 24:12 121:23
**investigator** 35:18 73:25 105:14 106:6
**invited** 108:3
**involve** 13:16
**involved** 12:17,24 20:25 27:23 28:15 35:7 40:4 72:23 96:4
**involvement** 126:2
**involving** 119:23
**iq** 126:7
**issue** 131:11
**issues** 10:14 38:18 131:17

**j**

**j** 3:3
**jail** 98:3 112:16
**james** 1:15,17 5:5 5:24 6:13 34:1 107:6,16,19,22 126:11 132:20
**january** 31:2 39:9 62:16 69:5
**jennifer** 49:16 62:19
**jerome** 83:16
**jerry** 82:2 84:18
**jersey** 1:20,21 2:9 2:12 6:14 133:6 133:23
**jester** 2:2 123:13
**jim** 88:7
**job** 24:5
**joe** 77:2,5,6,16 78:13,13,19 79:16 125:8

**john** 59:7 61:10 62:6,10 80:11 85:4
**join** 33:25 34:1
**joined** 20:21
**jomanna** 1:18 5:13 133:4,22
**jones** 64:3 66:17 68:6,11,18 70:17 98:8,9,10,19,20,25 99:15,19 100:5 101:19 102:2 123:19
**josephine** 73:10 116:7,18
**jr** 58:23 59:11,20
**judge** 131:13
**july** 38:10
**jump** 69:5
**june** 57:2,2 76:5 90:13 115:14
**jury** 71:7 111:25
**jury's** 116:15
**justice** 85:18

**k**

**kansas** 1:2 2:7,19 2:24 3:5,10,20 5:8 22:20 29:1,5 33:16,17 43:13,14 60:19 61:4,4 67:4 68:2,13 72:13,14 78:10,10 93:12,13 131:15
**kate** 11:23
**katherine** 3:24 6:2
**kck** 92:9 93:14 106:23
**keep** 23:22 25:24 26:1 61:10 70:13 80:12 99:10 102:2 131:9 132:14

**kendra** 95:3,4,21 96:3,20
**kept** 19:2 22:9 24:7 25:1 26:15 26:16 34:11 62:23 89:4 125:23 129:8
**kgg** 1:3 5:9
**khv** 1:3 5:9
**kid** 61:1
**kill** 72:9
**killed** 62:15 79:1 80:2,3
**killer** 61:4,5
**killings** 64:5
**kind** 15:3 16:4 22:11 23:19 26:14 29:12 34:20 54:7 54:14 55:13 93:17 97:22 128:25 130:18 132:1
**kingpin** 60:23
**kitchen** 108:3
**knew** 48:22 53:10 58:11 66:20 72:21 77:23 85:21 92:18 93:14 97:7 99:19 99:21,22,22 100:13 101:14,17 109:23 126:3 127:5
**know** 7:7,25 12:12 12:25 14:7 15:25 17:10 18:2,7 19:11,17,24 20:24 22:19 23:13 24:21 26:10 27:21 30:11 32:9,21 33:15 35:25 36:3,8 40:3 43:25 47:7,9 48:14,19 50:2 52:13 53:3 54:3,7

54:13 55:12,25 56:2 58:2 61:23 68:5,16,17,18,20 68:25 69:2,20 72:19 73:22 74:1 74:5,24,25 75:8,12 77:4 79:4 80:9,17 81:7,10 87:13 88:9,20 89:6,7 92:16,20 95:11,12 99:12 100:2 102:6 102:7,19 103:13 103:21 105:23 106:6 108:3 109:4 109:25 110:1,2,3,9 111:17 112:2,4 114:14,15 124:8 125:24 128:9 129:1,1 130:9,23 131:1,6,16
**knowing** 98:18,20 111:25
**knowledge** 27:12 63:5 72:4 126:6 128:18
**known** 58:23 59:21 68:12 76:25
**kraughter** 111:15 111:17
**kraughter's** 111:15
**krstolich** 107:16 107:19,23 108:11 108:23 109:2,12 109:18 110:11,16 110:18,20

**l**

**l** 8:23
**laid** 82:11
**lamonte** 1:6 3:23 7:16,19 9:8,23

12:17 15:13,22,23
18:21 20:8 22:18
22:19 26:8,11,22
27:4 29:14,16,23
30:15,18 31:4,12
32:6 43:7 46:1,12
46:13 47:21 51:7
53:25 54:9 55:4,9
56:7,24 71:1,5,13
72:7 81:21 82:8
82:12 83:24 84:19
85:10 88:17 89:11
109:21,23,24,25
111:5,16,18,19,21
112:5,12 114:5
116:10,10 117:13
125:20
**lamonte's** 9:13
22:13 24:12 42:17
51:22 85:19 90:10
126:10
**large** 9:21 25:22
28:25 34:17
**lasted** 67:16
**late** 31:16 97:16
100:23
**lathrop** 3:2 28:18
28:19,20,21
**law** 6:2 11:19,19
20:15 26:24 27:21
28:17 29:8 93:14
123:14
**laws** 28:14
**lawsuit** 103:10
**lawyers** 28:12
**lay** 124:20
**layla** 57:5 124:8
124:11,14
**layout** 85:9
**lead** 82:14

**leader** 59:24 61:6
**leaders** 59:22 60:7
60:14
**leadership** 60:16
**leading** 47:6 77:6
95:23
**leads** 120:5
**learn** 18:16
**learned** 35:11 59:6
115:16
**learning** 34:23,25
35:11 93:11
**leave** 69:21,24
**led** 107:2
**lee** 1:6
**left** 64:23 73:7
74:18
**legal** 9:15 17:4
20:17,21 32:9
**legitimate** 127:15
**length** 73:18
**lengthy** 57:20
58:10,18
**letter** 4:12 15:4,6
15:7,15 16:2,3,10
16:11 19:23 20:2
20:4,5,7,12 23:1,2
23:5,7,11,13 24:7
29:15 31:11,12,15
31:16 82:15 83:1
83:7,16 84:4,17
129:21
**letters** 13:24
**level** 17:7 19:16
**levels** 18:5 99:12
**liability** 101:20
**license** 1:19
133:22
**lied** 75:20
**lieutenant** 111:23
111:24 112:6

113:11,17
**life** 19:20 97:17
**lifted** 106:8
**line** 49:18 50:1,9,9
51:13 119:4
**lines** 60:3
**list** 25:8
**listened** 62:25
**litigation** 27:13,20
27:24
**little** 30:14 34:16
48:8 75:7 78:23
94:8 96:16 108:4
112:7 119:19
125:6
**live** 98:22 101:2
**lives** 93:7
**living** 64:14,17
68:12,17,18,20
93:7
**llc** 2:21
**llp** 2:14 3:2,12,17
27:23
**local** 35:15
**locate** 44:3 111:19
129:5,7
**located** 81:11
**log** 130:5,7,17,20
131:5
**long** 26:21 32:4
67:15 97:21
109:17
**longer** 8:14,16
61:25
**longest** 38:19
**look** 13:25 14:21
17:22 29:23 30:9
30:24 39:11 60:15
74:18 79:7 130:7
**looked** 13:10
30:24

