EXHIBIT
12
RG SUMMARY JUDGMENT

# AFFIDAVIT OF JAMES MCCLOSKEY

I, James McCloskey, being of sound mind and lawful age, hereby state on my oath as follows:

1. I am the founder and Executive Director Emeritus of Centurion Ministries (CM), an organization established in 1983 in Princeton, New Jersey. I am a 1964 graduate of Bucknell University, and spent 13 years in the business world before obtaining a Master's in Divinity from Princeton Theological Seminary. During an experience as a student chaplain, I began the work of what would later become Centurion Ministries when I began to investigate the claim of innocence by a Trenton State Prison inmate. That inmate, Jorge De Los Santos, was exonerated and released in 1983 as a result of my investigation.

2. At the time of its founding, CM was a pioneering organization, the very first in this country dedicated to obtaining the exoneration and the release of the actually innocent. Today, CM remains unique. It is the only innocence organization whose focus is nationwide in non-DNA cases and also extends to Canada.

3. Every year, CM receives anywhere from 1100 to 1600 requests from inmates seeking our assistance in overturning their wrongful convictions. Because of the time and resources required for each case, we can accept only a small fraction of these requests. Before any case is accepted by CM, our staff or trained volunteers obtain and review the entire court record. Then, either I or another CM director reviews the entire record; this review is followed by an in-person interview of the prisoner. All of this occurs prior to the acceptance of any case. No case is accepted unless it is fully vetted and the claim of innocence is extremely compelling.

4. Although CM takes advantage of DNA and other forensic testing to prove innocence when there is physical evidence that can be tested, no such evidence is available in most cases. Therefore, the majority of CM's cases are non-DNA cases that require "in-the-field" investigation, including locating and interviewing new and old witnesses, obtaining a variety of records or documents, and securing the release of exculpatory evidence that may have sat in police files for decades.

5. Typically, a CM investigation requires five or more years of intense effort before a wrongfully convicted individual has an opportunity to prove his or her innocence. With our investigators, forensic experts, and the attorneys who work with us, CM has been successful in obtaining the release of 54 people who have been wrongfully convicted, each serving either a life sentence or a death sentence. These 54 men and women collectively spent 1109 years falsely imprisoned.

6. I have been directly involved in a majority of CM's cases, directing and conducting the investigations in the field, working closely with the attorneys handling those

1

EXHIBIT 115

LMKSDC_0007301

cases, and assisting with the evidentiary hearings when the cases are presented in a courtroom.

7. As with most wrongful conviction cases nationally, the majority of CM's cases have involved eyewitness misidentification, false testimony by incentivized informants, false confessions, invalid forensic techniques ("junk science"), misconduct by police and/or the prosecutor, and inadequate representation by defense counsel. One or more of these typical causes of wrongful conviction has been present in nearly all of CM's cases.

8. When we first began reviewing Lamonte McIntyre's case, it appeared to be a straightforward case of eyewitness misidentification. As time went on, however, we discovered several more of the typical "markers" associated with wrongful conviction cases.

9. We learned, for instance, that the prosecutor withheld critical exculpatory evidence, including statements by eyewitnesses who said Lamonte McIntyre was not the shooter. We also learned that the lead detective, Roger Golubski, had an ongoing sexual relationship with a female eyewitness who was never interviewed and whose account would have pointed to another perpetrator, not Lamonte McIntyre. We also learned that police failed to investigate obvious leads indicating that the crime was likely linked to the victims' drug activities. We also learned that the prosecutor had recently engaged in a romantic relationship with the trial judge, which neither of them disclosed to defense counsel, thereby avoiding any motion to recuse the judge based on perceived or potential bias.

10. Since the trial, one of the two eyewitnesses who testified against Lamonte McIntyre has recanted her testimony and signed two affidavits stating Lamonte McIntyre was not the shooter. The other eyewitness admitted her confusion during the identification process and stated that on the ride down to the police station to view photographs with Detective Golubski, she had grown nervous because Golubski had expressed his sexual interest in her.

11. After a thorough review of the record in Lamonte McIntyre's case, we began focused investigative work on the case in 2009. Beginning in early 2009, I made the first of more than 15 trips to Kansas City, Kansas, to conduct investigation. During these trips, each of which lasted at least a week, I tracked down and interviewed old witnesses, developed new leads, examined every aspect of the trial record including the exhibits, and interviewed scores of new witnesses. During this investigation, I worked with attorney Cheryl Pilate, other members of her law firm, and additional investigators from the local area, including Dan Clark, Dan Grothaus, and Michael Bussell.

12. Once we had conducted much of the initial investigation, we began obtaining affidavits from witnesses. Over a period of five years, we obtained more than 40 affidavits in support of Lamonte McIntyre's innocence case. Although some of these affidavits were relatively easy to obtain, others were far more difficult. Some witnesses moved or frequently changed cell phone numbers, making them difficult to find. Also, many wished to avoid involvement with anything to do with the police. A number of witnesses expressed fear of the police and lack of trust in the criminal justice system.

13. The murders in Lamonte McIntyre's case were typical of many of those occurring in Kansas City, Kansas, during the 1990s as the inner cities were wracked with gang and drug-related violence. The crime was a double homicide in a drug-infested neighborhood in the north end. Both victims suffered from drug addiction.

14. The murders occurred on a warm afternoon on April 15, 1994. A single assailant, toting a shotgun, ran west down a wooded hill, up to a car parked on Hutchings street. Two men, Doniel Quinn and Donald Ewing, were sitting in that car. The shooter went straight to the passenger side of the vehicle and fired several shots. He then turned and ran back up the wooded hill to a vehicle and driver waiting for him on the street to the east, Hiawatha. The shooter slipped into a getaway car, and the two men left.

