**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS**

LAMONTE MCINTYRE &,
ROSE LEE MCINTYRE,

        Plaintiffs,

    v.                            Case No. 2:18-cv-02545-KHV-KGG

UNIFIED GOVERNMENT OF WYANDOTTE
COUNTY AND KANSAS CITY, KS, et al.,

        Defendants.

---

**Joint Motion to Transfer Trial to Wichita and Memorandum in Support**

    Defendants, Unified Government of Wyandotte County and Kanas City Kansas (Unified Government), Roger Golubski (Golubski), the Estates of James Michael Krstolich, Dennis Otto Barber, and Lieutenant Steven Culp; Dennis Ware, James L. Brown, and W.K. Smith (Defendant Officers) jointly move to transfer to Wichita as the place of its trial and submit the following memorandum in support.

## I. Nature of the Matter

    This case arises from the exoneration of plaintiff, Lamonte McIntyre. He and his mother, plaintiff Rose McIntyre, bring several direct claims against all defendants, including: § 1983 claims for malicious prosecution, evidence fabrication, familial association claims, failure to intervene, and conspiracy and a state law malicious prosecution claim. Doc. 562 at 40-41. Plaintiffs also bring § 1983 *Monell* and state-law *respondeat superior* claims against Unified Government and § 1983 supervisory claims against defendant Lieutenant Steve Culp. *Id.* at 41.

    Former Detective Roger Golubski is at the center of both plaintiffs' allegations and the

media storm and public outcry directed at the Kansas City Kansas Police Department (KCKPD). Golubski is publicly accused of drug dealing, rape, murder, and framing Mr. McIntyre and many other wrongs. An onslaught of interviews of alleged victims have aired, the results of federal investigations published, and Golubski's 555 invocations of his right to silence dissected. A call for outside investigation, sweeping accountability, and reform has been taken up in the media, advocacy groups, and governing officials. As demonstrated in scathing editorials, televised protests and rallies, and political interviews and debates, the notoriety of this case in KCK and neighboring counties can only produce a jury pool having prejudged this case based on inescapable public opinion. Accordingly, a transfer to Wichita for trial is necessary.

## II. Statement of Facts

What follows is a sampling of articles counsel has collected from local news outlets in chronological order.

1. *Detective at center of Lamonte McIntyre case retiring*, KMBC 9, 10/27/16, *Ex. 001; Appendix 2, pp. 1-2.*

2. *Detective from controversial 1994 KCK case retires from Edwardsville police*, The Kansas City Star, 10/27/16, *Ex. 002; Appendix 2, p. 3.*

3. *Lamonte McIntyre, wrongly imprisoned for 23 years for double murder, finally set free*, The Kansas City Star, 10/14/17, *Ex. 003; Appendix 2, pp. 4-7.*

4. *After wrongfully convicting Lamonte McIntyre, Wyandotte County must root out judicial corruption*, The Kansas City Star, 10/17/17, *Ex. 004; Appendix 2, pp. 8-9.*

5. *Exonerated After Decades Behind Bars, Lamonte McIntyre Never Lost Hope for Justice*, KCUR 89.3, *Ex. 005, filed conventionally.*

6. *Lamonte McIntyre was exonerated. But Wyandotte County still needs a conviction integrity unit*, The Kansas City Star, 10/25/17, *Ex. 006; Appendix 2, pp. 10-11.*

7.      *KBI investigating former KCK detective after wrongfully convicted man set free*, KSHB, 11/10/17, *Ex. 007; Appendix 2, pp. 12-13.*

8.      *I spent 23 years in prison for a crime I didn't commit. Kansas is giving me nothing*, The Kansas City Star, 12/23/17, *Ex. 008; Appendix 2, pp. 14-15.*

9.      *Lamonte McIntyre says freedom still seems surreal*, KMBC 9, 12/26/17, *Ex. 009, filed conventionally.*

10.     *Hear Lamonte McIntyre Speaking from Prison*, The Kansas City Star, 2/7/18, *Ex. 010; Appendix 2, p. 16.*

11.     *Hear Lamonte McIntyre Speaking from Prison*, The Kansas City Star, 2/7/18, *Ex. 011, filed conventionally.*

12.     *Lamonte McIntyre talks about freedom after 23 years behind bars*, The Kansas City Star, 2/7/18, *Ex. 012, filed conventionally.*

13.     *Rosie McIntyre in 'dream world' after son is finally freed*, The Kansas City Star, 2/7/18, *Ex. 013, filed conventionally.*

14.     *Wronged by police: Lamonte McIntyre's mother describes sexual assault by a detective*, The Kansas City Star, 5/17/18, *Ex. 014; Appendix 2, pp. 17-18.*

Her son, Lamonte, was wrongfully convicted in 1994, when he was 18, in a trial marked by shocking malfeasance, including witness intimidation, lackadaisical defense work, lack of physical evidence and generally shoddy police work.

Lamonte McIntyre is 41, and something of local celebrity ….

15.     *Wyandotte County prosecutor wants to review old convictions; law enforcement pushes back*, KCTV5, 8/1/18, *Ex. 015; Appendix 2, pp. 19-22.*

16.     *Lawsuit accuses KCK police of abusing power, planting evidence*, KCTV5, 10/11/18, *Ex. 016, filed conventionally.*

17.     *Lawsuit accuses KCK police of decades of corruption, sexual abuse*, KMBC 9,

10/12/18, *Ex. 017, filed conventionally.*

18.   *Wyandotte County Man Sues Police, City For Sexual Coercion, False Evidence*,

KCUR, 10/12/18, *Ex. 018; Appendix 2, pp. 23-25.*

19.   *Ex-police chaplain says he quit after working with detective named in Lamonte*

*McIntyre lawsuit*, KMBC 9, 10/13/18, *Ex. 019; Appendix 2, pp. 26-27.*

> Demanding Chief Ziegler resign, full investigation into Golubski, and hotline for
> women sexually abused.

20.   *Protestors want KCKPD chief gone, department investigated*, KCTV5, 6/6/19,

*Ex. 020, filed conventionally.*

Discussing Community Integrity Unit, expungement program, and Golubski.

21.   *Up To Date Segment 1: Wyandotte County District Attorney*, KCUR 89.3,

6/19/19, *Ex. 021, filed conventionally.*

22.   *Kansas City, Kansas police chief talks accomplishments, controversy*, KCTV5,

7/10/19, *Ex. 022, filed conventionally.*

23.   *Aug. 30, 2019 Editorial: Compensation for Lamonte McIntyre*, KMBC, 8/30/19,

*Ex. 023, filed conventionally.*

24.   *Lamonte McIntyre working to help others wrongly imprisoned*, KMBC 9, 8/30/19,

*Ex. 024, filed conventionally.*

> "The act of silence by those in power (has) continued to perpetuate the mistakes of
> the past on the backs of the less fortunate and powerless," Mark A. Dupree Sr. said
> in an "open letter" released Tuesday. at 1
>
> Dupree said the case "is a symptom of a larger and scarier issue in our criminal
> justice system and across the nation … at 2

25.   *Wyandotte County district attorney blasts treatment of wrongly convicted Kansan*,

The Kansas City Star, 12/24/19, *Ex. 025; Appendix 2, pp. 28-29.*

26.   *Lamonte McIntyre to finally get what he deserves —compensation for wrongful*

*conviction*, The Kansas City Star, 2/4/20, *Ex. 026; Appendix 2, pp. 30-31.*

27.     *Lamonte McIntyre and legal team question accountability in his wrongful conviction*, kctv5, 2/14/20, *Ex. 027, filed conventionally.*

28.     *State awards Lamonte McIntyre $1.5 million in mistaken-conviction lawsuit*, kmbc, 2/24/20, *Ex. 028, filed conventionally.*

29.     *Wrongfully convicted Lamonte McIntyre to receive $1.5 million from Kansas*, KSHB, 2/24/20, *Ex. 029, filed conventionally.*

30.     *Lamonte McIntyre says his life is starting now: McIntyre to receive $1.5 million from state of Kansas*, KMBC 9, 2/26/20, *Ex. 030, filed conventionally.*

Reporting the Court's denial of defendants' motions to dismiss.

31.     *Judge Allows Wrongfully Convicted Lamonte McIntyre's Civil Case Against Wyandotte County To Proceed*, KCUR, 3/3/20, *Ex. 031; Appendix 2, pp. 31-34.*

32.     *Judge's ruling lets KCK police corruption lawsuit by wrongfully convicted man proceed*, The Kansas City Star, 3/4/20, *Ex. 032; Appendix 2, pp. 35-37.*

33.     *Wyandotte County's History Of Police Abuses May Complicate Officials' Efforts For 'Positive Change'*, KCUR, 6/8/20, *Ex. 033; Appendix 2, pp. 38-40.*

34.     *Innocent man moves on with life but questions lack of accountability in his wrongful conviction*, kctv5, 6/12/20, *Ex. 034, filed conventionally.*

35.     *Why is Kansas City, Kansas, protecting former cop accused of abusing poor Black women?*, kansascity.com, 10/14/21, *Ex. 035; Appendix 2, pp. 41-43.*

Reporting rally where Kansas state Rep. Cindy Holscher got up and said Golubski's name. "Today, he is a free man. Despite numerous allegations, he is able to roam the streets."

36.     *'One bad policeman can destroy a city,' says filmmaker Kevin Willmott. KCK should listen*, kansascity.com, 6/29/20, *Ex. 036; Appendix 2, pp. 44-45.*

37.     *Federal Investigators agree to look into 'dirty cop' accusations in Kansas City, Kansas*, kctv5, 7/2/20, *Ex. 037, filed conventionally.*

38.     *KBI says it shared information with feds on ex-KCK cop accused of abusing Black women*, The Kansas City Star, 7/2/20, *Ex. 038 ; Appendix 2, pp. 46-48.*

39.     *Nearly 30 Kansas lawmakers call for investigation of former KCK police detective*, Fox4, 7/2/20, *Ex. 039, filed conventionally.*

40.     *State Sexual Assault Criminal Investigation Into Former Kansas City, Kansas, Police Officer Sent to Federal Authorities*, KCUR, 7/2/20, *Ex. 040; Appendix 2, pp. 49-51.*

A letter signed by 27 state lawmakers from both parties was sent to the Kansas Bureau of Investigation asking them to immediately investigate former Kansas City, Kansas, detective Roger Golubski and other members of the police force who were involved in the allegations of "sexual abuse of women, malicious actions toward citizens, and framing of individuals for crimes they did not commit." at 1

41.     *Kansas legislators seek investigation into former KCK detective*, KSHB.com, 7/30/20, *Ex. 041 ; Appendix 2, pp. 52-54.*

42.     *Wyandotte County DA challenger pledges to improve transparency, police relations*, KSHB.com, 8/4/20, *Ex. 042; Appendix 2, pp. 55-57.*

43.     *Activists take their demand for an investigation of ex-KCK cop to Justice Department*, The Kansas City Star, 4/18/20, *Ex. 043; Appendix 2, pp. 58-59.*

Reporting creation of Community Integrity Unit in Wyandotte County in wake of McIntyre case and allegations against Golubski.

44.     *Could Strong District Attorneys Be a Solution for Police Accountability? Effort In Wyandotte County May Be Instructive*, flatlandkc.org, 10/1/20, *Ex. 044; Appendix 2, pp. 60-71.*

45.     *These Exonerees from Kansas and Missouri are Working to Free Others Wrongfully Imprisoned*, KCUR 89.3, 10/26/20, *Ex. 045, filed conventionally.*

46.     *McIntyre shared the experience with his 18-year-old son, who also voted for first*

*time*, KMBC 9, 11/4/20, *Ex. 046, filed conventionally.*

47.  *Accused Of Coercing Women Into Sex And Lies To Solve Cases, ex-KCK Cop*

*Takes The Fifth*, KCUR, 1/3/21, *Ex. 047; Appendix 2, pp. 72-83.*

> In a November deposition in a civil case against him, Golubski mostly declined to answer questions by invoking his Fifth Amendment right not to incriminate himself. He did that a nice round 555 times.

> Among the questions he wouldn't answer were these: Did he have a sideline in selling drugs and "facilitating prostitution" while he was a police detective? Ever get charges dismissed in return for sex? Ever rape a minor in his cop car? Or threaten to harm a woman if she turned him in?

