UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| **LAMONTE MCINTYRE & ROSE LEE MCINTYRE,**<br><br>**Plaintiffs,**<br><br>v.<br><br>**UNIFIED GOVERNMENT OF WYANDOTTE COUNTY AND KANSAS CITY, KS, et al.,**<br><br>**Defendants.** | Case No. 2:18-cv-02545-KHV-KGG |

**MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT GOLUBSKI'S MOTION TO EXCLUDE PLAINTIFFS' EXPERT JENNIFER DYSART PH.D.**

Plaintiffs Lamonte McIntyre and Rose Lee McIntyre, by and through undersigned counsel, submit this Memorandum of Law in Opposition to Defendant Golubski's Motion to Exclude Plaintiffs' Expert Jennifer Dysart, Ph.D. (Doc. 573).

**I.   Introduction**

Defendant Golubski seeks to exclude the entirety of Dr. Jennifer Dysart's expert opinions but does not offer a single argument that bears on the admissibility of her testimony. In fact, Golubski does not challenge the impeccable qualifications of Dr. Dysart, as a nationally renowned expert in the field of eyewitness misidentification, but instead offers a handful of criticisms that go to the weight of her testimony. Indeed, Golubski's unsupported argument that Dr. Dysart's testimony is irrelevant ignores the fact that Lamonte McIntyre was arrested and convicted based exclusively on eyewitness identifications. Dr. Dysart's testimony will undoubtably aid the jury in determining what caused two independent witnesses to wrongly identify Lamonte McIntyre as the assailant by explaining how known flaws of human memory combined with  improper police

suggestion can affect the accuracy of the identifications in this case. Further, Golubski's arguments that Dr. Dysart uses insufficient facts, speculates, and makes credibility determinations are simply veiled attempts to exclude Dr. Dysart's opinions solely because he disagrees with them. Instead, Golubski's own cited cases, as well as others across the country, acknowledge the reliability of expert eyewitness identification testimony in complex factual cases like the one at bar, and the nationwide trend is to admit such testimony to assist the factfinder with counterintuitive phenomena underlying misidentifications. Here, Dr. Dysart's opinion – that the jury can find that Defendants' conduct violated basic police interview practices and that those violations very likely caused the misidentifications of Lamonte McIntyre – is not only relevant and based on reliable methodology but is critical to assist the jury with the multifaceted circumstances presented in this action. Thus, Dr. Dysart's opinions should be allowed in their entirety.

## II. There Is No Basis to Exclude or Limit the Testimony of Dr. Dysart.

### A. Dr. Dysart is Clearly Qualified, and Her Eyewitness Identification Testimony is Admissible.

An expert qualified by knowledge, skill, experience, training, or education may testify to their opinions "[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid 702. Indeed, "[t]he first step of the district court's gatekeeping inquiry is to determine whether the expert has a reliable basis in the knowledge and experience of his or her discipline." *Myrick v. Husqvarna Pro. Prod., Inc.*, 508 F. Supp. 3d 846, 854 (D. Kan. 2020) (internal citations and quotations omitted); *see also Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147 (1999); *Daubert v. Merrell Dow Pharms., Inc.,* 509 U.S. 579, 589 (1993). Although Golubski wisely does not challenge Dr. Dysart's qualifications as an

expert on eyewitness identifications,[1] he appears to challenge the admissibility of such expert testimony in general, outside of "narrow" circumstances. (Motion, at 5-6). In doing so, Golubski relies on *United States v. Rodriguez-Felix*, 450 F.3d 1117 (10th Cir. 2006). For the reasons described below, this reliance is misplaced.

