UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

LAMONTE MCINTYRE & ROSE LEE
MCINTYRE,

                Plaintiffs,

v.

UNIFIED GOVERNMENT OF WYANDOTTE
COUNTY AND KANSAS CITY, KS, et al.,

                Defendants.

Case No. 2:18-cv-02545-KHV-KGG

**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO
DEFENDANT ROGER GOLUBSKI'S MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................................... ii

INTRODUCTION ............................................................................................................... 1

RESPONSE TO GOLUBSKI'S STATEMENT OF UNCONTROVERTED MATERIAL
FACTS ................................................................................................................................ 2

ADDITIONAL MATERIAL CONTROVERTED FACTS ......................................... 57

NATURE OF THE MATTER ...................................................................................... 130

QUESTIONS PRESENTED ......................................................................................... 135

ARGUMENT AND AUTHORITIES .......................................................................... 136

   I.   LEGAL STANDARD ........................................................................................ 136

   II.    ADVERSE INFERENCES BASED ON GOLUBSKI'S FIFTH AMENDMENT
   INVOCATIONS SUPPORT DENIAL OF SUMMARY JUDGMENT ............................... 136

   III.    A REASONABLE JURY COULD FIND GOLUBSKI FABRICATED
   EVIDENCE ........................................................................................................ 138

   IV.    A REASONABLE JURY COULD FIND GOLUBSKI SUPPRESSED *BRADY*
   EVIDENCE ........................................................................................................ 143

   V.    A REASONABLE JURY COULD FIND GOLUBSKI LIABLE FOR
   MALICIOUS PROSECUTION .............................................................................. 148

      A.   A Reasonable Jury Could Find that No Probable Cause Existed ........................... 149

      B.   A Reasonable Jury Could Find Golubski Caused Lamonte's Prosecution ............. 152

   VI.    A REASONABLE JURY COULD FIND THAT GOLUBSKI PARTICIPATED
   IN A CONSPIRACY ........................................................................................... 154

   VII.    A REASONABLE JURY COULD FIND THAT GOLUBSKI INTERFERED
   WITH THE RIGHT TO FAMILIAL ASSOCIATION ...................................................... 156

CONCLUSION ............................................................................................................... 156

CERTIFICATE OF SERVICE ...................................................................................... 157

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ballinger v. Kerby*,
  3 F.3d 1371 (10th Cir. 1993) ..............................................................................147

*Baxter v. Palmigiano*,
  425 U.S. 308 (1976)...........................................................................................136

*Becker v. Kroll*,
  494 F.3d 904 (10th Cir. 2007) ............................................................................143

*Bellamy v. City of New York*,
  914 F.3d 727 (2d Cir. 2019)...............................................................................144

*Bledsoe v. Bd. of Cnty. Comm'rs of Cnty. of Jefferson, Kansas*,
  501 F. Supp. 3d 1059 (D. Kan. 2020)................................................................143

*Bledsoe v. Jefferson County*,
  275 F. Supp. 3d 1240 (D. Kan. 2017)........................................................143, 154

*Bowen v. Maynard*,
  799 F.2d 593 (10th Cir. 1986) ....................................................................146, 147

*Caldwell v. City & County of San Francisco*,
  889 F.3d 1105 (9th Cir. 2018) ............................................................................140

*Carrillo v. County of Los Angeles*,
  798 F.3d 1210 (9th Cir. 2015) ............................................................................144

*Emmett v. Armstrong*,
  973 F.3d 1127 (10th Cir. 2020) .............................................................1, 136, 138

*Farmer v. Brennan*,
  511 U.S. 825 (1994)...........................................................................................151

*Foster v. California*,
  394 U.S. 440 (1969)...........................................................................................153

*Frasier v. Evans*,
  992 F.3d 1003 (10th Cir. 2021) ..........................................................................155

*Geter v. Fortenberry*,
  849 F.2d 1550 (5th Cir. 1988) ............................................................................144

*Good v. Curtis*,
  601 F.3d 393 (5th Cir. 2010) ..............................................................................140

*Green v. Haskell Cty. Bd. of Comm'rs*,
  568 F.3d 784 (10th Cir. 2009) ............................................................................137

*Gregory v. City of Louisville,*
    444 F.3d 725 (6th Cir. 2006) .................................................................................140

*Heck v. Humphrey,*
    *512 U.S. 477 (1994)* ...........................................................................................138

*Jimenez v. City of Chicago*,
    732 F.3d 710 (7th Cir. 2013) ...............................................................................152

*Jones v. City of Chicago,*
    856 F.2d 985 (7th Cir. 1988) ...............................................................................153

*Keith v. Koerner,*
    843 F.3d 833 (10th Cir. 2016) .....................................................................136, 137

*Kyles v. Whitley,*
    514 U.S. 419 (1995).............................................................................................144

*Lowery v. Cnty. of Riley,*
    522 F.3d 1086 (10th Cir. 2008) ...........................................................................156

*Martinez v. Carson,*
    697 F.3d 1252 (10th Cir. 2012) ...........................................................................152

*Mellen v. Winn,*
    900 F.3d 1085 (9th Cir. 2018) .............................................................144, 146, 151

*Mirlis v. Greer,*
    952 F.3d 36 (2d Cir. 2020)...................................................................................136

*Montoya v. Vigil,*
    898 F.3d 1056 (10th Cir. 2018) ...........................................................................149

*Mooney v. Holohan,*
    294 U.S. 103 (1935).............................................................................................143

*Myers v. Brewer,*
    No. 17-2682-CM, 2019 WL 7293584 (D. Kan. Dec. 30, 2019).....................28, 137

*Newsome v. McCabe,*
    256 F.3d 747 (7th Cir. 2001) ...............................................................................147

*Nuckols v. Gibson*,
    233 F.3d 1261 (10th Cir. 2000) ...........................................................................146

*Pierce. Tiscareno v. Anderson*,
    639 F.3d 1016 (10th Cir. 2011) ...........................................................................147

*Pierce v. Gilchrist,*
    359 F.3d 1279 (10th Cir. 2004) ...........................................................143, 147, 148, 153

*Process Serv. v. Ellison,*
    767 F.2d 684 (10th Cir. 1985) .............................................................................137

*Pyle v. Kansas,*
    317 U.S. 213 (1942).............................................................................................143

iii

*Restivo v. Hessemann*,
   846 F.3d 547 (2d Cir. 2017)................................................................152

*Rivera v. Guevara*,
   319 F. Supp. 3d 1004 (N.D. Ill. 2018) ................................................137

*S.E.C. v. Smart*,
   678 F.3d 850 (10th Cir. 2012) .......................................................27, 28

*Sanchez v. Hartley*,
   810 F.3d 750 (10th Cir. 2016)  ...........................................148, 149, 151

*Schneider v. City of Grand Junction Police Dep't*,
   717 F.3d 760 (10th Cir. 2013) ............................................................152

*SEC v. Erwin*,
   No. 13-CV-03363-CMA-KMT, 2021 WL 3773649 (D. Colo. Aug. 25, 2021) ..................137

*Smith v. Sec'y of New Mexico Dep't of Corr.*,
   50 F.3d 801 (10th Cir. 1995) ..............................................................144

*Snell v. Tunnell*,
   920 F.2d 673 (10th Cir. 1990) ............................................................154

*Stewart v. Donges*,
   915 F.2d 572 (10th Cir. 1990) ....................................................149, 151

*Thompson v. Clark*,
   142 S. Ct. 1332 (2022)........................................................................148

*Tolan v. Cotton*,
   572 U.S. 650 (2014)............................................................................149

*Trujillo v. Bd. of Cnty. Comm'rs*,
   768 F.2d 1186 (10th Cir. 1985) ..........................................................156

*Truman v. Orem City*,
   1 F.4th 1227 (10th Cir. 2021) ....................................................138, 143

*United States v. $148,840 in U.S. Currency*,
   521 F.3d 1268 (10th Cir.2008) .............................................................27

*United States v. Buchanan*,
   891 F.2d 1436 (10th Cir. 1989) ..........................................................148

*United States v. Ochoa-Fabian*,
   935 F.2d 1139 (10th Cir. 1991) ..........................................................151

*United States v. Wade*,
   388 U.S. 218 (1967)............................................................................153

*Wilkins v. DeReyes*,
   528 F.3d 790 (10th Cir. 2008) ............................................................149

iv

## INTRODUCTION

Lamonte McIntyre spent over 23 years imprisoned for a double murder of which he is actually innocent. Discovery has produced overwhelming direct and circumstantial evidence that it was pervasive misconduct by KCKPD investigators, including in particular lead investigator Roger Golubski, that caused Lamonte's wrongful conviction. Golubski fabricated identifications from the only two witnesses to identify Lamonte McIntyre—Niko Quinn and Ruby Mitchell— and fabricated reports of the circumstances in which those identifications were obtained to falsely bolster them. He suppressed abundant exculpatory evidence, including that the best witness to the crime, Stacy Quinn, recognized the shooter, Monster, as a known killer for hire, and that other evidence demonstrated he was the real perpetrator.

It is unclear how Golubski will counter this evidence at trial, given that he has refused to answer any questions about his liability in this case, instead asserting his Fifth Amendment right to remain silent in response hundreds upon hundreds of times. But it is crystal clear that at this stage of this proceeding, he cannot dispute Plaintiffs' claims. It is the most basic rule of summary judgment that Plaintiff's evidence must be credited and all reasonable inferences drawn in their favor. *See, e.g.*, *Emmett v. Armstrong*, 973 F.3d 1127, 1135 (10th Cir. 2020) ("At trial, the factfinder will have to decide what to believe; at summary judgment, however, we are required to believe [Plaintiff] if the record supports him."). Golubski's brief never mentions this well-established rule, and instead consistently flouts it, for example ignoring direct evidence of his misconduct and seeking to draw tortured inferences from the evidence in his favor. He also repeatedly ignores this Court's prior rulings and binding Tenth Circuit law.

In short, there is absolutely no merit to Golubski's motion for summary judgment. It should be denied in full.

**RESPONSE TO GOLUBSKI'S
STATEMENT OF UNCONTROVERTED MATERIAL FACTS**

**<u>The Parties & Nature of Claim</u>**

1.      Plaintiff Lamonte McIntyre (Lamonte) was convicted in September of 1994 for the April 15, 1994, murders of Doniel Quinn and Donald Ewing.  Lamonte McIntyre spent twenty-three years in prison for the murders before being exonerated. (Doc. 562: Pre-Trial Order, Factual Stipulations ¶ 15)

**RESPONSE:** Uncontroverted with clarification. Lamonte was in prison for 23 years, 5 months and 28 days. (Doc. 562: Pre-Trial Order, Factual Stipulations ¶ 15).

2.      Roger Golubski (Golubski) is a former Detective for the Kansas City Kansas Police Department.  Roger Golubski was one of the detectives that investigated the April 15, 1994 murders. (Doc. 562: Pre-Trial Order, Factual Stipulations ¶ 2; Exhibit 1: Case File, LMKSDC_0003392-3395)

**RESPONSE:** Uncontroverted, but Plaintiffs deny that the material cited (Doc. 562: Pre-Trial Order, Factual Stipulations ¶ 2) supports this paragraph.  Answering further, Roger Golubski was the lead detective investigating the April 15, 1994 murders. Plaintiffs' Statement of Additional Material Facts (hereinafter referred to as "SAMF") ¶ 37.

3.      Rose McIntyre (Rose) is Lamonte's mother.  Rose alleges Golubski sexually assaulted her many years before the April 15, 1994, murders of which Lamonte was convicted. (Doc. 562: Pre-Trial Order, Plaintiff's Legal Claims, p. 43–44)

**RESPONSE:** Uncontroverted in part. The cited evidence does not state the time period for the alleged sexual assault, which occurred in the late 1980s. SAMF ¶ 328.

2

4.      Lamonte and Rose McIntyre's lawsuit generally alleges Lamonte was framed by Detective Golubski and others in the Kansas City Kansas Police Department. The lawsuit alleges that Detective Golubski's motive for framing Lamonte McIntyre was Rose declined his sexual advances. (Doc. 562: Pre-Trial Order, Plaintiff's Legal Claims, p. 43–44)

**RESPONSE:** Uncontroverted in part. Plaintiffs deny Defendant's characterization of Plaintiffs' allegations in this lawsuit regarding motive, as the cited evidence states that "Golubski used the Quinn/Ewing investigation as a mechanism to retaliate against Rose for refusing his continued sexual advances." However, Plaintiffs also allege that "[e]ither to protect the Brooks-Robinson drug gang, to frame Rose's son, Lamonte, in retaliation for her spurning his demands for a sexual relationship, to close the case quickly, because one eyewitness Ruby Mitchell believed the man she saw resembled a different man named Lamonte, or a combination of the above, Golubski fixated on Lamonte McIntyre." (Doc. 562: Pre-Trial Order, Plaintiff's Legal Claims, p. 9). Uncontroverted as to the remainder.

5.      Niko Quinn was the close cousin of one of the decedents, Doniel Quinn, and witnessed the murders on April 15, 1994. (Exhibit 1: Case File at LMKSDC_0003393, 3417–3419; Exhibit 2: Deposition of Niko Quinn, tr. 20:15–21)

**RESPONSE:** Uncontroverted with clarification that Niko Quinn did not have a direct view of the murders, as she was walking up Hutchings Street towards her mother's house at the time, did not pay the shooter mind as he came down the hill toward Hutchings Street, viewed the shooting at an angle, and could not make out the shooter's face due to the glare of the sun. SAMF ¶¶ 39–40.

6.     Niko Quinn lived at 3018 Hutchings, which was only a few doors down from where the shooting occurred. Niko Quinn had "few" drug houses at the time of the murders. (Exhibit 2: Deposition of Niko Quinn tr. 73:4–9, 30:4–33:14)

**RESPONSE:** Uncontroverted as to where Niko Quinn lived when the shooting occurred. The remainder of this paragraph is controverted, as the cited testimony states that Niko Quinn, along with others, was involved with several drug houses. Regardless, the portion of this allegation relating to "drug houses" is not material and is instead irrelevant.

7.     Niko Quinn lived with her kids and boyfriend Chris Jones, aka "C-Love" aka "The Grim Reaper." Like Niko Quinn, Chris Jones was also a drug dealer and was feared in the neighborhood. (Exhibit 3: Statement of Niko Quinn, LMKSDC0003417–3419, Exhibit 2: Deposition of Niko Quinn, tr. 29:9–30:10, 14:17–24, 47:4–19)

**RESPONSE:** Controverted in part as unsupported by Golubski Exhibit 3, and to the extent that it states Niko Quinn was feared in the neighborhood. Uncontroverted as to the remainder. Regardless, the portion of this allegation relating to Chris Jones being "a drug dealer" and being "feared in the neighborhood" is not material and is instead irrelevant.

8.     In April of 1994, Niko Quinn only dated and hung around big-time drug dealers. That was her "motto." (Exhibit 4: Transcript of Niko Quinn's DA Interview, tr. 35:5–36:6)

**RESPONSE:** Uncontroverted with clarification that this quote appears on Exhibit 4: Transcript of Niko Quinn's DA Interview, tr. 34:18. Also, this allegation relating to Niko Quinn's dating drug dealers is not material and is instead irrelevant.

9.     The big-time drug dealer she was dating on April 15, 1994, was Christopher Jones, also known as "C-Love" and the "Grim Reaper." (Exhibit 2: Deposition of Niko Quinn, tr. 14:17–24; 47:1–19, 27:14–29:4)

**RESPONSE:** Uncontroverted. Regardless, this allegation relating to "C-Love" and his nicknames is not material and is instead irrelevant.

10.     While there were other violent and big-time drug dealers in the Kansas City, Kansas area drug trade, even those other drug dealers feared C-Love, including Cecil Brooks. (Exhibit 2: Deposition of Niko Quinn, tr. 47:1–19)

**RESPONSE:** Uncontroverted with clarification that the evidence cited states that Cecil Brooks and "all of these guys" were scared of C-Love. Regardless, this allegation relating to Chris Jones being "a drug dealer" and being "feared" is not material and is instead irrelevant.

11.     C-Love utilized the Edgar Family—led by Neil "Ace" Edgar, Sr.—for his supplier of drugs, specifically Ace's daughter, Monita. (Exhibit 2: Deposition of Niko Quinn, tr. 34:19–35:19, 52:24–53:6)

**RESPONSE:** Controverted as unsupported by the cited evidence, which states only that Ace's daughter "dealt with C-Love." Regardless, this allegation relating to Chris Jones ("C-Love") and his drug suppliers is not material and is instead irrelevant.

12.     At one point, Niko Quinn accused Chris Jones of the murders. She was told the same by people in her family. (Exhibit 2: Deposition of Niko Quinn, tr. 116:9–23)

**RESPONSE:** Controverted. At some point Niko Quinn was told "by a family member or something they were saying that C-Love had did it." Niko Quinn did not remember whom she heard that from. When asked at her deposition whether she at any point in time thought that C-Love might have *something to do with* these murders Niko Quinn responded, "I accused him; but no, he didn't do it." (Ex. 2: Niko Quinn Dep. 116:9–23) (emphasis added). Additionally, Niko Quinn maintained that Monster was the true perpetrator. SAMF ¶¶ 75–78, 81, 204.

**Eyewitness Ruby Mitchell**

13.     At the time of the April 15, 1994 murders, Ruby Mitchell lived across the street

from where the murders took place (3020 Hutchings) and witnessed the shooting. (Exhibit 1:

Case File, Ruby Mitchell Statement at LMKSDC_0003421–3425)

**RESPONSE:** Controverted as Plaintiffs deny Defendant's characterization of Ruby

Mitchell's view of the shooting. Instead, Ruby Mitchell lived diagonally across the street, two

houses down from the shooting and had been standing in her doorway talking on the phone when

she viewed the shooting through a storm door with a screen. SAMF ¶¶ 105–106. She was unable

to see the shooter's facial features during the shooting. SAMF ¶ 107. The police failed to prepare

any scale diagram or photographs that would have documented the distance from witness

vantage points to the shooting. (Ex. 1: Entire Police File, LMKSDC_0003391–3500). Another

witness near Ruby was Bernard Crawford, who was standing on Niko Quinn's porch next door

next door to Ruby's house. Although Crawford's presence was known to the detectives and he

was endorsed as a witness for trial, they never made any attempt to interview him.  (Pl. Ex. 33:

WyCo District Ct. Case File, LMKSDC_0003501-3704). Crawford testified in his deposition

that he could not see who the shooter was: "[I]t was at such a distance, I don't think anyone in

my area could see who it was," adding: "No, I couldn't see. It was too far away." (Ex. 14:

Bernard Crawford Dep. 13:20-23; 15:12-18).

14.     Ruby Mitchell identified Lamonte as the shooter in the April 15, 1994, murders

twice in open Court. (Exhibit 5: Preliminary Hearing Transcript, tr. 9:5–14; Exhibit 6: Trial

Transcript, tr. 174:26–175:11, 208:2–8)

**RESPONSE:** Uncontroverted, with the clarification that every aspect of the

identification process was tainted with improper suggestion and coercive influence. Answering

further, according to Plaintiffs' expert in eyewitness identification, Dr. Jennifer Dysart, when a witness sees a photograph in multiple identification procedures or contexts, there is a risk this sense of familiarity on the part of the witness may lead to an increased likelihood of choosing that person and a feeling of increased confidence in subsequent identification procedures. SAMF ¶ 142. Further, if police suggestion occurred during the photo procedures—as Plaintiffs allege— "the subsequent identifications in court are of no value. There is no way to distinguish between the contaminated, unreliable identifications and the witnesses' actual memory of the events, and, therefore, no reliable way to assess whether the suspect was present at the crime." (Pl. Ex. 34: Expert Report of Jennifer Dysart p. 16); *see also* (Pl. Ex. 35: Dennis Ware Dep. 185:21–187:2) (agreeing that the concept that if police suggest a particular photo on one occasion, that suggestion will taint that witness's identifications down the line was "just common sense," and a basic policing concept understood by 1994).

15.     To date, Ruby Mitchell has not recanted her identification of Lamonte McIntyre as the shooter. In Ruby Mitchell's 2011 affidavit, which was procured by Lamonte McIntyre's investigator James McCloskey, she did not recant, but rather asked for forgiveness, "if I made a mistake in the identification of Lamonte McIntyre. (Exhibit 7: Deposition of James McCloskey, tr. 46:9–18, 120:17–22; Exhibit 8: Ruby Mitchell Affidavit, ¶ 13)

**RESPONSE:** Controverted. Ruby Mitchell's affidavit states "If I made a mistake in the identification of Lamonte McIntyre or the person who did this double homicide, I am truly sorry for this occurrence." (Ex. 8: Ruby Mitchell Aff. ¶ 13). However, Ruby Mitchell has testified she believed she was identifying Lamonte Drain. *See* Ex. 9: Ruby Mitchell Dep. 143:24-25 ("I thought I was selecting...Lamonte Drain."); *see also id.* at 126:22-127:14. Ruby testified that the shooter had "thick" or "fat" French braids "going to the back." (Ex. 9: Ruby Mitchell Dep.

7

21:10–22:7). She told police about the French braids but was never shown any photograph that depicted someone with French braids. (Ex. 9: Ruby Mitchell Dep. 46:16–47:21, 67:7–15). The only time Ruby Mitchell has ever spoken to Lamonte McIntyre she was sitting in the courthouse with her son's ex-girlfriend. According to Mitchell, "I didn't actually know who he was, I just recognized -- kind of recognized his face from everything that was going on, on the TV and all that. . .  And then I just got up and I walked over there and asked him was he Lamonte McIntyre. He said yes. And I gave him a hug and started crying. And he gave me a hug. And I was like, 'I'm sorry for what happened to you.' And that was it." (Ex. 9: Ruby Mitchell Dep. 144:25-145:3).

16.    Ruby Mitchell did not know or ever recall seeing Detective Golubski prior to April 15, 1994. Ruby Mitchell never saw or spoke with Detective Golubski again after April 15, 1994. (Exhibit 9: Deposition of Ruby Mitchell, tr. 124:15–125:8)

**RESPONSE:** Uncontroverted that these statements accurately reflect the testimony cited. However, Plaintiffs deny Defendant's characterization in Paragraph 16 that Ruby Mitchell did not know or speak to Detective Golubski before or after April 15, 1994. In approximately 1990, Jacqueline Poole saw a detective's vehicle parked in front of Ruby Mitchell's former residence near 63rd Terrace and State Avenue on a number of occasions. Poole saw a detective come and go from this vehicle and enter Mitchell's house three or four times. The detective always stayed just about thirty minutes then left, and his visits were always in the evening or at night. Poole later learned the detective visiting Mitchell was Detective Golubski. According to Poole, it was "obvious" that Detective Golubski was not investigating Mitchell, but was visiting her to obtain sexual favors. (Pl. Ex. 36: Jacquelyn Poole Aff. ¶¶ 2, 6, 8-9).

8

17.     Police, including Roger Golubski, did not suggest, intimidate, or otherwise influence Ruby Mitchell into identifying Lamonte McIntyre as Doniel Quinn and Donald Ewing's murders but she was told that if she saw anyone, she noticed to point them out, and that is what she did. She picked out who she thought was the guy that come down the hill to kill Doniel and Donald. (Exhibit 9: Deposition of Ruby Mitchell, tr. 59:14-21, 112:24–113:1); Exhibit 6: Trial Transcript tr. 174:23–175:11, 179:2–7, 195:16–196:15; 205:2–8; Exhibit 5: Preliminary Hearing, tr. 18:21–23; Exhibit 11: Ruby Mitchell Interview Recording)

**RESPONSE:** Controverted. Golubski created a coercive environment through the use of sexual intimidation while transporting her to the station to make an identification. SAMF ¶¶ 122–127. Additionally, Golubski and Krstolich used suggestion and coercion to have Mitchell choose McIntyre's photo from the lineup, including, among other tactics, showing two photo identification procedures both containing Lamonte McIntyre's photo and including Lamonte McIntyre's name on the back of a loose Polaroid. SAMF ¶¶ 139–165; Response to Golubski's Fact, ¶ 15. Golubski and Krstolich never documented Ruby's description that the shooter had French braids, nor did they show her any photographs of possible suspects with French braids. SAMF ¶¶ 130–131; (Ex. 9: Ruby Mitchell Dep. 46:16–47:21, 67:7–15). Krstolich and Golubski also made no effort to find the "Lamont" who had actually dated Ruby's niece, and they fed Ruby the last name of McIntyre to support their fabrication that Ruby had volunteered the shooter's last name. SAMF ¶¶ 158–171.   Additionally, Paragraph 17 is a legal conclusion regarding the issue at the heart of Plaintiffs' case, whether the Defendants improperly suggested or coerced Ruby Mitchell into identifying Lamonte McIntyre.

**Lamonte McIntyre's Investigator**

18.     James McCloskey was Lamonte's primary investigator for many years. Mr.
McCloskey took it upon himself to try to exonerate Lamonte and, in the process, conducted
numerous interviews and obtained numerous witness affidavits. (Exhibit 7: Deposition of James
McCloskey, tr. 10:4–15, 91:19–92:14)

        **RESPONSE:** Controverted in part. Uncontroverted that Mr. McCloskey conducted
numerous interviews and obtained numerous witness affidavits. Golubski mischaracterizes James
McCloskey's testimony, as the evidence cited does not support that Mr. McCloskey was
Lamonte's "primary investigator for many years" or that he "took it upon himself" to exonerate
Lamonte.

19.     McCloskey, believing the truth "evolves" over time, did not record most of his
interviews with most witnesses. (Exhibit 7: Deposition of James McCloskey, tr. 45:1–5)

        **RESPONSE:** Controverted. Golubski misstates the testimony. Mr. McCloskey states that
"the reason[] or one of the reasons" he doesn't record witness interviews is because in the cases
he investigates—innocence cases—"the truth comes out in bits and pieces and evolves over
time." (Ex. 7: James McCloskey Dep. 45:1-5). *See also* Ex. 12: James McCloskey Aff. ¶¶ 12,
25–27 (addressing challenges of innocence investigation in Kansas City, Kansas, where residents
fear the police, are mistrustful of the court system, and fear consequences of cooperating in
innocence cases).

20.     McCloskey made approximately 19 trips to Kansas to interview over a hundred
people. (Exhibit 12: Affidavit of James McCloskey, ¶ 11; Exhibit 13: Exoneration Hearing
Transcript, 103:19–104:2; Exhibit 7: Deposition of James McCloskey tr 72:12–17)

**RESPONSE:** Uncontroverted with clarification that the cited evidence states that Mr. McCloskey made "more than 15 trips to Kansas City," (Ex. 12: James McCloskey Aff. ¶ 11) and that he interviewed "approximately" "100 or so people" (Ex. 7: James McCloskey Dep. 72:12–17). Additionally, McCloskey began his investigation in 2009 and was still working on the investigation seven years later in June 2016. (Ex. 12: James McCloskey Aff. ¶ 11).

21.      McCloskey, who is not an ordained minister or priest, wore a priest collar when he would interview witnesses. (Exhibit 7: Deposition of James McCloskey, tr. 127:9–128:6)

**RESPONSE:** Controverted. Golubski misstates the testimony. The cited evidence states only that Mr. McCloskey would wear a priest collar "on occasion…in the early part of the investigation" in this case and no witness in this case has testified that McCloskey wore a priest collar during their interviews.  McCloskey, though he chose not to be ordained, did earn a Master's degree from a Presbyterian Divinity School. (Ex. 7: James McCloskey Dep. 127:9–20).

22.      One of the first things McCloskey did was find and interview Ruby Mitchell, he recorded that interaction. (Exhibit 13: 2017 Exoneration Hearing, tr. 104:3–23; Exhibit 7: Deposition of James McCloskey tr. 43:13–44:13)

**RESPONSE:** Uncontroverted.

23.      At least two witnesses in this case have accused McCloskey of coercive, intimidating, suggestive, and/or harassing tactics. (Exhibit 14: Deposition of Bernard Crawford, tr. 21:4–24:21, Exhibit 15: Deposition of Joe Robinson, tr. 111:12–117:7)

**RESPONSE:** Controverted. Golubski misstates the testimony. Neither Mr. Crawford nor Mr. Robinson ever accused Mr. McCloskey of the tactics stated above. Robinson testified that he stopped talking to Mr. McCloskey because he brought a former FBI agent with him. (Ex. 15: Joe Robinson Dep. 111:5-8). Crawford testified that he was addicted to drugs at the time, and that

11

Mr. McCloskey was "a little disappointed" that he could not make an identification and that he was "a little loud" (Ex. 14: Bernard Crawford Dep. 23:4, 23:24). The only time "intimidation" is mentioned in the cited testimony is when Golubski's own counsel raised it, asking Mr. Crawford if he felt as Mr. McCloskey was "trying" to intimidate him, to which Mr. Crawford testified "I do. Intimidate *or embarrass.*" *Id.* at 23:16-18 (emphasis added).

**Murder Victim Doniel Quinn**

24.     One of the victims in the April 15, 1994 slaying was Doniel Quinn, who was a close cousin of Niko Quinn. Doniel Quinn had a drug addiction and, according to Lamonte's lead investigator, was a known drug addict and "scandalous"—meaning that he would steal to feed his addiction, including from his family. (Exhibit 2: Deposition of Niko Quinn tr. 33:25–34:3; Exhibit 7: Deposition of James McCloskey, tr. 101:4–17. Doing any kind of robbing or stealing in the drug business was "very dangerous." Joe Robinson Aff. ¶ 14.

     **RESPONSE:** Uncontroverted.

25.     Doniel Quinn also worked for another drug dealer who was close in proximity to one of Niko Quinn's drug houses. (Exhibit 4: Transcript of Niko Quinn's Meeting with District Attorney, tr. 1:23–2:15, Exhibit 2: Deposition of Niko Quinn, tr. 11:18–12:15, 142:14–17)

     **RESPONSE:** Controverted. Unsupported by the evidence cited. Further, whether "another drug dealer…was close in proximity" to Niko Quinn is not material and is instead irrelevant. *See supra,* Plaintiffs' Response to Golubski's SOF, ¶ 6.

26.     Doniel Quinn worked in the drug trade as a doorman for a drug house that was not run by Niko Quinn or Chris Jones aka "C-Love" but would occasionally bring customers to one of Niko's houses to sell drugs. (Exhibit 2: Deposition of Niko Quinn, tr. 142:14–17)

12

**RESPONSE:** Uncontroverted in part, as the allegation that Niko Quinn "had" drug houses is controverted and not supported by the evidence cited. *See supra,* Plaintiffs' Response to Golubski's SOF, ¶ 6.

### Doniel's Purported Debt for Stealing Drugs

27.     Niko Quinn, Doniel's cousin, testified that a week or so before Doniel's murder, he had been beaten up by Aaron Robinson, Monster, and five others for being believed to have stolen drugs from one of their drug houses. (Exhibit 2: Deposition of Niko Quinn tr. 40:21–46:13)

**RESPONSE:** Uncontroverted.

28.     According to Niko, she sent her sister and her then-boyfriend, C-Love, to try to pay the debt—$4,000, which Niko had and was ready and willing to pay—but the offer was not accepted. (Exhibit 2: Deposition of Niko Quinn tr. 40:21–46:13)

**RESPONSE:** Uncontroverted with clarification that the cite to Niko Quinn's testimony should extend be tr. 40:21-46:25.

29.     The night before Doniel was murdered, Aaron Robinson, Cecil Brooks, and Neil Edgar, Jr. (aka "Monster") stopped Doniel while he was walking with Niko and several others in between Niko's drug houses. Niko alleges C-Love pulled Doniel out of the car. (Exhibit 2: Deposition of Niko Quinn tr. 50:7–51:18; Exhibit 4: Transcript of District Attorney Interview, tr. 1:16–5:10)

**RESPONSE:** Uncontroverted in part as the allegation that the drug houses were Niko's is controverted and not supported by the evidence cited. *See supra,* Plaintiffs' Response to Golubski's SOF, ¶ 6.

**The April 15, 1994 Murders and Subsequent Investigatory Efforts**

30.     On April 15, 1994, around 2:00 p.m., a man walked down the hill from Hiawatha Street to a blue vehicle parked on Hutchings Street in Kansas City, Kansas, and fired numerous shotgun blasts into the car killing its occupants—Doniel Quinn and Donald Ewing. (Doc. 562: Pre-Trial Order, Factual Stipulations ¶ 5)

**RESPONSE:** Uncontroverted with clarification that the cited evidence states "On April 15, 1994, Doniel Quinn and Donald Ewing were shot while they sat in the front seat of a parked car on Hutchings Street, in Kansas City, Kansas by a lone assailant who fired a shotgun at least 4 times."

31.     The time police arrived at the scene, Stacy Quinn—Niko's sister who also witnessed the shooting—had left. She was not there. (Exhibit 16: Hearing on Motion for New Trial, tr. 28: 10–22)

**RESPONSE:** Controverted. Stacy Quinn witnessed the shooting, which occurred across the street from her house, and remained in the area of the scene of the crime following the shooting. (Ex. 16: Hearing on Motion for New Trial 13:24-14:3); SAMF ¶¶ 192–193.

32.     Stacy Quinn testified in a 1996 hearing that she left the area immediately after the shooting because she was hurting and mad. (Exhibit 16: Hearing on Motion for New Trial, tr. 28: 10–22)

**RESPONSE:** Controverted. Stacy Quinn remained in the area of the scene of the crime following the shooting. SAMF ¶¶ 192–193. The cited evidence states only that Ms. Quinn was "hurt". She testified that she was mad "after we went to the hospital." (Ex. 16: Hearing on Motion for New Trial 28:24-25). Stacy Quinn also testifies she was in the Kansas City, Kansas

14

area numerous times from 1994 to 1996 when she saw the shooter on the streets. (Pl. Ex. 38: Stacy Quinn 1996 Aff. ¶ 7).

33.     Stacy Quinn "stayed out" and did not go back home for a long time after the murders, instead, she was doing drugs to cope, around four times a day. (Exhibit 16: Hearing on Motion for New Trial, tr. 33:5–11)

**RESPONSE:** Plaintiff denies Defendant's characterization of Stacy Quinn's testimony. Stacy Quinn, when asked to describe her drug usage after the shooting, stated it was "about three times out of the weeks that I been out there," and that "I just stayed out there after that, I didn't come back home." Further, the cited testimony from Ms. Quinn is at Ex. 16: 33:5-16. *See also* Plaintiffs' Response to Golubski's SOF, ¶¶ 32–33.

34.     On April 4, 1996, at the hearing for New Trial, Stacy Quinn testified that she did not speak with police because she was messed up and on drugs at the time.  (Exhibit 16:  Hearing on Motion for New Trial, tr. 18:17–22)

**RESPONSE:** Uncontroverted that Stacy Quinn testified she was "messed up" and "on drugs" immediately following the Quinn/Ewing homicides because she "seen it so good that this just messed [her] up for a while." (Ex. 16: Hearing on Motion for New Trial, 18:17-20:2.) Controverted to the extent Paragraph 34 infers that Stacy Quinn was on drugs at the time of the shooting, as Stacy testified that she was not on drugs and had a "clear mind" when she witnessed the murders. *Id.* Additionally, Stacy Quinn "believe[d] that the shooter saw [her] on April 15, 1994 when he committed the double homicide." (Pl. Ex. 38: Stacy Quinn 1996 Aff. ¶¶ 7–8). Additionally, Golubski knew Stacy Quinn well; he had an ongoing relationship with her since she was a teenager from the mid-1980s through 2000, in which he paid her for sex. (Ex. 10: Niko Quinn 2014 Aff. ¶ 27); (Ex. 2: Niko Quinn Dep. 12:10–15, 82:9–13; 171:22–173:10, 177:19–

15

178:8; (Ex. 17: Freda Quinn 2011 Aff. ¶19–20); (Pl. Ex. 39: Freda Quinn 2016 Aff. ¶ 6); (Pl. Ex. 40: D.L.[1] 2014 Aff. ¶ 10); (Pl. Ex. 37: Joe Robinson Aff. ¶¶ 20, 22); (Ex. 4: Niko Quinn DA Interview 36:10–17); (Pl. Ex. 41: Roger Golubski Dep. 189:17–190:21).

35.     Approximately forty-six minutes after the shooting, Niko Quinn gave a recorded statement to Detective W.K. Smith.  In her statement, Niko Quinn said she saw the shooting but didn't recognize the shooter. (Exhibit 1: Case File at LMKSDC003417-3419)

**RESPONSE:** Uncontroverted. Smith failed to record Niko Quinn's description of the shooter's physical features aside from his clothing; or he failed to ask her for a more detailed description of the shooter in the first place. He also failed to ask Niko Quinn or failed to record where she had been standing when she saw the perpetrator. (Ex. 1: Case File at LMKSDC_0003417-3419); (Pl. Ex. 42: W.K. Smith Dep. 332:3-333:8). At his deposition Smith could not think of any legitimate police reason not to have asked Niko Quinn for a physical description of the man she had just seen shoot the victims at close range. (Pl. Ex. 42: W.K. Smith Dep. 337:4-11)

36.     Niko Quinn began to give her statement to officer W.K. Smith at the scene of the crime but her family and her boyfriend, Chris Jones, told her to stop talking. (Exhibit 2: Deposition of Niko Quinn, tr. 72:9–14; 67:10–17; 131:1–6)

---

[1] In accordance with the Pretrial Order, the initials of alleged victims of sexual assault are used herein but the names of those individuals are known to the parties. *See*  Doc. 562: Pre-Trial Order, Factual Stipulations ¶ 15. Further, only the redacted versions of certain affidavits and depositions (Plaintiffs' Exhibits 40, 44, 45, 47, 48, 49, 54, 55, 75, 76, 80, and 82) are attached as exhibits to this Motion in compliance with the Protective Order entered in this case (Doc. 124). However, if the Court should want copies of the unredacted versions of these affidavits, Plaintiffs will provide them.

**RESPONSE:** Controverted. Niko Quinn testified that her answer "no" to the question "whether or not people in the Cadillac, your cousin included, were having any difficulties with anyone?" was not truthful "because my family was sitting there telling me don't say nothing, let's go." (Ex. 2: Niko Quinn Dep. 72:9–15). Although Chris Jones was someone who told Niko not to talk to police in general, he was not present when Niko Quinn gave her statement to officer W.K. Smith at the scene of the crime and is not mentioned in the police file. (Ex. 2: Niko Quinn Dep. 66:23-67:17); *see generally* Ex. 1.

