**EXHIBIT 55**

## AFFIDAVIT OF M'SHERIE JOHNSON

I, M'Sherie Johnson, being of sound mind and lawful age, hereby state on my oath as follows:

1. My name is M'Sherie Johnson, and I lived during my childhood and early adult years in Kansas City, Kansas. I presently reside in Des Moines, Iowa.

2. In 1994, a cousin, Lamonte McIntyre, was charged with the murders of two people. I know he did not commit those homicides because he was with me and my family at the time of the shooting.

3. In April 1994, I lived at 1515 Wood in Kansas City, Kansas, with my mother, sister and brother. An aunt, Peggy Crowder, lived with her family just across the alleyway on Walker. Lamonte was one of the children of another aunt, Rose McIntyre, who also lived in Kansas City, Kansas. Family members would frequently go back and forth between the two homes, on Wood and Walker, to visit and spend time together.

4. I remember very clearly the day of the homicides because Lamonte was arrested that day. I also remember the events of that day because I gave a statement to the police a few days after the murders and later testified at Lamonte's trial.

5. As he often did during that time period, Lamonte had been spending time at our house and at Aunt Peggy's house. On the day he was arrested, I remember that I had first seen Lamonte briefly around noon at Aunt Peggy's. He was watching television with Peggy's daughter, Felicia. I stayed there just a few minutes, then returned to my home at 1515 Wood.

6. Around 2 p.m. or a little after, I remember that Lamonte came over to 1515 Wood to use the phone to call a cab for somebody at Aunt Peggy's house. It was not unusual to call a cab from time to time, as some folks in our neighborhood did not always have access to reliable transportation and bus service was very poor.

7. After Lamonte made the phone call, he returned to Aunt Peggy's house. He then returned to our house a few minutes later and called another cab. He then went back to Aunt Peggy's to tell them a cab was coming, then he came back to our house and stayed the rest of the afternoon.

8. I remember at some point in the mid-afternoon Lamonte's brother, James, came over to our house and spent some time with Lamonte.

9. Lamonte remained at our house at 1515 Wood until his mother, Rose, came to pick him up in the late afternoon, maybe around 5 p.m. or somewhat earlier.

10. I remember what Lamonte was wearing that day, primarily because we had been teasing him about his clothing. He had been in the same clothes for three days, and we had been joking about that. I specifically recall that Lamonte was wearing goldish-bronze pants, a black shirt, and a blue and white and yellow hat (a Michigan hat).

1

11. A few days after Lamonte was arrested, I gave a statement to the police and told them about how Lamonte had been at Peggy's house on the day of the arrest. I told police that Lamonte had come to our house on Wood twice that afternoon to use the phone to call for a cab. I also told police that Lamonte had been wearing the same clothes for three days, and I described those clothes including the goldish-bronze pants and the Michigan hat.

12. I know I was examined at trial about the time that I first saw Lamonte on the day of the shooting. With regard to when he first appeared at our house at 1515 Wood, I first saw him there at 2 p.m. or a little later. But I had seen him for the very first time that day, very briefly, at Aunt Peggy's house around noon. I was clear in my police statement about this, but the questions about this confused me at trial. At trial, I was trying to describe when I first saw Lamonte that day at 1515 Wood, not when I had seen him at Aunt Peggy's house about two hours earlier.

13. I remember late in the afternoon on the day of Lamonte's arrest that my grandmother called my family's house to say that police had been at her house looking for Lamonte. We did not know why. Lamonte briefly talked to our grandmother on the phone, and then his mother came by to pick him up.

14. I remember when Aunt Rose came in the house. She had no idea why police were looking for Lamonte and neither did any of us. Aunt Rose asked Lamonte if he had messed up and missed a court date or something like that. Lamonte told her, "No," and said he had had no idea why police were looking for him and that he had not done anything wrong. Aunt Rose then said something to effect of: "OK, then, let's go." As she was leaving with Lamonte, she told us: "We will be back." I specifically remember that Aunt Rose did not seem to be overly concerned and thought any issue with the police concerned something very minor.

15. All of us were shocked when Lamonte was arrested for murder, as we knew he had been with us at the time the police said the homicides occurred. Several family members testified for Lamonte at his trial, including my mother, Yolanda Johnson. My mother would not have testified unless she knew for certain that Lamonte was innocent.

16. Lamonte has always been well-loved in our family. As a teenager, he was someone who enjoyed jokes and could keep people laughing.

17. My family was shocked and stunned when Lamonte was convicted. We just couldn't believe it. Some of us felt his attorney had not done a very good job at trial and had not properly prepared Lamonte's witnesses for what to expect in a courtroom.

18. In the years since Lamonte was convicted, many people have told me that they know Lamonte is innocent. In fact, Niko Quinn, one of the eyewitnesses who testified against Lamonte at trial, admitted to me that she had lied in her courtroom testimony.

19. At some point I learned that the lead investigator in Lamonte's case was Detective Roger Golubski. I found this information very upsetting as I am aware – along with the rest of the community – of Golubski's reputation as a dirty, corrupt cop.

2

Exh. 55

20. Detective Golubski is very well known for stealing drugs from drug dealers. He would shake them down for drugs and money, but not arrest them. I am personally acquainted with two former drug dealers that he repeatedly shook down, and they told me about how Golubski stole their dope. Because they were doing something illegal, they did not report these crimes to the police department. Also, Detective Golubski is viewed as being very powerful, so people were afraid to make any kind of complaint about him.

21. In addition to shaking down drug dealers, Detective Golubski was also widely known for having sexual relationships with crack-addicted prostitutes who also functioned as his so-called "informants."

22. At that time, the area around 13th and Wood was a real hot spot for drugs and prostitution, and I saw Golubski pick up prostitutes there several times. The prostitute would get in his car, and they would drive off to a more private location. About ten minutes later, Golubski would return with her and drop her off. He was always in his detective vehicle when he did this.

23. One of the prostitutes with whom he had a regular sexual relationship was a drug-addicted woman named ▇▇▇▇▇▇. I personally witnessed Golubski pick up and drop of ▇▇▇ on a number of occasions in the early 1990s near 13th and Wood.

24. It was widely known in the community that the crack-addicted women – often referred to as "smokers" – would perform oral sex on Golubski in his detective vehicle. They also supposedly gave him information for his cases, but they were not the kind of people who would be reliable informants.

25. Everyone in the inner city area knew what Golubski was doing in terms of shaking down drug dealers and having sexual relationships with crack-addicted prostitutes. He was viewed throughout the community as a "dirty cop," and people avoided him whenever possible.

FURTHER AFFIANT SAYETH NOT

05-07-2016
Date

State of ~~Missouri~~ KANSAS

County of WYANDOTTE

Subscribed and sworn to before me on this 7 day of MAY, 2016.

05/07/2016   1141 HRS
Date

M'Sherie Johnson
M'Sherie Johnson

MICHAEL D. BUSS:
My Appointment Expires
September 22, 2019

Notary Public

4

Exh. 55

LMKSDC_0004729