# EXHIBIT 60

**Page 1**

```
 1           IN THE UNITED STATES DISTRICT COURT
               FOR THE DISTRICT OF KANSAS
 2
    LAMONTE MCINTYRE, et al.,*
 3                             *
          Plaintiffs,          *
 4                             *
    v.                         * Case No. 2:18-cv-02545-KHV-KGG
 5                             *
    UNITED GOVERNMENT OF        *
 6  WYANDOTTE COUNTY AND        *
    KANSAS CITY, KS, et al., *
 7                             *
          Defendants.          *
 8
    ***********************************************************
 9              ORAL DEPOSITION OF
                    CLYDE BLOOD
10               FEBRUARY 3, 2021
                     VOLUME 1
11  ***********************************************************
12
13
14
15
16
17         ANSWERS AND DEPOSITION OF CLYDE BLOOD, produced as a
18  witness at the instance of the Plaintiffs, taken in the
19  above-styled and -numbered cause on the 3rd day of
20  February, 2021, A.D., beginning at 9:07 a.m., before D.
21  Beth Randolph, a Certified Shorthand Reporter in and for
22  the State of Texas, at the Holiday Inn Express, located at
23  325 Village Park Drive, Alvarado, Texas, in accordance
24  with the Federal Rules of Civil Procedure and the
25  agreement hereinafter set forth.
```

**Page 2**

```
 1              A P P E A R A N C E S
 2  FOR THE PLAINTIFFS:
 3  MS. EMMA FREUDENBERGER (ZOOM VIDEO CONFERENCE)
    MS. YASMIN DAGNE
 4  Neufeld Scheck & Brustin, LLP
    99 Hudson Street, Eighth Floor
 5  New York, New York 10013
    (212) 965-9081
 6  (212) 965-9084 (Fax)
    emma@nsbcivilrights.com
 7
    MS. CHERYL A. PILATE (ZOOM VIDEO CONFERENCE)
 8  Morgan Pilate, LLC
    926 Cherry Street
 9  Kansas City, Missouri  64106
    (816) 471-6694
10  (816) 472-3516 (Fax)
    cpilate@morganpilate.com
11
    FOR THE DEFENDANT, CLYDE BLOOD:
12
    MS. ELIZABETH EVERS GUERRA
13  Sanders Warren Russell & Scheer, LLP
    11225 Colege Boulevard, Suite 450
14  Overland Park, Kansas  66210
    (913) 234-6100
15  (913) 234-6199 (Fax)
    e.evers@swrsllp.com
16
    FOR THE DEFENDANT, UNIFIED GOVERNMENT OF WYANDOTTE COUNTY
17  AND KANSAS CITY KS:
18  MR. DAVID R. COOPER (ZOOM VIDEO CONFERENCE)
    Fisher Patterson Sayler & Smith
19  3550 SW 5th Street
    Topeka, Kansas  66606
20  (785) 232-7731
    (785) 232-6604 (Fax)
21  dcooper@fpsslaw.com
22
23
24
25
```

**Page 3**

```
 1  FOR THE DEFENDANT, ROGER GOLUBSKI:
 2  MR. MORGAN L. ROACH (ZOOM VIDEO CONFERENCE)
    McCauley & Roach, LLC
 3  527 West 39th Street, Suite 200
    Kansas City, Missouri  64111
 4  (816) 523-1700
    (816) 523-1708 (Fax)
 5  morgan@mccauleyroach.com
 6  ALSO PRESENT: (ZOOM VIDEO CONFERENCE)
    MR. JAMES BAIN
 7  MS. ARIEL MANNING
    MS. ALANA MCMULLIN
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

**Page 4**

```
 1              I N D E X
 2  Appearances..............................Page    2
 3  Exhibit Index............................Page    5
 4  Examination by Ms. Freudenberger.........Page    7
 5  Signature and Corrections................Page  291
 6  Reporter's Certificate...................Page  292
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```



CLYDE BLOOD VOLUME 1                                February 03, 2021
MCINTYRE vs UNITED GOVERNMENT OF WYANDOTTE              17—20

Page 17

1 in custody.  We took him out of the jail and put him in
2 with other subjects of similar appearance and did a
3 physical lineup.
4    Q.  Okay.  And I take it that was the policy at the
5 time.  If you had a suspect in custody, you would conduct
6 a physical lineup?
7    A.  It was a procedure we followed at that time, yes.
8    Q.  Okay.  Did that procedure change at any point in
9 time during your career with the Kansas City, Kansas,
10 Police Department?
11    A.  Do what?
12    Q.  Did that procedure change at any point in time
13 during your tenure?
14    A.  Not to my knowledge.  They can still be doing it
15 for all I know.
16    Q.  All right.  And I take it there's a reason for
17 that.  In other words, it's common sense as a detective
18 that a -- an identification at a live lineup is persuasive
19 evidence at trial.  Correct?
20        MS. GUERRA:  Object to form.  You can
21 answer.
22        THE WITNESS:  What?
23        MS. GUERRA:  You can answer.
24    A.  I would assume it would be.  I mean, that was the
25 purpose of the lineup in the first place.  If they

Page 18

1 couldn't identify them, they couldn't.  That was it.  If
2 they did, we forwarded the information to the prosecutor.
3    Q.  (BY MS. FREUDENBERGER) And were there
4 situations -- my understanding is in most departments --
5 well, I'll withdraw the question and back up.  You
6 conducted a lineup in that case because the suspect was
7 already in custody.  Right?
8    A.  Yes.  Yes, ma'am.
9    Q.  Okay.  And then there are other situations where
10 you don't have a suspect in custody, an arrest hasn't been
11 made, and witnesses are shown photographic lineups.
12 Correct?
13    A.  Yes, ma'am.
14    Q.  All right.  Was the policy and practice in the
15 Kansas City, Kansas, Police Department that even after
16 getting a positive identification in a photo array, a
17 photo lineup, you would then proceed to a physical lineup
18 to have the suspect identify the -- I apologize.  The
19 witness -- witness or victim identify the individual in
20 person?
21    A.  Not necessarily, no.  I don't -- if they
22 identified a photo lineup, we would proceed with our
23 investigation and interview the subject that was
24 identified.  But I never did -- I don't recollect ever
25 running a physical lineup in conjunction to a photo

Page 19

1 lineup.
2    Q.  Okay.  And when approximately did that case
3 occur?
4    A.  I don't know.  I don't remember.  I mean, ma'am,
5 that's been a long time ago.
6    Q.  Well, was that case toward the beginning of
7 your -- can you say whether that case was toward the
8 beginning of your career or toward the end of your career?
9    A.  Not to my recollection, no, I can't.
10    Q.  Could have been your first year as a detective,
11 could have been your last?
12    A.  It was somewhere in between.  It wasn't my last
13 day.  It wasn't my first.
14    Q.  All right.  Before we move on, sir, there are
15 particular -- very particular rules that govern the way
16 that detectives conduct identification proceedings in
17 serious cases.  Correct?
18        MS. GUERRA:  Object to form.  You can
19 answer.
20        THE WITNESS:  I'm sorry?
21        MS. GUERRA:  You can answer.
22        THE WITNESS:  Oh, okay.
23    A.  I don't remember any written SOPs as to how
24 lineups were run.  I just remember that we tried to make
25 the lineup fair.  Like I wouldn't put a white guy in with

Page 20

1 a bunch of -- with several black guys or vice versa.
2        We try to build the lineup like a
3 photographic or a physical lineup, either one, with people
4 of similar appearance where when the victim would have to
5 say, yeah, that's him or I can't.  And I've had many
6 lineups where the victim could not identify anybody even
7 though the suspect was in the lineup because they --
8 similar appearances.
9        I mean, you just -- we never tried to
10 set anybody up to burn them.  We tried to be as fair and
11 honest and aboveboard as possible and I know -- well, go
12 ahead.  I'm sorry.
13    Q.  (BY MS. FREUDENBERGER) So that was one rule.
14 When assembling a lineup be it a photographic lineup or an
15 in person lineup, one rule is that you try to select
16 fillers who had a similar appearance to the suspect.
17 Correct?
18    A.  Yes, ma'am.  For example --
19    Q.  Okay.
20    A.  -- if you had if a guy that had a beard, I
21 wouldn't put him in a lineup with a bunch of clean shaven
22 people.  We would try to --
23    Q.  Of course, because the --
24    A.  Right.
25    Q.  Common sense dictates and basic policing dictates



Page 21

1 that a witness is more likely -- well, I'll withdraw it
2 and ask a similar question that the reason you wouldn't do
3 that is because that would be suggestive.  Right?
4      A.  Yes.
5      Q.  So making an identification procedure unreliable.
6 Correct?
7      A.  That's right.
8      Q.  Okay.  And that's what you were trained.
9 Correct?
10      A.  Yes.
11      Q.  And I gather another rule regarding lineups,
12 photographic or in person, was that you would never
13 include more than one suspect in a lineup.  Correct?
14      A.  No, we tried to avoid that if at all possible.
15      Q.  Okay.  That's something else that --
16      A.  I remember one --
17      Q.  -- according to your training.  Correct?
18      A.  Well, I don't remember any lineups where we had
19 multiple suspects in the same lineup.  I don't remember
20 doing that.  But I would try to avoid that if I could.
21      Q.  And the reason you wouldn't do that is because
22 that would make the lineup inherently unreliable.
23 Correct?
24      A.  Yes.
25      Q.  Okay.  And I take it you also wouldn't put

Page 22

1 multiple family members in one lineup.  Correct?
2      A.  No.  I wouldn't care for that idea at all.
3      Q.  Okay.
4      A.  My brother and I look a lot alike.  If you put us
5 both in lineup, I might get picked for something he did
6 and I don't think I'd like that.
7      Q.  All right.  That was another rule in the
8 department at the time.  Correct?
9            MR. COOPER:  Object to form.
10      Q.  (BY MS. FREUDENBERGER) Oh, and counsel's correct.
11 I said at the time and you haven't identified the time
12 period.  That was another rule in place during your tenure
13 at the Kansas City, Kansas, Police Department.  Correct?
14      A.  I don't recollect it as a rule but it was a
15 personal thing that I would never have done.  I wouldn't
16 agree with it.
17      Q.  And one reason that you wouldn't agree is because
18 it is common sense that if you put multiple suspects -- or
19 I apologize -- multiple family members in one lineup, that
20 lineup is going to be unreliable.  Correct?
21            MS. GUERRA:  Object to form.
22            THE WITNESS:  Huh?
23            MS. GUERRA:  You can answer.
24      A.  What do you do if you have twins, you know,
25 identical twins.  You could not make a fair lineup of

Page 23

1 that.  And like I said, my bother and I are an example.
2 We looked a lot alike even though he was older.  Well,
3 he's dead now, but even though he was older than I was, we
4 had similar characteristics.
5            MS. GUERRA:  Sergeant Blood, just answer
6 the question she asks.  Okay?
7      Q.  (BY MS. FREUDENBERGER) In other words, individual
8 family members often look similar.  Correct?
9      A.  Yes.
10      Q.  As a police officer, it's just common sense that
11 you wouldn't put multiple family members in a photo lineup
12 if you are trying to create a fair array.  Correct?
13            MS. GUERRA:  Some objection.
14      A.  Common sense and fairness.
15      Q.  (BY MS. FREUDENBERGER) Okay.  That's just basic.
16 Correct?
17      A.  Uh-huh.
18      Q.  Oh, one other quick point.  The court reporter
19 can't take down uh-huhs or huh-uhs or shrugs.
20      A.  Sorry.
21      Q.  So I'll ask you to answer verbally.
22      A.  Okay.  Will do that.
23      Q.  All right.  So the answer was yes?
24      A.  Yes.
25      Q.  Okay.

Page 24

1      A.  I understand.
2      Q.  All right.  Another rule I gather when assembling
3 photo lineups is that detectives would use the
4 photograph -- the closest available photograph in time to
5 the crime.  Correct?
6            MR. COOPER:  Object to form.
7      A.  The close -- I'm sorry?
8      Q.  (BY MS. FREUDENBERGER) Sure.  Policy and
9 procedure was to use the closest available photograph of a
10 suspect in time to the crime.  Correct?
11      A.  I'm not sure.  We had zillions of photographs
12 available in the crime lab, mug shots, and that's where we
13 would get a lot of our photographs to build a lineup and
14 the availability -- we didn't have names, numbers.  It was
15 just a face.  That's all.
16            And, I mean, another example of lineups,
17 we used a lot of high school yearbooks.  They got a bunch
18 of photographs in them and we would just tape over the
19 names and let people look through the yearbook.  If they
20 identified someone, then we would find out the name and
21 work from there.  But, you know, it just -- what was
22 available and fair.
23      Q.  That makes sense.  And yearbooks obviously have
24 dates on them.  Right?
25      A.  Really have what?



Page 25

1    Q.   Yearbooks are dated.  Correct?
2    A.   Sure.
3    Q.   So if you had a crime that occurred in 1997 and
4  you were going to do a -- and you were going to show a
5  witness a yearbook to see if they could pick somebody out,
6  you would choose the yearbook from 1997 if it was
7  available.  If not, 1996 before you would use the yearbook
8  from 1992.  Correct?
9    A.   That's right.  We'd use --
10        MS. GUERRA:  Object to form and also
11  improper hypothetical.  Let me --
12        THE WITNESS:  Yes.  I'm sorry.
13        MS. GUERRA:  Why don't we make sure to
14  pause after Emma's question --
15        THE WITNESS:  I'm sorry.
16        MS. GUERRA:  -- so if any of us have
17  objections.  No worries.  Then I can assert the objection
18  but you can still give an answer.  Okay.  You can give
19  your answer.
20        THE WITNESS:  Oh, I can give the answer?
21        MS. GUERRA:  Yes, yes.
22    A.   We kept our yearbooks up-to-date.  Every year
23  when a new yearbook was issued at the local schools, we
24  would run around and collect the yearbooks.  They would
25  voluntarily give them to us and we kept them up-to-date.

