# EXHIBIT 64

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

LAMONTE McINTYRE, et al.,)
                         )
          Plaintiffs,    )
                         )
vs.                      ) 2:18-cv-02545-KHV-KGG
                         )
UNIFIED GOVERNMENT OF    )
WYANDOTTE COUNTY AND     )
KANSAS CITY, KANSAS,     )
et al.,                  )
                         )
          Defendants.    )

          30(b)(6) DEPOSITION OF UNIFIED
GOVERNMENT, by MICHAEL YORK, a Witness, taken on
behalf of the Plaintiffs, before Alison A. Tracy,
Missouri CCR No. 554, Kansas CSR No. 1525,
pursuant to Notice, on the 9th day of December,
2021, at Lathrop GPM LLP, 2345 Grand, Suite 2200,
Kansas City, Missouri.

Page 22

1    MR. ROACH:  Join.
2    A.  How I did it, if that's what you are
3  asking me, how I conducted a photo lineup, how I
4  chose the photographs?
5        MR. COOPER:  Right now the topic is
6  a 10 year period, during the nineties how were
7  fillers selected.
8    A.  What I remember is that you selected
9  five, if the suspect was a white male, 25 to 30
10 years of age, facial hair, things like that, you
11 would pick five white males in that same age
12 category with facial hair and you would put them
13 in the lineup.  So, for example, if the Polaroid
14 or the mug shot had a really close picture of the
15 suspect's face, you would pick five other
16 photographs with the photograph really close or
17 with a face really close to the picture, so you
18 would make it as fair as possible to the suspect.
19 He wouldn't stick out amongst the five others.
20   Q.  (By Ms. Paras)  Should the, I'm a
21 referring to these photos as filler photos, is
22 there a particular term you used as photos that
23 were not of the suspect themself?
24   A.  No.
25   Q.  So if I'm referring to filler photos,

Page 23

1  that's what I mean.
2    A.  Okay.
3    Q.  Just to clarify.  You mentioned that you
4  started in 1998 and it was difficult for you to
5  speak before then.  I just want to make sure.  As
6  I mentioned in the beginning, I'm here to ask you
7  about policies from 1990 to 2000.  Do you feel
8  you are able to speak about how things worked in
9  terms of these identification procedures
10 pre-1998?
11   A.  I think I can give you a good
12 understanding of why things happened.  But to
13 specifically tell you why a person did something
14 in 1994 or 5, I can speculate as to why I believe
15 that happened that way.  But to know the policies
16 and procedures prior to 1998, no, I could not
17 tell you specifically.
18   Q.  Okay.
19        MR. COOPER:  The witness is --
20 reasonable inquiry has been made and the witness
21 is here to testify regarding the specified topic,
22 which is policies, procedures, rules,
23 regulations, customs or practices.  And just to
24 let you know, the witness is concerned about if
25 you want to ask why a specific photograph was in

Page 24

1  this case selected or not selected, he is not
2  prepared to answer that question.
3        MS. PARAS:  Yes.  And just to
4  confirm, I'm asking about general photo selection
5  procedures.
6    Q.  (By Ms. Paras)  Yes, I think, sir, you
7  said you couldn't -- just now you said you
8  couldn't speak to what a specific person did what
9  they did.  But in general can you speak to what
10 may have been general policy or the general rules
11 and practices from 1990 to 1998, for example,
12 before you got there?
13   A.  Yes, I think I can.
14   Q.  Okay.  When you are choosing these
15 non-suspect photos or the filler photos, should
16 they be of people that -- is the policy to choose
17 photos of people that you know are innocent of
18 the crime?
19        MR. COOPER:  Object to form.
20        MS. EVERS GUERRA:  Object to form.
21        MR. ROACH:  Join.
22        MS. PARAS:  Sorry, I could not hear
23 the objection.  If you can get a little closer to
24 the mic.
25        MR. COOPER:  It was just object to

