# EXHIBIT 77

```
 1            IN THE UNITED STATES DISTRICT COURT
                   FOR THE DISTRICT OF KANSAS
 2

 3   LAMONTE MCINTYRE, et al.,

 4         Plaintiffs,

 5   -vs-                            2:18-CV-02545-KHV-KGG

 6   UNIFIED GOVERNMENT OF
     WYANDOTTE COUNTY
 7   AND
     KANSAS CITY, KANSAS, et al.,
 8
           Defendants.
 9

10         THE VIDEO RECORDED DEPOSITION OF
                  CECIL A. BROOKS,
11
     produced, sworn and examined on the part of the
12   Defendants, pursuant to Notice of Deposition on
     September 7, 2021, at the Robert J. Dole Federal
13   Courthouse, 500 State Avenue, in the City of
     Kansas City, in the County of Wyandotte, and
14   State of Kansas, before me,

15
                    BRENT W. CHRISTOPHER
16       (Mo) CCR NO. 883 - (Ks) CCR NO. 1193
                            of
17            CHRISTOPHER VIDEO & REPORTING

18
     a Certified Court Reporter in and for the States
19   of Missouri and Kansas.

20

21

22

23

24

25
```

CERTIFIED COPY

## Page 2

```
                    APPEARANCES

For the Plaintiffs:

        LATHROP GPM, LLP
        2345 Grand Blvd., Suite 2200
        Kansas City, MO 64108
        816.292.2000
        alana.mcmullin@lathropgpm.com
     By: Ms. Alana McMullin
   and
        MORGAN PILATE, LLC
        926 Cherry Street
        Kansas City, MO 64106
        816.471.6694
        cpilate@morganpilate.com
     By: Ms. Cheryl A. Pilate

For Defendants Unified Government of Wyandotte
County and Kansas City, Kansas:
        FISHER, PATTERSON, SAYLER & SMITH, LLP
        3550 SW Fifth Street
        Topeka, KS 66606
        785.232.7761
        cbranson@fpsslaw.com
        dcooper@fpsslaw.com
     By: Mr. Charles E. Branson
         and Mr. David Cooper

For Defendant Roger Golubski:

        MCCAULEY & ROACH, LLC
        527 W. 39th Street, Suite 200
        Kansas City, Missouri 64111
        816.523.1700
        morgan@mccauleyroach.com
     By: Mr. Morgan L. Roach
   and
        ENSZ & JESTER, PC
        1100 Main Street, Suite 2121
        Kansas City, MO 64105
        816.474.8010
        gist@enszjester.com
     By: Mr. Matthew Gist
```

## Page 3

```
                APPEARANCES (Cont'd)
For Defendants The Estate of Detective James
Michael Krstolich, Detective Dennis Ware, Officer
James L. Brown, The Estate of Lieutenant Dennis
Otto Barber, Detective Clyde Blood, Detective
W.K. Smith, and Estate of Lieutenant Steve Culp:
        SANDERS, WARREN, RUSSELL & SHEER, LLP
        11225 College Blvd., Suite 450
        Overland Park, KS 66210
        913.234.6100
        t.hayes@swrsllp.com
     By: Ms. Tracy M. Hayes (Via Zoom)

For the witness Cecil Brooks:

        REDMON LAW FIRM
        831 Armstrong
        Kansas City, Kansas 66101
        913.342.5917
        michael@mredmonlaw.com
     By: Mr. Michael Redmon
Also appearing via Zoom:
        Mr. Lamonte McIntyre, Plaintiff
        Mr. Christopher Napolitano
        Ensz & Jester, P.C.

        Mr. Edward James Bain, III
        Unified Government of Wyandotte County
        Kansas City, Kansas

        Ms. Emma Freudenberger
        Neufeld, Scheck & Brustin, LLP
Videographer/Videoconference Moderator:
        CHRISTOPHER VIDEO & REPORTING
        City Center Square
        1100 Main Street, Suite 2060
        Kansas City, Missouri 64105
        816.471.7800
        brent@christophervideo.com
     By: Mr. Brent W. Christopher
                    ***
```

## Page 4

```
                I N D E X
                                    Page
Examination by Mr. Gist               5
Examination by Mr. Branson           12
Examination by Ms. Guerra            13
Examination by Ms. Pilate            14
Examination by Mr. Gist              42
Signature Page                       45
Reporter's Certificate               47

                    ***

        Exhibit No.     Idfd
            97   -       6
            98   -       6

         (Exhibits are attached.)
```

## Page 5

1  (The deposition commenced at 9:40 a.m.)
2         CECIL A. BROOKS,
3  of lawful age, after having been first duly sworn
4  to tell the truth, the whole truth, and nothing
5  but the truth, testified as follows:
6         EXAMINATION
7  BY MR. GIST:
8    Q. Mr. Brooks, would you please state your
9  full name?
10   A. Cecil A. Brooks.
11   Q. Mr. Brooks, my name is Matt Gist, I'm
12 here this morning -- I'm here this morning to
13 take your deposition in a civil case, a civil
14 lawsuit that was filed by Lamonte and Rosie
15 McIntyre against the Unified Government and some
16 police officers. And the civil case pertains to
17 Lamonte McIntyre's conviction back in 1994 for
18 double murder of Doniel Quinn and Donald Ewing.
19 And that's what the civil case is about, is about
20 Lamonte McIntyre's conviction of those two -- the
21 murder of those two persons. The only reason I
22 was here to take -- the primary reason I wanted
23 to take your deposition today is that plaintiff's
24 counsel has provided in the discovery of the
25 civil case those two documents in front of you,

