# EXHIBIT 90

## DECLARATION OF TIMOTHY J. HAUSBACK

I, Timothy J. Hausback, being of sound mind and lawful age, hereby state as follows:

1. My name is Timothy J. Hausback, and I am a resident of the State of Missouri. I am originally from Kansas, and in 1968, I graduated from Shawnee Mission East High School.

2. From December 1972 through 1989, I worked for the Kansas City, Kansas Police Department (KCKPD). I graduated from the police academy in 1973. I started out as a patrol officer and was promoted to sergeant several years later. In 1989, I had to retire for medical reasons after suffering a serious back injury during a police pursuit.

3. During my time at the KCKPD, I worked in patrol in many different areas of the city. I also spent time in the Vice Unit and in Traffic, and, as a sergeant, I supervised patrol officers in various districts of the city.

4. I took great pride in being a police officer, and I felt that my profession was essential to the health of the community and served many vital functions. I cared deeply about the citizens of Kansas City, Kansas, and I strived to get to know them and to make their environment safer. In approximately 1975, I received the "Men in Blue" award in recognition of the high number of felony arrests I'd made.

5. When I first started at the Department, I asked to be assigned to a high crime, low-income district in the "north end," located from First Street to Tenth Street. We drove one-man cars, and I was always busy.

6. I soon discovered how much the residents of that area appreciated an honest officer who cared about the community. I did not lie or beat people, and residents were typically cooperative with me and greeted me in a friendly manner. They were not so friendly toward some other officers, who would

1

sometimes be jeered as they drove past or would be the targets of thrown cans or bottles.

7. A significant number of residents in the north end were vulnerable people – they were poor, or addicted to drugs, or without stable housing or otherwise suffered from serious problems. One thing that really troubled me as an officer was when I saw such persons being abused or exploited.

8. While there were some officers who were sincerely committed to serving this vulnerable population, others leveraged the authority of their badge to prey on the vulnerable. In particular, some officers took advantage of poor, struggling or addicted women, including those who worked on the street as prostitutes. Some of the women had drug problems, others were homeless or overwhelmed by the challenges of providing for children.

9. In the mid to late 1970s, I discovered that one of my fellow KCKPD officers, Roger Golubski, was taking advantage of some of the women who worked as prostitutes. On many occasions, I saw Golubski sitting in his patrol car in the "Bottoms," an industrial area next to the river at Third and James Street, which was well known as an area where prostitutes were available.

10. Golubski had no reason to be in the Bottoms at those times. In fact, he was violating KCKPD orders by being "out of district" when he should have been patrolling his assigned area. Golubski seemed quite comfortable shirking his assignment and made no effort to disguise that he was looking for prostitutes.

11. Because of the frequency of his visits to the Bottoms, Golubski was very well known among the prostitutes there. He had a reputation for seeking "blow jobs."

12. Golubski's activities with prostitutes were widely known in the Department, especially in Division 1, where his familiarity with prostitutes would sometimes come up during the daily roll call. The Division 1 office was then in the basement of City Hall, right across from the Detective Bureau.

2

13. What deeply troubled me was that Golubski's pursuit and exploitation of prostitutes in the Bottoms seemed to be accepted in the Department. No one questioned it, and no one was doing anything about it.

14. I was very disturbed by Golubski's open disregard of rules and his improper exploitation of women, and I decided to report his misconduct to my commanding officer, Major Monchil. I told Major Monchil that I had seen Golubski in the Bottoms with prostitutes and that Golubski was widely known in the Bottoms for having sex with prostitutes while on duty.

15. Monchil listened to my report but said nothing in response. To my knowledge, nothing whatsoever was done to correct or discipline Golubski. In fact, he continued with his illegal activities.

16. Subsequently, one of the "pimps" who appeared to have a close association with Golubski made a false complaint to the Department about me, claiming that I was extorting money in the Bottoms. This was a total fabrication, but after ignoring my report about Golubski, Internal Affairs was directed to conduct an investigation of me. I then told Internal Affairs about Golubski patronizing prostitutes in the Bottoms. I also got an attorney and accused the pimp of defamation. I was offered a settlement but turned it down. I only wanted the restoration of my good name.

17. To my knowledge, Internal Affairs did nothing with the information that I provided about Roger Golubski's exploitation of prostitutes in the Bottoms.

18. In the 1970s, I was assigned to work in the Vice Unit, and, as part of that assignment, I visited so-called "gentlemen's clubs" where there was nude dancing. The clubs operated after hours and were very popular, but they were filled with illegal activities. They were essentially strip joints that exploited vulnerable women and invited crime. I soon learned that some police officers were getting sex in these strip clubs. Two officers that I saw in the clubs were Randy Murphy and James Bishop.

