# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| **LAMONTE MCINTYRE & ROSE LEE MCINTYRE,** | |
| **Plaintiffs,** | Case No. 2:18-cv-02545-KHV-KGG |
| **v.** | |
| **UNIFIED GOVERNMENT OF WYANDOTTE COUNTY AND KANSAS CITY, KS, et al.,** | |
| **Defendants.** | |

### PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO <u>OFFICER DEFENDANTS' MOTION FOR SUMMARY JUDGMENT</u>

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................ iii

INTRODUCTION ................................................................ 1

RESPONSE TO THE OFFICER DEFENDANTS' STATEMENT OF
UNCONTROVERTED MATERIAL FACTS ............................................ 3

ADDITIONAL MATERIAL CONTROVERTED FACTS ................................... 55

NATURE OF THE MATTER ...................................................... 145

QUESTIONS PRESENTED ....................................................... 151

ARGUMENT AND AUTHORITIES .................................................. 151

  I.    LEGAL STANDARD ...................................................... 151

  II.    GOLUBSKI'S FIFTH AMENDMENT INVOCATIONS SUPPORT DENIAL
OF SUMMARY JUDGMENT ...................................................... 152

  III.   THE COURT SHOULD SUMMARILY REJECT DEFENDANTS'
IMPROPERLY RAISED ARGUMENTS .............................................. 153

  IV.   A REASONABLE JURY COULD FIND DEFENDANTS KRSTOLICH,
WARE, BARBER, AND BROWN FABRICATED EVIDENCE ............................. 154

    A.    Krstolich Fabricated Ruby Mitchell's Identification ................. 155

    B.    Ware Fabricated Niko Quinn's Identification ........................ 157

    C.    Barber Fabricated Rose's and Lamonte's Alibi Statements and Sources
Implicating Lamonte ...................................................... 160

    D.    Brown Fabricated Lamonte's Alibi Statement ........................ 162

  V.    A REASONABLE JURY COULD FIND KRSTOLICH AND WARE
SUPPRESSED *BRADY* EVIDENCE .............................................. 162

  VI.   A REASONABLE JURY COULD FIND DEFENDANTS KRSTOLICH,
WARE, BARBER, BROWN, CULP AND SMITH LIABLE FOR PLAINTIFF'S
MALICIOUS PROSECUTION ................................................... 164

    A.    A Reasonable Jury Could Find that No Probable Cause Existed ......... 165

    B.    A Reasonable Jury Can Find Defendants Acted with Malice ............. 166

    C.    A Reasonable Jury Could Find Defendants Caused Lamonte's Prosecution .... 169

  VII.   A REASONABLE JURY COULD FIND DEFENDANTS KRSTOLICH,
WARE, AND CULP LIABLE FOR FAILURE TO INTERVENE. ........................ 170

  VIII.  A REASONABLE JURY COULD FIND THAT DEFENDANTS
KRSTOLICH, WARE, BARBER, AND CULP CONSPIRED WITH GOLUBSKI TO
DEPRIVE PLAINTIFF OF A FAIR TRIAL ...................................... 170

  IX.   SUPERVISORY LIABILITY .............................................. 172

CONCLUSION.............................................................................................................. 172

CERTIFICATE OF SERVICE ..................................................................................... 173

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Baxter v. Palmigiano*,
   425 U.S. 308 (1976)...........................................................................152

*Becker v. Kroll*,
   494 F.3d 904 (10th Cir. 2007) ...........................................................162

*Bellamy v. City of New York*,
   914 F.3d 727 (2d Cir. 2019)...............................................................162

*Bledsoe v. Bd. of Cnty. Comm'rs of Cnty. of Jefferson, Kansas*,
   501 F. Supp. 3d 1059 (D. Kan. 2020)................................................162

*Bledsoe v. Jefferson County*,
   275 F. Supp. 3d 1240 (D. Kan. 2017)........................................154, 171

*Bowen v. Maynard*,
   799 F.2d 593 (10th Cir. 1986) ....................................................163, 164

*Caldwell v. City & County of San Francisco*,
   889 F.3d 1105 (9th Cir. 2018) .....................................................157, 160

*Carrillo v. County of Los Angeles*,
   798 F.3d 1210 (9th Cir. 2015) ............................................................163

*Coquina Invs. v. TD Bank, N.A.*,
   760 F.3d 1300 (11th Cir. 2014) ..........................................................152

*Dodds v. Richardson*,
   614 F.3d 1185 (10th Cir. 2010) ..........................................................172

*Emmett v. Armstrong*,
   973 F.3d 1127 (10th Cir. 2020) ..............................................1, 151, 152

*F.D.I.C. v. Fid. & Deposit Co. of Md.*,
   45 F.3d 969 (5th Cir. 1995) ................................................................152

*Farmer v. Brennan*,
   511 U.S. 825 (1994).............................................................................166

*Frasier v. Evans*,
   992 F.3d 1003 (10th Cir. 2021) ..........................................................172

*Geter v. Fortenberry*,
   849 F.2d 1550 (5th Cir. 1988) ............................................................163

*Good v. Curtis*,
   601 F.3d 393 (5th Cir. 2010) .......................................................157, 160

*Gorenc v. Proverbs*,
   447 F. Supp. 3d 1110 (D. Kan. 2020).................................................153

*Green v. Haskell Cnty. Bd. of Comm'rs*,
    568 F.3d 784 (10th Cir. 2009) ............................................152

*Gregory v. City of Louisville*,
    444 F.3d 725 (6th Cir. 2006) .................................157, 160, 162

*Heck v. Humphrey*,
    512 U.S. 477 (1994)............................................................154

*Jimenez v. City of Chicago*,
    732 F.3d 710 (7th Cir. 2013) ............................................168

*Jones v. City of Chicago*,
    856 F.2d 985 (7th Cir. 1988) ............................................169

*Jones v. Norton*,
    809 F.3d 564 (10th Cir. 2015) ..........................................170

*Keith v. Koerner*,
    843 F.3d 833 (10th Cir. 2016) ..............................152, 153, 159

*Kyles v. Whitley*,
    514 U.S. 419 (1995)............................................................162

*Martinez v. Carson*,
    697 F.3d 1252 (10th Cir. 2012) ...............................159, 169

*Mellen v. Winn*,
    900 F.3d 1085 (9th Cir. 2018) .................162, 164, 168, 172

*Mglej v. Gardner*,
    974 F.3d 1151 (10th Cir. 2020) ........................................166

*Montoya v. Vigil*,
    898 F.3d 1056 (10th Cir. 2018) ........................................164

*Newsome v. McCabe*,
    256 F.3d 747 (7th Cir. 2001) ............................................163

*Nuckols v. Gibson*,
    233 F.3d 1261 (10th Cir. 2000) ........................................163

*Peterson v. Minerva Surgical, Inc.*,
    No. CV 19-2050-KHV, 2019 WL 6255159 (D. Kan. Nov. 22, 2019) .................................153

*Pierce v. Gilchrist*,
    359 F.3d 1279 (10th Cir. 2004) ...............154, 163, 164, 169

*Restivo v. Hessemann*,
    846 F.3d 547 (2d Cir. 2017)...............................................167

*Sanchez v. Hartley*,
    810 F.3d 750 (10th Cir. 2016) ..........................................165

*Sandifer v. Green*,
    126 Fed. Appx. 908 (10th Cir. 2005)................................172

iv

*Schneider v. City of Grand Junction Police Dep't,*
   717 F.3d 760 (10th Cir. 2013) .......................................................................159, 169

*Schreiner v. Hodge,*
   504 P.3d 410 (Kan. 2022) ...........................................................................................154

*Smith v. Sec'y of New Mexico Dep't of Corr.,*
   50 F.3d 801 (10th Cir. 1995) .....................................................................................163

*Snell v. Tunnell,*
   920 F.2d 673 (10th Cir. 1990) .............................................................................170, 171

*Stewart v. Donges,*
   915 F.2d 572 (10th Cir. 1990) ...................................................................................165

*Tolan v. Cotton,*
   572 U.S. 650 (2014).....................................................................................................165

*Truman v. Orem City,*
   1 F.4th 1227 (10th Cir. 2021) ..............................................................................154, 162

*United States v. Ochoa-Fabian,*
   935 F.2d 1139 (10th Cir. 1991) ...........................................................................169, 172

*Wilkins v. DeReyes,*
   528 F.3d 790 (10th Cir. 2008) ...........................................................................165, 166

**INTRODUCTION**

Lamonte McIntyre spent over 23 years imprisoned for a double murder of which he is actually innocent. Discovery has produced overwhelming direct and circumstantial evidence that it was pervasive misconduct by KCKPD investigators, including each of the Officer Defendants, that caused Lamonte's wrongful conviction. Krstolich and Ware each worked together with Golubski to fabricate identifications from the only two witnesses to identify Lamonte McIntyre—Ruby Mitchell and Niko Quinn, respectively—and fabricated reports of the circumstances in which those identifications were obtained to falsely bolster them. Barber and Brown each fabricated statements attributed to Rose and Lamonte McIntyre to falsely contradict Lamonte's truthful alibi. Culp specifically switched assignments to put non-homicide detective Golubski in charge of the double homicide investigation where he could continue his pattern of exploiting Black women to generate false evidence to close cases. And both Culp, Golubski's supervisor, and Smith, Golubski's partner on the investigation, ignored glaring red flags that Golubski's investigation was a sham.

As this Court held in its order on Defendants' motion to dismiss, this conduct describes constitutional violations for which Defendants may be held liable. The Court considered Defendants' legal arguments at length, and in a detailed order described how Plaintiff's claims were viable and Defendants were not entitled to qualified immunity. Discovery has now substantiated Plaintiff's key allegations. Nevertheless, Defendants completely ignore those prior rulings, largely just recycling the same legal arguments the Court already rejected. Like Golubski, they also ignore the most basic rule of summary judgment: that Plaintiff's evidence must be credited and all reasonable inferences drawn in his favor. *See, e.g.*, *Emmett v. Armstrong*, 973 F.3d 1127, 1135 (10th Cir. 2020) ("At trial, the factfinder will have to decide

1

what to believe; at summary judgment, however, we are required to believe [Plaintiff] if the record supports him."). Defendants' motion for summary judgment should be rejected.

**RESPONSE TO THE OFFICER DEFENDANTS'
STATEMENT OF UNCONTROVERTED MATERIAL FACTS**

<u>**Ewing/Quinn Homicide and Investigation**</u>

     1.     At around 2:00 p.m. on April 15, 1994, Doniel Quinn and Donald Ewing were shot while they sat in the front seat of a parked car on Hutchings Street, in Kansas City, Kansas by a lone assailant who fired a shotgun at least 4 times.  Doc. 562, Pretrial Order, Factual Stipulation ¶ 5; Exhibit 1, Ewing/Quinn Homicide File (Deposition Exhibit 5), P0002.

     **Response:** Uncontroverted.

     2.     Numerous Kansas City, Kansas Police Department ("KCKPD") personnel responded to the scene, including Officer L. Vallejo, Officer J. Orendac, Officer G. Wansley, Officer J. Myers, Officer Ambler, Officer Clair, Officer Howard, Officer Stubler, Officer Keith, Officer Bagsby, Officer Steel, Sgt. Singleton, Sgt. Keith, Detective Golubski, Detective Krstolich, Sgt. Blood, Detective Shomin, Detective Maskill, Detective W.K. Smith, Detective Nelson, Lt. Culp, ADA Grosko, Captain Twitchell, Lt. Harrington, and ID Unit Officers.  Exhibit 1, P0006, 0020, 0021, 0051.

     **Response:** Controverted in part, with objection. Uncontroverted that the police file indicates the above KCKPD personnel responded to the scene of the Ewing/Quinn homicide. However, to the extent Defendants are using the police report for the truth of the matter, or to imply the above is a complete list of all officers present at the scene, Plaintiffs object on the basis of inadmissible hearsay.

     3.     It is indicated in the homicide file that at 2:14 p.m., Officer J.D. Myers reported to 3032 Hutchings where he saw the victims.  He roped off the crime scene with Officer Ambler. Exhibit 1, P0018.

3

**Response:** Controverted in part, with objection. Uncontroverted that the materials cited indicate that Officer Meyers reported to 3032 Hutchings where he saw the victims, and that he roped off the crime scene for Officer Ambler. However, to the extent Defendants are using the police report for the truth of the matter, Plaintiffs object on the basis of inadmissible hearsay.

4.      It is indicated in the homicide file that at 2:15 p.m., Officer Ambler was dispatched to 3031 Hutchings and reported that he observed no brass in the street around the victims' car.  Officer Wansley was assigned to rope off the immediate area.  Officer J. Bagsby was given control of an eyewitness.  Officer Myers was given control of another black female witness.  EMS transported the victims.  Exhibit 1, P0020.

**Response:** Controverted in part, with objection. Plaintiffs clarify that the evidence cited does not clearly state the time of the dispatch. The remainder of ¶ 4 is uncontroverted. However, to the extent Defendants are using the police report for the truth of the matter, Plaintiffs object on the basis of inadmissible hearsay.

5.      It is indicated in the homicide file that Officer Ambler, Officer Keith, Officer Wansley and Officer Myers conducted a canvas of a vacant lot on the west side of Hutchings. Exhibit 1, P0020.

**Response:**  Controverted in part, with objection. Plaintiffs agree that the report states what is cited above, with clarification that it is unclear whether Officer Ambler participated in the canvas; also, the report refers to "too [sic] vacant lots on the west side of Hutchings," but does not specify which area(s) in the two lots were canvassed by officers. Also, there is no indication that officers searched the adjoining lot facing Hiawatha through which the shooter traveled to reach the getaway car. (Ex. 1: Police Report, LMKSDC_0003410, 3418-3419). Additionally, there is no diagram or specific description of the area(s) canvassed or of the path

taken by the shooter.  Further, to the extent Defendants are using the police report for the truth of the matter, Plaintiffs object on the basis of inadmissible hearsay.

6.      It is indicated in the homicide file that Officer Wansley assisted Sgt. Keith in searching a vacant burnt building on the northwest corner of Hiawatha.  Exhibit 1, P0020.

**Response:** Controverted in part, with objection. Plaintiffs clarify that the information contained in ¶ 6 appears on P0014. To the extent Defendants are using the police report for the truth of the matter, Plaintiffs object on the basis of inadmissible hearsay.

7.      It is indicated in the homicide file that Officer Wansley canvassed the area, identified Ruby Mitchell of 3020 Hutchings and she related that she heard someone arguing out in front of her residence.  When she looked out the front door, she noticed a black male wearing all black, carrying a shotgun.  The black male approached the driver's side of the vehicle and fired the shotgun into the driver's window at the driver.  The black male then went around to the front passenger side and shot into the passenger in the vehicle.  The suspect then ran west across a vacant lot toward Hiawatha.  Exhibit 1, P0020.

**Response:**  Controverted in part, with the clarification that this information appears on P0014/LMKSDC_0003404, and, to the extent Defendants are using the police report for the truth of the matter, Plaintiffs object on the basis of inadmissible hearsay. Additionally, Wansley's report contains the only account in the police file describing where the shooter stood. It states that Ruby Mitchell described the shooter as initially firing through the driver's side and then going around to the passenger side and firing more shots. However, when detectives took the taped statements of Niko Quinn and Ruby Mitchell at the scene, they did not ask any questions about where the shooter stood as he fired at the vehicle. (Ex. 1: Police File, LMKSDC_0003417-3424).

8.      It is indicated in the homicide file that Officer Wansley met with Alvin Finley of

3029 Hiawatha, who said he was in bed and did not hear any shots fired.  Exhibit 1, P0014.

**Response**: Controverted in part, with objection. Plaintiffs agree that the report states what

is cited above. However, to the extent Defendants are using the police report for the truth of the

matter, Plaintiffs object on the basis of inadmissible hearsay.

9.      It is indicated in the homicide file that Officer Wansley met with Breon Shelton

who said she heard several shots fired.  She also noticed a dark blue Chevy Caprice classic

parked on the west side of Hiawatha across from her residence near the open vacant lot.  She saw

two black males seated in the vehicle.  A canvass of the remaining area was met with negative

results.  Exhibit 1, P0014.

**Response:** Controverted in part, with objection. Plaintiffs clarify that this information

appears on P0015/LMKSDC_0003405 and also add that the "open vacant lot" facing Hiawatha

referenced by Breon Shelton was the lot that officers did not report searching for evidence. *See*

Plaintiffs' Response to Defendant Officers' SOF, ¶ 5. To the extent Defendants are using the

police report for the truth of the matter, Plaintiffs object on the basis of inadmissible hearsay.

10.     It is indicated in the homicide file that at 2:20 p.m., ID Officers Clair and Howard

as well as Lt. Harrington reported to the homicide scene where they took photos of the scene,

collected physical evidence and processed the victim's vehicle.  Officer Howard ran a video and

collected evidence while Officer Clair took still photos and dusted the vehicle for latent prints.

Exhibit 1, P0017/26.

**Response:** Controverted in part, with objection. Plaintiffs agree that the report cited

states Howard arrived at 2:20 pm and was not joined by the other officers until 2:45 pm.

However, the "photos of the scene" do not include any photos of the lots searched by officers,

nor do they show any possible pathway taken by the shooter. The video is similarly lacking such depictions. Further, the report states that Officer Clair dusted the vehicle for fingerprints, but nothing in the file indicates that the prints were ever compared with any suspect. (Ex. 1: Police File, LMKSDC_0003430-3431; 3407-3416). Also, to the extent Defendants are using the police report for the truth of the matter, Plaintiffs object on the basis of inadmissible hearsay.

11.     It is indicated in the homicide file that Officer Clair collected physical evidence from the victims' vehicle, including clothing, plastic wadding, a crack pipe, glass, cash, blood and liquor bottles.  From the crime scene, he collected four spent shell casings and additional glass and blood samples.  Exhibit 1, P0040-0041.

**Response:** Controverted in part, with objection. Plaintiffs clarify that the evidence cited states that Officer Clair reported the evidence collected but it is unclear whether he actually collected it himself.  Further, to the extent Defendants are using the police report for the truth of the matter, Plaintiffs object on the basis of inadmissible hearsay.

12.     It is indicated in the homicide file that at 2:30 p.m., Sgt. Blood and Det. Maskill reported to the crime scene.  Det. Smith, Golubski and Krstolich were all on scene interviewing witnesses.  Lt. Culp directed Sgt. Blood and Det. Maskill to Bethany Medical Center to see what information could be obtained regarding the victim.  Exhibit 1, P0053-6.

**Response:** Controverted in part, with objection. Plaintiffs agree that the report states what is cited above. But, to the extent Defendants are using the police report for the truth of the matter, Plaintiffs object on the basis of inadmissible hearsay.

13.     Detective Golubski prepared a full body diagram of Donald Ewing and diagram of the crime scene. Exhibit 1, P0048-49.

**Response:** Controverted, with objection.  The pages cited do not state who prepared the diagram of Donald Ewing. Answering, further, the "diagram" of the scene is actually a sketch and is not complete. Further, to the extent Defendants are using the police report for the truth of the matter, Plaintiffs object on the basis of inadmissible hearsay.

14.     On April 16, 1994, autopsies of Doniel Quinn and Donald Ewing were performed. Photographs were taken and physical evidence was collected.  Exhibit 1, P0056-8, P0025; P0047.

**Response:** Controverted in part, with objection. Plaintiffs agree that the page cited states that Detective Shomin, a homicide detective, attended the autopsy of Doniel Quinn. (Ex. 1, Police File, P0057/LMKSDC_0003447). But, to the extent Defendants are using the police report for the truth of the matter, Plaintiffs object on the basis of inadmissible hearsay.

15.     In an investigative addendum dated April 16, 1994, Detective Golubski reported Ruby Mitchell identified the suspect as someone with the first name "Lamonte" and Detective Maskill had also obtained information that the suspect's name was "Lamonte". Exhibit 1, P0062-0064.

**Response:**  Controverted, with objection. Plaintiffs agree that the report states what is cited above. Further, Plaintiffs, dispute that Detective Maskil had obtained information that the suspect's name was "Lamonte." Detective Maskil never wrote any report in this case, nor did he document any tip, street talk, or information from an informant relevant to the Quinn/Ewing investigation. Golubski's report instead simply cites Maskil's "information," with no source, stating only that "Detective Maskil also ascertained some information that the suspect's name was 'Lamonte.'"  (Ex. 1: Police file, LMKSDC_0003453). Furthermore, the evidence cited states that "Ms. Mitchell stated [to Krstolich] that she knew the suspect because she used to date his

8

cousin." However, to the extent Defendants are using the police report for the truth of the matter, Plaintiffs object on the basis of inadmissible hearsay.

16.     In an investigative addendum dated April 16, 1994, Detective Golubski reported he went to the area of 1515 Wood to attempt to locate a suspect vehicle.  At this location there was a vehicle that was described as being driven often by Lamonte and James McIntyre.  Photos were taken and later shown to people in a neighborhood canvas.  Exhibit 1, P0065-66.

**Response:** Controverted, with objection. Uncontroverted that the report states that a vehicle was described as being driven "very often" by Lamonte and James McIntyre. But, there is no witness or source cited for this information, nor is the "suspect vehicle" described in any way. The report further states that "numerous photos of the car were taken," but no photographs or property reports reflecting the submission of such photographs exists. (Ex. 1: Police File, LMKSDC_0003455). Photos of a vehicle purportedly connected to Lamonte were never included in the police report, mentioned elsewhere in the investigative file, or provided to Lamonte McIntyre at any point. Other than Golubski's report, there is no other reference to these photos until after Lamonte McIntyre's arrest, when Defendant Barber stated in his interview by Golubski that "there was information early on that a blue vehicle that [Lamonte is] known to ride in or matched the description which he's been seen to operate was a block over from the homicide scene." (Ex. 1: Police File, LMKSDC_0003433-3436). As with the other alleged vehicle, there is no source for this information provided or referenced by Barber. Lastly, Golubski's report indicates that he showed a photograph of the vehicle "that was described as driven very often by Lamonte and James McIntyre" to Ms. Shelton, and that "she stated this was the wrong vehicle." (Ex. 1: Police File, LMKSDC_0003456). Accordingly, any reference to photographs of the above-mentioned vehicle is irrelevant. Additionally, to the extent Defendants

are using the police report for the truth of the matter, Plaintiffs object on the basis of inadmissible hearsay.

17.     On April 16, 1994, Detective Golubski reported he spoke to Josephine Quinn who indicated she did not get a good look at the suspect and could not identify anyone from the photo lineup.  Josephine Quinn stated that her daughter Stacy Quinn knew the suspect but was not available that day to view the lineup.  Josephine said she would make every effort to have Stacy Quinn get in contact with police.  Exhibit 1, P0065-66.

**Response:** Controverted, with objection. Plaintiffs agree that the report states what is cited above.  However, to the extent Defendants are using the police report for the truth of the matter, Plaintiffs object on the basis of inadmissible hearsay. Additionally, Golubski indicated in his report that he and Ware spoke to Josephine Quinn on April 16, 1994 and that "Josephine stated as per Detective W.K. Smith's statement with her that was not identified by Detective Smith through that statement by Josephine, that there was another daughter by the name of Stacy who stated she knew who the suspect was but on this particular date of the photo line up, Stacy was not available." (Ex. 1: Police File, LMKSDC_0003456). Plaintiffs controvert that Stacy Quinn was "not available." Stacy Quinn was present at the scene of the crime, voluntarily told police that she had seen the shooting, and waited in the yard while police interviewed Niko Quinn. SAMF ¶¶ 34, 216–217. Additionally, Golubski knew Stacy Quinn well; he had an ongoing relationship with her since she was a teenager from the mid-1980s through 2000, in which he paid her for sex. SAMF ¶¶ 221–225.  Further, Stacy's friend, C.S.R. attested that Stacy was easy to find and could usually be located on Quindaro. SAMF ¶ 215.

18.     It is indicated in the homicide file that on April 16, 1994, Detective Golubski and Detective Ware went to 2743 Cleveland and left a business card to speak with John Quinn.

Exhibit 1, P0065-66.

**Response:** Controverted, with objection. Plaintiffs agree that the report states what is cited above, However, to the extent Defendants are using the police report for the truth of the matter, Plaintiffs object on the basis of inadmissible hearsay.

19.     It is indicated in the homicide file that on April 16, 1994, Detective Golubski and Detective Ware recanvassed the 3000 block of Hiawatha.  They made contact with witness Breon Shelton and her mother.  She said that although the photos of the vehicle taken at 1515 Wood are the same color as the suspect vehicle, she did not think they were the same vehicle. Breon was shown the five-person line up but could not identify anyone.  She saw one suspect exit the vehicle to do the shooting and the other suspect remain in the vehicle.  Exhibit 1, P0065-66.

**Response:** Controverted in part, with objection. Ms. Shelton did not equivocate, "she stated this was the wrong vehicle." (Ex. 1: Police File, LMKSDC_0003455-3456). However, to the extent Defendants are using the police report for the truth of the matter, Plaintiffs object on the basis of inadmissible hearsay.

20.     It is indicated in the homicide file that on April 19, 1994, Det. Golubski took a statement from John Quinn who stated neither victim told him they had a problem.  Although John's son Doniel never told him about a problem, John said he sensed something wasn't right weeks and weeks ago due to the way he was acting and individuals he associated with.  Exhibit 1, P0072-77.

**Response:** Controverted, with objection. Plaintiffs dispute Defendants' characterization of John Quinn's taped interview. There, Mr. Quinn stated that Doniel Quinn was associated with the "wrong type of individual," people who were the "worst kind," and he likened them to a

"cobra snake" where "any kind of bite would be instant death." (Ex. 1: Police File, LMKSDC_0003462-3467). Additionally, Defendant Golubski did not show John Quinn photos of any potential suspects, nor did he investigate whom Doniel was associating with. (*See generally* Ex. 1: Police File) Further, to the extent Defendants are using the police report for the truth of the matter, Plaintiffs object on the basis of inadmissible hearsay.

21.     It is indicated in the homicide file that on April 20, 1994, Detective Golubski took statements from Yolanda Johnson, Natasha Haygood, and M'Sherie Johnson regarding Lamonte McIntyre's whereabouts on the day of the shooting, including what he was wearing.  Detective Golubski also inquired regarding their knowledge about Lamonte McIntyre's involvement with drug use / sales and vehicles with which he may be associated.  Exhibit 1, P0078-102.

**Response:** Controverted in part, with objection. Plaintiffs agree that the report states what is cited above, however, to the extent Defendants are using the police report for the truth of the matter, Plaintiffs object on the basis of inadmissible hearsay.

22.     It is indicated in the homicide file that on September 21, 1994, Det. Golubski took a statement from Keva Garcia, Ruby Mitchell's niece, regarding the "Lamonte" she was talking to.  Keva Garcia reviewed a picture of Lamonte McIntyre and said that they looked alike but were not the same.   Exhibit 1, P0105-109.

**Response:** Controverted, with objection. In the cited interview, Keva Garcia says the photograph shown to her looks "a little bit" like Lamont Drain but states "there is a definite difference" between the photograph and Lamont Drain, including that Lamonte McIntyre has a longer neck, his ears are big, and his skin color is lighter than Lamont Drain. (Ex. 1:  Police File, Statement of Keva Garcia at LMKSDC_0003499–3499). Keva also stated that the Lamont she used to date was not Lamonte McIntyre and that she had never seen Lamonte McIntyre before.

*Id.*; SAMF ¶¶ 191–193. According to the prosecutor, Terra Morehead, this interview of Keva

Garcia, five days before trial, was conducted on her behalf as part of Morehead's preparation for

trial. SAMF ¶ 192. Additionally, to the extent Defendants are using the police report for the truth

of the matter, Plaintiffs object on the basis of inadmissible hearsay.

   23.    Det. Golubski prepared the Prosecutive Summary.  Exhibit 1, P0005.

   **Response:** Uncontroverted.

   24.    Stacy Quinn is listed as a witness in the Prosecutive Summary as a witness "who

can testify to observing the crime and to possibly being able to identify the suspect".  Exhibit 1,

P0003.

   **Response:** Controverted in part, with objection. Plaintiffs agree that the Prosecutive

Summary states Stacy Quinn "can testify to observing the crime and to possibly being able to

identify the suspect." However, to the extent Defendants are using the police report for the truth

of the matter, Plaintiffs object on the basis of inadmissible hearsay. Further, this prosecution

summary is inconsistent with Golubski's actual report, which states Stacy "knew who the suspect

was." (Ex. 1: Police File, LMKSDC_0003456).

   25.    Detective Golubski was identified as the lead detective on the case at trial.

Exhibit 2, Trial Transcript, LMKSDC_0004098.

   **Response:** Uncontroverted.

**Interview of Niko Quinn and Josephine Quinn by Defendant Smith**

   26.    At the scene, Niko Quinn's and Josephine Quinn's recorded witness statements

were taken by Detective W.K. Smith.  Exhibit 1, P0006.

   **Response:**  Controverted, with objection. Plaintiffs agree that W.K. Smith took recorded

witness statements from Niko Quinn and Josephine Quinn. However, to the extent Defendants

are using the police report for the truth of the matter, Plaintiffs object on the basis of inadmissible hearsay.

27.     In her recorded statement to Detective Smith, Niko Quinn described a suspect dressed in black – black shirt, black hat, black pants and black tennis shoes.  Exhibit 1, P00027-30.

**Response:** Uncontroverted that Niko Quinn provided this description of the shooter's clothing during the taped interview cited above, which occurred about 45 minutes after the shooting. However, in that recorded statement, Detective Smith did not ask Niko to describe the shooter's physical characteristics. Further, to the extent Defendants are using the police report for the truth of the matter, Plaintiffs object on the basis of inadmissible hearsay.

28.     In her recorded statement to Detective Smith, Niko Quinn stated she did not recognize the shooter, he was carrying a shotgun with a long barrel, and he shot three times and returned from the way he came.  Exhibit 1, P00027-30.

**Response:** Uncontroverted that Niko Quinn made these statements, among others, during the taped interview cited above, which occurred about 45 minutes after the shooting. Further, to the extent Defendants are using the police report for the truth of the matter, Plaintiffs object on the basis of inadmissible hearsay.

29.     In her recorded statement to Detective Smith, Niko Quinn denied any knowledge of either of the victims having difficulties with anyone.  Exhibit 1, P00027-30.

**Response:** Controverted in part, with objection. Plaintiffs first clarify that when asked whether she knew if the victims were having difficulties with anyone, Niko Quinn stated "No, I don't." (Ex. 1: Police File, P00027-30/LMKSDC_0003417-3420). However, to the extent Defendants are using the police report for the truth of the matter, Plaintiffs object on the basis of

14

inadmissible hearsay. *See* ¶ 31, below. Further, in her deposition, Niko Quinn gave sworn testimony regarding Doniel Quinn's difficulties with the Brooks-Robinson drug gang and how she had told Golubski about those problems. (SAMF ¶¶ 96–99; Pl. Ex. 132: Niko Quinn Dep. 72:9–18).

30.   In her recorded statement to Detective Smith, Niko Quinn denied she had ever seen the suspect before but that would be able to recognize the person if she saw him again. Exhibit 1, P00027-30.

**Response:** Uncontroverted that Niko Quinn made these statements, among others, during the taped interview cited above, which occurred about 45 minutes after the shooting. Further, to the extent Defendants are using the police report for the truth of the matter, Plaintiffs object on the basis of inadmissible hearsay. Further, to the extent Defendants are using the police report for the truth of the matter, Plaintiffs object on the basis of inadmissible hearsay.

31.   At her deposition, Niko Quinn testified she did not recall speaking to Detective Smith prior to the recording starting.  Exhibit 3, Deposition of Niko Quinn, 131:15-18.

**Response:** Controverted. In the evidence cited, Niko Quinn says she did not know what she told Smith prior to the recording starting.

32.   At her deposition, Niko Quinn admitted to not telling Detective Smith the truth in her statement.  Exhibit 4, Deposition of Niko Quinn, 72:9-15.

**Response:** Controverted. Niko Quinn testified that her answer "no" to the question "whether or not people in the Cadillac, your cousin included, were having any difficulties with anyone?" was not truthful "because my family was sitting there telling me don't say nothing, let's go." (Ex. 4: Niko Quinn Dep. 72:9–15). Plaintiffs also note that the interview of Niko took place approximately forty-five minutes after her cousin was murdered in front of her. (Ex. 1:

15

Police File, LMKSDC_0003417) Further, within weeks of the crime, Niko told Golubski about Doniel being beat up in the days before his murder and about his injuries, stating "that Cecil had his boys had jumped him maybe a week or two before he was killed, and also told him that they were trying to get him in the car the last two days before he was killed." She also told Golubski that Doniel "didn't have no beef with nobody but the guys that jumped him." (Pl. Ex. 132: Niko Quinn Dep. 174:8–175:17); SAMF ¶ 99, 111–113.

33.     At her deposition, Niko Quinn admitted intentionally withholding information regarding her cousin's trouble with drug dealers.  Exhibit 5, Deposition of Niko Quinn, 51:11-52:1; 72:9-15.

**Response:** Controverted. Niko Quinn testified that her answer "no" to the question "whether or not people in the Cadillac, your cousin included, were having any difficulties with anyone?" was not truthful "because my family was sitting there telling me don't say nothing, let's go." (Ex. 4: Niko Quinn Dep. 72:9–15). Plaintiffs also note that the interview of Niko took place approximately forty-five minutes after her cousin was murdered in front of her. (Ex. 1: Police File, LMKSDC_0003417) Further, within weeks of the crime, Niko told Golubski about Doniel being beat up in the days before his murder and his injuries, "that Cecil had his boys had jumped him maybe a week or two before he was killed, and also told him that they were trying to get him in the car the last two days before he was killed." She also told Golubski that Doniel "didn't have no beef with nobody but the guys that jumped him." (Pl. Ex. 132: Niko Quinn Dep. 174:8–175:17); SAMF, ¶ 99, 111-113.

34.     At her deposition Niko Quinn testified that her family and boyfriend told her not to speak to the police.  Exhibit 6, Deposition of Niko Quinn, 72:9-15; 67:10-17; 131:1-6.

16

**Response:** Controverted. Niko Quinn testified that her answer "no" to the question "whether or not people in the Cadillac, your cousin included, were having any difficulties with anyone?" was not truthful "because my family was sitting there telling me don't say nothing, let's go." (Ex. 5: Niko Quinn Dep. 72:9–15). Although Chris Jones was someone who told Niko not to talk to police in general, he was not present when Niko Quinn gave her statement to officer W.K. Smith at the scene of the crime and is not mentioned in the police file. (Pl. Ex. 132: Niko Quinn Dep. 66:23-67:17; *see generally* Ex. 1).

35.     At her deposition, Niko Quinn testified that the voice of Freda Quinn can be heard saying "is this over, I'm trying to get to the hospital".  Exhibit 7, Deposition of Niko Quinn, 130:15-25.

**Response:** Uncontroverted with clarification that Niko Quinn's testimony cited above is referring to audio taken on the day of the homicides.

36.     At her deposition, Niko Quinn testified that she was wanting to get the interview over with so she could go to the hospital.  Exhibit 8, Deposition of Niko Quinn, 138:21-25.

**Response:** Uncontroverted that she so testified.

37.     In her recorded statement to Detective Smith, Josephine Quinn stated she heard three or four shots but could not identify a suspect.  Exhibit 1, P0036-39.

**Response:** Controverted. In the evidence cited, Josephine Quinn states she heard "about three (3) or four (4)" shots" but only stated "I turned around to try to get a look at him and I couldn't but he had turned at that time and had ran...." Further, to the extent Defendants are using the police report for the truth of the matter, Plaintiffs object on the basis of inadmissible hearsay.

38.     In her recorded statement to Detective Smith, Josephine Quinn said that Doniel Quinn was a loafer but she did not know whether he was involved in drug trafficking or what he

17

was involved in.  Exhibit 1, P0036-39.

**Response:** Uncontroverted. However, to the extent Defendants are using the police report for the truth of the matter, Plaintiffs object on the basis of inadmissible hearsay.

39.     In her recorded statement to Detective Smith, Josephine Quinn did not state that Stacy Quinn had witnessed the shooting.  Exhibit 1, P0036-39.

**Response:** Uncontroverted. However, Golubski documented in his report that Golubski and Ware spoke to Josephine Quinn on April 16, 1994 and that "Josephine stated as per Detective W.K. Smith's statement with her that was not identified by Detective Smith through that statement by Josephine, that there was another daughter by the name of Stacy who stated she knew who the suspect was but on this particular date of the photo line up, Stacy was not available." (Ex. 1: Police File, LMKSDC_0003456). Additionally, the claim that Stacy was "not available" is not true. SAMF ¶¶ 34, 216–217. Further, to the extent Defendants are using the police report for the truth of the matter, Plaintiffs object on the basis of inadmissible hearsay.

40.     Detective Smith did not testify at the preliminary hearing or trial.  Exhibit 9, witness lists from trial and preliminary hearing.

**Response:** Uncontroverted.

41.     Defendant Smith testified he does not recall interviewing Niko Quinn or Josephine Quinn.  Exhibit 10, Deposition of Detective Smith, 96:3-9.

**Response:** Controverted. Smith stated that he does not remember whether Josephine Quinn provided information he wanted to follow up on when he interviewed her. (Pl. Ex. 81: W.K. Smith Dep. 95:17-96:9).

42.     Defendant Smith did not write a report as part of the investigation.  *See* Exhibit 1.

18

**Response:** Uncontroverted. Additionally, each KCKPD officer was obligated to write a report including every step they took during an investigation, even if another detective on the case would be writing a report including similar information. (Pl. Ex. 99: Clyde Blood Dep. 110:4–22); (Pl. Ex. 102: James Brown Dep. 212:3–8); SAMF ¶¶ 56, 272.

**Ruby Mitchell Interactions with Defendant Krstolich**

43.     Ruby Mitchell's witness statement and a composite sketch were taken by Detective James Krstolich.  Exhibit 1, P0050.

**Response:** Controverted in part. According to Ruby Mitchell's testimony, when she arrived at the station, Krstolich and Golubski interviewed her. (Pl. Ex. 135: Ruby Mitchell Aff. ¶ 6); (Pl. Ex. 136: Ruby Mitchell Dep. 56:2-6); SAMF ¶ 150. Krstolich then asked Mitchell to help develop a composite of the shooter. *Id.*; (Ex. 1: Police File, LMKSDC_0003442); SAMF ¶ 158. Then, Krstolich and Golubski were both present during the photo showing and taped interview of Mitchell and together obtained her identification of Lamonte McIntyre. (Pl. Ex. 131: TT, 170:12-20; 282:12); SAMF ¶ 161–188. Also, in the Prosecutive Summary, drafted by Golubski, he describes himself as being able to testify to the "photo line up" and to the identification of Lamonte McIntyre by Ruby Mitchell.  (Ex. 1: Police File, LMKSDC_0003394). Further, to the extent Defendants are using the police report for the truth of the matter, Plaintiffs object on the basis of inadmissible hearsay.

44.     It is indicated in the homicide file that at 2:55 p.m., Detective Krstolich took Ruby Mitchell's initial statement wherein Ms. Mitchell described a suspect dressed in all black with a short shotgun who shot four or five times.  His hair was not real short, it was slicked back. As to height, she said "About, I don't know, 5'6", I don't know."  Ruby said the suspect was thin and brown skinned.  She would recognize him again if she saw him.  The suspect was wearing a

19

black t-shirt with white writing and black khakis.  Exhibit 1, P0031-0035.

**Response:** Controverted in part, with objection. Plaintiffs agree that the report states what is cited above, however Golubski and Krstolich never documented Mitchell's description that the shooter had French braids, nor did they show her any photographs of possible suspects with French braids. When asked if she saw the shooter's face, Mitchell stated: "Well, he's brown-skinned, that's all I could tell."  SAMF ¶¶ 139–140, 151–153 (Pl. Ex. 136: Ruby Mitchell Dep. 46:16–47:21, 67:7–15). Further, to the extent Defendants are using the police report for the truth of the matter, Plaintiffs object on the basis of inadmissible hearsay.

45.     It is indicated in the homicide file that at 5:58 p.m., Ruby Mitchell made a positive identification of Lamonte McIntyre.  Exhibit 1, P0031-0035.

**Response:** Controverted in part, with objection. The cited materials only reflect that Krstolich reported *after the alleged photo array and identification took place* that Ruby Mitchell "has made a positive identification of the party," prior to 1758 hours. (Ex. 1: Police File LMKSDC_0003424). Additionally, the police file reflects that Detectives Krstolich and Golubski asked Mitchell "Q. Who is this party? A. Lamonte. Q. Do you know his last name? A. Yes. Q. What is it? A. McIntyre. Q. How do you know this party? A. Because he used to talk to my niece. Q. How long have you known him? A. For a couple months." (Ex. 1: Police File LMKSDC_0003421-3425). However, Plaintiffs controvert Paragraph 45 to the extent it implies Ruby Mitchell's identification of Lamonte McIntyre was not the result of improper coercion or suggestion. There is no contemporaneous audio or video recording of the identification of Lamonte McIntyre. (Pl. Ex. 73: Dysart Report p. 4). Further, Mitchell was never shown photos that reflected her original description of the shooter (who had "French braids"), and Golubski and Krstolich showed Mitchell at least two sets of photos: a six-person photo lineup which had

20

the photos all affixed to one page and the five loose Polaroids later shown to Niko Quinn. SAMF ¶¶ 161–164. Additionally, Mitchell identified the shooter as Lamonte McIntyre, reciting the name of man she did not know but instead "learned" that information after her off-the-record identification. She also wrongly identified Lamonte McIntyre as the "Lamont" who used to talk to her niece. (Pl. Ex. 131: Ruby Mitchell TT 180:15-23); (Pl. Ex. 135: Ruby Mitchell Aff. ¶ 7). Also, to the extent Defendants are using the police report for the truth of the matter, Plaintiffs object on the basis of inadmissible hearsay.

46.     Detective Krstolich's investigative addendum reports that Ruby Mitchell had to get her kids from school before she could report to the bureau to try to conduct a composite sketch of the suspect.  The composite results made Ruby Mitchell believe that she recognized the suspect as a guy named "Lamonte".  Exhibit 1, P0051-52.

**Response:** Controverted in part, with objection. Uncontroverted that Ruby Mitchell retrieved her children from school after witnessing the crime, and hours later was driven to the police headquarters by Detective Golubski. But, during that drive, Detective Golubski sexually harassed Mitchell, making unsettling comments of a sexual nature to her and putting his hand on her upper thigh. (Pl. Ex. 135: Ruby Mitchell Aff. ¶¶ 5, 14-16); (Pl. Ex. 136: Ruby Mitchell Dep. 50:3–55:22); SAMF ¶¶ 144-149. Controverted as to the remainder. When Mitchell arrived at the station, Krstolich and Golubski interviewed her and she told them that the shooter looked exactly like her niece's former boyfriend whose first name was Lamont, because both the shooter and the Lamont she knew had French braids. Then, Krstolich asked Mitchell to help develop a composite of the shooter. SAMF ¶¶ 150-152, 158–160. Additionally, the composite was a highly unusual mechanism to employ when the witness had already identified a specific person as the shooter.

SAMF ¶ 159. Also, to the extent Defendants are using the police report for the truth of the matter, Plaintiffs object on the basis of inadmissible hearsay.

47.     In her statement, Ruby Mitchell states that said recognized the suspect as Lamonte, a guy who used to try and talk to her niece.  Exhibit 1, P0051-52.

**Response:** Controverted as unsupported by the evidence cited. When Mitchell arrived at the station, Krstolich and Golubski interviewed her and she told them that the shooter looked exactly like her niece's former boyfriend whose first name was Lamont, because both the shooter and the Lamont she knew had French braids. Then, Krstolich asked Mitchell to help develop a composite of the shooter. SAMF ¶¶ 158–160. Additionally, the composite was a highly unusual mechanism to employ when the witness had already identified a specific person as the shooter. SAMF ¶159. Also, the composite did not resemble the shooter as described by Mitchell. SAMF ¶¶ 152, 158-160. Also, to the extent Defendants are using the police report for the truth of the matter, Plaintiffs object on the basis of inadmissible hearsay.

48.     It is indicated in the homicide file that Ruby Mitchell identified a photograph of Lamonte McIntyre from a photo lineup.  Exhibit 1, P0052.

**Response:** Controverted in part, with objection. Uncontroverted that Defendant Detectives falsely reported that Ruby Mitchell had made a positive photographic identification without suggestion. However, controverted to the extent Paragraph 48 implies Ruby Mitchell's identification of Lamonte McIntyre was not the result of improper coercion or suggestion. The cited material does not accurately document or reflect the process that resulted in Ruby Mitchell falsely identifying Lamonte McIntyre as the shooter. Mitchell told detectives the shooter had French braids, but she was not shown photographs of persons with French braids. (Ex. 1: Police File, Krstolich Investigative Addendum [4/15/1994], LMKSDC_0003442); (Pl. Ex. 136: Ruby

Mitchell Dep. 58:18-10, 62:4-64;1; 66:12-23); (Pl. Ex. 131: James Krstolich TT p. 281:5–25). Mitchell was not informed that the actual perpetrator may or may not be present, but rather was asked, during the taped portion of the interview, if she saw the shooter among the photographs. There is no contemporaneous audio or video recording of the identification of Lamonte McIntyre. (Pl. Ex. 73: Dysart Report p. 4).

Further, the cited materials only reflect that Krstolich reported *after the alleged photo array and identification took place* that Ruby Mitchell "has made a positive identification of the party. She thought she knew him and know she knows she is positive that she did see the shooter and she knew who he was," and that Ruby Mitchell picked out the picture of the Lamont who "used to talk to my niece." (Ex. 1: Police File LMKSDC_0003421-3425). Ruby Mitchell testified at trial that she did not know Lamonte McIntyre and did not provide police with his last name, but instead "learned" that information after her off-the-record identification. (Pl. Ex. 131: Ruby Mitchell TT 180:15-23); (Pl. Ex. 135: Ruby Mitchell Aff. ¶ 7.) Also, to the extent Defendants are using the police report for the truth of the matter, Plaintiffs object on the basis of inadmissible hearsay.

49.     At her deposition, Ruby Mitchell testified she pointed to the picture that she thought was the shooter.  Exhibit 11, Deposition of Ruby Mitchell, 60:1-7.

**Response:**  Controverted. Mitchell testified that she believed she had identified Lamont Drain as the shooter, and that he was the Lamonte who dated her niece. (Pl. Ex. 136: Ruby Mitchell Dep. 69:25-70:6; 143:16-25).

50.     At her deposition, Ruby Mitchell denied anyone telling her the name "Lamonte McIntyre."  Exhibit 12, Deposition of Ruby Mitchell, 78:6-14.

**Response:** Controverted. Ruby Mitchell testified that she didn't know anyone's last name, and she "didn't know" from where the last name originated. Exhibit 12, Deposition of Ruby Mitchell, 78:6-14. Further, Ruby Mitchell clarified at trial that she did not know Lamonte McIntyre and did not provide police with his last name, but instead "learned" that information after her off-the-record identification. (Pl. Ex. 131: Ruby Mitchell TT 180:15-23); (Pl. Ex. 135: Ruby Mitchell Aff. ¶ 7). Additionally, the name Lamonte McIntyre appears on the back of the Polaroid shown to Mitchell. (Pl. Ex. 85: Polaroids from Lineup with Names on Back).

51.    At her deposition, Ruby Mitchell denied anyone turning a picture over and showing her the name "Lamonte McIntyre."  Exhibit 13, Deposition of Ruby Mitchell, 79:2-13.

**Response:** Controverted. Ruby Mitchell testified that she didn't remember anybody turning a photograph over to show her a name. Exhibit 13, Deposition of Ruby Mitchell, 79:2-13.

52.    At her deposition, Ruby Mitchell denied giving any false testimony at the trial. Exhibit 14, Deposition of Ruby Mitchell, 92:2-8.

**Response:** Uncontroverted. Ruby Mitchell testified that she believed she had identified Lamont Drain as the shooter, and that he was the Lamonte who dated her niece. (Pl. Ex. ___: Ruby Mitchell Dep. 69:25-70:6; 143:16-25)

53.    At her deposition, Ruby Mitchell testified she did not believe she made a mistake in her identification of Lamonte McIntyre.  Exhibit 15, Deposition of Ruby Mitchell, 100:20-24.

**Response:** Controverted. Ruby Mitchell testified that she thought she was identifying "a Lamonte that [she] knew," Lamonte Drain. Exhibit 15, Deposition of Ruby Mitchell, 100:20-24. The only time Ruby Mitchell has ever spoken to Lamonte McIntyre was after his 2017 release when she was sitting in the courthouse with her son's ex-girlfriend. According to Mitchell, "I

24

didn't actually know who he was, I just recognized -- kind of recognized his face from everything that was going on, on the TV and all that. . .  And then I just got up and I walked over there and asked him was he Lamonte McIntyre. He said yes. And I gave him a hug and started crying. And he gave me a hug. And I was like, 'I'm sorry for what happened to you.' And that was it." (Pl. Ex. 136: Ruby Mitchell Dep. 144:25-145:3).

54.     At her deposition, Ruby Mitchell testified the officers did not pressure her to pick a particular picture or suggest she pick a particular picture.  Exhibit 16, Deposition of Ruby Mitchell, 112:21-113:1.

**Response:** Uncontroverted that she so testified. Controverted to the extent Paragraph 54 implies Ruby Mitchell's identification of Lamonte McIntyre was not the result of improper coercion or suggestion by Golubski and Krstolich, resulting in Mitchell identifying McIntyre's photo from the lineup, including, among other tactics, showing at least two sets of photos: a six-person photo lineup which had the photos all affixed to one page and five loose Polaroids, both of which contained Lamonte McIntyre's photo. Additionally, Lamonte McIntyre's name appears on the back of the Polaroid shown to Mitchell. (Pl. Ex. 85: Polaroids from Lineup with Names on Back). Further, Ruby Mitchell testified that she believed she had identified Lamont Drain as the shooter, and that he was the Lamonte who dated her niece. (Pl. Ex. 136: Ruby Mitchell Dep. 69:25-70:6; 143:16-25).

**Defendant Barber Involvement with Investigation**

55.     Lt. Barber did not prepare a written report and instead gave a recorded witness statement to Detective Golubski.  Exhibit 1, P0043-46.

**Response:**  Uncontroverted that Barber did not prepare a written report. However, Plaintiffs clarify that the evidence cited is simply a transcript of a recorded witness statement and

does not address whether a written report was prepared. Additionally, each KCKPD officer was obligated to write a report including every step they took during an investigation, even if another detective on the case would be writing a report including similar information. (Pl. Ex. 99: Clyde Blood Dep. 110:4–22); (Pl. Ex. 102: James Brown Dep. 212:3–8); (Pl. Ex. 101: Randy Eskina 2016 Aff. ¶¶ 68-72). Additionally, former KCKPD officer Randy Eskina attested that he had "never seen an officer interviewed in lieu of writing a report in any other case. It is not a desirable practice." (Pl. Ex. 101: Randy Eskina 2016 Aff. ¶ 72).

56.     At 8:35 p.m., Detective Golubski took Lt. Dennis Barber's statement.  Exhibit 1, P0043-46

**Response:** Uncontroverted that Golubski took a taped statement from Lt. Barber, but controverted to the extent Paragraph 54 suggests the information contained therein was truthful and accurate. In fact, to the extent Defendants are using the police report for the truth of the matter, Plaintiffs object on the basis of inadmissible hearsay.

57.     Lt. Barber stated he spoke with Lamonte McIntyre's grandmother, Maxine Crowder, and his mother, Rose McIntyre and told them that they were investigating Lamonte for a felony crime.  Exhibit 1, P0043-46.

**Response:** Controverted in part, with objection. The transcript of the audiotaped statement Golubski took from Defendant Barber states that Barber indicated to Rose McIntyre and Maxine Crowder at the time of Lamonte McIntyre's arrest that "there had been some street talk, wherein Lamonte McIntyre had been named as a suspect in a felony crime." However, to the extent Defendants are using the police report for the truth of the matter, Plaintiffs object on the basis of inadmissible hearsay.

58.     Lt. Barber stated that unsolicited, Ms. McIntyre asked if someone had told her she

had killed somebody, would that person be taken down and charged with murder.  Exhibit 1, P0043-46.

**Response:** Uncontroverted that Lt. Barber made these statements to Defendant Golubski, but controverted to the extent Paragraph 58 suggests the information contained therein was truthful and accurate. In fact, to the extent Defendants are using the police report for the truth of the matter, Plaintiffs object on the basis of inadmissible hearsay. Instead, Barber's report of Rose McIntyre's statements on April 15, 1994 was false. At FiFi's, Rose McIntyre asked Barber "what this was all about," to which Barber replied, "that it could be about a fight or disturbance or something like that." Rose did not bring up the word "murder." Barber fabricated a false and inculpatory statement by Rose McIntyre in an attempt to imply that she knew Lamonte McIntyre was guilty of the murders. SAMF ¶¶ 255–264.

59.    Lt. Barber stated that when Ms. McIntyre asked what time the serious felony crime occurred and Lt. Barber responded with "2:00 p.m.", Ms. McIntyre indicated that it couldn't have been Lamonte because he was at FiFis from 11:00 a.m. to 2:45 p.m.  Exhibit 1, P0043-46.

**Response:** Uncontroverted that Lt. Barber made these statements to Defendant Golubski, but controverted to the extent Paragraph 59 suggests the information contained therein was truthful and accurate. In fact, to the extent Defendants are using the police report for the truth of the matter, Plaintiffs object on the basis of inadmissible hearsay. Barber's report of Rose McIntyre's statements on April 15, 1994 was false. In fact, Barber asked Rose McIntyre where Lamonte McIntyre had been on April 14, 1994, the day before the shooting, not the day of, to which Rose truthfully replied that the day before the shooting, Lamonte McIntyre was with her at

27

FiFi's restaurant. Barber fabricated a false and inculpatory statement by Rose McIntyre in an attempt to imply that she knew Lamonte McIntyre was guilty of the murders. SAMF ¶¶ 255–264.

60.     Lt. Barber stated he directed Officer Brown to do a stop and pat down frisk and handcuff Lamonte for questioning.  Exhibit 1, P0043-46.

**Response:** Uncontroverted the report states what is cited above, however, to the extent Defendants are using the police report for the truth of the matter, Plaintiffs object on the basis of inadmissible hearsay.

61.     Lt. Barber stated that he asked Lamonte about whether he had any problems with any groups, he said he had not, and during that day had been with his brother James, neither of which had been in a fight or jumped or had an altercation with any individuals.  Exhibit 1, P0043-46.

**Response:** Controverted. Barber never asked Lamonte his whereabouts on the day of the shooting, but instead asked about whether Lamonte was in a gang or knew anyone in a blue low rider. SAMF ¶ 268. Additionally, Lamonte McIntyre consistently gave police the same, truthful alibi: that he had been at Peggy Williams's and Yolanda Johnson's homes at the time of the shooting, where his brother "showed up sometime" that day. SAMF ¶¶ 265, 274. Further, to the extent Defendants are using the police report for the truth of the matter, Plaintiffs object on the basis of inadmissible hearsay.

62.     Lt. Barber stated that they had received information that the suspect blue vehicle matched the description of a vehicle Lamonte McIntyre has been seen to operate. Exhibit 1, P0043-46.

**Response:** Controverted. The cited statement by Defendant Barber, taken after Lamonte McIntyre's arrest, states "there was information early on that a blue vehicle that he's known to

ride in or matched the description which he's been seen to operate was a block over from the homicide scene." There is no contemporaneous documentation of any such information in the file. Regardless, Golubski's 4/16/94 Investigative Addendum indicates that he showed a photograph of a vehicle "that was described as driven very often by Lamonte and James McIntyre" to Ms. Shelton to which "she stated this was the wrong vehicle." (Ex. 1: Police File, LMKSDC_0003456). Further, to the extent Defendants are using the police report for the truth of the matter, Plaintiffs object on the basis of inadmissible hearsay.

63.     Lt. Barber stated that Officer Viera received information from an informant in the Juniper Gardens area that Lamonte is known to frequent that he was seen riding in a 1998 white Oldsmobile with blue tinted windows in the area of 2nd street.  Exhibit 1, P0043-46.

**Response:** Uncontroverted that the report reflects Barber stated "Officer Viera, which I had assistance to, received information from an informant in the Juniper Gardens area, where Lamont is also known to frequent. This information was that he was seen riding in an Oldsmobile 98, white in color, with blue tinted windows in the area of 2nd Street." Officer Viera, however, never provided a report, nor a taped statement, regarding any information obtained from any "informant" in this case.  Additionally, there is no information or report in the police file that refers to a white Oldsmobile 98 or links such a vehicle to the Ewing-Quinn homicides. However, to the extent Defendants are using the police report for the truth of the matter, Plaintiffs object on the basis of inadmissible hearsay.

**Defendant Brown Interactions with Lamonte McIntyre**

64.     It is indicated in the homicide file that Officer James Brown was instructed to assist Lt. Barber in locating a juvenile suspect.  Officer Brown made contact with Lamonte McIntyre and his mother Rose McIntyre at FiFi's.  Officer Brown transported Lamonte McIntyre

to the detective bureau.  Exhibit 1, P0024.

**Response:** Uncontroverted, however, to the extent Defendants are using the police report for the truth of the matter, Plaintiffs object on the basis of inadmissible hearsay.

65.     Officer Brown's transport report did not include information regarding any conversations with Lamonte McIntyre during the transport.  Exhibit 1, P0023-24.

**Response:** Uncontroverted that Brown never wrote a report about any alleged statement by Lamonte. (Ex. 1: Police File, Brown Arrest Report, LMKSDC_0003413-3414); SAMF ¶¶ 246, 250-257. However, when Officer Brown transported Lamonte to the police station, Lamonte asked Brown what this was all about, and Brown said, "If you did nothing wrong, you got nothing to worry about." SAMF ¶¶ 270. And to the extent Defendants are using the police report for the truth of the matter, Plaintiffs object on the basis of inadmissible hearsay.

66.     It is indicated in the homicide file that at 8:04 p.m., Detective Golubski interviewed Lamonte McIntyre who stated he was at his auntie's house with his auntie, cousin and cousin's girlfriend in the vicinity of 16th and Wood all day long and that some dude came by and told them that Little Quinn's brother had been shot.  Exhibit 1, P0052.

**Response:** Controverted in part, with objection. Uncontroverted that the report states what is cited above, however, the time is not included in the cited evidence. Further, to the extent Defendants are using the police report for the truth of the matter, Plaintiffs object on the basis of inadmissible hearsay. Additionally, Golubski falsely reported that Golubski had read Lamonte McIntyre his rights before questioning him, and that Lamonte "refused to sign anything, but that he would talk to us." (Ex. 1: Police File, LMKSDC_0003453). Also, Golubski and Krstolich questioned Lamonte "about the events of my day," "asked me do I know this person or that person. And they asked about -- they said a homicide happened today, and one guy lived long

enough to say I did it. And I told him he must have been mistaken. I'm not the person you're looking for. My name is Lamonte McIntyre. I don't know who you're looking for, but it's not me. And the other guy standing up and started screaming. Called me a n***** killer. Told me I think it's a game. And I said, 'No, I don't think it's a game, I'm just not the person you're looking for.' And he started screaming." (Pl. Ex. 137: Lamonte McIntyre Dep. 151:9-152:6). McIntyre was not read his Miranda rights "until everything was over." "After that, they put me in handcuffs and they sent me to jail. They told me I was being charged with two counts of first degree murder. And they told my mother that I wasn't being charged with anything, I was just being held for questioning." (*Id.* at 151:9-155:21).

67.     Defendant Brown testified at his deposition that he does not recall transporting Lamonte McIntyre.  Exhibit 17, Deposition of James Brown, 210:12-16.

**Response:** Uncontroverted that he so testified.

**Defendant Ware Involvement with Investigation**

68.     It is indicated in the homicide file that on April 16, 1994, Detective Golubski, accompanied by Detective Dennis Ware, went to 3018 Hutchings to speak with eye-witness Niko Quinn.  Exhibit 1, P0065-66.

**Response:** Uncontroverted, however, to the extent Defendants are using the police report for the truth of the matter, Plaintiffs object on the basis of inadmissible hearsay.

69.     Detective Dennis Ware did not write a report related to this interaction.  See Exhibit 1.

**Response:** Uncontroverted.

70.     Detective Dennis Ware testified at his deposition he only went with Detective Golubski as back up.  Exhibit 18, Deposition of Dennis Ware, 168:1-13.

31

**Response:** Uncontroverted that the evidence cited reflects Ware testified that Golubski "had no partner to partner up with and he went down the hallway of the crimes against persons unit and tried to find someone that night to go with him just to back him up…" Ware further testified at his deposition that "I have no clue as to why I went with Golubski for that particular day. I have no idea." (Pl. Ex. 74: Dennis Ware Dep. 171:22-172:2).

71.     Detective Dennis Ware testified at his deposition he did not know anything about the case.  Exhibit 19, Deposition of Dennis Ware, 166:20-25.

**Response:** Uncontroverted only that the cited evidence reflects Ware was asked in his deposition "Is it possible that you chose the photographs to show to Niko Quinn?" to which Ware answered "I don't believe it is possible. I didn't know anything about this case." Ware further testified that he thought Golubski would have told him if a suspect was under arrest at the time he went to show a witness photographs in the investigation of a crime that occurred the day before. (Pl. Ex. 74: Dennis Ware Dep. 185:12-20).

72.     Detective Dennis Ware testified at his deposition he does not recall meeting with Niko Quinn.  Exhibit 20, Deposition of Dennis Ware, 167:8-15.

**Response:** Uncontroverted only that the cited evidence reflects Ware was asked "Do you dispute that you were present for the photo showing with Niko Quinn the day after the crimes? And Ware answered, "I'm not disputing that, no, ma'am." Ware was then asked "In other words, you were there, you just don't have any independent memory of it, is that right?" To which he answered "That's correct.".

73.     The photo lineup used with Niko Quinn on April 16, 1994 was the same shown to Ruby Mitchell on April 15, 1994. Exhibit 21, Trial Transcript, LMKSDC0004129.

**Response:** Uncontroverted that Niko Quinn saw the same set of five loose Polaroid photos Ruby Mitchell viewed on April 15, 1994, which contained a 1992 picture of Lamonte McIntyre, a photograph of Lamonte's brother, James McIntyre, and a photograph of Lamonte's cousin, Terrence, for Mitchell to view. (Pl. Ex. 131: TT 170:12-20; 282:12); (Pl. Ex. 85: Polaroids from Lineup with Names on Back).

74.     Detective Dennis Ware did not compile the pictures used for the photo lineup with Niko Quinn.  Exhibit 22, Deposition of Dennis Ware, 166:20-166:25.

**Response:** Controverted. Ware testified only that he "did not believe it is possible" that he chose the photographs shown to Niko Quinn, but admitted that he does not have an independent recollection of the case. (Ex. 22: Dennis Ware Dep. 166:20-166:25); (Pl. Ex. 74: Dennis Ware Dep. 167:8-15).

75.     Detective Golubski included in his report that Niko Quinn was still visibly traumatized by what happened as both victims were cousins of hers. Exhibit 1, P0065.

**Response:** Uncontroverted that Golubski documented in his report that "it is very obvious that Niko Quinn knows exactly who the shooter is, but being highly traumatized at this time is reluctant to provide that information." (Ex. 1: Police File, LMKSDC_0003455–3456). However, Plaintiffs deny that this report is true or accurate as further detailed in Plaintiffs' Response to Officer Defendants' SOF ¶ 77. And, to the extent Defendants are using the police report for the truth of the matter, Plaintiffs object on the basis of inadmissible hearsay.

76.     Niko Quinn testified at her deposition in this matter that she was under the influence of drugs at the time of her meeting with Detective Golubski and Ware on April 16, 1994.  Exhibit 23, Deposition of Niko Quinn, 81:17-22.

**Response:** Uncontroverted that Niko Quinn testified she was still "under the influence" of PCP when she spoke with Golubski and Ware, because she had done PCP for the first time the night before, after she witnessed the shooting of her cousin, Doniel. (Ex. 23: Niko Quinn Dep. 81:3–22).

77.     Detective Golubski included in his report that Niko Quinn viewed a photo lineup of five individuals and repeatedly and for a prolonged period of time viewed photo three, Lamonte McIntyre's photograph, and began shaking, becoming teary eyed and hesitant to make statements.  Exhibit 1, P0065.

**Response:** Controverted in part, with objection. Uncontroverted that the report states what is cited above, with clarification that the evidence cited does not establish that Lamonte McIntyre's photograph was photo three. However, Plaintiffs deny that Golubski's report is true or accurate and to the extent Defendants are using the police report for the truth of the matter, Plaintiffs object on the basis of inadmissible hearsay. Instead, Niko testified that she was given a stack of five photographs, two of whom she immediately recognized as Raymond Hickman, her cousin, and James McIntyre, whom she used to date. Detective Golubski then told Niko that if she knew who it was, she'd better testify and that it would be better for her if she did. SAMF ¶¶ 60–84. Niko Quinn did not tentatively identify Lamonte McIntyre, but instead told Golubski and Ware that she could not make any identification from the photos. (Pl. Ex. 132: Niko Quinn Dep. 185:21–25). Further, Niko testified that she was holding onto two pictures in her hand, and while doing so, the officers asked her what name Ruby said the shooter's name was, and Niko said Lamont. And when she was holding the pictures, the officer said why are you staring at that other picture (the picture of Lamonte McIntyre). Niko said she didn't know and when she looked at the other one, she said "no, I don't know who it is." (Pl. Ex. 132: Niko Quinn Dep. 83:17-

34

85:1); SAMF ¶¶ 77–84. While Golubski was instructing Niko Quinn to make an identification and asking about the name Ruby Mitchell had given, Ware placed his thumb on Lamonte McIntyre's photo, as if he were pointing at it. At the same time that Ware was pointing at Lamonte, Niko remembered seeing the name "Lamonte" on the photo police showed her. Despite this direct suggestion, Niko Quinn told Golubski and the Ware that she could not make an identification from these photos. SAMF ¶¶ 77–84. Additionally, when asked if he fabricated this report of the April 16, 1994 identification procedure with Niko Quinn, Golubski invoked his Fifth Amendment right to remain silent. (Pl. Ex. 80: Roger Golubski Dep. 163:4–166:2).

78.    Detective Golubski reported that Niko Quinn indicated that she could not positively identify the shooter from the photographs.  Exhibit 1, P0065.

**Response:** Uncontroverted, but to the extent Defendants are using the police report for the truth of the matter, Plaintiffs object on the basis of inadmissible hearsay.

79.    Niko Quinn testified at her deposition that she was able to rule out some of the individuals in the photo lineup for various reasons.  Exhibit 24, Deposition of Niko Quinn, 83:3-16.

**Response:** Uncontroverted. *See* Plaintiffs' Response to Defendant Officers' SOF, ¶ 77.

80.    Niko Quinn testified at her deposition that one of the officers, but she was not sure which one, made comments like "what was the name that Ruby had said the guy's name was?" and Niko Quinn Responded "Lamont."  Exhibit 25, Deposition of Niko Quinn, 84:16-25; 134:24-135:9.

**Response:** Uncontroverted. *See* Plaintiffs' Response to Defendant Officers' SOF, ¶ 77.

81.    Niko Quinn testified that she told the officers that she did not know who it was and they left.  Exhibit 26, Deposition of Niko Quinn, 85:11-18.

**Response:** Uncontroverted. *See* Plaintiffs' Response to Defendant Officers' SOF, ¶ 77.

82.     Niko Quinn testified that she could not say that anything that was done was inappropriate or improper from the meeting with Detective Golubski and Detective Ware on April 16, 1994.  Exhibit 27, Deposition of Niko Quinn, 85:20-23.

**Response:** Controverted. Niko Quinn testified to numerous improper tactics Golubski and Ware used at their meeting with Niko Quinn on April 16, 1994.When directly asked at her deposition "How is it that Detective Golubski pressured you to make an identification?" Niko stated, "Because he was saying that I had to make an identification and that I knew, when he was saying you know who did it, you know who killed your cousin, and then that's when it was said, stated, what did Ruby say his name was? When he made that statement that's when they held the photo up. And the guy had -- I don't remember if it was him or the other guy who was holding the pictures, but they pointed, they had Lamonte's picture and the other guy's picture, because I already ruled out…James and my cousin.…" (Pl. Ex. 132: Niko Quinn Dep. 182:1–18). Further, Niko clarified in her testimony that she was given a stack of five photographs, two of whom she immediately recognized as Raymond Hickman, her cousin, and James McIntyre, whom she used to date. Detective Golubski then told Niko that if she knew who it was, she'd better testify and that it would be better for her if she did. Niko then told Ware and Golubski, after holding the other three photographs, that "No, I don't know who it is." She did not make an identification even though Ware and Golubski held the photo of Lamonte McIntyre up while asking her what Mitchell said the shooter's name was and continued to tell her that she knew who the shooter was. While Golubski was instructing Niko Quinn to make an identification and asking about the name Ruby Mitchell had given, Ware placed his thumb on Lamonte McIntyre's photo, as if he were pointing at it. At the same time that Ware was pointing at Lamonte. She then remembered

36

seeing the name "Lamonte" on the photo police showed her. Despite this direct suggestion, Niko Quinn told Golubski and the other detective that she could not make an identification from these photos. SAMF ¶¶ 69, 77-84. Further, Ware admits that if he placed his thumb on Lamonte McIntyre's photo as Niko Quinn described that would have been "grossly improper" and "direct suggestion" and that he knew that in 1994. SAMF ¶ 80.

83.     Niko Quinn testified that it was Terra Morehead who threatened to take her kids away if she did not testify.  Exhibit 28, Deposition of Niko Quinn, 104:12-105:14; 108:20-109:1.

**Response:** Uncontroverted that Niko Quinn testified that Terra Morehead threatened to take her kids away if she did not testify on several occasions.

84.     Defendant Ware did not testify at the preliminary hearing or trial.  Exhibit 29, Deposition of Dennis Ware, 154:17-20.

**Response:** Uncontroverted.

## Criminal Proceedings

85.     On June 28, 1994, a waiver and preliminary hearing were held before the Honorable Matthew G. Podrebarac in Wyandotte County District Court. The witnesses who testified at this hearing were Ruby Mitchell, Niko Quinn, Roger Golubski, Rose McIntyre and Denise Armstrong.  Exhibit 30, Preliminary Hearing Transcript, FPSS043624, FPSS043626, FPSS043675.

**Response:** Uncontroverted.

86.     Ruby Mitchell identified Lamonte McIntyre as the shooter and maintained this identification throughout cross-examination. Exhibit 31, Preliminary Hearing Transcript, FPSS043634.

37

**Response:** Controverted in part. At the preliminary hearing, Ruby Mitchell testified contrary to her police statement, stating that she did not know and had never previously seen Lamonte McIntyre and that she did not know his name was "Lamonte" until she went to the police station and went through some photos with police. (Pl. Ex. 138: Preliminary Hearing 10:2–3, 14:12–18). Further, Plaintiffs dispute the allegation in Paragraph 86 to the extent it suggests the identification of Lamonte McIntyre by Ruby Mitchell was not the result of improper coercion or suggestion. *See* Plaintiffs' Response to Defendant Officers' SOF, ¶ 87. Additionally, Plaintiffs' expert Dr. Jennifer Dysart opines that when a witness sees a photograph in multiple identification procedures or contexts, there is a risk this sense of familiarity on the part of the witness may lead to an increased likelihood of choosing that person and a feeling of increased confidence in subsequent identification procedures. (Pl. Ex. 73: Expert Report of Jennifer Dysart, pp. 15–16). Further, if police suggestion occurred during the photo procedures—as Plaintiffs allege—"the subsequent identifications in court are of no value. There is no way to distinguish between the contaminated, unreliable identifications and the witnesses' actual memory of the events, and, therefore, no reliable way to assess whether the suspect was present at the crime." *Id.* at p. 16; *see also* (Pl. Ex. 74: Dennis Ware Dep. 185:21-187:2) (agreeing that the concept that if police suggest a particular photo on one occasion, that suggestion will taint that witness's identifications down the line was "just common sense," and a basic policing concept understood by 1994).

87.     During her testimony, Ruby Mitchell denied that a detective told her who to pick out of the lineup, stating "No.  He didn't tell me to pick nothing."  Exhibit 32, Preliminary Hearing Transcript, FPSS043643.

**Response:** Controverted in part. Uncontroverted that Ruby Mitchell testified to the above at the preliminary hearing. However, Plaintiffs dispute the allegation in Paragraph 87 to the extent it suggests the identification of Lamonte McIntyre by Ruby Mitchell was not the result of improper coercion or suggestion. Instead, when Golubski drove Mitchell to the police station, prior to the identification procedure, Golubski sexually harassed and inappropriately touched her, making Mitchell nervous and uncomfortable and after which Mitchell was worried Golubski would arrest her. SAMF, ¶¶ 144–149. Golubski and Krstolich failed to appropriately document the multiple photo procedures they conducted with Ruby Mitchell. Because they showed Mitchell at least one photo lineup in addition to the five loose photographs they showed to both Mitchell and Niko Quinn, and each contained a photo of Lamonte McIntyre, they tainted the identification. Additionally, the six-photo array shown to Mitchell was never described or documented in the police report. Despite audio-recording interviews with Mitchell before and after the identification procedure, Golubski and Krstolich failed to record the photo identification procedure itself. Lamonte McIntyre's name was also on the back of the Polaroid that was handed loose to Mitchell. The fact that Mitchell provided Lamonte McIntyre's last name – a man she did not know – reflects the contamination in the identification procedures.  When asked whether he used improper suggestion and pressure to get Mitchell to choose Lamonte McIntyre's photo, Golubski invoked his Fifth Amendment right. When asked whether he lied in his written report that Mitchell chose Lamonte McIntyre's photo without suggestion and coercion, he also invoked the Fifth Amendment. SAMF ¶¶ 161–188.

88.     Niko Quinn identified Lamonte McIntyre as the shooter and maintained this identification throughout cross-examination.  Exhibit 33, Preliminary Hearing Transcript, FPSS043651.

**Response:** Controverted to the extent that Paragraph 86 suggests Niko Quinn's in-court identification of Lamonte McIntyre was not the result improper coercion or suggestion. *See* Plaintiffs' Response to Defendant Officers' SOF, ¶ 83.

89.     Rose McIntyre testified that she gave a statement as to the whereabouts of Lamonte McIntyre.  Exhibit 34, Preliminary Hearing Transcript, FPSS043671.

**Response:** Controverted. Rose McIntyre only provided to officers that Lamonte was at FiFi's when they asked where he was the day *prior* to the crime, not the day of. (Ex. 1: Police File, Dennis Barber Stmt. to Golubski, 4/15/1994, LMKSDC_0003434, 3453); (Ex. 35 and Ex. 36: Preliminary Hearing, 46:5–47:8, LMKSDC_0003752-3753).

90.     Rose McIntyre testified she told police Lamonte was at work based on her belief they were talking about the day before the shooting.  Exhibit 35, Preliminary Hearing Transcript, LMKSDC_0003752.

**Response:** Controverted in part. Uncontroverted that the cited materials reflect Rose McIntyre testified she told police Lamonte was at work the day before the shooting "because they g[a]ve her the date before, not the date of." Controverted that this was Rose's "belief" but instead what actually occurred. (Ex. 35: Preliminary Hearing LMKSDC_0003752).

91.     Rose McIntyre testified when she realized the shooting occurred the day Lamonte McIntyre was taken into custody, she told officers that he was at his aunt's house. Exhibit 36, Preliminary Hearing Transcript, LMKSDC_0003753.

**Response:** Uncontroverted that Rose McIntyre truthfully told police that "if you're talking about today. LaMonte was over auntie's house." (Ex. 35 and Ex. 36: Preliminary Hearing, 46:5–47:8, LMKSDC_0003752-3753).

92.     Judge Podrebarac waived Lamonte McIntyre to adult status and found probable

cause existed to bind Lamonte McIntyre over as charged.  Exhibit 37, Preliminary Hearing

Transcript, FPSS043699-700.

  **Response:** Uncontroverted.

  93. Lamonte McIntyre's criminal jury trial occurred the week of September 26, 1994.

Exhibit 38, Trial Transcript, FPSS043703.

  **Response:** Uncontroverted.

  94. Niko Quinn identified Lamonte McIntyre as the shooter and maintained this

identification throughout cross-examination.  Exhibit 39, Trial Transcript, FPSS43864.

  **Response:** Controverted in part. Uncontroverted that Niko Quinn identified Lamonte

McIntyre as the shooter at Lamonte's criminal trial, but controverted to the extent that Paragraph

94 suggests Niko Quinn's in-court identification of Lamonte McIntyre was not the result of

improper coercion or suggestion.

  95. Niko Quinn denied that Detective Golubski suggested in any way who she should

identify when he and another detective showed her photos the day after the murder.  Exhibit 40,

Trial Transcript, FPSS043861.

  **Response:** Controverted in part. Uncontroverted that when asked at trial, "When

Detective Golubski handed those [photos] to you, did he suggest in any way that you should

identify any one of those photographs in your in looking at them? Niko answered "No."

However, controverted to the extent Paragraph 95 suggests that Niko Quinn's testimony

regarding the identification procedure was truthful and accurate, and not the result of improper

coercion or suggestion. *See* Plaintiffs' Response to Defendant Officers' SOF ¶ 82.

  96. Niko Quinn testified she held on to one photo the entire time but did not identify

anyone.  Exhibit 41, Trial Transcript, FPSS043862.

**Response:** Controverted in part. Uncontroverted that Niko testified at trial she held onto the photo "while Detective Golubski was there" "the whole time we set and talked." However, controverted to the extent Paragraph 96 suggests that Niko Quinn's testimony regarding the identification procedure was truthful and accurate, and not the result of direct threats, improper coercion or suggestion. *See* Plaintiffs' Response to Defendant Officers' SOF, ¶¶ 77, 83 and 95.

97.     Ruby Mitchell identified Lamonte McIntyre as the shooter and maintained this identification throughout cross-examination. Exhibit 42, Trial Transcript, FPSS043895-6; FPSS043929.

**Response:** Controverted in part. Uncontroverted that Ruby Mitchell identified Lamonte McIntyre as the shooter at trial, but every aspect of the identification process was tainted with improper suggestion and coercive influence. *See* Plaintiffs' Response to Defendant Officers' SOF, ¶¶ 45-54. Answering further, according to Plaintiffs' expert in eyewitness identification, Dr. Jennifer Dysart, when a witness sees a photograph in multiple identification procedures or contexts, there is a risk this sense of familiarity on the part of the witness may lead to an increased likelihood of choosing that person and a feeling of increased confidence in subsequent identification procedures. SAMF ¶ 164. Further, if police suggestion occurred during the photo procedures—as Plaintiffs allege—"the subsequent identifications in court are of no value. There is no way to distinguish between the contaminated, unreliable identifications and the witnesses' actual memory of the events, and, therefore, no reliable way to assess whether the suspect was present at the crime." (Pl. Ex. 73: Expert Report of Jennifer Dysart p. 16); *see also* (Pl. Ex. 74: Dennis Ware Dep. 185:21–187:2) (agreeing that the concept that if police suggest a particular photo on one occasion, that suggestion will taint that witness's identifications down the line was "just common sense," and a basic policing concept understood by 1994).

42

Also, Mitchell's testimony at trial falsely portrays her original statement to police.  She testifies that when she selected Lamonte McIntyre's photograph that she knew he was not the Lamonte who had dated her niece. (Pl. Ex. 131: TT 127:10–14, 195:16–196:15). This is directly contrary to her statement to police in which she states that she knew the shooter because he used to talk to her niece, that she had known him a couple of months, and that she knew his first and last names, which she recites. (Ex. 1: Police File, LMKSDC_0003421-3425). These gross contradictions reflect a tainted and manipulated identification.

98.     Detective Krstolich testified that he had been employed with the KCKPD for almost twenty years and a detective for ten years.  Exhibit 43, Trial Transcript FPSS044002.

**Response:** Uncontroverted.

99.     Detective Krstolich testified that he made contact with Ruby Mitchell shortly after the shooting at her residence and Ms. Mitchell thought she could recognize the suspect if she saw him again so Detective Krstolich asked her to come with him to the KCKPD to build a composite picture of the suspect.  Exhibit 44, Trial Transcript, FPSS044004.

**Response:** Uncontroverted that Krstolich so testified. However, Krstolich took a taped statement from Mitchell at the scene, a transcript of which is found at (Ex. 1: Police File, LMKSDC_0003421. There, when Krstolich asked whether Mitchell could see the shooter's face, she responded, "Well, he's brown skinned, that's all I could tell. I don't know no scars or nothing like that." (Ex. 1: Police File, Mitchell Stmt. to Krstolich, LMKSDC_0003423).

100.     Detective Krstolich testified that after the composite was made, Ms. Mitchell said she thought she knew who the party was.  She almost called out his name when she saw him before the shooting and gave the name "Lamonte".  Exhibit 45, Trial Transcript, FPSS044005.

**Response:** Uncontroverted that Krstolich so testified. However, Plaintiffs dispute that Krstolich's testimony is true or accurate, as Ruby Mitchell testified that she believed she had identified Lamont Drain as the shooter, and that he was the Lamonte who dated her niece. (Pl. Ex. 136: Ruby Mitchell Dep. 69:25-70:6; 143:16-25). *See also* Plaintiffs' Response to Defendant Officers' SOF, ¶¶ 45-54.

101.    Detective Krstolich testified that he handed Ms. Mitchell the stack of five photos and did not suggest at all who she should pick out.  Ms. Mitchell selected Lamonte McIntyre's photograph.  Exhibit 46, Trial Transcript, FPSS044009-10.

**Response:** Uncontroverted that Detective Krstolich so testified. However, Plaintiffs dispute that Krstolich's testimony is true or accurate, and that Mitchell's identification of Lamonte McIntyre was not the result of improper coercion or suggestion, as described in Plaintiffs' Responses to Defendant Officers' SOF, ¶¶ 45-54.

102.    Detective Golubski testified to a second meeting with Niko Quinn where she identified Lamonte McIntyre as the shooter.  Exhibit 47, Trial Transcript, LMKSDC_0004130-0004132.

**Response:** Controverted in part. Uncontroverted that Detective Golubski testified at trial to a second meeting with Niko Quinn behind Wyandotte High School. Controverted to the extent it implies that Niko Quinn's identification of Lamonte McIntyre at that meeting was not the result of improper coercion or suggestion. Instead, Niko Quinn testified that she told Golubski that Aaron Robinson and Monster had beaten up Doniel Quinn in the days before the murders, and that they came looking for him the night before the murders. She said that Doniel Quinn only had "beef" with that drug gang, and no one else.  Golubski responded by warning Niko Quinn to leave that alone, that she "shouldn't be talking about Cecil, be careful what [she] say[s] about

Cecil because they found his ex-girlfriend's remains behind Washington High School." Golubski

then lied to Niko, telling her Cecil Brooks and Aaron Robinson and their gang "didn't do it, they

couldn't have did it because they had the guy in custody [referring to Lamonte McIntyre], they

had the clothes he was wearing and they had the gun so they got the right person." Knowing

Niko Quinn was scared for her life, Golubski offered to put her in protective custody; he then did

help her get through bureaucracy to move to 4th Street. SAMF ¶¶ 95–106. Further, when asked if

he fabricated Niko Quinn's identification of Lamonte McIntyre, Golubski pled the Fifth. SAMF

¶ 106.

103.    Detective Golubski testified there was a not a report regarding this meeting.

Exhibit 48, Trial Transcript, LMKSDC_0004134.

**Response:** Uncontroverted that Golubski did not document the meeting in any written

report. Additionally, each KCKPD officer was obligated to write a report including every step

they took during an investigation, even if another detective on the case would be writing a report

including similar information. (Pl. Ex. 99: Clyde Blood Dep. 110:4–22); (Pl. Ex. 102: James

Brown Dep. 212:3–8); (Pl. Ex. 101: Randy Eskina Aff. ¶¶ 68-72). Further, Defendant Smith

admitted that failing to document a positive photo identification from an eyewitness does not

make any sense, because a positive identification of a suspect awaiting trial from one of the

eyewitnesses who is adamant is powerful evidence that officers would have every incentive to

document and turn over so it could be used. (Pl. Ex. 81: W.K. Smith Dep. 345:25-347:14).

104.    Lt. Dennis Barber testified that he has been employed with the KCKPD for 24

years.  Exhibit 49, Trial Transcript FPSS044079.

**Response:** Uncontroverted.

105.    Lt. Barber testified that he was responsible for obtaining the name "Lamonte

McIntyre" during the investigation and that he had obtained the name from numerous sources. Exhibit 50, Trial Transcript, FPSS044080.

**Response:** Uncontroverted that Barber testified as such. Defendants have never identified any particular "source" from which the name "McIntyre" allegedly came.

Prosecutor Morehead represents to the Court that Lieutenant Barber "was the one that was told this information and that information then got back to the other detectives and that's how the name and the photograph was pulled. It was from street talk that the name Lamonte McIntyre came up." Golubski never testifies that Barber worked with any sources. Although Barber testified at trial that he obtained the name of Lamonte McIntyre "from numerous sources," these sources were never identified, are not documented in the police file, and are not mentioned in his taped statement to Detective Golubski after Lamonte's arrest. (Pl. Ex. 131: Barber TT 353:7–14); (Ex. 1: Police File, LMKSDC_0003433-3435). In reality, Lamonte McIntyre was innocent, SAMF ¶¶ 22–28, and the actual street talk was that Monster committed the crime, SAMF ¶ 20. When Lamonte was arrested, people in the streets "knew it was the wrong guy. It was somebody we never heard of." (Pl. Ex. 76: Joe Robinson Aff. ¶ 19).

106.    Lt. Barber testified that he made contact with Ms. McIntyre after he was dispatched to FiFi's on a specific request to go there and speak with Lamonte's mother.  Exhibit 51, Trial Transcript, FPSS044083.

**Response:** Uncontroverted that Barber so testified.

107.    Lt. Barber testified that upon arrival, Lamonte's grandmother Maxine Crowder introduced Lt. Barber to Lamonte's mother, Ms. McIntyre, and Lt. Barber told her that there had been allegations that Lamonte was involved in a felony crime.  Exhibit 52, Trial Transcript, FPSS044084.

**Response:** Controverted in part. Uncontroverted that Barber so testified, but controverted that Lt. Barber's statements were true or accurate. Instead, Barber's report of Rose McIntyre's statements on April 15, 1994 was false. SAMF ¶¶ 255–264. Additionally, the transcript of the audiotaped statement Golubski took from Defendant Barber regarding his investigation of the Ewing/Quinn homicides states only that Barber indicated to Rose McIntyre at the time of Lamonte McIntyre's arrest that "there had been some street talk, wherein Lamonte McIntyre had been named as a suspect in a felony crime." (Ex. 1: Case File at LMKSDC_003433–3436, LMKSDC_0003453).

108.   Lt. Barber testified that Ms. McIntyre was uncertain as to what a felony crime meant, so Lt. Barber explained that it was a serious crime punishable by more than one year in jail such as a shooting, stabbing or robbery.  Exhibit 53, Trial Transcript, FPSS044084.

**Response:** Uncontroverted that Barber so testified. But controverted that Lt. Barber's statements were true or accurate for the reasons identified in Plaintiffs' Response to Defendant Officers' SOF ¶ 107; SAMF ¶¶ 255–264.

109.   Lt. Barber testified that he did not indicate that it was a double homicide and while he was explaining what a felony crime was, Ms. McIntyre said words to the effect that if she had killed somebody, would he take her down and charge her?  Exhibit 54, Trial Transcript, FPSS044085-87.

**Response:**  Uncontroverted that Barber so testified, but controverted that Lt. Barber's statements were true or accurate for the reasons identified in Plaintiffs' Response to Defendant Officers' SOF ¶ 107; SAMF ¶¶ 255–264, including that at FiFi's, Rose McIntyre asked Barber "what this was all about," to which Barber replied, "that it could be about a fight or disturbance or something like that." Rose did not bring up the word "murder." Barber fabricated a false and

47

inculpatory statement by Rose McIntyre in an attempt to imply that she knew Lamonte McIntyre was guilty of the murders. SAMF ¶¶ 255–264.

110.    Lt. Barber testified that then Ms. McIntyre said that it could not have been Lamonte because he had been a Fi Fi's all day.  Exhibit 55, Trial Transcript, FPSS044087.

**Response:** Uncontroverted that Barber so testified, but controverted that Lt. Barber's statements were true or accurate for the reasons identified in Plaintiffs' Response to Defendant Officers' SOF ¶ 107, including that Barber asked Rose McIntyre where Lamonte McIntyre had been on April 14, 1994, the day before the shooting, not the day of, to which Rose truthfully replied that the day before the shooting, Lamonte McIntyre was with her at FiFi's restaurant. SAMF ¶¶ 230–239.

111.    Officer James Brown testified that he started with the KCKPD in September 1991.  Exhibit 56, Trial Transcript, FPSS044093.

**Response:** Uncontroverted.

112.    Officer Brown testified that he made contact with Ms. McIntyre who indicated she wanted to meet with Lt. Barber, so he called Lt. Barber to FiFi's.  Exhibit 57, Trial Transcript, FPSS044094.

**Response:** Uncontroverted.

113.    Officer Brown testified that at around 8:40 p.m., Officer Brown per Lt. Barber's instruction patted Lamonte McIntyre down and placed him in the patrol car to transport to the bureau.  Exhibit 58, Trial Transcript, FPSS044094-5.

**Response:** Uncontroverted that Brown testified that Barber instructed him to pat Lamonte McIntyre down and place him in custody. Further, Officer Brown told him that he was

not arrested and that if he did nothing wrong he had nothing to worry about. (Pl. Ex. 137: Lamonte McIntyre Dep. 148:21-150:6); SAMF ¶¶ 265–270.

114.    Officer Brown testified that during the transport, Lamonte McIntyre asked what was going on, and Officer Brown said detectives wanted to talk to him about an incident. Exhibit 59, Trial Transcript, FPSS044094-5.

**Response:** Uncontroverted. Additionally, Lamonte McIntyre testified that while being transported to the station, he asked Officer Brown what this was all about, and Brown said, "If you did nothing wrong, you got nothing to worry about." SAMF ¶¶ 265–270.

115.    Officer Brown testified that Lamonte McIntyre made the unsolicited statement that that he didn't know what he could have done because he was at Fi Fi's all day helping his mother out in the kitchen doing some work.  Exhibit 60, Trial Transcript, FPSS044094-96.

**Response:** Controverted in part. Uncontroverted that Brown so testified, but controverted that Brown's testimony was true or accurate, as Lamonte never told any officer he was at FiFi's at the time of the crime. Instead, Brown's claim regarding what Lamonte said is false. When Officer Brown transported Lamonte to the police station, Lamonte asked Brown what this was all about, and Brown said, "If you did nothing wrong, you got nothing to worry about." SAMF ¶¶ 265–270.

116.    Officer Brown testified that he was present at the bureau when Detective Golubski and Detective Krstolich were speaking with Lamonte McIntyre, and heard him say he was in the area of 15th and Wood all day.  Exhibit 61, Trial Transcript, FPSS044096.

**Response:** Controverted in part. Uncontroverted that Brown testified that he was present when Golubski and Krstolich questioned Lamonte McIntyre and that he testified "one comment that I remember was the detective asked him where he was all day and he stated in the area of

15th and Wood." Indeed, at the police station, Lamonte McIntyre truthfully told the officers that he was "at his auntie's house … all day long." (Ex. 1:  Police File, Krstolich Report, 4/15/1994, LMKSDC_0003442; Golubski Report, 4/16/1994, LMKSDC_0003454); (Pl. Ex. 131: Lamonte McIntyre TT 452:18–453:23); SAMF ¶¶ 265–270. Controverted to the extent Paragraph 116 is implying that Lamonte McIntyre provided police inconsistent alibis or that Brown's testimony or report of Lamonte McIntyre's statements are true or accurate for the reasons detailed in Plaintiffs' Response to Defendant Officers' SOF, ¶ 107.

117.    Officer Brown testified this is when he remembered that Lamonte McIntyre told him that he was at Fi Fi's all day on 5th and Richmond so he wrote the detective a note telling him what Lamonte McIntyre had said in the car that he had been at Fi Fi's with his mother all day.  Exhibit 62, Trial Transcript, FPSS044096-97.

**Response:** Uncontroverted that Brown so testified. However, controverted to the extent Paragraph 117 is implying that Lamonte McIntyre provided police inconsistent alibis or that Brown's testimony or report of Lamonte McIntyre's statements are true or accurate for the reasons detailed in Plaintiffs' Response to Defendant Officers' SOF, ¶ 115, including that Lamonte never told any officer he was at FiFi's at the time of the crime. Instead, when Officer Brown transported Lamonte to the police station, Lamonte asked Brown what this was all about, and Brown said, "If you did nothing wrong, you got nothing to worry about." SAMF ¶¶ 265–270.

118.    Lamonte McIntyre testified that he spent the night of April 14, 1994 at 1510 Walker at Peggy Crowder's house.  On the morning of the 15th, he got up, left with his mother to have her do something at the house, came back early, went to the store, stayed there, watched a couple of movies, and started using the phone between 1:20-1:30 p.m.  Exhibit 63, Trial

Transcript FPSS044181-82.

**Response:** Controverted to the extent it is unsupported by the evidence cited, which is Barber's testimony, not Lamonte McIntyre's. On April 15, 1994, Lamonte McIntyre was at the house of his aunt, Peggy Williams (Crowder), for half the day until sometime around 2pm, when he went to call a cab for one of Williams' guests at the home of his other aunt, Yolanda Johnson, as Williams did not own a phone. After making the call, Lamonte returned briefly to Williams' home. He shortly thereafter went back to Johnson's home to call a cab for a second guest of Williams' and remained at Johnson's home thereafter. SAMF ¶¶ 232–237.

119.    Lamonte McIntyre testified that he stayed at Yolanda's house after calling a cab a second time around 1:45 – 1:50 p.m. until his mother took him to FiFi's between 4:30 and 5 p.m. Exhibit 64, Trial Transcript, FPSS044183-84.

**Response:** Controverted to the extent it is unsupported by the evidence cited, which is Barber's testimony, not Lamonte McIntyre's. *See* Plaintiffs Response to Officer Defendants' SOF ¶ 118.

120.    Lamonte McIntyre testified that he did not tell the police officer he had been at FiFi's all that day.  Exhibit 65, Trial Transcript, FPSS044186.

**Response:** Controverted to the extent it is unsupported by the evidence cited, which is Barber's testimony, not Lamonte McIntyre's. *See* Plaintiffs Response to Officer Defendants' SOF ¶ 118. Further, Lamonte never told any officer he was at FiFi's at the time of the crime. SAMF ¶ 265.

121.    Lamonte McIntyre was convicted by the jury for the murders of Doniel Quinn and Donald Ewing.  Doc. 562, Pretrial Order, Stipulation of Fact ¶ 15.

**Response:** Uncontroverted, with clarification that Lamonte McIntyre is innocent of the crimes for which he was convicted. SAMF ¶¶ 22–28.

122.    On March 29, 1996, Lamonte McIntyre's counsel Lindsey Erickson filed a Motion for New Trial based on Newly Discovered Evidence.  Exhibit 66, Motion for New Trial, FPSS044313-6.

**Response:** Uncontroverted.

123.    In the Motion for New Trial, Ms. Erickson alleged that she spoke with Niko Quinn who recanted her previous statements that McIntyre was the shooter on April 15, 1994 and that Niko stated that she committed perjury on the witness stand because she wanted the entire thing to be over with and because she wanted someone, anyone, to be convicted for killing her cousins.  If called to testify, Niko would state that after viewing four photos of McIntyre, there is no doubt in her mind that McIntyre is not the shooter.  Exhibit 67, Motion for New Trial, FPSS044313-6.

**Response:** Controverted in part. Uncontroverted that the Motion for New Trial cited reflects the above. However, the Motion also clarifies that "Niko wants to tell the truth" and that several other bases for relief existed, such as the newly discovered evidence of Stacy Quinn, an eyewitness who was never interviewed by police, who came forward to testify that she saw the shooter and that Lamonte McIntyre was not him. (Ex. 67: Motion for New Trial, FPSS044313-6). Additionally, although Niko falsely identified Lamonte McIntyre as the shooter, due to police and prosecutor coercion, *see* Plaintiff's Response to Officer Defendants' SOF ¶¶ 77, 83 and 95, "not everything [she] told the jury was false." (Pl. Ex. 132: Niko Quinn Dep. 157:9-23).

124.    In the Motion for New Trial, Ms. Erickson alleged that she spoke with Stacy Quinn, a newly discovered witness, who informed Ms. Erickson that the wrong person was

52

convicted for the double homicide.  Exhibit 68, Motion for New Trial, FPSS044313-6.

**Response:** Uncontroverted. *See* Plaintiff's Response to Officer Defendants' SOF ¶ 123.

125.    In the Motion for New Trial, Ms. Erickson alleged that Stacy said that she got a good look at the shooter and, after looking at four photographs of McIntyre, there is no doubt in Stacy's mind that he was not the shooter.  Exhibit 69, Motion for New Trial, FPSS044313-6.

**Response:** Uncontroverted. *See* Plaintiff's Response to Officer Defendants' SOF ¶ 123.

126.    On April 4, 1996, at the hearing for New Trial, Stacy Quinn testified that she did not speak with police because she was messed up and on drugs at the time.  Exhibit 70, Hearing on Motion for New Trial, FPSS044338.

**Response:** Uncontroverted that Stacy Quinn testified she was "messed up" and "on drugs" immediately following the Quinn/Ewing homicides because she "seen it so good that this just messed [her] up for a while." (Pl. Ex. 139: Hearing on Motion for New Trial, 18:17-20:2). Controverted to the extent Paragraph 126 suggests that Stacy Quinn was on drugs at the time of the shooting, as Stacy testified that she was not on drugs and had a "clear mind" when she witnessed the murders. *Id.* Additionally, Stacy Quinn "believe[d] that the shooter saw [her] on April 15, 1994 when he committed the double homicide." (Pl. Ex. 77: Stacy Quinn 1996 Aff. ¶¶ 7–8). Additionally, Golubski knew Stacy Quinn well; he had an ongoing relationship with her since she was a teenager from the mid-1980s through 2000, in which he paid her for sex. SAMF ¶¶ 221–226.

127.    Stacy Quinn testified that she left the area immediately after the shooting because she was hurting and mad.  Exhibit 71, Hearing on Motion for New Trial, FPSS044348.

**Response:** Controverted. Unsupported by the evidence cited. The cited evidence states only that Ms. Quinn was "hurt". Further, Stacy Quinn remained in the area of the scene of the

crime following the shooting. SAMF ¶¶ 34, 216–217. Stacy's later testimony, which the Defendants omit, clarifies that she was mad "after we went to the hospital" and that she still had contact with her family in the months following the shooting. (Pl. Ex. 139: Hearing on Motion for New Trial 28:23-29:14). Stacy also attested she was in the Kansas City, Kansas area numerous times from 1994 to 1996 when she saw the shooter on the streets. (Pl. Ex. 77: Stacy Quinn 1996 Aff. ¶ 7); SAMF ¶93.

## ADDITIONAL MATERIAL CONTROVERTED FACTS

**Donald Ewing and Doniel Quinn are killed in a shooting during the afternoon of April 15, 1994**

1.      Doniel Quinn, who had an addiction to crack, was a regular customer of Aaron Robinson and worked as an occasional "doorman" for him at a drug house on North 21st Street. (Pl. Ex. 76: Joe Robinson Aff. ¶¶ 13–14); (Pl. Ex. 133: Niko Quinn 2014 Aff. ¶¶ 13-15); (Pl. Ex. 132: Niko Quinn Dep. 42:4-13); (Pl. Ex. 82: Cecil Brooks Aff. ¶¶ 11-15).

2.      In the weeks before he was killed, word on the street was that Doniel Quinn had stolen drugs from this stash house operated by Cecil Brooks and Aaron Robinson, and which was overseen by Neil Edgar, Jr., known as "Monster." (Pl. Ex. 83: Shonda Nichols Aff. ¶¶ 17–18)[1]; (Pl. Ex. 76: Joe Robinson Aff. ¶¶ 13–15); (Pl. Ex. 133: Niko Quinn 2014 Aff. ¶¶ 13–15); Golubski SOF, ¶ 24.

3.      Monster was an enforcer who would shoot people for hire and worked for Aaron Robinson's drug gang. (Pl. Ex. 76: Joe Robinson Aff. ¶¶ 3–19); (Pl. Ex. 82: Cecil Brooks Aff. ¶¶ 3–20).

4.      Aaron Robinson ran a drug operation under the "mentorship" of Cecil Brooks, a "major figure in the Kansas City, Kansas, drug business." (Pl. Ex. 82: Cecil Brooks Aff. ¶¶ 1–6); (Pl. Ex. 76: Joe Robinson Aff. ¶¶ 8, 12).

---

[1] In accordance with the Pretrial Order, the initials of alleged victims of sexual assault are used herein but the names of those individuals are known to the parties. See Doc. 562: Pretrial Order, Factual Stipulations ¶ 15. Further, only the redacted versions of certain affidavits and depositions (Plaintiffs' Exhibits 79, 83, 84, 86, 87, 88, 93, 94, 114, 115, 119, and 121) are attached as exhibits to this Motion in compliance with the Protective Order entered in this case (Doc. 124). However, if the Court should want copies of the unredacted versions of these affidavits, Plaintiffs will provide them.

5.      About a week before Doniel Quinn's murder, Aaron Robinson, Monster, and their associates beat him with poles and kicked him, leaving Doniel with a black eye, a swollen face, blood running down his face, and bruises all on his leg. Doniel Quinn was able to get away. (Pl. Ex. 133: Niko Quinn 2014 Aff. ¶ 14); (Pl. Ex. 132: Niko Quinn Dep. 12:10–15, 40:21–43:11, 171:22–173:10, 40:21–41:10, 42:4–43:11, 173:11–174:7; (Pl. Ex. 134: Niko Quinn DA Interview 1:1–3:25); (Pl. Ex. 84: Kendra Dean-Martin 2013 Aff. ¶ 9); Golubski's SOF ¶ 27.

6.      After that beating, there was a bounty out on Doniel Quinn for $4,000. Doniel Quinn's cousin, Niko Quinn, sent two people (including her sister, Stacy Quinn) to Aaron Robinson and Cecil Brooks to see if she could pay this debt but was told they didn't want the money. (Pl. Ex. 132: Niko Quinn Dep. 20:12–19, 43:17–46:25).

7.      The night before Doniel Quinn was murdered, Monster and his drug-business associates rode by in a car and tried to get Doniel Quinn to join them. (Pl. Ex. 132: Niko Quinn Dep. 12:10–15, 48:3–7, 48:20–49:17, 50:7–51:18); (Pl. Ex. 134: Niko Quinn DA Interview 1:1–5:21); Golubski's SOF ¶ 29.

8.      Monster was hired to kill Doniel Quinn. (Pl. Ex. 82: Cecil Brooks 2016 Aff. ¶ 17, LMKSDC_0004828); (Pl. Ex. 133: Niko Quinn 2014 Aff. ¶ 16); (Pl. Ex. 83: Shonda Nichols Aff. ¶¶ 19–20); (Pl. Ex. 76: Joe Robinson Aff. ¶¶ 7–17).

9.      On April 15, 1994, Doniel Quinn sat in a blue Cadillac on Hutchings Street in Kansas City, Kansas with Doniel Ewing. (Pretrial Order, Doc. 562, Stipulations, ¶ 5); (Ex. 1: Police File, Golubski Report, 4/16/1994 LMKSDC_0003392).

10.     Monster shot into the passenger side of the car with a shotgun in broad daylight. (Pl. Ex. 82: Cecil Brooks 2016 Aff. ¶¶ 15-18); (Pl. Ex. 133: Niko Quinn 2014 Aff. ¶¶ 14-16, 25-

26); (Pl. Ex. 135: Ruby Mitchell Aff. ¶ 3); (Ex. 1: Police File, Wansley Report, 4/16/1994 LMKSDC_0003404).

11.     Doniel Quinn died at the crime scene, while Ewing died at the hospital, both from shotgun wounds. (Pretrial Order, Doc. 562, Stipulations, ¶¶ 6-7); (Ex. 1: Police File, Golubski Report, 4/16/1994 LMKSDC_0003392).

**Monster is the real perpetrator**

12.     Monster bragged to a female friend that he had killed Ewing and Doniel Quinn. (Pl. Ex. 83: Shonda Nichols Aff. ¶¶ 18–23).

13.     Further, Aaron Robinson told his family members that Monster had committed the killings, and both Cecil Brooks and Joe Robinson attested that Monster was responsible for the murders. (Pl. Ex. 82: Cecil Brooks 2016 Aff. ¶ 18); (Pl. Ex. 76: Joe Robinson Aff. ¶¶ 15-16).

14.     Even before the murders, Monster had a reputation for doing "wild" and "crazy" things and for being violent and "wicked" without capacity for remorse (Pl. Ex. 82: Cecil Brooks Aff. ¶ 21); (Pl. Ex. 76: Joe Robinson Aff. ¶ 17); (Pl. Ex. 86: Gregory Wilson 2015 Aff. ¶¶ 2–8); (Pl. Ex. 87: Siobaughn Nichols 2014 Aff. ¶ 22); (Pl. Ex. 83: Shonda Nichols Aff. ¶¶ 14–18).

15.     Monster was close to an associate, Marlon Williams, who was a cousin of Aaron Robinson. Williams was always with Monster, including on the night before the murders. (Pl. Ex. 76: Joe Robinson Aff. ¶ 18); (Pl. Ex. 134: Niko Quinn DA Interview 1:1–5:21); (Pl. Ex. 132: Niko Quinn Dep. 50:7-51:2); (Pl. Ex. 88: Kendra Dean-Martin 2015 Aff. ¶¶ 5-7); (Pl. Ex. 84: Kendra Dean-Martin 2013 Aff. ¶ 5); (Pl. Ex. 89: Nathan Richardson Aff. ¶ 11); (Pl. Ex. 82: Cecil Brooks 2016 Aff. ¶¶ 12-14).

16.     One of Monster's associates also participated in the killings of Ewing and Quinn, by driving Monster to and from the crime scene in a blue car. (Pl. Ex. 82: Cecil Brooks Aff.

¶¶ 12-21); (Pl. Ex. 86: Gregory Wilson 2015 Aff. ¶ 11); (Pl. Ex. 88: Kendra Dean-Martin 2015 Aff. ¶ 5); (Pl. Ex. 84: Kendra Dean-Martin 2013 Aff. ¶¶ 3-12).

17.     Aaron Robinson and Marlon Williams are now deceased, and Cecil Brooks is in prison. (Pl. Ex. 82: Cecil Brooks 2016 Aff. ¶ 1); (Pl. Ex. 76: Joe Robinson Aff. ¶ 2); (Pl. Ex. 88: Kendra Dean-Martin 2015 Aff. ¶ 5); (Pl. Ex. 90: News Articles, LMKSDC_0026622–0026628).

18.     Monster is now serving thirty years in prison after pleading guilty to a different homicide in which he shot the victim in the head multiple times without provocation, put the victim's body in the trunk, poured gasoline over the car, and ordered the car set it on fire. (Pl. Ex. 91: Neil Edgar Jr. Dep. 42:10–45:19); (Pl. Ex. 92: Sentencing Transcript, Neil Edgar Jr.).

19.     Despite this gruesome crime and Monster's thirty-year sentence, he will still become parole-eligible in early 2027, and his sentence expires in 2031. (Pl. Ex. 92: Sentencing Transcript, Neil Edgar Jr.).

20.     Many members of the KCK community acknowledge that Monster committed the murders of Ewing and Doniel Quinn and that Lamonte McIntyre is innocent, and that Monster was known to be a violent thrill seeker. (Pl. Ex. 132: Niko Quinn Dep. 71:16–72:8); (Pl. Ex. 87: Siobaughn Nichols 2014 Aff. ¶¶ 21–22); (Pl. Ex. 82: Cecil Brooks Aff. ¶¶ 1–6, 8-15); (Pl. Ex. 76: Joe Robinson Aff. ¶¶ 8, 12, 18); (Pl. Ex. 93: James McIntyre Aff. ¶ 16); (Pl. Ex. 94: M'Sherie Johnson 2016 Aff. ¶ 18); (Pl. Ex. 140: Freda Quinn 2011 Aff. ¶¶ 24–25); (Pl. Ex. 95: Frank Freeman 2011 Aff. ¶¶ 5–6).

21.     Monster did not know Lamonte McIntyre. (Pl. Ex. 91: Neil Edgar Jr. Dep. 40:21–41:18).

**Lamonte McIntyre is innocent of the murders of Ewing and Doniel Quinn**

22.     Lamonte McIntyre is actually innocent of the double homicide for which he was convicted. (Certificate of Innocence, Case 2:18-cv-02545-KHV-KGG, Dkt. 187–2, pp. 2–5); (Pl. Ex. 133: Niko Quinn 2014 Aff. ¶ 28); (Pl. Ex. 134: Niko Quinn DA Interview 43:13–44:24, 47:12–24, 62:12–63:1); (Pl. Ex. 132: Niko Quinn Dep. 12:10–15, 92:22–94:7, 188:23–189:10); (Pl. Ex. 80: Roger Golubski Dep. 193:7–13, 199:22–200:4).

23.     Lamonte maintained his innocence before trial—never requesting a plea because, according to his defense attorney, "Lamonte maintained that he was innocent, he didn't do it," during trial when he testified on the stand, and throughout his time in prison and beyond. (Pl. Ex. 96: Gary Long Dep. 67:17–23); (Pl. Ex. 131: Lamonte McIntyre TT 453:24–454:19); (Pl. Ex. 97: Gary Long 2015 Aff. ¶ 3); (Pl. Ex. 95: Frank Freeman 2011 Aff. ¶¶ 9–10); (Pl. Ex. 126: Lamonte McIntyre 2016 Aff. ¶¶ 2, 11); (Pl. Ex. 93: James McIntyre Aff. ¶ 10); (Pl. Ex. 98: Rashida Martis 2011 Aff. ¶ 6).

24.     Lamonte McIntyre was at the home of one of his aunts (just across the alley from the home of his other aunt, where he was also spending time that day) on the afternoon the murders took place, as confirmed by five people. (Ex. 1: Police File, Yolanda Johnson Stmt. by Golubski, 4/20/1994, LMKSDC_0003469–3470); (Pl. Ex. 94: M'Sherie Johnson 2016 Aff. ¶¶ 3–9); (Ex: 1: Police File, M'Sherie Johnson Stmt. to Golubski, 4/20/1991); (Pl. Ex. 109: Rose McIntyre 2014 Aff. ¶ 6); (Ex. 1: Natasha Haygood Stmt. to Golubski, 4/20/1994, LMKSDC_0003477–3480); (Pl. Ex. 131: Felicia Williams TT 391:3–393:2; Peggy Crowder TT 378:2–381:8).

25.     Regardless, Lamonte McIntyre was convicted of the murders of Doniel Quinn and Donald Ewing on September 29, 1994, and was imprisoned 23 years, 5 months, and 28 days. (Pretrial Order, Doc. 562, Stipulations, ¶ 15).

26.     On October 13, 2017, Lamonte McIntyre's conviction was vacated by the District Court of Wyandotte County, Kansas and his charges were dismissed. (Pretrial Order, Doc. 562, Stipulations, ¶ 17). (Pl. Ex. 110: Evidentiary Hearing 333:19–336:9); (Pl. Ex. 127: Order Releasing Def. from Custody & Dismissal).

27.     On February 24, 2020, Lamonte McIntyre received a Certificate of Innocence stating that he "did not commit the crimes for which he was convicted and sentenced" nor was he "an accessory or accomplice to the acts that were the basis of the convictions." (Pretrial Order, Doc. 562, Stipulations, ¶ 15; Certificate of Innocence, Case 2:18-cv-02545-KHV-KGG, Dkt. 187–2, pp. 2–5).

28.     Ware testified at his deposition that he has "no basis whatsoever" to dispute the court's finding that Lamonte McIntyre is factually innocent. (Pl. Ex. 74: Dennis Ware Dep. 115:23–116:5).

**The homicide investigation was originally assigned to KCKPD homicide detectives, Blood and Maskil, but within mere hours, Culp reassigns the investigation to W.K. Smith and non-homicide detective Roger Golubski**

29.     Homicide detectives Blood and Maskil were originally assigned to lead the investigation of the murders of Ewing and Doniel Quinn. (Ex. 1: Police File, Krstolich Report, 4/15/1994, LMKSDC_0003441; Police File, Blood Report, 4/15/1994, LMKSDC_0003446; Police File, Ambler Report, 4/15/1994, LMKSDC_0003410-3411).

30.     Blood and Maskil arrived at the scene first, followed by Culp, Golubski, and finally Smith. (Ex. 1: Police File, Wansley Investigative Addendum, LMKSDC_0003410–3411).

31.     As she watched the shooter come down the hill towards Doniel Quinn and Ewing, Ruby Mitchell immediately recognized him as someone she knew—a man named Lamont, who used to date her niece. (Pl. Ex. 136: Ruby Mitchell Dep. 17:21–26:25.)

32.     When he arrived at the scene, Golubski spoke to Ruby Mitchell who told him that she thought the shooter had previously dated her niece. (Pl. Ex. 136: Ruby Mitchell Dep. 43:14-44:8; 46:16-47:21.)

33.     Golubski knew of "Lamonte McIntyre" because he had previously coerced Rose McIntyre into coming to his office, where he sexually assaulted her, and, following that, had harassed her for months. (Pl. Ex. 109: Rose McIntyre 2014 Aff. ¶¶ 45– 62); *see infra,* ¶¶ 328–348.

34.     Stacy Quinn was also at the crime scene, waiting in Josephine Quinn's yard while W.K. Smith interviewed her sister, Niko. Stacy Quinn told the officers that she saw the crime and knew who the shooter was. (Pl. Ex. 132: Niko Quinn Dep. 137:20–138:3.)

35.     Golubski knew Stacy Quinn because he had a long-time sexual relationship with her. (Pl. Ex. 133: Niko Quinn 2014 Aff. ¶ 27); (Pl. Ex. 132: Niko Quinn Dep. 12:10–15, 82:9–13, 177:19–178:8.)

36.     Culp reassigned the investigation to homicide detective W.K. Smith and non-homicide detective Roger Golubski. (Ex. 1: Police File, Blood Report, 4/15/1994, LMKSDC_0003446); (Pl. Ex. 81: W.K. Smith Dep. 34:13–23).

37.     After Smith, Golubski, and Krstolich arrived on scene, Culp directed them to interview the witnesses at the scene and sent Blood and Maskil to the hospital where Ewing had been taken.  (Ex. 1: Police File, Blood Report, 4/15/1994, LMKSDC_0003444).

38.     Golubski became the lead detective on the case, with Smith claiming that his role was limited to interviews on the scene. (Pl. Ex. 81: W.K. Smith Dep. 101:8–106:3, 126:10–128:17); (Pl. Ex. 80: Roger Golubski Dep. 49:14–19); (Pl. Ex. 131: TT 295:10–12); (Pl. Ex. 143: Tarik Khatib Dep. 20:25–21:8).

39.     As partners on the case, Golubski and Smith would have been responsible "to both try to work out direction on … how they proceed on the investigation of the case," according to Ware. (Pl. Ex. 74: Dennis Ware Dep. 174:22–175:12). The only reason Smith could come up with for why he failed to take any additional investigative steps in the case is that Golubski reported that he had satisfactorily solved it. (Pl. Ex. 81: W.K. Smith Dep. 105:18–106:3).

40.     Smith understood by 1994 that it was important to keep abreast of what was happening in the cases that he was assigned to because a district attorney could ask him questions about a case he had been assigned. (Pl. Ex. 81: W.K. Smith Dep. 255:13–256:1, 258:12–23); (Pl. Ex. 143: Tarik Khatib Dep. 152:15–153:6).

41.     There was no legitimate police reason for Culp to make Golubski, a non-homicide detective, the lead detective on this double homicide investigation, when Smith, a homicide detective was also assigned to work the case. (Pl. Ex. 99: Clyde Blood Dep. 64:2–15, 66:15–20, 72:22–73:2, 75:18–25, 76:4–7, 76:14–22, 179:17–180:2, 185:4–11, 203:4–10).

42.     The KCKPD homicide division had the "manpower" and resources it needed to thoroughly investigate every homicide investigation. (Pl. Ex. 99: Clyde Blood Dep. 68:20–70:1). In the event that the homicide division was investigating multiple homicides and had to bring in help by non-homicide detectives, the homicide detective was to take the lead, with the non-homicide detective assisting. (Pl. Ex. 99: Clyde Blood Dep. 72:2–73:8, 75:18–76:22).

43.     Culp understood at the time that homicide detectives had specialized training to inform the specific steps needed for investigating homicide. (Pl. Ex. 99: Clyde Blood Dep. 77:1–15). Blood had never seen a non-homicide detective assigned to be lead investigator in any other case. (Pl. Ex. 99: Clyde Blood Dep. 184:22–185:11).

**Niko Quinn, a partial witness to the shooting of Donald Ewing and Doniel Quinn, observes that the shooter is short and tells that to Golubski, who does not report it**

44.     Niko Quinn was walking up Hutchings Street toward the house of her mother, Josephine Quinn, who lived a couple doors down, when the shooting occurred. (Pl. Ex. 133: Niko Quinn 2014 Aff. ¶ 7); (Pl. Ex. 134: Niko Quinn DA Interview 6:16–8:16); (Pl. Ex. 132: Niko Quinn Dep. 12:10–15, 171:22–173:10). Niko observed the shooter walk downhill towards the car, but she "really didn't pay no attention to mind" at that time. Shen then saw him bend over the car and heard the first shot; at that point she turned around and walked back toward the house. (Pl. Ex. 134: Niko Quinn DA Interview 40:11–22; 42:9–43:12); (Pl. Ex. 132: Niko Quinn Dep. 12:10–15, 56:9–60:9).

45.     Niko Quinn was at an angle from the shooter, and, given sun glare she could not see the details of the shooter's face, but she could see his silhouette. (Pl. Ex. 132: Niko Quinn Dep. 61:6–21, 62:25–63:5, 64:25–65:5, 142:25–143:2). Niko Quinn noticed that the shooter "was a short guy," around 5'6" or 5'7", and that he had a "medium brown" skin tone. (Pl. Ex. 134: Niko Quinn DA Interview 8:19–24, 49:17–50:24); (Pl. Ex. 132: Niko Quinn Dep. 12:10–15, 108:11–19).

46.     Monster had a medium skin color, was no more than 5'7", and shared the same build as the shooter that Niko Quinn observed. (Pl. Ex. 108: Monster MODOC Offender Profile,

LMKSDC_00004926); (Pl. Ex. 147: Monster Mug Shot 1996); (Pl. Ex. 134: Niko Quinn DA

Interview 50:8–23); (Pl. Ex. 132: Niko Quinn Dep. 12:10–15).

47.     In a taped interview by Det. Smith shortly after the crime, Niko Quinn was asked

how the shooter was dressed and responded "He had on black. A black hat, black pants, and

black tennis shoes." Quinn was not asked on the tape to describe the shooter, including his

height, build, or skin tone.  (Ex. 1: Police File, Niko Quinn Stmt. by Smith, 4/15/1994,

LMKSDC_0003417–20). The interview lasted only a few minutes. *Id.*

48.     On April 16, 1994, the day after the murder, Golubski and Ware spoke to Niko

Quinn about the murders. Niko Quinn explained to them "the guy that killed [her] cousin was not

a big, tall guy. He was maybe like 5'7", 5'6", somewhere around there. He was a short guy." (Pl.

Ex. 134: Niko Quinn DA Interview 8:19–24); (Pl. Ex. 132: Niko Quinn Dep. 12:10–15) (Ex. 1:

Police File, Golubski Investigative Addendum, 4/16/1994, LMKSDC_0003455).

49.     Lamonte McIntyre is significantly taller and had a different skin tone than the

description Niko Quinn gave police of the shooter. (Pl. Ex. 133: Niko Quinn 2014 Aff. ¶¶ 21,

29); (Pl. Ex. 142: Niko Quinn 1996 Aff. 1996, ¶¶ 5, 8); (Pl. Ex. 134: Niko Quinn DA Interview

39:14–19, 47:3–7); (Pl. Ex. 132: Niko Quinn Dep. 12:10–15, 171:22–173:10).  The Arrest

Report by Defendant Brown in the police file lists McIntyre's height as 5'11". (Ex. 1: Police

File, Arrest Report, LMKSDC_0003413)

50.     When asked if he recognized that the consistent description of the shooter as

approximately 5'6" or 5'7" was inconsistent with Lamonte McIntyre, who was at least 5'11",

Golubski refused to answer and instead invoked his Fifth Amendment right to remain silent. (Pl.

Ex. 80: Roger Golubski Dep. 152:22–154:21); (Ex. 1: Police File, Arrest Report,

LMKSDC_0003413).

51.     Smith has interviewed hundreds of witnesses during the course of his career and was skilled at conducting witness interviews. (Pl. Ex. 81: W.K. Smith Dep. 63:16–23, 227:19–228:21). By 1994, Smith was an experienced detective who knew how to conduct witness interviews. (Pl. Ex. 81: W.K. Smith Dep. 73:13–24, 227:19–228:21).

52.     Smith further testified that he understood by 1994 that it was important to get all information possible from a witness during his initial interview, including a physical description of the perpetrator as possible, such as height, weight, build, and skin color, and to figure out where the witness was standing in relation to the perpetrator to assess how well the witness could see. (Pl. Ex. 81: W.K. Smith Dep. 75:19–76:19, 327:9–328:7, 331:9–332:2).

53.     Smith failed to ask Niko Quinn any of these questions when he interviewed her on tape at the scene, and the interview lasted only a few minutes. (Pl. Ex. 81: W.K. Smith Dep. 332:3–333:12, 335:17–337:11, 338:7–24) (Ex. 1: Police File, Golubski Addendum 4/16/1994, LMKSDC_0003455–3456). Neither Culp nor Golubski addressed this failure by Smith to ask Niko Quinn for a description of the shooter she observed. (Pl. Ex. 81: W.K. Smith Dep. 341:18–342:3).

54.     Detectives had an obligation in 1994 to ensure that anything potentially relevant they learned from a witness was documented either in a report; according to Blood, "[i]f it wasn't on paper, it didn't happen." (Pl. Ex. 99: Clyde Blood Dep. 107:7–108:23); *see also* (Pl. Ex. 81: W.K. Smith Dep. 272:23–273:12).

55.     Also in 1994, it was important to document investigative information in police reports so that a supervisor could review what was done in an investigation, to track leads, and to make a thorough record of all the evidence gathered to give to the prosecutor. (Pl. Ex. 102: James Brown Dep. 183:3–184:11).

65

56.     Each KCKPD officer was obligated to write a report including every step they took during an investigation, even if another detective on the case would be writing a report including similar information. (Pl. Ex. 99: Clyde Blood Dep. 110:4–22); (Pl. Ex. 102: James Brown Dep. 212:3–8).

57.     Despite this obligation, Golubski and Ware did not record in any report this description by Niko Quinn of the shooter's height, which was inconsistent with Lamonte McIntyre. (Pl. Ex. 99: Clyde Blood Dep. 112:21–113:10); (Pl. Ex. 74: Dennis Ware Dep. 223:6–15); (Ex. 1: Entire Police File, LMKSDC_0003391–3500.)

58.     Officers also had an obligation to bring witnesses down to the station and interview them as quickly as possible after the crime occurred to avoid witnesses' memories changing and their later failure to cooperate. (Pl. Ex. 99: Clyde 90:19–92:2).

59.     Even though Niko Quinn told Smith that she might recognize the shooter if she saw him again, he did not take her down to the station to conduct a photo identification procedure that day. (Pl. Ex. 81: W.K. Smith Dep. 137:15–144:9).

**In violation of procedure, Golubski and Ware bring an improperly suggestive set of photos to show Niko Quinn**

60.     KCKPD procedure in 1994 was to conduct a live lineup any time a suspect was in custody, as opposed to a photo lineup. (Pl. Ex. 99: Clyde 16:22–17:8).

61.     However, on April 16, 1994, the day after the murders, when McIntyre was already in custody, Golubski and Ware went to Niko Quinn's home and showed her a stack of five loose photos with the names written on the back. (Ex. 1: Police File, Golubski Investigative Addendum, 4/16/1994, LMKSDC_0003455); (Pl. Ex. 133: Niko Quinn 2014 Aff. ¶ 17); (Pl. Ex.

74: Dennis Ware Dep. 167:1–15); (Pl. Ex. 132: Niko Quinn Dep. 82:2–83:4, 171:22–173:10,

181:6–12); (Pl. Ex. 85: Polaroids from Lineup with Names on Back).

62.      Smith had been assigned to work the case with Golubski; it was out of the

ordinary for Ware to accompany Golubski instead of Smith. (Pl. Ex. 74: Dennis Ware Dep.

169:10–23).

63.      The procedure for putting together a photo lineup at the KCKPD was to put the

photo of the suspect and fillers in a manila folder with squares cut in it. It was not proper

procedure to hand a witness a stack of photos, as that could be suggestive. (Pl. Ex. 81: W.K.

Smith Dep. 147:24–148:8, 151:16–152:19); (Pl. Ex. 99: Clyde Blood Dep. 161:19–24).

64.      A photo lineup should include only one suspect and the rest should be fillers

(other people who closely resemble the suspect), and typically the identification unit would find

the fillers to fill out the rest of the photo lineup. (Pl. Ex. 81: W.K. Smith Dep. 147:24–149:15,

152:20–154:18); (Pl. Ex. 74: Dennis Ware Dep. 161:1–162:24); (Pl. Ex. 99: Clyde Blood Dep.

20:13–21:24); (Pl. Ex. 103: Michael York Dep. 24:6–26:2, 27:17–28:16).

65.       As Michael York, the Unified Government's representative explained, when

choosing fillers, the idea is that "[y]ou are certain when you are choosing those photographs that

this person is not part of the crime, was not responsible for the crime." (Pl. Ex. 103: Michael

York Dep. 25:4–13).

66.      Plaintiffs' eyewitness identification expert Dr. Dysart opines, "It is critically

important to include fillers who had nothing to do with the crime so that the array contains

clearly wrong answers; this is necessary in order to test the reliability of the witness's selection

when they do select a suspect." (Pl. Ex. 73: Expert Report of Jennifer Dysart p. 12).

67.     Two of the other photos in the five-photo stack Niko Quinn viewed were of Lamonte McIntyre's relatives: his brother, James McIntyre; and his cousin, Terrence. (Pl. Ex. 85: Polaroids from Lineup with Names on Back); (Pl. Ex. 93: James McIntyre Aff. ¶ 29); (Pl. Ex. 105: Lamonte McIntyre 2022 Decl. ¶ 4 & Ex. A).

68.     KCKPD officers understood it was improper to include multiple family members in one photo lineup because that would be suggestive and unfair. (Pl. Ex. 74: Dennis Ware Dep. 160:1–8, 162:16–163:2); (Pl. Ex. 99: Clyde Blood Dep. 21:25–23:24, 221:17–222:18); (Pl. Ex. 103: Michael York Dep. 36:20–37:2); (Pl. Ex. 73: Expert Report of Jennifer Dysart p. 12); (Pl. Ex. 104: Timothy Maskil 2015 Aff. ¶ 10); (Pl. Ex. 80: Roger Golubski Dep. 107:11–108:15).

69.     During this photo showing, Niko Quinn told Golubski and Ware that she recognized two of the men included in the photographs whom she knew didn't do the shooting: Lamonte McIntyre's brother, James McIntyre, whom she used to date, and Raymond Hickman, who is her cousin. (Pl. Ex. 85: Polaroids from Lineup with Names on Back); (Pl. Ex. 134: Niko Quinn DA Interview 22:24–23:10); (Pl. Ex. 132: Niko Quinn Dep. 12:10–15, 82:25-85:16).

70.     The photo stack included a photo of Lamonte McIntyre taken in 1992, when he was sixteen years old, nearly one and a half years younger and when he had a much more childish face. (Pl. Ex. 85: Polaroids from Lineup with Names on Back); (Pl. Ex. 107: Lamonte McIntyre 1994 Mugshot).

71.     At the time of interview with Niko Quinn on April 16, 1994, KCKPD officers had access to a more recent photograph of Lamonte McIntyre from February 1994, which provided a more accurate depiction of Lamonte, and also had Lamonte McIntyre in custody. However, the 1994 photograph was not shown to witnesses in this case, and no in-person line up was

conducted. (Ex. 1: Entire Police File, LMKSDC_0003391–3500); (Pl. Ex. 107: Lamonte McIntyre 2/28/1994 Mugshot).

72.     There was such a "discernible difference" between Lamonte McIntyre's features as depicted in the 1992 photo used in the photo stack and a photo of McIntyre taken in February 1994 that to Ware, they looked like different people. (Pl. Ex. 74: Dennis Ware Dep. 241:13–243:18); *see also* (Pl. Ex. 73: Expert Report of Jennifer Dysart p. 13).

73.     The practice in the KCKPD was to select the closest available in time photograph of the suspect for a photo identification procedure so that it would be "the closest likeness…to what the perpetrator looked like when the witness saw them" to maximize the chance the witness would select the perpetrator. (Pl. Ex. 74: Dennis Ware Dep. 231:2–233:16); (Pl. Ex. 99: Clyde Blood Dep. 26:8–19); (Pl. Ex. 100: Russell Fischer Report, p. 15). If the suspect was a juvenile, the first step would have been to determine their most recent arrest when choosing a photo. (Pl. Ex. 81: W.K. Smith Dep. 149:19–25).

74.     Ware admitted he could not think of any "conceivable legitimate reason" to use the 1992 photo of McIntyre in a lineup if the 1994 photo was available and agreed it would be important to ask Golubski why he selected a photograph of Lamonte McIntyre from 1992 to show the witnesses when there was a photograph taken two months prior to the crime apparently available. (Pl. Ex. 74: Dennis Ware Dep. 243:19–244:22); (Pl. Ex. 107: Lamonte McIntyre 2/28/1994 Mugshot).

75.     Golubski reported that he had shown Niko Quinn a "photo lineup," which has a particular meaning in police vernacular: a number of photos either mounted on a piece of paper or in a manila envelope with squares cut out. (Pl. Ex. 74: Dennis Ware Dep. 156:12–157:9,

189:9–190:18); (Pl. Ex. 81: W.K. Smith Dep. 265:17–267:13); (Pl. Ex. 100: Russell Fischer Report p. 14).

76.     Calling the showing of a stack of five Polaroids loosely handed to a witness a "photo lineup" is inaccurate, and it could mislead a supervisor or prosecutor that any selection made is more inculpatory than it actually is. (Pl. Ex. 80: Roger Golubski Dep. 113:1–25, 163:4–16); (Pl. Ex. 74: Dennis Ware Dep. 156:12–157:9, 189:9–190:18); (Pl. Ex. 81: W.K. Smith Dep. 265:17–267:13); (Pl. Ex. 100: Russell Fischer Report p. 14).

**Golubski and Ware use suggestion and coercion during the first photo procedure they conduct with Niko Quinn, but are unsuccessful in obtaining an identification**

77.     After Niko Quinn eliminated the two people she personally recognized from the stack of five photos, she was holding the remaining pictures and looking at them. Golubski told Niko Quinn that if she knew who the shooter was, she better testify and that it would be better for her if she did. (Pl. Ex. 133: Niko Quinn 2014 Aff. ¶ 17). Niko told Golubski and Ware "No, I don't know who it is." (Pl. Ex. 132: Niko Quinn Dep. 83:21–85:16).

78.     As Niko Quinn explained: "That's when they grabbed the pictures back and the one guy held the picture and he said what did he—what did she [Ruby Mitchell] say the guy's name was? And I said she said Lamont. So he's holding the picture like this of Lamonte and he said, "What did she say the man's name was?" And I said Lamont. When they held the picture up they held it in the sun and I could see Lamonte's name on the back. And I just stared at the picture and just staring at it. And I gave them the picture back and said I don't know who it was. And that's when they were saying you know who it is, you know who it is. I said I don't know." (Pl. Ex. 132: Niko Quinn Dep. 83:21–85:16, 135:6–24); (Pl. Ex. 134: Niko Quinn DA Interview 23:12–24:13, 63:10–18); (Pl. Ex. 133: Niko Quinn 2014 Aff. ¶ 18.)

79.     While Golubski was instructing Niko Quinn to make an identification and asking about the name Ruby Mitchell had given, Ware placed his thumb on Lamonte McIntyre's photo, as if he were pointing at it. (Pl. Ex. 133: Niko Quinn 2014 Aff. ¶ 18); (Pl. Ex. 132: Niko Quinn Dep. 12:10–15, 181:6–182:17); (Pl. Ex. 134: Niko Quinn DA Interview 23:12–24:13).

80.     Ware admitted that if he placed his thumb on Lamonte McIntyre's photo as Niko Quinn described, that would have been "grossly improper" and "direct suggestion" and that he knew that in 1994. (Pl. Ex. 74: Dennis Ware Dep. 85:21–86:20, 183:7–17); *see also* (Pl. Ex. 73: Expert Report of Jennifer Dysart p. 14); (Pl. Ex. 143: Tarik Khatib Dep. 232:4–233:16).

81.     Ware also understood by 1994 that if he observed Golubski try to influence Niko Quinn's suggestion in any of the ways she described he had an obligation to intervene and to report Golubski up the chain of command; Ware did not do so. (Pl. Ex. 74: Dennis Ware Dep. 179:18–182:11); (Pl. Ex. 81: W.K. Smith Dep. 253:5–254:16).

82.     If any of the Defendant officers became aware that Golubski had fabricated evidence in the course of the investigation, or lied about the investigative steps he took, they had an obligation to report that information. (Pl. Ex. 143: Tarik Khatib Dep. 93:20–94:14; 255:21–256:7, 267:25–268:22).

83.     According to Ware, if he had even a hint of a sense that a fellow officer was breaking the rules, he would have reported that officer; but in all his years as a KCKPD officer, he never saw another officer or civilian employee engage in any misconduct more serious than a uniform violation or tardiness. (Pl. Ex. 74: Dennis Ware Dep. 73:16–22; 79:17–80:13).

84.     Despite this direct suggestion, Niko Quinn told Golubski and the other detective that she could not make an identification from these photos. (Pl. Ex. 132: Niko Quinn Dep. 171:22–173:10, 185:21–25); (Pl. Ex. 133: Niko Quinn 2014 Aff. ¶ 18).

**Golubski fabricates a police report of his first identification procedure with Niko Quinn**

85.     In his police report, Golubski reported that Niko Quinn had a physical reaction to viewing the photo of Lamonte McIntyre, claiming she stared at it and "began shaking, became teary eyed, and was very hesitant in making any statements," that she could not describe any difference between this photo and the shooter, would not let go of the photo for four or five minutes, and then said she "thought this was the individual but was not sure at this time positively. But thought this might be him." Golubski also reported that it was "very obvious that Niko Quinn knows exactly who the shooter is, but being highly traumatized at this time is reluctant to provide that information." (Ex. 1: Police File, Golubski Investigative Addendum (4/16/1994), LMKSDC_003455-3456); *see also* (Pl. Ex. 131: Roger Golubski TT 326:16–27:17).

86.     Golubski's report does not accurately describe the circumstances surrounding Niko Quinn's viewing of the photographs. In particular, Niko Quinn did not tentatively identify Lamonte McIntyre, as Golubski describes in his report, but instead told Golubski and Ware that she could not make any identification from the photos. (Pl. Ex. 132: Niko Quinn Dep. 185:21–25).

87.     Golubski's report of the identification procedure omits the direct suggestion Niko Quinn describes by Golubski and Ware and also omits that Niko Quinn could immediately eliminate two of the five people in the array because she knew them and knew they were not the perpetrator. (Ex. 1: Police File, Golubski Addendum 4/16/1994, LMKSDC_0003455–3456); (Pl. Ex. 134: Niko Quinn DA Interview 22:24–23:10); (Pl. Ex. 132: Niko Quinn Dep. 12:10–15, 82:25-85:16).

88.     When asked if he fabricated this report of the April 16, 1994 identification procedure with Niko Quinn, Golubski refused to answer and instead invoked his Fifth Amendment right to remain silent. (Pl. Ex. 80: Roger Golubski Dep. 163:4–166:2).

**Niko Quinn realizes the real perpetrator is Monster**

89.     Within a few days after the murder, Niko Quinn realized her cousins had been shot by associates of a dangerous group of drug-dealers that included Cecil Brooks and his cousin Aaron Robinson, in some sort of a "drug hit," and they were the same group that beat up Doniel Quinn about a week before his murder and came looking for him the night before the murder. (Pl. Ex. 132: Niko Quinn Dep. 88:18–89:2, 196:2–10; 12:10–15, 40:21–43:11, 171:22–173:10, 40:21–41:10, 42:4–43:11, 173:11–174:7); (Pl. Ex. 133: Niko Quinn 2014 Aff. ¶ 14.); (Pl. Ex. 134: Niko Quinn DA Interview 1:1–3:25); (Pl. Ex. 84: Kendra Dean-Martin 2013 Aff. ¶ 9); Golubski's SOF ¶ 27.

90.     This group included "Monster," who was an enforcer who would shoot people for hire and worked for Aaron Robinson. (Pl. Ex. 76: Joe Robinson Aff. ¶¶ 3–19); (Pl. Ex. 82: Cecil Brooks Aff. ¶¶ 3–20).

91.     After the murder, for three of four days in a row people would park in front of Niko Quinn's house, knock on her door, and she would look out and "two dudes are standing on [her] porch with guns." Niko Quinn was scared that they were coming after her because she had witnessed a murder, and she left and went to Missouri. (Pl. Ex. 132: Niko Quinn Dep. 88:7–17, 90:19–91:14).

92.     Around the same time, a "couple of days after" Lamonte McIntyre was picked up, a girl named Tiffany Daniel told Niko Quinn at a gas station that Lamonte didn't do the shooting,

73

Monster did. (Pl. Ex. 134: Niko Quinn DA Interview 43:13–44:17); (Pl. Ex. 132: Niko Quinn

Dep. 12:10–15, 75:19–76:5).

93.     Stacy Quinn also pointed out Monster to Niko Quinn after the murders and said,

"That's the one that killed Little Don"; she would point him out to Niko Quinn "all the time."

(Pl. Ex. 134: Niko Quinn DA Interview 43:23–44:24, 46:10–47:24); (Pl. Ex. 132: Niko Quinn

Dep. 12:10–15, 171:22–173:10); (Pl. Ex. 133: Niko Quinn 2014 Aff ¶ 19).

94.     Niko Quinn became confident Monster was the shooter. (Pl. Ex. 132: Niko Quinn

Dep. 12:10–15, 71:16–72:8); (Pl. Ex. 134: Niko Quinn DA Interview 46:10–47:24).

**Niko Quinn calls Golubski to tell him she knows Monster killed her cousin, but Golubski
pressures her to identify Lamonte McIntyre**

95.     Because she was scared about the people showing up at her house with guns,

Niko Quinn called Golubski on the phone. She told him she needed to talk to him and that she

could identify the guy who killed her cousin. "At the time that [she] called him [she] knew it was

Monster and Cecil and them." (Pl. Ex. 132: Niko Quinn Dep. 91:15–92:7, 149:2–15).

96.     Approximately three weeks or a month after the murders, Golubski met with Niko

Quinn behind the Wyandotte High School track. (Pl. Ex. 133: Niko Quinn 2014 Aff. ¶ 19.); (Pl.

Ex. 132: Niko Quinn Dep., 92:8–12, 92:22–24, 171:22–173:10) (Pl. Ex. 131: Roger Golubski TT

327:18–328:16).

97.     Niko Quinn sat in Golubski's car with him alone to talk to him. (Pl. Ex. 132: Niko

Quinn Dep. 93:2–14).

98.     It was KCKPD practice in 1994 that two officers should be present for a witness

interview whenever practicable, and officers were trained as such. (Pl. Ex. 99: Clyde Blood Dep.

92:3–17).

99.     Niko Quinn describes what she told Golubski: "So when I sat in the car with Golubski I told him I know who killed my cousin, and he said how I know. And I explained to him what took place before my cousin was killed, which was him getting beat by Aaron Robinson and Monster, and that they had tried to pick him up the day prior to the murder, trying to get him to go with them the day of the murder. And just word on the street and whatever." (Pl. Ex. 132: Niko Quinn Dep. 93:15–94:7). Niko Quinn specifically told Golubski about Doniel being beat up in the days before his murder and his injuries, "that Cecil had his boys had jumped him maybe a week or two before he was killed, and also told him that they were trying to get him in the car the last two days before he was killed." She also told him Doniel "didn't have no beef with nobody but the guys that jumped him." (Pl. Ex. 132: Niko Quinn Dep. 174:8–175:17).

100.     Golubski responded by warning Niko Quinn to leave that alone, that she "shouldn't be talking about Cecil, be careful what [she] say[s] about Cecil because they found his ex-girlfriend's remains behind Washington High School." (Pl. Ex. 132: Niko Quinn Dep. 93:15–94:7, 175:18–176:4).

101.     Golubski told Niko Quinn Cecil Brooks and Aaron Robinson and their gang "didn't do it, they couldn't have did it because they had the guy in custody [referring to Lamonte McIntyre], they had the clothes he was wearing and they had the gun so they got the right person." (Pl. Ex. 132: Niko Quinn Dep. 176:5–20).

102.     However, the police never had any incriminating clothes, gun, or any other physical or forensic evidence implicating Lamonte McIntyre. (Pl. Ex. 141: Terra Morehead Dep. 177:21–178:14, 181:12–15, 182:7–15, 182:18–25); (Pl. Ex. 96: Gary Long Dep. 58:19–60:3, 60:13–16).

103.    Knowing Niko Quinn was scared for her life, Golubski offered to put her in protective custody; he then helped her move to 4th Street. (Pl. Ex. 132: Niko Quinn Dep. 98:9–99:4, 186:1–187:10); (Pl. Ex. 80: Roger Golubski Dep. 169:19–170:11).

104.    During this conversation, Golubski put a lot of pressure on Niko Quinn to make a positive identification. Specifically, Golubski "gives [her] the picture, he tells [her] that they had the clothes, they had the gun, and they had Lamonte in custody, and they knew for a fact that he was the one that killed [her] cousin." (Pl. Ex. 132: Niko Quinn Dep. 94:8–14); (Pl. Ex. 133: Niko Quinn 2014 Aff. ¶ 20); (Pl. Ex. 132: Niko Quinn Dep. 171:22–173:10).

105.    Golubski also asked Niko Quinn if it was possible that the people after her could be Lamonte McIntyre's brothers and cousins; Niko Quinn told him she knew the McIntyre family (although she did not know Lamonte) and that "there is no way that [they] would do anything like that." (Pl. Ex. 132: Niko Quinn Dep. 94:15–23).

106.    When asked if he fabricated Niko Quinn's identification of Lamonte McIntyre, Golubski refused to answer and instead invoked his Fifth Amendment right to remain silent. (Pl. Ex. 80: Roger Golubski Dep. 150:14–151:3, 174:19–175:2).

**In violation of policy/procedure Golubski makes no contemporaneous report of Niko Quinn's alleged identification or the exculpatory information she reports to him about Monster**

107.    It is the lead detective's obligation in a homicide case to ensure that every potentially significant thing that happens is accurately documented in the file, including identification procedures, whether they resulted in a positive identification or not. (Pl. Ex. 99: Clyde Blood Dep. 107:7–25, 118:23–119:12, 164:13–165:4); (Pl. Ex. 144: Ronald Miller Dep. 75:25–77:5).

108.    It was KCKPD practice to audio record witness statements whenever possible, and each homicide detective carried a tape recorder with them in the field. (Pl. Ex. 99: Clyde Blood Dep. 93:4–17). The practice was then that these interviews would be transcribed and signed by the witnesses. (Pl. Ex. 99: Clyde Blood Dep. 110:23–111:12).

109.    When witnesses were re-interviewed, officers were obligated to make separate documentation of those subsequent interviews. (Pl. Ex. 99: Clyde Blood Dep. 123:19–124:22).

110.    Golubski did not make any contemporaneous report of his meeting with Niko Quinn behind Wyandotte High School nor the alleged second photo identification procedure. (Pl. Ex. 131: Roger Golubski TT 330:24–331:4); (Pl. Ex. 141: Terra Morehead Dep. 141:12–142:1, 185:8–187:25); Golubski SOF ¶ 85.

111.    Niko Quinn told Golubski on numerous occasions that the police had gotten the wrong man for Doniel's murder, and that her sister said the real killer was Monster. In response, Golubski said nothing and took no action. (Pl. Ex. 133: Niko Quinn 2014 Aff. ¶ 28, 2014); (Pl. Ex. 134: Niko Quinn DA Interview: 171:22–173:10).

112.    For example, before she was going to testify, Niko Quinn and Golubski were in a room together at the juvenile courthouse. Niko Quinn told Golubski that Lamonte McIntyre did not commit the crime. Golubski's sole response was that they "could not discuss that in here." There, Golubski also told Niko Quinn that she heard she used to strip and asked her to get up and dance on the table for money. (Pl. Ex. 134: Niko Quinn DA Interview 30:23–31:18); (Pl. Ex. 132: Niko Quinn Dep. 12:10–15).

113.    Encountering Golubski around 2011, Niko Quinn waved him down, to which Golubski responded that he should not talk to her because she is the one who "told on him" to an

investigator regarding his misconduct. (Pl. Ex. 134: Niko Quinn DA Interview 64:4–25); (Pl. Ex. 132: Niko Quinn Dep., 12:10–15).

**Consistent with Niko Quinn's account to Golubski, Defendants have a lot of other evidence indicating that the double homicide was a drug hit**

114.    Police collected a crack pipe from the car where Ewing and Quinn were murdered. (Ex. 1: Police File, Golubski Report, 4/16/1994 LMKSDC_0003394; Police File, Clair Report, 4/18/1994, LMKSDC_0003430; Police File, LMKSDC_0003453).

115.    Police knew that drug trafficking took place in the area in which the double homicide occurred. (Pl. Ex. 74: Dennis Ware Dep. 208:23-209:19).

116.    Detective Ware testified that in "any homicide you want to find out whether there is some drug connection," and that it is "more likely" a homicide is drug-related when there is an "execution style murder in the middle of the day" near the area of 18th Street and Quindaro in Kansas City, Kansas in 1994. (Pl. Ex. 74: Dennis Ware Dep. 211:16–215:19).

117.    Indeed, Golubski alleges that the North End neighborhood where the murders occurred was "riddled with addiction and drug dealers preying upon those with drug addictions." (Pretrial Order, Doc. 562, Contentions of Defendant Roger Golubski, p. 26).

118.    Doniel Quinn's father, John Quinn, also told Golubski that Doniel had been hanging out with "[a] cobra snake [whose] any kind of bite would be instant death." (Ex. 1: Police File, John Quinn Stmt. LMKSDC_0003462, 0003466). There is no record that Golubski or any other detective attempted or did follow up on John Quinn's statement.

119.    When Smith interviewed Josephine Quinn, a potential eyewitness to the crime, he asked whether Doniel Quinn, her nephew, was involved in drug trafficking because it was an

obvious angle for investigation given the circumstances of the crime. (Ex. 1: Josephine Quinn

Stmt. by Smith, 4/15/1994, LMKSDC_0003428); (Pl. Ex. 81: W.K. Smith Dep. 385:8–19).

120.    Smith testified that, when he took a statement from Josephine Quinn at the scene

of the crime, he knew "that Josephine had more information but wasn't forthcoming because she

feared, I think she feared some reprisals." However, Smith did not document these impressions

in his report, nor did he orally report them to Golubski. (Pl. Ex. 81: W.K. Smith Dep. 90:8–

93:22. By the early 1990s, Smith understood that it was important to document and memorialize

all information that could be obtained from a witness. (Pl. Ex. 81: W.K. Smith Dep. 78:10–19.

121.    According to Defendants' own expert, Tarik Khatib, it was "an obvious and

important angle" to look into whether Lamonte McIntyre had any connection to the drug gangs

operating in the area of the shooting once he became a suspect. (Pl. Ex. 143: Tarik Khatib Dep.

181:7–16, 184:6–11).

**Golubski later fabricates that Niko Quinn made an adamant identification of Lamonte McIntyre during this meeting behind Wyandotte High School**

122.    After the preliminary hearing, Golubski reported to the prosecutor that Niko

Quinn had earlier volunteered an adamant and unequivocal identification of Lamonte McIntyre,

without any suggestion from him, approximately a week after the murder. (Pl. Ex. 141: Terra

Morehead Dep. 131:3–18).

123.    Golubski later testified at trial that Niko Quinn had made an "adamant"

identification of Lamonte McIntyre during this meeting, and that she had done so without any

suggestion from him. (Pl. Ex. 131: Roger Golubski TT 327:18–329:15).

124.    Golubski's report was a lie; Niko Quinn was never adamant about selecting

Lamonte McIntyre's photo; rather, she described detectives' direct suggestion as to who she

should identify. (Pl. Ex. 132: Niko Quinn Dep. 188:23–189:18); (Pl. Ex. 80: Roger Golubski Dep. 172:3–22); *see supra* paras. 78–88.

125.    Golubski's failure to make any contemporaneous record or inform anyone of Niko Quinn's identification at the time it first happened is so unusual as to raise questions about the legitimacy of Golubski's investigation. In fact, Smith had never seen anything like that in the course of his police career. Further, Blood agreed he had never seen a case where an officer failed to document a positive identification from an eyewitness, and that if he obtained a positive identification, he would be "tickled" and would document it because "that made my job a lot easier if that's the guy." (Pl. Ex. 99: Clyde Blood Dep. 173:4–16); (Pl. Ex. 81: W.K. Smith Dep. 350:9–352:4). *See also* (Pl. Ex. 100: Russell Fischer Report p. 13–14).

126.    When asked if the reason he did not make a contemporaneous record of what he later described as an adamant identification by Niko Quinn was because it didn't happen that way, and, in reality, he told Niko Quinn who to pick, Golubski refused to answer and instead invoked his Fifth Amendment right to remain silent. (Pl. Ex. 80: Roger Golubski Dep. 177:11–178:7, 179:5–180:10, 180:17–181:2).

**Ruby Mitchell is a partial eyewitness to the shooting of Donald Ewing and Doniel Quinn**

127.    Ruby Mitchell lived diagonally across the street, two houses down from the parked car where Ewing and Quinn were shot. (Pl. Ex. 138: Preliminary Hearing 5:16–6:5, 10:4–11:19).

128.    Mitchell was standing in her doorway with her five-year-old son, talking on the phone, when she briefly viewed, through a storm door with a screen, the shooter approach the car and commit the murders, (Pl. Ex. 136: Ruby Mitchell Dep. 16:1-17:20); (Pl. Ex. 138: Preliminary Hearing, Ruby Mitchell 15:17–16:4).

129.     Mitchell did not see any of the shooter's facial features, but thought she recognized the shooter as her niece's boyfriend due to his skin tone and hairstyle, and was about to call out to him when she saw the gun.  (Pl. Ex. 136: Ruby Mitchell Dep. 21:10-18; 24:19-25:19; 42:7–11); (Pl. Ex. 138: Preliminary Hearing, Ruby Mitchell 13:6–20); (Pl. Ex. 135: Ruby Mitchell Aff. ¶¶ 9, 12).

130.     Although Mitchell only knew her niece's boyfriend by his first name, "Lamont," his full name is Lamont Drain. (Pl. Ex. 136: Ruby Mitchell Dep. 26:19-25); (Pl. Ex. 138: Preliminary Hearing, Ruby Mitchell 19:6–7); (Pl. Ex. 131: Ruby Mitchell TT 181:6–11).

131.     Mitchell had a friendly relationship with Drain; he called her "auntie," she spent time with him with her niece, and he came over to her house sometimes. (Pl. Ex. 136: Ruby Mitchell Dep. 24:5-18, 25:15-26:10); (Pl. Ex. 131: Ruby Mitchell TT 165:12-25).

132.     Mitchell thought that the Lamonte she knew, who had dated her niece, was the person who did the shooting. At no point during the shooting did Mitchell change her mind about who she thought it was. (Pl. Ex. 136: Ruby Mitchell Dep. 127:10-14); (Pl. Ex. 131: Ruby Mitchell TT 165:12-166:7).

133.     Mitchell was shocked by the shots; she shut the door and called the police. (Pl. Ex. 136: Ruby Mitchell Dep. 42:7–21).

134.     Mitchell then went back outside where she met Niko Quinn and sat with her on her porch. (Pl. Ex. 131: Ruby Mitchell TT 167:16-168:2). Mitchell told Niko Quinn the shooter was Lamont, her niece's boyfriend. (Pl. Ex. 134: Niko Quinn DA Interview 19:16-24; 21:11-22); (Pl. Ex. 132: Niko Quinn Dep. 64:3-14).

135.     Like Lamont Drain, Neil Edgar Jr, "Monster," wore thick French braids that lay back against his scalp. (Pl. Ex. 136: Ruby Mitchell Dep. 21:10-22:1, 28:8-20); (Pl. Ex. 131:

81

Ruby Mitchell TT 186:6-16, 208:13-209:6); (Pl. Ex. 82: Cecil Brooks Aff. ¶ 24); (Pl. Ex. 95: Frank Freeman 2011 Aff. ¶ 8).

**Mitchell gives a limited description of the shooter which is consistent with Monster and inconsistent with Lamonte McIntyre**

136.     While police were at the scene, Mitchell spoke with Detective Golubski alone on her porch and he asked Mitchell what the shooter looked like, and she told him that the shooter had dark skin and braids, and that she'd thought it was her niece's boyfriend. (Pl. Ex. 136: Ruby Mitchell Dep. 43:14-44:8; 46:10-47:21.)

137.     Detective Golubski failed to document this encounter with Ruby Mitchell, or the information she reported to him. (Ex. 1: Entire Police File, LMKSDC_0003391–0003500.)

138.     At his deposition, Golubski refused to answer and instead invoked his Fifth Amendment rights in response to questioning about whether it was clear to him based on where Mitchell was standing at the time of the crime that she would not have been able to see the shooter's face. (Pl. Ex. 80: Roger Golubski Dep. 101:5–21, 157:5–22).

139.     At 2:55pm, Krstolich took a taped statement from Mitchell. (Ex. 1: LMKSDC_0003421).  She described the shooter as brown-skinned, wearing all black clothing, including black khakis and a black t-shirt with white writing on it, only about 5'6" tall. (Ex. 1: Police File, LMKSDC_0003422–23). Monster is 5'7". (Pl. Ex. 108: Monster MODOC Offender Profile, LMKSDC_00004926).

140.     When Krstolich asked whether Mitchell could see the shooter's face, she responded, "Well, he's brown skinned, that's all I could tell. I don't know no scars or nothing like that." (Ex. 1: Police File, Ruby Mitchell Stmt. to Krstolich, LMKSDC_0003423).

141.    In 1994, Lamonte McIntyre was tall and skinny, almost six feet tall, and he wore his hair in a short, closely cropped hair style. (Ex. 1: Police File, Arrest Report, LMKSDC_0003413); (Pl. Ex. 107: Lamonte McIntyre 2/28/1994 Mugshot).

142.    On the day of the shooting Lamonte McIntyre wore a blue "Michigan" hat, brown or rust-colored jeans, and a faded black t-shirt. (Ex. 1: Police File, Witness Stmt., Yolanda Johnson, LMKSDC_0003469; Natasha Haygood Stmt. by Golubski, LMKSDC_0003480; M'Sherie Johnson Stmt. by Golubski, LMKSDC_0003489); (Pl. Ex. 131: M'Sherie Johnson TT 428:12–25; Peggy Crowder TT 381:9–16).

143.    Witnesses were able to recall Lamonte McIntyre's outfit because he had been wearing the same clothes for days. (Ex. 1: Police File, Natasha Haygood Aff, LMKSDC_0003480; M'Sherie Johnson Stmt. by Golubski, LMKSDC_0003489); (Pl. Ex. 109: Rose McIntyre 2014 Aff. ¶ 7).

**Golubski drives Mitchell to the police station for a follow-up interview, and sexually harasses her during the drive**

144.    Later that afternoon, Golubski drove Mitchell to the police department. (Pl. Ex. 135: Ruby Mitchell Aff. ¶¶ 5, 14); (Pl. Ex. 136: Ruby Mitchell Dep. 46:10–15).

145.    During the drive Golubski told Mitchell that he thought she was pretty and had a nice body, asked if she had a boyfriend and put his hand on her upper thigh. (Pl. Ex. 135: Ruby Mitchell Aff. ¶ 14); (Pl. Ex. 136: Ruby Mitchell Dep. 50:3–55:22).

146.    Golubski's actions made Mitchell nervous and uncomfortable, and she was worried about what he might do on the way back home when it would be dark out. She was also afraid he would arrest her for solicitation or offer her money for sex. (Pl. Ex. 136: Ruby Mitchell Dep. 54:10-18); (Pl. Ex. 135: Ruby Mitchell Aff. ¶ 16).

147.     Mitchell remained nervous about this experience with Golubski while at the police department; she was still upset talking about the experience twenty-seven years later at her deposition. (Pl. Ex. 136: Ruby Mitchell Dep. 55:20–22; 64:2–17).

148.     By making sexual comments about Mitchell's body, Golubski "departed from minimally acceptable police practice by creating a threatening and coercive environment prior to conducting a photo identification" with her. It was widely understood by 1994, that making sexual remarks about a witness could create a negative environment in which the witness could not accurately identify the shooter. (Pl. Ex. 100: Russell Fischer Report, p. 12).

149.     Indeed, it was against KCKPD policy at the time for an officer to transport members of the opposite sex in police vehicles alone, given the risks involved in police interactions with witnesses of the opposite sex. (Pl. Ex. 100: Russell Fischer Report, p. 13).

**At the station, Mitchell tells Golubski and Krstolich that she thought the shooter was a man she knew named "Lamont"—which Golubski uses as an opportunity to make Lamonte McIntyre his primary suspect**

150.     Golubski and Krstolich interviewed Mitchell at the police department. (Pl. Ex. 135: Ruby Mitchell Aff. ¶6); (Pl. Ex. 138: Preliminary Hearing 39:9–12).

151.     During the interview, Mitchell again reported that the shooter looked like her niece's former boyfriend whose first name was "Lamont." (Pl. Ex. 135: Ruby Mitchell Aff. ¶ 8); (Pl. Ex. 136: Ruby Mitchell Dep. 56:14-57:18); (Ex. 1: Police File, Krstolich Report, 4/15/1994, LMKSDC_0003442).

152.     Mitchell was positive that the shooter had French braids, which appeared to be of medium length and braided to the back of his head. She reported this description to police "from the very beginning." (Pl. Ex. 135: Ruby Mitchell Aff. ¶¶ 9, 12); *see supra* para. 114; (Pl. Ex. 136: Ruby Mitchell Dep. 46:16-47:21).

153.    According to Plaintiff's expert in police practices, Russ Fischer, a former Chief of the Criminal Investigations Division at the Miami-Dade Police Department, if Mitchell's sworn account that she "from the very beginning," told police the shooter had French braids is accurate, then the failure of Golubski and Krstolich to document this description is deeply troubling for a number of reasons, including because she selected Lamonte McIntyre's photo which did not include French braids. According to Chief Fischer, the contradictions regarding hair styles signaled the need to take all available steps to corroborate Mitchell's identification. (Pl. Ex. 100: Russell Fischer Report p. 12).

154.    At his deposition, Golubski refused to answer and instead invoked his Fifth Amendment right to remain silent when asked whether, upon hearing Ruby identify the shooter as a black teenager named "Lamont," he thought of Lamonte McIntyre because Golubski knew his mother and saw an opportunity to get back at her. (Pl. Ex. 80: Roger Golubski Dep. 103:16–105:4, 106:6–107:10, 267:10–268:15).

155.    In the late 1980s or early 1990s the KCKPD had very important rules about how photo identification procedures were conducted. (Pl. Ex. 74: Dennis Ware Dep. 85:8-16; 28:23-29:21).

156.    When putting together a photo lineup in the early 1990s, the procedure was to go to the crime lab identification unit, where books of photos were organized by criminal jacket number or alphabetical order by name, go through the photos, and pick out similar photographs one by one until the detective had what they thought was a fair array. (Pl. Ex. 99: Clyde Blood Dep. 167:24-168:10; 170:16-172:4).

157.    Instead, in this case, Golubski obtained Polaroids of Lamonte McIntyre and his brother and cousin from a file relating to a prior unrelated incident during which all three were

85

arrested. Golubski SOF ⁋ 55; Def. Golubski's Mot. in Supp. of Summ. J. (D.E. 582), at 9–10, ¶¶ 52–55.

158.    Krstolich then asked Mitchell to help develop a composite of the shooter. (Ex. 1: Police File, Krstolich Investigative Addendum, April 15, 1994, LMKSDC_0003442).

159.    It was highly unusual at the time to create a composite when the witness has already identified a specific person she believes is the shooter. (Pl. Ex. 73: Expert Report of Jennifer Dysart p. 7, 11); (Pl. Ex. 128: Jennifer Dysart Dep. 32:7–33:20).

160.    Because Mitchell did not see the perpetrator's face, the composite drawing is indistinct. The composite and the photograph of Lamonte McIntyre Mitchell selected "do not look a lot alike." (Pl. Ex. 81: W.K. Smith Dep. 359:11-23); (Pl. Ex. 80: Roger Golubski Dep. 101:22–102:18); (Ex. 1: Police File, Composite LMKSDC_0003440).

**Golubski and Krstolich show Mitchell multiple, improper photo arrays, and use suggestion to force her to choose Lamonte McIntyre**

161.    Golubski and Krstolich showed Mitchell at least two sets of photos: a six-person photo lineup which had the photos all affixed to one page and the five loose Polaroids later shown to Niko Quinn. (Ex. 1: Police File, Krstolich Investigative Addendum [4/15/1994], LMKSDC_0003442); (Pl. Ex. 136: Ruby Mitchell Dep. 58:18-10, 62:4-64;1; 66:12-23); *see supra* paras. 47–61. Krstolich also referred in his report to Mitchell viewing "mug books." (Ex. 1: Police File, Krstolich Investigative Addendum [4/15/1994], LMKSDC_0003443).

162.    According to Ware, one reason it is important not to influence a witness's photo selection is because a suggestive photo showing can impact a witness's memory in important ways. Ware understood by 1994 that if you used suggestion with a witness during one photo showing, that could influence not only that photo showing, but any additional identification

procedures that occurred down the line. According to Ware, the concept that if police suggest a particular photo on one occasion, that suggestion will taint that witness's identifications down the line was "just common sense," and a basic policing concept understood by 1994. (Pl. Ex. 74: Dennis Ware Dep. 185:21-187:2); (Pl. Ex. 143: Tarik Khatib Dep. 233:17–24).

163.    Lamonte McIntyre's photograph appeared in both the six-photo array and the loose stack of photographs. No other individual appeared in both sets of photographs. (Pl. Ex. 136: Ruby Mitchell Dep. 70:22-72:10, 81:12-22); (Pl. Ex. 106: Photo Line Up, LMKSDC_0002623, 2625, 2627, 2629, 2631).

164.    According to Plaintiffs' expert in eyewitness identification, Dr. Jenn Dysart, when a witness sees a photograph in multiple identification procedures or contexts, there is a risk this sense of familiarity on the part of the witness may lead to an increased likelihood of choosing that person and a feeling of increased confidence in subsequent identification procedures. (Pl. Ex. 73: Expert Report of Jennifer Dysart pp. 15–16).

165.    The six-photo array shown to Ruby Mitchell was not preserved in the police file, nor is there any other record of what other photos were included, or whether or to what extent Lamonte McIntyre's photo stood out in this array. (Ex. 1: Entire Police Case File, LMKSDC_0003391–3500).

166.    Golubski and Krstolich did not audio-record the photo identification procedures with Mitchell, even though they tape-recorded Mitchell's statements before and after the procedure. (Pl. Ex. 130: 4/15/1994 Audio Recording of Mitchell Stmt. LMKSDC_0003424-45).[2]

---

[2] Plaintiffs' Exhibit 130 is the 4/15/1994 Audio Recording of Mitchell Stmt. (LMKSDC_0003424-45). Plaintiffs' Exhibit 130 is the same as Plaintiffs' Exhibit 91 to Plaintiffs' Memorandum of Law in Opposition to Defendant Golubski's Motion for Summary

167.     In a written report, Golubski documented that "Mitchell immediately identified the photo of Lamonte McIntyre as being the perpetrator." (Ex. 1: Case File, Investigative Addendum by Golubski, 4/16/1994, LMKSDC_0003453).

168.     The transcript of the 4/15 audio-recorded interview of Ruby Mitchell states:

Q: What name did you almost call out?
A: Lamont.
Q: Why did you almost yell Lamont?
A: Because he used to try to talk to my niece and I knew him.
Q: When you got to headquarters did we show you a series of five (5) pictures?
A: Yes.
Q: Were you able to pick out the shooter of the picture?
A: Yes.
Q: Is there a number on that picture?
A: Yes.
Q: What is the number?
A: Number three (3).
Q Are you absolutely sure this is the party who did the shooting?
A: Yes.
Q: Who is this party?
A: Lamont.
Q: Do you know his last name?
A: Yes.
Q: What is it?
A: McIntyre.
Q: How do you know this party?
A: Because he used to talk to my niece.
Q: How long have you known him?
A: For a couple months.

(Pl. Ex. 130: 4/15/1994 Audio Recording of Mitchell Stmt. LMKSDC_0003424-3445).

169.     But both during and after the shooting, Mitchell believed she was looking at Lamont Drain. (Pl. Ex. 136: Ruby Mitchell Dep. 143:24-25; 126:22-127:14); *see supra* ¶¶ 107–109.

---

Judgment (Doc. 605.63), a copy of which has been sent to the parties and a courtesy copy will be sent to the court in accordance with the Court's Order (Doc. 610).

170.    In 1994 Lamonte McIntyre was at least four inches taller than Neil Edgar Jr., the shooter Ruby Mitchell saw, he did not have the distinctive braids she described, and he has distinctive large ears that stick away from his face. (Pl. Ex. 135: Ruby Mitchell Aff. ¶¶ 9, 12); *see supra* ¶¶ 114, 130; (Pl. Ex. 136: Ruby Mitchell Dep. 46:16-47:21); (Pl. Ex. 107: Lamonte McIntyre 2/28/1994 Mugshot); (Pl. Ex. 108: Monster MODOC Offender Profile); (Ex. 1: Police File, Arrest Report, LMKSDC_0003413); (Pl. Ex. 142: Niko Quinn 1996 Aff. ¶8); (Ex. 1: Police File, Keva Garcia statement taken by Golubski, Sept. 21, 1994, LMKSDC_0003498-3499).

171.    There were visible differences between Lamont Drain and the photo of Lamonte McIntyre that Mitchell selected, including that Lamonte McIntyre has a longer neck and his ears are big. (Ex. 1: Police File, Keva Garcia statement, LMKSDC_0003498-3499).

172.    When asked whether he used improper suggestion and pressure to get Mitchell to choose the photo of Lamonte McIntyre, Golubski refused to answer and instead invoked his Fifth Amendment right to remain silent. (Pl. Ex. 80: Roger Golubski Dep. 103:16–111:22).

173.    When asked if he lied in his written report and reports to the prosecutor when he claimed that Mitchell immediately identified Lamonte McIntyre from a proper array without any prompting or suggestion, Golubski again refused to answer and instead invoked his Fifth Amendment right to remain silent. (Pl. Ex. 80: Roger Golubski Dep. 111:16–15:15).

174.    On the back of the photograph Ruby Mitchell selected it says "Lamonte McIntyre 07-28-76, RG." (Pl. Ex. 85: Polaroid Photos of Line Up, LMKSDC_0004356-4357); (Pl. Ex. 131: Ruby Mitchell TT 171:20-22); (Pl. Ex. 138: Preliminary Hearing 13:23–15:3).

175.    Krstolich gave a different version of the photo identification procedure than Golubski or Ruby Mitchell. According to Krstolich's written report, Mitchell was shown "pictures of different Lamontes" in a "picture interview of five (5) separate black individuals"

89

with the picture of Lamonte McIntyre in position three. Krstolich reported that Mitchell selected Lamonte McIntyre's photo from this array. (Ex. 1: Police File, Krstolich Investigative Addendum [4/15/1994], LMKSDC_0003442).

176.    No set of photographs of different Lamontes is preserved in the police file. (Ex. 1: Entire Police Case File, LMKSDC_0003391–3500).

177.    If it occurred as Krstolich described, such a photo procedure departed from KCKPD procedure by introducing in one photo lineup multiple suspects, when only one suspect should be presented per procedure. (Pl. Ex. 103: Michael York Dep. 165:14–166:24); (Pl. Ex. 73: Expert Report of Jennifer Dysart 11–12); (Pl. Ex. 74: Dennis Ware Dep. 161:10–162:24); (Pl. Ex. 99: Clyde Blood Dep. 21:11–24).

178.    According to Plaintiff's expert in police practices, Chief Fischer, "failing to document the circumstances surrounding how Ruby Mitchell came to identify his photograph or provide his first and last name when she was not acquainted with him and had mistaken the perpetrator for a different man named Lamonte" was a "blatant deviation[] from the most basic minimally acceptable police procedures." (Pl. Ex. 100: Russell Fischer Report, p. 7).

179.    Khatib testified at his deposition that Krstolich should have reported Golubski's use of suggestion in the identification procedure if he observed it. (Pl. Ex. 143: Tarik Khatib Dep. 203:3–18).

180.    Nonetheless, Lamonte McIntyre was arrested six hours after the shooting based on Mitchell's photo identification. (Ex. 1: Police File, Golubski Investigative Addendum LMKSDC_0003453; Krstolich Investigative Addendum LMKSDC_0003442); (Pl. Ex. 141: Terra Morehead Dep. 222:22–223:7).

**Golubski and Krstolich fabricate that Mitchell volunteered the last name "McIntyre," when in reality they fed her that last name**

181.    When asked by Krstolich on tape, "Do you know his last name?" Mitchell paused before stating, "yes," then responded "McIntyre" when asked the last name. (Pl. Ex. 130: 4/15/1994 Audio Recording of Mitchell Stmt. 05:04–05:15).

182.    Providing both a first and last name made Mitchell seem familiar with the shooter, and thus more credible. (Ex. 1: Police File, Ruby Mitchell Stmt. by Krstolich, LMKSDC_0003425); (Pl. Ex. 100: Russell Fischer Report, p. 9); (Pl. Ex. 74: Dennis Ware Dep. 257:16–259:9).

183.    Detective Ware testified that Mitchell's ability to volunteer Lamonte McIntyre's full complete name is a smoking gun fact corroborating her identification. (Pl. Ex. 74: Dennis Ware Dep. 257:16–259:9).

184.    At her deposition, Mitchell testified that the last name McIntyre had to come from another source because she "never knew nobody's last name" … "Like I said, I didn't even know Lamonte Drain's last name, so how would I know Lamonte McIntyre's last name?". (Pl. Ex. 136: Ruby Mitchell Dep. 74:25–75:10; 77:5-24; 78:6-14; 79:14-80:2).

185.    But the person who dated her niece was Lamont Drain, not Lamonte McIntyre. And Mitchell did not know Drain's last name at the time. (Ex. 131: Ruby Mitchell TT 182:11-18); (Pl. Ex. 135: Ruby Mitchell Aff. ¶8); (Pl. Ex. 138: Preliminary Hearing, Ruby Mitchell 19:6–7); (Pl. Ex. 136: Ruby Mitchell Dep. 75:6–10).

186.    At the time of the shooting, Ruby Mitchell did not know Lamonte McIntyre. (Pl. Ex. 136: Ruby Mitchell Dep. 79:16–21, 80:13–81:5, 124:19–22).

187.    When asked if Golubski fed Mitchell the last name "McIntyre" and falsely represented to the prosecutor that Mitchell had volunteered it, Golubski refused to answer and instead invoked his Fifth Amendment right to remain silent. (Pl. Ex. 80: Roger Golubski Dep. 115:16–119:1); *see also* (Pl. Ex. 73: Expert Report of Jennifer Dysart p. 10).

188.    Ware admitted if Golubski and Krstolich provided Ruby Mitchell with the last name McIntyre and failed to disclose that, that would be "gross misconduct." (Pl. Ex. 74: Dennis Ware Dep. 267:15–268:9); *see also* (Pl. Ex. 100: Russell Fischer Report p. 11); (Pl. Ex. 143: Tarik Khatib Dep. 194:22–195:13).

**Despite Mitchell's clear identification that her niece used to date the shooter, officers do not interview her niece until months later, and do so only at the behest of the prosecutor**

189.    According to Detective Ware, because Ruby Mitchell's niece could potentially corroborate that her aunt, one of two potential eyewitnesses to the crime, knew the suspect who just potentially shot two people in broad daylight, it was critically important to interview Ruby Mitchell's niece right away, both to corroborate that Ruby Mitchell was in fact personally acquainted with Lamonte McIntyre, and because if her niece had recently seen him, she might have additional information about the shooter. (Pl. Ex. 74: Dennis Ware Dep. 259:22-260:23).

190.    Officers know, by 1994 that it was important to interview witnesses as quickly as possible, before their memories fade, before they talk to others about what they saw, before they were influenced by others, and in case they later decided not to cooperate. (Pl. Ex. 81: W.K. Smith Dep. 74:14–75:76:2).

191.    There was no legitimate police reason to fail to interview Mitchell's niece in a timely manner. (Pl. Ex. 74: Dennis Ware Dep. 261:4–12); (Pl. Ex. 100: Russell Fischer Report p. 11–12).

192.    But Golubski did not interview Mitchell's niece, Keva Garcia, until five days before the trial began, as part of Prosecutor Morehead's preparation for trial. (Pl. Ex. 141: Terra Morehead Dep. 242:8–244:1); (Pl. Ex. 80: Roger Golubski Dep. 121:23–122:22); (Ex. 1: Police File, Keva Garcia Stmt. by Golubski, 9/21/1994, LMKSDC_0003496); (Pl. Ex. 131: Trial Transcript (p. 1) cover page).

193.    Garcia stated that the Lamont she used to date was not Lamonte McIntyre and that she had never seen Lamonte McIntyre before. (Ex. 1: Police File, Keva Garcia Stmt., 4/15/1994, LMKSDC_0003498).

194.    Lamonte McIntyre also said he never met Garcia before and only knew her name since he saw it in a police report. (Pl. Ex. 131: Lamonte McIntyre TT 453:18–21).

195.    Consistent with Ruby Mitchell's account, Garcia also told police Drain wore his hair in braids. He also had big lips and a big nose, and darker skin than Lamonte McIntyre, so they looked different. (Ex. 1: Police File, Keva Garcia Stmt., 4/15/1994, LMKSDC_0003498–3499).

**Of all the witnesses, Stacy Quinn has the best view of the crime.**

196.    Stacy Quinn had the "closest and least obstructed view" of the crime. (Pl. Ex. 100: Russell Fischer Report, pp. 17–18); (Pl. Ex. 133: Niko Quinn 2014 Aff. ¶ 16); (Pl. Ex. 132: Niko Quinn Dep. 171:22–173:10); (Pl. Ex. 80: Roger Golubski Dep. 183:4–186:16); (Pl. Ex. 73: Expert Report of Jennifer Dysart Report p. 6); (Pl. Ex. 139: Hearing on Motion for New Trial 22:6–8).

197.    Stacy Quinn was already "looking out the door" of mother's home when she "noticed a man walking down the hill toward Hutchings Street…toward the light blue car" with a "shotgun in his hand." Stacy then saw the "man walk[] up to the passenger's side…point[] the

shotgun at the passenger, and fire[] twice…pump[] the gun again, fire[], and shot the passenger in the face…[and] fire[] again, shooting the driver." (Pl. Ex. 77: Stacy Quinn 1996 Aff. ¶¶ 1–6); (Pl. Ex. 139: Hearing on Motion for New Trial 12:21–18:10); (Pl. Ex. 134: Niko Quinn DA Interview 7:17–8:16, 42:9–43:12); (Pl. Ex. 132: Niko Quinn Dep., 12:10–15).

198.    Stacy Quinn saw the shooter "both from the front and from the back" and "got a clear view of the man's face." (Pl. Ex. 77: Stacy Quinn 1996 Aff. ¶ 3).

199.    Stacy Quinn observed that the shooter "had braids in his hair and had on black pants with a white T-shirt with black writing on it," and was "approximately 5'7 or 5'8[], thin, dark complected with abnormal lips, and braided hair." (Pl. Ex. 77: Stacy Quinn 1996 Aff. ¶¶ 5, 7, 9, 12); (Pl. Ex. 139: Hearing on Motion for New Trial 14:24–25, 15:6–7, 21:23–22:2).

200.    Stacy Quinn recognized the shooter as Neil Edgar, Jr., (aka "Monster"), whom she had seen on the streets. After later viewing photographs of Lamonte McIntyre, she was "positive" that Lamonte McIntyre "was not the person who committed the double homicide on April 15, 1994." (Pl. Ex. 77: Stacy Quinn 1996 Aff. ¶ 9); (Pl. Ex. 134: Niko Quinn DA Interview 1:22–2:22, 9:4–9, 38:1–39:3, 43:13–44:24); (Pl. Ex. 132: Niko Quinn Dep. 12:10–15); (Pl. Ex. 76: Joe Robinson Aff. ¶¶ 11, 20–21).

201.    Following Lamonte McIntyre's arrest, Stacy Quinn stated that Lamonte "McIntyre's face is too long, he is too tall, and his lips are too dark" to be the shooter. (Pl. Ex. 77: Stacy Quinn 1996 Aff. ¶ 12); (Pl. Ex. 139: Hearing on Motion for New Trial 21:6–22:16).

**By the morning after the murder, Golubski and Ware learn that Stacy Quinn not only saw the crime but knew the identity of the shooter**

202.    Golubski and Ware spoke with Niko and Stacy Quinn's mother, Josephine Quinn, at her home at 3032 Hutchings on April 16, 1994. (Ex. 1: Police File, Golubski Report, 4/16/1994 LMKSDC_0003455-3456).

203.    Golubski reported, "Josephine stated she did not get a good look at the individual. She also viewed the five photos and cannot identify anyone." (Ex. 1: Police File, Golubski Report, 4/16/1994 LMKSDC_0003456, 3393).

204.    The five photos shown to Josephine Quinn were the same five photos shown to Niko Quinn on April 16, 1994 and Ruby Mitchell on April 15, 1994, containing a photograph of Lamonte McIntyre from two years prior and containing two of Lamonte's relatives. *See* SAMF, ¶ 52; (Ex. 1: Police File, Golubski Report, 4/16/1994 LMKSDC_0003455-3456).

205.    According to the police report, Josephine Quinn told Golubski and Ware that her daughter Stacy not only saw the suspect, but "knew who the suspect was but on this particular date of the photo line up, Stacy was not available." (Ex. 1: Police File, Golubski Report, 4/16/1994 LMKSDC_0003456); (Pl. Ex. 80: Roger Golubski Dep. 186:24–187:20).

206.    In his report written the day after the crime, Golubski stated that "At this time there still remains the possibility that John Quinn and Stacy Quinn can identify the perpetrators photo." (Ex. 1: Police File, Golubski Report, 4/16/1994 LMKSDC_0003456).

207.    Likewise, in his prosecutorial summary written the day after the crime, Golubski documented that Stacy Quinn "can testify to observing the crime and to possibly being able to identify the suspect." (Ex. 1: Police File, Prosecutive Summary Golubski Report, 4/16/1994 LMKSDC_0003393).

95

**Although Stacy Quinn was the most important lead in an otherwise weak case, Golubski does not report any of his interactions with her**

208.     Defendant Smith admits it would have been "critically important" to follow up with Stacy Quinn and that had he known Stacy knew who the suspect was, he "would have went to her and/or called her in to take a statement." (Pl. Ex. 81: W.K. Smith Dep. 129:4–130:17).

209.     Any minimally trained and experienced investigator "would have understood that Stacy Quinn was a critical witness." (Pl. Ex. 100: Russell Fischer Report, p. 17); (Pl. Ex. 81: W.K. Smith Dep. 129:4–15); (Pl. Ex. 141: Terra Morehead Dep. 239:13–241:2).

210.      When asked whether Stacy Quinn became his most important lead once he heard that she knew who the true perpetrator was, Golubski refused to answer and instead invoked his Fifth Amendment right to remain silent. (Pl. Ex. 80: Roger Golubski Dep. 187:12–188:20).

211.     Additionally, when asked whether he agreed that finding Stacy Quinn should have been his top priority in the investigation, Golubski refused to answer and instead invoked his Fifth Amendment right to remain silent. (Pl. Ex. 80: Roger Golubski Dep. 187:12–188:20).

212.     Given the distance and angle from which Ruby Mitchell saw the shooter and the failure or reluctance of Niko Quinn to identify a suspect, Defendants should have recognized the importance of finding and interviewing Stacy Quinn. (Pl. Ex. 100: Russell Fischer Report p. 18).

213.     According to Detectives Ware and Smith, there was no conceivable reason for failing to follow up with Stacy Quinn after April 16, 1994. (Pl. Ex. 74: Dennis Ware Dep. 194:1–16, 200:3–8); (Pl. Ex. 81: W.K. Smith Dep. 129:4–130:8).

214.     Golubski did not document an interview with Stacy Quinn, or any attempt to locate her after April 16, 1994. (Ex. 1: Police File, LMKSDC_0003392–0003500); (Pl. Ex. 80: Roger Golubski Dep. 196:8–198:3); (Pl. Ex. 141: Terra Morehead Dep. 263:6–265:7).

215.     No Defendant reported questioning Stacy Quinn about the double homicide, ran a criminal history to help locate Stacy Quinn, attempted to identify relevant associates or addresses, or spoke to her family, friends, or neighbors regarding her whereabouts after she was "unavailable" on April 16, 1994. Also, no defendant documented any further effort to contact Stacy at 3032 Hutchings, even though that is where she normally stayed.  (Ex. 1: Police File, LMKSDC_0003391–3500); (Pl. Ex. 100: Russell Fischer Report p. 18); (Pl. Ex. 74: Dennis Ware Dep. 200:3–205:21); (Pl. Ex. 139: Hearing on Motion for New Trial 12:12–14). A friend of Stacy's who knew her from the streets, attested that if Stacy was not at home, she could readily be found in the community, often along Quindaro. (Pl. Ex. 119: C.S.R. Aff. ¶ 20).

216.     Stacy Quinn remained in the area of the scene of the crime following the shooting. (Pl. Ex. 77: Stacy Quinn 1996 Aff. ¶ 11); (Pl. Ex. 139: Hearing on Motion for New Trial 12:15–17); (Pl. Ex. 132: Niko Quinn Dep. 66:23–67:9, 137:20–138:3); (Pl. Ex. 125: Stacy Quinn Booking and Probation Records).

217.     Stacy Quinn was present at the scene of the crime, voluntarily told police that she had seen the shooting, and waited in the yard while police interviewed Niko Quinn. (Pl. Ex. 77: Stacy Quinn 1996 Aff.); (Pl. Ex. 132: Niko Quinn Dep. 66:23–67:9, 137:20–138:3).

218.     According to Detective Ware, at a minimum, if Detective Golubski had taken additional steps to locate Stacy Quinn, the fact that he did so should be documented in his narrative report. (Pl. Ex. 74: Dennis Ware Dep. 205:15–21).

219.     Culp, the supervisor of the Ewing/Quinn investigation, should have perceived the failure to interview—or at a minimum, document attempts to locate—Stacy Quinn and followed up on it. (Pl. Ex. 74: Dennis Ware Dep. 200:12–25).

220.    The complete lack of any documentation regarding detectives' efforts to find Stacy Quinn should have been a "red flag" to any minimally competent supervisor—not just in regard to the aspects of the investigation involving Stacy Quinn, but to the investigation writ large. (Pl. Ex. 100: Russell Fischer Report, p. 18).

**Golubski has had a sexual relationship with Stacy Quinn for years**

221.    Golubski knew Stacy Quinn well; he had an ongoing relationship with her, in which he paid her for sex. (Pl. Ex. 133: Niko Quinn 2014 Aff. ¶ 27); (Pl. Ex. 132: Niko Quinn Dep. 12:10–15, 177:19–178:8); (Pl. Ex. 79: D.L. 2014 Aff. ¶ 10); (Pl. Ex. 76: Joe Robinson Aff. ¶¶ 20, 22); (Pl. Ex. 134: Niko Quinn DA Interview 36:10–17); (Pl. Ex. 80: Roger Golubski Dep. 189:18–190:21); (Pl. Ex. 145: Freda Quinn Dep. 57:14–58:7).

222.    Golubski had been paying Stacy Quinn for sex since she was a minor, sixteen or seventeen years old, from the mid-1980s through 2000, when Stacy Quinn was murdered. (Pl. Ex. 140: Freda Quinn 2011 Aff. ¶¶ 18–20); (Pl. Ex. 78: Freda Quinn 2016 Aff. ¶ 6); (Pl. Ex. 76: Joe Robinson Aff. ¶ 22); (Pl. Ex. 80: Roger Golubski Dep. 189:17–190:21).

223.    Sometimes Golubski would pick up Stacy Quinn from Josephine Quinn's house, where she typically stayed, and she would be gone for a few days at a time. (Pl. Ex. 140: Freda Quinn 2011 Aff. ¶ 19); (Pl. Ex. 145: Freda Quinn Dep. 57:14–58:7); (Pl. Ex. 80: Roger Golubski Dep. 190:14–191:4); (Pl. Ex. 79: D.L. 2014 Aff. ¶ 11).

224.    When Stacy Quinn returned, she would have new clothes and money. (Pl. Ex. 140: Freda Quinn 2011 Aff. ¶ 19).

225.    Because Golubski had a years-long sexual relationship with Stacy Quinn, it would have been easy for him to locate her for an interview. (Pl. Ex. 133: Niko Quinn 2014 Aff. ¶ 27); (Pl. Ex. 140: Freda Quinn 2011 Aff. ¶ 18–19); (Pl. Ex. 80: Roger Golubski Dep. 190:1–21).

98

There is no documentation in the police file concerning Golubski's relationship with Stacy or any notation that, given the relationship, another detective should interview Stacy. (Ex. 1: Entire Police File, LMKSDC_0003391–3500.)

226.    If Golubski were having a sexual relationship with a witness, there is no legitimate police reason for him to fail to inform his colleagues, so that another officer could interview that witness. (Pl. Ex. 146: Terry Zeigler Dep. 104:3–12).

**Golubski learns Stacy Quinn recognized that Monster was the shooter, not Lamonte McIntyre, but buries this exculpatory evidence**

227.    Stacy Quinn told Golubski and another officer that Lamonte McIntyre did not commit the murders, and instead, that the real perpetrator was Monster. (Pl. Ex. 134: Niko Quinn DA Interview 62:12–63:1); (Pl. Ex. 132: Niko Quinn Dep. 12:10–15); (Pl. Ex. 80: Roger Golubski Dep. 193:7–13, 199:22–200:4).

228.    In response, Golubski and the other officer called her "crackhead" and other names. (Pl. Ex. 134: Niko Quinn DA Interview 62:12–63:1); (Pl. Ex. 132: Niko Quinn Dep. 12:10–15).

229.    Niko Quinn told Golubski "on a number of occasions through the years that police had gotten the wrong man for Doniel's murder," and that her sister, Stacy Quinn "said the real killer was Monster." (Pl. Ex. 133: Niko Quinn 2014 Aff. ¶ 28); (Pl. Ex. 134: Niko Quinn DA Interview 43:13–44:24; 47:12–24); (Pl. Ex. 132: Niko Quinn Dep. 12:10–15).

230.    When asked whether Stacy Quinn told him in the weeks after the murder that Monster was the shooter, Golubski refused to answer the question and instead invoked his Fifth Amendment right to remain silent. (Pl. Ex. 80: Roger Golubski Dep. 193:7–13).

231.     Stacy Quinn died in 2000, the victim of a homicide. Golubski was assigned to the investigation of her murder. (Pl. Ex. 140: Freda Quinn 2011 Aff. ¶ 20); (Pl. Ex. 132: Niko Quinn Dep. 118:14–19); (Pl. Ex. 80: Roger Golubski Dep. 192:9–16).

**At the time of the murders, Lamonte McIntyre is at the home of his aunt**

232.     Doniel Quinn and Ewing were shot around 2pm on April 15, 1994. (Ex. 1: Police File, Golubski Investigative Summary, LMKSDC_0003392); Golubski SOF ¶ 30.

233.     On April 15, 1994, Lamonte McIntyre was at the house of his aunt, Peggy Williams (Crowder), for half the day until sometime around 2pm, when he went to call a cab for one of Williams' guests at the home of his other aunt, Yolanda Johnson, as Williams did not own a phone. After making the call, Lamonte returned briefly to Williams' home. He shortly thereafter went back to Johnson's home to call a cab for a second guest of Williams' and remained at Johnson's home thereafter. (Ex. 1: Police File, Yolanda Johnson Stmt. by Golubski, 4/20/1994, LMKDC_0003468–71; Natasha Haygood Stmt. to Golubski, 4/20/1994, LMKSDC_0003477–80; M'Sherie Johnson Stmt. to Golubski, 4/20/1991, LMKSDC_0003486–88); (Pl. Ex. 94: M'Sherie Johnson 2016 Aff. ¶ 6); (Pl. Ex. 98: Rashida Martis 2011 Aff. ¶¶ 1–4); (Pl. Ex. 137: Lamonte McIntyre Dep. 138:15–142:9); (Pl. Ex. 131: Lamonte McIntyre TT 447:16–450:9; Peggy Crowder TT 378:9–381:8; Yolanda Johnson TT 427:10–428:8).

234.     Lamonte McIntyre's aunts' homes were only a "hop, skip, and a jump" away from one another, as Johnson's house was directly behind Crowder's house, separated only by an alley. (Ex. 1: Police File, Yolanda Johnson Stmt. by Golubski, 4/20/1994, LMKDC_0003469); (Pl. Ex. 137: Lamonte McIntyre Dep. 139:12–23); (Pl. Ex. 94: M'Sherie Johnson 2016 Aff. ¶ 3); (Pl. Ex. 109 Rose McIntyre 2014 Aff. ¶ 6).

100

235.     After calling a cab for Williams' second guest, Lamonte McIntyre remained at Johnson's home until early evening when he got word the police were looking for him. (Ex. 1: Police File, Yolanda Johnson Stmt. by Golubski, 4/20/1994, LMKDC_0003469–3470); (Pl. Ex. 137: Lamonte McIntyre Dep. 138:15–139:142:9); (Pl. Ex. 94: M'Sherie Johnson 2016 Aff. ¶¶ 3–9); (Pl. Ex. 109 Rose McIntyre 2014 Aff. ¶ 6); (Ex. 1: Police File, Natasha Haygood Stmt. to Golubski, 4/20/1994, LMKSDC_0003477–3480; M'Sherie Johnson Stmt. to Golubski, 4/20/1991, LMKSDC_0003479–80); (Pl. Ex. 131: Lamonte McIntyre TT 447:16–450:9).

236.     M'Sherie Johnson, Montre Johnson, Rashida Johnson, and Natasha Haygood were present at Yolanda Johnson's house on April 15, 1994 when Lamonte was there. (Pl. Ex. 131: Yolanda Johnson TT 418:2–13).

237.     James McIntyre, Lamonte McIntyre's brother, arrived at Johnson's house around 3:30pm or 4pm. (Ex. 1: Police File, Yolanda Johnson Stmt. by Golubski, 4/20/1994, LMKDC_0003473; Natasha Haygood Stmt. to Golubski, 4/20/1994, LMKSDC_0003480); (Pl. Ex. 94: M'Sherie Johnson 2016 Aff. ¶ 8); (Ex. 1: Natasha Haygood Stmt. to Golubski, 4/20/1994, LMKSDC_0003477; M'Sherie Johnson Stmt. to Golubski, 4/20/1991, LMKSDC_0003486).

238.     Golubski knew that Lamonte McIntyre's alibi at the time of the murders involved calling a cab company, United Cab, on the phone. (Ex. 1: Police File, Yolanda Johnson Stmt. to Golubski, 4/20/1994, LMKSDC_0003470); (Pl. Ex. 101: Randy Eskina 2016 Aff. ¶¶ 74–76, 81).

239.     Police never contacted the cab company to find out whether records of the calls existed or whether they could confirm the calls had been placed. (Ex. 1: Police File, Yolanda Johnson Stmt. to Golubski, 4/20/1994, LMKSDC_0003470); (Pl. Ex. 101: Randy Eskina 2016 Aff. ¶¶ 74–76, 81).

**The evening of the crime, Barber reports that he asked Rose McIntyre where Lamonte McIntyre was the day before the crime, to which she answered truthfully**

240.    On April 15, 1994, the day of the crime, Barber went to 2908 Parkwood, the

house of Lamonte McIntyre's grandmother, Maxine Crowder who was "very cooperative" with

police, telling them Rose McIntyre, Lamonte's mother, worked at FiFi's, a restaurant at 5th and

Parallel. (Pl. Ex. 131: Barber TT 354:2–355:2); (Ex. 1: Police File, Dennis Barber Stmt. to

Golubski, 4/15/1994, LMKSDC_0003433–3435; Police File, Golubski Investigative Addendum,

4/16/1994, LMKSDC_0003453).

241.    Barber then proceeded to search for Lamonte McIntyre "on the streets" and "kept

putting out additional information as [he] obtained it so that the uniformed units would have

availability of it." (Ex. 1: Police File, Dennis Barber Stmt. To Golubski, 4/15/1994,

LMKSDC_0003434); (Pl. Ex. 131: Barber TT 355:12–16).

242.    At around 8pm the evening of the crime, Lieutenant Barber instructed Brown to

assist Barber in locating Lamonte McIntyre. (Ex. 1: Police File, Brown Report, 4/15/1994,

LMKSDC_0003414).

243.    Barber left his name and number with Maxine Crowder and instructed her to have

Lamonte McIntyre get in touch with him. (Pl. Ex. 131: Maxine Crowder TT 438:8–17; Lamonte

McIntyre TT 450:10-451:10; Barber TT 354:8:20–358:1).

244.    Crowder called Rose McIntyre to let her know the police were searching for her

son, Lamonte McIntyre. (Pl. Ex. 110: Evidentiary Hearing, Rose McIntyre 331:14–25); (Pl. Ex.

131:  Maxine Crowder TT 438:8–17); (Pl. Ex. 109: Rose McIntyre 2014 Aff. ¶¶ 4-5).

245.     Crowder then called Lamonte McIntyre at the home of his aunt, Yolanda Johnson, to let him know that the police, Barber in particular, were looking for him. (Pl. Ex. 131: Maxine Crowder TT 438:18–439:19).

246.     After getting the call from her mother, Maxine Crowder, Rose McIntyre picked up Crowder and went to Johnson's house to pick up Lamonte McIntyre and take him to the station. (Pl. Ex. 131: Lamonte McIntyre TT 450–51); (Pl. Ex. 109: Rose McIntyre 2014 Aff. ¶¶ 6-8).

247.     Before going to the station, Rose gave Lamonte McIntyre Barber's card, which Barber had left with Crowder. Lamonte called Barber several times, but he did not answer. (Pl. Ex. 131: Lamonte McIntyre TT 450:10-451:10); (Pl. Ex. 109: Rose McIntyre 2014 Aff. ¶¶ 6–7).

248.     Rose McIntyre saw a police officer sitting in the parking lot of FiFi's on the way to the station so she went up to him and told the officer that she had her son, Lamonte, and wanted to "get things straightened out" as Lamonte McIntyre had not been involved in any problems. (Ex. 1: Police File, Dennis Barber Stmt. to Golubski, 4/15/1994, LMKSDC_03434); (Pl. Ex. 131: Lamonte McIntyre TT 451:16-452:1); (Pl. Ex. 109: Rose McIntyre 2014 Aff. ¶ 8).

249.     Barber then received a radio call that Rose McIntyre requested his presence in front of FiFi's Restaurant. (Ex. 1: Police File, Dennis Barber Stmt. To Golubski, 4/15/1994, LMKSDC_0003433); (Pl. Ex. 131: Barber TT 355:17–356:19); (Ex. 1: Police File, Golubski Investigative Addendum, 4/16/1994, LMKSDC_0003453).

250.     Upon arrival, Barber located Rose McIntyre and her mother, Maxine Crowder, in the parking lot, with Lamonte McIntyre sitting in Rose McIntyre's parked car. (Ex. 1: Police File, Brown Report, 4/15/1994, LMKSDC_0003414; Police File, Dennis Barber Stmt. To

103

Golubski, 4/15/1994, LMKSDC_03434); (Pl. Ex. 131: Maxine Crowder TT 440:1–8; Barber TT

355:17–19); (Ex. 1: Barber Stmt. by Golubski, LMKSDC_0003433).

251.    Brown was also present at the FiFi's parking lot while Barber was questioning

Rose McIntyre. (Pl. Ex. 131: Barber TT 361:16–362:3; Brown TT 366:18–367:23).

252.    In fact, within minutes of Rose McIntyre's arrival in the FiFi's parking lot, "the

entire parking lot filled with police." (Pl. Ex. 109: Rose McIntyre 2014 Aff. ¶ 8).

253.    Barber asked Rose McIntyre where Lamonte McIntyre had been on April 14,

1994, the day before the shooting, not the day of. (Pl. Ex. 138: Preliminary Hearing 46:5–24).

254.    Rose McIntyre truthfully replied that the day before the shooting, Lamonte

McIntyre was with her at FiFi's restaurant, where they were both working. (Pl. Ex. 138:

Preliminary Hearing 46:5–47:8).

**Barber and Brown fabricate that Rose McIntyre was not truthful in her response to their inquiry about Lamonte McIntyre's whereabouts and also fabricate a statement by Rose McIntyre that implied Lamonte McIntyre had committed a murder**

255.    When asked about Lamonte McIntyre's whereabouts on the day of the crime,

Rose McIntyre truthfully answered that he was at his aunt's house. (Pl. Ex. 138: Preliminary

Hearing 46:5–47:8).

256.    Instead, Barber reported that he told Rose the incident happened that day, and she

replied, "Well that couldn't have been Lamont that was involved because he works part-time at

FiFi's and he was here from 11:00 this morning until 2:45 this afternoon." (Ex. 1: Police File,

Dennis Barber Stmt. to Golubski, 4/15/1994, LMKSDC_0003434; Police File, Golubski

Investigative Addendum, 4/16/1994, LMKSDC_0003453; Police File, Golubski Report,

4/16/1994 LMKSDC_0003393).

257.    Barber's recounting of Rose McIntyre's statement was false, and so was his testimony at trial stating the same. Rose McIntyre only provided to officers that Lamonte was at FiFi's when they asked where he was the day prior to the crime, not the day of. (Ex. 1: Police File, Dennis Barber Stmt. to Golubski, 4/15/1994, LMKSDC_0003434, 3453); (Pl. Ex. 138: Preliminary Hearing 46:5–47:8); as was his testimony at trial. (Pl. Ex. 109: Rose McIntyre 2014 Aff. ¶¶ 9–10, 19); (Pl. Ex. 131: Barber TT 358:8–359:13, 363:24–364:11).

258.    Additionally, while at the FiFi's parking lot, Rose McIntyre asked Barber "what this was all about," to which Barber replied, "that it could be about a fight or disturbance or something like that." (Pl. Ex. 109: Rose McIntyre 2014 Aff. ¶ 9); (Pl. Ex. 131: Lamonte McIntyre TT 452:2-17); (Ex. 1: Police File, Dennis Barber Stmt. to Golubski, 4/15/1994, LMKSDC_0003434).

259.    Expressing her disbelief at the amount of police at FiFi's, Rose McIntyre then asked, "If somebody told you that they had a fight with someone, are you going to just come and arrest them before you've talked to them and found out the facts?" and "You mean all of these officers are here for a fight or a domestic disturbance?" (Pl. Ex. 109: Rose McIntyre 2014 Aff. ¶¶ 9–10).

260.    Barber stated that Rose McIntyre "was not familiar with what a felony crime was," so he explained a felony was "anything punishable by more than a year in prison," for example, "a shooting, a stabbing or an armed robbery." (Ex. 1: Police File, Dennis Barber Stmt. to Golubski, 4/15/1994, LMKSDC_0003434).

261.    Barber then reported another statement by Rose McIntyre, that "[t]otally unsolicited, she indicated to me that if someone had told me that she had killed somebody, would I take them down and charge them with murder." (Ex. 1: Police File, Dennis Barber Stmt. to

Golubski, 4/15/1994, LMKSDC_0003434); (Pl. Ex. 131: Barber TT 360:7–15); (Ex. 1: Police

File, Golubski Report, 4/16/1994 LMKSDC_0003393).

262.   To bolster the inculpatory nature of this statement, which Rose never made,

Barber maintained that he had not previously mentioned "homicide" or "murder." (Ex. 1: Police

File, Dennis Barber Stmt. to Golubski, 4/15/1994, LMKSDC_0003434; Police File, Golubski

Report, 4/16/1994 LMKSDC_0003394; Police File, Golubski Report, 4/16/1994,

LMKSDC_0003453); (Pl. Ex. 131: Barber TT 360:7–9); (Pl. Ex. 109: Rose McIntyre 2014 Aff.

¶¶ 9–10, 19).

263.   Rose had not brought up the word "murder," nor did she assume Lamonte

McIntyre would be questioned regarding a murder. (Pl. Ex. 109: Rose McIntyre 2014 Aff. ¶¶ 10,

19); (Pl. Ex. 137: Lamonte McIntyre Dep. 231:13–232:16; 452:2-17).

264.   Barber's report of Rose McIntyre's statements on April 15, 1994 are "totally

untrue." (Pl. Ex. 109: Rose McIntyre 2014 Aff. ¶¶ 9–10, 19).

**Barber and Brown fabricate a false alibi statement that they attribute to Lamonte
McIntyre**

265.   Lamonte McIntyre consistently gave police the same, truthful alibi: that he had

been at Peggy Williams's and Yolanda Johnson's homes at the time of the shooting. (Pl. Ex. 131:

Lamonte McIntyre TT 447:16–450:9; 452:21-453:14); (Pl. Ex. 137: Lamonte McIntyre Dep.

138:15–142:9); (Ex. 1: Police File, Golubski Report, 4/16/1994, LMKSDC_0003453-3454).

266.   Defendants first questioned Lamonte McIntyre when Rose McIntyre brought him

to the FiFi's parking lot the evening of the crime. (Ex. 1: Police File, Dennis Barber Stmt. to

Golubski, 4/15/1994, LMKSDC_0003434); (Pl. Ex. 131: Maxine Crowder TT 440:1–18;

Lamonte McIntyre TT 451:17–452:1; Barber TT 361:6–362:3); (Pl. Ex. 109: Rose McIntyre

2014 Aff. ¶¶ 8–9); (Ex. 1: Police File, Golubski Investigative Addendum, 4/16/1994, LMKSDC_0003453).

267.    Barber said that at FiFi's, Lamonte McIntyre said that "during the day he had been with his brother, James, and neither…had been in any fight or been jumped on or had any altercation with any individuals." (Ex. 1: Police File, Dennis Barber Stmt. to Golubski, 4/15/1994, LMKSDC_0003435; Golubski Report, 4/16/1994 LMKSDC_0003393).

268.    Barber's account was false, as Barber never asked Lamonte his whereabouts on the day of the shooting, but instead asked about whether Lamonte was in a gang or knew anyone in a blue low rider. (Pl. Ex. 131: Lamonte McIntyre TT 452:2–453:23); (Pl. Ex. 137: Lamonte McIntyre Dep. 231:13–232:16). After Barber spoke with Lamonte McIntyre, Brown transported him to the KCKPD police station. (Pl. Ex. 131: James Brown TT 368:6–12); (Ex. 1: Police File, Brown Report, 4/15/1994, LMKSDC_0003414).

269.    Lieutenant Barber did not prepare a written report of his investigation into the Ewing/Quinn homicides, but instead gave a recorded statement to Detective Golubski after Lamonte McIntyre's arrest. (Ex. 1: Police File, LMKSDC_0003433-3436). Former KCKPD officer Randy Eskina attested that he had "never seen an officer interviewed in lieu of writing a report in any other case. It is not a desirable practice." (Pl. Ex. 101: Randy Eskina 2016 Aff. ¶ 72).

270.    During this car ride, Lamonte asked Brown what this was all about, and Brown said, "If you did nothing wrong, you got nothing to worry about." (Pl. Ex. 137: Lamonte McIntyre Dep. 231:13-235:11); (Pl. Ex. 131: James Brown TT 368:13-16).

271.    After bringing Lamonte McIntyre to the station, Brown, Golubski, and Krstolich interviewed him, but did not record this interview. (Ex. 1: Police File, Krstolich Report,

4/15/1994, LMKSDC_0003442); (Pl. Ex. 131: Lamonte McIntyre TT 452:18–453:17); (Ex. 1:

Police File, Golubski Report, 4/16/1994 LMKSDC_0003393).

272.     KCKPD policy at the time required each officer with knowledge to write his own

report. (Pl. Ex. 99: Clyde Blood Dep. 109:24–110:22). This failure to tape an interview violated

KCKPD policy and practice as of 1994, which was to audio record and then transcribe witness

statements. (Pl. Ex. 100: Russell Fischer Report pp. 15–16, 17); (Pl. Ex. 101: Randy Eskina 2016

Aff. ¶ 72); (Pl. Ex. 99: Clyde Blood Dep. 110:23–113:10); (Pl. Ex. 81: W.K. Smith Dep. 77:7–

78:19).

273.     During this interview, Lamonte McIntyre truthfully told the officers that he was

"at his auntie's house … all day long." (Ex. 1: Police File, Krstolich Report, 4/15/1994,

LMKSDC_0003442; Police File, Golubski Report, 4/16/1994, LMKSDC_0003454); (Pl. Ex.

131: Lamonte McIntyre TT 452:18–453:23).

274.     Lamonte McIntyre also truthfully told Krstolich and Golubski that "later in the

day his brother, James, did come by." (Ex. 1: Police File, Krstolich Report, 4/15/1994,

LMKSDC_0003442).

275.     Golubski reported that Lamonte McIntyre "stated that throughout the day he had

been with an aunt, Yolanda Johnson, at 1515 Wood…that at no time did he leave until his

brother arrived at about 4:00. Then he still did not leave until he was contacted by his

grandmother and mother than then was taken to the area of 5th and Parallel by his mother." (Ex.

1: Police File, Golubski Report, 4/16/1994, LMKSDC_0003453-3454).

276.     Brown later testified that on the ride to the police station, Lamonte McIntyre told

him, unsolicited, that "he didn't know what he could have done because he was at FiFi's all day

helping his mother out in the kitchen doing some work." (Pl. Ex. 131: James Brown TT 368:13–369:12).

277.    Brown further testified that it was not until after hearing Lamonte McIntyre's statement to Krstolich and Golubski regarding where he was at the time of the crime that Brown "remembered he told me he was FiFi's all day on 5th and Richmond. So I wrote the detective a note just telling him basically he told me in the car on the way up here that he had been at FiFi's with his mother all day." (Pl. Ex. 131: James Brown TT 369:13–371:5).

278.    Lamonte McIntyre never told any officer he was at FiFi's at the time of the crime; Brown's claim is false. (Pl. Ex. 131: Lamonte McIntyre TT 452:18–453:23); (Pl. Ex. 137: Lamonte McIntyre Dep. 149:12–150:6, 231:13–235:11); (Pl. Ex. 131: James Brown TT 368:6–370:8; Lamonte McIntyre TT 457:25–458:7).

279.    Brown failed to document Lamonte McIntyre's alleged inculpatory statements in his police report. (Ex. 1: Police File, Brown Arrest Report, 4/15/1994, LMKSDC_0003413–3414).; Brown Dep. 183:3–184:11, 212:3–8; (Pl. Ex. 99: Clyde Blood Dep. 110:4–22).

280.    Further, there is no mention of Brown's alleged note to Krstolich and Golubski purportedly relaying Lamonte's statements anywhere in the police file. *See* (Ex. 1: Police File, Brown Arrest Report, 4/15/1994, LMKSDC_0003391-3500).

281.    Brown understood it was important to document any alibi statement given to police in a double homicide case. (Pl. Ex. 102: James Brown Dep. 192:11–23, 195:20–196:4, 200:3–16); (Ex. 1: Police File, Brown Arrest Report, 4/15/1994, LMKSDC_0003413–3414).

282.    By failing to document this alleged "alibi" statement in his report, Brown violated KCKPD officers' obligation to document all investigative steps. (Pl. Ex. 100: Russell Fischer

Report, p. 17); (Pl. Ex. 99: Clyde Blood Dep. 109:24–110:22); (Pl. Ex. 144: Ronald Miller Dep. 77:14–17).

283.    Instead, the first time Brown provided this false alibi to the defense was at Lamonte McIntyre's trial, five and a half months after the investigation took place. (Pl. Ex. 131: James Brown TT 368:13–21); (Pl. Ex. 102: James Brown Dep. 207:16–208:2).

284.    The prosecutor argued that "inconsistent alibi" evidence existed, based on Barber and Brown's fabricated accounts of Rose and Lamonte McIntyre's statements and the truthful alibi Lamonte gave to Golubski and Krstolich when questioned at the station the evening of the crime, which was used against Lamonte McIntyre before and at trial. (Pl. Ex. 141: Terra Morehead Dep. 178:15–180:8).

285.    According to Plaintiffs' police practices expert, the intentional misrepresentation to the prosecutor by Barber, Brown, and Golubski that Rose McIntyre and Lamonte McIntyre made these inculpatory, inaccurate alibi statements amounted to serious police misconduct and egregious violations of minimally accepted practices. (Pl. Ex. 100: Russell Fischer Report p. 15).

**Defendants "clear" the case the day after the homicides despite failing to gather and test key forensic evidence, failing to investigate the identity of a getaway driver, and failing to establish any motive**

286.    Lamonte McIntyre was in custody within approximately six hours of the crime. (Ex. 1: Police File, Ambler Report, LMKSDC_0003404; Arrest Report, LMKSDC_0003413). No other suspect appears anywhere in the file. (Ex. 1: Entire Police File, LMKSDC_0003391–3500). Golubski reported on April 16, 1994, the day after the shooting, that the case was cleared upon the arrest of Lamonte McIntyre. (Ex. 1: Police File, Golubski Investigative Addendum/Clearance, LMKSDC_0003457).

287.     Homicide detectives had an obligation to conduct all available forensic tests even if they were worried the testing might turn up evidence pointing away from a suspect. The practice in homicide cases in KCKPD was "when in doubt, order the test." (Pl. Ex. 99: Clyde Blood Dep. 145:11–146:13); *see also* (Pl. Ex. 144: Ronald Miller Dep. 74:24–75:24).

288.     Defendants failed to investigate whether any physical evidence linked Lamonte McIntyre to the crime scene. (Pl. Ex. 138: Preliminary Hearing, Niko Quinn 24:8–25:10; Ruby Mitchell 7:11–8:9); (Pl. Ex. 110: Evidentiary Hearing, Ron Singer 55:12–65:22); (Pl. Ex. 124: Ron Singer 2016 Aff.  ¶¶ 4–5); (Pl. Ex. 101: Randy Eskina 2016 Aff. ¶ 14–16); (Pl. Ex. 100: Russell Fischer Report, pp. 18–20); (Pl. Ex. 144: Ronald Miller Dep. 77:6–13).

289.     Because the shooter was standing only a few inches or feet from the car during the murders and there was blood and glass on the ground, seizing Lamonte McIntyre's shoes when he was arrested less than six hours after the shooting was a basic, critically important investigative step to take. (Pl. Ex. 99: Clyde Blood Dep. 209:18-211:6).

290.     Golubski did not seize Lamonte McIntyre's shoes to look for glass and blood from the crime scene, even though the presence of blood alone would have been inculpatory. (Pl. Ex. 110: Evidentiary Hearing, Ron Singer 56:14–65:22; 70:11–72:25; 79:9–80:18); (Pl. Ex. 101: Randy Eskina 2016 Aff. ¶ 14); (Pl. Ex. 99: Clyde Blood Dep. 152:12–153:15, 211:7–216:2, 218:18–219:1); (Pl. Ex. 109: Rose McIntyre 2014 Aff. ¶ 16); (Pl. Ex. 100: Russell Fischer Report pp. 18–19).

291.     Another basic, obvious investigative step when Lamonte McIntyre was arrested six hours after this close-range shooting was to seize his clothing to look for residue or inculpatory items on his person. (Pl. Ex. 99: Clyde Blood Dep. 211:7-212:9); (Pl. Ex. 143: Tarik Khatib Dep. 246:2–13).

292.     At his deposition, Blood testified that if Lamonte McIntyre had been wearing the clothing he was arrested in at the time of this shooting, one would expect to see fragments of glass and blood on his clothes if he were the perpetrator: "I'd sure be looking." Further, Blood could not think of a legitimate police reason not to collect Lamonte McIntyre's clothing when he was arrested. (Pl. Ex. 99: Clyde Blood Dep. 211:16-22; 212:10-18).

293.     Lamonte McIntyre's face, hands, and clothing were also never examined for gunshot residue, as "any minimally trained and experienced investigator in Golubski's position would have understood the importance of" doing, according to police practices expert. (Pl. Ex. 100: Russell Fischer Report pp. 18–19); (Pl. Ex. 101: Randy Eskina 2016 Aff. ¶ 14); (Pl. Ex. 99: Clyde Blood Dep. 151:25–152:11, 212:21–213:6, 218:18–219:1); (Pl. Ex. 109: Rose McIntyre 2014 Aff. ¶ 16); (Pl. Ex. 111: Russell Fischer Dep. 96:11–97:23, 101:10–103:16).

294.     Rose McIntyre pleaded with officers, asking them why they did not do a ballistics test on Lamonte McIntyre to show that he had not shot a gun. (Pl. Ex. 109: Rose McIntyre 2014 Aff. ¶¶ 11, 16); (Pl. Ex. 112: Rose McIntyre Dep. 190:7-191:6).

295.     The officer Rose spoke with responded, "they didn't do that kind of test in Kansas." But this was untrue, as Blood stated there was "no legitimate police reason" "not to collect Lamonte McIntyre's clothing," as "[t]here should be residue on the clothing as well" if he were involved in the close-range shooting. (Pl. Ex. 99: Clyde Blood Dep. 151:25–152:11, 211:7–23); (Pl. Ex. 109: Rose McIntyre 2014 Aff. ¶¶ 11, 16); (Pl. Ex. 112: Rose McIntyre Dep. 190:7–191:6).

296.     Blood admitted that Golubski's failure to seize Lamonte McIntyre's clothing for testing and failure to search Lamonte McIntyre's home could only be due to either Golubski's

incompetence or Golubski's failure to conduct a legitimate investigation. In Blood's experience, Golubski was not incompetent. (Pl. Ex. 99: Clyde Blood Dep. 218:21–221:4).

297.    If Lamonte McIntyre had no gunshot residue on his face, hands and clothing, that would be evidence tending to suggest he may not have committed the crime. If Lamonte McIntyre hadn't changed clothes and there was no blood or glass on his clothing, that, too, would be evidence he was not responsible. (Pl. Ex. 99: Clyde Blood Dep. 213:2-11).

298.    At his deposition, Blood testified that Golubski's failure to take Lamonte McIntyre's clothing and order a gunshot residue test was a major red flag. (Pl. Ex. 99: Clyde Blood Dep. 213:12-214:12).

299.    Additionally, Defendants failed to analyze latent prints taken from the victims' vehicle at the scene. (Pl. Ex. 110: Evidentiary Hearing, Ron Singer 60:15–61:22, 64:5–10, 69–70); (Pl. Ex. 124: Ron Singer 2016 Aff. ¶ 4); (Pl. Ex. 101: Randy Eskina 2016 Aff. ¶ 14); (Pl. Ex. 100: Russell Fischer Report, p. 19); (Pl. Ex. 99: Clyde Blood Dep. 141:20–142:15, 145:11–146:7).

300.    During Krstolich's interview with Mitchell at the scene he asked her whether the shooter walked across fresh dirt when he walked down the hill across the street from Mitchell's home, to which she replied, "Yes." However, Defendants failed to obtain footprints from the scene or to document the path taken by the shooter. (Ex. 1: Police File, Ruby Mitchell Stmt. by Krstolich, LMKSDC_0003422); (Pl. Ex. 81: W.K. Smith Dep. 163:20–166:16); (Pl. Ex. 100: Russell Fischer Report p. 19).

301.    Defendants failed to obtain—or apply for—a search warrant to search Lamonte McIntyre's home, or the homes of his relatives, for the weapon, as would have been police practice. (Pl. Ex. 110: Evidentiary Hearing, Ron Singer 61:23–63:6); (Pl. Ex. 124: Ron Singer

2016 Aff. ¶ 4(b)); (Pl. Ex. 101: Randy Eskina 2016 Aff. ¶ 14); (Pl. Ex. 104: Timothy Maskil

2015 Aff. ¶ 9); (Pl. Ex. 99: Clyde Blood Dep. 216:3–221:4); (Pl. Ex. 81: W.K. Smith Dep.

107:25-111:1); (Pl. Ex. 109: Rose McIntyre 2014 Aff. ¶ 16); (Pl. Ex. 100: Russell Fischer

Report, p. 19); (Pl. Ex. 143: Tarik Khatib Dep. 246:14–249:19).

302.    When asked if it was "possible that it just didn't occur to Golubski to search

Lamonte McIntyre's home," Blood laughed and replied that was not likely. (Pl. Ex. 99: Clyde

Blood Dep. 216:22–217:12).

303.    At his deposition, Smith could think of no reason why Lamonte McIntyre's home

was not searched for items of evidentiary value, including the murder weapon. (Pl. Ex. 81: W.K.

Smith Dep. 109:22–115:10).

304.    Blood admitted that it is very troubling that in this double homicide close-range

shooting case in which the court has now made an innocence finding Golubski failed to either

seize Lamonte McIntyre's clothing or execute a search warrant of his home. (Pl. Ex. 99: Clyde

Blood Dep. 218:18-219:1).

305.    Defendants reported no canvass searching for the murder weapon, even though it

is a critical step in a homicide investigation that any reasonable officer would have understood

the significance of doing. (Pl. Ex. 110: Evidentiary Hearing, Ron Singer 69:16–70:4); (Pl. Ex.

81: W.K. Smith Dep. 106:21–107:12); (Pl. Ex. 100: Russell Fischer Report pp. 7, 19).

306.    Each of the Defendants had the obligation to identify key evidence at the scene to

make sure it was collected. (Pl. Ex. 99: Clyde Blood Dep. 143:13–144:6); (Pl. Ex. 81: W.K.

Smith Dep. 165:19–166:16).

307.    The failure to gather key evidence and conduct key tests violated KCKPD's

policy at the time on investigating crimes of violence, and there was no legitimate police reason

to omit basic investigative steps known to officers in 1994. (Pl. Ex. 113: Policy); (Pl. Ex. 101: Randy Eskina 2016 Aff. ¶ 15–16).

308.   Defendants also failed to conduct investigative steps to identify a getaway driver—including failing to ask Lamonte McIntyre who drove him—as there was no legitimate police reason not to investigate the identity of the driver. (Pl. Ex. 100: Russell Fischer Report, p. 19–20); (Pl. Ex. 74: Dennis Ware Dep. 198:9–200:17.); (Pl. Ex. 143: Tarik Khatib Dep. 249:20–250:6).

309.   If Golubski or another detective had failed to take that step, Ware admits it was up to Culp, the supervisor, to do so. In fact, as supervisor, Culp should have easily spotted these deficiencies in the investigation. (Pl. Ex. 99: Clyde Blood Dep. 120:22–121:20, 218); (Pl. Ex. 81: W.K. Smith Dep. 41:17–42:4); (Pl. Ex. 74: Dennis Ware Dep. 200:3–17; 218:17–21; 261:16–266:15.)

310.   Police officers have an obligation to accurately report what they find in the course of their investigation, whether it helps or hurts their case. (Pl. Ex. 143: Tarik Khatib Dep. 145:2–146:17).

311.   Homicide investigations do not end with arrests; the Defendants were obligated to continue taking investigate steps "as long as [they] have leads to follow up." (Pl. Ex. 99: Clyde Blood Dep. 94:5–95:7). It was imperative that homicide detectives follow up on all possible leads regardless of whether a suspect was already in custody. (Pl. Ex. 99: Clyde Blood Dep. 95:13–96:13).

312.   Homicide investigations similarly do not end with the completion of the prosecution summary; officers were to forward any additionally uncovered information to the

prosecution. (Pl. Ex. 99: Clyde Blood Dep. 128:12–130:9). That was true even if the information

uncovered hurt the officers' theory of the case. (Pl. Ex. 99: Clyde Blood Dep. 130:18–132:9).

**A weak case, at trial, no physical or forensic evidence implicates Lamonte McIntyre, no evidence connects him to the victims, and he consistently maintains his innocence and presents an alibi**

313.    There was no physical evidence, forensic evidence, murder weapon, blood

evidence, DNA evidence, fingerprint evidence, motive, or confession linking Lamonte McIntyre

to the crime. (Pl. Ex. 141: Terra Morehead Dep. 181:12–183:4); (Pl. Ex. 96: Gary Long Dep.

58:19–60:16); (Pl. Ex. 131: Terra Morehead Closing TT 478:23–479:13).

314.    Lamont McIntyre consistently maintained his innocence. He testified at trial that

he did not commit the crime. (Pl. Ex. 131: Lamonte McIntyre TT 453:24–454:19); *see supra* ¶¶

22–27.

315.    Lamonte McIntyre testified that he was at the house of his aunt, Yolanda Johnson,

the afternoon of the shooting and earlier that day, he had been at the home of his aunt, Peggy

Crowder, who lived just in front of Johnson. (Pl. Ex. 131: Lamonte McIntyre TT 447:16–450:9,

452:24–453:3, 464:10-11; Peggy Crowder TT 378:9–381:8; Yolanda Johnson TT 402:23–

406:9).

316.    Lamonte McIntyre testified that he went between his two aunts' homes two times

to use Johnson's phone to call a taxi for two of Crowder's guests, as Crowder did not have a

phone; then he remained at Johnson's home. (Pl. Ex. 131: Lamonte McIntyre TT 447:16–450:9).

Lamonte McIntyre testified that he was not at any other location besides these two homes on the

afternoon of April 15, 1994. (Pl. Ex. 131: Lamonte McIntyre TT 464:10–12).

317.    Four alibi witnesses testified at trial and confirmed that around the time of the

crime, Lamonte McIntyre was at Johnson's home to make a phone call. (Pl. Ex. 131: Peggy

Crowder TT 378:9–381:8; Yolanda Johnson TT 402:23–406:9; M'Sherie Johnson TT 426:8–428:8; Felicia Williams TT 391:3–393:2, 396:20–397:22).

**The case turns on Defendants' fabricated identifications by Ruby Mitchell and Niko Quinn, and the fabricated alibi statements Defendants attributed to Rose McIntyre and Lamonte McIntyre**

318.     The primary evidence the prosecution offered against Lamonte McIntyre at trial were the identifications by Niko Quinn and Ruby Mitchell. (Pl. Ex. 96: Gary Long Dep. 58:19–59:5); (Pl. Ex. 141: Terra Morehead Dep. 181:5–185:15).

319.     The theory of the case presented by McIntyre's defense attorney was that the identifications by Niko Quinn and Mitchell were incorrect, and he used all the ammunition available to demonstrate that their purported identifications were unreliable. (Pl. Ex. 96: Gary Long Dep. 60:9–12, 60:23–61:11).

320.     Ruby Mitchell identified Lamonte McIntyre during the trial and testified that she was inside her house looking out throughout the shooting. (Pl. Ex. 131: Ruby Mitchell TT 166:17–24; 174:23–175:11).

321.     Mitchell also testified that at the time of the shooting she recognized the shooter as the Lamont who used to date her niece (Lamont Drain) who she had seen "lots of times," that she was so certain it was Lamont Drain she was going to call out his name, and that at that point there was no doubt in her mind he did the shooting and she did not change her mind. (Pl. Ex. 131: TT 165:12–166:7, 180:6–181:14, 184:6–24, 188:1–5).

322.     Mitchell testified that she had later identified Lamonte McIntyre as the shooter from a set of five photos. (Pl. Ex. 131: TT 171:10–172:4). This set of photos did not include a photo of Lamont Drain. (Pl. Ex. 85: Polaroids from lineup with names on back, LMKSDC_0004352–4361); Golubski SOF ¶ 58.

117

323.     Mitchell testified that Lamonte McIntyre and Lamont Drain look "exactly alike," "almost identical," like identical twins. (Pl. Ex. 131: TT 172:18–173:2, 181:19–182:1, 209:18–21).

324.     Lamonte McIntyre and Lamont Drain do not look like identical twins. (Pl. Ex. 131: Terra Morehead Closing TT 478:1–7); (Ex. 1: Police File, Keva Garcia Statement LMKSDC_0003498); (Pl. Ex. 107: Lamonte McIntyre 1994 Mugshots); (Pl. Ex. 123: Lamont Drain Mugshots 1994).

325.     Niko Quinn also made an unequivocal positive identification of Lamonte McIntyre in court during the trial. (Pl. Ex. 131: Niko Quinn TT 143:13–144:13).

326.     Morehead argued to the jury in closing that the identifications were accurate because "these are two independent witnesses [who] are not connected aside from being neighbors." (Pl. Ex. 131: TT 475:18–21).

327.     Morehead also presented evidence from Golubski that Niko Quinn was adamant when she made her alleged positive photographic identification approximately a week after the murders. (Pl. Ex. 131: Roger Golubski TT 327:24–329:15).

328.     In closing argument, Morehead emphasized the second photo identification procedure Golubski conducted with Niko Quinn, telling the jury that Niko Quinn "looked at those pictures and she said I'm positively sure No. 3 is the one who I saw shoot into that car." (Pl. Ex. 131: Terra Morehead Closing TT 476:4–20).

329.     Morehead also argued the jury should disbelieve Lamonte McIntyre's alibi because of the reports and testimony from Officer Brown and Lieutenant Barber that both Lamonte McIntyre and Rose McIntyre had previously offered inconsistent statements about where he had been that day. (Pl. Ex. 131: TT 479:14–480:9).

118

330.     Specifically, Morehead attempted to impeach Lamonte McIntyre with this false alibi, after he had truthfully testified that he was at his aunt's home at the time of the murders. (Pl. Ex. 131: TT 452:21–453:3, 457:25–458:15).

331.     In the defense closing argument, Long argued "the best evidence of reasonable doubt is Ruby Mitchell. She's the one who tells you there's another man out there that I was convinced did this shooting." (Pl. Ex. 131: TT 488:12–16).

332.     In her rebuttal closing, Morehead told the jury that this "is not a case of mistaken identification" as "Ruby Mitchell picked out the photograph of the person she saw do the shooting" and "Nikki Quinn completely at a different place at a different time picked out the same individual that Ruby picked out." (Pl. Ex. 131: Terra Morehead Closing TT 492:2–492:17).

333.     Morehead's final point was that "the state has submitted you a case where two individuals observe the defendant, Lamonte McIntyre, shoot Doniel Quinn and Donald Ewing in cold blood." (Pl. Ex. 131: Terra Morehead Closing TT 493:8–17).

334.     The jury requested the court reporter read back Niko Quinn and Ruby Mitchell's testimony during trial. (Pl. Ex. 131: TT 494:15–499:14).

**The jury never hears crucial evidence in this case, as Defendants never turned over evidence of their investigative misconduct to the prosecution or defense**

335.     Lamonte McIntyre never learned of any exculpatory evidence beyond what was presented at trial prior to his wrongful conviction. Lamonte McIntyre also never learned from any source that Monster was rumored to be responsible for the murders of Ewing and Doniel Quinn prior to his wrongful conviction. Lamonte McIntyre never learned of any evidence implicating Monster as the true perpetrator before his wrongful conviction. (Pl. Ex. 105: Lamonte McIntyre 2022 Decl. ¶¶ 3–4).

119

336.     The suggestion used by Golubski and Ware to get Niko Quinn to identify Lamonte McIntyre was never reported to the prosecution or to the defense. (Pl. Ex. 141: Terra Morehead Dep. 54:2–20, 124:1–127:4); (Pl. Ex. 96: Gary Long Dep. 63:13–64:16, 65:7–19).

337.     The failure to disclose to the prosecutor the suggestion used during the first photo lineup with Niko Quinn violated the duty of officers to turn over potentially exculpatory material to the prosecutor, which any officer should have been aware of by 1994. (Pl. Ex. 102: James Brown Dep. 184:22–186:23); (Pl. Ex. 99: Clyde Blood Dep. 130:10–134:3) *see also* (Pl. Ex. 100: Russell Fischer Report p. 14).

338.     Morehead testified at her deposition that if she been told that Golubski or any other officer had used suggestion to obtain Niko Quinn or Ruby Mitchell's identifications of Lamonte McIntyre, she would have made sure that was documented and disclosed to the defense, and that did not happen. (Pl. Ex. 141: Terra Morehead Dep. 126:19–127:16).

339.     At some point between the preliminary hearing and trial, Golubski told the prosecutor about the second photo identification procedure he conducted with Niko Quinn but did not tell her about the suggestion he used during the procedure. Instead, Golubski told Morehead that Niko Quinn was adamant about her identification of Lamonte McIntyre. (Pl. Ex. 141: Terra Morehead Dep. 131:3–18); (Pl. Ex. 131: Roger Golubski TT 328:20–329:15). Golubski never wrote any report about this second photo identification procedure. Defendant Officers' SOF ¶100 and SAMF ¶110.

340.     Morehead alleges she did not know that Golubski's testimony about identification by Niko Quinn's second photo identification was false, and that he had really used suggestion to procure Niko Quinn's identification during this procedure, otherwise she would have had an obligation to correct the false testimony or turn over evidence of misconduct or any evidence that

undermined the officers' credibility as Brady evidence. (Pl. Ex. 141: Terra Morehead Dep. 77:25–79:15; 80:7–81:5; 81:6–10; 81:11–22; 82:4–25, 83:7–13, 83:20–84:1, 85:3–19, 84:5–19, 88:13–20, 91:2–11, 236:2–11).

341.    Golubski never reported to the prosecution that he had helped Niko Quinn relocate in exchange for her identification of Lamonte McIntyre, nor did he report that he had used pressure, suggestion, and threats to fabricate Niko Quinn's second identification procedure. (Pl. Ex. 141: Terra Morehead Dep. 54:2–20, 141:12–142:1); (Pl. Ex. 80: Roger Golubski Dep. 170:12–171:2).

342.    Had Lamonte McIntyre's defense counsel learned police used suggestion when conducting a photo identification procedure with Niko Quinn, he would have used it to undermine her identification. (Pl. Ex. 96: Gary Long Dep. 63:13–64:16, 65:7–19).

343.    Golubski and Krstolich never reported to prosecutor Terra Morehead or to Lamonte McIntyre's defense attorney that they used misconduct to obtain Ruby Mitchell's identification of Lamonte McIntyre during the photo procedure. (Pl. Ex. 141: Terra Morehead Dep. 128:3–9, 269:17–24, 274:24–275:23); (Pl. Ex. 80: Roger Golubski Dep. 115:1–15).

344.    Had Lamonte McIntyre's defense counsel learned police used suggestion when conducting a photo identification procedure with Mitchell, he would have used it to undermine her identification. (Pl. Ex. 96: Gary Long Dep. 62:8–63:9, 64:17–65:6).

345.    Had Lamonte McIntyre's defense counsel had evidence of the police misconduct underlying this investigation, he would have used it in his defense to the best of his ability. (Pl. Ex. 96: Gary Long Dep. 66:20–25).

346.    Golubski failed to document or disclose to the prosecution that Stacy Quinn could identify Monster as the perpetrator. *See* Ex. 1: Police File, Golubski Investigative Addendums

LMKSDC_0003452–3456; (Pl. Ex. 141: Terra Morehead Dep. 263:6–265:7); *see also* Pl. Ex. 144: Ronald Miller Dep. 77:18–78:25.

347.     Had detectives located and interviewed Stacy Quinn, Morehead would have expected those interactions to be documented in a report in the police file; they are not. (Pl. Ex. 141: Terra Morehead Dep. 258:6–15, 264:13–265:7). *See generally*, Ex. 1.

348.     Had defense counsel learned that Niko Quinn or Stacy Quinn asserted that Lamonte McIntyre was not the shooter, he would have used it to the best of his ability in defending McIntyre, especially given this case relied entirely upon eyewitness testimony. (Pl. Ex. 96: Gary Long Dep. 67:24–68:8); (Pl. Ex. 97: Gary Long 2015 Aff. ¶¶ 12–14).

349.     When asked whether he told the prosecutor that that he had searched thoroughly for Stacy Quinn but had been unable to locate her, and when asked why he lied and told the prosecutor he could not find Stacy Quinn, Golubski refused to answer and instead invoked his Fifth Amendment right to remain silent. (Pl. Ex. 80: Roger Golubski Dep. 188:21–189:25, 193:23–194:4).

350.     When asked whether the jury never learned that the man Stacy Quinn saw was not Lamonte McIntyre because he lied and said she could not be found, Golubski refused to answer and instead invoked his Fifth Amendment right to remain silent. (Pl. Ex. 80: Roger Golubski Dep. 197:21–198:3).

351.     When asked whether his interactions with Stacy Quinn during this investigation, and the fact of his relationship with her were material, exculpatory evidence that the prosecutor would have been obligated to turn over to the defense, Golubski refused to answer and instead invoked his Fifth Amendment right to remain silent. (Pl. Ex. 80: Roger Golubski Dep. 197: 3–12).

352.    Golubski failed to disclose to the prosecutor that he was engaged in a sexual relationship with Stacy Quinn. Withholding this information from the prosecution amounted to serious police misconduct and egregious violations of minimally accepted police practices. (Pl. Ex. 80: Roger Golubski Dep. 195:8–14, 197:3–12); (Pl. Ex. 141: Terra Morehead Dep. 245:20–23); (Pl. Ex. 100: Russell Fischer Report, p. 18).

353.    When asked whether Stacy Quinn was lying when she came forward in 1996 on her own accord to state that Lamonte McIntyre was not the real perpetrator and testified as such at his post-conviction hearing, Golubski refused to answer and instead invoked his Fifth Amendment right to remain silent. (Pl. Ex. 80: Roger Golubski Dep. 199:1–199:14).

354.    When asked if, at various points in time Niko Quinn, Stacy Quinn, and Josephine Quinn, approached him to tell him that Lamonte McIntyre was not the shooter and whether he purposefully did not document these occasions or share them with the prosecution, because he wanted to make sure Lamonte McIntyre stayed convicted and to hide his own misconduct, Golubski refused to answer and instead invoked his Fifth Amendment right to remain silent. (Pl. Ex. 80: Roger Golubski Dep. 199:22–201:13).

355.    Morehead understood that had she learned of any of the misconduct by Golubski in his interviews, or lack thereof, with Stacy Quinn during the investigation, she would have had a duty to disclose this misconduct as Brady evidence and that she had a duty of candor with the court. (Pl. Ex. 141: Terra Morehead Dep. 77:25–79:15; 80:7–81:5; 81:6–10; 81:11–22; 82:4–25, 83:7–13, 83:20–84:1, 84:3–15, 85:3–19, 88:13–20, 91:2–11, 236:2–11); (Pl. Ex. 100: Russell Fischer Report p. 16).

356.    In general, Morehead alleged she never learned of any exculpatory evidence she did not disclose and would have disclosed any exculpatory information she had learned. (Pl. Ex.

141: Terra Morehead Dep. 77:25–79:15; 80:7–81:5; 81:6–10; 81:11–22; 82:4–25, 83:7–13, 83:20–84:1, 84:3–15, 85:3–19, 88:13–20, 91:2–11, 236:2–11).

357.     It was Culp's responsibility, as the supervisor for the Ewing/Quinn investigation, to make sure that officers under his command took all proper investigative steps and complied with their obligations to overturn exculpatory evidence to the prosecution. (Pl. Ex. 99: Clyde Blood 132:24–134:24); (Pl. Ex. 81: W.K. Smith Dep. 10:9–19, 38:6–42:4).

358.     When the prosecution summary was complete, it was the supervisor's "job to review it and go through it and see if anything else was needed" before it was sent over to the district attorney's office. (Pl. Ex. 81: W.K. Smith Dep. 225:19–226:18).

**Culp would have had ample opportunity to observe the investigative steps taken in this case, but failed to intervene.**

359.     In 1994, each of the detectives in the crimes against persons unit had an office off the same hallway. Ware Dep. 116:6–13; (Pl. Ex. 99: Clyde Blood 86:19–88:13).

360.     Culp's office was also in that hallway, approximately twenty or thirty feet away from Golubski's. Ware Dep. 116:14–118:3; (Pl. Ex. 99: Clyde Blood Dep. 82:6–85:6). Culp tended to work with his door open. It wasn't unusual for Culp to be in his office in the evenings or nighttime hours. Ware Dep. 118:21–24; (Pl. Ex. 99: Clyde Blood Dep. 86:19–88:13).

361.     It was Culp's obligation to make sure that the investigations being conducted under his command were done properly. Ware Dep. 124:25–126:10. Culp "supervised everything" in the homicide department in 1994. (Pl. Ex. 99: Clyde Blood Dep. 48:18–25, 66:15–24, 66:25–67:24).

362.     As the supervisor, Culp "had to know what was going on around him. He was in charge." (Pl. Ex. 99: Clyde Blood Dep. 80:14–22). If there was anything wrong with the

investigative steps he took, it was Culp's responsibility as of 1994 and 1995 to inform him so that he could correct them. (Pl. Ex. 81: W.K. Smith Dep.185:18–188:20).

363.    At his deposition Ware could not think of a single time Culp came to him and instructed him to do something different in an investigation he was conducting, or asked him questions about an investigation he was conducting. (Pl. Ex. 74: Dennis Ware Dep. 123:13–25).

364.    At his deposition, Smith could not think of a single time Culp asked him to conduct an additional investigative step before referring a case to the prosecution. (Pl. Ex. 81: W.K. Smith Dep. 226:19–227:2). However, Smith believed Culp reviewed his investigative report before sending it to the prosecution. (Pl. Ex. 81: W.K. Smith Dep. 229:9–25).

365.    Culp "was calling the shots on this McIntyre case." (Pl. Ex. 99: Clyde Blood Dep. 66:15–24). It was Culp's "sole responsibility" to supervise investigations, and if he needed help, it was his responsibility to go up the command staff to the major or captain. (Pl. Ex. 99: Clyde Blood Dep. 67:25–14).

366.    In fact, in 1994, in the KCKPD, detectives had an affirmative obligation to keep Culp informed about their investigations and detectives would brief Culp any time there was new information in an investigation, including when a witness made a positive identification. (Pl. Ex. 99: Clyde Blood Dep. 78:18–81:10, 204:12–205:23).

367.    As the supervisor, Culp had an affirmative duty to inquire about the investigative steps detectives were taking. (Pl. Ex. 99: Clyde Blood Dep. 78:18–81:10, 133:19–134:8). Culp had a number of avenues available to stay up-to-date on detectives' homicide investigations, including initiating a conversation with one of the officers in the bureau, calling officers, accompanying officers on witness interviews, reviewing investigative reports, and directing follow-up investigation. (Pl. Ex. 99: Clyde Blood Dep. 135:22–137:16).

368. Detectives' reports pertaining to a particular case would be stored in a "central file" maintained at the bureau by the secretaries and accessible to all the detectives working the case as well as their supervisor (Culp). (Pl. Ex. 99: Clyde Blood Dep. 118:13–120:8); (Pl. Ex. 81: W.K. Smith Dep. 295:21–296:22, 298:25–299:6, 299:12–24).

369. As long as Culp had read the investigative reports in this case, he would have been in the position to question where the last name "McIntyre" originated. (Pl. Ex. 143: Tarik Khatib Dep. 170:18–171:4).

370. Additionally, from reading both Ruby Mitchell's and Keva Garcia's statements, Culp should have known to inquire about the discrepancy between the names each provided as the man she used to date: Lamonte McIntyre versus Lamont Drain. (Pl. Ex. 143: Tarik Khatib Dep. 197:17–199:20). There is no indication that Culp requested a follow-up investigation on this discrepancy. (Pl. Ex. 143: Tarik Khatib Dep. 199:21–200:5).

371. Barring a legitimate explanation from Golubski, the contradiction between what Keva Garcia reported to Golubski in September 1994 and what Ruby Mitchell reported on the day of the crimes should have raised a major red flag for Culp both about the reliability of Ruby Mitchell's investigation and Golubski's and Krstolich's conduct in this investigation, assuming they came to his attention. (Pl. Ex. 74: Dennis Ware Dep. 266:2–267:7).

372. In his deposition, former KCKPD Chief, Ron Miller testified, "if Culp was a lieutenant in homicide at the time of this case, he would have solid knowledge of this case." (Pl. Ex. 144: Ronald Miller Dep. 228:4–14). Miller would have expected that Culp knew about the course of the Ewing/Doniel Quinn homicide investigation and the steps that were taken and not taken, and be able to spot gaps in the investigation. (Pl. Ex. 144: Ronald Miller Dep. 231:8–17).

126

373.     Before former KCKPD Sergeant Tim Hausback, who had been employed by the KCKPD from 1972–1989, left the KCKPD, Culp told him that he knew detectives in the homicide division "were gone all day[,] closed their cases[,] [b]ut he did not know what they were doing. (Pl. Ex. 129: Tim Hausback Aff. ¶¶ 1–8, 29).

374.     Culp told Hausback that he recognized "in case after case, detectives did not follow up on leads" and that "detectives had lied in their reports." (Pl. Ex. 129: Tim Hausback Aff. ¶ 30). When Culp would vet these reports, he would "discover that the detectives had not even spoken with the witnesses." (Pl. Ex. 129: Tim Hausback Aff. ¶ 30).

375.     Despite understanding that there were improperly conducted homicide investigations abound in the KCKPD Homicide Division, it appeared Culp took no action to remedy his detectives' deficiencies. (Pl. Ex. 129: Tim Hausback Aff. ¶ 31).

**A few years before Defendants wrongfully convicted Lamonte McIntyre, Golubski uses threats and coercion to solicit sexual favors from Rose McIntyre**

376.     In the late 1980s, Rose McIntyre was sitting in a car with her then-boyfriend, Greg Hill, when Golubski approached the car and ordered Rose McIntyre to get out of Hill's car and go to his unmarked patrol car. (Pl. Ex. 109: Rose McIntyre 2014 Aff. ¶¶ 45–50); (Pl. Ex. 112:  Rose McIntyre Dep. 67:1–3, 68:4–18, 78:12–90:22); (Pl. Ex. 118: Gregory Hill Aff. ¶¶ 1–4); (Pl. Ex. 80: Roger Golubski Dep. 231:1–233:2).

377.     Golubski then threatened to arrest Hill. Out of fear, Rose McIntyre complied and followed Golubski back to his unmarked patrol car. (Pl. Ex. 109: Rose McIntyre 2014 Aff. ¶ 49); (Pl. Ex. 112: Rose McIntyre Dep. 90:18–22, 92:18–19); (Pl. Ex. 80: Roger Golubski Dep. 233:3–12).

378.     Alone in his car, Golubski threatened Rose McIntyre that he could arrest her and have her charged, and that if she "wanted to keep Greg from being arrested" that she had to come to the police station the next day. (Pl. Ex. 109: Rose McIntyre 2014 Aff. ¶¶ 50–53).

379.     Golubski told Rose she was a "nice looking lady" and made it clear that Golubski expected to get sexual favors from Rose, saying he wanted to "eat" her "pussy" and telling Rose if she "went with him" he could "help" her. (Pl. Ex. 109: Rose McIntyre 2014 Aff. ¶¶ 50–53; (Pl. Ex. 112: Rose McIntyre Dep. 95:15–100:19); (Pl. Ex. 80: Roger Golubski Dep. 232:21–233:2, 233:21–234:3).

380.     Terrified, and to protect herself and Greg from being arrested, Rose McIntyre "felt powerless to say no" to Golubski's demands. Complying with Golubski's threats, Rose did not tell Hill that Golubski asked her to come to the police station. (Pl. Ex. 109: Rose McIntyre 2014 Aff. ¶¶ 53-55).

381.     Golubski told Rose to come to the station late the next day, so, she went between 9 and 10pm. (Pl. Ex. 109: Rose McIntyre 2014 Aff. ¶¶ 54–56); (Pl. Ex. 112: Rose McIntyre Dep. 101:24–102:9); (Pl. Ex. 80: Roger Golubski Dep. 235:6–19).

382.     When Rose McIntyre arrived, she parked in the police station's garage, and an officer minding the desk buzzed her into the station. (Pl. Ex. 109: Rose McIntyre 2014 Aff. ¶ 57); (Pl. Ex. 112: Rose McIntyre Dep. 122:16–123:17).

383.     Golubski's office was right by the door, and when Rose McIntyre went in, Golubski shut the door behind her and told her that he liked Black women, that things would go better for her if she complied with his demands, and that he could "make it hard" for her or "make it light" for her. (Pl. Ex. 109: Rose McIntyre 2014 Aff. ¶¶ 57–58); (Pl. Ex. 80: Roger Golubski Dep. 235:6–236:2).

128

384.    Golubski again threatened to arrest Hill if Rose did not comply, saying "I don't have to do anything else to Greg if you let me eat your pussy." (Pl. Ex. 109: Rose McIntyre 2014 Aff. ¶ 58); (Pl. Ex. 112: Rose McIntyre Dep. 111:6–19); (Pl. Ex. 80: Roger Golubski Dep. 236:3–237:10).

385.    During this encounter, Golubski told Rose McIntyre he wanted to date her, let her know that he knew she had kids, and tried to incentivize her by offering to help her with her children. (Pl. Ex. 112: Rose McIntyre Dep. 109:1–110:8); (Pl. Ex. 109: Rose McIntyre 2014 Aff. ¶ 58).

386.    Golubski then got up from behind the desk where he was sitting, turned off the lights, pulled down Rose McIntyre's clothes, and performed oral sex on her for about fifteen to twenty minutes, while to Rose McIntyre, "every moment was excruciating." (Pl. Ex. 109: Rose McIntyre 2014 Aff. ¶ 59); (Pl. Ex. 112: Rose McIntyre Dep. 109:14–110:25); (Pl. Ex. 80: Roger Golubski Dep. 237:11–16).

387.    When asked if he forced Rose McIntyre to receive oral sex from him, Golubski refused to answer and instead invoked his Fifth Amendment right to remain silent. (Pl. Ex. 80: Roger Golubski Dep. 237:17–23).

388.    Rose submitted to this forced sexual assault only due to Golubski's direct and specific threat to arrest her or Hill if she did not comply. (Pl. Ex. 109: Rose McIntyre 2014 Aff. ¶ 59).

389.    Golubski told Rose McIntyre not to tell anyone what transpired in his office. (Pl. Ex. 109: Rose McIntyre 2014 Aff. ¶ 61); (Pl. Ex. 80: Roger Golubski Dep. 240:13–20).

**During Golubski's sexual assault of Rose McIntyre, another officer enters the office, but does not intervene**

390.     At one point, a white KCKPD officer in uniform opened the door to Golubski's office, turned on the light, stood in the doorway and saw Golubski sexually assault Rose McIntyre. (Pl. Ex. 109: Rose McIntyre 2014 Aff. ¶ 60); (Pl. Ex. 112: Rose McIntyre Dep. 110:23-111:5); (Pl. Ex. 80: Roger Golubski Dep. 237:11–238:5).

391.     When the officer saw what Golubski was doing, he did not act surprised. (Pl. Ex. 109: Rose McIntyre 2014 Aff. ¶ 60).

392.     The officer then backed out of the doorway and left, turning off the light and shutting the door behind him, without making any effort to intervene. (Pl. Ex. 109: Rose McIntyre 2014 Aff. ¶ 60); (Pl. Ex. 112: Rose McIntyre Dep. 110:23–113:4).

393.     Golubski was undeterred by the interruption by another officer and continued with the sexual assault. (Pl. Ex. 109: Rose McIntyre 2014 Aff. ¶ 60); (Pl. Ex. 112: Rose McIntyre Dep. 110:23–113:4).

394.     Other officers were present in the station at the time, but no officer came to Rose McIntyre's assistance or helped her in any way. (Pl. Ex. 109: Rose McIntyre 2014 Aff. ¶ 60).

395.     No incident report, internal affairs complaint, or any other document referencing the sexual assault of Rose McIntyre by Golubski at the KCKPD police station was ever filed or submitted by a KCKPD officer or employee.

396.     When asked whether this was the first—or last—time another KCKPD officer walked in on him while he was engaged in a sexual act in his office, Golubski refused to answer and instead invoked his Fifth Amendment right to remain silent. (Pl. Ex. 80: Roger Golubski Dep. 237:17–240:12); *see also* (Pl. Ex. 129: Tim Hausback Aff. ¶ 25).

**Seeking to avoid further sexual assault by Golubski, Rose McIntyre attempts to report him to the KCKPD Internal Affairs Department and ultimately changes her address and telephone number**

397.    Golubski told Rose McIntyre that he wanted an ongoing sexual relationship with her. (Pl. Ex. 109: Rose McIntyre 2014 Aff. ¶ 61); (Pl. Ex. 112: Rose McIntyre Dep. 113:5–10).

398.    Upon leaving the station, Rose McIntyre felt "sick to [her] stomach" and "dirty and totally humiliated" after Golubski "had treated [her] like a whore and forced [her] to submit to his sexual desires." (Pl. Ex. 109: Rose McIntyre 2014 Aff. ¶ 62).

399.    Following the assault, Golubski harassed Rose McIntyre for weeks, calling her two or three times a day and telling her he wanted her to come back to his office to "do it again" with her and wanted her to be his "woman." (Pl. Ex. 109: Rose McIntyre 2014 Aff. ¶ 63); (Pl. Ex. 112: Rose McIntyre Dep. 113:5–117:8); (Pl. Ex. 80: Roger Golubski Dep. 240:21–241:2).

400.    Golubski then offered Rose McIntyre money in return for sexual favors, promising Rose McIntyre that he could do "a lot" for her and help her with her five children. (Pl. Ex. 109: Rose McIntyre 2014 Aff. ¶ 63); (Pl. Ex. 112: Rose McIntyre Dep. 113:5–117:8); (Pl. Ex. 80: Roger Golubski Dep. 240:21–241:15).

401.    Rose McIntyre "dreaded" Golubski's persistent calls and "continued to fear him," but sometimes she would speak with him on the phone "to placate him" in the hopes he would not force her to again provide sexual favors. (Pl. Ex. 109: Rose McIntyre 2014 Aff. ¶ 64); (Pl. Ex. 112: Rose McIntyre Dep. 113:5–117:8).

402.    Rose McIntyre reported Golubski's misconduct to the KCKPD Internal Affairs Department soon after the sexual assault occurred in his office. (Pl. Ex. 112: Rose McIntyre Dep. 105:1–22, 106:18–25, 127:6–131:6, 140:2–17).

403.     The officers Rose McIntyre encountered at KCKPD Internal Affairs refused to take or file her complaint against Golubski, stating that "they don't believe that their officers act like that." (Pl. Ex. 112: Rose McIntyre Dep. 105:1–22, 106:18–25, 127:6–131:6, 140:2–17).

404.     Rose McIntyre knew there was no one else in the department she could complain to because "Golubski was known to be very powerful in the community and in the police department." (Pl. Ex. 109: Rose McIntyre 2014 Aff. ¶ 64).

405.     To avoid Golubski's unwanted advances, Rose McIntyre moved homes and changed her telephone number. (Pl. Ex. 109: Rose McIntyre 2014 Aff. ¶ 65); (Pl. Ex. 112: Rose McIntyre Dep. 114:21–115:2, 117:24–118:1); (Pl. Ex. 80: Roger Golubski Dep. 241:16–242:2).

406.     After Rose McIntyre moved and changed her phone number, she did not hear from Golubski. (Pl. Ex. 109: Rose McIntyre 2014 Aff. ¶ 65); (Pl. Ex. 112: Rose McIntyre Dep. 125:5–18).

407.     When asked whether Rose had made it clear to Golubski that she would not be having sexual relations with him again, Golubski refused to answer and instead invoked his Fifth Amendment right to remain silent. (Pl. Ex. 80: Roger Golubski Dep. 242:3–243:16).

408.     When asked whether Rose's rejection of Golubski's sexual advances angered Golubski, as he was not used to women turning him down, Golubski refused to answer and instead invoked his Fifth Amendment right to remain silent. (Pl. Ex. 80: Roger Golubski Dep. 243:17–246:25).

409.     When asked whether Golubski was used to coercing women to have sex with him as he wanted, often through threats, violence, and rape, Golubski refused to answer and instead invoked his Fifth Amendment right to remain silent. (Pl. Ex. 80: Roger Golubski Dep. 243:17–246:25).

**Golubski commits sexual and investigative misconduct prior to 1994 and when reported to the KCKPD, no action was taken**

410.    In the mid to late 1970s, Hausback personally "saw Golubski sitting in his patrol car in the 'Bottoms,' an industrial area next to the river at Third and James Street, which was well known as an area where prostitutes were available." (Pl. Ex. 129: Tim Hausback Dec. ¶ 9). As an officer assigned to the area, Hausback knew that "Golubski had no reason to be in the Bottoms at those times. In fact, he was violating KCKPD orders by being 'out of district' when he should have been patrolling his assigned area." Hausback observed that Golubski "made no effort to disguise that he was looking for prostitutes." (Pl. Ex. 129: Tim Hausback Dec. ¶ 10). Golubski "was very well known among the prostitutes there" and had a "reputation for seeking 'blow jobs.'" (Pl. Ex. 129: Tim Hausback Dec. ¶ 11).  Golubski's pursuit and exploitation of prostitutes was widely known and accepted in the KCKPD, so much so that his "familiarity with prostitutes would sometimes come up during the daily roll call." (Pl. Ex. 129: Tim Hausback Dec. ¶¶ 12–15).

411.    Former officer Michael Kobe, employed by KCKPD from 1985–2010, testified at his deposition that Golubski "had cultivated a large network of informants who were responsible for providing…important information to be used in criminal investigations and that Detective Golubski had acquired a great deal of prestige and esteem because of this." (Pl. Ex. 72: Michael Kobe Dep. 13:1–17, 35:2–36:18). Kobe was uncomfortable with how Golubski might have cultivated those informants, since even Black officers who grew up in the area where Golubski's informants were located did not have the same network of informants that Golubski did. (Pl. Ex. 72: Michael Kobe Dep. 35:2–39:6).

412.     Kobe further testified that Golubski had "dates" with African-American informants, where "dates" was a euphemism for "sexual encounters." (Pl. Ex. 72: Michael Kobe Dep. 40:7–42:13, 45:14–46:3, 47:1–5). Kobe heard that Golubski was dating Black, female informants from multiple people within the KCKPD, and outside the KCKPD as well. (Pl. Ex. 72: Michael Kobe Dep. 42:14–43:1, 82:14–18, 84:2–85:9).

413.     Further, Kobe testified that "there was good reason to believe that Detective Golubski was having sexual relations with African-American females and that probably some of those females were informants." (Pl. Ex. 72: Michael Kobe Dep.80:19–82:18).

414.     Former KCKPD homicide detective Timothy Maskil attested that "[t]hroughout the police department, Golubski was known for having sex with black, drug-addicted prostitutes" whom he used as informants. (Pl. Ex. 104: Timothy Maskil 2015 Aff. ¶¶ 1–2, 13).

415.     Former KCKPD officer Ruby Ellington, who had been employed with the KCKPD for twenty-five years, attested that she had "learned early on that [Golubski] had left his wife and begin pursuing prostitutes." (Pl. Ex. 120: Ruby Ellington 2015 Aff. ¶¶ 2, 5). Like Maskil, she stated that "Golubski developed a reputation for being obsessed with prostitutes, specifically black female prostitutes who were typically drug-addicted as well as poor and powerless." (Pl. Ex. 120: Ruby Ellington 2015 Aff. ¶ 6).

416.     Brown worked with Ruby Ellington at the KCKPD, and believed her to be a truthful officer with whom he had positive experiences. (Pl. Ex. 102: James Brown Dep. 107:18–108:10).

417.     Golubski "used his color of authority over these prostitutes/informants to obtain sexual relations." (Pl. Ex. 104: Timothy Maskil 2015 Aff. ¶ 14); (Pl. Ex. 120: Ruby Ellington 2015 Aff. ¶ 6).

418.    Tina Peterson, a resident of KCK's "north end," encountered numerous victims of Roger Golubski while working at the KCK shelter for battered women and observed him openly riding around in his police car with Black women whom he stalked, harassed, and sexually exploited. In the late 1980s, Tina called the police department and stated that she worked at the shelter for battered women and wanted to make a complaint about Golubski's abuse of women. The person answering the phone stated someone would get back with her, and Tina left her name and phone number so she could be contacted. But no one from the Department called back. A week later, Tina called again and explained for the second time that she worked at the battered women's shelter and that she wanted to make a complaint about Golubski. Once again, she was told someone from the department would call her back, and once again, no one did. (Pl. Ex. 117: Tina Peterson Dec. ¶¶ 1–7, 10-21).

419.    Golubski's reputation in the community was that he was a sexual predator, known for exploiting, threatening, and abusing people in the community and targeting the most vulnerable women to then use "his police authority to force them to provide sex." Golubski was also widely known for harassing the men in the community, especially those who had any suspected involvement with drugs. He would collect money from these men who feared being arrested if they did not comply with his demands. (Pl. Ex. 117: Tina Peterson Dec. ¶¶ 1–9); (Pl. Ex. 120: Ruby Ellington 2015 Aff. ¶¶ 5–19); (Pl. Ex. 104: Timothy Maskil 2015 Aff. ¶¶ 7, 12–18).

420.    "Everyone in the Department would see … Golubski in the company of prostitutes" and "knew that when [Golubski] would go out on calls, that any black female involved would likely end up in his police car with him." (Pl. Ex. 120: Ruby Ellington 2015 Aff. ¶ 7). In exchange for picking up prostitutes and receiving sexual favors from them, Golubski

would take care of their warrants and tickets, or help them solve other legal troubles. Golubski made no secret of these activities. (Pl. Ex. 120: Ruby Ellington 2015 Aff. ¶ 8–14).

421.    According to former KCKPD Chief, Ron Miller, if Golubski had a network almost entirely composed of African American females that would "raise a question in my mind." (Pl. Ex. 144: Ronald Miller Dep. 104:18–105:5). Miller also testified that "[e]veryone knows that Golubski has an affinity for black females," particularly young women. (Pl. Ex. 144: Ronald Miller Dep. 55:10–25, 63:12–64:10, 243:13–244:9); (Pl. Ex. 75: Ricky Armstrong Dep. 53:10–54:24); (Pl. Ex. 72: Michael Kobe Dep. 28:2–29:1).

422.    It was also widely known that Golubski fathered children with several black prostitutes in Kansas City, Kansas. (Pl. Ex. 120: Ruby Ellington 2015 Aff. ¶ 15–17); (Pl. Ex. 72: Michael Kobe Dep. 103:3–13).

423.    Yet, "the Administration of the [KCKPD] turned a blind eye to Golubski's activities because the information that Golubski appeared to be obtaining from these black prostitutes/informants seemed to get results, in terms of getting cases 'cleared.'" (Pl. Ex. 104: Timothy Maskil 2015 Aff. ¶ 14). Indeed, Golubski's misconduct and his exploitation of black women was well known throughout the Department" but he "was never punished," instead "he rose steadily through the ranks and became a powerful detective." (Pl. Ex. 120: Ruby Ellington 2015 Aff. ¶¶ 6, 18); (Pre-Trial Order, Stipulation ¶ 3).

424.    Kobe testified that it would not "have been possible for Detective Golubski to…have operated as he did without the knowledge of commanders knowing what he was doing and how he was operating….He may have gotten it done once or twice, but the pattern [of using informants and not providing their name and the allegations of Golubski's sexual relations with

136

informants] was over a lengthy period of time and I don't think that that pattern could have …

reasonably escaped the notice of a commander." (Pl. Ex. 72: Michael Kobe Dep. 98:3–99:20).

425.    Kobe never heard anyone at the KCKPD suggest that they should investigate

Golubski's use of informants or his sexual relationship with informants. (Pl. Ex. 72: Michael

Kobe Dep. 85:21–86:4).

**Despite that it was common knowledge within the KCKPD that Golubski was engaged in
sexual and investigative misconduct, Defendants claim not to have heard anything about
this behavior.**

426.    Ware understood the KCKPD had a written policy in place stating that officers'

personal behavior "must be beyond reproach"; Ware agreed with that policy, because if one

officer behaves in a way that indicates they may be susceptible to acts of corruption or bribery,

that risks undermining the credibility of the entire department. (Pl. Ex. 74: Dennis Ware Dep.

59:1-60:13).

427.    Ware maintains integrity was something that was critically important to him

throughout his career; he understood that one of his primary responsibilities as a police officer

was to fight corruption, whether inside or outside the Department. Ware understood that if he

saw any indication of any sort of corrupt behavior by a fellow officer, he was obligated to

affirmatively report it, and testified that he took that obligation very seriously. (Pl. Ex. 74:

Dennis Ware Dep. 69:19-70:17; 72:4-22).

428.    During the time he worked as one of the ten to fifteen detectives investigating

serious felonies in the early-to-mid-nineteen-nineties with Golubski, Ware maintains he never

saw any indication, no matter how slight, that Golubski was engaging in any kind of corruption

or violation of the rules more serious than a uniform infraction, and never heard so much as a

hint of a rumor that Golubski might be doing anything improper including patronizing

137

prostitutes. (Pl. Ex. 74: Dennis Ware Dep. 96:23–97:8; 99:4–101:5; 102:11–18). If he had, Ware testified he would have investigated whether the information had merit, and if he determined there was any possibility the rumor was true, he would have been sure to immediately report it up the chain of command. (Pl. Ex. 74: Dennis Ware Dep. 102:23–104:16).

429.    Ware testified at his deposition that the first time he ever heard any allegation that Golubski was misusing his position as a detective in any way was when he read the complaint in this action. (Pl. Ex. 74: Dennis Ware Dep. 104:18–105:16).

430.    Ware admits he has "selective memory" and sometimes chooses not to remember things. (Pl. Ex. 74: Dennis Ware Dep. 9:19–10:11).

431.    Brown too swore he never heard any allegation that Golubski took drugs from members of the KCK community nor that Golubski had sex with drug-addicted prostitutes, witnesses, or defendants, until 2017 or later. (Pl. Ex. 102: James Brown Dep. 34:23–35:3–19, 38:5–25, 43:1–44:23, 47:15–48:20, 53:9–56:14, 110:1–15). Brown also denied ever hearing that Golubski drove women around in his patrol car or that Golubski was caught having sexual relations with a woman in his office until he spoke with his attorneys in the context of this lawsuit. (Pl. Ex. 102: James Brown Dep. 63:22–65:13). Brown also claims he never heard that Golubski gave drugs to drug-addicted women in the community. (Pl. Ex. 102: James Brown Dep. 107:2–17).

432.    Any officer had the obligation, under KCKPD policy as of 1994, to document and immediately report corruption by another officer, including a fellow officer's violation of the code of ethics. (Pl. Ex. 75: Ricky Armstrong Dep. 77:10–83:24. Ethics violations included an officer's having sexual relations with a prostitute while on duty or paying for sex while on or off duty. (Pl. Ex. 75: Ricky Armstrong Dep. 85:18–89:2).

138

433.     Brown testified at his deposition that any employee of the KCKPD in the 1990s who heard of Golubski's sexual encounters with informants would have been required to report this misconduct up the chain of command or to Internal Affairs. (Pl. Ex. 102: James Brown Dep. 101:5–102:19).

434.     Smith also understood by 1994 that if he observed a fellow detective engaging in improper conduct, he had an obligation to intervene, including if he became aware that another officer used suggestion in identification procedures, used coercion in witness interviews, or knew an officer had broken the law. (Pl. Ex. 81: W.K. Smith Dep. 253:5–255:2, 376:7–12). When asked about Golubski's reputation and work with informants, Smith merely stated that he knew Golubski had a number of informants in the North End. (Pl. Ex. 81: W.K. Smith Dep. 353:19–22).

435.     KCKPD Officers could have reported Golubski's misconduct by notifying their immediate supervisors, notifying their commanders, or writing a report. (Pl. Ex. 102: James Brown Dep. 102:20–103:2).

436.     If an officer had sex with an informant or a witness, the officer could exert improper influence over that informant. (Pl. Ex. 102: James Brown Dep.110:16–25. There is no legitimate reason for an officer or detective to have sex with an informant. (Pl. Ex. 102: James Brown Dep. 125:25–126:5).

437.     Additionally, KCKPD supervisors knew that police officers were susceptible to corruption. (Pl. Ex. 99: Clyde Blood Dep. 30:24–31:9).

438.     According to former KCKPD Chief, Ron Miller, a supervisor could ask an officer if they had relationships with women in the community that could create a conflict of interest with an investigation. If Culp had heard of such a potential conflict of interest, it is his

responsibility to follow up on the allegation or rumor of misconduct. (Pl. Ex. 144: Ronald Miller Dep. 70:25–73:10); *see also* (Pl. Ex. 75: Ricky Armstrong Dep. 175:25–176:20; (Pl. Ex. 72: Michael Kobe Dep. 32:1–19). Former KCKPD Chief Terry Zeigler testified that if Golubski had a sexual relationship with any witness in a case, there was no legitimate reason for him not to inform the Detective Bureau so that another detective could be assigned. (Pl. Ex. 146: Terry Zeigler Dep. 104:3-12.)

**Golubski has illicit associations with drug dealers in KCK, including Cecil Brooks, the cousin of Aaron Robinson**

439.   Starting in the 1970s, Golubski developed close and illicit associations with drug dealers, protected them from arrest, and warned them of investigations and planned raids. In return, Golubski was supplied money and drugs to operate his network of informants and to exploit black females in the community for sex. Cecil Brooks was one of Golubski's illicit associates. (Pl. Ex. 76: Joe Robinson Aff. ¶¶ 20–26); (Pl. Ex. 120: Ruby Ellington 2015 Aff. ¶¶ 5–22); (Pl. Ex. 93: James McIntyre Aff. ¶¶ 16-29); (Pl. Ex. 122: Jermaine McIntyre 2016 Aff. ¶¶ 2–20); (Pl. Ex. 121: N.H. 2015 Aff. ¶¶ 3–6, 11–12); (Pl. Ex. 119: C.S.R. Aff. ¶¶ 8–22); (Pl. Ex. 82: Cecil Brooks 2016 Aff. ¶¶ 25–28); (Pl. Ex. 84: Kendra Dean-Martin 2013 Aff. ¶¶ 13–18); (Pl. Ex. 88: Kendra Dean Martin Aff. ¶¶ 13–14); (Pl. Ex. 117: Tina Peterson Aff. ¶¶ 22-39); (Pl. Ex. 115: S.K. Dep. at 199-201); (*see generally* Pl. Ex. 116: Cecil Brooks Dep.).

440.   In the 1990s, Tina Peterson worked at a service station called McCall's on Quindaro in KCK. The owner, Cecil Brooks, was a prominent drug dealer who was well known throughout the community for paying police for protection, as he operated his drug business from McCall's openly and with no fear of arrest. Peterson personally observed Roger Golubski at McCall's at least a couple times a week. Sometimes he would park his car on the lot and Cecil

would go out to speak with him but other times Golubski would head into the backroom where Cecil did drug deals and they would meet behind closed doors. On at least one occasion, Peterson observed Cecil pulling out cash from the cash register at McCall's and giving it to Golubski. (Pl. Ex. 117: Tina Peterson Aff. ¶¶ 22–34).

441.    Around that same time, Peterson worked at Delavan apartments, which was previously owned by Cecil Brooks. During his ownership, the complex was a well-known hub of drug activity. Peterson saw Cecil and Golubski there together and observed them socializing with underage girls. After the property was sold to another owner, Cecil's back office was cleaned out and Peterson personally observed guns, drugs, and money being discovered and pulled out of the attic. (Pl. Ex. 117: Tina Peterson Dec. ¶¶ 35–37).

442.    Kobe testified that Cecil Brooks was a known criminal in the Kansas City, Kansas area and that Brooks and Golubski had met and had conversations as "both had very high profiles in the African-American community." (Pl. Ex. 72: Michael Kobe Dep. 107:9–15, 109:18–23).

443.    When asked about his illicit associations with Cecil Brooks, his receiving of money from Cecil and other drug dealers in exchange for protection from arrest and prosecution, and his specific protection of Cecil Brooks' gang in investigating the Ewing and Quinn homicides, Golubski refused to answer and instead invoked his Fifth Amendment right to remain silent. (Pl. Ex. 80: Roger Golubski Dep. 226:14–23; 227:1–17; 255:4–256:3; 256:4–25; 257:1–13; 259:5–19; 259:9–260:5; 260:14–23; 2610:24–261:15; 261:16–262:12; 262:19–25; 263:1–8; 264:25–265:7; 263:22–264:24; 267:18–25; 368:4–373:25).

444.    When asked about his illicit associations with Roger Golubski, his paying Golubski money for protection from arrest and prosecution, and the protection by Golubski while

investigating the Ewing and Quinn homicides, Cecil Brooks refused to answer and instead invoked his Fifth Amendment right to remain silent. (Pl. Ex. 116: Cecil Brooks Dep. 11:8–20; 19:9–24:13).

445.    Within the KCKPD, Golubski had "a reputation for taking street drugs from users and dealers and giving those drugs to prostitutes in return for sexual acts. Many in the Department heard about this, but they just ignored it or covered up his misconduct." (Pl. Ex. 120: Ruby Ellington 2015 Aff. ¶ 9).

446.    Brown claims he never heard any allegations that Golubski stole drugs, made money from drug sales, or protected drug dealers from arrest. (Pl. Ex. 102: James Brown Dep. 159:2–163:20).

447.    If any of the Defendant officers became aware that Golubski was engaging in the drug trade in any capacity, or had committed any other crime, they had the obligation to immediately report it to their supervisors. (Pl. Ex. 143: Tarik Khatib Dep. 92:15–93:19).

**Golubski continues to commit sexual assaults of women, using his status as a KCKPD officer to gain power over them**

448.    In August 1999 Golubski came to the house where O.W. lived with her twin fourteen-year-old sons and two younger children. Golubski had a search warrant. (Pl. Ex. 114: O.W. Dep. 14:13–17:21). The house was searched and O.W.'s sons were taken into custody. (Pl. Ex. 114: O.W. Dep. 18:10-19. They were later charged with murder. (Pl. Ex. 114: O.W. Dep. 57:13–58:13).

449.    Golubski was assigned to O.W.'s sons' case. (Pl. Ex. 114: O.W. Dep. 38:9–12). While the case was pending, Golubski returned to Ms. O.W.'s home, and told her he could help

her sons because he knew the DA. (Pl. Ex. 114: O.W. Dep. 27:13–29:12). Golubski then made

sexual advances; when O.W. resisted, he raped her. (Pl. Ex. 114: O.W. Dep. 29:13–31:25).

450.     Golubski repeatedly raped O.W., including while on-duty in his police vehicle,

and by forcing her to perform oral sex, during the pendency of her sons' case. (Pl. Ex. 114: O.W.

Dep. 62:15–63:15; 54:5–25; 41:14–16; 42:4–43:16). He told her he could "be a good friend" and

help her with the case. When O.W. told Golubski she was going to make a complaint, he

threatened that "he can have somebody do something to me and that they would never find me."

(Pl. Ex. 114: O.W. Dep. 42:4–43:24; 56:4–12).

451.     Golubski first contacted S.K. in approximately 2007, when she was thirteen years

old. (Pl. Ex. 115: S.K. Dep. 9:1–15; 50:7–22). He falsely told her she was listed as a witness to

or involved in an incident and that if she didn't want to go to jail, she needed to meet him away

from the police station. (Pl. Ex. 115: S.K. Dep. 9:19–10:20).

452.     S.K. met Golubski in a Walmart parking lot and spoke to him in his vehicle,

where he sexually assaulted her. (Pl. Ex. 115: S.K. Dep. 14:11–25:12). Golubski then continued

to rape S.K. dozens of times over a period of the next four years. (Pl. Ex. 115: S.K. Dep. 28:5–

30:17; 35:3–54:15).

453.     Golubski threatened S.K. "just keep my mouth shut and that if I wanted to see my

sweet little grandma again" she should not talk to anyone about him "or I would be kissing my

grandma goodbye or my brother would be doing life in jail. . .[h]e can put some charge on him

and make sure he doesn't see daylight again" (Pl. Ex. 115: S.K. Dep. 21:3–22:18).

454.     Since 1996, over twenty civilian witnesses and at least three former law

enforcement officials have come forward with sworn allegations that Golubski engaged in

corruption including, in many instances, sexual misconduct. According to Plaintiff's expert in

police practices, Chief Fischer, "Without crediting the substance of any allegation, the sheer number and common pattern of the allegations should have raised major red flags to KCKPD administration about Roger Golubski." (Pl. Ex. 100: Russell Fischer Report, pp. 23–24).

### NATURE OF THE MATTER

On April 15, 1994, at around 2:00 p.m., Neil Edgar, Jr. ("Monster") walked up to Doniel Quinn and Donald Ewing as they sat in a blue Cadillac on Hutchings Street in Kansas City, Kansas, and shot them to death at close range in broad daylight. Plaintiffs' Statement of Affirmative Material Facts (Pl. SAMF) ¶¶ 8–13. Monster worked as an enforcer for a major drug operation in Kansas City, Kansas, run by Cecil Brooks and Aaron Robinson, and Doniel Quinn was suspected of stealing drugs from them. Pl. SAMF ¶¶ 1–4.

Plaintiff Lamonte McIntyre, then 17 years old, is actually innocent of this shooting; he had no involvement, did not know Monster, or the victims, and was not at the scene. Pl. SAMF ¶¶ 21–28, 232–235; Plaintiffs' Response to Golubski's SOF ¶ 95. Nor did McIntyre and Monster look alike; Monster was 5'7" and wore his hair in French braids; Lamonte McIntyre is almost 6' tall and had short hair. Pl. SAMF ¶¶ 46, 50, 139, 141.

Stacy Quinn, Doniel Quinn's cousin, was across the street during the shooting. Pl. SAMF ¶¶ 196–198; Plaintiffs' Response to Golubski's SOF ¶ 31. She clearly saw the shooter's face and recognized him as Monster, whom she knew. Pl. SAMF ¶¶ 93, 198, 200, 227. Two other witnesses got glimpses of the shooter: Stacy's sister Niko Quinn, who saw mostly the shooter's silhouette from her vantage point, and a neighbor, Ruby Mitchell, who glimpsed the shooter through a screen door while on the phone inside her house. Pl. SAMF ¶¶ 45, 128.

The Kansas City Kansas Police Department ("KCKPD") immediately came to the scene, including originally assigned homicide detectives Clyde Blood and Tim Maskil, supervisor Steve Culp, homicide detective W.K. Smith, and non-homicide detectives James Krstolich and Roger Golubski. Pl. SAMF ¶¶ 29–30, 36–37. Golubski was known in the Kansas City, Kansas community and throughout the KCKPD for associating with Black females working as

145

prostitutes in the City's North End, including for taking care of warrants and tickets if they provided him sex, and for using these women as "informants" to clear cases. Pl. SAMF ¶¶ 410–425, 439.

Stacy Quinn told officers at the scene that she saw the crime and knew who the shooter was; Golubski knew Stacy Quinn well, as he had paid her for sex for years, since she was sixteen or seventeen years old. Pl. SAMF ¶¶ 34, 216–217, 221–225. Also at the scene, Mitchell told Golubski and others (including Niko Quinn) that she thought she recognized the shooter as a "Lamont" who used to date her niece (Mitchell had mistaken Monster for this Lamont, Lamont Drain, who wore his hair in the same French-braided style as Monster). Pl. SAMF ¶¶ 31–32, 129–131, 134, 136, 151, 321. Golubski knew of Lamonte McIntyre because Golubski had previously sexually assaulted and harassed his mom, Rose McIntyre, until she moved, changed her phone number, and reported him to the KCKPD. Pl. SAMF ¶¶ 33, 376–408.

Although there was no legitimate police reason to do so, Culp reassigned non-homicide detective Golubski as the lead investigator in the case, supported by Smith—although policy dictated that as the trained homicide detective, Smith was supposed to run the investigation. Pl. SAMF ¶¶ 36–43. Despite no forensic evidence connecting him to the scene and no description of the shooter matching him, Lamonte McIntyre became the first and only suspect.  Pl. SAMF ¶¶ 102, 287–313.

Golubski and Krstolich could tell from seeing Ruby Mitchell's vantage point that she would not have been able to see the shooter's face. Pl. SAMF ¶¶ 136, 139–140. Golubski drove Mitchell to the police station, sexually harassing her during the drive. Pl. SAMF ¶¶ 144–149. At the station, Golubski and Krstolich showed Mitchell two sets of photos; Lamonte McIntyre's photo was the only one to appear in both. Pl. SAMF ¶¶ 161–164. The first was a six-photo lineup

146

which had the photos all affixed to one page; this lineup was not preserved and there is no record of what other photos were included or how suggestive it was. Pl. SAMF ¶¶ 161–165, 178. The second was a stack of five loose Polaroids with the names written on the back, a suggestive procedure. Pl. SAMF ¶¶ 161, 163, 172–174, 178–179. Although they taped interviews with Mitchell both before and afterward, the identification procedure itself was not taped. Pl. SAMF ¶¶ 166, 178–179.

Golubski and Krstolich reported to the prosecutor that Mitchell was only shown one set of five photos, and claimed that she "immediately" selected a photo of Lamonte McIntyre—the innocent man Golubski had targeted. Pl. SAMF ¶¶ 22–28, 33, 167, 173, 343. But Mitchell believed she was identifying the Lamont who used to date her niece; in a taped statement she said she had known the person she identified "[f]or a couple months" "because he used to talk to [her] niece" and identified him by first and last name as Lamont McIntyre. Pl. SAMF ¶ 168. Although Golubski and Krstolich represented that Mitchell volunteered the last name "McIntyre," she did not. Pl. SAMF ¶¶ 168–169, 181–188. The Lamont that Mitchell knew was named Lamont Drain. Pl. SAMF ¶¶ 130, 185. And she did not know anyone's last name, including Lamont Drain or Lamont McIntyre (who she did not know). Pl. SAMF ¶¶ 130, 184–186. In reality, Golubski and Krstolich used direct suggestion to obtain Mitchell's identification, perhaps by showing her the back of the photos which displayed the suspect's names so that she could select the only one named "Lamont." Pl. SAMF ¶¶ 61, 78, 161–180.

Based solely on this fabricated identification, Lamonte McIntyre was arrested, and Golubski reported the case had been "cleared." Pl. SAMF ¶ 180, 286. Both Lamonte and Rose McIntyre truthfully reported that he had nothing to do with the shooting, that he had been his aunt's house, and provided specific corroborable details, like that he had called a cab at a specific

147

time. Pl. SAMF ¶ 238–239, 255, 265, 273, 275. Golubski, Krstolich, Brown, and Barber could also see that Lamonte McIntyre was substantially taller than the shooter was consistently reported to be and had a different hairstyle. Pl. SAMF ¶ 48, 50, 139,  250–251, 266. Golubski not only failed to investigate this alibi, he, along with Barber and Brown, fabricated statements they attributed to both Lamonte and Rose McIntyre, claiming each had volunteered the same false alibi. Pl. SAMF ¶¶ 255–285.

Contrary to KCKPD policy and practice, Defendant officers failed to conduct the most basic investigative steps, even though it was their responsibility to direct evidence collection. Pl. SAMF ¶¶ 286–312. Defendant officers did not collect Lamonte McIntyre's clothes or shoes when he was arrested hours after the shooting, did not seek a search warrant to look for the gun, did not test for gun-shot residue on his face, hands, or clothing (even as Rose pleaded such a test would clear him), did not collect footprints from the fresh dirt the shooter had walked through at the scene, or analyze latent prints that had been collected. Pl. SAMF ¶¶ 289–305. There was no legitimate police reason for these failures, especially given the weakness of the case against Lamonte McIntyre. Pl. SAMF ¶¶ 295–298, 302–304, 307, 309–312.

The following day, Golubski and Ware brought the same five loose Polaroids they showed Ruby Mitchell to Niko Quinn's house. Pl. SAMF ¶ 204. After Quinn told Golubski and Ware she immediately recognized two of the photos as people she knew who were not the perpetrator, she looked at the remaining three and said she could not make any identification. Pl. SAMF ¶¶ 61, 77. Golubski then grabbed the photos, and while Ware put his thumb on McIntyre's photo, Golubski asked, "what did [Ruby] say the man's name was?" and held the photo so Quinn could see the name "Lamonte McIntyre" written on the back. Pl. SAMF ¶¶ 78–

148

79. Despite this direct suggestion, Quinn told them she could not make any identification. Pl. SAMF ¶ 84.

Within a few days after the murder, Niko Quinn realized her cousins had been shot by Monster on the orders of Cecil Brooks and Aaron Robinson. Pl. SAMF ¶¶ 89, 92–94. Associates of theirs started coming by her house with guns to intimidate her. Scared, she called Golubski to set up a meeting, saying she wanted to identify her cousin's killer. Pl. SAMF ¶ 95.

Golubski met with Niko Quinn alone in a car behind the Wyandotte High School track. Pl. SAMF ¶¶ 96–97. Niko Quinn told him she knew that Monster and Cecil were responsible for her cousin's murder and provided truthful information to corroborate her report. Pl. SAMF ¶¶ 92–94, 99. In response, Golubski warned Niko Quinn not to say anything about the true perpetrators and pressured her to identify Lamonte McIntyre. Pl. SAMF ¶ 100-101, 103. Although Golubski would later falsely report to the prosecutor that Niko Quinn made an "adamant" positive identification at this time, he did not make any written or contemporaneous documentation of this meeting at all. Pl. SAMF ¶¶ 107–110, 122–126.

Golubski also spoke to Stacy Quinn, with whom he had had a longstanding sexual relationship, and who he knew had the best view of the crime. Pl. SAMF ¶¶ 196–198, 221–230. Stacy Quinn told him that Lamonte McIntyre was innocent, and Monster was the shooter. Pl. SAMF ¶¶ 227–231. Golubski never reported any of the exculpatory information implicating Monster from Stacy or Niko Quinn, or even that he had spoken to Stacy Quinn. Pl. SAMF ¶¶ 214–215, 225, 227–231.

Part of Culp's duty as the lieutenant in charge of the homicide division was to make sure all homicide investigations were conducted properly. SAMF ¶ 361. Culp had an affirmative duty to stay abreast of the detectives' investigative steps in order to evaluate whether more

149

investigation needed to be done or leads needed to be followed up with. SAMF ¶¶ 361–367, 372.

To do so, Culp was expected to review the central files pertaining to the investigation, which

were kept in an accessible location and contained each officer's report. SAMF ¶¶ 367–368. Had

he reviewed these reports, Culp would have noticed the discrepancies surrounding the origin of

the last name "McIntyre." SAMF ¶ 369.  He would have also noticed that last name of the

individual arrested for the crime ("McIntyre") was not the same as the last name of the individual

Mitchell's niece used to date and ("Drain"). SAMF ¶¶ 370–371. It would then be up to Culp to

direct the detectives investigating the case to take any follow-up investigative steps necessary.

SAMF ¶¶ 362–365, 372. Though Culp was long-aware of the improper tactics KCKPD homicide

detectives would use to cut corners in their investigations, there is no documentation that he took

any steps to remedy these improper means in the Ewing/Quinn investigation. SAMF ¶¶ 373–375.

    The case progressed to trial, based primarily on the fabricated identifications from Niko

Quinn and Ruby Mitchell. Pl. SAMF ¶¶ 313, 318. No physical or forensic evidence tied Lamonte

McIntyre to the crime, there was no evidence of a murder weapon, and no motive or even

evidence of any link between Lamonte McIntyre and the victims. Pl. SAMF ¶¶ 102, 313.

Lamonte McIntyre proclaimed his innocence and testified to his alibi, corroborated by four alibi

witnesses, but was impeached with Barber and Brown's fabricated evidence that he and his mom

had allegedly presented a false alibi. Pl. SAMF ¶¶ 313, 329–330.

    Neither the prosecutor, defense, nor jury ever knew of the improper suggestion

Defendants used to obtain the two identifications. Pl. SAMF ¶¶ 336–342. Nor did they know of

the substantial evidence implicating true perpetrator Monster, including that the best witness,

Stacy Quinn, could identify him as the perpetrator, or that he had a motive and had attacked

Doniel Quinn shortly before his murder, Pl. SAMF ¶¶ 313, 346–355, or that that the inaccurate

alibi Barber and Brown attributed to Lamonte, the only other remotely persuasive evidence in this case besides the witness identifications, was fabricated. Pl. SAMF ¶¶ 329–330. Lamonte McIntyre was wrongly convicted and spent over 23 years wrongly imprisoned before he was eventually exonerated and given a Certificate of Innocence by the state of Kansas. Pl. SAMF ¶ 27.

**QUESTIONS PRESENTED**

1. Could a reasonable jury find that Krstolich, Ware, Barber and Brown fabricated evidence?

2. Could a reasonable jury find Krstolich and Ware suppressed *Brady* evidence?

3. Could a reasonable jury find Krstolich, Ware, Barber, Brown, Culp and Smith liable for Plaintiff's malicious prosecution?

4. Could a reasonable jury find Krstolich, Ware and Culp liable to failing to intervene?

5. Could a reasonable jury find that Krstolich, Ware, Barber and Culp conspired with Golubski to deprive Plaintiff of a fair trial?

6. Could a reasonable jury find Culp's supervision was a cause of Plaintiffs' constitutional deprivations?

**ARGUMENT AND AUTHORITIES**

## I.  LEGAL STANDARD

On Defendants' motion for summary judgment, the Court "must view the evidence, and all inferences arising from that evidence, in the light most favorable to" Plaintiff. *See Emmett v. Armstrong*, 973 F.3d 1127, 1130 (10th Cir. 2020). Because "credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge," on Defendants' motion Plaintiff's evidence "is to be believed

151

and all justifiable inferences are to be drawn in [their] favor." *Keith v. Koerner*, 843 F.3d 833, 852 (10th Cir. 2016) (cleaned up, internal citations omitted). Summary judgment may only be granted if there are no genuine issues of material fact and Defendants are entitled to judgment as a matter of law. *Emmett*, 973 F.3d at 1132.

## II.   GOLUBSKI'S FIFTH AMENDMENT INVOCATIONS SUPPORT DENIAL OF SUMMARY JUDGMENT

"[I]n proper circumstances silence in the face of accusation is a relevant fact not barred from evidence by the Due Process Clause.…Silence is often evidence of the most persuasive character." *See, e.g., Baxter v. Palmigiano*, 425 U.S. 308, 319 (1976) (internal citations and quotation marks omitted). Because in a civil case "there is no constitutional bar to the admission of this evidence, [evidence that a witness has invoked his Fifth Amendment rights] is admissible if it is relevant and not otherwise prohibited by the rules." *F.D.I.C. v. Fid. & Deposit Co. of Md.*, 45 F.3d 969, 977 (5th Cir. 1995); *see also Coquina Invs. v. TD Bank, N.A.*, 760 F.3d 1300, 1310–11 (11th Cir. 2014) (holding a witness's invocation of the Fifth Amendment privilege is admissible on a "case-by-case basis" if the adverse inference "is trustworthy under all of the circumstances") (collecting cases).[3]

At trial, the jury could consider Golubski's silence and failure to provide any explanation for his actions as evidence suggesting his misconduct. *See, e.g.*, *Green v. Haskell Cnty. Bd. of Comm'rs*, 568 F.3d 784, 803 n.12 (10th Cir. 2009) (describing "inferences…that the law ordinarily permits to be drawn when one does not rebut a serious allegation of wrongdoing,

---

[3] As these cases make clear, at trial of the Officer Defendants' claims, the Court could instruct the jury that it may draw an adverse inference based on Golubski's silence. However, the Court need not address that question yet because, at this stage, the Court must draw any permissible evidentiary inference in Plaintiff's favor. *Keith*, 843 F.3d at 852.

despite understanding it and being well situated to respond—that is, the inference that the [party] accepts the truth of the allegation"). Because on summary judgment the Court must draw all reasonable inference in Plaintiff's favor, *Keith*, 843 F.3d at 852, it too may consider Golubski's silence as probative evidence on the summary judgment motion.

## III.   THE COURT SHOULD SUMMARILY REJECT DEFENDANTS' IMPROPERLY RAISED ARGUMENTS

A substantial portion of Defendants' brief is devoted to reiterating legal arguments that this Court already rejected at the motion-to-dismiss stage—without even acknowledging the Court's prior rulings on these issues, let alone identifying any basis to reconsider them. There is none. *See, e.g.*, *Gorenc v. Proverbs*, 447 F. Supp. 3d 1110, 1113 (D. Kan. 2020) ("A motion to reconsider is available when the court has misapprehended the facts, a party's position, or the controlling law, but it is not appropriate to revisit issues already addressed or advance arguments that could have been raised in prior briefing.") (cleaned up, internal citation omitted); *Peterson v. Minerva Surgical, Inc.*, No. CV 19-2050-KHV, 2019 WL 6255159, at *1 (D. Kan. Nov. 22, 2019) ("A motion to reconsider is not a second opportunity for the losing party to make its strongest case, to rehash arguments or to dress up arguments that previously failed.").

In particular, (1) Defendants' argument that any § 1983 claim based on the Fourth Amendment should be dismissed based on the statute of limitations, D.E. 575 at 26–27, was already rejected by the Court, D.E. 190 at 14–16, 31–32; (2) Defendants' argument that the existence of a state law tort remedy bars any § 1983 claim based on the Fourteenth Amendment, D.E. 575 at 27–29, was already rejected by the Court, D.E. 190 at 17–20, 32; (3) Defendants' argument that there is no separate claim for fabrication or *Brady* violations distinct from malicious prosecution, D.E. 575 at 39–40, was already rejected by the Court, D.E. 190 at 13, 37–

38; (4) Defendants' argument that Plaintiff's § 1983 failure to intervene, conspiracy, and supervisory liability claims were filed too late, D.E. 575 at 44–45, was already rejected by the Court, D.E. 190 at 47, 53, 57–58; and (5) Defendants' argument that they are entitled to discretionary function immunity for the state law malicious prosecution claim, D.E. 575 at 52–55, was already rejected by the Court, D.E. 190 at 62–63.[4] All should be rejected for the reasons originally stated by the Court.

## IV.  A REASONABLE JURY COULD FIND DEFENDANTS KRSTOLICH, WARE, BARBER, AND BROWN FABRICATED EVIDENCE[5]

To prove a § 1983 fabrication claim, Plaintiff must show "(1) the defendant knowingly fabricated evidence, (2) the fabricated evidence was used against the plaintiff, (3) the use of the fabricated evidence deprived the plaintiff of liberty." *Truman v. Orem City*, 1 F.4th 1227, 1236 (10th Cir. 2021).[6] With the exception of the recycled arguments discussed above, Defendants do not dispute this legal standard; nor do they dispute that fabrication of evidence was clearly established as unconstitutional by 1994, as this Court has already held. D.E. 190 at 42 (quoting *Bledsoe v. Jefferson County*, 275 F. Supp. 3d 1240, 1254 (D. Kan. 2017)); *see also Pierce v. Gilchrist*, 359 F.3d 1279, 1299 (10th Cir. 2004) (holding it was clearly established by 1986 that "the deliberate or reckless falsification or omission of evidence" was unconstitutional). Their only argument is factual: they assert they did not fabricate any evidence. A reasonable jury can

---

[4] Although Defendants cite a Kansas Supreme Court case decided after the Court's decision, D.E. 575 at 54, it does not change the relevant law. *See Schreiner v. Hodge*, 504 P.3d 410, 428 (Kan. 2022) (reaffirming that the KTCA "does not insulate malicious or wanton conduct because such conduct reflects the absence of discretion, not its abuse").

[5] Plaintiffs no longer pursue a § 1983 claim for the fabrication of evidence against Defendant W.K. Smith.

[6] In addition, Plaintiff must show the conviction or sentence has been invalidated as required by *Heck v. Humphrey*, 512 U.S. 477 (1994). *Truman*, 1 F.4th at 1236 (but that issue is not disputed here).

find Krstolich, Ware, Barber, and Brown each fabricated evidence used to cause Plaintiff's wrongful conviction.

### A.     Krstolich Fabricated Ruby Mitchell's Identification

A jury can find, together with Golubski, Krstolich fabricated Ruby Mitchell's identification of Lamonte McIntyre, as well as falsely represented that she had volunteered the full name "Lamonte McIntyre," to falsely suggest she was identifying someone she knew personally. As Krstolich and Golubski recognized, Ruby Mitchell could not see the shooter's face well enough to identify him, as she was diagonally across the street, inside her house looking through a screen door at the time of the shooting. Pl. SAMF ¶¶ 127–128, 138, 140, 160. Although Monster was the shooter she viewed, she mistakenly believed it was the "Lamont" who her niece used to date (Lamont Drain), likely based on the similar French-braid hairstyle both wore. Pl. SAMF ¶¶ 31–32, 132, 134–135, 151, 168–170, 195. Mitchell told Golubski and other officers she believed the shooter was "Lamont," meaning Lamont Drain (although she did not know his last name at the time). Pl. SAMF ¶¶ 32, 168.

Golubski and Krstolich then presented Mitchell with two separate sets of photos: a six-person photo lineup which had all the photos affixed to one page (which would be proper procedure) and a stack of five loose Polaroid photos with the suspects' names written on the back (which is improperly suggestive). Pl. SAMF ¶ 61, 78, 161, 163, 174. The six-photo lineup is not preserved by Golubski or Krstolich in the police file so there is no record of how suggestive it may have been, but Lamonte McIntyre's photo was the only one repeated in the two sets of photos. Pl. SAMF ¶ 163. The set of five loose Polaroids also included Lamonte McIntyre's brother and cousin; officers knew it was improperly suggestive to include multiple family members in one lineup but Golubski and Krstolich did so here anyway. Pl. SAMF ¶¶ 67–68.

155

Although Mitchell's statements before and after the identification procedures were tape recorded, the identification procedure itself was not. Pl. SAMF ¶ 166. But afterwards, Defendants recorded that Mitchell was identifying as the shooter the person who she had known "[f]or a couple months" because he "used to talk to my niece" and whom she identified by first and last name as Lamont McIntyre. Pl. SAMF ¶ 168.

A reasonable jury can conclude from all this evidence that Golubski and Krstolich used direct suggestion to get Mitchell to misidentify the innocent McIntyre, just as Niko Quinn testified Golubski did with her the following day. There is no reasonable explanation for why Mitchell would happen to select out of the stack of photos the same innocent person the police suspected, whom she had never seen before, but who happened to be the only one to share the same first name as the person she mistakenly believed she had seen. Mitchell would later claim she confused McIntyre and Drain because they looked like "identical twins" but even the prosecution had to admit that they do not. Pl. SAMF ¶¶ 323–324. Moreover, Mitchell was adamant she did not know Lamonte McIntyre's name and could not have volunteered it, both because she did not know Lamonte McIntyre and because she did not know anyone's last name, including Lamont Drain's. Pl. SAMF ¶ 184.

The obvious implication is that Golubski and Krstolich must have fed Lamonte McIntyre's last name to Mitchell—most likely in the same way Golubski and Ware did with Niko Quinn the next day, by showing Mitchell the back of the photo with Lamonte's name written on it and highlighting that his first name matched Mitchell's description. Krstolich described yet a different procedure, an array of five photos in which *all* were named Lamont, but there is no record of anyone compiling an array of all Lamonts and, in any event, it would be improperly suggestive to compose such an all-suspect array. Pl. SAMF ¶¶ 175–177. The jury can

156

conclude this was a lie to cover up for the fact that Mitchell was really identifying the only person in the stack named Lamont, and she was doing so based on his name, not his face. Finally, when Golubski was questioned at his deposition whether he used direct suggestion to obtain Mitchell's identification, fed her the name McIntyre, and lied when he claimed she had volunteered it, he pled the Fifth. Pl. SAMF ¶¶ 154, 172–173, 187.

Mitchell's identification was repeatedly used against McIntyre, as the sole basis for his arrest, and was used in conjunction with Niko Quinn's fabricated identification at the preliminary hearing, and at trial. Pl. SAMF ¶¶ 180, 318, 291, 320, 326, 332–334. And the transcript of the statement taken by Krstolich falsely indicating that Ruby Mitchell knew Lamonte McIntyre was forwarded to the prosecution. Pl. SAMF ¶¶ 168, 343. Krstolich can therefore be held liable for fabricating Mitchell's false identification of Plaintiff, which was used to obtain his wrongful conviction. *See Good v. Curtis*, 601 F.3d 393, 396–99 (5th Cir. 2010) (officer who uses undue suggestion to procure false identification is liable for wrongful conviction that resulted after witness testified to that identification at trial); *Caldwell v. City & County of San Francisco*, 889 F.3d 1105, 1113–14, 1117–18 (9th Cir. 2018) (officer could be liable for fabricating evidence if he intentionally used suggestion to infect witness's recollection of the shooter and the witness testified to the false identification at trial); *Gregory v. City of Louisville*, 444 F.3d 725, 745–47 (6th Cir. 2006) (holding officer could be liable for conducting impermissibly suggestive identification procedure where witness's identification was subsequently introduced at trial, causing plaintiff's wrongful conviction).

### B.    Ware Fabricated Niko Quinn's Identification

The jury can find that, together with Golubski, Ware fabricated Niko Quinn's identification of Lamonte McIntyre. Niko Quinn testified that after she told Golubski and Ware

she could not make an identification from the set of Polaroid photos he gave her, they directly suggested she should identify Lamonte McIntyre, by displaying his photo to her while Ware pointed to it with his thumb, and Golubski asking her "what did [Ruby] say the man's name was?" to which she answered "Lamonte" and holding the photo so Quinn could see Lamonte McIntyre's name on the back. Pl. SAMF ¶¶ 77–83. Even so, Quinn told Golubski and Ware she could not make an identification from these photos. Pl. SAMF ¶ 84. After additional pressure from Golubski in a second meeting behind the Wyandotte High School track, Niko Quinn eventually acquiesced to this direct suggestion and falsely identified Lamonte as the shooter from the exact same photo that Ware and Golubski had earlier suggested to her was the perpetrator. Niko then repeated that identification, at both the preliminary hearing and at trial. Pl. SAMF ¶¶ 95–106, 325; Plaintiffs' Response to Defendant Officers' SOF 88. Further, when Golubski was questioned at his deposition whether he used direct suggestion to obtain Quinn's identification and fabricated his report of the April 16, 1994 identification procedure, Golubski pled the Fifth. Pl. SAMF ¶¶ 88, 106, 126.

There is no dispute that Niko Quinn's testimony describes impermissible direct suggestion; indeed, Ware admitted that simply placing his thumb on the photo would have been "grossly improper" and "direct suggestion" and that he knew that in 1994. Pl. SAMF ¶ 80. Rather, Defendants argue that because Niko Quinn did not identify Lamonte during that meeting, Ware's direct suggestion cannot be the cause of her false identification.[7] Defendants made

---

[7] Presumably in an attempt to distance Ware from Golubski's misconduct, Defendants also argue that Golubski's report of this identification procedure accurately recorded that Quinn did not identify Lamonte McIntyre at this meeting. D.E. 575 at 35. In actuality, Golubski's report of this identification procedure was a fabrication, falsely claiming, among other things, that Niko Quinn told them she thought McIntyre was the shooter but couldn't make a positive identification. Pl.

exactly this argument at the motion-to-dismiss stage, and the Court explained how it was wrong, because "Tenth Circuit law does not support the narrow causational rule that the Officers propose." D.E. 190 at 41. Rather, an officer is liable if he "set in motion a series of events that he knew or reasonably should have known would cause others to deprive plaintiff of his constitutional rights" and that other people "may have concurrently caused the harm does not change the outcome as to defendant." D.E. 190 at 41 (quoting *Martinez v. Carson*, 697 F.3d 1252, 1255 (10th Cir. 2012)) (cleaned up). The Court specifically considered and rejected Defendants' argument that Ware could not be responsible for causing Niko Quinn's false identification because of the delay: the allegations that Ware directly suggested that Quinn identify Lamonte McIntyre "plausibly show that Ware's coercive tactics…caused the violation of Lamonte's rights. That Ware was not physically present when Quinn eventually made the identification does not compel a different conclusion." D.E. 190 at 41–42.

Furthermore, causation "is generally a question of fact for the jury," *Schneider v. City of Grand Junction Police Dep't*, 717 F.3d 760, 778 (10th Cir. 2013), and at this stage Plaintiff's evidence must be credited and all reasonable inferences drawn in his favor, *Keith*, 843 F.3d at 852. Here, there is ample evidence from which a jury could find Ware was instrumental in causing the false identification. Ware himself admitted he understood in 1994 that direct suggestion with a witness on one occasion would taint any subsequent identification by that witness down the line. SAMF ¶ 162. Ware also admitted if he merely saw Golubski attempt to influence Niko Quinn's selection, he both had an obligation to intervene to stop it and to report Golubski for this improper behavior; it is undisputed Ware did neither. SAMF ¶ 82–83. The jury

SAMF ¶ 85. Ware, who was present for the interaction with Niko Quinn, had personal knowledge that what Golubski reported was false.

can find Ware responsible for fabricating Niko Quinn's identification. *See Good*, 601 F.3d at 396–99; *Caldwell*, 889 F.3d at 1113–14, 1117–18; *Gregory*, 444 F.3d at 745–47.

> ### C.     Barber Fabricated Rose's and Lamonte's Alibi Statements and Sources Implicating Lamonte

The jury can find that Barber fabricated a false statement from Rose McIntyre and Lamonte McIntyre to undermine Lamonte McIntyre's truthful alibi. Golubski recorded a statement from Barber alleging that Rose made a "totally unsolicited" statement suggesting both that she knew Lamonte was guilty of the murders, and also that she lied about his alibi to protect him. Pl. SAMF ¶ 261. Additionally, Barber alleged that at the same meeting with Rose, when asked his whereabouts for the day Lamonte said "during the day he had been with his brother, James." Both Rose and Lamonte have repeatedly and consistently maintained these statements are false. Pl. SAMF ¶¶ 263–264. This false evidence was forwarded to the prosecutor and then used at trial to impeach Lamonte's truthful alibi. Pl. SAMF ¶¶ 329–330, 356. Defendants mischaracterize the record, claiming that Rose admitted what Barber reported was accurate, that she was the one who had been confused about the date, and that Barber had no way to know that. That is not what Rose testified to; she said Barber *asked her* about April 14 (the day before the shooting) and she accurately responded about Lamonte's whereabouts on that date, and Barber misrepresented that she was offering a false alibi for April 15. SAMF ¶ 255–257. Furthermore, Barber does not even argue that there was any mistake about the other portion of the fabricated statement, his false claim that "[t]otally unsolicited, she indicated to me that if someone had told me that she had killed somebody, would I take them down and charge them with murder." Pl.

SAMF ¶¶ 258–264. It is undisputed that Rose denies that this ever happened.[8] As this Court held at the motion-to-dismiss stage, such fabrication makes out a violation of Lamonte's constitutional rights. D.E. 190 at 43 (rejecting Defendants' argument to the contrary as "frivolous").

In addition, the jury can find Barber fabricated that unnamed sources allegedly implicated Lamonte McIntyre in the murder within hours of the shooting. Given the speed with which Lamonte McIntyre became the lead suspect—within a few hours of the crime—there was essentially no opportunity for any such communication with street sources; at his deposition, Defendant Smith testified that he had never in his career solved a case via information on the street within hours of a homicide and described that as "different," in other words, not the way things work in the real world. Plaintiffs' Response to Defendant Officers' SOF ¶ 105. Contrary to policy, the alleged sources were never identified or documented in the police file. SAMF ¶ 55–56, 282.  There is substantial reason to doubt that any sources would identify Lamonte McIntyre as the shooter given that he is innocent, did not look like the actual shooter, and the actual street talk was that Monster committed the crime. Pl. SAMF ¶¶ 22–28, 50, 139–141, 170–171. Furthermore, Golubski and Krstolich offered inconsistent accounts as to how Lamonte McIntyre first became a suspect before claiming Barber had learned the name from purported unnamed sources. Plaintiffs' Response to Defendant Officers' SOF ¶ 105; Plaintiffs' Response to Golubski's SOF ¶ 52.

---

[8] Defendants' request that the Court ignore all evidence from Plaintiff Rose McIntyre is puzzling. As Defendants know, Rose is expected to be recovered sufficiently to be available for deposition shortly and able to testify live at trial (which would plainly be admissible). Furthermore, the Court specifically instructed that summary judgment should proceed now despite the need to complete limited discovery (including the completion of Rose's deposition) at a later date. *See* Doc. 562, Pretrial Order, p. 58-59.

### D.     Brown Fabricated Lamonte's Alibi Statement

The jury can find Brown fabricated that Lamonte McIntyre provided a false alibi statement to him. Pl. SAMF ¶¶ 265–285. Brown claimed that during the ride to the police station, Lamonte falsely claimed he had been working at the restaurant during the shooting. Pl. SAMF ¶¶ 270, 276–278. Like Rose, Lamonte has repeatedly and consistently maintained that he never said that, but instead consistently provided police with his truthful alibi. Pl. SAMF ¶ 278. As the Court held at the motion-to-dismiss stage, Brown may be liable for this fabrication of evidence. D.E. 190 at 42 (calling Defendants' challenge to this claim "frivolous").

Defendants argue that Brown is absolutely immune for his trial testimony, but Brown himself claims that he reported this to Golubski in a written note, well before trial. *See, e.g.*, *Gregory v. Louisville*, 444 F.3d 725, 741–42 (6th Cir. 2006) (holding "absolute immunity for testimony at trial does not 'relate back' to shield pretrial, nontestimonial acts such as fabrication of evidence"); *cf. Truman v. Orem City*, 1 F.4th 1227, 1241 n8 (10th Cir. 2021) (applying same rule to absolute prosecutorial immunity).

## V.     A REASONABLE JURY COULD FIND KRSTOLICH AND WARE SUPPRESSED *BRADY* EVIDENCE

To prove his § 1983 *Brady* claim, Plaintiff must show that Defendants (1) suppressed evidence; (2) that the evidence was favorable to Plaintiff; and (3) that the evidence was material to Plaintiff's defense. *See Becker v. Kroll*, 494 F.3d 904, 924 (10th Cir. 2007); *Bledsoe v. Bd. of Cnty. Comm'rs of Cnty. of Jefferson, Kansas*, 501 F. Supp. 3d 1059, 1123 (D. Kan. 2020); *see also* D.E. 190 at 40 n.22; *Bellamy v. City of New York*, 914 F.3d 727, 751 (2d Cir. 2019); *Mellen v. Winn*, 900 F.3d 1085, 1096 (9th Cir. 2018). Materiality is assessed "collectively, not item by item," *Kyles v. Whitley*, 514 U.S. 419, 436 (1995). At bottom, the question is whether the suppression deprived Lamonte McIntyre of a fair trial; in other words, if "confidence in the

162

outcome of the trial" has been "undermined by the cumulative effect of" the nondisclosures. *Smith v. Sec'y of New Mexico Dep't of Corr.*, 50 F.3d 801, 828, 835 (10th Cir. 1995).

Defendants do not dispute this legal standard. Nor do they challenge that it was clearly established by 1994 that an officer who hid exculpatory evidence violated the Constitution. In *Pierce v. Gilchrist*, the Tenth Circuit held that as of 1986 an officer had "fair warning" that the "deliberate or reckless…omission of evidence was a constitutional violation." 359 F.3d 1279, 1299 (10th Cir. 2004) (citing *Newsome v. McCabe*, 256 F.3d 747, 752–53 (7th Cir. 2001), which it described as "finding that *Brady* clearly established that officers could not withhold information that plaintiff's fingerprints did not match those found at the crime scene or that officers influenced witnesses to pick plaintiff out of police lineup"). Their only arguments are factual; Defendants claim they did not suppress any exculpatory evidence.

A reasonable jury can find Defendants Krstolich and Ware liable for suppressing evidence of the direct suggestion used to obtain the two identifications described above. *See, e.g., Carrillo v. County of Los Angeles*, 798 F.3d 1210, 1225–27 (9th Cir. 2015) (holding officers not entitled to qualified immunity for suppressing evidence impeaching reliability of witness identifications); *Geter v. Fortenberry*, 849 F.2d 1550, 1559–60 (5th Cir. 1988) (holding officers not entitled to qualified immunity for suppressing evidence of improper suggestion in identification procedures).

"[T]he question of materiality and the possible effect of the withheld evidence on the verdict[] is a mixed question of fact and law." *Bowen v. Maynard*, 799 F.2d 593, 610 (10th Cir. 1986). Defendants do not address the materiality of the withheld evidence, but a reasonable jury could easily find the suppression (individually or collectively) undermines confidence in the outcome of the trial. *See, e.g., Nuckols v. Gibson*, 233 F.3d 1261, 1266–67 (10th Cir. 2000)

(reversing denial of habeas where "[t]he prosecution withheld evidence that would have allowed

defense counsel the means to test [the key eyewitness's] credibility"); *Bowen*, 799 F.2d at 613

("Where, as here, identity is in issue, a creditable alibi defense is presented, and no physical

evidence ties the defendant to the crime, material showing that someone resembling the

defendant had motive, opportunity, and ability to commit the crime is 'sufficient to undermine

[our] confidence in the outcome' of the trial."); *see also Mellen v. Winn*, 900 F.3d 1085, 1096–

1101 (9th Cir. 2018) (reversing grant of summary judgment against § 1983 *Brady* claim and

holding that undisclosed impeachment of eyewitness who was sole evidence of guilt was

material as a matter of law).

## VI.   A REASONABLE JURY COULD FIND DEFENDANTS KRSTOLICH, WARE, BARBER, BROWN, CULP AND SMITH LIABLE FOR PLAINTIFF'S MALICIOUS PROSECUTION

To prove his malicious prosecution claim, Lamonte McIntyre must show (1) Defendants

caused Plaintiff's continued confinement or prosecution; (2) the prosecution terminated in

Plaintiff's favor; (3) there was no probable cause; (4) Defendants acted with malice; and (5)

Plaintiff sustained damages. D.E. 190 at 33 (citing *Montoya v. Vigil*, 898 F.3d 1056, 1066 (10th

Cir. 2018). Defendants do not dispute that Plaintiff can show favorable termination and

Plaintiff's damages; their arguments on the other elements ignore the evidence. Defendants also

do not dispute that it was clearly established by 1994 that it was unconstitutional to cause a

prosecution without probable cause. *See, e.g.*, *Pierce v. Gilchrist*, 359 F.3d 1279, 1285–1300

(10th Cir. 2004) (holding official could be liable for § 1983 malicious prosecution which caused

wrongful conviction, and that conduct clearly unconstitutional by 1986).[9]

###### A.    A Reasonable Jury Could Find that No Probable Cause Existed

Probable cause requires "a substantial probability that a crime has been committed and that a specific individual committed the crime." *Wilkins v. DeReyes*, 528 F.3d 790, 801 (10th Cir. 2008) (internal citation omitted). As always, on Defendants' motion for summary judgment, the facts must be assessed in the light most favorable to Plaintiff, crediting his evidence and drawing all reasonable inferences in his favor. *See Tolan v. Cotton*, 572 U.S. 650, 656–57 (2014).

"[T]he Fourth Amendment prohibits officers from knowingly or recklessly relying on false information to institute legal process when that process results in an unreasonable seizure." *Sanchez v. Hartley*, 810 F.3d 750, 754 (10th Cir. 2016). As a result, the probable cause analysis must set aside any such false information, *Wilkins*, 528 F.3d at 801–02, and take into account any material exculpatory information known to Defendants at the time, *Stewart v. Donges*, 915 F.2d 572, 582–83 (10th Cir. 1990). The only evidence Defendants point to is the identification by Ruby Mitchell, but as explained above that evidence was fabricated and must be disregarded. Just as the Court held at the motion-to-dismiss stage, if the only evidence supporting probable cause is falsified, there is no probable cause. *See* D.E. 190 at 34–35. [10]

---

[9] The same basic elements apply to the state law malicious prosecution claim, D.E. 190 at 59–61, and therefore this same evidence makes out Plaintiff's malicious prosecution claim under state law.

[10] As the Court explained in its order on the motion to dismiss, in this malicious prosecution suit the "arguable probable cause" standard does not apply. D.E. 190 at 34 n.16. Yet again, Defendants do not even mention the Court's prior ruling, let alone identify any basis to revisit it. However, given that Defendants do not identify *any* non-fabricated evidence supporting the prosecution, it is elementary that this does not even provide arguable cause.

**B.      A Reasonable Jury Can Find Defendants Acted with Malice**

Whether Defendants acted with malice is a "fact question"; if officers fabricated evidence or "knowingly relied on false evidence" that would demonstrate malice. *Wilkins*, 528 F.3d at 800–01; *see also Farmer v. Brennan*, 511 U.S. 825, 842 (1994) (A § 1983 defendant's knowledge and intent is "a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence."). Moreover, "[m]alice may be inferred if a defendant causes the prosecution without arguable probable cause." *Mglej v. Gardner*, 974 F.3d 1151, 1171 (10th Cir. 2020).

Here, there is evidence that would support a jury finding that each Defendant acted with malice. First, the evidence that Krstolich, Ware, Barber and Brown fabricated evidence is alone sufficient to support a finding of malice. *See* D.E. 190 at 35–36 (describing how Defendants' fabrication of evidence in support of the prosecution would demonstrate malice).

The jury could also reasonably find both Culp and Smith acted with malice. Culp, Golubski's supervisor, intentionally reassigned the case from the homicide detectives who were initially assigned to Golubski, a non-homicide detective with an extensive reputation and history of sexually exploiting Black women and using them as informants to close cases based on false evidence. Pl. SAMF ¶¶ 29–43, 410–425. There was no legitimate reason for this assignment. Pl. SAMF ¶¶ 41–43. At the very least Smith, who was a homicide detective (and therefore had specialized training) should have been the lead over Golubski. Pl. SAMF ¶¶ 38–39, 41–43. The jury can find that Culp intentionally assigned the case to Golubski due to his history and reputation of exploiting vulnerable Black women to create false evidence and close cases, as well as his particular history with key witness Stacy Quinn, which demonstrates malice. *See* D.E. 190 at 35–36.

166

The jury can also find that both Culp and Smith were aware of the serious deficiencies in Golubski's investigation, which were glaring red flags that it was not a legitimate investigation. Culp, as Golubski's supervisor, "had to know" what was going on in the investigations he supervised because he was in charge and in fact signed off on Golubski's deficient and contradictory reports. Pl. SAMF ¶¶ 359–367. He was ultimately "calling the shots on the McIntyre case" and had an obligation to keep informed of all developments as they occurred, whether by reviewing the reports, talking to the investigators, or accompanying them on witness interviews. Pl. SAMF ¶¶ 359–375. Smith, as Golubski's partner on the investigation, understood it was important for him to keep abreast of developments in the case because he could be asked about it by the district attorney at any time, and the case file would have been readily available to him. Pl. SAMF ¶¶ 40, 368. In addition, the officers worked together in the same physical office and so had ample opportunity to discuss the investigation in person. Pl. SAMF ¶¶ 359–360.

Even the case file alone made Golubski's investigative failures clear: Golubski failed to collect Lamonte McIntyre's shoes and clothes when he was arrested hours after the shooting, failed to conduct a search for the murder weapon, failed to conduct or request testing for gun-shot residue or to analyze latent prints taken from the scene or collect footprints from the fresh dirt, failed to investigate any possible getaway driver, and failed to check the phone records to the cab company given as part of Lamonte's alibi. Pl. SAMF ¶¶ 239, 286–308. As a number of officers have described, there is no legitimate, police reason for these failures to take such investigative steps. Pl. SAMF ¶¶ 287, 307, 309–312. *See, e.g.*, *Restivo v. Hessemann*, 846 F.3d 547, 580 (2d Cir. 2017) (holding evidence of a defendant's persistent deviations from "applicable professional standards" can "support an inference of intentional or reckless conduct that violated a plaintiff's constitutional rights") (internal quotation marks omitted); *see also*

167

*Jimenez v. City of Chicago*, 732 F.3d 710, 721–22 (7th Cir. 2013) (same). This, too, demonstrates malice. *See* D.E. 190 at 36 (holding that if Smith "intentionally failed to take basic investigative steps that would have exonerated Lamonte because he was actively avoiding information that would have pointed any direction other than Lamonte" that demonstrates malice).

And there were still more red flags apparent from the case file alone. For example, there were obvious contradictions as to where the name "McIntyre" came from, and what identification procedures were conducted with Ruby Mitchell, as well as obvious contradictions between Ruby Mitchell's statement that Lamonte McIntyre was the person who dated her niece, Keva Garcia, and Keva Garcia's statement that she had never met him, and the person she dates was named Lamont Drain. But there is no indication Culp directed Golubski to locate and speak to Keva Garcia before the prosecutor directed that in the few days before trial, and no indication he sought any additional follow up after the Garcia interview demonstrated a major red flag about the reliability of the Ruby Mitchell identification and the conduct of Golubski and Krstolich. Pl. SAMF ¶¶ 192, 370–371. Nor is there any indication Culp directed Golubski to try to locate Stacy Quinn, the witness reported in the file to know who the perpetrator was, nor did Smith take any steps to locate or interview her. Pl. SAMF ¶¶ 208, 214–220, 363–364.

Finally, before this investigation Culp admitted to another KCKPD Sergeant, Tim Hausback, that he knew that "in case after case, detectives did not follow up in their leads" and "had lied in their reports" and that when he vetted what they were doing he would "discover that detectives had not even spoken with the witnesses." Pl. SAMF ¶¶ 373–375. Yet the jury can find Culp took no action to intervene, not before this case and not during this case. *See Mellen v. Winn*, 900 F.3d 1085, 1102 (9th Cir. 2018) (describing detective's "decision not to inquire

further" as "the hallmark of a deliberate action to avoid confirming suspicions" which is "tantamount to knowledge under the law") (cleaned up, internal citation omitted); *United States v. Ochoa-Fabian*, 935 F.2d 1139, 1141 (10th Cir. 1991) ("[T]he avoidance of knowledge of particular facts may circumstantially show that the avoidance was motivated by sufficient guilty knowledge to satisfy the" legal requirement.).

### C.   A Reasonable Jury Could Find Defendants Caused Lamonte's Prosecution

As the Court has previously noted, under § 1983 an officer is liable for the harm his conduct proximately causes, which includes if he "set in motion a series of events that [he] knew or reasonably should have known would cause others to deprive [plaintiff] of [his] constitutional rights." *Martinez v. Carson*, 697 F.3d 1252, 1255 (10th Cir. 2012); D.E. 190 at 37, 41–42. That other people "may have concurrently caused the harm does not change the outcome as to defendant." *Id.* (cleaned up). Causation "is generally a question of fact for the jury." *Schneider v. City of Grand Junction Police Dep't*, 717 F.3d 760, 778 (10th Cir. 2013).

Furthermore, where there is evidence the officer fabricated evidence and suppressed exculpatory evidence, subsequent actions by others do not break the causal chain:

> [A] prosecutor's decision to charge, a grand jury's decision to indict, a prosecutor's decision not to drop charges but to proceed to trial—none of these decisions will shield a police officer who deliberately supplied misleading information that influenced the decision.... *[Officers] cannot hide behind the officials whom they have defrauded.*

*Pierce v. Gilchrist*, 359 F.3d 1279, 1292–93 (10th Cir. 2004) (quoting *Jones v. City of Chicago*, 856 F.2d 985, 994 (7th Cir. 1988)) (emphasis in original).

Here, the jury could easily find each of the officers played a causal role in Lamonte's wrongful conviction. As explained above, Krstolich and Ware were each responsible for the misidentifications of Ruby Mitchell and Niko Quinn, respectively, which were they key evidence

169

against Plaintiff at his trial. Barber and Brown were each responsible for fabricated statement evidence which was presented against Lamonte at trial. And Culp set the entire process in motion by choosing Golubski to lead the investigation and then permitted the wrongful prosecution by deliberately ignoring the obvious signs it was a sham investigation, as did Smith. As the Court has already held, this is sufficient to demonstrate causation. D.E. 190 at 35–36.

## VII.   A REASONABLE JURY COULD FIND DEFENDANTS KRSTOLICH, WARE, AND CULP LIABLE FOR FAILURE TO INTERVENE.

"An officer who has a realistic opportunity to intervene but fails to do so is liable 'for the preventable harm caused by the actions of the other officers where that officer observes or has reason to know' that the others committed a constitutional violation." D.E. 190 at 45 (quoting *Jones v. Norton*, 809 F.3d 564, 576 (10th Cir. 2015). Defendants do not dispute that standard, rather they again argue there was no underlying constitutional violation. As explained above, a reasonable jury could find that Krstolich and Ware each failed to intervene in direct suggestion with the identification procedures, and that Culp was aware of Golubski's investigative misconduct but failed to take any action to stop it. As the Court has already held, that makes out a claim for failure to intervene. D.E. 190 at 46–47. Furthermore, Defendants admit if they were aware of other detectives engaging in this blatant investigative misconduct they were obligated to take steps to stop it, such as reporting it at the time. Pl. SAMF ¶¶ 81–83, 179, 434, 447.

## VIII.  A REASONABLE JURY COULD FIND THAT DEFENDANTS KRSTOLICH, WARE, BARBER, AND CULP CONSPIRED WITH GOLUBSKI TO DEPRIVE PLAINTIFF OF A FAIR TRIAL

Under § 1983, Defendants are liable for "a conspiracy to deprive a plaintiff of a constitutional or federally protected right under color of state law." *Snell v. Tunnell*, 920 F.2d 673, 701 (10th Cir. 1990) (affirming denial of summary judgment on § 1983 conspiracy claim) (internal quotation marks omitted). "Frequently, a [§ 1983] conspiracy must be proven with circumstantial

evidence because rarely will there be direct evidence of an express agreement among all the conspirators to conspire." *Id.* (internal quotation marks and alterations omitted). For that reason, "a defendant's assent can be inferred from acts furthering the conspiracy's purpose." *Bledsoe*, 275 F. Supp. 3d at 1252. The fact that the other members of the conspiracy may not have known "the exact limits of the illegal plan or the identity of all the participants therein" is irrelevant to the ultimate conclusion that they were part of the conspiracy. *Snell*, 920 F.2d at 702 (internal quotation marks and citation omitted).

There is evidence that a number of separate officers worked in tandem with Golubski to create false evidence, hide exculpatory evidence, bless obvious failures to investigate, all in the service of depriving Lamonte McIntyre of his constitutional right to a fair trial. Pl. SAMF ¶ 29, 36–38, 41–43 (Culp reassigns case to Smith and non-homicide detective, Golubski in the interest of closing the case quickly); 60–83 (Ware and Golubski use suggestion and coercion during a photo identification procedure with Niko Quinn using improper photos); 85–88 (Golubski creates a report on the improper identification procedure with Quinn in which he omits his and Ware's suggestion); 114–121 (Ware, Smith, and all detectives working the case ignore evidence that the homicides were drug-motivated); 150–160 (Golubski and Krstolich fail to compile photos and a composite that match Ruby Mitchell's description of shooter); 161–180 (Golubski and Krstolich use suggestion during a photo identification procedure with Mitchell); 181–188 (Golubski and Krstolich feed Mitchell the last name "McIntyre"); 189–195, 370–371 (all officers fail to interview Mitchell's niece in a timely manner); 208–220 (Golubski and all officers fail to document any encounters with Stacy Quinn); 239 (all officers fail to investigate McIntyre's alibi that he had placed calls to a cab company); 255–285 (Brown, Barber, and Golubski coordinate to fabricate inconsistent alibi statements by Rose and Lamonte McIntyre); 286–312 (all officers fail

171

to conduct basic forensic testing). This, alone, suggests at least a tacit conspiratorial agreement. *Cf. Frasier v. Evans*, 992 F.3d 1003, 1025–26 (10th Cir. 2021) (noting that "proof that defendants formed an agreement or conspired to engage in lawful activities" would be insufficient).

## IX.   SUPERVISORY LIABILITY

As Defendants admit, a supervisor may be held liable if "an affirmative link exists between the constitutional deprivation and either the defendant's personal participation, his exercise of control or direction, or his failure to supervise." D.E. 575 at 49 (quoting *Sandifer v. Green*, 126 Fed. Appx. 908, 909 (10th Cir. 2005). Plaintiff must also prove the Defendant had a culpable state of mind, D.E. 190 at 56, which here would mean at least deliberate indifference. S*ee, e.g., Dodds v. Richardson*, 614 F.3d 1185, 1204–05 (10th Cir. 2010). Yet again, Defendants' only argument is factual, claiming that none of Culp's subordinates violated the Constitution and, even if they did, there's no evidence that Culp was aware of any constitutional violations at the time. D.E. 575 at 50. But a reasonable jury could find otherwise; that the investigation Culp directly supervised was replete with unconstitutional misconduct and obvious violations of policy, that Culp himself was aware of these numerous red flags, and yet failed to take obviously necessary steps to protect Lamonte McIntyre's right to a fair trial, causing his wrongful conviction. From this record, a jury can easily conclude Culp either directly condoned Golubski's pattern of misconduct or consciously avoided confirmation of the obvious misconduct throughout the investigation, which itself demonstrates guilty knowledge. *See Mellen*, 900 F.3d at 1102; *Ochoa-Fabian*, 935 F.2d at 1141.

## CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment should be denied.

Date: April 27, 2022      Respectfully submitted,

            LATHROP GPM LLP

            By: /s/ *Michael J. Abrams*
            Michael J. Abrams #15407
            Alana M. McMullin #78948
            2345 Grand Boulevard, Suite 2200
            Kansas City, MO 64108
            (816) 292-2000
            (816) 292-2001 Facsimile
            michael.abrams@lathropgpm.com
            alana.mcmullin@lathropgpm.com

            Cheryl A. Pilate #14601
            Lindsay Runnels #78822
            Morgan Pilate, LLC
            926 Cherry Street
            Kansas City, MO 64106
            Telephone: (816) 471-6694
            Facsimile: (816) 472-3516
            cpilate@morganpilate.com

            Barry Scheck (*admitted pro hac vice*)
            Emma Freudenberger (*admitted pro hac vice*)
            Sona R. Shah (*admitted pro hac vice*)
            Grace Paras (*admitted pro hac vice*)
            Neufeld Scheck & Brustin, LLP
            99 Hudson Street, Eighth Floor
            New York, NY 10013
            Telephone: (212) 965-9081
            Facsimile: (212) 965-9084
            emma@nsbcivilrights.com

            *Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

   The undersigned certifies that on the 27th day of April, 2022, the foregoing was electronically filed with the clerk of the court using the CM/ECF system which will provide notice and service to all counsel of record.

            By:  /s/ *Michael J. Abrams*
            An Attorney for Plaintiff