# **EXHIBIT 75**

Page 1

```
 1              UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF KANSAS
 2

 3

 4   LAMONTE McINTYRE and ROSE  )
     LEE McINTYRE,              )
 5                              )
                 Plaintiffs,    )
 6                              )
        vs.                     )Case No. 2:18-cv-02545
 7                              )
     UNIFIED GOVERNMENT OF      )
 8   WYANDOTTE COUNTY and KANSAS)
     CITY, KANSAS, et al.,      )
 9                              )
                 Defendants.    )
10
11
12
13
14    VIDEO CONFERENCE 30(b)(6) DEPOSITION OF UNIFIED
15     GOVERNMENT OF WYANDOTTE COUNTY and KANSAS CITY,
16                       KANSAS BY
17                  RICKY L. ARMSTRONG
18          TAKEN ON BEHALF OF THE PLAINTIFFS
19                   JUNE 15, 2021
20
21
22
23
24
25
```

Page 50

1  misstates his testimony. It's not a 30(b)(6)
2  topic.
3      You may respond.
4   A.  If -- if a witness -- and that may be the
5  better way to describe this, if a witness
6  witnesses a crime and that witness is critical to
7  the prosecution, that's the time where a
8  magistrate would determine if you had to provide
9  that witness if that witness was trying to remain
10 anonymous. Informants are more -- are farther
11 down that path. Informants typically may not have
12 all the information, they may have parts of
13 information. So it's just further down the
14 information tree, but not always. But a witness
15 is a witness. An informant may or may not be a
16 witness. They may just be somebody -- we called
17 them persons with knowledge, persons who thought
18 they had knowledge, a person who had heard a
19 rumor. Those things all come through that vein of
20 informants. And that's up to the officer or the
21 investigator to determine the value and the
22 credibility of that and how that information is
23 brought forward.
24   Q.  (By Ms. Freudenberger) And were these
25 rules in the department about documenting

Page 51

1  information that came from persons with knowledge?
2      MR. COOPER: Not a 30(b)(6) topic.
3  Object to form.
4      You may respond.
5   A.  Two different types of reports were
6  available to every police officer during my entire
7  career. Those reports were an investigative
8  report and an addendum report. They were used
9  sometimes interchangeably, but I believe I know
10 the difference between the two. But they were
11 reports that if someone gave information that you
12 found to be credible and valuable, you document --
13 you reduced it to writing and you submitted it.
14 Either attached it to a complaint number, which
15 was tied to an ongoing investigation, or it would
16 just be information forwarded to a detective or to
17 the person within the department who had
18 responsibility over that potential complaint or
19 piece of information.
20      And so, yes, that was -- it was always
21 available for officers that if you received any
22 information that was either valuable or
23 potentially valuable in your determination, then
24 you document that to addendum or investigative.
25 Or if it was a crime, you made an offense report.

Page 52

1   Q.  (By Ms. Freudenberger) That was a rule?
2      MR. COOPER: Object to form.
3   A.  Those were available. Those three
4  avenues of reducing something to writing, those
5  were the three basic ways of getting reports --
6   Q.  (By Ms. Freudenberger) Okay.
7   A.  -- after you receive information.
8   Q.  Okay. Turning back to Roger Golubski,
9  another thing you said at your deposition in 2012,
10 in the Seifert case, was: The stories, you know,
11 I think that were consistent was that if you
12 needed some information, he was someone you could
13 go to and he could find that information out.
14     That was another rumor you had heard
15 about Roger Golubski by 2012, correct?
16  A.  Yes, I gave testimony to that.
17  Q.  Okay. And you used the term "the stories
18 were." Fair to say, Roger Golubski was somebody
19 you had heard a number of stories about by --
20 well, that's not a good question. Withdrawn.
21     Let me ask you this. You go on to say:
22 I heard that there was some who suggested he
23 didn't share that information as readily as they
24 might have liked in terms of his informants, but
25 that's -- I've -- I've heard that.

