# EXHIBIT 141

Page 1

1           IN THE UNITED STATES DISTRICT COURT
                FOR THE DISTRICT OF KANSAS

2

3    LAMONTE McINTYRE, et al.,)
                              )
4               Plaintiffs, )
                              )
5    vs.                      ) 2:18-cv-02545-KHV-KGG
                              )
6    UNIFIED GOVERNMENT OF    )
     WYANDOTTE COUNTY AND     )
7    KANSAS CITY, KANSAS,     )
     et al.,                  )
8                             )
                Defendants. )

9

10

11

12

13

14              VIDEOTAPE DEPOSITION OF TERRA

15   MOREHEAD, a Witness, taken on behalf of the

16   Plaintiffs, before Alison A. Tracy, Missouri

17   CCR No. 554, Kansas CSR No. 1525, pursuant to

18   Notice, on the 27th day of April, 2021, at

19   Lathrop GPM LLP, 2345 Grand, Suite 2200, Kansas

20   City, Missouri.

21

22

23

24

25

1    A.   Yes.
2    Q.   (By Ms. Freudenberger)  And what I'm
3  getting at is, my understanding, correct me if
4  I'm wrong, my understanding is in that
5  conversation you reported to Mark Dupree and
6  Jennifer Tatum that you were not made aware of
7  any of the investigative misconduct Lamonte
8  McIntyre was alleging on the part of the
9  detectives, correct?
10            MR. COOPER:  Object to form.
11            MR. GIST:  Join.
12            MS. EVERS GUERRA:  Join.
13    A.   I was never aware of any misconduct
14  occurring in connection with this prosecution.
15    Q.   (By Ms. Freudenberger)  Okay.  Including
16  by Officer Golubski, correct?
17            MR. COOPER:  Object to form.
18    A.   I was not aware of any misconduct by any
19  law enforcement personnel during the course of
20  this prosecution.
21    Q.   (By Ms. Freudenberger)  And you made
22  that clear to Mark Dupree and Jennifer Tatum when
23  you met with them, right?
24    A.   I would have said that, yes.
25    Q.   Okay.  And another thing you told them

1  is that -- and just to be clear, you don't
2  believe, as you sit here today, correct me if I'm
3  wrong, that the investigative misconduct Lamonte
4  McIntyre alleges, occurred, am I right about
5  that?
6            MR. COOPER:  Object to form.
7            MR. GIST:  Join.
8            MS. EVERS GUERRA:  Join.
9    A.   I don't have any personal knowledge
10  about whether anything happened or not.  I was
11  never made aware of anything, so I have no
12  personal knowledge, so I don't have an opinion
13  one way or the other.
14    Q.   (By Ms. Freudenberger)  Okay.  And just
15  talking about what you articulated during your
16  meetings with Mark Dupree and Jennifer Tatum now,
17  did you express during those meetings that one
18  reason you don't -- one reason you doubted the
19  allegations Lamonte McIntyre was making about
20  investigative misconduct by the police is because
21  there were other senior investigators, in
22  addition to Golubski, who participated in key
23  investigative steps in this case?
24            MR. COOPER:  Object to form.
25            MS. EVERS GUERRA:  Join.

1    A.   I don't believe I ever was asked nor did
2  I articulate, because I don't have a personal --
3  I don't have any personal knowledge about any
4  misconduct by anyone.  So I can't really doubt
5  something if I don't have an opinion about it.
6  All I can tell you is I was never made aware of
7  any misconduct by any law enforcement in the
8  course of this prosecution.
9    Q.   (By Ms. Freudenberger)  Okay.  At some
10  point you learned that the Superior Court in
11  Kansas vacated Lamonte McIntyre's conviction,
12  correct?
13            MR. COOPER:  Object to form.
14    A.   The Superior Court?
15            MS. EVERS GUERRA:  Join.
16    Q.   (By Ms. Freudenberger)  I apologize.  I
17  used the wrong terminology.  I do cases all over
18  the country.  At some point you learned that a
19  judge had overturned Lamonte McIntyre's
20  conviction, correct?
21    A.   I don't know if I'm aware of that at
22  all.
23    Q.   Is this the first you are learning that
24  Lamonte McIntyre's conviction has been
25  overturned?

1    A.   Yes.  I don't know that I knew anything
2  like that.  I just know that during the 1507
3  proceeding Mr. Dupree opted not to pursue the
4  prosecution and the case was dismissed.  But I
5  don't know anything about -- anything beyond
6  that.
7    Q.   All right.  Well, you understand in the
8  process of the case being dismissed the
9  conviction had to be vacated, right?
10    A.   All I know is the conviction was
11  reinstated and then Mr. Dupree opted not to
12  pursue the case and dismissed the case.  So I
13  don't know of any -- so once he went through that
14  process, the case didn't go forward logistically.
15    Q.   I understand.  But regardless of the
16  mechanics -- make it simpler, because I think we
17  are on the same page.  The conviction has to be
18  vacated before the indictment is dismissed.  You
19  understand there is no intact conviction against
20  Lamonte McIntyre?
21    A.   Right, I'm aware of that.
22    Q.   That was my question.  And do you also
23  understand that the court has adjudicated, has
24  since adjudicated Lamonte McIntyre innocent of
25  the double homicide he was convicted of?

Page 74

1    A.  I don't recall one way or the other.
2         MS. FREUDENBERGER:  You know, this
3  is actually -- we have to break in four minutes
4  for one of the defense lawyers to attend a court
5  conference and this is a logical point for that
6  break.  Why don't we break now.  And Beth,
7  approximately how long do you think you need?
8         MS. EVERS GUERRA:  I thank you, I
9  appreciate that.  The hearing is at 11:00 and it
10 is a short status hearing so I would hope 11:15
11 at the latest.  11:10, 11:15.
12        MS. FREUDENBERGER:  Why don't we
13 plan to reconvene at 11:15.
14        MS. EVERS GUERRA:  That would be
15 great.  Thank you guys.
16        THE VIDEOGRAPHER:  We are going off
17 the record.  Time on the monitor 10:56 a.m.
18        (Short recess was taken.)
19        THE VIDEOGRAPHER:  We are back on
20 the record.  Time on the monitor 11:18 a.m.
21   Q.  (By Ms. Freudenberger)  Before we move
22 on, from your time at the Wyandotte County
23 District Attorney's Office, during the course of
24 your, the sex crimes prosecutions you handled,
25 did you have the opportunity to work closely with

Page 75

1  victims of sexual misconduct?
2    A.  Physical and sexual, just child abuse in
3  general.
4    Q.  Okay.  And did you also handle sexual
5  assault prosecutions where the victims were
6  adults?
7    A.  Yes.
8    Q.  In those cases did you have the
9  opportunity to work closely with victim of sexual
10 assault?
11   A.  Yes.
12   Q.  I have never been a prosecutor.  My
13 understanding is sex crimes prosecutions
14 necessarily involve building up a rapport with
15 the victim.  Is that correct, would you say?
16   A.  I think any time you deal with a victim,
17 there is some sort of rapport that you build up.
18 I don't know -- I would say probably more so
19 there is more of a trust thing with children.
20 Just the wide gamut of victims in general I would
21 say you have to have some level of trust and
22 rapport going on no matter what the crime is.
23   Q.  Fair enough.  I guess what I mean is, in
24 a sex crime, like by definition you have to build
25 on the victim's -- you have to be able to discuss

Page 76

1  something very personal and traumatic with a
2  victim which necessarily requires a certain
3  amount of rapport building, would you agree?
4    A.  Yes.
5    Q.  Okay.  Did you have an opportunity, in
6  the course of prosecution sex crimes with the
7  Wyandotte County District Attorney's Office, to
8  observe the emotional toll that coming forward
9  took on victims of sexual assault?
10        MR. COOPER:  Object to form.
11   A.  I think it varied from individual to
12 individual.  There were definitely some that had
13 more difficulties than others.  But it wasn't
14 like an across the board conclusion that you
15 could make.  I think it varied.
16   Q.  (By Ms. Freudenberger)  Okay.  I want to
17 ask you some questions about -- I'm trying to
18 think of a way to do this that doesn't require
19 you to talk about anything connected to your work
20 as a U.S. Attorney.  Let's do it this way.  We
21 will cap it to your time at the Wyandotte County
22 District Attorney's Office.
23        You understood by 1994 certainly that
24 there were particular ethical obligations
25 incumbent on prosecutors, right?

Page 77

1         MR. COOPER:  Object to form.
2  Vague.
3    A.  Generally, yes.
4    Q.  (By Ms. Freudenberger)  Yes.  Generally
5  speaking?
6    A.  Yes.
7    Q.  And I'm trying to phrase things so it
8  doesn't include your work as a U.S. Attorney so
9  that you can answer it.  So, as a prosecutor in
10 the Wyandotte County District Attorney's Office
11 you understood that there were -- you had
12 particular ethical obligations you were required
13 to adhere to, right?
14        MR. COOPER:  Object to form.
15   A.  Yes.
16   Q.  (By Ms. Freudenberger)  Okay.  And by
17 1994 you were an experienced prosecutor, right?
18   A.  I had been in the District Attorney's
19 Office for six years.
20   Q.  Okay.  And you fully understood the
21 ethical obligations incumbent on you as a
22 prosecutor, correct?
23        MR. COOPER:  Object to form.
24   A.  Generally.
25   Q.  (By Ms. Freudenberger)  Okay.  In other

Page 78

1  words, you understood by 1994 that you had an
2  obligation of candor toward the tribunal under
3  the Kansas ethical rules, right?
4      A.  Yes.
5      Q.  You understood that you had an
6  obligation not to make any false statements of
7  fact or law to the judges presiding over your
8  cases, correct?
9      A.  Yes.
10     Q.  And you had an understanding that if you
11 inadvertently made a false statement of material
12 fact or law, you had an obligation to correct it,
13 right?
14           MR. COOPER:  Object to form.
15     A.  Generally, yes.
16     Q.  (By Ms. Freudenberger)  In other words,
17 if you -- I'm just asking about your general
18 obligations as a prosecutor here.  Generally you
19 understood by 1994 that if you represented a fact
20 that was material to the case you were
21 prosecuting to the court, and you realized it,
22 you had an obligation to correct it, right?
23     A.  Generally, yes.
24     Q.  You also had an obligation not to
25 sponsor false testimony, right?

