Tarik Khatib
1047 E 251st Diagonal Road
Lawrence, Kansas 66047
785-423-4674
Tarikkhatib1@gmail.com

Elizabeth A. Evers Guerra
Sanders Warren Russell & Scheer LLP
11225 College Boulevard, Suite 450
Overland Park, Kansas 66210

Re: *McIntyre et all. v Unified Government of Wyandotte County and Kansas City, Kansas et al.,*
No. 2:18-cv-o2545-KHV-KGG

Dear Ms. Guerra,

At your request, I have reviewed materials regarding the Kansas City, Kansas Police Department (KCKPD) investigation of the April 15, 1994, double homicide of Doniel Quinn and Donald Ewing.  It should be noted, and to the extent possible, the primary focus of my review and subsequent opinions are as they relate to the specific defendants represented by your firm: Daphne R. Halderman, as Special Administrator of the estate of Michael Krstolich, deceased; Detective Dennis Ware; Officer James L. Brown; Daphne R. Halderman, as Special Administrator of the estate Lieutenant Dennis Otto Barber, deceased; Detective Clyde Blood; Detective W.K. Smith; Daphne R. Halderman, as Special Administrator of the estate Lieutenant Steve Culp, deceased.

My understanding is that discovery is still ongoing in this matter.  Additional information may affect the opinions expressed and can be addressed through supplemental reports to this document or discussed during any subsequent testimony I may provide.

**Qualifications and Experience**

I have 25 years of law enforcement experience gained while working at the Lawrence, Kansas, Police Department.  During my career, I served in a variety of capacities providing me with a broad base of knowledge regarding police operations, policies, and culture.   These include serving as patrol officer, drug unit investigator, field training officer, training unit officer, patrol supervisor, drug unit supervisor, detective supervisor, patrol commander, administrative services commander, and chief of police.  I also functioned as a department instructor for topics such as leadership, investigations, drug unit operations, informants, and intelligence gathering.  I currently serve as the Law Enforcement Leadership Academy (LELA) Program Director where I teach and facilitate leadership development in addition to my managerial role.  I have a bachelor's degree from the University of Kansas, and I am a graduate

of the Federal Bureau of Investigation National Academy.  My attached (Attachment A) Curriculum Vitae provides additional information regarding my experience and qualifications.

**Materials Reviewed**

1. KCKPD Investigative Report for the Quinn-Ewing Double Homicide
2. Transcripts of June 28, 1994, Preliminary/Waiver Hearing for Lamonte McIntyre
3. Transcripts of September 26-29, 1994, Criminal Trial of Lamonte McIntyre
4. Transcript of November 18, 1994, Motion for a New Trial
5. Transcript of April 4, 1996, Hearing on Motion for a New Trial
6. Transcripts of October 12-13, 2017, Evidentiary Hearing
7. Attorney Digest of Police Investigation
8. Attorney Digest of Evidentiary Hearing
9. Attorney Digest of Preliminary Hearing
10. Attorney Digest of Lamonte McIntyre Trial
11. Transcript of Deposition of Clyde Blood
12. Transcript of Deposition of Dennis Ware
13. Transcript of Deposition of James Brown
14. Transcript of Deposition of Lamonte McIntyre
15. Transcript of Deposition of Michael Kobe
16. Transcript of Deposition of Ophilia Williams
17. Transcript of Deposition of Ricky Armstrong
18. Transcript of Deposition of Roger Golubski, Vols. I and II
19. Transcript of Deposition of Rose McIntyre
20. Transcript of Deposition of Ruby Mitchell
21. Transcript of Deposition of Shanaya Kane
22. Transcript of Deposition of Terra Morehead
23. Transcript of Deposition of William K. Smith
24. Transcript of Deposition of Russell Fischer
25. Transcript of Deposition of Ronald Miller in Max Seifert v. UGWC
26. Transcript of Deposition of Michael York in Max Seifert v. UGWC
27. Transcript of Deposition of Ricky Armstrong in Max Seifert v. UGWC
28. Affidavit of Timothy Maskil (September 23, 2015)
29. Affidavit of Randy Eskina (June 2, 2016)
30. Affidavit of Ruby Ellington (May 14, 2015)
31. Affidavit of Ruby Mitchell (June 13, 2011)
32. Affidavit of Siobaughn Nichols (August 12, 2014)
33. Affidavit of Shonda Nichols (August 4, 2014)
34. Affidavit of Saundra Newsom (February 14, 2011)
35. Affidavit of Tamika Burks (October 15, 2014)
36. Affidavit of Stacy Quinn (March 27, 1996)
37. Affidavit of Niko Quinn (April 2, 1996)
38. Affidavit of Niko Quinn (June 30, 2014)
39. Affidavit of Tonette Anderson (February 20, 2012)

2

40. Affidavit of Kendra Dean Martin (July 30, 2015)
41. Affidavit of Kendra Dean Martin (March 4, 2013)
42. Affidavit of Michael Redmon (January 6, 2015)
43. Affidavit of M'Sherie Johnson (May 7. 2016)
44. Affidavit of Deyvonne Love (April 29, 2014)
45. Affidavit of Alan Jennerich (April 8, 2015)
46. Affidavit of Ethel Abbott (December 11, 2013)
47. Affidavit of Freda Quinn (October 21, 2011)
48. Affidavit of Freda Quinn (June 18, 2016)
49. Affidavit of Cecil Brooks (June 22. 2016)
50. Affidavit of James McIntyre (December 11, 2014)
51. Affidavit of Jacquelyn Poole (November 5, 2014)
52. Affidavit of Joe Robinson (February 9, 2011)
53. Affidavit of Natasha Hodge (April 10, 2014)
54. Affidavit of Gregory Hill (September 28, 2011)
55. Affidavit of Nicole French (September 10, 2013
56. Affidavit of Rose McIntyre (December 5, 2014)
57. Affidavit of Rashida Martis (August 30, 2011)
58. Kansas City Star Articles from 1994
59. Various Contemporary Newspaper Articles
60. Marlon Williams New Articles
61. Neil Edgar Jr. Warrant Affidavit
62. Six Videos of Terry Ziegler Posted to Social Media
63. Polaroid Photographs
64. Various KCKPD Training Documents, Polices, and General Orders
65. Roger Golubski Personnel File and Disciplinary Materials
66. Steve Culp Training and Classifications Files
67. Dennis Barber Training and Classifications Files
68. Expert Witness Report by Russell Fischer
69. Transcript of Deposition of Niko Quinn
70. Transcript of Deposition of Neil Edgar Jr.
71. Transcript of Deposition of James McCloskey
72. Transcript of Deposition of Freda Quinn

**Methodology**

The timeline and related information to examine regarding this case spans from before the April 15, 1994, double homicide of Doniel Quinn and Donald Ewing to the present time; a period of more than 27 years.  During this time, police practices, training, leadership approach, culture, and public expectations have changed.  I also understand that the memory of many of the individuals involved have faded and a number are deceased.  To the extent possible, I attempt to look through the lens of the time and available documented and factual material when presenting my opinions.  My understanding of police practice is based on my professional experience serving in many law enforcement roles including at all levels of supervision and

3

command within a police department, and my knowledge and training.   My opinions are therefore based on the facts and materials reviewed as well as on my experience, knowledge, and training.  Pursuant to the requirements of Rule 26 of the Federal Rules of Civil Procedure, I have studied the reports and other material provided to me regarding this case.

**Case Background**

The Friday, April 15, 1994, the double homicide of Doniel Quinn and Donald Ewing took place during an unprecedented time of homicides within Kansas City, Kansas.  According to the news articles provided (Kansas City Star Articles from 1994), Kansas City, Kansas, was on pace by the summer of 1994 to surpass the record number of 59 homicides set in 1992.  By April 1994, 25 homicides had occurred, five within the 72-hour period around the time of the murders of Doniel Quinn and Donald Ewing.  The Star articles also described how this double murder case came on the heels of two other homicides that week: the Wednesday shooting of a man riding in a vehicle, and a Thursday double shooting at an apartment where one person was killed.  The articles also cited increased drug activity as one reason for the increase in violence.  In his deposition, Ricky Armstrong reported that Kansas City, Kansas, was averaging 60 homicides a year in the 1990's (Armstrong Dep., p. 63).  And Detective Randy Eskina, who was a detective in 1995, described how the mid 1990's was a time when Kansas City, Kansas, had a lot of homicides and homicide detectives were very busy with drug related violence (Eskina Aff., ¶ 1, ¶ 8).

According to Clyde Blood, there were four homicide detectives (two teams of two) in 1994 and they rotated being on call for homicides.  And depending on the number of cases, the other team could be called out as well as other detectives (Blood Dep., p. 64-65).  Dennis Ware also recalled there being four homicide detectives in 1994 which was a part of the larger crimes against persons unit comprised of 10 to 15 detectives.  He and Roger Golubski were two of those detectives (Ware Dep., p. 98-99).

The police report details how over 20 members of the KCKPD responded and were involved with the initial investigation.  These include the following investigatory personnel: Lieutenant Steve Culp, Detective Clyde Blood, Detective Roger Golubski, Detective Michael Krstolich, Detective Timothy Maskil, Detective Mike Shomin, Detective W.K. Smith, and Detective Dennis Ware.  According to the police reports, initial investigative steps included:

1. **Cordoning off the crime scene and initiating a crime scene log (4/15/94)**.  KCKPD Officers Wansley, Ambler, and Myers responded to the scene, secured the crime scene, and logged individuals who entered the crime scene.  Officers also noted taking control of two eyewitnesses.

2. **Conducting an initial canvass of the area to identity potential witnesses (4/15/94)**.  Offer Wansley conduced an area canvas and obtained a brief statement from Ruby Mitchell who indicated she saw the shooting and described how the suspect ran west across a lot toward Hiawatha.  Officer Wansley and Sergeant Keith then

searched a vacant building on the northwest corner of Hiawatha and Brown.  While canvassing this area, Officer Wansley contacted another individual, Alvin Finley, who did not witness or hear anything.  Officer Wansley then contacted Breon Shenton at 3025 Hiawatha who reported hearing shots fired.  She also saw a dark blue Chevrolet Caprice occupied by two Black males parked on the west side of Hiawatha across from her residence near an open lot.  Officer Wansley reported he continued to canvass the area around Hiawatha and Brown and did not report any further contacts.

3. **Processing the crime scene and area around the scene (4/15/94)**. Officer Howard and Officer Clair processed the scene assisted by Lieutenant Harrington.  A video and still photographs of the scene were taken and the vehicle was dusted for latent prints.  Detective Maskil searched the area immediately north of the vehicle and located four spent shotgun shell casings. The property report lists several items collected including plastic waddings, shotgun casings, and blood and glass samples. A diagram of the crime scene was prepared.

4. **Traveling to medical centers to collect evidence (4/15/94)**.  Detective Blood and Detective Maskil traveled to Bethany Medical Center where one of the victims was transported.   They identified and spoke with the transporting medical (KARE) technician and obtained some information as what may have caused the victim's wounds.  Detectives also worked to identify the victim.  Detective Blood and Detective Maskil then traveled to the K.U. Medical Center where the second victim had been transported.  They identified and spoke with the transporting medical (KARE) technician for the second victim, spoke with a family member who identified the victim, and in consultation with the Emergency Room doctor, made notations as to the victim's injuries attempting to identify the weapon used.  During their time at the medical centers, Detectives Blood and Maskil identified and spoke with several family members of the victims to gain information.  At the request of Detectives, Officer Vallejo travelled to the Bethany Medical Center and recovered several of the personal effects and clothing of Donald Ewing.  He also noted speaking with the medical transport personnel in his report.

5. **Witness Statement (4/15/94).** Detective W.K. Smith conducted an on-scene audio taped interview of Josephine Quinn.  Josephine Quinn described hearing the shooting, going out to the victims' vehicle, and turning to see the suspect run. Josephine Quinn identified one of the victims as "little Don" and reported he was involved in illegal drug activity.

6. **Witness Statement (4/15/94).** Detective W.K. Smith conducted an on-scene audio taped interview of Niko Quinn.  Niko Quinn described seeing the suspect coming from the direction of Hiawatha, shoot into the victims' vehicle and then leave back toward Hiawatha, the direction he came from.  She reported that she did not recognize the suspect but that if she saw the person again, she would be able to

recognize him.  Niko Quinn describes that the suspect was wearing all black clothing (shirt, hat, pants, and tennis shoes) and the suspect's weapon appeared to be shotgun.

7. **Witness Statement (4/15/94).**  Detective Michael Krstolich conducted an on-scene audio taped interview of Ruby Mitchell.  Ruby Mitchell described seeing the suspect come from the hill across from her house, drop something and then picking it back up, and then "pump" the weapon used in a way to describe a shotgun.  Ruby Mitchell stated the suspect fired four or five times at the victims after appearing to have said something to them.  She described the suspect as a black male, 5'6" tall with a thin build, hair that was not real short, but slicked back down, like an afro but going back, and wearing a black shirt with white writing on the front of it and black pants.  Ruby Mitchell stated the suspect ran back up the hill he came from and that she could recognize the suspect if she saw him again.

8. **Identikit to develop a suspect composite (4/15/94).**  Detective Krstolich asked Ruby Mitchell to come to the KCKPD Detective Bureau for the purpose of building a facial composite of the suspect.  It appears one was developed, and Ruby Mitchell reported that it looked like the face of the suspect as best as she could remember.  While at the police department, Ruby Mitchell stated that she thought she recognized the suspect as a person named "Lamonte", who used to talk to her niece.  Ruby Mitchell stated that she almost called out his name when she saw the suspect run down the hill.  Ruby Mitchell looked through mug books and different pictures of Lamontes were shown to her in a "five-picture interview".  The picture of Lamonte McIntyre was obtained with the assistance of the District Attorney's Office.  From a photo lineup, Ruby Mitchell identified the photograph of Lamonte McIntyre as the suspect who committed the shooting.  When asked if she knew Lamonte's last name, Ruby Mitchell stated it was McIntyre and she knows this because he used to talk to her niece.  Ruby Mitchell stated she was positive Lamonte McIntyre was who did the shooting.

9. **Arrest of Lamonte McIntyre (4/15/94).**  In his initial reports, Detective Golubski summarized the investigation thus far and that Ruby Mitchell had positively identified Lamonte McIntyre as the suspect.  Detective Golubski noted that Detective Maskil also had some information that the suspect's name was "Lamonte".   Numerous KCKPD personnel began looking for Lamonte McIntyre.  Lieutenant Barber, who was assisting as part of the Response Unit, contacted Lamonte McIntyre's grandmother, Maxine Crowder, at Lamonte McIntyre's last known address and asked for her assistance in locating him.  Lieutenant Barber was later dispatched to meet with Rose McIntyre who had Lamonte McIntyre with her and he was taken into custody.  Lieutenant Barber relayed that Rose McIntyre made an unsolicited statement regarding if someone had killed someone, would they be taken in and charged with murder.  Lieutenant Barber also reported that Rose McIntyre stated Lamonte McIntyre was at FiFi's from 11:00 a.m. – 2:45 p.m. on this

day.  Lieutenant Barber reported that Lamonte McIntyre stated he was at his brother's that day.  Lieutenant Barber also stated that there was information that a blue vehicle that Lamonte McIntyre was known to ride in and/or matched that description was a block away from the homicide scene.

10. **Interview of Lamonte McIntyre (4/15/94).**  When interviewed, Lamonte McIntyre stated that he was with his aunt, Yolanda Johnson throughout the day.  He stated he did not leave the residence until he was contacted by his grandmother and mother to meet with officers.  Lamonte McIntyre identified two individuals he was with at the residence: Montray Johnson, and his girlfriend, Tasha.  He stated that while he was at the residence, Montray and Tasha did not leave either.  Lamonte McIntyre stated his brother arrived at the residence at 4:00.   Lamonte McIntyre then stated an unknown male walked by the residence and told Tasha and Montary that Chris Quinn's brother had been shot.  Lamonte McIntrye was transported to the Juvenile Detention Center by Officer James Brown.

The initial steps taken in the investigation of the double homicide of Doniel Quinn and Donald Ewing include many common, accepted, and expected investigatory steps:

- A large contingent of personnel to flood the area to capture as much information and evidence as possible.
- Securing the crime scene.
- Crime scene processing.  I would agree with Plaintiff's forensic expert, Ronald Singer, that the crime scene investigation of the incident was adequate (Transcript of Oct 12-13 Evidentiary Hearing, p. 55).
- Collection of evidence from the crime scene and victims.
- Traversing the path the suspect was last seen taking.
- Canvassing the area for witnesses and evidence.
- Conducting initial witness interviews.
- Assigning personnel to the medical centers where the victims were transported.
- Contacting family members to ascertain information about the victims.
- Medical examinations of the victims to identify method/manner of death and evidence collection.
- Work to identify and locate any suspect(s).

