# EXHIBIT 51 – PART 1

1       IN THE DISTRICT COURT OF WYANDOTTE COUNTY, KANSAS

2

LAMONTE MCINTYRE,        )

3                    )

           Petitioner,   )

4                    )

    vs.               )    Case No. 16 CV 508

5                    )

STATE OF KANSAS,        )

6                    )

           Respondent.   )

7

8           TRANSCRIPT OF EVIDENTIARY HEARING

9                 (Volume I)

10      PROCEEDINGS had before the Honorable Edward Bouker,

11   Senior Judge, at Kansas City, Kansas, on the 12th day of

12   October, 2017.

13      APPEARANCES:

14      The petitioner, LAMONTE MCINTYRE, appeared in person

15   and by Cheryl A. Pilate, Attorney at Law, 926 Cherry

16   Street, Kansas City, Missouri 64106; Tricia Bushnell and

17   Lindsay Runnels, Midwest Innocence Project, 369 Broadway

18   Boulevard, Suite 2, Kansas City, Missouri 64111.

19      The respondent, STATE OF KANSAS, appeared by Jennifer

20   Tatum and Francis Gipson, Assistant District Attorneys,

21   Wyandotte County Courthouse, 710 North 7th Street Kansas

22   City, Kansas 66101.

23

24

25

LMKSDC_0026264

<pre>
 1                          INDEX
                                                Page
 2     Petitioner's opening statement             7

 3
       PETITIONER'S WITNESSES    DIRECT  CROSS  REDIRECT  RECROSS
 4     Gloria Labat                 9
       Ronald Singer               49     65      77
 5     James McCloskey             81    153     191
       Saundra Newsom             216
 6     Lawrence Fox               253    303     311
       Rose McIntyre              314
 7

 8     State's motion for new trial                      335
       State's motion to dismiss                         336
 9     Certificate of certified court reporter           337

10                          EXHIBITS

11     Petitioner's Exhibits              Offered    Received
       1   (police reports)              203,333     203,333
12     2-4                                   333         333
       5-7 (trial transcripts)           203,333     203,333
13     8-119                                 333         333
       120 (Mr. Fox's report)            258,333     258,333
14     121-130                               333         333
       131 (handwritten notes)           197,333     197,333
15     132-133                               333         333
       134 (Cecil Brooks' draft affidavit) 142,333   142,333
16     135 (photos)                      113,333     113,333
       136 (transcript of audio tape)        333         333
17     137-149                               333         333
       150 (Mr. Fox's CV)                256,333     256,333
18     151 (Mr. Singer's resumé)          53,333      53,333
       152-160                               333         333
19     161 (audio tape)                  234,333     234,333
       162 (letter)                       96,333      96,333
20     163                                   333         333
       164 (6/21/10 letter)              140,333     140,333
21     165 (stipulation)                 211,333     211,333
       166 (Ms. Newsom's corrected
22       affidavit)                      240,333     240,333
       167-168                               333         333
23
       Respondent's Exhibits
24     1 (DNA report)                        73          73

25
</pre>

TINA R. ST. JOHN, RPF, CRR

1          THE COURT:  Good morning everyone.  Before we
2     get started, I want to go through a few things.
3     Obviously this case has gotten you all out this
4     morning and you're more than welcome.  However, so
5     things work smoothly and so everyone gets a chance to
6     present what they want to present, and obviously
7     they're presenting it to me and I need to hear and I
8     need to take notes, I need to pay attention.  So a
9     few things that I want to mention to you before we
10    get started.
11         First of all, I know typically it wouldn't seem
12    like people in the audience section leaning over and
13    whispering to each other and having a conversation
14    would be a problem, but it is distracting and it
15    tends to draw my attention.  And also sometimes it's
16    louder than you think it is.  So I'm going to ask you
17    please not to discuss the case amongst yourselves out
18    there in the audience or whatever you want to
19    discuss, don't do it here.
20         Also, try to keep leaving the courtroom at a
21    minimum while we're in session.  In other words,
22    don't go in and out and in and out because
23    particularly with this many people in the courtroom,
24    that's distracting for everyone here.
25         If you have a cell phone, you are not allowed by

LMKSDC_0026266

1          any electronic means to take video or audio of this
2          hearing.  And if you have a cell phone, please turn
3          it off at this point in time.  I'll give you a few
4          minutes to do that.  You can have it on out in the
5          hallway, you can use your cell phone out in the
6          hallway, just don't do it in here.  There is a
7          Supreme Court rule -- and I don't want to start our
8          relationship with -- with being unpleasant, but I
9          will tell you that I am allowed to take your cell
10         phone if I see you violating this rule.  I've never
11         had to do that and I don't think I will this morning
12         either.  But please if you've got a cell phone, turn
13         it off at this time.  Try to remember if you use it
14         out in the hallway during breaks, try to remember to
15         turn it off before you come back in.

16              I got a -- an e-mail from a reporter with a
17         local newspaper that I did not get a chance because I
18         was on the road to respond to asking whether or not
19         that reporter could use a laptop to take notes rather
20         than a notepad.  That's you, okay.  You're free to do
21         that, but understand that you're not allowed to take
22         audio or video with that laptop, and that's basically
23         the rules.

24              UNIDENTIFIED SPECTATOR:  That includes photos,
25         correct?

LMKSDC_0026267

1          THE COURT:  That includes photos.  No photos,
2     okay.
3          UNIDENTIFIED SPECTATOR:  Okay.
4          THE COURT:  There is a local court rule that
5     I've been made aware of about how permission to do
6     that can be sought.  Nobody has sought to do that so
7     in accordance with the rule at least.  So no photos
8     at this point in time.  But you're welcome to use
9     your laptop as a substitute to take notes, just no
10    audio or video or photos, okay.
11         I may think of things that I'm not thinking
12    about right now during the -- during the trial -- oh,
13    one other thing, I know that this is likely to be
14    very emotional for many people.  Please do not react
15    to testimony up here, okay.  In other words, your
16    facial reactions are testimony.  You are not under
17    oath, okay.  And I will ask you not to do it.  And if
18    it continues, I'll ask you to leave.  I understand
19    the emotion, but it's disruptive and it's testimony
20    that's not under oath.
21         So understand also that I have read the briefs
22    here, what has been submitted prior to trial, so I do
23    know what -- I do understand generally what's going
24    on, but I have no evidence before me at this point in
25    time.  So, you know, the attorneys will be doing that

TINA R. ST. JOHN, RPF, CRR

1      over the next -- we're actually scheduled for two

2      days this week and the rest -- the entire week next

3      week, and so that's what we will be doing and I will

4      be paying close attention and doing everything I can

5      to gather in all of the facts and everything I need

6      to make a very knowledgeable decision and I'm sure

7      the attorneys will do their utmost to help me do

8      that.

9           So I think that's all I have.  Let me announce

10      the case and have the attorneys announce the

11      appearances as they need to do.  This is case number

12      16CV508, Lamonte McIntyre versus State of Kansas.

13      Would you announce your appearances please.

14           MS. TATUM:  May it please the court, Your Honor.

15      The State appears by Jennifer Tatum and Francis

16      Gipson.

17           MS. PILATE:  Good morning, Your Honor.

18      Petitioner, Lamonte McIntyre, is present personally

19      and also appears through counsel Cheryl Pilate,

20      Lindsay Runnels and Tricia Bushnell.  And at counsel

21      table we also have our paralegal, Melissa Testrake.

22           THE COURT:  All right.  Do either of you have

23      opening statements?

24           MS. PILATE:  Your Honor, if I may, I have a few

25      brief words.

LMKSDC_0026269

1          THE COURT:  All right.

2          MS. PILATE:  I think everybody's anxious to get

3     to the evidence, but I've prepared just a very few

4     words here.

5          Your Honor, Lamonte McIntyre is innocent.  The

6     evidence will show that he had nothing to do with the

7     murders of Doniel Quinn and Donald Ewing.  He did not

8     know them, had never met them and was with his family

9     when they were shot to death.  The evidence that

10    showed his innocence was buried, never collected or

11    manipulated falsely to show guilt.  That is what the

12    evidence will show.

13         The time from the shooting to Lamonte's arrest

14    was only six hours.  In that time police conducted a

15    mere 19 minutes of taped interviews taking no steps

16    to find a weapon, accomplice, a motive or any

17    physical evidence.  In fact, the evidence will show

18    that police did not obtain a shred of evidence to

19    show that Lamonte McIntyre even knew the two victims.

20         A retired police detective from the Kansas City,

21    Kansas Police Department who examined the case

22    against Lamonte McIntyre concluded that it was

23    grossly deficient, filled with inexplicable failures

24    and lapses, all of which casts severe doubt on the

25    work of the detectives who handled it.

LMKSDC_0026270

1          In this post-conviction investigation of Lamonte

2     McIntyre's case done many years later, investigators

3     and lawyers have collected the evidence that should

4     have been gathered by police, and that evidence shows

5     that everyone who knew anything about the shootings

6     knew that Lamonte McIntyre was innocent.  That

7     knowledge extends to the families of the two victims

8     who have also suffered for 23 years from this

9     injustice.

10          In this hearing the evidence that will be

11    presented should have been presented 23 years ago.

12    That evidence will show that Lamonte McIntyre was

13    innocent, that his trial was unfair and riddled with

14    constitutional errors and that he deserves to have

15    his convictions vacated.  Thank you, Your Honor.

16          THE COURT:  Thank you.  On behalf of the State,

17    do you have an opening?

18          MS. TATUM:  No, Your Honor.  Thank you.

19          THE COURT:  All right.  You may call your first

20    witness.

21          Ma'am, if you would step forward up here please.

22                        GLORIA LABAT

23    called as a witness on behalf of the Petitioner,

24    having first been duly sworn, testified as follows:

25          THE COURT:  You may examine.


                    TINA R. ST. JOHN, RPF, CRR

<u>DIRECT EXAMINATION</u>

BY MS. PILATE:

Q.   Good morning, Ms. Labat.

A.   Good morning.

Q.   Can you please tell the court where you reside
     generally?

A.   Wyandotte County, 2020 Oakland is where I live now.

Q.   And is that in Kansas City, Kansas?

A.   Kansas City, Kansas.

Q.   Have you resided in Kansas City, Kansas your entire
     life?

A.   Yes, I have.  Not all my life.  I moved to California
     for 10 years and then came back.

          THE COURT:  Ma'am, could I -- I'm sorry, could I
     get you to -- yes, that's exactly what I need you to
     do.  Thank you.

          THE WITNESS:  Is this okay now?

          MS. PILATE:  Yes.

          THE WITNESS:  Okay.

Q.   (By Ms. Pilate)  And can you tell us what your
     present status is, whether you're employed or
     retired?

A.   I'm a retiree from the government.

Q.   Okay.  And where did you work?

A.   I worked for Social Security for 43 years.

TINA R. ST. JOHN, RPF, CRR

1    Q.   Okay.  And what was your position when you retired?

2    A.   A claims representative.

3    Q.   In terms of the case that we're here for today, can

4         you tell us if you have a connection to any of the

5         individuals that are a part of this case?

6    A.   Yeah.  I have both relatives --

7    Q.   Okay.

8    A.   -- my nephew and a cousin.

9    Q.   Okay.  Could you please explain which is which and

10        what the connection is?

11   A.   Okay.  Donny is my nephew, he was the first born of

12        my sister and first born of the family is my nephew.

13        And Don is my cousin, and he's from my girlfriend

14        and -- his dad -- his dad is my cousin and they are

15        -- and then they created Don and so Don is my cousin

16        -- so both are relatives.

17   Q.   Okay.

18   A.   Uh-huh.

19   Q.   Let's break that down a little bit.  You said Don or

20        Donald was the first born?

21   A.   Right.

22   Q.   When you say first born, do you mean a --

23   A.   First born of the Hawthorn family, my mama's side.

24   Q.   Okay.  A first born grandson?

25   A.   Grandson.

TINA R. ST. JOHN, RPF, CRR

1    Q.   Okay.  And who is your mama?

2    A.   Bessie Hawthorn, she worked for the State as a police

3         -- police department as a cook.

4    Q.   Okay.  And did she have some connection with the

5         courthouse?

6    A.   Yeah.  They call her mom.  She was a chef and she was

7         a cook and people always say that when you go to

8         Wyandotte County Jail, you gonna get a good

9         home-cooked meal from Bessie, you know.  So if you up

10        there for traffic ticket or whatever, you know, you

11        get fed well, but she was loved by both -- everybody.

12   Q.   Okay.  So was your mother's name Bessie Hawthorn?

13   A.   Uh-huh, Bessie Hawthorn.

14   Q.   Okay.  And Donald Ewing was her first born

15        grandchild?

16   A.   First born grandson.

17   Q.   Okay.  And Donald Ewing is your nephew?

18   A.   Right.

19   Q.   And his mother is one of your sisters, right?

20   A.   My first sister, my oldest one.

21   Q.   Okay.  And where is she now?

22   A.   She's deceased.

23   Q.   Okay.  And what was her name please?

24   A.   Ora, O-r-a, Ewing.

25   Q.   Okay.  And could you explain your connection to the

LMKSDC_0026274

| 1 | | other victim in this case and who that is? |
|---|---|---|
| 2 | A. | Okay.  Donny -- Doniel Quinn is my cousin.  And my |
| 3 | | best girlfriend who I grew up with, that's her son. |
| 4 | Q. | Okay. |
| 5 | A. | And then her husband at that time was my cousin. |
| 6 | Q. | Okay. |
| 7 | A. | So it's like double cousin -- relative, I have both |
| 8 | | -- |
| 9 | Q. | Okay.  So you had a connection to Doniel Quinn both |
| 10 | | through your girlfriend, correct? |
| 11 | A. | Right. |
| 12 | Q. | Who was your good friend since childhood? |
| 13 | A. | Right, since the fourth or fifth grade. |
| 14 | Q. | Okay.  And then you also mentioned that you were |
| 15 | | related to the father of Doniel Quinn? |
| 16 | A. | Yeah.  My grandfather and his grandfather was |
| 17 | | brothers, twin brothers. |
| 18 | Q. | I'm sorry, you said what, twin brothers? |
| 19 | A. | Uh-huh. |
| 20 | Q. | Okay.  So you were related to the father of Doniel |
| 21 | | Quinn? |
| 22 | A. | Right. |
| 23 | Q. | And his name was? |
| 24 | A. | John Quinn. |
| 25 | Q. | Okay.  And what is the name of the mother of Doniel |

LMKSDC_0026275

1          Quinn?

2     A.   Saundra Sublette at that time.

3     Q.   Okay.  And how do you know her today?  What's her

4          last name today?

5     A.   Luscen (phonetics).

6     Q.   Okay.  And does she remain your friend?

7     A.   Yes, she still is.

8     Q.   Okay.  Did Donald Ewing have a particular

9          significance to your mother, Bessie Hawthorn?

10    A.   Yeah.  In the old school days like they called -- the

11         kids would call my mom "mom" instead of grandma, you

12         know, that's the way.  And then like she baby-sitted

13         him and, you know, was our -- our first grandchild,

14         her first grandchild and my first nephew and so we

15         kind of grew up -- we grew up with Donny, matter of

16         fact.

17    Q.   Okay.  So would it be fair to say that your mother,

18         Bessie Hawthorn, was close to Donald Ewing?

19    A.   Oh, absolutely, all the way, you know, from day one

20         since he was born.

21    Q.   Okay.  Now, was there a day in April of '94 that you

22         recall that has particular significance to you with

23         regard to both of the individuals we've just talked

24         about, Donald Ewing and Doniel Quinn?

25    A.   Repeat the question again.

LMKSDC_0026276

1   Q.   Is there a day in April of 1994 that you recall with

2       respect to Donald Ewing and Doniel Quinn?

3   A.   Oh, yeah, for them being together the day that the

4       they -- when the murder took place, yeah, that day,

5       yeah.  I had got off from work, work for the

6       government, and I had got home -- and in Wyandotte

7       County everybody knew somebody's family.  And when

8       you knew somebody's family, like I was a Hawthorn.

9       There was 11 of us, someone knew a Hawthorn, somebody

10      knew a Sublette, somebody knew something.  We all

11      knew people, you know, we like family so 'cause we

12      went to school and everything.  So when I got home, I

13      got a call from someone, I don't remember who was it

14      said your nephew just got killed.

15           And I said, are you serious?

16           And they said, yeah, they say he got killed

17      around the corner from your house, my mama's house.

18           So I immediately hung up the phone and I went.

19      They told me it was on that street that he got killed

20      on and I went down there and to see was it true.  And

21      when I got down there, they had the yellow thing that

22      you block where nobody can come across and

23      everything, scene of the crime and stuff like that.

24      And I was trying to get through there 'cause Donny's

25      car was out there and I was trying to go through, and

LMKSDC_0026277

1       I told the police, I said I'm Donny's auntie.  He --
2       did he get shot here?
3            So they said, well, which one?
4            And I said, Donny Ewing.
5            They said, well, they just took him to the
6       hospital at Bethany.  And, you know, he's gone there.
7            So in the meantime, my cousin, Josephine, was
8       telling me that they got -- that man didn't come from
9       there to shoot Donny, he was shooting -- she was on
10      the porch, she was outside on the porch and she was
11      saying that ain't where he went.  He went this way
12      and that's not the person is all who they got or
13      whatever, that's not the right person.  And they said
14      that he went this way and he's, you know, she was on
15      the porch.  And at that time I was talking to the
16      detective.  The detective that I was talking to was a
17      black guy.
18  Q.  Uh-huh.
19  A.  But it was two detectives.
20  Q.  Uh-huh.
21  A.  And, of course, I don't remember their names because
22      names was not important to me at that time.  I was
23      dealing with the death knowing my son -- my nephew
24      was -- got shot.  At that time he was not dead.
25  Q.  Uh-huh.

LMKSDC_0026278

```
 1    A.    So the detective told me that -- what hospital he was
 2          at and so then I went to the house and my mom was
 3          getting off work and she had got home and we
 4          immediately went to the hospital to see Don -- Donny.
 5          And then when we got there, they said he's in
 6          surgery.  And news carried real fast, you know.  You
 7          don't really have to call everybody because somebody
 8          calls somebody to tell them and then we all there and
 9          look up four or five of my family was there so I
10          didn't call them and so that's how it goes, you know.
11          And so we was all at the hospital.  So it passed on
12          that way.
13    Q.    Uh-huh.
14    A.    And then when we got there, the doctor came out and
15          said that he didn't make it.
16    Q.    Okay.  Let's go back and break this down a little
17          bit.  When you first arrived at the scene where this
18          shooting had taken place, what do you remember
19          seeing?
20    A.    I saw two detectives and I saw that thing across, the
21          yellow thing where you can't go, and I saw Donny's
22          car, and they was blocked it off where you couldn't
23          go and I was trying to get there to get to my nephew.
24          And people was on the porch coup- -- most people was
25          on their porch outside looking.
```

TINA R. ST. JOHN, RPF, CRR

1    Q.    Okay.  You just mentioned a car, what car did you
2          see?
3    A.    It was a blue car.  And I'm not good on the names of
4          what type of car it was, but it was -- Donny had a
5          light blue car.
6    Q.    Okay.  Do you know if that car was registered or
7          owned by anyone else in your family?
8    A.    Nobody but Donny.
9    Q.    Okay.  And you knew that car as Donny's car?
10   A.    Right, 'cause Donny would drive the car.  You know,
11         Donny was dealing with cancer.
12   Q.    Okay.
13   A.    And sometimes he had good days and bad days and he'd
14         get out and drive around and they, you know, down in
15         Wyandotte County and drive and he gets up in the
16         morning and drive and it relaxes him.  And he did
17         that so when you driving down in the old school, you
18         know, when you going down the street driving or
19         something like you see a relative or friend, you pick
20         'em up and give 'em a ride.
21   Q.    Uh-huh.
22   A.    And so happened that day Donny was driving down the
23         street when he saw his cousin Don.  And he said,
24         well -- walking, so he said, where are you going?
25         I'll give you a ride, pulled over, said where are you

LMKSDC_0026280

```
 1          going?  Come on, man, I'll take you in, and that's
 2          how they hooked up together --
 3    Q.    Okay.
 4    A.    -- you know.
 5    Q.    Do you know where you would have heard that or is
 6          that an assumption you made based on what you knew
 7          about how Don operated?
 8    A.    Well, that's the way we all do.
 9    Q.    Okay.
10    A.    You know, and then I know that's only way Donny would
11          have got hold to Don -- Doniel because they didn't
12          hang around together.
13    Q.    Okay.
14    A.    You know, and so but then -- but he knew of him.
15    Q.    So it wasn't -- what you're saying it wasn't
16          common --
17    A.    Right.
18    Q.    -- for them to hang out together?
19    A.    Right.  Right.
20    Q.    Okay.  And you mentioned seeing a couple of
21          detectives, right?
22    A.    Yeah, I saw two.
23    Q.    And are those the detectives you spoke with?
24    A.    Yes.
25    Q.    Okay.  And did they provide you with any information
```

LMKSDC_0026281

1          about what happened?

2     A.   No, they did not provide me.  But one -- one

3          information, I stand correction, is he told me that

4          Donny was at Bethany St. Margaret's Hospital --

5     Q.   Okay.

6     A.   -- you know, and that was it.

7     Q.   Okay.  And you also mentioned that you recall seeing

8          a woman named Josephine?

9     A.   Yeah, Josephine is my cousin and that's Donny --

10         Doniel's auntie.  And John and Josephine are sister

11         and brother.  Doniel's daddy and Josephine are sister

12         and brother.

13              MS. PILATE:  Okay.  If I may have just a second?

14         I apologize.  We had a slide apparently we can't

15         find.

16    Q.   (By Ms. Pilate)  But explain how Josephine Quinn was

17         your cousin.

18    A.   Yes, Josephine was my cousin.

19    Q.   Uh-huh.

20    A.   And that was Don's auntie, you know, Saundra's sons,

21         Josephine was.  And she was on the porch and she was

22         telling the police -- a detective that they got the

23         wrong person, that it's not -- that's not the way

24         they went.  They went that way, he walked that way,

25         he came from that way.  I did hear that was -- that

TINA R. ST. JOHN, RPF, CRR

| 1 | | conversation, but I was also dealing with my nephew |
|---|---|---|
| 2 | | been shot and trying to get there too.  So naturally |
| 3 | | I did not go up there to talk to Josephine, I was |
| 4 | | trying to go to the hospital to go see about my |
| 5 | | nephew and then get my mom.  So she -- I thought |
| 6 | | immediately of my mom and my sister, how they gonna |
| 7 | | react to that and tell them that Don got shot.  At |
| 8 | | that time he was not dead -- |
| 9 | Q. | Uh-huh. |
| 10 | A. | -- you know, and that -- |
| 11 | Q. | Did you -- did you go to the scene at the point that |
| 12 | | you finished work for the day, at the end -- |
| 13 | A. | Right. |
| 14 | Q. | -- of your usual work hours? |
| 15 | A. | Uh-huh. |
| 16 | Q. | And what time did you usually get off work? |
| 17 | A. | 6:00 to 2:00, 2:30, but I think I somehow got off |
| 18 | | early that day because I was there at 2:30 so I don't |
| 19 | | know, I can't recall what time I got off, but -- I |
| 20 | | know I went to work, but I don't know -- I might have |
| 21 | | took off early or something, but it was about 2:30. |
| 22 | | My mom usually got home by 2:30 or 3:00 o'clock -- |
| 23 | Q. | Okay. |
| 24 | A. | -- from where she was and I -- |
| 25 | Q. | You had not yet seen her? |

LMKSDC_0026283

1   A.   No, I had not seen her.

2   Q.   But you think it was about 2:30?

3   A.   Yeah, 2:30.

4   Q.   And to the best of your recollection, both Doniel

5        Quinn and Donald Ewing were no longer there?

6   A.   Neither one of 'em was at the --

7   Q.   Okay.

8   A.   -- scene.

9   Q.   So when you arrived, it was after?

10  A.   Right.  So it could have been like, you know, 3:00

11       o'clock or something.

12  Q.   Okay.

13  A.   Three, somewhere in that area, 3:00 or 3:30

14       something.

15       MS. PILATE:  I apologize.  We now have an

16       exhibit up on the screen, and this is a demonstrative

17       exhibit that we've marked as 163 and I apologize for

18       the earlier delay.

19  Q.   (By Ms. Pilate)  But do you see on the exhibit there

20       Josephine Quinn?  Can you see that far, Ms. Labat?

21       Okay, great.

22  A.   I actually can't see that far from here.

23  Q.   Okay.

24       MS. PILATE:  Your Honor, may we move it just a

25       little bit?

TINA R. ST. JOHN, RPF, CRR

```
 1              THE COURT:  Well, you can either move that or
 2         you can have the witness come forward.  It might be
 3         -- whichever you think is best.
 4              MS. PILATE:  Okay.
 5              THE WITNESS:  It would be better for me to come
 6         up there.
 7              MS. PILATE:  Okay.
 8                   (The witness left the stand.)
 9    Q.   (By Ms. Pilate)  Ms. Labat, on Exhibit 163, do you
10         see some individuals that you know?
11    A.   Yes.
12    Q.   Or have known?
13    A.   Uh-huh.  That's Don, my cousin who got shot,
14         grandmother and grandfather there.
15    Q.   Okay.
16    A.   And that's his dad and that's Donny, Doniel right
17         there (indicating).
18    Q.   Okay.
19    A.   And then -- and that's Freda (phonetics), it's his
20         auntie --
21    Q.   Okay.
22    A.   -- and that's Josephine.
23    Q.   Okay.
24    A.   And then that's Nicki and that's Liz and Stacy.
25         These are Josephine's kids.
```

TINA R. ST. JOHN, RPF, CRR

1    Q.   Okay.  So at the top, would you agree that they are

2         the grandparents there?

3    A.   Grandparents, uh-huh.

4    Q.   And the grandparents would be Fred and Cinderella

5         Quinn?

6    A.   No.  Fred is -- daddy and my mama's dad are twin

7         brothers.

8    Q.   Okay.

9    A.   So that's how I know them.

10   Q.   So you're saying that Fred is a twin brother of or

11        Fred's dad is a twin brother?

12   A.   Uh-huh.

13   Q.   Is a twin brother of your grandfather?

14   A.   No, of their dad.  Their dad.

15   Q.   When you say -- okay.  Whose dad?

16   A.   Fred's dad.

17   Q.   Okay.

18   A.   Bruce --

19   Q.   Okay.

20   A.   -- is -- and my grandfather.

21   Q.   Okay.

22   A.   Blaine.

23   Q.   Okay.

24   A.   Bruce and Blaine.

25   Q.   Okay.  I understand.  So Fred's father, Bruce, is a

LMKSDC_0026286

1          twin brother of Blaine who was your grandfather?  Did

2          I get that right?

3    A.    Did I get that right?  Okay, Bruce and Blaine, those

4          are Fred's daddy --

5    Q.    Uh-huh.

6    A.    -- and my mama, Bessie -- Bessie -- Blaine, that's my

7          mama's daddy.

8    Q.    Okay.

9    A.    And Fred's daddy is Bruce.

10   Q.    Okay.

11   A.    Okay.

12   Q.    So your mother's father is Blaine?

13   A.    Right.

14   Q.    And he is the brother of Fred's father Bruce?

15   A.    Right.  There we go.

16   Q.    Do we have it now?

17   A.    Now you got it, okay.

18   Q.    And, in fact, the Quinn family tree is more extensive

19         than that, is it not?

20   A.    Oh, definitely.  Oh, definitely.

21   Q.    Okay.  And are you acquainted with other siblings of

22         John and Freda and Josephine?

23   A.    Yeah.  We grew up together.  Like I said, families in

24         Wyandotte County, you know, we know each other, you

25         know, you know, we big families and go to school or

TINA R. ST. JOHN, RPF, CRR

1           summer would come over and see 'em and all that stuff
2           there, you know.  And Josephine went to school with
3           me --
4      Q.   Uh-huh.
5      A.   -- and my girlfriend Saundra.
6      Q.   Okay.  So the three of you all knew each other?
7      A.   Yeah, Josephine and I knew each other 'cause we was
8           cousins, and Saundra and I knew each other since the
9           fourth grade, and then later in life Saundra met my
10          cousin.
11     Q.   John?
12     A.   John, uh-huh.
13     Q.   And when you saw Josephine, did she appear to --
14               THE COURT:  Can I interrupt just for a minute,
15          counsel?  Do you still need her?
16               MS. PILATE:  We're calling up another photo.
17     Q.   (By Ms. Pilate)  Okay.
18     A.   That's my nephew.
19     Q.   Okay.  And when you say your nephew, you mean Donald
20          Ewing?
21     A.   Donald Ewing, right.
22     Q.   Okay.  And I think you mentioned earlier that at the
23          time of the shooting that he was suffering from some
24          illness?
25     A.   Stomach cancer, yeah.  He had stomach -- and he'd get

LMKSDC_0026288

1        up some days and he would ride around, you know, in
2        Wyandotte County to look at the scenery just pass by,
3        you know, to relax him, then he'd go back in the
4        house back to his home.
5    Q.  Do you want to return to the witness stand, Ms.
6        Labat?
7                    (The witness resumed the stand.)
8                    MS. PILATE:  Thank you.
9                    THE WITNESS:  Uh-huh.
10   Q.  (By Ms. Pilate)  Now, I think you said the next thing
11       you remember is going to Bethany Hospital; is that
12       right?
13   A.  Right.
14   Q.  And it was at the hospital that you saw some other
15       family members, is that --
16   A.  Yeah.
17   Q.  Okay.  And at some point you were informed that --
18   A.  Don.
19   Q.  -- that Don had passed, right?
20   A.  Uh-huh.
21   Q.  Okay.  And do you recall at about what point in the
22       afternoon you might have heard that?
23   A.  It wasn't -- I don't think it was 6:00 o'clock.
24   Q.  Uh-huh.
25   A.  You know, I don't know what time, but it was -- it

LMKSDC_0026289

1        wasn't that long, maybe between 6:00 and 7:00 or

2        something like that.

3    Q.  Okay.  Now, following this shooting, do you recall if

4        any detective ever came to interview you or ask you

5        any questions about what you knew about your nephew

6        Don and his associates or what he might have been

7        doing in life?

8    A.  No.  I don't recall -- neither one of the detectives

9        coming to my mama's house, and I was living at my

10       mom's residence at that time.

11   Q.  Uh-huh.

12   A.  But of course if they did come, they would have to

13       come when I was at work and they did not come back to

14       talk to any of our, as far as I know, any of my

15       siblings or, you know, anything or ask any questions

16       or anything.  And I did not even know -- matter fact,

17       if I recall, I called up there --

18   Q.  Uh-huh.

19   A.  -- and asked them to let me know what's going on with

20       the situation with Don and Doniel on the -- why did

21       this happen, the story, how did this happen, you

22       know, because I didn't know how -- why was anybody

23       want to kill Don or Donny at that time.

24   Q.  Uh-huh.

25   A.  And then like I said, I was -- I had just had a

```
 1              sister who had died from cancer, breast cancer, and,
 2              you know, dealing with Donny's death and then worry
 3              about my mom and how she gonna react on this and
 4              everything 'cause that was her first born.  I just,
 5              you know, the main thing that I was focused on was
 6              dealing with the death of Donny --
 7      Q.      Uh-huh.
 8      A.      -- and Don and dealing with my mother, how she gonna
 9              handle it and the family and all that stuff then and
10              preparing the funeral.  I mean we had enough on our
11              plate then to be trying to find out who killed who --
12      Q.      Uh-huh.
13      A.      -- or what happened there at that time.  It was just,
14              you know --
15      Q.      And you're talking about the period immediately
16              surrounding --
17      A.      Right.
18      Q.      -- the shooting?
19      A.      Right.  And so nobody came and talked to us --
20      Q.      Okay.
21      A.      -- you know, anything.  And next thing you know, I
22              heard they got the person.  I think they said they
23              got that person that same day or the next day or
24              something.
25      Q.      Okay.
```

TINA R. ST. JOHN, RPF, CRR

1     A.    They picked him up, you know, and got him --

2     Q.    Uh-huh.

3     A.    -- and so Lamonte -- and I don't know Lamonte, I

4           never met him, I don't know his side of his family

5           and I don't know what he looked like, you know,

6           anything so...

7     Q.    Okay.  Did you hear anything at that point after the

8           shooting and let's say before the trial about this

9           person you heard about Lamonte, did you hear anything

10          else?

11    A.    Yeah.  Josephine kept saying they got the wrong

12          person and all that stuff there.  And people said

13          that that was -- through other people, they said no

14          name was who killed Donny, but they just said they

15          got the wrong person.  So then I found out that they

16          was gonna have the trial for Lamonte.  And so

17          naturally I was gonna go to that to find out how this

18          all came to.  And people would talk a little bit, say

19          a little bit.  You know, well, that's the wrong

20          person or the person they got was not there or

21          whatever and all that stuff there.  So and then I had

22          talked to Saundra and Saundra said that John had told

23          her that that's not the person who killed my nephew

24          and Don.

