# **<u>EXHIBIT 54</u>**

CLYDE BLOOD VOLUME 1                                          February 03, 2021
MCINTYRE vs UNITED GOVERNMENT OF WYANDOTTE                              1—4

**Page 1**

1          IN THE UNITED STATES DISTRICT COURT
              FOR THE DISTRICT OF KANSAS
2
   LAMONTE MCINTYRE, et al.,*
3                           *
        Plaintiffs,         *
4                           * Case No. 2:18-cv-02545-KHV-KGG
   v.                       *
5                           *
   UNITED GOVERNMENT OF     *
6  WYANDOTTE COUNTY AND     *
   KANSAS CITY, KS, et al., *
7                           *
        Defendants.         *
8
   ************************************************************
9              ORAL DEPOSITION OF
                   CLYDE BLOOD
10             FEBRUARY 3, 2021
                    VOLUME 1
11 ************************************************************
12
13
14
15
16
17      ANSWERS AND DEPOSITION OF CLYDE BLOOD, produced as a
18 witness at the instance of the Plaintiffs, taken in the
19 above-styled and -numbered cause on the 3rd day of
20 February, 2021, A.D., beginning at 9:07 a.m., before D.
21 Beth Randolph, a Certified Shorthand Reporter in and for
22 the State of Texas, at the Holiday Inn Express, located at
23 325 Village Park Drive, Alvarado, Texas, in accordance
24 with the Federal Rules of Civil Procedure and the
25 agreement hereinafter set forth.

**Page 2**

1        A P P E A R A N C E S
2  FOR THE PLAINTIFFS:
3  MS. EMMA FREUDENBERGER (ZOOM VIDEO CONFERENCE)
   MS. YASMIN DAGNE
4  Neufeld Scheck & Brustin, LLP
   99 Hudson Street, Eighth Floor
5  New York, New York 10013
   (212) 965-9081
6  (212) 965-9084 (Fax)
   emma@nsbcivilrights.com
7
   MS. CHERYL A. PILATE (ZOOM VIDEO CONFERENCE)
8  Morgan Pilate, LLC
   926 Cherry Street
9  Kansas City, Missouri  64106
   (816) 471-6694
10 (816) 472-3516 (Fax)
   cpilate@morganpilate.com
11
   FOR THE DEFENDANT, CLYDE BLOOD:
12
   MS. ELIZABETH EVERS GUERRA
13 Sanders Warren Russell & Scheer, LLP
   11225 Colege Boulevard, Suite 450
14 Overland Park, Kansas  66210
   (913) 234-6100
15 (913) 234-6199 (Fax)
   e.evers@swrsllp.com
16
   FOR THE DEFENDANT, UNIFIED GOVERNMENT OF WYANDOTTE COUNTY
17 AND KANSAS CITY KS:
18 MR. DAVID R. COOPER (ZOOM VIDEO CONFERENCE)
   Fisher Patterson Sayler & Smith
19 3550 SW 5th Street
   Topeka, Kansas  66606
20 (785) 232-7731
   (785) 232-6604 (Fax)
21 dcooper@fpsslaw.com
22
23
24
25

**Page 3**

1  FOR THE DEFENDANT, ROGER GOLUBSKI:
2  MR. MORGAN L. ROACH (ZOOM VIDEO CONFERENCE)
   McCauley & Roach, LLC
3  527 West 39th Street, Suite 200
   Kansas City, Missouri  64111
4  (816) 523-1700
   (816) 523-1708 (Fax)
5  morgan@mccauleyroach.com
6  ALSO PRESENT: (ZOOM VIDEO CONFERENCE)
   MR. JAMES BAIN
7  MS. ARIEL MANNING
   MS. ALANA MCMULLIN
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

**Page 4**

1            I N D E X
2  Appearances..............................Page    2
3  Exhibit Index............................Page    5
4  Examination by Ms. Freudenberger.........Page    7
5  Signature and Corrections................Page  291
6  Reporter's Certificate...................Page  292
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25



CLYDE BLOOD VOLUME 1                                    February 03, 2021
MCINTYRE vs UNITED GOVERNMENT OF WYANDOTTE              13–16

Page 13

1   A.  I'm trying to remember that one.  It was -- I
2 think it was a sexual assault, and as I recollect, it was
3 an elderly lady was a victim.  We put a suspect on lineup.
4 She never made a positive identification, but when she saw
5 the guy, she just lost it.  She freaked out, she passed
6 out, she started screaming and crying.  And based on that,
7 you know, the prosecutor went ahead and filed the case.
8         The -- again, he fought the thing and
9 the city attorneys handled it.  At some point I think
10 after the lineup, the lady said that was the guy but I
11 don't remember and it got -- I know the court dismissed
12 the lawsuit.  I don't remember names, dates.  This is the
13 only time I ever -- the other time I remember being
14 involved in any kind of lawsuit.
15   Q.  Understood.  And was the individual who the lady
16 identified convicted in that case?
17   A.  Yes, yes.
18   Q.  Okay.  Was that conviction subsequently vacated?
19   A.  No.
20   Q.  Do you know if that conviction was overturned?
21   A.  No, I don't think so.  Not that I know of.
22   Q.  All right.  Were you the officer who handled the
23 lineup in that case?
24   A.  Well, myself and my partner.  We both worked it
25 together, but the lineup was a physical lineup with other

Page 14

1 individuals, male subjects.
2   Q.  All right.
3   A.  It wasn't --
4   Q.  And I gather after the lineup -- and you were
5 present for the lineup?
6   A.  Yes, as was my partner at the time.
7   Q.  Okay.  And was that Officer Maskil?
8   A.  That would have been Tim Maskil, yes.
9   Q.  All right.  You mentioned that the witness, the
10 victim in the case, the elderly woman, did not positively
11 ID the suspect at the lineup.  Correct?
12   A.  No.  She just -- she just lost it.  She started
13 crying and just -- she just lost it.  That's all.  She was
14 terrified, I guess.  I don't know.
15   Q.  Was the prosecutor present for the lineup?
16   A.  No.
17   Q.  At the time of that investigation, what was the
18 policy in the Kansas City, Kansas, Police Department in
19 terms of when district attorneys attended lineups and when
20 they didn't?  Was that -- did the detective running the
21 case have the discretion to bring the DA in or not?
22   A.  It wasn't a common occurrence for a district
23 attorney to attend the lineup.  They just -- they were
24 always tied up on other cases and we presented our
25 evidence and if they decided to go with it or not, they

Page 15

1 were the last word in any prosecution.
2   Q.  Okay.  And I take it in the vast majority of
3 cases, the district attorney did not attend the lineups.
4 Correct?
5   A.  Not that I remember, no.
6   Q.  Okay.  Do you remember any case you ever handled
7 where a DA was present for a lineup?
8   A.  Not really, no.
9   Q.  Okay.  So it's sounds like the -- and I'm going
10 to ask you a bunch of questions today, sir, about policies
11 and procedures in the Kansas City, Kansas, Police
12 Department.  I'm not from the area and so bear with me.
13   A.  Sure.
14   Q.  Sounds like --
15   A.  If you'll bear with me.  Sorry.
16   Q.  What you're saying is that the policy and
17 procedure in the Kansas City, Kansas, Police Department
18 was the detectives ran lineups without the district
19 attorney present.  Correct?
20   A.  Sure.  If the DA would have been available, they
21 would have been there.  We would have welcomed them.  I
22 just don't recollect having any district attorneys attend
23 a lineup.
24   Q.  In other words, you as a detective wouldn't have
25 stopped a district attorney from attending the lineup, but

Page 16

1 the regular practice was that district attorneys did not
2 attend lineups?
3   A.  You said I would stop him from -- I didn't hear
4 what you said.
5   Q.  No, I was -- let me repeat the question.  It
6 sounds like what you're saying is had a DA shown up and to
7 attend a lineup, you certainly would not have stopped them
8 from doing so?
9   A.  No.
10   Q.  But the regular policy and practice, procedure
11 was that district attorneys did not attend lineups.
12 Correct?
13   A.  The district attorney was my lawyer.  If he would
14 have been there, I would have welcomed him with open arms.
15 But they didn't -- he just wasn't always there and he
16 wasn't always available.
17   Q.  In fact, you have no recollection of that ever
18 happening?
19   A.  I'm sorry?
20   Q.  You have no recollection of that ever happening?
21   A.  No.
22   Q.  Was -- in the case you're describing, was there a
23 photo array, a photo lineup, conducted with the victim
24 prior to the lineup?
25   A.  No.  We ran a physical lineup because the man was



Page 17

1  in custody.  We took him out of the jail and put him in
2  with other subjects of similar appearance and did a
3  physical lineup.
4      Q.   Okay.  And I take it that was the policy at the
5  time.  If you had a suspect in custody, you would conduct
6  a physical lineup?
7      A.   It was a procedure we followed at that time, yes.
8      Q.   Okay.  Did that procedure change at any point in
9  time during your career with the Kansas City, Kansas,
10 Police Department?
11     A.   Do what?
12     Q.   Did that procedure change at any point in time
13 during your tenure?
14     A.   Not to my knowledge.  They can still be doing it
15 for all I know.
16     Q.   All right.  And I take it there's a reason for
17 that.  In other words, it's common sense as a detective
18 that a -- an identification at a live lineup is persuasive
19 evidence at trial.  Correct?
20          MS. GUERRA:  Object to form.  You can
21 answer.
22          THE WITNESS:  What?
23          MS. GUERRA:  You can answer.
24     A.   I would assume it would be.  I mean, that was the
25 purpose of the lineup in the first place.  If they

Page 18

1  couldn't identify them, they couldn't.  That was it.  If
2  they did, we forwarded the information to the prosecutor.
3      Q.   (BY MS. FREUDENBERGER) And were there
4  situations -- my understanding is in most departments --
5  well, I'll withdraw the question and back up.  You
6  conducted a lineup in that case because the suspect was
7  already in custody.  Right?
8      A.   Yes.  Yes, ma'am.
9      Q.   Okay.  And then there are other situations where
10 you don't have a suspect in custody, an arrest hasn't been
11 made, and witnesses are shown photographic lineups.
12 Correct?
13     A.   Yes, ma'am.
14     Q.   All right.  Was the policy and practice in the
15 Kansas City, Kansas, Police Department that even after
16 getting a positive identification in a photo array, a
17 photo lineup, you would then proceed to a physical lineup
18 to have the suspect identify the -- I apologize.  The
19 witness -- witness or victim identify the individual in
20 person?
21     A.   Not necessarily, no.  I don't -- if they
22 identified a photo lineup, we would proceed with our
23 investigation and interview the subject that was
24 identified.  But I never did -- I don't recollect ever
25 running a physical lineup in conjunction to a photo

Page 19

1  lineup.
2      Q.   Okay.  And when approximately did that case
3  occur?
4      A.   I don't know.  I don't remember.  I mean, ma'am,
5  that's been a long time ago.
6      Q.   Well, was that case toward the beginning of
7  your -- can you say whether that case was toward the
8  beginning of your career or toward the end of your career?
9      A.   Not to my recollection, no, I can't.
10     Q.   Could have been your first year as a detective,
11 could have been your last?
12     A.   It was somewhere in between.  It wasn't my last
13 day.  It wasn't my first.
14     Q.   All right.  Before we move on, sir, there are
15 particular -- very particular rules that govern the way
16 that detectives conduct identification proceedings in
17 serious cases.  Correct?
18          MS. GUERRA:  Object to form.  You can
19 answer.
20          THE WITNESS:  I'm sorry?
21          MS. GUERRA:  You can answer.
22          THE WITNESS:  Oh, okay.
23     A.   I don't remember any written SOPs as to how
24 lineups were run.  I just remember that we tried to make
25 the lineup fair.  Like I wouldn't put a white guy in

Page 20

1  a bunch of -- with several black guys or vice versa.
2          We try to build the lineup like a
3  photographic or a physical lineup, either one, with people
4  of similar appearance where when the victim would have to
5  say, yeah, that's him or I can't.  And I've had many
6  lineups where the victim could not identify anybody even
7  though the suspect was in the lineup because they --
8  similar appearances.
9          I mean, you just -- we never tried to
10 set anybody up to burn them.  We tried to be as fair and
11 honest and aboveboard as possible and I know -- well, go
12 ahead.  I'm sorry.
13     Q.   (BY MS. FREUDENBERGER) So that was one rule.
14 When assembling a lineup be it a photographic lineup or an
15 in person lineup, one rule is that you try to select
16 fillers who had a similar appearance to the suspect.
17 Correct?
18     A.   Yes, ma'am.  For example --
19     Q.   Okay.
20     A.   -- if you had if a guy that had a beard, I
21 wouldn't put him in a lineup with a bunch of clean shaven
22 people.  We would try to --
23     Q.   Of course, because the --
24     A.   Right.
25     Q.   Common sense dictates and basic policing dictates



**Page 21**

1 that a witness is more likely -- well, I'll withdraw it
2 and ask a similar question that the reason you wouldn't do
3 that is because that would be suggestive. Right?
4    A.   Yes.
5    Q.   So making an identification procedure unreliable.
6 Correct?
7    A.   That's right.
8    Q.   Okay. And that's what you were trained.
9 Correct?
10    A.   Yes.
11    Q.   And I gather another rule regarding lineups,
12 photographic or in person, was that you would never
13 include more than one suspect in a lineup. Correct?
14    A.   No, we tried to avoid that if at all possible.
15    Q.   Okay. That's something else that --
16    A.   I remember one --
17    Q.   -- according to your training. Correct?
18    A.   Well, I don't remember any lineups where we had
19 multiple suspects in the same lineup. I don't remember
20 doing that. But I would try to avoid that if I could.
21    Q.   And the reason you wouldn't do that is because
22 that would make the lineup inherently unreliable.
23 Correct?
24    A.   Yes.
25    Q.   Okay. And I take it you also wouldn't put

**Page 22**

1 multiple family members in one lineup. Correct?
2    A.   No. I wouldn't care for that idea at all.
3    Q.   Okay.
4    A.   My brother and I look a lot alike. If you put us
5 both in lineup, I might get picked for something he did
6 and I don't think I'd like that.
7    Q.   All right. That was another rule in the
8 department at the time. Correct?
9         MR. COOPER: Object to form.
10    Q.   (BY MS. FREUDENBERGER) Oh, and counsel's correct.
11 I said at the time and you haven't identified the time
12 period. That was another rule in place during your tenure
13 at the Kansas City, Kansas, Police Department. Correct?
14    A.   I don't recollect it as a rule but it was a
15 personal thing that I would never have done. I wouldn't
16 agree with it.
17    Q.   And one reason that you wouldn't agree is because
18 it is common sense that if you put multiple suspects -- or
19 I apologize -- multiple family members in one lineup, that
20 lineup is going to be unreliable. Correct?
21         MS. GUERRA: Object to form.
22         THE WITNESS: Huh?
23         MS. GUERRA: You can answer.
24    A.   What do you do if you have twins, you know,
25 identical twins. You could not make a fair lineup of

**Page 23**

1 that. And like I said, my bother and I are an example.
2 We looked a lot alike even though he was older. Well,
3 he's dead now, but even though he was older than I was, we
4 had similar characteristics.
5         MS. GUERRA: Sergeant Blood, just answer
6 the question she asks. Okay?
7    Q.   (BY MS. FREUDENBERGER) In other words, individual
8 family members often look similar. Correct?
9    A.   Yes.
10    Q.   As a police officer, it's just common sense that
11 you wouldn't put multiple family members in a photo lineup
12 if you are trying to create a fair array. Correct?
13         MS. GUERRA: Some objection.
14    A.   Common sense and fairness.
15    Q.   (BY MS. FREUDENBERGER) Okay. That's just basic.
16 Correct?
17    A.   Uh-huh.
18    Q.   Oh, one other quick point. The court reporter
19 can't take down uh-huhs or huh-uhs or shrugs.
20    A.   Sorry.
21    Q.   So I'll ask you to answer verbally.
22    A.   Okay. Will do that.
23    Q.   All right. So the answer was yes?
24    A.   Yes.
25    Q.   Okay.

**Page 24**

1    A.   I understand.
2    Q.   All right. Another rule I gather when assembling
3 photo lineups is that detectives would use the
4 photograph -- the closest available photograph in time to
5 the crime. Correct?
6         MR. COOPER: Object to form.
7    A.   The close -- I'm sorry?
8    Q.   (BY MS. FREUDENBERGER) Sure. Policy and
9 procedure was to use the closest available photograph of a
10 suspect in time to the crime. Correct?
11    A.   I'm not sure. We had zillions of photographs
12 available in the crime lab, mug shots, and that's where we
13 would get a lot of our photographs to build a lineup and
14 the availability -- we didn't have names, numbers. It was
15 just a face. That's all.
16         And, I mean, another example of lineups,
17 we used a lot of high school yearbooks. They got a bunch
18 of photographs in them and we would just tape over the
19 names and let people look through the yearbook. If they
20 identified someone, then we would find out the name and
21 work from there. But, you know, it just -- what was
22 available and fair.
23    Q.   That makes sense. And yearbooks obviously have
24 dates on them. Right?
25    A.   Really have what?



Page 25

1    Q.   Yearbooks are dated.  Correct?
2    A.   Sure.
3    Q.   So if you had a crime that occurred in 1997 and
4    you were going to do a -- and you were going to show a
5    witness a yearbook to see if they could pick somebody out,
6    you would choose the yearbook from 1997 if it was
7    available.  If not, 1996 before you would use the yearbook
8    from 1992.  Correct?
9    A.   That's right.  We'd use --
10        MS. GUERRA:  Object to form and also
11   improper hypothetical.  Let me --
12        THE WITNESS:  Yes.  I'm sorry.
13        MS. GUERRA:  Why don't we make sure to
14   pause after Emma's question --
15        THE WITNESS:  I'm sorry.
16        MS. GUERRA:  -- so if any of us have
17   objections.  No worries.  Then I can assert the objection
18   but you can still give an answer.  Okay.  You can give
19   your answer.
20        THE WITNESS:  Oh, I can give the answer?
21        MS. GUERRA:  Yes, yes.
22   A.   We kept our yearbooks up-to-date.  Every year
23   when a new yearbook was issued at the local schools, we
24   would run around and collect the yearbooks.  They would
25   voluntarily give them to us and we kept them up-to-date.

Page 26

1        So if I had a '97 as you say lineup to
2    run, I'd use the most current yearbook available.  And
3    sometimes the yearbooks weren't out yet for that year.
4    You know how the school year runs.  And usually the
5    yearbook is, I think, the last thing that comes out
6    towards the end of the school year.  So we would use
7    whatever was current or available.
8    Q.   (BY MS. FREUDENBERGER) And the reason you would
9    use whatever was current is because you would always want
10   to show a witness a photograph of the suspect that looked
11   the most like what the suspect looked like at the time of
12   the crime.  Right?
13   A.   Yes.
14   Q.   And the same would be true for mug shots.
15   Correct?
16   A.   Yes.
17   Q.   That's just common sense basic policing.
18   Correct?
19   A.   Yes.
20   Q.   Okay.  The yearbook -- let's call it the yearbook
21   lineups.  It sounds like that was a regular custom and
22   practice in the Kansas City, Kansas, Police Department to
23   conduct yearbook lineups?
24   A.   I used it primarily when I was assigned to the
25   juvenile division.  And afterwards very rarely did I have

Page 27

1    occasion to use the yearbook for anything.  It was just
2    when I was in juvenile, I worked with juveniles.
3    Q.   Okay.  All right, sir.  You're currently retired?
4    A.   Yes, ma'am.
5    Q.   What year did you retire?
6    A.   I retired from Kansas City, Kansas, in 1997.  Then
7    I retired again from the Garden City, Kansas, Police
8    Department in 2014.
9    Q.   Did you go directly from the Kansas City, Kansas,
10   Police Department to the Garden City Police Department?
11   A.   No, ma'am.  When I left Kansas City, we moved to
12   western Kansas to be close to my family.  My daughter and
13   son-in-law were there.  And I went to work for the Garden
14   City Community College as a police officer.  They
15   disbanded the police department at that time because the
16   new college president didn't like policemen or guns and
17   they went to security.
18        They fired the chief because they no
19   longer needed him and I left and went on to help on my
20   neighbor's farm.  Then later the college called me and
21   asked me to go back to work as a security officer.  They
22   offered a decent wage.  I went back.
23        And while I worked there the second
24   time, I got to know a lot of city policemen in Garden City
25   and several times they asked me to go to work or apply for

Page 28

1    Garden City Police Department.  So I finally did went to
2    work there and that's where I stayed until I retired in
3    2014.  I retired there as a master patrol officer.
4    Q.   All right.  And what year did you join the Kansas
5    City, Kansas, Police Department?
6    A.   1968.  I got out of the Army in 1968 I think in
7    February.  I applied for the police department and I was
8    hired in April of '68.  Went to work for Kansas City,
9    Kansas.
10   Q.   Okay.  Did you go into the Army directly after
11   high school?
12   A.   I was drafted.  I was -- at the time I was
13   drafted in the Army, I was working for the Harry Gorby
14   Corporation in Kansas City.  I'm a welder by trade.  I got
15   drafted in the Army.  When my tour -- when I made my ATS,
16   I extended six months because I wanted to go in the police
17   department.
18        And by extending six months that would
19   help me avoid having to make reserve meetings and things
20   like that.  I could go on about my business as a
21   policeman.  So I went to work for the Kansas City, Kansas,
22   and I was there until I retired in '97.
23   Q.   All right.  Any other jobs you've held between
24   1968 and today?
25   A.   A bunch of them.  I worked part-time for the



Page 29

1 board of education.  I worked security for Gains.  I
2 worked security of the vocational technical school for a
3 while.
4           I got married and when I started buying
5 diapers and baby food, I started working extra jobs.  When
6 I started Kansas City, Kansas, my base pay was $305 a
7 month.  I had taken a cut in pay when I left the Army to
8 go in the police department so, you know.
9    Q.  Did the Kansas City, Kansas, Police Department
10 have any rules about outside employment?
11    A.  No.  As long as it didn't interfere with the job.
12    Q.  What?
13    A.  As long as it didn't interfere with my job as a
14 police officer.
15    Q.  So as long as -- according to the rules of the
16 Kansas City, Kansas, Police Department as long as your out
17 of work activities weren't interfering with your ability
18 to carry out your duties as a police officer, any outside
19 employment was permitted?
20    A.  Depending -- they wouldn't -- they didn't want us
21 working in bars and nightclubs or places with live
22 entertainment.  We could work security jobs but no --
23    Q.  What was the reason for that, sir?
24           MS. GUERRA:  Object to the form.  You
25 can answer if you know.

Page 30

1           THE WITNESS:  What?
2           MS. GUERRA:  You can answer.
3    A.  Well, obviously where you've got alcohol involved
4 or possible drugs and potential violations if a
5 policeman's working there, maybe you might be tempted to
6 look the other way or something.  I don't know.
7           But the point is it's pretty hard to
8 work for someone, take a paycheck, and then throw their
9 customers in jail.  And so it was just a -- never worked
10 anything like that.  Not -- I didn't.
11    Q.  (BY MS. FREUDENBERGER)  And that's just a common
12 sense concept --
13    A.  Sure.
14    Q.  -- in policing?
15           MS. GUERRA:  Object to form.  Let her
16 finish the question.
17           THE WITNESS:  Okay.
18    Q.  (BY MS. FREUDENBERGER)  If police officers are
19 around -- particularly investigators are around drugs or
20 alcohol, it's commonly understood in policing that the
21 temptation to engage in vice becomes more difficult.
22 Correct?  That was a bad question.  Let me rephrase it.
23           MS. GUERRA:  Let her rephrase it.
24    Q.  (BY MS. FREUDENBERGER)  It was clear that your
25 supervisors in the Kansas City, Kansas, Police Department

Page 31

1 understood that -- it was clear to you that your -- that
2 your supervisors up the chain of command in the Kansas
3 City, Kansas, Police Department understood that police
4 officers could be susceptible to corruption.  Correct?
5           MS. GUERRA:  Object to the form.  You
6 can answer.
7    A.  I suppose so, but the whole idea was don't get
8 involved in that kind of activity in the first place and
9 you wouldn't have that problem.
10    Q.  (BY MS. FREUDENBERGER)  Exactly.  In other words,
11 it's a common sense concept in policing that police
12 officers need to maintain a distance from the potential --
13 from any potential criminal activity themselves.  Correct?
14    A.  Yes.
15    Q.  Okay.  And that would include alcohol.  Correct?
16    A.  That would what include what?  I'm sorry.
17    Q.  That would include places where alcohol was
18 served.  Correct?
19    A.  Yes.
20    Q.  That would include proximity to the drug trade.
21 Correct?
22    A.  I would not want to be around that for any reason
23 unless I was there officially on duty.
24    Q.  And there are actual professional reasons that as
25 a police officer you would not want to be around the drug

Page 32

1 trade outside of the context of your policing duties.
2 Correct?
3    A.  Definitely compromises your credibility.
4    Q.  Exactly.  And it compromises your credibility in
5 the community that you're policing.  Correct?
6    A.  Correct.
7    Q.  Okay.
8           MS. GUERRA:  Object to the form.  Sorry.
9    Q.  (BY MS. FREUDENBERGER)  And I gather the same
10 would be true of prostitution?
11    A.  Yes, ma'am.
12    Q.  And you laugh because that is such an obvious
13 basic concept for a police officer.  Correct?
14           MS. GUERRA:  Object to the form.  You
15 can answer.
16           THE WITNESS:  I'm sorry?  Oh.
17    A.  Well, my only association with prostitution or
18 prostitutes is when they were victims and I interviewed
19 them.  I never was one of their customers or I never used
20 any prostitutes as informants.  I didn't like the idea of
21 informants anyway.  But my association with prostitution
22 was mostly was when I found them working as a homicide
23 victim.  Or assault victim.
24    Q.  (BY MS. FREUDENBERGER)  Okay.  And there are
25 important professional reasons that police officers should



CLYDE BLOOD VOLUME 1
MCINTYRE vs UNITED GOVERNMENT OF WYANDOTTE

February 03, 2021
57—60

Page 57

1  Right?
2      A.  The original indictment for a homicide has been
3  dismissed?  If it was overturned, I would assume it would
4  be.
5      Q.  Okay.  There was a hearing, a post conviction
6  hearing, in the McIntyre case in 2017.  Between when you
7  left -- when your retirement in 2014 and when the attorney
8  generals came to Texas to meet with you, have you spoken
9  about this case with anybody from any branch of government
10  at all?
11      A.  No.
12          MS. GUERRA:  I'm going to object to the
13  form.
14          THE WITNESS:  I'm sorry.
15          MS. GUERRA:  I was just objecting to the
16  form but you can go ahead and answer.
17      A.  No, not that I recollect.  I would have no reason
18  to.
19      Q.  (BY MS. FREUDENBERGER) Between 1994 and being
20  served with a complaint in this case -- you know what,
21  I'll withdraw that question.
22          At any point in time, has anyone from
23  the Kansas City, Kansas, Police Department in any capacity
24  approached you to ask you any questions about this
25  investigation at all?

