# **EXHIBIT 69**

Page 1

1        IN THE UNITED STATES DISTRICT COURT
              FOR THE DISTRICT OF KANSAS
2
3   LAMONTE McINTYRE, et al.,)
                             )
4             Plaintiffs,    )
                             )
5   vs.                      ) 2:18-cv-02545-KHV-KGG
                             )
6   UNIFIED GOVERNMENT OF    )
    WYANDOTTE COUNTY AND     )
7   KANSAS CITY, KANSAS,     )
    et al.,                  )
8                            )
              Defendants.    )
9
10
11
12            VIDEOTAPE DEPOSITION OF RONALD LEE
13   MILLER, a Witness, taken on behalf of the
14   Plaintiffs, before Alison A. Tracy, Missouri
15   CCR No. 554, Kansas CSR No. 1525, pursuant to
16   Notice, on the 20th day of December, 2021, at
17   Lathrop GPM LLP, 2345 Grand, Suite 2200, Kansas
18   City, Missouri.
19
20
21
22
23
24
25

Page 54

1   MS. EVERS GUERRA: Join.
2   MR. COOPER: Join.
3   Q. (By Ms. Pilate) Did you ever -- I will
4 reask it. Did you ever, at any point prior to
5 2015, hear from anyone that Roger Golubski had
6 sexual contact in his office at the police
7 department with black females?
8   MR. ROACH: Same objection.
9   MS. EVERS GUERRA: Join.
10  A. Not that I recall.
11  Q. (By Ms. Pilate) You never heard that
12 from a single person?
13  MR. ROACH: Object to form.
14  A. That's the third time you have asked me,
15 and the answer is the same. I do not recall that
16 at this moment. I do not recall ever being told
17 that, no.
18  Q. (By Ms. Pilate) Okay. Did anyone ever
19 raise with you the issue of Roger Golubski's
20 informant network? And again, turn your
21 attention to the period before 2015.
22  MR. ROACH: Object to form.
23  A. I knew that -- command staff knew that
24 Roger Golubski had an informant network. He was
25 assigned to the criminal investigation division

Page 55

1 or the detective bureau, whatever title you want
2 to put on that, he was assigned there as a
3 detective, and it was known that he had
4 informants that he worked to get information. So
5 yes, the answer to that is yes, we knew that he
6 had an informant network. Most detectives do.
7 Most detectives who have been around a long time
8 develop informants, that's what they do as
9 detectives.
10  Q. (By Ms. Pilate) Did you learn anything
11 about who his network was composed of?
12  A. No. Everyone knows that Roger Golubski
13 had an affinity for black females. He was
14 married to an African American woman for some
15 time. But who his informants were or what
16 activity he may have been involved with them was
17 not widely known, and I didn't know that he was
18 involved with African American females other than
19 to know he had an informant network and that
20 probably some of them were African American
21 females and others.
22   So it was known that he had an informant
23 network, but that's not unusual. That's
24 acceptable police practice to develop informant
25 networks to get information.

Page 56

1   Q. You reviewed your deposition from 2012,
2 correct?
3   A. I did.
4   Q. And do you recall the questions in there
5 about Roger Golubski having contact with
6 prostitutes?
7   A. If I recall correctly, the question
8 was -- if I recall correctly, there was a
9 separation in that thing about prostitutes and
10 people in the projects, people working in the
11 quote, projects, end quote. At this moment I
12 think there was a separation of those two. And
13 so the question was -- the issue was did his
14 informant network include prostitutes. I don't
15 know that it did, but I don't know that it did
16 not. It may very well have. That would not be
17 unusual if it did.
18   MS. EVERS GUERRA: Is this a good
19 time for a break, if you don't mind? We have
20 been going about an hour and 20 minutes.
21   MS. PILATE: Okay, fine.
22   THE VIDEOGRAPHER: Please stand by.
23 The time is 10:50 a.m. and we are going off the
24 record.
25   (Short recess was taken.)

