# EXHIBIT 104

## DECLARATION OF MAX SEIFERT

I, Max Seifert, being of sound mind and lawful age, hereby state as follows:

1. My name is Max Seifert. I am a resident of the State of Kansas and presently live in Leavenworth County. For my entire life, until four years ago, I resided in Kansas City, Kansas. From 1975 until 2005, I worked for the Kansas City, Kansas Police Department (KCKPD).

2. After I retired from the KCKPD, I worked as a security officer for different employers, including briefly, the Unified Government (UG), where I worked at the courthouse. In 2008, I joined the Wyandotte County Sheriff's Department, which is also part of the UG, as a jail classification technician. I also served as an unpaid reserve officer during that time, a role I entered in 2005. I retired from the Sheriff's Department in 2015.

3. At the Police Academy, in 1975, one of my classmates was Roger Golubski. After finishing our training at the Academy, we both began work as patrol officers. We worked in different areas of the city, and I did not have much contact with Golubski again until the early 1990s when both of us were detectives.

4. From 1993 through 1995, I shared an office with Golubski in the Detective Bureau. Golubski and I got along okay, but I noticed some things that raised questions in my mind about what he was doing.

5. One day, a black woman came to see Golubski in the Detective Bureau, and it seemed that their relationship was not purely business. Her demeanor and the fact she brought him a soda made me wonder what was going on. I also remember an incident that resulted in a call to the department from a neighborhood resident. Golubski, who was not on duty, was in a vehicle with a woman in the north end. Their conversation – by Golubski's own description -- became loud, and a neighborhood resident called the Department, and officers were sent to the scene. When Golubski arrived at the office later that

1

day, he was very upset. He told me he had merely been in a car with a woman, and he felt that the patrol officers had not been sufficiently respectful or deferential to him.

6. I found both of these incidents odd. But, as I came to learn during my time in the Bureau, all of the detectives along with older officers and the commanders, all knew that Golubski was pursuing black females in the community and having sex with them.

7. No one in the Department questioned Golubski's conduct. No one raised any questions about whether it was proper or could cause a problem of any kind.

8. During my time at the Department, I sometimes heard from people in the community who did not like Golubski's pursuit of black women.

9. One man, who I knew well, called me one day and said in an upset tone that Golubski was "up here in the north end buying p\*\*\*y" and that "wasn't right." The man stated repeatedly, in an indignant tone: "And that is against the law." Another man, who was an arrestee in a case, told me that he knew Golubski had been sexually "messing with" his child's mother. The men in the community did not seem to like Golubski.

10. Another incident involving Golubski was well known in the Department. Golubski was apparently spotted somewhere in the north end when he was off duty, and his actions attracted a patrol officer's attention. The officer's sergeant, Jerry Sipes, told the officer to contact Golubski. But when the officer started in that direction, Golubski fled in his vehicle.

11. It was also widely known in the department that Golubski may have children in the north end. One day, an officer arrested a young woman who told the officer that she was Golubski's daughter. Golubski confirmed this information to the officer.

12. I did not hear anyone express surprise that Golubski had a daughter by one of the black women in the community. These women were often poor and vulnerable, and Golubski would be seen in places like housing projects or

2

while leaving cheap hotels where prostitutes were known to serve their customers. One day, when I was working off-duty security at a housing project, I personally saw Golubski walk out of a woman's unit; he and the woman walked outside together, and it was clear from Golubski's demeanor that he had a personal connection with the woman. He was clearly off duty and dressed casually.

13. On one occasion, I learned that Golubski was out driving around with an alleged sexual assault victim from one of my cases. Golubski called to let me know that he and the woman were out "looking at locations." Both the phone call and Golubski's stated justification seemed very odd to me, but I did not pursue it. I felt it was especially odd because I had executed a warrant earlier that day at an alleged suspect's address and Golubski had shown up for no apparent reason.

14. Sexual misconduct was widely accepted in the Department, and no one thought much of it. It was regarded as no big deal. No one seemed to care about any potential ethical transgressions or violations. Sexual misconduct was simply accepted.

15. It never occurred to me to report these instances of misconduct or improper sexual behavior. I knew this behavior was accepted, and, had I done so, I would have been labeled a "rat" or a "traitor" and likely would have suffered retaliation.

16. Golubski was so open about his pursuit of black women that he pursued them even in the Department and in front of his colleagues.

17. One day, I was interviewing a black woman as Golubski walked by the interview room. He looked through the square glass window, did a double take, and then walked in. He tried to joke with the woman and asked her if she had any kids. When she said she had a son, he again attempted to joke with her, stating: "Well, does he look like me?" On another occasion, a detective

3

that I worked with had to handle an upset man who said he did not appreciate Golubski asking his girlfriend out on a date.

18. One day, I was taking a female witness to my office for an interview. She was a prostitute, and she was someone whose information I regarded as reliable and accurate based on past experience. I noticed that, as we walked past the area where the detectives worked, she was chuckling. When I asked why, she told me: "Two of your detectives are my customers." I was not at all shocked when she said this, and I moved ahead with my interview.

19. Once I was promoted to the Detective Bureau in 1991, I remained there during the rest of my career at the KCKPD. For some of those years, Lieutenant Culp was my supervisor.

20. I initially perceived Culp as a good supervisor and supportive of the detectives under his command. But a comment he made one day troubled me. I was working on an aggravated battery case in 1994 or 1995 and needed to do some follow up interviews. Culp did not think I should do the additional work. He told me that, in the Bureau, detectives "were making "Yugos, not Cadillacs."

21. Later, I learned that Culp was giving part of his time to a relationship that he had not disclosed. When a woman in the community was raped and the officers did a report, one of the facts discovered was that Culp had been at her house prior to the alleged rape by her boyfriend and that same day, that Culp and the boyfriend had earlier had a confrontation. Culp later explained to me that he was a type of "mentor" to the woman, who was much younger than him.

22. Another person that I was acquainted with at the KCKPD was James Krstolich. He was in the same Academy class with Golubski and was also promoted to detective. He was known to be a close friend of Golubski. During his time at the KCKPD, Krstolich had grown very overweight. Because of his large size, he worked primarily from the office and was not known for going out into the field.

4

I hereby state under penalty of perjury that the foregoing statement is true and correct.


05-02-2022
Date

*Max R. Seifert*
Max Seifert

5