IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

LAMONTE MCINTYRE &,
ROSE LEE MCINTYRE,

          Plaintiffs,

   v.                          Case No. 2:18-cv-02545-KHV-KGG

UNIFIED GOVERNMENT OF WYANDOTTE
COUNTY AND KANSAS CITY, KS, et al.,

          Defendants.

---

**Reply in Support of Unified Government Motion for Summary Judgment**

The Unified Government of Wyandotte County and Kansas City, Kansas (Unified Government) submits this reply in support of its Motion for Summary Judgment. Defendants first clarify a few matters. First, Unified Government is in fact moving for summary judgment on the direct claims against the Officers as predicate constitutional violations for the *Monell* claim. *See* Doc. 580 at 33 ("A municipality may not be held liable where there was no underlying constitutional violation by any of its officers." (quoting *Hinton v. City of Elwood*, 997 F.2d 774, 782 (10th Cir. 1993)). Second, Unified Government welcomes Plaintiffs' concession that claims for failure to intervene, conspiracy, and supervisory liability cannot be the predicate for a *Monell* claim. Doc. 624 at 244 n.8.

Third, Unified Government is not moving for reconsideration of the Court's dismissal order. Doc. 190. It makes some of the same arguments considering the changed standard of review, under which the Court no longer assumes Plaintiffs' allegations are true but, instead, requires admissible evidence to support Plaintiffs' claims. To the extent Unified Government repeats

rejected arguments, it is preserving them.

**Statement of Facts**

To aid the Court in tracking the voluminous response to defendant's statements of fact (DSOF) and plaintiffs' additional statement of facts (PSOF), this reply sets forth the original statement in block quote text, plaintiffs' response in *block quote italics*, and defendant's reply (if any) in **bold text.**

A.      **The People**

1.      At the time of Lamonte McIntyre's arrest and conviction, Roger Golubski, James Michael Krstolich, Dennis Ware, James. L. Brown, W.K. Smith, Dennis Otto Barber and Steve Culp were employed as police officers and/or detectives for the Kansas City, Kansas Police Department. Stipulation Doc. 562, ¶ 2.A.1.

*Response: Uncontroverted.*

**Reply: None.**

2.      At the time of Lamonte McIntyre's arrest and conviction, Defendant Culp supervised the homicide detectives at the Kansas City, Kansas Police Department. Stipulation Doc. 562, ¶ 2.A.2.

*Response: Uncontroverted.*

**Reply: None.**

3.      Defendant Steve Culp was the Lieutenant supervising the homicide and crimes against persons unit in 1994 at the time of the Ewing/Quinn homicides. Stipulation Doc. 562, ¶ 2.A.8.

*Response: Uncontroverted. Steve Culp supervised the 1994 investigation into the Ewing/Quinn homicides. SAMF ¶¶ 219, 309, 357, 361, 365, 367.*

**Reply: Though plaintiffs do not dispute the stated fact, Plaintiffs' response adds additional, but non-responsive, information contrary to D.Kan. Rule 56.1(b)(2).**

4.      During the Ewing/Quinn homicide investigation, Dennis Barber was a Lieutenant in the Response Unit. Stipulation Doc. 562, ¶ 2.A.9.

*Response: Uncontroverted.*

**Reply: None.**

5.      Roger Golubski became a detective in February 1986, was promoted to the rank of captain in August 2002, and retired from the KCKPD effective April 1, 2010. Stipulation Doc. 562, ¶ 2.A.3.

*Response: Uncontroverted. Golubski was never severely reprimanded, and was instead promoted. SAMF ¶¶ 508–511.*

**Reply: Though plaintiffs do not dispute the stated fact, Plaintiffs' response adds additional,**

**but non-responsive, information contrary to D.Kan. Rule 56.1(b)(2).**

**B.      April 15, 1994: the homicide of Donald Ewing and Doniel Quinn and the investigation.**

6.      On April 15, 1994, Doniel Quinn and Donald Ewing were shot in the front seat of a parked car on Hutchings Street, in Kansas City, Kansas by a lone assailant who fired a shotgun at least 4 times. Stipulation Doc. 562, ¶ 2.A.5.

*Response: Uncontroverted.*

**Reply: None.**

7.      Doniel Quinn died of a shotgun wound to the head. Stipulation Doc. 562, ¶ 2.A.6.

*Response: Uncontroverted.*

**Reply:  None.**

8.      Donald Ewing was transported to Bethany Medical Center, where he died of multiple gunshot wounds from a shotgun. Stipulation Doc. 562, ¶ 2.A.7.

*Response: Uncontroverted.*

**Reply:  None.**

9.      Ruby Mitchell, Niko Quinn, and Josephine Quinn gave recorded statements at the scene. Stipulation Doc. 562, ¶¶ 2.B.11, 14, 15.

*Response: Uncontroverted in part. Uncontroverted that Ruby Mitchell, Niko Quinn, and Josephine Quinn gave recorded statements at the scene, but Plaintiffs disagree Paragraph 9 is supported by the cited material as Defendants cite to the Pretrial Order Stipulation that states: "The parties have stipulated to the foundation (but not the admissibility) of the following exhibits for purposes of summary judgment and trial." A stipulation to foundation of a document does not support that the content of those documents is admissible or uncontroverted. Accordingly, the cited material does not support the fact alleged in Paragraph 9.*

**Reply: Plaintiffs purport to controvert DSOF ¶ 9 "in part" asserting that the admittedly**

authentic recordings do not support the statement that the identified witnesses gave recorded statements. The hearsay objection is inapplicable as the recorded statements are not offered to prove the truth of the matters stated therein, but rather that the statements were made to police. *United States v. Lambinus*, 747 F.2d 592, 597 (10th Cir. 1984), *cert. denied*, 471 U.S. 1067 (1985). Though Plaintiffs controvert this statement of fact, the response does not dispute any of the stated facts and does not cite to any materials in the record that dispute the facts stated. FRCP 56(c)(1)(A). There is no genuine dispute as to any material fact. FRCP 56(c)(1).

10.     Golubski prepared a full body diagram of Donald Ewing and diagram of the crime scene. Police File, pp. 48-49; Trial Transcript Vol. I, 295:16-296:4.

*Response: Controverted, with objection. The pages cited do not state who prepared the diagram of Donald Ewing. Answering, further, the "diagram" of the scene is actually a sketch and is not complete.*

**Reply:** Plaintiffs purport to controvert DSOF ¶ 10 but fails to address the cited trial testimony setting forth the stated fact. Plaintiffs' commentary on DSOF ¶ 10 raises no dispute, let alone a dispute as to a material fact. Although Plaintiffs controvert this statement of fact, the response does not dispute any of the stated facts and does not cite to any materials in the record that dispute the facts stated. FRCP 56(c)(1)(A). There is no genuine dispute as to any material fact. FRCP 56(c)(1).

11.     At the scene, Ruby Mitchell said she saw the shooting, described the shooter as dressed in black with hair that "wasn't real short, it was slicked back, going like this. It wasn't slicked down, it was like an afro but it was going back like this." Police File, pp. 31-34.

*Response: Controverted in part, with objection. Plaintiffs agree that the report states what is cited above, however that is not the entirety of the description that Ruby Mitchell provided. Golubski and Krstolich never documented Mitchell's description that the shooter had French braids, nor did they show her any photographs of possible suspects with French braids. SAMF, ¶¶ 136,152–153. Further, to the extent Defendant is using the police report for the truth of the matter, Plaintiffs object on the basis of inadmissible hearsay. In fact, Defendants knew that Mitchell only saw a part of the shooting, as she was talking on the phone, at an angle and across the street, and looking out through a storm door with a screen.*

*SAMF ¶¶ 127–129, 136, 139–140.*

**Reply: Plaintiffs purport to controvert DSOF ¶ 11 without addressing the statement itself. Plaintiffs' response states DSOF ¶ 11 does not set forth everything Ruby Mitchell did or said on April 15, 1994. Plaintiffs' response does not "fairly meet the substance of the matter asserted" as required by D.Kan. Rule 56.1(e) and does not dispute any of the facts set forth in DSOF ¶ 11. Although Plaintiffs controvert this statement of fact, the response does not dispute any of the stated facts and does not cite to any materials in the record that dispute the facts stated. FRCP 56(c)(1)(A). There is no genuine dispute as to any material fact. FRCP 56(c)(1).**

12.    Ruby Mitchell said she could recognize the shooter if she saw him again. Police File, pp. 31-34.

*Response: Controverted in part. Uncontroverted that the report states what is cited above. However, when asked if she saw the shooter's face, Mitchell stated: "Well, he's brown-skinned, that's all I could tell." SAMF ¶ 140. Based on the shooter's hair and complexion, Mitchell told police that she thought the shooter was a man her niece used to date (Lamont Drain). SAMF ¶¶ 136, 151–152, 168–169, 171, 185, 195, 321. Further, to the extent Defendant is using the police report for the truth of the matter, Plaintiffs object on the basis of inadmissible hearsay.*

**Reply: Plaintiffs purport to controvert DSOF ¶ 12 "in part," again, without addressing the statement itself. Plaintiffs' response states DSOF ¶ 12 does not set forth everything Ruby Mitchell did or said on April 15, 1994. Plaintiffs' response does not "fairly meet the substance of the matter asserted" as required by D.Kan. Rule 56.1(e) and does not dispute any of the facts set forth in DSOF ¶ 11. Plaintiffs further purport to object to Ruby Mitchell's admittedly authentic recorded statement as inadmissible hearsay. Mitchell's statement is not offered to prove the truth of the matter asserted (that is, that she could in fact recognized the shooter if she saw him again), but rather that Mitchell's statement was made to show the effect on the those made privy to her statement. Statements offered for the effect on the**

listener, however, are generally not hearsay. *United States v. Lambinus*, 747 F.2d at 597.

Though Plaintiffs controvert this statement of fact, the response does not dispute any of the

stated facts and does not cite to any materials in the record that dispute the facts stated.

FRCP 56(c)(1)(A). There is no genuine dispute as to any material fact. FRCP 56(c)(1).

> 13.     The Police File contains an investigative addendum dated April 16, 1994, in which Golubski reported Ruby Mitchell identified the suspect as someone with the first name "Lamonte" and Detective Maskill had also obtained information that the suspect's name was "Lamonte". Police File, 62-64, Stipulation Doc. 562, ¶ 2.b.8.

> *Response: Controverted, with objection. Plaintiffs agree that the report states what is cited above. But Plaintiffs dispute that Detective Maskil had obtained information that the suspect's name was "Lamonte." Detective Maskil never wrote any report in this case, nor did he document any tip, street talk, or information from an informant relevant to the Quinn/Ewing investigation. Golubski's report instead simply cites Maskil's information," with no source, stating only that "Detective Maskil also ascertained some information that the suspect's name was 'Lamonte.'" (Ex. 1: Police file, LMKSDC_0003453). Furthermore, the evidence cited states that "Ms. Mitchell stated [to Krstolich] that she knew the suspect because she used to date his cousin." However, to the extent Defendant is using the police report for the truth of the matter, Plaintiffs object on the basis of inadmissible hearsay. Additionally, Plaintiffs disagree Paragraph 13 is supported by the Pretrial Order Stipulation cited, which states: "The parties have stipulated to the foundation (but not the admissibility) of the following exhibits for purposes of summary judgment and trial." A stipulation to foundation of a document does not support that the content of those documents is admissible or uncontroverted. Accordingly, the Pretrial Order citation does not support the fact alleged in Paragraph 13.*

Reply: 13. Plaintiffs purport to controvert DSOF ¶ 13 on the basis of a hearsay objection.

Although Plaintiffs controvert this statement of fact, the response does not dispute any of the

stated facts and does not cite to any materials in the record that dispute the facts stated.

FRCP 56(c)(1)(A). There is no genuine dispute as to any material fact. FRCP 56(c)(1). As set

forth above, the statements are not hearsay when offered for the effect on the listener. That

is, the statement is not offered to prove that Lamonte was the shooter, but rather that police

acted on Mitchell's statement the shooter's name was Lamonte. "If the significance of an

offered statement lies solely in the fact that it was made, no issue is raised as to the truth of

anything asserted, and the statement is not hearsay." *Echo Acceptance Corp. v. Household Retail Servs., Inc.*, 267 F.3d 1068, 1087 (10th Cir. 2001) (quoting Fed. R. Evid. 801 advisory committee's note). Further, the Police Report is admissible under Fed. R. Evid. 803(8) as a public record. In a civil case, police reports may be admissible as public records under Rule 803(8)(A)(ii) for information that the officer observed and recorded in the police report. *Dorato v. Smith*, 108 F. Supp. 3d 1064, 1071 (D.N.M. 2015).

14. Mitchell went to police station and identified Lamonte McIntyre from a photo lineup. Police File, at pp 34-35 (Transcription of Mitchell Recorded Statement), Stipulation Doc. 562, ¶ 2.b.8.

*Response: Controverted in part, with objection. The cited material does not accurately document or reflect the process that resulted in Ruby Mitchell identifying Lamonte McIntyre as the shooter. Mitchell was not informed that the actual perpetrator may or may not be present, but rather was asked, during the taped portion of the interview, if she saw the shooter among the photographs. There is no contemporaneous audio or video recording of the identification of Lamonte McIntyre. (Pl. Ex. 60: Expert Report of Jennifer Dysart p. 4). Further, the cited materials only reflect that Krstolich reported after the alleged photo array and identification took place that Ruby Mitchell "has made a positive identification of the party," prior to 1758 hours. (Ex. 1: Police File, LMKSDC_0003424). Additionally, the police file reflects that Detectives Krstolich and Golubski asked Mitchell "Q. Who is this party? A. Lamonte. Q. Do you know his last name? A. Yes. Q. What is it? A. McIntyre. Q. How do you know this party? A. Because he used to talk to my niece. Q. How long have you known him? A. For a couple months." (Ex. 1: Police File, LMKSDC_0003421-3425). Also, Plaintiffs controvert Paragraph 14 to the extent it implies Ruby Mitchell's identification of Lamonte McIntyre was not the result of improper coercion or suggestion. Instead, Golubski created a coercive environment through the use of sexual intimidation while transporting her to the station to make an identification, making Mitchell nervous and uncomfortable and after which Mitchell was worried Golubski would arrest her. SAMF ¶¶ 144–149.*

*Additionally, Golubski and Krstolich used suggestion and coercion to have Mitchell choose McIntyre's photo from the lineup, including, among other tactics, showing two photo identification procedures both containing Lamonte McIntyre's photo and including Lamonte McIntyre's name on the back of a loose Polaroid. SAMF ¶¶ 161–180. Golubski and Krstolich never documented Ruby's description that the shooter had French braids, nor did they show her any photographs of possible suspects with French braids. SAMF ¶¶ 136–137, 152–153; (Ex. 10: Ruby Mitchell Dep. 46:16–47:21, 67:7–15); (Ex. 11: Polaroids from lineup with names on back).*

*Krstolich and Golubski also made no effort to find the "Lamont" who had actually dated Ruby's niece, and they fed Ruby the last name of McIntyre to support their fabrication that Ruby had volunteered the shooter's last name. SAMF ¶¶ 181–192. Additionally, Golubski and Krstolich showed Mitchell at least two sets of photos: a six-person photo lineup which had the photos all affixed to one page and the five loose Polaroids later shown to Niko Quinn. SAMF ¶¶ 161, 163. Moreover, Mitchell identified the shooter as Lamonte McIntyre, reciting the name of man she did not know but instead "learned" that information after her off-the-record identification. She also wrongly identified Lamonte McIntyre as the "Lamont" who used to talk to her niece. (Ex. 2: Ruby Mitchell TT 180:15-23); (Pl. Ex. 32: Ruby Mitchell Aff. ¶ 7).*

*Also, to the extent Defendant is using the police report for the truth of the matter, Plaintiffs object on the basis of inadmissible hearsay. Plaintiffs further disagree Paragraph 14 is supported by the Pretrial Order Stipulation cited, which states: "The parties have stipulated to the foundation (but not the admissibility) of the following exhibits for purposes of summary judgment and trial." A stipulation to foundation of a document does not support that the content of those documents is admissible or uncontroverted. Accordingly, the Pretrial Order citation does not support the fact alleged in Paragraph 14.*

**Reply: 14. Plaintiffs purport to controvert DSOF ¶ 14 "in part" but without disputing the facts stated. Plaintiffs' two-page response criticizes the process by which Mitchell made her identification and makes several assertions that are contrary to the record--e.g., that Mitchell was shown "Lamonte McIntyre's photo and including Lamont McIntyre's name on the back of a loose Polaroid." Mitchell testified that, when shown the pictures, Mitchell looked only at the photographs, she did not look on the back and did not know until shown at trial that there was a name on the back of the photo. Trial Transcript Vol. I, 205:2-18. Though Plaintiffs controvert this statement of fact, the response does not dispute any of the stated facts and does not cite to any materials in the record that dispute the facts stated. FRCP 56(c)(1)(A). There is no genuine dispute as to any material fact. FRCP 56(c)(1).**

15.    Det. Krstolich's report says Ruby Mitchell stated, "she thought she recognized the party by the name of 'Lamonte.'" Stipulation Doc. 562, ¶ 2.A.11, Police File, at pp 52.

*Response: Uncontroverted, but to the extent Defendant is using the police report for the truth of the matter, Plaintiffs object on the basis of inadmissible hearsay.*

**Reply: Plaintiffs object to DSOF ¶ 15 as hearsay. Statements offered for the effect on the listener, however, are generally not hearsay.** *See Echo Acceptance Corp.,* **267 F.3d at 1087. Further, the Krstolich's Written Report is admissible under Fed. R. Evid. 803(8) as a public record (Krstolich is deceased and unavailable as a witness).**

16.     The Police File contains a transcription of a recorded statement by Lt. Barber, taken at 8:35 p.m., regarding his activities on April 15, 1994. Lt. Barber's recorded statement reflects he spoke with Lamonte McIntyre's grandmother, Maxine Crowder, and his mother, Rose McIntyre and told them that they were investigating Lamonte for a felony crime. Police File, pp. 43-46.

*Response: Controverted in part, with objection. Uncontroverted that the police file contains a transcription of a recorded statement by Lt. Barber. However, the transcript of the audiotaped statement Golubski took from Defendant Barber states that Barber indicated to Rose McIntyre and Maxine Crowder at the time of Lamonte McIntyre's arrest that "there had been some street talk, wherein Lamonte McIntyre had been named as a suspect in a felony crime." However, to the extent Defendant is using the police report for the truth of the matter, Plaintiffs object on the basis of inadmissible hearsay.*

**Reply: 16. Plaintiffs purport to controvert DSOF ¶ 16 on the basis of a hearsay objection. As set forth above, the statements are not hearsay when offered for the effect on the listener. Further, Lt. Barber's Recorded Statement, which plaintiffs admit is authentic and accurate, is admissible under Fed. R. Evid. 803(8) as a public record (Barber is deceased and unavailable as a witness).**

17.     Lt. Barber's recorded statement reflects that, unsolicited, Ms. McIntyre asked: if someone had told her she had killed somebody would that person be taken down and charged with murder. Police File, pp. 43-46.

*Response: Uncontroverted that Lt. Barber reports in his statement to Defendant Golubski the above alleged statement from Ms. McIntyre, but controverted to the extent Paragraph 17 suggests the information contained therein was truthful and accurate. In fact, to the extent Defendant is using the police report for the truth of the matter, Plaintiffs object on the basis of inadmissible hearsay. Instead, Barber's report of Rose McIntyre's statements on April 15, 1994 was false. At FiFi's, Rose McIntyre asked Barber "what this was all about," to which Barber replied, "that it could be about a fight or disturbance or something like that." Rose did not bring up the word "murder." Barber fabricated a false and inculpatory statement by Rose McIntyre in an attempt to imply that she knew Lamonte McIntyre was guilty of the*

*murders. SAMF ¶¶ 258-264.*

**Reply: 17. Plaintiffs state DSOF ¶ 17 is uncontroverted with respect to the accuracy of the stated fact (what Lt. Barber's recorded statement says). Plaintiffs assert a hearsay objection. Lt. Barber's recorded statement is admissible under Fed. R. Evid. 803(8) as a public record.**

18.     Lt. Barber's recorded statement reflects that when Ms. McIntyre asked what time the serious felony crime occurred and Lt. Barber responded with "2:00 p.m.", Ms. McIntyre indicated that it couldn't have been Lamonte because he was at FiFis from 11:00 a.m. to 2:45 p.m. Police File, pp. 43-46.

*Response: Uncontroverted that Lt. Barber reports in his statement to Defendant Golubski the above alleged statement from Ms. McIntyre, but controverted to the extent Paragraph 18 suggests the information contained therein was truthful and accurate. To the extent Defendant is using the police report for the truth of the matter, Plaintiffs object on the basis of inadmissible hearsay. Barber's report of Rose McIntyre's statements on April 15, 1994 was false. In fact, Barber asked Rose McIntyre where Lamonte McIntyre had been on April 14, 1994, the day before the shooting, not the day of, to which Rose truthfully replied that the day before the shooting, Lamonte McIntyre was with her at FiFi's restaurant. Barber fabricated a false and inculpatory statement by Rose McIntyre in an attempt to imply that she knew Lamonte McIntyre was guilty of the murders. SAMF ¶¶ 253–257.*

**Reply: Plaintiffs state DSOF ¶ 18 is uncontroverted with respect to the accuracy of the stated fact (what Lt. Barber's recorded statement says). Plaintiffs assert a hearsay objection. Lt. Barber's recorded statement is admissible under Fed. R. Evid. 803(8) as a public record.**

19.     Lt. Barber's recorded statement reflects he directed Officer Brown to detain Lamonte McIntyre. Police File, pp. 43-46.

*Response: Controverted in part, with objection. Uncontroverted that the cited material, Lt. Barber's statement, reflects that Barber directed Brown to "conduct a stop/frisk." Further, to the extent Defendant is using the police report for the truth of the matter, Plaintiffs object on the basis of inadmissible hearsay.*

**Reply: Plaintiffs purport to controvert DSOF ¶ 19 on the basis of a hearsay objection. As set forth above, the statements are not hearsay when offered for the effect on the listener. Further, Lt. Barber's Recorded Statement, which plaintiffs admit is authentic and accurate, is admissible under Fed. R. Evid. 803(8) as a public record.**

20.     Lt. Barber's recorded statement reflects he asked Lamonte whether he had any problems with any groups, he said he had not, and during that day had been with his brother James, neither of which had been in a fight or jumped or had an altercation with any individuals. Police File, pp. 43-46.

*Response: Controverted in part with objection. Uncontroverted that Lt. Barber reports in his statement to Defendant Golubski the above alleged statements, but controverted to the extent Paragraph 20 suggests the information contained therein was truthful and accurate. In fact, to the extent Defendant is using the police report for the truth of the matter, Plaintiffs object on the basis of inadmissible hearsay. Instead, Barber never asked Lamonte his whereabouts on the day of the shooting, but instead asked about whether Lamonte was in a gang or knew anyone in a blue low rider. SAMF ¶¶ 267–268. Additionally, Lamonte McIntyre consistently gave police the same, truthful alibi: that he had been at Peggy Williams's and Yolanda Johnson's homes at the time of the shooting, where his brother "showed up sometime" that day. SAMF ¶¶ 271–275, 278.\\*

**Reply: Plaintiffs purport to controvert DSOF ¶ 20 on the basis of a hearsay objection. As set forth above, the statements are not hearsay when offered for the effect on the listener. Further, Lt. Barber's Recorded Statement, which plaintiffs admit is authentic and accurate, is admissible under Fed. R. Evid. 803(8) as a public record.**

21.     Lt. Barber's recorded statement reflects police had received information that the suspect blue vehicle matched the description of a vehicle Lamonte McIntyre had been seen to operate. Police File, pp. 43-46.

*Response: Controverted in part, with objection. Uncontroverted that the cited statement by Defendant Barber, taken after Lamonte McIntyre's arrest, states "there was information early on that a blue vehicle that he's known to ride in or matched the description which he's been seen to operate was a block over from the homicide scene." However, Plaintiffs dispute that the information contained Baber's statement was truthful or accurate. Further, to the extent Defendant is using the police report for the truth of the matter, Plaintiffs object on the basis of inadmissible hearsay. There is no contemporaneous documentation of any such information in the file. Regardless, Golubski's 4/16/94 Investigative Addendum indicates that he showed a photograph of a vehicle "that was described as driven very often by Lamonte and James McIntyre" to Ms. Shelton to which "she stated this was the wrong vehicle." (Ex. 1: Police File, LMKSDC_0003456).*

**Reply: Plaintiffs purport to controvert DSOF ¶ 21 on the basis of a hearsay objection. As set forth above, the statements are not hearsay when offered for the effect on the listener. Further, Lt. Barber's Recorded Statement, which plaintiffs admit is authentic and accurate,**

is admissible under Fed. R. Evid. 803(8) as a public record.

22.     Lt. Barber's recorded statement reflects that Officer Viera received information from an informant in the Juniper Gardens area that Lamonte is known to frequent that he was seen riding in a 1998 white Oldsmobile with blue tinted windows in the area of Second Street. Police File, pp. 43-46.

*Response: Controverted in part, with objection. Uncontroverted that the report reflects*

*Barber stated "Officer Viera, which I had assistance to, received information from an informant in the Juniper Gardens area, where Lamont is also known to frequent. This information was that he was seen riding in an Oldsmobile 98, white in color, with blue tinted windows in the area of 2nd Street." However, to the extent Defendant is using the police report for the truth of the matter, Plaintiffs object on the basis of inadmissible hearsay. Officer Viera, however, never provided a report, nor a taped statement, regarding any information obtained from any "informant" in this case. Additionally, there is no information or report in the police file that refers to a white Oldsmobile 98 or links such a vehicle to the Ewing-Quinn homicides.*

**Reply: Plaintiffs purport to controvert DSOF ¶ 22 on the basis of a hearsay objection. As set forth above, the statements are not hearsay when offered for the effect on the listener. Further, Lt. Barber's Recorded Statement, which plaintiffs admit is authentic and accurate, is admissible under Fed. R. Evid. 803(8) as a public record.**

23.     Defendant James L. Brown drove Lamonte McIntyre to the detective bureau. Stipulation Doc. 562, ¶ 2.A.12.

*Response: Uncontroverted.*

**Reply: None.**

24.     Lamonte McIntyre was advised of his rights, spoke briefly to Det. Golubski and Det. Krstolich, invoked his right to silence, and was taken and booked at the Juvenile Detention Center. Police File, pp. 63-64

*Response: Controverted. The cited evidence states, among other things, that Lamonte McIntyre "was brought into the Bureau. In the Bureau he was advised of his rights by Detective Golubski. This was witnessed by Detective Krstolich and Officer Brown. Lamont stated that he would refuse to sign anything, but that he would talk to us. This, once again I stressed this, after he was advised of his rights. He proceeded to give us his [date of birth and home address]....He stated that throughout the day he had been with an aunt, Yolanda Johnson, at 1515 Wood....At*

*this address he was with a cousin, Montray Johnson and his girlfriend, Tasha. He stated that at no time did he leave until his brother arrived at about 4:00. Then he still did not leave until he was contacted by his grandmother and mother and then was taken to the area of 5th and Parallel by his mother. He stated that while at the address of 1515 Wood, that neither Montray or Tasha left either….After this Lamonte refused to give a formal statement. He was then taken and booked into the Juvenile Detention Center.*

*However, this report is false. Golubski falsely reported that he had read Lamonte McIntyre his rights before questioning him, and that Lamonte "refused to sign anything, but that he would talk to us." (Ex. 1: Police File, LMKSDC_0003453). Instead, Golubski and Krstolich questioned Lamonte "about the events of my day," "asked me do I know this person or that person. And they asked about -- they said a homicide happened today, and one guy lived long enough to say I did it. And I told him he must have been mistaken. I'm not the person you're looking for. My name is Lamonte McIntyre. I don't know who you're looking for, but it's not me. And the other guy standing up and started screaming. Called me a n\*\*\*\*\* killer. Told me I think it's a game. And I said, 'No, I don't think it's a game, I'm just not the person you're looking for.' And he started screaming." (Pl. Ex. 79: Lamonte McIntyre Dep. 151:9-152:6). McIntyre was not read his Miranda rights "until everything was over." Lamonte testified that "After that, they put me in handcuffs and they sent me to jail. They told me I was being charged with two counts of first degree murder. And they told my mother that I wasn't being charged with anything, I was just being held for questioning." (Id. at 151:9-155:21).*

**Reply: Plaintiffs purport to controvert DSOF ¶ 24. The response does not dispute any of the stated facts and does not cite to any materials in the record that dispute the facts stated. FRCP 56(c)(1)(A). Plaintiffs' response extends more than a page of text and recounts other things that were said while Lamonte McIntyre spoke with Dets. Golubski and Krstolich, but does not dispute the stated facts that Lamonte was advised of his rights, spoke briefly, invoked his rights, and was booked. There is no genuine dispute as to any material fact. FRCP 56(c)(1).**

25.     Lamonte McIntyre was taken into police custody at approximately 8:00 p.m. on the day the crime occurred. Stipulation Doc. 562, ¶ 2.A.10.

*Response: Uncontroverted. Also, when Lamonte McIntyre was taken into custody, it had only been six hours since the double homicide occurred. See SAMF ¶¶ 180, 286.*

**Reply: None.**

C.    **April 16, 1994 to September 21, 1994**

1.    **April 16**

26.    The Police File contains an investigative addendum dated April 16, 1994, in which Golubski reported he went to the area of 1515 Wood to attempt to locate a suspect vehicle. At this location there was a vehicle that was described as being driven often by Lamonte and James McIntyre. Photos were taken and later shown to people in a neighborhood canvas. Police File, 65-66.

*Response: Controverted, with objection. Uncontroverted that Golubski's report states that a vehicle was described as being driven "very often" by Lamonte and James McIntyre. Controverted to the extent Paragraph 26 suggests the information contained in Golubski's report was truthful and accurate. In fact, to the extent Defendant is using the police report for the truth of the matter, Plaintiffs object on the basis of inadmissible hearsay. But, there is no witness or source cited by Golubski for this information, nor is the "suspect vehicle" described in any way. The report further states that "numerous photos of the car were taken," but no photographs or property reports reflecting the submission of such photographs exist. (Ex. 1: Police File, LMKSDC_0003455). Photos of a vehicle purportedly connected to Lamonte were never included in the police report, mentioned elsewhere in the investigative file, or provided to Lamonte McIntyre at any point. Other than Golubski's report, there is no other reference to these photos until after Lamonte McIntyre's arrest, when Defendant Barber reported to Golubski in his interview that "there was information early on that a blue vehicle that [Lamonte is] known to ride in or matched the description which he's been seen to operate was a block over from the homicide scene." (Ex. 1: Police File, LMKSDC_0003433-3436). As with the other alleged vehicle noted by Golubski, there is no source for this information provided or referenced by Barber. Lastly, Golubski's report indicates that he showed a photograph of the vehicle "that was described as driven very often by Lamonte and James McIntyre" to Ms. Shelton, and that "she stated this was the wrong vehicle." (Ex. 1: Police File, LMKSDC_0003456). Accordingly, any reference to photographs of the above-mentioned vehicle is irrelevant.*

**Reply: Plaintiffs purport to controvert DSOF ¶ 26. Although Plaintiffs controvert this statement of fact, the response does not dispute any of the stated facts and does not cite to any materials in the record that dispute the facts stated. FRCP 56(c)(1)(A). Golubski's narrative report is admissible under Fed. R. Evid. 803(8) as a public record, reporting events observed and recorded contemporaneously with the actions described therein. There is no genuine dispute as to any material fact. FRCP 56(c)(1).**

27.     The Police File contains an investigative addendum dated April 16, 1994, in which Golubski reported he and Det. Ware went to 3018 Hutchings to speak with eyewitness Niko Quinn. Police File, 65-66.

*Response: Uncontroverted, however, to the extent Defendant is using the police report for the truth of the matter, Plaintiffs object on the basis of inadmissible hearsay.*

**Reply: Plaintiffs do not dispute the facts stated in DSOF ¶ 27. Plaintiffs' hearsay objection should be overruled. As set forth above, the statements are not hearsay when offered for the effect on the listener and Golubski's report is admissible under Fed. R. Evid. 803(8) as a public record.**

28.     The photo lineup used with Niko Quinn on April 16, 1994 was the same shown to Ruby Mitchell on April 15, 1994. Trial Transcript Vol. II, 326:2-8.

*Response: Uncontroverted that Niko Quinn saw the same set of five loose Polaroid photos Ruby Mitchell viewed on April 15, 1994, which contained a 1992 picture of Lamonte McIntyre, a photograph of Lamonte's brother, James McIntyre, and a photograph of Lamonte's cousin, Terrence, for Mitchell to view. (Ex. 2: TT 170:12-20); (Ex: 3 282:12); (Ex. 11: Polaroids from Lineup with Names on Back).*

**Reply: Though plaintiffs do not dispute the stated fact, Plaintiffs' response adds additional, but non-responsive, information contrary to D.Kan. Rule 56.1(b)(2).**

29.     Detective Golubski included in his report that Niko Quinn was still visibly traumatized by what happened as both victims were cousins of hers. Police File, 65.

*Response: Uncontroverted that Golubski documented in his report that "it is very obvious that Niko Quinn knows exactly who the shooter is, but being highly traumatized at this time is reluctant to provide that information." (Ex. 1: Police File, LMKSDC_0003455–3456). However, Plaintiffs deny that Golubski's report is true or accurate and to the extent Defendant is using the police report for the truth of the matter, Plaintiffs object on the basis of inadmissible hearsay. Instead, Niko testified that she was given a stack of five photographs, two of whom she immediately recognized as Raymond Hickman, her cousin, and James McIntyre, whom she used to date. Detective Golubski then told Niko that if she knew who it was, she'd better testify and that it would be better for her if she did. SAMF ¶¶ 60–84. Niko Quinn did not tentatively identify Lamonte McIntyre, but instead told Golubski and Ware that she could not make any identification from the photos. (Ex. 12: Niko Quinn Dep. 185:21–25). Further, Niko testified that she was holding onto two pictures in her hand, and while doing so, the officers asked her what name*

*Ruby said the shooter's name was, and Niko said Lamont. And when she was holding the pictures, the officer said why are you staring at that other picture (the picture of Lamonte McIntyre). Niko said she didn't know and when she looked at the other one, she said "no, I don't know who it is." (Ex. 12: Niko Quinn Dep. 83:17- 85:1); SAMF ¶¶ 77–84.*

*While Golubski was instructing Niko Quinn to make an identification and asking about the name Ruby Mitchell had given, Ware placed his thumb on Lamonte McIntyre's photo, as if he were pointing at it. At the same time that Ware was pointing at Lamonte, Niko remembered seeing the name "Lamonte" on the photo police showed her. Despite this direct suggestion, Niko Quinn told Golubski and the Ware that she could not make an identification from these photos. SAMF ¶¶ 77–84. Additionally, when asked if he fabricated this report of the April 16, 1994 identification procedure with Niko Quinn, Golubski invoked his Fifth Amendment right to remain silent. (Pl. Ex. 63: Roger Golubski Dep. 163:4–166:2).*

**Reply: Plaintiffs do not dispute the facts stated in DSOF ¶ 29. Plaintiffs nonetheless "deny" this statement of fact without disputing the stated facts and do not cite to any materials in the record that dispute the facts stated. FRCP 56(c)(1)(A). Plaintiffs' response extends more than a page of text of additional, but non-responsive, information contrary to D.Kan. Rule 56.1(b)(2). The response recounts other things that were said while Niko Quinn spoke with Dets. Golubski and Ware but does not dispute the stated facts. There is no genuine dispute as to any material fact. FRCP 56(c)(1).**

30.   Niko Quinn testified at her deposition in this matter that she was under the influence of drugs at the time of her meeting with Detective Golubski and Ware on April 16, 1994. Niko Quinn dep., 81:17-22.

*Response: Uncontroverted that Niko Quinn testified she was "under the influence" of PCP when she spoke with Golubski and Ware, because she had done PCP for the first time the night before, after she witnessed the shooting of her cousin, Doniel. (Ex. 12: Niko Quinn Dep. 81:3–22).*

**Reply: Though plaintiffs do not dispute the stated fact, Plaintiffs' response adds additional, but non-responsive, information contrary to D.Kan. Rule 56.1(b)(2).**

31.   Detective Golubski included in his report that Niko Quinn viewed the photo lineup of five individuals, she repeatedly and for a prolonged period of time viewed photo three (Lamonte McIntyre's photograph) shook, became teary eyed and hesitant to make statements. Police File, 65.

*Response: Controverted in part, with objection. Uncontroverted that the report states what is cited above, with clarification that the evidence cited does not establish that Lamonte McIntyre's photograph was photo three. However, Plaintiffs deny that Golubski's report is true or accurate as further detailed in Plaintiffs' Response to UG SOF ¶ 29. And, to the extent Defendant is using the police report for the truth of the matter, Plaintiffs object on the basis of inadmissible hearsay.*

**Reply: Plaintiffs do not dispute the facts stated in DSOF ¶ 31. Plaintiffs nonetheless "deny" that Golubski's report is true and accurate, cross-referencing the additional, non-responsive information in response to DSOF ¶ 29. It is undisputed that (1) the photo array shown to Niko Quinn was the same array shown to Ruby Mitchell and (2) that photo no. 3 was a photo of Lamonte McIntyre. There is no genuine dispute as to any material fact. FRCP 56(c)(1).**

32.     Detective Golubski reported that Niko Quinn indicated that she could not positively identify the shooter from the photo lineup. Police File, 65.

*Response: Uncontroverted, but to the extent Defendant is using the police report for the truth of the matter, Plaintiffs object on the basis of inadmissible hearsay.*

**Reply: Plaintiffs do not dispute the facts stated in DSOF ¶ 32. Plaintiffs' hearsay objection should be overruled. As set forth above, the statements are not hearsay when offered for the effect on the listener and Golubski's report is admissible under Fed. R. Evid. 803(8) as a public record.**

33.     Det. Ware accompanied Golubski as back up, but did not know anything about the case. Ware dep., 166:20-25, Ware dep., 168:1-13.

*Response: Uncontroverted that the evidence cited reflects Ware testified that Golubski "had no partner to partner up with and he went down the hallway of the crimes against persons unit and tried to find someone that night to go with him just to back him up…" However, Ware further testified at his deposition that "I have no clue as to why I went with Golubski for that particular day. I have no idea." (Ex. 6: Dennis Ware Dep. 171:22-172:2). Additionally, Ware was asked in his deposition "Is it possible that you chose the photographs to show to Niko Quinn?" to which Ware answered "I don't believe it is possible. I didn't know anything about this case." Ware further testified that he thought Golubski would have told him if a suspect was under arrest at the time he went to show a witness photographs in the investigation of a crime that occurred the day before. (Ex. 6: Dennis Ware Dep. 185:12-20).*

**Reply: Though Plaintiffs do not dispute the stated fact, Plaintiffs' response adds additional, but non-responsive, information contrary to D.Kan. Rule 56.1(b)(2).**

34.     Det. Ware does not recall meeting with Niko Quinn. Ware dep., 167:8-15.

*Response: Uncontroverted that the cited evidence reflects Ware was asked "Do you dispute that you were present for the photo showing with Niko Quinn the day after the crimes? And Ware answered, "I'm not disputing that, no, ma'am." Ware was then asked, "In other words, you were there, you just don't have any independent memory of it, is that right?" To which Ware answered, "That's correct."*

**Reply: Though plaintiffs do not dispute the stated fact, Plaintiffs' response adds additional, but non-responsive, information contrary to D.Kan. Rule 56.1(b)(2).**

35.     Det. Ware did not compile the pictures used for the photo lineup with Niko Quinn. Ware dep., 166:20-166:25.

*Response: Controverted. Ware testified only that he "did not believe it is possible" that he chose the photographs shown to Niko Quinn, but admitted that he does not have an independent recollection of the case. (Ex. 6: Dennis Ware Dep. 166:20-166:25, 167:8-15). Further, see Golubski's SOF, ¶ 54 ("Detectives worked to put a photo array together that included a photograph of Lamonte McIntyre.")*

**Reply: Plaintiffs purport to controvert DSOF ¶ 35. Though Plaintiffs controvert this statement of fact, the response does not dispute any of the stated facts and does not cite to any materials in the record that dispute the facts stated. FRCP 56(c)(1)(A). There is no genuine dispute as to any material fact. FRCP 56(c)(1). DOSF ¶ 35 is not disputed.**

36.     The Police File contains an investigative addendum dated April 16, 1994, where Golubski reported he spoke to Josephine Quinn who indicated she did not get a good look at the suspect and could not identify anyone from the photo lineup. The report further states Josephine Quinn stated that her daughter Stacy Quinn knew the suspect but was not available that day to view the lineup. Josephine said she would make every effort to have Stacy Quinn get in contact with police. Police File, pp. 65-66; Stipulation Doc. 562, ¶ 2.A.13.

*Response: Controverted, with objection. Plaintiffs agree that the report states what is cited above. However, to the extent Defendant is using the police report for the truth of the matter, Plaintiffs object on the basis of inadmissible hearsay. Additionally, Plaintiffs disagree Paragraph 36 is supported by the Pretrial Order Stipulation cited, which states: "The parties have stipulated to the foundation (but not the admissibility) of the following exhibits for purposes of summary judgment*

*and trial." A stipulation to foundation of a document does not support that the content of those documents is admissible or uncontroverted. Accordingly, the Pretrial Order citation does not support the fact alleged in Paragraph 36. Further, Golubski indicated in his report that he and Ware spoke to Josephine Quinn on April 16, 1994 and that "Josephine stated as per Detective W.K. Smith's statement with her that was not identified by Detective Smith through that statement by Josephine, that there was another daughter by the name of Stacy who stated she knew who the suspect was but on this particular date of the photo line up, Stacy was not available." (Ex. 1: Police File, LMKSDC_0003456). Plaintiffs also controvert that Stacy Quinn was "not available." Stacy Quinn was present at the scene of the crime, voluntarily told police that she had seen the shooting, and waited in the yard while police interviewed Niko Quinn. SAMF ¶¶ 93, 215–217. Additionally, Golubski knew Stacy Quinn well; he had an ongoing relationship with her since she was a teenager from the mid-1980s through 2000, in which he paid her for sex. SAMF ¶¶ 35, 221–226. Further, Stacy's friend, C.S.R. attested that Stacy was easy to find and could usually be located on Quindaro. SAMF ¶ 215.*

**Reply: Plaintiffs purport to controvert DSOF ¶ 36. Although Plaintiffs controvert this statement of fact, plaintiffs agree the stated fact is accurate (the report says what it says), the response does not dispute any of the stated facts and does not cite to any materials in the record that dispute the facts stated. FRCP 56(c)(1)(A). Plaintiffs' further cross-reference to their additional statements of fact which are, themselves based on affidavits of persons without personal knowledge and inadmissible speculation. Golubski's narrative report is admissible under Fed. R. Evid. 803(8) as a public record, reporting events observed and recorded contemporaneously with the actions described therein. There is no genuine dispute as to any material fact. FRCP 56(c)(1).**

37.    The Police File contains an investigative addendum dated April 16, 1994, in which Golubski reported he and Detective Ware went to 2743 Cleveland and left a business card to speak with John Quinn. Police File, 65-66.

*Response: Controverted, with objection. Plaintiffs agree that the report states what is cited above, However, to the extent Defendant is using the police report for the truth of the matter, Plaintiffs object on the basis of inadmissible hearsay.*

**Reply: Plaintiffs purport to controvert DSOF ¶ 37. Although Plaintiffs controvert this statement of fact, plaintiffs agree the facts stated are accurate (the report says what it says),**

the response does not dispute any of the stated facts and does not cite to any materials in the record that dispute the facts stated. FRCP 56(c)(1)(A). Golubski's narrative report is admissible under Fed. R. Evid. 803(8) as a public record, reporting events observed and recorded contemporaneously with the actions described therein. There is no genuine dispute as to any material fact. FRCP 56(c)(1).

38.     The Police File contains an investigative addendum dated April 16, 1994, in which Golubski reported he and Detective Ware recanvassed the 3000 block of Hiawatha and made contact with witness Breon Shelton and her mother, who reported that although the photos of the vehicle taken at 1515 Wood are the same color as the suspect vehicle, she did not think they were the same vehicle. Breon was shown the five-person line up but could not identify anyone. Breon saw one suspect exit the vehicle shoot and the other suspect remain in the vehicle. Police File, 65-66.

*Response: Controverted in part, with objection. Ms. Shelton did not equivocate, "she stated this was the wrong vehicle." (Ex. 1: Police File, LMKSDC_0003455-3456). However, to the extent Defendant is using the police report for the truth of the matter, Plaintiffs object on the basis of inadmissible hearsay.*

**Reply: Plaintiffs purport to controvert DSOF ¶ 38. Although Plaintiffs controvert this statement of fact, plaintiffs agree the stated fact is accurate (the report says what it says), the response does not dispute any of the stated facts and does not cite to any materials in the record that dispute the facts stated. FRCP 56(c)(1)(A). Golubski's narrative report is admissible under Fed. R. Evid. 803(8) as a public record, reporting events observed and recorded contemporaneously with the actions described therein. There is no genuine dispute as to any material fact. FRCP 56(c)(1).**

39.     The Police File contains an investigative addendum dated April 16, 1994, in which Golubski reported he took a statement from John Quinn who stated neither victim told him they had a problem. Although John's son Doniel never told him about a problem, John said he sensed something wasn't right weeks and weeks ago due to the way Doniel was acting and individuals he associated with. Police File, 72-77.

*Response: Controverted, with objection. Plaintiffs dispute Defendants' characterization of John Quinn's taped interview. There, Mr. Quinn stated that Doniel Quinn*

*was associated with the "wrong type of individual," people who were the "worst kind," and he likened them to a "cobra snake" where "any kind of bite would be instant death." (Ex. 1: Police File, LMKSDC_0003462-3467). Additionally, Defendant Golubski did not show John Quinn photos of any potential suspects, nor did he investigate whom Doniel was associating with. (See generally Ex. 1: Police File) Further, to the extent Defendant is using the police report for the truth of the matter, Plaintiffs object on the basis of inadmissible hearsay.*

**Reply: Plaintiffs purport to controvert DSOF ¶ 39. Although Plaintiffs controvert this statement of fact, plaintiffs agree the stated fact is accurate (the report says what it says), the response does not dispute any of the stated facts and does not cite to any materials in the record that dispute the facts stated. FRCP 56(c)(1)(A). The transcription of John Quinn's statement, which plaintiffs admit is authentic, is not offered to prove the truth of what he said, but rather that he said what he said to the detectives. Golubski's narrative report is admissible under Fed. R. Evid. 803(8) as a public record, reporting events observed and recorded contemporaneously with the actions described therein. There is no genuine dispute as to any material fact. FRCP 56(c)(1).**

40.     The Police File reflects Golubski prepared the Prosecutive Summary. Police File, 05.

*Response: Uncontroverted.*

**Reply: None.**

41.     Stacy Quinn is listed as a witness in the Prosecutive Summary as a witness "who can testify to observing the crime and to possibly being able to identify the suspect". Police File, 03.

*Response: Controverted in part, with objection. Plaintiffs agree that the Prosecutive Summary states Stacy Quinn "can testify to observing the crime and to possibly being able to identify the suspect." However, to the extent Defendant is using the police report for the truth of the matter, Plaintiffs object on the basis of inadmissible hearsay. Further, this prosecution summary is inconsistent with Golubski's actual report, which states Stacy "knew who the suspect was." (Ex. 1: Police File, LMKSDC_0003456).*

**Reply: Plaintiffs purport to controvert DSOF ¶ 41, but agree with the stated fact (the**

**prosecutive summary lists Stacy Quinn as a witness that saw the crime and could possibly identify the suspect). The Prosecutive Summary is not offered for the truth of the matters stated therein (i.e., whether Stacy Quinn in fact saw the crime or could in fact identify the suspect) but rather to show Golubski documented the fact Stacy Quinn was a potential witness for both the prosecutor's file and anyone reading it. There is no genuine dispute as to any material fact. FRCP 56(c)(1).**

42.     The prosecution report prepared by Golubski was receipted by the District Attorney's Office on April 16, 1994. 04-16-94 Receipt for Prosecution Report.

*Response: Uncontroverted.*

**Reply: None.**

**2.      April 18, Charges filed.**

43.     On April 18, 1994, a complaint was filed in Wyandotte County District Court Case No. 94JV489, charging Lamonte McIntyre with 2 counts of first-degree murder. 04-18-94 94JV489 Complaint.

*Response: Uncontroverted.*

**Reply: None.**

**3.      April 20**

44.     The Police File reflects, on April 20, 1994, Detective Golubski took statements from Yolanda Johnson, Natasha Haygood, and M'Sherie Johnson regarding Lamonte McIntyre's whereabouts on the day of the shooting, including what he was wearing. Detective Golubski also inquired regarding their knowledge about Lamonte McIntyre's involvement with drug use/sales and vehicles with which he may be associated. Police File, pp 78-102; Trial Transcript, 297:6-8.

*Response: Controverted in part, with objection. Plaintiffs agree that the report states what is cited above, however, to the extent Defendant is using the police report for the truth of the matter, Plaintiffs object on the basis of inadmissible hearsay.*

**Reply: Plaintiffs purport to controvert DSOF ¶ 44 "in part." Although Plaintiffs controvert this statement of fact, plaintiffs agree the stated fact is accurate (the report says what it says), the response does not dispute any of the stated facts and does not cite to any materials in the**

record that dispute the facts stated. FRCP 56(c)(1)(A). Golubski's narrative report is admissible under Fed. R. Evid. 803(8) as a public record, reporting events observed and recorded contemporaneously with the actions described therein. There is no genuine dispute as to any material fact. FRCP 56(c)(1).

### 4.    Niko Quinn later made an identification.

45.    Golubski had a second meeting with Niko Quinn where she identified Lamonte McIntyre as the shooter. Trial Transcript Vol. II, 327:24-329:15; Niko Quinn dep., 91:15-20, 91:24-92:12, 149:13 15, 150:9-13, 151:4 5.

*Controverted in part. Uncontroverted that Niko Quinn testified to a second meeting with Defendant Golubski behind Wyandotte High School. Controverted to the extent it implies that Niko Quinn's identification of Lamonte McIntyre at that meeting was not the result of improper coercion or suggestion. Instead, Niko Quinn testified that she told Golubski that Aaron Robinson and Monster had beaten up Doniel Quinn in the days before the murders, and that they came looking for him the night before the murders. She said that Doniel Quinn only had "beef" with that drug gang, and no one else. Golubski responded by warning Niko Quinn to leave that alone, that she "shouldn't be talking about Cecil, be careful what [she] say[s] about Cecil because they found his ex-girlfriend's remains behind Washington High School." Golubski then lied to Niko, telling her Cecil Brooks and Aaron Robinson and their gang "didn't do it, they couldn't have did it because they had the guy in custody [referring to Lamonte McIntyre], they had the clothes he was wearing and they had the gun so they got the right person." Knowing Niko Quinn was scared for her life, Golubski offered to put her in protective custody; he then did help her get through bureaucracy to move to 4th Street. SAMF ¶¶ 95–106. Further, when asked if he fabricated Niko Quinn's identification of Lamonte McIntyre, Golubski pled the Fifth. SAMF ¶ 106.*

**Reply: Plaintiffs purport to controvert DSOF ¶ 45. Although Plaintiffs controvert this statement of fact, the response does not dispute any of the stated facts and does not cite to any materials in the record that dispute the facts stated. FRCP 56(c)(1)(A). Plaintiffs' response extends more than half a page of text of additional, but non-responsive, information contrary to D.Kan. Rule 56.1(b)(2). The response recounts other things that were said while Niko Quinn positively identified Lamonte McIntyre from the photo array, but does not dispute the stated facts that Golubski met a second time with Niko Quinn and she identified**

Lamonte McIntyre as the shooter. **The fact Golubski asserted his rights under the Fifth Amendment is not admissible evidence that Quinn's identification was fabricated. This is, in part, why DSOF ¶ 45 cites to Niko Quinn's trial and deposition testimony which affirms the fact stated. There is no genuine dispute as to any material fact. FRCP 56(c)(1).**

46.     Detective Golubski testified he did not make a report regarding this second meeting with Niko Quinn. Trial Transcript Vol. II, 331:3-4.

*Uncontroverted that Golubski did not document the meeting in any written report. Additionally, each KCKPD officer was obligated to write a report including every step they took during an investigation, even if another detective on the case would be writing a report including similar information. (Pl. Ex. 54: Clyde Blood Dep. 110:4–22); (Pl. Ex. 58 : James Brown Dep. 212:3–8); (Pl. Ex. 80: Randy Eskina Aff. ¶¶ 68-72). Further, Defendant Smith admitted that failing to document a positive photo identification from an eyewitness does not make any sense, because a positive identification of a suspect awaiting trial from one of the eyewitnesses who is adamant is powerful evidence that officers would have every incentive to document and turn over so it could be used. (Pl. Ex. 59: W.K. Smith Dep. 345:25-347:14).*

**Reply: Though DSOF ¶ 46 is undisputed, Plaintiffs' response adds half a page of additional, but non-responsive, information contrary to D.Kan. Rule 56.1(b)(2).**

### 5.     September 21

47.     The Police File reflects, on September 21, 1994, Golubski took a statement from Keva Garcia, Ruby Mitchell's niece, regarding the "Lamonte" she (Keva) was talking to. Keva Garcia reviewed a picture of Lamonte McIntyre and said that they looked alike but were not the same. Police File, 105-109; Stipulation Doc. 562, ¶¶ 2.B.10

*Response: Controverted, with objection. In the cited interview, Keva Garcia says the photograph shown to her looks "a little bit" like Lamont Drain but states "there is a definite difference" between the photograph and Lamont Drain, including that Lamonte McIntyre has a longer neck, his ears are big, and his skin color is lighter than Lamont Drain. (Ex. 1: Police File, Statement of Keva Garcia at LMKSDC_0003499–3499). Keva also stated that the Lamont she used to date was not Lamonte McIntyre and that she had never seen Lamonte McIntyre before. Id.; SAMF ¶¶ 193–194. According to the prosecutor, Terra Morehead, this interview of Keva Garcia, five days before trial, was conducted on her behalf as part of Morehead's preparation for trial. SAMF ¶ 192. Additionally, to the extent Defendant is using the police report for the truth of the matter, Plaintiffs object on the basis of inadmissible hearsay. Additionally, Plaintiffs disagree Paragraph 47*

*is supported by the Pretrial Order Stipulation cited, which states: "The parties have stipulated to the foundation (but not the admissibility) of the following exhibits for purposes of summary judgment and trial." A stipulation to foundation of a document does not support that the content of those documents is admissible or uncontroverted. Accordingly, the Pretrial Order citation does not support the fact alleged in Paragraph 47.*

**Reply: Plaintiffs purport to controvert DSOF ¶ 47. Although Plaintiffs controvert this statement of fact, the response does not dispute any of the stated facts and does not cite to any materials in the record that dispute the facts stated. FRCP 56(c)(1)(A). Plaintiffs' page-long response does not address the facts stated contrary to D.Kan. Rule 56.1(b)(2). Plaintiffs' hearsay objection misses the mark in that the admittedly authentic transcription of Keva Garcia's statement is not offered for the truth of the matters asserted therein. Rather, it is offered to show her statement was taken. There is no genuine dispute as to any material fact. FRCP 56(c)(1).**

### 6. Waiver/Preliminary Hearing

48. On June 28, 1994, a waiver and preliminary hearing were held before the Honorable Matthew G. Podrebarac in Wyandotte County District Court. The witnesses who testified at this hearing were Ruby Mitchell, Niko Quinn, Roger Golubski, Rose McIntyre and Denise Armstrong. Waiver/Preliminary Hearing Transcript.

*Response: Uncontroverted.*

**Reply: None.**

49. Ruby Mitchell identified Lamonte McIntyre as the shooter and maintained this identification throughout cross-examination. Waiver/Preliminary Hearing Transcript, pp. 5-20.

*Response: Controverted in part. Uncontroverted that Ruby Mitchell identified Lamonte McIntyre at the preliminary hearing. However, Ruby Mitchell testified contrary to her police statement, stating that she did not know and had never previously seen Lamonte McIntyre and that she did not know his name was "Lamonte" until she went to the police station and went through some photos with police. (Pl. Ex. 68: Preliminary Hearing 10:2–3, 14:12–18). Further, Plaintiffs dispute Paragraph 49 to the extent it suggests the identification of Lamonte McIntyre by Ruby Mitchell was not the result of improper coercion or suggestion*

*detailed in Plaintiffs' Response to UG's SOF, ¶ 14. Additionally, Plaintiffs' expert Dr. Jennifer Dysart opines that when a witness sees a photograph in multiple identification procedures or contexts, there is a risk this sense of familiarity on the part of the witness may lead to an increased likelihood of choosing that person and a feeling of increased confidence in subsequent identification procedures. (Pl. Ex. 60: Expert Report of Jennifer Dysart, pp. 15–16). Further, if police suggestion occurred during the photo procedures—as Plaintiffs allege—"the subsequent identifications in court are of no value. There is no way to distinguish between the contaminated, unreliable identifications and the witnesses' actual memory of the events, and, therefore, no reliable way to assess whether the suspect was present at the crime." Id. at p. 16; see also (Ex. 6: Dennis Ware Dep. 185:21-187:2) (agreeing that the concept that if police suggest a particular photo on one occasion, that suggestion will taint that witness's identifications down the line was "just common sense," and a basic policing concept understood by 1994).*

**Reply: Plaintiffs purport to controvert DSOF ¶ 49 despite admitting the statement accurately states Ruby Mitchell identified Lamonte McIntyre as the shooter at the preliminary hearing. Plaintiffs' page-long response offers argument about the reliability of Mitchell's identification. Mitchell denies her initial identification was the product of suggestion or coercion. *See* DSOF ¶ 14. There is no genuine dispute as to any material fact. FRCP 56(c)(1).**

50.     During her testimony, Ruby Mitchell denied that a detective told her who to pick out of the lineup, stating "No. He didn't tell me to pick nothing." Waiver/Preliminary Hearing Transcript, pp. 5-20.

*Response: Controverted in part. Uncontroverted that Ruby Mitchell testified to the above at the preliminary hearing. However, Plaintiffs dispute the allegation in Paragraph 50 to the extent it suggests the identification of Lamonte McIntyre by Ruby Mitchell was not the result of improper coercion or suggestion, as detailed in Plaintiffs' Responses to UG's SOF, ¶¶ 14 and 49*

**Reply: Plaintiffs purport to controvert DSOF ¶ 50 "in part" despite admitting the statement accurately states Ruby Mitchell's testimony. There is no genuine dispute as to any material fact. FRCP 56(c)(1). DOSF ¶ 50 is not disputed.**

51.     Niko Quinn identified Lamonte McIntyre as the shooter and maintained this identification throughout cross-examination. Waiver/Preliminary Hearing Transcript, pp. 21-34.

*Response: Uncontroverted that Niko Quinn identified Lamonte McIntyre as the shooter at the preliminary hearing, but controverted to the extent that Paragraph 51 suggests Niko Quinn's in-court identification of Lamonte McIntyre was not the result of direct threats, improper coercion or suggestion. See Plaintiffs' Response to UG SOF, ¶ 29 and 45. Further, Niko Quinn has stated that "When I came to the courthouse to testify, I saw Lamonte McIntyre. As soon as I saw him stand up in the courtroom, I released that he absolutely could not be the shooter because he was much taller than the shooter. Also, his ears are too large and stick out too far away from his face, and the shooter's ears did not. I knew then, and I know now, that Lamonte McIntyre was not the man who shot Doniel and Don. At the courthouse, I talked to the prosecutor, Terra Morehead, and told her twice that Lamonte McIntyre was not the shooter, that the police had the wrong man. Ms. Morehead dismissed my statement and told me I could be held in contempt and go to jail and have my children taken from me. I testified, and let the prosecutor lead me through my testimony." (Pl. Ex. 25: Niko Quinn 2014 Aff. ¶ 21). Additionally, Niko testified that she identified Lamonte McIntyre in court because "Ms. Morehead dismissed my statement [that Lamonte was not the shooter] and told me I could be held in contempt and go to jail and have my children taken from me" and so she "testified, and let the prosecutor lead [her] through [her] testimony." (Pl. Ex. 25: Niko Quinn 2014 Aff ¶ 21). Niko also testified that "I might have said anything in that trial because I was threatened in '94 and '96. So none of that was true, because I was told what to say." (Ex. 12: Niko Quinn Dep. 157:9-16).*

*Additionally, Plaintiffs' expert Dr. Jennifer Dysart opines that when a witness sees a photograph in multiple identification procedures or contexts, there is a risk this sense of familiarity on the part of the witness may lead to an increased likelihood of choosing that person and a feeling of increased confidence in subsequent identification procedures. (Pl. Ex. 60: Expert Report of Jennifer Dysart, pp. 15–16). Further, if police suggestion occurred during the photo procedures—as Plaintiffs allege—"the subsequent identifications in court are of no value. There is no way to distinguish between the contaminated, unreliable identifications and the witnesses' actual memory of the events, and, therefore, no reliable way to assess whether the suspect was present at the crime." Id. at p. 16; see also (Ex. 6: Dennis Ware Dep. 185:21-187:2) (agreeing that the concept that if police suggest a particular photo on one occasion, that suggestion will taint that witness's identifications down the line was "just common sense," and a basic policing concept understood by 1994).*

**Reply: Plaintiffs purport to controvert DSOF ¶ 51. Plaintiffs admit this statement of fact accurately describes Niko Quinn's cross-examination testimony. The response does not dispute any of the stated facts and does not cite to any materials in the record that dispute the facts stated. FRCP 56(c)(1)(A). There is no genuine dispute as to any material fact. FRCP 56(c)(1). DOSF ¶ 51 is not disputed.**

52.    Rose McIntyre testified that she gave a statement as to the whereabouts of Lamonte McIntyre. Waiver/Preliminary Hearing Transcript, 46:1-12.

*Response: Controverted. Rose McIntyre only provided to officers that Lamonte was at FiFi's when they asked where he was the day prior to the crime, not the day of. (Ex. 1: Police File, Dennis Barber Stmt. to Golubski, 4/15/1994, LMKSDC_0003434, 3453); (Pl. Ex. 68: Preliminary Hearing, 46:5–47:8).*

**Plaintiffs purport to controvert DSOF ¶ 52. The materials cited by Plaintiffs' response corroborate, not dispute, the stated fact. See below for the materials cited by plaintiff. There is no genuine dispute as to any material fact. FRCP 56(c)(1). DOSF ¶ 52 is not disputed.**

detain Lamont or to request a warrant or filing of charges regarding same. This conversation convened at approximately 1950 hours with Ms. McIntyre. She made an inquiry of me as to what time this serious problem had occurred and I indicated around 2:00. Her response was "Well that couldn't have been Lamont that was involved because he works part-time at FiFi's and he was here from 11:00 this morning until 2:45 this afternoon. I indicated "Well, that's why I needed to talk to the young man that there's two sides in every story" and that

94JV0489                                                              Page 46

```
 1   Q.  (By Mr. Stecklein)  Do you recall during the
 2   investigation whether you gave a statement to the police
 3   on this case here?
 4   A.  Yes.
 5   Q.  Okay.  And did you give a statement as to the
 6   whereabouts of LaMonte McIntyre?
 7   A.  Well, yes.  When they come down tricking me, trying to
 8   find out where Monte was, I told them Monte was at work,
 9   because they give me the date before, not the date of.
10   Q.  Okay.  So you're saying today that -- that when the
11   police came down and told you, they tricked into thinking
12   it was the day before?
13   A.  Yes.
```

53.    Rose McIntyre testified she told police Lamonte was at work, believing they were talking about the day before the shooting. Waiver/Preliminary Hearing Transcript, 46:1-12 ("When they come down tricking me, trying to find out where Monte was, I told them Monte was at work, because they give me the date before, not the date of.").

*Response: Controverted in part. Uncontroverted that the cited materials reflect Rose McIntyre testified she told police Lamonte was at work the day before the shooting "because they g[a]ve her the date before, not the date of." Controverted that this was Rose's "belief" but instead what actually occurred. (Pl. Ex. 68: Preliminary Hearing, pg 46.).*

**Reply: Plaintiffs admit the accuracy of DSOF ¶ 53 but purport to controvert the statement.**

**There is no genuine dispute as to any material fact and DSOF ¶ 53 is not disputed.**

54.    Rose McIntyre testified when she realized the shooting occurred the day Lamonte McIntyre was taken into custody, she told officers that he was at his aunt's house. Waiver/Preliminary Hearing Transcript, 47:4-5 (And I told the officer then, I said, "Well, if you're talking about today, Lamonte was over auntie's house.").

*Response: Uncontroverted that Rose McIntyre truthfully told police that "if you're talking about today. LaMonte was over auntie's house." (Pl. Ex. 68: Preliminary Hearing: 46:5– 47:8).*

**Reply: Though plaintiffs do not dispute the stated fact, Plaintiffs' response adds additional,**

**but non-responsive, information contrary to D.Kan. Rule 56.1(b)(2).**

55.    On June 28, 1994, Judge Podrebarac waived Lamonte McIntyre to adult status and found probable cause existed to bind Lamonte McIntyre over as charged. Waiver/Preliminary Hearing Transcript, LMKSDC_0003779-81; 06-28-94 JE of Waiver and Preliminary Hearing.

*Response: Uncontroverted.*

**Reply: None.**

D.    **Jury Trial**

56.    Lamonte McIntyre's criminal jury trial occurred the week of September 26, 1994. Trial Transcript Vol. I; Trial Transcript Vol. II; Trial Transcript Vol. III.

*Response: Uncontroverted.*

**Reply: None.**

57.    At trial, Niko Quinn positively identified Lamonte McIntyre as the shooter and maintained this identification throughout cross-examination. Trial Transcript Vol. I, pp. 111-156 see ¶¶ 165-168, infra.

*Response: Controverted in part. Uncontroverted that Niko Quinn identified Lamonte McIntyre as the shooter at Lamonte's criminal trial, but controverted to the extent that Paragraph 57 suggests Niko Quinn's in-court identification of*

*Lamonte McIntyre was not the result of direct threats, improper coercion or suggestion detailed in Plaintiffs' Response to UG's SOF ¶¶ 29, 45 and 51.*

**Reply: Plaintiffs purport to controvert DSOF ¶ 57. Plaintiffs admit this statement of fact accurately describes Niko Quinn's trial testimony. The response does not dispute any of the stated facts and does not cite to any materials in the record that dispute the facts stated. FRCP 56(c)(1)(A). There is no genuine dispute as to any material fact. FRCP 56(c)(1). DOSF ¶ 57 is not disputed.**

58.     At trial, Ruby Mitchell identified Lamonte McIntyre as the shooter and maintained this identification throughout cross-examination. Trial Transcript Vol. I pp. 157-208; see ¶¶ 104-115, infra.

*Controverted in part. Uncontroverted that Ruby Mitchell identified Lamonte McIntyre as the shooter at trial, but every aspect of the identification process was tainted with improper suggestion and coercive influence. See Plaintiffs' Response to UG, ¶¶ 14 and 49. Answering further, according to Plaintiffs' expert in eyewitness identification, Dr. Jennifer Dysart, when a witness sees a photograph in multiple identification procedures or contexts, there is a risk this sense of familiarity on the part of the witness may lead to an increased likelihood of choosing that person and a feeling of increased confidence in subsequent identification procedures. SAMF ¶ 164. Further, if police suggestion occurred during the photo procedures—as Plaintiffs allege—"the subsequent identifications in court are of no value. There is no way to distinguish between the contaminated, unreliable identifications and the witnesses' actual memory of the events, and, therefore, no reliable way to assess whether the suspect was present at the crime." (Pl. Ex. 60: Expert Report of Jennifer Dysart p. 16); see also (Ex. 6: Dennis Ware Dep. 185:21–187:2) (agreeing that the concept that if police suggest a particular photo on one occasion, that suggestion will taint that witness's identifications down the line was "just common sense," and a basic policing concept understood by 1994).*

*Also, Mitchell's testimony at trial falsely portrays her original statement to police. She testifies that when she selected Lamonte McIntyre's photograph that she knew he was not the Lamonte who had dated her niece. (Ex. 2: TT 127:10–14, 195:16–196:15). This is directly contrary to her statement to police in which she states that she knew the shooter because he used to talk to her niece, that she had known him a couple of months, and that she knew his first and last names, which she recites. (Ex. 1: Police File, LMKSDC_0003421-3425). These contradictions reflect a tainted and manipulated identification.*

**Reply: Plaintiffs purport to controvert DSOF ¶ 58. Plaintiffs admit this statement of fact**

accurately describes Ruby Mitchell's trial testimony. The response does not dispute any of the stated facts and does not cite to any materials in the record that dispute the facts stated. FRCP 56(c)(1)(A). There is no genuine dispute as to any material fact. FRCP 56(c)(1). DOSF ¶ 58 is not disputed.

### 1.   Krstolich

59.   Detective Krstolich testified that he made contact with Ruby Mitchell shortly after the shooting at her residence and Ms. Mitchell thought she could recognize the suspect if she saw him again so Detective Krstolich asked her to come with him to the KCKPD to build a composite picture of the suspect. Trial Transcript Vol. I, 276:8-277:13.

*Response: Uncontroverted that Krstolich so testified. However, Krstolich took a taped statement from Mitchell at the scene, a transcript of which is found at (Ex. 1: Police File, LMKSDC_0003421. There, when Krstolich asked whether Mitchell could see the shooter's face, she responded, "Well, he's brown skinned, that's all I could tell. I don't know no scars or nothing like that." (Ex. 1: Police File, Mitchell Stmt. to Krstolich, LMKSDC_0003423). Further, when Mitchell arrived at the station, Krstolich and Golubski interviewed her and she told them that the shooter looked exactly like her niece's former boyfriend whose first name was Lamont, because both the shooter and the Lamont she knew had French braids. Then, Krstolich asked Mitchell to help develop a composite of the shooter. SAMF ¶¶ 135, 150–152, 158–160. Additionally, the composite was a highly unusual mechanism to employ when the witness had already identified a specific person as the shooter. SAMF ¶ 159.*

**Reply: Plaintiffs do not dispute DSOF ¶ 59. Plaintiffs admit this statement of fact accurately describes Det. Krstolich's trial testimony. The response does not dispute any of the stated facts and does not cite to any materials in the record that dispute the facts stated. FRCP 56(c)(1)(A). There is no genuine dispute as to any material fact. FRCP 56(c)(1). DOSF ¶ 59 is not disputed.**

60.   Detective Krsotlich testified that after the composite was made, Ms. Mitchell said she thought she knew who the party was. She almost called out his name when she saw him before the shooting and gave the name "Lamonte". Trial Transcript Vol. I, 278:2-14, 280:10-18.

*Response: Uncontroverted that Krstolich so testified. However, Plaintiffs dispute that Krstolich's testimony is true or accurate, as Ruby Mitchell testified that she*

*believed she had identified Lamont Drain as the shooter, and that he was the Lamonte who dated her niece. (Ex. 10: Ruby Mitchell Dep. 69:25-70:6; 143:16-25). Further, after the un-recorded photo array and identification allegedly took place with Ruby Mitchell, Krstolich reported that Mitchell "has made a positive identification of the party. She thought she knew him and know she knows she is positive that she did see the shooter and she knew who he was," and that Ruby Mitchell picked out the picture of the Lamont who "used to talk to my niece." (Ex. 1: Police File LMKSDC_0003421-3425). However, Ruby Mitchell testified at trial that she did not know Lamonte McIntyre and did not provide police with his last name, but instead "learned" that information after her off-the-record identification. (Ex. 3: Ruby Mitchell TT 180:15-23); (Pl. Ex. 32: Ruby Mitchell Aff. ¶ 7.) Mitchell also testified that at the time of the shooting she recognized the shooter as the Lamont who used to date her niece (Lamont Drain) who she had seen "lots of times," that she was so certain it was Lamont Drain she was going to call out his name, and that at that point there was no doubt in her mind he did the shooting and she did not change her mind. (Ex. 2: TT 165:12–166:7, 180:6–181:14, 184:6–24, 188:1–5); See also Plaintiffs' Response to UG SOF, ¶¶ 59.*

**Reply: Plaintiffs do not dispute DSOF ¶ 60. Plaintiffs admit this statement of fact accurately describes Det. Krstolich's trial testimony. The response does not dispute any of the stated facts and does not cite to any materials in the record that dispute the facts stated. FRCP 56(c)(1)(A). There is no genuine dispute as to any material fact. FRCP 56(c)(1). DOSF ¶ 60 is not disputed.**

61.     Detective Krstolich testified that he handed Ms. Mitchell the stack of five photos and did not suggest at all who she should pick out. Ms. Mitchell selected Lamonte McIntyre's photograph. Trial Transcript Vol. I, 280:19-283:16.

*Response: Uncontroverted that Detective Krstolich so testified. However, Plaintiffs dispute that Krstolich's testimony is true or accurate, and that Mitchell's identification of Lamonte McIntyre was not the result of improper coercion or suggestion, as described in Plaintiffs' Responses to UG SOF, ¶¶ 14, 49 and 60.*

**Reply: Plaintiffs do not dispute DSOF ¶ 61. Plaintiffs admit this statement of fact accurately describes Det. Krstolich's trial testimony. The response does not dispute any of the stated facts and does not cite to any materials in the record that dispute the facts stated. FRCP 56(c)(1)(A). There is no genuine dispute as to any material fact. FRCP 56(c)(1). DOSF ¶ 61 is not disputed.**

## 2.     Golubski

62.     Detective Golubski testified to a second meeting with Niko Quinn where she identified Lamonte McIntrye as the shooter. Trial Transcript Vol. II, 327:25-329:15.

*Response: Controverted in part. Uncontroverted that Detective Golubski testified at trial to a second meeting with Niko Quinn behind Wyandotte High School. Controverted to the extent it implies that Niko Quinn's identification of Lamonte McIntyre at that meeting was not the result of direct threats, improper coercion or suggestion. Instead, Niko Quinn testified that she told Golubski that Aaron Robinson and Monster had beaten up Doniel Quinn in the days before the murders, and that they came looking for him the night before the murders. She said that Doniel Quinn only had "beef" with that drug gang, and no one else. Golubski responded by warning Niko Quinn to leave that alone, that she "shouldn't be talking about Cecil, be careful what [she] say[s] about Cecil because they found his ex-girlfriend's remains behind Washington High School." Golubski then lied to Niko, telling her Cecil Brooks and Aaron Robinson and their gang "didn't do it, they couldn't have did it because they had the guy in custody [referring to Lamonte McIntyre], they had the clothes he was wearing and they had the gun so they got the right person." Knowing Niko Quinn was scared for her life, Golubski offered to put her in protective custody; he then did help her get through bureaucracy to move to 4th Street. SAMF ¶¶ 95–103. Further, when asked if he fabricated Niko Quinn's identification of Lamonte McIntyre, Golubski pled the Fifth. SAMF ¶ 106. See Plaintiffs' Response to UG's SOF ¶ 45*

**Reply: Plaintiffs purport to controvert DSOF ¶ 62 "in part." Plaintiffs admit this statement of fact accurately describes Golubski's trial testimony. The response does not dispute any of the stated facts and does not cite to any materials in the record that dispute the facts stated. FRCP 56(c)(1)(A). There is no genuine dispute as to any material fact. FRCP 56(c)(1). DOSF ¶ 62 is not disputed.**

63.     Detective Golubski testified there was a not a report regarding this meeting. Trial Transcript Vol. II, 331:3-4.

*Response: Uncontroverted that Golubski did not document the meeting in any written report. (Pl. Ex. 54: Clyde Blood Dep. 110:4–22); (Pl. Ex. 58: James Brown Dep. 212:3–8); (Pl. Ex. 80: Randy Eskina Aff. ¶¶ 68-72). Further, Defendant Smith admitted that failing to document a positive photo identification from an eyewitness does not make any sense, because a positive identification of a suspect awaiting trial from one of the eyewitnesses who is adamant is powerful evidence that officers would have every incentive to document and turn over so it could be used. (Pl. Ex. 56: W.K. Smith Dep. 345:25-347:14). See Plaintiffs' Response to UG's SOF ¶ 46.*

**Reply: Though plaintiffs do not dispute the stated fact, Plaintiffs' response adds additional, but non-responsive, information contrary to D.Kan. Rule 56.1(b)(2).**

    64.    At trial Golubski testified, out of the hearing of the jury, that he got the name Lamonte McIntyre "Through other police personnel and other sources that may have pertinent information." Trial Transcript Vol. II, 306:22-307:1.

*Response: Controverted in part. Uncontroverted that Golubski so testified but controverted that his testimony was truthful or accurate. Defendants have provided inconsistent accounts of how the name Lamonte McIntyre's name and photograph originated in the investigation. Defendants have never identified any particular "source" from which the name "McIntyre" allegedly came. Prosecutor Morehead represents to the Court that Lieutenant Barber "was the one that was told this information and that information then got back to the other detectives and that's how the name and the photograph was pulled. It was from street talk that the name Lamonte McIntyre came up." Golubski never testifies that Barber worked with any sources. Although Barber testified at trial that he obtained the name of Lamonte McIntyre "from numerous sources," these sources were never identified, are not documented in the police file, and are not mentioned in his taped statement to Detective Golubski after Lamonte's arrest. (Ex. 3: Barber TT 353:7–14); (Ex. 1: Police File, LMKSDC_0003433-3435). In reality, Lamonte McIntyre was innocent, SAMF ¶¶ 22–28, and the actual street talk was that Monster committed the crime, SAMF ¶ 20. When Lamonte was arrested, people in the streets "knew it was the wrong guy. It was somebody we never heard of." (Pl. Ex. 24: Joe Robinson Aff. ¶ 19).*

**Reply: Plaintiffs purport to controvert DSOF ¶ 64 "in part." Plaintiffs admit this statement of fact accurately describes Golubski's trial testimony. The response does not dispute any of the stated facts and does not cite to any materials in the record that dispute the facts stated. FRCP 56(c)(1)(A). Plaintiffs' cross-reference PSOF ¶ 20, which is entirely based on inadmissible speculation by persons who lack personal knowledge of the statement. There is no genuine dispute as to any material fact. FRCP 56(c)(1). DOSF ¶ 64 is not disputed.**

    65.    At trial Golubski testified, out of the hearing of the jury, that he got the name and and photo from an Assistant D.A. in the juvenile department. Trial Transcript Vol. II, 307:6-10.

*Response: Controverted in part. Uncontroverted that Golubski so testified but controverted that his testimony is truthful or accurate. Instead, Golubski's Investigative Addendum documents that after Golubski learned the first name "Lamonte," "with the assistance of Victoria Meyers of the District Attorney's*

*Office," and afterward, "a picture was produced of a Lamonte McIntyre." Id.; LMKSDC_0003453. When asked at his deposition whether he lied when he claimed that he showed Lamonte McIntyre's photo to Ruby Mitchell because a confidential informant had provided his name, to bolster Mitchell's false identification, Golubski invoked his Fifth Amendment right to remain silent. (Pl. Ex. 63: Roger Golubski Dep. 127:14–129:6, 131:14–22, 135:20–137:4, 171:3–9). Now, Golubski asserts that he took the photos of Lamonte McIntyre from Robert Goddell, a detective who investigated an unrelated case wherein Lamonte McIntyre was a suspect. (Doc. 582, at 9–10, ¶¶ 52–55). Further, the other Defendants have provided inconsistent accounts of how Lamonte McIntyre's name and photograph originated in the investigation, which do not involve Victoria Meyer, as further detailed in Plaintiffs' Response to UG's SOF ¶ 64.*

**Reply: Plaintiffs purport to controvert DSOF ¶ 65 "in part." Plaintiffs admit this statement of fact accurately describes Golubski's trial testimony. The response does not dispute any of the stated facts and does not cite to any materials in the record that dispute the facts stated. FRCP 56(c)(1)(A). The fact Golubski asserted his rights under the Fifth Amendment is not admissible evidence that Mitchell's identification was fabricated. Further there is no inherent inconsistency between Golubski's testimony that Victoria Meyer assisted and the use of the photos from the robbery worked by Robert Goddell. Ms. Meyer was the juvenile prosecutor and McIntyre had pled guilty to that robbery charge. There is no genuine dispute as to any material fact. FRCP 56(c)(1). DOSF ¶ 65 is not disputed.**

66.     At trial Golubski testified, to the jury, that he got the name from "various sources". Trial Transcript Vol. II, 310:5-15.

*Response: Controverted in part. Uncontroverted that Golubski so testified but controverted that his testimony is truthful or accurate. Golubski and Defendant Officers have provided inconsistent accounts of how the name Lamonte McIntyre's name and photograph originated in the investigation, as further detailed in Plaintiffs' Responses to UG's SOF ¶¶ 64 and 65. Also, at his deposition in this case, Defendant Smith testified that he had never in his career solved a case via information on the street within hours of a homicide and described that as "different," in other words, not the way things work in the real world. (Pl. Ex. 59: W.K. Smith Dep. 356:9-23.)*

**Reply: Plaintiffs purport to controvert DSOF ¶ 66 "in part." Plaintiffs admit this statement of fact accurately describes Golubski's trial testimony. The response does not dispute any of**

the stated facts and does not cite to any materials in the record that dispute the facts stated.

FRCP 56(c)(1)(A). There is no genuine dispute as to any material fact. FRCP 56(c)(1). DOSF

¶ 66 is not disputed.

### 3.  Barber

67.     Lt. Barber testified at trial he was "directly responsible in obtaining the name of Lamonte McIntyre during [the] investigation" and he obtained the name "from numerous sources." Trial Transcript Vol. II, 353:7-14.

*Response: Uncontroverted that Barber testified as such. However, Defendants have never identified any particular "source" from which the name "McIntyre" allegedly came. Prosecutor Morehead represents to the Court that Lieutenant Barber "was the one that was told this information and that information then got back to the other detectives and that's how the name and the photograph was pulled. It was from street talk that the name Lamonte McIntyre came up." Golubski never testifies that Barber worked with any sources. Although Barber testified at trial that he obtained the name of Lamonte McIntyre "from numerous sources," these sources were never identified, are not documented in the police file, and are not mentioned in his taped statement to Detective Golubski after Lamonte's arrest. (Ex. 3: Barber TT 353:7–14); (Ex. 1: Police File, LMKSDC_0003433-3435). In reality, Lamonte McIntyre was innocent, SAMF ¶¶ 20–28 and the actual street talk was that Monster committed the crime, SAMF ¶ 20. When Lamonte was arrested, people in the streets "knew it was the wrong guy. It was somebody we never heard of." (Pl. Ex. 24: Joe Robinson Aff. ¶ 19). Further, Barber's testimony contradicts the other accounts provided by the other Defendants regarding how Lamonte McIntyre's name and photograph originated in the investigation, as detailed in Plaintiffs' Response to UG's SOF ¶¶ 64 and 65.*

**Reply: Plaintiffs do not dispute DSOF ¶ 67. Plaintiffs admit this statement of fact accurately describes Lt. Barber's trial testimony. The response does not dispute any of the stated facts and does not cite to any materials in the record that dispute the facts stated. FRCP 56(c)(1)(A). The so-called "street talk" cited by plaintiffs is not information communicated to police, nor is there any foundation or personal knowledge for the cited materials. Plaintiffs' response does not identify how Barber's testimony is inconsistent with, or contradicts, other accounts provided by other defendants. There is no genuine dispute as to any material fact. FRCP 56(c)(1). DOSF ¶ 67 is not disputed.**

68.     Lt. Barber testified that he made contact with Ms. McIntyre after he was dispatched to Fi Fi's on a specific request to go there and speak with Lamonte's mother. Trial Transcript Vol. II, 355:17-356:19.

*Response: Uncontroverted that Barber so testified.*

**Reply: None.**

69.     Lt. Barber testified that upon arrival, Lamonte's grandmother Maxine Crowder introduced Lt. Barber to Lamonte's mother, Ms. McIntyre, and Lt. Barber told her that there had been allegations that Lamonte was involved in a felony crime. Trial Transcript Vol. II, 356:20-360-15.

*Response: Controverted in part and duplicative of UG SOF, ¶ 16. Uncontroverted that Lt. Barber so testified, but controverted to the extent Paragraph 69 suggests Lt. Barber's statements were true or accurate. Instead, Barber's report of Rose McIntyre's statements on April 15, 1994 was false. SAMF ¶¶ 253–264. Additionally, the transcript of the audiotaped statement Golubski took from Defendant Barber regarding his investigation of the Ewing/Quinn homicides states only that Barber indicated to Rose McIntyre at the time of Lamonte McIntyre's arrest that "there had been some street talk, wherein Lamonte McIntyre had been named as a suspect in a felony crime." (Ex. 1: Case File at LMKSDC_003433– 3436, LMKSDC_0003453). See also Plaintiffs' Response to UG's SOF ¶ 16.*

**Reply: Plaintiffs purport to controvert DSOF ¶ 69. Plaintiffs admit this statement of fact accurately describes Lt. Barber's trial testimony. The response does not dispute any of the stated facts and does not cite to any materials in the record that dispute the facts stated. FRCP 56(c)(1)(A). There is no genuine dispute as to any material fact. FRCP 56(c)(1). DOSF ¶ 69 is not disputed.**

70.     Lt. Barber testified that Ms. McIntyre was uncertain as to what a felony crime meant, so Lt. Barber explained that it was a serious crime punishable by more than one year in jail such as a shooting, stabbing or robbery. *Id.*

*Response: Controverted in part and duplicative of UF SOF, ¶ 18. Uncontroverted that Lt. Barber so testified, but controverted to the extent Paragraph 70 suggests Lt. Barber's statements were true or accurate. Instead, Barber's testimony of Rose McIntyre's statements on April 15, 1994 was false. In fact, Barber asked Rose McIntyre where Lamonte McIntyre had been on April 14, 1994, the day before the shooting, not the day of, to which Rose truthfully replied that the day before the shooting, Lamonte McIntyre was with her at FiFi's restaurant. Barber fabricated a false and inculpatory statement by Rose McIntyre in an attempt to imply that she knew Lamonte McIntyre was guilty of the murders. SAMF ¶¶ 258–264. See also*

*Plaintiffs' Response to UG's SOF ¶ 18.*

**Reply: Plaintiffs purport to controvert DSOF ¶ 70. Plaintiffs admit this statement of fact accurately describes Lt. Barber's trial testimony. The response does not dispute any of the stated facts and does not cite to any materials in the record that dispute the facts stated. FRCP 56(c)(1)(A).** *See* **Reply to DSOF ¶ 52,** *supra***. There is no genuine dispute as to any material fact. FRCP 56(c)(1). DOSF ¶ 70 is not disputed.**

71.     Lt. Barber testified that he did not indicate that it was a double homicide and while he was explaining what a felony crime was, Ms. McIntyre said words to the effect that if she had killed somebody, would he take her down and charge her? *Id.*

*Response: Controverted in part, and duplicative of UG's SOF ¶ 18. Uncontroverted that Lt. Barber so testified, but controverted that Lt. Barber's statements were true or accurate for the reasons identified in Plaintiffs' Response to Defendant UG SOF ¶¶ 16, 18, 69 and 70; SAMF ¶¶ 258–264, including that at FiFi's, Rose McIntyre asked Barber "what this was all about," to which Barber replied, "that it could be about a fight or disturbance or something like that." Rose did not bring up the word "murder." Barber fabricated a false and inculpatory statement by Rose McIntyre in an attempt to imply that she knew Lamonte McIntyre was guilty of the murders. SAMF ¶¶ 253–264.*

**Reply: Plaintiffs purport to controvert DSOF ¶ 71. Plaintiffs admit this statement of fact accurately describes Lt. Barber's trial testimony. The response does not dispute any of the stated facts and does not cite to any materials in the record that dispute the facts stated. FRCP 56(c)(1)(A).** *See* **Reply to DSOF ¶ 52,** *supra***. There is no genuine dispute as to any material fact. FRCP 56(c)(1). DOSF ¶ 71 is not disputed.**

72.     Lt. Barber testified that then Ms. McIntyre said that it could not have been Lamonte because he had been a Fi Fi's all day. *Id.*

*Response: Controverted in part. Uncontroverted that Lt. Barber so testified, but controverted that Lt. Barber's statements were true or accurate for the reasons identified in Plaintiffs' Response to UG SOF ¶¶ 16, 18, 69 and 70, including that Barber asked Rose McIntyre where Lamonte McIntyre had been on April 14, 1994, the day before the shooting, not the day of, to which Rose truthfully replied that the day before the shooting, Lamonte McIntyre was with her at FiFi's restaurant. SAMF ¶¶ 253–257.*

**Reply: Plaintiffs purport to controvert DSOF ¶ 72. Plaintiffs admit this statement of fact accurately describes Lt. Barber's trial testimony. The response does not dispute any of the stated facts and does not cite to any materials in the record that dispute the facts stated. FRCP 56(c)(1)(A).** *See* **Reply to DSOF ¶ 52,** *supra.* **There is no genuine dispute as to any material fact. FRCP 56(c)(1). DOSF ¶ 72 is not disputed.**

### 4. Brown

73.    Officer James Brown testified that he started with the KCKPD in September 1991. Trial Transcript Vol. II, 366.

*Response: Uncontroverted.*

**Reply: None.**

74.    Officer Brown testified that he made contact with Ms. McIntyre who indicated she wanted to meet with Lt. Barber, so he called Lt. Barber to FiFi's. Trial Transcript Vol. II, 366.

*Response: Uncontroverted.*

**Reply: None.**

75.    Officer Brown testified that at around 8:40 p.m., Officer Brown per Lt. Barber's instruction patted Lamonte McIntyre down and placed him in the patrol car to transport to the Detective's Bureau. Trial Transcript Vol. II, 66-67.

*Response: Uncontroverted that Brown testified that Barber instructed him to pat Lamonte McIntyre down and place him in custody. Further, Officer Brown told Lamonte McIntyre that he was not arrested and that if he did nothing wrong, he had nothing to worry about. (Pl. Ex. 79: Lamonte McIntyre Dep. 148:21-150:6); SAMF ¶ 270.*

**Reply: Though plaintiffs do not dispute the stated fact, Plaintiffs' response adds additional, but non-responsive, information contrary to D.Kan. Rule 56.1(b)(2).**

76.    Officer Brown testified that during the transport, Lamonte McIntyre asked what was going on, and Officer Brown said detectives wanted to talk to him about an incident. Trial Transcript Vol. II, 366-68.

*Response: Uncontroverted. Additionally, Lamonte McIntyre testified that while being transported to the station, he asked Officer Brown what this was all about, and Brown said, "If you did nothing wrong, you got nothing to worry about."*

*SAMF ¶ 270.*

**Reply: Though plaintiffs do not dispute the stated fact, Plaintiffs' response adds additional, but non-responsive, information contrary to D.Kan. Rule 56.1(b)(2).**

77.     Officer Brown testified that Lamonte McIntyre made the unsolicited statement that that he didn't know what he could have done because he was at Fi Fi's all day helping his mother out in the kitchen doing some work. Trial Transcript Vol. II, 368-69.

*Response: Controverted in part. Uncontroverted that Brown so testified, but controverted that Brown's testimony was true or accurate, as Lamonte never told any officer he was at FiFi's at the time of the crime. Instead, Brown's claim regarding what Lamonte said is false. When Officer Brown transported Lamonte to the police station, Lamonte asked Brown what this was all about, and Brown said, "If you did nothing wrong, you got nothing to worry about." SAMF ¶¶ 268, 270, 276–278.*

**Reply: Plaintiffs purport to controvert DSOF ¶ 77. Plaintiffs admit this statement of fact accurately describes Ofc. Brown's trial testimony. The response does not dispute any of the stated facts and does not cite to any materials in the record that dispute the facts stated. FRCP 56(c)(1)(A). DOSF ¶ 77 is not disputed.**

78.     Officer Brown testified that he was present at the bureau when Detective Golubski and Detective Krstolich were speaking with Lamonte McIntyre, and heard him say he was in the area of 15th and Wood all day. Trial Transcript Vol. II, 368-69.

*Response: Controverted in part. Uncontroverted that Brown testified that he was present when Golubski and Krstolich questioned Lamonte McIntyre and that he testified "one comment that I remember was the detective asked him where he was all day and he stated in the area of 15th and Wood." Indeed, at the police station, Lamonte McIntyre truthfully told the officers that he was "at his auntie's house ... all day long." (Ex. 1: Police File, Krstolich Report, 4/15/1994, LMKSDC_0003442; Golubski Report, 4/16/1994, LMKSDC_0003454); (Ex. 4: Lamonte McIntyre TT 452:18–453:23); SAMF ¶¶ 265, 273, 277–278. Controverted to the extent Paragraph 78 is implying that Lamonte McIntyre provided police inconsistent alibis or that Brown's testimony or report of Lamonte McIntyre's statements are true or accurate for the reasons detailed in Plaintiffs' Response to UG SOF, ¶¶ 69, 75–77.*

**Reply: Plaintiffs purport to controvert DSOF ¶ 78. Plaintiffs admit this statement of fact**

accurately describes Ofc. Brown's trial testimony. **The response does not dispute any of the stated facts and does not cite to any materials in the record that dispute the facts stated. FRCP 56(c)(1)(A). DOSF ¶ 78 is not disputed.**

79.    Officer Brown testified this is when he remembered that Lamonte McIntyre told him that he was at Fi Fi's all day on 5th and Richmond so he wrote the detective a note telling him what Lamonte McIntyre had said in the car that he had been at Fi Fi's with his mother all day. Trial Transcript Vol. II, 369-70.

*Response: Uncontroverted that Brown so testified. However, controverted to the extent Paragraph 79 is implying that Lamonte McIntyre provided police inconsistent alibis or that Brown's testimony or report of Lamonte McIntyre's statements are true or accurate for the reasons detailed in Plaintiffs' Response to UG SOF, ¶¶ 69, 75–78, including that Lamonte never told any officer he was at FiFi's at the time of the crime. Instead, when Officer Brown transported Lamonte to the police station, Lamonte asked Brown what this was all about, and Brown said, "If you did nothing wrong, you got nothing to worry about." SAMF ¶¶ 270–285.*

**Reply: Plaintiffs purport to controvert DSOF ¶ 79. Plaintiffs admit this statement of fact accurately describes Ofc. Brown's trial testimony. The response does not dispute any of the stated facts and does not cite to any materials in the record that dispute the facts stated. FRCP 56(c)(1)(A). DOSF ¶ 79 is not disputed.**

80.    Lamonte McIntyre testified that he spent the night of April 14, 1994 at 1510 Walker at Peggy Crowder's house. On the morning of the 15th, he got up, left with his mother to have her do something at the house, came back early, went to the store, stayed there, watched a couple of movies, and started using the phone to call a cab between 1:20-1:30 p.m. Trial Transcript Vol. III, 447-48.

*Response: Plaintiffs dispute Paragraph 80's characterization of Lamonte McIntyre's trial testimony, which speaks for itself. See Exhibit 4, Volume 3: Trial Transcript. Further, on April 15, 1994, Lamonte McIntyre was at the house of his aunt, Peggy Williams (Crowder), for half the day until sometime around 2pm, when he went to call a cab for one of Williams' guests at the home of his other aunt, Yolanda Johnson, as Williams did not own a phone. After making the call, Lamonte returned briefly to Williams' home. He shortly thereafter went back to Johnson's home to call a cab for a second guest of Williams' and remained at Johnson's home thereafter. SAMF ¶¶ 232–237.*

**Reply: Plaintiffs purport to controvert DSOF ¶ 80. Plaintiffs do not dispute the accuracy of**

the facts stated, but restate Lamonte McIntyre's trial testimony (but not inconsistently with DSOF ¶ 80). The response does not dispute any of the stated facts and does not cite to any materials in the record that dispute the facts stated. FRCP 56(c)(1)(A). DOSF ¶ 80 is not disputed.

81.     Lamonte McIntyre testified that he stayed at Yolanda's house after calling a cab a second time around 1:45-1:50 p.m. until his mother took him to FiFi's between 4:30 and 5 p.m. Trial Transcript Vol. III, 449-50.

*Response: Plaintiffs dispute Paragraph 81's characterization of Lamonte McIntyre's trial testimony, which speaks for itself. See Ex. 4: Volume 3, Trial Transcript. See also Plaintiffs Response to UG SOF ¶ 80.*

**Reply: Plaintiffs purport to controvert DSOF ¶ 81. Plaintiffs do not dispute the accuracy of the facts stated, but restate Lamonte McIntyre's trial testimony (but not inconsistently with DSOF ¶ 81). The response does not dispute any of the stated facts and does not cite to any materials in the record that dispute the facts stated. FRCP 56(c)(1)(A). DOSF ¶ 81 is not disputed.**

82.     Lamonte McIntyre testified that he did not tell the police officer he had been at FiFi's all that day Trial Transcript Vol. III, 451.

*Response: Plaintiffs dispute Paragraph 82's characterization of Lamonte McIntyre's trial testimony, which speaks for itself. See Ex. 4: Volume 3, Trial Transcript. See also Plaintiffs Response to UG SOF ¶ 80. But, uncontroverted that Lamonte never told any officer he was at FiFi's at the time of the crime. SAMF ¶¶ 265–267, 275, 278.*

**Reply: Plaintiffs purport to controvert DSOF ¶ 82. Plaintiffs do not dispute the accuracy of the facts stated, but restate Lamonte McIntyre's trial testimony (but not inconsistently with DSOF ¶ 82). The response does not dispute any of the stated facts and does not cite to any materials in the record that dispute the facts stated. FRCP 56(c)(1)(A). DOSF ¶ 82 is not disputed.**

83.     Lamonte McIntyre was convicted by the jury for the murders of Doniel Quinn and Donald Ewing. Doc. 562, Pretrial Order, Stipulation of Fact ¶ 15.

*Response: Uncontroverted, with clarification that Lamonte McIntyre is innocent of the crimes for which he was convicted. SAMF ¶¶ 20–28.*

**Reply: Though plaintiffs do not dispute the stated fact, Plaintiffs' response adds additional, but non-responsive, information contrary to D.Kan. Rule 56.1(b)(2).**

84.     Lamonte McIntyre was convicted of the murders of Doniel Quinn and Donald Ewing on September 29, 1994, and was imprisoned 23 years, 5 months, and 28 days. Stipulation Doc. 562, ¶ 2.A.15.

*Response: Uncontroverted.*

**Reply: None.**

85.     On January 6, 1995, Lamonte was sentenced to two consecutive life sentences. Stipulation Doc. 562, ¶ 2.A.16.

*Response: Uncontroverted.*

**Reply: None.**

### E.     Identification by Ruby Mitchell

86.     Mitchell saw the shooting on April 15, 1994, while in her house standing in her doorway, with her five-year-old son, talking to one of her best friends, and looking through the screen of her storm door. Mitchell dep., 16:1-17: 15, 89:11–16; Waiver/Preliminary Hearing Transcript, 5:7-18.

*Response: Uncontroverted that Mitchell so testified at the Preliminary Hearing, but controverted to the extent Paragraph 86 had a clear view of the shooter. SAMF ¶¶ 127–129.*

**Reply: Though plaintiffs do not dispute the stated fact, Plaintiffs' response adds additional, but non-responsive, information contrary to D.Kan. Rule 56.1(b)(2).**

87.     Mitchell saw the shooter, a black male carrying a gun, walk down the hill across the street from her house, wearing a black T-shirt and black pants. Waiver/Preliminary Hearing Transcript, 5:19-6:18; Mitchell dep., 17:21-18:18,

***Response:*** *Uncontroverted.*

**Reply: None.**

88.     Mitchell saw the shooter walk to a blue car occupied by two black males, say something, then raise the gun and shoot into the car four or five times. Waiver/Preliminary Hearing Transcript, 6:22-8:12, Mitchell dep., 40:17-41:22.

*Response: Uncontroverted.*

**Reply: None.**

89.      Mitchell saw the shooter run back up the hill. Waiver/Preliminary Hearing Transcript, 8:13-19, Mitchell dep., 42:13-42:16.

*Response: Uncontroverted.*

**Reply: None.**

90.      Mitchell called the police. Mitchell dep., 89:11–16, 42:13-42:16; Waiver/Preliminary Hearing Transcript, 8:20-23, 89:11-16.

*Response: Uncontroverted.*

**Reply: None.**

91.      At the time of the shooting Mitchell was standing in her doorway with her five-year-old son while talking to one of her best friends and looking through the screen of her storm door. Mitchell dep., 16:1-17: 15.

*Response: Uncontroverted.*

**Reply: None.**

92.      Ruby Mitchell was first interviewed after the shooting by uniformed officer Gary Wansley. Police File, p. 14.

*Response: Controverted with objection. The evidence cited states that Gary Wansley spoke with Ruby Mitchell "while canvassing the area," not that he interviewed her Ruby Mitchell does not recall talking to a uniformed officer. (Ex. 10: Ruby Mitchell Dep. 43:14-16). Additionally, to the extent Defendant is using the police report for the truth of the matter, Plaintiffs object on the basis of inadmissible hearsay. Further, Wansley's report contains the only account in the police file describing where the shooter stood. It states that Ruby Mitchell described the shooter as initially firing through the driver's side and then going around to the passenger side and firing more shots. However, when detectives took the taped statements of Niko Quinn and Ruby Mitchell at the scene, they did not ask any questions about where the shooter stood as he fired at the vehicle. (Ex. 1: Police File, LMKSDC_0003417-3424)*

**Reply: Plaintiff purports to controvert DSOF ¶ 92 but do not dispute the facts stated.**

**Plaintiff's hearsay objection is misplaced as Ofc. Wansley's report is not offered to prove the**

**truth of its content, but rather that the encounter was documented. The report is also**

admissible under Fed. R. Evid. 803(8). The Response does not dispute any of the stated facts

and does not cite to any materials in the record that dispute the facts stated. FRCP

56(c)(1)(A). There is no genuine dispute as to any material fact. FRCP 56(c)(1).

93.     Ruby Mitchell gave a recorded statement to Det. Krstolich while standing on the porch of her home. Police File, at pp 31-35 (Transcription of Mitchell Recorded Statement), Stipulation Doc. 562, ¶ 2.b.8; Mitchell dep., 43:21-44:14.

*Response: Uncontroverted that Ruby Mitchell gave a recorded statement to Det. Krsolich at the scene. However, in the evidence cited, Ruby Mitchell states that she spoke to an unnamed detective on her porch, who did not record her. (Ex. 10: Ruby Mitchell Dep. 43:17-44:6). Also, the Police File states that Ruby Mitchell's statement was taken in part at the police station. (Ex. 1: Police File, pp 31-35). According to Ruby Mitchell's testimony, when she arrived at the station, Krstolich and Golubski interviewed her. (Pl. Ex. 32: Ruby Mitchell Aff. ¶ 6); (Ex. 10: Ruby Mitchell Dep. 56:2-6); SAMF ¶¶ 136–137. Further, to the extent Defendant is using the police report for the truth of the matter, Plaintiffs object on the basis of inadmissible hearsay.*

**Reply: Though plaintiffs do not dispute the stated fact, Plaintiffs' response adds additional,**

**but non-responsive, information contrary to D.Kan. Rule 56.1(b)(2).**

94.     A detective asked Mitchell to come downtown and make a statement and Mitchell agreed to do so. Mitchell dep., 44:22-46:11.

*Response: Uncontroverted.*

**Reply: None.**

95.     Det. Krstolich prepared a composite with Ruby Mitchell. Police File, p. 50, 52.

*Response: Controverted in part. According to Ruby Mitchell's testimony, when she arrived at the station, Krstolich and Golubski interviewed her. (Pl. Ex. 32: Ruby Mitchell Aff. ¶ 6); (Ex. 10: Ruby Mitchell Dep. 56:2-6); SAMF ¶ 150. Krstolich then asked Mitchell to help develop a composite of the shooter. Id.; (Ex. 1: Police File, LMKSDC_0003442); SAMF ¶ 158. Then, Krstolich and Golubski were both present during the photo showing and taped interview of Mitchell and together obtained her identification of Lamonte McIntyre. (Ex. 2: TT, 170:12-20; 282:12); SAMF ¶¶ 150–160. Also, in the Prosecutive Summary, drafted by Golubski, he describes himself as being able to testify to the "photo line up" and to the identification of Lamonte McIntyre by Ruby Mitchell. (Ex. 1: Police File, LMKSDC_0003394). Further, to the extent Defendant is using the police report for the truth of the matter, Plaintiffs object on the basis of inadmissible hearsay. It*

*would have been highly unusual to create a composite when the witness has already identified a specific person she believed was the shooter, according to Plaintiffs' police practices expert. SAMF ¶ 159.*

**Reply: Plaintiffs purport to controvert DSOF ¶ 95. Plaintiffs admit this statement of fact accurately describes Ofc. Brown's trial testimony. The response does not dispute any of the stated facts and does not cite to any materials in the record that dispute the facts stated. FRCP 56(c)(1)(A). DOSF ¶ 95 is not disputed.**

96.     Mitchell looked at "a lineup book" at the police station then picked out photo number 3. Waiver/Preliminary Hearing Transcript, 19

*Response: Controverted. Mitchell did not testify that she looked at a "lineup book" or that she chose photograph number 3. Instead, Detective Krstolich testified that he handed Ms. Michell a stack of five photos. Additionally, Mitchell was shown a six-person photo lineup which had the photos all affixed to one page and five loose Polaroids, both of which contained Lamonte McIntyre's photo. Additionally, Lamonte McIntyre's name appears on the back of the Polaroid shown to Mitchell. SAMF ¶¶ 161–165, 174; (Ex. 11: Polaroids from Lineup with Names on Back). See also Plaintiffs' Response to UG SOF ¶ 14.*

**Reply: Plaintiffs purport to controvert DSOF ¶ 96 but do not address the testimony given nor does the cited record dispute that Mitchell looked at books before the photo array.**

97.     According to the recording of Ruby Mitchell's statement, at 1758 (5:58 p.m.), Mitchell agreed she told Det. Krstolich that

  a.     Mitchell she "almost called out" the name Lamonte when she saw the man come down the hill,
  b.     that Lamonte "used to try to talk to [her] niece,"
  c.     that Mitchell had been shown a series of five pictures,
  d.     that Mitchell was able to pick out the shooter,
  e.     the number of the picture of the shooter was number three,
  f.     Mitchell was absolutely sure the person in picture number three was the "party who did the shooting,"
  g.     the name of the "party" was Lamonte McIntyre, and
  h.     Mitchell knew the "party" because "he used to talk to my niece.

Police File, at pp 34-35 (Transcription of Mitchell Recorded Statement).

*Response: Controverted in part, with objection. Uncontroverted that Krstolich's report states that Mitchell said the above. However, controverted to the extent Paragraph 97 implies Ruby Mitchell's identification of Lamonte McIntyre was not*

*the result of improper coercion or suggestion by Golubski and Krstolich, detailed in Plaintiffs' Response to UG's SOF ¶ 14, including among other tactics, showing at least two sets of photos: a six- person photo lineup which had the photos all affixed to one page and five loose Polaroids, both of which contained Lamonte McIntyre's photo. Additionally, Lamonte McIntyre's name appears on the back of the Polaroid shown to Mitchell. (Ex. 11: Polaroids from Lineup with Names on Back). Further, Ruby Mitchell testified that she believed she had identified Lamont Drain as the shooter, and that he was the Lamonte who dated her niece. (Ex. 10: Ruby Mitchell Dep. 69:25-70:6; 143:16-25).*

**Reply: Plaintiffs purport to controvert DSOF ¶ 97 "to the extent [it] implies Ruby Mitchell's identification of Lamonte McIntyre was not the result of improper coercion or suggestion." Plaintiffs admit this statement accurately describes Mitchell's recorded statement. The response does not dispute any of the stated facts and does not cite to any materials in the record that dispute the facts stated. FRCP 56(c)(1)(A). DOSF ¶ 97 is not disputed.**

1.    **Ruby Mitchell confirmed her identification of photo # 3 as the shooter and, in court, identified Lamonte McIntyre as the shooter.**

98.    Ruby Mitchell testified during the Waiver/Preliminary Hearing. Waiver/Preliminary Hearing Transcript, pp. 5-21.

*Response: Uncontroverted*

**Reply: None.**

99.    During the Waiver/Preliminary Hearing, Mitchell testified she got a close look at the shooter and identified Lamonte McIntyre, the defendant/respondent sitting in the courtroom, as the shooter. Waiver/Preliminary Hearing Transcript, 9:5-14.

*Response: Controverted in part. Uncontroverted that Mitchell identified Lamonte McIntyre at the preliminary hearing, but controverted to the extent Paragraph 99 to the extent it suggests the identification of Lamonte McIntyre by Ruby Mitchell was not the result of improper coercion or suggestion detailed in Plaintiffs' Response to UG SOF, ¶ 14, 49, and 58. Further, at the preliminary hearing, Ruby Mitchell testified contrary to her police statement, stating that she did not know and had never previously seen Lamonte McIntyre and that she did not know his name was "Lamonte" until she went to the police station and went through some photos with police. (Pl. Ex. 68: Preliminary Hearing 10:2–3, 14:12–18). Additionally, Plaintiffs' expert Dr. Jennifer Dysart opines that when a witness sees a photograph in multiple identification procedures or contexts, there is a risk this sense of familiarity on the part of the witness may lead to an increased likelihood of*

*choosing that person and a feeling of increased confidence in subsequent identification procedures. (Pl. Ex. 60: Expert Report of Jennifer Dysart, pp. 15–16). Further, if police suggestion occurred during the photo procedures—as Plaintiffs allege—"the subsequent identifications in court are of no value. There is no way to distinguish between the contaminated, unreliable identifications and the witnesses' actual memory of the events, and, therefore, no reliable way to assess whether the suspect was present at the crime." Id. at p. 16; see also (Ex. 6: Dennis Ware Dep. 185:21-187:2) (agreeing that the concept that if police suggest a particular photo on one occasion, that suggestion will taint that witness's identifications down the line was "just common sense," and a basic policing concept understood by 1994).*

**Reply: Plaintiffs purport to controvert DSOF ¶ 99 "in part" while admitting the fact stated is accurate. Plaintiffs dispute the accuracy of Mitchell's in-court identification of Lamonte McIntyre as the shooter without disputing she made the in-court identification. The response does not dispute any of the stated facts and does not cite to any materials in the record that dispute the facts stated. FRCP 56(c)(1)(A). DOSF ¶ 97 is not disputed.**

100.    During the Waiver/Preliminary Hearing, Mitchell testified that she heard "Nicki [sic] and her mother arguing," that Mitchell went do the door and saw the "guy" coming down the hill. Mitchell was about to call out "Lamonte" because she knew a man named Lamonte when the man shot the two men in the car. Waiver/Preliminary Hearing Transcript, 13:6-17.

*Response: Plaintiffs dispute Defendant's characterization of Mitchell's testimony, which speaks for itself. Instead, the cited testimony states: "Well, actually I was in the house. Me and my son, we was in the house, and I was doing my hair. And I heard Nicki and her mother arguing, and I came to the door; and Nicki's mother was walking back up to her house, and then that's when I seen the guy coming down the hill. And I was about to call out 'LaMonte,' 'cause I know a LaMonte; and I was about to call out his name, and that's when I seen him shoot the two guys."*

**Reply: Plaintiffs purport to dispute DSOF ¶ 100 without disputing the accuracy of the fact stated.**

```
 6   Q.   Okay.  And what were you doing when you first saw him?
 7   A.   When I first saw him?
 8   Q.   Uh-huh.
 9   A.   Well, actually I was in the house.  Me and my son, we
10        was in the house, and I was doing my hair.  And I
11        heard Nicki and her mother arguing, and I came to the
12        door; and Nicki's mother was walking back up to her
13        house, and then that's when I seen the guy coming down
14        the hill.  And I was about to call out "LaMonte,"
15        'cause I know a LaMonte; and I was about to call out
16        his name, and that's when I seen him shoot the two
17        guys.
```

**The response does not dispute any of the stated facts and does not cite to any materials in the**

**record that dispute the facts stated. FRCP 56(c)(1)(A). DOSF ¶ 100 is not disputed.**

101.    During the Waiver/Preliminary Hearing, Mitchell testified she thought the shooter was a person named Lamonte because he looked like the Lamonte she knew. Waiver/Preliminary Hearing Transcript, 13:18-24.

*Response: Plaintiffs dispute Defendant's characterization of Mitchell's testimony, which speaks for itself. Instead, the cited testimony reflects that Mitchell was first asked, "So you thought this was a person named LaMonte that you knew?" to which Mitchell replied, "Yeah." Mitchell was then asked, "Did he look like the LaMonte you know?" to which she answered "Yeah."*

**Reply: Plaintiffs purport to dispute DSOF ¶ 101 without disputing the accuracy of the fact**

**stated. The response does not dispute any of the stated facts and does not cite to any materials**

**in the record that dispute the facts stated. FRCP 56(c)(1)(A). DOSF ¶ 101 is not disputed.**

102.    During the Waiver/Preliminary Hearing, Mitchell testified she told the police she thought the shooter's was named Lamonte. Waiver/Preliminary Hearing Transcript, 13:23-14:11.

*Response: Plaintiffs dispute Defendant's characterization of Mitchell's testimony, which speaks for itself. Instead, the cited testimony states that Mitchell testified she police she thought the shooter was Lamont. (Pl. Ex. 68: Waiver/Preliminary Hearing Transcript 13:23-25) Ruby Mitchell then testified that she did not mean that the shooter was Lamonte McIntyre, and that she meant the Lamonte that she knew because he was talking to her niece. (Pl. Ex. 68: Waiver/Preliminary Hearing Transcript 14:1-4).*

**Reply: Plaintiffs purport to dispute DSOF ¶ 102 without disputing the accuracy of the fact stated. The response does not dispute any of the stated facts and does not cite to any materials in the record that dispute the facts stated. FRCP 56(c)(1)(A). DOSF ¶ 102 is not disputed.**

103.    During the Waiver/Preliminary Hearing, Mitchell testified that she identified photo number 3 from a photo on the same day of the shooting, that she was sure of the identification at the time she made the identification, and the person in that photo was the same person sitting in the court room (Lamonte McIntyre). Waiver/Preliminary Hearing Transcript, 18:2-20.

*Response: Plaintiffs dispute Defendant's characterization of Mitchell's testimony, which speaks for itself. Instead, at the preliminary hearing, Ruby Mitchell testified contrary to her police statement, stating that she did not know and had never previously seen Lamonte McIntyre and that she did not know his name was "Lamonte" until she went to the police station and went through some photos with police. (Pl. Ex. 68: Preliminary Hearing 10:2–3, 14:12–18). Further, Plaintiffs dispute the allegation in Paragraph 103 to the extent it suggests the identification of Lamonte McIntyre by Ruby Mitchell was not the result of improper coercion or suggestion. See Plaintiffs' Response to UG SOF, ¶¶ 14, 49, and 58. Additionally, Plaintiffs' expert Dr. Jennifer Dysart opines that when a witness sees a photograph in multiple identification procedures or contexts, there is a risk this sense of familiarity on the part of the witness may lead to an increased likelihood of choosing that person and a feeling of increased confidence in subsequent identification procedures. (Pl. Ex. 60: Expert Report of Jennifer Dysart, pp. 15–16). Further, if police suggestion occurred during the photo procedures—as Plaintiffs allege—"the subsequent identifications in court are of no value. There is no way to distinguish between the contaminated, unreliable identifications and the witnesses' actual memory of the events, and, therefore, no reliable way to assess whether the suspect was present at the crime." Id. at p. 16; see also (Ex. 6: Dennis Ware Dep. 185:21-187:2) (agreeing that the concept that if police suggest a particular photo on one occasion, that suggestion will taint that witness's identifications down the line was "just common sense," and a basic policing concept understood by 1994).*

**Reply: Plaintiffs purport to dispute DSOF ¶ 103 without disputing the accuracy of the fact stated.**

```
    22  A.  Yes, he did.
    23  Q.  Okay.  And you told the police that you thought the
    24      person who did the shooting was LaMonte?
    25  A.  Yes, I did.
```

```
 1   Q.   And when you told that to the police, you didn't mean
 2        this person.  You meant the LaMonte you thought you
 3        knew?
 4   A.   Yeah, and that's what I told the police, the LaMonte
 5        that I thought I knew, but like I -- I seen his
 6        face --
 7   Q.   Okay.
 8   A.   -- after --
 9   Q.   Okay.  Well, let -- let's -- you told the police you
10        thought it was a person named LaMonte?
11   A.   Yes.
12   Q.   And before today, you didn't --
```

**The response does not dispute any of the stated facts and does not cite to any materials**

**in the record that dispute the facts stated. FRCP 56(c)(1)(A). DOSF ¶ 103 is not disputed.**

### 2.    At trial, Ruby Mitchell confirmed her identification of photo # 3 as the shooter and made in-court identifications of Lamonte McIntyre as the shooter.

104.    At trial, Mitchell made in-court identification of Lamonte McIntyre as the person she saw shoot Quinn and Ewing on April 15, 1994. Trial Transcript, 174:23-175:15, 208:2-8.

*Response: Controverted in part and duplicative of UG SOF ¶ 58. Uncontroverted that Ruby Mitchell identified Lamonte McIntyre as the shooter at trial, but every aspect of the identification process was tainted with improper suggestion and coercive influence as detailed in Plaintiffs' Response to Defendant Officers' SOF, ¶¶ 14, 49 and 58. Answering further, according to Plaintiffs' expert in eyewitness identification, Dr. Jennifer Dysart, when a witness sees a photograph in multiple identification procedures or contexts, there is a risk this sense of familiarity on the part of the witness may lead to an increased likelihood of choosing that person and a feeling of increased confidence in subsequent identification procedures. SAMF ¶ 164.*

*Further, if police suggestion occurred during the photo procedures—as Plaintiffs allege—"the subsequent identifications in court are of no value. There is no way to distinguish between the contaminated, unreliable identifications and the witnesses' actual memory of the events, and, therefore, no reliable way to assess whether the suspect was present at the crime." (Pl. Ex. 60: Expert Report of Jennifer Dysart p. 16); see also (Ex. 6: Dennis Ware Dep. 185:21–187:2) (agreeing that the concept that if police suggest a particular photo on one occasion, that suggestion will taint that witness's identifications down the line was "just common sense," and a basic policing concept understood by 1994).*

**Reply: Plaintiffs purport to controvert DSOF ¶ 104 "in part" while admitting the fact stated is accurate. Plaintiffs dispute the accuracy of Mitchell's in-court identification of Lamonte McIntyre as the shooter without disputing she made the in-court identification. The response does not dispute any of the stated facts and does not cite to any materials in the record that dispute the facts stated. FRCP 56(c)(1)(A). DOSF ¶ 104 is not disputed.**

105.    At trial, Mitchell testified the photographs were handed to her and she was asked if she saw the "one that done the shooting." Trial Transcript Vol. I, 179:2-7.

*Response: Plaintiffs dispute Defendant's characterization of Mitchell's testimony, which speaks for itself. Instead, the cited testimony reflects Mitchell was asked "when you looked at these photographs were they just handed to you in a jumbled fashion like this or were they attached to something? To which Mitchell testified "He just – he just handed them to me and they like this and told me did I see the one that done the shooting." Further controverted to the extent Paragraph 105 suggests that Mitchell's identification of Lamonte McIntyre was not the result of improper coercion or suggestion, as described in Plaintiffs' Responses to Defendant Officers' SOF ¶¶ 14, 49, and 58.*

**Reply: Plaintiffs purport to dispute DSOF ¶ 105 without disputing the accuracy of the fact stated. The response does not dispute any of the stated facts and does not cite to any materials in the record that dispute the facts stated. FRCP 56(c)(1)(A). DOSF ¶ 105 is not disputed.**

106.    At trial, Mitchell testified that, on April 15, 1994, she did a sketch with the detective, and she was shown 5 photographs, State's Exhibits 28, 29, 30, 31 and 32. Trial Transcript Vol. I, 170:12-23.

*Response: Plaintiffs dispute Defendant's characterization of Mitchell's testimony, which speaks for itself. According to Ruby Mitchell's testimony, when she arrived at the station, Krstolich and Golubski interviewed her. (Pl. Ex. 32: Ruby Mitchell Aff. ¶ 6); (Ex. 10: Ruby Mitchell Dep. 56:2-6); SAMF ¶ 150. Krstolich then asked Mitchell to help develop a composite of the shooter. Id.; (Ex. 1: Police File, LMKSDC_0003442); SAMF ¶ 158. Then, Krstolich and Golubski were both present during the photo showing, where they showed Mitchell at least two sets of photos: a six-person photo lineup which had the photos all affixed to one page and five loose Polaroids, both of which contained Lamonte McIntyre's photo. Additionally, Lamonte McIntyre's name appears on the back of the Polaroid shown to Mitchell. SAMF ¶¶ 78, 174; (Ex. 11: Polaroids from Lineup with Names on Back). After the photo showing, Golubski and Krstolich taped an interview of Mitchell stating she positively identified Lamonte McIntyre off-record. (Ex. 2: TT, 170:12-20; 282:12); SAMF ¶ 161–188. Further controverted to the extent*

*Paragraph 105 suggests that Mitchell's identification of Lamonte McIntyre was not the result of improper coercion or suggestion, as described in Plaintiffs' Responses to Defendant Officers' SOF, ¶¶14, 49, and 58.*

**Reply: Plaintiffs purport to dispute DSOF ¶ 106 without disputing the accuracy of the fact stated. The response does not dispute any of the stated facts and does not cite to any materials in the record that dispute the facts stated. FRCP 56(c)(1)(A). DOSF ¶ 106 is not disputed.**

107.    Mitchell identified State's Exhibit 30 as the shooter both on April 15 and at trial. Lamonte McIntyre's name is on the back of that photograph. Trial Transcript, 171:10-19.

*Response: Controverted. In the cited evidence, Ruby Mitchell testifies that, on April 15 she identified State's Exhibit 30 as the photograph of the shooter. At the attorney's instruction, she turned the photo over to read Lamonte McIntyre's name on the back of the photograph. At her deposition, Mitchell testified that she believed she had identified Lamont Drain as the shooter, and that he was the Lamonte who dated her niece. (Ex. 10: Ruby Mitchell Dep. 69:25- 70:6; 143:16-25).*

**Reply: Plaintiffs purport to controvert DSOF ¶ 107 while admitting the fact stated is accurate. Plaintiffs dispute the accuracy of Mitchell's in-court identification of Lamonte McIntyre as the shooter without disputing she said the shooter was State's Exhibit 30 which was a Polaroid of Lamonte McIntyre. As further reflected in DSOF ¶ 109, Mitchell also testified she knew the person she identified as the shooter was not the Lamonte (Drain) that dated her niece. The response does not dispute any of the stated facts and does not cite to any materials in the record that dispute the facts stated. FRCP 56(c)(1)(A). DOSF ¶ 107 is not disputed.**

108.    At trial, Mitchell testified that no one suggested or hinted that she should pick out the picture she selected. Trial Transcript Vol. I, 174:13-17.

*Response: Controverted in part and duplicative of UG SOF ¶ 50. Uncontroverted that Ruby Mitchell testified to the above at the preliminary hearing. However, Plaintiffs dispute Paragraph 108 to the extent it suggests the identification of Lamonte McIntyre by Ruby Mitchell was not the result of improper coercion or suggestion, as detailed in Plaintiffs' Responses to UG's SOF, ¶¶ 14 and 49.*

**Reply: Plaintiffs purport to controvert DSOF ¶ 108 "in part" while admitting the fact stated**

is accurate. **Plaintiffs dispute the accuracy of Mitchell's identification of Lamonte McIntyre as the shooter without disputing she made the identification. The response does not dispute any of the stated facts and does not cite to any materials in the record that dispute the facts stated. FRCP 56(c)(1)(A). DOSF ¶ 108 is not disputed.**

109.    Mitchell agreed that Lamonte McIntyre, the person in the photograph she had identified as the shooter, is not the same Lamonte that used to date her niece. Trial Transcript, 171:24 to 172:2.

*Response: Controverted. Plaintiffs dispute Defendant's characterization of Mitchell's testimony, which speaks for itself. Instead, the cited testimony reflects Mitchell was asked "When you picked that photograph out, Miss Mitchell – first of all, is that the same Lamonte that dated your niece or that you knew was acquainted with your niece?" to which Mitchell said "No." Additionally, at her deposition, Mitchell testified that she believed she had identified Lamont Drain as the shooter, and that he was the Lamonte who dated her niece. (Ex. 10: Ruby Mitchell Dep. 69:25-70:6; 143:16-25). Further, Plaintiffs dispute Paragraph 109 to the extent it suggests the identification of Lamonte McIntyre by Ruby Mitchell was not the result of improper coercion or suggestion, as detailed in Plaintiffs' Responses to UG's SOF, ¶¶ 14 and 49.*

**Reply: Plaintiffs purport to controvert DSOF ¶ 109 while admitting the fact stated is accurate. Plaintiffs dispute the accuracy of Mitchell's identification of Lamonte McIntyre as the shooter without disputing she made the identification.**

```
23   Q    When you picked that photograph out, Miss Mitchell

24        -- first of all, is that the same Lamonte that

25        dated your niece or that you knew was acquainted

                                              Page 172

 1        with your niece?

 2   A    No.
```

**The response does not dispute any of the stated facts and does not cite to any materials in the record that dispute the facts stated. FRCP 56(c)(1)(A). DOSF ¶ 109 is not disputed.**

110.    At trial, Mitchell testified she knew that the shooter, and the person being sketched was not the Lamonte she knew (Lamonte Drain), though the shooter looked "exactly like Lamonte Drain). Trial Transcript Vol. I, 185:11-20, 194:6-9.

*Response: Controverted in part. Uncontroverted that Mitchell testified she knew the shooter and that the result of the composite sketch, which did not resemble the shooter as described by Mitchell, SAMF ¶¶ 152, 158–160, did not reflect the Lamonte she knew (Lamonte Drain). Controverted that the cited material reflects the remainder of allegations in Paragraph 110. Additionally, the composite was a highly unusual mechanism to employ when the witness had already identified a specific person as the shooter. SAMF ¶ 159. Further, Plaintiffs dispute Paragraph 110 to the extent it suggests the identification of Lamonte McIntyre by Ruby Mitchell was not the result of improper coercion or suggestion, as detailed in Plaintiffs' Responses to UG's SOF, ¶¶ 14 and 49.*

**Reply: Plaintiffs purport to controvert DSOF ¶ 110 "in part" while admitting the fact stated is accurate. Plaintiffs dispute the accuracy of Mitchell's identification of Lamonte McIntyre as the shooter without disputing she made the identification.**

Page 185

```
10   A    I just told you after the -- we done the sketch I
11        knew it wasn't Lamonte I knew.
12   Q    Okay.  But when you looked at these photographs you
13        pulled out, photograph which has been marked State's
14        Exhibit 30, which is a photograph Lamonte McIntyre,
15        who you've already testified looks exactly like
16        Lamonte Drain, is that correct?
17   A    Yes.
18   Q    Did you think you were picking out a picture of
19        Lamonte Drain when you looked at these photographs?
```

```
                                                        Page 194

    1                 (The question was read by the reporter as

    2                 follows: "After reading that you indicated that

    3                 at the prior hearing when you decided it wasn't

    4                 the Lamonte you knew is when you looked at

    5                 those photographs."

    6                 THE WITNESS:  I told you after we done the

    7         sketch that's when I knew it wasn't the Lamonte.  It

    8         wasn't a -- pictures.  You keep saying the pictures,

    9         not the pictures.  It was the sketch that we did.
```

**DOSF ¶ 110 is not disputed.**

111.   At trial, Mitchell testified she knew the picture she looked at and picked was not Lamonte Drain. Trial Transcript Vol. I, 182:11-185:17.

*Response: Uncontroverted that she so testified at trial, but controverted that this statement was true or accurate, as Mitchell recently testified that she believed she had identified Lamont Drain as the shooter, and that he was the Lamonte who dated her niece. (Ex. 10: Ruby Mitchell Dep. 69:25-70:6; 143:16-25). Further, Plaintiffs dispute Paragraph 111 to the extent it suggests the identification of Lamonte McIntyre by Ruby Mitchell was not the result of improper coercion or suggestion, as detailed in Plaintiffs' Responses to UG's SOF, ¶¶ 14 and 49.*

**Reply: Plaintiffs purport to dispute DSOF ¶ 111 while admitting the fact stated is accurate. Plaintiffs dispute the accuracy of Mitchell's identification of Lamonte McIntyre as the shooter, and her trial testimony that she knew the photo she identified as the shooter was not Lamonte Drain. Plaintiffs' citation to Mitchell's recent deposition testimony does not dispute what she testified to at trial. The response does not dispute any of the stated facts and does not cite to any materials in the record that dispute the facts stated. FRCP 56(c)(1)(A). DOSF ¶ 111 is not disputed.**

112.   At trial, Mitchell testified she had not seen Lamonte McIntyre prior to April 15, 1994, and she had seen him three times (i) on April 15, (ii) at the preliminary hearing, and (iii) at the trial while she was testifying. Trial Transcript Vol. I, 198:1-8.

*Response: Plaintiffs dispute Defendant's characterization of Mitchell's testimony, which speaks for itself. Instead, the cited testimony reflects she was only asked "prior to April 15th, you're saying you've never seen Lamonte McIntyre before" to which she answered "No, I haven't." Uncontroverted that she testified she then saw Lamonte at the prior hearing and at trial. However, Plaintiffs dispute Paragraph 112 to the extent it suggests the identification of Lamonte McIntyre by Ruby Mitchell was not the result of improper coercion or suggestion, as detailed in Plaintiffs' Responses to UG's SOF, ¶¶ 14 and 49.*

**Reply: Plaintiffs purport to dispute DSOF ¶ 112 without disputing the accuracy of the fact stated.**

```
                                                 Page 198

    1    Q    And prior to April 15th you're saying you've never

    2         seen Lamonte McIntyre before?

    3    A    No, I haven't.

    4    Q    Okay.  So counting today this is third time you've

    5         seen him in your life?

    6    A    Yes.

    7    Q    April 15th the prior hearing and today?

    8    A    Yes.
```

**The response does not dispute any of the stated facts and does not cite to any materials in the record that dispute the facts stated. FRCP 56(c)(1)(A). DOSF ¶ 112 is not disputed.**

113.    At trial, Mitchell testified she picked out, as the shooter, the photograph of the person she saw, which was photograph number 3. Trial Transcript Vol. I, 204:5-15.

*Response: Uncontroverted that she so testified. However, Plaintiffs dispute Paragraph 113 to the extent it suggests the identification of Lamonte McIntyre by Ruby Mitchell was not the result of improper coercion or suggestion, as detailed in Plaintiffs' Responses to UG's SOF, ¶¶ 14 and 49.*

**Reply: Plaintiffs purport to dispute DSOF ¶ 113 without disputing the accuracy of the fact stated. Plaintiffs dispute the accuracy of Mitchell's identification of Lamonte McIntyre as the shooter without disputing she made the identification. The response does not dispute any**

of the stated facts and does not cite to any materials in the record that dispute the facts stated.

**FRCP 56(c)(1)(A). DOSF ¶ 113 is not disputed.**

114.   At trial, Mitchell was shown the back of the photograph and testified the name Lamonte McIntyre was on the back of the picture she picked. Trial Transcript Vol. I, 204:16-18.

*Response: Uncontroverted with clarification that the cited material reflects Mitchell was shown the back of the photograph with Lamonte McIntyre written on it and when asked, read the name off the back.*

**Reply: None.**

115.   At trial, Mitchell testified that, when shown the pictures Mitchell looked only at the photographs, she did not look on the back and did not know until shown at trial that there was a name on the back of the photo. Trial Transcript Vol. I, 205:2-18.

*Response: Plaintiffs dispute Defendant's characterization of Mitchell's testimony, which speaks for itself. Instead, Mitchell was asked whether she looked on the back to see what name they might have, to which she testified, "No, cause I didn't know there was a name on the back of it." However, Plaintiffs dispute Paragraph 115 to the extent it suggests the identification of Lamonte McIntyre by Ruby Mitchell was not the result of improper coercion or suggestion, as detailed in Plaintiffs' Responses to UG's SOF, ¶¶ 14 and 49. Further, Ruby Mitchell clarified at trial that she did not know Lamonte McIntyre and did not provide police with his last name, but instead "learned" that information after her off-the-record identification. (Ex. 2: Ruby Mitchell TT 180:15-23); (Pl. Ex. 32: Ruby Mitchell Aff. ¶ 7). Additionally, Ruby Mitchell testified that she didn't know anyone's last name, and she "didn't know" from where the last name originated. (Ex. 10: Ruby Mitchell Dep. 78:6-14). And, the name Lamonte McIntyre appears on the back of the Polaroid shown to Mitchell. (Ex. 11: Polaroids from Lineup with Names on Back).*

**Reply: Plaintiffs purport to dispute DSOF ¶ 115 without disputing the accuracy of the fact stated. Plaintiffs dispute the accuracy of Mitchell's identification of Lamonte McIntyre as the shooter without disputing she made the identification. The response does not dispute any of the stated facts and does not cite to any materials in the record that dispute the facts stated. FRCP 56(c)(1)(A). DOSF ¶ 115 is not disputed.**

**3.     At deposition, Mitchell confirmed she picked the photograph of the person she believed to be the shooter, that she was not told the name Lamonte McIntyre, she was not pressured to select a particular photo, and that she testified truthfully at trial.**

116.    At deposition, Mitchell testified the photo she picked at the police station was the same person who shot the occupants in the car. Mitchell dep., 60: 1 7, 127:5-9, 140:14-24.

*Response: Controverted. The cited testimony directly controverts Paragraph 116, as Mitchell testifies "Yes" when asked "did you think that the Lamonte that you knew, the one that dated your niece, was the person who shot the two people in the blue car on Hutchings Street?" (Ex. 10: Ruby Mitchell Dep.127:5-9). And when Mitchell is asked "The picture that you picked out with the detective at the police station, the only reason you picked it out is that's the person you saw do the shooting; is that true?" she responds, stating, "Again, I picked the picture out because it looked just like the Lamonte that I knew." (Ex. 10: Ruby Mitchell Dep. 140:14-24). Accordingly, Mitchell wrongly identified Lamonte McIntyre, testifying that she believed she had identified Lamont Drain as the shooter, and that he was the Lamont who dated her niece. (Ex. 2: Ruby Mitchell TT 180:15-23); (Pl. Ex. 32: Ruby Mitchell Aff. ¶ 7); (Ex. 10: Ruby Mitchell Dep. 69:25-70:6; 143:16-25).*

**Reply: Plaintiffs purport to controvert DSOF ¶ 116. Mitchell's deposition testimony is clear (and consistent with her trial testimony) that the picture she picked was always the person she believed to be the shooter.**

**Q. Was there any direction from the police like point out the shooter or tell us which one is the shooter?**
**A. They just told me to pick who I think -- who -- if I see somebody that I thought I knew or -- I just picked the photo that I thought -- I thought that was the guy that came down the hill.**

**Mitchell dep., 60: 1-7.**

**Q. And did you think that the Lamonte that you knew, the one that dated your niece, was the person who shot the two people in the blue car on Hutchings Street?**
**A. Yes.**
**Mitchell dep., 127:5-9**
**Q. The picture that you picked out with the detective at the police station, the only reason you picked it out is that's the person you saw do the shooting; is that true**
**MS. BROWN: Object to the form. Go ahead and answer if you can.**
**A. Again, I picked the picture out because it looked just like the Lamonte that I knew.**

> **Q. (By Mr. Cooper) Who is the person you believe shot the two gentlemen in the blue car?**
> **A. Exactly.**

**Mitchell dep., 140:14-24. Mitchell's deposition testimony, in 2021, that she then thought she had been picking a picture of Lamonte Drain does not (1) dispute her previous testimony that she picked the picture of the person she believed to be the shooter, (2) that picture was of Lamonte McIntyre, and (3) that she knew at the time she picked the picture that the person looked like Lamonte Drain but was not Lamonte Drain. The response does not dispute any of the stated facts and does not cite to any materials in the record that dispute the facts stated. FRCP 56(c)(1)(A). Rather, Plaintiffs' response argues Mitchell was mistaken in her 1994 identifications of Lamonte McIntyre as the shooter. DOSF ¶ 116 is not disputed.**

117.    At deposition, Mitchell denied anyone telling her the name "Lamonte McIntyre." Mitchell dep., 78:6-14 ("I'm not going to sit here and lie and say somebody told me that name or nothing." 78:11-78:12).

*Response: Plaintiffs dispute Defendant's characterization of Mitchell's testimony, which speaks for itself. Instead, Ruby Mitchell testified that she didn't know anyone's last name, and she "didn't know" from where the last name originated. (Ex. 10: Ruby Mitchell Dep. 78:6-14). Further, Ruby Mitchell clarified at trial that she did not know Lamonte McIntyre and did not provide police with his last name, but instead "learned" that information after her off-the-record identification. (Ex. 2: Ruby Mitchell TT 180:15-23); (Pl. Ex. 32: Ruby Mitchell Aff. ¶ 7). Additionally, the name Lamonte McIntyre appears on the back of the Polaroid shown to Mitchell. (Ex. 11: Polaroids from Lineup with Names on Back).*

**Reply: Plaintiffs purport to dispute DSOF ¶ 117 without disputing the accuracy of the fact stated. The response does not dispute any of the stated facts and does not cite to any materials in the record that dispute the facts stated. FRCP 56(c)(1)(A). DOSF ¶ 117 is not disputed.**

118.    At deposition, Mitchell denied detectives pressured her to selecting a certain photo, and denied detectives suggested a photo for her to select. Mitchell dep., 112:21-113:1.

*Response: Uncontroverted that she so testified. Controverted to the extent Paragraph 118 implies Ruby Mitchell's identification of Lamonte McIntyre was not the result of improper coercion or suggestion by Golubski and Krstolich, resulting*

*in Mitchell identifying McIntyre's photo from the lineup, detailed in Plaintiffs'*
*Responses to UG's SOF ¶ 14, 49, and 58.*

**Reply: Plaintiffs purport to dispute DSOF ¶ 118 without disputing the accuracy of the fact**

**stated.**

```
                                                    Page 205

 1          face or nothing like that.

 2      Q   When he gave you these pictures, they're lined up

 3          here on this table but how were they presented to

 4          you?  Were they done like this or were they handed

 5          to you or what?

 6      A   They was handed to me and he said look through these

 7          and see if you can pick out the person who did the

 8          shooting.

 9      Q   Were they handed to you in order numbers 1, 2, 3, 4,

10          and 5?  Were they just handed to you like this and

11          told you to look through them?

12      A   Yes.

13      Q   And what parts of the photographs did you look at?

14      A   Face.

15      Q   Okay.  You didn't look on the back to see what name

16          they might have on the back, did you?

17      A   No, cause I didn't know there was a name on the back

18          of it.
```

**The response does not dispute any of the stated facts and does not cite to any materials in the**

**record that dispute the facts stated. FRCP 56(c)(1)(A). DOSF ¶ 118 is not disputed.**

119.    At deposition, Mitchell denied anyone turning a picture over and showing
her the name "Lamonte McIntyre." Mitchell dep., 79:2-13.

*Response: Controverted. Ruby Mitchell testified that she didn't remember anybody*
*turning a photograph over to show her a name. (Ex. 10: Ruby Mitchell Dep. 79:2-*
*13).*

**Reply: Plaintiffs purport to controvert DSOF ¶ 119 without disputing the accuracy of the**

fact stated. **The response does not dispute any of the stated facts and does not cite to any materials in the record that dispute the facts stated. FRCP 56(c)(1)(A). DOSF ¶ 119 is not disputed.**

120.   At deposition, Mitchell denied giving any false testimony at the trial. Mitchell dep., 92:2-8.

*Response: Controverted. The cited material states that Ruby Mitchell testified that she "did the best to answer the questions truthfully the best you could." Further, Mitchell believed she had identified Lamont Drain as the shooter, and that he was the Lamont who dated her niece. (Ex. 10: Ruby Mitchell Dep. 69:25-70:6; 143:16-25).*

**Reply: Plaintiffs purport to controvert DSOF ¶ 120. The response does not dispute the stated fact and does not cite to record materials that dispute the stated fact. FRCP 56(c)(1)(A). The cited testimony states:**

> **Q. And at the court hearing you did the best to answer the questions truthfully the best you could; is that correct?**
> **A. That's correct.**
> **Q. You didn't intentionally give any false testimony in court, did you?**
> **A. I didn't give no false testimony.**

**Mitchell dep., 92:2-92:8. DSOF ¶ 120 is not disputed.**

121.   At deposition, Mitchell testified she did not believe she made a mistake in her identification of Lamonte McIntyre. Mitchell dep., 100:20-24.

*Response: Controverted. Ruby Mitchell testified that she thought she was identifying "a Lamonte that [she] knew," Lamonte Drain. (Ex. 10: Ruby Mitchell Dep. 100:20-24). The only time Ruby Mitchell has ever spoken to Lamonte McIntyre was after his 2017 release when she was sitting in the courthouse with her son's ex-girlfriend. According to Mitchell, "I didn't actually know who he was, I just recognized -- kind of recognized his face from everything that was going on, on the TV and all that... And then I just got up and I walked over there and asked him was he Lamonte McIntyre. He said yes. And I gave him a hug and started crying. And he gave me a hug. And I was like, 'I'm sorry for what happened to you.' And that was it." (Ex. 10: Ruby Mitchell Dep. 144:25-145:3).*

**Reply: Plaintiffs purport to controvert DSOF ¶ 121. The response does not dispute the stated fact and does not cite to record materials that dispute the stated fact. FRCP 56(c)(1)(A). The**

cited testimony states:

> **Q. Do you believe you made a mistake in -- in identifying Lamonte McIntyre? A. No, I don't believe I made no mistake in nothing that I said. Like I said, I thought I said a Lamonte that I knew.**

**Mitchell dep., 100:20-100:24. DSOF ¶ 121 is not disputed.**

122.    At deposition, Mitchell testified that her trial testimony was truthful. Mitchell dep., 96:16-18

*Response: Controverted. Although Ruby Mitchell testified that she told the truth at trial, she disagreed that the trial transcript accurately reflected her testimony. (Ex. 10: Ruby Mitchell Dep. 94:5-96:19 Further, Mitchell testified she believed she had identified Lamont Drain as the shooter, and that he was the Lamonte who dated her niece. (Ex. 10: Ruby Mitchell Dep. 69:25- 70:6; 143:16-25).*

**Reply: Plaintiffs purport to controvert DSOF ¶ 122 while agreeing the statement accurately reflects Mitchell's testimony. The response does not dispute the stated fact and does not cite to record materials that dispute the stated fact. FRCP 56(c)(1)(A). DSOF ¶ 122 is not disputed.**

### 4.    Mitchell was not coerced or manipulated.

123.    The only time Mitchell ever saw Roger Golubski was the day of the shooting. Mitchell dep., 125:5-8. Mitchell had never seen or heard of Golubski before the shooting, id. 124:15-25, and Mitchell never saw Golubski after he drove her home from the police station. Id., 125:1-4.

*Response: Uncontroverted that these statements accurately reflect the testimony cited. However, Plaintiffs deny Defendant's characterization in Paragraph 123 that Ruby Mitchell did not know or speak to Detective Golubski before or after April 15, 1994. In approximately 1990, Jacqueline Poole saw a detective's vehicle parked in front of Ruby Mitchell's former residence near 63rd Terrace and State Avenue on a number of occasions. Poole saw a detective come and go from this vehicle and enter Mitchell's house three or four times. The detective always stayed just about thirty minutes then left, and his visits were always in the evening or at night. Poole later learned the detective visiting Mitchell was Detective Golubski. According to Poole, it was "obvious" that Detective Golubski was not investigating Mitchell, but was visiting her to obtain sexual favors. (Pl. Ex. 85: Jacquelyn Poole Aff. ¶¶ 2, 6, 8-9).*

**Reply: Plaintiffs purport to dispute DSOF ¶ 123 without disputing the accuracy of the fact**

stated. **The response does not dispute any of the stated facts and does not cite to any materials in the record that dispute the facts stated. FRCP 56(c)(1)(A). Plaintiffs' response resorts to inadmissible speculation that Mitchell and Golubski had a preexisting sexual relationship-- which Mitchell denied. Mitchell dep., 125:1-25; 136:9-136:25. DOSF ¶ 123 is not disputed.**

## F.     Identification by Niko Quinn

124.    On April 15, 1994, while at the scene of the Ewing/Quinn homicides, Det. Smith took recorded statements from Niko Quinn and Josephine Quinn. Police File, 06, pp 27-29; Niko Quinn dep., 71:7-9.

*Response: Controverted, with objection. Plaintiffs agree that W.K. Smith took recorded witness statements from Niko Quinn and Josephine Quinn on April 15, 1994. However, to the extent Defendant is using the police report for the truth of the matter, Plaintiffs object on the basis of inadmissible hearsay.*

**Reply: Plaintiffs purport to controvert DSOF ¶ 124 while admitting the accuracy of the statement itself. Plaintiffs agree that W.K. Smith took recorded witness statements from Niko Quinn and Josephine Quinn on April 15, 1994. Doc. 624, 63. Plaintiffs' hearsay objection is inapplicable as the recording is not offered to prove the truth of the matters stated by witnesses, but rather that the recorded statements were made. Although Plaintiffs controvert this statement of fact, the response does not dispute any of the stated facts and does not cite to any materials in the record that dispute the facts stated. FRCP 56(c)(1)(A). There is no genuine dispute as to any material fact, FRCP 56(c)(1), and DSOF ¶ 124 is not disputed.**

125.    Niko Quinn described a shooter to Det. Smith as a man dressed in black, wearing a black shirt, black hat, black pants and black tennis shoes. Police File, p. 27-29.

*Response: Uncontroverted that Niko Quinn provided this description of the shooter's clothing during the taped interview cited above, which occurred about 45 minutes after the shooting. However, in that recorded statement, Detective Smith did not ask Niko to describe the shooter's physical characteristics. Further, to the extent Defendant is using the police report for the truth of the matter, Plaintiffs object on the basis of inadmissible hearsay.*

**Reply: Plaintiffs purport to controvert DSOF ¶ 125 while admitting the accuracy of the statement itself. Plaintiffs' hearsay objection is inapplicable as the recording is not offered to prove the truth of the matters stated by witnesses, but rather that the recorded statements were made. Although Plaintiffs controvert this statement of fact, the response does not dispute any of the stated facts and does not cite to any materials in the record that dispute the facts stated. FRCP 56(c)(1)(A). There is no genuine dispute as to any material fact, FRCP 56(c)(1), and DSOF ¶ 125 is not disputed.**

126.   Niko Quinn told Det. Smith she did not recognize the shooter, the shooter was carrying a shotgun with a long barrel, and he shot three times and ran back from the way he came. Police File, p. 27-29.

*Response: Uncontroverted that Niko Quinn made these statements, among others, during the taped interview cited above, which occurred about 45 minutes after the shooting. Further, to the extent Defendant is using the police report for the truth of the matter, Plaintiffs object on the basis of inadmissible hearsay.*

**Reply: Plaintiffs purport to controvert DSOF ¶ 126 while admitting the accuracy of the statement itself. Plaintiffs' hearsay objection is inapplicable as the recording is not offered to prove the truth of the matters stated by witnesses, but rather that the recorded statements were made. Although Plaintiffs controvert this statement of fact, the response does not dispute any of the stated facts and does not cite to any materials in the record that dispute the facts stated. FRCP 56(c)(1)(A). There is no genuine dispute as to any material fact, FRCP 56(c)(1), and DSOF ¶ 126 is not disputed.**

127.   Niko Quinn denied to Det. Smith having any knowledge of either of the victims having difficulties with anyone. Police File, p. 27-29.

*Response: Controverted in part, with objection. Plaintiffs first clarify that when asked whether she knew if the victims were having difficulties with anyone, Niko Quinn stated "No, I don't." (Ex. 1: Police File, P00027-30/LMKSDC_0003417-3420). Additionally, Niko Quinn testified that her answer "no" above was not truthful "because my family was sitting there telling me don't say nothing, let's go." (Ex. 12: Niko Quinn Dep. 72:9–15). However, to the extent Defendant is using the police report for the truth of the matter, Plaintiffs object on the basis of*

*inadmissible hearsay. Additionally, Niko Quinn testified she did not know what she told W.K, Smith prior to the recording starting. (Ex. 12: Niko Quinn Dep. 131:15-18). Further, within weeks of the crime, Niko told Golubski about Doniel being beat up in the days before his murder and about his injuries, stating "that Cecil had his boys had jumped him maybe a week or two before he was killed, and also told him that they were trying to get him in the car the last two days before he was killed." She also told Golubski that Doniel "didn't have no beef with nobody but the guys that jumped him." (Ex. 12: Niko Quinn Dep. 174:8–175:17); SAMF ¶ 99.*

**Reply: Plaintiffs purport to controvert DSOF ¶ 127 while admitting the accuracy of the statement itself. Plaintiffs' hearsay objection is inapplicable as the recording is not offered to prove the truth of the matters stated by witnesses, but rather that the recorded statements were made. Although Plaintiffs controvert this statement of fact, the response does not dispute any of the stated facts and does not cite to any materials in the record that dispute the facts stated. FRCP 56(c)(1)(A). There is no genuine dispute as to any material fact, FRCP 56(c)(1), and DSOF ¶ 127 is not disputed.**

128.    Niko Quinn told Det. Smith she had never seen the shooter before but that she would recognize the person if she saw him again. Police File, p. 27-29.

*Response: Uncontroverted that Niko Quinn made these statements, among others, during the taped interview cited above, which occurred about 45 minutes after the shooting. Further, to the extent Defendant is using the police report for the truth of the matter, Plaintiffs object on the basis of inadmissible hearsay.*

**Reply: Plaintiffs admit the accuracy of DSOF ¶ 128 but asserts a hearsay objection. Plaintiffs' hearsay objection is inapplicable as Niko Quinn's recorded statement is not offered to prove the truth of Niko's statements, but rather that the recorded statement was made. DSOF ¶ 128 is not disputed.**

129.    While giving her statement to Det. Smith, Niko Quinn was in a hurry to finish the interview because she wanted to go to the hospital with her family members who were standing in her yard. She went to the hospital after giving her statement. Niko Quinn dep., 137:23-138:3, 138:21-25, 138:17-20.

*Response: Uncontroverted that she so testified. Plaintiffs also note that the interview of Niko took place approximately forty-five minutes after her cousin was murdered in front of her. (Ex. 1: Police File LMKSDC_0003404, 3417)*

**Reply: Though plaintiffs do not dispute the stated fact, Plaintiffs' response adds additional,**

**but non-responsive, information contrary to D.Kan. Rule 56.1(b)(2).**

> ### 1. Niko Quinn denied being able to positively identify the shooter from the photo lineup.

130.    At trial, Niko Quinn testified Golubski and another detective contacted her the day after the shooting at her home. Trial Transcript Vol. I, 139:2-24

*Response: Uncontroverted with clarification that the other detective was Defendant Ware See Doc. 611: Defendant Officers SOF ¶ 68; (Exhibit 1: Police File, LMKSDC_0003455–3456).*

**Reply: Though plaintiffs do not dispute the stated fact, Plaintiffs' response adds additional,**

**but non-responsive, information contrary to D.Kan. Rule 56.1(b)(2).**

131.    At trial, Niko Quinn testified Golubski showed her five photographs (States Exhibits 28-32). Trial Transcript Vol. I, 139:25-140:21; States Exhibits 28-32.

*Response: Uncontroverted that she so testified. However, Plaintiffs dispute that Niko Quinn's identification of Lamonte McIntyre was not the result of improper coercion or suggestion, as described in Plaintiffs' Responses to UG SOF, ¶¶ 29 and 45. Additionally, it was Golubski and Ware that brought the same five loose Polaroids they showed Ruby Mitchell to Niko Quinn's house. Pl. SAMF ¶ 204. After Quinn told Golubski and Ware she immediately recognized two of the photos as people she knew who were not the perpetrator, she looked at the remaining three and said she could not make any identification. Pl. SAMF ¶¶ 61, 77. Additionally, the five photos shown to Niko Quinn contained a 1992 picture of Lamonte McIntyre, a photograph of Lamonte's brother, James McIntyre, and a photograph of Lamonte's cousin, Terrence, for Mitchell to view. (Ex. 2: TT 170:12-20); (Ex. 3: 282:12); (Ex. 11: Polaroids from Lineup with Names on Back)*

**Reply: Plaintiffs purport to dispute DSOF ¶ 131 without disputing the accuracy of the fact**

**stated. The response does not dispute any of the stated facts and does not cite to any materials**

**in the record that dispute the facts stated. FRCP 56(c)(1)(A). DOSF ¶ 131 is not disputed.**

132.    At trial, Niko Quinn testified Golubski did not suggest in any way that she should identify any of the photographs. Trial Transcript Vol. I, 140:22-25.

*Response: Controverted in part. Uncontroverted that when asked at trial, "When Detective Golubski handed those [photos] to you, did he suggest in any way that you should identify any one of those photographs in your in looking at them? Niko answered "No." However, controverted to the extent Paragraph 132 suggests that*

*Niko Quinn's testimony regarding the identification procedure was truthful and accurate, and not the result of improper coercion or suggestion. See Plaintiffs' Response to UG SOF ¶¶ 29 and 45.*

**Reply: Plaintiffs purport to dispute DSOF ¶ 132 without disputing the accuracy of the fact stated. The response does not dispute any of the stated facts and does not cite to any materials in the record that dispute the facts stated. FRCP 56(c)(1)(A). DOSF ¶ 132 is not disputed.**

133.    At trial, Niko Quinn testified photograph number 3 stood out to her but did not tell Golubski anything other than she didn't know. Trial Transcript Vol. I, 141-1-25.

*Response: Plaintiffs dispute Defendant's characterization of Niko's testimony, which speaks for itself. Instead, Niko testified, "yes" when asked if "any one picture stand out to you as you were looking through them?" and testified "No. 3" when asked, "which photograph was that?" Further, Niko was also asked, "what did you tell Detective Golubski?" and answered, "I didn't say. I didn't say nothing. I just told him that I didn't know." Additionally, Niko testified that she was given a stack of five photographs, two of whom she immediately recognized as Raymond Hickman, her cousin, and James McIntyre, whom she used to date. Detective Golubski then told Niko that if she knew who it was, she'd better testify and that it would be better for her if she did. SAMF ¶¶ 60–84. Niko Quinn did not tentatively identify Lamonte McIntyre, but instead told Golubski and Ware that she could not make any identification from the photos. (Ex. 12: Niko Quinn Dep. 185:21–25). Further, Niko testified that she was holding onto two pictures in her hand, and while doing so, the officers asked her what Ruby said the shooter's name was, and Niko replied, "Lamont." And when she was holding the pictures, the officer said Niko why she was staring at the picture of Lamonte McIntyre. Niko said she didn't know and also that, "no, I don't know who it is." (Ex. 12: Niko Quinn Dep. 83:17-85:1); SAMF ¶¶ 77–84. While Golubski was instructing Niko Quinn to make an identification and asking about the name Ruby Mitchell had given, Ware placed his thumb on Lamonte McIntyre's photo, as if he were pointing at it. At the same time that Ware was pointing at Lamonte, Niko remembered seeing the name "Lamonte" on the photo police showed her. Despite this direct suggestion, Niko Quinn told Golubski and the Ware that she could not make an identification from these photos. SAMF ¶¶ 77–84. Additionally, when asked if he fabricated this report of the April 16, 1994 identification procedure with Niko Quinn, Golubski invoked his Fifth Amendment right to remain silent. (Pl. Ex. 63: Roger Golubski Dep. 163:4–166:2). Accordingly, Plaintiffs dispute that Quinn's identification of Lamonte McIntyre was not the result of improper coercion or suggestion, as described in Plaintiffs' Responses to UG SOF ¶¶ 29 and 45.*

**Reply: Plaintiffs purport to dispute DSOF ¶ 133 without disputing the accuracy of the fact stated. The response does not dispute any of the stated facts and does not cite to any materials**

in the record that dispute the facts stated. FRCP 56(c)(1)(A). Niko Quinn's cited testimony

reads:

> Q What did he tell you to do with those photographs?
> A He just asked me to look through them and see if I could ID one of the pictures for being the shooter.
> Q And when you looked through those photographs did any one picture stand out to you as you were looking through them?
> A Yes.
> Q And which photograph was that?
> A. No. 3
> Q. And could you turn that photograph over and tell me the name that appears on the back of that photograph?
> A. Lamonte McIntyre.
> Q. Now when you saw that photograph the day after this shooting, what did you think about that photograph, Miss Quinn?
> A. I just thought, oh, God, it's him.
> Q Did you tell Detective Golubski that, Miss Quinn?
> A No.
> Q What did you tell Detective Golubski?
> A I didn't say. I didn't say nothing. I just told him that I didn't know .
> Q Did -- how long did you hold on to that picture while Detective Golubski was there?
> A The whole time we set and talked.

**Trial Transcript Vo. 1, 145:1-25. DOSF ¶ 133 is not disputed.**

134.    At trial, Niko Quinn testified she later contacted Golubski and told him she could identify the shooter. Trial Transcript Vol. I, 145:24-146:7.

*Response: Uncontroverted.*

**Reply: None.**

135.    At trial, Niko Quinn positively identified Lamonte McIntyre to be the shooter on April 15, 1994. Trial Transcript Vol. I, 156:4-7.

*Response: Controverted in part. Uncontroverted that Niko Quinn identified Lamonte McIntyre as the shooter at trial, but did not identify him on April 15, 1995. Further, Plaintiffs controvert the above to the extent that Paragraph 135 suggests Niko Quinn's in-court identification of Lamonte McIntyre was not the result improper coercion or suggestion. See Plaintiffs' Response to UG SOF ¶¶ 29 and 45.*

**Reply: Plaintiffs purport to controvert DSOF ¶ 135 "in part" while admitting the fact stated**

is accurate. **Plaintiffs dispute the accuracy of Niko Quinn's in-court identification of Lamonte McIntyre as the shooter without disputing she made the in-court identification. The response does not dispute any of the stated facts and does not cite to any materials in the record that dispute the facts stated. FRCP 56(c)(1)(A). DOSF ¶ 135 is not disputed.**

136.    At deposition, Niko Quinn testified she spoke with Golubski and another detective the morning after the shooting, before 8 a.m. when she was shown some photographs. Niko Quinn dep., 81:13-19, 82:17-83:7.

*Response: Uncontroverted.*

**Reply: None.**

137.    At deposition, Niko Quinn testified she recognized one of the photographs to be her cousin, Raymond Hickman, and another photograph to be James McIntyre. Niko excluded a third photograph then held the remaining two photographs and stared at them. Niko Quinn dep., 82:17-83:7.

*Response: Uncontroverted with clarification. Niko testified that she was given a stack of five photographs, two of whom she immediately recognized as Raymond Hickman, her cousin, and James McIntyre, whom she used to date. Detective Golubski then told Niko that if she knew who it was, she'd better testify and that it would be better for her if she did. SAMF ¶¶ 61, 69, 77, 84. Niko Quinn did not tentatively identify Lamonte McIntyre, but instead told Golubski and Ware that she could not make any identification from the photos. (Ex. 12: Niko Quinn Dep. 185:21–25). Further, Niko testified that she was holding onto two pictures in her hand, and while doing so, the officers asked her what name Ruby said the shooter's name was, and Niko said Lamont. And when she was holding the pictures, the officer said why are you staring at that other picture (the picture of Lamonte McIntyre). Niko said she didn't know and when she looked at the other one, she said "no, I don't know who it is." ((Ex. 12: Niko Quinn Dep. 83:17-85:1); SAMF ¶¶ 77–78. While Golubski was instructing Niko Quinn to make an identification and asking about the name Ruby Mitchell had given, Ware placed his thumb on Lamonte McIntyre's photo, as if he were pointing at it. At the same time that Ware was pointing at Lamonte, Niko remembered seeing the name "Lamonte" on the photo police showed her. Despite this direct suggestion, Niko Quinn told Golubski and the Ware that she could not make an identification from these photos. SAMF ¶¶ 84. Additionally, when asked if he fabricated this report of the April 16, 1994 identification procedure with Niko Quinn, Golubski invoked his Fifth Amendment right to remain silent. (Pl. Ex. 63: Roger Golubski Dep. 163:4–166:2).*

**Reply: Though plaintiffs do not dispute the stated fact, Plaintiffs' response adds additional, but non-responsive, information contrary to D.Kan. Rule 56.1(b)(2).**

138.    At deposition, Niko Quinn testified she had had a relationship with James McIntyre 1991-1992. Niko Quinn dep., 146:17-147:3.

*Response: Uncontroverted.*

**Reply: None.**

139.    At deposition, Niko Quinn testified she initially told the detectives she could not identify the shooter. Niko Quinn dep., 82:17-83:7, 185:21-25.

*Response: Uncontroverted.*

**Reply: None.**

140.    At deposition, Niko Quinn testified she gave the photos back and one of the detectives asked who Ruby Mitchell said the shooter was, and Niko responded "Lamonte." Niko Quinn dep., 84:2-85:1.

*Response: Controverted. Niko Quinn testified that she was holding onto two pictures in her hand, and while doing so, the officers asked her what name Ruby said the shooter's name was, and Niko said Lamont. And when she was holding the pictures, the officer said why are you staring at that other picture (the picture of Lamonte McIntyre). Niko said she didn't know and when she looked at the other one, she said "no, I don't know who it is." (Ex. 12: Niko Quinn Dep. 83:17-85:1); SAMF ¶¶ 77–84. While Golubski was instructing Niko Quinn to make an identification and asking about the name Ruby Mitchell had given, Ware placed his thumb on Lamonte McIntyre's photo, as if he were pointing at it. At the same time that Ware was pointing at Lamonte, Niko remembered seeing the name "Lamonte" on the photo police showed her. Despite this direct suggestion, Niko Quinn told Golubski and the Ware that she could not make an identification from these photos. SAMF ¶¶ 79–84.*

**Reply: Plaintiffs purport to controvert DSOF ¶ 140 without disputing the accuracy of the**

**fact stated. The cited testimony by Niko Quinn reads:**

**A. So when they brung the pictures we were looking at them and I looked at them several times. And I handed them back and they were, like, do you know, do anybody look familiar? And at the time, I'm just starting from the beginning, I told him I know he didn't do it because this is my cousin and I know he wouldn't do it. I know him, which is James McIntyre, I know he wouldn't do it. Then I held three pictures. And he had one of a guy with a slim face, I believe, and a short cut. I was like no, this ain't him. Then there was another guy with kind of like a little flattop, and then there was Lamonte. So I was looking at the pictures and one of the officers was like, what was the name that Ruby had said the guy's name was? And I said Lamont. And when I was holding the pictures, I was holding them, like these are the pictures, I**

**will just use this, these are the pictures, I'm holding them, I'm looking at them. And he said why are you staring at that other picture? It was a picture of Lamonte. Then I said, I don't know. Then I looked at the other the one, I was like no, I don't know who it is.**

**Niko Quinn dep., 84:2-85:1. Plaintiffs' response adds additional, but non-responsive, information contrary to D.Kan. Rule 56.1(b)(2). The response does not dispute any of the stated facts and does not cite to any materials in the record that dispute the facts stated. FRCP 56(c)(1)(A). DOSF ¶ 140 is not disputed.**

141.    At deposition, Niko Quinn testified that one of the officers held the photographs up and she was able to read Lamonte's name through the photograph with the sun behind the photo. Niko Quinn dep., 85:2-18.

*Response: Controverted in part. Uncontroverted Niko Quinn so testified, but after Niko Quinn told Golubski and Ware "No, I don't know who it is," (Ex. 12: Niko Quinn Dep. 83:21– 85:16), "That's when they grabbed the pictures back and the one guy held the picture and he said what did he—what did she [Ruby Mitchell] say the guy's name was? And I said she said Lamont. So he's holding the picture like this of Lamonte and he said, "What did she say the man's name was?" And I said Lamont. When they held the picture up they held it in the sun and I could see Lamonte's name on the back. And I just stared at the picture and just staring at it. And I gave them the picture back and said I don't know who it was. And that's when they were saying you know who it is, you know who it is. I said I don't know." (Ex. 12: Niko Quinn Dep. 83:21–85:16, 135:6–24); (Pl. Ex. 30: Niko Quinn DA Interview 23:12–24:13, 63:10–18); (Pl. Ex. 25: Niko Quinn 2014 Aff. ¶ 18.)*

**Reply: Plaintiffs purport to controvert DSOF ¶ 141 "in part" while admitting the fact stated is accurate. The response does not dispute any of the stated facts and does not cite to any materials in the record that dispute the facts stated. FRCP 56(c)(1)(A). Plaintiffs' response adds additional, but non-responsive, information contrary to D.Kan. Rule 56.1(b)(2). The citation to Niko Quinn's unsworn interview with the District Attorney, when offered to prove the truth of Niko's statements, is inadmissible hearsay. DOSF ¶ 141 is not disputed.**

142.    At deposition, Niko Quinn testified she started crying because she saw the name LaMonte on the back of the photograph, and she remembered that was the name called out by Ruby Mitchell. Niko Quinn dep., 184:9-185:20.

*Response: Uncontroverted that she so testified, but the cited evidence also states*

*Niko Quinn testified "And like I said, the man was holding the picture like this, "You know who she is talking about, you know, you know who did it," is what he said. At that time I told him I didn't know, I couldn't identify the person."*

**Reply: Though plaintiffs do not dispute the stated fact, Plaintiffs' response adds additional, but non-responsive, information contrary to D.Kan. Rule 56.1(b)(2).**

143.    At deposition, Niko Quinn testified Golubski did not do anything inappropriate at that meeting. Niko Quinn dep., 85:20-23.

*Response: Plaintiffs dispute Defendant's characterization of Niko's testimony, which speaks for itself. Regardless, controverted. Niko Quinn testified to numerous improper tactics Golubski and Ware used at their meeting with Niko Quinn on April 16, 1994. When directly asked at her deposition "How is it that Detective Golubski pressured you to make an identification?" Niko stated, "Because he was saying that I had to make an identification and that I knew, when he was saying you know who did it, you know who killed your cousin, and then that's when it was said, stated, what did Ruby say his name was? When he made that statement that's when they held the photo up. And the guy had -- I don't remember if it was him or the other guy who was holding the pictures, but they pointed, they had Lamonte's picture and the other guy's picture, because I already ruled out...James and my cousin...." (Ex. 12: Niko Quinn Dep. 182:1–18). Further, Niko clarified in her testimony that she was given a stack of five photographs, two of whom she immediately recognized as Raymond Hickman, her cousin, and James McIntyre, whom she used to date. Detective Golubski then told Niko that if she knew who it was, she'd better testify and that it would be better for her if she did. Niko then told Ware and Golubski, after holding the other three photographs, that "No, I don't know who it is." She did not make an identification even though Ware and Golubski held the photo of Lamonte McIntyre up while asking her what Mitchell said the shooter's name was and continued to tell her that she knew who the shooter was. While Golubski was instructing Niko Quinn to make an identification and asking about the name Ruby Mitchell had given, Ware placed his thumb on Lamonte McIntyre's photo, as if he were pointing at it. At the same time that Ware was pointing at Lamonte. She then remembered seeing the name "Lamonte" on the photo police showed her. Despite this direct suggestion, Niko Quinn told Golubski and the other detective that she could not make an identification from these photos. SAMF ¶¶ 77–84. Further, Ware admits that if he placed his thumb on Lamonte McIntyre's photo as Niko Quinn described that would have been "grossly improper" and "direct suggestion" and that he knew that in 1994. SAMF ¶ 80.*

**Reply: Plaintiffs purport to dispute DSOF ¶ 143 without disputing the accuracy of the stated fact. The response does not dispute any of the stated facts and does not cite to any materials in the record that dispute the facts stated. FRCP 56(c)(1)(A). Plaintiffs' response adds**

additional, but non-responsive, information contrary to D.Kan. Rule 56.1(b)(2). The

testimony cited for DSOF ¶ 143 reads:

> Q. What, if anything, do you feel that Roger Golubski did inappropriate -- improper, wrong, at that meeting, if anything?

> A. I really can't say anything.

Niko Quinn dep., 85:20-85:23. DOSF ¶ 143 is not disputed.

144.    Niko Quinn signed an affidavit, Deposition Exhibit 128, in April 1996 at the request of an attorney. The affidavit describes Niko's meeting with Golubski as follows:

> The day after the shooting, the police came to my house about 8 o'clock in the morning, and was questioning me about the shooting the day before. Det. Golubski told me it was him I'd talked to, but I don't remember because I was still in shock. He showed me four or five pictures and when I looked at them, I knew two of the people in the pictures and I held two of them in my hand and he was telling me I knew who it was, and he said if I'd testify it'd be better for me, because it was my cousin sitting in the car. One of the pictures was of LaMont [sic] McIntrye and the other one was someone I didn't know. It was the two pictures causing confusion, I knew LaMont [sic]. When I told him I wasn't sure, he pressured me to make a decision.

Niko Quinn dep., 85:24-86:15 96:5-23.

*Response: Controverted. Niko Quinn was specifically asked about this portion of her affidavit at her deposition and clarified that the statement was accurate, but "wasn't that day," and that she knew Lamonte only "because I seen the name on the picture. I didn't know Lamonte personally....Then seeing him on the news." (Ex. 12: Niko Quinn Dep. 87:1–88:3). Further, Niko Quinn only testified that she "believe[s] so" when asked whether the affidavit was presented to her by an attorney. (Exhibit 12: Niko Quinn Dep. 96:14-16).*

Reply: Plaintiffs purport to controvert DSOF ¶ 144 without controverting the stated fact--

that is, that Niko Quinn signed the affidavit with the quoted text. Plaintiffs' response adds

additional, but non-responsive, information contrary to D.Kan. Rule 56.1(b)(2). DOSF ¶ 144

is not disputed.

145.    At deposition, Niko Quinn testified she recalls Golubski pressuring her to decide who the shooter was from the photographs as described in the affidavit. Niko

Quinn dep., 86:25-87:22

*Response: Uncontroverted that Niko Quinn testified about Golubski's pressuring her to identify a photograph, and that, among other things, "he was telling me I knew who it was, and he said if I didn't testify it would be better for me because -- if I testify it would be better for me because it was my cousin sitting in the car…"When I told him I wasn't sure, he pressured me to make a decision."*

**Reply: Though plaintiffs do not dispute the stated fact, Plaintiffs' response adds additional, but non-responsive, information contrary to D.Kan. Rule 56.1(b)(2).**

146.    At deposition, Niko Quinn testified she felt pressured to make an identification, because Golubski would say things like "you know who did it," while holding up the two photos Niko had not excluded (numbers 3 and 4). Niko Quinn dep., 182:1-183:23.

*Response: Uncontroverted.   Niko Quinn testified to numerous improper tactics Golubski and Ware used at their meeting with Niko Quinn on April 16, 1994.When directly asked at her deposition "How is it that Detective Golubski pressured you to make an identification?" Niko stated, "Because he was saying that I had to make an identification and that I knew, when he was saying you know who did it, you know who killed your cousin, and then that's when it was said, stated, what did Ruby say his name was? When he made that statement that's when they held the photo up. And the guy had -- I don't remember if it was him or the other guy who was holding the pictures, but they pointed, they had Lamonte's picture and the other guy's picture, because I already ruled out…James and my cousin…." (Ex. 12: Niko Quinn Dep. 182:1–18). Further, Niko clarified in her testimony that she was given a stack of five photographs, two of whom she immediately recognized as Raymond Hickman, her cousin, and James McIntyre, whom she used to date. Detective Golubski then told Niko that if she knew who it was, she'd better testify and that it would be better for her if she did. Niko then told Ware and Golubski, after holding the other three photographs, that "No, I don't know who it is." She did not make an identification even though Ware and Golubski held the photo of Lamonte McIntyre up while asking her what Mitchell said the shooter's name was and continued to tell her that she knew who the shooter was. While Golubski was instructing Niko Quinn to make an identification and asking about the name Ruby Mitchell had given, Ware placed his thumb on Lamonte McIntyre's photo, as if he were pointing at it. At the same time that Ware was pointing at Lamonte. She then remembered seeing the name "Lamonte" on the photo police showed her. Despite this direct suggestion, Niko Quinn told Golubski and the other detective that she could not make an identification from these photos. SAMF ¶¶ 77–84. Further, Ware admits that if he placed his thumb on Lamonte McIntyre's photo as Niko Quinn described that would have been "grossly improper" and "direct suggestion" and that he knew that in 1994. SAMF ¶ 80.*

**Reply: Though plaintiffs do not dispute the stated fact, Plaintiffs' response adds additional,**

but non-responsive, information contrary to D.Kan. Rule 56.1(b)(2).

147.    At deposition, Niko Quinn testified she said, "I said I don't know," to the detectives and the detectives left. Niko Quinn did not identify a suspect on April 16, 1994. Niko Quinn dep., 85:15-85:18, 88:4-6.

*Response: Uncontroverted.*

**Reply: None.**

148.    At deposition, Niko Quinn admitted to not telling Detective Smith the truth in her statement. Niko Quinn dep., 72:9-14.

*Response: Controverted and duplicative of UG SOF ¶ 127. Niko Quinn testified that her answer "no" to the question "whether or not people in the Cadillac, your cousin included, were having any difficulties with anyone?" was not truthful "because my family was sitting there telling me don't say nothing, let's go." (Ex. 12: Niko Quinn Dep. 72:9–15). Plaintiffs also note that the interview of Niko took place approximately forty-five minutes after her cousin was murdered in front of her. (Ex. 1: Police File, LMKSDC_0003417) Further, within weeks of the crime, Niko told Golubski about Doniel being beat up in the days before his murder and about his injuries, stating "that Cecil had his boys had jumped him maybe a week or two before he was killed, and also told him that they were trying to get him in the car the last two days before he was killed." She also told Golubski that Doniel "didn't have no beef with nobody but the guys that jumped him." (Ex. 12: Niko Quinn Dep. 174:8–175:17; SAMF ¶ 99, 111–113.*

**Reply: Plaintiffs purport to controvert DSOF ¶ 148 without controverting the stated fact--**

**that is, that Niko Quinn admitted during her deposition that she lied to Det. Smith. Plaintiffs'**

**response adds additional, but non-responsive, information contrary to D.Kan. Rule**

**56.1(b)(2). DOSF ¶ 148 is not disputed.**

149.    At deposition, Niko Quinn admitted she intentionally withheld information regarding her cousin's trouble with drug dealers. Niko Quinn dep., 51:11-52:1; 72:9-14.

*Response: Controverted and duplicative of UG SOF ¶ 127. Niko Quinn testified that her answer "no" to the question "whether or not people in the Cadillac, your cousin included, were having any difficulties with anyone?" was not truthful "because my family was sitting there telling me don't say nothing, let's go." (Ex. 12: Niko Quinn Dep. 72:9–15). Plaintiffs also note that the interview of Niko took place approximately forty-five minutes after her cousin was murdered in front of her. (Ex. 1: Police File, LMKSDC_0003417) Further, within weeks of the crime, Niko told Golubski about Doniel being beat up in the days before his murder and*

*his injuries, "that Cecil had his boys had jumped him maybe a week or two before he was killed, and also told him that they were trying to get him in the car the last two days before he was killed." She also told Golubski that Doniel "didn't have no beef with nobody but the guys that jumped him." (Ex. 12: Niko Quinn Dep. 174:8–175:17); SAMF, ¶ 99, 111-113.*

**Reply: Plaintiffs purport to controvert DSOF ¶ 149 without controverting the stated fact--**

**that is, that Niko Quinn withheld information about her cousins' trouble with drug dealers.**

**Plaintiffs' response adds additional, but non-responsive, information contrary to D.Kan.**

**Rule 56.1(b)(2). DOSF ¶ 149 is not disputed.**

150.    Detective Smith did not testify at the preliminary hearing or trial. Waiver/Preliminary Hearing Transcript; Trial Transcript, Vol. I, (listing witnesses).

*Response: Uncontroverted.*

**Reply: None.**

151.    Defendant Smith testified he does not recall interviewing Niko Quinn or Josephine Quinn. Smith dep., 96:3-9.

*Response: Controverted. Smith stated that he does not remember whether Josephine Quinn provided information he wanted to follow up on when he interviewed her. (Pl. Ex. 59: W.K. Smith Dep. 95:17-96:9). Smith does not contest that he interviewed Josephine Quinn at the scene of the homicide. (Pl. Ex. 59: W.K. Smith Dep. 95:5–12).*

**Reply: Plaintiffs purport to dispute DSOF ¶ 151. The response does not dispute any of the**

**stated facts and does not cite to any materials in the record that dispute the facts stated.**

**FRCP 56(c)(1)(A). Plaintiffs' response adds additional, but non-responsive, information**

**contrary to D.Kan. Rule 56.1(b)(2). The testimony cited for DSOF ¶ 151 reads:**

> **Q. (By Ms. Freudenberger) And so obviously that's information you wanted to follow up on to see whether she could lead you to the perpetrator, correct?**
> **MR. STURDIVAN: Object to form.**
> **MR. COOPER: Join.**
> **Q. (By Ms. Freudenberger) Did you answer, sir?**
> **A. No, I didn't. Ma'am, I don't remember, I don't remember that day, night or whatever it was. Okay. All I'm doing is going by what's reading here. I cannot tell you what I did during that time.**

Smith dep., 95:22-96:9. DSOF ¶ 151 is not disputed.

### 2. Niko Quinn, a few days or weeks after the shooting, positively identified Lamonte McIntyre as the shooter to Golubski

152.    Niko Quinn later called Golubski and arranged to meet with him, saying she can identify the shooter. She testified it was perhaps two weeks or up to a month later. Niko Quinn dep., 91:15-20, 91:24-92:12, 149:13 15, 151:4 5.

*Response: Uncontroverted.*

**Reply: None.**

153.    Niko Quinn met Golubski behind the Wyandotte High School at the track. She was driven by Chris Jones to the meeting. Niko Quinn dep., 92:22-93:1

*Response: Uncontroverted.*

**Reply: None.**

154.    Chris Jones was present while Niko met with Golubski in his car, standing outside the car while Niko had the window down. Niko Quinn dep., 149:16-150:8.

*Response: Uncontroverted that she so testified. Controverted to the extent that Paragraph 154 suggests Niko Quinn's identification of Lamonte McIntyre at this meeting was not the result of improper coercion or suggestion by police as detailed in Plaintiffs' Response to UG SOF ¶ 45.*

**Reply: Plaintiffs do not dispute the accuracy of DSOF ¶ 154. Plaintiffs' response adds additional, but non-responsive, information contrary to D.Kan. Rule 56.1(b)(2). DOSF ¶ 154 is not disputed.**

155.    Golubski gave Niko Quinn the same photographs she was shown at the first meeting, and Niko picked out Lamonte McIntyre's photo . Niko Quinn dep., 150:9-13.

*Response: Controverted in part. Uncontroverted that Niko Quinn was given the same photographs she was shown at the first meeting with Golubski and Ware, where improper suggestion and coercion was used, see Plaintiffs Response to UG SOF ¶¶ 29 and 143, and that she testified she picked one out. However, the cited material does not support that the photograph she picked out was Lamonte McIntyre. Further controverted to the extent Paragraph 155 implies that Niko Quinn's identification of Lamonte McIntyre at that meeting was not the result of improper coercion or suggestion as detailed in Plaintiffs' Response to UG SOF ¶ 45.*

**Reply: Plaintiffs purport to controvert DSOF ¶ 155 "in part" while admitting the fact stated is accurate. The response does not dispute any of the stated facts and does not cite to any materials in the record that dispute the facts stated. FRCP 56(c)(1)(A). Plaintiffs' response adds additional, but non-responsive, information contrary to D.Kan. Rule 56.1(b)(2). DOSF ¶ 155 is not disputed.**

156.    When Niko Quinn met with Golubski at Wyandotte High School, he did not threaten her in any way nor did he proposition her for sex. Niko Quinn dep., 150:21-151:3

*Response: Controverted in part. Uncontroverted that Niko Quinn testified Golubski did not "proposition you for sex while you were in the car behind Wyandotte High School." But, controverted that Golubski did not threaten her or proposition her for sex at another time. Instead, Niko Quinn told the DA that she had never had sex with Golubski but that "he had tried." (Pl. Ex. 30: Niko Quinn DA Interview 36:7-9). Niko Quinn also testified that she told Golubski that Aaron Robinson and Monster had beaten up Doniel Quinn in the days before the murders, and that they came looking for him the night before the murders. She said that Doniel Quinn only had "beef" with that drug gang, and no one else. Golubski responded by warning Niko Quinn to leave that alone, that she "shouldn't be talking about Cecil, be careful what [she] say[s] about Cecil because they found his ex-girlfriend's remains behind Washington High School." Knowing Niko Quinn was scared for her life, Golubski offered to put her in protective custody; he then did help her get through bureaucracy to move to 4th Street. SAMF ¶¶ 95–99. Further, when asked if he fabricated Niko Quinn's identification of Lamonte McIntyre, Golubski pled the Fifth. SAMF ¶ 106. See also Plaintiffs' Response to UG SOF ¶ 45 and 136. Further, Niko has previously sworn that "The police questioned me and threatened to take my children away from me if I did not talk." (Pl. Ex. 57: Niko Quinn 1996 Aff. ¶ 16). Niko also testified that "I might have said anything in that trial because I was threatened in '94 and '96. So none of that was true, because I was told what to say." (Ex. 12: Niko Quinn Dep. 157:9-16).*

**Reply: Plaintiffs purport to controvert DSOF ¶ 156 "in part" while admitting the fact stated is accurate. The response does not dispute any of the stated facts and does not cite to any materials in the record that dispute the facts stated. FRCP 56(c)(1)(A). Plaintiffs' response adds additional, but non-responsive, information contrary to D.Kan. Rule 56.1(b)(2). DOSF ¶ 156 is not disputed.**

### 3.     Niko Quinn identified Lamonte McIntyre as the shooter During the Waiver/Preliminary Hearing

157.   Niko Quinn testified During the Waiver/Preliminary Hearing. Waiver/Preliminary Hearing Transcript, pp. 21-35.

*Response: Uncontroverted.*

**Reply: None.**

158.   During the Waiver/Preliminary Hearing, Niko Quinn testified she was outside and saw the shooting on April 15, 1994. Waiver/Preliminary Hearing Transcript, 21:13-23.

*Response: Uncontroverted.*

**Reply: None.**

159.   Niko Quinn, in her Waiver/Preliminary Hearing Transcript testimony, described the shooter as a black male, wearing a black hat, a black shirt, black pants, and black shoes with a medium build carrying a gun. Waiver/Preliminary Hearing Transcript, 21:24-23-17.

*Response: Uncontroverted that when asked what the shooter was wearing, Niko Quinn testified to the above description.*

**Reply: None.**

160.   Niko Quinn, in her Waiver/Preliminary Hearing Transcript testimony, testified she was asked after the shooting by Ruby Mitchell whether that (the shooter) was Lamonte and Niko denied knowing anyone named Lamonte. Waiver/Preliminary Hearing Transcript, 25:17-23.

*Response: Uncontroverted that Niko Quinn so testified.*

**Reply: None.**

161.   Niko Quinn, in her Waiver/Preliminary Hearing Transcript testimony, testified she got a clear view of the shooter and, while in-court, identified Lamonte McIntyre as the shooter. Waiver/Preliminary Hearing Transcript, 25:24-26:9.

*Response: Uncontroverted that Niko Quinn testified to the above, but controverted to the extent that Paragraph 161 suggests Niko Quinn's in-court identification of Lamonte McIntyre and the identification procedure was truthful and accurate, and not the result of direct threats, improper coercion or suggestion detailed in Plaintiffs' Response to UG SOF, ¶¶ 29, 45 and 51. Niko testified that "I might have said anything in that trial because I was threatened in '94 and '96. So none of that was true, because I was told what to say." (Ex. 12: Niko Quinn Dep. 157:9- 16).*

**Reply: Plaintiffs do not dispute the accuracy of DSOF ¶ 161. Plaintiffs' response adds additional, but non-responsive, information contrary to D.Kan. Rule 56.1(b)(2). DOSF ¶ 161 is not disputed.**

162. Niko Quinn, in her Waiver/Preliminary Hearing Transcript testimony, testified officers came to show her photographs on April 16 but that she did not pick anyone out of the photos. Niko further testified that she was able to identify the shooter from the photographs but that she told the police the she could not because she was scared. Waiver/Preliminary Hearing Transcript, 32:1-2, 32:21-33-1.

*Response: Controverted in part. The cited evidence reflects only that Niko Quinn testified she was able to identify the shooter in court and that she was sure. Further controverted to the extent that Paragraph 162 suggests Niko Quinn's testimony regarding the identification procedure was truthful and accurate, and not the result of improper coercion or suggestion detailed in Plaintiffs' Response to UG SOF, ¶¶ 29, 45, 51, and 161.*

**Reply: Plaintiffs purport to controvert DSOF ¶ 162 "in part" while admitting the fact stated is accurate. The response does not dispute any of the stated facts and does not cite to any materials in the record that dispute the facts stated. FRCP 56(c)(1)(A). Plaintiffs' response adds additional, but non-responsive, information contrary to D.Kan. Rule 56.1(b)(2). DOSF ¶ 162 is not disputed.**

163. Niko Quinn, in her Waiver/Preliminary Hearing Transcript testimony, testified she was sure Lamonte McIntyre was the shooter. Waiver/Preliminary Hearing Transcript, 32:1-2, 32:21-33-1.

*Response: Uncontroverted that she so testified. Controverted to the extent that Paragraph 163 suggests Niko Quinn's in-court identification of Lamonte McIntyre was not the result improper coercion or suggestion detailed in Plaintiffs' Response to UG SOF, ¶¶ 29, 45, 51, and 161.*

**Reply: Plaintiffs do not dispute the accuracy of DSOF ¶ 163. Plaintiffs' response adds additional, but non-responsive, information contrary to D.Kan. Rule 56.1(b)(2). DOSF ¶ 163 is not disputed.**

164. Niko Quinn, in her Waiver/Preliminary Hearing Transcript testimony, testified she was shown the photographs, and asked/told "You know who did it,

don't you?" But Niko would not say anything. The officer said, "Can you identify him?" and Niko said she could but did not want to. Waiver/Preliminary Hearing Transcript, 33:23-34:12.

*Response: Uncontroverted that she so testified. Controverted to the extent that Paragraph 164 suggests Niko Quinn's testimony regarding the identification procedure was truthful and accurate, and not the result of improper coercion or suggestion detailed in Plaintiffs' Response to UG SOF, ¶¶ 29, 45, 51, and 161.*

**Reply: Plaintiffs do not dispute the accuracy of DSOF ¶ 164. Plaintiffs' response adds additional, but non-responsive, information contrary to D.Kan. Rule 56.1(b)(2). DOSF ¶ 164 is not disputed.**

### 4.     Niko Quinn identified Lamonte McIntyre as the shooter at trial

165.     Niko Quinn testified on the first day of the trial. Trial Transcript Vol. I, pp. 122-156.

*Response: Uncontroverted.*

**Reply: None.**

166.     At trial, Niko Quinn denied that Detective Golubski suggested in any way who she should identify when he and another detective showed her photos the day after the murder. Trial Transcript Vol. I, 140:22-25.

*Response: Controverted in part. Uncontroverted that when asked at trial, "When Detective Golubski handed those [photos] to you, did he suggest in any way that you should identify any one of those photographs in your in looking at them? Niko answered "No." However, controverted to the extent Paragraph 166 suggests that Niko Quinn's testimony regarding the identification procedure was truthful and accurate, and not the result of improper coercion or suggestion detailed in Plaintiffs' Response to UG SOF ¶¶ 29, 45, 51, and 161.*

**Reply: Plaintiffs purport to controvert DSOF ¶ 166 "in part" while admitting the fact accurately states Niko Quinn's trial testimony. The response does not dispute any of the stated facts and does not cite to any materials in the record that dispute the facts stated. FRCP 56(c)(1)(A). Plaintiffs' response adds additional, but non-responsive, information contrary to D.Kan. Rule 56.1(b)(2). DOSF ¶ 166 is not disputed.**

167.     At trial, Niko Quinn positively identified Lamonte McIntyre as the shooter

to the jury. Trial Transcript Vol. I, 143:1-8, 156:4-7.

*Response: Controverted in part. Uncontroverted that Niko Quinn identified Lamonte McIntyre as the shooter at Lamonte's criminal trial, but controverted to the extent that Paragraph 167 suggests Niko Quinn's in-court identification of Lamonte McIntyre was not the result of improper coercion or suggestion. Niko testified, "I might have said anything in that trial because I was threatened in '94 and '96. So none of that was true, because I was told what to say." (Ex. 12: Niko Quinn Dep. 157:9-16). Further, Niko's in-court identifications followed improper suggestion and coercion from Defendants Golubski and Ware, as well as direct threats detailed in Plaintiffs' Responses to UG SOF ¶¶ 29, 45, 51, and 161.*

**Reply: Plaintiffs purport to controvert DSOF ¶ 167 "in part" while admitting the fact accurately states Niko Quinn positively identified Lamonte McIntyre as the shooter during her trial testimony. The response does not dispute any of the stated facts and does not cite to any materials in the record that dispute the facts stated. FRCP 56(c)(1)(A). Plaintiffs' response adds additional, but non-responsive, information contrary to D.Kan. Rule 56.1(b)(2). DOSF ¶ 167 is not disputed.**

168.    Niko Quinn testified photo No. 3 stood out to her and she held on to photo No. 3 the entire time she talked but she did not identify anyone. Trial Transcript Vol. I, 141:4-25.

*Response: Controverted and duplicative of UG SOF ¶ 133. See Plaintiffs' Response to UG SOF ¶ 133.*

**Reply: Plaintiffs purport to dispute DSOF ¶ 168 without disputing the accuracy of the fact stated. The response does not dispute any of the stated facts and does not cite to any materials in the record that dispute the facts stated. FRCP 56(c)(1)(A). Niko Quinn's cited testimony reads:**

**Q What did he tell you to do with those photographs?**
**A He just asked me to look through them and see if I could ID one of the pictures for being the shooter.**
**Q And when you looked through those photographs did any one picture stand out to you as you were looking through them? A Yes. Q And which photograph was that?**
**A. No. 3**
**Q. And could you turn that photograph over and tell me the name that appears**

on the back of that photograph?

A. Lamonte McIntyre.

Q. Now when you saw that photograph the day after this shooting, what did you think about that photograph, Miss Quinn?

A. I just thought, oh, God, it's him.

Q Did you tell Detective Golubski that, Miss Quinn? A No. Q What did you tell Detective Golubski?

A I didn't say. I didn't say nothing. I just told him that I didn't know .

Q Did -- how long did you hold on to that picture while Detective Golubski was there?

A The whole time we set and talked.

**Trial Transcript Vo. 1, 145:1-25. DOSF ¶ 168 is not disputed.**

> **5.      At deposition, Niko Quinn testified that she lied when identifying Lamonte McIntyre as the shooter because she was pressured by the prosecutor.**

169.      At deposition, Niko Quinn testified she did not recall speaking to Detective Smith prior to the recording starting. Niko Quinn dep., 131:15-18.

*Response: Controverted. In the evidence cited, Niko Quinn says she did not know what she told Smith prior to the recording starting.*

**Reply: Plaintiffs purport to controvert DSOF ¶ 169. The witnesses testimony was as follows:**

> **Q. […] You earlier testified that even after listening to the audio, you have no recollection of the statement. Is that fair to say?**
> **A. Yes.**
> **Q. So, fair to say you have no idea what, if anything, you told W.K. Smith before he pushed record, is that correct?**
> **A. Yes.**

**Niko Quinn dep., 131:11-131:18. DSOF ¶ 169 is not disputed.**

170.      At deposition, Niko Quinn testified that, after the shooting, Ruby Mitchell yelled "Oh my God that's Lamonte." Niko Quinn dep., 62:3-10, 64:8-20.

*Response: Uncontroverted that she so testified.*

**Reply: None.**

171.      Niko Quinn denies a detective threatened her kids in order to get her to make a statement. Niko Quinn dep., 66:5-10.

*Response: Controverted. In the evidence cited, Niko Quinn states a detective did not threaten her "at that time." Instead, Niko Quinn testified that Terra Morehead visited Niko's residence, leaving a card and a message: contact me or I will have you arrested and take your children away and Terra Morehead was accompanied*

*on this occasion by "two detectives". (Ex. 12: Niko Quinn Dep. 101:8-102:12).*

**Reply: Plaintiffs purport to controvert DSOF ¶ 171. Niko Quinn has no personal knowledge of any "detectives" threatening to take her children. Rather Niko testified she was told a woman (Terra Morehead) made the threat while accompanied by two detectives. The testimony cited by plaintiffs do not support the assertion or inference that any KCKPD detective threatened Niko Quinn. DSOF ¶ 171 is not disputed.**

172.     At deposition, Niko Quinn admitted to not telling Detective Smith the truth in her statement. Niko Quinn dep., 72:9-14.

*Response: Controverted and duplicative of UG SOF ¶ 148. Niko Quinn testified that her answer "no" to the question "whether or not people in the Cadillac, your cousin included, were having any difficulties with anyone?" was not truthful "because my family was sitting there telling me don't say nothing, let's go." (Ex. 12: Niko Quinn Dep. 72:9–15). Plaintiffs also note that the interview of Niko took place approximately forty-five minutes after her cousin was murdered in front of her. (Ex. 1: Police File, LMKSDC_0003417) Further, within weeks of the crime, Niko told Golubski about Doniel being beat up in the days before his murder and about his injuries, stating "that Cecil had his boys had jumped him maybe a week or two before he was killed, and also told him that they were trying to get him in the car the last two days before he was killed." She also told Golubski that Doniel "didn't have no beef with nobody but the guys that jumped him." (Ex. 12: Niko Quinn Dep. 174:8–175:17); SAMF ¶ 99, 111–113.*

**Reply: Plaintiffs purport to controvert DSOF ¶ 172 without controverting the stated fact-- that is, that Niko Quinn admitted during her deposition that she lied to Det. Smith. Plaintiffs' response adds additional, but non-responsive, information contrary to D.Kan. Rule 56.1(b)(2). DOSF ¶ 172 is not disputed.**

173.     At deposition, Niko Quinn admitted intentionally withholding information regarding her cousin's trouble with drug dealers. Niko Quinn dep., 51:11-52:1; 72:9-14.

*Response: Controverted and duplicative of UG SOF ¶¶ 127 and 149. Niko Quinn testified that her answer "no" to the question "whether or not people in the Cadillac, your cousin included, were having any difficulties with anyone?" was not truthful "because my family was sitting there telling me don't say nothing, let's go." (Ex. 12: Niko Quinn Dep. 72:9–15). Plaintiffs also note that the interview of Niko took place approximately forty-five minutes after her cousin was murdered in*

*front of her. (Ex. 1: Police File, LMKSDC_0003417). Further, within weeks of the crime, Niko told Golubski about Doniel being beat up in the days before his murder and his injuries, "that Cecil had his boys had jumped him maybe a week or two before he was killed, and also told him that they were trying to get him in the car the last two days before he was killed." She also told Golubski that Doniel "didn't have no beef with nobody but the guys that jumped him." (Ex. 12: Niko Quinn Dep. 174:8–175:17); SAMF, ¶ 99, 111-113.*

**Reply: Plaintiffs purport to controvert DSOF ¶ 173 without controverting the stated fact-- that is, that Niko Quinn withheld information about her cousins' trouble with drug dealers. Plaintiffs' response adds additional, but non-responsive, information contrary to D.Kan. Rule 56.1(b)(2). DOSF ¶ 173 is not disputed.**

174.    At deposition Niko Quinn testified that her family and boyfriend told her not to speak to the police. Niko Quinn dep., 72:9-14; 67:10-17; 131:1-6.

*Response: Controverted. Niko Quinn testified that her answer "no" to the question "whether or not people in the Cadillac, your cousin included, were having any difficulties with anyone?" was not truthful "because my family was sitting there telling me don't say nothing, let's go." (Ex. 12: Niko Quinn Dep. 72:9–15). Although Chris Jones was someone who told Niko not to talk to police in general, he was not present when Niko Quinn gave her statement to officer W.K. Smith at the scene of the crime and is not mentioned in the police file. (Ex. 12: Niko Quinn Dep. 66:23-67:17; see generally Ex. 1, Police File).*

**Reply: Plaintiffs purport to controvert DSOF ¶ 174 without controverting the stated fact-- that is, that Niko Quinn testified she was being told not to speak with the police. Plaintiffs' response adds additional, but non-responsive, information contrary to D.Kan. Rule 56.1(b)(2). DOSF ¶ 174 is not disputed.**

175.    At deposition, Niko Quinn testified that the voice of Freda Quinn can be heard saying "is this over, I'm trying to get to the hospital". Niko Quinn dep., 130:15-25.

*Response: Uncontroverted with clarification that Niko Quinn's testimony cited above is referring to audio taken on the day of the homicides.*

**Reply: None.**

176.    At deposition, Niko Quinn testified that she was wanting to get the interview over with so she could go to the hospital. Niko Quinn dep., 138:21-25.

*Response: Duplicative of ¶ 129. However, uncontroverted that she so testified. Plaintiffs also note that the interview of Niko took place approximately forty-five minutes after her cousin was murdered in front of her. (Ex. 1: Police File, LMKSDC_0003404, 3417).*

**Reply: None.**

177.    In her recorded statement to Detective Smith, Josephine Quinn stated she heard three or four shots but could not identify a suspect. Police File, 36-39.

*Response: Controverted. In the evidence cited, Josephine Quinn states she heard "about three (3) or four (4)" shots" but only stated "I turned around to try to get a look at him and I couldn't but he had turned at that time and had ran...." Further, to the extent Defendant is using the police report for the truth of the matter, Plaintiffs object on the basis of inadmissible hearsay.*

**Reply: Plaintiffs purport to controvert DSOF ¶ 177 without controverting the stated fact-- that Josephine Quinn gave a recorded statement and made the statements set forth. Plaintiffs' hearsay objection is inapplicable as the statement is offered only to show the statement was made, and not for the truth of Josephine Quinn's statements. DSOF ¶ 177 is not disputed.**

178.    In her recorded statement to Detective Smith, Josephine Quinn said that Doniel Quinn was a loafer but she did not know whether he was involved in drug trafficking or what he was involved in. Police File, 36-39.

*Response: Uncontroverted. However, to the extent Defendant is using the police report for the truth of the matter, Plaintiffs object on the basis of inadmissible hearsay.*

**Reply: Plaintiffs do not dispute the accuracy of DSOF ¶ 178 but assert a hearsay objection. Plaintiffs' hearsay objection is inapplicable as the statement is offered only to show the statement was made, and not for the truth of Josephine Quinn's statements. DSOF ¶ 178 is not disputed.**

179.    In her recorded statement to Detective Smith, Josephine Quinn did not state that Stacy Quinn had witnessed the shooting. Police File, 36-39.

*Response: Uncontroverted. However, Golubski documented in his report that Golubski and Ware spoke to Josephine Quinn on April 16, 1994 and that*

*"Josephine stated as per Detective W.K. Smith's statement with her that was not identified by Detective Smith through that statement by Josephine, that there was another daughter by the name of Stacy who stated she knew who the suspect was but on this particular date of the photo line up, Stacy was not available." (Ex. 1: Police File, LMKSDC_0003456). Additionally, the claim that Stacy was "not available" is not true. SAMF ¶¶ 93, 215–217. Further, to the extent Defendant is using the police report for the truth of the matter, Plaintiffs object on the basis of inadmissible hearsay.*

**Reply: Plaintiffs do not dispute the accuracy of DSOF ¶ 179. Plaintiffs' response adds additional, but non-responsive, information contrary to D.Kan. Rule 56.1(b)(2). Plaintiffs' hearsay objection is inapplicable as the statement is offered only to show the statement was made, and not for the truth of Josephine Quinn's statements. DOSF ¶ 179 is not disputed.**

180.    Detective Smith did not testify at the preliminary hearing or trial. Waiver/Preliminary Hearing Transcript, Trial Transcript Vol. I, witness lists from trial and preliminary hearing.

*Response: Uncontroverted.*

**Reply: None.**

**G.    Alleged threats to and alleged promise of favors to Niko Quinn.**

181.    Before the Ewing/Quinn homicides, Niko Quinn did not know Golubski. Niko Quinn dep., 177:24-178:1.

*Response: Uncontroverted with clarification that in Niko's next statements, omitted by Defendant in Paragraph 181, she testifies she "heard about him from my sister, my sister, Lela, and my sister, Stacy, that Stacy had had a relationship with him," describing the relationship with Stacy as "intimate," She then testifies: "I just heard -- the things I heard wasn't good about Golubski. Don't trust him, he is a snake. They called him Pollock. They called him all kind of stuff. People on the street they didn't like him, and said he was a bully, the devil, amongst other things" that he was involved in the drug trade himself, and specifically that he "had shooken people down, have went into dope houses took people's money, drugs, guns, on several occasions," and that he "was on my cousin's payroll. He was on Cecil's payroll. And there was another guy that stayed down in the projects they said he was on his payroll, just several people around in that neighborhood." (Exhibit 12: Niko Quinn Dep. 178:9-179:12).*

**Reply: Plaintiffs do not dispute the accuracy of DSOF ¶ 181. Plaintiffs' response adds additional, but non-responsive, information contrary to D.Kan. Rule 56.1(b)(2). DSOF ¶ 181**

is not disputed.

182.    During the meeting behind the high school, Niko Quinn told Golubski she was scared because she had seen people with guns next to her house and knocking on her door. Niko Quinn dep., 88:7-88:17, 89:22-90:14.

*Response: Controverted. The cited evidence does not reflect or support that Niko Quinn told Golubski she was scared because she had seen people with guns near her house. Instead, in the cited deposition testimony, Niko agrees that "in the days after the shooting people are coming up to your house. And then at one point you are in the car with Pork Chop, and a couple guys with guns are on your property." Then, Niko's next statements, omitted by Defendant in Paragraph 182, reflects Niko is asked: "within, let's say within a few days after the murder you are assuming this was some Aaron Robinson drug hit, correct?" to which she responds, "Yes." And again when asked, "And you think that these guys coming on your property are Aaron Robinson people coming to maybe kill you, probably kill you, maybe kill other people?" to which she responds, "It was just me and my children in the house." (Exhibit 12: Niko Quinn Dep.88:18-89:2).*

**Reply: Plaintiffs purport to controvert DSOF ¶ 182 without controverting the stated fact-- that Niko Quinn told Golubski of her concerns of people coming to her house with guns. Plaintiffs' response adds additional, but non-responsive, information contrary to D.Kan. Rule 56.1(b)(2). DSOF ¶ 182 is not disputed.**

183.    The "help" given by Golubski for Niko Quinn's relocation was telling her to talk to the housing authority, which resulted in her moving to an apartment on 4th and Cleveland. Niko Quinn dep., 98:22-99:5

*Response: Plaintiffs dispute Defendant's characterization of Niko Quinn's testimony, which speaks for itself. Instead, Niko Quinn stated that Golubski told her he would help her move to a new place, and that "he later did." (Pl. Ex. 25: Niko Quinn 2014 Aff. 2014 ¶ 19). Further, Golubski told her "to go down to the Housing Authority, and somehow they talked to someone in the Housing Authority and got [her] moved in to this place that was available at the time" and that Golubski "helped [her] supposedly get protective custody." (Ex. 12: Niko Quinn Dep. 98:9-99:4).*

**Reply: Plaintiffs purport to controvert DSOF ¶ 183 without controverting the stated fact-- that the "help" given Niko Quinn was directing her to the Housing Authority. The testimony cited by DSOF ¶ 183 and by Plaintiffs' response reads:**

**"Q. Did Detective Golubski help you move to a new place?**

**A. They helped me supposedly get protective custody.**

**Q. If you want, it is in paragraph 19. It says, "I told Detective Golubski about this and he said he would help me move to a new place, which he later did."**

**A. Yes.**

**Q. Is that the 4th and Cleveland?**

**A. Yes. Q. Financially did he help you?**

**A. No.**

**Q. He is just like, those apartments have some spots?**

**A. If I can explain.**

**Q. Yes.**

**A. He told me to go down to the Housing Authority, and somehow they talked to someone in the Housing Authority and got me moved in to this place that was available at the time. (Exhibit 129 was marked.)**

Niko Quinn dep., 98:9-99:5. None of the testimony cited in plaintiff's response disputes the

stated fact. DSOF ¶ 183 is not disputed.

184.     There is no evidence that Golubski threatened Niko Quinn in any way at any time, and no evidence Golubski threatened to take her children away if she did not testify.

*Response: Controverted. This statement is not supported by the record. Instead, evidence shows that Golubski threatened and coerced Niko Quinn into identifying Lamonte McIntyre numerous times. First, during the first photo identification procedure, Niko testified that she was given a stack of five photographs, two of whom she immediately recognized as Raymond Hickman, her cousin, and James McIntyre, whom she used to date. Detective Golubski then told Niko that if she knew who it was, she'd better testify and that it would be better for her if she did. SAMF ¶¶ 60–84. Niko Quinn did not tentatively identify Lamonte McIntyre, but instead told Golubski and Ware that she could not make any identification from the photos. (Ex. 12: Niko Quinn Dep. 185:21–25). Further, Niko testified that she was holding onto two pictures in her hand, and while doing so, the officers asked her what name Ruby said the shooter's name was, and Niko said Lamont. And when she was holding the pictures, the officer said why are you staring at that other picture (the picture of Lamonte McIntyre). Niko said she didn't know and when she looked at the other one, she said "no, I don't know who it is." (Ex. 12: Niko Quinn Dep. 83:17- 85:1); SAMF ¶¶ 77–84. While Golubski was instructing Niko Quinn to make an identification and asking about the name Ruby Mitchell had given, Ware placed his thumb on Lamonte McIntyre's photo, as if he were pointing at it. At the same time that Ware was pointing at Lamonte, Niko remembered seeing the name "Lamonte" on the photo police showed her. Despite this direct suggestion, Niko Quinn told Golubski and the Ware that she could not make an identification from*

*these photos. SAMF ¶¶ 77–84. Additionally, when asked if he fabricated this report of the April 16, 1994 identification procedure with Niko Quinn, Golubski invoked his Fifth Amendment right to remain silent. (Pl. Ex. 63: Roger Golubski Dep. 163:4–166:2).*

*Next, at the second meeting with Niko Quinn and Golubski behind Wyandotte High School, Niko testified that she told Golubski that Aaron Robinson and Monster had beaten up Doniel Quinn in the days before the murders, and that they came looking for him the night before the murders. She said that Doniel Quinn only had "beef" with that drug gang, and no one else. Golubski responded by warning Niko Quinn to leave that alone, that she "shouldn't be talking about Cecil, be careful what [she] say[s] about Cecil because they found his ex-girlfriend's remains behind Washington High School." Golubski then lied to Niko, telling her Cecil Brooks and Aaron Robinson and their gang "didn't do it, they couldn't have did it because they had the guy in custody [referring to Lamonte McIntyre], they had the clothes he was wearing and they had the gun so they got the right person." Knowing Niko Quinn was scared for her life, Golubski offered to put her in protective custody; he then did help her get through bureaucracy to move to 4th Street. SAMF ¶¶ 95–106. Further, when asked if he fabricated Niko Quinn's identification of Lamonte McIntyre, Golubski pled the Fifth. SAMF ¶ 106.*

**Reply: Plaintiffs purport to controvert DSOF ¶ 184, but none of the assertions in plaintiffs' response, or the referenced additional statements of fact dispute the stated fact--there is no evidence that Golubski threated Niko Quinn in any way at any time or that Golubski threatened to take her children away if she did not testify. The fact Golubski asserted his rights under the Fifth Amendment is not admissible evidence that Niko Quinn's identification was fabricated and the undisputed facts show Niko Quinn did, in fact, identify Lamonte McIntyre as the shooter. See DSOF ¶¶ 152-168. DSOF ¶ 184 is not disputed.**

185.   Niko Quinn testified that Golubski never threatened to take her children away. Niko Quinn dep., 102:13-102:19.

*Response: Uncontroverted that she so testified, however, Niko also testified that Terra Morehead visited Niko's residence after the shooting but before trial, leaving a card and a message: contact me or I will have you arrested and take your children away, and Terra Morehead was accompanied on this occasion by "two detectives". (Ex. 12: Niko Quinn Dep. 101:8-102:12).*

**Reply: Plaintiffs do not dispute the accuracy of DSOF ¶ 185. Plaintiffs' response adds additional, but non-responsive, information contrary to D.Kan. Rule 56.1(b)(2). Niko Quinn**

has no personal knowledge of any "detectives" threatening to take her children. Rather Niko

testified she was told a woman (Terra Morehead) made the threat while accompanied by two

detectives. The testimony cited by plaintiffs do not support the assertion or inference that

any KCKPD detective threatened Niko Quinn. DOSF ¶ 185 is not disputed.

> 186.    Niko Quinn testified that Terra Morehead threatened to take her children
> away if she did not testify. Niko Quinn dep., 104:12-105:14; 108:20-109:1.
>
> *Response: Uncontroverted that Niko Quinn testified that Terra Morehead
> threatened to take her kids away if she did not testify on several occasions. See also
> Plaintiffs' Responses to UG SOF ¶¶ 51, 161, and 184.*

**Reply: None.**

**H.    Street Sources**

> 187.    The trial testimony regarding sources is set forth, supra, at ¶¶ 64, 66, and
> 67.
>
> *Response: Plaintiffs controvert the contentions made in the above identified
> Paragraphs, so see Plaintiffs' Responses to UG SOF ¶ ¶ 64, 66, and 67.*

**Reply: Plaintiffs' purport to controvert DSOF ¶ 187 by cross-referencing their responses to**

**the referenced paragraphs. Those responses do not dispute the stated facts. See DSOF ¶¶ 64,**

**66, and 67 and the replies thereto, *supra*. DSOF ¶ 187 is not disputed.**

> 188.    There is no evidence that the "street sources" did not exist.
>
> *Response: Controverted. There is no evidence that the "street sources" Defendants
> reported in the Police File did exist. Instead, Defendants have never identified any
> particular "source" from which the name "McIntyre" allegedly came. Instead, the
> Police File states only that Detective Maskil "ascertained some information"
> regarding the suspect's first name of Lamonte. Further, Detective Maskil did not
> create a report regarding his investigative activities on the Quinn-Ewing homicide,
> and instead his partner, Detective Blood documented both of their investigations in
> an Investigative Addendum. See Ex. 1 Police File, LMKSDC_0003443- 3446.*
>
> *Blood's report documents that he and Maskil went from the crime scene directly to
> Bethany Medical Center, and from Bethany Medical Center directly to K.U.
> Medical Center, where they met with a KARE Technician from the Kansas City,
> Kansas Fire Department, interviewed a cousin of the victim, observed Don Quinn's
> body in the Emergency Room, and consulted with Emergency room staff regarding*

Mr. Quinn's injuries. (Ex. 1: Police File, Blood Investigative Addendum, LMKSDC_0003443-3446). According to the transcript of her audiotaped interview, Ruby Mitchell had selected Lamonte McIntyre's photograph by 17:58 hours. Id. at LMKSCD_0003424. Blood's report documents two phone calls handled by Detective Maskil: one with Sharon Bennett, a relative of Doniel Quinn, from whom "Detective Maskil was unable to obtain any useful information," and one with Mrs. Cinderella Quinn, the grandmother of Mr. Quinn, who "was unable to offer any information as to Don's address or date of birth. She indicated that none of the family was available at this time and she had no idea where they were at but she would have them make contact with either Det. Maskil or Sgt. Blood for additional information." Blood's report documents information received from six individuals he or Detective Maskil spoke with after leaving the crime scene on the afternoon of April 15, none of which document he or Detective Maskil obtaining any information about the identity of the shooter. Blood's report concludes: "There is nothing to add to this report at this time. At the orders of Lt. Culp the case has been turned to Det.'s W.K. Smith and Roger Golubski for further investigation." Id. at LMKSDC_0003446.

Additionally, Prosecutor Morehead represents to the Court that Lieutenant Barber "was the one that was told this information and that information then got back to the other detectives and that's how the name and the photograph was pulled. It was from street talk that the name Lamonte McIntyre came up." (Ex. 3: TT, 301:9–18). Golubski never testifies that Barber or Maskil worked with any sources. Although Barber testified at trial that he obtained the name of Lamonte McIntyre "from numerous sources," these sources were never identified, are not documented in the police file, and are not mentioned in his taped statement to Detective Golubski after Lamonte's arrest. (Ex. 3: Barber TT 353:7–14); (Ex. 1: Police File, LMKSDC_0003433-3435). In reality, Lamonte McIntyre was innocent, SAMF ¶¶ 22–27, and the actual street talk was that Monster committed the crime, SAMF ¶ 20. When Lamonte was arrested, people in the streets "knew it was the wrong guy. It was somebody we never heard of." (Pl. Ex. 24: Joe Robinson Aff. ¶ 19).

In contrast, Golubski is asked, "How did you get the name Lamonte McIntyre, Detective?" answering, "Through other police personnel and other sources that may have pertinent information." (Ex. 3: TT 306:15–25). On the next page, Golubski represents to the Court that he actually got Lamonte McIntyre's "name and photograph" from an Assistant D.A. in the juvenile department. (Id. 307:5-10) Golubski's Investigative Addendum documents that after Golubski learned the first name "Lamonte," "with the assistance of Victoria Meyers of the District Attorney's Office," and afterward, "a picture was produced of a Lamonte McIntyre." Id.; LMKSDC_0003453. When asked at his deposition whether he lied when he claimed that he showed Lamonte McIntyre's photo to Ruby Mitchell because a confidential informant had provided his name, to bolster Mitchell's false identification, Golubski invoked his Fifth Amendment right to remain silent. (Pl. Ex. 63: Roger Golubski Dep. 127:14–129:6, 131:14–22, 135:20–137:4, 171:3–9). Now, Golubski asserts that he took the photos of Lamonte McIntyre from Robert Goddell, a detective who investigated an unrelated case wherein Lamonte McIntyre was a

*suspect. (Doc. 582, at 9–10, ¶¶ 52–55).*

*Additionally, Detective Krstolich further contradicts the above statements by Defendants, as he testified that the name "Lamonte McIntyre" came up when "Miss Mitchell called around until she found out the name of the Lamonte. I believe that's what she did." (Ex. 3: TT 280:24- 281:20). Golubski also states in his report a "fact" that is claimed nowhere else—that Ms. Mitchell "knew the suspect because she used to date his cousin." (Ex. 1: Police File, Golubski 4/15/1994 report p. 2, LMKSDC_0003453). This "fact" is obviously different than a claim that the suspect used to date Ms. Mitchell's niece and reflects yet another fabrication.*

*At his deposition in this case, Defendant Smith testified that he had never in his career solved a case via information on the street within hours of a homicide and described that as "different," in other words, not the way things work in the real world. (Pl. Ex. 59: W.K. Smith Dep. 356:9-23.)*

*In reality, Lamonte McIntyre was innocent, SAMF ¶¶ 22–28, and the actual street talk was that Monster committed the crime, SAMF ¶ 20. When Lamonte was arrested, people in the streets "knew it was the wrong guy. It was somebody we never heard of." (Pl. Ex. 24: Joe Robinson Aff. ¶ 19).*

**Reply: Plaintiffs' purport to controvert DSOF ¶ 188 without citing to any record evidence to dispute the stated fact--that there is no evidence the "street sources" referenced at trial did not exist. As set forth in DSOF ¶ 189, the trial court did not permit the witnesses to identify any street sources. None of plaintiffs' three-page response provides any admissible basis to state the sources referenced at trial did not exist. DSOF ¶ 188 is not disputed.**

189.    The trial court precluded witnesses from disclosing the sources at trial. Trial Transcript, Vol. II, 298:1-308:16.

*Response: Controverted. The trial court told the prosecution that "I don't want you to get into the credibility of the source because if you get into the credibility of the source then you're offering it for the truth of the matter," which would have been hearsay. So, the court stated, "I would be prone to keep that out…also it is an exception to hearsay to explain how they zeroes in on this fellow without getting into specifics and violating his rights to get into any sort of criminal background…I still have to give the witness leeway to indicate that he got this information not for the truth of the matter but to show how in the heck she got the name Lamonte McIntyre and the photograph. I mean, they developed it form investigating and they consulted numerous sources. Let's just say that they consulted numerous sources period, that's very vague and ambiguous. And if you want to get into that on cross-examination I will certainly allow you." (Ex. 3: TT 307:11-25). Indeed, at no point during the trial nor in the colloquy with the court, did any witness or the prosecutor*

*provide the names or identity of any alleged "sources" so that the court and the parties could cross-examine them or corroborate whether such "sources" existed. Instead, the prosecutor simply told the court that "this information came from confidential informants, numerous confidential informants, numerous police officers obtained information with the name Lamonte McIntyre" and specifically stated that she was not offering such information for the "truth of the matter but to show their course of investigation." (Ex. 3: TT 298:1-308:16).*

**Reply: Plaintiffs' purport to controvert DSOF ¶ 189 without citing to any record evidence to dispute the stated fact--that the trial court precluded witnesses from disclosing the sources during the trial. DSOF ¶ 189, is not disputed.**

190.    There is no evidence that Golubski utilized or relied upon any of his informants during the Ewing/Quinn homicide investigation or prosecution.

*Response: Controverted. The evidence in this case directly supports that Golubski relied on informants during the Ewing/Quinn homicide investigation and prosecution. Indeed, Golubski's report specifically states that Detective Maskil "ascertained some information" regarding the suspect's first name of Lamonte. Further, Detective Maskil did not create a report regarding his investigative activities on the Quinn-Ewing homicide, and instead his partner, Detective Blood documented both of their investigations in an Investigative Addendum. See Ex. 1, Police File, LMKSDC_0003443-3446. Golubski then interviewed Lt. Barber, who reported that "Officer Viera, which I had assistance to, received information from an informant in Juniper Gardens area, where Lamont is known to frequent. This information was that he was seen riding in an Oldsmobile 98, white in color, with blue tinted windows in the area of 2nd Street." (Ex. 1: Police File, LMKSDC_0003435). Further, when Golubski is asked at trial "How did you get the name Lamonte McIntyre, Detective?" answering "Through other police personnel and other sources that may have pertinent information." (Ex. 3: TT 306:15–25).*

**Reply: Plaintiffs purport to controvert DSOF ¶ 190 without addressing the fact actually stated--that Golubski did not use or rely upon any of <u>his</u> informants during the Ewing/Quinn homicide. Plaintiffs' response addresses information obtained by Det. Makill, Lt. Barber, Officer Viera. There remains no evidence that Golubski relied or utilized his "vast network of informants" during the Ewing/Quinn homicide. Plaintiffs' speculation is not evidence. DSOF ¶ 190 is not disputed.**

I.     **Rose McIntyre confirmed she told officers that Lamonte McIntyre had been at work.**

191.    During the Waiver/Preliminary Hearing, Rose McIntyre, testified that she gave a statement as to the whereabouts of Lamonte McIntyre. Waiver/Preliminary Hearing Transcript, 46:5-7.

*Response: Controverted. Rose McIntyre only provided to officers that Lamonte was at FiFi's when they asked where he was the day prior to the crime, not the day of. (Ex. 1: Police File, Dennis Barber Stmt. to Golubski, 4/15/1994, LMKSDC_0003434, 3453); (Ex. 68: Preliminary Hearing, 46:5–47:8).*

**Reply: Plaintiffs purport to controvert DSOF ¶ 191 without addressing the fact actually stated--that Rose McIntyre testified about her statement to police. Plaintiffs' response adds additional, but non-responsive, information contrary to D.Kan. Rule 56.1(b)(2). DOSF ¶ 191 is not disputed.**

192.    During the Waiver/Preliminary Hearing, Rose McIntyre, testified she told police Lamonte was at work based on her belief they were talking about the day before the shooting. Waiver/Preliminary Hearing Transcript, 46:5-47:8.

*Response: Controverted in part. Uncontroverted that the cited materials reflect Rose McIntyre testified she told police Lamonte was at work the day before the shooting "because they g[a]ve her the date before, not the date of." Controverted that this was Rose's "belief" but instead what actually occurred. (Ex. 68: Preliminary Hearing).*

**Reply: Plaintiffs purport to controvert DSOF ¶ 192 without disputing the fact actually stated. The response admits the accuracy of the statement. DSOF ¶ 192 is not disputed.**

193.    During the Waiver/Preliminary Hearing, Rose McIntyre, testified when she realized the shooting occurred the day Lamonte McIntyre was taken into custody, she told officers "Well, if you're talking about today, Lamonte was over auntie's house." Waiver/Preliminary Hearing Transcript, 47:4-5.

*Response: Uncontroverted that Rose McIntyre truthfully said that to police. (Ex. 68: Preliminary Hearing, 46:5–47:8).*

**Reply: None.**

J.     **Stacy Quinn was unavailable and did not give a statement to police.**

194.    Stacy Quinn did not testify during the jury trial in 94 CR 1213. Stipulation Doc. 562, ¶ 2.A.14.

*Response: Uncontroverted.*

**Reply: None.**

195.    The Police File documents that, on April 16, 1994, Golubski and Ware attempted to contact other persons present at the scene of the shooting, leaving a card for John Quinn, and spoke with Josephine Quinn who related Stacy Quinn was not available and "said she would make ever [sic] effort to contact her daughter and have her get in contact with [detectives]." Police File, p. 66.

*Response: Controverted, with objection. Plaintiffs agree that the report states what is quoted above, but Defendant's characterization of the report in the remaining portions of Paragraph 195 is controverted. Golubski indicated in his report that he and Ware spoke to Josephine Quinn on April 16, 1994 and that "Josephine stated as per Detective W.K. Smith's statement with her that was not identified by Detective Smith through that statement by Josephine, that there was another daughter by the name of Stacy who stated she knew who the suspect was but on this particular date of the photo line up, Stacy was not available." (Ex. 1: Police File, LMKSDC_0003456). Additionally, to the extent Defendant is using the police report for the truth of the matter, Plaintiffs object on the basis of inadmissible hearsay. Also, Plaintiffs controvert Golubski's reporting that Stacy Quinn was "not available." Instead, Stacy Quinn was present at the scene of the crime, voluntarily told police that she had seen the shooting, and waited in the yard while police interviewed Niko Quinn. SAMF ¶¶ 93, 216–217. Additionally, Golubski knew Stacy Quinn well; he had an ongoing relationship with her since she was a teenager from the mid-1980s through 2000, in which he paid her for sex. SAMF ¶¶ 35, 221–226. Further, Stacy's friend, C.S.R. attested that Stacy was easy to find and could usually be located on Quindaro. SAMF ¶ 215.*

**Reply: Plaintiffs purport to controvert DSOF ¶ 195 while admitting the statement of fact accurately sets forth the content of the report. Plaintiffs' hearsay objection is inapplicable as the report is a public record under Fed. R. Evid. 803(8). Plaintiffs' response provides no admissible evidence disputing the fact Stacy Quinn was not available for a statement on April 16, 1994, or thereafter. DSOF ¶ 195 is not disputed.**

196.    On April 4, 1996, Stacy Quinn testified she did not talk to the police because she was "messed up" and "on drugs at the time." Motion for New Trial Transcript 18:17-22.

*Response: Controverted, in part. Uncontroverted that Stacy Quinn testified she was "messed up" and "on drugs" immediately following the Quinn/Ewing homicides because she "seen it so good that this just messed [her] up for a while." (104Pl. Ex. 13: Hearing on Motion for New Trial, 18:17-20:2). Controverted to the extent*

*Paragraph 196 suggests that Stacy Quinn was on drugs at the time of the shooting, as Stacy testified that she was not on drugs and had a "clear mind" when she witnessed the murders. Id. Additionally, Stacy Quinn "believe[d] that the shooter saw [her] on April 15, 1994 when he committed the double homicide." (Pl. Ex. 73: Stacy Quinn 1996 Aff. ¶¶ 7–8). Additionally, Golubski knew Stacy Quinn well; he had an ongoing relationship with her since she was a teenager from the mid-1980s through 2000, in which he paid her for sex. SAMF ¶¶ 35, 221–226.*

**Reply: Plaintiffs purport to controvert DSOF ¶ 196 while admitting the statement of fact accurately sets forth the content of Stacy Quinn's testimony. Plaintiffs' response adds additional, but non-responsive, information contrary to D.Kan. Rule 56.1(b)(2). DOSF ¶ 196 is not disputed.**

197.    Stacy Quinn testified she left the area before the police arrived. Motion for New Trial Transcript 19:4-8; 28:14-25

*Response: Controverted. Stacy Quinn witnessed the shooting, which occurred across the street from her house, and remained in the area of the scene of the crime following the shooting. (Ex. 16: Hearing on Motion for New Trial 13:24-14:3); SAMF ¶¶ 192–193. Further, Niko Quinn testified that Stacy Quinn was present at the scene of the crime, voluntarily told police that she had seen the shooting, and waited in the yard while police interviewed Niko Quinn. SAMF ¶¶ 34, 216–217.*

**Reply: Plaintiffs purport to controvert DSOF ¶ 197 while admitting the statement of fact accurately sets forth the content of Stacy Quinn's testimony. Plaintiffs' response adds additional, but non-responsive, information contrary to D.Kan. Rule 56.1(b)(2). DOSF ¶ 197 is not disputed.**

198.    Stacy Quinn testified she did not speak to anyone about the shooting until Lamonte's attorney Lindsay Erickson contacted her in jail. Motion for New Trial Transcript P:30 5-7.

*Response: Controverted. Stacy Quinn testified that she did not speak to any investigators before Ms. Erickson contacted her. Motion for New Trial Transcript P:30 5-7. Further, Stacy Quinn affirmed under oath that "The police never questioned me about the double homicide, although I have been in the area." (Pl. Ex. 73: Stacy Quinn Aff. ¶ 11). Niko Quinn testified that Stacy Quinn was present at the scene of the crime, voluntarily told police that she had seen the shooting, and waited in the yard while police interviewed Niko Quinn. SAMF ¶¶ 34, 216–217.*

**Reply: Plaintiffs purport to controvert DSOF ¶ 198 while admitting the statement of fact**

accurately sets forth the content of Stacy Quinn's testimony. **Plaintiffs' response adds additional, but non-responsive, information contrary to D.Kan. Rule 56.1(b)(2). DOSF ¶ 198 is not disputed.**

> 199.    Lamonte McIntyre's trial attorney, Gary Long, could not locate Stacy Quinn before trial. Motion for New Trial Transcript 39:20–40:10.

> *Response: Controverted. The cited material does not support that Gary Long could not locate Stacy Quinn before trial. Instead, Long clarified his testimony in the pages omitted by Defendant above, stating he was not looking for Stacy Quinn but instead "anybody else who saw it, umm, from the statements of the other – the two witnesses that testified at trial, Neeko [sic] Quinn and the other lady, they didn't say there were other people around. Umm, I found it hard to believe, and again I wasn't any more successful in finding people who were saying they saw what happened than – than the police department was." (Ex. 13: Hearing on Motion for New Trial, 41:6-15). Further, in Long's 2015 affidavit, he again specifically states that "After the trial, I learned of a witness, Stacy Quinn, who testified in a post-trial hearing that she had seen the shooting and that the perpetrator was not Lamonte McIntyre. When I examined the police file, it contained no statement from a Stacy Quinn…Had I been aware at the time that Stacy Quinn had witnessed the shooting and knew that Lamonte was not the shooter, I certainly would have attempted to interview her, and I would have subpoenaed her as a defense witness at the trial." (Pl. Ex: 47 Gary Long Aff. ¶ 12)*

**Reply: Plaintiffs purport to controvert DSOF ¶ 199 while admitting the statement of fact accurately sets forth the content of Stacy Quinn's testimony. Plaintiffs' response adds additional, but non-responsive, information contrary to D.Kan. Rule 56.1(b)(2). DOSF ¶ 199 is not disputed.**

> 200.    There is no evidence Stacy Quinn was available for interview between April 15, 1994 and the September 1994 trial.

> *Response: Controverted. Stacy Quinn swore under oath that "The police never questioned me about the double homicide, although I have been in the area." (Pl. Ex. 73: Stacy Quinn Aff. ¶ 11). Additionally, Stacy Quinn was present at the scene of the crime, voluntarily told police that she had seen the shooting, and waited in the yard while police interviewed Niko Quinn. SAMF ¶¶ 34, 216–217. Additionally, Golubski knew Stacy Quinn well; he had an ongoing relationship with her since she was a teenager from the mid-1980s through 2000, in which he paid her for sex. SAMF ¶¶ 221–225. Further, Stacy's friend, C.S.R. attested that Stacy was easy to find and could usually be located on Quindaro. SAMF ¶ 215. Further, Stacy's later testimony, clarifies that she was mad "after we went to the hospital" and that she*

*still had contact with her family in the months following the shooting. (Ex. 13: Hearing on Motion for New Trial 28:23-29:14). Stacy also attested she was in the Kansas City, Kansas area numerous times from 1994 to 1996 when she saw the shooter on the streets. (Pl. Ex. 73: Stacy Quinn 1996 Aff. ¶ 7); SAMF ¶ 93.*

**Reply: Plaintiffs purport to controvert DSOF ¶ 200 without citing to any admissible evidence that disputes the stated fact. Stacy Quinn is deceased, her affidavits are inadmissible hearsay. Stacy Quinn's testimony during post-trial proceeding was that she was not available for interview, see DSOF ¶¶ 196-199.**

201.    There is no evidence Stacy Quinn communicated an exculpatory account to Golubski or any other KCKPD detective or officer.

*Response: Controverted. Stacy Quinn told Golubski and another officer that Lamonte McIntyre did not commit the murders, and instead, that the real perpetrator was Monster. (Pl. Ex. 30: Niko Quinn DA Interview 62:12–63:1); (Ex. 12: Niko Quinn Dep. 12:10–15); (Pl. Ex. 63: Roger Golubski Dep. 193:7–13, 199:22–200:4). 228. In response, Golubski and the other officer called her "crackhead" and other names. (Pl. Ex. 30: Niko Quinn DA Interview 62:12–63:1); (Ex. 12: Niko Quinn Dep. 12:10–15). Additionally, Niko Quinn testified that Stacy Quinn was present at the scene of the crime, voluntarily told police that she had seen the shooting, and waited in the yard while police interviewed Niko Quinn. SAMF ¶¶ 34, 216–217. Further, Niko Quinn told Golubski on numerous occasions that the police had gotten the wrong man for Doniel's murder, and that her sister, Stacy Quinn, said the real killer was Monster. In response, Golubski said nothing and took no action. (Pl. Ex. 25: Niko Quinn 2014 Aff. ¶ 28, 2014); (Pl. Ex. 30: Niko Quinn DA Interview: 171:22–173:10). Also, when asked whether Stacy Quinn told him in the weeks after the murder that Monster was the shooter, Golubski refused to answer the question and instead invoked his Fifth Amendment right to remain silent. (Pl. Ex. 63: Roger Golubski Dep. 193:7–13).*

**Reply: Plaintiffs purport to controvert DSOF ¶ 201 without citing to any admissible evidence that disputes the stated fact. Stacy Quinn is deceased (*see State v. Washington*, 275 Kan. 644, 646, 68 P.3d 134, 140 (2003) (affirming conviction of Stacy Quinn's murder)) and there is no testimony by her that disputes DSOF ¶ 201. Niko Quinn's statements, affidavits and testimony are not based on personal knowledge and are inadmissible. Plaintiffs' response, that Niko Quinn told Golubski that Stacy Quinn told her, is inadmissible hearsay. Golubski's assertion of his rights under the Fifth Amendment is not evidence that Stacy Quinn ever gave**

an exculpatory statement to Golubski or any other detective or officer. DSOF ¶ 201 is not disputed.

202.    There is no admissible evidence Stacy Quinn was sexually exploited by Golubski.

*Response: Controverted. Golubski knew Stacy Quinn well; he had an ongoing relationship with her, in which he paid her for sex. (Pl. Ex. 25: Niko Quinn 2014 Aff. ¶ 27); (Ex. 12: Niko Quinn Dep. 12:10–15, 177:19–178:8); (Pl. Ex. 75: D.L. 2014 Aff. ¶ 10); (Pl. Ex. 24: Joe Robinson Aff. ¶¶ 20, 22); (Pl. Ex. 30: Niko Quinn DA Interview 36:10–17); (Pl. Ex. 63: Roger Golubski Dep. 189:18–190:21); (Pl. Ex. 77: Freda Quinn Dep. 57:14–58:7). Indeed, Golubski had been paying Stacy Quinn for sex since she was a minor, sixteen or seventeen years old, from the mid-1980s through 2000, when Stacy Quinn was murdered. (Pl. Ex. 43: Freda Quinn 2011 Aff. ¶¶ 18–20); (Pl. Ex. 44: Freda Quinn 2016 Aff. ¶ 6); (Pl. Ex. 24: Joe Robinson Aff. ¶ 22); (Pl. Ex. 63: Roger Golubski Dep. 189:17–190:21). Sometimes Golubski would pick up Stacy Quinn from Josephine Quinn's house, where she typically stayed, and she would be gone for a few days at a time. (Pl. Ex. 43: Freda Quinn 2011 Aff. ¶ 19); (Pl. Ex. 77: Freda Quinn Dep. 57:14–58:7); (Pl. Ex. 63: Roger Golubski Dep. 190:14–191:4); (Pl. Ex. 75: D.L. 2014 Aff. ¶ 11). However, there is no documentation in the police file concerning Golubski's relationship with Stacy or any notation that, given the relationship, another detective should interview Stacy. (Ex. 1: Entire Police File, LMKSDC_0003391–3500.)*

**Reply: Plaintiffs purport to controvert DSOF ¶ 202 without citing to any admissible evidence that disputes the stated fact. Stacy Quinn is deceased and there is no testimony by her that disputes DSOF ¶ 202. None of the summary judgment record cited in plaintiffs' response is based on personal knowledge and is inadmissible speculation. DSOF ¶ 202 is not disputed.**

203.    There is no evidence any employee of the KCKPD had knowledge of any relationship between Golubski and Stacy Quinn.

*Response: Controverted. It was common knowledge that Golubski had a sexual relationship with Stacy Quinn, also known as "Buckwheat," from the time she was a teenager to the time of her death in 2001. See (Pl. Ex. 24: Joe Robinson Aff. ¶ 22-26); (Pl. Ex. 74: C.S.R. Aff. ¶ 17-20); (Pl. Ex. 75: D.L. Aff. ¶ 7-11); (Pl. Ex. 43: Freda Quinn 2011 Aff. ¶¶ 16-21). Further, Niko Quinn told the DA's Office that Golubski was coming around her house all the time after Lamonte's trial, "warning me about police watching" or "sitting out in front of my house," and the DA asked her "Do you think it's because of this case, do you think it's because of your sister?" to which Niko replied "I'm not sure if it was because of that, but he did have a relationship with my sister." (Pl. Ex. 30: Niko Quinn DA Interview 34:5-36:17). Further, Niko told the DA that when Golubski would come around it was*

with "another Hispanic officer, his name was Paul something, I thought his name
was John. It was a Mexican officer. And he used to sit on my porch…Paul
Rodriguez or Paul Ramirez or something…but he would be on my porch…" (Id. at
tr. 36:18-37:12) Additionally, Stacy was taken out of her jail cell one time by
Golubski and "somebody else" to talk to her and Golubski said he "shouldn't be
talking" to Niko Quinn because she and Stacy told on him to an investigator. (Id.
at 62:12-64:17)

Moreover, Golubski's sexual exploitation of Black women working as prostitutes
in the KCK community, which included Stacy Quinn, was well-known throughout
the KCKPD and regardless his sexual exploitation was reported to the KCKPD by
community members numerous times. See (Pl. Ex. 90: Alan Jennerich Aff. ¶¶ 7-9);
(Pl. Ex. 89: Ruby Ellington Aff. ¶¶ 5-19); (Pl. Ex. 62: Timothy Maskill Aff. ¶¶ 13-
18); (Pl. Ex. 95: Tina Peterson Aff. ¶¶ 6-21); (Pl. Ex. 50: Rose McIntyre Aff. ¶¶
45-72); (Pl. Ex. 86: Tim Hausback Aff. ¶¶ 9-26). Michael Kobe also testified that
it would not "have been possible for Detective Golubski to…have operated as he
did without the knowledge of commanders knowing what he was doing and how he
was operating….He may have gotten it done once or twice, but the pattern [of using
informants and not providing their name and the allegations of Golubski's sexual
relations with informants] was over a lengthy period of time and I don't think that
that pattern could have … reasonably escaped the notice of a commander." (Pl.
Ex. 88: Michael Kobe Dep . 98:3–99:20); SAMF ¶¶ 413–441.

**Reply: Plaintiffs purport to controvert DSOF ¶ 203 without citing to any admissible evidence that disputes the stated fact. Stacy Quinn is deceased and there is no testimony by her that disputes DSOF ¶ 202. None of the various affidavits or deposition testimony in plaintiffs' one-plus-page response is based on personal knowledge and constitute inadmissible speculation. DSOF ¶ 203 is not disputed.**

## K.     Rose McIntyre-alleged sexual assault

204.     There is no evidence that any individual defendant knew of any action by
Golubski with Rose McIntyre, or that any policymaker for KCKPD was ever
informed of the alleged misconduct.

Response: Controverted. During Golubski's sexual assault of Rose McIntyre at the
KCKPD station, another officer in uniform opened the door to Golubski's office,
turned on the light, stood in the doorway and saw Golubski sexually assault Rose
McIntyre. (Pl. Ex. 50: Rose McIntyre 2014 Aff. ¶ 60); (Pl. Ex. 83: Rose McIntyre
Dep. 110:23- 111:5); (Pl. Ex. 63: Roger Golubski Dep. 237:11–238:5); SAMF,
¶¶ 376-389. See also Plaintiffs' Response to UG SOF ¶ 203; SAMF ¶¶ 442-459.
Additionally, Rose McIntyre reported the incident to a KCKPD officer in Internal
Affairs. SAMF ¶ 403.

**Reply: Plaintiffs purport to controvert DSOF ¶ 204 without citing to any admissible evidence that disputes the stated fact. Plaintiffs' response does not identify the person who supposedly walked in on Rose McIntyre nor does it identify the person in Internal Affairs that Rose McIntyre claims to have told. Plaintiffs' assertion that a policymaker knew is inadmissible speculation. DSOF ¶ 204 is not disputed.**

205.    There is no evidence that anyone in Internal Affairs documented Rose McIntyre's alleged report she was assaulted by Golbuski, and no evidence that any specific person employed by the KCKPD had knowledge of that alleged report.

*Response: Controverted. Rose McIntyre reported her sexual assault by Golubski to several KCKPD employees at Internal Affairs but they refused to take or file her complaint against Golubski, stating that "they don't believe that their officers act like that." (Pl. Ex. 83: Rose McIntyre Dep. 105:1–22, 106:18–25, 127:6–131:6, 140:2–17); SAMF ¶¶ 403–406.*

**Reply: Plaintiffs purport to controvert DSOF ¶ 205 without citing to any admissible evidence that disputes the stated fact. Plaintiffs' response does not identify any record evidence, or any documentation that disputes the stated fact. DSOF ¶ 205 is not disputed.**

**L.    Policymaker for KCKPD**

206.    At all relevant times, the final policymaker for the KCKPD was the Chief of Police. Attachment 15 Plaintiffs Answer to Interrogatory 7 from UG; Attachment 16 Armstrong Declaration; Attachment 17 Miller Declaration; General Order 01-93; General Order 05-94.

*Response: The allegation in Paragraph 206 is a legal conclusion to which no response is required. To the extent that a response is required, uncontroverted.*

**Reply: Plaintiffs admit the stated fact--that, at all relevant times, the final policymaker for the KCKPD was the Chief of Police.**

**1.    The KCKPD had appropriate policies in place**

207.    KCKPD had in place, in 1993 and 1994, appropriate policies for the period. Fischer dep., 106:6-106:25.

*Response: Controverted with objection. Paragraph 207 is ambiguous and vague as it fails to identify what specific "policies" Paragraph 207 is referring to so that*

*Plaintiffs can accurately or fully respond. Notwithstanding the above, Plaintiffs'*
*expert, Russell Fischer testified that the written policies and general orders of the*
*KCKPD that he reviewed for 1993 and 1994 were consistent with appropriate*
*policies for the period. SAMF ¶¶ 405–406, 469–492. However, Plaintiffs dispute*
*that the unwritten policies, practices and customs of the KCKPD or the Unified*
*Government were appropriate or constitutional, as detailed in the Pretrial Order*
*and SAMF ¶¶ 493–513.*

**Reply: Plaintiffs purport to controvert DSOF ¶ 207 without actually disputing the stated**

**fact. Plaintiffs' expert, Fischer, testified that all the policies he reviewed were appropriate.**

**Fischer read the policies and procedures in the KCKPD that were used in in 1994, which are**

**detailed in his report, and the policies were appropriate at the time. Fischer dep., 106:6 – 25.**

**The response asserts, without any evidentiary basis there were "unwritten policies, practices**

**and customs of the KCKPD or the Unified Government, that were not appropriate or**

**constitutional, citing to PSOF ¶¶ 493–513. As detailed in the Unified Government's Reply to**

**PSOF ¶¶ 493–513, plaintiffs present no admissible evidence of any inappropriate or**

**unconstitutional "unwritten policies, practices, and customs." DSOF ¶ 207 is not disputed.**

208.    KCKPD policy required that an officer aware of, or had credible
information of, misconduct by another officer to write a report to the supervisor—
whether a criminal violation, or violation of administrative policy. Armstrong dep.,
79:17-80:7, 80:8-81:2, 81:3-5, 81:10-83:1.

*Response: Controverted in part. Uncontroverted that any officer had the*
*obligation, under KCKPD policy as of 1994, to document and immediately report*
*corruption by another officer, including a fellow officer's violation of the code of*
*ethics. (Ex. 21: Ricky Armstrong Dep. 77:10–83:24). There was no requirement*
*that the report had to be written, nor that the officer himself had to have "credible*
*information" of the misconduct. Further, other KCKPD officers did report*
*Golubski's misconduct to the KCKPD. See SAMF ¶¶ 517–520. Further, Defendants*
*themselves testified that if an officer "saw any indication of any sort of corrupt*
*behavior by a fellow officer, he was obligated to affirmatively report it," (Ex. 6:*
*Dennis Ware Dep. 69:19-70:17; 72:4-22), that "any employee of the KCKPD in*
*the 1990s who heard of Golubski's sexual encounters with informants would have*
*been required to report this misconduct up the chain of command or to Internal*
*Affairs," (Pl. Ex. 58: James Brown Dep. 101:5–102:19), and that if they observed*
*a fellow detective engaging in improper conduct, he had an obligation to intervene,*
*including if he became aware that another officer used suggestion in identification*
*procedures, used coercion in witness interviews, or knew an officer had broken the*

*law. (Pl. Ex. 59: W.K. Smith Dep. 253:5–255:2, 376:7–12).*

**Reply: Plaintiffs purport to controvert DSOF ¶ 208 without disputing the fact stated.**

**Plaintiffs' response adds additional, but non-responsive, information contrary to D.Kan.**

**Rule 56.1(b)(2). DOSF ¶ 208 is not disputed.**

209.    All police officers, regardless of rank, were responsible for reporting violations or taking action if it was within their area of responsibility. Armstrong dep., 171:11-20.

*Response: Controverted. Instead, the KCKPD rule in the 1990s was that every single "police officer from patrolman to the chief was responsible for reporting violations or taking action if it came under their purview, absolutely." (Ex. 21: Ricky Armstrong Dep. 171:5– 20).*

**Reply: Plaintiffs purport to controvert DSOF ¶ 209 without disputing the fact stated.**

**Plaintiffs' response adds additional, but non-responsive, information contrary to D.Kan.**

**Rule 56.1(b)(2). DOSF ¶ 209 is not disputed.**

210.    KCKPD policy precludes a sexual relationship with an informant that impacts the officers ability to impartially perform their duties. Armstrong dep., 163:12-22.

*Response: Uncontroverted. Additionally, according to former KCKPD Chief, Ron Miller, a supervisor could ask an officer if they had relationships with women in the community that could create a conflict of interest with an investigation. If Culp had heard of such a potential conflict of interest, it is his responsibility to follow up on the allegation or rumor of misconduct. (Pl. Ex. 69: Ronald Miller Dep. 70:25– 73:10); see also (Ex. 21: Ricky Armstrong Dep. 175:25– 176:20; (Pl. Ex. 88: Michael Kobe Dep. 32:1–19). Former KCKPD Chief Terry Zeigler testified that if Golubski had a sexual relationship with any witness in a case, there was no legitimate reason for him not to inform the Detective Bureau so that another detective could be assigned. (Pl. Ex. 78: Terry Zeigler Dep. 104:3-12.)*

**Reply: Plaintiffs do not controvert DSOF ¶ 210 but add additional, non-responsive,**

**information contrary to D.Kan. Rule 56.1(b)(2). DOSF ¶ 210 is not disputed.**

211.    Receipt of information from informants was not governed by KCKPD policy--the way the information was documented depended on the relevancy of the information, viability of the information, and willingness of the person who shared the information to be identified. Armstrong dep., 48:4-9.

*Response: Uncontroverted that there was no written KCKPD policy governing informants outside the Narcotics and Vice Departments, but controverted to the extent Paragraph 211 implies there was no unwritten policy, custom, or practice that Golubski was allowed to use, sexually exploit, or pay with drugs or money his informants in order to close cases. In fact, "the Administration of the [KCKPD] turned a blind eye to Golubski's activities because the information that Golubski appeared to be obtaining from these black prostitutes/informants seemed to get results, in terms of getting cases 'cleared.'" (Pl. Ex. 62: Timothy Maskil 2015 Aff. ¶ 14). Indeed, Golubski's misconduct and his exploitation of black women was well known throughout the Department" but he "was never punished," instead "he rose steadily through the ranks and became a powerful detective." (Pl. Ex. 89: Ruby Ellington 2015 Aff. ¶¶ 6, 18); (Pre- Trial Order, Stipulation ¶ 3); see also SAMF ¶¶ 413–564. Further, former Chief Armstrong stated that monetary exchanges with informants had to be signed off by a supervisor. SAMF ¶ 423.*

**Reply: Plaintiffs do not controvert DSOF ¶ 211 but add additional, non-responsive, information contrary to D.Kan. Rule 56.1(b)(2). DOSF ¶ 211 is not disputed.**

212.    If an officer was found to be having sex with his informants, that conduct implicates "gross immorality" which violated KCKPD policy. Armstrong dep., 60:23-61:16.

*Response: Uncontroverted with clarification that the above – as well as having sex with prostitutes – would have also violated the KCKPD Ethics Code. (Ex. 21: Ricky Armstrong Dep. 83:2–84:2, 85:13–86:5; 86:6–87:13).*

**Reply: None.**

213.    The KCKPD enacted a General Order implementing a Code of Ethics applicable to all KCKPD employees. Attachment 22 Code of Ethics; Armstrong dep., 77:4-15, 78:9-16.

*Response: Uncontroverted.*

**Reply: None.**

214.    The Code of Ethics required that any officer address known corruption [or misconduct] by other officers. Armstrong dep., 79:5-12; Attachment 22 Code of Ethics.

*Response: Controverted in part. Uncontroverted that the Code of Ethics required any officer address known corruption by other officers. Controverted, as the cited evidence does not reference "misconduct" but instead requires an officer address known corruption or bribery.*

**Reply: Plaintiffs purport to controvert DSOF ¶ 214 "in part" without disputing the fact**

stated. Plaintiffs response seems to categorized "corruption or bribery" as something other than misconduct. The response does not dispute any of the stated facts and does not cite to any materials in the record that dispute the facts stated. FRCP 56(c)(1)(A). Plaintiffs' response adds additional, but non-responsive, information contrary to D.Kan. Rule 56.1(b)(2). DOSF ¶ 214 is not disputed.

215.    An officer soliciting sex from a prostitute would violate the Code of Ethics. Armstrong dep., 85:24-86:5.

*Response: Uncontroverted. See Plaintiffs' Response to UG SOF ¶ 212.*

**Reply: None.**

216.    If a person came to Internal Affairs with a complaint, Internal Affairs did not have the discretion to refrain from documenting the complaint. Armstrong dep., 135:19-22. For example, Internal Affairs is obligated to take complaint by a citizen who complains of being sexually assaulted or harassed by a KCKPD detective. Armstrong dep., 128:6-20, 128:21-129:8.

*Response: Uncontroverted that Paragraph 216 is an accurate reflection of what the KCKPD policy regarding Internal Affairs and reporting of complaints from citizens should have been, however, controverted to the extent Paragraph 216 suggests such a policy was adhered to by KCKPD employees or officers as stated in SAMF ¶¶ 403–407, 469–513, 518–537.*

**Reply: Plaintiffs do not controvert DSOF ¶ 216 but add additional, non-responsive, information contrary to D.Kan. Rule 56.1(b)(2). DOSF ¶ 216 is not disputed.**

217.    KCKPD policy prohibited officers from inducing a witness to give a false statement or testimony or coercing a witness based on a sexual relationship with the officer. Armstrong dep., 164:3-19.

*Response: Uncontroverted that Paragraph 217 is an accurate reflection of what the KCKPD policy regarding witnesses' false statements and sexual relationships with officers should have been, however, controverted to the extent Paragraph 217 suggests such a policy was adhered to by KCKPD employees or officers as stated in SAMF ¶¶ 403–407, 469–513, 518–537.*

**Reply: Plaintiffs do not controvert DSOF ¶ 217 but add additional, non-responsive, information contrary to D.Kan. Rule 56.1(b)(2). DOSF ¶ 217 is not disputed.**

## 2. KCKPD practices and procedures for photo lineups were appropriate

218.    In the 1990s, the KCKPD had no written policies on how to conduct a photo lineup. York Dep. 46: 10-14 47: 3-6.

*Response: Uncontroverted.*

**Reply: None.**

219.    A photo lineup is five to six photos shown to a victim or witness to identify the suspect. York Dep. 18:21-25 19:1-2 133: 6-11 158: 12-14.

*Response: Uncontroverted.*

**Reply: None.**

220.    The suspect photo could be anywhere in the arrangement. York Dep. 19:4-10.

*Response: Uncontroverted with clarification that there should only be one suspect in each photo line up. See SAMF ¶ 64–65.*

**Reply: Plaintiffs do not controvert DSOF ¶ 220 but add additional, non-responsive, information contrary to D.Kan. Rule 56.1(b)(2). DOSF ¶ 220 is not disputed.**

221.    Photos were sometimes placed in a manila folder with six boxes cut out to display the photos, but could be displayed on a surface or in a loose stack. York Dep. 19:11-17, 117: 1-25 118: 1-9 161: 4-8

*Response: Controverted in part. The procedure for putting together a photo lineup at the KCKPD was to put the photo of the suspect and fillers in a manila folder with squares cut out. It was not proper procedure to hand a witness a stack of photos, as that could be suggestive. (Pl. Ex. 59: W.K. Smith Dep. 147:24–148:8, 151:16–152:19); (Pl. Ex. 54: Clyde Blood Dep.161:19–24).*

**Reply: Plaintiffs purport to controvert DSOF ¶ 221 "in part" without disputing the fact stated. Plaintiffs cite to testimony by Det. Smith that he did not use stacks of photos. Smith did not testify policy precluded use of a stack of photos. Plaintiffs also cite to Det. Blood's testimony that the use of cutout folders for photo lineups was "one of the procedures we followed." Blood did not testify policy precluded use of a stack of photos. The response does not dispute any of the stated facts and does not cite to any materials in the record that dispute**

the facts stated. FRCP 56(c)(1)(A). Plaintiffs' response adds additional, but non-responsive, information contrary to D.Kan. Rule 56.1(b)(2). DOSF ¶ 221 is not disputed.

222.    Though there was no written policy on number of photos in a photo lineup, it was generally accepted that five to six photos would be used. York Dep. 20:4-24 21:11.

*Response: Uncontroverted.*

**Reply: None.**

223.    Filler photos are subjects not suspected of the crime. York Dep. 25: 4-13.

*Response: Uncontroverted. Additionally, a photo lineup should include only one suspect and the rest should be fillers (other people who closely resemble the suspect), and typically the identification unit would find the fillers to fill out the rest of the photo lineup. (Pl. Ex. 59: W.K. Smith Dep. 147:24–149:15, 152:20–154:18); (Ex. 6: Dennis Ware Dep. 161:1–162:24); (Pl. Ex. 54: Clyde Blood Dep.20:13– 21:24); (Ex. 23: Michael York Dep. 24:6–26:2, 27:17–28:16). As Michael York, the Unified Government's representative explained, when choosing fillers, the idea is that "[y]ou are certain when you are choosing those photographs that this person is not part of the crime, was not responsible for the crime." (Ex. 23: Michael York Dep. 25:4–13). Further, Plaintiffs' eyewitness identification expert Dr. Dysart opines, "It is critically important to include fillers who had nothing to do with the crime so that the array contains clearly wrong answers; this is necessary in order to test the reliability of the witness's selection when they do select a suspect." (Pl. Ex. 60: Expert Report of Jennifer Dysart p. 12).*

**Reply: Plaintiffs do not controvert DSOF ¶ 223 but add additional, non-responsive, information contrary to D.Kan. Rule 56.1(b)(2). DOSF ¶ 223 is not disputed.**

224.    Filler photos would have similar physical characteristic to the suspect, such as race, sex, age, facial hair, skin color and be taken from similar distances such that the suspect should not stand out from the filler photos. York Dep. 22: 7-19 27:20-25 28: 1-2. 28: 5-9 28: 10-16 29:3-15 37: 12-21.38: 23-25 39: 1-7.

*Response: Uncontroverted.*

**Reply: None.**

225.    If a crime had multiple suspects, each suspect would have a photo lineup. York Dep. 14-18.

*Response: Uncontroverted with clarification that the citation should be 165:14-18. See also Plaintiffs Response to UG SOF ¶ 223.*

**Reply: None.**

226.    Polaroid cameras were available in the detective's bureau. York Dep. 33: 2-5.

*Response: Uncontroverted with clarification that the correct citation is Ex. 23: 33:21-24; 34:1-13.*

**Reply: None.**

227.    Detectives in the 1990s had boxes, three-ring binders and desk drawers of photos and Polaroids. York Dep. 32: 10-13, 61:20-23.

*Response: Uncontroverted.*

**Reply: None.**

228.    Detective used Polaroids, and also used mug shots from city jail, and yearbooks for photo lineups. York Dep. 32: 13-17, 64:11-14.

*Response: Uncontroverted. The practice in the KCKPD was to select the closest available in time photograph of the suspect for a photo identification procedure so that it would be "the closest likeness...to what the perpetrator looked like when the witness saw them" to maximize the chance the witness would select the perpetrator. SAMF ¶ 73.*

**Reply: Plaintiffs do not controvert DSOF ¶ 228 but add additional, non-responsive,**

**information contrary to D.Kan. Rule 56.1(b)(2). DOSF ¶ 228 is not disputed.**

229.    There was no central unit that stored photos, detectives would share Polaroid photos. York Dep. 60:1-13 60: 17-21 60:25 61: 1-4.

*Response: Uncontroverted.*

**Reply: None.**

230.    There was no policy preventing use of relatives of the suspect in a photo lineup. York Dep. 35: 24-25 36:1.

*Response: Controverted. KCKPD officers, including Defendants in this action, understood it was improper to include multiple family members in one photo lineup because that would be suggestive and unfair. SAMF ¶ 68.*

**Reply: Plaintiffs purport to controvert DSOF ¶ 230 without citing to any record evidence**

**that disputes the stated fact. Plaintiffs' response cross-references PSOF ¶ 68 which does not**

dispute the fact stated--that no policy precluded the use of relatives of the suspect in a photo

lineup. DSOF ¶ 230 is not disputed.

> 231.    Detectives would carry photos in the field for lineup. York Dep. 71: 17-25
> 72: 1-11.

> *Response: Uncontroverted.*

**Reply: None.**

> 232.    Lineups did not include random photos, a known suspect was needed to
> conduct a lineup. York Dep. 78-1-8, 132: 1-3

> *Response: Uncontroverted that lineups should not have included random photos,
> and that a known suspect was needed to conduct a lineup. Additionally, KCKPD
> procedure in 1994 was to conduct a live lineup any time a suspect was in custody,
> as opposed to a photo lineup. (Pl. Ex. 54: Clyde Blood 16:22–17:7).*

**Reply: Plaintiffs do not controvert DSOF ¶ 232 but add additional, non-responsive,**

**information contrary to D.Kan. Rule 56.1(b)(2). DOSF ¶ 232 is not disputed.**

> 233.    Any photo that accurately depicts the suspect's face is acceptable in a photo
> lineup. York Dep. 82:21-15.

> *Response: Controverted. The practice in the KCKPD was to select the closest
> available in time photograph of the suspect for a photo identification procedure so
> that it would be "the closest likeness…to what the perpetrator looked like when the
> witness saw them" to maximize the chance the witness would select the perpetrator.
> SAMF ¶ 73.*

**Reply: Plaintiffs purport to controvert DSOF ¶ 233 without citing to any record evidence**

**that disputes the stated fact. Plaintiffs' response cross-references PSOF ¶ 73 which does not**

**dispute the fact stated--that any photo accurately depicting the suspect's face was acceptable**

**in a photo lineup. PSOF ¶ 73 did not speak to policy, but instead to individual practices of**

**various detectives. DSOF ¶ 233 is not disputed.**

**M.    Alleged Misconduct by Golubski (the following are within plaintiffs' contentions,
Plaintiffs Contentions, Doc 562).**

> 234.    There is no admissible evidence that any officer, supervisor, and/or
> policymaker for the KCKPD knew of that "Golubski threatened, coerced and

sexually assaulted black women, feeding them drugs and forcing them to act as 'informants,' both for his cases and to keep secure his network of illegal activity.

*Response: Controverted. See Plaintiffs' Responses to UG SOF ¶¶ 202-205; 211; 216-217. Further, Plaintiffs refer to SAMF ¶¶ 413–441. Additionally, Paragraph 234 improperly sets forth legal arguments and fails to support its assertion with any citation to the record in violation of Rule 56.1(a) (and this Court's Summary Judgment Guidelines, ¶¶ 6-10) and should therefore be disregarded.*

**Reply: Plaintiffs purport to controvert DSOF ¶ 234 without citing any admissible evidence that disputes the stated fact. Plaintiffs' response cross-references their responses to DSOF ¶¶ 202-205; 211; 216; PSOF ¶¶ 413-441, to which defendant has addressed evidentiary objections to each as plaintiffs' responses or statements are either not supported by the cited record and/or based on inadmissible hearsay, speculation and conjecture. Plaintiffs further object claiming DSOF ¶ 234 lacks a citation to the record. A party moving for summary judgment need not prove a negative. Rather, the movant bears the initial burden to show the absence of a genuine issue of material fact and, when movant that does not bear the burden of persuasion at trial need not negate the nonmovant's claim but make its prima facie demonstration simply by pointing out to the court a lack of evidence essential to the nonmovant's claim. *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670–71 (10th Cir. 1998). DSOF ¶ 234 is not disputed.**

235.    There is no admissible evidence any supervisor and/or policymaker within the KCKPD knowingly permitted Golubski to violate the rights of citizens at any time, and particularly in 1994 and before.

*Response: Controverted. See Plaintiffs' Responses to UG SOF ¶¶ 202-205; 211; 216- 217. Further, Plaintiffs refer to SAMF ¶¶ 377–397, 413–441, 518–537, 562– 564, 578–597. Additionally, Paragraph 235 improperly sets forth legal arguments and fails to support its assertion with any citation to the record in violation of Rule 56.1(a) (and this Court's Summary Judgment Guidelines, ¶¶ 6-10) and should therefore be disregarded.*

**Reply: Plaintiffs purport to controvert DSOF ¶ 235 without citing any admissible evidence that disputes the stated fact. Plaintiffs' response cross-references their responses to DSOF**

¶¶ 202-205; 211; 216-217, and PSOF ¶¶ 377–397, 413–441, 518–537, 562–564, 578–597, to which defendant has addressed evidentiary objections to each as plaintiffs' responses or statements are either not supported by the cited record and/or based on inadmissible hearsay, speculation and conjecture. Plaintiffs further object claiming DSOF ¶ 235 lacks a citation to the record. A party moving for summary judgment need not prove a negative. Rather, the movant bears the initial burden to show the absence of a genuine issue of material fact and, when movant that does not bear the burden of persuasion at trial need not negate the nonmovant's claim but make its prima facie demonstration simply by pointing out to the court a lack of evidence essential to the nonmovant's claim. *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670–71 (10th Cir. 1998). DSOF ¶ 235 is not disputed.

> 236.    There is no admissible evidence that any officer, supervisor, and/or policymaker for the KCKPD knew Golubski used and coercion of informants or used physical threats and abuse toward men and women, or threats to harm loved ones.
>
> *Response: Controverted. See Plaintiffs' Responses to UG SOF ¶¶ 202-205; 211; 216- 217. Further, Plaintiffs refer to SAMF ¶¶ 377–397, 413–441, 518–537, 562– 564, 578–597. Additionally, Paragraph 236 improperly sets forth legal arguments and fails to support its assertion with any citation to the record in violation of Rule 56.1(a) (and this Court's Summary Judgment Guidelines, ¶¶ 6-10) and should therefore be disregarded.*

**Reply: Plaintiffs purport to controvert DSOF ¶ 236 without citing any admissible evidence that disputes the stated fact. Plaintiffs' response cross-references their responses to DSOF ¶¶ 202-205; 211; 216-217 and PSOF ¶¶ 377–397, 413–441, 518–537, 562–564, 578–597, to which defendant has addressed evidentiary objections to each as plaintiffs' responses or statements are either not supported by the cited record and/or based on inadmissible hearsay, speculation and conjecture. Plaintiffs further object claiming DSOF ¶ 236 lacks a citation to the record. A party moving for summary judgment need not prove a negative. Rather, the movant bears the initial burden to show the absence of a genuine issue of material**

fact and, when movant that does not bear the burden of persuasion at trial need not negate the nonmovant's claim but make its prima facie demonstration simply by pointing out to the court a lack of evidence essential to the nonmovant's claim. *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670–71 (10th Cir. 1998). DSOF ¶ 236 is not disputed.

> 237.    There is no admissible evidence that any officer, supervisor, and/or policymaker for the KCKPD knew Golubski repeatedly produced unreliable evidence that that was the product of coercive relationships or bribes.

> *Response: Controverted. See Plaintiffs' Responses to UG SOF ¶¶ 202-205; 211; 216-217. Further, Plaintiffs refer to SAMF ¶¶ 414, 416–417, 422, 425–427, 455, 551. Additionally, Paragraph 237 improperly sets forth legal arguments and fails to support its assertion with any citation to the record in violation of Rule 56.1(a) (and this Court's Summary Judgment Guidelines, ¶¶ 6-10) and should therefore be disregarded.*

Reply: Plaintiffs purport to controvert DSOF ¶ 237 without citing any admissible evidence that disputes the stated fact. Plaintiffs' response cross-references their responses to ¶¶ 202-205; 211; 216-217 and PSOF ¶¶ 414, 416–417, 422, 425–427, 455, 551, to which defendant has addressed evidentiary objections to each as plaintiffs' responses or statements are either not supported by the cited record and/or based on inadmissible hearsay, speculation and conjecture. Plaintiffs further object claiming DSOF ¶ 237 lacks a citation to the record. A party moving for summary judgment need not prove a negative. Rather, the movant bears the initial burden to show the absence of a genuine issue of material fact and, when movant that does not bear the burden of persuasion at trial need not negate the nonmovant's claim but make its prima facie demonstration simply by pointing out to the court a lack of evidence essential to the nonmovant's claim. *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670–71 (10th Cir. 1998). DSOF ¶ 237 is not disputed.

> 238.    There is no admissible evidence that any officer, supervisor, and/or policymaker for the KCKPD knew Golubski used improper and/or unconstitutional methods to "clear" cases, frame an innocent person, or protect a drug dealer.

*Response: Controverted. See Plaintiffs' Responses to UG SOF ¶¶ 202-205; 211; 216-217. Further, Plaintiffs refer to SAMF ¶¶ 286, 425. Additionally, Paragraph 238 improperly sets forth legal arguments and fails to support its assertion with any citation to the record in violation of Rule 56.1(a) (and this Court's Summary Judgment Guidelines, ¶¶ 6-10) and should therefore be disregarded.*

**Reply: Plaintiffs purport to controvert DSOF ¶ 238 without citing any admissible evidence that disputes the stated fact. Plaintiffs' response cross-references their responses to ¶¶ 202-205; 211; 216-217 and PSOF ¶¶ 286, 425, to which defendant has addressed evidentiary objections to each as plaintiffs' responses or statements are either not supported by the cited record and/or based on inadmissible hearsay, speculation and conjecture. Plaintiffs further object claiming DSOF ¶ 238 lacks a citation to the record. A party moving for summary judgment need not prove a negative. Rather, the movant bears the initial burden to show the absence of a genuine issue of material fact and, when movant that does not bear the burden of persuasion at trial need not negate the nonmovant's claim but make its prima facie demonstration simply by pointing out to the court a lack of evidence essential to the nonmovant's claim.** *Adler v. Wal-Mart Stores, Inc.***, 144 F.3d 664, 670–71 (10th Cir. 1998). DSOF ¶ 238 is not disputed.**

239.    There is no admissible evidence that any officer, supervisor, and/or policymaker for the KCKPD knew Golubski assaulted, harassed, and/or and coerced women generally, or Rose McIntyre specifically.

*Response: Controverted and duplicative of UG SOF ¶¶ 204-205. See Plaintiffs Responses to UG SOF ¶ 204-205. Further, Plaintiffs refer to SAMF ¶¶ 403, 405–406, 413–441, 469–492, 518–520, 533–537. Additionally, Paragraph 239 improperly sets forth legal arguments and fails to support its assertion with any citation to the record in violation of Rule 56.1(a) (and this Court's Summary Judgment Guidelines, ¶¶ 6-10) and should therefore be disregarded.*

**Reply: Plaintiffs purport to controvert DSOF ¶ 239 without citing any admissible evidence that disputes the stated fact. Plaintiffs' response cross-references their responses to ¶¶ 204-205 and PSOF ¶¶ 403, 405–406, 413–441, 469–492, 518–520, 533–537, to which defendant**

has addressed evidentiary objections to each as plaintiffs' responses or statements are either not supported by the cited record and/or based on inadmissible hearsay, speculation and conjecture. Plaintiffs further object claiming DSOF ¶ 239 lacks a citation to the record. A party moving for summary judgment need not prove a negative. Rather, the movant bears the initial burden to show the absence of a genuine issue of material fact and, when movant that does not bear the burden of persuasion at trial need not negate the nonmovant's claim but make its prima facie demonstration simply by pointing out to the court a lack of evidence essential to the nonmovant's claim. *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670–71 (10th Cir. 1998). DSOF ¶ 239 is not disputed.

240.    There is no admissible evidence that any officer, supervisor, and/or policymaker for the KCKPD knew Golubski fathered children out of wedlock.

*Response: Controverted. It was widely known within the KCKPD that Golubski fathered children with several black prostitutes in Kansas City, Kansas. (Pl. Ex. 89: Ruby Ellington 2015 Aff. ¶ 15–17); (Pl. Ex. 88: Michael Kobe Dep. 103:3–13); (Pl. Ex. 78: Terry Zeigler Dep. 26:9–27:5). Yet, "the Administration of the [KCKPD] turned a blind eye to Golubski's activities because the information that Golubski appeared to be obtaining from these black prostitutes/informants seemed to get results, in terms of getting cases 'cleared.'" (Pl. Ex. 62: Timothy Maskil 2015 Aff. ¶ 14). Indeed, Golubski's misconduct and his exploitation of black women was well known throughout the Department" but he "was never punished," instead he "rose steadily through the ranks and became a powerful detective." (Pl. Ex. 89: Ruby Ellington 2015 Aff. ¶¶ 6, 18); (Pre-Trial Order, Stipulation ¶ 3). Further, Terry Zeigler testified about how, during an investigation, he went with Golubski to a house on Tennyson where a young woman asked him: "[H]ave you seen Roger's grandbaby?" (Pl. Ex. 78: Terry Zeigler Dep. 26:18-22). Zeigler said "no," and the woman pulled a picture off the mantle and said, "this is Roger's grandbaby." (Pl. Ex. 78: Terry Zeigler Dep. 26:22-25). The woman also said it was "Neosha's baby." (Pl. Ex. 78: Terry Zeigler Dep. 27:1). Outside of the house, Zeigler asked Golubski about the grandbaby, and Golubski stated: "Man, that's my play family." (Pl. Ex. 78: Terry Zeigler Dep. 27:1-5). Zeigler never inquired further and testified that the situation did not raise any questions in his mind. (Pl. Ex. 78: Terry Zeigler Dep. 27:1-12). In his declaration, Max Seifert stated that it was widely known in the department that Golubski had children in the north end. For example, one day, an officer arrested a young woman who told the officer that she was Golubski's daughter. Golubski confirmed this information to the officer. (Pl. Ex. 104: Max Seifert Dec. ¶ 11). Further, Greg Wilson, a north end resident, is personally acquainted with Neosha Collier, a young woman widely known in the*

*community as Golubski's daughter. (Pl. Ex. 33: Gregory Wilson 2015 Aff. ¶ 12).*

*Regardless of the above, Paragraph 240 improperly sets forth legal arguments and fails to support its assertion with any citation to the record in violation of Rule 56.1(a) (and this Court's Summary Judgment Guidelines, ¶¶ 6-10) and should therefore be disregarded.*

**Reply: Plaintiffs purport to controvert DSOF ¶ 240 without citing any admissible evidence that disputes the stated fact. Plaintiffs' response refers to the affidavit of the deceased Ruby Ellington (which does not evince personal knowledge of the stated fact) and the depositions of Mike Kobe and Terry Ziegler and the affidavits of Max Siefert and Gregory Wilson. *See* Ellington Obituary; Attachment 2. None of the cited record provides any basis for the witnesses to have personal knowledge of (1) whether Golubski fathered any children out of wedlock or (2) that such fact was known to any officer, supervisor, and/or policy maker for KCKPD. Plaintiffs further object claiming DSOF ¶ 240 lacks a citation to the record. A party moving for summary judgment need not prove a negative. Rather, the movant bears the initial burden to show the absence of a genuine issue of material fact and, when movant that does not bear the burden of persuasion at trial need not negate the nonmovant's claim but make its prima facie demonstration simply by pointing out to the court a lack of evidence essential to the nonmovant's claim. *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670–71 (10th Cir. 1998). DSOF ¶ 240 is not disputed.**

241.    There is no admissible evidence that any officer, supervisor, and/or policymaker for the KCKPD knew of Golubski sex with in his office, or sex with informants, prostitutes and/or witnesses.

*Response: Controverted. Evidence that officers, supervisors, and/or policymakers for the KCKPD knew Golubski had sex in his office, or sex with informants, prostitutes and/or witnesses is detailed in SAMF ¶¶ 377–468, 518–537, 565–577. Regardless, Paragraph 241 improperly sets forth legal arguments and fails to support its assertion with any citation to the record in violation of Rule 56.1(a) (and this Court's Summary Judgment Guidelines, ¶¶ 6-10) and should therefore be disregarded.*

**Reply: Plaintiffs purport to controvert DSOF ¶ 241 without citing any admissible evidence that disputes the stated fact. Plaintiffs' response cross-references PSOF ¶¶ ¶ 377–468, 518–537, 565–577, to which defendant has addressed evidentiary objections to each as plaintiffs' responses or statements are either not supported by the cited record and/or based on inadmissible hearsay, speculation and conjecture. Plaintiffs further object claiming DSOF ¶ 241 lacks a citation to the record. A party moving for summary judgment need not prove a negative. Rather, the movant bears the initial burden to show the absence of a genuine issue of material fact and, when movant that does not bear the burden of persuasion at trial need not negate the nonmovant's claim but make its prima facie demonstration simply by pointing out to the court a lack of evidence essential to the nonmovant's claim.** *Adler v. Wal-Mart Stores, Inc.*, **144 F.3d 664, 670–71 (10th Cir. 1998). DSOF ¶ 241 is not disputed.**

> 242.    There is no admissible evidence that any officer, supervisor, and/or policymaker for the KCKPD knew Golubski worked with or for gang leaders and/or drug dealers.
>
> *Response: Controverted. Evidence that officers, supervisors, and/or policymakers for the KCKPD knew Golubski worked with or for gang leaders and/or drug dealers is detailed in SAMF ¶¶ 460, 551–564. Regardless, Paragraph 242 improperly sets forth legal arguments and fails to support its assertion with any citation to the record in violation of Rule 56.1(a) (and this Court's Summary Judgment Guidelines, ¶¶ 6-10) and should therefore be disregarded.*

**Reply: Plaintiffs purport to controvert DSOF ¶ 242 without citing any admissible evidence that disputes the stated fact. Plaintiffs' response cross-references PSOF ¶¶ 460, 551–564, to which defendant has addressed evidentiary objections to each as plaintiffs' responses or statements are either not supported by the cited record and/or based on inadmissible hearsay, speculation and conjecture. Plaintiffs further object claiming DSOF ¶ 242 lacks a citation to the record. A party moving for summary judgment need not prove a negative. Rather, the movant bears the initial burden to show the absence of a genuine issue of material**

**fact and, when movant that does not bear the burden of persuasion at trial need not negate the nonmovant's claim but make its prima facie demonstration simply by pointing out to the court a lack of evidence essential to the nonmovant's claim.** *Adler v. Wal-Mart Stores, Inc.*, **144 F.3d 664, 670–71 (10th Cir. 1998). DSOF ¶ 242 is not disputed.**

> 243.    There is no admissible evidence that any officer, supervisor, and/or policymaker for the KCKPD regularly aided Golubski by making sure he could clear warrants and make cases against his informants disappear in exchange for sexual favors and information.
>
> *Response: Controverted. Evidence that officers, supervisors, and/or policymakers for the KCKPD regularly aided Golubski by making sure he could clear warrants and make cases against his informants disappear in exchange for sexual favors and information is detailed in SAMF ¶¶ 421, 433, 448–457; see also (Pl. Ex. 78: Terry Zeigler Dep. 151:1-154:9) (describing how Zeigler and Golubski promised undisclosed benefits to witnesses); (Pl. Ex. 78: Terry Zeigler Dep. 153:9-154:9) (describing the process of doing so, stating "we could have the ticket set aside or the charges set aside"). Regardless, Paragraph 243 improperly sets forth legal arguments and fails to support its assertion with any citation to the record in violation of Rule 56.1(a) (and this Court's Summary Judgment Guidelines, ¶¶ 6-10) and should therefore be disregarded.*

**Reply: Plaintiffs purport to controvert DSOF ¶ 243 without citing any admissible evidence that disputes the stated fact. Plaintiffs' response cross-references PSOF ¶¶ 421, 433, 448–457, to which defendant has addressed evidentiary objections to each as plaintiffs' responses or statements are either not supported by the cited record and/or based on inadmissible hearsay, speculation and conjecture. Plaintiff also adds additional, but non-responsive, information from Terry Ziegler's deposition contrary to D.Kan. Rule 56.1(b)(2). Plaintiffs further object claiming DSOF ¶ 243 lacks a citation to the record. A party moving for summary judgment need not prove a negative. Rather, the movant bears the initial burden to show the absence of a genuine issue of material fact and, when movant that does not bear the burden of persuasion at trial need not negate the nonmovant's claim but make its prima facie demonstration simply by pointing out to the court a lack of evidence essential to the**

nonmovant's claim. ***Adler v. Wal-Mart Stores, Inc.***, 144 F.3d 664, 670–71 (10th Cir. 1998).

DSOF ¶ 243 is not disputed.

> 244.    There is no admissible evidence that misconduct by Golubski repeatedly came to the attention of the KCKPD and was known by the highest levels of the Department.
>
> *Response: Controverted. Evidence that misconduct by Golubski repeatedly came to the attention of the KCKPD and was known by the highest levels of the Department is detailed in SAMF ¶¶ 403, 413–441, 469–537, 551, 555. Regardless, Paragraph 244 improperly sets forth legal arguments and fails to support its assertion with any citation to the record in violation of Rule 56.1(a) (and this Court's Summary Judgment Guidelines, ¶¶ 6-10) and should therefore be disregarded*

**Reply: Plaintiffs purport to controvert DSOF ¶ 244 without citing any admissible evidence that disputes the stated fact. Plaintiffs' response cross-references PSOF ¶¶ 403, 413–441, 469–537, 551, 555, to which defendant has addressed evidentiary objections to each as plaintiffs' responses or statements are either not supported by the cited record and/or based on inadmissible hearsay, speculation and conjecture. Plaintiffs further object claiming DSOF ¶ 244 lacks a citation to the record. A party moving for summary judgment need not prove a negative. Rather, the movant bears the initial burden to show the absence of a genuine issue of material fact and, when movant that does not bear the burden of persuasion at trial need not negate the nonmovant's claim but make its prima facie demonstration simply by pointing out to the court a lack of evidence essential to the nonmovant's claim. *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670–71 (10th Cir. 1998). DSOF ¶ 244 is not disputed.**

> 245.    There is no admissible evidence that KCKPD administration spoke with Golubski about his improper use of Black sex workers as informants, or knew his use of informants did not comport with KCKPD policy or was otherwise improper.
>
> *Response: Controverted. See (Pl. Ex. 62: Timothy Maskil 2015 Aff. ¶¶ 1–2, 13-14). Regardless, Paragraph 245 improperly sets forth legal arguments and fails to support its assertion with any citation to the record in violation of Rule 56.1(a) (and this Court's Summary Judgment Guidelines, ¶¶ 6-10) and should therefore be disregarded.*

**Reply: Plaintiffs purport to controvert DSOF ¶ 245 without citing any admissible evidence that disputes the stated fact. Plaintiffs' response references the affidavit of the deceased Tim Maskil which is inadmissible hearsay, is not based on personal knowledge and presents only speculation and conjecture. Attachment 3, Maskil Obituary. Plaintiffs further object claiming DSOF ¶ 245 lacks a citation to the record. A party moving for summary judgment need not prove a negative. Rather, the movant bears the initial burden to show the absence of a genuine issue of material fact and, when movant that does not bear the burden of persuasion at trial need not negate the nonmovant's claim but make its prima facie demonstration simply by pointing out to the court a lack of evidence essential to the nonmovant's claim.** *Adler v. Wal-Mart Stores, Inc.*, **144 F.3d 664, 670–71 (10th Cir. 1998). DSOF ¶ 245 is not disputed.**

246.    There is no admissible evidence that Golubski's alleged misconduct was known, permitted, and/or endorsed.

*Response: Controverted. Evidence that Golubski's alleged misconduct was known, permitted, and/or endorsed is detailed in SAMF ¶¶ 403, 413–441, 469–537, 551, 555. Further, see (Pl. Ex. 69: Ronald Miller Dep. 244:4-9) ("We knew he had an informant network. We knew that he liked black women, young black women. We knew that he was working those networks and getting information, but he could come up with information, so he worked those cases"); (Pl. Ex. 92: Ronald Miller 9-14-12 Dep. 72:21-75:3) (Golubski being involved with prostitutes wasn't "foreign" to Miller). Additionally, the KCKPD command staff's reference to the direct reports and complaints by other officers and community members of Golubski's misconduct as "rumors" is indicative of their knowledge, endorsement, and deliberate indifference. Regardless, Paragraph 246 improperly sets forth legal arguments and fails to support its assertion with any citation to the record in violation of Rule 56.1(a) (and this Court's Summary Judgment Guidelines, ¶¶ 6-10) and should therefore be disregarded.*

**Reply: Plaintiffs purport to controvert DSOF ¶ 246 without citing any admissible evidence that disputes the stated fact. Plaintiffs' response references the deposition of Ron Miller which does not identify any misconduct by Golubski that was known. permitted and/or endorsed. Plaintiffs further object claiming DSOF ¶ 246 lacks a citation to the record. A**

party moving for summary judgment need not prove a negative. Rather, the movant bears the initial burden to show the absence of a genuine issue of material fact and, when movant that does not bear the burden of persuasion at trial need not negate the nonmovant's claim but make its prima facie demonstration simply by pointing out to the court a lack of evidence essential to the nonmovant's claim. *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670–71 (10th Cir. 1998). DSOF ¶ 246 is not disputed.

247.    There is no evidence that Golubski's so-called informant network was utilized in investigation and prosecution for the Ewing/Quinn homicides.

*Response: Controverted. Regardless, Paragraph 247 improperly sets forth legal arguments and fails to support its assertion with any citation to the record in violation of Rule 56.1(a) (and this Court's Summary Judgment Guidelines, ¶¶ 6-10) and should therefore be disregarded. Notwithstanding the above, Plaintiffs refer Defendant to Plaintiffs' Response to UG SOF ¶ 190.*

*Further, Lamonte McIntyre is innocent, and no reliable evidence against him has ever existed. But because Golubski had a "vast network of informants" and could "clear" cases that others purportedly could not, (Pl. Ex. 88: Michael Kobe Dep. 36:3, 36:16) the obviously flawed and fabricated case against McIntyre was sent to the prosecutor's office within two days. (Ex: 5: Receipt for Prosecution Report) The KCKPD command staff knew that Roger Golubski had an informant network, and that he "worked" those informants to get information." (Pl. Ex. 69: Ronald Miller Dep. 54:18-55:9). Golubski "kept his informants close to the vest," but the composition of his network was widely known. (Pl. Ex. 92: Ronald Miller 9-14-12 Dep. 243:13- 244:9). Former Police Chief Miller admitted: "We knew he had an informant network. We knew that he liked black women, young black women. We knew that he was working those networks and getting information, but he could come up with information, so he worked those cases." (Pl. Ex. 92: Ronald Miller 9-14-12 Dep. 244:4-9).*

*The existence of Golubski's "network" is what allowed him – and his fellow detectives – to claim reliance on alleged anonymous sources in the Ewing-Quinn police file, referring to unidentified "street talk," the claim that Maskil "ascertained" the name "Lamonte" (as stated in Golubski's report as there was no report by Maskil) and vague tips about vehicles that Lamonte was supposedly seen in. (See Ex. 1 at LMKSDC_0003433-35; 3453) In her opening statement, prosecutor Morehead told the jury that "confidential informants" and "numerous reliable sources" indicated "that the individual who was responsible for this [crime] was the defendant, Lamonte McIntyre." (Pl. Ex. 102: Opening Statement TT 6). Of course, none of these "reliable sources" ever testified, nor did the officers identify who their sources were. Instead, the "street talk" had never pointed to*

*Lamonte. Joe Robinson, the cousin of Aaron Robinson and the brother of Cecil Brooks, stated that when news reports stated who Lamonte McIntyre was arrested for the double homicide, 'It was somebody we had never heard of." (Pl. Ex. 24: Joe Robinson Aff. ¶ 19).*

*Golubski's control of his informant network allowed him to ensure that the exculpatory account of Stacy Quinn, whom he began sexually exploiting when she was a teenager, was never included in the police file. (See generally Exhibit 1: Police File); SAMF ¶¶ 35, 221–226. It also allowed Golubski to use his reputation to influence Niko Quinn during the meeting behind Wyandotte High School. See Plaintiffs' Response to UG's SOF ¶ 45. When Niko told Golubski that it was Aaron Robinson and his gang that had "beef" with Doniel, Golubski shut her down with his inside information, stating she "shouldn't be talking about Cecil, be careful...about Cecil because they found his ex-girlfriend's remains behind Washington High School." Id. Golubski then lied to Niko, telling her Cecil Brooks and Aaron Robinson and their gang "didn't do it, they couldn't have did it because they had the guy in custody [referring to Lamonte McIntyre], they had the clothes he was wearing and they had the gun so they got the right person." Id.*

*Golubski was widely viewed "as being very powerful." (Pl. Ex. 41: M'Sherie Johnson Aff. ¶ 20). KCK community members knew that he had a network of informants comprised of drug-addicted women who complied with his demands for sex and information. Id. at ¶¶ 20-25. Golubski would stalk residents in the housing projects, and everyone was afraid because they knew Golubski had "ultimate power" and could "put a case" on anyone. (Pl. Ex. 33: Gregory Wilson Aff. ¶¶ 13-21). The fear of Golubski in the community and the reliance of his colleagues and commanders on Golubski's informant network allowed Golubski to readily "clear" cases, including those that had otherwise "dead-ended." See (Pl. Ex. 88: Michael Kobe Dep. 35:2- 36:18). Golubski "cleared" the McIntyre case in hours, even though he had no physical evidence, conducted no searches, identified no motive, and did not have any evidence that Lamonte McIntyre even knew the two victims. The police file instead refers to "street talk" and unidentified "sources" to explain how Lamonte McIntyre's name first surfaced, and the prosecutor then recited those false claims in her opening statement.*

**Reply: Plaintiffs purport to controvert DSOF ¶ 247 without citing any admissible evidence that disputes the stated fact. Plaintiffs further object claiming DSOF ¶ 237 lacks a citation to the record. A party moving for summary judgment need not prove a negative. Rather, the movant bears the initial burden to show the absence of a genuine issue of material fact and, when movant that does not bear the burden of persuasion at trial need not negate the nonmovant's claim but make its prima facie demonstration simply by pointing out to the**

court a lack of evidence essential to the nonmovant's claim. *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670–71 (10th Cir. 1998). Plaintiffs' response resorts to speculation that Golubski's "vast network of informants" was utilized to close the Ewing/Quinn homicide investigation, whereas the record shows informants were used by Lt. Barber, Det. Maskil, and Officer Vierra DSOF ¶¶ 14, 64-67, 187-190. DSOF ¶ 247 is not disputed.

### Plaintiffs' Additional Statement of Facts (PSOF)

1. Doniel Quinn, who had an addiction to crack, was a regular customer of Aaron Robinson and worked as an occasional "doorman" for him at a drug house on North 21st Street. (Pl. Ex. 24: Joe Robinson Aff. ¶¶ 13–14); (Pl. Ex. 25: Niko Quinn 2014 Aff. ¶¶ 13-15); (Ex. 12: Niko Quinn Dep. 42:4-13); (Pl. Ex. 26: Cecil Brooks 2016 Aff. ¶¶ 11-15).

Reply: Objection PSOF ¶1 is not supported by admissible evidence. "An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4). The cited portion of the affidavits lack foundation, fail to demonstrate personal knowledge of the facts stated, are based on hearsay, and are inadmissible speculation.

2. In the weeks before he was killed, word on the street was that Doniel Quinn had stolen drugs from this stash house operated by Cecil Brooks and Aaron Robinson, and which was overseen by Neil Edgar, Jr., known as "Monster." (Pl. Ex. 83: Shonda Nichols 2014 Aff. ¶¶ 17– 18)5; (Pl. Ex. 24: Joe Robinson Aff. ¶¶ 13–15); (Pl. Ex. 25: Niko Quinn 2014 Aff. ¶¶ 13–15); Golubski SOF, ¶ 24.

Reply: Objection PSOF ¶ 2 is not supported by evidence that would be admissible at trial. The cited portion of the affidavits lack foundation, fail to demonstrate personal knowledge of the facts stated, are based on hearsay, and are inadmissible speculation.

3. Monster was an enforcer who would shoot people for hire and worked for Aaron Robinson's drug gang. (Pl. Ex. 24: Joe Robinson Aff. ¶¶ 3–19); (Pl. Ex. 26: Cecil Brooks 2016 Aff. ¶¶ 3–20); (Pl. Ex. 28: Tamika Burks Aff. ¶ 4).

Reply: Objection PSOF ¶ 3 is not supported by evidence that would be admissible at trial.

**The cited portion of the affidavits lack foundation, fail to demonstrate personal knowledge of the facts stated, are based on hearsay, and are inadmissible speculation.**

4. Aaron Robinson ran a drug operation under the "mentorship" of Cecil Brooks, a "major figure in the Kansas City, Kansas, drug business." (Pl. Ex. 26: Cecil Brooks 2016 Aff. ¶¶ 1–6); (Pl. Ex. 24: Joe Robinson Aff. ¶¶ 8, 12); (Pl. Ex. 28: Tamika Burks Aff. ¶ 3); (Pl. Ex. 29: Siobaughn Nichols Aff. ¶ 21); (Pl. Ex. 31: Kendra Dean-Martin 2013 Aff. ¶ 5).

**Reply: Objection PSOF ¶ 4 is not supported by evidence that would be admissible at trial.**

**The cited portion of the affidavits lack foundation, fail to demonstrate personal knowledge of the facts stated, are based on hearsay, and are inadmissible speculation.**

5. About a week before Doniel Quinn's murder, Aaron Robinson, Monster, and their associates beat him with poles and kicked him, leaving Doniel with a black eye, a swollen face, blood running down his face, and bruises all on his leg. Doniel Quinn was able to get away. (Pl. Ex. 25: Niko Quinn 2014 Aff. ¶ 14); (Ex. 12: Niko Quinn Dep. 12:10–15, 40:21–43:11, 171:22– 173:10, 40:21–41:10, 42:4–43:11, 173:11–174:7; (Pl. Ex. 30: Niko Quinn DA Interview 1:1– 3:25); (Pl. Ex. 31: Kendra Dean-Martin 2013 Aff. ¶ 9); Golubski's SOF ¶ 27.

**Reply: Objection PSOF ¶ 5 is not supported by evidence that would be admissible at trial.**

**The cited portion of the affidavits lack foundation, fail to demonstrate personal knowledge of the facts stated, are based on hearsay, and are inadmissible speculation.**

6. After that beating, there was a bounty out on Doniel Quinn for $4,000. Doniel Quinn's cousin, Niko Quinn, sent two people (including her sister, Stacy Quinn) to Aaron Robinson and Cecil Brooks to see if she could pay this debt but was told they didn't want the money. (Ex. 12: Niko Quinn Dep. 20:12–19, 43:17–46:25).

**Reply: Objection PSOF ¶ 6 is not supported by evidence that would be admissible at trial.**

**Niko Quinn's statements about what she was told are hearsay and speculation.**

7. The night before Doniel Quinn was murdered, Monster and his drug-business associates rode by in a car and tried to get Doniel Quinn to join them. (Ex. 12: Niko Quinn Dep. 12:10–15, 48:3–7, 48:20–49:17, 50:7–51:18); (Pl. Ex. 30: Niko Quinn DA Interview 1:1–5:21); Golubski's SOF ¶ 29.

**Reply: PSOF ¶7 Uncontroverted.**

8. Monster was hired to kill Doniel Quinn. (Pl. Ex. 26: Cecil Brooks 2016 Aff.

¶ 17); (Pl. Ex. 25: Niko Quinn 2014 Aff. ¶ 16); (Pl. Ex. 27: Shonda Nichols 2014 Aff. ¶¶ 19–20); (Pl. Ex. 24: Joe Robinson Aff. ¶¶ 7–17); (Pl. Ex. 29: Siobaughn Nichols Aff. ¶ 21).

**Reply: Objection Plaintiff's ¶ 8 is not supported by evidence that would be admissible at trial. The cited portion of the affidavits lack foundation, fail to demonstrate personal knowledge of the facts stated, are based on hearsay, and are inadmissible speculation.**

9. On April 15, 1994, Doniel Quinn sat in a blue Cadillac on Hutchings Street in Kansas City, Kansas with Doniel Ewing. (Pretrial Order, Doc. 562, Stipulations, ¶ 5); (Ex. 1: Police File, Golubski Report, 4/16/1994 LMKSDC_0003392).

**Reply: PSOF ¶9 Uncontroverted.**

10. Monster shot into the passenger side of the car with a shotgun in broad daylight. (Pl. Ex. 26: Cecil Brooks 2016 Aff. ¶¶ 15-18); (Pl. Ex. 25: Niko Quinn 2014 Aff. ¶¶ 14-16, 25-26); (Pl. Ex. 32: Ruby Mitchell 2011 Aff. ¶ 3); (Ex. 1: Police File, Wansley Report, 4/16/1994 LMKSDC_0003404).

**Reply: PSOF 10, identifying "Monster" as the shooter, is not supported by the cited references to the record and is inadmissible speculation. It is not disputed that the shooting was with a shotgun in broad daylight.**

11. Doniel Quinn died at the crime scene, while Ewing died at the hospital, both from shotgun wounds. (Pretrial Order, Doc. 562, Stipulations, ¶¶ 6-7); (Ex. 1: Police File, Golubski Report, 4/16/1994 LMKSDC_0003392).

**Reply: PSOF ¶11 Uncontroverted.**

**Monster is the real perpetrator**

12. Monster bragged to a female friend that he had killed Ewing and Doniel Quinn. (Pl. Ex. 27: Shonda Nichols 2014 Aff. ¶¶ 18–23).

**Reply: Objection Plaintiff's ¶ 12 is not supported by evidence that would be admissible at trial. The cited portion of the affidavits lack foundation, fail to demonstrate personal knowledge of the facts stated, are based on hearsay, and are inadmissible speculation.**

13. Further, Aaron Robinson told his family members that Monster had committed the killings, and both Cecil Brooks and Joe Robinson attested that Monster was responsible for the murders. (Pl. Ex. 26: Cecil Brooks 2016 Aff. ¶ 18); (Pl. Ex. 24:

Joe Robinson Aff. ¶¶ 15-16).

**Reply: Objection Plaintiff's ¶ 13 is not supported by evidence that would be admissible at trial. The cited portion of the affidavits lack foundation, fail to demonstrate personal knowledge of the facts stated, are based on hearsay, and are inadmissible speculation.**

14. Even before the murders, Monster had a reputation for doing "wild" and "crazy" things and for being violent and "wicked" without capacity for remorse (Pl. Ex. 26: Cecil Brooks 2016 Aff. ¶ 21); (Pl. Ex. 24: Joe Robinson Aff. ¶ 17); (Pl. Ex. 33: Gregory Wilson 2015 Aff. ¶¶ 2–8); (Pl. Ex. 29: Siobaughn Nichols 2014 Aff. ¶ 22); (Pl. Ex. 27: Shonda Nichols 2014 Aff. ¶¶ 14–18); (Pl. Ex. 31: Kendra Dean-Martin 2013 Aff. ¶ 4); (Pl. Ex. 34: N.F. Aff. ¶ 5).

**Reply: Objection Plaintiff's ¶ 14 is not supported by evidence that would be admissible at trial. The cited portion of the affidavits lack foundation, fail to demonstrate personal knowledge of the facts stated, are based on hearsay, and are inadmissible speculation.**

15. Monster was close to an associate, Marlon Williams, who was a cousin of Aaron Robinson. Williams was always with Monster, including on the night before the murders. (Pl. Ex. 24: Joe Robinson Aff. ¶ 18); (Pl. Ex. 30: Niko Quinn DA Interview 1:1–5:21); (Ex. 12: Niko Quinn Dep. 50:7-51:2); (Pl. Ex. 35: Kendra Dean-Martin 2015 Aff. ¶¶ 5-7); (Pl. Ex. 31: Kendra Dean-Martin 2013 Aff. ¶ 5); (Pl. Ex. 36: Nathan Richardson Aff. ¶ 11); (Pl. Ex. 26: Cecil Brooks 2016 Aff. ¶¶ 12-14).

**Reply: Objection Plaintiff's ¶ 15 is not supported by evidence that would be admissible at trial. The cited portion of the affidavits lack foundation, fail to demonstrate personal knowledge of the facts stated, are based on hearsay, and are inadmissible speculation.**

16. One of Monster's associates also participated in the killings of Ewing and Quinn, by driving Monster to and from the crime scene in a blue car. (Pl. Ex. 26: Cecil Brooks 2016 Aff. ¶¶ 12-21); (Pl. Ex. 33: Gregory Wilson 2015 Aff. ¶ 11); (Pl. Ex. 35: Kendra Dean-Martin 2015 Aff. ¶ 5); (Pl. Ex. 31: Kendra Dean-Martin 2013 Aff. ¶¶ 3-12).

**Reply: Objection Plaintiff's ¶ 16 is not supported by evidence that would be admissible at trial. The cited portion of the affidavits lack foundation, fail to demonstrate personal knowledge of the facts stated, are based on hearsay, and are inadmissible speculation.**

17. Aaron Robinson and Marlon Williams are now deceased, and Cecil Brooks is in prison. (Pl. Ex. 26: Cecil Brooks 2016 Aff. ¶ 1); (Pl. Ex. 24: Joe Robinson Aff. ¶ 2); (Pl. Ex. 35: Kendra Dean-Martin 2015 Aff. ¶ 5); (Pl. Ex. 37: News Articles).

**Reply: PSOF ¶17 Uncontroverted in part. Brooks is on parole and not in prison. Exhibit 77, Deposition of Cecil Brooks, tr. 1, indicating the deposition was taken on September 7, 2021, at the Robert J. Dole Federal Courthouse.**

18. Monster is now serving thirty years in prison after pleading guilty to a different homicide in which he shot the victim in the head multiple times without provocation, put the victim's body in the trunk, poured gasoline over the car, and ordered the car set it on fire. (Pl. Ex. 38: Neil Edgar Jr. Dep. 42:10–45:19); (Pl. Ex. 39: Sentencing Transcript, Neil Edgar Jr.).

**Reply: Objection Plaintiff's 18 is irrelevant and prejudicial, and the fact of his subsequent conviction would not be admissible at trial to prove Neil Edgar, Jr. committed the Quinn/Ewing murders, and the fact of his conviction, which occurred many years after the Quinn/Ewing murders could not have been known by police investigating the Quinn/Ewing homicides in 1994, would be inadmissible at trial pursuant under Fed. R. Evid. 404(b), and cannot be used to support summary judgment pursuant to Fed. R. Civ. P. 56(c)(2).**

19. Despite this gruesome crime and Monster's thirty-year sentence, he will still become parole-eligible in early 2027, and his sentence expires in 2031. (Pl. Ex. 39: Sentencing Transcript, Neil Edgar Jr.).

**Reply: Objection Plaintiffs' ¶ 19 is irrelevant and prejudicial, and the fact of his subsequent conviction would not be admissible at trial to prove Neil Edgar, Jr. committed the Quinn/Ewing murders, and the fact of his conviction, which occurred many years after the Quinn/Ewing murders could not have been known by police investigating the Quinn/Ewing homicides in 1994, would be inadmissible at trial pursuant under Fed. R. Evid. 404(b), and cannot be used to support summary judgment pursuant to Fed. R. Civ. P. 56(c)(2).**

20. Many members of the KCK community acknowledge that Monster committed the murders of Ewing and Doniel Quinn and that Lamonte McIntyre is innocent, and that Monster was known to be a violent thrill seeker. (Ex. 12: Niko Quinn Dep.

71:16–72:8); (Pl. Ex. 29: Siobaughn Nichols 2014 Aff. ¶¶ 21–22); (Pl. Ex. 26: Cecil Brooks 2016 Aff. ¶¶ 1–6, 8-15); (Pl. Ex. 24: Joe Robinson Aff. ¶¶ 8, 12, 18); (Pl. Ex. 40: James McIntyre 2014 Aff. ¶ 16); (Pl. Ex. 41: M'Sherie Johnson 2016 Aff. ¶ 18); (Pl. Ex. 43: Freda Quinn 2011 Aff. ¶¶ 24–25); (Pl. Ex. 42: Frank Freeman 2011 Aff. ¶¶ 5–6); (Pl. Ex. 45: Michael Redmon Aff. ¶¶ 7, 9); (Pl. Ex. 34: N.F. Aff. ¶ 3).

**Reply: PSOF ¶ 20 is immaterial and based on affidavits of persons who lack personal knowledge of the facts asserted therein. None of the cited affidavits demonstrate personal knowledge of the identity of the person that shot Quinn and Ewing. The statements are inadmissible speculation.**

21. Monster did not know Lamonte McIntyre. (Pl. Ex. 38: Neil Edgar Jr. Dep. 40:21- 41:18).

**Reply: PSOF ¶21 Uncontroverted but immaterial.**

**Lamonte McIntyre is innocent of the murders of Ewing and Doniel Quinn**

22. Lamonte McIntyre is actually innocent of the double homicide for which he was convicted. (Certificate of Innocence, Case 2:18-cv-02545-KHV-KGG, Dkt. 187–2, pp. 2–5); (Pl. Ex. 25: Niko Quinn 2014 Aff. ¶ 28); (Pl. Ex. 30: Niko Quinn DA Interview 43:13–44:24, 47:12– 24, 62:12–63:1); (Ex. 12: Niko Quinn Dep. 12:10–15, 92:22–94:7, 188:23–189:10); (Pl. Ex. 63: Roger Golubski Dep. 193:7– 13, 199:22–200:4).

**Reply: PSOF ¶22 is uncontroverted that Lamonte McIntyre has received a certificate of innocence, but that is immaterial because the issue is whether probable cause existed to believe that Lamonte McIntyre was the shooter.**

23. Lamonte maintained his innocence before trial—never requesting a plea because, according to his defense attorney, "Lamonte maintained that he was innocent, he didn't do it," during trial when he testified on the stand, and throughout his time in prison and beyond. (Pl. Ex. 46: Gary Long Dep. 67:17–23); (Ex. 4: Lamonte McIntyre TT 453:24–454:19); (Pl. Ex. 47: Gary Long 2015 Aff. ¶ 3); (Pl. Ex. 42: Frank Freeman 2011 Aff. ¶¶ 9–10); (Pl. Ex. 49: Lamonte McIntyre 2016 Aff. ¶¶ 2, 11); (Pl. Ex. 40: James McIntyre 2014 Aff. ¶ 10); (Pl. Ex. 48: Rashida Martis 2011 Aff. ¶ 6).

**Reply: PSOF ¶23 Uncontroverted but immaterial.**

24. Lamonte McIntyre was at the home of one of his aunts (just across the alley

from the home of his other aunt, where he was also spending time that day) on the afternoon the murders took place, as confirmed by five people. (Ex. 1: Police File, Yolanda Johnson Stmt. by Golubski, 4/20/1994, LMKSDC_0003469–3470); (Pl. Ex. 41: M'Sherie Johnson 2016 Aff. ¶¶ 3–9); (Ex: 1: Police File, M'Sherie Johnson Stmt. to Golubski, 4/20/1991); (Pl. Ex. 50: Rose McIntyre 2014 Aff. ¶ 6); (Ex. 1: Police File, Natasha Haygood Stmt. to Golubski, 4/20/1994, LMKSDC_0003477–3480); (Ex. 4: Felicia Williams TT 391:3–393:2; Peggy Crowder TT 378:2–381:8).

**Reply: PSOF ¶24 is Uncontroverted, but immaterial. While Lamonte McIntyre may have actually been at his aunt's house on the afternoon the murders took place, this case must be judged on the information law enforcement had at the time. Further, Defendant does not understand this fact to assert that Lamonte McIntyre's alibi witnesses, Lamonte McIntyre, and Rose McIntyre, did gave inconsistent statements as to Lamonte McIntyre's whereabouts at the time in question. Therefore, this fact is uncontroverted.**

25. Regardless, Lamonte McIntyre was convicted of the murders of Doniel Quinn and Donald Ewing on September 29, 1994, and was imprisoned 23 years, 5 months, and 28 days. (Pretrial Order, Doc. 562, Stipulations, ¶ 15).

**Reply: Uncontroverted.**

26. On October 13, 2017, Lamonte McIntyre's conviction was vacated by the District Court of Wyandotte County, Kansas and his charges were dismissed. (Pretrial Order, Doc. 562, Stipulations, ¶ 17). (Pl. Ex. 51: Evidentiary Hearing 333:19–336:9); (Pl. Ex. 52: Order Releasing Def. from Custody & Dismissal).

**Reply: Uncontroverted.**

27. On February 24, 2020, Lamonte McIntyre received a Certificate of Innocence stating that he "did not commit the crimes for which he was convicted and sentenced" nor was he "an accessory or accomplice to the acts that were the basis of the convictions." (Pretrial Order, Doc. 562, Stipulations, ¶ 15; Certificate of Innocence, Case 2:18-cv-02545-KHV-KGG, Dkt. 187–2, pp. 2–5).

**Reply: Uncontroverted.**

28. Ware testified at his deposition that he has "no basis whatsoever" to dispute the court's finding that Lamonte McIntyre is factually innocent. (Ex. 6: Dennis Ware Dep. 115:23–116:5).

**Reply: Uncontroverted.**

**The homicide investigation was originally assigned to KCKPD homicide detectives, Blood and Maskil, but within mere hours, Culp reassigns the investigation to W.K. Smith and non-homicide detective Roger Golubski**

29. Homicide detectives Blood and Maskil were originally assigned to lead the investigation of the murders of Ewing and Doniel Quinn. (Ex. 1: Police File, Krstolich Report, 4/15/1994, LMKSDC_0003441; Blood Report, 4/15/1994, LMKSDC_0003446; Ambler Report, 4/15/1994, LMKSDC_0003410-3411).

**Reply: Objection. PSOF ¶ 29 is not supported by the cited record. Nothing in the cited record says Blood and Maskil were assigned as lead detectives or that the case was "reassigned" to Smith and Golubski. is controverted. PSOF 29 is, nonetheless, immaterial. Other KCKPD officers, including Officer Ambler and Wansley, arrived before Blood, Maskil, Culp, Golubski, and Smith. (Exhibit 1 at 3410–3411, 3443 "Upon [Blood's arrival] we made contact with Off. Burdette Ambler").**

30. Blood and Maskil arrived at the scene first, followed by Culp, Golubski, and finally Smith. (Ex. 1: Police File, Wansley Investigative Addendum, LMKSDC_0003410–3411).

**Reply: PSOF ¶30 Uncontroverted but immaterial.**

31. As she watched the shooter come down the hill towards Doniel Quinn and Ewing, Ruby Mitchell immediately recognized him as someone she knew—a man named Lamont, who used to date her niece. (Ex. 10: Ruby Mitchell Dep. 17:21–26:25).

**Reply: Objection, PSOF ¶31 is not supported by the cited record. At no point prior to Ruby Mitchell's deposition in this case did Ruby Mitchell assert she thought she was identifying the "Lamont" she knew. At trial, Ms. Mitchell testified that she identified a person that she knew was not the "Lamont" that she knew. And, years later, in an audio-recorded statement to Lamonte McIntyre's investigator, Ms. Mitchell maintained that truth stating, "I seen the guy and he lookeded [sic] just like my nieces ex-boyfriend, that's who I said he lookeded [sic] like, I didn't say it was him, I just said it lookeded [sic] like him." Doc. 582-12 (conventionally filed). This was consistent with her trial testimony, which indicated that she knew the person**

she identified was not the "Lamont" she knew. Trial Transcript, 196:10–15.

32. When he arrived at the scene, Golubski spoke to Ruby Mitchell who told him that she thought the shooter had previously dated her niece. (Ex. 10: Ruby Mitchell Dep. 43:14-44:8; 46:16-47:21.)

**Reply: Objection, PSOF ¶32 is not supported by the cited record. The statement of Ruby Mitchell taken at the scene was taken not by Detective Golubski, but by Detective Krstolich. Police File, LMKSDC3421–3424.**

33. Golubski knew of "Lamonte McIntyre" because he had previously coerced Rose McIntyre into coming to his office, where he sexually assaulted her, and, following that, had harassed her for months. (Pl. Ex. 50: Rose McIntyre 2014 Aff. ¶¶ 45– 62); see infra, ¶¶ 328–348.

**Reply: Objection. PSOF ¶ 33 is not supported by admissible evidence. Defendant objects because PSOF ¶33 is supported by an affidavit of one of the parties, Rose McIntyre, who despite being properly noticed for a deposition, unilaterally canceled her deposition mid-way through and has not finished her deposition. *Hardy v. Flood*, Case No. 17-cv-00677-CMA-NRN, 2019 WL 2076563 at \*2 (D. Colo. May 10, 2019) (Excluding use of incomplete deposition at trial because defendant did not have a fair opportunity to cross-examine deponent with the benefit of evidence that should have been produced prior to the deposition). Further, nothing in the affidavit cited supports the fact that Roger Golubski knew Lamonte McIntyre. (Pl. Ex. 70: Rose McIntyre 2014 Aff. ¶¶ 45–62). Thus, this fact is not supported by admissible evidence, as is required by Fed. R. Civ. P. 56(c)(1).**

34. Stacy Quinn was also at the crime scene, waiting in Josephine Quinn's yard while W.K. Smith interviewed her sister, Niko. Stacy Quinn told the officers that she saw the crime and knew who the shooter was. (Ex. 12: Niko Quinn Dep. 137:20–138:3).

**Reply: Objection. The statement is not supported by admissible evidence. PSOF ¶34 is directly contradicted by the sworn testimony of Stacy Quinn at the motion for new trial where she testified she left immediately after the shooting and before police arrived. Doc.**

**580-24: Motion for New Trial FPSS 044348 14-22. The testimony of Niko Quinn is inadmissible hearsay.**

35. Golubski knew Stacy Quinn because he had a long-time sexual relationship with her. (Pl. Ex. 25: Niko Quinn 2014 Aff. ¶ 27); (Ex. 12: Niko Quinn Dep. 12:10–15, 82:9–13, 177:19–178:8).

**Reply: Objection. The statement is not supported by admissible evidence. The only evidence used to support this fact is inadmissible hearsay and speculation. Fed. R. Civ. P. 56(c)(2). Niko Quinn never witnessed Stacy Quinn and Roger Golubski engage in sex acts. In fact, in her deposition, she simply stated that Golubski had "some kind of dealings with [her] sister" and that they had an "intimate" relationship. Doc. 580-23, Niko Quinn dep., 82:9–13, 177:19–178:8. This testimony does not support the leap that they had a sexual relationship beyond Niko Quinn's speculation.**

36. Culp reassigned the investigation to homicide detective W.K. Smith and non-homicide detective Roger Golubski. (Ex. 1: Police File, Blood Report, 4/15/1994, LMKSDC_0003446); (Pl. Ex. 59: W.K. Smith Dep. 34:13–23).

**Reply: Objection. The statement is not supported by admissible evidence. PSOF ¶34 asserts the case was reassigned. There is no evidence Culp had assigned anyone the case before Golubski and Smith.**

37. After Smith, Golubski, and Krstolich arrived on scene, Culp directed them to interview the witnesses at the scene and sent Blood and Maskil to the hospital where Ewing had been taken. (Ex. 1: Police File, Blood Report, LMKSDC_0003444).

**Reply: Objection. The statement is not supported by admissible evidence. The record cited to support PSOF ¶37 does not support the fact that "Culp directed" Golubski and Krstolich to interview witnesses" as required by Fed. R. Civ. P. 56(c)(1). Rather, the cited evidence states that when Blood arrived "Officers on scene, Det. W.K. Smith and Roger Golubski, and Det. James Krstolich, were in the process of interviewing witnesses." And that later,**

**"Reporting Officer [Blood] and Det. Maskill were advised by Lt. Culp to proceed to Bethany**

**Medical Center." Therefore, this fact is unsupported by the cited evidence and is also**

**immaterial.**

38. Golubski became the lead detective on the case, with Smith claiming that his role was limited to interviews on the scene. (Pl. Ex. 59: W.K. Smith Dep. 101:8–106:3, 126:10–128:17); (Pl. Ex. 63: Roger Golubski Dep. 49:14–19); (Ex. 3: TT 295:10–12); (Pl. Ex. 53: Tarik Khatib Dep. 20:25–21:8).

**Reply: PSOF ¶38 Uncontroverted but immaterial.**

39. As partners on the case, Golubski and Smith would have been responsible "to both try to work out direction on … how they proceed on the investigation of the case," according to Ware. (Ex. 6: Dennis Ware Dep. 174:22–175:12). The only reason Smith could come up with for why he failed to take any additional investigative steps in the case is that Golubski reported that he had satisfactorily solved it. (Pl. Ex. 59: W.K. Smith Dep. 105:18– 106:3).

**Reply: PSOF ¶39 Uncontroverted but immaterial.**

40. Smith understood by 1994 that it was important to keep abreast of what was happening in the cases that he was assigned to because a district attorney could ask him questions about a case he had been assigned. (Pl. Ex. 59: W.K. Smith Dep. 255:13–256:1, 258:12–23); (Pl. Ex. 53: Tarik Khatib Dep. 152:15–153:6).

**Reply: PSOF ¶40 Uncontroverted but immaterial.**

41. There was no legitimate police reason for Culp to make Golubski, a non-homicide detective, the lead detective on this double homicide investigation, when Smith, a homicide detective was also assigned to work the case. (Pl. Ex. 54: Clyde Blood Dep. 64:2–15, 66:15–20, 72:22–73:2, 75:18–25, 76:4–7, 76:14–22, 179:17–180:2, 185:4–11, 203:4–10).

**Reply: Objection, PSOF ¶41 is supported only by the non-disclosed opinion testimony of**

**Clyde Blood who was neither Culp nor Golubski's supervisor nor a disclosed expert witness.**

**As a result, the evidence supporting this fact is not admissible and is objectionable pursuant**

**to Fed. R. Civ. P. 56(c)(2). Also PSOF ¶41 is immaterial.**

42. The KCKPD homicide division had the "manpower" and resources it needed to thoroughly investigate every homicide investigation. (Pl. Ex. 54: Clyde Blood Dep. 68:20–70:1). In the event that the homicide division was investigating multiple homicides and had to bring in help by non-homicide detectives, the homicide

detective was to take the lead, with the non- homicide detective assisting. (Pl. Ex. 54: Clyde Blood Dep. 72:2–73:8, 75:18–76:22).

**Reply: Objection, PSOF ¶42 is supported only by the non-disclosed opinion testimony of Clyde Blood who was neither Culp nor Golubski's supervisor nor a disclosed expert witness. Though PSOF ¶42 is immaterial, it is controverted in part in that Defendant Ware testified it was not uncommon for a non-homicide detective to work homicides and even though he was not a homicide detective, he has worked a number of homicide cases over the course of his career. Doc. 580-13, Ware Dep. 130:1-6. Defendant Ware furthermore testified that it was not his understanding that the homicide detective would take the lead when both a homicide detective and a non-homicide detective were assigned to assist.** *Id.* **Ware Dep. 174:9-21).**

> 43. Culp understood at the time that homicide detectives had specialized training to inform the specific steps needed for investigating homicide. (Pl. Ex. 54: Clyde Blood Dep. 77:1–15). Blood had never seen a non-homicide detective assigned to be lead investigator in any other case. (Pl. Ex. 54: Clyde Blood Dep. 184:22–185:11).

**Reply: Objection and controverted, but immaterial. PSOF ¶43 is supported only by the non-disclosed opinion testimony of Clyde Blood. Further, what Defendant Culp knew and/or understood is unknown as he is deceased and the cited language is inadmissible speculation by Detective Blood. FRCP 56(c)(2).**

> **Niko Quinn, a partial witness to the shooting of Donald Ewing and Doniel Quinn, observes that the shooter is short and tells that to Golubski, who does not report it**

> 44. Niko Quinn was walking up Hutchings Street toward the house of her mother, Josephine Quinn, who lived a couple doors down, when the shooting occurred. (Pl. Ex. 25: Niko Quinn 2014 Aff. ¶ 7); (Pl. Ex. 30: Niko Quinn DA Interview 6:16–8:16); (Ex. 12: Niko Quinn Dep. 12:10–15, 171:22–173:10). Niko observed the shooter walk downhill towards the car, but she "really didn't pay no attention to mind" at that time. Shen then saw him bend over the car and heard the first shot; at that point she turned around and walked back toward the house. (Pl. Ex. 30: Niko Quinn DA Interview 40:11–22; 42:9–43:12); (Ex. 12: Niko Quinn Dep. 12:10–15,

56:9–60:9).

**Reply: PSOF ¶44 is uncontroverted.**

45. Niko Quinn was at an angle from the shooter, and, given sun glare she could not see the details of the shooter's face, but she could see his silhouette. (Ex. 12: Niko Quinn Dep. 61:6–21, 62:25–63:5, 64:25–65:5, 142:25–143:2). Niko Quinn noticed that the shooter "was a short guy," around 5'6" or 5'7", and that he had a "medium brown" skin tone. (Pl. Ex. 30: Niko Quinn DA Interview 8:19–24, 49:17–50:24); (Ex. 12: Niko Quinn Dep. 12:10–15, 108:11–19).

**Reply: PSOF ¶45 is controverted, in part, but the dispute is immaterial. Niko Quinn's testimony, contradicts itself. If all Niko Quinn could see was the shooter's silhouette, she would not be able to determine his skin tone. Thus, this fact is controverted by the same evidence used to support it. Niko Quinn Dep. 61:6–21, 62:25–63:5, 64:25–65:5, 142:25–143:2. Further, in all of Niko Quinn's prior statements—her statement on the scene of the crime, her testimony at the June 28, 1994 preliminary hearing, her testimony at the September 1994 trial, her 1996 affidavit, her 2014 affidavit, and her 2017 statement to the Wyandotte County District Attorney's Office—never mentioned not being able to see the shooter due to the sun's glare. Docs. 582-3, 582-4, 582-5, 582-6, 582-10, 582-19.**

46. Monster had a medium skin color, was no more than 5'7", and shared the same build as the shooter that Niko Quinn observed. (Pl. Ex. 55: Monster MODOC Offender Profile); (Pl. Ex. 56: Monster Mug Shot 1996); (Pl. Ex. 30: Niko Quinn DA Interview 50:8–23); (Ex. 12: Niko Quinn Dep. 12:10–15).

**Reply: PSOF ¶46 is immaterial and is not supported by the reference to the record.**

47. In a taped interview by Det. Smith shortly after the crime, Niko Quinn was asked how the shooter was dressed and responded "He had on black. A black hat, black pants, and black tennis shoes." Quinn was not asked on the tape to describe the shooter, including his height, build, or skin tone. (Ex. 1: Police File, Niko Quinn Stmt. by Smith, 4/15/1994, LMKSDC_0003417–20). The interview lasted only a few minutes. Id.

**Reply: PSOF ¶47 Uncontroverted.**

48. On April 16, 1994, the day after the murder, Golubski and Ware spoke to Niko Quinn about the murders. Niko Quinn explained to them "the guy that killed [her]

cousin was not a big, tall guy. He was maybe like 5'7", 5'6", somewhere around there. He was a short guy." (Pl. Ex. 30: Niko Quinn DA Interview 8:19–24); (Ex. 12: Niko Quinn Dep. 12:10–15) (Ex. 1: Police File, Golubski Investigative Addendum, 4/16/1994, LMKSDC_0003455).

**Reply: Objection, PSOF ¶48 is not supported by the cited record or admissible evidence. Niko Quinn's unsworn statement to the District Attorney is hearsay. This fact states that Niko told Golubski that "the guy that killed [her] cousin was not a big, tall guy. He was maybe like 5'7", 5'6", somewhere around there. He was a short guy." However, the cited testimony simply states in a disjointed sentence that "Golubski knew," not that she told him. Therefore, this fact is both unsupported and lacks foundation, as required by Fed. R. Civ. P. 56(c)(1) and (2). Further, the cited statement does not appear to be in reference, specifically, to the April 16, 1994 meeting with Roger Golubski.**

49. Lamonte McIntyre is significantly taller and had a different skin tone than the description Niko Quinn gave police of the shooter. (Pl. Ex. 25: Niko Quinn 2014 Aff. ¶¶ 21, 29); (Pl. Ex. 57: Niko Quinn 1996 Aff. ¶¶ 5, 8); (Pl. Ex. 30: Niko Quinn DA Interview 39:14–19, 47:3–7); (Ex. 12: Niko Quinn Dep. 12:10–15, 171:22–173:10). The Arrest Report by Defendant Brown in the police file lists McIntyre's height as 5'11". (Ex. 1: Police File, Arrest Report, LMKSDC_0003413)

**Reply: Objection, PSOF ¶49 is not supported by the cited record or admissible evidence. The term "significantly taller" is a relative term that is vague and ambiguous. Further as explained in the preceding facts, Niko Quinn's own testimony, if believed, demonstrates she could not make out the skin tone of the shooter because she could only see his silhouette. Doc 582-2: Niko Quinn Dep. 61:6–21, 62:25–63:5, 64:25–65:5, 142:25–143:2.**

50. When asked if he recognized that the consistent description of the shooter as approximately 5'6" or 5'7" was inconsistent with Lamonte McIntyre, who was at least 5'11", Golubski refused to answer and instead invoked his Fifth Amendment right to remain silent. (Pl. Ex. 63: Roger Golubski Dep. 152:22–154:21); (Ex. 1: Police File, Arrest Report, LMKSDC_0003413).

**Reply: PSOF ¶50 Uncontroverted but immaterial.**

51. Smith has interviewed hundreds of witnesses during the course of his career

and was skilled at conducting witness interviews. (Pl. Ex. 59: W.K. Smith Dep. 63:16–23, 227:19– 228:21). By 1994, Smith was an experienced detective who knew how to conduct witness interviews. (Pl. Ex. 59: W.K. Smith Dep. 73:13–24, 227:19–228:21).

**Reply: PSOF ¶51 Uncontroverted but immaterial.**

52. Smith further testified that he understood by 1994 that it was important to get all information possible from a witness during his initial interview, including a physical description of the perpetrator as possible, such as height, weight, build, and skin color, and to figure out where the witness was standing in relation to the perpetrator to assess how well the witness could see. (Pl. Ex. 59: W.K. Smith Dep. 75:19–76:19, 327:9–328:7, 331:9–332:2).

**Reply: PSOF ¶52 Uncontroverted but immaterial.**

53. Smith failed to ask Niko Quinn any of these questions when he interviewed her on tape at the scene, and the interview lasted only a few minutes. (Pl. Ex. 59: W.K. Smith Dep. 332:3–333:12, 335:17–337:11, 338:7–24) (Ex. 1: Police File, Golubski Addendum 4/16/1994, LMKSDC_0003455–3456). Neither Culp nor Golubski addressed this failure by Smith to ask Niko Quinn for a description of the shooter she observed. (Pl. Ex. 59: W.K. Smith Dep. 341:18– 342:3).

**Reply: Objection, controverted in part, and immaterial. PSOF ¶53 is controverted in that Niko Quinn admitted that she did not share information with Defendant Smith because her family was there telling her not to say anything and the culture of the time was to not talk to the police. Doc 582-2: Niko Quinn Dep. Niko Quinn Dep. 72:9-18. Niko Quinn testified that her family, sister Lela, Freda and "all of them" asserted that she hadn't seen anything and that she should not talk to the police. Doc 582-2: Niko Quinn Dep. Quinn Dep. 65:12-66:4. When she was giving the recorded statement to Smith, it was "chaos" and everyone was standing in her yard – family had started gathering and there were "about a hundred or some people out there". Doc 582-2: Niko Quinn Dep. Quinn Dep. 138:4-13. The victims had been transported to the hospital and she wanted to get the interview over with so she could go to the hospital. Doc. 582-2, Quinn Dep. p. 138:14-25. Quinn recalled that she was in a car when she gave the recorded statement and her family was telling her not to say anything.**

**Doc 582-2: Niko Quinn Dep. Quinn Dep. p. 144:24-145:11. She identified a voice in the background of the audio statement as that of her Aunt Freda who was asking if "this was over" and she was wanting to get to the hospital. Doc 582-2: Niko Quinn Dep. Quinn Dep. p. 130:15-131:6.**

> 54. Detectives had an obligation in 1994 to ensure that anything potentially relevant they learned from a witness was documented either in a report; according to Blood, "[i]f it wasn't on paper, it didn't happen." (Pl. Ex. 54: Clyde Blood Dep. 107:7–108:23); see also (Pl. Ex. 59: W.K. Smith Dep. 272:23–273:12).

**Reply: Objection, controverted in part, and immaterial. PSOF ¶54 is supported only by the non-disclosed opinion testimony of James Brown. It is further controverted in that James Brown explained that sometimes individuals have a lot to say and they just talk, saying things that may not be important to document and it may be known until later what is relevant or important for documentation purposes. Doc. 611-33, James Brown Dep. p. 189:12 – 195:10. Furthermore, Dennis Ware explained that in 1994, he believed it was common practice for only one detective to prepare a report if both detectives were doing the same thing. Doc. 582-13, Ware Dep. p. 119:19 – 120: 16.**

> 55. Also in 1994, it was important to document investigative information in police reports so that a supervisor could review what was done in an investigation, to track leads, and to make a thorough record of all the evidence gathered to give to the prosecutor. (Pl. Ex. 58: James Brown Dep. 183:3–184:11).

**Reply: Objection, controverted in part, and immaterial. PSOF ¶55 is supported only by the non-disclosed opinion testimony of James Brown. It is further controverted in that James Brown explained that sometimes individuals have a lot to say and they just talk, saying things that may not be important to document and it may be known until later what is relevant or important for documentation purposes. Doc. 611-33, Brown Dep. p. 189:12 – 195:10. Furthermore, Dennis Ware explained that in 1994, he believed it was common practice for only one detective to prepare a report if both detectives were doing the same thing. Doc. 582-**

13, Ware Dep. p. 119:19 – 120: 16.

56. Each KCKPD officer was obligated to write a report including every step they took during an investigation, even if another detective on the case would be writing a report including similar information. (Pl. Ex. 54: Clyde Blood Dep. 110:4–22); (Pl. Ex. 58: James Brown Dep. 212:3–8).

**Reply: Objection, controverted in part, and immaterial. PSOF ¶56 is supported only by the non-disclosed opinion testimony of James Brown and Clyde Blood. It is further controverted in that Dennis Ware explained that in 1994, he believed it was common practice for only one detective to prepare a report if both detectives were doing the same thing. Doc. 582-13, Ware Dep. p. 119:19 – 120: 16.**

57. Despite this obligation, Golubski and Ware did not record in any report this description by Niko Quinn of the shooter's height, which was inconsistent with Lamonte McIntyre. (Pl. Ex. 54: Clyde Blood Dep. 112:21–113:10); (Ex. 6: Dennis Ware Dep. 223:6–15); (Ex. 1: Entire Police File, LMKSDC_0003391–3500.)

**Reply: Objection and controverted. PSOF ¶57 is supported only by the nondisclosed opinion testimony of Dennis Ware and Clyde Blood.**

58. Officers also had an obligation to bring witnesses down to the station and interview them as quickly as possible after the crime occurred to avoid witnesses' memories changing and their later failure to cooperate. (Pl. Ex. 54: Clyde Blood Dep. 90:19–92:2).

**Reply: Objection, controverted in part, and immaterial. PSOF ¶58 is supported only by the non-disclosed opinion testimony of Clyde Blood. It is controverted in that Defendant Smith testified that it is important for a variety of reasons to interview witnesses as quickly as possible however never testified that there was an obligation to bring witnesses to the station to interview them. (Exhibit C, Smith dep. p. 74:14 – 75:18).**

59. Even though Niko Quinn told Smith that she might recognize the shooter if she saw him again, he did not take her down to the station to conduct a photo identification procedure that day. (Pl. Ex. 59: W.K. Smith Dep. 137:15–144:9).

**Reply: PSOF ¶59 Uncontroverted but immaterial.**

**In violation of procedure, Golubski and Ware bring an improperly suggestive set of photos to show Niko Quinn**

60. KCKPD procedure in 1994 was to conduct a live lineup any time a suspect was in custody, as opposed to a photo lineup. (Pl. Ex. 54: Clyde Blood Dep. 16:22–17:7).

**Reply: Objection, controverted in part, and immaterial. PSOF ¶60 is supported only by the non-disclosed opinion testimony of Clyde Blood. It is controverted as Defendant Smith generally testified that photo lineups were used to identify suspects in 1994. Doc. 611-12, Smith Dep. p. 145:11-19; 147:15-150:8. and Defendant Ware testified that to the best of his recollection, live lineups were generally only done upon suggestion of a supervisor. Doc. 582-13, Ware Dep. p. 155:6-156:11.**

61. However, on April 16, 1994, the day after the murders, when McIntyre was already in custody, Golubski and Ware went to Niko Quinn's home and showed her a stack of five loose photos with the names written on the back. (Ex. 1: Police File, Golubski Investigative Addendum, 4/16/1994, LMKSDC_0003455); (Pl. Ex. 25: Niko Quinn 2014 Aff. ¶ 17); (Ex. 6: Dennis Ware Dep. 167:1–15); (Ex. 12: Niko Quinn Dep. 82:2–83:4, 171:22–173:10, 181:6–12); (Ex. 11: Polaroids from Lineup with Names on Back).

**Reply: PSOF ¶61 is uncontroverted insofar that five photos were shown to Niko Quinn and that the name of each person was written on the back. To the extent Plaintiffs are asserting the backs of the photos were shown to Niko Quinn, that fact is controverted as it is not supported by the cited evidence as required by Fed. R. Civ. P. 56(c)(1).**

62. Smith had been assigned to work the case with Golubski; it was out of the ordinary for Ware to accompany Golubski instead of Smith. (Ex. 6: Dennis Ware Dep. 169:10– 23).

**Reply: Objection and controverted in part, but immaterial. PSOF ¶62 is uncontroverted that Clyde Blood indicated in his report that the file has been assigned to W.K. Smith and Roger Golubski.**

63. The procedure for putting together a photo lineup at the KCKPD was to put the photo of the suspect and fillers in a manila folder with squares cut in it. It was not

proper procedure to hand a witness a stack of photos, as that could be suggestive. (Pl. Ex. 59: W.K. Smith Dep. 147:24–148:8, 151:16–152:19); (Pl. Ex. 54: Clyde Blood Dep. 161:19–24).

**Reply: Objection PSOF ¶63, as stated is not supported by the cited record. The deposition testimony of W.K. Smith addresses his procedure or "a" procedure, and does not say there was a single procedure required by the KCKPD. Doc. 611-12, Smith Dep. 147:24–148:8, 151:16–152:19.** *See* **DSOF 221. Photos were sometimes placed in a manila folder with six boxes cut out to display the photos, but could be displayed on a surface or in a loose stack. York Dep. 19:11-17, 117: 1-25 118: 1-9 161: 4-8 As a result, the record used by plaintiffs to support this fact as to the KCKPD's procedure does not support the same as required by Fed. R. Civ. P. 56(c)(1).**

64. A photo lineup should include only one suspect and the rest should be fillers (other people who closely resemble the suspect), and typically the identification unit would find the fillers to fill out the rest of the photo lineup. (Pl. Ex. 59: W.K. Smith Dep. 147:24–149:15, 152:20–154:18); (Ex. 6: Dennis Ware Dep. 161:1–162:24); (Pl. Ex. 54: Clyde Blood Dep. 20:13–21:24); (Ex. 23: Michael York Dep. 24:6–26:2, 27:17–28:16).

**Reply: PSOF ¶64 Objection and controverted, but immaterial. Plaintiffs mischaracterize the cited testimony which does not support this fact as alleged as required by Fed. R. Civ. P. 56(c)(1). The cited portions of W.K. Smith's testimony speak to his practices. Mr. Ware did not testify that there was such a "rule." Ware dep., 161: 7–9. Mr. York similarly testified. York Dep., 25:19–26:10). And, Mr. Blood's testimony was also related to his own practices ("I don't recollect it as a rule but it was a personal thing ….") Blood dep., 22:14–16.**

65. As Michael York, the Unified Government's representative explained, when choosing fillers, the idea is that "[y]ou are certain when you are choosing those photographs that this person is not part of the crime, was not responsible for the crime." (Ex. 23: Michael York Dep. 25:4–13).

**Reply: Uncontroverted.**

66. Plaintiffs' eyewitness identification expert Dr. Dysart opines, "It is critically

important to include fillers who had nothing to do with the crime so that the array contains clearly wrong answers; this is necessary in order to test the reliability of the witness's selection when they do select a suspect." (Pl. Ex. 60: Expert Report of Jennifer Dysart p. 12).

**Reply: Uncontroverted but immaterial.**

67. Two of the other photos in the five-photo stack Niko Quinn viewed were of Lamonte McIntyre's relatives: his brother, James McIntyre; and his cousin, Terrence. (Ex. 11: Polaroids from Lineup with Names on Back); (Pl. Ex. 40: James McIntyre 2014 Aff. ¶ 29); (Pl. Ex. 61: Lamonte McIntyre 2022 Decl. ¶ 4 & Ex. A).

**Reply: Uncontroverted.**

68. KCKPD officers understood it was improper to include multiple family members in one photo lineup because that would be suggestive and unfair. (Ex. 6: Dennis Ware Dep. 160:1–8, 162:16–163:2); (Pl. Ex. 54: Clyde Blood Dep. 21:25–23:24, 221:17–222:18); (Ex. 23: Michael York Dep. 36:20–37:2); (Pl. Ex. 60: Expert Report of Jennifer Dysart p. 12); (Pl. Ex. 62: Timothy Maskil 2015 Aff. ¶ 10); (Pl. Ex. 63: Roger Golubski Dep. 107:11–108:15).

**Reply: PSOF ¶68 controverted, in part, but immaterial. None of the testimony of the officers suggests such practices were "improper" but rather that they would not do it, or that it was not the general rule or best practice. Thus, this fact is not supported by the cited evidence as required by Fed. R. Civ. P. 56(c)(1).**

69. During this photo showing, Niko Quinn told Golubski and Ware that she recognized two of the men included in the photographs whom she knew didn't do the shooting: Lamonte McIntyre's brother, James McIntyre, whom she used to date, and Raymond Hickman, who is her cousin. (Ex. 11: Polaroids from Lineup with Names on Back); (Pl. Ex. 30: Niko Quinn DA Interview 22:24–23:10); (Ex. 12: Niko Quinn Dep. 12:10–15, 82:25-85:16).

**Reply: Uncontroverted.**

70. The photo stack included a photo of Lamonte McIntyre taken in 1992, when he was sixteen years old, nearly one and a half years younger and when he had a much more childish face. (Ex. 11: Polaroids from Lineup with Names on Back); (Pl. Ex. 64: Lamonte McIntyre 1994 Mugshot).

**Reply: PSOF ¶70 is uncontroverted insofar that the photograph used was from 1992 and Lamonte McIntyre was a year and a half older at the time of the shooting. Controverted that**

he looked more childish as the cited evidence does not support such a statement as required

by Fed. R. Civ. P. 56(c)(1).

> 71. At the time of interview with Niko Quinn on April 16, 1994, KCKPD officers had access to a more recent photograph of Lamonte McIntyre from February 1994, which provided a more accurate depiction of Lamonte, and also had Lamonte McIntyre in custody. However, the 1994 photograph was not shown to witnesses in this case, and no in-person line up was conducted. (Ex. 1: Entire Police File, LMKSDC_0003391–3500); (Pl. Ex. 64: Lamonte McIntyre 2/28/1994 Mugshot).

**Reply: Objection, PSOF ¶71 is not supported by the evidence cited as required by Fed. R.**

**Civ. P. 56(c)(1). Simply because an earlier mugshot existed does not (1) demonstrate that in**

**1994 law enforcement would have an easily searchable database to learn of the existence of**

**such a photo or (2) to easily retrieve it so as to have access to such a photo. Thus, this fact is**

**unsupported and controverted, but immaterial because eyewitness did pick out Lamonte**

**McIntyre, both in a photo array and in open court, in person.**

> 72. There was such a "discernible difference" between Lamonte McIntyre's features as depicted in the 1992 photo used in the photo stack and a photo of McIntyre taken in February 1994 that to Ware, they looked like different people. (Ex. 6: Dennis Ware Dep. 241:13–243:18); see also (Pl. Ex. 60: Expert Report of Jennifer Dysart p. 13).

**Reply: PSOF ¶72 is uncontroverted but immaterial as two months later two eyewitnesses**

**identified Lamonte McIntyre, in person, in open Court, as the shooter and again in**

**September 1994. _See_ DSOF ¶¶ 97-169, which detail the various identifications by Mitchell**

**and Niko Quinn.**

> 73. The practice in the KCKPD was to select the closest available in time photograph of the suspect for a photo identification procedure so that it would be "the closest likeness…to what the perpetrator looked like when the witness saw them" to maximize the chance the witness would select the perpetrator. (Ex. 6: Dennis Ware Dep. 231:2–233:16); (Pl. Ex. 54: Clyde Blood Dep. 26:8–19); (Pl. Ex. 66: Russell Fischer Report p. 15). If the suspect was a juvenile, the first step would have been to determine their most recent arrest when choosing a photo. (Pl. Ex. 59: W.K. Smith Dep. 149:19–25).

**Reply: Objection, PSOF ¶73 is not supported by the cited record, but immaterial. The cited**

testimony does not indicate that the closest available in time must always be used and is thus unsupported by the evidence as required by Fed. R. Civ. P. 56(c)(1). Rather, the goal is to get a photograph that accurately depicts the perpetrator at the time of the crime as someone could have been injured, changed hairstyles, or any other number of appearance characteristics. This fact is further immaterial.

> 74. Ware admitted he could not think of any "conceivable legitimate reason" to use the 1992 photo of McIntyre in a lineup if the 1994 photo was available and agreed it would be important to ask Golubski why he selected a photograph of Lamonte McIntyre from 1992 to show the witnesses when there was a photograph taken two months prior to the crime apparently available. (Ex. 6: Dennis Ware Dep. 243:19–244:22); (Pl. Ex. 64: Lamonte McIntyre 2/28/1994 Mugshot).

Reply: Objection. PSOF ¶74 is controverted in part, but immaterial. The question posed to Dennis Ware asked him to assume the later 1994 photo was available—meaning known and accessible—by police at the time. Thus, his answer demonstrates that a legitimate reason to use the 1992 photo would be that the 1994 photo was either not known or not accessible by police in the hours immediately after the homicides. Thus, this fact is not supported by the cited evidence as required by Fed. R. Civ. P. 56(c)(1). This fact is further immaterial.

> 75. Golubski reported that he had shown Niko Quinn a "photo lineup," which has a particular meaning in police vernacular: a number of photos either mounted on a piece of paper or in a manila envelope with squares cut out. (Ex. 6: Dennis Ware Dep. 156:12–157:9, 189:9– 190:18); (Pl. Ex. 59: W.K. Smith Dep. 265:17–267:13); (Pl. Ex. 66: Russell Fischer Report p. 14).

Reply: Objection, PSOF ¶75 is not supported by the cited record. Dennis Ware testified that in is, nonetheless, immaterial the "strictest sense" of the term "photo lineup" refers to displaying a series of photos together and that when someone refers to a "photo lineup" they are "generally" referring to that procedure. As a result, this fact is not supported by the cited evidence as required by Fed. R. Civ. P. 56(c)(1). Further, Defendant objects because this testimony asked Ware and others to speculate as to what an unidentified officer may have

been thinking or referring to when he or she referenced a "photo lineup" which would be inadmissible at trial and, therefore, cannot be used to support this fact in summary judgment. Fed. R. Civ. P. 56(c)(2). PSOF 75 is further immaterial.

> 76. Calling the showing of a stack of five Polaroids loosely handed to a witness a "photo lineup" is inaccurate, and it could mislead a supervisor or prosecutor that any selection made is more inculpatory than it actually is. (Pl. Ex. 63: Roger Golubski Dep. 113:1–25, 163:4– 16); (Ex. 6: Dennis Ware Dep. 156:12–157:9, 189:9–190:18); (Pl. Ex. 59: W.K. Smith Dep. 265:17–267:13); (Pl. Ex. 66: Russell Fischer Report p. 14).

Reply: Objection, PSOF ¶ 76 is not supported by the cited record. Whether calling a photo lineup a stack "could" mislead someone else requires speculation. Further, while the full transcript is not in the record, it's worth noting that Plaintiffs' own expert testified that a photo stack is not inherently less reliable than a photo array. Fisher Dep., 219:12–23.

> ### Golubski and Ware use suggestion and coercion during the first photo procedure they conduct with Niko Quinn, but are unsuccessful in obtaining an identification

> 77. After Niko Quinn eliminated the two people she personally recognized from the stack of five photos, she was holding the remaining pictures and looking at them. Golubski told Niko Quinn that if she knew who the shooter was, she better testify and that it would be better for her if she did. (Pl. Ex. 25: Niko Quinn 2014 Aff. ¶ 17). Niko told Golubski and Ware "No, I don't know who it is." (Ex. 12: Niko Quinn Dep. 83:21–85:16).

Reply: Uncontroverted.

> 78. As Niko Quinn explained: "That's when they grabbed the pictures back and the one guy held the picture and he said what did he—what did she [Ruby Mitchell] say the guy's name was? And I said she said Lamont. So he's holding the picture like this of Lamonte and he said, "What did she say the man's name was?" And I said Lamont. When they held the picture up they held it in the sun and I could see Lamonte's name on the back. And I just stared at the picture and just staring at it. And I gave them the picture back and said I don't know who it was. And that's when they were saying you know who it is, you know who it is. I said I don't know." (Ex. 12: Niko Quinn Dep. 83:21–85:16, 135:6–24); (Pl. Ex. 30: Niko Quinn DA Interview 23:12–24:13, 63:10–18); (Pl. Ex. 25: Niko Quinn 2014 Aff. ¶ 18.)

Reply: Uncontroverted that Niko Quinn gave this testimony during her 2021 deposition.

Niko Quinn's 2014 affidavit says "I told him I wasn't sure and could not make an identification." Niko Quinn's interview with the District Attorney is unsworn, inadmissible hearsay but does offer a third version.

> 79. While Golubski was instructing Niko Quinn to make an identification and asking about the name Ruby Mitchell had given, Ware placed his thumb on Lamonte McIntyre's photo, as if he were pointing at it. (Pl. Ex. 25: Niko Quinn 2014 Aff. ¶ 18); (Ex. 12: Niko Quinn Dep. 12:10–15, 181:6–182:17); (Pl. Ex. 30: Niko Quinn DA Interview 23:12–24:13).

Reply: Uncontroverted that Niko Quinn testified that one of the officers at the meeting on April 16, 1994, placed his thumb on the photograph. PSOF ¶ 79 is unsupported by record evidence to the extent that it suggests Ware employed suggestion or coercion, Ware denies any improper suggestion. Doc. 582-13, Ware Dep. 84:24-85:7. Niko Quinn herself, in her most recent testimony, stated neither Ware or Golubski did nothing wrong in their interaction with her on April 16, 1994. Niko Quinn, dep., 85:20–23.

> 80. Ware admitted that if he placed his thumb on Lamonte McIntyre's photo as Niko Quinn described, that would have been "grossly improper" and "direct suggestion" and that he knew that in 1994. (Ex. 6: Dennis Ware Dep. 85:21–86:20, 183:7–17); see also (Pl. Ex. 60: Expert Report of Jennifer Dysart p. 14); (Pl. Ex. 53: Tarik Khatib Dep. 232:4–233:16).

Reply: Uncontroverted but immaterial. Niko Quinn did not make a positive identification while Det. Ware was present.

> 81. Ware also understood by 1994 that if he observed Golubski try to influence Niko Quinn's suggestion in any of the ways she described he had an obligation to intervene and to report Golubski up the chain of command; Ware did not do so. (Ex. 6: Dennis Ware Dep. 179:18–182:11); (Pl. Ex. 59: W.K. Smith Dep. 253:5–254:16).

Reply: Objection, PSOF ¶81 is unsupported by the cited record. This fact is not supported by the evidence cited as required by Fed. R. Civ. P. 56(c)(1). Det. Ware's testimony was that he had an obligation to intervene and report instances of improper suggestion had he seen Golubski indicate to a witness whom she ought to pick Ware dep. 178:3-178:4. None of the

cited record supports any suggestion that Ware saw Golubski employ improper suggestion. Niko Quinn testified Golubski did nothing wrong in his interaction with her on April 16, 1994. Niko Quinn dep., 85:20–23.

82. If any of the Defendant officers became aware that Golubski had fabricated evidence in the course of the investigation, or lied about the investigative steps he took, they had an obligation to report that information. (Pl. Ex. 53: Tarik Khatib Dep. 93:20–94:14; 255:21– 256:7, 267:25–268:22).

Reply: Uncontroverted.

83. According to Ware, if he had even a hint of a sense that a fellow officer was breaking the rules, he would have reported that officer; but in all his years as a KCKPD officer, he never saw another officer or civilian employee engage in any misconduct more serious than a uniform violation or tardiness. (Ex. 6: Dennis Ware Dep. 73:16–22; 79:17–80:13).

Reply: PSOF ¶83 Controverted in part, but the dispute is immaterial. Controverted in that Det. Ware also testified that he indirectly referred an officer to Internal Affairs on more than one occasion. Doc. 582-13, Ware Dep. 74:1-25. The occasion Ware recalled involved an officer stealing money from a crime scene. *Id.* Ware did not see him steal money but another detective reported it to him. *Id.* The officer who stole money was terminated. *Id.*

84. Despite this direct suggestion, Niko Quinn told Golubski and the other detective that she could not make an identification from these photos. (Ex. 12: Niko Quinn Dep. 171:22– 173:10, 185:21–25); (Pl. Ex. 25: Niko Quinn 2014 Aff. ¶ 18).

Reply: PSOF ¶84 is, in part unsupported by the cited record. It is undisputed that Niko Quinn did not make an identification from the photo lineup on April 16, 1994. Niko Quinn stated Golubski did nothing improper—such as direct suggestion. Niko Quinn dep., 85:20–23.

### Golubski fabricates a police report of his first identification procedure with Niko Quinn

85. In his police report, Golubski reported that Niko Quinn had a physical reaction to viewing the photo of Lamonte McIntyre, claiming she stared at it and "began shaking, became teary eyed, and was very hesitant in making any statements," that

she could not describe any difference between this photo and the shooter, would not let go of the photo for four or five minutes, and then said she "thought this was the individual but was not sure at this time positively. But thought this might be him." Golubski also reported that it was "very obvious that Niko Quinn knows exactly who the shooter is, but being highly traumatized at this time is reluctant to provide that information." (Ex. 1: Police File, Golubski Investigative Addendum (4/16/1994), LMKSDC_003455-3456); see also (Ex. 3: Roger Golubski TT 326:16–27:17).

**Reply: Uncontroverted.**

86. Golubski's report does not accurately describe the circumstances surrounding Niko Quinn's viewing of the photographs. In particular, Niko Quinn did not tentatively identify Lamonte McIntyre, as Golubski describes in his report, but instead told Golubski and Ware that she could not make any identification from the photos. (Ex. 12: Niko Quinn Dep. 185:21–25).

**Reply: PSOF ¶86 is objectionable as unsupported by the cited record (but is immaterial).**

**Plaintiffs misstate the evidence as Golubski never stated Niko Quinn "tentatively identified"**

**Lamonte McIntyre. Further, this fact is not supported by the cited evidence as required by**

**Fed. R. Civ. P. 56(c)(1).**

87. Golubski's report of the identification procedure omits the direct suggestion Niko Quinn describes by Golubski and Ware and also omits that Niko Quinn could immediately eliminate two of the five people in the array because she knew them and knew they were not the perpetrator. (Ex. 1: Police File, Golubski Addendum 4/16/1994, LMKSDC_0003455–3456); (Pl. Ex. 30: Niko Quinn DA Interview 22:24–23:10); (Ex. 12: Niko Quinn Dep. 12:10–15, 82:25- 85:16).

**Reply: PSOF ¶87 Objection, but immaterial. This fact is not supported by the evidence cited**

**because the record does not support the assertion of direct suggestion. Niko Quinn testified**

**Golubski did nothing wrong in his interaction with her on April 16, 1994. Niko Quinn dep.,**

**85:20–23. Uncontroverted that the report does not identify any direct suggestion and, as**

**stated by Niko Quinn, neither does she.**

88. When asked if he fabricated this report of the April 16, 1994 identification procedure with Niko Quinn, Golubski refused to answer and instead invoked his Fifth Amendment right to remain silent. (Pl. Ex. 63: Roger Golubski Dep. 163:4–166:2).

**Reply: PSOF ¶88 is uncontroverted but misleading because Golubski exercised his Fifth Amendment rights as to all questions pertaining to the investigation. Golubski's invocation of his Fifth Amendment rights is not evidence Golubski fabricated the identification procedure.**

### Niko Quinn realizes the real perpetrator is Monster

89. Within a few days after the murder, Niko Quinn realized her cousins had been shot by associates of a dangerous group of drug-dealers that included Cecil Brooks and his cousin Aaron Robinson, in some sort of a "drug hit," and they were the same group that beat up Doniel Quinn about a week before his murder and came looking for him the night before the murder. (Ex. 12: Niko Quinn Dep. 88:18–89:2, 196:2–10; 12:10–15, 40:21–43:11, 171:22–173:10, 40:21–41:10, 42:4–43:11, 173:11–174:7); (Pl. Ex. 25: Niko Quinn 2014 Aff. ¶ 14); (Pl. Ex. 30: Niko Quinn DA Interview 1:1–3:25); (Pl. Ex. 31: Kendra Dean-Martin 2013 Aff. ¶ 9); Golubski's SOF ¶ 27.

**Reply: Controverted but immaterial. What and when Niko Quinn subjectively "realized" is immaterial because this case must be judged upon what Golubski knew and could have reasonably believed based on the information, *he* had the time. Further, Niko Quinn's numerous statements contradict this statement as to what she knew and when. She wants this Court and a jury to believe now that she knew Aaron Robinson's "crew" were involved and told Golubski such in her requested meeting behind Wyandotte High School, but that was not what she testified to in multiple affidavits within the first 20 years of her testimony (as shown below):**

**Niko Quinn's 1996 Affidavit (Exhibit 19):**

```
10.  Approximately one month after the shooting I met Det. Golubski
     of the Kansas City, Kansas Police Department, behind Wyandotte
High School Track, and I indicated to him two guys the night before
were waiting for me, they came from a field behind where I stay, I
saw the guns and when I saw them we pulled off.  A guy by the name
of Pork Chop was driving me.  I indicated to Det. Golubski that I
was scared, he said it could not have been Lamont McIntrye because
he had been incarcerated since April 15th.  He asked me if it could
have been one of Lamont's brothers but I told him the guys were too
short.  I told him I knew James McIntrye.
```

**Niko Quinn's 2014 Affidavit (Exhibit 10):**

19. A week or two or maybe a month later, I spoke again with Detective Golubski. We met behind the Wyandotte High School track. I was scared because I had seen two

men on a vacant lot near my house. I told Detective Golubski about this, and he said he would help me move to a new place, which he later did.

20. In this same conversation, Detective Golubski continued to put a lot of pressure on me to make an identification. I thought that Lamonte in some ways looked somewhat similar to the shooter. I was scared, and I allowed Detective Golubski to push me to identify Lamonte McIntyre from his photograph.

**Further, in her interview given to the Wyandotte County District Attorney, she makes clear that she did not know Monster was involved at all until Stacy Quinn told her years later, and she even disagreed with her sister. Doc. 611-134, Niko Quinn Interview to Wyandotte County DA, 43:13–45:19, "Girl that ain't the one that killed Little Don."**

```
 5      A.  As the person that I seen, but at the
 6   time I hadn't seen him in years, to see him like
 7   face to face right here.  But as I started
 8   looking at him and seeing him, I started
 9   realizing, and then my sister and then it was an
10   incident after the fact that I found out for sure
11   was him.
12      Q.  Because the worst thing that could
13   happen here, if it's not bad enough, is Lamonte
14   McIntyre is innocent, the worse thing that could
15   happen is we get a second innocent person.  And I
16   know it's hard when you see things and they
17   happen fast.  I mean, are you certain that that's
18   who you saw?  If you're not, it's okay.
19      A.  I'm certain that's who it was.  I'm
20   certain.  And not only that, he tried to kill me
21   after the fact.  He came to my house.
22      Q.  Tell me about that.
23      A.  In '94 -- no, '95 or '96 I lived down on
24   4th Street, off of 4th and Cleveland.
25      Q.  So that's going to be a couple years
```

90. This group included "Monster," who was an enforcer who would shoot people

for hire and worked for Aaron Robinson. (Pl. Ex. 24: Joe Robinson Aff. ¶¶ 3–19); (Pl. Ex. 26: Cecil Brooks 2016 Aff. ¶¶ 3–20).

**Reply: PSOF ¶90 Defendant incorporates the objection and response to Plaintiffs' Fact No. 89 above.**

91. After the murder, for three of four days in a row people would park in front of Niko Quinn's house, knock on her door, and she would look out and "two dudes are standing on [her] porch with guns." Niko Quinn was scared that they were coming after her because she had witnessed a murder, and she left and went to Missouri. (Ex. 12: Niko Quinn Dep. 88:7–17, 90:19–91:14).

**Reply: Uncontroverted.**

92. Around the same time, a "couple of days after" Lamonte McIntyre was picked up, a girl named Tiffany Daniel told Niko Quinn at a gas station that Lamonte didn't do the shooting, Monster did. (Pl. Ex. 30: Niko Quinn DA Interview 43:13–44:17); (Ex. 12: Niko Quinn Dep. 12:10–15, 75:19–76:5).

**Reply: PSOF ¶92 Controverted and objection. Niko Quinn testified it was the day Lamonte McIntyre was "picked up," which was the day of the shooting. Niko Quinn DA Interview 43:13–22 ("it must have been when they picked Lamonte up."). Niko Quinn never passed this information on to the police. PSOF ¶ 92 is not supported by evidence that would be admissible at trial. The cited portion of the record fails to demonstrate personal knowledge of the facts stated, are based on hearsay, and are inadmissible speculation.**

93. Stacy Quinn also pointed out Monster to Niko Quinn after the murders and said, "That's the one that killed Little Don"; she would point him out to Niko Quinn "all the time." (Pl. Ex. 30: Niko Quinn DA Interview 43:23–44:24, 46:10–47:24); (Ex. 12: Niko Quinn Dep. 12:10–15, 171:22–173:10); (Pl. Ex. 25: Niko Quinn 2014 Aff ¶ 19).

**Reply: PSOF ¶93 Objection. This fact is supported entirely by inadmissible hearsay of Stacy Quinn, in violation of Fed. R. Civ. P. 56(c)(2). Further, Plaintiffs leave out Niko Quinn's response to Stacy Quinn's statement in which Niko Quinn stated, "Girl, that ain't the one that killed Little Don." *Id.*, 44:6–7.**

94. Niko Quinn became confident Monster was the shooter. (Ex. 12: Niko Quinn

Dep. 12:10–15, 71:16–72:8); (Pl. Ex. 30: Niko Quinn DA Interview 46:10–47:24).

**Reply: Uncontroverted.**

**Niko Quinn calls Golubski to tell him she knows Monster killed her cousin, but Golubski pressures her to identify Lamonte McIntyre**

95. Because she was scared about the people showing up at her house with guns, Niko Quinn called Golubski on the phone. She told him she needed to talk to him and that she could identify the guy who killed her cousin. "At the time that [she] called him [she] knew it was Monster and Cecil and them." (Ex. 12: Niko Quinn Dep. 91:15–92:7, 149:2–15).

**Reply: PSOF ¶95 Controverted in part, but immaterial. Uncontroverted that Niko Quinn called Golubski on the phone and told him she needed to talk to him because she was scared about people showing up at her house with guns and that she could identify the killer. The assertion that Niko Quinn knew it was Monster and Cecil and them that killed her cousin is not supported by the cited record. Niko Quinn's numerous statements contradict this statement as to what she knew and when. Regardless, that fact is immaterial because what she subjectively "knew" is immaterial to what she told police and what police knew constituted probable cause.**

96. Approximately three weeks or a month after the murders, Golubski met with Niko Quinn behind the Wyandotte High School track. (Pl. Ex. 25: Niko Quinn 2014 Aff. ¶ 19.); (Ex. 12: Niko Quinn Dep., 92:8–12, 92:22–24, 171:22–173:10) (Ex. 3: Roger Golubski TT 327:18– 328:16).

**Reply: Uncontroverted.**

97. Niko Quinn sat in Golubski's car with him alone to talk to him. (Ex. 12: Niko Quinn Dep. 93:2–14).

**Reply: PSOF ¶97 Uncontroverted that Niko Quinn and Golubski were the only two people physically in the car. However, by way of further clarification, Niko Quinn's boyfriend drove her to the meeting and stood outside the car in which Golubski and Niko Quinn sat during their meeting. Niko Quinn Dep. 92:22-93:14.**

98. It was KCKPD practice in 1994 that two officers should be present for a witness interview whenever practicable, and officers were trained as such. (Pl. Ex. 54: Clyde Blood Dep. 92:3–17).

**Reply: Uncontroverted.**

99. Niko Quinn describes what she told Golubski: "So when I sat in the car with Golubski I told him I know who killed my cousin, and he said how I know. And I explained to him what took place before my cousin was killed, which was him getting beat by Aaron Robinson and Monster, and that they had tried to pick him up the day prior to the murder, trying to get him to go with them the day of the murder. And just word on the street and whatever." (Ex. 12: Niko Quinn Dep. 93:15–94:7). Niko Quinn specifically told Golubski about Doniel being beat up in the days before his murder and his injuries, "that Cecil had his boys had jumped him maybe a week or two before he was killed, and also told him that they were trying to get him in the car the last two days before he was killed." She also told him Doniel "didn't have no beef with nobody but the guys that jumped him." (Ex. 12: Niko Quinn Dep. 174:8–175:17).

**Reply: PSOF ¶99 Uncontroverted that these quotations are accurate, but misleading. Niko clarified during this meeting that she only believed that Cecil's crew "had something to do" with the murders, not that one of them was necessarily the shooter. Niko Quinn Dep. 93:17-94:7. The cited portions of the deposition are set forth below:**

**Q. And in this meeting, just tell me in your own words how that meeting goes.**

**A. So when I sat in the car with Golubski I told him I know who killed my cousin, and he said how I know. And I explained to him what took place before my cousin was killed, which was him getting beat by Aaron Robinson and Monster, and that they had tried to pick him up the day prior to the murder, trying to get him to go with them the day of the murder. And just word on the street and whatever. And he told me that I shouldn't be talking about Cecil, be careful what I say about Cecil because they found his ex-girlfriend's remains behind Washington High School in a park or something, a park near Washington High School. I said okay, what are you telling me that for? I don't care. I know they had something to do with my cousin.**

**Niko Quinn dep., 93:15-94:7**

**Q. And you told the police, specifically Detective Golubski, about the fact that Doniel was beaten up in the days before his murder, correct?**

**MR. GIST: Object to form, leading and suggestive.**
**MS. EVERS GUERRA: Join.**

MR. COOPER: Join.

A. Yes.

Q. (By Mr. Abrams) what did you tell

Niko Quinn dep., 174:8-174:17 Niko Quinn's prior statements are inconsistent with this factual assertion. Niko Quinn's 1996 Affidavit, Niko Quinn's 2014 Affidavit. PSOF ¶ 99 is immaterial.

100. Golubski responded by warning Niko Quinn to leave that alone, that she "shouldn't be talking about Cecil, be careful what [she] say[s] about Cecil because they found his ex-girlfriend's remains behind Washington High School." (Ex. 12: Niko Quinn Dep. 93:15– 94:7, 175:18–176:4).

Reply: PSOF ¶100 Uncontroverted, but immaterial. Niko Quinn's numerous statements have been inconsistent on this issue and, notably, her earlier statements do not make the allegation that Golubski "warned" her that she should not be talking about Cecil. 1996 Affidavit, ¶ 10; 2014 Affidavit ¶¶ 19–20. Further, Niko Quinn did not "care" about any such warning and wanted to make her statement anyway. Niko Quinn dep., 99:22–94:23. PSOF ¶ 100 is immaterial.

101. Golubski told Niko Quinn Cecil Brooks and Aaron Robinson and their gang "didn't do it, they couldn't have did it because they had the guy in custody [referring to Lamonte McIntyre], they had the clothes he was wearing and they had the gun so they got the right person." (Ex. 12: Niko Quinn Dep. 176:5–20).

Reply: Uncontroverted.

102. However, the police never had any incriminating clothes, gun, or any other physical or forensic evidence implicating Lamonte McIntyre. (Pl. Ex. 67: Terra Morehead Dep. 177:21–178:14, 181:12–15, 182:7–15, 182:18–25); (Pl. Ex. 46: Gary Long Dep. 58:19–60:3, 60:13–16).

Reply: Uncontroverted.

103. Knowing Niko Quinn was scared for her life, Golubski offered to put her in protective custody; he then helped her move to 4th Street. (Ex. 12: Niko Quinn Dep. 98:9–99:4, 186:1–187:10); (Pl. Ex. 63: Roger Golubski Dep. 169:19–170:11).

**Reply: PSOF ¶103 Controverted in part, but immaterial. Uncontroverted that Niko Quinn was scared and that Roger Golubski directed her to publicly available housing resources, and put her in contact with the same, but provided no other assistance, financial or otherwise. Niko Quinn dep., 98:13–99:4.**

104. During this conversation, Golubski put a lot of pressure on Niko Quinn to make a positive identification. Specifically, Golubski "gives [her] the picture, he tells [her] that they had the clothes, they had the gun, and they had Lamonte in custody, and they knew for a fact that he was the one that killed [her] cousin." (Ex. 12: Niko Quinn Dep. 94:8–14); (Pl. Ex. 25: Niko Quinn 2014 Aff. ¶ 20); (Ex. 12: Niko Quinn Dep. 171:22–173:10).

**Reply: Uncontroverted.**

105. Golubski also asked Niko Quinn if it was possible that the people after her could be Lamonte McIntyre's brothers and cousins; Niko Quinn told him she knew the McIntyre family (although she did not know Lamonte) and that "there is no way that [they] would do anything like that." (Ex. 12: Niko Quinn Dep. 94:15–23).

**Reply: PSOF ¶105 Controverted in part, but immaterial. Uncontroverted except that Niko Quinn testified she did know Lamonte McIntyre, well enough in fact to know he had the reputation of being a "Sponge Bob Square Pants." Niko Quinn dep., 160:2-13.**

106. When asked if he fabricated Niko Quinn's identification of Lamonte McIntyre, Golubski refused to answer and instead invoked his Fifth Amendment right to remain silent. (Pl. Ex. 63: Roger Golubski Dep. 150:14–151:3, 174:19–175:2).

**Reply: Uncontroverted but misleading because Golubski exercised his Fifth Amendment rights as to all questions pertaining to the investigation. Golubski's invocation of his Fifth Amendment rights is not evidence Golubski fabricated Niko Quinn's identification of Lamonte McIntyre.**

**In violation of policy/procedure Golubski makes no contemporaneous report of Niko Quinn's alleged identification or the exculpatory information she reports to him about Monster**

107. It is the lead detective's obligation in a homicide case to ensure that every potentially significant thing that happens is accurately documented in the file, including identification procedures, whether they resulted in a positive

identification or not. (Pl. Ex. 54: Clyde Blood Dep. 107:7–25, 118:23–119:12, 164:13–165:4); (Pl. Ex. 69: Ronald Miller Dep. 75:25–77:5).

**Reply: Uncontroverted**

108. It was KCKPD practice to audio record witness statements whenever possible, and each homicide detective carried a tape recorder with them in the field. (Pl. Ex. 54: Clyde Blood Dep. 93:4–17). The practice was then that these interviews would be transcribed and signed by the witnesses. (Pl. Ex. 54: Clyde Blood Dep. 110:23–111:12).

**Reply: Uncontroverted.**

109. When witnesses were re-interviewed, officers were obligated to make separate documentation of those subsequent interviews. (Pl. Ex. 54: Clyde Blood Dep. 123:19–124:22).

**Reply: Uncontroverted.**

110. Golubski did not make any contemporaneous report of his meeting with Niko Quinn behind Wyandotte High School nor the alleged second photo identification procedure. (Ex. 3: Roger Golubski TT 330:24–331:4); (Pl. Ex. 67: Terra Morehead Dep. 141:12–142:1, 185:8–187:25); Golubski SOF ¶ 85.

**Reply: Uncontroverted.**

111. Niko Quinn told Golubski on numerous occasions that the police had gotten the wrong man for Doniel's murder, and that her sister said the real killer was Monster. In response, Golubski said nothing and took no action. (Pl. Ex. 25: Niko Quinn 2014 Aff. ¶ 28, 2014); (Pl. Ex. 30: Niko Quinn DA Interview 171:22–173:10).

**Reply: PSOF ¶111 Objection and controverted in part, but immaterial. Plaintiffs cite to a non-existent portion of her interview transcript with the District Attorney—pages 171–173—but that transcript is only 67 pages long. As a result, Plaintiffs' fail to support this fact with a citation to the record as required by Fed. R. Civ. P. 56(c)(1). Further, the cited testimony from Niko Quinn's 2014 affidavit does not state that she told Golubski numerous times prior to Lamonte McIntyre's conviction but rather "on a number of occasions through the years." (Ex. 10 ¶ 28). Thus, to the extent this fact alleges Niko Quinn told Golubski Lamonte McIntyre was not the shooter at any time prior to his conviction, this fact is not supported**

by a citation to the record as required by Fed. R. Civ. P. 56(c)(1).

112. For example, before she was going to testify, Niko Quinn and Golubski were in a room together at the juvenile courthouse. Niko Quinn told Golubski that Lamonte McIntyre did not commit the crime. Golubski's sole response was that they "could not discuss that in here." There, Golubski also told Niko Quinn that she heard she used to strip and asked her to get up and dance on the table for money. (Pl. Ex. 30: Niko Quinn DA Interview 30:23–31:18); (Ex. 12: Niko Quinn Dep. 12:10–15).

**Reply: PSOF ¶112 is objectionable as unsupported by the cited record (but is immaterial). Niko Quinn testified that she had no memory of the preliminary hearing/juvenile waiver hearing. Niko Quinn dep., 99:16–22; 101:5–7. Further, Niko Quinn testified that during this alleged interaction where Golubski asked her to dance, Stacy Quinn was in the room. There is no evidence that Stacy Quinn was present during either the waiver/preliminary hearing or at trial. PSOF 112 is unsupported by the cited evidence as required by Fed. R. Civ. P. 56(c)(1).**

113. Encountering Golubski around 2011, Niko Quinn waved him down, to which Golubski responded that he should not talk to her because she is the one who "told on him" to an investigator regarding his misconduct. (Pl. Ex. 30: Niko Quinn DA Interview 64:4–25); (Ex. 12: Niko Quinn Dep., 12:10–15).

**Reply: PSOF ¶113 Objection. This fact and the supporting evidence lack foundation. Niko Quinn alleges Roger Golubski told her that she "told on him" without any foundation as to what misconduct, when, if, or to whom Niko Quinn "told on him." Thus, this fact is unsupported by the citation to the record as it lacks foundation and is pure speculation and conjecture, in violation of Fed. R. Civ. P. 56(c)(2).**

**Consistent with Niko Quinn's account to Golubski, Defendants have a lot of other evidence indicating that the double homicide was a drug hit**

114. Police collected a crack pipe from the car where Ewing and Quinn were murdered. (Ex. 1: Police File, Golubski Report, 4/16/1994 LMKSDC_0003394; Clair Report, 4/18/1994, LMKSDC_0003430; Police File, LMKSDC_0003453).

**Reply: Uncontroverted.**

115. Police knew that drug trafficking took place in the area in which the double homicide occurred. (Ex. 6: Dennis Ware Dep. 208:23–209:19).

**Reply: Uncontroverted.**

116. Detective Ware testified that in "any homicide you want to find out whether there is some drug connection," and that it is "more likely" a homicide is drug-related when there is an "execution style murder in the middle of the day" near the area of 18th Street and Quindaro in Kansas City, Kansas in 1994. (Ex. 6: Dennis Ware Dep. 211:16–215:19).

**Reply: PSOF ¶116 Uncontroverted that the quotations are accurate, but misleading since the investigation did include efforts to establish a drug connection.** *See,* **Police File, Yolanda Johnson Statement at LMKSDC0003571–3572.**

117. Indeed, Golubski alleges that the North End neighborhood where the murders occurred was "riddled with addiction and drug dealers preying upon those with drug addictions." (Pretrial Order, Doc. 562, Contentions of Defendant Roger Golubski, p. 26).

**Reply: Uncontroverted.**

118. Doniel Quinn's father, John Quinn, also told Golubski that Doniel had been hanging out with "[a] cobra snake [whose] any kind of bite would be instant death." (Ex. 1: Police File, John Quinn Stmt. LMKSDC_0003462, 0003466). There is no record that Golubski or any other detective attempted or did follow up on John Quinn's statement.

**Reply: Uncontroverted.**

119. When Smith interviewed Josephine Quinn, a potential eyewitness to the crime, he asked whether Doniel Quinn, her nephew, was involved in drug trafficking because it was an obvious angle for investigation given the circumstances of the crime. (Ex. 1: Josephine Quinn Stmt. by Smith, 4/15/1994, LMKSDC_0003428); (Pl. Ex. 59: W.K. Smith Dep. 385:8–19).

**Reply: Uncontroverted.**

120. Smith testified that, when he took a statement from Josephine Quinn at the scene of the crime, he knew "that Josephine had more information but wasn't forthcoming because she feared, I think she feared some reprisals." However, Smith did not document these impressions in his report, nor did he orally report them to Golubski. (Pl. Ex. 59: W.K. Smith Dep. 90:8– 93:22). By the early 1990s, Smith understood that it was important to document and memorialize all information that could be obtained from a witness. (Pl. Ex. 59: W.K. Smith Dep. 78:10–19).

**Reply: PSOF ¶ 120 Controverted in part, but immaterial. Defendant Smith testified that based on his reading of the statement at the deposition that "by reading the context of what she did say, he could tell that she was [hiding something]". W.K. Smith Dep. 90:8–93:22.**

121. According to Defendants' own expert, Tarik Khatib, it was "an obvious and important angle" to look into whether Lamonte McIntyre had any connection to the drug gangs operating in the area of the shooting once he became a suspect. (Pl. Ex. 53: Tarik Khatib Dep. 181:7–16, 184:6–11).

**Reply: PSOF ¶121 Controverted. The record in reference to Plaintiff's contention read in context reveals Khatib to express agreement that connection to drug gangs operating in the area could be looked at. Detective Golubski's line of questioning attempted to explore a drug related component to the murders and whether Lamonte McIntyre was involved in drug dealing. (See Khatib Rpt. pp. 17-18, Doc. 622).**

### Golubski later fabricates that Niko Quinn made an adamant identification of Lamonte McIntyre during this meeting behind Wyandotte High School

122. After the preliminary hearing, Golubski reported to the prosecutor that Niko Quinn had earlier volunteered an adamant and unequivocal identification of Lamonte McIntyre, without any suggestion from him, approximately a week after the murder. (Pl. Ex. 67: Terra Morehead Dep. 131:3–18).

**Reply: Uncontroverted.**

123. Golubski later testified at trial that Niko Quinn had made an "adamant" identification of Lamonte McIntyre during this meeting, and that she had done so without any suggestion from him. (Ex. 3: Roger Golubski TT 327:18–329:15).

**Reply: Uncontroverted.**

124. Golubski's report was a lie; Niko Quinn was never adamant about selecting Lamonte McIntyre's photo; rather, she described detectives' direct suggestion as to who she should identify. (Ex. 12: Niko Quinn Dep. 188:23–189:18); (Pl. Ex. 63: Roger Golubski Dep. 172:3–22); see supra paras. 78–88.

**Reply: Objection, PSOF ¶124 is unsupported. Whether Niko Quinn was "adamant" in her positive identification of Lamonte McIntyre as the shooter is immaterial. *See* DSOF ¶¶ 152-168. Controverted, but immaterial as to the issues in Defendants' motions. See Golubski's**

testimony, Trial Transcript 328:25–329:15 ("she told me she could make a positive ID of the suspect. [… Q …] when she identified photo No. 3 did she indicate to you how positive she was about that identification? She was adamant about it.").

125. Golubski's failure to make any contemporaneous record or inform anyone of Niko Quinn's identification at the time it first happened is so unusual as to raise questions about the legitimacy of Golubski's investigation. In fact, Smith had never seen anything like that in the course of his police career. Further, Blood agreed he had never seen a case where an officer failed to document a positive identification from an eyewitness, and that if he obtained a positive identification, he would be "tickled" and would document it because "that made my job a lot easier if that's the guy." (Pl. Ex. 54: Clyde Blood Dep. 173:4–16); (Pl. Ex. 59: W.K. Smith Dep. 350:9–352:4). See also (Pl. Ex. 66: Russell Fischer Report p. 13–14).

**Reply: PSOF ¶125 is unsupported by the cited record. Evidence of Niko Quinns' identification was admitted at preliminary hearing, trial and discussed during deposition.**

126. When asked if the reason he did not make a contemporaneous record of what he later described as an adamant identification by Niko Quinn was because it didn't happen that way, and, in reality, he told Niko Quinn who to pick, Golubski refused to answer and instead invoked his Fifth Amendment right to remain silent. (Pl. Ex. 63: Roger Golubski Dep. 177:11– 178:7, 179:5–180:10, 180:17–181:2).

**Reply: PSOF ¶126 Uncontroverted but misleading because Golubski exercised his Fifth Amendment rights as to all questions pertaining to the investigation and immaterial as to claims against Defendant Unified Government.**

### Ruby Mitchell is a partial eyewitness to the shooting of Donald Ewing and Doniel Quinn

127. Ruby Mitchell lived diagonally across the street, two houses down from the parked car where Ewing and Quinn were shot. (Pl. Ex. 68: Preliminary Hearing 5:16–6:5, 10:4– 11:19).

**Reply: Uncontroverted.**

128. Mitchell was standing in her doorway with her five-year-old son, talking on the phone, when she briefly viewed, through a storm door with a screen, the shooter approach the car and commit the murders, (Ex. 10: Ruby Mitchell Dep. 16:1–17:20); (Pl. Ex. 68: Preliminary Hearing, Ruby Mitchell 15:17–16:4).

**Reply: Uncontroverted.**

129. Mitchell did not see any of the shooter's facial features, but thought she recognized the shooter as her niece's boyfriend due to his skin tone and hairstyle, and was about to call out to him when she saw the gun. (Ex. 10: Ruby Mitchell Dep. 21:10-18; 24:19-25:19; 42:7–11); (Pl. Ex. 68: Preliminary Hearing, Ruby Mitchell 13:6–20); (Pl. Ex. 32: Ruby Mitchell 2011 Aff. ¶¶ 9, 12).

**Reply: PSOF ¶ 129 is not supported by the cited record. Mitchell's identification and testimony is detailed at DSOF ¶¶ 88-122. Through trial, Michell maintained the shooter looked like the Lamonte that dated her niece, but was not one and the same person.**

130. Although Mitchell only knew her niece's boyfriend by his first name, "Lamont," his full name is Lamont Drain. (Ex. 10: Ruby Mitchell Dep. 26:19-25); (Pl. Ex. 68: Preliminary Hearing, Ruby Mitchell 19:6–7); (Ex. 2: Ruby Mitchell TT 181:6–11).

**Reply: PSOF ¶130 Controverted, but immaterial. As Plaintiffs admit, his name was "Anthony Lewis." Plaintiffs, on their Exhibit Index list Exhibit 84 as the "Lamonte Drain 1984 Mugshots" but the photographs identify the individual as "Anthony Lewis," which further demonstrates why police would not have been able to show Ruby Mitchell a picture of a "Lamonte Drain" because the mugshots were identified as Anthony Lewis.**

131. Mitchell had a friendly relationship with Drain; he called her "auntie," she spent time with him with her niece, and he came over to her house sometimes. (Ex. 10: Ruby Mitchell Dep. 24:5-18, 25:15-26:10); (Ex. 2: Ruby Mitchell TT 165:12-25).

**Reply: Uncontroverted.**

132. Mitchell thought that the Lamonte she knew, who had dated her niece, was the person who did the shooting. At no point during the shooting did Mitchell change her mind about who she thought it was. (Ex. 10: Ruby Mitchell Dep. 127:10-14); (Ex. 2: Ruby Mitchell TT 165:12-166:7).

**Reply: PSOF ¶132 Controverted as contrary to the record. The text of the deposition testimony cited by plaintiffs' response reads as follows: "Q. And when you went to court and -- and testified, did you think you were identifying the person who shot the people in the blue car on the street, on Hutchings Street? A. Yes." Mitchell dep., 127:10-127:14. Mitchell**

testified at trial that **Lamonte McIntyre, the person in the photograph she had identified as the shooter, was not the same Lamonte that used to date her niece. Trial Transcript, 171:24 to 172:2.**

133. Mitchell was shocked by the shots; she shut the door and called the police. (Ex. 10: Ruby Mitchell Dep. 42:7–21).

**Reply: Uncontroverted but immaterial.**

134. Mitchell then went back outside where she met Niko Quinn and sat with her on her porch. (Ex. 2: Ruby Mitchell TT 167:16-168:2). Mitchell told Niko Quinn the shooter was Lamont, her niece's boyfriend. (Pl. Ex. 30: Niko Quinn DA Interview 19:16-24; 21:11-22); (Ex. 12: Niko Quinn Dep. 64:3-14).

**Reply: PSOF ¶134 Controverted in part, but immaterial. Mitchell insists she didn't know Lamonte Drain's last name. Mitchell dep. 26:19-25, 74:8-10, 77:20-24.**

135. Like Lamont Drain, Neil Edgar Jr, "Monster," wore thick French braids that lay back against his scalp. (Ex. 10: Ruby Mitchell Dep. 21:10-22:1, 28:8-20); (Ex. 2: Ruby Mitchell TT 186:6-16, 208:13-209:6); (Pl. Ex. 26: Cecil Brooks 2016 Aff. ¶ 24); (Pl. Ex. 42: Frank Freeman 2011 Aff. ¶ 8); Pl. Ex. 31: Kendra Dean-Martin 2013 Aff. ¶ 8).

**Reply: PSOF ¶135 Controverted as contrary to the record. Whatever Mitchell's recollection about French Braids may be, in the admittedly authentic recording of Mitchell's statement, she described the shooter as dressed in black with hair that "wasn't real short, it was slicked back, going like this. It wasn't slicked down, it was like an afro but it was going back like this." Police File, pp. 31-34; Doc. 582-11 (filed conventionally).**

**Mitchell gives a limited description of the shooter which is consistent with Monster and inconsistent with Lamonte McIntyre**

136. While police were at the scene, Mitchell spoke with Detective Golubski alone on her porch and he asked Mitchell what the shooter looked like, and she told him that the shooter had dark skin and braids, and that she'd thought it was her niece's boyfriend. (Ex. 10: Ruby Mitchell Dep. 43:14-44:8; 46:10-47:21.)

**Reply: PSOF ¶136 is unsupported by the cited record. The statement of Ruby Mitchell taken at the scene was taken not by Detective Golubski, but by Detective Krstolich. Police File,**

**LMKSDC3421–3424. Whatever Mitchell's recollection about French Braids may be, in the admittedly authentic recording of Mitchell's statement, she described the shooter as dressed in black with hair that "wasn't real short, it was slicked back, going like this. It wasn't slicked down, it was like an afro but it was going back like this." Police File, pp. 31-34; Doc. 582-11 (filed conventionally).**

137. Detective Golubski failed to document this encounter with Ruby Mitchell, or the information she reported to him. (Ex. 1: Entire Police File, LMKSDC_0003391–0003500.)

**Reply: PSOF ¶137 Controverted, but immaterial. The statement of Ruby Mitchell taken at the scene was taken not by Detective Golubski, but by Detective Krstolich. Police File, LMKSDC3421–3424.**

138. At his deposition, Golubski refused to answer and instead invoked his Fifth Amendment rights in response to questioning about whether it was clear to him based on where Mitchell was standing at the time of the crime that she would not have been able to see the shooter's face. (Pl. Ex. 63: Roger Golubski Dep. 101:5–21, 157:5–22).

**Reply: PSOF ¶138. Uncontroverted but immaterial and misleading because Golubski exercised his Fifth Amendment rights as to all questions pertaining to the investigation. Golubski's invocation of his Fifth Amendment rights is not evidence that Mitchell could not see the shooter's face.**

139. At 2:55pm, Krstolich took a taped statement from Mitchell. (Ex. 1: LMKSDC_0003421). She described the shooter as brown-skinned, wearing all black clothing, including black khakis and a black t-shirt with white writing on it, only about 5'6" tall. (Ex. 1: Police File, LMKSDC_0003422–23). Monster is 5'7". (Pl. Ex. 55: Monster MODOC Offender Profile); (Pl. Ex. 31: Kendra Dean-Martin 2013 Aff. ¶ 8); (Pl. Ex. 28: Tamika Burks Aff. ¶ 5).

**Reply: Uncontroverted.**

140. When Krstolich asked whether Mitchell could see the shooter's face, she responded, "Well, he's brown skinned, that's all I could tell. I don't know no scars or nothing like that." (Ex. 1: Police File, Ruby Mitchell Stmt. to Krstolich, LMKSDC_0003423).

**Reply: Uncontroverted.**

141. In 1994, Lamonte McIntyre was tall and skinny, almost six feet tall, and he wore his hair in a short, closely cropped hair style. (Ex. 1: Police File, Arrest Report, LMKSDC_0003413); (Pl. Ex. 64: Lamonte McIntyre 2/28/1994 Mugshot).

**Reply: PSOF ¶141 Objection. This fact is vague and ambiguous as to what constitutes almost six feet tall. However, Defendant does not controvert that Lamonte McIntyre, at the time of his arrest was 5 feet 11 inches, skinny, and had short hair.**

142. On the day of the shooting Lamonte McIntyre wore a blue "Michigan" hat, brown or rust-colored jeans, and a faded black t-shirt. (Ex. 1: Police File, Witness Stmt., Yolanda Johnson, LMKSDC_0003469; Natasha Haygood Stmt. by Golubski, LMKSDC_0003480; M'Sherie Johnson Stmt. by Golubski, LMKSDC_0003489); (Ex. 4: M'Sherie Johnson TT 428:12–25; Peggy Crowder TT 381:9–16).

**Reply: PSOF ¶142 Uncontroverted that these witnesses state that at some point on the day of the shooting, Lamonte McIntyre was dressed as described.**

143. Witnesses were able to recall Lamonte McIntyre's outfit because he had been wearing the same clothes for days. (Ex. 1: Police File, Natasha Haygood Aff, LMKSDC_0003480; M'Sherie Johnson Stmt. by Golubski, LMKSDC_0003489); (Pl. Ex. 50: Rose McIntyre 2014 Aff. ¶ 7).

**Reply: PSOF ¶143 Uncontroverted that these witnesses testified as such.**

**Golubski drives Mitchell to the police station for a follow-up interview, and sexually harasses her during the drive**

144. Later that afternoon, Golubski drove Mitchell to the police department. (Pl. Ex. 32: Ruby Mitchell 2011 Aff. ¶¶ 5, 14); (Ex. 10: Ruby Mitchell Dep. 46:10–15).

**Reply: PSOF ¶144 Controverted, but immaterial. Detective Krstolich was the one who interviewed Ruby Mitchell on scene and asked her to go down to the station to prepare a composite sketch. Police File, at LMKSDC0003441–3442. Further, Ruby Mitchell testified that the same detective that took her statement on her porch drove her to the police station. Mitchell dep., 117:5–10.**

145. During the drive Golubski told Mitchell that he thought she was pretty and had

a nice body, asked if she had a boyfriend and put his hand on her upper thigh. (Pl. Ex. 32: Ruby Mitchell 2011 Aff. ¶ 14); (Ex. 10: Ruby Mitchell Dep. 50:3–55:22).

**Reply: PSOF ¶145 Controverted, but immaterial. Detective Krstolich was the one who interviewed Ruby Mitchell on scene and asked her to go down to the station to prepare a composite sketch. (Exhibit 1, at LMKSDC0003441–3442). Further, Ruby Mitchell testified that the same detective that took her statement on her porch drove her to the police station. Mitchell dep., 117:5–10.**

146. Golubski's actions made Mitchell nervous and uncomfortable, and she was worried about what he might do on the way back home when it would be dark out. She was also afraid he would arrest her for solicitation or offer her money for sex. (Ex. 10: Ruby Mitchell Dep. 54:10-18); (Pl. Ex. 32: Ruby Mitchell 2011 Aff. ¶ 16).

**Reply: PSOF ¶146 Controverted, but immaterial. Detective Krstolich was the one who interviewed Ruby Mitchell on scene and asked her to go down to the station to prepare a composite sketch. Police File, at LMKSDC0003441–3442. Further, Ruby Mitchell testified that the same detective that took her statement on her porch drove her to the police station. Mitchell dep., 117:5–10.**

147. Mitchell remained nervous about this experience with Golubski while at the police department; she was still upset talking about the experience twenty-seven years later at her deposition. (Ex. 10: Ruby Mitchell Dep. 55:20–22; 64:2–17).

**Reply: PSOF ¶147 Controverted, but immaterial. Detective Krstolich was the one who interviewed Ruby Mitchell on scene and asked her to go down to the station to prepare a composite sketch. Police File, at LMKSDC0003441–3442. Further, Ruby Mitchell testified that the same detective that took her statement on her porch drove her to the police station. Mitchell dep., 117:5–10.**

148. By making sexual comments about Mitchell's body, Golubski "departed from minimally acceptable police practice by creating a threatening and coercive environment prior to conducting a photo identification" with her. It was widely understood by 1994, that making sexual remarks about a witness could create a negative environment in which the witness could not accurately identify the

shooter. (Pl. Ex. 66: Russell Fischer Report p. 12).

**Reply: PSOF ¶148 Controverted, but immaterial. Detective Krstolich was the one who interviewed Ruby Mitchell on scene and asked her to go down to the station to prepare a composite sketch. Police File, at LMKSDC0003441–3442. Further, Ruby Mitchell testified that the same detective that took her statement on her porch drove her to the police station. Mitchell dep., 117:5–10. Objection. The assertion that sexual remarks during a car ride created an inaccurate eyewitness identification is inadmissible speculation. At trial, Mitchell testified that no one suggested or hinted that she should pick out the picture she selected. Trial Transcript Vol. I, 174:13-17. Mitchell denied being pressured by detectives to select a certain photo, and denied detectives suggested a photo for her to select. Mitchell dep., 112:21-113:1.**

149. Indeed, it was against KCKPD policy at the time for an officer to transport members of the opposite sex in police vehicles alone, given the risks involved in police interactions with witnesses of the opposite sex. (Pl. Ex. 66: Russell Fischer Report p. 13).

**Reply: PSOF ¶ 149. Controverted as unsupported by admissible evidence and unsupported by the cited evidence. The Fischer Report is inadmissible hearsay. The cited portion of the Fischer Report does not state KCKPD policy precluded transport of the opposite sex. Rather, General Order 93-22 required that when transporting persons of the opposite sex, the officer will "provide their radio numbers, starting locations, destination, race and sex of the prisoner and the starting mileage and radio broadcast to dispatch prior to transporting a prisoner. Upon arrival at the destination, officers will advise dispatch and relay the ending mileage. The dispatcher will acknowledge both transmission and state the exact time of broadcasts."**

**At the station, Mitchell tells Golubski and Krstolich that she thought the shooter was a man she knew named "Lamont"—which Golubski uses as an opportunity to make**

Lamonte McIntyre his primary suspect

150. Golubski and Krstolich interviewed Mitchell at the police department. (Pl. Ex. 32: Ruby Mitchell 2011 Aff. ¶6); (Pl. Ex. 68: Preliminary Hearing 39:9–12).

**Reply: PSOF ¶150 is objectionable as unsupported by the cited record (but is immaterial). The citations do not support this fact as required by Fed. R. Civ. P. 56(c)(1). Paragraph 6 of Ex. 8 does not identify Golubski nor does the transcription of the interview at the station. (Exhibit at LMKSDC 3421) (identifying only Detective Krstolich). Further, Ruby Mitchell testified that the same detective that took her statement on her porch and drove her to the police station was the same detective that showed her the photos at the station. Mitchell dep., 117:11–17.**

151. During the interview, Mitchell again reported that the shooter looked like her niece's former boyfriend whose first name was "Lamont." (Pl. Ex. 32: Ruby Mitchell 2011 Aff. ¶ 8); (Ex. 10: Ruby Mitchell Dep. 56:14-57:18); (Ex. 1: Police File, Krstolich Report, 4/15/1994, LMKSDC_0003442).

**Reply: Uncontroverted.**

152. Mitchell was positive that the shooter had French braids, which appeared to be of medium length and braided to the back of his head. She reported this description to police "from the very beginning." (Pl. Ex. 32: Ruby Mitchell 2011 Aff. ¶¶ 9, 12); see supra para. 114; (Ex. 10: Ruby Mitchell Dep. 46:16-47:21).

**Reply: PSOF ¶152 Controverted, but immaterial. Ruby Mitchell testified at trial that she did not see the shooter's hair. (Exhibit 6, tr. 182:5–14; 186:17–21)**

153. According to Plaintiff's expert in police practices, Russ Fischer, a former Chief of the Criminal Investigations Division at the Miami-Dade Police Department—who also has been lead instructor for the International Association of Chiefs of Police (IACP) as it relates Internal Affairs: Legal and Operational Issues and has been hired by the DOJ to train homicide investigators in Colombia—if Mitchell's sworn account that she "from the very beginning," told police the shooter had French braids is accurate, then the failure of Golubski and Krstolich to document this description is deeply troubling for a number of reasons, including because she selected Lamonte McIntyre's photo which did not include French braids. According to Chief Fischer, the contradictions regarding hair styles signaled the need to take all available steps to corroborate Mitchell's identification. (Pl. Ex. 66: Russell Fischer Report p. 12, Ex. A p. 1.); (Pl. Ex. 82: Russell Fischer Dep.

26:6–27:9).

**Reply: PSOF ¶153 Objection. Plaintiff's expert attempts to judge the credibility of the witness, incomplete hypothetical and engages in speculation.**

154. At his deposition, Golubski refused to answer and instead invoked his Fifth Amendment right to remain silent when asked whether, upon hearing Ruby identify the shooter as a black teenager named "Lamont," he thought of Lamonte McIntyre because Golubski knew his mother and saw an opportunity to get back at her. (Pl. Ex. 63: Roger Golubski Dep. 103:16– 105:4, 106:6–107:10, 267:10–268:15).

**Reply: PSOF ¶154 Uncontroverted but immaterial and misleading because Golubski exercised his Fifth Amendment rights as to all questions pertaining to the investigation.**

155. In the late 1980s or early 1990s the KCKPD had very important rules about how photo identification procedures were conducted. (Ex. 6: Dennis Ware Dep. 85:8-16; 28:23- 29:21).

**Reply: PSOF ¶155 is objectionable as unsupported by the cited record (but is immaterial). Plaintiffs cite the deposition of Dennis Ware for the proposition that the KCKPD had very important rules. However, Mr. Ware was not testifying on behalf of the KCKPD, but rather himself. As a result, his answer does not support the fact asserted as required by Fed. R. Civ. P. 56(c)(1).**

156. When putting together a photo lineup in the early 1990s, the procedure was to go to the crime lab identification unit, where books of photos were organized by criminal jacket number or alphabetical order by name, go through the photos, and pick out similar photographs one by one until the detective had what they thought was a fair array. (Pl. Ex. 54: Clyde Blood Dep. 167:24-168:10; 170:16-172:4).

**Reply: PSOF ¶156 is objectionable as unsupported by the cited record (but is immaterial). Plaintiffs cite the deposition of Clyde Blood. However, Mr. Blood was not testifying on behalf of the KCKPD, but rather himself and his answers are without foundation to apply them globally to the KCKPD in the 1990s. As a result, his answer lacks foundation and does not support the fact asserted as required by Fed. R. Civ. P. 56(c)(1). Further, Mr. Blood testified that "Nowadays you punch it into a computer and it spits them out. Before then we had to**

**dig through and pick them out one by one until we got what we thought was fair." Blood**

**dep., 171:19–22.**

> 157. Instead, in this case, Golubski obtained Polaroids of Lamonte McIntyre and his brother and cousin from a file relating to a prior unrelated incident during which all three were arrested. Golubski SOF ⫟ 55; Def. Golubski's Mot. in Supp. of Summ. J. (D.E. 582), at 9–10, ¶¶ 52–55.

**Reply: PSOF ¶157 Uncontroverted that Golubski obtained the Polaroids in question, but**

**misleading because Golubski was looking for photographs of the already identified suspect,**

**Lamonte McIntyre, and not fillers. Police File, at LMKSDC 3453.**

> 158. Krstolich then asked Mitchell to help develop a composite of the shooter. (Ex. 1: Police File, Krstolich Investigative Addendum, April 15, 1994, LMKSDC_0003442).

**Reply: PSOF ¶158 Controverted as to the timing of the composite sketch, but immaterial.**

**Krstolich testified that he asked Ruby Mitchell to complete a composite sketch because she**

**indicated she could identify him again if she saw him. And, almost as an "afterthought" once**

**the composite sketch was done, she volunteered the name "Lamonte." Police File, at**

**LMKSDC0003441–3442; Exhibit 6, tr. 280:10–23.**

> 159. It was highly unusual at the time to create a composite when the witness has already identified a specific person she believes is the shooter. (Pl. Ex. 60: Expert Report of Jennifer Dysart pp. 7, 11); (Pl. Ex. 70: Jennifer Dysart Dep. 32:7–33:20).

**Reply: PSOF ¶159 Objection. First, as made clear in response to other facts, Ruby Mitchell**

**never thought, prior to her deposition, that the shooter was the Lamont she knew. Further,**

**the cited evidence does not support the fact alleged that Ms. Dysart's report does not opine**

**that using composites is highly unusual but, rather, that they are not frequently used because**

**they are unreliable. Thus, this fact is not supported by the citation to the record as required**

**by Fed. R. Civ. P. 56(c)(1). Regardless, here, a composite was used prior to obtaining the**

**name of the suspect. Police File, at LMKSDC0003441–3442; Exhibit 6, tr. 280:10–23.**

160. Because Mitchell did not see the perpetrator's face, the composite drawing is indistinct. The composite and the photograph of Lamonte McIntyre Mitchell selected "do not look a lot alike." (Pl. Ex. 59: W.K. Smith Dep. 359:11-23); (Pl. Ex. 63: Roger Golubski Dep. 101:22–102:18); (Ex. 1: Police File, Composite LMKSDC_0003440).

**Reply: PSOF ¶160 Objection. The evidence cited does not support the asserted fact as to the reason the composite sketch was indistinct as required by Fed. R. Civ. P. 56(c)(1). Further, the reason the composite sketch was drawn was because she told Detective Krstolich she could make an identification. Police File, at LMKSDC0003441–3442)**

### Golubski and Krstolich show Mitchell multiple, improper photo arrays, and use suggestion to force her to choose Lamonte McIntyre

161. Golubski and Krstolich showed Mitchell at least two sets of photos: a six-person photo lineup which had the photos all affixed to one page and the five loose Polaroids later shown to Niko Quinn. (Ex. 1: Police File, Krstolich Investigative Addendum [4/15/1994], LMKSDC_0003442); (Ex. 10: Ruby Mitchell Dep. 58:18-10, 62:4-64;1; 66:12-23); see supra paras. 47–61. Krstolich also referred in his report to Mitchell viewing "mug books." (Ex. 1: Police File, Krstolich Investigative Addendum [4/15/1994], LMKSDC_0003442).

**Reply: PSOF ¶161 Controverted, but immaterial. Defendant Unified Government does not controvert that Ruby Mitchell, in a deposition given in 2021, testified to certain things she had not previously testified to and which were, at time, entirely contrary to her earlier statements and sworn testimony. For example, Ruby Mitchell clearly testified she thought the shooter looked like the Lamont she knew, not that the shooter was the Lamont that she knew. During her deposition—27 years after the murders and after interactions—Mitchell testified she thought she picked out the Lamonte she knew. Mitchell dep., 9: 70:2–6. When presented with certified trial transcripts of her prior testimony, Mitchell claimed the transcripts were incorrect. Mitchell dep., 92:22–95:3.**

162. According to Ware, one reason it is important not to influence a witness's photo selection is because a suggestive photo showing can impact a witness's memory in important ways. Ware understood by 1994 that if you used suggestion with a witness during one photo showing, that could influence not only that photo

showing, but any additional identification procedures that occurred down the line. According to Ware, the concept that if police suggest a particular photo on one occasion, that suggestion will taint that witness's identifications down the line was "just common sense," and a basic policing concept understood by 1994. (Ex. 6: Dennis Ware Dep. 185:21-187:2); (Pl. Ex. 53: Tarik Khatib Dep. 233:17–24).

**Reply: PSOF ¶162 Uncontroverted as to Ware's testimony and understanding.**

163. Lamonte McIntyre's photograph appeared in both the six-photo array and the loose stack of photographs. No other individual appeared in both sets of photographs. (Ex. 10: Ruby Mitchell Dep. 70:22-72:10, 81:12-22); (Pl. Ex. 71: Photo Line Up).

**Reply: PSOF ¶163 Controverted, but immaterial. Defendant Unified Government does not controvert that Ruby Mitchell, in a deposition given in 2021, testified to certain things she had not previously testified to and which were, at time, entirely contrary to her earlier statements and sworn testimony. For example, Ruby Mitchell clearly testified she thought the shooter looked like the Lamont she knew, not that the shooter was the Lamont that she knew. During her deposition—27 years after the murders and after interactions—Mitchell testified she thought she picked out the Lamonte she knew. Mitchell dep., 9: 70:2–6. When presented with certified trial transcripts of her prior testimony, Mitchell claimed the transcripts were incorrect. Mitchell dep., 92:22–95:3.**

164. According to Plaintiffs' expert in eyewitness identification, Dr. Jenn Dysart, when a witness sees a photograph in multiple identification procedures or contexts, there is a risk this sense of familiarity on the part of the witness may lead to an increased likelihood of choosing that person and a feeling of increased confidence in subsequent identification procedures. (Pl. Ex. 60: Expert Report of Jennifer Dysart pp. 15–16).

**Reply: PSOF ¶164 Uncontroverted that Dr. Dysart's report says this.**

165. The six-photo array shown to Ruby Mitchell was not preserved in the police file, nor is there any other record of what other photos were included, or whether or to what extent Lamonte McIntyre's photo stood out in this array. (Ex. 1: Entire Police Case File, LMKSDC_0003391–3500).

**Reply: Controverted, but immaterial. Defendant Unified Government does not controvert**

that Ruby Mitchell, in a deposition given in 2021, testified to certain things she had not previously testified to and which were, at time, entirely contrary to her earlier statements and sworn testimony. For example, Ruby Mitchell clearly testified she thought the shooter looked like the Lamont she knew, not that the shooter was the Lamont that she knew. During her deposition—27 years after the murders and after interactions—Mitchell testified she thought she picked out the Lamonte she knew. Mitchell dep., 9: 70:2–6. When presented with certified trial transcripts of her prior testimony, Mitchell claimed the transcripts were incorrect. Mitchell dep., 92:22–95:3.

166. Golubski and Krstolich did not audio-record the photo identification procedures with Mitchell, even though they tape-recorded Mitchell's statements before and after the procedure. (Pl. Ex. 72: 4/15/1994 Audio Recording of Mitchell Stmt. LMKSDC_0003424-45).6

Reply: PSOF ¶166 Controverted, in part, but immaterial. The citations do not support that Defendant Golubski was involved in the photo identification procedures. See Police File, at LMKSDC 3421) (identifying only Detective Krstolich). Further, Ruby Mitchell testified that the same detective that took her statement on her porch (which was Detective Krstolich) and drove her to the police station was the same detective that showed her the photos at the station. Mitchell dep., 117:11–17.

167. In a written report, Golubski documented that "Mitchell immediately identified the photo of Lamonte McIntyre as being the perpetrator." (Ex. 1: Police File, Investigative Addendum by Golubski, 4/16/1994, LMKSDC_0003453).

Reply: Uncontroverted.

168. The transcript of the 4/15 audio-recorded interview of Ruby Mitchell states: Q: What name did you almost call out? A: Lamont. Q: Why did you almost yell Lamont? A: Because he used to try to talk to my niece and I knew him. Q: When you got to headquarters did we show you a series of five (5) pictures? A: Yes. Q: Were you able to pick out the shooter of the picture? A: Yes. Q: Is there a number on that picture? A: Yes. Q: What is the number? A: Number three (3). Q Are you absolutely sure this is the party who did the shooting? A: Yes. Q: Who is this party? A: Lamont. Q: Do you know his last name? A: Yes. Q: What is it? A: McIntyre. Q:

How do you know this party? A: Because he used to talk to my niece. Q: How long have you known him? A: For a couple months. (Pl. Ex. 72: 4/15/1994 Audio Recording of Mitchell Stmt. LMKSDC_0003424-3445).

**Reply: PSOF ¶168 Uncontroverted that the above is accurate as to a portion of the transcript of the interview conducted by Detective Krstolich.**

169. But both during and after the shooting, Mitchell believed she was looking at Lamont Drain. (Ex. 10: Ruby Mitchell Dep. 143:24-25; 126:22-127:14); see supra ¶¶ 107–109.

**Reply: PSOF ¶169 is contrary to the record. PSOF 169 is true only insofar as Ruby Mitchell's 2021 deposition. Mitchell's identifications and testimony in 1994 state the opposite. See DSOF ¶¶ 97-122.**

170. In 1994 Lamonte McIntyre was at least four inches taller than Neil Edgar Jr., the shooter Ruby Mitchell saw, he did not have the distinctive braids she described, and he has distinctive large ears that stick away from his face. (Pl. Ex. 32: Ruby Mitchell 2011 Aff. ¶¶ 9, 12); see supra ¶¶ 114, 130; (Ex. 10: Ruby Mitchell Dep. 46:16-47:21); (Pl. Ex. 64: Lamonte McIntyre 2/28/1994 Mugshot); (Pl. Ex. 55: Monster MODOC Offender Profile); (Ex. 1: Police File, Arrest Report, LMKSDC_0003413); (Pl. Ex. 57: Niko Quinn 1996 Aff. ¶8); (Ex. 1: Police File, Keva Garcia statement taken by Golubski, Sept. 21, 1994, LMKSDC_0003498-3499).

**Reply: PSOF ¶170 Uncontroverted as to the physical descriptions provided. Objection regarding Ruby Mitchell seeing Neil Edgar Jr., as it is not supported by the evidence cited. FRCP 56(c)(1).**

171. There were visible differences between Lamont Drain and the photo of Lamonte McIntyre that Mitchell selected, including that Lamonte McIntyre has a longer neck and his ears are big. (Ex. 1: Police File, Keva Garcia statement, LMKSDC_0003498-3499).

**Reply: PSOF ¶171 Controverted, but immaterial. Even Keva Garcia, the girlfriend of Lamont Drain (aka Anthony Lewis), stated Lamonte McIntyre and Lamont Drain looked like each other a little bit. Police File, 6498.**

172. When asked whether he used improper suggestion and pressure to get Mitchell to choose the photo of Lamonte McIntyre, Golubski refused to answer and instead

invoked his Fifth Amendment right to remain silent. (Pl. Ex. 63: Roger Golubski Dep. 103:16–111:22).

**Reply: PSOF 172 Uncontroverted but immaterial and misleading because Golubski exercised his Fifth Amendment rights as to all questions pertaining to the investigation.**

173. When asked if he lied in his written report and reports to the prosecutor when he claimed that Mitchell immediately identified Lamonte McIntyre from a proper array without any prompting or suggestion, Golubski again refused to answer and instead invoked his Fifth Amendment right to remain silent. (Pl. Ex. 63: Roger Golubski Dep. 111:16–15:15).

**Reply: PSOF ¶173 Uncontroverted but immaterial and misleading because Golubski exercised his Fifth Amendment rights as to all questions pertaining to the investigation.**

174. On the back of the photograph Ruby Mitchell selected it says "Lamonte McIntyre 07-28-76, RG." (Ex. 11: Polaroid Photos of Line Up with Names on Back); (Ex. 2: Ruby Mitchell TT 171:20-22); (Pl. Ex. 68: Preliminary Hearing 13:23–15:3).

**Reply: PSOF ¶174 Uncontroverted, but misleading. The "RG" letters are Detective Robert Goddell's initials and are in his handwriting. Songer Report, 20.**

175. Krstolich gave a different version of the photo identification procedure than Golubski or Ruby Mitchell. According to Krstolich's written report, Mitchell was shown "pictures of different Lamontes" in a "picture interview of five (5) separate black individuals" with the picture of Lamonte McIntyre in position three. Krstolich reported that Mitchell selected Lamonte McIntyre's photo from this array. (Ex. 1: Police File, Krstolich Investigative Addendum [4/15/1994], LMKSDC_0003442).

**Reply: PSOF ¶ 175 Objection and controverted in part, but immaterial. Uncontroverted as to what Detective Krstolich's report says, but the assertion that his version of the identification procedure was different is not supported by the evidence cited as required by Fed. R. Civ. P. 56(c)(1)**

176. No set of photographs of different Lamontes is preserved in the police file. (Ex. 1: Entire Police Case File, LMKSDC_0003391–3500).

**Reply: Uncontroverted.**

177. If it occurred as Krstolich described, such a photo procedure departed from

KCKPD procedure by introducing in one photo lineup multiple suspects, when only one suspect should be presented per procedure. (Ex. 23: Michael York Dep. 165:14–166:24); (Pl. Ex. 60: Expert Report of Jennifer Dysart pp.11–12); (Ex. 6: Dennis Ware Dep. 161:10–162:24); (Pl. Ex. 54: Clyde Blood Dep. 21:11–24).

**Reply: PSOF ¶177 Uncontroverted that if such occurred, it would have deviated from the**

**"general" practice as described in Exhibits 35, 60, and 64.**

178. According to Plaintiff's expert in police practices, Chief Fischer, "failing to document the circumstances surrounding how Ruby Mitchell came to identify his photograph or provide his first and last name when she was not acquainted with him and had mistaken the perpetrator for a different man named Lamonte" was a "blatant deviation[] from the most basic minimally acceptable police procedures." (Pl. Ex. 66: Russell Fischer Report p. 7).

**Reply: PSOF ¶178 Objection. Plaintiff's expert attempts to judge the credibility of the**

**witness, incomplete hypothetical and engages in speculation.**

179. Khatib testified at his deposition that Krstolich should have reported Golubski's use of suggestion in the identification procedure if he observed it. (Pl. Ex. 53: Tarik Khatib Dep. 203:3–18).

**Reply: PSOF ¶179 Controverted as this fact is not supported by the evidence cited as**

**required by Fed. R. Civ. P. 56(c)(1). Mr. Khatib was asked "if Detective Golubski and**

**Detective Krstolich was privy to it, Krstolich had an obligation to intervene and make sure**

**what actually had transpired was documented and report Detective Golubski for it, right?"**

**Objections to form were asserted. Mr. Khatib responded with "I think in general I would**

**agree. But I also noted that in Ruby Mitchell's testimony it was pretty consistent that she**

**would say no, nobody coerced me or told me to say that. But certainly if an officer observes**

**somebody coerce somebody else or do something inappropriate, then generally speaking you**

**would expect that officer to report that." (Pl. Ex. 143: Tarik Khatib Dep. 203:3–18).**

180. Nonetheless, Lamonte McIntyre was arrested six hours after the shooting based on Mitchell's photo identification. (Ex. 1: Police File, Golubski Investigative Addendum LMKSDC_0003453; Krstolich Investigative Addendum LMKSDC_0003442); (Pl. Ex. 67: Terra Morehead Dep. 222:22–223:7).

**Reply: PSOF ¶180 Controverted in part, but immaterial. Uncontroverted that Ruby Mitchell's positive identification was one of the elements of probable cause that Lamonte McIntyre was the shooter. Controverted to the extent this fact implies her identification was the sole basis as Detective Barber's "numerous sources" identified Lamonte as the shooter, Lamonte had a history of being involved in the drug trade, and was involved in another violent crime, among other things. Police File,: Case File at LMKSDC003433–3436 at 3434, LMKSDC003453; Exhibit 6: Trial Transcript, tr. 301:9–18, 306:15–25)**

> **Golubski and Krstolich fabricate that Mitchell volunteered the last name "McIntyre," when in reality they fed her that last name**
>
> 181. When asked by Krstolich on tape, "Do you know his last name?" Mitchell paused before stating, "yes," then responded "McIntyre" when asked the last name. (Pl. Ex. 72: 4/15/1994 Audio Recording of Mitchell Stmt. 05:04–05:15).

**Reply: PSOF ¶181 Objection. The use of the word "pause" is ambiguous, and a relative term. Defendant does not controvert that Ruby Mitchell responded "yes" and stated "McIntyre." Further, the audio recording speaks for itself.**

> 182. Providing both a first and last name made Mitchell seem familiar with the shooter, and thus more credible. (Ex. 1: Police File, Ruby Mitchell Stmt. by Krstolich), LMKSDC_0003425); (Pl. Ex. 66: Russell Fischer Report p. 9); (Ex. 6: Dennis Ware Dep. 257:16–259:9).

**Reply: PSOF ¶182 Objection and immaterial. This fact is unclear as to who believed Ms. Mitchell was more credible because she was able to state his first and last name on a recorded statement to police, and how that impacted, if at all, the existence of probable cause, especially in light of the fact that she twice identified Lamonte McIntyre in open court and, during trial, explained that Lamonte McIntyre was not the Lamont Drain she knew. Exhibit 6: Trial Testimony of Ruby Mitchell, tr. 171:23–172:15).**

> 183. Detective Ware testified that Mitchell's ability to volunteer Lamonte McIntyre's full complete name is a smoking gun fact corroborating her identification. (Ex. 6: Dennis Ware Dep. 257:16–259:9).

**Reply: PSOF ¶183 Objection and immaterial. Detective Ware's opinion testimony is improper and inadmissible given that Detective Ware is neither a disclosed expert nor Roger Golubski's supervisor. Further, whether detectives had a "Smoking gun" or not, does not impact whether or not probable cause, or at least arguable probable cause, existed. As a result, this fact is immaterial.**

184. At her deposition, Mitchell testified that the last name McIntyre had to come from another source because she "never knew nobody's last name" … "Like I said, I didn't even know Lamonte Drain's last name, so how would I know Lamonte McIntyre's last name?". (Ex. 10: Ruby Mitchell Dep. 74:25–75:10; 77:5-24; 78:6-14; 79:14-80:2).

**Reply: PSOF ¶184 Uncontroverted that Ms. Mitchell so testified.**

185. But the person who dated her niece was Lamont Drain, not Lamonte McIntyre. And Mitchell did not know Drain's last name at the time. (Ex. 2: Ruby Mitchell TT 182:11-18); (Pl. Ex. 32: Ruby Mitchell 2011 Aff. ¶8); (Pl. Ex. 68: Preliminary Hearing, Ruby Mitchell 19:6– 7); (Ex. 10: Ruby Mitchell Dep. 75:6–10).

**Reply: PSOF ¶185 Controverted but immaterial. The person who dated her niece, at least according to Plaintiffs' Exhibit Index and Exhibit 84 is "Lewis Anthony."**

186. At the time of the shooting, Ruby Mitchell did not know Lamonte McIntyre. (Ex. 10: Ruby Mitchell Dep. 79:16–21, 80:13–81:5, 124:19–22).

**Reply: Uncontroverted.**

187. When asked if Golubski fed Mitchell the last name "McIntyre" and falsely represented to the prosecutor that Mitchell had volunteered it, Golubski refused to answer and instead invoked his Fifth Amendment right to remain silent. (Pl. Ex. 63: Roger Golubski Dep. 115:16–119:1); see also (Pl. Ex. 60: Expert Report of Jennifer Dysart p. 10).

**Reply: PSOF ¶187 Uncontroverted but immaterial and misleading because Golubski exercised his Fifth Amendment rights as to all questions pertaining to the investigation.**

188. Ware admitted if Golubski and Krstolich provided Ruby Mitchell with the last name McIntyre and failed to disclose that, that would be "gross misconduct." (Ex. 6: Dennis Ware Dep. 267:15–268:9); see also (Pl. Ex. 66: Russell Fischer Report p. 11); (Pl. Ex. 53: Tarik Khatib Dep. 194:22–195:13).

**Reply:**

> **Despite Mitchell's clear identification that her niece used to date the shooter, officers do not interview her niece until months later, and do so only at the behest of the prosecutor**
>
> 189. According to Detective Ware, because Ruby Mitchell's niece could potentially corroborate that her aunt, one of two potential eyewitnesses to the crime, knew the suspect who just potentially shot two people in broad daylight, it was critically important to interview Ruby Mitchell's niece right away, both to corroborate that Ruby Mitchell was in fact personally acquainted with Lamonte McIntyre, and because if her niece had recently seen him, she might have additional information about the shooter. (Ex. 6: Dennis Ware Dep. 259:22-260:23).

**Reply: PSOF ¶189 Objection, but immaterial. Detective Ware's opinion testimony is improper and inadmissible given that Detective Ware is neither a disclosed expert nor Roger Golubski's supervisor.**

> 190. Officers know, by 1994 that it was important to interview witnesses as quickly as possible, before their memories fade, before they talk to others about what they saw, before they were influenced by others, and in case they later decided not to cooperate. (Pl. Ex. 59: W.K. Smith Dep. 74:14–75:76:2).

**Reply: PSOF ¶190 Objection, controverted in part, but immaterial. Defendant Smith's opinion testimony is improper and inadmissible as Defendant Smith is not disclosed as an expert. Further, Defendant Smith testified as to his knowledge of interviewing witnesses in the early 1990s, not the knowledge of officers, generally. To the extent this testimony is being offered to prove the knowledge of all officers in 1994, Defendant objects on the basis of inadmissible speculation.**

> 191. There was no legitimate police reason to fail to interview Mitchell's niece in a timely manner. (Ex. 6: Dennis Ware Dep. 261:4–12); (Pl. Ex. 66: Russell Fischer Report p. 11– 12).

**Reply: PSOF ¶191 Objection and immaterial. Detective Ware's opinion testimony is improper and inadmissible given that Detective Ware is neither a disclosed expert nor Roger Golubski's supervisor. Further, regardless of the time in which Keva Garcia was**

**interviewed, it did not change the probable cause analysis at the time of arrest, or at the time of conviction because Golubski did interview Keva Garcia, and she confirmed that Ruby Mitchell told Lamonte Drain that she did not tell police it was him, but rather it looked like him. Police File,: Statement of Keva Garcia at LMKSDC0003497–3498.**

192. But Golubski did not interview Mitchell's niece, Keva Garcia, until five days before the trial began, as part of Prosecutor Morehead's preparation for trial. (Pl. Ex. 67: Terra Morehead Dep. 242:8–244:1); (Pl. Ex. 63: Roger Golubski Dep. 121:23–122:22); (Ex. 1: Police File, Keva Garcia Stmt. by Golubski, 9/21/1994, LMKSDC_0003496); (Ex. 2: Trial Transcript (p. 1) cover page).

**Reply: Uncontroverted.**

193. Garcia stated that the Lamont she used to date was not Lamonte McIntyre and that she had never seen Lamonte McIntyre before. (Ex. 1: Police File, Keva Garcia Stmt., 4/15/1994, LMKSDC_0003498).

**Reply: Uncontroverted.**

194. Lamonte McIntyre also said he never met Garcia before and only knew her name since he saw it in a police report. (Ex. 4: Lamonte McIntyre TT 453:18–21).

**Reply: Uncontroverted.**

195. Consistent with Ruby Mitchell's account, Garcia also told police Drain wore his hair in braids. He also had big lips and a big nose, and darker skin than Lamonte McIntyre, so they looked different. (Ex. 1: Police File, Keva Garcia Stmt., 4/15/1994, LMKSDC_0003498– 3499).

**Reply: PSOF ¶195 Controverted in part, but immaterial. Keva Garcia stated Lamonte McIntyre and Lewis Anthony (Lamont Drain) looked a little bit alike. Police File, tr. 6498)**

**Of all the witnesses, Stacy Quinn has the best view of the crime.**

196. Stacy Quinn had the "closest and least obstructed view" of the crime. (Pl. Ex. 66: Russell Fischer Report pp. 17–18); (Pl. Ex. 25: Niko Quinn 2014 Aff. ¶ 16); (Ex. 12: Niko Quinn Dep. 171:22–173:10); (Pl. Ex. 63: Roger Golubski Dep. 183:4–186:16); (Pl. Ex. 60: Expert Report of Jennifer Dysart p. 6); (Ex. 13: Hearing on Motion for New Trial 22:6–8).

**Reply: Objection. PSOF ¶ 196 is inadmissible hearsay and speculation. None of the witnesses or evidence cited by plaintiffs for PSOF ¶ 196 has, or could have, personal knowledge of what**

**Stacy Quinn saw or could see.**

197. Stacy Quinn was already "looking out the door" of mother's home when she "noticed a man walking down the hill toward Hutchings Street…toward the light blue car" with a "shotgun in his hand." Stacy then saw the "man walk[] up to the passenger's side…point[] the shotgun at the passenger, and fire[] twice…pump[] the gun again, fire[], and shot the passenger in the face…[and] fire[] again, shooting the driver." (Pl. Ex. 73: Stacy Quinn 1996 Aff. ¶¶ 1–6); (Ex. 13: Hearing on Motion for New Trial 12:21–18:10); (Pl. Ex. 30: Niko Quinn DA Interview 7:17–8:16, 42:9–43:12); (Ex. 12: Niko Quinn Dep. 12:10–15).

**Reply: Objection. Stacy Quinn is deceased, her 1996 affidavit is inadmissible hearsay. Niko Quinn's statements and testimony of what Stacy Quinn saw or could see are also inadmissible hearsay, lack foundation, and are inadmissible speculation.**

198. Stacy Quinn saw the shooter "both from the front and from the back" and "got a clear view of the man's face." (Pl. Ex. 73: Stacy Quinn 1996 Aff. ¶ 3).

**Reply: Objection. Stacy Quinn is deceased, her 1996 affidavit is inadmissible hearsay.**

199. Stacy Quinn observed that the shooter "had braids in his hair and had on black pants with a white T-shirt with black writing on it," and was "approximately 5'7 or 5'8[], thin, dark complected with abnormal lips, and braided hair." (Pl. Ex. 73: Stacy Quinn 1996 Aff. ¶¶ 5, 7, 9, 12); (Ex. 13: Hearing on Motion for New Trial 14:24–25, 15:6–7, 21:23–22:2).

**Reply: Objection. Stacy Quinn is deceased, her 1996 affidavit is inadmissible hearsay.**

200. Stacy Quinn recognized the shooter as Neil Edgar, Jr., (aka "Monster"), whom she had seen on the streets. After later viewing photographs of Lamonte McIntyre, she was "positive" that Lamonte McIntyre "was not the person who committed the double homicide on April 15, 1994." (Pl. Ex. 73: Stacy Quinn 1996 Aff. ¶ 9); (Pl. Ex. 30: Niko Quinn DA Interview 1:22–2:22, 9:4–9, 38:1–39:3, 43:13–44:24); (Ex. 12: Niko Quinn Dep. 12:10–15); (Pl. Ex. 24: Joe Robinson Aff. ¶¶ 11, 20–21).

**Reply: Objection. Stacy Quinn is deceased, her 1996 affidavit is inadmissible hearsay. Niko Quinn's statements and testimony of what Stacy Quinn saw or could see are also inadmissible hearsay, lack foundation, and are inadmissible speculation. The same is true for Joe Robinson's affidavit.**

201. Following Lamonte McIntyre's arrest, Stacy Quinn stated that Lamonte "McIntyre's face is too long, he is too tall, and his lips are too dark" to be the

shooter. (Pl. Ex. 73: Stacy Quinn 1996 Aff. ¶ 12); (Ex. 13: Hearing on Motion for New Trial 21:6–22:16).

**Reply: Objection. Stacy Quinn is deceased, her 1996 affidavit is inadmissible hearsay.**

**By the morning after the murder, Golubski and Ware learn that Stacy Quinn not only saw the crime but knew the identity of the shooter**

202. Golubski and Ware spoke with Niko and Stacy Quinn's mother, Josephine Quinn, at her home at 3032 Hutchings on April 16, 1994. (Ex. 1: Police File, Golubski Report, 4/16/1994 LMKSDC_0003455-3456).

**Reply: Uncontroverted.**

203. Golubski reported, "Josephine stated she did not get a good look at the individual. She also viewed the five photos and cannot identify anyone." (Ex. 1: Police File, Golubski Report, 4/16/1994 LMKSDC_0003456, 3393).

**Reply: Uncontroverted.**

204. The five photos shown to Josephine Quinn were the same five photos shown to Niko Quinn on April 16, 1994 and Ruby Mitchell on April 15, 1994, containing a photograph of Lamonte McIntyre from two years prior and containing two of Lamonte's relatives. See SAMF, ¶ 52; (Ex. 1: Police File, Golubski Report, 4/16/1994 LMKSDC_0003455-3456).

**Reply: Uncontroverted.**

205. According to the police report, Josephine Quinn told Golubski and Ware that her daughter Stacy not only saw the suspect, but "knew who the suspect was but on this particular date of the photo line up, Stacy was not available." (Ex. 1: Police File, Golubski Report, 4/16/1994 LMKSDC_0003456); (Pl. Ex. 63: Roger Golubski Dep. 186:24–187:20).

**Reply: Uncontroverted.**

206. In his report written the day after the crime, Golubski stated that "At this time there still remains the possibility that John Quinn and Stacy Quinn can identify the perpetrators photo." (Ex. 1: Police File, Golubski Report, 4/16/1994 LMKSDC_0003456).

**Reply: Uncontroverted.**

207. Likewise, in his prosecutorial summary written the day after the crime, Golubski documented that Stacy Quinn "can testify to observing the crime and to possibly being able to identify the suspect." (Ex. 1: Police File, Prosecutive Summary Golubski Report, 4/16/1994 LMKSDC_0003393).

**Reply: Uncontroverted.**

**Although Stacy Quinn was the most important lead in an otherwise weak case, Golubski does not report any of his interactions with her**

208. Defendant Smith admits it would have been "critically important" to follow up with Stacy Quinn and that had he known Stacy knew who the suspect was, he "would have went to her and/or called her in to take a statement." (Pl. Ex. 59: W.K. Smith Dep. 129:4–130:17).

**Reply: PSOF ¶208 Objection and immaterial. Detective Smith's undisclosed opinion testimony is improper and inadmissible given that Detective Smith is neither a disclosed expert nor Roger Golubski's supervisor. Fed. R. Civ. P. 56(c)(2)**

209. Any minimally trained and experienced investigator "would have understood that Stacy Quinn was a critical witness." (Pl. Ex. 66: Russell Fischer Report p. 17); (Pl. Ex. 59: W.K. Smith Dep. 129:4–15); (Pl. Ex. 67: Terra Morehead Dep. 239:13–241:2).

**Reply: PSOF ¶209 Uncontroverted, but misleading. Defendant Golubski's report demonstrates he understood Stacy Quinn was a critical witness. See *supra*, 181–183.**

210. When asked whether Stacy Quinn became his most important lead once he heard that she knew who the true perpetrator was, Golubski refused to answer and instead invoked his Fifth Amendment right to remain silent. (Pl. Ex. 63: Roger Golubski Dep. 187:12–188:20).

**Reply: PSOF ¶210 Uncontroverted but immaterial and misleading because Golubski exercised his Fifth Amendment rights as to all questions pertaining to the investigation.**

211. Additionally, when asked whether he agreed that finding Stacy Quinn should have been his top priority in the investigation, Golubski refused to answer and instead invoked his Fifth Amendment right to remain silent. (Pl. Ex. 63: Roger Golubski Dep. 187:12–188:20).

**Reply: PSOF ¶211 Uncontroverted but immaterial and misleading because Golubski exercised his Fifth Amendment rights as to all questions pertaining to the investigation.**

212. Given the distance and angle from which Ruby Mitchell saw the shooter and the failure or reluctance of Niko Quinn to identify a suspect, Defendants should have recognized the importance of finding and interviewing Stacy Quinn. (Pl. Ex. 66: Russell Fischer Report p. 18).

**Reply: PSOF ¶212 Controverted, but immaterial. Defendant Golubski's report demonstrates he understood Stacy Quinn was a critical witness and the importance of finding and interviewing her.**

213. According to Detectives Ware and Smith, there was no conceivable reason for failing to follow up with Stacy Quinn after April 16, 1994. (Ex. 6: Dennis Ware Dep. 194:1–16, 200:3–8); (Pl. Ex. 59: W.K. Smith Dep. 129:4–130:8).

**Reply: SOF ¶213 Objection and immaterial. Detectives Ware's and Smith's undisclosed opinion testimony is improper and inadmissible because neither were disclosed experts and calls for speculation. Fed. R. Civ. P. 56(c)(2).**

214. Golubski did not document an interview with Stacy Quinn, or any attempt to locate her after April 16, 1994. (Ex. 1: Police File, LMKSDC_0003392–0003500); (Pl. Ex. 63: Roger Golubski Dep. 196:8–198:3); (Pl. Ex. 67: Terra Morehead Dep. 263:6–265:7).

**Reply: Objection, controverted in part, but immaterial. The cited evidence does not support the proposition that Roger Golubski made no attempts after April 16, 1994, to locate Stacy Quinn. Terra Morehead's cited testimony indicates that if the KCKPD was successful in locating Stacy Quinn, she would have expected them to tell her and that she would not have expected Golubski to report results if his efforts were fruitless. (Exhibit 28 tr. 263:17-21, 264:13–265:4) Thus, that portion of this fact is not properly supported. Defendant does not controvert that there is no documented interview with Stacy Quinn because Golubski was unable to locate her and that he did not document any attempt to locate her after April 16, 1994.**

215. No Defendant reported questioning Stacy Quinn about the double homicide, ran a criminal history to help locate Stacy Quinn, attempted to identify relevant associates or addresses, or spoke to her family, friends, or neighbors regarding her whereabouts after she was "unavailable" on April 16, 1994. Also, no defendant documented any further effort to contact Stacy at 3032 Hutchings, even though that is where she normally stayed. (Ex. 1: Police File, LMKSDC_0003391–3500); (Pl. Ex. 66: Russell Fischer Report p. 18); (Ex. 6: Dennis Ware Dep. 200:3–205:21); (Ex. 13: Hearing on Motion for New Trial 12:12–14). A friend of Stacy's who knew

her from the streets, attested that if Stacy was not at home, she could readily be found in the community, often along Quindaro. (Pl. Ex. 74: C.S.R. Aff. ¶ 20).

**Reply: PSOF ¶215 Controverted in part, but immaterial. The information cited does not support the fact that no criminal history was run on Stacy Quinn. Fed. R. Civ. P. 56(c)(1). Further, Detective Golubski spoke with Josephine Quinn, who told him she would reach out to her. Police File, at LMKSDC0003456) Uncontroverted as to the remainder.**

216. Stacy Quinn remained in the area of the scene of the crime following the shooting. (Pl. Ex. 73: Stacy Quinn 1996 Aff. ¶ 11); (Ex. 13: Hearing on Motion for New Trial 12:15–17); (Ex. 12: Niko Quinn Dep. 66:23–67:9, 137:20–138:3); (Pl. Ex. 76: Stacy Quinn Booking and Probation Records).

**Reply: PSOF ¶216 Controverted, but immaterial. Stacy Quinn testified in a 1996 hearing that she left the area immediately after the shooting because she was hurting and mad. Hearing on Motion for New Trial, tr. 28: 10–22.**

217. Stacy Quinn was present at the scene of the crime, voluntarily told police that she had seen the shooting, and waited in the yard while police interviewed Niko Quinn. (Pl. Ex. 73: Stacy Quinn 1996 Aff.); (Ex. 12: Niko Quinn Dep. 66:23–67:9, 137:20–138:3).

**Reply: PSOF ¶217 is objectionable as unsupported by the cited record (but is immaterial). This fact is supported solely by inadmissible evidence as statements from Stacy Quinn in an affidavit cannot be presented at trial in an admissible format given that she is deceased. Fed. R. Civ. P. 56(c)(2). Further, Niko Quinn cannot testify to the statements of Stacy Quinn as that too would be inadmissible hearsay. Fed. R. Civ. P. 56(c)(2) As a result, this fact is not supported by admissible evidence. Further, Stacy Quinn herself, during a hearing before the Court, testified that when police arrived on the scene, she was not there. Hearing on Motion for New Trial, tr. 28: 10–22)**

218. According to Detective Ware, at a minimum, if Detective Golubski had taken additional steps to locate Stacy Quinn, the fact that he did so should be documented in his narrative report. (Ex. 6: Dennis Ware Dep. 205:15–21).

**Reply: PSOF ¶218 Objection and immaterial. Detective Ware's opinion testimony is improper and inadmissible given that Detective Ware is neither a disclosed expert nor Roger Golubski's supervisor. Fed. R. Civ. P. 56(c)(2)**

219. Culp, the supervisor of the Ewing/Quinn investigation, should have perceived the failure to interview—or at a minimum, document attempts to locate—Stacy Quinn and followed up on it. (Ex. 6: Dennis Ware Dep. 200:12–25).

**Reply: PSOF ¶219 is objectionable as unsupported by the cited record (but is immaterial). Detective Ware's opinion testimony is improper and inadmissible given that Detective Ware is neither a disclosed expert nor Mr. Culp or Roger Golubski's supervisor. Fed. R. Civ. P. 56(c)(2).**

220. The complete lack of any documentation regarding detectives' efforts to find Stacy Quinn should have been a "red flag" to any minimally competent supervisor—not just in regard to the aspects of the investigation involving Stacy Quinn, but to the investigation writ large. (Pl. Ex. 66: Russell Fischer Report p. 18).

**Reply: PSOF ¶220 Objection, controverted. Golubski did document the existence and potential importance of Stacy Quinn, and an effort to find her. Police File, Report of Golubski LMKSDC0003456)**

**Golubski has had a sexual relationship with Stacy Quinn for years**

221. Golubski knew Stacy Quinn well; he had an ongoing relationship with her, in which he paid her for sex. (Pl. Ex. 25: Niko Quinn 2014 Aff. ¶ 27); (Ex. 12: Niko Quinn Dep. 12:10–15, 177:19–178:8); (Pl. Ex. 75: D.L. 2014 Aff. ¶ 10); (Pl. Ex. 24: Joe Robinson Aff. ¶¶ 20, 22); (Pl. Ex. 30: Niko Quinn DA Interview 36:10–17); (Pl. Ex. 63: Roger Golubski Dep. 189:18–190:21); (Pl. Ex. 77: Freda Quinn Dep. 57:14–58:7).

**Reply: PSOF ¶221 is objectionable as unsupported by the cited record (but is immaterial). Freda Quinn and Niko Quin's statements do not explicitly state that they witnessed any sexual interaction, or were even told of sexual interactions. Fed. R. Civ. P. 56(c)(1). At most, these statements are merely speculation and lack foundation. Fed. R. Civ. P. 56(c)(2). As it relates to the affidavit of "DL", her affidavit as it relates to Golubski and Stacy Quinn does**

not go so far as to lay the foundation that Golubski and Stacy Quinn engaged in sexual relations, only that she saw Golubski with Stacy Quinn in his vehicle. Fed. R. Civ. P. 56(c)(1). Finally, the affidavit of Joe Robinson is inadmissible hearsay because he denied at deposition, to providing any of the information contained in that affidavit, its contents will not be admissible at trial. Thus, this fact is unsupported by admissible evidence. Fed. R. Civ. P. 56(c)(2).

> 222. Golubski had been paying Stacy Quinn for sex since she was a minor, sixteen or seventeen years old, from the mid-1980s through 2000, when Stacy Quinn was murdered. (Pl. Ex. 43: Freda Quinn 2011 Aff. ¶¶ 18–20); (Pl. Ex. 44: Freda Quinn 2016 Aff. ¶ 6); (Pl. Ex. 24: Joe Robinson Aff. ¶ 22); (Pl. Ex. 63: Roger Golubski Dep. 189:17–190:21).

Reply: PSOF ¶222 is objectionable as unsupported by the cited record (but is immaterial). Freda Quin's statements do not explicitly state that she witnessed any sexual interaction, or was even told of sexual interactions. Fed. R. Civ. P. 56(c)(1). At most, these statements are merely speculation and lack foundation. Fed. R. Civ. P. 56(c)(2). Finally, the affidavit of Joe Robinson is inadmissible hearsay because, as evidenced by his total denial that he provided any of the information contained in that affidavit, its contents will not be admissible at trial. Thus, this fact is unsupported by admissible evidence. Fed. R. Civ. P. 56(c)(2).

> 223. Sometimes Golubski would pick up Stacy Quinn from Josephine Quinn's house, where she typically stayed, and she would be gone for a few days at a time. (Pl. Ex. 43: Freda Quinn 2011 Aff. ¶ 19); (Pl. Ex. 77: Freda Quinn Dep. 57:14–58:7); (Pl. Ex. 63: Roger Golubski Dep. 190:14–191:4); (Pl. Ex. 75: D.L. 2014 Aff. ¶ 11).

Reply: PSOF ¶223 Uncontroverted that Freda Quinn claims this.

> 224. When Stacy Quinn returned, she would have new clothes and money. (Pl. Ex. 43: Freda Quinn 2011 Aff. ¶ 19).

Reply: PSOF ¶224 Uncontroverted that Freda Quinn claims this.

> 225. Because Golubski had a years-long sexual relationship with Stacy Quinn, it would have been easy for him to locate her for an interview. (Pl. Ex. 25: Niko Quinn

2014 Aff. ¶ 27); (Pl. Ex. 43: Freda Quinn 2011 Aff. ¶ 18–19); (Pl. Ex. 63: Roger Golubski Dep. 190:1–21). There is no documentation in the police file concerning Golubski's relationship with Stacy or any notation that, given the relationship, another detective should interview Stacy. (Ex. 1: Entire Police File, LMKSDC_0003391–3500.)

**Reply: PSOF ¶225 is objectionable as unsupported by the cited record (but is immaterial). As explained in response above, the cited evidence lacks foundation and only speculates as to a sexual relationship between Stacy Quinn and Roger Golubski. Further, nothing in the cited testimony suggests it would be "easy" for Golubski to get in touch with Stacy Quinn. Thus this fact is unsupported by the citations to the record and otherwise controverted. Fed. R. Civ. P. 56(c)(1).**

226. If Golubski were having a sexual relationship with a witness, there is no legitimate police reason for him to fail to inform his colleagues, so that another officer could interview that witness. (Pl. Ex. 78: Terry Zeigler Dep. 104:3–12).

**Reply: PSOF 226 Objection and immaterial. Terry Zeigler's opinion testimony is improper and inadmissible given that Mr. Zeigler was not disclosed as an expert. Fed. R. Civ. P. 56(c)(2).**

### Golubski learns Stacy Quinn recognized that Monster was the shooter, not Lamonte McIntyre, but buries this exculpatory evidence

227. Stacy Quinn told Golubski and another officer that Lamonte McIntyre did not commit the murders, and instead, that the real perpetrator was Monster. (Pl. Ex. 30: Niko Quinn DA Interview 62:12–63:1); (Ex. 12: Niko Quinn Dep. 12:10–15); (Pl. Ex. 63: Roger Golubski Dep. 193:7–13, 199:22–200:4).

**Reply: PSOF ¶227 is objectionable as unsupported by the cited record (but is immaterial). Other than Defendant Golubski's Fifth Amendment assertion, the other evidence cited is inadmissible hearsay inasmuch as Niko Quinn's testimony of what Stacy Quinn allegedly told her is inadmissible hearsay. Fed. R. Civ. P. 56(c)(2).**

228. In response, Golubski and the other officer called her "crackhead" and other names. (Pl. Ex. 30: Niko Quinn DA Interview 62:12–63:1); (Ex. 12: Niko Quinn Dep. 12:10– 15).

**Reply: PSOF ¶228 is objectionable as unsupported by the cited record (but is immaterial). The evidence cited is inadmissible hearsay inasmuch as Niko Quinn's Niko Quinn's testimony of what Stacy Quinn allegedly told her is inadmissible hearsay. Fed. R. Civ. P. 56(c)(2).**

> 229. Niko Quinn told Golubski "on a number of occasions through the years that police had gotten the wrong man for Doniel's murder," and that her sister, Stacy Quinn "said the real killer was Monster." (Pl. Ex. 25: Niko Quinn 2014 Aff. ¶ 28); (Pl. Ex. 30: Niko Quinn DA Interview 43:13–44:24; 47:12–24); (Ex. 12: Niko Quinn Dep. 12:10–15).

**Reply: PSOF ¶229 Objection and controverted in part, but immaterial. Uncontroverted that Niko Quinn's affidavit alleges "on a number of occasions through the years that police had gotten the wrong man for Doniel's murder" without specifying when exactly this supposedly occurred. However, the evidence cited about Stacy Quinn's statement is inadmissible hearsay inasmuch as Niko Quinn's Niko Quinn's testimony of what Stacy Quinn allegedly told her is inadmissible hearsay. Fed. R. Civ. P. 56(c)(2).**

> 230. When asked whether Stacy Quinn told him in the weeks after the murder that Monster was the shooter, Golubski refused to answer the question and instead invoked his Fifth Amendment right to remain silent. (Pl. Ex. 63: Roger Golubski Dep. 193:7–13).

**Reply: PSOF ¶230 Uncontroverted but immaterial and misleading because Golubski exercised his Fifth Amendment rights as to all questions pertaining to the investigation.**

> 231. Stacy Quinn died in 2000, the victim of a homicide. Golubski was assigned to the investigation of her murder. (Pl. Ex. 43: Freda Quinn 2011 Aff. ¶ 20); (Ex. 12: Niko Quinn Dep. 118:14–19); (Pl. Ex. 63: Roger Golubski Dep. 192:9–16).

**Reply: PSOF ¶231 Uncontroverted that Stacy Quinn was murdered in 2000 and that Golubski was assigned to investigate her murder, which was solved and admitted to by the perpetrator.**

**At the time of the murders, Lamonte McIntyre is at the home of his aunt**

232. Doniel Quinn and Ewing were shot around 2pm on April 15, 1994. (Ex. 1: Police File, Golubski Investigative Summary, LMKSDC_0003392); Golubski SOF ¶ 30.

**Reply: Uncontroverted.**

233. On April 15, 1994, Lamonte McIntyre was at the house of his aunt, Peggy Williams (Crowder), for half the day until sometime around 2pm, when he went to call a cab for one of Williams' guests at the home of his other aunt, Yolanda Johnson, as Williams did not own a phone. After making the call, Lamonte returned briefly to Williams' home. He shortly thereafter went back to Johnson's home to call a cab for a second guest of Williams' and remained at Johnson's home thereafter. (Ex. 1: Police File, Yolanda Johnson Stmt. by Golubski, 4/20/1994, LMKDC_0003468–71; Natasha Haygood Stmt. to Golubski, 4/20/1994, LMKSDC_0003477–80; M'Sherie Johnson Stmt. to Golubski, 4/20/1991, LMKSDC_0003486– 88); (Pl. Ex. 41: M'Sherie Johnson 2016 Aff. ¶ 6); (Pl. Ex. 48: Rashida Martis 2011 Aff. ¶¶ 1–4); (Pl. Ex. 79: Lamonte McIntyre Dep. 138:15–142:9); (Ex. 4: Lamonte McIntyre TT 447:16–450:9; Peggy Crowder TT 378:9–381:8; Yolanda Johnson TT 427:10–428:8).

**Reply: PSOF ¶233 Uncontroverted but immaterial that witness generally gave these statements.**

234. Lamonte McIntyre's aunts' homes were only a "hop, skip, and a jump" away from one another, as Johnson's house was directly behind Crowder's house, separated only by an alley. (Ex. 1: Police File, Yolanda Johnson Stmt. by Golubski, 4/20/1994, LMKDC_0003469); (Pl. Ex. 79: Lamonte McIntyre Dep. 139:12–23); (Pl. Ex. 41: M'Sherie Johnson 2016 Aff. ¶ 3); (Pl. Ex. 50: Rose McIntyre 2014 Aff. ¶ 6).

**Reply: PSOF ¶234 Uncontroverted but immaterial that witness generally gave these statements.**

235. After calling a cab for Williams' second guest, Lamonte McIntyre remained at Johnson's home until early evening when he got word the police were looking for him. (Ex. 1: Police File, Yolanda Johnson Stmt. by Golubski, 4/20/1994, LMKDC_0003469–3470); (Pl. Ex. 79: Lamonte McIntyre Dep. 138:15–139:142:9); (Pl. Ex. 41: M'Sherie Johnson 2016 Aff. ¶¶ 3– 9); (Pl. Ex. 50: Rose McIntyre 2014 Aff. ¶ 6); (Ex. 1: Police File, Natasha Haygood Stmt. to Golubski, 4/20/1994, LMKSDC_0003477–3480; M'Sherie Johnson Stmt. to Golubski, 4/20/1991, LMKSDC_0003479–80); (Ex. 4: Lamonte McIntyre TT 447:16–450:9).

**Reply: PSOF ¶235 Uncontroverted but immaterial that witness generally gave these statements.**

236. M'Sherie Johnson, Montre Johnson, Rashida Johnson, and Natasha Haygood were present at Yolanda Johnson's house on April 15, 1994 when Lamonte was there. (Ex. 4: Yolanda Johnson TT 418:2–13).

**Reply: PSOF ¶236 Uncontroverted but immaterial that witness generally gave these statements.**

237. James McIntyre, Lamonte McIntyre's brother, arrived at Johnson's house around 3:30pm or 4pm. (Ex. 1: Police File, Yolanda Johnson Stmt. by Golubski, 4/20/1994, LMKDC_0003473; Natasha Haygood Stmt. to Golubski, 4/20/1994, LMKSDC_0003480); (Pl. Ex. 41: M'Sherie Johnson 2016 Aff. ¶ 8); (Ex. 1: Police File, Natasha Haygood Stmt. To Golubski, 4/20/1994, LMKSDC_0003477; M'Sherie Johnson Stmt. to Golubski, 4/20/1991, LMKSDC_0003486).

**Reply: PSOF ¶237 Uncontroverted but immaterial that witness generally gave these statements.**

238. Golubski knew that Lamonte McIntyre's alibi at the time of the murders involved calling a cab company, United Cab, on the phone. (Ex. 1: Police File, Yolanda Johnson Stmt. to Golubski, 4/20/1994, LMKSDC_0003470); (Pl. Ex. 80: Randy Eskina 2016 Aff. ¶¶ 74–76, 81).

**Reply: PSOF ¶238 Objection but immaterial. The statement of Yolanda Johnson in Exhibit 1 does not support the fact asserted because Yolanda was not saying that Lamonte's defense would include this alibi. Fed. R. Civ. P. 56(c)(1). Further, the Affidavit of Randy Eskina presents purported opinion testimony which, because it has not been properly disclosed, is not admissible at trial. Fed. R. Civ. P. 56(c)(2). Moreover, the cited portions of his affidavit more accurately stand for the proposition that Defendant Golubski should have known, not knew. Thus, this fact is unsupported as required by Fed. R. Civ. P. 56(c)(1).**

239. Police never contacted the cab company to find out whether records of the calls existed or whether they could confirm the calls had been placed. (Ex. 1: Police File, Yolanda Johnson Stmt. to Golubski, 4/20/1994, LMKSDC_0003470); (Pl. Ex. 80: Randy Eskina 2016 Aff. ¶¶ 74–76, 81).

**Reply: PSOF ¶239 Objection, but immaterial. The evidence cited does not support this fact as alleged as required by Fed. R. Civ. P. 56(c)(1).**

**The evening of the crime, Barber reports that he asked Rose McIntyre where Lamonte McIntyre was the day before the crime, to which she answered truthfully**

240. On April 15, 1994, the day of the crime, Barber went to 2908 Parkwood, the house of Lamonte McIntyre's grandmother, Maxine Crowder who was "very cooperative" with police, telling them Rose McIntyre, Lamonte's mother, worked at FiFi's, a restaurant at 5th and Parallel. (Ex. 3: Barber TT 354:2–355:2); (Ex. 1: Police File, Dennis Barber Stmt. to Golubski, 4/15/1994, LMKSDC_0003433–3435; Golubski Investigative Addendum, 4/16/1994, LMKSDC_0003453).

**Reply: Uncontroverted.**

241. Barber then proceeded to search for Lamonte McIntyre "on the streets" and "kept putting out additional information as [he] obtained it so that the uniformed units would have availability of it." (Ex. 1: Police File, Dennis Barber Stmt. To Golubski, 4/15/1994, LMKSDC_0003434); (Ex. 3: Dennis Barber TT 355:12–16).

**Reply: Uncontroverted.**

242. At around 8pm the evening of the crime, Lieutenant Barber instructed Brown to assist Barber in locating Lamonte McIntyre. (Ex. 1: Police File, Brown Report, 4/15/1994, LMKSDC_0003414).

**Reply: Uncontroverted.**

243. Barber left his name and number with Maxine Crowder and instructed her to have Lamonte McIntyre get in touch with him. (Ex. 4: Maxine Crowder TT 438:8–17; Lamonte McIntyre TT 450:10-451:10); (Ex. 3: Dennis Barber TT 354:8:20–358:1).

**Reply: Uncontroverted.**

244. Crowder called Rose McIntyre to let her know the police were searching for her son, Lamonte McIntyre. (Pl. Ex. 51: Evidentiary Hearing, Rose McIntyre 331:14–25); (Ex. 4: Maxine Crowder TT 438:8–17); (Pl. Ex. 50: Rose McIntyre 2014 Aff. ¶¶ 4-5).

**Reply: Uncontroverted.**

245. Crowder then called Lamonte McIntyre at the home of his aunt, Yolanda Johnson, to let him know that the police, Barber in particular, were looking for him. (Ex. 4: Maxine Crowder TT 438:18–439:19).

**Reply: Uncontroverted.**

246. After getting the call from her mother, Maxine Crowder, Rose McIntyre picked up Crowder and went to Johnson's house to pick up Lamonte McIntyre and take him to the station. (Ex. 4: Lamonte McIntyre TT 450–451); (Pl. Ex. 50: Rose McIntyre 2014 Aff. ¶¶ 6-8).

**Reply: Uncontroverted.**

247. Before going to the station, Rose gave Lamonte McIntyre Barber's card, which Barber had left with Crowder. Lamonte called Barber several times, but he did not answer. (Ex. 4: Lamonte McIntyre TT 450:10-451:10); (Pl. Ex. 50: Rose McIntyre 2014 Aff. ¶¶ 6–7).

**Reply: Uncontroverted.**

248. Rose McIntyre saw a police officer sitting in the parking lot of FiFi's on the way to the station so she went up to him and told the officer that she had her son, Lamonte, and wanted to "get things straightened out" as Lamonte McIntyre had not been involved in any problems. (Ex. 1: Police File, Dennis Barber Stmt. to Golubski, 4/15/1994, LMKSDC_03434); (Ex. 4: Lamonte McIntyre TT 451:16-452:1); (Pl. Ex. 50: Rose McIntyre 2014 Aff. ¶ 8).

**Reply: PSOF ¶ 248 Uncontroverted that Rose McIntyre made such statements. Controverted to the extent this fact alleges Lamonte McIntyre had not been involved in any problems given his arrest six weeks earlier for possession of crack cocaine. (Exhibit 32).**

249. Barber then received a radio call that Rose McIntyre requested his presence in front of FiFi's Restaurant. (Ex. 1: Police File, Dennis Barber Stmt. To Golubski, 4/15/1994, LMKSDC_0003433); (Ex. 3: Dennis Barber TT 355:17–356:19); (Ex. 1: Police File, Golubski Investigative Addendum, 4/16/1994, LMKSDC_0003453).

**Reply: Uncontroverted.**

250. Upon arrival, Barber located Rose McIntyre and her mother, Maxine Crowder, in the parking lot, with Lamonte McIntyre sitting in Rose McIntyre's parked car. (Ex. 1: Police File, Brown Report, 4/15/1994, LMKSDC_0003414; Dennis Barber Stmt. to Golubski, 4/15/1994, LMKSDC_03434); (Ex. 4: Maxine Crowder TT 440:1–8); (Ex. 3: Barber TT 355:17– 19); (Ex. 1: Police File, Barber Stmt. by Golubski, LMKSDC_0003433).

**Reply: Uncontroverted.**

251. Brown was also present at the FiFi's parking lot while Barber was questioning Rose McIntyre. (Ex. 3: Dennis Barber TT 361:16–362:3; Brown TT 366:18–

367:23).

**Reply: Uncontroverted.**

252. In fact, within minutes of Rose McIntyre's arrival in the FiFi's parking lot, "the entire parking lot filled with police." (Pl. Ex. 50: Rose McIntyre 2014 Aff. ¶ 8).

**Reply: Uncontroverted.**

253. Barber asked Rose McIntyre where Lamonte McIntyre had been on April 14, 1994, the day before the shooting, not the day of. (Pl. Ex. 68: Preliminary Hearing 46:5–24).

**Reply: PSOF ¶253 Controverted, but immaterial. Lt. Barber testified that Ms. McIntyre gave a statement as to Lamonte McIntyre's whereabouts on the day of the murder, not April 14, 1994, which he then relayed to Detective Golubski. Police File,: Barber Statement at LMKSDC0003433–3436) Regardless, what is material is what was relayed to Detective Golubski.**

254. Rose McIntyre truthfully replied that the day before the shooting, Lamonte McIntyre was with her at FiFi's restaurant, where they were both working. (Pl. Ex. 68: Preliminary Hearing 46:5–47:8).

**Reply: PSOF ¶254 Controverted, but immaterial. Lt. Barber testified that Ms. McIntyre gave a statement as to Lamonte McIntyre's whereabouts on the day of the murder, not April 14, 1994, which he then relayed to Detective Golubski. Police File, Barber Statement at LMKSDC0003433–3436. Regardless, what is material is what was relayed to Detective Golubski.**

**Barber and Brown fabricate that Rose McIntyre was not truthful in her response to their inquiry about Lamonte McIntyre's whereabouts and also fabricate a statement by Rose McIntyre that implied Lamonte McIntyre had committed a murder**

255. When asked about Lamonte McIntyre's whereabouts on the day of the crime, Rose McIntyre truthfully answered that he was at his aunt's house. (Pl. Ex. 68: Preliminary Hearing 46:5–47:8).

**Reply: PSOF ¶255 Controverted in part, but immaterial. Lt. Barber testified that Ms.**

McIntyre gave a statement as to Lamonte McIntyre's whereabouts on the day of the murder, not April 14, 1994. Police File, Barber Statement at LMKSDC0003433–3436. See DSOF ¶¶ 18-22, 67-72.

> 256. Instead, Barber reported that he told Rose the incident happened that day, and she replied, "Well that couldn't have been Lamont that was involved because he works part-time at FiFi's and he was here from 11:00 this morning until 2:45 this afternoon." (Ex. 1: Police File, Dennis Barber Stmt. to Golubski, 4/15/1994, LMKSDC_0003434;    Golubski    Investigative    Addendum,    4/16/1994, LMKSDC_0003453; Golubski Report, 4/16/1994 LMKSDC_0003393).

Reply: PSOF ¶256 Controverted in part, but immaterial. Lt. Barber testified that Ms. McIntyre gave a statement as to Lamonte McIntyre's whereabouts on the day of the murder, not April 14, 1994. (Golubski's Exhibit 1: Barber Statement at LMKSDC0003433–3436). Ms. McIntyre later testified she clarified the date confusion with "officers," but did not identify Barber specifically. See DSOF ¶¶ 18-22, 67-72.

> 257. Barber's recounting of Rose McIntyre's statement was false, and so was his testimony at trial stating the same. Rose McIntyre only provided to officers that Lamonte was at FiFi's when they asked where he was the day prior to the crime, not the day of. (Ex. 1: Police File, Dennis Barber Stmt. to Golubski, 4/15/1994, LMKSDC_0003434, 3453); (Pl. Ex. 68: Preliminary Hearing 46:5–47:8); as was his testimony at trial. (Pl. Ex. 50: Rose McIntyre 2014 Aff. ¶¶ 9–10, 19); (Ex. 3: Barber TT 358:8–359:13, 363:24–364:11).

Reply: PSOF ¶257 Controverted in part, but immaterial. Lt. Barber testified that Ms. McIntyre gave a statement as to Lamonte McIntyre's whereabouts on the day of the murder, not April 14, 1994. Police File: Barber Statement at LMKSDC0003433–3436). See DSOF ¶¶ 18-22, 67-72.

> 258. Additionally, while at the FiFi's parking lot, Rose McIntyre asked Barber "what this was all about," to which Barber replied, "that it could be about a fight or disturbance or something like that." (Pl. Ex. 50: Rose McIntyre 2014 Aff. ¶ 9); (Ex. 4: Lamonte McIntyre TT 452:2-17); (Ex. 1: Police File, Dennis Barber Stmt. to Golubski, 4/15/1994, LMKSDC_0003434).

Reply: PSOF ¶258 is objectionable as unsupported by the cited record (but is immaterial).

The cited evidence does not support the entirety of the fact alleged as required by Fed. R.
Civ. P. 56(c)(1), as it relates to the quotation attributed to Detective Barber. Further
transcript page 452 of Exhibit 6—which is the transcript produced by Plaintiffs—is missing
page 452 despite the bates numbers being sequential. As a result, the record does not support
this fact as required by Fed. R. Civ. P. 56(c)(1). Detective Barber, when asked by Ms.
McIntyre about what a felony was, said "anything punishable by more than a year in prison.
Examples of such may be a shooting, a stabbing, or an armed robbery." Police File, Barber
Statement at LMKSDC003434.

259. Expressing her disbelief at the amount of police at FiFi's, Rose McIntyre then
asked, "If somebody told you that they had a fight with someone, are you going to
just come and arrest them before you've talked to them and found out the facts?"
and "You mean all of these officers are here for a fight or a domestic disturbance?"
(Pl. Ex. 50: Rose McIntyre 2014 Aff. ¶¶ 9–10).

Reply: PSOF ¶259 Objection and controverted. The document relied on is inadmissible
hearsay. Fed. R. Civ. P. 56(c)(2).

260. Barber stated that Rose McIntyre "was not familiar with what a felony crime
was," so he explained a felony was "anything punishable by more than a year in
prison," for example, "a shooting, a stabbing or an armed robbery." (Ex. 1: Police
File, Dennis Barber Stmt. to Golubski, 4/15/1994, LMKSDC_0003434).

Reply: Uncontroverted.

261. Barber then reported another statement by Rose McIntyre, that "[t]otally
unsolicited, she indicated to me that if someone had told me that she had killed
somebody, would I take them down and charge them with murder." (Ex. 1: Police
File, Dennis Barber Stmt. to Golubski, 4/15/1994, LMKSDC_0003434); (Ex. 3:
Barber TT 360:7–15); (Ex. 1: Police File, Golubski Report, 4/16/1994
LMKSDC_0003393).

Reply: Uncontroverted.

262. To bolster the inculpatory nature of this statement, which Rose never made,
Barber maintained that he had not previously mentioned "homicide" or "murder."
(Ex. 1: Police File, Dennis Barber Stmt. to Golubski, 4/15/1994,
LMKSDC_0003434; Golubski Report, 4/16/1994 LMKSDC_0003394; Golubski
Report, 4/16/1994, LMKSDC_0003453); (Ex. 3: Barber TT 360:7–9); (Pl. Ex. 50:

Rose McIntyre 2014 Aff. ¶¶ 9–10, 19).

**Reply: PSOF ¶262 is objectionable as unsupported by the cited record (but is immaterial).**
**The justification for why Barber made his report that he had not mentioned "homicide" or**
**"murder" is not supported by the cited evidence as required by Fed. R. Civ. P. 56(c)(1). It is**
**mere speculation, especially considering Defendant Barber is deceased. Further, to the extent**
**Ms. McIntyre's affidavit is relied on, it is inadmissible hearsay. Fed. R. Civ. P. 56(c)(2).**

263. Rose had not brought up the word "murder," nor did she assume Lamonte
McIntyre would be questioned regarding a murder. (Pl. Ex. 50: Rose McIntyre 2014
Aff. ¶¶ 10, 19); (Pl. Ex. 79: Lamonte McIntyre Dep. 231:13–232:16; 452:2-17).

**Reply: PSOF ¶263 Controverted, but immaterial. Barber relayed to Detective Golubski that**
**"Totally unsolicited, [Ms. McIntyre] indicated to [Detective Barber] that if someone had told**
**[Detective Barber] that she had killed somebody, would [Detective Barber] take them down**
**and charge them with murder. Prior to this, the word "homicide" or "murder" had never**
**been murmured from [Detective Barber's] mouth." Police File, Barber Statement at**
**LMKSDC0003434). Further transcript page 452 of Exhibit 6—which is the transcript**
**produced by Plaintiffs—is missing page 452 despite the bates numbers being sequential. As**
**a result, the record does not support this fact as required by Fed. R. Civ. P. 56(c)(1).**

264. Barber's report of Rose McIntyre's statements on April 15, 1994 are "totally
untrue." (Pl. Ex. 50: Rose McIntyre 2014 Aff. ¶¶ 9–10, 19).

**Reply: PSOF ¶265 Objection, Ms. McIntyre's affidavit is inadmissible hearsay. Fed. R.Civ.**
**P. 56(c)(2).**

### Barber and Brown fabricate a false alibi statement that they attribute to Lamonte McIntyre

265. Lamonte McIntyre consistently gave police the same, truthful alibi: that he
had been at Peggy Williams's and Yolanda Johnson's homes at the time of the
shooting. (Ex. 2: Lamonte McIntyre TT 447:16–450:9; 452:21-453:14); (Pl. Ex.
79: Lamonte McIntyre Dep. 138:15–142:9); (Ex. 1: Police File, Golubski Report,
4/16/1994, LMKSDC_0003453-3454).

**Reply: PSOF ¶265 Controverted, but immaterial, and the citations do not support the factual assertion as required by Fed. R. Civ. P. 56(c)(1). The Police File, the most contemporaneous evidence, does not reference Peggy Williams' home. Furthermore, on the way to the police station, Lamonte told Officer James Brown that he had been with his mom at work. (Golubski's Exhibit 6: Trial Transcript, tr. 370:13–371:5).**

266. Defendants first questioned Lamonte McIntyre when Rose McIntyre brought him to the FiFi's parking lot the evening of the crime. (Ex. 1: Police File, Dennis Barber Stmt. to Golubski, 4/15/1994, LMKSDC_0003434); (Ex. 4: Maxine Crowder TT 440:1–18; Lamonte McIntyre TT 451:17–452:1); (Ex. 3: Barber TT 361:6–362:3); (Pl. Ex. 50: Rose McIntyre 2014 Aff. ¶¶ 8–9); (Ex. 1: Police File, Golubski Investigative Addendum, 4/16/1994, LMKSDC_0003453).

**Reply: Uncontroverted.**

267. Barber said that at FiFi's, Lamonte McIntyre said that "during the day he had been with his brother, James, and neither…had been in any fight or been jumped on or had any altercation with any individuals." (Ex. 1: Police File, Dennis Barber Stmt. to Golubski, 4/15/1994, LMKSDC_0003435; Golubski Report, 4/16/1994 LMKSDC_0003393).

**Reply: Uncontroverted.**

268. Barber's account was false, as Barber never asked Lamonte his whereabouts on the day of the shooting, but instead asked about whether Lamonte was in a gang or knew anyone in a blue low rider. (Ex. 4: Lamonte McIntyre TT 452:2–453:23); (Pl. Ex. 79: Lamonte McIntyre Dep. 231:13–232:16). After Barber spoke with Lamonte McIntyre, Brown transported him to the KCKPD police station. (Ex. 3: James Brown TT 368:6–12); (Ex. 1: Police File, Brown Report, 4/15/1994, LMKSDC_0003414).

**Reply: PSOF ¶268 Controverted, but immaterial. The information cited states Lamonte McIntyre told Barber he was at his aunt's house and who he was with.**

269. Lieutenant Barber did not prepare a written report of his investigation into the Ewing/Quinn homicides, but instead gave a recorded statement to Detective Golubski after Lamonte McIntyre's arrest. (Ex. 1: Police File, LMKSDC_0003433-3436). Former KCKPD officer Randy Eskina attested that he had "never seen an officer interviewed in lieu of writing a report in any other case. It is not a desirable practice." (Pl. Ex. 80: Randy Eskina 2016 Aff. ¶ 72).

**Reply: PSOF ¶269 Controverted in part, objection. Uncontroverted in that Lt. Barber did**

**not prepare a written report but instead gave a recorded statement to Detective Golubski.**

**Controverted in that Randy Eskina's undisclosed opinion testimony is improper and**

**inadmissible given that Mr. Eskina was not a disclosed expert and calls for speculation. Fed.**

**R. Civ. P. 56(c)(2). Further controverted in that exceptions to police officers writing their**

**own reports include the supervisory privilege to not have to "cut paper" during their**

**activities on a shift as they go from call to call and assist the officers they supervise. The**

**primary objective is to document the information, which was Lt. Barber accomplished with**

**his taped statement. Doc. 622, Khatib Rpt. P. 34.**

> 270. During this car ride, Lamonte asked Brown what this was all about, and Brown said, "If you did nothing wrong, you got nothing to worry about." (Pl. Ex. 79: Lamonte McIntyre Dep. 231:13-235:11); (Ex. 3: James Brown TT 368:13-16).

**Reply: PSOF ¶270 Objection, but uncontroverted that Lamonte McIntyre testified as such.**

**However, the citation to Brown's trial testimony does not support the factual assertion as**

**required by Fed. R. Civ. P. 56(c)(1).**

> 271. After bringing Lamonte McIntyre to the station, Brown, Golubski, and Krstolich interviewed him, but did not record this interview. (Ex. 1: Police File, Krstolich Report, 4/15/1994, LMKSDC_0003442); (Ex. 4: Lamonte McIntyre TT 452:18–453:17); (Ex. 1: Police File, Golubski Report, 4/16/1994 LMKSDC_0003393).

**Reply: PSOF ¶271 Uncontroverted that all three officers were present during the interview**

**and that the interview was not recorded.**

> 272. KCKPD policy at the time required each officer with knowledge to write his own report. (Pl. Ex. 54: Clyde Blood Dep. 109:24–110:22). This failure to tape an interview violated KCKPD policy and practice as of 1994, which was to audio record and then transcribe witness statements. (Pl. Ex. 66: Russell Fischer Report pp. 15–16, 17); (Pl. Ex. 80: Randy Eskina 2016 Aff. ¶ 72); (Pl. Ex. 54: Clyde Blood Dep. 110:23–113:10); (Pl. Ex. 59: W.K. Smith Dep. 77:7– 78:19).

**Reply: PSOF ¶272 Objection, but immaterial. Plaintiffs fail to cite to evidence, specifically a**

**written KCKPD policy or corporate representative's testimony for the KCKPD, that**

**demonstrates that the KCKPD's policy, rather than the individual affiant's own practices, required an officer with knowledge to prepare an individual report. Specifically, Plaintiffs' "support" for this fact is from Clyde Blood who simply testified, despite being led to answer differently, that "That's the way Maskil and I operated." Blood dep., 110:9–11. Further, the affidavit of Randy Eskina is inadmissible expert opinion testimony that has not been properly disclosed. And the evidence by Clyde Blood as it relates to audio recording statements does not support this fact as he testified that was one of the ways to document a witness statement and that another way was to have someone else transcribe it as the witness was talking. Blood dep., 112:5–10.**

273. During this interview, Lamonte McIntyre truthfully told the officers that he was "at his auntie's house … all day long." (Ex. 1: Police File, Krstolich Report, 4/15/1994, LMKSDC_0003442; Golubski Report, 4/16/1994, LMKSDC_0003454); (Ex. 4: Lamonte McIntyre TT 452:18–453:23).

**Reply: PSOF ¶273 Uncontroverted that this was Lamonte McIntyre's statement.**

274. Lamonte McIntyre also truthfully told Krstolich and Golubski that "later in the day his brother, James, did come by." (Ex. 1: Police File, Krstolich Report, 4/15/1994, LMKSDC_0003442).

**Reply: PSOF ¶274 Uncontroverted that this was Lamonte McIntyre's statement.**

275. Golubski reported that Lamonte McIntyre "stated that throughout the day he had been with an aunt, Yolanda Johnson, at 1515 Wood…that at no time did he leave until his brother arrived at about 4:00. Then he still did not leave until he was contacted by his grandmother and mother than then was taken to the area of 5th and Parallel by his mother." (Ex. 1: Police File, Golubski Report, 4/16/1994, LMKSDC_0003453-3454).

**Reply: Uncontroverted.**

276. Brown later testified that on the ride to the police station, Lamonte McIntyre told him, unsolicited, that "he didn't know what he could have done because he was at FiFi's all day helping his mother out in the kitchen doing some work." (Ex. 3: James Brown TT 368:13- 369:12).

**Reply: Uncontroverted.**

277. Brown further testified that it was not until after hearing Lamonte McIntyre's statement to Krstolich and Golubski regarding where he was at the time of the crime that Brown "remembered he told me he was FiFi's all day on 5th and Richmond. So I wrote the detective a note just telling him basically he told me in the car on the way up here that he had been at FiFi's with his mother all day." (Ex. 3: James Brown TT 369:13–371:5).

**Reply: Uncontroverted.**

278. Lamonte McIntyre never told any officer he was at FiFi's at the time of the crime; Brown's claim is false. (Ex. 4: Lamonte McIntyre TT 452:18–453:23); (Pl. Ex. 79: Lamonte McIntyre Dep. 149:12–150:6, 231:13–235:11); (Ex. 3: James Brown TT 368:6–370:8); (Ex. 4: Lamonte McIntyre TT 457:25–458:7).

**Reply: PSOF ¶278 Controverted in part. Uncontroverted that Plaintiff so testified. Defendant Brown testified as follows:**

```
13   Q     During the course of transporting the suspect,
14         Lamonte McIntyre, to the Detective Bureau, did he
15         make any comments or statements to you?
16   A     Yes.  Mr. McIntyre asked me what was going on.  And
17         I just told him that detectives wanted to talk to
18         him about an incident and then he stated that he
19         didn't know what he could have done because he was
20         at Fi Fi's all day helping his mother out in the
21         kitchen doing some work.
```

**Defendant Officers' Exhibit 58. The credibility determination of whether "Brown's claim is false" is not a proper factual statement. Fed. R. Civ. P. 56(c)(1).**

279. Brown failed to document Lamonte McIntyre's alleged inculpatory statements in his police report. (Ex. 1: Police File, Brown Arrest Report, 4/15/1994, LMKSDC_0003413– 3414); (Pl. Ex. 58: James Brown Dep. 183:3–184:11, 212:3– 8); (Pl. Ex. 54: Clyde Blood Dep. 110:4–22).

**Reply: Uncontroverted.**

280. Further, there is no mention of Brown's alleged note to Krstolich and Golubski purportedly relaying Lamonte's statements anywhere in the police file. See (Ex. 1: Police File, Brown Arrest Report, 4/15/1994, LMKSDC_0003391-3500).

**Reply: Uncontroverted.**

281. Brown understood it was important to document any alibi statement given to police in a double homicide case. (Pl. Ex. 58: James Brown Dep. 192:11–23, 195:20–196:4, 200:3–16); (Ex. 1: Police File, Brown Arrest Report, 4/15/1994, LMKSDC_0003413–3414).

**Reply: PSOF ¶281 Controverted. The citations do not support the factual assertion. Brown does not admit it is "important to document," instead he says it was important to notify the detectives, as he did. James Brown Dep. 195:20-196:4.**

282. By failing to document this alleged "alibi" statement in his report, Brown violated KCKPD officers' obligation to document all investigative steps. (Pl. Ex. 66: Russell Fischer Report p. 17); (Pl. Ex. 54: Clyde Blood Dep. 109:24–110:22); (Pl. Ex. 69: Ronald Miller Dep. 77:14–17).

**Reply: PSOF ¶282 Objection, but immaterial. Plaintiffs fail to cite evidence, specifically a written KCKPD policy or a corporate representative's testimony for the KCKPD, that demonstrates the KCKPD's policy. Specifically, Plaintiffs' "support" for this fact is from Clyde Blood who simply testified, despite being led to answer differently, that "That's the way Maskil and I operated." Blood dep., 110:9–11. Further, hearsay objection, because Plaintiffs cannot rely upon their expert's report for the truth of the facts asserted. Fed. R. Civ. P. 56(c)(2).**

283. Instead, the first time Brown provided this false alibi to the defense was at Lamonte McIntyre's trial, five and a half months after the investigation took place. (Ex. 3: James Brown TT 368:13–21); (Pl. Ex. 58: James Brown Dep. 207:16–208:2).

**Reply: PSOF ¶283 Uncontroverted, but misleading. Golubski's prosecution summary provided to the District Attorney's office clearly states that Officer Brown would have information to provide regarding "remarks given by Mr. Lamonte McIntyre." Police File, at LMKSDC0003394 ¶ 15.**

284. The prosecutor argued that "inconsistent alibi" evidence existed, based on Barber and Brown's fabricated accounts of Rose and Lamonte McIntyre's statements and the truthful alibi Lamonte gave to Golubski and Krstolich when questioned at the station the evening of the crime, which was used against Lamonte

McIntyre before and at trial. (Pl. Ex. 67: Terra Morehead Dep. 178:15–180:8).

**Reply: PSOF ¶284 Objection and controverted in part, but immaterial. Uncontroverted that the prosecutor argued Lamonte McIntyre's inconsistent alibis. However, the asserted fact as to the untruthfulness of Barber and Brown's testimony is not supported by evidence demonstrating that such statements were "fabricated" or "truthful" as is required by Fed. R. Civ. P. 56(c)(1). As a result, those conclusions are unsupported and cannot be relied upon. Fed. R. Civ. P. 56(c)(1).**

285. According to Plaintiffs' police practices expert, the intentional misrepresentation to the prosecutor by Barber, Brown, and Golubski that Rose McIntyre and Lamonte McIntyre made these inculpatory, inaccurate alibi statements amounted to serious police misconduct and egregious violations of minimally accepted practices. (Pl. Ex. 66: Russell Fischer Report p. 15).

**Reply: PSOF ¶285 Objection and controverted in part, but immaterial. Uncontroverted that Plaintiffs' police practices expert wrote as such, but this fact is not supported by evidence to demonstrate that such statements were intentional misrepresentations as is required by Fed. R. Civ. P. 56(c)(1). Further, this is an improper credibility determination by Plaintiff's expert. As a result, this fact is immaterial for purposes of summary judgment.**

**Defendants "clear" the case the day after the homicides despite failing to gather and test key forensic evidence, failing to investigate the identity of a getaway driver, and failing to establish any motive**

286. Lamonte McIntyre was in custody within approximately six hours of the crime. (Ex. 1: Police File, Ambler Report, LMKSDC_0003404; Arrest Report, LMKSDC_0003413). No other suspect appears anywhere in the file. (Ex. 1: Entire Police File, LMKSDC_0003391– 3500). Golubski reported on April 16, 1994, the day after the shooting, that the case was cleared upon the arrest of Lamonte McIntyre. (Ex. 1: Police File, Golubski Investigative Addendum/Clearance, LMKSDC_0003457).

**Reply: Uncontroverted.**

287. Homicide detectives had an obligation to conduct all available forensic tests even if they were worried the testing might turn up evidence pointing away from a suspect. The practice in homicide cases in KCKPD was "when in doubt, order the

test." (Pl. Ex. 54: Clyde Blood Dep. 145:11–146:13); see also (Pl. Ex. 69: Ronald Miller Dep. 74:24–75:24).

**Reply: PSOF ¶287 Controverted, but immaterial, lacks foundation. Clyde Blood's opinion is inadmissible because he is not a disclosed expert. Fed. R. Civ. P. 56(c)(2). In contrast, Plaintiffs' own disclosed expert controverted this assertion by opining that testing should have simply been "contemplated." Ex. 72: Russell Fischer Dep. 101:10–102:8.**

288. Defendants failed to investigate whether any physical evidence linked Lamonte McIntyre to the crime scene. (Pl. Ex. 68: Preliminary Hearing, Niko Quinn 24:8–25:10; Ruby Mitchell 7:11–8:9); (Pl. Ex. 51: Evidentiary Hearing, Ron Singer 55:12–65:22); (Pl. Ex. 81: Ron Singer 2016 Aff. ¶¶ 4–5); (Pl. Ex. 80: Randy Eskina 2016 Aff. ¶ 14–16); (Pl. Ex. 66: Russell Fischer Report pp. 18–20); (Pl. Ex. 69: Ronald Miller Dep. 77:6–13).

**Reply: PSOF ¶288 Objection, but immaterial. Plaintiffs fail to support this fact with evidence that could be presented in an admissible format at trial. Specifically, the only evidence that actually "supports" this fact is the unidentified and undisclosed expert opinions of Randy Eskina and Mr. Singer, neither of which are admissible at trial given they have not been properly disclosed. Fed. R. Civ. P. 56(c)(2). Further, Mr. Singer has not even been disclosed as a witness as a word search does not reveal he has been disclosed on Plaintiff's Eleventh Amended Rule 26 disclosures. Fed. R. Civ. P. 56(c)(2). This fact is immaterial because the issue is whether probable cause existed, not whether Defendants conducted a perfect investigation.**

289. Because the shooter was standing only a few inches or feet from the car during the murders and there was blood and glass on the ground, seizing Lamonte McIntyre's shoes when he was arrested less than six hours after the shooting was a basic, critically important investigative step to take. (Pl. Ex. 54: Clyde Blood Dep. 209:18-211:6).

**Reply: PSOF ¶289 Objection. Plaintiffs offer undisclosed expert testimony which is not admissible at trial. Fed. R. Civ. P. 56(c)(2). Further, the cited testimony is not definitive; rather, Mr. Blood responded that he merely assumes and probably, would have taken those**

steps.

290. Golubski did not seize Lamonte McIntyre's shoes to look for glass and blood from the crime scene, even though the presence of blood alone would have been inculpatory. (Pl. Ex. 51: Evidentiary Hearing, Ron Singer 56:14–65:22; 70:11–72:25; 79:9–80:18); (Pl. Ex. 80: Randy Eskina 2016 Aff. ¶ 14); (Pl. Ex. 54: Clyde Blood Dep. 152:12–153:15, 211:7–216:2, 218:18–219:1); (Pl. Ex. 50: Rose McIntyre 2014 Aff. ¶ 16); (Pl. Ex. 66: Russell Fischer Report pp. 18–19).

**Reply: PSOF ¶290 Uncontroverted that there is no indication that Golubski, nor anyone else involved in the investigation, seized Lamonte McIntyre's shoes.**

291. Another basic, obvious investigative step when Lamonte McIntyre was arrested six hours after this close-range shooting was to seize his clothing to look for residue or inculpatory items on his person. (Pl. Ex. 54: Clyde Blood Dep. 211:7-212:9); (Pl. Ex. 53: Tarik Khatib Dep. 246:2–13).

**Reply: PSOF ¶ 91 is objectionable as unsupported by the cited record (but is immaterial). Plaintiffs improperly offer undisclosed expert testimony which is not admissible at trial. Fed. R. Civ. P. 56(c)(2). Further, Plaintiffs' own disclosed expert acknowledged that not all departments have the capability to adequately search for residue, but that is normally something that is contemplated. Russell Fischer Dep. 101:10-102:8. This fact is further immaterial because a test showing no residue would not have obviated the probable cause already then-existing.**

292. At his deposition, Blood testified that if Lamonte McIntyre had been wearing the clothing he was arrested in at the time of this shooting, one would expect to see fragments of glass and blood on his clothes if he were the perpetrator: "I'd sure be looking." Further, Blood could not think of a legitimate police reason not to collect Lamonte McIntyre's clothing when he was arrested. (Pl. Ex. 54: Clyde Blood Dep. 211:16-22; 212:10-18).

**Reply: PSOF ¶292 is objectionable as unsupported by the cited record (but is immaterial). Plaintiffs improperly offer a fact witnesses' testimony as undisclosed expert testimony which would not be admissible as such at trial. Fed. R. Civ. P. 56(c)(2).**

293. Lamonte McIntyre's face, hands, and clothing were also never examined for gunshot residue, as "any minimally trained and experienced investigator in

Golubski's position would have understood the importance of" doing, according to police practices expert. (Pl. Ex. 66: Russell Fischer Report pp. 18–19); (Pl. Ex. 80: Randy Eskina 2016 Aff. ¶ 14); (Pl. Ex. 54: Clyde Blood Dep. 151:25–152:11, 212:21–213:6, 218:18–219:1); (Pl. Ex. 50: Rose McIntyre 2014 Aff. ¶ 16); (Pl. Ex. 82: Russell Fischer Dep. 96:11–97:23, 101:10–103:16).

**Reply: PSOF ¶293 Controverted in part, but immaterial. Plaintiffs' own disclosed expert controverted this assertion by opining that testing should have been "contemplated," not that it had to be done. (Ex. 72: Russell Fischer Dep. 101:10-102:8)**

294. Rose McIntyre pleaded with officers, asking them why they did not do a ballistics test on Lamonte McIntyre to show that he had not shot a gun. (Pl. Ex. 50: Rose McIntyre 2014 Aff. ¶¶ 11, 16); (Pl. Ex. 83: Rose McIntyre Dep. 190:7-191:6).

**Reply: PSOF ¶294 Uncontroverted, but immaterial. A "ballistics" test would not have obviated the probable cause that existed at the time—an eyewitness identification, among other things—as criminals frequently wear gloves and change clothes.**

295. The officer Rose spoke with responded, "they didn't do that kind of test in Kansas." But this was untrue, as Blood stated there was "no legitimate police reason" "not to collect Lamonte McIntyre's clothing," as "[t]here should be residue on the clothing as well" if he were involved in the close-range shooting. (Pl. Ex. 54: Clyde Blood Dep. 151:25–152:11, 211:7– 23); (Pl. Ex. 50: Rose McIntyre 2014 Aff. ¶¶ 11, 16); (Pl. Ex. 83: Rose McIntyre Dep. 190:7–191:6).

**Reply: PSOF ¶295 Uncontroverted, in part, but objection to the remainder. Uncontroverted that Rose McIntyre testified that an officer, who was not Golubski, told her that "they didn't do that kind of test in Kansas." However, the remainder of this fact is not supported as Mr. Blood's testimony does not support the assertion that such tests did occur in Kansas or that Mr. McIntyre's shoes were not collected upon his arrest and detention. Fed. R. Civ. P. 56(c)(1).**

296. Blood admitted that Golubski's failure to seize Lamonte McIntyre's clothing for testing and failure to search Lamonte McIntyre's home could only be due to either Golubski's incompetence or Golubski's failure to conduct a legitimate investigation. In Blood's experience, Golubski was not incompetent. (Pl. Ex. 54: Clyde Blood Dep. 218:21–221:4).

**Reply: PSOF ¶296 is objectionable as unsupported by the cited record (but is immaterial). Plaintiffs improperly offer undisclosed expert testimony, and such testimony would be inadmissible at trial. Thus, Plaintiffs have failed to support this fact with admissible evidence as required by Fed. R. Civ. P. 56(c)(2).**

> 297. If Lamonte McIntyre had no gunshot residue on his face, hands and clothing, that would be evidence tending to suggest he may not have committed the crime. If Lamonte McIntyre hadn't changed clothes and there was no blood or glass on his clothing, that, too, would be evidence he was not responsible. (Pl. Ex. 54: Clyde Blood Dep. 213:2-11).

**Reply: PSOF ¶297 Uncontroverted but immaterial as any number of "ifs" could have been either inculpatory or exculpatory but none of it would have obviated the probable Case cause that did exist, including among other things the eyewitness identification provided by Ruby Mitchell, the numerous sources provided by Barber that identified Lamonte McIntyre as the shooter, the information given to Golubski about the inconsistent alibi statements, and Lamonte McIntyre's criminal history, among other things.**

> 298. At his deposition, Blood testified that Golubski's failure to take Lamonte McIntyre's clothing and order a gunshot residue test was a major red flag. (Pl. Ex. 54: Clyde Blood Dep. 213:12-214:12).

**Reply: PSOF ¶298 is objectionable as unsupported by the cited record (but is immaterial). Plaintiffs improperly offer undisclosed expert testimony and such testimony would be inadmissible at trial. Thus, Plaintiffs have failed to support this fact with admissible evidence as required by Fed. R. Civ. P. 56(c)(2).**

> 299. Additionally, Defendants failed to analyze latent prints taken from the victims' vehicle at the scene. (Pl. Ex. 51: Evidentiary Hearing, Ron Singer 60:15–61:22, 64:5–10, 69–70); (Pl. Ex. 81: Ron Singer 2016 Aff. ¶ 4); (Pl. Ex. 80: Randy Eskina 2016 Aff. ¶ 14); (Pl. Ex. 66: Russell Fischer Report p. 19); (Pl. Ex. 54: Clyde Blood Dep. 141:20–142:15, 145:11–146:7).

**Reply: PSOF ¶299 Objection but immaterial. Plaintiffs fail to support this fact with evidence that would be admissible at trial as it is all non-disclosed expert opinion testimony from**

Clyde Blood, Randy Eskina, and Ron Singer. Mr. Singer has not been disclosed as a witness

on the Rule 26 Disclosures, and Mr. Eskina and Mr. Blood have not been disclosed as expert

witnesses. Thus, Plaintiffs have failed to support this fact with admissible evidence as

required by Fed. R. Civ. P. 56(c)(2).

> 300. During Krstolich's interview with Mitchell at the scene he asked her whether the shooter walked across fresh dirt when she walked down the hill across the street from Mitchell's home, to which she replied, "Yes." However, Defendants failed to obtain footprints from the scene or to document the path taken by the shooter. (Ex. 1: Police File, Ruby Mitchell Stmt. by Krstolich, LMKSDC_0003422); (Pl. Ex. 59: W.K. Smith Dep. 163:20–166:16); (Pl. Ex. 66: Russell Fischer Report p. 19).

**Reply: PSOF ¶300 Controverted in part, but immaterial. Uncontroverted as to Krstolich and**

**Mitchell's statements, but controverted as to the remainder because it is not supported by**

**the cited evidence as required by Fed. R. Civ. P. 56(c)(1)**

> 301. Defendants failed to obtain—or apply for—a search warrant to search Lamonte McIntyre's home, or the homes of his relatives, for the weapon, as would have been police practice. (Pl. Ex. 51: Evidentiary Hearing, Ron Singer 61:23–63:6); (Pl. Ex. 81: Ron Singer 2016 Aff. ¶ 4(b)); (Pl. Ex. 80: Randy Eskina 2016 Aff. ¶ 14); (Pl. Ex. 62: Timothy Maskil 2015 Aff. ¶ 9); (Pl. Ex. 54: Clyde Blood Dep. 216:3–221:4); (Pl. Ex. 59: W.K. Smith Dep. 107:25-111:1); (Pl. Ex. 50: Rose McIntyre 2014 Aff. ¶ 16); (Pl. Ex. 66: Russell Fischer Report p. 19); (Pl. Ex. 53: Tarik Khatib Dep. 246:14–249:19).

**Reply: PSOF ¶301 Objection, but immaterial. Plaintiffs fail to support this fact with evidence**

**that could be presented in an admissible format at trial as required by Fed. R. Civ. P.**

**56(c)(2). Specifically, the only evidence that actually "supports" this fact is the unidentified**

**and undisclosed expert opinions of Randy Eskina and Mr. Singer, neither of which are**

**admissible at trial given they have not been properly disclosed. Further, Mr. Singer has not**

**even been disclosed as a witness as a word search does not reveal he has been disclosed on**

**Plaintiff's Eleventh Amended Rule 26 disclosures. This fact is immaterial because Plaintiffs**

**had an eyewitness, Lamonte McIntyre's criminal history, the report that he was known to**

**drive around in a vehicle matching the description of the getaway driver, and thus probable**

cause.

302. When asked if it was "possible that it just didn't occur to Golubski to search Lamonte McIntyre's home," Blood laughed and replied that was not likely. (Pl. Ex. 54: Clyde Blood Dep. 216:22–217:12).

**Reply: PSOF ¶302 Objection. This fact is unsupported by evidence that could be presented in an admissible format at trial as required by Fed. R. Civ. P. 56(c)(2). On page 217 of the cited testimony, Blood states "It's my opinion only." (Exhibit 60: tr. 217:3) Mr. Blood has not been identified or disclosed as an expert witness and his testimony, when read, is clear he is guessing as to the reasons no search warrant was obtained and is, therefore, mere speculation that is inadmissible. (Exhibit 60: tr. 217:3–6 "It's my opinion only. I would have got the search warrant, but why the other man did what he did, I don't know. It could be lack of experience on his part. I don't know.").**

303. At his deposition, Smith could think of no reason why Lamonte McIntyre's home was not searched for items of evidentiary value, including the murder weapon. (Pl. Ex. 59: W.K. Smith Dep. 109:22–115:10).

**Reply: PSOF ¶303 is objectionable as unsupported by the cited record (but is immaterial). The cited testimony does not support the fact asserted as required by Fed. R. Civ. P. 56(c)(1). The cited testimony merely states that it would depend "on the circumstances" and that it could have possibly been important. (Exhibit 42: tr. 110:2–6; 113:8–13; 114:16–17 ("It is kind of hard to speculate when I wasn't there. He could have, I guess."). This fact is immaterial because Plaintiffs had an eyewitness, Lamonte McIntyre's criminal history, the report that he was known to drive around in a vehicle matching the description of the getaway driver, and thus probable cause.**

304. Blood admitted that it is very troubling that in this double homicide close-range shooting case in which the court has now made an innocence finding Golubski failed to either seize Lamonte McIntyre's clothing or execute a search warrant of his home. (Pl. Ex. 54: Clyde Blood Dep. 218:18-219:1).

**Reply: PSOF ¶304 is objectionable as unsupported by the cited record (but is immaterial).**

**Plaintiffs improperly offer a fact witnesses' testimony as undisclosed expert testimony and**

**such testimony would be inadmissible at trial. Thus, Plaintiffs have failed to support this fact**

**with admissible evidence as required by Fed. R. Civ. P. 56(c)(2).**

> 305. Defendants reported no canvass searching for the murder weapon, even though it is a critical step in a homicide investigation that any reasonable officer would have understood the significance of doing. (Pl. Ex. 51: Evidentiary Hearing, Ron Singer 69:16–70:4); (Pl. Ex. 59: W.K. Smith Dep. 106:21–107:12); (Pl. Ex. 66: Russell Fischer Report pp. 7, 19).

**Reply: PSOF ¶305 is objectionable as unsupported by the cited record (but is immaterial).**

**Aside from Mr. Fisher's report, which contains inadmissible hearsay if used for the truth of**

**the matter asserted, the citations do not establish the Defendants reported no canvas search**

**for the murder weapon. Further, Mr. Singer has neither been disclosed as a fact witness nor**

**an expert witness.**

> 306. Each of the Defendants had the obligation to identify key evidence at the scene to make sure it was collected. (Pl. Ex. 54: Clyde Blood Dep. 143:13–144:6); (Pl. Ex. 59: W.K. Smith Dep. 165:19–166:16).

**Reply: PSOF ¶306 Objection. Detective Blood and Defendant Smith's opinion testimony is**

**improper and inadmissible given that Detective Blood and Defendant Smith were not**

**disclosed as an expert and thus not supported by admissible evidence as required by Fed. R.**

**Civ. P. 56(c)(2). Uncontroverted that the job of a detective is to gather evidence. However,**

**this fact, as Defendant understands it does not allege a constitutional duty.**

> 307. The failure to gather key evidence and conduct key tests violated KCKPD's policy at the time on investigating crimes of violence, and there was no legitimate police reason to omit basic investigative steps known to officers in 1994. (Pl. Ex. 84: Policy); (Pl. Ex. 80: Randy Eskina 2016 Aff. ¶ 15–16).

**Reply: PSOF ¶307 Objection. The stated fact is not supported by the cited evidence as**

**required by Fed. R. Civ. P. 56(c)(1), or by evidence that would be admissible at trial as**

**required by Fed. R. Civ. P. 56(c)(2). Exhibit 74 is not a handbook from KCKPD, but rather**

**the KBI, and Mr. Eskina is an undisclosed expert witness.**

> 308. Defendants also failed to conduct investigative steps to identify a getaway driver—including failing to ask Lamonte McIntyre who drove him—as there was no legitimate police reason not to investigate the identity of the driver. (Pl. Ex. 66: Russell Fischer Report p. 19–20); (Ex. 6: Dennis Ware Dep. 198:9–200:17.); (Pl. Ex. 53: Tarik Khatib Dep. 249:20– 250:6).

**Reply: PSOF ¶308 Controverted, but immaterial. Investigative steps were taken into the**

**getaway vehicle and driver. Specifically, Breon Shelton was interviewed at the scene and the**

**following day. Detective Golubski sought to verify whether the vehicle outside Lamonte**

**McIntyre's abode matched the description of the getaway vehicle. Police File, at**

**LMKSDC0003452–3456; Exhibit 6: Trial Transcript, tr. 240:11–15; 248:6–11). Further,**

**Lamonte McIntyre had already denied involvement, so asking who drove him away would**

**have been futile. Further, this fact is immaterial because, as explained above, probable cause**

**already existed.**

> 309. If Golubski or another detective had failed to take that step, Ware admits it was up to Culp, the supervisor, to do so. In fact, as supervisor, Culp should have easily spotted these deficiencies in the investigation. (Pl. Ex. 54: Clyde Blood Dep. 120:22–121:20, 218); (Pl. Ex. 59: W.K. Smith Dep. 41:17–42:4); (Ex. 6: Dennis Ware Dep. 200:3–17; 218:17–21, 261:16–266:15.)

**Reply: PSOF ¶309 Objection and immaterial. Detective Ware's undisclosed opinion**

**testimony is improper and inadmissible given that he is neither a disclosed expert nor Roger**

**Golubski's or Culp's supervisor. Further, this fact is immaterial because, as explained above,**

**probable cause already existed.**

> 310. Police officers have an obligation to accurately report what they find in the course of their investigation, whether it helps or hurts their case. (Pl. Ex. 53: Tarik Khatib Dep. 145:2– 146:17).

**Reply: PSOF ¶310 Controverted. Mr. Khatib actually testified that "to the extent possible,"**

**officers should report what they find. (Pl. Ex. 143: Tarik Khatib Dep. 145:2-9).**

311. Homicide investigations do not end with arrests; the Defendants were obligated to continue taking investigate steps "as long as [they] have leads to follow up." (Pl. Ex. 54: Clyde Blood Dep. 94:5–95:7). It was imperative that homicide detectives follow up on all possible leads regardless of whether a suspect was already in custody. (Pl. Ex. 54: Clyde Blood Dep. 95:13–96:13).

**Reply: PSOF ¶311 Objection and controverted in part. Detective Blood's opinion testimony is improper and inadmissible given that Detective Blood was not disclosed as an expert and thus not supported by admissible evidence as required by Fed. R. Civ. P. 56(c)(2). Controverted in that Tarik Khatib testified that if they are able, police officers should follow leads that are reasonably practical, regardless of whether those leads point to or away from their suspect. (Pl. Ex. 143, Tarik Khatib Dep. 144:17-145:1).**

312. Homicide investigations similarly do not end with the completion of the prosecution summary; officers were to forward any additionally uncovered information to the prosecution. (Pl. Ex. 54: Clyde Blood Dep. 128:12–130:9). That was true even if the information uncovered hurt the officers' theory of the case. (Pl. Ex. 54: Clyde Blood Dep. 130:18–132:9).

**Reply: PSOF ¶312 Objection, but immaterial. Detective Blood's opinion testimony is improper and inadmissible given that Detective Blood was not disclosed as an expert and thus not supported by admissible evidence as required by Fed. R. Civ. P. 56(c)(2).**

**A weak case, at trial, no physical or forensic evidence implicates Lamonte McIntyre, no evidence connects him to the victims, and he consistently maintains his innocence and presents an alibi**

313. There was no physical evidence, forensic evidence, murder weapon, blood evidence, DNA evidence, fingerprint evidence, motive, or confession linking Lamonte McIntyre to the crime. (Pl. Ex. 67: Terra Morehead Dep. 181:12–183:4); (Pl. Ex. 46: Gary Long Dep. 58:19–60:16); (Ex. 4: Terra Morehead Closing TT 478:23–479:13).

**Reply: PSOF ¶313 Uncontroverted, but immaterial because, as explained above, probable cause already existed.**

314. Lamont McIntyre consistently maintained his innocence. He testified at trial that he did not commit the crime. (Ex. 4: Lamonte McIntyre TT 453:24–454:19); see supra ¶¶ 22–27.

**Reply: Uncontroverted.**

315. Lamonte McIntyre testified that he was at the house of his aunt, Yolanda Johnson, the afternoon of the shooting and earlier that day, he had been at the home of his aunt, Peggy Crowder, who lived just in front of Johnson. (Ex. 4: Lamonte McIntyre TT 447:16–450:9, 452:24–453:3, 464:10-11; Peggy Crowder TT 378:9–381:8; Yolanda Johnson TT 402:23– 406:9).

**Reply: Uncontroverted.**

316. Lamonte McIntyre testified that he went between his two aunts' homes two times to use Johnson's phone to call a taxi for two of Crowder's guests, as Crowder did not have a phone; then he remained at Johnson's home. (Ex. 4: Lamonte McIntyre TT 447:16–450:9). Lamonte McIntyre testified that he was not at any other location besides these two homes on the afternoon of April 15, 1994. (Ex. 4: Lamonte McIntyre TT 464:10–12).

**Reply: Uncontroverted.**

317. Four alibi witnesses testified at trial and confirmed that around the time of the crime, Lamonte McIntyre was at Johnson's home to make a phone call. (Ex. 4: Peggy Crowder TT 378:9–381:8; Yolanda Johnson TT 402:23–406:9; M'Sherie Johnson TT 426:8–428:8; Felicia Williams TT 391:3–393:2, 396:20–397:22).

**Reply: PSOF ¶317 Controverted. Lamonte McIntyre testified his alibi witnesses were just making things up and presented terribly. (Exhibit 29: Deposition of Lamonte McIntyre, tr. 167:4–17)**

**The case turns on Defendants' fabricated identifications by Ruby Mitchell and Niko Quinn, and the fabricated alibi statements Defendants attributed to Rose McIntyre and Lamonte McIntyre**

318. The primary evidence the prosecution offered against Lamonte McIntyre at trial were the identifications by Niko Quinn and Ruby Mitchell. (Pl. Ex. 46: Gary Long Dep. 58:19– 59:5); (Pl. Ex. 67: Terra Morehead Dep. 181:5–185:15).

**Reply: Uncontroverted.**

319. The theory of the case presented by McIntyre's defense attorney was that the identifications by Niko Quinn and Mitchell were incorrect, and he used all the ammunition available to demonstrate that their purported identifications were unreliable. (Pl. Ex. 46: Gary Long Dep. 60:9–12, 60:23–61:11).

**Reply: PSOF ¶319 Uncontroverted that Gary Long testified he believed he "did his best"**

**and agreed he used all the ammunition he had available to demonstrate Ruby Mitchell and Niko Quinn's identifications were unreliable. Notably, however, this fact does not assert Mr. Long used all of the ammunition available to him as to other aspects of the criminal case.**

320. Ruby Mitchell identified Lamonte McIntyre during the trial and testified that she was inside her house looking out throughout the shooting. (Ex. 2: Ruby Mitchell TT 166:17–24; 174:23–175:11).

**Reply: Uncontroverted.**

321. Mitchell also testified that at the time of the shooting she recognized the shooter as the Lamont who used to date her niece (Lamont Drain) who she had seen "lots of times," that she was so certain it was Lamont Drain she was going to call out his name, and that at that point there was no doubt in her mind he did the shooting and she did not change her mind. (Ex. 2: TT 165:12–166:7, 180:6–181:14, 184:6–24, 188:1–5).

**Reply: PSOF ¶321 Controverted, in part, but immaterial. Ms. Mitchell testified at trial that while she may have initially thought it was the Lamont that dated her niece, when she saw Lamonte McIntyre's photo, she knew that was the "face [she] saw at the shooting" and acknowledged the shooter she identified—Lamonte McIntyre—was not the Lamont that dated her niece. (Exhibit 6, tr. 171:23–10)**

322. Mitchell testified that she had later identified Lamonte McIntyre as the shooter from a set of five photos. (Ex. 2: TT 171:10–172:4). This set of photos did not include a photo of Lamont Drain. (Ex. 11: Polaroids from Lineup with Names on Back); Golubski SOF ¶ 58.

**Reply: Uncontroverted.**

323. Mitchell testified that Lamonte McIntyre and Lamont Drain look "exactly alike," "almost identical," like identical twins. (Ex. 2: TT 172:18–173:2, 181:19–182:1, 209:18–21).

**Reply: Uncontroverted.**

324. Lamonte McIntyre and Lamont Drain do not look like identical twins. (Ex. 4: Terra Morehead Closing TT 478:1–7); (Ex. 1: Police File, Keva Garcia Statement LMKSDC_0003498); (Pl. Ex. 64: Lamonte McIntyre 1994 Mugshots); (Pl. Ex. 65: Lamont Drain Mugshots 1994).

**Reply: Uncontroverted.**

325. Niko Quinn also made an unequivocal positive identification of Lamonte McIntyre in court during the trial. (Ex. 2: Niko Quinn TT 143:13–144:13).

**Reply: Uncontroverted.**

326. Morehead argued to the jury in closing that the identifications were accurate because "these are two independent witnesses [who] are not connected aside from being neighbors." (Ex. 4: TT 475:18–21).

**Reply: Uncontroverted.**

327. Morehead also presented evidence from Golubski that Niko Quinn was adamant when she made her alleged positive photographic identification approximately a week after the murders. (Ex. 3: Roger Golubski TT 327:24–329:15).

**Reply: Uncontroverted.**

328. In closing argument, Morehead emphasized the second photo identification procedure Golubski conducted with Niko Quinn, telling the jury that Niko Quinn "looked at those pictures and she said I'm positively sure No. 3 is the one who I saw shoot into that car." (Ex. 4: Terra Morehead Closing TT 476:4–20).

**Reply: Uncontroverted.**

329. Morehead also argued the jury should disbelieve Lamonte McIntyre's alibi because of the reports and testimony from Officer Brown and Lieutenant Barber that both Lamonte McIntyre and Rose McIntyre had previously offered inconsistent statements about where he had been that day. (Ex. 4: TT 479:14–480:9).

**Reply: Uncontroverted.**

330. Specifically, Morehead attempted to impeach Lamonte McIntyre with this false alibi, after he had truthfully testified that he was at his aunt's home at the time of the murders. (Ex. 4: TT 452:21–453:3, 457:25–458:15).

**Reply: PSOF ¶330 Objection. This fact is supported by a citation to the record that does not exist. Plaintiffs cite to Page 452 of the trial transcript—a transcript which was produced to Defendants by Plaintiff—but page 452 appears to be missing from the transcript. Thus, this fact is unsupported as required by Fed. R. Civ. P. 56(c)(1).**

331. In the defense closing argument, Long argued "the best evidence of reasonable

doubt is Ruby Mitchell. She's the one who tells you there's another man out there that I was convinced did this shooting." (Ex. 4: TT 488:12–16).

**Reply: Uncontroverted.**

332. In her rebuttal closing, Morehead told the jury that this "is not a case of mistaken identification" as "Ruby Mitchell picked out the photograph of the person she saw do the shooting" and "Nikki Quinn completely at a different place at a different time picked out the same individual that Ruby picked out." (Ex. 4: Terra Morehead Closing TT 492:2–492:17).

**Reply: Uncontroverted.**

333. Morehead's final point was that "the state has submitted you a case where two individuals observe the defendant, Lamonte McIntyre, shoot Doniel Quinn and Donald Ewing in cold blood." (Ex. 4: Terra Morehead Closing TT 493:8–17).

**Reply: PSOF ¶333 Objection. This fact is supported by a citation to the record that does not exist. Plaintiffs cite to Page 493 of the trial transcript—a transcript which was produced to Defendants by Plaintiff—but page 493 appears to be missing from the transcript. Thus, this fact is unsupported as required by Fed. R. Civ. P. 56(c)(1).**

334. The jury requested the court reporter read back Niko Quinn and Ruby Mitchell's testimony during trial. (Ex. 4: TT 494:15–499:14).

**Reply: Uncontroverted.**

**The jury never hears crucial evidence in this case, as Defendants never turned over evidence of their investigative misconduct to the prosecution or defense**

335. Lamonte McIntyre never learned of any exculpatory evidence beyond what was presented at trial prior to his wrongful conviction. Lamonte McIntyre also never learned from any source that Monster was rumored to be responsible for the murders of Ewing and Doniel Quinn prior to his wrongful conviction. Lamonte McIntyre never learned of any evidence implicating Monster as the true perpetrator before his wrongful conviction. (Pl. Ex. 61: Lamonte McIntyre 2022 Decl. ¶¶ 3–4).

**Reply: PSOF ¶335 Uncontroverted that there was no evidence about "Monster" prior to Lamonte McIntyre's 1994 conviction. Also uncontroverted as to what Lamonte McIntyre personally knew, despite whether his representatives told him.**

336. The suggestion used by Golubski and Ware to get Niko Quinn to identify

Lamonte McIntyre was never reported to the prosecution or to the defense. (Pl. Ex. 67: Terra Morehead Dep. 54:2–20, 124:1–127:4); (Pl. Ex. 46: Gary Long Dep. 63:13–64:16, 65:7–19).

**Reply: PSOF ¶336 Objection. The fact that suggestion was used is not supported by the cited evidence as required by Fed. R. Civ. P. 56(c)(1), and has been otherwise controverted in response to other facts. Uncontroverted that no suggestion was disclosed because it did not exist.**

337. The failure to disclose to the prosecutor the suggestion used during the first photo lineup with Niko Quinn violated the duty of officers to turn over potentially exculpatory material to the prosecutor, which any officer should have been aware of by 1994. (Pl. Ex. 58: James Brown Dep. 184:22–186:23); (Pl. Ex. 54: Clyde Blood Dep. 130:10–134:3) see also (Pl. Ex. 66: Russell Fischer Report p. 14).

**Reply: PSOF ¶337 Objection. The fact that suggestion was used is not supported by the cited evidence as required by Fed. R. Civ. P. 56(c)(1), and has been otherwise controverted in response to other facts. Uncontroverted that no suggestion was disclosed because it did not exist.**

338. Morehead testified at her deposition that if she been told that Golubski or any other officer had used suggestion to obtain Niko Quinn or Ruby Mitchell's identifications of Lamonte McIntyre, she would have made sure that was documented and disclosed to the defense, and that did not happen. (Pl. Ex. 67: Terra Morehead Dep. 126:19–127:16).

**Reply: Uncontroverted.**

339. At some point between the preliminary hearing and trial, Golubski told the prosecutor about the second photo identification procedure he conducted with Niko Quinn but did not tell her about the suggestion he used during the procedure. Instead, Golubski told Morehead that Niko Quinn was adamant about her identification of Lamonte McIntyre. (Pl. Ex. 67: Terra Morehead Dep. 131:3–18); (Ex. 3: Roger Golubski TT 328:20–329:15). Golubski never wrote any report about this second photo identification procedure. Defendant Officers' SOF ¶100 and SAMF ¶110.

**Reply: PSOF ¶339 Objection. The fact that suggestion was used is not supported by the cited evidence as required by Fed. R. Civ. P. 56(c)(1), and has been otherwise controverted in**

**response to other facts. Uncontroverted that no suggestion was disclosed because it did not exist.**

> 340. Morehead alleges she did not know that Golubski's testimony about identification by Niko Quinn's second photo identification was false, and that he had really used suggestion to procure Niko Quinn's identification during this procedure, otherwise she would have had an obligation to correct the false testimony or turn over evidence of misconduct or any evidence that undermined the officers' credibility as Brady evidence. (Pl. Ex. 67: Terra Morehead Dep. 77:25–79:15; 80:7–81:5; 81:6–10; 81:11–22; 82:4–25, 83:7–13, 83:20–84:1, 85:3–19, 84:5–19, 88:13– 20, 91:2–11, 236:2–11).

**Reply: PSOF ¶340 Uncontroverted as to a prosecutor's obligation, but objection as to the remaining facts. The fact that suggestion was used is not supported by the cited evidence as required by Fed. R. Civ. P. 56(c)(1), and has been otherwise controverted in response to other facts. Uncontroverted that no suggestion was disclosed because it did not exist.**

> 341. Golubski never reported to the prosecution that he had helped Niko Quinn relocate in exchange for her identification of Lamonte McIntyre, nor did he report that he had used pressure, suggestion, and threats to fabricate Niko Quinn's second identification procedure. (Pl. Ex. 67: Terra Morehead Dep. 54:2–20, 141:12–142:1); (Pl. Ex. 63: Roger Golubski Dep. 170:12–171:2).

**Reply: PSOF ¶341 Objection. The fact asserted that Golubski helped Niko Quinn relocate is not supported by the cited evidence as required by Fed. R. Civ. P. 56(c)(1), and has been otherwise controverted in response to other facts. Uncontroverted that no such relocation information was disclosed because it did not exist.**

> 342. Had Lamonte McIntyre's defense counsel learned police used suggestion when conducting a photo identification procedure with Niko Quinn, he would have used it to undermine her identification. (Pl. Ex. 46: Gary Long Dep. 63:13–64:16, 65:7–19).

**Reply: PSOF ¶342 Objection. The fact that suggestion was used is not supported by the cited evidence as required by Fed. R. Civ. P. 56(c)(1), and has been otherwise controverted in response to other facts. Uncontroverted that no suggestion was disclosed because it did not exist.**

343. Golubski and Krstolich never reported to prosecutor Terra Morehead or to Lamonte McIntyre's defense attorney that they used misconduct to obtain Ruby Mitchell's identification of Lamonte McIntyre during the photo procedure. (Pl. Ex. 67: Terra Morehead Dep. 128:3–9, 269:17–24, 274:24–275:23); (Pl. Ex. 63: Roger Golubski Dep. 115:1–15).

**Reply: PSOF ¶343 Objection. The fact asserted that Golubski and Krstolich engaged in misconduct is not supported by the cited evidence as required by Fed. R. Civ. P. 56(c)(1), and has been otherwise controverted in response to other facts. Uncontroverted no such purported misconduct was disclosed because it did not exist.**

344. Had Lamonte McIntyre's defense counsel learned police used suggestion when conducting a photo identification procedure with Mitchell, he would have used it to undermine her identification. (Pl. Ex. 46: Gary Long Dep. 62:8–63:9, 64:17–65:6).

**Reply: PSOF ¶344 Objection. The fact that suggestion was used is not supported by the cited evidence as required by Fed. R. Civ. P. 56(c)(1), and has been otherwise controverted in response to other facts. Uncontroverted that no suggestion was disclosed because it did not exist.**

345. Had Lamonte McIntyre's defense counsel had evidence of the police misconduct underlying this investigation, he would have used it in his defense to the best of his ability. (Pl. Ex. 46: Gary Long Dep. 66:20–25).

**Reply: PSOF ¶345 Objection. The fact that misconduct was engaged in is not supported by the cited evidence as required by Fed. R. Civ. P. 56(c)(1), and has been otherwise controverted in response to other facts. Otherwise, uncontroverted.**

346. Golubski failed to document or disclose to the prosecution that Stacy Quinn could identify Monster as the perpetrator. See (Ex. 1: Police File, Golubski Investigative Addendums LMKSDC_0003452–3456); (Pl. Ex. 67: Terra Morehead Dep. 263:6–265:7); see also (Pl. Ex. 69: Ronald Miller Dep. 77:18–78:25).

**Reply: PSOF ¶346 Controverted, but immaterial. Golubski did document that Stacy Quinn could possibly identify the shooter—whether Monster, or someone else. Police File, at LMKSDC0003456.**

347. Had detectives located and interviewed Stacy Quinn, Morehead would have expected those interactions to be documented in a report in the police file; they are not. (Pl. Ex. 67: Terra Morehead Dep. 258:6–15, 264:13–265:7). See generally, (Ex. 1, Police File).

**Reply: PSOF ¶347 Uncontroverted that Ms. Morehead would have so expected and that detectives were unable to locate and interview Stacy Quinn prior to Lamonte McIntyre's trial.**

348. Had defense counsel learned that Niko Quinn or Stacy Quinn asserted that Lamonte McIntyre was not the shooter, he would have used it to the best of his ability in defending McIntyre, especially given this case relied entirely upon eyewitness testimony. (Pl. Ex. 46: Gary Long Dep. 67:24–68:8); (Pl. Ex. 47: Gary Long 2015 Aff. ¶¶ 12–14).

**Reply: PSOF ¶348 The asserted fact that Niko Quinn or Stacy Quinn asserted that Lamonte McIntyre was not the shooter prior to Lamonte McIntyre's trial is not supported by the evidence cited as required by Fed. R. Civ. P. 56(c)(1). Otherwise, uncontroverted.**

349. When asked whether he told the prosecutor that that he had searched thoroughly for Stacy Quinn but had been unable to locate her, and when asked why he lied and told the prosecutor he could not find Stacy Quinn, Golubski refused to answer and instead invoked his Fifth Amendment right to remain silent. (Pl. Ex. 63: Roger Golubski Dep. 188:21–189:25, 193:23–194:4).

**Reply: PSOF ¶349 Uncontroverted but immaterial and misleading because Golubski exercised his Fifth Amendment rights as to all questions pertaining to the investigation and immaterial as to claims against Defendant Unified Government.**

350. When asked whether the jury never learned that the man Stacy Quinn saw was not Lamonte McIntyre because he lied and said she could not be found, Golubski refused to answer and instead invoked his Fifth Amendment right to remain silent. (Pl. Ex. 63: Roger Golubski Dep. 197:21–198:3).

**Reply: PSOF ¶350 Uncontroverted but immaterial and misleading because Golubski exercised his Fifth Amendment rights as to all questions pertaining to the investigation and immaterial as to claims against Defendant Unified Government.**

351. When asked whether his interactions with Stacy Quinn during this

investigation, and the fact of his relationship with her were material, exculpatory evidence that the prosecutor would have been obligated to turn over to the defense, Golubski refused to answer and instead invoked his Fifth Amendment right to remain silent. (Pl. Ex. 63: Roger Golubski Dep. 197: 3– 12).

**Reply: PSOF ¶351 Uncontroverted but immaterial and misleading because Golubski exercised his Fifth Amendment rights as to all questions pertaining to the investigation and immaterial as to claims against Defendant Unified Government.**

352. Golubski failed to disclose to the prosecutor that he was engaged in a sexual relationship with Stacy Quinn. Withholding this information from the prosecution amounted to serious police misconduct and egregious violations of minimally accepted police practices. (Pl. Ex. 63: Roger Golubski Dep. 195:8–14, 197:3–12); (Pl. Ex. 67: Terra Morehead Dep. 245:20– 23); (Pl. Ex. 66: Russell Fischer Report p. 18).

**Reply PSOF ¶352 Objection. The asserted fact that Golubski and Stacy Quinn were engaged in a sexual relationship is not supported by the cited evidence as required by Fed. R. Civ. P. 56(c)(1), and has been otherwise controverted in response to other facts.**

353. When asked whether Stacy Quinn was lying when she came forward in 1996 on her own accord to state that Lamonte McIntyre was not the real perpetrator and testified as such at his post-conviction hearing, Golubski refused to answer and instead invoked his Fifth Amendment right to remain silent. (Pl. Ex. 63: Roger Golubski Dep. 199:1–199:14).

**Reply: PSOF ¶353 Uncontroverted but immaterial and misleading because Golubski exercised his Fifth Amendment rights as to all questions pertaining to the investigation and immaterial as to claims against Defendant Unified Government.**

354. When asked if, at various points in time Niko Quinn, Stacy Quinn, and Josephine Quinn, approached him to tell him that Lamonte McIntyre was not the shooter and whether he purposefully did not document these occasions or share them with the prosecution, because he wanted to make sure Lamonte McIntyre stayed convicted and to hide his own misconduct, Golubski refused to answer and instead invoked his Fifth Amendment right to remain silent. (Pl. Ex. 63: Roger Golubski Dep. 199:22–201:13).

**Reply: PSOF ¶354 Uncontroverted but immaterial and misleading because Golubski exercised his Fifth Amendment rights as to all questions pertaining to the investigation and**

immaterial as to claims against Defendant Unified Government.

355. Morehead understood that had she learned of any of the misconduct by Golubski in his interviews, or lack thereof, with Stacy Quinn during the investigation, she would have had a duty to disclose this misconduct as Brady evidence and that she had a duty of candor with the court. (Pl. Ex. 67: Terra Morehead Dep. 77:25–79:15; 80:7–81:5; 81:6–10; 81:11–22; 82:4–25, 83:7–13, 83:20–84:1, 84:3–15, 85:3–19, 88:13–20, 91:2–11, 236:2–11); (Pl. Ex. 66: Russell Fischer Report p. 16).

**Reply: Uncontroverted.**

356. In general, Morehead alleged she never learned of any exculpatory evidence she did not disclose and would have disclosed any exculpatory information she had learned. (Pl. Ex. 67: Terra Morehead Dep. 77:25–79:15; 80:7–81:5; 81:6–10; 81:11–22; 82:4–25, 83:7–13, 83:20–84:1, 84:3–15, 85:3–19, 88:13–20, 91:2–11, 236:2–11).

**Reply: Uncontroverted.**

357. It was Culp's responsibility, as the supervisor for the Ewing/Quinn investigation, to make sure that officers under his command took all proper investigative steps and complied with their obligations to overturn exculpatory evidence to the prosecution. (Pl. Ex. 54: Clyde Blood Dep. 132:24–134:24); (Pl. Ex. 59: W.K. Smith Dep. 10:9–19, 38:6–42:4).

**Reply: PSOF ¶357 Controverted and objection. Mr. Blood and Defendant Smith's opinion testimony is improper and inadmissible as neither Mr. Blood nor Defendant Smith were disclosed as an expert or ever served in a supervisory role. (Ex. E, Blood Dep. 48:18-25; Ex. C, Smith Dep. 40:14-21). Therefore, this fact is not supported by admissible evidence. Fed. R. Civ. P. 56(c)(2). Controverted in that Clyde Blood testified that Culp had the same obligation as they did to turn over exculpatory evidence. "We're all part of the same team." (Ex. E, Blood Dep. 132:24-133:10). Furthermore, W.K. Smith did not affirm or deny that it was Lt. Culp's obligation to make sure that homicide detectives under his command took all appropriate investigative steps. (Ex. C, Smith Dep. 38:6-24.) When asked if it was Lt. Culp's responsibility to ensure that he did his job properly, W.K. Smith responded "I'm not a supervisor. I would assume that, yes." (Ex. C, Smith Dep. 40:14-21).**

358. When the prosecution summary was complete, it was the supervisor's "job to review it and go through it and see if anything else was needed" before it was sent over to the district attorney's office. (Pl. Ex. 59: W.K. Smith Dep. 225:19–226:18).

**Reply: PSOF ¶358 Controverted and objection. Defendant Smith's opinion testimony is improper and inadmissible as Defendant Smith was disclosed as an expert or ever served in a supervisory role. (Ex C, Smith Dep. 40:14-21). Therefore, this fact is not supported by admissible evidence. Fed. R. Civ. P. 56(c)(2). Further, the cited testimony does not support the fact as stated as required by Fed. R. Civ. P. 56(c)(1) as when asked if it was Lt. Culp's responsibility to ensure that he did his job properly, W.K. Smith responded "I'm not a supervisor. I would assume that, yes." (Ex. C, Smith Dep. 40:14-21).**

**Culp would have had ample opportunity to observe the investigative steps taken in this case, but failed to intervene.**

359. In 1994, each of the detectives in the crimes against persons unit had an office off the same hallway. (Ex. 6: Dennis Ware Dep. 116:6–13); (Pl. Ex. 54: Clyde Blood Dep. 86:19– 88:13).

**Reply: Uncontroverted.**

360. Culp's office was also in that hallway, approximately twenty or thirty feet away from Golubski's. (Ex. 6: Dennis Ware Dep. 116:14–118:3); (Pl. Ex. 54: Clyde Blood Dep. 82:6– 85:6). Culp tended to work with his door open. It wasn't unusual for Culp to be in his office in the evenings or nighttime hours. (Ex. 6: Dennis Ware Dep. 118:21–24); (Pl. Ex. 54: Clyde Blood Dep. 86:19–88:13).

**Reply: PSOF ¶360 Controverted in part, but immaterial. Mr. Blood testified he could not remember where Golubski's office was located. (Ex. E, Blood Dep. 82:6-85:6).**

361. It was Culp's obligation to make sure that the investigations being conducted under his command were done properly. (Ex. 6: Dennis Ware Dep. 124:25–126:10). Culp "supervised everything" in the homicide department in 1994. (Pl. Ex. 54: Clyde Blood Dep. 48:18–25, 66:15–24, 66:25–67:24).

**Reply: PSOF ¶361 Controverted and objection. Defendant Ware's opinion testimony is improper and inadmissible as Defendant Ware was not disclosed as an expert. Therefore, this fact is not supported by admissible evidence. Fed. R. Civ. P. 56(c)(2). Controverted in**

that, when asked if he had any supervisory responsibilities as a sergeant in the homicide unit in 1994, Mr. Blood said that he did not and that in this case, Lt. Culp supervised everything. (Ex. E, Blood Dep. 48:18-25). Objection to the use of Clyde Blood's testimony regarding supervisory practices and responsibilities for the truth of the matter asserted as this constitutes inadmissible speculation given Mr. Blood was never a supervisor.

> 362. As the supervisor, Culp "had to know what was going on around him. He was in charge." (Pl. Ex. 54: Clyde Blood Dep. 80:14–22). If there was anything wrong with the investigative steps he took, it was Culp's responsibility as of 1994 and 1995 to inform him so that he could correct them. (Pl. Ex. 59: W.K. Smith Dep.185:18–188:20).

Reply: PSOF ¶362 Objection. Mr. Blood and Defendant Smith's opinion testimony is improper and inadmissible as neither Detective Blood nor Defendant Smith were disclosed as an expert or ever served in a supervisory role. (Ex. E, Blood Dep. 48:18-25; Ex. C, Smith Dep. 40:14-21). Further, this includes inadmissible speculation. Therefore, this fact is not supported by admissible evidence. Fed. R. Civ. P. 56(c)(2).

> 363. At his deposition Ware could not think of a single time Culp came to him and instructed him to do something different in an investigation he was conducting, or asked him questions about an investigation he was conducting. (Ex. 6: Dennis Ware Dep. 123:13–25).

Reply: PSOF ¶363 Controverted, but immaterial. When asked whether he remembered any time when Lt. Culp came to him and asked questions about an investigation he was conducting, Mr. Ware responded with "Nothing specific, but I'm sure he did."

Ware Dep. 123:18-22.

> 364. At his deposition, Smith could not think of a single time Culp asked him to conduct an additional investigative step before referring a case to the prosecution. (Pl. Ex. 59: W.K. Smith Dep. 226:19–227:2). However, Smith believed Culp reviewed his investigative report before sending it to the prosecution. (Pl. Ex. 59: W.K. Smith Dep. 229:9–25).

Reply: PSOF ¶364 Controverted, objection. When asked whether Lt. Culp came back to

detectives and asked them to do additional work on a case before it was sent to the prosecution, Mr. Smith responded with "I've never seen him do it, but I'm sure he has. He never had to do it with me." (Ex C, Smith Dep. 226:19-25). Mr. Smith went on to explain that that was not because Lt. Culp was not paying attention to his work, it was simply because he was a thorough detective. (Ex. C, Smith Dep. 229:9-25). To the extent this testimony is being used for the truth of the matter asserted regarding Lt. Culp's supervisory practices beyond the personal observations of Mr. Smith, objection on the basis of inadmissible speculation.

> 365. Culp "was calling the shots on this McIntyre case." (Pl. Ex. 54: Clyde Blood Dep. 66:15–24). It was Culp's "sole responsibility" to supervise investigations, and if he needed help, it was his responsibility to go up the command staff to the major or captain. (Pl. Ex. 54: Clyde Blood Dep. 67:25–14).

Reply: PSOF ¶365 Controverted and objection. Mr. Blood's opinion testimony is improper and inadmissible as Detective Blood was not disclosed as an expert or ever served in a supervisory role. (Ex E, Blood Dep. 48:18-25). Therefore, this fact is not supported by admissible evidence. Fed. R. Civ. P. 56(c)(2). Controverted in that Mr. Blood also testified that Lt. Culp "left us to our judgment on the cases because like I say, he had never worked a homicide until he took over the unit". (Ex E, Blood Dep. 100:14-25). Lt. Culp told them to follow their leads, do what they think is right, that's it, and that is what they did. (Id.) Lt. Culp relied on the detectives' experience regarding whether they should continue investigating after they arrested a suspect. (Ex. E, Blood Dep. 101:16-20). Lt. Culp generally left investigations up to the detectives due to their knowledge and experience working homicides. (Ex. E, Blood Dep. 104:10-14; 200:21 -24). They would work their cases and brief Lt. Culp with new information. (Ex. E, Blood Dep. 204:12 – 205:23). Dennis Ware testified that in his experience there are different styles of supervision a manager can employ in a police department, and that Lt. Culp was not overbearing. He would "not let you get away

with anything" but generally let detectives run their own investigations according to their own expertise and let the detectives do their jobs. Doc. 582-13,Ware: 122:13-123:12).

> 366. In fact, in 1994, in the KCKPD, detectives had an affirmative obligation to keep Culp informed about their investigations and detectives would brief Culp any time there was new information in an investigation, including when a witness made a positive identification. (Pl. Ex. 54: Clyde Blood Dep. 78:18–81:10, 204:12–205:23).

**Reply: PSOF ¶366 Objection. Mr. Blood's opinion testimony is improper and inadmissible as Mr. Blood was not disclosed as an expert.**

> 367. As the supervisor, Culp had an affirmative duty to inquire about the investigative steps detectives were taking. (Pl. Ex. 54: Clyde Blood Dep. 78:18–81:10, 133:19–134:8). Culp had a number of avenues available to stay up-to-date on detectives' homicide investigations, including initiating a conversation with one of the officers in the bureau, calling officers, accompanying officers on witness interviews, reviewing investigative reports, and directing follow-up investigation. (Pl. Ex. 54: Clyde Blood Dep. 135:22–137:16).

**Reply: PSOF ¶367 Controverted and objection. Mr. Blood's opinion testimony is improper and inadmissible as Mr. Blood was not disclosed as an expert or ever served in a supervisory role. (Ex. E, Blood Dep. 48:18-25). Controverted as Mr. Blood testified that as *officers* they had a *duty* to keep Defendant Culp informed:**



```
2    A.   It was our responsibility to keep him informed.
3    Q.   Okay. So you actually had an affirmative
4 obligation to make sure Lieutenant Culp was aware of all
5 investigative developments in major cases. Fair to say?
6    A.   We kept him posted on everything we had going.
7    Q.   And that was your obligation as a detective.
8 Correct?
9    A.   I think so, yes.
```

**Pl. Ex. 99, Clyde Blood Depo. 79:2-9.**

> 368. Detectives' reports pertaining to a particular case would be stored in a "central file" maintained at the bureau by the secretaries and accessible to all the detectives working the case as well as their supervisor (Culp). (Pl. Ex. 54: Clyde Blood Dep.

118:13–120:8);  (Pl.  Ex.  59:  W.K.  Smith  Dep.  295:21–296:22,  298:25–299:6, 299:12–24).

**Reply: Uncontroverted.**

369. It was standard across the KCKPD as of at least 1978, that when a supervisor reviewed an officer's investigative report, the supervisor "is responsible by policy to ensure for accuracy, completion of all the boxes, checking of the boxes, as it were, and … that it was done and completed properly." (Ex. 21: Ricky Armstrong Dep. 151:8–152:7).

**Reply: Uncontroverted.**

370. As long as Culp had read the investigative reports in this case, he would have been in the position to question where the last name "McIntyre" originated. (Pl. Ex. 53: Tarik Khatib Dep. 170:18–171:4).

**Reply: PSOF ¶369 Controverted as the fact is not supported by the cited evidence as required**

**by Fed. R. Civ. P. 56(c)(1). Mr. Khatib actually testified as follows:**

```
18      Q.  (By Ms. Freudenberger)  By the way, this
19   is a question that Lieutenant Culp could have
20   sought an answer to back on April 16 of 1994 when
21   he was reviewing and signing off on this report,
22   right?  He would have been in a better position
23   to find out the answer to where the last name
24   McIntyre came from than you and me today, right?
25           MR. COOPER:  Object to form.
```
```
                                          Page 171
1           MS. EVERS GUERRA:  Object to form.
2           MR. ROACH:  Join.
3      A.  As he was reviewing and signing off on
4   the reports.
```

371. Additionally, from reading both Ruby Mitchell's and Keva Garcia's statements, Culp should have known to inquire about the discrepancy between the names each provided as the man she used to date: Lamonte McIntyre versus Lamont Drain. (Pl. Ex. 53: Tarik Khatib Dep. 197:17–199:20). There is no indication that Culp requested a follow-up investigation on this discrepancy. (Pl. Ex. 53: Tarik

Khatib Dep. 199:21–200:5).

**Reply: PSOF ¶371 Controverted in part. Uncontroverted in that there is no request for additional information from Lt. Culp in the file regarding follow-up investigation on this discrepancy. Controverted in that Mr. Khatib testified that, in hindsight review of the reports, there appears to be a discrepancy between the two statements, "but in terms with the time, I don't know that somebody reading this report, as you asked earlier, would have picked up on that." (Ex F, Khatib Dep. 196:3-24).**

372. Barring a legitimate explanation from Golubski, the contradiction between what Keva Garcia reported to Golubski in September 1994 and what Ruby Mitchell reported on the day of the crimes should have raised a major red flag for Culp both about the reliability of Ruby Mitchell's investigation and Golubski's and Krstolich's conduct in this investigation, assuming they came to his attention. (Ex. 6: Dennis Ware Dep. 266:2–267:7).

**Reply: PSOF ¶372 Controverted and objection. Defendant Ware's opinion testimony is improper and inadmissible as Defendant Ware was not disclosed as an expert and calls for speculation. Therefore, this fact is not supported by admissible evidence. Fed. R. Civ. P. 56(c)(2).**

373. In his deposition, former KCKPD Chief, Ron Miller testified, "if Culp was a lieutenant in homicide at the time of this case, he would have solid knowledge of this case." (Pl. Ex. 69: Ronald Miller Dep. 228:4–14). Miller would have expected that Culp knew about the course of the Ewing/Doniel Quinn homicide investigation and the steps that were taken and not taken, and be able to spot gaps in the investigation. (Pl. Ex. 69: Ronald Miller Dep. 231:8–17).

**Reply: PSOF ¶373 Controverted in part. Uncontroverted in that Chief Miller so testified. Controverted in that Chief Miller also testified that "Steve Culp is a guy who has a lot of experience, very ethically driven, and would have been involved with his detectives on homicide investigations, considering that there may have been as many as 60, 70, 75 a year, a lot, and multiple homicide investigative teams, so that somebody is kind of coordinating those actions so that the lieutenant has a general idea of what they are doing but may not be**

**there joined to the hip with them doing their investigation. So he would know those kind of**

**things, but he might not know everything every detective did every minute." (Ex. G, Miller**

**Dep.: 230:20-231:7).**

374. Before former KCKPD Sergeant Tim Hausback, who had been employed by the KCKPD from 1972–1989, left the KCKPD, Culp told him that he knew detectives in the homicide division "were gone all day[,] closed their cases[,] [b]ut he did not know what they were doing. (Pl. Ex. 86: Tim Hausback Aff. ¶¶ 1–8, 29).

**Reply: PSOF ¶374 Objection to the use of Tim Hausback's Declaration for the truth of the**

**matter asserted as this constitutes inadmissible hearsay and therefore, this fact is not**

**supported by admissible evidence. Fed. R. Civ. P. 56(c)(2). Furthermore, the information**

**contained therein dates from 1972-1989 and is irrelevant to Sgt. Culp's supervisory practices**

**in 1994. Finally, this alleged fact was not included by Plaintiffs in the original Pretrial Order**

**or the Supplement as required by the court, and therefore, should be disregarded.**

375. Culp told Hausback that he recognized "in case after case, detectives did not follow up on leads" and that "detectives had lied in their reports." (Pl. Ex. 86: Tim Hausback Aff. ¶ 30). When Culp would vet these reports, he would "discover that the detectives had not even spoken with the witnesses." (Pl. Ex. 86: Tim Hausback Aff. ¶ 30).

**Reply: PSOF ¶375 Objection to the use of Tim Hausback's Declaration for the truth of the**

**matter asserted as this constitutes inadmissible hearsay and therefore, this fact is not**

**supported by admissible evidence. Fed. R. Civ. P. 56(c)(2). Furthermore, the information**

**contained therein dates from 1972-1989 and is irrelevant to Sgt. Culp's supervisory practices**

**in 1994. Finally, this alleged fact was not included by Plaintiffs in the original Pretrial Order**

**or the Supplement as required by the court, and therefore, should be disregarded.**

376. Despite understanding that there were improperly conducted homicide investigations abound in the KCKPD Homicide Division, it appeared Culp took no action to remedy his detectives' deficiencies. (Pl. Ex. 86: Tim Hausback Aff. ¶ 31).

**Reply: Objection to the use of Tim Hausback's Declaration for the truth of the matter**

asserted as this constitutes inadmissible hearsay and therefore, this fact is not supported by admissible evidence. Fed. R. Civ. P. 56(c)(2). Furthermore, the information contained therein dates from 1972-1989 and is irrelevant to Sgt. Culp's supervisory practices in 1994. Finally, this alleged fact was not included by Plaintiffs in the original Pretrial Order or the Supplement as required by the court, and therefore, should be disregarded.

### A few years before Defendants wrongfully convicted Lamonte McIntyre, Golubski uses threats and coercion to solicit sexual favors from Rose McIntyre

377. In the late 1980s, Rose McIntyre was sitting in a car with her then-boyfriend, Greg Hill, when Golubski approached the car and ordered Rose McIntyre to get out of Hill's car and go to his unmarked patrol car. (Pl. Ex. 50: Rose McIntyre 2014 Aff. ¶¶ 45–50); (Pl. Ex. 83: Rose McIntyre Dep. 67:1–3, 68:4–18, 78:12–90:22); (Pl. Ex. 87: Gregory Hill Aff. ¶¶ 1–4); (Pl. Ex. 63: Roger Golubski Dep. 231:1–233:2).

Reply: PSOF ¶377 Objection, but immaterial. Plaintiffs support this fact almost entirely with the testimony of Rose McIntyre, either by affidavit or her incomplete deposition. Given that Rose McIntyre unilaterally terminated her deposition halfway through her deposition and it is unclear whether she will be able to testify at trial, her testimony, unless she completes her deposition prior to trial, should be inadmissible against Defendant Unified Government as it has been deprived of any opportunity to cross-examine Ms. McIntyre which potentially may have controverted the facts alleged. *Hardy v. Flood*, Case No. 17-cv-00677-CMA-NRN, 2019 WL 2076563 at *2 (D. Colo. May 10, 2019) (Excluding use of incomplete deposition at trial because defendant did not have a fair opportunity to cross-examine deponent with the benefit of evidence that should have been produced prior to the deposition). Further, as it relates to the Defendant Unified Government, this is immaterial.

378. Golubski then threatened to arrest Hill. Out of fear, Rose McIntyre complied and followed Golubski back to his unmarked patrol car. (Pl. Ex. 50: Rose McIntyre 2014 Aff. ¶ 49); (Pl. Ex. 83: Rose McIntyre Dep. 90:18–22, 92:18–19); (Pl. Ex. 63: Roger Golubski Dep. 233:3–12).

**Reply: PSOF ¶378 Objection, but immaterial. For the reasons set forth in reply to PSOF ¶ 377,** *supra***, the testimony of Rose McIntyre by affidavit or her incomplete deposition should is inadmissible to oppose defendant's motion for summary judgment.** *See Hardy v. Flood***,** *supra***. Further, as it relates to the Defendant Unified Government, this is immaterial.**

379. Alone in his car, Golubski threatened Rose McIntyre that he could arrest her and have her charged, and that if she "wanted to keep Greg from being arrested" that she had to come to the police station the next day. (Pl. Ex. 50: Rose McIntyre 2014 Aff. ¶¶ 50–53).

**Reply: PSOF ¶379 Objection, but immaterial. For the reasons set forth in reply to PSOF ¶ 377,** *supra***, the testimony of Rose McIntyre by affidavit or her incomplete deposition should is inadmissible to oppose defendant's motion for summary judgment.** *See Hardy v. Flood***,** *supra***. Further, as it relates to the Defendant Unified Government, this is immaterial.**

380. Golubski told Rose she was a "nice looking lady" and made it clear that Golubski expected to get sexual favors from Rose, saying he wanted to "eat" her "pussy" and telling Rose if she "went with him" he could "help" her. (Pl. Ex. 50: Rose McIntyre 2014 Aff. ¶¶ 50–53; (Pl. Ex. 83: Rose McIntyre Dep. 95:15–100:19); (Pl. Ex. 63: Roger Golubski Dep. 232:21–233:2, 233:21–234:3).

**Reply: PSOF ¶380 Objection, but immaterial. For the reasons set forth in reply to PSOF ¶ 377,** *supra***, the testimony of Rose McIntyre by affidavit or her incomplete deposition should is inadmissible to oppose defendant's motion for summary judgment.** *See Hardy v. Flood***,** *supra***. Further, as it relates to the Defendant Unified Government, this is immaterial.**

381. Terrified, and to protect herself and Greg from being arrested, Rose McIntyre "felt powerless to say no" to Golubski's demands. Complying with Golubski's threats, Rose did not tell Hill that Golubski asked her to come to the police station. (Pl. Ex. 50: Rose McIntyre 2014 Aff. ¶¶ 53-55).

**Reply: PSOF ¶381 Objection, but immaterial. For the reasons set forth in reply to PSOF ¶ 377,** *supra***, the testimony of Rose McIntyre by affidavit or her incomplete deposition should is inadmissible to oppose defendant's motion for summary judgment.** *See Hardy v. Flood***,** *supra***. Further, as it relates to the Defendant Unified Government, this is immaterial.**

382. Golubski told Rose to come to the station late the next day, so, she went between 9 and 10pm. (Pl. Ex. 50: Rose McIntyre 2014 Aff. ¶¶ 54–56); (Pl. Ex. 83: Rose McIntyre Dep. 101:24–102:9); (Pl. Ex. 63: Roger Golubski Dep. 235:6–19).

**Reply: PSOF ¶382 For the reasons set forth in reply to PSOF ¶ 377, *supra*, the testimony of Rose McIntyre by affidavit or her incomplete deposition should is inadmissible to oppose defendant's motion for summary judgment. *See Hardy v. Flood*, *supra*. Further, as it relates to the Defendant Unified Government, this is immaterial.**

383. When Rose McIntyre arrived, she parked in the police station's garage, and an officer minding the desk buzzed her into the station. (Pl. Ex. 50: Rose McIntyre 2014 Aff. ¶ 57); (Pl. Ex. 83: Rose McIntyre Dep. 122:16–123:17).

**Reply: PSOF ¶383 Objection, but immaterial. For the reasons set forth in reply to PSOF ¶ 377, *supra*, the testimony of Rose McIntyre by affidavit or her incomplete deposition should is inadmissible to oppose defendant's motion for summary judgment. *See Hardy v. Flood*, *supra*. Further, as it relates to the Defendant Unified Government, this is immaterial.**

384. Golubski's office was right by the door, and when Rose McIntyre went in, Golubski shut the door behind her and told her that he liked Black women, that things would go better for her if she complied with his demands, and that he could "make it hard" for her or "make it light" for her. (Pl. Ex. 50: Rose McIntyre 2014 Aff. ¶¶ 57–58); (Pl. Ex. 63: Roger Golubski Dep. 235:6–236:2).

**Reply: PSOF ¶384 Objection, but immaterial. For the reasons set forth in reply to PSOF ¶ 377, *supra*, the testimony of Rose McIntyre by affidavit or her incomplete deposition should is inadmissible to oppose defendant's motion for summary judgment. *See Hardy v. Flood*, *supra*. Further, as it relates to the Defendant Unified Government, this is immaterial.**

385. Golubski again threatened to arrest Hill if Rose did not comply, saying "I don't have to do anything else to Greg if you let me eat your pussy." (Pl. Ex. 50: Rose McIntyre 2014 Aff. ¶ 58); (Pl. Ex. 83: Rose McIntyre Dep. 111:6–19); (Pl. Ex. 63: Roger Golubski Dep. 236:3– 237:10).

**Reply: PSOF ¶385 Objection, but immaterial. For the reasons set forth in reply to PSOF ¶ 377, *supra*, the testimony of Rose McIntyre by affidavit or her incomplete deposition should**

is inadmissible to oppose defendant's motion for summary judgment. *See Hardy v. Flood*, *supra.* **Further, as it relates to the Defendant Unified Government, this is immaterial.**

> 386. During this encounter, Golubski told Rose McIntyre he wanted to date her, let her know that he knew she had kids, and tried to incentivize her by offering to help her with her children. (Pl. Ex. 83: Rose McIntyre Dep. 109:1–110:8); (Pl. Ex. 50: Rose McIntyre 2014 Aff. ¶ 58).

**Reply: PSOF ¶387 Objection, but immaterial. For the reasons set forth in reply to PSOF ¶ 377, *supra*, the testimony of Rose McIntyre by affidavit or her incomplete deposition should is inadmissible to oppose defendant's motion for summary judgment. *See Hardy v. Flood*, *supra.* Further, as it relates to the Defendant Unified Government, this is immaterial.**

> 387. Golubski then got up from behind the desk where he was sitting, turned off the lights, pulled down Rose McIntyre's clothes, and performed oral sex on her for about fifteen to twenty minutes, while to Rose McIntyre, "every moment was excruciating." (Pl. Ex. 50: Rose McIntyre 2014 Aff. ¶ 59); (Pl. Ex. 83: Rose McIntyre Dep. 109:14–110:25); (Pl. Ex. 63: Roger Golubski Dep. 237:11–16).

**Reply: PSOF ¶388 Uncontroverted but misleading and immaterial because Golubski exercised his Fifth Amendment rights as to all questions pertaining to the investigation and immaterial as to the Defendant Unified Government.**

> 388. When asked if he forced Rose McIntyre to receive oral sex from him, Golubski refused to answer and instead invoked his Fifth Amendment right to remain silent. (Pl. Ex. 63: Roger Golubski Dep. 237:17–23).

**Reply: PSOF ¶388 Uncontroverted but misleading because Golubski exercised his Fifth Amendment rights as to all questions pertaining to the investigation and immaterial as to the Defendant Unified Government.**

> 389. Rose submitted to this forced sexual assault only due to Golubski's direct and specific threat to arrest her or Hill if she did not comply. (Pl. Ex. 50: Rose McIntyre 2014 Aff. ¶ 59).

**Reply: PSOF ¶389 Objection, but immaterial. For the reasons set forth in reply to PSOF ¶ 377, *supra*, the testimony of Rose McIntyre by affidavit or her incomplete deposition should**

is inadmissible to oppose defendant's motion for summary judgment. *See Hardy v. Flood*, *supra.* Further, as it relates to the Defendant Unified Government, this is immaterial.

390. Golubski told Rose McIntyre not to tell anyone what transpired in his office. (Pl. Ex. 50: Rose McIntyre 2014 Aff. ¶ 61); (Pl. Ex. 63: Roger Golubski Dep. 240:13–20).

**Reply: PSOF ¶390 Objection, but immaterial. For the reasons set forth in reply to PSOF ¶ 377, *supra*, the testimony of Rose McIntyre by affidavit or her incomplete deposition should is inadmissible to oppose defendant's motion for summary judgment. *See Hardy v. Flood*, *supra.* Further, as it relates to the Defendant Unified Government, this is immaterial.**

### During Golubski's sexual assault of Rose McIntyre, another officer enters the office, but does not intervene

391. At one point, a white KCKPD officer in uniform opened the door to Golubski's office, turned on the light, stood in the doorway and saw Golubski sexually assault Rose McIntyre. (Pl. Ex. 50: Rose McIntyre 2014 Aff. ¶ 60); (Pl. Ex. 83: Rose McIntyre Dep. 110:23- 111:5); (Pl. Ex. 63: Roger Golubski Dep. 237:11–238:5).

**Reply: PSOF ¶391 Objection, but immaterial. For the reasons set forth in reply to PSOF ¶ 377, *supra*, the testimony of Rose McIntyre by affidavit or her incomplete deposition should is inadmissible to oppose defendant's motion for summary judgment. *See Hardy v. Flood*, *supra.* Further, as it relates to the Defendant Unified Government, this is immaterial.**

392. When the officer saw what Golubski was doing, he did not act surprised. (Pl. Ex. 50: Rose McIntyre 2014 Aff. ¶ 60).

**Reply: PSOF ¶392 Objection, but immaterial. For the reasons set forth in reply to PSOF ¶ 377, *supra*, the testimony of Rose McIntyre by affidavit or her incomplete deposition should is inadmissible to oppose defendant's motion for summary judgment. *See Hardy v. Flood*, *supra.* Further, as it relates to the Defendant Unified Government, this is immaterial.**

393. The officer then backed out of the doorway and left, turning off the light and shutting the door behind him, without making any effort to intervene. (Pl. Ex. 50: Rose McIntyre 2014 Aff. ¶ 60); (Pl. Ex. 83: Rose McIntyre Dep. 110:23–113:4).

**Reply: PSOF ¶393 Objection, but immaterial. Plaintiffs support this fact almost entirely with the testimony of Rose McIntyre, either by affidavit or her incomplete deposition. For the reasons set forth in reply to PSOF ¶ 377, *supra*, the testimony of Rose McIntyre by affidavit or her incomplete deposition should is inadmissible to oppose defendant's motion for summary judgment. *See Hardy v. Flood*, *supra*. Further, as it relates to the Defendant Unified Government, this is immaterial.**

> 394. Golubski was undeterred by the interruption by another officer and continued with the sexual assault. (Pl. Ex. 50: Rose McIntyre 2014 Aff. ¶ 60); (Pl. Ex. 83: Rose McIntyre Dep. 110:23–113:4).

**Reply: PSOF ¶394 Objection, but immaterial. Plaintiffs For the reasons set forth in reply to PSOF ¶ 377, *supra*, the testimony of Rose McIntyre by affidavit or her incomplete deposition should is inadmissible to oppose defendant's motion for summary judgment. *See Hardy v. Flood*, *supra*. Further, as it relates to the Defendant Unified Government, this is immaterial.**

> 395. Other officers were present in the station at the time, but no officer came to Rose McIntyre's assistance or helped her in any way. (Pl. Ex. 50: Rose McIntyre 2014 Aff. ¶ 60).

**Reply: PSOF ¶395 Objection, but immaterial. For the reasons set forth in reply to PSOF ¶ 377, *supra*, the testimony of Rose McIntyre by affidavit or her incomplete deposition should is inadmissible to oppose defendant's motion for summary judgment. *See Hardy v. Flood*, *supra*. Further, as it relates to the Defendant Unified Government, this is immaterial.**

> 396. No incident report, internal affairs complaint, or any other document referencing the sexual assault of Rose McIntyre by Golubski at the KCKPD police station was ever filed or submitted by a KCKPD officer or employee.

**Reply: PSOF ¶396 Uncontroverted that Rose McIntyre never made any complaint or submitted a report to the KCKPD.**

> 397. When asked whether this was the first—or last—time another KCKPD officer walked in on him while he was engaged in a sexual act in his office, Golubski refused to answer and instead invoked his Fifth Amendment right to remain silent.

(Pl. Ex. 63: Roger Golubski Dep. 237:17–240:12); see also (Pl. Ex. 86: Tim Hausback Aff. ¶ 25).

**Reply: PSOF ¶397 Uncontroverted but misleading because Golubski exercised his Fifth Amendment rights as to all questions pertaining to the investigation and immaterial as to the Defendant Unified Government. Objection to the use of Tim Hausback's declaration for the truth of the matter asserted as this constitutes inadmissible hearsay and therefore, this fact is not supported by admissible evidence. Fed. R. Civ. P. 56(c)(2). Finally, this alleged fact was not included by Plaintiffs in the original Pretrial Order or the Supplement as required by the court, and therefore, should be disregarded.**

> **Seeking to avoid further sexual assault by Golubski, Rose McIntyre attempts to report him to the KCKPD Internal Affairs Department and ultimately changes her address and telephone number**

398. Golubski told Rose McIntyre that he wanted an ongoing sexual relationship with her. (Pl. Ex. 50: Rose McIntyre 2014 Aff. ¶ 61); (Pl. Ex. 83: Rose McIntyre Dep. 113:5–10).

**Reply: PSOF ¶398 Objection, but immaterial. For the reasons set forth in reply to PSOF ¶ 377, *supra*, the testimony of Rose McIntyre by affidavit or her incomplete deposition should is inadmissible to oppose defendant's motion for summary judgment. *See Hardy v. Flood*, *supra*. Further, as it relates to the Defendant Unified Government, this is immaterial.**

399. Upon leaving the station, Rose McIntyre felt "sick to [her] stomach" and "dirty and totally humiliated" after Golubski "had treated [her] like a whore and forced [her] to submit to his sexual desires." (Pl. Ex. 50: Rose McIntyre 2014 Aff. ¶ 62).

**Reply: PSOF ¶399 Objection, but immaterial. For the reasons set forth in reply to PSOF ¶ 377, *supra*, the testimony of Rose McIntyre by affidavit or her incomplete deposition should is inadmissible to oppose defendant's motion for summary judgment. *See Hardy v. Flood*, *supra*. Further, as it relates to the Defendant Unified Government, this is immaterial.**

400. Following the assault, Golubski harassed Rose McIntyre for weeks, calling her two or three times a day and telling her he wanted her to come back to his office

to "do it again" with her and wanted her to be his "woman." (Pl. Ex. 50: Rose McIntyre 2014 Aff. ¶ 63); (Pl. Ex. 83: Rose McIntyre Dep. 113:5–117:8); (Pl. Ex. 63: Roger Golubski Dep. 240:21–241:2).

**Reply: PSOF ¶400 Objection, but immaterial. For the reasons set forth in reply to PSOF ¶ 377, *supra*, the testimony of Rose McIntyre by affidavit or her incomplete deposition should is inadmissible to oppose defendant's motion for summary judgment. *See Hardy v. Flood*, *supra*. Further, as it relates to the Defendant Unified Government, this is immaterial.**

401. Golubski then offered Rose McIntyre money in return for sexual favors, promising Rose McIntyre that he could do "a lot" for her and help her with her five children. (Pl. Ex. 50: Rose McIntyre 2014 Aff. ¶ 63); (Pl. Ex. 83: Rose McIntyre Dep. 113:5–117:8); (Pl. Ex. 63: Roger Golubski Dep. 240:21–241:15).

**Reply: PSOF ¶401 Objection, but immaterial. For the reasons set forth in reply to PSOF ¶ 377, *supra*, the testimony of Rose McIntyre by affidavit or her incomplete deposition should is inadmissible to oppose defendant's motion for summary judgment. *See Hardy v. Flood*, *supra*. Further, as it relates to the Defendant Unified Government, this is immaterial.**

402. Rose McIntyre "dreaded" Golubski's persistent calls and "continued to fear him," but sometimes she would speak with him on the phone "to placate him" in the hopes he would not force her to again provide sexual favors. (Pl. Ex. 50: Rose McIntyre 2014 Aff. ¶ 64); (Pl. Ex. 83: Rose McIntyre Dep. 113:5–117:8).

**Reply: PSOF ¶402 Objection, but immaterial. For the reasons set forth in reply to PSOF ¶ 377, *supra*, the testimony of Rose McIntyre by affidavit or her incomplete deposition should is inadmissible to oppose defendant's motion for summary judgment. *See Hardy v. Flood*, *supra*. Further, as it relates to the Defendant Unified Government, this is immaterial.**

403. Rose McIntyre reported Golubski's misconduct to the KCKPD Internal Affairs Department soon after the sexual assault occurred in his office. (Pl. Ex. 83: Rose McIntyre Dep. 105:1–22, 106:18–25, 127:6–131:6, 140:2–17).

**Reply: PSOF ¶403 Objection, but immaterial. For the reasons set forth in reply to PSOF ¶ 377, *supra*, the testimony of Rose McIntyre by affidavit or her incomplete deposition should is inadmissible to oppose defendant's motion for summary judgment. *See Hardy v. Flood*,**

*supra.* **Further, as it relates to the Defendant Unified Government, this is immaterial.**

404. The officers Rose McIntyre encountered at KCKPD Internal Affairs refused to take or file her complaint against Golubski, stating that "they don't believe that their officers act like that." (Pl. Ex. 83: Rose McIntyre Dep. 105:1–22, 106:18–25, 127:6–131:6, 140:2–17).

**Reply: PSOF ¶404 Objection, but immaterial. For the reasons set forth in reply to PSOF ¶ 377,** *supra***, the testimony of Rose McIntyre by affidavit or her incomplete deposition should is inadmissible to oppose defendant's motion for summary judgment.** *See Hardy v. Flood***,** *supra.* **Further, as it relates to the Defendant Unified Government, this is immaterial.**

405. If, in 1988 or 1989, a woman came to Internal Affairs to file a complaint about being sexually assaulted by a detective, Internal Affairs personnel should have documented that complaint. (Ex. 21: Ricky Armstrong Dep. 127:22–128:20).

**Reply: Uncontroverted.**

406. If a woman came to Internal Affairs and attempted to report an officer for pulling her over and attempting to extort sex from her by threatening to arrest her sons if she did not submit, Internal Affairs personnel should have documented that complaint. (Ex. 21: Ricky Armstrong Dep. 128:21–129:9).

**Reply: Uncontroverted.**

407. Rose McIntyre knew there was no one else in the department she could complain to because "Golubski was known to be very powerful in the community and in the police department." (Pl. Ex. 50: Rose McIntyre 2014 Aff. ¶ 64).

**Reply: Uncontroverted.**

408. To avoid Golubski's unwanted advances, Rose McIntyre moved homes and changed her telephone number. (Pl. Ex. 50: Rose McIntyre 2014 Aff. ¶ 65); (Pl. Ex. 83: Rose McIntyre Dep. 114:21–115:2, 117:24–118:1); (Pl. Ex. 63: Roger Golubski Dep. 241:16–242:2).

**Reply: PSOF ¶408 Objection, but immaterial. For the reasons set forth in reply to PSOF ¶ 377,** *supra***, the testimony of Rose McIntyre by affidavit or her incomplete deposition should is inadmissible to oppose defendant's motion for summary judgment.** *See Hardy v. Flood***,** *supra.* **Further controverted in that Lamonte McIntyre testified he never lived in one place**

**more than a year, calling into question the reason Ms. McIntyre moved. (Golubski's Ex. 29:**

**Lamonte McIntyre Dep. 10:12-11:7; 17:23- 19:20) Moreover, Rose McIntyre testified that to**

**avoid Detective Golubski—a detective she asserts was all-powerful—she moved a block.**

**(Golubski's Exhibit 73, tr. 118:2–16). Further, as it relates to the Defendant Unified**

**Government, this is immaterial.**

> 409. After Rose McIntyre moved and changed her phone number, she did not hear
> from Golubski. (Pl. Ex. 50: Rose McIntyre 2014 Aff. ¶ 65); (Pl. Ex. 83: Rose
> McIntyre Dep. 125:5–18).

**Reply: PSOF ¶409 Objection, but immaterial. For the reasons set forth in reply to PSOF ¶**

**377,** *supra***, the testimony of Rose McIntyre by affidavit or her incomplete deposition should**

**is inadmissible to oppose defendant's motion for summary judgment.** *See Hardy v. Flood***,**

*supra***. Further, as it relates to the Defendant Unified Government, this is immaterial.**

> 410. When asked whether Rose had made it clear to Golubski that she would not
> be having sexual relations with him again, Golubski refused to answer and instead
> invoked his Fifth Amendment right to remain silent. (Pl. Ex. 63: Roger Golubski
> Dep. 242:3–243:16).

**Reply: PSOF ¶410 Uncontroverted but misleading because Golubski exercised his Fifth**

**Amendment rights as to all questions pertaining to the investigation and immaterial as to**

**Defendant Unified Government.**

> 411. When asked whether Rose's rejection of Golubski's sexual advances angered
> Golubski, as he was not used to women turning him down, Golubski refused to
> answer and instead invoked his Fifth Amendment right to remain silent. (Pl. Ex.
> 63: Roger Golubski Dep. 243:17–246:25).

**Reply: PSOF ¶411 Uncontroverted but misleading because Golubski exercised his Fifth**

**Amendment rights as to all questions pertaining to the investigation and immaterial as to**

**Defendant Unified Government.**

> 412. When asked whether Golubski was used to coercing women to have sex with
> him as he wanted, often through threats, violence, and rape, Golubski refused to
> answer and instead invoked his Fifth Amendment right to remain silent. (Pl. Ex.

63: Roger Golubski Dep. 243:17–246:25).

**Reply: PSOF ¶412 Uncontroverted but misleading because Golubski exercised his Fifth Amendment rights as to all questions pertaining to the investigation and immaterial as to Defendant Unified Government.**

> ### KCKPD and other law-enforcement officers know that Golubski commits sexual and investigative misconduct prior to 1994, but when reported to the KCKPD, no action was taken
>
> 413. In the mid to late 1970s, Hausback personally "saw Golubski sitting in his patrol car in the 'Bottoms,' an industrial area next to the river at Third and James Street, which was well known as an area where prostitutes were available." (Pl. Ex. 86: Tim Hausback Dec. ¶ 9). As an officer assigned to the area, Hausback knew that "Golubski had no reason to be in the Bottoms at those times. In fact, he was violating KCKPD orders by being 'out of district' when he should have been patrolling his assigned area." Hausback observed that Golubski "made no effort to disguise that he was looking for prostitutes." (Pl. Ex. 86: Tim Hausback Dec. ¶ 10). Golubski "was very well known among the prostitutes there" and had a "reputation for seeking 'blow jobs.'" (Pl. Ex. 86: Tim Hausback Dec. ¶ 11). Golubski's pursuit and exploitation of prostitutes was widely known and accepted in the KCKPD, so much so that his "familiarity with prostitutes would sometimes come up during the daily roll call." (Pl. Ex. 86: Tim Hausback Dec. ¶¶ 12–15).

**Reply: PSOF ¶413 Objection to the use of Hausback's Declaration for the truth of the matter asserted as this constitutes inadmissible hearsay and speculation and therefore, this fact is not supported by admissible evidence. Fed. R. Civ. P. 56(c)(2). The declaration does not provide any basis for personal knowledge of any conduct by Golubski other than being out of his assigned area while on duty. Finally, this alleged fact was not included by Plaintiffs in the original Pretrial Order or the Supplement as required by the court, and therefore, should be disregarded. Uncontroverted and immaterial given that Mr. Hausback was neither employed nor has any foundation to testify as to occurrences during the time period in which Lamonte McIntyre was investigated, charged, and convicted of two counts of murder. Thus, any information he may have is entirely irrelevant and overly prejudicial. Further this is immaterial to the Defendant Unified Government's motion.**

414. Former officer Michael Kobe, employed by KCKPD from 1985–2010, testified at his deposition that Golubski "had cultivated a large network of informants who were responsible for providing…important information to be used in criminal investigations and that Detective Golubski had acquired a great deal of prestige and esteem because of this." (Pl. Ex. 88: Michael Kobe Dep. 13:1–17, 35:2–36:18). Kobe was uncomfortable with how Golubski might have cultivated those informants, since even Black officers who grew up in the area where Golubski's informants were located did not have the same network of informants that Golubski did. (Pl. Ex. 88: Michael Kobe Dep. 35:2–39:6).

**Reply: PSOF ¶414 Uncontroverted that Mr. Kobe so testified. However, his testimony is speculative and inadmissible at trial so does not support a material fact. Fed. R. Civ. P. 56(c)(2). Further, it is immaterial to the claims against the Defendant Unified Government.**

415. Kobe further testified that Golubski had "dates" with African-American informants, where "dates" was a euphemism for "sexual encounters." (Pl. Ex. 88: Michael Kobe Dep. 40:7–42:13, 45:14–46:3, 47:1–5). Kobe heard that Golubski was dating Black, female informants from multiple people within the KCKPD, and outside the KCKPD as well. (Pl. Ex. 88: Michael Kobe Dep. 42:14–43:1, 82:14–18, 84:2–85:9).

**Reply: PSOF ¶415 is objected to because the statement is not supported by the cited record. The statement is, however, immaterial to Defendant Unified Government's motion. Mr. Kobe testified to Golubski's "alleged" relationships because "I don't know. I would hear that he was going on a date with a black female". (Ex. H, Kobe Dep. 40:8-14). Objection as also includes inadmissible speculation and hearsay that is not admissible at trial. Fed. R. Civ. P. 56(c)(2).**

416. Further, Kobe testified that "there was good reason to believe that Detective Golubski was having sexual relations with African-American females and that probably some of those females were informants." (Pl. Ex. 88: Michael Kobe Dep. 80:19–82:18).

**Reply: PSOF ¶416 is objected to because the statement is not supported by the cited record. The statement is, however, immaterial to Defendant Unified Government's motion. Mr. Kobe testified "My suspicion was that Detective Golubski – that there was good reason to believe" that Detective Golubski was having the described sexual relations. (Pl. Ex. 72:**

**Michael Kobe Dep.80:19–82:18). Objection as also includes inadmissible speculation and hearsay that is not admissible at trial. Fed. R. Civ. P. 56(c)(2).**

> 417. Former KCKPD homicide detective Timothy Maskil attested that "[t]hroughout the police department, Golubski was known for having sex with black, drug-addicted prostitutes" whom he used as informants. (Pl. Ex. 62: Timothy Maskil 2015 Aff. ¶¶ 1–2, 13).

**Reply: PSOF ¶417 Objection. The cited record supporting this fact is inadmissible. Fed. R. Civ. P. 56(c)(2). Mr. Maskil is deceased and, as a result, cannot testify at trial, making the contents of his affidavit not admissible at trial. Further, the statement is speculative, vague, and lacks foundation.**

> 418. Former KCKPD officer Ruby Ellington, who had been employed with the KCKPD for twenty-five years, attested that she had "learned early on that [Golubski] had left his wife and begin pursuing prostitutes." (Pl. Ex. 89: Ruby Ellington 2015 Aff. ¶¶ 2, 5). Like Maskil, she stated that "Golubski developed a reputation for being obsessed with prostitutes, specifically black female prostitutes who were typically drug-addicted as well as poor and powerless." (Pl. Ex. 89: Ruby Ellington 2015 Aff. ¶ 6).

**Reply: PSOF ¶418 Objection. The cited record supporting this fact is inadmissible. Fed. R. Civ. P. 56(c)(2). Ms. Ellington is deceased and, as a result, cannot testify at trial, making the contents of her affidavit not admissible at trial. Further, the statement is speculative, vague, and lacks foundation.**

> 419. Brown worked with Ruby Ellington at the KCKPD, and believed her to be a truthful officer with whom he had positive experiences. (Pl. Ex. 58: James Brown Dep. 107:18–108:10).

**Reply: PSOF ¶419 Objection. The statement is contrary to the cited record and, further is immaterial. Brown actually testified that he never believed Ms. Ellington to be untruthful to him in the conversations he personally had with her. (Pl. Ex. 102: James Brown Dep. 108:5–10). Objection to the use of this testimony because it is improper character evidence of a deceased officer whose affidavit constitutes inadmissible hearsay, so it is immaterial to the**

**issues in the Defendant Unified Government's Motion.**

420. Golubski "used his color of authority over these prostitutes/informants to obtain sexual relations." (Pl. Ex. 62: Timothy Maskil 2015 Aff. ¶ 14); (Pl. Ex. 89: Ruby Ellington 2015 Aff. ¶ 6).

**Reply: PSOF ¶420 Objection. The "evidence" supporting this fact is inadmissible. Fed. R. Civ. P. 56(c)(2). Mr. Maskil and Ms. Ellington are deceased and, as a result, cannot testify at trial, making the contents of their affidavits not admissible at trial. Further, the statement is speculative, vague, and lacks foundation. Further, this is immaterial to the issues in the Defendant Unified Government's Motion.**

421. "Everyone in the Department would see ... Golubski in the company of prostitutes" and "knew that when [Golubski] would go out on calls, that any black female involved would likely end up in his police car with him." (Pl. Ex. 89: Ruby Ellington 2015 Aff. ¶ 7). In exchange for picking up prostitutes and receiving sexual favors from them, Golubski would take care of their warrants and tickets, or help them solve other legal troubles. Golubski made no secret of these activities. (Pl. Ex. 89: Ruby Ellington 2015 Aff. ¶ 8–14).

**Reply: PSOF ¶421 Objection. The "evidence" supporting this fact is inadmissible. Fed. R. Civ. P. 56(c)(2). Ms. Ellington is deceased and, as a result, cannot testify at trial, making the contents of her affidavit not admissible at trial. Further, the statement is speculative, vague, and lacks foundation.**

422. According to former KCKPD Chief, Ron Miller, if Golubski had a network almost entirely composed of African American females that would "raise a question in my mind." (Pl. Ex. 69: Ronald Miller Dep. 104:18–105:5). Miller also testified that "[e]veryone knows that Golubski has an affinity for black females," particularly young women. (Pl. Ex. 69: Ronald Miller Dep. 55:10–25, 63:12–64:10, 243:13–244:9); (Ex. 21: Ricky Armstrong Dep. 53:10–54:24); (Pl. Ex. 88: Michael Kobe Dep. 28:2–29:1).

**Reply: PSOF ¶422 Objection. Uncontroverted that Ron Miller so testified. However, this information is immaterial to the issues in Defendant Unified Government's Motion. Further, the statement that "everyone knows" is speculative and inadmissible so cannot be considered for summary judgment. Fed. R. Civ. P. 56(c)(2).**

423. It was prohibited for an officer to have sexual contact with informants. (Pl. Ex. 78: Terry Zeigler Dep. 88:9–23); (Ex. 21: Ricky Armstrong Dep. 60:23–63:7) (stating having sex with an informant would violate the KCKPD policy against gross immorality). In fact, the KCKPD had strict rules on working with informants. (Ex. 21: Ricky Armstrong Dep. 40:10– 41:24). Even a monetary exchange with an informant had to be signed off by a supervisor. (Ex. 21: Ricky Armstrong Dep. 40:10–41:21).

**Reply: Controverted in Part. Mr. Armstrong testified to strict rules governing narcotics informants. Further, the line of questions was objected to as outside the scope of the 30(b)(6) notice and counsel asked about his personal experience. (Ex. 21: Ricky Armstrong Dep. 39:5–40:23).**

424. It was also widely known within the Department that Golubski fathered children with several black prostitutes in Kansas City, Kansas. (Pl. Ex. 89: Ruby Ellington 2015 Aff. ¶ 15–17); (Pl. Ex. 88: Michael Kobe Dep. 103:3–13); (Pl. Ex. 78: Terry Zeigler Dep. 26:9–27:5).

**Reply: PSOF ¶424 Objection and controverted. The "evidence" supporting this fact is inadmissible. Fed. R. Civ. P. 56(c)(2). Ms. Ellington is deceased and, as a result, cannot testify at trial, making the contents of her affidavit not admissible at trial. Further, the statement is speculative, vague, and lacks foundation. Further, it is controverted in that Mr. Kobe testified:**



```
3        Q. (BY MR. ABRAMS)  Okay.  You also heard that —
4     or there were rumors about Golubski having children,
5     fathering children among — among members of — among
6     informants in Kansas City, Kansas?
7            MR. ROACH:  Object to form.
8        A.  I believe I heard something to that effect.
9     Your Detective Bussell asked me if I had heard the term
10    "Golubski babies" and I had not.  But there was — I —
11    I seem to recall where it was speculated that he may
12    have impregnated some African — African-American
13    females, but I don't have a really clear memory of that.
```

**(Pl. Ex. 72: Michael Kobe Dep. 103:3–13).**

**Further, the cited portion of Mr. Zeigler's testimony does not support Golubski had a child with a black prostitute. Mr. Zeigler testified:**

> Q. Did you ever meet any children that he fathered with any woman in the community?
> A. No.
> Q. Did you ever meet a young woman named Neosha Collier?
> A. Never met her. I heard the name.
> Q. What did you hear about that name?
> A. Is it Neosha?
> Q. Neosha, N-e-o-s-h-a, Collier.
> A. It was Neosha is the way it was presented to me. We were at a house on Tennyson, went into the house, working an investigation, and a young lady said have you seen Roger's grandbaby? And I said no, didn't know Roger had any grandbabies. And she pulled a picture off the mantle and she said this is Roger's grandbaby. And I said oh, it is a cute baby.

**Terry Zeigler Depo. 26: 9-25.**

> 425. Yet, "the Administration of the [KCKPD] turned a blind eye to Golubski's activities because the information that Golubski appeared to be obtaining from these black prostitutes/informants seemed to get results, in terms of getting cases 'cleared.'" (Pl. Ex. 62: Timothy Maskil 2015 Aff. ¶ 14). Indeed, Golubski's misconduct and his exploitation of black women was well known throughout the Department" but he "was never punished," instead "he rose steadily through the ranks and became a powerful detective." (Pl. Ex. 89: Ruby Ellington 2015 Aff. ¶¶ 6, 18); (Pre-Trial Order, Stipulation ¶ 3).

**Reply: PSOF ¶425 Objection. The "evidence" supporting this fact is inadmissible. Fed. R. Civ. P. 56(c)(2). Mr. Maskil and Ms. Ellington are deceased and, as a result, cannot testify at trial, making the contents of their affidavits not admissible at trial. Further, the statement is speculative, vague, and lacks foundation. Further, this is immaterial to the issues in the Defendant Unified Government's Motion.**

> 426. Kobe testified that it would not "have been possible for Detective Golubski to…have operated as he did without the knowledge of commanders knowing what he was doing and how he was operating….He may have gotten it done once or twice, but the pattern [of using informants and not providing their name and the allegations of Golubski's sexual relations with informants] was over a lengthy period of time and I don't think that that pattern could have … reasonably escaped the notice of a commander." (Pl. Ex. 88: Michael Kobe Dep. 98:3–99:20).

**Reply: PSOF ¶426 Objection. Uncontroverted that Michael Kobe so testified. However, this information is immaterial to the issues in Defendant Unified Government's Motion. Further, the statement is speculative, vague, lacks foundation, and inadmissible so cannot be considered for summary judgment. Fed. R. Civ. P. 56(c)(2).**

> 427. Kobe never heard anyone at the KCKPD suggest that they should investigate Golubski's use of informants or his sexual relationship with informants. (Pl. Ex. 88: Michael Kobe Dep. 85:21–86:4). Kobe testified that one day he heard officers talking about how a detective walked into Golubski's office and observed him receiving oral sex. Kobe reported what he had heard to Major Wohlforth, who did not respond. (Pl. Ex. 88: Michael Kobe Dep. 24:17– 26:15). No one from KCKPD subsequently asked questions of Kobe regarding what he reported. (Pl. Ex. 88: Michael Kobe Dep. 47:21–48:1).

**Reply: PSOF ¶427 Objection. Uncontroverted that Michael Kobe so testified. However, this information is immaterial to the issues in Defendant Unified Government's Motion. Further, the statement is speculative, vague, lacks foundation, and inadmissible so cannot be considered for summary judgment. Fed. R. Civ. P. 56(c)(2).**

> 428. When Kobe reported what he heard about Golubski's sexual relations in his office to Major Wohlforth, "[b]ased on previous situations [he] didn't have high hopes [Wohlforth] would pursue it. That is as gingerly as [Kobe] could present it." (Pl. Ex. 88: Michael Kobe Dep. 32:20–33:3). In the past when Kobe had flagged dangerous behavior of fellow officers for his supervisors in the past, who failed to make any inquiries into or take any action regarding the officer misconduct Kobe reported. (Pl. Ex. 88: Michael Kobe Dep. 48:2–64:9, 67:5–11).

**Reply: PSOF ¶428 Objection. Uncontroverted that Michael Kobe so testified. However, this information is immaterial to the issues in Defendant Unified Government's Motion. Further, the statement is speculative, vague, lacks foundation, and inadmissible so cannot be considered for summary judgment. Fed. R. Civ. P. 56(c)(2).**

> 429. Every report of officer misconduct that Kobe made up the chain of command was met with silence or repudiation of Kobe for making the report. (Pl. Ex. 88: Michael Kobe Dep. 109:24–111:13).

**Reply: PSOF ¶429 Objection. Uncontroverted that Michael Kobe so testified. However, this**

information is immaterial to the issues in Defendant Unified Government's Motion. Further, the statement is speculative, vague, lacks foundation, and inadmissible so cannot be considered for summary judgment. Fed. R. Civ. P. 56(c)(2).

430. KCKPD superiors did not welcome reports or complaints about fellow officers. (Pl. Ex. 88: Michael Kobe Dep. 111:14–113:7).

**Reply: PSOF ¶430 Objection. Uncontroverted that Michael Kobe so testified. However, this information is immaterial to the issues in Defendant Unified Government's Motion. Further, the statement is speculative, vague, lacks foundation, and inadmissible so cannot be considered for summary judgment. Fed. R. Civ. P. 56(c)(2).**

431. Former KCKPD Chief, Ricky Armstrong, testified that there was no indication that the KCKPD has ever, or is currently, investigating Golubski. (Ex. 21: Ricky Armstrong Dep. 9:7–10, 76:6–13).

**Reply: PSOF ¶431 Objection. Armstrong was asked if he had "seen or heard of anything that indicates to you that the Kansas City, Kansas Police Departments is now or has ever investigated the allegations against Roger Golibski? (Ex. 21: Ricky Armstrong Dep. 9:7–10, 76:6–13). Further, the line of questions was objected to as outside the scope of the 30(b)(6) notice.**

432. When asked whether he was "aware of any of these so-called rumors with respect to Roger Golubski?" at his deposition, former KCKPD Chief Miller responded, "You hear rumors every day. So the question would be, are they consistent, are you hearing the same rumor over and over again, have you heard the same rumor from different people." (Pl. Ex. 69: Ronald Miller Dep. 66:10–25).

**Reply: PAOF ¶432 Controverted and misleading. Miller spoke testified about rumors in general and then answered: "And the reality is, I don't have any hard facts that indicate Roger Golubski ever did anything wrong." (Pl. Ex. 69: Ronald Miller Dep. 66:23–25).**

433. In the 1970s or 1980s, Hausback also observed a KCKPD member getting oral sex from a woman in a KCKPD office with the door open. While he could not see the officer's face, his body resembled Golubski's. Hausback had issued a traffic ticket to the woman a little while earlier. His supervisor, Sergeant Gray called him

into his office and demanded that Hausback rescind the ticket, while nodding in the direction of the office where the woman performed oral sex on Golubski. (Pl. Ex. 86: Tim Hausback Dec. ¶¶ 24–25).

**Reply: PSOF ¶375 Objection to the use of Tim Hausback's Declaration for the truth of the matter asserted as this constitutes inadmissible hearsay and therefore, this fact is not supported by admissible evidence. Fed. R. Civ. P. 56(c)(2). Hausback engages in inadmissible speculation. Finally, this alleged fact was not included by Plaintiffs in the original Pretrial Order or the Supplement as required by the court, and therefore, should be disregarded.**

434. In 2006, former KCKPD Chief Terry Zeigler heard a "rumor" that another officer, James Bauer walked in on Golubski having oral sex in his office. Though Zeigler worked in Internal Affairs at that time, he did not investigate, though he admitted that, if it were true, it would be important to follow up on. (Pl. Ex. 78: Terry Zeigler Dep. 67:25–75:5).

**Reply: PSOF ¶434 Objection. What Mr. Zeigler may have heard is inadmissible hearsay and therefore, this fact is not supported by admissible evidence. Fed. R. Civ. P. 56(c)(2).**

435. It was prohibited for an officer or employee to use a KCKPD office to have sex. (Pl. Ex. 78: Terry Zeigler Dep. 244:25–245:5).

**Reply: Uncontroverted.**

436. Brown testified at his deposition, "I am not aware of anybody monitoring Roger Golu[b]ski." (Pl. Ex. 58: James Brown Dep. 111:20–24).

**Reply: Uncontroverted.**

437. At no point in time did anyone from the KCKPD ask Defendant Blood any questions about Golubski. (Pl. Ex. 54: Clyde Blood Dep. 58:4–8).

**Reply: Uncontroverted.**

438. During Jennerich's investigations of KCKPD officer misconduct, he "repeatedly heard about…Golubski," who "used the authority of his position to extort sexual favors from black females." (Pl. Ex. 90: Al Jennerich Aff. ¶¶ 6–8).

**Reply: Objection PSOF ¶438 is not supported by evidence that would be admissible at trial. The cited portion of the affidavit lack foundation, fail to demonstrate personal knowledge of**

the facts stated, are based on hearsay, and are inadmissible speculation.

439. These "powerless" women, many of whom worked as prostitutes and were addicted to drugs, "complied with [Golubski's] demands because they knew they would be arrested if they say no." Jennerich also learned that these "women knew that unless they provided what Golubski wanted…he could arrest them and have them held in the jail." (Pl. Ex. 90: Al Jennerich Aff. ¶¶ 6–9).

**Reply: Objection PSOF ¶439 is not supported by evidence that would be admissible at trial.**

**The cited portion of the affidavit lack foundation, fail to demonstrate personal knowledge of**

**the facts stated, are based on hearsay, and are inadmissible speculation.**

440. These women told Jennerich that Golubski would take them across state lines to a motel in Riverside, Missouri, where he would compel them "to engage in sexual acts for [his] benefit." (Pl. Ex. 90: Al Jennerich Aff. ¶ 9).

**Reply: Objection PSOF ¶440 is not supported by evidence that would be admissible at trial.**

**The cited portion of the affidavit lack foundation, fail to demonstrate personal knowledge of**

**the facts stated, are based on hearsay, and are inadmissible speculation.**

441. These women "did not feel free to complain to anyone because they did not know who to complain to and they felt the police department would always protect Golubski." (Pl. Ex. 90: Al Jennerich Aff. ¶ 9).

**Reply: Objection PSOF ¶441 is not supported by evidence that would be admissible at trial.**

**The cited portion of the affidavit lack foundation, fail to demonstrate personal knowledge of**

**the facts stated, are based on hearsay, and are inadmissible speculation.**

### KCK Community members know that Golubski commits sexual and investigative misconduct

442. Community members had the same perceptions of Golubski as did these law-enforcement officers: that Golubski "was known as a corrupt officer who had sex with prostitutes," and other vulnerable young, Black women, including those addicted to drugs. (Pl. Ex. 27: Shonda Nichols Aff. ¶ 28); (Pl. Ex. 96: N.H. 2015 Aff. ¶ 8); (Pl. Ex. 34: N.F. Aff. ¶ 8); (Pl. Ex. 75: D.L. 2014 Aff. ¶¶ 7, 9–10, 12–13); (Pl. Ex. 91: E.A. Aff. ¶ 21); (Pl. Ex. 93: Tonette Anderson Aff. ¶ 7); Criminal defense attorneys in the area also understood that this was Golubski's reputation. (Pl. Ex. 45: Michael Redmon Aff. ¶ 9).

**Reply: Objection PSOF ¶442 is not supported by evidence that would be admissible at trial.**

**The cited portion of the affidavits lack foundation, fail to demonstrate personal knowledge**

**of the facts stated, are based on hearsay, and are inadmissible speculation. PSOF ¶ 442 is not**

**supported by the reference to Pl. Ex. 96: N.H. 2015 Aff.**

443. Golubski especially liked young women, "very young, sometimes," and would pay them for sex, including a twelve-year-old and sixteen-year-old, one of whom was Siobaughn Nichols' cousin. (Pl. Ex. 29: Siobaughn Nichols Aff. ¶ 6); (Exhibit 74: S.K. Dep.).

**Reply: Objection PSOF ¶443 is not supported by evidence that would be admissible at trial.**

**The cited portion of the affidavit lack foundation, fail to demonstrate personal knowledge of**

**the facts stated, are based on hearsay, and are inadmissible speculation.**

444. After they married, Golubski told his ex-wife, E.A., that he was attracted to Black women "[b]ecause they're uneducated." (Pl. Ex. 91: E.A Aff. ¶ 10).

**Reply: Objection. PSOF ¶ 444 is immaterial to Defendant Unified Government's motion.**

445. Everyone who KCK community member, Siobaughn Nichols, knew was aware of Golubski's reputation and would openly talk about it. (Pl. Ex. 29: Siobaughn Nichols Aff. ¶ 5).

**Reply: Objection PSOF ¶445 is not supported by evidence that would be admissible at trial.**

**The cited portion of the affidavit lack foundation, fail to demonstrate personal knowledge of**

**the facts stated, are based on hearsay, and are inadmissible speculation.**

446. "Everyone knew" that "Golubski was simply part of the criminal community where drugs and sex were sold." (Pl. Ex. 29: Siobaughn Nichols Aff. ¶ 30).

**Reply: Objection PSOF ¶446 is not supported by evidence that would be admissible at trial.**

**The cited portion of the affidavit lack foundation, fail to demonstrate personal knowledge of**

**the facts stated, are based on hearsay, and are inadmissible speculation.**

447. "People seemed to believe that Detective Golubski ran Wyandotte County because he could seemingly get away with anything." (Pl. Ex. 29: Siobaughn Nichols Aff. ¶ 2).

**Reply: Objection PSOF ¶448 is not supported by evidence that would be admissible at trial.**

**The cited portion of the affidavit lack foundation, fail to demonstrate personal knowledge of the facts stated, are based on hearsay, and are inadmissible speculation.**

448. Golubski "used the power of his badge to manipulate people and to get them to do what he wanted. Often what he wanted was sex, and he used his position to get it." (Pl. Ex. 29: Siobaughn Nichols Aff. ¶ 4).

**Reply: Objection PSOF ¶448 is not supported by evidence that would be admissible at trial.**

**The cited portion of the affidavit lack foundation, fail to demonstrate personal knowledge of the facts stated, are based on hearsay, and are inadmissible speculation.**

449. Long-time KCK resident, Shonda Nichols., saw Golubski with prostitutes and recalled that they would often get in Golubski's car. (Pl. Ex. 27: Shonda Nichols Aff. ¶ 30).

**Reply: Objection PSOF ¶449 is not supported by evidence that would be admissible at trial.**

**The cited portion of the affidavit lack foundation, fail to demonstrate personal knowledge of the facts stated, are based on hearsay, and are inadmissible speculation.**

450. When Golubski came around, the women working as prostitutes knew they "had a choice of providing sexual services or getting arrested." (Pl. Ex. 75: D.L. 2014 Aff. ¶ 7).

**Reply: Objection PSOF ¶450 is not supported by evidence that would be admissible at trial.**

**The cited portion of the affidavit lack foundation, fail to demonstrate personal knowledge of the facts stated, are based on hearsay, and are inadmissible speculation.**

451. For example, on a number of occasions, Golubski would pick up prostitutes three or four times a week and drop them off a half hour or so later in front of Nathan Richardson's house, where many of the girls would stay. There, the girls told Richardson that they did not like having sexual relations with Golubski, but he provided them protection from arrest. He would even "tip off" the girls to warrants so they could evade arrest. (Pl. Ex. 36: Nathan Richardson 2015 Aff. ¶¶ 4-6).

**Reply: Objection PSOF ¶451 is not supported by evidence that would be admissible at trial.**

**The cited portion of the affidavit lack foundation, fail to demonstrate personal knowledge of the facts stated, are based on hearsay, and are inadmissible speculation.**

452. Golubski was widely known to resolve or dismiss prostitutes' pending criminal charges or tickets in exchange for sex. (Pl. Ex. 29: Siobaughn Nichols Aff. ¶¶ 5, 7).

**Reply: Objection PSOF ¶452 is not supported by evidence that would be admissible at trial.**

**The cited portion of the affidavit lack foundation, fail to demonstrate personal knowledge of the facts stated, are based on hearsay, and are inadmissible speculation.**

453. Golubski would keep his favorite prostitutes out of jail or would make sure, if they did get arrested, that they would get out of jail quickly. (Pl. Ex. 27: Shonda Nichols Aff. ¶ 28).

**Reply: Objection PSOF ¶453 is not supported by evidence that would be admissible at trial.**

**The cited portion of the affidavit lack foundation, fail to demonstrate personal knowledge of the facts stated, are based on hearsay, and are inadmissible speculation.**

454. Golubski would force women to have sexual relations with him under the threat that he would arrest their boyfriends if they did not comply. (Pl. Ex. 27: Shonda Nichols Aff. ¶ 29); (Pl. Ex. 50: Rose McIntyre 2014 Aff. ¶¶ 44-72).

**Reply: Objection PSOF ¶454 is not supported by evidence that would be admissible at trial.**

**The cited portion of the affidavit lack foundation, fail to demonstrate personal knowledge of the facts stated, are based on hearsay, and are inadmissible speculation.**

455. Golubski would pay for tips concerning crimes and providing information to Golubski directly was more lucrative than calling the police hotline because he paid immediately, and in cash—about $40–$50 for a tip. Golubski once paid N.H. $100 for a tip about the location of a robbery suspect. (Pl. Ex. 96: N.H. 2015 Aff. ¶ 9).

**Reply: Controverted PSOF ¶455 is not supported by the reference to the record**

456. Golubski's ties to criminal activity in the KCK community had dangerous consequences for some of the informants he worked with. N.F., a teenage KCK resident, ultimately had to flee KCK in the 1990s, after she had provided information about a murder Golubski was investigating. She heard from people on the street that Golubski had told the suspects that she had given the police information about their role in the murders. Golubski's actions "made her a target of the of those killers, and they started chasing [her] with their weapons," once showing up at her mother's house with an assault rifle. (Pl. Ex. 34: N.F. Aff. ¶¶1–2, 9–12).

**Reply: Objection PSOF ¶456 is not supported by evidence that would be admissible at trial. The cited portion of the affidavit lack foundation, fail to demonstrate personal knowledge of the facts stated, are based on hearsay, and are inadmissible speculation.**

> 457. Golubski would also form exploitive "relationships" with numerous witnesses from the cases he worked. He met his ex-wife through an investigation and then continued to watch her "comings and goings," "knew when [her] boyfriend went to work," "kept after [her] until [she] agreed to go out with him," and "told her he would take of [her] financially." (Pl. Ex. 91: E.A. Aff. ¶¶ 3–4, 14).

**Reply: Objection PSOF ¶457 is not supported by evidence that would be admissible at trial. The cited portion of the affidavit lack foundation, fail to demonstrate personal knowledge of the facts stated, are based on hearsay, and are inadmissible speculation.**

> 458. Members of the community knew that Golubski had fathered children with black women in the community. (Pl. Ex. 91: E.A. Aff. ¶ 11); (Pl. Ex. 31: Kendra Dean-Martin 2013 Aff. ¶ 18).

**Reply: Objection PSOF ¶458 is not supported by evidence that would be admissible at trial. The cited portion of the affidavit lack foundation, fail to demonstrate personal knowledge of the facts stated, are based on hearsay, and are inadmissible speculation.**

> 459. Tina Peterson, a resident of KCK's "north end," encountered numerous victims of Roger Golubski while working at the KCK shelter for battered women and observed him openly riding around in his police car with Black women whom he stalked, harassed, and sexually exploited. In the late 1980s, Tina called the police department and stated that she worked at the shelter for battered women and wanted to make a complaint about Golubski's abuse of women. The person answering the phone stated someone would get back with her, and Tina left her name and phone number so she could be contacted. But no one from the Department called back. A week later, Tina called again and explained for the second time that she worked at the battered women's shelter and that she wanted to make a complaint about Golubski. Once again, she was told someone from the department would call her back, and once again, no one did. (Pl. Ex. 95: Tina Peterson Dec. ¶¶ 1–7, 10-21).

**Reply: PSOF ¶459 Objection. To the extent this fact asserts wrongful conduct on the part of Roger Golubski, Ms. Peterson's affidavit constitutes inadmissible hearsay. Ms. Peterson neither alleges to have been assaulted by Golubski, nor has any first-hand knowledge.**

Rather, all of her purported "evidence" is information provided to her by unidentified individuals and is quintessential hearsay. Further, none of this evidence is admissible under Rules 403 and 404(b), as it does not have any relevance to the Ewing/Quinn homicide investigation but is nothing more than an attempt to smear Detective Golubski with inadmissible hearsay in hopes of unfairly prejudicing him before a jury. Such efforts are, or should be, inadmissible. *Old Chief v. United States*, 519 U.S. 172, 181 (1997) (quoting *Michelson v. United States*, 335 U.S. 469, 475–76 (1948)) (finding that Rule 404(b) reflects the common-law tradition to not permit propensity evidence that would persuade a jury to prejudge a defendant as "one with a bad general record and deny him a fair opportunity to defend against a particular charge.").

> 460. Golubski's reputation in the community was that he was a sexual predator, known for exploiting, threatening, and abusing people in the community and targeting the most vulnerable women to then use "his police authority to force them to provide sex." Golubski was also widely known for harassing the men in the community, especially those who had any suspected involvement with drugs. He would collect money from these men who feared being arrested if they did not comply with his demands. (Pl. Ex. 95: Tina Peterson Dec. ¶¶ 1–9); (Pl. Ex. 89: Ruby Ellington 2015 Aff. ¶¶ 5–19); (Pl. Ex. 62: Timothy Maskil 2015 Aff. ¶¶ 7, 12–18)

Reply: PSOF ¶460 Objection. The "evidence" supporting this fact is inadmissible. Fed. R. Civ. P. 56(c)(2). First, both Mr. Maskil and Ms. Ellington are deceased. And, as a result, cannot testify at trial, making the contents of their affidavits not admissible at trial. Further, the affidavit of Ms. Peterson, as explained above, lacks foundation, and contains inadmissible hearsay as all of her allegations against Roger Golubski were allegedly told to her by other unidentified individuals. Further, none of this evidence is admissible under Rules 403 and 404(b), as it does not have any relevance to the Ewing/Quinn homicide investigation but is nothing more than an attempt to smear Detective Golubski with inadmissible hearsay in hopes of unfairly prejudicing him before a jury. Such efforts are, or should be, inadmissible.

*Old Chief*, 519 U.S. 172 at 181.

**In multiple instances, both before and around the time of the Doniel Quinn/Ewing investigation, Golubski would pressure community members to provide false accounts as informants or sham witnesses.**

461. E.A., a former wife of Golubski was a twenty-year-old worker at a gas station where a murder occurred. (Pl. Ex. 91: E.A. Aff. ¶¶ 1–3). E.A. called out sick the day of the crime so Golubski used this as an excuse to interrogate her as a possible suspect, intimidating her and accusing her of lying, then continued to treat her as a witness, despite her lack of knowledge regarding the crime, and "kept showing up at her home." (Pl. Ex. 91: E.A. Aff. ¶ 3).

**Reply: PSOF ¶ 461 is immaterial to Defendant Unified Government's motion.**

462. When KCK community member, Nichols was "just 15, in the mid 1990s, Detective Golubski repeatedly tried to force [her] to give a false account in a homicide case, trying to get [her] to say that she saw a shooting that [she] did not witness." (Pl. Ex. 29: Siobaughn Nichols Aff. ¶ 8).

**Reply: PSOF ¶ 462 is immaterial to Defendant Unified Government's motion.**

463. To try and force Nichols to give a false witness account, Golubski followed her and pressured her constantly for weeks, bringing her to the police station headquarters. (Pl. Ex. 29: Siobaughn Nichols Aff. ¶¶ 8–16).

**Reply: PSOF ¶ 463 is immaterial to Defendant Unified Government's motion.**

464. Each time she was at the station, Golubski would pressure Nichols for hours. He would also threaten to take her baby away and put her in jail as an accessory to murder if she did not comply. (Pl. Ex. 29: Siobaughn Nichols Aff. ¶¶ 15, 16).

**Reply: PSOF ¶ 464 is immaterial to Defendant Unified Government's motion.**

465. In 2008, KCK resident, Tamika Burks, was "hit on" by Golubski and another officer when they interviewed her for information during a homicide investigation. When Burks was taken to the police station she was "very uncomfortable" as a detective hit on her on the way there and Golubski hit on her on the way back, telling Burks she "looked good" and asking if she minded him calling her. (Pl. Ex. 28: Tamika Burks Aff. ¶¶ 9–12).

**Reply: PSOF ¶ 465 is immaterial to Defendant Unified Government's motion.**

466. After this incident, Golubski "would contact [Burks.] by phone or would come by [her] apartment or [her] job," making "clear he liked [her]." Burks knew of Golubski's "reputation in the community for 'messing' around with black girls" and "[b]ecause he knows where [she] live[s], [she] feels very uncomfortable." (Pl.

Ex. 28: Tamika Burks Aff. ¶¶ 14–17).

**Reply: PSOF ¶ 466 is immaterial to Defendant Unified Government's motion.**

467. From time to time, Golubski would ask D.L., a former KCK resident who worked as a prostitute and who had sex with Golubski frequently in the West Bottoms, if she knew anything about shootings that had occurred, once he became a detective. (Pl. Ex. 75: D.L. 2014 Aff. ¶¶ 1-14).

**Reply: PSOF ¶ 467 is immaterial to Defendant Unified Government's motion.**

468. Brown testified that, "If … an officer was having inappropriate sexual relations with an informant, that officer must tell their supervisor about the sexual relations." (Pl. Ex. 58: James Brown Dep. 127:16–128:18). He continued that, "if an officer has had sexual relations for a period of ten years with a victim that becomes a homicide victim, that they should be letting the police department, the supervisor and the DA's office know about this prior relationship." (Pl. Ex. 58: James Brown Dep. 137:21–138:14). The KCKPD had an Internal Affairs process in place to investigate allegations of misconduct

**Reply: PSOF ¶468 Objection, but immaterial. Plaintiffs cite the deposition of James Brown. Plaintiffs improperly offer undisclosed expert testimony, and such testimony would be inadmissible at trial. Mr. Brown was not testifying on behalf of the KCKPD, but rather himself and his answers are without foundation to apply them globally to the KCKPD in the 1990s. As a result, his answer lacks foundation and does not support the fact asserted as required by Fed. R. Civ. P. 56(c)(1).**

469. In the 1990s, "Internal Affairs was always available for members of the public to make a complaint." (Ex. 21: Ricky Armstrong Dep. 111:3–9).

**Reply: Uncontroverted.**

470. The public could file complaints by calling a phone number, walking into the Internal Affairs officers, or reporting to a supervisor in the field. (Ex. 21: Ricky Armstrong Dep. 117:3–118:9).

**Reply: Uncontroverted.**

471. According to the Unified Government's designee in this action, and former Chief's administrative aide from 1996–2000, then former Chief himself, Rick Armstrong, "[p]eople who had complaints" were "encouraged" "to bring them forward to the police department." (Ex. 21: Ricky Armstrong Dep. 134:7–135:4,

139:20–23).

**Reply: Uncontroverted.**

472. Each time a complaint was made to the KCKPD Internal Affairs division, the officer taking the complaint would fill out a form containing the complainant's name, contact information, the name of the officer against the whom the complaint was made, serial number, and information regarding the allegation with enough detail that the Chief could determine whether or not to investigate the complaint. (Ex. 6: Dennis Ware Dep. 314:13–315:4, 318:19– 320:11).

**Reply: Uncontroverted.**

473. As long as a complaint was "credible" it would be documented by Internal Affairs personnel. (Ex. 21: Ricky Armstrong Dep. 126:11–25). A complaint would be found not "credible" only in rare circumstances, like if the complainant was "so intoxicated and/or so impaired," and was otherwise "a very broad, open complaint process." (Ex. 21: Ricky Armstrong Dep. 126:11–25).

**Reply: Uncontroverted.**

474. Per KCKPD policy, individuals manning Internal Affairs' front desk did not have discretion to say they did not think an allegation was merited or to fail to record the allegation. (Ex. 21: Ricky Armstrong Dep. 134:7–24).

**Reply: Uncontroverted.**

475. KCKPD policy was to err on the side of documenting a complaint, "even [for] the most minor things." (Ex. 21: Ricky Armstrong Dep. 127:1–19).

**Reply: Uncontroverted.**

476. The practice and procedure in KCKPD was that any civilian complaint had to be documented and sent up the chain of command, all the way to the Chief of Police or to the Deputy Chief of Police. (Ex. 6: Dennis Ware Dep. 313:6–314:7, 322:17–323:8, 329:10–330:10).

**Reply: Uncontroverted.**

477. The Chief or Deputy Chief would determine whether to investigate a complaint. (Ex. 6: Dennis Ware Dep. 323:9–15, 327:12–17, 329:20–330:1). If the Chief or Deputy Chief determined that a complaint should be investigated, the subject of the complaint's supervisor would communicate that fact to the officer. (Ex. 6: Dennis Ware Dep. 313:24–314:12).

**Reply: Uncontroverted.**

478. The Chief also had the authority to direct investigation of an officer even if a formal complaint had not been lodged against that officer, either by asking that a reporting officer file a complaint or by ordering a "chief special" and directing an investigation without going through the formal complaint process. (Ex. 21: Ricky Armstrong Dep. 109:19–110:21).

**Reply: Uncontroverted.**

479. When reviewing a complaint, the Chief would brief his administrative aide on complaints received and then the administrative aide would assign Internal Affairs to begin an investigation then serve as the liaison between the Chief and Internal Affairs for the duration of the investigation. (Ex. 21: Ricky Armstrong Dep. 139:24–141:20).

**Reply: Uncontroverted.**

480. Minor allegations would be directed back down to a front-line supervisor to address; major allegations would require Internal Affairs detectives to gather evidence, interview witnesses, and determine a conclusion from this evidence. (Ex. 21: Ricky Armstrong Dep. 134:7–24).

**Reply: Uncontroverted.**

481. An Internal Affairs detective investigating an allegation against an officer should first speak with the complainant and get a complete understanding of the allegations made by that complainant. (Ex. 6: Dennis Ware Dep. 311:3–313:5).

**Reply: Uncontroverted.**

482. Internal Affairs kept records of every complaint reported for a period of time. (Ex. 6: Dennis Ware Dep. 315:13–316:13).

**Reply: Uncontroverted.**

483. It was important for Internal Affairs to maintain records of complaints and preserve them for a period of time, in part, because multiple complaints of a similar nature could indicate a pattern and practice of misconduct within the KCKPD. (Ex. 6: Dennis Ware Dep. 316:14–317:14).

**Reply: Uncontroverted.**

484. Similarly, repeated complaints against the same officer could lend credence against that officer, or at least increase the urgency of investigating that officer's conduct. (Ex. 6: Dennis Ware Dep. 317:15–318:18).

**Reply: Uncontroverted.**

485. Internal Affairs had adequate resources to conduct investigations into complaints. (Ex. 6: Dennis Ware Dep. 331:16–332:22).

**Reply: Uncontroverted.**

486. Detectives investigating complaints made to Internal Affairs were to document their findings in a detailed investigative report, which along with any other documentation, would be forwarded to the Chief or his designee for review. (Ex. 6: Dennis Ware Dep. 335:21–336:18).

**Reply: Uncontroverted.**

487. If a civilian reported criminal behavior by an officer, the KCKPD had to take that complaint very seriously, and it would have been improper for the officer taking the complaint to fail to send it up the chain of command. (Ex. 6: Dennis Ware Dep. 332:10–333:12). Additionally, as of 1990, of if an officer became aware of a fellow officer's criminal behavior, he would have to immediately report it to the KCKPD. (Ex. 21: Ricky Armstrong Dep. 83:2–84:2).

**Reply: Uncontroverted.**

488. The Chief did not have discretion to decline to investigate a complaint against an officer who had been involved in criminal activity per KCKPD policy. (Ex. 21: Ricky Armstrong Dep. 111:1–24).

**Reply: Uncontroverted.**

489. Officers would similarly have to report instances of other officer's violations of KCKPD policies, including its ethics policy; having sex with prostitutes would be one such ethics violation. (Ex. 21: Ricky Armstrong Dep. 83:2–84:2, 85:13–86:5). If the officer had sex with a prostitute while on duty, that would be an unequivocal violation of policy and another officer would have to report that behavior if he became aware of it. (Ex. 21: Ricky Armstrong Dep. 86:6–87:13).

**Reply: Uncontroverted.**

490. The Chief or his designee would make the decision to close out an investigation of a complaint reported to Internal Affairs. (Ex. 6: Dennis Ware Dep. 334:6–22).

**Reply: Uncontroverted.**

491. The Chief would be made aware of any complaints that rose to the level of confirmed violation, especially if it were a major violation. (Ex. 21: Ricky Armstrong Dep. 142:16–143:17).

**Reply: Uncontroverted.**

492. If the complaint was founded, by 1993, the Chief or his designee would determine the officer's specific disciplinary measure. (Ex. 6: Dennis Ware Dep. 336:24–337:5); (Ex. 21: Ricky Armstrong Dep. 100:25–102:12).

**Reply: Uncontroverted.**

**The evidence in this case suggests a complete breakdown of those processes**

493. According to Plaintiffs' expert in police practices, Chief Fischer, if the evidence in the record from civilian and police witness affidavits and third-party deposition testimony in this case that Golubski engaged in the widespread misconduct and criminal activity is credited, then the investigative failures and other misconduct in the Quinn-Ewing homicide investigation fits into a larger picture of widely tolerated corruption in the KCKPD. (Pl. Ex. 66: Russell Fischer Report pp. 6–7).

**Reply: PSOF ¶493 Objection and controverted in part, but immaterial. Uncontroverted that Plaintiffs' police practices expert wrote as such, but this fact is not supported by evidence to demonstrate alleged acts actually occurred as is required by Fed. R. Civ. P. 56(c)(1). Further, this is an improper credibility determination by Plaintiff's expert. As a result, this fact is immaterial for purposes of summary judgment.**

494. Chief Fischer opined, "If Golubski in fact was involved in even a fraction of the misconduct described in these affidavits… then the Department's failure to supervise and discipline him amounts to one of the most shocking failures I have seen in my decades as a police supervisor." (Pl. Ex. 66: Russell Fischer Report pp. 6–7).

**Reply: PSOF ¶494 Objection and controverted in part, but immaterial. Uncontroverted that Plaintiffs' police practices expert wrote as such, but this fact is not supported by evidence to demonstrate alleged acts actually occurred as is required by Fed. R. Civ. P. 56(c)(1). Further, this is an improper credibility determination by Plaintiff's expert. As a result, this fact is immaterial for purposes of summary judgment.**

495. Even if only a portion of these allegations are credited, then Culp's failure to provide adequate supervision in the Quinn-Ewing homicide investigation is not only deeply troubling but would constitute an endorsement of Golubski's investigative misconduct given the significant and foreseeable risk that Golubski would continue past corruption and illegal practices to engage in similar

misconduct in the Quinn-Ewing homicide investigation. (Pl. Ex. 66: Russell Fischer Report pp. 6–7).

**Reply: PSOF ¶495 Objection and controverted in part, but immaterial. Uncontroverted that Plaintiffs' police practices expert wrote as such, but this fact is not supported by evidence to demonstrate alleged acts actually occurred as is required by Fed. R. Civ. P. 56(c)(1). Further, this is an improper credibility determination by Plaintiff's expert. As a result, this fact is immaterial for purposes of summary judgment.**

496. According to Chief Fischer, even so-called rumors within the Department of the type of misconduct alleged against Golubski should have triggered a complete and unbiased investigation into Golubski's methods for closing cases and his relationships with women cooperating in the Quindaro neighborhood and surroundings. (Pl. Ex. 66: Russell Fischer Report pp. 6–7).

**Reply: PSOF ¶496 Objection and controverted in part, but immaterial. Uncontroverted that Plaintiffs' police practices expert wrote as such, but this fact is not supported by evidence to demonstrate alleged acts actually occurred as is required by Fed. R. Civ. P. 56(c)(1). Further, this is an improper credibility determination by Plaintiff's expert. As a result, this fact is immaterial for purposes of summary judgment.**

497. Defendant Ware, a former Lieutenant in charge of homicide and Major in charge of Internal Affairs, testified that a police department cannot function effectively without an adequate internal disciplinary mechanism. Because police officers are out working in communities around crime and all different types of vice, a basic concept in policing is that there needs to be functional internal structures in place to ensure that if a police officer engages in corruption, they are adequately disciplined. (Ex. 6: Dennis Ware Dep.52:8–53:3).

**Reply: PSOF ¶497 Objection, but immaterial. Plaintiffs cite the deposition of Dennis Ware. However, Mr. Ware was not testifying on behalf of the KCKPD, but rather himself and his answers are without foundation to apply them globally to the KCKPD in the 1990s. As a result, his answer lacks foundation and does not support the fact asserted as required by Fed. R. Civ. P. 56(c)(1).**

498. Another basic concept in policing is that if a police officer engages in corruption, even minor corruption, and they are not disciplined, that can have terrible consequences for the department as a whole. In particular, it sends a message to that officer that corruption is tolerated. (Ex. 6: Dennis Ware Dep. 53:4–54:5).

**Reply: PSOF ¶498 Objection, but immaterial. Plaintiffs cite the deposition of Dennis Ware. Plaintiffs improperly offer undisclosed expert testimony, and such testimony would be inadmissible at trial. Mr. Ware was not testifying on behalf of the KCKPD, but rather himself and his answers are without foundation to apply them globally to the KCKPD in the 1990s. As a result, his answer lacks foundation and does not support the fact asserted as required by Fed. R. Civ. P. 56(c)(1).**

499. And if a police department sends a message to an officer working in that department that minor corruption is tolerated, that officer may then feel emboldened to continue engaging in corruption; that is just another basic concept in police administration. (Ex. 6: Dennis Ware Dep. 54:6–21).

**Reply: PSOF ¶499 Objection, but immaterial. Plaintiffs cite the deposition of Dennis Ware. Plaintiffs improperly offer undisclosed expert testimony, and such testimony would be inadmissible at trial. Mr. Ware was not testifying on behalf of the KCKPD, but rather himself and his answers are without foundation to apply them globally to the KCKPD in the 1990s. As a result, his answer lacks foundation and does not support the fact asserted as required by Fed. R. Civ. P. 56(c)(1).**

500. Furthermore, if a police officer is allowed to engage even in minor corruption without discipline, that can potentially send a message to the rest of the police force that corruption will be tolerated, and can in turn embolden other officers to engage in corruption. (Ex. 6: Dennis Ware Dep. 54:22–55:13).

**Reply: PSOF ¶500 Objection, but immaterial. Plaintiffs cite the deposition of Dennis Ware. Plaintiffs improperly offer undisclosed expert testimony, and such testimony would be inadmissible at trial. Mr. Ware was not testifying on behalf of the KCKPD, but rather himself and his answers are without foundation to apply them globally to the KCKPD in the**

**1990s. As a result, his answer lacks foundation and does not support the fact asserted as required by Fed. R. Civ. P. 56(c)(1).**

> 501. Ware, a former police administrator and high-ranking supervisor in the KCKPD testified that there are standards and concepts that are widely accepted in the profession, and one of those is that when officers break the rules, they need to be disciplined. (Ex. 6: Dennis Ware Dep. 57:4–23).

**Reply: PSOF ¶501 Objection, but immaterial. Plaintiffs cite the deposition of Dennis Ware. Plaintiffs improperly offer undisclosed expert testimony, and such testimony would be inadmissible at trial. Mr. Ware was not testifying on behalf of the KCKPD, but rather himself and his answers are without foundation to apply them globally to the KCKPD in the 1990s. As a result, his answer lacks foundation and does not support the fact asserted as required by Fed. R. Civ. P. 56(c)(1).**

> 502. Ware further explained that one reason that officers need to be disciplined when they break the rules is that if they are not, then it sends a message to other officers that it is okay to break the rules. If officers are allowed to break the rules without discipline, that also risks sending a message to the community that the department is policing, that undermines the credibility of police in the field. In other words, if one officer behaves in a way that indicates that they may be susceptible to acts of corruption or bribery, that risks undermining the credibility of the entire department. These, too, are basic concept in policing. (Ex. 6: Dennis Ware Dep. 57:15–60:8).

**Reply: PSOF ¶502 Objection, but immaterial. Plaintiffs cite the deposition of Dennis Ware. Plaintiffs improperly offer undisclosed expert testimony, and such testimony would be inadmissible at trial. Mr. Ware was not testifying on behalf of the KCKPD, but rather himself and his answers are without foundation to apply them globally to the KCKPD in the 1990s. As a result, his answer lacks foundation and does not support the fact asserted as required by Fed. R. Civ. P. 56(c)(1).**

> 503. By 1994, it was clear to Blood that his supervisors up the chain of command in the Kansas City, Kansas, Police Department understood that police officers could be susceptible to corruption. It was also a commonsense concept in policing that police officers need to maintain a distance from any potential criminal activity

themselves. (Pl. Ex. 54: Clyde Blood 30:24-31:14). This includes proximity to the drug trade outside the context of official police duties, as well as proximity to prostitution outside the context of official police work. (Pl. Ex. 54: Clyde Blood Dep. 31:24-32:11.)

**Reply: PSOF ¶503 Objection, but immaterial. Plaintiffs cite the deposition of Clyde Blood.**

**Plaintiffs improperly offer undisclosed expert testimony, and such testimony would be**

**inadmissible at trial. Mr. Blood was not testifying on behalf of the KCKPD, but rather**

**himself and his answers are without foundation to apply them globally to the KCKPD in the**

**1990s. As a result, his answer lacks foundation and does not support the fact asserted as**

**required by Fed. R. Civ. P. 56(c)(1).**

504. At his deposition, Detective Blood admitted that based on the allegations made by former KCKPD officers Tim Maskil and Ruby Ellington and Detective Golubski's invocation of the Fifth Amendment at his deposition when asked questions about this misconduct, a full investigation should be done to determine whether he committed any felonies on the job. (Pl. Ex. 54: Clyde Blood Dep. 268:24-269:7.)

**Reply: Immaterial. Plaintiffs provide no admissible evidence that any person ever reported**

**any specific misconduct by Golubski to an identified person.**

505. According to Blood, to determine whether the allegations of Golubski committing a pattern of felonies on the job are just gossip or have merit you "[s]tart investigating Golubski and find out who the women were he allegedly had violated and go interview them. You start somewhere. You got to start and go to the source and work it backwards. It's just that simple." (Pl. Ex. 54: Clyde Blood Dep. 272:7-17.)

**Reply: Immaterial. Plaintiffs provide no admissible evidence that any person ever reported**

**any specific misconduct by Golubski to an identified person.**

506. When asked whether, if those investigations against Golubski were substantiated, the department should conduct a full investigation into who was aware of them and failed to report them. Blood testified: "Be speculation but if there's a -- my opinion where there's smoke, there's fire. So if those allegations were made, I'd check them out… . If they're positive, then you go for it. (Pl. Ex. 54: Clyde Blood Dep 272:18-273:3.)

**Reply: Immaterial. Plaintiffs provide no admissible evidence that any person ever reported**

any specific misconduct by Golubski to an identified person.

507. If Golubski was known for having sex with Black, drug-addicted prostitutes to the extent where fellow detectives were confronting him about it, that's something the department should have investigated and potentially disciplined Golubski for if there were any merit to those allegations, because it would jeopardize any number of cases, confidential information, and the department's reputation in the community. (Pl. Ex. 54: Clyde Blood Dep. 237:3-238:4.)

**Reply: Immaterial. Plaintiffs provide no admissible evidence that any person ever reported any specific misconduct by Golubski to an identified person.**

508. Chief Fischer reviewed Golubski's Internal Affairs jacket and noted "[t]he only documented disciplinary action in the materials I have reviewed is from 1978, when the KCKPD Internal Affairs found that Golubski violated rule 3.16, which states that, "No officer shall make false reports or knowingly enter or cause to enter in any Department book, record or reports any inaccurate, false or improper police information or other material matter." (Pl. Ex. 66: Russell Fischer Report pp. 26–27).

**Reply: Uncontroverted and immaterial. There is no evidence of the basis for Golubski's 1978 disciplinary action other than it was connected to his report involving an in-custody death. There is no evidence of any falsehood by Golubski or what the particular conduct was that resulted in the disciplinary action.**

509. For the incidents listed on Golubski's police jacket, all except two have dispositions that are either "unfounded," "exonerated," "not sustained," "inactivated," "none," or "no discipline…warranted[.]" (Pl. Ex. 105: Golubski Jacket); (Pl. Ex. 66: Russell Fischer Report pp. 26–27).

**Reply: Uncontroverted and immaterial.**

510. According to Chief Fischer, "[t]he absence of investigation into and discipline for numerous, serious allegations of corrupt activities raises serious concerns about the KCKPD's disciplinary apparatus at this time—including the failure of fellow officers/detectives to report and of supervisors to discipline. Indeed, at least two of the incidents in his police jacket suggest conduct similar to the numerous, serious allegations made by several witnesses, including former KCKPD officers. In one incident, a woman alleges that Golubski divulged her status as confidential informant to people in her apartment complex, exposing her to potential harm. In another, a woman alleged that Golubski used racist language—threatening to 'haul her black ass in for aiding and abetting'—similar to the abusive language other women alleged that Golubski routinely used in his interactions with them." (Pl. Ex.

66: Russell Fischer Report pp. 26–27).

**Reply: Objection. PSOF ¶ 510 is based entirely on inadmissible speculation. Fischer's report is inadmissible speculation and conjecture based on a lack of personal knowledge and lack of factual basis. Fischer bases his belief and assertions about allegations of misconduct by Golubski on the affidavits of Tim Maskil and Ruby Ellington. Fischer dep., 107:1-25. Tim Maskil and Ruby Ellington are deceased. See Attachment 2, Ellington Obituary; Attachment 3, Maskil obituary. Fischer cannot identify a single specific instance of misconduct by Golubski based on the affidavits by either Ellington or Maskil affidavit. Fischer dep., 108:1-8. Fischer is not aware of any occasion in which Ellington or Maskil reported a specific incident of Golubski's misconduct to anyone at KCKPD. Fischer dep., 108:9-109:1. Fischer's opinion of a "total breakdown of the Internal affairs mechanism" is inadmissible speculation.**

> 511. Given the multiple pathways for complaints by civilians and KCKPD employees about officers to be reported to KCKPD management, the specific obligations of supervisors and the KCKPD Chief of Police to follow up on allegations, and the evidence of numerous allegations against Golubski, the absence of any documentation of a single Internal Affairs investigation into or related discipline of Golubski, and in light of Golubski's numerous promotions, suggests there was a complete and total breakdown of the Internal Affairs mechanism from top to bottom—by fellow officers, including Defendant Officers who deny any knowledge of these numerous allegations, to KCKPD management, including the Chief of Police who is responsible for discipline—over several decades. (Pl. Ex. 66: Russell Fischer Report pp. 26–27).

**Reply: Objection. PSOF ¶ 511 is based entirely on inadmissible speculation. Fischer's report is inadmissible speculation and conjecture based on a lack of personal knowledge and lack of factual basis. Fischer bases his belief and assertions about allegations of misconduct by Golubski on the affidavits of Tim Maskil and Ruby Ellington. Fischer dep., 107:1-25. Tim Maskil and Ruby Ellington are deceased. See Attachment 2, Ellington Obituary; Attachment 3, Maskil obituary. Fischer cannot identify a single specific instance of misconduct by Golubski based on the affidavits by either the Ellington or Maskil affidavit. Fischer dep.,**

**108:1-8. Fischer is not aware of any occasion in which Ellington or Maskil reported a specific incident of Golubski's misconduct to anyone at KCKPD. Fischer dep., 108:9-109:1. Fischer's opinion of a "total breakdown of the Internal affairs mechanism" is inadmissible speculation.**

> 512. At his deposition, Fischer further explained, "I'm talking about the notion that, if, as asserted by Ellington and Maskil, it was common knowledge about some of these transgressions that Golubski was involved in, there should have been some action as a result of that." "If, as described, it was common knowledge within the police department, as asserted by those two individuals, actions should have been taken to inquire and verify, or not substantiate, that those kind of activities were occurring or not occurring." (Pl. Ex. 82: Russell Fischer Dep. pp. 110:5–112:2).

**Reply: Objection. PSOF ¶ 512 is based entirely on inadmissible speculation. Fischer's report is inadmissible speculation and conjecture based on a lack of personal knowledge and lack of factual basis. Fischer bases his belief Golubski engaged in a variety of criminal conduct on the affidavits of Tim Maskil and Ruby Ellington. Fischer dep., 107:1-25. Tim Maskil and Ruby Ellington are deceased. Fischer cannot identify a single specific instance of misconduct by Golubski based on the affidavits by either Ellington or Maskil affidavit. Fischer dep., 108:1-8. Fischer is not aware of any occasion in which Ellington or Maskil reported a specific incident of Golubski's misconduct to anyone at KCKPD. Fischer dep., 108:9-109:1. Fisher's opinion is inadmissible speculation.**

> 513. Chief Fischer further testified that if the affidavits and information he reviewed for this case are true, then Golubski engaged in a variety of significant criminal conduct, including false testimony; bribery; procuring and soliciting prostitution; drug dealing/drug trafficking; sexual assault, including rape and involving minors and others; and physical and verbal assault. (Pl. Ex. 82: Russell Fischer Dep. pp. 38:2–39:7). KCKPD supervisors also had a role in disciplining officers

**Reply: Objection. PSOF ¶ 513 is based entirely on inadmissible speculation. Fischer's report is inadmissible speculation and conjecture based on a lack of personal knowledge and lack of factual basis. Fischer bases his belief Golubski engaged in a variety of criminal conduct on the affidavits of Tim Maskil and Ruby Ellington. Fischer dep., 107:1-25. Tim Maskil and**

**Ruby Ellington are deceased. Fischer cannot identify a single specific instance of misconduct by Golubski based on the affidavits by either Ellington or Maskil affidavit. Fischer dep., 108:1-8. Fischer is not aware of any occasion in which Ellington or Maskil reported a specific incident of Golubski's misconduct to anyone at KCKPD. Fischer dep., 108:9-109:1. Fisher's opinion is inadmissible speculation.**

514. Supervisors had discretion to deal with minor infractions and administrative violations without going through the Internal Affairs process. (Ex. 21: Ricky Armstrong Dep. 111:1–24). However, supervisors were not trained on what standard of proof to use when investigating a minor infraction. (Ex. 21: Ricky Armstrong Dep. 112:20–113:25).

**Reply: Uncontroverted.**

515. According to Armstrong, "it was incumbent, it was trained, it was engrained in the police department that if you had knowledge of criminal action or administrative violations occurring and didn't take action, the consequences were significant to both supervisors for a demotion, termination and for officers who violated policy." (Ex. 21: Ricky Armstrong Dep. 143:18–145:18).

**Reply: Uncontroverted.**

516. There was a policy of checks and balances stating that if a supervisor was aware of a violation and did not take action, the supervisor would be disciplined. (Ex. 21: Ricky Armstrong Dep. 143:18–146:12).

**Reply: Uncontroverted.**

517. It was a rule in the KCKPD in the 1990s that every single "police officer from patrolman to the chief was responsible for reporting violations or taking action if it came under their purview, absolutely." (Ex. 21: Ricky Armstrong Dep. 171:5–20).

**Reply: Uncontroverted.**

**Over the span of many years, many attempt to report Golubski's misconduct to the KCKPD**

518. In the 1970s, Hausback reported to his commanding officer, Major Monchil, that he had seen Golubski with prostitutes and that Golubski was widely known for having sex with prostitutes while on duty, "Monchil listened … but said nothing in response." (Pl. Ex. 86: Tim Hausback Dec. ¶¶ 14–15, 18).

**Reply: Objection. The statement asserted in PSOF ¶ 518 is not supported by admissible**

evidence. Hausback's declaration expresses only personal knowledge of Golubski being out of district, but does not evince personal knowledge of Golubski actually paying for sex or soliciting sexual favors from prostitutes. Hausback's declaration is inadmissible speculation and inadmissible hearsay (offering non-specific "reputation" evidence as proof of such conduct without personal knowledge). "An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4). Hausback's declaration does not show Hausback is competent to testify on the matters asserted. The personal knowledge standard makes an affidavit inadmissible if the witness could not have actually perceived or observed that which it testifies Argo v. Blue Cross & Blue Shield of Kan., Inc., 452 F.3d 1193, 1200 (10th Cir. 2006).

> 519. Internal Affairs did not pursue an investigation against Golubski based on Hausback's report. (Pl. Ex. 86: Tim Hausback Dec. ¶ 16).

Reply: Objection. The statement asserted in PSOF ¶ 519 is not supported by admissible evidence. Hausback's declaration expresses only personal knowledge of Golubski being out of district, but does not evince personal knowledge of Golubski "patronizing prostitutes" nor does Hausback's declaration identify any specific individual to whom he disclosed any facts based on personal knowledge.

> 520. Instead, one of the "'pimps' who appeared to have a close association with Golubski made a false complaint to Internal Affairs about Hausback, which Internal Affairs did investigate. (Pl. Ex. 86: Tim Hausback Dec. ¶ 16).

Reply: Objection. The statement asserted in PSOF ¶ 520 is not supported by admissible evidence. Hausback's declaration expresses only personal knowledge of Golubski being out of district, but does not evince personal knowledge of Golubski "patronizing prostitutes" nor does Hausback's declaration identify any specific individual to whom he disclosed any facts

based on personal knowledge.

521. KCK resident Dion Martin, a young teen at the time, was stopped by Roger Golubski on multiple occasions beginning in the late 1980s through the late-1990s, terrorizing him and subjecting him to harassment. (Pl. Ex. 94: Dion Martin Dep. 21:2–17, 22:7–23, 23:23– 24:3, 26:3–27:2, 28:6–13, 49:10–18, 75:7–13). During these stops Golubski would beat up, threaten, or rob Martin. (Pl. Ex. 94: Dion Martin Dep. 24:17–26:2, 26:24–27:24).

**Reply: Objection. PSOF ¶ 521 is immaterial to the Unified Government's motion. Even crediting Martin's testimony, the stated fact has no relevance to the claims made pertaining to the 1994 Ewing/Quinn homicides. Plaintiffs present no admissible evidence that the conduct described by Martin was known to or reported to any supervisor or policymaker for the KCKPD.**

522. The first time Golubski stopped Martin, he was a teenager walking home from his cousin's house. Golubski said to Martin, "caught you by yourself" and then asked Martin, "You got anything for me?" while he dug through Martin's pockets. Martin believed Golubski was looking for money. (Pl. Ex. 94: Dion Martin Dep. 55:5–56:21). Golubski also handcuffed Martin, then put him in his unmarked vehicle and took him "up the street a little bit … to let [Martin] know that [he] could be taken away any time he wanted to." (Pl. Ex. 94: Dion Martin Dep. 56:22–58:9, 61:2–9).

**Reply: Objection. PSOF ¶ 522 is immaterial to the Unified Government's motion. Even crediting Martin's testimony, the stated fact has no relevance to the claims made pertaining to the 1994 Ewing/Quinn homicides. Plaintiffs present no admissible evidence that the conduct described by Martin was known to or reported to any supervisor or policymaker for the KCKPD.**

523. During this first encounter, Golubski warned Martin, "I'll see you again." Martin knew of Golubski's reputation for harassing other teenagers by that point, and was so scared that he urinated on himself. (Pl. Ex. 94: Dion Martin Dep. 58:10– 59:21).

**Reply: Objection. PSOF ¶ 523 is immaterial to the Unified Government's motion. Even crediting Martin's testimony, the stated fact has no relevance to the claims made pertaining**

to the 1994 Ewing/Quinn homicides. **Plaintiffs present no admissible evidence that the conduct described by Martin was known to or reported to any supervisor or policymaker for the KCKPD.**

> 524. During their second encounter, a few months later, Martin was walking alone again around one o'clock in the morning, with some money in his pocket this time. Golubski again stopped Martin, handcuffed him, put him in his vehicle, told him they "were going for a ride," and drove him to the James Street riverbank. (Pl. Ex. 94: Dion Martin Dep. 60:1–61:14).

**Reply: Objection. PSOF ¶ 524 is immaterial to the Unified Government's motion. Even crediting Martin's testimony, the stated fact has no relevance to the claims made pertaining to the 1994 Ewing/Quinn homicides. Plaintiffs present no admissible evidence that the conduct described by Martin was known to or reported to any supervisor or policymaker for the KCKPD.**

> 525. There, Golubski—and other officers present at the riverbank—told Martin to get on his knees, made him strip down to his underwear, then rummaged through his pockets and took about five hundred dollars from his pockets. Golubski also took crack cocaine from his pockets. (Pl. Ex. 94: Dion Martin Dep. 62:15–63:10, 65:5-68:25).

**Reply: Objection. PSOF ¶ 525 is immaterial to the Unified Government's motion. Even crediting Martin's testimony, the stated fact has no relevance to the claims made pertaining to the 1994 Ewing/Quinn homicides. Plaintiffs present no admissible evidence that the conduct described by Martin was known to or reported to any supervisor or policymaker for the KCKPD.**

> 526. During this same encounter, the officers played "Russian Roulette" with Martin, in which they loaded a revolver, spun it against the side of Martin's head, and clicked the trigger. The officers taunted Martin during this "mind game," "torturing" him by asking, "think you're going to make it home?" (Pl. Ex. 94: Dion Martin Dep. 65:5–68:25).

**Reply: Objection. PSOF ¶ 526 is immaterial to the Unified Government's motion. Even crediting Martin's testimony, the stated fact has no relevance to the claims made pertaining**

to the 1994 Ewing/Quinn homicides. Plaintiffs present no admissible evidence that the conduct described by Martin was known to or reported to any supervisor or policymaker for the KCKPD.

527. Martin was forced to walk about fifteen blocks home in his underwear and socks. (Pl. Ex. 94: Dion Martin Dep. 67:23–69:9).

**Reply: Objection. PSOF ¶ 527 is immaterial to the Unified Government's motion. Even crediting Martin's testimony, the stated fact has no relevance to the claims made pertaining to the 1994 Ewing/Quinn homicides. Plaintiffs present no admissible evidence that the conduct described by Martin was known to or reported to any supervisor or policymaker for the KCKPD.**

528. Martin and his mother went to the KCKPD to report Golubski's misconduct following this incident at the riverbank. (Pl. Ex. 94: Dion Martin Dep. 32:6–14, 40:25–41:4, 71:14–72:24).

**Reply: Objection. PSOF ¶ 528 is not supported by the cited record. Martin testified he and his mother went to the police department but did not make a report and that no specific information was provided by Martin or his mother. Further, the stated fact has no relevance to the claims made pertaining to the 1994 Ewing/Quinn homicides.**

529. When they tried to file a complaint, they were told by Internal Affairs personnel that they could not. (Pl. Ex. 94: Dion Martin Dep. 40:25–44:20, 46:3–19, 71:14–75:6).

**Reply: Objection. PSOF ¶ 529 is not supported by the cited record. Martin testified he and his mother went to the police department but did not make a report and that no specific information was provided by Martin or his mother. Martin said they spoke only to a person at the front desk, not a person in Internal Affairs. Further, the stated fact has no relevance to the claims made pertaining to the 1994 Ewing/Quinn homicides.**

530. Golubski continued to pick up Martin and take him to the James Street riverbank on subsequent occasions, where Golubski would take money and drugs

from Martin, would sometimes make him strip down to his underwear, and, on one or two additional occasions, would play "Russian Roulette" with him. (Pl. Ex. 94: Dion Martin Dep. 75:7–77:15). Once, Golubski struck him on the head with a night stick or a gun. (Pl. Ex. 94: Dion Martin Dep. 77:16–78:15).

**Reply: Objection. PSOF ¶ 530 is immaterial to the Unified Government's motion. Even crediting Martin's testimony, the stated fact has no relevance to the claims made pertaining to the 1994 Ewing/Quinn homicides. Plaintiffs present no admissible evidence that the conduct described by Martin was known to or reported to any supervisor or policymaker for the KCKPD.**

531. At each encounter, Golubski and the officers knew Martin's name, called him the "N word," and would warn Martin, "see you-all again, we'll catch up to you later." (Pl. Ex. 94: Dion Martin Dep. 79:11–80:21).

**Reply: Objection. PSOF ¶ 531 is immaterial to the Unified Government's motion. Even crediting Martin's testimony, the stated fact has no relevance to the claims made pertaining to the 1994 Ewing/Quinn homicides. Plaintiffs present no admissible evidence that the conduct described by Martin was known to or reported to any supervisor or policymaker for the KCKPD.**

532. Despite initially reporting Golubski's misconduct, Martin gave up hope of getting "something done for what [he] went through with [Golubski]" and instead just "tr[ied] to stay away from [Golubski]." (Pl. Ex. 94: Dion Martin Dep. 53:11–23).

**Reply: Objection. PSOF ¶ 532 is not supported by the cited record. Martin testified he and his mother did not report Golubski's conduct. Further, the stated fact has no relevance to the claims made pertaining to the 1994 Ewing/Quinn homicides.**

533. Golubski's ex-wife, E.A., also reported his behavior to the KCKPD after their divorce, when he would call her frequently, watch her and follow her. (Pl. Ex. 91: E.A. Aff. ¶¶ 16, 18, 20).

**Reply: Objection. PSOF ¶ 533 is not supported by admissible evidence. the affidavit cited for the statement fails to evince personal knowledge of the facts asserted. Further, PSOF 533**

is immaterial to Defendant Unified Government's motion.

534. Golubski's stalking of E.A. was so bad, she reported him to the police department, and "he was told he had to stay at least 50 feet away." Still, Golubski would show up at her work, her friends' homes, and would park on E.A.'s street—to the point where her neighbors also reported Golubski to the police department. (Pl. Ex. 91: E.A. Aff. ¶ 16).

**Reply: Objection. PSOF ¶ 534 is not supported by admissible evidence. the affidavit cited for the statement fails to evince personal knowledge of the facts asserted. Further, PSOF 534 is immaterial to Defendant Unified Government's motion.**

535. Later, Golubski paid a teenager to break into E.A.'s house two times in four days. "When these thefts occurred, [Golubski] tried to ride to the rescue like a night in shining armor," bringing the identification unit to dust her home for prints as a ploy to scare E.A. into returning to a relationship with him. (Pl. Ex. 91: E.A. Aff. ¶¶ 19–20).

**Reply: Objection. PSOF ¶ 535 is not supported by admissible evidence. the affidavit cited for the statement fails to evince personal knowledge of the facts asserted. Further, PSOF 535 is immaterial to Defendant Unified Government's motion.**

536. Another time, when E.A. was pulling in from a night with friends, Golubski blocked her with his car and told her he wanted to talk, then reached into her car, and grabbed her by her necklace, twisting it until it dug into her skin. E.A. friend called the police; Golubski fled the scene before they arrived. (Pl. Ex. 91: E.A. Aff. ¶ 17).

**Reply: Objection. PSOF ¶ 536 is immaterial to Defendant Unified Government's motion.**

537. Additionally, Golubski repeatedly threatened, harassed, and interrogated, KCK community member Nichols. to get her to provide a false witness account for a shooting, even though she had not seen the crime take place. (Pl. Ex. 29: Siobaughn Nichols Aff. ¶¶ 8–20). Eventually Nichols's mother reported Golubski's behavior to the police department. Golubski stopped contacting Nichols after that. (Pl. Ex. 29: Siobaughn Nichols Aff. ¶¶ 21).

**Reply: Objection. PSOF ¶ 537 is immaterial to Defendant Unified Government's motion.**

**Nichols' affidavit states that Golubski did not believe Nichols' denial.**

**Despite that it was common knowledge within the KCKPD and the community that Golubski was engaged in sexual and investigative misconduct, Defendants**

claim not to have heard anything about this behavior.

538. Ware understood the KCKPD had a written policy in place stating that officers' personal behavior "must be beyond reproach"; Ware agreed with that policy, because if one officer behaves in a way that indicates they may be susceptible to acts of corruption or bribery, that risks undermining the credibility of the entire department. (Ex. 6: Dennis Ware Dep. 59:1- 60:13).

**Reply: PSOF ¶538 Controverted and objection. Defendant Ware's opinion testimony is improper and inadmissible as Defendant Ware was not disclosed as an expert and calls for speculation. Further, the answer provided by Defendant Ware, after objection, was to an improper question that is designed to prey upon the juror's sympathy and not based on the evidence and the law. Therefore, this fact is not supported by admissible evidence. Fed. R. Civ. P. 56(c)(2).**

539. Ware maintains integrity was something that was critically important to him throughout his career; he understood that one of his primary responsibilities as a police officer was to fight corruption, whether inside or outside the Department. Ware understood that if he saw any indication of any sort of corrupt behavior by a fellow officer, he was obligated to affirmatively report it, and testified that he took that obligation very seriously. (Ex. 6: Dennis Ware Dep. 69:19-70:17; 72:4-22).

**Reply: PSOF ¶539 Controverted and objection. Defendant Ware's opinion testimony is improper and inadmissible as Defendant Ware was not disclosed as an expert and calls for speculation. Further, the answer provided by Defendant Ware, after objection, was to an improper question that is designed to prey upon the juror's sympathy and not based on the evidence and the law. Therefore, this fact is not supported by admissible evidence. Fed. R. Civ. P. 56(c)(2).**

540. During the time he worked as one of the ten to fifteen detectives investigating serious felonies in the early-to-mid-nineteen-nineties with Golubski, Ware maintains he never saw any indication, no matter how slight, that Golubski was engaging in any kind of corruption or violation of the rules more serious than a uniform infraction, and never heard so much as a hint of a rumor that Golubski might be doing anything improper including patronizing prostitutes. (Ex. 6: Dennis Ware Dep. 96:23–97:8; 99:4–101:5; 102:11–18). If he had, Ware testified he would have investigated whether the information had merit, and if he determined there

was any possibility the rumor was true, he would have been sure to immediately report it up the chain of command. (Ex. 6: Dennis Ware Dep. 102:23–104:16).

**Reply: PSOF ¶540 Uncontroverted Ware so testified; but objection as Defendant Ware's opinion testimony is improper and inadmissible as Defendant Ware was not disclosed as an expert and calls for speculation. Further, the answer provided by Defendant Ware, after objection, was to an improper question that is designed to prey upon the juror's sympathy and not based on the evidence and the law. Therefore, this fact is not supported by admissible evidence. Fed. R. Civ. P. 56(c)(2).**

541. Ware testified at his deposition that the first time he ever heard any allegation that Golubski was misusing his position as a detective in any way was when he read the complaint in this action. (Ex. 6: Dennis Ware Dep. 104:18–105:16).

**Reply: Uncontroverted.**

542. Ware admits he has "selective memory" and sometimes chooses not to remember things. (Ex. 6: Dennis Ware Dep. 9:19–10:11).

**Reply: PSOF ¶542 Controverted. This statement was taken out of context. Plaintiff inquired whether Defendant Ware had any concerns regarding his health or was taking any medication that affected his memory. When asked whether anyone ever suggested that he had memory problems, Ware, in jest, joked that his wife tells him he does not recall things she says and has "selective memory" in the context of what his wife tells him to do or fix something:**



```
19      Q.  Has anyone ever suggested to you that
20  you have any memory problems whatsoever?
21      A.  My wife tells me that.
22      Q.  What does your wife tell you?
23      A.  She tells me that she told me something
24  long ago or the other day or last week and
25  sometimes I don't recall those conversations that
```

> 1  she mentions.
> 2     Q.   Is it your understanding you have a
> 3  problem with your memory, or simply that you may
> 4  not remember everything you and your wife talk
> 5  about?
> 6     A.   I do have selective memory, I suppose.
> 7     Q.   What does that mean?
> 8     A.   If my wife says something that I
> 9  don't -- oftentimes she asks me to do something
> 10 or to fix something or whatever and sometimes I
> 11 choose to remember that or I choose not to.

543. Brown too swore he never heard any allegation that Golubski took drugs from members of the KCK community nor that Golubski had sex with drug-addicted prostitutes, witnesses, or defendants, until 2017 or later. (Pl. Ex. 58: James Brown Dep. 34:23–35:3–19, 38:5–25, 43:1–44:23, 47:15–48:20, 53:9–56:14, 110:1–15). Brown also denied ever hearing that Golubski drove women around in his patrol car or that Golubski was caught having sexual relations with a woman in his office until he spoke with his attorneys in the context of this lawsuit. (Pl. Ex. 58: James Brown Dep. 63:22–65:13). Brown also claims he never heard that Golubski gave drugs to drug-addicted women in the community. (Pl. Ex. 58: James Brown Dep. 107:2–17).

**Reply: Uncontroverted.**

544. Any officer had the obligation, under KCKPD policy as of 1994, to document and immediately report corruption by another officer, including a fellow officer's violation of the code of ethics. (Ex. 21: Ricky Armstrong Dep. 77:10–83:24). Ethics violations included an officer's having sexual relations with a prostitute while on duty or paying for sex while on or off duty. (Ex. 21: Ricky Armstrong Dep. 85:18–89:2).

**Reply: Uncontroverted.**

545. Brown testified at his deposition that any employee of the KCKPD in the 1990s who heard of Golubski's sexual encounters with informants would have been required to report this misconduct up the chain of command or to Internal Affairs. (Pl. Ex. 58: James Brown Dep. 101:5–102:19).

**Reply: PSOF ¶545 Objection, Defendant Browns's opinion testimony is improper and inadmissible as Defendant Brown was not disclosed as an expert and calls for speculation.**

**Further, the cited testimony does not support this fact as required by Fed. R. Civ. P. 56(c)(1).**
**Defendant Brown actually testified as to the fact pattern wherein a person learned that Roger**
**Golubski was having sex with drug-addicted prostitutes who he was using as informants,**
**then that person would have been required to report it. (Ex B, James Brown Deposition,**
**95:15-102-19).**

546. Smith also understood by 1994 that if he observed a fellow detective engaging in improper conduct, he had an obligation to intervene, including if he became aware that another officer used suggestion in identification procedures, used coercion in witness interviews, or knew an officer had broken the law. (Pl. Ex. 59: W.K. Smith Dep. 253:5–255:2, 376:7–12). When asked about Golubski's reputation and work with informants, Smith merely stated that he knew Golubski had a number of informants in the North End. (Pl. Ex. 59: W.K. Smith Dep. 353:19–22).

**Reply: PSOF ¶546 Controverted in part, Defendant Smith actually testified that he had**
**heard Golubski had a number of informants in the north end but "I just heard that. I don't**
**know if its true or not." (Pl. Ex. 81 Smith Dep. 353:19-354:2). Therefore, this fact is not**
**supported by admissible evidence. Fed. R. Civ. P. 56(c)(2).**

547. KCKPD Officers could have reported Golubski's misconduct by notifying their immediate supervisors, notifying their commanders, or writing a report. (Pl. Ex. 58: James Brown Dep. 102:20–103:2).

**Reply: PSOF ¶547 The cited testimony does not support this fact as required by Fed. R. Civ.**
**P. 56(c)(1).**

548. If an officer had sex with an informant or a witness, the officer could exert improper influence over that informant. (Pl. Ex. 58: James Brown Dep.110:16–25. There is no legitimate reason for an officer or detective to have sex with an informant. (Pl. Ex. 58: James Brown Dep. 125:25–126:5).

**Reply: PSOF ¶548 The cited testimony does not support this fact as required by Fed. R. Civ.**
**P. 56(c)(1). Further, Defendant Brown's opinion testimony is improper and inadmissible**
**given that Defendant Brown was not disclosed as an expert.**

549. Additionally, KCKPD supervisors knew that police officers were susceptible

to corruption. (Pl. Ex. 54: Clyde Blood Dep. 30:24–31:14).

**Reply: PSOF ¶449 Defendant Blood's opinion testimony is improper and inadmissible given that Defendant Blood was not disclosed as an expert and calls for speculation as Mr. Blood was not a supervisor. Controverted in part as in response to whether KCKPD supervisors understood that police officers could be susceptible to corruption, Mr. Blood responded "I suppose so, but the whole idea was don't get involved in that kind of activity in the first place and you wouldn't have that problem." (Pl Ex. 99 Blood Dep. 30:24-31:9).**

550. According to former KCKPD Chief, Ron Miller, a supervisor could ask an officer if they had relationships with women in the community that could create a conflict of interest with an investigation. If Culp had heard of such a potential conflict of interest, it is his responsibility to follow up on the allegation or rumor of misconduct. (Pl. Ex. 69: Ronald Miller Dep. 70:25–73:10); see also (Ex. 21: Ricky Armstrong Dep. 175:25–176:20; (Pl. Ex. 88: Michael Kobe Dep. 32:1–19). Former KCKPD Chief Terry Zeigler testified that if Golubski had a sexual relationship with any witness in a case, there was no legitimate reason for him not to inform the Detective Bureau so that another detective could be assigned. (Pl. Ex. 78: Terry Zeigler Dep. 104:3-12.)

**Reply: PSOF ¶550 The cited testimony does not directly support this fact as required by Fed. R. Civ. P. 56(c)(1). Further, these statements are all based on speculation. Therefore, this fact is not supported by admissible evidence. Fed. R. Civ. P. 56(c)(2).**

### Golubski has illicit associations with drug dealers in KCK, including Cecil Brooks, the cousin of Aaron Robinson

551. Starting in the 1970s, Golubski developed close and illicit associations with drug dealers, protected them from arrest, and warned them of investigations and planned raids. In return, Golubski was supplied money and drugs to operate his network of informants and to exploit black females in the community for sex. Cecil Brooks was one of Golubski's illicit associates. (Pl. Ex. 24: Joe Robinson Aff. ¶¶ 20–26); (Pl. Ex. 89: Ruby Ellington 2015 Aff. ¶¶ 5– 22); (Pl. Ex. 40: James McIntyre 2014 Aff. ¶¶ 16-29); (Pl. Ex. 97: Jermaine McIntyre 2016 Aff. ¶¶ 2–20); (Pl. Ex. 96: N.H. 2015 Aff. ¶¶ 3–6, 11–12); (Pl. Ex. 74: C.S.R. Aff. ¶¶ 8–22); (Pl. Ex. 26: Cecil Brooks 2016 Aff. ¶¶ 25–28); (Pl. Ex. 31: Kendra Dean-Martin 2013 Aff. ¶¶ 13–18); (Pl. Ex. 35: Kendra Dean Martin 2015 Aff. ¶¶ 13–14); (Pl. Ex. 95: Tina Peterson Aff. ¶¶ 22-39); (Pl. Ex. 98: S.K. Dep. at 199-201); (Pl. Ex. 101: J.H. Dec. ¶ 26; (see generally Pl. Ex. 99: Cecil Brooks Dep).

Reply: PSOF ¶551 Objection and controverted, but immaterial. Pursuant to Fed. R. Civ. P. 56(c)(2), none of the cited evidence is admissible. It would be excluded under Rules 403 and 404(b), as it does not have any relevance to the Ewing/Quinn homicide investigation but is nothing more than an attempt to smear Detective Golubski with inadmissible character evidence in hopes of unfairly prejudicing him before a jury. Such efforts are, or should be, inadmissible. *Old Chief*, 519 U.S. at 181. Further, Cecil Brooks' affidavit makes clear that Golubski was not on Cecil Brook's payroll. (Exhibit 43: ¶¶ 25–26) In fact, Cecil Brooks states that Golubski would steal money from Cecil Brooks' cohorts. (*Id.*) Further, Cecil Brooks himself testified that he was not well acquainted with Roger Golubski. (Exhibit 77: tr. 19:9–11). PSOF ¶589 is not supported by (Pl. Ex. 96: N.H. 2015 Aff ¶¶ 16-29) Finally, this is immaterial to the issues in Defendant Unified Government's motion.

> 552. In the 1990s, Tina Peterson worked at a service station called McCall's on Quindaro in KCK. The owner, Cecil Brooks, was a prominent drug dealer who was well known throughout the community for paying police for protection, as he operated his drug business from McCall's openly and with no fear of arrest. Peterson personally observed Roger Golubski at McCall's at least a couple times a week. (Pl. Ex. 95: Tina Peterson Dec. ¶¶ 22–34).

Reply: PSOF ¶552 Objection pursuant to Fed. R. Civ. P. 56(c)(2). To the extent this fact asserts wrongful conduct on the part of Roger Golubski, Ms. Peterson's affidavit lacks foundation and is inadmissible hearsay. Ms. Peterson neither alleges to have been assaulted by Golubski, nor has any first-hand knowledge. Rather, all of her purported "evidence" is information provided to her by unidentified individuals and is quintessential hearsay. Further, none of this evidence is admissible under Rules 403 and 404(b), as it does not have any relevance to the Ewing/Quinn homicide investigation but is nothing more than an attempt to smear Detective Golubski with inadmissible hearsay in hopes of unfairly prejudicing him before a jury. Such efforts are, or should be, inadmissible. *Old Chief*, 519

U.S. at 181. Further, this is immaterial to the issues in the Defendant Unified Government's motion.

> 553. Sometime Golubski would park his car on the lot and Cecil would go out to speak with him but other times Golubski would head into the backroom where Cecil did drug deals and they would meet behind closed doors. On at least one occasion, Peterson observed Cecil pulling out cash from the cash register at McCall's and giving it to Golubski. (Pl. Ex. 95: Tina Peterson Dec. ¶¶ 22–34).

**Reply: PSOF ¶553 PSOF ¶552 Objection pursuant to Fed. R. Civ. P. 56(c)(2). To the extent this fact asserts wrongful conduct on the part of Roger Golubski, Ms. Peterson's affidavit lacks foundation and is inadmissible hearsay. Ms. Peterson neither alleges to have been assaulted by Golubski, nor has any first-hand knowledge. Rather, all of her purported "evidence" is information provided to her by unidentified individuals and is quintessential hearsay. Further, none of this evidence is admissible under Rules 403 and 404(b), as it does not have any relevance to the Ewing/Quinn homicide investigation but is nothing more than an attempt to smear Detective Golubski with inadmissible hearsay in hopes of unfairly prejudicing him before a jury. Such efforts are, or should be, inadmissible. *Old Chief*, 519 U.S. at 181. Further, this is immaterial to the issues in the Defendant Unified Government's motion.**

> 554. Around that same time, Peterson worked at Delavan apartments, which was previously owned by Cecil Brooks. During his ownership, the complex was a well-known hub of drug activity. Peterson saw Cecil and Golubski there together and observed them socializing with underage girls. After the property was sold to another owner, Cecil's back office was cleaned out and Peterson personally observed guns, drugs, and money being discovered and pulled out of the attic. (Pl. Ex. 95: Tina Peterson Dec. ¶¶ 35–37).

**Reply: PSOF ¶554 Objection. None of this evidence is admissible under Rules 403 and 404(b), as it does not have any relevance to the Ewing/Quinn homicide investigation but is nothing more than an attempt to smear Detective Golubski with inadmissible character evidence in hopes of unfairly prejudicing him before a jury. Such efforts are, or should be, inadmissible.**

*Old Chief*, 519 U.S. at 181. Further, this is immaterial tot he issues in Defendant Unified Government's motion.

> 555. Kobe testified that Cecil Brooks was a known criminal in the Kansas City, Kansas area and that Brooks and Golubski had met and had conversations as "both had very high profiles in the African-American community." (Pl. Ex. 88: Michael Kobe Dep. 107:9–15, 109:18–23).

**Reply: PSOF ¶556 Uncontroverted that Mr. Kobe so testified; but immaterial to the issues in the Defendant Unified Government's motion. Further, these statements are vague, lack foundation, and based on speculation. Therefore, this fact is not supported by admissible evidence. Fed. R. Civ. P. 56(c)(2).**

> 556. When asked about his illicit associations with Cecil Brooks, his receiving of money from Cecil and other drug dealers in exchange for protection from arrest and prosecution, and his specific protection of Cecil Brooks' gang in investigating the Ewing and Quinn homicides, Golubski refused to answer and instead invoked his Fifth Amendment right to remain silent. (Pl. Ex. 63: Roger Golubski Dep. 226:14–23; 227:1–17; 255:4–256:3; 256:4–25; 257:1– 13; 259:5–19; 259:9–260:5; 260:14–23; 2610:24–261:15; 261:16–262:12; 262:19–25; 263:1–8; 264:25–265:7; 263:22–264:24; 267:18–25; 368:4–373:25).

**Reply: PSOF ¶556 Uncontroverted but misleading because Golubski exercised his Fifth Amendment rights as to all questions pertaining to the investigation. Further, this is immaterial to the Defendant Unified Government's motion.**

> 557. When asked about his illicit associations with Roger Golubski, his paying Golubski money for protection from arrest and prosecution, and the protection by Golubski while investigating the Ewing and Quinn homicides, Cecil Brooks refused to answer and instead invoked his Fifth Amendment right to remain silent. (Pl. Ex. 99: Cecil Brooks Dep. 11:8–20; 19:9–24:13).

**Reply: PSOF ¶557 Controverted, but immaterial. While Cecil Brooks did plead the Fifth, he did answer at least one question: "And you were well acquainted with Roger Golubski, correct?" To which Mr. Brook answered, "No." Someone who is not well acquitted does not pay that person money for "protection."**

> 558. Golubski bought $200 of crack cocaine from K.D., a former drug dealer in

Kansas City, Missouri in 1998 through an intermediary. (Pl. Ex. 31: Kendra Dean-Martin 2013 Aff. ¶¶ 1–2, 13–14).

**Reply: PSOF ¶ 558. Objection. The cited record/affidavit, on its face shows the affiant lacks personal knowledge of the matters asserted and relies on inadmissible hearsay and speculation. Fed. R. Civ. P. 56(c)(2). PSOF ¶ 558 is immaterial to Defendant Unified Government's motion.**

559. When the intermediary paid K.D. for her role in the drug sale, the intermediary told her "Golubski spends big money and will come back again for a similar agreement." (Pl. Ex. 31: Kendra Dean-Martin 2013 Aff. ¶ 14–16).

**Reply: PSOF ¶ 559. Objection. The cited record/affidavit, on its face shows the affiant lacks personal knowledge of the matters asserted and relies on inadmissible hearsay and speculation. D630PSOF ¶ 559 is immaterial to Defendant Unified Government's motion.**

560. Golubski propositioned K.D. for sexual favors. She had been afraid of Golubski because he was an investigator in a case involving K.D.'s sister. So when Golubski propositioned her for her phone number, called her, and asked to go over her house, K.D. complied. (Pl. Ex. 31: Kendra Dean-Martin 2013 Aff. ¶¶ 17–18).

**Reply: PSOF ¶ 560 is immaterial to Defendant Unified Government's motion.**

561. While at K.D.'s house, Golubski "made a big effort to persuade [K.D.] to engage in sexual relations with him," saying that he liked black women and asking if she liked "white guys." K.D. declined his advances and said she would call him if she was interested but never did. Subsequently, Golubski called her a number of times, even though K.D. had given him no encouragement. (Pl. Ex. 31: Kendra Dean-Martin 2013 Aff. ¶ 18).

**Reply: PSOF ¶ 561 is immaterial to Defendant Unified Government's motion.**

**Despite that it was common knowledge within the KCKPD that Golubski was engaged in drug dealing, Defendants claim not to have heard anything about this behavior.**

562. Within the KCKPD, Golubski had "a reputation for taking street drugs from users and dealers and giving those drugs to prostitutes in return for sexual acts. Many in the Department heard about this, but they just ignored it or covered up his misconduct." (Pl. Ex. 89: Ruby Ellington 2015 Aff. ¶ 9).

**Reply: PSOF ¶562 Objection. The "evidence" supporting this fact is inadmissible. Fed. R.**

Civ. P. 56(c)(2). **Ms. Ellington is deceased and, as a result, cannot testify at trial, making the contents of her affidavits not admissible at trial. Further, the statement is speculative, vague, and lacks foundation. Further, this is immaterial to the issues in the Defendant Unified Government's Motion.**

> 563. Brown claims he never heard any allegations that Golubski stole drugs, made money from drug sales, or protected drug dealers from arrest. (Pl. Ex. 58: James Brown Dep. 159:2–163:20).

**Reply: Uncontroverted.**

> 564. If any of the Defendant officers became aware that Golubski was engaging in the drug trade in any capacity, or had committed any other crime, they had the obligation to immediately report it to their supervisors. (Pl. Ex. 53: Tarik Khatib Dep. 92:15–93:19).

**Reply: Uncontroverted.**

> **Golubski continues to commit sexual assaults of women, using his status as a KCKPD officer to gain power over them**

> 565. Since 1996, over twenty civilian witnesses and at least three former law enforcement officials have come forward with sworn allegations that Golubski engaged in corruption including, in many instances, sexual misconduct. According to Plaintiff's expert in police practices, Chief Fischer, "Without crediting the substance of any allegation, the sheer number and common pattern of the allegations should have raised major red flags to KCKPD administration about Roger Golubski." (Pl. Ex. 66: Russell Fischer Report pp. 23–24).

**Reply: PSOF ¶565 Objection, hearsay. This fact is not supported by evidence that would be admissible at trial as this fact is supported only by Plaintiffs' expert report. Plaintiffs cannot introduce hearsay evidence by having an expert testify to alleged facts for the truth of the matter asserted. Fed. R. Civ. P. 56(c)(2).**

> 566. In August 1999 Golubski came to the house where O.W. lived with her twin fourteen-year-old sons and two younger children. Golubski had a search warrant. (Pl. Ex. 100: O.W. Dep. 14:13–17:21). The house was searched and O.W.'s sons were taken into custody. (Pl. Ex. 100: O.W. Dep. 18:10-19. They were later charged with murder. (Pl. Ex. 100: O.W. Dep. 57:13–58:13).

**Reply:  PSOF  ¶566 Objection  and  uncontroverted,  but  immaterial.  The  1999  homicide**

investigation referenced has no relevance to the Ewing/Quinn investigation. As a result, this fact, and all evidence supporting it is inadmissible.

> 567. Golubski was assigned to O.W.'s sons' case. (Pl. Ex. 100: O.W. Dep. 38:9–12). While the case was pending, Golubski returned to Ms. O.W.'s home, and told her he could help her sons because he knew the DA. (Pl. Ex. 100: O.W. Dep. 27:13–29:12). Golubski then made sexual advances; when O.W. resisted, he raped her. (Pl. Ex. 100: O.W. Dep. 29:13–31:25).

**Reply: PSOF ¶573 Objection. None of this evidence is admissible under Rules 403 and 404(b), as it does not have any relevance to the Ewing/Quinn homicide investigation but is nothing more than an attempt to smear Detective Golubski with inadmissible character evidence in hopes of unfairly prejudicing him before a jury. Such efforts are, or should be, inadmissible.** *Old Chief***, 519 U.S. at 181. Further, this is immaterial to the issues in the Defendant Unified Government's motion.**

> 568. Golubski repeatedly raped O.W., including while on-duty in his police vehicle, and by forcing her to perform oral sex, during the pendency of her sons' case. (Pl. Ex. 100: O.W. Dep. 62:15–63:15; 54:5–25; 41:14–16; 42:4–43:16). He told her he could "be a good friend" and help her with the case. When O.W. told Golubski she was going to make a complaint, he threatened that "he can have somebody do something to me and that they would never find me." (Pl. Ex. 100: O.W. Dep. 42:4–43:24; 56:4–12).

**Reply: PSOF ¶568 Objection. None of this evidence is admissible under Rules 403 and 404(b), as it does not have any relevance to the Ewing/Quinn homicide investigation but is nothing more than an attempt to smear Detective Golubski with inadmissible character evidence in hopes of unfairly prejudicing him before a jury. Such efforts are, or should be, inadmissible.** *Old Chief***, 519 U.S. at 181. Further, this is immaterial to the issues in the Defendant Unified Government's motion.**

> 569. In the mid-2000s, former KCK resident, J.H., a young mother and domestic-violence victim who was struggling with drug addiction, encountered Golubski when he showed up at her door and told her he was working on her case. (Pl. Ex. 101: J. H. Dec. ¶¶ 1, 3–4). J.H. "quickly felt uncomfortable in his presence," as "Golubski was staring at [her] chest" and "made a comment about the appearance

of [her] breasts." (Pl. Ex. 101: J. H. Dec. ¶¶ 5–6).

**Reply: PSOF ¶ 569. Objection, PSOF ¶ 569 is immaterial to Defendant Unified Government's motion.**

570. Golubski let J.H. "know that he knew [she] had drugs in the house and that he could arrest" her. Then, he told J.H. he was interested in her sexually, stating that he liked Black women and asking her if she "dated" white men. (Pl. Ex. 101: J. H. Dec. ¶¶ 6, 9).

**Reply: PSOF ¶ 570. Objection, PSOF ¶ 569 is immaterial to Defendant Unified Government's motion.**

571. "[O]n numerous times over the next two or three years" J.H. got in Golubski's car and he would drive her to his house to perform oral sex on her, which she hated. (Pl. Ex. 101: J. H. Dec. ¶¶ 11–16).

**Reply: PSOF ¶ 571. Objection, PSOF ¶ 571 is immaterial to Defendant Unified Government's motion.**

572. Golubski made no attempt to hide his encounters with J.H. from his colleagues. (Pl. Ex. 101: J. H. Dec. ¶¶ 11, 17).

**Reply: PSOF ¶ 572. Objection, PSOF ¶ 572 is immaterial to Defendant Unified Government's motion.**

573. Golubski would also drive J.H. around and ask her if she had information about particular women, suspects or victims whose cases he was investigating. Golubski would also show J.H. photos from his stacks of photos in his police vehicle, many of whom were women. When he drove around, Golubski appeared to be looking for these women. (Pl. Ex. 101: J. H. Dec. ¶¶ 18–24).

**Reply: PSOF ¶ 573. Objection, PSOF ¶ 573 is immaterial to Defendant Unified Government's motion.**

574. Golubski first contacted S.K. in approximately 2007, when she was thirteen years old. (Pl. Ex. 98: S.K. Dep. 9:1–15; 50:7–22). He falsely told her she was listed as a witness to or involved in an incident and that if she didn't want to go to jail, she needed to meet him away from the police station. (Pl. Ex. 98: S.K. Dep. 9:19–10:20).

**Reply: PSOF ¶574 Objection. None of this evidence is admissible under Rules 403 and 404(b),**

as it does not have any relevance to the Ewing/Quinn homicide investigation but is nothing more than an attempt to smear Detective Golubski with inadmissible character evidence in hopes of unfairly prejudicing him before a jury. Such efforts are, or should be, inadmissible. *Old Chief*, 519 U.S. at 181. Further, this is immaterial to the issues in the Defendant Unified Government's motion.

> 575. S.K. met Golubski in a Walmart parking lot and spoke to him in his vehicle, where he sexually assaulted her. (Pl. Ex. 98: S.K. Dep. 14:11–25:12). Golubski then continued to rape S.K. dozens of times over a period of the next four years. (Pl. Ex. 98: S.K. Dep. 28:5–30:17; 35:3–54:15).

**Reply: PSOF ¶575 Objection. None of this evidence is admissible under Rules 403 and 404(b), as it does not have any relevance to the Ewing/Quinn homicide investigation but is nothing more than an attempt to smear Detective Golubski with inadmissible character evidence in hopes of unfairly prejudicing him before a jury. Such efforts are, or should be, inadmissible. *Old Chief*, 519 U.S. at 181. Further, this is immaterial to the issues in the Defendant Unified Government's motion.**

> 576. Golubski threatened S.K. "just keep my mouth shut and that if I wanted to see my sweet little grandma again" she should not talk to anyone about him "or I would be kissing my grandma goodbye or my brother would be doing life in jail…[h]e can put some charge on him and make sure he doesn't see daylight again" (Pl. Ex. 98: S.K. Dep. 21:3–22:18).

**Reply: PSOF ¶576 Objection. None of this evidence is admissible under Rules 403 and 404(b), as it does not have any relevance to the Ewing/Quinn homicide investigation but is nothing more than an attempt to smear Detective Golubski with inadmissible character evidence**

> 577. N.H., a KCK woman who formerly worked as prostitute encountered Golubski in 2007, when he pulled her over to question her, claiming she matched the description of a suspect wanted in an aggravated battery. Golubski then asked for her phone number and called her, becoming a regular customer of hers from 2007–2009, regularly paying her for sex in cash. (Pl. Ex. 96: N.H. 2015 Aff. ¶¶ 7–8).

**Reply: Objection, PSOF ¶577 is not supported by the reference to the record.**

**There was a pattern of similar misconduct throughout the KCKPD**

578. According to former FBI Special Agent, Alan Jennerich, who was assigned to investigate fifteen to twenty KCKPD officers for civil rights violations in the late 1980s and early 1990s, there was a culture in KCKPD to "protect the wrongdoers." There was also a culture of "longstanding and systemic" corruption. (Pl. Ex. 90: Al Jennerich Aff. ¶¶ 1–4).

**Reply: Objection PSOF ¶578 is not supported by admissible evidence. The cited portion of the affidavits lack foundation, fail to demonstrate personal knowledge of the facts stated, are based on hearsay, and are inadmissible speculation. Fed. R. Civ. P. 56(c)(2).**

579. Even Jennerich's attempts to conduct an investigation of KCKPD officers "posed a significant challenge," as there was a "blue code of silence," meaning the "officers did not report the misconduct of other officers, even when their misconduct was criminal." (Pl. Ex. 90: Al Jennerich Aff. ¶¶ 3–4).

**Reply: Objection PSOF ¶579 is not supported by admissible evidence. The cited portion of the affidavits lack foundation, fail to demonstrate personal knowledge of the facts stated, are based on hearsay, and are inadmissible speculation.**

580. Many KCKPD supervisors also "swept wrongdoing under the rug rather than confronting it and rooting it out." (Pl. Ex. 90: Al Jennerich Aff. ¶ 4).

**Reply: Objection PSOF ¶580 is not supported by admissible evidence. The cited portion of the affidavits lack foundation, fail to demonstrate personal knowledge of the facts stated, are based on hearsay, and are inadmissible speculation.**

581. One example of such wrongdoing was KCKPD officers' frequenting of prostitutes and having sex while on duty. (Pl. Ex. 75: D.L. 2014 Aff. ¶¶ 1–3, 7–8); (Pl. Ex. 96: N.H. 2015 Aff. ¶¶ 10–11).

**Reply: Objection. PSOF ¶ 581 is not supported by the cited record.**

582. Brown testified at his deposition that there was a time the KCKPD had to "down one of our police cars because" officers were using their cars to have sex with members of the community. (Pl. Ex. 58: James Brown Dep. 119:3–120:20).

**Reply: PSOF ¶582 Controverted in part. Brown testified one car had to be taken down and it may be the same incident he testified about previously. PSOF is misleading to the extent it**

implicates "officers" and "their cars".

583. A KCK woman who formerly worked as a prostitute, D.L., stated that some of the "best customers were police officers of the Kansas City, Kansas, police department." (Pl. Ex. 75: D.L. 2014 Aff. ¶¶ 1–3, 7–8).

**Reply: Objection PSOF ¶583 is not supported by admissible evidence. The cited portion of the affidavits lack foundation, fail to demonstrate personal knowledge of the facts stated, are based on hearsay, and are inadmissible speculation. Fed. R. Civ. P. 56(c)(2).**

584. Another KCK woman who formerly worked as a prostitute, N.H. also stated that it "was a common occurrence for Kansas City, Kansas cops to frequent prostitutes." If they "wanted to go to a prostitute's house in the middle of the afternoon, that's what they did." (Pl. Ex. 96: N.H. 2015 Aff. ¶¶ 10–11).

**Reply: Objection. PSOF ¶ 584 is not supported by the cited record.**

585. When these KCKPD officers would arrive at N.H.'s home for paid sex, they "generally wore their uniforms, if they were street cops, or their typical work clothes if they were detectives. They also drove off in their official police cars." (Pl. Ex. 96: N.H. 2015 Aff. ¶¶ 10– 11).

**Reply: Objection. PSOF ¶ 585 is not supported by the cited record.**

586. Golubski would bring other officers to the area where prostitutes congregated, acting as the "ringleader" and "introducing [the other officers] to the prostitutes." (Pl. Ex. 75: D.L. 2014 Aff. ¶ 8).

**Reply: PSOF ¶ 586. Objection, PSOF ¶ 586 is not supported by admissible evidence. "An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4). D.L.'s affidavit does not show she is competent to testify on the matters asserted. The personal knowledge standard makes an affidavit inadmissible if the witness could not have actually perceived or observed that which it testifies Argo v. Blue Cross & Blue Shield of Kan., Inc., 452 F.3d 1193, 1200 (10th Cir. 2006). PSOF 586 is, further, immaterial to defendant Unified Government's motion.**

587. Similar behavior occurred in the 1970s: Hausback learned of a supervisor, Sergeant Rozine, who took prostitutes to "customers" during the 1976 Republic[an] convention. Hasuback reported the conduct to Internal Affairs. (Pl. Ex. 86: Tim Hausback Dec. ¶ 23).

**Reply: PSOF ¶ 587. Objection, PSOF ¶ 587 is not supported by admissible evidence. "An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4). Hausback's declaration does not show Hausback is competent to testify on the matters asserted. The personal knowledge standard makes an affidavit inadmissible if the witness could not have actually perceived or observed that which it testifies Argo v. Blue Cross & Blue Shield of Kan., Inc., 452 F.3d 1193, 1200 (10th Cir. 2006).**

588. KCKPD Detective Robert "Bobby" Lane, was a client of N.H.'s as well. (Pl. Ex. 96: N.H. 2015 Aff. ¶¶ 10–11).

**Reply: Controverted. PSOF ¶ 588 is not supported by the cited record.**

589. N.H. was raped by KCKPD Officer William Saunders, after he arrested her at a gas station. N.H. knew something was not right after he handcuffed her and put her in the backseat of his car, but then did not call the station, run her name, or take her downtown to the station. Instead, he pulled up to an abandoned crack house off Quindaro and forced her to perform oral sex on him while he held his gun the entire time. (Pl. Ex. 96: N.H. 2015 Aff. ¶ 13).

**Reply: Controverted PSOF ¶589 is not supported by the reference to the record**

590. N.H. reported Saunders to the Internal Affairs department, where she made a statement to an officer working in Internal Affairs. The Internal Affairs officer said she was not surprised by the complaint "because complaints had been made against Saunders in the past." (Pl. Ex. 96: N.H. 2015 Aff. ¶ 14).

**Reply: Controverted PSOF ¶590 is not supported by the reference to the record**

591. Internal Affairs accompanied N.H. to the abandoned crack house where Saunders raped her, where there was still evidence of his footprint on the rug and her nose ring on the floor. Internal Affairs officers cut the carpet and took the boot print for evidence. (Pl. Ex. 96: N.H. 2015 Aff. ¶ 15).

**Reply: Controverted PSOF ¶591 is not supported by the reference to the record**

592. Other officers of the KCKPD, including Detective Robert "Bobby" Lane, were also clients of N.H.'s and it "was a common occurrence for Kansas City, Kansas cops to frequent prostitutes." (Pl. Ex. 96: N.H. 2015 Aff. ¶¶ 10–11).

**Reply: Controverted PSOF ¶592 is not supported by the reference to the record**

593. Other officers, in the 1970s, including Randy Murphy and James Bishop would frequent strip clubs and would pay for sex. (Pl. Ex. 86: Tim Hausback Dec. ¶ 18). Hausback would observe them during his time in Vice and reported the misconduct to Major Monchil and then-Chief Allen Meyers. No one in the department conducted any investigation. (Pl. Ex. 86: Tim Hausback Dec. ¶¶ 18–21).

**Reply: Objection, PSOF ¶ 595 is not supported by admissible evidence. "An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4). Hausback's declaration does not show Hausback is competent to testify on the matters asserted. The personal knowledge standard makes an affidavit inadmissible if the witness could not have actually perceived or observed that which it testifies Argo v. Blue Cross & Blue Shield of Kan., Inc., 452 F.3d 1193, 1200 (10th Cir. 2006).**

594. Former KCKPD Chief, Ricky Armstrong, testified that "there are a few cases … of officers who were accused of sexual activities with people." One officer was accused of raping "Hispanic men, many of them undocumented persons with no recourse." (Ex. 21: Ricky Armstrong Dep. 65:1–67:14, 136:24–138:12). Another was "accused of having sex with somebody in his police car." Another officer "stopped two teenagers in a car being romantic and had the female come back and engage in some sort of inappropriate sexual activity." There "is a handful" of officers engaging in this behavior. (Ex. 21: Ricky Armstrong Dep. 65:1–67:14).

**Reply: PSOF Objection. The line of questions was objected to as outside the scope of the 30(b)(6) notice and counsel asked about his personal experience or about "policing across the board, not the Kansas City, Kansas Police Department in particular. (Ex. 21: Ricky Armstrong Dep. 39:5-40:23, 136:24-137:20).**

595. Hausback states that "the KCKPD had a substantial problem with sexual misconduct, which was not isolated to just a few officers." (Pl. Ex. 86: Tim Hausback Dec. ¶ 22).

**Reply: PSOF ¶ 595. Objection, PSOF ¶ 595 is not supported by admissible evidence. "An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4). Hausback's declaration does not show Hausback is competent to testify on the matters asserted. The personal knowledge standard makes an affidavit inadmissible if the witness could not have actually perceived or observed that which it testifies Argo v. Blue Cross & Blue Shield of Kan., Inc., 452 F.3d 1193, 1200 (10th Cir. 2006).**

596. Hausback became aware of late-night parties in the 1970s, called "choir practice" that took place behind the downtown library at night, where women would give oral sex to multiple officers. (Pl. Ex. 86: Tim Hausback Dec. ¶ 23).

**Reply: PSOF ¶ 596. Objection, PSOF ¶ 596 is not supported by admissible evidence. "An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4). Hausback's declaration does not show Hausback is competent to testify on the matters asserted. The personal knowledge standard makes an affidavit inadmissible if the witness could not have actually perceived or observed that which it testifies Argo v. Blue Cross & Blue Shield of Kan., Inc., 452 F.3d 1193, 1200 (10th Cir. 2006).**

597. Additionally, officers would abuse KCK community members, alongside Golubski. For example, officers played "Russian Roulette" with Dion Martin, and subjected him to a number of abusive practices. See supra paras. 521–532.

**Reply: Objection. PSOF ¶ 597 is immaterial to the Unified Government's motion. Even crediting Martin's testimony, the stated fact has no relevance to the claims made pertaining**

to the 1994 Ewing/Quinn homicides. Plaintiffs present no admissible evidence that the conduct described by Martin was known to or reported to any supervisor or policymaker for the KCKPD.

598. Max Seifert was a KCKPD employee from 1975-2005. Seifert was in the same class of detectives as Golubski in the Police Academy and also shared an office with Golubski from 1993-1995. (Pl. Ex. 104: Max Seifert Aff. ¶¶ 1-4).

**Reply: PSOF ¶ 598. Objection, immaterial.**

599. Seifert observed that Golubski appeared to have non-business interactions with various women in his office and in his police vehicle. (Pl. Ex. 104: Max Seifert Aff. ¶ 5).

**Reply: PSOF ¶ 599. Objection, immaterial.**

600. According to Seifert, "all of the detectives along with older officers and the commanders, knew that Golubski was pursuing black females and having sex with them" and that Golubski had fathered children with poor, black women in the north end. (Pl. Ex. 104: Max Seifert Aff. ¶¶ 6, 10, 11-13, 16-18).

**Reply: PSOF ¶ 600. Objection, PSOF ¶ 600 is not supported by admissible evidence. "An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4). D644**

601. To Seifert's knowledge, no one in the KCKPD ever questioned Golubski's conduct or raised any sort of concern about whether his conduct was proper or could cause issues of any kind. (Pl. Ex. 104: Max Seifert Aff. ¶ 7).

**Reply: PSOF ¶ 601. Objection, PSOF ¶ is merely a statement of a lack of knowledge of the subject.**

602. Additionally, Seifert learned through his interactions with KCK community members during investigations that Golubski was engaging in prostitution, paying women cash for sex. (Pl. Ex. 104: Max Seifert Aff. ¶ 9).

**Reply: PSOF ¶ 602. Objection, PSOF ¶ 602 fails to evince personal knowledge of the matters stated and are inadmissible.**

603. Sexual misconduct was widely accepted within KCKPD and was "regarded as no big deal." In fact, another KCKPD officer, Bobby Lane, was known for having sex with prostitutes as well and "no one seemed to care about that either." (Pl. Ex. 104: Max Seifert Aff. ¶ 14).

**Reply: PSOF ¶ 603. Objection, PSOF ¶ 603 fails to evince personal knowledge of the matters stated and are inadmissible.**

604. In 1991, Seifert was promoted to detective, where Culp became his supervisor. Once, when Seifert went out to conduct follow-up interviews in an investigation, Culp expressed that the additional investigation was not necessary, stating that in the Bureau, detectives "were making "Yugos, not Cadillacs." (Pl. Ex. 104: Max Seifert Aff. ¶ 20).

**Reply: PSOF ¶ 604. Objection, immaterial.**

## IV. Argument and Authorities

A.     **Judgment is appropriate on the malicious prosecution claims under Count I.**

1.     **The claims under the Fourth Amendment in Counts 1, 2, 4, 5, 6, and 7 are time-barred and should be dismissed.**

Insofar as Plaintiffs' Fourth Amendment claims are based on false arrest/imprisonment, he is well past the statute of limitations. This argument is not inconsistent with the Court's dismissal order, which merely rejected Defendants' statute of limitations challenge to Plaintiffs' malicious prosecution claims. Doc. 190 at 16. The Court stated: "While a false imprisonment claim begins to accrue when the false imprisonment ends, a malicious prosecution claim does not accrue until the criminal proceedings terminate in plaintiff's favor." Doc. 190 at 14-15; *id.* at 34 n.16 ("Lamonte is asserting a malicious prosecution claim which, by definition, is based on the institution of legal process – not his warrantless arrest."). Plaintiffs' false imprisonment ended when he was bound over for trial, at which time his false imprisonment claim accrued. Plaintiffs' claims still rest in part on conduct before Mr. McIntyre was bound over for trial. Claims stemming from these actions are time-barred.

**2.      § 1983 malicious prosecution claims for Fourteenth Amendment procedural due process violations are precluded by the existence of an adequate state law remedy.**

As stated, defendant is preserving this issue. The issue is presently before the Tenth Circuit in *Bledsoe v. Bd. of Cty. Commissioners of Cty. of Jefferson, Kansas*, Appeal No. 20-3252. *See* Brief of Appellant, 2021 WL 743441 (C.A.10), *48-*49.

**3.      There was probable cause for Lamonte McIntyre's arrest, detention, prosecution, and conviction.**

Plaintiffs' sole criticism of the investigation supporting probable cause is their claim both Ruby Mitchell's and Niko Quinn's identifications were fabricated. Plaintiffs' arguments unsupported by admissible evidence and are, instead, premised on inadmissible hearsay and speculation. *See* below.

Even if the identifications were fabricated, Plaintiffs do not demonstrate a genuine dispute regarding a Fourteenth Amendment due process violation. It is not enough to demonstrate an unduly suggestive line up. Doc. 580 at 39-41 (discussing *Hensley v. Carey*, 818 F.2d 646, 649 (7th Cir. 1987)). Plaintiffs must demonstrate Mr. McIntyre's right to fair proceedings was violated. *Id.*[1] In that task, Plaintiffs fall woefully short. *See Alexander*, 433 F.3d at 555-56 (listing avenues for demonstrating an unfair trial caused by a suggestive line up, such as the record concerning a motion to suppress or objection to the lineup).

**B.      Judgment is appropriate for the § 1983 claims under Count 2 predicated on alleged**

---

[1] Whether the Officers instituted legal proceedings with malice and fabricated evidence goes to false arrest/imprisonment—not due process in the legal proceedings. *Compare Sanchez v. Hartley*, 810 F.3d 750, 754 (10th Cir. 2016) ("[T]he Fourth Amendment prohibits officers from knowingly or recklessly relying on false information to *institute* legal process when that process results in an *unreasonable seizure*."), *with Alexander v. City of S. Bend*, 433 F.3d 550, 555 (7th Cir. 2006) ("South Bend cannot be liable under § 1983 [14th Amendment due process] unless Alexander shows how the flaws in South Bend's identification techniques made his *trial* unfair.").

fabrication and *Brady* violations.

1. **A claim under § 1983 is precluded by the existence of an adequate state law remedy.**

As stated, defendant is preserving this issue. The issue is presently before the Tenth Circuit in *Bledsoe v. Bd. of Cty. Commissioners of Cty. of Jefferson, Kansas*, Appeal No. 20-3252. *See* Brief of Appellant, 2021 WL 743441 (C.A.10), *48-*49.

2. **Even if not precluded under *Parratt*, the Count 2 claims of fabrication and *Brady* violations fail for lack of admissible evidence supporting such claims.**

Plaintiffs' response to Defendants' argument that there is no admissible evidence supporting Count 2 is to supply dozens of inadmissible statements of fact. *See, e.g.*, Replies to PSOF ¶¶ 1-11, 31-32, 50, 55-56, 61, 63-76, 78-80, 84-85, 92-110, 114-26, 129-31, 134, 136, 139-41, 151-52, 161-78, 184, 187, 196-98, 200, 204-220, 216-17, 221-225, 227-28, 255-57, 261, 267-68, 270, 276-78, 282, 321, 323-24, 551-61. As expected, Plaintiffs submitted an affidavit from Rose McIntyre (Doc. 624-28) strewn with inadmissible hearsay *See* Replies to PSOF ¶¶ 24, 235, 257-60, 262-64, 294-95, 377-80, 382, 384-86, 389-90, 398, 400-01, 404, 454.

In the absence of corroborating evidence, Det. Golubski's invocations of his right to silence, PSOF ¶¶ 88, 106, 126, 172-73, 187, 230, 556, do not supply a negative inference. *Doe ex rel. Rudy–Glanzer v. Glanzer*, 232 F.3d 1258, 1264-66 n.2 (9th Cir. 2000) (holding an "adverse inference can only be drawn when" silence is countered by "independent evidence" of each "specific fact being questioned"). Of note, Golubski faced potential criminal charges at the time of his deposition. Additionally, Plaintiffs present Det. Golubski's invocations as if he did so selectively. Golubski asserted his Fifth Amendment rights with respect to all questions that bore any connection to the investigation of the Ewing/Quinn homicides. If Plaintiffs cannot produce independent corroborative evidence now, there is no reason to think they can at trial. Det. Golubski's comprehensive invocations on counsel's advice in the face of criminal changes are

"ambiguous" and do not create a genuine issue of fact to preclude summary judgment. *State Farm Life Ins. Co. v. Gutterman*, 896 F.2d 116, 119 (5th Cir. 1990) (affirming summary judgment to insurance beneficiary despite non-movants' introduction of beneficiary's refusal to answer deposition questions regarding the circumstances of the policy holder's fatal shooting); *see also Avirgan v. Hull*, 932 F.2d 1572, 1580 (11th Cir. 1991) ("Invocation of the fifth amendment privilege did not give rise to any legally cognizable inferences sufficient to preclude entry of summary judgment. The negative inference, if any, to be drawn from the assertion of the fifth amendment does not substitute for evidence needed to meet the burden of production."); *White v. Polk Cnty.*, 207 F. App'x 977, 979 n.6 (11th Cir. 2006) (affirming summary judgment to officer when only evidence of intent to harm was adverse inference from officer's refusal to answer whether he intended to harm).

## C.   The Unified Government is entitled to summary judgment as to Plaintiffs' *Monell* claims in Count 7.

Plaintiffs do not contest they must prevail on one of their direct constitutional claims against the Officers to succeed on their *Monell* claim. And they limit their predicate claims to Counts 1-2. As demonstrated above, they fail to demonstrate a genuine issue of fact on whether the Officers are liable for malicious prosecution, fabrication, or Brady violations. Therefore, Unified Government is entitled to summary judgment.

*Arguendo*, Plaintiffs fail to demonstrate a genuine dispute of either a custom or practice of constitutional violations, final policy makers' deliberate indifference, or a direct causal link to their claimed deprivations. Regarding the policy or custom element, Plaintiffs are mistaken that Defendant Officers' alleged constitutional violations against themselves could constitute the requisite custom or policy for *Monell* liability. The official policy or custom must have caused Plaintiffs' injuries. *Cordova v. Aragon*, 569 F.3d 1183, 1194 (10th Cir. 2009) ("[B]asic principals

of linear time prevent us from seeing how conduct that occurs after the alleged violation could have somehow caused that violation.").

Plaintiffs' response to Defendants' contention that there is no admissible evidence of a preexisting policy, practice, custom, or causation is to again proffer dozens of inadmissible or irrelevant statements of fact. *See* Replies to PSOF ¶¶ 413-68, 493-577, 581, 583-93. Their police practices expert and KCKPD officers, in turn relied on this inadmissible evidence in arriving upon their opinions. PSOF ¶¶ 153, 422, 432, 493-94, 504-07, 540, 545-48, 550.

On deliberate indifference, the question is whether the Chief of Police or City Administrator knew of Det. Golubski's alleged misconduct. The only "evidence" Plaintiffs proffer of the policy makers' knowledge is Golubski's uncorroborated, copious invocations of his right to silence, which occurred decades after the claimed constitutional violations at hand.

On causation, the allegations against Golubski, if considered, are primarily that he had sex with prostitutes—not that he had a history of malicious prosecution or the like. The one pertinent comment Plaintiffs make is that 20 civilian witnesses swore Det. Golubski engaged in corruption, including "coercion of false statements to close cases." Doc 624 at 258. Of the PSOF cited, only one supports this allegation:

> Chief Fischer further testified that if the affidavits and information he reviewed for this case are true, then Golubski engaged in a variety of significant criminal conduct, including false testimony; bribery; procuring and soliciting prostitution; drug dealing/drug trafficking; sexual assault, including rape and involving minors and others; and physical and verbal assault. (Pl. Ex. 82: Russell Fischer Dep. pp. 38:2–39:7).

*Id.* at 217 ¶ 513. The Court and Defendants are left to guess whether Chief Fischer's finding of false testimony came from an affidavit or "information." But Fischer admits he cannot identify a single specific instance of misconduct by Golubski based on the affidavits or information he reviewed. Replies to PSOF ¶¶ 510-513.

Without a pre-existing pattern of malicious prosecution, fabrication, and Brady violations, Golubski's alleged framing of Mr. McIntyre cannot fairly have been said to be caused by the Unified Government's alleged permissiveness. Plaintiffs' cases all concern a far more direct causal link. *E.g., Burke v. Regalado*, 935 F.3d 960, 1001 (10th Cir. 2019) (holding a jury could find a sheriff had a policy or custom of deficient medical care causing the plaintiff's death from deficient medical care). Plaintiffs correct that, if Det. Golubski had been removed from his position he would not have been in a position to frame Mr. McIntyre. Doc. 624 at 260. But § 1983 liability requires actual *and* proximate cause. *Furber v. Taylor*, 685 F. App'x 674, 678-79 (10th Cir. 2017) (citing *Monroe v. Pape*, 365 U.S. 167, 187 (1961) ("Section 1983 should be read against the background of tort liability that makes a man responsible for the natural consequences of his actions")). Proximate cause was present in *Ortega v. City & Cnty. of Denver*, when a municipality had a custom of ignoring and delaying resolution of excessive force complaints—including one against the defendant officer—giving the officer time to commit excessive force against the plaintiff. 944 F. Supp. 2d 1033, 1040 (D. Colo. 2013). The alleged tolerance of Golubski's sexual coercion (for which there is no evidence that such coercion was known to the KCKPD) does not create a genuine dispute of a custom causing Mr. McIntyre's alleged framing.

Because Plaintiffs have not met their burden of production to demonstrate a genuine issue of fact on (1) whether a constitutional violation occurred; (2) whether Unified Government Policy makers were aware of a pattern of malicious prosecution, fabrication, and Brady violations; or (3) causation, the Court should grant summary judgment to Defendants.

**D.   Judgment for defendants is warranted on the state law malicious prosecution claim (Counts 8 and 9) because (1) there was probable cause to support the arrest, detention, charge, prosecution, and conviction of Lamonte McIntyre, and (2) the claim is barred by the exceptions set forth in K.S.A. 75-6104(c), (d), (e), (i), and (n).**

Plaintiffs again fail to proffer admissible evidence supporting malicious prosecution.

Therefore, Unified Government is entitled to summary judgment on the state malicious prosecution claims. *Arguendo*, Plaintiffs fail to demonstrate a genuine issue of fact on Unified Government's immunity under the KTCA.

Plaintiffs offer no response to Unified Government's assertions of immunity under K.S.A. 75-6104(c)-(e), (i), and (n). Unified Government is immune for "adoption or enforcement of, or failure to adopt or enforce, a written policy," K.S.A. 75-6104(d), which form a significant basis of Plaintiffs' state claims. Plaintiffs further do not challenge Unified Government's immunity in so far as the Officers made a reasonable, but mistaken, probable cause determination. K.S.A. 75-6104(e). And Plaintiffs do not challenge Unified Government's immunity insofar as Mr. McIntyre's prosecution and conviction could have been avoided through different training, supervision, or hiring decisions. K.S.A. 75-6104(n).

Any non-immunized conduct was outside the scope of the Officers' employment. "The liability of the State for an act of an employee depends ... upon whether the employee ... was acting in the prosecution of the State's business and within the scope of the employee's authority, or had stepped aside from that business ["and therefore unforeseeable"] and done an individual wrong." *Commerce Bank of St. Joseph, N.A. v. State*, 251 Kan. 207, 211, 215, 833 P.2d 996, 1001 (1992). Although scope of employment is often a jury question, Plaintiffs' allegations of fabrication, coercion, and subordination of perjury to serve Det. Golubski's personal ends of retaliation and protecting his own cannot be considered within the scope of the Officers' employment as a matter of law. *Compare id.* at 215 (affirming summary judgment in favor of the State because a state employee's acceptance of a bribe was not within the scope of employment).

Plaintiffs' cases in support of their scope of employment argument are distinguishable. *Leininger v. United States*, found a doctor's improper and unnecessary genital examinations were

within the scope of his employment because his employment entailed one-on-one full body exams—including genital exams. 499 F. Supp. 3d 973, 989-90 (D. Kan. 2020). The improper exams served a dual purpose of medical thoroughness and sexual gratification. *Id.* at 990; *see also Lowery v. United States*, No. 15-4972-DDC-KGS, 2016 WL 3855550, at *4 (D. Kan. July 15, 2016) (same). *Martinez v. Shinseki*, found: "An interview of an employee, by the employer, relating to incidents that occurred at work, is clearly within the scope of the employment." No. 09-1313-WEB, 2010 WL 2400927, at *1 (D. Kan. June 11, 2010). In *Lowery v. Cnty. of Riley*, the relevant issue was "whether the city and county defendants are proper parties to be held liable for malicious prosecution under state law." No. 04-3101-JTM, 2005 WL 1242376, at *1 (D. Kan. May 25, 2005). The court merely held a police department's employees could be considered city and county personnel for purposes of the latter entities' liability. *Id.* at *12-14. Although the court listed the elements for a scope of employment determination, *id.* at *13, it did not reach the issue of whether the alleged malicious prosecution was within the scope of employment. Therefore, Unified Government is immune from liability for Plaintiffs' state malicious prosecution claim.

## Conclusion

The Unified Government is entitled to judgment as to all claims made directly against it and all claims derivatively against it.

Fisher, Patterson, Sayler & Smith, LLP
3550 SW 5th Street
Topeka, Kansas 66606
Tel: (785) 232-7761 | Fax: (785) 286-6609
dcooper@fpsslaw.com | cbranson@fpsslaw.com

s/ David R. Cooper
David R. Cooper                    #16690
Charles E. Branson                 #17376
Brian C. Mauldin                   #28636
*-and-*

Henry E. Couchman Jr., #12842
Edward James Bain, #26442
Unified Government of Wyandotte
County/Kansas City, Kansas
Legal Department
701 N. 7th Street, Suite 961
Kansas City, Kansas 66101
Tel: (913) 573-5060 | Fax: (913) 573-5243
hcouchman@wycokck.org
jbain@wycokck.org

Attorneys for Defendant Unified Government of
Wyandotte County and Kansas City, Kansas

## Certificate of Service

I hereby certify on the 16th day of May, 2022, I electronically filed the foregoing with the clerk of the court by using the CM/ECF system which will send a notice of electronic filing to counsel of record:

Michael J. Abrams-Michael.Abrams@LathropGPM.com
William G. Beck-William.Beck@LathropGPM.com
Alexander T. Brown-Alexander.Brown@LathropGPM.com
Alana M. McMullin-Alana.McMullin@LathropGPM.com
Cheryl A. Pilate-cpilate@morganpilate.com
Lindsay J. Runnels-lrunnels@morganpilate.com
Barry Scheck-barry@nsbcivilrights.com
Emma Freudenberger-emma@nsbcivilrights.com
Grace Ann Paras-grace@nsbcivilrights.com
Amelia B. Green-amelia@nsbcivilrights.com
Sona Shah-sona@nsbcivilrights.com
**Attorneys for Plaintiffs**

Sean M. Sturdivan-s.sturdivan@swrllp.com
Elizabeth A. Evers-e.evers@swrllp.com
Tracy M. Hayes-t.hayes@swrllp.com
**Attorneys for The Estate of Detective James Michael Krstolich, Det. Ware, Officer James L. Brown, The Estate of Lieutenant Dennis Otto Barber, Detective Clyde Blood, Detective W.K. Smith, and The Estate of Lieutenant Steve Culp**

Morgan L. Roach-morgan@mccauleyroach.com
Sean P. McCauley-sean@mccauleyroach.com
Jeffrey S. Kratofil-jeff@mccauleyroach.com
Matthew J. Gist-mgist@enszjester.com
Christopher M. Napolitano-cnapolitano@enszjester.com
**Attorneys for Defendant Roger Golubski**

s/David R. Cooper