**looking** 28:24 30:1
52:20 55:14,14
96:6 111:16,18
115:13 126:24
**looks** 18:3
**lord** 78:2,9
**loss** 87:24 112:11
**lost** 114:20
**lot** 12:10,15 14:24
72:11 75:4 78:3
91:25 92:13 94:9
123:18 126:9,15
**loud** 77:19 79:11
**louis** 27:7,10
**love** 64:3,9,12,13
64:17 65:1,3,7,11
65:16,23 66:17,25
68:12 69:13,21,24
70:9,17,21 80:8
99:5,22,25 100:15
100:20,25 101:4
101:24 102:5,13
123:19
**love's** 67:22 68:1
**loved** 101:8,16

**m**

**ma'am** 108:13
114:22 128:19
129:10
**macmurchy** 3:25
5:12
**main** 2:6 11:1
16:17 24:11,16
32:1 105:18 128:4
**maintain** 20:11
26:17
**maintained** 19:3
26:20
**maintaining** 51:21
**majority** 13:19

| | | | |
|---|---|---|---|
| **making** 56:17 84:18 | **mccloskey's** 4:13 130:1 132:9 | 68:1,15 80:21 95:6 120:20 121:7 132:5 | 80:23 82:2 83:15 83:16 85:8 93:25 94:4 120:18 121:16 |
| **man** 53:4 79:19 99:6 108:3 116:12 116:12,22 | **mcintyre** 1:6,6 3:23 5:6 7:16 15:22 18:22 20:8 | **meeting** 18:8 47:3 48:7 50:13 51:1,2 | **mic** 6:23 **michael** 3:3 5:21 |
| **management** 8:6 16:22 | 22:18,19 26:9,11 29:16 30:15,18 | 53:20 54:2 57:15 57:21,23 62:21,23 | **middle** 100:23 **midwest** 29:1,4 |
| **mark** 77:11 | 31:4,12 32:20,20 | 63:6,9 67:15,19,24 | **mind** 25:19 36:17 |
| **marked** 36:23 42:7 50:18,21 | 32:24 33:4,10,13 33:22,22 34:5,12 | 82:6,7,11 83:7,19 83:23 84:18 93:10 | 47:15 65:24 72:10 73:4,22 88:22 |
| 74:9 77:12 82:19 90:16 95:17 | 34:19 35:3 36:14 37:24 38:4 39:15 | 120:11,13 121:12 **meetings** 17:5 | 89:9 116:24 117:9 120:22 125:6 |
| 123:25 124:3 | 40:2 41:3,4 42:2 | 18:6 34:4,12 42:2 | 127:5,8 132:13 |
| **martin** 95:4,4,22 96:4,20 | 42:12,16 43:7 46:1,12,13 51:8 | 42:12 58:15 120:24 | **mine** 34:2 60:13 **ministries** 5:6,24 |
| **martin's** 4:14 | 54:9 56:7 71:2,6 | **member** 16:21 | 7:18,19 8:4,11 |
| **master** 127:15 | 71:14 72:7 81:21 | 17:14 | 23:16 115:9 |
| **material** 24:21,22 33:9 71:9 | 82:8,12 83:24 84:19 87:11,19 | **members** 9:25 16:14,21 17:11 | 117:15 118:25 129:9 |
| **materials** 47:11 | 109:24,25 111:6 | **memo** 31:7,11,22 | **ministry** 127:19 |
| **matt** 5:11 6:20 | 125:12,18,20 | 31:24 32:2,7 | **minutes** 57:10 |
| 21:15 28:1 45:22 56:11 123:16 | **mcintyre's** 7:20 9:8,24 12:18 | 108:14 114:4,6,8 114:19 | 67:17 73:14,15,16 73:19,19 74:21 |
| **matter** 1:18 5:6 | 15:13 26:23 27:4 | **memorandum** | 112:16 |
| 26:22 97:8 108:18 | 29:14,24 32:6 | 31:3 32:13 | **miscarrying** 85:18 |
| 117:24 118:20 | 41:22 56:24 85:10 | **memory** 14:14 | **mischaracterizat...** |
| **matthew** 2:3 3:25 | 89:11 117:14 | 37:11 38:3 | 60:14,15 |
| 5:19 | 126:7 | **men** 59:12 79:1 | **misconduct** 13:20 |
| **mccauley** 3:7 | **mean** 14:22 15:12 | 109:6 | 84:25 85:13 |
| **mccloskey** 1:15,17 | 48:2,9 51:11 61:5 | **mentioned** 1:18 | **misdeeds** 85:16 |
| 4:3,10 5:5,24 6:13 | 100:4 106:5 | 19:10 67:10,21 | **mispronounce** |
| 6:19 20:4 21:12 | 117:23 132:2 | 85:3,5 119:21 | 11:24 |
| 21:23 22:5 23:9 | **meaning** 37:23 | 120:17 | **mississippi** 94:1 |
| 28:7 37:3 40:14 | 78:20 | **message** 61:10 | **missouri** 2:7,24 |
| 43:3 46:9 49:25 | **means** 24:20 37:7 | 80:12 | 3:5,10 29:2,5 68:2 |
| 55:8 66:15 86:14 | **meant** 66:21 | **messed** 51:7 71:3 | **misstates** 119:4 |
| 102:19 115:7 | **media** 5:4 66:4,11 | **met** 33:17 38:21 | **mistake** 47:21 |
| 119:12,21 122:2 | 123:6 | 47:1,5 57:12 | 51:16 53:3 |
| 122:20 131:23 | **meet** 33:12,21 | 62:16 64:13,14 | **mistaken** 111:4 |
| 132:20 | 35:22 38:20 46:24 | 65:23 67:4,5 | |
| | 66:19,25 67:24 | 68:13 77:1,4,6 | |

**misunderstood**
45:21
**mitchell** 43:8,19
44:4,8,10 45:14
46:10,12,25 47:16
49:7 50:14 51:2
52:2 54:2 55:11
56:8 109:6,19
110:5 119:12,24
120:13,18,20
121:11,17,21
122:3,7
**mitchell's** 43:24
46:21 51:10
**mixed** 101:15
**mom** 85:20
**moment** 32:19
**money** 10:20,22
10:25,25 11:1,2,7
11:14,20 70:12
**monies** 11:3
**monster** 58:23,24
59:2,10,21 60:7,11
61:8 64:4 69:9
72:8 79:2 80:10
**monster's** 60:16
**month** 130:24
**morehead** 71:1,5
116:11,16,21
**morgan** 2:21 3:8
6:6 26:24 27:3
29:9
**morning** 5:1 6:19
6:21 69:19,20
**mother** 64:14
67:22 68:2 97:18
101:9 111:14
**mother's** 67:25
68:15 70:23
**motivation** 127:22

**mouth** 61:11
80:12
**move** 29:13 56:10
61:7 91:4 130:8
132:10
**moving** 93:7
**mugshot** 81:20
**multiple** 52:3
**murder** 64:18,21
112:2,5 117:6
**murdered** 59:13
70:4
**murders** 70:10,11
**murky** 125:6
**muscle** 60:11