15. Both of the victims were fatally injured. Doniel Quinn died almost immediately at the scene, and Donald Ewing died a short time later.

16. Witnesses standing across the street saw the shooting. Two were standing in a front doorway and another was walking up the street. Three of the eyewitnesses, Josephine Quinn, Niko Quinn and Stacy Quinn, were related to victim Doniel Quinn – Josephine as Doniel's aunt, and Niko and Stacy as Doniel's first cousins. They were also related to Donald Ewing, who was a more distant cousin.

17. Although Josephine Quinn and Niko Quinn gave statements to the police, detectives asked them few questions. The witness who attracted the most immediate attention from police was Ruby Mitchell, even though her viewing position was furthest from the scene.

18. Ms. Mitchell told police that the shooter looked like a man she was acquainted with named "Lamonte" who had dated her niece. Rather than trying to identify the "Lamonte" who had dated the niece, police instead showed Ruby Mitchell a photograph of Lamonte McIntyre, even though Lamonte McIntyre had never dated her niece and Ms. Mitchell had never met him.

19. Although police claimed in their report that they showed photographs of men named "Lamonte" to Ms. Mitchell, a review of the photo array reveals that only one

3

Exh. 121

LMKSDC_0007303

"Lamonte" was included in the grouping – Lamonte McIntyre—along with two other young, male members of Lamonte McIntyre's immediate family.

20. After viewing the photographs, Ms. Mitchell states, in a short follow-up to her taped statement, that the shooter was "Lamonte *McIntyre*," even though she had never met Lamonte McIntyre and did not know his name prior to her conversations with police. Reflecting her confusion, Ms. Mitchell nonetheless states that "Lamonte McIntyre" is the Lamonte who "dated" her niece, a claim contradicted by later investigation and acknowledged at trial to be incorrect. Subsequent, and relatively simple investigation later revealed that Ms. Mitchell's niece dated a young, black male named Lamont Drain.

21. At trial, Ms. Mitchell testified that when she made the "composite sketch" with police (assembling standardized facial features from a kit), she realized the shooter was not the "Lamonte" that she knew. "We done the sketch [and] I knew it wasn't the Lamonte I knew." There is no explanation for why Ms. Mitchell decided to pick another Lamonte – Lamonte McIntyre – after deciding the composite sketch was not the "Lamonte [she] knew."

22. The entire case against Lamonte McIntyre was based solely on the accounts of the Ruby Mitchell and Niko Quinn, another eyewitness who has since recanted. There was no other evidence tying Lamonte McIntyre to the crime.

23. Centurion Ministries conducted an exhaustive six and a half year investigation into this case. This investigation was one of the most challenging investigations that CM has conducted for a variety of reasons, most importantly because of many witnesses' fear of retaliation from law enforcement in Kansas City, Kansas, and because of the pervasive poverty and chaotic lives of some of the witnesses.

24. Without question, many of the witnesses we interviewed have a very real fear of Roger Golubski specifically and law enforcement in general based on their own experiences in the community.

25. As is evidenced in the numerous witness affidavits filed in this case, Roger Golubski was and remains a prominent figure in the African American community in Kansas City, Kansas. Mr. Golubski's victimization of the community, especially of African American women, had pervasive effects on the willingness of some witnesses to provide information. These witnesses feared arrest and targeting by law enforcement. Even though Mr. Golubski has retired from the Kansas City, Kansas police department, he is still a presence within the community, as he now works as a detective in nearby Edwardsville and can still be seen frequently in Kansas City, Kansas. According to witnesses, he continues to frequent Kansas City, Kansas housing projects and can be found cruising the streets in the vicinity of Quindaro

Boulevard. It is well known within the community that Mr. Golubski has remaining ties to the Kansas City, Kansas police force. These factors directly impacted witnesses' willingness to talk to investigators about Mr. McIntyre's case. Because of these difficulties, attorneys and investigators had to spend an unprecedented amount of time with witnesses to obtain their trust. Despite making significant inroads, these witnesses still fear the consequences of telling the truth about Roger Golubski and the injustices their community has suffered.

26. A different, though related, challenge is that some witnesses in this case are poor and marginalized. Many live in substandard housing and move frequently, some many times in a year. Some suffer from addiction and live in transient housing. Many have infrequent access to cellular phones, and as a result, frequently change telephone numbers. Often we would find a witness after an exhaustive search, but be unable to find them again for some time. The effort and complexity that these issues added to the investigation, and the time it took to adequately investigate Mr. McIntyre's case cannot be overstated.

27. We attempted to locate some witnesses in excess of several times without success. Other witnesses we spoke to but could never locate again. We spoke with several witnesses that gave credible, valuable information who became afraid to talk with us further. Still others agreed to talk with us, but refused to sign affidavits and witness statements for fear of the consequences to them and their families from law enforcement. There is no doubt that the investigation in this case was hindered, and significantly delayed, for all of the reasons stated above.

28. We began obtaining affidavits in 2011 and obtained affidavits up to the present, some in June of 2016. Many of these affidavits took years of diligent investigation to obtain. For example, my first contact with witness Cecil Brooks was in 2010, and Mr. Brooks signed an affidavit just a week ago, in June of 2016.

Further affiant sayeth not.

Dated this ___27___ day of June, 2016.

*Jim McCloskey*
Founder of Centurion Ministries

Subscribed and Sworn to me on this ___27___ day of June, 2016.

State of _New Jersey_

County of _Mercer_

Notary Public _Rosemary Kay_

ROSEMARY KAY
ID # 2044883
NOTARY PUBLIC
STATE OF NEW JERSEY
My Commission Expires May 16, 2018

6

Exh. 121