> Also this one: "You closed dozens of cases by manipulating witnesses to give false testimony?" And this: "Throughout the 1980s and 1990s, you used your network of women on the streets to provide false information to close your cases, correct?" at 1

> Is no one in the Kansas City, Kansas Police Department at all curious about the extent and the impact of these alleged crimes? Or the potential abuse of power by those who were supposed to be protecting the community? If not, what does that say about the culture of the department, not just then but now? at 3

48.  *Why is Roger Golubski, an accused rapist and former KCK cop, still walking*

*around free?*, The Kansas City Star, 1/3/21, *Ex. 048; Appendix 2, pp. 84-87.*

49.  *Allegations continue to mount against retired KCK detective*, KCUR 89.3, 1/4/21,

*Ex. 049, filed conventionally.*

50.  *Detective Golubski Under Investigation*, KCUR 89.3, 1/4/21, *Ex. 050, filed*

*conventionally.*

51.  *Investigation Into Ex-Cop's Behavior Reveals More About The Culture Of Kansas*

*City, Kansas, Police*, flatlandskc.org, 1/26/21, *Ex. 051, filed conventionally.*

Discussing Mr. McIntyre's wrongful conviction.

52.  *'I'll throw your Black ass in jail': Kansas City, Kansas is still waiting for justice*,

The Kansas City Star, 2/4/21, *Ex. 052; Appendix 2, pp. 88-92.*

Reporting that the Unified Government is eager to protect Golubski, an accused serial rapist.

53.     *Why Witness in 1994 Trial Of Lamonte McIntyre Gave False Testimony*, KCUR 89.3, 2/3/21, *Ex. 053, filed conventionally.*

54.     *Feds investigating KCK cold case; it may have something to do with allegations of police corruption*, kctv, 3/9/21, *Ex. 054; Appendix 2, pp. 93-95.*

55.     *Family in KCK cold case says FBI wants to know more about detective who worked case*, kctv5, 3/17/21, *Ex. 055, filed conventionally.*

Identifying Mr. McIntyre as one of the protestors.

56.     *Local group protests at KCK City Hall, calling for arrest of former police officer*, fox4kc, 3/19/21, *Ex. 056, filed conventionally.*

57.     *Public action to be held seeking indictment of Roger Golubski Friday*, kctv5, 3/19/21, *Ex. 057; Appendix 2, p. 96.*

58.     *The fatal shooting of Donald Ewing and Doniel Quinn*, kansascity.com, 3/22/21, *Ex. 058, filed conventionally.*

59.     *No Justice: How Lamonte McIntyre was wrongly convicted of double murder*, The Kansas City Star, 3/22/21, *Ex. 059; Appendix 2, pp. 97-116.*

Discussing intimidation of protesting woman of color.

60.     *Former police chaplain speaks about culture of KCKPD and trauma to citizens*, The Kansas City Star, 10/22/21, *Ex. 060, filed conventionally.*

Daughter of murder victim accuses Golubski of involvement in her mother's death. Also discussing protest demanding indictment of Golubski.

61.     *22 years after mother of 6 found dead on side Kansas metro road, daughter pleas for justice*, Fox4, 3/31/21, *Ex. 061, filed conventionally.*

62.     *Murdered KCK prostitutes all connected to one man: police detective Roger*

*Golubski*, The Kansas City Star, 3/31/21, *Ex. 062; Appendix 2, pp. 117-125.*

> The common denominator in the murders of six Black women who were killed in Kansas City, Kansas decades ago is that they all had a close connection to Kansas City, Kansas homicide detective Roger Golubski.

> Five had been blackmailed, bribed or otherwise coerced into sexual relationships with him, according to their friends and relatives. The sixth had only been seen around with him.

> Think about that: Wouldn't any other man who'd been having sex with a series of murder victims be a suspect in their killings? Or at a minimum, someone the cops would want to talk to? That he was also the investigator in some of these cases is wrong on its face.

63.    *Why Haven't KCKPD Done More About a Long List of Slain Black Women*,

KCUR, 3/31/21, *Ex. 063, filed conventionally.*

> Interviews of family members of Rose Calvin and discussing her connection to Golubski and others of his sexual victims, including Ms. McIntyre.

64.    *Families say it's connected to retired KCK detective Roger Golubski*, kctv5,

4/2/21, *Ex. 064, filed conventionally.*

> Discussing veteran's allegations of assault by Golubski in police headquarters. at 1

> Finally, someone on the other side of the office door banged on it a few times, as if to say, "Knock it off," I guess like I used to do with my New York neighbor who liked to bounce his basketball off our common wall at all hours. Was a screaming woman in Golubski's office such a minor irritant — such a "not this again" non-event — in the KCKPD that pounding on the door a few times while strolling on past actually seemed like the right response?

> If we could just freeze the action right there for a minute, I can't tell if this is a police station or the worst frat house on campus. What kind of police can't or won't hear the panicked screams of someone in trouble in his own office?

> All of those big-cheese KCKPD officials who've claimed never to have had any inkling about this man's many alleged victims must be the most clueless cops in history. Or would be, if they were telling the truth.

> And c'mon, if they weren't worried about scrutiny of their own actions, rather than only Golubski's, they would have called for an independent audit long ago, and going forward promised a no-tolerance view of alleged serial rapists who've investigated the murder of the multiple Black women they happen to have been exploiting, sexually and otherwise. at 2

If he doesn't know where bodies — real bodies; that is not a metaphor — are buried, then why do they continue to wrap their arms around an accused serial rapist whose "girls" kept winding up dead? Neither Golubski's lawyer nor a spokeswoman for the KCKPD returned calls seeking comment. at 2-3

SOS, Joe Biden and Merrick Garland. If KCK is still part of the United States of America, please send in the lawyers stat, because the Black people who live there have for decades been left for dead. at 5

65.    *Air Force vet has PTSD not from her service, but from attempted rape by ex-KCK*

*cop*, The Kansas City Star, 4/25/21, *Ex. 065; Appendix 2, pp. 126-130.*

Discussing a family's belief that Golubski had something to do with the killing of a mother.

66.    FBI *launches billboards asking for information in 1998 cold case*, kctv5, 5/4/21,

*Ex. 066; Appendix 2, pp. 131-132.*

It's the incestuousness of KCK that makes its corruption possible. This one man is not some lone, rogue monster who fooled his four-square colleagues all those years. No, Golubski has gotten away with all that he has because the system he was part of is so gothic that he was really only a symptom of its rot. "They've been doing this a long time to people," Betts' mother, Ellen Betts, told me. "We've got to plow through and be strong, but it's plain, in-your-face mutilation and modern-day lynching." at 1

McKinney's new pro bono attorney, Sarah Swain, who was one of a bunch of lawyers whom the previously unrepresented McKinney sent blind letters, begging for legal help, puts it this way: "With a heroin-selling, prostitute-killing detective, anything is possible."

That Golubski and other KCK officers had lucrative side hustles in the drug business is not a new allegation, and I'm hardly alone in suspecting that that's why his old department is still so carefully protecting him. at 2

67.    *Innocent men imprisoned for the murder of corrupt KCK cop Roger Golubski's*

*nephew*, The Kansas City Star, 5/9/21, *Ex. 067; Appendix 2, pp. 133-137.*

Hello, DOJ, civil rights division? We've got a 'plain, in-your-face mutilation and modern-day lynching' situation in Kansas City, Kansas, as one of the many victims of KCK police thuggery accurately described it last week.

So here's our question to you, Attorney General Merrick Garland and Associate Attorney General Vanita Gupta and anyone with President Joe Biden's ear. We're asking because we persist in believing that if any of you knew about this not-OK situation, you wouldn't be OK with it, either:

How many deaths, rapes, wrongful convictions and other assorted terrors would it take to get somebody with subpoena power and no conflicts of interest to look into the crimes of the Kansas City, Kansas Police Department, anyway?

In case you think that all of the above must surely be hyperbole, listen to retired FBI agent Alan Jennerich, who swore to the following in an affidavit in exoneree Lamonte McIntyre's case six years ago:

"Throughout the late 1980s and early 1990s, I investigated officers of the Kansas City, Kansas Police Department who were suspected of engaging in a variety of illegal activity including drug trafficking, soliciting, payoffs, using excessive force and stealing from those they were sworn to protect. In all, I investigated perhaps 15 to 20 officers who were suspected of civil rights violations and other offenses under federal criminal law.

"Investigating those officers posed a significant challenge," he said, "as the culture of the KCKPD tended to protect the wrongdoers. The 'blue code' of silence meant that the officers did not report the misconduct of other officers, even when that misconduct was criminal. Further, as I discovered, corruption at the KCKPD was longstanding and systemic, and many of the commanding officers swept wrongdoing under the rug rather than confronting it and rooting it out."

As he says, the FBI has looked into this situation, on and off, since the '80s, leading nowhere in particular, and not for lack of evidence. at 1

KCK POLICE DEPARTMENT 'RIDDLED WITH CORRUPTION'

A letter we received this week, from a former Kansas City, Kansas official in response to our ongoing coverage of Golubski said this: "The KCK Police Department was — and continues to be — riddled with corruption. Such is NOT a secret in KCK!!!!"

Noooo kidding. So why does nothing ever happen to bring Golubski and his many protectors to account?

It's long been clear that the federal government is the only institution with the tools and the independence to root out decades of obscene racist law enforcement in Kansas City, Kansas.

The U.S. Justice Department should announce a full review of the KCKPD for the civil rights violations perpetrated by Golubski and all of the co-conspirators who have covered up his shocking behavior for decades.

The FBI should provide the evidence it has gathered to federal prosecutors who should then present their findings to a federal grand jury for criminal indictments.

As that process continues, the DOJ's Civil Rights Division must begin negotiations with the KCKPD over a consent agreement that would address the systemic racism

in the department.

Year after year and decade after decade, residents of KCK have begged the local government to repair this broken system.

But mayors and commissioners have come and gone without enacting any serious reform. All along allowing Golubski and other criminals with a badge to do as they pleased, first on the public payroll and then while collecting a public pension. at 2

68.    *Hello, DOJ? We've got 'plain, in-your-face mutilation and modern-day lynching'*

*here*, The Kansas City Star Editorial Board, 5/19/21, *Ex. 068; Appendix 2, pp. 138-140.*

Discussing Golubski, asserting the DOJ should review "the civil rights violations perpetrated by Golubski and all of the co-conspirators who have covered up his shocking behavior for decades."

69.    Jaws of Justice Radio on 90.1 FM, Kansas Radio, 5/15/21, *Ex. 069, filed*

*conventionally.*

What's been going on inside the Wyandotte County District Attorney's office is vile. at 1

You'd almost think Dupree had only wanted a fake integrity unit to begin with.

Whatever his motivation, his commitment to taking on police corruption is invisible to the human eye.

This is, however, a happy day for those who never wanted such a team funded to begin with, because they want lifelong criminal Roger Golubski and his many collaborators at the Kansas City, Kansas Police Department to remain protected in perpetuity.

This, too, is why only the Department of Justice can take on corruption in Wyandotte County: Those inside the system either have a conflict of interest or are just not interested. at 2

70.    *Racist, hateful recordings show the Wyandotte County DA's 'integrity' unit had*

*none*, The Kansas City Star Editorial Board, 5/30/21, *Ex. 070; Appendix 2, pp. 141-142.*

Discussing discrimination and callousness in the Wyandotte County's Community Integrity Unit and firing of entire unit. at 1

Welcome to Wyandotte County, where files go to disappear. at 2

So when will Mark Dupree's office get serious about the wrongful convictions and

cases of police corruption that no one else in KCK officialdom wants him to pursue?

One of the first times I wrote about Roger Golubski's corruption and violence, in 2019, Dupree's spokesman, Jonathan Carter, told me the office would have no more to say on that subject: "We've addressed the McIntyre thing ad nauseam." Ad nauseam as in you're sick of it? "We've moved past it," he answered.

The "McIntyre thing" revealed a lot about Golubski and his colleagues, who had to have known that McIntyre was not guilty of the double murder for which he, too, served 23 years. And what happened to McIntyre has happened to others, so where's the follow-up?

While we wait, Golubski is still walking around free and collecting a pension and his victims are still in pain. Les McKinney and Brian Betts would love to be able to "move past" what the Kansas City Kansas Police Department and the Wyandotte County District Attorney's office did to them all those years ago, but they're still being wronged today.

It's Mark Dupree's own integrity, or lack of it, that will decide what happens to them now. at 3

71.    *Replacement for fired prosecutor: 'I'm here to see what kind of shoes you're wearing'*, The Kansas City Star, 6/1/21, *Ex. 071; Appendix 2, pp. 143-146.*

April King was in the fifth grade when her 26-year-old mother, Christina Ranae King, nicknamed "Cricket" by her family, because she was so tiny, was found beaten to death in Kansas City, Kansas. That was on Christmas Day, 1998.