In *Rodrigez-Felix,* a criminal action, the District Court of New Mexico excluded the proposed testimony of an expert in "memory and decision processes which underlie eyewitness identification decisions," because the proffered testimony "did not meet the minimal *Daubert* standards required for expert testimony" and his report was "woefully inadequate in…allowing [the court] to assess the reasoning and methodology underlying the expert's opinion and to determine whether it is both scientifically valid and applicable to a particular set of facts." *Id.* at 1125. On appeal, the Tenth Circuit also found that the proffered expert's testimony was "wholly inadequate," and "other than generalized assertions regarding the factors which can affect an eyewitness's identification, the report fails to sufficiently reference specific and recognized scientific research…such that the court could determine if this foundational research had been subjected to peer review, and if so, whether it had been accepted in the community." *Id.* at 1126. Thus, the Court held that the district court did not abuse its discretion in excluding the expert's testimony. *Id.* The court then noted that any error in doing so was harmless because "each eyewitness's identification of Rodriguez–Felix was corroborated by an 'evidentiary cornucopia,'" (including a video tape of the perpetrator from which "the jury itself was able to confirm his identity,"). *Id.* at 1126.

---

[1] Although Plaintiffs could find no direct challenge to Dr. Dysart's qualifications, Golubski challenges expert eyewitness identification testimony in general, making her qualifications relevant. Indeed, Dr. Dysart is among a handful of the country's most qualified experts in eyewitness misidentification, a field that encompasses both the psychology of memory and police practices' effect on eyewitness memory. *See generally* Ex. A. Dr. Dysart holds a Ph.D. in Social Psychology and is a tenured professor at John Jay College of Criminal Justice in New York. *Id.* at 1, 23. She is the co-author of a leading treatise, more than a dozen peer-reviewed articles, and four published book chapters on the topic. *Id.* at 23-43. She has also taught police investigators how to conduct eyewitness identification procedures in conferences across the country. *Id.*

Accordingly, the court found only "common-sense deficiencies in the prosecution's case" and since "cross examination amply exposed" such deficiencies, the expert "would have offered only unremarkable conclusions, most of which would have bolstered the government's case." *Id.* Golubski also cites an unpublished Tenth Circuit case, *United States v. Wofford,* 766 Fed. App'x 576 (10th Cir. 2019). But, like *Rodriguez-Felix,* the Court in *Wofford* held only that the district court did not abuse its discretion by excluding an eyewitness expert's testimony based on the expert's failure to demonstrate his expertise as it related to the specific facts of the case, *id.* at 581, and likewise held that because "the other witness identification and the strong circumstances" evidenced guilt, any exclusion of such testimony was harmless. *Id.*

Unlike the experts in *Rodrigez-Felix* and *Wofford,* Dr. Dysart's report and testimony are more than sufficient to analyze the reasoning and methodology underlying her opinions. Indeed, her report discusses not only the scientific peer-reviewed literature, published research, and decades of experience upon which she bases her opinions, but explains that through such research and experience a series of factors, generally accepted and relevant to the current case, have been shown to influence the reliability of eyewitness identifications. *See* Exhibit A (Dr. Dysart's Report), p. 6. Dr. Dysart then applies these peer-reviewed factors to the facts in this case, concluding that if witness testimony is to be believed by the jury, the identification procedures used by police very likely led to the wrongful prosecution and conviction of Lamonte McIntyre. *Id.* at 3-20. Moreover, unlike *Rodrigez-Felix* and *Wofford*, most of the system variables that tend to make Ruby Mitchell and Niko Quinn's eyewitness identifications unreliable were not known to Lamonte McIntyre at the time of his trial and include "such psychological phenomena as the feedback factor and unconscious transference" which the *Rodriguez-Felix* court held is "the very type of scientific knowledge to which *Daubert'*s relevance prong is addressed.", 450 F.3d at 1124. Additionally,

4

because the two officers who conducted the eyewitness procedures resulting in alleged positive identifications cannot be cross-examined by Plaintiffs,[2] exposing the identifications' deficiencies and police misconduct on cross-examination is impossible.