37.     Before she was told to stop talking to police, Detective Smith asked her if Doniel had any trouble with anyone. Niko said "no," which Niko now admits was a lie. (Exhibit 3: Niko Quinn Witness Statement; Exhibit 2: Deposition of Niko Quinn, tr. 51:11–52:1; 72:9–14.)

**RESPONSE:** Uncontroverted in part, as Niko Quinn testified that her answer "no" to the question "whether or not people in the Cadillac, your cousin included, were having any difficulties with anyone?" was not truthful "because my family was sitting there telling me don't say nothing, let's go." (Ex. 2: Niko Quinn Dep. 72:9–15). *See* Plaintiffs' Response to Golubski's SOF ¶ 36.

38.     The culture at that time, at least in Niko Quinn's eyes, was not to cooperate with the police. (Exhibit 2: Deposition of Niko Quinn, tr. 72:9–18)

**RESPONSE:** Uncontroverted that Niko Quinn testified "yes" when asked whether "that was kind of the culture at the time was don't talk to the police?" (Ex. 2: Niko Quinn Dep. 72:16–18).

39.     Niko Quinn also told Detective Smith, and later testified twice in Court that she had never seen the shooter before that day. (Exhibit 3: Niko Quinn Statement, LMKSDC0003417–3419, Exhibit 6: Trial Transcript, tr. 143:9–16)

17

**RESPONSE:** Uncontroverted that Niko Quinn told Detective Smith she had never seen the shooter before that day and testified in Court both that she had never seen the man she identified in court as the shooter, Lamonte McIntyre, before April 15, 1994 nor since April 15, 1994.

40.     Niko Quinn's closest aunt, Freda Quinn, came to the scene of the shooting minutes after it happened. (Exhibit 2: Deposition of Niko Quinn, tr. 20:1–8, Exhibit 17: Affidavit of Freda Quinn, ¶ 5)

**RESPONSE:** Uncontroverted.

41.     Niko told her Aunt Freda Quinn that she (Niko) had seen the shooter, knew him from school, and knew who he was. (Exhibit 17: Affidavit of Freda Quinn, ¶ 9; Exhibit 18: Deposition of Freda Quinn, tr. 38:16–39:2)

**RESPONSE:** Uncontroverted that these statements accurately reflect the testimony cited by Freda Quinn. However, when asked whether Niko Quinn told Freda Quinn she recognized the shooter from school, Niko referenced her emotional upset and responded: "I might have. I could have said anything that day. I don't remember." (Ex. 2: Niko Quinn Dep. 70:3-6).

42.     The evening of the shooting, a news report on television stated that someone had been arrested for the double murder and a picture was flashed on the television screen.  Niko Quinn said something to the effect of "they got the wrong guy." (Exhibit 17: Affidavit of Freda Quinn, ¶ 8; Exhibit 18: Deposition of Freda Quinn, tr. 40:18–24)

**RESPONSE:** Uncontroverted that these statements accurately reflect the testimony cited by Freda Quinn. However, when asked about this exact issue, Niko Quinn testified that she saw the photo of Lamonte McIntyre's photo on the news "maybe a couple days later." When asked about Freda Quinn's testimony that Niko Quinn saw the newscast the day of the shooting, Niko

18

Quinn clearly stated, "it wasn't the day of the shooting" and that she knew "it wasn't that night because they didn't look at no TV" that night. (Ex. 2: Niko Quinn Dep. 145:12-146:14); *see also* (Ex. 2: Niko Quinn Dep. 73:14–74:23).

43.     The evening Lamonte was arrested (April 15, 1994), Tiffany Daniel told Niko Quinn that "Monster" committed the murders. (Exhibit 4: Transcript of Niko Quinn Interview with District Attorney, tr. 43:13–22)

**RESPONSE:** Controverted. Niko Quinn states that Daniel told her "that Lamonte didn't do it, she said Monster did it" a "couple of days after" the shooting took place. SAMF ¶ 75.

44.     Niko Quinn admitted in a 1996 affidavit that she knew Lamonte McIntyre even though she testified in court that she had never seen Lamonte McIntyre before the shooting. (Exhibit 19: 1996 Niko Quinn Affidavit, ¶ 11; Exhibit 2: Deposition of Niko Quinn, tr. 87:23–88:3)

**RESPONSE:** Controverted. Niko Quinn's 1996 Affidavit states that "One of the pictures was of LaMont [sic] McIntyre and the other one was someone I didn't know. It was the two pictures causing confusion, I knew LaMont." (Ex. 19: Niko Quinn 1996 Aff. ¶ 11). Niko Quinn was asked about this statement from her affidavit in her deposition and clarified that the statement was accurate, but "wasn't that day," and that she knew Lamonte only "because I seen the name on the picture. I didn't know Lamonte personally….Then seeing him on the news." (Ex. 2: Niko Quinn Dep. 87:1–88:3).

45.     Niko told the District Attorney in 2017 that she knew Neil Edgar, Jr. from her childhood, and saw him the night before trying to lure Doniel into his vehicle. (Exhibit 2: Deposition of Niko Quinn, tr. 1:23–5:6; Exhibit 2: Deposition of Niko Quinn, tr. 71:24–72:8)

19

**RESPONSE:** Controverted in part. The cited testimony states only that Niko Quinn saw Neil Edgar, Jr. the night before the shooting "sitting in the car" and "had not seen Monster since we were younger."

46.    Niko Quinn told James McCloskey that Monster went to Robert and John Quinn's house with a shotgun with the message "keep your mouth shut." Robert and John Quinn communicated this to Niko Quinn.  (Exhibit 7: Deposition of James McCloskey, tr. 61:7–12)

**RESPONSE:** Uncontroverted in part, as the evidence cited does not state who communicated the above incident to Niko Quinn.

**<u>Ruby Mitchell Says the Shooter Looked Like a "Lamonte"</u>**

47.    Detective Krstolich interviewed Ruby Mitchell and, when she indicated she would recognize the shooter if she saw him again, he asked her to go with him to the police station to prepare a composite sketch. (Exhibit 1: Case File at LMKSDC003441–3442; Exhibit 6: Trial Transcript, tr. 277:5–22)

**RESPONSE:** Uncontroverted that these statements accurately reflect the testimony of Detective Krstolich and the police report cited.

48.    The officers allowed Ruby Mitchell the flexibility to go to the station later so she could tend to her children. (Exhibit 1: Case File at LMKSDC0003422)

**RESPONSE:** Uncontroverted that Ruby Mitchell retrieved her children from school after witnessing the crime, and hours later was driven to the police headquarters by Detective Golubski. During that drive, Detective Golubski made unsettling comments of a sexual nature to her. (Ex. 8: Ruby Mitchell Aff. ¶¶ 5, 14-16); SAMF ¶¶ 122–127.

20

49.     Krstolich worked with Ruby Mitchell to prepare a composite. After which, Ruby told Detective Krstolich of the name "Lamonte." (Exhibit 1: Case File at LMKSDC003441–3442)

**RESPONSE:** Uncontroverted that Ruby Mitchell prepared a composite of the shooter. The remaining statements are controverted. When Mitchell arrived at the station, Krstolich and Golubski interviewed her and she told them that the shooter looked exactly like her niece's former boyfriend whose first name was Lamont, because both the shooter and the Lamont she knew had French braids. Then, Krstolich then asked Mitchell to help develop a composite of the shooter. SAMF ¶¶ 128–138. Additionally, the composite was a highly unusual mechanism to employ when the witness had already identified a specific person as the shooter. SAMF ¶ 137.

50.     After Ruby Mitchell told Krstolich of the name "Lamonte" she agreed to look at photographs to try to identify a suspect.  (Exhibit 6: Trial Transcript, tr. 170:17–20; 280:10–18)

**RESPONSE:** Controverted. Mitchell told Krstolich and Golubski that the shooter looked exactly like her niece's former boyfriend whose first name was Lamont, because "the person that did the shooting had French braids… the same as the hairstyle of this Lamont who dated my niece." (Ex. 8: Ruby Mitchell Aff. ¶¶ 8-9); SAMF ¶¶ 128–130. Afterward, Krstolich then asked Mitchell to help develop a composite of the shooter.  (Ex. 9: Ruby Mitchell Dep. 56:14-57:18); SAMF ¶¶ 52–53; (Ex. 1: Case File, Krstolich Investigative Addendum, April 15, 1994, LMKSDC_0003442). After viewing the composite, Ruby Mitchell realized the sketch did not look like the Lamonte she knew. Then, Krstolich and Golubski compiled a five-photograph array containing a 1992 picture of Lamonte McIntyre, a photograph of Lamonte's brother, James McIntyre, and a photograph of Lamonte's cousin, Terrence Brown, for Mitchell to view. (Ex. 6: Golubski TT 170:12-20); (Ex. 11: Ruby Mitchell Audio Recording of Stmt.); SAMF ¶¶ 55–59.

21

51.     Around 6:00 p.m. on April 15, 1994, Ruby Mitchel, an eyewitness to the shooting who called police, chose Lamonte McIntyre out of a stack of polaroid photographs, identifying him as the shooter. (Exhibit 1: Case File at LMKSDC0003421-3425, 3441–3441)

**RESPONSE:** Controverted. The cited material does not accurately document or reflect the process that resulted in Ruby Mitchell identifying Lamonte McIntyre as the shooter. Mitchell was not informed that the actual perpetrator may or may not be present, but rather was asked, during the taped portion of the interview, if she saw the shooter among the photographs. There is no contemporaneous audio or video recording of the identification of Lamonte McIntyre. (Pl. Ex. 34: Dysart Report p. 4). Further, the cited materials only reflect that Krstolich reported *after the alleged photo array and identification took place* that Ruby Mitchell "has made a positive identification of the party. She thought she knew him and know she knows she is positive that she did see the shooter and she knew who he was," and that Ruby Mitchell picked out the picture of the Lamont who "used to talk to my niece." (Ex. 1: Case File LMKSDC_0003421-3425). Ruby Mitchell testified at trial that she did not know Lamonte McIntyre and did not provide police with his last name, but instead "learned" that information after her off-the-record identification. (Ex. 6: Ruby Mitchell TT 180:15-23); (Ex. 8: Ruby Mitchell Aff. ¶ 7.)

**Detectives Barber and Maskill developed the suspect's name, Lamonte McIntyre**

52.     Detectives Dennis Barber and Tim Maskill worked with their sources to see if they could develop any leads and "numerous sources" and "street talk" informed them of the name "Lamonte McIntyre" as the shooter. (Exhibit 1: Case File at LMKSDC003433–3436 at 3434, LMKSDC003453; Exhibit 6: Trial Transcript, tr. 301:9–18, 306:15–25)

**RESPONSE:** Controverted. Defendants have never identified any particular "source" from which the name "McIntyre" allegedly came. Instead, Golubski Exhibit 1 states only that

Detective Maskil "ascertained some information" regarding the suspect's *first* name of Lamonte. Further, Detective Maskil did not create a report regarding his investigative activities on the Quinn-Ewing homicide, and instead his partner, Detective Blood documented both of their investigations in an Investigative Addendum. See Ex. 1 at LMKSDC_0003443-3446. Blood's report documents that he and Maskil went from the crime scene directly to Bethany Medical Center, and from Bethany Medical Center directly to K.U. Medical Center, where they met with a KARE Technician from the Kansas City, Kansas Fire Department, interviewed a cousin of the victim, observed Don Quinn's body in the Emergency Room, and consulted with Emergency room staff regarding Mr. Quinn's injuries. (Ex. 1: Blood Investigative Addendum, LMKSDC_0003443-3446). According to the transcript of her audiotaped interview, Ruby Mitchell had selected Lamonte McIntyre's photograph by 17:58 hours. *Id.* LMKSCD_0003424.

Blood's report documents two phone calls handled by Detective Maskil: one with Sharon Bennett, a relative of Doniel Quinn, from whom "Detective Maskil was unable to obtain any useful information," and one with Mrs. Cinderella Quinn, the grandmother of Mr. Quinn, who "was unable to offer any information as to Don's address or date of birth. She indicated that none of the family was available at this time and she had no idea where they were at but she would have them make contact with either Det. Maskil or Sgt. Blood for additional information." Blood's report documents information received from six individuals he or Detective Maskil spoke with after leaving the crime scene on the afternoon of April 15, none of which document he or Detective Maskil obtaining any information about the identity of the shooter. Blood's report concludes: "There is nothing to add to this report at this time. At the orders of Lt. Culp the case has been turned to Det.'s W.K. Smith and Roger Golubski for further investigation." *Id.* LMKSDC_0003446.

23

In the first cited excerpt from Golubski Exhibit 6 (Ex. 6A: TT 301:9–18), Prosecutor Morehead represents to the Court that Lieutenant Barber "was the one that was told this information and that information then got back to the other detectives and that's how the name and the photograph was pulled. It was from street talk that the name Lamonte McIntyre came up." Golubski never testifies that Barber or Maskil worked with any sources. Although Barber testified at trial that he obtained the name of Lamonte McIntyre "from numerous sources," these sources were never identified, are not documented in the police file, and are not mentioned in his taped statement to Detective Golubski after Lamonte's arrest. (Ex. 6A: Barber TT 353:7–14); (Ex. 1: LMKSDC_0003433-3435. In reality, Lamonte McIntyre was innocent, SAMF ¶¶ 22–27, and the actual street talk was that Monster committed the crime, SAMF ¶ 20. When Lamonte was arrested, people in the streets "knew it was the wrong guy. It was somebody we never heard of." (Pl. Ex. 37: Joe Robinson Aff. ¶ 19).

In the second cited excerpt (Ex. 6A: TT 306:15–25), Golubski is asked "How did you get the name Lamonte McIntyre, Detective?" answering "Through other police personnel and other sources that may have pertinent information." On the next page, which Golubski does not cite, he represents to the Court that he actually got Lamonte McIntyre's "name and photograph" from an Assistant D.A. in the juvenile department. (*Id.* 307:5-10) Golubski's Investigative Addendum documents that after Golubski learned the first name "Lamonte," "with the assistance of Victoria Meyers of the District Attorney's Office," and afterward, "a picture was produced of a Lamonte McIntyre." *Id.;* LMKSDC_0003453. When asked at his deposition whether he lied when he claimed that he showed Lamonte McIntyre's photo to Ruby Mitchell because a confidential informant had provided his name, to bolster Mitchell's false identification, Golubski invoked his Fifth Amendment right to remain silent. (Pl. Ex. 41: Roger Golubski Dep. 127:14–129:6,

24

131:14–22, 135:20–137:4, 171:3–9). Now, Golubski asserts that he took the photos of Lamonte

McIntyre from Robert Goddell, a detective who investigated an unrelated case wherein Lamonte

McIntyre was a suspect. (Doc. 582, at 9–10, ¶¶ 52–55).

       Additionally, Detective Krstolich further contradicts the above statements by Defendants,

as he testified that the name "Lamonte McIntyre" came up when "Miss Mitchell called around

until she found out the name of the Lamonte. I believe that's what she did." (Ex. 6: TT 280:24-

281:20). Golubski also states in his report a "fact" that is claimed nowhere else—that Ms.

Mitchell "knew the suspect because she used to date his cousin." (Ex. 1: Golubski 4/15/1994

report p. 2, LMKSDC_0003453). This "fact" is obviously different than a claim that the suspect

used to date Ms. Mitchell's niece and reflects yet another fabrication.

       At his deposition in this case, Defendant Smith testified that he had never in his career

solved a case via information on the street within hours of a homicide and described that as

"different," in other words, not the way things work in the real world. (Pl. Ex. 42: W.K. Smith

Dep. 356:9-23.)

       53.    Dennis Barber was directly responsible for obtaining the name Lamonte

McIntyre. (Golubski Exhibit 6: Trial Transcript tr. 353:7–10)

       **RESPONSE:** Controverted. *See supra* Plaintiffs' Response to Golubski's SOF, ¶ 52.

There is no documentation to support this fact.  Further, Golubski's documentation and

representations to the Court at trial contradict Paragraph 53. (Ex. 1: Case File

LMKSDC_0003453); (Pl. Ex. 42: W.K. Smith Dep. 356:9-23). Also, Golubski did not submit

the above cited page of the trial transcript as part of Golubski Exhibit 6. Regardless, the

transcript of the audiotaped statement Golubski took from Defendant Barber states only that

Barber indicated to Rose McIntyre at the time of Lamonte McIntyre's arrest that "there had been

some street talk, wherein Lamonte McIntyre had been named as a suspect in a felony crime;" Defendant Barber does not state he actually received that information. (Ex. 1: Case File at LMKSDC_0003434). Neither Golubski's Investigative Addendums nor Detective Krstolich's Investigative Addendum indicate that either officer received information from Lt. Barber about street talk indicating Lamonte McIntyre was responsible for the crimes. *Id.* at LMKSDC_0003452-3456; LMKSDC_0003441-3442. Indeed, Detective Golubski's "Prosecution Summary" created on 4/16/94 states only that Lt. Barber can testify to remarks made by Lamonte and Rose McIntyre. *Id.* at LMKSDC_0003393-3394.

54.     Detectives worked to put a photo array together that included a photograph of Lamonte McIntyre. (Exhibit1: Case File at LMKSDC003453)

**RESPONSE:** Controverted. The cited material does not reflect that Detectives worked to put a photo array together, but instead states that "With the assistance of Victoria Meyers of the District Attorney's Office, a picture was produced of a Lamonte McIntyre. A photo line-up was comprised and was shown to Ms. Mitchell." Additionally, Detective Golubski was the lead investigator. (Ex. 6A: TT 295:10-12).

55.     The photograph of Lamonte McIntyre and two others were taken from a file relating to a prior arrest involving an armed robbery in which Robert Goddell was the investigating detective.  Lamonte McIntyre eventually pleaded guilty to involvement in an armed robbery.  The back of the photos bears the initials of Robert Goddell—RG. (Exhibit 20: Documents from Armed Robbery Arrest; Exhibit 21: Mark Songer Report)

**RESPONSE:** Controverted. Also, this fact is not material and is instead irrelevant. Further, Mark Songer's report only analyzes the handwritings of Detectives Roger Golubski and Robert Goddell, it does not support, nor does it even mention, that the referenced photographs

26

were taken in connection with a prior arrest. *See* Ex. 21. Additionally, no document cited by

Defendant in Paragraph 53 supports that Lamonte McIntyre pled guilty to involvement in an

armed robbery. Additionally, Plaintiffs object to Golubski Exhibit 20 in its entirety, as it contains

only inadmissible hearsay and information irrelevant to the case at hand.

**Ruby Mitchell Identifies Lamonte's Photo**

56.     All three photographs taken by Robert Goddell were used in the set of photos

shown to Ruby Mitchell. The other two photos shown to Ruby Mitchell came from Detective

Golubski's collection of photos of individuals he had interacted with on the job. (Exhibit 21:

Mark Songer Report)

**RESPONSE:** Controverted and also irrelevant. Mark Songer's report only analyzes the

handwritings of Detectives Roger Golubski and Robert Goddell, it does not support, nor does it

even mention, that Robert Goddell took the three photographs referenced, and does not establish

the source of the remaining two photographs that allegedly "came from Detective Golubski's

collection of photos."  Plaintiffs further object to this Paragraph as an improper attempt to waive

Golubski's Fifth Amendment privilege in this action. "[T]o prevent a party from converting the

Fifth Amendment privilege from its intended use as a shield against compulsory self-

incrimination into an offensive sword," "a district court may strike conclusory testimony if the

witness asserts the Fifth Amendment privilege to avoid answering relevant questions, yet freely

responds to questions that are advantageous to his cause." *S.E.C. v. Smart*, 678 F.3d 850, 854

(10th Cir. 2012) (quoting *United States v. $148,840 in U.S. Currency*, 521 F.3d 1268, 1277 (10th

Cir.2008). Indeed, here, Defendant Golubski has repeatedly invoked his Fifth Amendment right

to remain silent throughout discovery in response to Plaintiffs' questions and discovery, and has

not formally withdrawn that invocation or voluntarily waived it. Accordingly, because the only

basis for Paragraph 56 is Golubski's own personal knowledge, not materials in the record, it should be stricken. *Myers v. Brewer*, No. 17-2682-CM, 2019 WL 7293584, at *3 (D. Kan. Dec. 30, 2019) (citing *S.E.C. v. Smart*, 678 F.3d 850, 855 (10th Cir. 2012)).

57.    When shown several photos, Ruby Mitchell easily picked Lamonte McIntyre as the assailant. (Exhibit 22: Audio Recording of Ruby Mitchell Regarding Quick Identification)

**RESPONSE:** Controverted. Ruby Mitchell described the assailant to police as having "French braids," and Golubski and Krstolich never showed Ruby any photos of suspects with French braids. (Ex. 9: Ruby Mitchell Dep. 21:10-22:1, 28:8-20). Also, when Golubski drove Mitchell to the police station, prior to the identification procedure, Golubski sexually harassed and inappropriately touched her, making Mitchell nervous and uncomfortable and after which Mitchell was worried Golubski would arrest her. SAMF, ¶¶ 122-127.  Golubski and Krstolich failed to appropriately document the multiple photo procedures they conducted with Ruby Mitchell. Because they showed Mitchell at least one photo lineup in addition to the one five loose photographs they showed to both Mitchell and Niko Quinn, and each contained a photo of Lamonte McIntyre, they risked tainting the identification. Additionally, because a six-photo array shown to Mitchell was never documented, it is undetermined whether that lineup was suggestive. Despite audio-recording interviews with Mitchell before and after the identification procedure, Golubski and Krstolich failed to record the photo identification procedure itself. Lamonte McIntyre's name was also on the back of the Polaroid that was handed loose to Mitchell. The fact that Mitchell provided Lamonte McIntyre's last name – a man she did not know – reflects the taint in the identification procedures.  When asked whether he used improper suggestion and pressure to get Mitchell to choose Lamonte McIntyre's photo, Golubski invoked his Fifth Amendment right. When asked whether he lied in his written report that Mitchell chose

Lamonte McIntyre's photo without suggestion and coercion, he also invoked the Fifth

Amendment. SAMF ¶¶ 139–157.

58.       The police, on April 15, 1994, did not show Ruby Mitchell a photograph of the

Lamonte her niece dated, Lamonte Drain aka Anthony Lewis. (Exhibit 23: Audio Recording of

Ruby Mitchell Interview Regarding Not Seeing Lamonte Drain photo).

**RESPONSE:** Uncontroverted.

**Lamonte's arrest and inconsistent alibi statements**

59.       After Ruby Mitchell identifies Lamonte McIntyre as the shooter, the police

department's efforts turn to finding and arresting Lamonte. This effort was spearheaded by Lt.

Dennis Barber. (Exhibit 6: Trial Transcript, tr. 353:23–25)

**RESPONSE:** Controverted in part. Uncontroverted that Barber so testified. Controverted

that Ruby Mitchell "identified" Lamonte McIntyre as the shooter without suggestion. *See*

Plaintiffs' Response to Golubski's SOF, ¶ Paragraph 57, supra; SAMF ¶¶ 215–229.

60.       Officer Wansley had learned from Breon Shelton that the getaway car was a blue

Chevrolet Caprice Classic. (Exhibit 6: Trial Transcript, tr. 240:11–15; 248:6–11)

**RESPONSE:** Uncontroverted.

61.       Police also had information that Lamonte McIntyre drove or rode around in such

a car. (Exhibit 1: Case File at LMKSDC0003435)

**RESPONSE:** Controverted. The cited statement by Defendant Barber, taken after

Lamonte McIntyre's arrest, states "there was information early on that a blue vehicle that he's

known to ride in or matched the description which he's been seen to operate was a block over

from the homicide scene." There is no contemporaneous documentation of any such information

in the file. Regardless, Golubski's 4/16/94 Investigative Addendum indicates that he showed a

photograph of a vehicle "that was described as driven very often by Lamonte and James McIntyre" to Ms. Shelton to which "she stated this was the wrong vehicle." (Ex. 1: Case File, LMKSDC_0003456).

62. Another officer, Officer Viera, knew Lamonte to have a hangout at Juniper Gardens. (Exhibit 1: Case File at LMKSDC0003435)

**RESPONSE:** Controverted as unsupported by the evidence cited. According to the evidence cited, Barber states in his report that "Office Viera, which I had assistance to, received information from an informant in Juniper Gardens area, where Lamont is known to frequent. This information was that he was seen riding in an Oldsmobile 98, white in color, with blue tinted windows in the area of 2nd Street." This statement does not support that Officer Viera knew Lamonte hung out at Juniper Gardens. Further, Officer Viera did not write any report documenting this alleged information.

63. Lt. Barber provided a statement to Detective Golubski that when he spoke with Lamonte McIntyre's mother, Rose McIntyre, prior to his arrest she had asked whether police would automatically take someone down and charge them with murder if someone told him that she had killed somebody. Lt. Barber also reported that she stated that Lamonte had been with her at FiFi's from 11:00 in the morning until 2:45 in the afternoon. (Exhibit 1: Case File at LMKSDC0003433–3436)

**RESPONSE:** Uncontroverted that Lt. Barber made these statements to Defendant Golubski, but controverted that Lt. Barber's statements were true or accurate. Instead, Barber's report of Rose McIntyre's statements on April 15, 1994 was false. In fact, Barber asked Rose McIntyre where Lamonte McIntyre had been on April 14, 1994, the day before the shooting, not the day of, to which Rose truthfully replied that the day before the shooting, Lamonte McIntyre

was with her at FiFi's restaurant. Further, at FiFi's, Rose McIntyre asked Barber "what this was all about," to which Barber replied, "that it could be about a fight or disturbance or something like that." Rose did not bring up the word "murder." Barber fabricated a false and inculpatory statement by Rose McIntyre in an attempt to imply that she knew Lamonte McIntyre was guilty of the murders. SAMF ¶¶ 230–239.

64.     Before being taken to the police station, Lamonte stated he had been with his brother, James, during the day. (Exhibit 1: Case File, Barber Statement at LMKSDC0003435)

**RESPONSE:** Controverted. Barber never asked Lamonte his whereabouts on the day of the shooting, but instead asked about whether Lamonte was in a gang or knew anyone in a blue low rider. (Ex. 6A: LM TT 452:2–453:23); (Ex. 29: Lamonte McIntyre Dep. 231:13–232:16). Additionally, Lamonte McIntyre consistently gave police the same, truthful alibi: that he had been at Peggy Williams's and Yolanda Johnson's homes at the time of the shooting, where his brother "showed up sometime" that day. (Ex. 6A: LM TT 447:16–450:9, 452:21-453:14); (Ex. 6: LM TT 138:23-143:1); (Ex. 29: Lamonte McIntyre Dep. 138:15–142:9); (Ex. 1: Police File, Golubski Report, 4/16/1994, LMKSDC_0003453-3454); SAMF ¶¶ 23–25, 207–214.

65.     Around 8:40 p.m. on April 15, 1994, Lamonte McIntyre was arrested by Lt. Barber and Officer James Brown. (Exhibit 24: Arrest Report)

**RESPONSE:** Controverted to the extent Defendant Golubski was not present when Lamonte McIntyre was arrested. (Ex. 6A: TT 310:12-21). Further, Lamonte McIntyre was told that he was being taken to the station for questioning, and that his mother could follow and pick him up when he left. The officer who drove Lamonte to the station told him that he was not arrested and that if he did nothing wrong he had nothing to worry about. (Ex. 29: Lamonte McIntyre Dep. 148:21-150:6).

In his 4/16/94 Investigative Addendum, Golubski falsely reported that Golubski had read Lamonte McIntyre his rights before questioning him, and that Lamonte "refused to sign anything, but that he would talk to us." (Ex. 1: Case File LMKSDC_0003453). Instead, Lamonte "was never arrested" before police questioned him at that station. As Lamonte McIntyre testified at his deposition, at the station officers sat McIntyre in a room. Two detectives questioned him "about the events of my day," "asked me do I know this person or that person. And they asked about -- they said a homicide happened today, and one guy lived long enough to say I did it. And I told him he must have been mistaken. I'm not the person you're looking for. My name is Lamonte McIntyre. I don't know who you're looking for, but it's not me. And the other guy standing up and started screaming. Called me a n***** killer. Told me I think it's a game. And I said, 'No, I don't think it's a game, I'm just not the person you're looking for.' And he started screaming." (Ex. 29: Lamonte McIntyre Dep. 151:9-152:6). McIntyre described one of the detectives as a heavyset guy with a mustache and glasses, and the other as a big guy. McIntyre was not read his Miranda rights "until everything was over." "After that, they put me in handcuffs and they sent me to jail. They told me I was being charged with two counts of first degree murder. And they told my mother that I wasn't being charged with anything, I was just being held for questioning." (*Id.* at Tr. 151:9-155:21)

66.     On the way to the police station, Lamonte told Officer James Brown that he had been with his mom at work. (Exhibit 6: Trial Transcript, tr. 370:13–371:5)

**RESPONSE:** Controverted. Lamonte never told any officer he was at FiFi's at the time of the crime. (Ex. 6A: LM TT 452:18–453:23); (Ex. 29: Lamonte McIntyre Dep. 149:12– 150:6, 231:13–235:11); (Ex. 6A: James Brown TT 368:6–370:8; LM TT 457:25–458:7). Instead, when Officer Brown transported Lamonte to the police station, Lamonte asked Brown what this was

all about, and Brown said, "If you did nothing wrong, you got nothing to worry about." SAMF ¶¶ 240–244.  Brown never wrote a report about any alleged statement by Lamonte; Brown's claim regarding what Lamonte said is false. Ex. 1: Police File, Brown Arrest Report, LMKSDC_0003413-3414) SAMF ¶¶ 246, 250-257.

67.     During Lamonte's interview at police headquarters, he stated that he was at his auntie's house at 15th and Wood all day. (Exhibit 1: Case File at LMKSDC0003453-54)

**RESPONSE:** Controverted to the extent Paragraph 67 is inferring that Lamonte McIntyre provided police inconsistent alibis**.** Uncontroverted that at the police station, Lamonte McIntyre truthfully told the officers that he was "at his auntie's house … all day long." (Ex. 1: Police File, Krstolich Report, 4/15/1994, LMKSDC_0003442; Golubski Report, 4/16/1994, LMKSDC_0003454); (Ex. 6A: Lamonte McIntyre TT 452:18–453:23).

**Niko Lingers on Lamonte's Photo the Day After the Shooting**

68.     The day after the murders, April 16, 1994, Golubski and Detective Ware went back to Niko Quinn's house to show Niko the photographs that were shown to Ruby Mitchell. (Exhibit 1: Case File at LMKSDC0003455–3456)

**RESPONSE:** Uncontroverted.

69.     On April 16, 1994, Niko Quinn was impaired on drugs (PCP) and alcohol at the time of her meeting with Detective Golubski and Detective Dennis Ware. (Exhibit 2: Deposition of Niko Quinn, tr. 81:3–22)

**RESPONSE:** Controverted. Niko Quinn's testimony cited above states only that Niko Quinn was still "under the influence" of PCP when she spoke with Golubski and Ware, because she had done PCP for the first time the night before. (Ex. 2: Niko Quinn Dep. 81:3–22).

70.     On April 16, 1994, Niko did not positively identify any of the photographs as the shooter, but lingered on one, Lamonte McIntyre's. (Exhibit 1: Case File at LMKSDC0003455-3456; Exhibit 6: Trial Transcript, 141:10–25)

**RESPONSE:** Controverted. Niko Quinn told Golubski and Ware that she could not make any identification from the photos. (Ex. 2: Niko Quinn Dep. 185:21–25). Further, Niko testified that she was holding onto two pictures in her hand, and while doing so, the officers prompted her, asking her what name Ruby said the shooter's name was, and Niko said Lamont. And when she was holding the pictures, the officer said why are you staring at that other picture (the picture of Lamonte McIntyre). Niko said she didn't know and when she looked at the other one, she said "no, I don't know who it is." (Ex. 2: Niko Quinn Dep. 83:17-85:1).  Additionally, when asked if he fabricated this report of the April 16, 1994 identification procedure with Niko Quinn, Golubski invoked his Fifth Amendment right to remain silent. (Pl. Ex. 41: Roger Golubski Dep. 163:4–166:2).

71.     At the time she was shown the photo array on April 16, 1994, she knew Lamonte's photo from seeing it on the news the night before. (Exhibit 2: Deposition of Niko Quinn, tr. 87:23–88:3)

**RESPONSE:** Controverted. Niko Quinn testified that she did not know Lamonte McIntyre "that day" she was shown the photo array and clarified that she knew Lamonte McIntyre at the time she provided her 1996 affidavit from seeing his "name on the picture" during the photo array, and from his photo on the news "but it wasn't the day of the shooting." (Ex. 2: Niko Quinn Dep. 87:13–88:3; 146:1-16); *see* Plaintiffs' Response to Golubski's SOF, ¶ 42.

72.     Niko did not think Golubski did anything improper during his meeting with Niko Quinn on April 16, 1994. (Exhibit 2: Deposition of Niko Quinn, tr. 85:20-23; Exhibit 6: Trial Transcript, tr. 140:22–141:3)

**RESPONSE:** Controverted. Niko Quinn testified to numerous improper tactics Golubski and Ware used at their meeting with Niko Quinn on April 16, 1994. First, Niko testified that she was given a stack of five photographs, two of whom she immediately recognized as her cousin, Raymond Hickman, and James McIntyre, whom she used to date. Detective Golubski then told Niko that if she knew who it was, she'd better testify and that it would be better for her if she did. Niko then told Ware and Golubski, after holding the other three photographs, that "No, I don't know who it is." She did not make an identification even though Ware and Golubski held the photo of Lamonte McIntyre up while asking her what Mitchell said the shooter's name was and continued to tell her that she knew who the shooter was. While Golubski was instructing Niko Quinn to make an identification and asking about the name Ruby Mitchell had given, Ware placed his thumb on Lamonte McIntyre's photo, as if he were pointing at it. At the same time that Ware was pointing at Lamonte, Detective Golubski was telling Niko that police had arrested the shooter and had the gun. She then remembered seeing the name "Lamonte" on the photo police showed her. Despite this direct suggestion, Niko Quinn told Golubski and the other detective that she could not make an identification from these photos. SAMF ¶¶ 62–64, 67.

Ware admits that if he placed his thumb on Lamonte McIntyre's photo as Niko Quinn described that would have been "grossly improper" and "direct suggestion" and that he knew that in 1994. SAMF ¶¶ 65–66.

73.     Detective Golubski documented in his report that Niko did not positively identify Lamonte, but that "it is very obvious that Niko Quinn knows exactly who the shooter is, but

being highly traumatized at this time is reluctant to provide that information." (Exhibit 1: Case

File, at LMKSDC0003455–3456)

   **RESPONSE:** Uncontroverted that Golubski documented in his report that Niko did not

positively identify Lamonte on April 16, 1994, and that "it is very obvious that Niko Quinn

knows exactly who the shooter is, but being highly traumatized at this time is reluctant to

provide that information." (Ex. 1: Case File, at LMKSDC0003455–3456) However, Plaintiffs

deny that this report is true or accurate as stated *supra* in Plaintiffs' Response to Golubski's SOF

¶ 72.

   74.   In fact, Stacy Quinn's mom, Josephine Quinn, stated to Detective Krstolich that

Stacy "knew who the suspect was" which Golubski documented in his report to the prosecutors.

(Exhibit 1: Case File at LMKSDC0003456)

   **RESPONSE:** Controverted. Golubski documented in his report that Golubski and Ware

spoke to Josephine Quinn on April 16, 1994 and that "Josephine stated as per Detective W.K.

Smith's statement with her that was not identified by Detective Smith through that statement by

Josephine, that there was another daughter by the name of Stacy who stated she knew who the

suspect was but on this particular date of the photo line up, Stacy was not available." (Ex. 1:

Case File at LMKSDC_0003456). Further, Plaintiffs deny that Stacy Quinn was "not available."

Stacy Quinn was present at the scene of the crime, voluntarily told police that she had seen the

shooting, and waited in the yard while police interviewed Niko Quinn. (Pl. Ex. 38: Stacy Quinn

1996 Aff.); (Ex. 2: Niko Quinn Dep. 137:20–138:3). Stacy Quinn also remained in the area of

the scene of the crime following the shooting. (Pl. Ex. 38: Stacy Quinn 1996 Aff. ¶ 11); (Ex. 16:

Hearing on Motion for New Trial 12:15–17); (Pl. Ex. 86: Stacy Quinn Booking and Probation

Records). Additionally, Golubski knew Stacy Quinn well; he had an ongoing relationship with

her since she was a teenager from the mid-1980s through 2000, in which he paid her for sex. (Ex. 10: Niko Quinn 2014 Aff. ¶ 16); (Ex. 2: Niko Quinn Dep. 12:10–15, 82:9–13; 171:22–173:10, 177:19–178:8); (Ex. 17: Freda Quinn 2011 Aff. ¶19–20); (Pl. Ex. 39: Freda Quinn 2016 Aff. ¶ 6); (Pl. Ex. 40: D.L. (2014) Aff. ¶ 10); (Pl. Ex. 37: Joe Robinson Aff. ¶¶ 20, 22); (Ex. 4: Niko Quinn DA Interview 36:10–17); (Pl. Ex. 41: Roger Golubski Dep. 189:17–190:21); (Ex. 18: Freda Quinn Dep. 57:16–58:7). Given these facts and his relationship with Stacy Quinn, Golubski's claim that she was not available is false. (Ex. 10: Niko Quinn 2014 Aff ¶ 27); (Ex. 11: Freda Quinn 2011 Aff. ¶ 18–19); (Pl. Ex. 41: Roger Golubski Dep. 190:8–21). Further, Stacy's friend, C.S.R. attested that Stacy was easy to find and could usually be located on Quindaro.  (Pl. Ex. 80: C.S.R. 2015 Aff. ¶¶ 19-20).