Page 26

1        So if I had a '97 as you say lineup to
2  run, I'd use the most current yearbook available.  And
3  sometimes the yearbooks weren't out yet for that year.
4  You know how the school year runs.  And usually the
5  yearbook is, I think, the last thing that comes out
6  towards the end of the school year.  So we would use
7  whatever was current or available.
8    Q.   (BY MS. FREUDENBERGER) And the reason you would
9  use whatever was current is because you would always want
10  to show a witness a photograph of the suspect that looked
11  the most like what the suspect looked like at the time of
12  the crime.  Right?
13    A.   Yes.
14    Q.   And the same would be true for mug shots.
15  Correct?
16    A.   Yes.
17    Q.   That's just common sense basic policing.
18  Correct?
19    A.   Yes.
20    Q.   Okay.  The yearbook -- let's call it the yearbook
21  lineups.  It sounds like that was a regular custom and
22  practice in the Kansas City, Kansas, Police Department to
23  conduct yearbook lineups?
24    A.   I used it primarily when I was assigned to the
25  juvenile division.  And afterwards very rarely did I have

Page 27

1  occasion to use the yearbook for anything.  It was just
2  when I was in juvenile, I worked with juveniles.
3    Q.   Okay.  All right, sir.  You're currently retired?
4    A.   Yes, ma'am.
5    Q.   What year did you retire?
6    A.   I retired from Kansas City, Kansas, in 1997.  Then
7  I retired again from the Garden City, Kansas, Police
8  Department in 2014.
9    Q.   Did you go directly from the Kansas City, Kansas,
10  Police Department to the Garden City Police Department?
11    A.   No, ma'am.  When I left Kansas City, we moved to
12  western Kansas to be close to my family.  My daughter and
13  son-in-law were there.  And I went to work for the Garden
14  City Community College as a police officer.  They
15  disbanded the police department at that time because the
16  new college president didn't like policemen or guns and
17  they went to security.
18        They fired the chief because they no
19  longer needed him and I left and went on to help my
20  neighbor's farm.  Then later the college called me and
21  asked me to go back to work as a security officer.  They
22  offered a decent wage.  I went back.
23        And while I worked there the second
24  time, I got to know a lot of city policemen in Garden City
25  and several times they asked me to go to work or apply for

Page 28

1  Garden City Police Department.  So I finally did went to
2  work there and that's where I stayed until I retired in
3  2014.  I retired there as a master patrol officer.
4    Q.   All right.  And what year did you join the Kansas
5  City, Kansas, Police Department?
6    A.   1968.  I got out of the Army in 1968 I think in
7  February.  I applied for the police department and I was
8  hired in April of '68.  Went to work for Kansas City,
9  Kansas.
10    Q.   Okay.  Did you go into the Army directly after
11  high school?
12    A.   I was drafted.  I was -- at the time I was
13  drafted in the Army, I was working for the Harry Gorby
14  Corporation in Kansas City.  I'm a welder by trade.  I got
15  drafted in the Army.  When my tour -- when I made my ATS,
16  I extended six months because I wanted to go in the police
17  department.
18        And by extending six months that would
19  help me avoid having to make reserve meetings and things
20  like that.  I could go on about my business as a
21  policeman.  So I went to work for the Kansas City, Kansas,
22  and I was there until I retired in '97.
23    Q.   All right.  Any other jobs you've held between
24  1968 and today?
25    A.   A bunch of them.  I worked part-time for the



Page 69

1    Q.  I'm sorry.  Could you -- could you repeat that or
2  could the court reporter read it back?
3    A.  Whenever the help was available if we needed
4  additional manpower, we got it.
5    Q.  Well, was there ever a situation where you
6  requested help and you were told no, sorry, you got to do
7  this on your own?
8    A.  I'm sorry?  I'm sorry.  I didn't --
9    Q.  Well, was there ever a situation where you asked
10  for manpower and were told, no, we can't provide it?
11    A.  Not that I recollect, no.
12    Q.  And, in fact, it sounds like there were practices
13  in place to ensure that all homicides were thoroughly and
14  properly investigated regardless of how busy the
15  department was.  Correct?
16    A.  Homicides took priority to other cases, yes.
17    Q.  I'm sorry.  What was that, sir?
18    A.  Homicides held priority over other cases, yes,
19  ma'am.
20    Q.  Okay.  So you were not limited in terms of the --
21  what the investigative steps you were able to take by
22  manpower shortages.  Fair to say?
23         MS. GUERRA:  Object to form.  You can
24  answer.
25    A.  Not really.  If we needed extra help, we could

Page 70

1  ask for it and get it.
2    Q.  (BY MS. FREUDENBERGER)  Okay.  And as you say,
3  there was never a situation where you asked for extra help
4  and were told you couldn't have it.  Correct?
5    A.  That never happened that I know of.
6    Q.  Okay.  And when you had so many homicides in a
7  week that the four of you would split up and -- well,
8  withdrawn.
9         In the situations you described where
10  there were so many homicides that you -- that you and
11  Maskil and Shomin and his partner would split up and other
12  detectives would be brought in, where would the other
13  detectives be brought in from?
14    A.  Well, there are various units in the detective
15  bureau.
16    Q.  Okay.  Any -- was there any kind of rhyme or
17  reason to which detectives were pulled in to assist on
18  homicides?
19    A.  Who was available at the time.
20    Q.  Okay.  And homicide detectives have particular
21  training.  Correct?
22    A.  We received what?
23    Q.  Particular training.  There were things homicide
24  detectives were trained to do that other detectives were
25  not.  Correct?

Page 71

1    A.  We had a lot of in-service training.  A lot of my
2  training was from older officers who had been there and
3  done that and I picked up a lot from them, their
4  experience.  I had homicide investigation training through
5  the metro squad when I become a member of that.  So there
6  was training available, yes.  Some guys had it, some
7  didn't.  I don't know.
8    Q.  Okay.  How many times approximately were there
9  enough homicides being active at one time that all four
10  homicide investigators were working different cases?
11    A.  I only remember the one time.  And here again
12  depending on the nature of the homicide like the night we
13  had four, one of them was what we called a smoking gun.
14  We had the victim, we had a witness, we had a suspect in
15  custody.  So it was matter of buttoning that up and
16  getting back to the other one.
17    Q.  Okay.
18    A.  So the circumstances varied.
19    Q.  All right.  But that was the only time that all
20  four of you were working different cases at one time?
21    A.  It's the only one I remember.  I don't remember
22  who the victims were.  I don't remember the cases.  I just
23  remember when it went down, we were all kind of like,
24  well, you know.
25    Q.  Okay.  And so in situations where all four

Page 72

1  homicide detectives were at -- withdrawn.
2         In situations where both teams of
3  homicide detectives were working different active
4  homicides and other detectives were brought in to assist,
5  I take it the homicide detective would be the lead
6  detective in charge of the investigation?
7    A.  That's the way it should be, yes, ma'am.
8    Q.  Okay.  And that was the -- the custom and
9  practice in the Kansas City, Kansas, Police Department at
10  the time?
11         MS. GUERRA:  Object to form.
12    A.  That would be the what now?  The process that the
13  lead investigator would be the homicide detective over the
14  hired help, the assisting help?  Is that what you said?
15    Q.  (BY MS. FREUDENBERGER)  Yes, that's my question.
16    A.  Well, yeah, if I was the homicide detective and
17  they sent me an assist, I would tell him what I needed.
18    Q.  Okay.
19    A.  And we would --
20    Q.  In other words, the homicide detective was always
21  the detective -- well, withdrawn.
22         The way it worked back in the -- say in
23  1994 is if the other detectives were brought in to assist
24  on homicides, the homicide detectives would remain in
25  charge of the investigation?



CLYDE BLOOD VOLUME 1                                February 03, 2021
MCINTYRE vs UNITED GOVERNMENT OF WYANDOTTE          73–76

Page 73

1       MS. GUERRA:  Object to form.

2    A.  Based on my experience, yes.

3    Q.  (BY MS. FREUDENBERGER)  Okay.  And there are

4  obvious reasons for that.  Correct?

5    A.  Well, yeah, when the experienced investigator

6  gets help and he's not experienced in a homicide

7  investigation, then kind of point him in a direction and

8  help him.  Help him help you.  It's a team effort.

9    Q.  Okay.  What crimes did the crimes against persons

10 unit investigate?

11   A.  We had a unit that is involved in child abuse, we

12 had the robbery unit, the assault unit, and the homicide

13 unit.  I think child abuse unit was later turned -- I'm

14 not sure but I think it might have been turned into the

15 juvenile division but I don't remember.

16       But I remember we had assault, robbery,

17 and homicide and crimes against persons like, you know,

18 rape, assaults, beating somebody up, things of that

19 nature.

20   Q.  In other words, serious felonies where somebody

21 was not killed?

22   A.  They were -- I'm sorry?

23   Q.  A serious -- like a variety -- it sounds like me

24 like what you're saying, correct me if I'm wrong, the

25 crimes against persons unit investigated serious felonies

Page 75

1    A.  Right.  I think he might have assisted but it's

2  just like Jim Krstolich was assigned to the assault -- the

3  persons unit, assault unit.  He didn't work homicides but

4  they called him out to assist because they had a lot of

5  work to do.

6    Q.  Okay.  And, sir, it looks like you're looking at

7  your attorney as you're asking --

8    A.  No, I'm looking across the room trying to

9  meditate and get my head together because I don't remember

10 a lot of this stuff.

11   Q.  Okay.

12       MS. GUERRA:  You doing okay?

13       THE WITNESS:  Huh?

14       MS. GUERRA:  You doing okay?

15       THE WITNESS:  Oh, yeah.

16       MS. GUERRA:  Okay.

17       THE WITNESS:  Age and mileage.

18   Q.  (BY MS. FREUDENBERGER)  And I take it based on

19 what you've described, sir, that it would have been highly

20 irregular for a detective in one of the other crimes

21 against persons unit, child abuse, robbery, assault, to

22 have been assigned the lead to run a homicide

23 investigation; is that correct?

24   A.  That was never my experience, no.  I never seen

25 that.

Page 74

1  but felonies where nobody died.

2    A.  Right.  Crimes against persons included the

3  homicide unit but the other units --

4    Q.  Oh, I see.  Okay.

5    A.  Right.

6    Q.  Oh, I see.  So crimes against persons was the

7  unit under which child abuse, robbery, assault, and

8  homicide --

9    A.  Yes, ma'am.

10   Q.  -- all consolidated; is that correct?

11   A.  Uh-huh, yes, ma'am.

12   Q.  Okay.  And back in 1994, what unit was Roger

13 Golubski working?

14   A.  I really don't remember.  I have no idea.  I

15 think he --

16   Q.  But not homicide?

17   A.  No, not to my knowledge, it wasn't.  He might

18 have been -- well, see that call that -- they -- I don't

19 know.  I don't know what assignment he was assigned to.

20 They could have had a reason to call him and put him in an

21 assignment.  I have no idea.

22   Q.  Well, what I'm asking you is Roger Golubski did

23 not routinely work homicides back in 1949.  Correct?

24   A.  I think he --

25   Q.  Mike Shomin and his partner worked homicides?

Page 76

1    Q.  So that would have been highly irregular?

2    A.  Depends on the circumstances and who made the

3  decision.  I don't know.

4    Q.  Well, can you think of a circumstance in which it

5  would have been appropriate to assign a assault, robbery,

6  or child abuse detective to run a homicide investigation?

7    A.  No.

8        MS. GUERRA:  Object to form.

9        THE WITNESS:  Huh?

10       MS. GUERRA:  Object to form.  You can

11 answer.

12   A.  No, I don't -- I wasn't there.  I have no idea

13 why such a decision would have been made.

14   Q.  (BY MS. FREUDENBERGER)  Well, I -- and my question

15 to you -- I hear that.  My question to you is can you

16 think of a reason -- can you think of any legitimate

17 police reason that a homicide would be assigned to be

18 investigated by a detective --

19       MS. GUERRA:  Same objection.

20   Q.  (BY MS. FREUDENBERGER)  -- from the child abuse,

21 robbery, or assault unit?

22   A.  Not really, no.

23   Q.  Okay.  There are reasons that homicide detectives

24 investigate homicides.  Correct?

25   A.  Well, that's why we were there, yes, ma'am.



CLYDE BLOOD VOLUME 1
MCINTYRE vs UNITED GOVERNMENT OF WYANDOTTE

February 03, 2021
105–108

Page 105

1 how detectives were supposed to conduct their
2 investigations?
3            MR. COOPER: Object to form and
4 foundation. It misstates the witness's prior testimony.
5            MS. GUERRA: Join.
6    Q. (BY MS. FREUDENBERGER) You tell me, sir. Were
7 there written rules?
8    A. None that I am aware of.
9    Q. Okay. Including when it came to investigating
10 leads after a suspect's arrest. Fair to say?
11   A. If we had leads to follow up even after the
12 arrest, we followed up on them because if they were
13 important or critical to the case and if you neglect them,
14 they may fall apart or get lost. They may not exist.
15 People change their mind.
16   Q. Of course you did. It would be insane not to.
17 Right?
18            MS. GUERRA: Object to form.
19            MR. COOPER: Object to form.
20   Q. (BY MS. FREUDENBERGER) If you're actually trying
21 to solve a case?
22            MR. COOPER: Object to form.
23            MS. GUERRA: You can answer.
24   A. We're trying to solve the case but we're also --
25 yeah, we're trying to solve the case and present it to the

Page 106

1 prosecutor.
2    Q. (BY MS. FREUDENBERGER) And if you're trying to
3 legitimately solve a case through legitimate police work,
4 you continue investigating all leads regardless of whether
5 there is a suspect in custody or not. Correct?
6            MS. GUERRA: Object to form.
7            MR. COOPER: Object to form and
8 foundation.
9            MS. GUERRA: You can answer.
10   A. We would follow up on any leads available to
11 solve the case and --
12   Q. (BY MS. FREUDENBERGER) So the answer is yes?
13   A. And what?
14            MR. COOPER: Object to form and
15 foundation and --
16   Q. (BY MS. FREUDENBERGER) So the answer to my
17 question was yes?
18            MS. GUERRA: Same objections. You can
19 answer the question.
20   A. We would follow up on the leads if they were
21 there.
22   Q. (BY MS. FREUDENBERGER) So the answer to my
23 question is yes?
24            MS. GUERRA: Same objections.
25            MR. COOPER: Objection.

Page 107

1    A. Yes.
2    Q. (BY MS. FREUDENBERGER) Okay.
3            MS. FREUDENBERGER: All right. We can
4 take a break.
5            (A recess was taken from 11:40 a.m. to
6            12:04 p.m.)
7    Q. (BY MS. FREUDENBERGER) All right. Sir, just a
8 few more questions before we get into this investigation.
9 As a homicide detective in the early 1990s and throughout
10 your career, you had an obligation to document everything
11 you did on a case. Correct?
12   A. Yes.
13            MS. GUERRA: Object to form. You can
14 answer.
15   A. Yes, we did. If it wasn't on paper, it didn't
16 happen and I can't remember anything.
17   Q. (BY MS. FREUDENBERGER) That's a common saying in
18 policing, if you don't write it down, it didn't happen.
19 Right?
20   A. Put it on paper, yes, ma'am. I can't remember
21 everything that everything told me. No way.
22   Q. And that's one reason that it's important for
23 detectives working any kind of serious case to accurately
24 and comprehensively document their work. Correct?
25   A. Yes, ma'am.

Page 108

1    Q. Okay. Because for one thing, you might forget a
2 detail. Right?
3    A. Yes, ma'am.
4    Q. Okay. And cases could take months or years to
5 solve. Correct?
6    A. Yes, ma'am.
7    Q. Could take months or years to go to trial.
8 Right?
9    A. Yes, ma'am.
10   Q. And you don't always know as an investigator
11 what's going to be relevant down the road. Correct?
12   A. I would know what would be relevant in court you
13 mean or relevant to the case?
14   Q. Or relevant to the case. I mean, one reason --
15 another reason it's important as a detective investigating
16 a case to write down everything that happens is because
17 something could happen that doesn't seem important and
18 turns out to be important down the line. Right?
19   A. That's right.
20            MS. GUERRA: Object to form.
21   Q. (BY MS. FREUDENBERGER) That's another reason it's
22 important to have everything written down. Correct?
23   A. Yes, ma'am.
24   Q. Okay. Documentation, in fact, is the bread and
25 butter of any homicide investigation. Fair to say?