Page 25

1  form.  You may answer.
2        MS. EVERS GUERRA:  Object to form.
3    A.  What was the question again?  I'm sorry.
4    Q.  (By Ms. Paras)  Sure.  When you are
5  choosing filler photos, is the goal to choose
6  photos of individuals who you are certain are
7  innocent of the crime?
8    A.  So, if you are choosing five non-suspect
9  photographs, yes, clearly they would not be
10 involved in the crime.  You are certain when you
11 are choosing those photographs that this person
12 is not part of the crime, was not responsible for
13 the crime.
14   Q.  So would it be proper to have more than
15 one suspect in a photo lineup?
16   A.  How I would do it, if there were two
17 suspects involved in the crime, then you would
18 have two separate photo lineups.
19   Q.  Okay.  And that's how you would do it.
20 Can you speak to how, if there was a general rule
21 on whether suspects should not be included in the
22 same lineup?
23   A.  As a general rule I can't really come up
24 with a reason as to why there would be two
25 suspects in one photographic lineup.  That would

7 (Pages 22 - 25)

Page 26

1  be my answer.  I don't know why that would
2  happen.
3     Q.  Okay.  So is it your understanding that
4  what was generally expected of an officer would
5  be that suspects were separated into different
6  photo lineups?
7     A.  Well, it would depend.  So if that's how
8  they were doing it in the early nineties, I'm not
9  aware of that; but I can tell you in 1998 that
10 practice was not occurring.
11    Q.  When were you trained?
12    A.  1992, that's my start.
13    Q.  Understood.  When were you trained, were
14 you trained on working with witnesses, for
15 example?
16    A.  In the police academy?
17    Q.  Yes.
18    A.  I'm sure we touched on that.  It has
19 been so long ago.  I don't remember if we
20 actually were part of a training block was
21 talking to witnesses.  I know they there was a
22 training block on how to talk to people, how do
23 deescalate and things like that.
24    Q.  Okay.  Do you have an sense from your
25 training if you were trained on photo lineup

Page 27

1  procedures like what we are discussing now?
2     A.  When I became a detective you were
3  assigned to an older detective, and really it was
4  on-the-job training or on-the-job learning.
5  There really wasn't a formal training process in
6  '98 when you were newly promoted to a detective
7  other than you were given to shadow an older
8  detective.
9     Q.  I guess what I'm asking is, in 1992 when
10 you left your original training do you have any
11 expectation of how you were supposed to perform
12 photo lineups?
13    A.  We did not cover in 1992 how to do a
14 photographic lineup.  Police officer, a patrol
15 officer would never be a part of that to begin
16 with.
17    Q.  Understood.  So, I want to keep asking
18 some questions about selecting filler photographs
19 for a photo lineup.  You touched on this.  But
20 when you are choosing photos for fillers, you are
21 you looking for photos that match the suspect's
22 photos that you are using in that lineup?
23    A.  We are looking for similar features that
24 would match the suspect.  Like if the suspect was
25 bald, we would have five other guys that were

Page 28

1  bald.  If he had a goatee or a mustache or a
2  beard, that would match as well.
3     Q.  Okay.  And is it your understanding that
4  that was the general rule from 1990 to 2000?
5     A.  I would say it was.  I mean, the general
6  rule, for the most, part common sense, that you
7  would provide five photographs that would
8  somewhat look like the suspect to make it as fair
9  as possible to the suspect.
10    Q.  And so would that apply to things like
11 the way their race is described or their skin
12 color?
13    A.  Yes.  If it was a black male that was
14 light-skinned with a beard, you would choose five
15 black males about the same age with light skin
16 and a beard.
17    Q.  Okay.  It sounds like, for example, if a
18 suspect is described or identified as having
19 caramel skin, you wouldn't use a dark-skinned
20 black male in that lineup, is that correct?
21    A.  Well, again, I don't know if that -- if
22 you are getting into skin colors, that's a hard
23 rule.  It has to be a black male that looks
24 similar to the suspect.  And so to get into
25 caramel or light-skinned, something, or dark

Page 29

1  skin, that's going to be tough for me to give you
2  an answer to.
3     Q.  Okay.  You mentioned in your example
4  that light-skinned -- your description,
5  light-skinned is one of the characteristics you
6  would take note of and that would inform your
7  decision on what type of filler photos to work
8  with, is that correct?
9     A.  Yes.  Ideally you would want -- you
10 wouldn't want the suspect being pretty
11 light-skinned and you would have five
12 dark-skinned black males.  That wouldn't add up,
13 that wouldn't make sense, that wouldn't be fair
14 to the suspect.  You would have to get the skin
15 color relatively close to that of the suspect's.
16    Q.  Okay.  Understood.  I'm curious, when
17 you are choosing filler photos, how much does
18 height come into play?  If you have a suspect
19 that is a certain height or was described as a
20 certain height.  Would you try to use filler
21 photos with that certain height?
22    A.  If it is just a mug shot, it is
23 basically from right here up, so that wouldn't
24 really matter.  But if you had a Polaroid lineup
25 and you were showing the entire picture, again,