Page 6
1  Exhibits 97 and 98. And Mr. Brooks, I don't mean
2  to hurry you, in fact, I'd like you to take your
3  time.
4      A.  Yes, go ahead.
5      Q.  I'm sorry?
6      A.  Go ahead.
7      Q.  So can you identify, do you recognize
8  these two documents in front of you, 97 and 98?
9      A.  Yes, I have seen them before.
10     Q.  Okay. And the 98, if you would turn to
11 the last page, is that your signature on the last
12 page of Exhibit 98?
13     A.  I will take the Fifth Amendment on that,
14 sir, please.
15     Q.  I apologize. Could you say that again?
16     A.  I would like to take the Fifth Amendment
17 on that.
18     Q.  Okay. And I was going to ask you some
19 questions about Exhibit 98, and I understand you
20 might be pleading the Fifth Amendment to that and
21 that's fine, I just need to clarify. So are you
22 taking the Fifth Amendment as to any questions
23 about Exhibit 98?
24     A.  Yes.
25     Q.  Will you tell me who presented this

Page 7
1  document to you? Who gave you Exhibit 98 to
2  begin with?
3      A.  I have to plead the Fifth on that. I
4  have no recollection of that.
5      Q.  At any point in time did you talk to a
6  gentleman by the name of Jim McClusky? He would
7  have -- he testified at a hearing that he came
8  down to Yazoo City, Mississippi and met with you
9  while you were incarcerated. Do you recall any
10 such meeting?
11     A.  I have talked to so many people, I can't
12 give you no names, no, sir.
13     Q.  So sitting here today, you don't
14 specifically recall a meeting with Jim McClusky?
15     A.  The name don't ring no bell, sir, I'm
16 sorry.
17     Q.  Do you recall any gentleman, Jim
18 McClusky or anyone else, ever suggesting to you
19 that if you signed this affidavit, Exhibit 98,
20 that you might benefit with an early release from
21 incarceration?
22     A.  Have nobody never proposition me with
23 anything, sir.
24     Q.  Okay.
25     A.  I did my whole sentence.

Page 8
1      Q.  Do you recall a gentleman by the name of
2  Aaron Robinson?
3      A.  Yes.
4      Q.  And was he a cousin of yours?
5      A.  Yes.
6      Q.  Do you have any knowledge of
7  Mr. Robinson being involved in the drug trade in
8  the early to mid 1990s?
9      A.  I respectfully take the Fifth Amendment
10 on that, sir.
11     Q.  Do you have any knowledge of Aaron
12 Robinson ordering a person by the name of Neil
13 Edgar, Junior, street name Monster, to carry out
14 a drug hit against Doniel Quinn in 1994?
15     A.  I would take the Fifth on that, sir,
16 respectfully.
17     Q.  Do you have any knowledge of Aaron
18 Robinson directing Neil Edgar, Junior, otherwise
19 known as Monster, or anyone else, to try and
20 intimidate the Quinn family so they would not
21 testify in court?
22         MR. REDMON: Objection. It's a
23 compound question and it's also leading. Form of
24 the question.
25         MR. GIST: I'll break it down. I

Page 9
1  agree.
2  BY MR. GIST:
3      Q.  Do you have any knowledge of Aaron
4  Robinson directing Neil Edgar, Junior to make any
5  type of threats to the Quinn family?
6          MR. REDMON: Objection to the form
7  of the question.
8  BY MR. GIST:
9      Q.  If you understand you can provide an
10 answer. Do you understand the question?
11     A.  I don't understand the question.
12     Q.  Did you know a lady by the name of Nico
13 Quinn in the 1990s?
14     A.  No, sir.
15     Q.  Did you know a gentleman by the name of
16 Chris Harris in the 1990s?
17     A.  No, sir.
18     Q.  Do you have -- it's my understanding
19 that Nico Quinn's family is very large. Did you
20 know any of the Quinn family in the 1990s in the
21 Kansas City, Kansas area?
22     A.  It's a large family. They are a large
23 family, so...
24     Q.  But as far as Nico, maybe if she went by
25 Nicole, you have no -- you didn't know Nico or

Page 10

1  Nicole Quinn?
2  A. No, sir.
3  Q. And did you know a gentleman by the name
4  of Chris Harris, I believe he had a street name
5  of Sea Love?
6  A. No, sir.
7  Q. Do you know a Doniel Quinn?
8  A. No, sir.
9  Q. So in 2017 there was a hearing, it was
10 October of 2017 I believe, there was a hearing in
11 the Wyandotte County District Court and there was
12 some testimony given by James McClusky wherein he
13 testified that Neil Edgar, Junior, otherwise
14 known as Monster, went to Robert Quinn's house
15 with John Quinn home with a shotgun. Do you have
16 any knowledge of anything like that transpiring?
17 A. I have no knowledge of nothing like
18 that.
19 Q. At this hearing I was speaking of,
20 plaintiff's counsel, Cheryl Pilot, on the record,
21 conveyed to the Court a conversation that she
22 stated that you had with prosecutor Mark Dupree.
23 Do you recall ever speaking to Wyandotte County
24 prosecutor Mark Dupree?
25 A. Yes.

Page 11

1  Q. And do you recall what you told
2  Mr. Dupree?
3  A. I'll take the Fifth on that, sir.
4  Q. Do you have any knowledge whatsoever of
5  Aaron Robinson being involved in a drug hit in
6  April of 1994?
7  A. I have no knowledge of that.
8  Q. Do you know a detective by the Roger --
9  a former detective by the name of Roger Golubski?
10 A. Yes.
11 Q. At any point in time did Mr. Golubski in
12 any fashion work for you?
13 A. I'll take the Fifth on that.
14 Q. Do you have any knowledge of Roger
15 Golubski working on behalf of Aaron Robinson at
16 any point in time?
17 A. I take the Fifth on that.
18 Q. Generally were you familiar with the
19 drug trade in Kansas City, Kansas?
20 A. Take the Fifth on that, sir.
21 Q. Okay. And I understand that, just I
22 think my question got cut off and I understand,
23 but do you have any knowledge of the Kansas City,
24 Kansas drug trade in the early to mid 1990s?
25 A. I take the Fifth on that, sir.