3

19. As I had done previously, I reported to Major Monchil what I saw. During my meeting with Monchil, then-Chief Allan Meyers was also present. I told both Monchil and Meyers about the officers having sex with women in the strip clubs. I also told them about Golubski exploiting prostitutes in the Bottoms.

20. Neither Major Monchil nor Chief Meyers responded to my report. To my knowledge, no one in the Department took any action to investigate Golubski or the other officers for their sexual misconduct.

21. Because of this inaction, I then met with an assistant City Attorney, Richard Keithly, and told him about the open and blatant sexual misconduct of KCKPD officers. Keithly was sympathetic to my concerns but was either unable to do anything or chose not to.

22. Subsequent developments showed me that the KCKPD had a substantial problem with sexual misconduct, which was not isolated to just a few officers.

23. I became aware of late-night parties ("choir practice") behind the downtown library where women were giving "blow jobs" to multiple officers, and the sexual activity was open. None of these women, to my knowledge, were prostitutes, but those parties were an indicator to me of how sexual misconduct was condoned. I also learned of a supervisor, Sergeant Rozine, who took prostitutes to "customers" during the summer of the 1976 Republic convention, which was held in Kansas City. I wrote up a report about Rozine's misconduct and took it to Internal Affairs.

24. The recklessness of officers and their willingness to engage in open misconduct with prostitutes also led to a sensitive situation. In the late 1970s, I wrote a traffic ticket to a woman who knew many police officers and was reputed to have engaged in sexual acts with some of them. I first saw her when we were stopped parallel with each other at a red light. She looked over and made direct eye contact with me, then drove straight through the red light. I wrote a ticket for the traffic violation.

4

25. Shortly thereafter, my supervisor, Sergeant Gray, called me into his office and demanded that I turn over to him the ticket I'd written to the woman. He told me had a big problem, and, as he said that, he nodded in the direction of an open office door in Division 1. I looked over and could clearly see a member of the Department getting oral sex from a woman. The woman was on her knees. I could not see the face of the officer, but the body resembled that of officer Golubski. Sergeant Gray later dismissed the traffic ticket I had written.

26. Following that, District Attorney Nick Tomasic called me into his office and told me he needed help with a problem. He said there was a prostitute going around who was providing oral sex to dozens of police officers and fire fighters. She kept a list of those for whom she had performed sexual services and threatened to expose the officers and fire fighters if she was arrested on a pending bad check charge. Tomasic knew I was not on her list, so he picked me to go out and arrest the woman, which I did, bringing that saga to a conclusion.

27. Back in the 1970s and 1980s, those who had connections appeared able to avoid consequences for many of their illegal acts. When I arrested a prostitute, I also arrested her customer or "john." But I soon found out, however, the tickets against "johns," particularly the wealthier ones, were often dismissed. I also learned of a doctor who was arrested more than 20 times for beating women and drunk driving, yet always escaped consequences. One night, I arrested him for driving under the influence. A department Major came to me and told me to drop the charge. I did not believe that I had the legal authority to do so under Kansas law. I consulted the governor's office, and the matter eventually fell into the hands of the press. I ultimately received an award from the governor.

28. In the 1970s and 1980s, Kansas City, Kansas was a pretty rough place. Quite a few people, especially women, went missing, and their families were grief stricken. When I encountered these situations, I always wrote up a missing

persons report. I was dismayed to discover, though, that when I contacted the detective working in the missing persons office that he had no interest in investigating these reports, telling me: "I don't mess with that."

29. The failure to do the work of policing seemed to extend to the Detective Bureau. Around the time that Lieutenant Steve Culp started supervising the Bureau, he called me in to speak with me. He told me he'd discovered that detectives were gone all day and that they close all their cases. But he did not know what they were doing.

30. Culp said that, in case after case, detectives did not follow up on leads. They would state in reports that the witnesses didn't see anything, but when Culp vetted their work, he would discover that the detectives had not even spoken with the witnesses.

31. Culp expressed to me that the detectives had lied in their reports. I suggested to him that he document this serious problem and take it to his commanding officer. I never heard anything further about this situation.

32. I recently learned that Roger Golubski listed me as a reference on his job application when was hired at the Police Department and that he described me as a "close friend." I have no recollection of ever meeting Roger Golubski prior to him joining the Kansas City, Kansas Police Department.

I hereby state under penalty of perjury that the foregoing statement is true and correct.

4-21-2022

Date

Timothy J. Hausback

6