Page 53

1      That was another thing you had heard
2  about Roger Golubski by 2012, correct?
3      MR. COOPER: Object to form.
4   A.  That -- that's the testimony I gave. I'm
5  not doubting that's what I said.
6   Q.  (By Ms. Freudenberger) Okay. And you
7  have no reason to dispute that testimony as you
8  sit here today, right?
9   A.  No.
10  Q.  Okay. You also testified there was
11 common knowledge in the department that Detective
12 Golubski liked African-American women. That was
13 true when you said it, right?
14  A.  I -- certainly if I said it, that's what
15 I knew at that time.
16  Q.  Okay. And would you agree today you're
17 aware that there were a number of -- withdrawn.
18     Did you have personal, firsthand
19 knowledge of Roger Golubski's sexual preferences?
20 Do you have any personal knowledge of Roger
21 Golubski's sexual preferences?
22     MR. COOPER: Object to form, not a
23 30(b)(6) topic.
24     You may answer in your personal capacity.
25  A.  No, I have no personal, firsthand

Page 54

1  knowledge.
2     Q.  (By Ms. Freudenberger)  Okay.  So all
3  your knowledge of Roger Golubski's sexual
4  preferences is strictly rumors you have heard,
5  correct?
6            MR. COOPER:  Object to form.
7     A.  I -- I knew Roger was married to an
8  African-American female.  That was something
9  that -- that in 19 -- in the late '90s, I guess,
10 that was -- early '90s that was a little bit
11 unusual at the time.
12    Q.  (By Ms. Freudenberger)  Okay.  And what
13 you said at your deposition in the Seifert case
14 was there was common knowledge that Detective
15 Golubski liked African-American women.  Had you
16 heard rumors by 2012 that Roger Golubski favored
17 African-American women over white women?
18           MR. COOPER:  Object to form, not a
19 30(b)(6) topic.
20           You may answer.
21    A.  I think my testimony, whatever I said in
22 2012, was my current knowledge at that time.  So
23 I'm not doubting my testimony.
24    Q.  (By Ms. Freudenberger)  Okay.  Have you
25 read the civil complaint in this case?

Page 55

1     A.  I don't believe I have unless it's in
2  that document that was...
3            MR. COOPER:  It is not.
4     A.  No, I have not.
5     Q.  (By Ms. Freudenberger)  Are you aware of
6  any testimony that's been given by any witnesses
7  in this case?  And by witnesses, I mean, anyone
8  who has testified at a deposition in this civil
9  matter, I'm not talking about the underlining
10 criminal case.
11    A.  I don't believe so.
12    Q.  Okay.  And you mentioned people -- that
13 people have approached you to ask questions about
14 allegations of misconduct against Golubski,
15 correct?
16    A.  Yeah, I think -- I think more general.
17 And I -- I -- you know, I think that people know
18 that I'm the former chief of police in Kansas
19 City, Kansas.  My current job is the president of
20 the crime commission.  So I still travel in the
21 law enforcement circles but also in the community.
22           So I have interaction with lots of
23 people.  And I won't say dozens, but numerous
24 people have said, you know, that's really bad or
25 that's sad to hear what's happening in Kansas

Page 56

1  City, Kansas.  And I -- I just couldn't -- I still
2  say I can't respond to it because I have not read
3  enough about the case to be informed.
4            So I think my first sense was that the
5  police department that I worked in, I worked
6  under, I'm personally offended about the corrupt
7  -- this idea of the police department being
8  corrupt because I certainly can testify that that
9  was not the case in my career.  And so that's
10 probably the piece that I feel when people ask.  I
11 mean, Kansas City, Kansas was not a corrupt police
12 department, and I vehemently disagree with that
13 characterization.
14    Q.  Okay.  When people have come up to you
15 and said things like the Kansas City, Kansas --
16 like it's sad what's happening in Kansas City,
17 Kansas, with reference to the police department,
18 what have you understood them to be saying in your
19 own mind?
20    A.  I think very specifically that what they
21 read is that the corruptness of the department,
22 that's probably more of the things I would respond
23 to.  Again, I've been very clear.  I didn't work
24 with Roger Golubski.  I'm not responding to, you
25 know, rumors or whatever has been alleged against

Page 57

1  him.  But the idea of the police department
2  condoning it or that there was broad general
3  knowledge that the police department was corrupt
4  and allowed this to occur, that's my response.
5            As a chief of police, I take great
6  responsibility, and during my tenure with Kansas
7  City, Kansas, very proud of the way our city
8  thrived, it reinvented itself, reduced crime.  And
9  as a police department, you know, we exceeded the
10 industry standard for best practice.  We were
11 multiple CALEA accredited.  And those were things
12 that I was a part of from my earliest time in the
13 department till the time I left.
14           And so that window of time is 1978 to
15 2013.  And during that period of time, that's,
16 again, what I respond to for those who ask.  I can
17 only testify to what I personally observed and
18 experienced.  And it was a very professional and
19 highly accountable police department during that
20 period of time.
21    Q.  Okay.  And it sounds like you're
22 extraordinarily proud of the work the Kansas City,
23 Kansas Police Department did throughout your
24 tenure, right?
25    A.  Yes, that is correct.