Page 79

1      A.  Yes.
2      Q.  And if you put on a witness, then, and
3  you knew what that witness was testifying to was
4  inaccurate, you had an obligation -- first you
5  had an obligation not to do that, correct?
6      A.  Correct.
7      Q.  And you had an obligation, if a witness
8  testified under examination by you to something
9  that was, you knew to be inaccurate, you had an
10 obligation to correct it, right?
11     A.  Yes.
12     Q.  You also understood -- by the way, I
13 take it you, as a prosecutor, took your ethical
14 obligations very seriously, is that correct?
15     A.  Yes.
16     Q.  At all times; true?
17     A.  Okay.  Again, I'm not authorized to give
18 any testimony about my employment with the U.S.
19 Attorney's Office.  And if you persist, I'm going
20 to have to excuse myself and call the 2(e)
21 officer as well as Mr. Slinkard to inform them
22 that you have repeatedly done exactly what was
23 told you weren't going to be doing.  Your
24 questions are open-ended and encompass the time
25 that I work in the U.S. Attorney's Office.  I

Page 80

1  cannot in any fashion provide testimony about
2  that aspect of my employment.
3      Q.  Okay.  So, let me do it this way to make
4  sure that my questions are not too general and
5  that I adhere to the agreement that we have
6  reached under the 2(e) regulations.  Okay?
7           During the prosecution of Lamonte
8  McIntyre at issue in this case, did you
9  understand that you had an ethical obligation not
10 to make a false material statement of fact or law
11 to the court?
12     A.  Yes.
13     Q.  During the prosecution of Lamonte
14 McIntyre at issue in this case, did you
15 understand that if you inadvertently made a false
16 statement of material fact to the court, you had
17 an obligation to correct it?
18     A.  Yes.
19     Q.  During the prosecution of Lamonte
20 McIntyre at issue to this case, did you
21 understand that you had an ethical obligation as
22 a prosecutor not to offer -- not to present
23 testimony you knew to be false?
24     A.  Yes.
25     Q.  And during the prosecution of Lamonte

Page 81

1  McIntyre at issue in this case, did you
2  understand that you had an ethical obligation if
3  a witness you were questioning said something you
4  knew to be inaccurate, to correct that?
5      A.  Yes.
6      Q.  Okay.  And during, at the time you were
7  involved in prosecuting Lamonte McIntyre, were
8  those ethical obligations that you took very
9  seriously?
10     A.  Yes.
11     Q.  Did you also understand, at the time of
12 your prosecution of Lamonte McIntyre, while you
13 were an Assistant District Attorney in the
14 Wyandotte County District Attorney's Office, that
15 you had an ethical obligation to refrain from
16 prosecuting any charge that you knew not to be
17 supported by probable cause?
18     A.  Yes.
19     Q.  Okay.  Was that also an ethical
20 obligation that you took seriously at the time of
21 the prosecution at issue in this case?
22     A.  Yes.
23     Q.  And did you also understand, at the time
24 of your prosecution of Lamonte McIntyre on behalf
25 of the State of Kansas, that you had an ethical

21 (Pages 78 - 81)

Page 82

1  obligation to disclose to the defense any Brady
2  material?
3     A.  Yes.
4     Q.  And did you, at the time of the
5  prosecution of Lamonte McIntyre, take your Brady
6  obligations very seriously?
7     A.  Yes.
8     Q.  Okay.  And you understood as -- well,
9  you understood by 1994, when you were prosecuting
10  Lamonte McIntyre, that Brady material encompassed
11  any potential exculpatory information?
12     A.  Yes.
13     Q.  Meaning any evidence with a potential to
14  favorably -- withdrawn.
15        Did you also understand by 1994 that
16  your Brady obligations extended to any
17  impeachment information?
18     A.  Yes.
19     Q.  That would include any prior
20  inconsistent statements of the witness, right?
21     A.  Yes.
22     Q.  And any evidence that would tend to
23  undermine the credibility of one of your
24  witnesses, correct?
25     A.  Yes.

Page 83

1     Q.  You understood that by 1994 when you
2  were prosecuting Lamonte McIntyre that your Brady
3  obligations extended to any information you
4  learned, whether it came to you in writing or
5  orally?
6     A.  Yes.
7     Q.  Okay.  By 1994 when you were prosecuting
8  Lamonte McIntyre, did you understand that one
9  reason it was important to adhere to your Brady
10  obligations was because if exculpatory or
11  impeachment material wasn't disclosed, that could
12  leave your prosecution vulnerable to reversal?
13     A.  Yes.
14     Q.  You understood by 1994 that it was
15  critically important to adhere to your Brady
16  obligations, because if you failed to do so that
17  could lead to discipline, correct?
18     A.  Generally, yes.
19     Q.  It could leave you vulnerable to
20  discipline, correct?
21     A.  Yes.
22     Q.  In other words, you understood by 1994
23  that failing to adhere to your Brady obligations
24  left both your cases and your career vulnerable
25  to a negative outcome?

Page 84

1     A.  Yes.
2        MR. COOPER:  Object to form.
3     Q.  (By Ms. Freudenberger)  So, for those
4  reasons and others, you were very careful during
5  this prosecution to adhere to your Brady
6  obligations at all times, correct?
7        MR. COOPER:  Object to form.
8     A.  Yes.
9        MS. EVERS GUERRA:  Join.
10     Q.  (By Ms. Freudenberger)  You took your --
11  fair to say you took your obligations in the
12  Brady versus Maryland very seriously during your
13  entire tenure with the Wyandotte County District
14  Attorney's Office?
15     A.  Yes.
16     Q.  And many prosecutors I have deposed over
17  the years have articulated a sort of informal
18  rule that when in doubt, you give the defense the
19  material.  Was that a practice, meaning if you
20  had any doubt as to whether information
21  constituted Brady material, you erred on the side
22  of disclosure, was that your practice in 1994
23  when you were prosecuting this case?
24     A.  I don't remember having any sort of
25  general practice.  Whatever the District

Page 85

1  Attorney's Office directive was, I would have
2  adhered to that.
3     Q.  Okay.  So, in other words, if
4  information had come across -- if information had
5  come to your attention during the course of this
6  prosecution and you questioned whether or not it
7  amounted to material you were obligated to
8  disclose under Brady, I take it you would have
9  brought that question to your supervisors at the
10  Wyandotte County District Attorney's Office and
11  discussed it with them, correct?
12     A.  Yes.
13     Q.  Do you remember that happening during
14  your prosecution of this case?
15     A.  No.
16     Q.  You certainly didn't violate any of your
17  ethical obligations during your prosecution in
18  this case, right?
19     A.  No.
20     Q.  Sometimes as a lawyer you have to
21  stretch the truth a little bit in terms of what
22  you argue.  Is it fair to say that in this very
23  serious double homicide case you believed that
24  the evidence supported every argument you made to
25  the jury?

22 (Pages 82 - 85)

Page 86

1    A.  I take exception --
2         MR. COOPER:  Object to form.
3    A.  I take exception with your
4  characterization that as a lawyer or prosecutor
5  you have to stretch the truth.
6    Q.  (By Ms. Freudenberger)  Okay.  In other
7  words --
8    A.  In other words --
9    Q.  You stand by every argument you made to
10  the jury in this case, correct?
11    A.  Is that your question?  Because that
12  wasn't your question before.
13    Q.  I'm asking you a different question.
14    A.  Okay.
15    Q.  Do you stand by every argument you made
16  to the jury in this case?
17    A.  Yes.  At the time I made the arguments
18  that I believe were supported by the evidence.
19    Q.  Okay.  And you didn't make any arguments
20  to the jury in this case that you did not believe
21  were fully supported by the evidence, correct?
22         MR. COOPER:  Object to form.  Asked
23  and answered.
24         MS. EVERS GUERRA:  Join.
25    A.  No.

Page 87

1    Q.  (By Ms. Freudenberger)  In other words,
2  I'm correct?
3    A.  Well, I think that had a double negative
4  in the question.
5    Q.  That's what I'm trying to get around.
6  In other words, you were agreeing with the
7  premise of my question?
8    A.  Do you want to reask that question?
9    Q.  Sure.  There were no arguments you made
10  to the jury in this case that you did not
11  believe?
12    A.  Again, that's a double negative.  Could
13  you rephrase that?
14    Q.  Were there any arguments you made to the
15  jury in this case that you do not believe were
16  fully supported by the evidence?
17    A.  No.
18    Q.  Were there any arguments you made to the
19  court at any time during these proceedings that
20  you did not believe were fully supported by the
21  evidence?
22    A.  No.
23    Q.  I apologize if I have asked this
24  already.  But you understood by the time of this
25  prosecution in 1994 that you had an affirmative

Page 88

1  obligation to disclose to the defense any
2  information that came to your attention that
3  tended to undermine the credibility of any of
4  your witnesses, correct?
5    A.  Yes.  You asked that question.  I would
6  stand by my earlier answer.
7    Q.  Okay.  Including any information that
8  tended to undermine the credibility of any of the
9  officers who investigated in this case, correct?
10    A.  They would be included if they testified
11  in that category of witnesses that testified.  So
12  again, I would stand by my earlier answer.
13    Q.  In other words, you understood by 1994
14  that if any information had come to your
15  attention that tended to undermine the
16  credibility of any of the officers you were
17  calling to testify, you had an obligation to
18  disclose that information to the defense,
19  correct?
20    A.  Yes.
21    Q.  We talked earlier about your Brady
22  obligations at the time of this prosecution in
23  1994 applying to information whether written or
24  oral.  Now, I'm only talking about your tenure.
25  We can make it easier.  We can cap it to this

Page 89

1  prosecution.  You understood by the time of this
2  prosecution that if information -- if information
3  triggering your Brady obligations came to your
4  attention orally, you had an obligation to ensure
5  that information was documented and affirmatively
6  disclosed to the defense, correct?
7         MR. COOPER:  Object to form.
8    A.  Generally, yes.
9    Q.  (By Ms. Freudenberger)  Okay.  And I
10  understand, or I take it from your answer that
11  you have no recollection of that happening in
12  this case, correct?
13    A.  I don't have any recollection of that
14  happening.
15    Q.  But had you learned of any Brady
16  material during the course of this prosecution
17  orally, you would have written it down or
18  directed someone else to write it down and
19  disclosed it to the defense, correct?
20    A.  Yes.
21    Q.  Pursuant to your ethical obligations as
22  prosecutor, correct?
23    A.  Yes.
24    Q.  And that did not happen in this
25  prosecution, right?

23 (Pages 86 - 89)

Page 90

1    A.  That did not happen, that I recall.
2    Q.  Okay.  On top of your affirmative
3 obligation to disclose Brady or potential
4 impeachment evidence to the defense at the time
5 of this prosecution, you also maintained an open
6 file policy, is that correct?
7    A.  I don't remember.  I don't remember what
8 the office policy was back then.  It changed.  So
9 whatever the policy was, I followed it.  But I
10 really don't have a recollection of what it was
11 at the time.
12    Q.  Okay.
13    A.  I know generally we allowed review of
14 our, of the reports and the like.  And then there
15 were some items that were physically provided.
16 Some policies changed over time.  I can't tell
17 you when that was.  Whatever the policy was, I
18 would have adhered to.
19    Q.  Okay.  We might be able to short-circuit
20 that.  Is it fair to say that during this
21 prosecution of Lamonte McIntyre, no information
22 came to your attention that tended to undermine
23 the credibility of any of the officers who
24 investigated this case?
25    A.  I don't remember having any such

Page 91

1 information.
2    Q.  And if any information had come to your
3 attention during this prosecution that could have
4 undermined the credibility of any of your
5 witnesses, you would have made sure that it was
6 documented and disclosed to Lamonte McIntyre's
7 defense attorney, correct?
8    A.  Yes.
9    Q.  And you have no recollection of that
10 happening, correct?
11    A.  I don't have any recollection of that.
12    Q.  Fair to say given the circumstances of
13 your job at the time of this prosecution, you
14 were primarily relying on the assigned detectives
15 to investigate the case?
16    A.  Yes.
17    Q.  In other words, it was incumbent -- I
18 apologize.  Were you not done?
19    A.  No, I wasn't done.  We had investigators
20 in the District Attorney's Office as well.  And
21 so once the case came to the District Attorney's
22 Office, our investigators may be involved in
23 post-filing aspects of the case.
24    Q.  All right.  I have not seen any
25 reference in the file in this case to any

Page 92

1 District Attorney's Office investigators.  As you
2 sit here today do you have any reason to believe
3 that there were investigators assigned to the
4 District Attorney's Office who participated in
5 this prosecution?
6    A.  Oh yeah, they would have.  We had
7 investigators involved in all of our cases.
8    Q.  Okay.  Do you have any specific
9 recollection of any District Attorney's Office
10 investigator involved in this prosecution?
11    A.  There would have been.  I'm not sure who
12 that would have been.  There were times that we
13 had two investigators in the office and I think
14 at one point we were up to four.  So, it could
15 have been any one of those individuals or more
16 than one that would have had involvement.  But I
17 can't tell you who they would have been at the
18 time in 1994.
19    Q.  It sounds like you are surmising there
20 may have been District Attorney Office
21 investigators involved in this case based on the
22 way things worked at the time, as opposed to a
23 specific memory of having a DA investigator
24 involved in this case, is that right?
25    A.  Well, I remember a specific event and I