Lamonte McIntyre was arrested at approximately 8:00 p.m., six hours after the crime occurred.  In my experience, this is not unheard of, especially in crimes involving the potential for reprisal or continued violence on the part of the suspect.  If a suspect can be identified, and probable cause exists, consideration could be given to arresting the suspect in the best interest of public safety with the intent to then conduct follow-up to fill in the investigatory picture beyond the initial probable cause[1].   An inference to this desire can be drawn from Lieutenant

---

[1] A witness (Ruby Mitchell) saying that she knows the suspect because she has seen him before and knows who he is.  That is compelling on the face of it.

Barber's statement to Detective Golubski concerning his conversation with Rose McIntyre. Lieutenant Barber told Rose McIntyre that he wanted Lamonte McIntyre to have the opportunity to tell his side of the story and hoped that would off-set any possible retaliatory actions from other family members (Barber Taped Statement., p. 2).  In his deposition Detective Blood states when working homicides, investigators could be in for the long haul if the case is not buttoned down within the first 10 or 12 hours (Blood Dep., p. 94).  And in his deposition, Detective W.K. Smith stated the way detectives would operate is to respond to the scene, take statements from individuals who they thought were witnesses and then later do the investigation as to what was obtained (Smith Dep., p. 94).

**Responsibility for Investigation**

The need for additional investigation after the arrest of a suspect can be associated with the timing of the arrest and other factors.  If circumstances allow and a known suspect is not likely to reoffend, or in-turn be retaliated against, then strategically timing the arrest to occur after the major portions of the investigation are complete is beneficial.  This allows for the gathering of most of the information before the judicial clock begins.  Knowing as much as possible as to what occurred before interviewing potential suspects is also desirable.  When an arrest is made early due to the circumstances as in this case, this places additional importance on the post-arrest investigation to continue to gather information.  From various sources within the record of the double homicide of Doniel Quinn and Donald Ewing investigation, it appears Detective Golubski was assigned the primary responsibility for the investigation:

- In his initial report, Detective Golubski summarizes what others did to inform his actions.  This suggests the case was his (Golubski Investigative Addendum, dated 4/15/1994).
- Detective Blood notes in his report that the case was turned over to Detective W.K. Smith and Detective Golubski for further investigation (Blood Investigative Addendum, dated 4/16/1994).
- The Identikit composite sheet lists Detective Krstolich as the kit operator, but Detective Golubski as the contact person (KCKPD Police File, p. 23).
- Detective Golubski appears to conduct all follow-up in the case.
- Detective Golubski is listed as having prepared the Prosecutive Summary Report (Prosecutive Summary, p. 4).
- At trial, Detective Golubski identified himself as the lead detective on the case (Trial Transcript, p. 295).
- At trial, Detective Krstolich indicated Detective Golubski was the lead detective – the detective of record (p. 290).

In his deposition, Detective Ware stated his opinion would be that Detective W.K. Smith and Detective Golubski were both assigned the case and with equal responsibility and would have worked it among themselves as to how to proceed (Ware. Dep., p. 174-175). Detective Smith does not recall being assigned to the case and does not recall taking any other

investigative steps (Smith Dep., p. 94).  From the record, it appears this was the case as there are no additional investigative steps taken by Smith.

**Non-Homicide Detectives Investigating Homicides**

In the material I examined, there appears to be differing information as to whether a non-homicide detective should have been assigned as the lead investigator in this case:

- In his deposition, Detective Blood stated it was not his experience that a detective from the crimes against persons unit would be assigned as the lead in a homicide investigation (Blood Dep., p. 75).
- Detective Ware stated it is not uncommon for a non-homicide detective to work homicides and even though he was not a homicide detective, he has worked a number of homicide cases over the course of his career (Ware Dep., p. 130).
- Detective Ware stated that is not his understanding that the homicide detective would take the lead when both a homicide detective and a non-homicide detective were assigned to assist (Ware Dep. p 174).
- In his affidavit, Detective Maskil stated he believes the case was assigned to Detective Golubski because of its location and because the homicides occurred in a predominately black area of the city; but the case should have been assigned to one of the four homicide detectives (Maskil Aff. ¶ 7).
- Detective Maskil also stated he believes Detective Golubski could be a decent detective (Maskil Aff. ¶ 11).
- When the murder rate spiked, they became short of regular homicide detectives and pulled in other detectives from other areas including those that handled non-homicide crimes against persons[2] (Eskina Aff., ¶ 8).

The record shows there were many homicides occurring during the time when this double homicide occurred.  In my opinion, it would not be practical or even possible for just two teams of two detectives to work approximately 60 homicide cases a year, yet alone 5 within the 72-hour period of this case.  One would have to utilize the additional detective personnel within the larger crimes again persons unit to be able to handle the workload and that would include assigning them as leads on the cases.

Even though he was the supervisor in charge when he took over the Homicide Unit after being promoted to Lieutenant, Lieutenant Culp had never worked a homicide (Blood Dep., p. 81).  And Detective Ware, who was also never a homicide detective, was sometimes given the responsibility of acting lieutenant in the crimes against persons unit of which the Homicide Unit was a part of (Ware Dep., p. 218). I did not locate any specific reference to department rules or procedures that provided guidance on detective case assignment.  This and the fact that some commanders (Culp and Ware) assigned to supervise the Homicide Unit did not have homicide detective experience suggests that being a homicide detective was not a prerequisite to be in

---

[2] Detective Golubski's assignment at the time.

charge of a homicide investigation.   A reasonable requirement would be for the lead detective assigned to the case be knowledgeable and experienced.

Detective Golubski was assigned to the Bureau of Investigations in 1986 (Roger Golubski Personnel File and Disciplinary Materials LMKSDC – 0022958., p. 2).  He would have had eight years of investigative experience by 1994.  In addition, Detective Golubski's training and travel records (FPSS 28939 – 29017 – Golubski Robert Training – Travel) included:

- 5/15/1987 – a travel request to attend Metro Squad training.  Detective Golubski was listed as one of the detectives to attend.
- 8/16/1989 – a travel request to attend the Metro Squad pistol range shoot. Detective Golubski was listed as one of the requestors.
- 10/5/1989 – a travel request to send detectives to Omaha, Nebraska to investigate a KCK homicide.  Detectives listed as travelling were Mike Shomin and Roger Golubski.
- 11/19/1991 – 11/22/1991 – Detective Golubski attended the Metro Squad Basic Death Investigation school.

From my personal recollection and experience, the Kansas City area Metro Squad was a prestigious multi-jurisdictional investigative group that worked on major cases including homicides.  Detective Golubski's participation in Metro Squad events and training suggests he was a member of the group and the KCKPD believed he was a capable detective as he was representing the KCKPD on regional major cases.  And as early as 1989, Detective Golubski was investigating homicides.

Detective Blood, who was a homicide detective, identified in-service training, experience from older officers, and homicide training he received from the Metro Squad as sources of his knowledge (Blood Dep., p. 70-71).   He had already worked numerous homicides before he went into the homicide unit and had been assigned to the Metro Squad (Blood Dep., p. 158-159).  When asked whether he had received formal training on interviewing witnesses, Detective Ware stated that he had not received formal training, but on-the-job training.  He did not know if it had to do with interviewing (Ware Dep., p. 248).  Detective Blood's and Detective Ware's training experiences were not unlike that of Detective Golubski's.

In my opinion, legitimate reasons to assign Detective Golubski as the lead on the case include:
- He was an experienced detective, has worked on homicides in the past, and appeared to have similar training as other homicide detectives.
- The case load required other detectives to take the lead on cases.
- Detective Golubski was familiar with the area in which the homicides took place, and this may have been an investigative advantage.

**Case Management and Supervision**

Case management and supervision during investigations can be structured in several ways.  One structure is where detectives act as the "eyes and ears" of the supervisor who becomes the central case manager giving direction and assigning leads as detectives gather and report information.   The supervisor would be aware of the case details which would then guide further direction.  Another structure is one in which a detective is assigned the lead on a case.  Case management and decisions as to how to investigate are up to the detective and the supervisor may be generally apprised of developments and would also provide requested resources.  Based on the information in the record, it appears the latter supervisory structure was utilized.  Lieutenant Culp's primary role was to make the initial assignments and then function as support for resource requests from the detectives working the case.

In my opinion, Lieutenant Culp would have likely been involved in the initial response and push to gather resources and make assignments and then he would have moved on to the next case to do the same thing as there were many homicide cases being worked around the time of the double homicide of Doniel Quinn and Donald Ewing.  There would have to be a reliance on detectives to manage the cases and the supervisor would function as a conduit for additional resource requests, something someone of command rank would have to authorize.  When help was needed on a homicide, the detectives could call their supervisor and they would receive it (Blood Dep., p. 65, and p. 70).

As previously noted, when Lieutenant Culp took over the Homicide Unit, he had never worked a homicide.  He was in charge of the unit but relied on the detectives to help him get through the job (Blood Dep., p. 81).  This created a situation where the detectives were likely more experienced and knowledgeable regarding homicide investigative procedures than Lieutenant Culp and he relied on them to keep him informed as opposed to his inquiring as to what was going on with a case.  Detective Blood stated he believed that Lieutenant Culp's practice was to keep up with the investigative steps of the detectives to the extent he was aware of them, and that it would be up to Lieutenant Culp to know what was going on and he could get that information if he wanted it (Blood Dep., p. 135-136).  As a supervisor himself, Detective Ware agreed that it would have been Lieutenant Culp's obligation in 1994 to make sure the detectives working for him were taking all appropriate and investigative steps to the extent possible (Ware Dep., p. 124).  Even though that might be the theoretical expectation, the reality appears to have been different:

- According to Detective Ware, Lieutenant Culp's supervisory style was to let detectives do their jobs and he did not recall a time when Lieutenant Culp came to him to do something differently during an investigation he was handling or asked him questions about the case (Ware Dep., p. 123).
- Detective Blood stated Lieutenant Culp left the detectives up to their own judgement on the cases because he had never worked a homicide until he took over the unit.  And if the detectives decided to stay at work longer when things quieted

11

down, Lieutenant Culp might go back home.  Detectives would call him back if they needed him (Blood Dep., p. 100).

- Detective Blood stated Lieutenant Culp never provided direction to detectives as to what to do or not.  Lieutenant Culp told detectives to just follow their leads and do what they thought was right.  Lieutenant Culp left it up to the detectives' experience as to whether they wanted to continue investigating after they made an arrest (Blood Dep., p. 100-101).
- Detective Blood stated he had no recollection of any rules relating to continuing the investigation after an arrest and Lieutenant Culp left it up to the discretion, experience, and knowledge of detectives because he had not worked homicides (Blood Dep., p. 104).
- Detective Blood stated that no one ever pressured him to solve a homicide or told him what to do or not to do.  He worked the homicides to the best of his ability to figure out what happened and had the freedom and resources to investigate homicides as he saw fit.  And Detective Blood agreed that Lieutenant Culp largely left detectives alone to their own discretion (Blood Dep., p. 200).
- Detective Blood stated that he and Detective Maskil operated on their own and would brief their supervisor.  No one rode in the backseat or told them what to do (Blood Dep., p. 204).
- According to Detective Maskil, detectives investigating homicides were typically free to be out in the community all day, with little supervision (Maskil Aff. ¶ 8).

Lieutenant Culp was promoted to detective in 1988 and spent one year in the Bureau of Investigations.  He was later transferred to the Internal Affairs Unit in 1989.  In 1991, he was promoted to Lieutenant and assigned to the Bureau of Investigations (FPSS 95225 – 5 Steven Culp Personnel File, p. 1).   Not accounting for what would be provided during regular departmental in-service training, it does not appear that Lieutenant Culp attended training specific to homicide investigations until after the double homicide of Doniel Quinn and Donald Ewing (FPSS 95225 – 5 Steven Culp Personnel File, p. 251, p. 255):

- Sexually Oriented and Violent Death Investigation Seminar: May 9, 1994
- Practical Homicide Investigation: July 7 – 9, 1997
- Practical Kinesic Interview and Interrogation: September 22 – 24, 1997

Lieutenant Culp had experience as a detective (mostly in Internal Affairs) and as the supervisor of the crimes against persons unit.  The statements of the detectives who worked for him show that he had a hands-off management style.  This likely was partly due to his inexperience with homicide cases as previously noted and, in my opinion, driven by the necessity of the workload environment he was operating in.  Even though he ensured detectives received the resources they needed to work their cases, it is conceivable that Lieutenant Culp himself did not have the time to stay informed to any level of investigative detail.  From the police reports, it appears Lieutenant Culp signed them.

Detective Ware, who held a similar role as Lieutenant Culp supervising (in an acting capacity) detectives described that his signature on the report would attest to what is included in the report, the quality of writing, and not necessarily to the entire case or all the investigative steps; just things spoken of on the pages he was signing (Ware Dep., p. 217 - 219).  This is not an uncommon supervisory approach.

In my experience, there are many times when police supervisors sign reports they may not have fully examined in the context of the greater investigation.  The importance of the investigation, the experience level of the investigator, trust in the investigators' capabilities, and supervisory time commitments are some of the variables involved.  Often, a signature is simply a required method to formally move a report into the department records management system thereby making it an official document to facilitate dissemination.  Absent the knowledge something was amiss or deficient, I do not believe the fact that Lieutenant Culp signed the police reports necessarily means that he approved of or even knew about all the facets of the investigation.

Given the large scope of personnel and cases Lieutenant Culp was responsible for, it is my opinion that he would have had to rely on the assigned lead detective to function as the case manager responsible for almost all aspects and to let him know if resources were needed.  Lieutenant Culp relied on the experience of the detectives, and it appears that detectives were given wide latitude to make investigative decisions.

**Follow-up Conducted**

According to the police reports, the follow-up was conducted almost entirely by Detective Golubski included:

1. **Canvassing for Suspect Vehicle (4/16/94).** Detective Golubski attempted to locate a suspect vehicle in the area of 1515 Wood that had been described as driven by Lamonte and James McIntyre.  A vehicle was located.  Detective Golubski noted the vehicle registration and took photographs of it and to show to witnesses and during neighborhood canvasses.

2. **Recanvassing the area of Hiawatha (4/16/94).**  Accompanied by Detective Ware, Detective Golubski recontacted Breon Shelton who had previously reported seeing a possible suspect vehicle.  She stated the vehicle at 1515 Woof photographed by Detective Golubski was the wrong one (did not have Daytons), but it was the same color as the one she saw.  She described the vehicle she observed as a blue Chevy Caprice Classic, 4-door, with dark tinted windows, and Kansas tags.  Breon Shelton described how one suspect stayed in the vehicle while the other exited it with what appeared to be a shotgun.  Breon Shelton was not able to identify anyone from the photographs she was shown.

3. **Follow-up interview of Josephine Quinn (4/16/94).** Accompanied by Detective Ware, Detective Golubski recontacted Josephine Quinn to show her a photo lineup as she had previously reported to Detective W.K. Smith that she had seen the suspect run up the hill.  Josephine Quinn stated she did not get a good look at the suspect.  She was not able to make an identification from the five photographs presented to her.  Josephine Quinn identified her brother, John Quinn, as being present during the time of the shooting.  She also reported that Stacy Quinn,[3] knew who the suspect was, however who that may be was not identified.   Detective Golubski reported that Stacy Quinn was not available on this date and that he asked Josephine Quinn to contact her daughter to convey the message to contact the police.  Detective Golubski noted his belief that John Quinn and Stacy Quinn may be able to identify the photo of the suspect.

4. **Follow-up interview of Niko Quinn (4/16/94).**  Accompanied by Detective Ware, Detective Golubski recontacted Niko Quinn to show her a photo lineup as she had previously reported to Detective W.K. Smith that even though she did not recognize the suspect, she would be able to recognize him if she saw him again.  Niko Quinn does not make a positive identification, but Detective Golubski notes in his report that she would not let go of photograph number three[4] and he suspects that Niko recognized the pictured individual as the suspect.