25    Q.    Okay.  Let's break that down a little.  You said that

TINA R. ST. JOHN, RPF, CRR

```
 1          Josephine kept saying to you it was the wrong person,
 2          right?
 3     A.   That was the wrong person.
 4     Q.   And then you said --
 5     A.   And they said get with Stacy, you all need to get
 6          with Stacy.  Stacy knows who it is.
 7     Q.   Okay.
 8     A.   You know, and Stacy's deceased now, but --
 9     Q.   Okay.
10     A.   -- Stacy --
11     Q.   So she said Stacy knew who the shooter was?
12     A.   Right, who the shooter was.
13     Q.   Okay.
14     A.   You know, get with Stacy.
15     Q.   And then you -- you said that people kept saying, do
16          you mean like this is what you would hear out in the
17          community?
18     A.   In the community, you know, from relatives or from
19          people who knew me or knew Saundra, you know,
20          somebody would say -- always say something that they
21          got the wrong person in jail and all this stuff here.
22          But I did not know Nicki was -- knew who it was at
23          all and she never came to me -- that's Josephine's
24          daughter.  And I never did know that Nicki knew who
25          killed my nephew and her cousin.  And, of course, the
```

TINA R. ST. JOHN, RPF, CRR

```
1              Quinn side of the family, all of them said they got
2              the wrong person, but they never gave a name --
3    Q.        Okay.
4    A.        -- on who did.  And I asked, but that ain't the
5              person.
6    Q.        Okay.  So what you heard is wrong person --
7    A.        Right, wrong person.
8    Q.        -- right?  But at some point you heard there was
9              going to be a trial?
10   A.        Right.
11   Q.        And was it at the trial that you heard for the first
12             time anything Nicki Quinn had to say?
13   A.        Yeah.  At that time -- and I always thought that the
14             detective would let us know they was gonna come and
15             say, well, we going to court here.  We didn't get a
16             call from the detectives or nothing.  You know, as
17             far as when they gonna have a trial or anything or
18             that they -- and, of course, we had to be guilty on
19             our side, we didn't call them neither because, you
20             know, we was still dealing with the drama.  You know,
21             it wasn't about -- you couldn't change that Donny and
22             Don was dead so as far as us focused on trying to
23             find the killer, we assumed that the detectives would
24             do their job and come up with the right people, right
25             person.
```

LMKSDC_0026294

```
 1    Q.   Okay.  Now, when you say the drama, do you mean what
 2         was going on in your family as far as grief?
 3    A.   Drama as far as, you know, why Don and Donny got
 4         killed.
 5    Q.   Okay.  And what was going on with your mother at this
 6         time?
 7    A.   She was taking it pretty hard, my mom, but she had
 8         stayed strong for us because she had 11 kids and, you
 9         know, we all looked at mom and so she -- she had her
10         moments, but she did it in privately.  And then, you
11         know, we'd say, well, mom, are you okay?  And I guess
12         she knew us well enough to know that she start
13         breaking down and crying, then everybody else would
14         probably break down and she had to be strong for the
15         family.
16    Q.   Okay.
17    A.   And that's the way my mama did her whole life.
18    Q.   Okay.
19    A.   She was a strong woman.
20    Q.   Yes.
21    A.   You know, but so the day that we found out that they
22         was going to go to trial --
23    Q.   Uh-huh.
24    A.   -- I went and Nicki was there and Josephine wasn't
25         there, but Cindy was there and some more Quinns, I
```

LMKSDC_0026295

1          don't know, they was there and I was there.  And I
2          came in in time to see Nicki testifying.
3     Q.   Okay.  What do you remember about how Nicki appeared
4          on the witness stand?
5     A.   She looked like she was in la la land, spaced off,
6          she'd answer yeah, this and that, you know, whatever,
7          you know, just like every time I see Nicki, that face
8          about, you know, Lamonte, she would always look like
9          sad.  And by saying la la land, like spaced out,
10         scared, nervous or --
11    Q.   So scared, nervous and sad?
12    A.   Sad and, you know.  And so anyway, after Nicki -- let
13         me go back to the situation that I recall.  So after
14         Nicki gave or testified, she said, is the person
15         there?  And they said, yeah, and pointed out Lamonte.
16         And so then whatever, they left and, you know, she
17         got off the stand and I think Nicki was the last
18         person they talked to that day, then we went outside
19         in the hallway.  Lamonte's mom was out there crying
20         real bad and said that's not my son, he didn't do it.
21         He was not there, he was with the family, he was not
22         there.
23              And Nicki came out, and I said, Nicki, was that
24         the person that killed Don and Doniel?
25              And she says, no, it wasn't.

```
1                    I said, why did you get up there and say that?
2                    She says, I was threatened they gonna take my
3          kids from me.
4                    And I said, well, why could they take your kids?
5          What did you do that they would wanna take your kids,
6          you know?
7                    She said, the detective said that if I didn't
8          say this, it was gonna take my children.
9                    And I couldn't comprehend what could she have
10         done where somebody gonna take her kids because the
11         system -- the law would be on your side.  How can you
12         take somebody's kids when you ain't done nothing?  So
13         but she said that that was the wrong person and the
14         detective made me say that.  Now, of course, the
15         detective she was talking about -- I said the black
16         one because I didn't remember the names or of the
17         white one.  She said the white one --
18    Q.   Okay.
19    A.   -- you know, on that, you know --
20    Q.   Did -- so --
21    A.   -- and then --
22    Q.   Did she appear upset when you talked to her on that
23         occasion?
24    A.   She was nervous and scared.  So then I said, well,
25         Nicki, you need to go tell them.
```

TINA R. ST. JOHN, RPF, CRR

1          So she says, well, I can't.

2          So by that time, the DA came out who was a

3     woman, came out, she come out the door and I went up

4     to her and I said, Nicki just told me that that was

5     not the person.  So she looked at me and she just

6     kept going, you know.

7          THE COURT:  Counsel, may I interrupt you for a

8     minute?

9          MS. PILATE:  Yes.

10          THE COURT:  I see another individual with a

11     laptop out there that has not asked for permission.

12     Are you with media?

13          UNIDENTIFIED SPECTATOR:  No.  I'm just taking

14     notes in absence of notepad.  I can put it away

15     though.

16          THE COURT:  Okay.  You know, yeah, I know this

17     gentleman had asked me and that's the reason that I'm

18     asking you what is your capacity here?  I mean it

19     really doesn't matter.  The only thing I want to make

20     sure of is that you understand you're not to be

21     taking pictures.

22          UNIDENTIFIED SPECTATOR:  Correct.

23          THE COURT:  You're not to be taking audio.

24          UNIDENTIFIED SPECTATOR:  Sure.

25          THE COURT:  And you're not to be verbatim

LMKSDC_0026298

1         recording this in any fashion.

2                 UNIDENTIFIED SPECTATOR:  Yeah, not doing any of

3         that.

4                 THE COURT:  All right.  Don't know whether it

5         makes any difference whether you're media or somebody

6         else as long as you follow the same rules that I set

7         out for this other individual.

8                 UNIDENTIFIED SPECTATOR:  You got it.

9                 THE COURT:  Okay.  Very good.  Go.

10                MS. PILATE:  Okay.  Thank you, Your Honor.

11   Q.   (By Ms. Pilate)  Ms. Labat, let's pick up where we

12        left off just a few seconds ago.  I think you stated

13        that you approached the --

14   A.   The DA.

15   Q.   -- the DA.  You mean by DA the district attorney?

16   A.   Right, uh-huh.

17   Q.   And there's another thing I need to ask you, you keep

18        referring to Nicki as Nicki?

19   A.   Right.

20   Q.   Is that the name you knew her by?

21   A.   Right, Nicki.

22   Q.   And is that person the same person that some people

23        call Niko?

24   A.   Yeah, Niko.

25   Q.   So just another way of saying the name or maybe a

LMKSDC_0026299

```
 1            nickname so is that right?
 2    A.      Uh-huh.
 3    Q.      Okay.  So you approached the DA and tell us what you
 4            said to her.
 5    A.      I said, Nicki just told me that she told a lie, that
 6            she didn't -- that's not the person.
 7    Q.      Uh-huh.
 8    A.      So she looked at me and she kept going and walking
 9            on.  And then the attorney came out and I told the
10            attorney, I said the same thing I said with her and
11            so he looked at me, said okay, I'll get back with
12            you, you know, and then I went to Lamonte's mom and
13            she was over there crying, and I told her that Nicki
14            said that that was not the right person.
15    Q.      Uh-huh.
16    A.      And she kept saying my baby didn't do it, my son was
17            not the one, he was not there.
18    Q.      Uh-huh.  Okay.
19    A.      So I remember giving her my number.
20    Q.      Uh-huh.
21    A.      But all I know is like when you all and, you know, I
22            don't know what she did, she might have just dropped
23            it, she might not recall because she was so in, you
24            know, concerned about they saying that that was her
25            son, Nicki had said that was her son.
```

1            And I also wanna go back a little bit on this
2       here.  I remember when Nicki was up here identifying
3       Lamonte, Lamonte looked like, you know, that type of
4       look like are you serious, you know, 'cause he didn't
5       really think that she was gonna point to him.  I mean
6       looked like, you know, are you serious, me, you know,
7       like that.
8    Q.  Right.  You just made a facial expression?
9    A.  Right.
10   Q.  And for the purpose of the written record --
11   A.  Uh-huh.
12   Q.  -- would you agree that the facial expression was
13       surprised or startled?
14   A.  Right, surprise to Lamonte --
15   Q.  Okay.
16   A.  -- you know, to do that.
17   Q.  Okay.
18   A.  And then I went to Lamonte's mom outside and she was
19       crying up a storm and just like any parent would be
20       and so she said that that was not the person --
21   Q.  Okay.
22   A.  -- at all, you know, my son didn't do that.
23   Q.  Did you leave the courthouse at that point?
24   A.  Yeah, I left the courthouse.  We walked on out and I
25       talked to Saundra and told her, she said she don't

```
 1              know who done it, but, you know, John said it's not
 2              him.  She said all she wanted was somebody, for them
 3              to get the right person.  'Cause I also told Saundra,
 4              my girlfriend --
 5       Q.     Okay.
 6       A.     -- but she said Don said Saundra had told me, she
 7              said Don, she went over to Don.
 8       Q.     Do you mean John?
 9       A.     John, uh-huh --
10       Q.     Okay.
11       A.     -- house and talked to John, and John said -- told
12              her, you know, who done this, did he do it?  And he
13              said, no, that wasn't the person.
14       Q.     Okay.
15       A.     And --
16       Q.     And Saundra told you that?
17       A.     Yeah, Saundra told me that.
18       Q.     Okay.  Did you ever speak with Stacy Quinn?  I think
19              you referred to her earlier, correct?
20       A.     Yes, Stacy.
21       Q.     Okay.  Did you ever speak with Stacy at any point
22              about this?
23       A.     I think I saw Casey -- Stacy one time on the bus
24              'cause she was always on Quindaro walking up and down
25              on Quindaro and I saw -- and I saw her one time, I
```

LMKSDC_0026302

```
 1          can't say what day or exact time or what, but I did
 2          saw Stacy one time.  And I said, Stacy, did you --
 3          did they get the right person in the jail for killing
 4          my nephew and your cousin?
 5              She said, no, that's not the one.
 6    Q.    Okay.
 7    A.    And I said, well, do you know who it is?
 8              And she says, I can't say.
 9    Q.    Okay.
10    A.    You know, and she just said that's not the one.  And
11          I want to clarify something.
12    Q.    Sure.
13    A.    I heard many times whoever I talked to friends,
14          relatives or whatever, you know, on the streets when
15          they would bring up that, they said that Lamonte was
16          not the one, but they never gave me a name of who
17          done it.
18    Q.    Okay.
19    A.    But they said Lamonte was not the one.
20    Q.    Okay.
21    A.    And I said, well, who -- naturally when you say he
22          wasn't the one, you say, well, who is it?
23    Q.    Okay.
24    A.    I can't say, but that is not the one.
25    Q.    Okay.
```

TINA R. ST. JOHN, RPF, CRR

1    A.    Now, then I saw Nicki throughout the years --

2    Q.    Okay.

3    A.    -- and I saw her one time at Price Chopper and we was

4          talking and I said, Nicki, did you ever get that

5          straightened out with the police or anything?

6          She says, no.

7          And I said, but, you know, I said, do -- she

8          said, all I can tell you is that they made me say it

9          was Lamonte, but he was not the one.

10   Q.    Okay.  And would it be correct to say that you ran

11         into Niko like that a number of times over the years?

12   A.    Yeah, throughout the years.  And matter of fact,

13         every time I'll run in to Nicki, that conversation

14         would come up like that.

15   Q.    Okay.

16   A.    You know, we -- because I just wanted to see if she

17         would be able to tell me now --

18   Q.    Uh-huh.

19   A.    -- who it was.

20   Q.    What was her demeanor or expression on those

21         occasions when you spoke to her?

22   A.    She wasn't happy about it and she was not boasting

23         about it or anything like that, she was sad.  It

24         bothers her.  She say, I feel sorry for him, you

25         know, but she said, I had to do what I had to do.

TINA R. ST. JOHN, RPF, CRR

```
 1            Because Nicki had five kids, you know.  And she said,
 2            I had to protect me from those taking my children.
 3       Q.   Okay.
 4       A.   And so -- but Nicki would never clarify why would
 5            they -- why would the detective take her kids.
 6       Q.   Okay.
 7       A.   She would never -- because I said, well, what could
 8            you have -- being a mom myself and being a person
 9            that, you know, you ain't done nothing, how can you
10            come up and take someone's children?  But I didn't
11            know what type of life Nicki lived or what she had
12            done that they had over her or anything, but she
13            never clarified that.
14       Q.   Did she -- did she appear distressed?
15       A.   Yes --
16       Q.   Did --
17       A.   -- and --
18       Q.   Okay.  By the situation?
19       A.   Yeah, by the situation and sad about the situation.
20            She says -- she always had a -- her eyes looked sad.
21       Q.   Okay.  What has been the impact on your family of
22            this situation with the conviction of Lamonte
23            McIntyre?
24       A.   I have to say this, I'm gonna say it, my nephew was
25            dead and Don, my cousin was dead.  The impact came
```

1      when they said they died and it never left, but it

2      was nothing that you was going to feel the pain of

3      knowing that they're not coming back.  So it wasn't a

4      fact, well, go find the killer or that because that

5      would not have changed the situation that my -- we

6      received.  You know, the love, Donny's not there.

7      Saundra, my best friend, lost her son.  And that

8      impact is enough to keep you and then it comes and

9      goes.  And like I said, when we talk about Donny --

10  Q.   Uh-huh.

11  A.   -- it's not a thing that you bring up every day.

12  Q.   Uh-huh.

13  A.   Every now and then we'd say something about Donny and

14      it would never be the murders.

15  Q.   Uh-huh.

16  A.   It would only be good things.  The summer of Donny

17      getting killed was never brought up unless someone

18      who didn't know us would ask us how he got killed,

19      but we didn't bring that up.  And we didn't bring up

20      Lamonte's side of the family.  As a matter of fact,

21      we didn't even want to know Lamonte's side of the

22      family as far as trying to be angry at Lamonte or

23      whatever.  That was not a thing that we wanted to --

24      we wasn't that type of people.

25  Q.   Uh-huh.

LMKSDC_0026306

1   A.   You know, we're not violent people, we're not person
2        -- people that want revenge or if -- whoever killed
3        my nephew and Donny today, I feel no more than what I
4        felt from the day one because you cannot bring
5        Donny --
6   Q.   Uh-huh.
7   A.   -- you know, I just want the right person to be let
8        free and the person -- God has the right to handle
9        everything.  And whatever the situation on who -- I
10       found out later that the person that killed Donny and
11       Don, I didn't know that person, but I knew his
12       family.  And -- and the -- Edgar Lincoln stayed at my
13       mama's house when he was put out of his house, he
14       stay at my -- my mama let him stay at our -- her
15       house.  And I was told it was one of those Edgar sons
16       that killed Donny.  Now, I don't know.  Like I said,
17       in Wyandotte County, we know of somebody's family.
18       You say where are you from?  Wyandotte County?  They
19       say, what's your last name?  Then we'd think about,
20       well, I know your -- do you have a relative like this
21       or that and so I never know who Lincoln's nephews
22       were.
23  Q.   But is that what you heard, that --
24  A.   Yeah, I heard.
25  Q.   -- it was one of Lincoln's nephews?

LMKSDC_0026307

1    A.    Right.

2    Q.    And when you say Lincoln, you mean like in Edgar?

3    A.    Uh-huh, and he's dead, deceased.

4    Q.    Okay.  Ms. Labat, is there anything else that you

5          want the court to know about this situation affecting

6          your family and you?

7    A.    Yeah.  I -- the thing about this is that I feel bad

8          for Lamonte that he got caught up in this and that I

9          didn't do more than what I could have done, but I did

10         go to three people.  Matter of fact, went to four

11         people:  Saundra, you can count that in, and then the

12         mother, and then the DA and the attorney on this.

13              But I -- I don't know, I like to say to Lamonte

14         I'm sorry, you know, that I didn't pursue this

15         better.  And I did tell your mom, but she probably --

16         I don't know what state of mind she is, 'cause like I

17         said, we all was kind of like dealing with death and

18         that, but -- and I don't know you and I know that you

19         was a young boy, but I never met you and I never knew

20         your mom and I am sorry that you had to go through

21         this and it take this long for it to come out.  And I

22         was telling Cheryl, I said, if they don't try to get

23         this situation fixed, I'm gonna end up with probably

24         in -- my memory's gonna be going and I might not be

25         here, you know, to do this, you know, to say this.


TINA R. ST. JOHN, RPF, CRR

1          And I said that we need to fix this to make it right

2          for you and hopefully that everybody will tell the

3          truth up on this, and that -- those detectives did

4          not come to my house to even show me a picture of you

5          or ask did I know you or did I -- anything about your

6          family or they didn't know the story, I mean didn't

7          tell me the story.

8               The story how my nephew and my cousin got

9          killed, this is the story that was told to me on the

10         streets that they was Don, my nephew, was taking Don

11         to a place to drop him off.  And while they were

12         sitting up there talking in the car, somebody came up

13         there and shot Don, my nephew, first, and then went

14         to the other side and shot Saundra's son, and that

15         then they walked away and kept going, and that was

16         it.  I heard it might have been related to drugs, but

17         I know my nephew was not into drugs 'cause he was

18         dealing with cancer.  And then I don't know the story

19         on -- I heard many stories about how that came down,

20         but I know that my cousin Andrew came over to my

21         house and told me personally that he knew who did it

22         and it was not you.  And Andrew said that he -- he

23         told me the story that how Don got into that

24         situation, Saundra's son, they was after him, not my

25         -- not my nephew and that it was over some drugs,

TINA R. ST. JOHN, RPF, CRR

1          money or something like that.  And I'm sorry that you

2          had to be -- take the fall for this, you know.  But

3          Andrew also told me that it was not you.  So

4          everybody who knew of the situation always said that

5          it was not you.

6                  MS. PILATE:  Thank you.

7                  THE WITNESS:  Uh-huh.

8                  MS. PILATE:  Ms. Labat.  I don't have anything

9          further.  Thank you.

10                 THE COURT:  Cross examination?

11                 MS. TATUM:  No thank you, Judge.

12                 THE COURT:  All right.  Thank you, ma'am.  You

13         may step down.

14                 THE WITNESS:  Okay.

15                 THE COURT:  You're free to stay or go.  I assume

16         she is going to be released from her subpoena if

17         there is one?

18                 MS. PILATE:  Uh-huh.

19                 THE COURT:  Any objection to that?

20                 MS. TATUM:  No.  No objection.

21                 THE COURT:  All right.  You're free to stay in

22         the courtroom or leave --

23                 THE WITNESS:  Okay.

24                 THE COURT:  -- as you choose to do.

25                 THE WITNESS:  All right.  Thank you.

```
1              THE COURT:  You bet.
2                  (Witness excused.)
3              THE COURT:  You know, I think we haven't --
4         we've only been in here for probably an hour, but I
5         don't think it makes a whole lot of sense to get
6         started for 15 or 20 minutes on the next witness and
7         then take a break so why don't we just take a break
8         right now.  We'll be in recess.  Thank you.
9              Counsel, let me do this real quick before we
10        take a break.  One thing I didn't mention on the
11        record and I think we had better is that the
12        attorneys have agreed on a sequestration order and so
13        both attorneys are responsible for admonishing their
14        witnesses that they're not to discuss the case or
15        allow others to discuss it with them and they are to
16        stay out of the courtroom until they testify.  Since
17        I don't know who the witnesses are, the attorneys are
18        responsible for seeing that that's done.
19             MS. TATUM:  Thank you.
20             MS. PILATE:  Thank you.
21                 (A recess was taken, after which the
22                  following proceedings were had, the
23                  petitioner being present.)
24             THE COURT:  All right.  This is a resumption in
25        the hearing of 16CV508, McIntyre versus State.
```

LMKSDC_0026311

```
 1            Are you ready for your next witness, Ms. Pilate?
 2       I'm sorry, we've got somebody else.
 3            MS. PILATE:  That would be Ms. Bushnell, but
 4       thank you.
 5            MS. BUSHNELL:  Yes, Your Honor.  We call Mr. Ron
 6       Singer.
 7                        RONALD SINGER
 8       called as a witness on behalf of the Petitioner,
 9       having first been duly sworn, testified as follows:
10            THE COURT:  All right, Ms. Bushnell, you may
11       examine.
12                      DIRECT EXAMINATION
13  BY MS. BUSHNELL:
14  Q.   Good morning, Mr. Singer.  Could you please state
15       your name and spell it for the record.
16  A.   Yes.  My name is Ronald Singer, it's R-o-n-a-l-d
17       S-i-n-g-e-r.
18  Q.   And where do you currently live?
19  A.   I live in Fort Worth, Texas.
20  Q.   And what is your occupation?
21  A.   I am a forensic scientist.
22  Q.   Where do you work?
23  A.   I am currently the technical and administrative
24       director for the Tarrant County, Texas Medical
25       Examiner's Office in Fort Worth.
```

LMKSDC_0026312

1    Q.    And what does that job entail?

2    A.    I am responsible for overseeing the operation of the

3          technical aspects of the medical examiner's office

4          that don't actually involve the medical examiners

5          themselves.  We are a full-service office so we offer

6          a crime laboratory, a toxicology laboratory and

7          several other laboratories of a technical nature.

8          And my job is to oversee the operation of those --

9          those entities within the building.  As far as our

10         accrediting bodies go, I am considered the laboratory

11         director for those laboratories.

12   Q.    And how long have you been in that position?

13   A.    I've been in that position for approximately eight

14         years.

15   Q.    And what did you do prior to that?

16   A.    Prior to that I was the crime laboratory director for

17         the medical examiner's office for approximately 20

18         years.  Prior to that I was the laboratory director

19         for the Jefferson Parish, Louisiana Sheriff's Office

20         Crime Laboratory, which is located in Metairie,

21         M-e-t-a-i-r-i-e, Louisiana.

22   Q.    And have you -- in the past, have you served in any

23         official positions on boards or associations related

24         to forensic science?

25   A.    Yes, ma'am, I have.  I am a past president of the

```
1              International Association of Forensic Sciences, a
2              distinguished fellow and past president of the
3              American Academy of Forensic Sciences, a past
4              president and distinguished member of the Association
5              of Firearm and Toolmark Examiners and a -- I have
6              been -- I've served on the board of directors of
7              several other forensic organizations as well, both
8              national and local.
9      Q.      Can you tell us about the American association --
10             excuse me -- the American Academy of Forensic
11             Science?
12     A.      Yes, the American Academy of Forensic Sciences is the
13             learned society in the United States that is devoted
14             to -- excuse me -- that is devoted to the education
15             and research and just the professional aspects of
16             forensic science in the United States.  It's divided
17             into 11 separate categories representing all of the
18             different disciplines within forensic science.  It
19             goes from anthropology all the way through
20             criminalistics and pathology, odontology, et cetera,
21             et cetera for all of the major districts.
22     Q.      And what is your educational background?
23     A.      I have a Bachelor of Science degree which I received
24             from Tulane University and a Master of Science degree
25             which I received from Loyola University of New
```

TINA R. ST. JOHN, RPF, CRR

LMKSDC_0026314

1          Orleans.  In addition to my formal education, I --
2          when I joined the crime lab in 1972, I began
3          attending and taking part in a number of specialized
4          training courses sponsored by local organizations,
5          national organizations, instrument manufacturers, all
6          of which were related to my areas of expertise in
7          forensic science.  I didn't start out as a crime lab
8          director.  And actually while I was a crime lab
9          director, I also did a lot of bench work up until the
10         time I was promoted into the position I'm currently
11         in.  And so I attended a number of training courses
12         and specialized courses in those aspects throughout
13         the years.
14    Q.   Have you taught any courses?
15    A.   Yes, I have.  I served on the faculty of Loyola
16         University for approximately 10 years where I taught
17         criminalistics, which is the science of crime
18         laboratories, and crime scene investigation.  I also
19         served -- when I moved to Fort Worth, I served on the
20         faculty of Texas Christian University in teaching
21         essentially the same courses, crime laboratory
22         operation, criminalistics and crime scene
23         investigation.  I've also taught at a number of
24         junior colleges around the Fort Worth area over the
25         years as well.

1    Q.    And have you testified in court before?

2    A.    Yes, I have.  I've testified in federal, state or

3          local courts in eight states:  Georgia, Mississippi,

4          Louisiana, Texas, Kansas, Missouri, Oklahoma and

5          Colorado.  I think that covers it.

6          MS. BUSHNELL:  Your Honor, may I approach?

7          THE COURT:  Yes.

8    Q.    (By Ms. Bushnell)  Mr. Singer, I'm handing you what's

9          been marked as Exhibit 151, do you recognize that?

10   A.    Yes.  This is a copy of my resumé.

11         MS. BUSHNELL:  Your Honor, I'd move to admit

12         151.

13         MS. TATUM:  No objection.

14         THE COURT:  It's admitted.

15   Q.    (By Ms. Bushnell)  So I want to talk with you today,

16         Mr. Singer, about the Lamonte McIntyre case, in

17         particular in your experience in investigations.

18         Throughout your career, have you participated in the

19         investigation of murders?

20   A.    Yes, I have.

21   Q.    And what does the role of forensic and scientific

22         evidence play in those investigations?

23   A.    Well, forensic science is there to establish a

24         scientific support for the investigation of crime.

25         It doesn't necessarily have to be a homicide, it can

LMKSDC_0026316

1            be any -- any crime.  Physical evidence is collected
2            at the scene of that crime and then that physical
3            evidence is evaluated in some way in an attempt to
4            either link a person or an object back to that
5            particular crime scene.  Basically that's what we do
6            over the years.  It's become much more sophisticated,
7            but I think when you boil it down, that's essentially
8            what we're there to do.
9       Q.   Okay.  And were you retained by the defense to serve
10           as an expert in this case?
11      A.   Yes, I was.  In August of 2015 I believe it was I was
12           contacted by Ms. Pilate to review some materials in
13           this case and to basically offer my opinion as to the
14           extent of the scientific work that was done in the
15           case.
16      Q.   And at the conclusion of that review, did you write a
17           report?
18      A.   Yes, I did.  I issued a -- an affidavit in June of
19           last year I believe.
20      Q.   I'm handing you what's been marked as Exhibit 78, do
21           you recognize that?
22      A.   Yes.  This is a copy of the affidavit that I prepared
23           and submitted to Ms. Pilate.
24                THE COURT:  Would you give me an exhibit number
25           again please?

1          MS. BUSHNELL:  Yes, Your Honor, it's 78.

2          THE COURT:  Thank you.

3    Q.   (By Ms. Bushnell)   And in reviewing this case, did

4         you review any materials?

5    A.   Yes, I did.  I received -- in fact, if I refer to my

6         notes, Your Honor, just to refresh my memory -- I got

7         police reports on this case, I got photographs, I got

8         a video of the crime scene, also contained video of

9         the autopsies themselves, I got volumes one and two

10        of the original trial transcript, I got the autopsy

11        reports as well.

12   Q.   And from this information, did you form an opinion

13        about the investigation and the forensic and

14        scientific evidence in this case?

15   A.   Yes, I did.

16   Q.   And what was that?

17   A.   Well, I determined that from what I had available to

18        me anyway, the crime scene investigation of the

19        incident was adequate.  It was done properly.  From

20        what I had available and what I read, the evidence

21        that was there was collected.  I mean you can always

22        find something to nitpick about, but in general, it

23        was done in a very adequate way.  Unfortunately

24        though, that's where it stopped.  Apparently none of

25        the evidence was ever sent for any kind of evaluation

LMKSDC_0026318

1          after that, nor was there any follow-up

2          investigation, at least that I am aware of, to

3          attempt to discover the shotgun that was used in the

4          case, ammunition, the clothing of the suspect who was

5          apprehended as I recall about six hours after the

6          incident and none of that was ever collected or

7          forwarded for any kind of investigation.

8     Q.   So did -- just break some of that down, there were

9          both things that were collected and never examined,

10         is that fair?

11    A.   Yes.

12    Q.   And then things that weren't collected?

13    A.   That's correct.  Yes, ma'am.

14    Q.   So I want to talk first about some of the things that

15         they didn't collect in this case.  In your review,

16         did you identify items that you thought should have

17         been collected?

18    A.   Yes, I did.  Given the nature of the case, the

19         incident as I gathered from the materials that were

20         available to me occurred when an individual came out

21         of a -- an open lot up to the vehicle and fired four

22         times at least into the vehicle and then proceeded

23         back through the lot to another street where they

24         left or he left.  That incident would have created

25         and did create, based on the video and on the

1          photographs, a lot of glass and blood at the original
2          scene where the shooting took place as well as glass
3          and the blood trail and other things that were found
4          down at the -- where the car finally came to a rest.
5          There was also evidence within the car, there was
6          plastic wadding that was found in the car and other
7          materials that indicated that this was a close shot.
8          That would have blown the passenger side window out,
9          no question in my mind about that.  The photographs
10         show what appears to be glass fragments in the street
11         and in the grass where the fired shotgun shells are.
12         All of that would have led to certainly the
13         possibility at least that the perpetrator of the
14         crime in retreating back across that field would have
15         walked through some of that glass and it's equally
16         possible that the actual incident of the blowing out
17         of that glass itself would have caused glass
18         particles to get on the perpetrator's clothing.  And,
19         of course, if he walked -- and blood as well -- and
20         if he walked through the glass, it would have been
21         imbedded in his shoes.  I also wouldn't be surprised
22         to find glass -- tissue or blood particles on his
23         shoes as well.  And let me just for the record say
24         that I'm saying his, but I don't, you know, the
25         perpetrator could be male or female.


                    TINA R. ST. JOHN, RPF, CRR

LMKSDC_0026320

1    Q.    Whoever the perpetrator was?

2    A.    Yes.

3    Q.    So there -- you're mentioning several things that

4          could have been -- if the clothes had been there

5          could have been examined for?

6    A.    Might have been, yes.

7    Q.    Or the shoes?  So one of the things you mentioned was

8          glass particles?

9    A.    Yes.

10   Q.    If there had been shoes that had been recovered that

11         had glass particles, could they have been analyzed to

12         show that they came from this area?

13   A.    Well, they could have been analyzed to show they were

14         glass that was the same type of glass that is used in

15         the window -- in automotive windows.  Automotive

16         glass is fairly easy to recognize actually.  And

17         although it probably -- you couldn't say that this

18         particular particle of glass from this shoe came from

19         that window to the exclusion of all windows in the

20         world, it certainly would have been automotive glass

21         and there was automotive glass at the scene.  So it's

22         a piece of evidence that tends to support in this --

23         under that circumstance, it would support that

24         individual, the wearer of those shoes being at that

25         scene.

LMKSDC_0026321

1    Q.    And in addition to these -- this automotive glass,
2          you talked about blood?
3    A.    Yes.
4    Q.    Can you elaborate a little bit more how blood would
5          have been useful to find on these clothes?
6    A.    Blood, given that this was 1994 as I recall, DNA
7          wasn't quite as sophisticated as it is today, but
8          blood present at that scene could have been certainly
9          analyzed for ABO type, it could have been analyzed
10         for any number of genetic markers that we were using
11         in the early 90's.  And depending on the laboratory,
12         it could have been analyzed for DNA.  That would have
13         been obviously blood on the clothing or shoes or body
14         of the perpetrator that was linked back to one of the
15         individuals in the vehicle would have put that
16         perpetrator at that scene or would have tended
17         certainly to put that -- it would have been very
18         strong evidence putting that perpetrator at the
19         scene.
20   Q.    And in your experience, is it -- are these items --
21         clothing or shoes -- typically collected?
22   A.    Yes.  When you -- it's been my experience over the 45
23         years that I've been involved in this that typically,
24         and particularly a homicide investigation, but in
25         most investigations where there's been an assault and

LMKSDC_0026322

1        there's the possibility of blood or where there's a

2        possibility of trace evidence on the clothing, the

3        clothing of the perpetrator or the clothing of the

4        suspect under arrest is collected.

5    Q.  And to your knowledge, was the clothing collected in

6        this case?

7    A.  I have no indication that it was.

8    Q.  Okay.  Were there any lab reports indicating that

9        there were -- clothing had ever been examined?

10   A.  I wasn't provided with any.

11   Q.  And in the documents that you reviewed, was there

12       anything that stated that those -- those items were

13       in possession of the State?

14   A.  No.  No, ma'am.

15   Q.  In addition to the clothing, was there other evidence

16       that could have been collected?

17   A.  Well, apparently the -- the vehicle from at least one

18       of the reports, the vehicle was processed for

19       fingerprints, but I don't see anything that --

20       there's no report that indicates what was lifted or

21       if -- what quality those fingerprints were.  Also the

22       shotgun shells were collected at the scene.  These

23       certainly would have been important for a number of

24       reasons, not the least of which is that if a shotgun

25       or similar ammunition is recovered from someone, that

LMKSDC_0026323

1           tends to link that.  Again, that is a link back to

2           that scene.  Also the shotgun shells could have been

3           fingerprinted or could have been -- DNA could have

4           been attempted, although in 1994 that would have been

5           a little problematic, but certainly fingerprinting

6           should have been done.

7    Q.    So let's break down a little bit about the shotgun

8          shells.  You mentioned that finger -- that there was

9          fingerprinting pulled, lifted?

10   A.    Well, there was no fingerprinting done of the shotgun

11         shells.

12   Q.    Okay.

13   A.    And that was during the trial Officer Clair testified

14         that they did not do any fingerprinting.

15   Q.    In your experience, have you fingerprinted shotgun

16         shells?

17   A.    Yes, yes.

18   Q.    And have you ever achieved a usable print?

19   A.    Yes, we have.  It's rare, there's no question that

20         it's rare, but it is certainly we have done it.  Our

21         record with fired ammunition is somewhere around 5

22         percent of the time.

23   Q.    And in addition to examining it for latent prints,

24         could the shells have been examined to see what gun

25         they had come from?