Page 58

1      A.  For McIntyre?
2      Q.  Yeah.
3      A.  No.  No, ma'am.
4      Q.  Okay.  At any point in time in your life, has
5  anybody from the Kansas City, Kansas, Police Department
6  come to you in any capacity and asked you any questions
7  about Roger Golubski?
8      A.  No.  No, not that I recollect.
9      Q.  Okay.  Are you aware that following your meeting
10  with the attorney general's office, the state courts in
11  Kansas issued a finding that Lamonte McIntyre is factually
12  innocent of the Ewing and Quinn murders?
13      A.  Not really.  Not really, no.
14      Q.  Okay.  So in other words, you were not aware that
15  the court actually found Lamonte McIntyre innocent.
16  Correct?
17      A.  No, ma'am.
18      Q.  Okay.  And that he's been awarded a certificate
19  of innocence of this double homicide?
20      A.  I had no idea, no knowledge.
21      Q.  Okay.  Are you aware that the courts ordered the
22  state to pay Lamonte McIntyre compensation under Kansas'
23  wrongful conviction compensation statute?
24      A.  I believe that's what the attorney general's guys
25  were questioning me about, but I don't know the

Page 59

1  disposition of what happened.
2      Q.  Okay.  The disposition is that the compensation
3  has been paid.  I'll represent that to you.  And are you
4  aware of the victims' families' support of Lamonte
5  McIntyre's innocence?
6      A.  No.
7      Q.  Okay.  Do you have a position, sir, on whether
8  Lamonte McIntyre is factually innocent of these crimes?
9      A.  No, ma'am.  No, ma'am.
10      Q.  In other words, you don't deny that Lamonte
11  McIntyre is innocent as the court so found?
12      A.  I can't confirm or deny either way.  I didn't
13  work the case.
14      Q.  Okay.  But you understand I'm telling you --
15      A.  Yes.
16      Q.  -- that the state court has, in fact, found
17  Lamonte McIntyre innocent?
18      A.  Yes.
19      Q.  And my question -- my question for you is do you
20  have any basis whatsoever to disagree with that finding?
21      A.  No.
22      Q.  Okay.  When's the last time you spoke with Tim
23  Maskil?
24      A.  Tim Maskil?  Been several years ago.  Prior to
25  all this, I talked to him on the phone.  Well, no, it was

Page 60

1  just as this come to surface because I called him and he
2  said that he had been contacted but he didn't remember
3  anything and that was it.  We didn't get into it any
4  further.  We talked a little bit about our target shooting
5  and this and that and that was pretty much it.
6      Q.  Did he call you or did you call him?
7      A.  I called him to check on him because I had heard
8  he was having problems anyway.  I don't know if it's true.
9  I was told he was having something to do with Alzheimer's.
10  And last I heard -- I haven't contacted him, but he was
11  living in a facility but I don't know if that's right.  I
12  really don't.
13      Q.  Okay.  And when you called him to check on him,
14  were you aware that -- well, what was your reason for
15  calling Tim up?
16      A.  Well, basically when I -- I had gotten a call
17  from a private detective asking questions about this case,
18  and I told the detective -- he's asking questions not
19  about this case but about Golubski in particular.  I told
20  the detective at that time, I didn't work with him that
21  much, he was a loner, he went his way, and I had very
22  little association with him.
23          I called Maskil and said, hey, have you
24  been contacted about anything on Golubski and he said,
25  yeah, but I told them I don't know nothing and that was



Page 45

1    A.   Sure.  People getting killed all the time.  I
2  mean, just -- and we were on call.
3    Q.   Okay.  Tell me how that bid -- by the way,
4  homicide was considered a desirable appointment for that
5  reason and others.  Correct?
6    A.   Some people put a lot of prestige on it, but to
7  me it was just a lot of hard work.  And prestige has never
8  meant nothing to me.
9    Q.   In the police department, homicide is considered
10  a plum assignment.  Fair to say?
11         MS. GUERRA:  Do you need repeat?
12         THE WITNESS:  I'm sorry?
13         MS. GUERRA:  Do you want to ask her to
14  repeat?
15    A.   If you would repeat because I couldn't
16  understand.
17    Q.   (BY MS. FREUDENBERGER)  Sure.  Within the police
18  department, homicide is considered a plum assignment.
19  Correct?
20    A.   By some, yes.
21    Q.   Okay.
22    A.   Mostly the ones that never been there.
23    Q.   And it's also the unit where there is the most
24  potential to make money.  Correct?
25    A.   I was never after rank.  Rank would have hurt me

Page 46

1  financially.
2    Q.   No, I understand, sir.  I'm asking now not about
3  you in particular.  I'm just asking in general the common
4  understanding was that there was more potential to make
5  more money as a homicide investigator because of all the
6  overtime.  Correct?
7    A.   Right.  And that's why I went.
8    Q.   Okay.  Certainly that was true in the early 1990s
9  given the spike in the murder rate in Kansas City.
10  Correct?
11    A.   Yes, ma'am.
12    Q.   Okay.  And homicide also is commonly understood
13  within the police department to carry the most prestige.
14  Fair to say?
15    A.   Was -- was what now?
16    Q.   Considered one of the most prestigious
17  assignments as detective in the Kansas City, Kansas,
18  Police Department in the early '90s?
19    A.   That would be some guys' opinions.  It wasn't
20  mine.
21    Q.   Okay.  But the common perception was that
22  homicide was one of the most prestigious assignments.
23  Correct?
24    A.   I suppose.
25         MS. GUERRA:  Objection.  Asked and

Page 47

1  answered.
2    Q.   (BY MS. FREUDENBERGER)  And homicide -- the
3  homicide unit fair to say was a -- if you wanted to
4  advance up the ranks, finding your way to homicide was a
5  good idea.  Correct?
6    A.   No, because we had to take a test for promotion.
7  And either you pass the test or you didn't and your job
8  had no bearing on your qualification.
9    Q.   Okay.  You mentioned that you were a sergeant at
10  the time of this investigation.
11    A.   Yes.
12    Q.   Did you make sergeant before Detective Maskil?
13    A.   I made sergeant when they put me in the cadet
14  unit, and I'm not sure where Maskil was at at that time,
15  whether he was a detective or a patrolman.  I don't
16  remember.
17    Q.   Okay.  I'm going to ask you to look at it
18  eventually but I don't need you to look at it yet.
19  According to your report, you were -- in 1994 at the time
20  of this investigation, you were a sergeant and Maskil was
21  a detective.
22    A.   Yes, ma'am.
23    Q.   As a sergeant working in homicide, did you have
24  any -- did your responsibilities differ from the
25  responsibilities of a regular homicide detective in any

Page 48

1  way?
2    A.   Tim Maskil and I were partners.  We worked
3  together.  Our job title had no bearing because we were
4  partners.  We worked together and I had no more say-so
5  than he did.  It was a mutual cooperative association to
6  get the job done and that's what we did.  I never pulled
7  rank.  I had a different title but we did the same job.
8    Q.   Okay.  And that was my question.  So in terms of
9  your responsibilities, sergeant and detective, the fact
10  that your rank was higher did not change your duties and
11  responsibilities as a detective in homicide in any way.
12  Correct?
13    A.   I wouldn't say rank was higher.  We made the
14  exact same pay.
15    Q.   Okay.  So sergeant was a rank equivalent to
16  detective; is that correct?
17    A.   Same pay grade.
18    Q.   Okay.  And then what about in terms of
19  supervisory responsibilities?  Did you have any
20  supervisory responsibilities as a sergeant in the homicide
21  unit in 1994?
22    A.   We had a lieutenant that supervised everything.
23  In this case, Lieutenant Culp.
24    Q.   So the answer is no?
25    A.   No.



Page 61

1 the end of the conversation of that part. And I don't
2 know what he knows or did or didn't know. I couldn't say
3 anything derogatory about Golubski. I didn't know him
4 that well.
5    Q.   So what was your understanding about who that
6 private investigator was?
7    A.   I don't remember.
8    Q.   Okay. And you mentioned then that you and Maskil
9 talked about just personal things?
10    A.   Sure, his kids. He's got sons and a daughter.
11 We talked about -- he had sold most of his guns and quit
12 shooting and discussed that kind of stuff. That was just
13 run-of-the-mill. That's all.
14    Q.   Okay. And that he was able to tell you about his
15 kids?
16    A.   We visited a little bit, yeah. He's got I think
17 two sons and I think he's got a daughter. I don't
18 remember. I don't remember their names. Terry I think is
19 one of his sons but I don't remember the other one.
20    Q.   And you said you heard but you don't know whether
21 it's true that Maskil might be dealing with Alzheimer's?
22    A.   He might be suffering from Alzheimer's?
23    Q.   Yeah.
24    A.   That was what I was told, yes. I don't know how
25 true that is because I -- well, like the next time I tried

Page 62

1 to contact him and his phone number was different. I
2 don't know where he's at. If he's in a rest home, which
3 one.
4    Q.   Okay.
5    A.   If he called me today and said he was in trouble,
6 I'd go to Kansas City to help him, you know, but I don't.
7    Q.   Okay. So you don't know whether there's any
8 truth to the allegations about his memory or not?
9    A.   No. I got memory problems of my own.
10    Q.   And certainly when you talked to Maskil on the
11 phone the time you just told me about, he seemed to be in
12 perfectly sound mind. Correct?
13          MS. GUERRA: Object to the form.
14    A.   In perfect what?
15    Q.   (BY MS. FREUDENBERGER) Perfectly sound mind. He
16 was able to tell you about his children and that he sold
17 his guns you talked about?
18    A.   A little inconsistent but it wasn't anything that
19 was a -- at that point that made me concerned. I mean, we
20 visited but.
21    Q.   Well, what was inconsistent? Tell me what
22 you're --
23    A.   Sometimes his responses were slow. Like he had
24 to figure out what I was saying or what I -- you know, it
25 just -- I can't say there's anything wrong with him. It

Page 63

1 just --
2    Q.   Okay.
3    A.   He's slow --
4    Q.   And that's normal aging. Correct?
5    A.   Yeah.
6    Q.   Response time is slow, yeah. Okay. You and
7 Maskil retire at the same time?
8    A.   Is what?
9    Q.   Did you and Maskil retire from the Kansas City,
10 Kansas, Police Department at the same time?
11    A.   No, he retired before I did. His wife was sick
12 and was dying. I think she had cancer if I remember. And
13 he left and retired. And then I think my partner after
14 that was Kenny Allen.
15    Q.   Okay.
16    A.   Maskil left a while before I did but I don't
17 remember how long.
18    Q.   All right. So I want to ask you some questions
19 about the way that homicide worked back at the time. And
20 I understand, sir, your position that you did not have
21 much to do with this case at all. Okay?
22    A.   Right.
23    Q.   So I just want to ask you some questions about
24 the way things worked in the homicide unit back in 1994.
25 Okay?

Page 64

1    A.   Uh-huh. Yes. Sorry.
2    Q.   Am I correct that during your tenure as a
3 homicide detective, the department had two teams of
4 homicide detectives?
5    A.   We had two teams, yes.
6    Q.   Okay. One team was you and Maskil?
7    A.   Yes, ma'am.
8    Q.   And the other was Mike Shomin and Kenny Allen?
9    A.   That or W.K. Smith. See, Mike had three
10 different partners for a while. He worked with Ray
11 McKinney, then W.K. Smith, and then I guess Kenny Allen.
12 I don't know. But they were the other team.
13    Q.   Okay. All right. But there were four homicide
14 detectives back in the homicide unit in 1994?
15    A.   Yes, ma'am.
16    Q.   And how were homicides assigned back in 1994?
17    A.   We were on call. We rotated the on call for
18 homicide. One team -- like my team, Maskil and I, we'd be
19 on call for two weeks for homicide. Be on call one week
20 for SIDS, and then we'd have a week in between where we
21 weren't on call for anything. If we lucked out. We got
22 that week. Otherwise, we'd get called out anyway. SIDS
23 by the way is sudden infant death. We investigated those
24 too.
25    Q.   Okay. And what would happen if there was more



Page 65

1 than one homicide in a week you were on call?

2    A. The other team would be called out depending on

3 where we were at. If we were on a homicide and we were

4 with a bunch of dead ends and another one occurred, we'd

5 take the next one and go back to the other one later.

6 Otherwise, they call out the other team.

7    Q. Okay. And were there ever situations where both

8 teams were occupied with active homicide investigations at

9 the same time?

10    A. Yes, ma'am.

11    Q. And what would happen under those circumstances?

12    A. Well, one night we had four homicides. Both

13 teams were activated. And then when the other homicides

14 occurred, we parted company. I went one way and Maskil

15 went one way. Shomin and his partner took the other two

16 cases and that's where we went. If we needed help, we'd

17 call the boss. He would send other detectives to assist

18 us.

19    Q. Okay. Under those circumstances -- first of all,

20 generally speaking, there are no investigations more

21 important than a homicide investigation. Fair to say?

22       MS. GUERRA: Object to the form. You

23 can answer.

24    A. Well, yeah, someone got murdered and you got

25 somebody running up and down the street that might kill

Page 66

1 somebody else, it would be a nice idea to get them off the

2 street.

3    Q. (BY MS. FREUDENBERGER) Exactly. And so it sounds

4 like the Kansas City, Kansas, Police Department had

5 various procedures in place in the early 1990s to ensure

6 that all homicides were thoroughly and properly

7 investigated. Correct?

8       MS. GUERRA: Object to the form. You

9 can answer.

10    A. Well, there's a problem in procedures. No two

11 homicides are the same and they have to be handled

12 according to that case. We had a general operating

13 procedure but then it could vary depending on the

14 circumstances.

15    Q. (BY MS. FREUDENBERGER) Okay. Fair enough. Who

16 was this supervisor -- who was your direct supervisor back

17 in 1994? So let me back up. You had two teams, you and

18 Maskil and Mike Shomin and whoever his partner was at the

19 time. Correct?

20    A. Right.

21    Q. Okay. And who was directly above the four of you

22 in the chain of command?

23    A. Well, at that time, Lieutenant Culp was calling

24 the shots on this McIntyre case.

25    Q. Well, but forget about the McIntyre case for a

Page 67

1 second. On just generally speaking, who was the -- who

2 was directly above you in homicide in the chain of

3 command?

4    A. Lieutenant Culp.

5    Q. Okay. He was the homicide commander?

6    A. Yes.

7    Q. Or homicide lieutenant?

8    A. That's what I'm saying.

9    Q. Okay. And were there any other lieutenants who

10 oversaw homicide at that time or was it just Culp?

11    A. It would have been Lieutenant Culp. Above him

12 would have been a captain or a major, whoever was in

13 charge at that time.

14    Q. Okay.

15    A. Of the investigation bureau.

16    Q. All right. Was the captain or major above Culp,

17 did that person have any responsibilities in the early

18 '90s --

19    A. No.

20    Q. -- for actually supervising the detectives or

21 sergeants investigating homicides?

22    A. No. That's why they had a lieutenant.

23    Q. Okay.

24    A. The lieutenant supervised the investigation.

25    Q. Okay. So it was Culp's responsibility alone to

Page 68

1 ensure that the homicides that you and Maskil and Shomin

2 and his partner were investigating were done by both.

3 Correct?

4       MS. GUERRA: Object to form.

5       THE WITNESS: Huh?

6       MS. GUERRA: You can answer.

7    A. He would have had sole responsibility unless he

8 needed assistance from a higher ranking officer. And he

9 always had -- he could always go to the captain or the

10 major or up the chain of command for whatever help he

11 needed.

12    Q. (BY MS. FREUDENBERGER) That was his obligation if

13 he needed the help. Correct?

14    A. Yes, yes.

15    Q. Okay. And I take it -- this is a silly question.

16 The Kansas City, Kansas, Police Department in your

17 experience took the investigation of homicides very

18 seriously. Correct?

19    A. We did.

20    Q. In other words, even at your busiest times, you

21 were provided the resources, the manpower you needed to

22 thoroughly investigate every homicide you caught.

23 Correct?

24    A. Whenever it was available, we had everything we

25 needed, yes.



Page 69

1    Q.   I'm sorry.  Could you -- could you repeat that or
2  could the court reporter read it back?
3    A.   Whenever the help was available if we needed
4  additional manpower, we got it.
5    Q.   Well, was there ever a situation where you
6  requested help and you were told no, sorry, you got to do
7  this on your own?
8    A.   I'm sorry?  I'm sorry.  I didn't --
9    Q.   Well, was there ever a situation where you asked
10  for manpower and were told, no, we can't provide it?
11    A.   Not that I recollect, no.
12    Q.   And, in fact, it sounds like there were practices
13  in place to ensure that all homicides were thoroughly and
14  properly investigated regardless of how busy the
15  department was.  Correct?
16    A.   Homicides took priority to other cases, yes.
17    Q.   I'm sorry.  What was that, sir?
18    A.   Homicides held priority over other cases, yes,
19  ma'am.
20    Q.   Okay.  So you were not limited in terms of the --
21  what the investigative steps you were able to take by
22  manpower shortages.  Fair to say?
23          MS. GUERRA:  Object to form.  You can
24  answer.
25    A.   Not really.  If we needed extra help, we could

Page 70

1  ask for it and get it.
2    Q.   (BY MS. FREUDENBERGER)  Okay.  And as you say,
3  there was never a situation where you asked for extra help
4  and were told you couldn't have it.  Correct?
5    A.   That never happened that I know of.
6    Q.   Okay.  And when you had so many homicides in a
7  week that the four of you would split up and -- well,
8  withdrawn.
9          In the situations you described where
10  there were so many homicides that you -- that you and
11  Maskil and Shomin and his partner would split up and other
12  detectives would be brought in, where would the other
13  detectives be brought in from?
14    A.   Well, there are various units in the detective
15  bureau.
16    Q.   Okay.  Any -- was there any kind of rhyme or
17  reason to which detectives were pulled in to assist on
18  homicides?
19    A.   Who was available at the time.
20    Q.   Okay.  And homicide detectives have particular
21  training.  Correct?
22    A.   We received what?
23    Q.   Particular training.  There were things homicide
24  detectives were trained to do that other detectives were
25  not.  Correct?

Page 71

1    A.   We had a lot of in-service training.  A lot of my
2  training was from older officers who had been there and
3  done that and I picked up a lot from them, their
4  experience.  I had homicide investigation training through
5  the metro squad when I become a member of that.  So there
6  was training available, yes.  Some guys had it, some
7  didn't.  I don't know.
8    Q.   Okay.  How many times approximately were there
9  enough homicides being active at one time that all four
10  homicide investigators were working different cases?
11    A.   I only remember the one time.  And here again
12  depending on the nature of the homicide like the night we
13  had four, one of them was what we called a smoking gun.
14  We had the victim, we had a witness, we had a suspect in
15  custody.  So it was matter of buttoning that up and
16  getting back to the other one.
17    Q.   Okay.
18    A.   So the circumstances varied.
19    Q.   All right.  But that was the only time that all
20  four of you were working different cases at one time?
21    A.   It's the only one I remember.  I don't remember
22  who the victims were.  I don't remember the cases.  I just
23  remember when it went down, we were all kind of like,
24  well, you know.
25    Q.   Okay.  And so in situations where all four

Page 72

1  homicide detectives were at -- withdrawn.
2          In situations where both teams of
3  homicide detectives were working different active
4  homicides and other detectives were brought in to assist,
5  I take it the homicide detective would be the lead
6  detective in charge of the investigation?
7    A.   That's the way it should be, yes, ma'am.
8    Q.   Okay.  And that was the -- the custom and
9  practice in the Kansas City, Kansas, Police Department at
10  the time?
11          MS. GUERRA:  Object to form.
12    A.   That would be the what now?  The process that the
13  lead investigator would be the homicide detective over the
14  hired help, the assisting help?  Is that what you said?
15    Q.   (BY MS. FREUDENBERGER)  Yes, that's my question.
16    A.   Well, yeah, if I was the homicide detective and
17  they sent me an assist, I would tell him what I needed.
18    Q.   Okay.
19    A.   And we would --
20    Q.   In other words, the homicide detective was always
21  the detective -- well, withdrawn.
22          The way it worked back in the -- say in
23  1994 is if the other detectives were brought in to assist
24  on homicides, the homicide detectives would remain in
25  charge of the investigation?



Page 73

1    MS. GUERRA:  Object to form.

2    A.  Based on my experience, yes.

3    Q.  (BY MS. FREUDENBERGER)  Okay.  And there are
4  obvious reasons for that.  Correct?

5    A.  Well, yeah, when the experienced investigator
6  gets help and he's not experienced in a homicide
7  investigation, then kind of point him in a direction and
8  help him.  Help him help you.  It's a team effort.

9    Q.  Okay.  What crimes did the crimes against persons
10  unit investigate?

11    A.  We had a unit that is involved in child abuse, we
12  had the robbery unit, the assault unit, and the homicide
13  unit.  I think child abuse unit was later turned -- I'm
14  not sure but I think it might have been turned into the
15  juvenile division but I don't remember.

16        But I remember we had assault, robbery,
17  and homicide and crimes against persons like, you know,
18  rape, assaults, beating somebody up, things of that
19  nature.

20    Q.  In other words, serious felonies where somebody
21  was not killed?

22    A.  They were -- I'm sorry?

23    Q.  A serious -- like a variety -- it sounds like to me
24  like what you're saying, correct me if I'm wrong, the
25  crimes against persons unit investigated serious felonies

Page 74

1  but felonies where nobody died.

2    A.  Right.  Crimes against persons included the
3  homicide unit but the other units --

4    Q.  Oh, I see.  Okay.

5    A.  Right.

6    Q.  Oh, I see.  So crimes against persons was the
7  unit under which child abuse, robbery, assault, and
8  homicide --

9    A.  Yes, ma'am.

10    Q.  -- all consolidated; is that correct?

11    A.  Uh-huh, yes, ma'am.

12    Q.  Okay.  And back in 1994, what unit was Roger
13  Golubski working?

14    A.  I really don't remember.  I have no idea.  I
15  think he --

16    Q.  But not homicide?

17    A.  No, not to my knowledge, it wasn't.  He might
18  have been -- well, see that call that -- they -- I don't
19  know.  I don't know what assignment he was assigned to.
20  They could have had a reason to call him and put him in an
21  assignment.  I have no idea.

22    Q.  Well, what I'm asking you is Roger Golubski did
23  not routinely work homicides back in 1949.  Correct?

24    A.  I think he --

25    Q.  Mike Shomin and his partner worked homicides?

Page 75

1    A.  Right.  I think he might have assisted but it's
2  just like Jim Krstolich was assigned to the assault -- the
3  persons unit, assault unit.  He didn't work homicides but
4  they called him out to assist because they had a lot of
5  work to do.

6    Q.  Okay.  And, sir, it looks like you're looking at
7  your attorney as you're asking --

8    A.  No, I'm looking across the room trying to
9  meditate and get my head together because I don't remember
10  a lot of this stuff.

11    Q.  Okay.

12        MS. GUERRA:  You doing okay?

13        THE WITNESS:  Huh?

14        MS. GUERRA:  You doing okay?

15        THE WITNESS:  Oh, yeah.

16        MS. GUERRA:  Okay.

17        THE WITNESS:  Age and mileage.

18    Q.  (BY MS. FREUDENBERGER) And I take it based on
19  what you've described, sir, that it would have been highly
20  irregular for a detective in one of the other crimes
21  against persons unit, child abuse, robbery, assault, to
22  have been assigned the lead to run a homicide
23  investigation; is that correct?

24    A.  That was never my experience, no.  I never seen
25  that.

Page 76

1    Q.  So that would have been highly irregular?

2    A.  Depends on the circumstances and who made the
3  decision.  I don't know.

4    Q.  Well, can you think of a circumstance in which it
5  would have been appropriate to assign a assault, robbery,
6  or child abuse detective to run a homicide investigation?