Page 57

1   THE VIDEOGRAPHER: The time is
2 11:20 a.m. and we are back on the record.
3   (Exhibit 152 was marked.)
4   Q. (By Ms. Paras) We are back on the
5 record after a break. Mr. Miller, before the
6 break there was reference made by you to a prior
7 deposition. Do you recall giving a deposition on
8 September 14, 2012 in the case styled Seifert v.
9 Unified Government of Wyandotte County and Kansas
10 City, Kansas?
11  A. Yes, ma'am.
12  Q. You will be relieved to know I will not
13 be asking you about the entire deposition but I
14 do have questions about a couple of pages. I'm
15 going to hand you an exhibit. I believe I have
16 enough copies for everyone. I'm handing you what
17 I have marked as Exhibit 152. If you could take
18 a quick look at this and see if you can identify
19 this document?
20  A. Yes, it appears to be a reproduction of
21 my deposition from September 14, 2012.
22  Q. Okay. And a portion thereof, correct?
23  A. Yes, a portion thereof.
24  Q. What we have are the cover page, and
25 then pages 33 to 36 and then 65 through 76. Does

Page 62

1  department?
2  A.  No.
3  Q.  Did you ever learn of it at any time
4  afterward?
5  A.  From the media.
6  Q.  Okay.  Other than from the media, have
7  you heard about that situation?
8  A.  No.  And I never heard about that until
9  I read that story in the media.  Didn't know
10 that.
11 Q.  On the next page of this deposition you
12 were asked a question about why you might not
13 have been told about this, and you answered, "I
14 would -- it gives me an opportunity to say you
15 can't assume the Chief knows everything."  Do you
16 see that?
17 A.  Yes.
18 Q.  Is that true, that the Chief does not
19 know everything?
20 A.  It is absolutely true in every law
21 enforcement agency in the United States.
22 Q.  Okay.  So, would it be fair to say,
23 then, that your subordinates didn't tell you
24 things?
25      MR. COOPER:  Object to form.

Page 63

1  A.  Yes, that would be fair.
2  Q.  (By Ms. Pilate)  Was there any training
3  or policy that would have required them to report
4  an allegation as serious as that to you?
5  A.  Yes.
6  Q.  And if such a situation occurred and it
7  was not reported to you, would that officer or
8  officers who were aware of it, would they have
9  violated policy?
10 A.  They would.
11      MR. COOPER:  Object to form.
12 Q.  (By Ms. Pilate)  Okay.  Thank you.  Did
13 anyone ever discuss with you what you called
14 Golubski's affinity for African American females?
15      MR. ROACH:  Object to form.
16 A.  The term affinity is my term.  I knew
17 that he, if you will, was attracted to black
18 females.  He was married to a black female for
19 some number of years.  I know that he had family
20 but I don't know anything about his family.  All
21 I knew is that he was married.
22      Having since read all of those accounts
23 laid out in the media, there is information that
24 I learned recently, that I did not know, because
25 the Chief may not know about the personal life of

Page 64

1  every one of his officers.  And there is a
2  difference between the rumor mill, what you may
3  hear about in every organization, and I suspect
4  even law offices, rumors about things that occur,
5  but the question is what do you have that is an
6  allegation that can be investigated or proven.
7       I won't go down that road unless you
8  want to.  You have to be able to prove these
9  things.  You hear a lot of things over a long
10 time.
11 Q.  (By Ms. Pilate)  I understand what you
12 are saying here.  And people keep talking about
13 rumors.  A rumor can be the same thing as an
14 allegation, correct?
15 A.  No.
16      MR. COOPER:  Object to form.
17 Q.  (By Ms. Pilate)  Well, if someone says
18 something and it travels through the office and
19 you are able to trace that to a particular
20 person, then that becomes an allegation, right?
21 A.  No.
22 Q.  If somebody says I have information that
23 Roger Golubski is spending time with and having
24 relations with black females who live in the
25 housing projects, is that something you would

Page 65

1  want to know more about?
2  A.  Yes.
3  Q.  Did anyone ever say that to you?
4  A.  No.
5  Q.  You never knew at any point that Roger
6  Golubski had relations with women in the housing
7  projects?
8       MR. ROACH:  Object to form.
9       MS. MEYER:  Object to form.
10      MR. COOPER:  Join.
11      MS. EVERS GUERRA:  Join.
12 A.  If we go back, which we don't have to
13 do, if we go back to the way you framed the
14 question, I would agree with you.  "I have
15 information that some officer is doing something
16 illegal in the projects of KCK."  "Really?  Okay.
17 Tell me more."  That's an allegation.  What do
18 you have?  What do you know?  Tell me what you
19 know.
20 Q.  (By Ms. Pilate)  If you heard something
21 like that, would you go to people in your
22 department and say hey, I heard this, do you know
23 anything about it, can you run this down for me?
24 A.  Commanding officers would have been
25 expected -- that may not rise to the level of the