**n**

**n** 2:1 4:1 8:23
**name** 5:11 6:19
11:24 35:18 57:6
57:7 59:11 64:2,3
66:17 67:6 68:3,6
68:6 89:20,22
93:24 103:8,12
106:24 107:4
109:23 110:1,3,6,9
123:13,14,15
124:9,19
**named** 6:5 103:9
**names** 27:22
**napolitanio**
130:22
**napolitano** 2:5 6:9
130:3 131:3,14,18
132:5,8
**nature** 19:14
32:16 90:3
**near** 53:25
**nearby** 59:17
**necessary** 31:9
**need** 22:22,22
32:23 47:15 56:15

79:12 88:7,9
130:8,8,10 132:13
**needed** 125:19
**neighboring** 72:25
73:1
**neil** 58:23 59:11
59:20
**neither** 133:13,15
**nervous** 125:16
**neufeld** 3:12 27:22
28:8
**never** 11:5,16,16
51:4 52:21 58:24
65:3 79:21,23
80:23 89:5,10
93:20 94:22 99:25
103:21 106:21,22
107:2,3 111:3,8
112:17 113:10,14
132:1
**new** 1:20,21 2:9,12
3:15,15 6:14 14:2
125:19 133:5,23
**news** 81:20
**newsom's** 59:7
**newspaper** 35:14
**niece** 109:22
126:15
**night** 64:4 79:1
80:2 88:12 100:23
100:23 102:8
**niko** 4:11 43:9,19
56:9,21 57:1,8,9,9
57:11,12,16,23
58:3,22,25 59:5,10
59:16,20 60:11
61:8,13 62:16
63:11,11 64:5,14
64:17 67:9 69:4
69:11,25 70:3,8,13
70:25 71:4,13,17

71:22,25 72:6,22
73:6,12 74:2,12,17
75:11,17 76:1,7,9
76:21 80:10 81:14
81:21 84:22 99:1
99:4,14 100:9,14
100:20 101:2,4,22
102:1,5,8 104:18
116:21 117:4
122:15 124:8,21
**nine** 9:13 10:1
**no.30xi00188500**
1:19
**nonprofit** 9:16
**normally** 25:24
44:24
**notarized** 125:9
**notary** 1:20 6:15
125:8,10 133:5,23
**note** 25:8 82:23
84:2
**notepad** 25:13
**notes** 25:13,17
**notices** 115:10
**nsb** 28:2,8
**nsi** 27:23 28:2,2
**nuanced** 78:24
**number** 4:8 8:9
9:9 12:25 13:9,13
17:20 28:25 70:19
70:23 88:6 92:5
92:25 93:18,22
103:9 120:17
130:15
**numerous** 42:12
89:17

**o**

**o** 8:22,23
**oath** 5:15
**object** 21:16 22:1
52:6,22 53:11

55:15 65:9 91:22
103:19 119:3,25
**objection** 21:9,18
40:7,10 41:13
46:14 47:18 48:17
48:18 52:7 54:16
63:13,23 64:7
65:8 104:5,14
105:12 107:9,24
109:3 111:1 113:8
113:19 117:17,22
118:5 124:17
125:21
**obtain** 24:18 91:20
110:23 125:19
**obtained** 17:9
28:13 103:17
109:7 117:13,21
121:11
**obtaining** 16:24
**obviously** 14:5,18
20:23 33:1 54:20
82:8 83:10 131:12
131:12
**occasion** 80:21,24
99:5 121:16
127:13
**occasions** 33:15
47:6,7 88:6 95:22
120:18 121:25
**occurred** 52:25
58:4 61:14 64:16
100:9,17 102:16
112:20 124:22
126:21
**october** 1:15,22
5:2 14:6,11 43:6
49:11,11
**odd** 91:24 118:13
**offer** 92:17

**offered** 51:15
131:22
**offhand** 96:14
104:7 105:9
**office** 6:3 26:9,10
62:17 69:4,18
82:25 83:21 88:13
111:16 126:23
**officer** 106:24,25
126:24
**officer's** 107:4
**officers** 111:5,7,13
112:9,13,21
**officially** 23:15
**oh** 57:24 117:3
**okay** 6:20,25 7:4,9
8:12 10:2 21:3
25:16 28:4 30:13
35:17 36:19 37:2
37:5 39:10 42:10
50:5,12,12 55:24
56:17 58:14 60:1
60:5 65:20 69:6
74:22 75:7 77:8
77:10 80:18 82:15
84:9 86:19 96:16
104:8 123:18,21
131:17,18 132:12
132:17
**old** 60:25
**older** 33:25
**oldest** 126:11
**once** 12:21,22 16:8
17:8 21:4 22:12
24:1,3 27:8 28:10
**ones** 58:19 91:21
91:21,24,25 93:2
101:9
**open** 132:14
**opened** 94:8
126:23

**operated** 59:17
76:22
**operating** 10:21
72:11 79:17
**operation** 77:20
78:21
**operational** 31:10
**operations** 10:5
98:2,24 101:21
**opinion** 43:11,12
98:21
**opportunity** 61:25
**ordained** 128:6,7
**order** 98:1,12
125:20
**orders** 61:1
**organization** 9:17
12:12 128:21
**organize** 130:16
**organized** 128:18
128:20 129:2
**original** 118:7
**originally** 130:22
**outcome** 5:17
11:21
**outlined** 11:12
22:25
**overall** 97:11
126:7
**overbroad** 22:2
48:17
**overland** 3:20
**oversees** 12:5
**owner** 67:5

**p**

**p** 2:1,1
**p.m.** 132:23
**pad** 30:10
**page** 4:2,8 31:3
32:8 37:5,18
49:12,17,19 50:1,2

50:3,5,8,10 60:2
75:1,7 83:3 84:5,9
91:3,4,15 106:11
114:4
**paid** 9:6,14 20:21
70:12
**paper** 26:15,15
35:15 128:18,19
130:15
**paragraph** 37:9
37:17,19 39:3,3,24
53:9 77:19 78:18
79:7 84:15 91:3
91:17 96:7,17,20
97:10 98:11
115:14 117:10
**paragraphs** 37:8
**parameters**
131:21
**park** 3:20
**part** 19:8,18 46:11
51:16 78:10 91:25
127:13
**participated** 97:20
**participation** 81:4
**particular** 10:17
14:22 26:22 31:25
48:22 75:6 84:14
96:9
**particularly** 18:3
**parties** 133:15
**partnership** 76:24
**parts** 56:15
**party** 5:15
**pass** 102:18
**passage** 114:21
**passed** 35:24 36:3
62:13 110:18
**passing** 94:24
**patterson** 2:14

**paul** 2:10 5:23
20:20,25 129:16
131:14
**paying** 52:4
**pc** 2:2
**people** 18:20
19:18 33:23 67:10
72:13 75:12 90:6
92:2 97:19 101:14
117:6 128:1
**percentage** 14:19
**perfectly** 127:14
**performing**
105:24
**period** 9:7,18,23
15:13,16,19 26:21
29:18,19 117:12
**perjured** 71:18
72:7
**perjury** 72:1
**permission** 22:23
**person** 11:13 15:7
16:3,3,9,12,17
28:11 31:25 34:5
57:23 58:15,22
59:5 122:4,8
128:2
**person's** 20:3
**personable** 101:13
**personal** 38:18
**personally** 33:12
66:22
**persons** 11:3
31:25 105:15
117:20,21 118:3,3
119:15,17
**pertaining** 34:21
**pertinent** 41:12
**petition** 12:7
**petitioners** 12:7