And from that day to this, the most painful memory associated with the most painful loss of April's life is what her grandma always said that then-KCK police detective Terry Mast told her when she asked him how the investigation was going. "She got off the phone crying and my grandpa asked her why. She said he told her, 'She's just another crackhead off the streets and we really don't investigate'" those homicides. "She didn't call back no more after that."

Is that why "we really don't investigate" certain murders? Mast was true to his word to April's grandmother, Penny Barnett, in any case, because her family never heard another whisper about any investigation. at 2

That "crackhead" comment was from another century, of course. But it was just two months ago that Star Cooper heard something all too similar when she called the KCKPD hoping to get them to reopen the investigation into the 1983 murder of her mom, Dorothy Fay Cooper.

Current KCKPD Capt. Rodney Smith, who was sympathetic when Cooper first reached out, called her the morning of March 26th, the day they were supposed to

meet, and told her that wouldn't be happening after all: "He said, 'My boss said there was no reason for us to open this case. We don't have any more evidence.' He got really rude with me after that. He said, 'I mean, she was a streetwalker. What else do you want us to do?' "

Treat her murder like it mattered, maybe? Because that's a human being you're talking about, with a family still suffering and still looking for answers.

THE CULTURE THAT MADE ROGER GOLUBSKI POSSIBLE at 3

Comments like that are no small thing, because they reflect a culture, in 1983 and today, that counts certain people as unworthy of even worrying about. And that culture, then and now, is what made depraved former KCK police detective Roger Golubski possible.

It was the view of the women Golubski preyed on as disposable that freed him to treat them as such, for decades using his badge to help him sexually exploit poor women, most of them Black. At least six women connected to Golubski were murdered, and some of those murders were investigated by him, too.

It was that attitude that allowed him to assault several women — including one screaming her head off — right in his office, secure in the knowledge that no one with the juice to stop him was going to bother.

It's also why Golubski has never been brought to justice: For one thing, that's because so many others were complicit in his predations. For another, it's because more of the public, even now, isn't demanding his immediate arrest. at 4

Golubski told them he was looking into the killing but "no one is talking. He told me that he went to look for evidence in the evidence closet and some evidence was missing."

What evidence, he wouldn't say. "I said you know, as a little girl I always had a dream that a police officer killed my mom. He said, 'That's bullshit.' I said, 'Who else can get back in your evidence closet to get rid of evidence?' He was done talking to me after that. When I tell you that man turned red, he turned red. He was pissed that I said anything like that." at 6

72.    *Why KCKPD won't investigate: 'She was a streetwalker. What else do you want*

*us to do?'*, The Kansas City Star, 6/3/21, *Ex. 072; Appendix 2, pp. 147-159.*

Ms. Quinn reported an unnamed officer chuckling about her sister's death.

73.    *Niko Quinn and Khadijah Hardaway talk about KCK police detective Roger*

*Golubski*, The Kansas City Star, 3/30/21, *Ex. 073, filed conventionally.*

74.   *Roger Golubski wasn't the only alleged rapist in KCKPD, but DA 'declined to prosecute,'* The Kansas City Star, 6/27/21, *Ex. 074; Appendix 2, pp. 160-164.*

Those who are calling for a civil rights investigation into the fatally discriminatory patterns and practices of the Kansas City Police Department are not going on a hunch out of nowhere that something is amiss.

Their 15-page letter to Attorney General Merrick Garland, which everyone should read and then read again, details with excruciating specificity the KCPD's record of excessive force, of excusing and defending excessive force, and of refusing to work with prosecutors to hold their own accountable for brutality, most often against Black and brown Kansas Citians.

Here are just the first few of the wrongful deaths and unprovoked attacks cited in the Unity Council's letter to Garland:

▪ In November of 2013, KCPD officers investigating a carjacking said they heard gunshots. In response, they fired at least 21 times at Phillippe Lora as he drove away in his SUV. As it turns out, Lora was unarmed, had committed no crime and had not threatened the officers or anyone else.

Lora was paralyzed as a result, and his injury cost Kansas City taxpayers a $4.8 million settlement. The officers who shot Lora, Dakota Merrill and Shane Mellot, are still on the force.

▪ That same year, another unarmed Black man, 24-year-old Ryan Stokes, was fatally shot from behind by a Kansas City police officer. Officers had chased Ryan into a Power & Light District parking lot after he was falsely accused of stealing another man's iPhone. After the shooting, KCPD described Stokes as a thief with a gun who was in a standoff with police and had refused to drop his weapon.

Daniel Straub, an African American officer involved in the chase that night, later testified that Stokes did not have a gun, had not stolen an iPhone and was complying with Straub's orders when he was shot from behind by another officer, William Thompson, who is still on the force. It was Straub who was fired, for contradicting the official narrative.

▪ In May of 2019, KCPD officer Dylan Pifer shot and killed Terrance Bridges, who was also unarmed. "Unsurprisingly," the letter to the DOJ says, "KCPD found no issues with the killing and Pifer was returned to active duty a mere nine days after the shooting." at 1

On and on these narratives go, dully repetitive unless one of these crimes happen to have ended, shortened or ruined your life.

Please do read the letter. Because if you do, you'll see that the PR effusions from the police department and the police board could not be more dishonest. at 2

75.     *If the feds look, they'll find many civil rights violations by Kansas City police*, The

Kansas City Star Editorial Board, 7/27/21, *Ex. 075; Appendix 2, pp. 165-166.*

76.     *Wyandotte police officials oppose DA's proposal to study possible innocence*

*cases*, Kansascity.com, 7/31/18, *Ex. 076; Appendix 3, pp. 1-2.*

Discussing Golubski and that he is an accused rapist.

77.     *Murder, revenge, a witness recanting - Who will dig into a retired KCK police*

*captain's old cases?*, KCTV, 8/2/21, *Ex. 077, filed conventionally.*

> The see-no-evil current mayor sees no need for a Justice Department civil rights investigation into KCK's scandal-plagued police department.

> Garner, who has the backing of the firefighters and spent decades at the Kansas City, Kansas Police Department, is calling for a DOJ investigation into allegations of longstanding and widespread corruption inside the department. "We need to have outside eyes," he told us, to properly investigate the many allegations of serious crimes committed by former KCK police detective Roger Golubski and others. at 1

78.     *In UG mayor's race, what Kansas City, Kansas needs is all the change it can get*,

The Kansas City Star Editorial Board, 8/2/21, *Ex. 078; Appendix 3, pp. 3-4.*

Discussing stance on investigation into KCKPD

79.     *Unified Government mayor candidates Alvey, Garner face off in first debate*,

Fox4, 8/31/21, *Ex. 079, filed conventionally.*

> Police officer says KCKPD officer William Saunders assaulted her. Nothing came of her formal complaint. Same for another female officer. at 1

> The culture that made former KCKPD detective Roger Golubski's many alleged predations possible was completely out of control, the officer who reported Saunders said.

> "It's been slowly getting better since Terry Zeigler left," she told me, referring to Golubski's former partner, who only stepped down as chief of police in 2019. "But this is just what you go through as a woman there."

> She showed me copies of internal affairs complaints she'd filed about superiors asking to see her breasts and asking her for oral sex in the office. These complaints

did not result in any punishment for the men involved either, she said, because there were naturally no witnesses to these conversations, so they were dismissed as unverifiable. They did, however, result in her reputation as "non-compliant" and someone with "a big mouth."

"The stress in the department is worse than the stress on the streets," she told me. "I'm more scared of the people in the department. You're scared to say anything, or if you do, you get froze out and they make your life hell." at 2

80.     *He's 'definitely a sexual predator': Former KCK cop says colleague assaulted her, too*, kansascity.com, 9/1/21, *Ex. 080; Appendix 3, pp. 5-7.*

This isn't a secret. Folks know about the misconduct.

81.     *Roc Nation explains why it's focusing on KCKPD*, kctv5, 9/21/21, *Ex. 081, filed conventionally.*

Discussing McIntyre suit

82.     *KCK incumbent Mayor David Alvey talks Wyandotte County police, taxes before election*, Fox4, *Ex. 082, filed conventionally.*

83.     *Jay-Z's Roc Nation files suit against KCKPD seeking records on police misconduct investigation*, kctv5, 10/11/21, *Ex. 083, filed conventionally.*

Discussing letter requesting DOJ investigation

84.     *Jaws of Justice*, KKFI, 10/11/21, *Ex. 084, filed conventionally.*

Discussing federal grand jury investigation

85.     *Federal grand jury investigates retired KCK Detective Roger Golubski, according to CNN*, kctv5, 10/14/21, *Ex. 085, filed conventionally.*

86.     *Federal grand jury investigating ex-KCK police detective Roger Golubski*, kansascity.com, 10/14/21, *Ex. 086; Appendix 3, pp. 8-9.*

87.     Former KCKPD detective target of federal investigation, department says, KSHB.com, 10/14/21, *Ex. 087, filed conventionally.*

88.     A federal investigation begins for former KCK detective Roger Golubski, accused of exploiting women, kmbc.com, 10/14/21, *Ex. 088, filed conventionally.*

89.     Kansas City, Kansas, police open museum even as news surfaces of federal probe into former detective, KCUR, 10/14/21, *Ex. 089; Appendix 3, pp. 10-13.*

90.     Victim's group says they were never contacted on investigation into former KCK detective, Fox4, 10/14/21, *Ex. 090, filed conventionally.*

91.     'Finally': Activists welcome grand jury investigation of ex-KCK cop Roger Golubski, kansascity.com, 10/15/21, *Ex. 091; Appendix 3, pp. 14-16.*

92.     Former KCK police chaplain, activist respond to federal investigation of Roger Golubski, KSHB.com, 10/15/21, *Ex. 092, filed conventionally.*

93.     *Grand jury investigates alleged abuse by kck detective*, KCUR 89.3, 10/15/21, *Ex. 093, filed conventionally.*

94.     *Exonerees react to federal investigation of former KCK detective, Strickland hearing*, Fox4, 10/15/21, *Ex. 094, filed conventionally.*

95.     *Local social justice organization reacts to federal investigation of former KCK detective*, KSHB.com, 10/17/21, *Ex. 095; Appendix 3, pp. 17-18.*

Discussing Mayor Alvey's response to federal grand jury investigation into Golubski

96.     *4Star Politics: David Alvey lays out vision in bid for second term leading Kansas City, KS/Wyandotte County*, fox4kc.com, 10/20/21, *Ex. 096; Appendix 3, pp. 19-20.*

97.     *Do you have a report to make about KCK police? Here's who you can call*, kansascity.com, 10/24/21, *Ex. 097; Appendix 3, p. 21.*

98.     *Explore a map of locations linked to allegations against former KCK cop Roger Golubski*, kansascity.com, 10/24/21, *Ex. 098; Appendix 3, pp. 22-27.*

Interview of Melinda Henneberger explaining how community viewed KCKPD as the grim reaper. The KCKPD took anything of value.

99.    *Kansas City, Kansas, resident describes how activities of former KCK detective Roger Golubski have affected the community*, The Kansas City Star, 10/24/21, *Ex. 099, filed conventionally.*

100.    *She's not the first to accuse this former KCK cop. But she had a rape kit done the next day*, The Kansas City Star, 10/24/21, *Ex. 100; Appendix 3, pp. 28-31.*

Roger Golubski testified in a November 2020 deposition in a civil case brought against him by Lamonte McIntyre. Sure, or disprove them. Though why, if there were any question, would this woman put herself in danger by coming forward to announce that there may be DNA out there that would show who and what KCK officialdom has been defending all these years? at 1

Even if they didn't keep the kit, so many victims, witnesses and even some cops have come forward at this point that I'm prepared to hope that all of the KCKPD's lost files, missing evidence and "Gosh, I never heard any of this" denials are about to end exactly as they should have long ago. That is, with Roger Golubski in handcuffs and the organization that made him possible declaring moral bankruptcy.

No matter how many times we're told that if any of this happened at all, it was so long ago that it no longer matters, the truth for victims is that decades of debilitating fear will really only be over when he is behind bars. at 2

"I ended up trying to kill myself" and was hospitalized for several days. "That it was somebody who was supposed to be protecting me — I trusted him, and got in the car thinking he was going to help me. I go see a therapist right now for that."

That's why the former KCK cops who talk to me about all of this say things like "People have turned up dead for less here," than telling the truth about crimes committed by their colleagues.

"You just have to compartmentalize" to survive, another said. "Once you got to a certain point" in the chain of command, that officer said, "it didn't matter what you did. It's still scary now, to be honest.''

With the FBI closing in, Golubski's "people on the inside" must be scared, too. Because if he ever is indicted, we'll be hearing a lot more about them. at 4

She's 54 now, and is prepared to testify. She is planning to call the FBI on Monday, so agents won't even have to look for her.