Next, despite the Tenth Circuit explicitly "emphasizing that the particular facts of a case drive the analysis" of expert testimony, Golubski argues that no expert eyewitness testimony should be allowed outside of the "limited conditions" of cross-racial identification, identification after a long delay, identification after observation under stress, and psychological phenomena as the feedback factor and unconscious transference, which the court identified in 1998. *See e.g. id.* at 1123-24. First and foremost, several of the "limited conditions" noted above are in fact present in this case, and thus Golubski's argument on this point is moot.[3] Nonetheless, this type of *per se* rule, which ignores the individualized facts and needs of a case, was directly rejected by the court in *Rodriguez-Felix. Id.* at 1125 ("The rejection…of a per se approach to expert testimony on eyewitness identification reflects *Daubert*'s liberal definition of what constitutes reliable, scientific knowledge.") Further, the court noted how the reliability of the psychological and scientific field of eyewitness identification has shifted over time, and that "subject to the trial court's careful supervision, properly conceived expert testimony may be admissible to challenge or support eyewitness evidence." *Id.* at 1124. The court also held that "[e]xpert evaluation of eyewitness testimony – in the abstract – may serve a critical trial function where the identification of a defendant is in dispute", that "modern research also recognizes that an eyewitness's identification

---

[2] Defendant Krstolich, the only officer (other than Golubski) present for the identification of Lamonte McIntyre by Ruby Mitchell, is deceased and Defendant Golubski, the only officer present for the identification of Lamonte McIntyre by Niko Quinn, has repeatedly invoked his Fifth Amendment right to remain silent.

[3] Dr. Dysart specifically concludes that identification after observation under stress is present in this case, as well as numerous psychological phenomena including post-identification feedback (the "feedback factor"), repeated identification procedures, unconscious transference, commitment effects, and post-event contamination, among others. *See* Ex. A, pp 6-20.

may be subject to significant witness error or manipulation," and that "research points to a number of factors that are helpful to evaluating the reliability of an eyewitness's identification of a suspect." *Id.* at 1123-24. The court then held that it will "remain cognizant that while cross-examination is often effective, expert testimony, when directed at complex issues, may provide a more effective tool for rebutting an eyewitness's testimony." *Id.* at 1125. These general principles favoring eyewitness testimony in complex cases should be applied here. Moreover, *Rodrigez-Felix* was decided in 2006, the first year Dr. Dysart began testifying as an expert on eyewitness identifications. Since then (and for the past 15 years), significant strides have been made in this scientific field, and courts within this Circuit have repeatedly admitted such testimony as reliable and relevant. *See e.g. United States v. Thomas,* 849 F.3d 906, 911 (10th Cir. 2017); *United States v. Oliver*, No. 2:00-CR-087ST, 2000 WL 35610160, at \*3 (D. Utah Apr. 18, 2000); *Davis v. Cline*, No. CIV.A. 06-3127-KHV, 2007 WL 1520916, at \*8 (D. Kan. May 24, 2007), *aff'd,* 277 F. App'x 833 (10th Cir. 2008). Indeed, Dr. Dysart has repeatedly testified about the reliability of eyewitness identifications in dozens of proceedings nationwide, without disqualification. Ex. A at 1; *see, e.g., Jones v. Cannizzaro*, 514 F. Supp. 3d 853, 864 (E.D. La. Jan. 21, 2021); *Wilson v. City of Los Angeles,* No. CV 18-5775-KS, 2020 WL 8211451, at \*25 (C.D. Cal. Dec. 23, 2020); *Rosario v. City of New York,* No. 18 CIV. 4023 (LGS), 2021 WL 1930293, at \*4 (S.D.N.Y. May 13, 2021).

## B.  Dr. Dysart's Testimony and Opinions are Reliable.

"The second step of the Court's gatekeeping inquiry is to determine if the expert's proffered testimony is reliable." *Myrick v. Husqvarna Pro. Prod., Inc.*, 508 F. Supp. 3d 846, 854 (D. Kan. 2020). Expert testimony is sufficiently reliable when it is "based on sufficient facts or data," it is "the product of reliable principles and methods," and the witness providing it "has reliably applied the principles and methods to the facts of the case." *Id.*; Fed. R. Evid. 702. Also, to be reliable, "[a]n expert opinion must be based on facts that enable the expert 'to express a reasonably accurate