75.     Golubski documented in his April 16, 1994, investigative addendum that Breon Shelton and Josephine Quinn were not able to identify Lamonte's photo as the shooter. (Exhibit 1: Case File at LMKSDC0003456)

**RESPONSE:** Uncontroverted.

76.     Golubski documents in his file to the prosecutors that Breon Shelton stated the car outside Lamonte's house was not the getaway car. (Exhibit 1: Case File at LMKSDC0003456).

**RESPONSE:** Uncontroverted.

**Lamonte's Prosecution Begins**

77.     On April 16, 1994, Roger Golubski submitted the prosecution summary to the Wyandotte County District Attorney's office.  (Exhibit 1: Case File at 3392–3395)

**RESPONSE:** Uncontroverted. Additionally, Golubski states that "This case is cleared with the arrest of Lamonte McIntyre". (Golubski Exhibit 1: LMKSDC_0003457)

37

78.     On April 18, 1994, Juvenile Prosecutor Vickie Myers filed two First Degree Murder Charges against Lamonte McIntyre in Juvenile Court. (Exhibit 25: Juvenile Complaint)

**RESPONSE:** Uncontroverted.

79.     On April 19, 1994, a hearing was held before the Juvenile Court, and Lamonte McIntyre was ordered to be detained or post a $250,000 surety bond. (Exhibit 26: Detention and Bond Order)

**RESPONSE:** Uncontroverted.

80.     Also on April 19 and April 21, 1994, Detective Golubski provided supplements to the prosecutor's summary to the Wyandotte District Attorney's office containing additional witness statements and skull diagrams of the victims. (Exhibit 27: Prosecutorial Supplements)

**RESPONSE:** Uncontroverted.

## Niko Quinn Calls Detective Golubski to Tell Him She Can Identify the Shooter

81.     A week or so after the murders, Niko Quinn called Roger Golubski, who had left a card with her the day after the homicide, and told Golubski she wanted to meet because she could identify the person who shot her cousin.  (Exhibit 2: Deposition of Niko Quinn, tr. 91:15–92:1, 149:2–15; Exhibit 6: Trial Transcript, tr. 145:24–146:2))

**RESPONSE:** Uncontroverted. At the time she called Golubski, Niko Quinn knew the killers were "Monster and Cecil and them." (Ex. 2: Niko Quinn Dep. 91:15-92:1).

82.     Niko Quinn was driven to the meeting by her boyfriend, Chris Jones. (Exhibit 2: Deposition of Niko Quinn, tr. 99:22–93:1)

**RESPONSE:** Uncontroverted. Also, this fact is not material and is instead irrelevant Further, the cited evidence is located at Ex. 2: Niko Quinn Dep. 92:22-93:1.

38

83.     During that meeting, Niko Quinn identified Lamonte McIntyre as the shooter. (Exhibit 2: Deposition of Niko Quinn, tr. 99:22–94:23)

**RESPONSE:** Controverted to the extent Paragraph 83 implies that  Niko Quinn's identification of Lamonte McIntyre at that meeting was not the result of improper coercion or suggestion. Instead, Niko Quinn testified that she told Golubski that Aaron Robinson and Monster had beaten up Doniel Quinn in the days before the murders, and that they came looking for him the night before the murders. She said that Doniel Quinn only had "beef" with that drug gang, and no one else.  Golubski responded by warning Niko Quinn to leave that alone, that she "shouldn't be talking about Cecil, be careful what [she] say[s] about Cecil because they found his ex-girlfriend's remains behind Washington High School." Golubski then lied to Niko, telling her Cecil Brooks and Aaron Robinson and their gang "didn't do it, they couldn't have did it because they had the guy in custody [referring to Lamonte McIntyre], they had the clothes he was wearing and they had the gun so they got the right person." Knowing Niko Quinn was scared for her life, Golubski offered to put her in protective custody; he then did help her get through bureaucracy to move to 4th Street. asked if he fabricated Niko Quinn's identification of Lamonte McIntyre, Golubski pled the Fifth. (Pl. Ex. 41: Roger Golubski Dep. 150:14–151:3, 174:19–175:2); SAMF ¶¶ 78–88.

84.     During the meeting, Niko told Golubski that she thought others, including Aaron Robinson and Cecil Brooks were involved in her cousins' deaths, in response Golubski cautioned her to be careful regarding Cecil Brooks because he had murdered his prior girlfriend and police were not able to prosecute him for it. But Niko Quinn did not care about Golubski's statement. (Exhibit 2: Deposition of Niko Quinn, tr. 99:22–94:23)

**RESPONSE:** Controverted. *See* Plaintiffs' Response to Golubski's SOF, ¶ 83.

85.     While Golubski did not document this information in a report, he did tell prosecutor Morehead sometime after the preliminary hearing but before trial. (Exhibit 28: Deposition of Terra Morehead, tr. 131:3–9).

**RESPONSE:** Uncontroverted that Golubski did not document the information in Golubski's SOF Paragraphs 81-84 nor Plaintiffs' responses to the same in a report. However, Terra Morehead only testified that Detective Golubski reported that Niko Quinn contacted him approximately a week after the initial photo showing and that "she identified Lamonte McIntyre's photo," not the circumstances surrounding the alleged identification noted in Plaintiffs' Response to Golubski's SOF ¶ 81 and ¶ 83. SAMF ¶¶ 100–104.

Additionally, at his deposition in this case, Defendant Smith admitted that failing to document a positive photo identification from an eyewitness does not make any sense, because a positive identification of a suspect awaiting trial from one of the eyewitnesses who is adamant is powerful evidence that officers would have every incentive to document and turn over so it could be used. (Pl. Ex. 42: W.K. Smith Dep. 345:25-347:14.

86.     Despite Golubski not informing the prosecution of the meeting behind Wyandotte High School prior to the June 28, 1994, preliminary hearing, Niko Quinn was called as a witness and identified Lamonte McIntyre in open court as the killer. (Exhibit 5: Preliminary Hearing Transcript, tr. 26:1–9)

**RESPONSE:** Controverted to the extent that Paragraph 86 infers Niko Quinn's in court identification of Lamonte McIntyre was not the result improper coercion or suggestion. Dr. Dysart opines that when a witness sees a photograph in multiple identification procedures or contexts, there is a risk this sense of familiarity on the part of the witness may lead to an increased likelihood of choosing that person and a feeling of increased confidence in subsequent

40

identification procedures. (Pl. Ex. 34: Expert Report of Jennifer Dysart pp. 15–16.). Further, if police suggestion occurred during the photo procedures – as Plaintiffs allege – "the subsequent identifications in court are of no value. There is no way to distinguish between the contaminated, unreliable identifications and the witnesses' actual memory of the events, and, therefore, no reliable way to assess whether the suspect was present at the crime." *Id.* at p. 16; *see also* Pl. Ex. 35: Dennis Ware Dep. 185:21-187:2 (agreeing that the concept that if police suggest a particular photo on one occasion, that suggestion will taint that witness's identifications down the line was "just common sense," and a basic policing concept understood by 1994). *See also* SAMF ¶ 142.

87.     Niko now states she acquiesced to picking Lamonte as the shooter because Golubski told her police had the clothes, the gun, Lamonte in custody, and police knew he was the shooter.  (Exhibit 2: Deposition of Niko Quinn, tr. 94:8–14)

**RESPONSE:** Uncontroverted that when asked at her deposition: "In this meeting you identify Lamonte McIntyre as the shooter, though" Niko Quinn described the improper tactics used by Golubski:  "Because he [Golubski] gives me the picture, he tells me that they had the clothes, they had the gun, and they had Lamonte in custody, and they knew for a fact that he was the one that killed my cousin." (Ex. 2: Niko Quinn Dep. 94:8–14). Additional improper tactics used by Golubski in this meeting which resulted in Niko Quinn's identification of Lamonte McIntyre are contained in Plaintiffs' Response to Golubski's SOF ¶¶ 81, ¶ 83, and 88. The remaining statements are controverted.

88.     While Golubski may have told "told [Niko] to go down to the housing authority" and "somehow [] talked to someone in the housing authority and got [Niko] moved into [a] place that was available at the time" Golubski provided Niko no other assistance, including no financial assistance. (Exhibit 2: Deposition of Niko Quinn, tr. 98:9–99:4)

41

**RESPONSE:** Uncontroverted that Niko Quinn stated that Golubski told her he would help her move to a new place, "which he later did," (Ex. 10: Niko Quinn 2014 Aff. 2014 ¶ 19) that Golubski told her "to go down to the Housing Authority, and somehow they talked to someone in the Housing Authority and got [her] moved in to this place that was available at the time" and that Golubski "helped [her] supposedly get protective custody." (Ex. 2: Niko Quinn Dep. 98:9-99:4).

89.     April 15, 1994, was the one and only day Ruby Mitchell interacted with Roger Golubski. (Exhibit 9: Deposition of Ruby Mitchell, tr. 124:15–125:8)

**RESPONSE:** Controverted. *See* Plaintiffs' Response to Golubski's SOF, ¶ 16, *supra*.

90.     Niko Quinn did not talk to any police, including Roger Golubski from the time she met with him behind Wyandotte High School through Lamonte's trial. (Exhibit 2: Deposition of Niko Quinn, tr. 166:21–25).

**RESPONSE:** Uncontroverted that Niko Quinn so testified. However, Niko testified that sometime before trial, three people came to her apartment, and that her cousin, Sandy Quinn told her, "it was two detectives and a woman, and the woman told me to tell you to get in contact with her, and if you didn't, she was going to arrest you and take your children from you." (Ex. 2: Niko Quinn Dep. 101:8-102:12).

**Detective Golubski's Additional Evidence Gathering Including Disclosing Exculpatory Evidence**

91.     On April 19, 1994, Detective Golubski interviewed John Quinn, the father of decedent Doniel Quinn. John Quinn told Detective Golubski that he did not see who committed the murders. Golubski submitted this additional statement to the prosecutor in a supplemental report. (Exhibit 27: Prosecution Supplements, Statement of John Quinn, WCDA0001825–1829)

**RESPONSE:** Uncontroverted that Golubski interviewed John Quinn, and submitted an additional statement in a supplemental report. However, during that interview, John Quinn was not asked whether he saw who committed the murders, nor is there any documentation in the file of John Quinn being shown photographs to see if he could identify his son's associates whom he described as "cobra snake[s]" who could inflict "instant death."  Additionally, John Quinn told Detective Golubski that he "sensed that something wasn't right weeks and weeks ago" with his son Doniel because of the "individuals he associate with" who were "the wrong type of individuals for him to be around," "the worst kind," "[a] cobra snake [whose] any kind of bite would be instant death." (Ex. 1: LMKSDC_0003462, 0003466). John Quinn clarified that he was talking about drug dealers, "youngsters" in particular, around 21 years old. *Id.*

92.     On April 20, 1994, Detective Golubski took statements from Yolanda Johnson, Natasha Haygood, and M'Sherie Johnson regarding Lamonte McIntyre's whereabouts on the day of the shooting, including what he was wearing.  Detective Golubski also inquired regarding their knowledge about Lamonte McIntyre's involvement with drug use/sales and vehicles with which he may be associated.  (Exhibit 27: Prosecution Supplements)

**RESPONSE:** Uncontroverted.

93.     On September 21, 1994, Det. Golubski took a statement from Keva Garcia, Ruby Mitchell's niece, regarding the "Lamonte" she was talking to.  Keva Garcia reviewed a picture of Lamonte McIntyre and said that they looked alike but were not the same. (Exhibit 1:  Case File Statement of Keva Garcia at LMKSDC0003496–3498)

**RESPONSE:** Controverted. In the cited evidence, Keva Garcia says the photograph shown to her looks "a little bit" like Lamont Drain but states "there is a definite difference" between the photograph and Lamont Drain, including that Lamonte McIntyre has a longer neck,

43

his ears are big, and his skin color is lighter than Lamont Drain. (Ex. 1:  Case File Statement of Keva Garcia at LMKSDC_0003499–3499). Keva also stated that the Lamont she used to date was not Lamonte McIntyre and that she had never seen Lamonte McIntyre before. *Id.* According to the prosecutor, Terra Morehead, this interview of Keva Garcia, five days before trial, was conducted on her behalf as part of Morehead's preparation for trial. (Ex. 28: Terra Morehead Dep. 242:8–244:1); (Pl. Ex. 41: Roger Golubski Dep. 121:23–122:22); (Ex. 1: Garcia Stmt. by Golubski, 9/21/1994, LMKSDC_0003496); Ex. 6: Trial Transcript (p. 1) cover page.

94.      Golubski noted in his file that there "remains the possibility that John Quinn and Stacy Quinn can identify" the shooter, but that Stacy Quinn was unavailable when he went to speak with her. (Exhibit 1: Case File at LMKSDC0003456)

**RESPONSE:** Uncontroverted that Golubski documented that "there remains the possibility that John Quinn and Stacy Quinn can identify the perpetrators photo," and that Golubski documented that "on this particular date of the photo line up, Stacy was not available." However, Plaintiffs deny that this report is true or accurate, as detailed in Plaintiff's Response to Golubski's SOF, ¶ 74.

**The June 28, 1994, Juvenile Waiver/Probable Cause Hearing**

95.      On June 28, 1994, a juvenile waiver hearing/preliminary hearing was held in juvenile court.  The prosecutor was A.J. Stecklein. (Exhibit 5: Transcript of Preliminary Hearing)

**RESPONSE:** Uncontroverted. Lamonte McIntyre was a juvenile, at age 17, at that time. Stecklein was the juvenile prosecutor, but Terra Morehead was present in the courtroom. (Ex. 5: Preliminary Transcript at 2).

96.      On June 28, 1994, Ruby Mitchell identified Lamonte McIntyre in open court as the killer.  (Exhibit 5: Preliminary Hearing Transcript, tr. 9:5–14)

**RESPONSE:** Controverted in part. At the preliminary hearing, Ruby Mitchell testified contrary to her police statement, stating that she did not know and had never previously seen Lamonte McIntyre and that she did not know his name was "Lamonte" until she went to the police station and went through some photos with police. Prelim Transcript 10, 14. Additionally, Dr. Jennifer Dysart, opines that when a witness sees a photograph in multiple identification procedures or contexts, there is a risk this sense of familiarity on the part of the witness may lead to an increased likelihood of choosing that person and a feeling of increased confidence in subsequent identification procedures. (Pl. Ex. 34: Expert Report of Jennifer Dysart, pp. 15–16.). Further, if police suggestion occurred during the photo procedures—as Plaintiffs allege—"the subsequent identifications in court are of no value. There is no way to distinguish between the contaminated, unreliable identifications and the witnesses' actual memory of the events, and, therefore, no reliable way to assess whether the suspect was present at the crime." *Id.* at p. 16; *see also* Pl. Ex. 35: Dennis Ware Dep. 185:21-187:2 (agreeing that the concept that if police suggest a particular photo on one occasion, that suggestion will taint that witness's identifications down the line was "just common sense," and a basic policing concept understood by 1994).

97.     After Lamonte McIntyre was "waived" into adult court, Terra Morehead took over the prosecution of Lamonte McIntyre. (Exhibit 28: Deposition of Terra Morehead, tr. 101:21-103:5)

**RESPONSE:** Uncontroverted, but noting that Morehead was present at the preliminary hearing. (Ex. 5: Preliminary Transcript at 2).

**Niko Quinn Alleges the Prosecutor threatened to Take Away her Children Prior to Trial**

98.     Sometime after the preliminary hearing, in the summer of 1994, Niko broke off her relationship with C-Love and moved to an apartment on Cleveland Street. (Exhibit 2: Deposition of Niko Quinn, tr. 100:12–101:4)

**RESPONSE:** Controverted as Niko Quinn did not testify that she had "broke[n] off her relationship with C-Love" but instead testified that her relationship was "off and on." Also, this fact is not material and is instead irrelevant.

99.     Terra Morehead visited Niko's residence, leaving a card and a message: contact me or I will have you arrested and take your children away. (Exhibit 2: Deposition of Niko Quinn, tr. 101:5–103:12)

**RESPONSE:** Uncontroverted, but incomplete. Additionally, Terra Morehead was accompanied on this occasion by "two detectives". (Ex. 2: Niko Quinn Dep. 101:8-102:12).

100.     After receiving a threat Niko Quinn consulted with an attorney and then met with Terra Morehead. (Exhibit 2: Deposition of Niko Quinn, tr. 101:5–103:12)

**RESPONSE:** Uncontroverted.

101.     During her meeting with Terra Morehead, she told Ms. Morehead that she was not sure Lamonte McIntyre was the killer.  (Exhibit 2: Deposition of Niko Quinn, tr. 103:25–105:25, 107:23–109:10)

**RESPONSE:** Uncontroverted. However, Morehead had previously been told by KCKPD that no suggestion had been used to obtain Niko Quinn's identification of Lamonte McIntyre, and that the same was true for Ruby Mitchell's identification. (Ex. 28: Terra Morehead Dep. 126:19-127:22; 272:18-5).

46

102.     In response, Ms. Morehead showed her photos of her dead cousins, and asked her, "don't you want somebody to be held accountable for this?" "don't you want something done?" and "don't you want somebody convicted?" at which time Niko began to cry and, "told her she didn't think it was Lamonte." Ms. Morehead showed her more graphic pictures and again said, "don't you want someone to be held accountable?" Niko relented and identified Lamonte McIntyre at trial as the shooter. (Exhibit 2: Deposition of Niko Quinn, tr. 103:25–105:25, 107:23–109:10)

**RESPONSE:** Uncontroverted that Niko Quinn testified to the above statements and that Niko Quinn subsequently identified Lamonte McIntyre at trial. Controverted to the extent Golubski suggests that this interaction was the sole cause of Niko Quinn's wrongful identification of Lamonte McIntyre. Instead, Niko Quinn testified that she was subject to police coercion and suggestion, including Golubski falsely telling her that police had the shooter's clothes and gun and they "knew" the assailant was Lamonte, *see* Plaintiff's Response to Golubski's SOF ¶ 83, and that during trial, the prosecutor "looked at me and gave me that look like if you don't do it, I'm going to send them to go get your kids." (Ex. 2: Niko Quinn Dep. 109:11-110:3).

**Lamonte's Criminal Jury Trial**

103.     On September 26-29, 1994, Lamonte's jury trial was held and Lamonte McIntyre was convicted. (Exhibit 6: Trial Transcript)

**RESPONSE:** Uncontroverted.

104.     Terra Morehead's investigators in the District Attorney's office would have been talked with trying to follow up with locating and serving witnesses. (Exhibit 28: Deposition of Terra Morehead, tr. 261:12-24)

**RESPONSE:** Controverted. KCKPD detectives would have been expected to locate witnesses and inform the prosecutor of any information they receive. (Ex. 28: Terra Morehead Dep. 263:6-265:4). Also, this fact is not material and is instead irrelevant.

105.    In December 1992, Lamonte McIntyre along with his brother James McIntyre and cousin Terrance Terrell, pleaded guilty to charges relating to an armed robbery. (Golubski Exhibit 29: Deposition of Lamonte McIntyre, tr. 117:8–118:1)

**RESPONSE:** Controverted, in part. Regardless, Lamonte McIntyre testified that although Terrance Brown, James McIntyre and Lamonte McIntyre pled guilty in relation to this incident in 1992, Lamonte's brother and cousin "admit to it" and that "the police somehow threw me in the mix by saying I threw a paper trying to distract him or something. And my lawyers advise me to take a plea bargain to avoid…jail time." (Ex. 29: Lamonte McIntyre Dep. 117:8–118:6; 112:15-22). Further, the case was in juvenile court, not adult court, and they all received probation. *Id.* Also, this fact is not material and is instead irrelevant.

106.    At the time she identified Lamonte McIntyre as the shooter, she knew it was not the "Lamonte" that dated her niece, but that it looked like that person. (Exhibit 6: Trial Transcript, tr. 127:10–14, 195:16–196:15; Exhibit 11: Ruby Mitchell Interview Clip 1).

**RESPONSE:** Controverted. Ruby Mitchell testified that she believed she had identified Lamont Drain as the shooter, and that he was the Lamonte who dated her niece. (Ex. 9: Ruby Mitchell Dep. 69:25-70:6; 143:16-25) *See also* Plaintiffs' Response to Golubski's SOF ¶ 15.

107.    In fact, she remembers almost calling out the name Lamonte at the time of the shootings. (Exhibit 9: Deposition of Ruby Mitchell, tr. 18:9–18, 124:4–14; Exhibit 5: Preliminary Hearing tr. 13:6-22)

**RESPONSE:** Uncontroverted.

48

108.    On September 26, 1994, Ruby Mitchell again identified Lamonte McIntyre in open court as the killer. (Exhibit 6: Trial Transcript, tr. 174:26–175:11, 208:2–8)

**RESPONSE:** Uncontroverted, but duplicative of Golubski's SOF ¶ 14. *See* Plaintiffs' Response to Golubski's SOF ¶ 14.  Also, Mitchell's testimony at trial falsely portrays her original statement to police.  She testifies that when she selected Lamonte McIntyre's photograph that she knew he was not the Lamonte who had dated her niece. (Ex. 6: TT 127:10–14, 195:16–196:15). This is directly contrary to her statement to police in which she states that she knew the shooter because he used to talk to her niece, that she had known him a couple of months, and that she knew his first and last names, which she recites. (Ex. 1: LMKSDC_0003421-3425). These gross contradictions reflect a tainted and manipulated identification.

109.    When Ruby Mitchell testified during the criminal proceedings, she thought she was identifying the person who did the shooting. (Exhibit 9: Deposition of Ruby Mitchell, tr. 127:10-14)

**RESPONSE:** Controverted. The evidence cited states that Ruby Mitchell believed she was identifying Lamont Drain as the shooter. (Ex. 9: Ruby Mitchell Dep. 126:25-127:14) *See also* Plaintiffs' Response to Golubski's SOF ¶ 15, 108.

110.    Niko Quinn testified that Ruby did yell out "Lamonte." (Exhibit 2: Deposition of Niko Quinn, tr. 62:3–15).

**RESPONSE:** Uncontroverted.

111.    On June 28, 1994, Ruby Mitchell identified Lamonte McIntyre in open court as the killer. (Exhibit 5: Preliminary Hearing Transcript, tr. 9:5–14)

**RESPONSE:** Uncontroverted, but duplicative of Golubski's SOF ¶ 14 and ¶ 96. *See* Plaintiffs' Response to Golubski's SOF ¶¶ 14, 96, 108.

112.    On September 26, 1994, Ruby Mitchell again identified Lamonte McIntyre in open court as the killer. (Exhibit 6: Trial Transcript, tr. 174:26–175:11, 208:2–8)

**RESPONSE:** Uncontroverted, but duplicative of Golubski's SOF ¶¶ 14 and 108. *See* Plaintiffs' Response to Golubski's SOF ¶¶ 14, 108.

113.    When Ruby Mitchell testified during the criminal proceedings, she thought she was identifying the person who did the shooting. (Exhibit 9: Deposition of Ruby Mitchell, tr. 127:10-14)

**RESPONSE:** Controverted and duplicative of Golubski's SOF ¶ 109. *See* Plaintiffs' Response to Golubski's SOF ¶¶ 108, 109.

114.    To date, Ruby Mitchell has not recanted her identification of Lamonte McIntyre as the shooter. In Ruby Mitchell's 2011 affidavit, which was procured by Lamonte McIntyre's investigator James McCloskey, she did not recant but rather asked for forgiveness, "if I made a mistake in the identification of Lamonte McIntyre. (Exhibit 7: Deposition of James McCloskey, tr. 46:9–18, 120:17–22; Exhibit 8: Ruby Mitchell Affidavit, ¶ 13)

**RESPONSE:** Controverted and duplicative of Golubski's SOF ¶ 15. *See* Plaintiffs' Response to Golubski's SOF ¶ 15.

115.    On September 26, 1994, Niko again identified Lamonte McIntyre as the killer in open court at Lamonte's jury trial. (Exhibit 10: 2014 Affidavit of Niko Quinn, ¶ 21)

**RESPONSE:** Uncontroverted, but misleading. Niko Quinn's affidavit, the evidence cited, states "When I came to the courthouse to testify, I saw Lamonte McIntyre. As soon as I saw him stand up in the courtroom, I released that he absolutely could not be the shooter because

50

he was much taller than the shooter. Also, his ears are too large and stick out too far away from his face, and the shooter's ears did not. I knew then, and I know now, that Lamonte McIntyre was not the man who shot Doniel and Don. At the courthouse, I talked to the prosecutor, Terra Morehead, and told her twice that Lamonte McIntyre was not the shooter, that the police had the wrong man. Ms. Morehead dismissed my statement and told me I could be held in contempt and go to jail and have my children taken from me. I testified, and let the prosecutor lead me through my testimony."

116.    Later, in her 1996 affidavit, Niko explained why she knowingly lied and identified Lamonte McIntyre as the shooter, stating that she "wanted the whole thing to over with" and "did not care who was convicted" but rather "wanted someone, anyone, to pay for their deaths." (Exhibit 19: 1996 Niko Quinn Affidavit, ¶ 6)

**RESPONSE:** Controverted. Although Niko Quinn states in the cited material that she "wanted the whole thing to over with" and "did not care who was convicted" but rather "wanted someone, anyone, to pay for their deaths," she did not say that was why she "lied and identified Lamonte McIntyre as the shooter" as Paragraph 116 alleges. Further, in the same paragraph of Niko's affidavit, she states "The police questioned me and threatened to take my children away from me if I did not talk." Further, Niko Quinn's identification behind the Wyandotte High School was the result of improper suggestion and coercion. *See* Plaintiff's Response to Golubski's SOF ¶ 83. Additionally, Niko testified that she identified Lamonte McIntyre in court because "Ms. Morehead dismissed my statement [that Lamonte was not the shooter] and told me I could be held in contempt and go to jail and have my children taken from me" and so she "testified, and let the prosecutor lead [her] through [her] testimony." (Ex. 10: Niko Quinn 2014 Aff. ¶ 21). Niko also testified that "I might have said anything in that trial because I was

51

threatened in '94 and '96. So none of that was true, because I was told what to say." (Ex. 2:
Niko Quinn Dep. 157:9-16).

117.    In her November 2021 deposition, Niko Quinn testified that Terra Morehead, not
Roger Golubski, threatened to have her kids taken away. (Exhibit 6: Trial Transcript tr. 143:1–
16)

**RESPONSE:** Controverted as the cited evidence does not support the allegation in
Paragraph 117.

118.    Lamonte's "alibi" witnesses provided inconsistent statements as to his
whereabouts on the date of the murders.  (Exhibit 29: Deposition of Lamonte McIntyre, tr.
167:8–168:11; Exhibit 1: Case File, Alibi Witness Statements at LMKSDC0003468–3492)

**RESPONSE:** Controverted. Lamonte testified only that his alibi witnesses at trial were
"inaccurate" and that "everybody give an account of the time they thought they saw me doing
whatever they was doing, and it seemed everybody had their own account of it." (Ex. 29:
Lamonte McIntyre Dep. 167:8–168:11). Further, the alibi statements cited in Paragraph 118 are
not "inconsistent" and are instead five people said Lamonte was at the home of his aunt, Yolanda
Johnson, at the time of the murder. (Ex. 1: Yolanda Johnson Stmt. by Golubski, 4/20/1994,
LMKDC_0003469–3470); (Pl. Ex. 55: M'Sherie Johnson 2016 Aff. ¶¶ 3–9); (Ex. 1: M'Sherie
Johnson Stmt. to Golubski, 4/20/1991, LMKSDC_0003479–3480); (Pl. Ex. 70: Rose McIntyre
2014 Aff. ¶ 6); (Ex. 1: Natasha Haygood Stmt. to Golubski, 4/20/1994, LMKSDC_0003477–
3480); (Ex. 6A: Felicia Williams TT 391:3–393:2; Peggy Crowder TT 378:2–381:8). This is
consistent with Lamonte's alibi given to police: that he had been at Peggy Williams's and
Yolanda Johnson's homes at the time of the shooting. (Ex. 6A: Lamonte McIntyre TT 447:16–

450:9; 452:21-453:14; (Ex: 29: Lamonte McIntyre Dep. 138:15–142:9); (Ex. 1: Police File, Golubski Report, 4/16/1994, LMKSDC_0003453-3454).

119.    Niko admits she perjured herself at Lamonte's criminal trial. (Exhibit 2: Deposition of Niko Quinn, tr. 157:1–16)

**RESPONSE:** Controverted.  Although Niko falsely identified Lamonte McIntyre as the shooter, due to police and prosecutor coercion, *see* Plaintiff's Response to Golubski's SOF ¶¶ 83, 88 and 116, "not everything [she] told the jury was false." (Ex. 2: Niko Quinn Dep. 157:9-23).

120.    Niko testified at trial that Golubski did not suggest that she should identify any of the photos shown to her. (Exhibit 6: Trial Transcript, tr. 140:22–141:9)

**RESPONSE:** Uncontroverted that Niko Quinn testified to the above at trial, but Plaintiffs deny such testimony was true or accurate. *See* Plaintiff's Response to Golubski's SOF ¶¶ 83, 88, and 116.

121.    Niko explained in her 1996 affidavit that the reason she identified Lamonte was that she wanted the whole thing to be over with, and she did not care who was convicted. Both victims sitting in the blue car were her cousins. She wanted someone, anyone, to pay for their deaths (Exhibit 19: 1996 Niko Quinn Affidavit, ¶ 5–6).

**RESPONSE:** Controverted and duplicative of Golubski's SOF ¶ 116. *See* Plaintiffs' Response to Golubski's SOF ¶ 116.

122.    Niko, in her 1996 affidavit, said she told Golubski during their meeting behind Wyandotte High School that she feared men stalking her with guns. (Exhibit 19: 1996 Niko Quinn Affidavit, ¶ 10)

**RESPONSE:** Uncontroverted with clarification. The cited evidence indicates that Niko Quinn saw men with guns waiting for her where she was living. (Ex. 19: Niko Quinn 1996 Aff. ¶ 10).

123.    Niko's 2014 affidavit states that when she met with Golubski at a neutral site, she believed "Lamonte in some ways looked somewhat similar to the shooter" and that she "allowed" Defendant Golubski to "push" her into identifying him. (Exhibit 10: 2014 Niko Quinn Affidavit, ¶ 20)

**RESPONSE:** Uncontroverted.

## Lamonte Dealt Drugs for his cousin, Donald Johnson, an associate of Cecil Brooks/Aaron Robinson

124.    According to Lamonte he sold drugs, crack cocaine, as often as he could for his cousin, Donald Johnson, Jr. (DJ) (Exhibit 29: Deposition of Lamonte McIntyre, tr. 123:2–124:17)

**RESPONSE:** Controverted. Also, this fact is not material and is instead irrelevant.   The cited evidence does not state that Lamonte sold drugs for Donald Johnson, Jr. Lamonte additionally testified that he sold drugs less than 50 times over the course of his lifetime. (Ex. 29: Lamonte McIntyre Dep. 125:23–126:4).

In reality, Lamonte McIntyre's reputation was that of a "Sponge Bob Square Pants," in other words, a "nerd." (Ex. 2: Niko Quinn Dep. 95:5–10).  In other words, he was not part of the drug world, and, as Joe Robinson attested, Lamonte was "somebody we had never heard of."  Pl. Ex. 37: Joe Robinson Aff. ¶ 19).

125.    On February 27, 1994, Lamonte McIntyre was arrested on possession of crack cocaine, and the trial was pending at the time he was charged with murdering Doniel Quinn and

54

Donald Ewing. (Exhibit 29: Deposition of Lamonte McIntyre, tr. 119:18–120:23, Exhibit 30: DA

Criminal History)

     **RESPONSE:** Controverted as not material and is instead irrelevant.

     126.    According to Lamonte's brother, DJ was a big-time drug dealer in Kansas City,

Kansas. (Exhibit 31: Deposition of Jermaine McIntyre, tr. 26: 1–25)

     **RESPONSE:** Uncontroverted. Also, this fact is not material and is instead irrelevant.

     127.    DJ knew and hung out with Aaron Robinson. (Exhibit 29: Deposition of Lamonte

McIntyre, tr. 100:14–101:10)

     **RESPONSE:** Controverted. Also, this fact is not material and is instead irrelevant.

Lamonte McIntyre never testified that DJ knew and hung out with Aaron Robinson, but only that

D.J. "knew everybody."

     128.    Six weeks before the murders on February 27, 1994, Lamonte, DJ, and Lamonte's

mother, Rose McIntyre were arrested at Yolanda Johnson's house. Lamonte was charged with

possession of crack cocaine (which he intended to sell), and DJ and Rose were arrested for

assaulting police officers, including Defendant James Brown. (Exhibit 29: Deposition of

Lamonte McIntyre, tr. 119:18–120:23, Exhibit 32: February 27, 1994, Arrest Records)

     **RESPONSE:** Controverted. Also, this fact is not material and is instead irrelevant. The

allegation in Paragraph 128 has no bearing on the case at hand, does not tend to make any fact in

this action more or less likely, and is only used to embarrass and prejudice Plaintiffs in this

public filing. Accordingly, Golubski Exhibit 32 and the allegations in Paragraph 128 should be

denied as irrelevant and stricken. If not, the cited materials, Golubski Exhibit 32 is inadmissible

hearsay and should be stricken; it also misstates the evidence. Additionally, the evidence cited

reflects only that Lamonte was arrested for possession, not charged. DJ and Rose McIntyre were

not arrested for assault; they were arrested for obstruction only because "she pulled up and she asked the officers what was going on. And the officers kept telling her to get back. And she said 'Okay, but he's a juvenile. I'm just trying to talk to my son.' And when she---they ended up in a confrontation, the officer and my mother. My mother just kept saying, 'I'm just trying to understand what's going on with my son,' because she just pulled up. She didn't know what was going on, you know." (Ex. 29: Lamonte McIntyre Dep. 121:22-122:12); (Ex. 32: February 27, 1994, Arrest Records).

## ADDITIONAL MATERIAL CONTROVERTED FACTS

**Donald Ewing and Doniel Quinn are killed in a shooting during the afternoon of April 15, 1994**

1.      Doniel Quinn, who had an addiction to crack, was a regular customer of Aaron Robinson and worked as an occasional "doorman" for him at a drug house on North 21st Street. (Pl. Ex 37: Joe Robinson Aff. ¶¶ 13–14); (Ex. 10: Niko Quinn 2014 Aff. ¶¶ 13-15); (Ex. 2: Niko Quinn Dep. 42:4-13); (Pl. Ex. 43: Cecil Brooks Aff. ¶¶ 11-15).

2.      In the weeks before he was killed, word on the street was that Doniel Quinn had stolen drugs from this stash house operated by Cecil Brooks and Aaron Robinson, and which was overseen by Neil Edgar, Jr., known as "Monster." (Pl. Ex. 44: Shonda Nichols Aff. ¶¶ 17–18); (Pl. Ex 37: Joe Robinson Aff. ¶¶ 13–15); (Ex. 10: Niko Quinn 2014 Aff. ¶¶ 13–15); Golubski SOF, ¶ 24.

3.      Monster was an enforcer who would shoot people for hire and worked for Aaron Robinson's drug gang. (Pl. Ex. 37: Joe Robinson Aff. ¶¶ 3–19) (Pl. Ex. 43: Cecil Brooks Aff. ¶¶ 3–20).

4.      Aaron Robinson ran a drug operation under the "mentorship" of Cecil Brooks, a "major figure in the Kansas City, Kansas, drug business." (Pl. Ex. 43: Cecil Brooks Aff. ¶¶ 1–6); (Pl. Ex. 37: Joe Robinson Aff. ¶¶ 8, 12).

5.      About a week before Doniel Quinn's murder, Aaron Robinson, Monster, and their associates beat him with poles and kicked him, leaving Doniel with a black eye, a swollen face, blood running down his face, and bruises all on his leg. Doniel Quinn was able to get away. (Ex. 10: Niko Quinn 2014 Aff. ¶ 14); (Ex. 2: Niko Quinn Dep. 12:10–15, 40:21–43:11, 171:22–173:10, 40:21–41:10, 42:4–43:11, 173:11–174:7; (Ex. 4: Niko Quinn DA Interview 1:1–3:25); (Pl. Ex. 45: Kendra Dean-Martin 2013 Aff. ¶ 9); Golubski's SOF ¶ 27.

57

6.      After that beating, there was a bounty out on Doniel Quinn for $4,000. Doniel

Quinn's cousin, Niko Quinn, sent two people (including her sister, Stacy Quinn) to Aaron

Robinson and Cecil Brooks to see if she could pay this debt but was told they didn't want the

money. (Ex. 2: Niko Quinn Dep. 20:12–19, 43:17–46:25).

7.      The night before Doniel Quinn was murdered, Monster and his drug-business

associates rode by in a car and tried to get Doniel Quinn to join them. (Ex. 2: Niko Quinn Dep.

12:10–15, 48:3–7, 48:20–49:17, 50:7–51:18); (Ex. 4: Niko Quinn DA Interview 1:1–5:21);

Golubski's SOF ¶ 29.

8.      Monster was hired to kill Doniel Quinn. (Pl. Ex. 43: Cecil Brooks 2016 Aff. ¶ 17,

LMKSDC_0004828); (Ex. 10: Niko Quinn 2014 Aff. ¶ 16); (Pl. Ex. 44: Shonda Nichols Aff.

¶¶ 19–20); (Pl. Ex. 37: Joe Robinson Aff. ¶¶ 7–17.)

9.      On April 15, 1994, Doniel Quinn sat in a blue Cadillac on Hutchings Street in

Kansas City, Kansas with Doniel Ewing. (Pretrial Order, Doc. 562, Stipulations, ¶ 5); (Ex. 1:

Police File, Golubski Report, 4/16/1994 LMKSDC_0003392).

10.     Monster shot into the passenger side of the car with a shotgun in broad daylight.

(Pl. Ex. 43: Cecil Brooks 2016 Aff. ¶¶ 15-18); (Ex. 10: Niko Quinn 2014 Aff. ¶¶ 14-16, 25-26);

(Ex. 8: Ruby Mitchell Aff. ¶ 3); (Ex. 1: Police File, Wansley Report, 4/16/1994

LMKSDC_0003404.)