Page 109

1            MS. GUERRA:  Object to form.  You can
2  answer.
3      A.  Yes, ma'am.
4      Q.  (BY MS. FREUDENBERGER) Okay.  For example, it's
5  important to document -- for example -- well, before we do
6  that, it's important for your documentation to not only be
7  accurate but to be comprehensive as well.  Right?
8      A.  Accurate and you said comprehensive?
9      Q.  Uh-huh.
10     A.  Right.  Yes, ma'am.
11     Q.  Okay.  And were you also trained to document your
12  work chronologically?
13     A.  Yes, ma'am.
14     Q.  Because sometimes the order in which things occur
15  can turn out to be important.  Correct?
16     A.  Yes, ma'am.
17     Q.  And I've looked at some training materials in
18  this case and it looks like you were trained that all
19  officers -- well, I'll make it simpler.  Earlier we talked
20  about the fact that any time you interview a witness if
21  possible, you would want another investigator present.
22  Right?
23     A.  If possible, yes.
24     Q.  And the requirement was that all officers with
25  knowledge should -- I'll quote to you from the training

Page 110

1  materials.  All officers with knowledge should write
2  reports, i.e., corroboration.  That's from documents
3  disclosed in this case.
4            Would you agree that the requirement was
5  that each investigator write a report documenting
6  everything that they did during an investigation?
7            MS. GUERRA:  Object to form.  You can
8  answer.
9      A.  That's the way Maskil and I operated.  If we
10  worked together and interviewed a person, we both wrote a
11  report.
12     Q.  (BY MS. FREUDENBERGER) And that's how you were
13  trained.  Correct?
14     A.  Yes, ma'am.
15     Q.  Okay.  That was your understanding of your
16  obligation.  Right?
17     A.  Well, that was the way we worked obligation or
18  not.
19     Q.  Okay.  In other words, it wouldn't have been
20  proper for you to say, oh, well, Maskil's writing this up,
21  I don't need to write it down?
22     A.  No, ma'am.
23     Q.  Okay.  And it looks to me in reviewing this file
24  like there were a few ways -- a few different ways that
25  information would be documented in a homicide

Page 111

1  investigation.  For one as you've already told me, in
2  interviewing witnesses, there would be a transcript
3  generated of an audio recording.  Correct?
4      A.  We did that as much as it was possible, yes,
5  ma'am.
6      Q.  Okay.  And if a transcript was generated of an
7  audio recording -- well, withdrawn.
8            Any time you recorded a witness
9  interview, the practice would be to have the witness sign
10  off on the transcription to certify it was accurate.
11  Correct?
12     A.  That was our preferred procedure, yes, ma'am.
13     Q.  Okay.  And explain to me why you would you want a
14  witness to sign.  Why was that a preferred procedure?
15     A.  We tape-recorded a statement and we saved it.  We
16  had it printed out or typed, whatever, and we asked the
17  witness to sign it.  And the witness signature I think is
18  as important as any other contract.  If you don't sign
19  your name there, it doesn't really mean nothing.  They
20  could always say I didn't say that which was why we also
21  kept the videotape.  A backup one for the other.
22     Q.  Okay.  Back in the '90s in 1994, were you
23  videotaping witness interviews?
24     A.  I don't remember exactly when but we did towards
25  the last videotape a couple of interviews, yes.

Page 112

1      Q.  All right.  So you would maintain that the
2  practice and procedure would have been to audio record a
3  witness interview and then have that witness interview
4  typed while the witness was still present?
5      A.  Yes, ma'am, and have the witness sign it.  And
6  also sometimes we'd take a witness statement verbally.
7  They would talk to us and our secretary would type it as
8  they said it.  And then when we finished up, we'd give it
9  to them.  They'd read it, sign it, and initial any
10  corrections or whatever.
11     Q.  Okay.  And obviously before you took the audio
12  recorded statement, you would talk to the witness.
13  Correct?
14     A.  Yes, ma'am.
15     Q.  Okay.  And that's called a pre-interview?
16     A.  Yes, ma'am.
17     Q.  Okay.  And during that pre-interview, you would
18  find out what the witness knew about the incident you were
19  investigating.  Correct?
20     A.  Yes, ma'am.
21     Q.  Okay.  And then you had an obligation to bring
22  out everything of any relevance reported to you in the
23  pre-interview either in the audio recorded statement or in
24  a narrative report.  Correct?
25           MS. GUERRA:  Object to form.  You can



Page 113

1 answer.

2    A.  Well, yes, we would -- I'm trying to figure

3 out -- what was the question now?  We would --

4    Q.  (BY MS. FREUDENBERGER)  Sure.  Anything that --

5 your obligation was to make sure that anything relevant a

6 witness had told you was documented either by bringing it

7 out in the audio recorded statement or by putting it in an

8 narrative report.  Correct?

9            MS. GUERRA:  Same objection.

10    A.  Yes, ma'am.

11    Q.  (BY MS. FREUDENBERGER) Okay.  And that would

12 include any credibility or reliability issues with a

13 witness you were made aware of.  Correct?

14    A.  Well, that would be the reason we would have the

15 witness sign a statement.  If later it's proven to be

16 false and credibility, we would have some recourse.

17    Q.  Okay.  That was the reason for the signing

18 requirement?

19    A.  One of the reasons for signing it, yes.

20    Q.  Okay.  And so, for example, I'll give you an

21 example of what I'm talking about.  If you interviewed a

22 witness and you smelled alcohol on their breath and they

23 were acting intoxicated, I assume you would have an

24 obligation to document that somewhere.  Correct?

25    A.  In most cases --

Page 114

1            MS. GUERRA:  Objection.  Form.

2            THE WITNESS:  I'm sorry.

3            MS. GUERRA:  Go ahead.

4    A.  In most cases we would not interview them.  We

5 would wait till they sobered up.

6    Q.  (BY MS. FREUDENBERGER) Okay.  But say -- all

7 right.  I'll give you -- I'll give you another example.

8 Say you have -- well, we talked earlier about sex workers,

9 prostitutes.  Say you're interviewing somebody who -- do

10 you know what a better example is?

11            A better example would be an informant,

12 somebody who is getting some kind of benefit in return for

13 their cooperation.  Obviously in that situation, you would

14 have to document the benefit they were getting.  Correct?

15            MS. GUERRA:  Object to form.  You can

16 answer.

17    A.  We interview the informants.  It's not very often

18 we took statements from them.  Because if they wanted to

19 be a confidential informant, their statements would be

20 admissible in court and could, you know, create a problem

21 for them.  So --

22    Q.  (BY MS. FREUDENBERGER) And an informant is only

23 as valuable as -- what's the saying?  An informant is only

24 as reliable as information they've provided in the past.

25 Right?

Page 115

1    A.  Even informants who gave information in the past,

2 whatever information we got we would try to validate it

3 before we acted on it.

4    Q.  And that's because information coming from an

5 informant who is getting something -- anything in return

6 for their information is inherently suspect.  Correct?

7    A.  We -- I never rewarded an informant with payment

8 or anything else.  They come to us with information.  They

9 want it confidential, you stay confidential.  We try to

10 act on the information if we can validate it.  I don't

11 like informants.

12    Q.  I understand.  And the reason that you don't like

13 it -- well, inherently informants have creditability

14 problems.  Correct?

15    A.  They have what?

16    Q.  Potential credibility problems.

17    A.  They have what?

18    Q.  Potential credibility problems.

19    A.  Sure, they have potential credibility -- we had a

20 tips hotline.  They call in to give us information and it

21 paid off sometimes.  They got paid for their information

22 but we never knew who they were.

23    Q.  Okay.  And by the way, any time information came

24 in through the tips hotline or a direct call to the

25 precinct, you had an obligation to document that.

Page 116

1 Correct?

2    A.  Sure.

3            MR. COOPER:  Objection.  Form.

4    Q.  (BY MS. FREUDENBERGER) Okay.  And any time anyone

5 who provided information got any kind of benefit in

6 exchange for their information, you had an obligation to

7 document that.  Correct?

8            MS. GUERRA:  Object to form.

9            THE WITNESS:  Huh?

10            MS. GUERRA:  Object to form.  You can

11 answer.

12    A.  If there was any exchange to their advantage for

13 giving us information, we would document it.  We had a

14 registered informant file.  Somebody would come through

15 with information.  The police department would pay them.

16            The informant was photographed and

17 printed and find a receipt for the money they got and it

18 was accountable because we were spending the city's money.

19 Here again, I don't like to use informants because I

20 wasn't going to spend my money for the information may or

21 not be good.

22    Q.  (BY MS. FREUDENBERGER) Well, and there was

23 another reason that informants have to be kept track of

24 and logged and documented not just because you're spending

25 the city's money but because prosecutors need to know if a



CLYDE BLOOD VOLUME 1
MCINTYRE vs UNITED GOVERNMENT OF WYANDOTTE

February 03, 2021
117–120

Page 117

1 witness they're relying on has provided information in the
2 past. Correct?
3     A.  Yes, because the prosecutor should know the
4 background and credibility of the informant because --
5     Q.  Okay.  And anything bearing on the credibility of
6 somebody providing information in any serious case should
7 be documented so that the prosecutor is aware of it.
8 Correct?
9         MR. COOPER:  Object to form and
10 foundation.
11         THE WITNESS:  Do what?
12         MS. GUERRA:  He objected to form and
13 foundation but you can answer if you know.
14     A.  Back again to your question because I heard
15 somebody say something.
16     Q.  (BY MS. FREUDENBERGER)  Sure.  Any information
17 that bears on -- withdrawn.
18         Any information potentially bearing on
19 the credibility of a witness providing information in any
20 of your cases had to be documented so the prosecutor was
21 aware of it.  Right?
22   A.  Yes, and that's the reason we --
23         MR. COOPER:  Objection.
24         MS. GUERRA:  He just objected again but
25 you can keep going.

Page 118

1     A.  That's the reason we would validate whatever
2 information we got from an informant.  If they told us
3 something, we would try to establish credibility of the
4 information before we acted on it.
5     Q.  (BY MS. FREUDENBERGER) Okay.  In other words, you
6 would try to go out and corroborate what the informant was
7 telling you -- telling you before you simply took that
8 information at face value.  Correct?
9   A.  Yes.
10     Q.  Okay.  That's another basic concept in policing.
11 Correct?
12   A.  Uh-huh.
13         MS. GUERRA:  Object to form.  You can
14 answer.
15         THE WITNESS:  I think I did.
16         MS. GUERRA:  Okay.  Okay.  Sorry.  Give
17 me some time to assert an objection before you answer.
18 Okay?
19         THE WITNESS:  I'm sorry.
20         MS. GUERRA:  That's okay.
21   Q.  (BY MS. FREUDENBERGER) Yes?
22   A.  Yes.
23   Q.  And it's the lead detective's obligation in a
24 homicide case to ensure that every potentially significant
25 thing that happens during a investigation is accurately

Page 119

1 documented.  Correct?
2         MS. GUERRA:  Object to form.
3             MR. COOPER:  Objection to form.
4         MS. GUERRA:  You can answer.
5   A.  Well, yes, ma'am.
6   Q.  (BY MS. FREUDENBERGER) Okay.  And where -- I
7 gather that procedure was all reports were put in a file
8 kept in some central location.  Correct?
9   A.  Every report we wrote regarding a homicide was in
10 that file, and where they kept the file or stored it, I
11 have no idea.  It was in a file cabinet somewhere.  We
12 could find it if we needed it.
13     Q.  Well, where did you keep the file when you were
14 working homicides?
15   A.  We kept it on --
16     Q.  While the investigation was active, where would
17 the file be kept?
18   A.  Carried it in my hand in my folder.  And I didn't
19 leave it around where other people would have access to
20 it.  It's just that simple.  Most --
21     Q.  Okay.  So you're working a homicide.  You are
22 preparing reports, you're putting them in the file, and
23 then what happens to the file?  During the pendency of the
24 investigation, where is the file maintained?
25   A.  Original copies would go to the secretaries who

Page 120

1 would have a central filing location accessible to the
2 lieutenant and the working officers.  That would be in a
3 secretary's office I assume.  We kept working copies in
4 our personal file to refer back to.
5     Q.  Okay.  So there would be a central file
6 maintained somewhere that the lieutenant and the
7 detectives working the case had access to.  Correct?
8   A.  Right.
9     Q.  And then the individual detective would also keep
10 copies of their reports?
11   A.  We would keep copies of them if we felt it was
12 necessary to refer back to them.
13     Q.  Okay.  So in this case, for example, there should
14 be both a -- back in 1994, there would have been both a
15 central copy of the file and Detective Golubski would have
16 had his own copy of the file.  Correct?
17   A.  I don't know about --
18         MR. COOPER:  Form.
19         MS. GUERRA:  You can go ahead.
20   A.  I don't know how Golubski operated, ma'am.  I did
21 not work with him.
22     Q.  (BY MS. FREUDENBERGER) Okay.  And one reason that
23 the file would have to be maintained in a place that
24 Lieutenant Culp had access to is because Lieutenant Culp
25 had a responsibility to review the investigative report as



CLYDE BLOOD VOLUME 1
MCINTYRE vs UNITED GOVERNMENT OF WYANDOTTE

February 03, 2021
121–124

Page 121

1  the investigation was going on.  Correct?
2      A.  Yes, ma'am.
3          MS. GUERRA:  Object to form.
4          THE WITNESS:  I'm sorry.
5          MS. GUERRA:  You can answer.
6          THE WITNESS:  Yes, ma'am.
7          MS. GUERRA:  Object to form.  You can
8  answer.
9      Q.  (BY MS. FREUDENBERGER) And that's because if
10  additional investigative steps were warranted, it was
11  Lieutenant Culp's responsibility to make sure they
12  occurred.  Correct?
13          MS. GUERRA:  Object to form.  You can
14  answer.
15      A.  Yes, ma'am.
16      Q.  (BY MS. FREUDENBERGER) And so Culp needed to have
17  access to the reports in order to find out what was
18  happening in the investigation and direct additional
19  investigative steps if necessary.  Correct?
20      A.  Yes.
21      Q.  Okay.  Did Lieutenant Culp ever come to you and
22  direct that you take an additional investigative step?
23      A.  There were -- would be incidents where he may get
24  information from another source and pass it to us to
25  follow up on.

Page 122

1      Q.  Okay.  And in those situations where Lieutenant
2  Culp came upon additional information relevant to the
3  investigation, he would have an obligation to do a report
4  and document it.  Correct?
5      A.  He did or we did?
6      Q.  He did.
7      A.  That would be his choice as a boss.  If he come
8  up with something he thought needed to be followed up, he
9  would tell us.  If we didn't know about it, we couldn't.
10      Q.  No, I understand.  I'm asking something
11  different.  In those situations if Lieutenant Culp was
12  actually conducting an investigation, then he would have
13  had an opportunity to document what he -- he would have
14  had an obligation to document what he was doing.  Right?
15          MS. GUERRA:  Object to form, foundation.
16  You can answer if you know.
17      A.  Well, yeah, he would document it but mostly he
18  would say I got this piece of information.  You need to
19  check it out and we would.  I don't know what kind of
20  reports he wrote, if any.
21      Q.  (BY MS. FREUDENBERGER) All right.  But in other
22  words, every -- every potentially significant thing that
23  happened during a homicide should be documented and put in
24  the file.  Correct?
25          MS. GUERRA:  Object to form.

Page 123

1          MR. COOPER:  Object to form and
2  foundation.
3          MS. GUERRA:  You can answer.
4      A.  We documented what we did and put it in the file
5  because at some point, it would be relevant to the case.
6      Q.  (BY MS. FREUDENBERGER) Okay.  That was a
7  requirement.  Correct?
8      A.  I would say --
9      Q.  That one wasn't optional.  Fair to say?
10      A.  Well, I would suggest it would be a requirement.
11  That's the way we functioned.  That was our SOP that we
12  did.  I can't account for the other team.
13      Q.  Okay.  You're not suggesting though, sir, that
14  only you and Maskil were required to create documentation
15  of what happened in your investigation?
16      A.  No, ma'am.
17      Q.  Okay.  And there were penalties for -- well
18  withdrawn.
19          So we talked about witness interactions.
20  And by the way, this may sound like a silly question, but
21  when you learn information from a witness during a
22  homicide, oftentimes there would be reasons -- I'll try
23  and ask this in a simpler way.  In a homicide case, you're
24  often talking to your witnesses more than once.  Correct?
25      A.  Talking to my witnesses what?