|  |  |
|---|---|
| Page 34<br>1 about officers Polaroid practices?<br>2   A.  So, I just remember that Polaroids were<br>3 available in the bureau, Polaroid cameras were<br>4 available in the bureau, and that was just the<br>5 method of taking photographs back then.<br>6   Q.  So it sounds like officers would have<br>7 access to Polaroids as they wanted or needed, is<br>8 that fair?<br>9   A.  You know, I don't remember.  Because<br>10 when I was an officer I did not have access to a<br>11 Polaroid camera in my trunk.  So that was<br>12 primarily detectives and probably our CSI, our<br>13 crime scene officers.<br>14   Q.  So, going back to how you choose filler<br>15 photographs for a photo lineup.  Would it be<br>16 proper to have multiple family members in one<br>17 lineup?<br>18   A.  I mean, it depends on what the scenario<br>19 is.  It depends on what availability there is for<br>20 the lineup.  But as a rule of thumb, I would say<br>21 it would be best to keep family members out of<br>22 your lineup.<br>23   Q.  Would that rule of thumb have been the<br>24 case from 1990 to 2000, for example?<br>25   A.  Well, I can just tell you this.  What I | Page 36<br>1 lineup.  It was just more of a common sense<br>2 approach that you would not do that because in<br>3 fear of, you know, a brother who is not part of<br>4 the crime, being implicated.  It is not fair to<br>5 the process.<br>6   Q.  (By Ms. Paras) Okay.  So, you are not<br>7 sure if there was a formal policy, but was it a<br>8 best practice?<br>9       MR. ROACH:  Object to form.<br>10       MR. COOPER:  Join.<br>11       MS. EVERS GUERRA:  Join.<br>12   A.  Again, I would say this.  It depends on<br>13 the circumstances.  If you don't know that is<br>14 your brother -- they were brothers or cousins and<br>15 it inadvertently happened, well, if it is a fair<br>16 lineup, it is a fair lineup.  If those people --<br>17 if the cousin matches the description of the<br>18 suspect, well, it is still to me would be a fair<br>19 lineup.<br>20   ==Q.  (By Ms. Paras)  I see.  But it was==<br>21 ==generally expected that if the officer knew he==<br>22 ==had brothers' photos in his hands he should not==<br>23 ==use them in the same lineup, is that correct?==<br>24 ==      MR. ROACH:  Object to form.==<br>25 ==  A.  I can tell you this.  When I was a== |
| Page 35<br>1 remember as a detective in '98, I don't know<br>2 about in 1990 or prior to 1998, I don't know what<br>3 the rule is, what the practice was.  But when I<br>4 was a detective, it was best, if you could avoid<br>5 it, to keep family members out of the lineup.<br>6 But I'm as sure as one can be there are some<br>7 times where you are unaware that the suspect's<br>8 cousin or the suspect's brother is in the photo<br>9 lineup because you just don't know the family.<br>10   Q.  But it sounds like the policy or the<br>11 general practice in 1998, at least, was that if<br>12 an officer did know that there were say two<br>13 brothers photos in their hand, they should not<br>14 put them in the same photo lineup, is that a<br>15 correct summary of your testimony?<br>16       MR. ROACH:  Object to form.<br>17       MS. EVERS GUERRA:  Join.<br>18       MR. COOPER:  Join.<br>19   A.  So, as a rule you would not want to --<br>20 you would not want to have brothers in a photo<br>21 lineup.  But --<br>22   Q.  (By Ms. Paras)  Go ahead.<br>23   A.  I just, I can tell you I don't -- well,<br>24 I don't believe that it was ever a policy to say<br>25 you cannot have brothers or cousins in the | Page 37<br>1 ==detective, the general rule was you stayed away==<br>2 ==from that.==<br>3   Q.  (By Ms. Paras)  Okay.  And it sounds<br>4 like it was also common sense not to use brothers<br>5 in a lineup, is that correct?<br>6   A.  Again, availability, and knowing what's<br>7 going on with the connection to the family, it<br>8 all depends on the circumstances that you are<br>9 dealing with.<br>10   Q.  A few more questions on these filler<br>11 photographs.  So, when choosing filler<br>12 photographs, how did clothing come into play?<br>13   A.  Well, that would be a tough photo lineup<br>14 if you are trying to find five other people with<br>15 a suit on, as a Polaroid.  So it really, really<br>16 hinged on the physical characteristics, not so<br>17 much the clothing, when it comes to -- you are<br>18 referring to a Polaroid lineup.  Because a mug<br>19 shot lineup would have, it is just again<br>20 basically upper chest, neck, up.  There is no<br>21 clothing for a mug shot photo lineup.<br>22   Q.  Okay.  So for a Polaroid lineup the<br>23 general rule was that it was more important what<br>24 physical features the filler photographs had than<br>25 what they were wearing, for example? |