Page 12

1        MR. GIST: At this time,
2  Mr. Brooks, I don't have any other questions. I
3  know there's some other attorneys here but I'll
4  pass the witness.
5        EXAMINATION
6  BY MR. BRANSON:
7  Q. Good morning, Mr. Brooks, my name is
8  Charles Branson, I represent the Unified
9  Government. I have a couple questions for you.
10 You were asked about your affidavit Exhibit 98.
11 The affidavit appears to be prepared in 2011 and
12 signed in 2016. Do you see that on the last page
13 where your signature's at?
14 A. Yes.
15 Q. Do you know when the affidavit was
16 originally presented to you?
17 A. I'll take the Fifth on that, sir.
18 Q. You said you had many conversations with
19 people about this case; is that correct?
20 A. I'll take the Fifth on that.
21 Q. I believe you testified earlier you
22 talked to a lot of people about this case.
23 A. I can't remember. I take the Fifth on
24 that.
25 Q. Well, sir, you already testified about

Page 13

1  that. I don't know that you can take the Fifth
2  on it or not.
3        MR. REDMON: If he wants to take
4  the Fifth, he'll take the Fifth.
5  BY MR. BRANSON:
6  Q. Sir, do you know Neil Edgar, Junior?
7  A. No.
8  Q. Do you know anybody with the nickname
9  Monster?
10 A. I take the Fifth on that, sir.
11       MR. BRANSON: That's all I have.
12       EXAMINATION
13 BY MS. GUERRA:
14 Q. Mr. Brooks, my name is Beth Evers
15 Guerra, I represent several officers in this
16 lawsuit and I have just a few questions for you.
17 Do you know a man by the name of James Krstolich?
18 A. I take the Fifth.
19 Q. Okay. Do you know a man named Dennis
20 Ware?
21 A. Take the Fifth.
22 Q. Do you know a man named Dennis Barber?
23 A. I take the Fifth.
24 Q. Do you know a man named James Brown?
25 A. I take the Fifth.

Page 14

1  Q. Do you know a man named Clyde Blood?
2  A. I take the Fifth.
3  Q. Do you know a man named W.K. Smith?
4  A. I take the Fifth.
5  Q. And do you know a man named Steve Culp?
6  A. I take the Fifth.
7  Q. Okay.
8     MS. GUERRA: I don't have any other
9  questions at this time.
10          EXAMINATION
11 BY MS. PILATE:
12 Q. Good morning, Mr. Brooks.
13 A. Good morning.
14 Q. You recognize your signature when you
15 see it; is that correct?
16 A. I take the Fifth.
17 Q. Okay. Please turn to -- if you'll
18 pardon me for a minute. A little mix-up on
19 deposition numbers.
20    Okay. I'm going to ask you to please
21 have Exhibit 98 in front of you, and please turn
22 to the third page of that exhibit. It's Bates
23 stamped 4829. Okay. Do you see that page, sir?
24 A. Yes.
25 Q. Okay. And do you see what appears to be

Page 15

1  a signature on the line where it says Cecil
2  Brooks?
3  A. I take the Fifth.
4  Q. Okay. Do you recognize your signature?
5  A. Take the Fifth.
6  Q. Is that your signature?
7  A. I take the Fifth.
8  Q. Is it correct, sir, that in the 1990s
9  and into the 2,000s that you were a major figure
10 --
11 A. I take the Fifth.
12 Q. -- in crack cocaine dealing in Kansas
13 City, Kansas?
14 A. I respectfully take the Fifth.
15 Q. Okay. And if you could, please, for the
16 sake of the court reporter and the record, let me
17 get my entire question out. Sometimes it might
18 be a little longer than you expect, and then when
19 my question is done then you can answer, and
20 we'll try and get a good flow going here, okay?
21 A. Okay.
22 Q. Do you have a number of family members
23 in the Kansas City, Kansas area who are involved
24 in the drug business?
25 A. I take the Fifth.

Page 16

1  Q. Okay. Is one of those family members
2  Joe Robinson, who is your brother?
3  A. I take the Fifth.
4  Q. And prior to his death in 1996, you were
5  also a cousin of Aaron Robinson, correct?
6     MR. GIST: Object to the question,
7  misstates facts not in evidence. Is that Joe
8  Robinson?
9     MS. PILATE: Yes.
10 BY MS. PILATE:
11 Q. I apologize for any lack of clarity
12 here. You are related to Joe Robinson, sir, are
13 you not?
14 A. I take the Fifth.
15 Q. Okay. You're related to Jerry Robinson
16 known as Dee Dee, are you not?
17 A. I take the Fifth.
18 Q. And you're related to Richard Robinson
19 known as Bone, correct?
20 A. I take the Fifth.
21 Q. And prior to his death, Aaron Robinson
22 was your first cousin, correct?
23 A. I take the Fifth.
24 Q. Okay. In the course of engaging in the
25 drug trade, you also associated with other

Page 17

1  persons, correct?
2  A. I take the Fifth.
3  Q. Would one of those persons be Wendell
4  Anderson, also known as Tank?
5  A. I take the Fifth.
6  Q. At a time when Aaron Robinson reached
7  adulthood, you taught him how to handle the drug
8  trade, correct?
9  A. I take the Fifth.
10 Q. You mentored him; isn't that right?
11 A. I take the Fifth.
12 Q. You helped him get his own spot; isn't
13 that right?
14 A. I take the Fifth.
15 Q. The area that you were active in the
16 drug trade was centered around parts of Quindaro,
17 and specifically the area of 18th to 27th and
18 Quindaro, correct?
19 A. I take the Fifth.
20 Q. And Aaron Robinson had a drug spot on
21 21st near Quindaro, correct?
22 A. I take the Fifth.
23 Q. And Aaron Robinson learned the drug
24 business quickly and he adapted rapidly to it, he
25 was a good learner, correct?