Page 74
1  A.  No, not to my knowledge.
2  Q.  Okay.  Have you seen or heard anything
3 indicating to you in any way that the Kansas City,
4 Kansas Police Department is looking into the
5 allegations against Detective Golubski while he
6 was an officer there?
7       MR. COOPER:  Not a 30(b)(6) topic.
8 Object to form.
9  A.  I wouldn't have any knowledge.
10  Q.  (By Ms. Freudenberger)  So you've not
11 seen any indication that the Kansas City, Kansas
12 Police Department is doing anything to investigate
13 whether Golubski actually committed the acts he's
14 been accused of?
15       MR. COOPER:  Object to form.
16  A.  I'm not working for the police
17 department.  I would have -- I mean, I believe
18 every day the men and women of the Kansas City,
19 Kansas Police Department are investigating crime
20 and information reported to them.  So I assume
21 that that investigation is happening every day.
22 They don't ask me about it and I don't ask them
23 about it.  It's what they do.
24       There's approximately 60 cities here in
25 the metro.  They're all investigating crime every

Page 75
1 day, and I don't call them and ask them how it's
2 going or whether they should or shouldn't be
3 investigating.  It's germane to that agency on
4 what's reported to them, and then when it falls
5 underneath their responsibility, then they
6 investigate it and that's their role.
7       And I'm confident that the police
8 department in Kansas City, Kansas knows what to
9 investigate and they don't need me calling from
10 afar asking if they're doing it.
11  Q.  (By Ms. Freudenberger)  And my question
12 to you is a little different.  Have you as a
13 former chief, former chief of police of Kansas
14 City, Kansas Police Department, seen or heard
15 anything indicating to you that the Kansas City,
16 Kansas Police Department has done anything to
17 investigate the allegations against Roger
18 Golubski?
19  A.  I -- I don't know how to answer that
20 question.  I don't know if they are or if they are
21 not.  I don't.
22  Q.  Okay.  So you have not seen anything
23 indicating to you that they are?
24       MR. COOPER:  Object to form.
25  A.  I don't know enough about this case.  I

Page 76
1 don't know what the allegations are.  I've not
2 read what's happening.  Has there been something
3 reported in the newspaper that they are?  Maybe, I
4 don't know, I've not read it.  I don't have
5 knowledge.
6  Q.  (By Ms. Freudenberger)  All I'm asking
7 you, sir, is what you have seen or heard.  Have
8 you, Rick Armstrong, seen or heard anything that
9 indicates to you that the Kansas City, Kansas
10 Police Department is now or has ever investigated
11 the allegations against Roger Golubski?
12  A.  I don't have any knowledge that they're
13 investigating Roger Golubski, no.
14  Q.  So the -- okay.  All right.
15       MR. ROACH:  Emma, this is Morgan.
16 Are you about ready for a break?
17       MS. FREUDENBERGER:  Yeah, we can
18 take a break.
19       MR. ROACH:  And just for the
20 record, same stipulation on objections, an
21 objection for one is an objection for all?
22       MS. FREUDENBERGER:  Yeah, that's
23 fine.
24       (Recess.)
25       MS. FREUDENBERGER:  Let's go ahead

Page 77
1 and mark the Code of Ethics as Exhibit 48.
2       MS. DAGNE:  Emma, it's already
3 been marked as an exhibit.  I believe Exhibit 20.
4       MS. FREUDENBERGER:  You know, I
5 think it was part of Exhibit 20.  Let's just mark
6 it separately as Exhibit 48.
7       MS. DAGNE:  Got it.
8       (Exhibit 48 was marked for
9    identification.)
10  Q.  (By Ms. Freudenberger)  All right, sir,
11 this is a document you've seen before?
12  A.  Yes, ma'am, I have.
13  Q.  All right.  Tell me what it is.
14  A.  It is the General Order, date of issue
15 looks like 5/1 of 1993, for Code of Ethics.
16  Q.  Okay.  Is this the Code of Ethics that
17 would have been in place in April of 1994?
18  A.  Yes, that would -- that would be correct.
19  Q.  Okay.  Are you familiar with this policy?
20  A.  Yes, I am.  I'm looking down third -- I
21 think it's the fourth paragraph on purpose.  It
22 has a date in there.  It said: Additionally,
23 guidelines set forth in this order all police
24 employees, as are all city employees, are subject
25 to the provisions of the Code of Ethics