Page 93

1 am fairly certain that it was the investigators
2 who were -- once the police investigation was
3 over, the detectives or the assigned officers
4 really weren't involved anymore, there really
5 wasn't -- there may have been in some cases, but
6 generally speaking there wasn't -- they didn't
7 continue working the case or being involved in
8 the case per se.
9    Q.  So it sounds like what you are saying is
10 that the usual practice in the Wyandotte County
11 District Attorney's Office by 1994 was that if
12 there was additional investigation that needed to
13 be done or that you wanted done, the usual
14 practice was to assign one of the DA office
15 investigators, as opposed to the detectives who
16 had investigated the case, is that right?
17    A.  Well, no, that's really not what I'm
18 saying.  I just, I guess my -- I just don't
19 remember there being like anything definitive.
20 But the investigators were more involved in like
21 tracking down witnesses, serving subpoenas,
22 assisting the prosecutor with like preparing the
23 prosecution part of the case.  The investigators
24 -- or the law enforcement officers really weren't
25 involved in that aspect.  So I don't know if I

24 (Pages 90 - 93)

1 the transcript regarding opening statements is
2 Exhibit 44 that has just been provided to the
3 witness.
4     (Exhibit 44 was marked.)
5   Q.  (By Ms. Freudenberger)  Ms. Morehead,
6 you are not suggesting that you would have told
7 the jury something in opening that you believed
8 the evidence might contradict, are you?
9        MR. COOPER:  Object to form.
10   A.  I don't think that was your question.
11 Your question was about --
12   Q.  (By Ms. Freudenberger)  I'm asking
13 you --
14   A.  About so this is a different question?
15 So what was the question?
16   Q.  You are not suggesting that you told the
17 jury things in opening that you had believed were
18 contradicted by the evidence just because it
19 wasn't argument, are you?
20   A.  No.  But that was not your question.
21 Your question had to do with me making an
22 argument during opening, was purely
23 what I anticipated the evidence would be from the
24 evidence presented.  So, that was what I was
25 basing my opening statement on.

1   Q.  And if you hadn't learned from the
2 police prior to your opening statements that when
3 they presented these photographs to Niko Quinn
4 she pulled out photograph number 3 and held it in
5 her hand, you wouldn't have told the jury that?
6   A.  Right.  As I indicated, it was in the
7 police report, it had been testified to in
8 prelim, and it was consistent with what Niko
9 Quinn had said.  So I would have said what I
10 believed the evidence was going to bear out.
11   Q.  Okay.  And it is possible that you
12 discussed it with either Detective Golubski or
13 Detective Ware ahead of time, too, you just don't
14 remember as you sit here today, correct?
15        MR. COOPER:  Object to form.
16   A.  That's correct.
17   Q.  (By Ms. Freudenberger)  Does the fact
18 that you said to the jury "the police will show
19 her the same five photographs and the police will
20 tell you when they presented these photographs to
21 her she pulled out photograph number 3," does
22 that indicate to you that you are considering
23 calling Detective Ware at trial?
24        MS. EVERS GUERRA:  Object to form.
25   A.  I don't know.

1   Q.  (By Ms. Freudenberger)  Okay.  Fair
2 enough.  Roger Golubski never reported to you
3 that he used any suggestion of any kind to elicit
4 Niko Quinn's ID, correct?
5   A.  No.
6        MR. COOPER:  That was a double
7 negative.
8   Q.  (By Ms. Freudenberger)  In fact --
9        MR. GIST:  That was a double
10 negative.
11   Q.  (By Ms. Freudenberger)  Roger Golubski's
12 consistent reports to you during this case were
13 that he had not used any suggestion of any kind,
14 is that right?  I will withdraw the question.  I
15 did it again.
16        Did Roger Golubski consistently report
17 to you that he had not used suggestion to obtain
18 the -- I will withdraw the question.
19        Did Roger Golubski consistently report
20 to you that Niko Quinn's identification of
21 Lamonte McIntyre originated with Niko Quinn?
22   A.  I'm sorry, I don't understand that
23 question.
24   Q.  Sure.  Golubski never reported to you
25 that he used suggestion with Niko Quinn?

1   A.  He never reported anything like that.
2   Q.  Okay.  In fact, it was clear to you from
3 Roger Golubski's documentation and your
4 conversations with him that Roger Golubski's
5 position was that he had used no suggestion with
6 Niko Quinn whatsoever to obtain her
7 identification of Lamonte McIntyre, correct?
8        MR. COOPER:  Object to form,
9 foundation.
10        MR. GIST:  Join.
11   A.  Even beyond that, it was confirmed from
12 my conversations with Niko Quinn.
13   Q.  (By Ms. Freudenberger)  But before we
14 get there, am I correct?  You said even beyond
15 that.
16   A.  No, I don't think he dissected that out.
17 I think it is a combination.  I think you are
18 trying to pigeonhole facts; and that's not how it
19 works.  I look from beginning to end, are things
20 consistent.  If Mr. -- if Roger Golubski had said
21 something and that was contradicted some way,
22 then, you know, I would recognize that.  But it
23 wasn't like there was a conversation where he,
24 where any officers say hey, I'm telling you the
25 truth on this.  It is just, tell me what happened

Page 126

1 and that's how it comes out. So I think your
2 question -- there would have never been a
3 conversation in the context that you are phrasing
4 it.
5    Q. Fair enough. So, when you said to Roger
6 Golubski, in substance, tell me what happened, he
7 described an identification procedure without
8 police suggestion, correct?
9           MR. COOPER: Object to form.
10 Assumes facts not in evidence.
11           MS. EVERS GUERRA: Join.
12    A. So, again, I don't have any recollection
13 about conversations. But I believe that any
14 testimony or conversations was always consistent
15 from what was in the police reports, to what was
16 testified to at the prelim, to what other
17 witnesses testified to or told me, and to what
18 was presented at trial.
19    Q. (By Ms. Freudenberger) Okay. That
20 answers my question. So had information come to
21 you from any source indicating that Roger
22 Golubski or any other officer had used suggestion
23 to obtain Niko Quinn's identification of Lamonte
24 McIntyre, you would have made sure that that was
25 documented and disclosed to the defense in this

Page 127

1 case, correct?
2    A. Absolutely.
3    Q. And that did not happen, correct?
4    A. That did not happen.
5    Q. Okay. And the same is true of Ruby
6 Mitchell's identification. Had any information
7 been brought to your attention indicating that
8 any suggestion had been used to obtain Ruby
9 Mitchell's identification of Lamonte McIntyre,
10 you would have ensured that information was
11 documented and disclosed to the defense, correct?
12           MR. COOPER: Object to form.
13    A. Correct.
14    Q. (By Ms. Freudenberger) And that did not
15 happen, correct?
16    A. That did not happen.
17    Q. Okay. No one ever reported to you that
18 the police used suggestion to obtain Ruby
19 Mitchell's identification of Lamonte McIntyre,
20 right?
21    A. Not until about two years after the
22 case.
23    Q. Okay.
24    A. Ruby Mitchell?
25    Q. Ruby Mitchell.

Page 128

1    A. Okay. I don't know any of that ever
2 coming up with Ruby Mitchell.
3    Q. Okay. Nobody ever reported to you that
4 any police officer had used any kind of
5 suggestion to obtain Ruby Mitchell's
6 identification of Lamonte McIntyre, correct?
7    A. No.
8    Q. In other words, correct?
9    A. Correct.
10    Q. Okay. And now you say that
11 approximately two years after Lamonte McIntyre
12 was convicted, it was indicated to you that
13 suggestion had been used to obtain Niko Quinn's
14 identification, right?
15    A. Yes.
16    Q. I know what you are referring to, but
17 why don't you tell me, from what source?
18    A. It was filings from Mr. McIntyre's
19 post-conviction lawyer, and I think it was
20 postured as maybe a motion for new trial or a
21 1507. I'm not sure exactly which, but one of
22 those.
23    Q. The filing alleged that Niko Quinn's
24 identification of Lamonte McIntyre had been
25 procured through police misconduct, correct?

Page 129

1    A. Yes. As I recall, at that stage she was
2 representing that it was based upon some sort of
3 threat to I think put her in jail if she didn't
4 testify and/or take her kids away, but I don't
5 remember which of that happened, because there
6 has been various versions over time that I have
7 become aware of. But I do know there was
8 something about law enforcement making a threat
9 of some sort.
10    Q. Okay. Take a look at the trial, I want
11 you to look at your direct with Roger Golubski
12 which I think should be in what has been marked
13 as Exhibit 41.
14    A. Okay.
15    Q. I'm going to direct you to page 329.
16 Let me know when you are there.
17    A. Okay.
18    Q. Now, there were two identifications
19 with -- identification procedures with Niko Quinn
20 at issue in this case, correct?
21    A. You mean where she was asked about
22 identification?
23    Q. Yes. In other words, the testimony was
24 that police went to Niko Quinn's house the day
25 after the incident and showed her photos and she

33 (Pages 126 - 129)

Page 130

1   had a visible reaction to Lamonte McIntyre's
2   photograph but did not make a positive ID, and
3   then a week later she did make a positive ID to
4   Detective Golubski.  That was the testimony that
5   you elicited at trial, correct?
6       A.   After -- I think there were three.
7   There was the one the night of the homicide where
8   she was interviewed about the incident, and then
9   there were the two with the lineup that you have
10  referenced.  So three contacts with law
11  enforcement were referenced at trial.
12      Q.   Okay.  Read to yourself, if you would,
13  page 329, lines 4 to 15.
14      A.   Okay.
15      Q.   Okay.  And this is testimony that you
16  elicited from Detective Golubski on direct,
17  correct?
18      A.   Yes.  I think this might have been
19  redirect.
20      Q.   You are right, it is, it is redirect.
21  All right.  But what Detective Golubski told you
22  in these question and answers was consistent with
23  his reports to you pretrial, correct?
24          MR. COOPER:  Object to form.  That
25  one is vague.

Page 131

1       A.   As far as I recall, yes, and consistent
2   with Niko Quinn's report.
3       Q.   Okay.  In other words, when you met with
4   Detective Golubski between the preliminary
5   hearing and trial, he reported to you, consistent
6   with his testimony, that Niko Quinn contacted him
7   approximately a week after the initial photo
8   showing, correct?
9       A.   That's correct.
10      Q.   And she expressed to him that she was
11  having a lot of emotional problems, correct?
12      A.   Yes.
13      Q.   That she identified Lamonte McIntyre's
14  photo, correct?
15      A.   Yes.
16      Q.   And that she was adamant about her
17  identification, correct?
18      A.   Yes.
19      Q.   Okay.  And I take it that Detective
20  Golubski's report to you about how that
21  identification procedure went down, was relevant
22  to you when Niko Quinn -- when the allegations
23  that Niko Quinn's identification had been
24  procured through misconduct came to light years
25  after the conviction.