5. **Interview of John Quinn (4/19/94).**  Detective Golubski conducted a taped interview of John Quinn, who is the father of one of the victims, Doniel Quinn, and the cousin of the other victim, Donald Ewing.   John Quinn had been previously identified by Josephine Quinn as someone who was present the day of the shooting.  John Quinn describes being in a vehicle which drove past the one the victims were sitting in right before the shooting.  John Quinn stated he was with his brother and another man as they drove past.   John Quinn heard the shots when they got to the corner of the street, but he did not observe the shooting or the suspect.  John Quinn stated he made his way back the victims' vehicle and he was the one who broke the window out trying to get to his son.  John Quinn stated Doniel Quinn had not indicated to him that he was having any problems with anyone, but he sensed something was not right weeks ago due to the way he was acting and the people he was associating with.  John Quinn described the people Doniel Quinn was associating with were the wrong type of people for him to around.  He described them as the worst kind; a "cobra snake" with a bite that would be instant death.  Doniel Quinn stated the individuals Doniel Quinn were associating with were drug dealers, but he does not know who they were other than they are young.

---

[3] Detective Golubski wrote this information had been provided to Detective W.K. Smith in her previous statement to him, but this was not noted in the statement she made to Detective W.K. Smith.
[4] My understanding is this is the photograph of Lamonte McIntyre.

6. **Interview of Yolanda Johnson (4/20/94).**  Detective Golubski conducted a taped interview of Yolanda Johnson[5].  Yolanda Johnson identified three other individuals that reside with her: Rashita Johnson, M'Sherie Johnson, and Montray Johnson. Yolanda Johnson reported that prior to 2:15 p.m. on the day of the shooting, the individuals at her residence were: Sherie Johnson, Montray Johnson, Rashita Johnson, and Tasha Haywood.   Yolanda Johnson stated that Lamonte McIntyre arrived at her residence at 2:15 p.m. and asked to use the phone to call a United Cab for his cousin, Michael.  She described Lamonte McIntyre as wearing a black faded shirt, a blue Michigan hat, and bronze/gold-colored pants when he arrived.  Yolanda Johnson stated that Lamonte McIntyre told her he had been at his Aunt Peggy Williams' house prior to coming over to her house.  Yolanda Johnson stated Lamonte McIntyre then left after calling for the cab.  She stated he returned and called for another United Cab and that at approximately 2:20 p.m., Lamonte McIntyre never left her house again until his mother arrived.   Yolanda Johnson stated when Rose McIntyre later came over, she stated that Lamonte McIntyre needed to talk to the police.  She stated there wasn't any conversation about why, including whether this was in reference to a shooting or double homicide.  Yolanda Johnson stated she has never seen Lamonte McIntyre with a gun, nor does she know him to sell drugs.  Yolanda Johnson denies that her house is being used to sell drugs[6].  She stated that James McIntyre came over to her house at 4:00 p.m. after he left work.  Yolanda Johnson stated she has never seen Lamonte McIntyre or anyone else with a blue vehicle.  Yolanda Johnson stated she does not know a young man by the name of Behyjrums Holmes. Yolanda Johnson stated that she has not seen a blue vehicle with a brown/beige top, sunroof, and Dayton's on it in front of her residence.   She stated that Lamonte McIntyre has never mentioned the names of the victims and she does not know if he knows them or not.  Yolanda Johnson stated she believes Lamonte McIntyre is innocent.

7. **Interview of Natasha Haywood (4/20/94).** Detective Golubski conducted a taped interview of Natasha Haywood[7], the girlfriend of Montray Johnson.  Natasha Haywood reported that she was at Yolanda Johnson's house all day the day of the shooting.   She identified M'Sherie Johnson, Rashita Johnson, Yolanda Johnson and Montray Johnson as individuals who were at the residence in the morning.  Natasha Haywood stated Lamonte McIntyre stopped by the residence and left sometime in the morning for 10 or 15 minutes and then arrived back at the residence around 2 – 2:15 p.m. She stated he came over from his uncle's house where he told her he had spent the previous night.  Natasha Haywood stated that when Lamonte McIntyre came over, he used the phone to call a cab for his uncle and then went back to his

---

[5] In his interview, Lamonte McIntyre had identified Yolanda Johnson as his aunt and the person's house he had been at throughout the day of the shooting.

[6] Detective Golubski represented to Yolanda Johnson that several people were recently arrested at her house for selling drugs.

[7] In his interview, Lamonte McIntyre identified "Tasha" as a person at the house he had been at throughout the day of the shooting.

uncle's.  According to Natasha Haywood, Lamonte McIntyre returned after approximately 10 minutes to call another cab.  Natasha Haywood stated that Lamonte McIntyre stayed at Yolanda Johnson's residence until he left with his brother after he got off work.  She stated this was at approximately 3:30 p.m. when James McIntyre arrived at the house.  Natasha Haywood stated that Lamonte and James McIntyre walked to their uncle's house.  Natasha Haywood recalled an unknown individual walking down the street and talking about a shooting.  She reported that she has never seen Lamonte or James McIntyre with a gun or associate with gang members.  Natasha Haywood stated that she has not seen Lamonte or James McIntyre with anyone who sold narcotics and they have never mentioned the names of the victims.   Natasha Haywood stated that Lamonte McIntyre had not mentioned to her that he was having problems with anyone recently.  She stated Lamonte McIntyre was wearing a blue, yellow, and white Michigan hat, a black faded t-shirt, and brown/rust-colored jeans and that he still had the same clothes on that he did in the morning.  Natasha Hawood stated that she does not know an individual by the name of Behyjrums Holmes but has seen him in a blue car with rims at Yolanda Johnson's house before.

8. **Interview of M'Sherie Johnson (4/20/1994).** Detective Golubski conducted a taped interview of M'Sherie Johnson[8].  M'Sherie Johnson stated that the first time she saw Lamonte McIntyre on the day of the shooting was at 12:00 p.m. at Peggy's (Williams) house.   She stated he was with a girl named Felicia.  M'Sherie Johnson stated she didn't stay long and the next time she saw Lamonte McIntyre was when he came over to her residence at 2 – 2:10 p.m. to use the telephone to call a cab for someone named Mike at Peggy's house.  M'Sherie Johnson stated Lamonte McIntyre left and then came back about five minutes later to use the phone again to call another cab. After that Lamonte went back over to tell them the cab was coming and then he returned to her residence where he stayed from 2:30 p.m. onwards.  M'Sherie Johnson stated that James McIntyre was also at her residence around 2:30 p.m. even though he does not normally get off work until 3 – 3:30 p.m.   M'Sherie Johnson stated Lamonte McIntyre was wearing a blue, white, and yellow Michigan hat, black shirt, and black/gray shoes.  M'Sherie Johnson stated Lamonte McIntyre does not change his clothes very often.  M'Sherie Johnson stated that when Rose McIntyre came over to over to pick up Lamonte McIntyre, there wasn't any specific discussion as to why the police were looking for him.  M'Sherie Johnson stated she has never seen Lamonte McIntyre with a gun, known him to associate with gang members, or deal drugs.  M'Sherie Johnson stated she was aware of the incident at her mother's house recently where Lamonte McIntyre was arrested for drugs and that "D.J." was arrested as well, but not for drugs.  M'Sherie Johnson stated that she has never heard Lamonte or James McIntyre mention the names of the victims and she does not know anyone that drives a blue vehicle with tinted windows.

---

[8] Identified as a person present at Yolanda Johnson's residence.

9. **Interview of Keva Garcia (9/21/94).** Detective Golubski conducted a taped interview of Keva Garcia[9]. Keva Garcia stated that Ruby Mitchell is her aunt. Keva Garcia stated that in April 1994, she was seeing or talking to an individual by the first name of Lamonte. She described him as kind of tall, dark complected, with long hair that was in braids. Keva Garcia stated he had big lips and a big nose. Keva Garcia stated she knew Lamonte for two to three weeks and that he lived somewhere in the neighborhood. She stated that she did not know Lamonte's last name and has not seen him since April. Keva Garcia stated that the night of the homicide, Lamonte came over to her aunt's house across the street from where the shooting occurred. She stated Ruby Mitchell told him she told the police that someone that looked like him shot the victims. Keva Garcia stated Lamonte stated he did not do it. Detective Golubski showed Keva Garcia a photograph[10]. She stated that the person looks a little bit like the Lamonte she knew, but that was not him. She stated there are facial similarities such as the lips, nose, and eyes. Differences include a longer neck, bigger ears, and a darker complexion. Keva Garcia stated she has never met the person in the photograph but agrees from a distance the person could be mistaken for the Lamonte she knows. Keva Garcia stated that there is a definite difference in her mind between the picture and the Lamonte she knew.

As previously discussed, due to the arrest of Lamonte McIntyre occurring relatively early in the investigation, the importance of conducting continued post-arrest investigation becomes more important. The record shows detectives are given latitude and discretion to investigate their cases as they see fit. As the lead detective on this case, Detective Golubski conducted follow-up that has components of what would be expected in an investigation:

- Attempted to identify and locate a suspect vehicle.
- Re-canvassed the area where the crime occurred.
- Re-interviewed previously identified witnesses to obtain additional information.
- Further interviewed family members of the victims.
- Attempted to identify associates of the suspect.
- Tried to ascertain a motive for the double homicide.
- Conducted photo line-ups.
- Interviewed potential alibi witnesses.
- Identified additional individuals to interview.

Some of Detective Golubski's line of questioning appeared to attempt to explore a drug related component to the murders and whether Lamonte McIntyre was involved in drug dealing. Detective Golubski referenced an arrest of Lamonte McIntyre not long before the homicides when interviewing M'Sherie Johnson. She recalled an incident where Lamonte McIntyre was arrested for drugs at Yolanda Johnson's house. An individual referred to as

---

[9] Identified by Ruby Mitchell as her niece who used to see the person she knew as Lamonte McIntyre.
[10] Presumably of Lamonte McIntyre.

"D.J."[11] was also arrested, but not for drugs according to M'Sherie Johnson (M'Sherie Johnson statement, p 6). Lamonte McIntyre was arrested in February 1994 with cocaine he was intending to sell (L. McIntyre Dep., p. 123-124). In his deposition, Lamonte McIntyre stated that he sold drugs as often as he could to make money and that he got the drugs from his cousin, D.J., who he worked for (L. McIntyre Dep., p 123-124, p. 126-127). Lamonte McIntyre was also arrested in 1992 for a robbery along with Terence Brown and his brother, James McIntyre (L. McIntyre Dep., p 110). Detective Golubski would most likely be aware of Lamonte McIntyre's criminal history if he were being investigated as a suspect.

When Detective Golubski interviewed Yolanda Johnson, he asked her if she knew about anyone selling drugs from her house, whether she knew a person by the name of Behyrums Holmes or was familiar with a blue vehicle he was associated with (Y. Johnson statement, p. 5-7). Detective Golubski also asked Natasha Haywood about Behyjrums Holmes and the blue vehicle he drives (with rims) being at Yolanda Johnson's residence at one time, or who he may be friends with (Haywood Statement, p. 9). It is possible that one of Detective Golubski's investigative inquiries sought to determine if illegal drug dealing was occurring from the area of Yolanda Johnson's residence and who Lamonte McIntyre was associated with.

Lamonte McIntyre's alibi witnesses appear to agree that he arrived at Yolanda Johnson's residence sometime between 2 – 2:15 p.m. The reported time of occurrence of the double homicide was listed as 2:00 p.m. In my opinion, the alibi statements themselves don't rule out Lamonte McIntyre as a suspect. And Lamonte McIntyre had provided several different stories at this point:

- He was with his brother, James, that day[12].
- He had not left the house when he was at Yolanda Johnsons.
- He told Officer Brown he was at FiFi's the day of the homicides.

**Additional Follow-up Needed**

The investigation of the double homicide of Doniel Quinn and Donald Ewing which took place on the day of the incident and the subsequent follow-up had components I would expect to be included in a competent homicide investigation. However, the investigation could have included the following additional steps:

- Collection of Lamonte McIntyre's clothing.
- Additional forensic testing. Although DNA technology was not as robust in 1994, an attempt to process the shotgun shells collected could have been attempted[13].

---

[11] Presumably this is Donald Johnson, Lamonte McIntyre's cousin.

[12] James was present at Yolanda Johnson's, but the time was after the homicides. This should have been clarified.

[13] On items, the decision would have to be made as to what could be more fruitful as processing items such as shotgun shells for fingerprints using technology such as a "superglue" fume tank could destroy the DNA.

- The record does not show if any items were submitted to the Kansas Bureau of Investigation (KBI) or other crime lab[14].
- Application for search warrants for any place where it could be articulated there would be evidence, however it is unclear from the record if it were known where Lamonte McIntyre was living.
- Continued attempts to locate the suspect vehicle[15].
- Making inquiries at the cab company to corroborate witness statements.
- Making inquiries at FiFi's to determine if Lamonte McIntyre was present the day of the homicides.
- Locating Stacy Quinn who reportedly knew who the suspect was[16].

There were several detectives initially involved in the case.  Even though the detectives were of equal rank, and some were sergeants [17] such as Detective Blood, he had no supervisory responsibilities of the homicide unit.  Lieutenant Culp was the supervisor (Blood Dep., p. 48). Based on the supervisory structure and work environment previously discussed, it would have been the responsibility of the lead case detective to ensure that further investigative steps were completed.   Homicides were a priority and if detectives needed extra help, they could ask for it and get it (Blood Dep., p. 69).  This assumes the detectives ask for the additional help. And Detective Golubski was described as a "loner" by Blood (Blood Dep., p. 43) and Maskil (Maskil Aff. ¶ 11).

In his deposition, Detective Blood stated he does not recall any written order or procedure that specified how detectives were to follow up on leads in 1994 (Blood Dep., p. 97). And he cannot recollect a policy that says to keep going or stop investigating and following leads, but personally he would feel obligated.  Detective Blood also does not remember written or verbal rules (Blood Dep., p. 99-100).  In his deposition, Detective Ware agreed that additional investigative steps should have included finding the getaway driver and questioning Lamonte McIntyre as to the identity of that person, unless he invoked, and finding Stacy Quinn (Ware Dep., p. 199-200).  Detective Golubski focuses on Lamonte McIntrye due to:

- What would appear to be a strong identification – Ruby Mitchell knows who the suspect is because she has seen him before and knows his name.  I am aware that litigation[18] in this case disputes this, but for purposes of examining what may have

---

[14] From my experience and recollection, during the 1990's the KBI lab was extremely behind on processing evidence, and it was not uncommon to not have lab results before an arrest or formal charges were brought.

[15] There were some attempts documented in the reports.  Typically, there would also have been BOLO (Be on the Lookout) police radio broadcasts and posting of the information on the patrol shift briefing clip board.  These actions would not usually be included in the narrative police reports.

[16] The reports document that Stacy Quinn was being sought in the investigation.  Based on my experience, individuals were sometimes successful in evading the police, especially when they may be witnesses in violent crimes and did not want to be involved due to fear.  Documentation of multiple unsuccessful attempts to locate Stacy Quinn would not have necessarily been documented in a police report (Morehead Dep., p. 250, 264 -265).

[17] For paygrade purposes according to Detective Blood.

[18] I do not believe at least the first name of who Ruby Mitchell thought who is seeing her niece is in contention.

been known at the time to the other detectives or Lieutenant Culp, Ruby Mitchell's original identification is compelling.

- Identification of Lamonte McIntyre by Niko Quinn.
- Alibi witnesses not being able to rule Lamonte McIntyre out according to the timeline.
- Lamonte McIntyre having a criminal history to include robbery and drug dealing.
- Inconsistencies as to where Lamonte McIntyre was that day.
- Informant information.

There are always additional steps that can be taken in an investigation.  Typically, as the lead investigator, Detective Golubski would have borne most of the responsibility to complete these additional steps.  The Wyandotte County District Attorney's Office had investigators who would have also been tasked with follow-up to locate and serve witnesses (Morehead Dep., p. 261).  Although the prosecutor does not direct anyone (police officers) to do anything, they could ask for follow-up investigation on a case (Morehead Dep., p. 247).  In addition, Lamonte McIntyre's defense attorneys could have attempted to locate witnesses as well[19].