TINA R. ST. JOHN, RPF, CRR

1    A.    Well, yes, and I mentioned that.  If a shotgun is
2          recovered, then the shotgun could be test fired and
3          the markings that are left behind by the firing of
4          that shotgun on those shells, on the reference
5          shells, could have been compared to the markings that
6          were left behind on those shotgun shells to try to
7          establish a link between that particular shotgun and
8          those shells, those fired shells.
9    Q.    And to your knowledge, was there ever a gun found, a
10         shotgun found in this case?
11   A.    No, I --
12   Q.    Was there ever a search done for a gun in this case?
13   A.    I have no report that indicates that they attempted
14         to look for one.
15   Q.    In your experience in murder investigations where
16         there is a weapon used, a gun used, do they search
17         the home, have folks search the home of the arrested
18         suspect?
19   A.    Sure.  Of course.
20   Q.    And in those cases do they look for the shotgun or
21         murder weapons used?
22   A.    Yes, and not only -- not only the weapon itself, but
23         for any indication that that person was involved with
24         firearms.  I've gotten a lot of cases where we've
25         never recovered a gun, but they go into a suspect's

LMKSDC_0026325

1       residence or whatever and they recover a box of

2       ammunition and that ammunition is similar to the

3       ammunition that's used.  Again, it's not a positive

4       absolute this is the person that did this crime, but

5       it's a link, it's one more piece of physical evidence

6       that then tends to link that person to that crime.

7   Q.  So in talking about the shotgun shells, you mentioned

8       DNA testing.

9   A.  Yes.

10  Q.  Was -- was DNA testing available at -- that would

11      have been useful in a shotgun shell in 1994?

12  A.  DNA testing was available, but my guess is that there

13      would not have been enough DNA present on the shotgun

14      shells in 1994 to get any kind of reasonable DNA

15      profile from them.

16  Q.  And to your knowledge, has the current defense team

17      sought DNA testing of those shells?

18  A.  It's my understanding that you did, yes.

19  Q.  And was DNA testing performed?

20  A.  I've been told that it was, yes.

21  Q.  And to your knowledge, what was the result of that

22      testing?

23  A.  I was told that it was inconclusive.

24  Q.  What does inconclusive mean?

25  A.  It means that they weren't able to get any kind of

LMKSDC_0026326

1              profile that, you know, to do any comparisons with.
2    Q.    So they weren't able to develop something that could
3              be useful in this case?
4    A.    That's correct, yes.
5    Q.    You also mentioned latent prints that had been
6              collected from the car.
7    A.    Yes.
8    Q.    Was there any examination ever performed on any of
9              that?
10   A.    Not to my knowledge, no.
11   Q.    What was your understanding of the evidence that was
12             used to convict Mr. McIntyre?
13   A.    Well, from reading the transcripts, it appears that
14             there were two eyewitnesses.
15   Q.    And in your opinion, what role does forensic evidence
16             play in cases where there's eyewitness
17             identifications?
18   A.    Well, obviously personally and -- and as, you know,
19             professionally, forensic evidence is very important
20             even in cases where there are eyewitnesses because
21             the forensic evidence then can either support or
22             refute what eyewitnesses have been saying -- have
23             been saying about the particular incident.  I mean
24             there are always gonna be differences between
25             eyewitnesses, there are going to be other kinds of

LMKSDC_0026327

1         areas where things may be, you know, vague.  Forensic

2         evidence, hard forensic evidence, either supports or

3         refutes what the eyewitness has to say.  And in that

4         regard, it's vital to a case in my opinion.

5    Q.   And so in other cases, in other murder investigations

6         you've worked on, has there been an effort to examine

7         or collect forensic evidence to support or refute

8         eyewitness identification?

9    A.   Yes.  In the vast majority of the cases that I

10        personally have been involved in and that have come

11        through our laboratory, discussions with the district

12        attorney's office in Tarrant County and in Jefferson

13        Parish would quite often material -- even, you know,

14        long after the indictment has occurred, evidence is

15        being submitted to us to provide that support, that

16        concrete link.

17   Q.   And in this case based upon your review, was anything

18        done that could create that kind of evidence, that

19        concrete link of using forensic and scientific

20        evidence available?

21   A.   Not to my knowledge, no.

22             MS. BUSHNELL:  Thank you.  No further questions.

23                     CROSS EXAMINATION

24   BY MS. TATUM:

25   Q.   Mr. Singer, when did your career in law enforcement

TINA R. ST. JOHN, RPF, CRR

1      start?  I guess I can look at your resumé, but...

2   A.  1972.

3   Q.  Okay.

4   A.  With Jefferson Parish Sheriff's Office.  We were

5      actually sworn so I was technically in law

6      enforcement, but I was not a patrol officer.

7   Q.  But you've been doing this a long time, correct?

8   A.  Yes, ma'am, I have.

9   Q.  Can you tell me or just tell us in general how much

10     have things changed as far as forensic evidence from

11     1972 to today's date?

12  A.  It's changed considerably, yes.  I mean there's been

13     an evolution from -- well, the best way that I can

14     describe it is, of course, obviously techniques have

15     gotten -- some techniques have gotten more

16     sophisticated, things have -- we can do more with

17     less today than we could originally.  Some of the

18     technology that we used early on in forensic science

19     has been discredited or has been reduced in its

20     value, but otherwise when there's been a constant

21     evolution, it's just like any other science, it's

22     gotten better as the years have gone by.

23  Q.  Where were you at in 1994, where were you working at

24     when this murder happened?

25  A.  I was with the Tarrant County Medical Examiner's

1           Office in Fort Worth, Texas.

2    Q.    And at that time what would you say the state of

3           forensic evidence was?

4    A.    Well, with some -- with a couple of notable

5           exceptions, which I'm sure you are well aware of, I

6           would say that the state of evidence was good,

7           particularly in some of the areas of trace analysis

8           and in certainly biology, forensic biology it was

9           good.  It wasn't as good as it is today, but it was

10          good.

11   Q.    Would you say at that time it was more common or less

12          common than it is today for investigating agencies to

13          submit items for forensic testing?

14   A.    I would -- I don't think that that's changed.

15   Q.    Okay.

16   A.    Well, let me say this, I think that, yes, there are

17          more agencies that may be submitting evidence to us

18          today, but not because the technology was -- is any

19          better.  There are agencies that have, you know, for

20          whatever reason, may have resisted sending evidence

21          but now realize and recognize the value of it and --

22          and are submitting it.  But in general, I don't think

23          that it's considerably changed, no.

24   Q.    Okay.  So you would say back in the '90s, agencies

25          submitted just as much or just as aware of that as

LMKSDC_0026330

1           they are today?

2    A.    I think they were aware of the value of forensic

3          evidence and I think they utilized it, yes.  I can't

4          -- I don't have any statistics to show, you know, how

5          many cases.  Our caseload has increased, there's no

6          question about that, but then so has crime.

7    Q.    Sure.  And my point was just that I think forensic

8          evidence has improved over the years and people's

9          knowledge of that has improved over the years?

10   A.    Forensic evidence has improved over the years.  There

11         are -- but I -- well, I would say that there are

12         certain areas of forensic science that have not --

13         that are -- there's little difference between what

14         was going on in '94 and what is going on now.

15   Q.    And you said you've looked at the reports and you

16         believe that the initial crime scene investigation

17         was done properly?

18   A.    Yes.

19   Q.    I think what you mean by that is that the CSI officer

20         collected shotgun shell casings, right?

21   A.    Well, yeah.  There was more than that obviously.

22   Q.    Right.

23   A.    They videoed the scene, they went out and they

24         collected glass samples not only from the ground, but

25         from the vehicles themselves, they dusted the

TINA R. ST. JOHN, RPF, CRR

```
 1              vehicle, they obviously searched the surrounding area
 2              to -- and found the shotgun shells which were
 3              photographed and collected.  I think in general they
 4              did the things that were necessary to do at the scene
 5              itself.
 6    Q.   Right.  And they took blood samples as well, correct?
 7    A.   Yeah, there was samples of blood taken from the
 8              scene, yes.
 9    Q.   So the scene -- the collection itself you don't have
10              an issue with, it's just what was done with that
11              after the fact that you think was done poorly?
12    A.   With regard to the material that was collected at the
13              scene, that's correct, yes.  I think -- I also think
14              though there are other things that should have been
15              looked for that were not.
16    Q.   Sure.  And you mentioned a gun should have been
17              looked for, correct?
18    A.   Sure.
19    Q.   Do you know if they did a canvass of the area at
20              least that would have allowed them to look for a gun
21              that was tossed aside?
22    A.   That I don't know.
23    Q.   Would that have been included in the police reports
24              though?
25    A.   I would have thought that it would have, yes.
```

TINA R. ST. JOHN, RPF, CRR

1    Q.   Okay.  You just don't believe you recall seeing
2         anything where they searched a residence for a
3         firearm?
4    A.   No, that's correct.
5    Q.   All right.  So looking for the gun, and this would
6         not be the first case you've ever heard of where a
7         gun's not recovered?
8    A.   No, of course not.
9    Q.   I mean it's pretty common, correct?
10   A.   It happens, sure.
11   Q.   Okay.  And then your other I think issue was that
12        they should have taken the suspect's clothing?
13   A.   Yes, absolutely.
14   Q.   And do you know whether or not they collected the
15        clothing or do you know -- you know at the time if it
16        was placed into property and it just was never tested
17        or do you believe they never collected clothing?
18   A.   The only thing that I have, if I recall, is I have
19        reference to when he was booked in, he was -- the
20        clothing was recovered.  But from there, I have no
21        idea what happened to it.  I have no -- no indication
22        that anything happened to it from that point on.
23   Q.   And in hindsight, you believe that should have been
24        tested?
25   A.   Absolutely, yes.

LMKSDC_0026333

```
 1    Q.    And, of course, that's a helpful test because if
 2          there was glass on it or blood, that would have been
 3          a link?
 4    A.    That's correct, yes.
 5    Q.    That's -- there's also the possibility that nothing's
 6          on it, right?
 7    A.    Certainly.
 8    Q.    And if that's the case, you know, it's something the
 9          defense could argue that he wasn't there, but it's
10          not conclusive, correct?
11    A.    That's correct.  It's -- it's -- well, neither is the
12          -- is the presence of blood or glass, but it is a
13          link, it's a positive link.  And in the same way, the
14          absence of that material is -- it tends to support
15          noninvolvement.
16    Q.    Right.  But, however, if there had been nothing on
17          it, the State still could have argued or the
18          investigators still could have argued he changed his
19          clothes in the six hours or something of that nature?
20    A.    Of course.
21    Q.    But, of course, in a perfect world all those tests
22          would have been done, right?
23    A.    Well, I would think and certainly -- it's reasonable
24          to assume that even in a less than perfect world
25          those tests should have been done.
```

TINA R. ST. JOHN, RPF, CRR

1    Q.   As far as the shell casings, it's my understanding --
2         and I'm sure you'll correct me if I'm wrong -- but
3         it's my understanding that fingerprints can be tough
4         to obtain from shell casings, and I think you
5         acknowledged that, right?
6    A.   Yes.  It is difficult, there's no question about
7         that.
8    Q.   And I think back in 1994 you mentioned something to
9         the effect that it was a lot more rare, a lot more
10        difficult to obtain DNA from casings than it is now?
11   A.   DNA, yes, that's correct.
12   Q.   And is it your opinion that probably examining
13        casings for DNA is preferable to fingerprints?
14   A.   Well, in 2017 I think you're absolutely right, yes.
15        If it was presented with shotgun shells and that was
16        the question, we would opt for the DNA as opposed to
17        the fingerprints.
18   Q.   Sure.  And it's my understanding, I'm not a
19        scientist, I just work in the field, that sometimes
20        if you try to lift the fingerprints off of shell
21        casings, that can destroy DNA sometimes?
22   A.   Yes, that's correct.  Yes.  You have to make a choice
23        generally.
24   Q.   Yeah, okay.  So in this case you are aware that the
25        State and the defense team together submitted the

LMKSDC_0026335

1      casings for DNA testing?

2    A.  Yes, I agree.

3    Q.  And it wasn't at the time, but it's better late than

4        never, correct?

5    A.  Of course.

6    Q.  All right.  Have you ever had a chance to review the

7        DNA report?

8    A.  I was only told that it was inconclusive, or that it

9        came back negative.

10   Q.  It's a pretty short report.  If I approach, would you

11       mind reviewing it so that you can confirm that?

12              (State's Exhibit 1 was marked for

13              identification.)

14          MS. TATUM:  May I approach, Your Honor?

15          THE COURT:  Yes.

16          MS. TATUM:  Also I'd ask does the defense team

17   have any objection in submitting this, State's 1,

18   into evidence?

19          MS. BUSHNELL:  No.

20          MS. TATUM:  No?  Thank you.  We'd move to admit.

21          THE COURT:  Are you offering it?

22          MS. TATUM:  I am offering it.

23          THE COURT:  All right.  It's admitted.

24          THE WITNESS:  Thank you.

25   Q.  (By Ms. Tatum)  And take a minute, I know you haven't

TINA R. ST. JOHN, RPF, CRR

 1           had a chance, but it is a fairly short report.  Just
 2           let me know when you're done reviewing it.
 3     A.    Okay.  Yes.
 4     Q.    Okay.  And that's essentially what the defense team
 5           told you the results, correct?
 6     A.    Yes, yes.
 7     Q.    It just says it's inconclusive, right?
 8     A.    Well, basically it says that no DNA was -- no profile
 9           was -- was developed; therefore, obviously it's an
10           inconclusive report.
11     Q.    Okay.  And it shows all four shell casings have been
12           tested?
13     A.    That's correct, yes.
14     Q.    So obviously it wasn't done at the time, but it's
15           been done now, right?
16     A.    Yes.
17     Q.    And would you have expected the result to have been
18           different if it was done in the '90s?
19     A.    That's hard to say.  Given today's technology,
20           certainly the fact that it was 20 years earlier and
21           the DNA on there was subjected -- subject to less
22           handling and less whatever, probably you -- I would
23           have expected maybe there might have been a better
24           chance of getting at least a partial profile, but
25           it's really impossible to say.  There may not -- it

TINA R. ST. JOHN, RPF, CRR

1        may have been totally negative at the time as well,

2        yes.

3    Q.   Okay.

4    A.   Sure.

5    Q.   And I know the technology is better now than it was

6        back then too?

7    A.   Yes, it is.

8    Q.   So that's a factor, correct?

9    A.   Absolutely, yes.

10   Q.   I think you said you've at least testified in many

11       states, have you worked in many states?  Sounds like

12       you have.

13   A.   Louisiana and Texas is the only case -- the only

14       states that I've actually been employed.  I have, you

15       know, as a private consultant, I have worked cases in

16       all of -- reviewed cases and in some case worked

17       evidence in all of those -- in all of those states.

18   Q.   Okay.  So you have cases in your private employment

19       that are submitted from all 50 states, is that or

20       close to that?

21   A.   No.  Well, certainly not only in private employment,

22       but our medical examiner's office takes cases from

23       anyone who has a legitimate need for our services.

24       We are not bound like most law enforcement offices

25       are where you can only take cases from that law

TINA R. ST. JOHN, RPF, CRR

1           enforcement.  So we've received cases and we've

2           analyzed cases from all over the country, yes.

3      Q.   I'm sorry.  This isn't a trick question.

4      A.   No, no.

5      Q.   I guess what I'm just asking you is how familiar you

6           are with the practices of other states as opposed to

7           Kansas City, Kansas in the '90s there.  That's a

8           better way to phrase it.  And if you're not, that's

9           okay.  But if you are --

10     A.   No, I -- I -- I'd be reluctant to try to opine about

11          -- about forensic practices anywhere in '94 other

12          than Louisiana or -- or Texas because those are the

13          ones -- and perhaps Oklahoma because those are the

14          ones that I have more direct knowledge about.  You

15          know, in 1994, I might not have been able to even

16          point to Kansas City, Kansas on a map.

17     Q.   So you don't know if the practices of the Kansas

18          City, Kansas Police Department at that time diverged

19          significantly from other police departments?

20     A.   I have no idea, no.

21     Q.   Okay.  And you can't say that, you know, them not

22          submitting these items you talked to us about today

23          in this particular case was something unusual or if

24          perhaps they weren't submitting as much forensic

25          evidence back in 1994, you don't know that either,

TINA R. ST. JOHN, RPF, CRR

1           correct?

2   A.   I don't know.  I have no idea of that.

3   Q.   So you don't know if they did this purposefully or if

4        it was because perhaps they had a lack of

5        understanding of forensic evidence?

6   A.   No, I have no opinion.  I have no way of knowing

7        that.

8           MS. TATUM:  Okay.  Thank you.  I have no further

9        questions.

10          THE COURT:  Redirect?

11          MS. BUSHNELL:  Yes, Your Honor.

12                  REDIRECT EXAMINATION

13  BY MS. BUSHNELL:

14  Q.   Mr. Singer, we talked about a number of different

15       methods of forensic review or forensic techniques --

16  A.   Yes.

17  Q.   -- such as the analysis of glass?

18  A.   Yes.

19  Q.   Was that a technique that was employed in 1994?

20  A.   Yes.

21  Q.   Has that changed significantly since 1994?

22  A.   Not significantly, no.

23  Q.   And we also talked about blood or serology that could

24       have been examined on the shoes.

25  A.   Yes.

TINA R. ST. JOHN, RPF, CRR

1    Q.   Was that available in 1994?

2    A.   Yes, to some extent.  DNA was rudimentary at that

3         time, but certainly ABO typing and then we were using

4         electrophoresis methods to get certain genetic

5         components of blood at that time.

6    Q.   And that was available in 1994?

7    A.   Yes.

8    Q.   And, in fact, blood typing was -- was fairly common

9         in 1994, is that fair to say?

10   A.   You talking about ABO typing?

11   Q.   Yes.

12   A.   Yes.  That goes back to the early 1900's.

13   Q.   And could that be used to find blood found on shoes?

14   A.   Sure.

15   Q.   And we also talked about firearms and toolmarks

16        examinations, was that available in 1994?

17   A.   The comparison of fired material to reference

18        material certainly was, yes.

19   Q.   And were -- to your knowledge, were any of these

20        searching for weapons in 1994?

21   A.   Sure.

22   Q.   Were they collecting the clothing of perpetrators or

23        suspects in 1994?

24   A.   Yes, yes.

25   Q.   I also want to show you an exhibit.  I'm gonna --

TINA R. ST. JOHN, RPF, CRR

LMKSDC_0026341

1           they're going to put this up, but I'm going to hand
2           you one as well.  This is Exhibit 21, page 15.  And,
3           Mr. Singer, what does this appear to be?
4     A.    This is a booking report apparently, this -- yeah,
5           you showed me this last night if I remember
6           correctly, and this is material that was taken from
7           Mr. McIntyre apparently at the time that he was
8           booked in.
9     Q.    So at the time he was arrested, they collected some
10          materials from him?
11    A.    Yes, they did.
12    Q.    But those were -- those were just collected in the
13          matter of course of booking before he did this?
14    A.    According to this, yes.
15    Q.    And to your knowledge, you never saw anything that
16          showed an examination of --
17    A.    No, ma'am, I did not.
18    Q.    I want to show your attention to the right column, it
19          seems to be what looks like a list of items, you can
20          look at it on your paper.
21    A.    Yes.
22    Q.    Do you see where it says shoes?
23    A.    I do, yes.
24    Q.    What does it say in regards to shoes?
25    A.    It says on person.

TINA R. ST. JOHN, RPF, CRR

1    Q.   So in your opinion, does that mean they collected
2         those shoes?
3    A.   Well, based on this -- on the face of this report, it
4         does not appear that they did because they list
5         things as having been reported, but this is listed as
6         being on person.
7    Q.   And so at that time even though they had him and were
8         collecting those other items, he was allowed to keep
9         his shoes?
10   A.   That -- that would appear to be the case, yes.
11   Q.   And what we've discussed is those shoes could have
12        contained some very important information?
13   A.   In my opinion, yes.
14   Q.   Such as glass fragments?
15   A.   Yes.
16   Q.   Or potential blood comparison that could have been
17        made?
18   A.   Yes.
19             MS. BUSHNELL:  Thank you.
20             THE COURT:  Anything else?
21             MS. TATUM:  No.  Thank you.
22             THE COURT:  All right.  May this witness be
23        excused?
24             MS. BUSHNELL:  Yes, Your Honor.
25             MS. TATUM:  Yes.

TINA R. ST. JOHN, RPF, CRR

1          THE WITNESS:  Thank you.

2          THE COURT:  You're free to go or stay as you

3     choose.

4               (Witness excused.)

5          MS. PILATE:  Your Honor, if I may, I have a

6     witness who's potentially not feeling well, I'm going

7     to step in the hallway and --

8          THE COURT:  Sure, that's fine.  Good time to

9     check, is everybody okay to go to noon or --

10          MS. TATUM:  I'm okay with that.  You guys all

11     okay?

12          MS. PILATE:  Yes.

13                    JAMES MCCLOSKEY

14     called as a witness on behalf of the Petitioner,

15     having first been duly sworn, testified as follows:

16          THE COURT:  Whenever you're ready.

17          MS. PILATE:  And thank you, Your Honor, for

18     allowing me a couple seconds out in the hallway.

19                   DIRECT EXAMINATION

20     BY MS. PILATE:

21     Q.   Good morning, sir.

22     A.   Good morning.  How are you?

23     Q.   Good.

24     A.   Good.

25     Q.   Could you please tell us your name and where you

TINA R. ST. JOHN, RPF, CRR

```
 1              reside generally?
 2    A.   My name is Jim McCloskey and I reside in Princeton,
 3         New Jersey.
 4    Q.   Okay.  And what is your present occupation or status?
 5    A.   Well, I was the founder of a nonprofit organization
 6         called Centurion Ministries and we work to free
 7         people we believe are innocent, wrongfully convicted
 8         serving life or death sentences.  And right now as of
 9         mid 2015, I retired from the management of the
10         organization, turned it over to my successor, but I
11         have still kept a number of cases that I've been
12         working on for years.
13    Q.   Okay.  So how would you describe your status?  Are
14         you --
15    A.   Semi -- I call it semi retired.
16    Q.   Okay.  And how long have you lived in Princeton, New
17         Jersey?
18    A.   I moved to Princeton, New Jersey in 1979 in order to
19         enter the master -- the three-year master divinity
20         program at the age of 37 after a 12-year business
21         career and three years in the Navy in Japan and
22         Vietnam.
23    Q.   Okay.  When you say -- I think you said divinity
24         school, am I right?
25    A.   Yes, Princeton -- I'm sorry.
```

LMKSDC_0026345

1    Q.   Explain what that divinity school is because not
2         everyone may know.
3    A.   Well, I went to Princeton Theological Seminary is the
4         formal name of the institution, and they prepare
5         mostly protestant ministers for the church pastoring.
6         So I entered in 1979 believing at that time that I
7         was going to be preparing to become an ordained
8         Presbyterian Church pastor, which didn't work out
9         that way.
10   Q.   Okay.  So your career took another turn, is that fair
11        to say?
12   A.   Yes, it did.
13   Q.   Okay.  Now, I think you stated that you entered
14        divinity school at age 37, is that --
15   A.   That's correct.
16   Q.   Okay.  And prior to that, you were in the business
17        world?
18   A.   Yes.
19   Q.   Okay.  Can you just tell us briefly about your time
20        in the business world?
21   A.   I spent five years -- six years in Tokyo, Japan
22        working for a management consulting firm.  We would
23        assist American firms to understand the Japanese
24        market and identify joint venture partners and help
25        negotiate those -- those combinations.  And then I

LMKSDC_0026346

1          came back home to Philadelphia and joined another

2          management consulting firm and my job there was to

3          build its business, its consulting business, with

4          Japanese companies operating in the United States and

5          to establish us in Tokyo, Japan.

6     Q.   Okay.  And what brought you to divinity school?

7     A.   Well, in the 19 -- throughout the 1970's working for

8          the Philadelphia consulting firm, for the first time

9          in my adult life I started to attend church.  Long

10         story short, I started to feel a call to leave the

11         business world and go into the ministry where I felt

12         I could live a more productive and God fearing life.

13    Q.   Okay.  And I think you said when you entered divinity

14         school, it was with the thought or intention that you

15         might become a church pastor at some point?

16    A.   That was the original intention and goal, yes.

17    Q.   Okay.  Did you have an experience in seminary that

18         ended up changing the direction that you took with

19         your theological education?

20    A.   Yes.  In my second year at the seminary in 1980 I

21         served as -- I did my field education work as a

22         student chaplain at Trenton State Prison and I was

23         assigned two cell blocks, 20 men per cell block.  And

24         in that capacity throughout the fall of 1980 I met a

25         gentleman who was doing a life sentence for a Newark

LMKSDC_0026347

1          murder.  I came to believe he was innocent, took a
2          year off from school, worked full time for him, came
3          back to the seminary after the year absence of
4          independent leave and continued working for him.  And
5          then in 1983 everything came together, we freed that
6          man, Mr. Jorge Los Santos, and exonerated him.  I
7          finished my master of divinity degree, but I had met
8          two other New Jersey lifers in whose innocence I had
9          come to believe and I felt that God was calling me
10         not to go into the church pastor, but to work to free
11         people I believed were completely innocent serving
12         crime -- serving life or death for crimes of others.
13    Q.   Okay.  At that time that you got that calling, was
14         there anyone else working in that field to exonerate
15         wrongfully convicted persons or persons who claimed
16         they were wrongfully convicted?
17    A.   Not from an organizational or systemic basis so I was
18         the first one to set up an organization specifically
19         designed with a mission and purpose to free people we
20         believed were innocent.
21    Q.   And tell us a little bit about how that organization
22         started.  Did you just turn the key and office door
23         one day and have a staff and everything you needed?
24    A.   No.  I lived in a rent-free room in a home occupied
25         by a delightful octogenarian woman, Mrs. Jateman

LMKSDC_0026348

```
 1            (phonetics).  Centurion's headquarters were my
 2            bedroom for the first eight years.  And then slowly
 3            but surely, we started to free some people, we got a
 4            little bit of credibility and foundation started to
 5            support us as well as individuals.  And in 1987 Kate
 6            Germond joined me, she read about us in the papers
 7            after we had freed somebody in New Jersey and slowly
 8            but surely we were able to start -- we built up the
 9            organization, moved out of my bedroom into an office
10            and went from there.
11    Q.      How did at that point in time, how did people find
12            you when you were operating your small operation out
13            of your bedroom?
14    A.      Well, we were for the first eight years up until
15            1987, we worked only New Jersey cases so we were
16            confined to that state.  So -- and then when we
17            started to free, we freed three New Jersey lifers,
18            the two that I began to work with, began Centurion
19            Ministry with.
20                By 1986 and slowly but surely we got some
21            publicity in New Jersey and we started getting
22            letters from Pennsylvania, New Jersey.  And then in
23            1986 one of the men that we freed in New Jersey, he
24            and I were on the Today show.  And at that point,
25            because nobody else in the United States was doing
```

TINA R. ST. JOHN, RPF, CRR

```
 1           this work, letters started coming pouring into our --
 2           to the house where I lived, and that started our
 3           national.
 4                One of the -- one of the petitioners was
 5           Clarence Brandley, he was on death row in Texas.  So
 6           Kate and I decided we better get down there and see
 7           what's going on with that case.  He, as it turned
 8           out, we were able to bring forward the star witness
 9           against him 10 years earlier who recanted his
10           testimony, 60 minutes came in, broadcast the story
11           and we got a stay of execution six days before his
12           execution was to happen and we eventually freed him.
13           But from that point on, we started to get a lot of --
14           a lot of letters from people all over the country
15           asking for our help.
16     Q.    Okay.  And in what year did the Clarence Brandley
17           exoneration occur?
18     A.    He was actually freed -- he was freed on January
19           23rd, 1990 off of death row.
20     Q.    Okay.  And I think you said that case came within six
21           days of execution?
22     A.    He came within six days of execution.
23     Q.    Can you explain to the court how Centurion Ministries
24           got its name, what that means?
25     A.    Judge, when I had set up Centurion as an
```

LMKSDC_0026350

1      organization, nonprofit organization, I named it

2      after the centurion who in Luke 23:47 looked up at

3      the crucified Christ and said certainly this man was

4      innocent.  That's where it came from.

5   Q.  Is your organization restricted in any way to people

6      with certain religious beliefs?  Does an applicant

7      for help have to belong to a particular religion?

8   A.  Actually, even though I call it Centurion Ministries

9      because in the beginning I looked at that as my

10     ministry, actually we're a secular organization in

11     that it matters not a wit to us if those who ask for

12     our help or those we eventually serve have any

13     religious inclination whatsoever.  And if they do, it

14     matters not a wit to us what that religion might be.

15  Q.  But the name, in fact, reflects the calling that you

16     felt you had?

17  A.  Yes.

18  Q.  At the time that you founded Centurion Ministries,

19     was there much understanding of the problem of

20     wrongful convictions?  Was there much analysis at

21     that point?

22  A.  No, there wasn't.  There was very little -- very --

23     no studies that I'm aware of on the subject in the

24     1980's, but I remember I wrote an article for the

25     John J. Criminal Justice Ethics magazine, and that

TINA R. ST. JOHN, RPF, CRR

1         was in 1989.  And as far as I'm -- as far as I

2         remember, that was about the first article that was

3         written that spelled out a possible systemic problem

4         here in the United States of innocent people being

5         wrongly convicted.

6    Q.   And since that time has there been more attention or

7         focus on this issue?

8    A.   Absolutely.  I think since that time bringing it up

9         to the present time, there's probably 60 or 70 what

10        they call innocence projects who are associated with

11        various law schools or schools of journalism or

12        independent across the country and there's also the

13        national registry of exonerations which was

14        established I think about eight or nine years ago and

15        they document and follow each and every exoneration

16        that occurs in the United States.  So there's been

17        quite a bit of attention spent on this phenomenon of

18        the convicted innocent in America.

19   Q.   Okay.  And have you seen any statistics anywhere that

20        you regard as a reliable source about --

21   A.   Yes.

22   Q.   From --

23   A.   The statistic that I think most people in this field

24        would consider to be the most reliable is the

25        National Registry of Exonerations out of -- well, now

LMKSDC_0026352

```
1              I think they're out of California, but they were
2              started in Chicago with a Center of Wrongful
3              Convictions and the law school.  But right now I
4              think they're -- if you go on their website, I think
5              they're up to about 1300 exonerations since 1989.  It
6              might be more than that now.
7    Q.   Okay.  Let's turn to your particular experiences on
8              cases, do you have any or are you able to tell us
9              approximately how many innocence cases you've worked
10             on in your career addressing this issue?
11   A.   We've altogether since I started Centurion in 1980
12             began the work, we have taken on 90 cases, we have
13             freed 58, we have completed 72 of the 90.  Of those
14             72, we have freed 58 and the other 18 we're still
15             working on.  The 14 that we haven't freed since I
16             began this work but have concluded they either died
17             in prison or we discovered that our assessment of
18             innocence was wrong and the State was right and we
19             dropped the case immediately, and that happened in 7
20             of those 14 cases.
21   Q.   So would it be true then that the purpose of your
22             organization is to work on behalf of those who are
23             truly actually innocent as opposed to someone who is
24             simply seeking relief from his conviction?
25   A.   That's correct.  We're -- we're only interested in
```

LMKSDC_0026353

```
 1              complete factual innocence.  And by that, we mean
 2              they had nothing whatsoever to do with the crime, had
 3              no knowledge, directly or indirectly, of the crime,
 4              until they were essentially arrested for that crime.
 5    Q.        Okay.  And what over -- over the years, what has been
 6              the geographical reach of Centurion Ministries?
 7    A.        Well, we work throughout the country and we get
 8              petitions for help throughout the nation.  But of the
 9              90 cases that we have embarked on, they have occurred
10              in 21 different states.  Now, there are a number of
11              cases in each state at different counties, but 21
12              different states and two Canadian we worked for a
13              Saskatoon person and a Winnipeg person and were able
14              to free them.
15    Q.        And over the years, has your work required you to do
16              quite a bit of travel?
17    A.        Quite a bit.
18    Q.        And what is the reason for that?
19    A.        Well, most of the cases we take on are non DNA and
20              they require exhaustive, methodical, thorough
21              investigations of both the crime and the conviction
22              and there's a lot of field work, a lot of shoe
23              leather involved, and that's what I've been doing
24              mostly for the last 38 years as my colleagues have as
25              well.  Once we take a case, whatever geographical
```

1       region, we go to that area and begin the

2       investigation and knock on doors, look for old

3       witnesses, look for new witnesses, retain attorneys,

4       forensic experts and try and do what we can to free

5       the person, develop new evidence, go back to court

6       and hopefully free -- free the individual.

7    Q. Would it be fair to say that non DNA cases present

8       some challenges that DNA cases do not?

9    A. Yes.  You know, DNA -- everybody likes to say, well,

10      DNA cases are easy.  Well, a lot of times they're not

11      because the district attorney, for whatever reasons,

12      will fight you tooth and nail and resist getting DNA

13      done.  However, in the 58 cases which we've freed, 10

14      were DNA freedoms, exonerations, the others were not.

15      And those other ones, as well as the current ones

16      we're working on, including Lamonte's, caused quite a

17      bit of -- of investigation and many, many trips to

18      the locality that our investigation required.  And

19      not only like in this case I would -- I spent a lot

20      of time coming out to Kansas City, Kansas, but I also

21      made a trip to Mississippi to interview a witness.

22      So by the time we come along to investigate a case,

23      it's a cold case, anonymous people, nobody's ever

24      heard of these folks outside the particular

25      community.  And by that time, a number of instances

LMKSDC_0026355

1          we have to travel, we locate witnesses wherever they

2          are.  A lot of them have moved to other parts of the

3          United States and we go wherever they are.

4     Q.   How does Centurion Ministries get its cases?

5     A.   Well, from 1992 until the present, we have received

6          anywhere from 1100 to 1600 requests for help from

7          people we never heard of each year.  So it's quite a

8          job to -- to sort out those perspective cases, those

9          petitioners and vet them and decide which ones are

10         worthy of our --

11    Q.   Uh-huh.

12    A.   -- resources, both human and treasury.  And then the

13         difficult situation is because there are a number of

14         good cases to work on and to select, we have to make

15         the difficult decision of which -- which you to begin

16         work on.