7    A.  No.

8        MS. GUERRA:  Object to form.

9        THE WITNESS:  Huh?

10        MS. GUERRA:  Object to form.  You can
11  answer.

12    A.  No, I don't -- I wasn't there.  I have no idea
13  why such a decision would have been made.

14    Q.  (BY MS. FREUDENBERGER) Well, I -- and my question
15  to you -- I hear that.  My question to you is can you
16  think of a reason -- can you think of any legitimate
17  police reason that a homicide would be assigned to be
18  investigated by a detective --

19        MS. GUERRA:  Same objection.

20    Q.  (BY MS. FREUDENBERGER) -- from the child abuse,
21  robbery, or assault unit?

22    A.  Not really, no.

23    Q.  Okay.  There are reasons that homicide detectives
24  investigate homicides.  Correct?

25    A.  Well, that's why we were there, yes, ma'am.



Page 77

1   Q.  That's what you were trained to do.  You had
2   specialized training in investigating homicides.  Right?
3   A.  And experience.
4   Q.  Yeah, and training and experience in
5   investigating homicides informed everything you did as a
6   homicide detective.  Correct?
7   A.  I'm sorry.  I misunderstood what you said.
8   Q.  Sure.  Your specialized training as a homicide
9   detective informed the steps you went through in
10  investigating homicides.  Right?
11  A.  Yes.
12  Q.  And certainly based on your experience with him
13  as a supervisor, Lieutenant Culp understood that.
14  Correct?
15  A.  Yes.
16  Q.  What was Lieutenant Culp like as a supervisor?
17  A.  I got along with him great.  He told me what he
18  wanted to do.  I did it.  If I needed help, he'd give it
19  to me.  He never gave me an order to do anything.  He
20  asked me to do it and I did what I could to help him out.
21  He was a good boss.  I don't know what else to say.
22  Q.  I mean, I understand you're speaking colloquially
23  which is normal, but police departments are paramilitary
24  organizations.  Correct?
25          MS. GUERRA:  Object to the form.  You

Page 78

1   can answer.
2   A.  Okay.  Semi, yeah.  When I got out of the Army
3   and went to the police department, I had to make a lot of
4   changes because I was used to a chain of command and
5   that's what I followed and when a lieutenant or a captain
6   said jump, I wanted to know how high and I did it.  It was
7   a lot more laid back than the Army.
8   Q.  (BY MS. FREUDENBERGER) That makes sense.  But in
9   a police department, it -- well, I'll ask you this
10  question.  If Lieutenant Culp ordered you to do
11  something -- or withdrawn.
12          If Lieutenant Culp asked you to do
13  something in a homicide, you were going to do it.  Right?
14  A.  As long as it's legal and upright.
15  Q.  As long as it's legal and upright, you do what
16  the lieutenant told you.  Right?
17  A.  Yes, ma'am.
18  Q.  Okay.  And were there times when Lieutenant
19  Culp -- I gather Lieutenant Culp was a hands-on
20  supervisor.  Correct?  He was respectful but he made sure
21  he was informed?
22  A.  Yes.
23          MR. COOPER:  Form.
24  Q.  (BY MS. FREUDENBERGER) He made sure he was aware
25  of what was going on in the investigations under his

Page 79

1   command.  Correct?
2   A.  It was our responsibility to keep him informed.
3   Q.  Okay.  So you actually had an affirmative
4   obligation to make sure Lieutenant Culp was aware of all
5   investigative developments in major cases.  Fair to say?
6   A.  We kept him posted on everything we had going.
7   Q.  And that was your obligation as a detective.
8   Correct?
9   A.  I think so, yes.
10  Q.  And, in fact, you were trained that you had an
11  obligation to keep your lieutenant informed of
12  investigative developments in major cases.  Right?
13  A.  My personal belief, I worked with the man, he
14  should know where I was at and what I was doing.
15  Q.  Well, but, sir, I'm pushing back a little on your
16  personal belief because in every police department I've
17  ever encountered around the country, detectives have
18  obligations, affirmative obligations, that they are
19  trained on to inform their supervisors about developments
20  in the investigations they're conducting.
21  A.  Yes, ma'am.
22          MS. GUERRA:  Object to the form.
23  Q.  (BY MS. FREUDENBERGER) And that was the case in
24  the Kansas City, Kansas, Police Department in the early
25  1990s as well as.  Correct?

Page 80

1           MS. GUERRA:  Object to the form.  You
2   can answer if you know.
3   A.  Well, yeah, I worked for the man.  He's in
4   charge.  He had to make decisions, supply the manpower,
5   whatever other help we needed, and if he didn't know what
6   was going on, he had to explain to his supervisor so I
7   wasn't going to leave him out there hanging out to dry.
8   Q.  (BY MS. FREUDENBERGER) Exactly.  And, in fact, he
9   had an obligation -- he had his own obligations to ensure
10  that the cases under his command were properly
11  investigated.
12  A.  Sure.
13          MS. GUERRA:  Object to the form.
14  Q.  (BY MS. FREUDENBERGER) And so he had to know what
15  was being done in those investigations in order to ensure
16  that was happening.  Correct?
17          MS. GUERRA:  Object to the form.  You
18  can answer.
19  A.  Well, yeah, I mean, his job -- he had to know
20  what was going on around him.  He was in charge.  He had
21  to explain to his bosses, the press, or whoever come
22  along.
23  Q.  (BY MS. FREUDENBERGER) Okay.  And were there
24  times, in fact, when Lieutenant Culp would come to you and
25  ask you questions about the cases you were investigating?



Page 81

1    A.  Well, absolutely.
2    Q.  In fact, it happened routinely.  Correct?
3    A.  He had a what?
4    Q.  That happened routinely.  Correct?  That was just
5    part of the day-to-day of the job?
6    A.  Well, sure.  Lieutenant Culp when he made
7    lieutenant and took over the homicide unit had never
8    worked a homicide.  I mean, he's in charge of the unit but
9    he relied on us to help him get through the job and, you
10   know, that's the way it was.
11   Q.  Okay.  And, in fact, is that your understanding
12   as to one reason that -- this sounds like a silly
13   question -- that homicide detectives were assigned to
14   investigate homicides?
15   A.  Yes.
16   Q.  Okay.  And there were particular investigative
17   steps you take over -- well, withdrawn.
18        There are some investigative steps that
19   you want to take in any homicide investigation.  Fair to
20   say?
21   A.  Yes, there are.
22   Q.  In any homicide investigation, you want to make
23   sure you are gathering any relevant evidence at the crime
24   scene.  Correct?
25        MR. COOPER:  Object to form.

Page 82

1    A.  Evidence at a crime scene?
2    Q.  (BY MS. FREUDENBERGER) Yeah.
3    A.  That evidence was collected by the crime scene
4    investigation officers, and we had a procedure that we
5    followed on crime scenes with what we called an ID unit.
6    Q.  Okay.  Tell me the -- back in 1994, what was the
7    layout of the Kansas City, Kansas, Police bureau?  I mean,
8    where did -- where was -- where did homicide detectives
9    sit?
10   A.  Where did we sit?
11   Q.  Yeah.  When you were in the -- actually in the
12   bureau -- is that the right word, by the way, for the
13   building you worked out of?
14   A.  Yeah, we were on the ground floor.  My partner
15   and Maskil and I shared an office in the -- would have
16   been the southeast corner.  Shomin -- well, actually we
17   were in -- Shomin was in the -- and W.K. was in the
18   southeast corner and we were in the office next to that
19   just a step to the north.  We were --
20   Q.  Okay.
21   A.  Our offices were closed doors but they were next
22   to each other.
23   Q.  Okay.  They shared a wall, in other words?
24   A.  There was a wall between us, yes, ma'am.
25   Q.  And where was Lieutenant Culp's office?

Page 83

1    A.  He was down the hall west of us about 20 feet to
2    the door to his office.
3    Q.  Okay.  And was the entire crimes against persons
4    unit on that same floor?
5    A.  They were on that same floor and that same
6    hallway.
7    Q.  Same floor and same hallway.  Okay.  So Detective
8    Golubski's office was on your hallway?
9    A.  I don't remember him having an office down there
10   at that time.  I don't know where he was assigned.  I
11   don't.
12   Q.  Okay.  But assuming he was assigned to the crimes
13   against persons unit back in 1994, he would have had an
14   office on your hallway.  Correct?
15   A.  Well, that would have been the general idea, yes,
16   but I don't remember him having a office there.
17   Q.  Well, you don't remember one way or the other.
18   Correct?
19   A.  Not really, no.
20   Q.  Okay.  And at that time, was the police
21   department housed in city hall?
22   A.  Yes, ma'am.
23   Q.  Okay.  So when you say the ground floor, you're
24   talking about the ground floor of city hall.  Correct?
25   A.  Yes, ma'am.  Well, wow.  I would call it the

Page 84

1    ground floor.  It was a -- we walked on the street level.
2    We had a floor above us which would have been ground level
3    for Seventh Street.  So, you know, it -- call it what you
4    want.  We were on a parking level, the underground parking
5    level.
6    Q.  And was the entire police department on one
7    level?
8    A.  No.  We had I think internal affairs and vice and
9    narcotics unit was up on the higher floor up.  I'm not
10   sure which one.
11   Q.  Okay.  But crimes against persons was on the
12   parking level floor?
13   A.  Ours was adjacent to the parking level floor,
14   yes, ma'am.  The underground parking where the VIPs
15   parked.
16   Q.  Okay.  And were there -- so just I understand the
17   layout, there's one hallway on that level and all of the
18   crimes agains persons detectives had offices off that
19   hallway?
20   A.  Then the next hallway over was crimes against
21   property.  Was burglary, auto theft.  And then there's
22   another hallway farther down.  I'm thinking that was -- I
23   think they had juvenile down there but I can't remember
24   what else.  We had three hallways.
25   Q.  Understood.  I just want to make sure I



Page 85

1 understand crimes against persons. So I'm correct there
2 was one hallway and all the crimes against persons
3 detectives had offices off that hallway. Correct?
4    A.  Yes, ma'am.
5    Q.  Okay. And that would include Lieutenant Culp?
6    A.  Yes, ma'am.
7    Q.  Okay. And did you work with your doors open or
8 closed most of the time?
9    A.  Depending if I was interviewing somebody, I close
10 the door because any outside interference, people walking
11 up and down the halls talking and carrying on, might
12 interrupt somebody's thought process or whatever but.
13   Q.  Okay. But when you weren't -- when detectives
14 weren't conducting interviews, did they generally keep
15 their doors open?
16   A.  No, we generally kept them closed. Just simply
17 closed theirs.
18   Q.  What about Lieutenant Culp?
19   A.  I don't recollect him leaving his door closed to
20 interview anybody unless we were having a conference.
21 Otherwise, his door was generally open.
22   Q.  Okay. And was he generally in his office as a
23 lieutenant?
24   A.  He moved around a lot. He had responsibilities
25 that weren't desk bound.

Page 86

1    Q.  Okay. And were there -- what was the -- what
2 were the rules about bringing witnesses into the bureau?
3 Was there a desk sergeant? I assume -- I assume witnesses
4 had to be -- I'll withdraw the question.
5          I assume any time you brought a civilian
6 into the building, they had to be signed in or logged in;
7 is that correct?
8    A.  They had to be escorted in by an officer. They
9 did not have free run of the building. We would meet them
10 at the front desk and escort them to our office. Escort
11 them out when they left.
12   Q.  Okay. And what about documenting that? How did
13 you document when you were bringing a civilian into the
14 bureau?
15   A.  We had no sign in or anything. I brought
16 witnesses in and took them to the office, interviewed
17 them, and sent them back out. My documentation was my
18 report.
19   Q.  Okay. And were there rules about bringing
20 witnesses or civilians into the bureau after-hours?
21   A.  No, because we had a 24/7 operation.
22   Q.  Okay. In other words, there would be people
23 working in the offices off the crimes against persons unit
24 at all times of day and night. Correct?
25   A.  No. Mostly the crimes against persons unit was a

Page 87

1 day job. They had an afternoon shift with the response
2 unit which is on down the hall by the main entrance to the
3 detective bureau. There might be other officers working
4 overtime there. There might be other officers coming in
5 and out but, yeah, there was always --
6    Q.  And there were times when your -- when your
7 investigative responsibilities required you to be in the
8 building at night. Right?
9    A.  Well, in homicide, yes, ma'am.
10   Q.  In homicide, yes. Okay. And, in fact, would it
11 have been unusual for you to be -- I'll withdraw it.
12          On the occasions where you were in
13 your -- in Detective Maskil's office at night, would be
14 unusual to be there alone on the hallway?
15   A.  Just for -- not always. Sometimes I would be in
16 there with a witness. I would be in there alone maybe
17 doing something else. Some other time --
18   Q.  But there were usually other people around?
19 That's the only thing I'm asking.
20   A.  Sometimes. It would depend on the circumstances.
21 If it wasn't interviewing anybody, you know, or doing
22 paperwork, that would be hit and miss.
23   Q.  Okay. Were there times when Lieutenant Culp was
24 in his office at night?
25          MS. GUERRA:  Objection to the form.

Page 88

1 Calls for speculation.
2          THE WITNESS:  Do what?
3          MS. GUERRA:  You can answer. Sorry.
4 You can answer.
5    A.  Well, of course. When we got called out, he got
6 called out too. And we would be in our office. He would
7 be there in his office if we needed something. I mean,
8 that was his job too.
9    Q.  (BY MS. FREUDENBERGER) Okay. If you were in your
10 office at night working an investigation, he would be
11 there too. Fair to say?
12   A.  As a rule, yeah. As a rule, yes. It could vary.
13 He might be somewhere else.
14   Q.  Same would be true of the other detectives in the
15 crimes against persons unit. Correct?
16          MS. GUERRA:  Object to the form. Go
17 ahead.
18   A.  I can't what now?
19   Q.  (BY MS. FREUDENBERGER) Same would be true of the
20 other detectives in the crimes against persons --
21   A.  Sometimes. It depends.
22   Q.  -- department obviously. Correct?
23   A.  Yeah, there's -- well, when we got a call on a
24 homicide unless they called out all four of us, Maskil and
25 I would have been there along with our lieutenant if he



Page 89

1  was there or doing something else.

2     Q.  And all I'm trying to get at is it sounds like it

3  would be unusual for you to be alone in your office at

4  night with a witness with nobody else around on the hall.

5     A.  Not really.  If Maskil and I are interviewing two

6  different witnesses at the same time, he would be in

7  another office.

8     Q.  No, I'm sorry.  I'm asking a different question.

9  I don't mean it would be unusual for you to be alone in

10  your office with a witness.  What I mean is it would be

11  unusual in a situation where there was an active case

12  going on and you -- say a homicide going on and you

13  were -- or any kind of active case and you were -- had

14  occasion to work at night in the bureau, it would be

15  unusual for you to be the only person working in the

16  crimes against persons hallway alone.

17             MS. GUERRA:  Object to form.  You can

18  answer.

19     A.  Yes, it would be unusual to a certain extent, but

20  then again, circumstances vary.  You can't --

21     Q.  (BY MS. FREUDENBERGER)  Fair enough.  But

22  generally speaking when you were working in the building

23  at night, there were usually other people around on your

24  hallway?

25     A.  There's somebody else around, yeah.

Page 90

1     Q.  Okay.  And did the doors on your office lock?

2     A.  Was my doors locked?  I rarely -- no.

3     Q.  Yeah, did the doors lock?

4     A.  Yes, they did but we never -- I never locked my

5  door.  If anybody come to my office, they knocked on the

6  door and I would tell them to enter.  It was just a common

7  courtesy.

8     Q.  In what circumstances would a witness be in a

9  detective's office late at night?

10     A.  Interview statements, witness statement.

11     Q.  And why would -- what circumstances would

12  occasion interviewing a witness in your office at night as

13  opposed to during the day?

14     A.  When homicides occur at two or three or four

15  o'clock in the morning, that's when you interview whoever

16  is available to get whatever information's available

17  before it slips their mind, they change their mind or

18  whatever.  So it wouldn't be uncommon.

19     Q.  All right.  In other words, when a homicide

20  happens and you have witnesses, you want to bring them

21  down to the precinct as quickly as possible to interview

22  them.  Correct?

23     A.  Yes, ma'am.

24     Q.  Okay.  And there are important police reasons for

25  that.  Right?

Page 91

1     A.  Well, most homicides never occur between 8:00 in

2  the morning and 4:00 in the evening.  They could occur any

3  time.  And the quicker you get the information available

4  is -- it's a common -- yes, ma'am, it's not unusual to

5  bring them in and interview them.

6     Q.  No, and as a detective investigating a serious

7  crime, you actually have an obligation to interview

8  witnesses as quickly as is practical.  Correct?

9             MR. COOPER:  Objection to form and

10  foundation.

11     A.  Yes.

12     Q.  (BY MS. FREUDENBERGER)  Okay.  And that's because

13  witnesses' memories can change.  Correct?

14     A.  Yes, ma'am.

15     Q.  And witnesses can decide for a variety of reasons

16  not to cooperate.  Correct?

17     A.  Yes, ma'am.

18     Q.  Okay.  And generally speaking, you want to get

19  somebody's account as close in time to their observations

20  as possible.  Correct?

21     A.  Yes, ma'am.

22     Q.  So for all those reasons and others, your

23  obligation as a detective was to bring a witness to the

24  police bureau and interview them as quickly as was

25  practical when investigating a major case like a homicide.

Page 92

1  Correct?

2     A.  Yes, ma'am.

3     Q.  All right.  And one thing I understand from the

4  documents but correct me if I'm wrong is that the rule was

5  actually that wherever possible, you should have two

6  detectives present for every interview.  Correct?

7     A.  Whenever it was possible, that was the best

8  procedure, yes, ma'am.

9     Q.  Okay.  That's how you were trained.  Correct?

10     A.  Yes.

11     Q.  Okay.  And that was the rule back in 1994.

12  Correct?

13     A.  It was a practice.  I don't know that it was -- I

14  don't remember any rules, but it was something we

15  practiced that we tried to have two investigators there.

16  If that wasn't possible, then we did what we had to do to

17  get the information.

18     Q.  And that's because you would want to have one

19  investigator asking the questions and one investigator as

20  a witness.  Correct?

21     A.  It could go either way.  We both would ask

22  questions.  When we took a statement, we would put the

23  statements taken by Sergeant Blood and Detective Maskil.

24  We would witness it.

25             We tape-record a lot of those statements



Page 93

1  and they were saved, typed out, printed out, whatever, and
2  the witness would sign it and we still had the statement
3  on cassette tape for later use if needed.
4      Q.  Okay.  And so the practice was to audio record
5  witness statements whenever possible.  Correct?
6      A.  Whenever possible, yes, ma'am.
7      Q.  Okay.  And that's one reason that witness
8  statements were supposed to transpire at the detective
9  bureau as opposed to out in the field.  Correct?
10     A.  No, we took them wherever we had to.  We carried
11  tape-recorders with us.
12     Q.  Okay.
13     A.  Sometimes it wasn't possible to go to the bureau.
14     Q.  Okay.  And so each of the homicide detectives
15  carried tape-recorders like pocket tape-recorders with you
16  so that you would be able to tape witness interviews?
17     A.  Yes, ma'am.
18     Q.  Okay.  And I take it that would be true for
19  suspect interviews as well.  In other words, if you went
20  out to make an arrest in a serious case, you would bring
21  your -- you were supposed to bring your pocket recorder so
22  that if the suspect decided to give a statement, you would
23  be able to record it?
24     A.  If we went out in the field, our practice was
25  when possible if we interviewed a suspect to bring him

Page 94

1  back to the bureau and interview him there.  Because
2  obviously if he was a suspect and we had the evidence we
3  needed, we would put him across the street in the county
4  jail.
5      Q.  Okay.  And by the way, you didn't then just call
6  it a day and go home.  Right?  In other words, a homicide
7  investigation doesn't end with arrest.  Correct?
8      A.  No.
9          MS. GUERRA:  Object to form.  You can
10  answer.
11     A.  No, there's -- no, you go until you -- as long as
12  you got leads to follow up.  I worked a lot of 80 and
13  90-hour weeks without going home.  And as long as -- it's
14  a fact when you get on a homicide call out, if you don't
15  have that thing pretty well buttoned down within the first
16  10 or 12 hours, you're in for the long-haul.  So once you
17  start the investigation, you keep following leads until
18  you run out of leads and then, okay, go home but it's
19  not --
20     Q.  (BY MS. FREUDENBERGER) And it's unusual to have a
21  homicide case buttoned up in the first 10 or 12 hours.
22  Correct?
23     A.  If we're lucky, yeah.  Some of them went on for
24  months.  You know, it depends on what kind of information
25  you get on the initial investigation.

Page 95

1      Q.  And, in fact -- well, withdrawn.
2          In some ways an arrest -- even in the
3  unusual circumstance where you are able to solve a
4  homicide in the first eight to ten hours, an investigation
5  continues long after arrest.  Correct?
6      A.  Sure.  There's a lot of leads to run down.  You
7  get them while they're fresh.
8      Q.  Right.  And you don't stop -- it's no less
9  important to run down leads once you have a suspect in
10  custody.  Correct?
11     A.  Any information or evidence that corroborates
12  whatever you have against your suspect, you run it down.
13     Q.  And the detective investigating a homicide has an
14  obligation to run down all possible leads regardless of
15  whether they had somebody in custody or not.  Correct?
16          MS. GUERRA:  Object to form.  You can
17  answer.
18          MR. COOPER:  Object to form.
19     A.  Well, of course.  If you have a potential lead
20  that will identify a suspect, will provide a reasonably
21  good witness, then you follow up on that lead.  Just don't
22  walk away and go home.
23     Q.  (BY MS. FREUDENBERGER) Okay.  In fact, you have
24  an obligation to do everything possible to corroborate
25  your evidence in the case.  Correct?

Page 96

1      A.  Sure.
2          MS. GUERRA:  Object to form.  You can
3  answer.
4      Q.  (BY MS. FREUDENBERGER) As long as there is
5  evidence to continue investigating, your obligation is to
6  track it down and investigate it.  Correct?
7          MR. COOPER:  Objection.  Form.
8          MS. GUERRA:  Objection.  Form.  You can
9  answer.
10     A.  Follow your leads until they run out.  That was
11  our -- the way Maskil and I worked.  If we run out of gas,
12  then we just catch a breath.  Otherwise, we kept going till
13  we just didn't have anything else to follow up on.
14          MS. GUERRA:  Emma, we've been going
15  about an hour now.  Just when you get to a good point, can
16  we take another short break?
17          MS. FREUDENBERGER:  Sure.
18     Q.  (BY MS. FREUDENBERGER) And, in fact, that wasn't
19  just the way that you and Maskil worked.  That was the
20  practice in the department.  Correct?
21          MS. GUERRA:  Object to form.
22          MR. COOPER:  Foundation.
23          MS. GUERRA:  You can answer if you know.
24          THE WITNESS:  What?
25          MS. GUERRA:  You can answer if you know.



Page 105

1 how detectives were supposed to conduct their
2 investigations?
3           MR. COOPER:  Object to form and
4 foundation.  It misstates the witness's prior testimony.
5           MS. GUERRA:  Join.
6     Q.  (BY MS. FREUDENBERGER) You tell me, sir.  Were
7 there written rules?
8     A.  None that I am aware of.
9     Q.  Okay.  Including when it came to investigating
10 leads after a suspect's arrest.  Fair to say?
11    A.  If we had leads to follow up even after the
12 arrest, we followed up on them because if they were
13 important or critical to the case and if you neglect them,
14 they may fall apart or get lost.  They may not exist.
15 People change their mind.
16    Q.  Of course you did.  It would be insane not to.
17 Right?
18           MS. GUERRA:  Object to form.
19           MR. COOPER:  Object to form.
20    Q.  (BY MS. FREUDENBERGER) If you're actually trying
21 to solve a case?
22           MR. COOPER:  Object to form.
23           MS. GUERRA:  You can answer.
24    A.  We're trying to solve the case but we're also --
25 yeah, we're trying to solve the case and present it to the

Page 106

1 prosecutor.
2     Q.  (BY MS. FREUDENBERGER) And if you're trying to
3 legitimately solve a case through legitimate police work,
4 you continue investigating all leads regardless of whether
5 there is a suspect in custody or not.  Correct?
6           MS. GUERRA:  Object to form.
7           MR. COOPER:  Object to form and
8 foundation.
9           MS. GUERRA:  You can answer.
10    A.  We would follow up on any leads available to
11 solve the case and --
12    Q.  (BY MS. FREUDENBERGER) So the answer is yes?
13    A.  And what?
14           MR. COOPER:  Object to form and
15 foundation and --
16    Q.  (BY MS. FREUDENBERGER) So the answer to my
17 question was yes?
18           MS. GUERRA:  Same objections.  You can
19 answer the question.
20    A.  We would follow up on the leads if they were
21 there.
22    Q.  (BY MS. FREUDENBERGER) So the answer to my
23 question is yes?
24           MS. GUERRA:  Same objections.
25           MR. COOPER:  Objection.

Page 107

1     A.  Yes.
2     Q.  (BY MS. FREUDENBERGER) Okay.
3           MS. FREUDENBERGER:  All right.  We can
4 take a break.
5           (A recess was taken from 11:40 a.m. to
6            12:04 p.m.)
7     Q.  (BY MS. FREUDENBERGER) All right.  Sir, just a
8 few more questions before we get into this investigation.
9 As a homicide detective in the early 1990s and throughout
10 your career, you had an obligation to document everything
11 you did on a case.  Correct?
12    A.  Yes.
13           MS. GUERRA:  Object to form.  You can
14 answer.
15    A.  Yes, we did.  If it wasn't on paper, it didn't
16 happen and I can't remember anything.
17    Q.  (BY MS. FREUDENBERGER) That's a common saying in
18 policing, if you don't write it down, it didn't happen.
19 Right?
20    A.  Put it on paper, yes, ma'am.  I can't remember
21 everything that everybody told me.  No way.
22    Q.  And that's one reason that it's important for
23 detectives working any kind of serious case to accurately
24 and comprehensively document their work.  Correct?
25    A.  Yes, ma'am.