17 (Pages 62 - 65)

Page 66

1  Chief. But commanding officers would most likely
2  hear about that before the upper level command
3  staff might, because they work alongside those
4  guys every day. Some of their peers may have
5  known something. I have read an affidavit.
6     Q. Let me ask you this. Are you aware of
7  any of these so-called rumors?
8         MR. ROACH: Object to form.
9         MR. COOPER: Join.
10    Q. (By Ms. Pilate) Were you aware of any
11  of these so-called rumors with respect to Roger
12  Golubski?
13        MR. ROACH: Same objection.
14        MS. EVERS GUERRA: Join.
15        MR. COOPER: Object to form, not
16  specific as to time.
17    A. Straight answer, you hear rumors every
18  day. If you haven't heard a rumor by 10:00 a.m.,
19  it is an unusual day. You hear rumors every day.
20  So the question would be, are they consistent,
21  are you hearing the same rumor over and over
22  again, have you heard the same rumor from
23  different people, what do you have. And the
24  reality is, I don't have any hard facts that
25  indicate Roger Golubski ever did anything wrong.

Page 67

1     Q. (By Ms. Pilate) Let me ask you this.
2  If you hear a rumor, you can investigate a rumor,
3  right?
4     A. If you investigated rumors, Ms. Pilate,
5  that's all you would do all day is investigate
6  rumors. No, you don't generally investigate
7  rumors.
8     Q. If you hear that Roger Golubski, let's
9  just say a for instance, is having sexual
10  relations with black females in the projects --
11  let me just ask you, is that a rumor you would
12  want to investigate?
13        MR. ROACH: Object to form.
14        MS. MEYER: Object to form.
15        MR. COOPER: Object to form.
16        MS. EVERS GUERRA: Join.
17    Q. (By Ms. Pilate) If you heard it any
18  time?
19    A. I would call that an allegation.
20  Because the way you worded it, in the way you
21  worded it as an attorney, I would call that an
22  allegation. Really? Well then we need to find
23  out what's going on. Tell me more. What do you
24  know. Where did you hear that? Who told you
25  that? Well let's go find out about that. Then

Page 68

1  when you say something to someone that you
2  supposedly heard it from, they go well, I don't
3  really have any information on that, that's just
4  something I heard. Oh really? Or, if Bauer
5  never told anybody that he had encountered that
6  situation and never told anybody at the time, how
7  do you follow up on something that nobody
8  reported?
9         If there were rumors out there and no
10  allegations and you have nothing upon which to
11  base an investigation, and you have to have a
12  witness, a complainant's statement, come and make
13  a complainant's statement, back many years ago.
14  A lot of those procedures and policies have
15  changed over the years, but it used to be that
16  someone would have to come forward and make a
17  complaint.
18        I get it that they might be too scared
19  to do that. But somebody has to come forward and
20  make a complaint. This is America. This is a
21  free country. Officers have rights. You
22  represent officers who have rights who you have
23  defended.
24    Q. Mr. Miller, hang on here a minute. I'm
25  not talking about officers having rights. What I

Page 69

1  am asking you is if you heard that Roger Golubski
2  was having relations with women in the housing
3  projects, and the housing projects where he
4  policed and had so-called sources, wouldn't you
5  want to get more information about that?
6         MR. ROACH: Object to form.
7         MS. MEYER: Object to form.
8         MR. COOPER: Object to form.
9         MS. EVERS GUERRA: Join.
10    A. And I never heard anybody ever tell me
11  that.
12    Q. (By Ms. Pilate) Not a single person
13  ever told you Roger --
14    A. No.
15    Q. What about did anyone ever tell you
16  Roger Golubski was seen driving on Quindaro with
17  black females?
18        MR. ROACH: Object to form.
19        MS. EVERS GUERRA: Join.
20    A. No, no one has told me that. Prior to
21  2015, no one has told me that.
22    Q. (By Ms. Pilate) No one ever told you
23  that Roger Golubski was known to have sexual
24  relationships with African American women in the
25  community?