**phone** 34:8 42:2
58:2,2,4,6,12,13
58:18 67:12,13
70:19,23 129:20
**photo** 51:23 55:9
109:23
**photograph**
123:20
**photos** 47:21
53:25
**phrasing** 120:1
**physical** 106:7
116:13
**pick** 112:16
**picked** 111:21
**picture** 12:22 54:8
**pieces** 45:3
**pies** 12:10
**pilate** 2:21,22 5:22
26:24,24 27:3
29:9 32:3 62:18
67:7 81:19 82:2
83:16 119:17
**pin** 52:11
**place** 1:21 6:14
25:12 26:7 44:18
57:13,16 64:24
74:23 83:7 89:9
111:21 133:9
**plaintiff** 32:21,22
**plaintiffs** 1:8 5:22
44:18 45:20
**plaintiffs's** 130:4
**plan** 22:10,16
**planning** 130:9
**plate** 126:15
**play** 30:8
**player** 77:22
**please** 6:11 7:25
21:14 39:23 42:5
49:16 50:1 57:14

66:23 76:4 77:19
79:11 86:17 87:14
106:23 115:20
131:9
**point** 10:1 11:18
15:8 16:12,15,17
18:9,10,12 19:5
25:4 26:19 32:24
42:13 47:15 54:3
58:16 71:24 74:1
76:10,17,18 83:4
85:22 87:23 94:16
94:19 100:20
112:3,25 113:3
125:19 131:17
**pointed** 48:3 55:2
75:22 79:20
127:25
**pointing** 48:25
83:9
**points** 43:21 84:17
**police** 13:16,20
17:3 24:19 53:16
73:7,13,24 74:2,4
74:13 75:21,25
76:10 85:15 92:9
93:13,14,17 98:3
102:3 106:24
109:6,17 111:15
111:17,22 112:1
112:12 114:3
126:23
**poorest** 25:19
**pop** 18:18
**portion** 87:4
**posed** 52:7
**position** 72:24
129:17
**possession** 114:6
**possibility** 47:20
72:10 124:23

**possibly** 39:15
**post** 127:10
**potential** 17:5,19
**potentially** 56:15
**poverty** 93:6
**power** 10:18,19
**precise** 122:1
**precision** 122:1
**predated** 31:12,14
**prefer** 40:15
**preliminarily**
115:7
**preliminary** 17:3
71:6,10,15,18
**prepare** 45:10
**prepared** 36:11
38:25 109:15,16
**preparing** 81:2
**presbyterian**
127:15
**present** 3:22 6:8
10:12 32:3 44:11
49:6 61:10 62:18
62:20,21 64:20
67:2,7,9,23 80:12
**presented** 17:16
31:7
**pressure** 71:20
**pressures** 72:11
**presume** 14:23
**pretty** 22:13 23:3
24:5 30:1 36:2
41:4 55:19 60:22
126:8
**previous** 56:21
**previously** 36:16
42:7 77:12 88:16
**priest** 127:11
**primarily** 29:5
33:24

**primary** 10:23 28:15 32:6 81:6
**princeton** 1:21 2:12 6:14 19:19
**prior** 14:10,14 18:24 24:22 27:4 32:4 35:6 42:11 58:24 87:25 89:15 89:24 126:10
**prison** 53:4 89:4 94:1,5
**privacy** 88:10
**privilege** 129:23 130:4,7,17,20 131:5,11
**privileges** 132:10
**probably** 9:13 10:1 14:23 47:1 65:24 67:17 83:11 88:3 91:23 116:2 121:8 129:4
**problem** 130:13
**problematic** 44:1
**problems** 7:13 78:5 79:5 100:11 101:19
**proceed** 92:4
**proceeding** 21:19
**process** 13:7 14:8 14:17 15:4,5,9,18 15:21 16:1 17:1,8 17:23 18:11 23:20 24:6 28:15 29:13
**procured** 117:15 118:4 119:1
**procuring** 120:19
**produce** 129:21,24 130:4
**produced** 45:20 62:24 108:18 129:18

**producing** 131:11
**product** 40:8 45:18 47:18 54:16 63:14 65:8,10,13 65:14 91:22 103:20 111:2 113:9 117:17 124:17 125:22 130:2
**production** 131:4 132:14
**prompted** 81:21
**pronoun** 119:16
**pronounce** 27:21
**prosecution** 11:8
**prosecutor** 71:1,5 85:8,14 115:17,21 116:11
**prosecutorial** 13:20
**prospective** 12:6 12:21 16:14 18:14 21:1 35:10
**prostitutes** 90:3
**provide** 11:14,20 27:16 35:4 36:5 108:23 124:11,25
**provided** 14:5 24:14 25:10 37:24 38:5 80:25 96:1 114:9,15,15
**providing** 35:13 90:10
**public** 1:20 17:10 125:8,10 133:5,23
**pull** 36:20 39:6 42:6 47:14 51:25 60:1 74:7 77:10 82:16 90:9,13 95:14

**pulled** 69:14
**purpose** 28:22 54:12 55:18,19 82:7 83:23 105:18 127:17
**pursuant** 115:10 129:18
**put** 41:19 49:12 74:12 79:23 130:19 131:19
**putting** 128:3

**q**

**question** 7:24 20:7 21:13,17,18,23 22:6 28:17 31:22 38:11 40:13 44:15 45:22 46:5 49:20 50:25 52:6 54:22 55:1 57:14 61:17 62:20 66:22 71:25 75:6,7,11 84:16 86:16 87:16 98:17 112:7 114:11 116:3 123:12 124:24 127:9
**questioned** 49:15 109:24
**questioning** 119:5
**questions** 7:17,18 18:17 29:13 32:19 32:23 41:2 42:16 44:15 49:14 66:16 84:11,14 91:16 93:23 102:18 103:11 114:23 120:6 122:20,22 123:11,19 128:9 129:11,13,14,16
**quick** 86:2
**quiet** 102:2

**quinn** 39:8 43:9,19 56:9,22 57:1,11,12 57:16,23 58:3,22 58:25 59:5,8,10,12 59:16,20,22 60:12 61:8,10,13,24 62:10,13,16 63:11 63:11 64:5 67:9 69:4,10,11 70:3,4 70:8,12,13,25 71:4 71:13,17,22,25 72:6,23 73:6,7 75:11,17 76:9,11 76:21 80:12,18,19 80:22 81:8,10,13 84:22,24 85:4 99:1,14 100:11,14 101:1,2,4,5,6,16 101:20 102:1 116:7 117:5 124:8 124:11,14
**quinn's** 4:11 61:9 69:25 73:12 74:2 74:12,17 76:1 80:11 102:8 124:8
**quintero** 64:5 79:22 99:24
**quite** 14:25 131:2

**r**

**r** 2:1 8:22,23
**raising** 126:14
**ran** 77:20,21 78:9 78:16,21,21 79:21
**rape** 85:19 87:7 89:16,25 126:18
**raped** 87:19
**raping** 84:23
**rapport** 88:1
**rare** 26:6
**rat** 98:22