Golubski is accused of exploiting and raping mostly poor Black women, whose male

companions and relatives he abused differently, threatening arrest and worse, throughout his 35-year career at the KCKPD.

A lot of time has passed since that 1990 hospital visit, of course. Law enforcement agencies across the country have been found to have violated their own policies by destroying rape kits, in some cases within months of receiving them, without ever testing them.

But if that kit has been preserved, then the years of official amnesia and what certainly looked like foot-dragging to the Golubski victims who talked to federal agents years ago, and never heard from them again, are finally coming to an end.

101.     *House of corruption: KCK police brought women to this place, former neighbor*

*says*, Kansas City Star, 10/24/21, *Ex. 101; Appendix 3, pp. 32-34.*

But Golubski wasn't the only dirty cop. In separate interviews, two former KCK drug dealers told me that while Golubski took a share of their profits every week, …. at 2

"Golubski was the biggest gangster out there."

When Stacey Quinn, who according to her family had been exploited by Golubski since her teen years, was murdered in 2000, he said, the assumption on the street was that he had killed her himself or had it done, though someone else was convicted for that crime. Why was that the assumption? "Because she was his," he said, and no one else would have dared.

… .

Golubski stopped him on the street one day when "I was doing things I shouldn't have been doing. He said, 'I've got your boy, and I need $1,000 to let him go.' I gave him the $1,000" to release his drug runner, and then "he charged me $500 to get the cocaine back." at 2

102.     *A week before election, activists ask KCK mayor to urge DOJ to investigate*

*KCKPD*, KSHB.com, 10/25/21, *Ex. 102, filed conventionally.*

103.     *Activists rally outside Unified Government building, push for investigation into*

*KCKPD*, kctv5.com, 10/25/21, *Ex. 103, filed conventionally.*

104.     *Victim's group continue push for DOJ investigation into KCKPD*, fox4kc.com,

10/25/21, *Ex. 104, filed conventionally.*

105.     *MORE2 rallies for DOJ investigation into KCKPD*, kctv5.com, 10/25/21, *Ex.*

*105; Appendix 3, pp. 35-36.*

106.     *'Long time coming': Rally calls for federal investigation of Kanas City, Kansas*

*police*, kansascity.com, 10/25/21, *Ex. 106, filed conventionally.*

107.     *Victim's group continues to push for DOJ investigation into KCKPD*,

fox4kc.com, 10/25/21, *Ex. 107; Appendix 3, pp. 37-38.*

108.     *Group protests outside KCK City Hall demanding investigation into police*

*department*, kmbc.com, 10/26/21, *Ex. 108, filed conventionally.*

> Candidate Turner: The facts is that there was a concentrated effort to stop any independent investigations into Wyandotte County. This Mayor dragged his feet in that regard. Race is in this. The victims look like me.

109.     *Video of Mayoral Debate Discussing Golubski*, KMBC 9, 10/27/21, *Ex. 109, filed*

*conventionally.*

110.     *Police corruption, taxes and immigration enforcement dominate Wyandotte/KCK*

*mayoral race*, kansascity.com, 10/29/21, *Ex. 110; Appendix 3, pp. 39-42.*

111.     *On The Vine: Allow me to reintroduce some folks*, kansascity.com, 10/30/21, *Ex.*

*111; Appendix 3, pp. 43-44.*

> Discussing reporters investigations of alleged corruption.

112.     *Decades of Corruption in the KCPD*, KCUR 89.3, 11/9/21, *Ex. 112, filed*

*conventionally.*

> Discussing rally demanding DOJ probe and FBI documents, 200 officers with misconduct allegations against them, discussion of internal affairs reports after three years, McIntyre, Golubski

113.     *FBI has investigated Kansas City, Kansas, Police for decades, but prosecution of*

*bad cops is rare*, KCUR 89.3, 11/9/21, *Ex. 113, filed conventionally.*

114.     *FBI has investigated Kansas City, Kansas, Police for decades, but prosecution of*

*bad cops is rare*, KCUR.org, 11/9/21, *Ex. 114; Appendix 3, pp. 45-52.*

Former KCKPD detective Roger Golubski is accused in a civil case of systematically preying on Black women to satisfy his sexual proclivities or to fabricate evidence to clear cases. He is also accused of protecting drug dealers.

As a federal grand jury investigates Roger Golubski, a former KCKPD detective, FBI documents dating back to the 1990s reported police beat Black people routinely, were said to be involved in the drug trade and ignored the crack cocaine problem. One FBI effort was dubbed "Tarnished Star."

The FBI agent was unsparing — and pessimistic — in an assessment of the Kansas City, Kansas, Police Department.

KCKPD officers routinely violated the civil rights of those they were sworn to protect. They severely beat people in the city jail. They were alleged to have been dealing illegal drugs and committing robberies. And they ignored the crack cocaine epidemic in Wyandotte County.

"The problem is as bad as it is because of corruption within the police department and general investigative incompetence," the FBI agent wrote.

Those findings were memorialized in a memo dated Dec. 18, 1992, by a special agent of the FBI, whose name was redacted, as part of an investigation into corruption within KCKPD that went under the code name "Operation Street Smart." at 1

But as records obtained from the FOIA request show, the FBI has known corruption within KCKPD "has existed for decades." And the agency appeared to have been frustrated at times by a lack of resources and inertia from the U.S. Attorney's office in Kansas in responding to FBI discoveries about the department.

"The situation did not develop overnight, and it will not be solved overnight," the memo reads. "The FBI has never convicted any KCKPD officer of any crime. Until this office does convict several police officers and hopefully gain the cooperation of some of these police officers, the situation in Kansas City, Kansas, will only deteriorate."

200 officers accused of misconduct

The FBI's investigation of the KCKPD during the early 1990s turned up several incidents of alleged excessive force and brutality by police officers.

One memo from 1993 to FBI headquarters said there were 200 officers accused of misconduct. Some had one complaint of excessive force against them. Others had between eight and 17 excessive force complaints over a three-year period.

The Kansas City FBI office and the U.S. Attorney identified 18 officers who made up the "core group" due to the numerous amounts of excessive force and conduct complaints against them. All the names were redacted from the records. In order to

investigate the allegations, the FBI estimated it would take at least four agents working full time for the "next 6 to 12 months or longer." at 3

"The KCKPD does not investigate civil rights violations against its officers anymore than it investigates allegations of drug dealing or robberies committed by officers," the report said. "It should be emphasized that the formal complaints made by citizens concerning violations of their civil rights is only the tip of the iceberg."

Chester Owens, the first African American city councilman in Kansas City, Kansas, when he was elected in 1983, said he's been fighting police brutality for decades. He believes the majority of officers are good, but there are still bullies who often pick up racist behavior as part of officer training.

"I think the difference of then and now (is) back then, some of them just took it on their own to do stuff," Owens said. "But now they've put it in form and trained them."

One incident from a memo dated April 22, 1993, described a disturbance near 7th and Troup streets in northeast Kansas City, Kansas. (The date it occurred is unclear; the FBI records redacted names, dates and other details of the incidents it recounted.)

The memo said several young people accused an officer of stepping on the back of an unnamed person, kicking a person in the ribs, using profanity and epithets including the n-word and striking a person on the head with a gun. The summary of the incident said no significant injury resulted.

"The police officer is white, and remarks were made which could indicate a lack of sensitivity on the officer's part to the black children," the memo stated. "If it is determined that this matter should be investigated, at least 25 interviews will be required."

A description of a similar incident was detailed in a written complaint by the NAACP legal department. The letter, according to FBI records, said that a group of 16 Black children between the ages of 7 and 16 were walking to a relative's house on a rainy day when six white officers stopped them.

The officers searched the children and ordered them to the ground; some of them were lying in mud.

"When one of the older cousins questioned why the police were doing this and asked what they had done wrong, one of the officers proceeded to hit him with his gun and repeatedly kick him with his shoes," the FBI summary of the NAACP's complaint said. "Another cousin was then thrown over the fence by another officer, and the officer proceeded to beat him." at 4

In an interview with KCUR nearly two years ago, FBI agent Al Jennerich, who investigated the KCKPD during the 1990s, backed up the FBI records.

To investigate that many officers in a small department was unusual, Jennerich said, adding that he was shocked at some of the KCKPD procedures, including the destruction of internal affairs reports after just three years.

"Now why would you do that? The only reason you do that would be to protect dirty cops or cops that are behaving improperly," he said. at 4

Since then, Golubski has been the main focus of a civil rights lawsuit filed by McIntyre and his mother against KCKPD officers and the Unified Government of Wyandotte County/Kansas City, Kansas.

The lawsuit portrays Golubski as a crooked cop who took advantage of Black women in the poorest sections of KCK. He exploited Black women, some of whom were addicted to drugs and others who were sex workers, for sexual favors or to compromise them into fabricating testimony to help him clear cases he investigated, according to the lawsuit.

In court filings, Golubski has denied the allegations. In a deposition, he refused to address more than 500 questions posed to him by McIntyre's legal team, citing his constitutional right against self-incrimination.

It's not clear what aspects of Golubski's alleged behavior have attracted the focus of the grand jury's investigation. A CNN report, citing former KCKPD chief Terry Zeigler, said the grand jury issued subpoenas for about a dozen case files from the police department. Both KCKPD and the Unified Government have confirmed they received federal subpoenas. at 7

Among the records they sought were investigative files about 18 women Golubski allegedly sexually exploited and used as informants. They also sought records of the investigations carried out by KCKPD into the murders of women Golubski had used as informants.

"A dozen or more of Golubski's female victims and/or informants have been murdered," reads a footnote in a filing by McIntyre's lawyers. "With only a couple of exceptions, at 6

these murders remain unsolved. In some instances, Golubski was a primary investigator in the case, despite his past relationship with the informant."

McIntyre's lawyers also want KCKPD files related to drug dealers and gang leaders who had connections to Golubski. The lawyers said the records are necessary to establish KCKPD's tolerance of misconduct by its officers.

The magistrate judge found most of the arguments by McIntyre's lawyers persuasive and ordered the Unified Government to make the records available. at 7

115. *FBI has Investigated Kansas City, Kansas, Police for Decades, but Prosecution of*

*Bad Cops is Rare*, flatlandkc.org, 11/9/21, *Ex. 115; Appendix 3, pp. 54-63.*

116.　*FBI has investigated Kansas City, Kansas, Police for decades, but prosecution of bad cops is rare*, lawrencekstimes.com, 11/10/21, *Ex. 116; Appendix 3, pp. 64-71.*

Former police detective Roger Golubski is accused of using his badge to exploit and rape vulnerable Black women. Federal prosecutors initiated a criminal grand jury investigation into Golubski in 2019.

The department has also been plagued by other controversies in recent years, including one officer pleading guilty to assaulting a cadet and another officer filing a lawsuit claiming she faced discrimination and sexism.

Tyrone Garner, the mayor-elect for Wyandotte County, has repeatedly said he supports a Department of Justice Investigation into the police department. Garner worked for the department for 32 years and retired as a deputy chief in June 2019. He was elected the new mayor of Wyandotte County/Kansas City, Kansas last week. at 1

117.　*Kansas City, Kansas, police featured in new TV show amid several controversies*, kansascity.com, 11/10/21, *Ex. 117; Appendix 3, p. 72.*

Featuring rally organized by MORE2 attended by victims' family members calling for DOJ investigation into abuses and corruption at the KCKPD. Multiple references to Golubski.

118.　*Kansas City, Kansas, police featured in new TV show amid several controversies*, kansascity.com, 11/10/21, *Ex. 118, filed conventionally.*

Discussing Golubski, and mentions McIntyre

119.　*Man serving life in prison for Kansas City, Kansas murder says he's innocent*, KMBC 9, 11/23/21, *Ex. 119, filed conventionally.*

Ahmon Mann has spent more than 20 years in prison for a murder he swears he did not do.

News of a federal grand jury targeting KCK police corruption didn't surprise him.

It was first reported by CNN.

"To be honest, I think it's way overdue," Mann said.

Mann says multiple prisoners inside Lansing prison are waiting to hear what happens next.

"Because you know, now with all of this happening, you know, we're seeing each other in the hallways. You know, I'm talking to a few guys and I never really ever talked to before. I didn't even know that they were going through the same thing I was going through," Mann said.

Mann says there are four prisoners, including himself, who had the same disgraced KCK detective work their cases. The men all claim to be wrongfully convicted. at 1

Terrible allegations against Golubski surfaced in the last decade due to other cases. Golubski has been accused in court documents of abusing his position and preying on the community he swore to protect.