6

conclusion as opposed to conjecture or speculation [but] absolute certainty is not required.'" *Kieffer v. Weston Land, Inc.*, 90 F.3d 1496, 1499 (10th Cir. 1996) (internal citations omitted). Further, a "plaintiff need not prove that the expert is undisputably correct or that the expert's theory is 'generally accepted' in the scientific community." *Dodge v. Cotter,* 328 F.3d 1212, 1222 (10th Cir. 2003). This is because, "[a]t the admissibility stage…the court's focus is solely on principles and methodology, not on the conclusions they generate." *Util. Trailer Sales of Kansas City, Inc. v. MAC Trailer Mfg., Inc.,* 267 F.R.D. 368, 372 (D. Kan. 2010) (internal quotations and citations omitted).

There are four nonexclusive factors that a trial court may consider in assessing reliability of an expert, including (1) whether the opinion at issue has been or is capable of being tested; (2) whether the opinion has been subjected to peer review and/or publication; (3) whether there is a known or potential rate of error associated with the methodology used and whether there are standards controlling the technique's operation; and (4) whether the theory has been accepted in the scientific community. *Myrick,* 508 F. Supp. at 854; *see also Daubert*, 509 U.S. at 593-94. Tellingly, although these factors are "neither definitive nor exhaustive," *Bitler v. A.O. Smith Corp*., 400 F.3d 1227, 1233 (10th Cir. 2004), Golubski fails to do more than regurgitate the above list without analysis. This is likely because the theories underlying Dr. Dysart's eyewitness misidentification testimony meet any definition of reliability: they have been susceptible and subjected to testing in peer-reviewed publications, including in articles and books published by Dr. Dysart, (*see, e.g.,* Ex. A at 1, 24-30 (listing 18 peer-reviewed articles and 47 peer-reviewed conference presentations)), Dr. Dysart has a relevant degree and decades of experience in the field, *see id.* at 1, 23-42, the system and estimator variables analyzed by Dr. Dysart in respect to this case have been shown through scientific peer-reviewed research to influence the reliability of eyewitness identifications, *see id.* at 5-20, and in determining how the accuracy of witness identification in

7

Plaintiffs' specific case may have been affected, Dr. Dysart "relies on a body of research and her experience in the field of eyewitness identification to opine on how the witness identification[s] in this case [were] influenced by...procedures actually used and the opportunities that the witnesses had to see the perpetrator." *Jones v. Cannizzaro*, 514 F. Supp. 3d 853, 864 (E.D. La. Jan. 21, 2021). This is paradigmatically sound methodology and regardless, Golubski does not put forth a single reason why Dr. Dysart's method of relying on her research and experience, relevant peer-reviewed literature, published case studies, historical and contemporary police practices, and exoneration data is unreliable – and he cannot.

Faced with Dr. Dysart's valid and reliable methods, Golubski argues that her opinions are based on insufficient facts and data.[4] (Motion, pp. 13-14). In doing so, Golubski argues that the "pertinent facts" were not provided to Dr. Dysart, including that (1) "Niko Quinn stated shortly after the shooting that Niko had seen the shooter and 'had known him from school,'" (2) "on the evening of the murders a news report stated that someone had been arrested (Lamonte McIntyre) and that a mug shot was flashed on the TV screen. Niko Quinn stated 'they got the wrong guy,'" and (3) Niko Quinn "knew who the shooter was." (Motion, ¶¶ 3, 4, and 11).[5] Golubski argues that these "facts" were produced in Freda Quinn's 2011 affidavit and 2021 deposition testimony (Exhibits C and F) and without considering them, Dr. Dysart's opinions should be excluded. In addition to Golubski citing no case law on this point, this argument fails for two other reasons. First, the above "facts," were provided to Dr. Dysart as they are contained in Niko Quinn's

---

[4] Golubski only argues that Dr. Dysart's opinion relating to Niko Quinn is based on "insufficient facts and data" but does not argue, nor can he, that Dr. Dysart's opinion relating to Ruby Mitchell is based on insufficient facts and data.