11.     Doniel Quinn died at the crime scene, while Ewing died at the hospital, both from

shotgun wounds. (Pretrial Order, Doc. 562, Stipulations, ¶¶ 6-7); (Ex. 1: Police File, Golubski

Report, 4/16/1994 LMKSDC_0003392).

**Monster is the real perpetrator**

12.     Monster bragged to a female friend that he had killed Ewing and Doniel Quinn. (Pl. Ex. 44: Shonda Nichols Aff. ¶¶ 18–23).

13.     Further, Aaron Robinson told his family members that Monster had committed the killings, and both Cecil Brooks and Joe Robinson attested that Monster was responsible for the murders. (Pl. Ex. 43: Cecil Brooks 2016 Aff. ¶ 18, LMKSDC_0004828); (Pl. Ex. 37: Joe Robinson Aff. ¶¶ 15-16).

14.     Even before the murders, Monster had a reputation for doing "wild" and "crazy" things and for being violent and "wicked" without capacity for remorse (Pl. Ex. 43: Cecil Brooks Aff. ¶ 21); (Pl. Ex. 37: Joe Robinson Aff. ¶ 17); (Pl. Ex. 47: Gregory Wilson 2015 Aff. ¶¶ 2–8); (Pl. Ex. 48: Siobaughn Nichols 2014 Aff. ¶ 22); (Pl. Ex. 44: Shonda Nichols Aff. ¶¶ 14–18).

15.     Monster had a cousin named Marlon Williams, who was always with Monster, including on the night before the murders. (Pl. Ex. 37: Joe Robinson Aff. ¶ 18); (Ex. 4: Niko Quinn DA Interview 1:1–5:21); (Ex. 2: Niko Quinn Dep. 50:7-51:2); (Pl. Ex. 49: Kendra Dean-Martin 2015 Aff. ¶¶ 5-7); (Pl. Ex. 45: Kendra Dean-Martin 2013 Aff. ¶ 5); (Pl. Ex. 50: Nathan Richardson Aff. ¶ 11).

16.     One of Monster's associates also participated in the killings of Ewing and Quinn, by driving Monster to and from the crime scene in a blue car. (Pl. Ex. 43: Cecil Brooks Aff. ¶¶ 12-21); (Pl. Ex. 47: Gregory Wilson 2015 Aff. ¶ 11); (Pl. Ex. 49: Kendra Dean-Martin 2015 Aff. ¶ 5); (Pl. Ex. 45: Kendra Dean-Martin 2013 Aff. ¶¶ 3-12).

17.     Aaron Robinson and Marlon Williams are now deceased, and Cecil Brooks is in prison. (Pl. Ex. 43: Cecil Brooks 2016 Aff. ¶ 1); (Pl. Ex. 37: Joe Robinson Aff. ¶ 2); (Pl. Ex. 49: Kendra Dean-Martin 2015 Aff. ¶ 5); (Pl. Ex. 51: News Articles, LMKSDC_0026622–0026628).

18.     Monster is now serving thirty years in prison after pleading guilty to a different homicide in which he shot the victim in the head multiple times without provocation, put the victim's body in the trunk, poured gasoline over the car, and ordered the car set it on fire. (Pl. Ex. 52: Neil Edgar Jr. Dep. 42:10–45:19); (Pl. Ex. 53: Sentencing Transcript, Neil Edgar Jr.).

19.     Despite this gruesome crime and Monster's thirty-year sentence, he will still become parole-eligible in early 2027, and his sentence expires in 2031. (Pl. Ex. 53: Sentencing Transcript, Neil Edgar Jr.).

20.     Many members of the KCK community acknowledge that Monster committed the murders of Ewing and Doniel Quinn and that Lamonte McIntyre is innocent, and that Monster was known to be a violent thrill seeker. (Ex. 2: Niko Quinn Dep. 71:16–72:8); (Pl. Ex. 48: Siobaughn Nichols 2014 Aff. ¶¶ 21–22); (Pl. Ex. 43: Cecil Brooks Aff. ¶¶ 1–6, 8-15); (Pl. Ex. 37: Joe Robinson Aff. ¶¶ 8, 12, 18); (Pl. Ex. 54: James McIntyre Aff. ¶ 16); (Pl. Ex. 55: M'Sherie Johnson Aff. ¶ 18); (Ex. 17: Freda Quinn 2011 Aff. ¶¶ 24–25); (Pl. Ex. 56: Frank Freeman Aff. ¶¶ 5–6).

21.     Monster did not know Lamonte McIntyre. (Pl. Ex. 52: Neil Edgar Jr. Dep. 40:21-41:18).

**Lamonte McIntyre is innocent of the murders of Ewing and Doniel Quinn**

22.     Lamonte McIntyre is actually innocent of the double homicide for which he was convicted. Certificate of Innocence, Case 2:18-cv-02545-KHV-KGG, Dkt. 187–2, pp. 2–5; Ex. 10: Niko Quinn 2014 Aff. ¶ 28); (Ex. 4: Niko Quinn DA Interview 43:13–44:24, 47:12–24, 62:12–63:1); (Ex. 2: Niko Quinn Dep. 12:10–15, 92:22–94:7, 188:23–189:10); (Pl. Ex. 41: Roger Golubski Dep. 193:7–13, 199:22–200:4).

23.     Lamonte has maintained his innocence before trial—never requesting a plea because, according to his defense attorney, "Lamonte maintained that he was innocent, he didn't do it," during trial when he testified on the stand, and throughout his time in prison and beyond. (Pl. Ex. 57: Gary Long Dep. 67:17–23); (Ex. 6A: Lamonte McIntyre TT453:24–454:19); Pl. Ex. 58: Gary Long 2015 Aff. ¶ 3:) (Pl. Ex. 56: Frank Freeman 2011 Aff. ¶¶ 9–10); (Pl. Ex. 87: Lamonte McIntyre Aff. ¶¶ 2, 11); (Pl. Ex. 54: James McIntyre Aff. ¶ 10); (Pl. Ex. 59: Rashida Martis 2011 Aff. ¶ 6).

24.     Lamonte McIntyre was at the home of one of his aunts (just across the alley from the home of his other aunt, where he was also spending time that day) on the afternoon the murders took place, as confirmed by five people. (Ex. 1: Yolanda Johnson Stmt. by Golubski, 4/20/1994, LMKSDC_0003469–3470; (Pl. Ex. 55: M'Sherie Johnson 2016 Aff. ¶¶ 3–9); Ex. 1: M'Sherie Johnson Stmt. to Golubski, 4/20/1991); (Pl. Ex. 70: Rose McIntyre 2014 Aff. ¶ 6); (Ex. 1: Natasha Haygood Stmt. to Golubski, 4/20/1994, LMKSDC_0003477–3480); (Ex. 6A: Felicia Williams TT 391:3–393:2; Peggy Crowder TT 378:2–381:8).

25.     Regardless, Lamonte McIntyre was convicted of the murders of Doniel Quinn and Donald Ewing on September 29, 1994, and was imprisoned 23 years, 5 months, and 28 days. Pretrial Order, Doc. 562, Stipulations, ¶ 15.

26.     On October 13, 2017, Lamonte McIntyre's conviction was vacated by the District Court of Wyandotte County, Kansas and his charges were dismissed. Pretrial Order, Doc. 562, Stipulations, ¶ 17. (Pl. Ex. 71: Evidentiary Hearing 333:19–336:9); (Pl. Ex. 88: Order Releasing Def. from Custody & Dismissal).

27.     On February 24, 2020, Lamonte McIntyre received a Certificate of Innocence stating that he "did not commit the crimes for which he was convicted and sentenced" nor was he

"an accessory or accomplice to the acts that were the basis of the convictions." Pretrial Order, Doc. 562, Stipulations, ¶ 15; Certificate of Innocence, Case 2:18-cv-02545-KHV-KGG, Dkt. 187–2, pp. 2–5.

**The homicide investigation was originally assigned to KCKPD homicide detectives, Blood and Maskil, but within mere hours, Culp reassigns the investigation to W.K. Smith and non-homicide detective Roger Golubski**

28.     Homicide detectives Blood and Maskil were originally assigned to lead the investigation of the murders of Ewing and Doniel Quinn. (Ex. 1: Police File, Krstolich Report, 4/15/1994, LMKSDC_0003441; Police File, Blood Report, 4/15/1994, LMKSDC_0003446; Police File, Ambler Report, 4/15/1994, LMKSDC_0003410-3411).

29.     Blood and Maskil arrived at the scene first, followed by Culp, Golubski, and finally Smith. (Ex. 1: Police File, Wansley Investigative Addendum, LMKSDC_0003410–3411).

30.     As she watched the shooter come down the hill towards Doniel Quinn and Ewing, Ruby Mitchell immediately recognized him as someone she knew—a man named Lamont, who used to date her niece. (Ex. 9: Ruby Mitchell Dep. 17:21–26:25.)

31.     When he arrived at the scene, Golubski spoke to Ruby Mitchell who told him that she thought the shooter had previously dated her niece. (Ex. 9: Ruby Mitchell Dep. 43:14-44:8; 46:16-47:21.)

32.     Golubski knew of "Lamonte McIntyre" because he had previously coerced Rose McIntyre into coming to his office, where he sexually assaulted her, and, following that, had harassed her for months. (Pl. Ex. 70: Rose McIntyre 2014 Aff. ¶¶ 45– 62); *see infra,* paras. 328–348.

33.     Stacy Quinn was also at the crime scene, waiting in Josephine Quinn's yard while W.K. Smith interviewed her sister, Niko. Stacy Quinn told the officers that she saw the crime and knew who the shooter was. (Ex. 2: Niko Quinn Dep. 137:20–138:3).

34.     Golubski knew Stacy Quinn because he had a long-time sexual relationship with her. (Ex. 10: Niko Quinn 2014 Aff. ¶ 27); (Ex. 2: Niko Quinn Dep. 12:10–15, 82:9–13, 177:19–178:8).

35.     Culp reassigned the investigation to homicide detective W.K. Smith and non-homicide detective Roger Golubski. (Ex. 1: Police File, Blood Report, 4/15/1994, LMKSDC_0003446).

36.     After Smith, Golubski, and Krstolich arrived on scene, Culp directed them to interview the witnesses at the scene and sent Blood and Maskil to the hospital where Ewing had been taken.  (Ex. 1: Police File, Blood Report, 4/15/1994, LMKSDC_0003444).

37.     Golubski became the lead detective on the case, with Smith claiming that his role was limited to interviews on the scene. (Pl. Ex. 42: W.K. Smith Dep. 101:8–106:3, 126:10–128:17); (Pl. Ex. 41: Roger Golubski Dep. 49:14–19); (Ex. 6A: TT 295:10–12).

38.     There was no legitimate police reason for Culp to make Golubski, a non-homicide detective, the lead detective on this double homicide investigation, when Smith, a homicide detective was also assigned to work the case. (Pl. Ex. 60: Clyde Blood Dep. 72:22–73:2, 75:18–25, 76:4–7, 76:14–22, 179:17–180:2, 185:4–11, 203:4–10).

**Niko Quinn, a partial witness to the shooting of Donald Ewing and Doniel Quinn, observes that the shooter is short and tells that to Golubski, who does not report it**

39.     Niko Quinn was walking up Hutchings Street toward the house of her mother, Josephine Quinn, who lived a couple doors down, when the shooting occurred. Niko Quinn Aff.

63

6/30/14 ¶ 7, LMKSDC_0006728; (Ex. 4: Niko Quinn DA Interview 6:16–8:16); (Ex. 2: Niko

Quinn Dep. 12:10–15, 171:22–173:10). Niko observed the shooter walk downhill towards the

car, but she "really didn't pay no attention to mind" at that time. Shen then saw him bend over

the car and heard the first shot; at that point she turned around and walked back toward the

house. (Ex. 4: Niko Quinn DA Interview 40:11–22; 42:9–43:12); (Ex. 2: Niko Quinn Dep.

12:10–15, 56:9–60:9).

      40.     Niko Quinn was at an angle from the shooter, and, given sun glare she could not

see the details of the shooter's face, but she could see his silhouette. (Ex. 2: Niko Quinn Dep.

61:6–21, 62:25–63:5, 64:25–65:5, 142:25–143:2). Niko Quinn noticed that the shooter "was a

short guy," around 5'6" or 5'7", and that he had a "medium brown" skin tone. (Ex. 4: Niko

Quinn DA Interview 8:19–24, 49:17–50:24); (Ex. 2: Niko Quinn Dep. 12:10–15, 108:11–19).

      41.     Monster had a medium skin color, was no more than 5'7", and shared the same

build as the shooter that Niko Quinn observed. Monster MODOC Offender Profile,

LMKSDC_00004926; Monster Mug Shot 1996 LMKSDC_0008144; (Ex. 4: Niko Quinn DA

Interview 50:8–23); (Ex. 2: Niko Quinn Dep. 12:10–15).

      42.     In a taped interview by Det. Smith shortly after the crime, Niko Quinn was asked

how the shooter was dressed and responded "He had on black. A black hat, black pants, and

black tennis shoes." Quinn was not asked on the tape to describe the shooter, including his

height, build, or skin tone.  Niko Quinn Stmt. by Smith, 4/15/1994, LMKSDC_0003417–20.

      43.     On April 16, 1994, the day after the murder, Golubski and Detective Ware spoke

to Niko Quinn about the murders. Niko Quinn explained to them "the guy that killed [her] cousin

was not a big, tall guy. He was maybe like 5'7", 5'6", somewhere around there. He was a short

guy." (Ex. 4: Niko Quinn DA Interview 8:19–24); (Ex. 2: Niko Quinn Dep. 12:10–15) (Ex. 1:

Police File, Golubski Investigative Addendum, 4/16/1994, LMKSDC_0003455).

44.     Lamonte McIntyre is significantly taller and had a different skin tone than the

description Niko Quinn gave police of the shooter. Niko Quinn Aff. 2014, ¶¶ 21, 29,

LMKSDC_006730–31; Niko Quinn Aff. 1996, ¶¶ 5, 8, LMKSDC_0006732–33. (Ex. 4: Niko

Quinn DA Interview 39:14–19, 47:3–7); (Ex. 2: Niko Quinn Dep. 12:10–15, 171:22–173:10).

45.     When asked if he recognized that the consistent description of the shooter as

approximately 5'6" or 5'7" was inconsistent with Lamonte McIntyre, who was at least 5'11",

Golubski refused to answer and instead invoked his Fifth Amendment right to remain silent. (Pl.

Ex. 41: Roger Golubski Dep. 152:22–154:21); (Ex. 1: Arrest Report, LMKSDC_0003413).

46.     Despite KCKPD officers' obligation to document anything relevant a witness has

told them, Golubski and Ware did not record in any report this description by Niko Quinn of the

shooter's height, which was inconsistent with Lamonte McIntyre. (Pl. Ex. 60: Clyde Blood Dep.

112:21–113:10); (Pl. Ex. 35: Dennis Ware Dep. 223:6–15); (Ex. 1: Entire Police File,

LMKSDC_0003391–3500.)

**In violation of procedure, Golubski and Ware bring an improperly suggestive set of photos
to show Niko Quinn**

47.     On April 16, 1994, the day after the murders, Golubski and Ware went to Niko

Quinn's home and showed her a stack of five loose photos with the names written on the back.

(Ex. 1: Police File, Golubski Investigative Addendum, 4/16/1994, LMKSDC_0003455); Niko

Quinn Aff. 6/30/2014, ¶ 17, LMKSDC_0006729; (Pl. Ex. 35: Dennis Ware Dep. 167:1–15); (Ex.

2: Niko Quinn Dep. 82:2–83:4, 171:22–173:10, 181:6–12); (Pl. Ex. 46: Polaroids from Lineup

with Names on Back).

48.    The procedure for putting together a photo lineup at the KCKPD was to put the photo of the suspect and fillers in a manila folder with squares cut in it. It was not proper procedure to hand a witness a stack of photos, as that could be suggestive. (Pl. Ex. 42: W.K. Smith Dep. 147:24–148:8, 151:16–152:19).

49.    A photo lineup should include only one suspect and the rest should be fillers (other people who closely resemble the suspect), and typically the identification unit would find the fillers to fill out the rest of the photo lineup. (Pl. Ex. 42: W.K. Smith Dep. 147:24–149:15, 152:20–154:18); (Pl. Ex. 35: Dennis Ware Dep. 161:1–162:24); (Pl. Ex. 60: Clyde Blood Dep. 20:13–21:24); (Pl. Ex. 64: Michael York Dep. 24:6–26:2, 27:17–28:16).

50.     As Michael York, the Unified Government's representative explained, when choosing fillers, the idea is that "[y]ou are certain when you are choosing those photographs that this person is not part of the crime, was not responsible for the crime." (Pl. Ex. 64: Michael York Dep. 25:4–13).

51.    Plaintiffs' eyewitness identification expert Dr. Dysart opines, "It is critically important to include fillers who had nothing to do with the crime so that the array contains clearly wrong answers; this is necessary in order to test the reliability of the witness's selection when they do select a suspect." (Pl. Ex. 34: Expert Report of Jennifer Dysart at 12).

52.    Two of the other photos in the five-photo stack Niko Quinn viewed were of Lamonte McIntyre's relatives: his brother, James McIntyre; and his cousin, Terrence. (Pl. Ex. 46: Polaroids from Lineup with Names on Back); (Pl. Ex. 54: James McIntyre Aff. ¶ 29); (Pl. Ex. 66: Lamonte McIntyre 2022 Decl. ¶ 4 & Ex. A).

53.    KCKPD officers understood it was improper to include multiple family members in one photo lineup because that would be suggestive and unfair. (Pl. Ex. 35: Dennis Ware Dep.

66

160:1–8, 162:16–163:2); (Pl. Ex. 60: Clyde Blood Dep. 21:25–23:24, 221:17–222:18); (Pl. Ex. 64: Michael York Dep. 36:20–37:2); (Pl. Ex. 34: Expert Report of Jennifer Dysart p. 12); (Pl. Ex. 65: Timothy Maskil 2015 Aff. ¶ 10); (Pl. Ex. 41: Roger Golubski Dep. 107:11–108:15).

54.    During this photo showing, Niko Quinn told Golubski and Ware that she recognized two of the men included in the photographs whom she knew didn't do the shooting: Lamonte McIntyre's brother, James McIntyre, whom she used to date, and Raymond Hickman, who is her cousin. (Pl. Ex. 46: Polaroids from Lineup with Names on Back); (Ex. 4: Niko Quinn DA Interview 22:24–23:10); (Ex. 2: Niko Quinn Dep. 12:10–15, 82:25-85:16).

55.    The photo stack included a photo of Lamonte McIntyre taken in 1992, when he was sixteen years old, nearly one and a half years younger and when he had a much more childish face. (Pl. Ex. 46: Polaroids from Lineup with Names on Back); (Pl. Ex. 68: Lamonte McIntyre 1994 Mugshot).

56.    At the time of interview with Niko Quinn on April 16, 1994, KCKPD officers had access to a more recent photograph of Lamonte McIntyre from February 1994, which provided a more accurate depiction of Lamonte, and also had Lamonte McIntyre in custody. However, the 1994 photograph was not shown to witnesses in this case, and no in-person line up was conducted. (Ex. 1: Entire Police File, LMKSDC_0003391–3500); (Pl. Ex. 68: Lamonte McIntyre 2/28/1994 Mugshot).

57.    There was such a "discernible difference" between Lamonte McIntyre's features as depicted in the 1992 photo used in the photo stack and a photo of McIntyre taken in February 1994 that to Detective Ware, they looked like different people. (Pl. Ex. 35: Dennis Ware Dep. 241:13–243:18); *see also* (Pl. Ex. 34: Expert Report of Jennifer Dysart p. 13).

58.     The practice in the KCKPD was to select the closest available in time photograph of the suspect for a photo identification procedure so that it would be "the closest likeness…to what the perpetrator looked like when the witness saw them" to maximize the chance the witness would select the perpetrator. (Pl. Ex. 35: Dennis Ware Dep. 231:2–233:16); (Pl. Ex. 60: Clyde Blood Dep. 26:8–19); (Pl. Ex. 61: Russell Fischer Report, p. 15).

59.     Ware admitted he could not think of any "conceivable legitimate reason" to use the 1992 photo of McIntyre in a lineup if the 1994 photo was available and agreed it would be important to ask Detective Golubski why he selected a photograph of Lamonte McIntyre from 1992 to show the witnesses when there was a photograph taken two months prior to the crime apparently available. (Pl. Ex. 35: Dennis Ware Dep. 243:19–244:22); Pl. Ex. 68: Lamonte McIntyre 2/28/1994 Mugshot).

60.     Golubski reported that he had shown Niko Quinn a "photo lineup," which has a particular meaning in police vernacular: a number of photos either mounted on a piece of paper or in a manila envelope with squares cut out. (Pl. Ex. 35: Dennis Ware Dep. 156:12–157:9, 189:9–190:18); (Pl. Ex. 42: W.K. Smith Dep. 265:17–267:13); (Pl. Ex. 61: Russell Fischer Report, p. 14).

61.     Calling the showing of a stack of five Polaroids loosely handed to a witness a "photo lineup" is inaccurate, and it could mislead a supervisor or prosecutor that any selection made is more inculpatory than it actually is. (Pl. Ex. 41: Roger Golubski Dep. 113:1–25, 163:4–16); (Pl. Ex. 35: Dennis Ware Dep. 156:12–157:9, 189:9–190:18); (Pl. Ex. 42: W.K. Smith Dep. 265:17–267:13); (Pl. Ex. 61: Russell Fischer Report, p. 14).

**Golubski and Ware use suggestion and coercion during the first photo procedure they conduct with Niko Quinn, but are unsuccessful in obtaining an identification**

62.     After Niko Quinn eliminated the two people she personally recognized from the stack of five photos, she was holding the remaining pictures and looking at them. Golubski told Niko Quinn that if she knew who the shooter was, she better testify and that it would be better for her if she did. (Ex. 10: Niko Quinn 2014 Aff. ¶ 17). Niko told Golubski and Ware "No, I don't know who it is." (Ex. 2: Niko Quinn Dep. 83:21–85:16).

63.     As Niko Quinn explained: "That's when they grabbed the pictures back and the one guy held the picture and he said what did he—what did she [Ruby Mitchell] say the guy's name was? And I said she said Lamont. So he's holding the picture like this of Lamonte and he said, "What did she say the man's name was?" And I said Lamont. When they held the picture up they held it in the sun and I could see Lamonte's name on the back. And I just stared at the picture and just staring at it. And I gave them the picture back and said I don't know who it was. And that's when they were saying you know who it is, you know who it is. I said I don't know." (Ex. 2: Niko Quinn Dep. 83:21–85:16, 135:6–24); (Ex. 4: Niko Quinn DA Interview 23:12–24:13, 63:10–18); (Ex. 10: Niko Quinn 2014 Aff. ¶ 18.)

64.     While Golubski was instructing Niko Quinn to make an identification and asking about the name Ruby Mitchell had given, Ware placed his thumb on Lamonte McIntyre's photo, as if he were pointing at it. (Ex. 10: Niko Quinn 2014 Aff. ¶ 18); (Ex. 2: Niko Quinn Dep. 12:10–15, 181:6–182:17); (Ex. 4: Niko Quinn DA Interview 23:12–24:13).

65.     Ware admitted that if he placed his thumb on Lamonte McIntyre's photo as Niko Quinn described, that would have been "grossly improper" and "direct suggestion" and that he

69

knew that in 1994. (Pl. Ex. 35: Dennis Ware Dep. 85:21–86:20, 183:7–17); *see also* (Pl. Ex. 34: Expert Report of Jennifer Dysart p. 14).

66.     Ware also understood by 1994 that if he observed Detective Golubski try to influence Niko Quinn's suggestion in any of the ways she described he had an obligation to intervene and to report Golubski up the chain of command; Ware did not do so. (Pl. Ex. 35: Dennis Ware Dep. 179:18–182:11); (Pl. Ex. 42: W.K. Smith Dep. 253:5–254:16).

67.     Despite this direct suggestion, Niko Quinn told Golubski and the other detective that she could not make an identification from these photos. (Ex. 2: Niko Quinn Dep. 171:22–173:10, 185:21–25); (Ex. 10: Niko Quinn 2014 Aff. ¶ 18.)

**Golubski fabricates a police report of his first identification procedure with Niko Quinn**

68.     In his police report, Golubski reported that Niko Quinn had a physical reaction to viewing the photo of Lamonte McIntyre, claiming she stared at it and "began shaking, became teary eyed, and was very hesitant in making any statements," that she could not describe any difference between this photo and the shooter, would not let go of the photo for four or five minutes, and then said she "thought this was the individual but was not sure at this time positively. But thought this might be him." Golubski also reported that it was "very obvious that Niko Quinn knows exactly who the shooter is, but being highly traumatized at this time is reluctant to provide that information." (Ex. 1: Police File, Golubski Investigative Addendum (4/16/1994), LMKSDC_003455-3456); *see also* Ex. 6A: Golubski TT 326:16–27:17.

69.     Golubski's report does not accurately describe the circumstances surrounding Niko Quinn's viewing of the photographs. In particular, Niko Quinn did not tentatively identify Lamonte McIntyre, as Golubski describes in his report, but instead told Golubski and Ware that she could not make any identification from the photos. (Ex. 2: Niko Quinn Dep. 185:21–25).

70

70.     Golubski's report of the identification procedure omits the direct suggestion Niko Quinn describes by Golubski and Ware and also omits that Niko Quinn could immediately eliminate two of the five people in the array because she knew them and knew they were not the perpetrator. (Ex. 1: Police File, Golubski Addendum 4/16/1994, LMKSDC_0003455–3456); (Ex. 4: Niko Quinn DA Interview 22:24–23:10); (Ex. 2: Niko Quinn Dep. 12:10–15, 82:25–85:16).

71.     When asked if he fabricated this report of the April 16, 1994 identification procedure with Niko Quinn, Golubski refused to answer and instead invoked his Fifth Amendment right to remain silent. (Pl. Ex. 41: Roger Golubski Dep. 163:4–166:2).

**Niko Quinn realizes the real perpetrator is Monster**

72.     Within a few days after the murder, Niko Quinn realized her cousins had been shot by associates of a dangerous group of drug-dealers that included Cecil Brooks and his cousin Aaron Robinson, in some sort of a "drug hit," and they were the same group that beat up Doniel Quinn about a week before his murder and came looking for him the night before the murder. (Ex. 2: Niko Quinn Dep. 88:18–89:2, 196:2–10; 12:10–15, 40:21–43:11, 171:22–173:10, 40:21–41:10, 42:4–43:11, 173:11–174:7); (Ex. 10: Niko Quinn 2014 Aff. ¶ 14.); (Ex. 4: Niko Quinn DA Interview 1:1–3:25); (Pl. Ex. 45: Kendra Dean-Martin 2013 Aff., ¶ 9); Golubski's SOF ¶ 27.

73.     This group included "Monster," who was an enforcer who would shoot people for hire and worked for Aaron Robinson. (Pl. Ex. 37: Joe Robinson Aff. ¶¶ 3–19); (Pl. Ex. 43: Cecil Brooks Aff. ¶¶ 3–20).

74.     After the murder, for three of four days in a row people would park in front of Niko Quinn's house, knock on her door, and she would look out and "two dudes are standing on

71

[her] porch with guns." Niko Quinn was scared that they were coming after her because she had witnessed a murder and left and went to Missouri. (Ex. 2: Niko Quinn Dep. 88:7–17, 90:19–91:14).

75.     Around the same time, a "couple of days after" Lamonte McIntyre was picked up, a girl named Tiffany Daniel told Niko Quinn at a gas station that Lamonte didn't do the shooting, Monster did. (Ex. 4: Niko Quinn DA Interview 43:13–44:17); (Ex. 2: Niko Quinn Dep. 12:10–15, 75:19–76:5).

76.     Stacy Quinn also pointed out Monster to Niko Quinn after the murders and said, "That's the one that killed Little Don"; she would point him out to Niko Quinn "all the time." (Ex. 4: Niko Quinn DA Interview 43:23–44:24, 46:10–47:24); (Ex. 2: Niko Quinn Dep. 12:10–15, 171:22–173:10); (Ex. 10: Niko Quinn 2014 Aff ¶ 19).

77.     Niko Quinn became confident Monster was the shooter. (Ex. 2: Niko Quinn Dep. 12:10–15, 71:16–72:8); (Ex. 4: Niko Quinn DA Interview 46:10–47:24).

**Niko Quinn calls Golubski to tell him she knows Monster killed her cousin, but Golubski pressures her to identify Lamonte McIntyre**

78.     Because she was scared about the people showing up at her house with guns, Niko Quinn called Golubski on the phone. She told him she needed to talk to him and that she could identify the guy who killed her cousin. "At the time that [she] called him [she] knew it was Monster and Cecil and them." (Ex. 2: Niko Quinn Dep. 91:15–92:7, 149:2–15).

79.     Approximately three weeks or a month after the murders, Golubski met with Niko Quinn behind the Wyandotte High School track. (Ex. 10: Niko Quinn 2014 Aff. ¶ 19.); (Ex. 2: Niko Quinn Dep., 92:8–12, 92:22–24, 171:22–173:10) (Ex. 6A: Golubski TT 327:18–328:16).

80.     Niko Quinn sat in Golubski's car with him alone to talk to him. (Ex. 2: Niko Quinn Dep. 93:2–14).

81.     Niko Quinn describes what she told Golubski: "So when I sat in the car with Golubski I told him I know who killed my cousin, and he said how I know. And I explained to him what took place before my cousin was killed, which was him getting beat by Aaron Robinson and Monster, and that they had tried to pick him up the day prior to the murder, trying to get him to go with them the day of the murder. And just word on the street and whatever." (Ex. 2: Niko Quinn Dep. 93:15–94:7). Niko Quinn specifically told Golubski about Doniel being beat up in the days before his murder and his injuries, "that Cecil had his boys had jumped him maybe a week or two before he was killed, and also told him that they were trying to get him in the car the last two days before he was killed." She also told him Doniel "didn't have no beef with nobody but the guys that jumped him." (Ex. 2: Niko Quinn Dep. 174:8–175:17).

82.     Golubski responded by warning Niko Quinn to leave that alone, that she "shouldn't be talking about Cecil, be careful what [she] say[s] about Cecil because they found his ex-girlfriend's remains behind Washington High School." (Ex. 2: Niko Quinn Dep. 93:15–94:7, 175:18–176:4).

83.     Golubski told Niko Quinn Cecil Brooks and Aaron Robinson and their gang "didn't do it, they couldn't have did it because they had the guy in custody [referring to Lamonte McIntyre], they had the clothes he was wearing and they had the gun so they got the right person." (Ex. 2: Niko Quinn Dep. 176:5–20).

84.     However, the police never had any incriminating clothes, gun, or any other physical or forensic evidence implicating Lamonte McIntyre. (Ex. 28: Terra Morehead Dep.

177:21–178:14, 181:12–15, 182:7–15, 182:18–25); (Pl. Ex. 57: Gary Long Dep. 58:19–60:3, 60:13–16).

85.     Knowing Niko Quinn was scared for her life, Golubski offered to put her in protective custody; he then helped her move to 4th Street. (Ex. 2: Niko Quinn Dep. 98:9–99:4, 186:1–187:10); (Pl. Ex. 41: Roger Golubski Dep. 169:19–170:11).

86.     During this conversation, Golubski put a lot of pressure on Niko Quinn to make a positive identification. Specifically, Golubski "gives [her] the picture, he tells [her] that they had the clothes, they had the gun, and they had Lamonte in custody, and they knew for a fact that he was the one that killed [her] cousin." (Ex. 2: Niko Quinn Dep. 94:8–14); (Ex. 10: Niko Quinn 2014 Aff. ¶ 20); (Ex. 2: Niko Quinn Dep. 171:22–173:10).

87.     Golubski also asked Niko Quinn if it was possible that the people after her could be Lamonte McIntyre's brothers and cousins; Niko Quinn told him she knew the McIntyre family (although she did not know Lamonte) and that "there is no way that [they] would do anything like that." (Ex. 2: Niko Quinn Dep. 94:15–23).

88.     When asked if he fabricated Niko Quinn's identification of Lamonte McIntyre, Golubski refused to answer and instead invoked his Fifth Amendment right to remain silent. (Pl. Ex. 41: Roger Golubski Dep. 150:14–151:3, 174:19–175:2).

**In violation of policy/procedure Golubski makes no contemporaneous report of Niko Quinn's alleged identification or the exculpatory information she reports to him about Monster**

89.     It is the lead detective's obligation in a homicide case to ensure that every potentially significant thing that happens is accurately documented in the file, including identification procedures, whether they resulted in a positive identification or not. (Pl. Ex. 60: Clyde Blood Dep. 107:7–25, 118:23–119:12, 164:13–165:4).

74

90.     Golubski did not make any contemporaneous report of his meeting with Niko
Quinn behind Wyandotte High School nor the alleged second photo identification procedure.
(Ex. 6A: Golubski TT 330:24–331:4); (Ex. 28: Terra Morehead Dep., 141:12–142:1, 185:8–
187:25); Golubski SOF ¶ 85.

91.     Niko Quinn told Golubski on numerous occasions that the police had gotten the
wrong man for Doniel's murder, and that her sister said the real killer was Monster. In response,
Golubski said nothing and took no action. (Ex. 10: Niko Quinn 2014 Aff. ¶ 28, 2014); (Ex. 4:
Niko Quinn DA Interview: 171:22–173:10).

92.     For example, before she was going to testify, Niko Quinn and Golubski were in a
room together at the juvenile courthouse. Niko Quinn told Golubski that Lamonte McIntyre did
not commit the crime. Golubski's sole response was that they "could not discuss that in here."
There, Golubski also told Niko Quinn that she heard she used to strip and asked her to get up and
dance on the table for money. (Ex. 4: Niko Quinn DA Interview 30:23–31:18); (Ex. 2: Niko
Quinn Dep. 12:10–15).

93.     Encountering Golubski around 2011, Niko Quinn waved him down, to which
Golubski responded that he should not talk to her because she is the one who "told on him" to an
investigator regarding his misconduct. (Ex. 4: Niko Quinn DA Interview 64:4–25); (Ex. 2: Niko
Quinn Dep., 12:10–15).

**Consistent with Niko Quinn's account to Golubski, Defendants have a lot of other evidence
indicating that the double homicide was a drug hit**

94.     Police collected a crack pipe from the car where Ewing and Quinn were
murdered. (Ex. 1: Police File, Golubski Report, 4/16/1994 LMKSDC_0003394; Police File,
Clair Report, 4/18/1994, LMKSDC_0003430; Police File, LMKSDC_0003453).

95.     Police knew that drug trafficking took place in the area in which the double homicide occurred. (Pl. Ex. 35: Dennis Ware Dep. 208:23-209: 19.)

96.     Detective Ware testified that in "any homicide you want to find out whether there is some drug connection," and that it is "more likely" a homicide is drug-related when there is an "execution style murder in the middle of the day" near the area of 18th Street and Quindaro in Kansas City, Kansas in 1994. (Pl. Ex. 35: Dennis Ware Dep. 211:16–215:19.)

97.     Indeed, Golubski alleges that the North End neighborhood where the murders occurred was "riddled with addiction and drug dealers preying upon those with drug addictions." Pretrial Order, Doc. 562, Contentions of Defendant Roger Golubski, p. 26.

98.     Doniel Quinn's father, John Quinn, also told Detective Golubski that Doniel had been hanging out with "[a] cobra snake [whose] any kind of bite would be instant death." (Ex. 1: Police File, John Quinn Stmt. LMKSDC_0003462, 0003466).

99.     When Smith interviewed Josephine Quinn, a potential eyewitness to the crime, he asked whether Doniel Quinn, her nephew, was involved in drug trafficking because it was an obvious angle for investigation given the circumstances of the crime. (Ex. 1: Josephine Quinn Stmt. by Smith, 4/15/1994, LMKSDC_0003428); (Pl. Ex. 42: W.K. Smith Dep. 385:8–19).

**Golubski later fabricates that Niko Quinn made an adamant identification of Lamonte McIntyre during this meeting behind Wyandotte High School**

100.     After the preliminary hearing, Golubski reported to the prosecutor that Niko Quinn had earlier volunteered an adamant and unequivocal identification of Lamonte McIntyre, without any suggestion from him, approximately a week after the murder. (Ex. 28: Terra Morehead Dep. 131:3–18).

101.    Golubski later testified at trial that Niko Quinn had made an "adamant" identification of Lamonte McIntyre during this meeting, and that she had done so without any suggestion from him. (Ex. 6A: Golubski TT 327:18–329:15).

102.    Golubski's report was a lie; Niko Quinn was never adamant about selecting Lamonte McIntyre's photo; rather, she described detectives' direct suggestion as to who she should identify. (Ex. 2: Niko Quinn Dep. 188:23–189:18); (Pl. Ex. 41: Roger Golubski Dep. 172:3–22); *see supra* paras. 78–88.

103.    Golubski's failure to make any contemporaneous record or inform anyone of Niko Quinn's identification at the time it first happened is so unusual as to raise questions about the legitimacy of Golubski's investigation. In fact, Smith had never seen anything like that in the course of his police career. Further, Blood agreed he had never seen a case where an officer failed to document a positive identification from an eyewitness, and that if he obtained a positive identification, he would be "tickled" and would document it because "that made my job a lot easier if that's the guy." (Pl. Ex. 60: Clyde Blood Dep. 173:4–16); (Pl. Ex. 42: W.K. Smith Dep. 350:9–352:4). *See also* (Pl. Ex. 61: Fischer Report, p. 13–14).

104.    When asked if the reason he did not make a contemporaneous record of what he later described as an adamant identification by Niko Quinn was because it didn't happen that way, and in reality he told Niko Quinn who to pick, Golubski refused to answer and instead invoked his Fifth Amendment right to remain silent. (Pl. Ex. 41: Roger Golubski Dep. 177:11–178:7, 179:5–180:10, 180:17–181:2).

**Ruby Mitchell is a partial eyewitness to the shooting of Donald Ewing and Doniel Quinn**

105.    Ruby Mitchell lived diagonally across the street, two houses down from the parked car where Ewing and Quinn were shot. (Ex. 5: Waiver Hearing 5:16–6:5, 10:4–11:19).