Page 124

1      Q.  More than once in the course of an investigation.
2      A.  We re-interview people several times as
3  necessary, yes.
4      Q.  Okay.  And new information would surface.  You
5  would go out and you would ask your witness questions
6  about that new information.  Correct?
7      A.  Yes, ma'am.
8      Q.  Wouldn't be unusual to have two or three or four
9  reports concerning interactions all with one witness.
10  Right?
11      A.  No.
12      Q.  And obviously if you're interviewing a witness
13  for a second or third time, your obligation to document
14  those interactions doesn't change.  You still have to
15  write it down in a report and put it in a file.  Right?
16      A.  We would indicate that we re-interviewed the
17  person for further information.
18      Q.  Okay.  And if that information was potentially
19  significant to the investigation, you would write it down.
20  Correct?
21          MR. COOPER:  Object to form.
22      A.  Yes, ma'am.  I'm sorry.
23      Q.  (BY MS. FREUDENBERGER) And how do you actually
24  document your work?  Do you carry a note pad with you out
25  in the field?



Page 129

1 that wasn't the end of it. If there was further
2 investigation necessary, the district attorney would
3 contact us. We would have a meeting and follow up on
4 whatever lead was necessary.
5     Q.   (BY MS. FREUDENBERGER) And if you determined --
6 if you came across information that indicated additional
7 investigation was necessary, it was your obligation either
8 to go and conduct that investigation or to inform the
9 district attorney of it. Correct?
10    A.   You mean if we found additional information we
11 thought was necessary?
12    Q.   Yeah.
13    A.   Yes, we would check it out and then we would
14 report it and forward it to the district attorney.
15    Q.   Okay. In other words, just because you completed
16 a prosecution summary doesn't mean that you are off the
17 hook for continuing to investigate the case. Correct?
18    A.   No, the case would continue if there's anything
19 else to do.
20    Q.   Okay. And the case should continue as long as
21 there is any -- any additional leads to follow up on.
22 Correct?
23    A.   Yes, ma'am.
24    Q.   Okay. And so, for example, say you had a
25 homicide and you had -- if you questioned a witness on the

Page 130

1 first day of the investigation and the witness won't talk
2 to you and the witness contacts you after you've completed
3 your prosecution summary and talks, what's your obligation
4 with that information?
5          MS. GUERRA:  Objection to form.
6 Foundation, incomplete hypothetical. You can answer.
7     A.   We would document what the witness had to say at
8 that point and forward it to the district attorney as
9 additional information.
10    Q.   (BY MS. FREUDENBERGER) And by the way, your
11 obligation to document information as a detective does not
12 hinge on whether the information helps or hurts your
13 theory of the case. Correct?
14    A.   Not really. If they had something they thought
15 was valuable, we would document it and forward it to the
16 prosecution. The district attorney would determine the
17 validity or the need of whatever information it might be.
18    Q.   I understand and I think I'm asking you something
19 a little bit different. As an investigator, your job --
20 you're basically a vacuum cleaner. Right? You're
21 collecting any relevant information and documenting it.
22 Right?
23    A.   Yes, ma'am.
24    Q.   Okay. Whether it helps or hurts your theory of
25 the case. Right?

Page 131

1     A.   You forward it. You forward it to the prosecutor.
2     Q.   You can't simply say, ooh, this information
3 points away from my guy so I'm not going to write it down.
4 Right?
5     A.   If the information directed a different course
6 away from the suspect, we would forward it because we
7 don't want to put an innocent person in jail.
8     Q.   Right. And you also need to make sure that the
9 prosecutor has any information that could come up in
10 court. Right?
11    A.   Yes, ma'am.
12    Q.   That's another reason to document information
13 that points away from your theory of the case. Right?
14    A.   Yes, ma'am. Any information that has a bearing
15 on the case to either prove innocence or guilt, you turn
16 it to the prosecutor. Make them aware of it.
17    Q.   Okay. And that's actually -- that's actually
18 something you were trained on well before 1994. Correct?
19    A.   I don't recollect any particular training, but
20 it's morally right that the person you either prove them
21 innocent or you prove them guilty but you let the facts
22 fall where they may. If you got evidence to clear them,
23 then so be it.
24    Q.   Well, yes, but leaving aside morals, you actually
25 had a legal obligation in the early 1990 -- certainly by

Page 132

1 the early 1990s to forward to the prosecutor any
2 exculpatory information. Right?
3     A.   That would be my belief, yes, ma'am.
4     Q.   Well, it's not just your belief. You understood
5 in the early 1990s -- by the early 1990s, you had an
6 obligation to turn over what's called Brady material.
7 Correct?
8     A.   My obligation was to protect the innocent as well
9 as the guilty. And if they had information --
10    Q.   I'm talking about something a little more
11 technical. You've heard of the case Brady v. Maryland?
12    A.   What?
13    Q.   Have you heard of the case Brady v. Maryland?
14    A.   Not that I recollect, no, ma'am.
15    Q.   Okay. Have you heard of exculpatory information?
16    A.   That's information that would direct guilt away
17 from the suspect.
18    Q.   Right.
19    A.   And if I had that kind of information, I would
20 present it.
21    Q.   And by present it, you mean forward it to the
22 prosecutor on the case. Correct?
23    A.   I would present it to the prosecutor in the case.
24    Q.   Okay. And it was Lieutenant Culp's
25 responsibility to make sure the detectives under his



CLYDE BLOOD VOLUME 1
MCINTYRE vs UNITED GOVERNMENT OF WYANDOTTE

February 03, 2021
133—136

---

Page 133

1  command presented all exculpatory information in their
2  possession to the prosecutors on the case.  Correct?
3          MS. GUERRA:  Object to form and
4  foundation.
5          MR. COOPER:  Object to form and
6  foundation.
7          MS. GUERRA:  You can answer.
8    A.  Well, he was the boss.  Yeah, he had an
9  obligation the same as we did.  We're all part of the same
10  team.
11    Q.  (BY MS. FREUDENBERGER) Okay.
12    A.  The truth.
13    Q.  And so it was Lieutenant Culp's job to make sure
14  that if you or Detective Maskil or Detective Golubski came
15  across information in an ongoing case in the early 1990s
16  pointing away from your suspect, then you documented that
17  and forwarded that to the prosecution.  Correct?
18    A.  Yes, if he was aware of it.
19    Q.  Well, and but a little more than that actually I
20  think, sir.  You tell me if I'm wrong, but isn't it the
21  lieutenant's responsibility to make sure that to take all
22  reasonable steps to make sure the detectives under his
23  command are complying with their prosecutional
24  obligations?
25    A.  Well, of course.

---

Page 134

1          MS. GUERRA:  Object to form.
2  Foundation.  You can answer.
3    A.  Yes, it would be his responsibility.
4    Q.  (BY MS. FREUDENBERGER) Okay.  And that's another
5  reason it was important for Lieutenant Culp to be
6  reviewing the documentation and keeping abreast of
7  developments in his investigations.  Correct?
8    A.  Yes.
9          MS. GUERRA:  Object to form.
10  Foundation.
11    Q.  (BY MS. FREUDENBERGER) And by his investigations,
12  I mean the investigations under his command.  You
13  understand that.  Correct?
14    A.  And his what?
15    Q.  You understand when I say his investigations, I
16  mean the investigations being conducted under his command?
17    A.  It's up to him to keep track of the investigation
18  and keep it on track.
19    Q.  Okay.  And ensure the detectives conducting the
20  investigation are complying with their constitutional
21  obligations.  Correct?
22          MS. GUERRA:  Object to form.  You can
23  answer.
24    A.  Yes, I would say so.
25    Q.  (BY MS. FREUDENBERGER) Okay.  And in your

---

Page 135

1  experience, Lieutenant Culp knew exactly what was
2  happening in the homicide investigations occurring under
3  his command.  Correct?
4          MS. GUERRA:  Object to form.  You can
5  answer if you know.
6    A.  He would have been kept posted on the
7  investigations that my partner and I worked.  I can't
8  vouch for anybody else.
9    Q.  (BY MS. FREUDENBERGER) Well, was Lieutenant
10  Culp's practice to keep up with the investigative steps
11  you and Detective Maskil were conducting?
12    A.  Yes, and he --
13          MS. GUERRA:  Object to form.
14    A.  And he did.
15    Q.  (BY MS. FREUDENBERGER) Any reason to think that
16  his practice was different when it came to other
17  investigators?
18    A.  No.  I'm not saying it was different.  I'm saying
19  that whatever may or may not have been presented to him,
20  he may not have been aware of.  There's things he may not
21  have been told or presented.
22    Q.  But it sounds to me like what you're saying is
23  insofar as you were concerned based on your experience and
24  your observation in the early 1990s, Lieutenant Culp had a
25  whole variety of avenues for keeping himself up-to-date

---

Page 136

1  and informed about the investigations going on under his
2  command.  Correct?
3    A.  Well, yeah, he was the boss.  It would be up to
4  him to know what's going on in his command.
5    Q.  Okay.  Particularly when it came to homicides.
6  Right?
7    A.  Any case.  It doesn't matter.
8    Q.  And if Lieutenant Culp wanted more information
9  about something going on in a case under his command, all
10  he had to do was yell across the hall to one of you and
11  initiate a conversation.  Right?
12    A.  If he had additional information he needed or
13  wanted, he would tell us about it and we would pursue
14  that.
15    Q.  Well, my question's a little different, sir.  If
16  Lieutenant Culp wanted more information about something
17  that was happening in an investigation under his command,
18  there were a whole variety of ways he could do that.
19  Right?
20          MS. GUERRA:  Object to the form.  You
21  can answer.
22    Q.  (BY MS. FREUDENBERGER) He could walk across the
23  hall to your office and ask questions.  Right?
24    A.  Yes, ma'am.
25    Q.  He could call you on the phone.  Right?

---



CLYDE BLOOD VOLUME 1
MCINTYRE vs UNITED GOVERNMENT OF WYANDOTTE

Page 141

1    A.  Oh, yes.

2    Q.  -- kinds of homicides.  Correct?

3    A.  Oh, yeah.  But, you know, first off, you can
4  survey a crime scene and sometimes figure out a little bit
5  of what happened.  You know, blood trails, footprints,
6  things of that nature.

7    Q.  The crime scene talks.  You've heard that
8  expression?

9    A.  Pretty much, yes, ma'am.

10   Q.  Okay.  For example, in a close-range shooting
11 case like this one -- but I'm not -- I won't ask you about
12 this particular case right now.  In a close -- in any
13 close-range shooting case, there may be blood or tissue
14 samples you'll want to have collected.  Fair to say?

15   A.  There usually is, yes.

16   Q.  Okay.  And in a close-range shooting case, it's
17 possible the perpetrator may have touched items at the
18 crime scene.  Correct?

19   A.  Yes, ma'am.

20   Q.  Okay.  And in any homicide case, you'll want to
21 make sure that all possible evidence is dusted for prints.
22 Correct?

23   A.  Yes, ma'am.

24   Q.  So that if prints are lifted, they can be
25 examined and compared with suspects.  Correct?

Page 142

1    A.  Yes, ma'am.

2    Q.  Okay.  For example, shotgun shells could be
3  present at the scene.  Correct?

4    A.  Yes, ma'am.

5    Q.  Okay.  And some shotgun shells have a longer
6  brass base that can be dusted for prints.  Correct?

7          MS. GUERRA:  Object to form.
8  Foundation.  You can answer.

9    A.  It's possible, yes.

10   Q.  (BY MS. FREUDENBERGER)  Okay.  So that's an
11 example of a kind of evidence that -- a type of evidence
12 that could be present at a crime scene in a close-range
13 shooting case that you as a homicide detective would want
14 to make sure was gathered and processed.  Fair to say?

15   A.  Yes, ma'am.  Yes, ma'am.

16   Q.  Okay.  And you'll want to look around.  I think
17 you mentioned blood trails?

18   A.  Look at the crime scene for any number of things.

19   Q.  Okay.

20   A.  It could be physical evidence anything from
21 blood, tissue, hair, shotgun shells, footprints.

22   Q.  Anything of potential evidentiary value you want
23 to make sure -- withdrawn.

24          Anything of potential evidentiary value
25 should be properly gathered and documented.  Fair to say?

Page 143

1    A.  Yes, ma'am.  That's the reason we had the crime
2  lab on the scenes on these cases.

3    Q.  Right.  But were there circumstances of the
4  homicide detective where you -- well, withdrawn.

5          One reason you went to the scene as a
6  homicide detective was to make sure that everything that
7  of potential evidentiary value was collected and
8  documented.  Right?

9          THE WITNESS:  Can I explain that?

10         MS. GUERRA:  You can answer the question
11 she's posed.

12   A.  Yes.

13   Q.  (BY MS. FREUDENBERGER) Were there times as the
14 homicide detective -- I understand that there are officers
15 with expertise in processing crime scenes and those are
16 the officers who actually respond to scenes and gather
17 evidence.

18         But were there times as the ranking
19 homicide detective on a scene that you would direct crime
20 scene officers to make sure something -- a piece of
21 evidence -- potential evidence wasn't overlooked?

22   A.  If I saw something that I thought was important,
23 I would point it out to the crime scene officer.

24   Q.  Okay.  And, in fact, as a lead detective on a
25 homicide investigation, it was your obligation to make

Page 144

1  sure that everything important was gathered and tested.
2  Correct?

3          MS. GUERRA:  Object to form.  You can
4  answer.

5    A.  I think that any detective on a scene sees
6  possible evidence, he's obligated to point it out.

7    Q.  (BY MS. FREUDENBERGER) Okay.  Fair enough.  Who
8  determines what tests are conducted -- well, first there
9  are a variety of tests that can be conducted on physical
10 evidence from crime scenes.  Correct?

11   A.  This was a situation -- that would be a situation
12 where we would get with the crime lab people.  Compare the
13 evidence.  And in many cases, a lot of evidence they could
14 not process would be transported to the Kansas Bureau of
15 Investigation Crime Lab in Topeka, Kansas.