10 (Pages 34 - 37)

Page 162
1  whole academic field of psychology surrounding
2  identification procedures, correct?
3      A.  Yes, ma'am.
4      Q.  And a whole body of academic literature
5  surrounding identification procedures, correct?
6      A.  I have read one article, yes, ma'am.
7      Q.  Okay.  In other words, you don't hold
8  yourself out as an expert in identification
9  procedures, correct?
10     A.  I could just tell you how the KCK PD did
11 our lineups.  I'm not an expert.
12     Q.  Okay.  And you are not familiar, aside
13 from the one article you read, with the body of
14 literature surrounding the psychology around
15 identification procedures, is that correct?
16     A.  I haven't read up on that.
17     Q.  Have you ever taught a course on the
18 psychology surrounding identification procedures?
19     A.  No, ma'am, I have not.
20     Q.  Ever taken such a course?
21     A.  I don't think I was -- I don't think I
22 went to a particular training on lineups.  I
23 can't remember.
24     Q.  And never taken such a course in an
25 academic setting?

Page 163
1      A.  I don't believe so, no.
2      Q.  And so when you say that you reviewed
3  the lineup in this case and it looked like a good
4  lineup, your basis for that is simply your own
5  knowledge of the way you did things as a police
6  officer, is that correct?
7           MR. ROACH:  Object to form.
8           MR. COOPER:  Join.
9      A.  I would say by looking at the
10 photographs and the characteristics of each
11 person and the suspect in that case, in my
12 opinion that was a valid lineup.
13     Q.  (By Ms. Freudenberger)  Okay.  You are
14 basing that on the similarity and physical
15 appearance among the members of the lineup?
16     A.  It looks to me like a fair lineup.
17     Q.  Okay.  And in your opinion the fact that
18 one of Lamonte McIntyre's cousins was in the
19 lineup does not make it an unfair lineup?
20     A.  No, ma'am, I don't believe so.  They
21 don't look alike.
22     Q.  What about if his brother was in the
23 lineup?
24     A.  Well, it would hinge on -- was his
25 brother not in the lineup?

Page 164
1      Q.  So, my first question is, does having a
2  brother in the photo lineup make it unfair, or
3  can you not say one way or another?
4      A.  Well, I would say if the brother, I
5  mean, doesn't really look like the suspect, I
6  could see where you would do that, even though,
7  like I said, the best practice would be not to do
8  that.  But that would be a fair lineup.
9      Q.  What is your basis for stating that?
10     A.  You still have five to six black males
11 that look like one another, meet the same -- have
12 the same, relatively same features, about the
13 same age, pretty close to the same skin tone,
14 things like that.
15     Q.  All right.  So your testimony is the
16 lineup in this case was a fair lineup, even
17 though it included a two year old picture of the
18 suspect, as well his brother and his cousin, is
19 that correct?
20          MR. COOPER:  Object to form.
21 Misstates facts.  Go ahead.
22          MS. EVERS GUERRA:  Join.
23          MR. ROACH:  Join.
24     A.  By looking at those five photographs,
25 again I'm going to say it was, to me it was a