Page 18
1   A. I take the Fifth.
2   Q. Aaron had his own crew, correct?
3   A. I take the Fifth.
4   Q. And he was a natural at the drug
5   business, correct?
6   A. I take the Fifth.
7   Q. And although you and Aaron were closely
8   related and shared many things, Aaron ran his
9   spot as he saw fit, correct?
10   A. I take the Fifth.
11   Q. And you had some drug spots in that same
12   area, did you not?
13   A. I take the Fifth.
14   Q. You also had something called trap
15   houses, correct?
16   A. I take the Fifth.
17   Q. You had stash houses for storing drugs,
18   correct?
19   A. I take the Fifth.
20   Q. And you had houses for selling drugs,
21   correct?
22   A. I take the Fifth.
23   Q. And in fact, the entire area up and down
24   Quindaro, and specifically in the area of 18th
25   and Quindaro, was infested with drugs and drug

Page 19
1   houses in the 1990s, correct?
2   A. I take the Fifth.
3   Q. And you made a lot of money during that
4   time; is that correct?
5   A. I take the Fifth.
6   Q. And during that time you became
7   acquainted with certain police officers, correct?
8   A. I take the Fifth.
9   Q. And you were well acquainted with Roger
10   Golubski, correct?
11   A. No.
12   Q. When did you first know Roger Golubski?
13   A. I take the Fifth.
14   Q. You knew Roger Golubski in the 1980s,
15   correct?
16   A. I take the Fifth.
17   Q. You have once referred to Roger Golubski
18   as a terrible man or an evil man, correct?
19   A. I take the Fifth.
20   Q. Golubski did things that you didn't
21   like, correct?
22   A. I take the Fifth.
23   Q. Golubski demanded money from drug
24   dealers, correct?
25   A. I take the Fifth.

Page 20
1   Q. And you paid Golubski because that was a
2   necessary part of staying in business, correct?
3   A. I take the Fifth.
4   Q. You were an informant for the Kansas
5   City, Kansas Police Department; is that correct?
6   A. I take the Fifth.
7   Q. You were an informant for Federal law
8   enforcement; is that correct?
9   A. I take the Fifth.
10   Q. In the course of acting as an informant,
11   you provided information to the Kansas City,
12   Kansas Police Department, correct?
13   A. I take the Fifth.
14   Q. And as a result of information that you
15   provided, other people and not you, were arrested
16   for drug activity, correct?
17   A. I take the Fifth.
18   Q. And your role as an informant for
19   Federal law enforcement, you provided information
20   that was used to bring cases against particular
21   individuals, correct?
22   A. I take the Fifth.
23   Q. Did you have anything to do with an
24   investigation of someone named Frank Ashley?
25   A. I take the Fifth.

Page 21
1   Q. As a result of your work as an
2   informant, were you allowed to engage in criminal
3   activity without repercussion?
4   A. I take the Fifth.
5   Q. During the entire time that you engaged
6   in drug activity in Kansas City, Kansas, and I'm
7   drawing your attention to the 80s, the 90s and
8   the 2000s, during that entire time period did you
9   ever do any prison time on a state case?
10   A. I take the Fifth.
11   Q. Do you have any felony convictions
12   arising from Wyandotte County?
13   A. I take the Fifth.
14   Q. Were you protected from being criminally
15   charged as a result of your connection with Roger
16   Golubski or your work as an informant?
17   A. I take the Fifth.
18   Q. Golubski kept you briefed on what was
19   going on in the department, correct?
20   A. I take the Fifth.
21   Q. At one point you amassed enough in
22   resources to buy an apartment complex, correct?
23   A. I take the Fifth.
24   Q. And that was Delavan Apartments, right?
25   A. I take the Fifth.

Page 22

1  Q. And you were present there frequently
2  before you officially purchased it, correct?
3  A. I take the Fifth.
4  Q. And it was you and your relative,
5  Richard Robinson, who were the owners of record
6  of that complex, correct?
7  A. I take the Fifth.
8  Q. And you became owners in approximately
9  1994, correct?
10 A. I take the Fifth.
11 Q. And during that time period that you
12 owned Delavan Apartments, Golubski was a frequent
13 visitor there, wasn't he?
14 A. I take the Fifth.
15 Q. And he met with you frequently, correct?
16 A. I take the Fifth.
17 Q. He met with you behind closed doors,
18 correct?
19 A. I take the Fifth.
20 Q. And you met with him at his vehicle,
21 correct?
22 A. I take the Fifth.
23 Q. And the purpose of that was to allow you
24 to continue your crack cocaine business unimpeded
25 by any arrest or criminal case, correct?

Page 23

1  A. I take the Fifth.
2  Q. And on Golubski's part, he also had a
3  connection with someone, you, who reaped a lot of
4  profits from the crack cocaine trade, correct?
5      MR. GIST: Object to form.
6  BY MS. PILATE:
7  Q. You can answer.
8  A. I take the Fifth.
9  Q. You paid Golubski from time to time,
10 correct?
11 A. I take the Fifth.
12 Q. Other people saw you hand him boxes and
13 envelopes, correct?
14 A. I take the Fifth.
15 Q. And other people saw hand-to-hand cash
16 transactions between you and Golubski, correct?
17     MR. GIST: Object to form.
18 A. I take the Fifth.
19 BY MS. PILATE:
20 Q. You paid Roger Golubski to keep yourself
21 and your gang out of trouble, correct?
22 A. I take the Fifth.
23 Q. And as a result of your close
24 relationship with Roger Golubski, no one in your
25 gang was even investigated for the double

Page 24

1  homicide of Donald Ewing and Doniel Quinn,
2  correct?
3  A. I take the Fifth.
4  Q. And as a result of your close
5  relationship with Roger Golubski, other members
6  of your gang were not criminally charged for very
7  serious and violent crimes; is that correct?
8      MR. GIST: Object to the form.
9  A. I take the Fifth.
10 BY MS. PILATE:
11 Q. To your knowledge was Joe Robinson ever
12 charged for the murder of Vicki Hollinshed-Dew?
13 A. I take the Fifth.
14 Q. Let's return to Tank, who's real name or
15 legal name was Wendell Anderson. Did Wendell
16 Anderson ever suffer any charge for a violent
17 crime he committed on your behalf?
18     MR. GIST: Object to form.
19 A. I take the Fifth.
20 BY MS. PILATE:
21 Q. Well, let me -- strike that. I'll start
22 over.
23     Wendell Anderson was known as your
24 enforcer, correct?
25 A. I take the Fifth.

Page 25

1  Q. He went by the name of Tank, correct?
2  A. I take the Fifth.
3  Q. And his job was to take care of business
4  and to get troublesome people out of the way and
5  to threaten people who threatened your business,
6  correct?
7      MR. GIST: Object to form.
8  A. I take the Fifth.
9  BY MS. PILATE:
10 Q. And Wendell Anderson never suffered any
11 criminal charge as a result of threatening or
12 violent acts he did on your behalf, correct?
13     MR. GIST: Object to form.
14 A. I take the Fifth.
15 BY MS. PILATE:
16 Q. Were you involved with Wendell Anderson
17 in the drug trade?
18 A. I take the Fifth.
19 Q. Did Wendell Anderson kill Beatrice
20 Russell?
21 A. I take the Fifth.
22 Q. Was Wendell Anderson spared a criminal
23 case, if you know, with the intervention of Roger
24 Golubski in that case?
25 A. I take the Fifth.

Case 2:18-cv-02545-KHV-KGG   Document 605-49   Filed 04/22/22   Page 9 of 14

26..29

Page 26

1  Q.  Was it Golubski's job to make sure that
2  you and people who were part of your drug gang
3  were protected from criminal consequences for
4  your actions?
5  A.  I take the Fifth.
6  Q.  Isn't it true that Aaron Robinson had a
7  number of young enforcers or shooters working for
8  him?
9      MR. GIST:  Object to form.
10 A.  I take the Fifth.
11 BY MS. PILATE:
12 Q.  Okay. And those enforcers were called
13 cats or thunder cats, right?
14 A.  I take the Fifth.
15 Q.  Okay. And you recognize one of those
16 thunder cats, who is closely or was closely
17 affiliated with Aaron as being a young man with
18 the street name of Monster, correct?
19 A.  I take the Fifth.
20 Q.  You recall Monster as someone who was
21 affiliated with Aaron Robinson, correct?
22 A.  I take the Fifth.
23 Q.  And you recall Aaron Robinson as someone
24 who was a shooter and willing to do whatever
25 Aaron needed or wanted?

Page 27

1  A.  I take the Fifth.
2      MS. HAYES:  Apologies, Cheryl. I
3  think you misspoke and said Aaron Robinson
4  instead of Monster.
5      MS. PILATE:  I'm sorry, let's do
6  that question over again.
7  BY MS. PILATE:
8  Q.  You recognized Monster as someone who
9  would do whatever Aaron Robinson needed, correct?
10 A.  I take the Fifth.
11 Q.  Because that was his job, he was a
12 little thunder cat working for Aaron, correct?
13 A.  I take the Fifth.
14 Q.  And drug gangs typically use juveniles
15 to carry out violent crimes because the criminal
16 consequences to them were less severe, correct?
17     MR. GIST:  Object to form.
18 A.  I take the Fifth.
19 BY MS. PILATE:
20 Q.  At some point you became aware of a
21 doorman who worked at Aaron's spot, correct?
22 A.  I take the Fifth.
23 Q.  And there were some problems with this
24 doorman, correct?
25 A.  I take the Fifth.

Page 28

1  Q.  And a doorman is someone who has an
2  important position. He manages who comes in and
3  who goes out at a drug spot, correct?
4      MR. GIST:  Object to form.
5  A.  I take the Fifth.
6  BY MS. PILATE:
7  Q.  At some point you learned that there was
8  a great deal of upset or anger over the fact that
9  the doorman at Aaron's spot was suspected of
10 stealing dope, correct?
11 A.  I take the Fifth.
12 Q.  And the theft of drugs was a matter to
13 be dealt with seriously, correct?
14 A.  I take the Fifth.
15 Q.  And there were conversations about the
16 fact that the doorman at the spot had stolen
17 dope, correct?
18 A.  I take the Fifth.
19 Q.  And when dope was stolen, trouble came,
20 right?
21 A.  I take the Fifth.
22 Q.  It has to be avenged, correct?
23 A.  I take the Fifth.
24 Q.  And you knew that this little thunder
25 cat was devoted to Aaron, right?

Page 29

1  A.  I take the Fifth.
2  Q.  And would do what Aaron needed, correct?
3  A.  I take the Fifth.
4  Q.  These little thunder cats were also paid
5  sometimes for doing tasks on behalf of the people
6  they worked for, correct?
7  A.  I take the Fifth.
8  Q.  When a large amount of dope goes
9  missing, someone had to pay for that, correct?
10 A.  I take the Fifth.
11 Q.  Those were the rules in those days,
12 correct?
13 A.  I take the Fifth.
14 Q.  And there was, in fact, a group
15 discussion about this troublesome situation at
16 Aaron's spot where dope went missing, correct?
17 A.  I take the Fifth.
18 Q.  And present at that discussion was Aaron
19 and Marlin and Monster and you, correct?
20 A.  I take the Fifth.
21 Q.  And there were a couple other guys there
22 whose names you don't recall, correct?
23 A.  I take the Fifth.
24 Q.  And you knew as a result of that
25 discussion and the fact there had to be a

CHRISTOPHER VIDEO & REPORTING
816.471.7800  cvandr.com  816.471.7998 (Fax)

1100 Main Street, Suite 2060
Kansas City, Missouri  64105

Page 30

1  response to the theft of dope that something was
2  going to happen, correct?
3     A.  I take the Fifth.
4     Q.  And you knew, based on how Aaron did
5  business and what the rules were, that Monster
6  did that shooting of the two men in the car on
7  Hutching Street shortly thereafter, correct?
8     A.  I take the Fifth.
9     Q.  And people in your group were upset
10 because two guys ended up getting killed instead
11 of just one, correct?
12    A.  I take the Fifth.
13    Q.  And two guys being killed would tend to
14 bring down a little more heat, a little more
15 attention, correct?
16    A.  I take the Fifth.
17    Q.  At the same time you also knew you had
18 someone at the police department who could help
19 take care of things for you, correct?
20    A.  I take the Fifth.
21    Q.  The people in your group were well
22 acquainted with Roger Golubski, who investigated
23 homicides, correct?
24        MR. GIST:  Object to form.
25    A.  I take the Fifth.

Page 31

1  BY MS. PILATE:
2     Q.  Roger Golubski was a powerful detective
3  at the department at the time, correct?
4        MR. GIST:  Object to form.
5     A.  I respectfully take the Fifth.
6  BY MS. PILATE:
7     Q.  And you knew this situation would have
8  to be handled in some way with an investigation,
9  correct?
10       MR. GIST:  Object to form.
11    A.  I take the Fifth.
12 BY MS. PILATE:
13    Q.  And other situations people could be
14 killed in the course of drug trafficking and they
15 would just go missing and no one would ever find
16 them, correct?
17       MR. GIST:  Object to form.
18    A.  I take the Fifth.
19 BY MS. PILATE:
20    Q.  You heard about Monster doing at least
21 one other murder, correct?
22    A.  I take the Fifth.
23    Q.  A murder of a white guy who was never
24 found; is that right?
25    A.  I take the Fifth.

Page 32

1     Q.  And you knew based on Monster's
2  reputation that he was willing to do about
3  anything, he was wild and he was a shooter,
4  correct?
5     A.  I take the Fifth.
6     Q.  And you knew when that shooting, that
7  double homicide went down, that Monster had done
8  it on behalf of Aaron, correct?
9     A.  I take the Fifth.
10    Q.  And you also knew that Golubski had the
11 investigation in hand and would take care of
12 things, correct?
13       MR. GIST:  Object to form.
14    A.  I take the Fifth.
15 BY MS. PILATE:
16    Q.  And by take care of things, that meant
17 keeping you or anyone in your group, your drug
18 dealing group from suffering any criminal
19 consequence, correct?
20    A.  I take the Fifth.
21    Q.  You knew that the case would either end
22 up unsolved, or some other person who had nothing
23 to do with it was going to be charged, correct?
24       MR. GIST:  Object to form.
25    A.  I take the Fifth.

Page 33

1  BY MS. PILATE:
2     Q.  And making sure that you and Aaron and
3  people in your gang were not charged also served
4  a purpose for Golubski, correct?
5        MR. GIST:  Object to form.
6     A.  I take the Fifth.
7  BY MS. PILATE:
8     Q.  Because powerful and very active drug
9  dealers like you and others in your gang provided
10 profits to certain police officers, correct?
11    A.  I take the Fifth.
12    Q.  Golubski made money from drug dealing by
13 members of your gang, correct?
14    A.  I take the Fifth.
15    Q.  Golubski also made money by selling
16 drugs himself, correct?
17       MR. GIST:  Object to form.
18    A.  I take the Fifth.
19 BY MS. PILATE:
20    Q.  And you and Golubski talked frequently
21 about the drug business, correct?
22    A.  I take the Fifth.
23    Q.  He met with you at Delavan, correct?
24    A.  I take the Fifth.
25    Q.  And when I say Delavan, I mean the

### Page 34

1  apartments, correct?
2  A. I take the Fifth.
3  Q. There was an office there, right?
4  A. I take the Fifth.
5  Q. And in that office you kept stashed
6  money, firearms, and drugs, correct?
7  A. I take the Fifth.
8  Q. And you and Golubski met there
9  frequently, correct?
10 A. I take the Fifth.
11 Q. You also later owned a service station
12 near the corner of 18th and Quindaro that
13 actually was about a block east of 18th and
14 squarely on the corner of Hutchings and Quindaro,
15 correct?
16 A. I take the Fifth.
17 Q. Okay. And that service station during
18 the time that you owned it was called McCall's,
19 correct?
20 A. I take the Fifth.
21 Q. And Golubski frequently visited you
22 there as well?
23 A. I take the Fifth.
24 Q. And people at the service station and in
25 that area would have seen you talking to Golubski

### Page 35

1  on a frequent basis, correct?
2  A. I take the Fifth.
3  Q. And you took money that you had on site
4  at McCall's and gave it to Golubski, correct?
5  A. I take the Fifth.
6  Q. Golubski expected you to turn over some
7  of your drug profits to him, correct?
8  A. I take the Fifth.
9     MR. GIST: Object to form.
10 BY MS. PILATE:
11 Q. You first entered into a business
12 relationship with Roger Golubski prior to 1994,
13 correct?
14 A. I take the Fifth.
15 Q. And in fact you knew him in the 1980s,
16 correct?
17 A. I take the Fifth.
18 Q. You were working at Church's Chicken
19 then, correct?
20 A. I take the Fifth.
21 Q. And that was at the same time that you
22 started your drug business, correct?
23 A. I take the Fifth.
24 Q. And you spoke with him frequently in
25 1993 and 1994, correct?

### Page 36

1  A. I take the Fifth.
2  Q. When you purchased the property called
3  Delavan Apartments, you purchased that property
4  with proceeds from the drug business, correct?
5  A. I take the Fifth.
6  Q. And in fact the Delavan Apartments were
7  a hot bed of drug activity, correct?
8  A. I take the Fifth.
9  Q. There was also prostitution going on
10 there, correct?
11 A. I take the Fifth.
12 Q. And there were men having sex with under
13 aged women, correct?
14 A. I take the Fifth.
15 Q. Yet police rarely visited Delavan
16 Apartments, except when you called in as a
17 victim; is that correct?
18    MR. GIST: Object to form.
19 A. I take the Fifth.
20 BY MS. PILATE:
21 Q. Do you know of any time when the police
22 investigated activity at Delavan Apartments?
23 A. I take the Fifth.
24 Q. The police never investigated, did they?
25 A. I take the Fifth.

### Page 37

1  Q. The police never conducted a raid at
2  Delavan, did they?
3  A. I take the Fifth.
4  Q. And the police never conducted a raid at
5  McCall's, did they?
6  A. I take the Fifth.
7  Q. Women were permitted to stay for free at
8  Delavan if they provided sexual services,
9  correct?
10 A. I take the Fifth.
11 Q. And one of the people who availed
12 themselves of sexual services at Delavan was
13 Roger Golubski, correct?
14 A. I take the Fifth.
15 Q. And before 1994 and during 1994 and
16 after '94, Roger Golubski routinely tipped you
17 off about investigations and drug raids planned
18 in areas where you did business, correct?
19    MR. BRANSON: Objection to form.
20 A. I take the Fifth.
21 BY MS. PILATE:
22 Q. And the purpose of that was to allow you
23 to avoid arrest, correct?
24 A. I take the Fifth.
25 Q. It also allowed you to moved your drugs,

### Page 38

1  so if a raid occurred your drugs would not be
2  found, correct?
3      A. I take the Fifth.
4      Q. You were aware that Golubski told others
5  that you were an informant and therefore not to
6  investigate you, correct?
7          MR. GIST: Object to form.
8      A. I take the Fifth.
9  BY MS. PILATE:
10     Q. He told others that you were his
11 informants, that you would be arrested, correct?
12     A. I take the Fifth.
13     Q. And that's what Golubski told you,
14 correct?
15     A. I take the Fifth.
16     Q. And with Golubski's protection and being
17 identified as an informant, you were allowed to
18 operate your drug business freely without
19 suffering arrest or prosecution, correct?
20     A. I take the Fifth.
21     Q. And in return you gave Golubski access
22 to drugs, correct?
23     A. I take the Fifth.
24     Q. And young women, correct?
25     A. I take the Fifth.

### Page 39

1      Q. And money, correct?
2      A. I take the Fifth.
3      Q. And you paid Golubski to make sure that
4  you would continue to avoid criminal
5  accountability, correct?
6      A. I take the Fifth.
7      Q. In other words, you paid Roger Golubski
8  to make sure you didn't get arrested in Kansas
9  City, Kansas in the early and mid 90s, correct?
10     A. I take the Fifth.
11     Q. And you paid Golubski to make sure that
12 no one at Delavan got busted or arrested,
13 correct?
14     A. I take the Fifth.
15     Q. And you paid Golubski to make sure no
16 one at Delavan got busted or arrested, despite
17 the drugs and prostitution occurring there,
18 correct?
19     A. I take the Fifth.
20     Q. You routinely met with Golubski at
21 Delavan Apartments in 1994, '95 and '96, correct?
22     A. I take the Fifth.
23     Q. And when the two of you would meet, it
24 would often be in your office behind closed
25 doors, correct?

### Page 40

1      A. I take the Fifth.
2      Q. And at times you would talk to him when
3  he was in his police vehicle, correct?
4      A. I take the Fifth.
5      Q. And you would lean into his vehicle so
6  that other people could not hear what you were
7  saying, correct?
8      A. I take the Fifth.
9      Q. Sitting here today, you know that Roger
10 Golubski was paid to cover up who actually
11 committed the homicide of Doniel Quinn and Donald
12 Ewing?
13         MR. GIST: Object to form.
14     A. I take the Fifth.
15 BY MS. PILATE:
16     Q. And you knew that Monster had been paid
17 some money to carry out that hit, correct?
18     A. I take the Fifth.
19     Q. And you knew that when dope was stolen,
20 the penalty was the person who was suspected of
21 stealing dope, would either suffer a beating or
22 other assault or possibly be killed, correct?
23     A. I plead the Fifth.
24     Q. And sitting here today, you know that
25 Monster was paid to murder Doniel Quinn, correct?

### Page 41

1      A. I take the Fifth.
2          MS. PILATE: You all, I'm going to
3  take a tiny break here. My cocounsel is trying
4  to tell me something. Do you mind if we take
5  five minutes here?
6          THE REPORTER: Okay. We're off.
7          (Recess taken at 10:30 a.m.)
8          THE REPORTER: We're back on.
9  BY MS. PILATE:
10     Q. I will be done in just a minute here, I
11 just have a couple more questions.
12         At some point you heard that a man had
13 been convicted for the double homicide of Doniel
14 Quinn and the man he was with, Donald Ewing,
15 correct?
16     A. I plead the Fifth.
17     Q. And when you heard about this, you heard
18 a name that was not familiar to you, correct?
19     A. I plead the Fifth.
20     Q. And no one had heard of the person that
21 was convicted for that double homicide, correct?
22     A. I plead the Fifth.
23     Q. And you knew that person who was Lamonte
24 McIntyre was innocent of that double homicide,
25 correct?

### Page 42

1  A.  I plead the Fifth.
2  Q.  Okay.
3       MS. PILATE: That's all I have.
4       MR. GIST: I have a few more
5  questions.
6            EXAMINATION
7  BY MR. GIST:
8  Q.  Mr. Brooks, with respect to Exhibit 98,
9  the affidavit, are you taking the Fifth Amendment
10 because of what it says or because part or all of
11 it's untrue?
12 A.  I take the Fifth.
13 Q.  And can we agree that the affidavit does
14 not say -- does not say that Roger Golubski
15 worked for you or Aaron Robinson?
16 A.  I take the Fifth.
17 Q.  Isn't it true that it's not an option
18 for an active drug dealer to snitch and testify
19 in court against a rival drug dealer?
20 A.  I take the Fifth.
21 Q.  If a drug dealer was to go into
22 Wyandotte County District Court and testify that
23 a rival drug dealer killed that witness's cousin,
24 that would be very dangerous, would it not?
25 A.  I take the Fifth.

### Page 43

1  Q.  Witnesses to a drug hit are in danger of
2  being harmed or killed over what they saw; isn't
3  that true?
4  A.  I take the Fifth.
5  Q.  Did Aaron Robinson pay Monster to try
6  and kill Nico Quinn?
7  A.  I take the Fifth.
8  Q.  Did Aaron Robinson pay Monster to try
9  and harm anybody in the Quinn family?
10 A.  I take the Fifth.
11 Q.  Over what Nico Quinn saw?
12 A.  I take the Fifth.
13      MR. GIST: I have no further
14 questions.
15      MS. PILATE: I don't have anything
16 else.
17      MR. BRANSON: Nothing.
18      THE REPORTER: Okay.  What about
19 signature?
20      MR. REDMON: I'd like to have him
21 read it.
22      THE REPORTER: Okay.  Send it to
23 you?
24      MR. REDMON: Yeah.
25      THE REPORTER: All right.  We're

### Page 44

1  off the record.
2       (The deposition concluded at 10:45 a.m.)

### Page 45

```
                  E R R A T A   S H E E T
RE: MCINTYRE VS. UNIFIED GOVT. OF WYANDOTTE CO., ET AL.
DEPOSITION OF:  CECIL A. BROOKS (09/07/21)

PG/LN NO.   CORRECTION            REASON FOR CHANGE

    :_____:_____:_____

    :_____:_____:_____

    :_____:_____:_____

    :_____:_____:_____

    :_____:_____:_____

    :_____:_____:_____

    :_____:_____:_____

    :_____:_____:_____

_____  I certify that I have read my deposition
         in the above case and I request that no
         changes be made.
_____  I certify that I have read my deposition
         in the above case and I request that the
         above changes be made.

              _____
                   CECIL A. BROOKS

STATE OF_____ )
                            SS:
COUNTY OF_____ )

Subscribed and sworn to before me this _____day
of_____, 2021.

              _____
                    NOTARY PUBLIC
My Commission Expires:_____
```

Page 46

September 9, 2021

REDMON LAW FIRM
Atty: Mr. Michael Redmon
Wit: Mr. Cecil A. Brooks
831 Armstrong
Kansas City, Kansas 66101
In Re:
MCINTYRE VS. UNIFIED GOVT. OF WYANDOTTE CO., ET AL.

Dear Mr. Brooks:

Enclosed is a copy of your deposition transcript for your examination and signing. You will also find an errata sheet for your convenience in making any changes or corrections.
Pursuant to the law, any change in "form or substance" of an answer shall be accompanied with a statement of the reason given by you for making such change.
Upon completion of your examination and reading, please sign the enclosed signature page and errata sheet in front of a notary public and return them to this office in the enclosed self-addressed envelope. If we have not received the signed documents from you within 30 days of the date of this letter or by time of trial, whichever occurs first, an unsigned copy of your deposition will be filed.

Sincerely,

CHRISTOPHER VIDEO & REPORTING
BY: BRENT W. CHRISTOPHER
Certified Court Reporter
Enclosures

Page 47

CERTIFICATE

I, Brent W. Christopher, a Certified Shorthand Reporter of the State of Kansas, do hereby certify:

That prior to being examined, the witness was first duly sworn;

That said testimony was taken down by me in shorthand at the time and place hereinbefore stated and was thereafter reduced to typewriting under my direction;

That the foregoing transcript is a true record of the testimony given by said witness;

That I am not a relative or employee or attorney or counsel of any of the parties or a relative or employee of such attorney or counsel or financially interested in the action.

Witness my hand and seal this 9th day of September, 2021.

BRENT W. CHRISTOPHER, CCR, CSR
Certified Court Reporter #1193
State of Kansas