20 (Pages 74 - 77)

Page 78

1  promulgated by the City of Kansas City, Kansas,
2  city ordinance, etc., adopted May 22nd of '84.
3        And I'm not sure if that -- if it would
4  say that's in addition to.  I was just trying to
5  look for that.
6     Q.  Yeah, I think that's in reference to the
7  city ordinance that this is a supplement to.
8     A.  Okay.
9     Q.  In other words, by the terms of this
10 policy, all employees of the Kansas City, Kansas
11 Police Department are subject both to the Code of
12 Ethics promulgated by the City of Kansas and City
13 Ordinance 64-645.  And this is a separate
14 additional Code of Ethics applicable to the police
15 department, right?
16    A.  Yes, I think that's correct.
17    Q.  Okay.  In other words, this document
18 memorializes ethical principles that the police
19 department viewed as important enough to codify
20 and mandate for all police department employees,
21 right?
22          MR. COOPER:  Object to form.
23       You may answer.
24    A.  I don't disagree.  I don't have any
25 reason to disagree with what you said.

Page 79

1     Q.  (By Ms. Freudenberger)  All right.  Take
2  a look at page 3 under Roman Numeral VIII.  It
3  says "Integrity."  Are you there?
4     A.  Yes, I'm here.
5     Q.  Okay.  Section A of Roman Numeral VIII
6  says:  A police officer will not engage in acts of
7  corruption or bribery, nor will an officer condone
8  such acts by other police officers.
9         Does this Code of Ethics mandate -- this
10 Code of Ethics place an obligation on officers to
11 address corruption by other officers?
12    A.  Yes.  In my opinion, yes.
13    Q.  Okay.  And what were the rules in place
14 in the Kansas City, Kansas Police Department in
15 1994 when it came to reporting violations of rules
16 and regulations by other officers?
17    A.  For any police officer who became aware
18 of it, they reduced that to writing a report to a
19 supervisor.  For a first line supervisor as being
20 sergeant and above, they could take immediate
21 action if they were made aware of a violation of
22 not just Code of Ethics but of any policy
23 violation.  And sergeants had the authority to
24 take immediate action, if necessary, and suspend
25 up to four days.  That was the level or scope of

Page 80

1  their authority.
2        If the alleged information was serious
3  enough, then it would be forwarded to -- up the
4  chain of command to the chief's office or it could
5  be forwarded from that sergeant and above straight
6  to Internal Affairs for investigation into the
7  alleged misconduct.
8     Q.  Okay.  And so am I correct that between
9  1990 and 2000, any officer in the Kansas City,
10 Kansas police officer -- Police Department who
11 witnessed an act of corruption by a fellow officer
12 had an affirmative obligation to document that act
13 in writing and report it up the chain of command
14 or directly to Internal Affairs?
15          MR. COOPER:  Object to form.  Not
16 a 30(b)(6) topic as to 1994, but you may respond.
17    A.  Any officer who was made aware of not
18 just an allegation, but credible, that it always
19 requires that receiving officer to make a
20 informed, trained, police-trained mind, do we have
21 a violation of crime that meets the standards that
22 you can craft a criminal allegation or charge.  Or
23 if it's a clear violation of administrative
24 policy, that that -- you're right, then an officer
25 has a requirement that they document that to

Page 81

1  notify their first line supervisor, their direct
2  report, and reduce that to writing.
3     Q.  (By Ms. Freudenberger)  And that would
4  include a violation of the Code of Ethics?
5     A.  Yes, that is correct.
6     Q.  Okay.  And describe to me that
7  determination.  How were officers expected to make
8  a determination as to whether allegations were
9  credible?
10    A.  Well, the training that police officers
11 receive in the academy in addition to being
12 trained on all city ordinances, state statutes.
13 But the specific elements of those -- of those
14 violations, of those city ordinances and state
15 statutes.  Specifically to -- to have -- to have
16 someone assert something happened, then the
17 question is, did you see it happen?  When did you
18 see it happen?  Then you go through the whole
19 thing of time, date, location, give a detailed
20 explanation.  And does that information received,
21 does it have the elements that a violation of
22 ordinance or state statute occurred.
23        And you're really looking for that
24 standard of probable cause, a combination of facts
25 or apparent facts viewed through the eyes of an

Page 82

1  experienced police officer which would lead a
2  person of reasonable conscious to believe that a
3  crime has, is or will be committed. That's the
4  basic standard that you're taught from day one. I
5  remember that from my early days on the police
6  department, and you try to apply that on
7  information received. And oftentimes that
8  individual officer, detective, that's what you're
9  working toward when people say something may have
10 occurred.
11        Unfortunately, sometimes people hear
12 things or people report partial things or you --
13 they don't know a name, they don't -- they don't
14 give you enough information that can take you to
15 that next step. I mean, you have to have that
16 next step. I mean, you have to be pointed toward
17 the person or a victim who can give authentication
18 or evidence, meaning an instrument of the crime.
19        Those are the kind of things that
20 officers are trained to gather to then forward
21 that into a report to then forward up to those who
22 are in charge. Because there are things that
23 officers in the field can take immediate action
24 on. Other things require a deeper investigation.
25 Those are things that are then forwarded to

Page 83

1  detectives to do the follow-up investigation.
2     Q. Okay. And just to be clear, we're
3  talking about investigations of other officers for
4  violations of the Code of Ethics, right?
5          MR. COOPER: Object to form.
6     A. Yeah, I think I was -- I was being more
7  general than that specific question. So coming
8  back to Code of Ethics, police officers are not --
9  it's not their typical, normal task to investigate
10 other officers. You like to believe that every
11 police officer is doing the same job going forward
12 which is investigating crimes outside -- I mean,
13 crimes from the community. But in the course of
14 their duty, if they become aware of an officer
15 doing something that violates policy or violates
16 criminal matter, then they immediately notify a
17 supervisor and document what they've -- what
18 they've witnessed and what they know to be
19 investigatable, so...
20        Is that -- is that a clear answer?
21    Q. (By Ms. Freudenberger) Yes. In other
22 words, that was their requirement between 1990 and
23 1994, correct?
24    A. I believe it is, yes.
25    Q. Okay. And was that also the requirement

Page 84

1  through your tenure as chief of police?
2     A. Yes, it was.
3     Q. Okay. The subsection b says: The public
4  demands that the integrity of police officers be
5  above reproach. Police officers must therefore
6  avoid any conduct that might compromise integrity,
7  and thus, undercut the public confidence in a law
8  enforcement agency.
9        Do you see that?
10    A. Yes, I do.
11    Q. Okay. That's codified in this policy,
12 Exhibit 48?
13    A. I'm sorry, I didn't hear that last part.
14    Q. That's codified in this policy, Exhibit
15 48?
16          MR. COOPER: Exhibit 48 is what
17 she's saying.
18    A. This is Exhibit 48, right?
19    Q. (By Ms. Freudenberger) Yep.
20          MR. COOPER: Yes. Emma, just so
21 you know, the document has -- actually has an
22 exhibit sticker of Exhibit 51.
23          MS. FREUDENBERGER: Yeah, I
24 understand. But it's been marked Exhibit 48 for
25 purposes of this deposition.

Page 85

1          MR. COOPER: Yes.
2     Q. (By Ms. Freudenberger) Okay. So I'm
3  going to give you a specific example. If a police
4  officer becomes aware that another officer has
5  solicited sex from a prostitute, would that
6  violate this Code of Ethics?
7          MR. COOPER: Object to form,
8  vague. The officer having knowledge or the --
9  the --
10          MS. FREUDENBERGER: Let me -- that
11 is true. It was a badly-worded question. Let me
12 rephrase that.
13    Q. (By Ms. Freudenberger) If an officer
14 were to solicit sex from a prostitute, whether on
15 or off duty, would that constitute a violation of
16 the Code of Ethics?
17    A. In my opinion, yes.
18    Q. Well, not -- but I'm not asking about
19 your opinion, I'm asking about the policies in
20 place in 1994. That's all.
21    A. As I interpret this policy and throughout
22 my tenure on the police department, the answer is,
23 yes, that would violate Code of Ethics.
24    Q. Okay. But I want to make sure we're
25 being clear here because you're speaking as a

Page 86

1 representative of the Unified Government about
2 this policy among other policies.  So would it
3 violate this Code of Ethics for an officer to
4 solicit sex from a prostitute?
5      A.   Yes.
6      Q.   If a fellow officer became aware --
7 withdrawn.
8           If an officer became aware that another
9 officer had solicited sex from a member of the
10 community, whether on or off duty, would that
11 officer have an obligation to report his or her
12 fellow officer?
13           MR. COOPER:  Assuming both
14 officers involved are KCKPD employees?
15           MS. FREUDENBERGER:  Correct.
16      A.   On duty -- on duty, the answer is
17 unequivocally yes.  If an officer became aware
18 that another officer engaged in soliciting a
19 prostitute on duty, I believe they would have a
20 direct obligation.  I believe the policy is clear,
21 they would have an obligation to report that.
22           Off duty, I don't know that I can say the
23 same.  I don't know that I can authenticate this
24 particular policy because officers aren't charged
25 with being supervisors.  Supervisors -- if you go

Page 87

1 back and look at our general orders regarding
2 disciplinary procedures, supervisors have a
3 responsibility when information is brought to them
4 regarding behavior or misconduct by officers to
5 report it.
6           So I'm trying to interpret this as best I
7 would think it would have been done in 1994.  So
8 the off-duty part, I'm not sure if the officer has
9 that obligation.
10           Now, commission of a crime, yes.  A
11 policy violation, I don't know that they have that
12 obligation -- or that would have been trained in
13 1994.  I don't know the answer to that.
14      Q.   (By Ms. Freudenberger)  What would the
15 training have been in 1994 regarding whether
16 soliciting -- well, what would the training have
17 been in 1994 regarding whether paying an
18 individual for sex was criminal or not?  In other
19 words, is that a criminal -- was that a criminal
20 act in Kansas in 1994 to pay somebody else for
21 sex?
22           MR. COOPER:  Object to form, not a
23 30(b)(6) topic.
24           You may respond.
25      A.   For my career, for the entire time I was

Page 88

1 on the police department, from 1978 until I left
2 in 2013, paying for a prostitute was illegal in
3 Kansas City, Kansas.
4      Q.   (By Ms. Freudenberger)  Okay.  But -- so
5 if an officer became aware that a fellow officer
6 had committed that crime off duty, are you telling
7 me that they were not required by policy to report
8 their fellow officer for that criminal --
9      A.   What I'm saying -- well, the question --
10 I think I was clear, we were talking about whether
11 an officer was -- the on-duty officer in their
12 official capacity had a requirement to report
13 criminal behavior.  An off-duty officer had a
14 requirement to report criminal behavior.  But who
15 they had sex with was not necessarily something
16 that an officer off duty would be responsible for
17 reporting.
18           But if you add the paid element to it to
19 make it a prostitute, then I believe they had
20 responsibility to report off duty as well, if it's
21 a criminal violation.
22      Q.   Okay.  And any -- paying anybody for sex
23 was a crime, right?  In other words, it's not
24 significant who you're paying for sex, it's the
25 act of paying for sex, right?

Page 89

1      A.   The acts of -- the act of paid
2 prostitution is a criminal violation.
3      Q.   Okay.  So regardless, if an officer -- if
4 Officer B paid for sex, and Officer A became aware
5 that Officer B had paid for sex off duty, Officer
6 A had an obligation to report Officer B under the
7 rules of the Kansas City, Kansas Police Department
8 in 1994, correct?
9      A.   Well, I think the question there --
10 because if I'm -- we're hypothetical and you're
11 asking me questions about what that might be.  The
12 question I would have to ask you is, did the
13 officer witness the firsthand knowledge that that
14 officer committed a criminal act.  Absolutely off
15 duty or on duty, they would have a responsibility
16 to report it.
17           But if off duty, an officer heard that
18 somebody had done something, that officer's not an
19 investigator.  It is not something that -- and
20 misdemeanors in Kansas City, Kansas, were not
21 investigated by detectives at that time.  So if
22 someone had knowledge, if someone had witnessed a
23 criminal act, the person who witnessed it could
24 bring forward a misdemeanor charge by going to
25 municipal court and swearing out a warrant that

Page 174

```
 1   If you listen or pay attention to those
 2 kinds of things, you -- you know -- so it's --
 3 rumors are -- you know, there are people that --
 4 the nature of police work.  Police work is
 5 difficult.  It's a difficult job.  It has
 6 different stressors.  You know, you try to -- you
 7 try to get through all this, try to work through
 8 the rumors and get to facts.  And if you don't
 9 have facts, someone telling you about a rumor
10 about somebody, you really can't take action and
11 would not be directed to try to do so.  You have
12 to have some facts.
13   Q.  (By Ms. Freudenberger)  Okay.
14   A.  Criminal facts.
15   Q.  So it sounds like the unofficial policy
16 in the Kansas City, Kansas Police Department was
17 that if -- that rumors were ignored in the absence
18 of -- withdrawn.
19       It sounds like the unofficial policy in
20 the Kansas City, Kansas Police Department was that
21 supervisors did not have an obligation to
22 investigate rumors even if those rumors were of
23 serious misconduct?
24           MR. COOPER:  Object to form,
25 misstates what his testimony -- his testimony just
```

Page 175

```
 1 was.
 2           MS. FREUDENBERGER:  I think that's
 3 what he just said.
 4           MR. COOPER:  Well, it's not, so
 5 I'll let him answer your question again.
 6   A.  Rumors need to be substantiated with
 7 facts.  We can't investigate rumors.  And
 8 individually each of us would hear information and
 9 then you decide what kind of rumor is something
10 that you care about and what kind of rumor you
11 might think has something you need to worry about.
12 I think that is as individual as the person who
13 hears it and how they apply what they should do
14 about it.
15       I certainly know of rumors that turn out
16 to be more credible as it relates to affairs and
17 relationships.  I've also heard many rumors that
18 were unequivocally not just false but that were,
19 you know, career damaging and character damaging.
20 And so, you know, you've got to apply, you know,
21 your own basic sense of logic when you hear a
22 rumor.  And the police department had nothing in a
23 policy -- I can assure you that I've never had a
24 policy on what we do with rumors.  Never.
25   Q.  (By Ms. Freudenberger)  Well, so say
```

Page 176

```
 1 you're a supervisor and you hear a rumor that your
 2 subordinate is having sex with prostitutes off
 3 duty.  Does the supervisor have complete
 4 discretion to follow up or ignore that
 5 information?
 6           MR. COOPER:  Object to form,
 7 incomplete hypothetical, misstates his prior
 8 testimony.
 9       You may respond.
10   A.  Yeah, I would -- I would think that if --
11 depending on the supervisor, depending on your --
12 on your relationship or your knowledge of that
13 detective, yeah, is it impacting, you know, job
14 performance.  I mean, all those things have to
15 weigh into it.  So I think it would be
16 situational.  I mean, if you felt that there was
17 credibility to it and it was affecting job
18 performance or violation of any of our policies,
19 then I think you're obligated to do something
20 about it.
21   Q.  (By Ms. Freudenberger)  Well --
22   A.  But if you just hear a rumor that
23 someone's doing that and you believe this person
24 to be someone who just deals with a -- and again,
25 the problem with informants, whether it's
```

Page 177

```
 1 narcotics or other investigations, well,
 2 oftentimes informants are engaged in a life-style
 3 that is -- that is on the criminal line.  People
 4 that give us information about drugs often use
 5 drugs, sell drugs, buy drugs.  Same --
 6   Q.  And that's one reason that there are
 7 rules in place governing the use of tracking of
 8 informants, right?
 9   A.  Well, those guidelines are, you know,
10 that it's incumbent upon the detective -- the
11 detective or the officer who is working with
12 informants that they follow our policies and
13 procedures and don't violate those, don't let
14 personal feelings, relationships interfere with
15 official conduct.
16   Q.  So let me ask you a different
17 hypothetical.  What if the supervisor hears a
18 rumor that one of their subordinates is paying
19 prostitutes for sex in their off-duty time, does
20 that supervisor have the discretion under the
21 department's rules to ignore that rumor or does
22 the supervisor have an obligation to investigate
23 it?
24           MR. COOPER:  Object to form, not a
25 30(b)(6) topic.
```