Page 132

1           MR. GIST:  Object to form.
2           MR. COOPER:  Join.
3       A.   Can you ask that question again?
4       Q.   (By Ms. Freudenberger)  I will even ask
5   you a simpler version of that question.  When
6   Lamonte McIntyre filed papers after his
7   conviction alleging that Niko Quinn's
8   identification had been procured through police
9   misconduct, I take it you did not find those
10  allegations credible?
11      A.   I did not and the judge did not.
12      Q.   Okay.  And I just want to talk about you
13  and your decisionmaking process.  Part of the
14  reason that you did not find those allegations
15  credible is because Detective Golubski had
16  consistently reported to you that Niko Quinn made
17  that positive identification of Lamonte McIntyre
18  without any suggestion from the police, correct?
19          MR. GIST:  Object to form.
20          MS. EVERS GUERRA:  Join.
21      A.   It was primarily based upon the fact
22  that Niko Quinn had, independent of Detective
23  Golubski, provided the same information about how
24  the identification was made at the time of the
25  trial, and then independent the information that

Page 133

1   Detective Golubski had provided.  So, you know,
2   as a prosecutor, that's what I look for.  If
3   there were deviations in those versions of
4   events, then that gives you pause or is suspect
5   that somebody is not telling the truth here.  And
6   that never happened.  So it wasn't based just
7   upon Detective Golubski's representations about
8   this lineup.  It was about the totality of what I
9   was aware of.  And I found it not -- I did not
10  believe that her subsequent version of events at
11  the post-conviction hearing was credible so I did
12  not believe it.
13      Q.   Okay.  And part of the reason you didn't
14  think it was credible is because prior to that
15  both she and Detective Golubski had reported a
16  consistent account of how the identification came
17  to pass, right?
18      A.   Correct.
19      Q.   Okay.
20          MR. COOPER:  You have been going a
21  little better than an hour and a half.  Are you
22  at a break point any time soon?
23          MS. FREUDENBERGER:  Almost.
24      Q.   (By Ms. Freudenberger)  And by the way,
25  I'm not suggesting in retrospect that there was

34 (Pages 130 - 133)

Page 138

1    A.  Again, I answered the question.  I would
2  stand on my prior answers that I have given.
3    Q.  (By Ms. Freudenberger)  Okay.  But you
4  have actually told me something else that is
5  important that you hadn't said previously.  This
6  investigation, there was contemporaneous
7  documentation of what the police had done during
8  this investigation, right?
9    A.  What do you mean by contemporaneous?
10    Q.  Sure.  There were actually police
11  reports that were filled out during the course of
12  this investigation by various officers, right?
13    A.  There were -- I know there were some.  I
14  don't know if everything was contemporaneously
15  documented.
16    Q.  I understand.  But the police wrote down
17  what they did, they created police reports and
18  they passed along those police reports to you.  I
19  will withdraw the question.
20         The police created reports of what they
21  did during this investigation, right?
22         MR. COOPER:  Object to form.
23    A.  Again, there were police reports
24  generated.  I mean, there is always stuff that is
25  revealed that isn't somewhere in a police report,

Page 139

1  so I don't want to say everything was documented,
2  because I know frequently that isn't done.
3    Q.  That's why you meet with the detectives
4  who conduct an investigation before you go ahead
5  with the trial, right?  You want to make sure you
6  know everything that happened?
7         MR. COOPER:  Object to form.
8    A.  We try to ascertain as many facts as we
9  can.
10    Q.  (By Ms. Freudenberger)  Right.  All I'm
11  saying is, in this case you didn't just have
12  Detective Golubski's account and Niko Quinn's
13  account prior to and at trial.  You also had
14  police reports and the police reports as to --
15         MR. COOPER:  You are going to have
16  to start over.  You have to start over.  It is
17  not an objection.  We lost the volume so there
18  were like three words that were omitted.
19    A.  You are cutting out every once in
20  awhile.
21    Q.  (By Ms. Freudenberger)  You had police
22  reports that described identification procedures
23  with witnesses in this case, right?
24    A.  Yes.
25    Q.  And the process, the processes described

Page 140

1  in those reports appeared on the face of the
2  reports to be proper, correct?
3    A.  Yes.
4    Q.  Okay.  There were no red flags in the
5  reports you reviewed that suggested to you that
6  the police had done anything wrong in this
7  investigation, right?
8    A.  Correct.
9    Q.  And that was also a factor in your
10  determination when Niko Quinn came forward after
11  conviction, that she was -- that those
12  post-convictions allegations were not credible,
13  correct?
14    A.  Right.  Which is what I think I
15  testified to.  From the beginning of the
16  investigation, through the preliminary hearing,
17  through my conversations, through the trial, I
18  look at each aspect of the prosecution.
19    Q.  Okay.  And had there been any red flags
20  in the documentation in this investigation
21  indicating to you -- withdrawn.  I think that's
22  it.  We are on the same page.  Why don't we take
23  a break now.
24         THE VIDEOGRAPHER:  Going off the
25  record.  Time on the monitor, 1:06 p.m.

Page 141

1         (Short recess was taken.)
2         THE VIDEOGRAPHER:  We are back on
3  the record.  Time on the monitor 1:23 p.m.
4    Q.  (By Ms. Freudenberger)  Ms. Morehead, to
5  close out this topic.  Roger Golubski never
6  reported to you that he threatened he would have
7  Niko Quinn's children taken away if she didn't
8  cooperate, right?
9    A.  No.  Correct.
10    Q.  No one --
11    A.  That was another double negative.
12    Q.  Right?  Roger Golubski never reported
13  offering Niko Quinn any sort of inducement to
14  identify Lamonte McIntyre, correct?
15    A.  He never did that, correct.
16    Q.  Roger Golubski never reported to you
17  that he had helped Niko Quinn relocate to a new
18  apartment in exchange for her identification of
19  Lamonte McIntyre, correct?
20    A.  I don't think I ever knew that she lived
21  anywhere other than on Hutchings Street.
22    Q.  So I'm correct that Roger Golubski never
23  reported to you that he helped her relocate to
24  another apartment in exchange for her
25  identification of Lamonte McIntyre, correct?

36 (Pages 138 - 141)

Page 142

1  A.  Correct.
2  Q.  You said that you were never aware of
3  her living anywhere other than Hutchings Street.
4  Did you ever have occasion to go to Niko Quinn's
5  house?
6  A.  To her house?  I don't recall
7  specifically going to her house.  I have a vague
8  recollection maybe of meeting with Ruby Mitchell,
9  but I'm not certain on that.  That would have
10  been prior to trial, so I don't remember.
11  Q.  Do you have a vague recollection of
12  going to Hutchings Street for some purpose prior
13  to trial?
14  A.  I may have.  But again, I don't know if
15  that's because I saw photos of the location or if
16  I really went there.  So I don't recall.
17  Q.  And again, had it come to your attention
18  from any source that Roger Golubski had
19  threatened to have Niko Quinn's children taken
20  away, you would have had an obligation to
21  disclose that, right?
22  A.  Yes.
23  Q.  You would have immediately done so,
24  right?
25  A.  Yes.

Page 143

1  Q.  You would have questioned Golubski about
2  that, right?
3  A.  Yes.
4  Q.  Okay.
5  A.  Again, I became --
6  Q.  And that never happened?
7  A.  I became aware of it two years after the
8  fact, obviously.  But not --
9  Q.  I'm talking about prior to trial.  My
10  questions are limited to prior to trial.
11  A.  Okay.  Well, you didn't indicate that,
12  so.  Prior to trial I was not aware of anything
13  like that.
14  Q.  Okay.  I want to go ahead and mark the
15  brief you submitted on direct appeal, the Brief
16  of Appellee on the front.
17  (Exhibit 45 was marked.)
18  MS. PILATE:  What number is that,
19  Emma?  Is that 45?
20  MS. FREUDENBERGER:  I think we are
21  at 45.  But I haven't been keeping close track.
22  Q.  (By Ms. Freudenberger)  Before I ask you
23  about this document, I have a couple more
24  questions.  When Niko Quinn first alleged that
25  Golubski threatened to have her children taken

Page 144

1  away, that struck you as wildly incredible,
2  right?
3  A.  I don't think I would characterize it --
4  MR. COOPER:  Objection to form.
5  MS. EVERS GUERRA:  Join.
6  A.  Wildly incredible is not anything in my
7  vocabulary.  I did not find that it was
8  consistent with anything that had came out to
9  that point?
10  Q.  (By Ms. Freudenberger)  Well, did it
11  strike you as implausible that a detective in the
12  Kansas City, Kansas Police Department would be
13  threatening to have witnesses children taken
14  away?
15  A.  I mean, yeah, I'm really unaware of
16  anything like that happening.  The police don't
17  really have the authority to take people's
18  children away.  A judge would have to do that,
19  based upon my practice.  So, but, I mean I know
20  she made the allegation two years after the fact
21  something about the police had threatened to take
22  her children away, is my recollection.
23  Q.  Okay.
24  A.  I think it was in the context of her not
25  showing up to testify, that context.  But that

Page 145

1  was the only time I heard anything like that
2  coming up.
3  Q.  Okay.  And by the way, Niko Quinn was,
4  fair to say, very emotional about this whole
5  case, right?
6  A.  I don't know that I found her extremely
7  emotional during my contact with her.  I mean,
8  I'm sure any time someone's family members are
9  murdered before your eyes it is going to be
10  emotional.  But I never felt like she was
11  emotionally unstable or there was any sort of
12  emotional instability.  I mean, she may have
13  cried.  I don't remember if she cried either at
14  the prelim or at the trial when she testified.
15  It may have happened.  I don't remember.  I don't
16  think your characterization -- I don't have any
17  independent recollection about her being
18  extremely emotional to the point that it was
19  something that I identified as her being
20  extremely emotional.
21  Q.  Okay.  As you said, police officers
22  don't have the authority to go directly to judges
23  and ask for somebody's children to be taken away
24  if they don't show up to court, right?
25  A.  There is a process that goes

37 (Pages 142 - 145)

Page 174

1 But I just don't recall.  I know what was
2 elicited, but it would only be a presumption.  I
3 would presume that.  But I can't say that for
4 certain.
5     Q.  Okay.
6     A.  I don't independently remember this
7 aspect of this case.
8     Q.  So, I understand you don't independently
9 remember, and we can put that aside.
10     A.  Okay.
11     Q.  So, what you state, and we don't have
12 your notes but we do have the words you spoke to
13 the judge that the court reporter wrote down.
14 And the words you said to the judge were, Well
15 judge, Detective Golubski will be the best
16 witness for that.  Actually Lieutenant Barber
17 will be because he was the one that was told this
18 information and that information then got back to
19 the other detectives and that's how the name and
20 photograph were pulled.  That's what you told the
21 court?
22     A.  Right.  But I didn't say confidential
23 informants, and I think that was what your
24 question was.  I used the word sources.
25     Q.  Well, if you look at back to page 298,

Page 175

1 line 6, you ask -- can you look at it with me?
2 Line 6 you asked Detective Golubski this is your
3 question, "How did the police department become
4 known or how did the name Lamonte McIntyre become
5 known to the police department?"  And then down
6 at the end of the page the court asks, you are
7 now at side bar and the court asks you what you
8 intend to do and how you intend to do it.  And
9 what you say is, "Judge, this type of evidence
10 this information came from confidential
11 informants, numerous confidential informants."
12 Those are your words, right?
13     A.  Okay.  Keep going.  "Numerous police
14 officers obtained information."  Which was what
15 my point was, that I'm not certain that
16 Lieutenant Barber got it directly from the
17 confidential informants.  He may have gotten it
18 directly from confidential informants himself, or
19 it may have been passed on to him from other law
20 enforcement officers.  And again, I don't recall.
21 I mean that's what I said.  It wasn't just
22 Lieutenant Barber talked to numerous confidential
23 informants like what you are saying now.  That's
24 not what I had represented to the court.
25     Q.  Okay.  But you represented to the court,

Page 176

1 based on what Lieutenant Barber had told you,
2 that Lamonte McIntyre's name first got injected
3 into this investigation based on what
4 confidential informants reported to police,
5 correct?
6     A.  Yes.
7         MR. COOPER:  Object to form.
8 Misstates prior testimony.  You may answer.
9     A.  That's my recollection based upon
10 reviewing this.
11     Q.  (By Ms. Freudenberger)  Okay.
12     A.  And "this" being this transcript.
13     Q.  And you understood that it would help
14 your case to some extent if you were able to
15 connect the dots for the jury as to how Lamonte
16 McIntyre's name got injected into this
17 investigation, correct?
18         MR. COOPER:  Object to form.  Asked
19 and answered.
20     A.  I believe I have answered that question
21 two prior occasions.  I would refer to my earlier
22 testimony and stand on it.
23     Q.  (By Ms. Freudenberger)  And now I'm
24 going to ask you a different question.  In your
25 mind it lent credibility to the police

Page 177

1 investigation that independent sources were the
2 genesis of -- withdrawn.  In your own mind as you
3 evaluated the case it made sense to you that -- I
4 will withdraw it again.
5         In your mind Lieutenant Barber's
6 explanation for how Lamonte McIntyre's name got
7 into this investigation in the first place lent
8 credibility to the police's investigation; fair
9 to say?
10     A.  Well, I think it lent credibility to the
11 eyewitness identification.  That's what I was
12 trying to build a case, based upon their
13 eyewitness identification.  So again, connecting
14 the dots, how was his name generated overall in
15 the investigation.
16     Q.  Fair enough.  So Lieutenant Barber's
17 report to you as to how Lamonte McIntyre's name
18 got into the investigation lent credibility to
19 the two identifications; fair to say?
20     A.  Yes.
21     Q.  And this was a case where there was no
22 physical evidence connecting Lamonte McIntyre to
23 the crime, right?
24     A.  Yeah, I don't know of any physical
25 evidence.

45 (Pages 174 - 177)

Page 178

1    Q.   There was no forensic evidence
2  connecting Lamonte McIntyre to the crime, right?
3    A.   No.
4    Q.   There was no murder weapon connecting
5  Lamonte McIntyre to the crime, right?
6    A.   No.
7    Q.   No blood evidence, DNA evidence
8  connecting Lamonte McIntyre to the crime,
9  anything like that?
10         MR. COOPER:  Object to form.
11    A.   No.
12    Q.   (By Ms. Freudenberger)  Lamonte McIntyre
13  hadn't confessed, there was no confession, right?
14    A.   There was no confession.
15    Q.   Okay.  The prosecution's entire case
16  rested on the IDs from Ruby Mitchell and Niko
17  Quinn, correct?
18    A.   I think probable cause was based upon
19  that.  However, the inconsistent alibi, we were
20  able to actually use that as well to make
21  argument.  So I think the independent or the
22  inconsistent alibis that they tried to give I
23  felt like I also gained some level of strength
24  based upon that as well.  So that's nothing that
25  you know going in, but that's the way it

Page 179

1  developed in this case.
2    Q.   In other words, you also understood that
3  there were contradictions between the police
4  account of statements Lamonte McIntyre made upon
5  his arrest and what Lamonte McIntyre said about
6  the statements he made on his arrest, right?
7    A.   Say that again.  You cut out.
8    Q.   Sure.  There were contradictions between
9  what the police reported Lamonte McIntyre had
10  said when he was arrested, and what Lamonte
11  McIntyre claimed he said at the time of his
12  arrest, right?
13    A.   That was part of the contradiction.
14    Q.   And there were also contradictions
15  between what the police said Lamonte McIntyre's
16  mother had stated upon his arrest and what
17  Lamonte McIntyre and his mother said she had
18  stated upon his arrest, right?
19    A.   I don't remember testimony about what
20  his mother said at trial.  I do seem to recall
21  that there were some statements she made at the
22  preliminary waiver hearing that were inconsistent
23  with what she had said when he was arrested.  But
24  I don't remember her testifying at trial so I'm
25  not sure that came up.  But I guess it may have.

Page 180

1  I do know there were contradictions -- the
2  contradictions that I was also speaking of were
3  just among his alibi witnesses.  They gave kind
4  of varying accounts.  There was also a question
5  about his statement about how he -- I think there
6  was some statement that he was unaware of the
7  homicide, but then he testified at trial that
8  some random person had came up and told him --
9    Q.   Here is the thing.  As you told me,
10  Ms. Morehead, your recollection of this case,
11  which happened almost 30 years ago now, is not
12  perfect.  And so we are going to waste time if
13  you are just talking about things that you think
14  you remember.
15    A.   Okay.
16    Q.   So I appreciate you are trying to be
17  helpful, but instead I'm going to ask you to
18  focus on my question and just answer the question
19  I ask.  Okay?
20    A.   I think your question was about the
21  contradiction.
22    Q.   It doesn't matter what you think my
23  question was about.  It really doesn't.  Just
24  listen to the questions that I have asked.  Okay?
25         MR. COOPER:  You cut the witness

Page 181

1  off in her answer, which is in fact responsive to
2  your question.
3         MS. FREUDENBERGER:  It wasn't even
4  remotely responsive.
5    Q.   (By Ms. Freudenberger)  In your brief on
6  direct appeal you say the jury was presented the
7  two sides of the story.  This is on page 11.  The
8  State's side, which consisted of eyewitness
9  identification of the defendant as the shooter,
10  and the defendant's side that he was somewhere
11  else at the time when the crime occurred.
12         Would you agree, Ms. Morehead, this case
13  basically boiled down to the eyewitness
14  identifications versus the alibi, correct?
15    A.   Yes.
16         MR. GIST:  Object.
17    A.   I think that's what I said.  That's what
18  I was trying to articulate when you cut me off.
19    Q.   (By Ms. Freudenberger)  Okay.  And so
20  any evidence that undermined either of the
21  identifications had the potential to jeopardize
22  your prosecution, correct?
23    A.   Say that again.  I'm sorry.
24    Q.   Sure.  Any evidence that undermined
25  either of the two identifications, had the

46 (Pages 178 - 181)

Page 182

1   potential to jeopardize your prosecution,
2   correct?
3          MR. COOPER:  Object to form.
4      A.   It may have.  I mean, the jury may have
5   discounted one of them and not the other.  So, I
6   mean, it might have, I guess.
7      Q.   (By Ms. Freudenberger)  Okay.  And by
8   the way, in addition to not having any forensic
9   evidence or any murder weapon or any biological
10  evidence connecting Lamonte McIntyre to the
11  crime, there was no fingerprint evidence
12  connecting Lamonte McIntyre to the crime, right?
13          MS. EVERS GUERRA:  Object to form.
14     A.   I think fingerprint evidence is
15  considered forensic evidence.
16     Q.   (By Ms. Freudenberger)  Okay.
17     A.   So that would be --
18     Q.   And you were never able to develop any
19  evidence of motive, correct?
20     A.   Yeah, I don't remember any direct
21  motive.
22     Q.   Well, there was no indirect motive
23  either, right?  You were never able to develop
24  any evidence of motive?
25     A.   No.

Page 183

1      Q.   Okay.  And you were never able to find a
2   connection between Lamonte McIntyre and the
3   victims of any kind, right?
4      A.   Not that I recall.
5      Q.   By the time of trial Detective Golubski
6   and Niko Quinn both maintained that there had
7   been a second positive identification of Lamonte
8   McIntyre, right?
9      A.   No, I think there was only one
10  identification.  There were -- I think she met
11  with the police three times.  The first one was
12  Detective Smith, the second one was where she
13  held on to the photo but said she couldn't be
14  sure, and then there was always the one where she
15  said she contacted police and told them yes, that
16  was, that was him.  So there was only one time
17  that I'm aware of, or that I recall, I should
18  say, where she verbally articulated during the
19  investigation that identification.
20     Q.   And that was the third time in the car,
21  right?
22     A.   Yes, that was my understanding.
23     Q.   In other words, the second interaction
24  between police and Niko Quinn on the day after
25  the crimes is an interaction from which one might

Page 184

1   be able to infer evidence based on Niko --
2   withdrawn.
3          The only positive identification from
4   Niko Quinn was the identification in the car,
5   correct?
6      A.   Yes.
7      Q.   And so that was critically important
8   evidence in this case that rested almost entirely
9   on two eyewitness identifications, right?
10          MR. COOPER:  Object to form.
11          MS. EVERS GUERRA:  Join.
12     A.   Again, I go back to the preliminary
13  hearing.  She testified under oath, as did Ruby
14  Mitchell, about their independent
15  identifications, and then also made in-court
16  identifications that he was the individual that
17  they had witnessed commit the murders.  So that's
18  how the identifications were made; out of court
19  and also in court.
20     Q.   (By Ms. Freudenberger)  And the
21  defense's strategy was to attack the accuracy of
22  those identifications, right?
23     A.   Again, I think I answered this question.
24  I wasn't really sure what his strategy was on
25  that.  He had an alibi defense.  And again, I

Page 185

1   wasn't certain to what extent he was attacking
2   the eyewitness identification because, as I
3   previously indicated, he did not want the
4   eyewitness identification jury instruction.
5      Q.   So --
6      A.   That's all I can speak to is what I
7   previously testified to.
8      Q.   Fair enough.  Given that your whole case
9   rested on the identifications by Ruby Mitchell
10  and Niko Quinn, are you not willing to say that
11  the fact that Niko Quinn made an adamant positive
12  photo identification of Lamonte McIntyre to
13  Detective Golubski about a week after the crime,
14  was important evidence in your case?
15     A.   Yes, it was important.
16     Q.   Okay.  And I can show you, but I am
17  guessing you may recall that Detective Golubski
18  never documented that positive identification
19  anywhere at all.
20     A.   I remember that coming up, that a report
21  wasn't generated.  But I think in the context of
22  there was testimony at the prelim, at the
23  preliminary hearing, and I thought that it was
24  pretty clear about that she identified it.  I
25  don't think it was clear that there were two

47 (Pages 182 - 185)

Page 186

1  separate meetings, the one where she just held on
2  to the picture and then the second one.  I
3  thought it was clear, because clearly there was
4  an indication that she didn't identify him in the
5  first one so there had to be a second one.  But I
6  know he didn't generate a report like, I guess
7  discerning that, because that came up I think in
8  the context of a colloquy that I recall reading.
9      Q.   Yes, it did come up in the context of a
10  colloquy.  And what you represent to the court is
11  that Detective Golubski made no documentation
12  whatsoever of that alleged adamant positive
13  identification.  And so that's something
14  presumably that you would have -- before I get
15  there.  You recall from reading that colloquy,
16  and perhaps from memory, that this was an issue
17  that the defense attorney made noise about at
18  trial, the fact that he was never made aware of
19  this alleged positive photo ID, right?
20          MR. COOPER:  Object to form.
21          MR. GIST:  Object to form.
22      A.   I recall that coming up.
23      Q.   (By Ms. Freudenberger)  And it was also
24  raised on direct appeal, right?
25      A.   Correct.

Page 187

1      Q.   Okay.  And presumably when you reviewed
2  the police file in this case, you noticed that --
3  well, withdrawn.  Given that there was no
4  documentation of the second positive
5  identification, your only source for that
6  information -- you know what, I'm going to
7  withdraw that question.
8          When you first noticed that there was no
9  documentation of that second identification in
10  the file, did you ask Detective Golubski where
11  the documentation was?
12      A.   No.  I mean, the first I knew about it
13  was at the preliminary hearing which the defense
14  attorney was present at.  I mean, there was
15  testimony about she couldn't initially identify,
16  and then later she was, so I believe she
17  testified about that.  I don't remember if
18  Detective Golubski did.  But I seem to recall
19  there was some testimony at the preliminary
20  hearing about that.  So I don't think I -- I
21  don't recall ever asking him why the report
22  wasn't generated.  Because again, I didn't become
23  involved until three or four months after the
24  homicide, after charges had already been filed.
25  So again, I don't recall asking why.

Page 188

1      Q.   I'm going to have you look at Niko
2  Quinn's testimony from the preliminary hearing.
3  It is very short.  You tell me where in that
4  testimony it suggests that there was a second
5  identification procedure.  It starts at page 21
6  and it goes to Page 34.  So please read those 13
7  pages and tell me when you are done.
8      A.   So, it is actually during cross on, kind
9  of starts on page 30.  There was discussion that
10  on April 15, which I assume was the day after --
11  she is gone.
12      Q.   I don't know what happened.  Can you
13  give me a line, please.
14      A.   So, Page 30, line 19, there is some
15  questions in there about April 15, and that has
16  to do with some photographs.  And she said, going
17  on to page 31, he said, "Did you pick somebody
18  out of those photos?"  And --
19      Q.   Whoa, whoa, whoa.  You just skipped,
20  Ms. Morehead, you just skipped over the important
21  part.
22          MR. GIST:  Object to form.
23      Q.   (By Ms. Freudenberger)  She says, "Well,
24  I seen some photographs."  And then she is asked,
25  "When?"  And then it says, "The 16th of April --"

Page 189

1  Question, "So you -- ".  Answer, "-- the day
2  after."  Question, "When did you see -- where did
3  you see those?"  Answer, "They came to my house."
4  You can't just skip the parts that are important
5  to my question.
6      A.   Okay.  I am going -- you asked me to
7  identify in the transcript, and that's what I'm
8  trying to do.  You are now interjecting into my
9  answer.  So --
10      Q.   That's because you skipped over the part
11  of the testimony that makes clear that she is
12  talking about the day after.  I'm asking you
13  about where it talks about the third interaction
14  in the car.
15      A.   Okay.  I'm getting there.
16      Q.   Okay.
17      A.   This is the second incident.  And the
18  question is, "Did you pick anybody out?"  "No."
19  "You weren't able to identify anybody?"  And she
20  said, "I was able to identify the guy but I just
21  didn't want to."  So that again was the day
22  after.
23      Q.   Right.
24      A.   And it might have been her trial
25  testimony then that I'm referring to which was

48 (Pages 186 - 189)

Page 222

1  told the jury the evidence would show about Niko
2  Quinn in your opening statement, and the fact
3  that you did not bring out the alleged positive
4  identification from Niko Quinn on direct
5  examination, is it fair to conclude that what
6  must have happened is you learned about the
7  alleged positive identification with Niko Quinn
8  for the first time when Niko Quinn testified at
9  trial?
10        MR. COOPER:  Object to form.
11    A.  On cross-examination?
12    Q.  (By Ms. Freudenberger)  Yes.
13    A.  Yeah, I mean that would make sense.  It
14  is definitely possible.
15        MS. FREUDENBERGER:  Thanks.  We can
16  take a break.
17        THE VIDEOGRAPHER:  Going off the
18  record.  The time on the monitor 3:35 p.m.
19        (Short recess was taken.)
20        THE VIDEOGRAPHER:  We are back on
21  the record.  Time on the monitor, 3:56 p.m.
22    Q.  (By Ms. Freudenberger)  Ms. Morehead,
23  you are aware that Lamonte McIntyre was arrested
24  on the basis of a photo identification by Ruby
25  Mitchell, correct?

Page 223

1    A.  Yes, I believe that was the primary
2  evidence that was available at the time of his
3  arrest.
4    Q.  Are you aware of any other evidence
5  available at the time of his arrest?
6    A.  Not that I'm aware of, not that I
7  remember.
8    Q.  By the way, other than the confidential
9  informants that you were -- the confidential
10  informant accounts that you weren't allowed to go
11  into detail about at trial, was there any other
12  evidence implicating Lamonte McIntyre in these
13  crimes that you did not introduce at trial?
14    A.  Not that I recall.
15    Q.  Presumably in this, given all of the
16  kinds of evidence you didn't have of the --
17  withdrawn.
18        Given that you did not have evidence of
19  motive or any physical evidence or forensic
20  evidence tying Lamonte McIntyre to the crimes,
21  had you had any additional inculpatory
22  information available you would have made every
23  effort to use it at trial, correct?
24        MR. COOPER:  Object to form.
25    A.  I presume I would have.

Page 224

1    Q.  (By Ms. Freudenberger)  And that should
2  be reflected in the transcript, correct?
3    A.  The trial transcript, yes.
4    Q.  Or the DA file?
5    A.  Yeah, I mean, whatever I knew, I knew
6  that I would have documented, so.
7    Q.  Whatever you knew, you used to the best
8  of your ability, correct?
9    A.  As far as I recall, yes.  Nothing comes
10  to my mind that wasn't used.
11    Q.  In other words, no reason to think, as
12  you sit here today, that you had additional
13  inculpatory information you did not use at the
14  trial of this case, correct?
15    A.  No, other than, I mean I don't remember
16  if I used -- I don't remember any -- the
17  information about what his mother had said, and
18  it really wasn't inculpatory, it was just
19  contradictory.  But again, I don't remember that
20  she was a witness so I don't know that I
21  introduced that.  But the record will obviously
22  speak for, it is the best evidence and would
23  speak for itself what was introduced.
24    Q.  But you were aware of the contradiction
25  between what Rose McIntyre maintained she said to

Page 225

1  the police and what the police maintained she had
2  said to them when you made the decision to move
3  forward with this prosecution, correct?
4        MR. COOPER:  Object to form.
5    A.  I think that came out at the preliminary
6  hearing.
7    Q.  (By Ms. Freudenberger)  So the answer is
8  yes?
9    A.  Or the waiver hearing.  I think she
10  testified as part of the waiver part of the
11  hearing.  So yes, I was aware of that
12  contradiction.
13    Q.  Okay.  Take a look at page 19 of the
14  waiver hearing, please.
15    A.  Page 19 of the waiver?
16    Q.  Waiver hearing.
17    A.  Okay.  Okay.
18    Q.  Read lines 16 to 23 to yourself.
19    A.  Okay.
20    Q.  Ruby Mitchell is clearly stating here
21  that she never knew Lamonte McIntyre's last name?
22    A.  Oh, you are not looking at the waiver
23  hearing.  You are looking at the preliminary
24  hearing.
25    Q.  I apologize.  I am.  You are right.

57 (Pages 222 - 225)

Page 234

1 serious question. I will ask you a serious
2 question about that, though. You never saw any
3 documentation from Lieutenant Barber of any of
4 the numerous confidential informants who
5 allegedly provided the name Lamonte McIntyre, did
6 you?
7      MR. COOPER: Object to form.
8      MS. EVERS GUERRA: Object to form.
9   A. I don't recall.
10   Q. (By Ms. Freudenberger) You don't recall
11 ever seeing any documentation from Lieutenant
12 Barber of the numerous confidential informants
13 who purportedly volunteered the name or
14 purportedly provided the name Lamonte McIntyre to
15 the police?
16      MR. COOPER: Object to form.
17      MS. EVERS GUERRA: Same objection.
18   A. I don't have any recollection.
19   Q. (By Ms. Freudenberger) Now, but to the
20 best of your recollection you did not --
21 withdrawn. You have no recollection of noticing
22 the contradiction between Ruby Mitchell's witness
23 statement and her testimony and reports that she
24 did not know Lamonte McIntyre's last name,
25 correct?

Page 235

1   A. Yes, I don't have any independent
2 recollection. Again, I may have -- we may have
3 discussed that in connection with her pretrial.
4 Because I would have only met with her once, like
5 Niko Quinn, before trial. And I just -- I mean
6 there may have been discussions, but I don't
7 independently remember that.
8   Q. Okay. And it is possible you didn't
9 know that, correct?
10   A. And it is possible I didn't know it, or
11 that I documented whether I knew or didn't know
12 it.
13   Q. Is it also possible that you asked
14 Krstolich about it when you met with him before
15 trial and he provided you with an explanation?
16   A. Possibly. Again, I don't have any
17 independent recollection of that.
18   Q. And you said you met with Ruby Mitchell
19 and Niko Quinn each one time before trial?
20   A. That would have been typically what I
21 would have done. I don't think I would have had
22 either the time or the -- I wouldn't have had a
23 reason to meet with them more than once. They
24 had already testified at prelim, then it was
25 handed off to me, and I would have met with them

Page 236

1 prior to trial.
2   Q. By the way, you would agree, I assume,
3 that Brady obligations are incumbent on the trial
4 attorney as a general matter of practice in the
5 Wyandotte County District Attorney's Office?
6   A. I think I answered that question, but
7 yes, it is required.
8   Q. Okay. In other words, you understood to
9 the extent that there was Brady material, that
10 was on you to turn it over to the defense, right?
11   A. Yes.
12   Q. Now, if you would look at Detective
13 Golubski's report at P65. Let me know when you
14 are there.
15   A. I'm here.
16   Q. I'm sorry, look at the second page of
17 the report, please.
18   A. Okay.
19   Q. The second paragraph. Read that to
20 yourself, please.
21   A. Okay.
22   Q. According to this report -- withdrawn.
23 Do you recall that Niko Quinn's mother, Josephine
24 Quinn, was also at home on the day of the
25 shooting on Hutchings Street?

Page 237

1   A. Yes, I remember that.
2   Q. And Golubski reported to you that he had
3 shown Josephine photos and she was not able to
4 identify the perpetrator, correct?
5   A. Right, correct.
6   Q. In other words, what Golubski reported
7 to you -- look actually up a paragraph, it says,
8 "She also viewed the five photos and cannot
9 identify anyone."
10   A. Yes. And that's consistent with what
11 she told me.
12   Q. Okay. So you met with Josephine prior
13 to trial?
14   A. Yes, in a pretrial interview.
15   Q. Okay. And did she report to you that
16 she was unable to identify anybody one way or
17 another because she had not gotten a good enough
18 look at the perpetrator? Or did she report to
19 you that -- withdrawn.
20   You understand, obviously, as a
21 prosecutor, the difference between a non-ID and
22 not being able to make an identification, right?
23   A. Right. Well yes, I think I can.
24   Q. You would agree, based on what Detective
25 Golubski wrote here, documented here, you can't

60 (Pages 234 - 237)

Page 238

1 tell whether Josephine Quinn didn't see the
2 perpetrator well enough to say one way or another
3 whether he was in the photographs, or whether she
4 said the perpetrator was not in the photographs,
5 correct?
6    A.  I think it was pretty clear she did not
7 get a good look at the individual, cannot
8 identify anyone.
9    Q.  Okay.
10   A.  That's consistent with what she told me.
11   Q.  By the way, Josephine was another person
12 who came forward after the conclusion of the case
13 and told you that you had the wrong guy, right?
14   A.  No, I didn't ever have any such
15 conversation with her.
16   Q.  Okay.  You recall there was a time where
17 you raised to Judge Burdette that members of the
18 McIntyre family were congregating in the hallway
19 together discussing the case?
20   A.  I don't remember that.
21   Q.  To the extent that anyone approached you
22 during trial and said you have the wrong guy, you
23 understood that it was members of the McIntyre
24 family who objected to the prosecution, right?
25   A.  I don't remember that at all.  I think I

Page 239

1 was aware -- I think I would have known who the
2 defendant family members were.  Many of them
3 testified.
4    Q.  Okay.  Anyway, looking at the next
5 paragraph, according to what Detective Golubski
6 documented --
7    A.  I'm sorry, what page?  Say that again.
8    Q.  This is page 2 of Golubski's report.
9    A.  What page is that?  I shut the -- I
10 thought we were done with that.
11   Q.  P66.
12   A.  Okay.  Say that again.  Go ahead.
13   Q.  It says here that Josephine reported she
14 had another daughter named Stacy who knew who the
15 suspect was, correct?
16   A.  Yes.
17   Q.  Obviously if Josephine Quinn --
18 withdrawn.  Obviously if there was any witness
19 who knew who the perpetrator was, it was
20 critically important for police to find that
21 person and interview them if possible, correct?
22       MR. COOPER:  Object to form.
23       MS. EVERS GUERRA:  Join.
24   A.  I mean, that was part of the prosecution
25 file, that there was a potential other witness.

Page 240

1 She was listed in there, I think at least in the
2 narrative or the synopsis, that she was a
3 potential witness.
4    Q.  (By Ms. Freudenberger)  So you
5 understood she was an important potential
6 prosecution witness?
7       MR. COOPER:  Object to form.
8    A.  She was a potential eyewitness.  What
9 she saw or what she didn't see, I at that point
10 didn't know, other than what Josephine Quinn had
11 said.
12   Q.  (By Ms. Freudenberger)  And Josephine
13 was saying, her mother was saying that she
14 actually knew who the perpetrator was, which is
15 different than being able to make an
16 identification, right?
17   A.  Yes, that's what was represented.
18   Q.  Okay.  So, obviously in this case, which
19 rested entirely on Niko Quinn and Ruby Mitchell's
20 IDs, if there was another witness who had seen
21 the perpetrator and knew his identity, it was
22 critically important to find and interview that
23 witness, correct?
24       MR. COOPER:  Object to form.
25   A.  Yes, we would have wanted --

Page 241

1       MS. EVERS GUERRA:  Join.
2    A.  We would have wanted to pursue that.
3    Q.  (By Ms. Freudenberger) So she was
4 potentially a critically important witness for
5 your case?
6       MR. COOPER:  Object to form.
7       MS. EVERS GUERRA:  Join.
8    A.  She was an official eyewitness who would
9 have had potentially useful information.
10   Q.  (By Ms. Freudenberger)  Okay.  And so
11 you must have had conversations with Detective
12 Golubski about Stacy Quinn, correct?
13       MR. COOPER:  Object to form.
14       MS. EVERS GUERRA:  Join.
15   A.  I would assume so.  I was generally
16 aware of her existence.  And I think, again
17 without seeing my notes that I took, I probably
18 would have spoken to Niko and Josephine about
19 that.  I don't know if I would have written down
20 like hey, where is Stacy at or anything.  But
21 obviously she was mentioned in the reports so I
22 would have expected that I would have pursued
23 that.  I don't, as I sit here today, I don't have
24 any independent recollection about what I would
25 have been told either by Detective Golubski or

61 (Pages 238 - 241)

Page 242

1  Niko Quinn or Josephine Quinn, who I would have
2  expected I might have had conversations with, or
3  any of the other investigators for that matter.
4  But I would have expected that I would have asked
5  about her presence and where she might be in
6  anticipation of potentially having her available
7  for trial.
8      Q.  Well, and you directed Detective
9  Golubski prior to trial to go out and interview
10 Keva Garcia, Ruby Mitchell's niece, correct?
11     MR. COOPER:  Object to form.
12     A.  I don't know if I -- I may have.  I
13 don't remember that name.  But I may have.
14     Q.  (By Ms. Freudenberger)  Well, there is a
15 report in the file, it is actually in this file,
16 of an interview conducted by Detective Golubski
17 with Ruby Mitchell's niece, and it takes place
18 within days of the start of trial.
19     A.  Okay.  I just don't remember her.  That
20 name is not familiar, so.
21     Q.  If Detective Golubski was out
22 interviewing potential witnesses within days of
23 the trial, it had to have been at your direction,
24 correct?
25     MR. COOPER:  Object to form.

Page 243

1      MS. EVERS GUERRA:  Join.
2      A.  I would have assumed it came up in some
3  context.  Either --
4      Q.  (By Ms. Freudenberger)  In other words
5  it is not possible -- I'm sorry.  I didn't mean
6  to cut you off.
7      A.  I would assume with the timing that it
8  was based upon some conversation I had with
9  someone to precipitate that happening, which
10 would explain that.  But I just don't have an
11 independent recollection.
12     Q.  That's fine.
13     A.  And again, my notes, let's say I was
14 talking to Ruby Mitchell and this came up, there
15 might be a note which might explain.
16     Q.  It would be good to have those notes.  I
17 think we can all agree it would be nice to have
18 those notes.  Don't know where they are.  Would
19 you agree, just based on the way things worked,
20 that it would have been highly irregular for
21 Detective Golubski to be going out and taking
22 tape recorded statements from witnesses within
23 days of the trial without you being in the loop?
24     MR. COOPER:  Object to form.
25     A.  Yes, I would have expected this would

Page 244

1  have been part of my trial prep, yes.
2      Q.  And so you also would have directed
3  Detective Golubski to go out and locate Stacy
4  Quinn, correct?
5      A.  Again, I would have expected some
6  conversation generally with law enforcement, also
7  with Niko and/or Josephine Quinn about her
8  whereabouts because we knew she was a witness.
9  But I don't have any independent recollection.
10     Q.  But the possibility there is the obvious
11 possibility that if Stacy Quinn didn't want to
12 participate in the prosecution, her mother and
13 sister might not tell you her whereabouts, right?
14     MR. GIST:  Object to form.
15     MR. COOPER:  Object to form.
16     MS. EVERS GUERRA:  Join.
17     A.  I don't want to speculate about that.
18 It may have been they didn't know where she was.
19 I don't know what I was told about her because I
20 don't remember.
21     Q.  (By Ms. Freudenberger)  I understand.  I
22 understand.  So --
23     A.  But that wasn't what she said.
24     Q.  Whatever -- let me ask you a different
25 question.  Whatever Niko Quinn and Josephine

Page 245

1  Quinn may have told you about Stacy, you would
2  not have stopped there, because there was always
3  the possibility that they were not divulging
4  everything, correct?
5      A.  I don't know if I thought they weren't
6  divulging.  I never got any sort of impression
7  until the trial that either of them was not being
8  cooperative.
9      Q.  My point is, regardless of what they
10 told you, you would have also directed detectives
11 working on this case to try to track down Stacy
12 Quinn, correct?
13     A.  I would have generally thought that that
14 would make sense, yes.  Or be on the lookout for
15 her, I mean.  My understanding was she was a
16 Wyandotte County resident so, you know, if they
17 came across her or saw her or encountered her,
18 you know, it was known that she was potential
19 witness in this case.
20     Q.  And you knew that she had a personal
21 relationship with Detective Golubski, right?
22     MR. GIST:  Object to form.
23     A.  I was not aware of any such thing.
24     MS. EVERS GUERRA:  Join.
25     Q.  (By Ms. Freudenberger)  But, in any

62 (Pages 242 - 245)

Page 258

1 whatever else was going on, I can't speak to
2 that. All I know is what happened from the point
3 I got the case assigned to me forward. And I do
4 know that because she was endorsed as a witness,
5 some level of attempt to locate her was done.
6    Q.   Okay. So, if the detectives, the KCK PD
7 detectives conducting this investigation had
8 located Stacy Quinn and interviewed her, there
9 should be a report in the file documenting that,
10 correct?
11    A.   Yes. I would have expected that I would
12 have been aware of that. And I don't recall
13 being aware of anything like that. Or if my
14 investigators had located her, and I don't recall
15 that either.
16    Q.   Okay. So at some point during your --
17 we saw at trial where you represented to the
18 judge you had multiple meetings with Detective
19 Golubski, right?
20    A.   Yes.
21    Q.   At some point during those multiple
22 meetings with Detective Golubski when you were
23 assigned and the trial, would have asked him
24 whether he had been able to track down Stacy
25 Quinn, correct?

Page 259

1       MR. COOPER: Object to form.
2       MS. EVERS GUERRA: Join.
3    A.   I don't have any independent
4 recollection of that. I would have potentially
5 asked that. I mean, I would have expected to ask
6 that, but I don't know of that. If there is
7 documentation by way of notes, then I would have
8 been aware of that. But absent --
9    Q.   (By Ms. Freudenberger) He must have
10 reported to you that he wasn't able to find her,
11 because you kept her on your subpoena list for
12 your own investigators to look for her?
13    A.   Well, we don't keep somebody on a
14 subpoena list. They are endorsed as a witness.
15 So you don't unendorse a witness. They are a
16 potential witness. And I think typically during
17 voir dire I ask the jurors of any potential
18 witness that they might be familiar with, whether
19 they are going to be called as a witness or not.
20    Q.   So, don't get ahead of me. I appreciate
21 the correction. You endorsed, you endorsed Stacy
22 Quinn as a witness. You put her on your subpoena
23 list, correct?
24       MR. COOPER: Object to form. That
25 one is compound.

Page 260

1       MS. EVERS GUERRA: Join.
2    Q.   (By Ms. Freudenberger) I will withdraw
3 the question. You put Stacy Quinn on your --
4 withdrawn. You wouldn't have put Stacy Quinn on
5 your subpoena list for trial if Detective
6 Golubski had said I interviewed her, she can't
7 make an ID; would you agree?
8    A.   No, I would have kept her on there. You
9 know, and on the charging document, the charging
10 attorney, who I'm not sure who that was in this
11 case, they often put names of witnesses down as
12 well so those names are on there. I don't know
13 what names were or weren't on there. And so--
14    Q.   (By Ms. Freudenberger) Let me try it
15 this way. The fact that there is no
16 documentation in the file of an interview between
17 any detective and Stacy Quinn, combined with the
18 fact that you included her on a subpoena list on
19 August 31 of 1994, tells you that what must have
20 happened is Detective Golubski reported to you
21 that he was unable to locate Stacy Quinn?
22       MR. COOPER: Object to form.
23       MR. GIST: Objection.
24       MS. EVERS GUERRA: Join.
25    A.   No, that's not correct.

Page 261

1    Q.   (By Ms. Freudenberger) You would have
2 had some sort of follow-up conversation with
3 Detective Golubski or Detective Ware about Stacy
4 Quinn and their efforts to find her, but you have
5 no recollection of what transpired, is that
6 right?
7       MR. COOPER: Object to form.
8    A.   That's not correct. I did not say -- I
9 think I repeatedly said I don't recall whether I
10 had conversations with them about Stacy Quinn.
11 So, I would stand by my prior testimony.
12    Q.   (By Ms. Freudenberger) Okay. But as a
13 busy prosecutor in the Wyandotte County District
14 Attorney's Office, you were depending on the KCK
15 PD detectives who investigated the cases you
16 prosecuted to follow up on all obvious
17 investigative leads in the course of their
18 investigations, would you agree?
19       MR. COOPER: Object to form.
20       MS. EVERS GUERRA: Join.
21    A.   As I have said, I think three times now,
22 my investigators in the DA's office would have
23 been tasked with trying to follow up with
24 locating and serving witnesses. So to the extent
25 that someone was endorsed as a witness, I would

66 (Pages 258 - 261)

Page 262

1 have provided the names, the subpoenas to them to
2 go out and try to locate. The investigators may
3 have contacted someone in law enforcement and
4 said hey, have you seen or heard from Stacy
5 Quinn. I may or may not have been privileged to
6 that. It was a work in progress, oftentimes.
7 And I know I wasn't actively out trying to locate
8 Stacy Quinn. I was relying on the work of the
9 investigators. What they did to try to track
10 down the witnesses I don't know.
11    Q. (By Ms. Freudenberger) Listen to my
12 question, because I'm asking something totally
13 different. During the pendency of the police
14 investigation in this case -- withdrawn. As you
15 just said, you were not out trying to locate
16 Stacy Quinn yourself, right?
17    A. I was not.
18    Q. That's not a prosecutor's job, right?
19    A. Well, I think if I had -- I mean, I
20 might have asked like Josephine Quinn or Niko
21 Quinn, so I'm not going to say it wasn't part of
22 my job. I would have probably made reasonable
23 inquiry of anybody that might have had contact
24 with her. Since they were family members, that
25 would make sense. But --

Page 263

1    Q. But you -- sorry.
2    A. But I don't remember if I talked to them
3 about it. So if I did and there is notes about
4 it, then I did it. But otherwise, I wasn't out
5 on the streets trying to locate her.
6    Q. Okay. But given the fact that she was a
7 potentially important eyewitness in the case, at
8 the point at which you got assigned the
9 prosecution and reviewed the file you would have
10 assumed that you would have relied on the fact
11 that the Kansas City, Kansas Police Department
12 detectives investigating this case had done
13 whatever they could to try to locate and
14 interview Stacy Quinn, along with any other
15 important potential eyewitness. Correct?
16       MR. COOPER: Object to form.
17    A. I would have expected -- they were aware
18 that she was a witness. So if they were able to
19 locate or encounter her, then I would have
20 expected them to do that and to let me know about
21 that and I --
22    Q. (By Ms. Freudenberger) You were relying
23 on them to do that, right?
24    A. I wasn't relying on anything. It wasn't
25 a make or break situation, as I have said. And

Page 264

1 again, we had investigators in the DA's office,
2 you know, they had responsibilities. And so I
3 don't recall having any specific conversation
4 with either the investigators or the DA's
5 investigators or the law enforcement
6 investigators about what they needed to be doing
7 to try to locate her. It was just something that
8 the police knew she was a witness, the
9 investigators knew she was a witness, so if they
10 were able to locate her, she was going to be a
11 witness in the case. And I was never alerted
12 that she had been located.
13    Q. Okay. And you expected Detective
14 Golubski to accurately document or otherwise
15 relay whatever investigative steps he took with
16 regard to Stacy Quinn in this case, correct?
17    A. As I previously testified, if someone
18 had negative results to report, I wouldn't have
19 expected to know that, you know. If somebody is
20 out in the community and they never encounter a
21 particular individual, I'm not going to get a
22 report I have been out in the community for 20
23 days and I never encountered this person.
24 Negative results I wouldn't expect there to be
25 documentation or even to know what might have

Page 265

1 gleaned her location. But if they located her
2 and if they were able to talk to her and get
3 information, then I would have expected to know
4 about that.
5    Q. Okay. You would have expected them to
6 inform you about that, correct?
7    A. Yes.
8    Q. Okay. Did you prosecute drug crimes in
9 your 14 years at the Wyandotte County District
10 Attorney's Office?
11    A. Hardly ever. There might be a homicide
12 or a child abuse case or sex crimes or robbery or
13 something that had drug implications involved,
14 maybe it was related somehow to drugs. But I did
15 very few actual like true drug prosecutions.
16    Q. All right. Your understanding, based on
17 your communications with the detectives in this
18 case, was that they had used the closest
19 available photograph of Lamonte McIntyre in time
20 to the crime, correct?
21       MR. GIST: Object to form.
22    A. I don't know if I knew any sort of -- I
23 don't recall any back story to the photo, his
24 photo. There may have been an indication either
25 in an investigative report or on the picture

67 (Pages 262 - 265)

Page 266

1 itself, but I don't independently remember that.
2    Q.   But your understanding was that the
3 photographs shown to the witnesses in this case
4 were properly compiled according to KCK PD
5 procedure, correct?
6        MR. COOPER:  Object to form.
7    A.   I'm not aware of any protocol or
8 procedure that was in place. I don't think that
9 was any -- I might have known, but as I sit here
10 I don't recall ever knowing that there were
11 protocols or procedures. I know legally what,
12 like in a photo array, you know, generally the
13 arguments that are going to be made to challenge
14 a photo array. But aside from that, I don't know
15 that I would have had any specific information
16 about Lamonte McIntyre's picture.
17    Q.   (By Ms. Freudenberger) In other words,
18 your understanding was that there was nothing
19 irregular about the array that Detective
20 Krstolich assembled in this case, correct?
21        MS. EVERS GUERRA:  Object to form.
22        MR. COOPER:  Join.
23    A.   All I know is there was a photo array
24 and it was reviewed by decision-makers in my
25 office and there was never any challenge to the

Page 267

1 array legally, that I'm aware of. So that's the
2 extent of the sum and substance of the photo
3 array that was used in this case.
4    Q.   (By Ms. Freudenberger) Okay. Who were
5 the decision-makers in your office you are
6 referring to? Who would have reviewed the photo
7 array?
8    A.   I would assume that whoever filed the
9 charges in juvenile court and in the adult court,
10 along with the criminal chief and potentially the
11 DA, or the chief deputy and the DA. But they
12 were the decision-makers. I don't know who
13 looked at that or reviewed the materials, but
14 they would be the ones who would preliminarily
15 look at that. When I got the case, it had
16 already gone through a number of hands. I was
17 unaware of anything. I think the word you used
18 was irregular. I look at it from a legal
19 standpoint of whether there was anything legal to
20 challenge the array on. So that's all I was
21 really familiar with as far as questioning the
22 lineup.
23    Q.   And so you are assuming that the array
24 was reviewed by decision-makers in your office
25 but you don't have personal knowledge of that,

Page 268

1 correct?
2    A.   Well, this police file --
3    Q.   Does not include any report on the array
4 itself, right?
5    A.   It doesn't provide any report? No. But
6 it may have had the photos that were utilized. I
7 know I saw the photos -- this is stapled. I
8 don't know how it got stapled or anything. But
9 there would have been the photo array that was
10 part of the investigation. I would have
11 expected --
12    Q.   Does it change your assumption about the
13 process the array was reviewed pursuant to know
14 that it was not actually a photo array, it was a
15 stack of loose photographs?
16    A.   Right, I was aware of that, it was loose
17 photos. But there still would have been
18 photocopies of what that array looked like or
19 what they consisted of, and that's what I was
20 referring to.
21    Q.   I see. So you when you looked at the
22 photo array it was actually -- I have seen this
23 in the file -- it was actually a color photocopy
24 of each, the front of each of the Polaroids
25 arranged in an array form, is that correct?

Page 269

1    A.   That's what I recall.
2    Q.   And that's what would have been reviewed
3 by the decision-makers in your office in
4 determining whether the array was legal?
5    A.   If it was included. I just don't know
6 what was included.
7    Q.   Okay. You endorsed a witness named
8 Monty Woodbury. Do you recall that?
9    A.   No.
10    Q.   Who was Monty Woodbury?
11    A.   I don't know. I would have to review.
12    Q.   You don't recall him --
13    A.   I would have to review my --
14    Q.   -- being endorsed?
15    A.   I would have to review any notes that I
16 had in the file.
17    Q.   All right. When you met with Detective
18 Krstolich between -- withdrawn.
19        You said you met with Detective
20 Krstolich sometime between getting assigned to
21 the case and calling him to testify at trial?
22    A.   Yes, I would have. I believe I would
23 have. And again, that would have been my normal
24 practice.
25    Q.   Okay. And you discussed his

68 (Pages 266 - 269)

Page 274

1   Q.   And if he had done anything like that,
2   you would have documented it and disclosed it to
3   the defense, and you did not, correct?
4       A.   What I knew is what I knew from these
5   reports, so that's the extent of what I knew.
6       Q.   Well, no reports.  I'm asking you had
7   Detective Krstolich described any suggestion in
8   connection with Identicate, you would have
9   documented that and disclosed it to
10  Mr. McIntyre's defense lawyer, pursuant to your
11  Brady obligations, right?
12      A.   Any exculpatory information I would have
13  disclosed, so I wasn't --
14      Q.   So the answer is yes?
15      A.   I had no knowledge about any sort of
16  exculpatory information related to this
17  identification process.
18      Q.   Okay.  And then if you look at page 282,
19  the last line of page 282.
20      A.   Okay.
21      Q.   And then read to line 4 on the next
22  page.
23      A.   Okay.
24      Q.   Your understanding, based on your
25  conversations with Detective Krstolich at the

Page 275

1   time you asked these questions, this question at
2   trial, Detective Krstolich had not used any
3   suggestion during the photo ID procedure with
4   Ruby Mitchell, correct?
5       A.   Yes.
6       Q.   And the same would be true of Detective
7   Golubski, correct?
8       A.   About Ruby Mitchell?
9       Q.   Yes.  Your understanding, based on your
10  conversations with Detective Krstolich, was that
11  Detective Golubski had not used any suggestion
12  with Ruby Mitchell, correct?
13      A.   I don't remember anything about
14  Detective Golubski, that coming up in any
15  conversation.  But I may have said did you or any
16  other officers or law enforcement, that might be
17  something I asked.  I don't independently recall.
18      Q.   In other words, your understanding,
19  based on your conversations with Detective
20  Krstolich, was that no law enforcement officer
21  had used any suggestion in connection with the
22  photo ID procedures with Ruby Mitchell, correct?
23      A.   That would be correct.
24      Q.   Did you ever receive information, prior
25  to the trial in this case, from any source at

Page 276

1   all, indicating that Detective Golubski had had
2   sexual contact with any of the witnesses in his
3   cases?
4       A.   No.
5       Q.   Had you learned, prior to trial in this
6   case, that Detective Golubski had had sexual
7   contact with any of the witnesses in this case,
8   in his case, any of his cases, would that have
9   been information you would have documented and
10  disclosed to Mr. Long in this case?
11      A.   That's a compound question.  Can you
12  break that down?
13      Q.   It is.  Sure.  Hypothetically had you
14  learned prior to the trial in this case that
15  Detective Golubski had had sexual contact with a
16  female witness in one of his cases, would you
17  have documented and disclosed that fact to
18  Mr. Long?
19      A.   Yes.
20      Q.   And your understanding, based on your
21  experience as a prosecutor in Wyandotte County,
22  is that that is information Mr. Long could have
23  used to impeach or attempt to impeach Detective
24  Golubski at trial, correct?
25      A.   I guess potentially, not knowing the

Page 277

1   parameters that you are talking about.  But, at
2   the very least I think it would have impugned the
3   prosecution, I guess.  But I didn't say that very
4   well.
5       Q.   It is information that defense could
6   have used to attack the integrity of the police
7   investigation in the case, correct?
8       A.   Potentially if that was an issue -- I'm
9   trying to remember legally.  I know at least, and
10  again I'm not testifying about federal court, but
11  I know there is federal rules and there are state
12  rules.  I don't remember under state court rules
13  about the ability to impeach someone on
14  extraneous facts.  I know there are such in
15  federal court.  So, it potentially could have
16  been used, I would just say that.
17      Q.   Okay.  You never learned anything about
18  Detective Golubski making sexually suggestive
19  comments to any of the witnesses in this case,
20  correct?
21      A.   Never.
22      Q.   Had you learned something like that, you
23  would have documented and disclosed that to
24  Mr. Long, correct?
25          MR. COOPER:  Object to form.

70 (Pages 274 - 277)