**Informant Handling**

Depending on the specifics of the case, information obtained from informants can be important during police investigations.  Based on my experience, an informant can often provide investigative access into criminal organizations and point investigators in the right direction when there are no other leads to follow.  Although I did not see a specific procedure or policy in the material I reviewed, the following information provides insight:

- Having informants was common for detectives, some detectives had more than others, and there were policies and procedures about how to manage informants (Armstrong Dep., p. 30-31).
- Over his 35-year career, Chief Armstrong could not cite a specific policy for whether informants had to be named or unnamed or how that was to be documented (Armstrong Dep., p. 47).
- Chief Armstrong described how when it came to providing money to informants, this was strictly regulated and had to be signed off by a supervisor (Armstrong Dep., p. 38-41).   And to the best of his recollection, the rules were more closely related to the handling of money and tracking how the money was used (Armstrong Dep., p. 42).
- How informant information was documented was based on the willingness of the person who shared the information, and it would be up to the magistrate or judiciary to determine if the identify of the informant would be provided (Armstrong Dep., p. 48).
- There is a difference between an informant that is witness to a crime or an informant that may have just heard something in terms of documenting this information (Armstrong Dep., p. 50).

---

[19] In my experience, it is not uncommon for the defense to engage private investigators to conduct additional inquires in homicide cases.

- Detectives develop information and they do not always share their information because they do not want to burn their sources (2012 Miller Max Seifert Dep., p. 69).
- In his deposition, Captain Kobe[20] could not think of a department General Order or Standard Operating Procedure or detective bureau SOP that required the documentation of informant information in investigative reports, although that was his personal rule (Kobe Dep., p. 94-95).
- Captain Kobe was not aware of any formalized procedure to designate someone as an informant or general orders that specified what criteria would be used to designate someone as an informant (Kobe Dep., p 108).
- If there was an exchange, like receiving money, the police department had a registered informant file.  Informants were photographed and printed and a receipt for the money would be included (Blood Dep., p. 116).
- Detective Ware, who had experience working vice, narcotics, and homicides stated there were policies and procedures for working with informants in the narcotics unit but was not sure if the rules applied to the entire department.  These rules included having a contract between the city and the informant when the informants were paid for information (Ware Dep., p. 127-128).
- If information could be corroborated through a different manner, then the source of the information could be protected from repercussions (Ware Dep., p. 133-134).
- If the information was learned from a highly confidential source, it was not necessary to document that in a standard police report or even inform supervision, other individuals working on the case, or prosecutors (Ware Dep., p. 137-138).
- If the informant was just pointing the finger at someone who committed a crime and the detective was able to culminate or develop evidence on your own, the source did not need to be identified (Ware Dep., p. 139 – 141).
- If the source became involved in the investigation in any other way than pointing in the right direction, they may have to be identified (Ware Dep., p. 141).
- The policy for the early 1990's homicide unit was that detectives did not have to document interactions with an informant who provided information as long as the detective was able to come up with other evidence (Ware Dep., p. 142).
- There was no documentation as to how an informant was to be used in the detective Bureau or how to handle documenting what an informant tells a detective (Ware. Dep., p. 149-150) and it was up to the individual detective to decide whether they wanted to document the source of information on a case (Ware Dep., p. 154).
- The narcotics unit is the only place Detective Ware knows of rules existing for documenting and outlining the use of informants (Ware Dep., p. 152).

The material reviewed included what appears to be a training document pertaining to informant use (FPSS 35763-35767 – Developing informants_00001).  The date is unknown, however there is 1983 case law cited within it.  The opening statement in the document states, "police officers ability rarely exceeds the quality or quantity of sources of information".  The

---

[20] Captain Kobe had experience as detective bureau commander in 2004.

document proceeds to identify the types of informants and what their motivations may be. The document cautions to "not disclose I.D. of source to anyone unless absolutely necessary". This would generally support the notion that police officers understand that informants can be an important component in investigations as well as the desire to not reveal their identity unless there is a reason to do so.

There was conflicting information as to whether a policy existed on how to manage informants, and this seemed to be more a function of whether money provided to the informant or exchanged for information. But there seems to be a consensus in the record that there was not an official rule or procedure on how to document informant information. In my experience, accepted law enforcement practice in 1994 would allow for not documenting informant information within investigative reports if the information were verifiable by other means and was not evidentiary in nature.

In reviewing the materials in this case, my understanding is the informant information was:

- Lieutenant Barber was directly responsible for obtaining the name of Lamonte McIntyre from numerous sources (Transcripts of September 26 to 29 1994 Criminal Trial of Lamonte McIntyre, p. 353).
- In his statement, Lieutenant Barber states there was information early on that Lamonte McIntyre and a blue vehicle he was associated with was a block over from the homicide scene (Barber Statement, p.3).
- It was reported to Lieutenant Barber that Officer Viera received information from an informant that Lamonte McIntyre was known to frequent the Juniper Gardens area and was seen riding in a white Oldsmobile 98 in the area of 2nd Street (Barber Statement, p. 3).
- Detective Maskil had also ascertained some information that the suspect's name was Lamonte (Golubski Investigative Addendum (4/16/94, p. 2).

The information did not seem to indicate whether the informant was a witness to the crime or not. From the record it appears the information was used as part of the process of identifying and locating Lamonte McIntyre as a potential suspect and then the information was corroborated through witness interviews, photo lineups, and identifications.

**Complaint Process and Knowledge of Alleged Misconduct**

In his deposition, Detective Ware stated he was assigned to Internal Affairs around the 2002-2004 timeframe (Ware Dep., p.309). In the 1990's Internal Affairs unit was comprised of two detectives and a Captain who were responsible for conducting all of the Internal Affairs investigations. To make a complaint, a citizen would have to phone in or come to the police department. The department did not engage in any outreach to the community to explain how a civilian could report a complaint (Ware Dep., p. 61-63.). In my experience, this would be

normal for the time before the practice to more actively engage the community to solicit this information and make the process more transparent became more prevalent.

Another way for complaints to come to the attention of Internal Affairs is through command staff or the office of the chief of police.  There is an obligation on everyone in the chain of command to report a potential departmental rules violation by another employee (Ware Dep., p. 64-65).  Internal Affairs was more reactive then proactive.  Internal Affairs would not go out and seek corruption, but if something happened that was considered corruption, they would act on it (Ware Dep., p. 71-72).  The department kept a record of every complaint reported to Internal Affairs for at least a period of time (Ware. Dep, p 316).

There was no requirement the complainant had to sign the complaint but there was a document the complainant needed to sign for the investigation to go forward, not that it had to have a signature to go to the chiefs of police's office (Ware Dep., p. 319-320).  To the best of Detective Ware's recollection, every complaint had to be documented and sent up the chain of command and then the chief or the deputy chief made the decision whether to investigate or not (Ware Dep., p. 329-330).

Chief Armstrong spent 1996 and 2000 as the chief's administrative aid and Internal Affairs was directly under him.  According to Chief Armstrong in his deposition, there were numerous investigations going on at any given time and complaints were forwarded to the FBI if the department felt like the needed to be (Armstrong Dep., p. 138).  The Internal Affairs commander had the discretion to determine if a complaint could be handled in an informal matter for minor issues, but not the discretion to not take the complaint (Armstrong Dep., p. 139).  The chief of police was not aware of all the complaints that are made, only those that are resolved and need disciplinary decisions (Armstrong Dep., p. 143).

The Internal Affairs policy for the KCKPD states that the Internal Affairs unit is charged with the responsibility of investigating allegation of misconduct against employees of the department (FPSS 108368-108373 – 09-96.pdf Internal Affairs Policy).  Specifically:

- Complaints that are determined to be a minor violation as determined by the Internal Affairs Commander may be investigated by the employee's supervisor (p. 2).
- Establishes time limitations for a Formal Administrative Investigations and representation (p.2).[21]
- Scheduling on a fair and equitable basis and to accommodate the officer (p. 30).
- Employee will be informed of name, rank of officer in charge of investigation and all persons present during the interview (p. 30).
- Interview questions must be restricted to circumstances surrounding the incident under investigation (p. 3).

---

[21] Likely due to police contracts and the Memorandum of Understanding.

- Employee under investigation will be informed in writing of the nature of the investigation prior to the interview, and will be informed of the names of all complainants unless there is some compelling reason to the contrary (p.
- Line of questioning pertinent to the issues, no broad questions such as "have you ever violated Department regulations…" (p. 4).
- No devious techniques or accusatory statements will be used (p.4).
- Individuals who make false complaints against employees can be prosecuted… and the department shall seek to have such cases prosecuted if it does not impair the surrounding investigations (p. 6).

The Internal Affairs policy acknowledges that the KCKPD has a Memorandum of Understanding (MOU) with the covered employee group. Although I did not review the MOU, I am familiar with some of the common rights bargained for. Several of these are represented in the Internal Affairs Policy. The effect of which is to establish a system of rights for the officers when they are accused of misconduct. Officers often interact with members of the public who may become upset with their actions or decisions, so protections appeared for the officers, especially in unionized departments. Not that this is the public expectation or desire today, but in 1994, this was a normal large department practice.

The effect on unionized departments with these protections is that the complaint process is rather formalized, and allegations of misconduct tend to have to be of a nature that rises above a rumor or general information that someone has engaged in misconduct. In his deposition, Chief Armstrong described how action cannot be taken on unverified rumors and there needs to be facts to investigate something. Even rumors of serious misconduct would still need to be substantiated with facts and he would not expect supervisors to necessarily investigate just based on a rumor (Armstrong Dep., p 172-173). If the rumor does not come with credible details such as when, what, where, who, then it is just a rumor. Chief Armstrong gave the example of a rumor that members of their SCORE Unit had been involved in theft. The rumors were that the members of the unit were taking things. The department did not have a complaint, report, or location. Once there was something credible, the department investigated[22] (Armstrong Dep., p 178).

As it pertains to Lieutenant Culp, Lieutenant Barber, Detective Krstolich, Detective Ware, Detective Blood, Detective W.K. Smith, and Officer James Brown, I did not locate any evidence within the material reviewed that would indicate they had information regarding the alleged misconduct of Detective Golubski.

**Detective Dennis Ware**

From the record, it appears Detective Ware's involvement in this investigation was to accompany Detective Golubski when he conducted follow-up on April 16, 1994. He

---

[22] According to a July 19, 2011, article in Officer.com, Chief Armstrong is quoted as stating the investigation began when a citizen filed a complaint and the department then reached out to the FBI for assistance.

accompanied Detective Golubski because he needed a partner with him when he went back to the places he needed to go (Ware., Dep. p. 168).  Unlike homicide detectives, Detective Golubski did not have a regular partner to work with (Eskina Aff., ¶ 9).

Detective Ware does not dispute he was present for the photo showing with Niko Quinn the day after the crime, but he has no independent recollection of it.  Detective Ware stated he was certain it was Golubski that selected the photos and not him because he was not assigned to the case (Ware Dep., p. 167).  Detective Ware agreed it is plausible the photographs used were Detective Golubski's due to his initials being on the back of them (Ware Dep. p. 177) and this would suggest that Detective Golubski had assembled the photo lineup.

Detectives could have their own collection of photographs and from those photographs would try to find photographs that matched or similarly matched an individual that they were investigating (Ware Dep., p. 158).  If detectives did not have photos of their own in their possession, they would see if other detectives had some.  There was also a photo book that had photos of all the individuals who were arrested to see if there were pictures there.  Lastly, and depending on the time frame, a computerized system from the Wyandotte County Sheriff's Office may have been available to provide mug shots.   The first place to go though were the personal detective photographs which detectives generally had and were up to the individual discretion of the detective (Ware Dep., p. 226-227).

The record did not reveal any KCKPD policies providing guidance on the use of photo lineup.  In general, photo lineups are utilized in an investigation when a witness has indicated they could potentially recognize the suspect if they saw them again and investigators have a potential suspect to place in the lineup.  Typically, they involve the selection of photographs depicting individuals who are similar to the suspect, but not so similar that they are effectively indistinguishable from each other.  In this regard it is more of an art form open to interpretation rather than a science with a strict set of rules.

In his deposition, Detective Ware stated he was trained to use five or more photos in in a photo lineup or stack of photographs shown to witnesses (Ware Dep., p. 223-224) and the term "photo lineup" used refers to the practice of presenting an array of multiple photos to a witness at the same time including showing people a stack of photos (Ware Dep. p. 157, p. 189).  Some of the considerations when photo lineups were constructed and presented include:

- Selecting fillers who had a similar appearance to the suspect, and to not put multiple suspects of the same crime in the same photo lineup (Ware Dep. p. 160).
- Not using multiple family members in a photo line-up unless there was a particular reason to do so as this would be too suggestive (Ware Dep. p. 160).
- Selecting photographs that had similar facial characteristics and facial hair as the suspect (Ware Dep., p. 241).
- Instructing the witness that the person may or may not be in the stack of photographs and not to indicate the suspect was in the stack or pressure the witness to pick someone out (Ware Dep., p. 178).

- Choosing a photograph of the suspect that was taken around the closest time to the crime unless there was some reason not to such as if the suspect changed their appearance since the crime (Ware Dep., p. 231-232).
- Selecting a photograph that would look most like what was understood the suspect looked like at the time of the crime (Ware Dep., p. 231-232).

It appears Detective Ware is familiar with commonly accepted photo lineup procedures however he does not recall any rules that were in place on when a photo lineup, mugshot books, or a stack of photos were to be used.  Detective Ware recalls using stacks of photos in the past and it depends on the details of the case.  (Ware Dep., p. 158).  Based on his understanding of how photos are presented to witnesses, it is likely if Detective Golubski used of a stack of photos to present to Niko Quinn, that would not have seemed out of the ordinary or noteworthy for Detective Ware to remember.

In his deposition, Detective Ware stated how he could see how a stack of photos could also be called a photo lineup and the other way around (Ware Dep., p. 188).  He also agreed that potentially writing "photo lineup" in a report may signal to prosecutor or a supervisor that any selection is more inculpatory than it actually is (Ware Dep., p. 190).   Detective Golubski's report does describe the presentation as a "photo line up of five individuals", however Detective Golubski describes how Niko Quinn would not let go of photograph number three and that he had to take the pictures from her (Golubski Investigative Addendum, 4/16/94, p. 1). Detective Golubski is describing a process in which he handed the pictures to Niko Quinn.

In her 2014 affidavit, Niko Quinn (Affidavit Niko Quinn 6.30.2014) stated that:

- The day after the shooting, Detective Golubski and another detective came to her house to talk to her about what she saw and to show her "four or five photos" (¶ 17).
- Detective Golubski told her that she knew who it was, and she had "better testify" and that it would be better for her if she did (¶ 17).
- When she looked at the photos, she told Detective Golubski she was not sure, that he pressured her to make an identification, and that the other Detective[23] who was holding the pictures, placed his thumb on the picture of Lamonte McIntyre as if he were pointing at it (¶ 18).

Niko Quinn also provided an affidavit in 1996 Niko Quinn (Affidavit Niko Quinn 4.2.1996).  In that affidavit, there was no mention of the detective holding the pictures and indicating Lamonte McIntyre with his thumb.  Presumably this would have been when her memory of the interaction would have been more recent.

In addition to identifying Lamonte McIntyre in court (Transcript of June 28, 1994, Preliminary Waiver Hearing Lamonte McIntrye), Niko Quinn testified that:

---

[23] Presumably Detective Ware.

- That she had a clear view of the suspect (p. 24-25).
- How the police came to her house on April 16, and she looked at photographs (p. 31).
- Described how she was able to identify the suspect at that time, but was scared (p. 31).
- Described Detective Golubski as bringing her the pictures and she had the "pictures in her hands" (p. 33).

In addition to identifying Lamonte McIntyre in court during the trial (Transcripts of September 26 to 29 1994 Criminal Trial of Lamonte McIntyre), Niko Quinn testified:

- She saw the suspect (p. 132).
- Detective Golubski and another detective came to her residence the day after the shooting (p. 133).
- Detective Golubski showed her five photographs and when he handed them to her, he did not suggest she should identify any one of the photographs she was looking at (p.141).
- That she picked out photograph number three[24] as one that stood out to her as the shooter but did not tell that to Detective Golubski because she was scared (p. 141-142).
- She called Detective Golubski about a week after not identifying the suspect and told him she could identify the suspect when he met with her (p. 146).

In her deposition, Niko Quinn stated she talked to a couple of detectives[25] the morning after the murders and she was still under the influence of PCP from the night before (Niko Quinn Dep., p. 81). Niko Quinn stated one of the detectives brought some pictures and asked her if anyone looked familiar. Niko Quinn stated she looked at the photographs several times, and then handed them back[26]. She was able to recognize two of the photographs as Raymond Hickman and James McIntyre and ruled them out. Left holding three pictures, she described one as an individual with a slim face and short cut and how that was not him. Another photograph was of an individual with a flat top, and then the third photograph was of Lamonte. One of the detectives asked Niko Quinn to recall who Ruby Mitchell stated she thought the name of the shooter was. Niko Quinn replied that Ruby Mitchell stated his name was Lamonte. Niko Quinn stated she was holding the pictures and looking at them when one of the detectives[27] asked why she was staring at one of the pictures (Lamonte McIntyre). Niko Quinn stated she told the detective she did not know why. Niko Quinn stated she looked at the other one and did not know who that was[28]. The detective took the pictures back and one of the

---

[24] Photograph of Lamonte McIntyre.
[25] Presumably Detectives Golubski and Ware.
[26] Suggesting Niko Quinn was holding the photographs.
[27] Probably Detective Golubski as this is like how he described it in his Investigative Addendum.
[28] Now two of the three photographs in her hands were not recognized by her.

detectives held the picture of Lamonte up and she was asked again who Ruby Mitchell stated the guy's name was.  She again replied, Lamonte.  Niko Quinn stated when the detective held the picture of Lamonte up in the sun, she could see Lamonte's name on the back[29].  Niko Quinn stated she "started staring at the picture and just stared at it" and then gave the picture back to the detective.  When asked if she knew who the picture was of, Niko Quinn replied she did not, but the detective said that she did know who it was.  Niko Quinn stated the detectives then left (Niko Quinn Dep., p. 82-85).

Niko Quinn stated she did not think Detective Golubski did anything improper or inappropriate at this meeting (Niko Quinn Dep., p. 85).  She also stated the officers (detectives) who showed her the pictures on the morning of April 16, 1994, did not touch or threaten her (Niko Quinn Dep., p. 148).

Although Niko Quinn could not recall which detective was talking to her during the interview[30], Detective Golubski's Investigative Addendum details how he asked her questions, showed her the pictures, and retrieved the pictures from her.  Niko Quinn reached out to Detective Golubski approximately three weeks to a month after the homicides to talk to him (Niko Quinn Dep., p. 91-92).  This suggests Detective Golubski was the individual who interacted with Niko Quinn during her interview and photo viewing on the day after the homicides as a relationship had been likely established.  During the same interview, Niko Quinn was asked by a detective to recall who Ruby Mitchell stated she thought the shooter was.  This question would most likely have been asked by Detective Golubski as Detective Ware was not involved in the case up to this point and it would be reasonable to conclude he would not have known who Ruby Mitchell was or what she might have told the police.  This supports the notion that Detective Ware was simply accompanying Detective Golubski due to his need to have a partner as Detective Ware had stated in his deposition (Ware., Dep. p. 168).  The record does not contain information Detective Ware did anything other than physically accompany Detective Golubski on 4-16-1994 to various locations as Detective Golubski conducted follow-up.  All activity was documented by Detective Golubski and Detective Ware was not called as a witness during the criminal trial.

Niko Quinn's deposition testimony seems to conflict with her 2014 affidavit where she indicated Detective Golubski pressured her to make an identification and that she had "better testify".  Here, she reports Detective Golubski did nothing improper.  Since Detective Ware accompanied Detective Golubski to interview Niko Quinn, he presumably would not have observed anything inappropriate either.  Niko Quinn's deposition testimony describes how she held the photographs and through a process of elimination seemed to arrive at the photograph of Lamonte McIntyre.  And Niko Quinn does not detail knowing the photograph was of Lamonte McIntyre until after she had already narrowed in on his photograph[31].  This is inconsistent with

---

[29] It is unknown if this means the photograph was turned over or if Niko Quinn was referring to being able to see the name through the polaroid photograph which would be difficult.  Also, Niko Quinn described how the picture was held up by the detectives, but then how she handed it back after staring at it.

[30] She did not know who Detective Golubski was at the time.

[31] When it was either held up and the sun illuminated it, or she held it in her hand.

her 2014 affidavit statement wherein it was described how all the photographs were held by the detectives and a thumb was placed on one of the photographs to draw attention to it.   In her deposition, Niko Quinn stated she does not know which detective held up the single photograph of Lamonte McIntyre (Niko Quinn Dep., p. 200).  Based on the record, this is most likely to have been Detective Golubski.  Niko Quinn's deposition testimony also comports with Detective Golubski's Investigative Addendum in which he described Niko Quinn repeatedly viewing photograph number three (Lamonte McIntyre) when he conducted the photo line-up the day after the homicides.

Except for the information Niko Quinn provided in her 2014 affidavit, her description as to how the photographs were presented to her appear to be consistent.  They were handed to her by Detective Golubski, and she held them in her hand.  And she also relays this during the trial which seemingly would have alerted the prosecutor to the type of photo lineup that was utilized.  Detective Ware denies the allegation against him that he pointed out an individual in the photo line-up (Ware Dep., p. 85).  In my opinion, it would be difficult for Detective Ware to have his thumb on the picture as Niko described in her affidavit if she was in fact holding them herself in her hand.  Based on her deposition testimony, Niko Quinn seems to have abandoned this assertion.

I did not find anything in the record to suggest Detective Ware was aware of any of the alleged allegations against Detective Golubski and in his deposition he stated he was extremely surprised by them (Ware Dep., p. 36).  Detective Ware testified that he never heard anything or rumors about the misconduct Golubski is alleged to have engaged in (Ware Dep., p. 97).  He never saw an indication that Golubski was engaging in any kind of corruption while they were in the crimes against persons unit (Ware Dep., p. 99) and did not hear anything from anyone else (Ware Dep., p. 102).

The allegations against Detective Ware appear to be solely based on Niko Quinn's statements.  These include her 1996 affidavit, 2014 affidavit, and 2021 deposition.  As has been previously indicated, the statements contain some contradictions.  In her deposition, Niko Quinn stated she was high on PCP the evening of the murders, she had been drinking, and she had not been asleep for days before she met with the detectives on the morning after the homicides.  This information should be considered when relying on Niko Quinn's memories.  Niko Quinn has no recollection which detective accompanied Detective Golubski nor can she recall what he looked like.  Niko Quinn could also not recall which detective engaged in her what activity[32] during the interview (Niko Quinn Dep., p. 134).

Based on the record available, Detective Ware accompanied Detective Golubski while he conducted follow-up and from the material I reviewed, I cannot conclude that he had knowledge of any improper actions during the time of the investigation.  I also did not find evidence that Detective Ware engaged in improper actions.

---

[32] Showed her the photographs or spoke to her.

**Lieutenant Steve Culp**

From my understanding, the allegations against Lieutenant Culp include that he "knowingly permitted Golubski to cover up his misconduct, including by intentionally failing to conduct a legitimate investigation in this case, leaving the real perpetrator on the streets to commit other heinous crimes" (McIntyre_Russell Fischer_Police Practices Report_052021, p. 7). In addition, he allegedly "closely monitored the investigation and approved each investigative step—including Defendants' deliberate evidence fabrications" (P's Second Amended Complaint, ¶ 50).

Lieutenant Culp's involvement and supervision of the investigation has been previously discussed in this document. Taken in totality, the material reviewed shows there appears to be conceptual agreement that as a supervisor, Lieutenant Culp is responsible for the work of his subordinates. The record also shows the homicide unit was operating in an environment that was seeing an unprecedented number of cases that it was responsible for. And the practice was to liberally allow detectives to manage all aspects of their cases. I did not locate information in the material reviewed that suggested Lieutenant Culp was involved in the court process, reviewed any of the court testimony, or would have been aware of what photographs were utilized in the photo lineups shown to any witness.

I did not find anything in the materials I reviewed suggesting Lieutenant Culp intentionally approved of any case deficiencies or knowingly looked the other way. Based on the work environment and how it appears the supervisory role was structured, Lieutenant Culp's activities on this case appear to be sufficient. He made the initial assignments when he responded to the scene of the double homicide, ensured resources were available, and assigned the case to competent Detectives: Golubski and W.K. Smith. As the record shows, the assigned detectives[33] would have been responsible for all aspects of the investigation and Lieutenant Culp would provide any requested resources. In my opinion, Detective Golubski should have taken extra investigative steps as the lead detective, but it is unclear if Lieutenant Culp actually knew what Detective Golubski was doing to any level of detail, nor would it seem to be required as I understand the supervisory structure in place and the wide latitude and trust given to detectives working homicides. I did not locate any testimony or statements in the reviewed materials that indicate that Lieutenant Culp was aware of the alleged misconduct of Detective Golubski.

**Detective Clyde Blood**

It appears Detective Blood's role in the investigation was limited. As previously discussed in this report, he briefly responded to the scene where he made some observations, and then spent the majority of his time traveling to the medical centers with Detective Maskil. Detective Blood noted in his report that the investigation was turned over to Detectives W.K.

---

[33] Detective Golubski in this case.

Smith and Golubski.  At that point, his involvement in the investigation concluded.  Detective Blood was not called during Lamonte McIntyre's trial.

According to the allegations (P's Second Amended Complaint, ¶ 88), Detective Blood "failed to take steps to have all of the physical evidence properly documented or collected. He also took no steps to document the shooter's specific route down the grassy hill or to direct a proper search for physical evidence in that area, a glaring omission as Ruby Mitchell told police that she saw the shooter drop something on the hill and attempt to pick it up".

According to the record, the KCKPD I.D Unit responded to the homicide scene to process it and collect evidence.  Although detectives can collect their own evidence on cases, during a homicide investigation the crime scene is typically worked by a team of individuals specifically assigned to that function.  In this case (according to the police reports), the personnel responsible for this were Officer Howard, Officer Clair and Lieutenant Harrington.  In his Investigative Addendum, Detective Blood documents that Detective Maskil searched the area immediately north of the vehicle and located four spent shotgun shell casings.  This information was provided to Officer Howard who indicated they would be collected.  When there are assigned crime science investigators, the evidence collection is conducted by as few as possible persons to minimize the chain of custody.  In my opinion, pointing these items out to the members of the I.D. Unit rather than collecting the evidence himself was the proper course of action.   As previously referenced in this report, I would agree with Plaintiff's forensic expert, Ronald Singer, that the crime scene investigation of the incident was adequate (Transcript of Oct 12-13 Evidentiary Hearing, p. 55).

Ruby Mitchell's first statement to one of the initial responding officers (Officer Wansley) did not indicate that she had observed the suspect drop anything.  It was not until later when Detective Krstolich was interviewing her that she mentioned it.  According to Ruby Mitchell's recorded statement (taken at 2:55 p.m. as noted in the report), the suspect stopped when he came down the hill and appeared to pick something up[34].  Ruby Mitchell surmised it might have been a shell or other object.  The way it was described seems to indicate that whatever was dropped was retrieved by the suspect.   According to Detective Blood's Investigative Addendum, he arrived at the crime scene at 2:30 p.m.  From the report, it does not appear he spent much time there before being assigned to proceed to the Bethany Medical Center.  It is entirely plausible that Detective Blood was unaware of the information regarding the object being dropped and then being picked back up.  According to the initial police reports (Officer Wansley Investigative Addendum), Officer Wansley and Sergeant Keith traveled in the direction the suspect appeared from and left.  They also canvassed that area.  It appears there was activity on the part of officers to trace the steps the suspect may have taken.

Another allegation (P's Second Amended Complaint, ¶ 89) against Detective Blood is that he "failed to properly document statements suggesting a motive for Doniel Quinn's

---

[34] Suggesting perhaps there wouldn't be anything there to retrieve from off the ground.

murder" when he interviewed Quinn family members at the hospital.  According to Detective Blood's report (Blood Investigative Addendum):

- Detective Maskil spoke with Sharon Bennet, a relative of Donald Ewing.  It was reported that Sharon Bennet did not have any useful information.
- Detectives (Blood and Maskil) spoke with Andrew Quinn, who identified himself as the cousin of Doniel Quinn.  Andrew Quinn was able to provide the name of Doniel Quinn's grandmother, Cinderella Quinn.
- Detective Maskil contacted Cinderella Quinn.  She was not able to provide any personal (address or date of birth) information for Doniel Quinn.  Cinderella Quinn also stated that none of the family members were available at the time, and she had no idea where they were[35].  Cinderella Quinn stated she would have the family members contact Detective Blood or Detective Maskil for additional information.

From Detective Blood's report, it appears that he and Detective Maskil attempted to ascertain information about the victims and identify family members to speak with.  They followed the leads as more family members were identified.  Detective Blood's report concludes with the statement that the case had been assigned to Detectives Golubski and W.K. Smith.  This would seem to indicate that any further follow-up would have been the responsibility of Detective Golubski and Detective W.K. Smith.   It is unclear from the materials I reviewed where the information that the individuals that Detective Blood spoke with on the day of the homicides provided motive information.  The material I examined indicates that Detective Blood was a competent homicide investigator who would have understood the importance of documenting such information if it had been provided.  Detective Maskil, who accompanied Detective Blood as his partner on the night of the homicide, did not detail any irregularities of deficiencies on the part of Detective Blood or that any of the family members had provided them with motive information (Maskil Aff.).

In his deposition, Detective Blood stated that he does not know Detective Golubski well and he did know how he operated because he did not work with him (Blood Dep., p. 61, p. 120).[36]  Even though he was Detective Maskil's partner for many years, Detective Blood was not aware of the allegations against Detective Golubski which Detective Maskil had detailed in his affidavit (Blood Dep., p. 228).  In reviewing Detective Maskil's Affidavit, I did not locate information indicating he shared his concerns about Detective Golubski with Detective Blood.  I also noted that Detective Maskil did not describe himself as having reported his concerns to a supervisor or anyone else besides Detective Golubski.

From my understanding, the allegations (2021-08-17 Plaintiffs' Sixth Amended Rule 26 Disclosures) against Detective Blood include he had "knowledge of Roger Golubski's improper actions in the conduct of investigations, including Golubski's sexual exploitation of poor,

---

[35] Suggesting detectives were asking who those family members were and where they could be found.
[36] It was pointed out to Detective Blood in his deposition that he had previously worked 20 cases together between 1988 and 1997.  Detective Blood did not recall these cases.

typically black women in the community and Golubski's use of these women as so-called "informants."  In my review of the material, I did not find any specific evidence of this.

**A note on witness and victim cooperation**

From my experience working violent crime cases including homicides in the 1990s, it was not uncommon for witnesses and even victims to not cooperate with the investigations. This was especially true in cases involving the business around the illegal drug trade.  Often criminal organizations were involved, and witnesses and victims feared reprisal for cooperating with the law enforcement.  Additionally, there was a street culture or code of not cooperating with police; and things were to be handled without law enforcement involvement.  It is quite possible the information regarding other suspects in the double homicide purported to have been known by investigators in this litigation was not known at that time.  If members of the victims' families knew the specific identities of additional suspects, the record does not show this was provided during the investigation.  And in at least one instance, Niko Quinn's assertion that she told Detective W.K. Smith that Doniel Quinn had stolen drugs from Neil Edgar Jr. did not seem to be borne out by the evidence (see the W.K. Smith section of this report, p. 37).

James McCloskey of Centurion Ministries, who interviewed over 100 individuals in connection with this case, acknowledged knowing about this code of silence (McCloskey Dep., p. 72).  And, in her deposition, Niko Quinn described how her family's position was to not talk to the police and the response was that no one saw anything when asked (Niko Quinn Dep., p. 65).  Niko Quinn also relayed that C-Love (Chris Jones) told her not to talk to the police (Niko Quinn Dep., p. 67).

**Lieutenant Dennis Barber**

According to the allegations (P's Second Amended Complaint), Lieutenant Barber:
- "Reviewed and approved Golubski and Krstolich's written reports despite reason to know that Mitchell's identification was unreliable and a product of police misconduct" (¶ 65).
- "Fully reviewed and approved Golubski and Ware's false report (¶ 67).

According to the police reports, Lieutenant Barber oversaw the Response Unit on April 15, 1994 (Barber Statement).  As such he did not have formal investigative responsibility for the double homicide of Doniel Quinn and Donald Ewing and organized resources to locate Lamonte McIntyre.  I did not locate information that Lieutenant Barber supervised any of the detectives during this investigation.  From the record, it appears that Lieutenant Barber only signed Officer Brown's arrest report.

Lieutenant Barber took several actions on the night of the initial investigation.  From the record, it does not appear he wrote a police report.  Rather, a taped statement was taken from

him by Detective Golubski at approximately 8:35 p.m.[37] In my experience, this is unusual, but it can happen.  Generally, police officers write their own reports.  Exceptions can include instances such as where the officer is a victim of a crime or if the officer were to be the subject of an officer involved shooting; and as an involved party, they did not write their own report.  In my career, I have also seen police reports where officers have documented what a supervisor did on a call in the police report.  This practice normally revolves around the notion of supervisory privilege to not have to "cut paper" during their activities on a shift as they go from call to call and assist the officers they supervise.  Their directions and actions would be documented in one of the officer's reports that was involved in the call.  Most often, these would involve situations where the supervisor's actions were relatively minor in nature or able to be covered in a paragraph.  It is unknown if taking a statement from another officer like what Detective Golubski's did with Lieutenant Barber was a common KCKPD practice.

Lieutenant Barber's statement provides a few key pieces of information:

- When he met Rose McIntyre[38] in the parking lot of FiFi's he tells her that there was "street talk" wherein Lamonte McIntyre was named as a suspect in a felony crime.
- Rose McIntyre made the unsolicited comment that if someone had killed somebody, would they be charged with murder; and this was significant to Lieutenant Barber as he had not mentioned "homicide" or "murder" before.
- Rose McIntyre stated that Lamonte McIntyre was at FiFi's between 11:00 a.m. until 2:45 p.m. "this afternoon".
- Lamonte McIntyre told Lieutenant Barber that he had been with his brother, James, that day.
- Lieutenant Barber noted there was information early on that a blue vehicle that Lamonte McIntyre was known to ride in or matched that description of was a block away from the homicide scene.
- Officer Viera, who was assisting Lieutenant Barber, had received information from an informant in the Juniper Gardens area that Lamonte McIntyre was seen riding in a white Oldsmobile 98 in the area and 2nd street.

Typically, this information would have been documented in an investigative addendum.  However, the primary objective is to document the information, and this appears to have been accomplished through Lieutenant Barber's taped statement given the night of the homicides.

During Lamonte McIntyre's trial (Transcripts of September 26 to 29 1994 Criminal Trial of Lamonte McIntyre), Lieutenant Barber testifies:

- He was directly responsible for obtaining the name of Lamonte McIntyre from numerous sources (p. 353).

---

[37] This would have been after Lamonte McIntyre would have been arrested.
[38] Lamonte was with her and waiting in her van.

- That after the name was given, one of the eyewitnesses[39] identified him as the shooter and Detective Golubski issued the pickup order for Lamonte McIntyre (p. 353).
- He did not give Ms. Crowder any indication about what kind of serious situation was causing him to look for Lamonte McIntyre (p. 354).
- Rose McIntyre told him Lamonte McIntyre was at FiFi's from 11:00 a.m. to 2:45 in the afternoon (p. 359).
- When he was explaining what a felony crime was to Rose McIntyre, she asked if somebody killed somebody, would they take them down and charge them? (p. 360).
- He explained that officers had an Oldsmobile stopped that Lamonte was possibly riding in, and he had to have the officers back down now the Lamonte McIntyre was located (p. 362).
- That he first spoke to Ms. Crowder at approximately 6:50 p.m.

My understanding is that one of the claims (P's Second Amended Complaint, ¶ 75) in this legal action is that Lieutenant Barber allegedly lied when he reported that Rose McIntyre attempted to provide a false alibi for Lamonte McIntyre by saying he was at FiFi's during the time when the homicides would have taken place.  Officer Brown's trial's trial testimony (see that section in this report) indicates that he heard this statement by Rose McIntyre to Lieutenant Barber.  Officer Brown also reported Lamonte McIntyre told him the same thing when he transported him to the Detective Bureau for an interview.  These statements appear to corroborate each other.

Another understood claim (P's Second Amended Complaint, ¶ 66) is that Lieutenant Barber failed to mention in his statement when Lamonte McIntyre's name was first identified by informants and his testimony at trial was fabricated to make it appear as if Lamonte McIntyre's name was known before the eyewitness testimony.  I did not locate information in the police reports as to specifically when the information would have been received.  An approximate timeline of the relevant events can be ascertained from the reports:

- The double homicide occurred at approximately 2:00 p.m.
- Ruby Mitchell began giving her statement at approximately 2:55 p.m.  This is the first portion of the statement on scene before the identikit and viewing of the photo lineup.
- Some time elapsed when Ruby Mitchell retrieved her children, and the interview is continued later at the Detective Bureau.  The report did not indicate exactly when this happened.  But there is a notation stating the time is now approximately 5:58 p.m. as the recorder is turned back on and Ruby Mitchell subsequently described how she identified Lamonte McIntyre.
- Approximately an hour before the meeting with Rose McIntyre in the parking lot of FiFi's, Lieutenant Barber had visited Maxine Crowder looking for Lamonte McIntyre. (Barber Statement, p. 3).  This would have put the time at around 7:00 p.m.

_____

[39] Ruby Mitchell identifies Lamonte McIntyre at approximately 5:58 p.m. according to Detective Krstolich's report.

- When he met Rose McIntyre in the parking lot of FiFi's he told her that there was "street talk" wherein Lamonte McIntyre was named as a suspect in a felony crime Barber Statement, p. 3). This was at an unknown time, but presumably shortly before Lamont's arrest at 8:00 p.m.
- Lamonte McIntyre's arrest report notes 8:00 p.m. as the time his detention begins.
- The statement Lieutenant Barber gave to Detective Golubski notes 8:35 pm as the approximate time the statement was started.

In Lieutenant Barber's statement the day of the homicides, he described how the information was received "early on" and additionally that Officer Viera had information from an informant about another vehicle. Based on the timing of Lieutenant Barber's statement (8:35 p.m.), the information would have had to come in sometime before that. It would be logical to think that the information could not have become known before 2:00 p.m. So, the timeframe for when the informant information could have come to light identifying[40] Lamonte McIntyre as the suspect would be between 2:00 p.m. to sometime before 5:58 p.m., when Ruby identifies Lamonte McIntyre as the suspect. That is almost four hours and that seems to be enough time for the information to start to circulate in the community about the homicides and victims.

In his Investigate Addendum (4/16/94), Detective Golubski noted that Detective Maskil had also ascertained some information that the suspect's name was Lamonte. It is not indicated where this information came from or what the timeframe could have been when the information was received. But it does seem to support the notion that different detectives were receiving information from sources.

Another claim (P's Second Amended Complaint, ¶ 74) that I understand to be alleged against Lieutenant Barber is that he fabricated Rose McIntyre's statement that she asked whether a person who killed someone could be arrested for murder. Rose McIntyre stated she never brought up the word, "murder" when the police were at FiFi's arresting her son, and she did not know the police wanted to question Lamonte McIntyre about a murder. She stated she never made those statements (R. McIntyre Aff., ¶ 19). Rose McIntyre's affidavit was submitted 20 years after the events of 1994 and memories can fade. At least one other statement made by her to Lieutenant Barber (that Lamonte was at FiFi's the day of the homicides) was corroborated by Officer Brown at time when he testified that he overheard her tell Lieutenant Barber that Lamonte McIntyre was at FiFi's that day.

I have not found any information in the material that I reviewed that would suggest that Lieutenant Barber conspired with Detective Golubski to alter the timeline of when informant information was received and then with Officer Brown to fabricate statements regarding what was said by Rose McIntyre. This would have to be the case to substantiate some of the claims.

---

[40] Before Ruby Mitchell identified him as the suspect.

**Officer James Brown**

According to the allegations (P's Second Amended Complaint), Officer Brown:
- "Falsely claimed that Lamonte said he had been working at a restaurant when the shooting happened" (¶ 78).
- "Either failed to accurately document Lamonte's statement in a police report, as required by the KCKPD and accepted police practices, or he did document the statement and failed to turn it over to the prosecution" (¶ 79).

At the direction of Lieutenant Barber, Officer Brown was involved in the search for Lamonte McIntyre and was dispatched to the FiFi's restaurant to meet with Rose McIntyre. Officer Brown completed the Arrest Report which is part of the police reports for the double homicide investigation.   Officer Brown did not write a separate Investigative Addendum but provided a narrative on the Arrest Report.

During Lamonte McIntyre's trial (Transcripts of September 26 to 29 1994 Criminal Trial of Lamonte McIntyre), Officer Brown testifies:
- He was advised by Lieutenant Barber that there had been a couple of homicides earlier and they were looking for the suspect possibly involved (p. 366).
- He went to where Rose McIntyre worked[41] and contacted her when she drove into the parking lot (p. 367).
- He heard Rose McIntyre make the statement to Lieutenant Barber that Lamonte McIntyre was with her at work that day (p. 370).
- He transported Lamonte McIntyre to the Detective Bureau and Lamonte McIntyre asked him what was going on (p. 368).
- He just told Lamonte McIntyre that detectives wanted to talk to him about an incident when Lamonte McIntyre asked what this was about (p. 368).
- Lamonte McIntyre stated he did not know what he could have done because he was at FiFi's all day helping his mother in the kitchen. (p. 368).
- Lamonte's statement was not in response to any questions he asked (p. 369).
- He was present during the interview when Detective Golubski and Detective Krstolich questioned Lamonte McIntyre and Lamonte McIntyre told the detectives he as in the area of 15th and Wood (p. 369).
- He wrote the detective a note telling him that Lamonte told him in the car ride that he was at FiFi' with his mother all day (p. 370).

Officer Brown did not document Lamonte McIntyre's alibi statement during the transport.   Rose McIntyre had previously made the statement that Lamonte McIntrye was at FiFi's the day of the homicides.  And Lamonte McIntyre initially told Lieutenant Barber that he was with his brother, James, that day.  He later told detectives that he was at Yolanda

---

[41] FiFi's.

Johnson's, and his brother arrived later in the afternoon. This was the first time information that Lamonte McIntyre was claiming to have been at FiFi's was introduced.

In his deposition, Officer Brown stated that he does not remember the arrest of Lamonte McIntyre or what might have been said in any interview of him including any coercive or threatening language (Brown Dep., p. 87-89). The deposition of Officer Brown did not provide any specific recollections on the part of Officer Brown that he could remember about this case and Officer Brown believes his testimony at trial was accurate due to the recency to the event at the time.

Best practices would have been for Officer Brown to document what Lamonte McIntyre said to him during the transport in the police report. From his perspective as a young, inexperienced officer, Officer Brown may have felt he fulfilled his obligation by writing the detective a note about what Lamonte McIntyre had said (Transcripts of September 26 to 29 1994 Criminal Trial of Lamonte McIntyre, p. 369-370). Even though the alibi is not completely new[42] in itself, it was the first time it was attributed to Lamonte McIntyre. However, I do not see any specific facts to suggest there was a nefarious reason as to why Officer Brown did not document the information in his arrest report.

In his deposition, Officer Brown stated he had not heard any allegations that Detective Golubski has taken drugs from members of the community or that he has had sex with drug-addicted prostitutes (Brown Dep., p. 34-35). He was also not aware of the information until the lawsuit had been filed and the allegations were being discussed in the newspapers (Brown Dep., p. 42). Officer Brown does not remember having any conversations with colleagues regarding Roger Golubski and his inappropriate behavior (Brown Dep., p. 61). I did not find factual evidence in the material that I reviewed that Officer Brown was aware of the allegations against Detective Golubski.

**Detective W.K. Smith**

According to the allegations (P's Second Amended Complaint), Detective W.K. Smith:
- "Omitted other important details, including that Niko Quinn told police about men associated with a nearby drug house who had recently beaten Donie" (¶ 85).
- "Intentionally did not document Josephine Quinn's statement to him that Stacy could identify the perpetrator" (¶ 85).
- "Never investigated any drug-related lead, despite the fact that Niko told police that men from a nearby drug house had recently beaten up Doniel" (¶ 86).
- "Failed to question" Stacy Quinn "to avoid developing evidence that exonerated McIntyre, or he did question Quinn and failed to document her exculpatory statements" (¶ 87).

---

[42] Rose McIntyre had also said that Lamonte McIntyre was at FiFi's the day of the homicides.

From the police reports in this case, Detective W.K. Smith was part of the initial response to the double homicide.  He conducted interviews of Josephine Quinn and Niko Quinn.  In his deposition, Detective Smith describes that the practice for detectives was to do pre-interviews before the taped statements to determine if the witnesses had any information of value (Smith Dep., p 78)[43].  In my experience, this was an acceptable practice.  One of the claims against Detective Smith was that he failed to document in his recorded statement information that Josephine Quinn told him that Stacy Quinn knew who the perpetrator was.  In Detective Golubski's Investigative Addendum (4/16/94) of his follow-up interview with Josephine Quinn, he documents that she reported that Stacy Quinn knew who the suspect was. Detective Golubski further states that the information had been provided to Detective W.K. Smith.

Detective W.K. Smith stated that Josephine Quinn did not tell him that Stacy Quinn knew who the suspect was and if she had he would have documented it (Smith Dep., p 129-130).  When asked if he told Detective Golubski that Josephine Quinn told him that Stacy Quinn knew who the suspect was, Detective Smith stated that he did not (Smith Dep., 132).  This is a contradiction.  When Detective Golubski subsequently contacted Josephine Quinn, she provided the information to him regarding Stacy Quinn knowing who the suspect was.  It is unclear why the contradiction exists.   Josephine did report to Detective Golubski that Stacy Quinn could identify the suspect.  Since Detective Smith has no recollection of the investigation, he likely may be answering from the perspective of what he thinks he would have done rather than actually recalling the interview.  Nevertheless, the information was documented.  If there was a desire to conceal Stacy Quinn's information, the information would not likely have been included in the reports.

 In Detective Ware's deposition, he was asked the hypothetical question that if Josephine Quinn had reported to Smith on the first day of the investigation that Stacy Quinn knew who the perpetrator was, then shouldn't that information have been included in the audio taped statement.  Detective Ware stated the information could be documented in the audio taped statement or in an investigative report (Ware Dep., p. 223-224).  The fact that the information concerning Niko Quinn was documented suggests that detectives were not trying to conceal this fact, and to do so in an investigative report seems to comport with acceptable practices at the time.

Another allegation was that Detective W.K. Smith did not fully document the conversation he had with Niko Quinn.  In her 2014 affidavit, Niko Quinn (Niko Quinn Affidavit 6.30.2014) stated that:

- She recalled telling the detective[44] that Doniel had been beaten up few days before by the people in the house he was staying at (¶ 13).

---

[43] Detective Blood also stated this was the practice.
[44] Presumably W.K. Smith who interviewed her on the day of the shooting.

- Doniel told her Aaron Robinson was one of those that beat him up because they suspected him of stealing drugs from Neil Edgar Jr., known as "Monster" (¶ 14).

Niko Quinn also provided an affidavit in 1996 Niko Quinn (Affidavit Niko Quinn 4.2.1996).  In that affidavit, there was no mention of the information about Doniel that she told Detective W.K. Smith.  Presumably this would have been when her memory of the interaction would have been more recent.

Nonetheless, during the taped interview portion of the interview, Detective W.K. Smith did ask Niko if she knew whether or not the victims, her cousin[45] were having difficulties with anyone.  Niko Quinn stated that she did not.  So even if she had mentioned it in the pre-interview, she was prompted to repeat the information during the taped portion and did not appear to do so.  And there wasn't a follow-up prompt drawing her back to what she might have shared in the pre-interview.

In her deposition, Niko Quinn recalled how Doniel Quinn had been beaten up by Aaron Robinson and Monster (Neil Edgar Jr.) regarding missing drugs sometime before he was killed, and that there was a bounty on him. Chris Jones, and later Stacy Quinn learned the bounty was $4,000.  Niko Quinn was willing to pay it.  Attempts to pay Aaron Robinson did not work and Niko Quinn recalled seeing Aaron Robinson and Monster driving up and down Quindaro trying to get Doniel in a car (Niko Quinn Dep., p. 41-49).  From this testimony, it appears Niko Quinn possessed important information relevant to the homicide investigation.  But this information was not shared with the detective (W.K. Smith) when he asked her if she knew whether the victims were having difficulties with anyone.  Niko Quinn stated the reason she did not give this information to the police is because her family was there telling her not to say anything and the culture of the time was to not talk to the police (Niko Quinn Dep., p. 72).  This information contradicts Niko Quinn's 2014 affidavit and appears to support the notion that witnesses in the case were not providing law enforcement with all the information they knew regarding the shootings.

During her deposition, Niko Quinn was asked if she recalled giving a statement to the police at her house or somewhere else on that block.  Niko Quinn stated that at her house, the police[46] asked if anyone had seen anything, and she replied she had.  But her family, sister (Lela), Freda, and "all of them" asserted she hadn't seen anything and that she should not talk to the police (Niko Quinn Dep., p. 65-66).  Niko Quinn stated by the time her family members were saying she had not seen anything; she had already told the police she had seen something.  Niko Quinn stated when she was giving the recorded statement to the detective[47], it was "chaos", and everyone was standing in her yard.  She described how the family had started gathering and there were "about a hundred or some people out there".  Niko Quinn stated the victims had been transported to the hospital and she wanted to get the interview

---

[45] Doniel Quinn.
[46] Likely the initial responding officers.
[47] Detective W.K. Smith.

over with so she could go to the hospital (Niko Quinn Dep., p. 137-138).  Niko Quinn listened to the audio of her statement given to Detective W.K. Smith the day of the murders.  Niko identified a voice in the background as that of her Aunt Freda (Quinn) who was asking if "this was over" and she was wanting to get to the hospital (Niko Quinn Dep., p. 130-131).  Niko Quinn recalled she was in a car when she gave the recorded statement and her family was telling her not to say anything (Niko Quinn Dep., p. 145).

Niko Quinn's description of the time shortly after the homicides paints a picture of a chaotic scene in which hundreds of individuals converge on the area.  Within the midst of this, the police attempt to conduct an investigation.  The record indicates Detective W.K. Smith took recorded statements from Niko Quinn and Josephine Quinn on scene shortly after the homicides.  One of the allegations is that the statements were too brief and did not go into the detail they should have.  Based on Niko Quinn's deposition testimony, it would have been unlikely and difficult for Detective W.K. Smith to have obtained more detailed information from Niko Quinn as she was being pressured to leave the area and may have been sitting in a car ready to leave.  This was likely the same environment Detective W.K. Smith encountered when he was interviewing Josephine Quinn.  There would also have been motivation for Niko Quinn and Josephine Quinn to not disclose the important information they possessed due to the pressure the family was exerting to not cooperate with the investigation.

In her deposition, Niko Quinn did not report having any recollection as to what she may have told Detective W.K. Smith before he took her recorded statement.  Niko Quinn also did not have any information that supported the allegation that Detective W.K. Smith purposely failed to ask her whether she knew of the motive for the shooting when taking her initial statement or that he deliberately failed to interview Stacy Quinn.  In addition, Niko Quinn stated she did not have any information which supported the allegation that Detective W.K. Smith purposely failed to ask her details about the shooter's appearance. (Niko Quinn Dep., p. 131-133).  Niko Quinn did not recall the detective putting any pressure on her or trying to coerce her (Niko Quinn Dep., p. 72).

In his deposition, Detective W.K. Smith agreed that according to the report, he was assigned to the investigation, but does not agree that he would have been the one to make the decisions as opposed to Detective Golubski (Smith Dep., p. 35).  Detective W.K. Smith did not appear to take any other actions in this investigation.  I did not find factual evidence in the material that I reviewed that Detective W.K. Smith was aware of the allegations against Detective Golubski or that Detective W.K. Smith engaged in improper actions during the investigation.

**Detective Michael Krstolich**

Detective Krstolich's investigative role is previously detailed on page 6 of this report.  One of the claims (P's Second Amended Complaint, ¶ 64) in this case is that detectives (one of which is Detective Krstolich) provided Ruby Mitchell with the last name of Lamonte McIntyre at some point in the investigation.  In looking at the audio taped statement Ruby McIntyre made

to Detective Krstolich, she provides the last name of McIntyre as the person she knows as the Lamonte who used to talk to her niece.  Read as written, the statement would be a powerful identification as the witness is stating the suspect was previously known to her.

My understanding of KCKPD detective practice is to utilize audio taping to memorialize witness statements.  The tapes do not continuously run and as has been presented, detectives usually conduct pre-interviews with witnesses to ascertain what they may know before recording a statement.  When detectives conduct investigations, it can be expected the information gathered would have been documented in a variety of ways: taped statements, investigative reports, and notes.  In my recollection, video recording was not very prevalent in 1994.  The interaction Ruby Mitchell had with detectives Krstolich and Golubski would have logically included portions that were "off-tape" such as when the composite was being built, any travel, and other conversations at the Detective Bureau.  I don't believe it would have been expected that the tape recorder would have run that whole time and the record does not show that was the expectation.  The lack of the capture of the moment Ruby Mitchell told this to detectives in itself would not be suspicious, and it appears as if Detective Krstolich was trying to ensure that what she told them off-tape was now documented as it appears to be an important piece if information.  Some other information is available regarding what may have occurred:

During Lamonte McIntyre's trial (Transcripts of September 26 to 29 1994 Criminal Trial of Lamonte McIntyre), Detective Krstolich testifies:

- He Interviewed Ruby Mitchell at her residence shortly after the shooting and asked her to come to the police department to build a composite of the suspect after she told him she could recognize the suspect if she saw him again (p. 276-277).
- After the composite was done, Ruby Mitchell stated she thought she knew who the suspect was and that she had almost called out his name when she saw him before the shooting.  The name she mentioned was Lamonte (p. 278).
- This occurred a short time after the composite was done and was almost like an afterthought (p. 280).
- She did not know the last name after the composite was completed (p. 292).
- She stated Lamonte dated someone she knew[48] and that is how she knows him (p. 292).
- Ruby Mitchell stated she did not know the last name, but she said she could find out (p. 278).
- A picture lineup was made using five photographs that Detective Golubski had (p. 281).
- He did not write it down, but the best of his knowledge, the last name of Lamonte McIntyre came up when Ruby Mitchell called around until she found the name.  He did not have personal knowledge of that (p. 281).
- Ruby Mitchell was shown the five photos around 5:00 or 6:00 p.m. and they were handed to her in a complete stack.

---

[48] Keva Garcia.

- Ruby Mitchell picked out #3, the photo of Lamonte McIntyre and said she was absolutely sure (p. 283).
- After seeing the last name of Lamonte McIntyre, Ruby did not indicate that it was not the Lamonte she thought she knew (p. 293).
- Detective Golubski was the lead detective or detective of record and took all the notes during the interview with Lamonte McIntyre (p. 290).
- As far as Detective Krstolich knew, the person he believed Ruby Mitchell was referring to as having dated the person she knew was Lamonte McIntyre (p. 293).

In Detective Golubski's testimony (Transcripts of September 26 to 29 1994 Criminal Trial of Lamonte McIntyre), he stated:
- Ruby Mitchell provided the first name Lamonte (p. 298).
- To best of his recollection, Ruby Mitchell only provided the first name after being asked that and perhaps Detective Krstolich was unclear where the last name from (p. 309).
- Lamonte McIntyre's name came from various sources.  And Ruby Mitchell identifies him in the lineup (p. 310).

In the Preliminary Waiver hearing, Ruby Mitchell (Transcript of June 28, 1994, Preliminary Waiver Hearing Lamonte McIntrye) testified:
- She saw the shooter that day and pointed Lamonte McIntyre out in the court room (p. 9).
- She thought the shooter was a Lamonte she knew (p. 13).
- Stated she has never seen this person in her life (sitting in the court room), never saw him before today (p. 14).
- But he (Lamonte McIntyre) looks like the person she thought was named Lamonte.
- She was about to call out Lamonte to the shooter when he came down the hill but did not actually do so (p. 17).
- Picked photo #3 and no one told her to do so (p. 18).
- She does not know Lamonte's last name (p. 19).
- That the Lamonte she knows does look like Lamonte McIntyre (p. 19).

During Lamonte McIntyre's trial (Transcripts of September 26 to 29 1994 Criminal Trial of Lamonte McIntyre), Ruby Mitchell testifies:

- She saw suspect come down the hill (p. 160).
- She recognized him as Lamonte, and she has seen him lots of times (p. 165).
- She was shown sketches and pictures at the police station (p. 168).
- She viewed five photographs (p. 170).
- She identified the shooter from the photographs (p. 171).
- This was not the same Lamonte that dated her niece (p. 172).
- The Lamontes look alike (p. 172).
- Identifies Lamonte McIntyre court room as the shooter (p. 175).

- No doubt it is him (p. 175).
- After the police did the sketch is when she decided it was not the Lamonte she knew (p. 184).

In Ruby Mitchell's deposition, she testified:

- That she thought she knew who the suspect was when he was coming down the hill, was about to greet him, then saw the gun and knew him as Lamonte (p. 24-26).
- After the sketch at the department, she believed it looked like the Lamonte she knew (p. 57).
- She was with two detectives, one of who was Detective Golubski.  Six photographs were shown to her on the table in front of her.  She recalled one piece of paper with six photographs on it.  The detectives didn't say anything about showing her pictures of different Lamontes.  The detectives just told her they were going to show her some pictures and asked that her if see saw anyone she noticed to point out, which she did (p. 59).
- The photos were not presented in a manila folder with cut outs, just loose (Polaroids), and she was sure there were six photos - two rows three and three on a piece of paper (p. 62,63).
- She was attracted to the picture because it looked like the Lamonte she knew, and she remembered the face (p. 66-67).
- She does not recall her taped statement[49] where she gave the name of Lamonte McIntyre.  She denied making the statement and not even knowing a Lamonte Drain let alone Lamonte McIntyre (p. 76).
- She does not remember turning over the photo to show see a name or where the name came from (p. 79).
- She recalled when she testified in court, she did not know the name McIntyre (p. 79).
- That the transcript of court proceeding is incorrect (p. 106).
- That during the Juvenile waiver hearing she did not say the suspect was black and tall.  She denied that she gave this testimony (p. 106).
- States she picked the picture out that she did because it looked like the Lamonte she knew and who she believed shot the victims (p. 140).

What appears consistent is Ruby Mitchell believes the Lamonte[50] she saw was the one that used to see her niece, Keva Garcia.  She tells the detectives the name of the shooter is Lamonte, and they show her a photo lineup which includes a photograph of Lamonte McIntyre. She identified him as the shooter in the photo lineup and in court.  Another one of the claims in

---

[49] The taped audio statement to Detective Krstolich.
[50] She independently told this to Niko Quinn as well.

this case is that Ruby Mitchell was coerced into falsely identify Lamonte McIntyre as the suspect (P's Second Amended Complaint, ¶ 57).  In her testimony, Ruby Mitchell stated that she was not pressured to pick a particular picture and the detectives did not draw her attention to a particular one.  The question remains, on what basis did Lamonte McIntyre get placed in the photo lineup?  Possible explanations include:

1. He was already a suspect known to detectives due to informants providing it.
2. Ruby identified recognizing the suspect as Lamonte, so detectives put Lamonte McIntyre in the lineup in the hopes he was the right Lamonte.
3. Lamonte McIntyre had recent a recent drug and prior robbery arrest and when the name, Lamonte, was mentioned, a picture of Lamonte McIntyre was placed in the line-up.

Of interest is also Ruby Mitchell's statement to Detective Krstolich that she knows the person that used to see her niece as Lamonte McIntyre.  I believe the record shows that Ruby Mitchell does not know Lamonte McIntyre.  So, possible explanations include:

1. Detectives told her the name of who she had picked out from the lineup.
2. She looked at the back of the photograph she selected as the photos were loose.
3. She called around and someone incorrectly told her the name of Lamonte McIntyre as the person who had been seeing her niece[51].
4. As alleged in the complaint, detectives used coercion or suggestion to pressure Ruby Mitchell to Identify Lamonte McIntyre and then had her give the taped statement.

Option #4 is refuted by the consistency[52] of Ruby Mitchell's testimony that she was not pressured or told who to pick from the photo lineup.  I am not able to determine one way or another on the other options.

I did not find factual evidence in the material that I reviewed that Detective Krstolich was aware of the allegations against Detective Golubski.

---

[51] The break in time between the initial on-scene statement and the one at the Detective Bureau would have provided time for this.
[52] Even though she was confused about some other details.

Compensation

      For my engagement in this case, it is my understanding that I will be compensated as a rate of $200 per hour for my work on this case, except that I will be compensated at a rate of $250 per hour for any deposition or trial testimony.

---

      Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct, to the best of my knowledge and belief.

By: /s/ _____          Dated: 11/24/2021
      Tarik Khatib

# ATTACHMENT A

**Tarik Khatib**
**1047 E 251st Diagonal Road**
**Lawrence, Kansas 66047**
**785-423-4674**
**Tarikkhatib1@gmail.com**

**CURRICULUM VITAE**

## SUMMARY

As a law enforcement officer for 25 years, I served in a variety of capacities at a municipal police department.  My background includes experience as a patrol officer, drug unit investigator, field training officer, training unit officer, patrol supervisor, drug unit supervisor, detective supervisor, patrol commander, administrative services commander, and chief of police.  My knowledge includes personally performing those duties as well as training, guiding, and supervising others performing those duties.   In addition to my experience, I have over 2000 hours of law enforcement and law enforcement related training.  Recently, I transitioned to a teaching and training program management role where I share my experience as well as continue to learn from the law enforcement leaders and instructors I interact with.

## EXPERIENCE

**Law Enforcement Leadership Academy (LELA) Program Director**
Public Management Center (PMC)
University of Kansas, Lawrence, Kansas                              June 2019 to Present

Manage, coordinate, market, recruit, and instruct in the Law Enforcement Leadership Academy (LELA), including the LELA Command School, LELA Supervisory School, and LELA Foundations/Introduction to Supervision. Design and deliver curricula, supervise and recruit instructors, and work collaboratively with the Kansas Law Enforcement Training Center (KLETC) and other law enforcement partners to ensure the continued relevance and success of the LELA programs. Teach supervision, management, and leadership topics across PMC programs.

**Chief of Police**
Lawrence Police Department, Lawrence, Kansas                    February, 2011 to June, 2017

Led and oversaw a department of 188 employees with an annual budget of approximately $20 million dollars.   Directed, planned, and managed the activities and operations of the police department including field operations, criminal investigations, records management, community and information services, training, special programs, and event management.  Organizational accomplishments and focus areas:

Transparency and Information
- Overhauled department website to include crime mapping, videos, 48-hours of police calls, department policy, memos, and information about various department processes.
- Adopted *Facebook* and *Twitter* platforms; department recognized for best Kansas public agency use of twitter award.
- Developed a plan to increase civilian review and oversight of the department to include: improving citizen access to filing a complaint; expanding the role of the Citizens' Advisory Board for Fair and Impartial policing; implementing the use of body cameras;

48

implementing race data collection regarding police-citizen contact; conducting independent, external to the police department reviews; and improving internal auditing of police officer service provision.

- Instituted the publication of an annual Office of Professional Accountability report.
- Instituted the publication of an annual Citation Accountability report.
- Instituted the publication of an annual *Taser* use report.
- Instituted the publication of an annual Use of Force report.
- Publication of a Department Annual Report.
- Assigned a dedicated Public Affairs Officer (sergeant) to better respond to media and public requests.
- Developed monthly department performance measures to discuss with city management.

Public Interaction

- Created an employee Public Engagement Committee to develop strategies.
- Provided Fair and Impartial Policing training for community members.
- Increased the frequency of personnel informally interacting with the public through participation in public meetings such as neighborhood associations, luncheons, breakfasts, and civic organizations.
- Encouraged and increased employee participation and volunteerism within the community to include programs to assist individuals in need.
- Helped create the Lawrence Police Foundation (LPF); a citizen group interested in assisting with the department's mission and goals. The LPF raised funds from private contributions to equip 38 of the department's vehicles with Automatic External Defibrillators (A.E.D.).
- Supported and participated in a newly created Valor Awards program which publicly recognized personnel for their actions.
- Partnered with Big Brothers Big Sisters to introduce the "Bigs in Blue" program to the schools which allowed for officers to visit with their mentees at school.

Resources

- Completed statistical research, comparison, and analysis of resource needs regarding personnel, equipment, and facilities.
- Presented data to city management, city commission, and the public.
- Succeeded in increasing the number of commissioned personnel.
- Succeeded in increasing the department's budget for overtime, equipment and training.
- Succeeded in increasing the number of supervisors.
- Succeeded in addressing compensation for supervisory personnel who are not covered by a Memorandum of Understanding (MOU) contract.
- Succeeded in gaining approval for the first phase in the construction of a new police facility after a failed sales tax vote two years earlier.
- Successfully communicated the need for police canines to the city commission and the public.
- Successfully secured funding to establish a Mental Health Squad comprised of officers and a civilian co-responder to improve the department's response to citizens experiencing a mental health crisis.

Hiring and Personnel
- Successfully articulated an "over-hire" strategy to help mitigate annual attrition and long officer training time.
- Initiated a training program for lateral transfer officers to counter staffing losses due to attrition.
- Increased diversity and representation within department.
- Restructured Information Technology positions to increase competitiveness and for retention.

Equipment
- Replaced obsolete in-car video systems and patrol vehicle Mobile Date Computers.
- Secured federal grant to outfit all police officers with body cameras.
- Implemented a new Computer Aided Dispatch (CAD) system.
- Implemented a new Records Management System.
- Replaced all officer hand-held radios.
- Cooperatively worked with the county to replace radio tower infrastructure for the public safety radio system.
- Successfully communicated the need for patrol rifles to the city commission and public.
- Significantly upgraded the capabilities of the department's Crisis Response Team through acquisition of modern equipment and vehicles, and access to best practices training for personnel.
- Significantly upgraded the department's technological equipment.

Structural Changes
- Bolstered patrol staffing by moving some positions back to patrol.
- Implemented a team-based 10-hour shift structure utilizing overlapping deployment times and a concentration of resources during peak call volume hours.
- Transitioned to a fixed schedule with overlapping days to accommodate training.
- Implemented Data Driven Approaches to Crime and Traffic Safety (DDACTS) to assign resources and initiatives to "hotspot" crime and traffic areas.

Supervisory Training and Development
- Increased leadership and accountability training through internally led workshops and group discussions.
- Insured best practices approach to leadership development by hosting outside instructors to present seminars for department personnel:  Risk Management for Law Enforcement; Leadership, Supervision and Officer Discipline; Challenging the Organizational Culture; Law Enforcement Supervision and Management; and Internal Investigations.
- Initiated sending sergeants to the Kansas Law Enforcement Training Center's Leadership Academy facilitated by the University of Kansas Public Management Center.
- Initiated sending sergeants to the Emerging Leaders curriculum facilitated by the University of Kansas Public Management Center.
- Initiated sending captains to the Kansas Law Enforcement Training Center's Command School facilitated by the University of Kansas Public Management Center.
- Increased supervisory participation in the city's Leadership Lawrence program.
- Increased supervisory participation in the Federal Bureau of Investigation's Central States Law Enforcement Executive Development Seminar (CSLEEDS) program.

- Introduced training specific to women in law enforcement by sending female officers to the International Association of Chiefs of Police Women's Leadership Institute.
- Developed "leadership toolbox" guide based on internal and external training.
- Completed "360 feedback" evaluation process for supervisory personnel.

General Training and Development
- Identified annual, bi-annual, and other required training for all personnel.
- Increased scenario and roleplay-based training.
- Initiated Mental Health First Aid training for all personnel.
- Initiated Crisis Intervention Team (CIT) training for officers.
- Provided Fair and Impartial Policing training to personnel.
- Provided Emotional Survival for Law Enforcement training for officers.
- Provided Force Science Institute training for officers.
- Provided Crucial Conversations training for officers.
- Transitioned to a new department firearm.
- Provided most officers with patrol rifle training.
- Provided active shooter refresher training.

Policy
- Reviewed and updated the department's policy manual.
- Adopted methodology for ensuring and tracking personnel review of policy.
- Incorporated department memos providing policy guidance into the new policy manual.
- New policies and extensive policy revisions included: Internal Affairs Investigations, Use of Force, Citation Accountability, Electronic Control Device (*Taser*), Domestic Violence, Social Media, Fair and Impartial Policing, Patrol Service Dogs, Mental Health Squad, Crisis Response Team (CIT), and Critical Incident Response.
- Established Use of Force Committee to review incidents and make recommendations.
- Developed Use of Force Report to better track officer use of force incidents.

Culture and Support
- Fostered a culture of openness and interaction among personnel and supervision.
- Established a peer support group program for personnel.
- Provided Emotional Survival for Law Enforcement training for officer families.
- Supported the formation of a spousal support group and provided funds for training.
- Assisted with the expansion of the public safety Chaplain program.
- Formed crisis response teams after events to debrief.
- Increased personnel accountability through reaffirmation of policy, training, and personnel investigations.

**Interim Chief of Police**
Lawrence Police Department, Lawrence, Kansas          September, 2010 to February, 2011

Ensured the continuity of leadership and operations while moving forward with improvement.

- Conducted small group meetings with employees to discuss challenges, address fears, and obtain valuable input and feedback.
- Redefined the role of the Public Affairs Officer (PAO).
- Met with community leaders to discuss their desires and expectations.

- Reinstituted the Citizen's Academy program and successfully graduated the 19th class.
- Presented internal and comparable city resource study to city management and staff and discussed future needs and areas in need of improvement.
- Implemented strategies to evaluate the stabilization of patrol staffing to provide a more equitable workload.
- Initiated a public engagement plan to include website improvements to better able to provide information in line with public expectations.
- Directed revisions to commence on selected policies.
- Examined internal performance measurements to better track department performance, accountability, and efficiency.
- Began participation in the _Benchmark City Survey_ to compare department metrics and demographics to other participant agencies.
- Initiated a leadership development program for sergeants.

**Police Captain – Information Services Division**
Lawrence Police Department, Lawrence, Kansas                    February 2009 to September, 2010

Responsible for leadership and management of two sergeants, three civilian managers, and 29 employees who oversaw a wide range of operations encompassing records, information technology, animal control, parking control, professional accountability, policy and procedures, media, evidence, and crime analysis. Assisted in the development, administration, and implementation of policies, procedures, standards of operation, budget plans, strategic plans, and goal setting. Directed and managed division budget priorities to prioritize expenditures and articulate future needs.

- Oversaw full implementation of in-car video systems and developed policy regarding the use of the systems and dissemination of the information.
- Initiated a review of current policies and procedures.
- Reorganized staffing to separate the media relations and professional accountability functions to increase capacity in each area and to better respond to information requests from the community.
- Worked with department staff to provide additional staffing to Information Technology and evidence to address workload and support needs.
- Developed a public engagement plan for the department.
- Conducted and supervised internal affairs investigations.

**Police Captain – Midnight Shift Commander**
Lawrence Police Department, Lawrence, Kansas                    June, 2008 to February, 2009

Functioned as the commanding officer for the midnight patrol shift and directed its operation. Performed various supervisory, administrative, and technical functions while overseeing the work of three sergeants and 22 officers.  Responsible for ensuring policies and procedures were followed and resources were deployed in an efficient manner to address crime suppression and service demands.  Worked with department staff to find flexibility in scheduling to align resources with demands.

- Developed strategies for increasing communication and accountability of the midnight shift to the rest of the department.

- Worked with staff to develop and deploy teams of officers from across shifts to address community concerns regarding underage drinking, public consumption, disorderly behavior, and crime reduction.
- Organized patrol staff to address uniformity in policy and procedures across the patrol shifts.
- Examined shift deployment and reorganization to better accommodate workload more efficiently.

**Police Sergeant – Investigations Division Supervisor**
Lawrence Police Department, Lawrence, Kansas                    June, 2006 to June, 2008

Reviewed criminal cases submitted by officers for determination of assignment to the Investigative Division.  Assigned selected cases and supervised the workload of 17 detectives, two juvenile investigators, one civilian teleserve officer, and an administrative support clerk.  Direct managed and assumed responsibility for major investigations including multiple homicides and shooting cases.  Maintained availability for consultation and call out for case investigation on a continual basis.  Interacted with other supervisors to build cooperative relationships between detectives and officers on case investigation and other projects.

- Increased Investigative Division efficiency and accountability resulting in overtime cost savings while maintaining case load.
- Compiled and submitted statistical end of the year report for Investigative Division with 2005 Resource Plan funding level recommendations.
- Prepared and presented charts outlining potential future department structure and development.
- Submitted resource tiered proposal concerning a downtown safety plan.

**Police Sergeant – Drug Enforcement Unit Supervisor**
Lawrence Police Department, Lawrence, Kansas                    May, 2002 to June, 2006

Responsible for the management and leadership of a dual agency drug investigative unit and reported to both jurisdictional chains of command.  Managed all aspects including: investigation, training, and equipment procurement.  Routinely assisted the Investigative Division by adopting high profile cases for management.  Interacted with the Patrol Division on projects and management of patrol resources on special investigations.
- Relocated and modernized the Drug Enforcement Unit and redefined its procedures and goals.
- Researched and implemented equipment and technological improvements to enhance investigative capabilities.
- Researched and proposed video and audio recording interviews in entirety and developed policy.
- Developed procedures regarding methamphetamine lab response.
- Researched and presented strategies for illicit drug trafficking intervention.
- Proposed city ordinance for marijuana and paraphernalia possession.
- Organized and led a team of detectives and officers to address issues related to downtown incidents of violence.
- Researched and wrote policies and procedures to include: video and audio recording, intelligence information, sources of information, cooperating

individuals, seizure of property, forfeiture of property, and drug tax assessment.
- Oversaw complex investigations resulting in the indictment of over 60 individuals on federal drug, weapons, and conspiracy charges.

**Police Sergeant – Midnight Shift Supervisor**
Lawrence Police Department, Lawrence, Kansas                      June, 2000 to May, 2002

Supervised the work of patrol officers and ensured the adequate allocation of resources during the shift.  Reviewed reports and arrests generated by assigned personnel.  Completed and administered employee evaluations.  Mentored officers and provided training opportunities for their development.  Responded to incidents of a serious nature to directly manage outcomes.  Ensured polices and procedures were followed and initiated personnel investigations.

**Police Officer – Training Unit**
Lawrence Police Department, Lawrence, Kansas                      November, 1998 to June, 2000

Responsible for a wide range of administrative duties to include: officer recruitment, hiring, background investigations, recruit officer training, and in-service training.  Researched policy and procedural changes and made recommendations.  Directed the 20th Basic Recruit Academy.

**Police Officer – Drug Enforcement Unit**
Lawrence Police Department, Lawrence, Kansas                      May, 1995 to June, 1997

Conducted complex narcotics investigations to uncover sources of illicit drugs and identification of suspects.  Utilized undercover and surveillance techniques, recruited and managed informants and cooperating individuals, prepared search warrant affidavits, planned and executed search warrants, and collected evidence.  Affected arrests and testified in court.

**Police Officer - Patrol**
Lawrence Police Department, Lawrence, Kansas                      June, 1997 to November, 1998
Lawrence Police Department, Lawrence, Kansas                      June, 1992 to May, 1995

Patrolled the city to preserve law and order, discover and prevent the commission of crimes, and enforce traffic and other laws and ordinances.  Responded to calls for service regarding misdemeanor and felony incidents as well as civil and other requests.  Performed investigations, collected evidence, conducted interviews, and completed written reports.  Affected arrests and testified in court.  Served as a Field Training Officer and trained recruits.

**<u>EDUCATION</u>**

Graduate Criminal Justice Education Certificate, University of Virginia, Charlottesville, VA, 2010.

Federal Bureau of Investigation National Academy – 240th session, Quantico, VA, 2010.

Federal Bureau of Investigation Central States Law Enforcement Executive Development Seminar, Lawrence, KS 2008.

Drug Enforcement Administration Narcotics Supervisor Leadership Program, Kansas City, MO, 2004.

13th Basic Police Recruit Academy, Lawrence, KS, 1992.

Bachelor of General Studies (major: Sociology), University of Kansas, Lawrence, KS, 1991.

## PROFESSIONAL AFFILIATIONS

Kansas Association of Chiefs of Police (KACP).

FBI National Academy Associates (FBINAA).

Fraternal Order of Police (FOP).

Member (former) of the Executive Board of the Heart of America Regional Computer Forensics Laboratory (Treasurer, 2011 – 2014; Chairman 2014 - 2017).

## AWARDS AND RECOGNITIONS

Meritorious Service Award – Lawrence Police Department, 2017.

Sectional Representative – 240th Session, FBI National Academy, 2010.

Fraternal Order of Eagles Lodge – Reverence for Law Award, 1997.

Appreciation award for service – Drug Enforcement Unit, 1996.

## COMMUNITY INVOLVEMENT

Member (former) of the Community Leadership Board of Directors for Big Brothers Big Sisters of Douglas County.
Member (former) of the Board of Directors (President, 2012) of The Shelter Inc.
Member (former) of the Douglas County Criminal Justice Coordinating Council.

## ADDITIONAL TRAINING, PARTIAL LIST

Emotional Intelligence EQi 2.0 Certification, Lawrence, 2020
Instructional Design Certification, Lawrence, 2020
Strength Deployment Inventory (SDI) 2.0 Certification, Lawrence 2019
Blue Courage; The Heart and Mind of the Guardian, Hutchinson, KS, 2016.
Targeting Criminal Investigations and Extremist Ideologies, Wichita, KS, 2016.
Force Science Institute; Use of Force and Officer Reaction Time, Lawrence, 2015.
Fergusson: Lessons Learned, Hutchinson, KS, 2015.
Racial or Other Biased-based Policing, Lawrence, KS, 2015.
Crucial Conversations, Lawrence, KS, 2015.
Best Practices in Mental Health Responses, San Antonio, TX, 2015.
Fifth Annual Civil Rights Symposium, Topeka KS, 2015.
Leadership and Media Relations, Wichita, KS, 2015.
Officer Involved Shootings, Hutchison, KS, 2014.
Risk Management for Law Enforcement, Lawrence, KS, 2014.

Officer Involved Shootings, Lawrence, KS, 2014.
Active Shooter; Kansas Center for Safe and Prepared Schools, Manhattan, 2013.
Police Ethics and Racial Profiling, Lake Ozark, MO, 2013.
Violent Crime Investigations and Officer Survival, Lake Ozark, MO, 2013.
Fair and Impartial Policing; Advisory Board Training Academy, Hutchinson, KS, 2013.
Leadership, Supervision and Officer Discipline, Lawrence, KS, 2013.
Internal Investigations, Lawrence, KS, 2013.
Law Enforcement Supervision and Management, Lawrence, KS, 2013.
Challenging the Organizational Culture, Kansas City, MO, 2012.
Brady-Giglio, Cases and Careers at Risk, Hutchinson, KS, 2011.
Guidelines for Social Media Use and Implementation, Kansas City, MO, 2010.
Kansas Homeland Security Summit, Wichita, KS, 2009.
Risk Management for Executives in Law Enforcement, Kansas City, MO, 2007.
Hotel and Street Interdiction, Title III, Drug Stings, and Officer Safety, Wichita, KS, 2006.
The Bulletproof Mind: Mental Preparation for Combat, Salina, KS, 2006.
Law Enforcement Supervision and Management, Lawrence, KS, 2006.
Advanced Supervision and Management, Lawrence, KS, 2005.
Employment and Labor Law Seminar, Overland Park, KS, 2005.
Geographic Profiling and Criminal Investigative Failures, Overland Park, KS, 2005.
Cellular Based Surveillance Systems, Washington, DC, 2004.
Stash Houses, Informants, Raid Planning, and Undercover Operations, Wichita, KS, 2003.
Terrorism Investigation; Cultural and Awareness Issues, Overland Park, KS, 2003.
Law Enforcement Criminal Intelligence Systems, Topeka, KS, 2002.
Hiring in the Spirit of Service, St. Joseph, MO, 2000.
Burglary and Robbery Investigation, Kansas City, MO, 2000.
Auto Theft Investigation, Overland Park, KS, 1999.
Advanced Kinesic Interview and Interrogation Phase II, Lawrence KS, 1997.
Kinesic Interview and Interrogation Phase I, Topeka, KS, 1996.
Practical Homicide Investigation, Kansas City, MO, 1996.
Basic Drug Investigator School, Des Moines, IA, 1995.
Criminal and Drug Interdiction, Kansas City MO, 1995.

## COURSES TAUGHT

Current Issues for Law Enforcement Executives, KU Public Management Center
Leadership Decision-making, KU Public Management Center
Knowledge Management and Succession Planning, KU Public Management Center
Community and Law Enforcement Relations, KU Public Management Center
Power of Leadership, KU Public Management Center
Role of Law Enforcement Supervision, KU Public Management Center
Generations in the Workplace, KU Public Management Center
Public Speaking and Communications, KU Public Management Center
Future of Public Service, KU Public Management Center
Leadership, Lawrence Police Department.
Injury and Death Investigations, Lawrence Police Department.
Theft Investigations, Lawrence Police Department.
Assault Investigations, Lawrence Police Department.
Burglary and Robbery Investigations, Lawrence Police Department.
Child in Need of Care Investigations, Lawrence Police Department.
Intelligence, Information and Informants, Lawrence Police Department.
Surveillance Strategies and Techniques, Lawrence Police Department.

Patrol Procedures, Lawrence Police Department.
Stolen Vehicle Investigations, Lawrence Police Department.
Drug Enforcement Operations, Lawrence Police Department.
Methamphetamine Labs, Lawrence Police Department.
Merchant Security Guidelines, Lawrence Police Department.