17    Q.   How does the screening process work?

18    A.   Well, we get a letter usually from the inmate who has

19         heard about us and then we -- we assign -- a staff

20         member assigns that letter to a volunteer or other

21         staff member to respond to, and it usually takes from

22         the day we get that first letter until we actually

23         commit to the case, those cases we've committed to

24         empirically, it's anywhere from three to seven years

25         of vetting.  We're a small organization, we have 20

1          volunteers, most of whom are adult volunteers from
2          the Princeton community, a few students, and we have
3          a staff of 10.  And five of the staff members spent
4          their time in building up, developing case work of
5          prospective cases and helping us decide which ones to
6          take on.
7               But ultimately, as in Lamonte's case if I may go
8          there for a second, he's a perfect example.  We
9          received a letter from him in 2003, and in that
10         letter he said I wrote you in 1996 and I was told
11         that you don't look at cases until the person has
12         exhausted all his appeals.
13    Q.   Uh-huh.
14    A.   But in that same letter in '03, he said I've
15         exhausted my appeals.  I need your help.  I'm
16         innocent, I didn't do this crime.  Please help me.
17         That got our attention.
18    Q.   Okay.  And actually, Mr. McCloskey, you've drawn my
19         attention to a letter that you handed to me.
20              MS. PILATE:  Your Honor, may I approach the
21         witness?
22              THE COURT:  Yes.
23              THE WITNESS:  Could I have a glass of water?
24              THE COURT:  Yes.  Is there some way to access a
25         glass of water?

LMKSDC_0026357

1          THE WITNESS:  Thank you, Judge.

2     Q.   (By Ms. Pilate)  Mr. McCloskey, I'm going to hand to

3          you a letter, it looks like it's written on yellow

4          legal paper.  We have marked it as Petitioner's

5          Exhibit 162 and it's got handwriting on it and a

6          signature at the bottom.  Is this a letter that you

7          recognize?

8     A.   Yes, it is.  This is the letter that -- this is the

9          first letter -- thank you -- this is the first letter

10         that we really received from -- from Lamonte since we

11         told him that we can't work for him -- since he first

12         wrote us in '96.  This is really the first working

13         letter, yes.

14    Q.   Okay.  And when you traveled to Kansas City to

15         testify in this matter, did you bring this letter

16         with you and provide it to me?

17    A.   I did.

18         MS. PILATE:  Okay.  Your Honor, I'm gonna go

19         ahead and show it to State's counsel.  Your Honor, I

20         only have one copy of this letter, can I show it to

21         you because I'm going to move for admission of it?

22         THE COURT:  Yes.  Do you have objection to this?

23         MS. TATUM:  No.  Thank you.

24         THE COURT:  All right.

25    Q.   (By Ms. Pilate)  Mr. McCloskey, I'm gonna place the

LMKSDC_0026358

1       letter back in front of you and ask you a couple of

2       questions about it.

3               THE COURT:  So we don't lose this because it's a

4       little confused here.

5               MS. PILATE:  Right.

6               THE COURT:  I take it that you have offered it,

7       you've received no objection.

8               MS. PILATE:  Right.

9               THE COURT:  And is it time to --

10              MS. PILATE:  And I am moving for admission of

11      162.

12              THE COURT:  All right.  It's admitted.

13              MS. PILATE:  Okay.

14   Q.   (By Ms. Pilate)  Mr. McCloskey, is there something

15       about this letter that attracted your attention to

16       it?

17   A.   Well, yeah.  I mean there's a couple things here, but

18       I guess one of them is he says I'm 100 percent

19       innocent of the crime I'm doing time for.  I've been

20       doing my best trying to prove that.  And also, as I

21       mentioned earlier, he mentions that when he wrote us

22       for the first time in 1996, he quotes our response as

23       we wouldn't be able to help you unless my case was,

24       quote, unquote "dead in the water".  That is an

25       expression we've used, and my appeals were quote,

LMKSDC_0026359

1      unquote "exhausted", which we've used that as well.

2  Q.  Uh-huh.

3  A.  We've since changed our criteria.  In other words,

4      we've began to work for petitioners earlier in the

5      appeals process, but this was what we did back in the

6      day.

7  Q.  Uh-huh.

8  A.  So yes.

9  Q.  Do you know about when you would have first seen that

10     letter?

11 A.  When I would have first seen this letter?

12 Q.  Uh-huh.

13 A.  It probably -- I don't -- I can't specifically

14     recall, but my guess is that one of the staff

15     probably, Kate Germond, my colleague and partner, she

16     probably would have brought this to my attention soon

17     after she got it.

18 Q.  Would it be fair to say that the type of person that

19     Centurion Ministries is looking to help is that

20     person who is truly 100 percent innocent?

21 A.  That's what -- that's our primary criteria.

22 Q.  And would that be why you terminate working on a case

23     when you discover that, in fact, your initial

24     assessment of the case in the petitioner being

25     innocent may have changed?

1    A.    Yes, in those seven cases that we dropped after

2          originally through our vetting process, we believed

3          that they were innocent.  Once we began the

4          investigation, we discovered, oops, doesn't look good

5          for the petitioner, and so I went into the prison and

6          interviewed that person and let them know that we're

7          dropping them because we no longer believe in their

8          innocence.

9    Q.    Okay.  Now, once a case has gone through the vetting

10         process and it's accepted as a Centurion Ministries

11         case, what does committing to the case involve?

12   A.    Committing to the case involves conducting a -- for

13         however long it takes -- a thorough reinvestigation

14         of the case, which in these instances usually

15         requires a reinvestigation of the crime as well as

16         the State's case against the convicted person and

17         trying to develop any new evidence that goes -- that

18         could assist us in presenting to a court credible new

19         evidence of innocence or -- and/or prosecutorial

20         misconduct or police misconduct, whatever it might

21         include.

22               Additionally, we assemble a forensic team of

23         experts, if that seems appropriate, to any individual

24         case, and we also retain an attorney to work with us.

25         So we -- we build a team -- investigators, Centurion,

LMKSDC_0026361

```
 1           attorneys and forensic experts -- then we go about
 2           our work.
 3      Q.   Okay.  Now, the letter from Lamonte McIntyre was sent
 4           in 2003, correct?
 5      A.   Yes.
 6      Q.   And do you know at what point active work began on
 7           his case?
 8      A.   Active work -- I got this case, I took a serious look
 9           at this case in the fall of 2008.
10      Q.   Uh-huh.
11      A.   Now, I was surprised by our staff that this case was
12           being developed and bubbling up to the top and it was
13           looking pretty good, but I didn't start reviewing.
14           Before we commit to any case, we accumulate the
15           entire record of the case, trial transcripts,
16           pre-trial hearings, post-trial hearings, discovery,
17           legal briefs, police reports, et cetera and we
18           collect them and we study them very carefully.  And
19           then before we commit to a case, either Kate or I,
20           Kate being my long-term partner, depending on who's
21           going to take the case -- in this case, in Lamonte's
22           case, it was decided I'll take this case.  So I read
23           all the transcripts, all the written material that I
24           just enunciated, then in January of 2009 I wrote
25           about a 21, 22-page memo on this case describing why
```

TINA R. ST. JOHN, RPF, CRR

1        the history of the case and why we believe Lamonte is

2        innocent.

3   Q.   Okay.  In your experience, can achieving an

4        exoneration of a wrongfully convicted person take

5        quite sometime?

6   A.   In our case of the 58 people we've been able to free,

7        it has taken on the average 5 to 10 years once we

8        begin the field work, which in this case began in

9        April of 2009.  There have been exceptions like there

10       are to any rule.  Two Dallas, Texas cases we freed

11       within 15 months.  That was unbelievable.  The stars

12       were aligned there.  The longest we've spent on a

13       case to free somebody was 20 years.

14  Q.   It's a long time, isn't it?

15  A.   Yeah, it was, especially for him.

16  Q.   What are, in your experience, the most common causes

17       of wrongful conviction?

18  A.   Well, there are, of course, a number of them.  One

19       that we commonly see is erroneous eyewitness

20       identification, perjury, I hate to say it, Your

21       Honor.  But in our experience in the cases we work

22       on, perjury is pervasive, it's endemic to the case by

23       a variety of witnesses or police officers.  There's

24       prosecutorial misconduct, the suppressing of

25       exculpatory material that is eventually discovered,

LMKSDC_0026363

```
 1              race can certainly be a factor.  A person of color in
 2              our view has two strikes against him or her once on
 3              the docket.  And forensic junk science we call it,
 4              forensic science where the local crime lab people
 5              pretty much bend their scientific evaluation of
 6              evidence to fit the police or prosecutor's view.  A
 7              number of these are -- the use -- we see this all the
 8              time, although it wasn't in Lamonte's case, the use
 9              of jailhouse career criminals, jailhouse confessions
10              as well as false confessions by the wrongly convicted
11              people once arrested, we see that as well.
12        Q.    What about lawyering, do you see --
13        A.    Yeah, that's another one.  That's ineffective or
14              inept lawyering, usually court appointed, who just
15              don't have the experience, they don't have the
16              resources and they don't have the will to do what
17              they should do, the most rudimentary of effort on
18              behalf of the indicted.
19        Q.    Do you recall what your initial impression was of
20              Lamonte McIntyre's case?
21        A.    Well, once I -- once I was able for myself, let alone
22              what the staff was telling me based on their review,
23              I was able once I read the entire record, I
24              formulated a number of impressions about the case.
25                    One was I thought that the -- the -- it was the
```

TINA R. ST. JOHN, RPF, CRR

1          eyewitness identification of one of the witnesses,

2          Ruby Mitchell, was highly problematic.  I saw where

3          the police investigation, you couldn't even call it

4          an investigation in our view, was -- was just

5          nonexistent really.  It was shocking how shallow and

6          superficial and quick it went and what they did --

7          sins of omission and comission is the way I phrased

8          it.

9                  And then, of course, we saw the prosecutorial

10         misconduct not -- where the trial prosecutor did not

11         share the statements by two of the witnesses that

12         they have the wrong man, two of the eyewitnesses.

13         The thing about this case that really struck me among

14         -- I guess this is primary, here you have five

15         eyewitnesses to this crime, four of whom were loved

16         ones and related to one of the two victims.  They

17         were eyewitnesses.  And one of them, not too soon

18         after or soon after the conviction, then throughout

19         the history of this case, has always claimed Niko

20         Quinn was this eyewitness.  The case against Lamonte

21         was built on two eyewitnesses, Ruby Mitchell and --

22         and Niko Quinn, both of whom saw the shooter come

23         down the hill, go to the car and shoot, fatally shoot

24         with a shotgun the two -- the two victims.  Anyway,

25         this case you have four loved ones, four family

```
 1              members of the -- of the victim who, all of whom know
 2              that the police arrested the wrong man and they told
 3              the police they arrested the wrong man and they lost
 4              a loved one.  They were witnesses and victims as well
 5              and the police totally disregarded, paid no attention
 6              to their protestation that they got the wrong man.
 7              All of these loved ones/witnesses wanted was justice,
 8              justice meaning you got the wrong man, please go out
 9              and investigate and get the right person.  We've
10              never seen that in any of our other cases, other 90
11              cases, I've never seen that --
12     Q.       So that --
13     A.       -- and it stunned me.
14     Q.       Okay.  So that is --
15     A.       How could you -- how could you -- how could you not
16              listen to the loved ones who witnessed this
17              traumatic, broad daylight slaying of these -- of
18              these two people?
19     Q.       Okay.  Once you had decided to commit to the
20              investigation of the Lamonte McIntyre case, did you
21              start making trips to Kansas City?
22     A.       I did.  I started the first trip was in April of '09
23              and I continued coming to Kansas City for the next
24              six years.  Altogether, I made about 19 -- 19 trips
25              to Kansas City, Kansas, three or four a year for six
```

LMKSDC_0026366

1          years and plus a trip to the federal prison in Yazoo

2          City, Mississippi to visit with Cecil Brooks.

3     Q.   Okay.  What were some of the steps that you took in

4          the investigation initially?

5     A.   Well, initially the first thing -- the first thing I

6          did -- and by the way, I worked with a local

7          investigator, Dan Clark.  Dan would join me at

8          different points in the six years that I worked on

9          the case.  But anyway, the first thing I did was went

10         to the crime scene and to stand where the

11         eyewitnesses were when they saw the shooter walk down

12         the hill and go towards the car.  So I tried -- we

13         tried to look at it from their viewpoint, from the

14         eyewitness viewpoint.

15    Q.   Uh-huh.

16    A.   And pretty readily discovered that Ruby Mitchell

17         would have been very -- I don't see how she could

18         have seen -- I don't see how -- let me put it this

19         way, I don't see how she could have recognized the

20         face of the shooter from the distance and the angle

21         where she was.  But anyway, went to the crime scene

22         and then the first thing I did was to look for Ruby

23         Mitchell, one of the two eyewitnesses.

24    Q.   Uh-huh.

25    A.   And Ruby is not an easy person to find.  She's --

LMKSDC_0026367

1       unfortunately, she doesn't have a home of her own and
2       never really has, at least since we began work on the
3       case in '09.  But she said at the -- when she was
4       taken to the police -- when she was taken to the
5       police department that several hours after the crime
6       occurred and she pointed to Lamonte McIntyre's photo,
7       she said this is the Lamonte who is dating my niece,
8       Keva Garcia.  Well, it's interesting to note that
9       Detective Golubski and his fellow detectives never --
10      never investigated or talked to or interviewed Keva
11      Garcia until the very eve of the trial five or six
12      months later.  That would have been my first step, go
13      to Keva.  Who's the Lamonte that you used to date?
14      Let's investigate him, let's see what he's all about,
15      let's get his photo, let's maybe even put him in a
16      lineup with Lamonte McIntyre who that same witness
17      thought was Lamont Drain, the Lamont who dated her
18      niece.  So anyway, I found Ruby soon -- in the first
19      trip and she was very cooperative.  Keva gave me her
20      phone number and I called -- called her up and she
21      said, yes, I agree to see you.  So I went over and
22      visited with her and she told me, she said, listen,
23      I've told the police from day one that the shooter
24      had French braids, cornrows.  Well, Lamonte never had
25      French braids.  She also told me, she said the

LMKSDC_0026368

1      victim's car was parked directly across the street

2      from my house.  Well, that was an inaccurate

3      recollection.  It was parked up the street.  And I

4      pointed that out to her.  She said, well, if the car,

5      as you say, if the car -- I still maintain she said

6      the car was parked directly across the street from my

7      house, but if you say it was parked up by the light

8      post, then I couldn't have seen him.  Well, that was

9      in accordance with our -- with our assessment

10     originally.  And she also alluded to the fact that

11     maybe I made -- she's not saying I made a mistake,

12     but she said I could have made a mistake, but I'm not

13     saying I did.

14          Okay.  So then also as part of the

15     investigation, I don't know, you let me know when I

16     should stop, but we also -- it was also important for

17     me to check out Lamonte's alibi.  At the trial he had

18     two aunts and two first cousins who testified that he

19     was with them that Friday afternoon --

20  Q.  Uh-huh.

21  A.  -- when the shooting took place around 2:00 o'clock.

22     So I was able to speak with each of those alibi

23     witnesses and I found them to be very credible.  They

24     didn't lie and make up a story because Lamonte was

25     there with them when this crime occurred a mile

LMKSDC_0026369

1          and-a-half away.

2               That also by the time we got the case and by the

3          time I was reviewing it myself, Saundra Newsom, the

4          mother of Doniel Quinn, one of the two victims, and

5          Niko Quinn who was one of the eyewitnesses who was on

6          record prior to the summer of 2008 recanting her

7          trial testimony saying that the prosecutor threatened

8          to take her kids away, the summer of 2008

9          independently of each other, Niko Quinn and Saundra

10         Newsom, the mother of Doniel Quinn, went to Rosie

11         McIntyre, Lamonte's mother, and told them that they

12         know the police have the wrong man and they've tried

13         to tell the police they have the wrong man and is

14         there anything they can do to help out your son,

15         Lamonte McIntyre.

16              So when I came in in April of '09 to begin the

17         investigation, one of the first things I did among

18         many others was to visit with Saundra Newsom, the

19         mother of the victim.  And, of course, Niko Quinn, we

20         found her and spoke with her.  But overall, broadly

21         speaking, the investigation encompassed the following

22         categories of witnesses:  Alibi witnesses, the Quinn

23         family members, Doniel Quinn, one of the two victims,

24         his various family members, several of whom were

25         eyewitnesses to the crime, aunts, uncles, former

TINA R. ST. JOHN, RPF, CRR

1          wife, girlfriend, friends of his.  It took me into

2          the drug world of Kansas City, Kansas which I didn't

3          figure on the investigation taking me, but you go

4          wherever it -- wherever it leads.  The current of the

5          river took me into the Kansas City, Kansas drug

6          world.  Yeah, I'm sorry.

7     Q.   No, you're doing fine.

8     A.   I tend to go on.

9          THE WITNESS:  Sorry, Judge.

10    Q.   I think you said a few minutes ago that you -- one of

11         the earliest --

12         THE COURT:  Counsel, may I interrupt?  We're

13         about five minutes 'til lunch.  And if you have

14         something that you can finish to a good breaking

15         point now, okay.  If I'm interrupting something,

16         okay, but it might be a good time for a break.

17         MS. PILATE:  Okay.  Your Honor, to be candid, I

18         was going to put up some photos of the crime scene

19         and that probably would take 10, 15 minutes.  So if

20         now's a good time, I'm fine with that.

21         THE COURT:  Okay.  Let's --

22         MS. PILATE:  We're going to when we come back go

23         into a couple of exhibits, so yeah, that would be

24         fine.

25         THE COURT:  Let me say that I am not as familiar

TINA R. ST. JOHN, RPF, CRR

1          with Kansas City, Kansas -- well, I'm not familiar

2          with Kansas City, Kansas, end of sentence.  So I am

3          going to say let's take about 'til 1:15 or 1:30.

4          Which do you think is best to let everyone to get

5          lunch and that kind of thing, 1:30 be okay?

6               MS. PILATE:  1:30 would be fine.  And actually

7          it would allow me to check on a witness who I think

8          might not be feeling very well.

9               THE COURT:  All right.  I might also tell you

10         while I'm thinking about it that I was told this

11         morning that they are doing a jury trial next week,

12         they need these bigger courtrooms for jury

13         orientation so we probably, I believe it's Monday,

14         I'll let you know for sure, but I think on Monday

15         morning we've agreed -- I've agreed on our behalf to

16         start at 10:00 o'clock so they can use this courtroom

17         rather than us moving around.  So keep that --

18               MS. PILATE:  Thank you.

19               THE COURT:  Okay.  We're in recess until 1:30.

20         We'll see you all back and start as promptly as we

21         can.

22                    (Thereupon, a luncheon recess was taken,

23                    after which the following proceedings were

24                    had, the petitioner being present.)

25               THE COURT:  Before we get started, I don't know

TINA R. ST. JOHN, RPF, CRR

1          whether all of you who were in here were here this
2          morning so I'll repeat this very quickly for your
3          benefit.  If you have a cell phone, please turn it
4          off.  No recording of audio, video, still pictures or
5          anything like that in the courtroom.  There is a
6          Supreme Court rule about having cell phones off and
7          I'm sure you all do that.  In fact, I see several of
8          you pulling them out and I appreciate that.
9               I would tell counsel that due to my
10          unfamiliarity with the area that I gave an hour
11          and-a-half for break for lunch.  I have now walked
12          around the area, had lunch here and I understand that
13          it's not a wasteland as far as places to eat are
14          concerned.  It's fairly easy to get to someplace to
15          eat.  So you can probably count on an hour to an hour
16          and 15 minute breaks from here on out.
17               I don't think I have anything else.  Are you
18          ready to continue with the witness?
19               And I will remind the witness, Mr. McCloskey,
20          you are still under oath.
21               THE WITNESS:  Yes, sir.
22     Q.   (By Ms. Pilate)  Okay.  We are back on the record
23          after lunch break.  Mr. McCloskey, can you see the TV
24          screen from where you are?
25     A.   Yes, I can.

TINA R. ST. JOHN, RPF, CRR

1    Q.    Okay.  Do you recognize that photo?

2    A.    Yes.  That's on Hutchings Street, the crime scene.

3    Q.    Okay.  Is there someone in the photo you recognize?

4    A.    From -- from here, no, I don't recognize anybody.

5    Q.    Okay.  Would you like to step down and see if there's

6         a person in the photo?

7               (The witness left the stand.)

8    A.    It's tough to recognize, but that could be me.  Is

9         that me?  I recognize the bald head.

10        MS. DERSCH:  Here, I'll blow it up.

11    Q.    (By Ms. Pilate)  Why don't we flip through the entire

12         series.  There's more photos than this overall, but I

13         picked four of them to go on this exhibit if you'd

14         like to look at them?

15    A.    You tell me if you're ready.

16        MS. PILATE:  Is that the second one?  Blow it

17         up.  Okay.  Next.

18    A.    That's me.

19    Q.    (By Ms. Pilate)  And the last one.

20    A.    Yeah.

21        MS. PILATE:  This is 135.

22    Q.    (By Ms. Pilate)  Okay.  Do you recognize those

23         photos, Mr. McCloskey?

24    A.    Yes, I do.

25    Q.    If you wouldn't mind staying up there for a minute.

LMKSDC_0026374

1        These are part of a series of photos that were taken
2        when, do you recall?
3   A.   To be honest with you, I don't recall when they were
4        taken, what year.  My guess would be around, I don't
5        know, 2010, it would have been the same time that the
6        crime took place in terms of the month and day.
7   Q.   Uh-huh.  Uh-huh.
8   A.   But I don't know what -- I don't remember what year.
9   Q.   Okay.  Could that have been at the beginning of your
10       investigation?
11  A.   It very well could have been, sure.
12  Q.   Okay.  And you recall making your first trips here in
13       2009?
14  A.   That's correct, in April 2009.
15  Q.   Okay.  Do you think these photos could be from that?
16  A.   They could very well be.  It makes sense because I
17       know I went to the crime scene first thing.
18  Q.   Okay.  And do you recall who took those photographs?
19  A.   I believe Investigator Dan Clark with whom I was
20       working.
21  Q.   Okay.  Are those photos an accurate depiction of the
22       areas shown in the photos at the time you were there?
23  A.   Yes, they are.
24  Q.   Okay.  And did you indeed have a difficult time
25       recognizing yourself in those photos?

TINA R. ST. JOHN, RPF, CRR

1    A.   Yes, I did.

2              MS. PILATE:  Okay.  You can return to your seat.

3                   (The witness resumed the stand.)

4              MS. PILATE:  Have you had a sufficient chance to

5         look at those?

6              MS. TATUM:  Are you marking four photos as the

7         one exhibit?

8              MS. PILATE:  Yeah, four photos compiles 135.

9              MS. TATUM:  Okay.  I don't have any objection to

10        them.

11             MS. PILATE:  Your Honor, there's no objection

12        and we would move for the admission of Exhibit 135,

13        which are four photos taken on Hutchings Street at

14        the start of Mr. McCloskey's investigation.

15             THE COURT:  And I understand there's no

16        objection, correct?

17             MS. TATUM:  That's correct.  Thank you, Judge.

18             THE COURT:  All right.  They are admitted.

19    Q.   (By Ms. Pilate)  Mr. McCloskey, what observations did

20        you make about the crime scene area as a result of

21        participating in that photo shoot?

22    A.   Well, one thing it brought to life once you're there,

23        it didn't necessarily come through as clearly in the

24        transcripts is that the car was up by the two men

25        sitting in the car.  The car was parked right by that

1          light stand to the right.  And Ruby Mitchell's

2          viewpoint it seemed to me would make it very

3          difficult for her to make an identification of the

4          shooter from her house.

5     Q.   Okay.  And that -- in that photograph, where are you

6          standing?  Do you know what lot that is?

7     A.   That would be Ruby Mitchell's -- that's where Ruby

8          Mitchell's home was I believe, her house was.

9     Q.   Okay.  And relative to where you were standing, where

10         was the light pole?  Is it off to the right or --

11    A.   It's off -- it's off to the right.

12    Q.   Okay.  Okay.  Looking up at the street there, does

13         that appear to be a view of Hutchings facing north?

14    A.   Yes, it is.

15    Q.   Okay.  And do you see the light pole?

16    A.   I do see the light stand, yeah.

17    Q.   Okay.  And is that the one you were talking about?

18    A.   Yes, it is.

19    Q.   Okay.  Did you make any observations about how easy

20         it was, for instance, for you to see or not see

21         things on Hutchings Street from various vantage

22         points?

23    A.   Well, yes, I made some observations from being there,

24         yes.  One, as I just said, it would be difficult for

25         Ruby Mitchell to be able to make any kind of a facial

LMKSDC_0026377

1        ID from where she was standing at her house.  And

2        also Stacy Quinn, I don't know if you want to show

3        that.

4     Q.  Go ahead.

5     A.  Show that house, but Stacy Quinn's home I think was

6        almost directly -- the victim's car, where they were

7        shot, they were shot in that car and it was almost

8        directly across from Stacy and Josephine Quinn's

9        house to the right.  That house to the right in that

10       photo is where Stacy and --

11    Q.  Right.  Go back there.

12    A.  That house -- okay.

13    Q.  Go ahead.

14    A.  That house to the right, there you go, there you go.

15    Q.  Okay.

16    A.  That house to the right is where Stacy and Josephine

17       Quinn were.  They were standing right by the front

18       door looking at -- right across the street at the car

19       where the victims were and where the shooter was when

20       he shot them.

21            MS. PILATE:  Okay.  This is -- let the record

22       reflect this is the fourth of the four photos in that

23       particular exhibit.

24    Q.  (By Ms. Pilate)  And what's the view here, if you

25       could describe from what vantage point it is?

LMKSDC_0026378

1    A.   What's the view?

2    Q.   Yeah, what's the view?  Is it from east looking west?

3    A.   It would be -- it would be east looking west, yes.

4    Q.   Okay.

5    A.   Where that car is pointed in the north -- towards the

6         north.

7    Q.   Okay.  And is that approximately where the car would

8         have been parked that the two victims were sitting

9         in?

10   A.   Well, yes, but approximately.  My understanding was

11        that the car was closer to the light pole when they

12        were shot.

13   Q.   Uh-huh.

14   A.   But then the car rolled back some feet to where it is

15        in that photo.

16   Q.   Okay.  And is the two-tone house there, kind of cream

17        color with brown trim that we see at the base of the

18        hill, is that the house that Josephine Quinn lived in

19        with Stacy Quinn at that time?

20   A.   That's correct.

21   Q.   Okay.  And do you see a person pictured in that

22        photograph?

23   A.   Again, I see myself.

24   Q.   Okay.  And is that at the bottom of the hill?

25   A.   That is the bottom of the hill, yes.

LMKSDC_0026379

1    Q.   Okay.  And do you believe that that is the hill the

2         shooter ran down?

3    A.   Well, yeah.  The shooter ran down -- well, he started

4         to the left of the photo up the hill and then made

5         his way down.  Now, to be honest with you, I'm not

6         sure if the shooter approached the car from this side

7         of that fence where those trees are or the other

8         side.  In other words, did he come to the left of

9         that fence, hit the street and then come up or did he

10        -- did he come down on the right side and to the car?

11        You would think that he would have come down to the

12        right because he would have been -- there would have

13        been less of an opportunity for anybody to have seen

14        him.

15   Q.   Correct.  Did you ever see anything in the interviews

16        of the witnesses that attempted to elicit that

17        information?

18   A.   Not that I recall.

19   Q.   Okay.  I think you said earlier you traveled to

20        Kansas City you said 19 times?

21   A.   Yes.

22   Q.   And on average, how long did you stay each time?

23   A.   Anywhere from on average a good week, sometimes a

24        little less, other times a couple days more.  One day

25        I remember was 12 -- one trip I remember was 12 days,

1          but a good week.

2    Q.    Were there any aspects of this case that made it

3          somewhat unusual for you other than the one you

4          previously mentioned with the involvement of

5          eyewitnesses who were also victims, was there

6          anything specifically about the police investigation

7          that you remember?

8    A.    Well, yeah.  I would like an opportunity, if I could,

9          to talk a little bit about that.  One is that the

10         police investigation ended, virtually ended, with

11         Ruby Mitchell's identification of Lamonte's photo

12         several hours after the crime occurred that

13         afternoon.  There was so many things that could have

14         been done that weren't done.  A number of them were

15         Stacy Quinn, she -- she got a good view of the -- of

16         the shooter and she told a number of her relatives

17         and loved ones that she knows who the shooter is.

18   Q.    Uh-huh.

19   A.    Josephine Quinn --

20   Q.    Uh-huh.

21   A.    -- her mother, told the police that Stacy -- when the

22         shooting occurred, Stacy left the scene before the

23         police came.

24   Q.    Okay.

25   A.    So Josephine told the police that her daughter,

LMKSDC_0026381

```
 1          Stacy, saw the shooter and she knows who that is.
 2     Q.   Uh-huh.
 3     A.   That was I believe in one of Golubski's police
 4          reports.
 5     Q.   Uh-huh.
 6     A.   Amazingly so, no -- there's no record of any police
 7          officer, Golubski included, interviewing Stacy, and
 8          she would have been very easy to find for Golubski --
 9     Q.   Uh-huh.
10     A.   -- because he had been having an illicit sexual
11          affair -- relationship -- I wouldn't even call it
12          affair -- but a sexual relationship with her for up
13          until that point at least five years.
14     Q.   So were you surprised in your review of this case to
15          see no interview of Stacy Quinn?
16     A.   I was -- I was very surprised because, you know, that
17          would be an obvious lead, all right, that she was an
18          eyewitness, I know her, I being Golubski, and I'm
19          gonna go talk to her and see what she can -- what
20          light she can shed.
21               Another thing that surprised me was about a week
22          or 10 days after the crime -- and this did not come
23          out until the trial, this was sprung on the defense
24          at trial -- that Detective Golubski took a -- had an
25          interview, a second interview with Niko Quinn, who
```

1       again was one of the -- one of the eyewitnesses to
2       the crime, and she identified the photo of -- of
3       Lamonte.  Now, Detective Golubski never told anybody
4       that, he never wrote it up, he never took a statement
5       from her, she never signed the back of a photo.  That
6       was kept as a dark secret by Detective Golubski until
7       the trial.
8    Q.  In the cases that you have worked on in your career
9       going back to I think you said 1980; is that correct?
10   A.  Yes.  Yeah.
11   Q.  Have you ever seen another case in which an interview
12       with an eyewitness to a murder on whom the eyewitness
13       identification largely depended was not documented?
14   A.  I never have.  And again, to emphasize the point,
15       there were only two eyewitnesses that this conviction
16       was based on -- Ruby Mitchell and Niko Quinn -- so
17       she was a very key, primary eyewitness.  And to not
18       document that interview and that identification is --
19       is unheard of.
20   Q.  Were there -- were there any other things about the
21       circumstances of the contact between Detective
22       Golubski and Niko Quinn that seemed unusual to you?
23   A.  Well, Niko has related to me and others that she told
24       Detective Golubski that Doniel Quinn was attacked and
25       beat up by three men at the drug house where -- where

LMKSDC_0026383

```
 1             he worked as a doorman and would go to -- to use and
 2             buy drugs.
 3     Q.      Uh-huh.
 4     A.      Those three men being Aaron Robinson who ran the drug
 5             house; Monster, Neil Edgar, Jr. who we believe is the
 6             shooter; and Marlin Williams who was Aaron Robinson's
 7             right hand man in running that drug house.  They --
 8             they attacked and beat up because they thought he
 9             stole drugs from them around that time.  So Niko has
10             made it very clear that she did tell the police that,
11             told Golubski that.
12     Q.      Have you ever seen any report that documented that
13             information from Niko Quinn to the police?
14     A.      There was no indication in any police report that --
15             that Detective Golubski heard about that or
16             documented or knew about that.  He made no mention of
17             it in any report.  And also as part of -- he -- he
18             never investigated Doniel Quinn and Donny Ewing, the
19             two victims' history, their personal history.  The --
20             the FBI, behavioral science people call it the
21             victimology, go into their world.  And he never even
22             interviewed anyone who knew Doniel -- Doniel,
23             including his mother.
24     Q.      Uh-huh.
25     A.      No one.  He did no investigation whatsoever.  He got
```

LMKSDC_0026384

1       that photo ID by Ruby Mitchell and then later on he
2       knew that was probably a little bit problematic.
3       Later on he got the one from Niko, and that was case
4       closed.
5           Another thing that happened was John Quinn,
6       Doniel's father who was a drug addict at the time and
7       in that world, he told Detective Golubski four to
8       five days after the crime that his son was -- was --
9       was involved and very active in a drug house where
10      the drug people were as deadly as Cobra snakes.  And
11      Golubski -- there's no indication whatsoever that
12      Detective Golubski in any way investigated that or
13      followed up that -- that promising -- what could have
14      been a promising lead.
15  Q.  Okay.
16  A.  Also there was -- again, Golubski -- Detective
17      Golubski was never -- I don't think he even tried,
18      but anyway there's no indication whatsoever that
19      there was any connection or -- between Doniel and the
20      -- and Lamonte McIntyre, no connection whatsoever.
21      They did not know each other.  There was no
22      motivation for Lamonte to do harm to Doniel in any
23      fashion, and that was never -- that was never --
24      there was no way that they could do it because it
25      didn't exist to establish any kind of relationship.

TINA R. ST. JOHN, RPF, CRR

1    Q.    Were you aware of any information developed at any
2          point by the police that pointed to any connection
3          between Lamonte McIntyre and either of the two
4          victims?
5    A.    As far as I know, no, there's no record of it and
6          there's no indication in my investigation that that
7          was developed at all.
8    Q.    Okay.  I'd like you to take a moment, if you could --
9    A.    Could I add one more point --
10   Q.    Sure.
11   A.    -- about that, the police investigation?  And that is
12         this, you know, when the shooter was standing right
13         by the passenger window of the car with a shotgun and
14         shot through the passenger window and killed both men
15         inside on the front seat, the glass was shattered,
16         there was blood leading from where the victim -- I'm
17         sorry -- where the shooter was standing all the way
18         down to where the car was stopped after it rolled a
19         bit.  You would think there would be some kind of
20         evidence if -- on Doniel's -- on Lamonte's clothes,
21         his shoes, looked for a weapon.  There was no search
22         warrant issued by Golubski or anyone from the police
23         looking for any evidence that could tie, any physical
24         evidence, that could tie Lamonte to this crime,
25         weapons, ammunition, clothing, et cetera.  That was

LMKSDC_0026386

| 1 |     | amazing that that was never done so... |
|---|-----|----------|
| 2 | Q.  | So if indeed Lamonte were the real killer, what |
| 3 |     | you're saying is you would have expected police to |
| 4 |     | look for and possibly find some physical evidence? |
| 5 | A.  | Absolutely, and that's not -- let's not forget that |
| 6 |     | Lamonte was arrested just several hours after that |
| 7 |     | crime. |
| 8 | Q.  | That is actually a transition into the next thing I |
| 9 |     | wanted to bring out.  If you could please look at |
| 10 |    | this, it's a demonstrative exhibit that is marked |
| 11 |    | Petitioner's 154.  Can you see it, Mr. McCloskey? |
| 12 | A. | Yes. |
| 13 | Q. | And could you just read it to yourself -- |
| 14 | A. | Yeah. |
| 15 | Q. | -- briefly and then we'll talk about it. |
| 16 | A. | Does that say Ruby Mitchell taking the police, is |
| 17 |    | that 3:00 o'clock to 5:55? |
| 18 | Q. | Right. |
| 19 | A. | Is that what that says? |
| 20 | Q. | Approximately. |
| 21 | A. | Right, right.  Makes positive ID.  Interview -- okay, |
| 22 |    | Lamonte McIntyre taken into custody based on total -- |
| 23 |    | right, okay, yes. |
| 24 | Q. | Okay.  Does the information stated on this board |
| 25 |    | appear to comport with your recollection? |

TINA R. ST. JOHN, RPF, CRR

```
 1   A.   It does with my recollection and reading all the
 2        police reports, yes.
 3   Q.   Okay.  And so does it look to you like the shooting
 4        occurred at about 2:00 PM?
 5   A.   Yes.
 6   Q.   Okay.  And the arrest of Lamonte McIntyre occurred
 7        approximately six hours later at 7:50 PM?
 8   A.   Right.  Yes.
 9   Q.   Okay.  So from the shooting to the arrest, six hours,
10        correct?
11   A.   Yes.
12   Q.   Okay.  In terms of the investigation, do you see the
13        reference on this board to the interview of Niko
14        Quinn by Detective Smith?
15   A.   I do.
16   Q.   Okay.  And doing some quick math in your head, about
17        how long does that interview appear to be?
18   A.   Looks like it took -- is that 2:50?  Two minutes.
19   Q.   I'm sorry, 2:46, does that --
20   A.   2:46 to 2:50?
21   Q.   Yeah.
22   A.   Yeah.
23   Q.   How long does that appear to you?
24   A.   That's four minutes.
25   Q.   So the interview of one eyewitness was four minutes,
```

TINA R. ST. JOHN, RPF, CRR

1               correct?

2      A.      Yes.

3      Q.      Okay.  And then going down the board here, do you see

4               an interview of Ruby Mitchell?

5      A.      Yes, I do.

6      Q.      Okay.  And does that appear to be about this -- a

7               similar length?

8      A.      Yes, couple minutes.

9      Q.      Okay.  How long would you say that is, 2:55 to 2:59?

10     A.      Looks like another four-minute interview.

11     Q.      Okay.  So we have two four-minute interviews, and

12              then what's after that?

13     A.      Josephine Quinn is interviewed by Detective Smith who

14              also interviewed Niko Quinn.

15     Q.      And how long does the interview with Josephine Quinn

16              last?

17     A.      Is that 2:58 or 2:56?

18     Q.      2:56.

19     A.      That's another four-minute interview.

20     Q.      To 3:06?

21     A.      So that's four plus 10, yeah.

22     Q.      So the longest one?

23     A.      Right.

24     Q.      And then at the bottom, do you see the second

25              interview of Ruby Mitchell?

LMKSDC_0026389

1    A.    Yes.

2    Q.    Okay.  And how long --

3    A.    Does that say 5:58 to 5:59?

4    Q.    Yes.

5    A.    One minute.

6    Q.    Well, actually we timed it.  It appeared to be 90

7          seconds.

8    A.    Okay.

9    Q.    Have you been involved in any other case that you

10         recall where an arrest of someone was made in a

11         murder case after approximately 19 to 20 minutes of

12         interviews?

13   A.    I think this breaks the record in my experience

14         anyhow.  No, I have not seen anything like this

15         before.

16   Q.    And does this timeline suggest to you something about

17         the brevity or superficiality of the investigation?

18   A.    It suggests to me that Detective Golubski had one

19         thing in mind, and that's to clear this case quickly

20         and move on.

21   Q.    In working on this case as an innocence case years

22         later, were there any particular challenges that were

23         presented in this particular case in terms of finding

24         witnesses or --

25   A.    Well, yes.  First of all, I'm a portly, bald white

1          fellow from New Jersey coming into Kansas City,

2          Kansas and the investigation involved mostly the

3          north end of KCK, the African American community.  So

4          it was important for me to present myself to these

5          various witnesses when I located them in their homes,

6          which I did, and that's my method of operation anyhow

7          rather than using the phone and I didn't have their

8          phone numbers to begin with.  I was able to locate

9          them and present myself.  And it took a while to

10         develop enough trust and rapport with the -- with the

11         people to where they felt freer to -- to talk to me

12         about what they really knew and what happened.  It

13         was not easy.  But on the other hand, over time and

14         after visits, it was able to be done largely, but

15         there also was some examples, a notable example is

16         where I just could not make any in roads.

17    Q.   So was this case at times difficult --

18    A.   Yes.

19    Q.   -- to navigate?

20    A.   Yes, it was difficult, but this case was difficult

21         and it -- it probably compares with other cases in

22         its difficulty for that -- for that reason.

23    Q.   Uh-huh.

24    A.   But, you know, you run in to that often when you go

25         into the communities.

TINA R. ST. JOHN, RPF, CRR

1    Q.    Okay.  Were there any other factors in what you

2          described as the north end of Kansas City, Kansas

3          that may have contributed to the difficulty of doing

4          the case?

5    A.    Well, several things.  First of all, this was --

6          especially in the '90s, this was a drug-infested

7          area.  There were innumerable drug houses throughout

8          the Quindaro district as they call it.  That's

9          Q-u-i-n-d-a-r-o.  And detective -- that was Detective

10         Golubski's hunting ground.  I mean he was -- he was

11         there all the time.  He knew everybody, everybody

12         knew him and everybody -- I say everybody -- most of

13         the people that I interviewed, and there were close

14         to a hundred, were deathly afraid of Detective

15         Golubski.  He had a reputation for planting drugs,

16         confiscating drugs, using the drugs that he would

17         confiscate as currency to purchase sexual favors from

18         drug-addicted prostitutes in that area.  There was

19         hardly a person I met and interviewed and got to know

20         who did not know that this was Detective Golubski's

21         predilection, and that also because of that, they

22         were -- they were fearful of him because he would not

23         hesitate to throw somebody in jail --

24   Q.    Okay.

25   A.    -- for something that they didn't do.


TINA R. ST. JOHN, RPF, CRR

1   Q.   Now, in your career, certainly you've encountered
2        difficulties and unusual behaviors or perhaps even
3        misconduct by law enforcement in other cases,
4        correct?
5   A.   Yes.  Yes, I have.
6   Q.   Is -- were the things that you found in this case in
7        any way unusual in type or scope?
8   A.   I don't know how to -- I don't know how to express
9        this in any other way except because of my personal
10       investigation and the conversations with scores and
11       scores and scores of African American residents in
12       the north end of Kansas City, Kansas, Detective
13       Golubski was the dirtiest cop I've ever encountered
14       in my almost 40 years of doing this work and then
15       went on.  This behavior of his went on, according to
16       the residents, for a good 30, 35 years.  And one of
17       -- one of the -- one of the drug-addicted prostitutes
18       who he had the sexual obsession and relationship with
19       was Stacy Quinn who saw the shooter and knew who the
20       shooter was.
21  Q.   Given the fact that Detective Golubski, according to
22       your investigation, had fairly regular contact with
23       Stacy Quinn, were you surprised that she was not
24       interviewed?
25  A.   I'm shocked that she wasn't interviewed.

TINA R. ST. JOHN, RPF, CRR

```
 1    Q.   Now, in -- in your recollection of this case, did
 2         Stacy Quinn testify at some point on the record?
 3    A.   In -- she came forward and gave an affidavit and
 4         testified.  And her affidavit I think was in late
 5         March of '96, she testified a week or two after that
 6         in court before Judge Burdette, the trial judge --
 7    Q.   Uh-huh.
 8    A.   -- and she made it very clear in her testimony that
 9         Lamonte McIntyre was not the shooter and she knew who
10         it was and she could identify him.
11    Q.   Did she point out the characteristics of Lamonte
12         McIntyre that in her view did not match the
13         appearance of the shooter?
14    A.   Yes.  Sorry.  My recollection is that the
15         characteristics -- the thing that led her to -- to
16         that conclusion that Lamonte was not the -- was not
17         the shooter was that Lamonte's ears stuck out and he
18         was -- he was significantly taller than the shooter.
19    Q.   Okay.  Thank you.  At some point did the name Cecil
20         Brooks come into the investigation?
21    A.   Yes, he did.  The first time I heard Cecil Brooks'
22         name mentioned was when Saundra Newsom, the mother of
23         Doniel Quinn, who was working with me to try and get
24         as much information as possible, that she went over
25         at my request, she went and interviewed John Quinn,
```

LMKSDC_0026394

```
 1                the father of Doniel, who she divorced in 1975
 2                because of his drug addiction and abusive behavior
 3                towards her.
 4                     Anyway, she still kept kind of a relationship
 5                with John, she didn't lose touch with him, but she
 6                didn't like to be around him that much.  She felt
 7                that she was John's -- the love of his life.  Anyway,
 8                John had told her prior to my arrival on the scene
 9                that they got the wrong -- they got the wrong man --
10        Q.      Uh-huh.
11        A.      -- and that he felt Cecil Brooks had something to do
12                with it.  So I don't like to do this and I do it very
13                rarely, but she made it very clear to me, I wanted to
14                go over and meet John with her.
15        Q.      Uh-huh.
16        A.      But she said that's a very bad idea.  He will not
17                accept you.  Quote, unquote, he doesn't like white --
18                white people.  So I took her advice and I asked her
19                if she would to take a recorder with her and record
20                the conversation with John, which she did without
21                hesitation.  And she and James McIntyre, Lamonte's
22                older brother who she knew and liked and respected,
23                she said let me take James with me.  So the two of
24                them went over and interviewed John.
25        Q.      Okay.  And did she want someone with her so she would
```

TINA R. ST. JOHN, RPF, CRR

1        feel more comfortable?

2    A.  Yes, yes.

3    Q.  Okay.  Now, is the name Aaron Robinson also familiar

4        to you?

5    A.  Aaron Robinson, yes, it is.  Aaron Robinson ran what

6        they called the drug spot.  That's another word for a

7        crack house where they would sell drugs -- traffic

8        was heavy at Aaron Robinson's drug spot, which is off

9        of Quindaro on North 21st Street.

10   Q.  And was this near Hutchings Street where the murders

11       occurred?

12   A.  Yes, same area as Hutchings Street, yes.

13   Q.  So nearby?

14   A.  Nearby, yes.

15   Q.  And what was the relationship between Aaron and Cecil

16       Brooks?

17   A.  Well, Cecil Brooks was 10 years Aaron's senior and

18       Cecil Brooks was the drug lord, the vicious drug lord

19       of that area of Kansas City, and he trained -- he was

20       -- he was Aaron Robinson's mentor.  And Robinson, by

21       the way, Aaron Robinson was his first cousin and they

22       were also very good friends.  Even though there were

23       10 years between them, they were very close.  And

24       Cecil Brooks, who ran -- who was the drug lord of

25       that community, he taught Aaron Robinson how to set

LMKSDC_0026396

1         up his own drug house and Aaron Robinson was a quick

2         learner, was a natural leader even though he was only

3         21 years old and he developed the drugs -- the drug

4         house or the drug spot where he ran it.  The top

5         assistant was Marlin Williams, another first cousin,

6         and a man by the name of -- young Thunder Cat they

7         call him.  The Thunder Cat meant in those days in

8         that world these were 14-, 15-, 16-year-old kids who

9         wanted to be part of the drug scene.  And Aaron --

10        they looked up to Aaron Robinson, and one of them was

11        this Neil Edgar, Jr., aka Monster.  So they were the

12        -- the three leaders of Aaron's drug spot:  Aaron,

13        Marlin and Monster.

14   Q.   Okay.  Now, do you have knowledge as to whether or

15        not Aaron Robinson is still around?

16   A.   Aaron Robinson was accidentally shot on Quindaro by

17        his best friend and right-hand man Marlin Williams in

18        early 19 -- I think it was 1996, early '96.

19   Q.   Okay.  And was that deemed accidental or intentional?

20   A.   It was deemed accidental.

21   Q.   Okay.  And Cecil Brooks, where is he to your

22        knowledge?

23   A.   Cecil Brooks is in the federal penitentiary.  I

24        understand now he's somewhere in Missouri.

25   Q.   Okay.  And did you have contact at some point with

TINA R. ST. JOHN, RPF, CRR

1          Mr. Brooks?

2     A.   I did.

3     Q.   How did that come about?

4     A.   Yeah, yeah.  Well, my investigation in addition to --

5          I had received what I considered to be pretty

6          reliable information that the real shooter of these

7          two victims was Neil Edgar, Jr., aka Monster, and

8          that Monster was close to Aaron Robinson and Marlin

9          Williams who in turn were very close with Cecil

10         Brooks.  Cecil Brooks was the man and Aaron Robinson

11         was very close to being the man.  Anyway, I thought

12         Cecil Brooks, by the time I came along, thank God, he

13         had been arrested and put in federal prison doing an

14         18-year stretch.  So in 2010 I decided to write Mr.

15         Brooks a letter, introduce myself and ask him if I

16         could come down and meet with him.  The way I phrased

17         it was something to the effect of -- I told him who I

18         was and what I was doing and investigating Lamonte

19         McIntyre case, that I believe that Lamonte was

20         innocent and that I thought that Mr. Brooks might be

21         able to shed some light on who the real shooter was.

22         And it was a two-page letter.  I got the second page

23         back of my original letter from Cecil two weeks later

24         or so saying feel free, come down and let's talk

25         about it.

LMKSDC_0026398

1    Q.    Okay.

2    A.    I was very excited by that prospect.  So I went down

3          to visit with him in June of 2010.  Okay, so --

4    Q.    What -- what did you learn --

5    A.    Okay.

6    Q.    -- upon visiting with Mr. Brooks?

7    A.    I spent about three hours with him and he was --

8          well, to be quite honest with you, he was very

9          charming and easy to be with, but I knew the real --

10         what the real Cecil Brooks was on the streets of KCK.

11         But anyway, he told me he was -- it took about an

12         hour, but once we got into the subject matter of

13         whatever he -- whatever information he could provide

14         me with regard to why Doniel and Donny Ewing, why

15         they were killed and by whom were they killed, he was

16         very honest and forthright with me much to my

17         surprise actually.  He told me that -- he said what

18         I'm gonna tell you is, first of all, Aaron Robinson,

19         as you know, is dead.  I think the world of him, I

20         will never tell you that he ordered the hit, but I do

21         know that -- that Monster, Neil Edgar, Jr., was the

22         shooter.

23              Now, he also said -- he said, look, I was the --

24         I was the -- I was the drug lord in that -- in that

25         area and Doniel was scandalous.  Now, what that means

1          is he was a drug addict who constantly would steal

2          things, and I know that to be true from -- from

3          interviewing with a number of Doniel's relatives.

4          But nevertheless, Doniel, according to Cecil, stole

5          drugs from Aaron Robinson, from Aaron Robinson's drug

6          spot.  Doniel was at that drug spot often to buy and

7          use drugs, but also as what they call a doorman.  In

8          other words, he would control the flow in and out of

9          the -- of Aaron Robinson's drug house up there on

10         North 21st.  And some drugs came up missing and Cecil

11         went on to tell me that the night before those two

12         men were killed that he visited Aaron's drug spot and

13         there was a conversation about the stolen -- about

14         Doniel stealing those drugs, and that conversation --

15         the participants in that conversation were Cecil

16         Brooks, Aaron Robinson, Marlin Williams and Monster.

17         And so the decision was made obviously to -- to kill

18         him.  And Monster was the shooter, as Cecil Brooks

19         told me, Monster, even though he was 15 going on 16,

20         he was what they call -- he was one of Aaron

21         Robinson's Thunder Cats.  The older members of that

22         drug organization would use the Thunder Cats, the

23         young kids who wanted to make their moments and get

24         recognized and enhance their status and even make

25         money, they would have the Thunder Cats do their

LMKSDC_0026400

1          violent murders for them.

2               Cecil also told me that Monster was paid $500

3          for the quote, unquote "ticket".  He was supposed to

4          get paid a thousand, but he only got paid half of

5          that.

6     Q.   Uh-huh.

7     A.   And he made it very clear that Monster was the

8          shooter and the reason Monster was also Aaron

9          Robinson's enforcer and shooter, he'd take care of

10         business if there was a problem.

11    Q.   Uh-huh.

12    A.   And if drugs come up missing and they suspect

13         somebody of being the culprit, that person's a dead

14         person without a doubt.

15    Q.   So you learned all these things when you spoke with

16         Cecil Brooks?

17    A.   Yes.

18    Q.   And did you believe at that time that he would sign

19         an affidavit if you requested one?

20    A.   I did.  I asked -- let me -- one more thing that he

21         provided me with.  I said, look, Cecil, I'm going

22         back to KCK and I'm trying to get Marlin Williams to

23         -- to be more open with me.  He's not cooperating

24         with me.  He would talk to me, but give me nothing,

25         although Marlin Williams did tell me that the night

LMKSDC_0026401

1      of the -- the night before the shooting, Doniel and

2      Donny Ewing were at the drug house smoking -- smoking

3      dope.  Anyway, I asked Cecil, would you write a

4      personal note for me to take to Marlin asking Marlin

5      to cooperate with me, which he did.

6           And I might add one more thing if I can, I think

7      one reason that Cecil Brooks was being honest with me

8      was that I -- I, along with my letter of

9      introduction, I sent a letter of recommendation by

10     Michael Redmon who is a very well known defense

11     lawyer here in town, and Michael Redmon was the

12     lawyer for the boys up at -- up at the north end, for

13     the drug people up at the north end.  So Michael --

14     Michael wrote a very strong letter asking Cecil

15     Brooks to -- to cooperate with me, which I think was

16     very helpful in the end.

17  Q.  Okay.  Mr. McCloskey, I've just marked a document

18      here as Petitioner's Exhibit 164 and I'm going to ask

19      you to take a look at it.  Do you recognize that

20      document?

21  A.  Yes.

22  Q.  And what is that?

23  A.  This is the handwritten letter by Cecil Brooks to

24      Marlin asking -- dated 6/21/10, which was the day of

25      my interview with Cecil in Mississippi asking Marlin

1          to cooperate with me.

2               MS. PILATE:  Okay.  I would like to show it to

3          the State's counsel.  Your Honor, may I show it to

4          you?  This is the only copy that I have.

5               THE COURT:  Yes.  Let's do it this way, it seems

6          to have worked up to now.  You're going to offer

7          this, the State has looked at it.  Do you have any

8          objection to me looking at it?

9               MS. TATUM:  No.

10               THE COURT:  All right.  Okay.

11               MS. PILATE:  Okay.  Your Honor, I'd like to move

12          for the admission of Petitioner's Exhibit 164.

13               THE COURT:  Objection?

14               MS. TATUM:  No.

15               THE COURT:  164 is admitted.

16     Q.   (By Ms. Pilate)  Mr. McCloskey, it's a short letter,

17          is it not?

18     A.   Yes.

19     Q.   Okay.  Could you please read that out loud.

20     A.   Yes.  Dated 6/21/10.  Hey, Marlin, what's up?  I

21          would like for you to talk with Jim a little more in

22          depth on this matter.  I'll be calling soon.  I told

23          Sarah I needed to talk with you.  Cecil Brooks, love

24          you.

25     Q.   Okay.  And that is a letter that Cecil wrote at your

LMKSDC_0026403

1         request, correct?

2    A.   Yes.  And I took it with me when I left the interview

3         with him.

4    Q.   Okay.  And did you give that letter to Marlin

5         Williams?

6    A.   I did.

7    Q.   And did he speak with you?

8    A.   He did, but didn't do any good.

9    Q.   Okay.  Did you, following your meeting with Cecil

10        Brooks, prepare a draft affidavit?

11   A.   I did.

12             MS. PILATE:  Okay.  I'd like that up.  That's

13        134.

14   Q.   (By Ms. Pilate)  Would you like, Mr. McCloskey, could

15        you come down again and look at the screen?

16             (The witness left the stand.)

17   A.   Yes.

18   Q.   (By Ms. Pilate)  Do you recognize that document, Mr.

19        --

20   A.   Yes, I do.

21   Q.   Okay.  All the way to the bottom please.  Is this a

22        document --

23   A.   Could you move it up for a second?

24             MS. DERSCH:  Yeah, sure.

25   A.   Just wanted to make sure it had the paragraph about

LMKSDC_0026404

1           Golubski in it, yeah.

2      Q.   (By Ms. Pilate)  Is that a document you prepared,

3           Mr. McCloskey?

4      A.   Yes.  Yes, it is.

5      Q.   And is -- is that a draft affidavit prepared for the

6           signature of Cecil Brooks?

7      A.   Yes.  Yes, it is.

8                MS. PILATE:  Okay.  And this exhibit is marked

9           as Petitioner's 134, any objection to that?  The

10          reason for it is -- Your Honor, may I?

11               (Counsel conferred.)

12               MS. TATUM:  Okay.  No problem.

13               MS. PILATE:  Your Honor, we move for the

14          admission of Petitioner's Exhibit 134.

15               THE COURT:  Objection?

16               MS. TATUM:  No.

17               THE COURT:  134 is admitted.

18     Q.   (By Ms. Pilate)  Mr. McCloskey, you can return to the

19          witness stand.

20               (The witness resumed the stand.)

21     Q.   (By Ms. Pilate)  And I do have a paper copy of it so

22          you don't have to come off the stand again.  There

23          you go.  Did you send this draft affidavit to Cecil

24          Brooks?

25     A.   I did not send it to him.  What I did was I wrote him

1           a letter.  I visited him as this indicates in June of
2           2010.  And then at some point, I forget exactly when,
3           probably the first quarter of 2011, I wrote him a
4           letter and reminded him that he had agreed to
5           consider signing an affidavit that I would prepare
6           and I would like to come down to the prison and visit
7           with him and go through, personally go through --
8           that I had written a draft and I want to go through
9           it with you personally rather than sending it to you.
10          As it turned out, when I sent that letter to him, he
11          had been moved from Mississippi to Arkansas, another
12          federal prison down there, so I sent it again and
13          never heard from him.
14   Q.     Okay.  Could you please turn to page two.  Would it
15          be fair to say that what is reflected in this draft
16          affidavit is based on what you learned when you
17          interviewed Mr. Brooks at the prison in Mississippi?
18   A.     Absolutely.
19   Q.     Okay.  Turning your attention to paragraph 16, could
20          you tell us please what that paragraph says?
21   A.     The guy who got convicted for these murders had
22          nothing to do with it.  None of us had ever heard of
23          him.
24   Q.     Okay.  Thank you.  And then number 18, if you could
25          read that as well?

LMKSDC_0026406

1    A.    Monster did the murders.  I know Monster did it

2          because Aaron told me Monster was the shooter.

3    Q.    And this is -- this information is based on what

4          Cecil Brooks told you?

5    A.    Yes, it is.

6    Q.    During the time that you worked on the case, would it

7          be fair to say that Cecil Brooks did not exhibit

8          further intentions to cooperate with you at that

9          time?

10   A.    Yes.  I had written him in I guess the first quarter

11         -- the earlier part of 2011, didn't hear from him and

12         then I wrote him again in 2000 -- in September of

13         2011 this time with another letter of recommendation

14         from Michael Redmon, the defense attorney, asking

15         Cecil to once again please cooperate, but he never

16         responded, Cecil never did.

17   Q.    Okay.  And do you know whether or not Cecil Brooks

18         signed that affidavit later at some point when

19         presented to him by an investigator following up?

20   A.    It's my understanding that he did sign basically

21         what's in this affidavit plus maybe a little bit more

22         in 2016.

23   Q.    Okay.  Thank you.  Turning your attention again to

24         your investigation, did you interview any members of

25         law enforcement?

TINA R. ST. JOHN, RPF, CRR

```
 1    A.   Yes, I did.  I -- I interviewed -- I decided -- first
 2         of all, I met with -- with you, with -- we met with
 3         District Attorney Jerry Gorman on two different
 4         occasions --
 5    Q.   Uh-huh.
 6    A.   -- I think in 2010 and 2013 to no avail, and then I
 7         decided in April of 2010 to -- it was a beautiful
 8         Friday afternoon to go out and present myself to
 9         Detective Golubski at his home in Edwardsville.
10    Q.   Okay.  And did he speak with you on that occasion?
11    A.   Yes, he did.  I drove up in the driveway, the garage
12         was open, a person was in the garage.  I explained to
13         her my -- who I was and what my purpose was and I'd
14         like to talk with Detective Golubski about an old
15         case of his.  And minutes later he came out and we
16         spoke on his front lawn.
17    Q.   Okay.  And did you learn anything speaking with
18         Detective Golubski?
19    A.   Well, not really.  I mean he -- he did say that -- he
20         did remember the case, he remembered that he -- he
21         said he cleared it fast, was a fast clear.  Then I
22         started asking him some questions.  I said, did you
23         know Stacy Quinn?  Knowing full well that he did know
24         her, know her well for some 10 years.  And he said,
25         no, I didn't know her.
```

TINA R. ST. JOHN, RPF, CRR

```
 1                I said, well, Josephine Quinn, Doniel's aunt,
 2          told you that Stacy knew who the killer was.  Did you
 3          interview Stacy?
 4                He says, not that I recall.  He said, the only
 5          thing I remember about her was when she was murdered
 6          in 2000, I was the chief investigator of her -- of
 7          her case.
 8                Then I asked him, I said, did you know Ruby
 9          Mitchell?  Because Ruby had given us an affidavit or
10          was about to but had told us, told me, and I think
11          you were with me at the time, that when she was
12          driven -- two hours or so after the crime, Golubski
13          drove her down to the police station to take a
14          statement from her and on the way down, Golubski said
15          to her -- this is Ruby telling that to you and me,
16          and it's in her affidavit later on -- that Golubski
17          commented to her that how pretty she is -- now, don't
18          forget she just witnessed a -- she was just
19          traumatized by witnessing a double homicide in broad
20          daylight right in front of her --
21     Q.   Uh-huh.
22     A.   -- and here Golubski is, according to Ruby, that
23          coming on to her on the way down to the police
24          station to take a statement saying how pretty she is,
25          what a nice figure she has, although he was more
```

LMKSDC_0026409

1        graphic than that with her about her figure, and that

2        he likes to date black women.  Do you like to date

3        white men?  And that just -- that just took her --

4        she was so fearful having no -- why is this man

5        asking me this, is he going to arrest me for

6        solicitation or offer to pay money for sex?  She was

7        just frozen in fear by this entreaty by Detective

8        Golubski and scared to death of him and she was also

9        worried if he takes me home and it's dark, what's he

10       gonna do to me?  So she was worrying about that.  You

11       know, that I think obviously affected her

12       malleability to make an ID on Lamonte an hour or two

13       later.

14   Q.  Okay.  Anything else that comes to mind?

15   A.  Yeah, I'd like to point out another paragraph if we

16       could in Cecil Brooks' draft affidavit --

17   Q.  Okay.

18   A.  -- about Golubski.

19   Q.  Okay.

20   A.  Again, this is chapter and verse of what Detective

21       Golubski was up to for decades up in KCK.

22       THE COURT:  Okay.  Let -- let me stop here for a

23       minute.  We're starting to get conversations out in

24       the audience section from several different places.

25       As I said this morning, please don't do that, okay.

TINA R. ST. JOHN, RPF, CRR

1          Go on.

2     Q.   (By Ms. Pilate)  Go ahead.

3     A.   Is it okay?

4     Q.   Yeah.

5     A.   All right.  I'd like to read paragraph 25 of Cecil

6          Brooks' draft that I prepared for him.  I'm also

7          acquainted with an employee of the Kansas City,

8          Kansas Police Department named Detective Golubski.

9          On at least two occasions I personally witnessed

10         Detective Golubski confiscate drugs -- confiscate

11         drugs from someone and not arrest that person.  Once

12         in about 1990, a young kid named Lamonte Washington

13         and I emerged from a dope house.  Golubski confronted

14         us outside the house.  He took $600 to $700 worth of

15         cocaine that was on Lamonte Washington and then let

16         him go without arresting him.  Detective Golubski did

17         the same thing at a later date when Henry Williams

18         and I came out of a drug smoker's house.  Golubski

19         took Henry's drugs and let him go.  In both

20         instances, Golubski never searched me for drugs.  He

21         knew I never carried them on my person.  This is

22         reflective of -- of what a number of people would

23         tell me in the community.

24    Q.   Okay.  So when you heard this, did it fit with things

25         you were learning elsewhere in the investigation?

TINA R. ST. JOHN, RPF, CRR

```
1    A.   Yes, it did.
2    Q.   Okay.  And we are almost done here, but I'd like you
3         to turn your attention again to the taped
4         conversation between John Quinn and Saundra Newsom.
5         Do you --
6    A.   Yes.
7    Q.   Okay.
8    A.   Yes.
9    Q.   Now, was that conversation the first time that you
10        learned of the name Cecil Brooks?
11   A.   Yes, it -- yes, it was.
12        MS. PILATE:  Okay.  I'd like to pull up -- I'm
13        not going to move to admit it, but Exhibit 136.  Go
14        to page four.
15   Q.   (By Ms. Pilate)  Mr. McCloskey, I am handing you
16        Movant's Exhibit 136, and it is a transcript of that
17        taped conversation.  I'm not going to move to admit
18        this because I'm going to play the audiotape at
19        another time, which is the actual evidence.  But I'm
20        going to ask you, Mr. McCloskey, to look at page
21        four.
22   A.   Yes.
23   Q.   Line 17.
24   A.   Yes.
25   Q.   And do you see what John Quinn says there in response
```

LMKSDC_0026412

```
 1              to questions from Saundra Newsom about who had
 2              committed this crime?
 3      A.      Yes.
 4      Q.      And what does he say?
 5      A.      On line 17, John Quinn says, I heard that one of
 6              them, the Brooks brothers.
 7      Q.      And then what does Saundra say?
 8      A.      Saundra then says, what's his first name?
 9                   John:  Cecil, Cecil Brooks, but this is just
10              between me and you.
11      Q.      Okay.  And turn please to page nine of that same
12              document.
13      A.      Yes.
14      Q.      And line 20.
15      A.      Yes.
16      Q.      Do you see what John Quinn says there?
17      A.      Can I read it?
18      Q.      Yes, please.  Go to line 20 to 23, what does John
19              Quinn tell --
20      A.      John Quinn:  Leave it alone, but the guy that did it
21              is dead.  The guy they gave him the charge for it, he
22              didn't do it.  I'm telling you I know that and I put
23              my life on it.  I know that for a fact.  But I don't
24              know what happened.  Whatever it was about, I don't
25              know to this day.  The only two could have told you
```

LMKSDC_0026413

1          is Buckwheat, that's Stacy Quinn, and Bob.  They
2          never told me, but they was all together when it
3          happened.  I know that much.
4    Q.    Okay.  Now, to your knowledge, did John Quinn remain
5          entangled with drugs and fighting drug addiction?
6    A.    Yes, he has for his pretty much his whole life up
7          until now.
8    Q.    Okay.  And does he appear to you to be saying here,
9          quote, the guy they gave him the charge for it, he
10         didn't do it.  Do you believe that's a reference to
11         Lamonte McIntyre?
12   A.    Yes, I do.  And he also says he'd stake his life on
13         it, yes.
14   Q.    And did this taped conversation add to your knowledge
15         in the investigation at the time you obtained it?
16   A.    Well, it -- it introduced me to -- it piqued my
17         interest about Cecil Brooks, the first time I heard
18         the name Cecil Brooks.  So, yes, with this and also
19         Niko Quinn had told me that Monster did it earlier.
20   Q.    Uh-huh.
21   A.    And I thought it was -- be worth my while to begin to
22         investigate this Cecil Brooks, Aaron Robinson,
23         Monster world.
24   Q.    Okay.  And do you recall in the little chunk of the
25         transcript we just looked at that there's a reference

TINA R. ST. JOHN, RPF, CRR

1          in there to a guy who's dead who was involved in
2          this?
3     A.   Yes.
4     Q.   Okay.  And --
5     A.   That would --
6     Q.   Aaron Robinson, the deceased?
7     A.   That would be Aaron Robinson I would think.
8     Q.   Okay.  Sitting here today, is there anything else
9          that you would like to bring out about the
10         investigation that you found either unusual or
11         notable or that added to your ultimate conclusions
12         about it?
13    A.   I guess I would just like to say what I said in the
14         beginning of my testimony, and that is this:  I've --
15         I've -- I've spoken at length with at least 16 or 17
16         members of the Quinn family, aunts, uncles, first
17         cousins, former wife, sister and every single one,
18         this is the Quinn family, the victims' family, every
19         single one believes that Lamonte had nothing to do
20         with this crime.  And at the same time, as I
21         mentioned earlier, Stacy Quinn, Josephine Quinn, Niko
22         Quinn, they were eyewitnesses to this crime, and
23         Stacy in particular, knows that it was not Lamonte,
24         it was Monster.  She knew Monster because she, being
25         a drug -- drug-addicted person for most of her life,

LMKSDC_0026415

1          she hung out at the Aaron Robinson drug spot, she

2          knew all the characters, she knew Monster very well.

3          She had a clear view of Monster and she told her

4          family from the very beginning it was not Lamonte,

5          the man they arrested, it was Monster.

6               And the family told the police time and time

7          again you have the wrong man and the police never

8          listened to them.  I can't imagine if I were them the

9          frustration and the anger and the hurt of being

10         dismissed by the KCK police with regard to what they

11         knew.  That's all I have to say.

12              MS. PILATE:  Thank you, Mr. McCloskey.

13              THE COURT:  We'll probably go for about 15

14         minutes and then take a break if that's okay.

15              MS. TATUM:  Sure.

16                      CROSS EXAMINATION

17    BY MS. TATUM:

18    Q.   Good afternoon, Mr. McCloskey.

19    A.   How are you?

20    Q.   Good.  How are you?

21    A.   What is your name?

22    Q.   Jennifer Tatum.

23    A.   Jennifer, nice to meet you.

24    Q.   Mr. McCloskey, as we get started today, you

25         understand that as prosecutors for the State of

LMKSDC_0026416

```
 1            Kansas, we are not trying to keep the defense from

 2            having their case heard.  You understand that,

 3            correct?

 4     A.     I do understand that.

 5     Q.     We could make a procedural objection and try to stop

 6            them, but we're not doing that in this case.

 7     A.     I appreciate that, yeah.

 8     Q.     And you understand too that this judge is going to be

 9            the fact finder so the questions that the defense

10            asks and that we ask are intended to clarify the

11            facts in this case so that he can make a good

12            decision about what happened.

13     A.     Yes.

14     Q.     Okay.  I just wanted to make sure you understood all

15            of the rules.

16     A.     I certainly do.

17     Q.     Thank you.  Let's talk a little bit about Cecil

18            Brooks --

19     A.     Right.

20     Q.     -- because that's kind of where we ended at.  So you

21            talked to Cecil, he gave you this information,

22            right --

23     A.     Yes.

24     Q.     -- that you just described?

25     A.     Yes, yes.
```

TINA R. ST. JOHN, RPF, CRR

1    Q.    You wrote up the affidavit, right?

2    A.    Yes.

3    Q.    Okay.  Did you ever give him the option of writing

4          his own affidavit?

5    A.    No, I did not.

6    Q.    Okay.  I mean was there a reason?  I don't know why

7          he wouldn't sign the affidavit, do you know why he

8          wouldn't over the years?

9    A.    Well, I think -- I don't know why, but I suspect that

10         he probably had some second thoughts about revealing

11         information about people who he cared for,

12         particularly Aaron Robinson.

13   Q.    Okay.  But that person was deceased, Aaron was

14         deceased, right?

15   A.    But his family was not and he's close with the

16         family.

17   Q.    Okay.  But that's your speculation that maybe he

18         didn't want to reveal that after the fact?

19   A.    Yeah, and he's also related to the Robinson family

20         too.

21   Q.    Okay.  But you never gave him the option of maybe

22         writing things in his own words?

23   A.    No.

24   Q.    Think that could have helped?

25   A.    When we had the conversation at the end of the day,

TINA R. ST. JOHN, RPF, CRR

1   after three hours with him, I asked him, I said, how

2   do you want to do this?  I said, if you don't want

3   to, I'd be more than happy to write a draft of what

4   you told me today.  He said, why don't you do it.

5 Q. Okay.  And then once you sent it, he would not sign

6   it?

7 A. He would not sign it.

8 Q. Was your three-hour visit with Mr. Brooks recorded,

9   do you know?

10 A. It was not.

11 Q. Okay.  And why was that?

12 A. Well, it was attorney -- I had an attorney visit with

13   him.  So as far as I know, the institution did not

14   record it.

15 Q. And are you an attorney as well?

16 A. I am not, no.  But they gave me that privilege.

17 Q. So they gave you a privilege as an attorney even

18   though you're not an attorney?

19 A. I didn't tell 'em I was an attorney, they gave me an

20   attorney type of visit, yes.

21 Q. And I'm not trying to argue with you, I'm just trying

22   to understand.

23 A. Okay.  We were in a separate room -- we were in a

24   separate attorney room for the interview.

25 Q. Okay.  They gave you that privilege?

LMKSDC_0026419

1    A.    Yes, they did.

2    Q.    Okay.  I'm sorry, can we both try not to talk?

3    A.    Sure.

4    Q.    If you just let me finish my question, I promise I

5          won't interrupt your answer.

6    A.    All right.  Sorry.

7    Q.    That's okay.  They put you in an attorney room where

8          it couldn't be recorded was your understanding?

9    A.    Well, they put me in an attorney room.  I don't know

10         whether it could be recorded or not, but to my

11         knowledge, it was not.

12   Q.    Were you interested in recording it yourself?

13   A.    No, not really, not at that time because I had no

14         idea -- when I went down there, it was just a shot in

15         the dark to be quite honest with you.  I was very

16         surprised that he was as revealing as he was.

17   Q.    Okay.  Do you know the circumstances of why Mr.

18         Brooks signed the affidavit in 2016, do you know

19         anything about that?

20   A.    Not really.

21   Q.    Okay.

22   A.    I was not involved in that.

23   Q.    Do you know who had him sign it?  If not, that's

24         okay.

25   A.    Well, I think one of the investigators for -- for

LMKSDC_0026420

```
1            Lamonte visited him and I don't know if he -- I don't
2            know the details, but I think that person was
3            instrumental in having Cecil Brooks sign it, sign the
4            affidavit.
5     Q.     All right.  So you don't -- you don't know what
6            changed for Cecil between 2010 and 2016?
7     A.     I do not.
8     Q.     All right.  Are you aware that at this point the
9            State and the defense team have cooperated to have
10           Mr. Brooks transported to court?
11    A.     I have heard that, yes.
12    Q.     Okay.  And you're aware that he's refused to come?
13    A.     I have heard that as well.
14    Q.     You mentioned earlier in your testimony that one of
15           the main reasons that you see in these wrongful
16           convictions that you've worked on is the testimony of
17           jailhouse informants or people who are in jail?
18    A.     That's correct.
19    Q.     Would you consider Cecil Brooks to be a person of
20           that quality or characterization?
21    A.     Not really because in my conversations with him,
22           initially he opened up the meeting asked me what can
23           you do for me, and I said I can't do anything for
24           you.
25    Q.     Okay.  And you probably know from talking to
```

LMKSDC_0026421

1          Ms. Pilate, that's exactly what he said to Mr. Dupree
2          when we had him come visit, he wanted something for
3          it.  You understand that, right?
4     A.   I heard that, yes.
5     Q.   Okay.  So you would say you would not characterize
6          him as an informant or someone whose credibility is
7          questionable?
8     A.   I -- I believed what he told me to be the truth of
9          the matter.  And one reason that I believe that is
10         because he was -- was and still is, as far as I know,
11         is he cared about his relatives, the Robinson family,
12         and he did not want to -- he was very careful not to
13         include Aaron as actually making the decision to
14         order the hit.  So he's being careful there, but I
15         found him to be very credible in coming forward with
16         that information.  He had nothing -- with me -- with
17         me before he talked to anybody else for years, he had
18         nothing to gain from it.
19    Q.   Let me go back to the beginning of your testimony
20         here.  You mentioned that you believed there was
21         prosecutorial misconduct in this case.
22    A.   That's correct.
23    Q.   Can you detail exactly what you believe that
24         misconduct was?
25    A.   Yes, I think I can.  Sure.

LMKSDC_0026422

```
 1   Q.   Okay.
 2   A.   All right.  First of all, Niko Quinn, as part of her
 3        -- well, let me start off with Josephine Quinn.
 4        Josephine Quinn.  According to Josephine in her
 5        affidavit in '97, she told Terra Morehead, the trial
 6        prosecutor, that they have the wrong man and Terra
 7        Morehead told her it's to the jury, it's out of our
 8        hands.  But to have an eyewitness to the crime tell
 9        the trial prosecutor that and for the trial
10        prosecutor not to reveal that to the defense I
11        consider to be misconduct.
12   Q.   So that's one instance of misconduct.  You're saying
13        that Josephine told you in '97 that during the trial
14        she told Ms. Morehead --
15   A.   Yes.
16   Q.   -- they had the wrong man or is it after?
17   A.   She went to the courthouse thinking that she was
18        going to be testifying.  She saw Lamonte in the
19        courtroom and she asked -- then she telephoned Terra.
20        Terra dismissed her that day.  She telephoned Terra
21        the next day or had a conversation with her, I think
22        it was by telephone, and told her that you have the
23        wrong man, he's too tall.  And Terra at that point
24        said it is, you know, it would be -- it's in the
25        jury's hands and there's nothing we can do about it
```

LMKSDC_0026423

1           so that was that.

2    Q.     According to Josephine, do you know if she called Ms.

3           Morehead before or after the verdict happened?

4    A.     Apparently it was during the jury deliberations.

5    Q.     Okay.  So that's one instance, and you base that

6           completely on Josephine's affidavit; is that correct?

7    A.     Yes.

8    Q.     All right.  Any other instances?

9    A.     Yes.  One other instance that I'm aware of in terms

10          of witnesses, and that is that Niko Quinn also told

11          Terra that you have the wrong man, that Lamonte is

12          not the shooter, and that was never revealed to the

13          defense by Ms. Morehead.

14   Q.     And do you -- I mean when is -- when was it that Niko

15          said she revealed this to Ms. Morehead?

16   A.     It would have been between the preliminary and the --

17          preliminary hearing in June of '94 and the trial is

18          my best recollection of that.

19   Q.     Okay.  So between preliminary hearing and trial?

20   A.     Yeah.

21   Q.     Niko's told you that, and you base that off an

22          affidavit?

23   A.     I base that off what Niko told me and I -- I believe

24          -- well, she told -- she told us that and I believe

25          that's in her affidavit as well.

1    Q.   Okay.  And you -- you've read the prelim transcript
2         and the trial transcript I assume?
3    A.   I have.
4    Q.   All right.  Let's say that your memory's correct that
5         she told her after prelim.  She never mentions that
6         in her trial testimony, does she?
7    A.   No, she did not.  She was -- may I?
8    Q.   Yes, please.
9    A.   She did not mention that in her trial testimony.  She
10        -- because she -- she was -- she -- her -- part of
11        her recollection of events was that a man and a woman
12        stopped by one of her relative's house, Sandy Quinn,
13        and told Sandy to tell Niko that if she changes her
14        testimony, they're gonna take her kids away.
15   Q.   And does Niko know who these people were?
16   A.   She doesn't know for sure, but she thinks -- believes
17        it was Terra that was one of them, but she doesn't
18        know that for sure, but they were from the district
19        attorney's office.
20   Q.   So what you're saying is she testified at trial and
21        identified this defendant saying she had no doubt it
22        was him, but you're saying, according to Niko, she
23        did that under threats from Terra Morehead?
24   A.   Under threats and duress, yeah.
25   Q.   Now, did you ever interview Terra Morehead in this

LMKSDC_0026425

1          case?

2   A.     I've never spoken with Terra Morehead.

3   Q.     Why not?

4   A.     Well, I spoke with Mike Redmon, the defense lawyer.

5   Q.     Uh-huh.

6   A.     And I asked him what do you think about the idea of

7          me speaking with Terra?  He said, Jim, don't even

8          try, it would be useless.  She would never in any way

9          concede that a wrongful conviction took place or give

10         you any grounds for a change.  So I took him at his

11         word and decided not to.

12  Q.     Okay.  So you've never talked to her, you don't know

13         if she would have talked to you or not or given you

14         an affidavit just like Niko did?

15  A.     I do not know that, no, because I never attempted to

16         talk with her.

17  Q.     Okay.  Have you ever attempted to look at her trial

18         record as far as her convictions over the years?

19  A.     I have not.

20  Q.     Okay.  So you wouldn't know whether or not, in fact,

21         she's dismissed cases before for lack of evidence in

22         her opinion?

23  A.     I do not have any knowledge about that.

24  Q.     Okay.  But that is obviously something people could

25         look into if they wanted to?

LMKSDC_0026426

1    A.    Yeah, they could I guess.

2    Q.    Okay.  You guess or --

3    A.    I guess, yeah.

4    Q.    And you understand too -- I mean Niko's given a

5          couple different affidavits in this case, right?

6    A.    Throughout history, yeah.

7    Q.    Yeah.  And they change every time, right?  I mean --

8    A.    No, I wouldn't say that.

9    Q.    You wouldn't say that?

10   A.    No.

11   Q.    So have you had an opportunity to review her two

12         affidavits recently?

13   A.    Well, let's see, I reviewed her most -- the recent

14         one that she gave in June of 2014 and I have read her

15         affidavit that she gave back in 1996.

16   Q.    Okay.  And your testimony is that -- actually I'm in

17         the wrong volume here.  Your testimony is that those

18         are consistent with each other?

19   A.    Well, to be honest with you, I kind of forget what

20         she said in '96.  I know it was much shorter and with

21         less detail.

22   Q.    Okay.  I mean do you -- do you want to review them or

23         not?  You don't have to if you think you remember

24         well enough, but --

25   A.    Let me review the '96 one if I could.

1    Q.   Okay.  They're both right here.

2              THE COURT:  Which is -- which to me is a great

3         time to take a break while he takes a look at that.

4         So why don't we take a 10-minute recess.

5                   (A recess was taken, after which the

6                   following proceedings were had, the

7                   petitioner being present.)

8              THE COURT:  All right.  We're back on the record

9         in 16CV508 after the recess and we're ready to

10        continue or you may continue with cross examination.

11             MS. TATUM:  Okay.

12   Q.   (By Ms. Tatum)  Mr. McCloskey, do you recall the

13        question from before the break?

14   A.   Yes.

15   Q.   Okay.  If you feel prepared to answer it, please go

16        ahead.

17   A.   Well, to be honest with you, I don't see a

18        contradiction.

19   Q.   Okay.

20   A.   I see that one -- one is more detailed than the

21        other, but I don't see a direct contradiction.

22   Q.   All right.  And what were the dates of those two

23        affidavits, sir?

24   A.   Let's see here, the most recent one was June 30th of

25        2014 and the older one was April the 2nd, 1996.

LMKSDC_0026428

1    Q.    Okay.  And you said you -- you don't see a
2          contradiction, you just think one is more detailed
3          than the other?
4    A.    Yeah.  Yes.
5    Q.    Okay.  Which one do you feel is more detailed?
6    A.    The most recent one.
7    Q.    All right.  And does she name Monster as the shooter
8          in either/or both or one?
9    A.    She -- she names Monster in the most recent one, but
10         does not name him in the older one.  She simply says
11         she knows him and has seen him, but doesn't name him.
12   Q.    Okay.  When do you think the name of Neil Edgar, Jr.
13         first came into this case, if you know based on your
14         review of the case file?
15   A.    Yes.  I know exactly when it came into view.
16   Q.    Okay.
17   A.    And that was when I interviewed Niko in -- in the
18         middle of 2009.  She mentioned Monster to me and I
19         had never heard of Monster prior to that interview
20         with her.
21   Q.    All right.  So that's when that name came into the
22         investigation?
23   A.    That's correct.
24   Q.    So just to be clear, you're not saying that
25         prosecutors at that time knew of this Monster person

TINA R. ST. JOHN, RPF, CRR

1          or, as far as you know, even law enforcement officers
2          at that time?
3    A.    As far as I know, there's no record of that.  I think
4          Golubski knew it.
5    Q.    Okay.  That's what you think, but there's no record
6          that Niko had come forward and said that until 2009?
7    A.    That's correct.
8    Q.    Okay.  Thank you.  You mentioned Stacy Quinn,
9          correct?
10   A.    Yes, ma'am.
11   Q.    Okay.  And you knew that I mean from your review of
12         reports, Josephine Quinn had said my daughter Stacy
13         might know something about it, right?
14   A.    That's correct.
15   Q.    She told investigators that, correct?
16   A.    I believe it was Golubski she said that to.
17   Q.    And she said I'll make sure she calls you or
18         something to that effect?
19   A.    I don't remember that part of it.
20   Q.    Okay.  Would it refresh your recollection to look at
21         Detective Golubski's investigative?
22   A.    Yes.
23   Q.    Okay.
24   A.    I mean if you have that part of it, yeah.
25   Q.    Sure.  Give me a second.

TINA R. ST. JOHN, RPF, CRR

1    A.    Take this?

2    Q.    Yeah.  I don't want you to get too overwhelmed.

3    A.    This is the report?

4    Q.    Yeah, you can look back.

5    A.    Do you know about where it is?

6    Q.    Yeah.

7    A.    Thanks.  Okay.

8    Q.    Okay.  So you'd agree that according to Golubski's

9          report -- and I understand your beliefs about

10         Detective Golubski -- but according to his report,

11         Josephine said, I'm going to have Stacy -- I'm going

12         to try to get her to contact you?

13   A.    According to the report, yes.

14   Q.    Okay.

15   A.    May I add something to that?

16   Q.    Sure.

17   A.    Okay.  Two points.  One is if you're an investigator,

18         you don't wait for somebody to call you, you do your

19         best to locate that person and talk with her.  That's

20         number one.

21               Number two, Golubski knew who Stacy was, he's

22         been having sex with her for up until this point,

23         '94, at least five years so it was very easy for him

24         to find Stacy.  She's walking the streets on

25         Quindaro, he picks her up there or in that

TINA R. ST. JOHN, RPF, CRR

1         neighborhood and does what he does with her.

2    Q.   Do you -- have you ever met with Stacy Quinn

3         yourself?

4    A.   She was killed in 2000.

5    Q.   Okay.  So you have not?

6    A.   I entered the case in 2009, no.

7    Q.   I understand.

8    A.   No.

9    Q.   So do you know if she ever acknowledged to anyone her

10        sexual relationship with Detective Golubski?

11   A.   Oh yes, absolutely.

12   Q.   Okay.  And who were those people?

13   A.   Freda Quinn for one.

14   Q.   Okay.

15   A.   Joe Robinson for another, and her whole family knew

16        she was having sex with Golubski.  That was common

17        knowledge within the family and within the community.

18   Q.   Were you aware in your review of the file that Stacy

19        Quinn testified at a motion for new trial?

20   A.   Yes.  Yes, in 1996.

21   Q.   All right.

22   A.   Yes.

23   Q.   And you've read her testimony?

24   A.   I have a while back, but yes, I read it.

25   Q.   And if you want to review with me you can, but do you

LMKSDC_0026432

```
 1            recall someone asking her why didn't you come forward
 2            before and tell someone what happened before today?
 3            Remember her being asked that?
 4    A.      Yeah.
 5    Q.      And she said, I was smoked out my head.
 6    A.      Yeah, she was -- that's what she -- that's what she
 7            told Judge Burdette that she was on crack for a lot
 8            of that time and that's why she hadn't come forward.
 9    Q.      And so I mean you agree that if someone -- I mean you
10            don't know what Detective Golubski's efforts were.
11            You think he didn't try, but Stacy also acknowledged
12            she was on drugs during that time and didn't want to
13            come forward.
14    A.      That's what she told Judge Burdette, but I'm sure
15            there were times within that period of time that --
16            well, first of all, she was scared of Monster.
17            Everybody was.
18    Q.      But Monster's name, from what you know, hadn't come
19            up.  But you think she knew it was Monster?
20    A.      Well, hadn't come up in my investigation, it
21            certainly came up before -- before I interviewed
22            Niko, came up in the very beginning of the crime.
23            She told her family members it was Monster who did
24            it.
25    Q.      But they were -- you would agree that they all said
```

TINA R. ST. JOHN, RPF, CRR

1       they were scared of that and that's -- and they

2       weren't telling people that.  They would say it

3       wasn't Lamonte, but they weren't telling people the

4       name.

5    A. They weren't telling the authorities, they weren't

6       telling the police because they didn't trust the

7       police.

8    Q. All right.  So do you know whether or not she ever

9       mentioned Monster in her trial or her testimony at

10      motion for new trial?

11   A. She did not mention Monster at that hearing.

12   Q. And you believe that's because of her fear?

13   A. I believe that.

14   Q. Okay.

15   A. Yes.

16   Q. And then do you know if she mentioned the sexual

17      relationship with Golubski during that testimony?

18   A. She did not.

19   Q. Okay.  And you believe that's also because of fear?

20   A. What, that she had sex with Golubski?

21   Q. Yeah, and why she didn't mention it at the time that

22      she was in a sexual relationship with him.

23   A. I just didn't think so.  I don't know why she didn't

24      mention it.  She wasn't asked that question so she

25      chose if she wasn't asked, she chose not to address

1         it.

2    Q.   Okay.  You mentioned earlier in your testimony that

3         you believe that people totally disregarded the

4         testimony of all of the witnesses for years I think?

5    A.   Well, all the witnesses.

6    Q.   Or the family maybe is what you said.

7    A.   Yes.

8    Q.   Of the Quinn family?

9    A.   Yes.

10   Q.   And when you say that, I mean you would acknowledge

11        though that as early as 1996 there was a motion for

12        new trial which was shortly after the trial, right?

13   A.   Yes.

14   Q.   Okay.  So Niko's affidavit was presented to a

15        court --

16   A.   Yes.

17   Q.   -- correct?

18   A.   Yes.

19   Q.   Stacy testified in front of a court?

20   A.   Yes.

21   Q.   And then the judge heard it and I know it's Judge

22        Burdette, right?  Correct?

23   A.   Yes.

24   Q.   But then it's appealed and then a Court of Appeals

25        hears it too?

LMKSDC_0026435

1    A.    Uh-huh, yes.

2    Q.    So do you think it was completely disregarded or do

3          you think part of it was heard and the courts decided

4          it the way they did, whether you agree with it or

5          not?

6    A.    Well, the family -- the family is very clear to us

7          that they told the police, they told Golubski that he

8          got -- he got the wrong man and Golubski told Niko

9          let it go, forget about it.  So they were telling the

10         police -- they were telling Golubski, but again you

11         have to understand that the people of that part of

12         this town do not trust the -- I'm sorry -- your

13         office, I don't know about the new regime, but they

14         didn't trust the old regime -- regimes, nor did they

15         especially trust the Kansas City police.  They just

16         knew the Kansas City police would not listen to them.

17         They tried, but nothing came of it.

18   Q.    So and that's what you mean when they say police

19         totally disregarded, you mean Golubski specifically,

20         is that who you mean?

21   A.    I know that he was the one who -- to whom Niko and

22         others told that they got the wrong man.

23   Q.    Okay.

24   A.    And Josephine, of course Josephine told Terra that as

25         did Niko and nobody did anything.  Nobody cared.

1        They had a conviction, they were gonna fight tooth

2        and nail to stick with it.

3   Q.   But affidavits and testimony was presented to the

4        court as early as 1996 regarding this though, you

5        would agree with that, whether that was on behalf of

6        Golubski or not, but that was presented within two

7        years of the trial, correct?

8   A.   Yes.  I mean Niko had recanted her testimony two

9        years within -- since the trial.  She -- and Stacy

10       had testified that they got the wrong man and she

11       knows who the killer is, but she wouldn't -- she

12       didn't identify him.  Nobody -- nobody asked her.  I

13       mean if -- if I'm her lawyer at that hearing, I'm

14       gonna ask her to identify do you know who the killer

15       is, who is it --

16  Q.   Right.

17  A.   -- or the DA, Terra Morehead.

18  Q.   But as you said though, I mean there's obviously fear

19       of retaliation in the community, correct?

20  A.   Well, there was fear from Stacy's perspective.  She

21       was afraid of Monster, there's no question about

22       that.  Monster went to Robert Quinn's house with a

23       shotgun when John and Robert were in the home

24       together and just appeared with a shotgun and then

25       left.  The message was clear, keep your mouth shut.

TINA R. ST. JOHN, RPF, CRR

1    Q.   And that was kind of my point, like maybe she

2         wouldn't have answered that question anyway, right?

3    A.   Well, she may have.

4    Q.   Okay.  She may have, she may not, but...

5              I want to talk about Ruby a little bit.  Were

6         you involved in speaking with her?

7    A.   Oh yes, yes.

8    Q.   Okay.  Has Ruby ever told you that she identified the

9         wrong person or has she -- I don't think she's ever

10        actually told you that, correct?

11   A.   Ruby -- well, it's a little complicated, a little

12        nuanced.  But Ruby at one point -- and this is, I

13        don't know, like maybe the third visit I had with her

14        when I pointed out to her in her trial testimony that

15        she had said on numerous occasions during her trial

16        testimony that she didn't pay any attention to the

17        hair --

18   Q.   Uh-huh.

19   A.   -- right, you remember that?

20   Q.   Yes, I do.

21   A.   Okay.  And she only focussed on the face.  It was the

22        face that enabled her to identify Lamonte McIntyre.

23        From the very first time I met with her, every single

24        time she was absolutely dead certain and she

25        maintains to us that she told the police that the --

TINA R. ST. JOHN, RPF, CRR

1          the shooter had French braids.

2     Q.   But you know that's not true --

3     A.   If I could just finish one more point about that.

4     Q.   Yeah, sorry about that.

5     A.   So when we were discussing this very point with her,

6          we showed her the photos of Lamonte, the photo array,

7          and his arrest photo.  And his hair was pretty much

8          as it is now, short cut, and she looked at that photo

9          and she burst out crying and said, please apologize

10         to his mother and to him that I participated in a

11         wrongful conviction.  That's what she said to us in

12         the privacy of her apartment.

13    Q.   Okay.  And was that recorded?

14    A.   No, it was not.

15    Q.   Okay.  That's not included in her affidavit either,

16         correct?

17    A.   I've not -- no, I don't think it is.

18    Q.   Okay.  Why was that not included in her affidavit?

19    A.   Well, she preferred that it not be included.

20    Q.   Now, did you write the affidavit for her or did she

21         write it herself?

22    A.   No.  I prepared the draft with her assistance.

23    Q.   She did -- she did not want that included though?

24    A.   She didn't want it included.  Could I add -- well --

25    Q.   I'm sorry.

1    A.    -- I'm sorry.  Well, never mind.  Sorry.

2    Q.    It's okay.  If you want to say something --

3    A.    I was gonna -- I was gonna talk about Ruby and the --

4          again, we're talking fear and trauma.  I mean can you

5          imagine being Ruby Mitchell and on the way down to

6          the police station Golubski makes a sexual verbal

7          sexual advance towards her how she felt about that?

8          And then when it comes time to make an ID, she knew

9          Golubski, she knew his reputation, he leaned over and

10         he made a sexual advance towards her and she again

11         was fearful of not -- not doing what he -- what he

12         wanted her to do.

13   Q.    And is that what she told you?  I know she told you

14         about the encounter in the car, right?  That's in her

15         affidavit, correct?

16   A.    Say what?  Yes, yes.

17   Q.    Okay.  Did she tell you she picked him out because

18         she was fearful?

19   A.    No, she did not.

20   Q.    Okay.  So this is your interpretation?

21   A.    Yes, it is, yeah.

22   Q.    Okay.  Is there a reason you don't tape your

23         conversations with -- with folks when you interview

24         them?

25   A.    The reason -- the reason being that usually for the

TINA R. ST. JOHN, RPF, CRR

1        truth to come out, it comes out in bits and pieces,

2        it evolves over time, interview after interview.  So

3        the culmination of the interviews and when we finally

4        get what we believe to be as much of a truth as we're

5        going to secure from the witness, then we -- we do

6        the affidavit.

7   Q.   Okay.  You never -- you never tape record it though?

8   A.   I wouldn't say never.  Sometimes I have.

9   Q.   All right.  And usually are you the one preparing the

10       affidavit or do you let the witness prepare it?

11  A.   Usually working with the witness, we -- we prepare

12       it.

13  Q.   I was having a hard time understanding in State's

14       Exhibit 135 (sic), you mentioned Ruby's viewpoint,

15       but I was having a hard time figuring out which

16       picture it was that was depicting her viewpoint.  Can

17       you show me?

18  A.   Yeah, if you can bring it up.

19  Q.   Yeah.  I'll have her flip through them.  It's State's

20       135 and it's four different pictures?

21            MS. RUNNELS:  State's 135?

22            MS. TATUM:  Or not State's.

23  Q.   (By Ms. Tatum)  I'll ask her to flip through the four

24       and you can just tell her to stop.

25            THE WITNESS:  Can I go up?

LMKSDC_0026441

```
 1                    MS. TATUM:  Yeah, please.
 2                    (The witness left the stand.)
 3    Q.   (By Ms. Tatum)  I assume one of them you took from
 4         Ruby's -- what you believe was Ruby's viewpoint,
 5         right?
 6    A.   Well, Dan Clark did, yes.
 7    Q.   Okay.  If you could just tell me which one of those
 8         that was?
 9    A.   Well, Ruby's house is back here (indicating) or it's
10         a vacant lot now, but where it was.
11    Q.   Okay.
12                    THE COURT:  And just for the record, if I could,
13         I understood his gestures to mean back toward the
14         viewpoint of the observer of this picture.
15                    THE WITNESS:  Yes.
16                    THE COURT:  Okay.
17    Q.   (By Ms. Tatum)  Go ahead.  Okay.  Was one of those --
18    A.   Go back one.
19    Q.   Was one of those meant to be from her viewpoint?
20    A.   Well, let's go -- could we go back?  Yes, this is --
21         this is the one (indicating).  That's me standing
22         looking up there.
23    Q.   Well, okay, I'm sorry.
24    A.   You can't see the whole thing.
25    Q.   Okay.  So just to clarify, is the photographer
```

LMKSDC_0026442

1         standing where Ms. Mitchell was supposedly standing,

2         is that what we are trying to depict?

3    A.   No, it's not.  This picture is not depicting that.

4    Q.   Okay.

5    A.   I'm not sure why this particular photo was taken

6         other than the fact that one of the two routes that

7         the shooter took may have been -- he may have went

8         here coming down the hill and then veered to his

9         right where the car was up there.

10   Q.   Okay.  I would -- I'm just curious if what you are

11        trying to tell us is that one of these pictures was

12        taken from her perspective?  And if it's not, that's

13        okay.

14   A.   I don't remember if one of the photos was or not to

15        be honest with you.

16   Q.   Can you look through them and tell us?

17   A.   Sure.  All right.  Now, let's see here, this is --

18        this is -- yeah, this is the vacant lot.

19        THE COURT:  If you'll allow me to interrupt

20   again.

21        MS. TATUM:  Sure.

22        THE COURT:  I want to make sure that the

23   record's clear here.

24        MS. TATUM:  Yes, sir.

25        THE COURT:  We've got four pictures in one

TINA R. ST. JOHN, RPF, CRR

1        exhibit.

2               MS. TATUM:  Yes.

3               THE COURT:  So if we could identify these when

4        you're asking the question with the help of the

5        person running the laptop whether this is the first,

6        second, third or fourth picture from the beginning of

7        that exhibit.

8               MS. TATUM:  This looks like the first picture.

9               MS. DERSCH:  It is the first picture.

10              THE WITNESS:  Okay.

11              MS. TATUM:  Yeah.

12   A.   This is the first picture.  This is where Ruby's

13        house was.

14   Q.   (By Ms. Tatum)  Okay.

15   A.   Okay.  Now, to be sure, we're not exactly sure how

16        far the porch was from the -- from the street, but we

17        figured it was right about here (indicating) and she

18        would be looking up there (indicating).

19   Q.   Okay.  So that's the one that's meant to depict what

20        you believe would have been Ruby's view?

21   A.   Basically, yeah.

22   Q.   Okay.  Thank you.  I was just confused which one it

23        was.  Thank you.

24   A.   Yeah.

25              (The witness resumed the stand.)


                    TINA R. ST. JOHN, RPF, CRR

1   Q.   Mr. McCloskey, you said that the investigation ended
2        I believe what, 7:50 PM when Lamonte was arrested?
3   A.   The only other -- well, there were two things -- two
4        activities that occurred after this evening, after
5        April 15th, 1994.  One was Detective Golubski
6        interviewed John Quinn.
7   Q.   Uh-huh.
8   A.   That's when John Quinn told him that his son, Doniel,
9        was hanging around with -- with bad drug people.
10  Q.   Right.
11  A.   Cobra snake, that was on a Thursday, so like three or
12       four days later.
13  Q.   Sure.
14  A.   And then -- then he got -- he -- after that interview
15       with John Quinn, the next week or so is when he
16       conveyed Niko behind the Wyandotte High School and
17       got the -- the Lamonte ID from her at that point.
18            MS. TATUM:  Okay.  May I approach, Your Honor?
19            THE COURT:  Yes.
20  Q.   (By Ms. Tatum)  Do you mind if I take that back?
21  A.   Sure.
22  Q.   Okay.  So after 7:50 PM on the date, you said number
23       one, he interviews John Quinn?
24  A.   Yeah, yes.
25  Q.   Which is the father?

TINA R. ST. JOHN, RPF, CRR

1    A.    Yes.

2    Q.    And I think he does ask him do you know the names of

3          any of these people and John says they're cobras, I

4          recall that.

5    A.    Did he specifically say do you know the names?  I

6          don't think he did --

7    Q.    Okay.

8    A.    -- but I could be wrong.

9    Q.    Okay.  We'll take a look real quick because I could

10         be wrong too.  Let's see.

11             MS. TATUM:  May I approach, Your Honor?

12   A.    This is it?

13   Q.    (By Ms. Tatum)  Yes, it is.

14   A.    Okay, thanks.  You want me to read it out loud?

15   Q.    Well, does he ask for names?

16   A.    Let's see, who has your son been hanging around with?

17             The worst kind.

18             And which is in your opinion what?

19             A Cobra snake with any kind of bite that would

20        be instant death.

21             Are you talking about drug dealers?

22             Well, yeah.  I don't know what to do, but I knew

23        something was about to --

24             Do you know any of these individuals by names

25        that he was dealing with?

LMKSDC_0026446

1            Okay, so you're right, he did ask for names.

2    Q.   And was John able to provide him with a name?

3    A.   And John says, no, I don't because they're

4         youngsters.

5    Q.   Okay.  So after you say this ended, the detective did

6         talk to John Quinn, right?

7    A.   Yeah.  Yes.

8    Q.   And talked to Niko Quinn again and we know he didn't

9         make a report of that?

10   A.   Yes.

11   Q.   But we know that from Niko as well?

12   A.   Yes.

13   Q.   Okay.  He also interviewed several alibi witnesses,

14        correct?

15   A.   Yes, he did.

16   Q.   Okay.  So that's important, don't you think, that he

17        interviewed alibi witnesses for the defendant?  I

18        mean the investigation wasn't over when he did that,

19        right?

20   A.   Yes, that's -- that's -- that's true.

21   Q.   Okay.  How many alibi witnesses did he interview?

22   A.   I think three or four.

23   Q.   Okay.  Would that include Yolanda Johnson?

24   A.   Could be.

25   Q.   Okay.  Natasha Haygood?

LMKSDC_0026447

```
 1    A.   Yes.

 2    Q.   M'Sherie Johnson?

 3    A.   Yes.

 4    Q.   Okay.  I don't think there are any other ones, but --

 5    A.   What was the date, when did he interview those folks?

 6    Q.   I can show you the reports, but based on what I have

 7         in front of me, John Quinn was April 19th, Yolanda

 8         was April 20th.  Do you disagree with me on any of

 9         these?

10    A.   No, I can't disagree.  I'm just wondering did they

11         present themselves or did he go out and initiate the

12         interview with them?

13    Q.   I don't --

14    A.   I think they presented themselves to him.

15    Q.   4/20.  I mean does that matter though as far as --

16    A.   Yes, I think it does, sure.

17    Q.   So if they presented themselves, you would still say

18         he ended it here?  I mean he could have refused to

19         interview them.

20    A.   In terms of ending it, yes, you have a point there.

21    Q.   Okay.

22    A.   But in terms of the intention, it's not like he went

23         out to assess his -- Lamonte's alibi because they --

24         they presented themselves to him to let him know that

25         Lamonte was with them when this happened.
```

TINA R. ST. JOHN, RPF, CRR

1    Q.   Right.  And he did interview them though?

2    A.   He did.  He did.  Yes, he did.

3    Q.   Provided taped statements?

4    A.   Yeah.

5    Q.   To defense counsel?

6    A.   Uh-huh.

7    Q.   And also the prosecutor?

8    A.   Uh-huh, yes.

9    Q.   Okay.  So that's not something that I think you said

10        something else he kept as his dark secret, but he

11        didn't keep these alibi witnesses as a dark secret.

12   A.   No, they presented themselves.

13   Q.   Okay.  And they did testify at trial, right?

14   A.   Yes, they did.

15   Q.   Okay.  And actually I think you mentioned this too,

16        but he -- he interviews that Keva, the niece of Ruby?

17   A.   Yeah, on September right before the trial.

18   Q.   Right.  But it was in September so --

19   A.   It was September.

20   Q.   Okay.  So the investigation hadn't ended by then?

21   A.   Well, it actually had.  Now they're getting ready for

22        trial.

23   Q.   But he still interviewed her and made that available

24        for people?

25   A.   Yes, right on the eve of the trial.

1    Q.    And sometimes that does happen.  I mean do you
2          disagree with me on that?
3    A.    I do disagree with that, most certainly.  Lamonte --
4          Ruby Mitchell when she's making the ID of Lamonte on
5          that evening of the -- of the crime says that this is
6          the Lamont who's dating my niece, Keva Garcia.
7    Q.    Sure.
8    A.    So if -- if I'm Golubski, I'm gonna go talk to Keva
9          Garcia, find out who the other Lamont is.  And by the
10         way, I interviewed Lamont Drain in 2010 and I was the
11         first person who ever spoke with him on this case --
12   Q.    Right.  And I'm --
13   A.    -- which I find to be shocking as well.
14   Q.    I'm not asking if he should have done it sooner or
15         not in your opinion, but he did go talk to her in
16         September.  So he didn't have to do that, but he went
17         and talked to her and provided that statement.  And
18         it was very clear -- hold on -- that Keva said -- I'm
19         going to let you talk too.
20   A.    No, I'm sorry.  Go ahead.
21   Q.    -- that Keva said, no, this is not Lamont Drain, this
22         is not the guy I was dating.  That was very clear and
23         all of that information was provided to all the
24         parties, right?
25   A.    Yes.

LMKSDC_0026450

| | | |
|---|---|---|
| 1 | Q. | Okay.  Go ahead now, what did you want to say?  I'll |
| 2 | | be quiet for yours. |
| 3 | A. | All I was going to say was, listen, they're at the |
| 4 | | eve of the trial, they know -- they know that Ruby is |
| 5 | | going to testify, she's probably going to mention |
| 6 | | Keva Garcia, they better get out there and see what |
| 7 | | she's gotta say before the trial. |
| 8 | Q. | Okay.  That's the way you see it. |
| 9 | A. | That's the way I see it. |
| 10 | Q. | But he did do it? |
| 11 | A. | He did do it. |
| 12 | Q. | Okay. |
| 13 | A. | And I'm guessing Terra Morehead had asked him to do |
| 14 | | it, but anyway... |
| 15 | Q. | I couldn't tell you that.  You mentioned you went and |
| 16 | | talked to Roger Golubski, correct? |
| 17 | A. | Yes, I did. |
| 18 | Q. | All right.  How long would you say you talked to him? |
| 19 | A. | I think Detective Golubski and I probably spoke for a |
| 20 | | half hour -- |
| 21 | Q. | Was he -- |
| 22 | A. | -- if that. |
| 23 | Q. | -- speaking with you on that? |
| 24 | A. | Yes, he was fine.  He wasn't defensive, he was |
| 25 | | affable, not defensive, clever in my view saying that |

TINA R. ST. JOHN, RPF, CRR

1       among other things, well Geez, if, you know, mistakes
2       are made, police make mistakes, eyewitness make
3       mistakes.  If we made a mistake in this case, we
4       better do something about it.
5  Q.   Okay.  So --
6  A.   That was his demeanor with me.
7  Q.   You felt he had a good demeanor with you when you
8       spoke with him?
9  A.   I felt the demeanor was affable, but underneath that,
10      I thought it was -- he was just trying to be pretty
11      cool about the whole thing.  In other words, I don't
12      think he was all serious we better get to the truth
13      of the matter.
14 Q.   Okay.
15 A.   He said he was gonna -- he said, listen, I can't
16      really talk to you about a lot of this because I need
17      to review the file.  And so I said to him, I said,
18      well listen, why don't you contact Jerry Gorman, the
19      DA, get the file, read it and after you do, here's my
20      card, please give me a call and let's talk about it
21      in detail.  I never heard from him.
22 Q.   Okay.  You said you talked to did you say close to a
23      hundred people who said they were deathly afraid of
24      Roger Golubski?
25 A.   I said I interviewed close -- probably over a hundred

1          people and a majority of those people were African

2          American and, yes, they were afraid of Golubski.  His

3          name came up most of the time.

4   Q.   How many people would you say?

5   A.   I'd say a hundred.

6   Q.   Okay.  So you'd say you interviewed at least --

7   A.   Yeah, this includes -- this includes all the Quinns,

8          I interviewed about 20 different people who were

9          associated with Monster or Aaron Robinson or Cecil

10         Brooks, I went into that drug world, interviewed

11         those people.  They were all telling me about

12         Golubski and how he planted drugs and confiscated

13         drugs, et cetera, and I interviewed a number of the

14         prostitutes who worked for Golubski or who provided

15         services for Golubski.  Some of them wouldn't talk to

16         me because they were afraid of him.  So I covered a

17         lot of bases.

18   Q.   Okay.  So I just want to make sure you said it was

19         about a hundred people --

20   A.   Yeah.

21   Q.   -- who said they're deathly afraid of him?

22   A.   They didn't say I'm deathly afraid of him, but they

23         were afraid of him.

24   Q.   Sorry, just trying to use the word you used earlier,

25         but they were afraid.

LMKSDC_0026453

1    A.    Yeah.

2    Q.    And were those interviews recorded?

3    A.    No.

4    Q.    No.  And I understand what you're saying, like some

5          people did not wanna be -- didn't wanna talk about it

6          with you, correct?

7    A.    The only interview that was recorded was the one with

8          John Quinn.

9    Q.    That was the only interview you recorded?

10   A.    That was the interview that Saundra Newsom, the

11         mother of Doniel, recorded.

12   Q.    Okay.  Thank you.  Thank you for clarifying that.

13         MS. TATUM:  Just a minute.  Nothing further.

14         Thank you, sir.

15         THE COURT:  Any redirect?

16                    REDIRECT EXAMINATION

17   BY MS. PILATE:

18   Q.    I have just a few questions.  Mr. McCloskey, at any

19         point during your investigation, did anyone ever tell

20         you Lamonte McIntyre was the killer of those two men?

21   A.    Not one person.

22   Q.    With regard to preparing affidavits, is it your

23         practice to prepare a draft based on what the witness

24         has told you and then to go over their draft with

25         them and make any changes, corrections or deletions

1           that are requested by the witness?

2    A.    Yes, that's -- that's the methodology, yeah.

3    Q.    And is part of the reason for this that most

4           witnesses don't know how to draft an affidavit?

5    A.    It would be very difficult for them to craft a draft.

6    Q.    Have you seen Josephine's handwritten affidavit?

7    A.    I have.  I have.

8    Q.    And would that affidavit reflect some of the

9           difficulty that witnesses have in drafting their own

10          affidavits?

11   A.    Yes, it would.

12   Q.    Now, in terms of your investigation of Cecil Brooks,

13          I think you said you regarded him as credible because

14          you had nothing to offer him?

15   A.    Yes.

16   Q.    Correct?

17   A.    That's correct.

18   Q.    And he had no reason to talk to you other than some

19          personal impulse maybe to set the record straight or

20          something like that?

21   A.    Well, another element to that -- to that visit with

22          him was he claimed at that point in time, this is in

23          the hour before we got in the meat of things, that he

24          was a Christian, he was reading scripture and he

25          recognized all the bad things he had done to a lot of

 1          people and he expressed regret for that and he felt

 2          it's about time I did something right.

 3    Q.    Okay.

 4    A.    So he was -- according to him, he was in the midst of

 5          some kind of personal transformation.

 6    Q.    Okay.  And did the bad things that you had heard

 7          Cecil had done, was there consistency about what

 8          those bad things were in terms of what you heard in

 9          the community?

10    A.    They were very vicious, torturing people, having them

11          sit on hot plates nude, casting them out of the house

12          nude, skinning them -- some people alive, I mean bad,

13          bad -- atrocious, cruel, brutal treatment of people

14          who for one reason or another angered him.

15    Q.    Okay.  And was Cecil eventually arrested by federal

16          authorities?

17    A.    Yes, he was.

18    Q.    And are you aware of the allegations in the federal

19          case?

20    A.    I -- I am and I was.  I'm not sure I can recite them

21          to you.  I did it -- I think for assaulting somebody

22          in some untoward manner, I forget the details.

23    Q.    Was it a drug case?

24    A.    It was a drug case.

25    Q.    And it include, as you recall, some allegations of

1        assault, correct?

2   A.   Yes, yes.

3   Q.   I think you mentioned in your testimony information

4        from Niko Quinn that the man associated with the

5        Aaron Robinson drug house had beaten up or assaulted

6        Doniel, correct?

7   A.   Yes, yes.

8   Q.   And do you consider that to be important information?

9   A.   I do because it happened -- Doniel came to -- to

10        Niko's house on Hutchings, the street where the crime

11        occurred, several days before he was killed and he

12        told her that -- that Monster, who he referred to as

13        Ace's son -- now, Ace was Monster's father.  And

14        another unfortunate thing here is that Monster's

15        father, Neil Edgar, Sr., and John Quinn, the father

16        of Doniel, grew up together and were best friends.

17        So, you know, it just -- I lost my -- I just lost my

18        train of thought.  What was the question?

19             (The last question was read back by the

20             court reporter.)

21   A.   Yes, yes.  Yes, it was very important because several

22        days before he was beat up by Ace's son --

23   Q.   Uh-huh.

24   A.   -- Monster --

25   Q.   Uh-huh.

TINA R. ST. JOHN, RPF, CRR

1    A.   -- Marlin Williams and Aaron Robinson.  That's what

2         he told Niko.

3    Q.   Okay.

4    A.   So you would think there would be some -- something.

5         There was a problem there.

6    Q.   Okay.  Would you consider information regarding men

7         who either had a motive to harm Doniel or had already

8         harmed him, would you consider that to be information

9         that if it is in the possession of the prosecution or

10        the police should be turned over to the defense?

11   A.   Yes, it should be turned over and followed up.

12   Q.   Are you aware of any recent discovery that has been

13        obtained in the case with respect to notes in the

14        prosecutor's file, handwritten notes?

15   A.   I did read them.  I think it's something to the

16        effect that -- that the prosecution or the police,

17        they knew that Doniel had been assaulted, something

18        like that prior to his murder, of course.

19        MS. PILATE:  Your Honor, may I approach the

20   witness?

21        THE COURT:  Yes.

22   Q.   (By Ms. Pilate)  Mr. McCloskey, I'm going to hand to

23        you information that I'll -- or a document and ask

24        you if you can take a look at it.  Have you ever seen

25        that before?

1    A.    Yes.  You had -- you had sent this to me.

2    Q.    Okay.  And do you recall the identification of that

3          as notes from the prosecutor's file?

4    A.    To be honest with you, I don't recall that that was

5          the source, but --

6    Q.    Okay.  Well --

7    A.    -- it was.

8    Q.    I will represent to you that --

9    A.    All right.

10   Q.    -- I obtained at least those handwritten notes from

11         the district attorney's office.  Now, looking at that

12         exhibit, do you see references to some type of

13         assault and injury?

14   A.    Yes.  May I read it?

15   Q.    Sure.

16               THE COURT:  Would you give me before he starts

17         that --

18               MS. PILATE:  I'm sorry?

19               THE COURT:  Would you give me that exhibit

20         number again?

21               MS. PILATE:  Yes, I'm sorry.  It is 134.  And,

22         Your Honor, we're just looking at the first page --

23         or I'm sorry, 131 -- excuse me -- 131.  And

24         Ms. Tatum, I think you guys would already have

25         that --

1          MS. TATUM:  We do.

2          MS. PILATE:  -- on your disk, yes.

3          Your Honor, would you like to look at it?

4          THE COURT:  No.  I just wanted it identified for

5     the record.

6     Q.   (By Ms. Pilate)  Okay.  And while I'm looking at it,

7          if I could move for admission of 131?

8          THE COURT:  Objection?

9          MS. TATUM:  No.

10         MS. PILATE:  Okay.

11         THE COURT:  131 is admitted.

12    Q.   (By Ms. Pilate)  Okay.  Could you please read that,

13         sir?

14    A.   Yes.  It says a week or two before, next line out of

15         breath, next line bruises on his face, cut on finger,

16         who had jumped on him some guys up the street.  He

17         said to leave it alone, said he was hungry.  That was

18         as far as -- drug rehab, tried to warn him, drug

19         rehab, next line tried to warn him.

20    Q.   Okay.  Does it appear that these handwritten notes

21         might relate to the same incident that Niko Quinn had

22         described in her affidavit with men assaulting Doniel

23         before he was killed?

24    A.   I think this is a very -- it's a very reasonable

25         inference to make.

LMKSDC_0026460

1    Q.   Certainly it would be something for defense counsel
2         to investigate, correct?
3    A.   For defense counsel to investigate and also for the
4         police to investigate.
5    Q.   Okay.  Have you ever seen anything in the police
6         investigative file or the trial record that would
7         suggest that this information was turned over to
8         defense counsel, Gary Long?
9    A.   There's nothing in the file or the records that
10        indicate that.
11   Q.   Okay.  Now, isn't one of the things that defense
12        counsel typically does is investigate to see whether
13        there are other suspects?
14   A.   Absolutely if you have -- if you have a responsible
15        defense counsel.
16   Q.   Okay.  And I think you mentioned earlier that this
17        was a drug-infested area?
18   A.   Yes.
19   Q.   Okay.  And what this relates to these -- these notes
20        here is that there were, quote, "some guys up the
21        street" that had done that.  Is that what it says?
22   A.   Yes, and geographically speaking, that would be --
23        that would fit with Niko or somebody who lived in the
24        -- in the area of the crime, Hutchings Street.  Up
25        the street was 21st and Quindaro --

1    Q.    Okay.

2    A.    -- which is where the drug house was --

3    Q.    Right.

4    A.    -- which is where he got beat up.

5    Q.    And both Niko Quinn and Josephine Quinn and Stacy

6          Quinn at that time all lived on Hutchings Street,

7          correct?

8    A.    That's correct.

9    Q.    Okay.  And this would appear to refer to someone in

10         the neighborhood who had done this, right?

11   A.    Yes.  Yes, somebody up the street, yeah.

12   Q.    And do you know of any evidence anywhere that this

13         information was ever disclosed to defense counsel?

14   A.    I don't believe it was.  I have no indication that it

15         was.

16   Q.    Okay.

17   A.    When I saw this when you sent it to me, I was very

18         surprised to see it.

19   Q.    Now, turning to Ruby Mitchell's identification, are

20         you aware of testimony she gave at trial in which she

21         said she did not know the name of the person she

22         identified, she said she just picked out the face?

23   A.    Yes.  That was her trial testimony, yes.

24   Q.    Okay.  Are you aware of trial testimony where she

25         said she did not know the last name of the person she

LMKSDC_0026462

1        picked out?

2    A.   I don't recall that specifically at this -- at this

3        time.

4            MS. PILATE:  Okay.  I'd like to go to volume one

5        of the trial testimony, page 189.  Okay, 189 please.

6        Enlarge it please.

7    Q.   (By Ms. Pilate)  Okay.  Mr. McCloskey, would you mind

8        stepping down --

9    A.   Yes.

10   Q.   -- and looking at the screen please.

11            (The witness left the stand.)

12   A.   Yes.

13   Q.   And do you see the question where Mr. Long begins at

14       line 7, do you recall what your answer was when I

15       asked it wasn't until you looked at the lineup both

16       down at the police station that you said it was

17       Lamonte McIntyre.  Do you recall what your response

18       was?  Do you see that?

19            MS. DERSCH:  No, it was on the wrong page.  I

20       apologize.

21            MS. PILATE:  One more page.

22   Q.   (By Ms. Pilate)  Okay.  Starting at line 7.

23   A.   Yes.  Do you recall what your answer was when I asked

24       it wasn't until you looked at the lineup book down at

25       the police station that you said it was Lamonte

TINA R. ST. JOHN, RPF, CRR

1          McIntyre.  Do you recall what your response was?

2              Answer, what you mean by response?

3              Question, what your answer was, do you recall?

4              Answer, well, I didn't know his last -- I didn't

5          know his last name.

6      Q.  Do you see that?

7      A.  Yes.

8      Q.  Okay.  And does that appear to you to be testimony by

9          Ruby Mitchell?

10     A.  Yes.

11     Q.  And she's saying there that she did not know the last

12         name of the picture or of the person she identified

13         in the photo?

14     A.  That's correct.  May I go back?

15     Q.  Yeah.

16             MS. PILATE:  Well, we're going to page 191

17         please.

18     Q.  (By Ms. Pilate)  Okay, beginning at line 11, do you

19         see where it says, do you remember being asked by me,

20         now, this is a question asked, it wasn't until you

21         looked at the book at the police station that you

22         decided it wasn't the Lamonte you knew.  Do you

23         remember what your answer was?

24             Answer, I didn't -- the Lamonte that I knew, it

25         wasn't until I looked at the book that I said I

1           didn't know.

2                Question, looked at the pictures?

3                Answer, looked at the pictures.  I didn't -- I

4           never knew him.

5                Do you see that?

6      A.   Yes.

7      Q.   So she has said she didn't know the last name of the

8           person she identified, and this was a person she did

9           not know.  Would you agree with that?

10     A.   I agree.

11     Q.   And then turning to page 204, do you see at the top

12          of the page where Ms. Mitchell testifies, I said I

13          didn't know.  I never knew his last name in the first

14          place?

15     A.   Yes, I see that.

16     Q.   Okay.  Question, okay.

17                And then the answer goes on with, and I never

18          knew his first name in the first place.  I just

19          picked out the person I saw.

20                Do you see that?

21     A.   Yes.

22     Q.   Does it appear to you that she is saying she did not

23          know the identity of the person she picked out, she

24          didn't know his last name and she didn't know his

25          first name?

LMKSDC_0026465

1    A.    Yes, it appears that she's indicated that three

2          separate times.

3                MS. PILATE:  Okay.  Now I would like to go to

4          the police -- not police -- her police statement in

5          Exhibit 1, and I want you to go to page 34, *Bates*

6          stamp 34.

7                And, Your Honor, we should put something in the

8          record on this.  Ms. Tatum and I agreed that the

9          trial record in terms of the trial transcript of the

10         police reports were stipulated to as far as

11         foundation and submitted or would be submitted into

12         the record.  Is that okay with Your Honor?

13               THE COURT:  Yes.  Is that true, Ms. Tatum?

14               MS. TATUM:  Yes, sir.

15               THE COURT:  All right.  So the trial transcript

16         and police --

17               MS. PILATE:  Police reports.

18               THE COURT:  -- police reports from this

19         incident --

20               MS. PILATE:  Correct.

21               THE COURT:  -- are to be introduced.

22               MS. PILATE:  Correct.

23               THE COURT:  Without further foundation.

24               MS. PILATE:  Correct.

25               THE COURT:  All right.

LMKSDC_0026466

1          MS. PILATE:  Thank you, Your Honor.

2          MS. TATUM:  And I believe those are -- do you

3     want them marked as State's 1, State's -- and 5

4     through 7, Ms. Pilate?

5          MS. PILATE:  Movant's, yeah, Movant's Exhibits 1

6     and 5, 6 and 7.

7          MS. TATUM:  Sorry.

8          THE COURT:  Okay.  So the transcript is 1?

9          MS. PILATE:  The police reports are 1 and the

10    transcript, the trial transcript, because there are

11    other transcripts.

12         THE COURT:  Right.

13         MS. PILATE:  The trial transcript is Exhibits 5,

14    6 and 7.

15         THE COURT:  Okay.

16   Q.  (By Ms. Pilate)  Okay.  Let's go to page-- *Bates*

17        stamp page 34 of Exhibit No. 1.  Okay.  Now, about,

18        oh, two-thirds of the way down in that report, do you

19        see the question -- first of all, let's identify this

20        as a statement of Ruby Mitchell.  Does this appear to

21        you to be a statement of Ruby Mitchell?

22   A.   Yes.  It says -- says that at the top.

23   Q.   At the very top of the page.

24   A.   Witness statement of Ruby Mitchell.

25   Q.   Okay.  Do you see the question, were you able to pick

                    TINA R. ST. JOHN, RPF, CRR

1          out the shooter of the picture?

2     A.   Where --

3     Q.   The lines aren't numbered, but about --

4     A.   Yes, right here (indicating), I see.  Were you able

5          to pick out the shooter of the picture?

6     Q.   Kind of an odd way of phrasing it.

7     A.   Picture of the shooter.

8     Q.   Right.  Do you see the answer?

9     A.   Yes.

10    Q.   Yes.  And the answer is yes, correct?

11    A.   Yes, that is correct.

12    Q.   And then the question is, is there a number on that

13         picture?

14    A.   Answer, yes.

15    Q.   Okay.  And what is that number?

16    A.   Answer, number three.

17    Q.   And do you see the question, are you absolutely sure

18         this is the party who did the shooting?

19    A.   Answer, yes.

20    Q.   And who is that party?

21    A.   Answer, Lamonte.

22    Q.   Okay.  And then turning to the next page, and so

23         she's given a first name there, correct?

24    A.   Yes.

25    Q.   And the name is Lamonte, right?

LMKSDC_0026468

```
 1    A.   Yes.
 2    Q.   Turning to the next page, page five of that same
 3         statement.
 4    A.   Yes.
 5    Q.   The question is, do you know his last name, do you
 6         see that?
 7    A.   Yes, I do.
 8    Q.   What does she answer?
 9    A.   And the answer is yes.
10    Q.   And the question is, what is it, what does she
11         answer?
12    A.   And her answer is, McIntyre.
13    Q.   So would you agree that Ruby Mitchell provides the
14         name of Lamonte McIntyre?
15    A.   Well, according to this police statement, yes.
16    Q.   Okay.  Are you aware of an audio recording that is
17         consistent with this transcript?
18    A.   Yes.
19    Q.   Okay.  And then continuing on that page, do you see
20         where it says how do you know this party?  And the
21         answer --
22    A.   Because he used to talk to my niece.
23    Q.   Question, how long have you known him?
24    A.   For a couple months.
25    Q.   Once again, you are absolutely sure this is the
```

1          party?

2     A.   Answer, yes.

3     Q.   Beyond a reason -- beyond any reasonable doubt?

4     A.   Answer, no.

5     Q.   Question, that's him?

6     A.   The answer, yep.

7     Q.   Okay.  So would you agree, based on this statement,

8          that Ruby Mitchell has identified what she says is

9          the shooter, the person she saw, she gave the name

10         Lamonte, she gave the name McIntyre, and said that he

11         was the Lamont who used to talk to her niece and that

12         she had known him for a couple of months?

13    A.   This -- yes, I -- that's what it says.

14    Q.   Okay.  And is all of that contradicted by her trial

15         testimony?

16    A.   Yes, it is.

17    Q.   Okay.  And at trial was it not indeed the evidence

18         that she didn't know Lamonte McIntyre?

19    A.   Yes.

20    Q.   And that she knew an entirely different Lamont,

21         right?

22    A.   That's correct.

23    Q.   Lamont Drain?

24    A.   Yes.

25    Q.   And if you were the investigator on the case and your

LMKSDC_0026470

1   witness had identified someone and said she knew him

2   and it turned out she didn't know him and she was

3   thinking of someone else entirely, wouldn't you want

4   to go back to the beginning and try and figure out

5   what had happened?

6 A. Exactly.  Yep.

7    MS. PILATE:  Okay.  You may return to your seat.

8     (The witness resumed the stand.)

9 Q. (By Ms. Pilate)  Now, in terms of any further

10   investigation after the arrest of Lamonte --

11 A. Could I point something -- excuse me.

12 Q. Yes.

13 A. May I point something out here?

14 Q. Yes.

15 A. These are the I guess the notes from the district

16   attorney's file?

17 Q. Correct.

18 A. Since we're on Lamont Drain, it says where is Lamont

19   Drain?  Why isn't he here?  I -- I think this is a DA

20   asking this question.  And when I interviewed Lamont

21   Drain in 2010, what 15, 16 years after the crime --

22 Q. Uh-huh.

23 A. -- he told me very clearly nobody had ever

24   interviewed him at all related to this crime.

25 Q. Thank you.  That would -- does that appear to you to

TINA R. ST. JOHN, RPF, CRR

1          be an omission in the investigation?

2    A.   Big one.

3    Q.   Now, when Detective Golubski interviewed John Quinn,

4          did you see any indication that he had shown to him

5          the photos that he had shown to Ruby Mitchell or to

6          Niko Quinn?

7    A.   I don't think so, no.

8    Q.   And I think we discussed earlier that although he

9          apparently spoke with or interviewed or had contact

10         with Niko Quinn some days after the shooting that he

11         did not document in any way that contact, correct?

12   A.   That's correct.

13   Q.   And is there anything that you have ever seen that

14         even establishes what date that contact occurred?

15   A.   Nothing other than Detective Golubski's testimony.

16   Q.   Based on the failure to document Niko's interview

17         with Golubski and the failure, according to her

18         affidavit, to document her report that Doniel had

19         been jumped on or beaten up by men associated with

20         Aaron's drug spot, would you agree that Detective

21         Golubski did not document certain information that he

22         knew?

23   A.   I think that's -- excuse me -- I think that's readily

24         apparent.

25   Q.   Okay.  So would you agree that it's certainly

LMKSDC_0026472

1          possible, based on these practices, that he would

2          have had information about Monster and simply not

3          documented it?

4     A.   Yes, I fully agree with that.

5                MS. PILATE:  Thank you.

6                THE COURT:  Do you have recross?

7                MS. TATUM:  No.  Thank you.

8                THE COURT:  All right.  May this witness be

9          excused?

10               MS. PILATE:  Yes.

11               THE COURT:  All right.  You're free to go or

12         stay as you choose.

13               THE WITNESS:  I would like to stay if I can.

14               THE COURT:  You're certainly welcome to do that.

15               THE WITNESS:  Thank you.

16               (Witness excused.)

17               THE COURT:  All right.  We find ourselves about

18         an hour before we're going to quit.  I would suggest

19         we take a brief recess, 10 minutes.

20               MS. PILATE:  Yeah, that would be terrific, Your

21         Honor, because I need to tidy up this table.

22               THE COURT:  All right.  Very good.  We'll take a

23         break for 10 minutes.  I'll see what I can do about

24         the temperature in here, if anything.

25               (A recess was taken, after which the

LMKSDC_0026473

1              following proceedings were had, the

2              petitioner being present.)

3        THE COURT:  Just for the record, this is a

4    resumption after the recess in 16 CV 508.  Are you

5    ready for your next witness?

6        MS. PILATE:  Well, Your Honor, we have a short

7    stipulation.  May I read it into the record?

8        THE COURT:  You may.

9        MS. PILATE:  Your Honor, this is a stipulation

10    that petitioner and the State have reached.  We have

11    marked it as Petitioner's Exhibit 165, and I have an

12    original here and I will come back with copies

13    tomorrow and also scan it and include it on our disk

14    of exhibits, and I'd like to read it into the record

15    if I may?

16        THE COURT:  You may.

17        MS. PILATE:  First I should preface this by

18    saying that this was information that was turned over

19    to the defense by the district attorney's office

20    following a meeting that Mark Dupree had with Cecil

21    Brooks, and this is a stipulation as to information

22    or statements I should say conveyed during that

23    meeting to Mr. Dupree, which Mr. Dupree then

24    disclosed to a group of individuals who were sitting

25    in a conference room at the district attorney's

LMKSDC_0026474

1          office that included me, my investigator, Mike

2          Bussell, and also Ms. Tatum and Ms. Gipson.  And the

3          date this occurred was on or about March 1, 2017.  I

4          do believe it was March 1.  And this is the

5          information.  There are a couple of relatively small

6          additional things that Mr. Bussell recalls from that

7          meeting, but this portion both sides agree on so I'm

8          going to go ahead and read that into the record,

9          okay.

10              Cecil Brooks conveyed the following to Mark

11         Dupree:  There was a meeting amongst Cecil, Aaron,

12         Marlin and Monster before Doniel -- and that's Doniel

13         Quinn -- was killed.  The meeting was about, quote,

14         "drugs and money", unquote.  The discussion concerned

15         what to do about Doniel.  The decision was made to

16         take care of him.  There were two reasons why Doniel

17         had to be handled.  He had stolen about $400 worth of

18         drugs.  Aaron said in Cecil's presence he'd take care

19         of it and have Monster handle it.  Aaron ordered the

20         hit and had Monster handle it.  Cecil was at that

21         meeting where the decision was made and he was

22         present during the discussion.

23              It took three days for the men to find Doniel

24         after that meeting.  After the killing, the group was

25         upset about how it was done.  Cecil was present

LMKSDC_0026475

1      during a conversation in which Aaron was yelling at

2      Monster about how the homicides were done.  Aaron's

3      girlfriend was also present at that conversation.

4      After the killings, Cecil also said something about

5      Monster being at Aaron's house afterwards with the

6      shotgun.  Aaron was in, quote, "pretty deep",

7      unquote, with Golubski.  Aaron was also in deep with

8      some other cops, but Cecil did not name them.

9            Cecil said with respect to Lamonte, meaning

10     Lamonte McIntyre -- and I'm adding that little

11     parenthetical there -- Cecil said with respect to

12     Lamonte, quote, "I know it wasn't him," unquote, who

13     did the murders.  Aaron ran his own drug spot but was

14     mentored by Cecil as he was his little cousin or

15     nephew.

16           At that time Golubski was on the north end of

17     Fifth Street a lot.  Golubski was at that time

18     running a few things in and out of the neighborhood.

19     And that is the end of the stipulation.

20           THE COURT:  All right.

21           MS. PILATE:  Thank you.

22           THE COURT:  And that is I assume you would have

23     let me know otherwise if this was not a stipulation,

24     but just for the record, Ms. Tatum, that is a

25     stipulation you have entered into; is that correct?

LMKSDC_0026476

1          MS. TATUM:  That is a stipulation Mr. Dupree

2     entered into, yes, as to what his testimony would be.

3          THE COURT:  Okay.

4          MS. PILATE:  And, Your Honor, we did do it for

5     the purpose of avoiding Mr. Dupree having to testify

6     because we wanted him to be able to attend the

7     proceeding if he so chose.

8          THE COURT:  All right.  So just so I'm clear,

9     and I'm glad I asked, this is not a stipulation as to

10    the truth of whether Mr. Brooks said.  This -- this

11    is -- and it may be a fine distinction, but it is --

12    it is an agreement that if Mr. Dupree was here, this

13    is what he would testify to?

14         MS. TATUM:  In my mind, it's an agreement that

15    this is what Mark Dupree said Cecil told him.  We

16    were not in the room.

17         THE COURT:  Right.

18         MS. TATUM:  Mr. Brooks didn't want us in there.

19    That's what Mr. Dupree would say Cecil Brooks told

20    him on that date.

21         THE COURT:  And Mr. Dupree was an investigator

22    for you?

23         MS. TATUM:  He's the district attorney.

24         THE COURT:  Oh, okay.  All right.  Sorry

25    about --

LMKSDC_0026477

1          MS. TATUM:  It's okay.

2          THE COURT:  -- my naivete about --

3          MS. TATUM:  No offense taken.

4          THE COURT:  Okay.  I understand now.

5          MS. PILATE:  Thank you, Your Honor.

6          THE COURT:  Do you have a --

7          MS. PILATE:  We do.

8          THE COURT:  -- another witness?

9          MS. PILATE:  We have one more witness and I

10   thought she was here, but she's probably just out in

11   the hall.

12          THE COURT:  Couple of quick questions while the

13   witness is coming in, is this a local witness?

14          MS. PILATE:  Yes, Your Honor.

15          THE COURT:  Is it someone you think we can get

16   finished with by 5:00 o'clock?  And if not, is that

17   going to cause a problem to stop at 5:00?

18          MS. PILATE:  It's definitely the hope to get

19   done by then.

20          THE COURT:  Okay.  Let's do what we can.

21          MS. PILATE:  May I check with Ms. Newsom

22   briefly?  Your Honor, we are going to make sure that

23   we finish today.

24          THE COURT:  Okay.  Ma'am, if you would step

25   right up here and the court reporter right here in

TINA R. ST. JOHN, RPF, CRR

1          front of me will administer an oath, okay.

2                         SAUNDRA NEWSOM

3          called as a witness on behalf of the Petitioner,

4          having first been duly sworn, testified as follows:

5               THE COURT:  When Ms. Newsom is seated, you may

6          examine.

7                        DIRECT EXAMINATION

8     BY MS. PILATE:

9     Q.   Good afternoon, Ms. Newsom.  We're going to have I

10         think maybe 30 or 40 minutes of testimony, Ms.

11         Newsom.  And if at any point you don't understand or

12         can't hear something I'm saying, please let me know.

13         And as I indicated, we're going to do everything we

14         can to get done by 5:00 o'clock.

15              Ms. Newsom, where do you reside?

16    A.   Wyandotte County.  I live in the Westheight area.

17    Q.   Okay.  And have you lived in Kansas City, Kansas most

18         of your life or all of your life?

19    A.   All of my life.

20    Q.   I'm sorry?

21    A.   All of my life.

22    Q.   In terms of why you're here today, could you explain

23         what relationship you have to this case?

24    A.   He's my son, my 21-year-old son.

25    Q.   Okay.  And which of the two victims are you referring

LMKSDC_0026479

1          to?

2    A.    Doniel Quinn.

3    Q.    And did he sometimes go by the name Doniel Sublette?

4    A.    Yes.

5    Q.    So either one?

6    A.    Yes.

7    Q.    And is Sublette your maiden name?

8    A.    When I got pregnant, we were not married.  We got

9          married after the -- after we found out I was

10         pregnant.

11   Q.    Okay.  And when you say "we got married", who are you

12         referring to?

13   A.    His father, John Quinn.

14   Q.    And approximately how long were you married to John

15         Quinn?

16   A.    About four years.

17   Q.    And at the time of his death, how old was Doniel?

18   A.    Twenty-one.

19   Q.    So had you divorced John Quinn at about the time

20         Doniel was four years old?

21   A.    Yes.

22   Q.    And did you raise Doniel primarily as a single

23         mother?

24   A.    Yes.

25   Q.    And did you also raise another child?

LMKSDC_0026480

1    A.    Yes.

2    Q.    And what is that child's name?

3    A.    My daughter, Marshelle (phonetics).

4    Q.    And is she a little older than Doniel?

5    A.    Yes.

6    Q.    Is she here in the courthouse today?

7    A.    Yes.

8    Q.    Okay.  What is your present status?  Are you employed

9          or retired or --

10   A.    I'm retired from the federal government.

11   Q.    Okay.  And where did you work for the federal

12         government?

13   A.    EPA.

14   Q.    And how many years were you there?

15   A.    Twenty-eight years.

16   Q.    And what kind of work did you do at the EPA?

17   A.    Basically some of everything, but I retired as a

18         graphics designer.

19   Q.    And what does a graphics designer do at the EPA?

20   A.    Well, I should say two things.  I was a photographer

21         for the agency and also a graphics designer.  And

22         what we would do is talk about the environment and

23         put that in a photograph form.

24   Q.    So essentially you were helping to design materials

25         for publications for the EPA?

LMKSDC_0026481

1    A.   Yes.

2    Q.   Is that correct?

3    A.   Yes.

4    Q.   And in your retirement, are you still pursuing

5         artistic type interests?

6    A.   Well, actually when -- when Don died, I had purchased

7         a sewing machine from the thrift store for $7 and the

8         only therapy I knew how to gain was through sewing.

9         So I started sewing pillows and I sewed so many

10        pillows at that time my husband said, honey, can you

11        just not make no more pillows because we don't have

12        nowhere to sleep.  So I just -- but that was therapy

13        for me.  It was the only way I knew how to keep going

14        so that's what I did.  And so from that, I just kept

15        doing what I knew how to do, what God gave me to do

16        to stay sane.

17   Q.   Uh-huh.  Obviously the death of your son has been

18        extremely difficult?

19   A.   The irony of it is Saturday is his birthday.

20   Q.   If he had not been murdered, do you know how old he

21        would be?

22   A.   Forty-four.

23   Q.   I'm sorry, 44?

24   A.   (Nodded head up and down.)

25   Q.   Are there things that have happened that have made

LMKSDC_0026482

1         the loss of your child more difficult than it

2         otherwise might have been?

3    A.   This has been hell for me because they've not allowed

4         me to bury him and close my son's casket.  Every time

5         I thought we were finished, we weren't.  Beginning --

6         when the detectives showed up at my house that Friday

7         night until now, the people who were in charge of his

8         case, they didn't take care.  The mayor of the county

9         at that time, he didn't take care.  Nobody came to my

10        house.

11   Q.   Let's break that down a little bit.  How did you hear

12        that your son had been killed?  Were you notified by

13        any member of the police department?

14   A.   No.  I've never met any of the police officers,

15        nobody.  Nobody came.  When I found out about it, it

16        was a crack kid who came to my door and asked me how

17        was my day going and they said I just wanna tell you

18        your son is dead.

19   Q.   So is that how you learned of the death of --

20   A.   That's how I found out about it.

21   Q.   Did any chaplain ever come to your house?

22   A.   Nobody from this area came to talk to me.  Nobody.

23        So my God friend told me that, you know, you can go

24        up to the courthouse -- I mean to the City Hall when

25        they have the mayor's meetings on Thursday, you can

```
 1          go up there and you can ask them.  So I said, okay.
 2          So I went to the City Hall one Thursday night and I
 3          let them ask -- answer all of their business and then
 4          I asked the question why is it that a mother in
 5          Overland Park son was killed in California, why is it
 6          that she, the police officers said on TV we want to
 7          wait and notify the family before we give his name
 8          out.  And here I'm in Wyandotte County and nobody,
 9          nobody came to my house to tell me anything.  So
10          instead of them answering the question, they just
11          said, well, we want to put that on tap for you to
12          come to the office and you can talk to us.  Okay.  So
13          a week later I went to the mayor's office.  It was
14          the mayor, the chief of police and about eight other
15          white males sitting at the table in his office and
16          real condescending, they said to me, well, Ms.
17          Newsom, where is it that you live that you felt you
18          should have been notified?  And I said, I live on
19          24th Street.  So the chief of police at that time
20          say, well, is that 24th and Quindaro?  I didn't say I
21          lived on 24th and Quindaro.  He said, well, where do
22          you live?  I said, I live in Westheight.  And it felt
23          like you could just hear air blowing because they
24          were all sitting there as if I was the lower person.
25          Then he started apologizing because they didn't
```

LMKSDC_0026484

1    notify me.  When I got ready to leave, the mayor

2    says, well, can I give you a hug?  I said, hug

3    yourself.  Hug yourself.  So I left.

4  Q.  Did any detective ever come --

5  A.  No.

6  Q.  -- to interview you about your son, about people he

7    might know or someone who might have a motive to harm

8    him?

9  A.  It was on a Friday night, this was the first time I

10    had laid eyes on the detective.  And I thought when

11    he came, he was coming to tell me more information

12    about the case, and instead he says to me, well, what

13    is a pretty lady like yourself doing at home on a

14    Friday night?  And do you date white men?  I said,

15    what?  So I guess the expression on my face must have

16    hit a nerve because he turned beat red and then he

17    said, well, I just wanted to let you know that we're

18    really working diligently on your son's case.

19    Immediately he left.  And I thought to myself how

20    disgusting.  I'm about to lose my mind and you're

21    here with this?  Are you serious?

22  Q.  Were you still grieving?

23  A.  Please.

24  Q.  Still grieving now?

25  A.  Today.

TINA R. ST. JOHN, RPF, CRR

1    Q.    Today?

2    A.    Today.  Today because they will not let me close my

3          son's coffin.

4    Q.    When you say that, what do you mean, Ms. Newsom?

5    A.    I don't know -- I don't understand why if you have to

6          do the right thing, I'm not here for me because my

7          son won't come back, he can't come back, but another

8          mother's son is in jail for a crime he didn't commit.

9          Why?  Why is he there?

10   Q.    Has the imprisonment of Mr. McIntyre made it

11         difficult for you to get closure with respect to your

12         son's death?

13   A.    Yes.  Even though I can't have mine back, he should

14         be able to go home to his mother.  Now, if he were

15         guilty, that would be something else, but we knew.

16         We knew.  They won't.

17   Q.    Ms. Newsom, did you hear at some point from --

18                   (Witness crying.)

19   A.    I'm sorry.

20   Q.    Ms. Newsom, my paralegal who thinks of everybody,

21         thank goodness, because sometimes we forget these

22         things, wanted you to know that the water in front of

23         you is fresh in case you needed to take a drink of

24         water.

25   A.    Thank you.  Thank you.

LMKSDC_0026486

1    Q.    I credit Melissa with that.  Did you hear at some
2          point anything about whether Lamonte McIntyre did or
3          didn't do these two homicides?
4    A.    Yes.
5    Q.    What did you hear and when did you hear it?
6    A.    Don's father told me day one that they had the wrong
7          guy, and he kept telling me to just leave it alone,
8          that it was not the right guy, Lamonte was not him.
9          At that point he didn't tell me who it was, but he
10         just kept saying it's not the right guy.
11   Q.    Did that information cause you to stress?
12   A.    Yes, because I wanted to know if you know who the
13         right one is, why are we not going after that one?
14         But he -- he had a problem too so...
15   Q.    When you say John had a problem, are you referring to
16         drugs?
17   A.    Yes.
18   Q.    And was, in fact, John addicted to drugs?
19   A.    Yes.
20   Q.    And was that part of the reason that your marriage to
21         him ended?
22   A.    Yes.
23   Q.    And did your son, Doniel, at some point become
24         involved with drugs?
25   A.    Don was what I would call a father's son.  His dad

LMKSDC_0026487

1        could do no wrong in his eyes. And I went to John

2        and begged him not to take John into that cave -- Don

3        into that cave with him. I begged him, but Don was

4        going to follow John, and he did. He did.

5        Everything I thought I was doing as a mother, I

6        tried, everything I knew, I tried.

7  Q.  Was -- was Doniel attempting around the time of his

8        death to get help for his addiction problem?

9  A.  Yes. He had gone into a treatment center. Matter of

10       fact, he had set up this -- they had got with the

11       police department and they had set up this program

12       called MAD, Men Against Drugs, and he was trying to

13       get out of it. He had just come out of treatment so

14       I thought we were getting it worked out, but --

15  Q.  He struggled?

16  A.  He struggled.

17  Q.  But he was your son?

18  A.  He was my baby.

19  Q.  Your baby. Just very briefly tell us the kind of

20       person Doniel was.

21  A.  The last time I saw Don, him and his sister had got

22       into a fuss. And she's like, mom, come and talk to

23       your son. So I went to the house and Don was a

24       shmoozer. I think everybody who ever got to know him

25       fell in love with him. He -- silly, I mean a

1    character.  And so that night he said, mom, because
2    he knew I was going to fuss him out and he hated it
3    when I fussed him out.  So he started trying to
4    shmooze me, BS on the other side.  So he said, mom,
5    you are so beautiful.  I said, boy, don't try.  You
6    -- you know why I'm here.  Yeah, but mom, just look
7    at it like this, I'm your only son, that kind of
8    foolishness.  But everybody that I know, they loved
9    'em some Don.
10       One -- one example was he took a Halloween bet
11    and he was -- he bet his boss that he wouldn't dress
12    up as a female.  So he did.  It was $150 bet.  He
13    said, mom, I needed the money.  I said, okay.  So I
14    could hear, I had just come home from work and I
15    could hear everybody outside just roaring.  It
16    sounded like I was at the Chiefs game it was so much
17    laughter going on.  So by that time I had darted in
18    to go to the bathroom.  He said, mom, come out for a
19    minute.  And I said, okay, give me a minute, I'm in
20    the bathroom.  So when I come out, he's sitting on
21    the couch, he had put this pink lipstick on, he had
22    on a wig, he had on a dress and I -- when I saw him,
23    I just laid on the floor, I couldn't even believe how
24    silly he looked.  And he said, well, I got the money,
25    I got the bet.  So he was that kind of guy.

LMKSDC_0026489

1            He broke his ankle one year playing football and
2       he had every girl bringing him something.  Don said
3       he wanted some -- Don said he wanted a pizza.  This
4       is not a hotel, what are you doing?  He said, mom,
5       what do I say when I got it like that?  So he was
6       that kind of guy.
7    Q. Yeah.  And did he have a child before he was shot?
8    A. Yes.
9    Q. And how old is that child now?
10   A. DJ will be 24 in November.
11   Q. So you have a grandson?
12   A. God blessed me with a grandson.
13   Q. And that brings you some comfort?
14   A. Oh boy.  Sometimes when I look at him, a little
15      rough.
16   Q. Other than John Quinn, did anyone else tell you that
17      the man who had been locked up for your son's and
18      Donald Ewing's murder was not the one who did it?
19   A. I think some of everybody was -- I don't know if it
20      was just because, but there was several people who
21      were saying, well, Lamonte didn't do that or the guy
22      -- excuse me -- the guy that they put in jail, he
23      didn't do that.  And so there were like everybody
24      everywhere I went, there was somebody telling me,
25      well, Don didn't -- I mean John -- Lamonte did not do

LMKSDC_0026490

1          that, they got the wrong guy.

2     Q.   Did Niko Quinn ever tell you that?

3     A.   Yes.

4     Q.   And what do you recall about that?

5     A.   It's just that she said she had been forced to tell a

6          lie because they threatened to take her children.

7     Q.   Was Nicki Quinn close to your son Doniel before his

8          murder?

9     A.   Yeah.  They were very close.  He spent a lot of time

10         with them.

11    Q.   Describe their relationship.

12    A.   They were just silly together, they were just silly

13         together.  He would tell me, mom, I'm going over to

14         Nicki's house, you know, or over to the family's

15         house.

16    Q.   They were first cousins?

17    A.   Yes.

18    Q.   And about the same age?

19    A.   Yes.

20    Q.   Did they spend time together?

21    A.   Yes.

22    Q.   Did any other members of the Quinn family or any of

23         Nicki's siblings say anything to you about who did it

24         or that the person who was locked up didn't do it?

25    A.   I can't remember all of -- who all didn't.  Some of

LMKSDC_0026491

```
 1          the Hawthorne family said he didn't do it.
 2    Q.    When you say the Hawthorne family, do you mean the
 3          family of Gloria Labat?
 4    A.    Yes.
 5    Q.    Was Hawthorne her maiden name?
 6    A.    Yes.
 7    Q.    And the name of her parents; is that right?
 8    A.    Yes.
 9    Q.    Did -- are you acquainted with a person named
10          Elizabeth Quinn?
11    A.    Liz, yes.
12    Q.    Yeah.
13    A.    Yes.
14    Q.    Okay.  What about her?
15    A.    I -- I just don't remember that.  I don't remember
16          Liz.  I just don't remember.
17    Q.    Okay.  Do you remember signing an affidavit?
18    A.    Yes.
19    Q.    Okay.  And there's a sentence in the affidavit saying
20          John's niece, Elizabeth Quinn, who I also call Liz,
21          has also told me of the belief in Lamonte's
22          innocence.  Do you recall that?
23    A.    I think that was during the time -- I think that was
24          during the time of the funeral, somewhere in there.
25          It -- I think.  I think.  I --
```

TINA R. ST. JOHN, RPF, CRR

1    Q.   Would it be fair to say that many people have made
2         this statement to you?
3    A.   Oh my God, yes.
4    Q.   Okay.  And those persons would be members of the
5         Quinn and Hawthorne families?
6    A.   And some of them weren't friends, were -- I mean some
7         of them weren't family, they were friends.
8    Q.   Uh-huh.  Did you know individuals with the last name
9         Edgar?
10   A.   Yes.
11   Q.   Okay.  And who are they please?
12   A.   Well, Tony Edgar, Charlie Edgar, those were friends
13        of John's and we used to hang out on Friday night
14        with them.
15   Q.   Uh-huh.
16   A.   Matter of fact, Monster's mother and father, we used
17        to hang out with them on Friday night.
18   Q.   And would that be Neil Edgar, Sr.?
19   A.   Yes.
20   Q.   And Christy Edgar?
21   A.   Yes.
22   Q.   Did Neil Edgar, Sr. have a nickname?
23   A.   He did, but I can't -- I'm drawing a blank.
24   Q.   This is a difficult day for you, isn't it?
25             (No response.)

TINA R. ST. JOHN, RPF, CRR

1   Q.   Ms. Newsom, if you could, please tell the court what

2        you want the court to know about this situation.

3   A.   First of all, thank you for coming from your area to

4        this area.  I appreciate it.

5             Second of all, Lamonte, I'm sorry.  I'm sorry

6        it's taken us so long to get here.  I'm sorry.  I

7        just wish that we could end this.  I want to get to

8        the point where I can close my son's coffin, please.

9        Every day that we go through this, every day, this is

10       like a wound that won't heal and I'm tired.  I just

11       wanna close the coffin and I just hope that we just

12       do the right thing and let him out.  Let him find a

13       life.  Let him be at peace.  Let us be at peace.  I

14       can't believe that I live in a county where you treat

15       a person or people the way that we've been treated.

16       I can't believe this.  This is horrible.  This is

17       horrible that every day for the last twenty something

18       years, every time we thought we had it done, the door

19       comes open again.

20            When my father and my husband at that time had

21       to go and identify my -- my son, I have never seen my

22       father cry, and he cried.  My mother cried harder

23       than I did.  So we're tired and I can't understand

24       why.  When you have it in front of you to do that you

25       don't do the right thing, I don't understand it.  I

TINA R. ST. JOHN, RPF, CRR

```
 1           don't understand it.
 2    Q.     Ms. Newsom, what do you feel today is the right
 3           thing?
 4    A.     I hope that the right decision is made, that you will
 5           let that boy go home to his mother.  I hope that's
 6           what you do because it is the right thing.  I don't
 7           ever wanna sit here again.  I want to close my son's
 8           coffin.  That's what I want to do, and I want to be
 9           at peace knowing that we've done that.  So when I
10           leave here, I want to be at peace.  That's all I
11           want.  That's it, just do the right thing.
12    Q.     Ms. Newsom, have you visited your son's grave?
13    A.     No, I have not.
14    Q.     And why have you not?
15    A.     Because it's not done yet.  It's not done yet.  When
16           Lamonte walks out, then I can close the coffin and I
17           can go and say finally it's done.  My son's birthday
18           is this week.  This is torture.
19    Q.     Is your belief that Lamonte McIntyre is innocent
20           based in part on what John has said to you?
21    A.     Yes, because from the beginning he said it.
22    Q.     Do you know of any reason why John would lie to
23           you --
24    A.     No.
25    Q.     -- about this?
```

LMKSDC_0026495

```
 1   A.   Right after the -- right before the funeral he told
 2        his mother he did not wanna go to the funeral.  Told
 3        him, no, that's not gonna happen.  So I asked her
 4        where was he at?  She told me where he was.  I went
 5        and found him.  You were there helping to make him,
 6        you'll be here to bury him.  And he kept saying then
 7        they got the wrong guy.  Then he said it.
 8   Q.   Do you feel the fact they, quote, "got the wrong
 9        guy", has -- has hurt John?
10   A.   I think I would just say that John probably sees Don
11        every day.  And I'm sure that -- this was his only
12        son in the world -- that he has suffered.  I'm sure
13        he has.
14   Q.   Do you recall a conversation that you had with your
15        ex-husband John where you were accompanied by James
16        McIntyre (sic) and spoke to John about what had
17        happened and who was involved and that conversation
18        was tape recorded, do you recall that?
19   A.   Yes.
20   Q.   Do you recall what John said about who did it or who
21        was involved I should say?
22   A.   He said that -- okay, I'm drawing a blank on who the
23        one who Cecil Bailey or Monster he said.  When we set
24        that up, I told the -- McCloskey that I would go
25        there, but I didn't want to go by myself.
```

1   Q.   Is the name Cecil Brooks familiar to you?

2   A.   Cecil Brooks, that's the name that I'm drawing a

3        blank on, yes.

4             (Counsel conferred with Ms. Tatum.)

5        MS. PILATE:  Your Honor, in the interest of

6        sparing Ms. Newsom further stress and pain, Ms. Tatum

7        is willing to stipulate to foundation for the

8        recorded audio conversation, which is Exhibit 161.

9        And then as an aid, there is a transcript that goes

10       with it.

11            THE WITNESS:  No, play the tape.

12            MS. PILATE:  You want to play the tape?

13            THE WITNESS:  Play the tape.  It can't be any

14       harder than sitting in this chair.  Play the tape.

15  Q.   (By Ms. Pilate)  Ms. Newsom, the tape will take --

16            THE COURT:  Counsel, I noticed you looked at

17       your watch.

18            MS. PILATE:  Right.

19            THE COURT:  I am willing to go after so we can

20       get this over with so that's not a problem if that's

21       not a problem for anyone else.

22       While we're getting this set up, the court

23       reporter says she needs to make a phone call about

24       working late.

25            MS. PILATE:  Okay.

TINA R. ST. JOHN, RPF, CRR

1          THE COURT:  So why don't we let you get this all
2     set up and ready to go and then --
3          MS. PILATE:  Okay.
4          THE COURT:  -- the court reporter in the
5     meantime will go make the phone call.
6          MS. PILATE:  Certainly.  Thank you.
7          THE COURT:  So if anybody else needs to do that,
8     feel free to do that now.
9              (A recess was taken, after which the
10              following proceedings were had, the
11              petitioner being present.)
12          THE COURT:  All right.  We're back on the record
13     in 16 CV 508.  You may proceed.
14              (State's Exhibit 161 was played for the
15              court.)
16  Q.  (By Ms. Pilate)  Ms. Newsom, were you able to hear
17     the conversation?
18  A.  Yeah.
19  Q.  Do you have a recollection of it?
20  A.  (Nodded head up and down.)
21  Q.  Sitting in here today, can you tell us what you
22     learned or came to understand during that
23     conversation?
24  A.  Well, like I said, he said from the beginning it
25     wasn't Lamonte so that's all I know.

LMKSDC_0026498

1    Q.    Did he seem to be saying let God handle it?

2    A.    Yeah.  John had a way of always wanting to make

3          things sound philosophical, and that was his way of

4          doing it like he's saying let it go.  And I'm like,

5          no.

6    Q.    You're not willing to do that?

7    A.    I'm not.  It's God's will.  No, it's not.  No, it's

8          not.

9    Q.    Do you believe that conversation is the first time

10         you heard the name Cecil Brooks?

11   A.    I think that was the first time I heard it was during

12         that.  I mean there were instances where I did hear

13         it, but I don't know that I made a connection to it

14         and who he was and I still don't know, I couldn't --

15         I don't know anything about him except for just the

16         rumor mill so I don't know him from anything.

17   Q.    You're not familiar with the drug world; is that

18         right?

19   A.    No.

20   Q.    So the name Cecil Brooks wouldn't be one that you

21         would know off the top?

22   A.    No.

23   Q.    Would you agree that parts of the conversation were

24         maybe a little bit difficult to hear or understand

25         because John -- of the way John talks?

LMKSDC_0026499

1    A.   Like I said, he -- he tries to sound -- that day, you
2         know, looking at -- thinking about and looking at how
3         he was reacting, he was irritated because we were
4         still asking him.
5    Q.   He didn't want you to ask?
6    A.   He did not want me to keep asking him.  He wanted me
7         to leave him alone.
8    Q.   Do you know why that is?
9    A.   Well, I have my own surmise of what it might be and
10        part of that would probably be fear, reprisal from
11        the folks who had the drugs, guilt because I had gone
12        to him on several occasions and asked him not to drag
13        Don into that lifestyle.
14   Q.   So was that a source of pain and conflict between the
15        two of you?
16   A.   Yes.  Yes.
17   Q.   Do you recall hearing in the conversation John saying
18        I heard that one of them, the Brooks brothers, Cecil,
19        Cecil Brooks, but this is just between me and you.
20        Do you recall hearing him say that?
21   A.   Yes.
22   Q.   Do you recall hearing him say, I said Cecil Brooks,
23        they say he put a contract on him.  He didn't kill
24        him, but it was a contract about something that
25        happened?

LMKSDC_0026500

1   A.   Yes.

2   Q.   Did you hear a reference to someone named Juice?

3   A.   Juice is Andrew.

4   Q.   And who is Andrew?

5   A.   He was John's cousin Andrew.

6   Q.   Was John close to Andrew?

7   A.   Oh yeah.

8   Q.   Did John seem to be saying to you that he had seen

9        the car and Juice had --

10  A.   Yes.

11  Q.   -- told him whose car it was based on the

12       description?

13  A.   Yes.

14  Q.   Do you know who Buckwheat is?

15  A.   No.

16  Q.   Okay.

17  A.   All these names...

18  Q.   Okay.  Do you recall John saying the guy they gave

19       him a charge for it, he didn't do it.  I'm telling

20       you, I know that and I put my life on it, I know that

21       for a fact?

22  A.   Yes.

23  Q.   Did that say to you that John's very strong belief

24       was that the person in prison for the homicide of his

25       son did not commit that homicide?

LMKSDC_0026501

1    A.    Yeah, definitely.

2    Q.    I have just a couple more questions.  Now, you spoke

3          earlier about a detective coming to visit you on a

4          Friday night.

5    A.    Yes.

6    Q.    What detective was that?

7    A.    Golubski.

8    Q.    And what -- what did you believe based on his

9          appearance and what he said to you that he was

10         looking for?  Why do you think he contacted you?

11   A.    You mean why did he show up that time of night?

12   Q.    Yes, at your house.

13   A.    It wasn't a guess.  Once he started talking, I knew

14         what he showed up for.

15   Q.    And what was that?

16   A.    I guess he thought I was available 'cause the

17         question was do you date white men.

18   Q.    And was this at some point after the funeral?

19   A.    Yes.

20   Q.    Okay.  And, in fact, did you recently review an

21         affidavit you had made earlier?

22   A.    Yes.

23   Q.    Okay.  And do you remember making a small correction

24         on that affidavit and we -- when we reviewed it and

25         you wrote in the word or initialled the word

1        "funeral" to identify the time --

2    A.   Yes.

3    Q.   -- when this detective came to see you?

4    A.   Yes.

5    Q.   It was after the funeral and he came to my door; is

6         that correct?

7    A.   Yes.

8    Q.   And you were still grieving then; is that correct?

9    A.   Yes.

10        MS. PILATE:  Your Honor, we have marked

11   Ms. Newsom's corrected affidavit as Exhibit 166, and

12   I'd move for the admission of that.

13        MS. TATUM:  No objection.

14        THE COURT:  It's admitted, 166 is admitted.

15        MS. PILATE:  And I would also move for the

16   admission of 161, which is the audiotape we just

17   listened to.

18        MS. TATUM:  I thought we already did that, but

19   no objection.

20        MS. PILATE:  Okay.

21        THE COURT:  It's admitted.

22        MS. PILATE:  And also -- I'm sorry.

23        THE COURT:  We hadn't done it so I just said

24   it's admitted.

25        MS. PILATE:  Okay.  I apologize, Your Honor.

TINA R. ST. JOHN, RPF, CRR

1          And Exhibit 136, which is the transcript that we

2          submit as an aid to understanding with the

3          acknowledgment that, of course, the tape itself is

4          the evidence.

5               THE COURT:  Objection?

6               MS. TATUM:  I don't have an objection to the

7          transcript.

8               THE COURT:  All right.  It's admitted, 136.

9               MS. PILATE:  Okay.  I will make my own little

10         comment or correction here on the record.  The

11         individual who transcribed this for me misspelled

12         Ms. Newsom's last name.  There's no E on the end of

13         Newsom, correct?

14              THE WITNESS:  Right.

15              MS. PILATE:  And Saundra is spelled with a U.

16         It's not Sandra, it's Saundra, correct?

17              THE WITNESS:  Yes.

18              MS. PILATE:  Your Honor, I just wanted the

19         record to reflect that.

20    Q.    (By Ms. Pilate)  Ms. Newsom, what are you hoping for

21         at this point in time?

22    A.    I don't know that I can even go back to gather myself

23         from these last years, but I hope that this is the

24         last time that we talk about this.  I hope that the

25         opportunity for him to get out of jail is present

1          now.  I hope that this journey is finished, that the

2          court will give her back her son.

3    Q.   Is it hard for you to rest knowing that you believe

4          the wrong person is in prison?

5    A.   It's been torture for the last years.  As I said

6          earlier, the only way that I can close my son's

7          coffin is to know that Lamonte's out of jail and that

8          we can all go back to or go and try to have a life.

9          But for me, I think about the disservice that this

10         system did, that if I'm only one person that they did

11         that to maybe, but I'm almost sure that the week that

12         my son died there were several others because the

13         funeral home told me that it was gonna take a while

14         before they could get to him because so many other

15         young guys had been killed that week.  And if this

16         detective and this court system handled any of the

17         other cases like mine, we're in trouble.  So I hope

18         that this court will see fit to give this boy back

19         some of his life.  I'm hoping because I don't know

20         that I have anymore energy.  I don't know that I have

21         anymore because I'm telling you, I'm so tired, but I

22         know that something good will come from this.  I

23         can't have done this much crying for these many years

24         for it not to.  So that is my hope that we will see

25         the end of this.

LMKSDC_0026505

1          And as far as those who had the opportunity to
2      make this right and didn't, I hope they can sleep.  I
3      hope they can sleep because I don't even know why
4      we're here when we had the opportunity to settle it
5      with a pencil just to say okay.  So I don't know
6      what's left to do.  I don't know what's left to do.
7      But I want to tell the judge I really appreciate your
8      coming and hearing because we didn't get justice
9      before, but I pray that we get it now.  I pray that
10     and I ask you to just look at all of the reasons why
11     and just do the right thing.  That's it.  That's it.
12     That's all I'm asking for.  You can't give me mine
13     back, you can't give me back the years, you can't
14     give me back the peace, but you can give him back to
15     his mother.  That's it.  That's all I'm asking.
16     That's it.
17          MS. PILATE:  Thank you, Ms. Newsom.  Thank you.
18          THE WITNESS:  And I want to thank the entire
19     team for taking care and staying with us through the
20     journey.  Some have had sleepless nights more than
21     me.  So I appreciate it, I really appreciate you,
22     that you're gonna take care and give this case
23     justice.  And that's all we all want, nothing else,
24     just do what's right.  Thank you.
25          MS. PILATE:  Thank you.  Thank you, Ms. Newsom.

LMKSDC_0026506

1          THE COURT:  You have cross?

2          MS. TATUM:  I do not, Your Honor.

3          THE COURT:  All right.  Thank you, Ms. Newsom.

4     You're finished.

5          THE WITNESS:  Thank you.

6          THE COURT:  You may step down.

7               (Witness excused.)

8          THE COURT:  All right.  Counsel, we will see you

9     -- was there something?

10          MS. RUNNELS:  No, there wasn't, Your Honor.

11          THE COURT:  All right.  We'll see you tomorrow

12     morning at 9:00 o'clock.  We're adjourned until then.

13     And as soon as you can be prepared to put your stuff

14     away and take what you need to take, the court

15     reporter is the one who will need to lock the

16     courtroom so I'm sure she would appreciate it if that

17     can happen sooner rather than later.  Thank you.

18               (Thereupon the proceedings were adjourned

19                to the following day, October 13, 2017.)

20

21

22

23

24

25


                    TINA R. ST. JOHN, RPF, CRR

1              C E R T I F I C A T E

2    STATE OF KANSAS
                          ss:
3    COUNTY OF WYANDOTTE

4         I, Tina R. St. John, a Certified Shorthand

5    Reporter, and the regularly appointed, qualified and

6    acting official reporter of Division 16 of the 29th

7    Judicial District of the State of Kansas, do hereby

8    certify that as such official reporter, I was present at

9    and reported in stenotype shorthand the above and

10   foregoing proceedings **LAMONTE MCINTYRE vs. STATE OF**

11   **KANSAS, Case No. 16 CV 508**, heard on October 12 and 13,

12   2017, before the Honorable Edward Bouker, Senior Judge.

13        I further certify that a transcript of my shorthand

14   notes was prepared; and that the complete transcript,

15   consisting of 336 pages in two volumes, is a true copy of

16   all of the proceedings.

17        **SIGNED AND ELECTRONICALLY FILED WITH THE DISTRICT**

18   **COURT OF WYANDOTTE COUNTY, KANSAS this 20th day of March,**

19   **2018.**

20

21                            /s/  Tina St. John
                              Tina R. St. John, RMR, CRR
22                            Supreme Court #1097

23

24

25

TINA R. ST. JOHN, RPF, CRR

LMKSDC_0026508