Page 108

1     Q.  Okay.  Because for one thing, you might forget a
2 detail.  Right?
3     A.  Yes, ma'am.
4     Q.  Okay.  And cases could take months or years to
5 solve.  Correct?
6     A.  Yes, ma'am.
7     Q.  Could take months or years to go to trial.
8 Right?
9     A.  Yes, ma'am.
10    Q.  And you don't always know as an investigator
11 what's going to be relevant down the road.  Correct?
12    A.  I would know what would be relevant in court you
13 mean or relevant to the case?
14    Q.  Or relevant to the case.  I mean, one reason --
15 another reason it's important as a detective investigating
16 a case to write down everything that happens is because
17 something could happen that doesn't seem important and
18 turns out to be important down the line.  Right?
19    A.  That's right.
20           MS. GUERRA:  Object to form.
21    Q.  (BY MS. FREUDENBERGER) That's another reason it's
22 important to have everything written down.  Correct?
23    A.  Yes, ma'am.
24    Q.  Okay.  Documentation, in fact, is the bread and
25 butter of any homicide investigation.  Fair to say?



Page 109

1           MS. GUERRA:  Object to form.  You can
2 answer.
3     A.  Yes, ma'am.
4     Q.  (BY MS. FREUDENBERGER)  Okay.  For example, it's
5 important to document -- for example -- well, before we do
6 that, it's important for your documentation to not only be
7 accurate but to be comprehensive as well.  Right?
8     A.  Accurate and you said comprehensive?
9     Q.  Uh-huh.
10    A.  Right.  Yes, ma'am.
11    Q.  Okay.  And were you also trained to document your
12 work chronologically?
13    A.  Yes, ma'am.
14    Q.  Because sometimes the order in which things occur
15 can turn out to be important.  Correct?
16    A.  Yes, ma'am.
17    Q.  And I've looked at some training materials in
18 this case and it looks like you were trained that all
19 officers -- well, I'll make it simpler.  Earlier we talked
20 about the fact that any time you interview a witness if
21 possible, you would want another investigator present.
22 Right?
23    A.  If possible, yes.
24    Q.  And the requirement was that all officers with
25 knowledge should -- I'll quote to you from the training

Page 110

1 materials.  All officers with knowledge should write
2 reports, i.e., corroboration.  That's from documents
3 disclosed in this case.
4           Would you agree that the requirement was
5 that each investigator write a report documenting
6 everything that they did during an investigation?
7           MS. GUERRA:  Object to form.  You can
8 answer.
9     A.  That's the way Maskil and I operated.  If we
10 worked together and interviewed a person, we both wrote a
11 report.
12    Q.  (BY MS. FREUDENBERGER)  And that's how you were
13 trained.  Correct?
14    A.  Yes, ma'am.
15    Q.  Okay.  That was your understanding of your
16 obligation.  Right?
17    A.  Well, that was the way we worked obligation or
18 not.
19    Q.  Okay.  In other words, it wouldn't have been
20 proper for you to say, oh, well, Maskil's writing this up,
21 I don't need to write it down?
22    A.  No, ma'am.
23    Q.  Okay.  And it looks to me in reviewing this file
24 like there were a few ways -- a few different ways that
25 information would be documented in a homicide

Page 111

1 investigation.  For one as you've already told me, in
2 interviewing witnesses, there would be a transcript
3 generated of an audio recording.  Correct?
4     A.  We did that as much as it was possible, yes,
5 ma'am.
6     Q.  Okay.  And if a transcript was generated of an
7 audio recording -- well, withdrawn.
8           Any time you recorded a witness
9 interview, the practice would be to have the witness sign
10 off on the transcription to certify it was accurate.
11 Correct?
12    A.  That was our preferred procedure, yes, ma'am.
13    Q.  Okay.  And explain to me why you would you want a
14 witness to sign.  Why was that a preferred procedure?
15    A.  We tape-recorded a statement and we saved it.  We
16 had it printed out or typed, whatever, and we asked the
17 witness to sign it.  And the witness signature I think is
18 as important as any other contract.  If you don't sign
19 your name there, it doesn't really mean nothing.  They
20 could always say I didn't say that which was why we also
21 kept the videotape.  A backup one for the other.
22    Q.  Okay.  Back in the '90s in 1994, were you
23 videotaping witness interviews?
24    A.  I don't remember exactly when but we did towards
25 the last videotape a couple of interviews, yes.

Page 112

1     Q.  All right.  So you would maintain that the
2 practice and procedure would have been to audio record a
3 witness interview and then have that witness interview
4 typed while the witness was still present?
5     A.  Yes, ma'am, and have the witness sign it.  And
6 also sometimes we'd take a witness statement verbally.
7 They would talk to us and our secretary would type it as
8 they said it.  And then when we finished up, we'd give it
9 to them.  They'd read it, sign it, and initial any
10 corrections or whatever.
11    Q.  Okay.  And obviously before you took the audio
12 recorded statement, you would talk to the witness.
13 Correct?
14    A.  Yes, ma'am.
15    Q.  Okay.  And that's called a pre-interview?
16    A.  Yes, ma'am.
17    Q.  Okay.  And during that pre-interview, you would
18 find out what the witness knew about the incident you were
19 investigating.  Correct?
20    A.  Yes, ma'am.
21    Q.  Okay.  And then you had an obligation to bring
22 out everything of any relevance reported to you in the
23 pre-interview either in the audio recorded statement or in
24 a narrative report.  Correct?
25           MS. GUERRA:  Object to form.  You can



Page 113

1  answer.
2     A.  Well, yes, we would -- I'm trying to figure
3  out -- what was the question now?  We would --
4     Q.  (BY MS. FREUDENBERGER)  Sure.  Anything that --
5  your obligation was to make sure that anything relevant a
6  witness had told you was documented either by bringing it
7  out in the audio recorded statement or by putting it in an
8  narrative report.  Correct?
9            MS. GUERRA:  Same objection.
10    A.  Yes, ma'am.
11    Q.  (BY MS. FREUDENBERGER) Okay.  And that would
12  include any credibility or reliability issues with a
13  witness you were made aware of.  Correct?
14    A.  Well, that would be the reason we would have the
15  witness sign a statement.  If later it's proven to be
16  false and credibility, we would have some recourse.
17    Q.  Okay.  That was the reason for the signing
18  requirement?
19    A.  One of the reasons for signing it, yes.
20    Q.  Okay.  And so, for example, I'll give you an
21  example of what I'm talking about.  If you interviewed a
22  witness and you smelled alcohol on their breath and they
23  were acting intoxicated, I assume you would have an
24  obligation to document that somewhere.  Correct?
25    A.  In most cases --

Page 114

1            MS. GUERRA:  Objection.  Form.
2            THE WITNESS:  I'm sorry.
3            MS. GUERRA:  Go ahead.
4     A.  In most cases we would not interview them.  We
5  would wait till they sobered up.
6     Q.  (BY MS. FREUDENBERGER) Okay.  But say -- all
7  right.  I'll give you -- I'll give you another example.
8  Say you have -- well, we talked earlier about sex workers,
9  prostitutes.  Say you're interviewing somebody who -- do
10  you know what a better example is?
11           A better example would be an informant,
12  somebody who is getting some kind of benefit in return for
13  their cooperation.  Obviously in that situation, you would
14  have to document the benefit they were getting.  Correct?
15           MS. GUERRA:  Object to form.  You can
16  answer.
17    A.  We interview the informants.  It's not very often
18  we took statements from them.  Because if they wanted to
19  be a confidential informant, their statements would be
20  admissible in court and could, you know, create a problem
21  for them.  So --
22    Q.  (BY MS. FREUDENBERGER) And an informant is only
23  as valuable as -- what's the saying?  An informant is only
24  as reliable as information they've provided in the past.
25  Right?

Page 115

1     A.  Even informants who gave information in the past,
2  whatever information we got we would try to validate it
3  before we acted on it.
4     Q.  And that's because information coming from an
5  informant who is getting something -- anything in return
6  for their information is inherently suspect.  Correct?
7     A.  We -- I never rewarded an informant with payment
8  or anything else.  They come to us with information.  They
9  want it confidential, you stay confidential.  We try to
10  act on the information if we can validate it.  I don't
11  like informants.
12    Q.  I understand.  And the reason that you don't like
13  it -- well, inherently informants have creditability
14  problems.  Correct?
15    A.  They have what?
16    Q.  Potential credibility problems.
17    A.  They have what?
18    Q.  Potential credibility problems.
19    A.  Sure, they have potential credibility -- we had a
20  tips hotline.  They call in to give us information and it
21  paid off sometimes.  They got paid for their information
22  but we never knew who they were.
23    Q.  Okay.  And by the way, any time information came
24  in through the tips hotline or a direct call to the
25  precinct, you had an obligation to document that.

Page 116

1  Correct?
2     A.  Sure.
3            MR. COOPER:  Objection.  Form.
4     Q.  (BY MS. FREUDENBERGER) Okay.  And any time anyone
5  who provided information got any kind of benefit in
6  exchange for their information, you had an obligation to
7  document that.  Correct?
8            MS. GUERRA:  Object to form.
9            THE WITNESS:  Huh?
10           MS. GUERRA:  Object to form.  You can
11  answer.
12    A.  If there was any exchange to their advantage for
13  giving us information, we would document it.  We had a
14  registered informant file.  Somebody would come through
15  with information.  The police department would pay them.
16           The informant was photographed and
17  printed and find a receipt for the money they got and it
18  was accountable because we were spending the city's money.
19  Here again, I don't like to use informants because I
20  wasn't going to spend my money for the information may or
21  not be good.
22    Q.  (BY MS. FREUDENBERGER) Well, and there was
23  another reason that informants have to be kept track of
24  and logged and documented not just because you're spending
25  the city's money but because prosecutors need to know if a



Page 117

1 witness they're relying on has provided information in the
2 past. Correct?
3     A.  Yes, because the prosecutor should know the
4 background and credibility of the informant because --
5     Q.  Okay.  And anything bearing on the credibility of
6 somebody providing information in any serious case should
7 be documented so that the prosecutor is aware of it.
8 Correct?
9             MR. COOPER:  Object to form and
10 foundation.
11            THE WITNESS:  Do what?
12            MS. GUERRA:  He objected to form and
13 foundation but you can answer if you know.
14    A.  Back again to your question because I heard
15 somebody say something.
16    Q.  (BY MS. FREUDENBERGER) Sure.  Any information
17 that bears on -- withdrawn.
18           Any information potentially bearing on
19 the credibility of a witness providing information in any
20 of your cases had to be documented so the prosecutor was
21 aware of it.  Right?
22    A.  Yes, and that's the reason we --
23            MR. COOPER:  Objection.
24            MS. GUERRA:  He just objected again but
25 you can keep going.

Page 118

1     A.  That's the reason we would validate whatever
2 information we got from an informant.  If they told us
3 something, we would try to establish credibility of the
4 information before we acted on it.
5     Q.  (BY MS. FREUDENBERGER) Okay.  In other words, you
6 would try to go out and corroborate what the informant was
7 telling you on -- telling you before you simply took that
8 information at face value.  Correct?
9     A.  Yes.
10    Q.  Okay.  That's another basic concept in policing.
11 Correct?
12    A.  Uh-huh.
13            MS. GUERRA:  Object to form.  You can
14 answer.
15            THE WITNESS:  I think I did.
16            MS. GUERRA:  Okay.  Okay.  Sorry.  Give
17 me some time to assert an objection before you answer.
18 Okay?
19            THE WITNESS:  I'm sorry.
20            MS. GUERRA:  That's okay.
21    Q.  (BY MS. FREUDENBERGER) Yes?
22    A.  Yes.
23    Q.  And it's the lead detective's obligation in a
24 homicide case to ensure that every potentially significant
25 thing that happens during a investigation is accurately

Page 119

1 documented.  Correct?
2            MS. GUERRA:  Object to form.
3            MR. COOPER:  Objection to form.
4            MS. GUERRA:  You can answer.
5     A.  Well, yes, ma'am.
6     Q.  (BY MS. FREUDENBERGER) Okay.  And where -- I
7 gather that procedure was all reports were put in a file
8 kept in some central location.  Correct?
9     A.  Every report we wrote regarding a homicide was in
10 that file, and where they kept the file or stored it, I
11 have no idea.  It was in a file cabinet somewhere.  We
12 could find it if we needed it.
13    Q.  Well, where did you keep the file when you were
14 working homicides?
15    A.  We kept it on --
16    Q.  While the investigation was active, where would
17 the file be kept?
18    A.  Carried it in my hand in my folder.  And I didn't
19 leave it around where other people would have access to
20 it.  It's just that simple.  Most --
21    Q.  Okay.  So you're working a homicide.  You are
22 preparing reports, you're putting them in the file, and
23 then what happens to the file?  During the pendency of the
24 investigation, where is the file maintained?
25    A.  Original copies would go to the secretaries who

Page 120

1 would have a central filing location accessible to the
2 lieutenant and the working officers.  That would be in a
3 secretary's office I assume.  We kept working copies in
4 our personal file to refer back to.
5     Q.  Okay.  So there would be a central file
6 maintained somewhere that the lieutenant and the
7 detectives working the case had access to.  Correct?
8     A.  Right.
9     Q.  And then the individual detective would also keep
10 copies of their reports?
11    A.  We would keep copies of them if we felt it was
12 necessary to refer back to them.
13    Q.  Okay.  So in this case, for example, there should
14 be both a -- or back in 1994, there would have been both a
15 central copy of the file and Detective Golubski would have
16 had his own copy of the file.  Correct?
17    A.  I don't know about --
18            MR. COOPER:  Form.
19            MS. GUERRA:  You can go ahead.
20    A.  I don't know how Golubski operated, ma'am.  I did
21 not work with him.
22    Q.  (BY MS. FREUDENBERGER) Okay.  And one reason that
23 the file would have to be maintained in a place that
24 Lieutenant Culp had access to is because Lieutenant Culp
25 had a responsibility to review the investigative report as



Page 121

1 the investigation was going on.  Correct?
2    A.  Yes, ma'am.
3        MS. GUERRA:  Object to form.
4        THE WITNESS:  I'm sorry.
5        MS. GUERRA:  You can answer.
6        THE WITNESS:  Yes, ma'am.
7        MS. GUERRA:  Object to form.  You can
8 answer.
9    Q.  (BY MS. FREUDENBERGER) And that's because if
10 additional investigative steps were warranted, it was
11 Lieutenant Culp's responsibility to make sure they
12 occurred.  Correct?
13       MS. GUERRA:  Object to form.  You can
14 answer.
15   A.  Yes, ma'am.
16   Q.  (BY MS. FREUDENBERGER) And so Culp needed to have
17 access to the reports in order to find out what was
18 happening in the investigation and direct additional
19 investigative steps if necessary.  Correct?
20   A.  Yes.
21   Q.  Okay.  Did Lieutenant Culp ever come to you and
22 direct that you take an additional investigative step?
23   A.  There were -- would be incidents where he may get
24 information from another source and pass it to us to
25 follow up on.

Page 122

1    Q.  Okay.  And in those situations where Lieutenant
2 Culp came upon additional information relevant to the
3 investigation, he would have an obligation to do a report
4 and document it.  Correct?
5    A.  He did or we did?
6    Q.  He did.
7    A.  That would be his choice as a boss.  If he come
8 up with something he thought needed to be followed up, he
9 would tell us.  If we didn't know about it, we couldn't.
10   Q.  No, I understand.  I'm asking something
11 different.  In those situations if Lieutenant Culp was
12 actually conducting an investigation, then he would have
13 had an opportunity to document what he -- he would have
14 had an obligation to document what he was doing.  Right?
15       MS. GUERRA:  Object to form, foundation.
16 You can answer if you know.
17   A.  Well, yeah, he would document it but mostly he
18 would say I got this piece of information.  You need to
19 check it out and we would.  I don't know what kind of
20 reports he wrote, if any.
21   Q.  (BY MS. FREUDENBERGER) All right.  But in other
22 words, every -- every potentially significant thing that
23 happened during a homicide should be documented and put in
24 the file.  Correct?
25       MS. GUERRA:  Object to form.

Page 123

1        MR. COOPER:  Object to form and
2 foundation.
3        MS. GUERRA:  You can answer.
4    A.  We documented what we did and put it in the file
5 because at some point, it would be relevant to the case.
6    Q.  (BY MS. FREUDENBERGER) Okay.  That was a
7 requirement.  Correct?
8    A.  I would say --
9    Q.  That one wasn't optional.  Fair to say?
10   A.  Well, I would suggest it would be a requirement.
11 That's the way we functioned.  That was our SOP that we
12 did.  I can't account for the other team.
13   Q.  Okay.  You're not suggesting though, sir, that
14 only you and Maskil were required to create documentation
15 of what happened in your investigation?
16   A.  No, ma'am.
17   Q.  Okay.  And there were penalties for -- well
18 withdrawn.
19       So we talked about witness interactions.
20 And by the way, this may sound like a silly question, but
21 when you learn information from a witness during a
22 homicide, oftentimes there would be reasons -- I'll try
23 and ask this in a simpler way.  In a homicide case, you're
24 often talking to your witnesses more than once.  Correct?
25   A.  Talking to my witnesses what?

Page 124

1    Q.  More than once in the course of an investigation.
2    A.  We re-interview people several times as
3 necessary, yes.
4    Q.  Okay.  And new information would surface.  You
5 would go out and you would ask your witness questions
6 about that new information.  Correct?
7    A.  Yes, ma'am.
8    Q.  Wouldn't be unusual to have two or three or four
9 reports concerning interactions all with one witness.
10 Right?
11   A.  No.
12   Q.  And obviously if you're interviewing a witness
13 for a second or third time, your obligation to document
14 those interactions doesn't change.  You still have to
15 write it down in a report and put it in a file.  Right?
16   A.  We would indicate that we re-interviewed the
17 person for further information.
18   Q.  Okay.  And if that information was potentially
19 significant to the investigation, you would write it down.
20 Correct?
21       MR. COOPER:  Object to form.
22   A.  Yes, ma'am.  I'm sorry.
23   Q.  (BY MS. FREUDENBERGER) And how do you actually
24 document your work?  Do you carry a note pad with you out
25 in the field?



CLYDE BLOOD VOLUME 1                                    February 03, 2021
MCINTYRE vs UNITED GOVERNMENT OF WYANDOTTE              125–128

1     A.  Where?

2     Q.  Did you carry a note pad?

3     A.  I carried a note pad, we carried a tape-recorder.

4 We might sit in a car eating a hamburger and tape record

5 our investigation statement or documentation.  It depended

6 where and what was convenient but we documented what we

7 did.

8     Q.  Okay.  And you documented -- was your practice to

9 write contemporaneous notes wherever possible?

10    A.  Write what notes?

11    Q.  Contemporaneous notes.

12    A.  Oh, like on our pad?

13    Q.  Yes.

14    A.  I would keep notes, yes.

15    Q.  Well, would you create your documentation as

16 close in time as possible to the events in order to ensure

17 that it was accurate?

18    A.  Yes, ma'am.

19    Q.  Okay.  Was that a basic practice in the homicide

20 unit at the time?

21    A.  It was my method.  I don't remember things so I

22 write it down.  I make notes.

23    Q.  Okay.  And once -- and so what was your process

24 for turning those notes into a written report?

25    A.  When I finished up with my notes, I have a bad

1 habit of doodling and I scribble little things on paper

2 and then when I finish my notes, I put the information in

3 the report and destroy the notes.  My information would be

4 my memory in the report.

5     Q.  Why do you destroy the notes?

6     A.  Because I doodle on them and I didn't want to

7 have explain to somebody in court why I had a picture of a

8 car and a clown in it or something while I was writing a

9 report.

10    Q.  Was it also because you knew that if you brought

11 your note pad to court, the attorneys for the defense

12 would have the opportunity to review your entire note pad?

13    A.  They had no reason to because what was in my

14 report is what they would get and it would cover what was

15 in my notes.

16    Q.  Okay.

17    A.  I didn't hide or conceal anything.

18    Q.  And that was a requirement at the time.  Correct?

19         MS. GUERRA:  Object to form.

20    A.  My what?

21    Q.  (BY MS. FREUDENBERGER) That was a requirement at

22 the time.  Correct?

23    A.  It wasn't a requirement.  It was the way I did

24 business.  It was my reaction.

25    Q.  By the way, was there also a document -- in

1 addition to the narrative reports and transcripts of

2 witness statements, was there also a document called the

3 prosecution summary that was in use in homicides cases?

4     A.  Yes, ma'am.

5     Q.  And what was the purpose of that document?

6     A.  Who was what?

7     Q.  What was the purpose of that document?

8     A.  It listed all suspects, statements, witness

9 statements, and any physical evidence and any other

10 evidence that -- it was a condensed thing to give the

11 district attorney something to work with.

12         When they got the prosecution summary,

13 we'd have a summary of what -- who was a witness and what

14 they had to say briefly.  And we'd have a summary of any

15 evidence, any suspects statements, but the prosecution

16 summary was exactly that.  It was a summation of

17 everything involved in the case and we'd give them a quick

18 look at what they were dealing with.

19    Q.  Okay.  So I take it that was a -- it was

20 critically important to -- that that document be accurate.

21 Correct?

22         MS. GUERRA:  Object to form.

23    A.  To being accurate?

24         MS. GUERRA:  You can answer.

25    A.  Of course, yes.

1     Q.  (BY MS. FREUDENBERGER) Because detectives

2 understood that the prosecutor would be looking to that

3 document to find out an overview of what each witness had

4 to say.  Fair to say?

5     A.  Yes, ma'am.

6     Q.  Okay.  And when was that document filled out in

7 an investigation?

8     A.  It would be upon completion of an investigation

9 and when it was ready to be presented to the district

10 attorney for review to determine if they would prosecute

11 or not so.

12    Q.  Okay.  And so what was the rule in place in terms

13 of regarding when an investigation should be presented to

14 the prosecution?

15         MS. GUERRA:  Object to form.  You can

16 answer.

17    A.  When we felt we had enough evidence, enough

18 information to present to the district attorney to file a

19 charge, then it was forwarded to the prosecutor's office,

20 district attorney.  They reviewed it.  If they had

21 questions, they would come back to us with me questions.

22 We would run down additional leads or any information they

23 wanted.

24         Generally it was presented when we felt

25 we had enough for the district attorney to work with.  But



Page 129

1 that wasn't the end of it. If there was further
2 investigation necessary, the district attorney would
3 contact us. We would have a meeting and follow up on
4 whatever lead was necessary.
5     Q.   (BY MS. FREUDENBERGER) And if you determined --
6 if you came across information that indicated additional
7 investigation was necessary, it was your obligation either
8 to go and conduct that investigation or to inform the
9 district attorney of it. Correct?
10    A.   You mean if we found additional information we
11 thought was necessary?
12    Q.   Yeah.
13    A.   Yes, we would check it out and then we would
14 report it and forward it to the district attorney.
15    Q.   Okay. In other words, just because you completed
16 a prosecution summary doesn't mean that you are off the
17 hook for continuing to investigate the case. Correct?
18    A.   No, the case would continue if there's anything
19 else to do.
20    Q.   Okay. And the case should continue as long as
21 there is any -- any additional leads to follow up on.
22 Correct?
23    A.   Yes, ma'am.
24    Q.   Okay. And so, for example, say you had a
25 homicide and you had -- if you questioned a witness on the

Page 130

1 first day of the investigation and the witness won't talk
2 to you and the witness contacts you after you've completed
3 your prosecution summary and talks, what's your obligation
4 with that information?
5          MS. GUERRA:  Objection to form.
6 Foundation, incomplete hypothetical. You can answer.
7     A.   We would document what the witness had to say at
8 that point and forward it to the district attorney as
9 additional information.
10    Q.   (BY MS. FREUDENBERGER) And by the way, your
11 obligation to document information as a detective does not
12 hinge on whether the information helps or hurts your
13 theory of the case. Correct?
14    A.   Not really. If they had something they thought
15 was valuable, we would document it and forward it to the
16 prosecution. The district attorney would determine the
17 validity or the need of whatever information it might be.
18    Q.   I understand and I think I'm asking you something
19 a little bit different. As an investigator, your job --
20 you're basically a vacuum cleaner. Right? You're
21 collecting any relevant information and documenting it.
22 Right?
23    A.   Yes, ma'am.
24    Q.   Okay. Whether it helps or hurts your theory of
25 the case. Right?

Page 131

1     A.   You forward it. You forward it to the prosecutor.
2     Q.   You can't simply say, ooh, this information
3 points away from my guy so I'm not going to write it down.
4 Right?
5     A.   If the information directed a different course
6 away from the suspect, we would forward it because we
7 don't want to put an innocent person in jail.
8     Q.   Right. And you also need to make sure that the
9 prosecutor has any information that could come up in
10 court. Right?
11    A.   Yes, ma'am.
12    Q.   That's another reason to document information
13 that points away from your theory of the case. Right?
14    A.   Yes, ma'am. Any information that has a bearing
15 on the case to either prove innocence or guilt, you turn
16 it to the prosecutor. Make them aware of it.
17    Q.   Okay. And that's actually -- that's actually
18 something you were trained on well before 1994. Correct?
19    A.   I don't recollect any particular training, but
20 it's morally right that the person you either prove them
21 innocent or you prove them guilty but you let the facts
22 fall where they may. If you got evidence to clear them,
23 then so be it.
24    Q.   Well, yes, but leaving aside morals, you actually
25 had a legal obligation in the early 1990 -- certainly by

Page 132

1 the early 1990s to forward to the prosecutor any
2 exculpatory information. Right?
3     A.   That would be my belief, yes, ma'am.
4     Q.   Well, it's not just your belief. You understood
5 in the early 1990s -- by the early 1990s, you had an
6 obligation to turn over what's called Brady material.
7 Correct?
8     A.   My obligation was to protect the innocent as well
9 as the guilty. And if they had information --
10    Q.   I'm talking about something a little more
11 technical. You've heard of the case Brady v. Maryland?
12    A.   What?
13    Q.   Have you heard of the case Brady v. Maryland?
14    A.   Not that I recollect, no, ma'am.
15    Q.   Okay. Have you heard of exculpatory information?
16    A.   That's information that would direct guilt away
17 from the suspect.
18    Q.   Right.
19    A.   And if I had that kind of information, I would
20 present it.
21    Q.   And by present it, you mean forward it to the
22 prosecutor on the case. Correct?
23    A.   I would present it to the prosecutor in the case.
24    Q.   Okay. And it was Lieutenant Culp's
25 responsibility to make sure the detectives under his



CLYDE BLOOD VOLUME 1                                              February 03, 2021
MCINTYRE vs UNITED GOVERNMENT OF WYANDOTTE                        133–136

Page 133

1  command presented all exculpatory information in their
2  possession to the prosecutors on the case.  Correct?
3              MS. GUERRA:  Object to form and
4  foundation.
5              MR. COOPER:  Object to form and
6  foundation.
7              MS. GUERRA:  You can answer.
8     A.  Well, he was the boss.  Yeah, he had an
9  obligation the same as we did.  We're all part of the same
10 team.
11    Q.  (BY MS. FREUDENBERGER) Okay.
12    A.  The truth.
13    Q.  And so it was Lieutenant Culp's job to make sure
14 that if you or Detective Maskil or Detective Golubski came
15 across information in an ongoing case in the early 1990s
16 pointing away from your suspect, then you documented that
17 and forwarded that to the prosecution.  Correct?
18    A.  Yes, if he was aware of it.
19    Q.  Well, and but a little more than that actually I
20 think, sir.  You tell me if I'm wrong, but isn't it the
21 lieutenant's responsibility to make sure that to take all
22 reasonable steps to make sure the detectives under his
23 command are complying with their prosecutional
24 obligations?
25    A.  Well, of course.

Page 134

1              MS. GUERRA:  Object to form.
2  Foundation.  You can answer.
3     A.  Yes, it would be his responsibility.
4     Q.  (BY MS. FREUDENBERGER) Okay.  And that's another
5  reason it was important for Lieutenant Culp to be
6  reviewing the documentation and keeping abreast of
7  developments in his investigations.  Correct?
8     A.  Yes.
9              MS. GUERRA:  Object to form.
10 Foundation.
11    Q.  (BY MS. FREUDENBERGER) And by his investigations,
12 I mean the investigations under his command.  You
13 understand that.  Correct?
14    A.  And his what?
15    Q.  You understand when I say his investigations, I
16 mean the investigations being conducted under his command?
17    A.  It's up to him to keep track of the investigation
18 and keep it on track.
19    Q.  Okay.  And ensure the detectives conducting the
20 investigation are complying with their constitutional
21 obligations.  Correct?
22              MS. GUERRA:  Object to form.  You can
23 answer.
24    A.  Yes, I would say so.
25    Q.  (BY MS. FREUDENBERGER) Okay.  And in your

Page 135

1  experience, Lieutenant Culp knew exactly what was
2  happening in the homicide investigations occurring under
3  his command.  Correct?
4              MS. GUERRA:  Object to form.  You can
5  answer if you know.
6     A.  He would have been kept posted on the
7  investigations that my partner and I worked.  I can't
8  vouch for anybody else.
9     Q.  (BY MS. FREUDENBERGER) Well, was Lieutenant
10 Culp's practice to keep up with the investigative steps
11 you and Detective Maskil were conducting?
12    A.  Yes, and he --
13              MS. GUERRA:  Object to form.
14    A.  And he did.
15    Q.  (BY MS. FREUDENBERGER) Any reason to think that
16 his practice was different when it came to other
17 investigators?
18    A.  No.  I'm not saying it was different.  I'm saying
19 that whatever may or may not have been presented to him,
20 he may not have been aware of.  There's things he may not
21 have been told or presented.
22    Q.  But it sounds to me like what you're saying is
23 insofar as you were concerned based on your experience and
24 your observation in the early 1990s, Lieutenant Culp had a
25 whole variety of avenues for keeping himself up-to-date

Page 136

1  and informed about the investigations going on under his
2  command.  Correct?
3     A.  Well, yeah, he was the boss.  It would be up to
4  him to know what's going on in his command.
5     Q.  Okay.  Particularly when it came to homicides.
6  Right?
7     A.  Any case.  It doesn't matter.
8     Q.  And if Lieutenant Culp wanted more information
9  about something going on in a case under his command, all
10 he had to do was yell across the hall to one of you and
11 initiate a conversation.  Right?
12    A.  If he had additional information he needed or
13 wanted, he would tell us about it and we would pursue
14 that.
15    Q.  Well, my question's a little different, sir.  If
16 Lieutenant Culp wanted more information about something
17 that was happening in an investigation under his command,
18 there were a whole variety of ways he could do that.
19 Right?
20              MS. GUERRA:  Object to the form.  You
21 can answer.
22    Q.  (BY MS. FREUDENBERGER) He could walk across the
23 hall to your office and ask questions.  Right?
24    A.  Yes, ma'am.
25    Q.  He could call you on the phone.  Right?



Page 137

1   A.   Yes, ma'am.

2   Q.   Okay.  He could go out and accompany you on

3   witness interviews if he wanted to.  Right?

4   A.   Yes, ma'am.

5   Q.   Okay.  He not only could but did review all

6   investigative reports.  Correct?

7   A.   To my knowledge, he did, yes, ma'am.

8   Q.   Okay.  And at any point in time, he had the

9   authority to direct or conduct any follow-up investigation

10  he saw fit.  Right?

11           MS. GUERRA:  Object to form.

12  A.   If he had reason for us to follow up on

13  something, he would advise us and we would do that.

14  Q.   (BY MS. FREUDENBERGER) That happened sometimes.

15  Right?

16  A.   Sure.

17  Q.   Okay.  Do you know what tunnel vision means, sir?

18  A.   Do I have what?

19  Q.   Do you know what tunnel vision means?

20  A.   Tunnel vision?

21  Q.   Yes.

22  A.   Sure, I've experienced that with people before.

23  They see what they want to see and nothing else.

24  Q.   And is tunnel vision something you were trained

25  to avoid?

Page 138

1   A.   Absolutely.

2   Q.   And that's a basic concept in policing.  Correct?

3   That it's important to avoid tunnel vision?

4   A.   Well, yeah.  It's kind of like saying don't

5   confuse me with facts while my mind's made up.  That's not

6   the way it works.

7   Q.   You had an obligation as a detective

8   investigating homicides to follow up on all leads

9   regardless of where they pointed.  Correct?

10  A.   Yes, ma'am.

11  Q.   And you had an obligation as a detective

12  investigating homicides to do everything possible to

13  corroborate or disprove what witnesses were telling you.

14  Correct?

15           MR. COOPER:  Object to form and

16  foundation.

17           MS. GUERRA:  Object to form.  You can

18  answer.

19  A.   Yes, we did.

20  Q.   (BY MS. FREUDENBERGER) Okay.  And that's

21  important both because you don't want to convict the wrong

22  person.  Right?

23  A.   Correct.

24  Q.   And if you convict the wrong person, you also run

25  the risk of letting a guilty party go free.  Correct?

Page 139

1   A.   Yes, ma'am.

2   Q.   And by the way, did you and Maskil share an

3   office the entire time you were partners?

4   A.   Yes, ma'am.

5   Q.   Okay.  I assume you talked about all kinds of

6   things?

7   A.   Woodworking, reloading, target shooting, police

8   work, news.

9   Q.   Okay.  Anything that you intentionally didn't

10  talk to Detective Maskil about?

11  A.   My personal life with my wife.  You know, that

12  was none of his business so.

13  Q.   Other than that?

14  A.   No, not that I recollect.

15  Q.   All right.  As a homicide detective, you were

16  not -- well, when you had a homicide as a homicide

17  detective working in the early '90s, I take it your

18  practice would be to respond to the scene?

19  A.   In the vast majority of the cases, yes.

20  Q.   Okay.

21  A.   Sometimes we would be directed by a boss to go

22  someplace else like the hospital or the morgue.  It was up

23  to the supervisor, yeah.

24  Q.   Okay.  But most often your supervisor would

25  direct the detectives who caught the case to go to the

Page 140

1   crime scene?

2   A.   That was the primary objective, yeah.  That's

3   what we did 99 percent of the time or most of the time.

4   Q.   Okay.  And there are reasons for that.  Right?

5   You would want to get a sense of what was going on at the

6   scene?

7   A.   Get a feel for the crime scene.  Get a look

8   around at who's in the area, the area that you get

9   familiar with because we might know somebody in the area

10  that would offer information up.

11  Q.   Talk to the responding officer?

12  A.   Huh?

13  Q.   Talk to the responding officer?

14  A.   Talk to the responding officer, yes, because a

15  lot of those young officers had information that we needed

16  and they would pass it to us.

17  Q.   Okay.  All reasons you would want to go to the

18  crime scene if at all possible.  Right?

19  A.   Yes, ma'am.

20  Q.   And there are obvious investigative steps in

21  certain kinds of homicides you want to make sure are

22  taken.  Correct?  If you're going to be working the case?

23  A.   I'm sorry.  My what?  Stats?

24  Q.   Sure.  There are obvious investigative steps to

25  take in certain --



CLYDE BLOOD VOLUME 1
MCINTYRE vs UNITED GOVERNMENT OF WYANDOTTE

February 03, 2021
141–144

Page 141

1    A.  Oh, yes.
2    Q.  -- kinds of homicides.  Correct?
3    A.  Oh, yeah.  But, you know, first off, you can
4  survey a crime scene and sometimes figure out a little bit
5  of what happened.  You know, blood trails, footprints,
6  things of that nature.
7    Q.  The crime scene talks.  You've heard that
8  expression?
9    A.  Pretty much, yes, ma'am.
10   Q.  Okay.  For example, in a close-range shooting
11 case like this one -- but I'm not -- I won't ask you about
12 this particular case right now.  In a close -- in any
13 close-range shooting case, there may be blood or tissue
14 samples you'll want to have collected.  Fair to say?
15   A.  There usually is, yes.
16   Q.  Okay.  And in a close-range shooting case, it's
17 possible the perpetrator may have touched items at the
18 crime scene.  Correct?
19   A.  Yes, ma'am.
20   Q.  Okay.  And in any homicide case, you'll want to
21 make sure that all possible evidence is dusted for prints.
22 Correct?
23   A.  Yes, ma'am.
24   Q.  So that if prints are lifted, they can be
25 examined and compared with suspects.  Correct?

Page 142

1    A.  Yes, ma'am.
2    Q.  Okay.  For example, shotgun shells could be
3  present at the scene.  Correct?
4    A.  Yes, ma'am.
5    Q.  Okay.  And some shotgun shells have a longer
6  brass base that can be dusted for prints.  Correct?
7          MS. GUERRA:  Object to form.
8  Foundation.  You can answer.
9    A.  It's possible, yes.
10   Q.  (BY MS. FREUDENBERGER) Okay.  So that's an
11 example of a kind of evidence that -- a type of evidence
12 that could be present at a crime scene in a close-range
13 shooting case that you as a homicide detective would want
14 to make sure was gathered and processed.  Fair to say?
15   A.  Yes, ma'am.  Yes, ma'am.
16   Q.  Okay.  And you'll want to look around.  I think
17 you mentioned blood trails?
18   A.  Look at the crime scene for any number of things.
19   Q.  Okay.
20   A.  It could be physical evidence anything from
21 blood, tissue, hair, shotgun shells, footprints.
22   Q.  Anything of potential evidentiary value you want
23 to make sure -- withdrawn.
24          Anything of potential evidentiary value
25 should be properly gathered and documented.  Fair to say?

Page 143

1    A.  Yes, ma'am.  That's the reason we had the crime
2  lab on the scenes on these cases.
3    Q.  Right.  But were there circumstances of the
4  homicide detective where you -- well, withdrawn.
5          One reason you went to the scene as a
6  homicide detective was to make sure that everything that
7  of potential evidentiary value was collected and
8  documented.  Right?
9          THE WITNESS:  Can I explain that?
10         MS. GUERRA:  You can answer the question
11 she's posed.
12   A.  Yes.
13   Q.  (BY MS. FREUDENBERGER) Were there times as the
14 homicide detective -- I understand that there are officers
15 with expertise in processing crime scenes and those are
16 the officers who actually respond to scenes and gather
17 evidence.
18         But were there times as the ranking
19 homicide detective on a scene that you would direct crime
20 scene officers to make sure something -- a piece of
21 evidence -- potential evidence wasn't overlooked?
22   A.  If I saw something that I thought was important,
23 I would point it out to the crime scene officer.
24   Q.  Okay.  And, in fact, as a lead detective on a
25 homicide investigation, it was your obligation to make

Page 144

1  sure that everything important was gathered and tested.
2  Correct?
3          MS. GUERRA:  Object to form.  You can
4  answer.
5    A.  I think that any detective on a scene sees
6  possible evidence, he's obligated to point it out.
7    Q.  (BY MS. FREUDENBERGER) Okay.  Fair enough.  Who
8  determines what tests are conducted -- well, first there
9  are a variety of tests that can be conducted on physical
10 evidence from crime scenes.  Correct?
11   A.  This was a situation -- that would be a situation
12 where we would get with the crime lab people.  Compare the
13 evidence.  And in many cases, a lot of evidence they could
14 not process would be transported to the Kansas Bureau of
15 Investigation Crime Lab in Topeka, Kansas.
16         We would write up the items, itemize the
17 items we wanted tested, and the comparisons made and take
18 it to Topeka.  They would sign for the evidence and
19 however long later, we get a written report from them as
20 to what they found.  So --
21   Q.  And whose job was it to determine which
22 comparisons should be made?
23   A.  That would be a combination or an agreement
24 between us and the crime lab people because they were
25 evidence technicians.  We weren't.  They knew some things



CLYDE BLOOD VOLUME 1
MCINTYRE vs UNITED GOVERNMENT OF WYANDOTTE

February 03, 2021
145–148

Page 145

1  we did not know and we would just compare notes and
2  decide.  It never hurts to examine something whether it
3  proves out or not.  Test it.
4      Q.  And when you say us, you mean the lead detective
5  on a homicide.  Right?
6      A.  Myself and Maskil worked closely with the crime
7  lab people in every case we worked and that was our
8  process.  We compared notes.  We met regularly in between
9  during the investigation and just -- it was just a team
10 effort.  That's all.
11     Q.  Well, and when in doubt, I take it the practice
12 was when in doubt, order the test.  Right?
13     A.  That's right.
14     Q.  In other words, you would never want to not dust
15 all possible evidence for prints because you don't think
16 it's likely.  Right?
17         MS. GUERRA:  Objection to form.
18 Foundation.  You can answer.
19     A.  You test it.  It doesn't matter whether it's
20 likely or not.  You test it and confirm whether it's
21 evidence or serves a purpose or not.
22     Q.  (BY MS. FREUDENBERGER) And you test -- you
23 order -- withdrawn.
24         You actually have an obligation -- did
25 you actually have an obligation as a homicide detective to

Page 146

1  conduct all possible tests even if you were worried if
2  they might turn up evidence pointing away from your
3  suspect?
4         MS. GUERRA:  Object to form.  You can
5  answer.
6      A.  Test the evidence.  If it proves him innocent,
7  then you go look for the other guy.
8      Q.  (BY MS. FREUDENBERGER) It would never be thought
9  to be appropriate to not order tests because they could
10 point away from your suspect.  Right?
11     A.  You request an examination regardless.  If it's
12 evidence and it has potential pro or con, you test the
13 evidence to see if it leads to or away from the suspect.
14     Q.  Okay.  And by the way, once you apprehend a
15 suspect, you want to gather any evidence possible from
16 them as well.  Correct?
17     A.  Yes, ma'am.
18     Q.  Right.  For example, if you have a suspect in a
19 close-range shooting case, you're going to want to conduct
20 a gunshot residue test.  Right?
21         MS. GUERRA:  Object to form.
22 Foundation.  You can answer.
23     A.  Well, if there's a reason to believe there's
24 evidence in his residence and you get a search warrant and
25 you got there, or you get a waiver of search which I

Page 147

1  prefer not to do.  I'd rather to get a search warrant and
2  then you go there and you try to seek any evidence.
3      Q.  (BY MS. FREUDENBERGER) Okay.  That's just a basic
4  investigative step, getting a search warrant for a
5  suspect's residence.  Correct?
6         MS. GUERRA:  Object to form.
7      A.  That's the way we would do it.
8      Q.  (BY MS. FREUDENBERGER) Or I'll withdraw it.
9  That's not always.  You're right.  A basic investigative
10 step is searching a suspect's residence for evidence.
11 Correct?
12     A.  In a lawful search, yes, ma'am.
13     Q.  Yes.  Can you recall any homicides you
14 investigated where you decided or determined not to search
15 a suspect's residence in the course of your career?
16     A.  Not really.  I don't know that we ever neglected
17 to or had the option that we used.  If we thought it was
18 necessary, we went.
19     Q.  And I'm asking you were there ever any homicides
20 that you can recall as you sit here today investigating
21 over the course of your career where you determined it
22 wasn't necessary to search a suspect's residence?
23     A.  Not really.
24     Q.  Okay.  And, in fact, assuming there was no good
25 reason not to, it would have been -- that's a prime

Page 148

1  example of an investigative step Lieutenant Culp was
2  obligated to make sure happened?
3         MS. GUERRA:  Object to form.
4  Foundation.  You can answer if you know.
5      A.  That would be his decision depending on what he
6  knew or what he knew at the time.
7      Q.  (BY MS. FREUDENBERGER) But if you neglected to
8  search a suspect's residence after arrest say either
9  because you forgot or you just overlooked it, it would
10 have been Lieutenant Culp's responsibility to ensure that
11 that happened.  Right?
12         MS. GUERRA:  Object to foundation.
13     A.  It would be ours as well because --
14         THE WITNESS:  I'm sorry.
15         MS. GUERRA:  Go ahead.
16     A.  If we felt it was necessary.  I've gotten many
17 search warrants and I have no hesitation of getting a
18 judge out of bed in the middle of the night and getting a
19 search warrant.  I'm awake.  He can wake up.  If it was
20 necessary, fine, we would do that.
21     Q.  (BY MS. FREUDENBERGER) And judges are available
22 at all hours of the day and night to execute search
23 warrants.  Right?
24     A.  We made a couple of them available.  They wasn't
25 happy about it but.



Page 149

1    Q.   But that's a routine -- getting a search warrant
2    to serve to a suspect's residence is a routine basic
3    investigative step in any homicide. Fair to say?
4        A.   Depends on the circumstances of the case. It's
5    up to the individual officer what they think's necessary.
6    I did not search --
7        Q.   All right. But you can't think of any time you
8    didn't do it?
9        A.   Huh?
10       Q.   You can't think of any time you didn't do it.
11   Right?
12       A.   Well, I can't not really. Wow. I know that I
13   didn't search the residence of every suspect in a homicide
14   because a lot of times it might not lead back there for
15   evidence. I don't know. If I thought it did, I would
16   have went to the extent of doing it.
17              MS. GUERRA:  Emma, I do think we've been
18   going close to an hour. So maybe when we get to a good
19   stopping point, we can take another break?
20              MS. FREUDENBERGER:  Yeah, I think we
21   need to take a lunch break soon. Let me just finish this
22   up.
23              MS. GUERRA:  Okay.
24       Q.   (BY MS. FREUDENBERGER) And another basic
25   investigative step in any homicide I gather once you have

Page 150

1    made an arrest is to search the suspect himself. Correct?
2        A.   If we arrest or contact somebody as a potential
3    suspect in a homicide, he's a potential danger to us, we
4    would search him.
5        Q.   All right. And would be searching him not only
6    to make sure he didn't have a weapon but to see if he had
7    anything of evidentiary significance on his person.
8    Correct?
9        A.   We search him for a weapon. Anything else would
10   be incidental to the search.
11       Q.   Okay. Another important step in any homicide
12   investigation is to search for a murder weapon. Correct?
13       A.   Is what?
14       Q.   To search for the murder weapon. Correct?
15       A.   It would be nice to have, yes. It would be good
16   evidence, yes.
17       Q.   And it's good evidence because if you can tie a
18   suspect to a murder weapon in a homicide, that is powerful
19   evidence you got. Right?
20       A.   I would be willing to search for that evidence,
21   yes, ma'am.
22       Q.   Okay. And, in fact, that's an important
23   investigative step to take in any homicide. Correct?
24       A.   Yes, ma'am.
25       Q.   And we talked a minute ago about gunshot residue

Page 151

1    testing. Describe for me briefly how that works.
2        A.   Gunshot residue is a chemical test. The sooner
3    you take it, the better because there's several things
4    that could destroy that evidence. If a person goes to the
5    urinal, body fluid would null and void the evidence.
6    After they've handled a dozen or two things, that evidence
7    could be gone.
8              So gunshot residue, a search for that
9    should be conducted as quickly as possible after the
10   incident. I'm no expert on that but that's been my
11   experience.
12       Q.   An as a homicide detective if a gunshot residue
13   test in a shooting case had happened and it was still
14   within a day or two of the crimes, you would direct it
15   to -- no reason you wouldn't direct that test to be done.
16   I understand there are all kinds of reasons that it might
17   not come back positive even if the suspect was the
18   shooter.
19              But in any shooting case, you would to
20   have a gunshot residue testing test done as -- on the
21   potential suspect's face and hands as quickly as
22   practical. Right?
23       A.   Yeah.
24              MS. GUERRA:  Object to form.
25              THE WITNESS:  I'm sorry?

Page 152

1              MS. GUERRA:  Object to form. You can
2    answer.
3        A.   After a day or two, it's probably a wasted
4    effort. But, yeah, if you think it's necessary or
5    possible, it doesn't cost that much to run that test. Run
6    the test.
7        Q.   (BY MS. FREUDENBERGER) Okay. And gunshot residue
8    can be detected on clothing as well the skin. Correct?
9        A.   Yes, I think so. I think that probably a better
10   chance of recovering it on clothing than it would be on
11   somebody's hands after they've done whatever they do.
12       Q.   And so in a shooting case, you would want to --
13   in a shooting case where you made an arrest within say a
14   day of the crime, you would want to collect a -- you know
15   what, withdrawn.
16              There's another crime scene phenomenon
17   I'm aware of called blowback. Do you know what blowback
18   is?
19       A.   Who? No.
20       Q.   All right. Well, in a close-range shooting case,
21   oftentimes blood from the victims will spray out --
22       A.   Sure.
23       Q.   -- of the body. Correct?
24       A.   Yes, ma'am.
25       Q.   Okay. And that's why if you apprehend a suspect



Page 153

1  within a reasonable amount of time after a close-range
2  shooting, you would want to collect their clothing to test
3  it for blood spatter. Correct?
4          MS. GUERRA: Object to form.
5  Foundation. You can answer.
6    A.  Here again, it depends whether he's had time to
7  change clothes. He bathed if he had blood all over him.
8  That's the first thing I'm going to do is get rid of that
9  evidence. And it's possible to do that.
10         Check -- never hurts to check. It never
11  hurts to run a test. And regardless of how nonsensical it
12  might seem, if we had reason to believe it was worth the
13  effort, we would run the test.
14    Q.  (BY MS. FREUDENBERGER) Okay.
15    A.  We. Maskil and I.
16         MS. FREUDENBERGER: All right. Let's
17  take a lunch break.
18         (A recess was taken from 1:06 p.m. to
19              1:39 p.m.)
20    Q.  (BY MS. FREUDENBERGER) All right. Sir, I take it
21  you were trained long before 1994 that witnesses make
22  mistakes in ID procedures for a variety of reasons?
23    A.  Witnesses may be what? Taped?
24    Q.  No. Witnesses can make mistakes in ID
25  proceedings for a variety of reasons?

Page 154

1    A.  Well, of course.
2    Q.  So you were trained it's critical to ensure that
3  you follow all safeguards designed to avoid mistakes in ID
4  proceedings. Correct?
5          MS. GUERRA: Object to form. You can
6  answer.
7    A.  I think it was a personal preference, not the way
8  I was trained.
9    Q.  (BY MS. FREUDENBERGER) Sir, you answered some
10  interrogatories about your training in this investigation.
11    A.  Yes, ma'am.
12    Q.  You have testified today that you had hours and
13  hours of in-service training at the Kansas City, Kansas,
14  Police Department.
15    A.  Yes, ma'am.
16    Q.  But you're being very careful whenever I ask you
17  about training or policies or procedures to simply
18  describe your personal preferences as opposed to any rules
19  or training in the department and I think you're doing it
20  on purpose and I understand why.
21         MS. GUERRA: Objection to this running
22  commentary and to this argumentative language. There's no
23  question here.
24         MS. FREUDENBERGER: I think he
25  understands what I'm saying but I'll be clear.

Page 155

1    Q.  (BY MS. FREUDENBERGER) Sir, every police
2  department around the country trains its homicide
3  detectives. You yourself had in-service training that you
4  have testified to under oath in the Kansas City, Kansas,
5  Police Department. You were a career officer in the
6  Kansas City, Kansas, Police Department. Right?
7    A.  Yes, ma'am.
8    Q.  Okay. And you attended in-service training.
9  Right?
10    A.  Yes, ma'am.
11    Q.  You went to the police academy. Right?
12    A.  Yes, ma'am.
13    Q.  Okay. And you weren't told, Sergeant -- or, you
14  know, Mr. Blood or Cadet Blood, Officer Blood, you know,
15  go by your moral and your personal preferences. You were
16  actually instructed on ways to conduct investigations.
17  Correct?
18    A.  I helped give a couple of classes in the academy,
19  yes, ma'am, and during in-service training. But you got
20  to realize --
21    Q.  Yeah, you actually -- you actually not only
22  received training, you trained other officers. Right?
23    A.  I passed on information based on my knowledge,
24  yes, ma'am. Experience.
25    Q.  Okay. And you didn't just pass on knowledge.

Page 156

1  You actually instructed other officers on how to conduct
2  particular investigative steps. Right?
3    A.  My methods is what I talked about.
4    Q.  Okay.
5    A.  What works for me may not work for somebody else.
6    Q.  Well, sure. That's true in terms of how to
7  question a witness perhaps. But are you saying, sir, that
8  there are no rules officers are trained on in the Kansas
9  City, Kansas, Police Department?
10    A.  I'm not saying there are no rules. I don't
11  remember any written rules or regulations. I don't
12  remember.
13    Q.  But I'm not talking about written rules or
14  regulations. I'm talking about there are all kinds of
15  rules in police departments. Right?
16    A.  Sure, there are.
17    Q.  Okay. There are rules about how you wear your
18  uniform in police departments. Right?
19    A.  Yes, ma'am.
20    Q.  Okay. There's a disciplinary system in place for
21  when officers break the rules. Right?
22    A.  Yes, ma'am.
23    Q.  Okay. And the only way for officers to be aware
24  of those rules absent written SOPs is to be trained in
25  them. Correct?



1   A.  Yes, ma'am.

2   Q.  You were trained in how to put together a proper

3 photo lineup.  Correct?

4   A.  Yes.

5   Q.  And you were trained, for example, that a proper

6 photo lineup contains at least six photographs.  Correct?

7   A.  Five, six, whatever was available.  Try to get

8 your five or six, whatever was available.

9   Q.  Okay.  Was your training actually that it was

10 five or six or was your training that it was six or more

11 because I've always heard six or more.

12   A.  It depends on whether we could get people in very

13 similar appearance.  And sometimes it's hard to find

14 people who look similar.

15   Q.  I see.  I'm sorry.  I wasn't being clear.  I'm

16 not talking about live lineups now.  Now I'm talking about

17 photo lineups.

18   A.  Same difference.

19   Q.  Okay.  My understanding of the rule but correct

20 me if this is wrong is that a photo lineup is supposed --

21 first of all, a photo lineup is supposed to be done using

22 a manilla envelope with spaces cut out for the

23 photographs.  Right?

24   A.  One of the procedures we followed, yes.

25   Q.  Okay.  And another one of the procedures you

1 followed was to have at least six photographs in a photo

2 lineup.  Correct?

3   A.  We utilized that, yes, frequently.

4   Q.  Okay.  And another procedure you followed was to

5 have six photographs of individuals who looked as much

6 like the suspect as possible.  Correct?

7   A.  Yes, ma'am.

8   Q.  Okay.  Not members of the suspect's family.

9 Correct?

10   A.  I was never in favor of that, no.

11   Q.  Okay.  And you were trained that when a witness

12 is making an ID from a photo lineup that that lineup

13 should be conducted at the precinct.  Correct?

14   A.  In the photo lineup?

15   Q.  Yeah.

16   A.  No.

17   Q.  No?

18   A.  We took the photo lineup -- they were portable.

19 We would go out, interview people, show them a photo

20 lineup.

21   Q.  Okay.  And was that a situation in which -- were

22 photo lineups a investigative step that multiple -- that

23 you want two investigators present for if possible?

24   A.  I'm trying to -- if we had a photo lineup and no

25 one was identified in that photo lineup, then that was --

1 that's where it stopped.  If someone identified somebody,

2 then we would follow up.

3   Q.  Okay.  And ideally you want to investigators

4 present so that there's a investigator who witnessed the

5 photo lineup in case a ID is made.  Right?

6   A.  Ideally but it never always worked that way.

7   Q.  Okay.  But that was what you were trained to do

8 if possible.  Correct?

9   A.  Sure, if possible.

10   Q.  Correct.  And you were trained to write out

11 exactly the words a suspect spoke when making an ID.

12 Correct?

13   A.  That was during a physical lineup with bodies

14 where the suspect was sometimes a voice identification

15 would be effective.  Had five different guys or six

16 different guys walk up to the two-way mirror and say

17 whatever the bad guy said and that was not uncommon.

18   Q.  Oh, I understand.  I'm saying something

19 different, sir.  When you -- I apologize.  That was my

20 fault.  When you were in situations where you're showing a

21 photo lineup to a witness and there is a difference

22 between a photo selections and a positive identification.

23 Would you agree?

24   A.  You mean if someone picked out somebody because

25 they looked like the bad guy?  Sure, I've had that happen

1 but it -- you know, there again, we checked it out.

2   Q.  But there's a difference between that's the bad

3 guy and that looks like the bad guy.  Right?

4   A.  Absolutely.

5   Q.  Okay.  The first is a positive ID and the second

6 is not.  Correct?

7   A.  Just don't know for sure until you find out.

8   Q.  Well, you don't know if it's the right guy or

9 not, but what I'm saying is when a witness looks at a

10 photo lineup and says that's the guy, that's a positive

11 identification.  Correct?

12   A.  Yeah.

13   Q.  And that positive identification is a term of art

14 in policing.  Correct?

15   A.  Is the what?

16   Q.  It's a term of art.  It has a particular meaning

17 in policing?

18   A.  Well, it's important, yes.

19   Q.  Okay.  And that looks like the guy or that could

20 be the guy, those are not positive identifications.

21 Right?

22   A.  No, ma'am.  That doesn't hold water.  That won't

23 work.

24   Q.  Okay.  And so for that reason, it's important --

25 critically important to document the words a suspect -- a



CLYDE BLOOD VOLUME 1
MCINTYRE vs UNITED GOVERNMENT OF WYANDOTTE

February 03, 2021
165–168

Page 165

1 witness speaks when he or she views a photo lineup.
2 Correct?
3      A.   Yes.  If they make a positive ID, say so.  If
4 not, you put that in the report too.
5      Q.   Okay.  And if not, you put -- and you were
6 trained to write -- you had an obligation to write down to
7 the best of your ability the exact words the witness
8 spoke.  Correct?
9      A.   I suppose.  If he said that looks like the guy,
10 that's what I would put in the report, yeah.
11      Q.   Okay.  That was the rule.  Right?
12      A.   That's the way I did it.
13      Q.   And it's the way you did it because it's the way
14 you were instructed to do it.  Right?
15      A.   It's the way I did it because that's the way I
16 thought it should have been done.  I don't recollect any
17 written rules.  I just remember what I did because I
18 thought it was the right way to do it.
19      Q.   And how did you come up with what you thought the
20 right way to do things was?
21      A.   Back to common sense again.  If she couldn't
22 positively identify somebody, I wasn't going to hang my
23 case on that hat rack.  I wouldn't do it.
24      Q.   Okay.  And you were actually informed at some
25 point prior to becoming a homicide detective as to what

Page 166

1 constituted a positive ID and what did not.  Correct?  You
2 weren't just left to make that decision yourself.
3      A.   I think a positive ID is when someone says that's
4 the guy period.  There's no doubt about it.
5      Q.   Yes, and, you know, sir, my question is at some
6 point, somebody told you that.  Correct?  During your
7 tenure as a police officer.
8      A.   I think it's just common sense.
9      Q.   All right.  And, sir, are you looking at your
10 lawyer before you answer?
11      A.   I'm what?  No, I'm not looking for anybody for an
12 answer.  I'm looking across the room at some silly artwork
13 over here and I'm trying to think and I just -- I'm not
14 going to -- you know, I can tell you what I know and what
15 I think and that's it.
16      Q.   You understood also that you had an obligation --
17 well, withdrawn.
18           Another rule around photo IDs is that
19 you had to document what photographs a witness viewed.
20 Correct?
21      A.   We had the names of the photos in the lineup
22 attached so that we knew whose photograph was in the
23 lineup, yes, ma'am.
24      Q.   Okay.  Because you need to know who the witness
25 saw -- withdrawn.

Page 167

1      Q.   If a witness sees a suspect and doesn't
2 pick them out, that's critically important information.
3 Right?
4      A.   Well, of course.  They can't identify them.
5      Q.   Right.  And so that's one reason it was important
6 to keep track of what photographs a witness saw.  Right?
7      A.   Yes.
8      Q.   Okay.  And there is a big difference between a
9 witness saying I don't recognize anyone and I don't know.
10 Right?
11      A.   If they don't know and they don't recognize, it's
12 basically the same thing.  They're not identifying anybody
13 as the bad guy.
14      Q.   Well, I'm not sure about that, sir.  I don't
15 recognize anyone means the perpetrator isn't in the array.
16 Right?
17      A.   Possibly or they don't recognize him.
18      Q.   Okay.  But I don't know whether I recognize
19 anybody --
20      A.   Same difference.  So they don't know, they don't
21 recognize them, there's nothing you can do with that.
22      Q.   Okay.
23      A.   That's the end of the interview, the lineup.
24      Q.   Okay.  When it came time to put together a
25 photo -- photo lineups in the early 1990s, where would you

Page 168

1 go to get the photographs?
2      A.   We went to the crime lab identification unit.  We
3 had books full of photographs.  We would go through those.
4 Sometimes we would just lay the book out with all the
5 photographs in it.
6           But we would go through the books, pick
7 out similar photographs to the person we were interested
8 in and try to make them as near the same as possible where
9 the person -- the witness had either identified the person
10 or not.  No ifs, ands, or no in between.
11      Q.   Okay.  And I take it you would always want to
12 obtain as detailed or complete a description of a suspect
13 as possible before administering an identification; is
14 that correct?
15      A.   Well, yes.  I mean, if you're going to go put
16 somebody in a lineup, you want to get similar appearance
17 people.  You don't want to just stack the deck against a
18 guy.
19      Q.   Right.  And that's one reason that you want to
20 before showing any photographs obtain as detailed and
21 complete a description as possible.  Right?
22      A.   As close as possible, yes, ma'am.
23      Q.   That's just common sense.  Right?
24      A.   Common sense, yes, ma'am.
25      Q.   Okay.  And the -- would you agree the level of



Page 169

1  detail in a witness' description is important
2  corroboration for the reliability of their identification?
3     A.  Sure.
4     Q.  Okay.  And any changes in the description given
5  by a witness from interview to interview are also
6  important to the witness' reliability.  Correct?
7     A.  Say from interview to interview?  One to the
8  other?
9     Q.  Yeah, for example -- I'll be clear.  If a
10  witness' description changes over time, you have an
11  obligation to investigate why their description is
12  changing.  Right?
13     A.  Of course.
14     Q.  Okay.  That's important to -- it goes to the
15  reliability of the witness' account.  Right?
16     A.  Yes, ma'am.
17     Q.  And the reliability of any subsequent
18  identification or failure to identify.  Right?
19     A.  Yeah.
20     Q.  If I say -- if I'm a witness and I say to you the
21  guy had straight, blond hair, and then the next day I say
22  to your partner the guy had short, curly, brown hair, that
23  would be a red flag that perhaps my description wasn't
24  reliable.  Right?
25     A.  In one sense.  In another sense, there's a

Page 170

1  possibility the guy got a haircut, you know, changed his
2  appearance.  It's not -- facial characteristics go beyond
3  the hair, I mean.
4     Q.  No, I understand.  But what I'm saying is if I
5  tell -- say I've seen -- I'm asking -- my hypothetical is
6  a little bit different.  If I have one interaction with a
7  suspect and I tell you the suspect had long, straight,
8  blond hair and I tell your partner the suspect had short,
9  curly, brown hair, that would be a red flag that
10  perhaps --
11     A.  Without question we would question that, yes,
12  ma'am.
13     Q.  Okay.  And that's why it's important to
14  investigate changing descriptions.  Correct?
15     A.  Yes, ma'am.
16     Q.  Okay.  Now, if all you have to go on is a
17  description of a subject -- in other words, if you're
18  dealing with a situation where the perpetrator of a crime
19  is a stranger to the witness, how do you go about
20  selecting a photograph?
21     A.  We got a situation -- well, again, we have no
22  idea what the suspect looks like other than what the
23  witness tells you so we try to base our photo lineup on
24  that information and get similar photographs.
25     Q.  And how do you go about getting the similar

Page 171

1  photograph?  Are you just rifling through hundreds of
2  drawers or are photographs -- were photographs at that
3  time back in 1994 organized in such a way as to enable you
4  to find similar photographs?
5     A.  We were organized.  We would go through them and
6  try to pick out similar photographs.  It may take a while.
7     Q.  And how were they organized?
8     A.  Oh, they would go by criminal jacket number or in
9  alphabetical order by name.  We had them cross-filed I
10  think in a couple of different methods so.
11     Q.  Okay.  Was there any sort of way that photographs
12  were -- what if you don't have somebody's name?  That's
13  what I'm asking.
14     A.  Name?
15     Q.  If you do not have a name and you want to show
16  somebody say black men between the ages of 20 and 24 who
17  have been arrested for assault, is there a way to find
18  those photographs assuming you don't have an answer?
19     A.  Sure.  Nowadays you punch it into the computer
20  and it spits them out.  Before then we had to dig through
21  and pick them out one by one until we got what we thought
22  was fair.
23     Q.  Okay.  So the only way to go through
24  photographs -- the photographs weren't organized by
25  physical characteristic in any way.  Is that fair to say?

Page 172

1     A.  No.  Nope.  They were -- you might have 500
2  criminal jackets with black guys, white guys, women all
3  mixed in.  You had to look at the individual jacket, pick
4  out a photograph, and try to fit it in.
5     Q.  Okay.  Was that something that detectives raised
6  a problem up the chain of command while you were working?
7     A.  Detective who?
8     Q.  Was that something detectives flagged as a
9  problem up the chain of command?
10        MS. GUERRA:  Objection.  Form.
11     Q.  (BY MS. FREUDENBERGER) Was it easier to
12  administer photo arrays if the photographs were organized
13  by description?
14        MS. GUERRA:  You can answer.
15     A.  Well --
16        MS. GUERRA:  If you know.
17        THE WITNESS:  I'm sorry?
18        MS. GUERRA:  You can answer if you know,
19  yeah.
20     A.  Well, I got distracted.  If would I what now?
21     Q.  (BY MS. FREUDENBERGER) Sure.  Was that something
22  that detectives flagged up the chain of command as a
23  problem while you were working that it would be much
24  easier to administer photo arrays if the photos were
25  organized by description?



Page 173

1    A.   We would get all kinds of photos and pick out the
2  ones that were most similar and put them together in the
3  lineup.  Chain of command had nothing to do with it.
4    Q.   Okay.  Did you ever see a case where an officer
5  failed to document a positive ID from an eyewitness?
6    A.   Not to my knowledge.
7    Q.   That would be grossly improper.  Correct?
8          MS. GUERRA:  Object to form.  You can
9  answer.
10   A.   Well, if I had somebody make an absolute positive
11  ID on a photograph, I would be tickled and I would go
12  document and then try to prove or disprove their
13  identification.
14   Q.   (BY MS. FREUDENBERGER) Okay.
15   A.   I mean, that made my job a lot easier if that's
16  the guy, you know.
17          MS. FREUDENBERGER:  Could we go ahead
18  and hand the witness what's been previously marked Exhibit
19  5.  That's the -- that will be his file in this case,
20  Beth.
21   Q.   This whole file is Exhibit 5?
22   Q.   (BY MS. FREUDENBERGER) It is, yeah.
23   A.   Okay.
24   Q.   And, sir, I'm going to ask you to turn to your
25  report which is Bates stamped --

Page 174

1    A.   Page 25.
2    Q.   Do you have it in front of you?
3    A.   I think it says Page 25.  I got page 25.  That's
4  not my report.
5    Q.   Yeah.
6    A.   So let's go back.
7    Q.   All right.  And before I show it to you, sir, can
8  you think of any circumstance --
9          MS. GUERRA:  P53.
10          THE WITNESS:  I'm sorry?
11          MS. GUERRA:  I think it's P53.
12          THE WITNESS:  253?
13          MS. GUERRA:  P at the bottom there, P53.
14   Q.   (BY MS. FREUDENBERGER) Yeah, but it says 25 in
15  handwritten numbers on the bottom of the first page.  If
16  you see your report, Sergeant Blood, I believe there's
17  only one.
18   A.   I've seen it but I don't remember what's in it.
19  Give me a minute.
20   Q.   But are you looking at it right now?
21          MS. GUERRA:  Just a second.
22   A.   No.  Okay.  Here we go.
23          MS. GUERRA:  Here it is, yeah, Page 25.
24          THE WITNESS:  25.  Okay.  My mistake.
25   Q.   (BY MS. FREUDENBERGER) All right, sir.  Before --

Page 175

1  I'm going to direct you to particular portions of this
2  report, but before I do, can you think of any legitimate
3  police reason not to document a positive ID in a homicide
4  case?
5    A.   No.
6    Q.   Okay.  Neither can I.  All right, sir.  I'd also
7  like to direct your attention to the last line of this
8  report.  Could you turn to Page 4 of your report?
9    A.   Page 4, last line.
10   Q.   Yeah.
11   A.   At the order of Lieutenant Culp, the case has
12  been turned to Detective W.K. Smith and Roger Golubski for
13  further investigation.
14   Q.   Yeah.  All right.  And so you and Detective
15  Maskil both responded to the crime scene in this case.
16  Correct?
17   A.   According to my report, we went to the scene,
18  yes.
19   Q.   All right.  And you would have been ordered to do
20  so by Lieutenant Culp.  That's the way things worked?
21   A.   He assigned us to make that call, yes.
22   Q.   Okay.  And according to your report, after
23  directing you and Detective Maskil to respond to the
24  scene, he directed you to turn over the case to W.K. Smith
25  and Roger Golubski.  Correct?

Page 176

1    A.   That's what the last line says, yes, ma'am.
2    Q.   Okay.  And given what you've told me about the
3  way that homicides worked back in 1994, what conceivable
4  reason could there have been for Lieutenant Culp directing
5  you and Detective Maskil to turn the case over to W.K.
6  Smith and Golubski?
7          MS. GUERRA:  Object to form.
8  Foundation.  You can answer if you know.
9          THE WITNESS:  My what?
10          MS. GUERRA:  You can answer.
11   A.   Well, actually, they were the detective -- W.K.
12  Smith's team was the homicide team on call.  They caught
13  the call.  We assisted and we did whatever we could do to
14  help.  We were sent about our business.  There was no --
15   Q.   (BY MS. FREUDENBERGER) And how do you know that
16  that's case?
17   A.   Huh?
18   Q.   What's your basis for -- what's your basis for
19  your testimony that W.K. Smith's team caught the case?
20   A.   Well, very simple.  If we would have been the
21  detectives on call, we would have been assigned the case.
22  They were on call obviously or we would have been the ones
23  to take over the case, not them.
24   Q.   Okay.  But Detective Golubski wasn't a homicide
25  detective.



CLYDE BLOOD VOLUME 1                                    February 03, 2021
MCINTYRE vs UNITED GOVERNMENT OF WYANDOTTE              177–180

Page 177

1    A.   Not at that time, not to my knowledge, no, ma'am.

2    Q.   Okay.  And so he wasn't detective W.K. Smith's
3 partner?

4    A.   No.  It would have been Detective Shomin but I
5 don't know where Shomin was at.  I don't know.  He might
6 have been on vacation at the time.

7    Q.   If Shomin wasn't on vacation at the time, any
8 reason you can think of of that W.K. Smith and Golubski would
9 have been assigned?

10        MS. GUERRA:  Object to form.
11 Foundation.  You can answer if you can.

12   A.   Well, you know, Golubski had been assigned for
13 reasons I wouldn't know of.  He might have had a
14 particular knowledge of the people, the area, and they
15 thought he would be a benefit to the investigation.  I
16 don't know.  It was not my decision.  And why it was
17 turned to Golubski and Smith, I don't know.

18        And the term "order", I'm still an old
19 military man.  When someone tells me to do something, he
20 outranks me, it's an order, and I follow up.  So it wasn't
21 like the lieutenant says get out of here and go away.  He
22 says it's their case, they'll take it over, go about your
23 business and we did and I don't question that.

24   Q.   (BY MS. FREUDENBERGER) I understand.  It was
25 Lieutenant Culp's call which two detectives worked this

Page 178

1 homicide.  Correct?

2    A.   He's the one that what now?

3    Q.   It was Lieutenant Culp's decision --

4    A.   Well, yes.

5    Q.   -- which two detectives worked the homicide.
6 Correct?

7    A.   Well, yes, because they were the -- if they were
8 the team on call, that would be the proper call to make.

9    Q.   Right.  But they couldn't have been the team on
10 call because Detective Smith's partner was Detective
11 Shomin.  Right?

12   A.   That's not true.  Shomin could have been on
13 vacation.  When Maskil -- if Maskil took vacation or I
14 took vacation, whoever took our place while we were on
15 call or vacation would be the assisting officer.  It's
16 common -- here again, it's back to whoever is available at
17 the time.

18        Golubski could have taken Maskils' or
19 Shomin's place because Shomin was involved elsewhere.  Who
20 knows.  He could have been in court.  A lot of reasons
21 there, but we were not the team on call and we did not get
22 the call.  It wasn't handed to us.  We assisted and went
23 on.

24   Q.   And so what were you directed to do?  What was
25 your job at the scene when you responded?

Page 179

1    A.   At the scene, we made contact with the officers
2 on the scene to gather any kind of information we could.
3 We went over and looked at the vehicle.  I don't remember
4 any of this.  I'm going by my report but --

5    Q.   Well, I see -- so I have your report, sir, and
6 I --

7    A.   Okay.

8    Q.   My question to you is a little different.  What
9 was the purpose of directing -- why were you and -- what
10 was your understanding as to why you and Detective Maskil
11 were ordered to go out to the scene if you were not the
12 team on call?

13   A.   It was a major case.  It was a double homicide.
14 They wanted as many people available as possible to get
15 there and get information as quickly as possible.  We did
16 what we were asked to do and we were released.

17   Q.   Okay.  Based on what you have told me thus far,
18 W.K. Smith should have been the lead detective on this
19 investigation.  Correct?

20   A.   I would assume so.  If Shomin wasn't available,
21 then Smith I would assume would have been the -- I don't
22 know.  I don't know why they changed.

23   Q.   Well, because Smith -- but you do know because
24 Smith was actually a homicide detective and Golubski was
25 not.

Page 180

1    A.   That's right.  To the best of my knowledge, yes,
2 ma'am.

3    Q.   Okay.  And so the way it should have worked is
4 that from this point forward assuming there was a reason,
5 a legitimate reason, to assign Golubski to assist Smith,
6 what should have happened is W.K. Smith should have been
7 the lead detective calling the shots on this homicide
8 investigation because he is the one with training and
9 experience in investigating homicides.  Correct?

10        MS. GUERRA:  Object to form.
11 Foundation.  You can answer.

12   A.   I can't say.  That's the lieutenant's call.  They
13 made that decision.  We were out of it.  We went about our
14 business.

15   Q.   (BY MS. FREUDENBERGER) Well, I understand it
16 wasn't your call and you were following orders from
17 Lieutenant Culp.  I'm clear on.  But can you think of any
18 legitimate police reason that Golubski would have been the
19 lead investigator on this investigation as opposed to W.K.
20 Smith, the actual homicide investigator?

21   A.   I honestly can't say because I don't know the
22 circumstances at the time that lieutenant made the
23 decision.  It wasn't me.

24   Q.   Well, can you think of a single possibility?

25   A.   Well, possibly they were going to try to groom



Page 181

1 Mr. Golubski to be a homicide detective or whatever. I
2 don't know.
3    Q.   Do you think they would have started him out on
4 this high profile double homicide if that were the case?
5    A.   Possibly. I never asked questions, ma'am. I did
6 what I was told.
7    Q.   You gave me another possibility. You volunteered
8 another possibility which is that perhaps Golubski had
9 knowledge of the area.
10    A.   Well, that would be an interesting point because
11 if he knew people in the area and knew people involved and
12 had a -- he might have a better sense of direction than
13 the other guy. I don't know. You take advantage of
14 whatever knowledge is available.
15    Q.   So am I right that the best explanation you can
16 think of as you sit here today for why Golubski ended up
17 the lead detective on this homicide is because he had
18 knowledge of the area?
19        MS. GUERRA:  Object to form.
20 Foundation.
21    A.   I can't say that. That's just a speculation on
22 my part. I have no idea. I didn't make that decision.
23 When I was relieved of that investigation, I went back to
24 my own. I had other cases to work.
25    Q.   (BY MS. FREUDENBERGER) Okay. Detective Shomin

Page 182

1 I'll represent to you went to the homicide -- went to the
2 autopsy of one of the victims the next morning.
3    A.   I don't know.
4    Q.   I'm telling you that he did.
5    A.   Okay. That's fine.
6    Q.   So that fact indicates that, in fact, Detective
7 Shomin was available to work this homicide. Correct?
8        MS. GUERRA:  Objection.  Form.
9 Foundation.
10    A.   I have no idea.
11    Q.   (BY MS. FREUDENBERGER) Well, take a look at
12 page -- I'm going by the numbers in the bottom right and
13 I'm going to direct your attention to -- bear with me
14 here. The next page.
15    A.   Page 54?
16    Q.   Yeah.
17    A.   No, wait a minute. Page 54 is Page 2 of my
18 report.
19    Q.   Your report's -- hold on a second. I'm looking
20 at the wrong description here.
21    A.   Okay.
22    Q.   All right. You can look at -- you can look at
23 the next page, P57.
24    A.   57. I'm looking at Page 60 which is an
25 investigative report by Detective Shomin.

Page 183

1        MS. GUERRA:  She said Page 57. This
2 right here. Field investigative report.
3    A.   That's --
4    Q.   (BY MS. FREUDENBERGER) Okay.
5        MS. GUERRA:  Okay.
6    A.   But this report was made by Joe Stubler, the
7 identification in the crime lab guy.
8    Q.   (BY MS. FREUDENBERGER) It was but you see the
9 first sentence says that on 1:00 p.m. on the 16th?
10    A.   Yes, it says Detective Shomin --
11    Q.   Was directed to the morgue at the request of
12 Detective Shomin?
13    A.   Yes, ma'am.
14    Q.   Okay. So that indicates Detective Shomin was
15 working this homicide. Correct?
16    A.   I would assume that to be true.
17    Q.   That's what the documentation shows. Right?
18    A.   Yes, ma'am.
19    Q.   Okay. So the reason that Golubski is assigned
20 doesn't seem to be because Smith's regular partner,
21 Shomin, is unavailable. Correct?
22    A.   I have no idea.
23        MS. GUERRA:  Objection to form.
24 Foundation.
25        THE WITNESS:  I'm sorry?

Page 184

1        MS. GUERRA:  Object to form and
2 foundation. You can answer if you know.
3    A.   Well, I have no idea. I don't know why it worked
4 out the way it did. It wasn't my decision.
5    Q.   (BY MS. FREUDENBERGER) Okay. It wasn't your
6 decision and it was irregular. Correct?
7    A.   I can't say that one way or the other. I don't
8 know why the decision was made or who made that decision.
9    Q.   Right. But it was -- and to be clear, maybe
10 there was a legitimate reason, but it was an irregular
11 assignment whether there was a reason for it or not.
12 Correct?
13    A.   I honestly don't know.
14    Q.   Well, but, sir, you do because you explained to
15 me with certainty the way that homicides assignments were
16 made back in this time and there was a team of homicide --
17 there were two teams of homicide detectives and the on
18 call detectives caught the case.
19    A.   Yes, ma'am.
20    Q.   So having a homicide detective and a non-homicide
21 detective working -- well, withdrawn.
22        Having a detective outside of the
23 homicide unit take over this case as lead investigator
24 assuming that's what happened was irregular.  Right?
25    A.   Again, I have no opinion as to why that decision



Page 185

1 was made. When I finished my assignment, I went back
2 about my business. Whatever happened to that case, I have
3 no idea.
4      Q.   And you have made that crystal clear, sir, many
5 times. But all I'm asking you -- you described with
6 specificity the way that the assignments worked. This
7 assignment based on the documentation that you have just
8 seen was out of the ordinary for the way that homicide
9 assignments worked at this time. Correct?
10     A.   I don't think I have never -- I have never
11 experienced prior to that.
12     Q.   Okay. Now, take a look at -- I'm just going to
13 go ahead and read for you, sir, some trial testimony from
14 Detective Golubski because given that we are doing this
15 deposition remotely, it's going to be much faster than
16 putting it up on the screen.
17          And I'm reading you from what's
18 previously been marked as Exhibit D which is Detective
19 Golubski's trial testimony in this case. And this is
20 Detective Golubski that I'm going to start on Page 328,
21 Line 8, and I'm going to read to you -- I'm doing this for
22 the record. Page 329, Line 3.
23          And it says -- it's talking about a
24 witness named Niko Quinn, and it says she stated that she
25 wanted to speak to me about what had occurred and

Page 186

1 requested to see the photos again. She stated that she
2 felt uncomfortable for safety reasons and requested if I
3 could meet her at what she would deem a neutral location.
4 At that time, I proceeded. We agreed to meet at
5 (unintelligible). She was in the company of a male
6 friend.
7          "QUESTION: And did you have those photographs
8 again, Detective Golubski?
9          ANSWER: Yes, ma'am, I did. Yes, I did.
10          QUESTION: And what happened during that contact
11 with Miss Quinn, Nikki Quinn?
12          ANSWER: Once again, I showed her the exact same
13 five photos. I asked her what the purpose of this was.
14 She stated she would like to see them again and she did.
15 At that point, she told me she could make a positive ID of
16 the suspect.
17          QUESTION: Which photo did she identify?
18          ANSWER: No. 3."
19          A little later down, he's asked and when
20 she identified Photo No. 3, did she indicate to you how
21 positive she was about that identification.
22          "ANSWER: She adamant about it."
23          Now, you understand that in that testimony I
24 just read, Detective Golubski is describing a positive
25 photo identification. Correct?

Page 187

1      A.   Yes, ma'am.
2      Q.   Okay. And Detective Golubski testified at the
3 trial in this case and has asserted in this civil
4 litigation that he told no one -- he did not document that
5 positive identification and told no one about that
6 identification until shortly before the trial which was
7 approximately five months later.
8          Can you think of any legitimate police
9 reason that a detective -- that Detective Golubski would
10 not have documented a positive identification from a
11 witness in this case?
12          MS. GUERRA: Object to form.
13 Foundation.
14          MR. ROACH: Object to the form.
15          MS. GUERRA: You can answer if you know.
16     A.   Well, ma'am, I was not there. I have no idea
17 what went on or why he did what he did. I don't know why
18 he wouldn't forward the information. I can't judge that
19 one way or the other. He had his reasons for what he did.
20     Q.   (BY MS. FREUDENBERGER) Well, can you think of any
21 potential reason?
22     A.   No, no, I can't but that's neither here nor
23 there. He had a reason. I don't. I can't think of any.
24     Q.   Well, one reason for not documenting a positive
25 identification is if you've used misconduct to elicit that

Page 188

1 identification and you don't think the witness is going to
2 hold up. Right?
3          MS. GUERRA: Object to form.
4 Foundation.
5      A.   I have no idea why he did what he did.
6      Q.   (BY MS. FREUDENBERGER) Okay. And all I'm asking
7 you is -- let's see. You know what, withdrawn.
8          You understand that there was a
9 preliminary hearing -- first of all, you understand from
10 reading our complaint if nothing else that there was no --
11 never any physical evidence tying Lamonte McIntyre to this
12 crime. Right?
13          MS. GUERRA: Object to form.
14     A.   I don't know. I don't know.
15     Q.   (BY MS. FREUDENBERGER) Okay. Sir, you read the
16 complaint when you were served with it?
17     A.   I read the what?
18     Q.   And I'm not going to quiz you on it. It was over
19 a year ago. But you read our complaint when you were
20 served with it. Correct?
21     A.   Not completely. I scanned over it and there's
22 parts there that I had nothing to do with. I just pushed
23 it off in the back. It's not my problem. I didn't do it.
24 I didn't take part in it. Nothing I could testify to. I
25 went back to my report. That's what I did and that's what



CLYDE BLOOD VOLUME 1
MCINTYRE vs UNITED GOVERNMENT OF WYANDOTTE

February 03, 2021
201–204

Page 201

1 Detective Golubski.  Right?

2     A.  I would assume.

3          MS. GUERRA:  Object to form.

4          THE WITNESS:  I'm sorry.

5          MS. GUERRA:  Object to form.  You can

6 answer.

7     A.  I would assume he would.  I don't know.  I don't

8 know how he associated with Golubski or what the

9 circumstances were.

10     Q.  (BY MS. FREUDENBERGER) Okay.  If you look to

11 Paragraph 7.  Read Paragraph 7 to yourself and then tell

12 me if you agree with it.

13     A.  Should or shouldn't have, I can't -- I didn't

14 call the shots on that.  Normally I don't think it would

15 have went that way, but then why he would have been, you

16 know -- I have no answer for that.

17     Q.  Okay.  Accept that normally it wouldn't have been

18 done the way it was done here.  Right?

19     A.  Normally it's from my experience, the two

20 homicide detectives on call would handle the case.  They

21 would be in charge.  If Roger was assigned to assist them,

22 fine, that's the way it worked because we -- once in a

23 while we'd get extra help.  But to sit down and say

24 that -- I don't know.  If I had a detective with expertise

25 in a certain area and I could depend on him, I wouldn't

Page 202

1 have any problem asking for help.

2     Q.  Okay.  But that's not what happened here.  This

3 case was actually assigned to Golubski as lead

4 investigator.

5     A.  I have no idea why that happened.  None

6 whatsoever.

7     Q.  Okay.  And you can't think of any reason for

8 it -- well, if -- if the reason to assign Golubski is that

9 he had expertise and contacts in the area where the crime

10 occurred, couldn't he have contributed his expertise and

11 made use of his contacts by assisting a homicide

12 detective?

13     A.  Yes, ma'am, he could have.

14     Q.  Okay.  So that wouldn't be a legitimate reason to

15 assign him as lead detective, would it?

16          MS. GUERRA:  Object to form.

17 Foundation.  You can answer if you know.

18          THE WITNESS:  I'm sorry?

19          MS. GUERRA:  You can answer.

20     A.  I really -- I don't know why -- what their

21 reasoning was so I can't say.

22     Q.  (BY MS. FREUDENBERGER) Okay.  But there is no

23 reason Detective Golubski couldn't have made use of his

24 contacts and his knowledge of the area as assisting a

25 homicide detective as opposed to being lead detective

Page 203

1 himself.  Right?

2     A.  Not that I can think of but that's, you know, not

3 my decision.

4     Q.  Okay.  And you can't think of any legitimate

5 reason as you sit here today to assign him.  Detective

6 Golubski was not a homicide detective as lead detective on

7 this double murder investigation.  Correct?

8          MS. GUERRA:  Object to form.  Asked and

9 answered.  You can --

10     A.  Not that I can think of, no.

11     Q.  (BY MS. FREUDENBERGER) Okay.  Read Paragraph 8 to

12 yourself, please, and let me know if you agree with it.

13     A.  Read which one?

14     Q.  Paragraph 8.

15     A.  Eight?

16     Q.  Yes.

17     A.  Go back.  I can't agree or disagree with it.  I

18 don't know what his motives were.

19     Q.  Okay.  Fair enough.  Would you agree that Roger

20 Golubski had always aspired to be a homicide detective?

21 And to be fair to you, sir, before you answer that

22 question, I'm going to tell you that according to records

23 we have received in this case, you and Golubski were lead

24 detectives together in 20 cases between 1988 and 1997.

25 Does that sound familiar to you?

Page 204

1     A.  I don't remember.  I don't remember, ma'am.

2     Q.  Well, do you have any reason to dispute that

3 fact?

4     A.  No, I don't.  I just plain don't remember it.

5     Q.  Okay.  Now, would you agree that your impression

6 of Golubski back in 1994 is that he aspired to be a

7 homicide detective?

8     A.  Well, he seemed to have an interest in it and

9 wanted the job I remember hearing.  What they're saying

10 here I don't know.  I just -- I think that's what he

11 wanted.  Several guys would like to have had that job.

12     Q.  Okay.  And would you also agree that detectives

13 investigating homicides were typically free to be out in

14 the community all day with little supervision?

15     A.  We operated pretty much on our own.  Maskil and I

16 would hit the road and do our investigations and then we'd

17 have a briefing with our boss and write our reports.  No

18 one rode in the backseat and told us what to do.

19     Q.  So the answer is, yes, you would agree?

20     A.  Yeah.

21     Q.  Well, you say briefing with your boss.  How often

22 would you brief Lieutenant Culp in the course of a

23 homicide investigation?

24     A.  Based on progress.  If he had questions, we would

25 sit down and brief him.  Unless we had something new to

Page 205

1 add, we generally kept going until we did have something
2 to brief him on.
3     Q.    Okay.  But would you brief him on major
4 developments in a case like getting the identification
5 of -- a positive identification of a suspect?
6     A.    Well, of course.
7     Q.    Okay.  Certainly you would thoroughly brief him
8 before any arrest was made.  Right?
9     A.    Depending on how the circumstances again because
10 if the arrest was something we had to do right away before
11 somebody got away, we knew where he was at, we would go
12 grab the guy and then come back and let the lieutenant
13 know why and what happened.
14     Q.    Okay.  And you would do that as quickly as
15 possible.  Correct?
16     A.    Yes, we did that.
17     Q.    Okay.  I mean, letting the lieutenant know why
18 and what happened is something that you would do as
19 quickly as possible after making an arrest.  Correct?
20     A.    Yes, yes.
21     Q.    Okay.  Or taking any important investigative
22 step.  Correct?
23     A.    Yes.
24     Q.    All right.  Now, I'm going to -- so read
25 Paragraph 9 to yourself, please.

Page 206

1     A.    Nine?
2     Q.    Yeah.
3     A.    Well, I --
4           MS. GUERRA:  No, there's no question.
5 Wait until she asks you a question.
6     Q.    (BY MS. FREUDENBERGER) Why did you laugh, sir?
7     A.    I'm sorry?
8     Q.    You laughed when you read that.  Tell me why.
9     A.    Well, no, it's just logic.
10     Q.    Logic dictates that one would execute a search
11 warrant in this double homicide case.  Right?
12     A.    Well, and here again, I don't know the
13 circumstances of why he did or did not.  I can't question
14 his decision.  I wasn't there.
15     Q.    All right.  Well, let me give you some facts
16 because I think you can question it.  The crime in this
17 case occurred at approximately 2:00 p.m. on April 15th.
18 Lamonte McIntyre was taken into custody at 7:50 p.m.  So
19 less than six hours after the crime occurred.
20     A.    Okay.
21     Q.    Now, you know from being at the crime scene in
22 this case that it was a close-range shooting with a
23 shotgun of two men inside a car.  Correct?
24     A.    Yes, ma'am.
25     Q.    Okay.  Now, if Lamonte McIntyre was taken into

Page 207

1 custody less than six hours after the shooting, executing
2 a search warrant would have been a no-brainer.  Correct?
3           MS. GUERRA:  Object to form.
4 Foundation.  You can answer if you know.
5     A.    I can't say that because I really don't know the
6 circumstances he was operating under at that time.
7     Q.    (BY MS. FREUDENBERGER) Well, let's talk about it.
8 Based on your time at the crime scene, you know that the
9 windows of the car were shattered.  Right?
10     A.    My understanding, yes, ma'am.
11     Q.    Okay.  And there was, in fact -- I can show you a
12 photograph if you like but you may not need it.  There
13 was, in fact, a large amount of shattered glass on the
14 ground next to the car.  Right?
15     A.    I'm not sure.  I don't recollect that part.
16     Q.    Okay.  Let me show you a photo.
17           MS. FREUDENBERGER:  Ariel, can you do a
18 screen share and pull up the crime scene photo?  Let's go
19 ahead and mark this as Exhibit 19.
20           MS. MANNING:  One moment.
21           MS. FREUDENBERGER:  All right.  If you
22 give me just a second, I'll tell you which one I want.
23 You know what, let's do instead, let's show Sergeant Blood
24 the crime scene video which is in potential exhibits crime
25 scene demonstrative.  Okay?  Can you pull that up on your

Page 208

1 screen, Ariel?
2           MS. MANNING:  Yes.  One moment, please.
3           MS. FREUDENBERGER:  And let's start at
4 about 2:20 of that video.  Great.
5     Q.    (BY MS. FREUDENBERGER) All right, sir.  Turn your
6 attention to this video which we're going to mark as
7 Exhibit 19.
8           MS. FREUDENBERGER:  And you can go ahead
9 and play.
10           THE WITNESS:  Are you asking me a
11 question?
12           MS. GUERRA:  No, no.  They're just
13 displaying Exhibit 19 and Ariel on their end is going to
14 push the play button.
15           MS. FREUDENBERGER:  Sorry, Ariel.  It
16 went off.  Can you go back?
17           MS. MANNING:  Just one moment.
18     Q.    (BY MS. FREUDENBERGER) Okay.  All right, sir.
19 You see that there is blood and tissue on the inside of
20 the car door here?
21     A.    Yes, ma'am.
22     Q.    Okay.  And let's keep watching.  And you can see
23 shattered glass --
24     A.    Yes, ma'am.
25     Q.    -- and blood on the ground next to the passenger



1  side door?
2      A.   Uh-huh, yes, ma'am.
3      Q.   As well as what appears to be either flesh or
4  brain matter?
5      A.   Yes, ma'am.
6      Q.   Okay.  And looks like a relatively substantial
7  amount of blood.
8          MS. FREUDENBERGER:  Ariel, can you pause
9  the video now?
10         THE WITNESS:  I'm sorry?
11         MS. FREUDENBERGER:  Thank you.
12         MS. GUERRA:  She's talking to Ariel.  No
13  question yet.
14         MS. FREUDENBERGER:  All right.  We
15  can -- yeah, if you leave it paused and then go back to
16  the witness, that would be great.  Thanks, Ariel.  So you
17  can stop the screen share.
18     Q.   (BY MS. FREUDENBERGER) All right, sir.  You saw
19  that there was both blood and glass on the ground next to
20  the passenger side of the car.  Correct?
21     A.   Yes, ma'am.
22     Q.   Okay.  And that's where the shooter was allegedly
23  standing at the time of the crime according to witness
24  accounts.  Correct?
25     A.   I assume, yes, ma'am.

1      Q.   Okay.  And given the blood and glass on the
2  ground, one obvious important investigative step when
3  Lamonte McIntyre was arrested less than six hours later
4  would have been to seize his shoes.  Correct?
5          MS. GUERRA:  Object to the form.
6      A.   Take his shoes?  I would assume, yes, I probably
7  would.
8      Q.   (BY MS. FREUDENBERGER) Not just probably.  Of
9  course you would take his shoes because --
10     A.   Well, yes, because there would be trace evidence
11  on his shoes if he walked around in that stuff.
12     Q.   Right.  And so testing could be done to -- first
13  of all, just the presence of blood on his shoes alone
14  would have been inculpatory.  Correct?
15     A.   That would have cost him some problems.
16     Q.   And, in fact, it's possible testing could have
17  been done to demonstrate that the blood on his shoes was
18  the blood belonging to the victims.  Correct?
19     A.   Yes, ma'am.
20     Q.   And another thing that could have been
21  potentially located would have been glass fragments in the
22  soles of his shoes.  Correct?
23     A.   Yes, ma'am.
24     Q.   Okay.  And so seizing a pair of shoes when he was
25  arrested less than six hours later was a basic critically

1  important investigative step to take.  Correct?
2      A.   I would advise taking them, yes, ma'am.
3      Q.   Okay.  Can you think of any legitimate police
4  reason as you sit here today not to have collected Lamonte
5  McIntyre's shoes when he was arrested?
6      A.   Not really.
7      Q.   Okay.  And another basic investigative step when
8  Lamonte McIntyre was arrested within six hours after this
9  close-range shooting would have been to seize his clothes.
10  Correct?
11     A.   Yes, ma'am.  There should be residue on the
12  clothing as well.
13     Q.   Okay.  And that is a obvious step to take in a
14  homicide close-range shooting.  Correct?
15     A.   I would collect his clothing and his shoes.
16     Q.   Any legitimate police reason you can think of as
17  you sit here today not to collect Lamonte McIntyre's
18  clothing --
19     A.   No, ma'am.
20     Q.   -- when he was arrested six hours -- less than
21  six hours after the crime?
22     A.   No, ma'am.
23     Q.   Okay.  Another basic obvious investigative step
24  would have been to -- well, before I get there, another
25  reason to collect his clothes would be to see if he had

1  anything inculpatory on his person given the -- that the
2  crime had occurred mere hours earlier.  Correct?
3      A.   That echoed a lot.  I'm trying to get what you
4  said.  Do it again.
5      Q.   Sure.  Another reason to take his clothes is
6  there could have been inculpatory -- he could have had
7  inculpatory items on his person.  Right?
8      A.   Well, sure, it could prove him guilty or not
9  guilty or involved one way or the other.
10     Q.   Yeah.  And in addition to the blood you would
11  expect to see on his clothing -- by the way -- withdrawn.
12         If Lamonte McIntyre had been wearing the
13  clothing he was arrested in at the time of this shooting,
14  if he were the perpetrator, you would expect to see
15  fragments of glass and blood on his clothes.  Right?
16     A.   I would expect that, yes, ma'am.
17     Q.   Okay.
18     A.   I'd sure be looking.
19     Q.   And if --
20     A.   I'm sorry?
21     Q.   And if Lamonte McIntyre had committed this
22  shooting the way it was described, you would expect to
23  find gunshot residue on his face, clothing, and hands.
24  Correct?
25     A.   It would be possible, yes.  Be worth checking for



Page 213

1  it.
2      Q.   And by the way, one reason you would check for it
3  is that if Lamonte McIntyre had no gunshot residue on his
4  face, hands, and clothing, that would be evidence tending
5  to suggest he may not have committed the crime.  Correct?
6      A.   True, yes, ma'am.
7      Q.   And if Lamonte McIntyre had changed -- had not
8  changed his clothing and there was no blood or glass on
9  his clothing, that would be evidence indicating he was not
10  responsible for the shooting.  Correct?
11      A.   Yes, ma'am, I agree.
12      Q.   Okay.  So those are additional important reasons
13  that any investigator who was attempting to conduct a
14  proper investigation should have taken Lamonte McIntyre's
15  clothing and performed a -- should have taken -- first
16  taken Lamonte McIntyre's clothing.  Correct?
17      A.   Yeah, I would have done that.
18      Q.   And second, ordered a gunshot residue test.
19  Correct?
20      A.   Yes, ma'am.
21      Q.   Okay.  Would you agree that Detective Golubski's
22  failure to do so in this case is a major red flag?
23      A.   Is a major --
24              MR. ROACH:  Object to the form.
25              MS. GUERRA:  You can answer.

Page 214

1      A.   It's a major what?
2      Q.   (BY MS. FREUDENBERGER) Red flag.
3              MS. GUERRA:  You can ask what that
4  means.
5              THE WITNESS:  What did she say?  Major
6  what?
7              MS. GUERRA:  If you don't understand,
8  you can ask her.
9      A.   Yeah, what did you -- a major what, ma'am?
10      Q.   (BY MS. FREUDENBERGER) A major red flag.
11      A.   Yes, it's something I would definitely want to
12  know about.  I'd check it out.
13      Q.   Okay.  And if you were the Lieutenant in charge
14  of this investigation and you saw in this case that
15  Detective Golubski had not seized Lamonte McIntyre's
16  clothing or shoes, that is something you would have
17  immediately questioned him about.  Correct?
18              MS. GUERRA:  Object to form.
19  Foundation.  You can answer if you know.
20      A.   There again, that depends on the experience or
21  lack thereof of the lieutenant.  You know, I worked
22  homicides.  He hadn't and he may not have thought of that.
23  I would have done it.  I'm not protecting the lieutenant.
24      Q.   (BY MS. FREUDENBERGER) Not just that you would
25  have done it.  You had investigated homicide shootings

Page 215

1  before.  Correct?
2      A.   Yes, ma'am.
3      Q.   Okay.  Under Lieutenant Culp.  Right?
4      A.   Uh-huh, yes, ma'am.
5      Q.   And so Lieutenant Culp certainly should have
6  known if only from supervising your investigations that it
7  is possible to test a suspect in a shooting's clothing for
8  the presence of blood or other trace evidence.  Correct?
9      A.   I would think it would fall under that, yes.
10      Q.   Okay.  He should have ordered that it be done
11  here.  Correct?
12              MS. GUERRA:  Object to form.
13  Foundation.  You can answer.
14      A.   I can't say why he did or didn't.  I know I would
15  have done it.  I know what I would have done.  I can't
16  vouch for what he did or didn't do or why.
17      Q.   (BY MS. FREUDENBERGER) I understand.  But as a
18  supervisor supervising this double homicide investigation,
19  Lieutenant -- that's something Lieutenant Culp should have
20  done.  Correct?  Is ensure Lamonte McIntyre's clothing and
21  shoes were seized and tested?
22      A.   I think it --
23              MS. GUERRA:  Same objections.
24              THE WITNESS:  I'm sorry.
25              MS. GUERRA:  I said same objections.

Page 216

1      A.   I think that would be a very important point to
2  cover, yes.
3      Q.   (BY MS. FREUDENBERGER) Okay.  Another important
4  point to cover would have been executing a search warrant
5  in Lamonte -- on Lamonte McIntyre's residence.  Correct?
6              MS. GUERRA:  Object to form.
7  Foundation.
8              MR. ROACH:  Object to the form.
9              MS. GUERRA:  You can answer if you know.
10      A.   Yes, I agree.
11      Q.   (BY MS. FREUDENBERGER) Okay.  To look for, for
12  example, the murder weapon.  Correct?
13      A.   Yes, ma'am.
14      Q.   Okay.  To look for bloody clothing Lamonte
15  McIntyre could have changed out of were he actually the
16  shooter.  Correct?
17      A.   Yes, ma'am.
18      Q.   To look for any other number of inculpatory
19  evidentiary items one might find in the home of a shooter
20  within six hours of a double homicide.  Correct?
21      A.   Yes, ma'am.
22      Q.   Any legitimate police reason as you sit here
23  today not to take the step of either asking for a consent
24  to search or getting a search warrant for Lamonte
25  McIntyre's home at this point in the investigation?



Page 217

1          MR. ROACH: Object to form.

2          MS. GUERRA: You can answer if you know.

3     A. It's my opinion only. I would have got the

4 search warrant, but why the other man did what he did, I

5 don't know. It could be lack of experience on his part.

6 I don't know.

7     Q. (BY MS. FREUDENBERGER) Do you think it's possible

8 that it just didn't occur to the Detective Golubski to

9 search Lamonte McIntyre's home?

10    A. I guess --

11    Q. You're laughing because it's not. Right?

12    A. Well, it's not very likely, no, ma'am.

13    Q. Okay. Well, one reason not to search Lamonte

14 McIntyre's home is if Detective Golubski knew he was

15 unlikely to find any inculpatory evidence. Correct?

16         MS. GUERRA: Object to form.

17 Foundation.

18         MR. ROACH: Object to the form.

19    A. I don't know. That would be speculation on my

20 part and I can't do that.

21    Q. (BY MS. FREUDENBERGER) Okay. Do you agree that

22 Detective Golubski's failure to execute a search warrant

23 on Lamonte McIntyre's residence is a red flag in this

24 investigation?

25         MR. ROACH: Object to the form.

Page 218

1          MS. GUERRA: You can answer if you know.

2          THE WITNESS: I'm sorry?

3          MS. GUERRA: You can answer if you know.

4     A. Well, it's something I would have done. I

5 wouldn't have declined or backed off on it. I would have

6 got the warrant. But there again, I wasn't in his shoes

7 at the time. I don't know why he did what he did.

8     Q. (BY MS. FREUDENBERGER) Well, not just that. You

9 can't think of any legitimate reason for him to do what he

10 did in failing to get the search warrant. Right?

11    A. Not really, no.

12    Q. Okay. And that's something else Lieutenant Culp

13 should have ensured happened in this case. Correct?

14         MS. GUERRA: Object to form.

15 Foundation. You can answer if you know.

16    A. I would think he would have caught on to that,

17 yes.

18    Q. (BY MS. FREUDENBERGER) Okay. Would you agree

19 that it is very troubling that in this double homicide

20 close-range shooting case in which the court has actually

21 made now an innocence finding Detective Golubski failed to

22 either seize Lamonte McIntyre's clothing or execute a

23 search warrant of his home?

24         MS. GUERRA: Object to form.

25         MR. ROACH: Object to the form.

Page 219

1     A. Yes.

2          MS. GUERRA: You can answer if you know.

3     A. Well, yeah, he come up short.

4     Q. (BY MS. FREUDENBERGER) It objectively -- just

5 objectively although you can't say what happened, on its

6 face it makes it look like Detective Golubski was not

7 conducting a legitimate investigation. Correct?

8          MS. GUERRA: Object to the form.

9          MR. ROACH: Object to the form.

10    A. That or he's pretty incompetent.

11    Q. (BY MS. FREUDENBERGER) Okay. I mean, you

12 investigated 20 cases with Detective Golubski. Was he

13 incompetent?

14    A. 20?

15    Q. Yeah.

16    A. No, not that I'm aware of. I don't know. Unless

17 he was assigned to a --

18    Q. All right. The department's homicide -- I want

19 to be fair to you. The department's homicide listings

20 list you and Detective Golubski as lead investigators

21 together on 20 cases.

22    A. Wow. I don't --

23    Q. My question to you as -- do you dispute -- that's

24 not consistent with your recollection?

25    A. That don't make sense to me. I would like

Page 220

1 awfully much to see those cases.

2     Q. Okay.

3     A. I don't remember it. I'm not.

4     Q. Okay. But, sir, you know, I have read everything

5 I think there is to read about Detective Golubski and I

6 have not seen a single person allege that he was

7 incompetent. Is your position that Detective Golubski was

8 incompetent?

9     A. No. Inexperienced maybe but not incompetent. I

10 think that he, you know.

11    Q. These are basic investigative steps he should

12 have known to take. Correct?

13    A. That's what I would have taken, yes.

14    Q. Well, not just steps you would have taken. Steps

15 based on your experience and training, steps you would

16 have expected Detective Golubski to know to take in this

17 double homicides case?

18    A. Well, again --

19         MR. ROACH: Object to the form.

20         MS. GUERRA: You can answer.

21    A. It goes back to common sense. You either

22 investigate it or you don't. If there's evidence to be

23 had, you look for it.

24    Q. (BY MS. FREUDENBERGER) Okay. And common sense

25 dictated that you want to seize Lamonte McIntyre's



Page 221

1 clothing and search his home here. Correct?

2    A.   I would have, yes.

3    Q.   Because it's just common sense?

4    A.   Yes.

5    Q.   Okay. Read Paragraph 10 to yourself, please.

6         MS. GUERRA: She's asking you to look at

7 the affidavit. Right? The Tim Maskil affidavit?

8         MS. FREUDENBERGER: Yes, that's correct.

9 Thanks.

10        THE WITNESS: Okay. Where are we at?

11 Which one?

12        MS. GUERRA: She said Paragraph 10.

13        THE WITNESS: Put my eyes back on.

14   A.   Okay.

15        MS. GUERRA: Wait till she asks the

16 question.

17   Q.   (BY MS. FREUDENBERGER) Now, assuming this is true

18 that the photo lineup used by Roger Golubski in the

19 McIntyre case contained photos of three McIntyre family

20 members, that would be another investigatory failure.

21 Correct?

22   A.   I would never have done that, no.

23        MR. ROACH: Object to the form.

24   Q.   (BY MS. FREUDENBERGER) You wouldn't have done

25 that among other reasons because it was suggestive.

Page 222

1 Correct?

2    A.   Yes, ma'am.

3    Q.   And against the rules. Correct?

4    A.   I don't recollect rules. It's just something I

5 wouldn't have done. It would be too suggestive.

6    Q.   Okay. And could have resulted in Lamonte

7 McIntyre being erroneously suggestive. Right?

8         MR. ROACH: Object to the form.

9    A.   I assume so, yes, he could be wrongfully

10 identified.

11   Q.   (BY MS. FREUDENBERGER) Okay. The fact that the

12 photo lineup contained photos of three McIntyre family

13 members would be one explanation for how Lamonte McIntyre

14 could have been identified by witnesses even if he was not

15 the perpetrator. Correct?

16        MR. ROACH: Object to the form.

17        MS. GUERRA: You can answer.

18   A.   I'm assuming it's possible, yes.

19   Q.   (BY MS. FREUDENBERGER) All right. Read Paragraph

20 11 to yourself, please.

21   A.   Paragraph 11?

22   A.   Yeah.

23   A.   Okay.

24   Q.   Why did you laugh, sir?

25   A.   Well, it's like a lot of the other detectives.

Page 223

1 He thought he was a better detective than he was. I guess

2 we all like to feed our ego, you know.

3    Q.   You see that Detective Maskil describes Golubski

4 as a loner the same way that you did earlier in your

5 deposition?

6    A.   That was my experience with him that he went his

7 own way and we'd get back together occasionally to compare

8 notes but most often he went off on his own.

9    Q.   Okay. And this is another place where you and

10 Detective Maskil have a consistent recollection. Right?

11   A.   Where I have a problem with recollection?

12   Q.   No. You have a -- your recollection is

13 consistent with Tim Maskil's recollection. Correct?

14   A.   In this case, yeah, I agree.

15        MR. ROACH: Object to the form.

16        MS. GUERRA: You can answer.

17   Q.   (BY MS. FREUDENBERGER) Okay.

18   A.   I saw him as a loner. That's it.

19   Q.   Okay. Was it apparent to you too that Roger

20 Golubski was trying to build his reputation as a detective

21 especially in the black community?

22        MR. ROACH: Object to the form.

23   A.   I couldn't say that one way or the other because

24 I don't know what he did in the black community. He was a

25 loner. He went down there and did what he did. I wasn't

Page 224

1 there.

2    Q.   (BY MS. FREUDENBERGER) Okay. But if you're

3 honest, sir, you heard rumors about some of the things

4 that Detective Golubski did down there in the black

5 community. Right?

6    A.   The only thing I heard about rumors was after

7 this thing started when I was --

8    Q.   Yeah.

9    A.   -- advised that I was a defendant in the case.

10 Because other than that, I stayed away from that. I went

11 home. I didn't run up and down the halls with those

12 people. I didn't gossip.

13   Q.   Okay. But Detective Maskil. Right?

14   A.   Detective Maskil what?

15   Q.   You spoke with Detective Maskil. Right?

16   A.   Well, yeah, every time we worked together, we

17 talked.

18   Q.   Well, not just every time you worked together.

19 You shared an office for years and talked about

20 woodworking and shooting, target shooting and police work.

21   A.   We agreed that Golubski was a loner but --

22   Q.   Okay. We'll get there. Let's keep going. Okay?

23 Read paragraph -- do me a favor and read Paragraphs 13,

24 14, and 15 to yourself.

25   A.   I have no idea --



Page 237

1 this line of questioning if you don't mind.
2              MS. GUERRA:  Sure.
3     Q.   (BY MS. FREUDENBERGER) If Maskil's recollection
4 is correct and Golubski was known for having sex with
5 black drug-addicted prostitutes to the extent where fellow
6 detectives were confronting him about it, that's something
7 that the department should have investigated and
8 potentially disciplined Golubski for if there were any
9 merit to those allegations.  Correct?
10              MS. GUERRA:  Object to form.
11              MR. COOPER:  Object to the form.
12              MR. ROACH:  Object to the foundation.
13              MR. COOPER:  At least three layers of
14 speculation in your question.  Go ahead.
15              MS. GUERRA:  You can answer if you know.
16     A.   I would think it's --
17     Q.   (BY MS. FREUDENBERGER) Yes, sir, you can answer.
18     A.   I would think it's something that someone would
19 be interested in investigating because it would jeopardize
20 too many investigations, too much confidential
21 information.
22     Q.   Okay.  It would jeopardize the -- any number of
23 cases.  Correct?
24     A.   Yes.
25     Q.   Jeopardize the department's reputation in the

Page 238

1 community.  Correct?
2              MS. GUERRA:  Object to form.
3 Foundation.  You can answer if you know.
4     A.   It wouldn't help any, no.
5     Q.   (BY MS. FREUDENBERGER) Not to mention it would be
6 exploitive and coercive of the women he was allegedly
7 having sex with.  Right?
8              MS. GUERRA:  Same objections.
9              MR. ROACH:  Object to the form.
10              MS. GUERRA:  You can answer if you know.
11     A.   No, I don't know.
12     Q.   (BY MS. FREUDENBERGER) Sir, maybe Maskil's making
13 this up.  Right?
14     A.   I'm what?
15     Q.   Maybe Maskil's making this up.  Right?
16     A.   No, I'm not making --
17              MS. GUERRA:  Object to the form.  Go
18 ahead, sir.
19     A.   I don't recollect.  I just plain don't.  I'm not
20 making anything up.
21     Q.   (BY MS. FREUDENBERGER) No, not you but Maskil.  I
22 mean, doesn't that seem kind of unlikely Maskil would have
23 been aware of this and you would have never heard anything
24 about it?
25              MR. COOPER:  Objection.  Form.

Page 239

1              MS. GUERRA:  Same objection.  Go ahead.
2     A.   I don't know.  I don't know.  I don't know why he
3 would make something like that up.  I have no idea.
4     Q.   (BY MS. FREUDENBERGER) Either Maskil is lying or
5 supervisors intentionally turned a blind eye to Golubski's
6 misconduct.  Correct?
7              MS. GUERRA:  Object to the form.
8              MR. COOPER:  Object to form.
9              MR. ROACH:  Object to the form.
10     A.   I can't say.  I don't have an opinion or a
11 recollection.
12     Q.   (BY MS. FREUDENBERGER) Well, those are the only
13 two possibilities.  Right?
14              MS. GUERRA:  Object to form.
15     A.   I can't accept that either.  There's all kinds of
16 possibilities.
17     Q.   (BY MS. FREUDENBERGER) Like what?  Just give me
18 one.
19              MR. ROACH:  Object to form.
20              MR. COOPER:  Join.
21              THE WITNESS:  What did she say?
22     Q.   (BY MS. FREUDENBERGER) Just give me one.
23     A.   I can't give you any.  I don't know that that's
24 true.  I don't know if Maskil had a reason to make it up.
25 I just have no recollection of any of it and I don't know

Page 240

1 if any of it's true or not.
2     Q.   But you would agree that either Maskil is
3 exaggerating or that the department turned a blind eye to
4 Golubski's misconduct.  Correct?
5              MS. GUERRA:  Same objections.
6              MR. COOPER:  Object to form.
7              MR. ROACH:  Object to form.
8     A.   I don't know.
9              MS. FREUDENBERGER:  All right.  We can
10 take a break.
11              MS. GUERRA:  Okay.
12              (A recess was taken from 3:51 p.m. to
13              4:01 p.m.)
14     Q.   (BY MS. FREUDENBERGER) Sir, are you familiar with
15 an officer named Ruby Ellington?
16     A.   I remember Ruby, yes.  Black girl.  Pretty decent
17 girl, yeah.
18     Q.   Well respected black female detective in the
19 department?
20     A.   Ruby was a detective?  Is that what you're
21 asking?
22     Q.   Yeah.
23     A.   I think she worked with vice and narcotics for a
24 while but I don't know if she made detective.  I don't
25 remember unless it was after I retired.



Page 265

1  You described her as a black girl.

2    A.  Okay.  She's a black girl, black officer.  She's

3  a lady.  She's a very fine person.

4    Q.  Based on what you've seen in these affidavits

5  from your former partner, Tim Maskil, and Ruby Ellington

6  who you believe is a fine officer, would you agree that a

7  criminal investigation should be initiated into Golubski

8  now to find out if these allegations have merit?

9            MR. ROACH:  Object to the form.

10   A.  I'm under the impression that such an

11  investigation is being conducted.  I don't know.  I have

12  no idea.  I'm away from there.  I have no idea.

13   Q.  (BY MS. FREUDENBERGER)  Would agree that it should

14  be?  By the way --

15           MR. ROACH:  Object to the form.

16           MS. GUERRA:  He was saying object to

17  form but you can answer.

18   A.  Well, if he's done everything they've accused him

19  of doing, then he's in violation of some laws and some

20  people's civil rights and he should be investigated.  He

21  should be held accountable.

22   Q.  (BY MS. FREUDENBERGER)  Okay.  What's the basis

23  for your understanding that a criminal investigation

24  against Golubski is ongoing?

25   A.  Is what?

Page 266

1    Q.  What's the basis for your understanding that a

2  criminal investigation against Golubski is ongoing?

3    A.  Well, just after this all took place and a

4  lawsuit started and now he's released from prison, I was

5  under the assumption that somebody's going to go back and

6  take a look at and try to figure out what happened and

7  why.  I don't know that anything is going on.

8    Q.  Separate and apart from an investigation into

9  Golubski for these allegations and whether he committed

10  any felonies, would you agree that the Kansas City,

11  Kansas, Police Department, should be investigating whether

12  multiple officers became aware or believed Golubski was

13  engaging in this kind of misconduct and failed to report

14  it?

15           MS. GUERRA:  Object to form.

16  Foundation.

17   A.  My opinion whether they investigate the police

18  department or not, before they do anything, they need to

19  investigate and confirm whether or not the criminal acts

20  by Golubski are founded or not.

21   Q.  (BY MS. FREUDENBERGER)  Well, but this is a

22  separate question.  So if -- regardless of whether

23  Golubski was actually engaging in these criminal acts if

24  there were multiple officers in the police department in

25  the 1990s who believed it was common knowledge that

Page 267

1  Golubski was committing felonies and not being disciplined

2  for it and failed to report it, the failure to report by

3  other officers who believed this was happening should

4  itself be investigated.

5            MS. GUERRA:  Same objections.

6    A.  In my opinion if that was the case, I would do

7  the investigation on Mr. Golubski first.  And then if it

8  led back to officers not being aware of what was going on

9  and you follow up and let the cards fall where they may.

10   Q.  (BY MS. FREUDENBERGER)  But I'm talking about

11  something else.  I'm talking about officers being aware of

12  what was going on and not reporting it.  There should be

13  an investigation into who in the chain of command knew

14  what and failed to stop it.  Correct?

15           MS. GUERRA:  Same objections.

16           MR. COOPER:  Object to form.

17           MS. GUERRA:  You can answer if you know.

18   A.  I have no opinion on that.  That's not the way I

19  would do it.

20           MR. COOPER:  Emma, I need to interrupt

21  for a minute.  Do you have an estimate how long you're

22  going to be?  I've got something that's got to happen by

23  5:00 and if we're going to be going that long, I need to

24  get somebody else to do it for me.

25           MS. FREUDENBERGER:  Yeah, I'm afraid we

Page 268

1  may be.  I'm sorry.

2            MR. COOPER:  Okay.

3            MS. GUERRA:  I got a hard stop at 5:00

4  as well.

5            MR. COOPER:  Can you give me 90 seconds?

6            MS. FREUDENBERGER:  You have a hard stop

7  at 5:00?

8            MS. GUERRA:  Yeah.  I got to get on -- I

9  mean, it's been a full day.  We've been here since

10  9:00 a.m. and I have a flight to catch.

11           MS. FREUDENBERGER:  I just wish you had

12  told me that earlier.  You know, we've agreed on ten hours

13  per witness.  I would have liked to have known that before

14  4:35.

15           MS. GUERRA:  I mean, if you can get it

16  done by like 5:15, I can hang in there but, I mean --

17           MS. FREUDENBERGER:  We'll reserve the

18  time and if he has to come back, he'll have to come back,

19           MS. GUERRA:  Okay.

20           MS. FREUDENBERGER:  I had to do that to

21  the witness but.

22           MR. COOPER:  Thanks for that.  You can

23  carry on.

24   Q.  (BY MS. FREUDENBERGER)  All right, sir.  I take it

25  your testimony is that based on what you've seen thus far



Page 269

1 of the allegations made by Tim Maskil and Ruby Ellington
2 and Detective Golubski's invocation at his deposition when
3 asked questions about this misconduct, you would agree
4 that Golubski should be investigated. A full
5 investigation should be done to determine whether he
6 comitted any felonies on the job. Correct?
7    A. Yes, ma'am.
8        MS. GUERRA: Same objection.
9        MR. ROACH: Object to the form.
10    Q. (BY MS. FREUDENBERGER) And if that -- if those
11 allegations are substantiated, then the Kansas City,
12 Kansas, Police Department should conduct a full
13 investigation into who knew what when and why it wasn't
14 reported. Correct?
15       MS. GUERRA: Same objections.
16       MR. COOPER: Form.
17       MR. ROACH: Object to form.
18    A. Here again, I see a lot of gossip possibly
19 involved. Some officers hear things whether they know it
20 to be a fact or not, and before if you investigate, try to
21 find out who was fully aware of what was going on and did
22 not take action. But gossip, I just don't think that it
23 would be appropriate to investigate somebody for saying,
24 oh, I heard this or I heard that but I don't know it for a
25 fact.

Page 270

1    Q. (BY MS. FREUDENBERGER) Well, sir, you didn't know
2 for a fact that Edgar Doswell had stolen the stereo. You
3 were told by a criminal who had just admitted to
4 conducting a burglary that a nameless police officer had
5 stolen a stereo.
6    A. Yes, ma'am.
7    Q. And you opened a criminal investigation into
8 that.
9    A. I didn't know it was Doswell at the time. He
10 said a policeman picked it up. We took him downtown,
11 showed him photographs. He pointed out Doswell. To prove
12 it, I went to investigate and interview Doswell. When I
13 got there, there was the stereo.
14    Q. You've told me that, sir, and I understand what
15 happened as a factual matter. But based on the word of a
16 criminal who had just admitted to committing a burglary,
17 you investigated whether or not a police officer had
18 stolen a stereo.
19    A. He was a cooperative criminal.
20    Q. Are you telling me that -- are you telling me
21 that the department need not investigate whether what
22 esteemed Officers Maskil and Ruby Ellington have sworn
23 under oath Golubski was doing?
24    A. I have no idea.
25       MS. GUERRA: Object to form.

Page 271

1 Foundation.
2       MR. ROACH: Object to the form.
3    A. I don't know.
4    Q. (BY MS. FREUDENBERGER) But, sir, how do you
5 determine whether it's just -- first of all, these are
6 allegations of an officer engaging in a pattern of
7 felonies. Right?
8    A. Yes.
9    Q. Okay. That's fundamentally different than water
10 cooler gossip. Right?
11    A. Than what? Well, here again, there's got to be
12 some credibility to what you're hearing. I had a
13 cooperative suspect on a burglary. He admitted to it. He
14 had no reason to lie to me at that point. He said that a
15 police officer picked up the stereo.
16       I checked and it was not in the property
17 room. I followed up on that investigation. And it was a
18 police officer who picked it up because it was in the
19 possession of the police officer when I recovered it.
20    Q. Okay. So you -- you -- so the -- objectively the
21 allegations by the guy who just admitted to comitting a
22 burglary were objectively more credible than what your
23 former colleagues Ruby Ellington and Tim Maskil have said
24 under oath in affidavits about Golubski; is that right?
25       MS. GUERRA: Objection to form and

Page 272

1 foundation.
2       MR. COOPER: Object to form.
3       MR. ROACH: Object to the form.
4    A. The guy admitted to a crime. He threw himself
5 under the bus. If he lied, it would only get worse. So,
6 yeah, I took his word for it.
7    Q. (BY MS. FREUDENBERGER) Okay. And how do you
8 determine whether the allegations of Golubski committing a
9 pattern of felonies on the job are just gossip or have
10 merit without an investigation?
11    A. Well, first of all --
12       MR. ROACH: Object to form.
13       THE WITNESS: Sorry.
14    A. Start investigating Golubski and find out who the
15 women were he allegedly had violated and go interview
16 them. You start somewhere. You got to start and go to
17 the source and work it backwards. It's just that simple.
18    Q. (BY MS. FREUDENBERGER) And if there's any truth
19 to those allegations, then the department should conduct a
20 full investigation into who was aware of them and failed
21 to report them. Correct?
22       MS. GUERRA: Object to form.
23 Foundation.
24    A. Be speculation but if there's a -- my opinion
25 where there's smoke, there's fire. So if those





Page 273

1 allegations were made, I'd check them out. If they prove
2 negative, that's the way it is. If they're positive, then
3 you go for it.
4    Q.  (BY MS. FREUDENBERGER) And by go for it, you mean
5 not only pursue criminal charges against Golubski but
6 investigate your former colleagues for their failure to
7 report this misconduct while it was going on. Correct?
8          MS. GUERRA:  Same objections.
9    A.  That's -- on my part, I don't know if they did or
10 didn't report it. I don't know.
11    Q.  (BY MS. FREUDENBERGER) Oh, so maybe they did
12 report it and no investigation was ever conducted?
13    A.  I have no idea. That's a guess and I'm not going
14 to make a guess.
15    Q.  All right. Well, if they didn't report it -- if
16 nobody reported it and it turns out that the allegations
17 are true, then the department should conduct a full
18 investigation into who knew what when and failed to come
19 forward. Right?
20          MR. COOPER:  Object to form. Would you
21 care to ask a relevant question on something that might be
22 admissible? You're wasting time.
23    Q.  (BY MS. FREUDENBERGER) Sir?
24    A.  I have no response for that. I don't know.
25    Q.  Okay. You told me all of the ways that this

Page 274

1 misconduct if Golubski was engaging in as Ruby Ellington
2 and Tim Maskil described could harm the department's
3 reputation in the community as well as jeopardize criminal
4 investigations Golubski was involved in at the time. Do
5 you remember that?
6          MR. COOPER:  Object to form.
7          MS. GUERRA:  Object to form.
8    A.  Any questionable event places the police
9 department's reputation in jeopardy. Look around the
10 United States right now. Every police department we have
11 has got a bull's-eye on their back.
12    Q.  (BY MS. FREUDENBERGER) What do you mean by that,
13 sir? Tell me why.
14    A.  I mean that people don't like the cops. They
15 don't trust the cops. Any allegations, people accept it
16 as truth whether it's proven over not. And to determine
17 if it's true or not, you investigate it, but at the same
18 time, you investigate it with your eyes wide-open. It may
19 be true. It may be gossip. You don't know.
20    Q.  Are you referring to the aftermath of the George
21 Floyd video and --
22    A.  No. We've had incidents all over the United
23 States where the police have been accused of shooting
24 people or shooting each other. We just had the two FBI
25 agents killed in Florida.

Page 275

1          And all these things are coupled to
2 discredit law enforcement and we still got a lot a darn
3 fine policemen out there that aren't doing anything wrong
4 but they're all catching heat over what one or two cops
5 do.
6    Q.  It's unfair. Right?
7          MR. COOPER:  Objection. Form.
8          MS. GUERRA:  Objection. Objection.
9 Form. Foundation, relevance.
10    A.  How about that little town in Missouri where the
11 cops shot the guy and they rioted for three or four weeks,
12 whatever. There's been --
13    Q.  (BY MS. FREUDENBERGER) You talking about
14 Ferguson?
15    A.  Yeah, there's been a number of incidents where
16 policemen have done things. Policemen are human beings.
17 They make mistakes, they have accidents, whatever the case
18 may be, but you can't blame every cop in town because of
19 one or two incidents and you can't hang your hat on one or
20 two incidents where everything else might be wrong.
21    Q.  And it's not fair to penalize an entire police
22 department and make other officers feel bad just because
23 one of their colleagues accidentally shot someone. Right?
24          MS. GUERRA:  Object to form.
25    A.  One of their cops fall short and if I thought it

Page 276

1 wasn't fair, I wouldn't have arrested Lee Ramsey. I
2 wouldn't have arrested Doswell. Sure, the police
3 department --
4    Q.  (BY MS. FREUDENBERGER) Yeah, the Ferguson example
5 is a good one.
6    A.  But the point is --
7    Q.  One or two officers made a mistake and the whole
8 department got dragged through the mud for it unfairly.
9 Right?
10          MS. GUERRA:  Objection.
11          MR. COOPER:  Form.
12    Q.  (BY MS. FREUDENBERGER) I'm just asking your
13 opinion, sir.
14    A.  Well, here again -- I'm trying to regroup. I got
15 pulled off track there.
16          MS. GUERRA:  Do you need a break?
17          THE WITNESS:  No.
18    A.  It's just my opinion that officers are human
19 beings just like anybody else. They're hired off the
20 streets in the cities they usually patrol or service.
21 There's good people, there's bad people, and that's the
22 chance we take when we hire them. And so far as offending
23 or embarrassing another policeman because another cop goes
24 bad, you can always sit down and say, hey, look, we're
25 cleaning our own house, you know.