Page 70

1         MR. ROACH:  Object to form.
2         MS. MEYER:  Object to form.
3         MS. EVERS GUERRA:  Join.
4    A.   He was married to an African American
5  woman in the community, so that would not be
6  unusual.
7    Q.   (By Ms. Pilate)  Let's put that aside.
8  Aside from his marriage to Ethel Golubski, who is
9  now Ethel Abbott, I believe, did you ever hear
10 that Roger Golubski had relationships with women
11 in that north end community?
12        MR. ROACH:  Object to form.
13        MS. MEYER:  Object to form.
14        MR. COOPER:  Form.
15   A.   I don't mean to dissect your question.
16 Relations as in she is an informant, she lives in
17 the projects, somebody he --
18   Q.   (By Ms. Pilate)  Personal sexual
19 relations.
20   A.   Or sexual relations, whether that of any
21 kind of what we would all normally refer to as
22 sexual relations.  No.
23   Q.   You never heard one time that Roger
24 Golubski had sexual relations with any black
25 female in the north end, other than his wife

Page 71

1  Ethel?
2         MR. ROACH:  Object to form.
3         MS. MEYER:  Object to form.
4    Q.   (By Ms. Pilate)  Is that true?
5    A.   That is true.  Who exactly would know
6  that with certainty unless they were there when
7  it happened.  It is rumor.  It is all rumor.
8    Q.   Mr. Miller, let me ask you this.  Your
9  department is full of trained investigators,
10 right?
11        MR. COOPER:  Object to form.
12   Q.   (By Ms. Pilate)  Correct?
13   A.   Yes.
14   Q.   You investigate allegations all the
15 time, correct?
16   A.   Yes.
17   Q.   And investigate crimes all the time?
18   A.   Yes.
19   Q.   And you have an Internal Affairs unit,
20 right?
21   A.   Yes.
22   Q.   And you also have an expectation that
23 your officers will tell you the truth, right?
24   A.   Yes.
25   Q.   And so would it be possible someone

Page 72

1  could call in Roger Golubski and say hey, we are
2  hearing these things about you?
3         MR. COOPER:  Object to form.
4    Q.   (By Ms. Pilate)  Are you having
5  relations with women in the housing projects?
6         MS. MEYER:  Object to form.
7         MR. ROACH:  Object to form.
8         MS. EVERS GUERRA:  Join.
9         MR. COOPER:  Join.
10   Q.   (By Ms. Pilate)  Could someone ask him
11 that?
12   A.   So let's dissect that a moment.  If you
13 call an officer in to discuss the potential
14 violation of law or rules and regulations, that
15 officer under Weingarten has a right to be
16 represented.  Then the representative, whether
17 that is a union member or a steward, comes in and
18 says Chief, do you have specific allegations
19 about our officer?  No, I have only got rumor.
20 Well, we categorically deny that and we are
21 leaving.
22        You have nothing, Cheryl, unless you
23 have allegations that have a foundation that are
24 supported by investigateable truth or allegation,
25 investigateable facts.  Rumors are everywhere.

Page 73

1    Q.   So you are saying in your department you
2  could not ask someone if they, an officer or a
3  detective, if they had a relationship or
4  relationships with women in the community that
5  might put them in a situation where they could,
6  for instance, have a conflict of interest?
7         MR. ROACH:  Object to form.
8         MS. MEYER:  Object to form.
9    A.   Yes, the answer to your question is yes
10 if you knew about it to ask the question.
11   Q.   (By Ms. Pilate)  What if you hear about
12 it, isn't that something you want to follow up
13 on?  Yes or no.
14        MR. COOPER:  Object to form.
15        MS. MEYER:  Object to form.
16   Q.   (By Ms. Pilate)  Just yes or no.  I just
17 want to know if you hear this, if you want to
18 follow up.
19        MR. ROACH:  Join.
20        MS. MEYER:  Object to form.
21        MR. COOPER:  Join.
22        MS. EVERS GUERRA:  Join.
23   A.   The answer is yes, and that would be the
24 responsibility, it would be assigned to the
25 commanding officer or the supervisors of that

Page 102

1  issue.  The question is, if any of the officers
2  in your department heard something like this, is
3  that something they should have turned over for
4  investigation?
5      A.  Yes, ma'am, I would say yes they should
6  have.
7      Q.  That's all I want to know.  Now, let's
8  go back to your deposition.  If you could please
9  look at page 73.  You can see there between lines
10 11 and 14 -- it wasn't me asking these questions,
11 it was apparently my co-counsel, asking about
12 people down in the projects where he, meaning
13 Roger Golubski, was working, females other than
14 his wife.  And you answered, "You hear a lot of
15 things in 34 years and you also learn things you
16 never knew before, but there were -- that's not
17 foreign to me, let's put it that way, that's not
18 foreign to me."  What did you mean by that that's
19 not foreign to me?
20     A.  It is very straightforward.  Even though
21 Mr. Kerns was asking the questions, you were
22 sitting right next to him the entire time, so you
23 know the exchange and recall the exchange.  My
24 point is that you hear a lot of things and that's
25 not foreign to me.  Roger was a detective in the

Page 103

1  minority community.  Roger worked a lot of
2  homicides that involved African American victims
3  in our community.  And so Roger Golubski is a
4  white detective, and there were other white
5  detectives, but Roger is a white detective
6  working minority community homicides.  So, they,
7  meaning the detectives, have to develop
8  informants, informant networks and get people to
9  talk to them and all that kind of thing.  So, it
10 is not foreign to me for that kind of thing to
11 happen.
12         And the reference of the question was,
13 I'm not talking about that.  I'm talking about
14 people down in the projects where he was working,
15 females other than his wife.  Well, you hear a
16 lot of things in 34 years.  You hear a lot of
17 things that police officers may have been
18 supposed to have done.  So, you run
19 investigations on the allegations that come
20 forward and you try to pay attention to other
21 things.
22         So, it is not foreign to me that -- the
23 issue is not foreign to me that he would be
24 talking to people down in the projects, working
25 with females other than his wife, that's not

Page 104

1  foreign to me, let's put it that way, that's not
2  foreign to me.  I understand police procedure.
3  And I was never assigned to the detective bureau
4  so I did not work with Roger Golubski in the
5  detective bureau.  I did not supervise the
6  detective bureau.  So investigative methods and
7  practices are not my area of responsibility --
8  not my area of specialty, let's put it that way.
9  I suppose I am responsible for the policies as
10 the Chief.
11         But, the point being, investigative
12 methods, investigative sources, that's not
13 foreign to me that those kind of things can
14 happen, various methods that they do.  And so if
15 he had an informant network that included African
16 American females, and African American males,
17 that's not foreign to me.
18     Q.  What if the network were almost entirely
19 composed of African American females?
20         MR. ROACH:  Object to form.
21     Q.  (By Ms. Paras)  Would that raise a
22 question for you?
23         MS. MEYER:  Object to form.
24         MS. EVERS GUERRA:  Join.
25     A.  It would raise a question in my mind,

Page 105

1  yes.  But, I don't know that I ever heard that
2  they were all African American females.  My point
3  in that answer in the deposition was, that kind
4  of thing is not foreign to me.  I get that.  I
5  was a police Chief a long time.  I get that.
6      Q.  (By Ms. Paras)  Okay.  Then, and you are
7  correct, I was at this deposition, but I'm not
8  going by my memory, I'm going by what's in the
9  transcript here.  You also make the point that
10 the Chief has to be careful about what you are
11 going to get into and the things that are
12 duty-related and personal life are separate as
13 long as the conduct is not a violation of policy
14 or a violation of law.  Correct?
15     A.  Correct.
16     Q.  And that raises the question of, what is
17 policy?  Were officers ever trained -- we have a
18 lot of young male officers and you have a
19 vulnerable female population, a poor,
20 impoverished, sometimes drug-addicted population.
21 Was there any treating or teaching that these
22 women cannot be victimized by officers, that
23 officers should not be targeting them for sexual
24 relations?
25         MR. ROACH:  Object to form.

```
                                                      Page 226
 1   Q.  And you have training on this?
 2   A.  Yes.
 3   Q.  And you have discipline imposed for
 4  failure to comply, correct?
 5   A.  Yes.  And all of those things occurred
 6  or have occurred.  Numerous cases.
 7   Q.  Okay.  Now, I think you said you were
 8  not ever a detective so you are not testifying
 9  here today as an expert in what happened in the
10  detective bureau in the 1990's, would that be
11  correct?
12   A.  Correct.
13   Q.  So you are not here to testify about the
14  kind of supervision they received, is that right?
15   A.  Well, to some degree, correct.  But I
16  also know that Dennis Barber, Dennis Ware, Steve
17  Culp, those guys were commanding officers in the
18  criminal investigation division.  Steve Culp was
19  a Deputy Chief in charge of those investigations.
20  So even though I may not be -- have not worked
21  there, Culp worked there, and I know what Culp,
22  what kind of person Culp was on how he supervised
23  detectives in the bureau and the standards in the
24  detective bureau and the standards that he held
25  his people accountable to.  But I can't give you
```

```
                                                      Page 227
 1  specifics because those commanders deal with
 2  those situations.  But, generally speaking, those
 3  commanders in the criminal investigation division
 4  or detective bureau know those procedures and
 5  policies and would hold their detectives
 6  accountable to those policy violations or rule
 7  violations that they may become aware of.
 8   Q.  That actually takes me to what I wanted
 9  to ask you next, which is, how closely did Culp
10  supervise the detectives who worked for him?
11   A.  I'm sorry.  How closely did he supervise
12  them?
13   Q.  Correct.
14   A.  I think he supervised them pretty
15  closely.  He was the homicide commander at one
16  point.  Although I can't tell you whether Roger
17  Golubski was there at the same time he was,
18  because Culp was in and out of that division
19  depending on who the Chief was.
20      Culp was very knowledgeable, Culp was
21  ethically driven, and a man of integrity.  So he
22  would want to make sure that those investigations
23  were being conducted properly.  But the
24  commanding officers of the various units,
25  including Kobe as we have, Captain Kobe as we
```

```
                                                      Page 228
 1  have referred to him, were doing the things that
 2  needed to be done, holding them accountable for
 3  the actions of their subordinates.
 4   Q.  So would it be your testimony here today
 5  that you would expect that Lieutenant Culp would
 6  have closely supervised the detectives in this
 7  case?
 8       MS. EVERS GUERRA:  Object to form.
 9   A.  I would testify that if Culp was a
10  lieutenant in homicide at the time of this case,
11  he would have solid knowledge of this case and
12  would be a very valuable person for you to talk
13  to.  Only he is dead, along with a lot of these
14  other guys.
15   Q.  (By Ms. Pilate)  Yes, we are aware.
16   A.  You would benefit from a deposition from
17  Steve Culp.  But that's not going to happen.
18   Q.  So you would expect that he would know
19  everything that Roger Golubski did or didn't do?
20       MR. ROACH:  Object to form.
21       MS. MEYER:  Object to form.
22       MS. EVERS GUERRA:  Object to form.
23   A.  Absolutely not.  If Roger Golubski was
24  secretive and doing stuff on his own and no one
25  knew, Culp would have no idea.
```

```
                                                      Page 229
 1   Q.  (By Ms. Pilate)  Well, put aside sex
 2  with witnesses and all that.  I'm talking about
 3  the investigation itself.  Would he have known,
 4  by reviewing reports or talking to Golubski, what
 5  Golubski had done or not done in the case?
 6       MR. ROACH:  Object to form.
 7       MS. MEYER:  Object to form.
 8       MS. EVERS GUERRA:  Object to form.
 9       MR. COOPER:  Join.
10   A.  Providing Golubski wrote a report on
11  this case that was being reviewed or critiqued by
12  commanders, and coming from the position of an
13  advocate for the other side of the investigation.
14  An example would be, in 2013 the IACP produced an
15  published a wrongful convictions document.  It is
16  worth finding and reading, because wrongful
17  convictions are a problem, and no one should be
18  wrongfully convicted.  But it happens.  So the
19  IACP set about trying to develop a model
20  procedure for police departments to adopt to
21  lessen the impact or the potential for wrongful
22  conviction.
23       Now, as it turns out, I was involved in
24  that because I was the co-chairman of the IACP's
25  forensics committee, and in that document lists
```

58 (Pages 226 - 229)

Page 230

1  the work that our committee did to contribute to
2  the wrongful convictions document.  So was Barry
3  Scheck of the Innocence Project.  He is cited in
4  that document, and some other people.  But that
5  came out in 2013 when I was the Chief in Topeka.
6        One of those things that the wrongful
7  convictions document describes are eyewitness
8  identification, misidentification of witnesses,
9  how photo arrays are supposed to be conducted,
10 who should be conducting them, checklists that
11 are gone down to make sure that things are --
12 boxes are being checked in investigations.  A
13 person of some healthy criticism making
14 detectives defend what they are doing and why
15 they are doing it in the investigation.
16       So, those were recognized as problems
17 that existed.  But that's 2013.  We are talking
18 about the early nineties when things may not have
19 been quite that clearcut or research done.  So
20 Steve Culp is a guy who has a lot of experience,
21 very ethically driven, and would have been
22 involved with his detectives on homicide
23 investigations, considering that there may have
24 been as many as 60, 70, 75 a year, a lot, and
25 multiple homicide investigative teams, so that

Page 231

1  somebody is kind of coordinating those actions so
2  that the lieutenant has a general idea of what
3  they are doing but he may not be there joined to
4  the hip with them doing their investigation.  So
5  he would know those kind of things, but he might
6  not know everything every detective did every
7  minute.
8     Q.  Based on your knowledge of Culp you
9  would expect him to know the course of the
10 investigation, the things that were done and not
11 done, and to be able to spot gaps or things that
12 needed to be filled in, right?
13          MS. MEYER:  Object to form.
14          MS. EVERS GUERRA:  Object to form.
15          MS. COOPER:  Join.
16          MR. ROACH:  Object to form.
17    A.  Yes.
18    Q.  (By Ms. Pilate) So generally you had a
19 high opinion of him as a supervisor?
20    A.  Steve Culp and I did not always agree,
21 but I don't want deputy chiefs that agree with me
22 every minute.  If three people agree, two of them
23 are unnecessary.  So I want Culp to tell me what
24 he knows and be able to defend his position, and
25 if he is right, I agree with him, okay, that's

Page 232

1  the way we are going to go, yes.  And he did a
2  good job of that, and so did Sam Breshears.
3     Q.  It is my understanding based on the
4  Rule 26 non-retained witness disclosure that you
5  may be offering opinions about the individuals
6  involved in this case.  So let's just kind of
7  quickly go through them.  I think we just hit
8  Mr. Culp.  Do you have an opinion about W.K.
9  Smith?
10    A.  W.K. Smith, or otherwise known as
11 William K. Smith, but he was known as W.K., was a
12 detective, was a seasoned detective, been there
13 for a long time.  I don't recall that W.K. Smith
14 set the world on fire being an investigator who
15 was really aggressive and tenacious in his
16 investigation of cases, but W.K. Smith was a good
17 detective, from what I know, and that his
18 evaluations were normal for a detective.  And
19 worked in the detective bureau a long time, very
20 knowledgeable person, African American who had a
21 lot of contacts in the minority community.
22    Q.  I think we just we went through Culp,
23 but I have one other question, maybe sort of sort
24 of a hierarchy thing.  Who did Culp report to if
25 he was the lieutenant over the detectives?  Where

Page 233

1  did you go up from there?
2     A.  As a lieutenant he would have reported
3  to either the captain of the criminal
4  investigations division or the major of the
5  criminal investigations.  And the reason I
6  differentiate those two is there weren't always
7  captains assigned to the bureau but there was
8  always a major assigned to the bureau.  As a unit
9  commander he would have reported to the director
10 of investigations division.
11    Q.  And that person would have been
12 responsible for making sure Culp did his job,
13 just as Culp was responsible for the detectives
14 beneath him, would that be correct?
15    A.  Yes, ma'am.
16    Q.  Okay.  And Culp at the time was a
17 lieutenant and that was a rank that was done away
18 with at some point, is that right?
19    A.  Yes.  If you are talking about with
20 regard to this specific case, back when the
21 double homicide occurred, I think Culp would have
22 been a lieutenant at that time in the homicide
23 unit.  I think.
24    Q.  He was.
25    A.  So, later he promoted up, and then later

| Page 242 | Page 244 |
|---|---|
| 1  Q.  Any other opinions on Dennis Ware?<br>2  A.  I know of nothing in Dennis Ware's<br>3  background that would impugn his integrity<br>4  either.  He was a commander in my command staff.<br>5  Those guys knew what they were supposed to be<br>6  doing and were supposed to be doing it.<br>7  Q.  James, I'm going to say it wrong --<br>8  A.  Krstolich?<br>9  Q.  Yes.<br>10  A.  James Krstolich, the Vietnam veteran,<br>11  joined the police department after I did, maybe<br>12  two, three years, came on the police department<br>13  in the mid 1970's, as I recall.  Was a Vietnam<br>14  veteran who had seen combat in Vietnam.<br>15  Krstolich was a patrol officer.  I worked with<br>16  Krstolich in patrol, patrolling the northeast<br>17  area of Kansas City, Kansas, along with several<br>18  other officers, but Krstolich was one of those.<br>19       A friendly guy, good street cop, knew<br>20  how to handle situations properly and ethically<br>21  and did so.  Attained the rank of detective, was<br>22  assigned to the criminal investigation division.<br>23  I don't believe he was ever a commanding officer<br>24  so he was a detective in the detective bureau, if<br>25  I'm recalling correctly.  And a good guy, kind of | 1  mold of those guys and some of them -- some<br>2  didn't like him.  But as far as I know, there are<br>3  people, Ware, Culp, other folks who would have<br>4  more specific knowledge.  We knew that he had an<br>5  informant network.  We knew that he liked black<br>6  women, young black women.  We knew that he was<br>7  working those networks and getting information,<br>8  but he could come up with information, so he<br>9  worked those cases.<br>10       And eventually he promoted to the rank<br>11  of captain, because there is a promotion process<br>12  defined in the union agreement that lets union<br>13  rank officers ascend into management up through<br>14  that process and Roger did that.<br>15       But without going back over all of it,<br>16  all of the things that you read down that list to<br>17  me earlier today, if there were others who knew<br>18  that to be true, they would have been obligated<br>19  to report it based on this General Order and<br>20  rules and regulations.  And if they didn't, they<br>21  should have.<br>22       I'm not here to defend Roger Golubski.<br>23  He has attorneys that are very capable of that.<br>24  I'm not here to defend him.  I'm here to answer<br>25  your questions.  If that happened as alleged, |
| **Page 243** | **Page 245** |
| 1  a practical joker kind of guy.  And then in later<br>2  years he was a big guy.  He was a big, big guy,<br>3  tall, big, just big, heavy, big.<br>4       But I know of nothing in his background<br>5  that would be an integrity-related issue.  He too<br>6  passed away.  Seems to me that he passed away<br>7  about the time of the acquisition of the property<br>8  for the Speedway out west in KCK, so about that<br>9  timeframe he passed away.<br>10       There are plenty of guys that I know<br>11  negative things on.  None of the people you have<br>12  mentioned so far are any of those people I know.<br>13  Q.  Okay.  What about Roger Golubski, are<br>14  you providing any opinions about him?<br>15  A.  Well, obviously I would refer you back<br>16  to the things that Mr. Kerns wanted to know in<br>17  the 2012 deposition.  Roger was you known as a<br>18  detective.  Some of the other detectives didn't<br>19  like him because -- initially didn't like him<br>20  because he kept his informants close to the vest.<br>21  He worked those cases.  He wasn't necessarily a<br>22  team player sharing information.  If there<br>23  were -- the detective division is a different<br>24  kind of a place in terms of cops who work there.<br>25  And Golubski may not have quite fit in to that | 1  that's wrong.  But, I have no knowledge.  And it<br>2  is hard for me to understand why he was never<br>3  prosecuted, the FBI never made a case on him, Al<br>4  Generish never made a case on him, the KBI never<br>5  made a case on him.  He was never prosecuted.<br>6  And to argue that all of those people were<br>7  somehow complicit and knew about his activity, is<br>8  completely wrong.<br>9       You asked me about Roger Golubski.  If<br>10  he was doing things, nobody knew about them.  And<br>11  so had there been information that would have<br>12  resulted in knowledge that would have formed a<br>13  foundation for an investigation, I would have<br>14  investigated him and looked him in the eye, just<br>15  like I did other people, and said that's<br>16  inappropriate conduct, you got to go, brother.<br>17       But no one knew, certainly I did not<br>18  know; because if I had, I would have done<br>19  something about it.<br>20  Q.  So that's your testimony is that no one<br>21  knew?<br>22  A.  If they knew, they weren't telling<br>23  anybody else.  And even Kobe says he didn't know.<br>24  In his deposition he said he didn't know.  Ruby<br>25  Ellington in her affidavit says everybody knew. |