**ratted** 99:1
**reactions** 128:1
**read** 8:1 14:5 18:6
32:10 37:13,19,21
39:3 49:17,20
50:1,4,9,12 60:3,5
63:2 77:19 79:11
84:3,10 86:19,19
87:5 96:18,19
109:17 115:24
127:9
**reading** 78:18
98:14
**reads** 15:7 16:3
**ready** 7:4 43:4
49:19 84:4,9
**real** 47:20 59:11
88:1
**realized** 51:23
**realizes** 51:6
**really** 6:22 12:5
16:22 17:14 18:4
23:8 30:25 34:15
48:23 60:19 73:4
78:7,9 79:12
84:12,24 88:8
100:18 132:1
**reason** 15:11
31:25 32:1 44:20
45:1 48:15 52:10
72:1 74:6 93:9
127:10 128:4
**reasons** 18:4 32:7
45:2 68:16 82:12
88:23 93:4
**recall** 30:2,4,14
35:3,13,17 36:7,14
41:5 48:5,6,7
57:13,15 58:18
67:15 70:1 76:6
80:18 81:13,18,23

82:4 83:19,21
86:15 90:9,20
96:11 97:15
103:16 104:3,12
104:15,22 105:4,7
105:13,21 107:4,7
107:13,22 108:6
108:19,20,23
109:1 110:11
112:19 113:1,6
120:11,13,14,25
125:8
**recalled** 116:13
**recant** 45:16 46:1
46:12
**recantation** 46:18
55:7
**receive** 18:17
**received** 11:7
24:22 29:15 35:16
39:12,13,14,16
44:7 57:11 114:12
**receives** 16:10
**recess** 42:21 66:7
86:7,23 102:25
123:2
**recognize** 77:15
**recognized** 81:15
92:18
**recollect** 56:22
58:20 97:14 98:10
**recollection** 33:6
38:7 53:3 56:25
90:4 105:11
106:13,18,20
109:14 110:8
112:18,25 119:22
120:1,2,10 121:13
122:2 124:18,22
**recollections**
112:6

**recommendation**
30:23
**record** 5:2,18 7:14
16:23,24 17:2,8
24:16,18 26:6
30:5 42:19,22,25
44:24 45:2 46:6
50:17 54:23 55:5
66:4,8,11 86:5,8
86:11,21,24 87:2,5
102:23 103:1,4,22
117:24 118:2,20
122:25 123:3,6
130:9 131:20
132:18
**recorded** 5:5 44:9
46:11 73:13
108:21 119:23
120:3,11,15,16
**recording** 44:7,7
45:20 59:7 73:18
73:20
**recordings** 25:25
25:25 26:1
**records** 13:10
17:10 18:17 19:2
19:14 23:21,24
24:6,11,19 25:1,20
34:20 121:15
129:17,21 131:8,9
**recross** 128:14
**redirect** 123:9
**refer** 8:11 84:14
**reference** 37:23
39:24 114:1
**referred** 27:23
60:6
**referring** 73:17
96:25 106:3
**reflect** 33:11 39:19
47:12

**reflects** 53:1
**refresh** 14:14
37:11 38:3
**regard** 26:14
82:14 89:14 106:3
**regarding** 103:14
103:17 105:7
107:8,19 109:1,11
110:11,20,24
113:2,7 132:14
**region** 29:3
**regretted** 89:2
**rejection** 132:1
**related** 5:15
**relating** 100:10
**relationship** 8:3,5
81:5 85:15 88:1
88:24 99:4,17
**relative** 133:14,16
**relatively** 18:10
25:19
**relatives** 80:16
111:20 116:8
**relay** 61:10
**relayed** 88:10
**religious** 128:2
**reluctance** 92:12
**reluctant** 92:6
94:8
**remain** 8:7
**remained** 20:22
**remaining** 6:5
**remember** 28:21
28:22 34:14 35:8
36:9,9 38:14
50:13 61:16,18
68:7 81:17 82:5,6
95:4,13 100:2,8
102:4 104:17,17
106:24 107:18
108:5 112:10

113:3,13 118:15
120:15 121:3,4
124:19,20
**remembered**
108:5
**remote** 124:24
**repeat** 21:14 57:14
66:22 86:17 87:12
**repeatedly** 53:21
54:7
**rephrase** 8:1 46:5
**report** 17:15 18:7
73:24 81:20
109:17
**reporter** 1:19 5:13
6:11 87:5 133:5
**reports** 17:3 24:12
37:13,14 114:3
**represent** 103:9
103:16 104:11
**represented** 11:4
**representing** 7:15
**represents** 13:12
**request** 17:10 58:6
92:5 131:8
**requested** 22:11
87:4
**requests** 14:2
**reread** 51:20
**resident** 128:3
**residents** 19:18
**resides** 70:17
**residing** 6:13
**resolve** 132:4
**resolved** 28:11
**respect** 18:21 21:3
27:25 45:6 125:12
**respected** 77:22
**response** 16:5,10
58:5 100:25 114:9
126:19

**responsibility**
31:10
**responsible** 16:18
105:24
**restaurant** 111:8
**resulted** 55:7
**resume** 7:4 43:4
**retain** 22:14
**retained** 4:18
24:10 27:24 28:7
**retainer** 28:16
**retired** 8:5 19:18
20:24 106:23
**retribution** 92:8
93:18
**return** 112:22
**reveal** 33:9
**review** 14:10
18:17 19:13 62:25
73:12
**reviewed** 14:13,15
37:12 71:9 90:24
114:2
**richer** 17:19
**ride** 48:25
**riesonover** 27:7
**right** 6:23 19:15
27:22 31:19 36:17
44:9 52:5 58:12
65:22 70:25 73:23
79:9 82:10 84:7
85:6 96:15 97:24
98:7,14 103:24
112:23 117:9
132:7
**ringing** 74:6
**rise** 17:12
**risen** 17:7
**rival** 100:1,3
**roach** 3:7,8 6:6,6

**road** 2:11
**robert** 61:9,24
62:6,7,12 80:11,16
**robinson** 59:18
61:2 64:4 69:9
70:7,9 73:2,3
76:24 77:2,5,16
78:3,13,13,19,20
79:22 99:20,22,23
100:1,5,11,14,18
100:19,22 117:6
125:8
**robinson's** 63:21
76:22 77:25
102:14
**roger** 5:20 6:9
7:15 32:15 84:22
84:23,25 87:19
89:17 90:1 94:20
102:9 126:18
127:5
**role** 11:23 12:2,9
60:16,23 95:9
**room** 6:24
**rosa** 1:6
**rose** 7:16 32:20,20
33:4,12,21 34:5,12
34:19 35:3 36:14
39:15 40:2 41:3,4
41:21 42:2,12,15
84:24 87:11,19
111:6 125:12,18
**rosy** 33:17,24 34:1
37:24 38:3 39:17
41:9 85:22 87:21
88:9 111:8,12,17
111:18,25 112:3,8
112:19 126:7,16
**ruby** 43:8,19,24
44:4,8,10 45:14
46:10,11,21,24

47:1,5,16 49:7
50:14 51:2,10
52:2 54:2 55:11
56:8 104:19 109:6
109:19,20 119:12
120:13 121:7
122:3,17
**rude** 15:12
**run** 10:5 22:17,19
77:25 79:13,14
98:2
**rundown** 10:10
**running** 79:25
**russell** 3:17

**s**

**s** 2:1 4:7
**sake** 106:10
**sanders** 3:17
**saundra** 59:7
**save** 70:12
**saw** 51:4,22 52:21
53:24 64:3 69:9
109:21 116:10
126:23 128:24
**saying** 24:7 49:1
55:12 61:18 70:1
73:19 78:19 81:17
81:21,23 99:2
102:4 106:16
**sayler** 2:14
**says** 38:12 46:1
54:7 74:19 96:10
**scandalous** 101:7
**scarce** 62:2
**scared** 62:4
**scene** 43:15 54:1
60:19 87:25
103:24 104:16,18
105:16,18 106:8
**scheck** 3:12 27:22
28:8

scheer 3:17
school 81:16
screen 39:6 49:12
49:14 90:9 91:6
115:23 123:12
scroll 42:8 49:21
49:22 83:3
second 39:24 40:9
49:13 79:10 84:5
95:12
secondary 81:3
secondly 116:20
secret 126:3
section 93:20
secure 45:9
security 110:14
see 9:11,12 32:8
32:10 37:2,10,24
39:25 52:3,15
53:22 56:12,12
70:11 75:9 91:13
96:22 98:16 100:4
103:18 115:22
125:25
seeing 91:8,10
seen 43:20 74:2,24
75:3 93:20 128:23
sell 101:10
selling 100:4
semiretirement
8:18
send 16:4 53:4
sense 30:13 41:10
72:4,6 112:3
sent 16:6 32:11
94:14
sentence 39:24
79:10
separate 99:18
serious 17:18
29:23 30:16 31:1

48:15
services 28:8,19
set 133:9
seven 130:14
shah 3:13 5:22
share 116:1
sharing 56:11,13
115:24
sharp 126:8
she'd 99:9
shells 105:17
shift 29:12 42:17
shocked 104:25
shooter 46:13
47:23 51:5,8,21
52:19 53:9,15
54:4,8,14 55:13
71:2,2,6,14 72:8
81:16 116:14
119:13 122:4,8,16
shooter's 51:4
52:3,4,15 53:22
shooters 52:21
shooting 43:15,22
43:25 51:24 59:3
61:14 64:24 69:11
69:15,19 73:8,14
73:19 76:12 81:15
81:19 109:21
111:20 124:15
125:3
shootings 61:19
short 41:4 43:3
47:22 55:3 66:15
86:14 102:15
104:24
shortly 14:13
61:19 117:6
shot 100:22
102:14

shotgun 61:9
80:11 105:17
show 26:10 28:2
34:19 36:21 54:6
54:8 123:20 128:2
showed 47:21
53:20
showing 52:2,10
54:12,14 55:8,11
56:15 81:20 91:7
shows 123:13
shut 61:11 80:13
sign 94:16
signature 133:21
significant 25:11
signing 49:8 90:25
silence 72:19
simplicity 131:14
simply 52:13
72:23
single 118:15
singular 89:22
sir 6:21 7:10,12
11:22 19:1 33:20
34:7 40:22 62:8
63:4 103:8 104:8
110:10 112:7
113:22 114:13
117:2 118:16
123:15 128:7
sister 57:10 124:8
sister's 58:6
sisters 57:5
sit 47:2 61:22
sittenauer 3:24
6:2
sitting 70:16 81:7
83:19
situation 48:12,16
48:20 93:6

six 29:6 130:14
small 14:19
smith 2:14 104:11
104:12,13 105:5,8
snitch 72:20,24
97:18
software 30:10
somebody 6:25
88:22 100:21
112:2
son 33:1 34:1,3
35:6,12 87:24
88:20 89:4 111:7
112:1,4,12 126:11
son's 40:4 89:14
127:6
sona 3:13 5:22
sorry 35:25 38:14
46:3 49:13 66:23
68:1,7 74:23 75:3
77:11 81:9 87:12
91:15 98:17 104:7
107:5 122:12
sound 29:16 33:19
44:9
sounds 44:22
source 10:20 11:1
73:9
sources 10:20,22
sparse 23:3
speak 9:5 15:21
24:16 25:3 66:19
66:25 105:4 107:2
109:15 110:23
111:23 112:12
speaking 97:2
105:11 107:3,13
113:7
speaks 46:15
specific 7:18 10:16
14:9 22:18 24:23

25:2 26:8 28:25
30:4 36:18 38:6
54:20 112:19
125:24
**specifically**  15:21
15:23 18:21 29:14
43:8,19 54:19
80:15 88:16 89:5
90:2 97:15 98:2,7
102:5
**specifics**  17:25
97:15
**spend**  14:24,25
**spent**  105:1,17
**spoke**  38:15 57:1
58:6 103:21
106:21 111:3
113:10,14
**spoken**  18:7
**spot**  59:22 60:8
100:14,22
**st**  27:7,10
**stacey**  73:6
**staff**  12:19 16:3,14
16:17,21 17:4,5,11
17:14,22 18:6,8
21:1 29:25 35:9
130:18
**staff's**  30:22
**stages**  38:17
101:24
**stand**  83:10
**stands**  21:19 93:1
93:22
**start**  43:14 71:3
75:25 83:12 84:6
**started**  48:4
**starting**  49:18
50:1
**starts**  16:8 37:18
75:8

**state**  1:20 5:17
10:10 11:8 28:14
29:2 63:12 117:11
121:24 133:5,23
**stated**  39:3 66:18
120:10
**statement**  48:22
73:13 74:2,3,13,17
74:19 85:4
**states**  1:1 37:22
**stay**  98:3
**stayed**  19:16
**stealing**  100:12
**steel**  101:8
**stenographically**
133:8
**stepped**  12:13
**steven**  113:5
**stick**  18:4
**sticky**  82:23 84:2
84:7
**stolen**  79:3
**stored**  26:12,13
**strategy**  22:8
**street**  2:6,18,23
3:9,14 64:3,15
66:17 124:21
**stressful**  125:14
**strike**  71:22
**strong**  30:23
**stuck**  126:24
**student**  127:16
**stuff**  41:19 51:11
**stumble**  21:15
**subject**  87:13
**subjective**  92:21
**submit**  31:24
**submitted**  131:25
**subpoena**  114:9
129:18 130:8,10
132:15

**subpoenas**  115:10
**subsequent**  25:5
25:18
**successful**  61:3
79:14 98:2
**suggest**  131:13
**suit**  11:9
**suite**  2:6 3:4,9,19
**suits**  28:13
**summaries**  17:16
25:21 34:11,22
68:9 121:20
**summarize**  84:17
**summarizing**
17:15 51:1 73:24
**summary**  18:6
24:13 25:6,11,14
32:8 39:8 67:18
108:14 121:10,15
**summer**  30:21
**supplier**  69:1 78:7
78:11 80:8 96:13
96:13
**suppliers**  96:8
**support**  85:10
117:13
**supposedly**  110:3
122:14
**sure**  30:12 31:14
33:6,7 34:10
39:21,22 51:18
56:13,17 57:6
58:21 76:19 89:23
90:25 98:15
103:25 105:24
112:23 117:7
131:9
**surprised**  29:25
30:14 70:4,5
**suspected**  100:19

**sw**  2:18
**swear**  6:11
**sworn**  6:15
**symbol**  127:19
128:4

|  t  |
|---|

**t**  4:7 56:10
**take**  7:16 10:17
12:8 13:2,8,25
15:1,3 16:15,24,25
16:25 17:22,23
18:12,24 19:7,21
20:9,19 21:4 24:8
25:13,17 26:1,25
30:23 32:5 40:24
49:13 51:12 53:8
56:23,24 60:3
72:2 86:2 100:6
111:22 112:16
131:12
**taken**  1:20 5:6
28:9,24 42:21
44:18 53:25 66:7
73:20 74:19 86:7
86:23 102:25
118:14 123:2
133:8
**takes**  23:22
**talk**  21:6 62:1,3,9
72:18,19 102:3
111:19 112:1,15
112:21 129:24
**talked**  38:12 56:21
58:10 65:6,13,18
67:21 88:5 96:12
98:4 99:16,24
108:4 124:8
**talking**  17:2 46:3
56:3 58:25 62:5,7
78:17 87:7 98:10
102:5

tape 45:23,25
46:15 62:25
task 130:17
tatum 49:16 62:19
teamed 27:6
tecum 115:10
telephone 57:19
57:20
telephoned 111:17
tell 23:9 44:16
47:19 49:18 62:3
63:8 64:5 69:11
69:23 70:13,16
71:17,22 73:6
75:20 76:9,10,19
76:21 79:13 84:4
88:7,21 89:2,11
90:5 94:20 99:19
100:15,25 101:4
101:18 102:1
110:5,8 111:12
112:8,19 118:10
118:12 122:15
123:20 124:14
telling 35:17 48:13
55:22 69:3 71:25
81:13,18 87:11
89:15,25 100:9
112:19
ten 10:1 19:17
term 20:6 23:7
terms 97:4 129:25
131:24 132:3
terra 71:1,5
116:11,14,21
terrible 126:11
testified 6:15
29:15,22 30:3
40:2 43:6 45:1
48:3 52:14 53:21
54:19 58:14 110:1

111:6 119:11
124:7
testify 116:10
testifying 32:14
48:6
testimony 4:10
13:22 14:5,11
15:14 25:23 27:17
30:2,4,7,9 48:4
49:11 50:15,18
51:1,3,25 52:11,21
52:24 53:1,14,21
54:6,13 55:7,12,21
56:2,7,15,21 60:2
60:6,13 114:1
116:15 118:16
119:22 130:1,5,6
131:25 132:19
133:7
testing 106:7
tests 105:25
thank 8:20,24
13:21 14:16 21:3
37:4,12 42:10
57:22 66:2 73:12
83:9 85:25 102:19
102:21 110:10
113:22 122:20
123:17,23 128:8
thing 43:15 44:3
84:10 93:16 100:8
110:12 111:9
things 10:8 12:15
19:14 32:15 63:8
69:3 72:20 78:13
79:14,19 90:1,3
112:24 116:6,24
126:14 129:25
think 9:11 15:15
19:11 23:2,4,7
24:3 25:10 28:23

32:17 33:7 34:13
36:10 38:16,17,21
38:24,24 39:2
41:8 44:23 57:2,6
58:1,14,20 64:22
64:22 67:20 68:10
70:5 73:4,15,17
74:21,25 75:22
76:1,7 77:6 78:24
80:5,15,25 81:3
82:16 85:15,21,22
86:15 88:23 90:5
97:1 103:22 105:6
105:14,17 109:18
111:22,24 114:25
117:3,7 120:21
122:13,16,17
124:23 125:4
129:6,20 131:22
thinking 104:6
110:7 122:6,10
third 27:5 51:2
54:3 75:7 83:3
91:3,4
thorough 24:5
104:25
thought 24:4 46:1
46:3 48:23,25
53:12,16 55:19
83:6 85:12 92:3
118:14 121:6
122:11
thousands 13:23
13:24
three 39:4 47:1,1,8
47:10 57:24 58:15
59:11,21 60:7,14
67:10 94:4 120:21
120:24 121:2,4,8
121:25 123:7

time 7:6 9:7,18,23
10:13 11:14,18
12:3,21 14:13,24
14:25 15:13,16,19
17:21 19:13 20:21
21:2 25:6 26:21
26:21 29:19 32:24
33:16 38:19,22
41:3,25 42:13,18
45:4 47:16 48:24
51:24 53:25 54:3
54:3 57:13,17,21
57:25 58:13 60:3
61:1 64:17,20
65:6,13,18,22 66:3
66:10 67:1,2 68:1
68:13,18 71:24
74:1,19 76:10
85:3,8,21 86:4,10
86:20 87:1,12,14
94:16,20 97:22
98:3 102:15,20,22
103:3 105:1
109:17,24 112:9
112:20,25 114:21
114:24 121:24
122:20 123:5,23
125:11,19 127:25
130:19 131:22,22
133:8
times 33:19 46:24
47:2 48:23 52:3
57:22 66:19,24
77:4 95:24 120:20
121:20 127:24
timing 61:21
today 7:17 8:10
9:6 14:10 52:24
70:16 81:7 83:20
119:11,22

**today's** 130:5,6
  132:19
**told** 40:6 51:22
  53:16,16 57:7
  58:22 59:2,6,10,16
  59:20 60:12,25
  61:8,13 64:14,22
  69:4,8,18,21 70:8
  70:25 71:1,4,4
  72:3 73:10,24
  75:17,25 76:13,19
  78:13 79:16,21
  80:10,16 81:14
  85:22 87:19 90:6
  94:22 99:14
  100:20 102:2,11
  102:12 108:7
  110:15,17 111:6,9
  111:14,22,25
  112:5,11,15,24
  116:8,11,14,21,22
  117:4,4 119:12
  122:13,17 126:17
**tons** 130:15
**top** 17:12 30:1
  42:2 74:18 96:14
  125:25
**topeka** 2:19
**topics** 128:21
**total** 13:9 37:5
  57:22 66:19,24
**totally** 93:11 129:1
**touched** 23:19
  24:4
**tracy** 3:18 6:4
  103:8
**trade** 78:3 96:4
**tragic** 89:8 126:11
**transcribed** 74:13
**transcript** 52:1
  63:2 73:23 113:25

133:7
**transcription** 74:3
  74:17
**transcripts** 17:3
**transformed**
  97:17
**trek** 121:23
**trial** 4:10 17:2
  30:9 48:4 50:18
  51:3 52:1,2,11,21
  53:21 54:6,13
  55:12,20 56:1
  71:7 110:1 116:10
  116:21
**tricks** 30:8
**tried** 62:2
**trip** 88:4
**trips** 34:9
**trouble** 38:16
  100:13
**true** 48:10 52:25
  65:4,5 75:18,19
  79:17 89:21 96:10
  127:1 133:7
**trust** 88:25 101:16
**trusting** 88:1
**truth** 45:3,9 71:25
  97:7
**try** 7:7 8:1 22:7
  28:14 35:5 41:11
  41:20 43:18 52:23
**trying** 12:7 15:24
  48:20 52:11 55:20
  69:9 98:3 124:20
  130:16
**turbulent** 99:4,16
**turn** 7:1 16:13
  50:3 111:19
**tv** 81:20
**twice** 77:6

**two** 27:13,17 32:4
  43:8 56:8 57:19
  57:24 58:1,4,15
  59:14 66:12 79:1
  80:2,25 95:8,23
  102:7 109:5
  116:24 122:14
  125:16 130:25
**type** 9:15 11:11
  19:22 21:6 23:21
  23:23 25:14
  108:14
**typed** 25:21

**u**

**u.s.** 5:8
**ultimately** 15:1
**unable** 38:19
  121:24
**uncertain** 7:24
**uncle** 61:9
**understand** 7:21
  7:22 13:7 15:14
  21:12,17 26:23
  31:23 35:24 41:15
  55:8,11 60:10,10
  65:12 68:11,22
  75:4 78:6 80:6
  94:14 97:9 131:10
**understanding** 9:5
  14:20 36:2,4
  61:24 62:12,14,18
  63:6 113:11 126:7
  128:16 130:3
**understood** 78:8
  96:3
**undivided** 30:19
**unfair** 84:12
**unfortunately**
  37:18
**unified** 1:11 5:7
  6:1 115:5

**unit** 5:4 66:5,11
  106:13 123:6
**united** 1:1
**unsettled** 47:24
**unwilling** 53:2
**update** 34:24
**upset** 48:24
**use** 23:7 25:14,22
**usually** 47:5

**v**

**vague** 112:14
**vantage** 43:21
**varies** 49:2
**variety** 28:12
**various** 18:5 19:19
  24:15
**verbal** 34:22
**veritext** 5:12,14
**verse** 92:12
**versus** 5:6 53:14
  55:3
**vetting** 13:6 14:17
  15:4,18,21 16:16
  16:18,18 23:20
  24:6 29:18
**vicinity** 63:20
**victims** 88:19
**video** 5:2,4,11
  42:19,25 66:4,11
  86:5,11,21 87:2
  102:23 103:4
  122:24 123:6
**videographer** 3:25
  5:1,13 6:10 42:18
  42:24 66:3,10
  86:4,10,20 87:1
  102:22 103:3
  122:24 123:5
  132:18
**view** 30:24 43:24

**violent** 99:6
**virtually** 5:10
**visit** 43:15,24 57:7
  80:24 92:1
**visited** 57:5
  107:25 110:12
**visiting** 88:4
  124:21
**volition** 12:14
**volunteer** 16:19
  16:20,20 17:13
  18:7 19:11 30:22
**volunteers** 12:20
  19:10,16
**vs** 1:9

**w**

**w** 8:23
**wait** 45:6
**waived** 132:9
**waiver** 54:21
**waldron** 8:22
  12:14
**walgreen's** 110:14
**walks** 19:19
**walkthrough** 49:7
**want** 13:6 14:16
  15:20 30:7,9
  32:19 37:7 42:17
  48:9 49:6 50:4
  51:16 56:13 84:10
  84:12 88:20 93:23
  95:2 100:5 102:5
  103:13 119:19
  123:19 124:16
**wanted** 14:9 32:2
  57:8 68:14 75:5
  77:18 85:9 89:6
  93:16 111:23
  112:1,1,12,15,21
  120:24 131:24
  132:8

**ware** 103:16,17,18
  104:4
**warren** 3:17
**washington**
  127:10
**way** 14:4 19:6
  31:1 38:2 45:16
  50:17 82:25
  126:21
**ways** 28:12
**we've** 6:22 24:10
  24:22 123:23
**wear** 127:11
**wearing** 122:16
  127:17,21,25
**wednesday** 1:15
  1:22
**week** 59:12,14
  76:11 100:20
**weekend** 14:15
**weighing** 88:22
**went** 33:16 43:18
  66:17 69:13 93:25
  100:22 110:14
  111:15,21 132:3
**west** 3:9
**whereabouts** 81:8
**wichita** 67:4,25
  68:12,15
**wife** 92:16
**william** 104:12,13
**willing** 62:3
**withdraw** 38:10
  118:21
**withheld** 115:17
  115:20,21 116:5
  116:20
**witness** 4:2 6:11
  23:12 24:23 25:1
  25:4 26:1 44:24
  45:9,11 46:17

47:19 48:13,19,21
  52:23 53:12 63:24
  64:8 65:22 67:18
  68:8 87:7 91:10
  91:23 94:24
  102:18,21 103:21
  104:6,15 105:13
  107:10,25 109:4
  111:3 113:10,20
  114:14 116:4,6
  117:23 118:6
  119:6 120:4
  121:19 122:3,23
  124:18 125:3,23
**witnessed** 124:15
**witnesses** 22:21
  24:15 72:18 93:5
  93:6 127:23
**wk** 104:11
**woman** 88:18
  126:16
**wondered** 110:2
**word** 23:12 92:21
**words** 98:25 101:7
  114:3
**wore** 47:23 53:15
**work** 7:19 9:12
  12:22 13:13 16:19
  20:3 22:9,15
  28:13 30:23 36:13
  40:7 45:18 46:21
  47:18 54:16 63:13
  65:8,9,13,14 72:5
  91:22 97:3,25
  98:1 103:20 111:1
  113:8 117:17
  124:17 125:21
  127:18,19 128:5,5
  130:2
**worked** 27:3,6,10
  32:3 76:7 87:24

92:23 93:19 94:21
  107:2
**working** 8:8,9 9:8
  9:24 10:11 17:14
  17:20 24:9 32:11
  34:2 88:3 97:18
  108:2 110:13
  111:8
**works** 20:18
**world** 72:3 97:3
  97:20,21 101:7
**write** 17:15 25:5
  25:11
**written** 11:11,13
  11:16 16:23 17:15
  33:3,9 44:15 83:2
**wrong** 28:3 44:2
  47:17 51:19 55:6
  74:18 81:22
  103:22 109:19
  116:12,22
**wrongdoings**
  32:15
**wrongful** 11:8
**wrongfully** 51:7
**wrote** 15:15 28:3
  31:2 32:7 109:18
  114:4 129:21
**wyandotte** 1:11
  5:7 14:6 62:17
  71:5 82:3,24

**x**

**x** 4:1,7

**y**

**y** 8:22
**yeah** 9:11 18:15
  22:7,22 50:6,11
  75:3 78:19 83:14
  84:8 87:17 90:12
  97:12,14 98:6

118:18 120:4
**year** 13:24 14:3,18
60:25 126:13
**years** 8:6,9,18
15:9 16:25 17:24
19:17 26:18 40:5
85:14 90:7 97:19
97:23 117:12
126:10 128:22,23
129:3
**yep** 127:14
**york** 3:15,15
**young** 126:15

**z**

**zoom** 1:21 2:1
5:11 7:11,12

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the
deponent or a party before the deposition is
completed, the deponent must be allowed 30 days
after being notified by the officer that the
transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to
sign a statement listing the changes and the
reasons for making them.

(2) Changes Indicated in the Officer's Certificate.
The officer must note in the certificate prescribed
by Rule 30(f)(1) whether a review was requested
and, if so, must attach any changes the deponent
makes during the 30-day period.

DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES
ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY.
THE ABOVE RULES ARE CURRENT AS OF APRIL 1,
2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES
OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.