Mann says Golubski's behavior was known in the Black community for decades.

"I don't even think it should have made it to the feds. So, I think they should have handled that years, decades ago. You know, now I'm happy that is happening that they put their hand in it but this ridiculous. Like I say, I didn't even know Golubski never seen him but I heard about him---as a kid," Mann said.

Mann told KCTV5 he feels Zeigler is responsible for pressuring that eyewitness too.

"Of course, yeah. So, they were partners. I mean, that's what they called them--Zeigler and Golubski. And they hadn't even been partners that long," Mann said. at 2

Zeigler has previously discussed his former partner with KCTV5 saying he was unaware of any behavior which needed to be reported.

Many families scoff at Zeigler's claim. The question how a detective could be so unaware of his partner's actions. at 3

120.   *'The truth will set me free:' Prisoner hopes for accountability in old KCK convictions*, kctv5.com, 12/7/21, *Ex. 120; Appendix 3, pp. 73-75*.

Garner's election comes at a time when the police department where he worked for more than three decades has come under fire. It was recently revealed that federal prosecutors opened a criminal grand jury investigation into former detective Roger Golubski, who is accused of using his badge to exploit and rape vulnerable Black women.

Throughout his mayoral campaign, Garner dealt with questions around whether he knew about Golubski's conduct, and, if he knew, why he didn't stop it.

Garner has repeatedly denied he knew of the accusations against Golubski, who retired in 2010.

He also supports a Department of Justice investigation into the Kansas City, Kansas, Police Department, at 1

121.     *Kansas City, Kansas, Mayor Tyrone Garner, commissioners to be sworn-in on*

*Monday,* kansascity.com, 12/13/21, *Ex. 121; Appendix 3, pp. 76-77.*

Civil rights organizations and community members have previously called for the Department of Justice to investigate the Kansas City, Kansas Police Department following allegations against retired KCK detective Roger Golubski. at 2

122.     *Unified Government of Wyandotte County/KCK Inauguration Ceremony: Mayor,*

*Sheriff and Commissioners Sworn in Monday*, kctv.com, 12/13/21, *Ex. 122; Appendix 3, pp. 78-*

*79.*

One of the biggest scandals deals with former detective Roger Golubski, who is accused of using his badge to exploit and rape vulnerable Black women. Federal prosecutors initiated a criminal grand jury investigation into Golubski in 2019.  at 1

123.     *'I wanted to do this job': A conversation with KCK Police Chief Karl Oakman*, kanascity.com, 12/15/21, *Ex. 123; Appendix 3, pp. 80-83.*

But the subpoenas, issued between June 2019 through November 2021, indicate that the Justice Department may be casting a wider net than just Golubski. One subpoena seeks records related to five different officers.

Although the records are heavily redacted, they provide the best public window yet into the federal investigation of a police department that many in the Kansas City, Kansas, community say has been corrupt and not held accountable for decades. at 1

Golubski has denied the allegations and in a November 2020 deposition in a civil lawsuit brought by McIntyre and his mother, he asserted his Fifth Amendment right against self-incrimination 555 times.

Laurie Levenson, a law professor at Loyola Marymount University who was not involved in the case, said the first batch of subpoenas appeared to seek broad swaths of information, including 22 years of homicide cases and internal affairs reports on several officers. Levenson, a former federal prosecutor, said federal authorities could be focused on a particular case to see the larger picture.

"You don't know where you're going to find that needle in the haystack," she said.

Federal investigators could be focused on Golubski because they need to find red flags and patterns of conduct and to see how widespread potential problems could

be, she said.

"They have to focus on this guy's misconduct, but the feds care more about systematic problems," Levenson said. "You bring in the feds when you have a problem that has metastasized." at 2

McIntyre's lawyers are also seeking records associated with several unsolved homicides in their civil lawsuit against Golubski, the Unified Government and others.

Last April, McIntyre's lawyers demanded the defendants turn over, among other things, photographs and investigative files of up to 19 women who were associated with Golubski. Some of the women, it was said, were murdered and had their cases investigated by Golubski, which McIntyre's attorneys said amounted to "a clear conflict of interest."

Activists have also called for a larger investigation by the U.S. Department of Justice's civil rights division.

In November, KCUR reported on two FBI investigations into the KCKPD in the 1990s that showed police beat Black people routinely, were said to be involved in the drug trade and ignored the city's crack cocaine problem. at 3

124.    *Federal probe into Kansas City, Kansas, Police is looking at officer misconduct,*

*decades of homicide*, KCUR, 1/18/22, *Ex. 124; Appendix 3, pp. 84-88.*

Golubski is accused in a civil lawsuit of routinely exploiting Black women in Kansas City, Kansas, with sex and drugs, both for his own gratification and to pressure victims into fabricating testimony to clear homicide cases he investigated. In court filings, he has denied those claims.

125.    *Federal probe into Kansas City, Kansas, police is looking at officer misconduct,*

*decades of homicides*, wyandottedaily.com, 1/18/22, *Ex. 125; Appendix 3, pp. 89-93.*

Team Roc contends that Kansas City, Kansas, officers have abused their authority, fabricated witness statements, planted evidence, concealed officer misconduct and solicited sexual favors from victims and witnesses. They have pointed to former detective Roger Golubski, who has been accused of using his badge to rape vulnerable Black women and was involved in the wrongful conviction that sent Lamonte McIntyre to prison for 23 years for murders he did not commit.

In their latest letter, the groups said there have been vast claims of coercion, rape and murder committed or facilitated by KCKPD officers. The Justice Department's inaction, they wrote, tells targeted minority communities "that their lives do not matter." at 1

Eight FBI investigations in the 1990s showed evidence of "depraved acts by the police department," according to the letter. The FBI recommended convicting several police officers at the time, it said.

"The DOJ's inaction since the FBI's warning 30 years ago proves that the DOJ has harbored the practices and patterns of crimes and discrimination committed by KCKPD," the groups wrote.

In a video released Tuesday along with the letter, Tricia Rojo Bushnell, director of the Midwest Innocence Project, said a police detective with the department for more than 30 years raped Black women. Yet he still draws his pension and is a free man, she noted. She appeared to be referring to Golubski.

"And we know there are at least 20 dead women who had some sort of relationship," she said in the video, which featured some of the women's loved ones.

Rojo Bushnell said in one incident, another officer walked in on the detective sexually assaulting a woman at the police department, saw what was happening and then closed the door.

"This was not a secret," she said. "It's not just him and his partners … it is an entire system. It is impossible to explain the depths and how much the Kansas City, Kansas Police Department had to cover for him."

Throughout the mayoral campaign last year, Garner faced questions about if he knew about corruption within the force, including Golubski — and, if he did, why he did not speak up. Garner has continuously denied he knew of any wrongdoing. at 2.

126.   *Jay-Z's Team Roc renews calls for DOJ probe into Kansas City, Kansas, police*

*misconduct*, kansascity.com, 1/18/22, *Ex. 126; Appendix 3, pp. 94-96.*

The organization also released an open letter to Associate U.S. Attorney General Vanita Gupta calling for the Department of Justice to "intensify its investigation into vast claims of corruption, coercion, rape, and murder committed or facilitated" by KCKPD members. at 1

The letter to Clarke, which was released after a month passed with no response, said it's past "time for the Department of Justice to take action," because it's "uniquely positioned to investigate the wrongdoing." It accuses KCKPD of:

Coercing, pressuring or improperly attempting to influence witness and defendant testimony;

Tampering with or fabricating evidence;

Harassment and retaliation toward women in KCKPD-patrolled neighborhoods;

Inappropriate relationships and sexual encounters or arrangements with women in the community;

Pushing for fabricated information, identifications and testimony in investigations;

Denying identifications and retractions of testimony in other investigations;

Failing to investigate or take action on additional cases.

The letter to Gupta — signed by Team Roc and Tricia Rojo Bushnell, executive director of the Midwest Innocence Project — takes issue with the DOJ's "continued inaction," saying that it sends a message to "targeted minority communities held hostage to the whims of the carceral state that justice does not exist for them, that their lives do not matter."

It highlights the results of eight FBI investigations involving KCKPD in the 1990s, which included "significant evidence of depraved acts," and suggests that federal inaction during the last 30 years amounts to tacitly condoning the conduct.

"There is no excuse that can justify the DOJ's silence," the letter to Gupta said. "This is not a select group of bad apples within KCKPD. To be silent is to admit to victims and survivors of pervasive police violence in Kansas City, Kansas, and across this nation that the entire system is guilty." at 1-2

Team Roc intensifies call for KCKPD 'pattern-or-practice' probe after DOJ inaction, KSHB.com, 1/18/22

The letter reveals that there were eight FBI investigations in the early 90s. One FBI recommendation actually says, "Until this office does convict several police officers and hopefully gain the cooperation of some of these police officers, the situation in Kansas City, Kansas, will only deteriorate."

Team Roc received the documents by filing Freedom of Information Act requests.

The Kansas City, Kansas, Police Department has been the subject of numerous KCTV5 investigations. There are terrible allegations surrounding one detective in particular, Roger Golubski. He's now retired but was a captain in the department. His partner, Terry Zeigler eventually became the police chief.

Families of murdered women accuse Golubski of being a predator who victimized the people he had sworn to protect. Golubski is also accused in court documents of intentionally botching a double murder investigation. at 1

Golubski has never faced any criminal charges. Team Roc is working to change that. It asks, "How long will KCKPD be allowed to hide behind the promise that it will fairly, fully, or vigorously 'investigate' itself? Or that the DOJ will seek justice for the children in Kansas City, Kansas?"

Includes a link to a petition calling for a DOJ investigation. at 2

127.    *Team Roc posts information gathered in open records requests, starts petition demanding investigation into KCKPD*, kctv5, 1/18/22, *Ex. 127; Appendix 3, pp. 97-99.*

128.    *Team Roc intensifies call for KCKPD 'pattern-or-practice' probe after DOJ inaction*, KSHB 1/18/2022, *Ex. 128; Appendix 3, pp. 99-103.*

Discussing accusation against Golubski and Grand Jury document requests. Discussing plaintiffs' case and federal prob into KCKPD.

129.    *A growing investigation into KCKPD*, KCUR 89.3, *Ex. 129, filed conventionally.*

Kansas City Kansas Police Chief Karl Oakman told The Star that he disagrees with those of us who have been begging for a Justice Department investigation into the department he's been running since June: "I think a DOJ investigation would do far more harm than good."

Why is that, Chief Oakman? If, as you say, you've seen no evidence of the corruption and crimes that I keep writing about, and that the local bureau of the FBI has known about since at least the late '80s, then what harm would a DOJ investigation do?

If, as you say, there's nothing to look into, then wouldn't such a probe do far more good than harm by restoring confidence? Right now, much of the community wouldn't trust the department with the time of day.

"I can't speak to what happened in the past," Chief Oakman told our paper. But the shame, Chief, is that you seem to want to keep it that way.

If any of the many rape and other serious allegations against former Detective Roger Golubski and other retired officers are true, how could you suggest that their victims and survivors deserve no answers and no justice? Since when does the KCKPD have no interest in past crimes?

Doesn't it interest you, Chief Oakman, to know how many other Lamonte McIntyres may be out there? McIntyre was exonerated in 2017, after serving 23 years for a double murder he did not commit. The chief witness in that case, Niko Quinn, has said she was coerced by Golubski and Wyandotte County prosecutor Terra Morehead into giving false testimony against an innocent man. at 1

As the Rev. Rick Behrens, former chaplain for the KCKPD and senior pastor of Grandview Park Presbyterian Church has said, even in recent years, "there have been many many lawsuits against our police department for abuse, for discrimination, for misconduct of all kinds, and millions spent to cover up these crimes. So any claims that this is ancient history … these are not true." at 2

As KCUR was first to report, based on heavily redacted documents obtained through a Kansas Open Records Act request, those subpoenas seem to suggest that the grand jury is looking into police misconduct far beyond that of the much-accused Golubski, though the grand jury has asked for homicide cases for the period between 1988 and 2010, the year Golubski retired.

Al Jennerich, a former FBI agent who tried without success to interest his superiors in pursuing allegations against Golubski and other dirty KCK cops in the late '80s, says he "there were a lot of dirtballs; it wasn't just Golubski," who even then was known to have been extorting and coercing a number of Black women sexually. at 2-3

'A LITTLE CHICAGO, WITH CORRUPTION AT EVERY LEVEL'

So what does it mean that the investigation has already been going on for so long without any visible result? It means "they don't know what they're doing," Jennerich told me. "That's, 'keep the media happy and make it look like they're doing something.' It's a joke."

"KCK is a little Chicago, with corruption at every level," says Jennerich, who also investigated police corruption in Cook County.

The KCKPD says there's no indication that the FBI is looking into today's department. Nor is there any indication that they're looking into cases before 1988, though Golubski joined the force in 1975, and some of the murders of women linked to him do go back further than that.

Star Cooper, who knows that her murdered mother, Dorothy Cooper, was connected to Golubski, says she's found more leads about her mom's 1983 killing on her own than police have. "It's going to take some out-of-town people" from the DOJ to take over from both the KCKPD and the local FBI, she feels.

When former KCKPD officer Tyrone Garner was running for mayor last summer, he promised that if elected, he would personally go to D.C. to ask for a DOJ investigation. I thought I'd ask him how his travel plans were coming during a Thursday interview that had been scheduled for nearly a month. But on Tuesday, his assistant canceled the appointment.

I regularly talk to past and present victims of KCK corruption, not all of it connected to the police department. And yes, it could be that the FBI investigation is so sprawling that that's why it's been going on for two years without any visible result. Or, Jennerich could be right that it's an exercise in wheel spinning, headed nowhere at all.

Either way, the DOJ needs to step in without any further delay. Victims don't have the "perception" of a problem; they have the kind of real pain that any real public servant would see needs to be acknowledged and addressed. at 3

130.   *New KCK Police Chief Karl Oakman says there's nothing to see. Victims deserve better*, kansascity.com, 1/19/22, *Ex. 130; Appendix 3, pp. 104-106.*

Several of the defense attorneys said that an injustice like the one done to Lamonte McIntyre, who served 23 years for a double murder he did not commit, would not have been prevented by a strong public defender's office because it was caused by prosecutorial and police misconduct. at 1

131.   *Wyandotte County has no public defender's office, and that's a scandal in itself*, kansascity.com, 1/24/22, *Ex. 131; Appendix 3, pp. 107-109.*

Mentions Lamonte McIntyre as wrongfully convicted with a brief comment from McIntyre

132.   *Rally held outside Jackson County Courthouse for Keith Carnes*, kmbc.com, 1/26/22, *Ex. 132, filed conventionally.*

Interview with Lamonte McIntyre. He explained he was convicted of two counts of first-degree murder for two men he had never heard of. He watched officials lie. This all had to do with a police officer.

133.   *Miracle of Innocence Lamonte McIntyre Fighting for Wrongly Convicted*, kccaresonline.org, 1/28/22, *Ex. 133, filed conventionally.*

Discussing Grand Jury Investigation into Golubski

134.   *Wyandotte County ushers in historic change with slate of new African American leaders*, KCUR, 1/31/22, *Ex. 134; Appendix 3, pp. 110-114.*

135.   *Wyandotte County ushers in historic change with slate of new African American leaders*, KCUR 89.3, 1/31/22, *Ex. 135, filed conventionally.*

136.   *Feds think KCK cop, 'a player in a much bigger operation,' killed Rhonda Tribue himself*, kansascity.com, 2/2/22, *Ex. 136; Appendix 3, pp. 115-117.*

▪ The civil rights division of the Department of Justice has been involved since the beginning.

▪ They are building a racketeering case, with the help of a team headed by a RICO expert from Boston.

▪ Investigators believe that Golubski killed Rhonda Easley Tribue himself in 1998. She is one of at least six murdered Black women who all had a close connection to Golubski. "That's one they think they can pin on him directly."

▪ Other former police officers under investigation include former KCKPD Chief Terry Zeigler, Golubski's former partner, who retired in 2019. Zeigler has repeatedly said he knows nothing about any wrongdoing and never even heard anything about any allegations against his partner. Another former officer investigators are looking at is William "Ed" Saunders, who has been accused of raping Natasha Hodge and attempting to assault a female colleague at the KCKPD.

(In a deposition in a civil case just over a year ago, Golubski invoked his Fifth Amendment right against self-incrimination 555 times.) at 1

Of Golubski's known accusers, "there's a huge list of women who've died or we can't find them," this person said, while some who have come forward "can't remember a date, or even an approximate date" they were attacked.

A handful of victims have come forward with accounts that have been corroborated, though, "and those are still probable charges."

"We even talked about getting DNA from (Golubski's unacknowledged) children," including some whose mothers were his victims, but that hasn't happened because it was thought to be too traumatic for those offspring and their families.

The RICO case is going forward "because he was a player in a much bigger operation. He was making money from drugs, and cleaning up their messes."

Another important impetus is that "some guys in prison are starting to talk. They're resentful that here they sit and Golubski has never been touched."

The COVID-related "compassionate release" of convicted KCK drug kingpin Cecil Brooks more than a year ago complicated the investigation, this person said, because "with him out, others won't talk."

Still, "there is a lot of evidence Golubski was helpful in taking care of murder situations, making sure investigations went in certain directions and didn't go in other directions."

And he didn't do that alone? "Not completely. A lot of people knew what he was up to. I know they're looking at Zeigler. The timing of his retirement was interesting. That was just as we were cranking up on the investigation."

Theoretically speaking, this person said, even those going before the grand jury and denying all knowledge of anything "can be useful, too," because perjury charges are always possible.

The probe is still moving slowly, "but when it comes, it will be perfect." Not might

be, but will be? Yes, and in all likelihood before the end of 2022.

Meanwhile, someone I know the FBI wants to interview, who worked with Golubski for years, says the former detective is still collecting "residual income" from protection, prostitution and drug debts, and that he has let all current and former associates know that if he goes down, they all will. at 2

Which, as I might have mentioned, can't happen soon enough. at 3

137.   Roc Nation and Voting in KCK – the 7th Street Podcast, 2/4/22, *Ex. 137, filed*

*conventionally.*

138.   *'I feel like a toddler out here': At 45, she's free for the first time in her life*,

kansascity.com, 2/14/2022, *Ex. 138; Appendix 3, pp. 118-120.*

After immediately reporting that she'd been raped at gunpoint by a KCK police officer, William "Ed" Saunders, in 1996, then-Wyandotte County DA Nick Tomasic declined to prosecute, despite DNA evidence. Saunders went right on working, though at least one colleague also accused him of sexual misconduct, and Hodge never heard back from police or prosecutors, then or ever. Saunders is now under investigation, as part of the federal probe into KCKPD police corruption involving former detective Roger Golubski and others. at 1.

139.   *Use of the Force_ KC Debates Police Department Staffing*, flatlandkc.org,

2/17/22, *Ex. 139, filed conventionally.*

When asked about the on-going federal investigation into misconduct by the city's police department from which he retired in 2019, Mayor Garner provided few details

The KCKPD is under a federal investigation stemming from allegations of decades of abuse and corruption at the hands of law enforcement officers. As an internal affairs officer, Garner said at times he was responsible for investigating and disciplining officers for misconduct.

"There were a lot of troubling things that came as a result of those complaints and investigations, and I forwarded that information to the law enforcement leadership at that time, and a lot of officers were held accountable," Garner said.

The retired police officer said he doesn't believe police should investigate themselves and welcomes an outside investigation of any public officials within the Unified Government. Garner also said it will take a "collaborative effort" to ensure proper and responsible policing. at 1

140.   *Kansas City, Kansas, mayor shares goals and frustrations two months into his*

*term*, KCUR.org, 2/21/2022, *Ex. 140; Appendix 3, pp. 118-122.*

Discussing allegations of KCKPD constitutional violations with Mayor Garner.

141.    KCUR 89.3, Feb 2022, *Ex. 141, filed conventionally.*

The entire KCKPD murder squad at that time witnessed, were aware and allowed him to sexually assault and rape the neglected women of . . . Wyandotte county.

142.    *Street Story: "Terra Morehead" – The 7th Street Podcast*, 2/26/22,

https://anchor.fm/the7thstreetpodcast/episodes/Street-Story-Terra-Morehead-e1ev740 (based out

of Kansas City), *Ex. 142, filed conventionally.*

143.    *MORE2 Open Letter* https://www.facebook.com/MORE2KC, 3/7/22, *Ex. 143;*

*Appendix 3, pp. 123-124.*

Dear Mayor Tyrone Garner~

This is an open letter imploring you to fulfill your campaign promise to contact the Department of Justice, echoing our request for a Pattern and Practice Investigation of the Kansas City, Kansas Police Department.

We first became aware of the numerous allegations related to retired detective Roger Golubski in 2017. To be clear, the allegations were never limited to just that one detective. We have no doubt that he was being protected by a system that allowed this to happen--a system you know is wrought with issues of racism & sexism.

While we remain grateful for the departure of Chief Ziegler, Golubski's one time partner who rose the ranks, we do not believe there have been any substantive changes within the department that would be necessary to restore public trust. A Dept. of Justice investigation would identify patterns that need to be addressed and create the climate needed to make those changes.

While the facts brought to light from the Lamonte McIntyre wrongful incarceration case should be enough to substantiate reasons for a DOJ investigation, the public should know that our concerns go beyond what was exposed by this case. For example, we are concerned about the cadet instructor who allegedly repeatedly raped a cadet. That cadet was fired for reporting her rape and filed a lawsuit against the department (2018). We are concerned about the white guy who woke up to three uniformed KCKPD officers assaulting him while he was sleeping in his own bed (2020) and he is also suing the department. We are concerned about the Spanish speaking immigrants who told us last year that they routinely give money to two police officers "for protection." We are concerned about your former fellow police

officer, Mr. Womack, who was killed by another officer this past year, while he was still employed by the department.

Yes, we believe Officer/ Detective Roger Golubski violated the badge, raped & harassed many Black women, and trumped up cases on multiple Black young men. He cited the 5th Amendment 555 times in the deposition on the Lamonte McIntyre case. That's an indicator something was incredibly wrong in that man's 30 year career.

We talk to the victims all the time. And, while many of them don't think anything will ever change, we have not given up on you yet, Mayor Garner. The mayor before you ignored their cries for his entire term, but we have not given up on you yet. Fulfill your campaign promise. Call the Dept. of Justice and invite them into your city so you can embark upon a journey of creating a safe community for ALL the people of Kansas City, Kansas.

144.    *Lamonte McIntyre seeks $93 million from Kansas City, Kansas, for 23 years*

*wrongfully imprisoned*, KCUR.org, 3/17/22, *Ex. 144; Appendix 3, pp. 125-127.*

The Unified Government wants to move the trial to Wichita because of the amount of media attention the case has drawn in the Kansas City area. at 1

Lamonte McIntyre, who now lives in Arizona, was "exposed to stark and horrific conditions" during his 23 years in prison, and failed to get the life experience adults need to make a successful life, his lawyers claim. McIntyre, who has been diagnosed with post-traumatic stress disorder, missed years with his family, which hurt his relationship with them, and as a private person, he suffered from the public attention, they say.

"As a result of depression and anxiety, Lamonte has problems sleeping," his lawyers state. "He experiences nightmares. During the day, he is also hypervigilant and anxious."

He also suffers emotional distress from witnessing his wrongful conviction's detrimental effects on his mother's life, which included thoughts of suicide and several mental breaks, his lawyers say. Rose McIntyre was in and out of psychological treatment for 17 years and has been diagnosed with complex PTSD.

The Unified Government is responsible for this pain and suffering, McIntyres' lawyers say, because KCKPD executives knew about Golubski's actions and did nothing to stop him.

"Defendants' misconduct in Lamonte McIntyre's case was the predictable result of the KCKPD's culture of corruption and the KCKPD's longstanding failure to supervise, discipline, or conduct adequate investigations, free of constitutional violations," the lawyers state. at 2

They also argue that more than a dozen officers and detectives were involved in the investigation of the 1994 double slaying. For example, Golubski contends that other KCKPD officers — not him — were the ones who identified McIntyre as the shooter.

The order indicates that the Unified Government and the other officers named in the lawsuit may ask the judge to have their cases tried separately from Golubski's. at 3

145.   *Lamonte McIntyre, mom seek at least $100 million from Unified Government,*

*KCKPD*, KSHB, 3/17/22, *Ex. 145; Appendix 3, pp. 128-129.*

Plaintiffs allege top KCKPD top brass knew of Golubski's actions.

146.   *Lamonte McIntyre, mom seek at least $100 million from Unified Government, KCKPD*, KSHB, 3/17/22, *Ex. 146, filed conventionally.*

They also allege KCKPD top brass knew about Golubski's misconduct but didn't stop him before he retired.

147.   *Lamonte McIntyre sues Wyandotte County for $93 million*, KMBC, 3/18/22, *Ex. 147, filed conventionally.*

148.   *Lamonte McIntyre files suit for $93 million*, kctv5.com, 3/17/22 (video), *Ex. 148, filed conventionally.*

149.   *Lamonte McIntyre, wrongly convicted in Kansas City, KS murders, seeks $93M in lawsuit*, Kansascity.com, 3/17/22, *Ex. 149; Appendix 3, pp. 130-131.*

Since the lawsuit was filed, the McIntyre's lawyers say several fellow officers have testified under oath that they knew Golubski frequently had relations with sex workers who he also used as informants. The lawyers say the ultimate goal was to clear homicide cases regardless of "whether that meant framing an innocent person" like McIntyre. at 1

150.   *MORE2 with Grandview Presbyterian Church Message to Mayor Garner –*

Facebook, 3/20/22, *Ex. 150, filed conventionally.*

Jingle: Lots of little secrets got past internal affairs. Call DOJ. We'd like to have a police force we all trust.

Comment notes that daily demonstrations started on February 22.

Contains link to online petition for Mayor Gardner to request DOJ investigation.

Metro Organization for Racial and Economic Equity – Facebook, 3/19/22

Jingle: Dear Mayor Garner, from your friends and supporters . . . "Don't delay! Call the DOJ!"

151.   *Group calls on mayor to push investigation into KCK police*, fox4kc.com, 3/22/22, *Ex. 151; Appendix 3, pp. 132-134.*

MORE2 said they've received little to no response from Garner since he became mayor. So, after calls, texts and an open letter, they've gotten creative in getting his attention.

They sent a telegram to Garner's building. It was performed by a clown.

MORE2 also marched the square with signs on St. Patrick's Day and Grummon even wrote and recorded a parody song and sent it to Garner.

Violet Martin claims her family is a victim of Roger Golubski, the former KCK detective is accused of extorting sexual favors from women and coercing some to provide false information to frame innocent people.

"Detective Roger Golubski is the villain of this story but it's not just one person. the whole system allowed him to not just exist, but thrive," Violet Martin said. "The whole system turned a blind eye."

152.   *At our public meeting on February 22, MORE2 leaders publicly announced our formal request to the Department of Justice for a pattern or practice investigation of KCKPD...,*

Metro Organization for Racial and Economic Equity – MORE2, Facebook, 3/4/22, *Ex. 152, filed conventionally.*

Clown Jingle, Mayor Garner. To protect KCK the corrupt KPKD must be brought to light.

153.   *Social justice group reignites call for Mayor Garner to request DOJ probe into KCKPD*, Kansascity.com, 3/22/22, *Ex. 153; Appendix 3, pp. 134-135.*

Garner defeated incumbent David Alvey in November's general election. Throughout his campaign, Garner said he supported a federal investigation into the police department where he worked for 32 years. A federal investigation into the police department was topic of conversation throughout the mayoral election in 2021. at 2

But the federal grand jury investigation into Golubski is not the same as a federal investigation into the department, Grummon said Tuesday.

"That's investigating Roger Golubski," Grummon said. "What we believe Mayor Garner said he would ask for publicly is a pattern or practice investigation of the entire KCKPD department."

154.    Appendix 4 is a table of 370 recordings or publications released from various Kansas City area media outlets, including those listed above, that discuss this case or the parties.

### III. Issue Presented

1.    Transfer of trial to Wichita is necessary because defendants have been excoriated in the local media for years on end making the selection of jurors without preconceived opinions impossible and giving every indication a trial in KCK would become a spectacle.

### IV. Argument and Authorities

"The theory of our [trial] system is that the conclusions to be reached in a case will be induced only by evidence and argument in open court, and not by any outside influence, whether of private talk or public print." *Skilling v. United States*, 561 U.S. 358, 378 (2010) (quoting *Patterson v. Colorado ex rel. Attorney General of Colo.*, 205 U.S. 454, 462 (1907)). In pursuit of this ideal, defendants move to transfer to Wichita as the place for trial pursuant to Local Rule 40.2(e) (providing for determination of place of trial upon motion). Because of the negative publicity surrounding this case in the Kansas City metro area, to try this case there would violate defendants' constitutional right to an impartial jury. For the same reason, "the interest of justice" impels transfer from Kansas City under 28 U.S.C. § 1404(a). *Compare Monterrosa v. City of Vallejo*, No. 2:20-CV-01563-TLN-DB, 2021 WL 516736, at *3 (E.D. Cal. Feb. 11, 2021) (considering defendant city's motion for intra-district transfer based on constitutional right to an impartial jury and § 1404).

### A.    A trial in Kansas City would violate defendants' right to an impartial jury.

The Fifth and Seventh Amendments guarantee civil litigants the right to an impartial jury.

*Skaggs v. Otis Elevator Co.*, 164 F.3d 511, 514–15 (10th Cir. 1998) (considering whether right violated after juror's untruthful voir dire response). District courts have applied the right to pre-trial negative publicity in civil cases, borrowing from the far more developed criminal jurisprudence. *E.g., Monterrosa*, 2021 WL 516736, at *3; *Guertin v. Michigan*, No. 16-CV-12412, 2017 WL 6390962, at *4 (E.D. Mich. Jan. 23, 2017); *Barnes v. United States*, No. 11-CV-0582-HE, 2013 WL 12425652, at *1, 3 n.1 (N.D. Okla. Jan. 25, 2013).

In the criminal context, "[b]y constitutional design, … trial occurs 'in the State where the … Crimes … have been committed.'" *Skilling*, 561 U.S. at 377-78 (quoting Art. III, § 2, cl. 3; citing Amdt. 6). "The Constitution's place-of-trial prescriptions, however, do not impede transfer of the proceeding to a different district at the defendant's request if extraordinary local prejudice will prevent a fair trial—a 'basic requirement of due process.'" *Id.* at 378 (quoting *In re Murchison*, 349 U.S. 133, 136 (1955)). The Court previously explained, "Community passions, often inflamed by adverse pretrial publicity, can call the integrity of a trial into doubt. In some instances, this Court has observed, the hostility of the community becomes so severe as to give rise to a 'presumption of [juror] prejudice.'" *Patton v. Yount*, 467 U.S. 1025, 1031 (1984). The Court has presumed juror prejudice in "extreme cases" of "vivid, unforgettable information." *Skilling*, 561 U.S. at 381, 384.[1] Relevant factors are: (1) "the size and characteristics of the community in which the crime occurred"; (2) the memorableless and prejudice of the publicity; (3) the time that elapsed between the crime and the trial; and (4) the breadth of the impact of the crime on the community. *Id.* at 382-84.

*Skilling* summarized the case of *Rideau v. Louisiana*, when presumed prejudice was found, as follows. Rideau robbed a bank, kidnapped three employees, and killed one of them. *Id.* at 379.

---

[1] Actual juror prejudice is assessed with voir dire. *See id.* at 385-99.

Police illegally interviewed Rideau and recorded his confessions. *Id.* Shortly before trial, a local television station broadcasted the confessions to audiences of 24,000 to 53,000 in a population of 150,000. *Id.* The court did not hesitate to hold—without examining a transcript of the voir dire—the denial of a transfer and subsequent trial violated due process. *Id.* The "trial atmosphere … [was] utterly corrupted by press coverage." *Id.* at 380 (alteration in original) (quoting *Murphy v. Florida,* 421 U.S. 794, 798–799 (1975)).

*Skilling* concerned an Enron CEO's denied motion for transfer based on "the community passion aroused by Enron's collapse and the vitriolic media treatment." *Id.* at 369-70, 377. In contrast to *Rideau*, Skilling's trial was held in Houston, a city of 4.5 million eligible jurors. *Id.* at 382 (noting reduced likelihood of prejudice when population over 600,000). News stories about Skilling, though unkind, contained no confession or other blatantly prejudicial information "viewers could not reasonably be expected to shut from sight." *Id.* Over four years elapsed between Enron's bankruptcy and Skilling's trial and the "decibel level of media attention diminished somewhat in the years following Enron's collapse." *Id.* at 383. Of "prime significance," Skilling's jury acquitted him of some counts, running counter to a presumption of prejudice. *Id.*

The Ninth Circuit has elaborated on considerations of publicity when determining presumed prejudice adding three factors:

> (1) whether there was a barrage of inflammatory publicity immediately prior to trial, amounting to a huge wave of public passion; (2) whether the news accounts were primarily factual because such accounts tend to be less inflammatory than editorials or cartoons; and (3) whether the media accounts contained inflammatory or prejudicial material not admissible at trial.

*Daniels v. Woodford*, 428 F.3d 1181, 1211 (9th Cir. 2005). In *Daniels*, the Ninth Circuit granted a habeas petition for failure to change venue because it found presumed prejudice before trial. Two police officers were murdered, and, within three months of trial, a football stadium was renamed in honor of one of the victims, and a statue commemorating fallen police officers was unveiled by

the county across from the courthouse. *Id.* The unveiling ceremony largely referred to the victim officers. *Id.* Police stations were "deluged" with tips on the investigation and offers to establish a memorial fund. *Id.* Local newspapers printed numerous letters from readers calling for the defendant's execution. *Id.* The victim officers became "posthumous celebrities," and 3000 people attended their funerals. *Id.* Newspapers reflected the prosecutor's theory of the case: to escape justice. *Id.* And the defendant's past criminal offenses were well publicized, which would have been inadmissible at trial. *Id.*

Applying Federal Rule of Criminal Procedure 21(a) (requiring transfer when defendant "cannot obtain a fair and impartial trial"), the Eastern District of Michigan transferred a case when "[f]actors such as the comment and castigation of public figures, the intensity and long duration of the publicity (since 1982), its inflammatory tone and content, and the continually repeated factual recitations, all militate[d] toward … a change of venue … ." *United States v. Ebens*, 654 F. Supp. 144, 146 (E.D. Mich. 1987). There were sixty-eight pages of articles from Detroit newspapers about the case containing "scathing" headlines, a cartoon, and inadmissible evidence. *Id.* at 145. A group was formed to publicize the case. *Id.* Rallies were held generating much television coverage including at least two special news stories and a national program. *Id.* Most damaging was a story, published several months before the court's decision, telling of the tragic deterioration of the life of the victim's mother. *Id.* at 145-46. Finally, the president and members of the Detroit City Counsel declared a day of mourning on the victim's behalf, presented a memorial to the victim's mother, and were uniformly quoted in the news media stating the defendant must be punished. Similar statements were attributed to a mayor, the Michigan Attorney General, and several religious and advocacy groups. *Id.* at 146.

Here, Kansas City, Kansas is, itself, a city of 157,000.[2] The total population (including unregistered voters) from which a federal jury pool would come is approximately 1,266,000.[3] The size of the community does not overcome the other factors. Local media has sustained a years-long barrage of reminders and recitations of the facts of Mr. McIntyre's exoneration and suit. Mr. McIntyre has been interviewed multiple times and appeared in televised events making him a local celebrity. The coverage is pervasive and rife with scathing editorials and victim interviews unanimous in the culpability of the named defendants. *See Statement of Facts*, *supra*, (301 pages of articles, 72 audio and video media, and listing 370 published print and other media items in just the Kansas City media market). All of the media articles are hearsay or double or triple hearsay, none of which was sworn under oath. *See* Fed.R.Evid. 801, 603. The vast majority of the content would be inadmissible at trial. *See* Fed.R.Evid. 401 (relevance); 403 (unfair prejudice); 404(a), (b)(1) (propensity evidence); 602 (no personal knowledge); 701 (unhelpful to determining a fact in issue); 704 (testimony on mental state). KCKPD reform has been the basis for multiple rallies and formation of groups. An outside investigation into the KCKPD was a platform for KCK Mayor Garner and subject of the mayoral debates and interviews. Mayor Garner's perceived failure to deliver on a DOJ investigation has precipitated Facebook jingles and a clown being sent to City Hall.

Although Golubski has not confessed to the many crimes of which he is accused, several news stories have noted his invocation of his Fifth Amendment rights and refusal to comment. A

---

[2] https://www.census.gov/quickfacts/kansascitycitykansas.

[3] *Compare* Local Rule 38.1 (identifying counties comprising Kansas City – Leavenworth and Fort Scott Divisions), *with* https://www.kansas-demographics.com/counties_by_population (Johnson 609,863; Wyandotte 169,245; Douglas 118,785; Leavenworth 81,881; Miami 34,191; Franklin 25,996; Atchison 16,348; Doniphan 7,510; Fort Scott Division 202,198).

The *Kansas City-Leavenworth Division* is comprised of the counties of Atchison, Doniphan, Douglas, Franklin, Johnson, Leavenworth, Miami, and Wyandotte. Fort Scott Division consists of Allen 12,526; Anderson 7,836; Bourbon 14,360; Chautauqua 3,379; Cherokee 19,362; Coffey 8,360; Crawford 38,972; Elk 2,483; Greenwood 6,016; Labette 20,184; Linn 9,591; Montgomery 31,486; Neosho 15,904; Wilson 8,624; Woodson 3,115

couple of articles went so far as to specify innocuous questions he answered and inculpatory questions he wouldn't. As far as the public is concerned, this is tantamount to a confession. Golubski's invocations regarding his previous misconduct would be inadmissible at trial, Fed.R.Evid. 404(a), (b)(1) (propensity evidence), but the bell is already rung. That he invoked his right hundreds of times itself would be inadmissible and is prejudicial to him, the Defendant Officers, and the Unified Government. *See United States ex rel. DRC, Inc. v. Custer Battles*, LLC, 415 F.Supp.2d 628, 636 (E.D.Va. 2006) (recognizing danger that at some point, inferences appropriately drawn from defendant's assertion of the privilege in response to numerous questions would "blur into a single inference" that all the defendants had engaged in every act alleged; thus, limiting inferences to three questions).

Media and public attention has only escalated since Mr. McIntyre's exoneration. Lamonte McIntyre has been described as a "something of a local celebrity." SOF ¶ 14.  The media has covered every major step in this case even anticipating a motion for change of venue and bifurcation. There is every reason to believe local attention will reach a furor as trial approaches. A KCK trial will induce a circus-type atmosphere impossible for jurors to shut from sight. Given the climate, a juror may promise impartiality for the chance to render a verdict. A verdict may be rendered from a conscious or unknown desire to enact social change and hold the KCKPD accountable for historical wrongs. A jury may even find defendants liable out of fear of community censure. The publicity, human nature, and the limits of voir dire warrant a finding of presumed prejudice and pre-voir dire transfer.

**B.    The 28 U.S.C. § 1404(a) factors impel transfer.**

"For the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought … ." 28 U.S.C. § 1404(a). Although Kansas constitutes only one judicial district, this District generally

considers § 1404(a) factors in resolving a motion for intra-district transfer. *LoganTree LP v. Garmin Int'l, Inc.*, No. 17-1217-EFM-ADM, 2020 WL 1686839, at *1 (D. Kan. Apr. 7, 2020). The considerations of convenience and interests of justice are evaluated as five factors:

> "(1) [the] plaintiff's choice of forum, (2) the convenience of the witnesses, (3) the accessibility of witnesses and other sources of proof, (4) the possibility of obtaining a fair trial, and (5) all other practical considerations that make a trial easy, expeditious, and economical."

*Id.* (quoting *McDermed v. Marian Clinic, Inc.*, 2014 WL 6819407, at *1 (D. Kan. 2014) (citing *Chrysler Credit Corp. v. Country Chrysler, Inc.*, 928 F.2d 1509, 1516 (10th Cir. 1991))). The district court has "broad discretion in deciding a motion to transfer base[d] on a case-by-case review of convenience and fairness." *Id.* (quoting *McDermed*, 2014 WL 6819407, at *1). And intradistrict transfers are judged by a "less rigorous" standard than interdistrict. *Edwards v. Sanyo Mfg. Corp.*, No. 3:05CV00293WRW, 2007 WL 641412, at *1 (E.D. Ark. Feb. 27, 2007) (citing *Johnson v. Burlington-Northern, Inc.*, 480 F. Supp.259, 260 (W.D. Mo. 1979)).

### 1.      The interests of justice determinatively favor transfer.

"The interest of justice may be determinative, warranting transfer or its denial even where the convenience of the parties and witnesses points toward the opposite result." *Research Automation, Inc. v. Schrader-Bridgeport Intern., Inc.*, 626 F.3d 973, 978 (7th Cir. 2010). And the "possibility of obtaining a fair trial" encompasses the right to an impartial jury and concerns with pre-trial publicity. *See Pac. Oil & Gas, LLC v. Chesapeake Energy Corp.*, No. 16-CV-2498-JAR, 2017 WL 1397538, at *9 (D. Kan. Apr. 18, 2017) (considering pre-trial publicity as part of the fairness analysis). The constitutional criminal jurisprudence is again persuasive. *See Barnes v. United States*, No. 11-CV-0582-HE, 2013 WL 12425652, at *1 (N.D. Okla. Jan. 25, 2013). Though, *Barnes* noted the exacting constitutional standard does not necessarily govern "the more flexible statutory standard of § 1404(a) for transfer." *Id.* at *3 n.5. Indeed, unlike criminal cases,

civil cases are not constitutionally prescribed to be in the state and district where the crime was committed.

For the same reasons as the constitutional argument, albeit under a more flexible standard, an impartial jury is impossible in KCK. *Powell v. Superior Ct.*, granted transfer reasoning Los Angeles County, with a jury pool of 6.5 million, could become so hostile as to make a fair trial unlikely. 232 Cal. App. 3d 785, 795, 283 Cal. Rptr. 777 (Ct. App. 1991), *modified* (July 30, 1991). Local newspapers, radio stations, and news channels blanketed Los Angeles County with coverage of a police beating of a black arrestee and related issues including numerous interviews with mayoral candidates and other officials. *Id.* at 796-98. A commission was formed, which found numerous instances of misconduct. *Id.* at 798-99. Last, a document threatening community violence if venue was changed was circulated, and there was a possibility of riots. *Id.* at 801. Although the incident received national attention, "the impact on residents of Los Angeles [wa]s unquestionably much greater because of the unabated and acrimonious total involvement of city officials and local community leaders." *Id.* at 802. The court concluded, "[i]n counties geographically removed from the locale of the crime, lack of a sense of community involvement will permit jurors a degree of objectivity unattainable" in the locale of the crime itself. *Id.* at 802 (quoting *Corona v. Superior Court*, 24 Cal.App.3d 872, 883 (1972)).

Here, if the filing of a lawsuit and allegations can engender such copious media and political attention, it is a veritable certainty no one in Kansas City and the surrounding area will not have a preconceived opinion as trial approaches. The recent destructive protests in Kansas City will impress upon a local jury the possibility of civil unrest and further destruction, should it find defendants not liable. *See Lozano v. State*, 584 So. 2d 19, 22–23 (Fla. Dist. Ct. App. 1991) ("Surely, the fear that one's own county would respond to a not guilty verdict by erupting into

violence is as highly 'impermissible [a] factor,' as can be contemplated." (quoting *Estelle v. Williams*, 425 U.S. 501, 505 (1976))). The interest of justice is determinative in this case when any inconvenience to plaintiffs arising from a transfer to Wichita is minimal.

### 2. Transfer would cause plaintiffs only slight inconvenience, and practical considerations favor transfer.

Regarding witnesses' convenience and accessibility of proof, most of the witnesses in this action are likely to be KCKPD officers so defendants bear the bulk of the inconvenience. Plaintiffs have ample time to make arrangements for a Wichita trial, in fact neither Plaintiff currently reside in the Kansas City area (they live in the Phoenix, Arizona area). To the extent any inconvenience to plaintiffs exists, the reality of modern times, the ease and availability of transportation, and the use of remote options (*e.g.,* Zoom) allay such inconvenience.

On the other hand, the Court and a great many veniremen would need to be inconvenienced in attempting the obtain an impartial jury from the Kansas City area and Kansas City media market. It would neither be easy, expeditious, or economical to wait until voir dire to confirm the jury pool's partiality. *Compare United States v. Ebens*, 654 F. Supp. 144, 145–46 (E.D. Mich. 1987) ("This court is convinced that the problem has become too severe to cure by careful voir dire, and that it would be extremely wasteful to attempt to do so."); *United States v. Engleman,* 489 F.Supp. 48, 50 (E.D.Mo.1980) ("Effective and economic judicial administration is not well served by calling an inordinate and unwieldy number of veniremen to see if an unbiased jury might be obtained, especially when it is already apparent that a substantial chance of intolerable prejudice exists."). Additionally, weeks long sequestration would be necessary in Kansas City but perhaps not in Wichita.

In sum, under either the constitutional or statutory standard, a transfer to Wichita is warranted. A transfer will better preserve the "theory of our [trial] system … that the conclusions

to be reached in a case will be induced only by evidence and argument in open court, and not by any outside influence, whether of private talk or public print." *Skilling*, 561 U.S. at 378 (citation omitted).

## V. Conclusion

WHEREFORE, defendants respectfully request that this Court grant their Motion to Transfer and transfer trial to Wichita, and order all other relief this Court deems just and proper.

Fisher, Patterson, Sayler & Smith, LLP
3550 S.W. 5th Street
Topeka, Kansas 66606
Tel: (785) 232-7761 | Fax: (785) 286-6609
dcooper@fpsslaw.com | cbranson@fpsslaw.com
s/David R. Cooper

| | |
|---|---|
| David R. Cooper | #16690 |
| Charles E. Branson | #17376 |
| Brian C. Mauldin | #28636 |

*-and-*
Henry E. Couchman Jr., #12842
Edward James Bain, #26442
Unified Government of Wyandotte
County/Kansas City, Kansas
Legal Department
701 N. 7th Street, Suite 961
Kansas City, Kansas 66101
Tel: (913) 573-5060 | Fax: (913) 573-5243
hcouchman@wycokck.org
jbain@wycokck.org

Attorneys for Defendant Unified Government of
Wyandotte County and Kansas City, Kansas

MCCAULEY & ROACH,
/s/Morgan L. Roach
Morgan L. Roach KS #23060
Sean P. Mccauley KS #20174
Nicholas S. Ruble KS #25636
Jeffrey S. Kratofil KS #23983
527 W. 39th Street, Suite 200
Kansas City, Missouri 64111
Telephone: 816-523-1700
Facsimile: 816-523-1708
E-mails:       morgan@mccauleyroach.com
               sean@mccauleyroach.com
               nick@mccauleyroach.com
               jeff@mccauleyroach.com
and
ENSZ & JESTER, P.C. LLC
Matthew J. Gist KS #20829
Christopher M. Napolitano KS #25499
Kansas City, Missouri 64105
Telephone: 816-474-8010
Facsimile: 816-471-7910
E-mails:       mgist@enszjester.com
               cnapolitano@enszjester.com
**Attorneys for Defendant Roger Golubski**

s/Tracy M. Hayes
Sean M. Sturdivan KS #21286
Tracy M. Hayes KS #23119
Elizabeth A. Evers KS #22580
SANDERS WARREN & RUSSELL LLP
Compass Corporate Centre
11225 College Blvd., Suite 450
Overland Park, KS 66210
Phone: 913-234-6100
Fax: 913-234-6199
s.sturdivan@swrllp.com
e.evers@swrllp.com
t.hayes@swrllp.com
**Attorneys for The Estate of Detective James Michael Krstolich, Detective Dennis Ware, Officer James L. Brown, The Estate of Lieutenant Dennis Otto Barber, Detective W.K. Smith, and The Estate of Lieutenant Steve Culp**

**Certificate of Service**

I hereby certify on the 15th day of April, 2022, I electronically filed the foregoing with the clerk of the court by using the CM/ECF system which will send a notice of electronic filing to counsel of record:

Michael J. Abrams – Michael.Abrams@LathropGPM.com
William G. Beck – William.Beck@LathropGPM.com
Alexander T. Brown – Alexander.Brown@LathropGPM.com
Alana M. McMullin – Alana.McMullin@LathropGPM.com
Cheryl A. Pilate – cpilate@morganpilate.com
Lindsay J. Runnels – lrunnels@morganpilate.com
Barry Scheck – barry@nsbcivilrights.com
Emma Freudenberger – emma@nsbcivilrights.com
Grace Ann Paras – grace@nsbcivilrights.com
Amelia B. Green – amelia@nsbcivilrights.com
Sona Shah – sona@nsbcivilrights.com
**Attorneys for Plaintiffs**

Sean M. Sturdivan – s.sturdivan@swrllp.com
Elizabeth A. Evers – e.evers@swrllp.com
Tracy M. Hayes – t.hayes@swrllp.com
**Attorneys for The Estate of Detective James Michael Krstolich, Detective Dennis Ware, Officer James L. Brown, The Estate of Lieutenant Dennis Otto Barber, Detective Clyde Blood, Detective W.K. Smith, and The Estate of Lieutenant Steve Culp**

Morgan L. Roach – morgan@mccauleyroach.com
Sean P. McCauley – sean@mccauleyroach.com
Jeffrey S. Kratofil – jeff@mccauleyroach.com
Matthew J. Gist – mgist@enszjester.com
Christopher M. Napolitano – cnapolitano@enszjester.com
**Attorneys for Defendant Roger Golubski**

s/David R. Cooper