[5] Golubski erroneously argues that Dr. Dysart was not provided the information in Exhibits D and E (the basis for ¶¶ 1, 2, 5, 6, 7, 8, 9, and 10 on pages 2-3 of Golubski's Motion), which is demonstrably false. Dr. Dysart did in fact review the "audio of 1/4/17 DA interview with Niko Quinn" (Ex. D) and "Transcript, Deposition of Niko Latoya Quinn (Nov. 3, 2021)," (Ex. E). *See* Ex. A, p. 2; *see also* Dr. Dysart's January 31, 2022 Amendment to her Expert Report, attached hereto as Exhibit G.

8

deposition testimony, which Dr. Dysart reviewed. *See* Ex. G. In her deposition, Niko Quinn was asked by Golubski's counsel about her conversations with Freda Quinn, Freda Quinn's testimony, the news report of Lamonte McIntyre, and whether she knew who the shooter was from school. *See* Ex. C at 86: 23-87:3; *see also* additional portions of Niko Quinn's November 3, 2021 Deposition, attached hereto as Exhibit H at 16:3-18; 69:24-70:6; 73:14-74:20). Second, even if Dr. Dysart did not consider these details an "expert's decision not to consider certain facts in formulating [her] opinions is a matter for cross-examination, and not exclusion, because that decision goes to the weight of the testimony, not its admissibility." *State Farm Fire & Cas. Co. v. Bell,* 30 F. Supp. 3d 1085, 1097 (D. Kan. 2014).[6]

Moreover, Dr. Dysart reviewed and relied upon the sworn statements and testimony of Ruby Mitchell, Niko Quinn, Defendant Golubski, Defendant Krstolich, Defendant Ware, Defendant Smith, Clyde Blood, Ronald Miller, Terra Morehead, Stacy Quinn, Caroline Adams, Jackie Poole, Dan Clark, Gloria Labat, and James McCloskey, the KCKPD investigative file for the Quinn/Ewing murders, the photographs shown to Ruby Mitchell and Niko Quinn, photographs of Lamonte McIntyre in 1994, photographs of Lamont Drain and Neil Edgar. Jr. (aka "Monster"), the audio recordings and transcripts of the 1994 interviews of Ruby Mitchell and Niko Quinn, and the audio recording of the 2017 interview of Niko Quinn by the DA, among other things. *See* Ex. A, p. 2; Ex. G. Accordingly, there is no credible argument that the plethora of evidence and material

---

[6] Golubski's Motion also argues that any "fact" not specifically referenced in Dr. Dysart's report must not have been considered by her (Motion, pp. 2-4, 13-14). This position has no merit and regardless it is not grounds for exclusion. *See McCoy v. Whirlpool Corp*., 214 F.R.D. 646, 652 (D. Kan. 2003) (noting that the Federal Rules "do[] not require that a report recite each minute fact or piece of scientific information that might be elicited on direct examination to establish the admissibility of the expert opinion under *Daubert*. Nor does it require the expert to anticipate every criticism and articulate every nano-detail that might be involved in defending the opinion on cross examination at a *Daubert* hearing.")

Dr. Dysart considered provides an insufficient factual basis for her opinions regarding the eyewitness identifications of Lamonte McIntyre in this case.

### C. Dr. Dysart's Testimony and Opinions are Relevant.

"The third and last step of the district court's gatekeeping function requires the court to analyze whether [the] proposed testimony is sufficiently relevant to the task at hand." *Myrick,* 508 F. Supp. At 855. Indeed, the "touchstone of admissibility is helpfulness to the trier of fact." *Sunlight Saunas, Inc. v. Sundance Sauna, Inc.,* 427 F.Supp. 1022, 1030 (D. Kan. 2006). "Whether testimony is helpful to the trier of fact essentially depends on whether the underlying reasoning and methodology can be properly applied to the facts of the case." *Bruner-McMahon v. Sedgwick Cty. Bd. of Comm'rs,* No. 10-CV-1064-KHV, 2012 WL 33837, at *4 (D. Kan. Jan. 6, 2012). However, any doubts as to whether Dr. Dysart's opinion will assist the trier of fact in this proceeding "should be resolved in favor of admissibility." *McCoy v. Whirlpool Corp.*, 214 F.R.D. 646, 652 (D. Kan. 2003).

Here, Dr. Dysart's testimony is relevant for two reasons. First, despite the overwhelming evidence that Lamonte McIntyre is innocent, at trial the parties will present two diametrically opposed views of the facts: Plaintiffs will present evidence that Lamonte McIntyre was falsely identified by two eyewitnesses as a result of Defendants' unnecessarily and impermissibly suggestive identification procedures. Defendants, on the other hand, will claim there was no police misconduct and that Lamonte McIntyre was identified because he is guilty[7] or because two independent witnesses falsely identified him either by mistake or by intention. Dr. Dysart's expert opinion is directly relevant and helpful to the jury's consideration of these competing claims. *See*

---

[7] Defendants have refused to stipulate that Lamonte McIntyre is innocent, and instead stipulate that: "Without prejudicing the right to contend the detention, arrest, charge, and conviction of Lamonte McIntyre were supported by probable cause, counsel for defendants will not argue to the jury that Lamonte McIntyre was ***definitively*** the shooter." Doc. 562, p. 3 (Stipulation, ¶ 23) (emphasis added).

10

*United States v. Rodrigez-Felix,* 450 F.3d 1117 (10th Cir. 2006) ("On a superficial level, the testimony is plausibly relevant since the question of whether the multiple eyewitness identifications of Rodriguez-Felix were reliable was a key issue at trial"); *see also United States v. Brownlee*, 454 F.3d 131, 144 (3d Cir. 2006) (holding "it was wrong to exclude expert testimony regarding the reliability of the very eyewitness identification evidence on which Brownlee was convicted.")

Second, Dr. Dysart's description of police identification procedures – including how they are commonly used and their effects – will provide crucial context to the jury as it considers Plaintiffs' Section 1983 claims relating to the identification procedures Defendants claim they conducted. For example, how likely it is that two individuals would independently select Lamonte McIntyre's photograph without suggestion if he in fact was not the perpetrator. In addition, Dr. Dysart properly applies generally accepted and peer-reviewed system and estimator variables to the facts of this case, finding the following circumstances likely affected the reliability of the two eyewitness identifications of Lamonte McIntyre: (1) perpetrator description did not match Mr. McIntyre, (2) the potential influence of a composite drawing, (3) photo array bias, (4) alleged suggestion with Niko Quinn, (5) witness confidence and post-identification feedback, (6) repeated identification procedures, unconscious transference and commitment effects, (7) post-event contamination, (8) limited opportunity to view, (9) weapon-focus effect, and (10) alleged prior familiarity. Ex. A at 5-20. Dr. Dysart's testimony on these scientific principles and the complex factual circumstances present in this case can clarify how certain arguments put forth by Defendants in support of the identifications – including that Ruby Mitchell did not recant, that Niko Quinn did not think Golubski did anything improper,[8] and that both witnesses identified Lamonte McIntyre

---

[8] The description of Niko Quinn's testimony in Golubski's Motion conveniently omits the testimony disproving this point, including that Niko went to the meeting knowing that "Monster and Cecil and them" committed the shooting, *see* Ex. H at 91:15-92:7, that when Golubski handed her the photograph of Lamonte McIntyre, he told her "that they had the (shooter's) clothes, they had the gun. . .and that they knew for a fact that he was the one that killed my cousin," *id.* at 94:8-14, and that when Niko Quinn told Golubski that Monster and Aaron Robinson tried to

11

multiple times in court – are actually indicators of the unreliable psychological phenomenon noted above, in addition to suggestion and/or coercion. *Id.* Since the circumstances present here counterintuitively indicate unreliability, expert testimony on this issue should be admitted. *Rodriguez-Felix*, 450 F.3d at 1124 (finding that these factors are "helpful to evaluating the reliability of an eyewitness's identification of a suspect"); *Hill v. New Orleans City,* No. CIV.A. 13-2463, 2015 WL 222185, at *7 (E.D. La. Jan. 13, 2015) (noting Dr. Dysart's opinion that a witness remaining confident in his identification despite exonerating forensic evidence is a "classic examples of commitment bias," which supported a reasonable inference by the trier of fact that he was exposed to suggestive identification procedures or that his credibility was faulty); *Young v. Conway*, 698 F.3d 69, 88 (2d Cir. 2012) ("Because eyewitnesses sincerely believe their testimony and are often unaware of the factors that may have contaminated their memories, they are more likely to be certain about their testimony…. And because jurors confound certainty and accuracy, cross-examination is less likely to be effective in discrediting eyewitnesses.")

Unsurprisingly, Golubski does not mention these compelling reasons why Dr. Dysart's testimony is relevant and helpful to the trier of fact in this eyewitness identification case. Instead, Golubski argues, somewhat chaotically, that Dr. Dysart's testimony is "based on possible scenarios that *might have* occurred, without directly analyzing *what actually* occurred," is "speculative, and conditioned on [] qualifiers," determines the "credibility of the eyewitnesses," and "attempts to discredit the testimony of eyewitnesses." (Motion, pp. 10-12). These arguments reflect a complete misunderstanding of Dr. Dysart's methodology and opinions and are nothing more than Golubski's disagreement with the merits of Dr. Dysart's conclusions and the facts in this case.

---

pick the victim up the day before the murder, Golubski said she "shouldn't be talking about Cecil, be careful what I say about Cecil because they found his ex-girlfriend's remains behind Washington High School in a park or something…" *Id.* at 93:15-94:7.

12

First, the use of "qualifiers" by Dr. Dysart does not make her opinions irrelevant, hypothetical, or speculative. Instead, such testimony reflects the unclear record in this action, avoids making credibility determinations, and follows peer-reviewed and generally accepted methods to determine the likelihood of an accurate identification based on the facts in this specific case without usurping the jury's role. *See Jones v. Cannizzaro*, 514 F. Supp. 3d 853, 864 (E.D. La. Jan. 21, 2021) (admitting Dr. Dysart's testimony as relevant and reliable because "Dysart's opinion is not equivocal. She opines that there is a decreased likelihood of an accurate identification by the victims in this case, making it more probable that Plaintiff is innocent.") Moreover, it is undeniable that Dr. Dysart has a sufficient factual basis to accept certain events or circumstances "might" have occurred in this action so that she can offer her relevant expertise in a manner tailored to the facts of the case. *See, e.g., Aspen Highlands Skiing Corp. v. Aspen Skiing Co.,* 738 F.2d 1509, 1524 (10th Cir. 1984) (affirming admission of expert testimony where "there may have been considerable evidence contradicting the expert's assumptions" but also "his assumptions were not without support" and explaining that "the full burden of exploration of the facts and assumptions underlying the testimony of an expert witness" falls "squarely on the shoulders of opposing counsel's cross-examination") (citation and internal quotation marks omitted); *see also Kieffer v. Weston Land, Inc.,* 90 F.3d 1496, 1500 (10th Cir. 1996) ("evidence provided a factual basis for Oliver's testimony about how an electric shock *might have occurred.* The district court correctly ruled that the jury was free to accept or reject the expert's opinion in deciding, *based on the proof provided by plaintiff…*") (emphasis added). Thus, the proper way for Defendants to address disagreements with an expert's wording, factual assumptions, or inconsistencies in the record (requiring an expert to use qualifiers) is on cross examination; it does not provide any basis to exclude Dr. Dysart's testimony.

Second, despite Golubski omitting such testimony in his Motion, Dr. Dysart makes abundantly clear that she is not making any credibility determinations and cannot vouch for the reliability of any witness statements. *See* additional portions of Dr. Dysart's September 23, 2021 Deposition, attached hereto as Exhibit I at 23:2-17; 200:14-18.

Third, although Golubski asserts Dr. Dysart's testimony is "within the jury's common knowledge," (Motion, p. 9), numerous courts across the country have recently found the opposite: "[a] lay juror would not know, for example, about the likely impact on perception of extreme stress and weapon focus, nor would the juror necessarily understand that the detective's identification practices were highly suggestive." *United States v. Nolan,* 956 F.3d 71, 82 (2d Cir. 2020); *United States v. Brownlee*, 454 F.3d 131, 142 (3d Cir. 2006) ("[W]hile science has firmly established the 'inherent unreliability of human perception and memory'...this reality is outside 'the jury's common knowledge,' and often contradicts jurors' 'commonsense' understandings"); *United States v. Brownlee*, 454 F.3d 131, 144 (3d Cir. 2006) ("[I]t would seem anomalous to hold that the probative value of expert opinion offered to show the unreliability of eyewitness testimony so wastes time or confuses the issue that it cannot be considered even when the putative effect is to vitiate the [primary] evidence offered by the government.") (internal citation omitted); *United States v. Smith*, 621 F. Supp. 2d 1207, 1213, 1217 (M.D. Ala. 2009) (rejecting the argument that eyewitness expert testimony "would not aid the jury because problems with eyewitness identification are within the 'ordinary knowledge of most lay jurors"); *see also United States v. Smithers,* 212 F.3d 306, 311–18 (6th Cir.2000); *United States v. Moore,* 786 F.2d 1308, 1313 (5th Cir.1986). In fact, Dr. Dysart's opinions provide relevant context around witnesses' differing accounts of the identification procedures used in this case, how/when those procedures are typically used, and the effect they have on a witness. Dr. Dysart offers testimony on what the relevant social science says about the

14

likelihood that, absent improper suggestion, two separate eyewitnesses would independently identify the same suspect if the identified suspect was innocent (very unlikely). *See* Ex. A, p. 20. Additionally, in light of this action's complex fact pattern, Dr. Dysart's explanation of several counterintuitive reliability factors, outside the jury's ken, will aid in evaluating competing accounts of what procedures were actually used here.

## III.   Conclusion

Golubski offers no basis to limit the proffered opinions from admittedly qualified expert Dr. Dysart, let alone to entirely preclude her testimony, as Golubski requests. Golubski's motion should be denied in its entirety.

Date: April 15, 2022                               Respectfully submitted,


                                                   LATHROP GPM LLP

                                                   By: /s/ *Alana M. McMullin*
                                                   Michael J. Abrams #15407
                                                   Alana M. McMullin #78948
                                                   2345 Grand Boulevard, Suite 2200
                                                   Kansas City, MO 64108
                                                   (816) 292-2000
                                                   (816) 292-2001 Facsimile
                                                   michael.abrams@lathropgpm.com
                                                   alana.mcmullin@lathropgpm.com

                                                   Cheryl A. Pilate #14601
                                                   Lindsay Runnels #78822
                                                   Morgan Pilate, LLC
                                                   926 Cherry Street
                                                   Kansas City, MO 64106
                                                   Telephone: (816) 471-6694
                                                   Facsimile: (816) 472-3516
                                                   cpilate@morganpilate.com

>Barry Scheck (*admitted pro hac vice*)
>Emma Freudenberger (*admitted pro hac vice*)
>Sona R. Shah (*admitted pro hac vice*)
>Grace Paras (*admitted pro hac vice*)
>Neufeld Scheck & Brustin, LLP
>99 Hudson Street, Eighth Floor
>New York, NY 10013
>Telephone: (212) 965-9081
>Facsimile: (212) 965-9084
>emma@nsbcivilrights.com
>
>*Attorneys for Plaintiffs*

## **CERTIFICATE OF SERVICE**

The undersigned certifies that on the 15th day of April, 2022, the foregoing was electronically filed with the clerk of the court using the CM/ECF system which will provide notice and service to all counsel of record.

>By: /s/ *Alana M. McMullin*
>An Attorney for Plaintiffs