106.     Mitchell was standing in her doorway with her five-year-old son, talking on the phone, when she briefly viewed, through a storm door with a screen, the shooter approach the car and commit the murders, (Ex. 9: Ruby Mitchell Dep. 16:1-17:20); (Ex. 5: Waiver Hearing – Mitchell 15:17–16:4).

107.     Mitchell did not see any of the shooter's facial features, but thought she recognized the shooter as her niece's boyfriend due to his skin tone and hairstyle, and was about to call out to him when she saw the gun.  (Ex. 9: Ruby Mitchell Dep. 21:10-18; 24:19-25:19; 42:7–11); (Ex. 5: Waiver Hearing – Mitchell 13:6–20); (Ex. 8 Ruby Mitchell Aff. ¶¶ 9, 12).

108.     Although Mitchell only knew her niece's boyfriend by his first name, "Lamont," his full name is Lamont Drain. (Ex. 9: Ruby Mitchell Dep. 26:19-25); (Ex. 5: Waiver Hearing – Mitchell 19:6–7); (Ex. 6: Ruby Mitchell TT 181:6–11).

109.     Mitchell had a friendly relationship with Drain; he called her "auntie," she spent time with him with her niece, and he came over to her house sometimes. (Ex. 9: Ruby Mitchell Dep. 24:5-18, 25:15-26:10); (Ex. 6: Mitchell TT 165:12-25).

110.     Mitchell thought that the Lamonte she knew, who had dated her niece, was the person who did the shooting. At no point during the shooting did Mitchell change her mind about who she thought it was. (Ex. 9: Ruby Mitchell Dep. 127:10-14); (Ex. 6: Mitchell TT 165:12-166:7).

111.     Mitchell was shocked by the shots; she shut the door and called the police. (Ex. 9: Ruby Mitchell Dep. 42:7–21.)

112.     Mitchell then went back outside where she met Niko Quinn and sat with her on her porch. (Ex. 6: Mitchell TT 167:16-168:2). Mitchell told Niko Quinn the shooter was Lamont,

her niece's boyfriend. (Ex. 4: Niko Quinn DA Interview 19:16-24; 21:11-22); (Ex. 2: Niko Quinn Dep. 64:3-14).

113.     Like Lamont Drain, Neil Edgar Jr, "Monster," wore thick French braids that lay back against his scalp. (Ex. 9: Ruby Mitchell Dep. 21:10-22:1, 28:8-20); (Ex. 6: Mitchell TT 186:6-16, 208:13-209:6); (Pl. Ex. 43: Cecil Brooks Aff. ¶ 24); (Pl. Ex. 56: Frank Freeman Aff. ¶ 8).

**Mitchell gives a limited description of the shooter which is consistent with Monster and inconsistent with Lamonte McIntyre**

114.     While police were at the scene, Mitchell spoke with Detective Golubski alone on her porch and he asked Mitchell what the shooter looked like, and she told him that the shooter had dark skin and braids, and that she'd thought it was her niece's boyfriend. (Ex. 9: Ruby Mitchell Dep. 43:14-44:8; 46:10-47:21.)

115.     Detective Golubski failed to document this encounter with Ruby Mitchell, or the information she reported to him. (Ex. 1: Entire Police File, LMKSDC_0003391–0003500.)

116.     At his deposition, Golubski refused to answer and instead invoked his Fifth Amendment rights in response to questioning about whether it was clear to him based on where Mitchell was standing at the time of the crime that she would not have been able to see the shooter's face. (Pl. Ex. 41: Roger Golubski Dep. 101:5–21, 157:5–22).

117.     At 2:55pm, Krstolich took a taped statement from Mitchell. (Ex. 1: LMKSDC_0003421).  She described the shooter as brown-skinned, wearing all black clothing, including black khakis and a black t-shirt with white writing on it, only about 5'6" tall. (Ex. 1: LMKSDC_0003422–23). Monster is 5'7". (Pl. Ex. 69: Monster MODOC Offender Profile, LMKSDC_00004926).

118.     When Krstolich asked whether Mitchell could see the shooter's face, she

responded, "Well, he's brown skinned, that's all I could tell. I don't know no scars or nothing

like that." (Ex. 1: Mitchell Stmt. to Krstolich, LMKSDC_0003423).

119.     In 1994, Lamonte McIntyre was tall and skinny, almost six feet tall, and he wore

his hair in a short, closely cropped hair style. (Ex. 1: Police File, Arrest Report,

LMKSDC_0003413); (Pl. Ex. 68: Lamonte McIntyre 2/28/1994 Mugshot).

120.     On the day of the shooting Lamonte McIntyre wore a blue "Michigan" hat, brown

or rust-colored jeans, and a faded black t-shirt. (Ex. 1: Witness Stmt., Yolanda Johnson,

LMKSDC_0003469; Natasha Haygood Stmt. by Golubski, LMKSDC_0003480; M'Sherie

Johnson Stmt. by Golubski, LMKSDC_0003489); (Ex. 6A: M'Sherie Johnson TT 428:12–25;

Peggy Crowder TT 381:9–16).

121.     Witnesses were able to recall Lamonte McIntyre's outfit because he had been

wearing the same clothes for days. (Ex. 1: Natasha Haygood Aff, LMKSDC_0003480; M'Sherie

Johnson Stmt. by Golubski, LMKSDC_0003489); (Pl. Ex. 70: Rose McIntyre 2014 Aff. ¶ 7).

**Golubski drives Mitchell to the police station for a follow-up interview, and sexually**
**harasses her during the drive**

122.     Later that afternoon, Golubski drove Mitchell to the police department. (Ex. 8:

Ruby Mitchell Aff. ¶¶ 5, 14); (Ex. 9: Ruby Mitchell Dep. 46:10–15).

123.     During the drive Golubski told Mitchell that he thought she was pretty and had a

nice body, asked if she had a boyfriend and put his hand on her upper thigh. (Ex. 8: Ruby

Mitchell Aff. ¶ 14; (Ex. 9: Ruby Mitchell Dep. 50:3–55:22).

124.     Golubski's actions made Mitchell nervous and uncomfortable, and she was

worried about what he might do on the way back home when it would be dark out. She was also

afraid he would arrest her for solicitation or offer her money for sex. (Ex. 9: Ruby Mitchell Dep. 54:10-18); (Ex. 8: Ruby Mitchell Aff. ¶ 16).

125.    Mitchell remained nervous about this experience with Golubski while at the police department; she was still upset talking about the experience twenty-seven years later at her deposition. (Ex. 9: Ruby Mitchell Dep. 55:20–22; 64:2–17.)

126.    By making sexual comments about Mitchell's body, Golubski "departed from minimally acceptable police practice by creating a threatening and coercive environment prior to conducting a photo identification" with her. It was widely understood by 1994, that making sexual remarks about a witness could create a negative environment in which the witness could not accurately identify the shooter. (Pl. Ex. 61: Russell Fischer Report, p. 12).

127.    Indeed, it was against KCKPD policy at the time for an officer to transport members of the opposite sex in police vehicles alone, given the risks involved in police interactions with witnesses of the opposite sex. (Pl. Ex. 61: Russell Fischer Report, p. 13).

**At the station, Mitchell tells Golubski and Krstolich that she thought the shooter was a man she knew named "Lamont"—which Golubski uses as an opportunity to make Lamonte McIntyre his primary suspect**

128.    Golubski and Krstolich interviewed Mitchell at the police department. (Ex. 8: Ruby Mitchell Aff. ¶6); (Ex. 5: Waiver Hearing 39:9–12).

129.    During the interview, Mitchell again reported that the shooter looked like her niece's former boyfriend whose first name was "Lamont." (Ex. 8: Ruby Mitchell Aff. ¶ 8); (Ex. 9: Ruby Mitchell Dep. 56:14-57:18); (Ex. 1: Police File, Krstolich Report, 4/15/1994, LMKSDC_0003442).

130.    Mitchell was positive that the shooter had French braids, which appeared to be of medium length and braided to the back of his head. She reported this description to police "from

the very beginning." (Ex. 8: Ruby Mitchell Aff. ¶¶ 9, 12); *see supra* para. 114; (Ex. 9: Ruby Mitchell Dep. 46:16-47:21.)

131.    According to Plaintiff's expert in police practices, Russ Fischer, a former Chief of the Criminal Investigations Division at the Miami-Dade Police Department, if Mitchell's sworn account that she "from the very beginning," told police the shooter had French braids is accurate, then the failure of Golubski and Krstolich to document this description is deeply troubling for a number of reasons, including because she selected Lamonte McIntyre's photo which did not include French braids. According to Chief Fischer, the contradictions regarding hair styles signaled the need to take all available steps to corroborate Mitchell's identification. (Pl. Ex. 61: Russell Fischer Report, p. 12).

132.    At his deposition, Golubski refused to answer and instead invoked his Fifth Amendment right to remain silent when asked whether, upon hearing Ruby identify the shooter as a black teenager named "Lamont," he thought of Lamonte McIntyre because Golubski knew his mother and saw an opportunity to get back at her. (Pl. Ex. 41: Roger Golubski Dep. 103:16–105:4, 106:6–107:10, 267:10–268:15).

133.    In the late 1980s or early 1990s the KCKPD had very important rules about how photo identification procedures were conducted. (Pl. Ex. 35: Dennis Ware Dep. 85:8-16; 28:23-29:21.)

134.    When putting together a photo lineup in the early 1990s, the procedure was to go to the crime lab identification unit, where books of photos were organized by criminal jacket number or alphabetical order by name, go through the photos, and pick out similar photographs one by one until the detective had what they thought was a fair array. (Pl. Ex. 60: Clyde Blood Dep. 167:24-168:10; 170:16-172:4).

82

135.    Instead, in this case, Golubski obtained Polaroids of Lamonte McIntyre and his brother and cousin from a file relating to a prior unrelated incident during which all three were arrested. Golubski SOF ¶ 55; Def. Golubski's Mot. in Supp. of Summ. J. (D.E. 582), at 9–10, ¶¶ 52–55.

136.    Krstolich then asked Mitchell to help develop a composite of the shooter. (Ex. 1: Case File, Krstolich Investigative Addendum, April 15, 1994, LMKSDC_0003442).

137.    It was highly unusual at the time to create a composite when the witness has already identified a specific person she believes is the shooter. (Pl. Ex. 34: Expert Report of Jennifer Dysart p. 7, 11); (Pl. Ex. 89: Jennifer Dysart Dep. 32:7–33:20).

138.    Because Mitchell did not see the perpetrator's face, the composite drawing is indistinct. The composite and the photograph of Lamonte McIntyre Mitchell selected "do not look a lot alike." (Pl. Ex. 42: W.K. Smith Dep. 359:11-23); (Pl. Ex. 41: Roger Golubski Dep. 101:22–102:18); (Ex. 1: Composite LMKSDC_0003440).

**Golubski and Krstolich show Mitchell multiple, improper photo arrays, and use suggestion to force her to choose Lamonte McIntyre**

139.    Golubski and Krstolich showed Mitchell at least two sets of photos: a six-person photo lineup which had the photos all affixed to one page and the five loose Polaroids later shown to Niko Quinn. (Ex. 1: Case File, Krstolich Investigative Addendum [4/15/1994], LMKSDC_0003442); (Ex. 9: Ruby Mitchell Dep. 58:18-10, 62:4-64;1; 66:12-23); *see supra* paras. 47–61.

140.    According to Defendant Ware, one reason it is important not to influence a witness's photo selection is because a suggestive photo showing can impact a witness's memory in important ways. Ware understood by 1994 that if you used suggestion with a witness during

one photo showing, that could influence not only that photo showing, but any additional identification procedures that occurred down the line. According to Ware, the concept that if police suggest a particular photo on one occasion, that suggestion will taint that witness's identifications down the line was "just common sense," and a basic policing concept understood by 1994. (Pl. Ex. 35: Dennis Ware Dep. 185:21-187:2).

141.    Lamonte McIntyre's photograph appeared in both the six-photo array and the loose stack of photographs. No other individual appeared in both sets of photographs. (Ex. 9: Ruby Mitchell Dep. 70:22-72:10, 81:12-22); (Pl. Ex. 67: Photo Line Up, LMKSDC_0002623, 2625, 2627, 2629, 2631).

142.    According to Plaintiffs' expert in eyewitness identification, Dr. Jenn Dysart, when a witness sees a photograph in multiple identification procedures or contexts, there is a risk this sense of familiarity on the part of the witness may lead to an increased likelihood of choosing that person and a feeling of increased confidence in subsequent identification procedures. (Pl. Ex. 34: Expert Report of Jennifer Dysart, pp. 15–16).

143.    The six-photo array shown to Ruby Mitchell was not preserved in the police file, nor is there any other record of what other photos were included, or whether or to what extent Lamonte McIntyre's photo stood out in this array. (Ex. 1: Entire Police Case File, LMKSDC_0003391–3500).

144.     Golubski and Krstolich did not audio-record the photo identification procedures with Mitchell, even though they tape-recorded Mitchell's statements before and after the procedure. (Pl. Ex. 91: 4/15/1994 Audio Recording of Mitchell Stmt. LMKSDC_0003424-45).[2]

145.     In a written report, Golubski documented that "Mitchell immediately identified the photo of Lamonte McIntyre as being the perpetrator." (Ex. 1: Case File, Investigative Addendum by Golubski, 4/16/1994, LMKSDC_0003453).

146.     The transcript of the 4/15 audio-recorded interview of Ruby Mitchell states:

Q: What name did you almost call out?
A: Lamont.
Q: Why did you almost yell Lamont?
A: Because he used to try to talk to my niece and I knew him.
Q: When you got to headquarters did we show you a series of five (5) pictures?
A: Yes.
Q: Were you able to pick out the shooter of the picture?
A: Yes.
Q: Is there a number on that picture?
A: Yes.
Q: What is the number?
A: Number three (3).
Q Are you absolutely sure this is the party who did the shooting?
A: Yes.
Q: Who is this party?
A: Lamont.
Q: Do you know his last name?
A: Yes.
Q: What is it?
A: McIntyre.
Q: How do you know this party?
A: Because he used to talk to my niece.
Q: How long have you known him?
A: For a couple months.

_____

[2] Plaintiff's Exhibit is the 4/15/1994 Audio Recording of Mitchell Stmt. (LMKSDC_0003424-45), a copy of which has been sent to the parties and a courtesy copy will be sent to the court. Further, a motion for leave to file the audio via flash drive is being filed contemporaneously with this Response.

(Pl. Ex. 91: 4/15/1994 Audio Recording of Mitchell Stmt. LMKSDC_0003424-45).

147.    But both during and after the shooting, Mitchell believed she was looking at Lamont Drain. (Ex. 9: Ruby Mitchell Dep. 143:24-25; 126:22-127:14); *see supra* paras. 107–109.

148.    In 1994 Lamonte McIntyre was at least four inches taller than Neil Edgar Jr., the shooter Ruby Mitchell saw, he did not have the distinctive braids she described, and he has distinctive large ears that stick away from his face. (Ex. 8: Ruby Mitchell Aff. ¶¶ 9, 12); *see supra* paras. 114, 130; (Ex. 9: Ruby Mitchell Dep. 46:16-47:21); (Pl. Ex. 68: Lamonte McIntyre 2/28/1994 Mugshot); (Pl. Ex. 69: Monster MODOC Offender Profile); (Ex. 1: Case File, Arrest Report, LMKSDC_0003413); (Ex. 19: Niko Quinn 1996 Aff. ¶8); (Ex. 1: Keva Garcia statement taken by Golubski, Sept. 21, 1994, LMKSDC_0003498-3499).

149.    There were visible differences between Lamont Drain and the photo of Lamonte McIntyre that Mitchell selected, including that Lamonte McIntyre has a longer neck and his ears are big. (Ex. 1: Keva Garcia statement, LMKSDC_0003498-3499).

150.    When asked whether he used improper suggestion and pressure to get Mitchell to choose the photo of Lamonte McIntyre, Golubski refused to answer and instead invoked his Fifth Amendment right to remain silent. (Pl. Ex. 41: Roger Golubski Dep. 103:16–111:22).

151.    When asked if he lied in his written report and reports to the prosecutor when he claimed that Mitchell immediately identified Lamonte McIntyre from a proper array without any prompting or suggestion, Golubski again refused to answer and instead invoked his Fifth Amendment right to remain silent. (Pl. Ex. 41: Roger Golubski Dep. 111:16–15:15).

152.    On the back of the photograph Ruby Mitchell selected it says "Lamonte McIntyre 07-28-76, RG." (Pl. Ex. 46: Photo, LMKSDC_0004356-4357); (Ex. 6: Mitchell TT 171:20-22); (Ex. 5: Waiver Hearing 13:23–15:3).

153.    Detective Krstolich gave a different version of the photo identification procedure than Detective Golubski or Ruby Mitchell. According to Krstolich's written report, Mitchell was shown "pictures of different Lamontes" in a "picture interview of five (5) separate black individuals" with the picture of Lamonte McIntyre in position three. Krstolich reported that Mitchell selected Lamonte McIntyre's photo from this array. (Ex. 1: Krstolich Investigative Addendum [4/15/1994], LMKSDC_0003442).

154.    No set of photographs of different Lamontes is preserved in the police file. (Ex. 1: Entire Police Case File, LMKSDC_0003391–3500).

155.    If it occurred as Krstolich described, such a photo procedure departed from KCKPD procedure by introducing in one photo lineup multiple suspects, when only one suspect should be presented per procedure. (Pl. Ex. 64: Michael York Dep. 165:14–166:24); (Pl. Ex. 34: Expert Report of Jennifer Dysart 11–12); (Pl. Ex. 35: Dennis Ware Dep. 161:10–162:24); (Pl. Ex. 60: Clyde Blood Dep. 21:11–24).

156.    According to Plaintiff's expert in police practices, Chief Fischer, "failing to document the circumstances surrounding how Ruby Mitchell came to identify his photograph or provide his first and last name when she was not acquainted with him and had mistaken the perpetrator for a different man named Lamonte" was a "blatant deviation[] from the most basic minimally acceptable police procedures." (Pl. Ex. 61: Russell Fischer Report, p. 7).

157.     Nonetheless, Lamonte McIntyre was arrested based on Mitchell's photo identification. (Ex. 1: Golubski Investigative Addendum LMKSDC_0003453; Krstolich Investigative Addendum LMKSDC_0003442); (Ex. 28: Terra Morehead Dep. 222:22–223:7).

**Golubski and Krstolich fabricate that Mitchell volunteered the last name "McIntyre," when in reality they fed her that last name**

158.     When asked by Krstolich on tape, "Do you know his last name?" Mitchell paused before stating, "yes," then responded "McIntyre" when asked the last name. (Pl. Ex. 91: 4/15/1994 Audio Recording of Mitchell Stmt. 05:04–05:15).

159.     Providing both a first and last name made Mitchell seem familiar with the shooter, and thus more credible. (Ex. 1: Mitchell Stmt. by Krstolich, LMKSDC_0003425); (Pl. Ex. 61: Russell Fischer Report, p. 9); (Pl. Ex. 35: Dennis Ware Dep. 257:16–259:9.)

160.     Detective Ware testified that Mitchell's ability to volunteer Lamonte McIntyre's full complete name is a smoking gun fact corroborating her identification. (Pl. Ex. 35: Dennis Ware Dep. 257:16–259:9.)

161.     At her deposition, Mitchell testified that the last name McIntyre had to come from another source because she "never knew nobody's last name" … "Like I said, I didn't even know Lamonte Drain's last name, so how would I know Lamonte McIntyre's last name?". (Ex. 9: Ruby Mitchell Dep. 74:25–75:10; 77:5-24; 78:6-14; 79:14-80:2.)

162.     But the person who dated her niece was Lamont Drain, not Lamonte McIntyre. And Mitchell did not know Drain's last name at the time. (Ex: 6: Mitchell TT 182:11-18); (Ex. 8: Ruby Mitchell Aff. ¶8); (Ex. 5: Waiver Hearing – Mitchell 19:6–7); (Ex. 9: Ruby Mitchell Dep. 75:6–10).

163. At the time of the shooting, Ruby Mitchell did not know Lamonte McIntyre. (Ex. 9: Ruby Mitchell Dep. 79:16–21, 80:13–81:5, 124:19–22.)

164. When asked if Golubski fed Mitchell the last name "McIntyre" and falsely represented to the prosecutor that Mitchell had volunteered it, Golubski refused to answer and instead invoked his Fifth Amendment right to remain silent. (Pl. Ex. 41: Roger Golubski Dep. 115:16–119:1); *see also* (Pl. Ex. 34: Expert Report of Jennifer Dysart p. 10).

165. Ware admitted if Golubski and Krstolich provided Ruby Mitchell with the last name McIntyre and failed to disclose that, that would be "gross misconduct." (Pl. Ex. 35: Dennis Ware Dep. 267:15–268:9); *see also* (Pl. Ex. 61: Russell Fischer Report, p. 11).

**Despite Mitchell's clear identification that her niece used to date the shooter, officers do not interview her niece until months later, and do so only at the behest of the prosecutor**

166. According to Detective Ware, because Ruby Mitchell's niece could potentially corroborate that her aunt, one of two potential eyewitnesses to the crime, knew the suspect who just potentially shot two people in broad daylight, it was critically important to interview Ruby Mitchell's niece right away, both to corroborate that Ruby Mitchell was in fact personally acquainted with Lamonte McIntyre, and because if her niece had recently seen him, she might have additional information about the shooter. (Pl. Ex. 35: Dennis Ware Dep. 259:22-260:23.)

167. There was no legitimate police reason to fail to interview Mitchell's niece in a timely manner. (Pl. Ex. 35: Dennis Ware Dep. 261:4–12); (Pl. Ex. 61: Russell Fischer Report, p. 11–12).

168. But Golubski did not interview Mitchell's niece, Keva Garcia, until five days before the trial began, as part of Prosecutor Morehead's preparation for trial. (Ex. 28: Terra

Morehead Dep. 242:8–244:1); (Pl. Ex. 41: Roger Golubski Dep. 121:23–122:22); (Ex. 1: Garcia Stmt. by Gol., 9/21/1994, LMKSDC_0003496); (Ex. 6: Trial Transcript (p. 1) cover page).

169.    Garcia stated that the Lamont she used to date was not Lamonte McIntyre and that she had never seen Lamonte McIntyre before. (Ex. 1: Keva Garcia Stmt., 4/15/1994, LMKSDC_0003498).

170.    Lamonte McIntyre also said he never met Garcia before and only knew her name since he saw it in a police report. (Ex. 6A: Lamonte McIntyre TT 453:18–21).

171.    Consistent with Ruby Mitchell's account, Garcia also told police Drain wore his hair in braids. He also had big lips and a big nose, and darker skin than Lamonte McIntyre, so they looked different. (Ex. 1: Keva Garcia Stmt., 4/15/1994, LMKSDC_0003498–3499).

**Of all the witnesses, Stacy Quinn has the best view of the crime.**

172.    Stacy Quinn had the "closest and least obstructed view" of the crime. (Pl. Ex. 61: Russell Fischer Report, pp. 17–18); (Ex. 10: Niko Quinn 2014 Aff. ¶ 16); (Ex. 2: Niko Quinn Dep. 171:22–173:10); (Pl. Ex. 41: Roger Golubski Dep. 183:4–186:16); (Pl. Ex. 34: Dysart Report p. 6); (Ex. 16: Hearing on Motion for New Trial 22:6–8).

173.    Stacy Quinn was already "looking out the door" of mother's home when she "noticed a man walking down the hill toward Hutchings Street…toward the light blue car" with a "shotgun in his hand." Stacy then saw the "man walk[] up to the passenger's side…point[] the shotgun at the passenger, and fire[] twice…pump[] the gun again, fire[], and shot the passenger in the face…[and] fire[] again, shooting the driver." (Pl. Ex. 38: Stacy Quinn 1996 Aff. ¶¶ 1–6); (Ex. 16: Hearing on Motion for New Trial 12:21–18:10). (Ex. 4: Niko Quinn DA Interview 7:17–8:16, 42:9–43:12); (Ex. 2: Niko Quinn Dep., 12:10–15).

174.     Stacy Quinn saw the shooter "both from the front and from the back" and "got a clear view of the man's face." (Pl. Ex. 38: Stacy Quinn 1996 Aff. ¶ 3).

175.     Stacy Quinn observed that the shooter "had braids in his hair and had on black pants with a white T-shirt with black writing on it," and was "approximately 5'7 or 5'8[], thin, dark complected with abnormal lips, and braided hair." (Pl. Ex. 38: Stacy Quinn 1996 Aff. ¶¶ 5, 7, 9, 12); (Ex. 16: Hearing on Motion for New Trial 14:24–25, 15:6–7, 21:23–22:2).

176.     Stacy Quinn recognized the shooter as Neil Edgar, Jr., (aka "Monster"), whom she had seen on the streets. After later viewing photographs of Lamonte McIntyre, she was "positive" that Lamonte McIntyre "was not the person who committed the double homicide on April 15, 1994." (Pl. Ex. 38: Stacy Quinn 1996 Aff. ¶ 9); (Ex. 4: Niko Quinn DA Interview 1:22–2:22, 9:4–9, 38:1–39:3, 43:13–44:24); (Ex. 2: Niko Quinn Dep. 12:10–15); (Pl. Ex. 37: Joe Robinson Aff. ¶¶ 11, 20–21).

177.     Following Lamonte McIntyre's arrest, Stacy Quinn stated that Lamonte "McIntyre's face is too long, he is too tall, and his lips are too dark" to be the shooter. (Pl. Ex. 38: Stacy Quinn 1996 Aff. ¶ 12); (Ex. 16: Hearing on Motion for New Trial 21:6–22:16).

**By the morning after the murder, Golubski and Ware learn that Stacy Quinn not only saw the crime but knew the identity of the shooter**

178.     Golubski and Ware spoke with Niko and Stacy Quinn's mother, Josephine Quinn, at her home at 3032 Hutchings on April 16, 1994. (Ex. 1: Police File, Golubski Report, 4/16/1994 LMKSDC_0003455-3456).

179.     Golubski reported, "Josephine stated she did not get a good look at the individual. She also viewed the five photos and cannot identify anyone." (Ex. 1: Police File, Golubski Report, 4/16/1994 LMKSDC_0003456, 3393).

91

180.    The five photos shown to Josephine Quinn were the same five photos shown to Niko Quinn on April 16, 1994 and Ruby Mitchell on April 15, 1994, containing a photograph of Lamonte McIntyre from two years prior and containing two of Lamonte's relatives. *See* SAMF, ¶ 52; (Ex. 1: Police File, Golubski Report, 4/16/1994 LMKSDC_0003455-3456).

181.    According to the police report, Josephine Quinn told Golubski and Ware that her daughter Stacy not only saw the suspect, but "knew who the suspect was but on this particular date of the photo line up, Stacy was not available." (Ex. 1: Police File, Golubski Report, 4/16/1994 LMKSDC_0003456); (Pl. Ex. 41: Roger Golubski Dep. 186:24–187:20).

182.    In his report written the day after the crime, Golubski stated that "At this time there still remains the possibility that John Quinn and Stacy Quinn can identify the perpetrators photo." (Ex. 1: Police File, Golubski Report, 4/16/1994 LMKSDC_0003456).

183.    Likewise, in his prosecutorial summary written the day after the crime, Golubski documented that Stacy Quinn "can testify to observing the crime and to possibly being able to identify the suspect." (Ex. 1: Prosecutive Summary Golubski Report, 4/16/1994 LMKSDC_0003393).

**Although Stacy Quinn was the most important lead in an otherwise weak case, Golubski does not report any of his interactions with he**

184.    Defendant Smith admits it would have been "critically important" to follow up with Stacy Quinn and that had he known Stacy knew who the suspect was, he "would have went to her and/or called her in to take a statement." (Pl. Ex. 42: W.K. Smith Dep. 129:4–130:17).

185.    Any minimally trained and experienced investigator "would have understood that Stacy Quinn was a critical witness." (Pl. Ex. 61: Russell Fischer Report, p. 17); (Pl. Ex. 42: W.K. Smith Dep. 129:4–15); (Ex. 28: Terra Morehead Dep. 239:13–241:2).

92

186.     When asked whether Stacy Quinn became his most important lead once he heard that she knew who the true perpetrator was, Golubski refused to answer and instead invoked his Fifth Amendment right to remain silent. (Pl. Ex. 41: Roger Golubski Dep. 187:12–188:20).

187.     Additionally, when asked whether he agreed that finding Stacy Quinn should have been his top priority in the investigation, Golubski refused to answer and instead invoked his Fifth Amendment right to remain silent. (Pl. Ex. 41: Roger Golubski Dep. 187:12–188:20).

188.     Given the distance and angle from which Ruby Mitchell saw the shooter and the failure or reluctance of Niko Quinn to identify a suspect, Defendants should have recognized the importance of finding and interviewing Stacy Quinn. (Pl. Ex. 61: Russell Fischer Report, p. 18).

189.     According to Detectives Ware and Smith, there was no conceivable reason for failing to follow up with Stacy Quinn after April 16, 1994. (Pl. Ex. 35: Dennis Ware Dep. 194:1–16, 200:3–8); (Pl. Ex. 42: W.K. Smith Dep. 129:4–130:8).

190.     Golubski did not document an interview with Stacy Quinn, or any attempt to locate her after April 16, 1994. (Ex. 1: Police file, LMKSDC_0003392–0003500); (Pl. Ex. 41: Roger Golubski Dep. 196:8–198:3); (Ex. 28: Terra Morehead Dep. 263:6–265:7).

191.     No Defendant reported questioning Stacy Quinn about the double homicide, ran a criminal history to help locate Stacy Quinn, attempted to identify relevant associates or addresses, or spoke to her family, friends, or neighbors regarding her whereabouts after she was "unavailable" on April 16, 1994. Also, no defendant documented any further effort to contact Stacy at 3032 Hutchings, even though that is where she normally stayed.  (Ex. 1: Police file, LMKSDC_0003391–3500); (Pl. Ex. 61: Russell Fischer Report, p. 18); (Pl. Ex. 35: Dennis Ware Dep. 200:3–205:21); (Ex. 16:  Hearing on Motion for New Trial 12:12–14). A friend of Stacy's

who knew her from the streets, attested that if Stacy was not at home, she could readily be found in the community, often along Quindaro. (Pl. Ex. 80: C.S.R. Aff. ¶ 20).

192.    Stacy Quinn remained in the area of the scene of the crime following the shooting. (Pl. Ex. 38: Stacy Quinn 1996 Aff. ¶ 11); (Ex. 16: Hearing on Motion for New Trial 12:15–17); (Ex. 2: Niko Quinn Dep. 66:23–67:9, 137:20–138:3).

193.    Stacy Quinn was present at the scene of the crime, voluntarily told police that she had seen the shooting, and waited in the yard while police interviewed Niko Quinn. (Pl. Ex. 38: Stacy Quinn 1996 Aff.); (Ex. 2: Niko Quinn Dep. 66:23–67:9, 137:20–138:3).

194.    According to Detective Ware, at a minimum, if Detective Golubski had taken additional steps to locate Stacy Quinn, the fact that he did so should be documented in his narrative report. (Pl. Ex. 35: Dennis Ware Dep. 205:15–21.)

195.    Culp, the supervisor of the Ewing/Quinn investigation, should have perceived the failure to interview—or at a minimum, document attempts to locate—Stacy Quinn and followed up on it. (Pl. Ex. 35: Dennis Ware Dep. 200:12–25.)

196.    The complete lack of any documentation regarding detectives' efforts to find Stacy Quinn should have been a "red flag" to any minimally competent supervisor—not just in regard to the aspects of the investigation involving Stacy Quinn, but to the investigation writ large. (Pl. Ex. 61: Russell Fischer Report, p. 18).

**Golubski has had a sexual relationship with Stacy Quinn for years**

197.    Golubski knew Stacy Quinn well; he had an ongoing relationship with her, in which he paid her for sex. (Ex. 10: Niko Quinn 2014 Aff. ¶ 27); (Ex. 2: Niko Quinn Dep. 12:10–15, 177:19–178:8); (Pl. Ex. 40: D.L. 2014 Aff. ¶ 10); (Pl. Ex. 37: Joe Robinson Aff. ¶¶ 20, 22);

(Ex. 4: Niko Quinn DA Interview 36:10–17); (Pl. Ex. 41: Roger Golubski Dep. 189:18–190:21); (Ex. 18: Freda Quinn Dep. 57:14–58:7).

198.   Golubski had been paying Stacy Quinn for sex since she was a minor, sixteen or seventeen years old, from the mid-1980s through 2000, when Stacy Quinn was murdered. (Ex. 17: Freda Quinn 2011 Aff. ¶¶ 18–20); (Pl. Ex. 39: Freda Quinn 2016 Aff. ¶ 6); (Pl. Ex. 37: Joe Robinson Aff. ¶ 22); (Pl. Ex. 41: Roger Golubski Dep. 189:17–190:21).

199.   Sometimes Golubski would pick up Stacy Quinn from Josephine Quinn's house, where she typically stayed, and she would be gone for a few days at a time. (Ex. 17: Freda Quinn 2011 Aff. ¶ 19); (Ex. 18: Freda Quinn Dep. 57:14–58:7); (Pl. Ex. 41: Roger Golubski Dep. 190:14–191:4); (Pl. Ex. 40: D.L. 2014 Aff. ¶ 11).

200.   When Stacy Quinn returned, she would have new clothes and money. (Ex. 17: Freda Quinn 2011 Aff. ¶ 19).

201.   Because Golubski had a years-long sexual relationship with Stacy Quinn, it would have been easy for him to locate her for an interview. (Ex. 10: Niko Quinn 2014 Aff. ¶ 27); (Ex. 17: Freda Quinn 2011 Aff. ¶ 18–19); (Pl. Ex. 41: Roger Golubski Dep. 190:1–21). There is no documentation in the police file concerning Golubski's relationship with Stacy or any notation that, given the relationship, another detective should interview Stacy. (Ex. 1: Entire Police File, LMKSDC_0003391–3500.)

### Golubski learns Stacy Quinn recognized that Monster was the shooter, not Lamonte McIntyre, but buries this exculpatory evidence

202.   Stacy Quinn told Golubski and another officer that Lamonte McIntyre did not commit the murders, and instead, that the real perpetrator was Monster. (Ex. 4: Niko Quinn DA

95

Interview 62:12–63:1); (Ex. 2: Niko Quinn Dep. 12:10–15); (Pl. Ex. 41: Roger Golubski Dep.

193:7–13, 199:22–200:4).

203.    In response, Golubski and the other officer called her "crackhead" and other

names. (Ex. 4: Niko Quinn DA Interview 62:12–63:1); (Ex. 2: Niko Quinn Dep. 12:10–15).

204.    Niko Quinn told Golubski "on a number of occasions through the years that

police had gotten the wrong man for Doniel's murder," and that her sister, Stacy Quinn "said the

real killer was Monster." (Ex. 10: Niko Quinn 2014 Aff. ¶ 28); (Ex. 4: Niko Quinn DA Interview

43:13–44:24; 47:12–24); (Ex. 2: Niko Quinn Dep. 12:10–15).

205.    When asked whether Stacy Quinn told him in the weeks after the murder that

Monster was the shooter, Golubski refused to answer the question and instead invoked his Fifth

Amendment right to remain silent. (Pl. Ex. 41: Roger Golubski Dep. 193:7–13).

206.    Stacy Quinn died in 2000, the victim of a homicide. Golubski was assigned to her

murder. (Ex. 17: Freda Quinn 2011 Aff. ¶ 20); (Ex. 2: Niko Quinn Dep. 118:14–19); (Pl. Ex. 41:

Roger Golubski Dep. 192:9–16).

**At the time of the murders, Lamonte McIntyre is at the home of his aunt**

207.    Doniel Quinn and Ewing were shot around 2pm on April 15, 1994. (Ex. 1:

Golubski Investigative Summary, LMKSDC_0003392); Golubski SOF ¶ 30.

208.    On April 15, 1994, Lamonte McIntyre was at the house of his aunt, Peggy

Williams (Crowder), for half the day until sometime around 2pm, when he went to call a cab for

one of Williams' guests at the home of his other aunt, Yolanda Johnson, as Williams did not own

a phone. After making the call, Lamonte returned briefly to Williams' home. He shortly

thereafter went back to Johnson's home to call a cab for a second guest of Williams' and

remained at Johnson's home thereafter. (Ex. 1: Yolanda Johnson Stmt. by Golubski, 4/20/1994,

96

LMKDC_0003468–71; Natasha Haygood Stmt. to Golubski, 4/20/1994, LMKSDC_0003477–80; M'Sherie Johnson Stmt. to Golubski, 4/20/1991, LMKSDC_0003486–88); (Pl. Ex. 55: M'Sherie Johnson 2016 Aff. ¶ 6); (Pl. Ex. 59: Rashida Martis 2011 Aff. ¶¶ 1–4); (Ex. 29: Lamonte McIntyre Dep. 138:15–142:9); (Ex. 6A: Lamonte McIntyre TT 447:16–450:9; Peggy Crowder TT 378:9–381:8; Yolanda Johnson TT 427:10–428:8).

209.    Lamonte McIntyre's aunts' homes were only a "hop, skip, and a jump" away from one another, as Johnson's house was directly behind Crowder's house, separated only by an alley. (Ex. 1: Yolanda Johnson Stmt. by Golubski, 4/20/1994, LMKDC_0003469); (Ex: 29: Lamonte McIntyre Dep. 139:12–23); (Pl. Ex. 55: M'Sherie Johnson Aff. ¶ 3); (Pl. Ex. 70 Rose McIntyre 2014 Aff. ¶ 6).

210.    After calling a cab for Williams' second guest, Lamonte McIntyre remained at Johnson's home until early evening when he got word the police were looking for him. (Ex. 1: Yolanda Johnson Stmt. by Golubski, 4/20/1994, LMKDC_0003469–3470); (Ex. 29: Lamonte McIntyre Dep. 138:15–139:142:9); (Pl. Ex. 55: M'Sherie Johnson Aff. ¶¶ 3–9); (Pl. Ex. 70 Rose McIntyre 2014 Aff. ¶ 6); (Ex. 1: Natasha Haygood Stmt. to Golubski, 4/20/1994, LMKSDC_0003477–3480; M'Sherie Johnson Stmt. to Golubski, 4/20/1991, LMKSDC_0003479–80); (Ex. 6A: Lamonte McIntyre TT 447:16–450:9).

211.    M'Sherie Johnson, Montre Johnson, Rashida Johnson, and Natasha Haygood were present at Yolanda Johnson's house on April 15, 1994 when Lamonte was there. (Ex. 6A: Yolanda Johnson TT 418:2–13).

212.    James McIntyre, Lamonte McIntyre's brother, arrived at Johnson's house around 3:30pm or 4pm. (Ex. 1: Yolanda Johnson Stmt. by Golubski, 4/20/1994, LMKDC_0003473; Natasha Haygood Stmt. to Golubski, 4/20/1994, LMKSDC_0003480); (Pl. Ex. 55: M'Sherie

Johnson Aff. ¶ 8); (Ex. 1: Natasha Haygood Stmt. to Golubski, 4/20/1994, LMKSDC_0003477; M'Sherie Johnson Stmt. to Golubski, 4/20/1991, LMKSDC_0003486).

213.     Golubski knew that Lamonte McIntyre's alibi at the time of the murders involved calling a cab company, United Cab, on the phone. (Ex. 1: Yolanda Johnson Stmt. to Golubski, 4/20/1994, LMKSDC_0003470); (Pl. Ex. 62: Randy Eskina 2016 Aff. ¶¶ 74–76, 81).

214.     Police never contacted the cab company to find out whether records of the calls existed or whether they could confirm the calls had been placed. (Ex. 1: Yolanda Johnson Stmt. to Golubski, 4/20/1994, LMKSDC_0003470); (Pl. Ex. 62: Randy Eskina 2016 Aff. ¶¶ 74–76, 81).

**The evening of the crime, Barber reports that he asked Rose McIntyre where Lamonte McIntyre was the day before the crime, to which she answered truthfully**

215.     On April 15, 1994, the day of the crime, Barber went to 2908 Parkwood, the house of Lamonte McIntyre's grandmother, Maxine Crowder who was "very cooperative" with police, telling them Rose McIntyre, Lamonte's mother, worked at FiFi's, a restaurant at 5th and Parallel. (Ex. 6A: Barber TT 354:2–355:2); (Ex. 1: Police File, Dennis Barber Stmt. to Golubski, 4/15/1994, LMKSDC_0003433–3435; Police File, Golubski Investigative Addendum, 4/16/1994, LMKSDC_0003453).

216.     Barber then proceeded to search for Lamonte McIntyre "on the streets" and "kept putting out additional information as [he] obtained it so that the uniformed units would have availability of it." (Ex. 1: Police File, Dennis Barber Stmt. To Golubski, 4/15/1994, LMKSDC_0003434); (Ex. 6A: Barber TT 355:12–16).

217.    At around 8pm the evening of the crime, Lieutenant Barber instructed Detective Brown to assist Barber in locating Lamonte McIntyre. (Ex. 1: Police File, Brown Report, 4/15/1994, LMKSDC_0003414).

218.    Barber left his name and number with Maxine Crowder and instructed her to have Lamonte McIntyre get in touch with him. (Ex. 6A: Maxine Crowder TT 438:8–17; Lamonte McIntyre TT 450:10-451:10; Barber TT 354:8:20–358:1).

219.    Crowder called Rose McIntyre to let her know the police were searching for her son, Lamonte McIntyre. (Pl. Ex. 71: Evidentiary Hearing Rose McIntyre 331:14–25); (Ex. 6A: Maxine Crowder TT 438:8–17); (Pl. Ex. 70 Rose McIntyre 2014 Aff. ¶¶ 4-5).

220.    Crowder then called Lamonte McIntyre at the home of his aunt, Yolanda Johnson, to let him know that the police, Barber in particular, were looking for him. (Ex. 6A: Maxine Crowder TT. 438:18–439:19).

221.    After getting the call from her mother, Maxine Crowder, Rose McIntyre picked up Crowder and went to Johnson's house to pick up Lamonte McIntyre and take him to the station. (Ex. 6A: Lamonte McIntyre TT 450–51); (Pl. Ex. 70 Rose McIntyre 2014 Aff. ¶¶ 6-8).

222.    Before going to the station, Rose gave Lamonte McIntyre Barber's card, which Barber had left with Crowder. Lamonte called Barber several times, but he did not answer. (Ex. 6A: Lamonte McIntyre TT 450:10-451:10); (Pl. Ex. 70 Rose McIntyre 2014 Aff. ¶¶ 6–7).

223.    Rose McIntyre saw a police officer sitting in the parking lot of FiFi's on the way to the station so she went up to him and told the officer that she had her son, Lamonte, and wanted to "get things straightened out" as Lamonte McIntyre had not been involved in any problems. (Ex. 1: Police File, Dennis Barber Stmt. to Golubski, 4/15/1994, LMKSDC_03434); (Ex. 6A: Lamonte McIntyre TT 451:16-452:1); (Pl. Ex. 70 Rose McIntyre 2014 Aff. ¶ 8).

224.     Barber then received a radio call that Rose McIntyre requested his presence in front of FiFi's Restaurant. (Ex. 1: Police File, Dennis Barber Stmt. To Golubski, 4/15/1994, LMKSDC_0003433); (Ex. 6A: Barber TT 355:17–356:19); (Ex. 1: Police File, Golubski Investigative Addendum, 4/16/1994, LMKSDC_0003453).

225.     Upon arrival, Barber located Rose McIntyre and her mother, Maxine Crowder, in the parking lot, with Lamonte McIntyre sitting in Rose McIntyre's parked car. (Ex. 1: Police File, Brown Report, 4/15/1994, LMKSDC_0003414; Police File, Dennis Barber Stmt. To Golubski, 4/15/1994, LMKSDC_03434); (Ex. 6A: Maxine Crowder TT. 440:1–8; Barber TT 355:17–19); (Ex. 1: Barber Stmt. by Golubski, LMKSDC_0003433).

226.     Brown was also present at the FiFi's parking lot while Barber was questioning Rose McIntyre. (Ex. 6A: Barber TT 361:16–362:3; Brown TT 366:18–367:23).

227.     In fact, within minutes of Rose McIntyre's arrival in the FiFi's parking lot, "the entire parking lot filled with police." (Pl. Ex. 70 Rose McIntyre 2014 Aff. ¶ 8).

228.     Barber asked Rose McIntyre where Lamonte McIntyre had been on April 14, 1994, the day before the shooting, not the day of. (Ex. 5: Waiver Hearing, 46:5–24).

229.     Rose McIntyre truthfully replied that the day before the shooting, Lamonte McIntyre was with her at FiFi's restaurant, where they were both working. (Ex. 5: Waiver Hearing, 46:5–47:8).

**Barber and Brown fabricate that Rose McIntyre was not truthful in her response to their inquiry about Lamonte McIntyre's whereabouts and also fabricate a statement by Rose McIntyre that implied Lamonte McIntyre had committed a murder**

230.     When asked about Lamonte McIntyre's whereabouts on the day of the crime, Rose McIntyre truthfully answered that he was at his aunt's house. (Ex. 5: Waiver Hearing, 46:5–47:8).

100

231.    Instead, Barber reported that he told Rose the incident happened that day, and she replied, "Well that couldn't have been Lamont that was involved because he works part-time at FiFi's and he was here from 11:00 this morning until 2:45 this afternoon." (Ex. 1: Police File, Dennis Barber Stmt. to Golubski, 4/15/1994, LMKSDC_0003434; Police File, Golubski Investigative Addendum, 4/16/1994, LMKSDC_0003453; Police File, Golubski Report, 4/16/1994 LMKSDC_0003393).

232.    Barber's report of Rose McIntyre's statement was false. Rose McIntyre only provided to officers that Lamonte was at FiFi's when they asked where he was the day prior to the crime, not the day of. (Ex. 1: Police File, Dennis Barber Stmt. to Golubski, 4/15/1994, LMKSDC_0003434, 3453); (Ex. 5: Waiver Hearing, 46:5–47:8).

233.    Additionally, while at the FiFi's parking lot, Rose McIntyre asked Barber "what this was all about," to which Barber replied, "that it could be about a fight or disturbance or something like that." (Pl. Ex. 70 Rose McIntyre 2014 Aff. ¶ 9); (Ex. 6A: Lamonte McIntyre TT 452:2-17); (Ex. 1: Police File, Dennis Barber Stmt. to Golubski, 4/15/1994, LMKSDC_0003434).

234.    Expressing her disbelief at the amount of police at FiFi's, Rose McIntyre then asked, "If somebody told you that they had a fight with someone, are you going to just come and arrest them before you've talked to them and found out the facts?" and "You mean all of these officers are here for a fight or a domestic disturbance?" (Pl. Ex. 70 Rose McIntyre 2014 Aff. ¶¶ 9–10).

235.    Barber reported that Rose McIntyre "was not familiar with what a felony crime was," so he explained a felony was "anything punishable by more than a year in prison," for

101

example, "a shooting, a stabbing or an armed robbery." (Ex. 1: Police File, Dennis Barber Stmt. to Golubski, 4/15/1994, LMKSDC_0003434).

236.    Barber then reported another statement by Rose McIntyre, that "[t]otally unsolicited, she indicated to me that if someone had told me that she had killed somebody, would I take them down and charge them with murder." (Ex. 1: Police File, Dennis Barber Stmt. to Golubski, 4/15/1994, LMKSDC_0003434); (Ex. 6A: Barber TT 360:7–15); (Ex. 1: Police File, Golubski Report, 4/16/1994 LMKSDC_0003393).

237.    To bolster the inculpatory nature of this statement, Barber also reported that he had not previously mentioned "homicide" or "murder.," (Ex. 1: Police File, Dennis Barber Stmt. to Golubski, 4/15/1994, LMKSDC_0003434; Police File, Golubski Report, 4/16/1994 LMKSDC_0003394; Police File, Golubski Report, 4/16/1994, LMKSDC_0003453); (Ex. 6A: Barber TT 360:7–9); (Pl. Ex. 70 Rose McIntyre 2014 Aff. ¶¶ 9–10, 19).

238.    Rose had not brought up the word "murder," nor did she assume Lamonte McIntyre would be questioned regarding a murder. (Pl. Ex. 70 Rose McIntyre 2014 Aff. ¶¶ 10, 19); (Ex. 29: Lamonte McIntyre Dep. 231:13–232:16; 452:2-17).

239.    Barber's report of Rose McIntyre's statement on April 15, 1994 is "totally untrue." (Pl. Ex. 70: Rose McIntyre 2014 Aff. ¶¶ 9–10, 19).

**Barber and Brown fabricate a false alibi statement that they attribute to Lamonte McIntyre**

240.    Lamonte McIntyre consistently gave police the same, truthful alibi: that he had been at Peggy Williams's and Yolanda Johnson's homes at the time of the shooting. (Ex. 6A: Lamonte McIntyre TT 447:16–450:9; 452:21-453:14); (Ex. 29: Lamonte McIntyre Dep. 138:15–142:9); (Ex. 1: Police File, Golubski Report, 4/16/1994, LMKSDC_0003453-3454).

241.     Defendants first questioned Lamonte McIntyre when Rose McIntyre brought him to the FiFi's parking lot the evening of the crime. (Ex. 1: Police File, Dennis Barber Stmt. to Golubski, 4/15/1994, LMKSDC_0003434); (Ex. 6A: Maxine Crowder TT 440:1–18; Lamonte McIntyre TT451:17–452:1; Barber TT 361:6–362:3); (Pl. Ex. 70 Rose McIntyre 2014 Aff. ¶¶ 8–9); (Ex. 1: Police File, Golubski Investigative Addendum, 4/16/1994, LMKSDC_0003453).

242.     Barber reported that at FiFi's, Lamonte McIntyre said that "during the day he had been with his brother, James, and neither…had been in any fight or been jumped on or had any altercation with any individuals." (Ex. 1: Police File, Dennis Barber Stmt. to Golubski, 4/15/1994, LMKSDC_0003435; Police File, Golubski Report, 4/16/1994 LMKSDC_0003393).

243.     This report was false, as Barber never asked Lamonte his whereabouts on the day of the shooting, but instead asked about whether Lamonte was in a gang or knew anyone in a blue low rider. (Ex. 6A: Lamonte McIntyre TT452:2–453:23); (Ex. 29: Lamonte McIntyre Dep. 231:13–232:16). After Barber spoke with Lamonte McIntyre, Brown transported him to the KCKPD police station. (Ex. 6A: Brown TT 368:6–12); (Ex. 1: Police File, Brown Report, 4/15/1994, LMKSDC_0003414).

244.     During this car ride, Lamonte asked Brown what this was all about, and Brown said, "If you did nothing wrong, you got nothing to worry about." (Ex. 29: Lamonte McIntyre Dep. 231:13-235:11); (Ex. 6A: Brown TT 368:13-16).

245.     After bringing Lamonte McIntyre to the station, Brown, Golubski, and Krstolich interviewed him, but did not record this interview. (Ex. 1: Police File, Krstolich Report, 4/15/1994, LMKSDC_0003442); (Ex. 6A: Lamonte McIntyre TT452:18–453:17); (Ex. 1: Police File, Golubski Report, 4/16/1994 LMKSDC_0003393).

246.     KCKPD policy at the time required each officer with knowledge to write his own report. (Pl. Ex. 60: Clyde Blood Dep. 109:24–110:22). This failure to tape an interview violated KCKPD policy and practice as of 1994, which was to audio record and then transcribe witness statements. (Pl. Ex. 61: Russell Fischer Report, pp. 15–16, 17); (Pl. Ex. 62: Randy Eskina 2016 Aff. ¶ 72); (Pl. Ex. 60: Clyde Blood Dep. 110:23–113:10); (Pl. Ex. 42: W.K. Smith Dep. 77:7–78:19).

247.     During this interview, Lamonte McIntyre truthfully told the officers that he was "at his auntie's house … all day long." (Ex. 1: Police File, Krstolich Report, 4/15/1994, LMKSDC_0003442; Police File, Golubski Report, 4/16/1994, LMKSDC_0003454); (Ex. 6A: Lamonte McIntyre TT 452:18–453:23).

248.     Lamonte McIntyre also truthfully told Krstolich and Golubski that "later in the day his brother, James, did come by." (Ex. 1: Police File, Krstolich Report, 4/15/1994, LMKSDC_0003442).

249.     Golubski reported that Lamonte McIntyre "stated that throughout the day he had been with an aunt, Yolanda Johnson, at 1515 Wood…that at no time did he leave until his brother arrived at about 4:00. Then he still did not leave until he was contacted by his grandmother and mother than then was taken to the area of 5th and Parallel by his mother." (Ex. 1: Police File, Golubski Report, 4/16/1994, LMKSDC_0003453-3454).

250.     Brown later testified that on the ride to the police station, Lamonte McIntyre told him, unsolicited, that "he didn't know what he could have done because he was at FiFi's all day helping his mother out in the kitchen doing some work." (Ex. 6A: Brown TT 368:13-369:12).

251.     Brown further testified that it was not until after hearing Lamonte McIntyre's statement to Krstolich and Golubski regarding where he was at the time of the crime that Brown

"remembered he told me he was FiFi's all day on 5th and Richmond. So I wrote the detective a note just telling him basically he told me in the car on the way up here that he had been at FiFi's with his mother all day." (Ex. 6A: Brown TT 369:13–371:5).

252.     Lamonte McIntyre never told any officer he was at FiFi's at the time of the crime; Brown's claim is false. (Ex. 6A: Lamonte McIntyre TT452:18–453:23); (Ex. 29: Lamonte McIntyre Dep. 149:12–150:6, 231:13–235:11); (Ex. 6A: Brown TT 368:6–370:8; Lamonte McIntyre TT 457:25–458:7).

253.     Brown failed to document Lamonte McIntyre's alleged inculpatory statements in his police report. (Ex. 1: Police File, Brown Arrest Report, 4/15/1994, LMKSDC_0003413–3414).

254.     Further, there is no mention of Brown's alleged note to Krstolich and Golubski purportedly relaying Lamonte's statements anywhere in the police file. *See* (Ex. 1: Police File, Brown Arrest Report, 4/15/1994, LMKSDC_0003391-3500).

255.     Brown understood it was important to document any alibi statement given to police in a double homicide case. (Pl. Ex. 63: James Brown Dep. 192:11–23, 195:20–196:4, 200:3–16); (Ex. 1: Police File, Brown Arrest Report, 4/15/1994, LMKSDC_0003413–3414).

256.     By failing to document this alleged "alibi" statement in his report, Brown violated KCKPD officers' obligation to document all investigative steps. (Pl. Ex. 61: Russell Fischer Report, p. 17); (Pl. Ex. 60: Clyde Blood Dep. 109:24–110:22).

257.     Instead, the first time Brown provided this false alibi to the defense was at Lamonte McIntyre's trial, five and a half months after the investigation took place. (Ex. 6A: James Brown TT 368:13–21); (Pl. Ex. 63: James Brown Dep. 207:16–208:2).

258.     The prosecutor argued that "inconsistent alibi" evidence existed, based on Barber and Brown's fabricated accounts of Rose and Lamonte McIntyre's statements and the truthful alibi Lamonte gave to Golubski and Krstolich when questioned at the station the evening of the crime, which was used against Lamonte McIntyre before and at trial. (Ex. 28: Terra Morehead Dep. 178:16–180:8).

259.     According to Plaintiffs' police practices expert, Barber, Brown, and Golubski's intentional misrepresentation to the prosecutor that Rose McIntyre and Lamonte McIntyre made these inculpatory, inaccurate alibi statements amounted to serious police misconduct and egregious violations of minimally accepted practices. (Pl. Ex. 61: Russell Fischer Report, p. 15).

**Defendants "clear" the case the day after the homicides despite failing to gather and test key forensic evidence, failing to investigate the identity of a getaway driver, and failing to establish any motive**

260.     Lamonte McIntyre was in custody within approximately six hours of the crime. (Ex. 1: Ambler Report, LMKSDC_0003404; Arrest Report, LMKSDC_0003413). No other suspect appears anywhere in the file. (Ex. 1: Entire Police File, LMKSDC_0003391–3500). Golubski reported on April 16, 1994, the day after the shooting, that the case was cleared upon the arrest of Lamonte McIntyre. (Ex. 1: Police File, Golubski Investigative Addendum/Clearance, LMKSDC_0003457).

261.     Homicide detectives had an obligation to conduct all available forensic tests even if they were worried the testing might turn up evidence pointing away from a suspect. The practice in homicide cases in KCKPD was "when in doubt, order the test." (Pl. Ex. 60: Clyde Blood Dep. 145:11–146:13).

262.     Defendants failed to investigate whether any physical evidence linked Lamonte McIntyre to the crime scene. (Ex. 5: Waiver Hearing, Niko Quinn 24:8–25:10; Ruby Mitchell

7:11–8:9); (Pl. Ex. 71: Evidentiary Hearing, Singer 55:12–65:22); (Pl. Ex. 85: Singer Aff. 2016

¶¶ 4–5, LMKSDC_0004834–36); (Pl. Ex. 62: Randy Eskina 2016 Aff. ¶ 14–16); (Pl. Ex. 61:

Russell Fischer Report, pp. 18–20).

263.   Because the shooter was standing only a few inches or feet from the car during

the murders and there was blood and glass on the ground, seizing Lamonte McIntyre's shoes

when he was arrested less than six hours after the shooting was a basic, critically important

investigative step to take. (Pl. Ex. 60: Clyde Blood Dep. 209:18-211:6).

264.   Golubski did not seize Lamonte McIntyre's shoes to look for glass and blood

from the crime scene, even though the presence of blood alone would have been inculpatory. (Pl.

Ex. 71: Evidentiary Hearing - Singer 56:14–65:22; 70:11–72:25; 79:9–80:18); (Pl. Ex. 62: Randy

Eskina 2016 Aff. ¶ 14); (Pl. Ex. 60: Clyde Blood Dep. 152:12–153:15, 211:7–216:2, 218:18–

219:1); (Pl. Ex. 70: Rose McIntyre 2014 Aff. ¶ 16); (Pl. Ex. 61: Russell Fischer Report, pp. 18–

19).

265.   Another basic, obvious investigative step when Lamonte McIntyre was arrested

six hours after this close-range shooting was to seize his clothing to look for residue or

inculpatory items on his person. (Pl. Ex. 60: Clyde Blood Dep. 211:7-212:9).

266.   At his deposition, Blood testified that if Lamonte McIntyre had been wearing the

clothing he was arrested in at the time of this shooting, one would expect to see fragments of

glass and blood on his clothes if he were the perpetrator: "I'd sure be looking." Further, Blood

could not think of a legitimate police reason not to collect Lamonte McIntyre's clothing when he

was arrested. (Pl. Ex. 60: Clyde Blood Dep. 211:16-22; 212:10-18).

267.   Lamonte McIntyre's face, hands, and clothing were also never examined for

gunshot residue, as "any minimally trained and experienced investigator in Golubski's position

107

would have understood the importance of" doing, according to police practices expert. (Pl. Ex. 61: Russell Fischer Report, pp. 18–19); (Pl. Ex. 62: Randy Eskina 2016 Aff. ¶ 14); (Pl. Ex. 60: Clyde Blood Dep. 151:25–152:11, 212:21–213:6, 218:18–219:1); Pl. Ex. 70: Rose McIntyre 2014 Aff. ¶ 16); (Pl. Ex. 72: Russell Fischer Dep. 96: 11–97:23, 101:10–103:16).

268.    Rose McIntyre pleaded with officers, asking them why they did not do a ballistics test on Lamonte McIntyre to show that he had not shot a gun. (Pl. Ex. 70: Rose McIntyre 2014 Aff. ¶¶ 11, 16); (Pl. Ex. 73: Rose McIntyre Dep. 190:7-191:6).

269.    The officer Rose spoke with responded, "they didn't do that kind of test in Kansas." But this was untrue, as Blood stated there was "no legitimate police reason" "not to collect Lamonte McIntyre's clothing," as "[t]here should be residue on the clothing as well" if he were involved in the close-range shooting. (Pl. Ex. 60: Clyde Blood Dep. 151:25–152:11, 211:7–23); (Pl. Ex. 70: Rose McIntyre 2014 Aff. ¶¶ 11, 16); (Pl. Ex. 73: Rose McIntyre Dep. 190:7–191:6).

270.    Blood admitted that Golubski's failure to seize Lamonte McIntyre's clothing for testing and failure to search Lamonte McIntyre's home could only be due to either Golubski's incompetence or Golubski's failure to conduct a legitimate investigation. In Blood's experience, Golubski was not incompetent. (Pl. Ex. 60: Clyde Blood Dep. 218:21–221:4).

271.    If Lamonte McIntyre had no gunshot residue on his face, hands and clothing, that would be evidence tending to suggest he may not have committed the crime. If Lamonte McIntyre hadn't changed clothes and there was no blood or glass on his clothing, that, too, would be evidence he was not responsible. (Pl. Ex. 60: Clyde Blood Dep. 213:2-11).

272.     At his deposition, Blood testified that Golubski's failure to take Lamonte McIntyre's clothing and order a gunshot residue test was a major red flag. (Pl. Ex. 60: Clyde Blood Dep. 213:12-214:12).

273.     Additionally, Defendants failed to analyze latent prints taken from the victims' vehicle at the scene. (Pl. Ex. 71: Evidentiary Hearing - Singer 60:15–61:22, 64:5–10, 69–70; (Pl. Ex. 85: Ron Singer 2016 Aff. ¶ 4); (Pl. Ex. 62: Randy Eskina 2016 Aff. ¶ 14); (Pl. Ex. 61: Russell Fischer Report, p. 19); (Pl. Ex. 60: Clyde Blood Dep. 141:20–142:15, 145:11–146:7).

274.     During Krstolich's interview with Mitchell at the scene he asked her whether the shooter walked across fresh dirt when he walked down the hill across the street from Mitchell's home, to which she replied, "Yes." However, Defendants failed to obtain footprints from the scene or to document the path taken by the shooter. (Ex. 1: Mitchell Stmt. by Krstolich, LMKSDC_0003422); (Pl. Ex. 42: W.K. Smith Dep. 163:20–166:16); (Pl. Ex. 61: Russell Fischer Report, p. 19).

275.     Defendants failed to obtain—or apply for—a search warrant to search Lamonte McIntyre's home, or the homes of his relatives, for the weapon, as would have been police practice. (Pl. Ex. 71: Evidentiary Hearing - Singer 61:23–63:6); (Pl. Ex. 85: Ron Singer 2016 Aff. 2016 ¶ 4(b)); (Pl. Ex. 62: Randy Eskina 2016 Aff. ¶ 14); (Pl. Ex. 65: Timothy Maskil 2015 Aff. ¶ 9); (Pl. Ex. 60: Clyde Blood Dep. 216:3–221:4); (Pl. Ex. 42: W.K. Smith Dep. 107:25–111:1); (Pl. Ex. 70: Rose McIntyre 2014 Aff. ¶ 16); (Pl. Ex. 61: Russell Fischer Report, p. 19).

276.     When asked if it was "possible that it just didn't occur to Detective Golubski to search Lamonte McIntyre's home," Blood laughed and replied that was not likely. (Pl. Ex. 60: Clyde Blood Dep. 216:22–217:12).

277.     At his deposition, Smith could think of no reason why Lamonte McIntyre's home was not searched for items of evidentiary value, including the murder weapon. (Pl. Ex. 42: W.K. Smith Dep. 109:22–115:10).

278.     Blood admitted that it is very troubling that in this double homicide close-range shooting case in which the court has now made an innocence finding Detective Golubski failed to either seize Lamonte McIntyre's clothing or execute a search warrant of his home. (Pl. Ex. 60: Clyde Blood Dep. 218:18-219:1).

279.     Defendants reported no canvass searching for the murder weapon, even though it is a critical step in a homicide investigation that any reasonable officer would have understood the significance of doing. (Pl. Ex. 71: Evidentiary Hearing - Singer 69:16–70:4); (Pl. Ex. 42: W.K. Smith Dep. 106:21–107:12); (Pl. Ex. 61: Russell Fischer Report, pp. 7, 19).

280.     Each of the Defendants had the obligation to identify key evidence at the scene to make sure it was collected. (Pl. Ex. 60: Clyde Blood Dep. 143:13–144:6).

281.     The failure to gather key evidence and conduct key tests violated KCKPD's policy at the time on investigating crimes of violence, and there was no legitimate police reason to omit basic investigative steps known to officers in 1994. (Pl. Ex. 74: Policy); (Pl. Ex. 62: Randy Eskina 2016 Aff. ¶ 15–16).

282.     Defendants also failed to conduct investigative steps to identify a getaway driver—including failing to ask Lamonte McIntyre who drove him—as there was no legitimate police reason not to investigate the identity of the driver. (Pl. Ex. 61: Russell Fischer Report, p. 19–20); (Pl. Ex. 35: Dennis Ware Dep. 198:9–200:17.)

283.     If Golubski or another detective had failed to take that step, Ware admits it was up to Culp, the supervisor, to do so. In fact, as supervisor, Culp should have easily spotted these

110

deficiencies in the investigation. (Pl. Ex. 60: Clyde Blood Dep. 120:22–121:20, 218); (Pl. Ex. 42: W.K. Smith Dep. 41:17–42:4); (Pl. Ex. 35: Dennis Ware Dep. 200:3–17; 218:17–21, 261:16– 266:15.)

**A weak case, at trial, no physical or forensic evidence implicates Lamonte McIntyre, no evidence connects him to the victims, and he consistently maintains his innocence and presents an alibi**

284.    There was no physical evidence, forensic evidence, murder weapon, blood evidence, DNA evidence, fingerprint evidence, motive, or confession linking Lamonte McIntyre to the crime. (Ex. 28: Terra Morehead Dep. 181:12–183:4); (Pl. Ex. 57: Gary Long Dep. 58:19– 60:16); (Ex. 6A: Morehead Closing TT 478:23–479:13).

285.    Lamont McIntyre consistently maintained his innocence. He testified at trial that he did not commit the crime. (Ex. 6A: Lamonte McIntyre TT 453:24–454:19); *see supra* paras. 22–27.

286.    Lamonte McIntyre testified that he was at the house of his aunt, Yolanda Johnson, the afternoon of the shooting and earlier that day, he had been at the home of his aunt, Peggy Crowder, who lived just in front of Johnson. (Ex. 6A: Lamonte McIntyre TT 447:16–450:9, 452:24–453:3, 464:10-11; Peggy Crowder TT 378:9–381:8; Yolanda Johnson TT 402:23– 406:9).

287.    Lamonte McIntyre testified that he went between his two aunts' homes two times to use Johnson's phone to call a taxi for two of Crowder's guests, as Crowder did not have a phone; then he remained at Johnson's home. (Ex. 6A: Lamonte McIntyre TT 447:16–450:9. Lamonte McIntyre testified that he was not at any other location besides these two homes on the afternoon of April 15, 1994. (Ex. 6A: Lamonte McIntyre TT 464:10–12).

288.     Four alibi witnesses testified at trial and confirmed that around the time of the crime, Lamonte McIntyre was at Johnson's home to make a phone call. (Ex. 6A: Peggy Crowder TT 378:9–381:8; Yolanda Johnson TT 402:23–406:9; M'Sherie Johnson TT 426:8–428:8; Felicia Williams TT 391:3–393:2, 396:20–397:22).

**The case turns on Defendants' fabricated identifications by Ruby Mitchell and Niko Quinn, and the fabricated alibi statements Defendants attributed to Rose McIntyre and Lamonte McIntyre**

289.     The primary evidence the prosecution offered against Lamonte McIntyre at trial were the identifications by Niko Quinn and Ruby Mitchell. (Pl. Ex. 57: Gary Long Dep. 58:19–59:5); (Ex. 28: Terra Morehead Dep. 181:5–185:15).

290.     Lamonte McIntyre's defense attorney's theory of the case was that the identifications by Niko Quinn and Mitchell were incorrect, and he used all the ammunition available to demonstrate that their purported identifications were unreliable. (Pl. Ex. 57: Gary Long Dep. 60:9–12, 60:23–61:11).

291.     Ruby Mitchell identified Lamonte McIntyre during the trial and testified that she was inside her house looking out throughout the shooting. (Ex. 6: Ruby Mitchell TT 166:17–24; 174:23–175:11).

292.     Mitchell also testified that at the time of the shooting she recognized the shooter as the Lamont who used to date her niece (Lamont Drain) who she had seen "lots of times," that she was so certain it was Lamont Drain she was going to call out his name, and that at that point there was no doubt in her mind he did the shooting and she did not change her mind. (Ex. 6: TT 165:12–166:7, 180:6–181:14, 184:6–24, 188:1–5).

293.     Mitchell testified that she had later identified Lamonte McIntyre as the shooter from a set of five photos. (Ex. 6: TT 171:10–172:4). This set of photos did not include a photo of

Lamont Drain. (Pl. Ex. 46: Polaroids from Lineup with Names on Back, LMKSDC_0004352–4361); Golubski SOF para. 58.

294.     Mitchell testified that Lamonte McIntyre and Lamont Drain look "exactly alike," "almost identical," like identical twins. (Ex. 6: TT 172:18–173:2, 181:19–182:1, 209:18–21).

295.     Lamonte McIntyre and Lamont Drain do not look like identical twins. Morehead Closing TT 478:1–7; (Ex. 1: Keva Garcia Statement LMKSDC_0003498); Pl. Ex. 68: Lamonte McIntyre 1994 Mugshots, LMKSDC_0009161); (Pl. Ex. 84: Lamont Drain Mugshots 1994).

296.     Niko Quinn also made an unequivocal positive identification of Lamonte McIntyre in court during the trial. (Ex. 6: Niko Quinn TT 143:13–144:13).

297.     Morehead argued to the jury in closing that the identifications were accurate because "these are two independent witnesses [who] are not connected aside from being neighbors." (Ex. 6A: TT 475:18–21).

298.     Morehead also presented evidence from Golubski that Niko Quinn was adamant when she made her alleged positive photographic identification approximately a week after the murders. (Ex. 6A: Golubski TT 327:24–329:15).

299.     In closing argument, Morehead emphasized the second photo identification procedure Golubski conducted with Niko Quinn, telling the jury that Niko Quinn "looked at those pictures and she said I'm positively sure No. 3 is the one who I saw shoot into that car." (Ex. 6A: Morehead Closing TT 476:4–20).

300.     Morehead also argued the jury should disbelieve Lamonte McIntyre's alibi because of the reports from Officer Brown and Lieutenant Barber that both Lamonte McIntyre and Rose McIntyre had previously offered inconsistent statements about where he had been that day. (Ex. 6A: TT 479:14–480:9).

301.    Specifically, Morehead attempted to impeach Lamonte McIntyre with this false alibi, after he had truthfully testified that he was at his aunt's home at the time of the murder. (Ex. 6A: TT 452:21–453:3, 457:25–458:15).

302.    In the defense closing argument, Long argued "the best evidence of reasonable doubt is Ruby Mitchell. She's the one who tells you there's another man out there that I was convinced did this shooting." (Ex. 6A: TT 488:12–16).

303.    In her rebuttal closing, Morehead told the jury that this "is not a case of mistaken identification" as "Ruby Mitchell picked out the photograph of the person she saw do the shooting" and "Nikki Quinn completely at a different place at a different time picked out the same individual that Ruby picked out." (Ex. 6A: Morehead Closing TT 492:2–492:17).

304.    Morehead's final point was that "the state has submitted you a case where two individuals observe the defendant, Lamonte McIntyre, shoot Doniel Quinn and Donald Ewing in cold blood." (Ex. 6A: Morehead Closing TT 493:8–17).

305.    The jury requested the court reporter read back Niko Quinn and Ruby Mitchell's testimony during trial. (Ex. 6A: TT 494:15–499:14).

**The jury never hears crucial evidence in this case, as Defendants never turned over evidence of their investigative misconduct to the prosecution or defense**

306.    Lamonte McIntyre never learned of any exculpatory evidence beyond what was presented at trial prior to his wrongful conviction. Lamonte McIntyre also never learned from any source that Monster was rumored to be responsible for the murders of Ewing and Doniel Quinn prior to his wrongful conviction. Lamonte McIntyre never learned of any evidence implicating Monster as the true perpetrator before his wrongful conviction. (Pl. Ex. 66: Lamonte McIntyre Dec. 2022 ¶¶ 3–4).

114

307.    The suggestion used by Golubski and Ware to get Niko Quinn to identify Lamonte McIntyre was never reported to the prosecution or to the defense. (Ex. 28: Terra Morehead Dep. 54:2–20, 124:1–127:4); (Pl. Ex. 57: Gary Long Dep. 63:13–64:16, 65:7–19).

308.    The failure to disclose to the prosecutor the suggestion used during the first photo lineup with Niko Quinn violated the duty of officers to turn over potentially exculpatory material to the prosecutor, which any officer should have been aware of by 1994. (Pl. Ex. 63: James Brown Dep. 184:22–186:23); (Pl. Ex. 60: Clyde Blood Dep. 130:10–134:3) *see also* (Pl. Ex. 61: Russell Fischer Report, p. 14).

309.    Morehead testified at her deposition that if she been told that Golubski or any other officer had used suggestion to obtain Niko Quinn or Ruby Mitchell's identifications of Lamonte McIntyre, she would have made sure that was documented and disclosed to the defense, and that did not happen. (Ex. 28: Terra Morehead Dep. 126:19–127:16).

310.    At some point between the preliminary hearing and trial, Golubski told the prosecutor about the second photo identification procedure he conducted with Niko Quinn but did not tell her about the suggestion he used during the procedure. Instead, Golubski told Morehead that Niko Quinn was adamant about her identification of Lamonte McIntyre. (Ex. 28: Terra Morehead Dep. 131:3–18); (Ex. 6A: Golubski TT 328:20–329:15).

311.    Morehead alleges she did not know that Golubski's testimony about identification by Niko Quinn's second photo identification was false, and that he had really used suggestion to procure Niko Quinn's identification during this procedure, otherwise she would have had an obligation to correct the false testimony or turn over evidence of misconduct or any evidence that undermined the officers' credibility as Brady evidence. (Ex. 28: Terra Morehead Dep. 77:25–

115

79:15; 80:7–81:5; 81:6–10; 81:11–22; 82:4–25, 83:7–13, 83:20–84:1, 84:3–15, 84:5–19, 88:13–20, 91:2–11, 236:2–11).

312.    Golubski never reported to the prosecution that he had helped Niko Quinn relocate in exchange for her identification of Lamonte McIntyre, nor did he report that he had used pressure, suggestion, and threats to fabricate Niko Quinn's second identification procedure. (Ex. 28: Terra Morehead Dep. 54:2–20, 141:12–142:1); (Pl. Ex. 41: Roger Golubski Dep. 170:12–171:2).

313.    Had Lamonte McIntyre's defense counsel learned police used suggestion when conducting a photo identification procedure with Niko Quinn, he would have used it to undermine her identification. (Pl. Ex. 57: Gary Long Dep. 63:13–64:16, 65:7–19).

314.    Golubski never reported to prosecutor Terra Morehead or to Lamonte McIntyre's defense attorney that he and Krstolich used misconduct to obtain Ruby Mitchell's identification of Lamonte McIntyre during the photo procedure. (Ex. 28: Terra Morehead Dep. 128:3–9); (Pl. Ex. 41: Roger Golubski Dep. 115:1–15).

315.    Had Lamonte McIntyre's defense counsel learned police used suggestion when conducting a photo identification procedure with Mitchell, he would have used it to undermine her identification. (Pl. Ex. 57: Gary Long Dep. 62:8–63:9, 64:17–65:6).

316.    Had Lamonte McIntyre's defense counsel had evidence of the police misconduct underlying this investigation, he would have used it in his defense to the best of his ability. (Pl. Ex. 57: Gary Long Dep. 66:20–25).

317.    Golubski failed to document or disclose to the prosecution that Stacy Quinn could identify Monster as the perpetrator. *See* Ex. 1: Golubski Investigative Addendums LMKSDC_0003452–3456; (Ex. 28: Terra Morehead Dep. 263:6–265:7).

116

318.     Had detectives located and interviewed Stacy Quinn, Morehead would have expected those interactions to be documented in a report in the police file; they are not. (Ex. 28: Terra Morehead Dep. 258:6–15, 264:13–265:7). *See generally*, Exhibit 1.

319.     Had defense counsel learned that Niko Quinn or Stacy Quinn asserted that Lamonte McIntyre was not the shooter, he would have used it to the best of his ability in defending McIntyre, especially given this case relied entirely upon eyewitness testimony. (Pl. Ex. 57: Gary Long Dep. 67:24–68:8); (Pl. Ex. 58: Gary Long 2015 Aff. ¶¶ 12–14).

320.     When asked whether he told the prosecutor that that he had searched thoroughly for Stacy Quinn but had been unable to locate her, and when asked why he lied and told the prosecutor he could not find Stacy Quinn, Golubski refused to answer and instead invoked his Fifth Amendment right to remain silent. (Pl. Ex. 41: Roger Golubski Dep. 188:21–189:25, 193:23–194:4).

321.     When asked whether the jury never learned that the man Stacy Quinn saw was not Lamonte McIntyre because he lied and said she could not be found, Golubski refused to answer and instead invoked his Fifth Amendment right to remain silent. (Pl. Ex. 41: Roger Golubski Dep. 197:21–198:3).

322.     When asked whether his interactions with Stacy Quinn during this investigation, and the fact of his relationship with her were material, exculpatory evidence that the prosecutor would have been obligated to turn over to the defense, Golubski refused to answer and instead invoked his Fifth Amendment right to remain silent. (Pl. Ex. 41: Roger Golubski Dep. 197: 3–12).

323.     Golubski failed to disclose to the prosecutor that he was engaged in a sexual relationship with Stacy Quinn. Withholding this information from the prosecution amounted to

117

serious police misconduct and egregious violations of minimally accepted police practices. (Pl.
Ex. 41: Roger Golubski Dep. 195:8–14, 197:3–12); (Ex. 28: Terra Morehead Dep. 245:20–23);
(Pl. Ex. 61: Russell Fischer Report, p. 18).

324.    When asked whether Stacy Quinn was lying when she came forward in 1996 on
her own accord to state that Lamonte McIntyre was not the real perpetrator and testified as such
at his post-conviction hearing, Golubski refused to answer and instead invoked his Fifth
Amendment right to remain silent. (Pl. Ex. 41: Roger Golubski Dep. 199:1–199:14).

325.    When asked if, at various points in time Niko Quinn, Stacy Quinn, and Josephine
Quinn, approached him to tell him that Lamonte McIntyre was not the shooter and whether he
purposefully did not document these occasions or share them with the prosecution, because he
wanted to make sure Lamonte McIntyre stayed convicted and to hide his own misconduct,
Golubski refused to answer and instead invoked his Fifth Amendment right to remain silent. (Pl.
Ex. 41: Roger Golubski Dep. 199:22–201:13).

326.    Morehead understood that had she learned of any of the misconduct by Golubski
in his interviews, or lack thereof, with Stacy Quinn during the investigation, she would have had
a duty to disclose this misconduct as Brady evidence and a duty of candor with the court. (Ex.
28: Terra Morehead Dep. 77:25–79:15; 80:7–81:5; 81:6–10; 81:11–22; 82:4–25, 83:7–13,
83:20–84:1, 84:3–15, 84:5–19, 88:13–20, 91:2–11, 236:2–11); (Pl. Ex. 61: Russell Fischer
Report, p. 16).

327.    In general, Morehead alleged she never learned of any exculpatory evidence she
did not disclose and would have disclosed any exculpatory information she had learned. (Ex. 28:
Terra Morehead Dep. 77:25–79:15; 80:7–81:5; 81:6–10; 81:11–22; 82:4–25, 83:7–13, 83:20–
84:1, 84:3–15, 84:5–19, 88:13–20, 91:2–11, 236:2–11).

**A few years before Defendants wrongfully convicted Lamonte McIntyre, Golubski uses threats and coercion to solicit sexual favors from Rose McIntyre**

328.    In the late 1980s, Rose McIntyre was sitting in a car with her then-boyfriend, Greg Hill, when Golubski approached the car and ordered Rose McIntyre to get out of Hill's car and go to his unmarked patrol car. (Pl. Ex. 70: Rose McIntyre 2014 Aff. ¶¶ 45–50); (Pl. Ex. 73: Rose McIntyre Dep. 67:1–3, 68:4–18, 78:12–90:22); (Pl. Ex. 79: Gregory Hill Aff. ¶¶ 1–4); (Pl. Ex. 41: Roger Golubski Dep. 231:1–233:2).

329.    Golubski then threatened to arrest Hill. Out of fear, Rose McIntyre complied and followed Golubski back to his unmarked patrol car. (Pl. Ex. 70: Rose McIntyre 2014 Aff. ¶ 49); (Pl. Ex. 73: Rose McIntyre Dep. 90:18–22, 92:18–19); (Pl. Ex. 41: Roger Golubski Dep. 233:3–12).

330.    Alone in his car, Golubski threatened Rose McIntyre that he could arrest her and have her charged, and that if she "wanted to keep Greg from being arrested" that she had to come to the police station the next day. (Pl. Ex. 70: Rose McIntyre 2014 Aff. ¶¶ 50–53).

331.    Golubski told Rose she was a "nice looking lady" and made it clear that Golubski expected to get sexual favors from Rose, saying he wanted to "eat" her "pussy" and telling Rose if she "went with him" he could "help" her. (Pl. Ex. 70: Rose McIntyre 2014 Aff. ¶¶ 50–53; (Pl. Ex. 73: Rose McIntyre Dep. 95:15–100:19); (Pl. Ex. 41: Roger Golubski Dep. 232:21–233:2, 233:21–234:3).

332.    Terrified, and to protect herself and Greg from being arrested, Rose McIntyre "felt powerless to say no" to Golubski's demands. Complying with Golubski's threats, Rose did not tell Hill that Golubski asked her to come to the police station. (Pl. Ex. 70: Rose McIntyre 2014 Aff. ¶¶ 53-55).

119

333.     Golubski told Rose to come to the station late the next day, so, she went between 9 and 10pm. (Pl. Ex. 70: Rose McIntyre 2014 Aff. ¶¶ 54–56); (Pl. Ex. 73: Rose McIntyre Dep. 101:24–102:9); (Pl. Ex. 41: Roger Golubski Dep. 235:6–19).

334.     When Rose McIntyre arrived, she parked in the police station's garage, and an officer minding the desk buzzed her into the station. (Pl. Ex. 70: Rose McIntyre 2014 Aff. ¶ 57); (Pl. Ex. 73: Rose McIntyre Dep. 122:16–123:17).

335.     Golubski's office was right by the door, and when Rose McIntyre went in, Golubski shut the door behind her and told her that he liked Black women, that things would go better for her if she complied with his demands, and that he could "make it hard" for her or "make it light" for her. (Pl. Ex. 70: Rose McIntyre 2014 Aff. ¶¶ 57–58); (Pl. Ex. 41: Roger Golubski Dep. 235:6–236:2).

336.     Golubski again threatened to arrest Hill if Rose did not comply, saying "I don't have to do anything else to Greg if you let me eat your pussy." (Pl. Ex. 70: Rose McIntyre 2014 Aff. ¶ 58); (Pl. Ex. 73: Rose McIntyre Dep. 111:6–19); (Pl. Ex. 41: Roger Golubski Dep. 236:3–237:10).

337.     During this encounter, Golubski told Rose McIntyre he wanted to date her, let her know that he knew she had kids, and tried to incentivize her by offering to help her with her children. (Pl. Ex. 73: Rose McIntyre Dep. 109:1–110:8); (Pl. Ex. 70: Rose McIntyre 2014 Aff. ¶ 58).

338.     Golubski then got up from behind the desk where he was sitting, turned off the lights, pulled down Rose McIntyre's clothes, and performed oral sex on her for about fifteen to twenty minutes, while to Rose McIntyre, "every moment was excruciating." (Pl. Ex. 70: Rose

120

McIntyre 2014 Aff. ¶ 59); (Pl. Ex. 73: Rose McIntyre Dep. 109:14–110:25); (Pl. Ex. 41: Roger

Golubski Dep. 237:11–16).

339.    When asked if he forced Rose McIntyre to receive oral sex from him, Golubski

refused to answer and instead invoked his Fifth Amendment right to remain silent. (Pl. Ex. 41:

Roger Golubski Dep. 237:17–23).

340.    Rose submitted to this forced sexual assault only due to Golubski's direct and

specific threat to arrest her or Hill if she did not comply. (Pl. Ex. 70: Rose McIntyre 2014 Aff. ¶

59).

341.    Golubski told Rose McIntyre not to tell anyone what transpired in his office. (Pl.

Ex. 70: Rose McIntyre 2014 Aff. ¶ 61); (Pl. Ex. 41: Roger Golubski Dep. 240:13–20).

**During Golubski's sexual assault of Rose McIntyre, another officer enters the office, but does not intervene**

342.    At one point, a white KCKPD officer in uniform opened the door to Golubski's

office, turned on the light, stood in the doorway and saw Golubski sexually assault Rose

McIntyre. (Pl. Ex. 70: Rose McIntyre 2014 Aff. ¶ 60); (Pl. Ex. 73: Rose McIntyre Dep. 110:23-

111:5); (Pl. Ex. 41: Roger Golubski Dep. 237:11–238:5).

343.    When the officer saw what Golubski was doing, he did not act surprised. (Pl. Ex.

70: Rose McIntyre 2014 Aff. ¶ 60).

344.    The officer then backed out of the doorway and left, turning off the light and

shutting the door behind him, without making any effort to intervene. (Pl. Ex. 70: Rose McIntyre

2014 Aff. ¶ 60); (Pl. Ex. 73: Rose McIntyre Dep. 110:23–113:4).

345.    Golubski was undeterred by the interruption by another officer and continued with the sexual assault. (Pl. Ex. 70: Rose McIntyre 2014 Aff. ¶ 60); (Pl. Ex. 73: Rose McIntyre Dep. 110:23–113:4).

346.    Other officers were present in the station at the time, but no officer came to Rose McIntyre's assistance or helped her in any way. (Pl. Ex. 70: Rose McIntyre 2014 Aff. ¶ 60).

347.    No incident report, internal affairs complaint, or any other document referencing the sexual assault of Rose McIntyre by Golubski at the KCKPD police station was ever filed or submitted by a KCKPD officer or employee.

348.    When asked whether this was the first—or last—time another KCKPD officer walked in on him while he was engaged in a sexual act in his office, Golubski refused to answer and instead invoked his Fifth Amendment right to remain silent. (Pl. Ex. 41: Roger Golubski Dep. 237:17–240:12).

**Seeking to avoid further sexual assault by Golubski, Rose McIntyre attempts to report him to the KCKPD Internal Affairs Department and ultimately changes her address and telephone number**

349.    Golubski told Rose McIntyre that he wanted an ongoing sexual relationship with her. (Pl. Ex. 70: Rose McIntyre 2014 Aff. ¶ 61); (Pl. Ex. 73: Rose McIntyre Dep. 113:5–10).

350.    Upon leaving the station, Rose McIntyre felt "sick to [her] stomach" and "dirty and totally humiliated" after Golubski "had treated [her] like a whore and forced [her] to submit to his sexual desires." (Pl. Ex. 70: Rose McIntyre 2014 Aff. ¶ 62).

351.    Following the assault, Golubski harassed Rose McIntyre for weeks, calling her two or three times a day and telling her he wanted her to come back to his office to "do it again" with her and wanted her to be his "woman." (Pl. Ex. 70: Rose McIntyre 2014 Aff. ¶ 63); (Pl. Ex. 73: Rose McIntyre Dep. 113:5–117:8); (Pl. Ex. 41: Roger Golubski Dep. 240:21–241:2).

352.    Golubski then offered Rose McIntyre money in return for sexual favors, promising Rose McIntyre that he could do "a lot" for her and help her with her five children. (Pl. Ex. 70: Rose McIntyre 2014 Aff. ¶ 63); (Pl. Ex. 73: Rose McIntyre Dep. 113:5–117:8); (Pl. Ex. 41: Roger Golubski Dep. 240:21–241:15).

353.    Rose McIntyre "dreaded" Golubski's persistent calls and "continued to fear him," but sometimes she would speak with him on the phone "to placate him" in the hopes he would not force her to again provide sexual favors. (Pl. Ex. 70: Rose McIntyre 2014 Aff. ¶ 64); (Pl. Ex. 73: Rose McIntyre Dep. 113:5–117:8).

354.    Rose McIntyre reported Golubski's misconduct to the KCKPD Internal Affairs Department soon after the sexual assault occurred in his office. (Pl. Ex. 73: Rose McIntyre Dep. 105:1–22, 106:18–25, 127:6–131:6, 140:2–17).

355.    The officers Rose McIntyre encountered at KCKPD Internal Affairs refused to take or file her complaint against Golubski, stating that "they don't believe that their officers act like that." (Pl. Ex. 73: Rose McIntyre Dep. 105:1–22, 106:18–25, 127:6–131:6, 140:2–17).

356.    Rose McIntyre knew there was no one else in the department she could complain to because "Golubski was known to be very powerful in the community and in the police department." (Pl. Ex. 70: Rose McIntyre 2014 Aff. ¶ 64).

357.    To avoid Golubski's unwanted advances, Rose McIntyre moved homes and changed her telephone number. (Pl. Ex. 70: Rose McIntyre 2014 Aff. ¶ 65); (Pl. Ex. 73: Rose McIntyre Dep. 114:21–115:2, 117:24–118:1); (Pl. Ex. 41: Roger Golubski Dep. 241:16–242:2).

358.    After Rose McIntyre moved and changed her phone number, she did not hear from Golubski. (Pl. Ex. 70: Rose McIntyre 2014 Aff. ¶ 65); (Pl. Ex. 73: Rose McIntyre Dep. 125:5–18).

123

359.     When asked whether Rose had made it clear to Golubski that she would not be having sexual relations with him again, Golubski refused to answer and instead invoked his Fifth Amendment right to remain silent. (Pl. Ex. 41: Roger Golubski Dep. 242:3–243:16).

360.     When asked whether Rose's rejection of Golubski's sexual advances angered Golubski, as he was not used to women turning him down, Golubski refused to answer and instead invoked his Fifth Amendment right to remain silent. (Pl. Ex. 41: Roger Golubski Dep. 243:17–246:25).

361.     When asked whether Golubski was used to coercing women to have sex with him as he wanted, often through threats, violence, and rape, Golubski refused to answer and instead invoked his Fifth Amendment right to remain silent. (Pl. Ex. 41: Roger Golubski Dep. 243:17–246:25).

**Golubski commits sexual and investigative misconduct prior to 1994 and when reported to the KCKPD, no action was taken**

362.     Timothy Hausback, a former KCKPD Sergeant, was a sworn officer with the KCKPD Department from 1972 through 1989. (Pl. Ex. 90: Tim Hausback Dec. ¶¶ 1–8).

363.     In the mid to late 1970s, Hausback personally "saw Golubski sitting in his patrol car in the 'Bottoms,' an industrial area next to the river at Third and James Street, which was well known as an area where prostitutes were available." (Pl. Ex. 90: Tim Hausback Dec. ¶ 9). As an officer assigned to the area, Hausback knew that "Golubski had no reason to be in the Bottoms at those times. In fact, he was violating KCKPD orders by being 'out of district' when he should have been patrolling his assigned area." Hausback observed that Golubski "made no effort to disguise that he was looking for prostitutes." (Pl. Ex. 90: Tim Hausback Dec. ¶ 10). Golubski "was very well known among the prostitutes there" and had a "reputation for seeking

'blow jobs.'" (Pl. Ex. 90: Tim Hausback Dec. ¶ 11).  Golubski's pursuit and exploitation of prostitutes was widely known and accepted in the KCKPD, so much so that his "familiarity with prostitutes would sometimes come up during the daily roll call." (Pl. Ex. 90: Tim Hausback Dec. ¶¶ 12–15).

364.     Tina Peterson, a resident of KCK's "north end," encountered numerous victims of Roger Golubski while working at the KCK shelter for battered women and observed him openly riding around in his police car with Black women whom he stalked, harassed, and sexually exploited. In the late 1980s, Tina called the police department and stated that she worked at the shelter for battered women and wanted to make a complaint about Golubski's abuse of women. The person answering the phone stated someone would get back with her, and Tina left her name and phone number so she could be contacted. But no one from the Department called back. A week later, Tina called again and explained for the second time that she worked at the battered women's shelter and that she wanted to make a complaint about Golubski. Once again, she was told someone from the department would call her back, and once again, no one did. (Pl. Ex. 78: Tina Peterson Dec. ¶¶ 1–7, 10-21).

365.     Golubski's reputation in the community was that he was a sexual predator, known for exploiting, threatening, and abusing people in the community and targeting the most vulnerable women to then use "his police authority to force them to provide sex." Golubski was also widely known for harassing the men in the community, especially those who had any suspected involvement with drugs. He would collect money from these men who feared being arrested if they did not comply with his demands. (Pl. Ex. 78: Tina Peterson Dec. ¶¶ 1–9); (Pl. Ex. 81: Ruby Ellington 2015 Aff. ¶¶ 5–19); (Pl. Ex. 65: Timothy Maskil 2015 Aff. ¶¶ 7, 12–18).

**Golubski has illicit associations with drug dealers in KCK, including Cecil Brooks, the cousin of Aaron Robinson**

366.    Starting in the 1970s, Golubski developed close and illicit associations with drug dealers, protected them from arrest, and warned them of investigations and planned raids. In return, Golubski was supplied money and drugs to operate his network of informants and to exploit black females in the community for sex. Cecil Brooks was one of Golubski's illicit associates. (Pl. Ex. 37: Joe Robinson Aff. ¶¶ 20–26); (Pl. Ex. 81: Ruby Ellington 2015 Aff. ¶¶ 5–22); (Pl. Ex. 54: James McIntyre Aff. ¶¶ 16-29); (Pl. Ex. 83: Jermaine McIntyre 2016 Aff. ¶¶ 2–20); (Pl. Ex. 82: N.H. 2015 Aff. ¶¶ 3–6, 11–12); (Pl. Ex. 80: C.S.R. Aff. ¶¶ 8–22); (Pl. Ex. 43: Cecil Brooks 2016 Aff. ¶¶ 25–28); (Pl. Ex. 45: Kendra Dean-Martin 2013 Aff. ¶¶ 13–18); (Pl. Ex. 49: Kendra Dean Martin Aff. ¶¶ 13–14); (Pl. Ex. 78: Tina Peterson Aff. ¶¶ 22-39); (Pl. Ex. 76: S.K. Dep. at 199-201); (*see generally* Pl. Ex. 77: Cecil Brooks Dep).

367.    In the 1990s, Tina Peterson worked at a service station called McCall's on Quindaro in KCK. The owner, Cecil Brooks, was a prominent drug dealer who was well known throughout the community for paying police for protection, as he operated his drug business from McCall's openly and with no fear of arrest. Peterson personally observed Roger Golubski at McCall's at least a couple times a week. Sometimes he would park his car on the lot and Cecil would go out to speak with him but other times Golubski would head into the backroom where Cecil did drug deals and would meet behind closed doors. On at least one occasion, Peterson observed Cecil pulling out cash from the cash register at McCall's and giving it to Golubski. (Pl. Ex. 78: Tina Peterson Aff. ¶¶ 22–34).

368.    Around that same time, Peterson worked at Delavan apartments, which was previously owned by Cecil Brooks. During his ownership, the complex was a well-known hub of

drug activity. Peterson saw Cecil and Golubski there together and observed them socializing with underage girls. After the property was sold to another owner, Cecil's back office was cleaned out and Peterson personally observed guns, drugs, and money being discovered and pulled out of the attic. (Pl. Ex. 78: Tina Peterson Dec. ¶¶ 35–37).

369.     When asked about his illicit associations with Cecil Brooks, his receiving of money from Cecil and other drug dealers in exchange for protection from arrest and prosecution, and his specific protection of Cecil Brooks' gang in investigating the Ewing and Quinn homicides, Golubski refused to answer and instead invoked his Fifth Amendment right to remain silent. (Pl. Ex. 41: Roger Golubski Dep. 226:14–23; 227:1–17; 255:4–256:3; 256:4–25; 257:1–13; 259:5–19; 259:9–260:5; 260:14–23; 2610:24–261:15; 261:16–262:12; 262:19–25; 263:1–8; 264:25–265:7; 263:22–264:24; 267:18–25; 368:4–373:25).

370.     When asked about his illicit associations with Roger Golubski, his paying Golubski money for protection from arrest and prosecution, and the protection by Golubski while investigating the Ewing and Quinn homicides, Cecil Brooks refused to answer and instead invoked his Fifth Amendment right to remain silent. (Pl. Ex. 77: Cecil Brooks Dep. 11:8–20; 19:9–24:13).

**Golubski continues to commit sexual assaults of women, using his status as a KCKPD officer to gain power over them**

371.     In August 1999 Golubski came to the house where O.W. lived with her twin fourteen-year-old sons and two younger children. Golubski had a search warrant. (Pl. Ex. 75: O.W. Dep. 14:13–17:21). The house was searched and O.W.'s sons were taken into custody. (Pl. Ex. 75: O.W. Dep. 18:10-19. They were later charged with murder. (Pl. Ex. 75: O.W. Dep. 57:13–58:13).

372.    Golubski was assigned to O.W.'s sons' case. (Pl. Ex. 75: O.W. Dep. 38:9–12).
While the case was pending, Golubski returned to Ms. O.W.'s home, and told her he could help
her sons because he knew the DA. (Pl. Ex. 75: O.W. Dep. 27:13–29:12). Golubski then made
sexual advances; when O.W. resisted, he raped her. (Pl. Ex. 75: O.W. Dep. 29:13–31:25).

373.    Golubski repeatedly raped O.W., including while on-duty in his police vehicle,
and by forcing her to perform oral sex, during the pendency of her sons' case. (Pl. Ex. 75: O.W.
Dep. 62:15–63:15; 54:5–25; 41:14–16; 42:4–43:16). He told her he could "be a good friend" and
help her with the case. When O.W. told Golubski she was going to make a complaint, he
threatened that "he can have somebody do something to me and that they would never find me."
(Pl. Ex. 75: O.W. Dep. 42:4–43:24; 56:4–12).

374.    Golubski first contacted S.K. in approximately 2007, when she was thirteen years
old. (Pl. Ex. 76: S.K. Dep. 9:1–15; 50:7–22). He falsely told her she was listed as a witness to or
involved in an incident and that if she didn't want to go to jail, she needed to meet him away
from the police station. (Pl. Ex. 76: S.K. Dep. 9:19–10:20).

375.    S.K. met Golubski in a Walmart parking lot and spoke to him in his vehicle,
where he sexually assaulted her. (Pl. Ex. 76: S.K. Dep. 14:11–25:12). Golubski then continued to
rape S.K. dozens of times over a period of the next four years. (Pl. Ex. 76: S.K. Dep. 28:5–30:17;
35:3–54:15).

376.    Golubski threatened S.K. "just keep my mouth shut and that if I wanted to see my
sweet little grandma again" she should not talk to anyone about him "or I would be kissing my
grandma goodbye or my brother would be doing life in jail. . .[h]e can put some charge on him
and make sure he doesn't see daylight again" (Pl. Ex. 76: S.K. Dep. 21:3–22:18).

377.    Since 1996, over twenty civilian witnesses and at least three former law enforcement officials have come forward with sworn allegations that Golubski engaged in corruption including, in many instances, sexual misconduct. According to Plaintiff's expert in police practices, Chief Fischer, "Without crediting the substance of any allegation, the sheer number and common pattern of the allegations should have raised major red flags to KCKPD administration about Roger Golubski." (Pl. Ex. 61: Russell Fischer Report, pp. 23–24).

## NATURE OF THE MATTER

On April 15, 1994, at around 2:00 p.m., Neil Edgar, Jr. ("Monster") walked up to Doniel Quinn and Donald Ewing as they sat in a blue Cadillac on Hutchings Street in Kansas City, Kansas, and shot them to death at close range in broad daylight. Plaintiffs' Statement of Affirmative Material Facts (Pl. SAMF) ¶¶ 8–13. Monster worked as an enforcer for a major drug operation in Kansas City, Kansas, run by Cecil Brooks and Aaron Robinson, and Doniel Quinn was suspected of stealing drugs from them. Pl. SAMF ¶¶ 1–4.

Plaintiff Lamonte McIntyre, then 17 years old, is actually innocent of this shooting; he had no involvement, did not know Monster, or the victims, and was not at the scene. Pl. SAMF ¶¶ 22–27, 207–210; Plaintiffs' Response to Golubski's SOF ¶ 95. Nor did McIntyre and Monster look alike; Monster was 5'7" and wore his hair in French braids; Lamonte McIntyre is almost 6' tall and had short hair. Pl. SAMF ¶¶ 41, 45, 117, 119.

Stacy Quinn, Doniel Quinn's cousin, was across the street during the shooting. Pl. SAMF ¶¶ 172–174; Plaintiffs' Response to Golubski's SOF ¶ 31. She clearly saw the shooter's face and recognized him as Monster, whom she knew. Pl. SAMF ¶¶ 76, 174, 176, 202. Two other witnesses got glimpses of the shooter: Stacy's sister Niko Quinn, who saw mostly the shooter's silhouette from her vantage point, and a neighbor, Ruby Mitchell, who glimpsed the shooter through a screen door while on the phone inside her house. Pl. SAMF ¶¶ 40, 106.

The Kansas City Kansas Police Department immediately came to the scene, including originally assigned homicide detectives Clyde Blood and Tim Maskil, supervisor Steve Culp, homicide detective W.K. Smith, as well as non-homicide detectives James Krstolich and Roger Golubski.  Pl. SAMF ¶¶ 28–29, 35, 36. Golubski was known in the Kansas City, Kansas community and throughout the KCKPD for associating with prostitutes in the City's North End,

130

including for taking care of warrants and tickets if they provided him sex, and for using prostitutes as "informants" to clear cases. Pl. SAMF ¶¶ 363–366.

Stacy Quinn told officers at the scene that she saw the crime and knew who the shooter was; Golubski knew Stacy Quinn well, as he had paid her for sex for years, since she was sixteen or seventeen years old. Pl. SAMF ¶¶ 192–193, 197–198. Also at the scene, Mitchell told Golubski and others (including Niko Quinn) that she thought she recognized the shooter as a "Lamont" who used to date her niece (Mitchell had mistaken Monster for this other Lamont, Lamont Drain, who wore his hair in the same French-braided style as Monster). Pl. SAMF ¶¶ 30–31, 107–109, 112, 114, 129, 292. Golubski knew of Lamonte McIntyre because he had previously sexually assaulted and harassed his mom, Rose McIntyre, until she moved, changed her phone number and reported him to the KCKPD. Pl. SAMF ¶¶ 32, 328–360. Although there was no legitimate police reason to do so, Culp reassigned non-homicide detective Golubski as the lead investigator in the case, supported by Smith. Pl. SAMF ¶¶ 35, 37–38. Despite no forensic evidence connecting him to the scene and no description of the shooter matching him, Lamonte McIntyre became the first and only suspect., and he was arrested within hours of the shooting based on a single witness statement  Pl. SAMF ¶¶ 84, 261–284.

Golubski could tell from seeing Ruby Mitchell's vantage point that she would not have been able to see the shooter's face. Pl. SAMF ¶ 116. Golubski drove Mitchell to the police station, sexually harassing her during the drive. Pl. SAMF ¶¶ 122–127. At the station, Golubski and Krstolich showed Mitchell two sets of photos; Lamonte McIntyre's photo was the only one to appear in both. Pl. SAMF ¶¶ 139–142. The first was a six-photo lineup which had the photos all affixed to one page; this lineup was not preserved and there is no record of what other photos were included or how suggestive it was. Pl. SAMF ¶¶ 47–61, 139, 143, 156. The second was a

131

stack of five loose Polaroids with the names written on the back, a suggestive procedure. Pl. SAMF ¶¶ 139, 141, 150–152, 156. Although they taped interviews with Mitchell both before and afterward, the identification procedure itself was not taped. Pl. SAMF ¶¶ 144, 156.

Golubski reported to the prosecutor that Mitchell was only shown one set of five photos, and claimed that she "immediately" selected a photo of Lamonte McIntyre—the innocent man Golubski had targeted. Pl. SAMF ¶¶ 22–27, 32, 145, 151. But Mitchell believed she was identifying the Lamont who used to date her niece; in a taped statement she said she had known the person she identified "[f]or a couple months" "because he used to talk to [her] niece" and identified him by first and last name as Lamont McIntyre. Pl. SAMF ¶ 146. Although Golubski and Krstolich represented that Mitchell volunteered the last name "McIntyre," she did not. Pl. SAMF ¶¶ 146–147, 158–165. The Lamont that Mitchell knew was named Lamont Drain. Pl. SAMF ¶¶ 108, 162. And she did not know anyone's last name, including Lamont Drain or Lamont McIntyre (who she did not know). Pl. SAMF ¶¶ 108, 161–163. In reality, Golubski and Krstolich used direct suggestion to obtain Mitchell's identification, perhaps by showing her the back of the photos which displayed the suspect's names so that she could select the only one named "Lamont." Pl. SAMF ¶¶ 47, 63, 139–157.

Based solely on this fabricated identification, Lamonte McIntyre was arrested, and Golubski reported the case had been "cleared." Pl. SAMF ¶ 157, 260. Both Lamonte and Rose McIntyre truthfully reported that he had nothing to do with the shooting, that he had been his aunt's house, and provided specific corroborable details, like that he had called a cab at a specific time. Pl. SAMF ¶ 213–214 230, 240, 247, 249. Golubski could also see that Lamonte McIntyre was substantially taller than the shooter was consistently reported to be and had a different hairstyle. Pl. SAMF ¶ 45. Golubski not only failed to investigate this alibi, he, along with Barber

132

and Brown, fabricated statements they attributed to both Lamonte and Rose McIntyre, claiming each had volunteered the same false alibi. Pl. SAMF ¶¶ 230–259.

Contrary to KCKPD policy and practice, Golubski failed to conduct the most basic investigative steps. Pl. SAMF ¶¶ 260–283. He did not collect Lamonte McIntyre's clothes or shoes when he was arrested hours after the shooting, did not seek a search warrant to look for the gun or ammunition, did not test for gun-shot residue on Lamonte's face, hands, or clothing (even as Rose pleaded such a test would clear him), did not collect footprints from the fresh dirt the shooter had walked through at the scene or analyze latent prints on the victim's vehicle that had been collected. Pl. SAMF ¶¶ 263–268, 273–276, 279. There was no legitimate police reason for these failures, especially given the weakness of the case against Lamonte McIntyre. Pl. SAMF ¶¶ 269–272, 276–278, 281.

The following day, Golubski and Ware brought the same five loose Polaroids they showed Ruby Mitchell to Niko Quinn's house. Pl. SAMF ¶ 180. After Quinn told Golubski and Ware she immediately recognized two of the photos as people she knew who were not the perpetrator, she looked at the remaining three and said she could not make any identification. Pl. SAMF ¶¶ 47, 62. Golubski then grabbed the photos, and while Ware put his thumb on McIntyre's photo, Golubski asked, "what did [Ruby] say the man's name was?" and held the photo so Quinn could see the name "Lamonte McIntyre" written on the back. Pl. SAMF ¶¶ 63–64. Despite this direct suggestion, Quinn told them she could not make any identification. Pl. SAMF ¶ 67.

Within a few days after the murder, Niko Quinn realized her cousins had been shot by Monster on the orders of Cecil Brooks and Aaron Robinson. Pl. SAMF ¶¶ 72, 75–77. Associates

of theirs started coming by her house with guns to intimidate her. Scared, she called Golubski to set up a meeting, saying she wanted to identify her cousin's killer. Pl. SAMF ¶ 78.

Golubski met her alone in a car behind the Wyandotte High School track. Pl. SAMF ¶¶ 79–80. Niko Quinn told him she knew that Monster and Cecil were responsible for her cousin's murder. Pl. SAMF ¶ 81. She explained how they had badly beaten Doniel Quinn a week or so before the murder, how they had tried to get him alone in a car the day before the murder, and how this was the only group with a "beef" with Doniel. Pl. SAMF ¶ 81. She also explained what others had reported to her about Monster being the shooter; both a girl named Tiffany Daniel and her sister Stacy Quinn told her that Monster was the shooter. Pl. SAMF ¶¶ 75–77, 81.

In response, Golubski warned Niko Quinn not to say anything about Cecil Brooks, Aaron Robinson or their gang, intimating that Cecil Brooks had killed his ex-girlfriend. Pl. SAMF ¶ 82. He also gave her a picture of Lamonte McIntyre and pressured her to identify him, falsely claiming they had the gun and clothes he had been wearing during the shooting so knew he was guilty. Pl. SAMF ¶¶ 83, 86. Knowing Niko Quinn was scared for her life, Golubski offered to put her in protective custody, and later helped her move to 4th Street. Pl. SAMF ¶ 85. Although Golubski would later falsely report to the prosecutor that Niko Quinn made an "adamant" positive identification at this time, he did not make any written or contemporaneous documentation of this meeting at all. Pl. SAMF ¶¶ 89–90, 100–103.

Golubski also spoke to Stacy Quinn, with whom he had had a longstanding sexual relationship, and who he knew had the best view of the crime. Pl. SAMF ¶¶ 172–174, 197–205. Stacy Quinn told him that Lamonte McIntyre was innocent, and Monster was the shooter. Pl. SAMF ¶¶ 202–205. Golubski never reported any of the exculpatory information implicating

Monster from Stacy or Niko Quinn, or even that he had spoken to Stacy Quinn. Pl. SAMF ¶¶ 190–191, 201, 202–205.

The case progressed to trial, based primarily on the fabricated identifications from Niko Quinn and Ruby Mitchell. Pl. SAMF ¶¶ 284, 289. No physical or forensic evidence tied Lamonte McIntyre to the crime, there was no evidence of a murder weapon, and no motive or even evidence of any link between Lamonte McIntyre and the victims. Pl. SAMF ¶ 84, 284. Lamonte McIntyre proclaimed his innocence and testified to his alibi, corroborated by four alibi witnesses, but was impeached with Barber and Brown's fabricated evidence that he and his mom had allegedly presented a false alibi. Pl. SAMF ¶¶ 284, 300–301.

Neither the prosecutor, defense, nor jury ever knew of the improper suggestion Golubski used to obtain the two identifications. Pl. SAMF ¶¶ 307–316. Nor did they know of the substantial evidence implicating true perpetrator Monster, including that the best witness, Stacy Quinn, could identify him as the perpetrator, or that he had a motive and had attacked Doniel Quinn shortly before his murder. Pl. SAMF ¶¶ 284, 317–326. Lamonte McIntyre was wrongly convicted and spent over 23 years wrongly imprisoned before he was eventually exonerated and given a Certificate of Innocence by the state of Kansas. Pl. SAMF ¶ 25.

## QUESTIONS PRESENTED

1. Could a reasonable jury find that Golubski fabricated evidence?

2. Could a reasonable jury find that Golubski withheld exculpatory evidence?

3. Could a reasonable jury find that Golubski, without probable cause, caused Lamonte McIntyre's prosecution?

4. Could a reasonable jury find that Golubski participated in a conspiracy?

135

5.  Could a reasonable jury find that Golubski interfered with Plaintiffs' right to familial association?

6.  Would Golubski be entitled to qualified immunity for any of these claims based on the factual record a reasonable jury could find?

## ARGUMENT AND AUTHORITIES

### I.    LEGAL STANDARD

On Defendant's motion for summary judgment, the Court "must view the evidence, and all inferences arising from that evidence, in the light most favorable to" Plaintiffs. *See Emmett v. Armstrong*, 973 F.3d 1127, 1130 (10th Cir. 2020). Because "credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge," on Defendant's motion Plaintiffs' evidence "is to be believed and all justifiable inferences are to be drawn in [their] favor." *Keith v. Koerner*, 843 F.3d 833, 852 (10th Cir. 2016) (cleaned up, internal citations omitted). Summary judgment may only be granted if there are no genuine issues of material fact and Defendant is entitled to judgment as a matter of law. *Emmett*, 973 F.3d at 1132.

### II.    ADVERSE INFERENCES BASED ON GOLUBSKI'S FIFTH AMENDMENT INVOCATIONS SUPPORT DENIAL OF SUMMARY JUDGMENT

"[I]n proper circumstances silence in the face of accusation is a relevant fact not barred from evidence by the Due Process Clause.…Silence is often evidence of the most persuasive character." *See, e.g.*, *Baxter v. Palmigiano*, 425 U.S. 308, 319 (1976) (internal citations and quotation marks omitted). As a result, at trial the jury may draw an adverse inference against Golubski based on his decision to remain silent and assert his Fifth Amendment privilege at his deposition. *See, e.g.*, *Mirlis v. Greer*, 952 F.3d 36, 44–48 (2d Cir. 2020) (holding district court properly instructed jury it could draw an inference against defendant based on his invocation of

136

Fifth Amendment privilege on questions of whether he sexually abused plaintiff); *Mid-Am.'s Process Serv. v. Ellison*, 767 F.2d 684, 686 (10th Cir. 1985) ("The individual petitioners unquestionably may assert a Fifth Amendment privilege in this civil case and refuse to reveal information properly subject to the privilege…in which event they may have to accept certain bad consequences that flow from that action."); *Myers v. Brewer*, No. 17-2682-CM, 2019 WL 7293584, at *3 (D. Kan. Dec. 30, 2019) ("If defendant asserts his Fifth Amendment privilege during the deposition, which the parties agree he has the right to do, plaintiff may (and would be permitted to) use that invocation in the civil trial as a basis for the jury to infer civil liability").

"Although a motion for summary judgment cannot be granted based on an adverse inference alone, an adverse inference may be given significant weight because silence when one would be expected to speak is a powerful persuader." *SEC v. Erwin*, No. 13-CV-03363-CMA-KMT, 2021 WL 3773649, at *5 (D. Colo. Aug. 25, 2021) (cleaned up, internal citations omitted). At trial, "the jury will be able to weigh [defendant's invocation] with the evidence in its totality and draw adverse inferences if it wishes." *Rivera v. Guevara*, 319 F. Supp. 3d 1004, 1040 (N.D. Ill. 2018). As a result, the Court may properly consider Golubski's Fifth Amendment invocation as probative evidence on his summary judgment motion. *See, e.g.*, *Rivera*, 319 F. Supp. 3d at 1035 (describing how circumstantial evidence "weighed with [defendant]'s Fifth Amendment invocation on this subject" would support a jury finding for plaintiff, necessitating denial of defendant's summary judgment motion). Indeed, at this stage, the Court must draw all reasonable inferences in Plaintiff's favor, *Keith*, 843 F.3d at 852, and even without any adverse inference instruction, the jury could consider Golubski's silence and failure to provide any explanation for his actions as evidence suggesting his misconduct. *See, e.g.*, *Green v. Haskell Cty. Bd. of Comm'rs*, 568 F.3d 784, 803 n.12 (10th Cir. 2009) (describing "inferences…that the

137

law ordinarily permits to be drawn when one does not rebut a serious allegation of wrongdoing, despite understanding it and being well situated to respond—that is, the inference that the [party] accepts the truth of the allegation"). *See Emmett*, 973 F.3d at 1130.

### III.     A REASONABLE JURY COULD FIND GOLUBSKI FABRICATED EVIDENCE

To prove a § 1983 fabrication claim, Plaintiff must show "(1) the defendant knowingly fabricated evidence, (2) the fabricated evidence was used against the plaintiff, (3) the use of the fabricated evidence deprived the plaintiff of liberty." *Truman v. Orem City*, 1 F.4th 1227, 1236 (10th Cir. 2021).[3] Each element is easily met.

First, there is direct evidence that Golubski fabricated both Niko Quinn's identification of Lamonte McIntyre and his reports regarding the circumstances surrounding the identification procedures he conducted with her. Niko Quinn testified that after she told Golubski she could not make an identification from the set of Polaroid photos he gave her, he directly suggested she should identify Lamonte McIntyre, by displaying his photo to her while Ware pointed to it with his thumb, asking her "what did [Ruby] say the man's name was?" to which she answered "Lamonte" and holding the photo so Quinn could see Lamonte McIntyre's name on the back. Pl. SAMF ¶¶ 62–66. Even so, Quinn told Golubski and Ware she could not make an identification from these photos. Pl. SAMF ¶ 67. Golubski then created a fabricated police report of this identification procedure, falsely claiming, among other things, that Niko Quinn told him she thought McIntyre was the shooter but couldn't make a positive identification, and also that it was

---

[3] In addition, Plaintiff must show the conviction or sentence has been invalidated as required by *Heck v. Humphrey, 512 U.S. 477 (1994). Truman*, 1 F.4th at 1236 (but that issue is not disputed here).

"very obvious that Niko Quinn knows exactly who the shooter is" but that she was traumatized and that was why she was unwilling to make a positive identification. Pl. SAMF ¶ 68.

Regarding the second meeting with Niko Quinn alone in a car behind Wyandotte High School track, Quinn testified she realized that Monster and Cecil Brooks and their associates were responsible for her cousin's death and called Golubski to identify them. Pl. SAMF ¶¶ 78–81. But after Quinn told Golubski that she knew who killed her cousin, describing how the only people who had a "beef" with him were "Cecil and his boys" and how they had beat him up badly shortly before his murder, Golubski told her she was wrong, Cecil Brooks and his associates couldn't have done it because he knew Lamonte McIntyre had committed the crime. Pl. SAMF ¶¶ 81, 83. He falsely told her that he had other evidence implicating McIntyre including the clothes he was wearing and the gun he had used, and pressured her to identify McIntyre as the shooter. Pl. SAMF ¶¶ 83–84. He also warned her not to talk about Cecil because Cecil's ex-girlfriend had been found dead. Pl. SAMF ¶ 82. And aware that Niko Quinn was scared for her life after people with guns had repeatedly shown up on her porch, Golubski offered to put her in protective custody and did in fact help her move to 4th Street. Pl. SAMF ¶ 85. It was only as a result of this direct suggestion that Niko Quinn eventually falsely identified Lamonte McIntyre as the shooter. Although Golubski initially made no report at all of this second meeting with Niko Quinn, he later falsely told the prosecutor that Quinn had made an "adamant" and unequivocal positive identification of McIntyre from the five-photo stack during this meeting. Pl. SAMF ¶¶ 89–90, 100–104.

All of this evidence was used against McIntyre to deprive him of his liberty; Niko Quinn's false identification was key evidence offered against him at the preliminary hearing and at trial, and Golubski's false reports about the circumstances of the two identification procedures

139

bolstered the reliability of the false identifications, both in the eyes of the prosecutor before trial and the jury at trial. Pl. SAMF ¶¶ 289, 296, 298. There is no dispute that Niko Quinn's testimony describes impermissible direct suggestion; for example, Ware admitted that simply placing his thumb on the photo would have been "grossly improper" and "direct suggestion" and that he knew that in 1994. Pl. SAMF ¶ 65. *See Good v. Curtis*, 601 F.3d 393, 396–99 (5th Cir. 2010) (officer who uses undue suggestion to procure false identification is liable for wrongful conviction that resulted after witness testified to that identification at trial); *Caldwell v. City & County of San Francisco*, 889 F.3d 1105, 1113–14, 1117–18 (9th Cir. 2018) (officer could be liable for fabricating evidence if he intentionally used suggestion to infect witness's recollection of the shooter and the witness testified to the false identification at trial); *Gregory v. City of Louisville*, 444 F.3d 725, 745–47 (6th Cir. 2006) (holding officer could be liable for conducting impermissibly suggestive identification procedure where witness's identification was subsequently introduced at trial, causing plaintiff's wrongful conviction). Further, when Golubski was questioned at his deposition whether he used direct suggestion to obtain Quinn's identification and fabricated his report of the April 16, 1994 identification procedure, Golubski pled the Fifth. Pl. SAMF ¶¶ 71, 88, 104.

A jury can also find Golubski and Krstolich fabricated Ruby Mitchell's identification of Lamonte McIntyre, as well as falsely represented that she had volunteered the full name "Lamonte McIntyre," to falsely suggest she was identifying someone she knew personally. As Golubski recognized, Ruby Mitchell could not see the shooter's face well enough to identify him, as she was diagonally across the street, inside her house looking through a screen door at the time of the shooting. Pl. SAMF ¶¶ 105–107, 116, 118, 138. Although Monster was the shooter she viewed, she mistakenly believed it was the "Lamont" who her niece used to date

(Lamont Drain), likely based on the similar French-braid hairstyle both wore. Pl. SAMF ¶¶ 30–31, 110, 112–114, 129, 146–148, 171. Mitchell told Golubski and other officers she believed the shooter was "Lamont," meaning Lamont Drain (although she did not know his last name at the time). Pl. SAMF ¶¶ 31, 146.

Golubski then presented Mitchell with two separate sets of photos: a six-person photo lineup which had all the photos affixed to one page (which would be proper procedure) and a stack of five loose Polaroid photos with the suspects' names written on the back (which is improperly suggestive). Pl. SAMF ¶ 47, 63, 139, 141, 152. The six-photo lineup is not preserved so there is no record of how suggestive it may have been, but Lamonte McIntyre's photo was the only one repeated in the two sets of photos. Pl. SAMF ¶ 143. The set of five loose Polaroids also included Lamonte McIntyre's brother and cousin; officers knew it was improperly suggestive to include multiple family members in one lineup but Golubski did so here anyway. Pl. SAMF ¶¶ 52–53. Although Mitchell's statements before and after the identification procedures were tape recorded, the identification procedure itself was not. Pl. SAMF ¶ 144. But afterwards, Defendants recorded that Mitchell was identifying as the shooter the person who she had known "[f]or a couple months" because he "used to talk to my niece" and whom she identified by first and last name as Lamont McIntyre. Pl. SAMF ¶ 146.

A reasonable jury can conclude from all this evidence that Golubski and Krstolich used direct suggestion to get Mitchell to misidentify the innocent McIntyre, just as Niko Quinn testified Golubski did with her the following day. There is no reasonable explanation for why Mitchell would happen to select out of the stack of photos the same innocent person the police targeted as the suspect, whom Mitchell had never seen before, but who happened to be the only one to share the same first name as the person she mistakenly believed she had seen. Mitchell

141

would later claim she confused McIntyre and Drain because they looked like "identical twins" but even the prosecution had to admit that they do not. Pl. SAMF ¶¶ 293–294. Moreover, Mitchell was adamant she did not know Lamonte McIntyre's name and could not have volunteered it, both because she did not know Lamonte McIntyre and because she did not know anyone's last name, including Lamont Drain's. Pl. SAMF ¶ 161. The obvious implication is that Golubski and Krstolich must have fed Lamonte McIntyre's last name to Mitchell—most likely in the same way Golubski did with Niko Quinn the next day, by showing Mitchell the back of the photo with Lamonte's name written on it and highlighting that his first name matched Mitchell's description. Krstolich described yet a different procedure, an array of five photos in which *all* were named Lamont, but there is no record of anyone compiling an array of all Lamonts and, in any event, it would be improperly suggestive to compose such an all-suspect array. Pl. SAMF ¶¶ 153–156. The jury can conclude this was a lie to cover up for the fact that Mitchell was really identifying the only person in the stack named Lamont, and she was doing it based on his name, not his face. Finally, when Golubski was questioned at his deposition whether he used direct suggestion to obtain Mitchell's identification, fed her the name McIntyre, and lied when he claimed she had volunteered it, he pled the Fifth.  Pl. SAMF ¶¶ 132, 150–151, 164.

Mitchell's identification was repeatedly used against McIntyre, as the sole basis for his arrest, and was used in conjunction with Niko Quinn's fabricated identification at the preliminary hearing, and at trial. Pl. SAMF ¶¶ 157, 289, 291, 293, 297, 303–304. And the transcript of Mitchell's interview, forwarded to the prosecution falsely indicated that Mitchell knew Lamonte McIntyre when she did not. Plaintiffs' Response to Golubski's SOF ¶ 77; Pl. SAMF ¶ 146. However, any identification Niko or Ruby made after the improper identification procedures noted above, including during subsequent court proceedings is "of no value" because "there is no

142

way to distinguish between the contaminated, unreliable identifications and the witnesses' actual memory of the events, and therefore, no reliable way to assess whether the suspect was present at the crime." Plaintiffs' Response to Golubski's SOF ¶¶ 14, 86, 96.

As the Tenth Circuit noted in *Truman*, "the right not to be deprived of liberty as a result of the fabrication of evidence by a government officer… has long been recognized as a constitutional right." 1 F.4th at 1236 n.3 (citing *Pyle v. Kansas*, 317 U.S. 213, 216 (1942)); *see also id.* at 1239 (describing how clearly established prohibition on use of fabricated evidence goes back to *Mooney v. Holohan*, 294 U.S. 103 (1935)); *Pierce v. Gilchrist*, 359 F.3d 1279, 1299 (10th Cir. 2004) (holding it was clearly established by 1986 that "the deliberate or reckless falsification or omission of evidence" was unconstitutional). Indeed, this Court specifically noted in its ruling on Defendants' motion to dismiss that "fabricating evidence is a clearly-established constitutional violation." D.E. 190 at 42 (quoting *Bledsoe v. Jefferson County*, 275 F. Supp. 3d 1240, 1254 (D. Kan. 2017)).

Although Golubski purports to raise an argument for qualified immunity, this just amounts to another improper attempt to dispute the facts. He concedes that it was well established by 1994 that fabrication was unconstitutional, he just claims that *he* didn't fabricate anything. D.E. 582 at 27. As described above, a reasonable jury can easily find he did.

## IV.    A REASONABLE JURY COULD FIND GOLUBSKI SUPPRESSED *BRADY* EVIDENCE

To prove his § 1983 *Brady* claim, Plaintiff must show that Golubski (1) suppressed evidence; (2) that the evidence was favorable to Plaintiff; and (3) that the evidence was material to Plaintiff's defense. *See Becker v. Kroll*, 494 F.3d 904, 924 (10th Cir. 2007); *Bledsoe v. Bd. of Cnty. Comm'rs of Cnty. of Jefferson, Kansas*, 501 F. Supp. 3d 1059, 1123 (D. Kan. 2020); *see*

143

*also* D.E. 190 at 40 n.22; *Bellamy v. City of New York*, 914 F.3d 727, 751 (2d Cir. 2019); *Mellen v. Winn*, 900 F.3d 1085, 1096 (9th Cir. 2018). Materiality is assessed "collectively, not item by item," *Kyles v. Whitley*, 514 U.S. 419, 436 (1995). At bottom, the question is whether the suppression deprived Lamonte McIntyre of a fair trial; in other words, if "confidence in the outcome of the trial" has been "undermined by the cumulative effect of" the nondisclosures. *Smith v. Sec'y of New Mexico Dep't of Corr.*, 50 F.3d 801, 828, 835 (10th Cir. 1995).

A reasonable jury can find Golubski liable for suppressing abundant exculpatory evidence, including the direct suggestion he used to obtain the two identifications described above,[4] his sexual relationships with or harassment of key witnesses, and evidence implicating the true perpetrator. *See, e.g., Carrillo v. County of Los Angeles*, 798 F.3d 1210, 1225–27 (9th Cir. 2015) (holding officers not entitled to qualified immunity for suppressing evidence impeaching reliability of witness identifications or evidence of alternative suspects); *Geter v. Fortenberry*, 849 F.2d 1550, 1559–60 (5th Cir. 1988) (holding officers not entitled to qualified immunity for suppressing evidence of improper suggestion in identification procedures).

The jury can find that Golubski hid compelling evidence pointing to the true perpetrator, Monster. Niko Quinn testified that before she met with Golubski behind Wyandotte High School, she knew that the true perpetrators were Monster, Cecil and his gang and she contacted Golubski to identify them to him. Pl. SAMF ¶¶ 78–81. She also described to Golubski in detail

---

[4] Golubski claims the Kansas Supreme Court held there was nothing exculpatory about his meeting with Niko Quinn behind Wyandotte High School. D.E. 582 at 31. But that evaluation was based on the lie from Golubski that the meeting was *inculpatory*—not what the jury could find is the truth: that Niko Quinn actually implicated Monster, and Golubski used direct suggestion and pressure to get her to identify Lamonte McIntyre, and even so she did not make the positive identification he later claimed.

144

some of the evidence demonstrating Monster had a motive to kill Doniel Quinn and had made a prior attempt, including that individuals in this group were the only ones Doniel had "beef" with, that they had badly beaten him shortly before he was killed, and that they had been trying to get him in their car the day before he was killed. Pl. SAMF ¶ 81. Stacy Quinn also directly told Niko Quinn that she recognized the shooter as Monster, who she knew; she told this to Niko Quinn "all the time." Pl. SAMF ¶¶ 76, 176.

And a jury can find that Golubski heard this directly from Stacy Quinn, as well, who was the best witness to the crime. Golubski knew Stacy Quinn personally; he had exploited her for sex for years; it would have been easy for him to locate her for an interview. Pl. SAMF ¶¶ 197–201. He knew as of at least the day after the shooting that she knew who the shooter was, and she was willing to cooperate with the police. Pl. SAMF ¶¶ 181–183, 192–193. Even though the case against Lamonte McIntyre was otherwise weak, and Stacy Quinn should have been his best lead, Golubski documented *no* attempts to locate her and bring her in for an interview. Pl. SAMF ¶¶ 172–173, 181, 184–194, 205. But he did not contemporaneously document his behind-the-high-school interaction with Niko Quinn, either, during which she told him Monster was the shooter and he told her not to repeat that to anyone and pressured her to identify Lamonte McIntyre, lying to her and claiming they had collected the gun and clothes and could prove he was the shooter. Pl. SAMF ¶¶ 78–90. Stacy Quinn herself said that she told Golubski that McIntyre was innocent and Monster was the shooter, and in response he just called her names. Pl. SAMF ¶¶ 202–203. And when Golubski was asked at his deposition whether Stacy Quinn told him in the weeks after the murder that Monster was the shooter, he pled the Fifth. Pl. SAMF ¶ 205.

Further, Golubski had connections to, and was involved in, the KCKPD drug trade at the time of the murders and was particularly close with Cecil Brooks. Pl. SAMF ¶¶ 366–370. Golubski's extensive knowledge of the gang and drug territory in the KCK community at the time made it clear to him that the area of the murders on Hutchings was dominated by Cecil Brooks and Aaron Robinson's drug gangs. Pl. SAMF ¶¶ 366–370. A jury can find that through his extensive contacts with Cecil Brooks, Golubski withheld exculpatory information regarding the gang's activity in that area and all evidence that associates of the Brooks or Robinson gangs were involved in the double homicide. Pl. SAMF ¶¶ 1–11, 94–99, 366–370. When asked questions at his deposition regarding his long-standing relationship with Cecil Brooks and his gang, including his payment for protection and insulation from criminal repercussions— specifically his protection of Monster in this case—Defendant Golubski pled the Fifth. Pl. SAMF ¶ 369.

"[T]he question of materiality and the possible effect of the withheld evidence on the verdict[] is a mixed question of fact and law." *Bowen v. Maynard*, 799 F.2d 593, 610 (10th Cir. 1986). Here, Golubski does not—and cannot—dispute that a reasonable jury could find this suppressed evidence was material individually, let alone collectively. *See, e.g.*, *Nuckols v. Gibson*, 233 F.3d 1261, 1266–67 (10th Cir. 2000) (reversing denial of habeas where "[t]he prosecution withheld evidence that would have allowed defense counsel the means to test [the key eyewitness's] credibility"); *Bowen*, 799 F.2d at 613 ("Where, as here, identity is in issue, a creditable alibi defense is presented, and no physical evidence ties the defendant to the crime, material showing that someone resembling the defendant had motive, opportunity, and ability to commit the crime is 'sufficient to undermine [our] confidence in the outcome' of the trial."); *see also Mellen v. Winn*, 900 F.3d 1085, 1096–1101 (9th Cir. 2018) (reversing grant of summary

146

judgment against § 1983 *Brady* claim and holding that undisclosed impeachment of eyewitness who was sole evidence of guilt was material as a matter of law).

Golubski's assertion that he is entitled to qualified immunity for his *Brady* violations is foreclosed by binding Tenth Circuit law.[5] In *Pierce v. Gilchrist*, the Tenth Circuit held that as of 1986 an officer had "fair warning" that the "deliberate or reckless…omission of evidence was a constitutional violation." 359 F.3d 1279, 1299 (10th Cir. 2004) (citing *Newsome v. McCabe*, 256 F.3d 747, 752–53 (7th Cir. 2001), which it described as "finding that *Brady* clearly established that officers could not withhold information that plaintiff's fingerprints did not match those found at the crime scene or that officers influenced witnesses to pick plaintiff out of police lineup"). Indeed, the very case Golubski cites, D.E. 582 at 29, explicitly holds "It is clear that the knowing and intentional failure of an investigator to turn over exculpatory evidence creates liability" which is why the court "denied qualified immunity" in *Pierce*. *Tiscareno v. Anderson,* 639 F.3d 1016, 1023 (10th Cir. 2011).

Nor do Golubski's claims of qualified immunity based on the specific *Brady* material he suppressed fare any better. To the contrary, pre-existing Tenth Circuit law made clear suppression of just these types of evidence would violate *Brady*. *See, e.g.*, *Ballinger v. Kerby*, 3 F.3d 1371, 1376 (10th Cir. 1993) (finding *Brady* violation based on suppression of impeachment evidence); *Bowen v. Maynard*, 799 F.2d 593, 613 (10th Cir. 1986) (finding *Brady* violation based on suppression of evidence which impeached identifications of eyewitnesses, evidence pointing to a credible alternate suspect, as well as evidence which "raises serious questions about

---

[5] Indeed, no other Defendant argues this duty was not clearly established.

the manner, quality, and thoroughness of the [police] investigation"); *see also United States v. Buchanan*, 891 F.2d 1436, 1443–45 (10th Cir. 1989) (finding evidence of sexual relationship between investigating officer and witness, known only to officer, was impeachment that should have been disclosed, but holding because witness and officer did not offer key testimony and substantial other evidence incriminated defendant; suppressed evidence was not material).[6]

## V.   A REASONABLE JURY COULD FIND GOLUBSKI LIABLE FOR MALICIOUS PROSECUTION

Golubski's arguments that there is no § 1983 malicious prosecution claim, D.E. 592 at 45–46, may be disposed of quickly. In *Thompson v. Clark*, 142 S. Ct. 1332 (2022), the Supreme Court explicitly recognized the viability of a § 1983 Fourth Amendment malicious prosecution claim, which the Tenth Circuit has also repeatedly recognized. *See, e.g.*, *Pierce v. Gilchrist*, 359 F.3d 1279, 1285–1300 (10th Cir. 2004) (holding official could be liable for § 1983 malicious prosecution which caused wrongful conviction, and that conduct clearly unconstitutional by 1986); *Sanchez v. Hartley*, 810 F.3d 750, 759–61 (10th Cir. 2016) (rejecting argument that uncertainty as to contours of § 1983 malicious prosecution claim entitled officers to qualified immunity, identifying "material question" as "whether the Constitution would clearly have prohibited" defendants' conduct at the time). This Court has explained at length why Golubski's assertion that any § 1983 malicious prosecution claim grounded in the Fourteenth Amendment is

---

[6] Golubski's assertion it was not clearly established that *Brady* applied to exculpatory information the officer failed to reduce to writing, D.E. 582 at 29–30, is similarly baseless. Indeed, in *Pierce* itself the claim was that Gilchrist knew from her examination that hairs found at the crime scene could *not* have come from Plaintiff, but failed to report that exculpatory result and instead reported the opposite: they *could have* come from Plaintiff. 359 F.3d at 1293. The Tenth Circuit held this was a clearly established constitutional violation as of 1986. *Id.* at 1299–1300.

barred by the existence of a state law claim is wrong and has been rejected by the Tenth Circuit, D.E. 190 at 17–19. Golubski points to no basis to reconsider this Court's ruling.

To prove his malicious prosecution claim, Lamonte McIntyre must show (1) Golubski caused Plaintiff's continued confinement or prosecution; (2) the prosecution terminated in Plaintiff's favor; (3) there was no probable cause; (4) Golubski acted with malice; and (5) Plaintiff sustained damages. D.E. 190 at 33 (citing *Montoya v. Vigil*, 898 F.3d 1056, 1066 (10th Cir. 2018). Golubski cannot dispute Plaintiff can show favorable termination, Golubski's malice, and Plaintiff's damages; indeed he does not try in his brief.

### A.    A Reasonable Jury Could Find that No Probable Cause Existed

Probable cause requires "a substantial probability that a crime has been committed and that a specific individual committed the crime." *Wilkins v. DeReyes*, 528 F.3d 790, 801 (10th Cir. 2008) (internal citation omitted). As always, on Golubski's motion for summary judgment, the facts must be assessed in the light most favorable to Plaintiff, crediting his evidence and drawing all reasonable inferences in his favor. *See Tolan v. Cotton*, 572 U.S. 650, 656–57 (2014). Golubski's omission of Plaintiff's evidence in his Motion does not change this analysis.

"[T]he Fourth Amendment prohibits officers from knowingly or recklessly relying on false information to institute legal process when that process results in an unreasonable seizure." *Sanchez v. Hartley*, 810 F.3d 750, 754 (10th Cir. 2016). As a result, the probable cause analysis must set aside any such false information, *Wilkins*, 528 F.3d at 801–02, and take into account any material exculpatory information known to Golubski at the time, *Stewart v. Donges*, 915 F.2d 572, 582–83 (10th Cir. 1990).

Considered under that framework, almost all of the evidence Golubski points to must be disregarded, including all witness identifications, the alleged inconsistent or otherwise

149

incriminating statements from Lamonte or Rose McIntyre, and the phantom street sources that supposedly incriminated the innocent Lamonte McIntyre within a few hours of the crime, and which a reasonable jury could find Golubski knew did not exist. Similarly, the car Golubski reports James and Lamonte McIntyre rode around in was specifically excluded by the sole eyewitness to see the car and getaway driver, Breon Shelton, as the car seen at crime. Plaintiffs' Response to Golubski's SOF ¶¶ 60–61, 76. Nor does anything in Lamonte McIntyre's relatively minor criminal history suggest he would be involved in anything like a close-range shooting in broad daylight. Plaintiffs' Response to Golubski's SOF ¶ 124. Other evidence is not inculpatory, such as evidence that Lamonte McIntyre allegedly hung out at Juniper Gardens, which has no particular connection to the crime or crime scene. Plaintiffs' Response to Golubski's SOF ¶ 62.

The only actual evidence Golubski had was that Ruby Mitchell, who Golubski knew did not have a vantage point to see the shooter's face, thought the shooter looked like the "Lamont" who used to date her niece—who was *not* Lamonte McIntyre. Pls. SAMF ¶¶ 30, 107–108, 110, 116, 146, 162. He also knew that both Niko Quinn and Stacy Quinn (the witness with the best view) identified Monster as the shooter and provided detailed evidence of his motive and past assaults on Doniel Quinn. This is not remotely close to probable cause to believe Lamonte McIntyre was the shooter. [7]

In his Motion, Golubski applies the wrong standard. Plaintiff does not need to prove the identifications were coerced, but rather that Golubski "either knew that [the evidence in

---

[7] As the Court explained in its order on the motion to dismiss, in this malicious prosecution suit the "arguable probable cause" standard does not apply. D.E. 190 at 34 n.16. Yet again, Golubski does not even mention the Court's prior ruling, let alone identify any basis to revisit it. However, the evidence viewed in the light most favorable to Plaintiff does not even provide arguable cause.

question] was untrue or recklessly disregarded the possibility." *See Sanchez v. Hartley*, 810 F.3d 750, 754, 759 (10th Cir. 2016) (rejecting argument that officers would not have had fair warning they could not rely on evidence they knew or recklessly disregarded was false unless the specific tactics they used to procure the evidence were prohibited); *see also Stewart*, 915 F.2d at 580–83 (holding even where victim's statement on its face provided probable cause, there would not be probable cause if other information suggested the victim's statement was false).

A § 1983 defendant's knowledge and intent is "a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence." *Farmer v. Brennan*, 511 U.S. 825, 842 (1994). There is ample evidence from which a reasonable jury could find Golubski knew or recklessly disregarded that the evidence implicating Lamonte McIntyre— including in particular the witness identifications—was false. First, there's direct evidence from both witnesses that each told Golubski someone else committed the crime (for Niko Quinn, Monster; for Ruby Mitchell, Lamont Drain). Pl. SAMF ¶¶ 31, 108, 78–81. But there is also abundant evidence that Golubski failed to take obvious and basic investigative steps, which the jury can conclude was deliberate. *See, e.g.*, *Mellen v. Winn*, 900 F.3d 1085, 1102 (9th Cir. 2018) (describing detective's "decision not to inquire further" as "the hallmark of a deliberate action to avoid confirming suspicions" which is "tantamount to knowledge under the law") (cleaned up, internal citation omitted); *United States v. Ochoa-Fabian*, 935 F.2d 1139, 1141 (10th Cir. 1991) ("[T]he avoidance of knowledge of particular facts may circumstantially show that the avoidance was motivated by sufficient guilty knowledge to satisfy the" legal requirement.). Golubski failed to collect Lamonte McIntyre's shoes and clothes when he was arrested hours after the shooting, failed to conduct a search for the murder weapon, failed to conduct or request testing for gun-shot residue or to analyze latent prints taken from the scene or collect footprints from the fresh

151

dirt, failed to investigate any possible getaway driver, failed to check the phone records to the cab company given as part of Lamonte's alibi, and failed to talk to Ruby Mitchell's niece who she claimed knew the Lamont she was identifying. Pl. SAMF ¶¶ 214, 260–282. As a number of officers have described, there is no legitimate, police reason for these failures to take such investigative steps. Pl. SAMF ¶¶ 261, 281–282. *See, e.g.*, *Restivo v. Hessemann*, 846 F.3d 547, 580 (2d Cir. 2017) (holding evidence of a defendant's persistent deviations from "applicable professional standards" can "support an inference of intentional or reckless conduct that violated a plaintiff's constitutional rights") (internal quotation marks omitted); *see also Jimenez v. City of Chicago*, 732 F.3d 710, 721–22 (7th Cir. 2013) (same). Finally, the jury can consider Golubski's invocation of his Fifth Amendment rights and refusal to answer whether he understood this evidence was false and he was intentionally framing Lamonte McIntyre out of personal animus against his mother. Pl. SAMF ¶ 132.

### B. A Reasonable Jury Could Find Golubski Caused Lamonte's Prosecution

As the Court has previously noted, under § 1983 an officer is liable for the harm his conduct proximately causes, which includes if he "set in motion a series of events that [he] knew or reasonably should have known would cause others to deprive [plaintiff] of [his] constitutional rights." *Martinez v. Carson*, 697 F.3d 1252, 1255 (10th Cir. 2012); D.E. 190 at 37, 41–42. That other people "may have concurrently caused the harm does not change the outcome as to defendant." *Id.* (cleaned up). Causation "is generally a question of fact for the jury." *Schneider v. City of Grand Junction Police Dep't*, 717 F.3d 760, 778 (10th Cir. 2013).

Furthermore, where, as here, there is evidence the officer fabricated evidence and suppressed exculpatory evidence, subsequent actions by others do not break the causal chain:

> [A] prosecutor's decision to charge, a grand jury's decision to indict, a prosecutor's decision not to drop charges but to proceed to trial—none of these decisions will shield a police officer who deliberately supplied misleading information that influenced the decision.... *[Officers] cannot hide behind the officials whom they have defrauded.*

*Pierce v. Gilchrist*, 359 F.3d 1279, 1292–93 (10th Cir. 2004) (quoting *Jones v. City of Chicago*, 856 F.2d 985, 994 (7th Cir. 1988)) (emphasis in original).

There is ample evidence from which the jury could find Golubski was responsible for the false evidence ultimately presented against Lamonte McIntyre at trial. The danger of unduly suggestive identification procedures is that they may cause an "*irreparable* mistaken identification." *Foster v. California*, 394 U.S. 440, 442 (1969) (emphasis added). This is because "once a witness has picked out the accused at the line-up, he is not likely to go back on his word later on." *United States v. Wade*, 388 U.S. 218, 229 (1967) (cleaned up, internal citation omitted). And Defendant Ware admitted that very risk was known to KCKPD officers in 1994. Pl. SAMF ¶ 140. The jury may certainly find that is what happened here, that Golubski's improper direct suggestion irreparably tainted Ruby Mitchell's identification. And as for Niko Quinn, she expressly testified that Golubski lied to her about the evidence against Lamonte, dismissed her identification of Monster and Cecil Brooks' gang as the true perpetrators and warned her not to talk against them. Pl. SAMF ¶¶ 78–84. She further testified that she told Golubski numerous times that Lamonte McIntyre was not the shooter, and that even at the courthouse, he was uninterested in the truth. Pl. SAMF ¶¶ 91–92. Golubski misled subsequent decisionmakers including in particular prosecutor Morehead, whom Golubski never informed that the evidence she was putting on was false or the product of suggestion.

Astonishingly, Golubski seems to argue because he did not fabricate *more* evidence against Lamonte McIntyre, and because he reported *some* exculpatory information (such as that

other witnesses did not identify him), the jury could not possibly believe the direct and circumstantial evidence establishing his extensive misconduct. Unsurprisingly, no case supports his audacious argument. Should he dare to make this argument at trial, the jury may (indeed, almost certainly will) reject it.

## VI. A REASONABLE JURY COULD FIND THAT GOLUBSKI PARTICIPATED IN A CONSPIRACY

Under § 1983, Defendants are liable for "a conspiracy to deprive a plaintiff of a constitutional or federally protected right under color of state law." *Snell v. Tunnell*, 920 F.2d 673, 701 (10th Cir. 1990) (affirming denial of summary judgment on § 1983 conspiracy claim) (internal quotation marks omitted). "Frequently, a [§ 1983] conspiracy must be proven with circumstantial evidence because rarely will there be direct evidence of an express agreement among all the conspirators to conspire." *Id.* (internal quotation marks and alterations omitted). For that reason, "a defendant's assent can be inferred from acts furthering the conspiracy's purpose." *Bledsoe*, 275 F. Supp. 3d at 1252. The fact that the other members of the conspiracy may not have known "the exact limits of the illegal plan or the identity of all the participants therein" is irrelevant to the ultimate conclusion that they were part of the conspiracy. *Snell*, 920 F.2d at 702 (internal quotation marks and citation omitted).

Golubski's first argument is there was no constitutional violation, which fails as explained above. Next, he claims there is no evidence of conspiratorial agreement, because all the evidence shows is "ordinary acts of law enforcement officers doing their jobs." D.E. 582 at 46. Hardly. There is evidence that a number of separate officers worked in tandem with Golubski to create false evidence, hide exculpatory evidence, bless obvious failures to investigate, all in the service of depriving Lamonte McIntyre of his constitutional right to a fair trial. Pl. SAMF ¶ 35, 38 (Culp

154

reassigns case to Smith and non-homicide detective, Golubski in the interest of closing the case quickly); 47–66 (Ware and Golubski use suggestion and coercion during a photo identification procedure with Niko Quinn using improper photos); 68–69 (Golubski creates a report on the improper identification procedure with Quinn in which he omits his and Ware's suggestion); 94–99 (Ware, Smith, and all detectives working the case ignore evidence that the homicides were drug-motivated); 128–138 (Golubski and Krstolich fail to compile photos and a composite that match Ruby Mitchell's description of shooter); 139–157 (Golubski and Krstolich use suggestion during a photo identification procedure with Mitchell); 158–165 (Golubski and Krstolich feed Mitchell the last name "McIntyre"); 166–168 (all officers fail to interview Mitchell's niece in a timely manner); 184–196 (Golubski and all officers fail to document any encounters with Stacy Quinn); 214 (all officers fail to investigate McIntyre's alibi that he had placed calls to a cab company; 230–258 (Brown, Barber, and Golubski coordinate to fabricate inconsistent alibi statements by Rose and Lamonte McIntyre); 260–283 (all officers fail to conduct basic forensic testing). This, alone, suggests at least a tacit conspiratorial agreement. *Cf. Frasier v. Evans*, 992 F.3d 1003, 1025–26 (10th Cir. 2021) (noting that "proof that defendants formed an agreement or conspired to engage in lawful activities" would be insufficient).

And there is more. The jury can find that Golubski participated with Barber in fabricating a false statement from Rose McIntyre to undermine Lamonte McIntyre's truthful alibi. Golubski recorded a statement Barber alleging that Rose made a "totally unsolicited" statement suggesting both that she knew Lamonte was guilty of the murders and that she lied about his alibi to protect him. Pl. SAMF ¶ 236. Rose has repeatedly and consistently maintained these statements are false. Pl. SAMF ¶¶ 238–239. Golubski then reported Barber's false statements in his report and represented to the prosecutor that "inconsistent alibis" existed, bolstering the evidence against

Lamonte. Pl. SAMF ¶ 258. Like Rose, Lamonte has repeatedly and consistently maintained that these statements are false. Pl. SAMF ¶ 252.

## VII.     A REASONABLE JURY COULD FIND THAT GOLUBSKI INTERFERED WITH THE RIGHT TO FAMILIAL ASSOCIATION

The Due Process Clause protects the right to familial association, and police are liable under § 1983 for misconduct that interferes with that right. *See Trujillo v. Bd. of Cnty. Comm'rs*, 768 F.2d 1186, 1189 (10th Cir. 1985). To prove liability, the plaintiff must show that the misconduct was "directed at the familial relationship with knowledge that the statements or conduct will adversely affect that relationship." *Lowery v. Cnty. of Riley*, 522 F.3d 1086, 1092 (10th Cir. 2008) (internal quotation marks omitted).

This Court already held, in its order on the motions to dismiss, both that Plaintiffs' claims that Golubski deprived them of their right to familial association are legally valid, and that it was clearly established as of 1994 that this conduct was unconstitutional. D.E. 190 at 23–25. And discovery has substantiated the claims pled in the Complaint, with evidence that Golubski sexually assaulted Rose McIntyre, pursued her for a relationship, and then retaliated against her family by framing her son for a murder he didn't commit. Pls. SAMF ¶¶ 132, 328–360. And a reasonable jury could find that this animus was directed against the entire family—including the innocent teen Golubski was framing for murder. Golubski identifies no basis to reconsider the Court's earlier ruling; he does not even acknowledge it.

## CONCLUSION

For the foregoing reasons, Golubski's motion for summary judgment should be denied in full.

156

Date: April 22, 2022                           Respectfully submitted,

                                               LATHROP GPM LLP

                                               By: /s/ Michael J. Abrams
                                               Michael J. Abrams #15407
                                               Alana M. McMullin #78948
                                               2345 Grand Boulevard, Suite 2200
                                               Kansas City, MO 64108
                                               (816) 292-2000
                                               (816) 292-2001 Facsimile
                                               michael.abrams@lathropgpm.com
                                               alana.mcmullin@lathropgpm.com

                                               Cheryl A. Pilate #14601
                                               Lindsay Runnels #78822
                                               Morgan Pilate, LLC
                                               926 Cherry Street
                                               Kansas City, MO 64106
                                               Telephone: (816) 471-6694
                                               Facsimile: (816) 472-3516
                                               cpilate@morganpilate.com

                                               Barry Scheck (*admitted pro hac vice*)
                                               Emma Freudenberger (*admitted pro hac vice*)
                                               Sona R. Shah (*admitted pro hac vice*)
                                               Grace Paras (*admitted pro hac vice*)
                                               Neufeld Scheck & Brustin, LLP
                                               99 Hudson Street, Eighth Floor
                                               New York, NY 10013
                                               Telephone: (212) 965-9081
                                               Facsimile: (212) 965-9084
                                               emma@nsbcivilrights.com

                                               *Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

The undersigned certifies that on the 22nd day of April, 2022, the foregoing was electronically filed with the clerk of the court using the CM/ECF system which will provide notice and service to all counsel of record.

                                               By: /s/ Michael J. Abrams
                                               An Attorney for Plaintiff