16         We would write up the items, itemize the
17 items we wanted tested, and the comparisons made and take
18 it to Topeka.  They would sign for the evidence and
19 however long later, we get a written report from them as
20 to what they found.  So --

21   Q.  And whose job was it to determine which
22 comparisons should be made?

23   A.  That would be a combination or an agreement
24 between us and the crime lab people because they were
25 evidence technicians.  We weren't.  They knew some things



Page 145

1 we did not know and we would just compare notes and
2 decide. It never hurts to examine something whether it
3 proves out or not. Test it.
4    Q. And when you say us, you mean the lead detective
5 on a homicide. Right?
6    A. Myself and Maskil worked closely with the crime
7 lab people in every case we worked and that was our
8 process. We compared notes. We met regularly in between
9 during the investigation and just -- it was just a team
10 effort. That's all.
11    Q. Well, and when in doubt, I take it the practice
12 was when in doubt, order the test. Right?
13    A. That's right.
14    Q. In other words, you would never want to not dust
15 all possible evidence for prints because you don't think
16 it's likely. Right?
17         MS. GUERRA: Objection to form.
18 Foundation. You can answer.
19    A. You test it. It doesn't matter whether it's
20 likely or not. You test it and confirm whether it's
21 evidence or serves a purpose or not.
22    Q. (BY MS. FREUDENBERGER) And you test -- you
23 order -- withdrawn.
24         You actually have an obligation -- did
25 you actually have an obligation as a homicide detective to

Page 146

1 conduct all possible tests even if you were worried if
2 they might turn up evidence pointing away from your
3 suspect?
4         MS. GUERRA: Object to form. You can
5 answer.
6    A. Test the evidence. If it proves him innocent,
7 then you go look for the other guy.
8    Q. (BY MS. FREUDENBERGER) It would never be thought
9 to be appropriate to not order tests because they could
10 point away from your suspect. Right?
11    A. You request an examination regardless. If it's
12 evidence and it has potential pro or con, you test the
13 evidence to see if it leads to or away from the suspect.
14    Q. Okay. And by the way, once you apprehend a
15 suspect, you want to gather any evidence possible from
16 them as well. Correct?
17    A. Yes, ma'am.
18    Q. Right. For example, if you have a suspect in a
19 close-range shooting case, you're going to want to conduct
20 a gunshot residue test. Right?
21         MS. GUERRA: Object to form.
22 Foundation. You can answer.
23    A. Well, if there's a reason to believe there's
24 evidence in his residence and you get a search warrant and
25 you got there, or you get a waiver of search which I

Page 147

1 prefer not to do. I'd rather to get a search warrant and
2 then you go there and you try to seek any evidence.
3    Q. (BY MS. FREUDENBERGER) Okay. That's just a basic
4 investigative step, getting a search warrant for a
5 suspect's residence. Correct?
6         MS. GUERRA: Object to form.
7    A. That's the way we would do it.
8    Q. (BY MS. FREUDENBERGER) Or I'll withdraw it.
9 That's not always. You're right. A basic investigative
10 step is searching a suspect's residence for evidence.
11 Correct?
12    A. In a lawful search, yes, ma'am.
13    Q. Yes. Can you recall any homicides you
14 investigated where you decided or determined not to search
15 a suspect's residence in the course of your career?
16    A. Not really. I don't know that we ever neglected
17 to or had the option that we used. If we thought it was
18 necessary, we went.
19    Q. And I'm asking you were there ever any homicides
20 that you can recall as you sit here today investigating
21 over the course of your career where you determined it
22 wasn't necessary to search a suspect's residence?
23    A. Not really.
24    Q. Okay. And, in fact, assuming there was no good
25 reason not to, it would have been -- that's a prime

Page 148

1 example of an investigative step Lieutenant Culp was
2 obligated to make sure happened?
3         MS. GUERRA: Object to form.
4 Foundation. You can answer if you know.
5    A. That would be his decision depending on what he
6 knew or what he knew at the time.
7    Q. (BY MS. FREUDENBERGER) But if you neglected to
8 search a suspect's residence after arrest say either
9 because you forgot or you just overlooked it, it would
10 have been Lieutenant Culp's responsibility to ensure that
11 that happened. Right?
12         MS. GUERRA: Object to foundation.
13    A. It would be ours as well because --
14         THE WITNESS: I'm sorry.
15         MS. GUERRA: Go ahead.
16    A. If we felt it was necessary. I've gotten many
17 search warrants and I have no hesitation of getting a
18 judge out of bed in the middle of the night and getting a
19 search warrant. I'm awake. He can wake up. If it was
20 necessary, fine, we would do that.
21    Q. (BY MS. FREUDENBERGER) And judges are available
22 at all hours of the day and night to execute search
23 warrants. Right?
24    A. We made a couple of them available. They wasn't
25 happy about it but.



1    Q.  But that's a routine -- getting a search warrant
2  to serve to a suspect's residence is a routine basic
3  investigative step in any homicide.  Fair to say?
4    A.  Depends on the circumstances of the case.  It's
5  up to the individual officer what they think's necessary.
6  I did not search --
7    Q.  All right.  But you can't think of any time you
8  didn't do it?
9    A.  Huh?
10    Q.  You can't think of any time you didn't do it.
11  Right?
12    A.  Well, I can't not really.  Wow.  I know that I
13  didn't search the residence of every suspect in a homicide
14  because a lot of times it might not lead back there for
15  evidence.  I don't know.  If I thought it did, I would
16  have went to the extent of doing it.
17          MS. GUERRA:  Emma, I do think we've been
18  going close to an hour.  So maybe when we get to a good
19  stopping point, we can take another break?
20          MS. FREUDENBERGER:  Yeah, I think we
21  need to take a lunch break soon.  Let me just finish this
22  up.
23          MS. GUERRA:  Okay.
24    Q.  (BY MS. FREUDENBERGER)  And another basic
25  investigative step in any homicide I gather once you have

1  made an arrest is to search the suspect himself.  Correct?
2    A.  If we arrest or contact somebody as a potential
3  suspect in a homicide, he's a potential danger to us, we
4  would search him.
5    Q.  All right.  And would be searching him not only
6  to make sure he didn't have a weapon but to see if he had
7  anything of evidentiary significance on his person.
8  Correct?
9    A.  We search him for a weapon.  Anything else would
10  be incidental to the search.
11    Q.  Okay.  Another important step in any homicide
12  investigation is to search for a murder weapon.  Correct?
13    A.  Is what?
14    Q.  To search for the murder weapon.  Correct?
15    A.  It would be nice to have, yes.  It would be good
16  evidence, yes.
17    Q.  And it's good evidence because if you can tie a
18  suspect to a murder weapon in a homicide, that is powerful
19  evidence you got.  Right?
20    A.  I would be willing to search for that evidence,
21  yes, ma'am.
22    Q.  Okay.  And, in fact, that's an important
23  investigative step to take in any homicide.  Correct?
24    A.  Yes, ma'am.
25    Q.  And we talked a minute ago about gunshot residue

1  testing.  Describe for me briefly how that works.
2    A.  Gunshot residue is a chemical test.  The sooner
3  you take it, the better because there's several things
4  that could destroy that evidence.  If a person goes to the
5  urinal, body fluid would null and void the evidence.
6  After they've handled a dozen or two things, that evidence
7  could be gone.
8          So gunshot residue, a search for that
9  should be conducted as quickly as possible after the
10  incident.  I'm no expert on that but that's been my
11  experience.
12    Q.  An as a homicide detective if a gunshot residue
13  test in a shooting case had happened and it was still
14  within a day or two of the crimes, you would direct it
15  to -- no reason you wouldn't direct that test to be done.
16  I understand there are all kinds of reasons that it might
17  not come back positive even if the suspect was the
18  shooter.
19          But in any shooting case, you would to
20  have a gunshot residue testing test done as -- on the
21  potential suspect's face and hands as quickly as
22  practical.  Right?
23    A.  Yeah.
24          MS. GUERRA:  Object to form.
25          THE WITNESS:  I'm sorry?

1          MS. GUERRA:  Object to form.  You can
2  answer.
3    A.  After a day or two, it's probably a wasted
4  effort.  But, yeah, if you think it's necessary or
5  possible, it doesn't cost that much to run that test.  Run
6  the test.
7    Q.  (BY MS. FREUDENBERGER)  Okay.  And gunshot residue
8  can be detected on clothing as well the skin.  Correct?
9    A.  Yes, I think so.  I think that probably a better
10  chance of recovering it on clothing than it would be on
11  somebody's hands after they've done whatever they do.
12    Q.  And so in a shooting case, you would want to --
13  in a shooting case where you made an arrest within say a
14  day of the crime, you would want to collect a -- you know
15  what, withdrawn.
16          There's another crime scene phenomenon
17  I'm aware of called blowback.  Do you know what blowback
18  is?
19    A.  Who?  No.
20    Q.  All right.  Well, in a close-range shooting case,
21  oftentimes blood from the victims will spray out --
22    A.  Sure.
23    Q.  -- of the body.  Correct?
24    A.  Yes, ma'am.
25    Q.  Okay.  And that's why if you apprehend a suspect



CLYDE BLOOD VOLUME 1
MCINTYRE vs UNITED GOVERNMENT OF WYANDOTTE

February 03, 2021
153–156

Page 153

1  within a reasonable amount of time after a close-range
2  shooting, you would want to collect their clothing to test
3  it for blood spatter.  Correct?
4          MS. GUERRA:  Object to form.
5  Foundation.  You can answer.
6      A.  Here again, it depends whether he's had time to
7  change clothes.  He bathed if he had blood all over him.
8  That's the first thing I'm going to do is get rid of that
9  evidence.  And it's possible to do that.
10          Check -- never hurts to check.  It never
11  hurts to run a test.  And regardless of how nonsensical it
12  might seem, if we had reason to believe it was worth the
13  effort, we would run the test.
14      Q.  (BY MS. FREUDENBERGER) Okay.
15      A.  We.  Maskil and I.
16          MS. FREUDENBERGER:  All right.  Let's
17  take a lunch break.
18          (A recess was taken from 1:06 p.m. to
19              1:39 p.m.)
20      Q.  (BY MS. FREUDENBERGER) All right.  Sir, I take it
21  you were trained long before 1994 that witnesses make
22  mistakes in ID procedures for a variety of reasons?
23      A.  Witnesses may be what?  Taped?
24      Q.  No.  Witnesses can make mistakes in ID
25  proceedings for a variety of reasons?

Page 154

1      A.  Well, of course.
2      Q.  So you were trained it's critical to ensure that
3  you follow all safeguards designed to avoid mistakes in ID
4  proceedings.  Correct?
5          MS. GUERRA:  Object to form.  You can
6  answer.
7      A.  I think it was a personal preference, not the way
8  I was trained.
9      Q.  (BY MS. FREUDENBERGER) Sir, you answered some
10  interrogatories about your training in this investigation.
11      A.  Yes, ma'am.
12      Q.  You have testified today that you had hours and
13  hours of in-service training at the Kansas City, Kansas,
14  Police Department.
15      A.  Yes, ma'am.
16      Q.  But you're being very careful whenever I ask you
17  about training or policies or procedures to simply
18  describe your personal preferences as opposed to any rules
19  or training in the department and I think you're doing it
20  on purpose and I understand why.
21          MS. GUERRA:  Objection to this running
22  commentary and to this argumentative language.  There's no
23  question here.
24          MS. FREUDENBERGER:  I think he
25  understands what I'm saying but I'll be clear.

Page 155

1      Q.  (BY MS. FREUDENBERGER) Sir, every police
2  department around the country trains its homicide
3  detectives.  You yourself had in-service training that you
4  have testified to under oath in the Kansas City, Kansas,
5  Police Department.  You were a career officer in the
6  Kansas City, Kansas, Police Department.  Right?
7      A.  Yes, ma'am.
8      Q.  Okay.  And you attended in-service training.
9  Right?
10      A.  Yes, ma'am.
11      Q.  You went to the police academy.  Right?
12      A.  Yes, ma'am.
13      Q.  Okay.  And you weren't told, Sergeant -- or, you
14  know, Mr. Blood or Cadet Blood, Officer Blood, you know,
15  go by your moral and your personal preferences.  You were
16  actually instructed on ways to conduct investigations.
17  Correct?
18      A.  I helped give a couple of classes in the academy,
19  yes, ma'am, and during in-service training.  But you got
20  to realize --
21      Q.  Yeah, you actually -- you actually not only
22  received training, you trained other officers.  Right?
23      A.  I passed on information based on my knowledge,
24  yes, ma'am.  Experience.
25      Q.  Okay.  And you didn't just pass on knowledge.

Page 156

1  You actually instructed other officers on how to conduct
2  particular investigative steps.  Right?
3      A.  My methods is what I talked about.
4      Q.  Okay.
5      A.  What works for me may not work for somebody else.
6      Q.  Well, sure.  That's true in terms of how to
7  question a witness perhaps.  But are you saying, sir, that
8  there are no rules officers are trained on in the Kansas
9  City, Kansas, Police Department?
10      A.  I'm not saying there are no rules.  I don't
11  remember any written rules or regulations.  I don't
12  remember.
13      Q.  But I'm not talking about written rules or
14  regulations.  I'm talking about there are all kinds of
15  rules in police departments.  Right?
16      A.  Sure, there are.
17      Q.  Okay.  There are rules about how you wear your
18  uniform in police departments.  Right?
19      A.  Yes, ma'am.
20      Q.  Okay.  There's a disciplinary system in place for
21  when officers break the rules.  Right?
22      A.  Yes, ma'am.
23      Q.  Okay.  And the only way for officers to be aware
24  of those rules absent written SOPs is to be trained in
25  them.  Correct?



CLYDE BLOOD VOLUME 1
MCINTYRE vs UNITED GOVERNMENT OF WYANDOTTE

February 03, 2021
161–164

Page 161

1    A.   Yes, ma'am.

2    Q.   You were trained in how to put together a proper

3 photo lineup.  Correct?

4    A.   Yes.

5    Q.   And you were trained, for example, that a proper

6 photo lineup contains at least six photographs.  Correct?

7    A.   Five, six, whatever was available.  Try to get

8 your five or six, whatever was available.

9    Q.   Okay.  Was your training actually that it was

10 five or six or was your training that it was six or more

11 because I've always heard six or more.

12    A.   It depends on whether we could get people in very

13 similar appearance.  And sometimes it's hard to find

14 people who look similar.

15    Q.   I see.  I'm sorry.  I wasn't being clear.  I'm

16 not talking about live lineups now.  Now I'm talking about

17 photo lineups.

18    A.   Same difference.

19    Q.   Okay.  My understanding of the rule but correct

20 me if this is wrong is that a photo lineup is supposed --

21 first of all, a photo lineup is supposed to be done using

22 a manilla envelope with spaces cut out for the

23 photographs.  Right?

24    A.   One of the procedures we followed, yes.

25    Q.   Okay.  And another one of the procedures you

Page 162

1 followed was to have at least six photographs in a photo

2 lineup.  Correct?

3    A.   We utilized that, yes, frequently.

4    Q.   Okay.  And another procedure you followed was to

5 have six photographs of individuals who looked as much

6 like the suspect as possible.  Correct?

7    A.   Yes, ma'am.

8    Q.   Okay.  Not members of the suspect's family.

9 Correct?

10    A.   I was never in favor of that, no.

11    Q.   Okay.  And you were trained that when a witness

12 is making an ID from a photo lineup that that lineup

13 should be conducted at the precinct.  Correct?

14    A.   In the photo lineup?

15    Q.   Yeah.

16    A.   No.

17    Q.   No?

18    A.   We took the photo lineup -- they were portable.

19 We would go out, interview people, show them a photo

20 lineup.

21    Q.   Okay.  And was that a situation in which -- were

22 photo lineups a investigative step that multiple -- that

23 you want two investigators present for if possible?

24    A.   I'm trying to -- if we had a photo lineup and no

25 one was identified in that photo lineup, then that was --

Page 163

1 that's where it stopped.  If someone identified somebody,

2 then we would follow up.

3    Q.   Okay.  And ideally you want to investigators

4 present so that there's a investigator who witnessed the

5 photo lineup in case a ID is made.  Right?

6    A.   Ideally but it never always worked that way.

7    Q.   Okay.  But that was what you were trained to do

8 if possible.  Correct?

9    A.   Sure, if possible.

10    Q.   Correct.  And you were trained to write out

11 exactly the words a suspect spoke when making an ID.

12 Correct?

13    A.   That was during a physical lineup with bodies

14 where the suspect was sometimes a voice identification

15 would be effective.  Had five different guys or six

16 different guys walk up to the two-way mirror and say

17 whatever the bad guy said and that was not uncommon.

18    Q.   Oh, I understand.  I'm saying something

19 different, sir.  When you -- I apologize.  That was my

20 fault.  When you were in situations where you're showing a

21 photo lineup to a witness and there is a difference

22 between a photo selections and a positive identification.

23 Would you agree?

24    A.   You mean if someone picked out somebody because

25 they looked like the bad guy?  Sure, I've had that happen

Page 164

1 but it -- you know, there again, we checked it out.

2    Q.   But there's a difference between that's the bad

3 guy and that looks like the bad guy.  Right?

4    A.   Absolutely.

5    Q.   Okay.  The first is a positive ID and the second

6 is not.  Correct?

7    A.   Just don't know for sure until you find out.

8    Q.   Well, you don't know if it's the right guy or

9 not, but what I'm saying is when a witness looks at a

10 photo lineup and says that's the guy, that's a positive

11 identification.  Correct?

12    A.   Yeah.

13    Q.   And that positive identification is a term of art

14 in policing.  Correct?

15    A.   Is the what?

16    Q.   It's a term of art.  It has a particular meaning

17 in policing?

18    A.   Well, it's important, yes.

19    Q.   Okay.  And that looks like the guy or that could

20 be the guy, those are not positive identifications.

21 Right?

22    A.   No, ma'am.  That doesn't hold water.  That won't

23 work.

24    Q.   Okay.  And so for that reason, it's important --

25 critically important to document the words a suspect -- a



1 witness speaks when he or she views a photo lineup.
2 Correct?
3    A.   Yes.  If they make a positive ID, say so.  If
4 not, you put that in the report too.
5    Q.   Okay.  And if not, you put -- and you were
6 trained to write -- you had an obligation to write down to
7 the best of your ability the exact words the witness
8 spoke.  Correct?
9    A.   I suppose.  If he said that looks like the guy,
10 that's what I would put in the report, yeah.
11    Q.   Okay.  That was the rule.  Right?
12    A.   That's the way I did it.
13    Q.   And it's the way you did it because it's the way
14 you were instructed to do it.  Right?
15    A.   It's the way I did it because that's the way I
16 thought it should have been done.  I don't recollect any
17 written rules.  I just remember what I did because I
18 thought it was the right way to do it.
19    Q.   And how did you come up with what you thought the
20 right way to do things was?
21    A.   Back to common sense again.  If she couldn't
22 positively identify somebody, I wasn't going to hang my
23 case on that hat rack.  I wouldn't do it.
24    Q.   Okay.  And you were actually informed at some
25 point prior to becoming a homicide detective as to what

1 constituted a positive ID and what did not.  Correct?  You
2 weren't just left to make that decision yourself.
3    A.   I think a positive ID is when someone says that's
4 the guy period.  There's no doubt about it.
5    Q.   Yes, and, you know, sir, my question is at some
6 point, somebody told you that.  Correct?  During your
7 tenure as a police officer.
8    A.   I think it's just common sense.
9    Q.   All right.  And, sir, are you looking at your
10 lawyer before you answer?
11    A.   I'm what?  No, I'm not looking for anybody for an
12 answer.  I'm looking across the room at some silly artwork
13 over here and I'm trying to think and I just -- I'm not
14 going to -- you know, I can tell you what I know and what
15 I think and that's it.
16    Q.   You understood also that you had an obligation --
17 well, withdrawn.
18           Another rule around photo IDs is that
19 you had to document what photographs a witness viewed.
20 Correct?
21    A.   We had the names of the photos in the lineup
22 attached so that we knew whose photograph was in the
23 lineup, yes, ma'am.
24    Q.   Okay.  Because you need to know who the witness
25 saw -- withdrawn.

1           If a witness sees a suspect and doesn't
2 pick them out, that's critically important information.
3 Right?
4    A.   Well, of course.  They can't identify them.
5    Q.   Right.  And so that's one reason it was important
6 to keep track of what photographs a witness saw.  Right?
7    A.   Yes.
8    Q.   Okay.  And there is a big difference between a
9 witness saying I don't recognize anyone and I don't know.
10 Right?
11    A.   If they don't know and they don't recognize, it's
12 basically the same thing.  They're not identifying anybody
13 as the bad guy.
14    Q.   Well, I'm not sure about that, sir.  I don't
15 recognize anyone means the perpetrator isn't in the array.
16 Right?
17    A.   Possibly or they don't recognize him.
18    Q.   Okay.  But I don't know whether I recognize
19 anybody --
20    A.   Same difference.  So they don't know, they don't
21 recognize them, there's nothing you can do with that.
22    Q.   Okay.
23    A.   That's the end of the interview, the lineup.
24    Q.   Okay.  When it came time to put together a
25 photo -- photo lineups in the early 1990s, where would you

1 go to get the photographs?
2    A.   We went to the crime lab identification unit.  We
3 had books full of photographs.  We would go through those.
4 Sometimes we would just lay the book out with all the
5 photographs in it.
6           But we would go through the books, pick
7 out similar photographs to the person we were interested
8 in and try to make them as near the same as possible where
9 the person -- the witness had either identified the person
10 or not.  No ifs, ands, or no in between.
11    Q.   Okay.  And I take it you would always want to
12 obtain as detailed or complete a description of a suspect
13 as possible before administering an identification; is
14 that correct?
15    A.   Well, yes.  I mean, if you're going to go put
16 somebody in a lineup, you want to get similar appearance
17 people.  You don't want to just stack the deck against a
18 guy.
19    Q.   Right.  And that's one reason that you want to
20 before showing any photographs obtain as detailed and
21 complete a description as possible.  Right?
22    A.   As close as possible, yes, ma'am.
23    Q.   That's just common sense.  Right?
24    A.   Common sense, yes, ma'am.
25    Q.   Okay.  And the -- would you agree the level of



CLYDE BLOOD VOLUME 1
MCINTYRE vs UNITED GOVERNMENT OF WYANDOTTE

February 03, 2021
169–172

Page 169

1  detail in a witness' description is important
2  corroboration for the reliability of their identification?
3     A.  Sure.
4     Q.  Okay.  And any changes in the description given
5  by a witness from interview to interview are also
6  important to the witness' reliability.  Correct?
7     A.  Say from interview to interview?  One to the
8  other?
9     Q.  Yeah, for example -- I'll be clear.  If a
10  witness' description changes over time, you have an
11  obligation to investigate why their description is
12  changing.  Right?
13     A.  Of course.
14     Q.  Okay.  That's important to -- it goes to the
15  reliability of the witness' account.  Right?
16     A.  Yes, ma'am.
17     Q.  And the reliability of any subsequent
18  identification or failure to identify.  Right?
19     A.  Yeah.
20     Q.  If I say -- if I'm a witness and I say to you the
21  guy had straight, blond hair, and then the next day I say
22  to your partner the guy had short, curly, brown hair, that
23  would be a red flag that perhaps my description wasn't
24  reliable.  Right?
25     A.  In one sense.  In another sense, there's a

Page 170

1  possibility the guy got a haircut, you know, changed his
2  appearance.  It's not -- facial characteristics go beyond
3  the hair, I mean.
4     Q.  No, I understand.  But what I'm saying is if I
5  tell -- say I've seen -- I'm asking -- my hypothetical is
6  a little bit different.  If I have one interaction with a
7  suspect and I tell you the suspect had long, straight,
8  blond hair and I tell your partner the suspect had short,
9  curly, brown hair, that would be a red flag that
10  perhaps --
11     A.  Without question we would question that, yes,
12  ma'am.
13     Q.  Okay.  And that's why it's important to
14  investigate changing descriptions.  Correct?
15     A.  Yes, ma'am.
16     Q.  Okay.  Now, if all you have to go on is a
17  description of a subject -- in other words, if you're
18  dealing with a situation where the perpetrator of a crime
19  is a stranger to the witness, how do you go about
20  selecting a photograph?
21     A.  We got a situation -- well, again, we have no
22  idea what the suspect looks like other than what the
23  witness tells you so we try to base our photo lineup on
24  that information and get similar photographs.
25     Q.  And how do you go about getting the similar

Page 171

1  photograph?  Are you just rifling through hundreds of
2  drawers or are photographs -- were photographs at that
3  time back in 1994 organized in such a way as to enable you
4  to find similar photographs?
5     A.  We were organized.  We would go through them and
6  try to pick out similar photographs.  It may take a while.
7     Q.  And how were they organized?
8     A.  Oh, they would go by criminal jacket number or in
9  alphabetical order by name.  We had them cross-filed I
10  think in a couple of different methods so.
11     Q.  Okay.  Was there any sort of way that photographs
12  were -- what if you don't have somebody's name?  That's
13  what I'm asking.
14     A.  Name?
15     Q.  If you do not have a name and you want to show
16  somebody say black men between the ages of 20 and 24 who
17  have been arrested for assault, is there a way to find
18  those photographs assuming you don't have an answer?
19     A.  Sure.  Nowadays you punch it into the computer
20  and it spits them out.  Before then we had to dig through
21  and pick them out one by one until we got what we thought
22  was fair.
23     Q.  Okay.  So the only way to go through
24  photographs -- the photographs weren't organized by
25  physical characteristic in any way.  Is that fair to say?

Page 172

1     A.  No.  Nope.  They were -- you might have 500
2  criminal jackets with black guys, white guys, women all
3  mixed in.  You had to look at the individual jacket, pick
4  out a photograph, and try to fit it in.
5     Q.  Okay.  Was that something that detectives raised
6  a problem up the chain of command while you were working?
7     A.  Detective who?
8     Q.  Was that something detectives flagged as a
9  problem up the chain of command?
10          MS. GUERRA:  Objection.  Form.
11     Q.  (BY MS. FREUDENBERGER) Was it easier to
12  administer photo arrays if the photographs were organized
13  by description?
14          MS. GUERRA:  You can answer.
15     A.  Well --
16          MS. GUERRA:  If you know.
17          THE WITNESS:  I'm sorry?
18          MS. GUERRA:  You can answer if you know,
19  yeah.
20     A.  Well, I got distracted.  If would I what now?
21     Q.  (BY MS. FREUDENBERGER) Sure.  Was that something
22  that detectives flagged up the chain of command as a
23  problem while you were working that it would be much
24  easier to administer photo arrays if the photos were
25  organized by description?



CLYDE BLOOD VOLUME 1                                February 03, 2021
MCINTYRE vs UNITED GOVERNMENT OF WYANDOTTE          173–176

Page 173

1    A.   We would get all kinds of photos and pick out the
2    ones that were most similar and put them together in the
3    lineup.  Chain of command had nothing to do with it.
4    Q.   Okay.  Did you ever see a case where an officer
5    failed to document a positive ID from an eyewitness?
6    A.   Not to my knowledge.
7    Q.   That would be grossly improper.  Correct?
8         MS. GUERRA:  Object to form.  You can
9    answer.
10   A.   Well, if I had somebody make an absolute positive
11   ID on a photograph, I would be tickled and I would go
12   document and then try to prove or disprove their
13   identification.
14   Q.   (BY MS. FREUDENBERGER)  Okay.
15   A.   I mean, that made my job a lot easier if that's
16   the guy, you know.
17        MS. FREUDENBERGER:  Could we go ahead
18   and hand the witness what's been previously marked Exhibit
19   5.  That's the -- that will be his file in this case,
20   Beth.
21   Q.   This whole file is Exhibit 5?
22   Q.   (BY MS. FREUDENBERGER) It is, yeah.
23   A.   Okay.
24   Q.   And, sir, I'm going to ask you to turn to your
25   report which is Bates stamped --

Page 174

1    A.   Page 25.
2    Q.   Do you have it in front of you?
3    A.   I think it says Page 25.  I got page 25.  That's
4    not my report.
5    Q.   Yeah.
6    A.   So let's go back.
7    Q.   All right.  And before I show it to you, sir, can
8    you think of any circumstance --
9         MS. GUERRA:  P53.
10        THE WITNESS:  I'm sorry?
11        MS. GUERRA:  I think it's P53.
12        THE WITNESS:  253?
13        MS. GUERRA:  P at the bottom there, P53.
14   Q.   (BY MS. FREUDENBERGER) Yeah, but it says 25 in
15   handwritten numbers on the bottom of the first page.  If
16   you see your report, Sergeant Blood, I believe there's
17   only one.
18   A.   I've seen it but I don't remember what's in it.
19   Give me a minute.
20   Q.   But are you looking at it right now?
21        MS. GUERRA:  Just a second.
22   A.   No.  Okay.  Here we go.
23        MS. GUERRA:  Here it is, yeah, Page 25.
24        THE WITNESS:  25.  Okay.  My mistake.
25   Q.   (BY MS. FREUDENBERGER) All right, sir.  Before --

Page 175

1    I'm going to direct you to particular portions of this
2    report, but before I do, can you think of any legitimate
3    police reason not to document a positive ID in a homicide
4    case?
5    A.   No.
6    Q.   Okay.  Neither can I.  All right, sir.  I'd also
7    like to direct your attention to the last line of this
8    report.  Could you turn to Page 4 of your report?
9    A.   Page 4, last line.
10   Q.   Yeah.
11   A.   At the order of Lieutenant Culp, the case has
12   been turned to Detective W.K. Smith and Roger Golubski for
13   further investigation.
14   Q.   Yeah.  All right.  And so you and Detective
15   Maskil both responded to the crime scene in this case.
16   Correct?
17   A.   According to my report, we went to the scene,
18   yes.
19   Q.   All right.  And you would have been ordered to do
20   so by Lieutenant Culp.  That's the way things worked?
21   A.   He assigned us to make that call, yes.
22   Q.   Okay.  And according to your report, after
23   directing you and Detective Maskil to respond to the
24   scene, he directed you to turn over the case to W.K. Smith
25   and Roger Golubski.  Correct?

Page 176

1    A.   That's what the last line says, yes, ma'am.
2    Q.   Okay.  And given what you've told me about the
3    way that homicides worked back in 1994, what conceivable
4    reason could there have been for Lieutenant Culp directing
5    you and Detective Maskil to turn the case over to W.K.
6    Smith and Golubski?
7         MS. GUERRA:  Object to form.
8    Foundation.  You can answer if you know.
9         THE WITNESS:  My what?
10        MS. GUERRA:  You can answer.
11   A.   Well, actually, they were the detective -- W.K.
12   Smith's team was the homicide team on call.  They caught
13   the call.  We assisted and we did whatever we could do to
14   help.  We were sent about our business.  There was no --
15   Q.   (BY MS. FREUDENBERGER) And how do you know that
16   that's case?
17   A.   Huh?
18   Q.   What's your basis for -- what's your basis for
19   your testimony that W.K. Smith's team caught the case?
20   A.   Well, very simple.  If we would have been the
21   detectives on call, we would have been assigned the case.
22   They were on call obviously or we would have been the ones
23   to take over the case, not them.
24   Q.   Okay.  But Detective Golubski wasn't a homicide
25   detective.



Page 177

1    A.  Not at that time, not to my knowledge, no, ma'am.

2    Q.  Okay.  And so he wasn't detective W.K. Smith's
3  partner?

4    A.  No.  It would have been Detective Shomin but I
5  don't know where Shomin was at.  I don't know.  He might
6  have been on vacation at the time.

7    Q.  If Shomin wasn't on vacation at the time, any
8  reason you can think of that W.K. Smith and Golubski would
9  have been assigned?

10         MS. GUERRA:  Object to form.
11  Foundation.  You can answer if you can.

12    A.  Well, you know, Golubski had been assigned for
13  reasons I wouldn't know of.  He might have had a
14  particular knowledge of the people, the area, and they
15  thought he would be a benefit to the investigation.  I
16  don't know.  It was not my decision.  And why it was
17  turned to Golubski and Smith, I don't know.

18         And the term "order", I'm still an old
19  military man.  When someone tells me to do something, he
20  outranks me, it's an order, and I follow up.  So it wasn't
21  like the lieutenant says get out of here and go away.  He
22  says it's their case, they'll take it over, go about your
23  business and we did and I don't question that.

24    Q.  (BY MS. FREUDENBERGER) I understand.  It was
25  Lieutenant Culp's call which two detectives worked this

Page 178

1  homicide.  Correct?

2    A.  He's the one that what now?

3    Q.  It was Lieutenant Culp's decision --

4    A.  Well, yes.

5    Q.  -- which two detectives worked the homicide.
6  Correct?

7    A.  Well, yes, because they were the -- if they were
8  the team on call, that would be the proper call to make.

9    Q.  Right.  But they couldn't have been the team on
10  call because Detective Smith's partner was Detective
11  Shomin.  Right?

12    A.  That's not true.  Shomin could have been on
13  vacation.  When Maskil -- if Maskil took vacation or I
14  took vacation, whoever took our place while we were on
15  call or vacation would be the assisting officer.  It's
16  common -- here again, it's back to whoever is available at
17  the time.

18         Golubski could have taken Maskils' or
19  Shomin's place because Shomin was involved elsewhere.  Who
20  knows.  He could have been in court.  A lot of reasons
21  there, but we were not the team on call and we did not get
22  the call.  It wasn't handed to us.  We assisted and went
23  on.

24    Q.  And so what were you directed to do?  What was
25  your job at the scene when you responded?

Page 179

1    A.  At the scene, we made contact with the officers
2  on the scene to gather any kind of information we could.
3  We went over and looked at the vehicle.  I don't remember
4  any of this.  I'm going by my report but --

5    Q.  Well, I see -- so I have your report, sir, and
6  I --

7    A.  Okay.

8    Q.  My question to you is a little different.  What
9  was the purpose of directing -- why were you and -- what
10  was your understanding as to why you and Detective Maskil
11  were ordered to go out to the scene if you were not the
12  team on call?

13    A.  It was a major case.  It was a double homicide.
14  They wanted as many people available as possible to get
15  there and get information as quickly as possible.  We did
16  what we were asked to do and we were released.

17    Q.  Okay.  Based on what you have told me thus far,
18  W.K. Smith should have been the lead detective on this
19  investigation.  Correct?

20    A.  I would assume so.  If Shomin wasn't available,
21  then Smith I would assume would have been the -- I don't
22  know.  I don't know why they changed.

23    Q.  Well, because Smith -- but you do know because
24  Smith was actually a homicide detective and Golubski was
25  not.

Page 180

1    A.  That's right.  To the best of my knowledge, yes,
2  ma'am.

3    Q.  Okay.  And so the way it should have worked is
4  that from this point forward assuming there was a reason,
5  a legitimate reason, to assign Golubski to assist Smith,
6  what should have happened is W.K. Smith should have been
7  the lead detective calling the shots on this homicide
8  investigation because he is the one with training and
9  experience in investigating homicides.  Correct?

10         MS. GUERRA:  Object to form.
11  Foundation.  You can answer.

12    A.  I can't say.  That's the lieutenant's call.  They
13  made that decision.  We were out of it.  We went about our
14  business.

15    Q.  (BY MS. FREUDENBERGER) Well, I understand it
16  wasn't your call and you were following orders from
17  Lieutenant Culp.  I'm clear on.  But can you think of any
18  legitimate police reason that Golubski would have been the
19  lead investigator on this investigation as opposed to W.K.
20  Smith, the actual homicide investigator?

21    A.  I honestly can't say because I don't know the
22  circumstances at the time that lieutenant made the
23  decision.  It wasn't me.

24    Q.  Well, can you think of a single possibility?

25    A.  Well, possibly they were going to try to groom



Page 185

1 was made. When I finished my assignment, I went back
2 about my business. Whatever happened to that case, I have
3 no idea.
4     Q.   And you have made that crystal clear, sir, many
5 times. But all I'm asking you -- you described with
6 specificity the way that the assignments worked. This
7 assignment based on the documentation that you have just
8 seen was out of the ordinary for the way that homicide
9 assignments worked at this time. Correct?
10     A.   I don't think I have never -- I have never
11 experienced prior to that.
12     Q.   Okay. Now, take a look at -- I'm just going to
13 go ahead and read for you, sir, some trial testimony from
14 Detective Golubski because given that we are doing this
15 deposition remotely, it's going to be much faster than
16 putting it up on the screen.
17          And I'm reading you from what's
18 previously been marked as Exhibit D which is Detective
19 Golubski's trial testimony in this case. And this is
20 Detective Golubski that I'm going to start on Page 328,
21 Line 8, and I'm going to read to you -- I'm doing this for
22 the record. Page 329, Line 3.
23          And it says -- it's talking about a
24 witness named Niko Quinn, and it says she stated that she
25 wanted to speak to me about what had occurred and

Page 186

1 requested to see the photos again. She stated that she
2 felt uncomfortable for safety reasons and requested if I
3 could meet her at what she would deem a neutral location.
4 At that time, I proceeded. We agreed to meet at
5 (unintelligible). She was in the company of a male
6 friend.
7          "QUESTION: And did you have those photographs
8 again, Detective Golubski?
9          ANSWER: Yes, ma'am, I did. Yes, I did.
10          QUESTION: And what happened during that contact
11 with Miss Quinn, Nikki Quinn?
12          ANSWER: Once again, I showed her the exact same
13 five photos. I asked her what the purpose of this was.
14 She stated she would like to see them again and she did.
15 At that point, she told me she could make a positive ID of
16 the suspect.
17          QUESTION: Which photo did she identify?
18          ANSWER: No. 3."
19          A little later down, he's asked and when
20 she identified Photo No. 3, did she indicate to you how
21 positive she was about that identification.
22          "ANSWER: She adamant about it."
23          Now, you understand in that testimony I
24 just read, Detective Golubski is describing a positive
25 photo identification. Correct?

Page 187

1     A.   Yes, ma'am.
2     Q.   Okay. And Detective Golubski testified at the
3 trial in this case and has asserted in this civil
4 litigation that he told no one -- he did not document that
5 positive identification and told no one about that
6 identification until shortly before the trial which was
7 approximately five months later.
8          Can you think of any legitimate police
9 reason that a detective -- that Detective Golubski would
10 not have documented a positive identification from a
11 witness in this case?
12          MS. GUERRA: Object to form.
13 Foundation.
14          MR. ROACH: Object to the form.
15          MS. GUERRA: You can answer if you know.
16     A.   Well, ma'am, I was not there. I have no idea
17 what went on or why he did what he did. I don't know why
18 he wouldn't forward the information. I can't judge that
19 one way or the other. He had his reasons for what he did.
20     Q.   (BY MS. FREUDENBERGER) Well, can you think of any
21 potential reason?
22     A.   No, no, I can't but that's neither here nor
23 there. He had a reason. I don't. I can't think of any.
24     Q.   Well, one reason for not documenting a positive
25 identification is if you've used misconduct to elicit that

Page 188

1 identification and you don't think the witness is going to
2 hold up. Right?
3          MS. GUERRA: Object to form.
4 Foundation.
5     A.   I have no idea why he did what he did.
6     Q.   (BY MS. FREUDENBERGER) Okay. And all I'm asking
7 you is -- let's see. You know what, withdrawn.
8          You understand that there was a
9 preliminary hearing -- first of all, you understand from
10 reading our complaint if nothing else that there was no --
11 never any physical evidence tying Lamonte McIntyre to this
12 crime. Right?
13          MS. GUERRA: Object to form.
14     A.   I don't know. I don't know.
15     Q.   (BY MS. FREUDENBERGER) Okay. Sir, you read the
16 complaint when you were served with it?
17     A.   I read the what?
18     Q.   And I'm not going to quiz you on it. It was over
19 a year ago. But you read our complaint when you were
20 served with it. Correct?
21     A.   Not completely. I scanned over it and there's
22 parts there that I had nothing to do with. I just pushed
23 it off in the back. It's not my problem. I didn't do it.
24 I didn't take part in it. Nothing I could testify to. I
25 went back to my report. That's what I did and that's what



CLYDE BLOOD VOLUME 1
MCINTYRE vs UNITED GOVERNMENT OF WYANDOTTE

February 03, 2021
201–204

Page 201

1 Detective Golubski.  Right?
2     A.   I would assume.
3          MS. GUERRA:  Object to form.
4          THE WITNESS:  I'm sorry.
5          MS. GUERRA:  Object to form.  You can
6 answer.
7     A.   I would assume he would.  I don't know.  I don't
8 know how he associated with Golubski or what the
9 circumstances were.
10     Q.   (BY MS. FREUDENBERGER) Okay.  If you look to
11 Paragraph 7.  Read Paragraph 7 to yourself and then tell
12 me if you agree with it.
13     A.   Should or shouldn't have, I can't -- I didn't
14 call the shots on that.  Normally I don't think it would
15 have went that way, but then why the would he have been, you
16 know -- I have no answer for that.
17     Q.   Okay.  Accept that normally it wouldn't have been
18 done the way it was done here.  Right?
19     A.   Normally it's from my experience, the two
20 homicide detectives on call would handle the case.  They
21 would be in charge.  If Roger was assigned to assist them,
22 fine, that's the way it worked because we -- once in a
23 while we'd get extra help.  But to sit down and say
24 that -- I don't know.  If I had a detective with expertise
25 in a certain area and I could depend on him, I wouldn't

Page 202

1 have any problem asking for help.
2     Q.   Okay.  But that's not what happened here.  This
3 case was actually assigned to Golubski as lead
4 investigator.
5     A.   I have no idea why that happened.  None
6 whatsoever.
7     Q.   Okay.  And you can't think of any reason for
8 it -- well, if -- if the reason to assign Golubski is that
9 he had expertise and contacts in the area where the crime
10 occurred, couldn't he have contributed his expertise and
11 made use of his contacts by assisting a homicide
12 detective?
13     A.   Yes, ma'am, he could have.
14     Q.   Okay.  So that wouldn't be a legitimate reason to
15 assign him as lead detective, would it?
16          MS. GUERRA:  Object to form.
17 Foundation.  You can answer if you know.
18          THE WITNESS:  I'm sorry?
19          MS. GUERRA:  You can answer.
20     A.   I really -- I don't know why -- what their
21 reasoning was so I can't say.
22     Q.   (BY MS. FREUDENBERGER) Okay.  But there is no
23 reason Detective Golubski couldn't have made use of his
24 contacts and his knowledge of the area as assisting a
25 homicide detective as opposed to being lead detective

Page 203

1 himself.  Right?
2     A.   Not that I can think of but that's, you know, not
3 my decision.
4     Q.   Okay.  And you can't think of any legitimate
5 reason as you sit here today to assign him.  Detective
6 Golubski was not a homicide detective as lead detective on
7 this double murder investigation.  Correct?
8          MS. GUERRA:  Object to form.  Asked and
9 answered.  You can --
10     A.   Not that I can think of, no.
11     Q.   (BY MS. FREUDENBERGER) Okay.  Read Paragraph 8 to
12 yourself, please, and let me know if you agree with it.
13     A.   Read which one?
14     Q.   Paragraph 8.
15     A.   Eight?
16     Q.   Yes.
17     A.   Go back.  I can't agree or disagree with it.  I
18 don't know what his motives were.
19     Q.   Okay.  Fair enough.  Would you agree that Roger
20 Golubski had always aspired to be a homicide detective?
21 And to be fair to you, sir, before you answer that
22 question, I'm going to tell you that according to records
23 we have received in this case, you and Golubski were lead
24 detectives together in 20 cases between 1988 and 1997.
25 Does that sound familiar to you?

Page 204

1     A.   I don't remember.  I don't remember, ma'am.
2     Q.   Well, do you have any reason to dispute that
3 fact?
4     A.   No, I don't.  I just plain don't remember it.
5     Q.   Okay.  Now, would you agree that your impression
6 of Golubski back in 1994 is that he aspired to be a
7 homicide detective?
8     A.   Well, he seemed to have an interest in it and
9 wanted the job I remember hearing.  What they're saying
10 here I don't know.  I just -- I think that's what he
11 wanted.  Several guys would like to have had that job.
12     Q.   Okay.  And would you also agree that detectives
13 investigating homicides were typically free to be out in
14 the community all day with little supervision?
15     A.   We operated pretty much on our own.  Maskil and I
16 would hit the road and do our investigations and then we'd
17 have a briefing with our boss and write our reports.  No
18 one rode in the backseat and told us what to do.
19     Q.   So the answer is, yes, you would agree?
20     A.   Yeah.
21     Q.   Well, you say briefing with your boss.  How often
22 would you brief Lieutenant Culp in the course of a
23 homicide investigation?
24     A.   Based on progress.  If he had questions, we would
25 sit down and brief him.  Unless we had something new to



CLYDE BLOOD VOLUME 1
MCINTYRE vs UNITED GOVERNMENT OF WYANDOTTE

February 03, 2021
209–212

**Page 209**

1 side door?

2    A.  Uh-huh, yes, ma'am.

3    Q.  As well as what appears to be either flesh or

4 brain matter?

5    A.  Yes, ma'am.

6    Q.  Okay.  And looks like a relatively substantial

7 amount of blood.

8        MS. FREUDENBERGER:  Ariel, can you pause

9 the video now?

10        THE WITNESS:  I'm sorry?

11        MS. FREUDENBERGER:  Thank you.

12        MS. GUERRA:  She's talking to Ariel.  No

13 question yet.

14        MS. FREUDENBERGER:  All right.  We

15 can -- yeah, if you leave it paused and then go back to

16 the witness, that would be great.  Thanks, Ariel.  So you

17 can stop the screen share.

18    Q.  (BY MS. FREUDENBERGER) All right, sir.  You saw

19 that there was both blood and glass on the ground next to

20 the passenger side of the car.  Correct?

21    A.  Yes, ma'am.

22    Q.  Okay.  And that's where the shooter was allegedly

23 standing at the time of the crime according to witness

24 accounts.  Correct?

25    A.  I assume, yes, ma'am.

**Page 210**

1    Q.  Okay.  And given the blood and glass on the

2 ground, one obvious important investigative step when

3 Lamonte McIntyre was arrested less than six hours later

4 would have been to seize his shoes.  Correct?

5        MS. GUERRA:  Object to the form.

6    A.  Take his shoes?  I would assume, yes, I probably

7 would.

8    Q.  (BY MS. FREUDENBERGER) Not just probably.  Of

9 course you would take his shoes because --

10    A.  Well, yes, because there would be trace evidence

11 on his shoes if he walked around in that stuff.

12    Q.  Right.  And so testing could be done to -- first

13 of all, just the presence of blood on his shoes alone

14 would have been inculpatory.  Correct?

15    A.  That would have cost him some problems.

16    Q.  And, in fact, it's possible testing could have

17 been done to demonstrate that the blood on his shoes was

18 the blood belonging to the victims.  Correct?

19    A.  Yes, ma'am.

20    Q.  And another thing that could have been

21 potentially located would have been glass fragments in the

22 soles of his shoes.  Correct?

23    A.  Yes, ma'am.

24    Q.  Okay.  And so seizing a pair of shoes when he was

25 arrested less than six hours later was a basic critically

**Page 211**

1 important investigative step to take.  Correct?

2    A.  I would advise taking them, yes, ma'am.

3    Q.  Okay.  Can you think of any legitimate police

4 reason as you sit here today not to have collected Lamonte

5 McIntyre's shoes when he was arrested?

6    A.  Not really.

7    Q.  Okay.  And another basic investigative step when

8 Lamonte McIntyre was arrested within six hours after this

9 close-range shooting would have been to seize his clothes.

10 Correct?

11    A.  Yes, ma'am.  There should be residue on the

12 clothing as well.

13    Q.  Okay.  And that is a obvious step to take in a

14 homicide close-range shooting.  Correct?

15    A.  I would collect his clothing and his shoes.

16    Q.  Any legitimate police reason you can think of as

17 you sit here today not to collect Lamonte McIntyre's

18 clothing --

19    A.  No, ma'am.

20    Q.  -- when he was arrested six hours -- less than

21 six hours after the crime?

22    A.  No, ma'am.

23    Q.  Okay.  Another basic obvious investigative step

24 would have been to -- well, before I get there, another

25 reason to collect his clothes would be to see if he had

**Page 212**

1 anything inculpatory on his person given the -- that the

2 crime had occurred mere hours earlier.  Correct?

3    A.  That echoed a lot.  I'm trying to get what you

4 said.  Do it again.

5    Q.  Sure.  Another reason to take his clothes is

6 there could have been inculpatory -- he could have had

7 inculpatory items on his person.  Right?

8    A.  Well, sure, it could prove him guilty or not

9 guilty or involved one way or the other.

10    Q.  Yeah.  And in addition to the blood you would

11 expect to see on his clothing -- by the way -- withdrawn.

12        If Lamonte McIntyre had been wearing the

13 clothing he was arrested in at the time of this shooting,

14 if he were the perpetrator, you would expect to see

15 fragments of glass and blood on his clothes.  Right?

16    A.  I would expect that, yes, ma'am.

17    Q.  Okay.

18    A.  I'd sure be looking.

19    Q.  And if --

20    A.  I'm sorry?

21    Q.  And if Lamonte McIntyre had committed this

22 shooting the way it was described, you would expect to

23 find gunshot residue on his face, clothing, and hands.

24 Correct?

25    A.  It would be possible, yes.  Be worth checking for



CLYDE BLOOD VOLUME 1                                    February 03, 2021
MCINTYRE vs UNITED GOVERNMENT OF WYANDOTTE          213–216

Page 213

1   it.
2      Q.   And by the way, one reason you would check for it
3   is that if Lamonte McIntyre had no gunshot residue on his
4   face, hands, and clothing, that would be evidence tending
5   to suggest he may not have committed the crime.  Correct?
6      A.   True, yes, ma'am.
7      Q.   And if Lamonte McIntyre had changed -- had not
8   changed his clothing and there was no blood or glass on
9   his clothing, that would be evidence indicating he was not
10  responsible for the shooting.  Correct?
11     A.   Yes, ma'am, I agree.
12     Q.   Okay.  So those are additional important reasons
13  that any investigator who was attempting to conduct a
14  proper investigation should have taken Lamonte McIntyre's
15  clothing and performed a -- should have taken -- first
16  taken Lamonte McIntyre's clothing.  Correct?
17     A.   Yeah, I would have done that.
18     Q.   And second, ordered a gunshot residue test.
19  Correct?
20     A.   Yes, ma'am.
21     Q.   Okay.  Would you agree that Detective Golubski's
22  failure to do so in this case is a major red flag?
23     A.   Is a major --
24          MR. ROACH:  Object to the form.
25          MS. GUERRA:  You can answer.

Page 214

1      A.   It's a major what?
2      Q.   (BY MS. FREUDENBERGER) Red flag.
3          MS. GUERRA:  You can ask what that
4   means.
5          THE WITNESS:  What did she say?  Major
6   what?
7          MS. GUERRA:  If you don't understand,
8   you can ask her.
9      A.   Yeah, what did you -- a major what, ma'am?
10     Q.   (BY MS. FREUDENBERGER) A major red flag.
11     A.   Yes, it's something I would definitely want to
12  know about.  I'd check it out.
13     Q.   Okay.  And if you were the Lieutenant in charge
14  of this investigation and you saw in this case that
15  Detective Golubski had not seized Lamonte McIntyre's
16  clothing or shoes, that is something you would have
17  immediately questioned him about.  Correct?
18          MS. GUERRA:  Object to form.
19  Foundation.  You can answer if you know.
20     A.   There again, that depends on the experience or
21  lack thereof of the lieutenant.  You know, I worked
22  homicides.  He hadn't and he may not have thought of that.
23  I would have done it.  I'm not protecting the lieutenant.
24     Q.   (BY MS. FREUDENBERGER) Not just that you would
25  have done it.  You had investigated homicide shootings

Page 215

1   before.  Correct?
2      A.   Yes, ma'am.
3      Q.   Okay.  Under Lieutenant Culp.  Right?
4      A.   Uh-huh, yes, ma'am.
5      Q.   And so Lieutenant Culp certainly should have
6   known if only from supervising your investigations that it
7   is possible to test a suspect in a shooting's clothing for
8   the presence of blood or other trace evidence.  Correct?
9      A.   I would think it would fall under that, yes.
10     Q.   Okay.  He should have ordered that it be done
11  here.  Correct?
12          MS. GUERRA:  Object to form.
13  Foundation.  You can answer.
14     A.   I can't say why he did or didn't.  I know I would
15  have done it.  I know what I would have done.  I can't
16  vouch for what he did or didn't do or why.
17     Q.   (BY MS. FREUDENBERGER) I understand.  But as a
18  supervisor supervising this double homicide investigation,
19  Lieutenant -- that's something Lieutenant Culp should have
20  done.  Correct?  Is ensure Lamonte McIntyre's clothing and
21  shoes were seized and tested?
22     A.   I think it --
23          MS. GUERRA:  Same objections.
24          THE WITNESS:  I'm sorry.
25          MS. GUERRA:  I said same objections.

Page 216

1      A.   I think that would be a very important point to
2   cover, yes.
3      Q.   (BY MS. FREUDENBERGER) Okay.  Another important
4   point to cover would have been executing a search warrant
5   in Lamonte -- on Lamonte McIntyre's residence.  Correct?
6          MS. GUERRA:  Object to form.
7   Foundation.
8          MR. ROACH:  Object to the form.
9          MS. GUERRA:  You can answer if you know.
10     A.   Yes, I agree.
11     Q.   (BY MS. FREUDENBERGER) Okay.  To look for, for
12  example, the murder weapon.  Correct?
13     A.   Yes, ma'am.
14     Q.   Okay.  To look for bloody clothing Lamonte
15  McIntyre could have changed out of were he actually the
16  shooter.  Correct?
17     A.   Yes, ma'am.
18     Q.   To look for any other number of inculpatory
19  evidentiary items one might find in the home of a shooter
20  within six hours of a double homicide.  Correct?
21     A.   Yes, ma'am.
22     Q.   Any legitimate police reason as you sit here
23  today not to take the step of either asking for a consent
24  to search or getting a search warrant for Lamonte
25  McIntyre's home at this point in the investigation?



Page 217

1        MR. ROACH:  Object to form.
2        MS. GUERRA:  You can answer if you know.
3     A.  It's my opinion only.  I would have got the
4  search warrant, but why the other man did what he did, I
5  don't know.  It could be lack of experience on his part.
6  I don't know.
7     Q.  (BY MS. FREUDENBERGER) Do you think it's possible
8  that it just didn't occur to the Detective Golubski to
9  search Lamonte McIntyre's home?
10    A.  I guess --
11    Q.  You're laughing because it's not.  Right?
12    A.  Well, it's not very likely, no, ma'am.
13    Q.  Okay.  Well, one reason not to search Lamonte
14  McIntyre's home is if Detective Golubski knew he was
15  unlikely to find any inculpatory evidence.  Correct?
16        MS. GUERRA:  Object to form.
17  Foundation.
18        MR. ROACH:  Object to the form.
19    A.  I don't know.  That would be speculation on my
20  part and I can't do that.
21    Q.  (BY MS. FREUDENBERGER) Okay.  Do you agree that
22  Detective Golubski's failure to execute a search warrant
23  on Lamonte McIntyre's residence is a red flag in this
24  investigation?
25        MR. ROACH:  Object to the form.

Page 218

1        MS. GUERRA:  You can answer if you know.
2        THE WITNESS:  I'm sorry?
3        MS. GUERRA:  You can answer if you know.
4     A.  Well, it's something I would have done.  I
5  wouldn't have declined or backed off on it.  I would have
6  got the warrant.  But there again, I wasn't in his shoes
7  at the time.  I don't know why he did what he did.
8     Q.  (BY MS. FREUDENBERGER) Well, not just that.  You
9  can't think of any legitimate reason for him to do what he
10  did in failing to get the search warrant.  Right?
11    A.  Not really, no.
12    Q.  Okay.  And that's something else Lieutenant Culp
13  should have ensured happened in this case.  Correct?
14        MS. GUERRA:  Object to form.
15  Foundation.  You can answer if you know.
16    A.  I would think he would have caught on to that,
17  yes.
18    Q.  (BY MS. FREUDENBERGER) Okay.  Would you agree
19  that it is very troubling that in this double homicide
20  close-range shooting case in which the court has actually
21  made now an innocence finding Detective Golubski failed to
22  either seize Lamonte McIntyre's clothing or execute a
23  search warrant of his home?
24        MS. GUERRA:  Object to form.
25        MR. ROACH:  Object to the form.

Page 219

1     A.  Yes.
2        MS. GUERRA:  You can answer if you know.
3     A.  Well, yeah, he come up short.
4     Q.  (BY MS. FREUDENBERGER) It objectively -- just
5  objectively although you can't say what happened, on its
6  face it makes it look like Detective Golubski was not
7  conducting a legitimate investigation.  Correct?
8        MS. GUERRA:  Object to the form.
9        MR. ROACH:  Object to the form.
10    A.  That or he's pretty incompetent.
11    Q.  (BY MS. FREUDENBERGER) Okay.  I mean, you
12  investigated 20 cases with Detective Golubski.  Was he
13  incompetent?
14    A.  20?
15    Q.  Yeah.
16    A.  No, not that I'm aware of.  I don't know.  Unless
17  he was assigned to a --
18    Q.  All right.  The department's homicide -- I want
19  to be fair to you.  The department's homicide listings
20  list you and Detective Golubski as lead investigators
21  together on 20 cases.
22    A.  Wow.  I don't --
23    Q.  My question to you as -- do you dispute -- that's
24  not consistent with your recollection?
25    A.  That don't make sense to me.  I would like

Page 220

1  awfully much to see those cases.
2     Q.  Okay.
3     A.  I don't remember it.  I'm not.
4     Q.  Okay.  But, sir, you know, I have read everything
5  I think there is to read about Detective Golubski and I
6  have not seen a single person allege that he was
7  incompetent.  Is your position that Detective Golubski was
8  incompetent?
9     A.  No.  Inexperienced maybe but not incompetent.  I
10  think that he, you know.
11    Q.  These are basic investigative steps he should
12  have known to take.  Correct?
13    A.  That's what I would have taken, yes.
14    Q.  Well, not just steps you would have taken.  Steps
15  based on your experience and training, steps you would
16  have expected Detective Golubski to know to take in this
17  double homicides case?
18    A.  Well, again --
19        MR. ROACH:  Object to the form.
20        MS. GUERRA:  You can answer.
21    A.  It goes back to common sense.  You either
22  investigate it or you don't.  If there's evidence to be
23  had, you look for it.
24    Q.  (BY MS. FREUDENBERGER) Okay.  And common sense
25  dictated that you want to seize Lamonte McIntyre's



Page 221

1  clothing and search his home here.  Correct?
2     A.  I would have, yes.
3     Q.  Because it's just common sense?
4     A.  Yes.
5     Q.  Okay.  Read Paragraph 10 to yourself, please.
6           MS. GUERRA:  She's asking you to look at
7  the affidavit.  Right?  The Tim Maskil affidavit?
8           MS. FREUDENBERGER:  Yes, that's correct.
9  Thanks.
10          THE WITNESS:  Okay.  Where are we at?
11  Which one?
12          MS. GUERRA:  She said Paragraph 10.
13          THE WITNESS:  Put my eyes back on.
14    A.  Okay.
15          MS. GUERRA:  Wait till she asks the
16  question.
17    Q.  (BY MS. FREUDENBERGER) Now, assuming this is true
18  that the photo lineup used by Roger Golubski in the
19  McIntyre case contained photos of three McIntyre family
20  members, that would be another investigatory failure.
21  Correct?
22    A.  I would never have done that, no.
23          MR. ROACH:  Object to the form.
24    Q.  (BY MS. FREUDENBERGER) You wouldn't have done
25  that among other reasons because it was suggestive.

Page 222

1  Correct?
2     A.  Yes, ma'am.
3     Q.  And against the rules.  Correct?
4     A.  I don't recollect rules.  It's just something I
5  wouldn't have done.  It would be too suggestive.
6     Q.  Okay.  And could have resulted in Lamonte
7  McIntyre being erroneously suggestive.  Right?
8           MR. ROACH:  Object to the form.
9     A.  I assume so, yes, he could be wrongfully
10  identified.
11    Q.  (BY MS. FREUDENBERGER) Okay.  The fact that the
12  photo lineup contained photos of three McIntyre family
13  members would be one explanation for how Lamonte McIntyre
14  could have been identified by witnesses even if he was not
15  the perpetrator.  Correct?
16          MR. ROACH:  Object to the form.
17          MS. GUERRA:  You can answer.
18    A.  I'm assuming it's possible, yes.
19    Q.  (BY MS. FREUDENBERGER) All right.  Read Paragraph
20  11 to yourself, please.
21    A.  Paragraph 11?
22    A.  Yeah.
23    A.  Okay.
24    Q.  Why did you laugh, sir?
25    A.  Well, it's like a lot of the other detectives.

Page 223

1  He thought he was a better detective than he was.  I guess
2  we all like to feed our ego, you know.
3     Q.  You see that Detective Maskil describes Golubski
4  as a loner the same way that you did earlier in your
5  deposition?
6     A.  That was my experience with him that he went his
7  own way and we'd get back together occasionally to compare
8  notes but most often he went off on his own.
9     Q.  Okay.  And this is another place where you and
10  Detective Maskil have a consistent recollection.  Right?
11    A.  Where I have a problem with recollection?
12    Q.  No.  You have a -- your recollection is
13  consistent with Tim Maskil's recollection.  Correct?
14    A.  In this case, yeah, I agree.
15          MR. ROACH:  Object to the form.
16          MS. GUERRA:  You can answer.
17    Q.  (BY MS. FREUDENBERGER) Okay.
18    A.  I saw him as a loner.  That's it.
19    Q.  Okay.  Was it apparent to you too that Roger
20  Golubski was trying to build his reputation as a detective
21  especially in the black community?
22          MR. ROACH:  Object to the form.
23    A.  I couldn't say that one way or the other because
24  I don't know what he did in the black community.  He was a
25  loner.  He went down there and did what he did.  I wasn't

Page 224

1  there.
2     Q.  (BY MS. FREUDENBERGER) Okay.  But if you're
3  honest, sir, you heard rumors about some of the things
4  that Detective Golubski did down there in the black
5  community.  Right?
6     A.  The only thing I heard about rumors was after
7  this thing started when I was --
8     Q.  Yeah.
9     A.  -- advised that I was a defendant in the case.
10  Because other than that, I stayed away from that.  I went
11  home.  I didn't run up and down the halls with those
12  people.  I didn't gossip.
13    Q.  Okay.  But Detective Maskil.  Right?
14    A.  Detective Maskil what?
15    Q.  You spoke with Detective Maskil.  Right?
16    A.  Well, yeah, every time we worked together, we
17  talked.
18    Q.  Well, not just every time you worked together.
19  You shared an office for years and talked about
20  woodworking and shooting, target shooting and police work.
21    A.  We agreed that Golubski was a loner but --
22    Q.  We'll get there.  Let's keep going.  Okay?
23  Read paragraph -- do me a favor and read Paragraphs 13,
24  14, and 15 to yourself.
25    A.  I have no idea --