Page 165
1  fair lineup.
2      Q.  (By Ms. Freudenberger)  Okay.  What is
3  the legitimate law enforcement -- well,
4  withdrawn.  Back in -- by the way, you may have
5  answered this earlier and I just missed it.  But
6  if Lamonte McIntyre's brother was a suspect in
7  the case, would that change your opinion about
8  whether it was a fair lineup?
9      A.  If that was known at the time, I would
10 say you need to separate those two lineups.  That
11 would be something that would be done by the
12 detectives knowing okay, we have two suspects, we
13 need two separate lineups.
14     Q.  You don't just, as a matter of basic
15 police practice, you don't include multiple
16 suspects in a photo array, correct?
17          MR. COOPER:  Object to form.
18     A.  It is one suspect per lineup.
19     Q.  (By Ms. Freudenberger)  Okay.  That's
20 just basic police investigation 101, correct?
21          MR. COOPER:  Object to form.
22          MS. EVERS GUERRA:  Join.
23          MR. ROACH:  Join.
24     A.  That's the practice, that's how I know
25 we do things.

42 (Pages 162 - 165)

Page 166

1  Q. (By Ms. Freudenberger) And we don't
2  have to go through them, but there are a number
3  of policing reasons for that minimally accepted
4  practice, correct?
5      MR. COOPER: Object to form. He
6  wasn't here to explain the reasons for them, just
7  to explain what they were, what the practices
8  were.
9  A. What's the question again?
10 Q. (By Ms. Freudenberger) I'm not asking
11 for all of the reasons, but there are a number of
12 investigative reasons not to include multiple
13 suspects in one photo array, correct?
14     MR. COOPER: Not a 30(b)(6) topic.
15 You can answer.
16 A. If you have two suspects and one crime,
17 you have to separate the two.
18 Q. (By Ms. Freudenberger) All I'm asking
19 you is --
20 A. It is not fair to the suspect. You are
21 not doing the five and six photographs like you
22 should, so it would be one suspect, one lineup,
23 five photographs, and the second suspect, another
24 lineup with five photographs.
25     MS. FREUDENBERGER: I think that's

Page 167

1  all I have.
2      MR. COOPER: Before we close the
3  record, let me consult with Charles real quick
4  about something.
5      (Short recess was taken.)
6          EXAMINATION
7  BY MR. ROACH:
8  Q. Very quick, sir. There were some
9  questions about that followed my questions about
10 not documenting in writing, at least, a positive
11 identification, and instead verbally telling the
12 district attorney about it. And the series of
13 questions from plaintiff's counsel ended with a
14 discussion about well, what if the person's name
15 is already in the file would there really be any
16 safety incentive to not include their name along
17 with the positive identification if that were the
18 case. In other words, if the name is already in
19 the file. Do you recall that line of
20 questioning?
21 A. Yes, sir.
22 Q. Okay. So I want to pick up right there.
23 What if the scenario is this, though. What if
24 the scenario is the person's name is in the file
25 but the prior references to that name did not

Page 168

1  include a positive identification from that
2  person, they subsequently give a positive
3  identification. Under that scenario, if you were
4  concerned about that witness's safety would there
5  be reason to not put in writing that subsequent
6  positive identification?
7  A. So, if you had a positive ID, right?
8  Q. Yes, and that person is concerned about
9  their safety.
10 A. Right. But her name is already in the
11 case file?
12 Q. Correct.
13 A. And they don't know if -- so I'm trying
14 to --
15 Q. Let me try to clarify. The name is
16 previously in the file.
17 A. Right.
18 Q. But there hadn't been a positive
19 identification by that person, thus no reference
20 yet to a positive identification by that person.
21 Okay?
22 A. Right.
23 Q. Subsequently you get a positive
24 identification from that person. If there are
25 safety concerns coming from that witness, what I

Page 169

1  want to know is, is would you have incentive to
2  then not put in writing that positive
3  identification if you were seeking to protect the
4  witness?
5  A. I mean, I think my --
6      MS. FREUDENBERGER: Objection.
7  Q. (By Mr. Roach) Go ahead.
8  A. I think my answer stays the same. I
9  think if the witness in a subsequent ID is still
10 concerned for her safety, then I think you have
11 the duty to protect that person. And if she is
12 -- that person is requesting not to have her name
13 attached to that particular ID or that particular
14 photo lineup, then I think we stay the course.
15 Q. In other words, the name might be out
16 there, but the identification is not publicly out
17 there?
18 A. Right, that is correct.
19 Q. Do I have that right?
20 A. You have that right.
21     MR. ROACH: Nothing further.
22     MS. EVERS GUERRA: Nothing. Thank
23 you.
24         EXAMINATION
25 BY MR. COOPER: